BROWNE GEORGE ROSS LLP
Eric M. George (State Bar No. 166403)
  egeorge@bgrfirm.com
Carl Alan Roth (State Bar No. 151517)
  croth@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

KELLER LENKNER LLC
Ashley C. Keller
  ack@kellerlenkner.com
150 N. Riverside Plaza, Suite 2570
Chicago, IL 60606
Telephone: (312) 741-5222

KELLER LENKNER LLC
U. Seth Ottensoser
  so@kellerlenkner.com
1330 Avenue of the Americas
New York, NY 10019
Telephone: (212) 653-9715

Attorneys for Plaintiff Kalman Isaacs,
individually and on behalf of all others similarly
situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KALMAN ISAACS, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  vs.<br><br>ELON MUSK and TESLA, INC.,<br><br>  Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Trial Date:  None Set |

1098965.1

1    Plaintiff Kalman Isaacs, individually and on behalf of all other persons similarly situated,

2 by his undersigned attorneys, for his complaint against defendants, alleges the following based

3 upon personal knowledge as to himself and his own acts, and information and belief as to all other

4 matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which

5 included, among other things, a review of the defendants' public documents, and announcements

6 made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire

7 and press releases published by and regarding defendant Tesla, Inc. ("Tesla" or the "Company"),

8 news articles about the Company, and information readily obtainable on the Internet. Plaintiff

9 believes that substantial evidentiary support will exist for the allegations set forth herein after a

10 reasonable opportunity for discovery.

11                          **NATURE OF THE ACTION AND RELEVANT BACKGROUND**

12    1.    This is a federal securities class action on behalf of a class consisting of all persons

13 other than Defendants (defined herein) who purchased securities of Tesla, Inc. ("Tesla") after

14 12:48pm eastern standard time on August 7, 2018 through and including August 8, 2018 (the

15 "Class Period"), seeking to recover damages caused by Defendants' violations of the federal

16 securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange

17 Act").   As a result of Defendants' materially false and misleading statements, as well as their

18 market manipulation, Tesla securities purchasers were injured to the tune of hundreds of millions

19 of dollars.

20    2.    Tesla designs, develops, manufactures and sells high-performance, fully electric

21 vehicles and designs, manufactures, installs, and sells solar energy generation and energy storage

22 products.

23    3.    Defendant Musk is the Chief Executive Officer and Chairman of the Company, and

24 owns or controls approximately 22% of the Company's shares.  Defendant Musk often uses his

25 Twitter account to issue statements on behalf of and regarding Tesla.  These Twitter statements are

26 referred to as "Tweets," and Defendant Musk has used them as a weapon against short sellers of

27 Tesla shares.  By way of background, in a short sale, an investor borrows shares and immediately

28 sells them on the open market hoping that he or she can purchase the shares later at a lower price,

return them to the lender and pocket the difference.  Short sellers profit when the company's shares go down and incur a loss when shares go up.  According to an August 2, 2018, article in *The Wall Street Journal* entitled *For Tesla's Elon Musk, Twitter Is Sword Against Short Sellers,* "Mr. Musk has been engaged for some time in a digital cat and mouse fight with negative investors on his company's stock, and so far he is winning.  His extraordinary use of Twitter to battle short sellers has often been followed by a jump in Tesla's stock price, hurting shorts in the process."  Among other things, on June 17, 2018, (a Sunday), Musk tweeted that Tesla short-sellers had "about three weeks before their short position explodes."  Tesla's stock rose 4% the first day of trading after Musk's weekend tweet.

4.      As described herein, Defendants embarked on a scheme and course of conduct to artificially manipulate the price of Tesla stock to completely decimate the Company's short-sellers (and, on the way, injured all purchasers of Tesla securities).  This started with a Musk Tweet at 12:48 p.m. on August 7 stating: "Am considering taking Tesla private at $420. Funding secured."

5.      In the succeeding several hours, Defendant Musk issued additional Tweets regarding the supposedly secure going-private transaction (the "Going Private Transaction").  For example, at 1:40pm, Musk Tweeted "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

6.      At 2:00pm, Musk Tweeted "My hope is *all* current investors remain with Tesla even if we're private.  Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX investment."  This Tweet was in response to @Gfilche who had Tweeted "Noooooo!!!!! Still processing what this means, but would be sad to see all the investors who've been w/ $TSLA miss out on the upside over the next few years.  Although if this helps the mission and Elon thinks it's smart, I understand and fully support."

7.      At 2:07pm, Defendant Musk Tweeted: "Absolutely.  Am super appreciative of Tesla shareholders.  Will ensure their prosperity in any scenario." This was in response to @heydave7, who had Tweeted "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. This would be only fair and the right thing to do."

8.      At 2:13pm, Musk Tweeted: "Shareholders could either to sell [sic] at 420 or hold shares & go private."

9.      At 2:14pm, he reassured shareholders by Tweeting that there would be "no change" to his status as CEO if the proposed deal was successful.

10.     At 3:07pm, Defendant Musk Tweeted: "Def no forced sales.  Hope all shareholders remain.  Will be way smoother & less disruptive as a private company.  Ends negative propaganda from shorts."  This was in response to a Tweet from @MindFieldMusic stating that "At 1st I was upset bc I thought this would be a forced buyout.  But if average folk like myself are allowed to reside with the garden walls along with you, then . . . Yes please."

11.     These series of tweets sparked a trading frenzy that drove Tesla shares to an intraday high of $387.46 — $45.47 above the previous day's closing price.  Trading volume spiked to 30 million shares (compared to an average of 8 million), representing over $11 billion of purchases in the open market.  Many Tesla short sellers covered their positions at artificially high prices in the wake of Musk's tweets.  In addition to the short-sellers, Defendants have injured all purchasers of Tesla securities during the Class Period who also purchased shares at artificially inflated prices.

12.     At approximately 3:30pm, Tesla released a statement via its corporate blog titled "Taking Tesla Private."  It contained an email from Musk sent to Tesla employees.  That email stated:

> Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.
>
> First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders. Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term. Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

I fundamentally believe that we are at our best when everyone is focused on executing, when we can remain focused on our long-term mission, and when there are not perverse incentives for people to try to harm what we're all trying to achieve.

This is especially true for a company like Tesla that has a long-term, forward-looking mission. SpaceX is a perfect example: it is far more operationally efficient, and that is largely due to the fact that it is privately held. This is not to say that it will make sense for Tesla to be private over the long-term. In the future, once Tesla enters a phase of slower, more predictable growth, it will likely make sense to return to the public markets.

Here's what I envision being private would mean for all shareholders, including all of our employees.

First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%). My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us. Either way, the future is very bright and we'll keep fighting to achieve our mission.
Thanks, Elon

13.    Importantly, this statement from Tesla was also materially false and misleading because it did not correct Defendant Musk's false and misleading statements that funding had been secured for the Going Private Transaction.  By not correcting Defendant Musk's misrepresentations, Tesla doubled-down on Musk's earlier false and misleading funding statements, and continued to cause artificial inflation in the price of the Company's stock. Additionally, in this statement, Defendant Musk expressly admitted that he is targeting short-sellers.  Musk's frequent complaints about "relentless attacks from short sellers" leaves no doubt whether or not he was intentionally trying to drive the price of Tesla shares higher, which would meet the definition of market manipulation and could carry possible criminal penalties.

14.    Finally, at 3:36pm, Musk Tweeted "Investor support is confirmed.  *Only reason why this is not certain is that it's contingent on a shareholder vote."* [Emphasis added.]. This Tweet was also materially false and misleading, because it affirmed that the transaction was fully financed and guaranteed so long as shareholders assented. However, Musk did not cast any doubt on the misstatement of fact that the Going Private Transaction was fully-financed; and he further misrepresented that other factors could not derail a Going Private Transaction when in reality they absolutely could.  For example, as subsequent developments make plain, the Board of Directors has not yet approved the Going Private Transaction, and their assent (not just shareholder approval) is required to facilitate such a transaction.  Because Musk did not inform the market that the deal required Board approval, he further misrepresented the status and the likelihood of the Going Private Transaction to the market.

15.    Although the trading in Tesla stock was halted for a short period of time during the afternoon of August 7, 2018, trading resumed at approximately 3:45pm eastern standard time.

16.    On or about August 8, 2018, several Company directors, including Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice and James Murdoch, issued a statement "Last week, Elon opened a discussion with the board about taking the company private, this included discussion as to how being private could better serve Tesla's long-term interests, *and also addressed the funding for this to occur.*  The board has met several times over the last week and is taking the appropriate next steps to evaluate this." [Emphasis added.]

17.     Importantly, this statement from Tesla's directors which addressed funding, did not correct Defendant Musk's earlier Tweets.  Because of Defendants' affirmative statements and market manipulation scheme, Tesla's stock price stayed artificially inflated throughout the day of August 8, 2018, as well.

18.     For many reasons, it is not possible for Defendant Musk to have secured funding for the deal.  First, it would be hard for Musk to raise the equity and debt financing needed for the deal (approximately $72 billion) given Tesla is not turning a profit.  Indeed, the Company is currently cash-flow negative.  How then could Tesla issue tens of billions of dollars of new debt when it is cash-flow negative?

19.     If debt cannot be used, another alternative would be finding equity partners.  For example, when Michael Dell took his computer maker private for $24.9 billion in 2013, he brought in buyout firm Silver Lake that contributed $1.4 billion in equity, raised more than $10 billion in bank debt, and received a $2 billion loan from Microsoft Corp.  There is no indication that Defendant Musk has any such equity financing lined-up.

20.     Indeed, many attempts by founders and top executives to take their companies private have never come to fruition.  For example, in March, Qualcomm Inc.  Chairman Paul Jacobs stepped down from the board to pursue a take-private bid for the U.S. chip maker, which has a market capitalization of $93 billion.  To date, this bid has not materialized.  Likewise, U.S. department store operator Nordstrom Inc.'s attempt to go private also failed earlier this year, after banks would not provide the necessary financing to the founding family members seeking to put together the deal.  Thus, Musk's statement that he had secured funding was especially material and significantly moved the market.  Because Musk has not secured financing, and has issued false and materially misleading information into the market, short sellers of Tesla stock were forced to cover their positions by purchasing shares at artificially inflated prices after 12:48pm on August 7, 2018.  Obviously, all purchasers of Tesla securities were injured as well.

21.     Many market commentators have weighed-in on this unprecedented situation.  According to former SEC Chairman Harvey Pitt (in a CNBC interview), Musk "is claiming there is a specific source of the funding so that had better be true.  He has also claimed there is a specific

1   amount available for funding.  That has to be true.  Otherwise, even if it's not manipulation it

2   would be fraud, so he's got two potential areas of difficulty right there."

3       22.     Indeed, Tesla still has not revealed where it is getting the more than $71 billion it

4   would cost to take the company private.  On information and belief, no such financing is yet in

5   place.  Given the size of the deal, which would require multiple banks, according to dealmakers

6   and analysts, "news of the deal would have leaked had Tesla already held discussions to secure

7   funding" according to UBS analyst Colin Langan.

8       23.     An August 10, 2018 article from *Bloomberg* entitled *Tesla Is Said to Seek Wide*

9   *Investor Pool For Take-Private Plan* puts the lie to Musk's Tweets that funding was secured.

10  Indeed, according to the article, Tesla and Musk want to avoid concentrating ownership in a few

11  large holders and, instead, are "seeking a wide pool of investors."  According to the article, "the

12  billionaire founder would prefer to amass a group of investors who could each contribute part of

13  the funds because he wants to avoid having one or two large new stakeholders in the company."  If

14  Musk is still looking to amass a group of investors, he certainly has not secured funding as touted

15  in his false and misleading Tweets.

16      24.     According to an August 8, 2018 article in *The Wall Street Journal* (that appeared

17  after trading for the day was closed), securities regulators have inquired with Tesla about

18  Defendant Musk's Tweets.  In this regard, The Securities and Exchange Commission has asked

19  whether Defendant Musk's unusual announcement on Tuesday was "factual."  The regulator also

20  asked Tesla about why the disclosure was made on Twitter rather than in a regulatory filing, and

21  whether the Company "believes the announcement."  According to the *The Wall Street Journal*

22  article, Musk "could be in trouble if regulators develop evidence that he made a statement only

23  intending to goose his company's stock price."

24  **JURISDICTION AND VENUE**

25      25.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

26  the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the

27  SEC, 17 C.F.R § 240.10b-5.

28      26.     This Court has jurisdiction over the subject matter of this action pursuant to 28

1    U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

2        27.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28

3    U.S.C. § 1391(b).  Tesla is located in this District and its shares are traded in this District and

4    many of the acts and practices complained of occurred in substantial part herein.

5        28.    In connection with the acts alleged in this complaint, Defendants, directly or

6    indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

7    to, the mails, interstate telephone communications, and the facilities of the national securities

8    markets.

9                                    **PARTIES**

10       29.    As reflected in the accompanying PSLRA certification, Plaintiff purchased Tesla

11   securities on August 8, 2018 and was damaged thereby.

12       30.    Defendant Tesla is a Delaware corporation maintaining its principal place of

13   business at 3500 Deer Creek Road, Palo Alto, California 94304.  Tesla shares trade on NASDAQ

14   under the ticker symbol "TSLA."

15       31.    Defendant Musk is the Chairman and Chief Executive Officer of Tesla.  Defendant

16   Musk issued the materially false and misleading Tweets on behalf of himself and Tesla.

17   **MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE**

18                              **CLASS PERIOD**

19       32.    The Class Period begins on Tuesday afternoon, August 7, 2018.  That is when

20   Defendants launched a nuclear attack on Tesla's short-sellers.  At approximately 12:48 p.m.

21   Eastern Standard Time, defendant Musk Tweeted "Am considering taking Tesla private at $420.

22   *Funding secured."*  [Emphasis added.]  After Defendant Musk issued this Tweet, Tesla's stock

23   price increased to $387.46, closing at $379.57 per share.

24       33.    In the succeeding several hours, Defendant Musk issued additional Tweets

25   regarding the Going Private Transaction.  For example, at 1:40pm, Musk Tweeted "I don't have a

26   controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be

27   selling in either scenario."

28       34.    At 2:00pm, Musk Tweeted "My hope is *all* current investors remain with Tesla

even if we're private.  Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX investment."  This Tweet was in response to @Gfilche who had Tweeted "Nooooooo!!!!! Still processing what this means, but would be sad to see all the investors who've been w/ $TSLA miss out on the upside over the next few years.  Although if this helps the mission and Elon thinks it's smart, I understand and fully support."

35.     At 2:07pm, Defendant Musk Tweeted: "Absolutely.  Am super appreciative of Tesla shareholders.  Will ensure their prosperity in any scenario."  This was in response to @heydave7, who had Tweeted "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. This would be only fair and the right thing to do."

36.     At 2:13pm, Musk Tweeted: "Shareholders could either to sell [sic] at 420 or hold shares & go private."

37.     At 2:14pm, he reassured shareholders by Tweeting that there would be "no change" to his status as CEO if the proposed deal was successful.

38.     At 3:07pm, Defendant Musk Tweeted: "Def no forced sales.  Hope all shareholders remain.  Will be way smoother & less disruptive as a private company.  Ends negative propaganda from shorts."  This was in response to a Tweet from @MindFieldMusic stating that "At 1st I was upset bc I thought this would be a forced buyout.  But if average folk like myself are allowed to reside with the garden walls along with you, then . . . Yes please."

39.     At approximately 3:30pm, Tesla released a statement via its corporate blog titled "Taking Tesla Private."  It contained an email from Musk sent to Tesla employees.  That email stated:

> Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.
>
> First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders. Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that

may be right for a given quarter, but not necessarily right for the long-term. Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

I fundamentally believe that we are at our best when everyone is focused on executing, when we can remain focused on our long-term mission, and when there are not perverse incentives for people to try to harm what we're all trying to achieve.

This is especially true for a company like Tesla that has a long-term, forward-looking mission. SpaceX is a perfect example: it is far more operationally efficient, and that is largely due to the fact that it is privately held. This is not to say that it will make sense for Tesla to be private over the long-term. In the future, once Tesla enters a phase of slower, more predictable growth, it will likely make sense to return to the public markets.

Here's what I envision being private would mean for all shareholders, including all of our employees.

First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%). My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us. Either way, the future is very bright and we'll keep fighting to achieve our mission.

Thanks, Elon

40.     Finally, at 3:36pm, Musk Tweeted "Investor support is confirmed.  *Only reason why this is not certain is that it's contingent on a shareholder vote.*"  [Emphasis added.].

41.     The foregoing statements were materially false and misleading and/or omitted to state other facts necessary to make the statements made not misleading because, *inter alia,* Defendant Musk had not secured funding for the deal.  Obviously, securing funding is necessary for a deal like this to be viable.  Furthermore, because Musk did not inform the market that the deal required Board approval, he further misrepresented the status and the likelihood of the Going Private Transaction to the market.  Thus, contrary to the statements made by Defendants Musk and Tesla, the deal is far from certain and is not fully-financed.

42.     Based on Defendants' materially false and misleading statements, Tesla shares traded-up sharply on August 7, 2018 (to $387.46) closing at $379.57 per share, on volume of over 30 million shares.  Among other things, this cost Tesla short-sellers hundred of millions dollars when they were forced thereafter to cover their positions by purchasing Tesla securities at artificially inflated prices.  Furthermore, all purchasers of Tesla's securities were buying millions of shares at artificially inflated prices.

## SUBSEQUENT DEVELOPMENTS

43.     On or about August 8, 2018, several Company directors, including Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch, issued a statement "Last week, Elon opened a discussion with the board about taking the company private, this included discussion as to how being private could better serve Tesla's long-term interests, *and also addressed the funding for this to occur.*  The board has met several times over the last week and is taking the appropriate next steps to evaluate this." [Emphasis added.]  This statement further conveyed the impression to the market that the deal was financed.  As a result, Tesla's stock remained artificially inflated throughout the day of August 8, 2018.

44.     According to Columbia Law School professor John Coffee, "If the stock price were to fall either because there's a corrective disclosure or because people figure that no one has been

approached by him [Musk] for financing, then you're able to satisfy a lot of causation . . . . The short-sellers will say those statements drove the price up.  That's all they're going to have to show."  *See* https://www.thestreet.com/markets/has-musk-crossed-the-line-here-s-what-the-sec-would-need-to-prove-14678013?puc=yahoo&cm_ven=YAHOO&yptr=yahoo.  According to Coffee, it's unlikely financing could have already been secured for what would be roughly a $50 billion deal.  As Coffee states in the article, "'Funding secured' is an objective factual statement that looks implausible given the great difficulty in lining up debt investors willing to fund 70 percent of a $70 billion or more record transaction."

45.     On August 9, 2018, on the heels of news that the SEC was investigating and market commentators and others casting doubt on the *bona fides* of the deal, Tesla's stock price fell $17.89, closing at $352.45.

## ADDITIONAL SCIENTER ALLEGATIONS

46.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Tesla and the Proposed Acquisition Transaction, were active and culpable participants in the fraud alleged herein.

47.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of personnel at the highest levels of the Company, including defendant Musk, the Company's CEO and Chairman.

48.     Defendant Musk, because of his position with Tesla, controlled his Tweets and the Company's public statements during the Class Period.  Defendant Musk, as the purported architect of the Going-Private Transaction, knew that funding had not been secured for the deal.  No

person—let alone the CEO and Chairman of a massive public company—could state that funding was secured when that was simply not true. Defendants knew that the marketplace was following news and Tweets by Defendant Musk regarding Tesla very closely and billions of dollars of Company shares would trade following the announcement of a fully-financed Going Private Transaction. Armed with that knowledge, any reasonable CEO would refrain from making such statements if they were not true.

49. Because of his position and access to material non-public information, defendant Musk knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations about the Going Private Transaction that were being made were false and misleading. As a result, defendant Musk is responsible for the accuracy of his corporate statements, including his Tweets, and is therefore responsible and liable for the misrepresentations contained therein.

50. Finally, it is clear that Defendant Musk Tweeted materially false and misleading information regarding the Going Private Transaction to exact personal revenge and "squeeze-out" the short-sellers who had purportedly been badgering him for months. By issuing materially false and misleading information which artificially inflated the Company's stock price, the short-sellers were forced to purchase artificially inflated shares in the market to cover their positions.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

51. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Tesla securities after 12:48pm eastern standard time on August 7, 2018 through and including August 8, 2018 (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, or any entity in which Defendants have or had a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tesla shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tesla or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented the Proposed Acquisition Transaction;

- whether Defendant Musk caused Tesla to issue false and misleading statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tesla securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them.  There will be no difficulty in the management of this action as a class action.

57.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

58.     Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 1288 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

59.     In the alternative, Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud on the market doctrine for the following reasons set forth below.

60.     The market for Tesla's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, the securities traded at artificially inflated prices during the Class Period, and Plaintiff and other members of the Class were forced to purchase Tesla securities at artificially inflated prices.

61.     During the Class Period, the artificial inflation of the securities was caused by the material misrepresentations and omissions particularized in this Complaint and caused the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Proposed Acquisition Transaction.  These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the securities to be artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the securities at such artificially inflated prices, and each of them has been damaged as a result.

62.     At all relevant times, the market for Tesla's common stock (and other securities) was an efficient market for the following reasons, among others:

1    (a) The Company's common stock met the requirements for listing, and was listed and

2  actively traded on the NASDAQ, a highly efficient and automated market;

3    (b) As a regulated issuer, Tesla filed periodic public reports with the SEC and/or the

4  NASDAQ;

5    (c) Defendants regularly communicated with public investors via established

6  market communication mechanisms, including through regular dissemination of press releases on

7  the national circuits of major newswire services and through other wide-ranging public

8  disclosures, such as communications with the financial press and other similar reporting services;

9  and/or;

10    (d) Tesla was followed by securities analysts employed by brokerage firms who wrote

11  reports about the Company, and these reports were distributed to the sales force and certain

12  customers of their respective brokerage firms.  Each of these reports was publicly available and

13  entered the public marketplace.

14    63.    As a result of the foregoing, the market for the securities promptly digested current

15  information regarding Tesla from all publicly available sources and reflected such information in

16  the price of the securities.  Under these circumstances, all purchasers of Tesla securities during the

17  Class Period suffered similar injury through their purchase thereof at artificially inflated prices and

18  are entitled to a presumption of reliance.

19    **LOSS CAUSATION**

20    64.    Defendants' wrongful conduct as alleged herein directly and proximately caused

21  the economic loss suffered by Plaintiff and the Class.  During the Class Period, Plaintiff and the

22  Class purchased or acquired Tesla securities at artificially inflated prices and were damaged

23  thereby.

24    **NO SAFE HARBOR**

25    65.    The statutory safe harbor provided for forward-looking statements under certain

26  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

27  The statements alleged to be false and misleading herein all relate to then-existing facts and

28  conditions.  In addition, to the extent certain of the statements alleged to be false may be

1  characterized as forward looking, they were not identified as "forward-looking statements" when

2  made and there were no meaningful cautionary statements identifying important factors that could

3  cause actual results to differ materially from those in the purportedly forward-looking

4  statements.   In the alternative, to the extent that the statutory safe harbor is determined to apply to

5  any forward-looking statements pleaded herein, Defendants are liable for those false forward-

6  looking statements because at the time each of those forward-looking statements was made, the

7  speaker had actual knowledge that the forward-looking statement was materially false or

8  misleading, and/or the forward-looking statement was authorized or approved by an executive

9  officer of  Tesla who knew that the statement was false when made.

## COUNT I

### (Against All Defendants For Violations of

### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

13   66.   Plaintiff repeats and realleges each and every allegation contained above as if fully

14  set forth herein.

15   67.   This Count is asserted against Defendants and is based upon Section 10(b) of the

16  Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

17   68.   During the Class Period, Defendants: (1) engaged in a plan, scheme, conspiracy

18  and course of conduct, pursuant to which they knowingly or recklessly engaged in acts,

19  transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff

20  and the other members of the Class; (2) made various untrue statements of material facts and

21  omitted to state material facts necessary in order to make the statements made, in light of the

22  circumstances under which they were made, not misleading; and (3) employed devices, schemes

23  and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was

24  intended to, and, throughout the Class Period, did: (i) deceive the investing public, including

25  Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the

26  market price of Tesla's securities; and (iii) cause Plaintiff and other members of the Class to

27  purchase Tesla securities at artificially inflated prices.  In furtherance of this unlawful scheme,

28  plan and course of conduct, Defendants took the actions set forth herein.

69.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the Tweets and other statements and documents described above.  Such Tweets and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Proposed Acquisition Transaction.

70.     By virtue of his position at Tesla (and the architect of the Proposed Acquisition Transaction), Defendant Musk had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the Chief Executive Officer and Chairman of Tesla (as well as the purported architect of the Going Private Transaction), Defendant Musk had knowledge of the details of Tesla's internal financial affairs and that financing for the deal had not been secured.

72.     Defendant Musk is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Defendant Musk was able to and did, directly or indirectly, control his Tweets and the content of the statements of Tesla.  As an officer of a publicly-held company, Defendant Musk had a duty to disseminate timely, accurate, and truthful information with respect to Tesla's businesses, operations, future financial condition, future prospects and the Proposed Acquisition Transaction.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tesla securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Proposed Acquisition Transaction result, Plaintiff and the other members of

1   the Class purchased Tesla securities at artificially inflated prices and relied upon the price of the

2   securities, the integrity of the market for the securities and/or upon statements disseminated by

3   Defendants, and were damaged thereby.

4       73.   During the Class Period, Tesla common stock (and other securities) was traded on

5   an active and efficient market.  Plaintiff and the other members of the Class, relying on the

6   materially false and misleading statements described herein, which the Defendants made, issued or

7   caused to be disseminated, or relying upon the integrity of the market, purchased Tesla securities

8   at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other

9   members of the Class known the truth, they would not have purchased said securities or would not

10   have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff

11   and the Class, the true value of Tesla securities was substantially lower than the prices paid by

12   Plaintiff and the other members of the Class.

13       74.   By reason of the conduct alleged herein, Defendants knowingly or recklessly,

14   directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5

15   promulgated thereunder.

16       75.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

17   other members of the Class suffered damages in connection with their respective purchases and

18   sales of the Company's securities during the Class Period.

19   <u>**COUNT II**</u>

20   **(Violations of Section 20(a) of the**

21   **Exchange Act Against Defendant Musk)**

22       76.   Plaintiff repeats and realleges each and every allegation contained in the foregoing

23   paragraphs as if fully set forth herein.

24       77.   During the Class Period, Defendant Musk participated in the operation and

25   management of Tesla, and conducted and participated, directly and indirectly, in the conduct of

26   Tesla's business affairs, including the Proposed Acquisition Transaction.  Because of his senior

27   position (and as the architect of the Going Private Transaction), defendant Musk knew the adverse

28   non-public information regarding Tesla, including that the funding for the deal had not been

1    secured.

2        78.    As an officer of a publicly owned company, Defendant Musk had a duty to

3    disseminate accurate and truthful information with respect to Tesla's financial condition and the

4    Proposed Acquisition Transaction, and to correct promptly any public statements which had

5    become materially false or misleading.

6        79.    Because of his position of control and authority as a senior officer, Defendant

7    Musk was able to, and did, control the contents of the various reports, press releases and public

8    filings which Tesla disseminated in the marketplace during the Class Period concerning the Going

9    Private Transaction (including the Tweets).  Throughout the Class Period, Defendant Musk

10   exercised his power and authority to cause Tesla to engage in the wrongful acts complained of

11   herein.  Defendant Musk therefore, was a "controlling person" of Tesla within the meaning of

12   Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct

13   alleged which artificially inflated the market price of Tesla securities.

14       80.    Defendant Musk, therefore, acted as a controlling person of Tesla.  By reason of his

15   senior management position at Tesla, Defendant Musk had the power to direct the actions of, and

16   exercised the same to cause, Tesla to engage in the unlawful acts and conduct complained of

17   herein.  Defendant Musk exercised control over the financial operations of Tesla and possessed the

18   power to control the specific activities which comprise the primary violations about which

19   Plaintiff and the other members of the Class complain.

20       81.    By reason of the above conduct, Defendant Musk is liable pursuant to Section 20(a)

21   of the Exchange Act for the violations committed by Tesla.

22                                **PRAYER FOR RELIEF**

23       WHEREFORE, Plaintiff demands judgment against Defendants as follows:

24       A.     Determining that the instant action may be maintained as a class action under Rule

25   23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

26       B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by

27   reason of the acts and transactions alleged herein;

28       C.     Awarding Plaintiff and the other members of the Class prejudgment and post-

1  judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

2          D.        Awarding such other and further relief as this Court may deem just and proper.

3                          **<u>DEMAND FOR TRIAL BY JURY</u>**

4          Plaintiff hereby demands a trial by jury.

5

6  DATED:  August 10, 2018                    Respectfully submitted,

7                                              BROWNE GEORGE ROSS LLP
                                                  Eric M. George
8                                                 Carl Alan Roth

9                                              KELLER LENKNER LLC
10                                                Ashley C. Keller
                                                  U. Seth Ottensoser
11

12                                         By:        /s/ Eric M. George
                                              _____
13                                                 Eric M. George
                                           Attorneys for Plaintiff Kalman Isaacs
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION

I, Kalman Isaacs hereby certify as follows:

1. I have reviewed and authorized the filing of the complaint against Tesla, Inc. ("Tesla") and Elon Musk, alleging violations of the federal securities laws.

2. I did not purchase securities of Tesla at the direction of counsel or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.

4. My transactions in Tesla securities during the class period are reflected in Exhibit A, attached hereto.

5. I have not sought to serve as a representative party or as a lead plaintiff in any class action under the federal securities laws filed during the last three years.

6. Beyond my pro rata share of any recovery, I will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 10th[th] day of August 2018.

Kalman Isaacs

1

EXHIBIT   A

EXHIBIT A

| | Action | Symbol | Security Description | Security Type | Quantity | Price | Amount |
|---|---|---|---|---|---|---|---|
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 1,000 | 376.54 | -376,540 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 400 | 376.87 | -150,748 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 394 | 376.74 | -148,435.56 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 200 | 376.2 | -75,239 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 200 | 376.21 | -75,242 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 200 | 376.23 | -75,246 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 186 | 376.86 | -70,095.96 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 100 | 376.2 | -37,620.5 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 100 | 376.22 | -37,622 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 100 | 376.24 | -37,624 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 100 | 376.26 | -37,626.4 |
| 08/08/2018 | YOU BOUGHT SHORT COVER | TSLA | TESLA INC COM | Short | 20 | 376.84 | -7,536.8 |
| | TOTALS | | | | 3,000 | -376.53 | -1,129,576.22 |

2