MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

ANDREW J. ENTWISTLE (*Pro Hac Vice* to be submitted*)*
aentwistle@entwistle-law.com
ARTHUR V. NEALON (*Pro Hac Vice* to be submitted*)*
anealon@entwistle-law.com
ROBERT N. CAPPUCCI (*Pro Hac Vice* to be submitted*)*
rcappucci@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 20th Floor
New York, NY  10171
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

*Counsel for Proposed Lead Plaintiff*
*FNY Investment Advisers, LLC and*
*Proposed Lead Counsel for the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| KALMAN ISAACS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON MUSK and TESLA, INC.,<br><br>Defendants. | Case No.  3:18-cv-04865-EMC<br><br>Hon. Edward M. Chen<br><br>CLASS ACTION<br><br>NOTICE OF MOTION AND MOTION OF FNY INVESTMENT ADVISERS, LLC FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Date:   November 15, 2018<br>Time:  1:30 p.m.<br>Place:  Courtroom 5, 17th Floor |

*[Additional captions appear on following pages]*

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
CASE NO. 3:18-cv-04865- EMC

WILLIAM CHAMBERLAIN, on behalf of himself and all others similarly situated,

        Plaintiff,

        vs.

ELON MUSK and TESLA, INC.,

        Defendants.

Case No.  3:18-cv-04876-EMC

---

JOHN YEAGER, individually and on behalf of all others similarly situated,

        Plaintiff,

        vs.

ELON MUSK and TESLA, INC.,

        Defendants.

Case No.  3:18-cv-04912-EMC

---

CARLOS MAIA, on behalf of himself and all others similarly situated,

        Plaintiff,

        vs.

ELON MUSK and TESLA, INC.,

        Defendants.

Case No.  3:18-cv-04939-EMC

---

KEWAL DUA, Individually and on Behalf of All Others Similarly Situated

        Plaintiff,

        vs.

ELON MUSK and TESLA, INC.,

        Defendants.

Case No.  3:18-cv-04948-EMC

| | |
|---|---|
| JOSHUA HORWITZ, Individually and on Behalf of All Others Similarly Situated | Case No.  3:18-cv-05258-EMC |
| Plaintiff, | |
| vs. | |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |
| ANDREW E. LEFT, Individually and on Behalf of All Others Similarly Situated | Case No.  3:18-cv-05463-EMC |
| Plaintiff, | |
| vs. | |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |
| ZHI XING FAN, Individually and on Behalf of All Others Similarly Situated | Case No. 3:18-cv-05470-EMC |
| Plaintiff, | |
| vs. | |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |
| SHAHRAM SODEIFI, Individually and on Behalf of All Others Similarly Situated | Case No. 3:18-cv-05899-EMC |
| Plaintiff, | |
| vs. | |
| TESLA, INC., a Delaware corporation, and ELON R. MUSK, an individual, | |
| Defendants. | |

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................... 2

II.    SUMMARY OF THE PENDING ACTIONS ................................................... 4

III.   THE RELATED ACTIONS SHOULD BE CONSOLIDATED ..................................... 11

IV.    FIRST NEW YORK SHOULD BE APPOINTED LEAD PLAINTIFF ........................ 12

       A.    The PSLRA Standard For Appointment Of Lead Plaintiff................................. 12

       B.    First New York Has Satisfied The PSLRA Requirements And Should Be
             Appointed Lead Plaintiff......................................................................... 13

       1.    This Motion Is Timely And Proper ....................................................... 13

       2.    First New York Believes It Has The Largest Financial Interest In The
             Relief Sought By The Class .................................................................. 14

       3.    First New York Satisfies Fed. R. Civ. P. 23 ......................................... 14

V.     FIRST NEW YORK'S CHOICE OF LEAD COUNSEL SHOULD BE
       APPROVED......................................................................................... 18

VI.    CONCLUSION ..................................................................................... 19

i

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
CASE NO. 3:18-CV-04865- EMC

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Felix v. Symantec Corp.*,
  No. 18-02902 WHA, 2018 WL 4029053 (N.D. Cal. Aug. 23, 2018) ............................. 11

4

5

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .......................................................................................... 15

6

7

*Hardy v. MabVax Therapeutics Holdings*,
  No. 18-cv-01160, 2018 WL 4252345 (S.D. Cal. Sept. 6, 2018) ................................. 11, 12

8

*In re Cavanaugh*,
  306 F.3d 726 (9th Cir. 2002) ......................................................................................... 14

9

10

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
  136 F. Supp. 3d 1159 (C.D. Cal. 2015) ...................................................................... 14, 15

11

12

*Pace v. Quintanilla*,
  No. SACV 14-2067-DOC (RNBx), 2014 WL 4180766 (C.D. Cal. Aug. 19, 2014) ........ 17

13

*Petersen v. Costco Wholesale Co*., *Inc.*,
  No. SA CV 13-1292-DOC (JCGx), 2016 WL 6768911 (C.D. Cal. Nov. 15, 2016) ........ 15

14

15

*Schriver v. Impac Mort. Holdings, Inc.*,
  No. SACV 06-31 CJC (RNBx), 2006 WL 6886020 (C.D. Cal. May 2, 2006) ................ 15

16

17

*Tanne v. Autobytel, Inc.*,
  226 F.R.D. 659 (C.D. Cal. 2005) .................................................................................. 16

18

**Statutes**

19

15 U.S.C. § 78u-4(a)(1) ......................................................................................................... 12

20

15 U.S.C. § 78u-4(a)(3)(A)(i) ............................................................................................ 12, 14

21

15 U.S.C. § 78u-4(a)(3)(A)(i)(I) .......................................................................................... 13

22

15 U.S.C. § 78u-4(a)(3)(A)(i)(II) ......................................................................................... 13

23

15 U.S.C. § 78u-4(a)(3)(B) .......................................................................................... 1, 12, 14

24

15 U.S.C. § 78u-4(a)(3)(B)(i) ......................................................................................... 2, 3, 12

25

15 U.S.C. § 78u-4(a)(3)(B)(ii) ............................................................................................ 11

26

15 U.S.C. § 78u-4(a)(3)(B)(iii) ............................................................................................ 3

27

15 U.S.C. § 78u-4(a)(3)(B)(iii)(aa) ..................................................................................... 14

28

ii

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
CASE NO. 3:18-CV-04865- EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ................................................................................. 3, 13

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) ............................................................................ 14

15 U.S.C. § 78u-4(a)(3)(B)(v) ...................................................................................... 2, 18

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... passim

Fed. R. Civ. P. 23(a) ........................................................................................................ 15

Fed. R. Civ. P. 23(a)(3) .................................................................................................... 15

Fed. R. Civ. P. 23(a)(4) .................................................................................................... 16

**Other Authorities**

H.R. Conf. Rep. No. 104-369 (1995) .......................................................................... 4, 17

S. Rep. No. 104-98 (1995) ................................................................................................. 4

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that at 1:30 p.m. on November 15, 2018, or on a date and at a time set by the Court, before the Honorable Edward M. Chen, United States District Judge, at the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, FNY Investment Advisers, LLC ("First New York") will respectfully move the Court for entry of an Order, pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), as follows:   (1) consolidating the above-captioned Related Securities Actions pursuant to Rule 42(a) of the Federal Rules of Civil Procedure; (2) appointing First New York as Lead Plaintiff for a proposed class consisting of persons or entities other than the defendants that purchased or otherwise acquired securities of Tesla, Inc. ("Tesla" or the "Company") during the period August 7, 2018 through August 17, 2018, inclusive (the "Class" and "Class Period"); (3) approving First New York's selection of Entwistle & Cappucci LLP ("Entwistle & Cappucci") and Susman Godfrey L.L.P. ("Susman Godfrey") to serve as Co-Lead Counsel for the Class; and (4) providing for any such further relief as the Court may deem just and proper.

This Motion is made on the grounds that consolidation of the Related Securities Actions, appointment of First New York as Lead Plaintiff and approval of its selection of Lead Counsel is appropriate under Rule 42(a) and the PSLRA.  First New York respectfully submits that it is the "most adequate plaintiff" under the PSLRA and is, therefore, entitled to be appointed Lead Plaintiff.  Specifically, First New York believes that it has the "largest financial interest" in the relief sought by the Class in this action by virtue of, among other things, the significant losses that First New York suffered as a result of defendants' wrongdoing.  First New York also satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure because its claims are typical of other Class members' claims and because it will fairly and adequately represent the interests of the Class.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities in Support Thereof, the Declaration of Marc M. Seltzer, filed concurrently herewith (the "Seltzer Decl."), the pleadings and other filings in this litigation, and such additional written or oral argument as may be permitted by the Court.

## STATEMENT OF ISSUES

1.      Whether the Court should consolidate the Related Securities Actions pursuant to Rule 42(a) of the Federal Rules of Civil Procedure;

2.      Whether the Court should appoint First New York as Lead Plaintiff, pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(i); and

3.      Whether the Court should approve First New York's selection of counsel, Entwistle & Cappucci and Susman Godfrey, as Lead Counsel, pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      PRELIMINARY STATEMENT

Pending before the Court are the nine above-captioned related securities class actions (the "Related Securities Actions")[1] against Tesla and Tesla's Chairman and Chief Executive Officer ("CEO") Elon R. Musk ("Musk") (collectively, "Defendants") arising out of Musk's false and misleading statements concerning a purported plan to take Tesla private at $420 per share, when, in fact, no such plan existed.  Specifically, Musk falsely represented that he was virtually certain Tesla could be taken private at a purchase price that reflected a substantial premium over Tesla's then-current share price, that funding for this multi-billion-dollar transaction had been "secured" and that the "only" contingency was a shareholder vote.  Musk's false statements caused the price of Tesla common stock to surge, thereby causing First New York and other members of the Class

---

[1] The Related Securities Actions were filed on the following dates:  *Isaacs v. Musk*, No. 3:18-cv-04865, August 10, 2018; *Chamberlain v. Tesla, Inc.*, No. 3:18-cv-04876, August 10, 2018; *Yeager v. Tesla, Inc.*, No. 3:18-cv-04912, August 13, 2018; *Maia v. Musk*, No. 3:18-cv-04939, August 14, 2018; *Dua v. Tesla, Inc.*, No. 3:18-cv-04948, August 15, 2018; *Horwitz v. Tesla, Inc.*, No. 3:18-cv-05258, August 28, 2018; *Sodeifi v. Tesla, Inc.*, No. 3:18-cv-05899, August 30, 2018; *Left v. Tesla, Inc.*, No. 3:18-cv-05463, September 6, 2018; and *Fan v. Tesla, Inc.*, No. 3:18-cv-05470, September 6, 2018.

2

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL CASE NO. 3:18-CV-04865- EMC

1   to purchase Tesla securities at artificially inflated prices.  Tesla investors, including First New

2   York, incurred significant losses when it was revealed, among other things, that Musk and Tesla

3   had not even discussed, much less confirmed with any funding source, a plan to take Tesla private

4   at the stated purchase price and, contrary to Musk's representations, that closing of any such

5   transaction would be subject to myriad contingencies.  Tesla, itself, is also liable for such false

6   and misleading statements because, among other things, it promoted them and failed to take steps

7   to correct them.

8        Pursuant to Rule 42(a), this Court is permitted to consolidate related actions that share

9   common questions of law or fact prior to determining lead plaintiff motions.  Here, the Related

10  Securities Actions all assert similar causes of action, substantially similar proposed class periods,

11  involve the same facts and name the same Defendants.  Thus, the Court should exercise its

12  discretion and consolidate the Related Securities Actions prior to determining any lead plaintiff

13  motions.

14       Pursuant to the PSLRA, this Court must appoint the "most adequate plaintiff" to serve as

15  Lead Plaintiff.  15 U.S.C. § 78u-4(a)(3)(B)(i).  In that regard, the Court is required to determine

16  which movant has the "largest financial interest" in the relief sought by the Class in this litigation

17  and whether such movant has made a *prima facie* showing that it is a typical and adequate class

18  representative under Fed. R. Civ. P. Rule 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

19       First New York satisfies all of the statutory requirements for appointment as Lead

20  Plaintiff.  Specifically, First New York:  (1) has timely filed this motion for appointment as Lead

21  Plaintiff; (2) believes it has the largest financial interest in this litigation; and (3) will adequately

22  represent the interests of the Class since it otherwise satisfies the typicality and adequacy

23  requirements of Fed. R. Civ. P. 23(a).  *See* 15 U.S.C. §78u-4(a)(3)(B)(iii).  In addition, First New

24  York's claims are typical, if not identical, to the other Class members.  Like other members of the

25  Class, First New York seeks recovery of losses incurred as a result of the artificial inflation in the

26  share price of Tesla common stock caused by Musk's false and misleading statements.  First New

27  York can adequately represent the interests of the Class since it has no conflicts with other class

28

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
CASE NO. 3:18-CV-04865- EMC

members and has chosen highly qualified proposed Lead Counsel who can vigorously pursue this litigation on behalf of the Class.

Also, as a large institutional investor that employs numerous investment professionals, First New York is exactly the type of investor whose participation in complex securities class actions the PSLRA was intended to foster. *See* H.R. Conf. Rep. No. 104-369 at 34 (1995), *reprinted in* 1995 U.S.C.A.A.N. 730, 733; S. Rep. No. 104-98 at 6 (1995), *reprinted in* 1995 U.S.C.A.A.N. 679, 685.  Moreover, First New York has previously participated in other complex securities litigation matters and has served in leadership roles therein.  In the present litigation, First New York has committed the resources necessary to vigorously pursue claims on behalf of the Class.

First New York's selection of Entwistle & Cappucci and Susman Godfrey as Co-Lead Counsel should likewise be approved by the Court because, pursuant to the PSLRA, the presumptive Lead Plaintiff is entitled to select the Lead Counsel of its choosing. Entwistle & Cappucci has extensive experience in the successful prosecution of securities class actions and will more than adequately represent the interests of all Class members.  First New York also seeks the appointment of Co-Lead Counsel Susman Godfrey, a firm with a nationwide reputation of excellence in the litigation of complex securities class actions.

## II.    SUMMARY OF THE PENDING ACTIONS

Based in Palo Alto, California, Tesla designs, develops, manufactures and sells electric vehicles and energy generation and storage systems in the United States and worldwide.  Tesla conducted its initial public offering in 2010 and is currently traded on the NASDAQ under the ticker symbol TSLA.

The Related Securities Actions arise from events surrounding a series of tweets by Tesla's Chairman and CEO Elon Musk concerning a purported go-private transaction beginning on August 7, 2018 at 12:48 p.m. eastern time, when Defendant Musk tweeted:  "***Am considering taking Tesla private at $420. Funding secured***."  At approximately 2:00 p.m. eastern time, Musk tweeted:  "My hope is *all* current investors remain with Tesla even if we're private.  Would

4

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
CASE NO. 3:18-CV-04865- EMC

create special purpose fund enabling anyone to stay with Tesla." Shortly thereafter, at 2:13 p.m. eastern time, Musk tweeted again: "*Shareholders could either to sell 420 or hold shares & go private*." Then, at 3:36 p.m. eastern time, he added: "*Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote*."

The actions each allege that Musk recklessly disregarded the fact that each of these statements was materially false or misleading because Musk knew that he had never discussed a going-private transaction at $420 per share with any potential funding source, had done nothing to investigate whether it would be possible for all current investors to remain with Tesla as a private company via a "special purpose fund" and had not confirmed support of Tesla's investors for a potential going private transaction. Musk also knew that he had not satisfied numerous additional contingencies, the resolution of which was highly uncertain, when he unequivocally declared, "Only reason why this is not certain is that it's contingent on a shareholder vote." Musk's public statements and omissions created the misleading impression that taking Tesla private was subject only to Musk choosing to do so and a shareholder vote.

Rather than act to correct the misstatements made by the Company's Chairman and CEO, internal communications reveal that Tesla acted in furtherance of this fraud. For example, just 35 minutes after Musk's initial tweet about taking Tesla private, Tesla's Chief Financial Officer sent a text message to Musk, stating: "Elon, am sure you have thought about a broader communication on your rationale and structure to employees and potential investors. *Would it help if [Tesla's head of communications], [Tesla's General Counsel], and I draft a blog post or employee email for you*?" Musk responded, "Yeah, that would be great." Tesla's Chief Financial Officer then replied: "Working on it. Will send you shortly." The blog post subsequently published on Tesla's corporate blog doubled down on his intent to take the Company private at $420 per share. The post stated in part:

> Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.

> First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate

best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders.  Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term.  Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

*        *        *

First, I would like to structure this so that all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%).  My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX.  If we were to go private, employees would still be able to periodically sell their shares and exercise their options.  This would enable you to still share in the growing value of the company that you have all worked so hard to build over time. [. . .]

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders.  If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us.  Either way, the future is very bright and we'll keep fighting to achieve our mission.

Other Tesla senior executives actively promoted Musk's false statements concerning a proposed take-private transaction.  For example, Tesla's head of Investor Relations replied to multiple emails from several investment bank research analysts reaffirming the truth of Musk's tweets, as follows:

- "I can only say that the first Tweet clearly stated that 'financing is secured.'  ***Yes, there is a firm offer***;"

6

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL CASE NO. 3:18-CV-04865- EMC

- "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else.  *I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct*;" and

- "I would assume that given we went full-on public with this, *the offer is as firm as it gets.*"

All of these statements were false and misleading when made.  Musk had never discussed a going-private transaction at $420 per share with any potential funding source, had done nothing to investigate whether it would be possible for all current investors to remain with Tesla as a private company via a "special purpose fund," and had not confirmed support of Tesla's investors for a potential going private transaction.

Musk's tweets, and Tesla's statements in the Company's corporate blog post and in response to investment banking analysts, had the effect of reassuring the market that a take-private transaction was imminent.  As a result, Tesla's stock price surged, reaching an intraday high of $387.46 per share, before closing at $379.57 per share August 7, 2018, a nearly 11 percent jump from the previous closing price.

The next day, *The Wall Street Journal* reported that U.S. regulators were inquiring whether "Elon Musk was truthful when he tweeted that he had secured funding" for the proposed buyout of Tesla and that Securities and Exchange Commission ("SEC") officials wanted to know whether Musk had a "factual basis" for posting "that the going-private transaction was all but certain, with only a shareholder vote needed to pull it off."  On news of the SEC probe, Tesla's stock price fell $9.23 per share, or 2.43 percent, to close at $370.34 on August 8, 2018.

Thereafter, on August 9, 2018, *Bloomberg* reported that the SEC was "intensifying its scrutiny of Tesla, Inc.'s public statements in the wake of Elon Musk's provocative tweet Tuesday about taking the electric-car company private."  That same day, *Reuters* reported that the Tesla's board had "not yet received a detailed financing plan from Musk and specific information on who will provide the funding."  As a result of these additional disclosures, further indicating that Musk

1    lacked the funding necessary to take the Company private, Tesla's stock price fell an additional

2    $17.89 per share, or 4.83 percent, to close at $352.45 per share on August 9, 2018.

3            On August 10, 2018, the first of the Related Securities Actions was filed against

4    Defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC

5    Rule 10b-5 promulgated thereunder related to the August 7, 2018 tweets and email.

6            On August 13, 2018, Musk tweeted:  "I'm excited to work with Silver Lake and Goldman

7    Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as

8    legal advisors, on the proposal to take Tesla private."  The Company posted also on its corporate

9    blog an "Update on Taking Tesla Private," in which Defendant Musk stated that:

10           (i) he had notified the Board of his intention to take the Company private at $420 per
11           share on August 2, 2018;

12           (ii) the Board had agreed that as a next step, Musk would reach out to some of Tesla's
             largest shareholders;

13
             (iii) Musk personally felt that it would be more appropriate to reach out to all investors at
14           the same time, "speaking for [him]self as a potential bidder for Tesla;"

15           (iv) Musk had been approached by the Saudi Arabian sovereign wealth fund nearly two
16           years before about taking the Company private. This fund had recently acquired a 5%
             stake in the Company;

17
             (v) Musk had met with the Saudi Fund on July 31, 2018, and left the meeting "with no
18           question that a deal with the Saudi sovereign fund could be closed, and that it was just a
             matter of getting the process moving;"
19
             (vi) Most of the capital required for going private would be funded by equity rather than
20           debt; and

21           (vii) Musk intended to move forward by having further discussions with other investors.
22
             On August 13, 2018, *The New York Times* published an article entitled, "Tesla Board
23
     Surprised by Elon Musk's Tweet on Taking Carmaker Private," reporting that some members of
24
     Tesla's Board were "totally blindsided by Mr. Musk's decision to air his plan on Twitter," which
25
     had not been "cleared" by the Board.  Additionally, the Saudi fund referenced earlier by Musk
26
     "had taken none of the steps" that a potential going-private transaction would entail, *i.e.* preparing
27

28
     NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
     CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
     CASE NO. 3:18-CV-04865- EMC

a term sheet or hiring a financial adviser to work on the deal. According to the article, "in a conversation with an informal adviser about the mess he had gotten himself into, Mr. Musk said he had taken to Twitter impulsively. He said he had done so because he was not the kind of person who could hold things in, and was angry at the company's critics."

On August 14, 2018, *Bloomberg* published an article entitled, "Goldman's Missing Mandate Adds to Clues Musk Tweeted Out of Turn," reporting that neither Goldman Sachs nor Silver Lake were yet working with Musk pursuant to a signed agreement or in an official capacity when Musk stated on Twitter late Monday, August 13, 2018, both firms were working with him as financial advisers. Following these revelations, Tesla's stock price fell $8.77 per share, or 2.46 percent, to close at $347.64 per share on August 14. 2018.

On August 16, 2018, after the market close, *The New York Times* published an in-depth interview with Musk entitled, "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," which revealed the personal stress Musk had been under, his use of the drug Ambien and the manner in which the August 7, 2018 tweets had been conceived. On that same day, *The Wall Street Journal* reported that the "SEC is investigating whether Mr. Musk intentionally misled investors when he tweeted about the proposal in a bid to hurt short-sellers by driving up Tesla's stock price," citing a person familiar with the matter. The article further stated that "regulators are pressing Tesla's directors to reveal how much information Mr. Musk shared with them before he tweeted about it last week." On this news, Tesla's stock price fell $29.95 per share or 8.92 percent, to close at $305.50 per share on August 17, 2018.

Later developments have further confirmed that the Company had not secured funding as of August 7, 2018, directly contradicting Musk's tweets. On August 24, 2018, *CNBC* published an article entitled, "Elon Musk hiring Morgan Stanley probably closed the book on 'funding secured,'" reporting that hiring the bank essentially ended any doubt as to whether Musk had, in fact, secured funding for the deal. The article stated in relevant part: "Tesla CEO Elon Musk's hiring of Morgan Stanley this week is just a small step in his ongoing quest to take Tesla private. But it has a larger, more damning implication: he probably didn't have funding secured, even in

the most loose sense of the phrase."  This article further detailed the corporate measures that would need to be taken to hire an investment bank and conduct due diligence in order to take the Company private.

On August 24, 2018, after the market closed, Tesla revealed through a post on its corporate blog that it would remain a public company, adding that existing shareholders believed Tesla would be "better off as a public company."  Following this revelation, *The Associated Press* reported the following day:  "First it was the shocking tweet that funding was secured and Tesla may go private, then a statement that the money wasn't locked down after all.  Two weeks later it's never mind, the whole deal is off . . . .  Chaos, though, comes with a price.  Experts say it all could wind up with Tesla exposed to a fine for misleading investors.  And even though Musk has almost legendary status, the episode could further erode his credibility with stakeholders who have endured multiple broken promises and years of losses as a public company."

At the time of each of the above statements, Musk had not determined or even explored whether it would be possible:  (1) for individual investors to invest in Tesla if it was a private company; (2) for all current Tesla shareholders to remain invested if Tesla were to go private; (3) to create a "special purpose fund enabling anyone to stay with Tesla;" or (4) to hold liquidity events "every 6 months or so."  In fact, Musk later admitted, "I thought the vast majority of existing investors would want to maintain their stake, and we would find a vehicle for small investors to participate.  That latter part was a fundamental misunderstanding that I just did not know − I thought there would be some way to retain small investors, but there isn't."  Musk's statements regarding specific terms of a transaction to take Tesla private created the misleading impression that these terms had been decided upon when, in fact, they had not even been investigated or determined to be possible.

On September 27, 2018, the SEC filed a civil action against Musk in the Southern District of New York for making false and misleading statements about the purported going private

transaction.[2]  Two days later, on September 29, the SEC filed a civil action against Tesla for failing to implement disclosure controls or procedures with respect to Musk's public statements.[3]

Also on September 29, the SEC announced a settlement agreement with Musk and Tesla, under which:  (i) Musk would be required to resign as Chairman and be replaced by an independent Chairman; (ii) Tesla would appoint two new independent directors; (iii) the Company would establish a committee composed of independent board members charged with overseeing Musk's public comments; and (iv) Musk and Tesla would each pay a $20 million penalty to be "distributed to harmed investors under a court-approved process."  The SEC's announced settlement agreement with Musk and Tesla remains subject to judicial approval.  *See S.E.C. v. Musk.*

## III.    THE RELATED ACTIONS SHOULD BE CONSOLIDATED

The PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this title . . . has been filed," courts shall not appoint a lead plaintiff until "after the decision on the motion to consolidate is rendered."  15 U.S.C. § 78u-4(a)(3)(B)(ii).

The court retains broad discretion under Federal Rule of Civil Procedure 42(a) to consolidate cases pending in the same district when the actions involve common questions of law or fact.  Fed. R. Civ. P. 42(a); *Felix v. Symantec Corp.*, No. 18-02902 WHA, 2018 WL 4029053, at *1 (N.D. Cal. Aug. 23, 2018).  Courts in this Circuit have recognized that securities class actions are particularly amenable to consolidation pursuant to Rule 42(a) in order to, among other things, reduce duplication and minimize the expenditure of time and money for all parties.  *See Hardy v. MabVax Therapeutics Holdings*, No. 18-cv-01160, 2018 WL 4252345, at *1 (S.D. Cal. Sept. 6, 2018).

---

[2] *S.E.C. v. Elon Musk*, No. 1:18-cv-08865-AJN (S.D.N.Y.).
[3] *United States Securities and Exchange Commission v. Tesla, Inc.*, No. 1:18-cv-08947 (S.D.N.Y.).

Here, the nine Related Securities Actions each asserts similar claims against the same defendants arising from the same alleged misstatements and omissions.  Although some of the Related Securities Actions have differing class definitions and class periods, "[d]ifferences in causes of action, defendants or the class period do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy served by consolidation."  *Hardy*, 2018 WL 4252345, at *2. First New York respectfully submits that judicial efficiency and a just resolution of the parties' claims would be served by consolidating the Related Securities Actions.

## IV.   FIRST NEW YORK SHOULD BE APPOINTED LEAD PLAINTIFF

### A.   The PSLRA Standard For Appointment Of Lead Plaintiff

The PSLRA sets forth the Lead Plaintiff selection procedures for "each private right of action arising under the [Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure."  15 U.S.C. §§ 78u-4(a)(1) and (a)(3)(B).  Specifically, Section 21D(a)(3)(A)(i) of the Exchange Act, as amended by the PSLRA, provides that:

> Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class--
>
> (I)    of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II)   that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. § 78u-4(a)(3)(A)(i).

Section 21D(a)(3)(B)(i) directs the Court to consider any motions by a purported class member to serve as Lead Plaintiff in response to any such notice by no later than 90 days after the date of publication of the aforementioned notice.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(i).  Under this section, the Court shall consider any motion made by a class member and shall appoint as Lead

12

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
CASE NO. 3:18-CV-04865- EMC

Plaintiff the member or members that the Court determined to be "most capable of adequately representing the interests of class members." *Id*.

The PSLRA requires the Court to adopt a rebuttable presumption that the "most adequate plaintiff" to serve as Lead Plaintiff is the "person or group of persons" that:

> (aa) has either filed the complaint or made a motion in response to [the aforementioned] notice;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure

*See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  The presumption may only be rebutted by proof from a class member that the "most adequate plaintiff":  (i) "will not fairly and adequately protect the interests of the class," or (ii) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  As discussed more fully below, neither of these factors applies to First New York.

**B.** **First New York Has Satisfied The PSLRA Requirements And Should Be Appointed Lead Plaintiff**

First New York respectfully submits that it is the presumptive "most adequate plaintiff," and should be appointed Lead Plaintiff, because it has complied with PSLRA procedural requirements, holds the largest financial interest of any known movant, and otherwise satisfies the requirements of Fed. R. Civ. P. 23.

**1.** **This Motion Is Timely And Proper**

First New York has filed this motion to serve as Lead Plaintiff in a timely manner.  On August 10, 2018, the plaintiff in the first-filed action against Tesla published a notice of pendency of this action pursuant to Section 21D(a)(3)(A)(i) of the Exchange Act.  *See* Seltzer Decl., Ex. B. The notice advised putative class members of the pendency of the action, the specific legal claims asserted in the complaint, the proposed class period and the 60-day deadline by which other class members must move this Court to be appointed as Lead Plaintiff.  *See* 15 U.S.C. § 78u-

4(a)(3)(A)(i)(I) & (II).  The instant motion is being filed on October 9, 2018, which is within 60 days from the publication of the notice.  *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

First New York has also selected and retained competent counsel to represent it and other members of the Class.  The firm resumes of Entwistle & Cappucci and Susman Godfrey, First New York's choice of Co-Lead Counsel, are attached as Exhibit C and Exhibit D respectively, to the Seltzer Declaration.  Accordingly, First New York has satisfied the individual requirements of 15 U.S.C. § 78u-4(a)(3)(A)(i) and (a)(3)(B)(iii)(aa).

### 2. First New York Believes It Has The Largest Financial Interest In The Relief Sought By The Class

The PSLRA instructs the Court to adopt a rebuttable presumption that the "most adequate plaintiff" for appointment as Lead Plaintiff is the entity or group of persons that has the largest financial interest in the relief sought by the class.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  In order to do so, "the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit."  *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002).  In calculating a proposed lead plaintiff's financial stake in the litigation, the Ninth Circuit recommends that the district court "select accounting methods that are both rational and consistently applied."  *Id.*, n. 4.[4]

First New York is presently unaware of any other Class member with a larger financial interest in the outcome of this litigation who has sought to be appointed as Lead Plaintiff of the class.  Accordingly, First New York has the largest financial interest and is thus the presumptive "most adequate plaintiff."  15 U.S.C. § 78u-4(a)(3)(B)(iii).

### 3. First New York Satisfies Fed. R. Civ. P. 23

In addition to possessing the largest financial interest in the outcome of the litigation, the Lead Plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B).  Rule 23(a) provides that an action may be

---

[4] In the context of comparing various movants' financial stakes based on common stock transactions, courts in this Circuit typically consider the *Olsten-Lax* factors.  *See Knox v. Yingli Green Energy Holding Co. Ltd.*, 136 F. Supp. 3d 1159, 1163 (C.D. Cal. 2015) (citations and internal quotations omitted).

1    certified as a class action only if the following requirements are satisfied: (1) the class is so

2    numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of

3    law or fact common to the class ("commonality"); (3) the claims or defenses of the representative

4    parties are typical of the claims or defenses of the class ("typicality") and (4) the representative

5    parties will fairly and adequately protect the interests of the class ("adequacy"). *See* Fed. R. Civ.

6    P. 23(a).

7         The party moving for lead plaintiff need only make a preliminary showing of the

8    typicality and adequacy prongs of Rule 23(a) – those that directly address the personal

9    characteristics of the class representative – and defer examination of the remaining requirements

10   until the Lead Plaintiff moves for class certification. *See Cavanaugh*, 306 F.3d 726, 730-31 (9th

11   Cir. 2002) (vacating order appointing lead plaintiff); *Schriver v. Impac Mort. Holdings, Inc.*, No.

12   SACV 06-31 CJC (RNBx), 2006 WL 6886020, at *3 (C.D. Cal. May 2, 2006) (granting motion

13   for consolidation of related cases, appointment of lead plaintiff, and appointment of class

14   counsel); *Knox*, 136 F. Supp. 3d at 1165.

15        As set forth below, First New York satisfies both the typicality and adequacy

16   requirements of Rule 23.

17              a)   **First New York's Claims Are Typical Of The Class**

18        First New York meets the typicality requirements of Fed. R. Civ. P. 23(a)(3). Rule

19   23(a)(3) provides that the claims or defenses of the representative parties must be typical of those

20   of the class. *See* Fed. R. Civ. P. 23(a)(3). The "test of typicality is 'whether other members have

21   the same or similar injury, whether the action is based on conduct which is not unique to the

22   named plaintiffs, and whether other class members have been injured by the same course of

23   conduct.'" *Petersen v. Costco Wholesale Co.*, *Inc.*, No. SA CV 13-1292-DOC (JCGx), 2016 WL

24   6768911, at *3 (C.D. Cal. Nov. 15, 2016) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497,

25   508 (9th Cir. 1992) (denying motion to decertify class). Here, the claims asserted by First New

26   York are typical of, if not identical to, the potential claims of other class members, in that First

27   New York and other Class members must show:

28
15
Notice of Motion, Motion and Memorandum of FNY Investment Advisers, LLC for
Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel
Case No. 3:18-cv-04865- EMC

(a)     whether defendants violated the federal securities laws;

(b)     whether defendants made or failed to correct false and misleading statements;

(c)     whether defendants' conduct caused the market price of Tesla common stock to be artificially inflated during the Class Period and thereby caused the losses suffered by Class members; and

(d)     whether members of the Class have sustained damages and, if so, what is the proper measure of damages.

Because there are well-defined common questions of law and fact in this case, the claims asserted by First New York are typical of the claims of the members of the proposed Class.  *See Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 667 (C.D. Cal. 2005) (finding typicality requirement met when the proposed Lead Plaintiff "submitted a sworn certification indicating that he [traded the company's] securities and suffered losses during the class period.").   Thus, First New York's claims are typical of those of other Class members.

**b)  <u>First New York Will Fairly And Adequately Represent The Interests Of The Class</u>**

First New York also satisfies the adequacy requirements of Fed. R. Civ. P. 23(a) 4). Under Fed. R. Civ. P. 23(a)(4), the representative parties must "fairly and adequately protect the interests of the class."  The PSLRA directs the Court to limit its adequacy inquiry to the existence of any conflict between the interests of First New York and the members of the Class.  Thus, in determining whether adequacy under Fed. R. Civ. P. 23(a)(4) is satisfied, the Court inquires whether a proposed Lead Plaintiff has "a sufficient interest in the outcome of the case" and a "willingness . . . to vigorously prosecute the action."  *Tanne*, 226 F.R.D. at 667-68.  The Court also "assess[es] whether [the proposed Lead Plaintiff] has interests antagonistic to the class, and whether his counsel have the necessary capabilities and qualifications."  *Id*.

As evidenced by First New York's substantial losses resulting from Defendants' wrongdoing during the Class Period, its interests are clearly aligned with the interests of the members of the Class it seeks to represent.  There is also no evidence of any antagonism between

First New York's interests and those of the other members of the Class.  As detailed above, First New York shares identical or substantially similar questions of law and fact with the other members of the proposed Class and its claims are typical of the members of the Class.

Moreover, First New York has retained competent and experienced counsel to prosecute these claims and to investigate further the facts giving rise to this action.  First New York's proposed Co-Lead Counsel are highly qualified, experienced in the prosecution of class actions involving federal and state securities law claims, and able successfully to conduct this complex litigation on behalf of the Class.  Thus, First New York satisfies the typicality and adequacy requirements of Fed. R. Civ. P. 23 for the purposes of this motion.

### c)  First New York Is An Ideal Lead Plaintiff to Represent the Class

As an institutional investor, First New York also satisfies the PSLRA's goal of encouraging institutional investors to "take the reins" in securities class actions.  *See* H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 755 (1995) (explaining that "increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representations in securities class actions.").  Courts in this Circuit and others have noted this Congressional preference to appoint institutional investors, such as First New York, as Lead Plaintiffs in federal securities class actions.  *See, e.g., Pace v. Quintanilla*, No. SACV 14-2067-DOC (RNBx), 2014 WL 4180766, at *2 (C.D. Cal. Aug. 19, 2014) (Carter, J.) ("[C]ourts have found that small groups whose members have suffered substantial losses . . . are suitable lead plaintiffs.").

First New York is a sophisticated institutional investor with a substantial financial stake in this litigation and will have every incentive to vigorously pursue this case and obtain the best possible recovery for the Class.  Appointing First New York as Lead Plaintiff would satisfy the PSLRA's aim of having the Class represented by an institutional investor with a significant stake in the outcome of the litigation.

**V.      FIRST NEW YORK'S CHOICE OF LEAD COUNSEL SHOULD BE APPROVED**

As the presumptive Lead Plaintiff, First New York's selection of the law firms of Entwistle & Cappucci and Susman Godfrey to serve as Co-Lead Counsel, pursuant to 15 U.S.C. 78u-4(a)(3)(B)(v), should be approved by the Court.

As reflected in its firm resume, Entwistle & Cappucci possesses extensive experience litigating securities class actions, having successfully prosecuted some of the largest and highest-profile securities class actions in history (*See* Seltzer Decl., Ex. C).  Entwistle & Cappucci has distinguished itself as one of the nation's premier complex litigation firms, and currently serves as Lead Counsel or as a member of Plaintiffs' Executive Committee in many high-profile securities class actions pending throughout the country.

In recent years, Entwistle & Cappucci has secured billions of dollars in recoveries on behalf of defrauded public and private institutional investors, including:  *In re Royal Ahold, N.V. Secs & ERISA Litig.*, MDL-01539 (D. Md.) (obtaining $1.1 billion recovery for class of investors); and *In re BankAmerica Securities Litigation*, No. 99-1264-CEJ (E.D. Mo.) (obtaining $490 million recovery for class of investors).

Since the firm's founding in 1980, Susman Godfrey has served as lead counsel in hundreds of class actions and other complex commercial disputes in courts throughout the country.  Susman Godfrey's practice is dedicated exclusively to litigating and trying lawsuits. The firm has represented clients in some of the largest and most complex cases ever litigated, and has demonstrated that it has the ability and resources to handle those cases effectively and efficiently.

Susman Godfrey's experience, track record of success and staying power are reflected in its wide recognition as one of the nation's leading trial firms, including by *The American Lawyer* in its first-ever "Litigation Boutique of the Year" competition and, more recently, by being named in 2014 to *National Law Journal's* "America's Elite Trial Lawyers" list.  The firm's lawyers are consistently recognized as "Super Lawyers" and "Rising Stars" in the states where they practice. Susman Godfrey currently has just over 130 lawyers nationwide in its four offices, over 90% of

1    whom served as federal judicial law clerks.

2         Susman Godfrey has handled numerous private as well as class action cases resulting in

3    highly significant recoveries for defrauded investors.  Susman Godfrey will also provide the

4    members of the Class with unparalleled legal representation throughout the course of this

5    litigation.

6         Accordingly, the Court should approve First New York's selection of Entwistle &

7    Cappucci and Susman Godfrey as Co-Lead Counsel for the Class.

8    **VI.    CONCLUSION**

9         For the foregoing reasons, First New York respectfully requests that the Court:   (i)

10   consolidate all related actions pursuant to Rule 42(a); (ii) appoint First New York as Lead

11   Plaintiff for the Class; (iii) approve its selection of Entwistle & Cappucci and Susman Godfrey as

12   Co-Lead Counsel for the Lead Plaintiff and the Class; and (iv) grant such other relief as the Court

13   may deem just and proper.

14   Dated:  October 9, 2018              Respectfully submitted,

15                                        MARC M. SELTZER
                                          SUSMAN GODFREY L.L.P.
16
                                          ANDREW J. ENTWISTLE *(Pro Hac Vice* to be submitted*)*
17                                        ARTHUR V. NEALON *(Pro Hac Vice* to be submitted*)*
                                          ROBERT N. CAPPUCCI *(Pro Hac Vice* to be submitted*)*
18
                                          ENTWISTLE & CAPPUCCI LLP
19
                                          By:    */s/ Marc M. Seltzer*
20                                                   Marc M. Seltzer
                                          *Counsel for Proposed Lead Plaintiff FNY Investment*
21                                        *Advisers, LLC and Proposed Lead Counsel for the Class*

22

23

24

25

26

27

28

NOTICE OF MOTION, MOTION AND MEMORANDUM OF FNY INVESTMENT ADVISERS, LLC FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL
CASE NO. 3:18-cv-04865- EMC