**Exhibit H**

**KELLER LENKNER LLC**
Ashley C. Keller (*admitted pro hac vice*)
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Telephone: (312) 741-5222
ack@kellerlenkner.com

**KELLER LENKNER LLC**
U. Seth Ottensoser (*admitted pro hac vice*)
1330 Avenue of the Americas, Suite 23A
New York, NY 10019
Telephone: (212) 653-9715
so@kellerlenkner.com

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
David J. Schwartz
Francis P. McConville
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
dschwartz@labaton.com
fmcconville@labaton.com

*Co-Counsel for Lead Plaintiff and the Class*
[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE TESLA INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION OF LEAD PLAINTIFF TO PARTIALLY LIFT THE PSLRA DISCOVERY STAY; MEMORANDUM OF LAW IN SUPPORT THEREOF** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

I.     INTRODUCTION ................................................................................................... 1

II.    STATEMENT OF RELEVANT FACTS ............................................................... 2

III.   ARGUMENT .......................................................................................................... 4

       A.     The Requested Discovery Is Sufficiently Particularized ........................... 4

       B.     The Requested Discovery Is Necessary to Prevent Undue Prejudice to
              Lead Plaintiff ............................................................................................... 5

       C.     Defendants Will Not Be Unduly Burdened By Producing Documents
              Already Produced Elsewhere ....................................................................... 9

IV.    CONCLUSION ..................................................................................................... 10

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*In re Bank of Am. Corp. Sec., Derivative & Emp't Ret. Income Security Act*
5     *(ERISA) Litig.*,
   No. 09 MDL 2058 (DC), 2009 WL 4796169 (S.D.N.Y. Nov. 16, 2009) ...........................9, 10

6

*In re China Intelligent Lighting and Elecs., Inc. Sec. Litig*,
7     No. CV 11-2768, 2012 WL 538267 (C.D. Cal. Feb. 14, 2012) ................................................8

8

*In re Delphi Corp. Sec. Derivative, & "ERISA" Litig.*,
   MDL No. 1725, 2007 WL 518626 (E.D. Mich. Feb. 15, 2007) ...............................................5
9

10

*In re Equifax Inc. Sec. Litig.*,
   No. 1:17-CV-3463-TWT, 2018 WL 3023278 (N.D. Ga. June 18, 2018)............................4, 7

11

*In re FirstEnergy Corp. Sec. Litig.*,
12     229 F.R.D. 541 (N.D. Ohio 2004) .......................................................................................5, 6

13

*Frank v. Dana Corp.*,
   No. 3:05-cv-7393, 2007 WL 1748887 (N.D. Ohio June 18, 2007) ...................................4, 5, 7
14

15

*Gruber v. Gilbertson*,
   No. 16-cv-9727, 2017 WL 3891701 (S.D.N.Y. Sept. 5, 2017) ...............................................5

16

*In re LaBranche Sec. Litig.*,
17     333 F. Supp. 2d 178 (S.D.N.Y. 2004)...............................................................................6, 7, 8

18

*In re Massey Energy Co. Sec. Litig.*,
   No. 5:10–0689, 2011 WL 4528509 (S.D.W. Va. Sept. 28, 2011) ..........................................6
19

20

*Med. Imaging Ctrs. of Am. v. Lichtenstein*,
   917 F. Supp. 717 (S.D. Cal. 1996) .........................................................................................6

21

*In re Metropolitan Sec. Litig.*,
22     No. CV-04-25-FVS, 2005 WL 940898 (E.D. Wash. Mar. 31, 2005).....................................10

23

*N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*,
   No. 14-11191, 2015 WL 1565462 (E.D. Mich. Apr. 8, 2015) ...............................................6
24

25

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   No. 4:08CV0160, 2010 WL 1628059 (N.D. Ohio Apr. 22, 2010) .........................................7

26

*Pension Trust Fund for Operated Eng'rs v. Assisted Living Concepts, Inc.*,
27     943 F. Supp. 2d 913 (E.D. Wis. 2013).....................................................................................6

28

*In re Rambus, Inc. Sec. Litig.*,
   No. C 06-4346 JF (HRL), 2007 WL 1430047 (N.D. Cal. May 14, 2007)................................8

*In re Royal Ahold N.V. Sec. & Erisa Litig.*,
   220 F.R.D. 246 (D. Md. 2004)........................................................................................5, 9

*Seippel v. Sidley, Austin, Brown & Wood LLP*,
   No. 03 Civ. 6942, 2005 WL 388561 (S.D.N.Y. Feb. 17, 2005) ....................................6

*SG Cowen Sec. Corp. v. U.S. Dist. Ct.*,
   189 F.3d 909 (9th Cir. 1999) ........................................................................................8

*Turocy v. El Pollo Loco*,
   No. CV 15-1343, 2017 WL 2495172 (C.D. Cal. May 10, 2017) ...................................9

*In re Tyco Int'l Ltd. Multidistrict Litig.*,
   MDL No. 02-1335-B, 2003 WL 23830479 (D.N.H. Jan. 29, 2003)................................9

*Waldman v. Wachovia Corp.*,
   No. 08 Civ. 2913(SAS), 2009 WL 86763 (S.D.N.Y. Jan. 12, 2009)................................4, 5, 6

*In re Worldcom, Inc. Sec. Litig.*,
   234 F. Supp. 2d 301 (S.D.N.Y. 2002)................................................................................7, 9

**Rules & Statutes**

15 U.S.C. § 78u-4(b) et seq................................................................................... *passim*

1

**NOTICE OF MOTION AND MOTION**

2

**TO:  ALL PARTIES AND THEIR COUNSEL OF RECORD**

3

      **PLEASE TAKE NOTICE** that Andrew E. Left, PROtecto Informatikai Szolgáltató

4

Korlátolt Felelősségű Társaság, Thierry Boutin, Dr. Abrar Shirazi, and Vilas Capital

5

Management, LLC (collectively, "Lead Plaintiff"), individually and on behalf of a class of

6

similarly situated persons and entities, by their undersigned attorneys, hereby move this Court in

7

Courtroom 5-17th Floor of the Honorable Edward M. Chen at the United States District Court,

8

Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San

9

Francisco, California 94102, on _____ at 1:30 p.m., or as soon thereafter as the matter may

10

be heard, for the entry of an Order: (1) to partially lift the discovery stay imposed by the Private

11

Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), and (2)

12

for the production of certain documents related to the settlement between Elon R. Musk and the

13

U.S. Securities Exchange Commission ("SEC"), as well as documents related to the settlement

14

between Tesla, Inc. and the SEC.

15

      This Motion is based upon the accompanying Memorandum of Law in support thereof,

16

the Declaration of James M. Wagstaffe ("Wagstaffe Decl.") filed herewith, and other filings

17

herein, and such other written or oral argument as may be permitted by the Court.

18

**I.    INTRODUCTION**

19

      Lead Plaintiff requests the Court partially lift the automatic PSLRA discovery stay for the

20

limited purpose of obtaining a clearly defined and identifiable set of documents, *i.e.*, those that

21

have already been produced to the SEC in its respective investigations and settlements with Elon

22

R. Musk ("Musk"), and Tesla, Inc. ("Tesla" or the "Company")(together, "Defendants") that are

23

directly related to the above-captioned action. The allegations in the above-captioned action

24

concern Defendants' materially false and misleading statements made to harm the Company's

25

short-sellers by artificially inflating the price of Tesla's stock, which in the process, injured many

26

27

28

investors of Tesla. ¶ 5.[1] Specifically, Defendant Musk artificially manipulated the price of Tesla securities with objectively false tweets regarding taking the company private and that the funding had been secured to do so.  ¶¶ 32–33. This was done in order to "burn" the Company's short-sellers, with whom Musk has had an open and longstanding feud.  ¶ 31. In the succeeding days, the truth regarding the supposedly "secure" financing needed to effectuate the going-private transaction began to emerge, exposing the fraudulent scheme, and in the process, injuring Class Period investors as the price of Tesla securities deteriorated rapidly.  ¶¶ 37–49.

The statements made by Musk and Tesla during the Class Period spurred an investigation by the SEC, which in turn caused the SEC to file complaints against Musk and Tesla, which were both expeditiously settled. Both Musk and the Company are now facing a veritable torrent of civil litigation.  As the litigation landscape is in a constant state of flux, Lead Plaintiff and the Class will be severely prejudiced if they are unable to access the same information that the Defendants have already produced to the SEC.  A modification of the PSLRA discovery stay is, therefore, necessary in this limited regard.

Moreover, this motion does not implicate any of the Congressional concerns underlying the stay of discovery under the PSLRA.  That is, there is little danger that the proposed discovery is a mere "fishing expedition" intended to coerce the settlement of an unmeritorious action.  To the contrary, it is clear from the expedited SEC investigation, prosecution, and subsequent settlements that this Action is far from meritless.

In sum, the limited relief requested herein is necessary to ensure that Lead Plaintiff and the Class are not unduly prejudiced by being the only party excluded from access to relevant sources of evidence regarding the circumstances that gave rise to this Action.

## II.   STATEMENT OF RELEVANT FACTS

Between August 7, 2018 through August 17, 2018, both dates inclusive (the "Class Period"), Defendants made numerous false and misleading statements concerning taking the company private, and that funding had been secured to do so. Specifically, on August 7, 2018,

---

[1] All citations to "¶ __" herein refer to paragraphs of the Class Action complaint that was filed in *Left v. Tesla, Inc.*, No. 3:18-cv-05463-EMC (N.D. Cal. Sept. 6, 2018).  *See* ECF No. 1.

1  Musk tweeted that he was considering taking the Company private for $420 a share, and that

2  funding had been secured. ¶¶ 5, 32–34. These initial statements caused the Company's stock to

3  boom in value, closing at $397.57 per share, nearly an 11 percent jump from the previous day's

4  closing price. ¶¶ 6, 36.

5          The truth would begin to emerge, however, late in the day on August 8, 2018 when *The*

6  *Wall Street Journal* published an article reporting an SEC probe into the validity of Musk's

7  statements. ¶¶ 7, 37. On news of the uncertainty of the deal, and the SEC probe, Tesla's stock

8  price fell $9.23 per share, or 2.43 percent, to close at $370.34 on August 8, 2018. ¶¶ 8, 38.  The

9  next day, on August 9, 2018, Tesla's stock price to fall $17.89 per share, or 4.83 percent, to close

10  at $352.45 per share on August 9, 2018. ¶¶ 11, 41.

11          On August 13, 2018, Musk tweeted that he had retained Goldman Sachs and Silver Lake

12  as financial advisors, as well as Wachtell, Lipton, Rosen & Katz and Munger, Tolles, & Olsen as

13  legal advisors in connection with taking the Company private. ¶ 42. On the heels of this tweet,

14  Tesla's stock price again sky-rocketed to an intra-day high of over $363 per share.   This

15  statement would be refuted, however, in an August 14, 2018 *Bloomberg* article, reporting that

16  neither named financial advisor was currently working with Musk in a professional capacity.

17  ¶¶ 13, 45. These revelations would cause Tesla stock to decline by $8.77 per share, or 2.46

18  percent, closing at $347.64 on August 14, 2018. ¶¶ 14, 46.

19          The truth would finally come out on August 16, 2017, when, in a *New York Times*

20  interview, Musk admitted that his August 7, 2018 statements had been made while under the

21  effects of the drug Ambien, thus fully revealing to investors that funding had not been secured

22  when he first tweeted about taking the company private. ¶¶ 16, 47. This final revelation to the

23  market as to the falsity of Musk's previous statements would cause Tesla stock to fall by $29.95

24  per share, or 8.92 percent, to close at $305.50 per share on August 17, 2018.

25          In connection with their investigation, the SEC filed a complaint against Musk on

26  September 27, 2018, and filed a complaint against the Company on September 29, 2018, alleging

27  that Musk's August 7, 2018 tweets were false and misleading. *See* Wagstaffe Decl. Ex. A. Both

28  were settled on September 29, 2018, and under the terms of the settlement, Defendants agreed to

1   pay a cumulative $40 million dollar fine; within 45 days of the settlement, Musk would step

2   down as Chairman of the Company for at least three years; the Company would appoint two

3   additional independent Board members; and the Company would keep heightened oversight over

4   all Musk's communications with investors.

5   ## III.   ARGUMENT

6          The Court should partially lift the PSLRA discovery stay because Lead Plaintiff readily

7   meets the exception to the stay articulated by Congress and the courts. The PSLRA's discovery

8   stay is not absolute. Rather, the PSLRA expressly contemplates that the stay of discovery during

9   the pendency of a motion to dismiss can be lifted or modified under appropriate circumstances:

10         In any private action arising under this chapter, all discovery and other
           proceedings shall be stayed during the pendency of any motion to dismiss, unless
11         the court finds upon the motion of any party that particularized discovery is
           necessary to preserve evidence or to prevent undue prejudice to that party.
12

13   15 U.S.C. § 78u-4(b)(3)(B).

14         Here, Lead Plaintiff's request to obtain limited discovery, *i.e.*, documents that have

15   already been produced to the SEC, is appropriate because: (1) the requested discovery is

16   sufficiently particularized; (2) it is necessary to prevent undue prejudice to Lead Plaintiff; and (3)

17   Defendants will not be unduly burdened.

18         **A.      The Requested Discovery Is Sufficiently Particularized**

19         Where a party requests discovery limited to an identifiable set of documents, courts have

20   found discovery sufficiently particularized. *See, e.g.*, *Waldman v. Wachovia Corp.*, No. 08 Civ.

21   2913(SAS), 2009 WL 86763, at *1 (S.D.N.Y. Jan. 12, 2009) ("It is undisputed that the discovery

22   plaintiffs request is sufficiently particularized, *as it is limited to a set of documents already*

23   *provided to state and federal regulators*.") (emphasis added); *see also In re Equifax Inc. Sec.*

24   *Litig.*, No. 1:17-CV-3463-TWT, 2018 WL 3023278, at *6 (N.D. Ga. June 18, 2018) (noting that

25   courts have found particularity requirement has been met in regards to "*information that has*

26   *been made available to regulators and plaintiffs in other actions*") (emphasis added) (citing *In re*

27   *Tyco Int'l Ltd. Multidistrict Litig.*, MDL No. 02-1335-B, 2003 WL 23830479, at *4 (D.N.H. Jan.

28   29, 2003)); *Frank v. Dana Corp.*, No. 3:05-cv-7393, 2007 WL 1748887, at *2 (N.D. Ohio June

18, 2007) (finding a discovery request sufficiently particularized because "[p]laintiff's request is for a 'clearly defined universe of documents'; namely, *those previously given to the SEC surrounding a similar information request*.") (emphasis added) (quoting *In re Worldcom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002)).

Moreover, courts have specifically held that "[a] request for documents previously produced *in connection with related investigations* is particularized under the PSLRA." *Id.* (emphasis added); *see also Gruber v. Gilbertson*, No. 16-cv-9727, 2017 WL 3891701, at *2 (S.D.N.Y. Sept. 5, 2017) (finding, among other things, that requesting documents already produced to the SEC was sufficiently particularized); *Waldman*, 2009 WL 86763, at *1 ("It is undisputed that the discovery plaintiffs request is sufficiently particularized, as it is *limited to a set of documents already provided to state and federal regulators*) (emphasis added); *In re Delphi Corp. Sec. Derivative, & "ERISA" Litig.*, MDL No. 1725, 2007 WL 518626, at *6 (E.D. Mich. Feb. 15, 2007) ("Lead Plaintiffs have adequately specified the target of the requested discovery: They only request the production of materials that have already been assembled and produced to Delphi's internal investigators and the federal authorities."); *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004) ("Lead Plaintiff's request is limited to the closed universe of materials that *FirstEnergy has already produced for government investigators* and the federal grand jury.") (emphasis added).

Here, as enumerated in Wagstaffe Decl. Ex B, Lead Plaintiff's request relates to an identifiable universe of documents, *i.e.*, those documents already produced by Musk and the Company in connection with the SEC investigations and settlements.  By so limiting the request, Lead Plaintiff has identified a "clearly defined universe of documents" that easily meets the particularity requirements of the PSLRA. *Royal Ahold N.V. Sec. & Erisa Litig.*, 220 F.R.D. 246, 250 (D. Md. 2004) (quoting *In re Worldcom*, 234 F. Supp. 2d at 306). Accordingly, Plaintiff's requested discovery is sufficiently particularized under the PSLRA.

### B.     The Requested Discovery Is Necessary to Prevent Undue Prejudice to Lead Plaintiff

Lead Plaintiff will suffer undue prejudice if it does not obtain access to the particularized

discovery sought. A key factor in determining whether to grant relief from the PSLRA discovery stay is whether production is necessary "to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B). Courts define undue prejudice as an "improper or unfair treatment rising to a level somewhat less than irreparable harm." *In re Massey Energy Co. Sec. Litig.*, No. 5:10–0689, 2011 WL 4528509, at *6 (S.D.W. Va. Sept. 28, 2011) (quoting *In re CFS-Related Sec. Fraud Litig.*, 179 F. Supp. 2d 1260, 1265 (N.D. Okla. 2001)); *see also N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, No. 14-11191, 2015 WL 1565462, at *3 (E.D. Mich. Apr. 8, 2015) (collecting cases). This concept attempts to "balance the competing concerns of maintaining truth and integrity in the marketplace while curbing meritless litigation." *Med. Imaging Ctrs. of Am. v. Lichtenstein*, 917 F. Supp. 717, 721 (S.D. Cal. 1996).

Courts have found undue prejudice "where the plaintiff lacks access to documents *already produced to governmental and other agencies* and in other lawsuits." *N.Y. State Teachers' Ret. Sys.*, 2015 WL 1565462, at *3 (emphasis added); *see also Pension Trust Fund for Operated Eng'rs v. Assisted Living Concepts, Inc.*, 943 F. Supp. 913, 916 (E.D. Wis. 2013) (finding undue prejudice due to "informational disadvantage" where Defendants were, among other things, being "investigated by the SEC, and [] facing other lawsuits"); *Seippel v. Sidley, Austin, Brown & Wood LLP*, No. 03 Civ. 6942, 2005 WL 388561, at *2 (S.D.N.Y. Feb. 17, 2005) (finding that in the context of numerous ongoing government investigations and private lawsuits, plaintiffs "will be prejudiced if they *lack access to documents which have been produced to others*") (emphasis added); *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 181 (S.D.N.Y. 2004) (noting courts have held that the statutory criteria for modification of the stay are met in "securities class actions involving *concurrent investigations by government agencies when doing so would not frustrate Congress' purposes in enacting the PSLRA*.") (emphasis added); *Waldman*, 2009 WL 86763, at *2 (citing *LaBranche* and granting motion to partially lift PSLRA stay where documents subject to discovery had previously been produced and plaintiffs needed documents to determine whether to pursue case); *FirstEnergy*, 229 F.R.D. at 545 (lifting stay to permit Lead Plaintiffs to obtain documents produced to government entities).

1    Specifically, Lead Plaintiff will be "the only major interested party in the criminal and

2    civil proceedings" lacking core documents, and will thus be "prejudiced by . . . inability to make

3    informed decisions about . . . litigation strategy in a rapidly shifting landscape." *In re WorldCom*,

4    234 F. Supp. 2d at 305. As set forth above, not only did the SEC investigate Musk's false

5    statements about taking the Company private, but subsequently and very quickly reached

6    multimillion dollar settlements with Defendants. *See In re Labranche*, 333 F. Supp. 2d at 180–84

7    (lifting stay where regulatory investigations concerned same facts as civil action and

8    multimillion dollar settlement had been reached). These investigations and settlements relate

9    directly to allegations in the Complaint. *See Id.*  Furthermore, some of these documents and

10   evidence have already become public in connection with the SEC complaint against Musk.

11   Thus, denying Plaintiffs evidence obtained by the SEC regarding near identical claims would be

12   an unduly prejudicial informational handicap.

13          As the current litigation landscape surrounding Defendants is in a constant state of flux,

14   limited discovery is crucial for Lead Plaintiff to evaluate its litigation strategy in pursuing the

15   Action.  For example, "whether or not to seek an early settlement to benefit the class without

16   further expense," in light of Defendants' multi-million dollar settlement with the SEC.  *In re*

17   *Labranche*, 333 F. Supp. at 184; *see also In re Equifax Inc. Sec. Litig.*, 2018 WL 3023278, at *2

18   ("Without allowing [Lead Plaintiff] to engage in the requested case management and discovery

19   planning efforts, the Lead Plaintiff will fall behind the parties in the parallel proceedings and will

20   be disadvantaged in making important decisions about how to proceed with the case."); *Cf. Ohio*

21   *Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2010 WL 1628059, at

22   *4 (N.D. Ohio Apr. 22, 2010) ("unlike *In re Worldcom*, . . . there are no ongoing settlement

23   discussions in the case at bar"); *Frank*, 2007 WL 1748887, at *4) ("The plaintiffs' strongest

24   argument in favor of the discovery they seek is that what they want is readily available and has

25   already been provided to the SEC, and its production entails no further intrusion into the affairs

26   or time of the company or defendants. Other courts have upheld discovery of documents

27   submitted in response to SEC requests. Those cases involved, however, circumstances in which

28

settlement negotiations either were underway, or the defendants had already made settlement payments.") (internal citations omitted).

Lead Plaintiff does not seek to lift the stay to launch a "fishing expedition" in order to meet the heightened pleading standards of the PSLRA—which it strongly believes the Complaint has already done—but instead to better traverse and strategize moving forward in light of the recent SEC settlements. *Compare In re Rambus, Inc. Sec. Litig.*, No. C 06-4346 JF (HRL), 2007 WL 1430047, at *2 (N.D. Cal. May 14, 2007) (upon finding that the plaintiff was not unduly prejudiced in their inability to discover individual defendants the court held that "as a matter of law, failure to muster facts sufficient to meet the [PSLRA's] pleading requirements cannot constitute the requisite 'undue prejudice' to justify a lift of the discovery stay.") (quoting *SG Cowen Sec. Corp. v. U.S. Dist. Ct.*, 189 F.3d 909, 913 (9th Cir. 1999)).

Finally, the proposed discovery is not contrary to the Congressional intent underlying the PSLRA.  In enacting the PSLRA's discovery stay provision, Congress "intended to prevent unnecessary imposition of discovery costs on defendants," and prevent plaintiffs from "conduct[ing] discovery so that they might uncover facts sufficient to satisfy the [PSLRA's] pleading requirements." *SG Cowen Sec. Corp.*, 189 F.3d at 911–12 (quoting H.R. Conf. Rep. No. 104–369, at 32 (1995), *reprinted in* 1995 U.S.CC.AN. 731); *see also In re China Intelligent Lighting and Elecs., Inc. Sec. Litig*, No. CV 11-2768, 2012 WL 538267, at *3 (C.D. Cal. Feb. 14, 2012) (noting that "coerc[ion] of an early settlement," or an improper quest to "discover some unalleged sustainable claim" would "contravene the purposes of the PSLRA's discovery stay"); *LaBranche*, 333 F. Supp. 2d at 181 (stating purpose of the PSLRA stay provision is "to protect defendants in actions . . . from the burden and expense of premature discovery" and to "prevent plaintiffs from filing securities fraud lawsuits as a vehicle in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint") (internal quotations omitted) (quoting *In re Vivendi Universal S.A., Sec. Litig.* No 02 Civ. 5571, 2003 WL 21035383, at *1 (S.D.N.Y. May 5, 2003)).  Importantly, however, courts have also held that "[m]aintaining the discovery stay as to materials *already provided to other entities and plaintiffs does not further*

1  the policies behind the PSLRA." *Turocy v. El Pollo Loco*, No. CV 15-1343, 2017 WL 2495172,

2  at *2 (C.D. Cal. May 10, 2017) (emphasis added).

3       In the current action, there is ample evidence that Lead Plaintiff's action is not the type of

4  "strike suit" Congress envisioned when enacting the stay, and Lead Plaintiff is fully confident in

5  the sufficiency of the Complaint.  This is a textbook example of securities fraud.  In addition, the

6  speed of the SEC's investigation, inquiry, prosecution, and settlements, offer ample assurance

7  that Plaintiffs' allegations are far from frivolous. *Royal Ahold N.V.*, 220 F.R.D. at 251 (lifting

8  stay with respect to documents produced to the government, in part, because "the securities

9  plaintiffs' case, whatever its ultimate disposition, is far from frivolous"); *In re Tyco Int'l Ltd.*,

10  2003 WL 23830479, at *4 (lifting stay where "none of the claims at issue are frivolous").

11      **C.**    **Defendants Will Not Be Unduly Burdened By Producing Documents Already Produced Elsewhere**

12       In contemplating whether lifting the PSLRA discovery stay is appropriate in a given case,

13  courts may take all facts into account to determine whether undue burden on the defendant

14  would exist.  *In re WorldCom*, 234 F. Supp. 2d at 306. "Courts weigh the burden to defendants

15  against the potential prejudice to plaintiffs, focusing on the production costs to defendants and

16  plaintiffs' need for early review of the documents." *In re Bank of Am. Corp. Sec., Derivative &*

17  *Emp't Ret. Income Security Act (ERISA) Litig.*, No. 09 MDL 2058 (DC), 2009 WL 4796169, at

18  *2 (S.D.N.Y. Nov. 16, 2009). Here, the prejudice to plaintiffs outweighs the burden, if any, to

19  defendants.

20       Where, as here, the documents have *already* been gathered, reviewed, and produced, the

21  burden is close to nil. *Id.* at *2, *6 ("The burden on defendants 'is slight when a defendant has

22  already found, reviewed and organized the documents.'") (quoting *Waldman*, 2009 WL 86763, at

23  *2) (internal quotations omitted). As one court observed: "The PSLRA was also designed to

24  protect defendants from unnecessary discovery costs, but here, since the requested documents

25  have already been found, compiled, and indexed, and Plaintiffs have agreed to pay all reasonable

26  production costs, the defendants will not be unduly burdened by producing the documents to

27  Plaintiffs." *In re Metropolitan Sec. Litig.*, No. CV-04-25-FVS, 2005 WL 940898, at *3 (E.D.

28

1    Wash. Mar. 31, 2005).

2          Here too, the documents sought, as enumerated in Wagstaffe Decl Ex. B, have already

3    been gathered, reviewed, and produced to the SEC, and Lead Plaintiff is willing to pay all

4    reasonable copying and production costs. As such, the burden of "making another copy for

5    plaintiffs here will be slight" on Defendants should the Court grant the relief requested herein. *In

6    re Bank of Am.*, 2009 WL 4796169, at *3

7    **IV.     CONCLUSION**

8          For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (1) partially

9    lift the discovery stay imposed by the PSLRA, 15 U.S.C. § 78u-4(b)(3)(B), and (2) permit the

10   production of certain documents related to the settlement between Defendants and the SEC.

11   DATED: _____, 2018

12                                                     Respectfully submitted,

13                                                     */s/ James M. Wagstaffe*

14                                                     James M. Wagstaffe (#95535)

15                                                     **KERR & WAGSTAFFE LLP**
                                                       Frank Busch (#258288)

16                                                     101 Mission Street, 18th Floor
                                                       San Francisco, CA 94105

17                                                     Telephone: (415) 371-8500
                                                       Facsimile: (415) 371-0500

18                                                     wagstaffe@kerrwagstaffe.com

19                                                     busch@kerrwagstaffe.com

20                                                     *Liaison Counsel for the Class*

21                                                     **KELLER LENKNER LLC**
                                                       Ashley C. Keller (*admitted pro hac vice*)

22                                                     150 N. Riverside Plaza, Suite 4270
                                                       Chicago, IL 60606

23                                                     Telephone: (312) 741-5222
                                                       ack@kellerlenkner.com

24

25                                                     **KELLER LENKNER LLC**
                                                       U. Seth Ottensoser (*admitted pro hac vice*)

26                                                     1330 Avenue of the Americas, Suite 23A
                                                       New York, NY 10019

27                                                     Telephone: (212) 653-9715
                                                       so@kellerlenkner.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
David J. Schwartz
Francis P. McConville
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
dschwartz@labaton.com
fmcconville@labaton.com

*Co-Counsel for Lead Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE TESLA INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC |
| | **CLASS ACTION** |
| | **[PROPOSED] ORDER GRANTING LEAD PLAINTIFF'S MOTION TO PARTIALLY LIFT THE PSLRA DISCOVERY STAY** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Having reviewed Lead Plaintiff's Motion to Partially Lift the PSLRA Discovery Stay (the

2    "Motion"), the accompanying Declaration of James M. Wagstaffe, any papers filed in opposition

3    thereto or in support thereof, as well as the files in the case and any argument presented, and for

4    good cause shown,

5    IT IS HEREBY ORDERED that:

6        1.    Lead Plaintiff's Motion is GRANTED;

7        2.    The PSLRA stay of discovery is partially lifted as provided herein; and

8        3.    Defendants shall timely provide to Andrew E. Left, PROtecto Informatikai

9    Szolgáltató Korlátolt Felelősségű Társaság, Thierry Boutin, Dr. Abrar Shirazi, and Vilas Capital

10   Management, LLC (collectively, "Lead Plaintiff"), all documents in Defendants' possession in

11   connection with the U.S. Securities and Exchange Commission's investigation, inquiry,

12   prosecution, and settlement with Defendants Tesla, Inc. and Elon R. Musk, relating to the above-

13   captioned action.

14   **IT IS SO ORDERED.**

15

16   DATED:_____, 2018

17                                                    _____
                                                      HONORABLE EDWARD M. CHEN
                                                      UNITED STATES DISTRICT JUDGE
18                                                    NORTHERN DISTRICT OF CALIFORNIA

19

20

21

22

23

24

25

26

27

28

1  **KELLER LENKNER LLC**
   Ashley C. Keller (*admitted pro hac vice*)
2  150 N. Riverside Plaza, Suite 4270
   Chicago, IL 60606
3  Telephone: (312) 741-5222
4  ack@kellerlenkner.com

5  **KELLER LENKNER LLC**
   U. Seth Ottensoser (*admitted pro hac vice*)
6  1330 Avenue of the Americas, Suite 23A
   New York, NY 10019
7  Telephone: (212) 653-9715
8  so@kellerlenkner.com

9  **LABATON SUCHAROW LLP**
   Christopher J. Keller
10 Eric J. Belfi
   David J. Schwartz
11 Francis P. McConville
   140 Broadway
12 New York, NY 10005
   Telephone: (212) 907-0700
13 Facsimile: (212) 818-0477
   ckeller@labaton.com
14 ebelfi@labaton.com
   dschwartz@labaton.com
15 fmcconville@labaton.com
16

17 *Co-Counsel for Lead Plaintiff and the Class*
   [Additional counsel on signature page]
18

19            **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
20               **SAN FRANCISCO DIVISION**

21 | | Case No. 3:18-cv-04865-EMC |
22 | IN RE TESLA INC. SECURITIES | **CLASS ACTION** |
23 | LITIGATION | |
   | | **DECLARATION OF JAMES M.** |
24 | | **WAGSTAFFE IN SUPPORT OF LEAD** |
   | | **PLAINTIFF'S MOTION TO PARTIALLY** |
25 | | **LIFT THE PSLRA DISCOVERY STAY** |
26

27

28

I, James M. Wagstaffe, hereby declare as follows:

I am a member in good standing of the bar of the State of California and am admitted to practice before this Court.  I am a partner at Kerr & Wagstaffe LLP, Liaison Counsel for the Class.  I respectfully submit this Declaration in Support of Lead Plaintiff's Motion to Partially Lift the PSLRA Discovery Stay, for the entry of an Order granting Lead Plaintiff's Motion to Partially Lift the PSLRA Discovery Stay.

Attached as Exhibits A and B are true and correct copies of the following documents:

EXHIBIT A:   Complaints filed by the U.S. Securities and Exchange Commission against Elon Musk and Tesla Inc. on September 27, 2018 and September 29, 2018, respectively; and

EXHIBIT B:   List enumerating documents requested.

Dated: _____, 2018

Respectfully submitted,

*/s/ James M. Wagstaffe*

James M. Wagstaffe (#95535)
**KERR & WAGSTAFFE LLP**
Frank Busch (#258288)
101 Mission Street, 18th Floor
San Francisco, CA 94105
Telephone: (415) 371-8500
Facsimile: (415) 371-0500
wagstaffe@kerrwagstaffe.com
busch@kerrwagstaffe.com

*Liaison Counsel for the Class*

**Exhibit A**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action No. 1:18-cv-8865 |
| | : | |
| ELON MUSK, | : | Jury Trial Demanded |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

_____  :

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges as follows:

### SUMMARY

1.      This case involves a series of false and misleading statements made by Elon Musk, the Chief Executive Officer of Tesla, Inc. ("Tesla"), on August 7, 2018, regarding taking Tesla, a publicly traded company, private.  Musk's statements, disseminated via Twitter, falsely indicated that, should he so choose, it was virtually certain that he could take Tesla private at a purchase price that reflected a substantial premium over Tesla stock's then-current share price, that funding for this multi-billion dollar transaction had been secured, and that the only contingency was a shareholder vote.  In truth and in fact, Musk had not even discussed, much less confirmed, key deal terms, including price, with any potential funding source.

2.      At approximately 12:48 p.m. EDT on August 7, 2018, during trading hours, Musk tweeted to his over 22 million Twitter followers, "Am considering taking Tesla private at $420.

Funding secured." This statement was false and misleading. Over the next three hours, Musk made a series of additional materially false and misleading statements via Twitter including:

- "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla."

- "Shareholders could either to [sic] sell at 420 or hold shares & go private."

- "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

3.      Musk knew or was reckless in not knowing that each of these statements was false and/or misleading because he did not have an adequate basis in fact for his assertions. When he made these statements, Musk knew that he had never discussed a going-private transaction at $420 per share with any potential funding source, had done nothing to investigate whether it would be possible for all current investors to remain with Tesla as a private company via a "special purpose fund," and had not confirmed support of Tesla's investors for a potential going-private transaction. He also knew that he had not satisfied numerous additional contingencies, the resolution of which was highly uncertain, when he unequivocally declared, "Only reason why this is not certain is that it's contingent on a shareholder vote." Musk's public statements and omissions created the misleading impression that taking Tesla private was subject only to Musk choosing to do so and a shareholder vote.

4.      Investors reacted to Musk's August 7 tweets. From the time of Musk's first tweet that day until the close of trading on August 7, Tesla's stock price increased by more than 6% on significantly increased volume and closed up 10.98% from the previous day.

5.      Musk's false and misleading public statements and omissions caused significant confusion and disruption in the market for Tesla's stock and resulting harm to investors.

6.      By engaging in the conduct alleged in this Complaint, Musk violated, and unless restrained and enjoined will violate again, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

7.      The Commission brings this action against Musk pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*] to enjoin the transactions, acts, practices, and courses of business alleged in this Complaint and to seek orders of disgorgement, along with prejudgment interest, civil penalties, and an officer and director bar against Musk, and such further relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), and 78aa*].

9.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Defendant transacts business in this District, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Musk regularly communicates via Twitter with users located in this District.  In addition, Tesla is traded on the Nasdaq Global Select Market, which is headquartered in this District, and trades in Tesla securities were handled and executed by trading personnel located in this District during the period relevant to the allegations.

**DEFENDANT**

10.     **Defendant Elon Musk**, age 47, resides in Los Angeles, California.  He co-
founded Tesla, Inc. in 2003 and since that time has been the Chairman of Tesla's Board of
Directors and largest stockholder.  He was named Chief Executive Officer in 2008.  Musk
oversees all product development, engineering, and design of Tesla's products.

**RELEVANT ENTITY**

11.     **Tesla**, which designs, develops, manufactures, and sells electric vehicles and
energy generation and storage systems, is incorporated in Delaware with its principal place of
business in Palo Alto, California.  Tesla conducted an initial public offering in 2010, and at all
relevant times, its common stock was registered with the Commission pursuant to Section 12(b)
of the Exchange Act [*15 U.S.C. § 78l(b)*] and was publicly traded on the Nasdaq Global Select
Market under the ticker symbol TSLA.

**FACTUAL ALLEGATIONS**

**Musk Used Twitter to Communicate with Millions of People as Tesla's Spokesperson**

12.     Musk created a profile on the social media application Twitter
(twitter.com/elonmusk) in 2009.  Since that time, Musk often used Twitter to communicate about
Tesla's business.  Tesla's Chief Financial Officer described Musk's Twitter statements as a
"strong channel of marketing" with Musk acting as a "spokesman" for Tesla.

13.     On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission
stating that it intended to use Musk's Twitter account as a means of announcing material
information to the public about Tesla and its products and services and has encouraged investors
to review the information about Tesla published by Musk via his Twitter account.

14.     In August 2018, over 22 million people, including members of the press, "followed" Musk on Twitter.  His tweets were published instantaneously to those people and were also publicly available to anyone with Internet access.

**Musk's Statements Regarding Tesla Short Sellers**

15.     In 2018, stock analysts and investors increasingly began to question whether Tesla could meet its previously announced production targets and begin to earn sufficient cash in order to sustain its operations and pay its existing debt load.  By August 2018, more than $13 billion worth of Tesla shares were being "shorted," meaning they were sold by investors who did not own them at the time of the sale.  Investors who sell stock short typically believe the price of the stock will fall and hope to buy the stock at the lower price to cover their short positions and earn a profit.  If the price of the stock rises, short sellers who then exit their short positions by purchasing the stock at the higher price will incur losses.

16.     Musk has complained that Tesla has been unfairly targeted by short sellers and predicted that short sellers would be "burned."  For example, on May 4, 2018, Musk tweeted, "Oh and uh short burn of the century comin soon.  Flamethrowers should arrive just in time." On June 17, 2018, Musk tweeted that short sellers "have about three weeks before their short position explodes."

**Preliminary Discussions Regarding Taking Tesla Private**

17.     Beginning in January 2017, Musk had three or four in-person meetings with representatives of a sovereign investment fund (the "Fund").  During these meetings, according to Musk, the lead representative of the Fund expressed a verbal desire to make a large investment in Tesla and establish a Tesla production facility in the Middle East.

18.     In late July 2018, Musk and representatives of the Fund had not spoken for many months.  On July 28, 2018, a representative of the Fund requested a meeting with Musk.  On the evening of July 31, Musk and his chief of staff met with three representatives of the Fund at Tesla's factory in Fremont, California for approximately 30 to 45 minutes.  Tesla's CFO joined midway through the meeting.

19.      According to Musk, at the meeting the Fund's lead representative told Musk that the Fund had recently acquired almost five percent of Tesla's common stock on the open market, expressed interest in taking Tesla private, and confirmed that he was empowered to make investment decisions for the Fund.  Musk later stated that he assumed without confirming that the lead Fund representative was proposing a "standard" going-private transaction, but the terms of any such deal were not discussed.

20.     During the July 31 meeting, the lead Fund representative again raised the prospect of establishing a production facility in the Middle East.  According to Musk, he expressed openness but made no commitment; Musk assumed that whether a Tesla production facility in the Middle East was a precondition to the Fund's willingness to take Tesla private would depend on the amount of capital the Fund was required to commit to the transaction.  Musk did not discuss his assumption with the representatives of the Fund.

21.     The July 31 meeting lacked discussion of even the most fundamental terms of a proposed going-private transaction.  For example, there was no discussion at the July 31 meeting of (1) any dollar amount or specific ownership percentage for the Fund's investment in a going-private transaction; (2) any acquisition premium to be offered to current Tesla shareholders; (3) any restrictions on foreign ownership of a significant stake in Tesla; (4) the Fund's available liquid capital; (5) whether the Fund had any past experience participating in a going-private

transaction; (6) any regulatory hurdles to completion of a going-private transaction; or (7) the board approval process necessary to take Tesla private.  Musk has acknowledged that the July 31 meeting was the most specific discussion of a transaction to take Tesla private between him and representatives of the Fund.

22.     According to Musk, at the close of the July 31 meeting, the lead representative of the Fund asked Musk to tell the Fund how he wanted to do a going-private transaction and represented that so long as the terms were "reasonable," the Fund would be fine with them. Musk acknowledged that no specific deal terms had been established at the meeting and that there was no discussion of what would or would not be considered reasonable.  Nothing was exchanged in writing, and there was no discussion of confidentiality.  Musk did not communicate with representatives of the Fund again about a going-private transaction until August 10, three days after his August 7 statements.

**Musk's Discussion of a Going-Private Transaction with Tesla's Board of Directors**

23.     On August 2, 2018, after market close, Musk sent an email with the subject, "Offer to Take Tesla Private at $420," to Tesla's Board of Directors, Chief Financial Officer, and General Counsel.  In the email, Musk explained his reasons for wanting to take Tesla private, including that being public "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand."  In the email, Musk asked that the "matter be put to a shareholder vote at the earliest opportunity" and stated that the "offer expires in 30 days."

24.     According to Musk, he calculated the $420 price per share based on a 20% premium over that day's closing share price because he thought 20% was a "standard premium" in going-private transactions.  This calculation resulted in a price of $419, and Musk stated that

he rounded the price up to $420 because he had recently learned about the number's significance in marijuana culture and thought his girlfriend "would find it funny, which admittedly is not a great reason to pick a price."

25.     Prior to Musk's meeting with Fund representatives on the evening of July 31, Tesla's stock had closed at approximately $298 per share. Accordingly, at the time of the meeting, the price per share with a 20% premium would have been approximately $358. Between the July 31 meeting and Musk's August 2 email to Tesla's board, Tesla's share price had increased over 17% following the company's August 1 earnings announcement. Musk realized that a spike in Tesla's share price might make a going-private transaction not feasible because it would require an investor in the transaction to pay a "premium on a spike." Musk, however, said that he assumed without confirming with the Fund or any other funding source that the 17% spike in Tesla's share price did not affect the feasibility of taking Tesla private at that time. Musk did not discuss a $420 price per share with any potential funding source for a Tesla going-private transaction prior to sending his email to Tesla's board.

26.     According to Musk, he thought that there was "a lot of uncertainty" regarding a potential going-private transaction at the time of his August 2 email to Tesla's board, "but it was worth investigating." He believed at the time that the likelihood of consummation of a transaction was about 50%.

27.     In response to Musk's August 2 email about taking Tesla private, Tesla's board held a telephonic meeting with Musk on the night of August 3. During that call, Musk informed the board that the Fund was interested in funding a going-private transaction.

8

28.     Musk also told board members that he wanted existing investors to stay with the company.  According to Musk, at least one board member told him that it would be "really difficult for small investors" to remain shareholders in a private Tesla.

29.     During the August 3 call, Musk told the board that he wanted to contact existing shareholders to assess their interest in participating in a going-private transaction.  The board authorized Musk to contact certain investors and asked him to report back to the board on those conversations.

**Musk's August 7 Statements and the Market's Reaction**

30.     Between the July 31 meeting with representatives of the Fund and the morning of August 7, Musk (1) did not have any further substantive communications with representatives of the Fund; (2) did not discuss a going-private transaction at a share price of $420 with any potential funding source; (3) had a conversation with a private equity fund representative about the process, but did not actually contact any additional potential strategic investors to assess their interest in participating in a going-private transaction; (4) did not provide Tesla's Board of Directors with a more specific proposal to take Tesla private; (5) did not contact existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (6) did not formally retain any advisors to assist with a going-private transaction; (7) did not determine whether retail investors could remain invested in Tesla as a private company; (8) did not determine whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) did not determine what regulatory approvals would be required for such a transaction or whether they could be satisfied.

31.     On August 6, Musk discussed a potential going-private transaction with a private equity fund partner with previous experience with such transactions.  During this call, Musk

mentioned that to execute the potential transaction, the number of Tesla shareholders needed to be below 300. At the time, Tesla had over 800 institutional shareholders and many more individual shareholders. According to the private equity fund partner, the transaction structure that Musk was contemplating was "unprecedented" in his experience.

32. These uncertainties notwithstanding, on Tuesday, August 7, 2018, Musk published a series of statements about a transaction to take Tesla private using his personal Twitter account. Musk did not consult with Tesla's Board of Directors, any other Tesla employees, or any outside advisors about these tweets before publishing them.

33. At approximately 12:48 PM EDT on Tuesday, August 7, 2018, Musk, using his mobile phone, published a tweet, "Am considering taking Tesla private at $420. Funding secured." Musk published this tweet in the middle of the day's official market trading. Immediately after this tweet, the trading volume and price of Tesla shares spiked.

34. Over the next few hours, Musk made additional statements about taking Tesla private. At approximately 1:15 PM EDT, Musk responded to another Twitter user's question, "At what price?" by repeating "420."

35. At approximately 1:23 PM EDT, about 35 minutes after Musk's initial tweet about taking Tesla private, Tesla's Chief Financial Officer sent a text message to Musk, "Elon, am sure you have thought about a broader communication on your rationale and structure to employees and potential investors. Would it help if [Tesla's head of communications], [Tesla's General Counsel], and I draft a blog post or employee email for you?" Musk responded, "Yeah, that would be great." Tesla's Chief Financial Officer then replied, "Working on it. Will send you shortly."

36.     At approximately 1:40 PM EDT, Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

37.     At approximately 2:00 PM EDT, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment."  In response to this tweet another Twitter user asked, "Could we still invest once private?"  Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

38.     At approximately 2:07 PM EDT, Musk responded to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super appreciative of Tesla shareholders. Will ensure their prosperity in any scenario."

39.     Nasdaq rules specify that listed companies such as Tesla must notify Nasdaq at least ten minutes prior to publicly releasing material information about corporate events like a proposed going-private action.  Musk did not notify Nasdaq prior to publishing his August 7 tweets.

40.     At approximately 2:08 PM EDT, Nasdaq halted trading in TSLA shares.

41.     At approximately 2:13 PM EDT, Musk tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."

42.     At approximately 3:07 PM EDT, Musk responded to a Twitter user's comment about a "forced buyout" by tweeting, "Def. no forced sales. Hope all shareholders remain.  Will

be way smoother & less disruptive as a private company.  Ends negative propaganda from shorts."  Later that day, Musk "retweeted" this statement, causing it to be published again in his Twitter feed.

43.     At approximately 3:16 PM EDT, Musk sent an email to Tesla employees.  The content of that email, entitled "Taking Tesla Private," was published to a publicly available Tesla blog at 3:32 PM EDT.  In the email and blog post, Musk explained his reasons for wanting to take Tesla private, including asserting that TSLA was "the most shorted stock in the history of the stock market" and stating that "being public means there are large numbers of people who have incentive to attack the company."

44.     In his company-wide email and blog post, Musk reiterated that he would like to structure a Tesla going-private transaction "so that all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share . . . ."  Musk added, "This proposal to go private would ultimately be finalized through a vote of our shareholders."

45.     A few minutes after publishing the blog post, at approximately 3:36 PM EDT, Musk tweeted a link to it in a tweet that stated, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."  Neither Musk's tweet nor the blog post provided any further information or context about the meaning of Musk's statement, "Investor support confirmed," or disclosed any contingencies other than a shareholder vote that would have to be satisfied in order to take Tesla private.

46.     Approximately nine minutes later, at 3:45 PM EDT, Nasdaq lifted the trading halt on Tesla shares.  After trading resumed, Tesla's stock price continued to rise, closing at $379.57, up over 6% from the time Musk first tweeted about taking Tesla private earlier that day.

**Reaction to Musk's August 7 Statements**

47.     Investors, stock analysts, and journalists immediately sought clarification of
Musk's August 7 statements.  At 1:00 PM EDT, approximately 12 minutes after Musk published
his tweet stating, "Am considering taking Tesla private at $420.  Funding secured," Tesla's own
head of Investor Relations sent a text to Musk's chief of staff asking, "Was this text legit?"

48.     At approximately 1:13 PM EDT, a Tesla investor and friend of Musk's chief of
staff texted the chief of staff, "What's Elon's tweet about?  Can't make any sense of it.  Would
be incredibly disappointing for shareholders that have stuck it out for so long."  A few minutes
later, at approximately 1:32 PM EDT, a business reporter texted Musk's chief of staff, "Quite a
tweet! (Is it a joke?)."

49.     At approximately 2:23 PM EDT, another reporter sent Musk an email with the
subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with
your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you
serious?  It seems like you are dancing into some pretty tricky legal territory by messing about
with the markets this way.  Is there an actual explanation coming?"

50.     After Tesla published Musk's email to Tesla employees on its blog, at
approximately 5:09 PM EDT on August 7, an investment bank research analyst emailed Tesla's
head of Investor Relations, "In the tweet, he said financing is secured but in the letter he doesn't
address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten
minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured'.  Yes,
there is a firm offer."

51.     At approximately 5:23 PM EDT, another research analyst emailed Tesla's head of
Investor Relations and another Investor Relations employee, "Had some questions/clarifications

on today's news and blog post.  Can either of you speak?"  A few minutes later, Tesla's head of Investor Relations responded, "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else.  I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct."

52.     After Tesla's head of Investor Relations received another inquiry from another investment bank research analyst at approximately 7:20 PM EDT, he asked whether the analyst had read Tesla's "official blog post on this topic."  The analyst responded, "I did.  Nothing on funding though?"  The head of Investor Relations replied, "The very first tweet simply mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of who the buyer is."  The analyst then asked, "Firm offer means there is a commitment letter or is this a verbal agreement?"  The head of Investor Relations responded, "I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets."

**Additional Statements by Musk on August 13**

53.     Musk did not make any attempt to clarify his August 7 statements until August 13.  During the interim, Musk continued to publish statements via his Twitter account, including an apparent joke on August 10 about "Short shorts coming soon to Tesla merch[andise]."

54.     On August 12, 2018, a news outlet reported that "people with knowledge of the [F]und's plans" said that it "hasn't made any firm decisions on whether to increase its stake, or by how much, but talks are ongoing . . . ."

55.     The following day, August 13, 2018, a blog post attributed to Musk called "Update on Taking Tesla Private" was published on Tesla's public blog.  In the blog post, Musk attempted to walk back his August 7 statements, stating publicly for the first time that when he had tweeted, "Am considering taking Tesla private at $420.  Funding secured," it was based on

14

his impression that there was "no question" that a deal with Fund could be closed and that it was "just a matter of getting the process moving."

56. Musk's August 13 post also disclosed for the first time that he was still in discussions about taking Tesla private with the Fund and a number of other investors and that no detailed proposal had been presented to the board or any board committee. This was contrary to Musk's August 7 tweet stating, "Only reason why this is not certain is that it's contingent on a shareholder vote."

57. Although it provided some new information about a potential transaction to take Tesla private, Musk's August 13 blog post still did not disclose that the $420 share price had not been agreed to by any potential funding source for a transaction to take Tesla private. Similarly, in the blog post, Musk again stated that his "proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders who preferred that option." Musk did not disclose that he had still not determined whether such a structure would be possible. After abandoning the going-private transaction, Musk admitted that his assumption that it would be possible for small shareholders to remain invested in Tesla as a private company was a "fundamental misunderstanding."

58. At approximately 11:15 PM EDT on Friday, August 24, 2018, after the close of official Nasdaq trading, a blog post was published on Tesla's public blog announcing that Musk had abandoned the process of attempting to take Tesla private.

59. The August 24 blog post, attributed to Musk, stated:

> Given the feedback I've received, it's apparent that most of Tesla's
> existing shareholders believe we are better off as a public
> company. Additionally, a number of institutional shareholders
> have explained that they have internal compliance issues that limit

15

> how much they can invest in a private company. There is also no
> proven path for most retail investors to own shares if we were
> private. Although the majority of shareholders I spoke to said they
> would remain with Tesla if we went private, the sentiment, in a
> nutshell, was "please don't do this."

This was the first time that Musk publicly disclosed the obstacles to allowing current Tesla

investors to remain invested if Tesla went private and thus corrected his multiple previous

misstatements that any going-private transaction would allow all current shareholders to remain

invested.

60.     On the next trading day, August 27, 2018, Tesla stock closed at $319.27, down

over 15% from the closing price of $379.57 on August 7, the date of Musk's initial tweets about

taking Tesla private.

**Musk's August 7 Statements Were Materially False and Misleading**

61.     Musk made multiple materially false statements on August 7, and taken together,

his August 7 statements left market participants with the false and misleading impression that if

Musk chose to take Tesla private at $420 per share, the only outstanding requirement to be

satisfied was a shareholder vote.

62.     Musk's first tweet on August 7 stated, "Am considering taking Tesla private at

$420. Funding secured." Musk then repeated the $420 share price in at least two additional

tweets that day. Later that day, Musk also tweeted, "Investor support is confirmed. Only reason

why this is not certain is that it's contingent on a shareholder vote." Musk's statements that

funding was "secured" and investor support was "confirmed" were false and misleading because,

in reality, Musk had no "secured" or "confirmed" commitment from any source to provide any

amount of funding. In addition, he had never even discussed taking Tesla private at a price of

$420 per share with the Fund or any other potential investor.

63. Musk's statement, "Only reason why this is not certain is that it's contingent on a shareholder vote," was also false and misleading. In fact, there were numerous reasons in addition to a shareholder vote why a going-private transaction was not "certain" at that time. Any going-private transaction would have required approval of Tesla's board or a specially-appointed committee of the board, and at that time, no formal proposal to take Tesla private had even been presented for consideration. In fact, no deal terms had been agreed upon with any source of funding, and any large investment to fund such a transaction would likely have been predicated on terms that the parties would have to negotiate and agree upon. For example, the Fund had indicated that its investment might be contingent on Tesla building a production facility in the Middle East, a condition that would have significantly complicated any transaction, and to which neither Musk nor Tesla had agreed. At least one Tesla board member described such a condition as a "non-starter."

64. Musk's August 7 statements, taken together, also created the misleading impression that certain terms of a transaction to take Tesla private had been determined when, in fact, they had not even been explored, and in some cases, proved to be impossible. On August 7, Musk repeatedly stated that all current Tesla investors would be able to remain invested in Tesla after a going-private transaction.

65. Specifically, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX investment." Musk also responded to another Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely. Am super

appreciative of Tesla shareholders. Will ensure their prosperity in any scenario." Musk also tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private." Finally, in his August 7 blog post, Musk stated " . . . all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share . . . ."

66.     Musk also responded to a Twitter user who asked, "Could we still invest once private?" by tweeting, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

67.     At the time of these statements, Musk had not determined or even explored whether it would be possible (1) for individual investors to invest in Tesla if it was a private company; (2) for all current Tesla shareholders to remain invested if Tesla were to go private; (3) to create a "special purpose fund enabling anyone to stay with Tesla"; or (4) to hold liquidity events "every 6 months or so." In fact, Musk later admitted, "I thought the vast majority of existing investors would want to maintain their stake, and we would find a vehicle for small investors to participate. That latter part was a fundamental misunderstanding that I just did not know -- I thought there would be some way to retain small investors, but there isn't." Musk's statements regarding specific terms of a transaction to take Tesla private created the misleading impression that these terms had been decided upon, when in fact, they had not even been investigated or determined to be possible.

**Musk Knew or Was Reckless in Not Knowing that His Statements Were False and Misleading**

68.     Musk made his false and misleading public statements about taking Tesla private using his mobile phone in the middle of the active trading day. He did not discuss the content of the statements with anyone else prior to publishing them to his over 22 million Twitter followers

and anyone else with access to the Internet.  He also did not inform Nasdaq that he intended to

make this public announcement, as Nasdaq rules required.

69.     Musk's statements were premised on a long series of baseless assumptions and

were contrary to facts that Musk knew.  Between the July 31 meeting with representatives of the

Fund and his August 7 misstatements, Musk knew that he (1) had not agreed upon any terms for

a going-private transaction with the Fund or any other funding source; (2) had no further

substantive communications with representatives of the Fund beyond their 30 to 45 minute

meeting on July 31; (3) had never discussed a going-private transaction at a share price of $420

with any potential funding source; (4) had not contacted any additional potential strategic

investors to assess their interest in participating in a going-private transaction; (5) had not

contacted existing Tesla shareholders to assess their interest in remaining invested in Tesla as a

private company; (6) had not formally retained any legal or financial advisors to assist with a

going-private transaction; (7) had not determined whether retail investors could remain invested

in Tesla as a private company; (8) had not determined whether there were restrictions on illiquid

holdings by Tesla's institutional investors; and (9) had not determined what regulatory approvals

would be required or whether they could be satisfied.

70.     In addition, Musk knew that Tesla's board had not yet voted on any proposal or

authorized a shareholder vote on it, and in fact, Musk had not yet even submitted a formal

proposal to Tesla's board.

71.     Musk did not disclose any of these material facts that were known to him when he

made his August 7 statements.  Unlike market participants reading his tweets, Musk knew that

his ostensibly "secured" funding was based on a 30 to 45 minute conversation regarding a

potential investment of an unspecified amount in the context of an undefined transaction

structure.  Musk also knew that there were many uncertainties beyond just a shareholder vote

that would have had to be resolved before any going-private transaction could have been

possible.  As a result, Musk knew or was reckless in not knowing that his August 7 statements

were false and misleading.

**Musk Omitted Material Facts**

72.     Musk's statements on August 7 also omitted material information.  Musk had a

duty to disclose material facts necessary to make his statements not misleading.

73.     Despite receiving numerous inquiries from journalists, research analysts, and

current Tesla investors indicating that they were confused by Musk's tweets and that the August

7 blog post had not remedied that confusion, Musk did not attempt to clarify the August 7

statements until the blog post, "Update on Taking Tesla Private," was issued on August 13.

74.     Moreover, the August 13 blog post still did not disclose that Musk had not

secured an agreement from any potential source of funding to fund a going-private transaction at

a price of $420 per share or that it was uncertain that a going-private transaction could be

accomplished in a manner that allowed existing Tesla shareholders to remain invested.

**Musk's Tweets Caused Market Chaos and Harmed Tesla Investors**

75.     Immediately prior to Musk's August 7 statements via Twitter, Tesla's stock was

trading at $356.67.  Musk's first tweet about taking Tesla private set off a trading frenzy, and the

trading volume and price of Tesla shares immediately spiked.  Nasdaq subsequently halted Tesla

trading for more than 90 minutes pending an official announcement from Tesla.  At the end of

August 7, after Musk's tweets and the post on Tesla's blog, the stock closed at $379.57, up

6.42% from just prior to the first tweet.

76.     By the close of market trading on August 13, after Musk and Tesla disclosed more information about the details underlying Musk's "funding secured" statement, Tesla's stock price had declined to around pre-tweet trading levels.  By the close of trading on August 27, the first trading day after Musk announced that he was abandoning his proposal to take Tesla private, Tesla's stock had dropped to $319.44.

77.     As a result of Musk's false and misleading statements and material omissions, investors who purchased Tesla stock in the period after the false and misleading statements but before accurate information was made known to the market were harmed.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

78.     Paragraphs 1 through 77 are hereby re-alleged and are incorporated herein by reference.

79.     Defendant, with scienter, in connection with the purchase or sale of securities as set forth above, directly or indirectly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading by the use of the means or instrumentalities of interstate commerce, and of the mails, and the facilities of a national securities exchange.

80.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, [*15 U.S.C. § 78j(b)*], and Rule 10b-5 thereunder, [*17 C.F.R. § 240.10b-5*].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*];

**III.**

Ordering Defendant to disgorge, with prejudgment interest, any ill-gotten gains received as a result of the violations alleged herein;

**IV.**

Ordering Defendant to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(d)(3)*];

**V.**

Ordering that Defendant be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [*15 U.S.C. § 78o(d)*]; and

# VI.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated: September 27, 2018                    Respectfully submitted,


                                             */s/ Jina L. Choi*
                                             Jina L. Choi
                                             Cheryl L. Crumpton*
                                             E. Barrett Atwood*

                                             *Application for admission *pro hac vice*
                                             forthcoming

                                             U.S. Securities and Exchange Commission
                                             100 F Street, N.E.
                                             Washington, D.C. 20549
                                             (202) 551-4459 (Crumpton)
                                             crumptonc@sec.gov

                                             44 Montgomery Street, Suite 2800
                                             San Francisco, CA 94104
                                             (415) 295-2467 (Atwood)
                                             atwoodb@sec.gov

Of counsel:

Erin E. Schneider
Steven Buccholz
Walker S. Newell
Bernard B. Smith

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____           :
                                                      :
UNITED STATES SECURITIES AND                          :
EXCHANGE COMMISSION                                   :
                                                      :
                    Plaintiff,                        :
                                                      :
            vs.                                       :      Civil Action No. 1:18-cv-8947
                                                      :
TESLA, INC.,                                          :
                                                      :
                    Defendant.                        :
                                                      :
_____           :

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges

as follows:

1.      This case involves the failure of Tesla, Inc. ("Tesla") to implement disclosure

controls or procedures to assess whether information disseminated by its Chief Executive

Officer, Elon Musk, via his Twitter account was required to be disclosed in reports Tesla files

pursuant to the Securities Exchange Act of 1934 ("Exchange Act") within the time periods

specified in the Commission's rules and forms.

2.      On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission

stating that it intended to use Musk's Twitter account as a means of announcing material

information to the public about Tesla and its products and services and has encouraged investors

to review the information about Tesla published by Musk via his Twitter account.

3.      Since that time, Musk has used his Twitter account to distribute material

information about Tesla, including company financial projections and key non-financial metrics.

Tesla, however, did not have disclosure controls or procedures in place to assess whether the information Musk disseminated via his Twitter account was required to be disclosed in reports Tesla files pursuant to the Exchange Act within the time periods specified in the Commission's rules and forms.  Nor did it have sufficient processes in place to ensure the information Musk published via his Twitter account was accurate or complete.

4.     By engaging in the conduct, Tesla violated, and unless restrained and enjoined will violate again, Rule 13a-15 [*17 C.F.R. § 240.13a-15*] of the Exchange Act [15 U.S.C. *§ 78a, et seq.*].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

5.     The Commission brings this action against Tesla pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*] to seek an order enjoining the transactions, acts, practices, and courses of business alleged in this Complaint, civil penalties, and such further relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), and 78aa*].

7.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Defendant transacts business in this District, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.

**DEFENDANT**

8.      **Tesla**, which designs, develops, manufactures, and sells electric vehicles and

energy generation and storage systems, is incorporated in Delaware with its principal place of

business in Palo Alto, California.  Tesla conducted an initial public offering in 2010, and at all

relevant times, its common stock was registered with the Commission pursuant to Section 12(b)

of the Exchange Act [*15 U.S.C. § 78l(b)*] and was publicly traded on the Nasdaq Global Select

Market under the ticker symbol TSLA.

**RELEVANT PERSON**

9.      **Elon Musk**, age 47, resides in Los Angeles, California.  He co-founded Tesla in

2003 and since that time has been the Chairman of Tesla's Board of Directors and largest

stockholder.  He was named Chief Executive Officer in 2008.  Musk oversees all product

development, engineering, and design of Tesla's products.

**FACTUAL ALLEGATIONS**

**Musk Used Twitter to Communicate with Millions of People as Tesla's Spokesman**

10.      In 2009, Musk created a profile on the social media application Twitter

(twitter.com/elonmusk).

11.      On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission

stating that it intended to use Musk's personal Twitter account as a means of announcing

material information to the public about the company and its products and services.  Tesla has

encouraged investors to review the information about the company published by Musk via his

Twitter account.

12.      Since November 2013, Musk has used his Twitter account to publish material

information about Tesla.  For example, Musk has published forward-looking guidance regarding

Tesla's financial metrics via Twitter.  Musk has also used Twitter to disclose key non-financial

information about Tesla, including production forecasts, production achievements, and new

product releases.  Tesla's Chief Financial Officer described Musk's Twitter statements as a

"strong channel of marketing" with Musk acting as a "spokesman" for Tesla.

13.    As of August 2018, over 22 million people, including members of the press,

"followed" Musk on Twitter.  His tweets were published instantaneously to those people and

were also publicly available to anyone with Internet access.

**Musk's August 2018 Statements Via Twitter**

14.    On Tuesday, August 7, 2018, Musk published a series of statements about a

transaction to take Tesla private using his personal Twitter account.  Musk did not consult with

Tesla's Board of Directors or any other Tesla employees about these tweets before publishing

them.

15.    At approximately 12:48 PM EDT on Tuesday, August 7, 2018, Musk, using his

mobile phone, published a tweet, "Am considering taking Tesla private at $420.  Funding

secured."  Immediately after this tweet, the trading volume and price of Tesla shares spiked.

16.    Over the next few hours, Musk made additional statements about taking Tesla

private.  At approximately 1:15 PM EDT, Musk responded to another Twitter user's question,

"At what price?" by repeating "420."

17.    At approximately 1:40 PM EDT, Musk tweeted, "I don't have a controlling vote

now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either

scenario."

18.    At approximately 2:00 PM EDT, Musk tweeted, "My hope is *all* current

investors remain with Tesla even if we're private.  Would create special purpose fund enabling

anyone to stay with Tesla.  Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment."  In response to this tweet, another Twitter user asked, "Could we still invest once private?"  Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

19.     At approximately 2:07 PM EDT, Musk responded to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super appreciative of Tesla shareholders. Will ensure their prosperity in any scenario."

20.     At approximately 2:08 PM EDT, Nasdaq halted trading in TSLA shares.

21.     At approximately 2:13 PM EDT, Musk tweeted, "Shareholders could either to [sic] sell at 420 or hold shares & go private."

22.     At approximately 3:07 PM EDT, Musk responded to a Twitter user's comment about a "forced buyout" by tweeting, "Def. no forced sales.  Hope all shareholders remain.  Will be way smoother & less disruptive as a private company.  Ends negative propaganda from shorts."  Later that day, Musk "retweeted" this statement, causing it to be published again in his Twitter feed.

23.     At approximately 3:36 PM EDT, Musk tweeted a link to a public Tesla blog post, entitled "Taking Tesla Private," in a tweet that stated, "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote."

24.     These statements by Musk via Twitter were false and misleading and impacted the price of Tesla's stock.

25.     After Nasdaq lifted the trading halt at approximately 3:45 PM EDT on August 7,

Tesla's stock price continued to rise, closing at $379.57, up over 6% from the time Musk first tweeted about taking Tesla private earlier that day.

**Reactions and Tesla's Response to Musk's August 7 Statements**

26.     Investors, stock analysts, and journalists immediately sought clarification of Musk's August 7 statements.  At 1:00 PM EDT, approximately 12 minutes after Musk published his tweet stating, "Am considering taking Tesla private at $420.  Funding secured," Tesla's head of Investor Relations sent a text to Musk's chief of staff asking, "Was this text legit?"

27.     At approximately 1:13 PM EDT, a Tesla investor and friend of Musk's chief of staff texted the chief of staff, "What's Elon's tweet about?  Can't make any sense of it.  Would be incredibly disappointing for shareholders that have stuck it out for so long."  A few minutes later, at approximately 1:32 PM EDT, a business reporter texted Musk's chief of staff, "Quite a tweet! (Is it a joke?)."

28.     At approximately 2:23 PM EDT, another reporter sent Musk an email with the subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you serious?  It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way.  Is there an actual explanation coming?"

29.     After Musk tweeted the link to the Tesla blog post, at approximately 5:09 PM EDT on August 7, an investment bank research analyst emailed Tesla's head of Investor Relations, "In the tweet, he said financing is secured but in the [blog post] he doesn't address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured.'  Yes, there is a firm offer."

30.     At approximately 5:23 PM EDT, another research analyst emailed Tesla's head of Investor Relations and another Investor Relations employee, "Had some questions/clarifications on today's news and blog post.  Can either of you speak?"  A few minutes later, Tesla's head of Investor Relations responded, "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else.  I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct."

31.     After Tesla's head of Investor Relations received another inquiry from another investment bank research analyst at approximately 7:20 PM EDT, he asked whether the analyst had read Tesla's "official blog post on this topic."  The analyst responded, "I did.  Nothing on funding though?"  The head of Investor Relations replied, "The very first tweet simply mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of who the buyer is."  The analyst then asked, "Firm offer means there is a commitment letter or is this a verbal agreement?"  The head of Investor Relations responded, "I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets."

**Tesla Did Not Have Controls or Procedures Regarding Musk's Use of Twitter to Disseminate Information About Tesla**

32.     Musk did not routinely consult with anyone at Tesla before publishing Tesla-related information via his Twitter account.  Likewise, no one at Tesla reviewed Musk's tweets prior to publication.

33.     Since November 5, 2013, when Tesla filed its Form 8-K disclosing that Musk's Twitter account would be used to disseminate material information about the company, Tesla did not have disclosure controls or procedures in place to assess whether the information published by Musk via his Twitter account was required to be disclosed in Tesla's Exchange Act reports within the time periods specified in the Commission's rules and forms.  Nor did Tesla have

sufficient processes in place to ensure the information Musk published via his Twitter account was accurate or complete. Indeed, until after the August 7, 2018 tweets, Tesla had no corporate policies that specifically addressed Musk's use of Twitter.

**CLAIM FOR RELIEF**
**Violations of Rule 13a-15 of the Exchange Act**

34.     Paragraphs 1 through 33 are hereby re-alleged and are incorporated herein by reference.

35.     Defendant has at all relevant times been an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*].

36.     Defendant failed to maintain controls and procedures designed to ensure that information required to be disclosed in the reports that it files or submits pursuant to the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the Commission's rules and forms.

37.     Defendant also failed to maintain controls and procedures designed to ensure that information required to be disclosed in the reports that it files or submits pursuant to the Exchange Act is accumulated and communicated to its management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

38.     By reason of the foregoing, Defendant violated Rule 13a-15 [*17 C.F.R. § 240.13a-15*] of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

8

## II.

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Rule 13a-15 [*17 C.F.R. § 240.13a-15*] of the Exchange Act;

## III.

Ordering Defendant to pay civil penalties pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*];

## IV.

Granting such other and further relief as this Court may deem just, equitable, or necessary.


Dated:  September 29, 2018                    Respectfully submitted,

                                              */s/ Jina L. Choi*
                                              Jina L. Choi
                                              Cheryl L. Crumpton*
                                              E. Barrett Atwood*

                                              *Application to appear *pro hac vice*
                                              forthcoming

                                              U.S. Securities and Exchange Commission
                                              100 F Street, N.E.
                                              Washington, D.C. 20549
                                              (202) 551-4459 (Crumpton)
                                              crumptonc@sec.gov

                                              44 Montgomery Street, Suite 2800
                                              San Francisco, CA 94104
                                              (415) 705-2467 (Atwood)
                                              atwoode@sec.gov

Of counsel:

Erin E. Schneider
Steven D. Buchholz
Walker S. Newell
Bernard B. Smyth

**Exhibit B**

**KELLER LENKNER LLC**
Ashley C. Keller (*admitted pro hac vice*)
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Telephone: (312) 741-5222
ack@kellerlenkner.com

**KELLER LENKNER LLC**
U. Seth Ottensoser (*admitted pro hac vice*)
1330 Avenue of the Americas, Suite 23A
New York, NY 10019
Telephone: (212) 653-9715
so@kellerlenkner.com

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
David J. Schwartz
Francis P. McConville
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
dschwartz@labaton.com
fmcconville@labaton.com

*Co-Counsel for Lead Plaintiff and the Class*
[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TESLA INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**CLASS ACTION**<br><br>**FIRST REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO DEFENDANTS** |

Andrew E. Left, PROtecto Informatikai Szolgáltató Korlátolt Felelősségű Társaság, Thierry Boutin, Dr. Abrar Shirazi, and Vilas Capital Management, LLC (collectively, "Lead Plaintiff") by and through their undersigned attorneys, hereby propound upon Defendants Elon R. Musk ("Musk") and Tesla, Inc. ("Tesla") (collectively, "Defendants") Lead Plaintiff's First Request for the Production of Documents. Lead Plaintiff demands that Defendants produce the following Documents and things, in the manner provided in the Definitions and Instructions herein, at the offices of Labaton Sucharow LLP, 140 Broadway, New York, New York 10005, within 30 days from the date of service of these requests, or at such other time and location upon with the parties may mutually agree.

## DEFINITIONS

1.      "All" shall include the term "each" and vice-versa, as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

2.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

3.      "Communication" or "communications" refers to any exchange of information, words, numbers, pictures, charts, studies, or graphs by any means of transmission, sending or receipt of information of any kind by or through any means including personal delivery, speech, writings, Documents, language (machine, foreign, or otherwise) of any kind, computer electronics, sound, radio or video signals, telecommunication, telephone, facsimile, mail, film, photographic film of all types, or other media of any kind.  The term "communication" also includes all inquiries, discussions, conversations, Correspondence, negotiations, agreements, presentations, understandings, Meetings, notices, requests, responses, demands, complaints, or press, publicity, or trade releases.

4.      "Concern," or "concerning," or "relating to" means referring to, describing, evidencing, reflecting upon, regarding, or constituting.

5.     "Correspondence" means any and all inquiries, discussion, conferences, conversations, negotiations, agreements, letters, memoranda, Meetings, interviews, telephone conversations, voicemails, notes, telegrams, facsimiles, text messages, instant messages, electronic mail, internet message board posting, tweets, Blackberry messages, iMessages, writings, or any other forms of communications, including both oral and written.

6.     "Document" or "Documents" is intended to have the broadest possible meaning under Federal Rule of Civil Procedure ("Rule") 34(a), and includes electronic or computerized data compilations, electronic file backup tapes, hard drives and images of hard drives, all drafts, Communications, Correspondence, memoranda, records, presentations, books, reports, transcripts or summaries of conversations or interviews, diaries, graphs, charts, diagrams, tables, photographs, recordings, tapes, microfilms, minutes, transcripts or summaries of Meetings or conferences, records and reports of consultants, press releases, stenographic, handwritten or any other notes, workpapers, checks and check vouchers, check stubs or receipts, and any paper or writing of whatever description, including any computer database or information contained in any computer although not yet printed out.  A draft or non-identical copy of any Document is a separate Document within the meaning of this term.

7.     "Employee" means any Person who at any time during the Relevant Period acted or purported to act on behalf of an entity, Defendants, or another Person or Persons including all present and former officers, directors, executives, partners, principals, managers, staff personnel, accountants, agents, representatives, in-house attorneys, independent contractors, advisors, and consultants of such entity, Person or Persons.

8.     "Including" means including without limitation.

9.     "Meeting" means the contemporaneous presence of any natural persons (including, but not limited to, by telephone, chat room, video conference, bulletin board programs, or instant messenger program), for any purpose, whether or not such presence was by chance or prearranged, and whether or not the Meeting was formal or informal or occurred in connection with some other activity.  Meeting also includes and calls for the production of, but is

not limited to, Documents such as presentations, minutes, records, invites, invitations, calendar reminders, or calendars regarding a Meeting, and Communications regarding the Meeting.

10.     "Refer" or "relate" means comprise, explicitly or implicitly refer to, reflect, record, memorialize, embody, discuss, evaluate, consider, review, report on, be reviewed in conjunction with, or be created, generated or maintained as a result of the subject matter of the request.

11.     "Tesla" means Tesla, Inc. and any of its divisions or business segments, together with its predecessors, successor, assigns, parents, subsidiaries, affiliates, members, partners, shareholders, owners, officers, directors, employees and agents, and any person acting or purporting to act on their respective behalf.

## INSTRUCTIONS

The following instructions shall apply to all requests herein.

1.     All Documents shall be produced in the order they are kept in the ordinary course of business, and shall be produced in their original folders, binders, covers or containers, or facsimiles thereof.

2.     These requests relate to all Documents that are known by, possessed by, controlled by, or available to Defendants, as well as any Documents in the possession, custody or control of Defendants' agents, attorneys, accountants, employees, partners, or other persons occupying similar positions or performing similar functions. This duty is not limited or affected by the fact that the same Document is available through another source.

3.     Defendants shall produce the original of each document described below, or if the original is not in its custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from other copies produced for any reason, including, but not limited to, the making of notes thereon.

4.     If any Document is known to exist but cannot be produced, that Document is to be specifically identified as precisely as possible and the reasons for the inability to produce that Document stated.

5.      Documents shall be produced in such fashion as to identify in whose possession and in what location that Document was located, including the physical location and the electronic location, if applicable.

6.      The fact that a Document is produced by another party or witness does not relieve Defendants of the obligation to produce their copy of the same Document, even if the two Documents are identical in all respects.

7.      Documents not otherwise responsive to this discovery request shall be produced if such Documents mention, discuss, refer to, or explain the Documents which are called for by this discovery request, or if such Documents are attached to Documents called for by this discovery request and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

8.      With respect to any Document which is withheld on a claim of privilege, Defendants are requested to provide a statement signed by Defendants' attorney setting forth as to each such Document the following information:

(a)     which privilege is claimed;

(b)     a precise statement of the facts upon which the claim of privilege is based;

(c)     the following information describing each purportedly privileged documents: i) its nature, *e.g.*, agreement, letter, memorandum, etc.; ii) the date it was prepared; iii) the date it bears; iv) the date it was sent; v) the date it was received; vi) the identity of the person preparing it; vii) the identity of the person sending it; viii) the identity of each person to whom it was sent or was to have been sent, including all addresses and all recipients of copies; ix) a statement as to whom each identified person represented or purported to represent at all relevant times;

(d)     a precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file; and

(e)     whenever a Document is not produced in full or is produced in redacted form, so indicate on the Document and state with particularity the reason or reasons it is not

1 being produced in full, and describe to the best of Defendants' knowledge, information and

2 belief, and with as much particularity as possible, those portions of the Document which are not

3 being produced.

4        9.      If a Document responsive to these requests was at any time in Defendants'

5 possession, custody or control but is no longer available for production, as to each such

6 Document state the following information:

7               (a)     whether the Document is missing or lost;

8               (b)     whether the Document has been destroyed;

9               (c)     whether the Document has been transferred or delivered to another person

10 and, if so, to whom and at whose request;

11              (d)     whether the Document has been otherwise disposed of; and

12              (e)     a precise statement of the circumstances surrounding the disposition of the

13 Document and the date of its disposition.

14       10.     Whenever necessary to bring within the scope of a request a response that might

15 otherwise be construed to be outside of its scope:

16              (a)     the use of a verb in any tense shall be construed as the use of the verb in

17 all other tenses;

18              (b)     the use of the word in its singular form shall be deemed to include within

19 its use the plural form as well, and vice versa;

20              (c)     the use of the words "each" or "all" shall be construed to include within

21 their use "any," "some," "each" or "all"; and

22              (d)     the connectives "and" and "or" shall be construed either conjunctively or

23 disjunctively.

24                              **RELEVANT TIME PERIOD**

25       Unless otherwise noted, the relevant time period of this document production request is

26 August 7, 2018 through the present (the "Relevant Time Period"). This document production

27 request requires that all documents created, generated, or dated during the Relevant Time Period,

28 as well as documents created, generated or dated outside this period, but which contain

1   information concerning this period, including events which occurred during this period, be

2   produced by Defendants.

3                           **DOCUMENTS REQUESTED**

4           1.      All Documents and Communications produced by Defendants or any non-party

5   other than Defendants concerning and/or relating to the matter, *United States Securities &*

6   *Exchange Commission v. Elon Musk*, No. 1:18-cv-8865 (S.D.N.Y. Sept. 27, 2018), including, but

7   not limited to:

8                   (a)     communications and correspondence between Defendants and the SEC;

9                   (b)     internal communications and correspondence by Defendants;

10                  (c)     wells notices;

11                  (d)     subpoenas;

12                  (e)     document retention notices;

13                  (f)     order of formal investigation, as well as any supplemental order; and

14                  (g)     Opening and Closing Reports, including "Case Closing

15  Recommendation," "Matter Under Inquiry Summary," "Investigation Summary," and/or similar

16  documents and/or reports.

17          2.      All Documents and Communications produced by Defendants or any non-party

18  other than Defendants concerning and/or relating to the matter, *United States Securities &*

19  *Exchange Commission v. Tesla, Inc.*, No. 1:18-cv-8947 (S.D.N.Y. Sept. 29, 2018), including, but

20  not limited to:

21                  (a)     communications and correspondence between Defendants and the SEC;

22                  (b)     internal communications and correspondence by Defendants;

23                  (c)     wells notices;

24                  (d)     subpoenas;

25                  (e)     document retention notices;

26                  (f)     order of formal investigation, as well as any supplemental order; and

27

28

1          (g)    Opening   and   Closing   Reports,   including   "Case   Closing

2  Recommendation," "Matter Under Inquiry Summary," "Investigation Summary," and/or similar

3  documents and/or reports.

4  DATED: _____, 2018

5                               Respectfully submitted,

6                               */s/ James M. Wagstaffe*

7                               James M. Wagstaffe (#95535)

8                               **KERR & WAGSTAFFE LLP**
Frank Busch (#258288)

9                               101 Mission Street, 18th Floor
San Francisco, CA 94105

10                            Telephone: (415) 371-8500
Facsimile: (415) 371-0500

11                            wagstaffe@kerrwagstaffe.com
busch@kerrwagstaffe.com

12

13                            *Liaison Counsel for the Class*

14                            **KELLER LENKNER LLC**
Ashley C. Keller (*admitted pro hac vice*)

15                            150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606

16                            Telephone: (312) 741-5222
ack@kellerlenkner.com

17

18                            **KELLER LENKNER LLC**
U. Seth Ottensoser (*admitted pro hac vice*)

19                            1330 Avenue of the Americas, Suite 23A
New York, NY 10019

20                            Telephone: (212) 653-9715
so@kellerlenkner.com

21

22                            **LABATON SUCHAROW LLP**
Christopher J. Keller

23                            Eric J. Belfi
David J. Schwartz

24                            Francis P. McConville
140 Broadway

25                            New York, NY 10005

26                            Telephone: (212) 907-0700
Facsimile: (212) 818-0477

27                            ckeller@labaton.com
ebelfi@labaton.com

28                            dschwartz@labaton.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

fmcconville@labaton.com

*Co-Counsel for Lead Plaintiff and the Class*