1  **KELLER LENKNER LLC**
   Ashley C. Keller (*admitted pro hac vice*)
2  150 N. Riverside Plaza, Suite 4270
   Chicago, IL 60606
3  Telephone: (312) 741-5222
   ack@kellerlenkner.com
4
   **KELLER LENKNER LLC**
5  U. Seth Ottensoser (*admitted pro hac vice*)
   1330 Avenue of the Americas, Suite 23A
6  New York, NY 10019
   Telephone: (212) 653-9715
7  so@kellerlenkner.com

8  **LABATON SUCHAROW LLP**
   Christopher J. Keller
9  Eric J. Belfi
   David J. Schwartz
10 Francis P. McConville
   140 Broadway
11 New York, New York 10005
   Telephone: (212) 907-0700
12 Facsimile: (212) 818-0477
   ckeller@labaton.com
13 ebelfi@labaton.com
   dschwartz@labaton.com
14 fmcconville@labaton.com

15 *Counsel for the Tesla Investor Group and*
   *Proposed Co-Lead Counsel for the Class*
16 [Additional counsel on signature page]

17                **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
18                  **SAN FRANCISCO DIVISION**

19 | KALMAN ISAACS, on behalf of himself and | Case No. 3:18-cv-04865-EMC
20 | all others similarly situated, |

   **CLASS ACTION**

21 |                    Plaintiff, | **MEMORANDUM OF LAW IN FURTHER**
                                    **SUPPORT OF THE MOTION OF THE**
22 |        v. | **TESLA INVESTOR GROUP FOR**
                 **CONSOLIDATION, APPOINTMENT AS**
23 | ELON MUSK and TESLA, INC, | **LEAD PLAINTIFF AND APPROVAL OF**
                                  **SELECTION OF LEAD COUNSEL; AND**
24 |                    Defendants. | **IN OPPOSITION TO COMPETING**
                                     **MOTIONS**
25
26 | Date:      November 15, 2018
   | Time:      1:30 p.m.
27 | Courtroom: 5 – 17th Floor
   | Judge:     Hon. Edward M. Chen

   *(caption continues on the following pages)*
28

MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE TESLA INVESTOR GROUP;
NO. 3:18-CV-04865-EMC

| | |
|---|---|
| WILLIAM CHAMBERLAIN, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:18-cv-04876-EMC |
| Plaintiff, | |
| v. | |
| TESLA INC., and ELON MUSK, | |
| Defendants. | |
| JOHN YEAGER, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:18-cv-04912-EMC |
| Plaintiff, | |
| v. | |
| TESLA, INC. and ELON MUSK, | |
| Defendants. | |
| CARLOS MAIA, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:18-cv-04939-EMC |
| Plaintiff, | |
| v. | |
| TESLA, INC. and ELON R. MUSK, | |
| Defendants. | |
| KEWAL DUA, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:18-cv-04948-EMC |
| Plaintiff, | |
| v. | |
| TESLA, INC. and ELON MUSK, | |
| Defendants. | |

*(caption continues on the following page)*

MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE TESLA INVESTOR GROUP; NO. 3:18-CV-04865-EMC

| | |
|---|---|
| JOSHUA HORWITZ, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:18-cv-05258-EMC |
| Plaintiff, | |
| v. | |
| TESLA INC., and ELON R. MUSK, | |
| Defendants. | |
| ANDREW E. LEFT, Individually and on Behalf of All Others Similarly Situated, | Case No.  3:18-cv-05463-EMC |
| Plaintiff, | |
| v. | |
| TESLA INC., and ELON R. MUSK, | |
| Defendants. | |
| ZHI XING FAN, Individually and on Behalf of All Others Similarly Situated, | Case No.  4:18-cv-05470-EMC |
| Plaintiff, | |
| v. | |
| TESLA INC., and ELON R. MUSK, | |
| Defendants. | |
| SHAHRAM SODEIFI, Individually and on Behalf of All Others Similarly Situated, | Case No.  3:18-cv-05899-EMC |
| Plaintiff, | |
| v. | |
| TESLA, INC., a Delaware corporation, and ELON R. MUSK, an individual, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ON TEMPUS AND OUF ............................................... 4

ARGUMENT ............................................................................................................. 7

I.      TEMPUS AND OUF FAIL TO SATISFY RULE 23's PREREQUISITES
        FOR APPOINTMENT AS LEAD PLAINTIFF ............................................... 7

        A.      Dantas Renders Tempus and OUF Inadequate and Unfit to Serve
                as Lead Plaintiff ................................................................................ 8

        B.      Tempus and OUF Do Not Satisfy the Typicality Requirement of
                Rule 23 .............................................................................................. 9

                1.      Tempus and OUF's Lack of Transparency Subjects Them
                        to Unique Defenses That Render Them Atypical ................... 10

                        (a)     Tempus and OUF Failed to Demonstrate that Opportunity
                                Gestão Has Proper Authority to Sign Certifications on
                                Their Behalf ........................................................... 11

                        (b)     OUF May Have Not Been a Registered Corporation For All
                                Relevant Periods .................................................... 12

                2.      OUF Fails to Demonstrate Standing to Serve as Lead
                        Plaintiff ........................................................................... 13

                3.      Tempus and OUF Experienced Skewed Front-End Losses
                        That Will Harm the Class as a Whole .................................. 14

                4.      Tempus and OUF Cannot Satisfy the Typicality
                        Requirement Because They are Exclusively Short Sellers of
                        Tesla Common Stock ......................................................... 16

II.     THE COURT SHOULD PERMIT THE TESLA INVESTOR GROUP TO
        CONDUCT LIMITED DISCOVERY INTO THE ABILITY OF TEMPUS
        AND OUF TO SERVE AS LEAD PLAINTIFF ............................................. 19

III.    THE TESLA INVESTOR GROUP IS THE PRESUMPTIVE LEAD
        PLAINTIFF ............................................................................................... 20

IV.     THE REMAINING COMPETING MOTIONS SHOULD BE DENIED ............ 22

A.   Littleton Is Atypical Because He Traded Almost Exclusively in Options ........................................................................................................... 22

B.   Bridgestone Has Not Proven Its Authority To Serve As Lead Plaintiff ............................................................................................................ 23

C.   FNY Is Atypical Because Of Its Immense Trading Activity and Its Failure to Quantify Its Financial Interest in This Litigation ................................ 24

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrada v. Atherogenics*,
No. 05 Civ. 00061 (RJH), 2005 WL 912359 (S.D.N.Y. April 19, 2005).................................22

*Andrade v. Am. Apparel, Inc.*,
No. CV1006352MMMRCX, 2011 WL 13131110 (C.D. Cal. Jan. 21, 2011)....................8, 20

*Applestein v. Medivation, Inc.*,
No. C 10-00998 MHP, 2010 WL 3749406 (N.D. Cal. Sept. 20, 2010)...........................20, 21

*In re Atl. Power Corp. Sec. Litig.*,
No. CV 13-10537-DPW, 2014 WL 12628589 (D. Mass. Mar. 31, 2014)..............................25

*In re Bally Total Fitness Sec. Litig.*,
No. 04C3530, 2005 WL 627960 (N.D. Ill. Mar. 15, 2005) .....................................................13

*Bruce v. Suntech Power Holdings Co.*,
No. CV 12-04061 RS, 2012 WL 5927985 (N.D. Cal. Nov. 13, 2012)....................................22

*Burke v. Ruttenberg*,
102 F. Supp. 2d 1280 (N.D. Ala. 2000) ................................................................................11

*Calpine Corp.*,
No. 4:02-CV-1200, 2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) ..............................16, 18

*In re Cardinal Health, Inc. Sec. Litig*,
226 F.R.D. 298 (S.D. Ohio 2005) ....................................................................................24-25

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) .........................................................................................3, 6, 7, 25

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)..............................................................................................2, 8

*In re Critical Path, Inc. Sec. Litig.*,
156 F. Supp. 2d 1102 (N.D. Cal. 2001) ..........................................................................16, 18

*Dantas v. Citibank*,
No. 1:17-cv-01257-SHS (S.D.N.Y.)..................................................................................5, 21

*In re Enron Corp. Sec. Litig.*,
206 F.R.D. 427 (S.D. Tex. 2002)..........................................................................................13

*In re Enzymotec Ltd. Sec. Litig*,
  No. 14-cv-5556, 2015 WL 918535 (S.D.N.Y. Apr. 27, 2016) ................................................11

*Ferrari v. Impath, Inc.*,
  No. 03 CIV. 5667, 2004 WL 1637053 (S.D.N.Y. July 20, 2004) ...........................................21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)......................................................................................................13

*In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.*,
  209 F.R.D. 447 (C.D. Cal. 2002) ..........................................................................................7, 9

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
  No. 05-cv-2745 (S.D.N.Y.), ECF No. 45 ...........................................................................4, 5, 21

*Johnson v. OCZ Tech. Grp., Inc.*,
  No. CV 12-05265 RS, 2013 WL 75774 (N.D. Cal. Jan. 4, 2013) ..........................................22

*McNichols v. Loeb Rhoades & Co., Inc.*,
  97 F.R.D. 331 (N.D. Ill. 1982)................................................................................................24

*In re Netflix Inc., Sec. Litig.*,
  No. 12-cv-0225, 2012 WL 1496171 (N.D. Cal. Apr. 27, 2012)..............................................14

*In re Network Assocs., Inc. Sec. Litig.*,
  76 F. Supp. 2d 1017 (N.D. Cal. 1999) ............................................................................8, 9, 20

*In re Peregrine Sys. Sec. Litig.*,
  No. CIV. 02 CV 870-J(RBB), 2002 WL 32769239 (S.D. Cal. Oct. 11, 2002) .......................7

*Irving Firemen's Relief & Ret. Fund v. Tesco PLC*,
  No. 14 Civ. 10020 (RMB), 2015 WL 1345931 (S.D.N.Y. Mar. 19, 2015)............................23

*Philips Med. Sys. Int'l B.V. v. Bruetman*,
  8 F.3d 600 (7th Cir.1993) (Posner, J.) ...................................................................................16

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*,
  229 F.R.D. 395 (S.D.N.Y. 2004) .........................................................................................2, 8

*Piven v. Skyes Enters.*,
  137 F. Supp. 2d 1295 (M.D. Fla. 2000)....................................................................................9

*Rao v. Quorum Health Corp.*,
  221 F. Supp. 3d 987, 990 (M.D. Tenn. 2016)........................................................................20

*Reitan v. China Mobile Games & Entm't Grp., Ltd.*,
  68 F. Supp. 3d 390 (S.D.N.Y. 2014)........................................................................................10

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*,
No. CIV.A. 00-5965 (JCL), 2005 WL 1365465 (D.N.J. June 7, 2005)......................16, 18, 19

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
219 F.R.D. 343 (D. Md. 2003)...............................................................................................13

*Seamans v. Aid Auto Stores, Inc.*,
No. 98-CV-7395(DRH), 2000 WL 33769023 (E.D.N.Y. Feb. 15, 2000) .............................24

*Searcy v. eFunds Corp.*,
No. 08 C 985, 2010 WL 1337684 (N.D.Ill. Mar. 31, 2010) ....................................................8

*Smajlaj v. Brocade Commc'ns Sys., Inc.*,
No. 05-cv-02042, 2006 WL 7348107 (N.D. Cal. 2006) .........................................9, 10, 12, 23

*In re Spectranetics Corp. Sec. Litig.*,
No. 08-CV-02048-REB-KLM, 2009 WL 4268291 (D. Colo. Nov. 19, 2009).......................14

*Sprint Commc'ns Co. L.P. v. APCC Servs. Inc.*,
128 S. Ct. 2531 (2008).............................................................................................................13

*Steamfitters Local 449 Pension Fund v. Cent. European Distribution Corp.*,
No. 11-cv-6247, 2012 WL 3638629 (D.N.J. Nov. 8, 2012) ..............................................12, 14

*In re Surebeam Corp. Sec. Litig.*,
No. 03 CV 1721JM(POR), 2004 WL 5159061 (S.D. Cal. Jan. 5, 2004)...........................7, 8, 9

*Switzenbaum v. Orbital Sciences Corp.*,
187 F.R.D. 246 (E.D. Va. 1999) ..............................................................................................25

*Tice v. Novastar Fin., Inc.*,
No. 04-0330-CV-W-OLD, 2004 WL 1895180 (W.D. Mo. Aug. 23, 2004)...........................24

*In re Vonage Initial Pub. Offering (IPO) Sec. Litig.*,
No. CIV A 07-177 (FLW), 2007 WL 2683636 (D.N.J. Sept. 7, 2007) ...................................21

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
549 F.3d 100 (2d Cir. 2008).....................................................................................................13

*Weikel v. Tower Semiconductor, Ltd.*,
183 F.R.D. 377 (D.N.J. 1988)...................................................................................................23

*Wilson, III, Robert E. v. Dantas, Daniel Valente*,
No. 650915/2012 (N.Y. Sup Ct. Mar. 23, 2012) ......................................................................6

**Statutes**

15 U.S.C. § 78u-4 *et seq.* ................................................................................................. *passim*

**Other Authorities**

Federal Rule of Civil Procedure Rule 23 .................................................................................. *passim*

United States Constitution Article III ..........................................................................................13

1    The Tesla Investor Group—comprising Andrew E. Left; PROtecto Informatikai

2    Szolgáltató Korlátolt Felelősségű Társaság; Thierry Boutin; Dr. Abrar Shirazi; and Vilas Capital

3    Management, LLC—respectfully submits this memorandum in further support of its motion for

4    consolidation of the above-captioned actions, appointment as lead plaintiff, and approval of

5    Keller Lenkner LLC and Labaton Sucharow LLP as Co-Lead Counsel and Kerr & Wagstaffe

6    LLP as Liaison Counsel for the Class[1] (ECF No. 47), and in opposition to all competing lead

7    plaintiff motions.[2]

8    ### PRELIMINARY STATEMENT

9    The Tesla Investor Group—a small, cohesive group of sophisticated investors that

10   provides the Class with the broadest representation—is the ***most adequate*** lead plaintiff

11   candidate in this litigation.  As set forth below, the Tesla Investor Group is the only prospective

12   lead plaintiff that meets the requirements of the Private Securities Litigation Reform Act of 1995

13   (the "PSLRA"), which provides that the "court shall adopt a presumption that the most adequate

14   plaintiff" is the movant with "the largest financial interest in the relief sought by the class" that

15   "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15

16   U.S.C. § 78u-4(a)(3)(B)(iii)(I).

17   Based solely on claimed losses, Tempus and OUF might appear well-positioned to argue

18   that they should serve as lead plaintiff.  The PSLRA, however, "does not permit courts simply to

19   'presume' that the movant with 'the largest financial interest in the relief sought by the class'

20   satisfies the typicality and adequacy requirements" of Rule 23.  *In re Cendant Corp. Litig.*, 264

21

22

23   [1]    The Class consists of "all injured purchasers and sellers of Tesla, Inc. securities between August 7, 2018 and August 17, 2018, inclusive."  ECF No. 47, at 2.

24   [2]    The other lead plaintiff motions were filed by FNY Investment Advisers, LLC ("FNY") (ECF

25   No. 40); Glen Littleton ("Littleton") (ECF No. 41); Jiri Kulik, Jason Han, Esmaeil Riahi, Deepak Mehta, and Raghunath Nama (the "Kulik Group") (ECF No. 45); Bridgestone Investment Corporation Limited

26   ("Bridgestone") (ECF No. 46); James Johnson ("Johnson") (ECF No. 64); Tempus International Fund SPC and Opportunity Unique Fund Inc. ("Tempus and OUF") (ECF No. 71); Donald Freeland, Alvin

27   Abrams, Christopher Lyman, and Rajinder Gaur (the "Freeland Group") (ECF No. 74); and Dany David ("David") (ECF No. 80).  The Freeland Group and the Kulik Group later withdrew their motions. ECF

28   No. 102, 104.

F.3d 201, 264 (3d Cir. 2001).  To the contrary, in exercising their gatekeeping function on behalf of absent class members, courts have an "ultimate obligation to appoint as lead plaintiff" the movant "most capable of representing the interests of the class."  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co.*, 229 F.R.D. 395, 407 n.19 (S.D.N.Y. 2004) (quoting *In re Versata Sec. Litig.*, No. C 01-1439, 2001 WL 34012374, at *3 (N.D. Cal. Aug. 20, 2001)).  The PSLRA requires courts to consider whether a proposed lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff atypical and incapable of adequately representing the class."  § 78u-4(a)(3)(B)(iii)(II).  On both of those grounds, Tempus and OUF's bid for lead plaintiff status fails.

Tempus and OUF's lead plaintiff application is fatally flawed for five principal reasons. *First*, Tempus and OUF are ultimately controlled by Daniel Dantas, whose background is rife with serious accusations by the Brazilian government and former business partners of corruption, money laundering, bribery, self-dealing, and breaches of fiduciary duty.[3]  As a result, Tempus and OUF cannot serve as honest and trustworthy fiduciaries of the Class—as surely will be argued by Defendants at class certification if Tempus and OUF are named lead plaintiffs, thereby jeopardizing the Class.  *Second*, Tempus and OUF are opaque investment vehicles purportedly managed by a third-party, Brazil-based investment manager.  Based on their submissions, it is impossible to determine whether: (1) Tempus and OUF satisfy Rule 23's typicality requirement; or (2) the Brazilian manager and its employees actually possessed the requisite authority to sign PSLRA certifications on their behalf.  It is not clear whether OUF even existed during the Class Period or when the certification was purportedly signed on its behalf.  *Third*, because it is unclear whether OUF itself held shares of Tesla, Inc. ("Tesla"), OUF does not appear to have Article III

---

[3]      Tempus and OUF's PSLRA certifications were signed by two employees of Opportunity Gestão de Investimentos e Recursos Ltda., a Brazil-based investment manager that is part of the Opportunity Group, an asset-management company founded in 1994 by Daniel Dantas and his business partner, Dorio Ferman.  *See* ECF Nos. 71-3; 71-4; *see also Who We Are*, OPPORTUNITY, https://www.opportunity.com.br/English/Opportunity (last updated Dec. 31, 2017).

1    standing to pursue this litigation.  *Fourth*, Tempus and OUF's claimed transactions were front-

2    loaded on a single date at the beginning of the Class Period, which creates perverse incentives

3    for them to generate outcomes that benefit themselves at the expense of investors who traded on

4    any other day of the Class Period.  *Finally*, Tempus and OUF suffered losses purely in their

5    capacity as short sellers, and basic economic and finance principles demonstrate that short sellers

6    may be subject to unique defenses that render them atypical plaintiffs and thus inadequate to

7    represent a class.  For the foregoing reasons, Tempus and OUF's application for lead

8    appointment must be rejected.[4]

9         Having rebutted the presumption that Tempus and OUF are the most adequate lead

10   plaintiff, the Tesla Investor Group—as the movant with the next greatest loss—is presumed to be

11   the most adequate plaintiff.  The Tesla Investor Group comprises experienced investors with

12   collective losses of ***$4.47 million***[5] on their transactions in Tesla securities during the class

13   period.  The Group provides the Class with the broadest spectrum of representation and ensures

14   that the interests of all Class members will be fairly and adequately represented in keeping with

15   the requirements of Rule 23.  Additionally, as set forth in their Joint Declaration, the members of

16   the Group are committed to protecting the interests of the Class and have already taken

17   significant steps to jointly ensure vigorous prosecution of this action.  *See* ECF No. 51-4.

18        The remaining movants have smaller losses, so their motions fail for that reason alone.

19   *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002).  In addition, several movants are so

20   inadequate that they could not be appointed even if they had suffered the greatest loss.

21   Accordingly, the Tesla Investor Group is the presumptive ***most adequate*** lead plaintiff under the

22

23   _____

24   [4]      At the very least, the Tesla Investor Group seeks limited discovery to determine whether Tempus
     and OUF can adequately represent the Class—discovery that the PSLRA expressly authorizes in these
     circumstances.  *See* § 78u-4(a)(3)(B)(iv).

25
26   [5]      The Tesla Investor Group's revised loss figure reflects the inclusion of certain Class Period
     options transactions by Vilas Capital Management, LLC ("Vilas Capital"), which were inadvertently
27   omitted from the Tesla Investor Group's initial lead plaintiff application.  The inclusion of the options
     transactions reduces the Tesla Investor Group's loss by $93,440, or 2% of its overall exposure.  *See*
28   Amended Loss Chart and amended Signed Certification by Vilas Capital, attached as Exhibit A
     to the Declaration of James M. Wagstaffe ("Wagstaffe Decl.") filed herewith.

1   PSLRA.  The Court should grant the Tesla Investor Group's motion and deny all competing

2   motions.

3   <u>**FACTUAL BACKGROUND ON TEMPUS AND OUF**</u>

4   Because Tempus and OUF have not provided any information about their Brazilian

5   investment manager or its owner, Daniel Dantas, the Tesla Investor Group provides this

6   summary for the Court:

7   Tempus and OUF are purportedly managed by Opportunity Gestão de Investimentos e

8   Recursos Ltda. ("Opportunity Gestão"),[6] a non-financial company dedicated exclusively to

9   managing third-party resources in the global financial market.  Opportunity Gestão is ultimately

10   controlled by Dantas, a notorious Brazilian entrepreneur, through Opportunity Consultoria Ltda.,

11   one of his many companies.[7]  Dantas is a controversial public figure in his native Brazil, and his

12   background is littered with accusations of wrongdoing—including corporate espionage; federal

13   criminal investigations for money laundering, tax evasion and corruption; and brief stints in jail.

14   Dantas also has been party to many bitter, public legal battles with former business partners,

15   several of whom have accused him of breaching his contractual and fiduciary duties and

16   engaging in improper self-dealing.[8]

17

18   ---

19   [6]   *See* ECF No. 71, at 11; *see also Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, No.
05-cv-2745 (S.D.N.Y.), ECF No. 45, at 3.  Opportunity Gestão is one of many entities that form the
20   Opportunity group.  *See Companies*, OPPORTUNITY https://www.opportunity.com.br/Empresa/Empresa
(last visited Oct. 23, 2018).

21   [7]   According to Opportunity Gestão's filing dated March 21, 2018 with the "Comissão de Valores
Mobiliários" (Brazil's equivalent of the Securities and Exchange Commission), Opportunity Gestão is
22   controlled by Opportunity Consultoria Ltda., which in turn is controlled by Dantas.  *See Formulário de
Referência*,  OPPORTUNITY, https://www.opportunity.com.br/Content/pdf/extra/Form_Referencia_OGI
23   R.pdf (Dec. 31, 2017); *see also* Declaration of Hui Chang, Esq., Wagstaffe Decl., Ex. B.

24   [8]   These legal disputes have been the subject of intense media coverage over the years. *See* Todd
Benson, *Citigroup Ousts Manager of Investments in Brazil*, N.Y. TIMES, https://www.nytimes.com/
25   2005/03/11/business/worldbusiness/citigroup-ousts-manager-of-investments-in-brazil.html (Mar. 11,
2015); Jonathan Karp & Paul Beckett, *Citigroup Nears Settlement Of Fund* Dispute in Brazil, W.S.J.,
26   https://www.wsj.com/articles/SB1032727129347490073 (Sept. 23, 2002); Geraldo Samor, *Brazilian
Police Make Accusations Against Dantas*, W.S.J., https://www.wsj.com/articles/SB111344817701706792
27   (Apr. 14, 2005); *see also* Susan Perkins, *Citigroup's Shareholder Tango in Brazil (A)*, KELLOGG SCH.
MGMT. CASES (2017), https://www.kellogg.northwestern.edu/kellogg-case-publishing/case-search/
28   (Wagstaffe Decl., Ex. C.).

1    Dantas' legal entanglements span 20 years.  In late 1997, Dantas partnered with Citigroup

2    to form CVC Fund to invest in Brazil's privatized telecommunications sector, including through

3    the purchase of Brasil Telecom.[9]  Major shareholders in the venture included Telecom Italia and

4    multiple Brazilian state pension funds.  Dantas' conduct led to several disputes between him and

5    his former partners, who alleged that Dantas engaged in misconduct such as illegal corporate

6    espionage against Telecom Italia executives.[10]  Dantas faced federal criminal charges of

7    corruption, criminal conspiracy, and breach of confidentiality in Brazil related to his methods of

8    gathering information about Telecom Italia executives to be used in lawsuits—charges Dantas

9    denied.[11]  Citigroup eventually ousted Dantas from the partnership after allegations of his self-

10   interested, illegal financial practices came to light.[12]  Seeking at least $300 million in damages,

11   Citigroup contended that Dantas, who had been responsible for the management and investment

12   decisions of CVC Fund, attempted to "benefit from a series of improper self-dealing

13   transactions" in violation of "contractual and fiduciary duties."[13]  The litigation between

14   Citigroup and Dantas ended in a confidential settlement in 2008.[14]

15   Concurrent with this bitter public feud, Dantas was party to several other lawsuits by

16   former business partners.  One former partner accused Dantas of "illegal wiretapping and

17   surveillance" to intimidate him and interfere with his business, damaging his reputation in the

18   process.[15]  Another former partner sued Dantas for "multiple breaches of fiduciary duties,

---

[9]    *See Int'l Equity Invs.*, No. 05-cv-2745, ECF No. 44.

[10]   *See* Perkins, *supra* note 8, at 8.

[11]   *See id.*

[12]   *Int'l Equity Invs.*, No. 05-cv-2745, ECF No. 44, at ¶ 7; *see also* Benson, *supra* note 8.

[13]   *Int'l Equity Invs.*, No. 05-cv-2745, ECF No. 44, at ¶ 7.

[14]   The April 2008 settlement agreement was filed under seal in an action filed by Dantas against Citibank. *See  Dantas v. Citibank*, No. 1:17-cv-01257-SHS (S.D.N.Y.), ECF No. 26.

[15]   *See Int'l Equity Invs.*, No. 05-cv-2745, ECF No. 630-3, ¶¶ 37–40.

constructive fraud and fraudulent concealment," and accused him of engaging in "an array" of harmful behavior.[16]

In 2008, Brazilian federal officials arrested, indicted, and convicted Dantas for money laundering, tax evasion, and racketeering to embezzle public funds.[17]  Several other Opportunity employees—including Dantas' sister Verônica Dantas, who also is listed as a manager for Opportunity Gestão—were implicated in criminal investigations and accused of serious financial crimes.[18]  Dantas was accused of paying bribes to a federal police officer in an effort to escape prosecution, and he was suspected of using funds from his business holdings to mastermind a complex money laundering scheme in the Cayman Islands.[19]

That same year, the U.S. government sought a temporary restraining order against any funds held or controlled by Dantas, his sister Verônica Dantas, Opportunity Group, Opportunity Fund, and Opportunity Unique Funds to enforce three restraining orders issued by Brazilian courts at the request of the Brazilian government.[20]  The affidavits filed with the application "establish that a competent Brazilian court has received evidence establishing that certain serious financial and corruption offenses have occurred in Brazil, upon which numerous individuals have been arrested, including Daniel Dantas, and others with control over the Opportunity Group

---

[16]     *See Wilson, III, Robert E. v. Dantas, Daniel Valente,* No. 650915/2012 (N.Y. Sup Ct. Mar. 23, 2012), ECF No. 3.

[17]     After many years of public litigation, "Dantas managed to get the case annulled in a series of legal moves."  On the heels of his release from prison, 45 Brazilian prosecutors protested that the decision constituted a "shameless affront to Brazil's democratic institutions" while 130 Brazilian judges chastised the court order "for skipping due process rules."  Blake Schmidt, *Bad Boy of Brazil Finance Is Now a Cattle-Ranching Billionaire*, Bloomberg (June 13, 2017), at https://www.bloomberg.com/news/articles/2017-06-13/bad-boy-of-brazil-finance-is-now-a-cattle-ranching-billionaire.

[18]     *See* Pedro de Rocha, *Justiça Nega Habeaus Corpus para Verônica Dantas*, ESTADÃO, https://politica.estadao.com.br/noticias/geral,justica-nega-habeas-corpus-para-veronica-dantas,683125 (Feb. 22, 2011); *see also* Declaration of Hui Chang, Esq., Wagstaffe Decl., Ex. B.

[19]     *See Fall of an opportunist*, ECONOMIST, https://www.economist.com/the-americas/2008/12/04/fall-of-an-opportunist (Dec. 4, 2008).

[20]     *See In re Any & All Funds & Assets In Brown Brothers Harriman & Co. Acct # 8870792 In Name Of Tiger Eye Investments Ltd.,* No. 1:08-mc-00807-JDB, (D.D.C.),  ECF Nos. 28, 29.

and Opportunity Fund."[21]  Dantas' business history is so sordid that Northwestern University's Kellogg School of Management has published an entire case study documenting his multi-decade series of unethical or illegal behavior.  *See* Wagstaffe Decl., Ex. C.

## ARGUMENT

## I.   TEMPUS AND OUF FAIL TO SATISFY RULE 23's PREREQUISITES FOR APPOINTMENT AS LEAD PLAINTIFF

The Ninth Circuit has described the "clear path" this Court "must follow" in selecting the lead plaintiff under the PSLRA.  *In re Cavanaugh*, 306 F.3d at 729.  As set forth in the statute, the Court must "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  The PSLRA establishes a rebuttable presumption that the "most adequate plaintiff" is the movant with "the largest financial interest in the relief sought by the class" who otherwise satisfies the typicality and adequacy requirements of Rule 23. § 78u-4(a)(3)(B)(iii)(I).  That presumption is rebutted upon proof that the presumptive most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." § 78u-4(a)(3)(B)(iii)(II).  "If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23."  *Cavanaugh*, 306 F.3d at 730; *see also In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.*, 209 F.R.D. 447, 450 (C.D. Cal. 2002) (citing *Z–Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1217–18 (9th Cir. 2000)).

Although Tempus and OUF purport to have larger losses than the Tesla Investor Group, they are not the "most adequate plaintiff" because they cannot "fairly and adequately protect the interest of the class."  15 U.S.C. § 78u-4(a)(B)(iii)(II)(aa).  Indeed, appointing Tempus and OUF

---

[21]     *In re Any & All Funds & Assets*, No. 1:08-mc-00807, ECF No. 29, at 3.

1   as lead plaintiff would saddle the Class with a representative controlled by Dantas, whose long

2   history of scandals and legal disputes calls into question his personal honesty and credibility.

3   Furthermore, Tempus and OUF's complete lack of transparency, dubious standing, and status as

4   short sellers of Tesla common stock whose losses were front-ended on a single date give rise to

5   unique defenses that render them inadequate and atypical representatives of the Class.

6   Accordingly, Tempus and OUF are unfit to serve as lead plaintiff irrespective of their claimed

7   financial interest.  Their motion should be denied.

8        **A.    Dantas Renders Tempus and OUF Inadequate and Unfit to Serve as Lead
              Plaintiff**
9

10       A lead plaintiff "serves as a fiduciary to advance and protect the interests of those whom

11  he purports to represent; their interests are entrusted to the fiduciary's diligence and successful

12  protection of the class depends upon the named plaintiff."  *In re Peregrine Sys. Sec. Litig.*, No.

13  CIV. 02 CV 870-J(RBB), 2002 WL 32769239, at *8 (S.D. Cal. Oct. 11, 2002) (internal quotation

14  marks omitted).  On this point, "courts have found that an individual is an inadequate lead

15  plaintiff due to unrelated misconduct which implicates the individual's ability to serve as a

16  fiduciary."  *In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721JM(POR), 2004 WL 5159061, at

17  *7 (S.D. Cal. Jan. 5, 2004) (citation omitted).[22]

18       Tempus and OUF are ultimately controlled by Dantas, who has been consistently

19  embroiled in civil litigation with former business partners while also being at the center of

20  criminal proceedings in his native Brazil.  As discussed above, those numerous legal disputes

21  involving Dantas demonstrate that Tempus and OUF's position is "'markedly different'" from

22  the rest of the class.  *In re Cendant Corp. Litig.*, 264 F.3d at 265.  Furthermore, "[w]ithout

23

24

---

25  [22]      *See also In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999)
     (holding a presumptive lead plaintiff inadequate due to an unrelated fraud investigation); *Pirelli*
26  *Armstrong Tire Corp. Retiree Medical Benefits Trust*, 229 F.R.D. at 416 ("CalPERS is correct that
     honesty and trustworthiness are relevant factors in assessing a candidate's ability to serve as an adequate
27  fiduciary for a class . . . ." (citing *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) and
     *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983))); *Andrade v. Am. Apparel, Inc.*, No.
28  CV1006352MMMRCX, 2011 WL 13131110, at *3 (C.D. Cal. Jan. 21, 2011).

---

MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE TESLA INVESTOR GROUP;
NO. 3:18-CV-04865-EMC                        8

1    comment or consideration of [Dantas'] guilt or innocence as to the underlying charges," Dantas'

2    colorful past shows "that there is at least a potential that [he] will be subject to unique defenses

3    and will not fairly and adequately protect the interests of the class." *Surebeam*, 2004 WL

4    5159061, at *7 (declining to appoint investor plagued by history of securities industry

5    misconduct). These allegations raise legitimate concerns about Dantas' credibility and honesty

6    and therefore preclude Tempus and OUF from being an adequate class representative. *See*

7    *Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 1337684, at *4, (N.D. Ill. Mar. 31, 2010) ("The

8    honesty and credibility of a class representative is a relevant consideration when performing the

9    adequacy inquiry 'because an untrustworthy plaintiff could reduce the likelihood of prevailing on

10   the class claims.'").

11       Similar instances of financial impropriety and past litigation have been deemed sufficient

12   to deny an applicant's lead plaintiff motion. Under remarkably similar facts, in *In re Network*

13   *Assocs., Inc. Sec. Litig*, Judge Alsup concluded that KBC Equity Funds, an investment entity

14   embroiled in financial and legal disputes, was inadequate to represent the class because the fund

15   was under investigation for criminal fraud violations in Belgium; the authorities had conducted

16   "raids" on the Belgian bank as part of its criminal fraud investigation; and the CEO of one of the

17   involved entities had already been arrested for tax evasion, fraud, money laundering, conspiracy,

18   and consorting with criminal elements. 76 F. Supp. 2d at 1029.

19       As in *Network Associates*, this Court should decline to appoint Tempus and OUF as lead

20   plaintiff and their motion should be denied.

21       **B.    Tempus and OUF Do Not Satisfy the Typicality Requirement of Rule 23**

22       Not only are they unfit to represent the Class adequately, but Tempus and OUF are

23   subject to multiple unique defenses, the result of which is that they do not satisfy the typicality

24   requirement of Rule 23. The PSLRA recognizes that where a lead plaintiff applicant is subject to

25   potential "unique defenses," its motion must be denied on typicality grounds. 15 U.S.C. § 78u-

26   4(a)(3)(B)(iii)(II)(bb); *see also Surebeam*, 2004 WL 5159061, at *7 (eliminating movant where

27   "unique defense[]" rendered it incapable of adequately representing the interests of the class).

28

1

         **1.**      **Tempus and OUF's Lack of Transparency Subjects Them to Unique Defenses That Render Them Atypical**

2

3        Tempus and OUF have complex, opaque structures that raise independent concerns about

4 whether they can serve as lead plaintiff.  In similar circumstances, courts have disqualified lead

5 plaintiff movants for a lack of transparency.  *See Smajlaj v. Brocade Commc'ns Sys., Inc.*, No.

6 05-cv-02042, 2006 WL 7348107, at *3 (N.D. Cal. 2006) ("In sum, there are too many questions

7 surrounding [movant's] standing, authority, transparency, and structure that may give rise to

8 unique defenses and are atypical of the class as a whole."); *see also, e.g., Gemstar-TV Guide*

9 *Int'l*, 209 F.R.D. at 452 & n.8 (rejecting lead plaintiff movants who provided insufficient

10 information about their identities, sophistication, and resources); *Piven v. Skyes Enters.*, 137 F.

11 Supp. 2d 1295, 1305 (M.D. Fla. 2000) (rejecting lead plaintiff motion of institution that failed to

12 provide information regarding its location, line of business, resources, and experience).

13        Tempus and OUF are investment entities that have done almost nothing to demonstrate

14 their capacity to litigate this case, let alone serve as lead plaintiff.  Tempus is a segregated

15 portfolio company ("SPC")[23] based in the Cayman Islands.  Beyond that fact, no other

16 information is publicly available, rendering Tempus a stranger in this litigation.  In that same

17 vein, OUF is a fund incorporated in the British Virgin Islands ("BVI") with only a cryptic

18 website that is otherwise not publicly accessible.  And Tempus and OUF themselves have been

19 silent thus far in the litigation; Opportunity Gestão purports to speak on their behalf but has

20 provided no evidence of its authority to do so.  *Cf. Smajlaj*, 2006 WL 7348107, at *3 (citing

21 "concern[] about an apparent reluctance by [movant] to turn over documentation of its authority

22 to litigate this matter to the Court, as well as the continuous 'new' revelations that appear to

23 expose the somewhat complicated and intricate structure of the company").  For these reasons

24

25

26   ————————————

[23]     A segregated portfolio company—a type of entity structure seemingly unique to the Cayman

27 Islands—consisting of a multitude of individual portfolios with their own unique and segregated assets and liabilities.  Only one instance was found where a SPC has served as a lead plaintiff.  *See Reitan v.*

28 *China Mobile Games & Entm't Grp., Ltd.*, 68 F. Supp. 3d 390 (S.D.N.Y. 2014).

1    alone, Tempus and OUF are subject to unique lack-of-transparency defenses that render them

2    inappropriate for the role of lead plaintiff.  *See id.* at *2–3.

3                    **(a)    Tempus and OUF Failed to Demonstrate that Opportunity
                            Gestão Has Proper Authority to Sign Certifications on Their
4                           Behalf**

5            In connection with any motion to be appointed lead plaintiff, the PSLRA requires the

6    movant to submit a sworn certification to assure the court that the proposed lead plaintiff is,

7    among other things, an appropriate and capable candidate and is willing to serve as class

8    representative.  15 U.S.C. § 78u-4(a)(2)(A).  To be valid, the certification must be "***personally***

9    signed by such plaintiff."  *Id.* (emphasis added).

10           The certifications submitted by Tempus and OUF were signed by their purported

11   investment manager, Opportunity Gestão.  Specifically, the two signatories are Ana Carolina

12   Silva Moreira Lima ("Lima"), the Compliance Director for Opportunity Gestão, and Bruno Bak

13   ("Bak"), Opportunity Gestão's portfolio manager.  *See* ECF No. 71, at 11.  It is impossible to

14   determine whether Opportunity Gestão, through its employees Lima and Bak, possessed the

15   requisite authority to sign the certifications for Tempus and OUF.

16           Both certifications claim Opportunity Gestão is authorized to sign on Tempus' and

17   OUF's behalf, but that assertion is devoid of corroborative evidence.  *See In re Enzymotec Ltd.*

18   *Sec. Litig,* No. 14-cv-5556, 2015 WL 918535, at *3 (S.D.N.Y. Apr. 27, 2016) ("Of course,

19   [movant] is correct that the PSLRA does not explicitly require the signer of a certification on

20   behalf of a corporation to identify his/her position within the company and provide a basis for

21   his/her signing authority. ***It seems plain to this Court, however, that any proper certification***

22   ***would include such basic information***." (emphasis added)).  Moreover, neither certification

23   explains the connection—if any—that Lima or Bak has to Tempus and OUF, aside from working

24   for Opportunity Gestão.  *See id.*  Furthermore, Tempus and OUF's memorandum in support of its

25   motion for lead plaintiff stated that Bak was granted power of attorney by Opportunity Gestão,

26

27

28

not by Tempus or OUF.[24]  Therefore, it appears that Opportunity Gestão gave Bak authority to sign the certification for Opportunity Gestão, but there is nothing demonstrating that Bak, Lima, or Opportunity Gestão had any authority to sign for Tempus or OUF.

Accordingly, both certifications fail to provide an adequate basis for establishing that Opportunity Gestão, through its employees Lima and Bak, had authority to act on behalf of Tempus and OUF.  That raises doubts as to Tempus and OUF's "genuine willingness to act as representative plaintiffs, a fact that the certification requirement is meant to determine."  *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1321 (N.D. Ala. 2000).  These informational deficiencies render Tempus and OUF's certifications fatal, as "nowhere in [either] certification does [Bak or Lima] identify [themselves] or provide any indication of [their] role within [Tempus and OUF]."  *Enzymotec*, 2015 WL 918535, at *3.  This creates the "substantial likelihood that [Tempus and OUF] would be subject to a unique defense regarding invalid or lack of certification because the validity of their purported certification is fairly debatable."  *Steamfitters Local 449 Pension Fund v. Cent. European Distribution Corp.*, No. 11-cv-6247, 2012 WL 3638629, at *12 (D.N.J. Nov. 8, 2012); *see also Smajlaj*, 2006 WL 7348107, at *2–3 (finding possibility of unique defenses where "it [was] unclear . . . whether [the movant] ha[d] authority to act on behalf of those funds, and whether any other [of movant's] management companies would need to authorize [the] suit").

### (b)    OUF May Have Not Been a Registered Corporation For All Relevant Periods

The scant publicly available information regarding OUF raises serious questions as to whether it even existed during the Class Period or when its certification was executed.  OUF is a BVI corporation, and a search of the BVI corporate registry yielded two results: one indicated that, as of June 28, 2018, OUF had been cancelled and listed amongst "Former Regulated Entities"; the other listed OUF amongst "Currently Regulated Entities," but only as of ***October 1,***

---

[24]      "Bruno Bak, who was granted Power of Attorney by Tempus and OUF's ***Investment Manager***." ECF No. 71, at 11 (emphasis added).

1    *2018*.  *See* Wagstaffe Decl., Ex. D.  Another portion of the BVI registry corroborates this

2    conclusion, listing one OUF as "cancelled" and another as active.  *Id.*

3        If OUF did not exist in August or September, it would mean not only that OUF was a

4    non-entity throughout the entire Class Period, but also when OUF's purportedly authorized

5    certification was signed on September 27, 2018.  That presents two potential unique defenses

6    against OUF: (1) it could not file a valid certification if it did not exist; and (2) it cannot pursue

7    this action if it did not exist during the Class Period.

8        The unique defenses on the certifications, authority, and proper registration set forth

9    above render both Tempus and OUF atypical candidates for lead plaintiff, as they would subject

10   the Class to a litigation sideshow of arguments wholly unique to the lead plaintiffs.  *See In re*

11   *Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009); *In re Bally Total Fitness*

12   *Sec. Litig.*, No. 04C3530, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005).[25]

13                    **2.      OUF Fails to Demonstrate Standing to Serve as Lead Plaintiff**

14       Under Article III of the United States Constitution, a plaintiff must show "injury-in-fact"

15   to have standing to sue.  *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d

16   100, 106 (2d Cir. 2008) (citing U.S. Const. art. III, § 2).  In securities lawsuits, the Supreme

17   Court has held that standing is predicated on the movant's having held the securities directly, or

18   at a minimum, having been assigned legal title to (or having a proprietary interest in) the claim.

19   *See Sprint Commc'ns Co. L.P. v. APCC Servs. Inc.*, 128 S. Ct. 2531, 2543–44 (2008); *see also*

20   *Huff*, 549 F.3d at 108.

21       Based on OUF's opaque structure, it is unclear whether OUF was the beneficial owner of

22   the subject Tesla securities or whether one of OUF's subsidiary funds actually held the shares.

23   Most hedge funds are structured as limited partnerships, which raises serious questions as to

24

25

26   [25]      *See also In re Royal Ahold N.V. Sec. & ERISA Litig.,* 219 F.R.D. 343, 352–53 (D. Md. 2003) ("It
     is difficult to see how Union, if appointed lead plaintiff, would be able to avoid devoting a large portion
27   of its time and efforts to proving it is not subject to . . . unique defense[s] . . . ."); *In re Enron Corp. Sec.*
     *Litig.,* 206 F.R.D. 427, 455–56 (S.D. Tex. 2002) (court was unwilling to "endanger th[e] litigation" by
28   appointing a presumptive lead plaintiff with unique defenses).

1    whether OUF—a corporation—is in fact a holding company.  Indeed, a search of OUF's arcane

2    website indicates three possible subsidiary funds: "Unique Logica Equities" and "Unique

3    Hedge" as "Weekly Funds," as well as "Multi-Strategy" as a "Monthly Fund."[26]  If OUF's

4    investment was through any of those funds or any undisclosed subsidiary fund, then that fund—a

5    separate legal entity—would have standing, but OUF would not.  *See In re Spectranetics Corp.*

6    *Sec. Litig.*, No. 08-CV-02048-REB-KLM, 2009 WL 4268291, at *2 (D. Colo. Nov. 19, 2009)

7    ("In effect, [movant] seeks to have [a separate legal entity] act as a co-lead plaintiff *sub silentio*.

8    For good reason, there is no authority for the appointment of a silent co-lead plaintiff.").

9          At worst, OUF lacks constitutional standing to sue.  At best, OUF's opacity will give rise

10   to unique defenses that Defendants will vigorously exploit to the detriment of the Class.  The

11   Court should not subject the class to such needless risks.  *In re Netflix Inc., Sec. Litig.*, No. 12-

12   cv-0225, 2012 WL 1496171, at *5 (N.D. Cal. Apr. 27, 2012) ("The Court finds a substantial

13   likelihood that a unique defense could be raised against a member of the Fish Group. Arkansas

14   Teacher-Boston points out that *Comstock is not actually the legal entity on which her calculation*

15   *of losses is based. Rather, the Comstock trust is.*" (emphasis added)).

16          **3.    Tempus and OUF Experienced Skewed Front-End Losses That Will**
               **Harm the Class as a Whole**
17

18          Tempus and OUF made all of their Class Period transactions on the first day of the Class

19   Period—August 7, 2018—when they purchased Tesla shares to cover pre-Class Period short

20   positions.  Moreover, by covering their short position, Tempus and OUF ***closed out*** their

21   position, eliminating any concern about what happened to the securities prices going forward.

22   *See* Expert Declaration of Robert M. Daines, Wagstaffe Decl., Ex. E, at ¶ 28.  Yet all movants

23   agree that the most adequate plaintiff must be assessed against a 10-day class period that covers

24   August 7, 2018, through August 17, 2018, both dates inclusive.  Fundamental principles of

25   behavioral economics and rational-choice theory render Tempus and OUF inadequate to

26

27   ───────────────────────────
     [26]    *Opportunity Unique Fund, Inc.*, OPPORTUNITYUNIQUE, http://opportunityunique.com/ (last
28   visited October 23, 2018).

1   represent investors throughout the Class Period.  *Id.* at ¶¶ 28–34; *see also* FED. R. CIV. PRO.

2   23(a)(4) (required named parties to "fairly and adequately protect the interests of the class").

3         Unlike many securities class actions, this case undoubtedly will involve a dispute over

4   when the Class Period should end.  Tesla will argue for as short a class window as possible,

5   adverting to various articles and news reports expressing skepticism that Elon Musk had truly

6   "secured" funding for a go-private transaction.  A party seeking to serve as the most adequate

7   plaintiff for an August-7-through-August-17 class must vigorously contest Tesla's assertion and

8   demonstrate that Tesla securities prices were still tainted by fraud through August 17.  A dispute

9   over the length of the Class Period does not involve the normal tension over whether some class

10  members will recover more than others.  It instead presents the sharp divide over who can

11  recover something versus who can recover nothing at all.

12        As purchasers exclusively on August 7, 2018, Tempus and OUF are not incentivized to

13  fight for the largest possible recovery.  To the contrary, they have perverse economic incentives

14  to enrich themselves at the expense of later-in-time investors. *See* Wagstaffe Decl., Ex. E, at

15  ¶¶ 30–32, 34.  Put bluntly, Tempus, OUF, and Tesla could reach an economic arrangement that

16  was rational for them while disserving the Class as a whole.  For instance, Tesla might agree to

17  pay aggrieved investors on August 7, 2018 *all* of their alleged damages.  In exchange, Tempus

18  and OUF could agree to seek a class composed only of investors on August 7, 2018.  *See id.* at

19  ¶¶ 29–30.  Tempus and OUF would achieve the maximum possible recovery while Tesla would

20  limit its overall exposure to pennies on the dollar.  Of course, Tempus, OUF, and Tesla's gain

21  would come at the cost of a *total loss* for every injured investor who transacted after August 7,

22  2018.  *See id.* at ¶ 30.  But that would not be Tempus or OUF's problem.  And if past conduct is

23  any indication, Tempus and OUF are controlled by someone who has no compunctions about

24  maximizing his own returns at the expense of those to whom he owes fiduciary duties.  Plaintiffs

25  that are economically incentivized to collude with defendants are not the most adequate

26  representatives of investor interests.  That is especially so because ours is an adversary system,

27  where courts rely on the zealous advocacy of the parties to crystalize issues and ensure a just

28

1    adjudication of civil disputes.  *See, e.g., Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 606

2    (7th Cir.1993).

3         The members of the Tesla Investor Group do not suffer from Tempus and OUF's

4    misaligned incentives.  *See* Wagstaffe Decl. Ex E, ¶¶ 28–34.  Rather, they are ideal lead

5    plaintiffs who transacted and suffered losses throughout the entire Class Period.  *See, e.g.,* Dr.

6    Shirazi (purchased shares on August 7, 2018 and held those shares until the end of the Class

7    Period); Thierry Boutin (purchased shares and sold puts on August 17, 2018); Andrew Left

8    (purchased and sold securities throughout the Class Period, including August 17, 2018).  The

9    Tesla Investor Group will not collude with Tesla to maximize its own gain at the expense of

10   absent class members because it has no economic incentive to do so.  *See id.* at ¶ 34.  It is

11   motivated to argue for the class period that controls this motion and to maximize the overall

12   recovery to all investors who were harmed by Defendants' misconduct from August 7, 2018

13   through August 17, 2018.  The Court deserves the zealous advocacy the Group promises to

14   deliver as this complex and high-stakes case unfolds.

15              **4.    Tempus and OUF Cannot Satisfy the Typicality Requirement Because
                       They are Exclusively Short Sellers of Tesla Common Stock**

16

17         Both Tempus and OUF suffered losses purely in their capacity as short sellers.  ECF Nos.

18   71-3; 71-4.  Well established economic and judicial principles confirm that shorts may be subject

19   to unique defenses that render them atypical plaintiffs.  Judicial caution is therefore warranted.

20   *See Weisz v. Calpine Corp.*, No. 4:02-CV-1200, 2002 WL 32818827, at *8 (N.D. Cal. Aug. 19,

21   2002); *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1109–10 (N.D. Cal. 2001); *see*

22   *also Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*, No. CIV.A. 00-5965 (JCL),

23   2005 WL 1365465, at *7 (D.N.J. June 7, 2005).

24         To see why this is so, a basic overview behind the mechanics of short selling is

25   instructive.  When shorting stock, a short seller borrows a share from a broker (who holds it on

26   behalf of a beneficial owner) and then immediately sells it at the prevailing market price,

27   receiving the cash proceeds from the sale.  At a future point, the short seller must repurchase a

28

share in the open market, returning it to the broker.  If the short seller repurchases the share for less than the initial sale (*i.e.*, if the price of the stock declines), she earns a profit; if the short seller repurchases the share for more than the price of the initial sale (*i.e.*, if the price of the stock appreciates), she suffers a loss.

The critical observation is that the broker is a creditor and short sellers are debtors who (like many borrowers) are subject to contractual restrictions that do not apply to parties who own their assets outright.  For instance, short sellers: (1) may be asked to return shares immediately to their owners through a recall (perhaps because the original owner has sold his shares and must deliver them to the subsequent purchaser); (2) must post collateral to guarantee their debts (effectuated through so-called margin accounts and margin requirements); and/or (3) may be forced to liquidate positions automatically if collateral requirements are breached.  Moreover, the amount of collateral a short seller must post increases as the value of shorted shares goes up.  This makes economic sense: as the value of shares appreciates, the cost to repay the short seller's debt goes up concomitantly.  *See* Wagstaffe Decl., Ex. E, at ¶¶ 24–25.

When false information drives a stock price higher, many shorts may cover their position—buying shares in the open market—in reliance on the falsehood.  Others, however, may transact in the market without relying on or even knowing about the false information at all.  For instance, short sellers may cover their position to avoid posting more collateral necessitated by the higher share price.  Frequently, they may be *forced* to liquidate their position without contemporaneous consent because the higher share price breaches a collateral limit in the short sellers' brokerage agreement or because the beneficial owner demands the shares back.  *See id.*, at ¶ 25.  Short sellers buying to cover should receive a presumption of reliance.  But Defendants will surely argue that they can rebut the presumption for shorts who covered to avoid posting collateral or who were forced out of their positions by third parties.  Because short sellers can and do cover their shorts for different reasons, not all short sellers are created equal, and many short sellers thus are poor candidates to represent a class.

1    Here, Tempus and OUF transacted in Tesla common stock solely to cover previous short

2 sales.  Although those transactions might have occurred in reliance on Musk's series of

3 misleading tweets, the minimal filings by Tempus and OUF leave reason for doubt.  Tempus and

4 OUF's trading disclosure shows irregular activity—namely, large purchases of stock at a

5 uniform price.  Perhaps that is their shorthand way of presenting "average" activity through an

6 extended period of time.  But if it is accurate—in other words, if Tempus and OUF moved their

7 entire block of shares in a single trade—that could indicate a forced sale rather than a conscious

8 choice to close out their short position.

9    Moreover, publicly available trading data suggests that Tempus and OUF purchased

10 Tesla stock late in the trading day, hours after Musk's original tweets and only minutes before

11 the market closed.  *See* Wagstaffe Decl., Ex. F.  That could suggest that the trades were made to

12 comply with margin calls or broker recalls, to ensure that Tempus and OUF concluded the

13 trading day in compliance with their collateral requirements.  More information from Tempus

14 and OUF is necessary to determine whether they would be subject to unique defenses and thus be

15 atypical.  At a minimum, discovery is required.  If Tempus and OUF bought Tesla shares to

16 avoid a margin call, because their broker forced them to close their positions, or because their

17 shares were recalled, they are subject to unique reliance defenses that prevent them from serving

18 as most adequate plaintiff.  *See Calpine Corp.*, 2002 WL 32818827, at *8; *Critical Path*, 156 F.

19 Supp. 2d at 1109–10; *Rocker Mgmt.*, 2005 WL 1365465, at *7.

20    By contrast, members of the Tesla Investor Group have filed supplemental declarations

21 confirming that any purchases of Tesla common stock that were made to cover short sales

22 occurred in reliance on Musk's tweets and not due to forced activity.  *See* Wagstaffe Decl. Ex G.

23 In addition, the Tesla Investor Group has presented the trading activity of all its members in full

24 detail so this Court can review all quantities and respective prices.

25

26

27

28

1     **II.**      **THE COURT SHOULD PERMIT THE TESLA INVESTOR GROUP TO**
           **CONDUCT LIMITED DISCOVERY INTO THE ABILITY OF TEMPUS AND**
2             **OUF TO SERVE AS LEAD PLAINTIFF**

3          If this Court does not deny Tempus and OUF's motion outright, the Tesla Investor Group

4  respectfully requests that the Court grant limited discovery to determine whether Tempus and

5  OUF are capable of adequately representing the Class.

6          When another plaintiff "demonstrates a reasonable basis for finding that the

7  presumptively most adequate plaintiff is incapable of adequately representing the class," the

8  PSLRA permits discovery relating to whether that party "is the most adequate plaintiff."  15

9  U.S.C. § 78u-4(a)(3)(B)(iv).  As set forth above, a reasonable basis exists to justify limited

10  discovery of Tempus and OUF given the defects in their motion and certifications, their lack of

11  transparency and failure to provide the most basic information about their standing and

12  adequacy, and the highly unusual trading patterns set forth in the funds' certifications.  *See*

13  *Applestein v. Medivation, Inc.*, No. C 10-00998 MHP, 2010 WL 3749406, at *5 (N.D. Cal. Sept.

14  20, 2010) ("the lack of transparency and publically [sic] available information about [opaque

15  investment fund movant] makes it impossible for the parties and the court to determine whether

16  or not [the fund] is a typical investor"); *Andradel*, 2011 WL 13131110, at *3 (allowing limited

17  discovery, citing cases where potential lead plaintiffs were disqualified for unrelated misconduct

18  and a lack of transparency); *Network Assocs.*, 76 F. Supp. 2d at 1027 (allowing discovery

19  concerning a movant's background, qualifications, and adequacy, and finding the information

20  gathered during the short depositions to have proven "illuminating"); *In re Vonage Initial Pub.*

21  *Offering (IPO) Sec. Litig.*, No. CIV A 07-177 (FLW), 2007 WL 2683636, at *3 (D.N.J. Sept. 7,

22  2007) (granting limited discovery of prospective lead plaintiff).

23          The Tesla Investor Group has demonstrated a reasonable basis for discovery of

24  Opportunity Gestão, Tempus, and OUF because they have *prima facie* standing, adequacy and

25  typicality deficiencies.[27]  If those issues are not clarified and resolved now, they almost certainly

26

27       [27]     On October 15, 2018, counsel for the Tesla Investor Group wrote to counsel for Tempus and
28  OUF requesting: (1) documents establishing Opportunity's relationship to Tempus and OUF and
authority to authorize litigation on their behalf; (2) documents establishing that Opportunity received such

1    will come back to haunt the Class at class certification, and they could jeopardize the litigation.

2    Accordingly, the Court should order limited discovery of Tempus and OUF in order to obtain a

3    full understanding of the funds' capacity to serve in the role of lead plaintiff.

4    **III.     THE TESLA INVESTOR GROUP IS THE PRESUMPTIVE LEAD PLAINTIFF**

5              For all the reasons set forth above, Tempus and OUF cannot serve as lead plaintiff.  As a

6    result, the plaintiff with the next-greatest loss—the Tesla Investor Group, with losses of

7    $**4,478,595.74**—is presumed to be the most adequate plaintiff.  The Group is an organically

8    formed, client-driven group of experienced and diverse investors: buyers who purchased and

9    held shares in anticipation of a go-private transaction, short sellers who bought to cover their

10   positions, and investors who traded options in reliance on Elon Musk's misstatements.  The

11   Group provides the Class with the broadest spectrum of representation and ensures that the

12   interests of all Class members will be adequately represented and vigorously protected.  *See* ECF

13   No. 51-4, at ¶¶ 7–9.

14             As set forth in the Tesla Investor Group's opening brief (ECF No. 47, at 10–12), the

15   PSLRA provides that multiple investors can serve as lead plaintiff under proper circumstances.

16   *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii) (providing that the court shall appoint a person "or group of

17   persons" as lead plaintiff).  In their Joint Declaration, the Group members explain that each of

18   them determined to form a group to seek appointment as lead plaintiff that would litigate this

19   action independently of counsel and in the best interests of all Class members.  *See* ECF No. 51-

20   4, at ¶¶ 7–8.   The Joint Declaration also explains when, how, and why the members of the

21

22   authorization prior to the date the certifications were signed; (3) the relationship between and among
     Opportunity, Tempus, OUF, and Dantas; (4) the identities of the fund(s) that actually executed the
23   transactions listed in the certifications; (5) the full record of transactions actually made by each entity in
     Tesla securities (including placement of new short sales) between August 7, 2018 and August 17, 2018,
24   inclusive; (6) the Comprehensive Settlement and Release Agreement, dated April 25, 2008, relating to the
     settlement of the litigation in *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, No. 05-cv-2745
25   (S.D.N.Y.), filed as an exhibit in *Dantas, et al. v. Citibank, N.A.,* et al., No. 1:17-cv-01257-JMF
     (S.D.N.Y.) (the "Dantas Litigation"); and (7) a copy of the legal opinion of Andre Zenkner Schmidt
26   provided to the court in the Dantas Litigation, on or about February 17, 2017.  *See* Wagstaffe Decl., Ex.
     H.  Counsel for Tempus and OUF ignored those legitimate requests, thereby preventing the Tesla Investor
27   Group from acquiring sufficient information to adequately assess Tempus and OUF's suitably to serve as
     lead plaintiff.
28

1    Group decided to join forces.  *See id.*, at ¶¶ 7–9.  In fact, after lengthy, separate discussions with

2    Keller Lenkner and Labaton Sucharow, Dániel Nemes, the sole owner and Managing Director of

3    group member PROtecto Informatikai Szolgáltató Korlátolt Felelősségű Társaság, specifically

4    requested that both firms work with him and other investors to create the broadest representation

5    for all Class Members.

6         Members of the Tesla Investor Group represent all the different trading strategies and

7    time periods that are covered by the class definition in this case.  *See* ECF Nos. 51-4, at ¶¶ 7; 47,

8    at 2.  The members of the Group purchased, sold, and transacted in Tesla securities throughout

9    the period of August 7, 2018, and August 17, 2018.  For example, Dr. Shirazi purchased Tesla

10   common stock on August 7, 2018, and held those shares until the end of the Class Period.  *See*

11   ECF No. 51-2, at 6–7.  PROtecto Informatikai Szolgáltató Korlátolt Felelősségű Társaság

12   purchased Tesla common stock during the Class Period to cover pre-existing short positions and

13   sold puts during the Class Period.  *See id.* at 4–5.  Thierry Boutin purchased Tesla common stock

14   throughout the Class Period (including on August 9, 16, and 17, 2018, and sold puts on August

15   17, 2018).  *See id.* at 6.  Andrew E. Left purchased and sold Tesla securities throughout the Class

16   Period, including on August 17, 2018.  *See id.* at 1–3.  Vilas Capital covered its pre-Class Period

17   short positions by buying Tesla common stock during the Class Period.  *See id.* at 7.  Thus, the

18   Tesla Investor Group would have standing to represent all members of the Class for the entire

19   length of the Class Period and would fully and fairly represent all the members of the Class,

20   notwithstanding when their purchases or sales occurred.  This broad coverage is in stark contrast

21   to Tempus and OUF, which covered their short positions by purchasing Tesla common stock

22   only on the first day of the Class Period.

23        The Tesla Investor Group also selected experienced counsel to represent the Class.

24   Keller Lenkner and Labaton Sucharow have served in numerous securities litigation proceedings

25   under the PSLRA.  Likewise, Kerr & Wagstaffe has substantial experience litigating complex

26   cases in this District and is well suited to serve as Liaison Counsel.  *See* ECF No. 47, at 14.

27

28

1    Because the Tesla Investor Group has a substantial financial interest in the relief sought

2 by the Class and is a qualified movant that otherwise satisfies Rule 23, the Court should appoint

3 it as lead plaintiff.[28]

4 **IV.    THE REMAINING COMPETING MOTIONS SHOULD BE DENIED**

5    Based on their own representations to the Court, the remaining movants—Johnson

6 ($333,185.26), David ($439,399.85), Bridgestone ($2,272,864.20), and Littleton

7 ($3,518,478.68)—claim smaller losses than the Tesla Investor Group.  FNY does not bother to

8 provide financial losses at all, and preliminary calculations show that FNY had ***gains*** from its

9 transactions during the Class Period.  Because the remaining movants have smaller losses than

10 the Tesla Investor Group, they cannot establish that they are the most adequate plaintiff.

11 Moreover, as set forth below, several movants could not be appointed even if they had the largest

12 financial loss.[29]  The competing motions should be denied.

13 **A.    Littleton Is Atypical Because He Traded Almost Exclusively in Options**

14    Littleton traded almost exclusively in options during the Class Period.  In fact, Littleton

15 purchased only 100 shares of Tesla common stock during the class period (on August 9, 2018)

16 for a claimed loss of $3,552, but he purchased or sold Tesla options for a claimed loss of

17 $3,514,926.68.  Options traders have been found inadequate as lead plaintiffs for classes that

18 include purchasers of equity.  *See, e.g.*, *Andrada v. Atherogenics*, Inc., No. 05CV61(RJH), 2005

19 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005).  That is because options trade not only based on the

20 underlying value of the reference security (in this case, Tesla stock), but also based on interest

21

22

23

24    [28]    Should the Court find any reason to deny the Tesla Investor Group's appointment as a whole, the
Court has inherent power to appoint individual members of the Group to serve as lead plaintiff.  *See e.g.,*
25 *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) ("A group vying for lead
plaintiff status does not necessarily rise and fall as a group.  Segmentation is a viable remedy and finds
26 support in case law."); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 306 (S.D.N.Y. 2001)
(selecting a single member of a proposed group to serve as lead plaintiff).

27    [29]    The Freeland Group and the Kulik Group withdrew their lead plaintiff applications on October
28 22, 2018 and October 23, 2018, respectively.  ECF No. 102, 104.

1    rates, time to expiration, and anticipated volatility.  *See id.*  As such, options traders are subject

2    to unique damages defenses that do not apply to stockholders.

3            For example, in *Andrada*, the court refused to appoint an options purchaser as lead

4    plaintiff on behalf of a class that included stock purchasers, stating:

5            Were South Ferry to be appointed lead plaintiff for the entire class, factual issues
             specific to South Ferry in determining the precise value of the options—*e.g.*, the
6            maturity, the volatility of the price of Atherogenics stock, the level of short term
             interest rates, and the competitive structure of the market in which the options are
7            traded—would likely threaten to become the focus of the litigation.

8    *Id.* (internal quotation marks omitted); *see also Weikel v. Tower Semiconductor, Ltd.*, 183 F.R.D.

9    377, 391 (D.N.J. 1988) (rejecting certification where movant had purchased Euro Options

10   because factual issues regarding value of options and damages would divert focus from the

11   underlying litigation).[30]

12           **B.     Bridgestone Has Not Proven Its Authority To Serve As Lead Plaintiff**

13           Because Bridgestone also traded almost exclusively in options during the Class Period,

14   Bridgestone is similarly inadequate to represent the Class of Tesla equity investors.  Moreover,

15   as set forth above, a lead plaintiff applicant is required to prove its authority to serve as lead

16   plaintiff on behalf of a corporation or partnership (*see supra* at 10-12, showing that Tempus and

17   OUF have not demonstrated such authority).  Bridgestone's PSLRA certification is defective, as

18   it does not demonstrate standing and authority to serve as lead plaintiff.  Although the

19   certification is signed by Jian Liu, it does not set forth Jian Liu's relationship to Bridgestone or

20   authority to sign the certification and move for appointment as lead plaintiff on its behalf.  *See,*

21   *e.g., Smajlaj*, 2006 WL 7348107, at *3 (rejecting hedge funds' lead plaintiff application because

22   of questions relating to authority to proceed).

23           Further, in its opening memorandum of law, Bridgestone overstated the size of its

24   financial interest in the litigation by approximately $1.7 million.  *Compare* ECF No. 46, at 6

25   ("Bridgestone suffered a loss of approximately $3.9 million") *with* ECF No. 52-2 (Bridgestone

26

27   ───────────────────────────────

28   [30]      If appointed, the Tesla Investor Group would endeavor to include Littleton as a class
     representative due to his losses in options, to represent the purchasers and sellers of Tesla options.

1   loss chart claiming $2,229,981.20 loss).  By incorrectly calculating losses in its initial motion by

2   almost $1.7 million, Bridgestone called into question the primary basis for its purported

3   appointment as lead plaintiff.  *See*, *e.g.*, *Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, No.

4   14 Civ. 10020 (RMB), 2015 WL 1345931, at *3 (S.D.N.Y. Mar. 19, 2015) (concluding that

5   incorrect loss calculations "undermine[] [movant's] adequacy as lead plaintiff").

6        **C.**    **FNY Is Atypical Because Of Its Immense Trading Activity and Its Failure to Quantify Its Financial Interest in This Litigation**

7

8         By virtue of its immense trading volume (both purchases and sales) during the Class

9   Period, FNY appears to have behaved much like a market maker, subjecting it to unique defenses

10   that render it atypical of the Class.  Market makers buy and sell stock regularly in hopes of

11   earning a small profit on each trade by capturing the difference between the bid and ask prices.

12   15 U.S.C. § 78c(a)(38); *McNichols v. Loeb Rhoades & Co., Inc.,* 97 F.R.D. 331, 344 (N.D. Ill.

13   1982).  Because they do not trade on the basis of information—whether true or false—

14   disseminated into the marketplace, market makers are subject to a strong reliance defense.  *See*

15   *Tice v. Novastar Fin., Inc.*, No. 04-0330-CV-W-OLD, 2004 WL 1895180, at *5 (W.D. Mo. Aug.

16   23, 2004) (holding a market maker atypical because it was potentially subject to unique defenses

17   regarding its reliance); *Seamans v. Aid Auto Stores, Inc.*, No. 98-CV-7395(DRH), 2000 WL

18   33769023, at *4 (E.D.N.Y. Feb. 15, 2000) (holding that a market maker could not be lead

19   plaintiff because reliance and materiality are unique defenses for a market maker); *McNichols,*

20   97 F.R.D. at 344 (holding that a market maker is atypical because "issues of both reliance and

21   materiality would be different for a market maker").

22         FNY's trading activity is indicative of just this sort of deficiency.  By the Tesla Investor

23   Group's calculations—necessary because FNY does not deign to supply calculations of its

24   own—FNY traded approximately $300 million through both purchases *and* sales of Tesla,

25   resulting in more than $400,000 in ***gains*** during the Class Period.  *See* Wagstaffe Decl., Ex. I.

26   That is not the trading activity of a plaintiff who relied on misinformation in the marketplace.  It

27   is no surprise, therefore, that a previous FNY bid to serve as lead plaintiff was denied.  *In re*

28

1  *Cardinal Health, Inc. Sec. Litig*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) (denying FNY's lead

2  plaintiff application after concluding that the firm was "susceptible to unique defenses and [ ]

3  thus [ ] not an adequate Lead Plaintiff").

4      FNY's failure to quantify its financial interest—and its elision of the fact that it appears

5  to have **profited** from Defendants' misconduct—calls into question its fitness and commitment to

6  serve as lead plaintiff.  Without any quantified financial interest, the Court cannot fully "compare

7  the financial stakes of the various plaintiffs and determine which has the most to gain from the

8  lawsuit." *In re Cavanaugh*, 306 F.3d at 730; *see also Switzenbaum v. Orbital Scis. Corp*., 187

9  F.R.D. 246, 250–51 (E.D. Va. 1999) (denying a lead plaintiff motion that provided the court with

10  only a "'simple mathematical' conclusion that they have the largest financial interest in the

11  case").  If FNY belatedly attempts to quantify a loss or financial interest, its tardy effort should

12  not be considered.  *See In re Atl. Power Corp. Sec. Litig*., No. CV 13-10537-DPW, 2014 WL

13  12628589, at *1 & n.1 (D. Mass. Mar. 31, 2014) (refusing to appoint investor with largest

14  financial interest as lead plaintiff group after it "chose not to provide specificity regarding its loss

15  amount," and finding such tactic "delayed full comparative analysis" and "bespeaks a less than

16  full commitment to transparency in providing the court with information that it ultimately would

17  require to make its decision").

## CONCLUSION

18

19      The Tesla Investor Group respectfully requests that the Court consolidate the above-

20  captioned related actions, appoint the Tesla Investor Group as Lead Plaintiff, approve its

21  selection of Keller Lenkner LLC and Labaton Sucharow LLP as Co-Lead Counsel and Kerr &

22  Wagstaffe LLP as Liaison Counsel for the Class, and deny all competing motions.  Alternatively,

23  the Tesla Investor Group respectfully requests limited discovery of Tempus and OUF concerning

24  their ability to fairly and adequately represent the Class.

25  DATED:  October 23, 2018                    Respectfully submitted,

26                                              */s/ James M. Wagstaffe*

27                                              James M. Wagstaffe (#95535)
                                                **KERR & WAGSTAFFE LLP**
28

Frank Busch (#258288)
101 Mission Street, 18th Floor
San Francisco, California 94105
Telephone: (415) 371-8500
Facsimile: (415) 371-0500
wagstaffe@kerrwagstaffe.com
busch@kerrwagstaffe.com

*Proposed Liaison Counsel for the Class*

**KELLER LENKNER LLC**
Ashley C. Keller (*admitted pro hac vice*)
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Telephone: (312) 741-5222
ack@kellerlenkner.com

**KELLER LENKNER LLC**
U. Seth Ottensoser (*admitted pro hac vice*)
1330 Avenue of the Americas, Suite 23A
New York, NY 10019
Telephone: (212) 653-9715
so@kellerlenkner.com

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
David J. Schwartz
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
dschwartz@labaton.com
fmcconville@labaton.com

*Counsel for the Tesla Investor Group and
Proposed Co-Lead Counsel for the Class*