**Exhibit C**



**KEL328**
Revised September 27, 2013

SUSAN PERKINS

# Citigroup's Shareholder Tango in Brazil (A)

*Inequitable action does not become permissible simply because it is legally possible.*[1]

On March 2, 2005, Mary Lynn Putney, Citigroup's vice president of global investments, stared at the legal report on her desk in disbelief. According to Mattos Filho, a Brazilian law firm Putney had retained, Daniel Dantas, "one of Brazil's cleverest financiers"[2] and the man Citigroup had hired five years earlier to manage its $750 million private equity investment in a Brazilian telecommunications industry joint venture, had allegedly mismanaged more than $300 million in assets and contracts. The expropriation offenses included using joint venture assets to pay for Dantas's own business's employees, office equipment, and even the use of private planes; covertly attempting to auction off partnership equity; signing new shareholder agreements with self-serving clauses; and making side deals estimated at more than $1 billion with major suppliers.

Dantas's misconduct related to his management of Citigroup's CVC Fund and II-FIA, a legal entity representing a group of large Brazilian pension funds. Together with Dantas's Grupo Opportunity, CVC and II-FIA owned Brasil Telecom, the third largest telecommunications company in the country. Since early in the partnership, Putney and her team had seen multiple signs that Dantas was acting in his own self-interest rather than the joint venture's, but the partnership's pyramidal ownership structure made his actions difficult to track. Now that Putney had clearer documentation of the ownership structure actually in place and Dantas's numerous expropriation schemes, she had to quickly determine how to disrupt his intricately woven web of control without allowing him to extract further value from the partnership. However, given Dantas's multi-pronged tactics, Citigroup's unfamiliarity with pyramidal ownership, and Brazil's legal and regulatory system, this would be no easy task.

## A Promising Partnership

In July 1998 Citigroup had decided to invest in Brazil's recently privatized telecommunications industry, based on the sector's growth potential. There were high levels of unmet demand in the market.[3] Only 20 percent of households had phone service at the time, with an average waiting time of more than two years for new lines in São Paulo. Citigroup had made

---

[1] U.S. District Court for the Southern District of New York (S.D.N.Y.), Motions 2745; 2006 U.S. Dist. Lexis 6776, 3.
[2] Jonathan Wheatley, "Missed Opportunity in Brazil," *Latin Finance*, October 1, 2000.
[3] ITU, World Communications Development Report—1998, 37.

©2013 by the Kellogg School of Management, Northwestern University. This case was written by Professor Susan Perkins. Cases are developed solely as the basis for class discussion. Cases are not intended to serve as endorsements, sources of primary data, or illustrations of effective or ineffective management. To order copies or request permission to reproduce materials, call 800-545-7685 (or 617-783-7600 outside the United States or Canada) or e-mail custserv@hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of the Kellogg School of Management.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

the investment through its wholly owned subsidiary, International Equity Investments, Inc. (IEII), placing $748 million in capital in a consortium jointly owned and organized by (1) Grupo Opportunity, one of Brazil's premier asset management companies, led by Daniel Dantas, and (2) II-FIA (Investidores Institucionais Fundo de Investimento em Ações),[4] which comprised several large Brazilian pension funds.

The new joint venture of sorts[5] took ownership of Brasil Telecom in July 1998. The equity participation of all three partners in the joint venture was held in a holding company named Zain Participações S.A. As Putney understood it, the original ownership structure was determined based on same-class securities proportional to the amount of capital invested. As such, both Citigroup's and the pension funds' investments dwarfed that of Grupo Opportunity, at 44.86 percent, 45.85 percent, and 9.29 percent respectively. To manage the large investment, Citigroup hired Dantas, head of Grupo Opportunity and reputedly the best foreign fund manager in Brazil at the time,[6] as the general manager of the offshore fund. Dantas—a Ph.D. in economics from Fundação Getulio Vargas (one of Brazil's leading business schools),[7] former MIT scholar, investment manager with Icatu and Banco Bradesco (Brazil's largest private sector bank), and former advisor to Brazilian President Fernando Collor—seemed perfect for the job. Citigroup was dazzled by Dantas's qualifications, connections, and expertise, especially his knowledge of the private equity market in Brazil.

Citigroup's investment was named the CVC Fund (Citigroup Venture Capital International Brazil, L.P.[8]), also known as the offshore fund, which was legally registered in the Cayman Islands but managed by Opportunity Equity Partners, LTD, a member of the Opportunity pyramidal group (also registered in the Cayman Islands). The CVC Fund was governed by a limited partnership agreement (LPA) in which the general partner was responsible for the management, control, operations, and policies of the fund. Putney hired Dantas to serve as the general partner. According to the Cayman Island laws of partnership, this was a common ownership structure (see **Exhibit 1**). On behalf of Citigroup's CVC Fund, Putney, the vice president of global investments, was the limited partner of register. Giving Dantas such control over the investment meant that he carried fiduciary responsibility to the limited partner Citigroup. Citigroup's original understanding of the shareholder arrangements among the partners regarding the Brasil Telecom ownership structure was that the U.S. company would assume indirect control through its dominant stake in Zain Participações (see **Exhibit 2**). At this point Citigroup knew little about the entities within the full chain of control over Brasil Telecom but recognized that, in theory, if Zain were the dominant owner, Citigroup's interests would ultimately be exercised in Brasil Telecom.

Because of Dantas's qualifications, the Brazilian onshore pension funds group, like Citigroup, hired him to manage its funds in the joint venture as the "general partner" of its

---

[4] II-FIA was formerly named the CVC/Opportunity Equity Partners Fundo de Investimento em Ações—Carteira Livre.

[5] The partnership agreement suggests the investment was more of a "side-by-side" investment with other entities. In essence, the CVC Fund invested and divested in tandem with other funds managed by entities under common control with Opportunity Equity.

[6] *Latin Finance* magazine named Opportunity Asset Management, founded and managed by Daniel Dantas, the Best Foreign Fund of the Year in 1997 based on asset performance. In 1997 Opportunity's fixed income fund achieved accumulated profitability of 160.31 percent over the prior five years. The company had received several similar accolades since its inception in 1992.

[7] Daniel Dantas completed his doctorate in 1982 at Fundação Getulio Vargas and subsequently engaged in postdoctoral research and teaching at MIT.

[8] According to the limited partnership agreement, the CVC Fund was governed by the general partner, Equity Partners, an Opportunity family firm, which was responsible for "management, control, operation, and policy" of the fund and acknowledged its status as a fiduciary for the limited partner (U.S. Dist. Ct., S.D.N.Y., 2005).

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

separate legal entity: II-FIA. Managing both the CVC Fund and II-FIA placed Dantas in a unique position within the joint venture: he was both minority stakes owner and general manager. At the time, this dual role did not appear to present a significant conflict of interest.

According to Citigroup, over the first years of the investment Dantas's performance as the general manager of the CVC Fund was satisfactory. And by all indications Brasil Telecom was growing well. By the end of September 2001 the company had completed installations of 9.86 million phone lines, well beyond its 2001 target of 7.89 million fixed lines installed.[9] Because of this performance indicator and others, Brasil Telecom, already the country's third largest fixed telecommunications company, quickly gained buy recommendations for its stocks listed on the Bovespa stock exchange (see **Exhibit 3**). Dantas was also involved in major hiring decisions, appointing the new CEO Carla Cico to run Brasil Telecom.

## Signs of Trouble

Soon, however, several disturbing signs surfaced regarding the joint venture, mostly surrounding Dantas's actions and motives. These included conflicts with other equity partners, ambiguity around the partnership's ownership structure, and family connections among the participants' boards.

### *Shareholder Disputes*

Dantas revealed himself as an aggressive and controversial manager through disputes with other minority shareholders of Brasil Telecom. For example, in 2001 Dantas initiated a battle with Telecom Italia, seeking to have it removed from the ownership structure based on regulatory constraints stipulated by Anatel, Brazil's telecommunications regulatory agency. However, top telecommunications industry executives alleged that the conflict arose because both Dantas's Grupo Opportunity and Telecom Italia were aggressively pursuing additional privatization deals to operate cellular telephone services, competing for such licenses with foreign investment partnerships other than the Citigroup venture. The *Wall Street Journal* reported that "the battle for control had hampered Brasil Telecom's growth,"[10] which was troubling.

In 2002 Dantas clashed with João Bosco Madeiro da Costa, the onshore pension fund manager, after da Costa alleged that Dantas provided money from the partnership to members of the ruling Workers' Party for use in a bribery scheme. Dantas denied such allegations outright. Citigroup's role as silent partner limited its presence in the partnership's daily operations, including these disputes; in fact, Citigroup deferred to Dantas's judgment in regard to these conflicts and presumed that he was acting to protect the U.S. company's interest.

---

[9] Lucy Berridge and John Hernandez, *Baskerville Market Review—Latincom Yearbook* (2002), 140.
[10] Jonathan Karp and Paul Beckett, "Citigroup Fund Dispute in Brazil Is Near Resolution," *Wall Street Journal*, September 23, 2002.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

## *Who Owns Whom?*

By 2003 more eyes were on the shareholder structure of Brasil Telecom, especially those of Anatel. The regulator was interested in the structure because its multiple layers and configuration made it challenging for even its participants to understand. Specifically, Brasil Telecom, the actual telecom service provider, was owned by a nexus of holding companies arranged in six tiers that made the exact ownership structure quite complex. As a result, Citigroup was clear about its participation in the holding company Zain (see **Exhibit 4**), which was owned by the three joint venture partners, but less certain about the entire chain of control, especially the implications of Citigroup's ownership ties to firms on lower tiers. For example, the following was revealed about the control chain in subsequent court proceedings:

> *Zain holds 68.28 percent of the voting shares in Invitel S.A., which in turn holds 99.99 percent of the voting shares in Techold, which owns 61.98 percent of the equity stakes in Solpart. Of the remaining shares in Solpart, 38 percent are held by Telecom Italia and 0.02 percent by Timepart. Solpart holds 51 percent of the voting shares in Brasil Telecom Participações (BTP) and BTP, the preferred and common shares of which are traded publicly in Brazil, holds 99.07 percent of the voting shares in Brasil Telecom.*[11]

However, the equity stakes invested were disproportionate to the voting stakes, particularly within the lower tiers (see Exhibit 4). This voting stake structure deviated dramatically from the shareholder agreement's original terms, which stipulated shares proportionate to invested capital.

Although such lack of disclosure was common practice in Latin America and particularly in Brazil, in 2004 Anatel ordered Brasil Telecom to divulge the shareholder ownership structure of Timepart Holdings. The regulatory agency suspected this holding company was indirectly controlled by Dantas rather than the CVC Fund.[12] Even Citigroup was not certain of the ownership structure in which it resided, as prior Brasil Telecom annual reports revealed shareholder configurations that were constantly evolving and ambiguous with regard to the ultimate parents and/or the presence of poorly identified holding companies (see **Exhibit 5**). For example, at the beginning of the joint venture, the 1998 annual report claimed that "Timepart is the holding [company] controlled by Telecom Holding S.A., Privtel Investimentos S.A., and Teleunion S.A." All three of these companies remained unknown to Citigroup; that is, from Citigroup's point of view they were not part of the control chain reflected in the ownership structure of Zain Participações. But the implications of the true ownership structure were of grave importance to Citigroup. For example, if Dantas were the owner of Timepart, then this would effectively give him control over 100 percent of the equity in Brasil Telecom through Timepart's 62 percent voting rights predicated on an equity stake of only 0.02 percent in the company (see Exhibit 4).

Anatel's investigation revealed a potential worst-case scenario for Citigroup: the owners of Timepart were Dantas's father Luiz, along with a business partner of Dantas and a third potentially related company.[13] Anatel described the three shareholders as "nebulous, because one is a dead person, another denied Anatel the information it requested, and a third shareholder is a Brazilian investor which has no history with the telecoms market."[14] The article did not state

---

[11] U.S. Dist. Ct., S.D.N.Y., 407 F. Supp. 2d 483, 2005 U.S. Dist. Lexis 10468, 4, decided June 2, 2005.
[12] "Regulator Seeks Clarification on BrT Shareholding," *Business News Americas*, March 9, 2004.
[13] Jonathan Wheatley, "Citigroup Faces More Pressure in Brazil," *Financial Times*, March 7, 2004.
[14] "BrT: Citigroup Does Not Control Operator," *Business News Americas*, March 12, 2004.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

which shareholder was which. Through an independent investigation, Citigroup identified the owners of the Timepart holding company as Luiz Dantas, Eduardo Santos, and the Woog family. According to U.S. Securities Exchange Commission filings, the Woog family reportedly controlled a former CVC entity called Cable Systems Holdings.[15] However, the family denied ownership of Timepart at the time of Citigroup's investigation. A senior onshore pension fund investor reported, "None of us knew that our partner [Opportunity] had additional control through another route. The people running Brasil Telecom are not the people that invested money in it."[16] As would later be discovered, unbeknownst to partners Citigroup and II-FIA, Opportunity had control of Brasil Telecom through familial ties and business associates linked directly to Grupo Opportunity's pyramidal ownership structure.

On the evening of October 6, 2003, around the time of Anatel's inquiry, twelve of the fourteen II-FIA board members voted to oust Dantas and Grupo Opportunity as the general fund manager without explanation to the public.

## *All in the Family*

Through Citigroup's and Anatel's investigations, Putney also learned that not only did Dantas effectively maintain indirect control through the combination of his minority stakes and managerial responsibilities for both the onshore and offshore funds, but he also called the shots through family members and close associates he appointed to each of the holding company firms' boards. For example, the three-person boards of the pyramid group firms Zain, Invitel, and Techold each included Dantas himself, his sister Verônica Valente Dantas, and Maria Amalia Delfim de Melo Coutrim, an Opportunity employee. Four of the six Brasil Telecom Participações board members were tied to the Dantas family: Dantas's sister, Verônica Valente Dantas; Dantas's brother-in-law, Arthur Joaquim de Carvalho; Dantas's former brother-in-law, Carlos Bernardo Torres Rodenburg; and a Grupo Opportunity attorney, Luis Carvalho de Motta Veiga, the board chairman.[17] Likewise, four of the seven board members of Brasil Telecom were affiliated at some level with Opportunity. All of these family members and close associates were brought in by Dantas over the years to control the decision making of this collective.

By early 2004, due to media and inside reports on some of the activities outlined above, Citigroup's Mary Lynn Putney had become suspicious of Dantas's corporate governance practices and ownership structure manipulation, especially given their lack of transparency. As an initial step, Putney met directly with key II-FIA executives to understand why they had decided to fire Dantas six months earlier. Her meeting with João Bosco Madeiro da Costa, the former onshore fund investment director, was illuminating and disturbing. One of the topics they discussed was other Dantas deals with poor outcomes. According to local sources, "Dantas is notorious for his opaque shareholder structures in Brazil."[18] For example, Canadian telecommunications company TIW (Telesystems International Wireless) also joint ventured with Grupo Opportunity on two cellular telecommunications companies, Telemig and Tele Norte. It was eventually forced to leave the market with no alternative other than to sell Dantas its assets at a fraction of the original investment. At that time TIW had twenty lawsuits filed in Brazil against Dantas for shareholder wrangling that ousted its presence from the board even though it was the

---

[15] Wheatley, "Citigroup Faces More Pressure in Brazil."

[16] Jonathan Wheatley, "Funds Enter Ownership Dispute," *Financial Times*, March 8, 2004.

[17] U.S. Dist. Ct., S.D.N.Y., 407 F. Supp. 2d 483, 2005 U.S. Dist. Lexis 10468, 4, decided June 2, 2005.

[18] "BrT: Citigroup Does Not Control Operator."

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

dominant stakeholder, with 48.93 percent of the company. Sadly, none of these cases were ever heard in the Brazilian court system.

Putney slowly came to understand that Dantas "maintained control of Brasil Telecom through a series of holding companies that sit within large labyrinths of holding companies."[19] Da Costa observed that Opportunity effectively controlled the pyramid with a dense network of strategically placed minority equity stakes coveted by majority voting rights. He believed that Dantas's strategy was simple: staging large battles between his partners to squeeze out value for himself. Because he held approximately 10 percent of the pyramid's top level, Dantas was the swing vote. Once he gained control through his carefully constructed dominant voting rights, Dantas peopled the boards with his appointees to take over their decision making, effectively blocking outside influences. Dantas took advantage of this position as the controlling general manager of the chain, running from one side to the other to manipulate control. This led to the onshore fund's firing Opportunity as the fund manager the prior year, alleging that Opportunity "began to perform a number of acts contrary to the interests of the Brazilian investors who had entrusted their funds to its management."[20]

## Fooling the World's Largest Bank

Putney's concerns regarding Dantas's business practices peaked when she was informed on October 14, 2004, that Globalvest Management Company, an emerging market fund management company, had filed a lawsuit against Citigroup for $300 million. The lawsuit alleged that Dantas, Globalvest's Brazilian investment manager, had tried to coerce the firm to sell its shares in other[21] CVC Fund-owned telecommunications companies well below the market value. This news came just after another lawsuit, settled in August 2004, had been brought by a former Opportunity Equity Partners employee involved in a shareholder feud with Dantas. In fact, such legal action against Dantas stretched back almost to the CVC Fund's inception. Roberto Demarco Almeida, an alleged disenfranchised shareholder and manager, had filed an injunction in 1999 to liquidate the CVC Fund through the Cayman Islands courts because Dantas had allegedly swindled him out of his 3.5 percent junior stake in the fund. While Citigroup was aware of this situation, Dantas had assured the firm that there had been no wrongdoing on his part; his innocence seemed to be confirmed by his winning the first round in the Cayman courts. However, after several rounds of appeal in the Cayman Islands, the case's final ruling in the English courts had the Queen of England endorsing a judgment against Dantas.[22] The potential threat of liquidating the fund was resolved by a settlement to Demarco in the amount of $15 million.[23]

For Citigroup, the timing of such legal action and scrutiny of its global corporate governance and ethical practices could not have been worse. It came at a time when Chuck Prince, Citigroup's CEO, was working to rebuild the bank's reputation after being hurt in scandals in the United States, Europe, and Asia. Citigroup had only recently regained the general confidence of

---

[19] Terry Wade, "Brazilian Police Wade through Kroll Documents," *Reuters News*, October 28, 2004.

[20] U.S. Dist. Ct., S.D.N.Y., 407 F. Supp. 2d 483, 2005 U.S. Dist. Lexis 10468, 7, decided June 2, 2005.

[21] CVC Fund also owned telecommunications properties other than Brasil Telecommunications (e.g., Amazonia) that are not mentioned in this case.

[22] "Dantas Is Condemned by the Court of England," *Gazeta Mercantil*, October 4, 2006.

[23] Irany Tereza, "Court of London Finishes with Dispute in Opportunity; Daniel Dantas Loses Share to Luis Robert Demarco," *Jornal do Commercio*, October 4, 2006.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

the investment community after its name had been tarnished by its alleged indirect role in the 2002 Enron scandal. In August 2004, two months prior to Globalvest's lawsuit, the bank was accused of violating unwritten trading conventions in the United Kingdom. The following month, Japanese regulators terminated the bank's private banking license for breaching securities regulations. Chuck Prince had just returned from Japan, where he had apologized in person to the firm's customers and regulators for failing at private banking, which had led to the bank's closure in Japan. Putney was concerned that if the shareholder issues with the CVC Fund escalated, similar damage control measures would be needed.

Reflecting on Citigroup's experience with Dantas to date, Putney recognized a distinct and disturbing pattern of shareholder disputes and governance wrangling, including the conflicts in 2000 between Dantas and Telecom Italia, a major shareholder in the Solpart holding company. At that time the management environment had become so contentious between Grupo Opportunity and Telecom Italia that Dantas had hired Luiz Felipe Lampreia, the Brazilian Foreign Relations Minister, to join Brasil Telecom to mediate between the partners.

Putney realized that preventing Dantas from disrupting or usurping the CVC Fund would require more decisive action.

## To Catch a Thief: Citigroup Takes Action

To obtain a more comprehensive view of Dantas's actions, especially those related to Citigroup's ownership stakes in Brasil Telecom, Putney commissioned an investigation by Mattos Filho, Citigroup's Brazilian legal counsel. The final legal report delivered in early March 2005 was shocking. It revealed that not only was Dantas manipulating ownership stakes in the control chain to his benefit, as João Bosco Madeiro da Costa suspected, but he was also writing contracts and realigning the ownership structure so that all assets would ultimately be transferred to Grupo Opportunity, not Citigroup.

### *Signs of Self-Dealing*

The report estimated that Dantas had siphoned more than $300 million in value from the CVC Fund. Through Grupo Opportunity, Dantas had not only abandoned fiduciary responsibility to Citigroup but engaged in multiple actions for personal gain. For example, there was evidence that Grupo Opportunity had used the joint venture's assets to pay for its own employees, furniture, $48 million in legal fees for unrelated disputes, and even the purchase and use of three private airplanes valued at $30 million. To facilitate rights transfers from the CVC Fund to Grupo Opportunity, Dantas "transferred custody of share registers relating to shares owned by the CVC Fund from a bank recognized for custodial services to an Opportunity entity."[24] When confronted with this information, Dantas confessed that he wished to take ownership of the pyramidal structure to extract a $544 million "control premium" for managing the CVC Fund, despite his non-controlling interest.[25]

---

[24] U.S. Dist. Ct., S.D.N.Y., 407 F. Supp. 2d 483, 2005 U.S. Dist. Lexis 10468, 7–9, decided June 2, 2005.
[25] U.S. Dist. Ct., S.D.N.Y., 2006 U.S. Dist. Lexis 6776, 9–10, Motion of Temporary Restraining Order, May 16, 2006; U.S. Dist. Ct., S.D.N.Y., 441 F. Supp. 2d 552, 2006 U.S. Dist. Lexis 50884, 13–14, July 26, 2006.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

The second major finding of the investigation was that Grupo Opportunity, without Citigroup's knowledge or approval, had attempted to simultaneously auction off equity in the holding company and indirect control over other assets owned by the CVC Fund. Grupo Opportunity's response to the allegations was not reassuring: "The auction was a gambit by Opportunity to reap itself a position for a control premium that rightfully belonged to the CVC Fund."[26]

A similar asset-swapping scheme was used with regard to two of Citigroup's telecommunications properties that Dantas managed. Dantas allegedly purchased the assets of former joint venture partner TIW for $70 million. The assets were deeded to Highlake, a holding company in the Grupo Opportunity pyramid and in the control chain of another of the CVC Fund investments. However, it was eventually revealed that Dantas had obtained the $70 million to purchase TIW's assets from the CVC Fund without the knowledge of Citigroup. Effectively, Dantas held the deed to the assets without investing any of his own equity. Thus, when the assets were sold, the proceeds could be diverted from rightful owner Citigroup to Dantas.

Further, the report noted that in 2003 Dantas signed new shareholder agreements as the general partner of the CVC Fund without the knowledge of Citigroup, making provisionary clauses that stated that the CVC Fund could not sell off 5 percent or more of its interest in Zain unless the purchaser bought all Brasil Telecom Participações (the holding company five rungs down the control chain) shares held by Grupo Opportunity entities. This new shareholder agreement, in place until 2028, effectively diverted prospective buyers' proceeds from Citigroup's 100 percent stakes in the CVC Fund to all of Grupo Opportunity's entities in the pyramidal chain. Putney recognized that this was a breach of fiduciary responsibility to the CVC Fund and that such acts were prosecutable in the United States.

Grupo Opportunity had also been accused by its former partners of making side deals with major supplier contracts that were estimated in value at more than R$1 billion. For example, Dantas was alleged to have provided bribery funds to the Worker's Party government officials, diverted through the advertising company of one Marcus Valério de Souza, an associate of Dantas's, as an advertising contract for the telecommunications companies. Dantas denied such claims. Brasil Telecom records revealed that R$20 million had been paid to five Brazilian lawyers during Grupo Opportunity's management of the funds. One of Dantas's lawyers, Aleida Castro & Associates, was paid approximately R$8 million in legal fees over two months. However, none of these payments could be traced to Brasil Telecom legal services.

Over time, Dantas must have recognized that his days as the CVC Fund manager would be numbered and took drastic measures to maintain control over the funds. For example, Citigroup's investigation also revealed that Dantas had constructed an umbrella agreement to keep himself in power through 2028 as the fund's general manager. The signed umbrella agreement, which came about in the summer of 2003—just prior to his being fired by the onshore fund—stated, "If either the CVC Fund or the Onshore Fund [II-FIA] removed Opportunity as general partner or manager, that fund would lose its voting rights in Zain."[27] This tactic would guarantee control for Dantas if either partner decided to fire him. As more of Dantas's actions came to light, one of the executives of the onshore pension fund stated, "There is no question that if reinstated as manager of the Onshore Fund, Dantas will run the Onshore Fund for his own interests at the expense of the

---

[26] U.S. Dist. Ct., S.D.N.Y., 407 F. Supp. 2d 483, 2005 U.S. Dist. Lexis 10468, 8, decided June 2, 2005.
[27] Ibid.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

pension funds to whom he is supposed to have owed a fiduciary duty."[28] The executive added that he and other fund managers must take legal action to fight the fabricated agreement.

Dantas also attempted to sell his claimed assets to Telecom Italia before Citigroup could take action. (See *Citigroup's Shareholder Tango in Brazil (B)*, page 2.)

The situation grew even more complicated as Putney and her executive team considered their options with regard to the CVC Fund. For example, Dantas and the then Brasil Telecom S.A. CEO, Carla Cico, faced federal charges of criminal conspiracy, breach of confidentiality, and corruption in a corporate espionage investigation, after allegedly hiring U.S.-based Kroll to obtain information about Telecom Italia to be used in lawsuits. Both denied the charges.[29] Further, it was revealed that Carla Cico, prior to her appointment as CEO of Brasil Telecom, had been an Opportunity employee paid $160,000 in consulting fees from the CVC Fund.[30]

## Decision Time

Citigroup faced a major dilemma regarding the CVC Fund's fate. As the *Wall Street Journal* observed, "While [Citigroup] is keen to expand in emerging markets and counts Brazil as one of its most promising plays, the [Brasil Telecom] episode underscores the potential pitfalls of allying with local money managers—more often made to take advantage of valuable holdings in privatized companies."[31] Mary Lynn Putney's investigation had revealed a long and disturbing list of actions undertaken by Dantas to expropriate Citigroup's assets for himself.

Citigroup had never dealt with acts of this exact nature and magnitude. Nonetheless, Putney's team knew it had to take quick and decisive action to prevent Dantas from further damaging their investment. Among the questions faced: Should the firm attempt to resume operations in Brazil or sell off its assets to minimize losses? What should Citigroup do to regain control of the fund? What legal actions could be taken against Daniel Dantas?

---

[28] Ibid.

[29] Jonathan Wheatley, "Citigroup in $300M Brazilian Lawsuit," *Financial Times*, April 13, 2005; Geraldo Samor, "Brazilian Police Make Accusations Against Dantas," *Wall Street Journal*, April 14, 2005.

[30] Ibid.

[31] Jonathan Karp and Paul Beckett, "Citigroup Fund Dispute in Brazil Near Resolution," *Wall Street Journal*, September 23, 2002.




This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

## Discussion Questions

1. What should Mary Lynn Putney and her team do next?

2. What strategy(ies) can Citigroup use to remove Daniel Dantas from the board?

3. What red flags about Dantas presented themselves in the case?

4. Explain the expropriation strategies Grupo Opportunity used against the equity interests of Citigroup.

5. Provide an example of asset shifting, tunneling, equity dilution, or control premiums, and explain how the expropriation behavior works.

6. Did Dantas breach his fiduciary responsibility to the CVC Fund? If so, how?

7. Are any of Dantas's business practices illegal in Brazil? In the United States? Provide explanations.

8. What steps, if any, would you take against Dantas?

9. How would the non-market "rules of the game" be different in the United States?

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

**Exhibit 1:** Ownership Structure

**Cayman Islands**

**THE PARTNERSHIP LAW**

**(1995 Revision)**

**Arrangement of Sections**

**PART VI—LIMITED PARTNERSHIPS**

**Definition and constitution of limited partnership.**

**46.**(1) A limited partnership may be established in the Islands for any lawful purpose or purposes, to be carried on either within the Islands or elsewhere by two or more persons upon the terms, with the rights and powers, and subject to the conditions, limitations, restrictions and liabilities herein mentioned.

   (2) A limited partnership may consist of any number of persons but shall include—

   (a) one or more persons called general partners, who shall be liable for all debts and obligations of the firm; and

   (b) one or more persons called limited partners, who shall at the time of entering into such partnership contribute thereto in actual cash payments, a specific sum as capital and who shall not be liable for the debts or obligations of the firm beyond the amount so contributed.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

**Exhibit 2:** Ownership Structure of Brasil Telecom, 1998



*Note:* Percentages reflect equity stakes.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

## Exhibit 3:

### Analyst Recommendations

| Equity Analyst | Stock Name | Stock Purchase Recommendation | Date of Analyst Report |
|---|---|---|---|
| Deutsche Bank | Brasil Telecom Participações | Strong Buy | 12/31/2000 |
| BES Securities do Brasil | Brasil Telecom Participações | Buy | 7/31/2000 |
| Solomon Smith Barney | Brasil Telecom SA | Buy | 12/18/2000 |
| ING Barings | Brasil Telecom Participações | Buy | 12/4/2000 |
| Banco Brascan | Brasil Telecom SA | Buy | 2/15/2001 |
| Banco Pactual | Brasil Telecom SA | Buy; Top Pick | 1/12/2001 |
| Santander Central Hispano | Brasil Telecom Participações | Buy | 5/15/2001 |
| Bear Stearns & Co. Inc. | Brasil Telecom SA | Buy | 8/9/2001 |

### Performance Ratios—Brasil Telecom Participações

| RATIO ANALYSIS | 1999 | 2000 | 2001E | 2002E | 2003E | 2004E | 2005E |
|---|---|---|---|---|---|---|---|
| Clients (thousands) | 4,718 | 6,218 | 7,618 | 8,380 | 9,218 | 9,679 | 9,969 |
| Residential | 3,316 | 4,376 | 5,362 | 6,898 | 6,488 | 6,812 | 7,017 |
| Non-residential | 959 | 1,252 | 1,533 | 1,687 | 1,855 | 1,948 | 2,006 |
| Others | 443 | 590 | 723 | 795 | 875 | 918 | 946 |
| Growth | 25% | 32% | 23% | 10% | 10% | 5% | 3% |
| Population (millions) | 28.3 | 28.6 | 28.9 | 29.2 | 29.4 | 29.7 | 30.0 |
| Penetration rate (company) | 17% | 22% | 26% | 29% | 31% | 33% | 33% |

*Source:* BES Securities do Brasil, July 31, 2000.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

**Exhibit 4:** Ownership Structure of Brasil Telecom, 2005



*Note:* Equity stakes are denoted by E or no notation; voting stakes are denoted by V.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

**Exhibit 5:** Ownership Structure of Brasil Telecom Holdings

OWNERSHIP STRUCTURE, 1999



*Note:* ON: Common Shares; PN: Preferred Shares

*Source:* Brasil Telecom Annual Report, 1999, 7.

OWNERSHIP STRUCTURE, 2000



*Note:* ON: Common Shares; PN: Preferred Shares

*Source:* Brasil Telecom Annual Report, 2000, 53.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.

## Exhibit 5 *(continued)*

OWNERSHIP STRUCTURE, 2002



*Note:* ON: Common Shares; PN: Preferred Shares
*Source:* Brasil Telecom Annual Report, 2002, 23.

OWNERSHIP STRUCTURE, 2003—UNDISCLOSED

*Source:* Brasil Telecom Annual Report, 2003.

This document is authorized for use only in Wesley Mendes Da Silva's Corporate Governance - S1463 course at FGV - EAESP, from February 2017 to August 2017.