# EXHIBIT C

EXHIBIT C-1

June 13, 2008

BULLETIN OF COMPULSORY LEGAL
ANNOUNCEMENTS

Bulletin n ° 72

Official Bulletin of the AMF
_____

Decisions of the Sanctions Committee
_____

# DECISION OF SANCTION ON THE COMPANY PROLOGUE

# SOFTWARE, S & W ASSOCIATES, ERNST & YOUNG AUDIT, EUROLAND FINANCE AND

# Messrs. VINCENT YOUNG, FRANCOIS SOREL, CHRISTIAN LEONETTI,

# THIERRY BOUTIN, JACQUES ROUVROY, ERIC ROUVROY, MARC FIORENTINO,

# LAURENT PFEIFFER

The 2nd section of the Sanctions Commission of the Autorité des marchés financiers (" **AMF** ");

Considering the Monetary and Financial Code, in particular its articles L. 621-14 and L. 621-15, in their successive versions, R. 621-5 to R. 621-7 and R. 621-38 to R. 621-40 , as well as Article L. 532-1 and Article L. 533-4, which are now incorporated in Article L. 533-11;

Considering the law n ° 2003-706 of August 1st, 2003 of modified financial security, taken in particular in its article 47;

Having regard to Article 144-3 of the AMF General Regulations;

Considering the COB Regulation n ° 98-07 relating to the obligation of public information, in particular its articles 1 to 3, maintained in force by article 47 of the aforementioned law n ° 2003-706 until their recovery, as of November 25, 2004, by the General Regulations of the AMF, in its articles 222-1 and 222-2, today becoming articles 221-1 and 223-1, and in its article 632-1;

Given the COB Regulation No. 90-08 on the use of privileged information, especially Articles 3 to 5, maintained in force by Article 47 of the aforementioned Act No. 2003-706, until their resumption , as of November 25, 2004, by sections 622-1 and 622-2;

Having regard to the COB Regulation No. 90-04 relating to the establishment of prices, in particular Article 3, maintained in force by Article 47 of the aforementioned Law No. 2003-706, until its resumption, as of 25 November 2004, by Article 631-1 of the AMF General Regulations;

Considering articles 2-1-6, 3-1-1, 3-3-10 of the General Regulations of the CMF, maintained in force by article 47 of the aforementioned law n ° 2003-706 until their recovery, to as of November 25, 2004, by the General Regulations of the AMF, in its articles 312-5, 321-24, 321-51 and 321-87, now codified respectively in Articles D.321-1 of the Monetary Code and Financial Regulation, 314-3 of the AMF General Regulation, and 7 of the European Commission Regulation (EC) No 1287/2006 of 10 August 2006 implementing Directive 2004/39 / EC of the European Parliament;

Having regard to the notices of objections dated 15 November 2006 addressed to PROLOGUE SOFTWARE, S & W ASSOCIES, ERNST & YOUNG AUDIT, and EUROLAND FINANCE, and to MM. Christian LEONETTI, Vincent YOUNG, François SOREL, Jacques ROUVROY, Eric ROUVROY, Thierry BOUTIN, Marc FIORENTINO and Laurent PFEIFFER;

Having regard to the decision of 15 January 2007 of the Chairman of the Sanctions Committee appointing Mr. Jacques BONNOT, Member of the Sanctions Committee, as Rapporteur;

Having regard to the written observations received by the AMF on December 4, 2006 by Mr. Eric ROUVROY, on December 19, 2006, by the company PROLOGUE SOFTWARE, January 16, 2007 by Mr. Jacques ROUVROY and by Mr. Emmanuel DAOUD on behalf of Mr. Christian LEONETTI, on January 17, 2007 by Maître André-François BOUVIER on behalf of S & W ASSOCIES and Mr. Vincent YOUNG, and by Maître Jean THIEFFRY on behalf of Mr. François SOREL and ERNST & YOUNG, the January 31, 2007 by Maître jérôme HERBET on behalf of EUROLAND FINANCE and Marc FIORENTINO, on January 31, 2007 by Maître Thibault de MONTBRIAL on behalf of Mr. Laurent PFEIFFER, on March 28, 2007 by Maître Jean THIEFFRY for the account of Mr. François SOREL and the company ERNST & YOUNG, April 25, 2007 by Mr. Eric ROUVROY, May 14, 2007 by Mr. Thierry VALLAT on behalf of Mr. Thierry BOUTIN;

Having regard to the letters of 11 December 2006 and 24 January 2007 from Mr François SOREL and ERNST & YOUNG, and the reply letter sent by the Rapporteur on 2 March 2007;

Having regard to the letter sent on 15 January 2007 by Mr Christian LEONETTI and the reply letter sent by the Rapporteur on 18 May 2007;

Having regard to the hearings by the Rapporteur of Mr Marc FIORENTINO, in his capacity as legal representative of EUROLAND FINANCE and personal mis en cause, on 31 May 2007, of Mr François

SOREL, on 12 June 2007, by Mr Christian LEONETTI, on June 13, 2007, of Mr. Eric DERMONT on behalf of the company PROLOGUE SOFTWARE on June 14, 2007, as well as that of Mr. Thierry BOUTIN, on July 11, 2007;

Having regard to the report of Mr Jacques BONNOT dated 17 January 2008;

Having regard to the convocation letters to a meeting of the Sanctions Committee of 28 February 2008, to which was annexed the report signed by the Rapporteur, sent on 17 January 2008 to PROLOGUE SOFTWARE, S & W ASSOCIES, ERNST & YOUNG AUDIT and EUROLAND FINANCE, as well as to MM. Christian LEONETTI, Vincent YOUNG, François SOREL, Jacques ROUVROY, Eric ROUVROY, Thierry BOUTIN, Marc FIORENTINO and Laurent PFEIFFER;

Having regard to the observations in reply to the Rapporteur's report presented on 1 February 2008, by Mrs Valérie MAINTRIEU-FRANTZ for the company PROLOGUE SOFTWARE and by Mr Eric ROUVROY and Mr Jacques ROUVROY, on 4 February 2008, by Maître André-François BOUVIER, for the company S & W ASSOCIES and by Maître Thibault de MONTBRIAL for Mr. Laurent PFEIFFER, on February 5, 2008, by Jérôme HERBET for EUROLAND FINANCE and by Jean THIEFFRY for ERNST & YOUNG AUDIT and M. François SOREL, on February 14, 2008, by the Bâtonnier Francis TEITGEN, for Mr. Marc FIORENTINO as well as by Emmanuel DAOUD,

for Mr Christian LEONETTI;

Considering the other parts of the file;

After hearing during the sitting of February 28, 2008:

- the Rapporteur in his report;

- Mr Nicolas NAMIAS, Government Commissioner, who indicated that he has no comments to make;

- Mr Christian LEONETTI and his counsel, Masters Emmanuel DAOUD and Maître Emmanuel MERCINIER;

- Mr Eric DERMONT and his counsel, Maître Valérie MAINTRIEU-FRANTZ;

- Mr François SOREL, on his behalf and for that of the company ERNST & YOUNG AUDIT which he represents as a partner, and his counsels Jean THIEFFRY and Augustin ROBERT;

- Mr Vincent YOUNG, on his behalf and for that of S & W ASSOCIES, which he represents as Chairman and Chief Executive Officer, and his counsel Maître André-François BOUVIER;

- Mr Thierrry BOUTIN and his counsel Maître Thierry VALLAT;

- Mr Jacques ROUVROY and his counsel Maître Aline PONCELET:

- Mr Eric ROUVROY and his counsel Maître Aline PONCELET;

- Mr. Marc FIORENTINO, and his counsel Mr. Bâtonnier Francis TEITGEN;

- EUROLAND FINANCE, represented by Mr Marc FIORENTINO as Chairman and Chief Executive Officer, and his advisers Bertrand CARADET and Jérôme HERBET;

- Mr. Laurent PFEIFFER and his counsel Maître Thibault de MONTBRIAL;

Respondents who spoke last;

## I. FACTS AND PROCEDURE

### A. FACTS

PROLOGUE SOFTWARE (hereinafter " *PROLOGUE* ") is a company specialized in software publishing. His shares were admitted to trading on the Nouveau Marché in 1998 and then on Eurolist. In 2005, PROLOGUE generated approximately 26.7 million sales.

Main shareholder and Chief Executive Officer of PROLOGUE, Mr. Georges SEBAN became Chairman of the Executive Board in 2000, following a change of structure of the company. On December 9, 2002, he was replaced by Christian LEONETTI as Chairman of the Management Board, to which Mr. Eric DERMONT succeeded on October 8, 2004. Due to a new modification of the company's structure, Mr. Eric DERMONT is today Chairman of the Board and General Manager of PROLOGUE.

After a period marked by significant external growth, PROLOGUE encountered, at the end of 2001, significant cash flow problems in the context of a turnaround in the sector. In order to reduce its indebtedness, the company then sold the building housing its head office to ING LEASE, while at the same time entering into a lease on this property.

The deterioration of the financial position of PROLOGUE led its auditors, the firms ERNST & YOUNG represented by Mr. François SOREL and S & W ASSOCIES represented by Mr. Vincent YOUNG, to start on November 7, 2002 and January 17, 2003 a first, then a second alert procedure pursuant to Article L. 234-1 of the French Commercial Code. On 9 December 2003, following a new alert procedure, an *ad hoc* agent was appointed, with the mission of obtaining from the banks the abandonment of part of their claims; the negotiations led to the conclusion, on June 25, 2004, of a memorandum of understanding between PROLOGUE and the banks, whereby the latter agreed to abandon 65% of their debts, ie a sum of € 16.5 million, in return for the actual payment, by 15 September 2004 at the latest, of the balance of € 5,776,512.80. This sum was to be settled by raising funds on the market by issuing shares with share warrants (hereinafter " *ABSA* ").

The transaction, which was carried out by EUROLAND FINANCE, was launched on August 9, 2004, with the objective of "*removing any uncertainty as to the continuity of* [the] *operation*" of PROLOGUE. The ABSA subscription period ended on 15 September and, on 6 October 2004, the new shares were listed on the same line as the old shares. However, in October 2004, the PROLOGUE share market was marked by a significant drop in the price as well as by a clear concentration on the sale of some investors, including, in particular, Thierry BOUTIN.

On November 2, 2004, PROLOGUE declared before the Evry Commercial Court the state of cessation of its payments. A bankruptcy proceeding was initiated, which resulted, on November 8, 2005, in the adoption of a continuation plan, the term of which is set for November 7, 2015. The listing of PROLOGUE shares, which was suspended on November 2, 2004, resumed on January 8, 2007.

## B. PROCEDURE

On December 23, 2004, the Secretary General of the Autorité des marchés financiers decided to open an investigation into the financial information and market of the PROLOGUE share as of December 31, 2002.

This survey was the subject of a report by the Investigations and Market Surveillance Department on September 25, 2006.

In view of the conclusions of this report and by decision of the Specialized Commission No 3 of 16 October 2006, the President of the AMF, by registered letter with acknowledgment of receipt of 15 November 2006, notified the complaints were reproached to:

- PROLOGUE, represented by Mr Eric DERMONT, its current Chief Executive Officer;

- S & W ASSOCIES, represented by Mr Vincent YOUNG, in charge of the audit of PROLOGUE at the material time;

- Mr Vincent YOUNG, in his capacity as statutory auditor, partner of the firm S & W ASSOCIES, in charge of the statutory auditors of PROLOGUE at the material time;

- ERNST & YOUNG, in charge of the audit of PROLOGUE at the material time, represented by its Chairman and Chief Executive Officer, Mr. Patrick GOUNELLE;

- François SOREL, in his capacity as statutory auditor, partner of the firm ERNST & YOUNG, in charge of the statutory auditors of PROLOGUE at the material time;

- Mr Christian LEONETTI, in his capacity as Chairman of the Executive Board of PROLOGUE at the material time;

- Mr Thierry BOUTIN, leader and principal shareholder of the CASALVA company at the material time and today, who participated in the capital increase of PROLOGUE;

- Mr Jacques ROUVROY;

- Mr Eric ROUVROY, brother of Mr Jacques ROUVROY;

- EUROLAND FINANCE, represented by its Chairman and Chief Executive Officer, Marc FORIENTINO;

- Mr Marc FIORENTINO, in his personal capacity as Chairman and Chief Executive Officer of EUROLAND FINANCE;

- Laurent PFEIFFER, as a EUROLAND FINANCE Ethics Officer.

These statements of objections essentially criticize:

- PROLOGUE, represented by its current Chairman and Chief Executive Officer, Mr Eric DERMONT, for having breached the public information obligations provided for in Articles 1, 2 and 3 of COB Regulation 98-

07 on " *the obligation to information to the public* "in articles 222-1, 222-2 and 632-1 of the AMF General Regulations by having:

. published on June 16, 2003, November 14, 2003, June 14, 2004 and December 17, 2004 of the consolidated financial statements as at December 31, 2002, June 30, 2003, December 31, 2003 and June 30, 2004, inaccurate due to the misstatement of the " *consequences of the transfer of the building housing its head office and its takeover in leasing* " ;

. issued to the market inaccurate, inaccurate or misleading information at the time of the launch of the ABSA issue, " *by stating conclusively that the issue of ABSA should* " remove any uncertainty about the continuity of the operation " " and failing to inform the market of all the " *constraints* " on the removal of this uncertainty, which resulted in particular from the fact that the cash flow forecast did not include a " *debt owing of 2, 7 million euros corresponding to the VAT that PROLOGUE had failed to declare for several months* " *;*

. issued to the market inaccurate, imprecise or misleading information, announcing, on October 1, 2004, at the end of the subscription period, " *the success of the capital increase* " in terms that " *suggested that, thanks to the capital increase and the subsequent exercise of the warrants, the company had definitively settled its liquidity problems* " ;

- Mr Christian LEONETTI, in his capacity as Chairman of the Management Board, the same facts, with the exception of the complaint concerning the publication on 17 December 2004, after his departure, of the accounts as at 30 June 2004;

-ERNST & YOUNG, represented by its Chairman and Chief Executive Officer, Mr. Patrick GOUNELLE, and S & W ASSOCIES, represented by Mr. Vincent YOUNG, and their respective associates, Messrs. François SOREL and Vincent YOUNG, to have, in the notice formulated on the occasion of the prospectus, issued to the market inaccurate, inaccurate or misleading information at the launch of the issue of ABSA by stating " *that the issue of ABSA was* " to remove any uncertainty about the continuity of the operation " with certain reservations that had nothing to do with the debts of TVA " , and failed to inform the market of all the " *constraints* " Weighing on the lifting of this uncertainty, in violation of Articles 1, 2 and 3 of COB Regulation 98-07 on the " *obligation to inform the public* " , contained in Articles 222-1, 222-2 and 632-1 of the AMF General Regulations;

- Mr. Jacques ROUVROY, to have sold between October 18 and October 22, 2004 the shares held by the company FINANCIERE DU VIGNOBLE, of which he is the main shareholder (527,907 shares for an amount of 88,632 €), and by his children, M Eric ROUVROY (122,500 shares for 21,152 €) and Mrs. Isabelle ROUVROY (87,500 shares for 14,875 €), after having been informed, notably by Mr. Eric DERMONT, of the probability of the next termination of PROLOGUE payments, contrary to the articles 3 to 5 of the COB Regulation No. 90-08 on " *the use of privileged information* " , found in Articles 622-1 and 622-2 of the AMF General Regulations;

- Mr. Eric ROUVROY, brother of the previous, to have sold on October 18, 2004, at the average unit price of € 0.16, the 90,000 PROLOGUE shares he had acquired, for a total amount of € 14,611, € 90, and the 60,000 shares acquired by his mother, for € 9,800, after having been informed, through Mr Jacques ROUVROY, of the probability of the next termination of PROLOGUE payments, contrary to Articles 3 to 5 of COB Regulation No ° 90-08 relating to the " *use of privileged information* " , referred to in Articles 622-1 and 622-2

of the AMF General Regulations;

- Mr Thierry BOUTIN:

. to have, in order to reduce the price, sold on September 24, 2004, short, 752,812 PROLOGUE shares representing 5.14% of its capital and 47% of the sales realized during the meeting, facts likely to constitute a breach of the provisions Article 3 of COB Regulation 90-04 on "*Establishment of* Prices " ;

. to have intervened massively, on behalf of the company CASALVA, between October 26 and November 1, 2004, for sale on the market of the title PROLOGUE, "*less than two hours*" after having been informed of the probability of the next cessation of payments of the company, at the meeting with MM. Eric DERMONT and Georges SEBAN, contrary to Articles 3 to 5 of COB Regulation 90-08 "*on the use of privileged information*", *found* in articles 622-1 and 622-2 of the General Regulations of the AMF;

- EUROLAND FINANCE, represented by its current Chief Executive Officer, Mr Marc FIORENTINO and the latter, as an individual:

. to have performed the investment service without having been authorized for this purpose, as part of the PROLOGUE capital increase carried out in 2004, contrary to Articles L. 532-1 and L. 533-4 of the Monetary and Financial Code as well as Article 3-1-1 of the General Regulation of the CMF, reproduced in substance in Article 321-24 of the AMF General Regulations;

. not having acted in the interest of his client by deciding to reduce from € 996,056 to € 350,000 the subscription of the company LANGLADE CAPITAL MANAGEMENT to the capital increase of PROLOGUE, facts that may constitute a breach of Article L. 533-4 of the French Monetary and Financial Code and Article 3-1-1 of the General Regulations of the CMF;

. not to have been able or to justify that the order of sale of 1,750,000 PROLOGUE shares that was transmitted to AUREL LEVEN had been issued by LANGLADE CAPITAL MANAGEMENT nor to provide proof of the moment of receipt order, which could be contrary to the provisions of article 3-3-10 of the General Regulations of the CMF;

. for having prepared and sent to the AMF, on March 14, 2005, a false order of sale "*intended to hide from the investigators the fact that this order had never been received*" , which could constitute a breach of the rules of good conduct, and in particular the principles of loyalty, fairness and respect for the integrity of the market, as well as the provisions of Article 144-3 of the AMF General Regulations;

- Mr Laurent PFEIFFER, as a EUROLAND FINANCE Ethics Officer, is also criticized for this last complaint.

In accordance with article R. 621-38 of the Monetary and Financial Code, a copy of the notifications of grievances was sent on 15 November 2006 by the AMF Chairman to the Chairman of the Sanctions Commission, who appointed as Rapporteur Mr Jacques BONNOT by decision of 15 January 2007. The persons implicated were notified by registered letters with acknowledgment of receipt of 29 March 2007, reminding them of the possibility of being heard by the Rapporteur, at their request. request, pursuant to Article R. 621-39 I of the French Monetary and Financial Code.

On December 19, 2006, PROLOGUE, represented by Mr. Eric DERMONT, indicated that it had no particular

comments to make at this stage while stating that it expressed "*all reservations regarding the exercise of its rights and actions in the light of the facts set out in that investigation report* ".

In response to the notifications of grievances, MM. Eric ROUVROY, Jacques ROUVROY and Christian LEONETTI, assisted by Emmanuel DAOUD, filed observations on 4 December 2006 and 16 January 2007 respectively.

Mr Vincent YOUNG and S & W ASSOCIES, assisted by Mr André-François BOUVIER, on the one hand, Mr François SOREL and ERNST & YOUNG, assisted by Mr Jean THIEFFRY, on the other hand, filed observations in reply on 17 January 2007.

EUROLAND FINANCE and Mr Marc FIORENTINO, assisted by Mr Jérôme HERBET, and Mr Laurent PFEIFFER, assisted by Mr Thibault de MONTBRIAL, filed observations in reply on 31 January 2007.

Mr François SOREL and ERNST & YOUNG submitted additional joint observations on 28 March 2007.

Mr Eric ROUVROY and Mr Thierry BOUTIN, assisted by Mr Thierry VALLAT, submitted additional observations in reply respectively on 25 April and 14 May 2007.

By letters of 11 December 2006 and 24 January 2007, Mr François SOREL and ERNST & YOUNG requested that additional complaints be notified to Mr Eric DERMONT, in his personal capacity. In his response of 2 March 2007, the Chairman of the Sanctions Committee, Mr. Daniel LABETOULLE, informed them that the Rapporteur had not considered it appropriate to request an extension of the grievances against Mr. Eric DERMONT.

On January 15, 2007, Mr. Christian LEONETTI expressed the wish that Mrs. Isabelle DULONG, former financial director of PROLOGUE, be heard. By letter dated 18 May 2007, the Rapporteur replied that, in the light of all the information contained in the investigation file, he did not consider it necessary to hold such a hearing.

The Rapporteur proceeded to hear all the persons implicated who had expressly requested it. So did he hear

Mr Marc FIORENTINO, in his personal capacity and in his capacity as legal representative of EUROLAND FINANCE, on May 31, 2007, Mr François SOREL on June 12, 2007, Mr Christian LEONETTI on June 13, 2007, Mr Eric DERMONT on behalf of PROLOGUE on June 14, 2007 and Thierry BOUTIN on July 11, 2007.

Comments in response to the Rapporteur's report were tabled on:

- 1st February 2008, by Maître Valérie MAINTRIEU-FRANTZ for the company PROLOGUE,

- 1st February 2008 by Mr Eric ROUVROY,

- 1st February 2008 by Mr Jacques ROUVROY,

- 4 February 2008, by André François BOUVIER, on behalf of S & W ASSOCIES and Vincent YOUNG,

- February 4, 2008 by Mr. Thibault de MONTBRIAL for Mr. Laurent PFEIFFER,

- February 5, 2008, by Maître Jérome HERBET for EUROLAND FINANCE,

- February 5, 2008, by Mr. Jean THIEFFRY, for ERNST & YOUNG AUDIT and Mr. François SOREL,

- 14 February 2008, by the Bar President Francis TEITGEN, for Mr Marc FIORENTINO,

- February 14, 2008, by Emmanuel DAOUD, for Mr. Christian LEONETTI.

## II. ON APPLICABLE TEXTS

Considering that the deficiencies that were the subject of the notice of grievances, which essentially took place in 2003 and 2004, must, in keeping with the principle of a softer law, be assessed in the light of the combined provisions of Articles L. 621-15 and L. 621-14 of the Monetary and Financial Code, as amended, depending on the date on which the facts occurred, either of Law No. 89-531 of 2 August 1989 or of Law No. 2003-706 August 1, 2003; that these two laws have in common to make the sanction conditional on the effects which the practices must have had: to distort the functioning of the market, to provide the interested parties with an unjustified advantage which they would not have obtained in the normal course of the market, to the equality of information and treatment of investors or their interests, to make issuers and investors benefit from the actions of intermediaries contrary to their professional obligations or, according to the latter, from undermining *the rights of savers* ;

### 1. With regard to the public information grievances notified to PROLOGUE, Mr Christian LEONETTI, and S & W ASSOCIES, Mr Vincent YOUNG, ERNST & YOUNG, and Mr François SOREL

Considering that PROLOGUE, Mr Christian LEONETTI, S & W ASSOCIES, Mr Vincent YOUNG, ERNST & YOUNG and Mr François SOREL, are reproached for providing inaccurate, inaccurate or misleading information; that the facts, having occurred during the years 2003 and 2004, must be assessed in the light of the provisions of the COB Regulation No. 98-07 then applicable, taken again by articles 222-1 and 222-2 of the General Regulations of the AMF, which became Articles 221-1 and 223-1 of the said General Regulations, entered into force on 25 November 2004; that the mis en cause, in accordance with the principle of the immediate application of the softer law, should also be made to benefit from the provisions of Article 632-1 of the General Regulation of the AMF, which are less that they require an inquiry as to whether the company, the managers and the auditors " *knew or ought to have known* " that the information they communicated to the public was inaccurate, imprecise or misleading;

### 2. Regarding the price manipulation grievance notified to Mr Thierry BOUTIN

Considering   that the notification of grievances addressed to Mr. Thierry BOUTIN for facts which took place on September 24, 2004 refers to the article 3 of the COB Regulation n ° 90-04 relating to the establishment of the prices actually applicable, since it was maintained in force by section 47 of the Act

n ° 2003-706 from August 1st, 2003 until its resumption, as of November 25th, 2004, by article 631-1 of the General Regulations of the AMF; that the latter provisions, which maintain the principle of prohibition of price manipulation by specifying the conditions and indices likely to qualify the breach, are not of a milder character such as to justify their application to facts committed before their entry into force; ;

### 3. With regard to the complaint concerning the use of inside information notified to MM. Jacques

**ROUVROY, Eric ROUVROY and Thierry BOUTIN**

Whereas the notifications of objections addressed to MM. Jacques ROUVROY, Eric ROUVROY and Thierry BOUTIN refer to Articles 3 to 5 of COB Regulation 90-08 on the use of privileged information, which remain applicable in this case; that indeed, if this Regulation was repealed by the decree of November 12, 2004 published in the Official Journal of November 24, 2004, it has been substituted articles 622-1 and 622-2 of the General Regulations of the AMF, which the content is almost equivalent; that, however, the new provisions, which make the existence of the breach known as " *sensitive* ", that the privileged information is likely to have had on prices, are more restrictive, and therefore less severe; so that they will benefit the mis en cause by virtue of the principle of the immediate application of the softer law;

**4. With regard to the complaints concerning breaches of the rules of good conduct and professional obligations notified to EUROLAND FINANCE, to Mr Marc FIORENTINO and to Mr Laurent PFEIFFER**

Considering that the notifications of grievances addressed to EUROLAND FINANCE, as well as to Mr Marc FIORENTINO, refer to Articles L. 532-1 and L.533-4 of the Monetary and Financial Code and Articles 2-1-6, 3- 1-1 and Article 3-3-10 of the General Regulations of the CMF;

Considering that Articles L. 532-1 and L.533-4 of the Monetary and Financial Code have been amended following the entry into force on 1 November 2007 of Ordinance No. 2007-544 of 12 April 2007, which does not introduce softer provisions; whereas these articles will therefore be applied in their wording prior to the above-mentioned order;

Considering that the General Regulation of the CMF was repealed with immediate effect by the decree of November 12, 2004 published in the Official Journal of November 24, 2004, which replaced the General Regulation of the AMF which he bore homologation; that the provisions of articles 2-1-6, 3-1-1 and article 3-3-10 of the General Regulations of the CMF, which are incorporated by the General Regulations of the AMF, are now codified respectively in Articles D.321-1 of the Monetary and Financial Code, 314-3 of the General Regulations of the AMF and 7 of Regulation (EC) No 1287/2006 of the European Commission of 10 August 2006 implementing Directive 2004/39 / EC of the European Parliament; that these texts do not include softer provisions, it will be applied in the present case Articles 2-1-6, 3-1-1 and 3-3-10 of the General Regulations of the CMF;

## III. ON THE BREACHES

## A. BREACHES OF PUBLIC INFORMATION OBLIGATION

Considering that it follows from Articles 2 and 3 of the COB Regulation 98-07 and 632-1 of the AMF General Regulation that " *constitutes, for any person, an infringement of the good information of the public the communication of a inaccurate, imprecise or misleading information* ", " *while that person knew or ought to have known that the information was inaccurate or misleading* ";

**1. Failure to account for the building housing the registered office of PROLOGUE in its consolidated accounts criticized by PROLOGUE and Christian LEONETTI**

Considering that, in this case, PROLOGUE is being criticized for "*the consequences of the sale of the building housing its head office and for its acquisition under finance lease*" in the consolidated financial statements for the year ended December 31, 2002, June 30 2003, 31 December 2003 and 30 June 2004, published on 16 June 2003, 14 November 2003, 14 June 2004 and 17 December 2004 respectively; that the grievances were notified, in terms identical to those concerning PROLOGUE, to Mr Christian LEONETTI, in his capacity as Chairman of the Executive Board of PROLOGUE at the material time, but only for the consolidated financial statements as of December 31, 2002, June 30, 2003 and December 31, 2003;

Whereas, in the light of accounting rules, the consolidated accounts must be established taking into account the principle of the predominance of the substance over the form, which leads to an analysis of the substance of an operation or its economic reality without be limited to its only legal form; whereas, in this way, an operation may be taken into account in accounting terms even if it has not been perfectly legalized, since its realization is certain from the economic point of view; that, applied to the leasing, this principle implies to treat it as a financing transaction when the conditions of redemption - and in particular the price of the exercise of option - are so favorable that its beneficiaries will have no other choice than to lift it;

Considering that it is established that on October 11, 2001, PROLOGUE, at the same time that it sold the building housing its headquarters to ING LEASE for € 3.81 million, entered into an agreement with lease contract on this property; that the property was then treated as if it had been sold, hence the recording of a capital gain on disposal of approximately € 2 million and a reduction of the debt of € 3,811,000 in the consolidated accounts of PROLOGUE; however, it appeared that the conclusion of a financial lease did not allow, under the accounting rules in force, and in the circumstances of the case, to consider that the immovable had been assigned; that in order to avoid accounting reprocessing, ING BAIL, a subsidiary of ING LEASE, and PROLOGUE signed, on April 5, 2002, an agreement in principle, retroactive to October 15, 2001, providing for the transfer of the loan by PROLOGUE to ING BAIL and the conclusion, at the same time, of a lease agreement between these two companies; it became apparent on 3 June 2004 that the agreement reached on 5 April 2002 was unlikely to be realized because of the refusal notified by an employee of ING LEASE; as at that date, the consolidated financial statements for the year ended December 31, 2003 had not been finalized; that in session, however, Mr. Christian LEONETTI indicated, without being expressly contradicted by the auditors, to have consulted the latter, which would not have asked him to reinstate the building to the assets; that he did not do so, especially since he was considering instituting proceedings to compel his partners to respect their commitments; that the building, which was also not "deconsolidated" in the accounts of the first semester of 2004, was on the other hand in those of the year 2004;

Considering that the financial statements as at December 31, 2002, June 30 and December 31, 2003 do not appear to be inaccurate, the implementation of the agreement in principle reached on April 4, 2002 was not definitively abandoned; that it is different from the accounts of the first semester, but that the responsibility of Mr. Christian LEONETTI will not be retained, this one having left his functions before their publication; that PROLOGUE will also be excluded for these accounts, since they were arrested after the opening of the insolvency proceedings;

**2. Failure to provide information on the cash flow difficulties reported to the market at the launch of the ABSA issue complained of by PROLOGUE, Christian LEONETTI and the statutory auditors**

Considering that PROLOGUE and Mr Christian LEONETTI are reproached for giving the market inaccurate, imprecise and misleading information in the communication relating to the issuance of ABSA by stating in the note of operation of July 31, 2004 on the capital increase of PROLOGUE "*in a peremptory manner that the issue of ABSA should*" *remove any uncertainty about the continuity of the operation* " and by failing to inform the market of all the " *constraints* " on the lifting of this uncertainty; a breach of the obligation to inform the public has also been notified to the statutory auditors, S & W ASSOCIES, ERNST & YOUNG AUDIT, MM. Vincent YOUNG and François SOREL, who are alleged to have, in the opinion formulated on the transaction note, confirmed this statement "*subject to certain reservations that had nothing to do with VAT debts*" , and omitted from inform the market of all the "*constraints*" on the removal of this uncertainty;

**2.1 The inaccurate, imprecise and misleading nature of the information relating to cash flow difficulties communicated to the market at the launch of the ABSA issue**

Considering that the incriminated note indicates that: "*This capital operation must allow Prologue to reinforce its own funds and to balance its financial structure. As part of the protocol signed on June 25, 2004, the Company will use a significant portion of the fundraising resulting from this transaction for the early repayment of its financial debts, including bonds issued in June 2002. This transaction must therefore raise uncertainty about going concern* ";* that following this note, PROLOGUE announced in a press release of August 3, 2004 the launch of a capital increase of € 12 million to "*repay a significant portion of its debt, and increase its financial capacity to accelerate its development endogenous and give society a new impetus to return to growth and profitability* ";* On August 11, 2004, in a press release announcing the turnover generated for the first half of 2004, PROLOGUE stated that a capital increase was under way to "*allow PROLOGUE to increase its capacities. significantly reduce its debt and support the resumption of growth* " ;

Considering that the cash plan on which the note of operation rested had omitted to take into account, since October 2003, a debt corresponding to the VAT collected, but not declared by PROLOGUE; that the mechanism of the fraud in place consisted in particular, in the case of intangible services under the VAT system for collection which were provided within the group formed by PROLOGUE and some of its subsidiaries, to inflate artificially the amount of deductible VAT in anticipation of its finding, even though it was not paid to the supplier, and to reduce by the same amount the sums to be repaid in respect of the VAT collected; that this fraud was spread over six subsidiaries of the group and over the two years 2003 and 2004; that was accumulated by PROLOGUE a debt of VAT reaching more than 2.7 M € on September 30, 2004 (odds 0060 and 001171); that the reinstatement of the debt in the cash flow plan would not have allowed PROLOGUE, with the funds raised as part of the capital increase, both to repay "*its financial debts*" and to ensure the continuity of its exploitation, contrary to what was indicated in the note d'opération; whereas, if the above-mentioned communiqués of 3 and 11 August 2004 - which refer to the reimbursement, no longer of the entirety, but only of a substantial part of the debts - provide information which tends to qualify or even

contradict those contained in the note of operation, they do not however contain any denial stating the VAT debt or the risks of cessation of payments, a situation of which the public did not exist until 2 November 2004; that these releases have thus maintained the confusion on the settlement of the cash difficulties of PROLOGUE;

Considering, therefore, that despite the information subsequently issued, that contained in the transaction note, stating that the raising of funds resulting from the capital increase would allow PROLOGUE to repay its bank debts and to insure the continuity of its operation is inaccurate and misleading, since the inclusion in the cash-flow plan of the VAT debt due would have led to the finding of an absence or even a cash deficit likely to lead to a state of cessation of payments; thus, the equality of information of the investors was impaired, those who intervened in the market when they did not belong to the governing bodies were not able to appreciate the reality the financial position of PROLOGUE and the related risks;

## 2.2. *On the Accountability of the Facts to the Respondents*

### 2.2.1 *The imputation of the facts to PROLOGUE and to Mr Christian LEONETTI*

Considering that the breach must be withheld against PROLOGUE which is, by nature, responsible for the information communicated on its behalf by its various legal representatives; that it is also constituted with respect to Mr. Christian LEONETTI who, in his capacity as Chairman of the Management Board, should have ensured the accuracy of the information provided on the occasion of the capital increase; that it results from the statements of the accountant of PROLOGUE qu'alerte on VAT fraud that it had just discovered, Mr. Christian LEONETTI would have " *evaded the question*" (odds 001162); that even assuming that, as he claims, he was not aware of it, it remains that if he had carried out the necessary checks, in particular with the financial director, he would have fully appreciated the deceptive nature of the note. Operation that, therefore, he " *knew*" or would, at least, " *must have known*" that the information given was incorrect;

### 2.2.2 *Accountability of the facts to the auditors*

Considering that the auditors incur a sanction only if it is established, or that they knew that the information communicated by the company with their approval was inaccurate, imprecise or misleading, or that the accomplishment of the normal diligences required by the texts would have allowed them to know it;

Considering that in previous years, PROLOGUE's VAT returns were regular and the reconciliations that had been presented did not contain any error; that, according to the statements of the accountant of PROLOGUE, the fraud described above would have been put in place, to solve the treasury problems, by the management team, which would have concealed (rating 001162); that it was not revealed until the arrival of Mr. Eric DERMONT who, immediately alerted by the accountant, made proceed to " *a more precise study of the situation with respect to the VAT*" (odds 001171); that thus, it is established, and moreover undisputed, that the mechanisms implemented to reduce or delay the refunds of VAT have been hidden to the auditors;

Considering that it is now necessary to inquire whether the completion of the required steps should have led MM. François SOREL and Vincent YOUNG to discover fraud and misleading information issued on the basis of inaccurate data; that it is not disputable that the auditors were very attentive to the risk of termination

of PROLOGUE payments, which they detected and which led them to trigger four alert procedures, on 7 November 2002, 17 January, March 6 and October 31, 2003; they particularly on 11 June 2004, worried about the " *technical framework of VAT*" ; that they then received from the financial director the assurance that this framing had been carried out, as evidenced by the mentions on their worksheet (odds 00150 and 00155); that, on June 21, 2004, this one and Mr. Christian LEONETTI gave them a letter mentioning in particular that they had " *reported all the significant facts related to fraud committed or suspected of which we knew*" ; that during their hearing, the auditors indicated that they could not have " *imagined that the management of PROLOGUE cheated and lied to us ... this fraud was very well organized, and up to the management* " (code 001055); they also requested, and obtained in July 2004, notes " *analysis of social and tax debts*" (rating 00330) *,* whose examination did not allow them to detect a fraud that only a close reconciliation, at the level of the company and its subsidiaries, VAT accounts with VAT declared could have appeared; that such a reconciliation is not expressly required in the context of a control relating only to the transaction note, so that the alleged facts do not seem to be attributable to a lack of diligence; that, even if the works involved in a public offering process involve special vigilance on the part of the auditors, the evidence is not reported, in this case, that they have disregarded their professional obligations;

Whereas it follows from the foregoing that the complaints made against ERNST & YOUNG and S & W ASSOCIES, as well as by MM. François SOREL and Vincent YOUNG, must be dismissed;

### 3. The failure to obtain information on the success of the capital increase issued at the end of the subscription period, criticized by PROLOGUE and Christian LEONETTI

Considering that PROLOGUE and Christian LEONETTI are criticized for having let believe, at the end of the ABSA subscription period, in a press release of October 1, 2004, that "*thanks to the capital increase and the the subsequent exercise of the warrants,* PROLOGUE "*had definitively solved its liquidity problems*" ;

Considering that, from the beginning of the operation, there was a risk of resolution of the banking protocol tending to the rescheduling of the debt since, on the one hand, the funds had not been paid at the fixed term, on the other hand, the provisional cash flow plan was incorrect due, in particular, to the omission of VAT debt; that, moreover, appeared various events, such as the reduction of 152.000 € of the amount of the cashing related to the subscription of Mr. Georges SEBAN due to the compensation made with his current account, or the payment to the financial director and to Mr Christian LEONETTI severance payments amounting to a total of € 557,000; that consequently, contrary to what indicated in the communiqué of October 1st, 2004, PROLOGUE was not then able to repay, with the first raising of the funds resulting from the increase of capital, the entirety of its bank debt , amounting to € 5.7 million; that in addition, given the cash deficit and bankruptcy of the company a month later, the announcement of the development and future growth of PROLOGUE was in total shift with the objective information available to people put involved in the actual situation of the company;

Considering that the information given to the public on 1 October 2004, according to which the " *first fundraising will allow PROLOGUE to repay its bank debt* " and through the exercise of ABSA, PROLOGUE would be able to " *accentuate* [the ] *development and* [ *growth* ] *in the coming months* "was therefore inaccurate, imprecise and misleading; whereas these facts have, by nature, undermined the equality of information of investors outside the company;

Considering that this breach will be held against PROLOGUE, which is responsible for the accuracy of the

information communicated on its behalf by its various legal representatives; that it will also be in respect of Mr Christian LEONETTI who, taking into account the information which he had, could not not be aware of the financial difficulties of PROLOGUE and the risks which ensued;

## B. THE COURT'S HANDLING FAILED BY MR. THIERRY BOUTIN

Considering that Mr. Thierry BOUTIN is accused of having sold on September 24, 2004, 752,812 PROLOGUE shares on behalf of CASALVA, of which he is the majority shareholder and the manager, in order to reduce the price of the title; that, if it is established that he operated in the open to give this company a profit on the shares that he was preparing to acquire, the elements of price manipulation, the sole object of the notice of grievance , on the other hand, are not united; that Mr Thierry BOUTIN will be put out of cause of this chief;

## C. THE BREACH OF INITIATIVES AGAINST MM. JACQUES ROUVROY, ERIC ROUVROY AND THIERRY BOUTIN

### 1. The privileged nature of the information relating to financial difficulties leading to the high probability of a declaration of termination of PROLOGUE payments

Considering that it follows from his hearing by the investigative services that, in the days that followed his taking office, which took place on Monday, October 11, 2004, Mr. Eric DERMONT noted " *that the amount of the liabilities payable by PROLOGUE was in fact between 20 and 30 million euros, which put the company in a situation of cessation of payments* "(Cote 001172); that at the meeting, he qualified these remarks by indicating that, had he discovered the first week of the existence of debts much higher than those which had been announced, he had deduced that the company should deposit his balance sheet at the end of the following week; that in any event, it is established that he reported his first findings, Saturday, October 16, 2004, the members of the board, then to Mr. Jacques ROUVROY, whose mediation had earned him to be appointed to the head of society; that during the investigation, the latter stated that Mr. Eric DERMONT had " *discovered the real financial situation of PROLOGUE, and in particular the state of its cash* ", that the company " *was actually in a situation of cessation of payments* " , and then telephoned to him "to *announce these difficulties* " (odds 001021); that during the session, Mr. Jacques ROUVROY has, in the extension of the last statements of Mr. Eric DERMONT, specified that during this phone call of October 16, had been mentioned only the difficulties related to the discovery of a liability much more important than expected;

Considering that the 26th of October following, Mr. Eric DERMONT, with Mr. Georges SEBAN, organized individual meetings with Mr. Jacques ROUVROY, as well as with Mr. Thierry BOUTIN, which he confirmed at the meeting, as he had declared during the investigation, to have presented " *the bankruptcy filing as an inescapable measure*" (code 001171);

Considering that pursuant to article 621-1 of the AMF General Regulation: " Inside *information is specific information that has not been made public, which concerns, directly or indirectly, one or more issuers of financial instruments, or one or more financial instruments, which, if made public, could have a significant influence on the price of the financial instruments concerned or the price of financial instruments related thereto* " ;

Considering that, on the one hand, until November 2, 2004, date of the filing of a balance sheet of PROLOGUE before the Commercial Court, the public was not informed that the liabilities were such that the funds raised would not allow it to face his debts; that the announcement of this impossibility, on October 16,

2004, constitutes information the market of which could all the less suspect the existence that, according to the communiqué of October 1, "*thanks to the capital increase and the subsequent exercise of the BSA* ", PROLOGUE was supposed to have " *definitely solved its liquidity problems* " ; that it is therefore irrelevant that, on October 16th, Mr. Eric DERMONT has or has not made an explicit reference to the filing of a declaration of cessation of payments; that this deposit was certainly evoked on the 26th of October next;

Whereas, on the other hand, are obviously accurate and likely to have a significant effect on the share price the information relating, first to the impossibility for the company, despite the capital increase , to meet the liabilities payable, then the need to declare the cessation of payments;

## 2. Detention and exploitation by defendants of privileged information

Considering that under Article 3 of COB Regulation No. 90-08 on the use of privileged information, "*Persons having privileged information in connection with the preparation and execution of a financial transaction must not use such market information on its own behalf or for the benefit of another, or communicate it for purposes other than those for which it is held* "; that according to Article 4 of the aforementioned Regulation, " *Persons who have been given privileged information in the exercise of their professions or their duties shall not exploit, on their own account or on behalf of others, such information on the market or communicate it for other purposes or for an activity other than those for which it was communicated* "; that, finally, under Article 5 of the above-mentioned Regulation, " *Anyone who knowingly possesses inside information directly or indirectly from a person mentioned in Articles 2, 3 and 4 of this Regulation shall not must not use such market information on its own account or on behalf of others* ';

Whereas MM. Thierry BOUTIN, Jacques ROUVROY  and Eric ROUVROY, who do not belong to the circle of persons falling under Articles 3 and 4 of COB Regulation 90-08, fall within the scope of Article 5 of this Regulation; the obligation of forbearance on any holder of privileged information is absolute, so that, unless it is justified by compelling reasons of force or force majeure, the mere act of the title concerned characterizes the breach;

## *2.1 On the holding and exploitation of privileged information by Thierry BOUTIN*

Considering that Mr Thierry BOUTIN has been criticized for intervening massively, on behalf of the company CASALVA GERMANY GmbH, in the sale on the market of the title PROLOGUE between October 26 and November 1, 2004, "*less than two hours'* after being informed of the likelihood of the company's next cessation of payments, at its meeting with MM. Eric DERMONT and Georges SEBAN;

Considering that Mr. Thierry BOUTIN has, during this very short period, sold 1,796,302 shares, whereas since October 7, 2004, he had practically not intervened; that, contrary to what he maintains, he held then the privileged information forbidding him to operate; that the wish, purely speculative, that he would have had to " *continue to sell (its) securities and gain an actual gain*" compared to its purchases (rating 00983), could in no way justify his intervention;

Considering that the elements constituting the breach of insider are all reunited against Mr Thierry BOUTIN, which can not escape his responsibility for the sole reason that he intervened under cover of the company of which he was then the leader and the sole shareholder, *for-hire* transactions falling within the scope of Article 5 of COB Regulation 90-08; that this breach infringed the rights of the investors at the same time as it compromised the proper functioning and integrity of the market, so that it has a particular gravity calling for a severe penalty;

### 2.2 On the holding and exploitation of privileged information by Mr. Jacques ROUVROY

Considering that Mr. Jacques ROUVROY, when he had just been informed of the impossibility for PROLOGUE to face his debts, sold between October 19th and 22nd, 2004 all the shares held by the company FINANCIERE DU VIGNOBLE, of which he is the principal shareholder (527,907 shares for an amount of 88,632 €), and by his children, Mr. Eric ROUVROY (122,500 shares for 21,152 €) and Mrs. Isabelle ROUVROY (87,500 shares for 14,875 €); however, as he pointed out, he sold a small number of securities in relation to the very significant amounts he invested in the company; This circumstance is, of course, ineffective from the point of view of the characterization of a breach which, by its very nature, has affected the normal operation of the market. that it will however be largely taken into account in the assessment of the amount of the sanction pronounced;

### 2.3 On the holding and exploitation of privileged information by Eric ROUVROY

Considering that Mr. Eric ROUVROY is reproached for having sold on October 18, 2004, at the average unit price of € 0.16, the 90,000 PROLOGUE shares he had acquired and the 60,000 shares acquired by his mother; that the evidence is however not reported that his brother, Mr. Jacques ROUVROY, transmitted him the privileged information which he held, while it is established that, the same day, Mr. Eric ROUVROY acquired securities PROLOGUE, so that the breach is not characterized;

### D. ON BREACHES OF THE RULES OF GOOD CONDUCT AND AX PROFESSIONAL OBLIGATIONS AFFECTED BY EUROLAND FINANCE AND MM. MARC FIORENTINO AND LAURENT PFEIFFER

#### 1. The exercise of an investment activity without authorization

Considering that under Article L. 532-1 of the Monetary and Financial Code, "*to provide investment services, investment firms and credit institutions must obtain an authorization (…)*"; that according to Article L. 533-4 of the said Code, "*Investment service providers (…) are required to comply with rules of good conduct designed to ensure the protection of investors and the regularity of transactions. / These rules (…) oblige in particular to: / (…) 7. Comply with all regulations applicable to the exercise of their activities in order to best promote the interests of their clients and the integrity of the business. market (…)*". ; than   Article 3-1-1 of the General Regulation of the CMF stated that: "*The rules of good conduct (…) establish (…) the general*

*principles of behavior and their essential rules of application and control, to which must comply with the authorized provider and the persons acting on its behalf or under its authority. / The managers of the authorized provider ensure compliance with these provisions and the implementation of appropriate resources and procedures. / The activities mentioned in article 2-1-1 are exercised with diligence, loyalty, fairness, in the respect of the primacy of the interests of the customers and the integrity of the market. (...) / The rules of good conduct adopted by these Authorized Providers and applying to their employees constitute for them a professional obligation* "; it follows from the combination of these texts that the fact for an investment service provider to perform an investment activity within the meaning of Article 2-1-6 of the General Regulation of the CMF, ie "*seeking subscribers or acquirers on behalf of an issuer or transferor of financial instruments*" without having been approved for that purpose constitutes a breach of its obligations;

Considering that in the present case, the investment firm EUROLAND FINANCE, represented by its Chairman and Chief Executive Officer, Mr Marc FIORENTINO, and the latter in his personal capacity, to have exercised without placement service for PROLOGUE;

Whereas it is established, and not disputed, that the authorization obtained by EUROLAND FINANCE was limited, at the material time, to the provision of the services of reception, transmission and execution of orders on behalf of third parties;

Considering that, firstly, it follows from the concordant statements of Mr Cyril TEMIN, employee of EUROLAND FINANCE in charge of the file (score 001100: "*EUROLAND assisted PROLOGUE in his search for investors*" ) and the two directors of PROLOGUE, MM. Georges SEBAN (number 001229: "*I insist on the fact that EUROLAND had indeed committed to placing the securities ... This is why the contract provides for a percentage of the funds raised*" ) and Christian LEONETTI (rating 001204: "*I am formal, in the spirit, EUROLAND FINANCE had to ensure the placement of the capital increase*" ), that the mission entrusted is analyzed in an activity of placement of the securities to be emitted during the capital increase carried out in 2004; that in this case, no other investment services provider has been called upon to invest the securities even though such an investment, since it is analyzed as an investment service, investment, can only be exercised by a service provider specifically authorized for this purpose; that if the contract did not expressly target this activity, it was because he could not refer to it, as EUROLAND FINANCE was not approved for the placement; that, on the other hand, as Georges SEBAN pointed out, it provided for the payment by PROLOGUE of a commission of proportional success (5% excluding taxes) to all the amounts raised, which corresponds to the  remuneration  the lead distributor of a program, to which a percentage of the total capital raised is traditionally paid;

Considering that in addition, many investors (ratings 001292 and 001293) have explicitly stated that it was following the solicitation of EUROLAND FINANCE that they subscribed to this capital increase; that the argument that the placement would not have been made to the public, this company having only "signal" the transaction to its own customers or respond to his request, is ineffective when they were solicited by Mr. Marc FIORENTINO or by Mr. Cyril TEMIN persons who were not then customers of EUROLAND FINANCE, as MM. Jean-François DESCAVES for HERA FINANCE (odds 00970), Roger POLANI for SPGP (odds 00959) or Thierry BOUTIN for CASALVA (odds 00987);

Considering that, finally, it is EUROLAND FINANCE which presented to the AMF a list of subscribers, attached to the visa application of the capital increase operation;

Whereas, therefore, EUROLAND FINANCE has not merely provided services for the reception, transmission and execution of orders on behalf of third parties, and has exercised, as part of the PROLOGUE

capital increase carried out in 2004, an investment activity within the meaning of article 2-1-6 of the General Regulation of the CMF without having the necessary authorization for this purpose; that the visa affixed by the AMF on the note of operation is obviously not worth validation of services that were provided without approval; Finally, the fact that senior executives of the issuer have also sought subscribers has no effect on the characterization of the alleged breach of EUROLAND FINANCE.

Considering, therefore, that the breach resulting from the exercise of a placement activity without approval is constituted in all its elements;

## 2. The primacy given to the interests of an investor over those of PROLOGUE

Considering that under Article L. 533-4 of the Monetary and Financial Code, applicable at the relevant time, "*Investment service providers (...) undertake in particular to: 1. Behave with loyalty and act fairly in the best interests of their clients and the integrity of the marketplace; (...) 6. Strive to avoid conflicts of interest and, when these can not be avoided, ensure that their clients are treated fairly* "; that Article 3-1-1 of the General Regulation of the CMF further specifies that "*The rules of good conduct (...) establish (...) the general principles of behavior and their essential rules of application and control , to which the authorized provider and those acting on his behalf or under his authority must comply. / The managers of the authorized provider ensure compliance with these provisions and the implementation of appropriate resources and procedures. / The activities mentioned in article 2-1-1 are exercised with diligence, loyalty, fairness, in the respect of the primacy of the interests of the customers and the integrity of the market. (...) / The rules of good conduct adopted by this regulation by authorized service providers and applying to their employees constitute for them a professional obligation* " ;

Considering that in this case, EUROLAND FINANCE and Marc FIORENTINO, in their personal capacity, are accused of not having acted in the interest of the PROLOGUE client by unilaterally reducing the subscription to the increase to € 350,000. the capital of LANGLADE CAPITAL MANAGEMENT, of which Mr. François LANGLADE was the manager and the principal shareholder;

Considering that it is established that Mr. Marc FIORENTINO took the initiative alone, at the end of September 2004, to reduce to 350.000 € the underwriting commitment of the company LANGLADE CAPITAL MANAGEMENT, without having consulted it before, whereas it undertook to subscribe for € 996,059; that the allegations of Mr. Marc FIORENTINO that this reduction would have corresponded to the wish of one of the leaders of PROLOGUE are expressly denied by him; that in any event, the reduction of the commitment of the company LANGLADE CAPITAL MANAGEMENT, initiated by Mr. Marc FIORENTINO to preserve the bonds of friendship uniting him with Mr. François LANGLADE, likely to become one of its " *main customers* " and intervened when the capital increase had not been fully subscribed and that, as we saw above, PROLOGUE had the greatest need for these funds, was obviously contrary to the interest of this company; PROLOGUE, who was charged by PROLOGUE with the task of making a capital increase essential to his survival, Marc FIORENTINO obviously betrayed the trust of his client;

Considering that the breach of the obligation to perform the investment services is promptly characterized by diligence, loyalty and fairness, while respecting the primacy of the interests of the client, which is of particular gravity in this case;

## 3. The impossibility to justify the receipt of an order to sell a block of shares

Considering that under article 3-3-10 of the General Regulation of the CMF, "*The authorized provider responsible for transmitting an order to another authorized provider is able to: - justify that the order transmitted was issued by the originator ; - to provide proof of the time of receipt and the time of transmission of the order. The same obligations apply to the agent referred to in Article 2-1-3* ";

Considering that in this case, Mr Marc FIORENTINO and EUROLAND FINANCE, as well as his deontologist Mr Laurent PFEIFFER, are reproached for the sale of 1,750,000 PROLOGUE shares subscribed by LANGLADE CAPITAL MANAGEMENT at the time the issue of ABSA, carried out on the market between 11 and 14 October 2004 through AUREL LEVEN, for not being able to justify or the existence of an order issued by the company the owner of the securities, or the moment when he was received;

Considering that EUROLAND FINANCE does not dispute its impossibility to prove that this order of sale, transmitted to AUREL LEVEN and executed between 11 and 14 October 2004, corresponded to an instruction given by the company LANGLADE CAPITAL MANAGEMENT;   that it is inoperative, for the characterization of the breach, to maintain that no prejudice would have resulted;

Considering, consequently, that the failure drawn from the absence of justification of a sale order passed on the account of the company LANGLADE CAPITAL MANAGEMENT and the moment of reception of said order, is constituted;

**4. Interference with the investigators' mission resulting from the transfer on 14 March 2005 of a false order of sale**

Considering that EUROLAND FINANCE, Mr Marc FIORENTINO, in his personal capacity, and Mr Laurent PFEIFFER, are reproached for having prepared and transmitted to the AMF, on March 14, 2005, a false order of sale " *Intended to hide from the investigators the fact that this order had never been received* ";

Considering, however, that in the absence of a legal basis other than Article 642-2 of the Monetary and Financial Code under which the " *disclosure [to the AMF] inaccurate information*" "*is punishable by imprisonment of two years or a fine of € 300,000* ", no breach within the competence of the Sanctions Commission can be retained in this respect;

**5. Accountability of the breaches of the mis en cause**

Considering that Mr Marc FIORENTINO contends that the breach resulting from the exercise of the activity of placement without approval can not be imputed to him, on the grounds that there would be no textual basis to the pursuits and that the *facts invoked would be exclusively charged to EUROLAND FINANCE* ';

Considering, however, that the officers must be regarded as intervening " *on behalf of* " the company within the meaning of Article L. 621-15 II of the Monetary and Financial Code, as applicable at the material time; that according to this article, the Sanctions Committee can impose a sanction, "*for any breach of their professional obligations defined by the laws, regulations and professional rules approved by the AMF in force, subject to the provisions of Article L 613-21* ", against the" *persons mentioned in 1 ° to 8 °, 11 ° and 12 ° of II of article 621-9* " ," *natural persons ... acting on behalf of one of the persons mentioned in 1 ° to 8 ° and 11 ° of II of Article L. 621-9 for any breach of their professional obligations defined by the laws, regulations and professional rules approved by the Autorité des Marchés Financiers, subject to the provisions*

of Article L. 631-21 "; as regards, in general, all the rules of conduct applicable to the investment services provider, Article 321-24 of the AMF General Regulation provided that the latter, as well as *the leaders of the authorized provider* ", ensure compliance with these rules" *and the implementation of appropriate resources and procedures* "; whereas this principle remains applicable in the present case, since the text has not been replaced by a softer provision capable of retroaction; that, since 1 November 2007, Article 313-6 of the General Regulations states that " *the responsibility to ensure that the investment services provider complies with his professional obligations mentioned in II of the article L. 621-15 of the French Monetary and Financial Code is the responsibility of its directors and, where applicable, its supervisory authority. In particular, the management and, where appropriate, the supervisory authority periodically assess and review the effectiveness of the policies, arrangements and procedures put in place by the provider to comply with his professional obligations and take appropriate measures to remedy possible failures* "; that is affirmed, permanently, the obligation made to the legal person and its leaders to ensure the respect, by the natural persons under their authority, laws, regulations and professional rules; that it is on the basis of the ignorance of this obligation of vigilance and supervision that the responsibility of the leaders can be sought;

Considering that the failings drawn from the exercise of the activity of placement without approval, but also of the non-respect of the primacy of the interest of the customer and the impossibility to justify a sale order, as previously established, are therefore attributable to EUROLAND FINANCE, as well as to Mr Marc FIORENTINO, in his capacity as manager; that the latter is all the less justified in challenging its responsibility, since it has also actively contributed, in a personal capacity, to the achievement of all these deficiencies;

Whereas on the other hand, Mr Laurent PFEIFFER, who proves that he has not failed in his obligations of control, will be excluded in the case of the lack of justification of the contentious sales order;

## IV. ON SANCTIONS AND PUBLICATION OF THE DECISION

Considering that according to the article L. 621-15 II. (c) of the Monetary and Financial Code in the version applicable at the material time referred to in the statements of objections, the Sanctions Committee may impose a sanction on any person who has engaged in practices contrary to the provisions or regulations, "*where such practices are such as to affect the rights of savers or have the effect of distorting the functioning of the market, to provide the parties with an unjustified advantage which they would not have obtained in the normal course of the contract to undermine the equality of information or treatment of investors or their interests or to make issuers or investors benefit from the actions of intermediaries contrary to their professional obligations* "; that pursuant to Article L. 621-15.III c) of the Monetary and Financial Code, as applicable at the time of the facts, the sanction incurred by PROLOGUE, Mr. Christian LEONETTI, as well as MM. Thierry BOUTIN and Jacques ROUVROY is "*a pecuniary sanction whose amount can not be greater than 1.5 million euros or ten times the amount of profits possibly made*" ;

Considering that it follows from Article L. 621-15 of the Monetary and Financial Code, in its version

applicable at the material time, that for investment service providers and for persons acting on their behalf or placed under their authority, there is also the warning, the reprimand, the temporary or definitive prohibition of the exercise of all or part of the activities or services provided;

Considering that the penalties will be proportionate to the seriousness of the breaches, as highlighted above (III);

Considering that Article L. 621-15, V of the Monetary and Financial Code provides that " *the sanctions commission may make its decision public in the publications, newspapers or media it designates (Ordinance No. 2007-544 of April 12 2007) "unless this publication is likely to seriously disrupt the financial markets or cause disproportionate harm to the parties involved*" ; that by these provisions, the legislator intended to highlight the requirements of general interest relating to market fairness, transparency of operations and the protection of savers who base the power of sanction of the Commission, and take into account the interest which is attached to the legal certainty of all operators that they may, by having access to the decisions rendered, better apprehend the content of the rules they must observe; In the present case, the publication of this Decision justifies its publication, since it is not such as to cause the persons concerned disproportionate damage.

**FOR THESE REASONS**


**And after having deliberated under the presidency of Mrs. Claude NOCQUET, by MM. Alain FERRI and Jean-Pierre MORIN, Members**

**of the 2nd section of the Sanctions Committee, and by Mr. Jean-Claude HANUS, Member of the 1st section of the Sanctions Committee, substitute of Mr. Antoine COURTEAULT pursuant to Article R. 621-7. I of the Monetary and Financial Code, in the presence of the Secretary of the meeting;**



**DECIDE TO :**


- Out of the way MM. Vincent YOUNG, François SOREL, Eric ROUVROY, Laurent PFEIFFER, as well as the companies S & W ASSOCIES and ERNST & YOUNG;

- To pronounce against:

. the company PROLOGUE SOFTWARE, a financial penalty of 100,000 € (one hundred thousand euros);

. Mr Christian LEONETTI, a financial penalty of 100,000 euros (one hundred thousand euros);

. Mr Thierry BOUTIN, a financial penalty of 500,000 € (five hundred thousand euros);

. Mr Jacques ROUVROY, a financial penalty of 5,000 € (five thousand euros);

. Mr Marc FIORENTINO, a warning and a pecuniary penalty of 50.000 € (fifty thousand euros);

. the EUROLAND company, a warning and a financial penalty of € 100,000 (one hundred thousand euros);

- Publish this decision in the " *Bulletin des annonces légales obligatoires* ", as well as on the website and in the AMF review.


In Paris, February 28, 2008

The Secretary of the Session The President

Brigitte LETELLIER Claude NOCQUET

**An appeal on the merits against the decision of the Sanctions Committee of February 28, 2008 was filed by Mr. Christian LEONETTI before the 1st Chamber of the Court of Appeal of Paris.**

**An appeal on the merits against the decision of the Sanctions Commission of February 28, 2008 was filed by Mr. Thierry BOUTIN before the 1 st Chamber of the Court of Appeal of Paris.**

**This decision may be appealed under the conditions set out in Articles R. 621-44 to R. 621-46 of the French Monetary and Financial Code.**

*0808490*

EXHIBIT C-2

13 juin 2008                      BULLETIN DES ANNONCES LEGALES OBLIGATOIRES                      Bulletin n° 72

# BULLETIN OFFICIEL DE L'AMF
————

## DÉCISIONS DE LA COMMISSION DES SANCTIONS

**DECISION DE SANCTION A L'EGARD DE LA SOCIETE PROLOGUE**

**SOFTWARE, S&W ASSOCIES, ERNST & YOUNG AUDIT, EUROLAND FINANCE ET DE**

**MM. VINCENT YOUNG, FRANCOIS SOREL, CHRISTIAN LEONETTI,**

**THIERRY BOUTIN, JACQUES ROUVROY, ERIC ROUVROY, MARC FIORENTINO,**

**LAURENT PFEIFFER**

La 2ème section de la Commission des sanctions de l'Autorité des marchés financiers (« *AMF* ») ;

Vu   le Code monétaire et financier, notamment ses articles L. 621-14 et L. 621-15, dans leurs versions successives, R. 621-5 à R. 621-7 et R. 621-38 à R. 621-40, ainsi que son article L. 532-1 et son article L. 533-4, aujourd'hui repris à l'article L. 533-11 ;

Vu   la loi n° 2003-706 du 1er août 2003 de sécurité financière modifiée, prise notamment en son article 47 ;

Vu   l'article 144-3 du Règlement général de l'AMF ;

Vu   le Règlement COB n° 98-07 relatif à l'obligation d'information du public, notamment ses articles 1 à 3, maintenu en vigueur par l'article 47 de la loi n° 2003-706 précitée jusqu'à leur reprise, à compter du 25 novembre 2004, par le Règlement général de l'AMF, en ses articles 222-1 et 222-2, devenus aujourd'hui les articles 221-1 et 223-1, et en son article 632-1 ;

Vu   le Règlement COB n° 90-08 relatif à l'utilisation d'une information privilégiée, notamment ses articles 3 à 5, maintenus en vigueur par l'article 47 de la loi n° 2003-706 précitée, jusqu'à leur reprise, à compter du 25 novembre 2004, par les articles 622-1 et 622-2 ;

Vu   le Règlement COB n° 90-04 relatif à l'établissement des cours, notamment son article 3, maintenu en vigueur par l'article 47 de la loi n° 2003-706 précitée, jusqu'à sa reprise, à compter du 25 novembre 2004, par l'article 631-1 du Règlement général de l'AMF;

Vu   les articles 2-1-6, 3-1-1, 3-3-10 du Règlement général du CMF, maintenus en vigueur par l'article 47 de la loi n°2003-706 précitée jusqu'à leur reprise, à compter du 25 novembre 2004, par le Règlement général de l'AMF, en ses articles 312-5, 321-24, 321-51 et 321-87, aujourd'hui codifiés respectivement aux articles D.321-1 du Code monétaire et financier, 314-3 du Règlement général de l'AMF, et 7 du Règlement n° 1287/2006 de la Commission européenne du 10 août 2006 portant mesures d'exécution de la directive 2004/39/CE du Parlement européen ;

Vu   les notifications de griefs datées du 15 novembre 2006, adressées aux sociétés PROLOGUE SOFTWARE, S&W ASSOCIES, ERNST & YOUNG AUDIT, et EUROLAND FINANCE, ainsi qu'à MM. Christian LEONETTI, Vincent YOUNG, François SOREL, Jacques ROUVROY, Eric ROUVROY, Thierry BOUTIN, Marc FIORENTINO et Laurent PFEIFFER ;

Vu   la décision du 15 janvier 2007 du Président de la Commission des sanctions désignant M. Jacques BONNOT, Membre de la Commission des sanctions, en qualité de Rapporteur ;

Vu   les observations écrites reçues par l'AMF le 4 décembre 2006 par M. Eric ROUVROY, le 19 décembre 2006, par la société PROLOGUE SOFTWARE, 16 janvier 2007 par M. Jacques ROUVROY ainsi que par Maître Emmanuel DAOUD pour le compte de M. Christian LEONETTI, le 17 janvier 2007 par Maître André-François BOUVIER pour le compte de la société S&W ASSOCIES et de M. Vincent YOUNG ainsi que par Maître Jean THIEFFRY pour le compte de M. François SOREL et de la société ERNST & YOUNG, le 31 janvier 2007 par Maître jérôme HERBET pour le compte de la société EUROLAND FINANCE et de M. Marc FIORENTINO, le 31 janvier 2007 par Maître Thibault de MONTBRIAL pour le compte de M. Laurent PFEIFFER, le 28 mars 2007 par Maître Jean THIEFFRY pour le compte de M. François SOREL et de la société ERNST & YOUNG, le 25 avril 2007 par M. Eric ROUVROY, le 14 mai 2007 par Maître Thierry VALLAT pour le compte de M. Thierry BOUTIN ;

Vu   les lettres des 11 décembre 2006 et 24 janvier 2007, adressées par M. François SOREL et la société ERNST & YOUNG, et la lettre en réponse adressée par le Rapporteur le 2 mars 2007 ;

Vu   la lettre adressée le 15 janvier 2007 par M. Christian LEONETTI et la lettre en réponse adressée par le Rapporteur le 18 mai 2007 ;

Vu   les auditions par le Rapporteur de M. Marc FIORENTINO, en sa qualité de représentant légal de EUROLAND FINANCE et de mis en cause à titre personnel, le 31 mai 2007, de M. François SOREL, le 12 juin 2007, de M. Christian LEONETTI, le 13 juin 2007, de M. Eric DERMONT pour le compte de la société PROLOGUE SOFTWARE le 14 juin 2007, ainsi que celle de M. Thierry BOUTIN, le 11 juillet 2007 ;

Vu   le rapport de M. Jacques BONNOT en date du 17 janvier 2008 ;

Vu   les lettres de convocation à une séance de la Commission des sanctions du 28 février 2008, auxquelles était annexé le rapport signé du Rapporteur, adressées le 17 janvier 2008 aux sociétés PROLOGUE SOFTWARE, S&W ASSOCIES, ERNST & YOUNG AUDIT et EUROLAND FINANCE, ainsi qu'à MM. Christian LEONETTI, Vincent YOUNG, François SOREL, Jacques ROUVROY, Eric ROUVROY, Thierry BOUTIN, Marc FIORENTINO et Laurent PFEIFFER ;

13 juin 2008                              BULLETIN DES ANNONCES LEGALES OBLIGATOIRES                              Bulletin n° 72

Vu   les observations en réponse au rapport du Rapporteur présentées le 1er février 2008, par Maître Valérie MAINTRIEU-FRANTZ pour la société PROLOGUE SOFTWARE ainsi que par M. Eric ROUVROY et par M. Jacques ROUVROY, le 4 février 2008, par Maître André-François BOUVIER, pour la société S&W ASSOCIES ainsi que par Maître Thibault de MONTBRIAL pour M. Laurent PFEIFFER, le 5 février 2008, par Maître Jérôme HERBET pour la société EUROLAND FINANCE ainsi que par Maître Jean THIEFFRY pour la société ERNST & YOUNG AUDIT et M. François SOREL, le 14 février 2008, par M. le Bâtonnier Francis TEITGEN, pour M. Marc FIORENTINO ainsi que par Maître Emmanuel DAOUD, pour M. Christian LEONETTI ;

Vu   les autres pièces du dossier ;

Après avoir entendu au cours de la séance du 28 février 2008 :

- M. le Rapporteur en son rapport ;
- M. Nicolas NAMIAS, Commissaire du Gouvernement, qui a indiqué ne pas avoir d'observations à formuler ;
- M. Christian LEONETTI et ses conseils, Maîtres Emmanuel DAOUD et Maître Emmanuel MERCINIER ;
- M. Eric DERMONT et son conseil, Maître Valérie MAINTRIEU-FRANTZ ;
- M. François SOREL, pour son compte et pour celui de la société ERNST & YOUNG AUDIT qu'il représente en tant qu'associé, et ses conseils Maîtres Jean THIEFFRY et Augustin ROBERT ;
- M. Vincent YOUNG, pour son compte et pour celui de la société S & W ASSOCIES qu'il représente en tant que Président Directeur Général, et son conseil Maître André-François BOUVIER ;
- M. Thierrry BOUTIN et son conseil Maître Thierry VALLAT ;
- M. Jacques ROUVROY et son conseil Maître Aline PONCELET :
- M. Eric ROUVROY et son conseil Maître Aline PONCELET ;
- M. Marc FIORENTINO, et son conseil M. le Bâtonnier Francis TEITGEN ;
- La société EUROLAND FINANCE représentée par M. Marc FIORENTINO en tant que Président Directeur Général, et ses conseils Maîtres Bertrand CARADET et Jérôme HERBET ;
- M. Laurent PFEIFFER et son conseil Maître Thibault de MONTBRIAL ;

Les personnes mises en cause ayant pris la parole en dernier ;

## I. FAITS ET PROCEDURE

### A.   FAITS

PROLOGUE SOFTWARE (ci-après " *PROLOGUE* ") est une société spécialisée dans l'édition de logiciels. Ses actions ont été admises à la négociation sur le Nouveau Marché en 1998, puis sur Eurolist. En 2005, PROLOGUE a réalisé environ 26,7 millions de chiffre d'affaires.

Principal actionnaire et Président Directeur Général de PROLOGUE, M. Georges SEBAN en est devenu le Président du directoire en 2000, à l'occasion d'un changement de structure de la société. Le 9 décembre 2002, il a été remplacé à la présidence du directoire par M. Christian LEONETTI, auquel a succédé, le 8 octobre 2004, M. Eric DERMONT. En raison d'une nouvelle modification de la structure de la société, M. Eric DERMONT est aujourd'hui Président du conseil d'administration et directeur général de PROLOGUE.

Après une période marquée par une importante croissance externe, PROLOGUE a rencontré, à la fin de l'année 2001, d'importantes difficultés de trésorerie dans un contexte de retournement de la conjoncture sectorielle. Afin de diminuer son endettement, la société a alors cédé l'immeuble abritant son siège social à la société ING LEASE, en concluant parallèlement avec cette dernière un crédit-bail sur ce bien.

La dégradation de la situation financière de PROLOGUE a conduit ses commissaires aux comptes, les cabinets ERNST & YOUNG représenté par M. François SOREL et S&W ASSOCIES représenté par M. Vincent YOUNG, à déclencher les 7 novembre 2002 et 17 janvier 2003 une première, puis une deuxième procédure d'alerte en application de l'article L. 234-1 du Code de commerce. Le 9 décembre 2003, à la suite d'une nouvelle procédure d'alerte, un mandataire *ad hoc* a été nommé, avec la mission d'obtenir de la part des banques l'abandon d'une partie de leurs créances ; les négociations ont abouti à la conclusion, le 25 juin 2004, d'un protocole d'accord entre PROLOGUE et les banques, par lequel ces dernières ont consenti à abandonner 65 % de leurs créances, soit une somme de 16,5 M€, en contrepartie du versement effectif, au plus tard le 15 septembre 2004, du solde, d'un montant de 5.776.512,80 €. Cette somme devait être réglée grâce à une levée de fonds sur le marché par émission d'actions à bons de souscriptions d'actions (ci-après les «  *ABSA*  »).

L'opération, dont la réalisation a été confiée à EUROLAND FINANCE, a été lancée le 9 août 2004, l'objectif étant de *« lever toute incertitude quant à la continuité de* [l'] *exploitation »* de PROLOGUE. La période de souscription des ABSA s'est achevée le 15 septembre, et, le 6 octobre 2004, les actions nouvelles ont été cotées sur la même ligne que les actions anciennes. Toutefois, au mois d'octobre 2004, le marché de l'action PROLOGUE a été marqué par une baisse significative du cours ainsi que par une nette concentration à la vente de quelques investisseurs, dont, notamment, M. Thierry BOUTIN.

Le 2 novembre 2004, PROLOGUE a déclaré devant le Tribunal de commerce d'Evry l'état de cessation de ses paiements. Une procédure de redressement judiciaire a été ouverte, qui a abouti, le 8 novembre 2005, à l'adoption d'un plan de continuation dont le terme est fixé au 7 novembre 2015. La cotation des actions de PROLOGUE, qui a été suspendue le 2 novembre 2004, a repris le 8 janvier 2007.

### B.   PROCEDURE

Le 23 décembre 2004, le Secrétaire général de l'Autorité des marchés financiers a décidé l'ouverture d'une enquête sur l'information financière et le marché du titre PROLOGUE à compter du 31 décembre 2002.

Cette enquête a fait l'objet d'un rapport de la Direction des Enquêtes et de la Surveillance des Marchés du 25 septembre 2006.

Au regard des conclusions de ce rapport et sur décision de la Commission spécialisée n° 3 du 16 octobre 2006, le Président de l'AMF a, par lettre recommandée avec demande d'avis de réception du 15 novembre 2006, notifié les griefs qui leur étaient reprochés à :

- PROLOGUE, représentée par M. Eric DERMONT, son Président Directeur Général actuel ;
- S&W ASSOCIES, représenté par M. Vincent YOUNG, en charge du commissariat aux comptes de PROLOGUE à l'époque des faits ;

- M. Vincent YOUNG, en sa qualité de commissaire aux comptes, associé du cabinet S&W ASSOCIES, en charge du commissariat aux comptes de PROLOGUE à l'époque des faits ;
- ERNST & YOUNG, en charge du commissariat aux comptes de PROLOGUE à l'époque des faits, représenté par son Président Directeur Général, M. Patrick GOUNELLE;
- M. François SOREL, en sa qualité de commissaire aux comptes, associé du cabinet ERNST & YOUNG, en charge du commissariat aux comptes de PROLOGUE à l'époque des faits ;
- M. Christian LEONETTI, en sa qualité de Président du directoire de PROLOGUE à l'époque des faits ;
- M. Thierry BOUTIN, dirigeant et principal actionnaire de la société CASALVA à l'époque des faits et aujourd'hui, et qui a participé à l'augmentation de capital de PROLOGUE ;
- M. Jacques ROUVROY ;
- M. Eric ROUVROY, frère de M. Jacques ROUVROY ;
- EUROLAND FINANCE, représentée par son Président Directeur Général, M. Marc FORIENTINO ;
- M. Marc FIORENTINO, à titre personnel en sa qualité de Président Directeur Général d'EUROLAND FINANCE ;
- M. Laurent PFEIFFER, en sa qualité de déontologue d'EUROLAND FINANCE.


Ces notifications de griefs reprochent en substance à :

- PROLOGUE, représentée par son Président Directeur Général actuel, M. Eric DERMONT, d'avoir manqué aux obligations de bonne information du public prévues aux articles 1, 2 et 3 du Règlement COB n° 98-07 relatif à « *l'obligation d'information du public* » repris aux articles 222-1, 222-2 et 632-1 du Règlement général de l'AMF en ayant :

. publié les 16 juin 2003, 14 novembre 2003, 14 juin 2004 et 17 décembre 2004 des comptes consolidés aux 31 décembre 2002, 30 juin 2003, 31 décembre 2003 et 30 juin 2004, inexacts, en raison de la comptabilisation erronée des « *conséquences de la cession de l'immeuble abritant son siège social et de sa reprise en crédit bail* » ;
. délivré au marché une information inexacte, imprécise ou trompeuse lors du lancement de l'émission d'ABSA, « *en affirmant de manière péremptoire que l'émission d'ABSA devait « lever toute incertitude sur la continuité de l'exploitation* » et en omettant d'informer le marché de l'ensemble des «*contraintes*» pesant sur la levée de cette incertitude, qui résultait notamment de l'absence de prise en compte, dans le plan de trésorerie prévisionnel, d'une « *dette exigible de 2,7 millions d'euros correspondant à la TVA que PROLOGUE avait omis de déclarer depuis plusieurs mois* » ;
. délivré au marché une information inexacte, imprécise ou trompeuse, en annonçant, le 1er octobre 2004, à l'issue de la période de souscription, « *le succès de l'augmentation de capital* » en des termes qui laissaient « *penser que, grâce à l'augmentation de capital et à l'exercice ultérieur des BSA, la société avait définitivement réglé ses problèmes de liquidités* » ;

- M. Christian LEONETTI, en sa qualité de Président du directoire, les mêmes faits, à l'exception du grief tiré de la publication le 17 décembre 2004, après son départ, des comptes arrêtés au 30 juin 2004 ;

-ERNST & YOUNG, représenté par son Président Directeur Général, M. Patrick GOUNELLE, et S&W ASSOCIES, représenté par M. Vincent YOUNG, ainsi qu'à leurs associés respectifs, MM. François SOREL et Vincent YOUNG, d'avoir, dans l'avis formulé à l'occasion de la note d'opération, délivré au marché une information inexacte, imprécise ou trompeuse lors du lancement de l'émission d'ABSA en affirmant « *que l'émission d'ABSA devait « lever toute incertitude sur la continuité de l'exploitation* » *sous certaines réserves qui n'avaient rien à voir avec les dettes de TVA* », et omis d'informer le marché de l'ensemble des « *contraintes* » pesant sur la levée de cette incertitude, en méconnaissance des articles 1, 2 et 3 du Règlement COB n° 98-07 relatif à « *l'obligation d'information du public* », repris aux articles 222-1, 222-2 et 632-1 du Règlement général de l'AMF ;

- M. Jacques ROUVROY, d'avoir cédé entre les 18 et 22 octobre 2004 les actions détenues par la société FINANCIERE DU VIGNOBLE, dont il est le principal actionnaire (527.907 actions pour un montant de 88.632 €), et par ses enfants, M. Eric ROUVROY (122.500 actions pour 21.152 €) et Mme Isabelle ROUVROY (87.500 actions pour 14.875 €), après avoir été informé, notamment par M. Eric DERMONT, de la probabilité de la prochaine cessation des paiements de PROLOGUE, faits contraires aux articles 3 à 5 du Règlement COB n° 90-08 relatif à « *l'utilisation d'une information privilégiée* », repris aux articles 622-1 et 622-2 du Règlement général de l'AMF ;

- M. Eric ROUVROY, frère du précédent, d'avoir cédé le 18 octobre 2004, au cours unitaire moyen de 0,16 €, les 90.000 actions PROLOGUE qu'il avait acquises, pour un montant total de 14.611, 90 €, et les 60.000 actions acquises par sa mère, pour 9.800 €, après avoir été informé, par l'intermédiaire de M. Jacques ROUVROY, de la probabilité de la prochaine cessation de paiements de PROLOGUE, faits contraires aux articles 3 à 5 du Règlement COB n° 90-08 relatif à « *l'utilisation d'une information privilégiée* », repris aux articles 622-1 et 622-2 du Règlement général de l'AMF ;

- M. Thierry BOUTIN :
. d'avoir, afin de faire baisser le cours, cédé le 24 septembre 2004, à découvert, 752.812 actions PROLOGUE représentant 5,14 % de son capital et 47 % des ventes réalisées lors de la séance, faits susceptibles de constituer un manquement aux dispositions de l'article 3 du Règlement COB n° 90-04 relatif à « *l'établissement des cours* » ;
. d'être intervenu massivement, pour le compte de la société CASALVA, entre le 26 octobre et le 1er novembre 2004, à la vente sur le marché du titre PROLOGUE, « *moins de deux heures* » après avoir été informé de la probabilité de la prochaine cessation des paiements de la société, lors de la réunion avec MM. Eric DERMONT et Georges SEBAN, faits contraires aux articles 3 à 5 du Règlement COB n° 90-08 « *relatif à l'utilisation d'une information privilégiée* », repris aux articles 622-1 et 622-2 du Règlement général de l'AMF ;

- EUROLAND FINANCE, représentée par son Président Directeur Général actuel, M. Marc FIORENTINO ainsi que ce dernier, à titre personnel :
. d'avoir exercé le service de placement sans avoir été agréé à cette fin, dans le cadre de l'opération d'augmentation de capital de PROLOGUE réalisée en 2004, faits contraires aux articles L. 532-1 et L. 533-4 du Code monétaire et financier ainsi qu'à l'article 3-1-1 du Règlement général du CMF, repris en substance à l'article 321-24 du Règlement général de l'AMF ;
. de ne pas avoir agi dans l'intérêt de son client en décidant de réduire de 996.056 € à 350.000 € la souscription de la société LANGLADE CAPITAL MANAGEMENT à l'augmentation de capital de PROLOGUE, faits pouvant constituer un manquement à l'article L. 533-4 du Code monétaire et financier et à l'article 3-1-1 du Règlement général du CMF ;
. de n'avoir été en mesure de justifier que l'ordre de vente de 1.750.000 actions PROLOGUE qui a été transmis à AUREL LEVEN avait bien été émis par la société LANGLADE CAPITAL MANAGEMENT ni d'apporter la preuve du moment de la réception dudit ordre, faits qui pourraient être contraires aux dispositions de l'article 3-3-10 du Règlement général du CMF;
. d'avoir établi et transmis à l'AMF, le 14 mars 2005, un faux ordre de vente « *destiné à masquer aux enquêteurs le fait que cet ordre n'avait jamais été reçu* », ce qui pourrait constituer un manquement aux règles de bonne conduite, et notamment aux principes de loyauté, d'équité et de respect de l'intégrité du marché, ainsi qu'aux dispositions de l'article 144-3 du Règlement général de l'AMF ;

- M. Laurent PFEIFFER, en sa qualité de déontologue d'EUROLAND FINANCE, se voit reprocher également ce dernier grief.

13 juin 2008                     BULLETIN DES ANNONCES LEGALES OBLIGATOIRES                     Bulletin n° 72

En application de l'article R. 621-38 du Code monétaire et financier, copie des notifications de griefs a été transmise le 15 novembre 2006 par le Président de l'AMF au Président de la Commission des sanctions, qui a désigné en qualité de Rapporteur M. Jacques BONNOT par décision du 15 janvier 2007. Les personnes mises en cause en ont été informées par lettres recommandées avec demande d'avis de réception du 29 mars 2007, leur rappelant la possibilité d'être entendues par le Rapporteur, à leur demande, en application du I de l'article R. 621-39 du Code monétaire et financier.

Le 19 décembre 2006, PROLOGUE, représentée par M. Eric DERMONT, a fait savoir qu'elle n'avait pas d'observation particulière à formuler à ce stade tout en précisant qu'elle émettait *« toutes réserves quant à l'exercice de ses droits et actions au regard des faits exposés dans ledit rapport d'enquête ».*

En réponse aux notifications de griefs, MM. Eric ROUVROY, Jacques ROUVROY et Christian LEONETTI, assisté par Maître Emmanuel DAOUD, ont déposé des observations respectivement les 4 décembre 2006 et 16 janvier 2007.

M. Vincent YOUNG et S&W ASSOCIES, assistés par Maître André-François BOUVIER, d'une part, M. François SOREL et ERNST & YOUNG, assistés par Maître Jean THIEFFRY, d'autre part, ont déposé des observations en réponse le 17 janvier 2007.

EUROLAND FINANCE et M. Marc FIORENTINO, assistés par Maître Jérôme HERBET, et M. Laurent PFEIFFER, assisté par Maître Thibault de MONTBRIAL, ont déposé des observations en réponse le 31 janvier 2007.

M. François SOREL et ERNST & YOUNG ont déposé des observations communes complémentaires le 28 mars 2007.

M. Eric ROUVROY et M. Thierry BOUTIN, assisté par Maître Thierry VALLAT, ont déposé des observations complémentaires en réponse respectivement le 25 avril et le 14 mai 2007.

Par courriers des 11 décembre 2006 et 24 janvier 2007, M. François SOREL et ERNST & YOUNG ont demandé que des griefs complémentaires soient notifiés à M. Eric DERMONT, à titre personnel. Dans sa réponse en date du 2 mars 2007, le Président de la Commission des sanctions, M. Daniel LABETOULLE, les a informés de ce que le Rapporteur n'avait pas estimé opportun de demander une extension de griefs à l'égard de M. Eric DERMONT.

Le 15 janvier 2007, M. Christian LEONETTI a notamment formulé le souhait que Mme Isabelle DULONG, ancienne directrice financière de PROLOGUE, soit entendue. Par lettre en date du 18 mai 2007, le Rapporteur lui a répondu que, au regard de l'ensemble des éléments figurant dans le dossier d'instruction, il ne lui paraissait pas utile de procéder à une telle audition.

Le Rapporteur a procédé à l'audition de toutes les personnes mises en cause qui en avaient formulé expressément la demande. Ainsi a-t-il entendu M. Marc FIORENTINO, à titre personnel et en sa qualité de représentant légal de EUROLAND FINANCE, le 31 mai 2007, M. François SOREL le 12 juin 2007, M. Christian LEONETTI le 13 juin 2007, M. Eric DERMONT pour le compte de PROLOGUE le 14 juin 2007 et M. Thierry BOUTIN le 11 juillet 2007.

Des observations en réponse au rapport du Rapporteur ont été déposées les :
- 1er février 2008, par Maître Valérie MAINTRIEU-FRANTZ pour la société PROLOGUE,
- 1er février 2008 par M. Eric ROUVROY,
- 1er février 2008 par M. Jacques ROUVROY,
- 4 février 2008, par Maître André François BOUVIER, pour le compte de S&W ASSOCIES et de M. Vincent YOUNG,
- 4 février 2008 par Maître Thibault de MONTBRIAL pour M. Laurent PFEIFFER,
- 5 février 2008, par Maître Jérome HERBET pour EUROLAND FINANCE,
- 5 février 2008, par Maître Jean THIEFFRY, pour ERNST & YOUNG AUDIT et M. François SOREL,
- 14 février 2008, par M. le Bâtonnier Francis TEITGEN, pour M. Marc FIORENTINO,
- 14 février 2008, par Maître Emmanuel DAOUD, pour M. Christian LEONETTI.


## II. SUR LES TEXTES APPLICABLES

Considérant que les manquements objet des notifications de griefs s'étant pour l'essentiel déroulés en 2003 et 2004, doivent, en vertu du principe de survie de la loi plus douce, être appréciés au regard des dispositions combinées des articles L. 621-15 et L. 621-14 du Code monétaire et financier, dans leur rédaction issue, selon la date à laquelle les faits sont intervenus, soit de la loi n° 89-531 du 2 août 1989, soit de la loi n° 2003-706 du 1er août 2003; que ces deux lois ont en commun de subordonner la sanction aux effets que doivent avoir eu les pratiques : fausser le fonctionnement du marché, procurer aux intéressés un avantage injustifié qu'ils n'auraient pas obtenu dans le cadre normal du marché, porter atteinte à l'égalité d'information et de traitement des investisseurs ou à leurs intérêts, faire bénéficier les émetteurs et les investisseurs des agissements d'intermédiaires contraires à leurs obligations professionnelles ou, selon le dernier de ces textes, porter atteinte *« aux droits des épargnants »* ;

**1.   En ce qui concerne les griefs relatifs à l'information du public notifiés à PROLOGUE, à M. Christian LEONETTI, ainsi qu'à S&W ASSOCIES, M. Vincent YOUNG, ERNST & YOUNG, et M. François SOREL**

Considérant qu'il est reproché à PROLOGUE, M. Christian LEONETTI, S&W ASSOCIES, M. Vincent YOUNG, ERNST & YOUNG et M. François SOREL, d'avoir communiqué des informations inexactes, imprécises ou trompeuses ; que les faits, s'étant produits durant les années 2003 et 2004, doivent être appréciés au regard des dispositions du Règlement COB n° 98-07 alors applicable, reprises par les articles 222-1 et 222-2 du Règlement général de l'AMF, devenus les articles 221-1 et 223-1 dudit Règlement général, entrés en vigueur le 25 novembre 2004 ; qu'il convient en outre de faire bénéficier les mis en cause, en vertu du principe de l'application immédiate de la loi plus douce, des dispositions de l'article 632-1 du Règlement général de l'AMF, moins sévères en ce qu'elles exigent de rechercher si la société, les dirigeants et les commissaires aux comptes *"savaient ou auraient dû savoir"* que les informations qu'ils ont communiquées au public étaient inexactes, imprécises ou trompeuses ;

**2.   En ce qui concerne le grief relatif à la manipulation de cours notifié à M. Thierry BOUTIN**

Considérant que la notification de griefs adressée à M. Thierry BOUTIN pour des faits qui se sont déroulés le 24 septembre 2004 vise l'article 3 du Règlement COB n° 90-04 relatif à l'établissement des cours effectivement applicable, puisqu'il a été maintenu en vigueur par l'article 47 de la loi n° 2003-706 du 1er août 2003 jusqu'à sa reprise, à compter du 25 novembre 2004, par l'article 631-1 du Règlement général de l'AMF ; que ces dernières dispositions, qui maintiennent le principe d'interdiction des manipulations de cours en précisant les conditions et les indices susceptibles de qualifier le manquement, ne présentent pas un caractère plus doux de nature à justifier leur application aux faits commis avant leur entrée en vigueur ;

13 juin 2008                                      BULLETIN DES ANNONCES LEGALES OBLIGATOIRES                                      Bulletin n° 72

**3.    En ce qui concerne le grief relatif à l'utilisation d'une information privilégiée notifié à MM. Jacques ROUVROY, Eric ROUVROY et Thierry BOUTIN**

Considérant que les notifications de griefs adressées à MM. Jacques ROUVROY, Eric ROUVROY et Thierry BOUTIN visent les articles 3 à 5 du Règlement COB n° 90-08 relatif à l'utilisation d'une information privilégiée, qui demeurent applicables en l'espèce ; qu'en effet, si ce Règlement a été abrogé par l'arrêté du 12 novembre 2004 publié au Journal officiel du 24 novembre 2004, lui ont été substitués les articles 621-1 et 622-2 du Règlement général de l'AMF, dont le contenu est quasiment équivalent ; que, toutefois, les dispositions nouvelles, qui subordonnent l'existence du manquement à l'incidence, qualifiée de « *sensible* », que l'information privilégiée est susceptible d'avoir eu sur les cours, sont plus restrictives, et dès lors moins sévères, de sorte qu'elles devront bénéficier aux mis en cause en vertu du principe de l'application immédiate de la loi plus douce ;

**4.    En ce qui concerne les griefs relatifs aux manquements aux règles de bonne conduite et aux obligations professionnelles notifiés à EUROLAND FINANCE, à M. Marc FIORENTINO ainsi qu'à M. Laurent PFEIFFER**

Considérant que les notifications de griefs adressées à EUROLAND FINANCE, ainsi qu'à M. Marc FIORENTINO, visent les articles L. 532-1 et L.533-4 du Code monétaire et financier et les articles 2-1-6, 3-1-1 et l'article 3-3-10 du Règlement général du CMF ;

Considérant que les articles L. 532-1 et L.533-4 du Code monétaire et financier ont été modifiés à la suite de l'entrée en vigueur, le 1er novembre 2007, de l'ordonnance n° 2007-544 du 12 avril 2007, qui n'introduit pas de dispositions plus douces ; qu'il sera en conséquence fait application de ces articles dans leur rédaction antérieure à il'ordonnance précitée ;

Considérant que le Règlement général du CMF a été abrogé avec effet immédiat par l'arrêté du 12 novembre 2004 publié au Journal Officiel du 24 novembre 2004, qui lui a substitué le Règlement général de l'AMF dont il portait homologation ; que les dispositions prévues par les articles 2-1-6, 3-1-1 et l'article 3-3-10 du Règlement général du CMF, reprises par le Règlement général de l'AMF sont aujourd'hui codifiées respectivement aux articles D.321-1 du Code monétaire et financier, 314-3 du Règlement général de l'AMF et 7 du Règlement n° 1287/2006 de la Commission européenne du   10 août 2006 portant mesures d'exécution de la directive 2004/39/CE du Parlement européen ; que ces textes ne comportant pas de dispositions plus douces, il sera fait application en l'espèce des articles 2-1-6, 3-1-1 et 3-3-10 du Règlement général du CMF ;

## III. SUR LES MANQUEMENTS

## A.   SUR LES MANQUEMENTS RELATIFS A L'OBLIGATION D'INFORMATION DU PUBLIC

Considérant qu'il résulte des articles 2 et 3 du Règlement COB n° 98-07 et 632-1 du Règlement général de l'AMF que « *Constitue, pour toute personne, une atteinte à la bonne information du public la communication d'une information inexacte, imprécise ou trompeuse», « alors que cette personne savait ou aurait dû savoir que les informations étaient inexactes ou trompeuses* » ;

**1.    Sur le manquement tiré de la comptabilisation de l'immeuble abritant le siège social de PROLOGUE dans ses comptes consolidés reproché à PROLOGUE et M. Christian LEONETTI**

Considérant qu'est critiquée, en l'espèce, la comptabilisation par PROLOGUE « *des conséquences de la cession de l'immeuble abritant son siège social et de sa reprise en crédit-bail* » dans les comptes consolidés arrêtés au 31 décembre 2002, 30 juin 2003, 31 décembre 2003 et 30 juin 2004, publiés respectivement les 16 juin 2003, 14 novembre 2003, 14 juin 2004 et 17 décembre 2004 ; que les griefs ont été notifiés, en des termes identiques à ceux visant PROLOGUE, à M. Christian LEONETTI, en sa qualité de Président du directoire de PROLOGUE au moment des faits, mais seulement pour les comptes consolidés aux 31 décembre 2002, 30 juin 2003 et 31 décembre 2003 ;

Considérant que, au regard des règles comptables, les comptes consolidés doivent être établis en prenant en compte le principe de la prédominance de la substance sur la forme, qui conduit à opérer une analyse de la substance d'une opération ou de sa réalité économique sans se limiter à sa seule forme juridique ; qu'ainsi, une opération peut être prise en considération sur le plan comptable même si elle n'a pas été parfaitement formalisée sur le plan juridique, dès lors que sa réalisation est certaine du point de vue économique ; que, appliqué au crédit-bail, ce principe implique de le traiter comme une opération de financement lorsque les conditions de rachat - et en particulier le prix de la levée d'option - sont tellement favorables que ses bénéficiaires n'auront d'autre choix que de la lever ;

Considérant qu'il est établi que le 15 octobre 2001, PROLOGUE, en même temps qu'elle a cédé l'immeuble abritant son siège social à la société ING LEASE pour un montant de 3,81 M€, a conclu avec cette dernière un contrat de crédit-bail sur ce bien ; que l'immeuble a alors été traité comme s'il avait été cédé, d'où l'enregistrement d'une plus-value de cession d'environ 2 M€ et d'une diminution de la dette de 3.811.000 € dans les comptes consolidés de PROLOGUE ; qu'il est toutefois apparu que la conclusion d'un crédit-bail ne permettait pas, au regard des règles comptables en vigueur, et dans les circonstances de l'espèce, de considérer que l'immeuble avait été cédé ; qu'afin d'éviter un retraitement comptable, la société ING BAIL, filiale de la société ING LEASE, et PROLOGUE ont signé, le 5 avril 2002, un accord de principe, avec effet rétroactif au 15 octobre 2001, prévoyant la cession du crédit-bail par PROLOGUE à la société ING BAIL et la conclusion, parallèlement, d'un contrat de location simple entre ces deux sociétés; qu'il est apparu, le 3 juin 2004, que l'accord intervenu le 5 avril 2002 risquait de ne pas se réaliser, du fait du refus notifié par une employée d'ING LEASE ; qu'à cette date, les comptes consolidés arrêtés au 31 décembre 2003 n'avaient pas été finalisés ; qu'en séance, M. Christian LEONETTI a toutefois indiqué, sans être expressément contredit par les commissaires aux comptes, avoir consulté ces derniers, qui ne lui auraient pas demandé de réintégrer l'immeuble à l'actif ; qu'il ne l'a donc pas fait, d'autant qu'il envisageait alors d'intenter une procédure pour contraindre ses partenaires à respecter leurs engagements ; que l'immeuble, qui n'a pas non plus été "déconsolidé" dans les comptes du premier semestre 2004, l'a en revanche été dans ceux de l'exercice 2004 ;

Considérant que les comptes arrêtés aux 31 décembre 2002, 30 juin et 31 décembre 2003 n'apparaissent pas inexacts, la mise en oeuvre de l'accord de principe intervenu le 4 avril 2002 n'ayant alors pas été définitivement abandonnée ; qu'il en va différemment des comptes du premier semestre 2004, mais que la responsabilité de M. Christian LEONETTI ne sera pas retenue, dès lors qu'il a quitté ses fonctions avant leur publication ; que PROLOGUE sera également mis hors de cause pour ces derniers comptes, dès lors qu'ils ont été arrêtés postérieurement à l'ouverture de la procédure collective ;

**2.    Sur le manquement tiré de l'information relative aux difficultés de trésorerie communiquée au marché lors du lancement de l'émission d'ABSA reproché à PROLOGUE, à M. Christian LEONETTI et aux commissaires aux comptes**

Considérant qu'il est reproché à PROLOGUE et à M. Christian LEONETTI d'avoir donné au marché une information inexacte, imprécise et trompeuse lors de la communication relative à l'émission d'ABSA en affirmant dans la note d'opération du 31 juillet 2004 sur l'augmentation de capital de PROLOGUE « *de manière péremptoire que l'émission d'ABSA devait « lever toute incertitude sur la continuité de l'exploitation* » et en omettant d'informer le marché de l'ensemble des « *contraintes* » pesant sur la levée de cette incertitude ; qu'un manquement à l'obligation d'information du public a également été notifié aux commissaires aux comptes, S&W ASSOCIES, ERNST & YOUNG AUDIT, MM. Vincent YOUNG et

BULLETIN DES ANNONCES LEGALES OBLIGATOIRES

François SOREL, auxquels il est reproché d'avoir, dans l'avis formulé sur la note d'opération, confirmé cette affirmation « *sous certaines réserves qui n'avaient rien à voir avec les dettes de TVA* », et omis d'informer le marché de l'ensemble des « *contraintes* » pesant sur la levée de cette incertitude ;

***2.1   Sur le caractère inexact, imprécis et trompeur de l'information relative aux difficultés de trésorerie communiquée au marché lors du lancement de l'émission d'ABSA***

Considérant que la note incriminée indique que : « *Cette opération de capital doit permettre à Prologue de renforcer ses fonds propres et d'équilibrer sa structure financière. Dans le cadre du protocole signé le 25 juin 2004, la Société utilisera une part significative de la levée de fonds résultant de cette opération pour le remboursement anticipé de ses dettes financières, y compris les obligations émises en juin 2002. Cette opération doit donc lever toute incertitude quant à la continuité de l'exploitation* » ; qu'à la suite de cette note, PROLOGUE a annoncé dans un communiqué du 3 août 2004 le lancement d'une augmentation de capital de 12 M€ pour « *rembourser une part significative de sa dette, et accroître ses capacités financières pour accélérer son développement endogène et donner à la société un nouvel élan pour renouer avec la croissance et la rentabilité* » ; que le 11 août 2004, à l'occasion d'un communiqué indiquant le chiffre d'affaires dégagé au titre du premier semestre 2004, PROLOGUE a précisé qu'une augmentation de capital était en cours pour « *permettre à PROLOGUE d'accroître ses capacités financières, de réduire considérablement son endettement et d'accompagner la reprise de sa croissance* » ;

Considérant que le plan de trésorerie sur lequel reposait la note d'opération omettait de prendre en compte, depuis octobre 2003, une dette correspondant à la TVA collectée, mais non déclarée par PROLOGUE ; que le mécanisme de la fraude mise en place a consisté notamment, à l'occasion des prestations immatérielles relevant du régime de la TVA à l'encaissement qui ont été fournies au sein du groupe formé par PROLOGUE et certaines de ses filiales, à gonfler artificiellement le montant de la TVA déductible en anticipant sa constatation, alors que celle-ci n'avait pas été payée auprès du fournisseur, et à réduire d'autant les sommes à reverser au titre de la TVA collectée ; que cette fraude a été répartie sur six filiales du groupe et sur les deux exercices 2003 et 2004 ; qu'a été accumulée par PROLOGUE une dette de TVA atteignant plus de 2,7 M€ au 30 septembre 2004 (cotes 0060 et 001171) ; que la réintégration de la dette dans le plan de trésorerie n'aurait pas permis à PROLOGUE, ainsi que les fonds levés dans le cadre de l'augmentation de capital, tout à la fois de rembourser « *ses dettes financières* » et d'assurer la continuité de son exploitation, contrairement à ce qui était indiqué dans la note d'opération ; que, si les communiqués des 3 et 11 août 2004 précités – qui évoquent le remboursement, non plus de l'intégralité, mais seulement d'une partie importante des dettes – fournissent des informations qui tendent à nuancer, voire à contredire celles figurant dans la note d'opération, ils ne comportent toutefois aucun démenti faisant état de la dette de TVA ou des risques de cessation des paiements, situation dont le public n'a connu l'existence que le 2 novembre 2004 ; que ces communiqués ont donc entretenu la confusion sur le règlement des difficultés de trésorerie de PROLOGUE ;

Considérant, en conséquence, qu'en dépit de l'information délivrée ultérieurement, celle contenue dans la note d'opération, affirmant que la levée de fonds issue de l'augmentation de capital permettrait à PROLOGUE de rembourser ses dettes bancaires et d'assurer la continuité de son exploitation, est inexacte et trompeuse, puisque l'intégration au plan de trésorerie de la dette de TVA exigible aurait conduit à constater une absence, voire un déficit de trésorerie susceptible de conduire à un état de cessation des paiements ; qu'ainsi, il a été porté atteinte à l'égalité d'information des investisseurs, ceux qui sont intervenus sur le marché alors qu'ils n'appartenaient pas aux organes dirigeants n'ayant pas été mis en mesure d'apprécier la réalité de la situation financière de PROLOGUE et des risques y afférents ;

### 2.2.   Sur l'imputabilité des faits aux personnes mises en cause

#### 2.2.1   Sur l'imputabilité des faits à PROLOGUE et à M. Christian LEONETTI

Considérant que le manquement doit être retenu à l'encontre de PROLOGUE qui est, par nature, responsable des informations communiquées en son nom par ses différents représentants légaux ; qu'il est également constitué à l'égard de M. Christian LEONETTI qui, en sa qualité de Président du Directoire, aurait dû s'assurer de l'exactitude de l'information délivrée à l'occasion de l'augmentation de capital ; qu'il résulte des déclarations du comptable de PROLOGUE qu'alerté sur la fraude à la TVA que ce dernier venait de découvrir, M. Christian LEONETTI aurait « *éludé la question* » (cote 001162) ; qu'à supposer même que, comme il le soutient, il n'en ait pas pris conscience, il demeure que s'il avait procédé aux vérifications nécessaires, notamment auprès de la directrice financière, il aurait pleinement mesuré le caractère trompeur de la note d'opération ; que, dès lors, il « *savait* » ou aurait, à tout le moins, « *dû savoir* » que l'information donnée était inexacte ;

#### 2.2.2   Sur l'imputabilité des faits aux commissaires aux comptes

Considérant que les commissaires aux comptes n'encourent une sanction que s'il est établi, soit qu'ils savaient que les informations communiquées par la société avec leur aval étaient inexactes, imprécises ou trompeuses, soit que l'accomplissement des diligences normales exigées par les textes leur auraient permis de le savoir ;

Considérant qu'au cours des années précédentes, les déclarations de TVA de PROLOGUE étaient régulières et les rapprochements qui avaient été présentés ne comportaient pas d'erreur ; que, selon les déclarations du comptable de PROLOGUE, la fraude décrite ci-dessus aurait été mise en place, pour résoudre les problèmes de trésorerie, par l'équipe de direction, qui l'aurait dissimulée (cote 001162) ; qu'elle n'a été révélée qu'à l'arrivée de M. Eric DERMONT qui, aussitôt alerté par le comptable, a fait procéder à « *une étude plus précise de la situation au regard de la TVA* » (cote 001171) ; qu'ainsi, il est établi, et au demeurant non contesté, que les mécanismes mis en oeuvre pour minorer ou retarder les reversements de TVA ont été cachés aux commissaires aux comptes ;

Considérant qu'il convient maintenant de rechercher si l'accomplissement des diligences requises aurait dû conduire MM. François SOREL et Vincent YOUNG à découvrir la fraude et le caractère trompeur des informations délivrées sur le fondement de données inexactes ; qu'il n'est pas contestable que les commissaires aux comptes ont été très attentifs au risque de cessation des paiements de PROLOGUE, qu'ils ont décelé et qui les a conduits à déclencher quatre procédures d'alerte, les 7 novembre 2002, 17 janvier, 6 mars et 31 octobre 2003 ; qu'ils se sont, notamment le 11 juin 2004, inquiétés du « *cadrage technique de la TVA* » ; qu'ils ont alors reçu de la directrice financière l'assurance que ce cadrage avait été réalisé, comme en attestent les mentions portées sur leur fiche de travail (cotes 00150 et 00155) ; que, le 21 juin 2004, celle-ci et M. Christian LEONETTI leur ont remis une lettre mentionnant notamment qu'ils avaient « *signalé tous les faits significatifs liés à des fraudes commises ou suspectées dont nous avons eu connaissance* » ; que, lors de leur audition, les commissaires aux comptes ont indiqué qu'ils n'avaient alors pas pu « *imaginer que la direction de PROLOGUE fraudait et nous mentait ... cette fraude a été très bien organisée, et ce jusqu'au plus haut du management* » (cote 001055) ; qu'ils ont par ailleurs demandé, et obtenu en juillet 2004, des notes « *d'analyse des dettes fiscales et sociales* » (cote 00330), dont l'examen ne leur a pas permis de détecter une fraude que seul un rapprochement minutieux, aux niveaux de la société et de ses filiales, des comptes de TVA avec la TVA déclarée aurait pu faire apparaître ; qu'un tel rapprochement n'est pas expressément exigé dans le cadre d'un contrôle portant seulement sur la note d'opération, de sorte que les faits reprochés ne paraissent pas pouvoir être imputés à un défaut de diligences ; que, même si les travaux participant d'un processus d'appel public à l'épargne impliquent une vigilance particulière de la part des commissaires aux comptes, la preuve n'est donc pas rapportée, en l'espèce, que ceux-ci aient méconnu leurs obligations professionnelles ;

Considérant qu'il résulte de ce qui précède, sans qu'il soit besoin d'examiner les moyens de procédure soulevés par les intéressés, que les griefs formulés à l'encontre de ERNST & YOUNG et S&W ASSOCIES, ainsi que de MM. François SOREL et Vincent YOUNG, doivent être écartés ;

**3.   Sur le manquement tiré de l'information relative au succès de l'augmentation de capital délivrée à l'issue de la période de souscription, reproché à PROLOGUE et à M. Christian LEONETTI**

Considérant qu'il est reproché à PROLOGUE et à M. Christian LEONETTI d'avoir laissé croire, au terme de la période de souscription des ABSA, dans un communiqué du 1er octobre 2004, que « *grâce à l'augmentation de capital et à l'exercice ultérieur des BSA »*, PROLOGUE « *avait définitivement réglé ses problèmes de liquidités* » ;

Considérant que, dès le début de l'opération, il existait un risque de résolution du protocole bancaire tendant au rééchelonnement de la dette puisque, d'une part, les fonds n'avaient pas été versés au terme fixé, d'autre part, le plan de trésorerie prévisionnel était erroné en raison, notamment, de l'omission de la dette de TVA ; qu'au surplus, sont apparus divers évènements, tels que la réduction de 152.000 € du montant de l'encaissement lié à la souscription de M. Georges SEBAN du fait de la compensation opérée avec son compte courant, ou le versement à la directrice financière et à M. Christian LEONETTI d'indemnités de départ atteignant la somme globale de 557.000 € ; qu'en conséquence, contrairement à ce qu'indiquait le communiqué du 1er octobre 2004, PROLOGUE n'était alors pas en mesure de rembourser, avec la première levée des fonds issus de l'augmentation de capital, l'intégralité de sa dette bancaire, d'un montant de 5,7 M€ ; qu'en outre, eu égard au déficit de trésorerie et au dépôt de bilan de la société survenu un mois après, l'annonce du développement et de la croissance à venir de PROLOGUE était en total décalage avec les informations objectives dont disposaient les personnes mises en cause sur la situation réelle de la société ;

Considérant que l'information donnée au public le 1er octobre 2004, selon laquelle la « *première levée de fonds va permettre à PROLOGUE de rembourser sa dette bancaire* » et grâce à l'exercice des ABSA, PROLOGUE serait à même « *d'accentuer* [le] *développement et* [la] *croissance dans les mois à venir* » était donc inexacte, imprécise et trompeuse ; que ces faits ont, par nature, porté atteinte à l'égalité d'information des investisseurs extérieurs à la société ;

Considérant que ce manquement sera retenu à l'encontre de PROLOGUE, qui est responsable de l'exactitude des informations communiquées en son nom par ses différents représentants légaux ; qu'il le sera également à l'égard de M. Christian LEONETTI qui, compte tenu des informations dont il disposait, ne pouvait pas ne pas avoir conscience des difficultés financières de PROLOGUE et des risques qui en résultaient ;

**B.   SUR LE MANQUEMENT DE MANIPULATION DE COURS REPROCHE A M. THIERRY BOUTIN**

Considérant qu'il est reproché à M. Thierry BOUTIN d'avoir cédé, le 24 septembre 2004, 752.812 actions PROLOGUE pour le compte de la société CASALVA, dont il est l'actionnaire majoritaire et le dirigeant, afin de faire baisser le cours du titre ; que s'il est établi qu'il a opéré à découvert, pour faire bénéficier cette société d'un profit sur les actions qu'elle se préparait à acquérir, les éléments constitutifs de la manipulation de cours, seule visée par la notification de griefs, ne sont en revanche pas réunis ; que M. Thierry BOUTIN sera donc mis hors de cause de ce chef ;

**C.   SUR LES MANQUEMENTS D'INITIE REPROCHES A MM. JACQUES ROUVROY, ERIC ROUVROY ET THIERRY BOUTIN**

**1.   Sur le caractère privilégié de l'information relative aux difficultés financières entraînant la forte probabilité d'une déclaration de cessation des paiements de PROLOGUE**

Considérant qu'il résulte de son audition par les services d'enquête que, dans les jours qui ont suivi sa prise de fonctions, intervenue le lundi 11 octobre 2004, M. Eric DERMONT a constaté « *que le montant du passif exigible de PROLOGUE était en réalité compris entre 20 et 30 millions d'euros, ce qui mettait la société en situation de cessation des paiements* » (cote 001172) ; que lors de la séance, il a nuancé ses propos en indiquant que, s'il avait découvert dès la première semaine l'existence de dettes très supérieures à celles qui avaient été annoncées, il n'en avait déduit que la société devrait déposer son bilan qu'à la fin de la semaine suivante ; qu'en toute hypothèse, il est établi qu'il a fait part de ses premières constatations, le samedi 16 octobre 2004, aux membres du directoire, puis à M. Jacques ROUVROY, dont l'entremise lui avait valu d'être nommé à la tête de la société ; que lors de l'enquête, ce dernier a déclaré que M. Eric DERMONT avait « *découvert la réelle situation financière de PROLOGUE, et notamment l'état de sa trésorerie* », que la société « *était en réalité en situation de cessation des paiements* », et lui avait alors téléphoné pour lui "*faire part de ces difficultés*" (cote 001021) ; que lors de la séance, M. Jacques ROUVROY a, dans le prolongement des dernières déclarations de M. Eric DERMONT, précisé que lors de cet appel téléphonique du 16 octobre, avaient été évoquées seulement les difficultés liées à la découverte d'un passif beaucoup plus important que prévu ;

Considérant que le 26 octobre suivant, M. Eric DERMONT a, avec M. Georges SEBAN, organisé des rencontres individuelles avec M. Jacques ROUVROY, ainsi qu'avec M. Thierry BOUTIN, auxquels il a confirmé en séance, comme il l'avait déclaré lors de l'enquête, avoir présenté « *le dépôt de bilan comme une mesure inéluctable* » (cote 001171) ;

Considérant qu'aux termes de l'article 621-1 du Règlement général de l'AMF : « *Une information privilégiée est une information précise qui n'a pas été rendue publique, qui concerne, directement ou indirectement, un ou plusieurs émetteurs d'instruments financiers, ou un ou plusieurs instruments financiers, et qui si elle était rendue publique, serait susceptible d'avoir une influence sensible sur le cours des instruments financiers concernés ou le cours d'instruments financiers qui leur sont liés* » ;

Considérant que, d'une part, jusqu'au 2 novembre 2004, date du dépôt de bilan de PROLOGUE devant le Tribunal de commerce, le public n'était pas informé de ce que le passif était tel que les fonds levés ne lui permettraient pas de faire face à ses dettes ; qu'à elle seule, l'annonce de cette impossibilité, le 16 octobre 2004, constitue une information dont le marché pouvait d'autant moins soupçonner l'existence que, selon le communiqué du 1er octobre, « *grâce à l'augmentation de capital et à l'exercice ultérieur des BSA »*, PROLOGUE était censé avoir « *définitivement réglé ses problèmes de liquidités* » ; qu'il est donc indifférent que, le 16 octobre, M. Eric DERMONT ait ou n'ait pas fait explicitement référence au dépôt d'une déclaration de cessation des paiements ; que ce dépôt a, de manière certaine, été évoqué le 26 octobre suivant ;

Considérant que, d'autre part, sont à l'évidence précises et de nature à avoir un effet sensible sur le cours de l'action les informations relatives, d'abord à l'impossibilité pour la société, malgré l'augmentation de capital, de faire face au passif exigible, ensuite à la nécessité de déclarer la cessation de ses paiements ;

**2.   Sur la détention et l'exploitation par les personnes mises en cause des informations privilégiées**

Considérant qu'aux termes de l'article 3 du Règlement COB n° 90-08 relatif à l'utilisation d'une information privilégiée, « *Les personnes disposant d'une information privilégiée à raison de la préparation et de l'exécution d'une opération financière ne doivent pas exploiter, pour compte propre ou pour compte d'autrui, une telle information sur le marché ni la communiquer à des fins autres ou pour une activité autre que celles à raison desquelles elle est détenue »* ; que selon l'article 4 du Règlement précité, « *Les personnes auxquelles a été communiquée une information privilégiée à l'occasion*

*de l'exercice de leurs professions ou de leurs fonctions ne doivent pas exploiter, pour compte propre ou pour compte d'autrui, une telle information sur le marché ou la communiquer à des fins autres ou pour une activité autre que celles à raison desquelles elle a été communiquée* » ; qu'enfin, aux termes de l'article 5 du Règlement précité, « *Toute personne qui, en connaissance de cause, possède une information privilégiée provenant directement ou indirectement d'une personne mentionnée aux articles 2, 3 et 4 du présent règlement, ne doit pas exploiter, pour compte propre ou pour compte d'autrui, une telle information sur le marché* » ;

Considérant que MM. Thierry BOUTIN, Jacques ROUVROY et Eric ROUVROY, qui n'appartiennent pas au cercle des personnes relevant des articles 3 et 4 du Règlement COB n° 90-08, entrent dans le champ de l'article 5 de ce Règlement ; que l'obligation d'abstention pesant sur tout détenteur d'une information privilégiée revêt un caractère absolu, de sorte que, sauf à justifier d'un motif impérieux relevant de la contrainte ou de la force majeure, le simple fait d'opérer sur le titre concerné caractérise le manquement ;

### 2.1   *Sur la détention et l'exploitation de l'information privilégiée par M. Thierry BOUTIN*

Considérant qu'il est reproché à M. Thierry BOUTIN d'être intervenu massivement, pour le compte de la société CASALVA GERMANY GmbH, à la vente sur le marché du titre PROLOGUE entre le 26 octobre et le 1er novembre 2004, « *moins de deux heures* » après avoir été informé de la probabilité de la prochaine cessation des paiements de la société, lors de sa réunion avec MM. Eric DERMONT et Georges SEBAN ;

Considérant que M. Thierry BOUTIN a, durant cette très courte période, cédé 1.796.302 titres, alors que depuis le 7 octobre 2004, il n'était quasiment pas intervenu ; que, contrairement à ce qu'il soutient, il détenait alors l'information privilégiée lui interdisant d'opérer ; que le souhait, purement spéculatif, qu'il aurait eu de « *continuer de vendre (ses) titres et engranger une plus-value effective* » par rapport à ses achats (cote 00983), ne saurait en aucune manière justifier son intervention ;

Considérant que les éléments constitutifs du manquement d'initié sont donc tous réunis à l'encontre de M. Thierry BOUTIN, qui ne saurait échapper à sa responsabilité au seul motif qu'il est intervenu sous couvert de la société dont il était alors le dirigeant et l'unique actionnaire, les opérations "*pour compte d'autrui*" entrant dans les prévisions de l'article 5 du Règlement COB n° 90-08 ; que ce manquement a porté atteinte aux droits des investisseurs en même temps qu'il a compromis le bon fonctionnement et l'intégrité du marché, de sorte qu'il revêt une particulière gravité appelant une sanction sévère ;

### 2.2   *Sur la détention et l'exploitation de l'information privilégiée par M. Jacques ROUVROY*

Considérant que M. Jacques ROUVROY, alors qu'il venait d'être informé de l'impossibilité pour PROLOGUE de faire face à ses dettes, a cédé entre les 19 et 22 octobre 2004 toutes les actions détenues par la société FINANCIERE DU VIGNOBLE, dont il est le principal actionnaire (527.907 actions pour un montant de 88.632 €), et par ses enfants, M. Eric ROUVROY (122.500 actions pour 21.152 €) et Mme Isabelle ROUVROY (87.500 actions pour 14.875 €); qu'il est toutefois, comme il l'a fait observer, vendu un faible nombre de titres par rapport aux montants très significatifs qu'il a investis dans la société ; que cette circonstance est, certes, inopérante du point de vue de la caractérisation du manquement qui a, par nature, porté atteinte au fonctionnement normal du marché ; qu'elle sera toutefois largement prise en compte dans l'appréciation du montant de la sanction prononcée ;

### 2.3   *Sur la détention et l'exploitation de l'information privilégiée par M. Eric ROUVROY*

Considérant qu'il est reproché à M. Eric ROUVROY d'avoir cédé le 18 octobre 2004, au cours unitaire moyen de 0,16 €, les 90.000 actions PROLOGUE qu'il avait acquises et les 60.000 actions acquises par sa mère ; que la preuve n'est toutefois pas rapportée que son frère, M. Jacques ROUVROY, lui ait transmis l'information privilégiée dont il était détenteur, tandis qu'il est établi que, le même jour, M. Eric ROUVROY a acquis des titres PROLOGUE, de sorte que le manquement n'est pas caractérisé ;

### D.   SUR LES MANQUEMENTS AUX REGLES DE BONNE CONDUITE ET AX OBLIGATIONS PROFESSIONNELLES REPROCHES A EUROLAND FINANCE ET A MM. MARC FIORENTINO ET LAURENT PFEIFFER

### 1.   Sur l'exercice d'une activité de placement sans agrément

Considérant qu'aux termes de l'article L. 532-1 du Code monétaire et financier, « *pour fournir des services d'investissement, les entreprises d'investissement et les établissements de crédit doivent obtenir un agrément (...)* » ; que selon l'article L. 533-4 dudit Code, « *Les prestataires de services d'investissement (...) sont tenus de respecter des règles de bonne conduite destinées à garantir la protection des investisseurs et la régularité des opérations. / Ces règles (...) obligent notamment à : / (...) 7. Se conformer à toutes les réglementations applicables à l'exercice de leurs activités de manière à promouvoir au mieux les intérêts de leurs clients et l'intégrité du marché (...)* ». ; que l'article 3-1-1 du Règlement général du CMF disposait que : « *Les règles de bonne conduite (...) établissent (...) les principes généraux de comportement et leurs règles essentielles d'application et de contrôle, auxquels doivent se conformer le prestataire habilité et les personnes agissant pour son compte ou sous son autorité. / Les dirigeants du prestataire habilité veillent au respect des présentes dispositions et à la mise en oeuvre des ressources et des procédures adaptées. / Les activités mentionnées à l'article 2-1-1 sont exercées avec diligence, loyauté, équité, dans le respect de la primauté des intérêts des clients et de l'intégrité du marché. (...) / Les règles de bonne conduite adoptées en vertu du présent Règlement par les prestataires habilités et s'appliquant à leurs collaborateurs constituent pour ceux-ci une obligation professionnelle* »; qu'il résulte de la combinaison de ces textes que le fait pour un prestataire de service d'investissement d'exercer une activité de placement au sens de l'article 2-1-6 du Règlement général du CMF, c'est à dire de *"recherche des souscripteurs ou des acquéreurs pour le compte d'un émetteur ou d'un cédant d'instruments financiers"*, sans avoir été agréé à cette fin constitue un manquement à ses obligations ;

Considérant qu'en l'espèce, il est reproché à l'entreprise d'investissement EUROLAND FINANCE, représentée par son Président Directeur Général, M. Marc FIORENTINO, ainsi qu'à ce dernier à titre personnel, d'avoir exercé sans agrément un service de placement pour PROLOGUE ;

Considérant qu'il est établi, et non contesté, que l'agrément obtenu par EUROLAND FINANCE était limité, à l'époque des faits, à la fourniture des services de réception, transmission et exécution d'ordres pour compte de tiers ;

Considérant que, tout d'abord, il résulte des déclarations concordantes de M. Cyril TEMIN, employé d'EUROLAND FINANCE en charge du dossier (cote 001100 : *"EUROLAND a assisté PROLOGUE dans sa recherche d'investisseurs"*) et des deux dirigeants de PROLOGUE, MM. Georges SEBAN (cote 00129 : *"J'insiste sur le fait qu'EUROLAND s'était bel et bien engagé à placer les titres... C'est la raison pour laquelle le contrat prévoit une rémunération en pourcentage des fonds levés"*) et Christian LEONETTI (cote 001204: *"Je suis formel, dans l'esprit, EUROLAND FINANCE devait bien assurer le placement de l'augmentation de capital"*), que la mission confiée s'analyse en une activité de placement des titres à émettre lors de l'augmentation du capital réalisée en 2004 ; qu'en l'espèce, il n'a d'ailleurs été fait appel à aucun autre prestataire de services d'investissement pour le placement des titres alors qu'un tel placement, dès lors qu'il s'analyse en un service d'investissement, ne peut être exercé que par un prestataire spécifiquement agréé à cette fin ; que si le contrat ne visait pas expressément cette activité, c'est parce qu'il ne pouvait pas y faire référence, EUROLAND FINANCE n'étant alors pas agréée pour le placement ; qu'en revanche, comme le fait observer M. Georges SEBAN, il prévoyait le versement par

13 juin 2008                                   BULLETIN DES ANNONCES LEGALES OBLIGATOIRES                                   Bulletin n° 72

PROLOGUE d'une commission de succès proportionnelle (5 % hors taxes) à l'ensemble des sommes levées, ce qui correspond à la rémunération du placeur chef de file d'une émission, auquel est traditionnellement versé un pourcentage du total des capitaux collectés ;

Considérant qu'en outre, de nombreux investisseurs (cotes 001292 et 001293) ont déclaré explicitement que c'est à la suite des sollicitations d'EUROLAND FINANCE qu'ils ont souscrit à cette augmentation de capital ; que l'argument selon lequel le placement n'aurait pas été fait auprès du public, cette société n'ayant fait que « signaler » l'opération à sa propre clientèle ou répondre à sa demande, est inopérant dès lors qu'ont été sollicités par M. Marc FIORENTINO ou par M. Cyril TEMIN des personnes qui n'étaient ainsi pas des clients d'EUROLAND FINANCE,  comme MM. Jean-François DESCAVES pour HERA FINANCE (cote 00970), Roger POLANI pour SPGP (cote 00959) ou Thierry BOUTIN pour CASALVA (cote 00987) ;

Considérant qu'enfin, c'est EUROLAND FINANCE qui a présenté à l'AMF une liste de souscripteurs, jointe à la demande de visa de l'opération d'augmentation de capital ;

Considérant qu'EUROLAND FINANCE ne s'est donc pas contentée de fournir des services de réception, transmission et exécution d'ordres pour compte de tiers, et a effectivement exercé, dans le cadre de l'augmentation de capital de PROLOGUE réalisée en 2004, une activité de placement au sens de l'article 2-1-6 du Règlement général du CMF sans disposer de l'agrément nécessaire à cet effet ; que le visa apposé par l'AMF sur la note d'opération ne vaut évidemment pas validation de services qui ont été fournis sans agrément ; qu'enfin, la circonstance que des dirigeants de l'émetteur ont également recherché des souscripteurs reste sans effet sur la caractérisation du manquement reproché à EUROLAND FINANCE ;

Considérant, en conséquence, que le manquement tiré de l'exercice d'une activité de placement sans agrément est constitué en tous ses éléments ;

**2.    Sur la primauté donnée aux intérêts d'un investisseur sur ceux de PROLOGUE**

Considérant qu'aux termes de l'article L. 533-4 du Code monétaire et financier, applicable à l'époque des faits, *« Les prestataires de services d'investissement (…) s'obligent notamment à : 1. Se comporter avec loyauté et agir avec équité au mieux des intérêts de leurs clients et de l'intégrité du marché ; (…) 6. S'efforcer d'éviter les conflits d'intérêts et, lorsque ces derniers ne peuvent être évités, veiller à ce que leurs clients soient traités équitablement »* ; que l'article 3-1-1 du Règlement général du CMF précise en outre que *« Les règles de bonne conduite (…) établissent (…) les principes généraux de comportement et les règles essentielles d'application et de contrôle, auxquels doivent se conformer le prestataire habilité et les personnes agissant pour son compte ou sous son autorité. / Les dirigeants du prestataire habilité veillent au respect des présentes dispositions et à la mise en oeuvre des ressources et des procédures adaptées. / Les activités mentionnées à l'article 2-1-1 sont exercées avec diligence, loyauté, équité, dans le respect de la primauté des intérêts des clients et de l'intégrité du marché. (…) / Les règles de bonne conduite adoptées en vertu du présent règlement par les prestataires habilités et s'appliquant à leurs collaborateurs constituent pour ceux-ci une obligation professionnelle »* ;

Considérant qu'en l'espèce, il est reproché à EUROLAND FINANCE et à M. Marc FIORENTINO, à titre personnel, de ne pas avoir agi dans l'intérêt du client PROLOGUE en réduisant unilatéralement à 350 000 € la souscription à l'augmentation de capital que devait faire la société LANGLADE CAPITAL MANAGEMENT, dont M. François LANGLADE était le gérant et le principal actionnaire ;

Considérant qu'il est établi que M. Marc FIORENTINO a pris seul l'initiative, fin septembre 2004, de réduire à 350.000 € l'engagement de souscription de la société LANGLADE CAPITAL MANAGEMENT, sans l'avoir préalablement consultée, alors qu'elle s'était engagée à souscrire à hauteur de 996.059 € ; que les allégations de M. Marc FIORENTINO selon lesquelles cette réduction aurait correspondu au souhait de l'un des dirigeants de PROLOGUE sont expressément démenties par ce dernier ; qu'en tout état de cause, la réduction de l'engagement de la société LANGLADE CAPITAL MANAGEMENT, initiée par M. Marc FIORENTINO pour préserver les liens d'amitié l'unissant à M. François LANGLADE, susceptible de devenir l'un de ses « clients principaux » et intervenue alors que l'augmentation de capital n'avait pas été intégralement souscrite et que, comme on l'a vu ci-dessus, PROLOGUE avait le plus grand besoin de ces fonds, était à l'évidence contraire à l'intérêt de cette société ; qu'investi par PROLOGUE de la charge de procéder à une augmentation de capital indispensable à sa survie, M. Marc FIORENTINO a manifestement trahi la confiance de sa cliente ;

Considérant qu'est dés lors caractérisé le manquement à l'obligation d'exécuter les services d'investissement avec diligence, loyauté et équité, dans le respect de la primauté des intérêts du client, qui revêt en l'espèce une particulière gravité ;

**3.    Sur l'impossibilité de justifier de la réception d'un ordre de vente d'un bloc d'actions**

Considérant qu'aux termes de l'article 3-3-10 du Règlement général du CMF, *« Le prestataire habilité chargé de transmettre un ordre à un autre prestataire habilité est en mesure : - de justifier que l'ordre transmis a été émis par le donneur d'ordre ; - d'apporter la preuve du moment de la réception et du moment de la transmission de l'ordre. Les mêmes obligations s'appliquent au mandataire mentionné à l'article 2-1-3 »* ;

Considérant qu'en l'espèce, il est reproché à M. Marc FIORENTINO et à EUROLAND FINANCE, ainsi qu'à son déontologue M. Laurent PFEIFFER, à propos de la vente de 1.750.000 actions PROLOGUE souscrites par LANGLADE CAPITAL MANAGEMENT au moment de l'émission d'ABSA, réalisée sur le marché entre les 11 et 14 octobre 2004 par l'intermédiaire de AUREL LEVEN, de n'avoir pas été en mesure de justifier ni de l'existence d'un ordre émis par la société propriétaire des titres, ni du moment où il aurait été reçu ;

Considérant que EUROLAND FINANCE ne conteste pas son impossibilité de prouver que cet ordre de vente, transmis à AUREL LEVEN et exécuté entre le 11 et le 14 octobre 2004, correspondait à une instruction donnée par la société LANGLADE CAPITAL MANAGEMENT ; qu'il est inopérant, pour la caractérisation du manquement, de soutenir qu'aucun préjudice n'en serait résulté ;

Considérant, en conséquence, que le manquement tiré de l'absence de justification d'un ordre de vente passé pour le compte de la société LANGLADE CAPITAL MANAGEMENT et du moment de réception dudit ordre, est constitué ;

**4.    Sur l'entrave à la mission des enquêteurs résultant de la transmission, le 14 mars 2005, d'un faux ordre de vente**

Considérant qu'il est reproché à EUROLAND FINANCE, à M. Marc FIORENTINO, à titre personnel, ainsi qu'à M. Laurent PFEIFFER, d'avoir établi et transmis à l'AMF, le 14 mars 2005, un faux ordre de vente *« destiné à masquer aux enquêteurs le fait que cet ordre n'avait jamais été reçu »* ;

Considérant toutefois qu'en l'absence de fondement légal autre que l'article 642-2 du Code monétaire et financier aux termes duquel le fait de *« communiquer [à l'AMF] des renseignements inexacts »* *« est puni d'un emprisonnement de deux ans ou d'une amende de 300.000 € »,* aucun manquement relevant de la compétence de la Commission des sanctions ne peut être retenu à ce propos ;

**5.    Sur l'imputabilité des manquements aux mis en cause**

Considérant que M. Marc FIORENTINO soutient que le manquement tiré de l'exercice de l'activité de placement sans agrément ne saurait lui être imputé, aux motifs qu'il n'existerait aucun fondement textuel aux poursuites et que les « *faits invoqués seraient exclusivement imputés à EUROLAND FINANCE* » ;

Considérant toutefois que les dirigeants doivent être regardés comme intervenant « *pour le compte* » de la société au sens de l'article L. 621-15 II du Code monétaire et financier, dans sa version applicable à l'époque des faits ; que selon cet article, la Commission des sanctions peut prononcer une sanction, « *au titre de tout manquement à leurs obligations professionnelles définies par les lois, règlements et règles professionnelles approuvées par l'AMF en vigueur, sous réserve des dispositions de l'article L. 613-21* », à l'encontre des « *personnes mentionnées aux I° à 8°, 11° et 12° du II de l'article 621-9* », des « *personnes physiques ... agissant pour le compte de l'une des personnes mentionnées aux 1° à 8° et 11° du II de l'article L. 621-9 au titre de tout manquement à leurs obligations professionnelles définies par les lois, règlements et règles professionnelles approuvées par l'Autorité des marchés financiers, sous réserve des dispositions de l'article L. 621-21* » ; qu'en ce qui concerne, de manière générale, l'ensemble des règles de bonne conduite applicables au prestataire de services d'investissement, l'article 321-24 du Règlement général de l'AMF disposait que celui-ci, ainsi que « *les dirigeants du prestataire habilité* », veillent au respect de ces règles « *et à la mise en œuvre des ressources et des procédures adaptées* » ; que ce principe demeure applicable en l'espèce, puisque le texte n'a pas été remplacé par une disposition plus douce susceptible de rétroagir ; qu'en effet, depuis le 1er novembre 2007, l'article 313-6 du Règlement général dispose que « *la responsabilité de s'assurer que le prestataire de services d'investissement se conforme à ses obligations professionnelles mentionnées au II de l'article L. 621-15 du Code monétaire et financier incombe à ses dirigeants et, le cas échéant, à son instance de surveillance. En particulier, les dirigeants et, le cas échéant, l'instance de surveillance évaluent et examinent périodiquement l'efficacité des politiques, dispositifs et procédures mis en place par le prestataire pour se conformer à ses obligations professionnelles et prennent les mesures appropriées pour remédier aux éventuelles défaillances* » ; qu'ainsi affirmée, de manière permanente, l'obligation faite à la personne morale et à ses dirigeants de veiller au respect, par les personnes physiques relevant de leur autorité, des lois, règlements et règles professionnelles ; que c'est sur le fondement de la méconnaissance de cette obligation de vigilance et de surveillance que peut être recherchée la responsabilité des dirigeants ;

Considérant que les manquements tirés de l'exercice de l'activité de placement sans agrément, mais aussi du non-respect de la primauté de l'intérêt du client et de l'impossibilité de justifier un ordre de vente, tels que précédemment établis, sont donc imputables à EUROLAND FINANCE, ainsi qu'à M. Marc FIORENTINO, en sa qualité de dirigeant ; que celui-ci est d'autant moins fondé à contester sa responsabilité qu'il a en outre activement concouru, à titre personnel, à la réalisation de l'ensemble des manquements ;

Considérant qu'en revanche, M. Laurent PFEIFFER, qui prouve n'avoir pas failli à ses obligations de contrôle, sera mis hors de cause en ce qui concerne l'absence de justification de l'ordre de vente litigieux ;

## IV. SUR LES SANCTIONS ET LA PUBLICATION DE LA DECISION

Considérant que selon l'article L. 621-15 II. c) du Code monétaire et financier dans sa version applicable à l'époque des faits visés par les notifications de griefs, la Commission des sanctions peut prononcer une sanction à l'encontre de toute personne qui s'est livrée à des pratiques contraires aux dispositions législatives ou réglementaires, « *lorsque ces pratiques sont de nature à porter atteinte aux droits des épargnants ou ont pour effet de fausser le fonctionnement du marché, de procurer aux intéressés un avantage injustifié qu'ils n'auraient pas obtenu dans le cadre normal du marché, de porter atteinte à l'égalité d'information ou de traitement des investisseurs ou à leurs intérêts ou de faire bénéficier les émetteurs ou les investisseurs des agissements d'intermédiaires contraires à leurs obligations professionnelles* » ; qu'en application de l'article L. 621-15.III c) du Code monétaire et financier, dans sa rédaction applicable à l'époque des faits, la sanction encourue par PROLOGUE, M. Christian LEONETTI, ainsi que MM. Thierry BOUTIN et Jacques ROUVROY est « *une sanction pécuniaire dont le montant ne peut être supérieur à 1,5 million d'euros ou au décuple du montant des profits éventuellement réalisés* » ;

Considérant qu'il résulte de l'article L. 621-15 du Code monétaire et financier, dans sa version applicable à l'époque des faits, que pour les prestataires de services d'investissement et pour les personnes agissant pour leur compte ou placées sous leur autorité, sont en outre encouru l'avertissement, le blâme, l'interdiction à titre temporaire ou définitif de l'exercice de tout ou partie des activités ou des services fournis ;

Considérant que les sanctions seront proportionnées à la gravité des manquements, telle qu'elle a été mise en lumière ci-dessus (III) ;

Considérant que l'article L. 621-15, V du Code monétaire et financier dispose que « *la commission des sanctions peut rendre publique sa décision dans les publications, journaux ou supports qu'elle désigne (Ordonnance n° 2007-544 du 12 avril 2007) « à moins que cette publication ne risque de perturber gravement les marchés financiers ou de causer un préjudice disproportionné aux parties en cause* » ; que par ces dispositions, le législateur a entendu mettre en lumière les exigences d'intérêt général relatives à la loyauté du marché, à la transparence des opérations et à la protection des épargnants qui fondent le pouvoir de sanction de la Commission, et prendre en compte l'intérêt qui s'attache, pour la sécurité juridique de l'ensemble des opérateurs, à ce que ceux-ci puissent, en ayant accès aux décisions rendues, mieux appréhender le contenu des règles qu'ils doivent observer ; qu'en l'espèce, la diffusion de la présente décision justifie sa publication, celle-ci n'étant pas de nature à causer aux personnes mises en cause un préjudice disproportionné ;

## PAR CES MOTIFS

**Et après en avoir délibéré sous la présidence de Mme Claude NOCQUET, par MM. Alain FERRI et Jean-Pierre MORIN, Membres de la 2 ème section de la Commission des sanctions, et par M. Jean-Claude HANUS, Membre de la 1 ère section de la Commission des sanctions, suppléant de M. Antoine COURTEAULT en application de l'article R. 621-7. I du Code monétaire et financier, en présence de la Secrétaire de séance ;**

## DECIDE DE :

- Mettre hors de cause MM. Vincent YOUNG, François SOREL, Eric ROUVROY, Laurent PFEIFFER, ainsi que les sociétés S&W ASSOCIES et ERNST & YOUNG ;

- Prononcer à l'encontre de :

. la société PROLOGUE SOFTWARE, une sanction pécuniaire de 100.000 € (cent mille euros) ;

. M. Christian LEONETTI, une sanction pécuniaire de 100.000 € (cent mille euros) ;

. M. Thierry BOUTIN, une sanction pécuniaire de 500.000 € (cinq cent mille euros) ;

BULLETIN DES ANNONCES LEGALES OBLIGATOIRES

. M. Jacques ROUVROY, une sanction pécuniaire de 5.000 € (cinq mille euros) ;

. M. Marc FIORENTINO, un avertissement et une sanction pécuniaire de 50.000 € (cinquante mille euros) ;

. la société EUROLAND, un avertissement et une sanction pécuniaire de 100.000 € (cent mille euros) ;

- Publier la présente décision au « *Bulletin des annonces légales obligatoires* », ainsi que sur le site internet et dans la revue de l'Autorité des marchés financiers.

A Paris, le 28 février 2008

La Secrétaire de Séance          La Présidente
Brigitte LETELLIER               Claude NOCQUET

**Un recours sur le fond à l'encontre de la décision de la Commission des sanctions du 28 février 2008 a été déposé par M. Christian LEONETTI devant la 1ère Chambre de la Cour d'appel de Paris.**

**Un recours sur le fond à l'encontre de la décision de la Commission des sanctions du 28 février 2008 a été déposé par M. Thierry BOUTIN devant la 1 ère Chambre de la Cour d'appel de Paris.**

**Cette décision peut faire l'objet d'un recours dans les conditions prévues aux articles R. 621-44 à R. 621-46 du Code monétaire et financier.**

*0808490*