EXHIBIT E

EFiled:  Mar 16 2017 04:16PM EDT
Transaction ID 60350469
Case No. 12711-VCS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| In re TESLA MOTORS, INC. STOCKHOLDER LITIGATION | x  Consolidated<br>:  C.A. No. 12711-VCS<br>:  PUBLIC REDACTED VERSION<br>:  Filed March 16, 2017<br>: |

## SECOND AMENDED VERIFIED CLASS ACTION
## AND DERIVATIVE COMPLAINT

Co-lead plaintiffs Arkansas Teacher Retirement System ("ATRS"), Boston Retirement System ("Boston"), Roofers Local 149 Pension Fund ("Roofers Local 149"), Oklahoma Firefighters Pension and Retirement System ("OFPRS"), KBC Asset Management NV ("KBC"), ERSTE-SPARINVEST Kapitalanlagegesellschaft m.b.H. ("ESK"), and Stichting Blue Sky Active Large Cap Equity Fund USA ("Blue Sky") and additional plaintiff Aaron Rocke ("Rocke," and together with ATRS, Boston, Roofers Local 149, OFPRS, KBC, ESK and Blue Sky, "Plaintiffs"), based on the knowledge of Plaintiffs as to themselves, and the review of publicly available information and non-public documents obtained pursuant to a demand to inspect books and records under Section 220 of the Delaware General Corporation Law, 8 *Del. C.* §220 ("Section 220"), as to all other matters, allege as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class and derivative action brought by Plaintiffs on behalf of themselves and all other similarly situated stockholders of Tesla, Inc.,

formerly known as Tesla Motors, Inc. ("Tesla" or the "Company"), and for the benefit of nominal defendant Tesla against: (a) Tesla's controlling stockholder Elon Musk and the other members of Tesla's Board of Directors (the "Tesla Board" or "Board") to remedy defendants' breaches of fiduciary duty and waste of corporate assets; and (b) Elon Musk and certain of the other defendants for unjust enrichment.

2.     Tesla is a Delaware corporation headquartered in Palo Alto, California that designs, develops, manufactures and sells electric vehicles and energy storage products.  Defendant Elon Musk led Tesla's pre-initial public offering ("IPO") funding rounds and is the Chairman of the Tesla Board, Tesla's Chief Executive Officer ("CEO") and Product Architect, and the Company's largest stockholder.  He is the dominant force in Tesla's corporate strategy and has a hands-on role in its product design.

3.     On June 21, 2016, Tesla announced in a blog post that it had made an offer (the "Offer") to acquire solar energy system installer SolarCity Corporation ("SolarCity").[1]  Elon Musk was also Chairman of the SolarCity Board of Directors (the "SolarCity Board") and SolarCity's largest stockholder, owning approximately 21.9% of its common stock at the time of the Offer.  SolarCity was founded by Elon Musk and his cousins, Peter Rive and Lyndon Rive.  Lyndon Rive served as

---

[1]     SolarCity is a Delaware corporation headquartered in San Mateo, California. Its common stock traded on The NASDAQ Global Select Market under the ticker symbol "SCTY."

SolarCity's CEO and Peter Rive is its Chief Technology Officer.  Both Lyndon Rive and Peter Rive were also directors on the SolarCity Board.

4.      On August 1, 2016, Tesla and SolarCity announced that they had executed a merger agreement pursuant to which Tesla would acquire SolarCity in an all-stock deal that at the time valued SolarCity at approximately $2.6 billion, or between $25.37 and $25.83 per share (the "Acquisition").

5.      Although stockholders invest in individual companies, by Elon Musk's own account, Tesla, SolarCity and his other company, Space Exploration Technologies Corporation ("SpaceX"), are a "pyramid" atop which he sits, and it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid of Tesla, SolarCity and SpaceX falters."

6.      Prior to the Acquisition, SolarCity consistently failed to turn a profit, had mounting debt, and was burning through cash at an unsustainable rate.  During its ten-year history, SolarCity accumulated over $3 billion in debt, nearly $1.5 billion of which was to become due before the end of 2017, and generated just over $1.8 billion in total revenue.  According to its Form 10-Q on August 9, 2016, as of June 30, 2016, SolarCity had cash and cash equivalents of only $145.7 million, which was then supplemented through a $305 million "cash equity" transaction announced on September 12, 2016.  By comparison, SolarCity incurred operating losses of $768 million in 2015 and $719 million during the first three quarters of 2016.

3

7.     Thus, the Acquisition was a bailout of SolarCity, which faced a likely bankruptcy in the near future absent the Acquisition.  This planned rescue benefitted the following six of the seven members of the Tesla Board and/or their family members, businesses and business partners:  (a) defendant Elon Musk and his cousins Peter Rive and Lyndon Rive; (b) defendant Antonio J. Gracias ("Gracias") and investment funds he manages; (c) defendant Kimbal Musk (Elon Musk's brother), his brother and cousins; (d) defendant Stephen T. Jurvetson ("Jurvetson"), his venture capital firm, and his firm's managing director; (e) the venture capital partner of defendant Ira Ehrenpreis ("Ehrenpreis"); and (f) defendant Brad W. Buss ("Buss"). Among other strong personal and financial ties to Elon Musk and SolarCity, *all* of the above are substantial SolarCity stockholders.

8.     Pursuant to Section 220, Plaintiffs demanded to inspect certain books and records of Tesla relating to the Offer and Acquisition and entered into confidentiality agreements with Tesla governing the production of such documents (the "220 Documents"), which Plaintiffs have received, reviewed and analyzed.  The 220 Documents, along with Tesla's public filings and other statements, show that the process by which the Tesla Board determined to make the Offer and to undertake the Acquisition was poisoned by the participation of Elon Musk and the conflicted directors who are beholden to him and stood to similarly benefit from the Acquisition.

4

9.     The Tesla Board did not form a special committee of independent directors to evaluate the Offer or the Acquisition.  Instead, Elon Musk and Gracias, both of whom serve on both the SolarCity Board and the Tesla Board, merely recused themselves from Tesla Board votes relating to the Acquisition.  This recusal was superficial, however, as both Elon Musk and Gracias participated in Tesla Board discussions and negotiations regarding the Acquisition.  Moreover, even setting Elon Musk and Gracias aside, the remaining members of the Tesla Board have disabling conflicts and therefore could not disinterestedly and independently consider the Acquisition.

10.    The Acquisition benefitted Elon Musk, his brother, his cousins, and other Tesla insiders at the expense of Tesla and its minority stockholders.  Thus, the Tesla Board's approval of the Acquisition constituted a breach of fiduciary duty and waste of corporate assets, and unjustly enriched Elon Musk and the other Tesla Board members who are SolarCity stockholders.  Plaintiffs bring this action to recover the damages caused by the improper self-dealing that led to the Acquisition and to compel Elon Musk and certain other defendants to disgorge to Tesla any payments and/or benefits received in connection with the Acquisition.

## PARTIES

**Plaintiffs and the Nominal Defendant**

11.    Plaintiff ATRS is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

12.    Plaintiff Boston is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

13.    Plaintiff Roofers Local 149 is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

14.    Plaintiff OFPRS is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

15.    Plaintiff KBC Asset Management NV is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

16.    Plaintiff ERSTE-SPARINVEST Kapitalanlagegesellschaft m.b.H. is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

17.     Plaintiff Stichting Blue Sky Active Large Cap Equity Fund USA is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

18.     Plaintiff Rocke is a stockholder of Tesla, was a stockholder of Tesla at the time of the wrongdoing alleged herein, and has been a stockholder of Tesla continuously since that time.

19.     Nominal defendant Tesla is a Delaware corporation with its principal place of business located at 3500 Deer Creek Road, Palo Alto, California.   Its common stock trades on The NASDAQ Global Select Market under the ticker symbol "TSLA."

## THE TESLA DEFENDANTS

### *Elon Musk*

20.     Defendant Elon Musk has served as Chairman of the Tesla Board since April 2004 and as its CEO since October 2008.   He is also the Company's largest stockholder.   At the time of the Acquisition, Elon Musk owned approximately 22.1% of Tesla's common stock primarily through the Elon Musk Revocable Trust dated July 22, 2003 (the "Elon Musk Trust").   Tesla admits in its filings with the Securities and Exchange Commission ("SEC") that Elon Musk is not an independent director of the Company.   Tesla's SEC filings also concede that the Company is "highly dependent on the services of Elon Musk"

21.    The Company has also disclosed that "Mr. Musk spends significant time with Tesla and is highly active in [Tesla's] management."  Thus, Elon Musk is inextricably involved in the Company's affairs and exerts a level of influence and day-to-day control over Tesla far beyond what would be typical given his equity stake.

22.    In addition, Tesla's bylaws contain several supermajority voting requirements.  For example, any changes at Tesla, including certain mergers, acquisitions, or changes to the Board's compensation or bylaws concerning the Board's composition must be approved by 66⅔ percent of total voting power of outstanding Tesla voting securities.  This supermajority standard allows Elon Musk significant control over corporate matters while only owning approximately 22% of Tesla's common stock.

23.    Elon Musk holds himself out as a visionary in the areas of alternative energy, electric cars and space travel.  Using a select group of favored investors, including Jurvetson, Gracias, and Ehrenpreis, Musk has sought to build enterprises serving each of those sectors.  An essential aspect of this investing relationship is the low cost of capital provided to Musk in light of his "visionary" status.  Musk and these favored investors understand the link between a SolarCity failure and an increase in the cost of capital for Musk's other enterprises.  All are undoubtedly aware that the failure of SolarCity would represent a major setback for Elon Musk and could

very well stymie his future endeavors in which they would expect to be included as early investors.

24.    Elon Musk has served as Chairman of the SolarCity Board since it was formed in July 2006, and is the cousin of its co-founders, Lyndon Rive and Peter Rive.[2]  At the time of the Acquisition, Elon Musk owned approximately 21.9% of SolarCity's common stock, making him its largest stockholder.   Through the Company's acquisition of SolarCity, Elon Musk personally received over half a billion dollars' worth of Tesla shares.

25.    Elon Musk has also served as the CEO, Chief Technology Officer and Chairman of the Board of SpaceX, the third company in Musk's "pyramid," since 2002.   SpaceX is a private aerospace manufacturer and space transport services company founded by Elon Musk to develop advanced rockets for satellite and human transportation.   Musk personally contributed $100 million in seed money to start SpaceX, which is believed to be one of the most valuable privately held companies in the world and was valued at an estimated $12 billion as of June 2016.

### *Buss*

26.    Defendant Buss has served on the Tesla Board since 2009.

27.    Buss was the Chief Financial Officer ("CFO") of SolarCity from August 2014 until his retirement in February 2016, and remained an employee of SolarCity

---

[2]    The mothers of the Musks and Rives are twins.

9

through March 31, 2016.  Thereafter, Buss served as a consultant to SolarCity through at least December 31, 2016.  At the time of the Acquisition, Buss beneficially owned 37,277 shares of SolarCity common stock.

28.     As set forth in Tesla's 2014 proxy statement, Tesla designated Buss as an "independent director" under NASDAQ rules.  He served on the Tesla Board's Audit, Compensation and Nominating and Governance Committees.  But when he joined SolarCity, he resigned from all three committees and according to Tesla's 2015 proxy statement, was admittedly not independent.

29.     Upon information and belief, Buss does not currently have full-time employment, but earned $4,954,785 as a director of Tesla for fiscal year 2015.  He is indebted to Elon Musk because of, among other things, the $32 million Buss received for 18 months of work as SolarCity's CFO.

30.     Prior to joining SolarCity, Buss was the CFO and EVP of Finance and Administration of Cypress Semiconductor Corporation ("Cypress"), a semiconductor design and manufacturing company.  Cypress provided a third-party manufacturer engaged by Tesla with semiconductors for use in Tesla's Model S.  Payments by Tesla allocable to the Cypress semiconductors were approximately $35,000 in 2012, $605,000 in 2013 and $817,000 in 2014.  Tesla's selection of Cypress's "TrueTouch automotive touchscreen solution for the infotainment system in the Model S" was touted by Cypress as a significant highlight of its third fiscal quarter of 2012.

10

### *Denholm*

31.   Defendant Robyn M. Denholm ("Denholm") has served on the Tesla Board since August 2014.  She is the Chair of the Tesla Board's Audit Committee and a member of its Compensation Committee and Nominating and Governance Committee.

32.   Denholm served as Executive Vice President, Chief Financial and Operations Officer at Juniper Networks, Inc. ("Juniper") from July 2013 until her retirement in February 2016.  ███████████████████████████████

████████████████████████████████████████████████████

Previously, she served as Juniper's Executive Vice President and CFO since August 2007.  Tesla purchases networking equipment manufactured by Juniper in the ordinary course of business through resellers.

33.   Denholm left Juniper in July 2016, and until 2017 did not have a full-time job.  In fiscal years 2014 and 2015, she earned $7,181,066 and $4,979,785, respectively, as a director of Tesla.

### *Ehrenpreis*

34.   Defendant Ehrenpreis has served on the Tesla Board since May 2007.  He is the Chair of both the Compensation Committee and the Nominating and Governance Committee of the Tesla Board.

11

35.     Since 2014, Ehrenpreis has been a managing partner and co-owner of venture capital firm DBL Partners ("DBL Partners"), which he co-founded with fellow managing partner and co-owner Nancy Pfund ("Pfund").[1]  Pfund was an observer on the Tesla Board from 2006 to 2010.  Pfund was also a member of the SolarCity Board and one of the two members of the Special Committee of the SolarCity Board (the "SolarCity Special Committee") that negotiated and approved the Acquisition on behalf of SolarCity.

36.     Pfund is also the managing director and founder of DBL Investors, LLC ("DBL Investors").  DBL Investors funds participated in SolarCity's Series D venture funding round (closed November 1, 2008); a Series E-1 preferred stock financing round (June 2010), contributing $1 million in capital; and a Series F preferred stock financing round (June and July 2011), contributing more than $1.6 million.  At the time of the Acquisition, Pfund beneficially owned (personally and through DBL Investors investment funds) 1,554,114 shares of SolarCity common stock.[3]  DBL

---

[3]     This includes: (a) 449,279 shares held of record by Bay Area Equity Fund I, L.P. (of which DBL Investors is the managing member of the general partner), which represents approximately 15–20% of this fund's total assets under management – valued at $52,648,556 according to DBL Investors' most recent Form ADV filed with the SEC on March 29, 2016; (b) 928,977 shares held of record by DBL Equity Fund-BAEF II, L.P.; (c) 119,208 shares held of record by Pfund as co-trustee of The Pfund Polakoff Family Trust dated February 18, 1993; (d) 38,000 shares held of record by The Pfund Polakoff 2014 CRUT u/a/d 11/07/14; and (e) 18,650 shares issuable upon exercise of options exercisable within 60 days from September 23, 2016.

Investors has also invested in SpaceX.  Pfund is a close friend of Elon Musk's and has said that "[h]e's always been a master of the universe in my mind."

37.    Ehrenpreis was an early investor in all things Elon Musk and has stuck with the entrepreneur during some of his darkest days.

38.    In addition, Ehrenpreis is an investor in and serves on the board of directors of Mapbox, Inc. ("Mapbox"), a provider of custom online maps.   In December of 2015, Tesla and Mapbox entered into an agreement pursuant to which Tesla expects to pay Mapbox certain ongoing fees, including $5 million over the first 12 months of the agreement.

39.    Ehrenpreis is a manager of DBL Partners Fund III ("DBL III").  Both Ehrenpreis and DBL III are investors in SpaceX.

### *Gracias*

40.    Defendant Gracias has served on the Tesla Board since May 2007.

41.    Gracias is the founder, managing partner, CEO, Chief Investment Officer, director and sole owner of private equity firm Valor Management Corp., d/b/a Valor Equity Partners ("Valor").

42.    Gracias has long been an investor in Elon Musk's enterprises, dating back to his investment in PayPal.[4] Gracias and Valor participated in several pre-IPO

---

[4]    In 1999, Elon Musk founded X.com, an online financial services and e-mail payment company.  In 2000, X.com merged with Confinity, which had a money transfer service called PayPal.  In 2001, the merged company was renamed PayPal,

venture funding rounds for SolarCity, Tesla and SpaceX,[5] and Gracias served on the boards of directors of all three companies at the time of the Acquisition.

43.     Gracias beneficially owned 211,854 shares of SolarCity common stock at the time of the Acquisition, which included (a) 159,023 shares held by AJG Growth Fund, LLC, an investment fund Gracias manages, (b) 38,665 shares held by a Valor private equity fund, Valor Equity Management II, LP, and (c) 14,166 shares issuable upon exercise of options exercisable within 60 days of September 23, 2016.

44.     Elon Musk has invested in Gracias's funds as well. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████

45.     Gracias has been described as one of Elon Musk's closest friends.  Elon Musk even gave Gracias the second Tesla Roadster ever made.

46.     Despite his friendship with Elon Musk and involvement with Musk's other companies, defendant Gracias has served as Tesla's purported "Lead

focusing primarily on the money transfer service.  In October 2002, PayPal was acquired by eBay for $1.5 billion, of which Elon Musk received $165 million.

[5]     Through his Valor funds, Gracias participated in four of Tesla's venture funding rounds: Series B (closed February 1, 2005), Series C (May 1, 2006), Series D (May 11, 2007), and Series E (closed February 8, 2008); as well as a pre-IPO venture debt raise conducted by Tesla in March 2009.  Valor owned nearly five million shares immediately prior to Tesla's IPO.  Similarly, Valor funds participated in SpaceX's $50 million Series C round (closed November 8, 2010) and its $1 billion Series E round (January 20, 2015).  Gracias and his Valor funds also participated in SolarCity's pre-IPO Series G preferred stock financing round (February and March 2012), contributing nearly $25 million.

14

Independent Director" since September 2010.  As Tesla has stated, Gracias has "broad authority to direct the actions of [Tesla's] independent directors."   In this role, Gracias, among other things: (a) reviews the agenda and materials for meetings of the independent directors; (b) consults with the CEO and Chairman (*i.e.*, Elon Musk) regarding Tesla Board meeting agendas, schedules and materials; (c) communicates with the CEO and Chairman; (d) acts as a liaison between the CEO and Chairman and the independent directors when appropriate; (e) raises issues with management on behalf of the independent directors; (f) annually reviews, together with the Nominating and Corporate Governance Committee, the Tesla Board's performance during the prior year; and (g) serves as the Tesla Board's liaison for consultation and communication with stockholders as appropriate.

### *Jurvetson*

47.     Defendant Jurvetson has served on the Tesla Board since June 2009.  He is a member of the Tesla Board's Audit Committee.  In fiscal year 2015, Jurvetson earned $6,095,984 as a Tesla director.

48.     Jurvetson is a managing director of venture capital firm Draper Fisher Jurvetson ("DFJ").  DFJ invested in Tesla before its 2010 initial public offering ("IPO"), participating in Tesla's Series C (closed May 1, 2006), Series D (closed May

11, 2007), and Series E (closed February 8, 2008) venture funding rounds.[6] Thereafter, Jurvetson joined the Tesla Board.  DFJ has not held Tesla stock since late 2014 or early 2015.

49.     Another managing director of DFJ, John H.N. Fisher ("Fisher"), was a director of SolarCity at the time of the Acquisition.  DFJ also invested in several of SolarCity's pre-IPO venture funding rounds.[7]  At the time of the Acquisition, funds managed by DFJ beneficially owned 3,308,266 shares of SolarCity's common stock – approximately 3.3% of shares outstanding.[8]  In addition, both Jurvetson and Fisher

---

[6]     Musk is reported to have given Jurvetson the first Tesla Model S ever made, and the second Tesla Model X.

[7]     DFJ first invested in SolarCity in September 2006 – nearly six years before the company's IPO.  The firm then participated in several SolarCity venture capital funding rounds, including: $29.9 million Series D round (November 1, 2008); $23.9 million Series E preferred stock round (October 1, 2009), contributing nearly $4 million; $21.4 million Series E-1 preferred stock round (June 2010), contributing nearly $9 million; and a $20 million Series F preferred stock financing round (June and July 2011), contributing more than $5.9 million.

[8]     DFJ's ownership of SolarCity includes: (a) 826,745 shares held of record by Draper Fisher Jurvetson Fund IX, L.P.; (b) 260,838 shares held of record by Draper Fisher Jurvetson Fund X, L.P.; (c) 1,653,952 shares held of record by Draper Fisher Jurvetson Growth Fund 2006, L.P.; (d) 22,403 shares held of record by Draper Fisher Jurvetson Partners IX, LLC; (e) 7,970 shares held of record by Draper Fisher Jurvetson Partners X, LLC; (f) 136,138 shares held of record by Draper Fisher Jurvetson Partners Growth Fund 2006, LLC; (g) 518 shares held of record by Draper Fisher Jurvetson Fund IX Partners, L.P.; (h) 319 shares held of record by Draper Fisher Jurvetson Fund X Partners, L.P.; (i) 177,612 shares held of record by Draper Associates, L.P.; (j) 160,396 shares held of record by Draper Associates Riskmasters Fund, LLC, and (k) 61,375 shares held of record by Draper Associates Riskmasters Fund III, LLC.

personally owned SolarCity common stock.  Specifically, Jurvetson owned 417,450 shares of SolarCity common stock held by the Steve and Karla Jurvetson Living Trust dated August 27, 2002.  Fisher owned 452,868 shares of SolarCity stock.[9]

50.     According to Tesla's 2016 annual proxy statement, DFJ is also a "significant stockholder" of SpaceX and participated in numerous venture funding rounds for that company.[10]  Jurvetson, Fisher and another DFJ managing director, Randall S. Glein, all serve on the SpaceX Board.

51.     Similar to Elon Musk's relationship with Gracias, not only does DFJ invest in Elon Musk, Elon Musk invests in DFJ.  Specifically, the Elon Musk Trust is a limited partner in the Draper Fisher Jurvetson Fund X, L.P.

---

[9]     This includes: (a) 401,053 shares of SolarCity common stock held by the John Fisher and Jennifer Caldwell Living Trust dated January 7, 2000, as amended and restated March 27, 2008; (b) 6,776 shares held directly by The Fisher/Caldwell 2012 Irrevocable Children's Trust U/A/D 6-12-12; (c) 1,500 shares held by Caren Patrick, custodian for each of the Saskia C. Fisher UTMA CA and Annelise Fisher UTMA CA; (d) 500 shares are held by John Fisher as Custodian of the Eliza Foster UTMA; (e) 18,651 shares issuable upon the exercise of options exercisable within 60 days of September 23, 2016, which, pursuant to the terms of the Merger Agreement, will be converted into Tesla stock options; and (f) 24,388 shares of SolarCity common stock held by investment firm JHNF Investment LLC, which Fisher manages.

[10]    DFJ participated in the following early venture funding rounds of SpaceX: $30.44 million Series B (August 11, 2009); $50 million Series C (November 8, 2010); lead investor in $30 million Series D (December 21, 2012); $1 billion Series E (January 20, 2015).

52.     In addition, Elon Musk and DFJ co-founder Tim Draper have invested alongside each other in other ventures, including NeuroVigil, which develops products that analyze brain signals.

### *Kimbal Musk*

53.     Defendant Kimbal Musk has served on the Tesla Board since April 2004. He is the brother of Elon Musk and cousin of Lyndon and Peter Rive.  Although not an employee of the Company, Tesla concedes in its SEC filings that Kimbal Musk is not an independent director of the Company.

54.     At the time of the Acquisition, Kimbal Musk beneficially owned 147,541 shares of SolarCity common stock.

55.     In fiscal year 2015, Kimbal Musk earned $4,964,381 as a director of Tesla.  The vast majority of his holdings in Tesla and SolarCity are pledged as collateral to secure personal indebtedness.

56.     Kimbal Musk is a director of SpaceX.

57.     Kimbal Musk is a limited partner of Valor Equity Partners II, L.P. (in which his brother has also invested) and Valor Equity Partners III-A, L.P., both of which are funds advised by Valor.

58.     Defendants Elon Musk, Buss, Denholm, Ehrenpreis, Gracias, Jurvetson and Kimbal Musk are referred to collectively herein as the "Tesla Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Tesla*

59.     Tesla was founded in 2003 by Silicon Valley engineers Martin Eberhard and Marc Tarpenning who "wanted to prove that electric cars could be better than gasoline-powered cars."

60.     ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ He immediately inserted himself into the Company's operations, including the design of its first car, the Roadster.  Over the next few years, Elon Musk acquired a controlling stake in the Company, participating in Tesla's Series B, C, D and E venture funding rounds.  Prior to the Company's IPO, Elon Musk invested approximately $70 million in Tesla.

61.     In November 2007, Elon Musk forced founder and then-CEO Eberhard out of the Company.  In October 2008, he appointed himself CEO.  Around that time, Tesla was in financial distress.  The Company was reportedly spending approximately $4 million per month attempting to bring the Roadster to market.  To keep Tesla afloat and bring the Roadster to market, in early 2009, Elon Musk personally borrowed $20 million from SpaceX to satisfy a 2008 pledge to fund that amount in Tesla (the "SpaceX Loan").  Having survived its financial problems, the Company later

19

expanded its automotive line to include a luxury sedan (the Model S) and an SUV (the Model X).

62.     Tesla conducted its IPO on June 29, 2010.  Elon Musk repaid the SpaceX Loan by selling 1.4 million shares of Tesla common stock for about $23.8 million. Since the IPO, Elon Musk has been the Company's largest stockholder, owning between approximately 26.5% and 29% of its outstanding common stock, until his sale of shares in a May 25, 2016 offering reduced his ownership stake to 22.5%.  As of September 23, 2016, Elon Musk owned 22.1% of Tesla's outstanding common stock.

63.     Until recently, Tesla's sole business was the design, development, manufacturing and sales of high-performance fully electric vehicles and advanced electric vehicle powertrain components.  The Company began producing and selling home energy storage systems in 2013 and commercial and utility energy storage systems in 2014.  Tesla's primary source of revenue, however, has remained the sale of its vehicles.

### SolarCity

64.     SolarCity was founded in 2006 by Elon and Kimbal Musk's cousins, Peter Rive and Lyndon Rive, after Elon Musk suggested to Lyndon Rive that he get into the solar industry as they were driving an RV to the Burning Man festival in Nevada.  Lyndon Rive is SolarCity's CEO and Peter Rive is its Chief Technology

Officer, and both served on the SolarCity Board.  Elon Musk was Chairman of the SolarCity Board and also SolarCity's largest shareholder at the time of the Acquisition, owning approximately 21.9% of its common stock.  Lyndon Rive and Peter Rive owned 3.9% and 3.8% of SolarCity's shares of common stock, respectively.

65.     Solar City primarily leases solar panel equipment to residential and commercial customers.  The lease payments received from its customers provide SolarCity its main source of revenue.  SolarCity relies on debt to finance its up-front costs associated with equipment and installation.

66.     SolarCity completed its IPO in December 2012.  Since then, SolarCity never had a profitable year and has suffered losses in all but three quarters.

67.     Elon Musk has long been propping up SolarCity.  In early 2013, Tesla and SolarCity were both in need of cash.  Musk increased his personal credit lines from $85 million to $300 million.  As collateral, he pledged 9.5 million Tesla shares and 6 million SolarCity shares, which comprised 29% of his total holdings in each company at the time.  From May 2013 to October 2013, Musk used funds from the increased credit lines to purchase $100 million in Tesla stock and $10 million in SolarCity stock to inject both companies with needed capital.

68.     In 2015, Musk again increased his personal credit lines to $475 million, and purchased $20 million in Tesla shares and $17.7 million in SolarCity shares.

When asked in an interview with *The Wall Street Journal* whether the Tesla Board has ever discussed Elon Musk's personal loans and whether they were in the best interests of stockholders, defendant Jurvetson replied "I don't have a desire to take on that question."

69.     Despite Elon Musk's aid, at the time of the Offer, SolarCity was struggling to finance its business, and those struggles continued.  Its business model has been described by a number of financial analysts as "unsustainable."  Although customer lease payments provide long-term income, SolarCity's debt and cost of financing continued to mount.  During the three years immediately prior to the Offer, SolarCity's debt increased 13-fold, totaling $3.56 billion as of June 2016.  In 2015, SolarCity's (a) debt interest payments equaled nearly a quarter of its revenue; (b) selling, general, and administrative expenses increased by 79.3% over the previous year; (c) research and development costs were nearly triple the amount spent in 2014; and (d) cash from operations was in the negative by $790 million.

70.     In February 2016, SolarCity disclosed fourth quarter 2015 results that fell short of guidance (which had already been lowered in October 2015) and announced below-expected first quarter 2016 installation guidance.  The company's stock dropped nearly 30% on this news.  A Deutsche Bank research report noted that "[management] credibility is at risk considering the fact that [SolarCity] has missed or guided down for multiple consecutive quarters in a row."

22

71. 

72.

73.

███████████████████████████████████

███████████████████████████████████

74.     Although SolarCity appeared focused on top-line growth, its expansion initiatives were unsuccessful.  As noted in an article published by *Fortune* on June 22, 2016, "SolarCity also seems to have bitten off more than it can chew when it comes to its plan to build a massive solar panel factory in upstate New York.  The company delayed its factory production plans a couple of months ago."  On August 1, 2016, SolarCity lowered its installation guidance for 2016, blaming weaker than expected bookings in the first half of the year.  Prior to Tesla's Offer, SolarCity's stock price had dropped by nearly 60% since the beginning of 2016.

75.     In 2016, SolarCity cut almost 20% of its workforce, reducing its employee count from 15,273 as of December 31, 2015 to 12,243 as of December 31, 2016.  This included a 22.4% decrease in operations, installations and manufacturing employees and a 26.6% decrease in sales and marketing employees.

76.     In addition, SolarCity undertook several rounds of bond offerings in recent years.  It referred to these bond offerings as "solar bonds" and attempted to sell them through its website.

77.     Analysts have noted that most retail investors were not interested in the solar bonds.  Historically, the largest buyer in these bond offerings was Musk's private company, SpaceX.  SpaceX purchased $90 million in solar bonds from

SolarCity in March 2015, $75 million in June 2015 and another $90 million in March 2016.[11]   In November 2015, another Elon Musk-affiliated entity purchased $10 million and Lyndon Rive purchased $3 million in solar bonds.

78.    SolarCity initiated its most recent offering on August 17, 2016, pursuant to which the company hoped to raise $124 million by issuing 18-month bonds bearing an interest rate of 6.5%.  Indicative of the lack of outside interest, on August 23, 2016, SolarCity disclosed that Elon Musk had placed orders to purchase $65 million and Lyndon and Peter Rive had each placed orders to purchase $17.5 million of these bonds — thus accounting collectively for $100 million, more than 80% of the total offering.

79.    In defending his borrowings from one of his three companies to fund the others, Elon Musk has admitted that Tesla, SolarCity and SpaceX are a "pyramid" atop which he sits, stating it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid of Tesla, SolarCity and SpaceX falters."

---

[11]    SpaceX's bond purchases from SolarCity have raised questions from Congress, where some are concerned that SpaceX is using money from federal contracts to fund SolarCity.  In April 2016, Representative Doug Lamborn (R. Colo.) proposed a bill amendment that would prohibit Elon Musk from using SpaceX money to buy SolarCity bonds.  In an interview, Rep. Lamborn said that the purpose of the proposed amendment, which was ultimately withdrawn, was to send a message to Musk.  The message appears to have been received, as SpaceX has not purchased any SolarCity bonds since then.

80.     In addition to its liquidity problems, SolarCity faced legal problems as well.   On September 26, 2016, Cogenra Solar, Inc., a subsidiary of SolarCity competitor SunPower Corporation, and Khosla Ventures III, L.P., filed a lawsuit against SolarCity and its subsidiary, Silevo, Inc. ("Silevo") accusing SolarCity and Silevo of misappropriating trade secrets and intellectual property and engaging in other violations of law relating to solar cell shingling technology.  The plaintiffs seek, *inter alia*, compensatory and punitive damages, and a permanent injunction prohibiting SolarCity and Silevo's use of the misappropriated information and prosecution of certain patent applications.

81.     That SolarCity's interests in Silevo may be ensnared in litigation is particularly concerning for Tesla's stockholders given Elon Musk's public statements that Silevo would be the driver of any synergies in the Acquisition and represents the gem of SolarCity.

### The Acquisition

82.     To prevent the collapse of SolarCity and a total loss on their substantial investments therein, by early 2016 Elon Musk and his cousins concluded that they needed a financial bailout.  However, SolarCity was in no position to conduct another equity offering.  It had already issued nearly 25 million additional shares since its IPO, and its stock had declined approximately 64% from February 2015 to February 2016.  Another debt offering was likewise unavailable.  SolarCity had just recently raised

26

capital in November 2015 for which it was forced to seek alternative funding. Accordingly, the credit markets were functionally closed to SolarCity in light of its massive debt and continuing cash burn.  Elon Musk and his cousins thus determined that the better option was to cause Tesla, at the expense of Tesla and its stockholders, to acquire SolarCity, which would provide SolarCity with access to Tesla's (somewhat) stronger balance sheet and greater ability to tap the public capital markets.

### *SolarCity's Financial Situation Grows Dire and Musk Begins His Push for Tesla to Acquire SolarCity*



83.

84.

Of course, SolarCity itself arose from Elon Musk's "suggestion" to Lyndon Rive during their drive to Burning Man.

85.



86.

87.



88.

89.

90.



91.

92.

93.



94. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████

*The Tesla Board Makes the Offer*

95. ███████████████████████████████████

███████████████████████████████████

██████████████████████████

96. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████

97. ███████████████████████████████████

███████████████████████████████████

████████████████████

98. 

99.

Conversely, that same day, an analyst from Goldman Sachs & Co., which was a co-underwriter in Tesla's $2

billion secondary stock offering that was issued just weeks earlier, publicly stated that SolarCity was the "worst positioned" company in the solar energy sector for capitalizing on future growth in the industry.

100. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████

101. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



102.

103.   On June 21, 2016, Tesla announced in a blog post that on June 20, 2016,

it had made the Offer to acquire SolarCity for Tesla stock that valued SolarCity at

$26.50 to $28.50 per share, or a range from approximately $2.6 to $2.8 billion.  The

Offer provided for an exchange ratio of 0.122x to 0.131x shares of Tesla stock for

each share of Solar City stock.[13]  The proposed purchase price reflected a 21%–30%

premium over SolarCity's closing price on June 20, 2016.  According to the Tesla

---

[13]     During a June 22, 2016 conference call, Tesla declined to explain whether there
was a price collar or similar mechanism in connection with the proposed exchange
ratio.

Board, the Offer provided "compelling value for SolarCity and its stockholders while also giving SolarCity's stockholders the opportunity to receive Tesla common stock at a premium exchange ratio . . . ."

104.   Tesla has touted that, because they were directors of both Tesla and SolarCity, Elon Musk and Gracias recused themselves from voting on the Offer at the June 20th meeting at which it was approved, and would recuse themselves from voting on the Offer at the SolarCity Board as well. ███████████████████████

███████████████████████████████████████████████

██████ on a June 22, 2016 conference call, when an analyst asked whether "recused from voting" also meant "recused from discussion and not present in the room when this was brought up," Tesla's General Counsel Todd Maron ("Maron") had to admit that it meant recused from voting only.

105.   Furthermore, when asked during the June 22, 2016 conference call "how independent do you consider the remaining directors; do they have any personal ownership of SolarCity and the other things that are likely to relate to the Board issues," Maron dodged the questions, stating that it was "really too early in the process to get into all the different details. . . . it's probably more appropriate to just focus on the business rationale for why this deal makes sense."

106.   Maron thus avoided disclosing that the five remaining Tesla Board members who did vote on the Offer included: (1) Kimbal Musk, who was a SolarCity

stockholder, Elon Musk's brother and the Rives' cousin and admittedly not an independent director; (2) Buss, who was SolarCity's recently retired CFO and then-current consultant and a SolarCity stockholder; (3) Ehrenpreis, whose venture capital firm partner, Pfund, was a SolarCity director and significant SolarCity stockholder; and (4) Jurvetson, who owned SolarCity stock both individually and through his venture capital firm DFJ, and whose partner at DFJ was a SolarCity director. Accordingly, Kimbal Musk, Buss, Ehrenpreis and Jurvetson, their family members, businesses and/or business partners, all stood to benefit from the Acquisition of SolarCity.

107. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████

### *The Market Reacts Unfavorably to*
### *Tesla's Acquisition Proposal*

108.   The market reacted to news of the Offer by quickly discounting Tesla's stock price by 10%, lowering the Company's market capitalization by $3.4 billion — more than the entire market capitalization of SolarCity.  SolarCity's stock price shot up by 17%.  The Offer was also widely panned by analysts, who questioned the purported synergies resulting from the combination and predicted that SolarCity would prove a distraction to Tesla management and aggravate its current cash flow problems.  Tesla stock was quickly downgraded by Morgan Stanley and Oppenheimer after the Offer was announced.

109.   In downgrading its rating of Tesla stock from "Outperform" to "Perform," Oppenheimer noted that the Offer "contemplate[ed] what we believe is a fundamental change to [Tesla's] business model."  Furthermore, Oppenheimer saw little benefit to Tesla in the deal: "We believe this acquisition would alleviate some of the financial concerns at [SolarCity] and yield operational synergies for the [SolarCity] platform including improved brand position, additional customer outreach, and improved engineering talent, but we struggle to see the benefit to [Tesla] other than potential leverage on its retail stores."  Oppenheimer explained its reason for downgrading its rating of Tesla:  "We believe investors are likely to view this transaction as a bailout for [SolarCity] and a distraction to [Tesla's] own production

hurdles."  Similarly, Morningstar stated, "[w]e are skeptical of the strategic benefit as well."

110.   On June 22nd, Morgan Stanley noted that the proposed acquisition "[i]ncreases execution complexity at a sensitive time for [Tesla's] core business," and pointed out that SolarCity's cash burn "would exacerbate cash consumption of Tesla on a pro forma basis."  Furthermore, Morgan Stanley saw "limited industrial logic to the combination overall."  On June 23, 2016, Morgan Stanley downgraded Tesla's stock from "Overweight" to "Equal Weight," stating:

> Does buying [SolarCity] help [Tesla] make better cars?  No. . . .
>
> Does buying [SolarCity] improve the pace of Tesla's cash burn?  No. . . .
>
> Does buying [SolarCity] improve Tesla's access to the capital markets to help fund the mission?  No. . . .

111.   In a research report titled "A lean mean cash burning machine for TSLA; a life-line for SCTY," Barclays stated:

> **Little in the way of synergies, much in the way of cash burn**: TSLA announced yesterday after the close that it offered to buy SCTY in an all-stock deal valued up to $2.9bn (based off the most recent price of Tesla). While no doubt the Tesla bulls will hail the combination as visionary, we believe the assumption of another $2.6bn of debt to fold in a solar company with limited synergies and uncertain growth/cash prospects only reinforces our negative view of TSLA (UW, PT $165). For SCTY (UW, PT $20), it is a timely lifeline in light of the issues we've recently highlighted (see here and here).
>
> **Combination reinforces cash burn** . . . :  Given limited access to capital for SCTY, we believe the core rationale for this deal is for SCTY to take advantage of TSLA's relatively favorable access to and cost of capital. However, the combined entity is likely to magnify the losses and cash burn that both were seeing individually. On a simple combination of

38

our current non-GAAP estimates for both companies, we estimate pretax losses of $1.3bn/$1.4bn in 2016/2018. More concerning is our combined estimate of cash burn of $2.8bn/$2.4bn in 2016/2018 (inclusive of cash from collateralized lease borrowing), as well as combined net debt of $2.5bn.

. . . **making it even more clear that Tesla will need additional capital raises**:  In funding SCTY's losses, it further reinforces our view TSLA will need to return to the capital markets for additional capital infusions, likely via the equity markets. However, this is contingent on the equity capital market remaining an open well for TSLA – which is far from certain.

**Advantages for SCTY:**  *Selling / branding* – SCTY can reduce customer acquisition cost by leveraging TSLA's retail sales network and brand recognition, which could expand the pool of customers and reduce sales time. SCTY's YE1Q16E sales cost of $0.67/w represented nearly a quarter of SCTY total system costs. There is nothing in the solar industry with brand awareness even approaching TSLA's. *Financing availability* – In our view, residential roof-top solar is a fragile business highly dependent on continuous external funding from the tax-equity and ABS markets - the potential to be part of a larger company could reduce this hurdle. SpaceX already owns $165mn of SCTY's recourse solar bonds. In addition, SCTY was at risk of tripping some credit covenants based on 12-month trailing GAAP gross profit to cash interest expense.

**Skeptical of TSLA benefits**:  In purchasing SCTY, TSLA is broadening its range as a vertically integrated clean energy company. It believes it could expand SCTY's addressable market and vice-versa, with SCTY benefiting from TSLA design and access to high-traffic stores. We are skeptical of the benefits. Not only do solar panels on cars make little sense (they'd be largely cosmetic), we think powering TSLA recharges with SCTY panels will be tough given recharges occur at night. Moreover, as previously discussed, stationary storage systems pulling solar power don't make sense in a net metering regime.

112.   Many analysts also criticized the obvious conflicts that existed between

the Tesla Board and the SolarCity Board, with Credit Suisse calling it a "corporate

governance mess."  JP Morgan questioned whether "SolarCity's capital needs could have been a motivating factor for the acquisition at this time."

113.   As *Fortune* stated, "the move is classic Musk.  He's partly doubling down on the slumping solar company, and is willing to pile SolarCity's risk onto the already risky, but temporarily stable, electric car maker."

114.   Following announcement of the Offer, on June 28, 2016, CtW Investment Group ("CtW"), which works with union-sponsored pension funds to enhance long-term stockholder value, sent a letter to Gracias, as "Lead Independent Director," questioning the Tesla Board's "failure to establish a corporate governance structure that inspires confidence that the terms [of the Offer] are being negotiated in the best interest of Tesla investors … particularly [] when six out of seven board members have ties to SolarCity."  CtW accurately noted that Tesla's corporate governance practices mirrored those of a private, venture capital-backed firm rather than a publicly traded company, and demanded that the Tesla Board, among other things, immediately recruit two new independent directors to form a special committee tasked with evaluating and negotiating any transaction with SolarCity.  CtW also specifically demanded the removal of Kimbal Musk from the Tesla Board.

115.   Tesla's corporate governance practices are akin to those of one component of a trifecta of private companies owned by one man – the "pyramid" Elon Musk believes his companies to be – and not those of a publicly traded company with

40

the best interests of its stockholders in mind.  Indeed, Elon Musk has previously expressed his preference to run private companies over public companies, writing in an email to SpaceX employees:  "[G]iven my experiences with Tesla and SolarCity, I am hesitant to foist being public on SpaceX, especially given the long term nature of our mission.  Some at SpaceX who have not been through a public company experience may think that being public is desirable. This is not so."

116.   On conference calls regarding the Acquisition, Elon Musk has all but confirmed that he runs Tesla as a private venture capital-backed firm.  For example, on June 22, 2016, in response to questions about the pricing of Tesla's proposal, Elon Musk showed utter disregard for his duty to maximize value for Tesla's stockholders, stating "one isn't going to be worried whether it's a few hundred million dollars one way or the other down the road."  In addition, on an August 1, 2016 conference call, Musk repeatedly referred to Tesla as "my company."

███████████████████████████ ***Musk Begins Communicating to the Market That the Acquisition is a Foregone Conclusion***

117. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████

41

118. ████████████████████████████ during a June 22, 2016 conference call, Elon Musk indicated to investors and analysts that the Acquisition was a *fait accompli*:

> Like the board opinion is unanimous for both companies. So, I mean, unless there's something discovered that like that I have no idea about or just that nobody on the board has any idea about, which is extremely unlikely, then the board would – the independent board members would recommend in favor of completing a transaction somewhere in the price range that was mentioned, most likely.

119. 

120. Thus, despite his limited recusal, Elon Musk knew that the Acquisition was a foregone conclusion because he wanted it to happen and he would use his outsized influence over the Company and Board to ensure that it happened. The

purportedly independent Tesla Board process of considering the Acquisition was therefore a sham.



124. 

125.

126.

127.

128. 

129.

130.

Elon Musk and the Rives personally provided the short-term capital that SolarCity so desperately needed by buying $100 million in SolarCity bonds on August 23, 2016. These bonds were to mature on February 17, 2018 and would be repaid by Tesla, with Tesla also paying 6.5% interest semi-annually through that date.

131. 

132.

133.

134.

135. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██

136. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

137.   Indeed, SolarCity's Form 10-K filed with the SEC on March 1, 2017, disclosed that it had determined that two milestones, which would have required SolarCity to make additional earnout payments to the prior owners of Silevo, would no longer be achieved.  The first milestone would have been reached if, prior to December 31, 2017, Silevo achieved both (i) volume production from a Silevo or SolarCity production facility located in the United States and (ii) full equipment commissioning in the Buffalo Factory while meeting target cost and efficiency

47

requirements.  The second milestone would have been reached if, prior to December 31, 2017, Silevo achieved volume production with target cost and efficiency requirements from the Buffalo Factory.

138.  ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████  Elon Musk continued to assure the market that the Acquisition was a near-certainty. Specifically, on July 20, 2016, Elon Musk published his "Master Plan, Part Deux" to Tesla's website, outlining *his* vision for the Company's future and updating *his* original "Master Plan" that had been published in 2006.

139.  The "Master Plan, Part Deux" was widely criticized by analysts.  As summed up by Barclays, it was "long on exciting visions of the future and short on financial details."

140.  One thing the "Master Plan, Part Deux" did make clear, however, is that the Acquisition is being driven by Elon Musk, as it has been a component of his strategy for Tesla for at least ten years:

The first master plan that I wrote 10 years ago is now in the final stages of completion.  It wasn't all that complicated and basically consisted of:

1.  Create a low volume car, which would necessarily be expensive

2.  Use that money to develop a medium volume car at a lower price

3.  Use that money to create an affordable, high volume car

48

And . . .

Provide solar power.  No kidding, this has literally been on our website for 10 years.

*       *       *

Part of the reason I wrote the first master plan was to defend against the inevitable attacks Tesla would face accusing us of just caring about making cars for rich people, implying that we felt there was a shortage of sports car companies or some other bizarre rationale. . .

However, the main reason was to explain how our actions fit into a larger picture, so that they would seem less random.  The point of all this was, and remains, accelerating the advent of sustainable energy, so that we can imagine far into the future and life is still good.  That's what "sustainable" means.  It's not some silly, hippy thing -- it matters for everyone. . . . the faster we achieve sustainability, the better.

Here is what we plan to do to make that day come sooner:

**Integrate Energy Generation and Storage**

Create a smoothly integrated and beautiful solar-roof-with-battery product that just works, empowering the individual as their own utility, and then scale that throughout the world.  One ordering experience, one installation, one service contact, one phone app.

We can't do this well if Tesla and SolarCity are different companies, which is why we need to combine and break down the barriers inherent to being separate companies.  That they are separate at all, despite similar origins and pursuit of the same overarching goal of sustainable energy, is largely an accident of history.  Now that Tesla is ready to scale Powerwall and SolarCity is ready to provide highly differentiated solar, the time has come to bring them together.

141.   Just before the release of the Master Plan, Part Deux, Tesla changed its

web address from teslamotors.com to tesla.com, which fueled rumors of a broader

strategy shift away from cars and towards the production of batteries and solar panels, which likewise contemplated that the Acquisition was inevitable.[14]

**Tesla Announces Entry into the Merger Agreement,
Which Benefits Elon Musk and Other SolarCity Stockholders**

142.   On August 1, 2016, Tesla and SolarCity announced that they had entered into an Agreement and Plan of Merger dated July 31, 2016 (the "Merger Agreement"), which sets forth the terms of the Acquisition.  In its Form 8-K filed with the SEC disclosing entry into the Merger Agreement and the terms of the Acquisition, Tesla stated that transactions contemplated by the Merger Agreement, including the Acquisition as well as an issuance of shares of Tesla common stock in connection therewith (the "Share Issuance"), were approved by the Tesla Board.[15]

143.   Under the Merger Agreement, each share of SolarCity common stock issued and outstanding was to be converted into the right to receive 0.110 shares of Tesla common stock (the "Exchange Ratio").  The Acquisition was valued at $2.6

---

[14]   On February 1, 2017, Tesla changed its name from "Tesla Motors, Inc." to "Tesla, Inc."

[15]   Pursuant to the terms of a "go-shop" provision in the Merger Agreement, SolarCity was entitled to a 45-day "go-shop" period running through September 14, 2016, during which time it was free to solicit a superior proposal (as defined by the Merger Agreement) from other potential suitors.   Unsurprisingly, considering SolarCity's precarious financial condition and the excessive deal price agreed to by Tesla, no such superior proposal arose.  While an unidentified "Party B" – the only remaining potential counterparty to a strategic transaction with SolarCity by mid-July – had engaged in discussions with SolarCity regarding a potential acquisition, no offer was ever made, and on July 22, 2016, Party B had determined not to proceed with a transaction.

billion or $25.37 per share of SolarCity stock based on the five-day volume weighted average price of Tesla shares as of July 29, 2016 (*i.e.*, the last trading day prior to the announcement of the Acquisition).   The Acquisition price rises to $25.83 per SolarCity share if based on the closing price of Tesla's shares as of that date.

144.   Not surprisingly, given Elon Musk's power and influence over the Tesla Board, the final consideration for the Acquisition valuing SolarCity at approximately $2.6 billion is within the range initially proposed at the June 20, 2016 Tesla Board meeting – ███████████████████████████████████████████

███████████████████████████████████

145.   Although the exchange ratio is slightly lower than that Tesla initially offered, the valuation of SolarCity is within the range initially proposed, and the Acquisition remains an attempt by Elon Musk and the Tesla Board to cause Tesla to bail Elon Musk, the Rives, and other affiliates out of their failing investments in SolarCity.

146.   Many large investors in SolarCity, such as Valor, DFJ and DBL, are also heavily invested in and hold seats on the boards of Musk's other enterprises, including Tesla and SpaceX.  If Elon Musk were to allow the SolarCity prong of his pyramid to default, resulting in his frequent investors receiving pennies on the dollar in bankruptcy, it is less likely that those investors would be willing to contribute

51

additional capital for Tesla, SpaceX or any future ventures.  By exchanging SolarCity stock for Tesla stock, Elon Musk saves these favored investors from large losses.

147.   Furthermore, causing Tesla to bail out SolarCity, rather than let SolarCity slide into bankruptcy, would protect Elon Musk's standing in the business community, as well as his ego.  The Acquisition will help preserve Musk's reputational capital and status as not just an innovative thinker, but also a businessman who can make new technology profitable for investors.  Despite any successes, SolarCity's demise as a public company would leave Elon Musk with a professional black eye and create intense public scrutiny, as SolarCity has accepted over $1.2 billion in government subsidiaries relating to clean energy.  Elon Musk's businesses often depend on public assistance, as his portfolio of companies had collectively benefited from over $4.9 billion in government support by the time of the Acquisition.

148.   A public failure of SolarCity would also greatly impair Elon Musk's ability to raise capital simply by making predictions of future products.  Many people who have backed Musk against calls that his business model is not financially sustainable, including current Tesla investors, could begin to question his logic.  Through the Acquisition, SolarCity's financial struggles can now be masked among the financial statements of a much larger corporation, while allowing Elon Musk to maintain his professional standing.

149.    Accordingly, the Acquisition was intended to, and did, benefit Elon Musk, his brother, his cousins and their affiliates, and certain Tesla directors at the expense of the Company and its minority stockholders.  Although a transaction that would be harmful to Tesla would generally be most damaging to Elon Musk, as he was Tesla's largest stockholder at the time of the Acquisition with approximately 22.1% of the Company's outstanding shares, that is not true here because any dilution of his Tesla stock will be offset by the rescue of the SolarCity stock and bonds he owns.  Indeed, the Acquisition resulted in a net increase in Elon Musk's ownership of Tesla common stock.  Further, Elon Musk will have the opportunity to increase his ownership interests going forward because his compensation as the Company's CEO consists almost exclusively of Tesla stock options.

150.    Following the consummation of the Acquisition, Elon Musk and Kimbal Musk's cousins, Lyndon Rive and Peter Rive, became executive officers of the surviving SolarCity subsidiary of Tesla.

### THE FINANCIAL UNFAIRNESS OF THE ACQUISITION

#### *The Acquisition Will Mire Tesla in Crushing Debt and Weaken Its Already-Strained Finances*

151.    As a result of the Acquisition, Tesla has taken on new financial obstacles at a time when Tesla is facing a number of its own challenges.  As aptly put in an August 1, 2016 *The Wall Street Journal* article commenting on the lack of cash at both companies, "Tesla latching on to SolarCity is the equivalent of a shipwrecked man

clinging to a piece of driftwood grabbing onto another man without one.  Tesla burned

through 50 cents of cash for each dollar of revenue in the past four quarters, while

SolarCity consumed a whopping $6.00."

152.   Indeed, following the announcement of the Acquisition, Standard &

Poor's lowered its outlook on Tesla to "CreditWatch with negative implications" "to

reflect the significant risks related to the sustainability of the company's capital

structure following the proposed transaction."

153.   The Acquisition has nearly doubled Tesla's debt.  As of June 30, 2016,

Tesla's consolidated indebtedness was approximately $3.7 billion and SolarCity's was

approximately $3.3 billion.  Further, as the Form S-4 filed with the SEC on August

31, 2016 explains, "the Combined Company may have to incur additional

indebtedness in connection with … the closing of the Merger, as well as for its

ongoing business needs."  This will "result in a substantial increase in comparison to

Tesla's indebtedness on a recent historical basis," and could, *inter alia*, "reduc[e]

Tesla's flexibility to respond to changing business and economic conditions and

increas[e] Tesla's interest expense."

154.



155.

156.    SolarCity attempted to satisfy its liquidity needs by offering an additional

$124 million in "solar bonds" in August 2016.  As explained above, despite offering

an annual interest rate of 6.5% for debt with only an 18-month duration, it appears few

buyers on the open market were interested.  Of course, Elon Musk and his cousins,

Peter Rive and Lyndon Rive, stepped in to purchase $100 million, or more than 80%,

of the debt.

157.   Prior to the Acquisition, SolarCity's problems appeared to be only worsening.  On August 1, 2016, *i.e.,* the day the parties announced the Acquisition, SolarCity lowered its full year guidance due to weaker than expected demand in the company's residential sector.  Then, on August 9, 2016, SolarCity reported a second quarter loss of $250.3 million, or 56 cents a share, compared with $155.7 million, or 23 cents a share, a year earlier.  For the third quarter, SolarCity incurred a loss of $225.3 million, or 55 cents per share, compared with a $234.2 million loss, or 52 cents per share, a year earlier.

158.   Tesla's lenders recognized the problems the Acquisition presented for the Company.  For example, one of Tesla's principal sources of cash is an asset-based loan agreement (the "ABL") under which a group of banks, including Goldman Sachs Bank USA and Deutsche Bank AG, provide Tesla with up to $1 billion in revolving credit.  The same day Tesla entered the Merger Agreement with SolarCity, Tesla also entered into a Fourth Amendment to the ABL with its lenders.  That Fourth Amendment excluded SolarCity from the definition of Tesla "Subsidiaries" entitled to use funds borrowed under the ABL and, further, included a provision requiring that "Tesla and its Subsidiaries shall not guarantee or otherwise become directly liable for any Indebtedness of SolarCity…"

159.   In other words, Tesla will not be able to use funds borrowed under the ABL to support SolarCity and will not be permitted to guarantee any other SolarCity

indebtedness.  One analyst, in an August 29, 2016 *Seeking Alpha* article titled "Tesla's Lenders Place SolarCity In A Leper Colony," described this as "a truly stunning provision" and noted that "[q]uite obviously," Tesla's lenders "view SolarCity as a danger to Tesla's financial integrity, and want to minimize the chance that any support given by Tesla to SolarCity will impair their right to be repaid."

160.   As a result, Tesla now needs to find other sources of funds to prop-up the combined company, with the most likely source being further dilutive equity offerings.  Indeed, Elon Musk previously commented that combining Tesla and SolarCity could require a "small equity capital raise" in 2017, which could be a "low to mid-single digit" percentage of Tesla's market capitalization, which currently stands at approximately $28.29 billion.

161.   Notably, the day after Tesla made these disclosures, its share price fell by more than $11, or 5.3%, and SolarCity's stock dropped by more than 9%.

162.   While Defendants claimed that Tesla's purpose in acquiring SolarCity was to take advantage of synergies between the two companies[16] and realize substantial long-term value, many industry analysts have questioned the viability of the projected synergies and view the Acquisition as a Tesla-financed bailout for SolarCity and its stockholders:

---

[16]   On an August 1, 2016 conference call, Elon Musk suggested that an estimate of $150 million to $200 million in synergies was "conservative."  However, when pressed for further detail on this estimate and whether it could be broken down quantitatively, Tesla representatives were unable to do so, stating only that "[r]ight now we're not assigning the $150 million at any lower level of detail than that."

(a)     Duncan Meaney, a financial adviser and portfolio manager at the Social Equity Group, was quoted as follows: "It does raise the suspicion that this is a way to bail out Solar City, which is a fairly significant money-losing operation."

(b)     In an article entitled "Tesla, SolarCity Look Like a Bad Fit," Bill Alpert and Travis Arbon of Barron's and Dow Jones & Company explain: "Musk envisions Tesla-store visitors picking up a $40,000 car, a $10,000 battery backup system, and a 20-year solar contract in one trip.  That's implausible.  He confessed on Wednesday's conference call that he had no idea how much overlap there is between Tesla car buyers and SolarCity homeowners, and we suspect that most thrift-minded solar-lease customers will find even Tesla's cost-reduced Model 3 car unaffordable whenever it rolls out."

(c)     "It's a bailout," said Jesse Pichel, an investment banker at Roth Capital Partners, adding, "SolarCity has had a hard time raising money. Tesla solves that problem."

(d)     Angelo Zino, an analyst at S&P Global Market Intelligence, was recently quoted in an online *Bloomberg* article as follows:  "This deal has everything to do with debt. Call it a bailout, call it what you will . . . SolarCity is one bad economic downturn away from going belly up."

(e)     Investment manager Jim Chanos blasted the proposal, calling it a "brazen Tesla bailout of SolarCity" and "a shameful example of corporate governance at its worst."

163.     On August 1, 2016, UBS published a research report titled "Tesla & SolarCity:  Deal Synergies Still Cloudy," maintaining its "sell" rating for Tesla and outlining the numerous troubling aspects of the Acquisition:

> . . . We continue to remain cautious on the deal given lack of compelling synergies (most could seemingly be achieved through a JV), and the fact this is an unneeded distraction for TSLA management which already faces challenges with the Model 3 launch and significant production targets.  We note that a lack of any quantitative assessment of the storage prospects – outside of (well articulated) prospects in Hawaii – emphasize the lack of clarity in terms of TSLA's ability to execute.  The deal would appear 'too early' for its time given the infancy of the resi solar sector (with net metering still largely in place).

> **Synergies Remain Vague**

> The company provided limited financial quantification of the $150m cost synergies.  Qualitatively, the synergies will come from lower customer acquisition costs by leveraging TSLA's retail footprint (foot traffic of 3m per year), savings from combined installation/service of solar & storage, savings from supply chain efficiencies (e.g. both companies source inverters), and leveraging TSLA's manufacturing expertise. Ultimately, TSLA envisions combining vehicle, charger, and storage delivery/installation in "a one truck and one trip" solution.  Given investor caution around the SCTY deal, we are surprised by the lack of quantitative details on the solar/storage combo.

> **SCTY: Cutting 2016 Guidance Again, Cost Improvements Marginal**

> Despite beating quarterly guidance, SCTY has cut 2016 install expectations again, implying only ~9.4% YoY growth in total installations on updated midpoint of 950MW. Further, we estimate total

sales cost per watt (on flat cost structure) would yield ~76 cents on a per unit basis –> 44% above the 53 cents disclosed in Q2'15 but consistent with management's previous comments suggesting ~20% cost improvement over Q1 customer acquisition cost of 97 cents. While this is still an improvement vs recent high of 97 cents last quarter, it doesn't appear sufficient to dispel concerns of more serious issues at the company. Our initial impression remains biased towards loan products and direct cash sales, which would not favor SCTY's current focus on PPAs.

**Few Details on New Products and Cost Savings**

We are increasingly cautious on resi solar fundamentals but note a number of questions remain unanswered today. The two new products focused on integrated solar+storage and another focused on new roof construction. The offerings weren't fleshed out, but management could provide more compelling details later. However, this lack of clarity on new products was combined with vague cost savings goals and lackluster cost improvements from SCTY, making for a generally cloudy outlook. Current disclosures in the merger agreement suggest cost savings will come from lower hardware, reduced installation, improved manufacturing, and reducing customer acquisition costs, though we are unsure how much of that would come from synergies versus previously planned cost reduction. Furthermore, SCTY's 45 day go-shop period could yield further offers, but we note the failed VSLR acquisition provides poor precedent here and we do not assume a bidding war occurs.

164.   UBS has continued to reiterate its position following the approval and closing of the Acquisition, stating in February 2017 that "[w]ith the closure of the SCTY merger, TSLA is assuming numerous risks . . . [which] include slowing sales growth, challenged economics following the end of ITC in 2022, risk from changes in net metering rules (ex. Nevada in late 2015), and Silevo commitments. We continue to believe SCTY is an unneeded distraction during a very challenging launch period."

165.    Similarly, on February 27, 2017, Goldman Sachs downgraded Tesla from "Neutral" to "Sell," citing, *inter alia*, the Acquisition.  Specifically, Goldman Sachs stated: "We believe the recent acquisition of SolarCity increased the risk profile of Tesla amidst a business model transition – from company-owned equipment installation and lease/PPA contracts to customer purchased equipment on cash/loan sales – and provides limited synergies.  Ultimately, the acquisition raised the net leverage of Tesla while creating EBITDA and FCF drag that requires incremental non-recourse debt to be raised.  Lastly, we see 2017 as a pivotal year for Tesla as it looks to become a mass automobile manufacturer, and with the integration of SolarCity also occurring the company may lack the singular focus it should have on achieving its Model 3 launch targets."

166.    Further, Tesla has no history of successfully completing any acquisition of this nature, which further draws into the question the viability of any projected synergies.  As Tesla concedes in its most recent Form 10-K filed with the SEC on March 1, 2017, Tesla "has no experience integrating a business of the size and scale of SolarCity.  If the integration process takes longer than expected or is more costly than expected, [Tesla] may fail to realize some or all of the anticipated benefits of the acquisition."  Tesla even identified the specific problems that may arise, including:

- "complexities associated with managing the combined businesses;"

- "integrating personnel from two companies;"

- "creation of uniform standards, controls, procedures, policies and information systems; and"

- "potential  unknown liabilities and unforeseen increased expenses, delays or regulatory conditions associated with the acquisition."

167.   Even if the hypothetical benefits of the Acquisition were supported by research and due diligence (which they are not) and the businesses could be successfully integrated (an enormous task which Tesla has no experience in undertaking), there was no rational business reason for Tesla to take on such a substantial risk to achieve them.  As Adam Jonas, Managing Director of the Global Auto Research Team at Morgan Stanley & Co., advised: "While there may be any number of lucid arguments supporting the strategic rationale of a combination, we believe many of the benefits could have been achieved through arm's length/strategic partnership and without the risks inherent in exposing Tesla shareholders to the financial and capital markets risks faced by SolarCity."

### *Evercore's Deficient Fairness Opinion*

168.   As noted above, Evercore served as the financial advisor to Tesla and provided a fairness opinion regarding the Acquisition.

62

169.   With the majority its advisory fee hanging in the balance, ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

### *Evercore's DCF Analyses of SolarCity Failed to Utilize*
### *Realistic Financial Projections Prepared by SolarCity Management*

170.   Evercore performed two DCF analyses of SolarCity.  With respect to the underlying financial projections, the first DCF relied on forecasts that were prepared by SolarCity management and provided to Evercore in mid-July 2016.   These projections are referred to as the "SolarCity Unrestricted Liquidity Case" in Joint Proxy Statement/Prospectus (the "Proxy") filed by Tesla on October 12, 2016.

171.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

172.  ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

173.  ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████

174.  ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

175. When SolarCity's financial advisor, Lazard, performed DCF analyses utilizing the SolarCity Liquidity Management Case, Lazard derived per share value ranges for SolarCity falling entirely below the Acquisition price. Specifically, Lazard's initial DCF analysis based on the SolarCity Liquidity Management Case calculated a "per-share equity value reference range for SolarCity of approximately $6.75 to $19.25." After correcting for a supposed "computational error," which the Proxy claims "double-counted SolarCity's projected outstanding indebtedness of $400 million under its revolving credit facility," Lazard's DCF analysis based on the SolarCity Liquidity Management Case yielded values for SolarCity of only "$10.50 to $23.25" per share. As explained above, the Acquisition price is $25.37 per share of SolarCity stock based on the five-day volume weighted average price of Tesla shares as of July 29, 2016 (*i.e.,* the last trading day prior to the announcement of the Acquisition), or $25.83 per SolarCity share if based on the closing price of Tesla's shares as of that date.

176. Despite learning of SolarCity management's alternate, lower projections, Evercore did not perform an additional DCF analysis and did not revise its valuation of SolarCity at all. Nor did the Board request that Evercore perform such an analysis. Instead, at an August 25, 2016 special meeting, despite its failure to perform any further DCF analysis, Evercore orally advised the Board that the SolarCity Liquidity Management Case did not alter "its prior valuation analysis." The Tesla Board

similarly determined that the new information did not "change[] its view as to the value of SolarCity," despite having neither requested nor received any further financial analysis.

### *Evercore Failed to Account for Forthcoming Federal Tax Changes that Thwart SolarCity's Long-Term Viability*

177.   Since at least 2008, SolarCity's business model has centered around the leasing of solar energy systems to residential and commercial customers, as opposed to cash- or loan-based sales.  Solar leases provide two primary financial benefits to SolarCity: (i) the future lease payments to be made by the customers receiving the solar energy systems, and (ii) tax equity associated with the Federal Solar Investment Tax Credit (the "Federal SITC").

178.   Although neither inherently provides quick and substantial cash, SolarCity developed ways to try to immediately monetize these benefits.  SolarCity monetizes these assets by selling or transferring the solar energy systems to funds or special purpose entities and will assign the tax attributes and lease payment streams to the investors in return for upfront cash.  SolarCity then uses the cash from investors to pay for its operating and capital costs including the expenses associated with installing future solar energy systems.

179.   Even setting aside SolarCity's historical inability to generate positive cash flows, its business model centered around solar leasing is unsustainable going forward, as the tax benefits under the Federal SITC will almost entirely be phased out.

180.   Under to the Energy Policy Act of 2005 (the "Energy Policy Act"), the Federal SITC presently allows for those investing in solar energy systems to recoup 30% of the total cost of their residential or commercial solar systems through dollar-for-dollar federal tax credits.  When SolarCity leases a solar system, as opposed to cash- or loan-based sale, the benefits of the Federal SITC accrue to SolarCity.

181.   However, for both residential and commercial systems, the Federal SITC declines to 26% of the total system costs in 2020 and drops again to 22% in 2021.  In 2022, the tax credit for commercial systems settles at a 10% rate while credits for residential systems are eliminated entirely.

182.   These significant reductions in the tax credits reconcile with the intent of the Energy Policy Act, which initiated the Federal SITC as a means to provide financial assistance to clean energy companies at a time when their costs were high, with the benefits ramping down as the price of clean energy became more competitive.  Tellingly, solar energy prices have dropped for six consecutive years and reached an all-time low in 2016.

183.   Although solar energy companies are presently benefitting from substantial tax credits under the Federal SITC, the propriety of the tax benefits has come into question.  As widely reported, the Senate Finance Committee (the "SFC") and the House Ways and Means Committee (the "HWMC") have launched an investigation into whether solar energy companies improperly received billions of

67

dollars in tax incentives.  In early 2016, Senator Orrin Hatch of the SFC, who is leading the probe along with Congressman Kevin Brady of the HWMC, concluded that the United States Treasury Department and Internal Revenue Service do not have adequate controls over the Federal SITC program.  As part of the inquiry, in September 2016 the SFC and the HWMC sent letters to seven foreign and domestic solar energy companies, including SolarCity, which expanded upon the initial investigation.

184.   Additionally, in July 2012, SolarCity received a subpoena from the U.S. Treasury Department's Offices of the Inspector General to deliver documents relating to SolarCity's applications for U.S. Treasury Grants and its communications with certain other solar energy development companies or with certain firms that appraise solar energy property for U.S. Treasury grant application purposes.

185.   The Inspector General and the United States Department of Justice are engaged in an ongoing investigation into whether SolarCity misrepresented the fair market value of its solar energy systems in Treasury grant applications (the "DOJ Investigation").

186.   If the DOJ Investigation results in a determination that SolarCity misrepresented the value of its solar energy systems, SolarCity could be required to pay material damages and penalties for any funds received based on such misrepresentations.  Indeed, SolarCity has already accrued a reserve for its potential

liability associated with the DOJ Investigation.  Because SolarCity securitized its solar

energy system assets, it may also be required to make indemnity payments to

SolarCity investors.

187. 

188.    The revenues from the tax benefits under the Federal SITC not only drive

SolarCity's available cash, but the tax incentives also drive consumer demand.  In its

Form 10-K filed on February 2, 2016, SolarCity explains that "[t]hese incentives help

catalyze private sector investments in solar energy, energy efficiency and energy

storage measures, including the installation and operation of residential and

commercial solar energy systems."

189. 

190.

███████████████████████████████████████████

███████████████████████████████████████████

### *Evercore Used Overly Conservative Financial Projections for Tesla*

191.   Evercore's financial analysis is also deficient because in determining that the Acquisition exchange ratio was "fair" it used projections for Tesla developed by Goldman Sachs on the basis of only publicly available information, instead of Tesla's management projections.

192.   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ ██████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

### *Analysts Sharply Question Evercore's Financial Analyses*

193.   Multiple analysts have questioned Evercore's valuation of SolarCity. For example, on September 6, 2016, Professor Aswath Damodaran, who teaches corporate finance and valuation at the Stern School of Business at New York University,

published a blog post and video titled "Keystone Kop Valuations: Lazard, Evercore and the TSLA/SCTY Deal" sharply criticizing the work underlying both Evercore and Lazard's fairness opinions.

194.   Like the many analysts cited above, Professor Damodaran questioned the purported synergies that Tesla has touted will result from the Acquisition.  In addition, he pointed out that Tesla cannot justify paying a control premium for SolarCity because both companies are already controlled by Elon Musk.

195.   Furthermore, Professor Damodaran characterized the banks' outsourcing of work and flawed assumptions as "lazy" and "incompetent," and noted that each is entitled to a significant fee that is contingent on the Acquisition being consummated, thus suggesting that the bankers' "errors" were the result of bias in favor of the Acquisition.  Specifically, Professor Damodaran pointed out the following faults in the bankers' analyses:

(a)   <u>No internal checks for consistency</u>:  In both banks' DCF analyses, there is "almost a cavalier disregard" for the connection between growth, risk and reinvestment.  Thus when the growth rate is adjusted, Evercore and Lazard failed to make a corresponding adjustment to cash flow and/or reinvestment.  As Professor Damodaran stated, no real business can increase its growth rate without reinvesting more and/or without changing its cash flows.

(b)   <u>Discount rates</u>:  Both Evercore and Lazard fail to change the discount rates used as they moved through time to 2021.  For example, Evercore uses

a 12-15% cost of capital estimated for the next four years, when SolarCity is a growth company with a lot of risk.  However, by 2021, both Tesla and SolarCity are described as money-making, profitable companies with a slower growth rate, but the banks failed to take this into account by changing the discount rate.  In addition, Professor Damodaran points out that for Tesla, Lazard uses a higher discount rate than Evercore, but for SolarCity, Evercore uses a higher discount rate than Lazard.

(c)   <u>Pricing and valuation</u>:  Both banks shift back and forth between value and price, and often mix the two, with Lazard estimating the terminal value for Tesla by taking cash flow for the next four years and applying 10x EBITDA.  This is not a valuation; it is forward pricing.

(d)   <u>Outsourcing of cash flows</u>:  Both banks used cash flow forecasts provided to them by management.  In the case of Tesla, the expected cash flows for 2016-2020 were generated by Goldman Sachs Equity Research, and for SolarCity, the cash flows for that same period were provided by SolarCity, conveniently under two scenarios, one with a liquidity crunch and one without.  Thus the bankers, who were instructed by their clients to use the cash flows handed to them, started off with biased raw numbers that were not believable.

(e)   <u>Terminal value "hijinks"</u>:  In estimating terminal value of Tesla, Evercore used a growth rate of 6-8% in perpetuity.  However, such a growth rate is

73

impossible in an economy where the risk-free rate is 1.5%, inflation is close to zero, and real growth is 1-1.5%.

196.    Professor Damodaran concluded that the bad assumptions and other flaws in Evercore's fairness opinion suggest "that the bankers involved in the Evercore valuations either have forgotten basic valuation or they just don't care."

### TESLA STOCKHOLDERS' VOTE ON THE ACQUISITION WAS COERCED AND NOT FULLY INFORMED

197.    On October 12, 2016, Tesla filed the Proxy with the SEC and scheduled a special meeting of Tesla stockholders to hold a vote on the Acquisition.  In attempt to conceal the self-interested nature and mask the insurmountable financial struggles of SolarCity, Defendants took steps, however, to predetermine the outcome of that vote. Recognizing that fully informed and disinterested Tesla stockholders would have reason to vote the deal down, Defendants withheld material information from the Proxy, including information concerning the insurmountable financial struggles of SolarCity and Defendants' self-interested reasons for bailing it out.  Compounding the Proxy's deficiencies, Elon Musk embarked on a public relations tour to foster support for the Acquisition, during which he made numerous misrepresentations to the public, including Tesla's stockholders, concerning the Acquisition.

198.    Putting aside Defendants' failure to fully inform Tesla's stockholders (and Elon Musk's efforts to propagandize them), Defendants effectively guaranteed stockholder approval of the Acquisition by failing to limit the vote to truly

disinterested Tesla stockholders.  Instead, Defendants allowed including institutional stockholders who had large equity positions in SolarCity (and who, therefore, shared the fundamental conflict leading Musk to pursue the Acquisition in the first place) to vote on the proposed transaction as "disinterested" Tesla stockholders.  Indeed, it appears that the Acquisition was approved only as a result of support from those conflicted SolarCity investors and that it ***did not*** win support from a majority of Tesla's truly disinterested stockholders.

### The Proxy Failed to Disclose That the Acquisition and Its Timing Were Driven by a Desire to Bail Out SolarCity and ██████████

199.   As set forth above, analysts recognized that the alleged synergies touted to justify the Acquisition were not realistic and could not have been the true reason for the deal.  In truth, the purpose of the Acquisition was to bail out SolarCity and protect Elon Musk's reputation and salvage the investments that Elon Musk and other Defendants had in SolarCity.  Although the Proxy set forth various "[r]easons for the [m]erger," the Proxy failed to disclose that the true purpose of the Acquisition was to rescue a financially failing SolarCity that could no longer survive as a standalone entity for self-interested reasons.

200.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



201. ███████████████████████████████████████████

████████████████████████████████████████████████ The Proxy

failed to disclose these facts.

### The Proxy Failed to Disclose the Patent Flaws in
### Evercore's DCF Analyses

202.   In the Proxy, Defendants disclosed only certain basic elements of

Evercore's DCF analyses to Tesla stockholders, and withheld information contained

in the 220 Documents.  Specifically, the Proxy provides: (i) the forecasts for Total

Megawatts Inspected, Sources of Cash, Use of Cash, and Net Generation (of cash) for

the underlying projections; (ii) Evercore's selected PGR; and (iii) Evercore's selected

discount rate.  By including just this minimal information, Defendants were able to

effectively mask the critical flaws that undermine Evercore's valuations, as discussed

above, and give Tesla stockholders the false impression that the proposed

consideration was fair.

203.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



204. ████████████████████████████████████████

205. ████████████████████████████████████████

████████████████████████████ The tax credits will drop by

another 16% for commercial solar systems and residential systems by another 26% by

2022.

206.   The Proxy's omission of Evercore's improper assumption for purposes of its DCF analyses is exacerbated by disclosures in the Proxy concerning other valuations.   For Evercore's Sum-of-the-Parts Analysis, the Proxy States: "In the terminal year it was assumed that these solar tax credits would not extend into perpetuity and therefore were not accounted for in the terminal value."   Because the Proxy fails to address this issue in connection with Evercore's DCF analyses, ▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████.

207.   As a result of these deficiencies in the Proxy, Tesla stockholders were led to believe that SolarCity was worth billions more than its true value.

### The Proxy Failed to Disclose that Defendant Buss Served as an Advisor to SolarCity While He and the Rest of the Tesla Board Determined to Undertake the Acquisition

208.   As discussed above, following his retirement as SolarCity's CFO, defendant Buss served as a consultant to SolarCity until December 31, 2016—that is, during the entire period in which the Tesla Board considered, negotiated, agreed to and then recommended approval of the Acquisition.

209.   The Proxy discloses that "Mr. Brad W. Buss, a member of the Tesla Board, was the Chief Financial Officer of SolarCity from August 2014 until February 2016," but wholly fails to disclose Buss's then-current role as a consultant to

SolarCity—thereby misleading Tesla stockholders to believe Buss's relationship with, and loyalties to, SolarCity ended in February 2016. The Proxy, therefore, misled Tesla's stockholders concerning Buss's independence and thereby prevented Tesla's stockholders from making a fully informed assessment as to the independence of the Board that structured and recommended the Acquisition.

### The Proxy Omitted Material Information Regarding Certain Tesla Directors' Relationship With SpaceX

210.   As alleged herein, multiple Tesla directors have relationships with SpaceX. Elon Musk, Kimbal Musk, Gracias and Jurvetson all serve on the SpaceX Board. Additionally, at least Elon Musk, Ehrenpreis (personally and through his DBL fund), Gracias (personally and through his Valor funds) and Jurvetson (through his DFJ funds) are investors in SpaceX.

211.   The Proxy fails to disclose the full scope of the conflict created by the Tesla directors' investments in, and other relationships with, SpaceX.

212.   SpaceX is mentioned in the Proxy only in connection with SpaceX's ownership of certain SolarCity solar bonds due in 2017. In connection with that disclosure, the Proxy identifies Elon Musk, Kimbal Musk, Gracias and Jurvetson as directors of SpaceX. The Proxy fails, however, to disclose any of the Tesla directors' investments in SpaceX.

213.   Further, the Proxy does not disclose the larger conflict created by the Tesla directors' investments in, and relationships with, SpaceX. As alleged herein,

even Elon Musk himself has acknowledged that Tesla, SolarCity and SpaceX form a "pyramid" and it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid of Tesla, SolarCity and SpaceX falters." As further alleged herein, a SolarCity failure would damage Elon Musk's reputation as a "visionary" and could harm his other enterprises, including SpaceX, by, *inter alia*, causing an increase in the cost of capital for such enterprises. As a result, each director affiliated with SpaceX would have added incentive to help prevent the SolarCity block in Musk's "pyramid" from collapsing.

214. This omitted information is material because, without it, Tesla's stockholders were misled about, and unable to assess, the potential effects on Tesla directors' interests in SpaceX if Tesla did not acquire SolarCity, and as a result, the independence of the Board that structured and recommended the Acquisition.

### The Proxy Failed to Disclose that Credit Suisse Acted as a Financial Advisor to SolarCity in Connection with the Acquisition

215. Recent analyst reports on Tesla issued by Credit Suisse disclose that Credit Suisse "has a material conflict of interest with the subject company" because it "is acting as financial advisor to SolarCity Corporation . . . on their sale to Tesla Motors Inc. . . ."

216. Credit Suisse is one of the lenders participating in Tesla's ABL, and appears to have prepared at least one slide of a presentation made by Tesla to

Institutional Shareholder Services ("ISS") in its efforts to gain support for the Acquisition.

217.   The Proxy failed to disclose that Credit Suisse advised SolarCity in connection with the Acquisition, or what Credit Suisse's role was in connection with the Acquisition.

### Elon Musk Made Unsupported and Contradictory Statements to the Media and Investors During a Public Relations Tour Leading up to the Stockholder Vote

218.   Following the announcement of the Offer, Elon Musk undertook a well-documented public relations tour in attempt to gain stockholder support for the Acquisition.   Compounding the deficiencies in the Proxy, Musk sought to propagandize Tesla's stockholders to vote in favor of the Acquisition by making numerous false or misleading statements to the media and investors as part of this campaign.   These statements are largely summarized in a 9-page presentation (the "November Press Release") posted to Tesla's investor relations website on November 1, 2016—just two weeks before the stockholder vote.

219.   The November Press Release states: "SolarCity is now no longer as reliant on leasing.  Its customers are increasingly choosing to opt for cash purchases and loans, which creates a healthier mix of upfront and recurring revenue." ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

220.   Further, direct sales were a drag on SolarCity's profitability.  In a report published on August 11, 2016, analysts at UBS Global Research state: "We view strategy shift towards increasing cash and loan sales with concerns, given that SCTY has had a history of negative gross margins for their Solar Energy Systems and Components Sales Segment, with the two year average gross margin approximately negative 10%."  Consequently, while a shift away from leasing and towards direct sales would help reduce the effects of the substantial phase out of the Federal SITCs, a larger percentage of direct sales is hardly a "healthier" product mix because each transaction creates a loss for SolarCity.

221.   In addition, the November Press Release states that Tesla believed SolarCity would "add more than half a billion dollars in cash to Tesla's balance sheet over the next 3 years." [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]



### *The Merger Agreement Failed to Limit the Vote to Only Disinterested Stockholders Who Did Not Suffer From Financial Conflicts*

222.   Tesla and SolarCity repeatedly touted that the Acquisition was conditioned on approval by not only a majority of the total shares of each company, but also a majority of the shares of each company not affiliated with Elon Musk. However, these purported protections were hollow, as the body of stockholders participating in the purportedly non-affiliated votes still includes many conflicted stockholders.

223.   Specifically, with respect to Tesla, Section 3.04 of the Merger Agreement provided that the Acquisition was subject to approval by (i) the holders of a majority of the total votes of Tesla shares cast at a to-be-scheduled special meeting of Tesla stockholders, which was ultimately held on November 17, 2016 (the "Special Meeting"); and (ii) the holders of a majority of the total votes of Tesla shares not owned by "Excluded Parent Parties" cast at the Special Meeting.  "Excluded Parent Parties" is defined in Section 9.03 of the Merger Agreement as:

the directors and named executive officers of [SolarCity] in each case as of the date of this Agreement and/or as of record date set in respect of the [Special Meeting] and including, for the avoidance of doubt, Elon Musk, Antonio Gracias and Jeffrey B. Straubel, and the Persons in which any of the foregoing Persons have a pecuniary interest or in the name of which the shares of [Tesla] Common Stock of any of the foregoing Persons are registered or beneficially held, whether directly or indirectly.

224.   The Merger Agreement therefore did not exclude from the purportedly disinterested vote numerous Tesla stockholders who are beholden to Elon Musk and/or who own, or whose family members and/or business partners own, SolarCity stock and therefore stood to benefit from the Acquisition, including: Kimbal Musk; Jurvetson; Ehrenpreis; Buss; Tesla executive officers, including Jason Wheeler, Doug Field and Greg Reichow; and any other Tesla stockholders who also owned stock in SolarCity.

225.   As of September 23, 2016, the record date for the Special Meeting, excluding shares held by Musk, Gracias, Straubel, and their affiliates, there were 118,044,090 shares of Tesla common stock outstanding and entitled to vote at the Special Meeting.  Of these shares, 68,788,787 voted in favor of the Acquisition.

226.   ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████ This overlap does not even include smaller institutional investors or individual shareholders, including Musk, who also owned shares in each company.

227.    These shareholders were not disinterested as they had the incentive to use Tesla's capital to bail out their investments in SolarCity, which were at risk of being zeroed out.  Therefore, most, if not all, of these institutional shareholders likely voted in favor of the Acquisition.  Despite their lack of disinterestedness, under the terms of the Acquisition they were eligible to vote on the transaction in the so-called majority of the minority vote, thus rendering the vote ineffective for cleansing purposes. Moreover, the fact that this overlap was highlighted to the Board before Tesla made its initial offer indicates that it knew any final deal was likely to gain Tesla shareholder approval and any purported majority of the minority vote that allowed overlapping shareholders to vote would be a sham.

228.    As these shareholders were not disinterested, the shares they held should be excluded from what are deemed disinterested shares. █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

85

229.   

230.   Because the ineffective protections in the Merger Agreement failed to condition the Acquisition on the vote of truly disinterested Tesla stockholders, the Acquisition was approved and then closed on November 21, 2016.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

231.   Plaintiffs bring Counts I through III and VI derivatively in the right and for the benefit of Tesla to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment and waste of corporate assets.

232.   Plaintiffs are stockholders of Tesla, were stockholders of Tesla at the time of the wrongdoing alleged herein, and have been stockholders of Tesla continuously since that time.

233.   Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

234.   As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action against the Individual Defendants.  Such

demand would be a futile and useless act because the Tesla Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

235.   The Board currently consists of seven directors: defendants Elon Musk, Kimbal Musk, Gracias, Ehrenpreis, Jurvetson, Buss and Denholm.  For the reasons set forth below, none of these directors is capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

### Elon Musk Cannot Disinterestedly and Independently Consider a Demand

236.   As Chairman of the Board of SolarCity and its largest stockholder, Elon Musk admittedly stands on both sides of the Acquisition.

237.   The Acquisition prevented a SolarCity implosion, which also eliminated the risk of a margin call on Elon Musk's $475 million in personal loans.

238.   As discussed herein, Elon Musk benefitted from the Acquisition because it protected the investments of Valor, DFJ and DBL in SolarCity.  Valor, DFJ and DBL are frequent investors in Elon Musk's various entities, and therefore keeping these investors happy will allow him to continue seeking financing from them in the future.

239.   In addition, as discussed herein, by causing the Company to bail out SolarCity, the Acquisition benefitted Elon Musk's cousins, Lyndon and Peter Rive, who were SolarCity co-founders, 3.9% and 3.8% (respectively) stockholders, and are

serving as executives of the surviving SolarCity subsidiary of Tesla following the consummation of the Acquisition.

240.   The Acquisition will also benefit Elon Musk's brother Kimbal Musk and close friend Gracias, both of whom are SolarCity stockholders.

241.  For all of these reasons, Elon Musk cannot disinterestedly and independently consider a demand to prosecute the claims alleged herein.

### Gracias Cannot Disinterestedly and Independently Consider a Demand

242.   Like Elon Musk, as a member of both the Tesla Board and the SolarCity Board, Gracias admittedly stood on both sides of the Acquisition.

243.  In addition, Gracias (personally and through certain Valor funds) beneficially owned SolarCity common stock and therefore stood to benefit from the Acquisition.

244.   Furthermore, Gracias cannot disinterestedly and independently consider a demand against his close friend Elon Musk.  The relationship between Elon Musk and Gracias dates back to at least 2001, when Gracias invested in PayPal.  Elon Musk subsequently provided Gracias and Valor the opportunity to participate in several pre-IPO venture funding rounds for SolarCity, Tesla and SpaceX, and appointed him to the board of directors of each company.  In fiscal year 2015, Gracias received almost $11 million in aggregate director compensation from Tesla and SolarCity, in addition to whatever he earned as a director of SpaceX.

245.   In addition, both Elon Musk and Kimbal Musk are invested in various Valor funds.  As manager of these funds, Gracias serves as a fiduciary to Elon Musk and Kimbal Musk.

246.   Valor's website includes a testimonial from Elon Musk, in which he describes Gracias's value to Tesla:

> I'd like to thank Valor for being a key investor.  And not just an investor, but a strategic partner. I don't think we would've made it without their help, so thank you.[17]

247.   Similarly, Valor's website includes the following testimonial from Peter Rive, COO & CTO of SolarCity:

> Valor is simply the best investor I've ever worked with.  Their initial diligence is thoughtful and detailed, but their help in improving the company after the investment is invaluable.  They have an awesome team who implement lean process methodologies to improve throughput without an increase in operating expenses. I want to emphasize the word "implement" which is key to the Valor guys.  They're not consultants who create a set of power point presentations – they actually do the work!  The end result is that when Valor invested in our company they simultaneously lowered the execution risk of the business.[18]

248.   Gracias uses these testimonials and his relationship with Elon Musk to solicit fund investors and entrepreneurs seeking venture capital on behalf of Valor.

249.   For all of these reasons, Gracias cannot disinterestedly and independently consider a demand to prosecute the claims alleged herein.

---

[17]   http://www.valorep.com/about (last visited on July 29, 2016).

[18]   http://www.valorep.com/about (last visited on July 29, 2016).

### *Kimbal Musk Cannot Disinterestedly and Independently Consider a Demand*

250.   Kimbal Musk was interested in the Acquisition, which benefits him and his family members (Elon Musk, Peter Rive and Lyndon Rive), who collectively owned over 26% of SolarCity's common stock.

251.   Kimbal Musk is not independent from his brother.  He sits on the Boards of Directors of Tesla and SpaceX by virtue of being Elon Musk's brother, and collects significant director fees as a result thereof.  In 2015, Kimbal Musk received director compensation from Tesla alone in the amount of $4,964,381.

252.   In addition, Kimbal Musk is not independent from Gracias (his brother's close friend with whom he sits on both the Tesla Board and the SpaceX Board), who is interested in the Acquisition and, through his control over Valor, manages two private equity funds in which Kimbal Musk has invested.

253.   For all of these reasons, Kimbal Musk cannot disinterestedly and independently consider a demand to prosecute the claims alleged herein.

### *Ehrenpreis Cannot Disinterestedly and Independently Consider a Demand*

254.   Ehrenpreis was interested in the Acquisition.  As alleged herein, his venture capital partner, Pfund, was a SolarCity stockholder and therefore stood to benefit from the Acquisition.  Pfund also served on the SolarCity Board and the SolarCity Special Committee.  Pfund was an observer on the Tesla Board from 2006 to 2010.

255.   Ehrenpreis is also not independent from Elon Musk.  Ehrenpreis, his partner Pfund, and the various funds they manage have collectively invested in all three of Elon Musk's current companies – Tesla, SolarCity and SpaceX.

256.   In addition, Ehrenpreis's interest in Mapbox and the payments to be received in connection therewith from Tesla impact his ability to disinterestedly consider a demand.

257. For all of these reasons, Ehrenpreis cannot disinterestedly and independently consider a demand to prosecute the claims alleged herein.

### Jurvetson Cannot Disinterestedly and Independently Consider a Demand

258.   Jurvetson is interested in the Acquisition because he, his partner (Fisher) and funds managed by their venture capital firm (DFJ) own SolarCity common stock. Accordingly, Jurvetson cannot disinterestedly consider a demand.

259.   Jurvetson also lacks independence from Elon Musk.  His venture capital firm has invested in Tesla, SolarCity and SpaceX, and Jurvetson and/or his venture capital partner Fisher serve on the boards of directors of all three companies.

260.   DFJ has turned a substantial profit from its investments in SolarCity, selling down its 26.2% interest down to 3.3% since the December 2012 IPO.  DFJ is also a "significant stockholder of SpaceX,"[19] which as of January 2015 was valued at approximately $12 billion.

---

[19]     Tesla Motors, Inc. Def. Proxy Statement (DEF14A) at 17 (Apr. 15, 2016).

261.   Jurvetson has not tried to hide his admiration for Elon Musk, stating that Musk's "passion is breathtaking" and praising his dedication and vision.

262.   Additionally, Jurvetson and DFJ serve as fiduciaries of the Elon Musk Trust, which is a limited partner of DFJ investment fund Draper Fisher Jurvetson Fund X, L.P.

263.   For all of these reasons, Jurvetson cannot disinterestedly and independently consider a demand to prosecute the claims alleged herein.

### Buss Cannot Disinterestedly and Independently Consider a Demand

264.   Like Elon Musk and Gracias, Buss stood on both sides of the Acquisition in two respects.  First, he beneficially owned 89,203 shares of SolarCity common stock.  Second, though Buss recently resigned as the Chief Financial Officer of SolarCity, he continued to serve as a consultant to SolarCity through the end of 2016.

265.   Buss's current primary source of income is his lucrative position as a director of Tesla.[20]  In fiscal year 2015, Buss earned an astounding $4,954,785 in director fees.  Accordingly, Buss cannot disinterestedly and independently consider a demand against (i) Denholm, Ehrenpreis and Gracias, who as members of Tesla's Compensation Committee, make recommendations to the Board as to director compensation; ███████████████████████████████████████

---

[20]   Through December 31, 2016, Buss received $1,000 per month in compensation from SolarCity for his service as an advisor.

███████████████████████████████████████████████████████

████████████████ or (iii) his fellow Board members as a whole, who consider the

Compensation Committee's recommendations and ultimately approve director

compensation.

266.   For all of these reasons, Buss cannot disinterestedly and independently

consider a demand to prosecute the claims alleged herein.

### *Denholm Cannot Disinterestedly and Independently Consider a Demand*

267.   Denholm left Juniper in February 2016, and until 2017 did not have a

full-time job.  Accordingly, her recent sole source of income has been her lucrative

position as a director of Tesla.  In fiscal years 2014 and 2015, Denholm earned

$7,181,066 and $4,979,785, respectively, in director fees as a Tesla director.

Accordingly, Denholm cannot disinterestedly and independently consider a demand

against (i) Ehrenpreis and Gracias, who in their capacities as fellow members of the

Compensation Committee make recommendations to the Board as to director

compensation; ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ iii) her fellow Board members as a whole, who consider the

Compensation Committee's recommendations and ultimately approve director

compensation.

### *The Acquisition Was Not the Product of a Valid Exercise of Business Judgment*

268.   Demand is further excused because the Acquisition was otherwise not the product of a valid exercise of business judgment.

269.   First, Elon Musk is the controlling stockholder of Tesla and stood on both sides of the Acquisition.  Indeed, Elon Musk and Tesla are essentially synonymous. Elon Musk provided the money that served as the foundation for the Company's early development: he led Tesla's Series A and Series B rounds of funding and co-led its Series C round of funding.  He has also been the single longest tenured individual at Tesla since the 2008 departure of co-founders Martin Eberhard and Marc Tarpenning (an event largely orchestrated by Elon Musk).

270.   Elon Musk is the dominant force behind Tesla's corporate strategy, which has proceeded for the last decade according to his "Master Plan," which was personally authored by Musk and was published to the Company's website on August 2, 2006.  The Company now has begun to proceed according to Musk's "Master Plan, Part Deux," which was published to the Company's website on July 20, 2016 (as explained above, the new plan calls for Tesla to combine with SolarCity, and confirms that this has been Elon Musk's plan for Tesla all along).  In an August 1, 2016 conference call about the Acquisition, Elon Musk explained: "I think I've spoken quite a bit at length probably about the objectives [of the Acquisition], so I don't think

there's anything new I have to add.  It was described when we announced it and then again in my master plan update … I should say master plan 10 years ago."

271.   In addition to crafting Tesla's big-picture strategy, Elon Musk is the Company's Chief Product Architect and has played a hands-on role in the design of its products, including dictating details such as the lowering of the Tesla Roadster's side rails by three inches and selecting interior trim.  Elon Musk is the clear public face of Tesla and he is viewed, both within the Company and by much of the public, as a visionary business leader who is, to a significant degree, personally responsible for Tesla's success.  As Tesla has acknowledged, "[i]n addition to serving as the CEO since October 2008, Mr. Musk has contributed significantly and actively to us since our earliest days in April 2004 by recruiting executives and engineers, contributing to the Tesla Roadster's engineering and design, raising capital for us and bringing investors to us, and raising public awareness of the Company."  Elon Musk himself has stated that he "tried to actually not be CEO quite hard and eventually [it] was sort of [that] or the company wasn't going to make it."

272.   For example, a January 14, 2015 *Detroit Free Press* profile typical of Elon Musk's press coverage described him as the subject of a "personality cult" while acknowledging that "[m]uch of [Tesla's] growth is pegged directly to the sheer force of Musk's personality."  As described in a *TIME* article published on August 4, 2016: "Like Apple under Steve Jobs and Amazon under Jeff Bezos, Tesla Motors has an

image deeply entangled with that of its founder.  Only with Tesla . . . success still lies in an often-delayed future. And so Musk is even more crucial to what Tesla is, because that future must be filtered through his vision."

273.    Tesla's lenders and strategic partners have agreed.  Affiliates of Daimler AG, with which Tesla previously entered into a series of strategic collaboration and other agreements, had the right to terminate such agreements in the event that Elon Musk was not serving as Tesla's CEO or Chairman and their representative on the Tesla Board did not approve of his successor.  Similarly, the Company's prior credit facility from the Department of Energy provided that Tesla would be in default thereof if Musk failed to own a certain amount of Tesla stock.

274.    The Company's annual and quarterly reports on Forms 10-K and 10-Q consistently acknowledge that Tesla is "highly dependent on the services of Elon Musk," who is "highly active in [the Company's] management," and if Tesla were to lose his services, it could "disrupt our operations, delay the development and introduction of our vehicles and services, and negatively impact our business, prospects and operating results as well as cause our stock price to decline."

275.   For years, the Company's quarterly and annual reports also acknowledged that the "concentration of ownership among [Tesla's] existing executive officers, directors and their affiliates may prevent new investors from influencing significant corporate decisions."  Although this ownership level was less

96

than 50%, the Company admitted that "these stockholders will be able to exercise a significant level of control over all matters requiring stockholder approval, including the election of directors, amendment of our certificate of incorporation and approval of significant corporate transactions."

276.   Elon Musk also had actual control and influence over the Board's decision-making, including its decisions to submit the Offer to SolarCity and to approve the Acquisition. As explained above, the Acquisition was conceived of and instigated by Musk and approved by a majority of directors who each shared with Elon Musk a special interest in the Acquisition.  These directors, and Elon Musk's confidante J.B. Straubel, collectively beneficially owned approximately 1% of Tesla's common stock as of September 23, 2016.

277.   Because Elon Musk is a controlling stockholder who stands on both sides of the Acquisition, the business judgment rule does not protect the Board's decision to approve the Acquisition, and demand is therefore excused.

278.   Second, the Acquisition was not approved by a Board majority consisting of independent and disinterested directors.  As explained above, five of Tesla's seven directors – each of whom suffered disabling conflicts – voted to approve the Acquisition.  For this reason as well, the business judgment rule does not protect the Board's decision to approve the Acquisition, and demand is therefore excused.

279.   Third, the Tesla Board's approval of the Acquisition was not taken honestly and in good faith, and the Acquisition process was otherwise without the bounds of reason.  As explained above, the Tesla Board's approval of the Acquisition advanced the interests of Elon Musk and other insiders rather than the interests of Tesla and its minority stockholders.   Furthermore, despite the potent conflicts possessed by a majority of its members, the Tesla Board, *inter alia*, (a) failed to form a special committee of disinterested and independent directors; (b) permitted Elon Musk's and Gracias's involvement in Board meetings and deliberation and generally limited their recusals to voting; and (c) failed to require recusals of the other conflicted directors.   The Acquisition also violated the Board's own internal governance procedures.   As the Company's public filings explain, Tesla's Audit Committee charter requires the Audit Committee to review and approve "***in advance*** any proposed related" party transactions (emphasis added).  The Audit Committee was therefore required to review and approve the Acquisition in advance, but failed to do so.

280.   The Board further failed to consider any alternatives to the Acquisition. The Board also knowingly failed to inform itself concerning material aspects of the Acquisition.  As explained above, after learning that SolarCity had withheld material information regarding its management's forecasts for the company, the Board failed to

request that Evercore perform an additional DCF analysis using those forecasts or perform any additional analysis regarding the value of SolarCity.

281.   Finally, analysts have been virtually unanimous in their assessment that the Acquisition did not serve any rational business purpose for Tesla, providing additional evidence that the decision to enter into the Acquisition cannot be the valid exercise of business judgment.

282.   For each of these reasons, a demand on the Board would be futile and is therefore excused.

## CLASS ACTION ALLEGATIONS

283.   Plaintiffs bring Counts IV, V and VII on their own behalf and as a class action, pursuant to Court of Chancery Rule 23, on behalf of all holders of Tesla common stock (the "Class") since August 1, 2016 and their successors in interest. Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants.

284.   This action is properly maintainable as a class action.

285.   The Class is so numerous that joinder of all members is impracticable.

286.   As September 15, 2016, there were approximately 114 million shares of Tesla common stock held by the Company's minority stockholders.   Upon information and belief, there are thousands of members of the Class.

287.   There are questions of law and fact which are common to the Class, including, but not limited to:

(a)   whether Defendants breached their fiduciary duties to Plaintiffs and the other members of the Class; and

(b)   whether Plaintiffs and the other members of the Class are entitled to damages as a result of Defendants' breaches of fiduciary duties.

288.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of claims of the other members of the Class, and Plaintiffs have the same interests as the other members of the Class.  All members of the Class have suffered the same harms in that the Tesla Defendants determined to cause the Company to undertake the Acquisition to benefit Elon Musk, his cousins, and certain other of the Defendants and their affiliates to the detriment of the Company's minority stockholders.

289.   Moreover, the Defendants caused the same equitable harm and damages to the Class through their breaches of their fiduciary duties of loyalty and care.

290.   Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

291.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the

individual Class members that would establish incompatible standards of conduct for Defendants.  Adjudications with respect to individual Class members would, as a practical matter, be dispositive, or would substantially impair the interests of the Class members.

292.   Defendants have acted or refused to act on grounds that apply generally to the Class, such that injunctive or declaratory relief is appropriate with respect to the Class as a whole.

293.   The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## FIRST CAUSE OF ACTION

### Derivatively on Behalf of Tesla Against Elon Musk for Breach of Fiduciary Duty in His Capacity as Tesla's Controlling Stockholder

294.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

295.   Elon Musk is the controlling stockholder of Tesla (see ¶¶269-277, *supra*).

296.   As controlling stockholder, Elon Musk owes fiduciary duties to the Company and its remaining stockholders.  In breach of those duties, Elon Musk used his control over the corporate machinery to, among other things, orchestrate Board

approval of the Acquisition, which unfairly provides SolarCity's stockholders, including himself and the other interested members of the Board, with excessive value for their failed investments in SolarCity.

297.   The Acquisition was a self-interested transaction for Elon Musk in several regards.  For example, a bailout of SolarCity would protect Elon Musk against personal loss arising from his personally guaranteed loans to SolarCity.  A bailout of SolarCity also provides Elon Musk with the ability to save his favored investors from tremendous loss now and, at the same time, preserve his ability to seek additional capital for his other enterprises in the future.  Elon Musk is considered a visionary in alternative energy, electric cars and space travel, and a public failure of SolarCity will greatly impair Elon Musk's reputation and his visionary status.

298.   As a result of Elon Musk's breaches of fiduciary duties, the Company has suffered and will continue to suffer harm, including, but not limited to, the excessive consideration to be paid to acquire SolarCity and the negative effects on Tesla's financial condition that will result from the Acquisition.

### SECOND CAUSE OF ACTION

**Derivatively on Behalf of Tesla Against the Tesla Defendants
for Breach of the Fiduciary Duty of Loyalty by
Causing Tesla to Acquire SolarCity**

299.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

102

300.   As alleged in detail herein, as directors and/or officers of Tesla, each of the Individual Defendants had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests.

301.   Each of the Individual Defendants breached his or her fiduciary duty of loyalty by causing and/or allowing Tesla to enter into the self-dealing SolarCity Acquisition, which was not, and could not have been, an exercise of good faith business judgment.  Rather, the SolarCity Acquisition was intended to, and did, unduly benefit Elon Musk and his cousins, at the expense of the Company and its minority stockholders.

302.   As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, the Company has sustained substantial damages, as alleged herein.

### THIRD CAUSE OF ACTION

### Derivatively on Behalf of Tesla Against Elon Musk, Kimbal Musk, Gracias, Buss and Jurvetson for Unjust Enrichment

303.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

304.   The Acquisition was specifically intended to bailout SolarCity and spread across all of Tesla's stockholders the loss that would otherwise be experienced only by Defendants Elon Musk, Kimbal Musk, Gracias, Buss and Jurvetson on their substantial investments in SolarCity.  The Acquisition forces Tesla and all its

stockholders to absorb a portion of SolarCity's losses irrespective of whether they currently hold SolarCity stock themselves.

305.   Accordingly, defendants Elon Musk, Kimbal Musk, Gracias, Buss and Jurvetson will receive improper profits as a result of the SolarCity Acquisition, as alleged herein.

306.   It would be unconscionable and against the fundamental principles of justice, equity and good conscience for such defendants to retain the improper benefits they receive as a result of the SolarCity Acquisition.

307.   To remedy the unjust enrichment of these defendants, the Court should order them to disgorge to the Company all benefits derived from the SolarCity Acquisition.

## FOURTH CAUSE OF ACTION

### Individual and Class Claim Against the Tesla Defendants for Breach of Fiduciary Duty

308.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

309.   Plaintiffs bring this Count IV individually and on behalf of the Class.

310.   The Tesla Defendants, as directors of Tesla, owed the minority stockholders of Tesla fiduciary duties of loyalty and care.  The Acquisition is intended to unduly benefit controlling stockholder Elon Musk at the expense of the Class through the improper transfer of economic and voting power from the individual Class

104

members to the Company's controlling stockholder.  Thus, in approving the Merger

Agreement and the Share Issuance and allowing the self-dealing Acquisition to take

place, the Tesla Defendants breached their fiduciary duty to the Class.

311.   The Tesla Defendants' breach of their fiduciary duty to the minority

stockholders entitles the Class to damages and other monetary relief, as well as

equitable relief, including rescission of the Merger Agreement and declaratory relief

to prevent the dilution of voting rights.

312.   Plaintiffs have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Individual and Class Claim Against Elon Musk
### for Breach of Fiduciary Duty as Controlling Stockholder

313.   Plaintiffs incorporate by reference and reallege each and every allegation

set forth above, as though fully set forth herein.

314.   Plaintiffs bring this Count V individually and on behalf of the Class.

315.   As the controlling stockholder of Tesla, Elon Musk had a fiduciary duty

to, among other things, act in furtherance of the best interests of the Company's

minority stockholders so as to benefit all stockholders equally and not in furtherance

of his own personal interests.

316.   Elon Musk breached his fiduciary duty by causing Tesla to enter into the

self-dealing Acquisition at a price that is unfair to the Company in order to unduly

benefit himself at the expense of the Company's minority stockholders through the

improper transfer of economic and voting power from the individual Class members to himself.

317.   As detailed herein, the Acquisition is intended to unduly benefit Elon Musk at the expense of the Class.  Thus, Elon Musk breached his fiduciary duty to the Class.

318.   Furthermore, the Share Issuance constitutes an improper expropriation of economic value and voting power from Tesla's public stockholders to its controlling stockholder Elon Musk.

319.   Therefore, the Acquisition and Share Issuance will not result in an equal dilution of each of the Company's shares.  Instead, the public stockholders will suffer a separate harm resulting from the extraction from the public stockholders, and redistribution to the controlling stockholder, of a portion of the economic value and voting power embodied in the minority interest.  Consequently, Tesla's public stockholders are entitled to recover the value represented by the overpayment.

### SIXTH CAUSE OF ACTION

**Derivatively on Behalf of Tesla Against the Tesla Defendants
for Waste**

320.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

321.   The Tesla Defendants owed Tesla the obligation to avoid wasting Tesla's assets.

322.   The Acquisition served no legitimate corporate purpose of Tesla and could not have been based on a valid assessment of Tesla's best interests.  Rather, the Acquisition was orchestrated and executed in order to advance the interests of SolarCity and the Tesla Defendants at the expense of Tesla.

323.   The Acquisition is so one-sided that no business person of ordinary, sound judgment could conclude that Tesla received adequate value in the transaction.

324.   The Tesla Defendants breached their obligations to Tesla and wasted corporate assets by proposing, approving, and implementing the Acquisition without proper corporate purpose, resulting in a needless and wasteful use of corporate assets.

325.   As a direct and proximate result of the waste of corporate assets by the Tesla Defendants, Tesla has been and continues to be damaged.

## SEVENTH CAUSE OF ACTION

### Individual and Class Claim Against the Tesla Defendants
### for Breach of the Duty of Disclosure

326.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

327.   Plaintiffs bring this Count VII individually and on behalf of the Class.

328.   As directors, officers and/or the controlling stockholder of Tesla, the fiduciary duties of each of the Tesla Defendants included the obligation to make full, accurate and non-misleading disclosures to Tesla's stockholders in connection with the Acquisition and any stockholder vote thereon.

329.   As alleged herein (¶¶191-217), the Tesla Defendants violated their duty of disclosure by making materially false, misleading and incomplete statements regarding the Acquisition and the circumstances surrounding it, including, without limitation, the purpose of the Acquisition, the flaws in Evercore's financial analyses, and the independence of the Tesla Board that negotiated and approved the Acquisition.

330.   As a result of the foregoing conduct and the consummation of the Acquisition, the Tesla Defendants breached the fiduciary duties they owed to Plaintiffs and the Class, and Plaintiffs and the Class suffered injury as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Certifying this action as a class action;

B.   Awarding Plaintiffs and the Class monetary and equitable relief against the Tesla Defendants for the expropriation of value that Plaintiffs and the Class sustained as a result of the Tesla Defendants' breaches of their fiduciary duties;

C.      Awarding Plaintiffs and the Class monetary and equitable relief against the Tesla Defendants for their breaches of fiduciary duties owed to the minority stockholders;

D.      Awarding the Company the amount of damages sustained as a result of the Tesla Defendants' breaches of fiduciary duties;

E.      Ordering Elon Musk, Kimbal Musk, Gracias, Jurvetson and Buss to disgorge to the Company improper benefits they receive in connection with the Acquisition;

F.      Declaring that the Tesla stockholders' approval of the Acquisition was not adequately informed;

G.      Awarding rescissory damages;

H.      Granting further appropriate equitable relief to remedy Defendants' breaches of fiduciary duty and unjust enrichment;

I.      Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

J.      Granting such other and further relief as the Court deems just and proper.

DATED:  March 9, 2017

**GRANT & EISENHOFER P.A.**

*/s/ James J. Sabella*
Jay W. Eisenhofer (#2864)
James J. Sabella (#5124)
123 Justison Street
Wilmington, DE  19801
Tel:  (302) 622-7000
Fax:  (302) 622-7100

***Co-Lead Counsel for Plaintiffs***

**OF COUNSEL:**

**ROBBINS GELLER RUDMAN & DOWD LLP**
Randall J. Baron
David T. Wissbroecker
Maxwell R. Huffman
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel:  (619) 231-1058
Fax: (619) 231-7423

**PRICKETT, JONES & ELLIOTT, P.A.**
Michael Hanrahan (#941)
Paul A. Fioravanti, Jr. (#3808)
Samuel L. Closic (#5468)
1310 N. King Street
Wilmington, Delaware 19801
Tel:  (302) 888-6500
Fax: (302) 658-8111

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Lee D. Rudy
Eric L. Zagar
Robin Winchester
Kristen L. Ross
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax: (610) 667-7056

**LABATON SUCHAROW LLP**

Ned Weinberger (#5256)
Ryan T. Keating (#5504)
Thomas Curry (#5877)
300 Delaware Ave., Suite 1340
Wilmington, Delaware  19801
Tel:  (302) 573-2540
Fax:  (302) 573-2529

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Mark Lebovitch
Jeroen van Kwawegen
1251 Avenue of the Americas
New York, NY  10020
Tel: (212) 554-1400
Fax: (212) 554-1444

**GUTTMAN, BUSCHNER & BROOKS PLLC**

Justin S. Brooks (#6119)
501 Silverside Road, Suite 12
Wilmington, DE 19809
(302) 327-9210

**FRIEDLANDER & GORRIS, P.A.**

Joel Friedlander (#3163)
Jeffrey M. Gorris (#5012)
1201 N. Market Street, Suite 2200
Wilmington, DE 19801
(302) 573-3500

*Additional Counsel for Plaintiffs*

111