**KELLER LENKNER LLC**
Ashley C. Keller (*admitted pro hac vice*)
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
Telephone: (312) 741-5222
ack@kellerlenkner.com

U. Seth Ottensoser (*admitted pro hac vice*)
1330 Avenue of the Americas, Suite 23A
New York, NY 10019
Telephone: (212) 653-9715
so@kellerlenkner.com

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
David J. Schwartz
Francis P. McConville
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
dschwartz@labaton.com
fmcconville@labaton.com

*Counsel for the Tesla Investor Group and*
*Proposed Co-Lead Counsel for the Class*
[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| KALMAN ISAACS, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br><br>            v.<br><br>ELON MUSK and TESLA, INC,<br><br>                    Defendants. | Case No. 3:18-cv-04865-EMC<br><br>**CLASS ACTION**<br><br>**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE TESLA INVESTOR GROUP FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL; AND IN OPPOSITION TO COMPETING MOTIONS**<br><br>Date:        November 15, 2018<br>Time:        1:30 p.m.<br>Courtroom:   5 – 17th Floor<br>Judge:       Hon. Edward M. Chen |

*(caption continues on the following pages)*

| | |
|---|---|
| WILLIAM CHAMBERLAIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TESLA INC., and ELON MUSK,<br><br>Defendants. | Case No. 3:18-cv-04876-EMC |
| JOHN YEAGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TESLA, INC. and ELON MUSK,<br><br>Defendants. | Case No. 3:18-cv-04912-EMC |
| CARLOS MAIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TESLA, INC. and ELON R. MUSK,<br><br>Defendants. | Case No. 3:18-cv-04939-EMC |
| KEWAL DUA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TESLA, INC. and ELON MUSK,<br><br>Defendants. | Case No. 3:18-cv-04948-EMC |

*(caption continues on the following page)*

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE TESLA INVESTOR GROUP, NO. 3:18-CV-04865-EMC

JOSHUA HORWITZ, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

TESLA INC., and ELON R. MUSK,

Defendants.

Case No. 3:18-cv-05258-EMC

---

ANDREW E. LEFT, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

TESLA INC., and ELON R. MUSK,

Defendants.

Case No.  3:18-cv-05463-EMC

---

ZHI XING FAN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

TESLA INC., and ELON R. MUSK,

Defendants.

Case No.  4:18-cv-05470-EMC

---

SHAHRAM SODEIFI, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

TESLA, INC., a Delaware corporation, and ELON R. MUSK, an individual,

Defendants.

Case No.  3:18-cv-05899-EMC

1

# **TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ............................................................................................... ii

3   PRELIMINARY STATEMENT ........................................................................................ 1

4   ARGUMENT ..................................................................................................................... 1

5   I.      THE TESLA INVESTOR GROUP IS THE MOST ADEQUATE
           PLAINTIFF IN THIS LITIGATION .................................................................. 1

6        A.     The PSLRA Expressly Contemplates Groups as Lead Plaintiff ............. 1

7        B.     Only the Tesla Investor Group Provides the Necessary
                Diversification to Adequately Represent the Class ................................ 4

8

9   II.     MULTIPLE MOVANTS MISSTATE BASIC FINANCIAL CONCEPTS .................... 6

10      A.     An Economically Sound Method of Calculating Damages
                Confirms That Littleton, Bridgestone, and FNY Suffered Smaller
11               Losses Than They Report ..................................................................... 6

12          1.     Littleton ................................................................................... 7

13          2.     Bridgestone ............................................................................. 7

14          3.     FNY ....................................................................................... 7

15      B.     Short Sellers Are Entitled to the Fraud-on-the-Market
                Presumption, But Tempus and OUF's Trading Activity May
16               Subject Them to Unique Defenses ........................................................ 8

17      C.     Options Traders Such as Littleton and Bridgestone Are Subject to
                Unique Defenses and Damages Theories That Render Them
18               Inadequate or Atypical .......................................................................... 9

19   III.    ALLEGATIONS OF IMPROPRIETY AGAINST MEMBERS OF THE
           TESLA INVESTOR GROUP DO NOT BEAR ON THEIR FITNESS TO
20          SERVE ............................................................................................................. 11

21   IV.    EVEN EXCLUDING MSSRS. LEFT AND BOUTIN, THE TESLA
           INVESTOR GROUP IS STILL SUPERIOR AS LEAD PLAINTIFF ......................... 13

22

23   V.     IF ANY LAW FIRM HAS A DISQUALIFYING CONFLICT OF
           INTEREST, IT IS ROBBINS GELLER, NOT LABATON SUCHAROW .................. 15

24   CONCLUSION ................................................................................................................. 15

25

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*Affiliated Ute Citizens of the State of Utah v. United States*,
5
    406 U.S. 128 (1972)...........................................................................................................6

6

*Aronson v. McKesson HBOC, Inc.*,
    79 F. Supp. 2d 1146 (N.D. Cal. 1999) .............................................................................2
7

*Andrada v. Atherogenics, Inc.*,
8
    No. 05CV61(RJH), 2005 WL 912359 (S.D.N.Y. Apr. 19, 2005) ....................................9

9

*In re Baan Co. Sec. Litig.*,
10
    186 F.R.D. 214 (D.D.C. 1999) .........................................................................................2

11

*Bang v. Acura Pharm., Inc.*,
    No. 10 C 5757, 2011 WL 91099 (N.D. Ill. Jan. 11, 2011) ..........................................3, 4
12

*In re Bank of Am. Corp. Auction Rate Sec. Mktg. Litig.*,
13
    No. MDL 09-02014 JSW, 2009 WL 2710413 (N.D. Cal. Aug. 26, 2009).......................2

14

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
15
    No. 09 MD 2058 (PKC), 2013 WL 1558686 (S.D.N.Y. Apr. 11, 2013).............................4

16

*Barnet v. Elan Corp., Pub. Ltd. Co.*,
    236 F.R.D. 158 (S.D.N.Y. 2005) ..................................................................................3, 4
17

*Bayer v. Neiman Marcus Grp., Inc.*,
18
    861 F.3d 853 (9th Cir. 2017) ............................................................................................6

19

*Binder v. Gillespie*,
20
    184 F.3d 1059 (9th Cir. 1999) ........................................................................................10

21

*Bruce v. Suntech Power Holdings Co.*,
    No. CV 12-04061 RS, 2012 WL 5927985 (N.D. Cal. Nov. 13, 2012)........................2, 4
22

*In re Cable & Wireless, PLC, Sec. Litig.*,
23
    217 F.R.D. 372 (E.D. Va. 2003) ......................................................................................4

24

*In re Cardinal Health Sec. Litig.*,
    226 F.R.D. 298 (S.D. Ohio 2005)...................................................................................14
25

*In re Cavanaugh*,
26
    306 F.3d 726 (9th Cir. 2002) ............................................................................................2

27

28

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)......................................................................................4

*In re Charles Schwab Sec. Litig.*,
    No. C 08-01510 WHA, 2008 WL 2635495 (N.D. Cal. July 3, 2008) ...................3, 4

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) ............................................................................13

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005). ECF No. 107..........................................................................7

*Emerson v. Genocea Biosciences, Inc.*,
    No. 17-12137-PBS, 2018 WL 839382 (D. Mass. Feb. 12, 2018)............................3

*In re eSpeed, Inc. Sec. Litig.*,
    232 F.R.D. 95 (S.D.N.Y. 2005) ...............................................................................6

*Flatt v. Superior Court*,
    885 P.2d 950 (Cal. 1994) .......................................................................................15

*Green v. Occidental Petroleum Corp.*,
    541 F.2d 1335 (9th Cir. 1976) .................................................................................6

*Hall v. Nat'l Recovery Sys. Inc.*,
    No. 96-132-CIV-T-17(C), 1996 WL 467512 (M.D. Fla. Aug. 9, 1996) .................13

*Harris v. Vector Mktg. Corp.*,
    753 F. Supp. 2d 996 (N.D. Cal. 2010) .........................................................11, 13, 14

*Hodges v. Akeena Solar, Inc.*,
    263 F.R.D. 528 (N.D. Cal. 2009).............................................................................2

*Johnson v. OCZ Tech. Grp., Inc.*,
    No. CV 12-05265 RS, 2013 WL 75774 (N.D. Cal. Jan. 4, 2013) ...........................4

*Lamie v. United States Trustee*,
    540 U.S. 526 (2004)..................................................................................................1

*In re Leapfrog Enters., Inc. Sec. Litig.*,
    No. C-03-05421 RMW, 2005 WL 3801587 (N.D. Cal. Nov. 23, 2005) ..................11, 13, 14

*Levie* v. *Sears, Roebuck & Co.*,
    496. F. Supp. 2d 944 (N.D. Ill. 2007) ....................................................................11

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)....................................................................................15

*Margolis v. Caterpillar, Inc.*,
    815 F. Supp. 1150 (C.D. Ill.1991) ...................................................................9

*McCracken v. Edwards Lifesciences Corp.*,
    No. 813CV1463JLSRNBX, 2014 WL 12694135 (C.D. Cal. Jan. 8, 2014) ....................2

*McGuire v. Dendreon Corp.*,
    No. C07-800MJP, 2008 WL 418122 (W.D. Wash. Feb. 13, 2008)..............................13

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000), *as amended* (June 19, 2000) ...................................6

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
    No. 05-cv-1151-SRC-CLW, slip op. (D.N.J. June 28, 2016), ECF No. 896......................4

*In re MGM Mirage Sec. Litig.*,
    No. 2:09-CV-01558-GMN, 2010 WL 4316754 (D. Nev. Oct. 25, 2010) ......................4

*In re MicroStrategy Inc. Sec. Litig.*,
    110 F. Supp. 2d 427 (E.D. Va. 2000) ...............................................................5

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)............................................................................6

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    182 F.R.D. 42 (S.D.N.Y. 1998) ......................................................................5

*In re Peregrine Sys. Sec. Litig.*,
    No. CIV. 02 CV 870-J(RBB), 2002 WL 32769239 (S.D. Cal. Oct. 11, 2002) ..............12, 13

*Perrin v. Sw. Water Co.*,
    No. 208CV7844FMCAGRX, 2009 WL 10654690 (C.D. Cal. Feb. 13, 2009) ....................2, 3

*Porzio v. Overseas Shipholding Grp.*,
    No. 12 CIV. 7948, 2013 WL 407678 (S.D.N.Y. Feb. 1, 2013)...................................3

*In re Regions Morgan Keegan Closed-End Fund Litig.*,
    No. 07-02830, 2010 WL 5173851 (W.D. Tenn. Dec. 15, 2010) ...............................14

*Richard NMI Bell v. Acendant Sols., Inc.*,
    No. CIV. A. 3:01-CV-0166, 2002 WL 638571 (N.D. Tex. Apr. 17, 2002) ...................5

*Robb v. Fitbit, Inc.*,
    No. 16-cv-00151-SI, 2016 WL 2654351 (N.D. Cal. May 10, 2016)............................3

*Ross v. Abercrombie & Fitch Co.*,
    No. 05-cv-819, 2007 WL 895073 (S.D. Ohio Mar. 22, 2007)...................................2

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ...........................................................................................8

*Senne v. Kansas City Royals Baseball Corp.*,
   315 F.R.D. 523 (N.D. Cal. 2016) ...................................................................................11

*In re Surebeam Corp. Sec. Litig.*,
   No. 03 CV 1721JM(POR), 2004 WL 5159061 (S.D. Cal. Jan. 5, 2004)........................13, 14

*In re Target Corp. Customer Data Sec. Breach Litig.*,
   892 F.3d 968 (8th Cir. 2018) ...........................................................................................5

*Weikel v. Tower Semiconductor Ltd.*,
   183 F.R.D. 377 (D.N.J. 1998)...........................................................................................9

*Wood v. Capital One Auto Fin., Inc.*,
   No. 06-CV-7, 2006 WL 6627680 (E.D. Wis. Sept. 19, 2006)..............................................13

*Yousefi v. Lockheed Martin Corp.*,
   70 F. Supp. 2d 1061 (C.D. Cal. 1999) ..............................................................................5

**Statutes**

15 U.S.C. § 78u4(a) et seq. ........................................................................................ *passim*

**Docketed Case**

*In re Tesla Motors, Inc. Stockholder Litig.*,
   C.A. No. 12711-VCS (Del. Ch.)........................................................................................15

**Other Authorities**

Fed. R. Civ. P. 23 .................................................................................................... *passim*

# PRELIMINARY STATEMENT

The Tesla Investor Group is the Court's best choice for lead plaintiff.[1]  No other movant presents the Group's combination of size, adequacy, typicality, and diversification—a combination that will be critical to maximizing recovery for the entire class given the unique circumstances of this case.  Other movants' lawyer-driven arguments that attack the adequacy of groups are counter to the plain text of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and case law interpreting it.  Moreover, many movants miscalculate and overstate their own losses and suffer from unique defenses that render them poor candidates to lead this litigation.  For the reasons discussed below, the Tesla Investor Group should be appointed lead plaintiff, its selection of counsel should be approved, and the competing motions should be denied.

# ARGUMENT

## I.  THE TESLA INVESTOR GROUP IS THE MOST ADEQUATE PLAINTIFF IN THIS LITIGATION

### A.  The PSLRA Expressly Contemplates Groups as Lead Plaintiff

Several movants—and even the Defendants themselves—self-servingly argue that a group cannot be appointed as lead plaintiff.  The Court need not look beyond the PSLRA itself to reject that false assertion.  The PSLRA expressly requires the Court to "appoint as lead plaintiff" the "member *or members*" of the class that meet the statutory requirements; the "person *or group of persons*" with the biggest financial stake and that satisfies Rule 23 is entitled to a rebuttable presumption of being the most adequate plaintiff.  15 U.S.C. § 78u4(a)(3)(B)(i), (iii) (emphases added).  Absent statutory ambiguity, "the sole function of the courts . . . is to enforce the statute according to its terms."  *Lamie v. United States Trustee,* 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Unions Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  The PSLRA is no exception, and courts cannot invoke judicial policy preferences as a means of

---

[1]  Capitalized terms are defined in the Tesla Investor Group's moving and opposition memoranda unless otherwise indicated. ECF Nos. 47, 108.

1    sidestepping unambiguous statutory text.  *See In re Cavanaugh*, 306 F.3d 726, 729–31 (9th Cir.

2    2002); *In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 216 (D.D.C. 1999).

3           Accordingly, any contentions about Tesla Investor Group members' lack of pre-litigation

4    relationships are justified only to the extent they bear on the Group's adequacy pursuant to Rule

5    23.  Any lead plaintiff—whether a group or an individual—is inadequate to protect the interests

6    of the class if subservient to counsel.  But that legitimate concern carries no weight here, and no

7    opposition brief proves otherwise.[2]   Defendants and competing movants cannot rebut the

8    undisputed facts that: (1) the Tesla Investor Group was formed after one of its *members*

9    suggested a combination of varied investors to best represent the class; (2) every member of the

10   Group is a sophisticated institutional or high-net-worth investor with decades of financial

11   experience; and (3) the Group's *members* agreed upon litigation-management procedures to

12   maximize recovery for the class.  *See* Joint Declaration of the Tesla Investor Group (ECF No.

13   51-4); Supplemental Joint Declaration of the Tesla Investor Group, Wagstaffe Decl., Ex. A.  The

14   Group's joint declarations confirm these facts and that the Group will adequately represent the

15   class.[3]  It strains credulity to suggest that the sophisticated members of the Tesla Investor Group

16

17   _____

18   [2]     The Tesla Investor Group consists of sophisticated investors who have set forth a plan for
     jointly overseeing this litigation.  That distinguishes the Group from those in cases cited by
19   David and Bridgestone, which involved large groups that failed to establish their cohesiveness.
     *See, e.g.*, *Ross v. Abercrombie & Fitch Co*., No. 05-cv-819, 2007 WL 895073, at *2, *4 (S.D.
20   Ohio Mar. 22, 2007) (where four individuals failed to submit "any type of joint affidavit or
     declaration from the group members concerning their cohesiveness," there "was no basis from
21   which to ascertain the ability of the" group or its members "to fairly and adequately represent the
     interests of the class"); *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1153–54 (N.D.
22   Cal. 1999) (where "groups as large as 4,000 plaintiffs strong [were] vying for appointment," the
     court expressed concerns over "assembling groups of litigants that will find it difficult to
23   coordinate their supervision of the representation").
     [3]     *See In re Bank of Am. Corp. Auction Rate Sec. Mktg. Litig.*, No. MDL 09-02014 JSW,
24   2009 WL 2710413, at *3 (N.D. Cal. Aug. 26, 2009).  Indeed, when courts in this Circuit have
     evaluated proposed lead plaintiff groups, they have routinely approved small groups such as the
25   Tesla Investor Group upon a showing of cohesion based on a joint declaration that addresses
     procedures for communication, decision-making, and managing the litigation, as well as an
26   understanding of the responsibilities of lead plaintiff and a demonstrated enthusiasm for
     achieving optimal results for the class.  *See, e.g.*, *McCracken v. Edwards Lifesciences Corp.*, No.
27   813CV1463JLSRNBX, 2014 WL 12694135, at *4 (C.D. Cal. Jan. 8, 2014); *Bruce v. Suntech
     Power Holdings Co.*, No. CV 12-04061 RS, 2012 WL 5927985, at *2–3 (N.D. Cal. Nov. 13,
28   2012); *Hodges v. Akeena Solar, Inc.*, 263 F.R.D. 528, 533 (N.D. Cal. 2009); *Perrin v. Sw. Water
     Co.*, No. 208CV7844FMCAGRX, 2009 WL 10654690, at *3 (C.D. Cal. Feb. 13, 2009).

1    are controlled by their chosen counsel.  That an iconic investor such as Andrew Left or a hedge

2    fund such as Vilas Capital would bend to their lawyers' will is too extravagant to be taken

3    seriously.  The members of the Tesla Investor Group have been, and will be, the driving force in

4    this case.

5         This Court and countless others routinely appoint investor groups such as the Tesla

6    Investor Group as lead plaintiff pursuant to the PSLRA.  *See Bruce*, 2012 WL 5927985, at *2

7    (appointing a group as lead plaintiff, noting "[t]his is a small and cohesive group, in accordance

8    with the PSLRA's goal of having an engaged lead plaintiff").[4]  If that argument sounds familiar

9    to other movants' counsel, it should: each firm attacking the propriety of appointing a group in

10   this case has *successfully* moved for appointment of a group as lead plaintiff in prior cases.[5]  The

11   only lawyer-driven concern here is opposing counsel's extra-textual, meritless attack on the

12   Tesla Investor Group.

13        Not only does the PSLRA expressly authorize groups to serve as lead plaintiff, but

14   empirical evidence suggests that groups achieve superior results—and groups such as the Tesla

15   Investor Group that include at least one financial institution perform better still:

16        [O]ur data supports the view that *groups perform better than individuals as lead*
17        *plaintiffs in larger cases*, while groups that include an entity yield larger
         settlements and greater provable loss ratios than those that occur with mere
18        aggregation of individuals.  These are among the most surprising findings of our
         study because most commentators (ourselves included) have cast a skeptical eye
19        toward aggregation as a means of finding the most adequate plaintiff.  However,

20   _____

21   [4]    *See also, e.g.*, *Robb v. Fitbit*, Inc., No. 16-cv-00151-SI, 2016 WL 2654351, at *4–7 (N.D.
     Cal. May 10, 2016) (appointing the unrelated investors in the "Fitbit Investor Group" as lead
22   plaintiff); *Johnson v. OCZ Tech. Grp., Inc.*, No. CV 12-05265 RS, 2013 WL 75774, at *3 (N.D.
     Cal. Jan. 4, 2013) ("Small, cohesive groups similar to the OCZ Investor Group are routinely
23   appointed as Lead Plaintiff in securities actions when they have shown their ability to manage
     the litigation effectively in the interests of the class without undue influence of counsel.");
24   *Perrin*, 2009 WL 10654690, at *3 (finding a group of four plaintiffs "not so large as to be
     unwieldy or unmanageable").

25   [5]    *See, e.g.*, *Emerson v. Genocea Biosciences, Inc.*, No. 17-12137-PBS, 2018 WL 839382
     (D. Mass. Feb. 12, 2018) (Levi & Korsinsky; five-member group); *Porzio v. Overseas*
26   *Shipholding Grp.*, No. 12 CIV. 7948, 2013 WL 407678 (S.D.N.Y. Feb. 1, 2013) (Robbins
     Geller; three-member group); *Bang v. Acura Pharm., Inc.*, No. 10 C 5757, 2011 WL 91099
27   (N.D. Ill. Jan. 11, 2011) (Kahn Swick; three-member group); *In re Charles Schwab Sec. Litig.*,
     No. C 08-01510 WHA, 2008 WL 2635495 (N.D. Cal. July 3, 2008) (Hagens Berman; six-
28   member group); *Barnet v. Elan Corp., Pub. Ltd. Co.*, 236 F.R.D. 158 (S.D.N.Y. 2005) (Entwistle
     & Cappucci co-lead counsel; six-member group).

1        our earlier supposition that a group would perform worse than an individual is not borne out by our settlement size and provable loss data.[6]

2

3 Perhaps those "surprising findings" are why Defendants themselves have taken the unusual step

4 of opposing a group appointment.  *See* ECF No. 105, at 1–2.

5        **B.**     **Only the Tesla Investor Group Provides the Necessary Diversification to Adequately Represent the Class**

6

7        The Tesla Investor Group offers the broadest spectrum of representation for a class that

8 encompasses multiple Tesla securities, trading strategies, and transactions that occurred

9 throughout the relevant class period.  No other movant purports to be as inclusive.

10        The class consists of all injured purchasers and sellers of Tesla securities between August

11 7, 2018 and August 17, 2018, both inclusive.  Defendants complain that lumping purchasers and

12 sellers together "makes no sense."  *Id.* at 2.  That is false.  The proposed class definition is

13 designed to represent *all* those harmed by Defendants' misconduct: purchasers of stock and call

14 options suffered losses, as did sellers of put options; long-only buyers sustained injury, as did

15 short sellers who covered their positions.  Regardless of investment strategy, every member of

16 the Tesla Investor Group can point to one reason for their loss: Defendants' series of false and

17 misleading statements.  Indeed, those losses occurred across the entire class period, not just in

18 the first few days of activity.  Accordingly, the Group provides this Court with an elegant and

19 efficient leadership solution in this complex matter.[7]

20

21

22      [6]     James D. Cox & Randall S. Thomas, *Does the Plaintiff Matter? An Empirical Analysis of Lead Plaintiffs in Securities Class Actions*, 100 Colum. L. Rev. 1587, 1638–39 (2006) (emphasis added); *see also, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 217–18 (3d Cir. 2001) ($3.2

23 billion recovery); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, No. 05-cv-1151-SRC-CLW, slip op. at 2, 11 (D.N.J. June 28, 2016), ECF No. 896 ($1.062 billion recovery); *In re

24 Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, No. 09 MD 2058 (PKC), 2013 WL 1558686, at *1–2 (S.D.N.Y. Apr. 11, 2013) ($4.25 billion recovery).

25      [7]     Courts consider broad representation an important factor in evaluating lead plaintiffs in

26 complex matters.  *See, e.g.*, *In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2010 WL 4316754, at *5 (D. Nev. Oct. 25, 2010) (appointing co-lead plaintiff who exclusively purchased

27 debt securities "in order to ensure that all plaintiffs are adequately represented"); *In re Cable & Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372, 375–77 (E.D. Va. 2003) ("exercising discretion to

28 appoint institution co-lead plaintiff with individual investor because individual had purchased defendant issuer's American Depositary Receipts on NYSE, whereas institution could represent

1    Movants who have among the smallest financial interests attempt to manufacture a role

2    for themselves by arguing that the solution to Rule 23 problems is to appoint subclasses of

3    investors to represent varied interests within the class.  That is not the appropriate course.  It is

4    highly unusual to appoint subclasses, particularly at the lead plaintiff phase.  *See In re*

5    *MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 440 (E.D. Va. 2000).  The logic is sound:

6    subclasses have as much if not more opportunity to undercut one another than do differently

7    situated parties represented as part of a single class.  *In re Target Corp. Customer Data Sec.*

8    *Breach Litig.*, 892 F.3d 968, 974 (8th Cir. 2018).  The possibility of inconsistent arguments and

9    conflicting evidence among subclasses serves only to minimize overall recovery.  No doubt that

10   is why Defendants seek to divide the varied investor constituencies so they can pit them against

11   one another.  ECF No. 105, at 2.

12   That said, although some tension among class members is natural in securities class

13   actions, the concerns are acute in this case: Tesla is a heavily shorted stock, so the class includes

14   many short sellers; the stock also has a significant number of relatively small "retail investors,"

15   which limits the number of large, sophisticated, "long-only" investors who would have traded

16   during the short class window; and because of Tesla's high volatility and speculative nature,

17   many investors chose to invest through options and other derivative products.  The Tesla

18   Investor Group was *formed* to solve the anticipated problems posed by these varying interests,

19   without the need for subclasses.   The Group's members—sophisticated individual and

20   institutional long investors; short sellers buying to cover; and options traders active in both calls

21   and puts—transacted and suffered losses throughout the entire class period.  Only the Tesla

22   Investor Group has significant losses, satisfies the adequacy and typicality requirements of Rule

23   23, and can best manage the inherent and pronounced tension that exists among the various types

24

25   purchasers of defendant issuer's common stock on London Stock Exchange"); *see also In re*
     *Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y. 1998); *Yousefi v. Lockheed*
26   *Martin Corp.*, 70 F. Supp. 2d 1061, 1071 (C.D. Cal. 1999).  In addition, the geographic diversity
     of the Tesla Investor Group "helps create balance among the demographics of the lead plaintiff
27   group members, and improves diversity of experience"—as opposed to the shallow arguments to
     the contrary from opposing movants.  *Richard NMI Bell v. Acendant Sols., Inc.*, No. CIV. A.
28   3:01-CV-0166, 2002 WL 638571, at *5 (N.D. Tex. Apr. 17, 2002).

1   of investors that were harmed in this case.  In every sense of the term, the Group is the *most*

2   *adequate* plaintiff.

3   **II.      MULTIPLE MOVANTS MISSTATE BASIC FINANCIAL CONCEPTS**

4              **A.      An Economically Sound Method of Calculating Damages Confirms That
                         Littleton, Bridgestone, and FNY Suffered Smaller Losses Than They Report**

5

6              Calculating damages in securities fraud cases can be a complex and daunting task.

7   Investors present data in different formats and often report hundreds of lines of trading data,

8   leaving the court to decipher the submissions.  *See, e.g.* ECF No. 40-1, Ex. A.  At bottom,

9   however, the law treats securities cases the same as most any tort: A proper damages analysis

10  seeks to place the injured party in the position it would have been in but for Defendants'

11  misconduct.  *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 872 (9th Cir. 2017) (citing

12  *Schneider v. Cty. of San Diego*, 285 F.3d 784, 795 (9th Cir. 2002)).  If an investor buys or sells a

13  security at a price that is tainted by fraud, her damages are based on the difference between the

14  effected price and the price that would have been obtained absent fraud.  *Affiliated Ute Citizens*

15  *of the State of Utah v. United States*, 406 U.S. 128, 154–55 (1972); *Green v. Occidental*

16  *Petroleum Corp.*, 541 F.2d 1335, 1341–46 (9th Cir. 1976).  The most sensible way to measure

17  the fraud premium (or discount) of a security is to compare its market price before and

18  immediately after the market reacts to the truth.  *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir.

19  2000).  At most, the PSLRA allows investors to base the post-fraud price on the 90-day

20  arithmetic average following the corrective disclosure.  *In re Mego Fin. Corp. Sec. Litig.*, 213

21  F.3d 454, 461 (9th Cir. 2000), *as amended* (June 19, 2000) (citing 15 U.S.C. § 78u–4(e) (1994)).

22             As some other movants have observed—but, ironically, not applied to their own data—

23  the price at which an investor originally transacted before a security was tainted by fraud is

24  irrelevant.  In addition, transactions that *profit* from a fraud-tainted price must be offset against a

25  movants' losses.  *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005).  Applying

26  those basic principles reveals that some movants have materially overstated their damages to this

27

28

1    Court (while hypocritically criticizing others for engaging in the exact same gamesmanship and

2    manipulation).  The Court should reject movants' deliberate efforts to overstate their damages.

3                    **1.**      **Littleton**

4            Littleton's claimed damages are vastly overstated, as he bases them in large part on

5    options purchased months before Defendants' misstatements.  There is no allegation that options

6    prices were tainted by fraud in February, April, or June 2018, let alone in December 2017, but

7    Littleton's calculation includes trading activity and losses from those periods.  ECF No. 42-2.

8    The price Littleton paid or received for options at those times is irrelevant.  The proper inquiry is

9    to compare the price *during* the class period to the price that would have obtained had the market

10   known the truth.  Correcting for Littleton's improper reference to pre-fraud transactions results in

11   total damages of less than $2.2 million—a decline of more than $1.3 million from what he first

12   reported.

13                   **2.**      **Bridgestone**

14           Bridgestone's reported damages in its opposition motion are even more misleading.

15   Bridgestone correctly remarks that reference to pre-fraud transactions cannot form the basis of

16   recovery under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  ECF No. 107, at 3–

17   4.  But although it chastises movants who violate that core principle, Bridgestone fails to abide

18   by it.  Throughout its opposition, Bridgestone claims damages of $3.9 million (ECF No. 107, at

19   4), blatantly ignoring that it originally submitted a damages calculation of *less than $2.3 million*.

20   ECF No. 52-2.  Perhaps unsurprisingly, the lower number is accurate based on precisely the

21   analysis Bridgestone says is required.  ECF No. 107, at 3–4.  The higher figure is driven by

22   reference to options purchased prior to the start of the class period, when no allegation of fraud

23   existed.  *Cf. id.* (citing *Dura*, 544 U.S. at 342).  Bridgestone is right on the law, but it is wrong on

24   the facts it has represented to this Court.

25                   **3.**      **FNY**

26           FNY attempts to use its enormous volume of market-maker-like trading to establish the

27   greatest financial interest.  But when calculating losses (for the first time) in its opposition, FNY

28

1    indulges yet another faulty methodology.  It claims approximately $300,000 of losses, based only

2    on the shares of Tesla it *purchased* during the class period.  That ignores the shares that remained

3    net short at artificially inflated prices (indicating that FNY actually *sold more shares than it*

4    *bought* at inflated prices), which fully offset any losses.  FNY points to its expenditure of $148

5    million in Tesla common stock purchases during the class period, concealing the $151 million of

6    simultaneous and frenetic selling activity.  The net result of FNY's trading ultimately produced

7    $2.9 million in proceeds.  Accounting for the post-fraud price of Tesla stock, an appropriate

8    damages methodology produces some $400,000 in trading *profits*.  FNY plainly does not have

9    the largest financial interest.

10   **B.      Short Sellers Are Entitled to the Fraud-on-the-Market Presumption, But**
          **Tempus and OUF's Trading Activity May Subject Them to Unique Defenses**

11

12        Bridgestone and Johnson contend that short sellers cannot receive the presumption of

13   reliance under the fraud-on-the-market doctrine.  ECF Nos. 107, at 4–5, 113, at 5–6.  That

14   position flouts basic legal principles and economic common sense.  The premise of their

15   argument is that short sellers do not rely on an efficient market because when they sell a stock

16   short, they believe the security's price will decline.  But in that same regard, when longs buy a

17   stock, they believe shares will appreciate in value.  Long or short, everyone who transacts in a

18   security does so for profit and believes the market price will move up or down over time.  The

19   fraud-on-the-market doctrine is not predicated on the assumption that investors have no

20   expectation of profit.  Instead, it relies on the assumption that the trading price fairly and

21   accurately reflects all publicly available information, thereby allowing participants to properly

22   assess risk and reward.  As such, the presumption of reliance extends to shorts and longs alike—

23   a short believes the price will ultimately fall, while a long believes it will rise.  *Accord*

24   *Schleicher v. Wendt*, 618 F.3d 679, 684–85 (7th Cir. 2010).

25        The presumption of reliance, however, can be rebutted in situations where a defendant

26   can establish that the plaintiff traded *irrespective* of fraud, such as when short sellers cover due

27   to margin calls or collateral requirements.  ECF No. 108, at 16–18.  For example, trades reported

28

by Tempus and OUF show irregular activity—namely, large purchases of stock at a uniform price that suggests transactions occurred only minutes before the market closed.  While not dispositive, such behavior could indicate a forced sale rather than a conscious choice to close out a short position.  In that situation, a short seller buying to cover is subject to a unique defense that should disqualify them as lead plaintiff.

By contrast, all members of the Tesla Investor Group that held net short positions have attested they made subsequent purchases solely because of the materially false and misleading information disseminated by the Defendants.  Therefore, they cannot be subject to any unique reliance defense that would preclude them from adequately representing the class.

### C.     Options Traders Such as Littleton and Bridgestone Are Subject to Unique Defenses and Damages Theories That Render Them Inadequate or Atypical

Numerous courts have held that investors who traded purely or predominately in options should not serve as lead plaintiff.  *See, e.g.*, *Andrada v. Atherogenics*, Inc., No. 05CV61(RJH), 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005); *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 391 (D.N.J. 1998); *Margolis v. Caterpillar, Inc.*, 815 F. Supp. 1150, 1156 (C.D. Ill.1991).  There are sound economic reasons undergirding that line of authority, which serve as independent grounds to defeat Littleton's and Bridgestone's motions.

An option contract is a derivative instrument because its value is derived by reference to a separate, underlying security.  *See* Supplemental Declaration of Robert M. Daines, Wagstaffe Decl., Ex. B, ¶ 2 n.2.  For example, a call option on a stock is the right—but not the obligation— to buy a share of the stock (and a put option is the right to sell a share of stock) at a specified price (the "strike price") on or before a specified time ("expiration date" or "expiry").  *Id.* ¶¶ 2–3.

Option pricing is more complicated than valuing stock, as multiple factors affect the price of the instruments.  For instance, part of an option's value is inherent in its name—the property by which a holder has the right, but not the obligation, to transact.  *See id.* ¶ 2.  Because they are "options," the time remaining until expiry is key to determining the instruments' value.  The longer the time to expiry, the more an option is worth; as expiry approaches, the value of the

1   option declines.  This is known as "decay" or "Theta."  *Id.* ¶¶ 3–4.  There are two notable

2   features of Theta: *first*, option decay is not linear but instead accelerates exponentially as expiry

3   nears.   *Second*, there is no accepted market signal to measure Theta; derivative investors

4   therefore must model decay on their own, and investors' different assumptions produce different

5   valuations.

6          Those well-established principles pose fatal problems for Littleton and Bridgestone.  The

7   10-day class window in this case saw a series of partial disclosures from Defendants, news

8   reports from investigative reporters, and commentary from the investor community.  As a result,

9   Defendants may argue that any injured option holder during the class period should have to

10  remove up to 10 days of Theta from their damages calculation, as that depreciation in the

11  option's value would have been incurred irrespective of the fraud.  Importantly, considering the

12  extensive series of options that Littleton and Bridgestone traded, the rate of decay in those

13  options would vary widely depending on their disparate times to expiry.  With no generally

14  accepted methodology to calculate Theta, Littleton and Bridgestone could be mired in a

15  complicated and idiosyncratic damages sideshow that would disserve the interests of the overall

16  Class.

17         In addition, and unlike Tesla's stock, a significant number of Tesla options are very

18  thinly traded.  Some of those options experienced a spike in volume in the aftermath of

19  Defendants' misstatements but traded very little (if at all) after the end of the class period.

20  Littleton and Bridgestone traded several of those options series.  That too has the potential to

21  subject Littleton and Bridgestone to unique defenses.  Because illiquid options are thinly traded,

22  they may not be entitled to the presumption of reliance under the fraud-on-the-market doctrine.

23  *See Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (citing *Cammer v. Bloom*, 711 F.

24  Supp. 1264, 1286–87 (D.N.J. 1989)).  And though the Black-Scholes pricing formula could be

25  used as a means of pricing illiquid options to measure damages, Defendants could make

26  arguments concerning the appropriate inputs to the formula: measures of go-forward volatility,

27

28

1    Theta, and abstruse concepts not fleshed out here for brevity's sake (such as Rho, Vega, and

2    Gamma), all of which create significant risk of distraction from the core issues in this case.

3            The Court should not saddle the class with the expense, diversion, and complex analysis

4    necessitated by appointing derivative traders as lead plaintiff.

5    **III.    ALLEGATIONS OF IMPROPRIETY AGAINST MEMBERS OF THE TESLA INVESTOR GROUP DO NOT BEAR ON THEIR FITNESS TO SERVE**

6

7            Tempus and OUF, Bridgestone, and David oppose the adequacy of Mr. Left and Mr.

8    Boutin to serve as class representatives in this litigation in light of past conduct in unrelated

9    matters.   Those past infractions, however, were isolated incidents, were not inherently

10   fraudulent, and did not involve breaches of fiduciary duties.

11           Isolated findings of wrongdoing by a regulator are insufficient to support a finding of

12   inadequacy.  *In re Leapfrog Enters., Inc. Sec. Litig.*, No. C-03-05421 RMW, 2005 WL 3801587,

13   at *4 (N.D. Cal. Nov. 23, 2005).  In fact,

14           issues relating to credibility do not automatically result in inadequacy of a class
             representative; rather, lack of credibility renders a class representative inadequate
15           "only where the representative's credibility is questioned on issues directly
             relevant to the litigation or there are confirmed examples of dishonesty, such as a
16           criminal conviction for fraud."

17   *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 570 (N.D. Cal. 2016) (quoting

18   *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010)); *see Harris*, 753 F.

19   Supp. 2d at 1015–16 (finding that while there were "credibility problems" with the proposed

20   class representative, the "credibility problems [were] not directly relevant to the claims" and did

21   not impact adequacy (emphasis omitted)).[8]

22           Opposing movants fail to provide sufficient facts to warrant disqualification of Mr. Left

23   or Mr. Boutin.  They raise two points about Mr. Left.  *First*, they contend he was barred from

24

25   _____
     [8]      *See also Levie* v. *Sears, Roebuck & Co.*, 496. F. Supp. 2d 944, 950–51 (N.D. Ill. 2007)
26   (appointing as lead plaintiff a day trader who had been sanctioned by the National Association of
     Securities Dealers for engaging in deceptive stock transactions and who had failed to disclose
27   that fact in discovery); Newberg on Class Actions § 3.68 (5th ed. 2015) (noting that "[m]ost
     courts have rejected the contention that a proposed representative is inadequate because of prior
28   unrelated unsavory, unethical, or even illegal conduct").

1   membership in the National Futures Associations ("NFA") for "false and misleading statements"

2   while "working at Universal Commodity Corporation" ECF No. 107, at 17.  In reality, Mr. Left

3   joined Universal as a 23-year-old and quit after only nine months.  The NFA ruling did not

4   specifically target Mr. Left but was against *all* current and former employees on a firm-wide

5   basis.  ECF No. 109-10.  *Second*, movants say Mr. Left was "banned from trading" on the Hong

6   Kong market for five years due to alleged misconduct in connection with a published market

7   report.  *See* ECF Nos. 107, at 17, 111, at 3, 115, at 8.  In that case, Mr. Left was punished for

8   public market commentary and vehemently denied wrongdoing.  In the wake of the ruling, Hong

9   Kong-based investors and analysts raised concerns over the implications for freedom of opinion,

10  arguing that the ruling would "strangle negative commentary about the city's markets."[9]  Mr.

11  Left was in good company: in a substantially similar ruling, Hong Kong's securities regulator

12  subjected Moody's Corporation, a U.S. financial services company, to a fine and reprimand for a

13  published report, finding that freedom of expression is "not absolute."[10]  Not only would that

14  incident be unlikely to arise in the United States, but the underlying facts are unrelated to the

15  pertinent facts in this litigation.  In addition, Tempus and OUF oppose the adequacy of Mr.

16  Boutin based on fines imposed by the Autorité des Marchés Financiers for "insider trading."

17  ECF No. 115, at 8.  Mr. Boutin's alleged conduct, however, is an aberration from his lengthy

18  investing track record, occurred more than a decade ago, and did not involve a finding of

19  dishonesty or a breach of any fiduciary duty.

20          As a fiduciary for the class, the lead plaintiff serves to "advance and protect the interests

21  of those whom he purports to represent; their interests are entrusted to the fiduciary's diligence

22  and successful protection of the class depends upon the named plaintiff."  *In re Peregrine Sys.*

23  *Sec. Litig.*, No. CIV. 02 CV 870-J(RBB), 2002 WL 32769239, at *8 (S.D. Cal. Oct. 11, 2002)

24

25

---

[9]      *Hong Kong bans short-seller Andrew Left from market for five years*, SOUTH CHINA
26  MORNING POST, https://www.scmp.com/business/article/2038381/hong-kong-bans-short-seller-
    andrew-left-market-five-years (Oct. 19, 2016).
27  [10]     *See* Eduard Gismatullin, *Hong Kong SFC Argues Free Speech Is Limited in Andrew Left*
    *Case*, BLOOMBERG QUINT, https://www.bloombergquint.com/china/hong-kong-sfc-argues-free-
28  speech-is-limited-in-andrew-left-case#gs.HIgNwAQ (June 10, 2016).

1   (quoting *Landry v. Price Waterhouse Coopers Chartered Accountants*, 123 F.R.D. 474, 477

2   (S.D.N.Y. 1989)).[11]  Here, unlike Tempus and OUF's founder and owner Daniel Dantas—who

3   has a consistent, 20-year history of misconduct—none of the transgressions attributed to Mr. Left

4   or Mr. Boutin involved breaches of fiduciary duty.  As detailed in the Group's opposing brief

5   (ECF No. 108), notorious "bad boy" Dantas has a lengthy civil and criminal record that includes

6   corporate espionage, money laundering, tax evasion, breaches of contractual and fiduciary

7   duties, and self-dealing.  *Cf. In re Leapfrog Enters.*, 2005 WL 3801587, at *4.  By contrast, the

8   isolated incidents involving Mr. Left and Mr. Boutin are not "so sharp as to jeopardize the

9   interests of absent class members" or otherwise render them unsuitable to represent the Class.

10  *Harris*, 753 F. Supp. 2d at 1015–16.[12]  Thus, while acknowledging Mr. Left and Mr. Boutin's

11  past incidents, the Tesla Investor Group submits that they are different in kind from the pervasive

12  and more serious transgressions that plague Dantas' record.[13]

13  **IV.    EVEN EXCLUDING MSSRS. LEFT AND BOUTIN, THE TESLA INVESTOR
           GROUP IS STILL SUPERIOR AS LEAD PLAINTIFF**

14          If this Court finds one or more members of the Tesla Investor Group to be improper, the

15  Court has inherent power to appoint individual members of the Group to serve as lead plaintiff.

16

17  _____

18  [11]     *See also In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721JM(POR), 2004 WL 5159061,
    at *7 (S.D. Cal. Jan. 5, 2004) ("courts have found that an individual is an inadequate lead
    plaintiff due to unrelated misconduct which implicates the individual's ability to serve as a

19  *fiduciary*" (emphasis added)).  In *Surebeam,* the court declined to appoint a lead plaintiff
    candidate who was named in more than 60 complaints to securities regulators. *Id.*

20  [12]     *See also Wood v. Capital One Auto Fin., Inc*., No. 06-CV-7, 2006 WL 6627680, at *4–7
    (E.D. Wis. Sept. 19, 2006) (finding a 16-year old conviction for misappropriating company funds

21  that "has no relation to this case" to be irrelevant because "there has been no subsequent conduct
    to suggest that Wood lacks the personal qualities necessary to represent a class in this civil suit");

22  *Hall v. Nat'l Recovery Sys. Inc.*, No. 96-132-CIV-T-17(C), 1996 WL 467512, at *5–6 (M.D. Fla.
    Aug. 9, 1996) (pattern of prior misconduct by proposed class representative raised concerns

23  about reliability and conscientiousness, justifying denial of class certification).

24  [13]     Bridgestone further alleges that Mr. Left's "new long position" in Tesla securities is
    detrimental to the class of short sellers, subjecting him to unique defenses and thus rending him

25  inadequate to represent the class.  ECF No. 107.  That argument is without merit.  Courts
    routinely reject the argument that post-class period investments render an investor atypical of the

26  Class.  *See McGuire v. Dendreon Corp*., No. C07-800MJP, 2008 WL 418122, at *2 (W.D.
    Wash. Feb. 13, 2008) ("Courts have repeatedly rejected the argument that a plaintiff's post-class

27  period transactions in a defendant company's securities are inconsistent with a claim of fraud or
    raise questions as to the plaintiff's adequacy and typicality."); *Dietrich v. Bauer,* 192 F.R.D. 119,

28  125 (S.D.N.Y. 2000) (finding proposed class representative typical despite continuing to
    purchase after dissemination of negative publicity).

1    Indeed, a "group vying for lead plaintiff status does not necessarily rise and fall as a group.  *In re*

2    *Cardinal Health Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005) (citing *Surebeam* 2004 WL

3    5159061, at *7).  "In fact, courts in this circuit routinely break apart a proposed group in search

4    of the most adequate plaintiff."  *Surebeam*, 2004 WL 5159061, at *7 (collecting cases).

5         Assuming *arguendo* that either Messrs. Left or Boutin do not satisfy Rule 23's adequacy

6    requirements—which the Group vigorously disputes, as discussed above—it is within the

7    Court's power to modify the Group's composition and allow the remaining members to proceed.

8    *See id.* at *8.[14]  Absent Mr. Left, the Group would have nearly $2.9 million in losses; absent Mr.

9    Boutin, it would have approximately $3.9 million in losses.  Each of those figures standing alone

10   represents the largest financial interest aside from that of Tempus and OUF, which, as detailed in

11   the Group's opposition brief (ECF No. 108), are inadequate and atypical for multiple,

12   independent reasons.  In the event both Messrs. Left and Boutin are excluded, the remaining

13   three members of the Group still have nearly $2.2 million in losses—far greater than any other

14   movant that complies with Rule 23.

15        Moreover, even without Messrs. Left and Boutin, the Group would comprise a long-only

16   purchaser, short sellers that bought to cover, a sophisticated institution, and those that transacted

17   in options.  It is undisputed that Dr. Shirazi is the largest long-only purchaser and is not subject

18   to unique defenses.  In addition, PROtecto and Vilas Capital are large, sophisticated short sellers

19   that no competing movant can attack as inadequate or atypical.[15]  Accordingly, there is no sound

20   reason to choose plaintiffs with smaller financial interests over individual Group members with

21

22

23   [14]    *See also In re Regions Morgan Keegan Closed-End Fund Litig.*, No. 07-02830, 2010 WL
     5173851, at *10–11 (W.D. Tenn. Dec. 15, 2010) (removing one group member upon finding
24   unique standing defense and appointing remaining group members as lead plaintiff); *In re*
     *Cardinal Health*, 226 F.R.D. at 307–09 (allowing segmentation of proposed group where two
25   members would be subject to unique defenses; appoints altered group as lead plaintiff upon
     finding that opposing movant with resultantly larger financial interest also subject to unique
26   defenses).
     [15]    David's offhand opposition to Vilas Capital's standing is without merit.  Vilas Capital's
27   certification was signed by its Chief Executive Officer and Chief Investment Officer, John C.
     Thompson, who had authority to act on its behalf (*see* ECF No. 51-4, at 3)—authority none of
28   the other competing movants disputes.

1   larger losses when each member of the Tesla Investor Group is ready and able to serve as lead

2   plaintiff—in the event the Court decides that the collective Group, as comprised, is improper or

3   that subclasses would better protect the interests of injured investors.[16]

4   **V.     IF ANY LAW FIRM HAS A DISQUALIFYING CONFLICT OF INTEREST, IT IS ROBBINS GELLER, NOT LABATON SUCHAROW**

5

6         The argument by Tempus and OUF that Labaton Sucharow has a disqualifying conflict of

7   interest is unavailing.  *See* ECF No. 115, at 8–10.  Labaton Sucharow was one of many law firms

8   involved in an unrelated derivative action against Tesla's board of directors.  Labaton Sucharow

9   played a tertiary role at best and has since withdrawn from the case with its clients' consent.  *See*

10  ECF No. 116-6; *see also In re Tesla Motors, Inc. Stockholder Litig.*, C.A. No. 12711-VCS (Del.

11  Ch.).  That eliminates any potential conflict. To the extent there is any conflict, it would affect

12  only David's proposed lead counsel, Robbins Geller, which is serving as co-lead counsel in the

13  derivative action.  *See* ECF No. 116-4.  Upon a determination that David and Tesla have adverse

14  interests, Robbins Geller would be subject to disqualification for simultaneously representing

15  both clients.  *See Flatt v. Superior Court*, 885 P.2d 950, 954–56 (Cal. 1994).

16                                    **<u>CONCLUSION</u>**

17        For all the foregoing reasons, the Tesla Investor Group respectfully requests that the

18  Court grant its motion and deny all competing motions.

19

20

21

22

23

24

25

26

---

27  [16]      Indeed, should the Court determine that subclasses are advisable, the Group's remaining members are ideal candidates for the long-only and short-seller subclasses.  *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249–50 (2d Cir. 2011); *see also* ECF Nos. 113 at 7–8, 117, at 4.

28

1   DATED:  October 30, 2018                    Respectfully submitted,

2                                               */s/ James M. Wagstaffe*

3                                               James M. Wagstaffe (#95535)
                                                **KERR & WAGSTAFFE LLP**
4                                               Frank Busch (#258288)
                                                101 Mission Street, 18th Floor
5                                               San Francisco, California 94105
                                                Telephone: (415) 371-8500
6                                               Facsimile: (415) 371-0500
                                                wagstaffe@kerrwagstaffe.com
7                                               busch@kerrwagstaffe.com

8                                               *Proposed Liaison Counsel for the Class*

9                                               **KELLER LENKNER LLC**
                                                Ashley C. Keller (*admitted pro hac vice*)
10                                              150 N. Riverside Plaza, Suite 4270
                                                Chicago, Illinois 60606
11                                              Telephone: (312) 741-5222
                                                ack@kellerlenkner.com
12
                                                U. Seth Ottensoser (*admitted pro hac vice*)
13                                              1330 Avenue of the Americas, Suite 23A
                                                New York, New York 10019
14                                              Telephone: (212) 653-9715
                                                so@kellerlenkner.com
15
                                                **LABATON SUCHAROW LLP**
16                                              Christopher J. Keller
                                                Eric J. Belfi
17                                              David J. Schwartz
                                                Francis P. McConville
18                                              140 Broadway
                                                New York, New York 10005
19                                              Telephone: (212) 907-0700
                                                Facsimile: (212) 818-0477
20                                              ckeller@labaton.com
                                                ebelfi@labaton.com
21                                              dschwartz@labaton.com
                                                fmcconville@labaton.com
22
                                                *Counsel for the Tesla Investor Group and*
23                                              *Proposed Co-Lead Counsel for the Class*

24

25

26

27

28