MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-4405
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

ANDREW J. ENTWISTLE (*Pro hac Vice*)
aentwistle@entwistle-law.com
ARTHUR V. NEALON (*Pro hac Vice*)
anealon@entwistle-law.com
ROBERT N. CAPPUCCI (*Pro hac Vice*)
rcappucci@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 20th Floor
New York, NY  10171
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

*Counsel for FNY Investment Advisers, LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| KALMAN ISAACS, on behalf of himself and all others similarly situated, | Case No.  3:18-cv-04865-EMC |
| Plaintiff, | Hon. Edward M. Chen |
| | CLASS ACTION |
| vs. | FNY INVESTMENT ADVISERS, LLC'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |
| | Date:  November 15, 2018 |
| | Time:  1:30 p.m. |
| | Place:  Courtroom 5, 17th Floor |

*[Additional captions appear on following pages]*

| | | |
|---|---|---|
| 1 | WILLIAM CHAMBERLAIN, on behalf of himself and all others similarly situated, | Case No.  3:18-cv-04876-EMC |
| 2 | | |
| 3 | Plaintiff, | |
| 4 | vs. | |
| 5 | ELON MUSK and TESLA, INC., | |
| 6 | Defendants. | |
| 7 | | |
| 8 | JOHN YEAGER, individually and on behalf of all others similarly situated, | Case No.  3:18-cv-04912-EMC |
| 9 | Plaintiff, | |
| 10 | | |
| 11 | vs. | |
| 12 | ELON MUSK and TESLA, INC., | |
| 13 | Defendants. | |
| 14 | CARLOS MAIA, on behalf of himself and all others similarly situated, | Case No.  3:18-cv-04939-EMC |
| 15 | Plaintiff, | |
| 16 | | |
| 17 | vs. | |
| 18 | ELON MUSK and TESLA, INC., | |
| 19 | Defendants. | |
| 20 | | |
| 21 | KEWAL DUA, Individually and on Behalf of All Others Similarly Situated | Case No.  3:18-cv-04948-EMC |
| 22 | Plaintiff, | |
| 23 | | |
| 24 | vs. | |
| 25 | ELON MUSK and TESLA, INC., | |
| 26 | Defendants. | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| JOSHUA HORWITZ, Individually and on Behalf of All Others Similarly Situated | Case No.  3:18-cv-05258-EMC |
| Plaintiff, | |
| vs. | |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |
| ANDREW E. LEFT, Individually and on Behalf of All Others Similarly Situated | Case No.  3:18-cv-05463-EMC |
| Plaintiff, | |
| vs. | |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |
| ZHI XING FAN, Individually and on Behalf of All Others Similarly Situated | Case No. 3:18-cv-05470-EMC |
| Plaintiff, | |
| vs. | |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |
| SHAHRAM SODEIFI, Individually and on Behalf of All Others Similarly Situated | Case No. 3:18-cv-05899-EMC |
| Plaintiff, | |
| vs. | |
| TESLA, INC., a Delaware corporation, and ELON R. MUSK, an individual, | |
| Defendants. | |

1

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT...................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

I.    SEPARATE AND INDEPENDENT LEADERSHIP FOR PURCHASERS OF TESLA
      COMMON STOCK IS NEEDED........................................................................................ 3

      A.    Common Stock Purchasers Should Have Their Own Independent
            Leadership Due to Antagonism Among the Various Categories of Investors ....... 3

      B.    Common Stock Purchasers Require Separate Leadership to Prosecute their
            Claims ..................................................................................................................... 4

      C.    Divergent Methodologies for Calculation of Damages Threaten to
            Prejudice Common Stock Purchasers Absent Separate Leadership for
            Those Purchasers..................................................................................................... 5

      D.    The Prosecution of Common Stock Purchasers' Claims Should Not Be
            Delayed by Discovery Battles Among Competing Short-Seller Movants.............. 6

II.   THE COMMON STOCK PURCHASERS SHOULD BE REPRESENTED BY FIRST
      NEW YORK AND, IF DEEMED APPROPRIATE BY THE COURT, AN
      INDIVIDUAL PLAINTIFF WITH A SIGNIFICANT FINANCIAL INTEREST IN
      THE COMMON STOCK PURCHASERS' CLAIMS ......................................................... 7

      A.    First New York's Early Recognition of the Need for Separate
            Representation Demonstrates Its Ability to Advocate for Purchasers of
            Tesla Common Stock ............................................................................................... 7

      B.    First New York is Highly Qualified to Serve as a Lead Plaintiff ......................... 7

      C.    The Common Stock Purchasers Would Also Be Well Served by
            Appointment of First New York, A Domestic Institutional Investor and an
            Individual as Co-Lead Plaintiffs ............................................................................ 9

III.  CRITICISM OF FIRST NEW YORK'S APPLICATION BY CERTAIN COMPETING
      MOVANTS IS UNSUPPORTED......................................................................................... 10

      A.    First New York has the Largest Gross Expenditures, the Largest Number of
            Shares Purchased, and Suffered a Net Loss ......................................................... 10

      B.    First New York Has Fully Complied with the PSLRA's Certification
            Requirements........................................................................................................ 10

      C.    First New York has Standing to Assert Claims as the Financial Advisor to
            the First New York Fund ...................................................................................... 11

      D.    First New York is Not a "Day Trader" or a "Market Maker".............................. 12

      E.    The "Net Seller" Arguments are Unavailing ....................................................... 12

CONCLUSION............................................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Andrada v. Atherogenics, Inc.*,
   No. 05CV61 (RJH), 2005 WL 912359 (S.D.N.Y. Apr. 19, 2005) ............................... 6, 10

*Chill v. Green Tree Fin. Corp.*,
   181 F.R.D. 398 (D. Minn. 1998) ..................................................................................... 12

*Emp'rs Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Anchor Capital Advisors*,
   498 F.3d 920 (9th Cir. 2007) .......................................................................................... 11

*Hodges v. Immersion Corp.*,
   No. C-09-4073 MMC, 2009 WL 5125917 (N.D. Cal. Dec. 21, 2009) ........................... 13

*Hufnagle v. Rino Int'l Corp.*,
   No CV 10-8695-VBF(VBKx), 2011 WL 710704 (C.D. Cal. Feb. 14, 2011).................. 11

*In re BP, PLC Sec. Litig.*,
   758 F. Supp. 2d 428 (S.D. Tex. 2010) ...................................................................... 4, 5, 9

*In re Cable & Wireless, PLC, Sec. Litig.*,
   217 F.R.D. 372 (E.D. Va. 2003) ....................................................................................... 5

*In re Cardinal Health, Inc. Securities Litigation*,
   226 F.R.D. 298 (S.D. Ohio 2005) ..................................................................................... 8

*In re Comdisco Sec. Litig.*,
   150 F. Supp. 2d 943 (N.D. Ill. 2001) .............................................................................. 13

*In re Extreme Networks Inc. Sec. Litig.*,
   No. 15-cv-04883-BLF, 2016 WL 3519283 (N.D. Cal. June 28, 2016) ............................ 8

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 428 (S.D.N.Y. 2013).............................................................................. 8

*In re McKesson HBOC, Inc. Sec. Litig.*,
   97 F. Supp. 2d 993 (N.D. Cal. 1999) ............................................................................. 13

*In re MGM Mirage Sec. Litig.*,
   No. 2:09-cv-01558-GMN-LRL, 2010 WL 4316754 (D. Nev. Oct. 25, 2010).................. 4

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ...................................................................................... 12

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   199 F.R.D. 119 (S.D.N.Y. 2001) .................................................................................... 12

*In re Rent–Way Sec. Litig.*,
   218 F.R.D. 101 (W.D. Pa. 2003)..................................................................................... 11

*Lehocky v. Tidel Techs., Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004) ........................................................................................ 11

*Lemanik, S.A. v. McKinley Allsopp, Inc.*,
    125 F.R.D. 602 (S.D.N.Y. 1989) ........................................................................................ 11

*Lloyd v. CVB Fin. Corp.*,
    No. CV 10-06256 MMM (PJWx), 2011 WL 13128303 (C.D. Cal. Jan. 21, 2011) ........... 7

*Miller v. Ventro Corp.*,
    No. 01-CV-1287, 2001 WL 34497752 (N.D. Cal. Nov. 28, 2001) .................................... 4

*Mulligan v. Impax Labs., Inc.*,
    No. C-13-1037 EMC, 2013 WL 3354420 (N.D. Cal. July 3, 2013) ................................. 11

*Prefontaine v. Research in Motion Ltd.*,
    No. 11-Civ-4068 (RJS), 2012 WL 104770 (S.D.N.Y. Jan. 5, 2012) ............................... 12

*Richardson v. TVIA, Inc.*,
    No. C 06304 RMW, 2007 WL 1129344 (N.D. Cal. Apr. 16, 2007) ................................ 13

*Schueneman v. Arena Pharm., Inc.*,
    No. 10cv1959 BTM(BLM), 2011 WL 3475380 (S.D. Cal. Aug. 8, 2011) ...................... 12

*Weisz v. Calpine Corp.*,
    No. 4:02-CV-1200, 2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) ................................ 9

*Yousefi v. Lockheed Martin Corp.*,
    70 F. Supp. 2d 1061 (C.D. Cal. 1999) ................................................................................ 9

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................................ 10

Fed. R. Civ. P. 23(d) ..................................................................................................................... 5

Fed. R. Civ. P. 42(a) .................................................................................................................... 13

**Statutes**

15 U.S.C. § 78u–4(a)(2)(A)(iv) .................................................................................................. 10

15 U.S.C. § 78u-4(a)(3)(B) ......................................................................................................... 13

15 U.S.C. § 78u–4(a)(3)(B)(i) ...................................................................................................... 9

**Other Authorities**

H.R. Conf. Rep. No. 104-369 (1995),
    *reprinted in* 1995 U.S.C.C.A.N. 730, 733 (1995) ..................................................... 8, 9

## PRELIMINARY STATEMENT

As First New York demonstrated in its response brief (ECF No. 117), purchasers of Tesla common stock require separate leadership from the other two categories of investors (short-sellers and derivatives traders) that are the subject of the competing motions before the Court.  Separate leadership is warranted because:

- antagonism exists between common stock purchasers and short-sellers, whose investment strategies and assumptions directly contradict one another;

- divergent theories of reliance, loss causation and damages will require different pleadings, development and proof; and

- there is a prospect of a limited source of recovery, with different categories of investors seeking damages for themselves based on different theories.

First New York is an ideal candidate to prosecute claims on behalf of investors in Tesla common stock, for the following reasons:

- While other movants seek to represent all investors – indifferent to the conflicts among them – First New York is one of only two movants (along with James Johnson) that have recognized common stock purchasers' need for independent leadership (ECF No. 117 at 3-4; ECF No. 113 at 5-7);

- First New York is a sophisticated institutional investor with a significant financial stake in common stock purchasers' claims,[1] which courts in this Circuit favor; and

- First New York has significant lead plaintiff experience and is otherwise qualified under Fed. R. Civ. P. Rule 23.

Courts in this Circuit have also found that the joint appointment of an institutional investor and an individual as co-lead plaintiffs is desirable because of the comprehensive and diverse coverage such representation provides.  In this regard, First New York would be pleased to serve as a co-lead plaintiff with James Johnson.

---

[1] *See* Exhibit 1, hereto, summarizing the financial interest of each movant or movant group by type of investment.

1

Several movants have made specious challenges to First New York's application based upon erroneous speculation and mischaracterization of the law and facts.[2]   However, these challenges are easily refuted:

- First New York is a sophisticated, multi-strategy institutional trading firm that employs a variety of trading strategies.  It is neither a market maker nor a day trader – the speculation of certain movants notwithstanding;

- First New York's certification of its transactions is accurate – speculation that several transactions were reported erroneously based on "ticker" data is simply incorrect;

- First New York suffered a loss, and thus, arguments that it was a net seller are meritless; and

- First New York, as the financial adviser to the First New York Fund, has standing to assert claims arising in connection with investments made by the First New York Fund, and has the contractual right to do so.[3]

It is respectfully submitted that the Court should appoint First New York as a lead plaintiff on behalf of the purchasers of Tesla common stock, together, if the Court deems it appropriate to do so, with James Johnson, an individual investor similarly willing to prosecute the claims of such purchasers.[4]

---

[2] Challenges have also been made to the applications of other movants, including accusations against some other movants of unethical conduct and claims that counsel have a disqualifying conflict due to their ongoing derivative representation of Tesla.  First New York does not take any position herein with respect to the challenges to other movants and responds only to the extent that its own application is implicated.

[3] FNY Partners Fund LP and its affiliates, including FNY Managed Accounts LLC, are collectively referred to herein as the "First New York Fund."

[4] First New York does not seek to represent options traders.  Data regarding its transactions in options securities was included in its certification to comply with the requirements of the PSLRA.  First New York takes no position as to who should be appointed to lead investors in derivative securities or short-sellers.

1

## ARGUMENT

2
3

I.   **SEPARATE AND INDEPENDENT LEADERSHIP FOR PURCHASERS OF TESLA COMMON STOCK IS NEEDED**

4

      A.   **Common Stock Purchasers Should Have Their Own Independent Leadership Due to the Antagonism Among the Various Categories of Investors**

5
6
7
8
9
10
11
12
13
14
15

      The three main classes of investors – namely (i) Tesla common stock purchasers, (ii) short-sellers and (iii) derivative securities investors – each invested based on very different investment strategies and assumptions.  Purchasers of common stock generally invest on the belief that stock will increase in price and yield dividends.  In stark contrast, short-sellers seek to profit from a decline in the stock price and sometimes publicly disparage the subject company in an effort to cause such a decline.  These investment approaches are naturally antagonistic, and more so where, as here, some of the short-seller movants actually engaged in public, self-interested efforts to drive down the price of Tesla stock, publicly claiming that the stock they sold short was overpriced.  Derivatives traders, meanwhile, profit largely by correctly predicting and accounting for volatility in the underlying stock's price, with some anticipating an increase, others a decrease, and yet others employing "market neutral" strategies.[5]

16
17
18
19
20

      The *ad hominem* attacks made by certain movants against other movants in their response briefing (particularly by movants who are short-sellers and options traders) further illustrate the antagonism between these different types of investors and demonstrate the acute need for separate representation of common stock purchasers.[6]  At a minimum, the extraordinary discord among

21

22
23

[5] *See, e.g.*, Lucas Downey, *10 Options Strategies to Know*, Investopedia (October 12, 2018), https://www.investopedia.com/trading/options-strategies/.

24
25
26
27

[6] *E.g.* ECF No. 107 at 17 (options trader accusing short-seller of dishonest and unethical conduct); ECF No. 108 at 4-7 (movant group accusing short-seller's founder of corporate espionage, money laundering, tax evasion, corruption, self-dealing, criminal conspiracy, "breach of confidentiality," paying bribes, fraud, and fraudulent concealment);  ECF No. 111 at 3 (common stock purchaser accusing short-seller of making "false and misleading statements to cheat, defraud or deceive a customer"); ECF No. 115 at 8 (short-seller reciting "proof" that another short-seller and a common stock purchaser "have engaged in fraudulent and deceitful conduct . . . ." including insider trading); *id.* at 8-10 stating that certain rival movants' counsel might be disqualified).

28

competing movants raises serious questions about the wisdom of appointing one lead plaintiff to represent all of the categories of investors.  Yet, only two movants (First New York and James Johnson) have recognized the existence of these conflicts among different categories of investors and proposed the sensible solution of appointing separate leadership for common stock purchasers.[7] It would not make sense to appoint a single plaintiff to lead all three types of Tesla investors, nor would it make sense to appoint, for the common stock purchasers, a lead plaintiff that failed from the outset to recognize the need for separate leadership.

### B.  Common Stock Purchasers Require Separate Leadership to Prosecute their Claims

In addition to their disparate investment strategies and assumptions, and aside from the acrimony between them, the different categories of investors have divergent interests with respect to issues fundamental to the prosecution of this case, including the development of both the theory and proof regarding reliance, loss causation and damages.  "Because of these divergent theories," the movants seeking to represent the universal class of investors "might not have an interest in vigorously pursuing the claims central" to the common stock purchaser's case.  *In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428, 438 (S.D. Tex. 2010); *In re MGM Mirage Sec. Litig.*, No. 2:09-cv-01558-GMN-LRL, 2010 WL 4316754, at *5 (D. Nev. Oct. 25, 2010) (recognizing "the benefit that could be provided by having a co-lead plaintiff that bought debt securities and is therefore positioned to vigorously advocate on behalf of similarly-situated debt purchasers" and appointing bond purchaser and stock purchaser as co-lead plaintiffs); *Miller v. Ventro Corp.*, No. 01-CV-1287, 2001 WL 34497752, at *11 (N.D. Cal. Nov. 28, 2001) ("The Court, therefore, finds its appropriate to appoint a bondholder as co-lead plaintiff in addition to a stockholder.").

Thus, to avoid prejudice to any investor group and later difficulties in the management of this litigation, the Court should appoint separate leadership for each of the three categories of

---

[7] The conflict is also apparent to defendants.  *See* ECF No. 105 at 2, noting the need for separate leadership of purchasers and sellers.

investors at this stage in the litigation.[8]  In *In re BP, PLC Securities Litigation* ("*BP*"), the court resolved competing motions for appointment as lead plaintiff by appointing separate lead plaintiffs for a subclass of investors whose transactions occurred within a shorter time period, noting that if it waited until class certification to do so, "[a]bsent class members could be prejudiced."  758 F. Supp. 2d at 438.  Here, as in *BP,* it "is *particularly important at this early stage of the case* to avoid prejudicing the claims of absent class members through the appointment of a lead plaintiff that cannot fully and fairly represent them.") (emphasis added).  *Id.*  As discussed in First New York's and James Johnson's response briefs, and as defendants and derivatives investor Littleton have stated, derivatives investors and short-sellers may not be incentivized to craft a consolidated complaint and develop a record that fully protects the interests of common stock purchasers.[9]  Thus, the Court should "ensure that all class members will adequately be represented in the prosecution of this action" by appointing separate leadership to avoid intra-class conflicts and ensure zealous advocacy for all common stock purchasers.  *Id.* at 438 (citing *In re Cable & Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372, 376 (E.D. Va. 2003)); *see also* Fed. R. Civ. P. 23(d).[10]

**C.    Divergent Methodologies for Calculation of Damages Threaten to Prejudice Common Stock Purchasers Absent Separate Leadership for Those Purchasers**

In addition to the unfortunate acrimonious accusations made by certain of the movants, arguments by some movants criticizing other movants' methodology for calculating losses further demonstrate why separate representation is appropriate.[11]  As one movant has pointed out, Tesla's

---

[8] Although courts may, in their discretion, postpone the appointment of separate leadership until the class certification stage, such a process would likely prejudice purchasers of common stock in this case.  *See BP,* 758 F. Supp. 2d at 441 (at the lead plaintiff stage, the court's primary concern is to "preserve the claims of all potential class members.").

[9] ECF No. 105 at 2; ECF No. 106 at 10-13; ECF No. 113 at 5-7; ECF No. 117 at 3-4.

[10] *Accord*, Defs.' Response, ECF No. 105 at 2 ("Movants should be required to address this inherent conflict at the outset.").

[11] *See, e.g.,* ECF No. 108 at 23-24; ECF No. 113 at 5; ECF No. 107 at 3-4, 11; 18-19.

1   ability to satisfy a judgment against it in this case is not assured.  Despite its sizable market

2   capitalization, it has been widely reported that Tesla has dangerously low cash reserves and has

3   historically not been profitable.[12]  Given the possibility that this action will ultimately involve a

4   limited source of recovery, and that the various methodologies disparately impact the three types

5   of investors, separate leadership for the common stock purchasers is clearly warranted.  Courts in

6   this Circuit have protected investors in similarly complex litigation by appointing separate

7   leadership for each type of security.  For example, the Central District of California recently

8   addressed the competing interests, and competing theories of damages, between common stock

9   sellers on the one hand, and derivative securities investors on the other, by appointing separate lead

10  plaintiffs and counsel.[13]

11  **D.   The Prosecution of Common Stock Purchasers' Claims Should Not Be Delayed by Discovery Battles Among Competing Short-Seller Movants**

12
13      The purchasers of common stock should be allowed to benefit from the prompt appointment

14  of leadership on their behalf, an explicit goal of the PSLRA.  However, one of the short-seller

15  movants has asked the Court to permit broad discovery into another short-seller's purported past

16  misconduct in connection with the competing lead plaintiff motions.  ECF No. 108 at 19-20, 25.

17  The purchasers of common stock should not be left without the benefit of leadership while the

18  short-seller movants engage in inter-movant discovery and, presumably, subsequent briefing and

19
20

21  [12] The recent financial results reported by Tesla, showing profitability for the first time, is apparently the subject of a separate investigation by the United States Department of Justice.

22
23  [13] *See Timber Hill LLC v. Pershing Square Capital Mgmt., L.P.*, Case No. 2:17-cv-04776-DOC (C.D. Cal. Oct. 13, 2017), ECF No. 63 (Carter, J.) (appointing separate lead plaintiff to represent investors in derivative securities); *see also In re Allergan, Inc. Proxy Violation Sec. Litig.*, Case No. 8:14-cv-02004 (C.D. Cal. 2017 Nov. 22, 2017), ECF No. 570 (Carter, J.) (brief by lead plaintiff group on behalf of seller of common stock in related case in support of conflicting methodology for the allocation of damages between common stock sellers and derivative securities investors); *Andrada v. Atherogenics, Inc.*, No. 05CV61 (RJH), 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (commenting on options-specific issues including maturity, volatility and short term interest rates and concluding that movant which purchased options only was not typical or adequate with respect to purchasers of common stock).

24
25
26
27
28

1   argument.  Moreover, purchasers of common stock will be best served by separate independent

2   representation throughout the litigation.[14]

3   **II.    THE COMMON STOCK PURCHASERS SHOULD BE REPRESENTED BY**
        **FIRST NEW YORK AND, IF DEEMED APPROPRIATE BY THE COURT, AN**
4       **INDIVIDUAL PLAINTIFF WITH A SIGNIFICANT FINANCIAL INTEREST IN**
        **THE COMMON STOCK PURCHASERS' CLAIMS**

5

6       **A.    First New York's Early Recognition of the Need for Separate Representation**
                **Demonstrates Its Ability to Advocate for Purchasers of Tesla Common Stock**

7       First New York is one of only two movants that have recognized the need for separate

8   leadership on behalf of purchasers of Tesla common stock.  The remaining movants simply ignore

9   these conflicts and seek appointment as lead plaintiff for an omnibus class comprised of all

10  purchasers, sellers and traders of various Tesla derivative securities harmed in any way by the

11  defendants' conduct.[15]  These movants ignore the serious reservations about their ability to

12  represent investors in securities in which they either did not invest or made relatively *de minimis*

13  investments.  That failure even to recognize the potential – and, in some respects, actual – conflicts

14  further demonstrates their inadequacy to represent investors in multiple classes of Tesla securities.

15      **B.    First New York is Highly Qualified to Serve as a Lead Plaintiff**

16      First New York is a large domestic institutional investor with a significant stake in the

17  outcome of the litigation that is capable of actively prosecuting the action and directly overseeing

18  the efforts of its counsel.  This is precisely the sort of lead plaintiff Congress envisioned when it

19  enacted the PSLRA. *Lloyd v. CVB Fin. Corp.*, No. CV 10-06256 MMM (PJWx), 2011 WL

20  13128303, at *5 (C.D. Cal. Jan. 21, 2011) ("[T]he Reform Act establishes a preference that

21  sophisticated institutional investors direct the course of securities cases."); *see also In re Extreme*

22

23

24  [14] Unfortunately, the Court's initial disposition of the current short-seller lead plaintiff contest may
    not finally end this issue, because at least one movant has sought to uncover unfavorable facts about
25  another short-seller through channels other than discovery in this action, including a threat to
    intervene in an unrelated case. ECF No. 110-8 (Ex. H to Wagstaffe Decl.).  In addition, defendants
26  may uncover information later in this action that gives rise to a motion to disqualify one or more of
    the short-seller investors.

27  [15] ECF Nos. 107, 108, 111, 115.

28

*Networks Inc. Sec. Litig.*, No. 15-cv-04883-BLF, 2016 WL 3519283, at *6 (N.D. Cal. June 28, 2016) ("To curb the troubling proliferation of lawyer-driven securities class actions and better serve the interests of the absent class members, Congress sought to increase the participation of institutional investors in prosecuting securities cases.") (citing H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 (1995)).

Additionally, First New York has significant experience serving as a lead plaintiff in securities fraud class actions. Most recently, First New York led a group of investors suing NASDAQ in a class action lawsuit arising from Facebook's initial public offering. That case raised novel claims that NASDAQ violated state and federal laws by failing to disclose technology weaknesses in its systems and failing to design and test them prior to the offering. Judge Robert Sweet of the Southern District of New York sustained First New York's complaint in a decision that represented the first time a court had sustained claims involving market disruption brought by a class of investors against a securities exchange. Ultimately, First New York negotiated a settlement with NASDAQ that yielded the largest ever recovery by shareholders against an exchange. Among other things, Judge Sweet found that NASDAQ was not entitled to self-regulatory organization ("SRO") immunity from certain claims arising from design, testing and promotion of its software because those activities were not performed in connection with the discharge of SRO responsibilities. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 460 (S.D.N.Y. 2013) ("*Facebook/NASDAQ*").[16]

---

[16] Two competing movants suggest that First New York's 2005 unsuccessful lead plaintiff application in *In re Cardinal Health, Inc. Securities Litigation* is somehow relevant to the instant application. 226 F.R.D. 298, n. 12 (S.D. Ohio 2005). However, in that case, the court only found that First New York did not have the largest financial interest in that case under the four-factor test it employed. The competing movants cite *dicta*, and predictably ignore First New York's more recent and relevant appointment and successful leadership in *Facebook/NASDAQ*.

1

2

### C.   The Common Stock Purchasers Would Also Be Well Served by Appointment of First New York – a Domestic Institutional Investor – and an Individual as Co-Lead Plaintiffs

3

Ninth Circuit precedent supports the appointment of both an institutional investor and an

4

individual as co-lead plaintiffs to represent a class of common stock purchasers. *Weisz v. Calpine*

5

*Corp.*, No. 4:02-CV-1200, 2002 WL 32818827, at *8 (N.D. Cal. Aug. 19, 2002) ("The Court finds

6

that appointing both an institutional and an individual investor to serve as co-lead plaintiffs will

7

ensure that all class members will adequately be represented in the prosecution of this action.");

8

*Yousefi v. Lockheed Martin Corp.*, 70 F. Supp. 2d 1061, 1070 (C.D. Cal. 1999) (same); *see also*

9

*BP*, 758 F. Supp. 2d at 440 ("The same logic applies to appointing institutional investors in addition

10

to individuals in the context of a subclass.").[17]

11

Here, as noted above, only First New York and James Johnson recognized the need for

12

separate leadership for the common stock investors, and First New York is the only domestic

13

institution investing in common stock (it also has almost three times the gross expenditures of any

14

other movant and its net loss on its common stock is comparable to the other movants in that

15

group).[18]

16

Certain derivatives investors and short-sellers have called attention to the fact that they also

17

purchased relatively small amounts of common stock.[19]  While this may, as a technical matter, be

18

19

---

20

[17] Contrary to the suggestion of several courts to avoid separate representation, co-leadership or subclasses, the very language of the PSLRA, itself, envisions the appointment of multiple lead

21

plaintiffs in certain instances. *See, e.g.*, 15 U.S.C. § 78u–4(a)(3)(B)(i) (the court "shall appoint as lead plaintiff the member *or members* of the purported plaintiff class that the court determines to

22

be most capable of adequately representing the interests of class members") (emphasis added); *see also* H.R. Conf. Rep. No. 104–369 at 32 (lead plaintiff provisions are "intended to encourage the

23

most capable *representatives* of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class") (emphasis added).

24

[18] We note that James Johnson's counsel and First New York's counsel have worked together quite

25

successfully in various cases, and First New York advises the Court that it would welcome the opportunity to work with Johnson and his counsel if directed to do so by the Court here.

26

27

[19] *E.g.* ECF No. 107 at 6, 15 (Bridgestone, which claims more than fifty times more losses from derivatives as it does from common stock); ECF No. 106 at 6-7, 9 (Littleton, who claims almost

28

one thousand times more losses from derivatives transactions than the $3,552 he claims to have lost

9

1   enough to confer standing to pursue claims on behalf of purchasers of common stock, it does not

2   provide them with an adequate incentive to protect the interests of those purchasers.  Rather, by

3   virtue of their more financially significant transactions in other types of securities, these movants

4   have a financial incentive to subordinate the interests of common stock purchasers throughout the

5   litigation and are thus not adequate within the meaning of Rule 23 or the PSLRA.

6   **III.    CRITICISM OF FIRST NEW YORK'S APPLICATION BY CERTAIN
        COMPETING MOVANTS IS UNSUPPORTED**

7
8       **A.    First New York has the Largest Gross Expenditures and the Largest Number
                of Shares Purchased and Suffered a Net Loss**

9           No movant disputes the fact that, having invested $148,211,433 and purchased 418,613

10  shares of Tesla common stock, First New York has the greatest amount of gross expenditures and

11  shares purchased of any movant and thus, at least by these measures, the greatest financial interest

12  of any movant.  *See* Exhibit 1 hereto.  Moreover, assertions by several competing movants

13  notwithstanding, First New York, in fact, suffered net losses of $304,204.98 on its common stock

14  investments.  *See* Exhibit 2 hereto.

15      **B.    First New York Has Fully Complied with the PSLRA's Certification
                Requirements**
16

17          Two competing movants erroneously fault First New York for not providing a calculation

18  of its loss figure when it moved for appointment as lead plaintiff.  ECF No. 107 at 18-19; ECF No.

19  108 at 24-25.   In fact, the law imposes no such requirement.[20]   Rather, the PSLRA directs

20  prospective lead plaintiffs to submit a sworn certification that "sets forth all of the transactions of

21  the plaintiff in the security that is the subject of the complaint during the class period specified in

22  the complaint."  15 U.S.C. § 78u–4(a)(2)(A)(iv).  First New York did so.  ECF No. 40-1 at Ex. A.

23

24  _____

25  from his purchases of common stock).  *Accord* ECF No. 108 at 22 (arguing that movant Littleton
    is inadequate and atypical with respect to "purchasers of equity," citing *Andrada v. Atherogenics,*
26  *Inc.*, No. 05CV61 (RJH), 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005)).

27  [20] Ironically, one of the movants levying this criticism at First New York has already amended its
    certification and calculation of its loss.  ECF No. 108 at 3, n. 5; ECF No. 110-1.
28

1    When examined, the cases cited by other movants for the proposition that preliminary analysis is

2    required either:  (i) simply stand for the non-controversial proposition that the PSLRA requires a

3    potential lead plaintiff to submit information about all relevant transactions with its initial motion;

4    or (ii) actually support the position that subsequent disclosure of loss calculations is not

5    disqualifying.  *See e.g. Mulligan v. Impax Labs., Inc.*, No. C-13-1037 EMC, 2013 WL 3354420, at

6    *9 (N.D. Cal. July 3, 2013) ("the late-filed information does not change the result on this motion.").

7    In any event, First New York's response included a calculation of its gross expenditures and its net

8    loss on purchases of common stock, rendering such criticism moot.  ECF No. 117 at 5; *see also*

9    Exhibit 2 hereto (providing additional detail).

10        **C.    First New York has Standing to Assert Claims as the Financial Advisor to the
               First New York Fund**

11

12            First New York, as an investment advisor, has standing to bring this case on behalf of the

13    fund it advises.

14                [A]s the Ninth Circuit has articulated, while some courts have held
                  that an investment advisor cannot be the appropriate lead plaintiff
                  because it did not have express written authority to sue on its clients'
15                behalf, other courts have found that an 'investment advisor has an
                  interest in its own right to receive full and fair disclosures regarding
16                the true value of a company's stock, and therefore is a 'purchaser'
                  under the PSLRA with proper standing to pursue litigation on behalf
17                of its individual clients.

18    *Hufnagle v. Rino Int'l Corp.*, No CV 10-8695-VBF(VBKx), 2011 WL 710704, at *6 (C.D. Cal.

19    Feb. 14, 2011) (citing *Emp'rs Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Anchor Capital*

20    *Advisors*, 498 F.3d 920, 922 n. 1 (9th Cir. 2007)); *see also Lehocky v. Tidel Techs., Inc.,* 220 F.R.D.

21    491, 501 (S.D. Tex. 2004); *In re Rent–Way Sec. Litig.,* 218 F.R.D. 101, 109 (W.D. Pa. 2003);

22    *Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602 (S.D.N.Y. 1989).  First New York serves

23    as the investment adviser to the First New York Fund, which held title to the securities at issue.

24    *See* Declaration of Shawn I. Fischman, submitted herewith ("Fischman Decl.") at ¶ 5.  Moreover,

25    it is entirely appropriate for First New York to prosecute claims on behalf of its fund because it has

26    the contractual right to do so.  *Id.*

27

28

### D.     First New York is Not a "Day Trader" or a "Market Maker"

Certain other movants erroneously speculate that First New York (among others) is a "day trader" or a "market maker."   However, First New York is a sophisticated, multi-strategy institutional investor that employs a variety of investment strategies; it is not a "market maker,"[21] or a "day trader."[22]  *See* Fischman Decl. at ¶ 7.  Although some of First New York's positions are purchased and sold on the same day, First New York employs a variety of stock trading strategies, including long-term strategies, in an attempt to maximize profitability.  *Id.*  First New York's traders engage in transactions with regard to a security's market price and the company's reported financials and other publicly available information.  Fischman Decl. at ¶ 4.

### E.     The "Net Seller" Arguments are Unavailing

Certain competing movants make much of their observation that First New York sold more Tesla securities during the proposed class period than it purchased.  This is irrelevant because First New York was nonetheless injured by the alleged fraud (*i.e.* was a "net loser"), [23] and it is well

---

[21] Even if First New York were a market maker – which it is not – this would not be a sufficient basis on which to deny its motion.  Indeed, market makers have been appointed lead plaintiffs in securities cases for over twenty years.  *E.g. In re NYSE Specialists Sec. Litig.,* 260 F.R.D. 55, 72 (S.D.N.Y. 2009); *In re Oxford Health Plans, Inc. Sec. Litig.,* 199 F.R.D. 119, 124 (S.D.N.Y. 2001) (appointing a market maker lead plaintiff because, "where the public market of a quoted security is polluted by false information, or where price, supply and demand are distorted as a result of misleading omissions, all types of investors are injured. . . . Included among those injured are so called market makers."); *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 412 (D. Minn. 1998) (appointing a market maker lead plaintiff after finding that market maker relied on the integrity of the market).

[22] Even if First New York were a "day trader" – which it is not – this would not be a sufficient basis on which to deny its motion.  Indeed, courts have appointed "day traders" as lead plaintiffs because day traders "have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts." *Prefontaine v. Research in Motion Ltd.,* No. 11-Civ-4068 (RJS), 2012 WL 104770, at *4 (S.D.N.Y. Jan. 5, 2012); *see also Schueneman v. Arena Pharm., Inc.,* No. 10cv1959 BTM(BLM), 2011 WL 3475380, at *7 (S.D. Cal. Aug. 8, 2011) ("a plaintiff's status as a purported 'day trader' is not enough in and of itself to rebut the presumption of adequacy.").

[23] Where, as here, the class period (which may change given certain later disclosures and related events) includes multiple corrective disclosures, the fact that an investor sold more shares than it

12

1  settled that "where a 'net seller' is a 'net loser,' the net seller has incurred a cognizable loss and is

2  the presumptive lead plaintiff where its net losses exceed those of the other movants." *Hodges v.*

3  *Immersion Corp.*, No. C-09-4073 MMC, 2009 WL 5125917, at *2 (N.D. Cal. Dec. 21, 2009); *see*

4  *also Richardson v. TVIA, Inc.,* No. C 06304 RMW, 2007 WL 1129344 at *12–15 (N.D. Cal. Apr.

5  16, 2007) (citing *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001); *In re*

6  *McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996-97 (N.D. Cal. 1999)) (appointing net

7  seller lead plaintiff over objection of competing movant).  On this basis, First New York should be

8  appointed as a lead plaintiff for a common stock class.[24]

9  ## CONCLUSION

10  For the reasons discussed above, First New York respectfully requests that the Court:  (i)

11  consolidate the above-captioned actions under Rule 42(a); (ii) appoint First New York to serve as

12  a lead plaintiff for purchasers of Tesla common stock pursuant to Section 21D(a)(3)(B) of the

13  Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B); (iii) approve the selection of Entwistle & Cappucci LLP

14  and Susman Godfrey L.L.P. as Lead Counsel for purchasers of Tesla common stock; and (iv) grant

15  such other relief as the Court may deem just and proper.

16

17  Dated:  October 30, 2018

By:    /s/ *Marc M. Seltzer*
Marc M. Seltzer

18

19  **SUSMAN GODFREY L.L.P.**
MARC M. SELTZER
20  1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067-4405
21  Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

22

23

24  purchased over the course of the entire period may have no bearing on whether and to what extent
25  that investor was injured.

26  [24] Several competing movants suggest that a few of First New York's reported transactions may be
inaccurate based on ticker reports of share price and volume.  However, in our digital age, tickers
27  do not reflect all transactions on a millisecond-by-millisecond basis.  First New York's transactions
are accurately reflected in its certification.
28

1

**ENTWISTLE & CAPPUCCI LLP**
ANDREW J. ENTWISTLE

2

ARTHUR V. NEALON
ROBERT N. CAPPUCCI

3

299 Park Avenue, 20th Floor
New York, NY  10171

4

Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

5

*Counsel for FNY Investment Advisers, LLC*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST NEW YORK'S REPLY IN FURTHER SUPPORT OF ITS LEAD PLAINTIFF MOTION
CASE NO. 3:18-CV-04865- EMC