# EXHIBIT B

                                    **Pages 1 - 61**

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

KALMAN ISAACS,                   )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )     **NO. C 18-CV-04865 EMC**
                                 )
ELON MUSK, et al.,               )
                                 )
          Defendants.            )
_____ )

                              San Francisco, California
                              Thursday, November 15, 2018

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Movant Dany David:
                    Lieff Cabraser Heimann & Bernstein
                    275 Battery Street, 29th Floor
                    San Francisco, CA  94111-3339
                    (415) 956-1000
          BY:   **ELIZABETH J. CABRASER, ATTORNEY AT LAW**
          BY:   **KATHERINE LUBIN BENSON, ATTORNEY AT LAW**

                    Robbins Geller Rudman & Dowd LLP
                    655 West Broadway, Suite 1900
                    San Diego, CA  92101
                    (619) 231-1058
          BY:   **DANIELLE S. MYERS, ATTORNEY AT LAW**
                **RACHEL L. JENSEN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported by:  Ana M. Dub, CSR No. 7445 RMR, CRR, CCRR, CRG, CCG
              Official Reporter

1    **APPEARANCES**:    (CONTINUED)

2    For Movants Tempus
     International Fund        Kaplan Fox & Kilsheimer LLP
3    SPC and Opportunity       350 Sansome Street, Suite 400
     Unique Fund, Inc.:        San Francisco, CA  94104
4                              (415) 772-4700
                    BY:    **MARIO M. CHOI, ATTORNEY AT LAW**
5                   BY:    **LAURENCE D. KING, ATTORNEY AT LAW**

6                              Kaplan Fox & Kilsheimer LLP
                               850 Third Avenue
7                              New York, New York 10022
                               (212) 687-1980
8                   BY:    **FREDERICK S. FOX, ATTORNEY AT LAW**

9    For Movant Bridgestone
     Investment                Kahn Swick & Foti LLC
10   Corporation Limited:      912 Cole Street, Suite 251
                               San Francisco, CA 94117
11                             (415) 459-6900
                    BY:    **RAMZI ABADOU, ATTORNEY AT LAW**
12
     For Movant
13   Glen Littleton:           Levi & Korsinsky LLP
                               1101 30th Street NW, Suite 115
14                             Washington, D.C. 20007
                               (202) 524-4290
15                  BY:    **NICHOLAS I. PORRITT, ATTORNEY AT LAW**

16   For Movant Tesla
     Investor Group:           Labaton Sucharow
17                             140 Broadway
                               New York, New York  10005
18                             (212) 907-0700
                    BY:    **CHRISTOPHER J. KELLER, ATTORNEY AT LAW**
19
     For Movant Tesla
20   Investor Group:           Keller Lenkner
                               150 N. Riverside Plaza, Suite 4270
21                             Chicago, IL 60606
                               (312) 741-5220
22                  BY:    **ASHLEY C. KELLER, ATTORNEY AT LAW**

23

24           (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff
     FNY Investment        Susman Godfrey L.L.P.
 3   Advisers, LLC:        1900 Avenue of the Stars, Suite 1400
                           Los Angeles, CA 90067-6029
 4                         (310) 789-3102
                           BY:  MARC M. SELTZER, ATTORNEY AT LAW
 5
     For Plaintiff
 6   FNY Investment        Entwistle & Cappucci
     Advisers, LLC:        299 Park Avenue, 20th Floor
 7                         New York, New York 10171
                           (212) 894-7200
 8                         BY:  ROBERT N. CAPPUCCI, ATTORNEY AT LAW

 9   For Movant
     James Johnson:        Hagens Berman Sobol Shapiro LLP
10                         715 Hearst Avenue, Suite 202
                           Berkeley, CA  94710
11                         (510) 725-3000
                           BY:  REED R. KATHREIN, ATTORNEY AT LAW
12
     For Defendants
13   Elon R. Musk          Fenwick & West LLP
     and Tesla, Inc.:      555 California Street, 12th Floor
14                         San Francisco, CA  94104
                           (415) 875-2300
15                         BY:  DEAN KRISTY, ATTORNEY AT LAW
                           BY:  JENNIFER C. BRETAN, ATTORNEY AT LAW
16

17

18

19

20

21

22

23

24

25
```

| 1 | <u>**Thursday - November 15, 2018**</u>                    <u>**1:58 p.m.**</u> |

 2                    P R O C E E D I N G S

 3                        ---o0o---

 4        **THE CLERK:**  Calling Civil Action 18-4865, Isaacs

 5   versus Musk, et al., related to Civil Action 18-4876, 18-4912,

 6   18-4939, 18-4948, 18-5258, 18-5463, 18-5470, and 18-5899.

 7        Counsel, please approach the podium and state your

 8   appearances for the record.

 9        **MS. CABRASER:**  Good afternoon, Your Honor.  Elizabeth

10   Cabraser, Lieff Cabraser Heimann & Bernstein, together with my

11   partner Katherine Lubin Benson, for movant, lead plaintiff

12   applicant Mr. Dany David.

13        **THE COURT:**  All right.  Thank you, Ms. Cabraser.

14        **MS. MYERS:**  Good afternoon, Your Honor.  Danielle

15   Myers, and with me is my partner Rachel Jensen, from Robbins

16   Geller Rudman & Dowd, along with the Lieff Cabraser firm, for

17   lead plaintiff movant Dany David.

18        **THE COURT:**  All right.  Thank you.

19        **MR. CHOI:**  Good afternoon, Your Honor.  Mario Choi,

20   Kaplan Fox & Kilsheimer.  With me are partners Fred Fox and

21   Larry King for the movants Tempus International and Opportunity

22   Unique Fund.

23        **THE COURT:**  All right.

24        **MR. FOX:**  Good afternoon, Your Honor.

25        **THE COURT:**  Thank you.

**PROCEEDINGS**

1      **MR. ABADOU:**  Good afternoon, Your Honor.  Ramzi Abadou

2  from the Kahn Swick & Foti law firm, here in San Francisco, on

3  behalf of Bridgestone Investment Corporation Limited.

4      I'd also like to take a moment to introduce my client,

5  Jian Liu, who flew down from Toronto for the hearing today.

6      Thank you, Your Honor.

7              **THE COURT:**  All right.  Thank you.

8      **MR. PORRITT:**  Good afternoon, Your Honor.  Nicholas

9  Porritt of the Levi & Korsinsky firm, representing movant

10  Glen Littleton.

11              **THE COURT:**  All right.  Thank you.

12      **MR. CHRISTOPHER KELLER:**  Good afternoon, Your Honor.

13  Chris Keller, Labaton Sucharow, representing the Tesla Investor

14  Group; and with me, by no relation, is Ashley Keller, who's

15  also representing the Tesla Investor Group.

16              **THE COURT:**  Thank you.

17      **MR. SELTZER:**  Good morning, Your Honor.  Marc Seltzer

18  of Susman Godfrey representing applicant FNY Investment

19  Advisers LLC, and with me is my co-counsel, Robert Cappucci.

20              **THE COURT:**  All right.  Good afternoon.

21      **MR. KATHREIN:**  Good afternoon, Your Honor.  Reed

22  Kathrein, with Hagens Berman Sobol Shapiro, representing movant

23  James Johnson.

24              **THE COURT:**  All right.  Thank you.

25      **MR. KRISTY:**  Good afternoon, Your Honor.  Dean Kristy,

**PROCEEDINGS**

1  Fenwick & West, with my colleague Jennifer Bretan.   We

2  represent Tesla and Elon Musk.

3          **THE COURT:**  All right.   Great.   Thank you.

4      You're outnumbered slightly here.

5          **MR. KRISTY:**  Yeah, I'm a little lonely.

6          **THE COURT:**  Yeah.

7      Well, what I'd like to concentrate on -- I know there are

8  lots of sort of very particular issues affecting various of the

9  proposed lead plaintiffs, some of those of a sort of

10  qualitative nature.

11      But what I'd like to do is take some time to talk about

12  some of the more larger issues to help me understand what the

13  potential, for instance, conflicts are and who should be

14  included and not included in the class, because there are so

15  many different kinds of investors and investments, long and

16  short options, stock purchases, and that may have some effect

17  on how we measure -- or how I measure who has the greatest

18  financial interest.

19      So, for instance, do I look at the aggregate in the end,

20  the net to each proposed lead plaintiff; or do I have to sort

21  of subcategorize those and look for those who had the largest

22  interests within a particular class of purchasers or sellers?

23      And so it is a little bit different here because it's

24  almost like taking a sneak peek at class cert issues in

25  advance, which I think is somewhat appropriate.

**PROCEEDINGS**

1          On the other hand, I do that cautiously because I don't

2     know enough at this point -- I don't know if anybody does -- to

3     make any definitive determinations about whether there are

4     going to be subclasses and that sort of thing.

5          But it'd be helpful to hear from you on some major points,

6     and I have some specific questions that have arisen.

7          So let me first ask -- and I'm going to ask by -- for no

8     other reason -- I could do this alphabetically.  I'll just do

9     so based on the size of the asserted total loss.  I know that's

10    in dispute.  But just to have some order, rather than your

11    coming up at random, I'll give each of the representatives a

12    chance to say something.  I'd like, though, to limit your

13    remarks to a couple of minutes so that we can get through; and

14    if I have further questions, I can come back to you.

15         And if there's nothing you have to add, don't worry.  It's

16    not going to be held against you that you chose not to say

17    anything.  In fact, that may be a plus.

18         So one question is:  Who belongs in the class?  I mean,

19    there are some obvious people, but maybe you can help me make a

20    little chart here.  And some of the papers have done that, but

21    in terms of the different kinds of investors and investments.

22         And let me start with the representative of Tempus

23    International that has the biggest asserted loss, and then

24    Tesla Investment Group, and then Bridgestone, and then

25    Mr. Littleton, Mr. David, Mr. James, and then the

PROCEEDINGS

1   FNY Investment.

2       So give me a list of who should be included in the class,

3   what kinds of investments.

4       **MR. CHOI:**  Mario Choi, Kaplan Fox.

5       To be perfectly honest with you, I think that obviously

6   the long purchasers and the short sellers should be in part of

7   the class -- or the putative class.

8       At this point, I actually don't think that there is really

9   a need to specify, honestly, because I think everybody here is

10  not going to disagree that they all had losses based on Tesla

11  and Mr. Musk's misrepresentations.  It just calls into question

12  who has the largest financial loss in this case.

13      But keeping it short and sweet, the long purchasers, as

14  well as the short sellers.

15      I can see option holders also as part of the class, having

16  reviewed the papers myself.  They, too, have asserted losses.

17  Obviously, at the class certification stage, and based on

18  discovery and expert opinion, that may change; but at this

19  point, I think they are a part of this putative class as well.

20      **THE COURT:**  All right.  Thank you.

21      Maybe at this point I should ask the defense side, because

22  I think you may have a slightly different view, or maybe I

23  misunderstood your view.  Who should be excluded at this point?

24      **MR. KRISTY:**  I think everybody should be excluded,

25  Your Honor.

1      **THE COURT:**  All right.  Thank you.

2          That's called a short and sweet answer.

3      **MR. KRISTY:**  Your Honor, I think the -- it's been very

4  interesting to read the plaintiffs' submissions because they

5  highlight a lot of the issues that are going to come up in

6  various ways, either on the motion to dismiss, presenting

7  issues of reliance, transaction causation, loss causation,

8  damages, and certainly will come up on class certification.

9          What's very clear to me is one thing that the class cannot

10 be.  And it's alleged in some of the complaints, including in

11 some of the lead plaintiff motions, which is they say all

12 transactions or all purchasers and all sales, without

13 differentiation of what they're talking about.  So, for

14 example, the core argument of some of these people is "I want

15 it to be all transactions."

16         Well, it can't be because, accepting for a moment, for

17 purposes of argument today, that the stock price was inflated.

18 When the stock price was inflated, somebody who purchased it

19 may have suffered a loss.  Think of your typical common stock

20 purchaser.  But the person who sold it, who, under the

21 definition of about half of the people in this room, would be

22 included, that person profited.  That person doesn't belong in

23 the class.

24         So it's not kind of our burden just yet, at this point in

25 the case, to say who --

1      **THE COURT:**  When you say "sold," are you talking about

2    sale of common stock?  Or --

3      **MR. KRISTY:**  Sure.  Sale of common stock, in that

4    situation, the guy who's on the other side of the transaction

5    of that purchase.

6      **THE COURT:**  Sold during the inflated period?

7      **MR. KRISTY:**  Correct.

8        And right now, the definitions in the existing complaint,

9    and even to some degree on these motions, don't explain how

10   both a purchaser and seller can be in the same class.  They

11   can't be.  One might have a claim.  The other one doesn't.

12       Now, the arguments you might make are, well, we're talking

13   about a certain type of seller.  It's going to be a short

14   seller who, in some ways, is really a purchaser, or some

15   options trader or what have you.  Not my burden just yet to

16   tell them how they should define their class, but it can't be

17   the way they've been defining it so far.

18       That said, I think the most serious issues that you will

19   see on the motion to dismiss and the class issues really

20   surround what I'll call the short sellers, the derivative

21   securities, the options kinds of traders.  Those will be

22   probably at the most forefront and present some of the more

23   complex issues.

24       But they're going to be the master of their pleading, and

25   we'll see how they allege it.  But it can't be everybody.  That

**PROCEEDINGS**

1   just doesn't work.

2           **THE COURT:**  Right.  But you acknowledge that there may

3   be some who sold, quote/unquote; but depending upon their

4   situation, it's conceivable that obviously a short seller may

5   have suffered a loss and maybe derivatives, to some extent.

6           **MR. KRISTY:**  Sure.

7       Now, keep in mind, Your Honor, that the short seller,

8   while they're called a short seller, are actually --

9           **THE COURT:**  Are actually buying, right.

10          **MR. KRISTY:**  They are actually buying, right.  They're

11  a type of purchaser.  They're not really a seller.

12          **THE COURT:**  Right.

13          **MR. KRISTY:**  So somebody's going to have to explain

14  how these other sellers get into the case.  I would have

15  thought it would be just all purchasers of different types.

16          **THE COURT:**  Okay.

17          **MR. KRISTY:**  That's our perspective.

18      The only other comment we had on this whole thing was just

19  one of efficiency, but I won't address that now.  That was in

20  our submission.

21      From our perspective, who the lead plaintiff is and who

22  the lead plaintiff counsel is, that's not really our place to

23  say.

24          **THE COURT:**  You want one to deal with as opposed to --

25          **MR. KRISTY:**  Well, or the minimum number.

1    And what I don't want to have, Your Honor, is if it's

2    going to be a foreign applicant -- we have some applicants here

3    who are in Hungary, who are in other parts of Europe or in the

4    Middle East, have investment advisers in Brazil.  If they're

5    appointed -- that's up to this side of the aisle, if you

6    will -- I want to make sure that they're going to participate

7    in discovery, assuming this case gets past the motion to

8    dismiss, here.

9        I don't want to hear about the Hague Evidence Convention.

10   I don't want to hear:  Defendants, you have to go to Brazil to

11   take a deposition.

12       They want to sue here; they want to lead here; they should

13   be here.  And I think that's our primary concern.

14            **THE COURT:**  All right.  Thank you.

15            **MR. KRISTY:**  Thank you, Your Honor.

16            **THE COURT:**  All right.  You want to respond?

17            **MR. CHOI:**  I do want to respond, Your Honor.

18       Some of what defense counsel has said, it is true that it

19   is the master -- the lead plaintiff is the master of the

20   complaint.  And so, obviously, whomever is selected as lead

21   plaintiff will take into consideration all of the issues that

22   come into play before making that judgment call as to who

23   should be and who should not be in the -- in the -- in the

24   class.

25            **THE COURT:**  Did you have an answer to -- a theoretical

**PROCEEDINGS**

1   answer or hypothetical answer to:  What's an example of a

2   seller that --

3           MR. CHOI:  Well, Tempus is one of those who short-sold

4   before but then purchased because of the --

5           THE COURT:  Right.  So the argument is, even though

6   you're called a short seller, you're actually purchasing during

7   the class period.

8           MR. CHOI:  Exactly.

9           THE COURT:  Can you conceive of anybody who sold

10  during the class period, not a short seller in that sense that

11  suffered damage, causally suffered damage as a result of the

12  alleged misrepresentation?

13          MR. CHOI:  I can.  I can see that there will be --

14  there may be -- you know, obviously, that will be subject to

15  review and to discovery.  There may be certain individuals or

16  groups or people who sold -- who short-sold and then made a

17  gain or made a profit during the class period.

18      But this isn't the case here.  None of the --

19          THE COURT:  What I was asking is:  Can you conceive of

20  somebody who sold during the class period who, nonetheless,

21  would have a claim here because they lost somehow, suffered a

22  loss?

23          MR. CHOI:  Yes.

24          THE COURT:  What's an example of that, even -- how

25  could somebody lose if they sold when the stock was

**PROCEEDINGS**

1  artificially inflated during this short window?

2      **MR. CHOI:**  I am sure that one of my colleagues would

3  want the podium.

4      **THE COURT:**  All right.  Let me go in order here.

5      **MR. PORRITT:**  I can give you a very concrete example.

6  Nicholas Porritt, Levi & Korsinsky.

7      **THE COURT:**  All right.  Let me -- I said I would go

8  down the list.  You'll have your chance.

9      So from the Tesla Group.

10      **MR. ASHLEY KELLER:**  Thank you, Your Honor.  Ashley

11  Keller for the Tesla Investor Group.

12      Let me concretely answer your question.  The class should

13  include purchasers of common stock during the relevant class

14  window.  It doesn't matter whether they were purchasing to go

15  long or buying to cover.  They should be included.

16      When we filed the initial complaint, we included sellers

17  of securities as well.  And that may seem confusing because if

18  you sold stock at an artificially inflated price, to

19  Your Honor's previous set of questions, it seems like you've

20  benefited from the fraud so that shouldn't be included.  But

21  what we had in mind, and what I suspect my able colleague was

22  about to say, are sellers of puts.

23      If you sold put options, you are a seller of a security,

24  the put option; but you are effectively taking a bet that the

25  underlying stock is going to rise in price.  And if it happened

**PROCEEDINGS**

1    during the class window, you were harmed as well, just as a

2    purchaser of stock.

3        **THE COURT:**  Well, if you're a put, if you own a put,

4    aren't you betting that the price will go down?

5        **MR. ASHLEY KELLER:**  Yes.  If you own a put, you are.

6    But if you sell a put, if you're short a put, writing a put, to

7    use the language of the industry, you're taking the opposite

8    bet.  So that's why sellers should be included.

9        I cannot contemplate, contrary to my colleague who just

10   spoke, a situation where someone was selling stock during the

11   inflated period and that that would count.

12       **THE COURT:**  Because that's the kind of seller who

13   would be included in the class?

14       **MR. ASHLEY KELLER:**  The seller of a put should be

15   included in the class.  I do not believe that the seller -- a

16   net seller of stock should be included in the class.

17       **THE COURT:**  Right.

18       **MR. ASHLEY KELLER:**  But there's another key point to

19   make here.  You've heard me say it in describing each of those

20   types of securities.  I would also add that buyers of call

21   options during the relevant class window should be included in

22   the class.  They were harmed as well.  Buying a call option is

23   also the equivalent of taking a bet.

24       **THE COURT:**  Because they paid an inflated price?

25       **MR. ASHLEY KELLER:**  That is exactly right.  They paid

1    an inflated price as a result of the underlying reference

2    security, here being Tesla stock, being inflated in value.

3            THE COURT:  All right.  So it's not the sellers of

4    stock per se.  It has to be sellers of something very

5    particular; in this case, sellers of a put option.

6            MR. ASHLEY KELLER:  That's correct.

7            THE COURT:  And then buyers of a call option.

8            MR. ASHLEY KELLER:  But a key point -- and I don't

9    mean to go into argument yet if you wanted to focus on this

10   narrower issue.  But you had to have been a purchaser of stock

11   or calls or a seller of puts during the relevant period while

12   the securities were tainted by fraud.  If you purchased a call

13   on August 2nd or in December of 2017, that can't count.

14   Mr. Musk hadn't even contemplated his tweet, I imagine, at

15   those periods of time.  And so, similarly, if you were trading

16   in put options prior to the class --

17           THE COURT:  Well, I understand this may inform the

18   measure of damages because there's been some critique that

19   people are looking at not the values immediately before the

20   statement, but some period of time before, which includes

21   market gains or losses, which are irrelevant from a causal

22   point of view.

23           MR. ASHLEY KELLER:  That's right.  That's the *Dura*

24   case.

25           THE COURT:  Got it.  Thank you.

1       **MR. ASHLEY KELLER:**  Thank you, Your Honor.

2       **THE COURT:**  All right.  For Bridgestone.

3       **MR. ABADOU:**  Good afternoon, Your Honor.  Ramzi

4  Abadou.  May it please the Court.

5       **THE COURT:**  Thank you.

6       **MR. ABADOU:**  Our view, and I think the view of

7  plaintiffs generally in this case, given the complaints that

8  have been alleged and filed, is that at this point it would be

9  a mistake, Your Honor, to limit the class in any way.  These

10  are detailed, complex issues that all of us will sort out with

11  the benefit of expert analysis before a consolidated complaint

12  is filed and/or at class certification.

13       You can imagine somebody who purchased before Musk's tweet

14  on August 7th who held those shares through partial

15  disclosures, which almost every complaint before the Court,

16  that I think the Court is going to consolidate, alleges.  The

17  truth doesn't always come out at once.  If you're induced to

18  hold through a partial disclosure and you analyze that partial

19  disclosure, you may decide to sell; you may decide to hold.

20       So I think it's a mistake for plaintiffs, at this early

21  stage, to start discussing how we're going to deal with

22  damages.

23       Now, people may come back at the end of the case, if

24  there's a settlement or a resolution, and object at the plan of

25  allocation or object under Federal Rule of Civil

1    Procedure 23(e)(5) and say this doesn't make sense or this

2    isn't fair.

3        But Congress, in enacting the PSLRA, didn't design and

4    explain what "largest financial interest in the relief sought"

5    meant.  It's one of the phrases in the statute that's not

6    defined.  Most Courts have looked at it as a rough proxy for

7    recoverable losses.

8        And so I think the process the Court used today in

9    identifying the top three losers, for lack of a better word,

10   makes sense under *Cavanaugh*.  Right?  That's what *Cavanaugh*

11   teaches.

12       In 2002, Judge Kozinski wrote that this process is

13   straightforward and it's sequential.  You start with the

14   biggest claim loss.  You look at the arguments that are raised

15   about that loss.

16       Here, we've raised arguments about Tempus, OUF, and

17   whether or not the vast majority of their losses are --

18           **THE COURT:**  And I will get to that.

19       **MR. ABADOU:**  Okay.

20           **THE COURT:**  So I'm not there yet.

21       So I've asked you to address one specific issue, and your

22   two minutes is just about up.

23       **MR. ABADOU:**  Thank you, Your Honor.

24           **THE COURT:**  All right.  Thank you.

25       For Mr. Littleton.

PROCEEDINGS

1          **MR. PORRITT:**  Nicholas Porritt, again,

2    Levi & Korsinsky.   Thank you, Your Honor.

3          Mr. Keller did, in fact, anticipate the example I was

4    going to give.   So, and I think he identified the long

5    positions and options.

6          Also included in the class in several of the complaints,

7    if not all of them, are also option holders who had short

8    positions, which may also involve purchases and sales,

9    depending on whether it's a put or a call.

10         When you have a price that's volatile during the class

11   period, as alleged, in response to various statements by

12   defendants, the stock price goes up; it goes down.   There may

13   well be short sellers as well who also may have positions.

14         I think, in general, over the course of the class period,

15   it's the long positions that suffer the most losses; but there

16   may be short positions there as well, in addition to the shorts

17   who held --

18         **THE COURT:**  Right.

19         **MR. PORRITT:**  -- in the class period.

20         I think at this stage, I would agree that it's premature

21   at this stage.   In every class -- in every securities class

22   action, you have members in the defined class who have suffered

23   no loss.   In a conventional class action, you have the

24   so-called in-and-out purchasers who purchased during the period

25   of inflation before a corrective disclosure.   They are defined

**PROCEEDINGS**

1    as purchasers during the period, but they are excluded, if you

2    like, from recovery, ultimately, in any settlement due to the

3    plan of allocation, the operation of the plan of allocation.

4         I think, Your Honor, here, looking at -- so I think it's

5    premature to start managing the class at this point.  As

6    the Court observed, I don't think the Court has enough

7    information to do what is going to be a very complex job.

8         I think what the Court needs to -- what I would suggest,

9    respectfully, is that the Court needs to look ahead as to how

10   this is going to -- how these issues are going to come up in

11   the future, and ensuring here that the class, as a whole, is

12   represented and you have broad representation of the various

13   different constituencies.

14        Because if the class here is defined down to, say, just be

15   purchasers of common stock, for instance, the result is going

16   to be that the option holders are going to file a second case

17   in this court, which will end up back here before Your Honor

18   and you'll be facing this exactly.  So I think it's more

19   efficient to have it all in one case.

20             **THE COURT:**  Right.

21         **MR. PORRITT:**  And the second thing that you may face

22   is, ultimately, should this result in a settlement -- I mean,

23   the straight liability questions -- What did Mr. Musk mean when

24   he made his tweet?  What was his intent? -- are fairly

25   straightforward, and it's a very defined class period here.

1   The issue is all about the damages and who should be in the

2   class.  That's the complexity here.

3       **THE COURT:**  So let me ask you -- and I'm going to

4   shift a little bit rather than -- I'm going to give, now,

5   everybody who hasn't had a chance to talk to address the other

6   question I have, which is evolving out of what you just said;

7   that is, potential conflicts.

8       I understand it may be premature to try to manage the case

9   and do a pre-Rule 23 analysis; and yet I think I have to have

10  some understanding of what potential conflicts, if any, there

11  are.  So I'd be curious what your -- one division is between

12  long and short.  People who had to close the short during the

13  class period paid a higher price to put the stock back, and

14  they suffered.  And, of course, people who purchased at the

15  height suffered.  So they both have that in common.

16      Are there conflicts that you can foresee -- whether in the

17  way the class is managed, defined, litigated -- are there any

18  potential conflicts between long and short, just to put it in a

19  very rough way?

20      **MR. PORRITT:**  I can foresee potential conflicts.  It

21  really -- what it's going to depend -- and I think more

22  analysis needs to be done in terms of the reaction of the stock

23  price.  And it's almost -- it's literally almost minute by

24  minute in this particular case for certain days, as to where

25  people placed trades and how that affects their particular

**PROCEEDINGS**

1    trading strategy at any particular point in time.

2        So I can see -- I can foresee down the -- down the road

3    that people will be claiming losses from different trading

4    strategies as a result from the same statement.  I'm not sure

5    that's necessarily a conflict per se in the sense that I'm not

6    sure one class can't recover if the other class does.  I mean,

7    they may be supplementary in that regard.

8        Where there may be a conflict is when you ultimately end

9    up, say, there is a resolution.  I don't think I'm being too --

10   I'm not claiming too much degree of foresight to predict that

11   this case may end up with a settlement, as many of these cases

12   do, as opposed to trial.  And if you end up with a settlement

13   fund, how that gets distributed between the various

14   constituencies, that is where I think a potential conflict

15   might arise at that particular point in time.

16       And that is where I think you almost want to get ahead of

17   it.  That is going to occur, and you almost want to get ahead

18   of it by making sure the constituencies are represented in the

19   case throughout and are involved in the settling of the

20   settlement fund.

21       And if we end up with a dispute in front of Your Honor as

22   to how to divide up the settlement fund, at least everyone is

23   informed, and you don't have one person with a status of lead

24   plaintiff and everyone trying to sort of object.  I don't think

25   that's a helpful aspect.  I think it would be better if

**PROCEEDINGS**

1  everyone was being involved in setting up -- everyone wants the

2  biggest fund as possible.  It may be in dividing it up that the

3  conflict arises.

4          **THE COURT:**  All right.  Thank you.  Appreciate that.

5          **MR. PORRITT:**  You're welcome.

6          **THE COURT:**  So let me hear on that second issue --

7  because I think I've heard enough on the first issue -- from

8  Mr. David's counsel.

9          **MS. MYERS:**  Good afternoon, Your Honor.  Danielle

10 Myers on behalf of Dany David.  May it please the Court.

11         With respect to the conflict issue, Judge Whyte -- and

12 that's Judge Whyte with a Y -- in the *McKesson* decision

13 actually considered the interests of several different

14 conflicting shareholders in their requests for appointment as

15 lead plaintiff, and specifically said that speculations about

16 possible conflicts at the lead plaintiff stage do not rebut the

17 presumption that one lead plaintiff can vigorously pursue all

18 available causes of action on behalf of all possible defendants

19 under all possible theories.

20         And we would submit to Your Honor that, yes, while this

21 case involves longs, shorts, and options transactions, there

22 are several movants before the Court that have invested in

23 those various types of securities.

24         And we've cited to Your Honor two Ninth Circuit decisions,

25 the *Hanon* case and the *Blackie* case, that talk about

**PROCEEDINGS**

1    sophisticated investors and reliance on the fraud-on-the-market

2    theory, which I think is really the crux of the question.  And

3    both of those Ninth Circuit decisions, in addition to,

4    actually, the *Basic* decision from the Supreme Court, talk about

5    the theory that it's hard to imagine any type of investor that

6    doesn't rely on market integrity at the end of the day.

7         **THE COURT:**  So would it be your view that a lead

8    plaintiff in this case could be comprised of someone or some

9    entity that only did short sales, because they relied on market

10   integrity, they were injured by the alleged fraud, et cetera,

11   et cetera?  Is it your view, then -- this presumption that

12   anybody could be trusted and trusted to litigate the interests

13   of all sellers, what's your view on that?

14        **MS. MYERS:**  As long as that short seller is typical

15   and adequate and purchased stock.  Right?  So the short seller,

16   as Your Honor recognized, actually did purchase to cover.  So

17   as long as that short seller purchased to cover and suffered a

18   loss in reliance on the fraudulent -- allegedly fraudulent

19   statements during the class period and, obviously, meets the

20   typicality and adequacy inquiry, then, yes, Your Honor.

21        We also pointed the Court to both Judge Alsup's recent

22   class certification decision in the *LendingClub* case, where the

23   defendants in that case asked the Court proactively at class

24   certification to exclude short sellers.  And Judge Alsup

25   declined to do that because the Court recognized that if you

**PROCEEDINGS**

exclude a short seller -- they are a purchaser -- and if they

purchased stock and lost on that transaction, they're entitled

to be in the class.  And because the class definition said "and

damaged thereby," the short sellers didn't need to be excluded.

        We also cited to Your Honor in our papers --

        **THE COURT:**  Is there a problem if a short seller

closed their sale, let's say, right at the height of the fraud;

and therefore, subsequent partial disclosures really had no

impact because they were out of the transaction; they already

paid the price at that point?  Or that might affect those who

are in a long position or purchase position; there may be more

complicated -- I don't know -- causal questions.  Do you see

any difference there?

        **MS. MYERS:**  I do see differences, depending on when

anyone bought and sold in the class period.  If somebody bought

before Mr. Musk's tweet, they don't have a causation problem.

Right?  So it's going to depend on the allegations of the

consolidated complaint, which is going to be up to the lead

plaintiff to frame and make sure that we allege concretely who

was harmed when by what.

        And I do believe that a consolidated complaint by any

qualified lead plaintiff will be able to make sure that there's

a concrete, cohesive theory whereby every investor -- long,

shorts, and options -- there won't be conflicting theories of

the fraud as to the nature of each type of investment, if that

PROCEEDINGS

1    makes sense.

2        **THE COURT:**  All right.   Thank you.

3        **MS. MYERS:**   Thank you.

4        **THE COURT:**   Appreciate it.

5    Let me hear from Mr. Johnson's counsel.

6        **MR. KATHREIN:**   Good afternoon, Your Honor.

7        **THE COURT:**   Good afternoon.

8        **MR. KATHREIN:**   Reed Kathrein.

9    I think you know from my papers that I'm probably the king

10   of conflicts here.   I do see conflicts.   I do see a big

11   problem.

12   I agree with Mr. Littleton that now's not the time to

13   exclude anyone from the class.   We've got some pretty broad

14   definitions, and I think most all those definitions are

15   represented by people in the room.

16   But as I point out in our papers, that there are conflicts

17   which will arise if there's a limited fund here.   And I'm

18   assuming that Tesla is a limited fund.

19   We haven't even tried to determine how much the options

20   damages are.   But just in long damages, or those who just

21   purchased based on volume and an inflation of about $19 or

22   39 -- I'm not sure which one offhand -- back-of-the-pocket was

23   about 700 million, maybe a billion dollars in damages,

24   excluding options.   It could be much more.

25   But we do think everyone should be included.   And I think

**PROCEEDINGS**

1   people here are demonstrating that people do stand in different

2   shoes and have different interests in mind.  I think it's -- it

3   would be folly to think that one party would be able to cover

4   everyone's interests and represent everyone's interests.

5          I will say that another example, we do have people like

6   Mr. David who started out the class period being short.  He

7   shorted immediately after the tweet and then, the next day,

8   covered it at a profit.  So even they may be in a different

9   shoe.  They may want to start out with a class that covers

10  sellers.

11         So in our case, I don't want to talk about the particulars

12  of any individual plaintiff or the value.  I think you're going

13  to get to those later.

14         But we do see that the three buckets of shorts -- and by

15  that, I mean people who were short before the class period and

16  then covered during the class period should be one basket --

17  longs, people who just bought during the class period, weren't

18  covering a short.

19         And the reason for that distinction is because, we talked

20  to many short sellers, and we told them that:  Your damage

21  theory is going to be different because you have an actual loss

22  between what you paid -- what you sold the stock for at the

23  short -- many of them were selling at 300 -- and 389, where you

24  covered.  That's what you guys want, and if I was representing

25  you, that's what I would argue for.

**PROCEEDINGS**

1        But that's a huge dollar amount, and it's really going to

2   eat up any settlement; whereas representing the long

3   purchasers, just those who purchased, it's pretty well

4   determined by the law that we're looking at the inflation.  And

5   that's how much the stock went up and went down as a result of

6   his tweet.  And it's -- I believe it's approximately $39.

7        That is a huge difference between an $89 damage.

8        **THE COURT:**  Well, does that suggest that we should

9   start thinking about subclasses now, between long and short,

10  because of the different damages approach and the likely

11  potential of looking at a limited fund?

12        **MR. KATHREIN:**  That's what I'm suggesting, Your Honor,

13  because ultimately, you're going to have a conflict on those

14  theories and it's better to get them all at the table now

15  rather than see a settlement and a preliminary approval of a

16  settlement and then wait for objectors to come in.  And it will

17  also give defendants the shot to come in and argue their

18  position up-front.

19        So I do suggest that we have three subclasses:  a class

20  of short, a class of long, and a class of options.

21        And options have so many different variables to argue

22  about.  I'm not sure that I would be -- want -- that I would

23  even want to represent them and argue about things such as

24  strike price, duration, volatility, maturity.  So in this -- in

25  this circumstance, I think that we should be looking at

PROCEEDINGS

1  subclasses.

2        **THE COURT:**  And what does that imply for the decision

3  now before me with respect to lead plaintiff?

4        **MR. KATHREIN:**  I think you should appoint a lead for

5  longs, and basically, I think the two contestants there would

6  be Tempus and the Tesla Investor Group.

7        Options, that would be Mr. Littleton and --

8        Mr. Ramzi, your client, I don't remember his name.

9        **MR. ABADOU:**  Bridgestone.

10       **MR. KATHREIN:**  And then out of the longs, I think it

11  would be Mr. Johnson and FNY.

12       I think Mr. David starts the period with a short position,

13  purchasing shorts, and I think he should be excluded.

14       **THE COURT:**  All right.  Thank you.

15       Let me hear from FNY.  And you can comment on that last

16  point too.

17       **MR. SELTZER:**  Yes, thank you, Your Honor.  Marc

18  Seltzer, Susman Godfrey, on behalf of FNY.

19       I agree with what Mr. Kathrein just said.  I don't think

20  you need a crystal ball to see that there are very divergent

21  interests here between the people who bought stock long, the

22  people who shorted the stock, and options traders.

23       With respect to the short sellers, they have a very

24  different theory and approach to this case than somebody who

25  bought the stock long.  They are ones who essentially were

1    discounting the market price, thinking that the stock was

2    overvalued and the stock would fall.  And then when the tweet

3    happened, afterwards, they covered.  They weren't forced to

4    cover, but they did cover.

5         What happened afterwards to the price of the stock upon

6    disclosure is really irrelevant to their case, but it's

7    critical to the long purchasers, to establish that the

8    disclosure revealed a falsity in the statements that Mr. Musk

9    made which caused the stock to drop.  That's one issue that

10   they have.

11        The second issue is one of becoming subject to a potential

12   defense of lack of reliance.  It's not hard to see that the

13   defendants would argue that a short seller can't argue that the

14   short seller relied upon the integrity of the market price of

15   the stock when they believed that the price was overstated.

16   That, again, is a critical distinction between the short

17   sellers and people who are buying on the open market, buying

18   the stock long.

19             THE COURT:  Repeat that point again, that there

20   couldn't be reliance on the integrity of the market?

21             MR. SELTZER:  In other words, if you're selling

22   short --

23             THE COURT:  Yeah.

24             MR. SELTZER:  -- you're someone who is subject to a

25   defense that you're not relying upon that the market price is

1  validly setting the price of the stock.

2      That's the fundamental assumption of the

3  fraud-on-the-market theory in *Basic against Levinson* and,

4  before that, *Blackie against Barrack*.

5      If I'm selling short, I'm testifying by my conduct that

6  the market price is not validly set.  I'm saying that it's

7  overstated.  So in that sense, I'm subject to a defense that I

8  would not be relying upon the integrity of the market in

9  selling the stock short.  That would be the focus of an

10  argument that you could anticipate the defendants would make

11  that they can't make against somebody who's buying the stock

12  long.

13      Second, Your Honor, with respect to the derivative

14  purchasers or traders, they have such a complicated different

15  approach to the valuation of their securities than would a

16  common stock purchaser.  As Mr. Kathrein mentioned, you look at

17  issues in applying the Black-Scholes model of volatility,

18  duration, maturity dates, the level of short-term interest

19  rates, none of which are relevant to the question of proving

20  the long purchasers' claims.

21      So as I said at the outset, Your Honor, you're not going

22  to need a crystal ball to see that there are going to be very

23  divergent approaches here; and you might as well resolve it

24  now, because each group, I think, deserves their own

25  representative who would adequately represent their interests

1   and make the arguments on behalf of these groups without being

2   weighed down with trying to resolve and represent groups that

3   have conflicting interests.

4          THE COURT:  Well, aren't those -- I understand how the

5   damages analysis and perhaps some of the substantive analysis

6   might diverge.  Maybe you can explain to me why they

7   necessarily conflict.

8          Why couldn't somebody who had both a long and a short

9   position be able to argue without tension between them?

10  Assuming no limited fund and we're not talking about competing

11  for a finite, you know, zero-sum game, but just advancing

12  litigation, why are those inconsistent?

13         MR. SELTZER:  Well, if you look at the damage

14  approach, for example, the short sellers are saying -- and this

15  is how they measure their losses in their papers -- that "We're

16  entitled to damages based upon the price that we sold short and

17  the price that we had to cover."

18         That has nothing to do with the common stock purchasers.

19  Their --

20         THE COURT:  But it's based on the theory that had it

21  not been for the fraud, their cover price wouldn't have been so

22  high.  It would have been covered a lot easier.  So they lost

23  that margin.

24         MR. SELTZER:  Now get into what's the difference in

25  the inflation.  What piece of the inflation would they be

1    proving is due to Mr. Musk's tweet?  What portion is due to the

2    inflation they thought already was built into the securities?

3        The common stock purchasers aren't going to have that kind

4    of difficulty in apportionment.  They can make their argument,

5    and their expert reports deal with what the price would have

6    been based upon the factors they take into account, not some

7    factors that the short sellers obviously acted on in selling

8    short.

9        So there's a real tension here in terms of --

10        **THE COURT:**  Again, I'm not sure where the tension is.

11   One may be predicated on a number of factors that don't inform

12   the other analysis.  But it's conceivable one could have one

13   number for their damages and the other group, because they have

14   a different theory, have another number.  But it's not clear to

15   me how they conflict.

16        **MR. SELTZER:**  Because if you look at what the experts

17   would say -- What would the price have been absent the

18   tweet? -- that's what the experts for the common stock

19   purchasers, the long purchasers, would be testifying about.

20        **THE COURT:**  Yeah.

21        **MR. SELTZER:**  What would the short sellers' expert be

22   testifying about?  What difference -- what difference would the

23   price have had -- had been, taking into account the fact that

24   they believed that the stock was overstated at the time that

25   they shorted the stock?

1          In other words, you're going to have conflicting expert

2     reports about what the damages are in this case; and that's a

3     built-in inherent conflict in terms of the litigation strategy

4     and approach.  And that's why --

5          THE COURT:  I guess I'm not -- maybe I'm simplifying

6     things.  At the end of the day, it's causally related.  Why

7     isn't it the same question?  Had Mr. Musk not tweeted what he

8     did compared to the market -- the actual market given the

9     tweet, there's a certain delta there.  And I'm not sure why

10    they may have -- shorts may have different expectations,

11    different analysis, different investment strategies; but at the

12    end of the day, it's how is it divorced from that delta?

13         MR. SELTZER:  Because the delta that the short sellers

14    would want to prove is different than the delta that the common

15    stock purchasers would want to prove.  That's the difference.

16         THE COURT:  That's what I'm trying to understand.

17         MR. SELTZER:  Because the short sellers have to take

18    into account the fact that when they sold short, they thought

19    the price was already inflated.  The common stock purchasers

20    wouldn't take that position.

21         THE COURT:  Well, that may have been their

22    expectation, and they may have been wrong due to market forces

23    that they didn't anticipate.  But those market forces are not

24    part of the damages, I would think.  The only part of the

25    damages are those causally related, whether you sold short or

1    long, to the tweet.

2        **MR. SELTZER:**  But it's not market forces.  They're

3    saying that the market wasn't validly setting the price at the

4    time that they shorted the stock.   That's a big difference than

5    the position that the common stock purchasers would be taking,

6    that at all times the market was reflecting all the available

7    information and was fairly pricing the stock until it was

8    impacted by the false tweet that Mr. Musk made.   That's a very

9    big difference in approach.

10       And, Your Honor, with respect to these issues, there are

11   cases that are directly on the money.   You have the *Zlotnick*

12   case, which is cited in the papers, which says that short

13   sellers can't represent long purchasers.   And there are other

14   cases that stand for that proposition.

15       This is not something that is a brand-new concept that is

16   being introduced in this case.   There are other cases cited in

17   the papers that stand for exactly the same proposition and go

18   into some detail as to why there is this conflict of position.

19       And, again, you also have the question that -- the

20   question that their lack of reliance is going to be a focus of

21   litigation.   That shouldn't be an issue that impacts negatively

22   the long purchasers.   They should have their own plaintiff that

23   isn't subject to that kind of a defense.

24       **THE COURT:**  Have there been any cases -- and is the

25   case you just cited, was that decided in the context of class

**PROCEEDINGS**

1    cert or in the context of selecting proposed lead counsel in

2    the PSLRA case?

3        **MR. SELTZER:**  You know, I believe the case I just

4    mentioned was in the context of class cert, but I'd have to

5    double-check to be sure.

6        **THE COURT:**  Are there any cases that have decided to

7    take this issue on and inform the way the Court decided to

8    choose lead?  Because it almost makes the Court decide the

9    Rule 23 question up-front.

10       **MR. SELTZER:**  Well, in a way, it anticipates the

11   Rule 23 question.

12       But as a question of case management, as I said, it's not

13   going to take a crystal ball to see that these issues are going

14   to come to the --

15       **THE COURT:**  Well, it may take a crystal ball to find

16   out exactly whether the conflicts in the different approaches

17   are actually conflicting and irreconcilable.

18       And I have to balance that against, yes, ideally, perhaps

19   we would have lead plaintiff and lead counsel for every group

20   that has a different theory.  In your case, you're proposing

21   three.  But that complicates the manageability, the efficiency,

22   and everything else in this case at the beginning point, partly

23   as a prophylactic measure to anticipate what you think is going

24   to be a problem down the line.  But it also means we've now

25   sort of tripled the expenditure of this case and committed to

1   it up-front, which I'm a little hesitant to do this early on

2   without having a full, robust Rule 23 analysis.

3       **MR. SELTZER:**  Well, there are cases that have

4   separated out representation at the outset.  The *BP* case is one

5   that did that at the time of the appointment of lead

6   plaintiffs, where the Court anticipated there would be the

7   kinds of issues in terms of separate interests being pursued in

8   different ways by different groups of plaintiffs.

9       I say, Your Honor, that I understand the desire to have

10  this as simple as possible, but what you have is the notion

11  here of having such a heterogeneous class that includes people

12  with conflicting interests, to say that it should be

13  represented by one lead plaintiff at this juncture when you can

14  see fairly readily down the road that it's going to be

15  separated out anyway, so you're going to have that division of

16  responsibility ultimately in this case --

17      **THE COURT:**  All right.  Let me ask you two questions,

18  then.  What about you have a situation where you have some

19  proposed lead plaintiffs that cover a couple of these bases,

20  that are common stock purchasers as well as option traders.

21  You have some that actually were on all sides of it and had

22  some short, some long, some --

23      **MR. SELTZER:**  Yes.

24      **THE COURT:**  So why wouldn't a simple-minded approach

25  be, well, let's minimize the number of plaintiffs.  We can

1    select the plaintiff that kind of had all three experiences, or

2    at least two of those, as opposed to three separate.  Why not

3    semi-consolidation?

4         MR. SELTZER:  It would be like -- and this may be an

5    extreme hypothetical.  Imagine one lawyer representing three

6    clients at the same time, each suing the other.  It would

7    simplify the proceeding there, that one lawyer in court

8    representing all three, but it would be a divided loyalty.

9    That lawyer would be asked to assume, which would be

10   contrary --

11        THE COURT:  Doesn't that assume that the parties are

12   completely adverse?  Whereas here, there is one common thread.

13   I mean, you want to say, whatever position you're in, that

14   Mr. Musk violated the law when he did, allegedly, what he did

15   and there were consequences in the market because of that.

16        MR. SELTZER:  I understand that, but then you have

17   different groups of people who were differently harmed,

18   according to their allegations, by what he did.  And the

19   proof -- the method of proving how they were harmed, the

20   mechanism of that harm is going to be very different and at

21   odds with each other, in terms of how they present their cases.

22        That's the nub of the problem here.

23        THE COURT:  All right.  Let me hear -- and I'll just

24   throw this open to anybody else on the plaintiff side that has

25   a differing view with respect to the need to sort of subdivide

**PROCEEDINGS**

1    at this point.

2         MR. SELTZER:   And, Your Honor, if I may, just one last

3    comment.   The *Aronson/McKesson* case was cited.   That was a

4    case, there was an option issue in that case; but there were

5    plaintiffs arguing, well, you have to have a separate plaintiff

6    for a 10b5 claim and a separate plaintiff for a 14(a) claim and

7    a separate plaintiff for a Section 11 claim.

8         There was no need to do that.   And the Court said the mere

9    possibility of a conflict that was, you know, entirely

10   theoretical didn't justify separating out the plaintiffs at

11   that point in time.

12        In the *Blackie versus Barrack* case that was cited, there

13   the issue was, Your Honor, there was a years-long fraud that

14   took place and there was an accelerating fraud, and the issue

15   was whether or not there was some conflict in the plaintiffs in

16   terms of the position they would take on damages on behalf of

17   all of the purchasers of the stock.

18        THE COURT:   All right.   Thank you.

19        MR. SELTZER:   Very different case.

20        THE COURT:   All right.   Let me hear from the --

21        MR. SELTZER:   Thank you, Your Honor.

22        THE COURT:   If you'd state, again, for the record.

23        MR. ABADOU:   Ramzi Abadou on behalf of Bridgestone,

24   Your Honor.

25        I do take a different view, but I think there's something

**PROCEEDINGS**

1   more important than that, which is I think the Ninth Circuit

2   takes a different view.  And we cited this at ECF 123 at the

3   ECF pinpoint 12 in our brief.

4        And I think it's very important for the Court to consider

5   this decision by the Ninth Circuit in a case called

6   *In re Cohen*.

7        And many of the movants who've asked for separate

8   representation -- and I know why they're doing it -- have done

9   so to get a position in the case.

10       But the Ninth Circuit said, in dicta, in a footnote,

11   sua sponte but it's still very important, that:

12            "The appointment of multiple lead plaintiffs

13        would . . . tend to run counter to the sequential inquiry

14        we outlined for selection of lead plaintiff."

15       In *Cavanaugh*.

16       And the Court says:

17            "Although none of the parties raise the issue, the

18        district court may have erred in appointing 'co-lead

19        plaintiffs,' a practice occasionally employed by district

20        courts."

21       What's fascinating about that, Your Honor, is in that

22   footnote, the Ninth Circuit panel cites two decisions:  *Yousefi*

23   *versus Lockheed Martin* out of the Central District of

24   California -- I believe it's a 1999 case -- and Judge Brieant's

25   case, *In re Oxford Health*, where the Courts did precisely what

1   you're asking about, after the mandatory 60-day deadline,

2   grouping together different investors with purported different

3   interests.

4       And the Ninth Circuit, I think, in *Cohen* was very

5   concerned about this because it tends to run afoul of

6   *In re Cavanaugh*, which is 306 F.3d 726, and I think the

7   substantive discussion is at 730 through 732.  And I think as

8   the Court is grappling with these issues, it ought to consider

9   what the Ninth Circuit said in *Cohen*.

10      Now, as a matter of practicality, this isn't the first

11  time courts have had to grapple with arguments of competing

12  interests and intra-class conflicts.  Arguably, the most

13  complex case that I'm aware of that was litigated in post-PSLRA

14  times is *In re Enron*.  And Judge Harmon's decision, which we

15  cite in our papers, deals with this very issue.  She had

16  bondholders, short sellers, options traders.  And what she did,

17  and what other judges who have been confronted with these

18  subclass arguments have done, is said one lead plaintiff and

19  one lead counsel can represent the interests of all investors.

20      At the end of the day, all of us on the plaintiff side are

21  on the same team.  Our job is to maximize the recovery for the

22  class.

23      Bridgestone, as the Court may know, has losses on common

24  stock and options, which is important, but it's not the

25  critical point.  The critical point under *Cavanaugh* is losses

**PROCEEDINGS**

1    suffered in sequential inquiry.  The Ninth Circuit specifically

2    says in *Cavanaugh* it's not a relative inquiry.  This is not a,

3    quote/unquote, beauty contest where, you know, firms talk about

4    how great they are and how the plaintiffs talk about -- I think

5    the Labaton group talked about its group being elegant.  That's

6    not what this is about.

7       The other thing the Ninth Circuit said in *Cavanaugh* is

8    that you don't do this on a round-robin basis.

9       And so I was -- you know, it's one thing that I teach my

10    students at Berkeley Law is, if there's binding authority that

11    may not be good for you, you've got to point it out to

12    the Court.  You have to point it out to the Court.

13       So now we have a filing that was submitted, I believe,

14    yesterday, Your Honor, by FNY and Mr. Johnson.  Didn't comply

15    with Rule -- Local Rule 73(d).  They didn't get permission from

16    the Court to file a supplemental brief.  They effectively filed

17    a new lead plaintiff motion --

18       **THE COURT:**  No.  I understand that.  I'm not here --

19    we could be here all day if we're going to start --

20       **MR. ABADOU:**  Sure.

21       **THE COURT:**  I'm not interested in going down that

22    road.

23       Let me hear from anybody else who has a comment about --

24       **MR. ABADOU:**  Thank you.

25       **THE COURT:**  Thank you.

1        -- about whether there is such an obvious conflict at this

2   point that the Court would be advised to start dividing up lead

3   plaintiffs.

4        **MR. ASHLEY KELLER:**  Thank you, Your Honor.  Ashley

5   Keller again for the Tesla Investor Group.

6        I, too, will make a statement against interest here.  If

7   the Court were to subdivide the groups, the Tesla Investor

8   Group has Dr. Shirazi, which is the largest single long-only

9   purchaser.  But nonetheless, we didn't advocate that the Court

10  break things up because we don't think that that is warranted

11  or appropriate here under the law.

12       That having been said, there are potential tensions and

13  conflicts between the various constituencies here that are

14  still grounded in economic common sense.

15       A point to make, though, is that I don't think that

16  there's a conflict necessarily between shorts and longs who are

17  buying shares of a security.  A long buys shares to open a

18  position.  A short, covering, buys shares to close out a

19  position.  But as Your Honor alluded to previously, they're

20  both buying shares, and they're both buying at an artificially

21  inflated price tainted by fraud.  And so the damages measure is

22  going to be the difference between the fraud-tainted price and

23  the price that ultimately would have obtained had there not

24  been fraud.  So there's really no tension there as a result of

25  the price inflation, nor is there a tension because of fraud on

**PROCEEDINGS**

1    the market.

2        I have to confess, there are some cases that say short

3    sellers can't represent a class because they don't have the

4    presumption of reliance; but with all due respect to the

5    jurists who issued those opinions, they're just flat wrong.

6        If you buy a share of stock, you also don't believe in the

7    market price if you're long.  You think that the stock price is

8    going to appreciate.  Everybody who trades in the stock market

9    does it to make money, and so they don't believe that the

10   current clearing price is the one that's going to obtain in the

11   future.

12       A short seller believes in the future the stock's going to

13   go down; a long buyer believes in the future the stock is going

14   to go up.  They both have to get the presumption of reliance or

15   nobody does.  And so that's not the reason that there's a

16   tension in this case.

17       The real tension in this case comes between those, at

18   least on the stock side -- and we can talk about options in a

19   moment.  But on the stock side of the ledger, the real tension

20   is between those who purchased immediately after the tweet, the

21   first moments of the class period, and those who purchased

22   later in time.

23       This is not the sort of securities fraud case where you

24   had a fraud that was put into the market, it artificially

25   inflated the price of the stock, and then at some discrete

**PROCEEDINGS**

1 future moment in time, there was a corrective disclosure, the

2 stock price dropped, and then everybody could say, "Oh, look at

3 the difference in price the moment before and the moment after

4 the corrective disclosure.  We now can measure everybody's

5 damages."

6   This was a series of dribs and drabs of information coming

7 out where the market got partial corrective disclosures, but

8 then the defendants came out with new statements that gave

9 false hope once again to the company going private at 420 a

10 share.  And so people could reasonably rely for lots of periods

11 of time over the proposed class period here, August 7th through

12 August 17th, on the misinformation that was being put into the

13 market.

14   If you purchased a share of stock, whether to cover or

15 just to go long, immediately after the tweets, you're in a very

16 different position, from an incentives perspective

17 economically, than someone on the 17th.

18   And so rough back-of-the-envelope damages, whether you say

19 it's $700 million or a couple of billion dollars, roughly a

20 third of the damages can be measured, if you're looking at the

21 90-day lookback price, on the first day of the tweet.

22   The bulk of the damages, two-thirds of the damages are for

23 purchasers or sellers of securities, purchasers of stock or

24 sellers of puts that happened on August 8th through

25 August 17th.

**PROCEEDINGS**

1       Folks like Tempus and OUF have zero economic incentive to

2   protect the interests of those absent class members because

3   they covered their position exclusively on the first day of the

4   class period.  That's a real tension.

5       Yes, they want to fight for a big pot of money from Tesla;

6   but to the extent that Tesla came to them and said, "Hey, let's

7   agree that the class window is really just a day" -- and make

8   no mistake -- and you can ask the defendants here, if you'd

9   like -- they are going to hotly dispute the class period

10  running all the way through August 17th.  They'd like to cabin

11  their exposure and say that the market became aware of the

12  misinformation far earlier.  And so it's going to require

13  zealous advocacy to get that type of class period.

14          THE COURT:  So if there's an investor group or

15  investor that engaged in transactions throughout the class

16  period, that would be an ideal lead plaintiff?

17          MR. ASHLEY KELLER:  Yes.  And you'll be shocked to

18  know that the Tesla Investor Group has.

19          THE COURT:  Surprise, surprise.

20          MR. ASHLEY KELLER:  Yes.  But, so the economic points

21  here, though, are important.  And I would refer the Court to

22  the expert declaration that we had submitted from

23  Professor Daines from Stanford --

24          THE COURT:  Right.  Thank you.

25          MR. ASHLEY KELLER:  -- who's a law and economics

PROCEEDINGS

1   person.

2           THE COURT:  All right.  Thank you.

3           MR. ASHLEY KELLER:  Thank you, Your Honor.

4           THE COURT:  Chance for rebuttal, I guess.

5           MR. CHOI:  Yes.  Thank you very much.  Mario Choi for

6   Tempus and OUF.

7       I strongly disagree with my learned colleague there.  As

8   Tempus and OUF have submitted declarations, there's no question

9   that Tempus and OUF will represent the interests of all

10  individual purchasers or sellers who have been damaged by the

11  misrepresentations made by Tesla and Mr. Musk.

12      And numerous courts have actually rejected this

13  front-loading argument.  For instance, Judge Alsup, in *Luna*

14  *versus Marvell*, in a class certification case, pointed out that

15  this equity conflict is present in almost every large case.

16  And there's not a reason to make this suggestion that Tempus

17  and OUF would not duly represent the putative class.

18          THE COURT:  Let me ask you, since you're here.  I did

19  want to ask you the question about the magnitude of the

20  asserted damages and the contention that the 15.8 million was

21  vastly overinflated because it's not just the loss that

22  occurred, but it's the loss that should be measured as to what

23  the -- perhaps the sale price would have been just immediately

24  before the tweet and compared -- relative to the closed-end

25  price during that period, not the actual purchase price -- or

**PROCEEDINGS**

1  not the actual beginning of the transaction, because that takes

2  into account all sorts of other market things that have nothing

3  to do with it.

4      So if you look at the time period, if you try to

5  extrapolate, at least one estimate was that your losses are

6  more in the range of 3.386.

7          MR. CHOI:  3.4.

8          THE COURT:  Something like that, yeah, as opposed to

9  15.8.

10     What do you say to that?

11         MR. CHOI:  I say to that, that -- and prove me if I'm

12  wrong by my colleagues -- but everybody, every movant in this

13  case did what we did.  We looked at the sales -- in our case,

14  we looked at the sales price; we looked at the purchase

15  price --

16         THE COURT:  Actual sales price.

17         MR. CHOI:  -- the actual sales price; we looked at the

18  actual purchase price; and we did the deduction.

19     Every single movant here did the same thing.

20         THE COURT:  Well, but does that make it right?  If

21  you're doing a short sale, why should the actual sales price

22  make a difference when, prior to the tweet, things, let's say,

23  didn't go the way you expected, your investor didn't expect?

24  Why should that be included in the aggregate damages to be

25  recovered?  It's not causally related to the tweet.

1      **MR. CHOI:**  Well, Your Honor, at this point I don't

2  think it's necessary to describe -- to go into that issue of

3  damages.

4      **THE COURT:**  Except when I've got to decide who's got

5  the largest -- I have to do some rough -- this is what's

6  complicated.  Now you want me to Rule 23 it.  Now you want me

7  to do a damages assessment as if we're at trial or something,

8  and there's even a request to do discovery.  So I do have to

9  look at that, and there's a big difference between 15.8 and

10  3.4.

11      **MR. CHOI:**  Well, Your Honor, we submit that we did

12  what was required of us.  We looked at the prices that we, in

13  this case, shorted; and then, because of the tweet that -- the

14  tweets that Mr. Musk presented, we bought to cover those

15  purchases.  So in that case, we relied on the market and

16  relied -- Tempus and OUF relied on the information provided in

17  the market to make that decision to purchase.

18      Therefore, we submit that the way that we have handled the

19  purchase pricing and the sales pricing and doing the

20  subtraction makes us the largest.

21      And going into the discovery issue, just to cover -- just

22  to cover that basis, our reply brief essentially answers

23  everything that the Left movant group has requested of us.

24  So --

25      **THE COURT:**  Okay.  I appreciate it.  Thank you.

**PROCEEDINGS**

1      Along those same lines, let me ask the Bridgestone

2   representative the specific question about a large portion of

3   the claim damages here, the 3.8, 3.9, I think it is --

4          **MR. ABADOU:**  Yes, Your Honor.

5          **THE COURT:**  -- includes -- there's some question about

6   I think it was some call options at -- I don't know if it was

7   the strike price or the price that --

8          **MR. ABADOU:**  Oh, sure.

9          **THE COURT:**  -- didn't make a whole lot of sense

10   relative to what Mr. Musk said.

11      And how could it be causally related to the tweet?

12          **MR. ABADOU:**  Sure, Your Honor.

13      That's the January 2019 call, I believe, with a strike

14   price of $450.  What they're arguing, essentially, is that the

15   tweet said 420.  Right?  We've secured funding or funding

16   secured at $420.

17      And I think the argument that's being made is that there's

18   no reliance there because they are assuming, incorrectly, that

19   he didn't rely -- Bridgestone -- I'm sorry.  Mr. Liu is here --

20   but Bridgestone didn't rely on the tweet in making that

21   investment.  It's incorrect.  Bridgestone did rely.

22      And there's absolutely nothing inconsistent with the 450

23   strike price because what you're saying is, what you think, as

24   a long investor, is that this is going to be a really good deal

25   and it's going to go for more than 420.  People are going to

1    get on board with this private transaction.  The stock market

2    is going to support this move, and it's going to go to 450.

3        So to the extent that they're arguing that there's no

4    reliance, they're simply incorrect.  Mr. Liu, on behalf of

5    Bridgestone, certainly relied on the tweet in purchasing that

6    particular option.  And like I said, he's here today.  I think

7    he's the only one amongst all the proposed lead plaintiffs who

8    actually showed up today.

9        **THE COURT:**  All right.  Let me ask you one other

10   question vis-à-vis Mr. Littleton.

11       I think Mr. Littleton's pitch is that Mr. Littleton

12   covered both long and short, as well as options and stock

13   purchases; whereas Bridgestone appears to only have gone long.

14   Is that right?

15       **MR. ABADOU:**  That's correct.  Mr. Liu and Bridgestone

16   were long.  Unlike a lot of investors, he believed in Tesla;

17   investors here who lost, who bet against the company.  He

18   drives a Tesla.  He believed in the company.  He was excited by

19   this news about perhaps a going-private transaction.

20       And the statement turned out -- and I don't want to risk

21   defendants' ire, so I'll throw in the word "allegedly."  You

22   know, the statement was false, and the complaints allege that.

23   So I think that that's incorrect.

24       And I'll make one other note, again, Your Honor, and it's

25   a process issue, which is, you know, I looked at this Court's

1   prior rulings on arguments raised for the first time on reply.

2   And personally, it drives me nuts when I see them.  And I'll

3   quote this Court, where you said:

4          "This Court shall not consider these arguments as

5       they were not raised until the reply brief."

6       And that's *Duarte versus Freeland*, 2008 U.S. District

7   6147.

8       Mr. Littleton could have raised what I view is a pretty

9   terrible argument on opposition.  He didn't, and he waited for

10  the reply to make the argument.  It's unfair.  It's somewhat --

11  I mean, I think that kind of process has turned this into a bit

12  of a free-for-all.

13      So I'm glad that, you know, the Court has imposed some

14  order on this process today, because I think that's consistent

15  with what the Ninth Circuit has asked of us and has asked of

16  the district courts in *Cohen* and *Cavanaugh*.

17          **THE COURT:**  All right.  Let me give Mr. Littleton's

18  counsel a chance to respond and to address the question.

19      If you look at the claimed losses here, I think your claim

20  was 3. -- close to 3.5 --

21          **MR. ABADOU:**  Thank you, Your Honor.

22          **THE COURT:**  -- 3.6 --

23  Thank you.

24      -- whereas the Bridgestone Investment is 3.861, but you

25  question some of that.

1        So I'll give you a chance, number one, to respond to the

2   reply problem; but, also, just as importantly, if not more

3   importantly, how do you turn the edge if one were just, for

4   instance, looking comparatively at these two?

5            **MR. PORRITT:**  Yes, Your Honor.

6        On the reply issue, I think there were -- the lead

7   plaintiff process under the PSLRA is somewhat unusual because

8   you almost need four rounds, because the opening briefs, you

9   have no idea of what -- who else -- who your opponents are when

10  you first move --

11           **THE COURT:**  Felt like 21 rounds to me, 7 times 3.

12           **MR. PORRITT:**  So I sympathize with the Court in that

13  regard.

14       But -- so you don't really -- the arguments often don't

15  get fleshed out until the opposition briefs come in, and then

16  the reply briefs really function as opposition briefs.

17       So, you know, I think it was fairly raised in the reply

18  brief.

19       We do have questions.  We did have questions about the

20  reasons for that trade.  I don't find the explanation terribly

21  convincing.  I think it is --

22       We have heard from defendants, speaking briefly, that they

23  are going to go directly at a motion to dismiss phase; and

24  then, presumably, if it gets into discovery and class

25  certification, at these questions of reliance.

**PROCEEDINGS**

 1          People's individual trading strategies are going to get

 2     examined, and this is one which just does not make sense,

 3     frankly.  And, because if you believe the tweet, then the price

 4     is not going above 450.  So -- or above 420 to reach the 450

 5     strike --

 6          **THE COURT:**  Well, I guess one would ask -- I don't

 7     remember what the expiration date was, but if the expiration

 8     date -- I don't know if it went well past or what it was, but

 9     it's conceivable that the tweet at 420 might have signaled

10     that, well, 450 is not out of range either.

11          **MR. PORRITT:**  I think that's a stretch.  And, once

12     again, it's more as if, do we want to have this litigation --

13     do we want that to become an issue in this litigation, is the

14     question at this point in time.

15          **THE COURT:**  And your position is that does account for

16     about 1.6 million of the -- do I recall?  Or --

17          **MR. PORRITT:**  Yes, Your Honor.

18          So the question is -- the other issue we raised was, we

19     don't know the timing of exactly when those options were

20     purchased.  And if they were purchased, obviously, before the

21     tweet, then obviously they're not part of the case.  And the

22     strike price suggested that perhaps they weren't responding to

23     a tweet suggesting a going-private transaction of 420.

24          So that was really just the question we're raising.

25     Obviously, we do not have discovery at this point in time.

**PROCEEDINGS**

1    So, I mean, I would point out, also in the context of

2    Bridgestone, I think their counsel's presentation here today

3    has made clear that they don't feel able to represent short,

4    people that are short positioned during the class, who are --

5    and that raises the issue, nonetheless, they are advocating

6    that they could represent shorts or there should be just one

7    representative.

8         I think the --

9         **THE COURT:**  Part of your pitch, quote/unquote, is that

10   you've got all bases sort of covered.

11        What about the defense argument or the other arguments

12   I've heard about inherent conflicts, that there are competing

13   theories of recovery and reliance, et cetera, et cetera?

14   Can Mr. Littleton ethically and effectively represent all

15   phases?

16        **MR. PORRITT:**  I think "yes" is the short answer, and

17   I'll explain why.

18        So what is important here, I believe, is that all those

19   constituencies are represented throughout the class -- the

20   period.

21        It's been advocated on behalf of both defendants, for

22   pragmatic reasons, and Bridgestone here that there should be

23   one lead plaintiff, the Enron approach, if you like.  One lead

24   plaintiff could represent everybody, no matter what their

25   interests were.

1       We cited several examples in our brief about cases where

2   that has not worked; where members of the class, when an

3   amended complaint is filed, option holders get dropped out;

4   certain people get dropped out and excluded from the class, and

5   because that lead plaintiff has no interest and an opt out in

6   good faith of that lead plaintiff in assessing that maybe those

7   people shouldn't be in the class or they don't have strong

8   claims, but you want someone with some skin in the game on

9   behalf of those people to be making that decision.

10      And so I agree with Mr. Keller's submission that you want

11  someone who really represents over the entire time period and,

12  also, the general classes of investments to be involved in the

13  decision-making at all aspects of all times of the case and to

14  be here fighting when they're attacking those particular

15  claimants while --

16      **THE COURT:**  And you contend that Mr. Littleton had

17  transactions throughout the entire class period?

18      **MR. PORRITT:**  He did have transactions throughout the

19  class period.  He had long and short during the entire class

20  period.  Not quite every day, but most days.  And so he has

21  direct skin in the game.  It will cost him money to let go

22  short claims, for instance.

23      So I think he would be a very effective advocate in that

24  regard because he has a direct financial interest.  And that,

25  after all, is what the PSLRA says, that financial interest is

PROCEEDINGS

1    the best proxy to be the best monitor and the best advocate on

2    behalf of the class.

3         **THE COURT:**  All right.  Let me hear from the Tesla

4    Group as the last thing I want to talk about, and that is the

5    issue about whether they should be considered a group and

6    whether the aggregation is appropriate, or whether this is a

7    lawyer-driven group of previously unrelated, disparate

8    investors who are put together solely for the purpose of

9    aggregating to meet the PSLRA number, not to tilt the question

10   or anything.

11        **MR. CHRISTOPHER KELLER:**  This is -- I'm Chris Keller

12   with Labaton Sucharow on behalf of the Tesla Investment Group.

13   May it please the Court.

14        All groups are not similarly situated.  There are many

15   courts that routinely appoint groups, particularly in the

16   Northern District of California, so long as the group appears

17   and is demonstrated, through record evidence, that they can

18   operate as a distinct group.

19        And the first proxy for that is:  How do they go about

20   choosing and evaluating counsel selections?

21        This group has submitted a detailed declaration that goes

22   far beyond the joint declarations that are submitted in the

23   vast majority of cases where you have a group seeking to be

24   appointed as the lead plaintiff.

25        In that regard, they detail how they interviewed counsel;

1   how it was their idea to join with other investors; how, in

2   fact, a number of the members of the Tesla Investor Group

3   interviewed both firms.  And it was their suggestion:  Why

4   don't you, the Labaton Sucharow firm and the Keller Lenkner

5   firm, work together?  We'd like to be part of a group that

6   represents all investors.

7        And that's the genesis of this group, which stands apart.

8   For the lawyers in this room who practice in this space and for

9   myself, who's been practicing in this space for 15 years, it is

10  the most authentic, organic investor group I've ever seen.

11       Beyond that, of course, the place we start on the analysis

12  is the statutory text, which very clearly says it's a group.

13  And the measure of whether that group is appropriate is a

14  simple, ordinary, straightforward Rule 23 analysis.  Is it

15  adequate?  Is it typical?

16       And the evidence that we've submitted in that declaration,

17  I believe, supports that strongly.  In fact, it's gone so far

18  beyond the type of evidence that a Court should consider in

19  appointing any lead plaintiff, whether it's a group or it's an

20  individual.  You want to know that that individual has

21  interviewed counsel.  What's their plan to oversee the case?

22       And this, in fact, of course, is going to segue into our

23  opposition to the Tempus/OUF motion.  We heard from counsel

24  from Tempus and OUF that Tempus and OUF are going to protect

25  the class.  "We're going to make sure."

**PROCEEDINGS**

1          Who is Tempus and OUF?  They have no employees.  They have

2     no operations.  They have no office.  They have two directors

3     who are professional directors of offshore companies.  They

4     serve at the pleasure of Opportunity Investment Group.  So

5     they're a figment.  They're a charade.

6          Why -- and so then we go after Opportunity.  We say, well,

7     Opportunity hasn't moved.  Opportunity hasn't submitted to the

8     jurisdiction of the Court.  Opportunity hasn't indicated

9     they're going to come and testify.

10          No, no.  Don't look at Opportunity.  Opportunity is not

11     the lead plaintiff here.  You should ignore Opportunity.  It's

12     Tempus and OUF.

13          But they don't exist.

14          **THE COURT:**  All right.  I will take this matter under

15     submission.  I appreciate it.

16          I do have one question for you.  All your investors, are

17     they on Facebook?  Are they friends?  Are they --

18          **MR. CHRISTOPHER KELLER:**  They have spoken twice.  They

19     do know each other.  It's a very active group.

20          **THE COURT:**  Are they on WhatsApp?  Do they have a --

21     just curious.  Different generation perhaps.

22          **MR. CHRISTOPHER KELLER:**  Thank you, Your Honor.

23          **THE COURT:**  All right.  Thank you.

24          **MR. CHOI:**  Your Honor, before we end this, I just want

25     to point out that contrary to my colleague's insinuations,

1   Tempus and OUF, we have submitted not only declarations of

2   their abilities to don the robe of lead plaintiff, but also, we

3   have provided information as to where they are from and what

4   they do.

5      So I take issue with how the insinuation of my client's --

6   I don't think that that's relevant.

7         **THE COURT:**  I understand.  And I think you've also had

8   a chance in the papers to respond to some of this, and I am

9   aware of that.  So --

10       **MR. CHOI:**  Thank you.

11       **THE COURT:**  -- that's fine.

12     I'm going to take the matter under submission, obviously.

13       **MR. CHOI:**  Thank you, Your Honor.

14       **THE COURT:**  This is the first step.

15     It seems like nobody opposes consolidation.  We're

16   obviously going to move forward.

17     So the next step is to appoint lead plaintiff and lead

18   counsel.

19     We don't have a further status conference date, and I'd

20   like to set one as a control date on the assumption that we'll

21   be able to make -- render this decision fairly quickly, and we

22   can get moving.

23     Maybe we should set a status conference towards the middle

24   of January.  Is that all right?

25       **THE CLERK:**  January 17th, Your Honor.

**PROCEEDINGS**

1        **THE COURT:** All right.  January 17th at 10:30.

2        And once I do appoint lead plaintiff, lead counsel, we'll

3   have protocol issues and a few other things that we'll want to

4   straighten out.  But we will take it one step at a time.

5        So, thank you.  Appreciate your cooperation.

6        **ALL:** Thank you, Your Honor.

7            (Proceedings adjourned at 3:17 p.m.)

8                    ---o0o---

9

10

11            <u>**CERTIFICATE OF REPORTER**</u>

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:   Thursday, November 22, 2018

16

17

18            _Ana M. Dub_

19   _____

20     Ana M. Dub, CSR No. 7445, RMR, CRR, CCRR, CRG, CCG
              U.S. Court Reporter

21

22

23

24

25