UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION. | Case No. 18-cv-04865-EMC<br><br>**ORDER DENYING MOTIONS TO RECONSIDER**<br><br>Docket Nos. 156, 158 |

On November 27, 2018, the Court granted Mr. Littleton's motion for appointment as Lead Plaintiff and approved his selection of Lead Counsel, the Levi & Korsinsky, LLP law firm. *See* Docket No. 152 (order). Within a week, two motions were filed asking for reconsideration of the appointment decision. The motions were filed by Mr. David (who had the greatest asserted loss immediately *after* Mr. Littleton) and Bridgestone (who had the greatest asserted loss immediately *before* Mr. Littleton). The Court ordered full briefing on the motions but indicated that there would be no hearing absent further order of the Court. *See* Docket Nos. 157, 160 (clerk's notices).

Having received and reviewed the full briefing, the Court hereby **DENIES** the motions to reconsider.

## I. FACTUAL & PROCEDURAL BACKGROUND

In the original briefing, the relevant parties claimed that their total loss was as follows:

- Bridgestone: $3,869,744.20.
- Mr. Littleton: $3,518,478.68.
- Mr. David: $439,399.

The Court declined to appoint Bridgestone as Lead Plaintiff for two reasons. First, it had "concerns regarding [Bridgestone's] adequacy or typicality": "Bridgestone held long positions –

both in common stock and options – but does not appear to have held any short positions."

Docket No. 152 (Order at 6). Second, the Court had

> some concern as to whether Bridgestone may have overstated its loss – or at least questions about its loss could well become a unique defense that would preoccupy it. As explained by [Mr.] Littleton,
> . . .
>
> > a substantial part of Bridgestone's total losses of $3,869,744.20 stem primarily from the $1,641,391 in losses it incurred from buying Tesla January 2019 $450 call options [on August 7, 2018]. [Dkt.] No. 52-5. These transactions, however, subject Bridgestone to a unique defense based on this class definition. Specifically, this loss chart (Dkt. 52-5) is proof that Bridgestone purchased the January 2019 $450 call options by not relying upon the first materially false and/or misleading statement issued by Musk on August 7, 2018 at 12:48 p.m. EDT stating that "Am considering taking Tesla private at $420. Funding secured." *See* Dkt. No. 46, at 3. If Bridgestone was relying upon the content of Musk's 12:48 p.m. tweet, it would not have purchased Tesla January 2019 $450 call option contracts because Musk's tweet was clear that he was only considering to take Tesla private at *$420* per share. It simply makes no sense that Bridgestone would have invested $2,156,496 to buy January 2019 $450 call option contracts relying on Musk's 12:48 p.m. tweet when they would expire worthless when Musk took Tesla private at $420. In fact, Bridgestone must have expected that Tesla's stock price would surpass $467.85 per share (the exercise price of $450 plus the highest premium paid of $17.85 for these call option contracts).
>
> Docket No. 118 (Reply at 6) (emphasis in original). This is not to say that a causally related loss based on Bridgestone's purchase of the January 2019 call options cannot be proven; but it does make a substantial portion of its loss assertion uncertain for purposes of the pending motions.

Docket No. 152 (Order at 6-7).

The Court subsequently appointed Mr. Littleton – the next in line after Bridgestone – for the following reasons. First, he had "the largest clear financial interest of the remaining moving parties." Docket No. 152 (Order at 7). In this regard, the Court found that Mr. Littleton had adequately responded to Mr. David's argument that Mr. Littleton was a net seller/net gainer (*i.e.*, that Mr. Littleton had not suffered any loss at all). "Second, Mr. Littleton held interests that cover

2

most of the persons/entities likely to be in the class – *i.e.*, long positions in common stock, long positions in options, and short positions in options – and thus can most adequately represent the class (in light of the differing damages analysis that might apply to each class of investors)." Docket No. 152 (Order at 7).

## II. **DISCUSSION**

Civil Local Rule 7-9 governs motions for reconsideration. In the instant case, both Mr. David and Bridgestone essentially argue for reconsideration on the basis of "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." Civ. L.R. 7-9(b)(3).

A. <u>Mr. David's Motion to Reconsider</u>

In his motion, Mr. David argues that the Court erred in concluding that Mr. Littleton was not a net seller/net gainer. Mr. David maintains that Mr. Littleton was a net seller/net gainer if the Court looks at the transactions that took place during the class period (August 7 to 17, 2018).

The critical transactions – no party disputes such – are the options transactions. (Mr. Littleton had limited common stock transactions and suffered little loss therefrom.) Mr. David notes that, during the class period, Mr. Littleton purchased 2,325 options for more than $9.4 million but also sold 3,630 options for more than $11.9 million. *See generally* Docket No. 42-2 (McCall Decl., Ex. B) (chart of Mr. Littleton's transactions). Thus, according to Mr. David, Mr. Littleton had a gain during the class period of more than $2.4 million. *See* Mot. at 1.

Mr. David's position is predicated on the notion that a party who *sells* securities during the class period profits because, during the class period, the value of the securities is *artificially inflated*. That notion makes sense where the securities at issue are common stock. If the value of the stock is artificially inflated, and a party sells the stock, then he is actually gaining from the fraud.

But, as noted above, Mr. Littleton's critical transactions involved options, not common stock, and Mr. Littleton has provided a sufficient explanation as to why the sale of at least some kinds of options resulted in loss. For example, in his original briefing, Mr. Littleton indicated that investors who, during the class period, sold call options with exercise prices above $420 were

3

injured. *See* Docket No. 118 (Reply at 9) (asserting that "investors with long call positions with exercise prices above $420 were injured as a result of the alleged fraud when they sold their call positions during the class period at times when the option market was affected by Musk's statement that he was thinking to take Tesla private at $420 per share"). Although Mr. Littleton did not precisely explain in his briefing how these investors were injured, his position seems to be that, once Mr. Musk made his statement about taking Tesla private for $420, the investors were essentially forced to sell at a discount their call options with a higher exercise price (the options had less, possibly little value, after the statement was made) and the forced sales resulted in a loss given what the investors had paid to open their position in the call options. The chart submitted by Mr. Littleton detailing his transactions indicate that, during the class period, he was an investor who sold call options with an exercise price over $420 during the class period.

Mr. Littleton has also provided an explanation, as part of his current briefing, as to how investors who sold put options during the class period were injured.[1] An investor who *purchases* a put option expects that the underlying stock will decrease in value. In contrast, an investor who *sells* a put option expects that the value of the underlying stock will rise. (In this respect, a seller of a put option is like a buyer of common stock – *i.e.*, both transact with the expectation that the price of the stock will increase. *See also* Opp'n at 4 (asserting that "selling put options is economically similar to purchasing a share of common stock).) When a fraud is disclosed, the stock will lose the artificial inflation, and the seller of the put option is injured "either by paying an increased cost to repurchase the put option or paying the now above market strike price [that the buyer of the put option can command]." Opp'n at 4. Thus a seller of a put, like the buyer of common stock, pays an artificially high price if he/she sells the put during the class period. The chart submitted by Mr. Littleton detailing his transactions indicate that, during the class period, he was an investor who sold put options during the class period.

Mr. David's main contention in response is that a net seller/net gainer analysis requires a court to "look[] exclusively at what an investor expended and received during the period of

---

[1] This was also discussed at the hearing on the appointment motions.

4

artificial inflation caused by defendants' false statements [*i.e.*, during the class period]. That is not, as Judge Koh recognized [in *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2011 U.S. Dist. LEXIS 16813 (N.D. Cal. Feb. 15, 2011)], 'the same as determining whether a party lost or earned money trading in a particular stock,'" which would involve analysis of pre- or even post-class period transactions. Reply at 5.

But, as Mr. Littleton argues in his papers, *Perlmutter* is distinguishable from the instant case. First, the class in *Perlmutter* was defined as those "who purchased or acquired Intuitive stock during the Class Period." *Perlmutter*, 2011 U.S. Dist. LEXIS 16813, at *4. There was no claim that investors trading in options – in particular, sellers of options – were part of the class.

Second, the net seller/net gainer analysis that Judge Koh conducted in *Perlmutter* was, at the end of the day, simply one means of trying to figure out whether a party had, as a "net" matter, benefitted from the alleged fraud. *See id.* at *29 ("The purpose of isolating the calculation of net sales and net gains to the Class Period is to determine whether a party potentially benefitted from the fraud."). Nothing in *Perlmutter* says that the net seller/net gainer analysis is dispositive, particularly where an explanation is given as to how a seller has been hurt from the fraud.

Third, Judge Koh's comment in *Perlmutter* that the net seller/net gainer analysis "is not the same as determining whether a party lost or earned money trading in a particular stock" must be taken in context. *Id.* Judge Koh's statement regarding the latter was with respect to the following situation:

> As alleged in the complaint, Defendants' fraud artificially inflated Intuitive's stock price during the Class Period. Thus, when Marcus purchased Intuitive stock *prior* to the Class Period, he purchased it at fair market value. When he sold it *during* the Class Period, however, he sold it at fraudulently inflated prices. As a result, instead of being injured by the fraud on these sales, Marcus actually benefitted from the fraud.

*Id.* at *29-30. In the instant case, Mr. Littleton is not claiming that he sold his call options with exercise prices over $420 at artificially inflated prices; rather, he intimates that those options were worth little given Mr. Musk's statement that he would be taking Tesla private at only $420. Likewise, Mr. Littleton is not claiming that he sold his put options at artificially inflated prices; rather, he is maintaining that, once the truth began to be disclosed, he was injured as the seller of

5

put options.

In short, unlike the situation in *Perlmutter*, Mr. Littleton could have lost money when he sold options during the class period. The Court therefore denies Mr. David's motion to reconsider.

B. <u>Bridgestone's Motion to Reconsider</u>

The Court similarly denies Bridgestone's motion to reconsider.

As an initial matter, the Court rejects Bridgestone's attempt to cast the order appointing Mr. Littleton as creating or endorsing a rule that diversity in holds (*e.g.*, both long and short positions) is more important than largest financial interest. The Court followed the prescriptions of 15 U.S.C. § 78u-4. That statute provides in relevant part that "the court shall adopt a presumption that the most adequate plaintiff . . . is the person or group of persons that . . . in the determination of the court, has the largest financial interest in the relief sought by the class" *and* "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(3)(B)(iii). Rule 23 requires consideration of, *inter alia*, adequacy.[2]

The Court should also reject Bridgestone's suggestion that the Court should give no consideration to potential conflicts among the class because "'equity conflict' is 'present in almost every large, complex securities case.'" *Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05477 WHA, 2017 U.S. Dist. LEXIS 178674, at *14 (N.D. Cal. Oct. 27, 2017). Equity conflict, as a general matter, may be "an inappropriate basis for denial of class certification," *i.e.*, on the ground of adequacy. But that does not mean that equity conflict never matters. And here, Mr. Littleton makes a fair point that, even if "long" interests are typically good enough to represent "short" interests, the instant case involves unique circumstances because there are allegations that Mr. Musk took his actions precisely because he wanted to hurt short sellers. That short sellers may

---

[2] Moreover, the statute continues that "[t]he presumption [above] may be rebutted only upon proof . . . that the most adequate plaintiff . . . will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(3)(B)(iii). In the instant case, the chart that Bridgestone submitted regarding its transactions constitutes proof that it did not have short positions and that it purchased call options with an exercise price of more than $420 on August 7, 2018.

6

actually have benefitted once the truth began to be disclosed, *see* Reply at 10, is not dispositive. A short seller, if not damaged, may not be a member of the class. But it is not possible to say at this stage that no short sellers at all are a part of the class or that the number or significance of short sellers is minimal.

As for Bridgestone's argument that the Court is prematurely conducting a damages analysis, *see* Reply at 3, the Court is not entirely unsympathetic to the contention. Nevertheless, "largest financial interest" requires the Court to consider loss and, where the claimed losses of the parties contending for lead position is disputed, the Court must engage in some level of analysis to determine the respective financial interests. Furthermore, it is plausible that Defendants would subject Bridgestone to a unique defense if a large amount of its loss was not sufficiently tied to the alleged fraud. Bridgestone makes a legitimate point that the defense may not win out because – as suggested by several analysts – it was possible that the acquisition would go higher than $420 per share. *See* Reply at 5 (stating that it is not surprising for "acquisition announcement [to] start a bidding war that could lead to a higher transaction price" and citing analysts' assessments suggesting the price would be higher than $420). Nevertheless, that would still be a unique defense that could preoccupy Bridgestone.

Finally, Bridgestone argues that, if the Court is questioning its purchase of $450 call options, then it should likewise question Mr. Littleton's purchase of call options greater than $420. *See* Mot. at 9-10 (arguing that Mr. Littleton's loss should likewise be reduced). But Bridgestone points to purchases of call options made by Mr. Littleton *before* Mr. Musk made the statement about taking Tesla private for $420 on August 7, 2018. *See* Mot. at 9 (referring to purchases made by Mr. Littleton of $450 call options on August 3, 2018, and December 19, 2017; citing pages 6-7 of the chart at Docket No. 42-2). Bridgestone misses the point that its purchase of $450 call options is problematic because it purportedly made the purchase *after* Mr. Musk made the above statement. Bridgestone tries to save itself on reply by arguing that, even if it bought the $450 call options after Mr. Musk's statement, it also ended up selling the options (to close its position) before the class period ended. *See* Reply at 11. But the point is that Defendants can argue Bridgestone never relied on Mr. Musks's statement for the initial purchase. In contrast, Mr.

7

Littleton can argue that he was forced to sell his $450 call options (during the class period) because the value of the options decreased upon Mr. Musk's statement.

### III. CONCLUSION

For the foregoing reasons, the Court denies the motions to reconsider. Mr. David and Bridgestone have failed to show that a manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

Mr. Littleton is ordered to file a consolidated amended complaint within thirty (30) days of the date of this order.

This order disposes of Docket Nos. 156 and 158.

**IT IS SO ORDERED**.

Dated: December 17, 2018

_____
EDWARD M. CHEN
United States District Judge