**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
44 Montgomery Street, Suite 650
San Francisco, California 94104
Tel: (415) 291-2420
Email: aapton@zlk.com
Email: amccall@zlk.com

*Attorneys for Lead Plaintiff Glen Littleton*
*and Lead Counsel for the Class*

[Additional counsel on signature blocks]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 18-cv-04865-EMC<br><br>Hon. Edward M. Chen<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>Demand for Jury Trial</u> |
|---|---|

Lead Plaintiff Glen Littleton ("Plaintiff"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation made by and through Plaintiff's attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Tesla, Inc. ("Tesla") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Tesla; (c) review and analysis of pleadings and other papers filed in the civil proceedings brought by the SEC against Tesla and Defendant Elon R. Musk ("Musk") in the United States District Court for the Southern District of New York, including the complaints filed and judgments entered therein; and (d) review of other publicly available information concerning Tesla.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE CLAIM

1. Plaintiff, on behalf of a class of shareholders who purchased or sold Tesla securities from August 7, 2018 to August 17, 2018 (the "Class Period") and were damaged thereby, brings this federal class action lawsuit against Defendants Tesla, Musk, and Tesla's Board of Directors (defined below). As alleged herein, Musk and Tesla violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j, and SEC Rule 10b-5, 17 C.F.R. 240.10b-5. Tesla's Board of Directors violated Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t. These violations caused Plaintiff and the class billions of dollars of damages for which Defendants should be held accountable.

2. Musk co-founded Tesla and, at all relevant times, served as the company's Chief Executive Officer and Chairman. On August 7, 2018, at 12:48 p.m. ET, Musk tweeted the following message to over 22 million people: "Am considering taking Tesla private at $420. Funding secured." Musk continued to tweet and make statements about the potential transaction including tweeting about three hours later: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." These statements and a later email published on August 13, 2018, created the impression to the public that it was virtually certain that Musk could take Tesla private at $420 per share, that funding for this multi-billion dollar transaction had been secured, and the only remaining contingency was a shareholder vote.

3. In fact, Musk had not even discussed, much less confirmed, key deal terms, including price, with any potential investor. There was no funding secured to take Tesla private at $420 per share or any other price. Musk had discussed taking Tesla private with Saudi Arabia's sovereign wealth fund (named the "Public Investment Fund"), but those discussions were extremely preliminary. They consisted of only exploring how the fund could be involved and did not result in any firm decision on whether the fund would increase its existing 5% stake in Tesla.

4. The statements were also false because Musk himself understood there was "a lot of uncertainty" surrounding the proposal and there were many contingencies that needed to be satisfied

before any transaction could be approved by Tesla stockholders. Musk had not reached any agreement as to the price per share, had not determined how the going-private transaction would be structured, had not determined whether and to what extent current shareholders would be in favor of the transaction or if Tesla's Board of Directors would even be in favor of having a shareholder vote, had not formally retained any advisors, and had not determined whether any regulatory approvals would need to be obtained for the transaction. Musk had also not reached any agreement concerning a significant contingency raised by the Public Investment Fund—building a Tesla production facility in the Middle East.

5. Musk knew of the uncertain and contingent nature of any going-private transaction for Tesla as well as the lack of any secured funding at $420 per share or at any other price. Yet Musk published his tweets and other statements anyway, disrupting the markets in Tesla securities such as stock and stock options, and causing billions of dollars of damage to Tesla investors. Indeed, Musk has since admitted in the fraud case brought against him by the SEC that his statements about the going-private transaction "were premised on a long series of baseless assumptions and were contrary to facts that [he] knew."

6. On August 17, 2018, *The New York Times* published an article based on a lengthy interview with Musk that reported that the Public Investment Fund had not committed to provide any cash, so funding was not "secured." *The New York Times* article further disclosed that no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it indicating that no going-private transaction was imminent. That day, Tesla's shares declined by almost 9%, erasing over $5 billion of Tesla's market capitalization. For investors that initially believed Musk's statements and purchased shares at artificially inflated prices in hopes that Tesla would ultimately pay $420 per share, they sustained millions of dollars in losses.

7. Investors who were "short" Tesla stock (meaning that they were betting the stock price would decline) were also damaged. Tesla had over 170 million shares outstanding at or around August 7, 2018. The "short interest" at that point in time was 33.8 million, meaning that almost 20% of Tesla's shareholders were betting that Tesla's stock would decline in value. Musk's tweet, which caused the price of Tesla's shares to increase 11% over the course of the day, resulted in a

mark-to-market loss of $1.1 billion for these short investors, many of whom had to purchase Tesla shares at inflated prices to cover their positions.

8. Option traders also suffered significant losses. Purchasers and sellers of call and put contracts, which are agreements that provide investors with either the right or the obligation to buy or sell shares at specific prices within particular periods of time, opened and closed positions at artificial prices due to the artificial inflation in Tesla's stock price and the increased implied volatility in Tesla's stock, resulting in damages to those investors.

9. By misleading investors regarding the proposed going-private transaction and its funding, Musk, either intentionally or with deliberate recklessness, harmed virtually every single other person and/or entity trading Tesla securities during the Class Period.

10. Members of Tesla's Board of Directors also bear responsibility for the losses suffered by Tesla investors as a result of Musk and Tesla's misrepresentations. The Board of Directors had responsibility for ensuring Tesla's public disclosures were truthful and accurate. In November 2013, Tesla identified Musk's Twitter account as an official channel of communication for the company. Once that occurred, Tesla's Board of Directors were duty-bound to oversee the accuracy of statements made by Musk on his Twitter account. While Tesla's board members issued press releases regarding the proposed going-private transaction and managed to persuade Musk from tweeting about the transaction for some of the Class Period, they did not use this control to ensure that the disinformation published by Musk was corrected until after the Class had already suffered billions of dollars in losses.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to: Sections 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j, and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5); and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. §78aa.

13. Venue is proper in this District pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District. Further, Tesla's principal executive offices are located within this District.

14. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

15. Lead Plaintiff Glen Littleton purchased and sold Tesla common stock and options during the Class Period and was damaged thereby. Littleton's certification evidencing his transactions in Tesla's securities during the Class Period, previously filed with the Court in connection with his motion for appointment as lead plaintiff, is incorporated herein by reference (ECF No. 42-1).

16. Defendant Tesla is a Delaware corporation with its principal executive offices located at 3500 Deer Creek Road, Palo Alto, California 94304. Tesla designs, develops, manufactures, and sells electric vehicles and energy generation and storage systems. The company's stock is listed on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "TSLA." Other Tesla securities include stock options which are traded and quoted on exchanges including: BOX Exchange LLC; Cboe BZX Options Exchange, Inc; Cboe C2 Options Exchange, Incorporated; Cboe EDGX Options Exchange, Inc.; Cboe Options Exchange, Incorporated; Miami International Securities Exchange, LLC; MIAX PEARL, LLC; Nasdaq BX, Inc.; Nasdaq GEMX, LLC; Nasdaq ISE, LLC; Nasdaq PHLX LLC; The Nasdaq Stock Market LLC; NYSE American LLC; and NYSE Arca, Inc.

17. Defendant Musk co-founded Tesla in July 2003. In early February 2004, Musk became Tesla's majority shareholder and joined the Board of Directors as its Chairman. By October 2008, Musk became both the Chief Executive Officer and spokesman of Tesla and has served in

that capacity since 2008. Musk was forced to step down as Chairman of Tesla's Board in October 2018 in accordance with his settlement with the SEC concerning the statements at issue herein.

18. Musk created a profile on the social media platform Twitter under the handle "@elonmusk" (twitter.com/elonmusk) in June 2009. Since that time, Musk often used Twitter to communicate about Tesla's business.

19. In November 2013, Tesla formally notified investors that it would use Musk's Twitter account as a formal means of communication to convey "additional information" about the company to investors. In a current report on Form 8-K dated November 5, 2013, Tesla stated, in pertinent part, as follows: "Tesla investors and others should note that we announce material information to the public about our company, products and services and other issues through a variety of means, including Tesla's website, press releases, SEC filings, blogs and social media, in order to achieve broad, non-exclusionary distribution of information to the public. . . . For additional information, please follow Elon Musk's and Tesla's Twitter accounts: twitter.com/elonmusk and twitter.com/TeslaMotors."

20. Defendant Brad W. Buss ("Buss") has served as a director of Tesla's Board since 2009. As a member of the Board, Buss acted as a controlling person of Tesla.

21. Defendant Robyn Denholm ("Denholm") has served as a director of Tesla's Board since 2014 and was appointed to chair the Board on November 7, 2018. As a member of the Board, Denholm acted as a controlling person of Tesla.

22. Defendant Ira Ehrenpreis ("Ehrenpreis") has served as a director of Tesla's Board since 2007. As a member of the Board, Ehrenpreis acted as a controlling person of Tesla.

23. Defendant Antonio J. Gracias ("Gracias") has served as a director of Tesla's Board since 2007 and has served as Tesla's Lead Independent Director since 2010. As a member of the Board, Gracias acted as a controlling person of Tesla.

24. Defendant James Murdoch ("Murdoch") has served as a director of Tesla's Board since 2017. As a member of the Board, Murdoch acted as a controlling person of Tesla.

25. Defendant Kimbal Musk has served as a director of Tesla's Board since 2004. As a member of the Board, Kimbal Musk acted as a controlling person of Tesla.

26. Defendant Linda Johnson Rice ("Rice") has served as a director of Tesla's Board since 2017. As a member of the Board, Rice acted as a controlling person of Tesla.

27. Defendants Buss, Denholm, Ehrenpreis, Gracias, Murdoch, Kimbal, and Rice are collectively referred to as the "Board."

## IV. <u>CLASS ACTION ALLEGATIONS</u>

28. Plaintiff brings this action on behalf of all individuals and entities who purchased or sold Tesla stock, options, and other securities during the Class Period and were damaged thereby, excluding Tesla, Musk, the Board, and each Defendant's immediate family members, legal representatives, heirs, successors or assigns, and any entity in which Tesla, Musk, or the Board have or had a controlling interest (the "Class").

29. The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tesla's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands if not hundreds of thousands of Class members. Record owners and other Class members may be identified from records maintained by Tesla or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30. At all relevant times herein, there were over 170 million shares of Tesla's common stock outstanding and hundreds of millions of dollars of other securities traded. Upon information and belief, these shares and option contracts were held by thousands of individuals located geographically throughout the country and the world. Joinder would be highly impracticable.

31. Plaintiff's claims are typical of the claims of the Class members as all Class members were similarly affected by the Defendants' wrongful conduct in violation of the federal securities laws complained of herein. Plaintiff bought and sold common stock and option contracts during the Class Period. The manner in which Plaintiff sustained damages in connection with each security that he held was similar, if not identical, to other Class members who purchased or sold Tesla securities.

32. Plaintiff has and will continue to fairly and adequately protect the interests of the

Class members.

33. Plaintiff has retained counsel competent and experienced in class and securities litigation.

34. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements concerning a proposed going-private transaction and its financing;

(c) whether the price of Tesla's securities during the Class Period were affected by Defendants' conduct complained of herein; and

(d) whether the Class members have sustained damages and, if so, what is the proper measure of damages.

36. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.

37. There will be no difficulty in the management of this action as a class action.

## V. <u>BACKGROUND ALLEGATIONS</u>

38. Tesla designs, develops, manufactures, and sells electric vehicles. These vehicles consist primarily of three models: the Model S luxury sedan, the Model X sport utility vehicle, and the Model 3 mass market sedan.

39. Both the Model S and Model X had experienced production difficulties after being introduced in 2012 and 2015, respectively. As the Model 3 vehicle was to be produced in greater numbers, analysts and investors closely followed Tesla's production plans for it.

40. On October 2, 2017, Tesla issued a press release stating that "Model 3 production was less than anticipated due to production bottlenecks." Despite promising to deliver 1,600 Model 3 vehicles in the third quarter of fiscal 2017, it had produced only 220 of the vehicles. Musk had previously promised on February 22, 2017 that Tesla would be producing 5,000 Model 3 vehicles per week by the end of 2017.

41. On November 1, 2017, in an "Update Letter" posted to its website, Tesla revealed that its manufacturing problems during the third quarter of fiscal 2017 had resulted in heavy spending in an effort to increase production. The spending resulted in wider-than-expected losses—$2.92 per share compared to the analyst consensus of $2.29 per share—and a sharp decline in the price of Tesla's common stock from $331.53 per share to $321.08 per share.

42. Notwithstanding its production problems, Tesla told shareholders in the November 1, 2017 "Update Letter" that it expected to achieve a production rate of 5,000 Model 3 vehicles per week late in the first quarter of 2018.

43. On January 3, 2018, the *Los Angeles Times* reported that Tesla's problems with battery production at its "Gigafactory" in Sparks, Nevada (where Tesla produces lithium-ion batteries and electric vehicles), were worse than it had acknowledged and likely to cause further delays and quality issues for the new Model 3 vehicles. The continued production problems led Tesla to revise its previously stated production targets in a press release dated January 3, 2018. From 5,000 Model 3 vehicles per week by the end of the first quarter of 2018, Tesla told investors that it was aiming for 2,500 Model 3 vehicles per week by the end of March, ramping up to 5,000 Model 3 vehicles per week by June.

44. On January 25, 2018, investors received additional information about Tesla's Model 3 production problems when CNBC reported that Tesla's Model 3 vehicle production was being hampered in part due to the fact that the company was still making its Model 3 vehicle batteries

partly by hand and having to "borrow" scores of employees from Panasonic, which is a partner in the Gigafactory and supplies lithium-ion battery cells, to help with this manual assembly.

45. Numerous short investors had targeted Tesla by this point in time. For example, CNBC reported in its January 25, 2018 article that Stanphyl Capital's Mark B. Spiegel had taken a "significant short position in the company." Spiegel told CNBC, in pertinent part, that: "While I've no doubt that Tesla will eventually work out its Model 3 vehicle production problems, the base model will cost Tesla at least mid-$40,000s to build. The company will never deliver more than a token few for less than the current $49,000 lowest-cost offering. Sales will hugely disappoint relative to expectations of over 400,000 a year. And even at those higher prices Tesla will never come anywhere close to its promised [profitability]."

46. As of January 31, 2018, the short interest in Tesla stock was approximately 30 million shares, or about 18% of Tesla's outstanding shares.

47. On April 3, 2018, Tesla revealed in a press release that instead of producing 2,500 Model 3 vehicles per week, it was only producing just over 2,000. According to the *Wall Street Journal* in an article published on April 3, 2018, Musk had developed a reputation for setting "ambitious deadlines that he fail[ed] to meet on time."

48. As of April 3, 2018, Tesla's short interest had grown to almost 32 million shares, or 19% of the company's outstanding shares.

49. On April 11, 2018, according to an article published by CNBC titled *Tesla is the biggest short in the US stock market*, the dollar amount of shares shorted on Tesla was $10.7 billion, or more than 25% of Tesla's available stock. Big banks, such as Goldman Sachs, were encouraging its clients to sell their Tesla stock on the premise that the company would not be able to meet its Model 3 vehicle production targets.

50. Musk publicly displayed his animosity towards short sellers of Tesla stock. On May 2, 2018, while participating in a conference call to discuss Tesla's earnings for the first quarter of 2018, Musk abruptly dismissed questions from analysts. In response to a question from Sanford Bernstein senior analyst Toni Sacconaghi about Tesla's capital requirements, Musk responded by saying "Boring, bonehead questions are not cool, Next?" In response to a question from RBC

Capital Markets Joseph Spak about Model 3 vehicle reservations, Musk said, "These questions are so dry. They're killing me."

51. On May 4, 2018, Musk defended his hostile behavior towards Sacconaghi and Spak, tweeting that they were just "two sell-side analysts who were trying to justify their Tesla short thesis."

52. Later on May 4, 2018, Musk tweeted "Oh and uh short burn of the century comin soon. Flamethrowers should arrive just in time." Shortly afterwards on May 4, 2018, Musk stated, "Looks like sooner than expected. The sheer magnitude of short carnage will be unreal. If you're short, I suggest tiptoeing quietly to the exit . . . ."

53. On May 7, 2018, Musk bought about $9.85 million worth of Tesla shares in the pre-market in a manner designed have the greatest impact on Tesla's stock price and force a burst of short-covering. On May 7, 2018, Tesla's stock price increased from $297.50 to $302.77.

54. Musk did this again on June 12, 2018 when he bought about $24.9 million worth of Tesla stock to maintain Tesla's stock price despite announcing that Tesla was cutting 46,000 employees, about 9% of its workforce.

55. On June 17, 2018, Musk tweeted that "[the shorts] have about three weeks before their short position explodes."

56. On July 2, 2018 and July 3, 2018, *The New York Times* and *Bloomberg* reported that Tesla finally met its production target of 5,000 Model 3 vehicles per week during the last seven days of June 2018.

57. Despite Tesla's increased Model 3 vehicle production figures, its stock price fell from $342.95 on June 29, 2018 to $310.86 on July 3, 2018. Tesla's short interest, however, also fell by 11% from 39 million shares to 34.6 million shares.

58. On July 22, 2018, the *Wall Street Journal* published a story focused on Tesla's request to suppliers to refund a portion of its past payments. According to this report, Tesla requested its suppliers to refund "a meaningful amount of its payments since 2016" to allow it to continue its operations and continue "the long-term growth between" Tesla and its suppliers.

Tesla's requests for refunds from its suppliers raised further questions about its cash position, which had dwindled due to Model 3 vehicle production issues.

59. Following the July 22, 2018 *Wall Street Journal* article, Tesla's stock price declined from $313.58 per share to $303.20 per share.

60. On July 24, 2018, in response to a growing short interest following the *Wall Street Journal* article, Musk contacted the employer of an author of an article published on *SeekingAlpha* and threatened to sue or complain publicly about the articles. The author, who managed a private family investment portfolio of approximately $1 billion, had published four articles titled "Just Say 'No' To Tesla's Misleading Margin Metric," "As Tesla Breaks Faith With Its Believers, It's Time To Go Short," "Even With Model 3 Success, Tesla Is Structurally Bankrupt," and "Tesla Investors Swallow The Blue Pill." Musk threatened that if the author continued to write, he would engage counsel and sue. As a result of Musk's threats, the author immediately stopped writing at *SeekingAlpha* and deactivated his Twitter account.

61. On July 30, 2018, U.S. News & World Report reported that Steve Eisman, the investor who famously predicted the collapse of the U.S. housing market in 2007 and 2008 and was featured in Michael Lewis's book *The Big Short*, was predicting a similar demise for Tesla. In an interview with Bloomberg, Eisman expressed the opinion that Musk had a hard time executing, despite being a "very, very smart man."

62. By July 31, 2018, Tesla's short interest was back to 35 million shares, or 20% of the company's outstanding stock.

63. On July 31, 2018, Musk and Sam Teller, who was employed by Tesla as Director, Office of the CEO, attended a meeting with representatives of the Public Investment Fund at the "Tesla Factory" in Freemont, California, for approximately 30 to 45 minutes. Deepak Ahuja, Tesla's Chief Financial Officer, joined the meeting about halfway through. On several occasions since January 2017, the Public Investment Fund had expressed interest in exploring with Musk a going-private transaction involving Tesla, but no proposed transaction had resulted from those discussions. During the July 31, 2018 meeting, a representative of the Public Investment Fund

mentioned that the fund would still be interested in exploring a going-private transaction if Tesla was prepared to build a production facility in the Middle East.

64. No additional details or terms were discussed, including fundamental terms such as: the dollar amount to be invested; the ownership percentage for the fund if Tesla was to go private; any acquisition premium to be offered to current Tesla shareholders; any potential restrictions on foreign ownership of a significant stake in Tesla; the fund's available liquid capital to contribute to a going-private transaction; whether the fund was experienced in going-private transactions; regulatory obstacles associated with a going-private transaction; or what, if any, approval from Tesla's Board was needed to take Tesla private.

65. When the July 31, 2018 meeting concluded, no legal documents had been signed, no term sheets had been executed, no advisors had been engaged, and no decision had been made with regard to the Middle East production facility.

66. On August 1, 2018, Tesla reported its financial results for the second quarter of 2018 in an investor "Update Letter" and during an investor conference call. Tesla's results exceeded analyst revenue expectations.

67. In the "Update Letter" published on August 1, 2018, Tesla also affirmed production targets of 6,000 Model 3 vehicles per week by the end of August.

68. Tesla's quarterly results led to a 16% surge in the company's stock price from $300.84 to $349.54.

69. On August 2, 2018, after the market closed, Musk sent an email to Tesla's Board, Chief Financial Officer, and General Counsel. The subject line of the email stated "Offer to Take Tesla Private at $420." In the email, Musk explained that he wanted to take Tesla private in order to, among other reasons, avoid the "constant defamatory attacks by the short-selling community" against Tesla. Musk also asked that the "matter be put to a shareholder vote at the earliest opportunity" and advised that the "offer expires in 30 days." At this point in time, Musk thought there was "a lot of uncertainty" regarding a potential going-private transaction and believed that the likelihood of consummating a transaction was about 50%.

70. According to Musk, the $420 per-share price for the going-private transaction was based on a 20% premium to the closing price of Tesla's stock on August 2, 2018, which was $349.54 per share. Musk believed that 20% was a "standard premium" in going-private transactions. Although the precise calculation equaled $419.49, Musk rounded the price up to $420 per share because he thought his girlfriend at the time, Claire Elise Boucher (also known as "Grimes"), would find it funny due to the significance of the number to marijuana users.

71. Since Musk's meeting with the Public Investment Fund on July 31, 2018, Tesla's stock price had increased over 17% due to the positive earnings results announced by the company on August 1, 2018. If Musk were to have applied the 20% premium to Tesla's stock price as of July 31, 2018 (closing price of $298.14 per share), the per-share price for the going-private transaction would have been approximately $358 per share. Accordingly, if the going-private transaction occurred at $420 per share, investors in the transaction would be paying a "premium on a spike," which Musk realized could make the going-private transaction not feasible. Notwithstanding, Musk did not discuss the $420 per-share price with the Public Investment Fund or any other funding source for a going-private transaction prior to sending his email to Tesla's Board on August 2, 2018.

72. On August 3, 2018, in response to Musk's email, the Board held a telephonic meeting at which time Musk informed the board that the Public Investment Fund was interested in funding a going-private transaction and that the fund was interested in having Tesla build a production facility in the Middle East. Concerning building a production facility in the Middle East, at least one Tesla Board member described such a condition as a "non-starter." Musk also told the Board that he wanted Tesla's existing investors to stay with the company. At least one Board member told Musk that it would be "really difficult for small investors" to remain shareholders if Tesla went private. Musk also asked the Board for permission to contact existing shareholders to assess their interest in participating in a going-private transaction. The Board authorized Musk to contact certain investors and report back.

73. On August 6, 2018, Musk discussed the going-private transaction with a private equity fund partner with experience in going-private transactions. During the call, Musk stated that the number of shareholders in a private Tesla would need to be below 300, yet at the time there

were over 800 institutional investors in Tesla. The private equity fund partner told Musk that the structure he was contemplating for the private company was "unprecedented" in his experience.

74. On August 7, 2018, while driving to the airport, Musk posted the following tweet at 12:48 p.m. ET: "Am considering taking Tesla private at $420. Funding secured."

75. At 1:00 p.m. ET, Martin Viecha, Tesla's Senior Director of Investor Relations, sent a text message to Musk asking, "Was this text legit?"

76. At 1:13 p.m. ET, a Tesla investor texted Teller asking, "What's Elon's tweet about? Can't make any sense of it. Would be incredibly disappointing for shareholders that have stuck it out for so long." Several minutes later, a reporter also texted Teller saying, "Quite a tweet! (Is it a joke?)."

77. At 1:15 p.m. ET, Musk responded to another Twitter user's question, "At what price?" by repeating "420."

78. At 1:40 p.m. ET, Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private. I won't be selling in either scenario."

79. At 2:00 p.m. ET, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment." In response to this tweet another Twitter user asked, "Could we still invest once private?" Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

80. At 2:07 p.m. ET, Musk responded to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely. Am super appreciative of Tesla shareholders. Will ensure their prosperity in any scenario."

81. At 2:08 p.m. ET, NASDAQ halted trading in Tesla stock due to the increased volatility. Trading remained halted for just over one and a half hours until 3:45 p.m. ET.

82. At 2:13 p.m. ET, Musk tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."

83. At 2:23 p.m. ET, a reporter emailed Musk with the subject line reading: "Are you just messing around?" In the email, the reporter said, "Reaching out to see what's going on with your tweets about taking the company private? Is this just a 420 joke gone awry? Are you serious? It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way. Is there an actual explanation coming?" At 3:07 p.m. ET, Musk responded to a Twitter user's comment about a "forced buyout" by tweeting, "Def. no forced sales. Hope all shareholders remain. Will be way smoother & less disruptive as a private company. Ends negative propaganda from shorts."

84. At 3:16 p.m. ET, Musk sent an email to Tesla employees. The content of that email, entitled "Taking Tesla Private," was published to a publicly available Tesla blog at 3:32 p.m. ET. In the email and blog post, Musk explained his reasons for wanting to take Tesla private, including asserting that TSLA was "the most shorted stock in the history of the stock market" and stating that "being public means there are large numbers of people who have incentive to attack the company." The complete email and blog post follows:

> ***Taking Tesla Private***
> August 7, 2018
>
> *The following email was sent to Tesla employees today:*
>
> Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.
>
> First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders. Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term. Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

I fundamentally believe that we are at our best when everyone is focused on executing, when we can remain focused on our long-term mission, and when there are not perverse incentives for people to try to harm what we're all trying to achieve.

This is especially true for a company like Tesla that has a long-term, forward-looking mission. SpaceX is a perfect example: it is far more operationally efficient, and that is largely due to the fact that it is privately held. This is not to say that it will make sense for Tesla to be private over the long-term. In the future, once Tesla enters a phase of slower, more predictable growth, it will likely make sense to return to the public markets.

Here's what I envision being private would mean for all shareholders, including all of our employees.

First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%). My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. If the process ends the way I expect it will, a private Tesla would

> ultimately be an enormous opportunity for all of us. Either way, the future is very bright and we'll keep fighting to achieve our mission.
>
> Thanks,
> Elon

85. At 3:36 p.m. ET, Musk tweeted: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

86. At the close of trading on August 7, 2018, Tesla's stock closed at $379.59, an increase of 10% from its opening price of $343.84.

87. At 5:09 p.m. ET, a research analyst emailed Viecha asking, "In the tweet, [Musk] said financing is secured but in the letter he doesn't address this. Can you clarify?" Viecha responded approximately ten minutes later stating, "I can only say that the first Tweet clearly stated that 'financing is secured'. Yes, there is a firm offer."

88. At 5:23 p.m. ET, another research analyst emailed Viecha and another investor relations team member asking, "Had some questions/clarifications on today's news and blog post. Can either of you speak?" Viecha responded a few minutes later stating, "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else. I only want to stress that Elon's first tweet, which mentioned 'financing secured' is correct."

89. At 7:20 p.m. ET, Viecha received another email from yet another research analyst. Viecha responded by asking if the analyst had read Tesla's "official blog post on this topic." The analyst said, "I did. Nothing on funding though?" Viecha replied, "The very first tweet simply mentioned 'Funding secured' which means there is a firm offer. Elon did not disclose details of who the buyer is." The analyst replied, "Firm offer means there is a commitment letter or is this a verbal agreement?" Viecha responded, "I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets."

90. Investors and analysts relied on and reacted to the August 7, 2018 representations. For example, RBC Capital Markets posted an analyst report on August 7, 2018 reporting Musk's tweets. RBC stated in pertinent part:

> **Tesla going private?** Earlier today, CEO Elon Musk started tweeting about "considering taking Tesla private at $420/share. Funding secured." This was later followed up with a letter to employees detailing the rationale. The structure would apparently be to create a special purpose fund enabling current shareholders to remain shareholders or cash out at $420. This would be subject to a shareholder vote. While we are not assessing probability today, we believe there is substance to the news and note that prior "controversial" shareholder votes (like Solar City) have always voted with Elon.
>
> . . .
>
> **New outside equity?** Elon's tone and messaging regarding a potential transaction lead us to believe that there could be significant outside funding lined up. Learning who this is will be important (and relevant for shareholders deciding whether they should stay involved should the deal consummate). We note an unconfirmed FT article from today indicates that Saudi Arabia's sovereign fund took a 3-5% stake on the public markets, it was also noted they approached Tesla about new shares. In our view, sovereign funds (broadly), cash rich tech companies, Chinese sources and large VCs could all be potential candidates to provide funding.

91. Morningstar Equity Research was similarly positive about Musk's statements. Morningstar published an analyst note on August 7, 2018, titled "Musk Tweets Tesla May Go Private at $420 a Share but Stockholders May Not Have to Sell at That Price." Morningstar's report stated:

> Tesla CEO Elon Musk tweeted around midday on Aug. 7 the following: "Am considering taking Tesla private at $420. Funding Secured." A buyout price of $420 per share would be for about $71.6 billion based on the July 27 outstanding share count of 170.6 million in the latest 10-Q filing, though it's unclear if Musk's roughly 22% ownership stake would be part of the deal or just converted into equity of a new private company. If a deal is announced and we think its execution is more likely than not, we will raise our fair value estimate to the deal price, but for now we are leaving our fair value estimate of $179 in place.
>
> We find it odd that Musk would disclose that he is considering doing a deal and specifying a price rather than not saying anything until Tesla actually announces it is going private. It is possible that he wants to hurt short sellers of Tesla now. He has been very vocal against them recently, including posting a satire video on Twitter on Aug. 5. We think it is also possible that he wants to get a price higher than $420, else we would expect him to simply announce he is considering going private with funding secured and leave the $420 number out of the tweet. We speculate that the funding comes mostly from tech investors, such as possibly SoftBank or Tencent (the latter bought 5% of Tesla in 2017), sovereign wealth funds, and wealthy Silicon Valley investors.
>
> We understand why Musk would want to go private. Rolling Stone in November quoted him saying, "I wish we could be private with Tesla. It actually makes us less

> efficient to be a public company." Tesla is still in its early stages of growth, and we think Musk would prefer to grow the company without having to check in with Wall Street every quarter. He probably instead wants investors who are there for the long run. An Aug. 7 Musk tweet said he would create a special-purpose fund allowing any Tesla investor to remain an owner or to sell at $420.

92. The reports from RBC Capital Markets and Morningstar Equity Research validated the market's reliance on Musk's tweet. While Musk had previously expressed interest in taking Tesla private, never before had he publicly stated that funding had been secured or that the transaction was certain with the only contingency being the outcome of a shareholder vote.

93. On August 8, 2018, before the market opened, Tesla issued a short press release relating to Musk's statements from the previous day. The statement, which was disseminated on *Globe Newswire* and posted to Tesla's website, stated:

> Statement from the following members of Tesla's Board of Directors: Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch
>
> PALO ALTO, Calif., Aug. 08, 2018 (GLOBE NEWSWIRE) -- Last week, Elon opened a discussion with the board about taking the company private. This included discussion as to how being private could better serve Tesla's long-term interests, and also addressed the funding for this to occur. The board has met several times over the last week and is taking the appropriate next steps to evaluate this.

94. At close of trading on August 8, 2018, Tesla's stock price closed at $370.34 per share, a decline of 2.5% from its prior close of $379.59 on August 7, 2018.

95. On August 8, 2018, Jeffries published a research report relating to Musk's tweets titled, "Tesla, Inc. (TSLA) Doing the 'Right Stuff', but Who Might be Tesla's Next Large Shareholder?" Jeffries stated in pertinent part:

> **Key Takeaway**
> **In a nod to the Space X structure, Elon Musk suggested taking Tesla private. Distraction or not, the move feels right even if Musk is downplaying how supportive public markets have been. With Tesla unable to take on more debt, we wonder who may fund the potential deal and end up as a new large shareholder. We raise estimates to reflect a better outlook post Q2. Our DCF fair value points to $300 and our new $360 PT bridges the gap to the $420 potential bid.**
>
> **Going private feels like the right thing to do** - True to his unconventional and questionable communication style, Elon Musk tweeted "Considering taking Tesla

> private at $420. Funding secured". No further details or confirmation. The rationale for being private is well known (see email to employees on website). There is no intention to merge with SpaceX. $420/share would value Tesla at $71bn, 2.3x 2019E revenue. Subject to a shareholder vote and to conditions offered in terms of liquidity, exit and potential remuneration the overall cash cost could be more modest considering c.20% insiders and c.30% long term holders. As Tesla can hardly take on more debt, providers of funds could become new large shareholders. Also, despite repeated complaints, Tesla has hugely benefited from supportive public markets and from abnormally low cost of capital which may not be sustained privately.

96. J.P. Morgan also published a report on August 8, 2018, titled, "Raise PT to Reflect Possible Go-Private Offer, But Remain Underweight on Chance Shares Could Again Trade on Fundamentals." J.P. Morgan stated:

> On Tuesday during the market, Tesla CEO Elon Musk announced via Twitter that he is considering pursuing a path (no final decision has been made) which would take the company private at a price of $420 per share. This was followed up by further statements that "funding has been secured" and "investor support confirmed". ***As surprising to us as these developments are, and as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured. Therefore, we are incorporating into our valuation the real possibility the equity will be taken out at $420 per share.*** Separate from the Twitter statements, the company also made public a letter Mr. Musk had written to Tesla employees in which he states, "If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us." To us, this suggests more than mere consideration — Mr. Musk expects Tesla will go private. We are not as certain, and so assign only a 50% probability to such a scenario in our updated valuation. We continue to believe Tesla's valuation based on fundamentals alone (i.e., a 50/50 blend of DCF and 2020-based multiples analysis — itself consisting of a blend of P/E, EV/EBITDA, and Price-to-Sales) is worth no more than $195 (our previous price target). But introducing a new 50% weighting of $420 suggests a large upward revision to our price target is warranted, and we newly value Tesla at $308 per share (i.e., 50/50 blend of $195 and $420).
>
> - **We continue to rate TSLA shares Underweight:** We remain Underweight-rated, including given the comparatively little +11% upside remaining vs. Tuesday's close to the purported $420 take-out price in comparison to the much larger -49% downside to the $195 we feel Tesla should trade at based upon an analysis of fundamentals alone. Our price target could move up or down based upon further developments affecting the likelihood the transaction will or will not go through.

- **Details of the proposed transaction are very few at this time:** Tesla provided no details regarding the needed funding, except to say that it has been secured. Mr. Musk stated current shareholders could continue to participate in the private company, suggesting the actual amount of needed cash could be far less than the firm's current equity valuation or enterprise value (equivalent to only the amount of shares tendered times $420 per share). Mr. Musk plants to continue to own ~20%.

(Emphasis added in italics and bold)

97. On August 8, 2018, Evercore published an analyst report titled, "A Private Life is a Happy Life." The report stated in pertinent part:

**A Private Life is a Happy Life**

*"Am considering taking Tesla private at $420. Funding secured."*

*"Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."*

- **What happened?** The above are two of a series of tweets by Tesla CEO Elon Musk yesterday, where the company announced that it is considering going private. In an e-mail to employees, posted on the Tesla website, Musk outlined his reasons. Among them, Musk pointed out that as a public company Tesla is "subject to wild swings in our stock price that can be a major distraction", subject "to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions… not necessarily right for the long-term" and opens Tesla to short sellers "who have the incentive to attack the company". He also wrote that his other company SpaceX, which is private and Musk does not want to take public, "is far more operationally efficient, and that is largely due to the fact that it is privately held". We believe Musk's intent is serious and genuine.

- **What is proposed?** Clearly, CEO Musk would like to take the company private. Again, in the e-mail to employees, he stated that he would like a structure where existing shareholders "can stay investors in a private Tesla or… can be bought out at $420 a share", his intention that "all Tesla employees… remain shareholders of the company" so that they can "share in the growing value of the company" and that there is no plan "to merge SpaceX and Tesla". Musk added that "this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different".

- **Could this happen?** It is important to note that, as of today, no details have been provided with regards to what "Funding secured" means, who is providing that funding and what any potential funding structure might look like. Our view is that "Funding secured" should be interpreted as a strong verbal commitment, with funds available and parties willing to execute quickly. However, it could be less than this. It may also be that initial legal documents, term sheets, letters of intent have been signed. While several

press reports suggest an "LBO", given Tesla's EBITDA and cash generation today, we don't see material leverage as likely. Instead, we see a possible scenario where 50 to 60% of existing shareholders (including Musk's 20% holding) continue, with their holdings rolled into a new private structure. This would leave Tesla needing to raise equity capital of $31 to $39Bn to buy out those existing public shareholders who tender; 40 to 50% of a $78Bn market value ($420 x 185Mn shares outstanding). We assume that the debt is rolled. We see the most likely route through which the $31 to $39Bn is funded being a combination of, 1/ a strategic investor acquiring a 15% to 20% stake, 2/ two to three private investment firms/ sovereign wealth funds acquiring up to 10% stakes and 3/ certain larger members of the existing shareholder base or some form of fund for smaller accredited investors making up the delta.

- **Is going private the right move?** The notion of going private is not new for Elon Musk. In an interview with Rolling Stone (Nov '17) Musk stated "I wish we could be private with Tesla… it actually makes us less efficient to be a public company". Musk's frustration with the capital markets, notably short sellers and the analyst community, has been evident in recent quarters. If a CEO, and the largest individual shareholder, of a company takes issue with public markets, then going private would seem to make sense. Traditionally, public markets have been there to provide a source of funding (note, we also believe they bring scrutiny and accountability which in many cases does lead to better practice). However, if a company does not need that funding or is able to source future funding privately, then there is no obvious reason for it to remain public. As Musk points out, being public does have disadvantages and can lead to short-termism. Depending on where the private funding may come from, going private may also provide Tesla with 1/ deeper pockets to grow internationally at a faster rate and 2/ security through the next US/capital markets recession where public funding would dry up.

- **Stock Implications** The majority of the move towards $420 is now done, with the share price sitting within 11%. As a result, unless there is evidence to suggest that the funding is not secured and a transaction cannot be completed, we believe there is little to be done with the stock at these levels. More broadly, if Tesla has attracted a strategic investor who is willing to not only help take the company private but also to provide material funding going forward, it should enable the company to execute and move faster as it seeks to complete its mission to move the world to a solar electric future. In the context of the industry, this only increases the need for transition at traditional OEMs who must carry out exhaustive powertrain restructuring if they choose to compete with a potentially faster and more nimble Tesla.

98. On August 8, 2018, after the market closed, the *Wall Street Journal* reported that the SEC had commenced an investigation into whether Musk had "a factual basis for tweeting Tuesday

that the going-private transaction was all but certain, with only a shareholder vote needed to pull it off."

99. At close of trading on August 9, 2018, Tesla's stock price closed at $352.45 per share, a decline of 5% from its prior close of $370.34 per share on August 8, 2018.

100. On August 10, 2018, Musk tweeted: "Short shorts coming soon to Tesla merch[andise]."

101. Also on August 10, 2018, Wayne Kaufman of Phoenix Financial Services stated on CNBC that there was a real possibility for Tesla to go private and that Musk "hates running public companies."

102. On August 12, 2018, *Bloomberg* published a report on Tesla's progress towards going private. The report stated, in pertinent part, that the Public Investment Fund that Musk had met with on July 31, 2018, which "recently built a stake just shy of 5 percent, is exploring how it can be involved," but "hasn't made any firm decisions on whether to increase its stake, or by how much . . . ."

103. On August 13, 2018, Musk posted on Tesla's blog during morning market hours. The blog post is titled "Update on Taking Tesla Private and states:

> As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy. As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.
>
> **What has happened so far?**
>
> On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share. This was a 20% premium over the ~$350 then current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st). My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.
>
> After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal), a full board meeting was held. During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.

At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders. Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me. They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future. I told the board that I would report back after I had these discussions.

**Why did I make a public announcement?**

The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private. However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time. As a result, it was clear to me that the right thing to do was announce my intentions publicly. To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**

Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction. Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

Recently, after the Saudi fund bought almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting. That meeting took place on July 31st. During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed.

I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement.

Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements.

> Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used. However, it would be premature to do so now. I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base. It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.
>
> It is also worth clarifying that most of the capital required for going private would be funded by equity rather than debt, meaning that this would not be like a standard leveraged buyout structure commonly used when companies are taken private. I do not think it would be wise to burden Tesla with significantly increased debt.
>
> Therefore, reports that more than $70B would be needed to take Tesla private dramatically overstate the actual capital raise needed. The $420 buyout price would only be used for Tesla shareholders who do not remain with our company if it is private. My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla.
>
> **What are the next steps?**
>
> As mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time. I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options. Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.
>
> If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected. If the board process results in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote.

104. On August 13, 2018, at 9:02 p.m. ET, Musk tweeted: "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private."

105. Morningstar issued an Analyst Note on August 13, 2018, titled "Tesla Buyout Looks likely to Us, but Timing and Structure Uncertain." Morningstar states in pertinent part:

> Tesla CEO Elon Musk issued a blog post Aug. 13 that states he is still gauging shareholder interest in Tesla going private at $420 a share, but our impression of his words is that he thinks it can happen, and we agree. Tesla's board still must receive a formal proposal and then will have to evaluate it, so we think a deal will

not happen this week but will eventually be announced. Musk also said the Saudi Arabian sovereign wealth fund has taken almost a 5% stake in Tesla, and he met with it recently about going private. All shareholders would have the choice of having their stock bought out at $420 a share or remaining invested in a private Tesla. We speculate that retail investors may have their equity moved to a publicly traded special-purpose vehicle while accredited investors would only be able to buy or sell shares every six months

We are maintaining our fair value estimate. We have changed our thinking since our Aug. 7 note and will not be raising our fair value estimate to the deal price. We normally would increase our valuation to a probability-weighted average of the offered price and our intrinsic value. However, Tesla's possible buyout is abnormal in that equityholders have the option to remain equityholders in a private Tesla, or at least own a special-purpose vehicle that would in turn own private Tesla, so we view this deal as similar to a tender offer. We see Tesla's equity ownership merely transferring to a different vehicle rather than going away as in a traditional buyout, so we do not see a deal changing our opinion of the intrinsic value of Tesla's publicly traded stock.

We think $420 is way too high a value, given our $179 fair value estimate. To generate a $420 per share valuation in our discounted cash flow model, we would need to almost triple our current projection for 2027 midcycle EBIT margin from 9% to nearly 23%. If someone wants to overpay, however, we can't say it's a bad deal for shareholders.

. . .

Musk in an Aug. 7 tweet said, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." We think this statement means Musk believes he has enough votes to go private. Musk also said in the Aug. 13 blog post that he estimates about two thirds of shareholders would go private and therefore not sell at $420. It sounds to us that he is not done talking to shareholders to gauge interest, but his estimate of about 66% of shareholders not tendering is not far off from our own assumption of 60%. We expect a deal, if announced, would be approved, and we estimate about 40% of shareholders will sell their shares at $420 or whatever a deal price ends up being, mostly due to their own mandates on not being able to hold private stock or caps on illiquid securities. This assumption puts the shareholder buyout price at $28.7 billion, by our calculation. We think most shareholders believe in Musk and want to remain invested with him. The six largest shareholders (Musk, Fidelity, Baillie Gifford, T. Rowe Price, TenCent, and the Saudi Arabia sovereign wealth fund) own about 53% of the stock by our estimates. We'd expect all these owners to not sell any of their stock because we think they believe Tesla can be far bigger than it is today. We do expect some forced selling from entities that cannot own private companies, such as index funds or some exchange-traded funds, but we think most Tesla retail and institutional shareholders are very loyal and patient with Musk and will want to remain invested. We think if the deal fails to happen, it would be due to regulatory issues mentioned earlier rather than lack of available capital. Musk said the Saudi sovereign wealth fund has been meeting with him since early 2017, trying to get

> him to take Tesla private, and at a July 31 meeting this year expressed regret to Musk that he has not taken it up on its offer. We assume the Saudis would put up sizable capital to help fund the deal and that is why Musk's first Aug. 7 tweet on a buyout said, "funding secured."

106. On August 14, 2018, before the market opened, Tesla issued a statement indicating that Tesla's Board had formed a special committee in connection with the going-private transaction. The statement read as follows:

> Tesla, Inc. (the "Company") announced today that its Board of Directors has formed a special committee comprised of three independent directors to act on behalf of the Company in connection with Elon Musk's previously announced consideration of a transaction to take the Company private (the "Going Private Transaction"). The special committee has not yet received a formal proposal from Mr. Musk regarding any Going Private Transaction nor has it reached any conclusion as to the advisability or feasibility of such a transaction.
>
> The special committee is composed of Brad Buss, Robyn Denholm and Linda Johnson Rice. The special committee has retained Latham & Watkins LLP as its legal counsel and intends to retain an independent financial advisor to assist in its review of a formal proposal once received. The Company has separately retained Wilson Sonsini Goodrich & Rosati as its legal counsel in this matter.
>
> The special committee has the full power and authority of the Board of Directors to take any and all actions on behalf of the Board of Directors as it deems necessary to evaluate and negotiate a potential Going Private Transaction and alternatives to any transaction proposed by Mr. Musk. The special committee's grant of authority provides that no Going Private Transaction will be consummated without the approval of the special committee. The special committee expects to provide a further update concerning the process associated with Mr. Musk's proposal as soon as practicable.
>
> No assurances can be given regarding the likelihood, terms and details of any proposal or potential Going Private Transaction, that any proposal made by Mr. Musk regarding a potential Going Private Transaction will be accepted by the special committee, that definitive documentation relating to any such Going Private Transaction will be executed or that such a transaction will be completed.

107. On August 14, 2018, around 12:53 p.m. ET, Bloomberg reported that neither Goldman Sachs nor Silver Lake were yet working with Musk pursuant to a signed agreement or in an official capacity. Later on August 14, 2018, the *New York Times* reported that Goldman "was in talks with Tesla about a possible role, but had not finalized anything. Silver Lake, meanwhile, is interested in investing in any going-private deal, but it isn't acting in a paid advisory capacity."

108. At close of trading on August 14, 2018, Tesla's stock price closed at $347.64 per share, a decline of 2.5% from its prior close of $356.41 on August 13, 2018.

109. On August 15, 2018, the *Wall Street Journal*, *Business Insider*, and *Fox Business* reported that the SEC had issued formal subpoenas concerning Musk's going-private tweets.

110. At close of trading on August 15, 2018, Tesla's stock price closed at $338.69 per share, a decline of 2.6% from its prior close of $347.64 on August 14, 2018.

111. On August 16, 2018, the *Wall Street Journal* reported that the "SEC [was] investigating whether Mr. Musk intentionally misled investors when he tweeted about the proposal in a bid to hurt short-sellers by driving up Tesla's stock price," citing a person familiar with the matter. The article further stated that "regulators [were] pressing Tesla's directors to reveal how much information Mr. Musk shared with them before he tweeted about it last week."

112. On August 16, 2018, after the market closed, *The New York Times* published online an article based on an in-depth interview with Musk. In addition to reporting on his health issues, Musk acknowledged in the article that he had chosen the proposed price of $420 per share because of "better karma" and that no-one had seen or reviewed his August 7, 2018 tweet "Am considering taking Tesla private at $420. Funding secured." before he posted it. The article also noted that the funding for the proposed going-private transaction "was far from secure" and the Public Investment Fund "had not committed to provide any cash."

113. *The New York Times* article appeared in print on August 17, 2018.

114. At close of trading on August 17, 2018, Tesla's stock price closed at $305.50 per share, a decline of 9% from its prior close of $335.45 on August 16, 2018.

115. On August 24, 2018, at 11:15 p.m. ET, a blog post titled "Staying Public" was published on Tesla's website. The post announced that Musk had abandoned the process of attempting to take Tesla private, stating as follows:

> Earlier this month, I announced that I was considering taking Tesla private. As part of the process, it was important to understand whether our current investors believed this would be a good strategic move and whether they would want to participate in a private Tesla.

> Our investors are extremely important to me. Almost all have stuck with us from the time we went public in 2010 when we had no cars in production and only a vision of what we wanted to be. They believe strongly in our mission to advance sustainable energy and care deeply about our success.
>
> I worked with Silver Lake, Goldman Sachs and Morgan Stanley, who have world-class expertise in these matters, to consider the many factors that would come into play in taking Tesla private, and to process all the incoming interest that we received from investors to fund a go-private transaction. I also spent considerable time listening to current shareholders, large and small, to understand what they think would be in the best long-term interests of Tesla.
>
> Based on all the discussions that have taken place over the last couple of weeks and a thorough consideration of what is best for the company, a few things are clear to me:
>
> - Given the feedback I've received, it's apparent that most of Tesla's existing shareholders believe we are better off as a public company. Additionally, a number of institutional shareholders have explained that they have internal compliance issues that limit how much they can invest in a private company. ***There is also no proven path for most retail investors to own shares if we were private.*** Although the majority of shareholders I spoke to said they would remain with Tesla if we went private, the sentiment, in a nutshell, was "please don't do this."
> - I knew the process of going private would be challenging, but it's clear that it would be even more time-consuming and distracting than initially anticipated. This is a problem because we absolutely must stay focused on ramping Model 3 and becoming profitable. We will not achieve our mission of advancing sustainable energy unless we are also financially sustainable.
> - That said, my belief that there is more than enough funding to take Tesla private was reinforced during this process.
>
> After considering all of these factors, ***I met with Tesla's Board of Directors yesterday and let them know that I believe the better path is for Tesla to remain public***. The Board indicated that they agree.
>
> Moving forward, we will continue to focus on what matters most: building products that people love and that make a difference to the shared future of life on Earth. We've shown that we can make great sustainable energy products, and we now need to show that we can be sustainably profitable. With all the progress we've made on Model 3, we're positioned to do this, and that's what the team and I are going to be putting all of our efforts toward.
>
> Thank you to all of our investors, customers and employees for the support you've given our company. I'm incredibly excited to continue leading Tesla as a public company. It is a privilege.

(Emphasis added).

116. On September 27, 2018, the SEC filed a complaint against Musk alleging violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Two days later, on September 29, 2018, the SEC filed a complaint against Tesla alleging violations of Rule 13a-15 under the Securities Exchange Act of 1934. Both Musk and Tesla later consented to judgments being entered against them. The judgments ordered Musk to resign as Tesla's Chairman, ordered Tesla to appoint additional independent directors, and required Tesla and Musk to each pay a $20 million penalty ($40 million total). The United States District Court for the Southern District of New York approved the settlements and the accompanying judgments and consents on October 16, 2018.

## VI. COUNT I: VIOLATION OF SECTION 10(b) AND RULE 10b-5 AGAINST TESLA AND MUSK

117. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118. During the Class Period, Tesla and Musk carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other Class members to purchase or sell Tesla securities at artificial prices. In furtherance of this unlawful scheme, plan and course of conduct, each of Tesla and Musk took the actions set forth herein.

119. Tesla and Musk: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and sellers of Tesla's securities in an effort to artificially affect the price of Tesla securities in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

### A. False and Materially Misleading Statements

120. On August 7, 2018, Musk publicly stated via Twitter: "Am considering taking Tesla private at $420. Funding secured."

121. The above statement in paragraph 120 was false and materially misleading because funding for a go-private transaction had in fact not been "secured". Further, although the tweet communicated to investors that a going-private transaction was imminent, Musk and Tesla had yet to take or even consider many of the necessary steps required to actually effect such a transaction. Specifically,

(a) There was no agreement to fund a going-private transaction involving Tesla;

(b) Musk had not discussed the potential price of $420 with the Public Investment Fund or any other potential investor;

(c) Musk had not had any further substantive conversations with the Public Investment Fund since his meeting on July 31, 2018;

(d) Musk had not discussed interest in participating in the transaction with any potential strategic investors;

(e) Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(f) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(g) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(h) Musk had not determined whether retail investors would be able to remain shareholders but had been advised that it would be unlikely and "unprecedented";

(i) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(j) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(k) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

122. On August 7, 2018, Musk responded to another Twitter user's question, "At what price?" by repeating "420."

123. The above statement in paragraph 122 was false and materially misleading because the tweet communicated to investors that a going-private transaction at $420 per share was imminent, when Musk and Tesla had yet to take or even consider many of the necessary steps required to actually effect such a transaction. Specifically,

(a) Musk had not discussed the potential price of $420 with the Public Investment Fund or any other potential investor;

(b) Musk had not had any further substantive conversations with the Public Investment Fund since his meeting on July 31, 2018;

(c) Musk had not discussed interest in participating in the transaction with any potential strategic investors;

(d) Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(e) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(f) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(g) Musk had not determined whether retail investors would be able to remain shareholders but had been advised that it would be unlikely and "unprecedented";

(h) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(i) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(j) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

124. On August 7, 2018, a Twitter user asked Musk: "Could we still invest once private?" Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

125. The above statement in paragraph 124 was false and materially misleading because the tweet communicated to investors that a going-private transaction was imminent, when Musk and Tesla had yet to take or even consider many of the necessary steps required to actually effect such a transaction. Specifically,

(a) Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(b) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(c) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(d) Musk had not determined whether retail investors would be able to remain shareholders but had been advised that it would be unlikely and "unprecedented";

(e) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(f) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(g) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

126. On August 7, 2018, Musk tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."

127. The above statement in paragraph 126 was false and materially misleading because the tweet communicated to investors that a going-private transaction at $420 per share was

imminent, when Musk and Tesla had yet to take or even consider many of the necessary steps required to actually effect such a transaction. Specifically,

(a) Musk had not discussed the potential price of $420 with the Public Investment Fund or any other potential investor;

(b) Musk had not had any further substantive conversations with the Public Investment Fund since his meeting on July 31, 2018;

(c) Musk had not discussed interest in participating in the transaction with any potential strategic investors;

(d) Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(e) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(f) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(g) Musk had not determined whether retail investors would be able to remain shareholders but had been advised that it would be unlikely and "unprecedented";

(h) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(i) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(j) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

128. On August 7, 2018, at 3:16 p.m. ET, Musk sent an email to Tesla employees that was published to Tesla's publically available blog at 3:32 p.m. ET. Musk stated in his email: "First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share . . . ."

129. The above statement in paragraph 128 was false and materially misleading because Musk and Tesla had no agreement or plan for taking Tesla private, and know it was unlikely that most shareholders of the public entity could remain shareholders in a private company. Specifically, this statement was misleading because:

(a) Musk had not discussed the potential price of $420 with the Public Investment Fund or any other potential investor;

(b) Musk had not had any further substantive conversations with the Public Investment Fund since his meeting on July 31, 2018;

(c) Musk had not discussed interest in participating in the transaction with any potential strategic investors;

(d) Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(e) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(f) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(g) Musk had not determined whether retail investors would be able to remain shareholders;

(h) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(i) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(j) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

130. On August 7, 2018, at 3:36 p.m. ET, Musk publicly stated via Twitter: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

131. The above statement in paragraph 130 was false and materially misleading because Musk and Tesla had yet to take, or even consider, many of the steps necessary to effect a going-private transaction. Of particular significance was the fact that Musk and Tesla had not even "secured" funding to take the company private at $420 per share or at any other price. Whether or not Tesla could go-private depended on a number of other issues in addition to a "shareholder vote," including whether Tesla's Board would approve the transaction and whether the company would agree to deal terms associated with funding the transaction. For example, the Public Investment Fund had indicated that its investment was possibly contingent upon Tesla building a production facility in the Middle East. On this particular point, at least one Tesla Board member described such a condition as a "non-starter." Specifically, this statement was misleading because:

(a) There was no agreement to fund a going-private transaction involving Tesla;

(b) Musk had not discussed the potential price of $420 with the Public Investment Fund or any other potential investor;

(c) Musk had not had any further substantive conversations with the Public Investment Fund since his meeting on July 31, 2018;

(d) Musk had not discussed interest in participating in the transaction with any potential strategic investors;

(e) Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(f) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(g) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(h) Musk had not determined whether retail investors would be able to remain shareholders;

(i) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(j) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(k) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

132. Collectively, Musk's August 7, 2018 statements gave Tesla investors and the market the impression that if Musk chose to take Tesla private at $420 per share, the only outstanding requirement to be satisfied was a shareholder vote. For the reasons set forth above, this was false and misleading.

133. Musk's August 7, 2018 statements, collectively, also gave Tesla investors and the market the impression that certain terms of the going-private transaction had been agreed when, in fact, they had not even been explored, and in some cases, proved to be impossible. For the reasons set forth above, this was false and misleading.

134. On August 13, 2018, Tesla published a post written by Musk on its website concerning Musk's "funding secured" tweet and plans for taking Tesla private. In the blog post, Musk stated that "My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option."

135. The above statement in paragraph 134 was false and materially misleading because Musk and Tesla had yet to take, or even consider, many of the steps necessary to effect a going-private transaction with structure described by Musk. Specifically, this statement was misleading because:

(a) There was no agreement to fund a going-private transaction involving Tesla;

(b) Musk had not discussed the potential price of $420 with the Public Investment Fund or any other potential investor;

(c) Musk had not discussed interest in participating in the transaction with any potential strategic investors;

(d) Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(e) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(f) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(g) Musk had not determined whether retail investors would be able to remain shareholders;

(h) Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

(i) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(j) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

136. In his August 13, 2018 blog post published by Tesla, Musk also wrote:

**Why did I say "funding secured"?**

Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction. Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

Recently, after the Saudi fund bought almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting. That meeting took place on July 31st. During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed.

> I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement.

137. The above statements in paragraph 136 were false and materially misleading. Musk's professed belief that there was "no question that a deal with the Saudi sovereign fund could be closed" was false and materially misleading because Musk knew there was "a lot of uncertainty" about the potential funding from the Public Investment Fund with a likelihood of success of just 50%. During the July 31, 2018 meeting with the Public Investment Fund, Musk also knew that that funding might be contingent upon whether Tesla would build a production facility in the Middle East which at least one Tesla Board member referred to as a "non-starter." Consequently, although Musk claimed to have "no question" that funding could be "secured," issues in fact existed that could prevent Tesla and Musk from obtaining the capital necessary to complete the transaction.

138. Tesla's and Musk's blog post also continued to omit and/or conceal that an agreement had not yet been secured from any potential source of funding to fund a going-private transaction at a price of $420 per share or that it was unlikely that current shareholders of the public company could remain shareholders once it went private.

139. On August 13, 2018, at 9:02 p.m. ET, Musk publicly stated via Twitter: "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private."

140. The above statement in paragraph 139 was false and materially misleading because Musk and Tesla had not signed an agreement to formally engage or retain Silver Lake and Goldman Sachs to assist with the going-private transaction by August 13, 2018.

## B. <u>Musk and Tesla Acted with Scienter</u>

### 1. <u>Musk knew that his statements were false and misleading.</u>

141. The misrepresentations alleged herein were made by Musk while he was in possession of material, non-public information that contradicted his public statements and/or rendered them materially false and misleading.

142. Musk knew that funding for a going-private transaction had not been "secured" at the time of his initial tweet on August 7, 2018 and was never secured during the Class Period. Based

on Musk's integral role in the discussions with the Public Investment Fund, Musk knew that he: (1) had not agreed upon any terms for a going-private transaction with the fund or any other funding source; (2) had no further substantive communications with representatives of the fund beyond their 30 to 45 minute meeting on July 31, 2018 until August 10, 2018; (3) had never discussed a going-private transaction at a share price of $420 with any potential funding source; (4) had not contacted any additional potential strategic investors to assess their interest in participating in a going-private transaction; and (5) that Tesla building a production facility in the Middle East as a prerequisite to the funding of any deal was a "non-starter."

143. Musk knew on August 7, 2018 and at all relevant times during the Class Period that he had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success

144. Musk also knew that on August 7, 2018 and at all relevant times during the Class Period he had not contacted existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company.

145. Musk also knew that neither he nor Tesla retained any financial advisors regarding the going-private transaction until August 15, 2018 when Tesla retained Goldman Sachs in that capacity.

146. Musk knew on August 7, 2018 he had not formally retained any legal advisors to assist with a going-private transaction.

147. Musk knew that on August 7, 2018 and at all relevant times during the Class Period he had not determined whether retail investors could remain invested in Tesla as a private company. Prior to Musk's August 7, 2018 statements, Musk had conversations with both a private equity manager and Tesla's Board concerning Musk's hopes for the structure of a private Tesla. Musk was told by the private equity manager and at least one director that the structure was "unprecedented" and that it would be "really difficult for small investors" to remain shareholders in a private Tesla. Musk admitted to the SEC that his proposal to allow retail investors to remain investors in Tesla as a private company was "a fundamental misunderstanding that I just did not know – I thought there

would be some way to retain small investors, but there isn't." Therefore, Musk knew his representations to investors that they could remain shareholders were materially misleading.

148. Musk knew that on August 7, 2018 and at all relevant times during the Class Period, he had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors.

149. Musk knew that on August 7, 2018 and at all relevant times during the Class Period, he had not determined what regulatory approvals would be required or whether they could be satisfied.

150. Musk also knew there had been no agreement to take Tesla private at $420 per share. Instead, Musk unilaterally decided on this amount simply by adding a 20% premium to Tesla's current stock price and rounding up to $420. This was intended as a joke for Musk's girlfriend which Musk admitted to the SEC "is not a great reason to pick a price." Musk knew he had not discussed this price with the Public Investment Fund or any other potential funding source.

151. Musk's intent is further supported by the fact that he continued to make false statements about Tesla going private even after he was warned about potential legal problems stemming from market manipulation. On August 7, 2018, at 2:23 p.m. ET, a reporter warned Musk via email that he was "dancing into some pretty tricky legal territory by messing about with the markets this way." Notwithstanding, Musk continued to mislead the public about Tesla going private.

2. <u>Musk had a motive to commit fraud: his campaign against short sellers.</u>

152. Musk's conduct was motivated by his animosity towards Tesla's short sellers.

153. Prior to Musk's August 7, 2018 tweets, on May 4, 2018, Musk told investors "oh and uh short burn of the century comin soon. Flamethrowers should arrive just in time." Shortly after, Musk stated, "Looks like sooner than expected. The sheer magnitude of short carnage will be unreal. If you're short, I suggest tiptoeing quietly to the exit . . . ."

154. Just three days later, on May 7, 2018, Musk bought about $9.85 million worth of Tesla shares in the pre-market in a manner designed have the greatest impact on Tesla's stock price and force a burst of short-covering.

155. Musk did this again on June 12, 2018 when he bought about $24.9 million worth of Tesla stock to maintain Tesla's stock price despite announcing that Tesla was cutting 46,000 employees, about 9% of its workforce.

156. In his August 2, 2018 email to the Board, Musk stated that he wanted to take Tesla private in order to, among other reasons, avoid the "constant defamatory attacks by the short-selling community" against Tesla.

157. Musk's false and materially misleading statements on August 7, 2018 were part of his efforts to harm short sellers of Tesla stock.

158. On August 7, 2018, following his initial tweet, Musk stated that Tesla "[will] be way smoother & less disruptive as a private company. Ends negative propaganda from shorts." This mention of short sellers just after Musk's initial tweet shows that Musk made his false statements with short sellers in mind.

159. In Musk's August 7, 2018 email to the company, Musk stated again that he wanted to take Tesla private because Tesla was "the most shorted stock in the history of the stock market" and stated that "being public means there are large numbers of people who have incentive to attack the company."

160. Musk even mocked short sellers after his August 7, 2018 tweets. For example, on August 10, 2018, Musk tweeted that "Short shorts [were] coming soon to Tesla merch[andise]." This was Musk's way of mocking short sellers for their losses due from Musk's false and materially misleading tweets.

161. The following chart illustrates Tesla's growing short interest relative to the company's stock price during the period from January 2018 through December 2018. The chart also demonstrates the effect Musk's "funding secured" tweet had on Tesla's short interest:




162. Further evidence that Musk's misrepresentations were made to "burn" short sellers is Musk's tweet following his settlement with the SEC admitting allegations of fraud based on those same misrepresentations. On October 4, 2018, just five days following Musk's settlement with the SEC, Musk tweeted, "Just want to that [sic] the Shortseller Enrichment Commission is doing incredible work. And the name change is so on point!" This again shows that Musk associated his misrepresentations with short sellers and that his statements were a deliberate attempt to "burn" short sellers and cause them financial harm.

163. In addition to Musk's disputes with short sellers of Tesla stock, Musk and Tesla were motivated to artificially inflate Tesla's stock because of a provision in Tesla's convertible bonds. Tesla has a $920 million 0.25% convertible issue due February 27, 2019. These bonds are convertible into common stock at a price of $359.8676 per share. Therefore, if the stock trades below that price, the holder would be better off taking cash. That would put pressure on Tesla which is cash deficient. However, by inflating Tesla's stock, Tesla would be able to redeem the debt in stock, obviating the need to come up with over $900 million in cash.

164. In addition, Tesla has 1.25% convertible totaling $1.38 billion that matures February 25, 2021. This issue also converts at the same price, and a common share price over $360 also would obviate the need to pay off this convert in cash.

165. As Barron's reported on August 7, 2018, "The surge in Tesla's shares after CEO Elon Musk's tweet about going private has had huge, salutary effect on its key convertible bonds and its financing position." Barron's stated that "[b]y pushing [Tesla's] common stock's price above the $360 level, his tweet has put a $900 million convert issue above its conversion price, which would effectively let the electric-auto maker pay off that obligation in stock instead of cash."

3. Alternatively, Musk acted with deliberate recklessness.

166. Alternatively, Musk was deliberately reckless in publishing his tweets and other statements regarding the potential going-private transaction. He published his statements knowing that there were no formal agreements to secure funding or to document a proposal to go private at $420 per share that was ready to be voted on by stockholders. He did not discuss the content of his August 7, 2018 tweets with anyone else prior to publishing them to his over 22 million Twitter followers and anyone else with access to the Internet. He also did not inform NASDAQ that he intended to make his initial public announcement, as NASDAQ rules required.

167. Musk's conduct represented an extreme departure from the standards of ordinary care, and presented a danger of misleading purchasers or sellers of Tesla securities that was either known to Musk or else was so obvious that Musk must have been aware of it.

4. Musk and Tesla settled quickly with the SEC.

168. On September 27, 2018, the SEC filed a Complaint against Musk alleging that he violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 when making his August 7, 2018 statements.

169. On September 28, 2018, Musk signed a Consent to entry of a judgment against him. Under 17 C.F.R. § 202.5(e), the SEC will not permit to be created "an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur." The SEC's policy is "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint . . . ." Pursuant to the Consent and Rule 202.5(e), Musk agreed that he "(i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public

statement to the effect that [Musk] does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that [Musk] does not deny the allegations."

170. Among the facts alleged by the SEC that Musk admits, or does not deny, are that Musk made multiple materially false statements on August 7, 2018 including the statements that: (1) "Am considering taking Tesla private at $420. Funding secured"; (2) "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote; (3) "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment"; (4) his response to another Twitter user asking, "Could we still invest once private?" by stating "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)"; (5) his response to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely. Am super appreciative of Tesla shareholders. Will ensure their prosperity in any scenario"; (6) "Shareholders could either to [sic] at 420 or hold shares & go private"; and (7) "I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share."

171. Also among the facts alleged by the SEC that Musk admits or does not deny are that the August 7, 2018 statements set forth in paragraph 170 "were premised on a long series of baseless assumptions and were contrary to facts that Musk knew" so that Musk knew or was reckless in not knowing that his August 7, 2018 statements were false and misleading.

172. On September 29, 2018, the SEC filed a Complaint against Tesla alleging that it violated SEC Rule 13a-15 issued pursuant to the Securities Exchange Act by failing to maintain adequate controls and procedures over its SEC filings.

173. On September 29, 2018, the SEC announced that it had reached a settlement with both Defendants. In a press release titled "Elon Musk Settles SEC Fraud Charges; Tesla Charged

With and Resolves Securities Law Charge," the SEC described the terms of the settlements as follows:

> Washington D.C., Sept. 29, 2018 —
> The Securities and Exchange Commission announced today that Elon Musk, CEO and Chairman of Silicon Valley-based Tesla Inc., has agreed to settle the securities fraud charge brought by the SEC against him last week. The SEC also today charged Tesla with failing to have required disclosure controls and procedures relating to Musk's tweets, a charge that Tesla has agreed to settle. The settlements, which are subject to court approval, will result in comprehensive corporate governance and other reforms at Tesla—including Musk's removal as Chairman of the Tesla board—and the payment by Musk and Tesla of financial penalties.
>
> According to the SEC's complaint against him, Musk tweeted on August 7, 2018 that he could take Tesla private at $420 per share — a substantial premium to its trading price at the time — that funding for the transaction had been secured, and that the only remaining uncertainty was a shareholder vote. The SEC's complaint alleged that, in truth, Musk knew that the potential transaction was uncertain and subject to numerous contingencies. Musk had not discussed specific deal terms, including price, with any potential financing partners, and his statements about the possible transaction lacked an adequate basis in fact. According to the SEC's complaint, Musk's misleading tweets caused Tesla's stock price to jump by over six percent on August 7, and led to significant market disruption.
>
> According to the SEC's complaint against Tesla, despite notifying the market in 2013 that it intended to use Musk's Twitter account as a means of announcing material information about Tesla and encouraging investors to review Musk's tweets, Tesla had no disclosure controls or procedures in place to determine whether Musk's tweets contained information required to be disclosed in Tesla's SEC filings. Nor did it have sufficient processes in place to that Musk's tweets were accurate or complete.
>
> Musk and Tesla have agreed to settle the charges against them without admitting or denying the SEC's allegations. Among other relief, the settlements require that:
>
> - Musk will step down as Tesla's Chairman and be replaced by an independent Chairman. Musk will be ineligible to be re-elected Chairman for three years;
> - Tesla will appoint a total of two new independent directors to its board;
> - Tesla will establish a new committee of independent directors and put in place additional controls and procedures to oversee Musk's communications;
> - Musk and Tesla will each pay a separate $20 million penalty. The $40 million in penalties will be distributed to harmed investors under a court-approved process.

> "The total package of remedies and relief announced today are specifically designed to address the misconduct at issue by strengthening Tesla's corporate governance and oversight in order to protect investors," said Stephanie Avakian, Co-Director of the SEC's Enforcement Division.
>
> "As a result of the settlement, Elon Musk will no longer be Chairman of Tesla, Tesla's board will adopt important reforms —including an obligation to oversee Musk's communications with investors—and both will pay financial penalties," added Steven Peikin, Co-Director of the SEC's Enforcement Division. "The resolution is intended to prevent further market disruption and harm to Tesla's shareholders."
>
> The SEC's investigation was conducted by Walker Newell, Brent Smyth, and Barrett Atwood and supervised by Steven Buchholz, Erin Schneider, and Jina Choi in the San Francisco Regional Office and Cheryl Crumpton in the SEC's Home Office.

174. On October 16, 2018, the United States District Court for the Southern District of New York entered a final judgment against Musk and Tesla. Under the terms of the judgment, Musk admitted that the allegations in the SEC Complaint filed against him are true for certain legal proceedings.

175. On November 8, 2018, Tesla announced that Robyn Denholm, a Tesla Board member and technology executive, would become the new Chairman of Tesla.

176. On December 28, 2018, Tesla also announced that as a result of the settlement with the SEC, that Larry Ellison, and Kathleen Wilson-Thompson would be joining Tesla's Board.

177. The SEC's quick and deliberate actions against Musk and Tesla adds to the inference that Musk acted with scienter. Further, the fact that Musk was required to step down as Chairman of Tesla as a direct result of his false and misleading statements further underscores Musk's scienter.

5. <u>Musk's scienter is imputed to Tesla.</u>

178. Musk, as Chief Executive Officer and Chairman of the Board, was the face of and spokesman for Tesla.

179. Tesla used social media and specifically Musk's Twitter account to convey corporate news.

180. When Musk tweeted information about Tesla on Twitter, he did so with apparent authority on behalf of Tesla. This placed Musk in a position of trust and confidence and controlled the level of oversight of his handling of the business.

181. Therefore, all statements made by Musk as well as his scienter are imputed to Tesla.

182. Musk's statements and scienter are also imputed to Tesla under the doctrine of *respondeat superior* and principles of common law agency.

**C. <u>Presumption of Reliance; Fraud-On-The-Market</u>**

183. At all relevant times, the market for Tesla's securities was an efficient market for the following reasons, among others:

(a) Tesla's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b) During the Class Period, Tesla's securities were actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, Tesla filed with the SEC periodic public reports;

(d) Tesla regularly communicated with public investors via established market communication mechanisms;

(e) Tesla was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Tesla was rapidly reflected in and incorporated into Tesla's stock and option prices during the Class Period.

184. The market for Tesla securities was open, well developed and efficient at all relevant times. As a result of Musk's and Tesla's materially false and misleading statements, Tesla securities traded at artificial prices during the Class Period. Plaintiff and other Class members purchased and/or sold Tesla securities relying upon the integrity of the market prices of Tesla securities and market information relating to Tesla, and were damaged as a result.

185. The current market prices of Tesla options, as well as all United States exchange-listed equity options, are based in part on the current price of the underlying stock. As the underlying stock price moves closer to or further away from an option's strike price, the value of that particular option is affected because the likelihood of that option being exercised increases or decreases. As a company's stock price reflects all public information concerning that company and the markets utilize the current market price of a company's stock to calculate the prices for equity options, all public information concerning a stock is incorporated into the price of a company's equity options as well.

186. As a result of the foregoing, the market for Tesla's securities promptly digested current information regarding Tesla from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers and sellers of Tesla's securities during the Class Period relied on Tesla and Musk's material misrepresentations and omissions when making their purchases or sales of Tesla's securities at market prices.

187. At the time of Tesla and Musk's misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other Class members and the marketplace known the truth regarding the proposed going-private transaction and its funding, which were not disclosed by Tesla or Musk, Plaintiff and other Class members would not have purchased or sold their Tesla securities, or, if they had purchased or sold such securities during the Class Period, they would not have done so at the artificial prices that they paid or received.

## D. Loss Causation and Economic Loss

188. When Musk made the "funding secured" tweet on August 7, 2018, and continued to make misrepresentations regarding the proposed going-private transaction as alleged herein, he damaged virtually every individual and/or entity trading Tesla securities during the Class Period.

### 1. Common Stock

189. Musk's "funding secured" tweet on August 7, 2018 and subsequent misrepresentations materially affected the market for Tesla securities. The price of Tesla's stock increased following the initial "funding secured" tweet, and then rose and fell in response to further

misrepresentations by Musk, other corporate statements, and reports by analysts and news media. Tesla's stock price dropped substantially once it was confirmed that funding for the go-private transaction had in fact never been "secured" and the proposed $420 price had never been agreed. The following chart illustrates the movement of Tesla's stock price during August 2018:




190. Musk's tweets on August 7, 2018 caused a massive increase in the price of Tesla's stock. From an opening price of $343.84 per share, Tesla's stock rose to an intraday high of $387.46 and closed at $379.57. Over 30 million shares were traded that day, or more than twice the daily average volume for Tesla stock over the previous 90 days.

191. On August 8, 2018, Tesla's stock price declined significantly. Contrary to what Musk had said on August 7, 2018, the press release from Tesla's Board did not state that funding for a going-private transaction had been "secured." From a closing price of $379.57 the day earlier, Tesla's stock closed at $370.34 per share on August 8, 2018. Volume for the stock was unusually heavy with over 24.5 million shares being traded.

192. On August 9, 2018, Tesla's stock price continued to decline. The previous day, after the market closed, the *Wall Street Journal* reported that the SEC was investigating Musk and Tesla over Musk's "funding secured" tweet. During the course of the day, Tesla's stock price declined by

almost 5% to close at $352.45. Again, volume was unusually high with over 17 million shares traded.

193. On August 13, 2018, following Musk's blog post dated August 13, 2018, Tesla's stock price rose during pre-market trading to open at $361.13 per share compared to its adjusted closing price from the day before of $356.41 per share. Tesla's stock closed at $356.41 per share with over 10.4 million shares traded during the day.

194. On August 14, 2018, Tesla's stock price continued to drop in response to Tesla's statement that the company had formed a special committee in connection with the going-private transaction and reports that neither Musk not Tesla had in fact retained the advisors that Musk had mentioned the day before. Tesla's stock closed at $347.64 per share.

195. On August 15, 2018, Tesla's stock price continued to decline. During the course of the day, multiple news sources reported that the SEC had issued formal subpoenas to Musk and Tesla. Tesla's stock closed at $338.69 per share.

196. On August 17, 2018, Tesla's stock closed at $305.50 per share, which represented a decline of $29.95 per share or almost 9% from the previous day. The decline was caused by *The New York Times* report on Musk which was published online after-market hours on August 16, 2018 and in print on August 17, 2018. The report confirmed to investors that Musk's "funding secured" tweet had in fact been false when made and that, in reality, there was no definitive agreement to take Tesla private in place, or even close to being finalized.

197. Musk's and Tesla's false and misleading statements artificially inflated the price of Tesla's common stock. By stating that he had "secured" funding to take Tesla private at $420, Musk led the public to believe that investors would receive $420 per share when the transaction was completed. As the truth concerning Musk's and Tesla's statements was revealed, the market started to doubt whether Musk had truly secured funding and if the company was truly going private. This, in turn, caused the price of Tesla's stock to decline as the artificial inflation began to dissipate.

198. Investors who purchased Tesla shares at inflated prices following Musk's August 7, 2018 tweet suffered losses as the fraud was revealed and Tesla's stock price declined.

199. Similarly, an investor who was betting against Tesla and was "short" its stock before August 7, 2018 also sustained losses in connection with Musk's and Tesla's false and misleading statements.

200. If an investor expects that the price of a company's stock will decrease in the future, an investor may open a short investment position in the company's common stock. To short a company's stock, an investor will borrow a share of the company's common stock from another party and sell it at the then current market price. The investor is obligated to replace the borrowed share in the future and may pay interest on the borrowed share to the lending party.

201. If the investor wishes to close his short stock position, the investor would "buy to cover" by purchasing a share of the company's common stock at the prevailing market price. If the stock price has decreased since the investor sold short the borrowed share, the investor would profit because he sold the share for a price greater than he paid to replace the borrowed share. If, however, the stock priced has increased, the investor would incur a loss as it would cost the investor more to replace the share than it received when selling the borrowed share.

202. Many short investors were required to "cover" their short positions when Musk tweeted that he had "secured" funding to take Tesla private at $420 per share. Any short investor that "covered" in the wake of Musk's tweet suffered significant damages as a result of having to purchase shares at artificially inflated prices.

2. Options

203. Option traders also sustained significant damages as a result of Musk's and Tesla's false and misleading statements.

204. An option contract is a type of security that provides an investor a right or obligation to buy or sell a specific security. For United States exchanged-listed options on publicly-traded stock, one option contract equals the right to buy or sell 100 shares of the underlying stock. Listed options are readily available on most listed securities. All exchange-listed equity options in the United States will denote: (i) the type of security underlying the option contract (*i.e.*, Tesla common stock); (ii) the price at which the underlying security may be bought or sold when the option is

exercised (the "strike price"); and (iii) the date by which the option must be exercised (the "expiration date").

205. There are two basic types of equity options: call options and put options. Call options give the holder the right, but not the obligation, to buy shares. The primary motivation of the call buyer is to realize financial reward from an increase in price of the underlying security. Accordingly, a call option holder can force the seller or the "writer" of a call option contract to sell shares of the underlying stock at the strike price, even if the stock is trading at a greater price.

206. Put options, on the other hand, give the holder the right, but not the obligation, to sell shares at the strike price. The motivation for the put holder is to make money when the stock falls in value. Accordingly, a put option holder can force the writer of a put option contract to buy shares of the underlying stock at the strike price, even if the stock is trading for a lesser price.

207. The value of a put or call option is dependent upon several factors, including: (i) the price of the underlying stock; (ii) the strike price; (iii) the time to expiration; and (iv) the implied volatility of the option.

208. In addition to artificially inflating the price of Tesla's stock, Musk's and Tesla's false and misleading statements also created extreme volatility in the market for Tesla's securities as the public tried to determine whether Tesla would in fact go private and, if so, at what price. Implied volatility represents the expected volatility of a stock over the life of an option. When implied volatility increases, the price of an option contract increases accordingly. The following chart illustrates the changes in volatility during August 2018 with the implied volatility for options expiring in the next 10 days (blue) exhibiting the most significant volatility compared to options expiring in the next 30 days (green) and year (black):




209. The abrupt increase in price, volume, and volatility in the market for Tesla securities, which was caused by Musk's and Tesla's false and misleading statements, resulted in significant damages for investors who sold or purchased options during the Class Period, depending on the particular option contracts held.

* * *

210. As a result of their purchases and sales of Tesla securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Musk's and Tesla's false and misleading statements caused Tesla's stock, options, and other securities to trade at artificial levels throughout the Class Period. By misleading investors about the going-private transaction and, in particular, that funding had not in fact been "secured," Musk and Tesla deceived investors. As the truth was revealed to investors, the prices of Tesla securities were affected significantly, causing economic loss to investors who had purchased or sold Tesla securities during the Class Period.

211. As described above, the changes in the price of Tesla's stock, options, and other securities after the truth about the going-private transaction and its funding were disclosed were the

direct result of the nature and extent of Musk's and Tesla's fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price changes in Tesla's securities negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Musk's and Tesla's fraudulent conduct.

### E. Safe Harbor Does Not Apply

212. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. None of the misrepresentations or omissions by Tesla and Musk involved forward-looking statements nor were they accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.

213. By virtue of the foregoing, Tesla and Musk have violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

## VII. COUNT II: VIOLATION OF SECTION 20(a) AGAINST THE BOARD

214. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

215. As members of Tesla's Board, Defendants Buss, Denholm, Ehrenpreis, Gracias, Murdoch, Kimbal, and Rice acted as controlling persons of Tesla within the meaning of Section 20(a) of the Securities Exchange Act of 1934.

216. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Tesla's operations and/or intimate knowledge of the false information and disseminated to the investing public, the Board had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Tesla, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Board was provided with or had unlimited access to Tesla's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

217. At all relevant times herein, the Board was responsible for overseeing management to ensure that Tesla operated in an effective, efficient, and ethical manner. This included ensuring that public communications to stockholders were accurate and not misleading.

218. Tesla identified Musk's Twitter account as an official channel of communication for the company. Accordingly, the Board had authority over and/or controlled statements made by Musk through his Twitter account. For example, Defendant Gracias, Tesla's lead independent director, contacted Musk after August 7, 2018 and ordered him to refrain from tweeting about the potential privatization transaction unless he previously discussed it with the Board. Musk did not publish a tweet about the transaction from August 8, 2018 to August 24, 2018. Similarly, the Board (except Kimbal) also issued a press release discussing the going-private transaction on August 8, 2018.

219. As set forth above, Musk and Tesla each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint and the Class was damaged thereby.

220. By virtue of their positions as controlling persons, the Board is liable pursuant to Section 20(a) of the Securities Exchange Act of 1934.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e) Such other and further relief as the Court may deem just and proper.

## IX. JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: January 16, 2019

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt (*admitted pro hac vice*)
Alexander A. Krot, III (*admitted pro hac vice*)
**LEVI & KORSINSKY, LLP**
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: akrot@zlk.com

-and-

Eduard Korsinsky (*pro hac vice to be submitted*)
Joseph Levi (*pro hac vice to be submitted*)
**LEVI & KORSINSKY, LLP**
55 Broadway, 10th Floor
New York, New York 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: ek@zlk.com
Email: jlevi@zlk.com

*Attorneys for Lead Plaintiff Glen Littleton and Lead Counsel for the Class*