1  DEAN S. KRISTY (CSB No. 157646)
   dkristy@fenwick.com
2  KEVIN P. MUCK (CSB No. 120918)
   kmuck@fenwick.com
3  JENNIFER BRETAN (CSB No. 233475)
   jbretan@fenwick.com
4  FENWICK & WEST LLP
   555 California Street, 12th Floor
5  San Francisco, CA  94104
   Telephone:      415.875.2300
6  Facsimile:      415.281.1350

7  ALISON C. JORDAN (CSB NO. 311081)
   ajordan@fenwick.com
8  FENWICK & WEST LLP
   801 California Street
9  Mountain View, CA  94041
   Telephone:      (650) 988-8500
10 Facsimile:      (650) 938-5200

11 Attorneys for Defendants Tesla, Inc., Elon Musk,
   Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,
12 Antonio J. Gracias, James Murdoch, Kimbal
   Musk, and Linda Johnson Rice

13

14                 UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16                 SAN FRANCISCO DIVISION

17                                    Case No.: 3:18-cv-04865-EMC

18                                    **NOTICE OF MOTION AND
                                      MOTION TO DISMISS
19 IN RE TESLA, INC. SECURITIES      CONSOLIDATED COMPLAINT;
   LITIGATION                        MEMORANDUM OF POINTS AND
20                                    AUTHORITIES IN SUPPORT
                                      THEREOF**
21
                                      Date:     March 5, 2020
22                                    Time:     1:30 p.m.
                                      Dept.:    Courtroom 5, 17th Floor
23                                    Judge:    Hon. Edward M. Chen

24                                    Date Action Filed:  August 10, 2018

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................ 1

ISSUES TO BE DECIDED ...................................................................................................... 1

I.      INTRODUCTION ...................................................................................................... 2

II.     STATEMENT OF FACTS .......................................................................................... 4

        A.      Mr. Musk's Discussions With PIF .................................................................. 4

        B.      Discussion Of A Possible Transaction With The Board On August 2-3, 2018 ...... 5

        C.      Mr. Musk Discloses Consideration Of A Possible Transaction On August 7 ........ 6

        D.      Mr. Musk Provides Additional Information On August 13, 2018 ........................ 7

        E.      Based On Shareholder Feedback, Mr. Musk Opts Not To Pursue A Deal ............ 7

        F.      The SEC Litigation And Settlements ................................................................ 8

        G.      This Case .......................................................................................................... 8

III.    PLAINTIFF'S CLAIM IS SUBJECT TO STRICT PLEADING REQUIREMENTS ....... 9

IV.     MR. MUSK'S STATEMENTS ARE NOT ACTIONABLE ......................................... 9

        A.      The August 7, 2018 Statements Were Not False Or Misleading ......................... 9

                1.      Funding Secured ................................................................................... 10

                2.      The "Intended" Structure Mr. Musk "Envisioned" And "Hoped For" ..... 12

                3.      The "Only" Contingency Was A Shareholder Vote ................................ 14

        B.      The August 13, 2018 Statements Were Not False Or Misleading ...................... 15

        C.      The Scienter Allegations Are Woefully Deficient ............................................. 15

V.      TESLA DID NOT MAKE THE ALLEGEDLY ACTIONABLE STATEMENTS .......... 19

VI.     PLAINTIFF DOES NOT ADEQUATELY PLEAD LOSS CAUSATION ..................... 21

        A.      August 7 Statements ......................................................................................... 21

        B.      August 13 Statements ....................................................................................... 23

VII.    PLAINTIFF'S SECTION 20(a) CLAIM AGAINST THE DIRECTORS FAILS ............ 23

VIII.   CONCLUSION ........................................................................................................ 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arthur Children's Trust v. Keim*,
994 F.2d 1390 (9th Cir. 1993)............................................................................24

*Attia v. Google LLC*,
2018 WL 2971049 (N.D. Cal. June 13, 2018) .....................................................5

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................14, 15

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 2937483 (N.D. Cal. May 20, 2016) ...................................................23

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)....................................................................9, 11, 12

*Burgess* v. *Premier Corp.*,
727 F.2d 826 (9th Cir. 1984)............................................................................24

*Cement Masons & Plasterers Jt. Pens. Tr. v. Equinix, Inc.*,
2012 WL 6044787 (N.D. Cal. Dec. 5, 2012) ................................................22, 23

*Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) .............................................................17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)............................................................................15

*Colyer v. Acelerx Pharms., Inc.*,
2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ...................................................16

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017)............................................................................22

*Dirks v. SEC*,
463 U.S. 646 (1983)............................................................................................16

*DSAM Glob. Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002)........................................................................16, 18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)............................................................................................21

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) .....................................................24

*Glazer Capital Mgmt., L.P. v. Magistri*,
549 F.3d 736 (9th Cir. 2008)............................................................................17

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**TABLE OF AUTHORITIES**
**(CONT'D)**

2

Page(s)

3

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)..........................................................................20

4

*Howard v. Everex Sys., Inc.*,
5       228 F.3d 1057 (9th Cir. 2000)...............................................................................................24

6

*In re CytRx Corp. Sec. Litig.*,
2015 WL 5031232 (C.D. Cal. July 13, 2015) ........................................................................20

7

*In re Energy Recovery Inc. Sec. Litig.*,
8       2016 WL 324150 (N.D. Cal. Jan. 27, 2016) .....................................................................24, 25

9

*In re Facebook, Inc. Sec. Litig.*,
2019 WL 46747237 (N.D. Cal. Sept. 25, 2019) .....................................................................18

10

*In re Intrexon Corp. Sec. Litig.*,
11      2017 WL 732952 (N.D. Cal. Feb. 24, 2017)...........................................................................22

12

*In re Leapfrog Enter., Inc. Sec. Litig.*,
200 F. Supp. 3d 987 (N.D. Cal. 2016) ....................................................................................21

13

*In re Lululemon Sec. Litig.*,
14      14 F. Supp. 3d 553 (S.D.N.Y. 2014) .......................................................................................13

15

*In re OmniVision Techs., Inc. Sec. Litig.*,
937 F. Supp. 2d 1090 (N.D. Cal. 2013) ..................................................................................11

16

*In re PayPal Holdings Inc. S'holder Deriv. Litig.*,
17      2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ...........................................................................11

18

*In re Read-Rite Corp.*,
335 F.3d 843 (9th Cir. 2008)...................................................................................................11

19

*In re Rigel Pharms., Inc. Sec. Litig.*,
20      697 F.3d 869 (9th Cir. 2012)..............................................................................................11, 12

21

*In re Salomon Analyst Level 3 Litig.*,
350 F. Supp. 2d 477 (S.D.N.Y 2004).......................................................................................13

22

*In re Silicon Storage Tech., Inc.*,
23      2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ..........................................................................19

24

*In re Yahoo! Inc. Sec. Litig.*,
2012 WL 3282819 (N.D. Cal. Aug. 10, 2012), *aff'd*, 611 F. App'x 387 (9th
25      Cir. 2015) .................................................................................................................................11

26

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
2018 WL 4181954 (N.D. Cal. Aug. 31, 2018).........................................................................17

27

*Jackson v. Fischer*,
28      2015 WL 1143582 (N.D. Cal. Mar. 13, 2015).........................................................................13

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## **TABLE OF AUTHORITIES**
## (CONT'D)

2

**Page(s)**

3    *Jackson v. Fischer*,
        931 F. Supp. 2d 1049 (N.D. Cal. 2013) ...............................................................21

4

5    *Janus Cap. Grp., Inc. v. First Deriv. Traders*,
        564 U.S. 135 (2011) ........................................................................................ *passim*

6    *Lipton v. Pathogenesis Corp.*,
        284 F.3d 1027 (9th Cir. 2002)...........................................................................19

7

8    *Loos v. Immersion Corp.*,
        762 F.3d 880 (9th Cir. 2014)...........................................................................9, 22

9    *Matrixx Initiatives, Inc. v. Siracusano*,
        131 S. Ct. 1309 (2011)....................................................................................9, 12

10

11   *Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
        540 F.3d 1049 (9th Cir. 2008).............................................................................9

12   *Mineworkers' Pension Scheme v. First Solar, Inc.*,
        881 F.3d 750 (9th Cir. 2018)...............................................................................21

13

14   *N.Y Hotel Trades Council & Hotel Ass'n v. Impax Labs., Inc.*,
        2019 WL 3779262 (N.D. Cal. Aug. 12, 2019).............................................22, 23

15   *Oaktree Principal Fund V, LP v. Warburg Pincus, LLC*,
        2016 WL 6782768 (C.D. Cal. Aug. 9, 2016).....................................................21

16

17   *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*,
        135 S. Ct. 1318 (2015)........................................................................................15

18   *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
        774 F.3d 598 (9th Cir. 2014)................................................................................9

19

20   *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
        96 F.3d 1151 (9th Cir. 1996)..............................................................................24

21   *Park v. GoPro, Inc.*,
        2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) ................................................ *passim*

22

23   *Rok v. Identiv, Inc.*,
        2016 WL 4205684 (N.D. Cal. Aug. 10, 2016)...................................................22

24   *Ronconi v. Larkin*,
        253 F.3d 423 (9th Cir. 2001)..........................................................................12, 13

25

26   *Schaffer Family Inv'rs, LLC v. Sonnier*,
        120 F. Supp. 3d 1028 (C.D. Cal. 2015).............................................................21

27   *SEC v. Lowy*,
        396 F. Supp. 2d 225 (E.D.N.Y. 2003) ..............................................................17

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## TABLE OF AUTHORITIES
### (CONT'D)

2

Page(s)

3   *SEC v. Platforms Wireless Int'l Corp.*,
       617 F.3d 1072 (9th Cir. 2010).............................................................................16, 17

4

*Sgarlata v. PayPal Holdings, Inc.*,
5       2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ............................................................24

6   *Sgarlata v. PayPal Holdings, Inc.*,
       2019 WL 4479562 (N.D. Cal. Sept. 18, 2019) .............................................................9

7

*Special Situations Fund III QP, LP v. Brar*,
8       2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ............................................................24

9   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
       551 U.S. 308 (2008).............................................................................................9, 15, 16

10

*Veal v. LendingClub Corp.*,
11       2019 WL 5698072 (N.D. Cal. Nov. 4, 2019) ..............................................................17

12   *Webb* v. *SolarCity Corp.*,
       884 F.3d 844 (9th Cir. 2018)...................................................................................9, 16

13

*Yourish v. Cal. Amplifier*,
14       191 F.3d 983 (9th Cir.1999).........................................................................................13

15   *Zucco Partners, LLC v. Digimarc Corp.*,
       552 F.3d 981 (9th Cir. 2009)..........................................................................16, 18, 23

16

**STATUTES AND RULES**

17

18   Federal Rules of Civil Procedure
       Rule 9(b) .................................................................................................................1, 9
19       Rule 12(b)(6) .................................................................................................................1

20   Private Securities Litigation Reform Act of 1995 ("PSLRA").............................1, 9, 17

21   Securities Exchange Act of 1934
       Section 10(b) ...................................................................................................... *passim*
22       Section 20(a) ...................................................................................................... *passim*
       Rule 13a-15 ....................................................................................................................8
23

24   **OTHER AUTHORITIES**

25   Lydie N.C. Pierre-Louis, *Hedge Fund Fraud and the Public Good*,
       15 Fordham J. Corp. & Fin. L. 21 (2009) (Ex. U) ....................................................18

26

27   Jennifer Robichaux Carter, *Hedge Funds Should Be Able to Challenge Patent
   Validity Using Inter Partes Review Despite Mixed Motives*,
       54 Hous. L. Rev. 1315 (2017) (Ex. V).......................................................................18

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

**TABLE OF AUTHORITIES**
**(CONT'D)**

**Page(s)**

3

Jessica Dye, *Tesla shares move higher on Saudi Arabia fund stake,* Financial
Times (Aug. 7, 2018) (Ex. W) ........................................................................................6

4

Rory Jones, Summer Said & Maureen Farrell, *Saudi Arabia Goes High-Tech in*

5

*Approach to Investing,* Wall St. J. (Aug. 15, 2018) (Ex. X) .........................................5

6

Ihor Dusaniwsky, *S3 Analytics: No Tesla Short Squeeze, Shorts Up $1.2 Billion*
*Since "The Tweet"* (August 17, 2018) (Ex. Y) ...........................................................19

7

Claudia Assis, *Tesla short sellers are up $1.2 billion since Elon Musk's 'going-*

8

*private' tweet*, MarketWatch (August 19, 2018) (Ex. Z) .............................................19

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on March 5, 2020, at 1:30 p.m., before the Honorable Edward M. Chen of the United States District Court for the Northern District of California, defendants Tesla, Inc. ("Tesla" or the "Company"), Elon Musk ("Mr. Musk"), and certain current and former members of Tesla's Board of Directors (Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice) (referred to as the "Director Defendants") move to dismiss the Consolidated Complaint for Violations of the Federal Securities Laws (the "CC"). Defendants move pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that plaintiff fails to state a claim for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. This motion is based on the Memorandum of Points and Authorities below, defendants' Request for Judicial Notice and for Consideration of Documents Incorporated by Reference, the Declaration of Jennifer C. Bretan and attached exhibits[1], the arguments of counsel, and any other matters properly before the Court.

## ISSUES TO BE DECIDED

1.      Should the Section 10(b) claim against Elon Musk be dismissed where plaintiffs (i) fail to allege specific facts showing that he made a false or misleading statement, and (ii) fail to plead particularized facts giving rise to a strong inference of scienter?

2.      Should the Section 10(b) claim against Tesla, which is based entirely on Mr. Musk's statements as a potential bidder, be dismissed where (i) plaintiff fails to plead falsity and scienter as to Mr. Musk, and (ii) there are no facts showing that Tesla was the "maker" of the challenged statements or had "ultimate authority" over them?

3.      Should the Section 10(b) claim be dismissed where plaintiff fails to plead loss causation?

4.      Should the Section 20(a) claim against the Director Defendants be dismissed where there is no underlying violation by Tesla, and where the allegations contradict any claim that they controlled Mr. Musk's challenged statements as a bidder?

---

[1] Unless otherwise noted, references to Exhibits ("Ex.") are to the Bretan Declaration.

## I.   INTRODUCTION

Plaintiff's allegations, focusing on tweets made by Elon Musk on August 7, 2018 regarding a take-private transaction he was "***considering***," do not come close to pleading securities fraud. Stripped of legally improper, almost wholesale reliance on unadjudicated allegations made by the SEC – the settlement of which expressly allows Mr. Musk and Tesla to challenge the sufficiency of all allegations here – plaintiff offers a fraud theory that makes no sense.  Viewed reasonably and objectively, it fails as a matter of fact, law and common sense.

Rather than being inconsistent with his private statements (as in most securities cases), the August 7 tweets ***mirror precisely*** what Mr. Musk privately told Tesla's Board days earlier about his goals, rationale, and funding for taking Tesla private. On August 2 and 3, Mr. Musk indicated to Tesla's Board that: (1) he believed Tesla would operate more effectively as a private company; (2) he desired to take Tesla private at $420 per share; (3) he hoped for a structure in which anyone who wished to remain a shareholder would be allowed to do so, in a manner similar to SpaceX (another of Mr. Musk's companies); and (4) based on almost two years of lobbying by Saudi Arabia's Public Investment Fund ("PIF"), including a July 31, 2018 meeting in which PIF again urged him to take Tesla private, he had more than enough funding for the transaction he was contemplating. In other words, ***days prior to any public disclosure***, Mr. Musk had ***already*** started the process of evaluating the transaction he was considering because he believed it made sense.

The timing of Mr. Musk's public disclosure was prompted by a leak, appearing in the *Financial Times* on the morning of August 7, of PIF's recent acquisition of nearly 5% of Tesla's stock on the open market, causing an immediate spike in Tesla's stock price. PIF had just told Mr. Musk of its purchase on July 31. Concerned his discussions with PIF regarding taking Tesla private would also leak, Mr. Musk moved quickly to ensure that all shareholders were privy to his intentions at once. As Mr. Musk explained, "the right thing to do was to announce my intentions publicly," so that all shareholders had information at "the same time."

Utilizing his personal Twitter account, and acting in the capacity of a bidder, Mr. Musk publicly advised (just 30 minutes after the *Financial Times* story): "Am ***considering*** taking Tesla private at $420. Funding secured." In a blog post that day and in subsequent tweets, Mr. Musk

1  explained his rationale for "considering" whether or not to take this action, expressed his "hope"

2  to structure a transaction so that current shareholders could remain with a private Tesla, said he

3  was still "considering" whether or not to move forward with a proposal, and noted that if he did,

4  the decision would "ultimately" be up to Tesla's shareholders. Just like the statements he made to

5  the Board days earlier, Mr. Musk made these statements because he believed them, and the

6  process that ensued evinces good faith. Mr. Musk retained leading financial and legal advisors to

7  assist him. Tesla's independent directors formed a special committee and also retained skilled

8  advisors. So did Tesla. Every aspect of the process that followed shows serious consideration

9  being given by all concerned to the transaction that Mr. Musk was considering.

10          Yet plaintiff's case is predicated on the flawed premise that all of this was some sort of

11  ruse to deceive investors and harm "short-sellers" by temporarily "inflating" Tesla's stock price.

12  That makes no sense. Mr. Musk stood to gain nothing by "lying" about his aspirations, and in fact

13  gained nothing. As even plaintiff concedes, Tesla's stock price had already risen sharply in the

14  days before the tweets, surging 16% on August 1, 2018 after Tesla reported stellar results.

15  Anyone shorting Tesla's stock was already in the red prior to August 7. And, while Tesla's stock

16  price increased substantially (for just one day) on August 7, it quickly declined below pre-tweet

17  levels, and articles like those referenced in the Complaint quote short-sellers *celebrating*, stating

18  "the time has finally come for the great Tesla short" and the "potential payoff for a short position

19  improves." Indeed, published reports indicate that short-sellers *profited* by about $1.2 billion

20  during the alleged class period (August 7 to August 17, 2018). The notion that Mr. Musk

21  privately told the Board what he was considering days earlier, triggering a formal process, just to

22  *harm* short-sellers – who then actually profited – is implausible.

23          Ultimately, Mr. Musk decided not to pursue a transaction based on feedback he received

24  from shareholders, who preferred Tesla to remain public. Mr. Musk explained his decision on

25  August 24 (after the class period, which ends on August 17), and confirmed again that funding

26  was no obstacle had shareholders supported it. That statement, which is not alleged to be

27  misleading, is also consistent with what Mr. Musk said from the start.

28          The Complaint fails for multiple reasons. *First*, as to Mr. Musk, plaintiff pleads no facts

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

showing that his statements were false or materially misleading. Nor are there pleaded facts giving rise to the cogent and compelling inference of scienter the law demands; to the contrary, the indicia of Mr. Musk's good faith vastly outweigh any competing inference. At most, plaintiff's allegations suggest that Mr. Musk could have done "more" before tweeting on August 7. But as this Court has recently held, allegations that amount to negligence, or even gross negligence, are insufficient to plead a fraud claim under Section 10(b). *See Park v. GoPro, Inc.*, 2019 WL 1231175, at *22 (N.D. Cal. Mar. 15, 2019).

*Second,* as to Tesla, it was not the "maker" of any alleged misstatement. The challenged statements were made by Mr. Musk as a potential bidder, not by Tesla (the recipient of any bid). Given that Tesla is not alleged to have made any misstatements or acted with scienter (indeed, even the SEC made no such allegations), the Section 10(b) claim also fails as to Tesla.

*Third,* plaintiff cannot plead loss causation – that any decline in Tesla's stock price was due to a corrective disclosure of facts allegedly misstated.

*Fourth,* the addition of a "control person" claim under Section 20(a) against the newly added Director Defendants is an obvious afterthought. Not only does it fail because there is no viable Section 10(b) claim against Tesla, the Complaint admits that Mr. Musk's August 7 tweets (in his capacity as a bidder) were not cleared with anyone at Tesla, much less the Director Defendants. Accordingly, plaintiff cannot plead actual control over the alleged misstatements.

Mr. Musk and Tesla may have a high profile, but a fraud claim is a serious matter. It must be grounded in facts and needs to make sense. This case does not. It should be dismissed.

## II.      STATEMENT OF FACTS

### A.      Mr. Musk's Discussions With PIF

Well before his August 2018 tweets, Mr. Musk made no secret of his belief that Tesla could operate more efficiently as a private company. *See* CC ¶ 91 (quoting Nov. 15, 2017 *Rolling Stone* article: "I wish we could be private with Tesla. It actually makes us less efficient to be a public company"). This observation did not go unnoticed. For nearly two years, PIF pursued Mr. Musk with its interest in taking Tesla private. At PIF's request, a meeting between Mr. Musk and PIF's senior decision-maker was set for July 31, 2018. At the meeting, PIF revealed that it had

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

recently acquired almost 5% of Tesla's stock on the open market (just below the public reporting threshold), costing it billions of dollars, as a sign of its interest in Tesla. As Mr. Musk would publicly explain: "[d]uring the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed." CC ¶ 103; Ex. K. As a result, "I left the July 31 meeting with no question that a deal with [PIF] could be closed, and that it was just a matter of getting the process moving." *Id.*[2]

**B.      Discussion Of A Possible Transaction With The Board On August 2-3, 2018**

The PIF meeting persuaded Mr. Musk to explore a take private transaction. To that end, he sent an email to Tesla's Board on August 2, entitled "Offer to Take Tesla Private at $420." CC ¶ 69; Ex. A.[3] Mr. Musk stated his "firm belief that Tesla can operate more effectively as a private company." As he explained, "being public during this period of rapid and often unpredictable growth": (1) "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand," (2) "[p]uts great pressure on Tesla to make decisions for a given quarter that are suboptimal for long-term shareholder value creation," and (3) "[c]auses wild swings in our share price, which are a constant distraction to Tesla employees, all of whom are shareholders, making it harder to focus on useful work." *Id.* Mr. Musk made clear that his desired structure was for shareholders to have the choice to remain in a private Tesla. *Id.*

Tesla's Board met on August 2 without Mr. Musk present, and again on August 3 with him present. CC ¶¶ 72, 103. Mr. Musk told the Board of PIF's interest in funding a take private

---

[2] Plaintiff assails the conclusions Mr. Musk drew because the meeting lasted only about 45 minutes. But there is no reason that verbal commitments cannot be made quickly, especially given PIF's long history of interest and vast financial means. In fact, fast, multi-billion-dollar commitments by PIF are not at all unusual. *See, e.g.*, Ex. B.  Published reports show, for example, that PIF committed $45 billion to Softbank in a deal "famously agreed upon in a 45-minute conversation . . . before the two sides then spent months agreeing on the details." Ex. X, Rory Jones, Summer Said & Maureen Farrell, *Saudi Arabia Goes High-Tech in Approach to Investing,* Wall St. J. (Aug. 15, 2018).

[3] Like most of his Complaint, plaintiff copies this allegation, without express attribution, from the SEC complaint. Such allegations have been repeatedly criticized by courts as improper and often stricken. *See Attia v. Google LLC*, 2018 WL 2971049, at *15 (N.D. Cal. June 13, 2018) (citing cases). Since plaintiff selectively quotes the email, defendants include it in full as Ex. A.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

transaction. *Id*. He also explained that, similar to SpaceX, his goal was to permit existing shareholders to remain with a private Tesla if they wanted to do so. *Id*.

### C.    Mr. Musk Discloses He Is Considering A Possible Offer On August 7

On August 7 at 9:18 a.m. PDT, the *Financial Times* reported that PIF had acquired a $2 billion stake in Tesla. Ex. B. The stock price quickly "moved sharply higher."[4] The prior day, Tesla's stock price closed at $341.99 (Ex. T), but rapidly increased to $356.67 on this news. *See* Ex. P at ¶ 75. The danger that a further leak of the potential take private transaction was acute. Mr. Musk concluded that "the right thing to do was announce my intentions publicly," so that he was "sharing the same information with all investors at the same time." CC ¶ 103; Ex. K.

Mr. Musk's personal Twitter account had over 22 million followers as of August 2018, including major news outlets. *See* CC ¶¶ 2, 166. Given that he was speaking as a potential bidder, Mr. Musk sent a short tweet from his personal account, publicly announcing at 9:48 a.m. (only 30 minutes after the *Financial Times* news broke): "Am *considering* taking Tesla private at $420. Funding secured." CC ¶ 74; Ex. C. (emphasis added). In subsequent tweets that day, he stated that "[m]y *hope* is *all* current investors remain with Tesla even if we're private," "[a]m super appreciative of Tesla shareholders," and "[d]ef no forced sales. Hope all shareholders remain. Will be way smoother & less disruptive as a private company. Ends negative propaganda from shorts." CC ¶¶ 79-80, 83; Exs. E-G.

Later that same day, Mr. Musk sent employees an email, also posted on Tesla's public blog, entitled "Taking Tesla Private." CC ¶ 84; Ex. I. Mr. Musk again stated "I'm *considering* taking Tesla private," *but that a "final decision has not yet been made*." *Id*. (emphasis added). He detailed the reasons, stressing that it was "all about creating the environment for Tesla to operate best." *Id*. Mr. Musk indicated that he "would like to structure this so that all shareholders have a choice" – *i.e.*, "similar in many ways to [] SpaceX" – and that any proposal would need to be "finalized through a vote of our shareholders." *Id*. Mr. Musk linked to the blog on his Twitter account at 12:36 p.m., with a short cover note: "Investor support is confirmed. Only reason why

---

[4] *See* Ex. W, Jessica Dye, *Tesla shares move higher on Saudi Arabia fund stake,* Financial Times (Aug. 7, 2018); *see also* CC ¶ 90 (analyst report referencing Financial Times story).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

this is not certain is that it's contingent on shareholder vote." CC ¶ 85; Ex. H.

Before the market opened on August 8, Tesla's independent directors issued a press release indicating that "[l]ast week, Elon opened a discussion with the board about taking the company private," and "[t]he board has met several times over the last week and is taking the appropriate next steps to evaluate this." CC ¶ 93; Ex. J. The Board subsequently announced that it had formed a special committee and had retained outside advisors. CC ¶ 106; Ex. M.

### D.     Mr. Musk Provides Additional Information On August 13, 2018

On August 13, Mr. Musk posted an "Update on Taking Tesla Private" with additional information on Tesla's blog. CC ¶ 103; Ex. K. Mr. Musk explained why he was "considering" a transaction, and why he notified the Board, in his "personal capacity," that he felt taking Tesla private would advance its best interests. *Id*. He also explained why he sent the August 7 tweet and said "funding secured." *Id*. Mr. Musk noted that he had "engaged advisors to investigate a range of potential structures and options," and to get to a "more precise understanding" on how many shareholders might remain if Tesla "became private." *Id*. He went on to explain, "[i]f and when a final proposal is presented, an evaluation process will be undertaken by a special committee of Tesla's board." *Id*. If that process "resulted in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote." *Id*. Again, the speculative nature of a possible transaction was clear: Mr. Musk had not even decided to make an offer; the ability and willingness of existing shareholders to participate would need to be determined; if he did decide to make an offer, the Board would have to go through its processes; and shareholders would then have to approve it. If these contingencies were a surprise, Tesla's stock would have gone down. It went up instead. *See* Ex. T.

### E.     Based On Shareholder Feedback, Mr. Musk Opts Not To Pursue A Deal

After extensive input from shareholders, Mr. Musk ultimately decided not to pursue a take private transaction. He announced his decision, and the reasons for it, in a "Staying Public" blog post on August 24. CC ¶ 115; Ex. N. As Mr. Musk explained, a number of institutional investors conveyed that their internal compliance rules put limits on private company investments. *Id*.  Mr. Musk also came to learn, contrary to his belief on August 7 and prior experience with SpaceX,

that "[t]here is also no proven path for most retail investors to own shares" if Tesla were private. *Id*. While he had decided not to proceed based on this feedback, he reiterated that "there is more than enough funding to take Tesla private [and this] was reinforced during this process." *Id*.

### F.     The SEC Litigation And Settlements

According to news reports, the SEC began an investigation on August 8, 2018, one day after Mr. Musk's tweets. CC ¶ 98. On September 27, the SEC filed suit against Mr. Musk under Section 10(b). Ex. P. On September 29, the SEC sued Tesla for a "disclosure controls" violation of Rule 13a-15 of the 1934 Act, alleging it lacked policies that "specifically addressed Musk's use of Twitter." Ex. Q, ¶¶ 1, 33. The SEC did not claim that Tesla made any misstatements or acted with scienter. No claims of any kind were asserted against Tesla's directors.

Both cases were settled on September 29. Nothing was adjudicated and the resolution was reached by consent "without admitting or denying the allegations" solely as to the SEC. Both Mr. Musk and Tesla expressly reserved the unfettered "right to take legal or factual positions in litigation or other legal proceedings in which the [SEC] is not a party." Ex. R, ¶ 13; Ex. S, ¶ 14.[5]

### G.     This Case

On August 10, 2018, the first of a series of securities class actions was filed alleging that "funding secured" was false and misleading. The suits named only Mr. Musk and Tesla as defendants. After consolidation, the Court appointed Glen Littleton as lead plaintiff, who filed the current Complaint, and later supplemented it on November 11, 2019 with a Chart per the Court's Standing Order. Other than adding references to news stories and analyst reports, plaintiff's pleading is almost a verbatim copy, without attribution, of the SEC's untested allegations against Mr. Musk. It also claims that Tesla violated Section 10(b), although the SEC brought no such charge. And, for the first time, it adds the Director Defendants, claiming they violated Section 20(a) by failing to control Tesla, even though the SEC made no such claim (and Tesla made no statements, much less with scienter).

---

[5] Plaintiff ignores the plain meaning of these provisions, and openly misstates other aspects of the settlement, claiming that Mr. Musk "admits or does not deny" the SEC allegations. CC ¶¶ 170-71. That is flatly wrong, as anyone reading the documents would know.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### III.   PLAINTIFF'S CLAIM IS SUBJECT TO STRICT PLEADING REQUIREMENTS

Under Section 10(b), plaintiff must plead: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014). Each element requires particularized facts satisfying Rule 9(b) and the "formidable" pleading standards of the PSLRA. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008); *see also Sgarlata v. PayPal Holdings, Inc.*, 2019 WL 4479562, at *4-5 (N.D. Cal. Sept. 18, 2019).

Specific contemporaneous facts showing falsity are required, not mere "fraud by hindsight." *GoPro*, 2019 WL 1231175, at *9, 13. A fact is material only if "a reasonable investor" would view it "as having significantly altered the 'total mix' of information." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321-22 (2011). An omission must affirmatively create "an impression of a state of affairs that differs in a material way from the one that actually exists," and a statement is not actionable merely because it is incomplete. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Plaintiff must also plead specific facts raising a strong inference of scienter – an intent to defraud or deliberate recklessness so egregious as to be tantamount to actual intent. *Webb* v. *SolarCity Corp.*, 884 F.3d 844, 850-51 (9th Cir. 2018). The inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2008).

Finally, plaintiff needs to plead loss causation – that a "revelation of fraudulent activity" caused Tesla's stock price decline. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

### IV.   MR. MUSK'S STATEMENTS ARE NOT ACTIONABLE

#### A.   The August 7, 2018 Statements Were Not False Or Misleading

Despite the many compelling reasons why Mr. Musk was considering taking Tesla private, plaintiff attacks three aspects of his statements on August 7: (1) "funding secured" (in his initial tweet); (2) that he "envisioned" and "hoped" for and "would like" a structure allowing shareholders to remain in a private Tesla if they so choose (in several tweets and a blog post); and

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(3) that the "only reason this is not certain is that it's contingent on a shareholder vote" (in a tweet). Plaintiff's claim fails in each case.

### 1.    Funding Secured

The only reasonable interpretation of Mr. Musk's "funding secured" statement on August 7 – which ***mirrors precisely*** what he told the Board days earlier – is that funding would be no obstacle if he decided to proceed with a transaction. It would make no sense to tell the Board he had funding, and to set in motion the extensive machinery of taking Tesla private (*e.g.*, retaining lawyers and financial advisors, convening a special committee), if he believed otherwise. Plus, funding was ***not*** an issue: as Mr. Musk announced on August 24 (in a post-class period statement that is not challenged), there was more than ample funding to take Tesla private. CC ¶ 115. The statement was not false on August 2, when Mr. Musk emailed the Board with his preliminary proposal and rationale. It was not false on August 3, when he met with the Board to discuss a potential transaction. It was not false on August 7, when he publicly stated that funding was no impediment. And it was not false in hindsight.

Plaintiff has no answer to the consistency between Mr. Musk's private and public statements about funding and the process that ensued. Instead, plaintiff tries to read an altogether different meaning into "funding secured," so that anything short of a "formal agreement" with PIF as of August 7, with specific "deal terms" and "price" discussed and agreed, renders the statement misleading. CC ¶ 121 (Chart #1). But Mr. Musk ***never said*** he had done any of those things. He was, after all, at the very outset of a process, "considering" whether to make an offer. Both the market reaction to his statement, and the context, belie plaintiff's claim.

Contrary to plaintiff's rigid interpretation, the phrase "funding secured" has no universal meaning. As the August 8 analyst report by Evercore (quoted in the Complaint) recognized, it could mean a range of things, from a written commitment to something far less:

> It is important to note that, as of today, no details have been provided with regards to what "funding secured" means, who is providing that funding and what any potential funding structure might look like. Our view is that "funding secured" should be interpreted as a strong verbal commitment, with funds available and parties willing to execute quickly. However, it could be less than this. (CC ¶ 97)

While some investors may have desired more detail or even questioned what Mr. Musk meant,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Section 10(b) is not meant to police statements that are merely incomplete. *See Brody,* 280 F.3d at

2   1006. Words do not mislead just because they may be susceptible to varying interpretations; they

3   mislead only if they "affirmatively create an impression of a state of affairs that differs in a

4   material way from the one that actually exists." *Id.*; *see also In re PayPal Holdings Inc. S'holder*

5   *Deriv. Litig.*, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018). This is true "even if investors

6   would consider the omitted information significant." *In re Rigel Pharms., Inc. Sec. Litig.*, 697

7   F.3d 869, 880 n.8 (9th Cir. 2012). And if a statement is susceptible to a reading that is "consistent

8   both with the lead plaintiffs' deduction . . . and with the opposite conclusion," that also fails to

9   state a claim.  *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1101 (N.D. Cal.

10   2013). Thus, it is not enough for plaintiff to point to his *preferred* interpretation and say "funding

11   secured" was misleading. He must plead facts "necessarily inconsistent" with the challenged

12   statement (*In re Read-Rite Corp.*, 335 F.3d 843, 846-48 (9th Cir. 2008)). He has not done so.

13         Indeed, at the time of Mr. Musk's statement, matters were in an early stage with

14   circumstances inherently in flux.[6] While the tweet conveyed his belief that funding would be

15   available, that is a far cry from saying that "formal documentation" setting forth "all deal terms"

16   with financing parties was in place. In fact, it was clear that important terms had yet to be

17   determined: most notably, ***how many shares of Tesla would be acquired*** if a take private

18   transaction were pursued, and hence the cost of any deal. As Mr. Musk expressly stated on

19   August 7, he "hoped" to use a structure where all Tesla shareholders would have the option of

20   remaining in a private company, and ***only those who did not wish to remain*** would receive the

21   $420 per share price being considered. Ex. I. He also indicated that he "wouldn't expect any

22   shareholder" to have a "controlling vote" "if we go private." Ex. D. Given that the cash to be paid

23   was necessarily indeterminate, as was the ownership structure, the notion that a two-word tweet

24   could ***only*** mean a written financing commitment, setting forth all terms, ignores the context of

25   the statement. *See In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *12 (N.D. Cal. Aug. 10,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

---

26

27   [6] Plaintiff repeatedly claims that Mr. Musk's August 7 tweet implied that a deal was "imminent."
*See, e.g.*, CC ¶¶ 121, 124-25 (Chart #1-4, 6). But plaintiff cites nothing to support that argument.
28   To the contrary, Mr. Musk said he was only "considering" a possible transaction – the decision to
go ahead had not even been made – so there is no reasonable basis to infer a deal was imminent.

---

2012) (statements omitting certain adverse facts on restructuring not misleading where discussions were "ongoing"), *aff'd*, 611 F. App'x 387 (9th Cir. 2015); *see also Matrixx*, 563 U.S. at 44 (statements evaluated "in the light of the circumstances under which they were made").[7]

The Complaint itself shows that the market was not "misled" in the way plaintiff claims. Addressing any confusion that may have existed, Mr. Musk's August 13 blog post devoted an entire section to "Why did I say 'funding secured'?" CC ¶ 103; Ex. K. Mr. Musk described the factors leading him to leave the July 31 PIF meeting "with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving." *Id*. This was why he "referred to 'funding secured' in the August 7th announcement." *Id*. The blog post was clear that there was no formal, written agreement with deal terms and price negotiated and agreed upon (as plaintiff claims the August 7 tweet implied). Yet the stock price **went up** on the day of the blog post (from $355.49 to $356.41), not down (as one would have expected if the blog revealed facts that were "necessarily inconsistent" with his earlier tweet). *See* Ex. T.

At most, plaintiff might argue the tweet was ambiguous or even incomplete, but it was not inconsistent with the facts as Mr. Musk knew them. Plaintiff therefore fails to plead falsity. *See Rigel*, 697 F.3d at 881 (no falsity where "the subsequent release of more extensive information . . . was not inconsistent with" earlier statement); *Brody*, 280 F.3d at 1007 (press release noting "expressions of interest," but not disclosing actual takeover proposals, not misleading because still "consistent with the more detailed explanation"); *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (undisclosed "circumstances are not inconsistent with the statements [at issue]").[8]

**2.    The "Intended" Structure Mr. Musk "Envisioned" And "Hoped For"**

The August 7 statements describing the possible structure Mr. Musk "envisioned," "hoped for," "intended" and "would like" were plainly aspirational. There is no dispute that this was Mr. Musk's true aim; indeed, he told the Board the same thing from the start. Such sentiments are not

---

[7] Plaintiff's allegation that Mr. Musk's reference to $420 (in response to a question "[a]t what price") was false or misleading is frivolous. *See* CC ¶ 122 (Chart #2). No facts suggest that Mr. Musk was not considering making an offer at that price.

[8] For the same reasons, plaintiff's attack on a portion of another tweet (*see* CC ¶ 130, Chart #6), in which Mr. Musk stated that "investor support is confirmed," fails as it also related to whether or not funding was secured. *See* CC ¶¶ 123, 127, 129, 131.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    actionable merely because they do not work out. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 997

2    (9th Cir.1999) ("[I]t is clearly insufficient for plaintiffs to say that [a] later, sobering revelation[]

3    makes[s] [an] earlier, cheerier statement a falsehood"); *In re Salomon Analyst Level 3 Litig.*, 350

4    F. Supp. 2d 477, 489 (S.D.N.Y 2004) ("It is not sufficient …to allege that an opinion was

5    unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events").

6         It was also clear that evaluation remained ongoing. On August 13, for example, Mr. Musk

7    noted that he had engaged advisors "to investigate a range of potential structures and options."

8    CC ¶ 103; Ex. K. And, despite quoting liberally from analysts, plaintiff does not point to any who

9    viewed such a potential structure as impossible to achieve. *See* CC ¶¶ 90-91, 95, 97, 105. To the

10   contrary, analysts viewed it as feasible, even pointing to SpaceX as an example. *Id*. ¶ 95.

11        Ignoring all of this, plaintiff nonetheless claims Mr. Musk's statements were misleading

12   because, prior to his tweet, he was allegedly told that the contemplated structure was "difficult" or

13   "unprecedented." CC ¶ 147; *see* Chart #3-5, 7. But a view that something is "difficult" or

14   "unprecedented" does not render the stated structure he desired ***false***. If anything, Mr. Musk's

15   career is a testament to his ability to overcome what is perceived as "difficult" and achieve the

16   "unprecedented" – *e.g.*, against all odds, building Tesla from scratch into a thriving manufacturer

17   of acclaimed, all-new, all-electric vehicles and sustainable energy products and revolutionizing

18   space technology by designing, manufacturing, and launching advanced rockets at SpaceX. That

19   something may be challenging is a far cry from a knowing fraud, especially when the statement

20   concerns a hope, desire, or goal. *See Ronconi*, 253 F.3d at 434 ("Problems and difficulties . . . do

21   not make a lie out of any of the alleged false statements").

22        As explained on August 24, it was only after the alleged class period that Mr. Musk came

23   to the realization that "[t]here is also no proven path for most retail investors to own shares if we

24   were private." CC ¶ 115. Mr. Musk told the SEC this was "a fundamental misunderstanding that I

25   just did not know – I thought there would be some way to retain small investors, but there isn't."

26   *Id*. ¶ 147. A mistake, however, is not fraud. "[F]alsity is a failure to be truthful – it is not a

27   misapprehension, misunderstanding or mistake of fact at the time a statement was made." *In re*

28   *Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014); *see Jackson v. Fischer*, 2015

WL 1143582, at *9 (N.D. Cal. Mar. 13, 2015) ("that certain predictions proved incorrect is not the same as alleging with particularity facts that show the initial prediction was a falsehood").

Plaintiff also fails to plead falsity simply because Mr. Musk later learned that some institutional shareholders had "internal compliance issues that limit how much they can invest in a private company." CC ¶ 115; Ex. N. The point of the process Mr. Musk initiated was to find out *whether* shareholders would support a take private transaction. The fact that some later advised Mr. Musk they did not, or could not because of *their own internal* investment rules, simply goes to the *ultimate level of support* for a transaction, but does not suggest Mr. Musk was committing fraud by disclosing what he was "considering." In any event, the claim is pure fraud by hindsight: there are no pleaded facts that even suggest that Mr. Musk knew of these internal restrictions, or the personal views of these investors, on August 7. *See GoPro*, 2019 WL 1231175, at *13.[9]

### 3.    The "Only" Contingency Was A Shareholder Vote

The securities laws do not operate under the assumption that "investors are nitwits." *Basic, Inc. v. Levinson*, 485 U.S. 224, 234 (1988). Yet plaintiff does exactly that by alleging that Mr. Musk's tweet that a transaction was "[o]nly . . . contingent on a shareholder vote" suggested *nothing else* needed to happen for a transaction to occur, and so was misleading. *See* CC ¶¶ 130-32, Chart #6. No reasonable investor would read the statement that way. Just three hours earlier, Mr. Musk had announced he was "considering" taking Tesla private, so the notion that he had wrapped up that process in a matter of hours defies logic. Moreover, the tweet (which is character constrained by design) also linked to a blog post in which Mr. Musk offered expansive comments emphasizing the numerous uncertainties – including that Mr. Musk was "considering" taking Tesla private but *even he* had not made "a final decision." CC ¶¶ 84-85; Exs. H-I.

There is no way to read these statements *in context* and conclude that a private Tesla was at the finish line, with but one hurdle (a shareholder vote) to clear. While the tweet underscored Mr. Musk's guiding principle that Tesla shareholders would have "ultimate" say in whether to go

---

[9] Plaintiff also alleges that Mr. Musk should have disclosed on August 7 that he believed there was a 50% chance of a deal being consummated. *See* CC ¶ 121. But the securities laws do not require Mr. Musk to publicly handicap a transaction. And, far from suggesting bad faith, this allegation shows the opposite: Mr. Musk believed there was an equally good chance that such a transaction would move forward and was worth exploring.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

private, it was obvious that any transaction would need to be carefully structured, vetted and approved by multiple stakeholders, including Tesla's Board and regulators. Indeed, on August 8, Tesla's independent directors issued a press release stating that a process was just getting started. CC ¶ 93; *see id*. ¶ 106 (formation of special committee). Because it was clear that there would be many moving pieces beyond a simple shareholder vote, nothing in the tweet substantially altered the total mix of information available in the market. *See Basic*, 485 U.S. at 231-32.

## B.    The August 13, 2018 Statements Were Not False Or Misleading

As for August 13, plaintiff makes only two further allegations, and neither withstands scrutiny. *First*, plaintiff attacks Mr. Musk's stated "***belief***" that there was "no question that a deal with the Saudi sovereign fund could be closed," claiming there was "uncertainty" since funding "***might*** be contingent upon whether Tesla would build a production facility in the Middle East." CC ¶ 137 (emphases added); Chart #8. But to be actionable, a statement of belief or opinion must be both subjectively and objectively untrue. *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). Plaintiff fails on both counts. There are no facts to suggest Mr. Musk did not truly believe a deal could be done with the PIF, nor is the mere possibility that PIF ***might*** condition funding on a local production facility an objective "fact" rendering his opinion untrue. Pleading falsity based on alleged omissions is "no small task" (*Omnicare*, 135 S. Ct. at 1332), and plaintiff's weak effort does not come close.

*Second*, plaintiff assails Mr. Musk's August 13 tweet that he was "excited to work with Silver Lake and Goldman Sachs as financial advisors" as misleading because he had not yet "signed an agreement to formally engage or retain" them. CC ¶¶ 139-40; Chart #9. But there is nothing unusual (or alleged to be so) about working with advisors prior to "formal" engagement agreements being signed. And there is no dispute that ***both of those advisors did work with Mr. Musk*** to evaluate taking Tesla private. Plaintiff's claim is baseless.

## C.    The Scienter Allegations Are Woefully Deficient

Under *Tellabs* (551 U.S. at 323)*,* plaintiff needs to plead specific facts giving rise to a strong inference that a defendant acted with the intent to mislead or with deliberate recklessness.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   *See GoPro*, 2019 WL 1231175, at *20, citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

2   981, 991 (9th Cir. 2009). Deliberate recklessness is "a highly unreasonable omission, involving

3   not merely simple, or even inexcusable negligence, but an extreme departure from the standards

4   of ordinary care, and which presents a danger of misleading buyers or sellers that is either known

5   to the defendant or is so obvious that the actor must have been aware of it." *Id.* at *12, quoting

6   *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002). Even where

7   "the complaint sets out a compelling case of negligence – perhaps even gross negligence – but

8   does not give rise to a strong inference that [defendant] acted with an intent to defraud, conscious

9   misconduct, or deliberate recklessness, as is required in a securities fraud case." *Id.* at *22.

10       The "bar set by *Tellabs* is not easy to satisfy." *Webb*, 884 F.3d at 855. The test is

11   subjective: scienter is not pleaded when a defendant acts in good faith. *See Colyer v. Acelerx*

12   *Pharms., Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015) ("knowing about the

13   existence of [problems] and knowing that one should report these [problems] to the public are two

14   different things"); *see also Dirks v. SEC*, 463 U.S. 646, 662 (1983) (no scienter if a defendant

15   "mistakenly think[s] the information . . . is not material"); *SEC v. Platforms Wireless Int'l Corp.*,

16   617 F.3d 1072, 1093 (9th Cir. 2010) ("the ultimate question is whether the defendant knew his or

17   her statements were false, or was consciously reckless as to their truth or falsity").

18       The Court looks at the allegations holistically, weighing plaintiff's allegations against any

19   "plausible, nonculpable explanation." *Tellabs*, 551 U.S. at 323-24, 326. Under this "inherently

20   comparative" inquiry, a complaint survives "only if a reasonable person would deem the

21   inference of scienter cogent and at least as compelling as any opposing inference." *Id.* Here, the

22   indicia of good faith are overwhelming and more than outweigh any contrary inference.

23       *First,* rather than being inconsistent with his private statements, the August 7 tweets were

24   consistent with what Mr. Musk told Tesla's Board on August 2 and 3. He hired lawyers and

25   financial advisors to assist him, and Tesla's Board formed a special committee and retained its

26   own advisors, none of which would make any sense unless Mr. Musk firmly believed what he

27   said. Indeed, the process that ensued shows that everyone involved was acting in good faith.

28       *Second,* the August 7 tweets were a good faith effort to advise all shareholders of the

transaction Mr. Musk was considering. Given the leak of PIF's stake, he thought public disclosure was "the right thing to do." CC ¶ 103; Ex. K. Plaintiff does not challenge that explanation. And even if, in retrospect, tweeting "may have been ill-advised," the form of communication (a tweet) does not make it a fraud. *See SEC v. Lowy*, 396 F. Supp. 2d 225, 247 (E.D.N.Y. 2003).

*Third,* Mr. Musk stood to gain ***nothing*** by attempting to "mislead" shareholders, and his statements were made in good faith, based on the facts as he understood them at the time. As to funding secured, PIF had pursued a take private transaction for almost two years and had already invested billions of dollars to acquire Tesla stock on the open market. Given PIF's enormous wherewithal, and Mr. Musk's July 31 meeting with its senior decision-maker, Mr. Musk believed that PIF stood ready to fund a deal. *See* Exs. B, K. Moreover, based on Mr. Musk's contemplated structure (in which he expected up to two-thirds of Tesla's shareholders to remain, which would require far less than what PIF appeared willing to commit), he fully believed funding was no obstacle. *Id.* So, even though plaintiff quarrels with the words Mr. Musk used in his tweet, there is ***no factual basis*** to suggest that he did not genuinely believe them. *See Platform Wireless*, 617 F.3d at 1093. Likewise, Mr. Musk had no reason to lie about the structure he "desired" or "hoped for." And if Mr. Musk's intent was to mislead by tweeting that the "only" contingency was a stockholder vote, he certainly ***would not have linked directly to a blog describing a whole range of uncertainties*** (including that he had not even decided whether to pursue a transaction).

With no answers to the facts and inferences showing good faith, plaintiff relies entirely on SEC allegations against Mr. Musk without attribution (though no other "source" is identified). It is well established, however, that reliance on SEC allegations is insufficient since they "are unproved and are contested [and] may not be used to demonstrate scienter." *Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (citing cases); *see also Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("The district court correctly held that these agreements [with SEC and DOJ] were not sufficient to meet the pleading requirements of the PSLRA"); *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 2018 WL 4181954, at *7 (N.D. Cal. Aug. 31, 2018) (such allegations are "insufficient to show cognizable fraud"); *Veal v. LendingClub Corp.*, 2019 WL 5698072, at *16 (N.D. Cal. Nov. 4,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2019) (plaintiffs may not allege "facts" simply because they appear in government complaint, since "[b]eing accused of wrongdoing is not [a] basis for securities fraud"). That is especially true where, as here, Mr. Musk's settlement with the SEC (as well as Tesla's settlement) expressly preserves the unfettered "right to take legal or factual positions," including the right to deny and fully defend against such claims, in this or any other litigation. Exs. S, T. Simply put, the SEC allegations are just allegations, not facts, and do not support the claims *in this case*.

But even ignoring the "source" of the allegations, they still do not suffice. As to Mr. Musk, the claim boils down to a complaint that he could have done "more" before his August 7 tweets and blog post to ensure that funding was secured, that his desired structure would work, and that shareholders would support it. *See, e.g.,* CC ¶¶ 3-4, 64-65, 121, 123, 125, 141-51.  At most, such allegations, if accepted as true, might be used to assert negligence, but they *do not* show that Mr. Musk deliberately sought to mislead investors. *See In re Facebook, Inc. Sec. Litig.,* 2019 WL 46747237, at *28 (N.D. Cal. Sept. 25, 2019) (scienter could not be based on allegations that FTC Consent Decree put company "on notice," where plaintiffs pleaded "no particularized facts from which this Court could infer that [defendant] consciously lied"); *see also DSAM*, 288 F.3d at 389; *Zucco*, 552 F.3d at 991; *GoPro*, 2019 WL 1231175, at *22.

Recognizing as much, plaintiff offers various allegations about Mr. Musk's well-known dislike for short-sellers. *See* CC ¶¶ 50-52. Mr. Musk is hardly alone. Many companies, executives and shareholders take a similarly dim view of short-selling:

> *[W]hy is short-selling . . . a despised trading tactic? . . . it is natural to dislike people that benefit at the misfortune of others, which is precisely what short-sellers do – they make money when assets decline in value or when companies do not perform well . . . Certain commentators have observed . . . hedge funds that use the short-selling trading technique frequently manipulate the market to obtain their desired decrease . . . by publishing false negative research reports.[10]*

Accordingly, that an executive (and substantial shareholder) such as Mr. Musk dislikes short-sellers is to be expected and is the sort of generic motive allegation that are insufficient to show

---

[10] Ex. U, Lydie N.C. Pierre-Louis, *Hedge Fund Fraud and the Public Good,* 15 Fordham J. Corp. & Fin. L. 21, 72 (2009). *See* Ex. V, Jennifer Robichaux Carter, *Hedge Funds Should Be Able to Challenge Patent Validity Using Inter Partes Review Despite Mixed Motives,* 54 Hous. L. Rev. 1315, 1329 (2017) ("[s]ome companies suspect short sellers are saboteurs willing to spread rumors about their enterprise to cause a stock price drop").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

scienter. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002); *In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *19 (N.D. Cal. Mar. 10, 2006). Indeed, the notion that Mr. Musk suddenly decided to lie about a potential take private transaction (and assembled a team of advisors and set in motion the processes before and after his August 7 statements) *just to harm* short-sellers is nonsensical. As plaintiff concedes, Tesla's stock price had already risen sharply in the days before the tweet after Tesla reported strong quarterly results on August 1, 2018. *See* CC ¶¶ 66-68. So anyone shorting Tesla's stock was in the red prior to August 7 based on Tesla's business achievements alone. Moreover, the pretense that short-sellers were "harmed" during the class period defies reality: while Tesla's stock price increased on August 7, it quickly declined below pre-tweet levels (*see* Ex. T), and short-sellers were exuberant, stating "the time has finally come for the great Tesla short." Ex. L (*see* CC ¶ 107).[11] In any event, such motive allegations are insufficient to show scienter. *See Lipton*, 284 F.3d at 1038.

## V.     TESLA DID NOT MAKE THE ALLEGEDLY ACTIONABLE STATEMENTS

Plaintiff bases his claim against Tesla entirely on Mr. Musk's August 7 and 13 statements. Not only is plaintiff unable to plead that those statements are actionable, they are not attributable to Tesla as a matter of law. Only a defendant who "makes" an alleged misstatement can be liable under Section 10(b). *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141-42 (2011). "The *maker* of the statement is the person or entity with *ultimate authority* over the statement, including its content and whether and how to communicate it." *Id*. at 142 (emphasis added). Preparing or publishing a statement for someone does not suffice. *Id*.[12] Because all challenged statements were "made" by Mr. Musk, the claim against Tesla fails.

"[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom

---

[11] Published reports indicate that short-sellers made a net profit of about $1.2 billion during the alleged class period. *See* Ex. Y, Ihor Dusaniwsky, *S3 Analytics: No Tesla Short Squeeze, Shorts Up $1.2 Billion Since "The Tweet"* (August 17, 2018); Ex. Z, Claudia Assis, *Tesla short sellers are up $1.2 billion since Elon Musk's 'going-private' tweet*, MarketWatch (August 19, 2018).

[12] The Court explained that this rule "might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit – or blame – for what is ultimately said." *Janus*, 564 U.S. at 143.

it is attributed." *Janus*, 564 U.S. at 142-143. Here, all of the allegedly actionable statements were, on their face, attributed solely to Mr. Musk. *See* CC ¶¶ 120, 122, 124, 126, 130, 139 (tweets from his Twitter account); *id*. ¶ 128 (his email message to employees); *id*. ¶¶ 134, 136 (blog post "written by [Mr.] Musk"). In fact, the Complaint quotes Mr. Musk confirming that the statements were *his*, rather than Tesla's:

> [W]hen I made the public announcement [on August 7], just as with this blog post and all other discussions I have had on this topic, ***I am speaking for myself as a potential bidder*** for Tesla.

*Id*. ¶ 103 (emphasis added). The statements all relate expressly to Mr. Musk's role "as a potential bidder for Tesla" (*id*.), as opposed to his position as CEO. Thus, in the original August 7 tweet, Mr. Musk said clearly that *he* was considering a go-private transaction. *Id*. ¶ 74. His subsequent statements reiterated the point. *Id*. ¶ 84 ("I announced that I'm considering taking Tesla private"); *id*. ¶ 103 ("As I announced last Tuesday, I'm considering taking Tesla private"); *id*. (describing initial board meeting of outside directors "to discuss ***my proposal***") (emphasis added); *id*. ¶ 134 (referring to the go-private transaction as "[m]y proposal"). Indeed, a prospective bidder such as Mr. Musk ***could not*** speak for Tesla regarding a potential transaction with the Company. That responsibility belonged to the independent members of the Board – a fact that those directors explicitly affirmed in the August 8 press release. Ex. J; CC ¶ 9; *see also id*. ¶ 106; Ex. M.

Not surprisingly, then, the Complaint lacks the requisite "specific facts" to establish that anyone other than Mr. Musk "had ultimate authority over the alleged misstatements." *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018); *see In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *7 (C.D. Cal. July 13, 2015). To the contrary, the Complaint suggests the ***opposite***, relying on: (i) an article asserting that "no-one [*sic*] had seen or reviewed [the] August 7, 2018 tweet" before Mr. Musk made it (CC ¶ 112); and (ii) the SEC's complaint against the Company (*id*. ¶¶ 116, 172), which alleges that "no one at Tesla reviewed Mr. Musk's tweets prior to publication." *See* Ex. Q, ¶ 32. These averments clearly show that Tesla was not the "maker" of the statements at issue here. *See Hefler*, 2018 WL 1070116, at *9.

Nor does the allegation that several of Mr. Musk's statements were posted on Tesla's website (CC ¶¶ 128, 136) make them attributable to the Company. "Merely hosting a document

on a Web site does not indicate that the hosting entity adopts the document as its own statement or exercises control over its content." *Janus*, 564 U.S. at 148 n.12. Similarly unavailing is the fact that years earlier (in a November 2013 SEC filing), Tesla said investors could obtain "additional information" by following Mr. Musk's personal Twitter account (*see* CC ¶ 19).[13] *Janus*, 564 U.S. at 148 n.12; *see Schaffer Family Inv'rs, LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1043 (C.D. Cal. 2015) (individual did not "make" statements where he allegedly "forwarded [other] defendants' unaltered emails" or "published the statements on their behalf").

Plaintiff also cannot salvage his claim against Tesla with conclusory allegations of "apparent authority," "*respondeat superior*" or "common law agency." *See* CC ¶¶ 180, 182. Assuming *arguendo* that those doctrines are still viable post-*Janus* (they are not), plaintiff would need to allege facts showing that Mr. Musk issued the challenged statements in the course and scope of his role as CEO. *See Oaktree Principal Fund V, LP v. Warburg Pincus, LLC*, 2016 WL 6782768, at *11 (C.D. Cal. Aug. 9, 2016); *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. 2013). However, each statement was explicitly made by Mr. Musk *personally*, in his capacity as a *potential bidder*, and cannot be imputed to Tesla. *See Oaktree*, 2016 WL 6782768, at *11-12.

## VI.   PLAINTIFF DOES NOT ADEQUATELY PLEAD LOSS CAUSATION

Loss causation requires plaintiff to trace a loss back to "the very facts about which the defendant [allegedly] lied." *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). It must be supported by particularized facts. *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1000 (N.D. Cal. 2016). Plaintiff does not satisfy that burden.

### A.   August 7 Statements

As to the August 7 statements, there is no allegation that facts purportedly misrepresented were ever revealed and caused Tesla's stock price to drop. While the stock price declined on

---

[13] Contrary to plaintiffs' claim, Tesla did ***not*** say it "would use [Mr.] Musk's Twitter account as a formal means of communication." *See* CC ¶ 19. Instead, Tesla explained it would use "Tesla's website, press releases, SEC filings, blogs and social media . . . to achieve broad, non-exclusionary distribution of information to the public." Ex. O. It then provided links to its own website for "information on Tesla and its products," "information for Tesla investors," and "the latest information from Tesla." *Id.* The cited 8-K went on to note that those interested in "additional information" could "follow Elon Musk's and Tesla's Twitter accounts." *Id.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

August 8 and 9 (CC ¶¶ 191, 192), plaintiff does not tie those drops to a "corrective disclosure." The only identified disclosure on August 8 was a press release (*id*. ¶ 191) noting the Board was in discussion with Mr. Musk about his possible interest in taking Tesla private. *Id*. ¶ 93. Nothing in that statement is alleged to be inconsistent with Mr. Musk's statements; plaintiff merely notes that the independent directors "did not state that funding . . . had been 'secured.'" *Id*. ¶ 191. But *silence* on funding is not a "revelation of fraudulent activity." *Loos*, 762 F.3d at 887; *see also In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017) (disclosures did not "reveal . . . something previously hidden or actively concealed").

Plaintiff also suggests Tesla's stock price dropped on August 9 following a report that the SEC had asked for information regarding Mr. Musk's August 7 statements. CC ¶¶ 98, 192. But the mere "announcement of an investigation [by the SEC] does not 'reveal' fraudulent practices to the market," and "without more, is insufficient to establish loss causation." *Loos*, 762 F.3d at 890; *see also Curry v. Yelp Inc.*, 875 F.3d 1219, 1225-26 (9th Cir. 2017); *N.Y Hotel Trades Council & Hotel Ass'n v. Impax Labs., Inc.*, 2019 WL 3779262, at *3 (N.D. Cal. Aug. 12, 2019).

As for Mr. Musk's August 13 blog post (CC ¶ 193), it only underscores the inability to plead loss causation. There, Mr. Musk directly addressed the issues purportedly misrepresented on August 7: "funding secured," his desired structure, and the status of a potential transaction and the many uncertainties. *Id*. ¶ 103. Thus, even if plaintiff could plead investors were misled on August 7, any misperceptions were removed – and the "truth" was revealed – by August 13. But critically, ***Tesla's stock price did not fall*** in response; instead, the price ***rose***.  CC ¶ 193; *see also* Ex. T. As a result, the August 13 blog (and market reaction) preclude plaintiff from establishing loss causation tied to August 7. *See Rok v. Identiv, Inc.*, 2016 WL 4205684, at *3 (N.D. Cal. Aug. 10, 2016) (no loss causation where stock did not decline after alleged corrective disclosure).

Finally, the Complaint references price declines on August 14, 15 and 17 (CC ¶¶ 194-96), but is unable to link them to a "corrective disclosure." Nothing revealed on August 14 –the formation of a special committee or reports that Mr. Musk's advisors had not yet been formally retained (*id*. ¶ 194) – had anything to do with facts allegedly misstated on August 7. *See Cement Masons & Plasterers Jt. Pens. Tr. v. Equinix, Inc.*, 2012 WL 6044787, at *9 (N.D. Cal. Dec. 5,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2012); *Impax*, 2019 WL 3779262, at *3. Plaintiff attributes the August 15 drop to reports that the SEC had issued subpoenas to Mr. Musk and Tesla (*id*. ¶ 195) but those reports were ***not corrective*** – they merely rehashed what was already reported. *See Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016). And while plaintiff claims the August 17 price decline was caused by a *New York Times* article that supposedly "confirmed" the truth about the "'funding secured' tweet" and absence of a "definitive agreement to take Tesla private" (CC ¶ 196), that article revealed nothing new on those topics. Moreover, it was entirely ***consistent*** with what Mr. Musk said on August 13 when the stock rose. As a result, the absence of loss causation requires dismissal of any claim based on the August 7 statements. *See Bonanno*, 2016 WL 2937483, at *5-6.

### B.    August 13 Statements

Plaintiff fares no better trying to plead loss causation based on the August 13 statements. Plaintiff alleges Mr. Musk's statement that he had "no question that a deal with the Saudi sovereign fund could be closed" (CC ¶ 137) was false, but cites no "corrective disclosure." To the contrary, even after Mr. Musk announced on August 24 that he would not proceed with a transaction (after the class period, and hence after any alleged inflation was gone), he reiterated that "there [was] more than enough funding to take Tesla private." *Id*. ¶ 115. With no revelation that funding was unattainable, loss causation is lacking. *See Equinix*, 2012 WL 6044787, at *9 (no loss causation where allegedly misstated fact was not disclosed to the market).

The same applies to Mr. Musk's statement that he would be "work[ing] with Silver Lake and Goldman." CC ¶ 139. That statement was never revealed to be false; instead, plaintiff merely refers to later news reports that the advisors had *not yet signed* formal agreements. *Id*. ¶¶ 107, 194. But on August 24 (post-class period), Mr. Musk confirmed that he had in fact "worked with Silver Lake [and] Goldman Sachs" (*id*. ¶ 115), so again there never was a "corrective disclosure," and hence there can be no loss causation. *See Equinix*, 2012 WL 6044787, at *9.

### VII.    PLAINTIFF'S SECTION 20(a) CLAIM AGAINST THE DIRECTORS FAILS

Plaintiff's inability to state a Section 10(b) claim against Tesla means the control person claim fails. *See Zucco*, 552 F.3d at 990. Even if that were not the case, plaintiff does not plead

1    that the directors exercised the requisite control over the allegedly actionable statements.

2            A defendant is liable as a control person under Section 20(a) only if he or she exercised

3    actual power or control over a primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065

4    (9th Cir. 2000). Bare conclusions do not suffice. *See Special Situations Fund III QP, LP v. Brar*,

5    2015 WL 1393539, at *10 (N.D. Cal. Mar. 26, 2015). Nor is status as a director sufficient. *See*

6    *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993). What is required are

7    ***specific facts*** showing defendant's exercise of actual power or control over the primary violator.

8    *See Sgarlata v. PayPal Holdings, Inc.*, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018).

9            Far from providing the requisite detail, the Complaint ***barely mentions the directors***,

10   doing little more than citing their positions and offering boilerplate descriptions of their

11   responsibilities. CC ¶¶ 215-17. Such averments are unavailing. *See Flynn v. Sientra, Inc.*, 2016

12   WL 3360676, at *17 (C.D. Cal. June 9, 2016); *In re Energy Recovery Inc. Sec. Litig.*, 2016 WL

13   324150, at *26 (N.D. Cal. Jan. 27, 2016). Plaintiff's inability to plead facts showing the directors'

14   power or control over the challenged misstatements is not surprising. As discussed above, Mr.

15   Musk was not speaking ***for Tesla*** when he said he was considering a take private transaction.[14]

16   Where no statement ***by the Company*** is at issue, there is no predicate corporate action on which

17   to premise Section 20(a) liability. *See Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151

18   (9th Cir. 1996) (no claim where director was not authorized to act in connection with the security

19   offering at issue); *Burgess* v. *Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (no claim where

20   director uninvolved with preparing prospectuses at issue).

21           To the extent the Complaint purports to offer more specific allegations, they only

22   undermine the control person claim. Most importantly, plaintiff expressly alleges that "no one had

23   seen or reviewed Musk's August 7, 2018 tweet before he posted it" (CC ¶¶ 6, 112) and that Mr.

24   Musk "did not discuss the content of his August 7, 2018 tweets with anyone else prior to

25   publishing them." *Id*. ¶ 166. Those allegations dispose of any claim that the directors "directed or

26   exercised control over [Mr. Musk] who allegedly made the false and misleading statements."

27   ───────────────────
     [14] Indeed, plaintiff ***does not*** name Mr. Musk as a control person of Tesla under 20(a), which itself
28   is a tacit admission that Mr. Musk was not speaking ***for Tesla*** on August 7 (or at any other time)
     with respect to taking Tesla private. *See* CC ¶ 215 (parties for purposes of the 20(a) claim).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Energy Recovery*, 2016 WL 324150, at \*26. Were it otherwise, it would be the rule, **rather than the highly unusual exception**, where directors are properly named as defendants in securities suits. (Tellingly, even the SEC did not assert a claim against them).

Plaintiff cannot circumvent that conclusion by alleging that Mr. Musk's personal Twitter account was "an official channel of communication." CC ¶ 218. As discussed above, Tesla never claimed to control his personal Twitter account or adopt his tweets as Company statements. And there are no facts showing that the Director Defendants had any involvement in (or advance knowledge of) the tweets. That is fatal to a control person claim. *See Energy Recovery*, 2016 WL 324150, at \*26. Similarly, the allegation that Mr. Musk was subsequently "ordered" to refrain from further tweets (CC ¶ 218) does not overcome plaintiff's admission that the directors had no advance knowledge of (let alone actual control over) the statements at issue. *Id.* ¶¶ 6, 112, 116.

## VIII.   CONCLUSION

Mr. Musk was "considering" taking Tesla private and truthfully disclosed what he "hoped" and "envisioned" that might look like. Not only were his public statements entirely consistent with what he told the Board privately days earlier, but every action he took before and after his tweet reflected his good faith pursuit of the opportunity. Likewise, the process undertaken by Tesla (which made no statement) and the directors (who are barely mentioned) demonstrate their good faith, not fraud. The Complaint should be dismissed.

Dated:   November 22, 2019                     FENWICK & WEST LLP

By: /s/        *Dean S. Kristy*
          Dean S. Kristy

Attorneys for Defendants Tesla, Inc., Elon Musk,
Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,
Antonio J. Gracias, James Murdoch, Kimbal Musk,
and Linda Johnson Rice

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO