DEAN S. KRISTY (CSB No. 157646)
dkristy@fenwick.com
KEVIN P. MUCK (CSB. No. 120918)
kmuck@fenwick.com
JENNIFER BRETAN (CSB No. 233475)
jbretan@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:      415.875.2300
Facsimile:      415.281.1350

ALISON C. JORDAN (CSB NO. 311081)
ajordan@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Telephone:      (650) 988-8500
Facsimile:      (650) 938-5200

Attorneys for Defendants Tesla, Inc., Elon Musk,
Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,
Antonio J. Gracias, James Murdoch, Kimbal
Musk, and Linda Johnson Rice

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No.: 3:18-cv-04865-EMC<br><br>**DECLARATION OF JENNIFER C. BRETAN IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED COMPLAINT**<br><br>Date:      March 5, 2020<br>Time:     1:30 p.m.<br>Dept.:    Courtroom 5, 17th Floor<br>Judge:    Hon. Edward M. Chen<br><br>Date Action Filed:  August 10, 2018 |

1    I, Jennifer C. Bretan, hereby declare:

2    1.    I am an attorney admitted to practice before this Court and a partner at the law

3    firm of Fenwick & West LLP which represents defendants Tesla, Inc. ("Tesla"), Elon Musk ("Mr.

4    Musk"), Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch,

5    Kimbal Musk, and Linda Johnson Rice (collectively with Tesla and Mr. Musk, "defendants") in

6    this action.  I have personal knowledge of the matters set forth in this declaration and, if called

7    upon to do so, could and would testify competently as to the matters described below.

8    2.    Attached as **Exhibit A** is a true and correct copy of the August 2, 2018 email from

9    Mr. Musk to Tesla's Board of Directors entitled "Offer to Take Tesla Private at $420".

10    3.    Attached as **Exhibit B** is a true and correct copy of an August 7, 2018 *Financial*

11    *Times* article by Arash Massoudi entitled "Saudi Arabia's sovereign fund builds $2bn Tesla

12    stake."

13    4.    Attached as **Exhibit C** is a true and correct copy of an August 7, 2018 tweet from

14    Mr. Musk's personal Twitter account, posted at 9:48 a.m. PDT.

15    5.    Attached as **Exhibit D** is a true and correct copy of an August 7, 2018 tweet from

16    Mr. Musk's personal Twitter account, posted at 10:40 a.m. PDT.

17    6.    Attached as **Exhibit E** is a true and correct copy of an August 7, 2018 tweet from

18    Mr. Musk's personal Twitter account, posted at 11:00 a.m. PDT.

19    7.    Attached as **Exhibit F** is a true and correct copy of an August 7, 2018 tweet from

20    Mr. Musk's personal Twitter account, posted at 11:07 a.m. PDT.

21    8.    Attached as **Exhibit G** is a true and correct copy of an August 7, 2018 tweet from

22    Mr. Musk's personal Twitter account, posted at 12:07 p.m. PDT.

23    9.    Attached as **Exhibit H** is a true and correct copy of an August 7, 2018 tweet from

24    Mr. Musk's personal Twitter account, posted at 12:36 p.m. PDT.

25    10.    Attached as **Exhibit I** is a true and correct copy of an August 7, 2018 email from

26    Mr. Musk to Tesla employees, which was also made available on Tesla's public blog, entitled

27    "Taking Tesla Private."

28    11.    Attached as **Exhibit J** is a true and correct copy of Tesla's August 8, 2018 press

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

release entitled "Statement from the following members of Tesla's Board of Directors: Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch".

12.     Attached as **Exhibit K** is a true and correct copy of an August 13, 2018 statement by Mr. Musk, which was made available on Tesla's public blog, entitled "Update on Taking Tesla Private."

13.     Attached as **Exhibit L** is a true and correct copy of an August 13, 2018 *Bloomberg* article by Angus Whitley and Dana Hull entitled "Musk's Says He's Working With Silver Lake, Goldman to Take Tesla Private."

14.     Attached as **Exhibit M** is a true and correct copy of Tesla's August 14, 2018 press release entitled "Tesla Announces Formation of Special Committee to Evaluate Potential Going Private Transaction" which Tesla filed with the Securities and Exchange Commission ("SEC') on Form 8-K.

15.     Attached as **Exhibit N** is a true and correct copy an August 24, 2018 statement by Mr. Musk, which was made available on Tesla's public blog, entitled "Staying Public."

16.     Attached as **Exhibit O** is a true and correct copy of Tesla's Form 8-K, filed with the SEC on or about November 5, 2013.

17.     Attached as **Exhibit P** is a true and is a true and correct copy of the complaint in *United States Securities and Exchange Commission vs. Elon Musk*, Case No. 1:18-cv-8865, filed on September 27, 2018 in the United States District Court for the Southern District of New York.

18.     Attached as **Exhibit Q** is a true and is a true and correct copy of the complaint in *United States Securities and Exchange Commission vs. Tesla, Inc.*, Case No. 1:18-cv-8947, filed on September 29, 2018 in the United States District Court for the Southern District of New York.

19.     Attached as **Exhibit R** is a true and correct copy of the Consent Motion for Entry of Final Judgment in *United States Securities and Exchange Commission vs. Elon Musk*, Case No. 1:18-cv-8865, filed on October 16, 2018 in the United States District Court for the Southern District of New York.

20.     Attached as **Exhibit S** is a true and correct copy of the Consent Motion for Entry

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

of Final Judgment in *United States Securities and Exchange Commission vs. Tesla, Inc.*, Case No. 1:18-cv-8947, filed on October 16, 2018 in the United States District Court for the Southern District of New York.

21.     Attached as **Exhibit T** is a true and correct copy of a table reflecting the daily stock prices for Tesla common stock from January 2, 2018 to December 31, 2018 (obtained from the Nasdaq website - http://www.nasdaq.com/symbol/tsla/historical).

22.     Attached as **Exhibit U** are true and correct excerpts of a 2009 *Fordham Journal of Corporate and Financial Law* article by Lydie N.C. Pierre-Louis entitled "Hedge Fund Fraud And The Public Good."

23.     Attached as **Exhibit V** are true and correct excerpts of a Spring, 2017 *Houston Law Review* comment by Jennifer Robichaux Carter entitled "Hedge Funds Should Be Able to Challenge Patent Validity Using Inter Partes Review Despite Mixed Motives."

24.     Attached as **Exhibit W** is a true and correct copy of an August 7, 2018 *Financial Times* article by Jessica Dye entitled "Tesla shares move higher on Saudi Arabia fund stake."

25.     Attached as **Exhibit X** is a true and correct copy of an August 15, 2018 *Wall Street Journal* article by Rory Jones, Summer Said & Maureen Farrell entitled "Saudi Arabia Goes High-Tech in Approach to Investing."

26.     Attached as **Exhibit Y** is a true and correct copy of an August 17, 2018 *S3 Analytics* article by Ihor Dusaniwsky entitled "No Tesla Short Squeeze, Shorts Up $1.2 Billion Since 'The Tweet'."

27.     Attached as **Exhibit Z** is a true and correct copy of an August 19, 2018 *MarketWatch* article by Claudia Assis entitled "Tesla short sellers are up $1.2 billion since Elon Musk's 'going-private' tweet."

Dated:   November 22, 2019          FENWICK & WEST LLP

                                    By: /s/      *Jennifer C. Bretan*
                                            Jennifer C. Bretan

                                    Attorneys for Defendants Tesla, Inc., Elon Musk,
                                    Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,
                                    Antonio J. Gracias, James Murdoch, Kimbal Musk,
                                    and Linda Johnson Rice

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT A

**From:**          Elon Musk
**Sent:**          Thursday, August 02, 2018 3:27 PM
**To:**            BoD; Todd Maron; Deepak Ahuja
**Subject:**       Offer to Take Tesla Private at $420


It is my firm belief that Tesla can operate more effectively as a private company for the next several years. In the future, once Tesla enters a phase of slower, more predictable growth, it will likely make sense to return to the public markets.

However, being public during this period of rapid and often unpredictable growth:

1. Subjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand.

2. Puts great pressure on Tesla to make decisions for a given quarter that are suboptimal for long-term shareholder value creation.

3. Causes wild swings in our share price, which are a constant distraction to Tesla employees, all of whom are shareholders, making it harder to focus on useful work.

The difference in operational efficiency between Tesla and SpaceX, the latter being privately held, is dramatic.

Unless another bidder comes forward with a better offer, I would ask that this matter be put to a shareholder vote at the earliest opportunity. This offer expires in 30 days.

Please note that I fully support any shareholders who wish to remain shareholders of Tesla as a private company retaining their shares. This offer is just for those who do not wish to remain shareholders of Tesla as a private company.

Regards,
Elon Musk

Chairman & CEO
Tesla, Inc.

# EXHIBIT B

Tesla Inc

## Saudi Arabia's sovereign fund builds $2bn Tesla stake

Investment vehicle overseen by Mohammed bin Salman acquired 3% to 5% of shares earlier this year



The Tesla founder and CEO, said 'Yes' when asked whether he wanted to take his company private to save 'a lot of headaches' associated with public markets © Reuters

Arash Massoudi in London and Richard Waters in San Francisco AUGUST 7 2018

Saudi Arabia's sovereign wealth fund has built a significant stake in Tesla — the latest bold bet by the state fund overseen by powerful crown prince Mohammed bin Salman.

Saudi's Public Investment Fund built the undisclosed stake of between 3 and 5 per cent of Tesla's shares this year, according to people with direct knowledge of the matter.

At Tesla's current share price the position is worth between $1.7bn and $2.9bn. The stake, which is below the 5 per cent threshold that requires public disclosure, makes the PIF one of Tesla's eight biggest shareholders, according to Bloomberg data.

The PIF, which has more than $250bn in assets, initially approached Tesla and chief executive Elon Musk to express interest in purchasing newly issued shares in the electric vehicle company.

However, Tesla did not act on the interest, one person informed on the matter said. Instead, the Saudi state fund acquired the position in secondary markets with the help of JPMorgan. Mr Musk and Tesla are aware of the PIF's shareholding, this person said.

The exact timing of the purchase is not known, though it is believed to have taken place after the crown prince's tour of the US in March.

Another person said the PIF and Mr Musk have been in touch since the Saudi fund bought a $3.5bn stake in ride-hailing group Uber in June 2016.

# £2.2bn

Tesla's cash reserves at the end of June

Mr Musk has resisted selling new shares this year, even though rating agency Moody's and many Wall Street analysts have argued he should build a bigger financial cushion.

Tesla burnt through $1.8bn in the first half of the year, leaving it with cash reserves of $2.2bn at the end of June. Mr Musk maintains that the electric carmaker will be cash-flow positive in the final two quarters of this year.

Saudi Arabia's investment appeared to confirm Mr Musk's claim last week that "we certainly could raise money". However, the Tesla boss also said it would be "better discipline" not to sell more shares. He is trying to prove to Wall Street that Tesla finally, after 15 years, has a financially sustainable business.

Chinese internet company Tencent took a 5 per cent stake in Tesla through stock market purchases early last year, paying out about $1.7bn to amass the position.

Tesla's stock is a battleground for short-sellers and those who believe in Mr Musk's vision for the company. According to Markit data, 27 per cent of the company's free float is out on loan to investors betting that its share price will decline, making it one of the most heavily shorted companies on the US market.



Short positions in Tesla stock

The PIF is driving the economic diversification efforts of Prince Mohammed, who is looking to wean his country's economy off a reliance on income generated from selling oil. Its operations are managed by the crown prince's trusted lieutenant Yasir al-Rumayyan.

In addition to the bet on Uber, the PIF has made several big-ticket investments, including a $45bn investment in the SoftBank Vision Fund and an up to $20bn commitment in an infrastructure fund managed by Blackstone. It also, in March, made a $400m investment in Florida-based Magic Leap, which makes "mixed reality" headsets.

The fund continues to look for other investment opportunities in companies linked to alternative energy. During his visit to the US Prince Mohammed and SoftBank founder Masayoshi Son unveiled an initiative to create the world's largest solar power generation project in the kingdom, aiming to spend $200bn by 2030.

More recently, the PIF has been in talks with global banks to borrow between $6bn and $8bn, marking the first time that the vehicle entrusted with driving the kingdom's economic transformation will directly tap banks to fund its mission.

*Additional reporting by Simeon Kerr and James Fontanella-Khan in New York*

Copyright The Financial Times Limited 2019. All rights reserved.

# EXHIBIT C



# EXHIBIT D



Elon Musk ✔ @elonmusk · Aug 7, 2018
Good morning 😃

💬 3.9K    🔁 3.2K    ♡ 47.7K    ⬆️

Fred Lambert ✔ @FredericLambert · Aug 7, 2018
Morning, can you confirm if you would retain control over the company? It wouldn't be an outright sale?

💬 15    🔁 13    ♡ 313    ⬆️

Elon Musk ✔
@elonmusk

Replying to @FredericLambert

I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private. I won't be selling in either scenario.

10:40 AM · Aug 7, 2018 · Twitter for iPhone

153 Retweets    1.6K Likes

💬    🔁    ♡    ⬆️

Fred Lambert ✔ @FredericLambert · Aug 7, 2018
Replying to @elonmusk
Interesting and would you like to stay CEO if this goes through?

💬 18    🔁 15    ♡ 299    ⬆️

Elon Musk ✔ @elonmusk · Aug 7, 2018
No change

💬 74    🔁 50    ♡ 1.4K    ⬆️

# EXHIBIT E



Elon Musk ✔ @elonmusk · 7 Aug 2018
Am considering taking Tesla private at $420. Funding secured.

🗨 6.2K   ↻ 16K   ♡ 87K   ✉

Gali @Gfilche · 7 Aug 2018
Noooooo!!!! Still processing what this means, but would be sad to see all the investors who've been w/ $TSLA miss out on the upside over the next few years. Although if this helps the mission & Elon thinks it's smart, I understand and fully support

🗨 62   ↻ 38   ♡ 1.1K   ✉

Elon Musk ✔
@elonmusk

**Following**

Replying to @Gfilche

My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX investment.

11:00 AM - 7 Aug 2018

951 Retweets 8,849 Likes

🗨 516   ↻ 951   ♡ 8.8K   ✉

# EXHIBIT F



**Elon Musk** ✔ @elonmusk · 7 Aug 2018
Am considering taking Tesla private at $420. Funding secured.

💬 6.2K    🔁 16K    ♡ 87K    ✉

**Dave L** @heydave7 · 7 Aug 2018
Though I understand your reasons, please don't take Tesla private.  There are hundreds of thousands of retail investors who have placed significant resources and risk into investing into Tesla for the long-term and would not think it's fair.

💬 16    🔁 10    ♡ 160    ✉

**Dave L** @heydave7 · 7 Aug 2018
Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company.  This would be only fair and the right thing to do.

💬 13    🔁 13    ♡ 277    ✉

**Elon Musk** ✔
@elonmusk                                    Following

Replying to @heydave7

## Absolutely. Am super appreciative of Tesla shareholders. Will ensure their prosperity in any scenario.

11:07 AM - 7 Aug 2018

495 Retweets  7,068 Likes

💬 276    🔁 495    ♡ 7.1K    ✉

# EXHIBIT G



# EXHIBIT H



**EXHIBIT I**

# Taking Tesla Private

August 7, 2018

*The following email was sent to Tesla employees today:*

Earlier today, ==I announced that I'm considering== taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.

==First, a final decision has not yet been made,== but the reason for doing this is all about creating the environment for Tesla to operate best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders. Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term. Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

I fundamentally believe that we are at our best when everyone is focused on executing, when we can remain focused on our long-term mission, and when there are not perverse incentives for people to try to harm what we're all trying to achieve.

This is especially true for a company like Tesla that has a long-term, forward-looking mission. SpaceX is a perfect example: it is far more operationally efficient, and that is largely due to the fact that it is privately held. This is not to say that it will make sense for Tesla to be private over the long-term. In the future, once Tesla enters a phase of slower, more predictable growth, it will likely make sense to return to the public markets.

Here's ==what I envision== being private would mean for all shareholders, including all of our employees.

First, ==I would like to structure== this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%). My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, ==my intention== is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us. Either way, the future is very bright and we'll keep fighting to achieve our mission.

Thanks,
Elon

# EXHIBIT J



**Statement from the following members of Tesla's Board of Directors: Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch**

August 8, 2018

PALO ALTO, Calif., Aug. 08, 2018 (GLOBE NEWSWIRE) -- Last week, Elon opened a discussion with the board about taking the company private. This included discussion as to how being private could better serve Tesla's long-term interests, and also addressed the funding for this to occur. The board has met several times over the last week and is taking the appropriate next steps to evaluate this.

Investor Relations Contact:
ir@tesla.com

Press Contact:
press@tesla.com

 Primary Logo

Source: Tesla, Inc.

# EXHIBIT K

# Update on Taking Tesla Private

Elon Musk
August 13, 2018

As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy. As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.

**What has happened so far?**
On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share. This was a 20% premium over the ~$350 then current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st). My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.

After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal), a full board meeting was held. During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.

At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders. Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me. They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future. I told the board that I would report back after I had these discussions.

**Why did I make a public announcement?**
The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private. However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time. As a result, it was clear to me that the right thing to do was announce my intentions publicly. To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**
Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional

meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction. Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

Recently, after the Saudi fund bought almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting. That meeting took place on July 31st. During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed.

I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement.

Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements.

Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used. However, it would be premature to do so now. I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base. It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.

It is also worth clarifying that most of the capital required for going private would be funded by equity rather than debt, meaning that this would not be like a standard leveraged buyout structure commonly used when companies are taken private. I do not think it would be wise to burden Tesla with significantly increased debt.

Therefore, reports that more than $70B would be needed to take Tesla private dramatically overstate the actual capital raise needed. The $420 buyout price would only be used for Tesla shareholders who do not remain with our company if it is private. My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla.

**What are the next steps?**
As mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time. I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options.

Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected. If the board process results in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote.

# EXHIBIT L

Deals

# Musk Says He's Working With Silver Lake, Goldman to Take Tesla Private

By <u>Angus Whitley</u> and <u>Dana Hull</u>
August 13, 2018, 6:16 PM PDT
*Updated on  August 14, 2018, 5:13 AM PDT*

▶ Advisers to work with Musk personally, carmaker spokesman says

▶ Musk's ambitious plan also involves interest from Saudi Arabia

Advertisement   0:02



<u>Elon Musk</u> continued to drip-feed details of his controversial plan to take <u>Tesla Inc.</u> private, saying late Monday that he's getting advice from Goldman Sachs Group Inc. and private-equity firm Silver Lake.

In a <u>tweet</u> late Monday California time, the electric-car maker's chief executive officer said he's also lined up legal advisers for the possible transaction. A Tesla spokesman said Musk's tweet refers to his own advisers and attorneys. Tesla board members didn't immediately respond to requests for comment.

Controversy has swirled around Musk's plan since the moment he announced it in a tweet a week ago, with some investors and lawyers questioning his claim to have secured funding for the move. Musk's tweet about taking Tesla private hadn't been cleared ahead of time with the company's board, the New York Times reported____, and the Securities and Exchange Commission is scrutinizing his statements.

Earlier Monday, Musk revealed that Saudi Arabia has long been interested in taking Tesla private, which gave him the confidence last week to tweet that he was considering the blockbuster deal. He also confirmed the country's Public Investment Fund recently bought an almost 5 percent stake and is interested in helping take Tesla private, as Bloomberg News reported Sunday.



The posts prolong Musk's piecemeal approach to explaining how he'll pull off a privatization of his money-losing automaker at a more than $70 billion market capitalization. Since the 47-year-old dropped that bombshell, he's used social media to sporadically update investors stuck in an information vacuum.

Click here for a QuickTake on the SEC and Musk's Tweet

## Who's Doing What?

Adding to potential confusion over who's doing what for whom, Reuters reported that Silver Lake is offering its assistance to Musk without compensation. Silver Lake hasn't been hired as a financial adviser in an official capacity and isn't currently discussing participating in the deal as an investor, Reuters said. A Goldman Sachs representative declined to comment, and Silver Lake representatives didn't immediately respond to requests for comment.

Silver Lake, with California offices in Menlo Park, Cupertino and San Mateo, has plenty of experience of helping take companies private. It partnered with Michael Dell in 2013 on the $24.4 billion deal to acquire his namesake computer company, contributing $1 billion of cash to the transaction. The technology-focused firm also participated in Dell Inc.'s $67 billion purchase of EMC Corp. in 2015. The same year, it agreed to take enterprise software maker SolarWinds Inc. private with Thoma Bravo in a deal valued at about $4.4 billion. Each of those transactions, however, involved the firm making an equity commitment to help fund the deal.

Saudi Arabia's sovereign wealth fund first approached Musk in early 2017 about taking Tesla off the market, he said in a blog post Monday. The Public Investment Fund is working to be part of any investor pool that emerges to take Tesla private, Bloomberg News reported on Sunday.

Read Bloomberg's Tesla coverage here:
Tesla Said to Draw Saudi Interest as Board Prepares to Meet
Musk Says 'Funding Secured' Claim Sparked by Saudi Meetings
Musk's Belated Explanation Is Unlikely to Get SEC Off His Back
Can Elon Musk Tweet That? The SEC Is Digging in: QuickTake
Elon Musk's Funding for Tesla Wasn't So Secure: Matt Levine

## Funding Tweet

Musk described a meeting late last month in which a managing director for the fund expressed regret that such a transaction hadn't moved forward. "I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving," Musk wrote, adding that this is why he tweeted       on Tuesday that he had "funding secured" to take Tesla private at $420 a share.

To read Matt Levine's opinion on Tesla funding, click here.

As Musk fills in the blanks, he's not convincing everyone. Sydney-based Totus Capital Pty is still short Tesla shares and has increased its bearish bet since the executive tweeted about taking the company private, said Ben McGarry, a fund manager at the firm.

"The time has finally come for the great Tesla short," McGarry said in a note last week. "When a CEO under extreme pressure lobs a light-on-detail privatization proposal, the potential payoff for a short position improves."

Shares of Tesla have gained 4.2 percent since Aug. 6, the day before Musk first revealed his buyout proposal. Still, the shares are well below the $420 level at which he said existing shareholders could be bought out, underscoring investor skepticism that the CEO will be able to fund the transaction. Tesla fell 0.4 percent to $355 at 8:11 a.m. New York time in trading before U.S. exchanges opened.



Several investors have sued Musk and Tesla, claiming the company's share price was manipulated. The SEC is said to be intensifying its scrutiny of the company and its CEO after having started gathering general information about Tesla and Musk's earlier public pronouncements about manufacturing goals and sales targets.

The law firms Musk said he is working with are Wachtell, Lipton, Rosen and & Katz, and Munger, Tolles & Olson.

**For more on Tesla, check out the** *Decrypted* **podcast:**

*– With assistance by Elizabeth Fournier, and Bei Hu*

*(Updates with background on Silver Lake deals in seventh paragraph.)*

## In this article

TSLA
**TESLA INC**

298.77 USD ▲ +4.06 +1.38%

---

SI1
**Generic 1st 'SI' Future**
15.95 USD/t oz. ▲ +0.02 +0.11%

---

GS
**GOLDMAN SACHS GP**
198.65 USD ▲ +2.65 +1.35%

---

3382936Z
**PUBLIC INVESTMENT FUND/THE**
Private Company

---

NYT
**NEW YORK TIMES-A**
32.44 USD ▼ -0.01 -0.03%

---

Terms of Service
Trademarks Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Contact Us Help

# EXHIBIT M



## Tesla Announces Formation of Special Committee to Evaluate Potential Going Private Transaction

August 14, 2018

PALO ALTO, Calif., Aug. 14, 2018 (GLOBE NEWSWIRE) -- Tesla, Inc. (the "Company") announced today that its Board of Directors has formed a special committee comprised of three independent directors to act on behalf of the Company in connection with Elon Musk's previously announced consideration of a transaction to take the Company private (the "Going Private Transaction"). The special committee has not yet received a formal proposal from Mr. Musk regarding any Going Private Transaction nor has it reached any conclusion as to the advisability or feasibility of such a transaction.

The special committee is composed of Brad Buss, Robyn Denholm and Linda Johnson Rice. The special committee has retained Latham & Watkins LLP as its legal counsel and intends to retain an independent financial advisor to assist in its review of a formal proposal once received. The Company has separately retained Wilson Sonsini Goodrich & Rosati as its legal counsel in this matter.

The special committee has the full power and authority of the Board of Directors to take any and all actions on behalf of the Board of Directors as it deems necessary to evaluate and negotiate a potential Going Private Transaction and alternatives to any transaction proposed by Mr. Musk. The special committee's grant of authority provides that no Going Private Transaction will be consummated without the approval of the special committee. The special committee expects to provide a further update concerning the process associated with Mr. Musk's proposal as soon as practicable.

No assurances can be given regarding the likelihood, terms and details of any proposal or potential Going Private Transaction, that any proposal made by Mr. Musk regarding a potential Going Private Transaction will be accepted by the special committee, that definitive documentation relating to any such Going Private Transaction will be executed or that such a transaction will be completed.

**Forward Looking Statements**

Certain statements in this announcement, including statements regarding a potential Going Private Transaction, are "forward-looking statements" that are subject to risks, uncertainties and contingencies. These risks, uncertainties and contingencies include, but are not limited to, the impact of the announcement of the formation of the special committee and review of a potential Going Private Transaction on the Company's business and its ability to implement any potential Going Private Transaction.  Various important factors could cause actual results to differ materially, including the risks identified in our SEC filings.

This list of factors is not intended to be exhaustive. Such forward-looking statements only speak as of the date of this announcement, and the Company disclaims any obligation to update information contained in these forward-looking statements.



Source: Tesla, Inc.

# EXHIBIT N

# Staying Public

Elon Musk

August 24, 2018

Earlier this month, I announced that I was considering taking Tesla private. As part of the process, it was important to understand whether our current investors believed this would be a good strategic move and whether they would want to participate in a private Tesla.

Our investors are extremely important to me. Almost all have stuck with us from the time we went public in 2010 when we had no cars in production and only a vision of what we wanted to be. They believe strongly in our mission to advance sustainable energy and care deeply about our success.

I worked with Silver Lake, Goldman Sachs and Morgan Stanley, who have world-class expertise in these matters, to consider the many factors that would come into play in taking Tesla private, and to process all the incoming interest that we received from investors to fund a go-private transaction. I also spent considerable time listening to current shareholders, large and small, to understand what they think would be in the best long-term interests of Tesla.

Based on all the discussions that have taken place over the last couple of weeks and a thorough consideration of what is best for the company, a few things are clear to me:

- Given the feedback I've received, it's apparent that most of Tesla's existing shareholders believe we are better off as a public company. Additionally, a number of institutional shareholders have explained that they have internal compliance issues that limit how much they can invest in a private company. There is also no proven path for most retail investors to own shares if we were private. Although the majority of shareholders I spoke to said they would remain with Tesla if we went private, the sentiment, in a nutshell, was "please don't do this."

- I knew the process of going private would be challenging, but it's clear that it would be even more time-consuming and distracting than initially anticipated. This is a problem because we absolutely must stay focused on ramping Model 3 and becoming profitable. We will not achieve our mission of advancing sustainable energy unless we are also financially sustainable.

- That said, my belief that there is more than enough funding to take Tesla private was reinforced during this process.

After considering all of these factors, I met with Tesla's Board of Directors yesterday and let them know that I believe the better path is for Tesla to remain public. The Board indicated that they agree.

Moving forward, we will continue to focus on what matters most: building products that people love and that make a difference to the shared future of life on Earth. We've shown that we can make great sustainable energy products, and we now need to show that we can be sustainably profitable. With all the progress we've made on Model 3, we're positioned to do this, and that's what the team and I are going to be putting all of our efforts toward.

Thank you to all of our investors, customers and employees for the support you've given our company. I'm incredibly excited to continue leading Tesla as a public company. It is a privilege.

# EXHIBIT O

8-K 1 d622890d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

---

## FORM 8-K

---

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported)**
**November 5, 2013**

---

# Tesla Motors, Inc.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-34756** | **91-2197729** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**3500 Deer Creek Road**
**Palo Alto, California 94304**
(Address of principal executive offices, including zip code)

**(650) 681-5000**
(Registrant's telephone number, including area code)

**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02    Results of Operations and Financial Condition.**

On November 5, 2013, Tesla Motors, Inc. ("Tesla") released its financial results for the quarter ended September 30, 2013 by posting its Third Quarter 2013 Shareholder Letter on its website. The full text of the shareholder letter is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

This information is intended to be furnished under Item 2.02 of Form 8-K, "Results of Operations and Financial Condition" and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 8.01.    Other Events.**

**Tesla Disclosure Channels To Disseminate Information**

Tesla investors and others should note that we announce material information to the public about our company, products and services and other issues through a variety of means, including Tesla's website, press releases, SEC filings, blogs and social media, in order to achieve broad, non-exclusionary distribution of information to the public. We encourage our investors and others to review the information we make public in the locations below as such information could be deemed to be material information. Please note that this list may be updated from time to time.

**Interested in keeping up with Tesla?**

For more information on Tesla and its products, please visit: teslamotors.com

For more information for Tesla investors, please visit: ir.teslamotors.com

For the latest information from Tesla, including press releases and the Tesla blog, please visit: teslamotors.com/press

For additional information, please follow Elon Musk's and Tesla's Twitter accounts: twitter.com/elonmusk and twitter.com/TeslaMotors

**Item 9.01    Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Tesla Motors, Inc. Third Quarter 2013 Shareholder Letter dated November 5, 2013. |

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**TESLA MOTORS, INC.**

By: /s/ Deepak Ahuja

**Deepak Ahuja**
**Chief Financial Officer**

Date: November 5, 2013

# EXHIBIT P

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

**UNITED STATES SECURITIES AND**                                    :
**EXCHANGE COMMISSION**                                             :
                                                                    :
          **Plaintiff,**   :
                                                                    :
          **vs.**          :    **Civil Action No. 1:18-cv-8865**
                                                                    :
**ELON MUSK,**                                                      :    **Jury Trial Demanded**
                                                                    :
          **Defendant.**   :
                                                                    :
_____  :

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges as follows:

### SUMMARY

1.     This case involves a series of false and misleading statements made by Elon Musk, the Chief Executive Officer of Tesla, Inc. ("Tesla"), on August 7, 2018, regarding taking Tesla, a publicly traded company, private. Musk's statements, disseminated via Twitter, falsely indicated that, should he so choose, it was virtually certain that he could take Tesla private at a purchase price that reflected a substantial premium over Tesla stock's then-current share price, that funding for this multi-billion dollar transaction had been secured, and that the only contingency was a shareholder vote. In truth and in fact, Musk had not even discussed, much less confirmed, key deal terms, including price, with any potential funding source.

2.     At approximately 12:48 p.m. EDT on August 7, 2018, during trading hours, Musk tweeted to his over 22 million Twitter followers, "Am considering taking Tesla private at $420.

Funding secured." This statement was false and misleading. Over the next three hours, Musk made a series of additional materially false and misleading statements via Twitter including:

- "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla."

- "Shareholders could either to [sic] sell at 420 or hold shares & go private."

- "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

3.      Musk knew or was reckless in not knowing that each of these statements was false and/or misleading because he did not have an adequate basis in fact for his assertions. When he made these statements, Musk knew that he had never discussed a going-private transaction at $420 per share with any potential funding source, had done nothing to investigate whether it would be possible for all current investors to remain with Tesla as a private company via a "special purpose fund," and had not confirmed support of Tesla's investors for a potential going-private transaction. He also knew that he had not satisfied numerous additional contingencies, the resolution of which was highly uncertain, when he unequivocally declared, "Only reason why this is not certain is that it's contingent on a shareholder vote." Musk's public statements and omissions created the misleading impression that taking Tesla private was subject only to Musk choosing to do so and a shareholder vote.

4.      Investors reacted to Musk's August 7 tweets. From the time of Musk's first tweet that day until the close of trading on August 7, Tesla's stock price increased by more than 6% on significantly increased volume and closed up 10.98% from the previous day.

5.      Musk's false and misleading public statements and omissions caused significant confusion and disruption in the market for Tesla's stock and resulting harm to investors.

6.      By engaging in the conduct alleged in this Complaint, Musk violated, and unless restrained and enjoined will violate again, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

7.      The Commission brings this action against Musk pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*] to enjoin the transactions, acts, practices, and courses of business alleged in this Complaint and to seek orders of disgorgement, along with prejudgment interest, civil penalties, and an officer and director bar against Musk, and such further relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), and 78aa*].

9.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Defendant transacts business in this District, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Musk regularly communicates via Twitter with users located in this District.  In addition, Tesla is traded on the Nasdaq Global Select Market, which is headquartered in this District, and trades in Tesla securities were handled and executed by trading personnel located in this District during the period relevant to the allegations.

**DEFENDANT**

10.    **Defendant Elon Musk**, age 47, resides in Los Angeles, California.  He co-
founded Tesla, Inc. in 2003 and since that time has been the Chairman of Tesla's Board of
Directors and largest stockholder.  He was named Chief Executive Officer in 2008.  Musk
oversees all product development, engineering, and design of Tesla's products.

**RELEVANT ENTITY**

11.    **Tesla**, which designs, develops, manufactures, and sells electric vehicles and
energy generation and storage systems, is incorporated in Delaware with its principal place of
business in Palo Alto, California.  Tesla conducted an initial public offering in 2010, and at all
relevant times, its common stock was registered with the Commission pursuant to Section 12(b)
of the Exchange Act [*15 U.S.C. § 78l(b)*] and was publicly traded on the Nasdaq Global Select
Market under the ticker symbol TSLA.

**FACTUAL ALLEGATIONS**

**Musk Used Twitter to Communicate with Millions of People as Tesla's Spokesperson**

12.    Musk created a profile on the social media application Twitter
(twitter.com/elonmusk) in 2009.  Since that time, Musk often used Twitter to communicate about
Tesla's business.  Tesla's Chief Financial Officer described Musk's Twitter statements as a
"strong channel of marketing" with Musk acting as a "spokesman" for Tesla.

13.    On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission
stating that it intended to use Musk's Twitter account as a means of announcing material
information to the public about Tesla and its products and services and has encouraged investors
to review the information about Tesla published by Musk via his Twitter account.

14.     In August 2018, over 22 million people, including members of the press, "followed" Musk on Twitter.  His tweets were published instantaneously to those people and were also publicly available to anyone with Internet access.

**Musk's Statements Regarding Tesla Short Sellers**

15.     In 2018, stock analysts and investors increasingly began to question whether Tesla could meet its previously announced production targets and begin to earn sufficient cash in order to sustain its operations and pay its existing debt load.  By August 2018, more than $13 billion worth of Tesla shares were being "shorted," meaning they were sold by investors who did not own them at the time of the sale.  Investors who sell stock short typically believe the price of the stock will fall and hope to buy the stock at the lower price to cover their short positions and earn a profit.  If the price of the stock rises, short sellers who then exit their short positions by purchasing the stock at the higher price will incur losses.

16.     Musk has complained that Tesla has been unfairly targeted by short sellers and predicted that short sellers would be "burned."  For example, on May 4, 2018, Musk tweeted, "Oh and uh short burn of the century comin soon.  Flamethrowers should arrive just in time." On June 17, 2018, Musk tweeted that short sellers "have about three weeks before their short position explodes."

**Preliminary Discussions Regarding Taking Tesla Private**

17.     Beginning in January 2017, Musk had three or four in-person meetings with representatives of a sovereign investment fund (the "Fund").  During these meetings, according to Musk, the lead representative of the Fund expressed a verbal desire to make a large investment in Tesla and establish a Tesla production facility in the Middle East.

18.     In late July 2018, Musk and representatives of the Fund had not spoken for many months.  On July 28, 2018, a representative of the Fund requested a meeting with Musk.  On the evening of July 31, Musk and his chief of staff met with three representatives of the Fund at Tesla's factory in Fremont, California for approximately 30 to 45 minutes.  Tesla's CFO joined midway through the meeting.

19.     According to Musk, at the meeting the Fund's lead representative told Musk that the Fund had recently acquired almost five percent of Tesla's common stock on the open market, expressed interest in taking Tesla private, and confirmed that he was empowered to make investment decisions for the Fund.  Musk later stated that he assumed without confirming that the lead Fund representative was proposing a "standard" going-private transaction, but the terms of any such deal were not discussed.

20.     During the July 31 meeting, the lead Fund representative again raised the prospect of establishing a production facility in the Middle East.  According to Musk, he expressed openness but made no commitment; Musk assumed that whether a Tesla production facility in the Middle East was a precondition to the Fund's willingness to take Tesla private would depend on the amount of capital the Fund was required to commit to the transaction.  Musk did not discuss his assumption with the representatives of the Fund.

21.     The July 31 meeting lacked discussion of even the most fundamental terms of a proposed going-private transaction.  For example, there was no discussion at the July 31 meeting of (1) any dollar amount or specific ownership percentage for the Fund's investment in a going-private transaction; (2) any acquisition premium to be offered to current Tesla shareholders; (3) any restrictions on foreign ownership of a significant stake in Tesla; (4) the Fund's available liquid capital; (5) whether the Fund had any past experience participating in a going-private

transaction; (6) any regulatory hurdles to completion of a going-private transaction; or (7) the board approval process necessary to take Tesla private.  Musk has acknowledged that the July 31 meeting was the most specific discussion of a transaction to take Tesla private between him and representatives of the Fund.

22.     According to Musk, at the close of the July 31 meeting, the lead representative of the Fund asked Musk to tell the Fund how he wanted to do a going-private transaction and represented that so long as the terms were "reasonable," the Fund would be fine with them. Musk acknowledged that no specific deal terms had been established at the meeting and that there was no discussion of what would or would not be considered reasonable.  Nothing was exchanged in writing, and there was no discussion of confidentiality.  Musk did not communicate with representatives of the Fund again about a going-private transaction until August 10, three days after his August 7 statements.

**Musk's Discussion of a Going-Private Transaction with Tesla's Board of Directors**

23.     On August 2, 2018, after market close, Musk sent an email with the subject, "Offer to Take Tesla Private at $420," to Tesla's Board of Directors, Chief Financial Officer, and General Counsel.  In the email, Musk explained his reasons for wanting to take Tesla private, including that being public "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand."  In the email, Musk asked that the "matter be put to a shareholder vote at the earliest opportunity" and stated that the "offer expires in 30 days."

24.     According to Musk, he calculated the $420 price per share based on a 20% premium over that day's closing share price because he thought 20% was a "standard premium" in going-private transactions.  This calculation resulted in a price of $419, and Musk stated that

he rounded the price up to $420 because he had recently learned about the number's significance in marijuana culture and thought his girlfriend "would find it funny, which admittedly is not a great reason to pick a price."

25.     Prior to Musk's meeting with Fund representatives on the evening of July 31, Tesla's stock had closed at approximately $298 per share.  Accordingly, at the time of the meeting, the price per share with a 20% premium would have been approximately $358. Between the July 31 meeting and Musk's August 2 email to Tesla's board, Tesla's share price had increased over 17% following the company's August 1 earnings announcement.  Musk realized that a spike in Tesla's share price might make a going-private transaction not feasible because it would require an investor in the transaction to pay a "premium on a spike."  Musk, however, said that he assumed without confirming with the Fund or any other funding source that the 17% spike in Tesla's share price did not affect the feasibility of taking Tesla private at that time.  Musk did not discuss a $420 price per share with any potential funding source for a Tesla going-private transaction prior to sending his email to Tesla's board.

26.     According to Musk, he thought that there was "a lot of uncertainty" regarding a potential going-private transaction at the time of his August 2 email to Tesla's board, "but it was worth investigating."  He believed at the time that the likelihood of consummation of a transaction was about 50%.

27.     In response to Musk's August 2 email about taking Tesla private, Tesla's board held a telephonic meeting with Musk on the night of August 3.  During that call, Musk informed the board that the Fund was interested in funding a going-private transaction.

28.     Musk also told board members that he wanted existing investors to stay with the company.  According to Musk, at least one board member told him that it would be "really difficult for small investors" to remain shareholders in a private Tesla.

29.     During the August 3 call, Musk told the board that he wanted to contact existing shareholders to assess their interest in participating in a going-private transaction.  The board authorized Musk to contact certain investors and asked him to report back to the board on those conversations.

**Musk's August 7 Statements and the Market's Reaction**

30.     Between the July 31 meeting with representatives of the Fund and the morning of August 7, Musk (1) did not have any further substantive communications with representatives of the Fund; (2) did not discuss a going-private transaction at a share price of $420 with any potential funding source; (3) had a conversation with a private equity fund representative about the process, but did not actually contact any additional potential strategic investors to assess their interest in participating in a going-private transaction; (4) did not provide Tesla's Board of Directors with a more specific proposal to take Tesla private; (5) did not contact existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (6) did not formally retain any advisors to assist with a going-private transaction; (7) did not determine whether retail investors could remain invested in Tesla as a private company; (8) did not determine whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) did not determine what regulatory approvals would be required for such a transaction or whether they could be satisfied.

31.     On August 6, Musk discussed a potential going-private transaction with a private equity fund partner with previous experience with such transactions.  During this call, Musk

mentioned that to execute the potential transaction, the number of Tesla shareholders needed to be below 300.  At the time, Tesla had over 800 institutional shareholders and many more individual shareholders.  According to the private equity fund partner, the transaction structure that Musk was contemplating was "unprecedented" in his experience.

32.     These uncertainties notwithstanding, on Tuesday, August 7, 2018, Musk published a series of statements about a transaction to take Tesla private using his personal Twitter account.  Musk did not consult with Tesla's Board of Directors, any other Tesla employees, or any outside advisors about these tweets before publishing them.

33.     At approximately 12:48 PM EDT on Tuesday, August 7, 2018, Musk, using his mobile phone, published a tweet, "Am considering taking Tesla private at $420.  Funding secured."  Musk published this tweet in the middle of the day's official market trading. Immediately after this tweet, the trading volume and price of Tesla shares spiked.

34.     Over the next few hours, Musk made additional statements about taking Tesla private.  At approximately 1:15 PM EDT, Musk responded to another Twitter user's question, "At what price?" by repeating "420."

35.     At approximately 1:23 PM EDT, about 35 minutes after Musk's initial tweet about taking Tesla private, Tesla's Chief Financial Officer sent a text message to Musk, "Elon, am sure you have thought about a broader communication on your rationale and structure to employees and potential investors.  Would it help if [Tesla's head of communications], [Tesla's General Counsel], and I draft a blog post or employee email for you?"  Musk responded, "Yeah, that would be great."  Tesla's Chief Financial Officer then replied, "Working on it.  Will send you shortly."

36.     At approximately 1:40 PM EDT, Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

37.     At approximately 2:00 PM EDT, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment."  In response to this tweet another Twitter user asked, "Could we still invest once private?"  Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

38.     At approximately 2:07 PM EDT, Musk responded to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super appreciative of Tesla shareholders. Will ensure their prosperity in any scenario."

39.     Nasdaq rules specify that listed companies such as Tesla must notify Nasdaq at least ten minutes prior to publicly releasing material information about corporate events like a proposed going-private action.  Musk did not notify Nasdaq prior to publishing his August 7 tweets.

40.     At approximately 2:08 PM EDT, Nasdaq halted trading in TSLA shares.

41.     At approximately 2:13 PM EDT, Musk tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."

42.     At approximately 3:07 PM EDT, Musk responded to a Twitter user's comment about a "forced buyout" by tweeting, "Def. no forced sales. Hope all shareholders remain.  Will

be way smoother & less disruptive as a private company.  Ends negative propaganda from shorts."  Later that day, Musk "retweeted" this statement, causing it to be published again in his Twitter feed.

43.    At approximately 3:16 PM EDT, Musk sent an email to Tesla employees.  The content of that email, entitled "Taking Tesla Private," was published to a publicly available Tesla blog at 3:32 PM EDT.  In the email and blog post, Musk explained his reasons for wanting to take Tesla private, including asserting that TSLA was "the most shorted stock in the history of the stock market" and stating that "being public means there are large numbers of people who have incentive to attack the company."

44.    In his company-wide email and blog post, Musk reiterated that he would like to structure a Tesla going-private transaction "so that all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share . . . ."  Musk added, "This proposal to go private would ultimately be finalized through a vote of our shareholders."

45.    A few minutes after publishing the blog post, at approximately 3:36 PM EDT, Musk tweeted a link to it in a tweet that stated, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."  Neither Musk's tweet nor the blog post provided any further information or context about the meaning of Musk's statement, "Investor support confirmed," or disclosed any contingencies other than a shareholder vote that would have to be satisfied in order to take Tesla private.

46.    Approximately nine minutes later, at 3:45 PM EDT, Nasdaq lifted the trading halt on Tesla shares.  After trading resumed, Tesla's stock price continued to rise, closing at $379.57, up over 6% from the time Musk first tweeted about taking Tesla private earlier that day.

**Reaction to Musk's August 7 Statements**

47.     Investors, stock analysts, and journalists immediately sought clarification of

Musk's August 7 statements.  At 1:00 PM EDT, approximately 12 minutes after Musk published

his tweet stating, "Am considering taking Tesla private at $420.  Funding secured," Tesla's own

head of Investor Relations sent a text to Musk's chief of staff asking, "Was this text legit?"

48.     At approximately 1:13 PM EDT, a Tesla investor and friend of Musk's chief of

staff texted the chief of staff, "What's Elon's tweet about?  Can't make any sense of it.  Would

be incredibly disappointing for shareholders that have stuck it out for so long."  A few minutes

later, at approximately 1:32 PM EDT, a business reporter texted Musk's chief of staff, "Quite a

tweet! (Is it a joke?)."

49.     At approximately 2:23 PM EDT, another reporter sent Musk an email with the

subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with

your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you

serious?  It seems like you are dancing into some pretty tricky legal territory by messing about

with the markets this way.  Is there an actual explanation coming?"

50.     After Tesla published Musk's email to Tesla employees on its blog, at

approximately 5:09 PM EDT on August 7, an investment bank research analyst emailed Tesla's

head of Investor Relations, "In the tweet, he said financing is secured but in the letter he doesn't

address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten

minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured'.  Yes,

there is a firm offer."

51.     At approximately 5:23 PM EDT, another research analyst emailed Tesla's head of

Investor Relations and another Investor Relations employee, "Had some questions/clarifications

on today's news and blog post.  Can either of you speak?"  A few minutes later, Tesla's head of

Investor Relations responded, "[A]part from what has been tweeted and what was written in a

blog post, we can't add anything else.  I only wanted to stress that Elon's first tweet, which

mentioned 'financing secured' is correct."

52.     After Tesla's head of Investor Relations received another inquiry from another

investment bank research analyst at approximately 7:20 PM EDT, he asked whether the analyst

had read Tesla's "official blog post on this topic."  The analyst responded, "I did.  Nothing on

funding though?"  The head of Investor Relations replied, "The very first tweet simply

mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of

who the buyer is."  The analyst then asked, "Firm offer means there is a commitment letter or is

this a verbal agreement?"  The head of Investor Relations responded, "I actually don't know, but

I would assume that given we went full-on public with this, the offer is as firm as it gets."

**Additional Statements by Musk on August 13**

53.     Musk did not make any attempt to clarify his August 7 statements until August

13.  During the interim, Musk continued to publish statements via his Twitter account, including

an apparent joke on August 10 about "Short shorts coming soon to Tesla merch[andise]."

54.     On August 12, 2018, a news outlet reported that "people with knowledge of the

[F]und's plans" said that it "hasn't made any firm decisions on whether to increase its stake, or

by how much, but talks are ongoing . . . ."

55.     The following day, August 13, 2018, a blog post attributed to Musk called

"Update on Taking Tesla Private" was published on Tesla's public blog.  In the blog post, Musk

attempted to walk back his August 7 statements, stating publicly for the first time that when he

had tweeted, "Am considering taking Tesla private at $420.  Funding secured," it was based on

his impression that there was "no question" that a deal with Fund could be closed and that it was "just a matter of getting the process moving."

56.     Musk's August 13 post also disclosed for the first time that he was still in discussions about taking Tesla private with the Fund and a number of other investors and that no detailed proposal had been presented to the board or any board committee.  This was contrary to Musk's August 7 tweet stating, "Only reason why this is not certain is that it's contingent on a shareholder vote."

57.     Although it provided some new information about a potential transaction to take Tesla private, Musk's August 13 blog post still did not disclose that the $420 share price had not been agreed to by any potential funding source for a transaction to take Tesla private.  Similarly, in the blog post, Musk again stated that his "proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders who preferred that option."  Musk did not disclose that he had still not determined whether such a structure would be possible.  After abandoning the going-private transaction, Musk admitted that his assumption that it would be possible for small shareholders to remain invested in Tesla as a private company was a "fundamental misunderstanding."

58.     At approximately 11:15 PM EDT on Friday, August 24, 2018, after the close of official Nasdaq trading, a blog post was published on Tesla's public blog announcing that Musk had abandoned the process of attempting to take Tesla private.

59.     The August 24 blog post, attributed to Musk, stated:

> Given the feedback I've received, it's apparent that most of Tesla's
> existing shareholders believe we are better off as a public
> company.  Additionally, a number of institutional shareholders
> have explained that they have internal compliance issues that limit

> how much they can invest in a private company.  There is also no
> proven path for most retail investors to own shares if we were
> private.  Although the majority of shareholders I spoke to said they
> would remain with Tesla if we went private, the sentiment, in a
> nutshell, was "please don't do this."

This was the first time that Musk publicly disclosed the obstacles to allowing current Tesla

investors to remain invested if Tesla went private and thus corrected his multiple previous

misstatements that any going-private transaction would allow all current shareholders to remain

invested.

60.     On the next trading day, August 27, 2018, Tesla stock closed at $319.27, down

over 15% from the closing price of $379.57 on August 7, the date of Musk's initial tweets about

taking Tesla private.

**Musk's August 7 Statements Were Materially False and Misleading**

61.     Musk made multiple materially false statements on August 7, and taken together,

his August 7 statements left market participants with the false and misleading impression that if

Musk chose to take Tesla private at $420 per share, the only outstanding requirement to be

satisfied was a shareholder vote.

62.     Musk's first tweet on August 7 stated, "Am considering taking Tesla private at

$420.  Funding secured."  Musk then repeated the $420 share price in at least two additional

tweets that day.  Later that day, Musk also tweeted, "Investor support is confirmed.  Only reason

why this is not certain is that it's contingent on a shareholder vote."  Musk's statements that

funding was "secured" and investor support was "confirmed" were false and misleading because,

in reality, Musk had no "secured" or "confirmed" commitment from any source to provide any

amount of funding.  In addition, he had never even discussed taking Tesla private at a price of

$420 per share with the Fund or any other potential investor.

16

63.     Musk's statement, "Only reason why this is not certain is that it's contingent on a shareholder vote," was also false and misleading.  In fact, there were numerous reasons in addition to a shareholder vote why a going-private transaction was not "certain" at that time. Any going-private transaction would have required approval of Tesla's board or a specially-appointed committee of the board, and at that time, no formal proposal to take Tesla private had even been presented for consideration.  In fact, no deal terms had been agreed upon with any source of funding, and any large investment to fund such a transaction would likely have been predicated on terms that the parties would have to negotiate and agree upon.  For example, the Fund had indicated that its investment might be contingent on Tesla building a production facility in the Middle East, a condition that would have significantly complicated any transaction, and to which neither Musk nor Tesla had agreed.  At least one Tesla board member described such a condition as a "non-starter."

64.     Musk's August 7 statements, taken together, also created the misleading impression that certain terms of a transaction to take Tesla private had been determined when, in fact, they had not even been explored, and in some cases, proved to be impossible. On August 7, Musk repeatedly stated that all current Tesla investors would be able to remain invested in Tesla after a going-private transaction.

65.     Specifically, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX investment."  Musk also responded to another Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super

appreciative of Tesla shareholders. Will ensure their prosperity in any scenario." Musk also tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private." Finally, in his August 7 blog post, Musk stated " . . . all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share . . . ."

66. Musk also responded to a Twitter user who asked, "Could we still invest once private?" by tweeting, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

67. At the time of these statements, Musk had not determined or even explored whether it would be possible (1) for individual investors to invest in Tesla if it was a private company; (2) for all current Tesla shareholders to remain invested if Tesla were to go private; (3) to create a "special purpose fund enabling anyone to stay with Tesla"; or (4) to hold liquidity events "every 6 months or so." In fact, Musk later admitted, "I thought the vast majority of existing investors would want to maintain their stake, and we would find a vehicle for small investors to participate. That latter part was a fundamental misunderstanding that I just did not know -- I thought there would be some way to retain small investors, but there isn't." Musk's statements regarding specific terms of a transaction to take Tesla private created the misleading impression that these terms had been decided upon, when in fact, they had not even been investigated or determined to be possible.

**Musk Knew or Was Reckless in Not Knowing that His Statements Were False and Misleading**

68. Musk made his false and misleading public statements about taking Tesla private using his mobile phone in the middle of the active trading day. He did not discuss the content of the statements with anyone else prior to publishing them to his over 22 million Twitter followers

and anyone else with access to the Internet.  He also did not inform Nasdaq that he intended to make this public announcement, as Nasdaq rules required.

69.    Musk's statements were premised on a long series of baseless assumptions and were contrary to facts that Musk knew.  Between the July 31 meeting with representatives of the Fund and his August 7 misstatements, Musk knew that he (1) had not agreed upon any terms for a going-private transaction with the Fund or any other funding source; (2) had no further substantive communications with representatives of the Fund beyond their 30 to 45 minute meeting on July 31; (3) had never discussed a going-private transaction at a share price of $420 with any potential funding source; (4) had not contacted any additional potential strategic investors to assess their interest in participating in a going-private transaction; (5) had not contacted existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (6) had not formally retained any legal or financial advisors to assist with a going-private transaction; (7) had not determined whether retail investors could remain invested in Tesla as a private company; (8) had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) had not determined what regulatory approvals would be required or whether they could be satisfied.

70.    In addition, Musk knew that Tesla's board had not yet voted on any proposal or authorized a shareholder vote on it, and in fact, Musk had not yet even submitted a formal proposal to Tesla's board.

71.    Musk did not disclose any of these material facts that were known to him when he made his August 7 statements.  Unlike market participants reading his tweets, Musk knew that his ostensibly "secured" funding was based on a 30 to 45 minute conversation regarding a potential investment of an unspecified amount in the context of an undefined transaction

structure.  Musk also knew that there were many uncertainties beyond just a shareholder vote that would have had to be resolved before any going-private transaction could have been possible.  As a result, Musk knew or was reckless in not knowing that his August 7 statements were false and misleading.

**Musk Omitted Material Facts**

72.     Musk's statements on August 7 also omitted material information.  Musk had a duty to disclose material facts necessary to make his statements not misleading.

73.     Despite receiving numerous inquiries from journalists, research analysts, and current Tesla investors indicating that they were confused by Musk's tweets and that the August 7 blog post had not remedied that confusion, Musk did not attempt to clarify the August 7 statements until the blog post, "Update on Taking Tesla Private," was issued on August 13.

74.     Moreover, the August 13 blog post still did not disclose that Musk had not secured an agreement from any potential source of funding to fund a going-private transaction at a price of $420 per share or that it was uncertain that a going-private transaction could be accomplished in a manner that allowed existing Tesla shareholders to remain invested.

**Musk's Tweets Caused Market Chaos and Harmed Tesla Investors**

75.     Immediately prior to Musk's August 7 statements via Twitter, Tesla's stock was trading at $356.67.  Musk's first tweet about taking Tesla private set off a trading frenzy, and the trading volume and price of Tesla shares immediately spiked.  Nasdaq subsequently halted Tesla trading for more than 90 minutes pending an official announcement from Tesla.  At the end of August 7, after Musk's tweets and the post on Tesla's blog, the stock closed at $379.57, up 6.42% from just prior to the first tweet.

76.     By the close of market trading on August 13, after Musk and Tesla disclosed more information about the details underlying Musk's "funding secured" statement, Tesla's stock price had declined to around pre-tweet trading levels.  By the close of trading on August 27, the first trading day after Musk announced that he was abandoning his proposal to take Tesla private, Tesla's stock had dropped to $319.44.

77.     As a result of Musk's false and misleading statements and material omissions, investors who purchased Tesla stock in the period after the false and misleading statements but before accurate information was made known to the market were harmed.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

78.     Paragraphs 1 through 77 are hereby re-alleged and are incorporated herein by reference.

79.     Defendant, with scienter, in connection with the purchase or sale of securities as set forth above, directly or indirectly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading by the use of the means or instrumentalities of interstate commerce, and of the mails, and the facilities of a national securities exchange.

80.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, [*15 U.S.C. § 78j(b)*], and Rule 10b-5 thereunder, [*17 C.F.R. § 240.10b-5*].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*];

**III.**

Ordering Defendant to disgorge, with prejudgment interest, any ill-gotten gains received as a result of the violations alleged herein;

**IV.**

Ordering Defendant to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(d)(3)*];

**V.**

Ordering that Defendant be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [*15 U.S.C. § 78o(d)*]; and

# VI.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated: September 27, 2018                    Respectfully submitted,


                                             */s/ Jina L. Choi*
                                             Jina L. Choi
                                             Cheryl L. Crumpton*
                                             E. Barrett Atwood*

                                             *Application for admission *pro hac vice*
                                             forthcoming

                                             U.S. Securities and Exchange Commission
                                             100 F Street, N.E.
                                             Washington, D.C. 20549
                                             (202) 551-4459 (Crumpton)
                                             crumptonc@sec.gov

                                             44 Montgomery Street, Suite 2800
                                             San Francisco, CA 94104
                                             (415) 295-2467 (Atwood)
                                             atwoodb@sec.gov

Of counsel:

Erin E. Schneider
Steven Buccholz
Walker S. Newell
Bernard B. Smith

# EXHIBIT Q

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action No. 1:18-cv-8947 |
| | : | |
| TESLA, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges as follows:

1.     This case involves the failure of Tesla, Inc. ("Tesla") to implement disclosure controls or procedures to assess whether information disseminated by its Chief Executive Officer, Elon Musk, via his Twitter account was required to be disclosed in reports Tesla files pursuant to the Securities Exchange Act of 1934 ("Exchange Act") within the time periods specified in the Commission's rules and forms.

2.     On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission stating that it intended to use Musk's Twitter account as a means of announcing material information to the public about Tesla and its products and services and has encouraged investors to review the information about Tesla published by Musk via his Twitter account.

3.     Since that time, Musk has used his Twitter account to distribute material information about Tesla, including company financial projections and key non-financial metrics.

Tesla, however, did not have disclosure controls or procedures in place to assess whether the information Musk disseminated via his Twitter account was required to be disclosed in reports Tesla files pursuant to the Exchange Act within the time periods specified in the Commission's rules and forms.  Nor did it have sufficient processes in place to ensure the information Musk published via his Twitter account was accurate or complete.

4.      By engaging in the conduct, Tesla violated, and unless restrained and enjoined will violate again, Rule 13a-15 [*17 C.F.R. § 240.13a-15*] of the Exchange Act [15 U.S.C. *§ 78a, et seq.*].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

5.      The Commission brings this action against Tesla pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*] to seek an order enjoining the transactions, acts, practices, and courses of business alleged in this Complaint, civil penalties, and such further relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), and 78aa*].

7.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Defendant transacts business in this District, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.

**DEFENDANT**

8.      **Tesla**, which designs, develops, manufactures, and sells electric vehicles and
energy generation and storage systems, is incorporated in Delaware with its principal place of
business in Palo Alto, California.  Tesla conducted an initial public offering in 2010, and at all
relevant times, its common stock was registered with the Commission pursuant to Section 12(b)
of the Exchange Act [*15 U.S.C. § 78l(b)*] and was publicly traded on the Nasdaq Global Select
Market under the ticker symbol TSLA.

**RELEVANT PERSON**

9.      **Elon Musk**, age 47, resides in Los Angeles, California.  He co-founded Tesla in
2003 and since that time has been the Chairman of Tesla's Board of Directors and largest
stockholder.  He was named Chief Executive Officer in 2008.  Musk oversees all product
development, engineering, and design of Tesla's products.

**FACTUAL ALLEGATIONS**

**Musk Used Twitter to Communicate with Millions of People as Tesla's Spokesman**

10.      In 2009, Musk created a profile on the social media application Twitter
(twitter.com/elonmusk).

11.      On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission
stating that it intended to use Musk's personal Twitter account as a means of announcing
material information to the public about the company and its products and services.  Tesla has
encouraged investors to review the information about the company published by Musk via his
Twitter account.

12.      Since November 2013, Musk has used his Twitter account to publish material
information about Tesla.  For example, Musk has published forward-looking guidance regarding

Tesla's financial metrics via Twitter.  Musk has also used Twitter to disclose key non-financial information about Tesla, including production forecasts, production achievements, and new product releases.  Tesla's Chief Financial Officer described Musk's Twitter statements as a "strong channel of marketing" with Musk acting as a "spokesman" for Tesla.

13.     As of August 2018, over 22 million people, including members of the press, "followed" Musk on Twitter.  His tweets were published instantaneously to those people and were also publicly available to anyone with Internet access.

**Musk's August 2018 Statements Via Twitter**

14.     On Tuesday, August 7, 2018, Musk published a series of statements about a transaction to take Tesla private using his personal Twitter account.  Musk did not consult with Tesla's Board of Directors or any other Tesla employees about these tweets before publishing them.

15.     At approximately 12:48 PM EDT on Tuesday, August 7, 2018, Musk, using his mobile phone, published a tweet, "Am considering taking Tesla private at $420.  Funding secured."  Immediately after this tweet, the trading volume and price of Tesla shares spiked.

16.     Over the next few hours, Musk made additional statements about taking Tesla private.  At approximately 1:15 PM EDT, Musk responded to another Twitter user's question, "At what price?" by repeating "420."

17.     At approximately 1:40 PM EDT, Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

18.     At approximately 2:00 PM EDT, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private.  Would create special purpose fund enabling

4

anyone to stay with Tesla.  Already do this with Fidelity's SpaceX [a privately held company for

which Musk serves as CEO] investment."  In response to this tweet, another Twitter user asked,

"Could we still invest once private?"  Musk responded, "Yes, but liquidity events would be

limited to every 6 months or so (like SpaceX)."

19.     At approximately 2:07 PM EDT, Musk responded to a Twitter user who wrote,

"Or if you do take Tesla private, please have a provision for retail investors who have held Tesla

shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new

private company. . . ." by tweeting, "Absolutely.  Am super appreciative of Tesla shareholders.

Will ensure their prosperity in any scenario."

20.     At approximately 2:08 PM EDT, Nasdaq halted trading in TSLA shares.

21.     At approximately 2:13 PM EDT, Musk tweeted, "Shareholders could either to

[sic] sell at 420 or hold shares & go private."

22.     At approximately 3:07 PM EDT, Musk responded to a Twitter user's comment

about a "forced buyout" by tweeting, "Def. no forced sales.  Hope all shareholders remain.  Will

be way smoother & less disruptive as a private company.  Ends negative propaganda from

shorts."  Later that day, Musk "retweeted" this statement, causing it to be published again in his

Twitter feed.

23.     At approximately 3:36 PM EDT, Musk tweeted a link to a public Tesla blog post,

entitled "Taking Tesla Private," in a tweet that stated, "Investor support is confirmed.  Only

reason why this is not certain is that it's contingent on a shareholder vote."

24.     These statements by Musk via Twitter were false and misleading and impacted

the price of Tesla's stock.

25.     After Nasdaq lifted the trading halt at approximately 3:45 PM EDT on August 7,

Tesla's stock price continued to rise, closing at $379.57, up over 6% from the time Musk first tweeted about taking Tesla private earlier that day.

**Reactions and Tesla's Response to Musk's August 7 Statements**

26.     Investors, stock analysts, and journalists immediately sought clarification of Musk's August 7 statements.  At 1:00 PM EDT, approximately 12 minutes after Musk published his tweet stating, "Am considering taking Tesla private at $420.  Funding secured," Tesla's head of Investor Relations sent a text to Musk's chief of staff asking, "Was this text legit?"

27.     At approximately 1:13 PM EDT, a Tesla investor and friend of Musk's chief of staff texted the chief of staff, "What's Elon's tweet about?  Can't make any sense of it.  Would be incredibly disappointing for shareholders that have stuck it out for so long."  A few minutes later, at approximately 1:32 PM EDT, a business reporter texted Musk's chief of staff, "Quite a tweet! (Is it a joke?)."

28.     At approximately 2:23 PM EDT, another reporter sent Musk an email with the subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you serious?  It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way.  Is there an actual explanation coming?"

29.     After Musk tweeted the link to the Tesla blog post, at approximately 5:09 PM EDT on August 7, an investment bank research analyst emailed Tesla's head of Investor Relations, "In the tweet, he said financing is secured but in the [blog post] he doesn't address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured.'  Yes, there is a firm offer."

30.     At approximately 5:23 PM EDT, another research analyst emailed Tesla's head of

Investor Relations and another Investor Relations employee, "Had some questions/clarifications

on today's news and blog post.  Can either of you speak?"  A few minutes later, Tesla's head of

Investor Relations responded, "[A]part from what has been tweeted and what was written in a

blog post, we can't add anything else.  I only wanted to stress that Elon's first tweet, which

mentioned 'financing secured' is correct."

31.     After Tesla's head of Investor Relations received another inquiry from another

investment bank research analyst at approximately 7:20 PM EDT, he asked whether the analyst

had read Tesla's "official blog post on this topic."  The analyst responded, "I did.  Nothing on

funding though?"  The head of Investor Relations replied, "The very first tweet simply

mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of

who the buyer is."  The analyst then asked, "Firm offer means there is a commitment letter or is

this a verbal agreement?"  The head of Investor Relations responded, "I actually don't know, but

I would assume that given we went full-on public with this, the offer is as firm as it gets."

**Tesla Did Not Have Controls or Procedures Regarding Musk's Use of Twitter to
Disseminate Information About Tesla**

32.     Musk did not routinely consult with anyone at Tesla before publishing Tesla-

related information via his Twitter account.  Likewise, no one at Tesla reviewed Musk's tweets

prior to publication.

33.     Since November 5, 2013, when Tesla filed its Form 8-K disclosing that Musk's

Twitter account would be used to disseminate material information about the company, Tesla did

not have disclosure controls or procedures in place to assess whether the information published

by Musk via his Twitter account was required to be disclosed in Tesla's Exchange Act reports

within the time periods specified in the Commission's rules and forms.  Nor did Tesla have

sufficient processes in place to ensure the information Musk published via his Twitter account was accurate or complete.  Indeed, until after the August 7, 2018 tweets, Tesla had no corporate policies that specifically addressed Musk's use of Twitter.

## CLAIM FOR RELIEF
### Violations of Rule 13a-15 of the Exchange Act

34.      Paragraphs 1 through 33 are hereby re-alleged and are incorporated herein by reference.

35.      Defendant has at all relevant times been an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*].

36.      Defendant failed to maintain controls and procedures designed to ensure that information required to be disclosed in the reports that it files or submits pursuant to the Exchange Act is recorded, processed, summarized, and reported, within the time periods specified in the Commission's rules and forms.

37.      Defendant also failed to maintain controls and procedures designed to ensure that information required to be disclosed in the reports that it files or submits pursuant to the Exchange Act is accumulated and communicated to its management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

38.      By reason of the foregoing, Defendant violated Rule 13a-15 [*17 C.F.R. § 240.13a-15*] of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Rule 13a-15 [*17 C.F.R. § 240.13a-15*] of the Exchange Act;

**III.**

Ordering Defendant to pay civil penalties pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*];

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary.


Dated:  September 29, 2018                    Respectfully submitted,

                                             */s/ Jina L. Choi*
                                             Jina L. Choi
                                             Cheryl L. Crumpton*
                                             E. Barrett Atwood*

                                             *Application to appear *pro hac vice*
                                             forthcoming

                                             U.S. Securities and Exchange Commission
                                             100 F Street, N.E.
                                             Washington, D.C. 20549
                                             (202) 551-4459 (Crumpton)
                                             crumptonc@sec.gov

                                             44 Montgomery Street, Suite 2800
                                             San Francisco, CA 94104
                                             (415) 705-2467 (Atwood)
                                             atwoode@sec.gov

Of counsel:

Erin E. Schneider
Steven D. Buchholz
Walker S. Newell
Bernard B. Smyth

# EXHIBIT R

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 1 6 2018

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : |
| Plaintiff, | : |
| vs. | :  No. 1:18-cv-8865-AJN-GWG |
| ELON MUSK | : |
| Defendant. | : |

## CONSENT MOTION FOR ENTRY OF FINAL JUDGMENT

Plaintiff United States Securities and Exchange Commission (the "Commission") respectfully submits this consent motion to enter final judgment according to the parties' settlement. In support of this motion, the Commission states the following:

1.     On September 27, 2018, the Commission filed a Complaint against Defendant Musk alleging violations of the federal securities laws.

2.     The parties have reached a settlement agreement in this case. Attached hereto as Exhibit 1 is the executed Consent of Defendant Elon Musk, setting forth the terms of his settlement with the Commission.

3.     Attached hereto as Exhibit 2 is the proposed Final Judgment to which Defendant Musk agreed. The proposed Final Judgment would permanently enjoin him from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. It would also order him to pay a penalty of $20,000,000 and to comply with the undertakings detailed in the Final Judgment.

The Commission respectfully requests that the Court enter the proposed Final Judgment

attached hereto as Exhibit 2.

Dated: September 29, 2018

Respectfully submitted,

/s/ Jina L. Choi
Jina L. Choi
Cheryl L. Crumpton*
E. Barrett Atwood*

*Motion to appear *pro hac vice* pending

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4459 (Crumpton)

44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2467 (Atwood)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : | |
| Plaintiff, | : | |
| vs. | : | **No. 1:18-cv-8865-AJN-GWG** |
| **ELON MUSK,** | : | |
| Defendant. | : | |

## CONSENT OF DEFENDANT ELON MUSK

1.    Defendant Elon Musk ("Defendant") waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant in this action only and over the subject matter of this action.

2.    Without admitting or denying the allegations of the complaint (except as provided herein in paragraph 13 and except as to personal jurisdiction as to this matter only and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

   (a)    permanently restrains and enjoins Defendant from violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") *[15 U.S.C. § 78j(b)]* and Rule 10b-5 thereunder *[17 C.F.R. § 240.10b-5]*;

   (b)    orders Defendant to pay a civil penalty in the amount of $20,000,000 under Section 21(d)(3) of the Exchange Act *[15 U.S.C. § 78u(d)(3)]*; and

   (c)    requires Defendant to comply with the undertaking set forth in this Consent and incorporated in the Final Judgment.

3.    Defendant acknowledges that the civil penalty paid pursuant to the Final

Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended. Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty argue that he is entitled to, nor shall he further benefit by, offset or reduction of any award of compensatory damages in any Related Investor Action by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

4.    Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

5.    Defendant undertakes to:

(a)    resign from his role as Chairman of the Board of Directors of Tesla, Inc. ("Chairman") within forty-five (45) days of the filing of this Consent and

2

agree not to seek reelection or to accept an appointment as Chairman for a period of three years thereafter. Upon request by Defendant, the Commission staff may grant in its sole discretion an extension to the deadline set forth above;

(b)     comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding (i) the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders; and

(c)     certify, in writing, compliance with undertaking (a) set forth above. The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence. Defendant shall submit the certification and supporting material to Steven Buchholz, Assistant Regional Director, U.S. Securities and Exchange Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA 94104, with a copy to the Office of Chief Counsel of the Enforcement Division, 100 F Street NE, Washington, DC 20549, no later than fourteen (14) days from the date of the completion of the undertaking.

6.     Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

7.     Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

8.      Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

9.      Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

10.     Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, of lack of compliance with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

11.     Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

12.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding.  Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.  Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations.  Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization.  This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding.  In addition, in any

4

disciplinary proceeding before the Commission based on the entry of the injunction in this

action, Defendant understands that he shall not be permitted to contest the factual allegations of

the complaint in this action.

13. Defendant understands and agrees to comply with the terms of 17 C.F.R. §

202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or

respondent to consent to a judgment or order that imposes a sanction while denying the

allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is

equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies

the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e),

Defendant: (i) will not take any action or make or permit to be made any public statement

denying, directly or indirectly, any allegation in the complaint or creating the impression that the

complaint is without factual basis; (ii) will not make or permit to be made any public statement

to the effect that Defendant does not admit the allegations of the complaint, or that this Consent

contains no admission of the allegations, without also stating that Defendant does not deny the

allegations; (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in

this action to the extent that they deny any allegation in the complaint; and (iv) stipulates solely

for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code *[11

U.S.C. § 523]* that the allegations in the complaint are true, and further, that any debt for

disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the

Final Judgment or any other judgment, order, consent order, decree or settlement agreement

entered in connection with this proceeding, is a debt for the violation by Defendant of the federal

securities laws or any regulation or order issued under such laws, as set forth in Section

523(a)(19) of the Bankruptcy Code *[11 U.S.C. § 523(a)(19)]*. If Defendant breaches this

agreement, the Commission may petition the Court to vacate the Final Judgment and restore this

action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial

obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings

in which the Commission is not a party.

14.     Defendant hereby waives any rights under the Equal Access to Justice Act, the

Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to

seek from the United States, or any agency, or any official of the United States acting in his or

her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees,

expenses, or costs expended by Defendant to defend against this action.  For these purposes,

Defendant agrees that Defendant is not the prevailing party in this action since the parties have

reached a good faith settlement.

15.     Defendant agrees that the Commission may present the Final Judgment to the

Court for signature and entry without further notice.

16.     Defendant agrees that this Court shall retain jurisdiction over this matter for the

purpose of enforcing the terms of the Final Judgment.

Dated: _September 28_ , 2018

_____
Elon Musk

On _September 28_ , 2018, _Elon Musk_ , a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent.

ALESSANDRA FRANCESCA FERRIS
Notary Public – California
Santa Clara County
Commission # 2218921
My Comm. Expires Oct 20, 2021

_____
Notary Public
Commission expires:

Approved as to form:

_____
Steven M. Farina
Williams & Connolly LLP
725 Twelfth Street N.W.
Washington, DC 20005

Attorney for Defendant

# CALIFORNIA JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA     )
                                ) ss.
COUNTY OF ALAMEDA      )

Subscribed and sworn to (or affirmed) before me on this 28th day of September 2018, by **Elon Musk**, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal.

ALESSANDRA FRANCESCA FERRIS
Notary Public – California
Santa Clara County
Commission # 2218921
My Comm. Expires Oct 20, 2021

_____ (Seal)
Notary Public
State of California

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : | |
| Plaintiff, | : | |
| vs. | : | No. 1:18-cv-8865-AJN-GWG |
| ELON MUSK, | : | |
| Defendant. | : | |

## FINAL JUDGMENT AS TO DEFENDANT ELON MUSK

The Securities and Exchange Commission having filed a Complaint and Defendant Elon Musk having entered a general appearance; consented to the Court's jurisdiction over Defendant in this matter only and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction and except as otherwise provided herein in paragraph III); waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") *[15 U.S.C. § 78j(b)]* and Rule 10b-5 promulgated thereunder *[17 C.F.R. § 240.10b-5]*, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light

of the circumstances under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a civil penalty in the amount of $20,000,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act *[15 U.S.C. § 78u(d)(3)]*. Defendant shall make this payment within 14 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Elon Musk as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended. The Court shall retain jurisdiction over the administration of any distribution of the Fund. If the Commission staff determines that the Fund will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not argue that he is entitled to, nor shall he further benefit by offset or reduction of any award of compensatory damages in any Related Investor Action by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of

3

exceptions to discharge set forth in Section 523 of the Bankruptcy Code *[11 U.S.C. § 523]* the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code *[11 U.S.C. § 523(a)(19)]*.  Nothing in this paragraph (a) constitutes an admission by Defendant for any purpose other than determining the applicability of Section 523(a)(19) or (b) affects Defendant's (i) testimonial obligations; or (ii) right to take any legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

## IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings set forth therein, including, but not limited to, the undertakings to:

    (a)    resign from his role as Chairman of the Board of Directors of Tesla, Inc. ("Chairman") within forty-five (45) days of the filing of this Consent and agree not to seek reelection or to accept an appointment as Chairman for a period of three years thereafter.  Upon request by Defendant, the Commission staff may grant in its sole discretion an extension to the deadline set forth above;

    (b)    comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding (i) the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and (ii) the pre-approval of any

such written communications that contain, or reasonably could contain, information material to the Company or its shareholders; and

(c)     certify, in writing, compliance with undertaking (a) set forth above. The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence. Defendant shall submit the certification and supporting material to Steven Buchholz, Assistant Regional Director, U.S. Securities and Exchange Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA 94104, with a copy to the Office of Chief Counsel of the Enforcement Division, 100 F Street NE, Washington, DC 20549, no later than fourteen (14) days from the date of the completion of the undertaking.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Dated: ___10/16/18___

_____
Hon. Alison J. Nathan
UNITED STATES DISTRICT JUDGE

# EXHIBIT S

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: **OCT 1 6 2018**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

      Plaintiff,

      vs.

TESLA, INC.

      Defendant.

No. 1:18-cv-8947

## CONSENT MOTION FOR ENTRY OF FINAL JUDGMENT

Plaintiff United States Securities and Exchange Commission (the "Commission") respectfully submits this consent motion to enter final judgment according to the parties' settlement. In support of this motion, the Commission states the following:

1.     On September 29, 2018, the Commission filed a Complaint against Defendant Tesla, Inc. ("Tesla") alleging violations of the federal securities laws.

2.     The parties have reached a settlement agreement in this case. Attached hereto as Exhibit 1 is the executed Consent of Defendant Tesla, setting forth the terms of its settlement with the Commission.

3.     Attached hereto as Exhibit 2 is the proposed Final Judgment to which Defendant Tesla agreed. The proposed Final Judgment would permanently enjoin Tesla from violating Rule 13a-15 of the Securities Exchange Act of 1934. It would also order Tesla to pay a penalty of $20,000,000 and to comply with the undertakings detailed in the Final Judgment.

The Commission respectfully requests that the Court enter the proposed Final Judgment

attached hereto as Exhibit 2.


Dated: September 29, 2018                        Respectfully submitted,

                                                 */s/ Jina L. Choi*
                                                 Jina L. Choi
                                                 Cheryl L. Crumpton*
                                                 E. Barrett Atwood*

                                                 *Motion to appear *pro hac vice* forthcoming

                                                 U.S. Securities and Exchange Commission
                                                 100 F Street, N.E.
                                                 Washington, D.C.  20549
                                                 (202) 551-4459 (Crumpton)

                                                 44 Montgomery Street, Suite 2800
                                                 San Francisco, CA 94104
                                                 (415) 705-2467 (Atwood)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : |
| Plaintiff, | : |
| vs. | : No. |
| TESLA, INC., | : |
| Defendant. | : |

## CONSENT OF DEFENDANT TESLA, INC.

1.    Defendant Tesla, Inc. ("Defendant" or "Company") waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant in this action only and over the subject matter of this action.

2.    Without admitting or denying the allegations of the complaint (except as provided herein in paragraph 14 and except as to personal jurisdiction as to this matter only and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

(a)    permanently restrains and enjoins Defendant from violation of Rule 13a-15 of the Securities Exchange Act of 1934 (the "Exchange Act") *[17 C.F.R. § 240.13a-15]*;

(b)    orders Defendant to pay a civil penalty in the amount of $20,000,000 under Section 21(d)(3) of the Exchange Act *[15 U.S.C. § 78u(d)(3)]*; and

(c)    requires Defendant to comply with the undertakings set forth in this Consent and incorporated in the Final Judgment.

3.    Defendant acknowledges that the civil penalty paid pursuant to the Final

Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended.  Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant agrees that it shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

       4.      Defendant agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.  Defendant further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

       5.      Within forty-five (45) days of the filing of this Consent, Defendant undertakes to

appoint an independent Chairman of the Company's Board of Directors ("Chairman") to replace Elon Musk, and agree not to reappoint Elon Musk to Chairman for a minimum of three years and unless such reappointment is approved by a majority vote of shareholders at such time.  Upon request by the Company, the Commission staff may grant in its sole discretion an extension to the deadline set forth above.

6.      Within ninety (90) days of the filing of this Consent, Defendant undertakes to:

(a)      add two independent directors to the Company's Board of Directors (one of which may be the independent Chairman if that person is appointed from outside the Company, its affiliates, and the affiliates of Elon Musk). Upon request by the Company, the Commission staff may grant in its sole discretion an extension to the deadline set forth above;

(b)      create a permanent committee ("Committee") of the Company's Board of Directors, consisting of independent directors only, overseeing the (i) implementation of the terms of this Consent and incorporated Final Judgment; (ii) controls and processes governing the Company's and its senior executives' disclosures and/or public statements that relate to the Company; and (iii) review and resolution of human resources issues or issues raising conflicts of interest that involve any member of executive management.  The charter and composition of the Committee is subject to review and approval by the staff of the Commission;

(c)      employ or designate an experienced securities lawyer ("Securities Counsel") whose qualifications are not unacceptable to the staff and maintain such counsel (or a successor Securities Counsel) for so long as the Company remains a reporting company under the Securities Exchange Act of 1934.  The Securities Counsel will review communications made through Twitter and other social media by the Company's senior officers in a manner that is consistent with the Company's disclosure policy and

procedures, including the procedures and controls referenced in subsection (d) below, as well as advise the Company on securities issues, including, but not limited to, compliance with all federal securities laws and regulations;

(d)    implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and to pre-approve any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders. The definition of, and the process to determine, which of Elon Musk's communications contain, or reasonably could contain, information material to the Company or its shareholders shall be set forth in the Company's disclosure policies and procedures; and

(e)    certify, in writing, compliance with the undertakings set forth above in paragraphs 5 and 6. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence within a reasonable amount of time. Defendant shall submit the certification and supporting material to Steven Buchholz, Assistant Regional Director, U.S. Securities and Exchange Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA 94104, with a copy to the Office of Chief Counsel of the Enforcement Division, 100 F Street NE, Washington, DC 20549, no later than fourteen (14) days from the date of the completion of the undertakings.

7.      Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

8.      Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

9.      Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

10.     Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

11.     Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

12.     Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

13.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding.  Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.  Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and

other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that it shall not be permitted to contest the factual allegations of the complaint in this action.

14. Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that it neither admits nor denies the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that Defendant does not deny the allegations; and (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

15. Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or

her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

     16.    Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

     17.    Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

Dated: _September 29_, 2018

Tesla, Inc.

By: _____

Todd A. Maron
General Counsel
Tesla, Inc.
3500 Deer Creek Road
Palo Alto, CA 94304

On _September 29_, 2018, _Todd Maron_, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent with full authority to do so on behalf of _Tesla, Inc._ as its _General Counsel_

STEPHANIE ROBIN CASTRO VARGO
Notary Public - California
Alameda County
Commission # 2169444
My Comm. Expires Oct 24, 2020

_____
Notary Public
Commission expires: _10/24/2020_

Approved as to form:

_Bradley J. Bondi_
Bradley J. Bondi
Cahill Gordon & Reindel LLP
1990 K Street, N.W.
Suite 950
Washington, D.C. 20006

Attorney for Defendant

7

# CALIFORNIA JURAT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
                                 ) ss.
COUNTY OF SAN MATEO )

Subscribed and sworn to (or affirmed) before me on this 29th day of September 2018, by **Todd Maron**, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal.

_____ (Seal)
Notary Public
State of California

STEPHANIE ROBIN CASTRO VARGO
Notary Public - California
Alameda County
Commission # 2169444
My Comm. Expires Oct 24, 2020

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION <br><br> Plaintiff, <br><br> vs. <br><br> TESLA, INC., <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> :    No. 1:18-cv-8947 <br> : <br> : <br> : <br> : <br> : |

## FINAL JUDGMENT AS TO DEFENDANT TESLA, INC.

The Securities and Exchange Commission having filed a Complaint and Defendant Tesla, Inc. ("Defendant" or "Company") having entered a general appearance; consented to the Court's jurisdiction over Defendant in this matter only and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction); waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Rule 13a-15 of the Securities Exchange Act of 1934 (the "Exchange Act") *[17 C.F.R. § 240.13a-15]*.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a civil penalty in the amount of $20,000,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act *[15 U.S.C. § 78u(d)(3)]*. Defendant shall make this payment within 14 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Tesla, Inc. as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended. The Court shall

2

retain jurisdiction over the administration of any distribution of the Fund. If the Commission staff determines that the Fund will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with the following undertaking set forth therein within forty-five (45) days of the filing of the Consent to appoint an independent Chairman of the Company's Board of Directors ("Chairman") to replace Elon Musk, and agree not to reappoint Elon Musk to Chairman for a minimum of three years and unless such reappointment is approved by a majority vote of shareholders at such time. Upon request by the Company, the Commission staff may grant in its sole discretion an extension to the deadline set forth above.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is
incorporated herein with the same force and effect as if fully set forth herein, and that Defendant
shall comply with the following undertakings set forth therein within ninety (90) days of the
filing of the Consent to:

(a)     add two independent directors to the Company's Board of Directors (one
        of which may be the independent Chairman if that person is appointed
        from outside the Company, its affiliates, and the affiliates of Elon Musk).
        Upon request by the Company, the Commission staff may grant in its sole
        discretion an extension to the deadline set forth above;

(b)     create a permanent committee ("Committee") of the Company's Board of
        Directors, consisting of independent directors only, overseeing the (i)
        implementation of the terms of this Consent and incorporated Final
        Judgment; (ii) controls and processes governing the Company's and its
        senior executives' disclosures and/or public statements that relate to the
        Company; and (iii) review and resolution of human resources issues or
        issues raising conflicts of interest that involve any member of executive
        management. The charter and composition of the Committee is subject to
        review and approval by the staff of the Commission;

(c)     employ or designate an experienced securities lawyer ("Securities
        Counsel") whose qualifications are not unacceptable to the staff and
        maintain such counsel (or a successor Securities Counsel) for so long as
        the Company remains a reporting company under the Securities Exchange
        Act of 1934. The Securities Counsel will review communications made
        through Twitter and other social media by the Company's senior officers
        in a manner that is consistent with the Company's disclosure policy and
        procedures, including the procedures and controls referenced in subsection

4

(d) below, as well as advise the Company on securities issues, including, but not limited to, compliance with all federal securities laws and regulations;

(d)    implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and to pre-approve any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders.  The definition of, and the process to determine, which of Elon Musk's communications contain, or reasonably could contain, information material to the Company or its shareholders shall be set forth in the Company's disclosure policies and procedures; and

(e)    certify, in writing, compliance with the undertakings set forth above in paragraphs III and IV.  The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Defendant agrees to provide such evidence within a reasonable amount of time.  Defendant shall submit the certification and supporting material to Steven Buchholz, Assistant Regional Director, U.S. Securities and Exchange Commission, 44 Montgomery Street, 28th Floor, San Francisco, CA 94104, with a copy to the Office of Chief Counsel of the Enforcement Division, 100 F Street NE, Washington, DC 20549, no later than fourteen (14) days from the date of the completion of the undertakings.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.


Dated: _____10/16/18_____        _____

                                              UNITED STATES DISTRICT JUDGE

6

**EXHIBIT T**

Tesla, Inc. - Stock Price - 2018
(obtained from https://www.nasdaq.com/symbol/tsla/historical)

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 1/2/2018 | 312 | 322.11 | 311 | 320.53 |
| 1/3/2018 | 321 | 325.25 | 315.55 | 317.25 |
| 1/4/2018 | 312.87 | 318.55 | 305.68 | 314.62 |
| 1/5/2018 | 316.62 | 317.24 | 312 | 316.58 |
| 1/8/2018 | 316 | 337.02 | 315.5 | 336.41 |
| 1/9/2018 | 335.16 | 338.8 | 327.4 | 333.69 |
| 1/10/2018 | 332.2 | 337 | 330 | 334.8 |
| 1/11/2018 | 335.24 | 344.81 | 333.26 | 337.95 |
| 1/12/2018 | 338.63 | 340.41 | 333.67 | 336.22 |
| 1/16/2018 | 337.54 | 345 | 334.8 | 340.06 |
| 1/17/2018 | 340.47 | 349 | 339.75 | 347.16 |
| 1/18/2018 | 345.67 | 352.3 | 343.74 | 344.57 |
| 1/19/2018 | 345 | 350.59 | 342.6 | 350.02 |
| 1/22/2018 | 349.4 | 357.83 | 349.2 | 351.56 |
| 1/23/2018 | 360 | 360.5 | 351 | 352.79 |
| 1/24/2018 | 354.58 | 354.75 | 343.52 | 345.89 |
| 1/25/2018 | 348.27 | 349.2 | 336.4 | 337.64 |
| 1/26/2018 | 341.5 | 344 | 335.71 | 342.85 |
| 1/29/2018 | 339.85 | 350.85 | 338.28 | 349.53 |
| 1/30/2018 | 345.14 | 348.27 | 342.17 | 345.82 |
| 1/31/2018 | 347.51 | 356.19 | 345.19 | 354.31 |
| 2/1/2018 | 351 | 359.66 | 348.63 | 349.25 |
| 2/2/2018 | 348.44 | 351.95 | 340.51 | 343.75 |
| 2/5/2018 | 337.97 | 344.47 | 333 | 333.13 |
| 2/6/2018 | 325.21 | 336.22 | 323.5 | 333.97 |
| 2/7/2018 | 338.99 | 346 | 335.66 | 345 |
| 2/8/2018 | 343.31 | 348.62 | 314.6 | 315.23 |
| 2/9/2018 | 319.93 | 320.98 | 294.76 | 310.42 |
| 2/12/2018 | 316.13 | 318.08 | 306.25 | 315.73 |
| 2/13/2018 | 315.02 | 324.19 | 312.51 | 323.66 |
| 2/14/2018 | 320.84 | 326.17 | 318.52 | 322.31 |
| 2/15/2018 | 324.5 | 334.12 | 322.4 | 334.07 |
| 2/16/2018 | 332.5 | 343.12 | 331.64 | 335.49 |
| 2/20/2018 | 334.47 | 340.84 | 331.5 | 334.77 |
| 2/21/2018 | 336.03 | 339.69 | 333.17 | 333.3 |
| 2/22/2018 | 335.53 | 347.44 | 334.75 | 346.17 |
| 2/23/2018 | 347.83 | 354.99 | 347.1 | 352.05 |
| 2/26/2018 | 353.5 | 359 | 352.36 | 357.42 |
| 2/27/2018 | 356.25 | 359.99 | 350.01 | 350.99 |
| 2/28/2018 | 352.57 | 355.24 | 342.22 | 343.06 |
| 3/1/2018 | 345.01 | 348.67 | 330.07 | 330.93 |
| 3/2/2018 | 326.98 | 335.22 | 322.97 | 335.12 |
| 3/5/2018 | 332.39 | 337.75 | 329.29 | 333.35 |
| 3/6/2018 | 333.75 | 336.37 | 327.03 | 328.2 |
| 3/7/2018 | 325.44 | 332.5 | 321.74 | 332.3 |

Tesla, Inc. - Stock Price - 2018
(obtained from https://www.nasdaq.com/symbol/tsla/historical)

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 3/8/2018 | 332.86 | 333.3 | 326.27 | 329.1 |
| 3/9/2018 | 324.1 | 328.49 | 322.37 | 327.17 |
| 3/12/2018 | 328.61 | 347.21 | 326.5 | 345.51 |
| 3/13/2018 | 328.61 | 347.21 | 326.5 | 341.84 |
| 3/14/2018 | 336.76 | 339.81 | 323.93 | 326.63 |
| 3/15/2018 | 329.38 | 332.85 | 321.1 | 325.6 |
| 3/16/2018 | 322.93 | 327.4 | 319.07 | 321.35 |
| 3/19/2018 | 316.5 | 320.75 | 309.67 | 313.56 |
| 3/20/2018 | 314.87 | 316.25 | 308.76 | 310.55 |
| 3/21/2018 | 310.25 | 322.44 | 310.19 | 316.53 |
| 3/22/2018 | 313.89 | 318.82 | 308.18 | 309.1 |
| 3/23/2018 | 311.25 | 311.25 | 300.45 | 301.54 |
| 3/26/2018 | 307.34 | 307.59 | 291.36 | 304.18 |
| 3/27/2018 | 304 | 304.27 | 277.18 | 279.18 |
| 3/28/2018 | 264.58 | 268.68 | 252.1 | 257.78 |
| 3/29/2018 | 256.49 | 270.96 | 248.21 | 266.13 |
| 4/2/2018 | 256.26 | 260.33 | 244.59 | 252.48 |
| 4/3/2018 | 269.82 | 273.35 | 254.49 | 267.53 |
| 4/4/2018 | 252.78 | 288.37 | 252 | 286.94 |
| 4/5/2018 | 289.34 | 306.26 | 288.2 | 305.72 |
| 4/6/2018 | 301 | 309.28 | 295.5 | 299.3 |
| 4/9/2018 | 300.37 | 309.5 | 289.21 | 289.66 |
| 4/10/2018 | 298.97 | 307.1 | 293.68 | 304.7 |
| 4/11/2018 | 300.74 | 308.98 | 299.66 | 300.93 |
| 4/12/2018 | 302.32 | 303.95 | 293.68 | 294.08 |
| 4/13/2018 | 303.6 | 303.95 | 295.98 | 300.34 |
| 4/16/2018 | 299 | 299.66 | 289.01 | 291.21 |
| 4/17/2018 | 288.87 | 292.17 | 282.51 | 287.69 |
| 4/18/2018 | 291.08 | 300.24 | 288.16 | 293.35 |
| 4/19/2018 | 291.08 | 301.01 | 288.55 | 300.08 |
| 4/20/2018 | 295.17 | 299.98 | 289.75 | 290.24 |
| 4/23/2018 | 291.29 | 291.62 | 282.33 | 283.37 |
| 4/24/2018 | 285 | 287.09 | 278.46 | 283.46 |
| 4/25/2018 | 283.5 | 285.16 | 277.25 | 280.69 |
| 4/26/2018 | 278.75 | 285.79 | 276.5 | 285.48 |
| 4/27/2018 | 285.37 | 294.47 | 283.83 | 294.08 |
| 4/30/2018 | 293.61 | 298.73 | 292.5 | 293.9 |
| 5/1/2018 | 293.51 | 300.82 | 293.22 | 299.92 |
| 5/2/2018 | 298.57 | 306.85 | 297.78 | 301.15 |
| 5/3/2018 | 278.79 | 288.04 | 275.23 | 284.45 |
| 5/4/2018 | 283 | 296.86 | 279.52 | 294.09 |
| 5/7/2018 | 297.5 | 305.96 | 295.17 | 302.77 |
| 5/8/2018 | 300.8 | 307.75 | 299 | 301.97 |
| 5/9/2018 | 300.41 | 307.01 | 300.05 | 306.85 |
| 5/10/2018 | 307.5 | 312.99 | 304.11 | 305.02 |

Tesla, Inc. - Stock Price - 2018
(obtained from https://www.nasdaq.com/symbol/tsla/historical)

| Date | Open | High | Low | Close |
|------|------|------|-----|-------|
| 5/11/2018 | 307.7 | 308.88 | 299.08 | 301.06 |
| 5/14/2018 | 303.32 | 304.94 | 291.62 | 291.97 |
| 5/15/2018 | 285.01 | 286.96 | 280.5 | 284.18 |
| 5/16/2018 | 283.83 | 288.81 | 281.56 | 286.48 |
| 5/17/2018 | 285.9 | 289.19 | 283.97 | 284.54 |
| 5/18/2018 | 284.65 | 284.65 | 274 | 276.82 |
| 5/21/2018 | 281.33 | 291.49 | 281.3 | 284.49 |
| 5/22/2018 | 287.76 | 288 | 273.42 | 275.01 |
| 5/23/2018 | 277.76 | 279.91 | 274 | 279.07 |
| 5/24/2018 | 278.4 | 281.11 | 274.89 | 277.85 |
| 5/25/2018 | 277.63 | 279.64 | 275.61 | 278.85 |
| 5/29/2018 | 278.51 | 286.5 | 276.15 | 283.76 |
| 5/30/2018 | 283.29 | 295.01 | 281.6 | 291.72 |
| 5/31/2018 | 287.21 | 290.37 | 282.93 | 284.73 |
| 6/1/2018 | 285.86 | 291.95 | 283.84 | 291.82 |
| 6/4/2018 | 294.34 | 299 | 293.55 | 296.74 |
| 6/5/2018 | 297.7 | 297.8 | 286.74 | 291.13 |
| 6/6/2018 | 300.5 | 322.17 | 297.48 | 319.5 |
| 6/7/2018 | 316.15 | 330 | 313.58 | 316.09 |
| 6/8/2018 | 319 | 324.48 | 317.15 | 317.66 |
| 6/11/2018 | 322.51 | 334.66 | 322.5 | 332.1 |
| 6/12/2018 | 344.7 | 354.97 | 338 | 342.77 |
| 6/13/2018 | 346.71 | 347.2 | 339.8 | 344.78 |
| 6/14/2018 | 347.63 | 358.75 | 346.6 | 357.72 |
| 6/15/2018 | 353.84 | 364.67 | 351.25 | 358.17 |
| 6/18/2018 | 355.4 | 373.73 | 354.5 | 370.83 |
| 6/19/2018 | 365.16 | 370 | 346.25 | 352.55 |
| 6/20/2018 | 358.04 | 364.38 | 352 | 362.22 |
| 6/21/2018 | 362 | 366.21 | 346.27 | 347.51 |
| 6/22/2018 | 351.54 | 352.25 | 332 | 333.63 |
| 6/25/2018 | 330.12 | 338.47 | 327.5 | 333.01 |
| 6/26/2018 | 336.05 | 343.55 | 325.8 | 342 |
| 6/27/2018 | 345 | 350.79 | 339.5 | 344.5 |
| 6/28/2018 | 348.66 | 357.02 | 346.11 | 349.93 |
| 6/29/2018 | 353.33 | 353.86 | 342.41 | 342.95 |
| 7/2/2018 | 360.07 | 364.78 | 329.85 | 335.07 |
| 7/3/2018 | 331.75 | 332.49 | 309.69 | 310.86 |
| 7/5/2018 | 313.76 | 314.39 | 296.22 | 309.16 |
| 7/6/2018 | 304.95 | 312.07 | 302 | 308.9 |
| 7/9/2018 | 311.99 | 318.52 | 308 | 318.51 |
| 7/10/2018 | 324.56 | 327.68 | 319.2 | 322.47 |
| 7/11/2018 | 315.8 | 321.94 | 315.07 | 318.96 |
| 7/12/2018 | 321.43 | 323.23 | 312.77 | 316.71 |
| 7/13/2018 | 315.58 | 319.58 | 309.25 | 318.87 |
| 7/16/2018 | 311.71 | 315.16 | 306.25 | 310.1 |

Tesla, Inc. - Stock Price - 2018
(obtained from https://www.nasdaq.com/symbol/tsla/historical)

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 7/17/2018 | 308.81 | 324.74 | 308.5 | 322.69 |
| 7/18/2018 | 325 | 325.5 | 316.25 | 323.85 |
| 7/19/2018 | 316.33 | 323.54 | 314.01 | 320.23 |
| 7/20/2018 | 321.23 | 323.24 | 311.71 | 313.58 |
| 7/23/2018 | 301.84 | 305.5 | 292.86 | 303.2 |
| 7/24/2018 | 304.42 | 307.72 | 292.55 | 297.43 |
| 7/25/2018 | 296.74 | 309.62 | 294.5 | 308.74 |
| 7/26/2018 | 304.85 | 310.7 | 303.64 | 306.65 |
| 7/27/2018 | 307.25 | 307.69 | 295.34 | 297.18 |
| 7/30/2018 | 295.9 | 296.1 | 286.13 | 290.17 |
| 7/31/2018 | 292.25 | 298.32 | 289.07 | 298.14 |
| 8/1/2018 | 297.99 | 303 | 293 | 300.84 |
| 8/2/2018 | 328.44 | 349.99 | 323.16 | 349.54 |
| 8/3/2018 | 347.81 | 355 | 342.53 | 348.17 |
| 8/6/2018 | 345.46 | 354.98 | 341.82 | 341.99 |
| 8/7/2018 | 343.84 | 387.46 | 339.15 | 379.57 |
| 8/8/2018 | 369.09 | 382.64 | 367.12 | 370.34 |
| 8/9/2018 | 365.55 | 367.01 | 345.73 | 352.45 |
| 8/10/2018 | 354 | 360 | 346 | 355.49 |
| 8/13/2018 | 361.13 | 363.19 | 349.02 | 356.41 |
| 8/14/2018 | 358.45 | 359.2 | 347.1 | 347.64 |
| 8/15/2018 | 341.91 | 344.49 | 332.14 | 338.69 |
| 8/16/2018 | 339.91 | 342.28 | 333.82 | 335.45 |
| 8/17/2018 | 323.5 | 326.77 | 303.53 | 305.5 |
| 8/20/2018 | 291.7 | 308.5 | 288.2 | 308.44 |
| 8/21/2018 | 310.61 | 324.79 | 309 | 321.9 |
| 8/22/2018 | 320.87 | 323.88 | 314.67 | 321.64 |
| 8/23/2018 | 319.14 | 327.32 | 318.1 | 320.1 |
| 8/24/2018 | 320.7 | 323.85 | 319.4 | 322.82 |
| 8/27/2018 | 318 | 322.44 | 308.81 | 319.27 |
| 8/28/2018 | 318.41 | 318.88 | 311.19 | 311.86 |
| 8/29/2018 | 310.27 | 311.85 | 303.69 | 305.01 |
| 8/30/2018 | 302.26 | 304.6 | 297.72 | 303.15 |
| 8/31/2018 | 302 | 305.31 | 298.6 | 301.66 |
| 9/4/2018 | 296.94 | 298.19 | 288 | 288.95 |
| 9/5/2018 | 285.05 | 286.78 | 277.18 | 280.74 |
| 9/6/2018 | 284.8 | 291.17 | 278.88 | 280.95 |
| 9/7/2018 | 260.1 | 268.35 | 252.25 | 263.24 |
| 9/10/2018 | 273.26 | 286.03 | 271 | 285.5 |
| 9/11/2018 | 279.47 | 282 | 273.55 | 279.44 |
| 9/12/2018 | 281.44 | 292.5 | 278.65 | 290.54 |
| 9/13/2018 | 288.02 | 295 | 285.18 | 289.46 |
| 9/14/2018 | 288.76 | 297.33 | 286.52 | 295.2 |
| 9/17/2018 | 290.04 | 300.87 | 288.13 | 294.84 |
| 9/18/2018 | 296.69 | 302.64 | 275.5 | 284.96 |

Tesla, Inc. - Stock Price - 2018
(obtained from https://www.nasdaq.com/symbol/tsla/historical)

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 9/19/2018 | 280.51 | 300 | 280.5 | 299.02 |
| 9/20/2018 | 303.56 | 305.98 | 293.33 | 298.33 |
| 9/21/2018 | 297.7 | 300.58 | 295.37 | 299.1 |
| 9/24/2018 | 298.48 | 303 | 293.58 | 299.68 |
| 9/25/2018 | 300 | 304.6 | 296.5 | 300.99 |
| 9/26/2018 | 301.91 | 313.89 | 301.11 | 309.58 |
| 9/27/2018 | 312.9 | 314.96 | 306.91 | 307.52 |
| 9/28/2018 | 270.26 | 278 | 260.56 | 264.77 |
| 10/1/2018 | 305.77 | 311.44 | 301.05 | 310.7 |
| 10/2/2018 | 313.95 | 316.84 | 299.15 | 301.02 |
| 10/3/2018 | 303.33 | 304.6 | 291.57 | 294.8 |
| 10/4/2018 | 293.95 | 294 | 277.67 | 281.83 |
| 10/5/2018 | 274.65 | 274.88 | 260 | 261.95 |
| 10/8/2018 | 264.52 | 267.76 | 249 | 250.56 |
| 10/9/2018 | 255.25 | 266.77 | 253.3 | 262.8 |
| 10/10/2018 | 264.61 | 265.51 | 247.77 | 256.88 |
| 10/11/2018 | 257.53 | 262.25 | 249.03 | 252.23 |
| 10/12/2018 | 261 | 261.99 | 252.01 | 258.78 |
| 10/15/2018 | 259.06 | 263.28 | 254.54 | 259.59 |
| 10/16/2018 | 265.7 | 277.38 | 262.24 | 276.59 |
| 10/17/2018 | 282.4 | 282.7 | 265.8 | 271.78 |
| 10/18/2018 | 269.29 | 271 | 263 | 263.91 |
| 10/19/2018 | 267.39 | 269.66 | 253.5 | 260 |
| 10/22/2018 | 260.68 | 261.86 | 252.59 | 260.95 |
| 10/23/2018 | 263.87 | 297.93 | 262.1 | 294.14 |
| 10/24/2018 | 301.05 | 304.44 | 285.73 | 288.5 |
| 10/25/2018 | 317.22 | 321 | 301.01 | 314.86 |
| 10/26/2018 | 308.25 | 339.9 | 306.65 | 330.9 |
| 10/29/2018 | 337.47 | 347.16 | 326.5 | 334.85 |
| 10/30/2018 | 328.39 | 337.9 | 322.26 | 329.9 |
| 10/31/2018 | 332.54 | 342 | 329.1 | 337.32 |
| 11/1/2018 | 338.26 | 347.84 | 334.73 | 344.28 |
| 11/2/2018 | 343.74 | 349.2 | 340.91 | 346.41 |
| 11/5/2018 | 340.5 | 343.96 | 330.14 | 341.4 |
| 11/6/2018 | 339.07 | 348.8 | 336.09 | 341.06 |
| 11/7/2018 | 343.34 | 351.18 | 340.8 | 348.16 |
| 11/8/2018 | 348.5 | 357.58 | 348.44 | 351.4 |
| 11/9/2018 | 349 | 354 | 345.23 | 350.51 |
| 11/12/2018 | 348.37 | 349.78 | 330.34 | 331.28 |
| 11/13/2018 | 333.16 | 344.7 | 332.2 | 338.73 |
| 11/14/2018 | 342.7 | 347.11 | 337.15 | 344 |
| 11/15/2018 | 342.33 | 348.58 | 339.04 | 348.44 |
| 11/16/2018 | 345.19 | 355.7 | 345.12 | 354.31 |
| 11/19/2018 | 356.34 | 366.75 | 352.88 | 353.47 |
| 11/20/2018 | 341.75 | 349.8 | 333.55 | 347.49 |

Tesla, Inc. - Stock Price - 2018
(obtained from https://www.nasdaq.com/symbol/tsla/historical)

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| 11/21/2018 | 352 | 353.1 | 337.4 | 338.19 |
| 11/23/2018 | 334.35 | 337.5 | 325.55 | 325.83 |
| 11/26/2018 | 325 | 346.22 | 325 | 346 |
| 11/27/2018 | 340.05 | 346.96 | 335.5 | 343.92 |
| 11/28/2018 | 345.99 | 348.28 | 342.21 | 347.87 |
| 11/29/2018 | 347 | 347.5 | 339.55 | 341.17 |
| 11/30/2018 | 341.83 | 351.6 | 338.26 | 350.48 |
| 12/3/2018 | 360 | 366 | 352 | 358.49 |
| 12/4/2018 | 356.05 | 368.68 | 352 | 359.7 |
| 12/6/2018 | 356.01 | 367.38 | 350.76 | 363.06 |
| 12/7/2018 | 369 | 379.49 | 357.65 | 357.97 |
| 12/10/2018 | 360 | 365.98 | 353.12 | 365.15 |
| 12/11/2018 | 369.91 | 372.17 | 360.23 | 366.76 |
| 12/12/2018 | 369.42 | 371.91 | 365.16 | 366.6 |
| 12/13/2018 | 370.15 | 377.44 | 366.75 | 376.79 |
| 12/14/2018 | 375 | 377.87 | 364.33 | 365.71 |
| 12/17/2018 | 362 | 365.7 | 343.88 | 348.42 |
| 12/18/2018 | 350.54 | 351.55 | 333.69 | 337.03 |
| 12/19/2018 | 337.6 | 347.01 | 329.74 | 332.97 |
| 12/20/2018 | 327.05 | 330.29 | 311.87 | 315.38 |
| 12/21/2018 | 317.4 | 323.47 | 312.44 | 319.77 |
| 12/24/2018 | 313.5 | 314.5 | 295.2 | 295.39 |
| 12/26/2018 | 300 | 326.97 | 294.09 | 326.09 |
| 12/27/2018 | 319.84 | 322.17 | 301.5 | 316.13 |
| 12/28/2018 | 323.1 | 336.24 | 318.41 | 333.87 |
| 12/31/2018 | 337.79 | 339.21 | 325.26 | 332.8 |

# EXHIBIT U

**15 Fordham J. Corp. & Fin. L. 21**

**Fordham Journal of Corporate and Financial Law**
2009

**Article**
Lydie N.C. Pierre-Louis[d1]

Copyright (c) 2009 Fordham Journal of Corporate & Financial Law; Lydie N.C. Pierre-Louis

# HEDGE FUND FRAUD AND THE PUBLIC GOOD

| | |
|---|---|
| Abstract | 23 |
| Introduction | 24 |
| I. Origins of the American Public Good Concept | 31 |
| A. Application of Public Good to Early American Corporations | 31 |
| B. Anti-Fraud Provisions of Blue Sky Laws | 33 |
| C. Disclosure Under the Federal Securities Laws to Protect Investors | 37 |
| II. Understanding Hedge Funds | 41 |
| A. Brief History of Hedge Funds | 43 |
| B. Hedge Funds Distinguished from Mutual Funds | 45 |
| C. Federal Exemptions Allow Hedge Funds to Avoid Regulation | 46 |
| III. Federal Regulators' Concern Regarding | 55 |
| Certain Hedge Fund Activity | 55 |
| A. Hedge Fund Growth and Public Investors | 56 |
| B. SEC Attempt to Regulate Hedge Funds | 59 |
| C. Legal Challenge to Proposed Hedge Fund Rule | 61 |
| IV. Certain Hedge Fund Activity Negatively | 65 |
| Affects the Public Good | 65 |
| C. Questionable Investment Strategies Impact Markets | 67 |
| 1. Short Selling | 70 |
| 2. Massive Derivatives Losses and Liquidity Problems | 73 |
| 3. Systemic Risk | 76 |
| 4. Contagion | 78 |

5. Excessively or Highly-Leveraged Transactions                                79

V. Hedge Funds Create a Zone of Manipulative Schemes                           82

A. Hedge Funds Engaging in Late Trading and Market Timing                      82

B. Hedge Funds Distributing Negative Research Reports to The Public            85

C. Hedge Funds Purchasing Credit Default Swaps                                 88

VI. Recommendation                                                            90

VII. Conclusion                                                               94

**\*23** Today we shall have come through a period of loose thinking, descending morals, an era of selfishness, of individual men and women and of whole nations. Blame not government alone for this. Blame ourselves in equal share. . ..

-- President Franklin Delano Roosevelt[1]

# Abstract

The current financial crisis resonates with every American, regardless of their connection to the securities markets. Many struggle to understand how and why the American financial and securities markets collapsed last year. In essence, why did the regulators fail to prevent the collapse? Government officials continue to analyze the relationship between the structural collapse of the markets and regulators' limited jurisdiction over a class of entities whose transactions substantially impact the markets: hedge funds. Congress can no longer deny hedge funds' detrimental impact on the financial and securities markets. The impetus for financial re-regulation has arrived. It is incumbent upon Congress to enact laws which extend the jurisdiction of federal regulators to hedge funds. At a minimum, such supervision is necessary to protect the investing public.

The elusiveness of hedge funds and their investment strategies is of particular concern. Federal regulation may take the form of a registration requirement. Perhaps publicly-traded companies should disclose their transactions with hedge funds. More comprehensive regulatory reform options include the creation of a hybrid regulatory hedge fund governance matrix based upon the dollar volume, frequency of trades and potential losses that hedge funds may experience. It is incumbent upon Congress to create the proper balance between protecting the investing public and maintaining sustainable American financial and securities markets, which in turn stabilizes the global economy.

Hedge funds are not known for readily revealing their investment strategies, positions, **\*67** profits or losses.[233] The proprietary trading strategies that they utilize, each with its own risk level and potential return signature, are not revealed to the investors, competitors or regulators.[234] The secrecy of hedge funds' operations prompted Federal Reserve Board Chairman Ben Bernanke to describe hedge funds as opaque--in that hedge funds do not have to disclose their trading strategies to anyone and rely heavily on secrecy, speed, and leverage to be profitable.[235]

## C. Questionable Investment Strategies Impact Markets

Federal regulators are concerned about the investment funds that invest in hedge funds-- typically called funds of funds.[236] Funds of funds usually invest in from fifteen to twenty-five hedge funds at a time.[237] Funds of funds are defined by their registration status.[238]**\*68** Commonly three types of fund of funds exist:(1) dual-registered funds, which are registered as the Securities Act; (2) '40 Act registered, which are registered under the Investment Company Act and make private placement offerings,[239] and (3) institutional funds, which are only offered to institutional investors.[240] Federal regulators have a growing concern about funds of funds availability to small investors via mutual funds.[241] Funds of funds usually charge a performance fee. As such, all funds of funds investors must be qualified investors under the Securities Act, Rule 205-3.[242]

The SEC has expressed concern regarding the lack of disclosure that funds of funds provide potential investors, and the limited disclosure provided to existing investors.[243] The SEC is particularly concerned about the double and sometimes triple layer of fees that investors are required to pay.[244] Typically, registered funds of funds pay a series of layered fees: (1) a management fee to the investment adviser of 1-2 percent of total assets under management, (2) a performance fee up to 20% of capital appreciation, and (3) the underlying hedge fund also pays similar investment fees.[245] Funds of funds do not disclose to their investors the actual or even the estimated fees incurred.[246] In addition to not disclosing their layered fees, funds of funds do not disclose their investment positions.[247] Registered funds of funds must disclose their financial statements and positions to investors in semi- **\*69** annual reports.[248] However, funds of funds only disclose the underlying hedge funds in which they have invested, they do not reveal the actual portfolio holdings in which the underlying hedge funds have invested.[249] Additionally, registered funds of funds must disclose their overall investment strategy and valuation information of a fund of funds' positions in an underlying hedge fund's portfolio holdings.[250]

Despite the amazing growth in the hedge fund industry, investors have begun to witness a certain level of the hedge fund implosion that may be similar to Long-Term Capital Management's failure, which required a bailout by the Federal Reserve Bank of New York and several major New York banks.[251] This is evidenced by the failure of Amaranth Advisors,[252] Bailey Coates Cromwell Fund,[253] and Sowood Capital Management, a hedge fund started by former Harvard University money managers that lost $350 million in July 2007, and was forced to sell its portfolio and return $1.5 billion to investors.[254]

Hedge funds engage in primarily three types of investment strategies: (1) directional investing,[255] (2) corporate event-driven investing,[256] and (3) arbitrage.[257] Basically, directional investing seeks to profit from price gains or declines in specific markets by simply purchasing a security when investors believe that it is going up, and selling a security when investors believe that the security is going down.[258] These are not complicated strategies but they are profitable. *70 Corporate event-driven investing seeks to profit from events like mergers or bankruptcies. Arbitrage seeks to profit from inefficient price discrepancies in the various markets such as the Asian markets in comparison to the European market or the American market.[259] In addition, to these three main investing strategies, thirty percent of hedge funds employ an equity long-short strategy, which is a mechanism by which standard stocks are hedged against the volatility of the equity position losing value by short-selling.[260] The strategy is basically to sell short the same security by betting that the value of the same asset class will decrease over a relatively short period of time.

## 1. Short Selling

Short-selling or shorting has a contentious global history. Napoleon Bonaparte declared short-selling tantamount to treason because it interfered with his ability to finance his military efforts.[261] During World War I, the New York Stock Exchange ("NYSE")[262]*71 implemented short-selling regulations for the first time in American history because of the fear that the German Kaiser[263] would short the American markets triggering a financial disruption of the American securities and financial markets.[264] Short selling has had a catastrophic impact on the securities and financial markets, and has led historically to economic turmoil, such as the Great Depression[265] and the current financial recession. In 1917, the NYSE was authorized to regulate short-selling.[266]

Currently, short-selling is still perceived as a behavioral economics matter that may need government regulation in order to be controlled. Certain countries have gone even further and implemented corporal punishment to deter short-selling. For example, in 1995, the Malaysian Finance Ministry proposed that short-selling be punished by caning.[267]*72 As late as 2001, approximately ten countries prohibited short-selling.[268] In fall 2008, due to the financial collapse in the markets, the SEC issued a temporary ban on short sales of 799 financial stocks to stop traders who sought to profit from the financial crisis by betting against bank shares. The temporary emergency action was designed to protect the integrity and quality of the securities market and strengthen investor confidence.[269]

The question then becomes why is short-selling viewed as such a despised trading tactic? The answer, in part, is human nature--that is, it is natural to dislike people that benefit at the misfortune of others, which is precisely what short-sellers do--they make money when assets decline in value or when companies do not perform well.[270] There is something almost un-American with regard to short-selling. It seems almost un-American to bet on the decrease of an

asset or company's value. Shorting is a phenomenon that has taken the securities industry by storm. Hedge funds have made fortunes by utilizing this mechanism.[271] Certain commentators have observed that hedge funds that use the short-selling trading technique frequently manipulate the market to obtain their desired decrease in a targeted company's stock price by publishing false negative research reports and simultaneously encouraging reputable business reporters to publish investigative reports exposing a targeted company's impending financial ruin.[272] What is often not revealed is that investigative business news articles written by the reputable business reporters are to a large extent, based on data supplied to the reporters by hedge funds, primarily the negative research report.[273]

There is evidence to support an issue that has been raised fairly often regarding hedge funds' attempts to manipulate the market. Some **\*73** commentators argue that hedge funds, in particular, those that primarily engage in short selling, frequently engage in market manipulation.[274] Nonetheless some commentators argue that short-selling is beneficial to the market because it eliminates market over-pricing.[275] They further argue that federal regulation should not be amended to subject hedge funds to the same rules against shorting to which mutual funds must comply.[276] Traditionally, mutual funds are prohibited from utilizing derivatives to avoid margin requirements established by the Federal Reserve Board's Regulation T, which requires a margin of 50% on short sales and long positions in a stock.[277] Hedge funds do not have such short selling constraints imposed upon their trading activity. As such, they are able use short-selling combinations to make very sophisticated long/short trade combinations based upon a hedge funds' prediction of price movements in the markets.[278]

2. Massive Derivatives Losses and Liquidity Problems

In addition to the risks associated with derivatives trading, the hedge fund industry has additional risks that are particular only to hedge funds which include: (1) systemic risk, (2) contagion, (3) fund failure, and (4) extreme leverage. Many commentators trading believe that derivatives are extremely risky investments,[279] especially given the **\*74** highly publicized massive derivative losses arising from situations such as Orange County, California's bankruptcy[280] and Long-Term Capital Management's federal bailout.[281] Warren Buffet once referred to derivatives as "financial weapons of mass destruction."[282] Ironically, properly employed derivatives do not present any greater risk than any other financial instruments.[283] It really depends on the controls that management implements to control the risk inherently associated with derivatives. However, management of derivatives is more complex, and mis-management has resulted in significant financial losses, which has **\*75** further resulted in the need for greater federal regulatory control. There are primarily four types of risks associated with derivatives: (1) market risk; (2) credit risk; (3) operational risk and (4) legal risk.[284]

Some commentators believe that hedge funds benefit the economy by: (1) mitigating price downturns, (2) bearing risks that counter-parties do not wish to bear, (3) making securities more liquid, (4) scouring out/manipulating inefficiencies in the market. These "benefits" are possible

## V. Hedge Funds Create a Zone of Manipulative Schemes

> All the capital employed in paper speculation is barren and useless . . . . It nourishes
> in our citizens habits of vice and idleness instead of industry and morality . . . .

-- Thomas Jefferson[315]

## A. Hedge Funds Engaging in Late Trading and Market Timing

In 2003, based primarily upon the information Noreen Harrington provided, the New York
Attorney General, Eliot Spitzer reached a $40 million settlement with Canary Capital Partners,
LLC and Canary Investment Management, LLC (collectively, "Canary Capital") and Mr.
Edward J. Stern, Managing Principal for violations of New York's General Business Law and
Executive Law involving arrangements to engage in market timing and late trading strategies.[316]
Subsequently, the New York Attorney General and the Massachusetts Secretary of the
Commonwealth each launched investigations into market timing and late trading of shares of
registered investment companies ("mutual funds"). The SEC and the U.S. Justice Department[317]
subsequently announced **\*83** similar investigations conducted in conjunction with the
investigations already underway in New York and Massachusetts.[318] The New York Attorney
General's Office investigated "arrangements"[319] between mutual funds and certain hedge funds
including Canary Capital that permitted the hedge funds to engage in market timing and/or late
trading. The "arrangements" are not per se illegal activities. However, "arrangements" entered
into by mutual funds with certain hedge fund investors that were allowed to market time the
purchases of mutual fund shares and redemptions of mutual fund shares for maximum profit for
the hedge funds.

These "arrangements" contradicted stated mutual fund policies and were not disclosed to all
mutual fund investors. These "arrangements" irrevocably harmed existing mutual fund investors
by siphoning profits from the other mutual fund investors. The "arrangements" were the bases of
breach of fiduciary duty claims against the mutual funds' investment advisers and board of
directors because of the funds' inconsistent application of fund policies regarding restrictions or
prohibitions against market timing and/or late trading. The mutual funds' prospectuses stated
that the funds' attempted to restrict or **\*84** discourage market timing and late trading activities
(including through the imposition of short-term trading penalties, delayed exchanges or
involuntary redemptions). However, that was far from the truth.

The complaint provided, in relevant part, that Canary Capital engaged in late trading on a daily
basis from March 2000 until the New York Attorney General's Office began its investigation in

July of 2003. During the declining market of 2001 and 2002, Canary Capital used late trading to, in effect, sell mutual fund shares short. This caused the mutual funds to overpay for their shares as the market went down, serving to magnify long-term mutual fund investors' losses. The investigation targeted dozens of mutual funds but only one hedge fund. The complaint further alleged that Canary Capital obtained some of its late trading "capacity" directly from one mutual fund manager, Bank of American N.A. Bank of America installed special computer equipment in Canary's office that allowed it to buy and sell Bank of America's mutual fund companies, the Nations Funds, and hundreds of other mutual funds at the 4:00 P.M. price until as late as 6:30 P.M. EST. In return, Canary Capital agreed to leave millions of dollars in Bank of America bond funds on a long-term basis as "sticky assets."[320] Based, in part on these allegations, Bank of America entered into a settlement agreement with the New York State Office of the Attorney General for approximately $675 million. Additionally, the settlement included corrective measures designed to set a new standard for accountability by the directors of mutual fund companies.[321]

At the center of the Bank of America story is the Nations Funds' board of directors' failure to disclose the "arrangements" that it had entered into with Canary Capital to the detriment of thousands of Nations Funds' investors. Under a specific provision of the settlement agreement, eight members of the board of directors of Nations Funds, resigned or otherwise left the board in the course of one year for their role in approving a controversial, if not per se illegal measure that enabled a hedge fund to conduct company-sanctioned market timing and late trading of Bank of America and other mutual funds by Canary Capital.[322] The Nations Funds' board directors breach of its fiduciary **85** duties by failing to protect the interest, and entering into "arrangement" that created a conflict of interest with the mutual fund investors. The directors allowed Canary Capital, a favored hedge fund client, to engage in late trading and market timing practices that personally harmed thousands of mutual fund investors. Bank of America never disclosed its "arrangement" with Canary Capital in its filings with the SEC. Failure to disclose such controversial, if not per se illegal activity which falls within the materiality requirement of the Securities Exchange Act and the rules promulgated thereunder evidences a need for further modification and clarification of the disclosure duties of publicly-traded companies.[323]

## B. Hedge Funds Distributing Negative Research Reports to the Public

Publication of questionable "research reports" is but one trading strategy that hedge funds employ. Hedge funds use a variety of investment strategies that are perceived as complex because they involve numerous combinations of trades in order to increase the probability of the hedge fund making a profitable return. Many types of investment strategies exist, including shorting, merger arbitrage,[324] distressed **86** securities,[325] convertible arbitrage,[326] and derivatives trading[327] to name a few. Perhaps of the almost exhaustive list of strategic trades that hedge funds use, the most infamous are derivatives trading. Regulators have been concerned about the derivative trading strategies that hedge funds **87** employ because of their potential impact on

the financial and securities markets and, in particularly on small investors.[328] Nonetheless, a relatively new trading strategy that hedge funds employ commonly referred to as "funds of funds"[329] has added an additional layer of concern for regulators because certain funds of funds are marketed to the general public.[330]

For short selling to work best in terms of the aggregate return that a hedge fund receives by speculating against a targeted company performing well, at times a hedge fund may engage in a manipulative measures to "create" a scenario where the marketplace perceives a targeted company as not performing well. A most effective means that hedge funds use to create a negative perception of a targeted company is the widespread publication of negative research reports about a targeted company to the general public.[331] Such hedge funds may spread false negative rumors on blogs and various investor chat rooms as well as release "research reports" about the company that they have shorted in order to create a wide-spread sell-off of the stock by investors which in turn drives the stock price down. As such, the hedge funds profit by purchasing the stock of the company from panicked investors who are desperate to sell the "sinking" stock. The hedge funds purchase the stock at abnormally low price locking in their predetermined profit.[332] The anti-fraud provision of the Securities Exchange Act Section 10b and **88 Rule10b-5[333] does not apply because the negative reports are not issued in connection with the purchase and sale of a security. The negative research reports are not published simultaneously with the purchase or sale of security, rather the hedge funds purchase securities weeks and months before the negative research reports are published, accumulating massive short positions, totaling millions of dollars.[334]

To further ensure that the marketplace perceives a targeted company in a negative light, prior to the release of the negative research reports, the hedge would have slowly accumulated over several months a sizable amount of credit default swaps. The purchase of the credit default swaps are designed to give the appearance in the marketplace that there is concern regarding the targeted company's financial ability to repay its debts and other financial obligations.

## C. Hedge Funds Purchasing Credit Default Swaps

The credit-default swaps market is $39 trillion market and has operated in the shadows. There is no public disclosure or any legal requirement governing these contracts.[335] Since there is no necessity to report these transactions to the SEC, federal regulators did not have a way to assess the amount of risk in the financial system, whether credit-default swaps have been accurately valued or honestly traded, and whether financial institutions issuing and trading credit default swaps **89 have taken on too much risk that threatens unsuspecting investors.[336]

Hedge funds purchase credit default swaps, which are insurance contracts that cover losses on the insured transaction in the event of a default. Credit default swaps were typically purchased to insure municipal bond, corporate debt and mortgage securities transactions.[337] Beginning in the

and, more importantly, on the American investing public.

The current financial collapse and economic struggle has proven that Congress cannot and should not deter from adopting legislation that can constrain the extravagance of certain hedge fund activity while simultaneously creating a regulatory balance that will not stifle innovation of new and creative financial products. The sustainability of the financial and securities markets, free of fraudulent or excessive hedge fund activity is imperative. The current absence of case law on this issue evidences that these are novel issues for the courts, Congress and the investing public. As such, it is uncertain whether a bright-line regulatory rule should be established. The challenge for Congress will be to amend, where necessary, the Securities Act, the Securities Exchange Act, the Investment Company Act, or the Adviser Act and the rules promulgated thereunder to provide define and to clarify "hedge fund activity" and "hedge funds," while simultaneously allowing such definitions to evolve with time, as new and innovative financial instruments are created in the hedge fund industry.

As for Noreen Harrington, the brave whistleblower who came forward to tell an amazing story of how hedge funds were defrauding American mutual fund investors--ninety-five million American *95 investors owe Ms. Harrington a debt of gratitude. However, as a result of her disclosure she lost her job and became subject of much media coverage. Nevertheless, because of her courage hundreds of investors impressed with her integrity and willingness to lose everything to protect the investing public have convinced Ms. Harrington that she should manage their investments. As such, Noreen Harrington created her own investment fund. She operates it with integrity and transparency. Ms. Harrington's investment fund's governance matrix utilizes a best practices model. The model confirms that money can be made without defrauding the public or compromising the integrity of the American financial and securities markets, which in turn stabilizes the global economy.

Footnotes

d1    Professor Pierre-Louis researches and writes in the areas of corporate, securities, commercial, property, communications and international law. Prior to joining the St. Thomas University faculty, Professor Pierre-Louis was an Assistant Clinical Professor at St. John's University School of Law, and the inaugural Director of the St. John's University School of Law, Securities Arbitration Clinic. Professor Pierre-Louis began her legal career as a legal assistant working on the Michael Milken securities fraud legal defense team at Rifkin, Wharton & Garrison under the supervision of Arthur Liman in New York. Professor Pierre-Louis is a former finance associate at Winthrop, Stimson, Putnam & Roberts (now known as Pillsbury Winthrop, LLP). Professor Pierre-Louis is a former Assistant Attorney General with the Office of New York State Attorney General, Eliot Spitzer, in the Bureau of Investment Protection where she enforced New York State securities law, the Martin Act, against the financial service industry. The Author is currently an LLM candidate at University of London, Queen Mary University, specializing in international business law. Professor Pierre-Louis received her B.A., Columbia University, Barnard College with a degree in economics and sociology; her M.A., New York University, Graduate School specializing in finance and international development; and her J.D. Fordham University School of Law. Comments and criticisms are welcome, please address comments to the author at St. Thomas University School of Law, 16401 NW 37th Avenue, Miami, FL, 33054 or by email at lplouis@stu.edu. This Article was presented at the Law & Society Annual Conference in Denver Colorado and at the LatCrit, Inc. XII Conference at Florida International University Law School, Miami, FL. The author would like to thank Professor Derrick A. Bell for his words of wisdom and unconditional support; Professors Leonard M. Baynes, William W. Bratton, Regina F. Burch and Lisa H. Nicholson for reviewing earlier drafts of this Article, Assistant Librarian Katie Brown for her excellent research assistance, and law students Andreas Koutsoudakis, Angela

Jones and Gigi Wolf-Blanco for their footnoting expertise. This article was written, in part, due to a writing stipend from St. Thomas University School of Law for which the author is grateful. All errors are the author's.

[1]    Franklin D. Roosevelt, Roosevelt's Nomination Address, Chicago, Ill. (July 2, 1932) (transcript available at http://newdeal.feri.org/speeches/1932b.htm) [hereinafter Roosevelt Address].

[2]    Benjamin Franklin, Poor Richard's Almanack 27 (U.S.C. Publ'g Co. 1914).

[3]    Francis v. United Jersey Bank, 432 A.2d 814, 822 (N.J. 1981) (holding that "[d]irectors are under a continuing obligation to keep informed about the activities of the corporation. Otherwise, they may not be able to participate in the overall management of corporate affairs." (citing Barnes v. Andrews, 298 F. 614 (S.D.N.Y. 1924))). Id. at 822 ("Directors may not shut their eyes to corporate misconduct and then claim that because they did not see the misconduct, they did not have a duty to look. The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect." (citing Wilkinson v. Dodd, 42 N.J. Eq. 234, 245 (N.J. Ch. 1886))).

[4]    See Brooke Masters, Spoiling for a Fight--The Rise of Eliot Spitzer 135 (Times Books 2006).

[5]    See Press Release, Office of the New York State Attorney General, Robertson Stevenson Settles Market Timing Case (Oct. 6, 2004), available at http://www.oag.state.ny.us/media_center/2004/oct/oct6b_04.html.

[6]    See Profile of Eric R. Dinallo, Henry Kaufman Visiting Professor of Finance at New York University's Leonard N. Stern School of Business, http:// w4.stern.nyu.edu/faculty/facultyindex.cgi?id=554 (last visited Nov. 2, 2009) (profiling Dinallo and highlighting his service as 39th Superintendent of the New York State Insurance Department).

[7]    Noreen Harrington, a respected 20-year Wall Street veteran, exposed the worst scandal in mutual fund history. See Rebecca Leung, Meet a Major-League Whistleblower: Woman Who Exposed Mutual Fund Scandal Talks to 60 Minutes II, CBS News, July 7, 2004, http:// www.cbsnews.com/stories/2004/02/17/60II/main600649.shtml. She was the whistleblower who revealed the misconduct in the recent mutual fund scandals. Id. Her efforts, along with the Office of New York Attorney General Eliot Spitzer, led to the end of late trading and market timing abuses, and created industry reforms that benefit and protect an estimated 95 million investors. Id.

[8]    Market timing is defined as "[t]he purchase and sale of securities based on short-term price patterns as well as on asset values." TheFreeDictionary.com, Market Timing, http://financial-dictionary.thefreedictionary.com/market+timing (last visited Oct. 7, 2009). "Some analysts use fundamental analysis to select the securities to purchase or sell; then they rely on market timing to decide when to trade those securities." Id.

[9]    Late trading is defined as the "[i]llegal practice of obtaining the next day's net asset value (NAV) of a mutual fund's shares and using this information to buy or sell those shares at the previous day's prices." InvestorWords.com, Late Trading, http://www.investorwords.com/7371/late_ trading.html (last visited Oct. 7, 2009).
As mutual funds usually compute the NAV at the close of a trading day (4:00 p.m. Eastern Time) for the next day's trades, a trader placing a buy or sell order after the closing time can still get that day's prices and can gain an unfair advantage over other traders. According to the SEC, "Late trading violates the federal securities laws ... and defrauds innocent investors." Late trading, however, is not the same as after-hours trading which is a legal practice.
Id.

[10]    The Securities and Exchange Commission (SEC) is a federal regulatory agency that has jurisdiction over the U.S. securities market. See SEC, The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilities Capital Formation, http:// www.sec.gov/about/whatwedo.shtml (last visited Oct. 7, 2009) [hereinafter Investor's Advocate]. Congress established the SEC in 1934 to enforce the newly adopted 1933 Securities Act and the 1934 Exchange Act, to promote stability in

# EXHIBIT V

**54 Hous. L. Rev. 1315**

**Houston Law Review**
Spring, 2017

Comment
Jennifer Robichaux Carter

Copyright © 2017 by The Houston Law Review; Jennifer Robichaux Carter

# HEDGE FUNDS SHOULD BE ABLE TO CHALLENGE PATENT VALIDITY USING INTER PARTES REVIEW DESPITE MIXED MOTIVES[a1]

## ABSTRACT

On February 10 and February 27, 2014, The Coalition for Affordable Drugs ("CFAD") filed petitions with the United States Patent and Trademark Office ("USPTO") challenging the validity of two patents covering Ampyra, a prescription drug that improves multiple sclerosis patients' ability to walk. Acorda Therapeutics, which owns the two patents, watched its stock drop 9.7% on February 10 and 4.8% on February 27 in reaction to news of CFAD's patent challenges. The patent challenge and ensuing stock drop comprise the initial steps of a new investment strategy developed by hedge fund manager Kyle Bass. Mr. Bass created CFAD to search for potentially invalid patents and file petitions requesting the USPTO to reassess the validity of these patents in an administrative process called inter partes review ("IPR").

CFAD states it is targeting patents that lack social value. The USPTO should have never issued the targeted patents in the first place because the patents fail to disclose anything novel and accomplish little more than keeping drug prices artificially high. However, CFAD's motives for challenging drug patents are not purely altruistic. It stands to make a profit by shorting the shares of companies holding the challenged patents and taking a long position on the shares of companies who stand to benefit from the challenged **\*1316** patent's invalidation. Opponents accuse CFAD of exploiting loopholes in the patent system and manipulating financial markets primarily for profit at the expense of biotechnological innovation. Critics urge the USPTO and Congress to amend laws or introduce new laws to prevent CFAD and other financial opportunists from challenging patents.

Case 3:18-cv-04865-EMC   Document 228   Filed 11/22/19   Page 133 of 149

HEDGE FUNDS SHOULD BE ABLE TO CHALLENGE..., 54 Hous. L. Rev. 1315

This Comment uncovers the merits of the biotechnology sector and CFAD's arguments, ultimately concluding that Congress should not create any legal barriers that would prevent hedge funds from challenging the validity of biotechnology patents. It is important for third parties who represent the interests of the public domain to have an opportunity to participate in the discussion over a patent's validity--even in instances where public interests are subordinated by personal motives. By allowing third parties who represent the public interest to challenge patents, Congress prevents biotechnology companies and their direct competitors from entrenching the patent system with patent owner's interests without any balancing consideration for public domain interests. Instead, Congress should introduce legislation that prevents parties' financial motives from abusing IPR's settlement provisions. Even third parties motivated primarily by personal gain can serve an important "ecological role" in maintaining the integrity of the U.S. patent system, ensuring invalid patents do not slip through the cracks.

## TABLE OF CONTENTS

I.        INTRODUCTION                                                          1317

II.       BREAKING DOWN CFAD'S STRATEGY                                         1321

          A. Invalid Patents                                                   1321

          B. Inter Partes Review                                               1324

          C. Short Selling                                                     1328

          D. Combining IPR and Short Selling to Create a New Investment        1330
          Strategy

III.      HOW HEDGE FUNDS FIT INTO THE CURRENT LEGAL                           1332
          FRAMEWORK & PROPOSED REFORM BY CFAD
          OPPONENTS

          A. CFAD's Strategy is Permissible Under Patent Law's Current         1332
          Legal Framework

          B. CFAD's Strategy from the SEC's Perspective                        1334

Case 3:18-cv-04865-EMC   Document 228   Filed 11/22/19   Page 134 of 149

HEDGE FUNDS SHOULD BE ABLE TO CHALLENGE..., 54 Hous. L. Rev. 1315

C. Proposed Patent System Reform                                            1334

IV.   WHY HEDGE FUNDS SHOULD BE ABLE TO CHALLENGE                          1337
      PATENTS

      A. The [Myriad] Case Study                                           1338

      B. Increasing the Number of Challenges Against Invalid Patents and   1340
      Preventing Entrenchment of Biotech Industry Interests

      C. CFAD: Biotech's First Formidable Threat to Improvidently          1342
      Granted Patents

V.    CONCLUSION                                                           1346

VI.   EPILOGUE                                                             1346

## *1317 I. INTRODUCTION

On February 10 and February 27, 2014, The Coalition for Affordable Drugs ("CFAD") filed several petitions with the United States Patent and Trademark Office ("USPTO") challenging the validity of two patents covering Ampyra, a prescription drug that improves multiple sclerosis patients' ability to walk.[1] Acorda Therapeutics, which owns the two patents, watched its stock drop 9.7% on February 10 and 4.8% on February 27 in reaction to news of the patent challenges.[2]

The patent challenge and ensuing stock drop comprise the initial steps of a new investment strategy developed by a well-known hedge fund manager Kyle Bass.[3] Mr. Bass created CFAD--which is owned by Bass's hedge fund, Hayman Capital Management--to search for potentially invalid patents and file petitions requesting the USPTO to reassess the validity of these patents in an administrative process called inter partes review ("IPR").[4]

CFAD states it is targeting patents that lack social value.[5] The USPTO should have never issued the targeted patents in the **\*1318** first place because the patents fail to disclose anything novel and accomplish little more than keeping drug prices artificially high.[6] CFAD states it is focusing on companies who are inappropriately extending their patents' period of exclusivity beyond the allotted twenty-year term by making simple, non-innovative changes to dosage or packaging.[7]

Case 3:18-cv-04865-EMC   Document 228   Filed 11/22/19   Page 135 of 149

HEDGE FUNDS SHOULD BE ABLE TO CHALLENGE..., 54 Hous. L. Rev. 1315

Since the AIA's enactment in 2012,[89] IPR has quickly become a popular litigation alternative across all technology fields.[90] Between September 16, 2012 (the date of enactment of the IPR provision of the AIA) and March 31, 2014,[91] 11.3% of IPR petitions filed challenged biotechnology and pharmaceutical patents.[92] Out of all the petitions challenging these patents, the **\*1328** PTAB instituted a review 83.2% of the time.[93] Of the instituted IPRs reviewing the validity of biotechnology and pharmaceutical patent claims, the PTAB invalidated all instituted claims in 87% of the decisions.[94]

## C. Short Selling

After reviewing aspects of CFAD's strategy related to the patent system, we now turn to its financial side: shorting a biotechnology company's stock.[95] Short selling is an investment strategy recognized and regulated by the Securities and Exchange Commission ("SEC").[96] Investors have practiced short selling since the seventeenth century.[97] In contrast to the conventional investor who purchases a security with the expectation the security price will increase,[98] investors short securities with the expectation the stock price will decrease.[99]

A traditional short sale requires three players--an owner, a borrower (the short-seller), and a purchaser--and multiple steps to achieve its intended effect.[100] In the first step of the transaction, the short seller borrows a security from the true owner.[101] In the second step, the short seller delivers the same security to a purchaser in exchange for payment.[102]

**\*1329** The act of returning the borrowed shares to the true owner--also referred to as "closing out" the position or "covering" the short sale--is the last step in the transaction.[103] The original owner does not require the short seller return the identical stock that it originally borrowed back to the owner, simply its equivalent.[104] The short seller buys these equivalent shares at the current market price from whomever is willing to sell them and returns these shares to the true owner, as a replacement for the shares it originally borrowed.[105]

The overall transaction is designed to return a profit if the stock price decreases between the time the short seller sold the borrowed shares to the buyer and the time the short seller returned the equivalent shares to the lender.[106] The short seller keeps the difference in value of (i) the original stock the short seller borrowed then sold to the market at a high price and (ii) the replacement stock the short seller bought at a cheaper price from the market and returned to the lender.[107]

Stigma surrounds short selling.[108] Because short sellers are betting against the growth of a company, the public and many members of the investment community view short selling as "UnAmerican,"[109] rooting against the home team, or bad manners.[110] Short selling is even illegal in some countries.[111] Company management dislikes onlookers who poke holes in how they run

their company.[112] Some companies suspect short sellers are saboteurs willing to spread rumors about their enterprise to cause a stock price drop.[113]

Short sellers who have practiced "shorting and distorting"--shorting a company's stock while simultaneously spreading negative rumors about the company in order to cause a stock price decrease--have rightfully increased public skepticism of short selling,[114] but the same can be said of traditional investors who **1330** "pump and dump"--taking a long position then spreading rumors that causes the stock price to increase.[115] Importantly, short selling is legally distinguishable from shorting and distorting: short selling is legal in the United States while shorting and distorting is not.[116]

Despite general suspicion and uneasiness directed toward short selling, it has many positive attributes.[117] It can be of valuable service by "provid[ing] an antidote to unrealistic expectations, reminding investors that stocks aren't on some unending march to ever greener pastures."[118] Short sellers provide liquidity to the markets, adding to the supply of stock by selling shares to buyers and buying falling shares from sellers.[119] They are often the first to point out financial fraud.[120] One 2012 study found that "[s]tock prices are more accurate when short sellers are more active."[121] Another 2007 study concluded markets in countries where short selling is legal and commonplace are more efficient than countries where short selling is illegal or rarely practiced.[122]

### D. Combining IPR and Short Selling to Create a New Investment Strategy

CFAD brought together the concepts of invalid patents, IPR, and short selling to create its novel investment strategy.[123] First, it looks for patents that it believes grant exclusivity to non-innovative products.[124] As a result, these patents offer little value other than driving up drug prices, because patent protection closes off the opportunity for generic drug manufacturers to offer the product at a lower price.[125] Second, it searches for patents or **1331** printed publications the examiner failed to consider during examination that might prove the technology is obvious or not novel, which would show the patent is invalid.[126] Third and fourth, CFAD files an IPR petition--using these new patents and printed publications to present arguments for why the patent fails novelty or obviousness requirements--and simultaneously shorts the stock of the company holding the patent.[127]

There are several points where the stock price could react to news about the patent challenge: the day the IPR petition is filed, the day the PTAB decides whether to institute review of the challenged patent, and the day the PTAB issues a final decision determining the patent's validity.[128] On the days CFAD filed challenges against two patents covering Ampyra, Acorda's stock price dropped 9.7% and 4.8% respectively.[129] Acorda's stock price rose 27.7% on the day the PTAB declined to review CFAD's petitions.[130] Theoretically, CFAD stands to make the most profit when it successfully invalidates one of the key patents of a company whose revenue is

**EXHIBIT W**

**fastFT** Tesla Inc

# Tesla shares move higher on Saudi Arabia fund stake



Jessica Dye in New York  AUGUST 7 2018

Tesla shares shifted into higher gear after the FT reported that Saudi Arabia's sovereign wealth fund has built a $2bn stake in Elon Musk's electric car company.

Shares of the company moved sharply higher, leaving them up 4.52 per cent to $357.20. They had been trading relatively flat earlier in the day.

The FT reported that Saudi Arabia's Public Investment Fund had built the undisclosed stake of between 3 and 5 per cent of Tesla's shares this year, making the position worth between $1.7bn and $2.9bn and turning PIF into one of Tesla's largest shareholders.

Copyright The Financial Times Limited 2019. All rights reserved.

# EXHIBIT X

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/saudi-arabia-goes-high-tech-in-approach-to-investing-1534325402

MARKETS

# Saudi Arabia Goes High-Tech in Approach to Investing

Talks with Tesla show how crown prince's sovereign-wealth fund has become a global player, but some worry about impulsive, risky bets



Saudi Crown Prince Mohammed bin Salman visits Lockheed Martin in San Francisco in April. **PHOTO:** HANDOUT/REUTERS

*By Rory Jones and Summer Said in Dubai and Maureen Farrell in New York*

Updated Aug. 15, 2018 3:37 p.m. ET

When Saudi Arabia's Crown Prince Mohammed bin Salman toured the U.S. two years ago, he couldn't even get an audience with Tesla Inc. Chief Executive Elon Musk, people familiar with the outreach said. Since then, his country's sovereign-wealth fund has boosted its stake in the car maker, and he is now weighing whether to be part of a deal to take the company private.

The shift shows how quickly Crown Prince Mohammed and his sovereign-wealth fund have become a pivotal global investor. The Public Investment Fund's moves have also brought an element of unpredictability to a $225 billion fund, mirroring the headlong leadership style of 32-year-old Prince Mohammed, who is trying to transform Saudi Arabia from a staid petrostate to a technology-focused economy.

But with its aggressive approach to investment, PIF is also leveraging up, sourcing direct deals and shifting into higher-risk tech startups. Some Saudis worry that it is jeopardizing the wealth of Saudi Arabia's next generation by combining politics and inexperience with impulsive bets on technologies of the future. The talks with electric-car maker Tesla have crystallized those concerns.

"There are several people in the government that would question that deal and whether it is the right call," an adviser to the Saudi government said. "Saudi Arabia wants to go big on electric vehicles but wanting something and making it a reality is something else."

Interviews with advisers and people close to the PIF said the fund sources its potential deals through political and business ties. The crown prince ultimately makes the call whether to go ahead with investments, and in many cases, has forged personal connections with the executives running the companies.

An adviser to the Saudi government said talks about investing more in Tesla included the crown prince, who also is likely to have the final say on increasing PIF's stake.

The Saudi royal toured the U.S. in 2016 in a push for tech deals that included an outreach to Tesla, which was rebuffed, people familiar with the matter said. Tesla declined to comment on the account.

In a blog post on Monday, Mr. Musk said Saudi Arabia had reached out to him two years ago and he started face-to-face talks early last year with the PIF on a major stake.

Since then, the fund built a 4.6% stake via listed shares in Tesla, one of the U.S. stock market's most-shorted stocks. PIF's Chief Executive Yasir Rumayyan currently is working on a detailed proposal to present to the crown prince about increasing PIF's stake in Tesla, the adviser to the Saudi government said.

Mr. Musk stunned markets last week when he shared his thinking over Twitter about taking Tesla private. The announcement is now subject to regulatory scrutiny.

Tesla's directors on Tuesday formed a special committee to evaluate Mr. Musk's suggestion of taking the company private.

The senior Saudi adviser and another person with knowledge of the matter said SoftBank Group Corp. Chief Executive Masayoshi Son encouraged the Saudis to buy into Chinese electric-battery maker Contemporary Amperex Technology Co., but the crown prince preferred Tesla because it is American.

A spokesman for SoftBank declined to comment on Mr. Son's advice for the crown prince. People close to SoftBank have ruled it out of any deal for Tesla, despite its major partnership with PIF.

Spokesmen for PIF declined to comment. The Saudi government and its royal court didn't respond to phone and email requests for comments on this article.

Officials at the Saudi fund are seeking Tesla's expertise to tie into broader plans to create new industries in solar-power generation, battery storage and electric-vehicle production, The Wall Street Journal has reported. The fund, which is talks with banks to raise billions of its own debt, hopes its investments in technology will act as a hedge against the decline of the energy sector.



Participants watch a movie advertising Saudi Arabia's Red Sea project on the sidelines of the three-day Future Investment Initiatives conference in Riyadh last October. PHOTO: FAYEZ NURELDINE/AGENCE FRANCE-PRESSE/GETTY IMAGES

The PIF isn't alone in investing in technology. Singapore's Temasek Holdings and GIC Private Ltd. and the China Investment Corp. also have become active in venture capital. Although unusual, other sovereigns such as Temasek also have taken on debt.

But the PIF is unique in the size and scope of the investments, said Javier Capapé, director of the Sovereign Wealth Lab at Madrid's IE Business School.

"PIF investing in tech is part of the country's wider strategy," he said. "What's not very clear to me is how investing in high-tech things will drive your economy or lead you into other sectors to compensate the oil."

The PIF is scrambling to raise money for its investments. The fund is in talks with banks to raise billions of its own debt and plans to use cash from the sale of its stake in Saudi Arabia's national chemicals company to oil giant Aramco, better known Saudi Arabian Oil Co., in a deal worth up to $70 billion.

The PIF's first major international technology investment, in Uber Technologies Inc., was hatched in 2016 after a barbecue in Riyadh attended by PIF's Mr. Rumayyan and then-Uber policy head and former White House official, David Plouffe, people familiar with the deal said. Uber's then-chief, Travis Kalanick, subsequently visited Saudi Arabia to meet Crown Prince

Mohammed and the PIF bought $3.5 billion stake within weeks, people familiar with the deal said.

The PIF soon after made an even bigger wager than Uber. It committed $45 billion into Softbank's $100 billion Vision Fund. That deal was famously agreed upon in a 45-minute conversation between Crown Prince Mohammed and Mr. Son, before the two sides then spent months agreeing on the details.

A month later in Dubai, Mr. Rumayyan stepped in with another surprising investment.

Emirati billionaire businessman Mohamed Alabbar was set to announce a major new e-commerce startup to take on Amazon Inc. Minutes before Mr. Alabbar took the stage at the Dubai Opera House, the PIF signed an agreement to back the venture, known as Noon, with $500 million, people familiar with this deal said. Although PIF had been reluctant to invest in the startup, Crown Prince Mohammed encouraged the deal because it is also backed by officials in Abu Dhabi, the capital of the United Arab Emirates and Saudi Arabia's closest ally, the people said.

In March, when Saudi Arabia also took a $400 million stake in augmented- reality startup Magic Leap Inc., people close to the deal were stunned at how quickly it came together—just six days. The speed caught the attention of Silicon Valley's financiers and entrepreneurs.

"They did the Uber deal and increased their profile as a fund," said an adviser familiar with Saudi government thinking. "When Yasir [Rumayyan] then went to California, everyone wanted to meet him."

**Write to** Rory Jones at rory.jones@wsj.com, Summer Said at summer.said@wsj.com and Maureen Farrell at maureen.farrell@wsj.com

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT Y



## S3 Analytics: No Tesla Short Squeeze, Shorts up $1.2 billion since "The Tweet"

Published on August 17, 2018



Ihor Dusaniwsky
Managing Director at S3 Partners

2 articles    + Follow

**Ihor Dusaniwsky, Managing Director of Predictive Analytics, S3 Partners**

Tesla Inc.'s (TSLA) Chairman/CEO/Co-founder Elon Musk New York Times interview has sparked a 9% decline in Tesla's stock price today. Elon Musk's tweets and interviews have had a volatile effect on both Tesla long and short shareholders.

On August 7th "The Tweet", which started the "taking Tesla private" frenzy, added $6.4 billion to Tesla's market cap and cost short sellers $1.3 billion in mark-to-market losses. Unfortunately for Elon Musk and the scores of Tesla retail and institutional long shareholders, the anticipated short squeeze resulting from Tesla's march to $420/share never materialized. Since The Tweet, Tesla's stock price has retreated over -19%, slicing over $12 billion from Tesla's market cap and generating $2.5 billion in mark-to-market profits for the short sellers who had stayed in their trades.

Tesla continues to be the largest equity short in the U.S. with $11.2 billion of short interest, 33.4 million shares shorted, or 26.20% of its float. Tesla has held the top spot in the U.S., with only a few interruptions since 2016. Worldwide, only Alibaba Group ADR (BABA) with $19.4 billion of short interest and Ping An Insurance (2318 HK) with $11.7 billion of short interest are larger.

While there has been some short covering since The Tweet, Elon Musk was only able to drive away less than 4% of his short sellers. Shorts have only covered 1.3 million shares since Tesla's original stock price spike, hardly a short squeeze and more likely an exit by shorter term momentum short sellers and fat-trimming by the lesser capitalized long-term short sellers. In actuality, many of the longer-term short sellers have backed up their bets and slightly increased their short exposure over the last week.





Tesla short sellers have had steely conviction in their thesis in the face of $5 billion of mark-to-market losses since 2016. Tesla short interest averaged $6.26 billion in 2016 and shorts were down $866 million in mark-to-market losses for the year. 2017 saw Tesla short interest increase by 50%, averaging $9.42 billion, but losses more than triple to $3.6 billion in mark-to-market losses. 2018 is yet again another losing year for Tesla short sellers but short interest continued to climb, averaging $10.8 billion in the first eight months of 2018. With today's $1 billion in mark-to-market gains, year-to-date mark-to-market losses have been trimmed to $509 million.

Tesla short sellers are now up $1.2 billion since "The Tweet" and the chances of a near-term large scale short squeeze are minimal. Unless Elon Musk can get more traction in "taking Tesla private" and its stock price reverses course and heads back up to Musk's $420/shares target, short sellers are under no impetus to cover their positions. With ample stock available to borrow and stock costs easing slightly to below 2.50% fee levels there is more than enough stock to short at a reasonable cost basis. If Tesla's stock price continues to slide we may see additional shares shorted and total shorts reach the 40 million share levels we saw in May. Tesla's short interest activity may turn into a binary event, if financing is truly secured and the privatization is likely, Tesla's stock price should near $420/share and many shorts will be squeezed out due to the another $3.8 billion of mark-to-market losses hitting their bottom line, but if the deal falls through and/or the SEC has issues with Elon Musk's tweets we'll see short sellers increasing their short positions as they recoup all or part of their $5 billion of losses they incurred since 2016.

Want deeper insight into the above analysis?

Contact: Ihor.Dusaniwsky@S3Partners.net

Managing Director Predictive Analytics, S3 Partners, LLC

# EXHIBIT Z

**Market**Watch

# Tesla short sellers are up $1.2 billion since Elon Musk's 'going-private' tweet

By Claudia Assis
Published: Aug 19, 2018 11:19 a.m. ET

Those betting on a Tesla slide have no reason to cover positions, note says



Bloomberg News/Landov

Investors betting that Tesla Inc. stock will fall appear to be having the last laugh, at least for now.

Tesla TSLA, -6.14% short sellers are up $1.2 billion in paper gains since the day Chief Executive Elon Musk tweeted he was "considering" taking the company private at $420 and funding was "secured," S3 Partners LLC, which tracks real-time short interest data, said in a note Friday.

Musk shocked markets with that tweet on Aug. 7, the first of many that day and which was followed by an email to employees explaining his reasons for wanting to take Tesla private. That day the shorts got walloped.

The tweet has sparked a U.S. Securities and Exchange Commission probe and doubts have grown around the funding to cinch a going-private deal.

Tesla shares are off 20% since the $379.57 close on Aug. 7, including a 9% loss Friday on the heels of an interview on the New York Times in which Musk describes his "excruciating year" and blamed short sellers for much of his stress.

"Unfortunately for Elon Musk and the scores of Tesla retail and institutional long shareholders, the anticipated short squeeze resulting from Tesla's march to $420/share never materialized," S3 Partners LLC, which tracks real-time short interest data, said in a note Friday.

Tesla has about $11.2 billion in short-seller interest, behind only Alibaba Group Holding Ltd. <u>BABA, +1.04%</u>

Short sellers bank on a stock falling in price. They then borrow the shares to sell them, hoping they can later pick them up at a lower price, return them to the original lender and pocket the difference.

There has been some short covering since the Aug. 7 tweet, but only about 4% of the Tesla short sellers have been driven away, S3 Partners said in the note.

**Read more:** <u>Elon Musk left plenty of questions about Tesla going private, experts say</u>

"Shorts have only covered 1.3 million shares since Tesla's original stock price spike, hardly a short squeeze and more likely an exit by shorter term momentum short sellers and fat-trimming by the lesser capitalized long-term short sellers," the note said. "In actuality, many of the longer-term short sellers have backed up their bets and slightly increased their short exposure over the last week."

Short sellers "are under no impetus to cover their positions" unless Musk can get more traction and the stock heads back toward the $420 mentioned, the note said.

"With ample stock available to borrow and stock costs easing slightly to below 2.50% fee levels, there is more than enough stock to short at a reasonable cost basis. If Tesla's stock price continues to slide we may see additional shares shorted and total shorts reach the 40 million share levels we saw in May."

In <u>the Times interview</u>, Musk said he had no regrets about saying "funding secured" in the tweet. According to the newspaper, efforts are under way to find a second-in-command who could take off some of the strain on Musk.

Tesla's $305.50 close Friday was the stock's lowest since Aug. 1. It brought weekly losses to more than 14%, the company's worst five-day period since early February 2016. The stock is now off 1.9% for the year, versus gains of 6.6% for the S&P 500 index <u>SPX, +0.22%</u>  and an advance of 3.8% for the Dow Jones Industrial Average. <u>DJIA, +0.39%</u>

**More from MarketWatch**

- <u>My wife is 61 and earns $50,000; I'm 65 and earn $400,000 — should she take Social Security next year?</u>
- <u>This chart shows how Vanguard's explosive growth has 'taken on a life of its own'</u>
- <u>Stocks higher but on track to post a loss for the week</u>