**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: 415-373-1671
Fax: 415-484-1294

*Attorneys for Lead Plaintiff Glen Littleton
and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**<br><br>Date:      March 5, 2020<br>Time:     1:30 p.m.<br>Location: Courtroom 5, 17th Floor<br>Judge:    Hon. Edward M. Chen<br><br>Date Action Filed: August 10, 2018 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

I.  INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................. 4

    A.  July 31, 2018 Meeting with Saudi Arabia Public Investment Fund. ...................... 4

    B.  August 7, 2018 Statements. ................................................................. 5

    C.  Market Reaction to Musk's Proposal. ..................................................... 6

    D.  SEC Proceedings. ............................................................................... 8

III.  LEGAL STANDARD ......................................................................................... 9

IV.  ARGUMENT ...................................................................................................... 10

    A.  MUSK AND TESLA VIOLATED SECTION 10(B) AND RULE 10B-5. .......... 10

        1.  The Complaint Adequately Pleads False Statements ................................. 10

        2.  Tesla is Liable for Musk's Statements. ................................................... 13

        3.  The Complaint Adequately Alleges Scienter .............................................. 16

        4.  Loss Causation is Adequately Alleged ..................................................... 21

    B.  TESLA'S BOARD VIOLATED SECTION 20(a) ............................................... 24

V.  CONCLUSION .................................................................................................... 25

1

2

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................................ 24

*Arthur Children's Trust v. Keim*,
  994 F.2d 1390 (9th Cir. 1993) ............................................................................. 25

*In re Atossa Genetics Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ............................................................................... 13

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ............................................... 10, 19

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................. 11

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013) ................................................................................ 15

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
  2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ..................................................... 17

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ............................................................................... 10

*Burgess v. Premier Corp.*,
  727 F.2d 826 (9th Cir. 1984) ............................................................................... 25

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ................................................................... 13, 15, 16

*Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ............................................................... 21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ......................................................................... 10, 13

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ............................................................................... 20

*Curry v. Yelp Inc.*,
  875 F.3d 1219 (9th Cir. 2017) ............................................................................. 23

*In re Daou Sys.*,
  411 F.3d 1006 (9th Cir. 2005) ............................................................................. 21

*de la Fuente v. DCI Telecomms., Inc.*,
  259 F. Supp. 2d 250 (S.D.N.Y. 2003) ................................................................. 20

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ........................................................................ 25

*In re Energy Recovery Inc. Sec. Litig.*,
  2016 WL 324150 (N.D. Cal. Jan. 27, 2016) ............................................... 15, 24

*Evanston Police Pens. Fund v. McKesson Corp.*,
  __ F. Supp. 3d __, 2019 WL 5587311 (N.D. Cal. Oct. 30, 2019 ........................... 9, 20

*Fabbri v. Wilkinson*,
  2019 WL 5781914 (C.D. Cal. Nov. 5, 2019) ................................................ 9

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012) ........................................................ 21

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ................................................................. 11

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................... 21

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ................................................................ 21

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ................................................................. 13

*Guevoura Fund v. Sillerman*,
  2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016) ............................................... 16

*Howard v. Everex Sys.*,
  228 F.3d 1057 (9th Cir. 2000) ............................................................... 24

*Institut'l Inv. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ................................................................. 17

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
  2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ............................................... 21

*Jackson v. Fischer*,
  2015 WL 1143582 (N.D. Cal. March 13, 2015) ............................................... 12

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
  564 U.S. 135 (2011) .......................................................................... 13

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .............................................................. 9, 10

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .............................................................. 18

iii

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ............................................................................ 17

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...................................................................... 22, 23

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ............................................................................ 23

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019) ...................................................................................... 15

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................. 12

*Maiman v. Talbott*,
   2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ................................................... 16

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................. 17

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
   881 F.3d 750 (9th Cir. 2018) ........................................................................ 21, 22

*In re Musical Instr. and Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ........................................................................... 20

*In re Musicmaker.com Sec. Litig.*,
    2001 WL 34062431 (C.D. Cal. June 4, 2001) .................................................. 10

*In re Mylan N.V. Sec. Litig.*,
   379 F. Supp. 3d 198 (S.D.N.Y. 2019) ................................................................ 20

*Nakkhumpun v. Taylor*,
   782 F.3d 1142 (10th Cir. 2015) ......................................................................... 18

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................................. 24

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) ...................................................................... 21, 22

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
   2016 WL 6782768 (C.D. Cal. Aug. 9, 2016) ..................................................... 16

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ....................................................................... 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ..................................................................................... 11, 13

iv

*In re Omnivision Tech., Inc. Sec. Litig.*,
  937 F. Supp. 2d 1090 (N. D. Cal. 2013) ............................................................. 12

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ............................................................................. 19

*Paracor Fin., Inc. v. GE Cap. Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ............................................................................. 25

*Patel v. Axesstel, Inc.*,
  2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ....................................................... 17

*In re Qualcomm Inc. Sec. Litig.*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .................................................... 17

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ............................................................................. 10

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
  2005 WL 1366025 (D.N.J. Jun. 8, 2005) ........................................................... 22

*S. Ferry LP #2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ....................................................................... 16, 17

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ....................................................................... 17, 18

*Schwartzman v. Morningstar, Inc.*,
  2014 WL 3843875 (E.D. Pa. Aug. 5, 2014) ....................................................... 15

*SEC v. Rogers*,
  221 F.3d 1349, 2000 WL642467 (Table) (9th Cir. 2000) ...................................... 9

*Sgarlata v. PayPal Holdings, Inc.*,
  2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) .................................................... 24

*In re Silicon Storage Tech.*,
  2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ..................................................... 18

*South Ferry LP # 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ........................................................ 17

*Special Situations Fund III v. Brar*,
  2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) .................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................... 16

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ................................................................................... 11

*Usher v. City of Los Angeles*,
    828 F.2d 556 (9th Cir. 1987) ........................................................................... 9

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
    2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) ................................................... 20

*Veal v. LendingClub Corp.*,
    2019 WL 5698072 (N.D. Cal. Nov. 4, 2019) ................................................... 21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ......................................................................... 20

*In re Yahoo! Inc. Sec. Litig.*,
    2012 WL 3282819 (N.D. Cal. Aug. 10, 2018) ................................................. 12

**Statutes**

15 U.S.C. §78j ..................................................................................................... 8

17 C.F.R. §202.5(e) ............................................................................................. 9

**Rules**

Fed. R. Civ. P. 12(d) ..................................................................................... 9, 10

I.      **INTRODUCTION**

On August 7, 2018, at 12:48 p.m. EDT, Tesla, Inc.'s Chairman and Chief Executive Officer, Elon Musk, shocked the investing world by tweeting to over 22 million people: "Am considering taking Tesla private at $420. Funding secured." The announcement was shocking even for the colorful and occasionally outrageous Musk as $420 represented a 22% premium over the current market price for Tesla's stock. Even though Musk had previously discussed a desire to take Tesla private, largely to avoid what he regarded as negative consequences from people selling Tesla stock short on public markets, there had been no prior indication that a transaction was imminent, the price would be so generous, or that funding had been secured. Throughout the afternoon, Musk repeated his announcement, confirming to one investor and Tesla employees the proposed price of $420 per share, and tweeting that "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." Musk also noted that going private "Ends negative propaganda from shorts."

Trading in Tesla's stock exploded, gaining over $35, or 10%, on its previous close on massive volume, and causing NASDAQ to halt trading in Tesla's stock from 2:08 p.m. to 3:45 p.m. Meanwhile, in response to intense interest from investors and analysts for further details about the proposed transaction and its funding, Tesla's Senior Director of Investor Relations confirmed to analysts that "Yes, there is a firm offer", "the offer is as firm as it gets" and "Elon's first tweet, which mentioned 'financing secured' is correct." Analysts thus reported that they believed Musk was "serious and genuine". JP Morgan revised its target price for Tesla stock to reflect the potential transaction, observing that the tweets are "declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured and Tesla's CEO says funding is secured." JP Morgan added that Musk's statements "suggest[] more than mere consideration – Mr. Musk expects Tesla will go private."

Ten days later Musk's statements were exposed as a tissue of lies. Musk has admitted that there was never any funding. Further, investors with whom Musk discussed the possibility of a transaction opposed it, no material terms had been proposed or agreed with Tesla's Board of Directors, investors, or potential sources of funding, and no financial or legal advisors had been

engaged. An investigation by the Securities and Exchange Commission was commenced and subpoenas served. Tesla's stock price fell back to earth, closing on August 17, 2018 at $305.50, a decline of $74.09, or 19.5%, from its close on August 7, 2018. Investors who had believed, like the financial analysts, that Musk was "serious and genuine", and purchased Tesla stock expecting a going-private transaction at $420 per share, lost billions of dollars. Other victims included investors who had sold Tesla stock short before August 7, 2018. The dramatic increase in Tesla's stock price following Musk's tweets forced many to cover their positions by buying Tesla stock at inflated prices and resulted in a paper loss exceeding a billion dollars. Musk ultimately settled with the SEC, stepped down as Tesla's Chairman, and personally paid a fine of $20 million.

These facts, pleaded with particularity in Plaintiff's Consolidated Complaint and largely conceded by Defendants, present a clear-cut instance of securities fraud. Musk and Tesla knowingly distributed false information regarding a fictitious, "certain" (but for a shareholder vote) going-private transaction at $420 per share, with funding secured. Relying on this false information, investors, including short sellers, lost billions of dollars. Defendants, however, ask the Court to dismiss these investors' claims as a matter of law. Their motion should be denied.

Defendants' primary argument is that Musk's statements on August 7, 2018 did not communicate any material facts but instead were merely "aspirational" and statements of "belief". Defendants' Memorandum of Points and Authorities at 10-12. According to Defendants, the "only reasonable interpretation" of Musk's August 7, 2018 tweet "is that funding would be no obstacle if he decided to proceed with a transaction." *Id*. at 10. Putting aside that even under this interpretation Musk's tweet was false when made, this interpretation is contrary to the interpretation of Tesla's own Senior Director of Investor Relations as well as sophisticated financial analysts. JP Morgan concluded, "Either funding is secured or it is not secured and Tesla's CEO says funding is secured." This is the most reasonable interpretation of Musk's tweets, and the one the market made. Of course, funding was not secured and Musk's tweet was false when it was made.

Equally false were Musk's representations that investor support is "confirmed" and the only remaining contingency is a shareholder vote. Musk knew on August 7, 2018 that he had *not secured* any investor support for the proposed transaction and that there were many contingencies before any

shareholder vote, most notably whether there would be any transaction at all. Defendants' response regarding this blatant falsehood is to simply assert that no reasonable investor would have believed Musk when he made those statements because they were obviously false. This is a bizarre defense and, again, Defendants simply ignore the reaction of analysts, Tesla's own Investor Relations department, and the market, which believed Musk when he made these statements and responded by buying Tesla stock in massive quantities. This reliance on Musk was entirely reasonable.

On August 13, 2018, Musk made further misrepresentations to maintain the illusion that there existed a potential going-private transaction at $420 per share. He continued to represent that there was "no question" that funding was available for the transaction from a Saudi Arabian sovereign fund when, in fact, there was no commitment from the fund (or even serious discussion) to provide any funding and the availability of any funding was highly uncertain. Musk also misleadingly tweeted that he was working with Silver Lake and Goldman Sachs as financial advisors in an attempt to provide credibility to his proposed transaction. It was later revealed that neither Silver Lake nor Goldman Sachs were retained regarding the transaction, as Musk surely knew on August 13, 2018.

The blatant falsehoods published by Musk as Tesla's CEO address matters that were directly in his personal knowledge: the proposed going-private transaction and the availability of funding that he was personally directing. It therefore follows that they were not made inadvertently or negligently. It is not credible to suggest that Musk did not know that funding was not secured when he published his tweet. Indeed, Musk has since admitted that on August 7, 2018, funding was highly uncertain with, at best, a 50% chance of success, and that his representations on August 7, 2018 "were premised on a long series of baseless assumptions and were contrary to facts that [he] knew." Further, Musk had a fervent personal motive to pump up Tesla's stock price by fair means or foul as a result of his longstanding animus towards short sellers. During his discussions of the proposed going-private transaction with the Tesla Board, its employees, and on his Twitter account, Musk returned repeatedly to the question of short sellers. On August 10, 2018, Musk even mocked short sellers suffering losses as a result of his earlier tweets, tweeting "Short shorts coming soon to Tesla merch[andise]." Defendants' response is to argue that this motive is "generic" because, according to Defendants, other corporate executives also dislike short sellers. Def. Mem. at 18-19. In addition to

improperly relying on facts outside the Complaint, this argument ignores the well-pleaded facts about Musk's particular dislike of short sellers.

Finally, Defendants make a half-hearted attempt to argue that Musk's statements did not cause any loss to Tesla investors. Again, this lacks credibility. Following Musk's statements on August 7, 2018, Tesla's stock price soared over 10% to $379. By the time the truth about the fictitious going-private transaction was understood by the market on August 17, 2019, it had declined back to $305. During this 10-day period, the proposed going-private transaction dominated the financial news. There is no legitimate question that Musk's false statements about the transaction and its funding were a substantial cause of investor losses suffered during this period.

While the primary culprit in the fraud here is Musk, Tesla and its Board are also responsible. As shown below, Tesla's "bidder" defense is unavailing, as it does not strip Musk of his apparent authority or reverse the effect of his false statements, or Tesla's confirmations thereof.  As identified by JP Morgan, Musk's statements were made with apparent authority and immediately attributed to Tesla as well. This is not surprising as Tesla points investors to Musk's personal Twitter account as a source of corporate information. Tesla also published Musk's statements on its website. Tesla's Investor Relations department affirmed the truth of Musk's August 7, 2018 tweets to financial analysts. Tesla's Board put out public statements regarding the potential going-private transaction, intervened with Musk regarding the content of his tweets, and confirmed their substance. This is more than sufficient for Tesla to be held responsible for the statements of its CEO about its stock, and for the Board to be held liable as control persons of Tesla.

## II.     STATEMENT OF FACTS

### A.     July 31, 2018 Meeting with Saudi Arabia Public Investment Fund.

On July 31, 2018, Musk met with representatives from the Saudi Arabia Public Investment Fund ("PIF"), a Tesla investor, which had just taken an under-5% stake in Tesla shares. Compl. ¶63. During this short meeting, there was a general discussion of the possibility of the PIF participating in a going-private transaction, a subject the PIF had previously raised. *Id*. Musk had publicly stated his preference for Tesla to operate as a private company, partly to avoid public reporting requirements. *Id*. ¶91. The PIF representative indicated some interest in exploring a going-private

transaction if Tesla would build a production facility in the Middle East. *Id*. ¶63. No further details were discussed about any transaction, including the price or size of any investment by PIF. *Id*. ¶64.

Nonetheless, even without any commitment or terms being agreed with the PIF or any other lender, on August 2, 2018, Musk sent an email to the Tesla Board communicating an "Offer to Take Tesla Private at $420". Compl. ¶69. The first reason provided for this proposal was to protect Tesla from "constant defamatory attacks by the short-selling community".[1] *Id*. Musk had not consulted any financial advisor before picking a proposed going-private price of $420 and had not consulted any legal advisors about his proposed structure that would enable small investors to remain stockholders of a private Tesla. *Id*. ¶¶70-72.

On August 3, 2018, Musk discussed the potential transaction with the Tesla Board. Compl. ¶72. Board members promptly told Musk that the condition to build a production facility in the Middle East as required by PIF was a "non-starter", and that keeping large numbers of small investors in a private Tesla was impracticable. *Id*. Musk himself thought there was "a lot of uncertainty" about the potential transaction and the chances of consummating it were no better than 50%. *Id*. ¶69. Discussions on August 6, 2018 with a private equity fund partner did not provide any further comfort as the partner told Musk the proposed structure was "unprecedented". *Id*. ¶73.

## B.    August 7, 2018 Statements.

Despite the lack of any coherent understanding on funding, a price picked essentially out of thin air, Board and investor incredulity, and knowing his preferred structure was impossible, on August 7, 2018 at 12:48 p.m. EST, Musk tweeted while driving to the airport: "Am considering taking Tesla private at $420. Funding secured." Compl. ¶74.[2]

---

[1] Tesla was one of the most heavily shorted stocks during 2018, especially as Tesla was experiencing difficulties in introducing its new Model 3 vehicle. Compl. ¶49. Short interest grew throughout 2018 and public statements criticizing Tesla and Musk were common. *Id*. ¶¶45-61. Musk frequently attacked short sellers in the media and on investor conference calls and purchased Tesla stock to support its price. *Id*. ¶¶50-60. Musk also used his personal Twitter account to engage with short sellers regarding Tesla, taunting them with statements such as "short burn of the century comin soon" and "the sheer magnitude of short carnage will be unreal". *Id*. ¶52. Nonetheless, and despite Musk's efforts, by July 31, 2018, the short interest in Tesla was 35 million shares, or 20% of its outstanding stock. *Id*. ¶62.

[2] In their memorandum, Defendants suggest for the first time that Musk sent his "Funding secured" tweet in response to an article published at 12:18 p.m. EDT on August 7, 2018 in the *Financial*

Since November 2013, Tesla had directed investors to Musk's personal Twitter account as a source of corporate information and Tesla monitored Musk's account (Compl. ¶19), as reflected by Tesla executives' immediate communications with Musk about the tweet. *Id.* ¶75. Musk then sent out further tweets repeating his intention to take Tesla private at $420 per share and giving details of his proposed structure, even though he knew this structure was "unprecedented" and unlikely to occur. *Id.* ¶¶77-80. Trading in Tesla stock exploded with an immediate and dramatic increase in price, and at 2:08 p.m. EDT, NASDAQ halted trading in Tesla stock until 3:45 p.m. *Id.* ¶81.

During the afternoon of August 7, 2018, Musk continued to make public statements about his proposed transaction both on his personal Twitter account and on a Tesla blog. Compl. ¶¶83-85. In these statements, Musk stated that even though "a final decision has not yet been made" Tesla will go private "if the process ends the way I expect it will." *Id.* ¶84. Musk also repeatedly cited short sellers as a reason to go private, stating the proposed transaction would "end[] negative propaganda from shorts" and bemoaning the fact that Tesla was "the most shorted stock in the history of the stock market". *Id.* ¶¶83-84. Finally, at 3:36 p.m. EDT, Musk tweeted "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." *Id.* ¶85. Tesla's stock closed at $379.59, an increase of 10% from its opening price of $343.84. *Id.* ¶86.[3]

### C. Market Reaction to Musk's Proposal.

The market immediately reacted to Musk's statements on August 7, 2018 as indicating a likely going-private transaction, especially as funding had been "secured." This impression was confirmed by Martin Viecha, Tesla's Senior Director of Investor Relations, who, in response to

---

*Times* disclosing the PIF's investment in Tesla. Def. Mem. at 2, 6, 17. This assertion is based on matters outside the Complaint and should be disregarded by the Court. *See* Lead Plaintiff's accompanying Motion to Convert Defendants' Motion to Dismiss to Motion for Summary Judgment. It is also entirely absent from the several explanations Musk gave later in August 2018 of the circumstances of the tweet. *See* Compl. ¶103. Defendants' current invocation of the *Financial Times* article as a trigger for Musk's tweet appears to be entirely an *ex post facto* rationalization by Defendants and their counsel. In any event, the existence of the *Financial Times* article does not excuse the intentional dissemination of false information.

[3] Defendants assert that Tesla's stock price had already increased to $357 on August 7, 2018, even before Musk's tweet at 12:48 p.m. Def. Mem. at 6. Even taking this factual assertion at face value, and it is again based on facts outside the Complaint, Tesla's stock price still increased dramatically by a further $22 in response to the new information in Musk's tweet, or over 6% in a single afternoon.

questions from financial analysts about funding, stated that "the first Tweet clearly stated that 'financing is secured'. ***Yes, there is a firm offer***" and "I only want to stress that Elon's first tweet, which mentioned 'financing secured' ***is correct***." Compl. ¶¶87-88 (emphasis added). Later that evening Viecha elaborated further advising an analyst: "The very first tweet simply mentioned 'Funding secured' which means there is a firm offer." *Id*. ¶89. When pressed if this meant there was a commitment letter, Viechia responded "***given we went full-on public with this, the offer is as firm as it gets***." *Id*. (emphasis added).

Viechia's natural reading of Musk's tweets was shared by financial analysts who issued reports later on August 7, 2018 and on August 8, 2018. RBC Capital Markets wrote that "we believe there is substance to the news and note that prior 'controversial' shareholder votes (like Solar City) have always voted with Elon. … Elon's tone and messaging regarding a potential transaction lead us to believe that there could be significant outside funding lined up." Compl. ¶90. JP Morgan raised its target price for Tesla stock to reflect the potential transaction saying:

> As surprising to us as these developments are, and as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, ***they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured.*** Therefore, we are incorporating into our valuation the real possibility the equity will be taken out at $420 per share…. [In Musk's letter to employees] he states, 'If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us.' To us, ***this suggests more than mere consideration – Mr. Musk expects Tesla will go private***.

*Id*. ¶96 (emphasis added). Evercore, while recognizing that some details were missing and there was still some uncertainty surrounding the proposed transaction, noted that it believed "Musk's intent is serious and genuine" and that "Funding secured' should be interpreted as "a strong verbal commitment, with funds available and parties willing to execute quickly." *Id*. ¶97. It also opined that by August 8, 2018, the market had accepted that funding was secured and a going-private transaction could be completed by Tesla and Musk. *Id*.

On August 8, 2018, the Tesla Board issued a statement that confirmed Musk had made a proposal to them. Compl. ¶93. Antonio Gracias, Tesla's lead independent director, also contacted Musk and ordered him to refrain from tweeting about the potential transaction without prior

1   clearance from the Tesla Board. *Id*. ¶218. After the market closed on August 8, 2018, the *Wall Street*

2   *Journal* reported that the SEC had commenced an investigation into whether Musk had "a factual

3   basis" for his August 7, 2018 tweets. *Id*. ¶98. The following day, Tesla's stock price declined 5% to

4   $352.45. *Id*. ¶99. On August 12, 2018, *Bloomberg* reported that the PIF "hasn't made any firm

5   decisions on whether to increase its stake [in Tesla], or by how much." *Id*. ¶102.

6         On August 13, 2018, Musk published a lengthy post regarding the potential transaction on

7   Tesla's blog where he sought to bolster his prior assertion that funding was secured for taking Tesla

8   private and how he intended to structure the transaction. Compl. ¶103. Musk also stated he had

9   engaged advisors, later identifying them as Silver Lake and Goldman Sachs. *Id*. ¶¶103-04. Analysts

10  were again persuaded that the proposed transaction was likely, with Morningstar stating that "our

11  impression of his words is that he thinks it can happen, and we agree…. we think a deal will not

12  happen this week but will eventually be announced," and stating their belief that "a deal, if

13  announced, would be approved." *Id*. ¶105. On August 14, 2018, however, *Bloomberg* reported that,

14  contrary to Musk's statement the day before, neither Silver Lake nor Goldman Sachs had been

15  engaged by Musk or Tesla. *Id*. ¶107. On August 15, 2018, it was reported that the SEC had issued

16  formal subpoenas relating to Musk's tweets and on August 16, 2018, the *New York Times* published

17  a detailed interview with Musk confirming that funding for the proposed transaction "was far from

18  secure" and the PIF "had not committed to provide any cash." *Id*. ¶112. Also on August 16, 2018,

19  the *Wall Street Journal* reported that the SEC's investigation into Musk was over whether he

20  "intentionally misled investors when he tweeted about the proposal in a bid to hurt short-sellers by

21  driving up Tesla's stock price." *Id*. ¶111. The next day, Tesla's stock price plunged 9% to close at

22  $305.50. *Id*. ¶114. Tesla and Musk stopped the charade on August 24, 2018, confirming that there

23  would be no going-private transaction. *Id*. ¶115.

24        **D.      SEC Proceedings.**

25        On September 27, 2018, the SEC filed a Complaint against Musk alleging that he violated

26  §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j, in making his August 7, 2018

27  statements. *Id*. ¶168. On September 28, 2018, Musk signed a Consent to entry of a judgment against

28  him. *Id*. ¶169. Under the terms thereof, Musk agreed he "(i) will not take any action or make or

permit to be made any public statement denying . . . any allegation in the complaint or creating the impression that the complaint is without factual basis; [and] (ii) will not make or permit to be made any public statement to the effect that [Musk] does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that [Musk] does not deny the allegations." *Id*. ¶169. Among the facts Musk admits under his Consent are that his August 7 statements were materially false and misleading and that they "were premised on a long series of baseless assumptions and were contrary to facts that Musk knew." *Id*. ¶171.[4]

## III.   LEGAL STANDARD

On a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Evanston Police Pens. Fund v. McKesson Corp.*, __ F. Supp. 3d __, 2019 WL 5587311, at *2 (N.D. Cal. Oct. 30, 2019)(*quoting Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (internal quotations and alterations omitted). "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint . . . ." *Id*. at 998 (citing Fed. R. Civ. P. 12(d)); *see also*, *e.g.*, *Fabbri v. Wilkinson*, 2019 WL 5781914 (C.D. Cal. Nov. 5, 2019) (denying motion to dismiss without prejudice for referencing materials outside the pleadings). While a court may consider materials incorporated into the complaint or properly subject to judicial notice, they should not be used to dispute well-pleaded facts or where their substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Khoja*, 899 F.3d at 1000. In particular, a district court should guard against defendants'

---

[4] Defendants argue that Musk's ability to take different legal positions under the terms of his Consent means he is also free to violate its clear terms and deny the underlying facts contained in the SEC Complaint. Def. Mem. at 8 n.5, 18. This is contrary to the terms of the Consent as well as relevant SEC Regulations. *See* 17 C.F.R. §202.5(e); *SEC v. Rogers*, 221 F.3d 1349, 2000 WL642467 (Table) (9th Cir. 2000).

attempts "to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id*. at 1002-03.[5]

## IV.    ARGUMENT

### A.    MUSK AND TESLA VIOLATED SECTION 10(B) AND RULE 10B-5.

#### 1.    <u>The Complaint Adequately Pleads False Statements</u>

A statement is misleading if it acts to "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *9 (N.D. Cal. Nov. 27, 2018). This may be alleged "when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. Falsity may also be alleged where "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017)(*quoting Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014)).

Defendants argue that the misleading meaning must be the *only* reasonable meaning. Def. Mem. at 10-11. That is not the law. A statement is misleading if it would mislead a reasonable investor, and to demonstrate such falsity a plaintiff is not required to rule out every strained interpretation a defendant may suggest. Instead, a court "must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage[]" and if, giving the plaintiff every reasonable inference, it is at least as plausible as not that a statement was misleading, then falsity has been adequately alleged. *See Khoja*, 899 F.3d at 1014; *see also In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *19, n.13 (C.D. Cal. June 4, 2001) ("The question is whether a defendant deliberately made a statement which would mislead a reasonable investor, not whether there is any conceivable interpretation of the defendant's words according to which they were not false."). Indeed, Defendants get the law exactly backwards: "only if the adequacy of the disclosure . . . is so

---

[5] As set forth in Plaintiff's Motion to Convert, this is precisely what Defendants attempt to do here in presenting extensive "facts" from materials neither referenced in the Complaint or subject to judicial notice. The Court should disregard these factual assertions or deny the motion to dismiss under Fed. R. Civ. P. 12(d).

obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (quotations omitted).

Here, there can be no doubt that Musk's statements on August 7, 2018, of "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote," "directly contradict what [Musk] knew at that time" and that "[Musk] [was] aware of undisclosed facts tending seriously to undermine the statement's accuracy." As the SEC (through its investigation and testimony from Musk and other witnesses), the *New York Times*, and other sources indicate, Musk acknowledged (and does not dispute now) that even the most rudimentary terms, including price, were not agreed, discussed or even thought out. Compl. ¶¶170-71. Indeed, Musk acknowledged that the only seemingly "concrete" term in his announcement (price), was not discussed with any funders, but was picked by Musk's girlfriend, as a joke, because it reflected marijuana jargon, which Musk admitted "is not a great reason to pick a price." *Id*. ¶150. Furthermore, neither funding nor investor support were secured; and every potential investor who Musk discussed the potential transaction with before August 7, 2018, as well as experienced members of the Tesla Board, told him the transaction was ill-advised and practically impossible. *Id*. ¶¶72-73.

Defendants' only argument is to latch on to a single word in Musk's initial tweet: "considering", and argue that this necessarily means that every other statement regarding the proposed transaction was somehow tentative, contingent, and not to be relied on. Def. Mem. at 11. But merely prefacing a statement with "Considering…" does not create a license to make any unfounded or fictitious statement; it still suggests that the item being "considered" is serious and real. A statement of opinion may be reasonably interpreted as an implied statement that "the speaker knows facts sufficient to justify him in forming the opinion, or that he at least knows no facts incompatible with the opinion." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 238-39 (1988) (discussing the duty to disclose accurately even preliminary merger negotiations and noting that even "no comment" can be misleading); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)(duty to disclose alternative means to achieve stated corporate goal may arise when alternatives are "under active and serious consideration"). That is concededly not the case here. This argument

is also conclusively contradicted by the reactions of Tesla's own Senior Director of Investor Relations who informed analysts that Musk's tweet was correct, that there was a "firm offer" that was "as firm as it gets". Compl. ¶¶87-89. It is further contradicted by the reaction of sophisticated analysts such as JP Morgan who noted that the tweets are "declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured and Tesla's CEO says funding is secured." *Id*. ¶96. JP Morgan continued that Musk's statements "***suggest[] more than mere consideration*** – Mr. Musk expects Tesla will go private." *Id*.[6] Most importantly, the market shared JP Morgan's interpretation, as evidenced by the billions of dollars in trading in reaction to the statement. *Id*. ¶¶189-92, 208-09. Defendants' strained interpretation of Musk's tweets should not be credited at the pleading stage and are certainly insufficient to overcome the plausible and well-pleaded falsity set forth in the Complaint.[7]

Similarly, Musk's statements published by Tesla on August 13, 2018 were also misleading. Musk stated that he had "engaged advisors" and then tweeted that these advisors were Silver Lake and Goldman Sachs. Compl. ¶¶103-04. The engagement of experienced advisors at this stage lent credibility to Musk's statements that a going-private transaction was still viable and imminent. It

---

[6] Defendants' inferences from Musk's August 2, 2018 emailed "offer" to the Tesla Board as justifying his August 7, 2018 tweet, if anything, actually indicate Musk himself would have understood the word "considering" as more than a hypothetical. Of course, Musk's August 2, 2018 email says nothing about funding being secured. Even analysts such as Evercore who acknowledged uncertainty about the proposed transaction concluded that Musk's August 7, 2018 tweet meant there was a firm offer of funding. Obviously, there was no firm offer of funding.

[7] Defendants' cases are distinguishable and reveal the highly contextual nature of the falsity inquiry. The statements in *Omnivision* were alleged to be misleading regarding Omnivision's relationship as a supplier of Apple, Inc. but failed to even mention Apple. *In re Omnivision Tech., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1101-02 (N. D. Cal. 2013). The misleading rumors about Apple came from analysts, not Omnivision. *Id*. Here, the only source of the misleading information about Tesla going private at $420 per share with funding secured came from Tesla and Musk. In *Yahoo!*, the alleged misrepresentations were, in fact, consistent with the state of affairs as alleged by plaintiffs. *In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *12 (N.D. Cal. Aug. 10, 2018). Musk's tweet that funding was secured was not consistent with the actual state of affairs, which is that funding was never secured. Finally the vague and conclusory statements about product quality in *lululemon* and that a technology was a "proven concept" in *Jackson* are quite different from the specific misrepresentations about funding and investor support alleged here and those cases lacked allegations of analyst reaction confirming the materiality and misleading nature of the alleged misrepresentations. *See Jackson v. Fischer*, 2015 WL 1143582, at *7 (N.D. Cal. March 13, 2015); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578-79 (S.D.N.Y. 2014).

was revealed shortly afterwards that neither Silver Lake or Goldman Sachs had been engaged by Musk or Tesla. *Id*. at ¶107. This is another actionable misstatement. *Id*. at ¶¶ 139-40.

Defendants attempt to defend the remaining statements made on August 13, 2018 as mere statements of opinion that are not actionable because Musk genuinely believed them. Def. Mem. at 15. A statement of opinion is still misleading, even if genuinely believed, if "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Align Tech., Inc.*, 856 F.3d at 615-16; *see also Omnicare*, 575 U.S. at 185-86; *In re Atossa Genetics Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017). Here, Musk was aware of undisclosed facts that undermined the accuracy of his statements regarding the viability of a going-private transaction. These facts included the lack of any commitment to funding from PIF or any other funder, the impracticality of the proposed structure, and the lack of investor and Board support.

### 2.   <u>Tesla is Liable for Musk's Statements.</u>

Defendants next argue that Tesla cannot be liable for Musk's statements, contending that *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) changes the long-standing rule that a corporation is liable for the statements of its senior officers, who have the apparent authority to make them. As post-*Janus* cases make clear, it does not. In the Ninth Circuit, it is "the general rule of imputation … that a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority'" *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (holding corporation liable for founder/CEO's misstatements even though he looted the company as part of his fraud) (citations omitted); *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) ("Nothing in *Janus* undid the long-standing rule that 'a corporation is liable for statements by employees who have apparent authority to make them.'") (citation omitted).

*Janus*, a mutual fund case, does not help Defendants. The Supreme Court held there that a mutual fund advisor helping prepare prospectuses for its client mutual funds, was not necessarily the "maker" of the statements in the prospectuses, where it was a separate legal corporation from the fund, which had a different governance structure and clearly independent board of trustees, and the

prospectuses gave no indication the advisor was involved in their preparation. 564 U.S. at 138, 147-48. Hence, the Court focused (as Defendants do in their brief) on the fact that merely preparing or publishing a statement for another (as a speechwriter might), does not transform that assistant into someone with authority, and thus potential liability, over the statement. *Id*. at 143-44.

In contrast, this is not a case where Tesla is alleged to have helped prepare a statement for Musk; Tesla was certainly not a mere drafter, assistant or facilitator for Musk, as in *Janus*. Rather, numerous factors distinguish this case from *Janus*, and demonstrate Musk's apparent authority in making the statements at issue. Musk was Tesla's co-founder, Chairman and CEO, and the constant face of and spokesman and promoter for, Tesla; Tesla and Musk were veritably alter egos. Compl. ¶¶2, 17, 178. Tesla communicated through Musk constantly, to its benefit. Musk created a Twitter account in which he primarily communicated about and promoted Tesla's (not his personal) business, and which Tesla's CFO termed a "strong channel of marking for Tesla" (Def. Ex. Q, SEC Tesla Complaint, ¶12). Indeed, in a public SEC filing, Tesla notified investors it would use Musk's Twitter account as a formal means of communication to convey "additional information" about Tesla to investors. Compl. ¶¶19, 218. Thus, just as Musk's public statements in media interviews, analyst calls and at business conferences regarding Tesla would be attributable to Tesla, so too would his statements on Twitter. This is especially so for such an important event in the life of a company as a going-private transaction.

Barely 2.5 hours after Musk's initial August 7 tweet, ***Tesla posted on its own blog*** Musk's email to employees ***referencing and confirming his earlier tweet***, along with additional information (*id*. ¶84), which Musk followed within minutes by a tweet from his account, reiterating that "[i]nvestor support is confirmed" with the "[o]nly" contingency being a shareholder vote (*id*. ¶85).[8]

---

[8] As the SEC Complaint states, barely half an hour after Musk's initial August 7 tweet, Tesla's CFO sent Musk a text message suggesting that he, Tesla's head of communications, and Tesla's General Counsel would draft an employee email/Tesla blog post reiterating and expounding on Musk's initial tweet. The CFO in fact posted it on Tesla's blog (Compl. ¶84); and after a few minutes Musk tweeted a link to it, reiterating that "[i]nvestor support is confirmed" and the "only reason" the deal was not "certain" was the requisite shareholder vote. *Id*. ¶85; Def. Ex. P ¶¶35, 43-45. Thus, Tesla and Musk worked hand-in-hand in publishing and re-publishing the false and misleading information. While "merely hosting a document on a Web site" or "forward[ing] an email" itself may not impose liability (such as the advisor's hosting the fund's SEC filing on its website in *Janus*, cited by Defendants),

And, within hours, Viecha **confirmed on behalf of Tesla three times** that "'funding [was] secured'" (*id*. ¶87-89) – thus, at a minimum, Tesla affirmatively adopted Musk's tweet. The next day, Tesla issued a statement by its Board echoing they had discussed a going-private transaction with Musk and "also addressed the funding for this to occur," further bolstering (and not retracting) Musk's claim. *Id*. ¶93. On August 13, 2018, Tesla published another statement by Musk on its site, expounding on the transaction, which likewise sought to buttress Musk's earlier assertions. *Id*. ¶103. These were affirmative repetitions or endorsements of Musk's statements by Tesla or those indisputably acting on its behalf.

Defendants seek to cast Musk as merely a "bidder,"[9] but being a potential "bidder" – announcing an intention to take the company he founded private – does not somehow strip Musk of his apparent authority for Tesla to evade liability for his misstatements (and Defendants cite no case law so holding); nor does it pit him against Tesla for it to invoke any "adverse interest" grounds for evading liability (an argument Defendants do not even make). *See, e.g.*, *ChinaCast*, 809 F.3d at 477 (citing *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494-96 (3d Cir. 2013) ("a swindler may still act with apparent authority, even if he is acting for his own benefit"; "when a corporate officer commits wrongdoing, the 'principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger'") (citation omitted); *In re Energy Recovery Inc. Sec. Litig.*, 2016 WL 324150, at \*25 (N.D. Cal. Jan. 27, 2016) ("Apparent authority liability is imposed even when the agent was acting solely for his own purposes"); *Guevoura Fund v. Sillerman*, 2016

---

that is a far cry from this case, where Tesla posted its own CEO's statements on its website and blog, and its senior officers co-drafted an email for Musk confirming his earlier tweet and posted it on Tesla's site (then confirmed it repeatedly). *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1100-01 (2019) ("dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, as well as the relevant statutory provisions"); *Schwartzman v. Morningstar, Inc.*, 2014 WL 3843875, at \*17-18 (E.D. Pa. Aug. 5, 2014) (investment research firm liable for statements by fund manager where it chose to publish misleading information supplied by him on its website). Tesla is alleged here to have violated Rule 10b-5(a), (b), and (c).

[9] Tesla relies on a contrived statement by Musk in his August 13, 2018 post, issued after his initial statements (and Tesla's confirmations thereof), designed to protect Tesla from Musk's reckless conduct, that he was "speaking for himself" as "potential bidder" (Def. Mem. at 20). However, such an ex post facto, self-serving statement does not reverse the effect of Musk's prior statements, and Tesla's confirmations thereof. At best, it creates fact questions not resolvable prior to discovery.

WL 4939372, at *11 (S.D.N.Y. Sept. 12, 2016) (company's primary liability sufficiently established where CEO allegedly fraudulently announced offer to take company private and "allegations suggest that the line between Sillerman's role as CEO of the Company and potential buyer is murky at best").[10]

### 3.   The Complaint Adequately Alleges Scienter

The relevant inquiry in considering scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). The inference "need not be irrefutable … or even the most plausible." *Id.* at 324. An inference of scienter is "strong," and a motion to dismiss must be denied, where "a reasonable person would deem [it]… cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* "[A] tie goes to the Plaintiff." *Maiman v. Talbott*, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010) (quotations omitted). Scienter may be pled by facts showing defendants had actual knowledge of, or access to, information contradicting the challenged statements, or were in a position where it would be "absurd" to suggest they did not know the undisclosed facts. *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

### a)  The Complaint Adequately Alleges Musk's Scienter

The Complaint alleges that Musk issued false statements, via Twitter and Tesla's own website and blog, that he knew to be false and misleading. As stated, in fact, funding was *not* "secured;" key terms had *not* been agreed on or even discussed, and it was wildly inaccurate that the "[o]nly reason why [the deal was] not certain" was that it was "contingent on a shareholder vote." Compl. ¶170. Musk, as the primary, direct participant in the events related to his statements, including discussions with the PIF, clearly had actual knowledge of their falsity. Indeed, he has admitted his statements were "premised on … baseless assumptions" and "contrary to facts that [he]

---

[10] Since, as shown above, Musk clearly made his statements with apparent authority in his role as Tesla CEO (understood as such by analysts, reporters and investors), Defendants' remaining authorities are inapplicable. *See Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2016 WL 6782768, at *10-11 (C.D. Cal. Aug. 9, 2016) (finding controlling shareholder Warburg Pincus and its employees not liable for statements made by acquired company's officers on calls, but finding Warburg *could* be liable as a "maker" of a statement by *its own* officer, citing *ChinaCast*, *supra*).

knew." *Id*. ¶¶5, 171. There could be no more explicit indication of scienter. *See Schueneman v. Arena Pharms.*, *Inc.*, 840 F.3d 698, 707 (9th Cir. 2016) (scienter pled where complaint alleged defendants knew of facts undermining their statements); *S. Ferry LP #2*, 542 F.3d at 785-86 (allegations of actual exposure to information/personal involvement sufficient).

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, is particularly on point. 416 F.3d 940 (9th Cir. 2005). There, the Ninth Circuit found that scienter had been sufficiently pleaded regarding defendants' false and misleading statements indicating a $25 million offering had been "completed", implying the money was received, when various contingencies meant much less had been received. *Id*. at 948. The court noted that "[t]here [were] few ways to make the misrepresentation more explicit" than defendants' "state[ing] as 'fact' that the initial stock offering 'ha[d] been completed. . . .'". *Id*.[11] As in *Livid*, "[b]ecause [Plaintiff] alleges that [Musk] knew the contested statement's most obvious interpretation was false when made, [Plaintiff] has met the heightened pleading standard for scienter by raising a strong inference of [D]efendants' deliberate recklessness." *Id*. Further, in response to analyst and investor questions, Musk and Tesla doubled-down and confirmed the assertions that the transaction was imminent, subject only to a shareholder vote, despite knowing this was not true. *See Institut'l Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (officer's false statements in response to specific queries supported scienter); *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *24 (S.D. Cal. Sept. 13, 2013) (same); *South Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (same).[12]

These misrepresentations had the desired effect, as Tesla's stock price shot up, "burning the shorts" (members of the Class) as intended, and all other Class members in the process. While motive is not necessary to show scienter (*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011)),

---

[11] *See also In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *9-11 (S.D. Cal. Mar. 18, 2019) (finding scienter where defendants made misrepresentations about matters they were involved in, despite claims of good faith); *Patel v. Axesstel, Inc.*, 2015 WL 631525, at *10-12 (S.D. Cal. Feb. 13, 2015) (scienter where CEO defendant allegedly involved in matters addressed by misrepresentations); *Special Situations Fund III v. Brar*, 2015 WL 1393539, at *5 (N.D. Cal. Mar. 26, 2015) (CEO's scienter pled given inference that important communication undermining his statements would "go straight to top management").

[12] Five days after his SEC settlement, Musk still tweeted, "Just want to that [sic] the Shortseller Enrichment Commission is doing incredible work." Compl. ¶162.

the Complaint alleges Musk's (admitted) intense dislike of, and intention to "burn the shorts" as a primary motive for Musk's false and misleading statements artificially inflating Tesla's stock price. *See, e.g.*, Compl. ¶¶50-55, 60, 69, 83-84, 91, 97, 100, 111, 152-62.[13]

While Defendants do not, and cannot, deny Musk's passionate motive targeting short sellers, they cast aspersions on short sellers generally (Def Mem. at 18). Short sellers, however, are legitimately entitled to trade on their view of the merits of a security, relying on public information (*see, e.g.*, Compl. ¶¶45-49, 56-61), except here Musk put out false information to burn them. Defendants cite no CEOs going to such lengths. Defendants' farfetched argument that dislike of short sellers amounts to the type of "general corporate motive" courts hold insufficient for scienter is, unsurprisingly, unsupported by any caselaw (neither case cited by Defendants remotely involved short sellers, much less such a single-minded desire to burn short sellers as here).[14] Plaintiff's motive allegations here are specific, well-supported and admitted, and demonstrate a premeditated course of conduct by Musk to "burn the shorts."

**b) Defendants' Defenses to Scienter are Meritless**

Defendants first attempt to deny the allegations of intent and deliberate recklessness by claiming Musk's initial tweets were "consistent with" what Musk told the Board on August 2 and 3, 2018, and advisers were later consulted, showing "good faith." This is a non-sequitur. Defendants attach a purported August 2, 2018 email Musk sent the Board, which indicates Musk wanted to thwart short sellers (confirming such motive) and told the Board Tesla was better off temporarily as

---

[13] Even if Musk's primary motive was to harm short sellers, the intent of his statements was to move (by artificially inflating it) the market price – which was the market price for *all* Class members – which he knew would harm *all* Class members. Musk's intense animus toward short sellers thus supports a finding of, at a minimum, Musk's deliberate recklessness as to whether all Class members would suffer damages. *See Schueneman*, 840 F.3d 698 at 705; *see also Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015) (finding scienter although defendants' primary motive may have been to mislead other potential strategic partners rather than investors; "[s]cienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of misleading investors.").

[14] *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (general motive to increase corporate opportunities); *In re Silicon Storage Tech.*, 2006 WL 648683, at *17-19 (N.D. Cal. Mar. 10, 2006) (motive to issue stock to help finance acquisition).

a private company, then would "return to the public markets" (presumably at a profit to Musk and his partner(s), but not Class members). Def. Ex. A. It does ***not*** indicate "funding was secured," or that the "only reason" the deal was not "certain" is the "shareholder vote." Moreover, as the Complaint alleges, during Musk's August 3, 2018 Board meeting, Board members immediately threw cold water on any such notion, telling Musk the floated conditions for this idea were "non-starter[s]" and "really difficult." Compl. ¶72. Thus, nothing in the email detracts from Defendants' knowledge that representations that funding was "secured," and the deal imminent, were false and misleading, as quickly revealed.

Defendants next suggest Musk merely meant to apprise all investors simultaneously of the transaction because word "leaked" about the PIF's stake of *below* 5% in Tesla. Def. Mem. at 2, 16-17. This ex post facto rationalization has no basis in fact. Musk nowhere referenced any "leak" as the reason for his tweet in prior statements concerning the reasoning for his announcements (which Defendants already concede were "ill-advised"). Other investors have taken 5% stakes in Tesla (and other companies) previously (*e.g.*, Def. Ex. B, noting China's Tencent took a 5% stake in Tesla in 2018), without suggesting that a going-private transaction was imminent. Accordingly, the *Financial Times* article did not create a compelling reason to announce a going-private transaction that, at best, was still a mere unthought-out idea to harm short sellers. It is certainly no reason to harm investors by making false assertions.[15]

Defendants also self-servingly assert that Musk "stood to gain nothing," and that this supports his statements were made in "good faith." Def. Mem. at 17. But (i) this is not an excuse for breaking the law, where the Complaint amply alleges, and Musk has largely admitted, that his statements were premised on baseless assumptions and contrary to facts that he knew (Compl. ¶171); (ii) even crediting Defendants' contentions (which are belied by the facts), Musk at a minimum acted with deliberate recklessness in choosing to make, and repeat, false and misleading assertions –

---

[15] *See also Azar*, 2018 WL 6182756, at *16-18 (recklessness shown where actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort"), *citing In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010). Likewise, Plaintiffs do not allege Musk could have "done more" before his statements (Def. Mem. at 18); rather, given that nothing was done, he should have refrained from making false statements (*i.e.*, said less).

especially in the face of the questions and warnings about legal repercussions raised, and given his position at Tesla and expansive public reach via Twitter; and (iii) Defendants ignore that Musk's admitted hatred of and desire to eviscerate short-sellers was a primary motive for his statements and actions; thus, Defendants cannot credibly argue Musk "stood to gain nothing" from his statements.

Musk and Tesla's settlements with the SEC strongly support Plaintiff's allegations. *See generally* Def. Ex. P-S. Notably, Musk and Tesla quickly settled the allegations against them, paying penalties, and with Musk agreeing step down as Chairman of Tesla's Board, strongly indicating the allegations' merit. *See Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (finding scienter given CEO's position, promotion of products, importance of issue to company, and company's FTC consent decree); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683, 685 (6th Cir. 2005) (quick settlement of (unadjudicated) ancillary suit a factor probative of scienter). Nonetheless, with their main arguments barely colorable, Defendants try to undermine Plaintiff's ability to invoke the SEC complaints and consent orders for their scienter allegations. This last-ditch effort is unavailing.

As recently reiterated by Judge Breyer, plaintiffs may rely on SEC or similar governmental allegations and/or consent orders in pleadings. *See Evanston Police*, 2019 WL 5587311, at *4 ("Because the Ninth Circuit has relied on comparable documents when deciding motions to dismiss Section 10(b) and antitrust claims, the Court holds it is appropriate to do so here") (*citing In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706-07 (9th Cir. 2012) (relying on allegations in SEC complaint incorporated into pleadings); *In re Musical Instr. and Equip. Antitrust Litig.*, 798 F.3d 1186, 1199 (9th Cir. 2015) (relying on allegations in FTC complaint and settlement)).[16] As the

---

[16] *See also In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) ("plaintiffs may base factual allegations on complaints from other proceedings because 'neither Circuit precedent nor logic supports . . . an absolute rule' against doing so"; considering AG allegations for scienter) (citations omitted); *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("Plaintiffs appropriately relied on the SEC complaint in pleading scienter and therefore state a claim under Section 10(b)"); *de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) ("[t]he striking similarity between the SEC's allegations and plaintiff's allegations does not demonstrate that plaintiff lacked evidentiary support. Rather, the SEC allegation provided plaintiff with evidentiary support. The PSLRA does not require that a plaintiff reinvent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of an SEC investigation has far more 'evidentiary support' than one based on [other sources].").

court observed in *In re Fannie Mae 2008 Securities Litigation*, "there is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA. Indeed, it makes little sense to say that information from a study or investigation—which the complaint could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint." 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012). Moreover, the Complaint's allegations are bolstered by facts outside the SEC documents, including Musk's admissions in interviews, and other public accounts.[17] *See, e.g.*, Compl. ¶¶112, 115.

### 4.   <u>Loss Causation is Adequately Alleged</u>

To adequately plead "loss causation" in the Ninth Circuit, a plaintiff must show a "'causal connection'" between the facts misrepresented and his or her alleged loss. *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013)). A plaintiff is not required to show "that a misrepresentation was the ***sole*** reason for the investment's decline in value in order to establish loss causation." *In re Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (emphasis in original and internal quotations omitted). The "ultimate issue" is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *First Solar*, 881 F.3d at 754. Consequently, "loss causation is a context-dependent inquiry as there are an infinite variety of ways for a tort to cause a loss." *Id.* (internal quotations omitted). Arguments over "loss causation" are therefore "normally inappropriate to rule on . . . at the pleading stage." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

---

[17] Defendants' cases are inapposite. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748-49 (9th Cir. 2008) (governmental settlement documents "were largely legal conclusions, rather than particularized facts," and "nothing in [the] settlement agreement … support[ed] the conclusion that [the defendant at issue] had actual knowledge" of the adverse facts); *Veal v. LendingClub Corp.*, 2019 WL 5698072, at *12–13, 20 (N.D. Cal. Nov. 4, 2019) (failure to plead falsity or scienter where, *inter alia*, majority of plaintiffs' allegations did not relate to the business practices mentioned in FTC action); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, *7 (N.D. Cal. Aug. 31, 2018) (mere existence of ongoing investigation insufficient where there was no regulatory complaint, findings or consent order); *Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (detailed FDIC report identifying one officer of the company as a wrongdoer could not be used to find other defendants liable).

Plaintiff easily meets the criteria for pleading loss causation. As an initial matter, Defendants do not address Plaintiff's allegations concerning "loss causation" for the "short" members of the class. Compl. ¶¶199-202. Musk's August 7 tweets forced many "short" investors to prematurely cover their positions at artificially inflated prices. *Id.* ¶202. Tesla's stock price increased dramatically after Musk's August 7 tweets, which were false and materially misleading. *Id.* ¶86. Thus, Plaintiff demonstrates the necessary "causal connection" between the misrepresentation and alleged loss for the purposes of the motion to dismiss. *See First Solar*, 881 F.3d at 753; *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1366025, at *7 (D.N.J. Jun. 8, 2005) (denying motion to dismiss where plaintiff demonstrated "loss causation" in "short-selling context" by alleging "false financial statements artificially inflated L&H stock, which, in turn, forced Plaintiffs to make cover transactions and incur significant losses").

Plaintiff also adequately demonstrates "loss causation" for the "long" members of the class. After Musk's August 7 tweets, Tesla's stock price rapidly increased to an intraday high of $387.46 per share and analysts regarded the transaction as likely. Compl. ¶¶ 90-91, 190. While Musk previously mentioned interest in a private Tesla and other investors had disclosed significant holdings in Tesla stock, never before had he publicly confirmed that funding had been "secured" or that the go-private transaction was imminent. *Id.* ¶92. Investors excited over the prospect of owning part of the private company, or those looking simply to profit by tendering their shares at $420/share, purchased shares of Tesla at artificially inflated prices. *Id.* ¶197.

As information questioning the seriousness and likelihood of the going-private transaction began to emerge, Tesla's stock price began to decline causing significant investor losses. *Id.* ¶¶191-96. Defendants argue that the disclosures relied upon by Plaintiff did not reveal any evidence of fraud. Def. Mem. at 21-23. But "'[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'" *First Solar*, 881 F.3d at 753 (quoting *Nuveen*, 730 F.3d at 1120). "Revelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Id.* at 754 (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).

The other indication to the market that the going-private transaction may be illusory were the reports of a swift SEC investigation. Compl. ¶¶98, 192. This led to increased doubts among investors and analysts about Musk's claims which, in turn, prompted an additional decline in Tesla's stock price. *Id.* ¶¶192, 197. These concerns were subsequently confirmed by Musk and Tesla's settlements with the SEC. *Id.* ¶¶ 116, 168-77. Defendants argue that "the mere" announcement of an SEC investigation cannot establish loss causation. Def. Mem. at 22. Defendants' application of the law is misguided. In *Lloyd*, the Ninth Circuit explicitly held that "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation." 811 F.3d at 1203.[18] Plaintiff hardly relies ***solely*** on the announcement of an SEC investigation; indeed, Plaintiff also points to Musk' admissions in his interview with the *New York Times*, other news reported in the financial media, as well as the ultimate resolution of the SEC investigation with a judgment against Musk for violating Rule 10b-5. Compl. ¶¶112, 116.

Finally, while Defendants claim that the August 13, 2018 blog post revealed the full "truth" to the market, Def. Mem. at 22, the facts show otherwise. Defendants' statements continued to mislead investors about the then-current status of the go-private transaction, including claiming the engagement of highly credible advisors, but concealed the fact that a funding agreement had not been obtained. Compl. ¶¶103-04, 134-40. Analyst reports issued in response to the blog post confirm this point. *Id.* ¶105 (Morningstar concluded the transaction "will eventually be announced" based upon Musk's blog post). "As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 544 F.

---

[18] This is consistent with *Loos v. Immersion Corp.* cited by Defendants, where the Ninth Circuit held that "the announcement of an investigation, without more, is insufficient to establish loss causation." 762 F.3d 880, 890 (9th Cir. 2014). Plaintiffs in *Loos* failed to allege any connection between the announced investigation and the alleged fraud, such as a subsequent disclosure creating a causative link. *Id.* Similarly in *Curry v. Yelp Inc.*, plaintiffs failed to establish a connection between complaints to the FTC and the alleged fraud. 875 F.3d 1219, 1225-26 (9th Cir. 2017). The SEC investigation here related directly to the alleged misrepresentations by Tesla and Musk and led quickly an SEC complaint alleging that Musk's August 7, 2018 tweets were false and in violation of the federal securities laws.

Supp. 2d 1009, 1025 (C.D. Cal. 2008). Given Plaintiff's allegations, substantiated by analyst reports, Defendants cannot carry their burden for a "truth-on-the-market" defense at this stage.

Additional proof on this point is evident in the declines in Tesla's stock price on August 14, 15, and 17, 2018. In response to reports that Tesla's board had not received a formal plan for the going-private transaction or had yet to even form a special committee to consider it, Tesla's stock price declined. Compl. ¶¶106, 106, 194. Likewise, when the *Wall Street Journal* and other sources reported the SEC's investigation had progressed to formal subpoenas aimed at determining whether Musk's August 7 tweet was intended to hurt short-sellers, Tesla's stock price declined again. *Id*. ¶¶110, 195. And, when the *New York Times* reported that Musk admitted during an interview that his August 7 and 13 tweets were essentially lacking sound factual basis, Tesla's stock price declined further. *Id*. ¶¶114, 196. Had the truth been fully disclosed on August 13, 2018 as Defendants contend, Tesla's stock price would not have reacted the way it did to news that emerged in the days that followed. *See No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp*., 320 F.3d 920, 935 (9th Cir. 2003) (decline in stock price evidenced materiality of new information released into market).

## B.  TESLA'S BOARD VIOLATED SECTION 20(a)

To state a claim for "controlling person" liability under §20(a), Plaintiffs need only allege an ability to control or influence (directly or indirectly) a primary violator, but need not allege that such defendants actually exercised control or participated in the underlying securities law violation. *See Am. West Holding*, 320 F.3d at 945, *quoting Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id*. Indeed, as Defendants' own cases state, "Courts have found 'general allegations concerning an individual's title and responsibilities' to be sufficient to establish control at the motion to dismiss stage" (*Sgarlata v. PayPal Holdings, Inc.*, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018), *quoting Energy Recovery*, 2016 WL 324150, at *25) although plaintiffs must provide "some factual support that defendants were in a position to control a primary violator." *Id*. Here, Plaintiffs have clearly done so.

The Complaint amply alleges that the Board were controlling persons of Tesla, and were able to, and did, influence its statements. Compl. ¶¶215-18. Besides having the authority to manage or oversee the management of Tesla's business, including its public communications to stockholders (*id*. ¶217), (i) since Tesla expressly identified Musk's Twitter account as an official channel of communication for Tesla (*id*. ¶218), the Board had authority over and controlled Musk's statements regarding Tesla thereon, and (ii) the Board actively involved itself in the potential going-private transaction (*e.g.*, forming a special committee, *id*. ¶106), including disclosures thereof.

As Defendants concede, the Board issued an August 8, 2018 statement confirming Musk's announcement, that he had "opened a discussion with the board" about the transaction, and which "addressed the funding" for it. *Id*. ¶93. Given these admissions, there is more than a plausible inference that (while not necessary to plead control) the Board authorized Musk's disclosure of the proposed transaction (nor have Defendants argued the Board did not authorize it, even if they had not expressly seen the tweet before he sent it, for which Defendants cite no requirement).[19] In fact, although the Board may not have proofread Musk's tweet, its control over Musk and his statements is shown by Gracias contacting Musk, after the August 7 market reaction, and asking him to refrain from further tweets about the transaction without further discussion with the Board. *Id*. ¶218. Musk complied and his future statements were primarily through Tesla's blog and website. This shows that the Board had sufficient authority and control for purposes of pleading a §20(a) claim, pre-discovery, over Musk's statements as Tesla CEO.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.[20]

---

[19]Defendants' remaining cases are inapplicable or support Plaintiff. *See Paracor Fin., Inc. v. GE Cap. Corp.*, 96 F.3d 1151, 1162-64 (9th Cir. 1996) (decided *on summary judgment*; lender in LBO transaction not controlling person where he had "none of the 'traditional indicia of control,' one of which is a seat on the board and had little or no involvement with the transaction in question); *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396-97 (9th Cir. 1993) (noting directorship is a "red light" indicating control and reversing summary judgment for defendant where he had power to control wrongdoer, regardless of whether he controlled transaction); *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (decision *after trial* where evidence showed director wholly uninvolved with company's business or industry).

[20] Should the Court dismiss any aspect of the Complaint, Plaintiff respectfully requests leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: December 27, 2019

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: 415-373-1671
Fax: 415-484-1294
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel:    (202) 524-4290
Fax:    (202) 333-2121
Email: nporritt@zlk.com
Email: akrot@zlk.com
(admitted *pro hac vice*)

-and-

Joseph E. Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel:    (212) 363-7500
Fax:    (212) 363-7171
Email: jlevi@zlk.com
Email: ek@zlk.com

*Attorneys for Lead Plaintiff Glen Littleton and the Class*