Pages 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES     )
LITIGATION,                      )     **No. C 18-4865 EMC**
_____  )
                                       San Francisco, California
                                       Friday, March 6, 2020


**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiffs:
                        LEVI & KORSINSKY, LLP
                        388 Market Street, Suite 1300
                        San Francisco, California 94111
                BY:     **ADAM M. APTON, ESQ.**
                        **Adam C. McCall, ESQ.**


For Defendants Tesla, Inc., Elon Musk, Brad W. Buss, Robyn
Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch,
Kimbal Musk, and Linda Johnson Rice:
                        FENWICK & WEST
                        555 California Street, 12th Floor
                        San Francisco, California  94104
                BY:     **DEAN S. KRISTY, ESQ.**
                        **JENNIFER BRETAN, ESQ.**


                        FENWICK & WEST LLP
                        801 California Street
                        Mountain View, California  94041
                BY:     **ALISON C. JORDAN, ESQ.**


**Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR**
             **Official Reporter**

<u>**Friday - March 6, 2020**</u>                                    **3:25 p.m.**

**P R O C E E D I N G S**

---oOo---

          **THE CLERK:**  Calling Civil Action 18-4865, In Re Tesla,

Inc., Securities Litigation.

      Counsel, please state your appearances for the record.

          **MR. PORRITT:**  Good afternoon, Your Honor.  Nicholas

Porritt, of Levi & Korsinsky, on behalf of the plaintiff, Glen

Littleton and the class.  And with me is Adam McCall of Levi &

Korsinsky.

          **THE COURT:**  All right.  Good afternoon.

          **MR. MCCALL:**  Good afternoon, Your Honor.

          **MR. KRISTY:**  Good afternoon, Your Honor.  Dean Kristy,

of Fenwick & West, for the defendants.  And with me are my

colleagues Jennifer Bretan and Alison Jordan.

          **THE COURT:**  All right.  Welcome, everyone.  Good

afternoon.  Thank you for your patience.

      I don't really need to spend time on this issue of

conversion to summary judgment or request for judicial notice.

It seems to me there's nothing that unusual about this case

that we can't treat this as a straight motion to dismiss.

      The five documents for which notice is being sought,

whether it's proper to take judicial notice of them or not, we

can get into a discussion about their relevance and whether

they should be noticed for purposes of their existence and not

03:26:13

1    for the truth of the matter stated, et cetera.

2         As far as I'm concerned, they're not particularly material

3    to what we need to do today, so I'd like to kind of get to the

4    merits of this thing first.

5         And, you know, to get to the August 7th tweet, the whole

6    question, as I assume with respect to truth or falsity and

7    scienter, is the statement "funding secured," not the "am

8    considering."  Isn't that the key question here?

9         And it does seem to me that, you know, there's a pretty

10   good argument, at least for purposes of the pending motion,

11   that to say something is secured does not reveal the fact that

12   there are some conditions, one of which was a pretty darn big

13   condition to any funding.  And it's arguably not accurate.  So

14   I'm not sure that's that complicated.

15        I understand there are other interpretations that might be

16   argued as to what that means, but it seems to me that there is

17   a reasonable interpretation that this means secured.

18        It's a firm offer.  As the senior director of investor

19   relations put it, a firm offer is as firm as it gets.  So I

20   guess that's the question.  Why isn't that enough to survive a

21   motion to dismiss at this point.

22        **MR. KRISTY:**  Sure, Your Honor.  I'm happy, happy to

23   address that.  I do think that's the key issue in the case.

24        I think when you look at that statement, to really

25   understand it and appreciate it, you have to look at the

03:27:59 1        context in which it was made.

2            What happened in the days leading up to it?  What did he

3        say?  What did he say about funding secured afterwards, and how

4        did the market react?  Those are all relevant facts that are

5        not just on falsity, but whether this is a deliberate lie.  And

6        that's really the test here under *Tellabs*.  It's not, could he

7        have used different words, better words, changed the words.

8            The question is whether he was engaged in a deliberate

9        scheme to hurt investors for ten days, which gained him

10        nothing.  That's ultimately the test.  That's ultimately what

11        they have to plead and what they have to show.

12            **THE COURT:**  And one of the arguments is that whether

13        he gained anything himself was not necessarily the motive.

14        This was to get the short sellers, short investors, and he

15        had -- he had it out for them.  Whether that's true or not,

16        that will have to be proven.  But, I mean, that's -- that's the

17        theory.

18            **MR. KRISTY:**  Right.  They have that speculative motive

19        theory.  And I really want to address that today, I really do,

20        because I think that's a very weak theory here, and it's

21        inconsistent with Mr. Musk's actual statements.

22            But let me step back for just one second, Your Honor, and

23        just talk about this pleading for a second, because this is a

24        very unique pleading in this case.

25            There are no confidential witnesses cited in this

03:29:14

1   complaint.   There are no internal documents cited in this

2   complaint.   There are no attributed sources, other than

3   occasional news articles, in this complaint.

4        We have pages and pages and pages of allegations without

5   any reference to where -- what is the basis for this

6   allegation, including this condition that they talk about,

7   about the production facility in the Middle East.   Who said

8   that?   When?   To whom?

9        None of those questions are answered, Your Honor.   And

10   that's why the plaintiff knows they've got a little problem.

11        This is a pretty unique complaint that usually doesn't get

12   past the goal line.   Those aren't well-pleaded facts, those are

13   just conclusions.   They don't cite any basis for it.

14        This is sort of the -- if the musical "Hamilton" were an

15   analogy, you have to be in the room when it happens.   Well,

16   they don't have anybody who's in the room when it happens, to

17   support those allegations.

18        That's why they tried to subpoena the SEC, because they

19   know they have these gaps.   And that was unsuccessful because

20   the Reform Act doesn't permit that.

21        And that's why the only thing they really do in this

22   complaint is copy wholesale from the underlying allegations in

23   the SEC complaint.   Of course, the SEC isn't subject to the

24   Reform Act.

25        And the law is very clear.   And I'm going to get into the

1    merits as though they've actually pleaded something in a

2    well-pleaded way, but the case law in this district is pretty

3    clear.

4         And Judge Freeman dealt with this directly in the *Lending*

5    *Club Securities Litigation*.  Just back in November we had a

6    very similar scenario, a lot of wholesale reliance on a

7    government complaint.  She said, "Plaintiffs may not allege

8    facts simply because they appear in government complaints."

9         She goes on to say, "They cannot do so without providing

10   any independent corroboration."  There has to be some

11   independent basis short of some allegation that some other

12   litigant offered in the case.

13        **THE COURT:**  So is the issue whether or not there was,

14   in fact, a condition of opening a plant in the Middle East?

15        **MR. KRISTY:**  Absolutely.  That's not a well-pleaded

16   factual allegation in this complaint.  It's conclusory, but

17   where they get it, on what basis --

18        **THE COURT:**  If that were expressly alleged, that

19   contrary to the assertion of -- that funding secured,

20   quote-unquote, that there was, in fact, this obstacle -- major

21   obstacle of having to agree to certain conditions, like opening

22   a factory in Saudi Arabia, that would be enough to state a

23   claim?

24        **MR. KRISTY:**  No, I don't agree with that, Your Honor.

25   But what I'm saying is, they haven't even pleaded that.  But

03:31:58 1      let's assume that they did.   Let's assume that they did.

2            For purposes of our motion, we assume that these

3      allegations can just be copied wholesale from some other

4      litigant.  Let's assume that.  I don't think that's proper

5      pleading, but let's assume it's true.

6            So then let's look at the context of what Mr. Musk did do,

7      what he did understand, and what he said.  All right.

8            The context.  He's had a long-standing interest in taking

9      this company private.  That's not disputed.  That's been public

10     knowledge for a long time.

11           For two years, the Saudi fund had pursued him about taking

12     Tesla private.  They certainly have the wherewithal to take it

13     private.  That, too, is conceded in the complaint, paragraph

14     63, among other places.

15           It was the fund that asked for the July 31 meeting with

16     Mr. Musk.  And it was attended by their senior decision-maker.

17     And at that meeting -- again, this is undisputed -- that senior

18     decision-maker again urged Mr. Musk to take the company private

19     and informed him for the first time that the fund had recently

20     acquired just under 5 percent, just under the public reporting

21     threshold, of Tesla shares.  They bought it, spent billions of

22     dollars to do that on the open market.  And, again, he urged

23     Mr. Musk to take the company private.

24           What's the proof of what -- the best proof of what

25     Mr. Musk believed?  Because this is a subjective test about

03:33:17 1    scienter.  What did he believe?  What did he take away from

2    that meeting?

3         Well, it's pretty clear, because two days later, on

4    August 2nd, he emails the board about his proposal to take

5    Tesla private at $420 a share.  This is all before anything is

6    public.  This is when everything is private.  That's Exhibit A

7    to our motion, it's referenced in the complaint, paragraph 69.

8         And on August 3rd -- and he explains the rationale, the

9    strategic rationale for why he wants to do it, how he would

10   like to structure it.

11        The next day, August 3rd, again conceded in the complaint,

12   there's a meeting of the board, at which Mr. Musk discusses the

13   funding source.  He discusses the Saudi fund with the board.

14        Now, if Mr. Musk didn't think that he was going to be able

15   to get funding from the Saudi fund based on that July 31

16   meeting, he wouldn't have emailed the board on August 2, he

17   wouldn't have discussed it with the board on August 3.

18        And the plaintiff has no answer to that at all, even

19   though we've emphasized it five times in our papers, because

20   there is no answer, because it shows you what he really

21   believed, what he believed.

22        Now, what happens after that?  Well, an entire process

23   ensues to show that everyone is taking this seriously.  The

24   board forms a special committee, retains advisers.  Mr. Musk

25   retains lawyers and financial advisers.  The company hires its

03:34:43

1    own set of lawyers --

2          **THE COURT:**  Well, paragraph 72 says in response to

3    Mr. Musk's email, the board held that telephone meeting in

4    which he informed the board that PIF was interested in funding

5    a go-private and that the fund was interested in having just to

6    build a production factory in the Middle East.  Concerning

7    building a production factory in the Middle East, at least one

8    board member said that's a nonstarter.

9          So there was some discussion about that.

10         **MR. KRISTY:**  According to the complaint, that's true.

11   But that's not inconsistent with the fact that they might

12   condition.  And that was the way the SEC phrased it, and these

13   guys have copied on it.  They might condition, they might not

14   condition.  A lot depends on what are you asking the fund to

15   do, how much are you asking them to invest?

16         And that brings me forward, Your Honor, to both the tweet,

17   the circumstances on when he tweeted and what he tweeted.  So

18   all of that happens on August 2nd and 3rd, and a process is

19   ensuing.

20         The tweet happens midday on August 7th.  The morning of

21   the tweet, the *Financial Times* reports an article that says the

22   Saudi fund had acquired 5 percent of Tesla shares, and the

23   price spikes up.

24         And proof that the price spiked up is in the SEC complaint

25   itself.  It's in paragraph 4, paragraph 46, paragraph 75, where

03:36:00 1   they all talk about how the price was up that day, about

2   5 percent, before Mr. Musk ever tweeted.

3       So he sees that --

4           **THE COURT:**  What paragraph was that?

5           **MR. KRISTY:**  It's in paragraphs of the underlying SEC

6   complaint.  These guys have decided not to copy those

7   paragraphs, but it's in paragraph 4, paragraph 46, and

8   paragraph 75, where the SEC talks about the price movement that

9   day, before Mr. Musk --

10          **THE COURT:**  But it's not in this complaint.

11          **MR. KRISTY:**  It's not in this complaint.  What's in

12   this complaint, in paragraph 90, is an analyst's report that

13   says -- and it's quoted in the complaint, that says, The price

14   spiked up this morning upon a report that -- by the *Financial*

15   *Times* that the Saudi fund acquired somewhere between 3 and

16   5 percent of the shares.  That's in paragraph 90.

17       And none of that is really seriously contested.  I mean,

18   the fact of the *Financial Times* story and that it occurred 30

19   minutes before he starts tweeting is sort of an unassailable

20   fact.  They want to fight about what inferences you draw from

21   all that, and that's fair enough.  We can discuss that.

22       But that's the state of play.  And when Mr. Musk issues

23   his tweet, he says, I really wanted to do this so that all

24   investors would have the same information at the same time.

25   That's what happens.

1          Now, let's look at those words that he used and the

2     context he used them, what happens.  So, literally, what that

3     tweet says is, "Am considering taking Tesla private at 420.

4     Funding is secured."

5          The next time Mr. Musk speaks to that issue is on

6     August 13.  And there's the blog post.  It's Exhibit K.  It's

7     also quoted verbatim in the complaint, where he explains "why I

8     said funding secured."

9          So between August 7th, the tweet, and August 13th, when he

10    gives his explanation, there is a lot of noise in the market.

11    No doubt about it.  And analysts -- again, the ones quoted,

12    paragraph 97 of the complaint, analysts are saying, That's an

13    incomplete statement.  He hasn't provided any details.  It

14    could mean any one of a number of things.

15         And Evercore, one of the analyst's reports quoted in the

16    complaint, talks about that.  Could be a written commitment.

17    Could mean a verbal commitment.  Could mean less than that.

18    It's unclear what it means.

19         But under *Brody* and other Ninth Circuit authority, the

20    fact that a statement is incomplete doesn't make it misleading.

21    You've got to show more than that.  You've got to show that it

22    affirmatively creates an impression of a state of affairs that

23    differs in a material way from the one that actually exists.

24    That's the legal test.  Not incompleteness.  Not I'd like to

25    know more.  The facts have to be much different.

1    So Mr. Musk --

2         **THE COURT:**  Well, it depends on the materiality of the

3    facts that are omitted.

4         **MR. KRISTY:**  Absolutely.  Absolutely, Your Honor.

5         **THE COURT:**  And if there was a contingency that was

6    potentially problematic or substantial, substantial commitment,

7    that could be deemed sufficiently material to make that a

8    misleading statement.

9         **MR. KRISTY:**  Potentially, Your Honor, but, you know,

10   we don't even have to speculate about it because on August 13th

11   Mr. Musk explains exactly what he meant.

12        On August 13th, in that blog post, he gives the background

13   to his historical meetings with the fund.  He gives the details

14   of what he thought his discussions were about.  And he explains

15   why he came away from that meeting with, in his mind, no

16   question that a deal with the Saudi fund could be closed.  And

17   he explains that in detail.

18        And how does the market react?  This is theoretically new

19   information, more information.  There's no indication from

20   Mr. Musk in that tweet that "I have a terms sheet," that "we

21   agreed on all of the terms of any potential financing," all the

22   stuff that the plaintiff alleges.

23        So he says all of that on August 13th, and how does the

24   market react?  The market doesn't react at all.  In fact, the

25   price doesn't go down.  That's what you would expect if this

03:38:48

03:40:00

1   was some revelation that was highly inconsistent with his

2   original tweet.  Instead, the price actually goes up a little.

3        And one of the analysts, I think -- that's quoted in the

4   complaint, paragraph 105, I think, hits it spot on, spot on.

5   It's a *Morning Star* report, august 14th --

6        **THE COURT:**  You're getting to causation now.  I

7   thought we were just talking about the very threshold issue of

8   truth and falsity, so I don't need to hear about -- what's the

9   relevance of whether the market actually went up or down at

10  this point?

11       **MR. KRISTY:**  Well, it goes to show you, Your Honor,

12  that -- whether the market was misled in the way that the

13  plaintiffs are claiming.

14       **THE COURT:**  That's indirect evidence of whether there

15  was truth or not.  And my question is, in his August 13th

16  tweet, where does he say anything about the potential plant in

17  Saudi Arabia?

18       **MR. KRISTY:**  He doesn't say that, because, again,

19  that's not a well-pleaded allegation in the complaint.

20       **THE COURT:**  Isn't that the point?  Instead, he says no

21  question that a deal with the Saudi sovereign fund could be

22  closed.  That's an impression he left.

23       **MR. KRISTY:**  Right.  That's his conclusion, correct.

24  He said, "I believed."  I left that meeting --

25       **THE COURT:**  Yeah.  He said that, but he doesn't say

03:41:21

1  anything about, well, there's one potential fly in the

2  ointment, that at least one board member says it's a

3  nonstarter, and that is, we've got to open a plant in Saudi

4  Arabia.

5      **MR. KRISTY:**  And we don't know from the complaint when

6  that director supposedly said that, who that director even is,

7  to whom they said it.  That's not pleaded.  That's kind of a

8  who, what, when, why, and where on fraud.

9      **THE COURT:**  Well, it is said that it happened, that

10  comment was made at the meeting of the 3rd; right?

11      **MR. KRISTY:**  Well, they have that in that paragraph,

12  but what's the basis for that allegation?  Just lawyer say-so?

13  There isn't a cited source.  There isn't a reference to

14  anything.  With the aid of a wordprocessor, anyone can type

15  anything.

16      But let me go to the mindset, Your Honor, because even if

17  you want to think that Mr. Musk's words could have been better,

18  he could have used different words, let's go to what's his

19  motive.  What's his incentive?  Why would he lie about that

20  detail?  What did he stand to gain from that?

21      And the plaintiff doesn't really answer that.  We get kind

22  of two arguments that are really the main scienter arguments in

23  their brief.  One is that he admitted it.  Right?  They say

24  they interpret the SEC settlement as some sort of admission,

25  when, in fact, it's a no admit/no deny settlement, which

1    reserves his right to contest anything in any case.

2        So that is sort of a roadmap to nowhere, but that's one of

3    their two main arguments.  He admitted that he never had

4    funding.  So that doesn't work.

5        So then the other motive, why would he lie?  Because you

6    still have to have some rationale.  That is the short seller

7    reasons -- right? -- that he wanted to do it to get at the

8    short sellers.

9        Well, that argument -- put aside, sort of, the speculative

10   nature of that, nobody comes out and says it -- it really kind

11   of backfires in some ways here.  No one really triggers an

12   entire process, hiring advisers and special committees and the

13   like, just to hurt short sellers.  It's not all some big, grand

14   ruse to get at short sellers for a short period of time.

15       Obviously, short sellers are hurt every time a stock price

16   goes up, they benefit every time a stock price goes down.  That

17   in and of itself doesn't prove anything.  That happens every

18   single day.

19       When you look at what Mr. Musk -- and he does refer to

20   short sellers in Exhibit A when he goes to the board on

21   August 2 and says, here's among the rationale for why I want to

22   take the company private, and he repeats it.

23       In his August 7th blog, he makes reference to short

24   sellers.  But what he says about short sellers is that the

25   benefits of the transaction are, in part, designed to get away

03:44:02

1   from their negative propaganda and their defamatory remarks

2   that hurt our valuable brand and hurt our shareholders.

3   Shareholders who, he also tweeted, I might add, on August 7th,

4   who he said he will ensure their protection and their welfare.

5   Those are among the tweets.

6      So what is he saying?  He's saying we have to get away

7   from this short-term thinking, the defamatory remarks and

8   negative propaganda of the short sellers.

9      That isn't a reason, a motive, to commit fraud.  It's a

10  motive to take the company private.  It underscores his good

11  faith, not his bad faith.

12     He didn't say, I did this so I could get even with the

13  short sellers.  He said, We've got to get away from them.  That

14  enhances the value of our company, it enhances the benefit to

15  the shareholders.

16     And it's obvious, if he was just lying about that.  So

17  let's say it's just a grand ruse.  Right?  It's just to lie

18  about it.  I'm just going to say it, "funding's secured."

19  That'll really give it to the short sellers.

20     Let's say that there was a fact witness who even could

21  support that.  Well, the lie is going to be revealed ten days

22  later when they don't do the deal.  That's not something you

23  can conceal.

24        **THE COURT:**  I guess that's the question.  If the

25  untruth is proven, and I know you contest that vigorously and

03:45:19  1   you say they haven't alleged it sufficiently, but if it's

2   unproven, I'm not sure, in a case like this, you need much more

3   in terms of scienter.

4       I mean, motive sometimes provides one of the plus factors

5   when you're looking at projections and you can't tell whether

6   it's a sincere projection or not.  But here, if it is found

7   that this was a material omission and misleading statement and

8   he knew what the real facts were, i.e., you know, there was a

9   real problem, that funding wasn't secure absent some condition

10   that at least one board member said was a nonstarter, I don't

11   know how deep you have to get into this.

12       It's not your typical case where you have to get deep into

13   motive and -- you know, it's an ancillary factor.

14       **MR. KRISTY:**  Fair enough, Your Honor.  Fair enough.

15   But that's their argument.  Their argument is admissions and

16   short sellers.  And I don't think that those work.  I don't

17   think a fraud for ten days designed to hurt short sellers, only

18   to reveal the truth, makes a whole lot of sense.

19       **THE COURT:**  Well, let me ask you, where is it that --

20   what is the untruth?  Is it the "funding secured"?

21       **MR. PORRITT:**  In that particular tweet, "funding

22   secured," Your Honor.

23       **THE COURT:**  What is untruthful about that?

24       **MR. PORRITT:**  Funding wasn't secured.

25       **THE COURT:**  Well, why was it not secured?  Was it

03:46:34

1    because of the condition, or was it because there was still the

2    shareholder approval thing, or was it because there was some

3    uncertainty on the Saudi side?  What was it that made it not

4    secured?

5         **MR. PORRITT:**  There was no agreement, verbal or

6    written, to provide funding.  There was no agreement on the

7    terms of the funding.  There was no suggestion, no agreement on

8    the price on which the transaction would occur.

9         There was no consideration of the amount for which the

10   funding will be provided by that particular fund or by any

11   other fund.  There was -- no firm decision had been made by the

12   public investment fund to commit to any funding.

13        And there was the condition of the manufacturing facility

14   in the Middle East, which is one of the conditions but only one

15   of the many.

16        **THE COURT:**  And where is that alleged?

17        **MR. PORRITT:**  Well, that's set forth in paragraph 64

18   and 65 of the complaint, paragraph 72 of the complaint,

19   paragraph 102 of the complaint.  And *New York Times* noted,

20   paragraph -- in 112, funding was not secure and that the PIF

21   had not committed to provide any cash.

22        And so I think it's more than well-pleaded, on a motion to

23   dismiss, that funding was not secured at this particular

24   instance on August 7th.

25        I mean, "funding secured" -- my friend said that, you

03:47:54

know, this isn't a question about the choice of words.  Well, of course it's about the choice of words, because "funding secured" isn't "funding might be secured," "confident in talks about funding."  Lots of different ways Mr. Musk could have expressed the same idea.  He didn't.  He used "funding secured."

**THE COURT:**  So why doesn't that go to scienter?  If it's a matter of, yeah, well, maybe they didn't come down with a term sheet or anything, but why can't it be inferred that he had enough confidence in this, in his conversations, to believe that it was, in a more kind of lay sense, secured?  And, in fact, enough that he sent an email to the board to talk about this?

Well, I guess he did admit, at least, according to allegation in 69, that there's a lot of uncertainty, but, nonetheless, that -- you know, that he had enough interaction with the officials in the PIF to believe that they were ready to commit.

**MR. PORRITT:**  Well, first of all, his email to the board doesn't say "funding secured."  So to say the tweet is consistent with the email to the board is incorrect because "funding secured" is additional to it, and it's in that August 2nd email to the board.

And I would submit that "funding secured" is -- it's very notable it's in the past tense, as if it's been completed.

03:49:33

1    Funding is available, is completed, is secured.  And that was

2    the phrase that the entire market, as you picked up on, and all

3    the analysts picked up on.

4        And I don't think you can get a better proxy for what the

5    market -- for a reasonable investor than JP Morgan.  And their

6    analyst was very clear, saying either funding is secured or it

7    is not secured, and Tesla's CEO says funding is secured.

8    That's in paragraph -- that's an analyst's quote in paragraph

9    96 of the complaint.

10       I mean, it can't get any more crystal clear than that.

11   And funding wasn't secured under any rational interpretation

12   the -- of those words and, certainly, under any reasonable

13   inference that we are entitled to as a plaintiff on the motion

14   to dismiss.

15       I think we have more than adequately pleaded that that

16   statement's incorrect.  And as Your Honor, I think, has

17   identified, if you accept that it was untrue, then it was

18   knowingly or at least deliberately recklessly untrue by

19   Mr. Musk, because he was the one who knows whether funding was

20   secured or not.

21       And to get to Mr. -- counsel's arguments about the

22   context, you initially didn't want to talk about the motion to

23   convert, but all those facts that he talked about, about the

24   *Financial Times* article, and what Mr. Musk was doing, and how

25   he was responding to the market price, none of that is in the

03:50:49 1    complaint.  That is all additional facts.

2         No one knows -- there's no fact, we don't know Mr. Musk

3    ever read that *Financial Times* article or that he knew what the

4    stock price was doing.  The *Financial Times* article was

5    published at 12:18 p.m.  He tweeted at 12:48 p.m.  During that

6    time he has stated he was driving to the airport from his

7    house, driving himself while tweeting, incidentally.

8         So when he saw this article, how it was brought to his

9    attention, if it ever was, the fact that on August 13th, as

10    counsel said, he set forth a self-serving statement for the

11    circumstances to try and limit the damage caused by this

12    August 7th tweet, nowhere does he mention responding to a

13    *Financial Times* article.

14         Nowhere does he respond to a price spike that had

15    occurred, supposedly, around noon on -- noon Eastern Time on

16    August 7th, which, by the way, is not in the complaint and is

17    not even referenced that -- that analyst article that counsel

18    referred to did not refer to a spike in price; it refers to

19    just the *Financial Times* report.

20         **THE COURT:**  Explain to me, what -- maybe I don't fully

21    understand.  What is the alleged response to the financial --

22    why is the August 3rd tweet -- or is it August 7th --

23    August 7th tweet a response -- I guess I'm missing something.

24         How is that a response to the *Financial Times* article

25    about the Saudi investment?

03:52:25

1    **MR. PORRITT:**  It's not our theory, Your Honor.

2    **THE COURT:**  What do you understand it to be?

3    **MR. PORRITT:**  I think what they're trying, because

4  they realize that the previous excuses by Mr. Musk don't hold

5  water, so this is like -- this is like version number five of

6  why he said "funding secured" when he had no basis to do so.

7    So it was set forth for the very first time in the motion

8  to dismiss filed a few months ago, 18 months after this tweet.

9  For the very first time, after he's had *New York Times*

10 interviews and put his own blog post out there, he comes up

11 that he was really responding to concern about there was an

12 increase in price following, supposedly, this *Financial Times*

13 article published at 12:18 p.m. on August 7th.

14   And then, I don't know why, to ameliorate or to some way

15 explain what that might be all about or that that news about

16 his discussions with the public investment fund might leak out

17 somehow, he decided to send out this tweet.  I think that is

18 the theory.  It is rather half baked.

19   **THE COURT:**  Once again, explain what is the --

20   **MR. KRISTY:**  That's the inference, Your Honor.  In

21 other words, he did make this tweet midday while the market was

22 open.  So you kind of ask yourself, well, why did he do it

23 then; right?  Plaintiffs don't have an allegation as to why he

24 did it then.

25   They have motives, theory, as to why he was lying and

03:53:48

1    everything else, but why did he issue the tweet at the time he

2    did?  Well, he had just had the meeting with the Saudi fund.

3    Their investment was not public information because they were

4    under the 5 percent public reporting threshold, and yet a news

5    story leaks containing that information.

6        So a natural inference from that is what else is going to

7    leak is the nature of the discussions about the take-private

8    transaction that everyone agrees they also discussed on

9    July 31st.  So that, the tweets follow that.  It's simply an

10   inference.

11       You don't have to depend -- it wouldn't explain a lie.

12   It's not a defense to a lie, but it's an explanation for what

13   is the sequence of events, what are the exigent circumstances

14   that are causing him to tweet.  That's no more than that.

15           **THE COURT:**  The idea this would preempt further leaks?

16           **MR. KRISTY:**  Correct.  Correct.  That makes sense;

17   right?  And now he's telling everybody at the same time what

18   the -- about the transaction that he's considering.

19       You don't have to put undue weight on it, but they react

20   to this story as though it's some bad fact for them.  And it

21   simply explains the sequence of events that occurred between

22   the time of the meeting with the Saudi fund and the time of the

23   very first tweet.

24       I want to add one other thing --

25           **THE COURT:**  I'm still trying to understand how --

03:55:01

1   substantively, why does this -- I mean, if you're afraid it's

2   going to be leaked out that there's discussion, why not say it?

3   This may be problematic, but why not say something a little bit

4   more accurate, like "preliminary discussions about possibly

5   going private" or something?

6       To name a price and say "funding secured" seems to go a

7   couple of steps beyond just merely anticipating and preempting

8   a further leak.

9           **MR. KRISTY:**  Well, "am considering" is accurate.  He

10  was considering it.  And no final decision was made.  He says

11  that.

12          **THE COURT:**  What about the 420?

13          **MR. KRISTY:**  420 was the price.  That's in the email

14  to the board.  That's why he's considering taking the company

15  private.  There's no allegation in this case, a fact allegation

16  said that that wasn't really the price.

17      So you go back to "funding secured."  And what would be

18  really easy in this case to show falsity of that statement is

19  if you couldn't do this deal because of an absence of funding.

20      All right.  If you had to come clean later on and said, "I

21  couldn't get the money," then, yeah, that goes to your scienter

22  point, Your Honor.  That would be, sort of, a direct evidence

23  of a lie, but it's not all the shades of gray of saying, look,

24  I believe I could get this funding.

25      It's so -- I'm trying to think of a good analogy, Your

03:56:19

1   Honor, and I don't have a perfect one, but let me take a stab

2   at this one.  All right.

3       Suppose Your Honor is interested in buying a house, and

4   for two years you've been in discussions with a bank about

5   providing you with financing for that house.  And the bank is

6   telling you, Judge Chen, buy that house, we're going to give

7   you the money.  Buy the house, we're behind you all the way.

8       And then they meet with you again a couple of days before

9   you make an offer on the house, and they say, Judge Chen, let's

10  do this, we're going to support you, we're going to give you

11  that funding.

12      Now, you haven't signed the mortgage, you don't know all

13  the deal terms, you haven't agreed to all of the dotting of the

14  Is and the crossing of the Ts, but that's what they're telling

15  you.

16      And then you go and you meet with your buyer, and they

17  say, Are you going to be able to pay for this?  And you say,

18  Yeah, funding's secured.  That's not a lie.

19      It's incomplete.  It doesn't say anything about what the

20  nature of that secured funding is, but it's an accurate

21  statement about what you're trying to convey.  And it's

22  certainly not a purposeful fraud, especially when, as it turns

23  out, you have the funding to do the deal.

24      And that kind of circles around, Your Honor, to one other

25  issue that's in this case.  And, again, I know --

03:57:33

1        **THE COURT:**  Well, the comeback is going to be, unlike

2    the situation you posit where there's been a specific

3    discussion with the bank about the terms and how much and that

4    sort of thing, they say in paragraph 64 that there are no

5    fundamental terms discussed, like the dollar amount, the

6    ownership percentage, acquisition premium, if any, potential

7    restrictions, et cetera, et cetera, that these are -- that's

8    like me telling the seller funds secured, and I just had a

9    preliminary discussion with the bank that says, yeah, we're

10   interested in lending on something, but you'll have to get me

11   some more information at some point.  And I don't have an

12   appraisal, I don't have an amount, I don't have anything.

13        At some point, I mean, I understand that maybe, number

14   one, it's not necessarily untruthful, it's not necessarily

15   misleading, or it's a harder case for scienter, but it sort of

16   depends on, you know, on how far along the spectrum one is when

17   one says "funding secured."

18        **MR. KRISTY:**  Understood, Your Honor.  Let me bring one

19   other issue up with "funding secured," if I may.

20        **THE COURT:**  Yeah.

21        **MR. KRISTY:**  And that's the loss causation point.  And

22   I know loss causation isn't usually the -- you know, it's more

23   the tail than the dog.  But one thing that's pretty compelling

24   in this situation is whatever you think "funding secured"

25   means, Mr. Musk only spoke to it on August 7th, okay.

03:58:5㏘

           The price goes up on August 7th.  He speaks to it on
     August 13th, price doesn't move.  Talking about what he meant
     by "funding secured."  That's it.

           There are no other class period statements about funding
     secured until August 24th, after the class period, when he
     reaffirms that the process said to him that funding would not
     have been an obstacle, that it actually confirmed that funding
     was available.

           So to have loss causation, you have to show that there's a
     corrective disclosure that "funding secured" was revealed
     during the class period to be a lie, that there's a corrective
     disclosure.  And that can't be.  It can't be speculation from
     market participants about that or analysts writing their own
     opinions about it.

           The law is very clear about that.  If you read
     Judge Orrick's decision in the *Cellular Biomedicine* case, Judge
     Seeborg's case in *Trexon*, what pundits think about doesn't
     matter.  What's the corrective disclosure?  There is none.

           The plaintiff takes a stab at one.  They say that
     *The New York Times* article dated August 16th, that gets
     published on August 17th, contains an admission from Mr. Musk
     that funding was not secure.  That's what they say.

           They talk about that article a whole bunch, by the way.
     But they never gave you the article, so we gave it to you.
     It's Reply Exhibit 1 to the Bretan declaration.

04:00:25

1          We gave you that article.  And that article can be read in
2     vain for any admission from Mr. Musk that he didn't have
3     funding.
4          In fact, what that article does, to the extent it talks
5     about the take-private transaction is it basically reiterates
6     everything Mr. Musk said on August 13th.  And the author
7     concludes -- based on the same information that's already out
8     there, the author says something like, but funding was far from
9     secured.
10          So that's great for *The New York Times* author, but that's
11     not a corrective disclosure coming from the company.  It's a
12     rehash of information that's already out there.
13          Now, the stock price does decline a little bit that day,
14     on August 17th, but it has nothing to do with new information
15     about funding secured or even new information about the
16     take-private.
17          There's a bunch of derogatory comments in that article
18     about Mr. Musk in terms of how emotionally drained he is.
19     There are allegations of recreational drug use and other things
20     in there in that story, and we put it before the Court.  It's a
21     very negative, unfair story.
22          But in terms of a corrective disclosure on funding
23     secured, it just ain't there.  And this is a fundamental
24     element of their claim --
25          **THE COURT:**  Well, at least as represented in the

04:01:41

1    complaint, it states that the going-private transaction was far

2    from secure and that the PIF had not committed to provide any

3    cash.

4         **MR. KRISTY:**  That's the allegation.  That is a quote.

5    What they're trying to do is quote the article.  But that's not

6    a corrective disclosure by the company.  And it's all based on

7    information that's already out there on August 13th.

8       What they're saying in their papers is Musk admitted it,

9    and he did not.  He's never admitted it.

10        **THE COURT:**  Where, on August 13th, was it evident to

11   the public that the PIF had not committed any --

12        **MR. KRISTY:**  Well, because he describes exactly what

13   they did do.  And he said that it was -- he describes their

14   conversation, describes what the level of --

15        **THE COURT:**  You're talking about his August 13th

16   tweet?

17        **MR. KRISTY:**  His August 13th blog post.

18        **THE COURT:**  The blog post.

19        **MR. KRISTY:**  Right.  It's Exhibit K, I believe.

20        **THE COURT:**  It's quoted in 103.

21        **MR. KRISTY:**  Yeah, it's quoted in 103.  Let me just go

22   to it, Your Honor.

23      And he says -- and he goes through there.  And when you

24   look at the tweet in Exhibit K, he says, "Why did I say

25   'funding secured'?" and he gives the history of what happened.

04:02:54

1    He talks about the recent meeting with the Saudi fund.  He

2  said:

3         "During the meeting the managing director of the fund

4      expressed regret that I have not moved forward previously

5      on a going-private transaction with them, and he strongly

6      expressed his support for funding a go-private

7      transaction.  I understood from him that no other

8      decision-makers were needed and that they were eager to

9      proceed."

10  He then says:

11         "I left the July 31 meeting with no question that a

12      deal with the sovereign fund could be closed and that it

13      was just a matter of getting the process moving.  That's

14      why I referred to 'funding secured' in the

15      August 7th announcement."

16     And he goes on to say in the next paragraph that -- what

17  his conversations had been with the Saudi fund, and he says he

18  has expressed support for proceeding subject to financial and

19  other due diligence and their internal review process for

20  obtaining approvals.

21     And he goes on to say he also asked for additional details

22  on how the company would be taken private, including any

23  required percentages and any regulatory requirements.  That's

24  what he says.

25     Now, at that point in time does he literally say "Here's a

1    bunch of things that I didn't have"?  Well, he didn't.  But

2    nobody reading that paragraph could say, There's a term sheet,

3    we have a certain amount guaranteed coming from the Saudi fund.

4    There's just no way you can read those words and interpret them

5    in that way.

6        So this is the exact description of what he's saying

7    happened, and it's the way the market reacts to it.  That

8    *Morning Star* report says, yeah, it just looks like the Saudi

9    fund can provide some sizable financing, and this isn't going

10   to be an impediment to getting the deal.  That's what he

11   literally says.  He explains it.

12       So whatever you think of his words on August 7th, and

13   maybe he was too optimistic and he got out a little over his

14   skis, but he tells you exactly what he meant on August 13th.

15   And that's not indicative of scienter, some intent to mislead.

16   He's telling you, in effect, I don't have this term sheet and

17   all the other details agreed upon.  This is what I'm doing.

18       And if you move on in that same document, again, the parts

19   that aren't even alleged to be misleading, he says -- it's

20   couple of paragraphs down.  He says:

21       "I continue to have discussions with the Saudi fund,

22       and I am also having discussions with a number of other

23       investors, which is something that I always planned to do,

24       since I would like Tesla to continue to have a broad

25       investor base."

04:05:21

1        That's what he says.  That, too, is consistent with his

2   tweets.  Because one of the tweets that the plaintiff doesn't

3   like, they don't like to talk about much, but one of his early

4   tweets, in response to a question from stockholders, is in

5   Exhibit D.  And one of the things they asked him and one of the

6   things he said is, "I don't have a controlling vote now.  It

7   wouldn't expect any shareholder to have one if we go private."

8        So he's saying from the very beginning, well, I think I

9   can get the money for this.  Nobody is going to -- nobody is

10  buying 80 percent of this company.  This is going to be a

11  widely dispersed group.  And he says that in the tweet.  That's

12  what that conveys, Exhibit D, and it's entirely consistent with

13  his statement on August 13th.

14       And that's why you can't find fraud.  You can quarrel with

15  his words.  I get it.  I get it.  But the notion that he's

16  trying to mislead people, trick them into thinking that the

17  Saudi fund had signed some commitment letter, that's just not

18  consistent with the facts and the inferences that you can draw

19  from them.

20       And that's why there's no loss causation, too, because the

21  market -- how does the market react to August 13th?  It kind of

22  understands this already, because the market is like, uhm,

23  okay, there isn't a big crash like this is new information.

24            **THE COURT:**  I tell you, the way I read this --

25            **MR. KRISTY:**  Okay.

04:06:4 **THE COURT:** -- I mean, it looks like he's justifying

what he said after the 31st meeting, which seemed much more

certain, because he says it was expressed to him strong support

for the funding, that no other decision-makers were going to be

needed, they were eager to proceed; therefore, he left the

July 31st meeting with no question that a deal with the Saudi

sovereign fund could be closed, just a matter of getting the

process moving.

That's why, retrospectively, I referred to "funding

secured" in the August 7th announcement.  Following that

announcement, he muddied it a little bit and says, well, I

continued to communicate with the managing director.  He

expressed support for proceeding.  Based on due diligence and

internal review, he asked for additional details.

He's now saying -- after the August 7th announcement, he's

got a slightly different gloss on things.  Well, they've got to

do due diligence and, by the way, uhm, you know, I want to see

what other sources there are.  It may be premature, you know,

to commit to one.  I continue to have discussions.

So it sounds to me like a little bit of backtracking,

which doesn't necessarily mean that his -- I mean, he's

explaining his scienter, because he says, according to him, he

firmly believed as of 31st he had the deal in the bag, there

was nothing other than just moving forward.

After the 7th, he's now saying on the 13th, well, it's a

04:08:15 1    little premature, we've got to do some due diligence, blah,

2    blah, blah, blah, blah.  And by the time the article comes out

3    on the 16th or the 17th, at least it's stated that, well, the

4    fund had not committed to providing any cash and was far from

5    secure.

6        So there is a shift over time.  And there's going to be

7    issues in this case about loss causation because, you know, I

8    forget what happens on the 13th when there's a slightly

9    different tone and an even different tone on the 16th or 17th,

10    but that's the way it looks to me when I look at this

11    complaint.

12        **MR. KRISTY:**  Understood that, Your Honor.  But on loss

13    causation, the law is pretty clear that it's not loss causation

14    based on the opinion of a *New York Times* article written -- if

15    you wanted to say that the company made a corrective disclosure

16    on August 17th, then that loss might be loss causation.

17        **THE COURT:**  You're saying it's the law that if a

18    falsity is discovered and not admitted to by the company, they

19    don't make a formal corrective disclosure, but it is discovered

20    and uncovered, let's say, by an agency or an investigative

21    reporter and stock drops, there is no loss causation?

22        **MR. KRISTY:**  There can be, but if the reporter is

23    revealing new information.  If they are basing their

24    conclusion --

25        **THE COURT:**  Well, that's the argument here, is the

04:09:37

1    August 16th article knew when it says it was far from secure,

2    which is a lot different from saying it was secured, and the

3    that the fund had not committed to providing any cash.

4        That's a little different -- well, quite a bit different

5    from the original tweet, and quite a bit different from the

6    August 13th blog.

7            **MR. KRISTY:**  But when you read the article -- this is

8    the key, it's not that conclusion.  It's is this opinion

9    based -- this is what Judge Orrick talks about in *Cellular*

10   *Biomedicine* and what Judge Seeborg talks about in *Trexon*.

11       It's, is that opinion of the market analyst/reporter,

12   whoever it is, is this based on new information or is it simply

13   their opinion based on old information?

14       And the problem the plaintiff has is they have the

15   pleading burden here.  I don't have to disprove it.  They have

16   to plead what the new information was that lends support for

17   that conclusion.

18       And they haven't done that because, to the extent that

19   article talks about the take-private transaction, it's the same

20   stuff that was already in the market by August 13th.  That's my

21   simple point, Your Honor.

22       You're right, yes, an investigative report, sure, if it's

23   based on new information.  But the plaintiff -- and this is a

24   specificity requirement under Ninth Circuit in the *Apollo Group*

25   case.  The plaintiff has to plead loss causation with

1    specificity.

2        So show what's new in that article about the take-private,

3    not just the ultimate opinion of the author.  What are the new

4    facts about the take-private?  And that's what they haven't

5    pleaded, and that's why they can't show loss causation, in my

6    mind, as to "funding secured."

7            THE COURT:  All right.  Let me get your response.  And

8    I'd like to know, why is there kind of at least a partial

9    withdrawal or partial disclosure by the 13th?

10           MR. PORRITT:  Well, Your Honor, so August 13th,

11   first -- and I think Your Honor has it exactly right -- it's

12   useful as an attempt for damage control by Mr. Musk.  I think

13   it is self-serving, and I think it is -- he condemns himself

14   out of his own mouth, because of the things that Your Honor

15   described, that there will be due diligence; that there'll be

16   further discussions; that we'll do a market test about other

17   potential inventors.

18       All of that is what happens before funding is secured, not

19   after funding is secured.  So all those statements demonstrate

20   the falsity of the August 7th tweet that funding was secured.

21           THE COURT:  And what happened to stock prices upon the

22   release of the 13th --

23           MR. PORRITT:  The stock price is kind of flat starting

24   out.  But what I would add to that --

25           THE COURT:  Does that have any causation problem for

04:12:18

1    you?

2         **MR. PORRITT:**  With respect, no, Your Honor, because --

3    and let me say why.  Because counsel for Mr. Musk and Tesla

4    here, of course, have omitted half of our loss causation

5    allegations, which was there was extensive reporting in the

6    media every day from August 7th right through to August 17th.

7         A critical disclosure was the disclosure on August 9th,

8    that an SEC investigation was -- had been opened investigating

9    whether Mr. Musk had any factual basis for his "funding

10   secured" and other tweets on August 7th, which, under *Lloyd*, by

11   the Ninth Circuit, is more than enough to establish loss

12   causation.  And the stock price went down $18 on the day after

13   that news report.

14        There was a further report on August 16th that -- that

15   formal subpoenas had been issued by the SEC, again aimed

16   directly at whether Musk intentionally misled investors through

17   his August 7th tweets.

18        So all of that is information that goes into the market,

19   as well as other reporting by *Bloomberg*, by the *Wall Street*

20   *Journal*, by *The New York Times*, all of which --

21        **THE COURT:**  And that's within the chain of causation,

22   that the SEC disclosure, obviously, as you would argue, is

23   causally related to the untruth.

24        **MR. PORRITT:**  Absolutely.  There is cases, obviously,

25   of just a general disclosure an SEC investigation exists may

04:13:41

1    not be sufficient to establish loss causation.

2         But I'd say the *Lloyd* case is crystal clear on this, by

3    the Ninth Circuit, that where that investigation is tied to the

4    subject matter or the alleged misrepresentation, and the stock

5    price declines, and there's a subsequent disclosure by the

6    company, or it is subsequently revealed that, in fact, the

7    subject matter of the fraud is sort of confirmed, if you like,

8    by the subsequent disclosure, the drop on the announcement of

9    the investigation establishes loss causation.

10        So here you don't need to try and connect the dots to

11   whether the SEC investigation announced related to the Musk

12   tweets on August 7th, Musk and Tesla tweets on August 7th,

13   because that's what the story said.

14        **THE COURT:**  So what was new about *The New York Times*

15   piece that brought to the market new information that resulted

16   in further loss?

17        **MR. PORRITT:**  So I think there's a -- I think a bunch

18   of things.  And we've been focusing very much on "funding

19   secure," and I think that's correct, but that's not the only

20   misleading information that Mr. Musk introduced into the market

21   on August 7th.

22        It's also in the nature that the whole -- that this

23   transaction was at all serious and far advanced and imminent,

24   and, in particular, that investor support was secured.  I mean,

25   that's what he tweeted at 3:45 p.m. on August 7th.

1   He quite specifically said, "Investor support is

2   confirmed.  Only reason why this is not certain is that it's

3   contingent on a shareholder vote."

4   So it's not just that funding was secured or the funding

5   is past that, because clearly the transaction is not going to

6   be imminent if you don't have funding secured.  But it was also

7   the whole aspect that this was well-thought-out, that this was

8   considered, and that this was --

9   **THE COURT:**  So in the complaint -- let me make sure I

10   have that.

11   **MR. PORRITT:**  That allegation is in -- what's the

12   paragraph?  Paragraph 130 is the specific misrepresentation,

13   Your Honor.  In a sort of chronological section of the

14   complaint, if you like, it is at paragraph 85.

15   3:36 p.m.  Sorry, I misspoke.

16   **THE COURT:**  Which?

17   **MR. PORRITT:**  Paragraph 85, Your Honor.

18   And if you want an insight into Mr. Musk's state of mind

19   or scienter as of August 7th, rather than relying on

20   self-serving statements or somehow subjective pure-heart-type

21   sort of statements from his counsel, you can say what Mr. Musk

22   says about investor support, which he wrote in his later on, on

23   August 24th blog post, where he states that:

24   "After having spoken to investors," which he clearly

25   had not done by August 7th, "it's apparent that most of

04:16:45 1        Tesla's existing shareholders believe we're better off as

2        a public company.  The sentiment of those shareholders, in

3        a nutshell, was please don't do this."

4        That's August 24th.  Two weeks earlier, he had said

5   investor support for the transaction is secured -- is

6   confirmed.  That's Musk's own statements.  I don't know how

7   more clearer you can get, for both scienter and a false

8   statement you can possibly get.

9        And those are particularized facts.  And that's not

10  apparent -- if you want to talk about the SEC complaint -- and,

11  I believe, the lying to the SEC complaint, for reasons we've

12  cited, and the *Verifone* decision by the Ninth Circuit supports

13  it, the recent decision by Judge Breyer in -- not Judge

14  Breyer -- in *McKesson* also completely supports why it's

15  completely okay to rely on allegations in the SEC complaint,

16  which are, A, admitted to by the defendant in the settlement;

17  and, B, are based upon an investigation that the SEC has

18  conducted.

19        But, in any event, this one has nothing to do with the

20  SEC.  This is just contrasting Mr. Musk's statements on

21  August 7th versus the statements on August 24th.

22            **THE COURT:**  And the class period --

23            **MR. PORRITT:**  -- is August 7th to August 17th, Your

24  Honor.

25            **THE COURT:**  And that's based on *The New York Times*?

04:18:11
1            **MR. PORRITT:**  Correct, Your Honor.  That's a correct

2    statement.

3            **THE COURT:**  So what is new --

4            **MR. PORRITT:**  Sorry, Your Honor, I got distracted.

5        So what is new, I think, in *The New York Times* article is

6    it further confirms that -- that there is no substance to this

7    transaction; that it was always just a reckless whim on behalf

8    of Mr. Musk; that he tweeted it out while driving, himself,

9    first thing in the morning, that -- at a time when he's under

10   acute stress at work, he's been taking both legal and illegal

11   drugs; and that the PIF was never really that -- was never

12   firmly behind it.

13       All of that just confirmed what are previously being

14   alluded to or concerns raised by the market, but does really

15   confirm that, yes, that's true, because those concerns were

16   raised earlier, between August 7th and August 16th, where

17   Mr. Musk, through his blog posts, essentially tries to put

18   those off, tried to correct them, and tried to say, no, no, no,

19   I am going forward, this is a real transaction, it does make

20   sense, I have thought about this.

21       I would submit that that's just absolutely untrue.  And

22   that's why we allege the August 13th blog post is, in itself, a

23   misleading statement.

24       And so I think it gave comfort -- even the stock price

25   already checked down before the August 13th blog post.  Why it

04:19:31

1  held steady or ticked up slightly was simply because he

2  confirmed -- and *Morning Star* report, we cited that in our

3  complaint -- *Morning Star* says, yes, I think this transaction

4  is going to happen; it's now not going to happen as quickly as

5  we thought it would when he first announced August 7th, but we

6  still think it's going to happen.

7       And that turned out, obviously, just to be completely

8  misguided and misled.

9            **MR. KRISTY:**  Your Honor --

10           **MR. PORRITT:**  If I --

11           **THE COURT:**  Let him finish.

12           **MR. PORRITT:**  So just on this argument that, well,

13  Mr. Musk really believed this -- that is, you know, to say

14  somehow this is a pure-heart defense to securities fraud, under

15  that basis -- that defense was run in the *SEC versus B Platform*

16  *Wilders* case to the Ninth Circuit.  And they correctly rejected

17  it by noting that if such a self-serving assertion could be

18  viewed as controlling, there would not be a successful

19  prosecution or claim for fraud.

20       Every fraud doer says, Well, I meant well.  Oh, I really

21  didn't mean it.  You know, everyone's misled and they've lost

22  billions of dollars.  That's really not what I intended.

23       There's very few defendants in a fraud action, either

24  brought criminally, regulatory, or civilly, who then says, yes,

25  you know what, I did take your money and run.

04:20:41

1      So unless you're going to -- under defendant's theory,

2    that would be the limit of 10(b)(5).  And that's not the case

3    of the Supreme Court.  The Supreme Court has rejected that

4    idea.  That's not the case and not how the Ninth Circuit views

5    10(b)(5).

6           **THE COURT:**  All right.  I'll give you last --

7           **MR. KRISTY:**  Your Honor, the crack about illegal drug

8    use is beyond the pale.

9           **THE COURT:**  I don't care about that.

10          **MR. KRISTY:**  Okay.  But I do, because he just said it

11   in a public forum, and that's pretty outrageous.

12      But what he didn't say, what he didn't identify -- the

13   article is right there.  It's an exhibit.  He didn't show you

14   what -- anything new about funding secured listed in this

15   article.

16      What he now just lapsed into was some claim that this is

17   all a sham, it's a sham transaction, it was never serious.

18   Well, the article doesn't say that.  And there are no facts

19   that support that.  It doesn't make sense.  People don't form

20   special --

21          **THE COURT:**  Well, let me ask you.

22          **MR. KRISTY:**  Okay.

23          **THE COURT:**  I think the blog on the 13th is somewhat

24   telling.  That shift -- when you look at page 25, the shift

25   from the -- his description at around line 23 to the following

1    paragraph that begins on line 25, and what I state earlier, he

2    says:

3              "The reason why I said, quote, funding secured,

4         because I had it in hand, I was left with a firm

5         impression.  When I left the July 31st meeting, there was

6         no question" -- his words -- "that a deal could be closed

7         and it was just a matter of getting the process moving."

8         Different -- different tone when he describes what

9    happened after the August 7th announcement.  It seems to me

10   it's a fair inference at this stage.

11        And I understand, under, you know, security law, there's a

12   heavier burden, the degree of specificity is high, scienter,

13   you've got to prove an extra degree of scienter, but this alone

14   tells me something.

15             MR. KRISTY:  So, Your Honor --

16             THE COURT:  You know, it's a very different tone.

17   Somebody says, oh, well, it's subject to due diligence and

18   their internal review to obtain approvals.  He wanted more

19   additional details?

20             MR. KRISTY:  Your Honor --

21             THE COURT:  Different tone.

22             MR. KRISTY:  But even if you were to find that --

23   remember, what we were talking about was loss causation.  So

24   where's the loss causation?  Where's the loss causation?  It's

25   an element of the case.  It's just not there.

04:23:01
1        Even if that's new information, a different tone, as Your

2   Honor --

3            THE COURT:  Well, by August 7th -- or by August 9th,

4   there was already a disclosure by the SEC, or some kind of

5   disclosure.  *Wall Street Journal* reported that, an SEC

6   investigation into Mr. Musk's --

7            MR. KRISTY:  Correct.  And under --

8            THE COURT:  And there was a 5 percent decline in price

9   there.  So even if he had only misled people -- you call this a

10  somewhat corrective -- quasi-corrective disclosure, and you

11  don't see anything happen, no loss causation, there was already

12  some loss suffered prior to that.

13           MR. KRISTY:  Well, *Loos v. Immersion*, in the Ninth

14  Circuit, said price decline because there's an announcement of

15  an investigation is not loss causation.  That's a matter of law

16  in the Ninth Circuit.

17           THE COURT:  You mean there can't be any evidence of

18  loss causation at all?

19           MR. KRISTY:  It's not -- it's insufficient evidence of

20  loss causation.  The existence of an investigation -- just

21  saying that "we're being investigated" is not loss causation

22  because it doesn't revolve.  That's the law of the Ninth

23  Circuit.

24       Now, they try to get around that by citing the *Lloyd* case,

25  which says, well, later on, if you combine the investigation,

04:24:13

1   no matter what the subject matter, with a later revelation

2   where you admit, oh, yeah, we were lying about our financial

3   statements or what have you, then you might have loss causation

4   when you connect all of those dots.  But that's not an

5   allegation in this complaint.

6       In fact, this complaint sort of stops long before this,

7   sort of, SEC case comes in.  So they're stuck in *Loos v.*

8   *Immersion* land.  That's what the law says, that the mere

9   existence of an SEC investigation isn't enough.

10      And they don't really address that point in the brief

11  because that doesn't go to any of these specific statements,

12  Your Honor.

13          **THE COURT:**  Well, the other fact is what happened when

14  *The New York Times* said that the PIF had not committed to

15  provide any cash and was far from secure?

16          **MR. KRISTY:**  I understand that, Your Honor, but that's

17  not new information.  They don't cite new information.  That's

18  the opinion of the author based on the facts that Mr. Musk

19  disclosed on the 13th.  That's why we challenge the plaintiff

20  to say, show us what's in reply Exhibit 1 that's new.

21      I understand that opinion, but that, the cases in the

22  Northern District say, isn't sufficient.  The author has to

23  show new information, not repackage or recharacterize or form

24  their own conclusions about old information.

25      Their opinion may be new.  Their opinion may affect the

04:25:32

1    market --

2          THE COURT:  I will give you one more chance to respond

3    to that.  What's new that wasn't already out there in

4    *The New York Times*?

5          MR. PORRITT:  Well, I think the circumstances of which

6    the tweet was given confirmed the recklessness of it.  It

7    therefore, concerns that perhaps there was no truth to it,

8    there was no substance behind it --

9          THE COURT:  But what was revealed on the 17th?  I

10   mean, that's the close of your class period.  What's novel

11   about this, as counsel argues, in terms of against loss

12   causation?  What's revealed here that terminates the -- closes

13   out the class period?

14         MR. PORRITT:  Well, I think this is -- I would

15   describe it as the final nail in the coffin of this

16   going-private transaction, even though perhaps it's in

17   somnambulant-like status until August 24th, when they

18   finally -- Tesla finally announces it's not going forward with

19   it.

20         But I think this -- with this interview by Mr. Musk, when

21   Mr. Musk confirms that this was not a serious transaction, not

22   well-thought-out, considered, having retained advice with

23   agreement on terms, everything that you would expect from --

24   you would expect to be revealed before the CEO of a public

25   company announces going private at 420 with funding secured.

1          And you can see the reaction of Tesla's investor relations

2     and the CFO, who immediately reacts, Is this for real?  And the

3     investor relations said the fact that we, as in Tesla, must go

4     full-on public with this, I assume it's as firm as it gets.

5          **THE COURT:**  I understand that goes to the whole

6     causation -- to the question of who he speaks for and --

7          **MR. PORRITT:**  Yes.

8          **THE COURT:**  I'm talking about his argument that

9     there's no loss causation, not even enough of a semblance of

10    loss causation shown, because there's never been a corrective

11    disclosure, there's been no close to this process.

12         **MR. PORRITT:**  Well --

13         **THE COURT:**  And I want to get your -- what you've --

14         **MR. PORRITT:**  I think the August 16th article is the

15    final corrective disclosure.  There's a material stock price

16    decline after that article comes out.  I think that stock price

17    is explained by the additional detail and further circumstance

18    of the lack of funding.

19         **THE COURT:**  What's the additional detail?

20         So the fact that the fund had not committed to provide any

21    cash, that's not a fact that had been previously disclosed in

22    any of the prior --

23         **MR. PORRITT:**  I don't believe that -- in that

24    specificity and that well sourced.  It says two people, based

25    on the discussion says.

04:28:10

1        So from a source as reliable as *The New York Times*, I

2   think it was new information.  I think the new information

3   saying that funding was not secured and then also the

4   additional circumstances of -- the circumstances of the tweet,

5   saying he tweeted from his car, et cetera, I mean, again, that

6   is about as close to deliberate recklessness as you can get

7   when a CEO is tweeting out a major public announcement

8   involving a significant corporate transaction, and he's doing

9   it, A, in a tweet, and, B, while driving.

10        And just on the loss causation point, on the SEC

11   investigation, counsel is incorrect that *Loos* governs here,

12   Your Honor.  We fall squarely into *Lloyd*.  No question.

13        If I can recite you to the *Lloyd* decision, also Ninth

14   Circuit, post *Loos*, 811 F.3d 1202 to 1203.

15             "In doing so, we hold that the announcement of an SEC

16        investigation related to an alleged misrepresentation" --

17        which we have here -- "coupled with subsequent revelation

18        of the inaccuracy of that misrepresentation" -- we have

19        here from the August 13th post and subsequently

20        August 24th post, as we talked about, and others -- "can

21        serve as a corrective disclosure for the purpose of loss

22        causation."

23        That is what is binding on this court, Your Honor.  Not

24   *Loos*.  And I know counsel likes *Loos* because it goes in his

25   direction, but he's just incorrect to say that it applies in

04:29:33 1    this case.

2            **THE COURT:**  All right.  I'm going to take this under

3    submission --

4            **MR. KRISTY:**  Okay.

5            **THE COURT:**  -- at this point.  I think you've given me

6    enough to look at here.  So thank you.

7            **MR. KRISTY:**  Thank you, Your Honor.

8            **MR. PORRITT:**  Thank you very much, Your Honor.

9        (At 4:29 p.m. the proceedings were adjourned.)

10                              - - - - -

11

12                    <u>**CERTIFICATE OF REPORTER**</u>

13        I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15    DATE: Tuesday, March 10, 2020

16

17

18                    _Katherine Sullivan_

19    _____

20        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                   U.S. Court Reporter

21

22

23

24

25