1

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
2   Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
3   San Francisco, CA 94111
Tel.: (415) 373-1671
4   Email: aapton@zlk.com
         amccall@zlk.com
5

6   *Attorneys for Lead Plaintiff and the Class*

7   [Additional Counsel on Signature Block]

8

9               **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11                **SAN FRANCISCO DIVISION**

12

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC |
| | **LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| | **ORAL ARGUMENT REQUESTED** |
| | Date: February 18, 2021<br>Time: 1:30 p.m.<br>Location: Courtroom 5, 17th Floor<br>Judge: Hon. Edward Chen |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on February 18, 2021 at 1:30 p.m., or as soon thereafter as this matter may be heard, in Courtroom 5 – 17th Floor of the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Lead Plaintiff Glen Littleton, by his counsel, will move, and hereby does move, this Court for an entry of an Order in the above-captioned action: (i) certifying pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure Lead Plaintiff's proposed Class (defined below) of all individuals and entities who purchased or sold Tesla stock, options, and other securities during the Class Period (defined below), and were damaged thereby; (ii) appointing Littleton as Class Representative; and (iii) appointing Levi & Korsinsky, LLP as Class Counsel.

PLEASE TAKE FURTHER NOTICE that this motion is based on the Memorandum of Points and Authorities below, the Declarations of Nicholas I. Porritt, Dr. Michael L. Hartzmark, Ph.D., and Lead Plaintiff Glen Littleton, and the exhibits attached thereto, the arguments of counsel, and any other matters properly before this Court. A proposed form of Order is also submitted herewith.

## ISSUES TO BE DECIDED

1.      Whether to certify the proposed Class (defined below) because it satisfies all the requirements of Rules 23(a) and 23(b)(3);

2.      Whether to appoint Littleton as Class Representative; and

3.      Whether to appoint Levi & Korsinsky as Class Counsel.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .......................................................................................... i

ISSUES TO BE DECIDED ............................................................................................................ i

TABLE OF CONTENTS ............................................................................................................... ii

TABLE OF AUTHORITIES ......................................................................................................... iii

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ................................................. 2

     A.    Musk Announces That He "Secured" Funding to Take Tesla Private at $420 Per Share and Investor Support is "Confirmed". ......................................................... 2

     B.    Defendants' Misrepresentations Artificially Inflate Tesla's Stock Price and Distort Its Option Prices. ...................................................................................... 5

     C.    Procedural History. ............................................................................................... 6

III.    THE PROPOSED CLASS ......................................................................................... 7

IV.    THE PROPOSED CLASS REPRESENTATIVE ...................................................... 7

V.     THE COURT SHOULD CERTIFY THE CLASS ACTION WITH LITTLETON AS CLASS REPRESENTATIVE AND LEVI & KORSINSKY AS CLASS COUNSEL. ... 8

     A.    The Standard on a Motion for Class Certification Favors Class Certification ...... 8

     B.    Littleton's Claims are Typical of the Class under Rule 23(a)(3). ......................... 9

     C.    Littleton Satisfies the Adequacy Requirement of Rule 23(a)(4) ......................... 11

     D.    The Requirements of Rule 23(b) Are Satisfied. ................................................... 13

          1.  Common Questions of Law and Fact Predominate ....................................... 13

          2.  No Individual Issues of Reliance Preclude Certification ............................. 14

          3.  Damages May Be Calculated Using a Common Methodology ..................... 25

          4.  Class Treatment is Superior to Other Methods of Adjudication .................. 28

     E.    Levi & Korsinsky Should be Appointed Class Counsel ..................................... 29

VI.    CONCLUSION ........................................................................................................ 30

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Abdullah v. U.S. Sec. Assocs., Inc.*,

4
     731 F.3d 952 (9th Cir. 2013)...................................................................... 9

5
*In re Adobe Sys., Inc. Sec. Litig.*,
     139 F.R.D. 150 (N.D. Cal. 1991) ............................................................... 9

6
*Amchem Prods., Inc. v. Windsor*,

7
     521 U.S. 591 (1997) ................................................................................ 13

8
*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
     568 U.S. 455 (2013) ........................................................................... 9, 14

9
*Angley v. UTi Worldwide Inc.*,

10
     311 F. Supp. 3d 1117 (C.D. Cal. 2018)..................................................... 17

11
*In re Bally Manufacturing Secs. Corp. Litig.*,
     141 F.R.D. 262 (N.D.Ill.1992) ................................................................ 21

12
*Basile v. Valeant Pharm. Int'l, Inc.*,

13
     No. SACV142004DOCKES, 2017 WL 3641591 (C.D. Cal. Mar. 15, 2017)......... 12

14
*Berner v. Lazzaro*,
     730 F.2d 1319 (9th Cir. 1984).................................................................. 8

15
*Blackie v. Barrack*,

16
     524 F.2d 891 (9th Cir. 1975)............................................................. 14, 25

17
*Cammer v. Bloom*,

18
     711 F. Supp. 1264 (D.N.J. 1989) ...................................................... passim

19
*Cheney v. Cyberguard Corp.*,
     213 F.R.D. 484 (S.D. Fla. 2003) ............................................................. 19

20
*Chu v. Sabratek Corp.*,

21
     100 F. Supp. 2d 815 (N.D. Ill. 2000) ....................................................... 22

22
*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
     270 F.R.D. 247 (S.D. Cal. 2010).............................................................. 16

23
*In re Cobalt Int'l Energy, Inc.*,

24
     No. CV H-14-3428, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ................... 22

25
*Comcast Corp. v. Behrend*,
     569 U.S. 27 (2013) ................................................................................ 25

26
*In re Connetics Corp. Sec. Litig.*,

27
     257 F.R.D. 572 (N.D. Cal. 2009) ........................................................ 20, 22

28

*Cooper Cos. Inc. Sec. Litig.*,
    254 F.R.D. 628 (C.D. Cal. 2009) ...................................................................................... 14, 15

*Cooper v. Thoratec Corp.*,
    No. 14-CV-0360 CW, 2018 WL 2117337 (N.D. Cal. May 8, 2018) ...................................... 28

*Crossen v. CV Therapeutics*,
    No. C 03-03709 SI, 2005 WL 1910928 (N.D. Cal. Aug. 10, 2005) ...................................... 10

*Deutschman v. Beneficial Corp.*,
    132 F.R.D. 359 (D. Del. 1990) .......................................................................................... 25

*In re Diamond Foods, Inc.*,
    295 F.R.D. 240 (N.D. Cal. 2013) ........................................................................... 13, 15, 16

*Eisen v. Carlisle and Jacquelin*,
    417 U.S. 156 (1974) .......................................................................................................... 28

*In re Enron Corp. Litig.*,
    529 F.Supp.2d 644 (S.D. Tex. 2006) ................................................................................. 21

*Epstein v. MCA, Inc.*,
    50 F.3d 644 (9th Cir. 1995) ................................................................................................. 9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) .......................................................................................................... 14

*In re Gaming Lottery Sec. Litig.*,
    No. 96 CIV 5567 RPP, 2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) ...................................... 19

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................................. 10, 11, 13

*Harris v. Palm Springs Alpine Estates, Inc.*,
    329 F.2d 909 (9th Cir. 1964) .............................................................................................. 13

*Hatamian v. Advanced Micro Devices, Inc.*,
    No. 14-CV-00226 YGR, 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ................................ 27

*Hayes v. MagnaChip Semiconductor Corp.*,
    No. 14-CV-01160-JST, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ...................... 16, 18, 27

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009) ....................................................................................... 21

*Huberman v. Tag-It Pac. Inc.*,
    314 F. App'x 59 (9th Cir. 2009) ........................................................................................ 20

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ........................................................................................... 25

*In re Juniper Networks, Inc. Sec. Litig.*,
    264 F.R.D. 584 (N.D. Cal. 2009) ........................................................................... 16, 28, 29

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................... passim

*In re LDK Solar Sec. Litig.*,
  255 F.R.D. 519 (N.D. Cal. 2009) ............................................................................... passim

*In re Lendingclub Sec. Litig.*,
  282 F. Supp. 3d 1171 (N.D. Cal. 2017) ........................................................................ 9, 10

*Levie v. Sears, Roebuck & Co.*,
  496 F. Supp. 2d 944 (N.D. Ill. 2007) .......................................................................... 20, 25

*Levy v. Gutierrez*,
  448 F. Supp. 3d 46 (D.N.H. 2019) ..................................................................................... 20

*Leyva v. Medline Indus.*,
  716 F.3d 510 (9th Cir. 2013) ............................................................................................ 27

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) .................................................................................... 11, 13

*Marcus v. J.C. Penney Co., Inc.*,
  No. 6:13-CV-736-MHS-KNM, 2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ............... 21, 27

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................................................. 21

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  No. CIV.A. 05-1151 SRC, 2013 WL 396117 (D.N.J. Jan. 30, 2013) .................................. 21

*In re Micron Techs. Inc. Sec. Litig.*,
  247 F.R.D. 627 (D. Idaho 2007) ....................................................................................... 28

*In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*,
  251 F.R.D. 656 (D. Utah 2008) ......................................................................................... 16

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ............................................................................................... 9

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ...................................................................................... 18

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ......................................................................................... 12

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ............................................................................................. 25

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) ........................................................................................... 10

*Schaefer v. Overland Express Family of Funds*,
  169 F.R.D. 124 (S.D. Cal. 1996) ...................................................................................... 10

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
   571 F. Supp. 2d 1315 (N.D. Ga. 2007) ................................................................. 19

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020) ..................................................................... 9, 11

*Siemers v. Wells Fargo & Co.*,
   243 F.R.D. 369 (N.D. Cal. 2007) ................................................................... 28, 29

*In re Snap Inc. Sec. Litig.*,
   334 F.R.D. 209 (C.D. Cal. 2019) ................................................................... 12, 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................ 8

*In re THQ Inc. Sec. Litig.*,
   No. 00-cv-01783-JFW-EX, 2002 WL 1832145 (C.D. Cal. Mar. 22, 2002) ............................. 9

*Tsirekidze v. Syntax-Brillian Corp.*,
   No. CV-07-02204-PHX-FJM, 2009 WL 2151838 (D. Ariz. July 17, 2009) ......................... 20

*In re UTStarCom, Inc., Sec. Litig.*,
   No. 04-cv-04908-JW, 2010 WL 1945737 (N.D. Cal. May 12, 2010) ..................................... 2

*In re VeriSign, Inc. Sec. Litig.*,
   No. 02-cv-02270-JW, 2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ................................... 12

*Vinh Nguyen v. Radient Pharm. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ................................................................... 18, 19

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ........................................................................... 12

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ............................................................................. 27

**Rules**

FED. R. CIV. P. 23(b)(3) ........................................................................................... 28

FED. R. CIV. P. 23(g)(1)(A) ..................................................................................... 29

# I.       PRELIMINARY STATEMENT

This is a securities class action arising from statements by Defendants Elon Musk and Tesla, Inc. from August 7, 2018 to August 17, 2018 regarding a potential transaction where Tesla would go private at a price of $420 per share. These statements caused Tesla's stock to trade at inflated prices and distorted the prices of Tesla options until the truth that the proposed transaction was illusory was finally revealed in a *New York Times* interview with Musk published on August 17, 2018. Lead Plaintiff, Glen Littleton, purchased stock and traded options from August 7, 2018 to August 17, 2018 and suffered significant damages as a result of Defendants' misrepresentations. He seeks to recover these losses as well as the losses suffered by all other Tesla investors who were similarly harmed. This Court has already held that Littleton's Consolidated Complaint for Violations of the Federal Securities Laws dated January 16, 2019 (ECF No. 184) ("Complaint"), adequately pleads claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a) against Tesla, Elon Musk, and the other Defendants. This Court should also certify the proposed class.

The Supreme Court and the Ninth Circuit have recognized that securities claims are particularly suited to treatment as class actions. The majority of the issues in this litigation, such as whether any Defendant made a misrepresentation, whether the misrepresentation was material, whether the misrepresentation was made knowingly or with deliberate recklessness, and whether individual Defendants controlled any maker of a misrepresentation, are identical for every member of the proposed class and are subject to common proof and determination. Other elements of the claims alleged in the Complaint, such as reliance and loss causation, are also subject here to common class-wide proof because Tesla common stock and options traded in efficient markets so that their prices quickly reflected any misrepresentation by Defendants. Indeed, the analysis by Littleton's expert, Dr. Michael Hartzmark, shows that Elon Musk's initial misrepresentation about taking Tesla private, published at 12:48 p.m. EDT on August 7, 2018, led to an almost instantaneous increase in Tesla's stock price, which increased from $356.85 at 12:47 p.m. EDT to close on August 7, 2018 at $379.57. Indeed, the reaction of Tesla's stock price to Elon Musk's statements was so dramatic that trading of its stock on the NASDAQ exchange was halted during

1   the afternoon of August 7, 2018 for almost ninety minutes. Dr. Hartzmark's analysis shows

2   similar reactions in the prices for Tesla options as well. Other metrics used by the courts to assess

3   the efficiency of a market for a security also strongly support the efficiency of the market for

4   Tesla securities.

5         Where a security trades in an efficient market that rapidly incorporates public information

6   about the security, including false or misleading information, reliance by investors on the

7   misrepresentations is presumed and the measurable impact of misrepresentations on the prices for

8   securities also shows loss causation. Thus, the only remaining issue that is not subject to common

9   class-wide proof is the amount of damages recoverable by each individual class member. This

10   factor, however, is no barrier to class certification especially where, as is the case here, calculation

11   of damages is largely a mechanical calculation following a common methodology as described

12   by Dr. Hartzmark.

13         Accordingly, Littleton's motion for class certification should be granted, Littleton should

14   be appointed as class representative, and Levi & Korsinsky, LLP should be appointed as class

15   counsel.

16   **II.     FACTUAL AND PROCEDURAL BACKGROUND**

17         **A.     Musk Announces That He "Secured" Funding to Take Tesla Private at $420**

18               **Per Share and Investor Support is "Confirmed".**

19         On August 7, 2018, at 12:48 p.m. EDT, Tesla's Chairman and Chief Executive Officer,

20   Elon Musk, tweeted the following message to over 22 million people: "Am considering taking

21   Tesla private at $420. Funding secured." ¶74.[1] During the afternoon of August 7, 2018, Musk

22   continued to make public statements about his proposed transaction both on his personal Twitter

23   account and on a Tesla blog. ¶¶83-85. In these statements, Musk stated that even though "a final

24   decision has not yet been made" Tesla will go private "if the process ends the way I expect it

---

25   [1] Citations to "¶__" refer to paragraphs in the Complaint and the corresponding paragraph in

26   Defendants' Answer to the Consolidated Complaint for Violations of the Federal Securities Laws
    (ECF No. 264) ("Answer"). "In reviewing a motion for class certification, the court generally is

27   bound to take the substantive allegations of the complaint as true," as the only question is
    "whether the requirements of Rule 23 have been met." *In re UTStarCom, Inc., Sec. Litig.*, No. 04-

28   cv-04908-JW, 2010 WL 1945737, at *3 (N.D. Cal. May 12, 2010).

1   will." ¶84. Finally, at 3:36 p.m. EDT, Musk tweeted "Investor support is confirmed. Only reason

2   why this is not certain is that it's contingent on a shareholder vote." ¶85.

3          The market immediately reacted to Musk's statements on August 7, 2018, believing that

4   he had "secured" funding and would be imminently taking Tesla private at $420 per share, that

5   the "funding" for this going-private transaction was already "secured," that Musk had already

6   "confirmed" "investor support" for this transaction, and that the transaction was only "contingent

7   on a shareholder vote." The impression that a going-private transaction was imminent and its

8   funding was "secured" was confirmed by Martin Viecha, Tesla's Senior Director of Investor

9   Relations, who, in response to questions from financial analysts about funding, stated that "the

10  first Tweet clearly stated that 'financing is secured'. ***Yes, there is a firm offer***" and "I only want

11  to stress that Elon's first tweet, which mentioned 'financing secured' ***is correct***." ¶¶87-88

12  (emphasis added). Later that evening Viecha elaborated further advising an analyst: "The very

13  first tweet simply mentioned 'Funding secured' which means there is a firm offer." ¶89. When

14  pressed if this meant there was a commitment letter, Viechia responded "***given we went full-on***

15  ***public with this, the offer is as firm as it gets***." *Id*. (emphasis added).

16         In analyst reports issued on August 7, 2018 and August 8, 2018, financial analysts

17  confirmed that the public believed that financing was secured. RBC Capital Markets wrote that

18  "we believe there is substance to the news and note that prior 'controversial' shareholder votes

19  (like Solar City) have always voted with Elon. . . . Elon's tone and messaging regarding a potential

20  transaction lead us to believe that there could be significant outside funding lined up." ¶90. JP

21  Morgan raised its target price for Tesla stock to reflect the potential transaction noting that "they

22  are nevertheless declarative statements from the CEO of a public company which we feel should

23  be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says

24  funding is secured. . . . To us, this suggests more than mere consideration – Mr. Musk expects

25  Tesla will go private." ¶96. Evercore, while recognizing that some details were missing and there

26  was still some uncertainty surrounding the proposed transaction, noted that it believed "Musk's

27  intent is serious and genuine" and that "'Funding secured' should be interpreted as "a strong verbal

28  commitment, with funds available and parties willing to execute quickly." ¶97. It also opined that

1  by August 8, 2018, the market had accepted that funding was secured and a going-private

2  transaction could be completed by Tesla and Musk. *Id.*

3      News reporting about the proposed transaction was widespread over the following week.

4  On August 8, 2018, the Tesla Board issued a statement that confirmed Musk had made a proposal

5  to them. ¶93. After the market closed on August 8, 2018, the *Wall Street Journal* reported that the

6  SEC had commenced an investigation into whether Musk had "a factual basis" for his August 7,

7  2018 tweets. ¶98. On August 12, 2018, *Bloomberg* reported that the Saudi Arabian Public

8  Investment Fund, identified as a potential source of funding for the proposed transaction, "hasn't

9  made any firm decisions on whether to increase its stake [in Tesla], or by how much." ¶102.

10      On August 13, 2018, Musk published a lengthy post regarding the potential transaction on

11  Tesla's blog where he sought to bolster his prior assertion that funding was secured for taking

12  Tesla private and how he intended to structure the transaction. ¶103. Musk also stated he had

13  engaged advisors, later identifying them as Silver Lake and Goldman Sachs. ¶¶103-04. Analysts

14  were again persuaded that the proposed transaction was likely, with Morningstar stating that "our

15  impression of his words is that he thinks it can happen, and we agree…. we think a deal will not

16  happen this week but will eventually be announced," and stating their belief that "a deal, if

17  announced, would be approved." ¶105. On August 14, 2018, however, *Bloomberg* reported that,

18  contrary to Musk's statement the day before, neither Silver Lake nor Goldman Sachs had been

19  engaged by Musk or Tesla. ¶107. On August 15, 2018, it was reported that the SEC had issued

20  formal subpoenas relating to Musk's tweets on August 7, 2018. ¶109. After market hours on

21  August 16, 2018, the *New York Times* published online, and later in print on August 17, 2018, a

22  detailed interview with Musk confirming that funding for the proposed transaction "was far from

23  secure" and the PIF "had not committed to provide any cash." ¶112. Also on August 16, 2018,

24  the *Wall Street Journal* reported after market hours that the SEC's investigation into Musk was

25  over whether he "intentionally misled investors when he tweeted about the proposal in a bid to

26  hurt short-sellers by driving up Tesla's stock price." ¶111. On August 24, 2018, Elon Musk and

27  Tesla confirmed that they were no longer pursuing a going-private transaction. ¶ 115.

28      As alleged in the Complaint, Elon Musk has since admitted that there was never any

1    funding. ¶¶170-71. Further, investors with whom Elon Musk discussed the possibility of a

2    transaction actually opposed rather than supported it, no material terms had been proposed or

3    agreed with Tesla's Board of Directors, investors, or potential sources of funding, and no financial

4    or legal advisors had been engaged. ¶173. Ultimately, both Elon Musk and Tesla consented to

5    judgments being entered against them in cases brought by the SEC. ¶116.

6         **B.      Defendants' Misrepresentations Artificially Inflate Tesla's Stock Price and**

7              **Distort Its Option Prices.**

8         Tesla's stock is listed on the NASDAQ Global Select market under the ticker symbol

9    "TSLA." Other Tesla securities include stock options which are traded and quoted on exchanges

10   including: BOX Exchange LLC; Cboe BZX Options Exchange, Inc; Cboe C2 Options Exchange,

11   Incorporated; Cboe EDGX Options Exchange, Inc.; Cboe Options Exchange, Incorporated;

12   Miami International Securities Exchange, LLC; MIAX PEARL, LLC; Nasdaq BX, Inc.; Nasdaq

13   GEMX, LLC; Nasdaq ISE, LLC; Nasdaq PHLX LLC; The Nasdaq Stock Market LLC; NYSE

14   American LLC; and NYSE Arca, Inc. ¶16. At or around August 7, 2018, Tesla had over 170

15   million shares outstanding. ¶30. The "short interest" at that point in time was 33.8 million,

16   meaning that almost 20% of Tesla's shareholders were betting that Tesla's stock would decline

17   in value. ¶7.

18        Elon Musk's tweets on August 7, 2018 had an immediate impact on the price of Tesla's

19   common stock. Littleton's expert, Dr. Hartzmark, explains in his report with "99% confidence"

20   that Musk's initial tweet on August 7 caused a 2.29% increase in Tesla's stock price within the

21   first minute of trading (*i.e.*, 12:48 p.m. to 12:49 p.m.). Expert Report of Michael L. Hartzmark,

22   Ph.D., attached as Exhibit A to the Declaration of Michael L. Hartzmark, Ph.D. ("Hartzmark

23   Report") at ¶75 n.117. Tesla's stock price continued to climb as Musk continued to assure the

24   public of the imminent going-private transaction, ultimately increasing $22.72 per share to close

25   at $379.57 compared to Tesla's price per share immediately preceding the tweet. *Id*. at ¶75. The

26   trading volume in Tesla stock also spiked, increasing to over 18 million shares prior to close or

27   more than double the average daily volume. *Id*. This volume, of course, also included "short"

28   investors purchasing shares to "cover" or "close" their pre-existing positions in response to the

1    sudden and dramatic increase in Tesla's stock price. *See id.* at ¶45 & Exhibit VII.

2          Elon Musk's tweets also distorted option prices. Because he announced a proposed price

3    of $420 for taking Tesla private, it immediately rendered many put options worthless as Tesla

4    stock would no longer have a chance to trade anywhere near their strike prices. *Id.* at ¶¶141-42.

5    Similarly, although an increase in stock price usually also increases the price of call options on

6    that stock, due to the effective price cap, call options on Tesla stock priced near or above the

7    proposed transaction price of $420 declined in value as they would not come into the money,

8    including the cost of the options themselves. *Id.*

9          **C.    Procedural History.**

10          Investors filed a securities class action complaint on August 10, 2018 following Elon

11   Musk's tweets. Several additional suits were filed over the next few weeks, ultimately being

12   consolidated into the above-captioned case when this Court appointed Littleton as the lead

13   plaintiff on November 27, 2018. ECF No. 152. Littleton filed the Complaint on January 16, 2019.

14   ECF No. 184. On April 15, 2020, the Court denied Defendants' motion to dismiss the Complaint.

15   ECF No. 251. Importantly, the Court held that Littleton "adequately pleaded falsity in the August

16   7, 2018 tweets" and the "August 13, 2018 tweet," namely because the well-pleaded factual

17   allegations demonstrated that Musk and Tesla "had not, in fact, secured funding for the

18   transaction" and that Musk "had not engaged Silver Lake or Goldman Sachs as the time of his

19   twitter post." *Id.* at 22, 25. The Court also held that Littleton sufficiently pleaded scienter based

20   on Musk's direct involvement in the various conversations prior to, during, and after the tweets.

21   *Id.* at 31-32. Finally, the Court rejected Defendants' arguments on loss causation, holding that

22   Littleton adequately alleged that Musk's and Tesla's misrepresentations proximately caused

23   damages for both "Short-selling Investors" and "Long-selling Investors." *Id.* at 37-40. The parties

24   are presently in discovery.

25

26

27

28

### III.    THE PROPOSED CLASS

Littleton moves to certify the following class of Tesla investors:

All individuals and entities who purchased or sold Tesla stock, options, and other securities from 12:48 p.m. EDT on August 7, 2018 to August 17, 2018 (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are: Defendants; the officers and directors of Tesla, Inc., at all relevant times; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

Class members who do not have recoverable damages as a result of the alleged fraud would not be eligible to participate in any recovery.

### IV.    THE PROPOSED CLASS REPRESENTATIVE

Glen Littleton is the proposed Class Representative. He is a sophisticated investor having formerly traded and acted as a market maker on the Kansas City Board of Trade as well as trading on the Chicago Mercantile Exchange. Declaration of Lead Plaintiff Glen Littleton, ¶7. He holds a Bachelor of Arts degree in finance from Washington State University. *Id*. at ¶2. He has traded Tesla securities since 2015 and has been consistently bullish, or long, on Tesla, expecting that its stock price would appreciate over time. *Id*. at ¶¶11. Littleton has, however, also consistently hedged his long exposure to Tesla, recognizing the volatility in its stock price largely caused by the public statements made by Elon Musk. *Id*. at ¶¶11, 13.

Therefore, on August 6, 2018, Littleton had a portfolio of Tesla options consisting of call options[2] that would generally profit as Tesla's stock prices increased. *Id*. at ¶13 & Exhibit A. Littleton also had positions in put options[3] designed to offer protection if Tesla's stock price unexpectedly declined. *Id*. Littleton follows Elon Musk on twitter and saw the tweet when it was posted at 12:48 p.m. EDT on August 7, 2018. *Id*. at ¶14. Littleton quickly realized that the tweet would have a severe adverse effect on his portfolio, especially his put options which would likely become worthless very quickly. *Id*. Believing that Elon Musk and Tesla would follow through on

---

[2] A call option is the right to purchase a security from the counterparty at a set price, the "strike price", on a certain date in the future. ¶205.

[3] A put option is the right to sell a security to the counterparty at a strike price on a certain date in the future. ¶206.

the announced plan to go private, Littleton proceeded to liquidate his portfolio over the next few days and established a new position with the assumption that Tesla would go private at around $420 per share. *Id*. at ¶15. To execute this strategy, Littleton bought 100 shares of Tesla common stock and bought and sold put and call options from August 7, 2018 to August 16, 2018. *Id*. at ¶15 & Exhibit B. Following the publication of the *New York Times* article on August 17, 2018, Littleton was forced to liquidate his portfolio again. *Id*. at ¶16. Littleton then maintained a small position in Tesla until September 12, 2018 when he sold and/or closed his entire position in Tesla securities. *Id*. at ¶17. He recently began reinvesting in Tesla again in December 2019. *Id*. at ¶18.

Since his appointment as Lead Plaintiff, Littleton has faithfully carried out his fiduciary obligations. He regularly communicates with his attorneys, reviews pleadings and motion papers, and participates in discovery. *Id*. at ¶22. He has searched for and assisted in the production of more than 1,500 pages of documents in response to Defendants' initial requests for production. *Id.* To date, Littleton has spent between 50 hours and 75 hours participating in the litigation. *Id.* Littleton stands ready, willing, and able to oversee this litigation and zealously protect the interests of the Class as the court-approved Class representative until the conclusion of this action. *Id.* at ¶24.

## V.   THE COURT SHOULD CERTIFY THE CLASS ACTION WITH LITTLETON AS CLASS REPRESENTATIVE AND LEVI & KORSINSKY AS CLASS COUNSEL.

### A.   The Standard on a Motion for Class Certification Favors Class Certification

Both the Supreme Court and the Ninth Circuit have repeatedly recognized that private securities class actions are an important enforcement mechanism to supplement governmental regulation of the securities markets. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions."); *Berner v. Lazzaro*, 730 F.2d 1319, 1322-23 (9th Cir. 1984) ("[P]rivate actions brought by investors have long been viewed as a necessary supplement to SEC enforcement actions."), *aff'd*, 472 U.S. 299 (1985). Indeed, "class actions commonly arise in securities fraud cases as the claims of separate investors are often too small to justify individual

1   lawsuits, making class actions the only efficient deterrent against securities fraud." *In re Adobe*

2   *Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 152 (N.D. Cal. 1991). Accordingly, in securities actions like

3   this one, Rule 23 fits "like a glove." *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995).

4     "Certification under Rule 23(b)(3) is a two-step process. Littleton must first show that the

5   four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members

6   is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

7   defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

8   representative parties will fairly and adequately protect the interests of the class." *SEB Inv. Mgmt.*

9   *AB v. Symantec Corp.*, 335 F.R.D. 276, 282 (N.D. Cal. 2020); *see also Abdullah v. U.S. Sec.*

10  *Assocs., Inc.*, 731 F.3d 952, 956 n.4 (9th Cir. 2013). "For a damages class under Rule 23(b)(3),

11  plaintiff must next establish 'that the questions of law or fact common to class members

12  predominate over any questions affecting only individual members, and that a class action is

13  superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id*.

14  The Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging

15  merits inquiries . . . ." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013);

16  *see also In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1178 (N.D. Cal. 2017) (Merits

17  questions may only be considered to the extent relevant to "determining whether the Rule 23

18  prerequisites for class certification are satisfied."). Thus, Littleton "need not make a prima facie

19  showing that he or she will prevail on the merits." *In re THQ Inc. Sec. Litig.*, No. 00-cv-01783-

20  JFW-EX, 2002 WL 1832145, at *2 (C.D. Cal. Mar. 22, 2002).

21    As discussed below, the requirements of Federal Rule 23 are readily satisfied here.[4]

22    **B.**  **Littleton's Claims are Typical of the Class under Rule 23(a)(3).**

23    Under Rule 23(a)(3)'s "permissive standards" for typicality, "representative claims are

24  'typical' if they are reasonably co-extensive with those of absent class members; they need not

25  be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014); *Symantec Corp.*,

26

27  ---
    [4] The parties agree that the requirements of Rule 23(a)(1) and 23(a)(2) are satisfied by the
28  proposed class in this case. *See* Stipulation and Order as Modified Re: Plaintiff's Motion for Class
    Certification dated September 21, 2020. ECF No. 288.

335 F.R.D. at 283. Typicality is satisfied when "the claims of the class representatives are typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted). Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *LendingClub*, 282 F. Supp. 3d at 1179 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Accordingly, differences in the amount of damages, the size or manner of purchase or holding, and the nature of the purchase or holding are insufficient to defeat class certification.

Littleton's purchases and sales during the Class Period are typical of other Class members and he relies on the same legal theory: that Elon Musk and Tesla's misrepresentations during the Class period inflated its stock price and distorted the price of options. The fact that Littleton traded predominately options rather than common stock does not preclude class certification. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 532-33 (N.D. Cal. 2009) (finding that trader using "risky" margin and option trades was an adequate and typical class representative as the "mere fact that plaintiff may have suffered even greater financial losses than other class members in response to a particular change in the stock's price does not render his interests adverse to the remainder of the class" and noting "there is nothing excessively 'risky' or troubling *per se* about the use of options"); *Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 129 (S.D. Cal. 1996) ("differences in the amount of damages, the size or manner of purchase, the nature of the purchase, and even the specific document influencing the purchase will not render a claim atypical in most securities cases" (internal quotation omitted)). This conclusion is not changed by the fact that Littleton, although holding an overall long position on Tesla during the Class Period, also hedged this position using options that would generate some profits on an unexpected stock price decline. *See Crossen v. CV Therapeutics*, No. C 03-03709 SI, 2005 WL 1910928, at *5 (N.D. Cal. Aug. 10, 2005) (investor who hedged his long position using options was still a typical and adequate class representative).

### C.     Littleton Satisfies the Adequacy Requirement of Rule 23(a)(4)

In determining whether a class representative can fairly and adequately protect the class under Rule 23(a)(4), courts assess whether he/she (i) will, together with counsel, prosecute the action vigorously on behalf of the class; and (ii) has any interests that conflict with, or are antagonistic to, those of the putative class members. *Symantec Corp.*, 335 F.R.D. at 282  (quoting *Hanlon*, 150 F.3d at 1020). Here, both requirements are satisfied.

As demonstrated by his vigorous prosecution of this action to date and summarized in his declaration, Littleton readily satisfies the adequacy requirement. Littleton Decl. at ¶¶21-25. *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) ("The record indicates clearly that [lead plaintiff] understands his duties and is currently willing and able to perform them. The Rule does not require more."). Specifically, Littleton has supervised and monitored the progress of this litigation and actively participated in the case, including reviewing pleadings and motions submitted in this matter, reviewing and responding to discovery requests, and producing documents in discovery. Further, Littleton has, among other things, filed a detailed Complaint, and has vigorously pursued fact discovery, including propounding document requests. *Id.* Littleton continues to supervise, monitor, and participate in the ongoing prosecution of this action and will represent the interests of the Class. *Id.*

Littleton also meets the second requirement of Rule 23(a)(4), which asks whether "the named plaintiffs and their counsel have any conflicts of interest with other class members . . . ." *Symantec Corp.*, 335 F.R.D. at 284-85. Littleton has no conflict of interest with other Class members – on the contrary, his claims arise from the same set of facts as other class members. Littleton's own trades in Tesla securities during the Class Period cover a broad range of the prospective Class members in this action, specifically investors that purchased Tesla's common stock at artificially inflated prices and purchasers and sellers of Tesla's options at artificial prices during the Class Period. In fact, this was one of the very reasons cited by this Court in its order appointing Littleton as the lead plaintiff. *See* ECF No. 152 at 7 ("Second, Mr. Littleton held interests that cover most of the persons/entities likely to be in the class – *i.e.*, long positions in

common stock, long positions in options, and short positions in options – and thus can most adequately represent the class[.]"). Thus, Littleton's interests are well aligned with those of the Class in proving Defendants' liability and maximizing the recovery of damages. In the context of securities class actions, courts have consistently found that class representatives that assert claims-based on facts similar to those of the absent class members meet the "comparable interest" standard and satisfy Rule 23(a)(4). *See, e.g., In re VeriSign, Inc. Sec. Litig.*, No. 02-cv-02270-JW, 2005 WL 7877645, at *8 (N.D. Cal. Jan. 13, 2005) ("The Lead Plaintiffs' claims and the unnamed class members' claims do not conflict. They all arise out of the same set of facts – Defendants' alleged misrepresentations during the Class Period.").

Applying those standards here, Littleton is plainly adequate to represent the Class: he sustained losses as a result of the same alleged material misrepresentations as other Class members, and his interest in obtaining the maximum possible recovery is coextensive with the interests of other Class members. Further, no conflicts of interest exist between Littleton and absent Class members, as all interests are aligned in establishing the same legal theories and factual allegations.[5]

Additionally, Littleton has retained qualified and capable counsel in Levi & Korsinsky,

---

[5] The fact that Littleton seeks to represent investors in different types of securities does not change the outcome on this issue. While class members purchased and/or sold different securities at different times, the Class as a whole sustained damage as a result of Musk's and Tesla's false statements about taking Tesla private. Thus, the class as a whole must prove the same elements for purposes of establishing liability and damages. Classes comprised of differing securities do not create intra-class conflicts as a matter of law and, consequently, do not require specialized class representation. *See, e.g., In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 218-19 (C.D. Cal. 2019) (certifying representative to oversee class consisting of investors with claims under Securities Act of 1933 and Securities Exchange Act of 1934); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 48-49 (S.D.N.Y. 2018) (rejecting argument concerning "intra-class conflict" where claims involved different misrepresentations, time periods, and corrective disclosures); *Basile v. Valeant Pharm. Int'l, Inc.*, No. SACV142004DOCKES, 2017 WL 3641591, at *7 (C.D. Cal. Mar. 15, 2017) (certification appropriate where "countervailing interests regarding the level of price inflation at any given time" are "substantially outweighed by the class members' common interests" (internal quotations omitted)); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 109 (S.D.N.Y. 2007) (rejecting intra-class conflict arguments that "small differences in returns experienced by holders of ADSs and ordinary shares may affect the amount of damage but are unlikely to alter the methodologies of calculation, at least to a degree necessary to warrant, at this juncture, the creation of subclasses").

LLP. Levi & Korsinsky is one of the most experienced securities class action firms in the United States and has a proven track record of success in complex securities cases such as this one. *See* Firm Resume attached as Exhibit A to the accompanying Declaration of Nicholas I. Porritt. Moreover, Levi & Korsinsky has vigorously prosecuted the proposed Class's claims to date by, *inter alia*: investigating and researching the proposed Class's potential claims; defeating Defendants' motion to dismiss; and propounding significant written discovery. Porritt Decl. at ¶¶2-5. Thus, Littleton satisfies the adequacy requirements of Rule 23(a)(4) and should be appointed as Class Representative.

### D. The Requirements of Rule 23(b) Are Satisfied.

In addition to meeting the requirements of Rule 23(a), the proposed Class satisfies the two requirements under Rule 23(b)(3) that: (a) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (b) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### 1. *Common Questions of Law and Fact Predominate*

Predominance is a test "readily met" in securities fraud cases like this one. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The "predominance" inquiry focuses on the relationship between the common and individual issues. *Las Vegas Sands, Inc.*, 244 F.3d at 1162; *LDK Solar*, 255 F.R.D. at 525. Rule 23(b)(3) does not require that every question of fact or law amongst the class be identical; it only requires that the common questions predominate over individual questions. Where, as here, common questions represent a significant aspect of the case and can be resolved for all members of the class in a single adjudication, class certification is justified. *See, e.g.*, *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 246 (N.D. Cal. 2013); *Hanlon*, 150 F.3d at 1022; *LDK Solar*, 255 F.R.D. at 525-26. Indeed, as the Ninth Circuit observed:

> [Rule 23] "does not require that all the members of the class be identically situated, if there are substantial questions either of law or fact common to all." [Rule 23] is based on the assumption that the economy of time, effort, and expense which will result from a common trial of substantial common issues exceeds the additional burden which may be imposed upon the court and the parties by the necessity of also determining in the common litigation those issues which may be several.

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 914-15 (9th Cir. 1964) (citation

1   omitted, footnote omitted); *accord Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

2       The elements of the underlying causes of action strongly influence whether common

3   issues predominate. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)

4   (*Halliburton I*). Here, Littleton seeks certification of the putative Class to pursue claims under

5   §§10(b) and 20(a) of the Exchange Act. The elements of a §10(b) claim are: "(1) a material

6   misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the

7   misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

8   misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at

9   460-61. §20(a) creates liability for control persons of violators of §10(b). There can be no dispute

10   that falsity, scienter, materiality, loss causation, and control are issues common to the Class

11   because "failure of proof" on any of these elements "would end the case" for all Class members.

12   *See Amgen*, 568 U.S. at 467-68. Thus, "materiality is a 'common questio[n]' for purposes of Rule

13   23(b)(3)". *Id*. Similarly, "this Court has held that loss causation and the falsity or misleading

14   nature of the defendant's alleged statements or omissions are common questions that need not be

15   adjudicated before a class is certified". *Id*. at 475; *see also Halliburton I*, 563 U.S. at 813 (holding

16   plaintiff need not prove loss causation at class certification).

17       Thus, common issues predominate as the Complaint alleges a "common course of

18   conduct" of misrepresentations that affect all members of the proposed Class in the same manner.

19   *See LDK Solar*, 255 F.R.D. at 530 ("all class members are unified by an interest in proving the

20   same common course of conduct regarding LDK's allegedly fraudulent inventory representations.

21   Common issues concerning that fundamental course of conduct predominate over any individual

22   incentives particular class members may have to maximize their damages."); *see also Cooper*

23   *Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 640 (C.D. Cal. 2009) ("[i]n summary, the critical questions

24   of what Defendants said, what they knew, what they may have withheld, and with what intent

25   they acted, are central to all class members' claims. Without favorable findings on these critical

26   questions related to liability, no member of the class can succeed.").

27           **2.   *No Individual Issues of Reliance Preclude Certification***

28       The element of reliance for the §10(b) claims also does not create any individualized

1   issues because Littleton and other Class members are entitled to a presumption of reliance under

2   the "fraud on the market" theory established by *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

3   "District courts in the Ninth Circuit have held that when plaintiffs plead a fraud-on-the-market

4   theory, questions of whether misleading conduct occurred, and whether that conduct occurred

5   with fraudulent intent, predominate over other questions." *Cooper Cos.*, 254 F.R.D. at 639. The

6   fraud-on-the-market presumption of reliance depends on the theory that, in an efficient market,

7   all information, including any misrepresentation, is incorporated into the price of a security, and

8   investors therefore rely on the misrepresentation when purchasing a security at the market price.

9   *Basic*, 485 U.S. at 247; *see also LDK Solar*, 255 F.R.D. at 526 ("[w]ithout the presumption, class

10  certification would be virtually impossible as individual questions regarding reliance would

11  predominate over common questions."). Thus, this issue turns on whether the market for Tesla's

12  securities was efficient.

13      Courts in this Circuit look to the so-called *Cammer* factors to assess market efficiency.

14  *Diamond Foods*, 295 F.R.D. at 247 (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87

15  (D.N.J. 1989)). The *Cammer* factors include: (1) whether the stock trades at a high weekly

16  volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has

17  market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form

18  S-3, as opposed to form S-1 or S-2; and (5) whether there are empirical facts showing a cause and

19  effect relationship between unexpected corporate events or financial releases and an immediate

20  response in the stock price. In addition, courts often have regard to the additional *Krogman*

21  factors, which include: (1) the company's market capitalization; (2) the bid-ask spread for stock

22  sales; and (3) float, the stock's trading volume without counting insider-owned stock. *Krogman*

23  *v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001).

24      Based on a thorough analysis of these well-established factors, Plaintiff's expert, Dr.

25  Michael Hartzmark, opines that the market for Tesla's securities traded in an open, developed,

26  and efficient market during the Class Period. Dr. Hartzmark's report containing his opinions and

27  their basis is attached as Exhibit A to his Declaration, filed with this motion. Dr. Hartzmark's

28  opinions are well-founded and should be accepted by the Court.

*a.   Tesla's common stock traded in an open, developed, and efficient market during the Class Period*

As an initial matter, Tesla's common stock traded on the NASDAQ, which courts have held is presumptively an efficient market. *Diamond Foods*, 295 F.R.D. at 250 ("Nor has defendant identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market."). A review of the *Cammer* and *Krogman* factors confirms this conclusion.

**Cammer** **I – Weekly Trading Volume**: As the court stated in *Cammer*, "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286. Tesla shares had a ratio of average weekly trading volume to shares outstanding of ***42%*** (including 54% for the week of August 6, 2018 – August 10, 2018, and 30% for the week of August 13, 2018 – August 17, 2018), which is significantly above *Cammer*'s 2% threshold. Hartzmark Report. at ¶26; *see Cammer*, 711 F. Supp. at 1293 (discussing 2% threshold). For comparison purposes, Tesla's turnover during the Class Period would have placed it in the top 5% of all the NYSE and NASDAQ-traded companies. *Id*. This supports a "strong presumption" that the market for Tesla common stock was efficient. *Id*. ¶27; *see, e.g.*, *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (S.D. Cal. 2010) (finding a stock with a weekly trading volume of 2.61% to have traded in an efficient market); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at *5 (N.D. Cal. Dec. 22, 2016) (finding 4.2% weekly share trading volume as "favor[ing] a finding of market efficiency" as it was "double the 2% that Cammer stated would justify a strong presumption of market efficiency.").

**Cammer** **II – Analyst Coverage**: During the Class Period, between 32 and 33 research analysts followed Tesla and 15 additional technical or analyst firms covered Tesla and reported results. Hartzmark Report at ¶29. This is more than sufficient to satisfy *Cammer* II. *See, e.g.*, *In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (four analysts sufficient); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) (same).

1    ***Cammer* III – Market Makers & Arbitrageurs:** Market makers and arbitrageurs, as

2    stated by the *Cammer* court, help ensure that news and reported financial results are reflected in

3    the price of a company's stock. *See Cammer*, 711 F. Supp. at 1286-87. Thus, the existence of

4    market makers and arbitrageurs in the market of a company's stock supports a finding of market

5    efficiency. Here, Tesla stock was traded on NASDAQ, was actively traded by a large group of

6    sophisticated institutional investors, and there were opportunities for arbitrage in Tesla's stock.

7    Hartzmark Report at ¶36.

8         As Dr. Hartzmark explains, the issue of arbitrage opportunities can be analyzed by

9    considering whether there is an availability of shares to borrow in order to enter into a short sale.

10   *Id.* ¶44. Here, Dr. Hartzmark found that Tesla's short interest ranged from 34.99 million shares

11   to 32.72 million shares during the Class Period. *Id.* ¶45. This relatively elastic supply and demand

12   suggests that arbitrageurs and traders with negative views on Tesla were able to actively trade.

13   This evidence of market makers and arbitrage opportunities in the market for Tesla common stock

14   is further proof that Tesla traded in an efficient market throughout the Class Period.

15        ***Cammer* IV – Form S-3 Eligibility**: To be eligible to register on Form S-3, an issuer must

16   (a) be current in its SEC filings for at least 12 months; and (b) have a public float of $75 million

17   – factors that Tesla easily satisfied throughout the Class Period. In fact, Tesla has filed a Form S-

18   3 six times since it became public in 2010, including both before and after the Class Period. *Id*.

19   ¶47. Tesla's common stock therefore indisputably satisfies the fourth *Cammer* factor, yet another

20   indication that it traded in an efficient market.

21        ***Cammer* V – Price Impact of Corporate Statements**: The *Cammer* court stated that

22   "[o]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate,

23   over time, a cause and effect relationship between company disclosures and resulting movements

24   in stock price."[6] *Cammer*, 711 F. Supp. at 1291. This factor requires "empirical facts showing a

25

26   _____

     [6] Courts, including several in this Circuit, have found that the fifth *Cammer* factor is not required

27   where the other *Cammer* and *Krogman* factors weigh in favor of market efficiency. *Angley v. UTi
     Worldwide Inc*., 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) ("Because there is no evidence
     disputing the first four *Cammer* factors and the *Krogman* factors weigh in favor of market
28   efficiency, the Court finds Plaintiff has met its burden of showing market efficiency"); *see also*

1    cause and effect relationship between unexpected corporate events or financial releases and an

2    immediate response in the stock price." *Hayes*, 2016 WL 7406418, at *6 (internal quotations

3    omitted). "Event studies are by far the most common test for a causal connection." *Petrie v. Elec.*

4    *Game Card, Inc.*, 308 F.R.D. 336, 352 (C.D. Cal. 2015).

5          Dr. Hartzmark performed a robust event study and concluded that Tesla common stock

6    exhibits the type of cause and effect relationship described in *Cammer*. As detailed in his report,

7    Dr. Hartzmark concluded that the price of Tesla stock reacted quickly to the release of new

8    company-specific "unexpected" news. Specifically, Dr. Hartzmark's analysis shows that on

9    August 7, 2018, at 12:17 p.m. EDT, Tesla's stock price rose swiftly from $342.26 to $354.38 in

10   response to the *Financial Times* reporting that a fund from Saudi Arabia was investing a large

11   amount in Tesla. Hartzmark Report at ¶74. These price movements demonstrated with "99%

12   confidence" that the information reported by the *Financial Times* caused a "rapid response" and

13   strongly supports the conclusion that Tesla common stock "trades in an open, well-developed and

14   efficient market." *Id*. ¶74 & n.115; *see also id*. ¶76.

15         Tesla's stock price also reacted immediately to Elon Musk's tweet at 12:48 p.m. EDT.

16   From $356.85 per share at 12:47 p.m. EDT, Tesla's stock increased by 2.29% within the first

17   minute of trading (*i.e.*, 12:48 p.m. to 12:49 p.m.). *Id*. ¶75 & n.117. Tesla's stock price continued

18   to increase before closing at $379.57. *See id.* ¶75. This immediate reaction to Elon Musk's tweets

19   on August 7, 2018 is strong evidence for market efficiency. *Id*. ¶76.

20         Similarly, on August 17, 2017, Tesla's stock price declined "rapidly" in response to the

21   article published by *The New York Times*, which reported on an interview with Elon Musk where

22   he indicated that funding had never been "secured" and that a going-private transaction was not

23   "imminent." *Id*. ¶77. From the previous day's closing price, Tesla's common stock price declined

24   from $335.45 per share on August 16, 2018 to a closing price of $305.50 on August 17, 2018. *Id*.

25   The "rapid price response" of Tesla's stock further supports the conclusion that Tesla's stock

26   traded in "an open, well-developed and efficient market." *Id*. ¶¶79-80.

27   _____

28   *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012) ("This Court
     recognizes that *Cammer* factors are 'an analytical tool, not a checklist' of requirements.").

1    Dr. Hartzmark also analyzed the relationship between Tesla stock returns on days when it

2  announced earnings news versus trading days with no news, specifically Tesla's announcement

3  of financial results on May 2, 2018 and August 1, 2018. *Id*. ¶¶68, 69. He concluded that Tesla-

4  specific information and large price movements in Tesla's stock price were related. *Id*. ¶¶68, 69.

5  Dr. Hartzmark further tested this cause-and-effect relationship by employing a statistical analysis

6  for autocorrelation, which concerns whether an observer can use the return from yesterday to

7  predict with the same level of certainty the return of today. *Id*. ¶¶87-89. He determined that there

8  was no statistically significant autocorrelation of Tesla abnormal returns. *Id*. ¶90. The lack of

9  autocorreclation is consistent with market efficiency. *In re Gaming Lottery Sec. Litig.*, No. 96

10  CIV 5567 RPP, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency found where

11  stock "did not exhibit autocorrelation.").

12    ***Krogman* 1 – Market Capitalization:** The *Krogman* court reasoned that higher market

13  capitalization is indicative of market efficiency because "there is a greater incentive for stock

14  purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478.

15  Throughout the Class Period, Tesla's market capitalization averaged approximately $59.55

16  billion, placing it in the 95th percentile of other common stocks listed on the NYSE or NASDAQ.

17  Hartzmark Report at ¶¶51-52. This factor is therefore satisfied.

18    ***Krogman* 2 – Bid-Ask Spread:** The *Krogman* court stated that "[a] large bid-ask spread

19  is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."

20  *Krogman*, 202 F.R.D. at 478. The average daily percent spread for Tesla common stock during

21  the Class Period was 0.02%. Hartzmark Report at ¶¶56. Such a spread compares favorably to

22  cases where courts have concluded that common stocks traded in efficient markets. *See*, *e.g.*,

23  *Radient Pharm. Corp.*, 287 F.R.D. at 574 (bid-ask spread of 0.58 percent supported market

24  efficiency); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007)

25  (bid-ask spread that "never exceeded 1.9%" weighed heavily in favor of market efficiency);

26  *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (average daily relative bid-

27  ask spread of 2.44% weighed in favor of market efficiency). Moreover, between 2016 and 2018,

28  Tesla's bid-ask spread was narrower than 90% of the common stocks on the NYSE and

NASDAQ. Hartzmark Report at ¶57.

*Krogman* **3 – Public Float of Tesla Stock**: A large public float indicates that a large proportion of shares are available to non-insiders, who can trade without restrictions and can profit by trading on new information to the marketplace, further evidence of market efficiency. *Id*. ¶53. Tesla's public float was approximately 79.7% of its shares during the Class Period, further evidence that Tesla common stock traded in an efficient market. *Id*. ¶54.

*       *       *

Thus, Tesla's common stock satisfied each of the *Cammer* and *Krogman* factors during the Class Period, which provides powerful evidence that it traded in an open, developed, and efficient market. Because the market for Tesla common stock was efficient, a presumption of reliance applies and common issues such as falsity, materiality, scienter, and loss causation predominate over any individual issues. *Huberman v. Tag-It Pac. Inc.*, 314 F. App'x 59, 63 (9th Cir. 2009) ("where Tag-It was traded on a national exchange and the stock prices reflected public information an efficient market is present. Therefore, the fraud-on-the-market presumption applies, eliminating the need for individual reliance by each class member. Common questions of fact and law predominate over individual questions pursuant to Rule 23(b)(3)."); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 579 (N.D. Cal. 2009) ("plaintiff has met its burden at this stage in the litigation by demonstrating that it traded on an efficient market and is therefore entitled to the presumption of reliance").[7]

---

[7] The presumption of reliance applies to all purchasers of Tesla stock during the Class Period, including investors purchasing Tesla stock to cover pre-existing short positions. *See Levy v. Gutierrez*, 448 F. Supp. 3d 46, 60 (D.N.H. 2019) (market for options was efficient as the court was "not persuaded that the classes of investors identified by Apple – short sellers, market-neutral arbitrageurs, and options traders – are indifferent to, or disregard whether, market prices are distorted by fraud."); *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-02204-PHX-FJM, 2009 WL 2151838, at *6 (D. Ariz. July 17, 2009) (rejecting defendants' argument that the fraud-on-the market presumption did not apply to "nearly half of the putative class consist[ing] of short-sellers and market makers" as "[s]hort-sellers and market makers depend on the market to provide accurate information regarding a company and its prospects whether or not they rely on the accuracy of a specific stock price or the prognosis for that price."); *Levie v. Sears, Roebuck & Co.*, 496 F. Supp. 2d 944, 949 (N.D. Ill. 2007) (finding "any [short sellers, day traders and other option traders] who can establish injury as a result of the alleged fraud is properly included in the class definition" because "[t]he fact that these traders have divergent motivations in

1

     *b. Tesla's option contracts traded in an open, developed, and efficient market during the Class Period*

2    As an initial matter, "an option market is tied to the market of the underlying security, and

3 thus where that security trades in an efficient market, the options are presumed to as well." *Marcus*

4 *v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2016 WL 8604331, at \*8 (E.D. Tex. Aug.

5 29, 2016), *report and recommendation adopted,* No. 6:13-CV-736, 2017 WL 907996 (E.D. Tex.

6 Mar. 8, 2017). Accordingly, many courts have found that where a company's common stock

7 trades in an efficient market, it follows that the company's option contracts also trade in an

8 efficient market. *See*, *e.g.*, *Marcus*, 2016 WL 8604331, at \*9 ("an experts' application of

9 the *Cammer* factors to common stock was sufficient to trigger the presumption for options as

10 well"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 434 (S.D.N.Y. 2014)

11 ("The Court has found that the market for CCME stock was efficient and is not persuaded that

12 there are any special circumstances that would preclude applying the fraud-on-the-market

13 presumption to options traders"); *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No.

14 CIV.A. 05-1151 SRC, 2013 WL 396117, at \*12 (D.N.J. Jan. 30, 2013) ("insofar as the alleged

15 Rule 10b–5 violations are predicated on put or call options transactions, the trading of Merck

16 stock on the efficient NYSE suffices to establish that the options also traded on

17 an efficient market."); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 (N.D. Ala. 2009)

18 (finding that "[b]ecause Stockholder Plaintiffs' evidence establishes that HealthSouth common

19 stock traded in an efficient market during the Class Period" that it "entitles them to invoke the

20 presumption of reliance in support of all their claims under Rule 10b–5"); *In re Sci.-Atlanta, Inc.*

21 *Sec. Litig.*, 571 F. Supp. 2d 1315, 1330 (N.D. Ga. 2007) ("In sum, therefore, where a put options

22 seller demonstrates market efficiency in the underlying security, he is generally entitled to rely

23 on the fraud on the market theory."); *In re Enron Corp. Litig.*, 529 F.Supp.2d 644, 754 (S.D. Tex.

24 2006) ("The Court finds that Dr. Nye's evidence applying the *Cammer/Unger/Bell* factors to the

25 stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims

26

27 ―――――――――――
purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof

28 that price paid no part whatsoever in their decision making." (quoting *In re Bally Manufacturing Secs. Corp. Litig.*, 141 F.R.D. 262, 269 n. 6 (N.D.Ill.1992)).

based on the options.").[8]

Accordingly, Dr. Hartzmark's analysis of the efficiency of the market for Tesla's common stock would be sufficient for the Court to find that the market for Tesla's option contracts on that common stock was also efficient. Notwithstanding, Dr. Hartzmark has still undertaken an analysis of the efficiency of the market for options on Tesla's common stock by applying the *Cammer* and *Krogman* factors (adapted as necessary).  Based on this analysis, Dr. Hartzmark has concluded that Tesla's option contracts traded in an open, developed, and efficient market during the Class Period.[9]

*Cammer* **I – Weekly Trading Volume**: Trading in Tesla options was very active during the Class Period. Over the Class Period, there was a total volume of 1,772,360 call option contracts (representing 177,236,000 underlying shares) and 1,598,370 put option contracts (representing 159,837,000 underlying shares). Hartzmark Report at ¶112. Thus, the number of shares represented by these contracts of 337,073,000 million shares is almost twice Tesla's 170.6 million outstanding shares over the Class Period. *Id*. It represents average weekly turnover of approximately 110% of the average outstanding shares. *Id*. Further, during the Class Period, the maximum open interest summed across all Tesla options that traded was 886,084 call option contracts (representing 88,608,400 underlying shares) and 1,464,106 summed across all put option contracts (representing 146,410,600 underlying shares). *Id*. ¶113.  This suggests an active secondary market for Tesla's option contracts. *Id*. This supports the conclusion that Tesla options traded in efficient markets. *Id*. ¶114.

---

[8] This premise holds true for a company's other securities, such as Tesla's convertible bonds in this case. *See, e.g., In re Cobalt Int'l Energy, Inc.*, No. CV H-14-3428, 2016 WL 215476, at *7 (S.D. Tex. Jan. 19, 2016) ("Because the bonds were convertible to common stock, and because Plaintiffs adequately alleged that there was an efficient market for the common stock, Plaintiffs have alleged sufficient facts on the reliance factor for their § 10(b) claim as to the bond offerings."); *Connetics Corp.*, 257 F.R.D. at 579 (". . . lead plaintiff has put forward unrebutted evidence that the market for Connetics common stock was efficient."); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 826 (N.D. Ill. 2000) ("Inasmuch as there existed an efficient market for Sabratek common stock, this Court also concludes that an efficient market existed for Sabratek convertible notes, which were convertible to Sabratek common stock.").

[9] *Cammer* Factors II (analyst coverage), IV (S-3 eligibility) and *Krogman* Factors 1 (market capitalization) and 3 (public float) apply identically to options as well as common stock. Each supports market efficiency.

1    *Cammer* **III – Market Makers & Arbitrageurs:** Exchange-traded options, also known

2    as "listed options," are not traded on the NASDAQ Global Select Market, but are mostly traded

3    on other domestic and international exchanges, with the primary exchange being the Cboe

4    Options Exchange. *Id*. ¶108. Accordingly, should it be found that Tesla common stock traded in

5    an efficient market, then that finding along with the fact that the Tesla options traded on a

6    centralized exchange — that provides the same type of information rich environment and

7    informational benefits to investors as those found for the NYSE and NASDAQ exchanges —

8    supports the conclusion that the Tesla options traded in an efficient market. *Id*. ¶111.

9    *Cammer* **V – Price Impact of Corporate Statements**: Dr. Hartzmark performed a robust

10   event study and put-call parity evaluation before concluding that Tesla options exhibit the type of

11   cause and effect relationship described in *Cammer*. He first conducted a cause-and-effect test for

12   price impact on individual options traded during the Class Period by examining the response of

13   option prices after the statistically significant stock price movements on August 7, 2018 and

14   August 17, 2018. *Id.* ¶138. This analysis relied on actual trades in options on Tesla common stock

15   to determine whether the movements in the options prices were directionally consistent with the

16   expected movement of the option based on the stock price movements alone and holding all other

17   variables that affect option prices constant. *Id.* ¶142. In response to the *Financial Times* article

18   issued on August 7, 2018 for the 671 option series that traded both before and after disclosure,

19   which represented over 85% of the volume during the Class Period, that 96% of the option series

20   moved in the expected direction. *Id.* ¶139. Likewise, for the August 17, 2018 *New York Times*

21   article, 1,162 option series that traded in the pre- and post-period, representing over 94% of the

22   total volume of all Tesla options during the Class Period, that over 95% of the option series moved

23   in the direction one would expect upon a drop in Tesla's common stock when holding all other

24   option pricing inputs constant. *Id.* ¶140. Accordingly, this factor also strongly weighs in favor of

25   market efficiency.

26        In response to Elon Musk's August 7, 2018 tweet, Dr. Hartzmark found that for the 867

27   series that traded both in the pre- and post-period, which represented almost 90% of the total

28   volume of all options traded during the Class Period, that 77% of the option series price

1    movements moved in the direction expected. *Id.* ¶141. Further, for the remaining 23% moving in

2    the opposite direction, the movements coincided with reasonable investor expectations believing

3    that it was less probable that Tesla's stock price would exceed the strike of the option prior to the

4    stated maturity of these option series. *Id.* ¶142. As a result, the impact on the volatility of Tesla

5    common stock along with the magnitude of such impact caused the option series prices to move

6    in a direction opposite to the increase in Tesla's common stock price. *Id.* ¶142. Accordingly,

7    option pricing in response to Elon Musk's tweet weighs in favor of market efficiency. *Id*. ¶143.

8          Dr. Hartzmark also conducted an empirical test to determine whether Tesla common stock

9    and exchange-traded options on Tesla common stock violated the put-call parity condition for

10   each minute interval of the Cboe Dataset during the Class Period. *Id*. ¶¶128-29. Dr. Hartzmark

11   found that the put-call parity relation held for 80% of the call option pairs and for 76.2% of the

12   put options pairs. *Id.* ¶131. Notably, Dr. Hartzmark found that the violations of the put-call parity

13   amounted to an average of 0.27% of the mid-point of Tesla's common stock's bid and ask price

14   for the call option-based pairs and 0.28% for the put option-based pairs. *Id.* ¶132. The direction

15   of the violations indicates that the cost to borrow Tesla common stock to enter a short stock

16   position was higher than normal. *Id.* Thus, Dr. Hartzmark concluded that when taking into account

17   the reported stock borrowing costs and the costs to enter the positions, which the put-call parity

18   relationship does not account for, that the average violation of 0.28%, or $0.98 of Tesla's common

19   stock average closing price during the Class Period, "is not indicative of unexploited arbitrage

20   opportunities or of an inefficient market, but simply reflects the relatively higher costs of shorting

21   the stock." *Id.* ¶133. This finding shows that the market for options on Tesla common stock was

22   efficient.

23         ***Krogman* 2 – Bid-Ask Spread:** The *Krogman* court stated that "[a] large bid-ask spread

24   is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."

25   *Krogman*, 202 F.R.D. at 478. The average daily percent spread for Tesla options during the Class

26   Period was 0.55% for call options and 0.45% for put option. Hartzmark Report at ¶115. Dr.

27   Hartzmark's analysis of individual options similarly showed that Tesla's options' bid-ask spreads

28   during the Class Period ranged between the 50th and 75th percentiles of NYSE- and NASDAQ-

1    traded companies. *Id*. ¶121. These analyses support the conclusion that Tesla options traded in

2    efficient markets. *Id*. ¶151.

3                                    *             *             *

4          Thus, Tesla's option contracts also satisfy each of the *Cammer* and *Krogman* factors

5    during the Class Period, which provides powerful evidence that they traded in an open, developed,

6    and efficient market. Accordingly, purchasers and sellers of Tesla option contracts during the

7    Class period are also entitled to a presumption of reliance. *See Levie*, 496 F. Supp. 2d at 949

8    ("traders in put and call options rely on the integrity of information disseminated in the market

9    just as do purchasers and sellers of the underlying security . . . any such trader who can establish

10   injury as a result of the alleged fraud is properly included in the class definition"); *Deutschman*

11   *v. Beneficial Corp.*, 132 F.R.D. 359, 370 (D. Del. 1990) (finding "purchaser of call options can

12   be presumed to rely on the market price and, consequently, can invoke the fraud on the market

13   presumptions" despite claims by defendants that call option purchasers are "'speculators' who do

14   not rely on the integrity of the market price.").

15                  **3.      *Damages May Be Calculated Using a Common Methodology.***

16         For a class certified under Rule 23(b)(3) a plaintiff must show that "damages are capable

17   of measurement on a classwide basis" and tie their damages model to their theory of liability.

18   *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013). Under Ninth Circuit law, "differences in

19   damages calculations" cannot defeat class certification. *See, e.g., Pulaski & Middleman, LLC v.*

20   *Google, Inc.*, 802 F.3d 979, 986-88 (9th Cir. 2015) (holding that district court erred in denying

21   class certification based on a misreading of *Comcast* and confirming that individualized "damage

22   calculation alone cannot defeat class certification."); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161,

23   1168 (9th Cir. 2014) ("So long as the plaintiffs were harmed by the same conduct, disparities in

24   how or by how much they were harmed did not defeat class certification."). As the Ninth Circuit

25   explained in its seminal *Blackie* decision: "[t]he amount of damages is invariably an individual

26   question and does not defeat class action treatment" because "should the class prevail[,] the

27   amount of price inflation during the period can be charted and the process of computing individual

28   damages ***will be virtually a mechanical task***." 524 F.2d at 905 (emphasis added).

1      Here, Class members' damages can be calculated using a common methodology, their out

2 of pocket loss, that applies uniformly to all Class members. Moreover, these common damages

3 methodologies are consistent with Littleton's and the Class's theory of liability – namely, that

4 Elon Musk and Tesla deceived the market about taking Tesla private. Misrepresentations by Elon

5 Musk and Tesla artificially inflated Tesla's stock price and distorted the prices of stock options,

6 artificially inflating the prices of some stock options and artificially deflating the price of others.

7 As Dr. Hartzmark's report explains, damages arising from the purchase of Tesla common stock

8 (including purchases to cover "short" transactions) can be uniformly calculated with the standard

9 "out-of-pocket" damages methodology. Hartzmark Report at ¶159. The out-of-pocket

10 methodology utilizes a simple formulaic way of calculating losses based on the difference

11 between the actual prices paid for or received on that day for a specific Tesla security and the true

12 or "but-for" values of the security absent the alleged misrepresentations and omissions. *Id*. ¶161.

13 To calculate these "but-for" values for the common stock in this action, Littleton's damages expert

14 could construct an "inflation ribbon" based on an event study like the one Dr. Hartzmark uses in

15 his report that measures the inflation in the price of Tesla's common stock caused by Elon Musk's

16 tweets on August 7, 2018. *Id*. ¶¶166-68. While individual damages for each Class member need

17 to be calculated based on each members' actual stock trading activity (*e.g.*, purchases or sales,

18 trade dates, trading prices, and number of shares traded), this is a purely mechanical and formulaic

19 exercise using readily available daily pricing information. *Id*. ¶175.

20      Likewise, the amount of inflation or deflation of an option price can be calculated by using

21 an options pricing model, such as the Black-Scholes option pricing model, and inputting the "but-

22 for" stock price and the "but-for" implied volatility level for each day. *Id*. ¶¶170-72.   Class

23 member option damages would be equal to the difference between the price paid or received and

24 the "but-for" price which may indicate either artificial inflation or deflation. As such, the

25 individual damages for each Class member can be calculated based on their actual option trading

26 activity (*e.g.*, purchases or sales, trade dates, trading prices, and number of options traded), which

27 would be a purely mechanical and formulaic exercise using readily available daily pricing

28 information. *Id*. ¶174. Thus, like the "out-of-pocket" method, this method would be formulaic

1   and applied class-wide. *Id.* ¶175. *See also Marcus,* 2016 WL 8604331, at *10 (accepting "but-

2   for" damages model over objection from defendants because, while "Defendants may disagree

3   with the methodology or feel that another methodology is correct," it did not make the plaintiffs'

4   "methodology inconsistent with [their] theory of liability").

5       In sum, the out-of-pocket damages calculations for both stock and options flow readily

6   from the "actions that created the legal liability" and therefore individual damages issues do not

7   predominate over common liability issues. *See Leyva v. Medline Indus.*, 716 F.3d 510, 513-14

8   (9th Cir. 2013) ("'In this circuit, however, damage calculations alone cannot defeat certification'"

9   (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010))). For

10  example, in *Hayes v. MagnaChip Semiconductor Corp.*, *supra*, the plaintiffs sought to certify one

11  global class that encompassed investors suing under Sections 10(b) and 20A alleging different

12  corrective disclosures and pursuing different damages. The plaintiffs adequately showed

13  predominance under *Comcast*. The court held that "[l]ike in *Hatamanian*, [plaintiff's expert's]

14  event study, if reliable, should suffice to show how damages could be calculated." 2016 WL

15  7406418, at *9 (citing *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226 YGR, 2016

16  WL 1042502, at *8–9 (N.D. Cal. Mar. 16, 2016)). Issues pertaining to the "fit" of the "damages

17  methodology" to the theory of the case related to loss causation, a common issue, given that the

18  plaintiffs asserted only "one theory" of fraud. *Id.*; *see also Snap*, 334 F.R.D. at 216-17 (granting

19  certification where damages models "[sought] to measure only 'damages attributable to

20  [plaintiff's] theory'—meaning a misstatement or omission in Snap's registration statement . . . .

21  To the extent that Defendant's arguments seek to challenge [plaintiff's expert's] ability in practice

22  to adjust for the confounding factors that may prevent isolation of price movement based on the

23  alleged partial corrective disclosures, this is an inquiry to consider at the merits stage."). Similarly,

24  in *LDK Solar*, "potentially conflicting incentives regarding the calculation of damages do not

25  preclude certification of the proposed class" because "'risky' trading strategies—margin trading

26  and options transactions—adds little to the inquiry" as the "mere fact that plaintiff may have

27  suffered even greater financial losses than other class members in response to a particular change

28  in the stock's price does not render his interests adverse to the remainder of the class." 255 F.R.D.

at 533; *see also Cooper v. Thoratec Corp.*, No. 14-CV-0360 CW, 2018 WL 2117337, at *6-7 (N.D. Cal. May 8, 2018) (granting certification of single proposed class where plaintiffs "sufficiently show[ed], at this stage, that damages are capable of measurement on a classwide basis" even though misrepresentations changed over course of the class period).

### 4.    *Class Treatment is Superior to Other Methods of Adjudication*

Rule 23(b)(3) requires that the class action device be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Courts consider four factors to determine superiority: "(1) the class members' interests in individually controlling a separate action; (2) the extent and nature of litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the manageability of a class action." *Juniper Networks*, 264 F.R.D. at 592. These factors are satisfied in this case.

First, the number of class members is too numerous, and the typical claim is too small for each individual class member to maintain a separate action. *See Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 376 (N.D. Cal. 2007) ("The amounts involved are modest per investor. No single investor could hope to recover more than it would cost to prosecute an individual suit."). Indeed, the likely modest size of most individual recoveries balanced against the significant resources necessary to prosecute this action against well-financed defendants, the "[e]conomic reality dictates that [this] suit proceed as a class action or not at all." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 161 (1974); *see also In re Micron Techs. Inc. Sec. Litig.*, 247 F.R.D. 627, 635 (D. Idaho 2007) ("If this action was not certified as a class, each plaintiff would have to establish the same fraudulent scheme. This repetitive process would 'unnecessarily burden the judiciary.'").

With respect to the second factor, Littleton is unaware of any other class action brought on behalf of Tesla investors that seeks recovery under the federal securities laws for the damages caused by Defendants' fraud. Consequently, multiplicity of suits and the risk of inconsistent adjudications is not an issue here.[10]

---

[10] The related derivative actions (*Laborers' District Council Contractors' Pension Fund of Ohio v. Musk*, C.A. No. 2019-0187-JRS; *Elton v. Musk*, 2018-0749-JRS; *Seidman v. Musk*, No. 2018-

1    Regarding the third factor, as in *Siemers*, "it seems undisputed that this venue, being the

2    home of [Tesla], is a desirable and convenient place to concentrate the litigation, no other venue

3    having been suggested." *Siemers*, 243 F.R.D. at 376.

4    Finally, on the fourth factor, this action, like numerous other securities actions, presents

5    no management difficulties that would preclude it from being maintained as a class action. The

6    proposed Class is ascertainable because membership is based on objective criteria, *i.e.*, the dates

7    that investors purchased or sold Tesla's publicly-traded securities, and putative Class members

8    can be easily identified through stock holder records.

9    In sum, class certification promotes judicial efficiency by permitting common claims and

10   issues to be tried only once with a binding effect on all parties. *See, e.g., Juniper Networks*, 264

11   F.R.D. at 592 ("Where thousands of identical complaints would have to be filed, it is superior to

12   concentrate claims through a class action in a single forum."). The superiority requirement is met

13   here.

14   **E.    Levi & Korsinsky Should be Appointed Class Counsel**

15   Littleton also respectfully requests that the Court appoint Levi & Korsinsky as Class

16   Counsel. In appointing class counsel, the Court must take into account: (i) the work counsel has

17   done; (ii) counsel's experience in handling *inter alia* class actions and the types of claims asserted;

18   (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit

19   to representing the class. FED. R. CIV. P. 23(g)(1)(A). Here, these considerations weigh heavily in

20   favor of appointing Levi & Korsinsky as Class Counsel. The firm is among the most experienced

21   securities class action firms in the nation and has prosecuted numerous successful securities class

22   actions. *See* Porritt Decl., Exhibit A. Under Littleton's supervision and direction, Levi &

23   Korsinsky has already undertaken a vigorous prosecution of this case, including by, among other

24   things: thoroughly analyzing, researching and investigating the securities law claims at issue;

25   drafting a detailed Consolidated Complaint; opposing Defendants' motions to dismiss; begun

26   _____

27   0775-JRS; *Krol v. Musk*, 2018-0802-JRS; *Dixon v. Musk*, 2018-0806-JRS; *Doris Shenwick Trust v. Musk*, 2018-0823-JRS; and *In re Tesla, Inc. S'holder Deriv. Litig.*, 1:18-cv-01669-CFC (D.

28   Del.) (consolidating two actions)), brought on behalf and for the benefit of Tesla, are currently stayed.

1  pursuing discovery from Defendants and other third parties; and retained a market efficiency

2  expert, Dr. Hartzmark, whose expert report is submitted with this Motion. Porritt Decl. at ¶¶2-5.

3  Finally, Levi & Korsinsky will commit the necessary resources to achieve a successful recovery

4  for investors. *Id.* at ¶7.

5  **VI.    CONCLUSION**

6       For the foregoing reasons, Littleton respectfully requests entry of an order certifying this

7  action as a class action pursuant to Federal Rule 23, appointing Littleton as Class Representative,

8  and appointing Levi & Korsinsky as Class Counsel.

9  Dated: September 22, 2020                    Respectfully submitted,

10                                              **LEVI & KORSINSKY, LLP**

11
                                                 s/ Adam M. Apton
12                                              Adam M. Apton (SBN 316506)
                                                Adam C. McCall (SBN 302130)
13                                              388 Market Street, Suite 1300
                                                San Francisco, CA 94111
14                                              Tel.: (415) 373-1671
                                                Email: aapton@zlk.com
15                                              Email: amccall@zlk.com

16
17                                                       -and-

18                                              Nicholas I. Porritt
                                                Alexander A. Krot III
19                                              **LEVI & KORSINSKY, LLP**
                                                1101 30th Street N.W., Suite 115
20                                              Washington, D.C. 20007
                                                Tel.: (202) 524-4290
21                                              Email: nporritt@zlk.com
                                                Email: akrot@zlk.com
22                                              (*admitted pro hac vice*)

23
24                                                       -and-

25                                              Joseph Levi
                                                Eduard Korsinsky
26                                              **LEVI & KORSINSKY, LLP**
                                                55 Broadway, 10th Floor
27                                              New York, New York 10006
                                                Tel.: (212) 363-7500
28                                              Fax: (212) 363-7171

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: jlevi@zlk.com
Email: ek@zlk.com
(*admitted pro hac vice*)

*Attorneys for Lead Plaintiff and the Class*