# EXCERPTS FROM THE DEPOSITION OF RYAN BRINKMAN TAKEN MAY 4, 2021

Page 1

 1

 2              UNITED STATES DISTRICT COURT

 3         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 4                 SAN FRANCISCO DIVISION

 5  ---------------------------X

 6  IN RE TESLA, INC.

 7  SECURITIES LITIGATION          Civil Action No.

 8                                 3:18-cv-04865-EMC

 9  ---------------------------X

10

11

12         REMOTE DEPOSITION OF RYAN BRINKMAN

13                   May 4, 2021

14

15

16  Reported by:

17  MARY F. BOWMAN, RPR, CRR

18  JOB NO. 193519

19

20

21

22

23

24

25

Page 2

May 4, 2021

12:30 p.m. EST

Remote deposition of RYAN BRINKMAN, held before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New Jersey.

Page 3

1

2          APPEARANCES: (BY VIDEOCONFERENCE)

3

4  LEVI & KORSINSKY

5  Attorneys for Plaintiffs

6       1101 30th Street, N.W.

7       Washington, D.C.  20007

8  BY:  NICHOLAS PORRITT, ESQ.

9       ELIZABETH TRIPODI, ESQ.

10

11

12  COOLEY

13  Attorneys for Tesla

14       3175 Hanover Street

15       Palo Alto, California 94304

16  BY:  PATRICK GIBBS, ESQ.

17       BINGXIN WU, ESQ.

18

19

20  Also Present:

21       Joshua Glick, Esq. JP Morgan

22       Candace Jackman, Esq., Tesla

23       Gabe Seymour, Videographer

24       KATHY AMES

25

1

2

3

4        IT IS HEREBY STIPULATED AND

5   AGREED, by and between the attorneys

6   for the respective parties herein, that

7   filing and sealing be and the same are

8   hereby waived.

9        IT IS FURTHER STIPULATED AND

10  AGREED that all objections, except as

11  to the form of the question, shall be

12  reserved to the time of the trial.

13

14       IT IS FURTHER STIPULATED AND

15  AGREED that the within deposition may

16  be sworn to and signed before any

17  officer authorized to administer an

18  oath, with the same force and effect as

19  if signed and sworn to before the

20  Court.

21

22

23

24

25

Page 5

1

2      THE VIDEOGRAPHER:  This is the
3 start of media number 1 of the
4 video-recorded deposition of Ryan
5 Brinkman in the matter In re: Tesla
6 Inc. Securities Litigation in the U.S.
7 District Court, Northern District of
8 California, San Francisco division,
9 number 3:18-CV-04865-EMC.
10      This deposition is being held by
11 remote video conference on May 4, 2021
12 at 11:33 a.m. central time.
13      My name is Gabe Seymour.  I am
14 legal video specialist from TSG
15 Reporting, headquartered in New York,
16 New York.  The court reporter is Mary
17 Bowman in association with TSG
18 Reporting.
19      Counsel, please introduce
20 yourselves.
21      (Whereupon, counsel placed their
22 appearances on the audio record.)
23             - - - -
24
25

1
2  RYAN BRINKMAN,
3      called as a witness by the parties,
4      having been duly sworn, testified as
5      follows:
6  EXAMINATION BY
7  MR. PORRITT:
8      Q.    Good afternoon, Mr. Brinkman.
9            As I just stated, my name is
10  Nicholas Porritt, I'm with the firm of Levi
11  & Korsinsky.  I'll be taking your
12  deposition here today.
13            First of all, could you state
14  your full name for the record.
15      A.    Ryan Joseph Brinkman.
16      Q.    What's your residential address?
17      A.    85 Tuckahoe Avenue in
18  Eastchester, New York, 10709.
19      Q.    Where are you sitting today for
20  today's deposition?
21      A.    Yes, I am in my house, that
22  residence, as opposed to my office.
23      Q.    Have you ever been deposed
24  before?
25      A.    No.

1

2    Q.   Do you recall if you received

3 anything other than just a simple approval

4 e-mail as you just described in response to

5 this e-mail?

6    A.   I don't recall.  I suspect it was

7 simply an approval e-mail, but I don't

8 recall.

9    Q.   If we can -- why don't we pull up

10 the next -- hold on one second on this

11 e-mail.

12        Why don't we go to the next

13 exhibit, will be Exhibit 15, which will be

14 your actual report -- this is easier to

15 read than what you have pasted in here.

16        That's 47.  There we go.

17    A.   OK, I have it open.

18    Q.   So I placed before the witness a

19 document marked as Exhibit 15.

20       (Exhibit 15, document Bates

21       stamped JPMS 00047 marked for

22       identification, as of this date.)

23       marked

24    Q.   It is noted dated 8th of August

25 2018.  It is Bates stamped JPMS 00047.  It

```
 1
 2    refers to 61.
 3              Have you had a chance to glance
 4    through this document, Mr. Brinkman?
 5        A.    Yes.
 6        Q.    Do you recognize this document?
 7        A.    Yes.
 8        Q.    What is this document?
 9        A.    This is the note that I wrote in
10    response to the events that we were talking
11    about earlier and was published overnight
12    and it was remaining underweight.
13              And yet, increasing my price
14    target very materially from 195 dollars to
15    308 dollars.  As a consequence of, as we
16    mentioned earlier, there were, you know, I
17    wanted to take a middle-of-the-road
18    approach.
19              There were a lot of reasons to
20    think there was a lot of veracity to this
21    and then there were also some lingering
22    concerns including that there was still not
23    a press release by the company and whatnot.
24    There was the blog post, but I decided to
25    weight it 50/50.  50 percent the same price
```

1
2   target I had before, which was based on the
3   fundamentals as if it was not going
4   private, and other 50 percent I weighted
5   420 dollars, and the note provides my
6   rationale for doing that, including the
7   thought process.  And it finishes by saying
8   that details are few and that investors
9   should be ready for me to potentially lower
10  my price target again if I needed to remove
11  the 50 percent go-private weight or
12  potentially to increase my price target if
13  it became more clear and maybe take it all
14  the way to 420.
15       Q.   And this note reflects perhaps in
16  more detail your thoughts regarding the
17  potential going private transaction as of
18  the early morning of August 8, 2018?
19       A.   Yes.
20       Q.   In that opening on page 1 of
21  Exhibit 15, you state that, "The Tweets we
22  are talking about on August 7 are
23  nevertheless declarative statements from
24  the CEO of a public company which we feel
25  should be considered seriously.  Either

Page 75

1
2  funding is secured or it is not secured.
3  Tesla CEO says funding is secured."
4           Do you see that?
5      A.   Yes.
6      Q.   Does that reflect what we talked
7  about earlier all the Tweets that took
8  place on August 7?
9      A.   Yes.  I was saying that it should
10 be taken seriously.
11     Q.   Do you recall getting any
12 questions or follow-up from any clients in
13 response to this note you published on
14 August 8, 2019?
15     A.   On August 8 and August 9, I was
16 100 percent focused on my auto conference,
17 hosting, you know, 50 or so companies one
18 after the other without even ability to
19 check my e-mail so much.
20          But I saw hundreds of investors
21 at that conference and probably spoke with
22 them about it.  But I wasn't actively using
23 my e-mail probably that day like I would
24 any other day.
25     Q.   Sorry, didn't mean to speak over

```
 1
 2      A.   For a note of this type, yeah,
 3  for me.
 4      Q.   You see there in the second
 5  sentence there, you say, "Obviously a tough
 6  call."
 7           Do you see that?
 8      A.   Yes.
 9      Q.   What made this reduction and
10  price target a tough call?
11      A.   As mentioned, I think I was the
12  first analyst to come out and say -- or one
13  of the first, that these Tweets weren't
14  true and essentially it would be tantamount
15  to say the CEO had lied or mislead
16  investors which is, you know, something
17  that's impolitic and I think I handled it
18  in the best way possible.
19              I never used incendiary language.
20  My notes are very restrained in how I come
21  across and I took that balanced approach in
22  increase in the price target, and to come
23  out and remove the 420, 50 percent
24  weighting would be to say, I don't think
25  this is, you know -- really have any chance
```

 1

 2   of happening.  I don't think that this

 3   is -- I don't think funding was secured.  I

 4   don't think that, you know -- it is sort of

 5   an acknowledgment of -- it would be

 6   putting -- it would be picked up by all the

 7   media, JP Morgan says that, you know, that

 8   contradicts Elon's statements, calls him

 9   out.

10              I tried to maintain good

11   relationships with all the companies that I

12   cover.  I wanted to do this in the best and

13   most responsible and even-handed way.  It

14   was going to be -- it's very difficult do

15   that though.  It's very difficult to come

16   out and contradict those earlier statements

17   in a fair and balanced way.

18              And you see the note that I'm

19   sure we are going to discuss next, that is

20   the outcome of my best effort there.

21              But I was also, as mentioned, the

22   first analyst, kind of sticking my neck

23   out, and yeah, it was a tough and

24   awkward -- the whole situation was

25   difficult to know how to respond to and I

Page 102

1
2  feel I did my best.
3      Q.   Do you recall -- in this week
4  leading up to this New York Times article,
5  August 16 or August 17, you revising the
6  note to be published on August 20, do you
7  recall any discussions within JP Morgan
8  regarding the situation at Tesla?
9      A.   No.  The only discussions would
10 have been between myself and my team, I
11 believe.
12     Q.   Do you recall what their views
13 were?
14     A.   Well, at that point in time, I
15 just had -- I typically have two U.S.-based
16 analysts and one in India.  At that point
17 in time, I just had one in India and one in
18 U.S. who was sort of transitioning on to
19 the team.
20          So I was kind of without a great
21 sounding board that I typically have.  And
22 so I don't think that there was a lot of
23 communication within the team.  I was kind
24 of making these calls.
25          MR. PORRITT:  Why don't we go to

Page 103

1
2        the next exhibit, Elizabeth, which will
3        be the 4047.
4              (Exhibit 22, document Bates
5        stamped JPMS40437 marked for
6        identification, as of this date.)
7        Q.    I placed before the witness a
8    document marked as Exhibit 22.  It's an
9    e-mail Bates stamped JPMS40437.
10              Do you see that, Mr. Brinkman?
11       A.    Yes.
12       Q.    Do you recognize this document?
13       A.    Yes.
14       Q.    What is it?
15       A.    This is similar to the earlier
16   e-mail we looked at which is me e-mailing
17   research management at JP Morgan the EQR
18   approval request e-mail group that the
19   supervisory analysts are cc'd on requesting
20   this time not to raise the price target by
21   more than 50 percent, but to lower the
22   price target -- I am sorry, not to raise
23   the price target --
24              (Reporter clarification)
25       A.    OK, this is similar to the other

Page 104

1
2   e-mail, but instead of requesting that I
3   raise the price target by more than 20
4   percent, I need to request permission to
5   lower the price target by more than 20
6   percent.  I provide my rationale there and
7   then paste it in the text of the note as
8   well.
9       Q.   And this is sent in looking at --
10  sent August 20, 2018, 6:03 a.m. suggests
11  that it is 2:03 a.m. on Monday morning.  I
12  don't know exactly -- do you recall sending
13  this e-mail early in the morning on that
14  Monday?
15      A.   I think I do, yeah.
16           It was a momentous time for me.
17      Q.   Do you recall discussing this
18  e-mail and this note with anyone before
19  sending this e-mail?
20      A.   No, I believe I authored this
21  note by myself in isolation.
22      Q.   And this e-mail reflects your
23  thinking at the time regarding Tesla as of
24  August 20, 2018?
25      A.   Yes.

Page 105

```
 1
 2      Q.    Why don't we mark the next
 3   exhibit, Exhibit 23, which will be the
 4   August 20 report.
 5              (Exhibit 23, document Bates
 6         stamped JPMS000001 marked for
 7         identification, as of this date.)
 8      Q.    I'll place before the witness a
 9   document marked Exhibit 23.  And it is a
10   note research note dated 20 August 2018
11   Bates stamped JPMS000001.
12              Is that document in front of you?
13      A.    Yes.
14      Q.    Do you recognize this document?
15      A.    Yes.
16      Q.    What this document?
17      A.    This is the second note that I
18   published on the topic of Tesla potentially
19   going private and it is essentially undoing
20   the first note.
21              The first note was to increase
22   the price target from 195 dollars to 308
23   dollars by equal-weighting my 195 price
24   target 50 percent and the go-private offer
25   of 420 dollars at 50 percent.
```

1
2          This note removes the 420
3   dollars, and therefore, the 420 dollar 50
4   percent weighting and, therefore, lowers
5   the price target back down to 195 dollars
6   given -- the title of the note is reverting
7   to valuing TSLA shares on fundamentals
8   alone, given funding appears to not have
9   been secured.  Price target back to 195
10  dollars.
11       Q.   Once again, this note reflects
12  your views on the -- on Tesla and the
13  going-private transaction at the time it
14  was published in August 20, 2018?
15       A.   Yes.
16            MR. PORRITT:  If -- we have been
17       over -- Ms. Bowman, how long have we
18       been going or the videographer can tell
19       us.
20            Are you all right, Mr. Brinkman,
21       do you want to keep going, or take a
22       five-minute, ten-minute break.
23            THE WITNESS:  Why don't we take
24       one of those 120-second breaks.  I'll
25       be right back.

1

2                CERTIFICATE

3  STATE OF NEW JERSEY )
                        )ss:
4  COUNTY OF UNION     )

5       I, MARY F. BOWMAN, a Registered

6  Professional Reporter, Certified

7  Realtime Reporter, and Notary Public

8  within and for the State of New Jersey,

9  do hereby certify:

10      That RYAN BRINKMAN, the witness

11 whose deposition is hereinbefore set

12 forth, was duly sworn by me and that

13 such deposition is a true record of the

14 testimony given by such witness.

15      I further certify that I am not

16 related to any of the parties to this

17 action by blood or marriage and that I

18 am in no way interested in the outcome

19 of this matter.

20      In witness whereof, I have

21 hereunto set my hand this 14th day of

22 May, 2021.

23
                _____
24              MARY F. BOWMAN, RPR, CRR

25