# EXCERPTS FROM THE DEPOSITION OF JOSEPH FATH TAKEN JULY 12, 2021

```
                                                              Page 1
1    UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4    -------------------------------)

5    IN RE TESLA, INC.

6    SECURITIES LITIGATION            Civil Action No.

7                                     3:18:cv-04865-EMC

8    -------------------------------)

9

10

11

12        REMOTE DEPOSITION OF JOSEPH FATH

13              New York, New York

14                July 12, 2021

15

16

17

18

19

20

21

22

23

24   Reported by:
     Linda Salzman
25   JOB NO. 196636
```

1    July 12, 2021

2    12:15 p.m.

3

4    Remote deposition of JOSEPH

5  FATH, the witness herein, held

6  remotely before Linda Salzman, a

7  Notary Public of the State of New

8  York.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   A P P E A R A N C E S:

 2

 3      LEVI & KORSINSKY

 4      Attorneys for Plaintiffs

 5           1101 30th Street, Northwest

 6           Washington, D.C.  20007

 7      BY:  NICHOLAS PORRITT, ESQ.

 8           KATHY AMES VALDIVIESO, ESQ.

 9

10      COOLEY

11      Attorneys for Tesla

12           3175 Hanover Street

13           Palo Alto, California 94304

14      BY:  PATRICK GIBBS, ESQ.

15           BINGXIN WU, ESQ.

16

17      T. ROW PRICE

18      Attorneys for the Witness

19           100 East Pratt Street

20           Baltimore, Maryland 21202

21      BY:  CHRIS SHAHEEN, ESQ.

22

23

24   Also Present:

25   LEM LATTIMER, Videographer
```

Page 4

```
 1                STIPULATIONS
 2         IT IS HEREBY STIPULATED AND
 3   AGREED by and among counsel for the
 4   respective parties hereto, that the
 5   sealing and certification of the
 6   within deposition shall be and the
 7   same are hereby waived;
 8         IT IS FURTHER STIPULATED AND
 9   AGREED all objections, except as to
10   the form of the question, shall be
11   reserved to the time of the trial;
12         IT IS FURTHER STIPULATED AND
13   AGREED that the within deposition may
14   be signed before any Notary Public
15   with the same force and effect as if
16   signed and sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

Page 5

1          THE VIDEOGRAPHER:  Good morning,
2   Counselors.  My name is Lem Lattimer.
3   I am a legal videographer in
4   association with TSG Reporting, Inc.
5          Due to the severity of COVID-19
6   and following the practice of social
7   distancing, I will not be in the same
8   room with the witness.  Instead, I
9   will record this videotaped deposition
10  remotely.  The reporter, Linda
11  Salzman, also will not be in the same
12  room and will swear the witness in
13  remotely.
14         Do all parties stipulate to this
15  video recording and remote swearing
16  and that it will be admissible in the
17  courtroom as if it had been taken
18  following Rule 30 of the Federal Rules
19  of Civil Procedures and the state's
20  rules where this case is pending?
21         Counselors, I need you to
22  stipulate.
23         MR. PORRITT:  Oh, yes.  So
24  stipulate.
25         MR. GIBBS:  So stipulated.

Page 6

1      THE VIDEOGRAPHER:  Thank you.
2   This is the start of media labeled No.
3   1 of the video-recorded deposition of
4   Joseph Fath in the matter of In re:
5   Tesla, Inc. Securities Litigation on
6   July 12, 2021, at approximately 12:16
7   p.m.
8          All appearances are noted on the
9   record.  Will the court reporter
10  please swear in the witness.
11 J O S E P H   F A T H,
12   called as a witness, having been duly
13   sworn by a Notary Public, was examined
14   and testified as follows:
15 EXAMINATION BY
16 MR. PORRITT:
17    Q.   Good afternoon, Mr. Fath.  My
18 name is Nicholas Porritt.  I'm with the
19 law firm of Levi & Korsinsky representing
20 the plaintiff Glen Littleton and the class
21 in this action.
22          Could you start off by just
23 stating your full name and position at T.
24 Rowe Price?
25    A.   Joseph Fath, F-A-T-H.  I run the

1  growth stock fund here, and I'm
2  technically a vice president.
3      Q.   And how long have you worked at
4  T. Rowe Price?
5      A.   Since the intern in 2001.  I
6  started full-time in August of 2002, so
7  going on 19 years.
8      Q.   And you said you are the
9  portfolio manager for the U.S. Growth
10 Stock Equity Strategy Fund; is that
11 correct?
12     A.   That's correct.
13     Q.   Okay.  Could you briefly
14 describe your responsibilities as a
15 portfolio manager for that fund.
16     A.   Yes.  I'm the lead portfolio
17 manager.  Product now is about $130
18 billion.  I run retail money in the United
19 States, as well as I have separate account
20 clients, a number of different
21 institutions.
22          Our strategy is focused on large
23 cap U.S. growth equities, but we also
24 invest internationally.  It's typically
25 companies over $10 billion in market cap.

```
 1        the witness a document previously
 2        marked as Exhibit 13.
 3        Q.    Do you see that, Mr. Fath?
 4        A.    I do.
 5        Q.    Do you recognize this document?
 6        A.    I recognize that Tweet, yes.
 7        Q.    Okay.  Do you recall when you
 8   first saw that Tweet?
 9        A.    Again, it was a frenzy that day,
10   but I see it's August 7th.  I remember
11   seeing it.  But, again, I was on vacation.
12   I saw it sometime during the day.
13        Q.    Do you recall reading the
14   statement there on the top of -- beginning
15   of the Tweet in Exhibit 13, "Investor
16   support is confirmed"?
17        A.    Absolutely.
18        Q.    Do you recall what your reaction
19   was to seeing those words?
20        A.    Yes.  I was shocked because I
21   said to myself, well, I know it's not us
22   because we haven't spoken to them.
23        Q.    What was your understanding of
24   the meaning of the words "investor support
25   is confirmed"?
```

Page 48

1  have an interest to do that if that came
2  to bear.
3       Q.   And is that something you had
4  considered before?
5       A.   Yes.  We've been private
6  investors in our public mutual funds for
7  many years.  I believe beginning back in
8  2007, we started private investing, as
9  well as public investing.
10      Q.   Is that something you considered
11 before with regard to Tesla?
12      A.   No, it was not.
13      Q.   Looking at -- back to Exhibit 44
14 the second sentence, you write, "I know
15 some separate accounts would be disallowed
16 given charter and I have Bonnie working up
17 those numbers now."
18           Do you see that?
19      A.   I do.
20      Q.   What do you mean when you say,
21 "would be disallowed given charter"?
22      A.   Some separate accounts have
23 mandates on their accounts that do not
24 allow privates, and so those accounts
25 aren't able to participate in a private

Page 49

 1    transaction.
 2            So if we own Tesla in their
 3    accounts publicly, we would have to
 4    dispose of those shares upon a takeout
 5    because those accounts would not be able
 6    to go along privately if the company was
 7    to go private.
 8        Q.    You next write, "Company is
 9    reaching out to the large holders now.
10    Good chance I get a call from Elon
11    directly later in the week."
12            Do you see that?
13        A.    I do.
14        Q.    As of this time August 18, 2018,
15    11:11 a.m., had you spoken to Elon Musk
16    about this potential transaction?
17        A.    I had not.
18        Q.    Do you know if anyone from T.
19    Rowe Price had spoken to Elon Musk
20    directly about this transaction?
21        A.    I know they did not.  There's
22    emails that you have in your other
23    documentation.
24            His chief of staff, his name was
25    Sam -- I can't recall his last name --

Page 50

1  reached out to me when I was in Nevis
2  after the initial Tweets, and I knew right
3  away that I needed to contact our head of
4  equities, Eric Veiel, as well as our
5  in-house counsel, which I did.
6          And I stepped back completely
7  from them in case I did get this call and
8  we would have needed to be restricted.  So
9  I turned it over to them to deal with it
10 directly, and they handled all
11 conversations from there.
12          So I know once that transpired,
13 no one else in the organization, other
14 than Eric and/or our in-house counsel,
15 would have spoken to the company directly.
16 I never spoke with Elon after that Tweet.
17     Q.   Okay.  In this sentence here on
18 Exhibit 44, you say, "Companies reaching
19 out to their large holders now."
20          Do you see that?
21     A.   Yes.
22     Q.   What's your basis for that
23 statement?
24     A.   IR, I believe, again, it was
25 Martin Viecha and may have been Eric Chew.

Page 54

```
 1            So he was willing -- if it were
 2   to go private, he would be willing to take
 3   exposure to only 50 basis points.  Given
 4   we all factor in illiquid securities and
 5   how much exposure we have there, illiquid
 6   securities clearly have more risk than
 7   liquid securities, given our inability to
 8   sell.
 9       Q.   So would Mr. Spencer's fund
10   maintain its position in Tesla as a
11   private company?
12       A.   It would, but a smaller position
13   than he had as a public company.
14       Q.   So he would reduce his holding?
15       A.   Correct.
16            MR. PORRITT:  Kathy, would you
17       bring over 16, Bates-stamp 16.
18            MS. VALDIVIESO:  Yes, Nick.  16
19       is uploaded.  It's there.
20            (Fath Exhibit 46, Email, Bates
21       No. TRP_000016, marked for
22       identification, as of this date.)
23            MR. PORRITT:  So I've placed
24       before the witness a document marked
25       as Exhibit 46.
```

Page 86

```
 1   transaction to get your thoughts and
 2   feedback."
 3           Do you see that?
 4      A.   I do.
 5      Q.   Was this the first contact you
 6   received from anyone at Tesla regarding
 7   the go-private transaction?
 8      A.   No.  The earlier discussions
 9   that we spoke about -- or that we just
10   discussed before this was with the
11   investor relations folks, so again, Martin
12   Viecha and Eric Chew.
13      Q.   That was a bad question.  I
14   apologize.
15           Was this the first contact you
16   received from Elon Musk or someone acting
17   on his behalf regarding the go-private
18   transaction?
19      A.   Yes.
20      Q.   And then you respond thanking
21   him for the email.  And then saying, "I am
22   cc'ing Eric Veiel here who is our head of
23   equities as well as our analyst (Joel
24   Grant) and one of our other PMs (Josh
25   Spencer), who is a large holder."
```

Page 124

1                C E R T I F I C A T E

2    STATE OF NEW YORK      )

3                           : ss

4    COUNTY OF NEW YORK     )

5

6              I, Linda Salzman, a Notary

7       Public within and for the State of

8       New York, do hereby certify:

9              That JOSEPH FATH, the witness

10      whose deposition is hereinbefore set

11      forth, was duly sworn by me and that

12      such deposition is a true record of

13      the testimony given by the witness.

14             I further certify that I am not

15      related to any of the parties to

16      this action by blood or marriage,

17      and that I am in no way interested

18      in the outcome of this matter.

19             IN WITNESS WHEREOF, I have

20      hereunto set my hand this 18th day

21      of July, 2021.       *Linda Salzman*

22                         _____

23                            Linda Salzman

24

25