1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7   IN RE TESLA, INC. SECURITIES                  Case No. 18-cv-04865-EMC

8   LITIGATION.
                                                   **FILED UNDER SEAL**
9
                                                   **ORDER GRANTING IN PART AND**
10                                                 **DENYING IN PART PLAINTIFF**
                                                   **LITTLETON'S MOTION FOR**
11                                                 **PARTIAL SUMMARY JUDGMENT**

12                                                 Docket No. 352

13

14

15          Plaintiff Glen Littleton has filed a securities class action against Defendants Tesla, Inc.;

16  Elon Musk (Tesla's CEO and former Chairman); and Tesla's Board of Directors based on events

17  that took place in August 2018.  Mr. Littleton alleges that Mr. Musk made false representations,

18  most notably in tweets, about taking Tesla from a public to a private company.

19          Currently pending before the Court is Mr. Littleton's motion for partial summary

20  judgment.  He seeks a ruling that four representations made during the relevant period were false

21  and with the requisite mental state (*i.e.*, scienter).  He also seeks a ruling that there was reliance on

22  the representations.  Having considered the parties' briefs and accompanying submissions, as well

23  as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Mr.

24  Littleton's motion.[1]

25

    _____

26  [1] On April 1, 2022, Defendants filed a motion to supplement the record, asking the Court to
    consider deposition testimony of Mr. Littleton that had not been taken at the time of the hearing on
27  the motion for partial summary judgment.  *See* Docket No. 386 (motion).  The Court **DENIES** the
    motion.  If Defendants believed that Mr. Littleton's testimony was critical for the summary
    judgment, then they should have asked for an extension of time to oppose the motion.  They did
28  not.  In any event, the Court has considered the content of Defendants' motion and it does not

United States District Court
Northern District of California

# I.   FACTUAL & PROCEDURAL BACKGROUND

The following is a timeline of the relevant events.

**1/2017.**  After Saudi Arabia's sovereign wealth fund – commonly referred to as the Saudi Public Investment Fund ("PIF") – reached out to Tesla, Mr. Musk met with Yasir Al-Rumayyan, a PIF representative.  "The planned substance [of the meeting] was not discussed in advance." Teller SEC Depo. at 130.  However, it appears that Mr. Musk agreed to meet with the Saudi PIF so that they could "discuss the possibility of [the PIF] working with [Tesla] to take Tesla private." Teller SEC Depo. at 130 (adding that this was his understanding based on a conversation between Mr. Musk and Sam Altman (who co-founded OpenAI with Mr. Musk) "where Elon expressed a desire to take Tesla private [a]nd Sam said these could be great partners to do that or one of the few funds in the world that would have the ability to do so"); *see also* Teller Depo. at 68-70, 75-76, 80-81 (indicating the same).

**5/2017.**  A dinner meeting was held involving the Saudi PIF and Tesla.  Mr. Al-Rumayyan of the Saudi PIF attended.  He brought with him Masa Son of SoftBank, a company that the PIF had partnered with/invested in.  On the Tesla side, attendees included Mr. Musk and Deepak Ahuja, Tesla's CFO.  Larry Ellison also attended.  *See* Ahuja SEC Depo. at 63-64; Teller Depo. at 70.

According to Mr. Ahuja, at the meeting, Mr. Al-Rumayyan and Mr. Son expressed interest in making "a large potential investment in Tesla in any form that Elon would desire.  And that included taking Tesla private as one of the options," which indicated

> confidence that they have sufficient funding to take Tesla all the way private.
>
> So it was clear that the conversation here was in – you know, it could be [$]30 to $60 billion range of financing for going private transaction, depending on how it's structured.[2]  But the numbers were large, and it was clear it was serious and well thought through

_____

affect the Court's analysis herein.

[2] Implicitly, structure considerations would take into account the fact that, if the PIF were to take a large percentage of ownership in Tesla, then there would be regulatory issues since the PIF is a foreign entity.  *See* Musk SEC Depo. at 132; *see also* Musk Depo. at 101 (indicating that above 20% ownership would require U.S. government approval).

United States District Court
Northern District of California

1    before their comment.

2    . . . .

3    I can't recall for sure if those specific numbers were mentioned, but my recollection is, as I was sitting there, if I was understanding their comments correctly, they were definitely talking about those kind of numbers. They obviously are extremely sophisticated. They knew what the valuation of Tesla was. And if they are offering to take Tesla private, they clearly understood those implications.

6    . . . .

7    They talked at length about taking Tesla private, and Elon being – keeping his share [25%], and they had the capacity to do the rest of the deal. That would clearly indicate those sums of money.

9    Ahuja Depo. at 31, 51-53.

10    Mr. Ahuja also testified that, subsequently, he had a conversation with Mr. Musk, where

11    Mr. Musk indicated that he was not comfortable about entering into a relationship with Mr. Son

12    specifically. This seemed to be because Mr. Son was making investments in, or contemplating

13    making investments in, companies that "would be likely in conflict with the mission of Tesla, and

14    that would create some unexpected or unintended conflicts which [Mr. Musk] was not comfortable

15    with."[3] Ahuja Depo. at 34. Mr. Musk appeared to have had a negative opinion of Mr. Son for

16    other reasons as well. *See* Teller SEC Depo. at 160-61 (testifying that "Elon goes a lot on gut

17    feel" and "just felt like [Mr. Son] did not get it"; adding that Mr. Musk was "annoyed about [Mr.

18    Son] continuing to press on this – I believe it was a factory in India [a]nd Elon like didn't

19    understand why [Mr.] Son would even care about that"). According to Mr. Musk, at that point in

20    time, he believed Mr. Al-Rumayyan had "delegated [the] responsibility [of taking Tesla private] to

21    [Mr. Son]." Musk SEC Depo. at 278; *see also* Teller SEC Depo. at 153 (testifying that Mr. Musk

22    "had turned more skeptical about the possibility of working with the Saudis at this point, and

23    working with Yasir" because "he understood, or his takeaway from the dinner at the Tesla factory

24    . . . was basically that these guys [Mr. Al-Rumayyan and Mr. Son] were kind of attached at the hip

25    for purposes of a go private").

26

27    ───────────────

28    [3] *See, e.g.*, Ahuja Depo. at 35 (mentioning "investments in other autonomous car companies and other electric car companies, in Uber, which Elon looked at also as a long-term serious competitor in the world and space of autonomous driving").

United States District Court
Northern District of California

3

1

2

3

4

5

6

7

8

9

10

11

12

13

United States District Court
Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**11/2017.** It appears that nothing of note with the Saudi PIF happened for the remainder of 2017. However, Mr. Musk continued to entertain thoughts of taking Tesla private, as indicated in a *Rolling Stone* article. *See* Batter Decl., Ex. D (on ECF Page 113, noting that Mr. Musk stated, "'I wish we could be private with Tesla'" and "'It actually makes us less efficient to be a public company'").

**4/2018.** It appears the Saudi PIF was again exploring taking a large stake in Tesla. Mr. Musk indicated to Mr. Al-Rumayyan that, if the PIF wished to demonstrate interest in investment in Tesla, "since Tesla's a publicly traded company, they should simply buy stock in Tesla, as a publicly traded company." Musk Depo. at 91; *see also* Musk Depo. at 93 (testifying that that is what another company, Tencent did – *i.e.*, invest up to the 5% level[4] – and that he cited that example to the Saudi PIF); Teller SEC Depo. at 155 (testifying that Mr. Musk said, in effect, to the PIF, "why don't you show us you're serious and, like, buy some stock?"). The Saudi PIF agreed that it "would go ahead and do it." Musk Depo. at 93.

**7/31/2018.** Mr. Musk met with representatives of the Saudi PIF, including Mr. Al-Rumayyan. Mr. Musk's "Chief of Staff," Mr. Teller, also attended the meeting. The meeting lasted somewhere between 30-60 minutes. *See* Musk Depo. at 99; Teller Depo. at 163. Mr. Ahuja attended for the last 10 minutes of the meeting.[5] *See* Ahuja Depo. at 82.

During the meeting, there was a discussion (as before) about taking Tesla private. *See* Musk Depo. at 99. (Mr. Teller contacted Mr. Ahuja to get him to join the meeting after the conversation became more serious about taking Tesla private – *i.e.*, not just a passive investment. *See* Teller Depo. at 140.) The Saudi PIF informed Mr. Musk that it had purchased about 5% of Tesla's stock.[6] *See* Ex. 79 (text from Mr. Teller); Musk Depo. at 99. According to Mr. Musk,

> [t]hey informed me that they had followed through with taking a 5

---

[4] It seems Mr. Musk suggested 5% because "U.S. reporting requirements start at 5 percent." Musk SEC Depo. at 155.

[5] Mr. Al Mogren of the Saudi PIF took notes during the meeting. *See* Ex. 80 (notes/minutes).

[6] With this purchase, the PIF seems to have become one of Tesla's largest shareholders, along with shareholders such as Mr. Musk himself, Fidelity, Baillie Gifford, T. Rowe Price, and Tencent. *See* McCall Reply Decl., Ex. R (Morningstar Digest article).

4

1

2

> percent stake in Tesla, and I was, like, Well, this is great.
>
> So based on a verbal discussion and a verbal agreement and no discussion of price, they went – they moved forward and took a 5 percent stake in Tesla. So what that meant was that you could trust their word. And so – and no – no written agreement was necessary, and no discussion of price was necessary. And that if they said they would do something, that they would.

5 Musk Depo. at 99-100.

6          In addition to the above, Mr. Al-Rumayyan "clarified" for Mr. Musk that he would not

7 delegate any take-private of Tesla to Mr. Son of SoftBank. Musk SEC Depo. at 277; *see also*

8 Musk Depo. at 115. According to Mr. Musk, when he asked Mr. Al-Rumayyan whether there

9 were other decisionmakers who would need to be involved, Mr. Al-Rumayyan said "no" and

10 stated that he was the decisionmaker. *See* Musk SEC Depo. at 115.

11          According to Mr. Musk, these two facts – *i.e.*, the purchase of about 5% of Tesla stock and

12 the removal of Mr. Son from the picture – were particularly important to him. *See* Musk SEC

13 Depo. at 146, 279.

14          However, the total amount of funding needed to take Tesla private was not discussed. Nor

15 was the price to be paid for Tesla stock if the company were to be taken private. *See* Musk Depo.

16 at 109-10; Teller Depo. at 164; Ahuja Depo. at 82, 84, 100-01. In addition, there was no

17 discussion about what percent ownership would be taken by the Saudi PIF if Tesla were to be

18 taken private. *See* Musk Depo. at 112. According to Mr. Ahuja, the Saudi PIF conveyed to Mr.

19 Musk that the PIF "was fundamentally keen on hearing from Elon directly the structure that he

20 would have in mind that he would like to do for a going-private transaction and what percentage

21 of that he would think would be needed or the financial calculations to take it private." Ahuja

22 Depo. at 97-98; *see also* Ex. 80 (notes/minutes written by Mr. Al Mogren of the Saudi PIF)

23 (writing that Mr. Al-Rumayyan said, "I would like to listen to your plan Elon and what are the

24 financial calculations to take it private in the next week and if I did not receive anything I will call

25 you").

26          **8/2/2018.** Several days after meeting with the Saudi PIF, Mr. Musk wrote an email to the

27 Board, Mr. Ahuja, and Todd Maron (Tesla's General Counsel), titled "Offer to Take Tesla Private

28 at $420." *See* Ex. 81 (email). In the email, Mr. Musk stated, *inter alia*, that "[i]t is my firm belief

United States District Court
Northern District of California

5

1   that Tesla can operate more effectively as a private company for the next several years" and that,

2   "[u]nless another bidder comes forward with a better offer, I would ask that this matter be put to a

3   shareholder vote at the earliest opportunity.  This offer expires in 30 days."  Ex. 81.

4         After receiving the email, the Board (excluding Mr. Musk and his brother) held a special

5   meeting.  *See* Ex. 82 (minutes).  Also present at the meeting were, *inter alia*, Mr. Ahuja, Mr.

6   Maron, and lawyers from the Wachtell law firm.  The Board discussed Mr. Musk's email about

7   taking Tesla private and the interest of the Saudi Arabia PIF "in helping Mr. Musk take the

8   Company private."  Ex. 82.

9             Mr. Ahuja noted that, based on the statements made by the PIF to
              Mr. Musk during the meeting, Mr. Musk believed that the PIF was
10            willing to fund the entire transaction.  Mr. Ahuja explained,
              however, that Mr. Musk believed Tencent and other large Tesla
11            shareholders would also participate in any going private transaction,
              but that Mr. Musk had not yet spoken with them.
12

13  Ex. 82.  The Board ultimately directed Mr. Maron to schedule another meeting "in which Mr.

14  Musk would provide additional details regarding his proposal and explain to the Board his

15  thinking on a possible going private transaction."  Ex. 82.

16        **8/3/2018.**  The next day, the Board (including Mr. Musk and his brother) held a special

17  meeting at which, *inter alia*, Mr. Ahuja and Mr. Maron were also present.  *See* Ex. 83 (minutes).

18  Mr. Musk explained "his thinking regarding privatization of the Company."  Ex. 83.  "Mr. Musk

19  stated that it was not his intention to provide shareholder control in a private Company to any

20  single entity, but rather to have ownership in the Company be dispersed over a broad base of

21  shareholders, including many of the Company's current shareholders."  Ex. 83.  Mr. Musk also

22  "explained the basis for his price of $420 per share, indicating that this price was about a 20%

23  premium over the current price of the stock, which had just undergone a recent run up after the

24  Company's Q2 earnings call."  Ex. 83.  With respect to funding, Mr. Musk noted that the PIF

25  indicated

26            it was willing to fund the entire going-private transaction.  [He]
              explained that given the PIF's interest, there is more than enough
27            capital available to take the Company private, including to buy out
              the entire Company if needed, including both the equity and the
28            debt.  He also expressed confidence that a large number of existing

6

shareholders would remain as investors and thus not need to be bought out, and that there would be significant demand from existing and new investors, which may include the UAE sovereign wealth fund, the Norwegian sovereign wealth fund, Silver Lake, Fidelity, Baillie Gifford, Tencent and T. Rowe Price, such that the Company would be able to choose between investors and allocate ownership among them.

Ex. 83.  Regarding advisors, Mr. Musk stated that he would be interviewing a lawyer at the Wachtell law firm and that he had not yet engaged a financial advisor.  *See* Ex. 83.  The Board "noted that a detailed proposal regarding a going private transaction had not yet been made and that one would be needed in order for the Board to properly analyze and evaluate it"; but, "[a]s an initial step," Mr. Musk was authorized "to have initial, conceptual conversations with a few of the Company's top shareholders, to explore their interest and gauge their reaction to a private corporate structure."  Ex. 83.  The Board noted "the importance of not selectively disclosing material non-public information."  Ex. 83; *see also* Musk Depo. at 165 (testifying that he came to the conclusion that it was not possible to have a conversation with some investors but not others without creating a selective disclosure problem); Musk SEC Depo. at 100 (indicating the same).

**8/4-8/50218.**  Mr. Musk had a conversation over the weekend with Michael Dell of Dell Computer.  Mr. Musk asked him about his experience taking Dell Computer private.  *See* Musk Depo. at 167.  Mr. Dell advised Mr. Musk to talk to Steve Rosenblum of the Wachtell law firm, which Mr. Musk did that same weekend.  *See* Musk SEC Tr. at 175-76.

**8/6/2018.**  Mr. Musk spoke with Egon Durban of Silver Lake Partners (a financial advisor) to discuss the possibility of taking Tesla private.  *See* Ex. 175 (Mr. Durban's handwritten notes).

**8/7/2018.**  At 9:48 a.m., Mr. Musk tweeted: "**Am considering taking Tesla private at $420.  Funding secured.**"[7]  Ex. 8 (tweet) (emphasis added).  About an hour later, he tweeted: "I don't have a controlling vote now [over the company] & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."  Ex. 9 (tweet).  Then, at 11:00 a.m., he tweeted: "My hope is *all* current investors remain with Tesla even if we're private.  Would

_____

[7] According to Mr. Musk, he intended to do a disclosure in the evening but, that morning, the Financial Times reported an investment in Tesla by the PIF.  *See* Musk SEC Depo. at 219-20; *see also* Must Depo. at 173 (testifying that it was important to get ahead of the Financial Times).

create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's

SpaceX investment."  Ex. 10 (tweet).  At 11:13 a.m., he tweeted: "Shareholders could either to sell

[sic] at 420 or hold shares & go private."  Ex. 11 (tweet).  About twenty minutes later, he tweeted:

"Def no forced sales.  Hope all shareholders remain.  Will be way smoother & less disruptive as a

private company.  Ends negative propaganda from shorts."  Ex. 11.

        Shortly after Mr. Musk's first tweet, Mr. Ahuja texted Mr. Musk as follows: "Elon, am

sure you have thought about a broader communication on your rationale and structure to

employees and potential investors.  Would it help if Sarah, Todd and I draft a blog post or

employee email for you?"  Ex. 121 (text message); *see also* Mot. at 11 (noting that Sarah O'Brien

was the head of Tesla Global Communications).  An email to employees was then drafted and sent

to employees, and further was posted on Tesla's website as a blog post regarding "Taking Tesla

Private."  Ex. 12 (website).  The email/blog post stated, *inter alia*, as follows.

> Earlier today, I announced that I'm considering taking Tesla private
> at a price of $420/share.  I wanted to let you know my rationale for
> this, and why I think this is the best path forward.
>
> First, a final decision has not yet been made, but the reason for
> doing this is all about creating the environment for Tesla to operate
> best.  As a public company, we are subject to wild swings in our
> stock price that can be a major distraction for everyone working at
> Tesla, all of whom are shareholders.  Being public also subjects us
> to the quarterly earnings cycle that puts enormous pressure on Tesla
> to make decisions that may be right for a given quarter, but not
> necessarily right for the long-term.  Finally, as the most shorted
> stock in the history of the stock market, being public means that
> there are large numbers of people who have the incentive to attack
> the company.
>
> . . . .
>
> Here's what I envision being private would mean for all
> shareholders, including all of our employees.
>
> First, I would like to structure this so that all shareholders have a
> choice.  Either they can stay investors in a private Tesla or they can
> be bought out at $420 per share, which is a 20% premium over the
> stock price following our Q2 earnings call (which had already
> increased by 16%).  My hope is for all shareholders to remain, but if
> they prefer to be bought out, then this would enable that to happen at
> a nice premium.
>
> . . . .

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. . . .

Ex. 12.

At 12:36 p.m., Mr. Musk sent out another tweet: "**Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote.**" Ex. 13 (tweet) (emphasis added). At the bottom of the tweet, there was a link to the above blog post on "Taking Tesla Private."

There was an immediate reaction to Mr. Musk's tweets and the blog post. For example, on the same day that the tweets and blog post were sent out, several of Tesla's shareholders reached out to Martin Viecha, Tesla's Director of Investor Relations. Mr. Viecha essentially conveyed to these shareholders that there was a "firm offer."

- *See* Ex. 58 (email exchange with Owuraka Koney of Jennison, dated 8/7/2018) (in response to post-blog post question about funding, Mr. Viecha stating, "The very first tweet simply mentioned 'Funding secured' which means that this is a firm offer"; when asked whether "[f]irm offer means there is a commitment letter or is this a verbal agreement?," stating, "I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets").

- *See* Ex. 146 (email exchange with Itay Michaeli of Citibank, dated 8/7/2018) (in response to comment that "the employee letter didn't make it clear whether there's an actual transaction on the table (with secured financing) or if this is more of a strategic announcement to consider pursuing such transaction," Mr. Viecha stating, "the very first Tweet mentioned a firm offer").

- *See* Ex. 150 (email exchange with Bradley Erickson of KeyBanc, dated 8/7/2018) (in response to comment that "he said financing is secured but in the letter he

1    doesn't address this," Mr. Viecha stating, "I can only say that the first Tweet

2    clearly stated that 'financing is secured.'  Yes, there is a firm offer").

3    • *See* Ex. 151 (email exchange with Toni Sacconaghi of Bernstein Research, dated

4    8/7/2018) (Mr. Viecha stating, "apart from what has been tweeted and what was

5    written in a blog post, we can't add anything else.  [¶] I only wanted to stress that

6    Elon's first tweet, which mentioned 'financing secured' is correct"; Mr.

7    Sacconaghi then stating, "What does 'financing secured' actually mean?  Are you

8    assuming TSLA will need $60B+ in financing, or assuming that many

9    shareholders don't take the offer and Tesla needs less.  Big difference.  'Financing

10   secured' implies the former"; Mr. Viecha responding: "It means that financing is

11   secured regardless of other assumptions").

12   During a deposition, an employee of T. Rowe Price (one of Tesla's significant

shareholders) stated that he assumed "funding secured" meant "[Mr. Musk] had secured sources or

financial sources to fund a go-private transaction" – "[t]o have locked and loaded and no question

at all a hundred percent that you have funding ready to go and you're prepared to move forward

with this transaction."  Fath Depo. at 28-29.

17   Analysts also began to react to the tweets and blog post.  *See, e.g.*, McCall Reply Decl.,

Ex. S (RTC Capital Markets article) (stating that "Elon's tone and messaging regarding a potential

transaction lead us to believe that there could be significant outside funding lined up"; adding that

there was "an unconfirmed FT article from today indicat[ing] that Saudi Arabia's sovereign fund

took a 3-5% stake on the public markets"); McCall Reply Decl., Ex. U (Bank of America/Merrill

Lynch article) (noting that "the proposal/transaction is far from finalized, and would require a

shareholder vote," plus, "no theoretical transaction method, funding plan, or structure was

outlined, and there is still some skepticism over whether such a transaction would ultimately (or

even could) be executed"; however, "we view today's announcement as having substance given

what appears to be at least three potential sources of capital (existing shareholders, Saudi

Sovereign Wealth Fund, Chinese government and investment funds)" and "[f]urther credence was

added with potential details in Musk's subsequent tweets regarding the setup of 'special purpose

10

fund' for existing investors to remain involved, commentary that no single shareholder would

have control, and that he would remain on as CEO").

**8/8/2018.** The day after the tweets and blog post, the Tesla Board issue a press release

stating as follows:

> Last week, Elon opened a discussion with the board about taking the
> company private.  This included discussion as to how being private
> could better serve Tesla's long-term interests, and also addressed the
> funding for this to occur.  The board has met several times over the
> last week and is taking the appropriate next steps to evaluate this.

Ex. 26 (press release).

The same day, Ryan Brinkman, an analyst with J.P. Morgan, issued a report on Tesla.  *See*

Ex. 15 (report).  In the report, Mr. Brinkman stated, *inter alia*:

> On Tuesday during the market, Tesla CEO Elon Musk announced
> via Twitter that he is considering pursuing a path (no final decision
> has been made) which would take the company private at a price of
> $420 per share.  This was followed up by further statements that
> "funding has been secured" and "investor support confirmed."  As
> surprising to us as these developments are, and as lacking as the
> statements are in any details regarding who is expected to provide
> the required amount of financing and on what terms, they are
> nevertheless declarative statements from the CEO of a public
> company which we feel should be considered seriously.  Either
> funding is secured or it is not secured, and Tesla's CEO says
> funding is secured.  Therefore, we are incorporating into our
> valuation the real possibility the equity will be taken out at $420 per
> share.  Separate from the Twitter statements, the company also made
> public a letter Mr. Musk had written to Tesla employees in which he
> states, "If the process ends the way I expect it will, a private Tesla
> would ultimately be an enormous opportunity for all of us."  To us,
> this suggests more than mere consideration – Mr. Musk expects
> Tesla will go private.  We are not as certain, and so assign only a
> 50% probability to such a scenario in our updated valuation.  We
> continue to believe Tesla's valuation based on fundamentals alone . .
> . is worth no more than $195 (our previous price target).  But
> introducing a new 50% weighting of $420 suggests a large upward
> revision to our price target is warranted, and we newly value Tesla
> at $308 per share (i.e., 50/50 blend of $195 and $420).

Ex. 15.

An analyst of a different company, Evercore, also issued a report on Tesla.  The Evercore

analyst's comments included the following:

> **Could this happen?**  It is important to note that, as of today, no
> details have been provided with regards to what "Funding secured"
> means, who is providing that funding and what any potential

United States District Court
Northern District of California

> funding structure might look like.  Our view is that "Funding secured" should be interpreted as a strong verbal commitment, with funds available and parties willing to execute quickly.  However, it could be less than this.  It may also be that initial legal documents, term sheets, letters of intent have been signed.

Ex. 33 (report) (bold in original).

**8/10/2018.**  Mr. Musk met with Mr. Durban of Silver Lake Partners.  *See* Ex. 179 (Silver Lake presentation materials).

That same day, it appears that news was being reported about Tesla and the Saudi PIF. Mr. Musk conveyed his displeasure to Mr. Al-Rumayyan of the Saudi PIF, indicating that he felt the news did not accurately represent the PIF's interest in Tesla.  *See* Ex. 121 (Mr. Musk texting, "It is extremely important that you confirm that you are in discussions with me regarding the take private transaction"); Musk Depo. at 226 (testifying that "I think there was some press or statement about – from the – the Saudi PIF that they were less committed to the – to supporting a take-private then, was my understanding").  Mr. Al-Rumayyan responded:

> Elon, As you know, PIF purchased a passive stake in shares of Tesla on the market in April 2018 as part of our investment strategy to diversify away from oil and increase our investment in emerging technologies, including electronic vehicles.  PIF remains interested in potential investment opportunities that are consistent with its investment strategy and the EV space is one of interest.  We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia that serves MENA, Europe, Asia and Africa with the right incentives on all fronts (subsidies on energy and land, tax exemptions, support in obtaining financing, etc.).  Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction.

Ex. 121.

At some point, Mr. Musk had a conversation with Mr. Al-Rumayyan in which the latter indicated that there were approvals he needed to obtain regarding investment in Tesla (*i.e.*, he was not the one and only decisionmaker).  According to Mr. Teller, however, Mr. Al-Rumayyan was still unequivocal about the PIF's desire to invest.  *See* Teller SEC Depo. at 296-98; Teller Depo. at 241-42.

**8/11/2018.**  Mr. Musk informed the Board (as well as Mr. Maron and Mr. Ahuja) that he had formally engaged Mr. Durban of Silver Lake Partners "to lead the Tesla go-private

1    transaction," as well as Mr. Rosenblum of the Wachtell law firm ("who was lead counsel on the

2    Dell deal").  Ex. 94 (email) (adding that Goldman Sachs was also supportive).

3         **8/12/2018.**  Mr. Musk again conveyed displeasure to Mr. Al-Rumayyan of the Saudi PIF

4    based on what appears to be news reporting.  *See, e.g.*, Ex. 121 (Mr. Musk texting, "What the hell

5    is going on here?  This is false").  In responding, Mr. Al-Rumayyan noted, *inter alia*: "Just wanted

6    to check-in and see when your team would be able to start sending us information and perhaps

7    have a kickoff call with our International Investments Team."  Ex. 121.  Mr. Al-Rumayyan later

8    texted:

9               Let's see the numbers and get our people to meet and discuss.  We
10              cannot approve something that we don't have sufficient information
               on.  We've agreed that you will send the financial information and
11              the way going forward within a week and no thing [sic] happened
               since.  The last thing I want to do is the "through [sic] you under the
12              bus[.]"  I am your friend.  So, please don't treat me like an enemy.
               I'm willing to fly to you or we can meet somewhere in Europe and
13              discuss . . . constructive next steps.

14   Ex. 121 (also referring to "[d]etails on how we can take the company private[;] [t]hat's what we

15   agreed on[;] [w]hat is the required percentage and so on[;] [w]hat are required regulatory

16   thresholds for taking it private").

17        After additional exchange, Mr. Musk texted: "There are many other investment funds who

18   want to be part of this deal.  We do not need your fund to get this done.  I will not work with an

19   organization who's [sic] public statement to the media do[es] not match their private statements to

20   me and my team."  Ex. 121.  He continued: "In light of these actions and nothing meaningful done

21   to correct them, Tesla will be moving forward with Silver Lake, Goldman and other investors to

22   take Tesla private."  Ex. 121.

23        It appears that, in spite of Mr. Musk's comment above, Mr. Musk and Mr. Al-Rumayyan

24   resolved their dispute later that day.  *See* Ex. 121 (Mr. Al-Rumayyan texting, "I will ask Shihana

25   to call Sam so they can work on PIF statement" and Mr. Musk responding, "Thank you.  This

26   means a great deal").

27        **8/13/2018.**  An update was posted on the Tesla website (as a blog post): "Update on

28   Taking Tesla Private."  In the update, Mr. Musk stated, *inter alia*, as follows:

United States District Court
Northern District of California

13

As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy.  As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.

**What has happened so far?**
On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share.  This was a 20% premium over the ~$350 then current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st).  My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.

After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal [Mr. Musk's brother and also a Board member], a full board meeting was held.  During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.

At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders.  Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me.  They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future.  I told the board that I would report back after I had these discussions.

**Why did I make a public announcement?**
The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private.  However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time.  As a result, it was clear to me that the right thing to do was announce my intentions publicly.  To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**
Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction.  Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

. . . . During the [July 31] meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed.

I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving.  This is why I referred to "funding secured" in the August 7th announcement.

Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund.  He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals.  He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements.

Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used.  However, it would be premature to do so now.  I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base.  It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.

. . . .

**What are the next steps?**
As I mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time.  I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options.  Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected.  If the board process results in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote.

Ex. 16 (website) (bold in original); *see also* Batter Decl., Ex. K (tweet ("I'm excited to work with

Silver Lake and Goldman Sachs as financial advisors, plus Wachtell . . . and Munger . . . as legal

1  advisors, on the proposal to take Tesla private.").

2          Apparently responding to the website posting, Mr. Al-Rumayyan texted Mr. Musk as

3  follows:

4                  Elon, I am personally surprised.  You have signed an NDA and
                   while we are waiting for you and your team to provide us with
5                  information to move forward, you post an ill-advised blog with
                   loose information.  Anyway, we hope that you and your team work
6                  on gathering the information as soon as possible and send that to us
                   to move forward.
7

8  Ex. 121.  Mr. Musk texted back, *inter alia*, that he had engaged Silver Lake Partners and Goldman

9  Sachs and "[w]e will have documents ready in about a week."  Ex. 121.

10         **8/14/2018.**  An analyst commented on the blog post described above as follows: "Tesla

11  CEO Elon Musk issued a blog post Aug. 13 that states he is still gauging shareholder interest in

12  Tesla going private at $420 a share, but our impression of his words is that he thinks it can happen,

13  and we agree."  McCall Reply Decl., Ex. R (Morningstar Digest article).

14                 We are maintaining our fair value estimate.  We have changed our
                   thinking since our Aug. 7 note and will not be raising our fair value
15                 estimate to the deal price.  We normally would increase our
                   valuation to a probability-weighted average of the offered price and
16                 our intrinsic value.  However, Tesla's possible buyout is abnormal
                   in that equityholders have the option to remain equityholders in a
17                 private Tesla, or at least own a special-purpose vehicle that would in
                   turn own private Tesla, so we view this deal as similar to a tender
18                 offer.

19  McCall Reply Decl., Ex. R.

20         **8/16/2018.**  The New York Times published an article on Mr. Musk and Tesla, titled "Elon

21  Musk Details 'Excruciating Personal Toll of Tesla Turmoil.'"  *See* Ex. 19 (article).  The article

22  stated, *inter alia*, that

23                 funding, it turned out, was far from secure.

24                 Mr. Musk has said he was referring to a potential investment by
                   Saudi Arabia's government investment fund.  Mr. Musk had
25                 extensive talks with representatives of the $250 billion fund about
                   possibly financing a transaction to take Tesla private – maybe even
26                 in a manner that would have resulted in the Saudis' owning most of
                   the company.  One of those sessions took place on July 31 at the
27                 Tesla factory in the Bay Area, according to a person familiar with
                   the meeting.  But the Saudi fund had not committed to provide any
28                 cash, two people briefed on the discussions said.

United States District Court
Northern District of California

1  Ex. 19.

2      **8/20/2018.** Mr. Brinkman, the J.P. Morgan analyst, issued another report on Tesla. *See*

3  Apton Decl., Ex. 23 (report). In the report, he stated that J.P Morgan was "reverting to valuing

4  Tesla shares on the basis of fundamentals alone . . . ." Ex. 23. He took note of the August 13

5  posting by Mr. Musk on the Tesla website which discussed, *inter alia*, the July 31 meeting with

6  the Saudi Arabian sovereign wealth fund. "*Our interpretation of subsequent events leads us to*

7  *believe that funding was not secured for a going private transaction, nor was there any formal*

8  *proposal.*" Ex. 23 (emphasis in original).

9          The revelation the Saudi firm is subsequently asking Tesla for
            details of how the company would be taken private suggests to us
10          that any deal is potentially far from even being formally proposed,
            which is different from our understanding on August 8 which was
11          based on Mr. Musk's statement on Twitter that, "Only reason why
            this is not certain is that it's contingent on a shareholder vote."
12

13  Ex. 23. Mr. Brinkman also stated: "Tesla does appear to be exploring a going private transaction,

14  but we now believe that such a process appears to be much less developed than we had earlier

15  presumed (more along the lines of high level intention), suggesting formal incorporation into our

16  valuation analysis seems premature at this time." Ex. 23 (emphasis in original).

17          When Mr. Musk tweeted on August 7 that, "Only reason why this is
            not certain is that it's contingent on a shareholder vote," we had
18          presumed that a formal proposal had been received from another
            party, that funding had been secured for that formal proposal, and
19          that the Board was at least informally supportive of the formal
            proposal. Given our updated interpretation that none of these three
20          presumptions are [sic] currently the case, we feel it is appropriate at
            this time to remove the 50% weighting . . . .
21

22  Ex. 23.

23      **8/23/2018.** The Board held a special meeting. The potential going-private transaction was

24  discussed. *See* Ex. 101 (minutes). Mr. Musk stated that "there was more than enough funding for

25  any proposed transaction and that he had asked his financial advisors to join the meeting to review

26  with the Board the various potential financing sources available." Ex. 101. But he also shared

27  that many of Tesla's current stockholders had a negative view

28          regarding the prospect of the Company going private, [there were]

> difficulties the Company's current stockholders would have in
> continuing to own Tesla's stock if the Company went private [*e.g.*,
> internal compliance would not permit ownership], [and there were]
> procedural difficulties of any going private transaction, including the
> extended length of time such a transaction would require, [which]
> may distract and negatively impact the Company's focus on its core
> business.

Ex. 101.  Mr. Musk's financial advisors, Mr. Durban from Silver Lake Partners and Mr. Dees

from Goldman Sachs, joined the meeting; they discussed "financing sources for a potential going

private transaction."  Ex. 101; *see also* Ex. 201 (Silver Lake presentation materials).  "The

financial advisors emphasized to the Board that, although their work was preliminary, the funding

was available from a variety of sources."  Ex. 101.  "Some of the specific funding sources

identified . . . included the UAE and Saudi Arabia sovereign wealth funds; Ron Baron's funds;

Google (Alphabet); Tencent and/or other Chinese investors; and Silver Lake."  Ex. 101.  The

advisors, as well as Mr. Musk, informed the Board that "both large institutions and small investors

strongly preferred seeing the Company remain a public company because, among other reasons, of

investment restrictions that prevented or limited certain large institutional stockholders from

owning shares in a private company."  Ex. 101.  Ultimately, the advisors expressed the "belie[f]

that the Company would be better continuing as a public company."  Ex. 101.  Mr. Musk then

informed the Board that, based on the information before him, "he now had concluded that it was

no longer in the best interests of the Company and its stockholders to take the Company private.

Accordingly, Mr. Musk informed the Board that he was withdrawing his offer to try and take the

Company private."  Ex. 101.  The Board voted to continue Tesla as a public company.  *See* Ex.

101.

## II.     DISCUSSION

A.     Requests to Seal

Several requests to seal have been filed in conjunction with the summary judgment

briefing.

- Docket No. 351 (related to the opening brief and supporting exhibits);

- Docket No. 364 (related to the opposition brief and supporting exhibits);

- Docket No. 367 (related to the opposition brief and supporting exhibits); and

1   • Docket No. 369 (related to the reply brief and supporting exhibits).

2   The confidential information at issue belongs to Tesla or third parties (including Silver

3   Lake, Goldman Sachs, and Tesla's investors).  Mr. Littleton expressly states that he objects to

4   sealing and does not believe that the documents are deserving of confidential treatment, although

5   he does not go into any detail.  *See, e.g.*, Docket No. 364 (Mot. at 1).

6   Declarations supporting the filing under seal have been submitted by Tesla, Silver Lake,

7   and Goldman Sachs.  *See* Docket No. 361 (Tesla); Docket No. 362 (Mr. Durban/Silver Lake);

8   Docket No. 364-1 (Tesla); Docket No. 367-1 (Tesla); Docket No. 373 (Mr. Durban/Silver Lake);

9   Docket No. 374 (Tesla); Docket No. 375-1 (Goldman Sachs).

10   In evaluating the requests to file under seal, the Court must bear in mind the standard

11   established by the Ninth Circuit in *Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th

12   Cir. 2006).

13   > Unless a particular court record is one "traditionally kept secret," a
    > "strong presumption in favor of access" is the starting point.  A party
14   > seeking to seal a judicial record then bears the burden of overcoming
    > this strong presumption by meeting the "compelling reasons"
15   > standard.  That is, the party must "articulate[] compelling reasons
    > supported by specific factual findings" that outweigh the general
16   > history of access and the public policies favoring disclosure, such as
    > the "'public interest in understanding the judicial process.'"  In turn,
17   > the court must "conscientiously balance[] the competing interests" of
    > the public and the party who seeks to keep certain judicial records
18   > secret.  After considering these interests, if the court decides to seal
    > certain judicial records, it must "base its decision on a compelling
19   > reason and articulate the factual basis for its ruling, without relying
    > on hypothesis or conjecture."

20

21   *Id.* at 1178-79.

22   The Court finds that Silver Lake and Goldman Sachs have satisfied the compelling reasons

23   standard for their requests to file under seal.  Both companies are third parties to this litigation;

24   more important, their requests to seal are sufficiently narrowly tailored.

25   However, the Court does not reach the same conclusion for Tesla's requests to seal.  While

26   there may be compelling reasons to keep certain information confidential (*e.g.*, related to the

27   interests of Tesla's investors), Tesla has, for the most part, painted with a broad brush in making

28   its requests to file under seal.  The information at issue may not be information that Tesla would

United States District Court
Northern District of California

19

ordinarily share with the public, but it is far from clear that Tesla would suffer any harm as a result of disclosure, especially as the proposed transaction never came to fruition and is well in the past. Tesla has not suggested that disclosure of the bulk of the information would, *e.g.*, hinder its ability to obtain financing, to court new investors, or to preserve its relationships with existing investors. Furthermore, it is notable that Mr. Musk himself made public comments about why he made statements that, *e.g.*, "funding [was] secured." Having provided a public explanation, he as well as Tesla can hardly complain if additional underlying facts are also disclosed. Finally, even Tesla implicitly recognizes that its sealing requests are problematic. In the supporting declarations, Nathaniel Smith of Tesla repeatedly states: "In Tesla's view, sealing the materials for a brief period of time – until trial – balances the public's right to access with Tesla's ability to preserve the sensitive and confidential nature of its information." Docket No. 361 (Smith Decl. ¶ 11); Docket No. 364-1 (Smith Decl. ¶ 12); Docket No. 367-1 (Smith Decl. ¶ 7); Docket No. 374 (Smith Decl. ¶ 10).

Accordingly, the Court grants Silver Lake and Goldman Sachs's requests to file under seal but denies Tesla's. Tesla's requests to seal are denied without prejudice – *i.e.*, the Court shall give Tesla an opportunity to file a narrowly tailored request for sealing. Tesla shall file a new request to seal within two weeks of the date of this order. So as to potentially avoid disputes, the Court orders the parties to meet and confer to see if they can reach agreement on sealing. If agreement is reached, the parties may submit (in lieu of a new motion to seal by Tesla) a stipulation on sealing within two weeks of the date of this order.

B.    <u>Legal Standard</u>

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence

1    must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

2    are to be drawn in the nonmovant's favor.  *See id.* at 255.

3            Where a plaintiff moves for summary judgment on claims that it has brought (*i.e.*, for

4    which it has the burden of proof), it "must prove each element essential of the claims . . . by

5    undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992); *see also*

6    *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears

7    the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting

8    an affirmative defense, he must establish beyond peradventure all of the essential elements of the

9    claim or defense to warrant judgment in his favor") (emphasis omitted).

10           In the instant case, Mr. Littleton has brought two causes of action: (1) a claim for violation

11   of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against Tesla and Mr. Musk and

12   (2) a claim for violation of § 20(a) against the Tesla Board.  The main cause of action is the §

13   10(b)/Rule 10b-5 claim.  To succeed on that claim, Mr. Littleton must prove (1) a

14   misrepresentation or omission of a material fact; (2) scienter; (3) causation; (4) reliance; and (5)

15   damages.  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1055 (9th Cir.

16   2005) (stating that these are the elements of a Rule 10b-5 claim).  In the pending motion, Mr.

17   Littleton moves for partial summary judgment on the following issues: (1) falsity (with respect to

18   four statements); (2) scienter (with respect to the same); and (3) reliance.

19   C.      Falsity and Scienter

20           For the § 10(b)/Rule 10b-5 claim, Mr. Littleton must first show there is no genuine dispute

21   of material fact that a false or misleading statement was made or that there was a misleading

22   omission.  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  A false

23   statement is one that is not true.  Even if a statement is literally true, it can still be misleading.  *See*

24   *id.*  "[A] statement is misleading if it would give a reasonable investor the impression of a state of

25   affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't*

26   *Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)

27   (internal quotation marks omitted; adding that, "to be misleading, a statement must be 'capable of

28   objective verification'").  An omission can also be misleading – but "[o]ften, a statement will not

United States District Court
Northern District of California

21

1  mislead even if it is incomplete or does not include all relevant facts.'"  *Brody*, 280 F.3d at 1006.

2  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."[8]  *Basic Inc. v. Levinson*,

3  485 U.S. 224, 239 n.17 (1988).

4        In addition to falsity, Mr. Little must also show there is no genuine dispute regarding

5  scienter.  "Scienter may be established . . . by showing that the defendants knew their statements

6  were false, or by showing that defendants were reckless as to the truth or falsity of their

7  statements."  *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010); *see also SEC v. Platforms*

8  *Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (noting that there can be either

9  "'deliberate recklessness'" or "'conscious recklessness'").  Scienter is "a subjective inquiry"; that

10  is, "[i]t turns on the defendant's actual state of mind."  *Gebhart*, 595 F.3d at 1042.  However, "the

11  objective unreasonableness of a defendant's conduct may give rise to an inference of scienter,"

12  and, therefore, evidence of "extreme departure from ordinary standards of care" may be

13  considered.  *Id.* at 1041-42.  Evidence as to whether the defendant "appreciate[d] the gravity of the

14  risk of misleading others" may also be considered," but

15       a defendant ordinarily will not be able to defeat summary judgment

16       by the mere denial of subjective knowledge of the risk that a
statement could be misleading.  Summary judgment requires a

17       statement that is materially misleading such that no reasonable jury
could conclude otherwise.  *See Anderson v. Liberty Lobby, Inc.*, 477

18       U.S. 242, 248-50 (1986).  Moreover, the statement must present a
danger of misleading buyers or sellers "that is either known to the

19       defendant or is so obvious that the actor must have been aware of
it."  *Hollinger*, 914 F.2d at 1569.  When the defendant is aware of

20       the facts that made the statement misleading, "he cannot ignore the
facts and plead ignorance of the risk."  *Makor Issues & Rights, Ltd.*

21       *v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008); *see also Vucinich*
*v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th

22       Cir. 1984) ("Summary judgment is generally inappropriate when

23  _____

[8] A duty to disclose does not arise just because information is material.  *See Matrixx Initiatives,*

24  *Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011) (stating that "§ 10(b) and Rule 10b-5(b) do not
create an affirmative duty to disclose any and all material information"); *see also In re Time*

25  *Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (stating that "a corporation is not required
to disclose a fact merely because a reasonable investor would very much like to know that fact").

26       "A duty to affirmatively disclose may arise when there is insider trading, a statute

27  requiring disclosure, or . . . an inaccurate, incomplete or misleading prior disclosure."  *City of*
*Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005); *see also Time*

28  *Warner*, 9 F.3d at 268 (stating that "one circumstance creating a duty to disclose arises when
disclosure is necessary to make prior statements not misleading").

United States District Court
Northern District of California

mental state is an issue, *unless no reasonable inference supports the adverse party's claim*." (emphasis added)).  Stated another way, if no reasonable person could deny that the statement was materially misleading, a defendant with knowledge of the relevant facts cannot manufacture a genuine issue of material fact merely by denying (or intentionally disregarding) what any reasonable person would have known.

*Platforms Wireless*, 617 F.3d at 1094.

According to Mr. Littleton, there is no genuine dispute that the following four representations, all made by Mr. Musk, were false or misleading and made with the requisite scienter:

- "Am considering taking Tesla private at $420.  Funding secured."  This was the first tweet sent by Mr. Musk on 8/7/2018.
- "Investor support is confirmed."  This was another tweet sent by Mr. Musk on 8/7/2018.
- "Only reason why this is not certain is that it's contingent on a shareholder vote."  This statement was part of the same tweet immediately above.
- "I have continued to communicate with the Managing Director of the Saudi fund.  He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals.  He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements."  This was part of the 8/13/2018 blog post on Tesla's website.  Mr. Littleton contends that this statement was misleading because it omitted the fact that there had been conflict between Mr. Musk and Mr. Al-Rumayyan.

1.   "Am considering taking Tesla private at $420.  Funding secured."

There is no real dispute here that the focus should be on the second part of the tweet, *i.e.*, "Funding secured."  With respect to this phrase, Mr. Littleton does not claim that the Saudi PIF did not have sufficient funds to take Tesla private.  Rather, Mr. Littleton claims that the statement "Funding secured" was false or, at the very least, misleading because the PIF had not, in fact, put up the money to take Tesla private, nor had it made any kind of legal or binding commitment to

provide any money.

To the extent Mr. Littleton suggests that "Funding secured" would necessarily be interpreted as there being a legal or binding commitment, *see* Mot. at 17, 20 (noting, *e.g.*, that the financial advisor Mr. Durban (of Silver Lake) has used the term "secured" to mean binding legal contracts committing capital), that is too narrow a reading.  However, as the Court has previously noted, the use of the term "secured" does suggest that funding was not something amorphous or speculative but rather fairly concrete and reasonably certain.  *See In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 924 (N.D. Cal. 2020) (in prior order, stating that, "[b]ecause Mr. Musk, the CEO of Tesla, included the highly-specific price of $420 at which shares would be bought for the going-private transaction, and because his tweet followed with 'funding secured,' a reasonable investor would have interpreted it as something more than a speculative amorphous opinion about future possibilities[;] [i]nstead, it can be read as implying a more concrete state of affair").  This is consistent with the dictionary definition of the term "secure" – *e.g.*, "to put beyond hazard of losing or of not receiving: GUARANTEE."  https://www.merriam-webster.com/dictionary/secure (last visited 3/31/2022).

Based on the evidence of record, the Court finds that no reasonable jury could find the statement "Funding secured" accurate and not misleading.  The evidence of record shows that there was nothing concrete about funding coming from the PIF; rather, discussions between Tesla and the PIF were clearly at the preliminary stage.  There had been no discussion about what the purchase price would be for a share of stock.  Nor had there been any discussion about what percentage of the company the PIF would own or the total amount of money the PIF would contribute.  Moreover, both at the conclusion of the 7/30/2018 meeting between Tesla and the PIF *and* thereafter, the PIF asked Tesla to provide information so that the PIF could make an assessment.  For example, Mr. Ahuja admitted that, at the end of the 7/30/2018 meeting, the PIF told Mr. Musk that it "was fundamentally keen on hearing from Elon directly the structure that he would have in mind that he would like to do for a going-private transaction and what percentage of that he would think would be needed or the financial calculations to take it private."  Ahuja Depo. at 97-98; *see also* Ex. 80 (notes/minutes written by Mr. Al Mogren of the Saudi PIF)

1    (writing that Mr. Al-Rumayyan said, "I would like to listen to your plan Elon and what are the

2    financial calculations to take it private in the next week and if I did not receive anything I will call

3    you").

4            Defendants protest that "Funding secured" is too ambiguous in meaning and therefore the

5    matter should not be decided at summary judgment but rather should be left for the jury to resolve.

6    As indicated above, the Court acknowledges that there is some softness to the term "secured."  But

7    even accepting that there is some room for disagreement as to precisely how secure something

8    must be before the term may be appropriately used, the term is not so elastic as to escape any real

9    meaning.  No reasonable jury could find "Funding secured" accurate and not misleading even

10   under a liberal understanding of the term "secured."  Notably, even the evidence on which

11   Defendants rely suggests that the public understood the phrase "Funding secured" to mean (1) at

12   least a verbal commitment (2) based on a discussion of at least some details about what funding

13   would entail.  For example, the Evercore report issued the day after the tweet stated as follows.

> **Could this happen?**  It is important to note that, as of today, no
> details have been provided with regards to what "Funding secured"
> means, who is providing that funding and what any potential
> funding structure might look like.  Our view is that "Funding
> secured" should be interpreted as a strong verbal commitment, with
> funds available and parties willing to execute quickly.  However, it
> could be less than this.  It may also be that initial legal documents,
> term sheets, letters of intent have been signed.

19   Ex. 33 (Evercore report) (bold in original).  Notably, although the report acknowledged that details

20   about the funding had not been provided publicly, it assumed that there had been some discussion

21   of details.  Mr. Littleton's evidence indicates the same.  *See, e.g.*, McCall Reply Decl., Ex. U

22   (Bank of America/Merrill Lynch article) (noting that "no theoretical transaction method, funding

23   plan, or structure was outlined," but "we view today's announcement as having substance given

24   what appears to be at least three potential sources of capital (existing shareholders, Saudi

25   Sovereign Wealth Fund, Chinese government and investment funds)" and "[f]urther credence was

26   added with potential details in Musk's subsequent tweets regarding the setup of 'special purpose

27   fund' for existing investors to remain involved, commentary that no single shareholder would

28   have control, and that he would remain on as CEO"); Ex. 15 (J.P. Morgan report) (stating that, "as

United States District Court
Northern District of California

1   lacking as the statements are in any details regarding who is expected to provide the required

2   amount of financing and on what terms, they are nevertheless declarative statements from the

3   CEO of a public company which we feel should be considered seriously").

4          Accordingly, the Court concludes that Mr. Littleton is entitled to partial summary

5   judgment with respect to the falsity of the phrase "Funding secured."  The Court now turns to the

6   issue of scienter.  The question is whether there is a genuine dispute of fact as to whether Mr.

7   Musk made this statement knowing it was false or with recklessness as to the falsity of the

8   statement.  The Court concludes that a reasonable jury could reach only one conclusion – *i.e.*, that

9   Mr. Musk recklessly tweeted to the public that funding was secured.  There is no dispute that, at

10  the time of the tweet, Mr. Musk knew all of the facts relating to Tesla's interaction with the PIF.

11  He was part of the 7/31/2018 meeting between the PIF and Tesla.  And when a "defendant is

12  aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead

13  ignorance of the risk'" of misleading others.  *Platforms Wireless*, 617 F.3d at 1094.  The Court

14  therefore affords no weight to Mr. Musk's statement in his blog post of 8/13/2018 that he used the

15  phrase "Funding secured" because he "left the July 31st meeting with no question that a deal with

16  the Saudi sovereign fund could be closed, and that it was just a matter of getting the process

17  moving."  Ex. 16 (website).

18          2.     "Investor support is confirmed."

19          As an initial matter, the Court notes that the full tweet stated as follows: "Investor support

20  is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote."

21  Mr. Littleton has broken the tweet into two separate challenges.  The second sentence is discussed

22  below.

23          The second sentence, however, has bearing on the first sentence.  It reflects that Mr. Musk

24  was making a distinction between "investor" and "shareholder"; in other words, "investor"

25  referred to the person or entity wanting to invest in Tesla whereas "shareholder" referred to

26  already existing investors.[9]  So understood, the statement "Investor support is confirmed" is false

27  _____

28  [9] Even if a reasonable jury could understand "investor support" to mean already existing investors, Defendants would fare no better.  The record is clear that Mr. Musk did not reach out to existing

United States District Court
Northern District of California

26

1    and misleading for essentially the same reasons as stated above.  That is, no reasonable could

2    conclude that support from the Saudi PIF was confirmed given the preliminary nature of the

3    discussions between the PIF and Tesla.  In addition, a reasonable jury could reach only one

4    conclusion regarding scienter: that Mr. Musk made his statement recklessly.  As noted above, Mr.

5    Musk was in fully aware of the facts given his participation in the 7/31/2018 meeting with the PIF.

6           3.      "Only reason why this is not certain is that it's contingent on a shareholder vote."

7           For the third statement (from the same tweet immediately above dated 8/7/2018), the Court

8    must first take into account the full context.  *See McMahan & Co. v. Wherehouse Entm't*, 900 F.2d

9    576, 579 (2d Cir. 1990) (indicating that statements should not be taken in isolation; asking

10   "whether defendants' representations, taken together and in context, would have mislead a

11   reasonable investor"); *cf. In re Convergent Techs. Sec. Lit.*, 948 F.2d 507, 512 (9th Cir. 1991)

12   (noting that "'[s]ome statements, although literally accurate, can become, through their context

13   and manner of presentation, devices which mislead investors'").  A copy of the tweet is below.



23   Ex. 13.

24          The above indicates that "this" refers to "Taking Tesla Private."  There is also a link to the

25   8/7/2018 blog post where Mr. Musk commented, *inter alia*, as follows:

26          Earlier today, I announced that I'm considering taking Tesla private

28   shareholders to get their views on taking the company private until after the above tweet was sent
     out.

at a price of $420/share.  I wanted to let you know my rationale for this, and why I think this is the best path forward.

First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best.  As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders.  Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term.  Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.

. . . .

Here's what I envision being private would mean for all shareholders, including all of our employees.

First, I would like to structure this so that all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%).  My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

. . . .

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. . . .

Ex. 12 (website).

Defendants argue that the blog post above raises at least a question of fact as to how a reasonable person would view the statement "Only reason why this is not certain is that it's contingent on a shareholder vote."  The Court is not persuaded.  While the blog post makes clear that a final decision on taking Tesla private had not been made, it did not specify any contingencies other than the "finaliz[ation] through a vote of our shareholders."  Ex. 12.  Thus, a reasonable investor could *only* conclude that the sole contingency left for taking Tesla private was

1    a shareholder vote.  The post used the word "only," implying that the only contingency was a

2    shareholder vote, not, *e.g.*, uncertainty of investor support.

3              Accordingly, the Court finds that no reasonable jury could find the statement accurate and

4    not misleading as there were, in fact, a number of contingencies that had to be addressed before

5    the matter could reach a shareholder vote, including but not limited to the laundry list of items

6    identified by Mr. Littleton: to wit, a determination of the terms and structure to take Tesla private

7    and investor agreement therewith, the hiring of financial and legal advisors, a formal proposal for

8    the Board to review, a negotiation with independent directors, the preparation of legal and

9    financial analysis and documentation, the signing of an agreement, the hiring of proxy advisors,

10   and the filing of regulatory approvals.  To the extent Defendants contend Mr. Musk's blog post of

11   8/13/2018 provided information about contingencies, that argument is beside the point – at least

12   for purposes of the summary judgment motion.  At this juncture, Mr. Littleton is simply asserting

13   that the statement at issue was false at the time it was made.  *See* Reply at 12.

14             Finally, as above, the scienter analysis follows the falsity analysis.  No reasonable jury

15   could find that Mr. Musk did not act recklessly given his clear knowledge of the discussions that

16   took place at the 7/31/2018 meeting.

17        4.    "I have continued to communicate with the Managing Director of the Saudi fund.

18              He has expressed support for proceeding subject to financial and other due

19              diligence and their internal review process for obtaining approvals.  He has also

20              asked for additional details on how the company would be taken private, including

21              any required percentages and any regulatory requirements."

22             The final statement comes from Mr. Musk's blog post of 8/13/2018.  Here, Mr. Littleton

23   contends falsity (as well as scienter) because, "[w]hile Musk wrote about his conversations with

24   the Saudi PIF at length, he did not disclose that over the previous weekend he had sought to end

25   all negotiations with the Saudi PIF."  Mot. at 23.  In other words, "[t]he August 13, 2018 blogpost

26   deliberately omitted the conflict between Musk and Al-Rumayyan to give a misleading impression

27   of an orderly and planned process for taking Tesla private."  Reply at 13.

28             The Court denies summary judgment on this statement.  As noted above, "a statement is

misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail*, 845 F.3d at 1275 (internal quotation marks omitted). Here, there was clearly some friction between Mr. Musk and Mr. Al-Rumayyan. *See, e.g.*, Ex. 121 (Mr. Musk texting, *inter alia*, as follows: "There are many other investment funds who want to be part of this deal. We do not need your fund to get this done. I will not work with an organization who's [sic] public statement to the media do[es] not match their private statements to me and my team"; also texting: "In light of these actions and nothing meaningful done to correct them, Tesla will be moving forward with Silver Lake, Goldman and other investors to take Tesla private"). However, it appears that that same day the two resolved their dispute. *See* Ex. 121 (Mr. Al-Rumayyan texting, "I will ask Shihana to call Sam so they can work on PIF statement" and Mr. Musk responding, "Thank you. This means a great deal"). Thus, a reasonable jury could well find that the blog post did not give an impression of a state of affairs that was materially different from the one that actually existed.

D.     Reliance

Finally, Mr. Littleton argues that he is entitled to summary judgment on the element of reliance. Because the Court is denying summary judgment on the fourth statement, it considers only reliance on the first three statements at issue.

> The reliance element "'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction – e.g., purchasing common stock – based on that specific misrepresentation."
>
> . . . [H]owever, [the Supreme Court has] recognized that requiring such direct proof of reliance "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." . . .
>
> [The Court] also noted that "[r]equiring proof of individualized reliance" from every securities fraud plaintiff "effectively would . . . prevent[] [plaintiffs] from proceeding with a class action" in Rule 10b-5 suits.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267-68 (2014). Thus, the Supreme Court has held that, instead of having direct proof of individualized reliance on a

1    misrepresentation, a plaintiff can establish a rebuttable presumption of reliance based on the fraud-

2    on-the-market doctrine.  Under the doctrine, there is a rebuttable presumption of reliance where

3    "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock

4    traded in an efficient market, and (4) the plaintiff traded the stock between when the

5    misrepresentations were made and when the truth was revealed." *Id.* at 268.  The doctrine

6                    "is based on the hypothesis that, in an open and developed securities
                     market, the price of a company's stock is determined by the
7                    available material information regarding the company and its
                     business. . . . Misleading statements will therefore defraud
8                    purchasers of stock even if the purchasers do not directly rely on the
                     misstatements."
9

10   *Basic*, 485 U.S. at 241-42; *see also In re Allstate Corp. Secs. Litig.*, 966 F.3d 595, 600, 605 (7th

11   Cir. 2020) (noting that, under the doctrine, "plaintiffs may prove that the given securities traded in

12   efficient markets in which prices reflect all publicly available information, including

13   misrepresentations, and all investors were thus entitled to rely on that public information and

14   pricing"; in other words, "if the securities in question trade on an efficient market, then the market

15   itself provides the causal connection between a misrepresentation and the price of the stock").

16          The presumption of reliance can be rebutted by

17                   "[a]ny showing that severs the link between the alleged
                     misrepresentation and either the price received (or paid) by the
18                   plaintiff, or his decision to trade at a fair market price."  So for
                     example, if a defendant could show that the alleged
19                   misrepresentation did not, for whatever reason, actually affect the
                     market price [*i.e.*, no price impact], . . . then the presumption of
20                   reliance would not apply.

21   *Halliburton*, 573 U.S. at 269.  Price impact, therefore, may be relevant to the issue of reliance

22   (also known as transaction causation) and not just loss causation (which is a separate element of a

23   10b-5 claim).  *See Allstate*, 966 F.3d at 609.

24          In *Basic*, where there were alleged misrepresentations about the possibility of a merger, the

25   Supreme Court provided two examples of how defendants could show that the alleged

26   misrepresentation had no price impact.

27                   [First], if petitioners could show that the "market makers" were
                     privy to the truth about the merger discussions here with
28                   Combustion, and thus that the market price would not have been

United States District Court
Northern District of California

> affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone. Similarly, if, despite petitioners' allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud.

*Basic*, 485 U.S. at 248-49.

In the instant case, Mr. Littleton is relying on the fraud-on-the-market doctrine to establish reliance. Defendants argue that summary judgment on this theory is not appropriate because there is a genuine dispute with respect to whether the statements at issue were material. They also note that any presumed reliance could be rebutted and contend that, here, there is a question of fact as to whether the alleged misrepresentation actually affected the stock price.

For purposes of the pending motion, the Court assumes that the three statements at issue were material, *i.e.*, because a reasonable investor would have viewed the statements as having significantly altered the total mix of information made available. *See Halliburton*, 573 U.S. at 278; *Basic*, 485 U.S. at 232. Certainly, there is evidence to support materiality because Tesla's stock price went up after the tweets, analysts issued reports commenting on the tweets, and Tesla's investors reached out to Tesla after the tweets.

But even if there were materiality, that would only give Mr. Littleton the benefit of a presumption of reliance; Defendants are still entitled to rebut the presumption. At the very least, there is a question of fact precluding summary judgment because, as Defendants have noted, there is evidence suggesting that the misrepresentations did not actually affect the market price. Specifically, there is evidence that, after the 8/13/2018 blog post, which served as a partial corrective disclosure, there was no decline or at least not a significant decline in stock price; thus, arguably, the reaction to the tweets on 8/7/2018 was a response to Mr. Musk contemplating taking Tesla private and not to statements that, *e.g.*, funding was secured or investor support confirmed.

### III.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Mr. Littleton's motion for partial summary judgment. The Court holds that, based on the evidence presented, there is no genuine dispute that the first three representations at issue were false and that Mr. Musk recklessly

made those representations.  To that extent, the motion is granted.  In all other respects, the motion for partial summary judgment is denied.

At this juncture, the Court provisionally files the entirety of this order under seal.  The parties are directed to meet and confer to determine which specific portions of the order are in need of sealing.  The parties shall submit a stipulation on sealing within two weeks of the date of this order.

This order disposes of Docket No. 352.


**IT IS SO ORDERED**.


Dated: April 1, 2022

_____
EDWARD M. CHEN
United States District Judge