EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **vs.** | :   **Civil Action No. 1:18-cv-8865** |
| | : |
| **ELON MUSK,** | :   **Jury Trial Demanded** |
| | : |
| **Defendant.** | : |
| | : |

_____ :

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission (the "Commission"), alleges as follows:

### SUMMARY

1.        This case involves a series of false and misleading statements made by Elon Musk, the Chief Executive Officer of Tesla, Inc. ("Tesla"), on August 7, 2018, regarding taking Tesla, a publicly traded company, private.  Musk's statements, disseminated via Twitter, falsely indicated that, should he so choose, it was virtually certain that he could take Tesla private at a purchase price that reflected a substantial premium over Tesla stock's then-current share price, that funding for this multi-billion dollar transaction had been secured, and that the only contingency was a shareholder vote.  In truth and in fact, Musk had not even discussed, much less confirmed, key deal terms, including price, with any potential funding source.

2.        At approximately 12:48 p.m. EDT on August 7, 2018, during trading hours, Musk tweeted to his over 22 million Twitter followers, "Am considering taking Tesla private at $420.

Funding secured." This statement was false and misleading. Over the next three hours, Musk made a series of additional materially false and misleading statements via Twitter including:

- "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla."

- "Shareholders could either to [sic] sell at 420 or hold shares & go private."

- "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."

3.      Musk knew or was reckless in not knowing that each of these statements was false and/or misleading because he did not have an adequate basis in fact for his assertions. When he made these statements, Musk knew that he had never discussed a going-private transaction at $420 per share with any potential funding source, had done nothing to investigate whether it would be possible for all current investors to remain with Tesla as a private company via a "special purpose fund," and had not confirmed support of Tesla's investors for a potential going-private transaction. He also knew that he had not satisfied numerous additional contingencies, the resolution of which was highly uncertain, when he unequivocally declared, "Only reason why this is not certain is that it's contingent on a shareholder vote." Musk's public statements and omissions created the misleading impression that taking Tesla private was subject only to Musk choosing to do so and a shareholder vote.

4.      Investors reacted to Musk's August 7 tweets. From the time of Musk's first tweet that day until the close of trading on August 7, Tesla's stock price increased by more than 6% on significantly increased volume and closed up 10.98% from the previous day.

5.      Musk's false and misleading public statements and omissions caused significant confusion and disruption in the market for Tesla's stock and resulting harm to investors.

6.     By engaging in the conduct alleged in this Complaint, Musk violated, and unless restrained and enjoined will violate again, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder.

## NATURE OF PROCEEDING AND RELIEF SOUGHT

7.     The Commission brings this action against Musk pursuant to Section 21(d) of the Exchange Act [*15 U.S.C. § 78u(d)*] to enjoin the transactions, acts, practices, and courses of business alleged in this Complaint and to seek orders of disgorgement, along with prejudgment interest, civil penalties, and an officer and director bar against Musk, and such further relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), and 78aa*].

9.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  Defendant transacts business in this District, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District, and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Musk regularly communicates via Twitter with users located in this District.  In addition, Tesla is traded on the Nasdaq Global Select Market, which is headquartered in this District, and trades in Tesla securities were handled and executed by trading personnel located in this District during the period relevant to the allegations.

**DEFENDANT**

10.    **Defendant Elon Musk**, age 47, resides in Los Angeles, California.  He co-
founded Tesla, Inc. in 2003 and since that time has been the Chairman of Tesla's Board of
Directors and largest stockholder.  He was named Chief Executive Officer in 2008.  Musk
oversees all product development, engineering, and design of Tesla's products.

**RELEVANT ENTITY**

11.    **Tesla**, which designs, develops, manufactures, and sells electric vehicles and
energy generation and storage systems, is incorporated in Delaware with its principal place of
business in Palo Alto, California.  Tesla conducted an initial public offering in 2010, and at all
relevant times, its common stock was registered with the Commission pursuant to Section 12(b)
of the Exchange Act [*15 U.S.C. § 78l(b)*] and was publicly traded on the Nasdaq Global Select
Market under the ticker symbol TSLA.

**FACTUAL ALLEGATIONS**

**Musk Used Twitter to Communicate with Millions of People as Tesla's Spokesperson**

12.    Musk created a profile on the social media application Twitter
(twitter.com/elonmusk) in 2009.  Since that time, Musk often used Twitter to communicate about
Tesla's business.  Tesla's Chief Financial Officer described Musk's Twitter statements as a
"strong channel of marketing" with Musk acting as a "spokesman" for Tesla.

13.    On November 5, 2013, Tesla publicly filed a Form 8-K with the Commission
stating that it intended to use Musk's Twitter account as a means of announcing material
information to the public about Tesla and its products and services and has encouraged investors
to review the information about Tesla published by Musk via his Twitter account.

14.     In August 2018, over 22 million people, including members of the press, "followed" Musk on Twitter.  His tweets were published instantaneously to those people and were also publicly available to anyone with Internet access.

**Musk's Statements Regarding Tesla Short Sellers**

15.     In 2018, stock analysts and investors increasingly began to question whether Tesla could meet its previously announced production targets and begin to earn sufficient cash in order to sustain its operations and pay its existing debt load.  By August 2018, more than $13 billion worth of Tesla shares were being "shorted," meaning they were sold by investors who did not own them at the time of the sale.  Investors who sell stock short typically believe the price of the stock will fall and hope to buy the stock at the lower price to cover their short positions and earn a profit.  If the price of the stock rises, short sellers who then exit their short positions by purchasing the stock at the higher price will incur losses.

16.     Musk has complained that Tesla has been unfairly targeted by short sellers and predicted that short sellers would be "burned."  For example, on May 4, 2018, Musk tweeted, "Oh and uh short burn of the century comin soon.  Flamethrowers should arrive just in time." On June 17, 2018, Musk tweeted that short sellers "have about three weeks before their short position explodes."

**Preliminary Discussions Regarding Taking Tesla Private**

17.     Beginning in January 2017, Musk had three or four in-person meetings with representatives of a sovereign investment fund (the "Fund").  During these meetings, according to Musk, the lead representative of the Fund expressed a verbal desire to make a large investment in Tesla and establish a Tesla production facility in the Middle East.

18.     In late July 2018, Musk and representatives of the Fund had not spoken for many months.  On July 28, 2018, a representative of the Fund requested a meeting with Musk.  On the evening of July 31, Musk and his chief of staff met with three representatives of the Fund at Tesla's factory in Fremont, California for approximately 30 to 45 minutes.  Tesla's CFO joined midway through the meeting.

19.     According to Musk, at the meeting the Fund's lead representative told Musk that the Fund had recently acquired almost five percent of Tesla's common stock on the open market, expressed interest in taking Tesla private, and confirmed that he was empowered to make investment decisions for the Fund.  Musk later stated that he assumed without confirming that the lead Fund representative was proposing a "standard" going-private transaction, but the terms of any such deal were not discussed.

20.     During the July 31 meeting, the lead Fund representative again raised the prospect of establishing a production facility in the Middle East.  According to Musk, he expressed openness but made no commitment; Musk assumed that whether a Tesla production facility in the Middle East was a precondition to the Fund's willingness to take Tesla private would depend on the amount of capital the Fund was required to commit to the transaction.  Musk did not discuss his assumption with the representatives of the Fund.

21.     The July 31 meeting lacked discussion of even the most fundamental terms of a proposed going-private transaction.  For example, there was no discussion at the July 31 meeting of (1) any dollar amount or specific ownership percentage for the Fund's investment in a going-private transaction; (2) any acquisition premium to be offered to current Tesla shareholders; (3) any restrictions on foreign ownership of a significant stake in Tesla; (4) the Fund's available liquid capital; (5) whether the Fund had any past experience participating in a going-private

transaction; (6) any regulatory hurdles to completion of a going-private transaction; or (7) the board approval process necessary to take Tesla private.  Musk has acknowledged that the July 31 meeting was the most specific discussion of a transaction to take Tesla private between him and representatives of the Fund.

22.     According to Musk, at the close of the July 31 meeting, the lead representative of the Fund asked Musk to tell the Fund how he wanted to do a going-private transaction and represented that so long as the terms were "reasonable," the Fund would be fine with them. Musk acknowledged that no specific deal terms had been established at the meeting and that there was no discussion of what would or would not be considered reasonable.  Nothing was exchanged in writing, and there was no discussion of confidentiality.  Musk did not communicate with representatives of the Fund again about a going-private transaction until August 10, three days after his August 7 statements.

**Musk's Discussion of a Going-Private Transaction with Tesla's Board of Directors**

23.     On August 2, 2018, after market close, Musk sent an email with the subject, "Offer to Take Tesla Private at $420," to Tesla's Board of Directors, Chief Financial Officer, and General Counsel.  In the email, Musk explained his reasons for wanting to take Tesla private, including that being public "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand."  In the email, Musk asked that the "matter be put to a shareholder vote at the earliest opportunity" and stated that the "offer expires in 30 days."

24.     According to Musk, he calculated the $420 price per share based on a 20% premium over that day's closing share price because he thought 20% was a "standard premium" in going-private transactions.  This calculation resulted in a price of $419, and Musk stated that

he rounded the price up to $420 because he had recently learned about the number's significance in marijuana culture and thought his girlfriend "would find it funny, which admittedly is not a great reason to pick a price."

25.      Prior to Musk's meeting with Fund representatives on the evening of July 31, Tesla's stock had closed at approximately $298 per share.  Accordingly, at the time of the meeting, the price per share with a 20% premium would have been approximately $358. Between the July 31 meeting and Musk's August 2 email to Tesla's board, Tesla's share price had increased over 17% following the company's August 1 earnings announcement.  Musk realized that a spike in Tesla's share price might make a going-private transaction not feasible because it would require an investor in the transaction to pay a "premium on a spike."  Musk, however, said that he assumed without confirming with the Fund or any other funding source that the 17% spike in Tesla's share price did not affect the feasibility of taking Tesla private at that time.  Musk did not discuss a $420 price per share with any potential funding source for a Tesla going-private transaction prior to sending his email to Tesla's board.

26.      According to Musk, he thought that there was "a lot of uncertainty" regarding a potential going-private transaction at the time of his August 2 email to Tesla's board, "but it was worth investigating."  He believed at the time that the likelihood of consummation of a transaction was about 50%.

27.      In response to Musk's August 2 email about taking Tesla private, Tesla's board held a telephonic meeting with Musk on the night of August 3.  During that call, Musk informed the board that the Fund was interested in funding a going-private transaction.

28.     Musk also told board members that he wanted existing investors to stay with the

company.  According to Musk, at least one board member told him that it would be "really

difficult for small investors" to remain shareholders in a private Tesla.

29.     During the August 3 call, Musk told the board that he wanted to contact existing

shareholders to assess their interest in participating in a going-private transaction.  The board

authorized Musk to contact certain investors and asked him to report back to the board on those

conversations.

**Musk's August 7 Statements and the Market's Reaction**

30.     Between the July 31 meeting with representatives of the Fund and the morning of

August 7, Musk (1) did not have any further substantive communications with representatives of

the Fund; (2) did not discuss a going-private transaction at a share price of $420 with any

potential funding source; (3) had a conversation with a private equity fund representative about

the process, but did not actually contact any additional potential strategic investors to assess their

interest in participating in a going-private transaction; (4) did not provide Tesla's Board of

Directors with a more specific proposal to take Tesla private; (5) did not contact existing Tesla

shareholders to assess their interest in remaining invested in Tesla as a private company; (6) did

not formally retain any advisors to assist with a going-private transaction; (7) did not determine

whether retail investors could remain invested in Tesla as a private company; (8) did not

determine whether there were restrictions on illiquid holdings by Tesla's institutional investors;

and (9) did not determine what regulatory approvals would be required for such a transaction or

whether they could be satisfied.

31.     On August 6, Musk discussed a potential going-private transaction with a private

equity fund partner with previous experience with such transactions.  During this call, Musk

mentioned that to execute the potential transaction, the number of Tesla shareholders needed to

be below 300.  At the time, Tesla had over 800 institutional shareholders and many more

individual shareholders.  According to the private equity fund partner, the transaction structure

that Musk was contemplating was "unprecedented" in his experience.

32.     These uncertainties notwithstanding, on Tuesday, August 7, 2018, Musk

published a series of statements about a transaction to take Tesla private using his personal

Twitter account.  Musk did not consult with Tesla's Board of Directors, any other Tesla

employees, or any outside advisors about these tweets before publishing them.

33.     At approximately 12:48 PM EDT on Tuesday, August 7, 2018, Musk, using his

mobile phone, published a tweet, "Am considering taking Tesla private at $420.  Funding

secured."  Musk published this tweet in the middle of the day's official market trading.

Immediately after this tweet, the trading volume and price of Tesla shares spiked.

34.     Over the next few hours, Musk made additional statements about taking Tesla

private.  At approximately 1:15 PM EDT, Musk responded to another Twitter user's question,

"At what price?" by repeating "420."

35.     At approximately 1:23 PM EDT, about 35 minutes after Musk's initial tweet

about taking Tesla private, Tesla's Chief Financial Officer sent a text message to Musk, "Elon,

am sure you have thought about a broader communication on your rationale and structure to

employees and potential investors.  Would it help if [Tesla's head of communications], [Tesla's

General Counsel], and I draft a blog post or employee email for you?"  Musk responded, "Yeah,

that would be great."  Tesla's Chief Financial Officer then replied, "Working on it.  Will send

you shortly."

36.     At approximately 1:40 PM EDT, Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private.  I won't be selling in either scenario."

37.     At approximately 2:00 PM EDT, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla.  Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment."  In response to this tweet another Twitter user asked, "Could we still invest once private?"  Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

38.     At approximately 2:07 PM EDT, Musk responded to a Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super appreciative of Tesla shareholders.  Will ensure their prosperity in any scenario."

39.     Nasdaq rules specify that listed companies such as Tesla must notify Nasdaq at least ten minutes prior to publicly releasing material information about corporate events like a proposed going-private action.  Musk did not notify Nasdaq prior to publishing his August 7 tweets.

40.     At approximately 2:08 PM EDT, Nasdaq halted trading in TSLA shares.

41.     At approximately 2:13 PM EDT, Musk tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."

42.     At approximately 3:07 PM EDT, Musk responded to a Twitter user's comment about a "forced buyout" by tweeting, "Def. no forced sales. Hope all shareholders remain.  Will

11

be way smoother & less disruptive as a private company.  Ends negative propaganda from shorts."  Later that day, Musk "retweeted" this statement, causing it to be published again in his Twitter feed.

43.     At approximately 3:16 PM EDT, Musk sent an email to Tesla employees.  The content of that email, entitled "Taking Tesla Private," was published to a publicly available Tesla blog at 3:32 PM EDT.  In the email and blog post, Musk explained his reasons for wanting to take Tesla private, including asserting that TSLA was "the most shorted stock in the history of the stock market" and stating that "being public means there are large numbers of people who have incentive to attack the company."

44.     In his company-wide email and blog post, Musk reiterated that he would like to structure a Tesla going-private transaction "so that all shareholders have a choice.  Either they can stay investors in a private Tesla or they can be bought out at $420 per share . . . ."  Musk added, "This proposal to go private would ultimately be finalized through a vote of our shareholders."

45.     A few minutes after publishing the blog post, at approximately 3:36 PM EDT, Musk tweeted a link to it in a tweet that stated, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."  Neither Musk's tweet nor the blog post provided any further information or context about the meaning of Musk's statement, "Investor support confirmed," or disclosed any contingencies other than a shareholder vote that would have to be satisfied in order to take Tesla private.

46.     Approximately nine minutes later, at 3:45 PM EDT, Nasdaq lifted the trading halt on Tesla shares.  After trading resumed, Tesla's stock price continued to rise, closing at $379.57, up over 6% from the time Musk first tweeted about taking Tesla private earlier that day.

**Reaction to Musk's August 7 Statements**

47.     Investors, stock analysts, and journalists immediately sought clarification of Musk's August 7 statements.  At 1:00 PM EDT, approximately 12 minutes after Musk published his tweet stating, "Am considering taking Tesla private at $420.  Funding secured," Tesla's own head of Investor Relations sent a text to Musk's chief of staff asking, "Was this text legit?"

48.     At approximately 1:13 PM EDT, a Tesla investor and friend of Musk's chief of staff texted the chief of staff, "What's Elon's tweet about?  Can't make any sense of it.  Would be incredibly disappointing for shareholders that have stuck it out for so long."  A few minutes later, at approximately 1:32 PM EDT, a business reporter texted Musk's chief of staff, "Quite a tweet! (Is it a joke?)."

49.     At approximately 2:23 PM EDT, another reporter sent Musk an email with the subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you serious?  It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way.  Is there an actual explanation coming?"

50.     After Tesla published Musk's email to Tesla employees on its blog, at approximately 5:09 PM EDT on August 7, an investment bank research analyst emailed Tesla's head of Investor Relations, "In the tweet, he said financing is secured but in the letter he doesn't address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured'.  Yes, there is a firm offer."

51.     At approximately 5:23 PM EDT, another research analyst emailed Tesla's head of Investor Relations and another Investor Relations employee, "Had some questions/clarifications

on today's news and blog post.  Can either of you speak?"  A few minutes later, Tesla's head of

Investor Relations responded, "[A]part from what has been tweeted and what was written in a

blog post, we can't add anything else.  I only wanted to stress that Elon's first tweet, which

mentioned 'financing secured' is correct."

    52.    After Tesla's head of Investor Relations received another inquiry from another

investment bank research analyst at approximately 7:20 PM EDT, he asked whether the analyst

had read Tesla's "official blog post on this topic."  The analyst responded, "I did.  Nothing on

funding though?"  The head of Investor Relations replied, "The very first tweet simply

mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of

who the buyer is."  The analyst then asked, "Firm offer means there is a commitment letter or is

this a verbal agreement?"  The head of Investor Relations responded, "I actually don't know, but

I would assume that given we went full-on public with this, the offer is as firm as it gets."

**Additional Statements by Musk on August 13**

    53.    Musk did not make any attempt to clarify his August 7 statements until August

13.  During the interim, Musk continued to publish statements via his Twitter account, including

an apparent joke on August 10 about "Short shorts coming soon to Tesla merch[andise]."

    54.    On August 12, 2018, a news outlet reported that "people with knowledge of the

[F]und's plans" said that it "hasn't made any firm decisions on whether to increase its stake, or

by how much, but talks are ongoing . . . ."

    55.    The following day, August 13, 2018, a blog post attributed to Musk called

"Update on Taking Tesla Private" was published on Tesla's public blog.  In the blog post, Musk

attempted to walk back his August 7 statements, stating publicly for the first time that when he

had tweeted, "Am considering taking Tesla private at $420.  Funding secured," it was based on

his impression that there was "no question" that a deal with Fund could be closed and that it was

"just a matter of getting the process moving."

56.     Musk's August 13 post also disclosed for the first time that he was still in

discussions about taking Tesla private with the Fund and a number of other investors and that no

detailed proposal had been presented to the board or any board committee.  This was contrary to

Musk's August 7 tweet stating, "Only reason why this is not certain is that it's contingent on a

shareholder vote."

57.     Although it provided some new information about a potential transaction to take

Tesla private, Musk's August 13 blog post still did not disclose that the $420 share price had not

been agreed to by any potential funding source for a transaction to take Tesla private.  Similarly,

in the blog post, Musk again stated that his "proposal was based on using a structure where any

existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with

the $420 per share buyout used only for shareholders who preferred that option."  Musk did not

disclose that he had still not determined whether such a structure would be possible.  After

abandoning the going-private transaction, Musk admitted that his assumption that it would be

possible for small shareholders to remain invested in Tesla as a private company was a

"fundamental misunderstanding."

58.     At approximately 11:15 PM EDT on Friday, August 24, 2018, after the close of

official Nasdaq trading, a blog post was published on Tesla's public blog announcing that Musk

had abandoned the process of attempting to take Tesla private.

59.     The August 24 blog post, attributed to Musk, stated:

> Given the feedback I've received, it's apparent that most of Tesla's
> existing shareholders believe we are better off as a public
> company.  Additionally, a number of institutional shareholders
> have explained that they have internal compliance issues that limit

> how much they can invest in a private company.  There is also no
> proven path for most retail investors to own shares if we were
> private.  Although the majority of shareholders I spoke to said they
> would remain with Tesla if we went private, the sentiment, in a
> nutshell, was "please don't do this."

This was the first time that Musk publicly disclosed the obstacles to allowing current Tesla
investors to remain invested if Tesla went private and thus corrected his multiple previous
misstatements that any going-private transaction would allow all current shareholders to remain
invested.

60.     On the next trading day, August 27, 2018, Tesla stock closed at $319.27, down
over 15% from the closing price of $379.57 on August 7, the date of Musk's initial tweets about
taking Tesla private.

**Musk's August 7 Statements Were Materially False and Misleading**

61.     Musk made multiple materially false statements on August 7, and taken together,
his August 7 statements left market participants with the false and misleading impression that if
Musk chose to take Tesla private at $420 per share, the only outstanding requirement to be
satisfied was a shareholder vote.

62.     Musk's first tweet on August 7 stated, "Am considering taking Tesla private at
$420.  Funding secured."  Musk then repeated the $420 share price in at least two additional
tweets that day.  Later that day, Musk also tweeted, "Investor support is confirmed.  Only reason
why this is not certain is that it's contingent on a shareholder vote."  Musk's statements that
funding was "secured" and investor support was "confirmed" were false and misleading because,
in reality, Musk had no "secured" or "confirmed" commitment from any source to provide any
amount of funding.  In addition, he had never even discussed taking Tesla private at a price of
$420 per share with the Fund or any other potential investor.

16

63.     Musk's statement, "Only reason why this is not certain is that it's contingent on a shareholder vote," was also false and misleading.  In fact, there were numerous reasons in addition to a shareholder vote why a going-private transaction was not "certain" at that time. Any going-private transaction would have required approval of Tesla's board or a specially-appointed committee of the board, and at that time, no formal proposal to take Tesla private had even been presented for consideration.  In fact, no deal terms had been agreed upon with any source of funding, and any large investment to fund such a transaction would likely have been predicated on terms that the parties would have to negotiate and agree upon.  For example, the Fund had indicated that its investment might be contingent on Tesla building a production facility in the Middle East, a condition that would have significantly complicated any transaction, and to which neither Musk nor Tesla had agreed.  At least one Tesla board member described such a condition as a "non-starter."

64.     Musk's August 7 statements, taken together, also created the misleading impression that certain terms of a transaction to take Tesla private had been determined when, in fact, they had not even been explored, and in some cases, proved to be impossible. On August 7, Musk repeatedly stated that all current Tesla investors would be able to remain invested in Tesla after a going-private transaction.

65.     Specifically, Musk tweeted, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX investment."  Musk also responded to another Twitter user who wrote, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company. . . ." by tweeting, "Absolutely.  Am super

appreciative of Tesla shareholders. Will ensure their prosperity in any scenario."  Musk also

tweeted, "Shareholders could either to [sic] at 420 or hold shares & go private."  Finally, in his

August 7 blog post, Musk stated " . . . all shareholders have a choice.  Either they can stay

investors in a private Tesla or they can be bought out at $420 per share . . . ."

      66.    Musk also responded to a Twitter user who asked, "Could we still invest once

private?" by tweeting, "Yes, but liquidity events would be limited to every 6 months or so (like

SpaceX)."

      67.    At the time of these statements, Musk had not determined or even explored

whether it would be possible (1) for individual investors to invest in Tesla if it was a private

company; (2) for all current Tesla shareholders to remain invested if Tesla were to go private; (3)

to create a "special purpose fund enabling anyone to stay with Tesla"; or (4) to hold liquidity

events "every 6 months or so."  In fact, Musk later admitted, "I thought the vast majority of

existing investors would want to maintain their stake, and we would find a vehicle for small

investors to participate. That latter part was a fundamental misunderstanding that I just did not

know -- I thought there would be some way to retain small investors, but there isn't."  Musk's

statements regarding specific terms of a transaction to take Tesla private created the misleading

impression that these terms had been decided upon, when in fact, they had not even been

investigated or determined to be possible.

**Musk Knew or Was Reckless in Not Knowing that His Statements Were False and Misleading**

      68.    Musk made his false and misleading public statements about taking Tesla private

using his mobile phone in the middle of the active trading day.  He did not discuss the content of

the statements with anyone else prior to publishing them to his over 22 million Twitter followers

and anyone else with access to the Internet.  He also did not inform Nasdaq that he intended to make this public announcement, as Nasdaq rules required.

69.     Musk's statements were premised on a long series of baseless assumptions and were contrary to facts that Musk knew.  Between the July 31 meeting with representatives of the Fund and his August 7 misstatements, Musk knew that he (1) had not agreed upon any terms for a going-private transaction with the Fund or any other funding source; (2) had no further substantive communications with representatives of the Fund beyond their 30 to 45 minute meeting on July 31; (3) had never discussed a going-private transaction at a share price of $420 with any potential funding source; (4) had not contacted any additional potential strategic investors to assess their interest in participating in a going-private transaction; (5) had not contacted existing Tesla shareholders to assess their interest in remaining invested in Tesla as a private company; (6) had not formally retained any legal or financial advisors to assist with a going-private transaction; (7) had not determined whether retail investors could remain invested in Tesla as a private company; (8) had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors; and (9) had not determined what regulatory approvals would be required or whether they could be satisfied.

70.     In addition, Musk knew that Tesla's board had not yet voted on any proposal or authorized a shareholder vote on it, and in fact, Musk had not yet even submitted a formal proposal to Tesla's board.

71.     Musk did not disclose any of these material facts that were known to him when he made his August 7 statements.  Unlike market participants reading his tweets, Musk knew that his ostensibly "secured" funding was based on a 30 to 45 minute conversation regarding a potential investment of an unspecified amount in the context of an undefined transaction

structure.  Musk also knew that there were many uncertainties beyond just a shareholder vote that would have had to be resolved before any going-private transaction could have been possible.  As a result, Musk knew or was reckless in not knowing that his August 7 statements were false and misleading.

**Musk Omitted Material Facts**

72.    Musk's statements on August 7 also omitted material information.  Musk had a duty to disclose material facts necessary to make his statements not misleading.

73.    Despite receiving numerous inquiries from journalists, research analysts, and current Tesla investors indicating that they were confused by Musk's tweets and that the August 7 blog post had not remedied that confusion, Musk did not attempt to clarify the August 7 statements until the blog post, "Update on Taking Tesla Private," was issued on August 13.

74.    Moreover, the August 13 blog post still did not disclose that Musk had not secured an agreement from any potential source of funding to fund a going-private transaction at a price of $420 per share or that it was uncertain that a going-private transaction could be accomplished in a manner that allowed existing Tesla shareholders to remain invested.

**Musk's Tweets Caused Market Chaos and Harmed Tesla Investors**

75.    Immediately prior to Musk's August 7 statements via Twitter, Tesla's stock was trading at $356.67.  Musk's first tweet about taking Tesla private set off a trading frenzy, and the trading volume and price of Tesla shares immediately spiked.  Nasdaq subsequently halted Tesla trading for more than 90 minutes pending an official announcement from Tesla.  At the end of August 7, after Musk's tweets and the post on Tesla's blog, the stock closed at $379.57, up 6.42% from just prior to the first tweet.

76.     By the close of market trading on August 13, after Musk and Tesla disclosed more information about the details underlying Musk's "funding secured" statement, Tesla's stock price had declined to around pre-tweet trading levels.  By the close of trading on August 27, the first trading day after Musk announced that he was abandoning his proposal to take Tesla private, Tesla's stock had dropped to $319.44.

77.     As a result of Musk's false and misleading statements and material omissions, investors who purchased Tesla stock in the period after the false and misleading statements but before accurate information was made known to the market were harmed.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

78.     Paragraphs 1 through 77 are hereby re-alleged and are incorporated herein by reference.

79.     Defendant, with scienter, in connection with the purchase or sale of securities as set forth above, directly or indirectly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading by the use of the means or instrumentalities of interstate commerce, and of the mails, and the facilities of a national securities exchange.

80.     By reason of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, [*15 U.S.C. § 78j(b)*], and Rule 10b-5 thereunder, [*17 C.F.R. § 240.10b-5*].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*];

**III.**

Ordering Defendant to disgorge, with prejudgment interest, any ill-gotten gains received as a result of the violations alleged herein;

**IV.**

Ordering Defendant to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [*15 U.S.C. § 78u(d)(3)*];

**V.**

Ordering that Defendant be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [*15 U.S.C. § 78o(d)*]; and

# VI.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated: September 27, 2018

Respectfully submitted,

*/s/ Jina L. Choi*

Jina L. Choi
Cheryl L. Crumpton*
E. Barrett Atwood*

*Application for admission *pro hac vice* forthcoming

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4459 (Crumpton)
crumptonc@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 295-2467 (Atwood)
atwoodb@sec.gov

Of counsel:

Erin E. Schneider
Steven Buccholz
Walker S. Newell
Bernard B. Smith