QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (*appearing pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

  Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
  Jeanine Zalduendo (Bar No. 243374)
  jeaninezalduendo@quinnemanuel.com
  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendants Tesla, Inc., Elon Musk,*
*Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,*
*Antonio J. Gracias, James Murdoch, Kimbal Musk,*
*And Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**DEFENDANTS' RENEWED ADMINISTRATIVE MOTION TO FILE UNDER SEAL DOCUMENTS IN SUPPORT OF THE PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT PAPERS** |

## I.     INTRODUCTION

Pursuant to Northern District of California Civil Local Rules 7-11 and 79-5, and as directed by the Court's order denying Defendants' Motions to Seal without prejudice (Dkt. No. 387), Defendants Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice (together, "Defendants") hereby bring a renewed Administrative Motion to File Under Seal ("Motion to Seal") various confidential excerpts, exhibits, and transcripts contained in the Parties' filings related to Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 352).  Pursuant to Civil Local Rule 79-5, this Motion to Seal is accompanied by a Proposed Order and Declaration of Nathaniel Smith.

## II.     BACKGROUND

Plaintiff moved for Partial Summary Judgment on January 11, 2022 (Dkt.     No. 352), Defendants opposed the Motion for Partial Summary Judgment on February 1, 2022 (Dkt. No. 365), and Plaintiff filed a reply in support of his Motion for Partial Summary Judgment on February 15, 2022.  (Dkt. No. 370).  In conjunction with the summary judgment briefing, the Parties and third parties moved the Court to seal confidential materials and information referenced therein, including:

- Docket No. 351 (related to the opening brief and supporting exhibits);
- Docket No. 364 (related to the opposition brief and supporting exhibits);
- Docket No. 367 (related to the opposition brief and supporting exhibits); and
- Docket No. 369 (related to the reply brief and supporting exhibits).

Declarations supporting the filings under seal have been submitted by Tesla, Silver Lake, and Goldman Sachs. *See* Dkt. No. 361 (Tesla); Dkt. No. 362 (Mr. Durban/Silver Lake); Dkt. No. 364-1 (Tesla); Dkt. No. 367-1 (Tesla); Dkt. No. 368 (Mr. Durban/Silver Lake); Dkt. No. 373 (Mr. Durban/Silver Lake); Dkt. No. 374 (Tesla); Dkt. No. 375-1 (Goldman Sachs).

The Court ultimately granted the narrowly tailored requests to seal made by third parties Silver Lake and Goldman Sachs (Dkt. No. 387 at 19).  However the Court denied Defendants' requests to seal without prejudice, indicating that a narrower focus on information that would "hinder [Tesla's] ability to obtain financing, to court new investors, or to preserve its relationships with existing

1   investors," may warrant sealing.  (*Id.* ˆat 20).  The Court ordered the Parties to meet and confer to

2   determine if agreement could be reached on a more "narrowly tailored request for sealing." (*Id.*).

3          On April 15, 2022, Defendants met and conferred with Plaintiff, suggesting a narrower set of

4   confidential materials that should remain under seal.  On April 19, 2022, counsel for Plaintiff

5   indicated that they agreed to the narrowed list of materials, and provided Defendants with a draft joint

6   stipulation memorializing the agreement.  Later the same day,  Defendants provided a slightly revised

7   joint stipulation, and informed Plaintiff that counsel was in the process of obtaining final approval to

8   file the joint stipulation.  On April 20, 2022, counsel for Plaintiff suddenly (and without an

9   explanation) reversed course, informing Defendants that they no longer agreed to the majority of the

10  materials covered by the stipulation.  Defendants made an additional attempt to narrow the materials

11  for sealing, but agreement could not be reached.  Accordingly, Defendants bring this renewed and

12  narrowed Motion to Seal confidential materials covered in the Parties' summary judgment papers.

13     **III.    ARGUMENT**

14         In the Ninth Circuit, the common law right of access to judicial proceedings "is not absolute

15  and can be overridden given sufficiently compelling reasons for doing so."  *Foltz v. State Farm Mut.*

16  *Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  Under the compelling reasons standard, the

17  Court must balance the harm that would result to the party seeking to seal the information against "the

18  general history of access and the public policies favoring disclosure, such as the public interest in

19  understanding the judicial process." *Kamakana v. City & Cty. of Honolulu,* 447 F.3d 1172, 1178-79

20  (9th Cir. 2006) (internal quotations omitted).  Courts have found that compelling reasons exist to

21  protect "any . . . compilation of information which is used in one's business, and which gives him an

22  opportunity to obtain an advantage over competitors who do not know or use it." *Whitewater West*

23  *Indus., Ltd. v. Pac. Surf Designs, Inc.*, No. 3:17-cv-01118, 2018 WL 3055938, at *2 (S.D. Cal. June

24  14, 2018).  Courts further recognize that "other sources of business information that might harm a

25  litigant's competitive standing may also constitute a compelling reason to seal." *Id.* Importantly, here,

26  the Court has indicated that materials that would "hinder [Tesla's] ability to obtain financing, to court

27  new investors, or to preserve its relationships with existing investors," may warrant sealing. (Dkt. No.

28  387 at 20).

In light of the Court's directive, Defendants have prepared a list of excerpts, exhibits and transcripts that pertain specifically to third party investor or shareholder participation in and private, non-public reaction to Elon Musk's 2018 bid to take Tesla private (the "Take Private Bid"), as well as personal cell phone records unrelated to this litigation, as detailed in the Declaration of Nathaniel Smith, filed concurrently herewith. Courts routinely find that the sensitivity of such information justifies keeping such information sealed. *See, e.g., Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17CV205-MMA (MDD), 2020 WL 1911502, at *3 (S.D. Cal. Apr. 20, 2020) (finding compelling reasons to seal "non-public, confidential information" concerning "commercial relationships," "agreements," and "business dealings" between the parties); *Network Appliance, Inc. v. Sun Microsystems Inc.*, No. C-07-06053 EDL, 2010 WL 841274, at *4 (N.D. Cal. Mar. 10, 2010) (sealing portions of deposition regarding "future business plans"); *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2012 WL 5476846 at *4 (W.D. Wash. Nov. 12, 2012) (sealing content related to company's "future business plans" and "strategic planning information"); *In re Qualcomm Litig.*, No. 3:17-CV-0108-GPC-MDD, 2018 WL 6252523, at *2 (S.D. Cal. May 9, 2018) (sealing information subject to confidentiality agreement because disclosure could harm the party "in future negotiations with existing customers, third-parties, and other entities with whom they do business"); *see also Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA, 2013 WL 2627487, at *3 (N.D. Cal. June 11, 2013) (sealing information that explained relationships with nonparties); and *Snapkeys, Ltd. v. Google LLC*, 2021 WL 1951250, at *3 (N.D. Cal. May 14, 2021) (compelling reasons exist to seal personally identifiable information);

Accordingly, Defendants request that the Court seal select materials from the Parties' summary judgment filings, as identified in the table below, because they contain protectable, non-public, confidential business information related to third party shareholders and investors in Tesla, who had an expectation of the private nature of the communications reflected therein. Defendants have narrowly tailored their request to include only information meriting sealing, using a line-by-line

approach, where applicable.[1]

| Document | Dkt. No. | Portion | Reason for Sealing |
|---|---|---|---|
| Plaintiff's Partial Motion for Summary Judgment | 352 | Updated redactions[2] | Confidential feedback from third party investors and shareholders related to Take Private Bid. |
| Defendants' Opposition to Partial Motion for Summary Judgment | 365 | Updated redactions | Confidential terms of potential third party investment in Take Private Bid. |
| Reply in Support of Partial Motion for Summary Judgment | 370 | Updated redactions | Internal third party shareholder reaction to Take Private Bid. |
| Exhibit 41 | 369-2; 371-10 | Updated redactions | Internal third party shareholder reaction to Take Private Bid. |
| Exhibit 44 | 351-4; 352-25 | Sealed in full | Internal third party shareholder reaction to Take Private Bid. |
| Exhibit 45 | 351-5; 352-26 | Sealed in full | Internal third party shareholder reaction to Take Private Bid. |
| Exhibit 46 | 351-6; 352-27 | Sealed in full | Internal third party shareholder reaction to Take Private Bid. |
| Exhibit 47 | 351-7; 352-28 | Sealed in full | Internal third party shareholder reaction to Take Private Bid. |
| Exhibit 58 | 351-8; 352-29 | Updated redactions | Confidential feedback from third party shareholder related to Take Private Bid. |
| Exhibit 79 | 351-9; 352-30 | Updated redactions | Private contact information |
| Exhibit 90 | 351-13; 352-35 | Sealed in full | Confidential feedback from third party shareholder related to Take Private Bid. |
| Exhibit 91 | 351-14; 352-36 | Updated redactions | Internal Tesla discussion of third party shareholder ownership percentages |
| Exhibit 121 | 351-24; 352-46 | Updated redactions | Private contact information |
| Exhibit 147 | 351-26; 352-48 | Sealed in full | Confidential feedback from third party shareholder related to Take Private Bid. |
| Exhibit 155 | 351-29; 352-51 | Sealed in full | Internal Tesla discussion of confidential third party |

[1] This list does not include materials of third parties Silver Lake and Goldman Sachs, which the Court has already ordered sealed. (Dkt. 387 at 19-20).

[2] Materials with new or revised redactions not previously presented to the Court are attached hereto. Materials fully under seal can be found at the docket numbers provided.

| | | | feedback on Take Private Bid. |
|---|---|---|---|
| Exhibit 157 | 351-30; 352-52 | Updated redactions | Internal Tesla discussion of confidential third party feedback on Take Private Bid. |
| Exhibit 158 | 351-31; 352-53 | Updated redactions | Confidential feedback from third party shareholder related to Take Private Bid. |
| Exhibit 165 | 351-32; 352-54 | Updated redactions | Private contact information |
| Excerpts from the Deposition of Joseph Fath | 352-6 | Updated redactions | Confidential feedback from third party shareholder related to Take Private Bid. |
| Excerpts from the Deposition of Nii Owuraka Koney | 351-45; 352-8 | Sealed in full | Confidential feedback from third party shareholder related to Take Private Bid. |
| Excerpts from the Deposition of Martin Viecha | 351-47; 352-11 | Updated redactions | Internal Tesla discussion of confidential third party feedback on Take Private Bid. |
| Excerpts from the Deposition of Elon Musk | 365-1 (Ex. B) | Updated redactions | Confidential terms, and other issues affecting potential third party investment in Take Private Bid. |
| Excerpts from the Deposition of Deepak Ahuja | 365-1 (Ex. E) | Updated redactions | Internal Tesla discussion of confidential third party feedback on Take Private Bid. |
| Excerpts from the Deposition of Joseph Fath | 371-4 | Updated redactions | Confidential feedback from third party shareholder related to Take Private Bid. |

Public disclosure of these confidential, non-public documents will reveal private communications related to Tesla investors' and shareholders' investment decisions, strategies, and feedback, all of which were expressed with the expectation of privacy. The release of such information publicly could chill future investors' willingness to speak freely and candidly with Defendants for fear of their communications being released publicly in the future, harming Tesla's "ability to obtain financing, to court new investors, or to preserve its relationships with existing investors." (Dtk. No. 387 at 20).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this renewed Administrative Motion to Seal.

1    DATED:  April 22, 2022        Respectfully submitted,

2

3                              QUINN EMANUEL URQUHART & SULLIVAN, LLP

                             By: */s/ Alex Spiro*

4                                  Alex Spiro *(appearing pro hac vice)*

5                                  *Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,*
                                 *Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,*

6                                  *James Murdoch, Kimbal Musk, And Linda Johnson Rice*

7                                      \*\*\*\*

8        I, Kyle K. Batter, am the ECF user whose ID and password are being used to file the above

9 motion.  In compliance with Local Rule 5-1(h)(3), I hereby attest that Alex Spiro has concurred in

10 the filing of the above motion.

11    DATED:  April 22, 2022            QUINN EMANUEL URQUHART &

12                                  SULLIVAN, LLP

13

14                            By   */S/ Kyle Batter*

15                                Kyle Batter

16

17

18

19

20

21

22

23

24

25

26

27

28

# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – REDACTED

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
          amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> **ORAL ARGUMENT REQUESTED** <br><br> Date: March 10, 2022 <br> Time: 1:30 p.m. <br> Location: Courtroom 5, 17th Floor <br> Judge: Hon. Edward Chen |

***FILED UNDER SEAL***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ................ 1

ISSUES TO BE DECIDED ................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 2

INTRODUCTION ............................................................................................................... 2

STATEMENT OF UNDISPUTED FACTS ....................................................................... 6

    A.    Tesla Background. ................................................................................... 6

    B.    July 31, 2018 Meeting with the Saudi Arabia Public Investment Fund. ............... 6

    C.    "Offer to Take Tesla Private at $420." ................................................. 7

    D.    August 7, 2018 Statements. .................................................................. 10

    E.    The Public's Response to Musk's Tweets. .......................................... 12

    F.    Musk's Attempts to Secure Funding and Confirm Investor Support. ................. 13

    G.    Musk Announces the Withdrawal of the Going-Private Transaction. ................. 15

LEGAL STANDARD ....................................................................................................... 16

ARGUMENT .................................................................................................................... 17

    A.    Plaintiff Is Entitled to Summary Judgment as to the Elements of Falsity and Scienter. ............................................................................................... 17

        1.    "Am considering taking Tesla private at $420. Funding secured." ............... 17

        2.    "Investor support is confirmed." ................................................. 21

        3.    "Only reason why this is not certain is that it's contingent on a shareholder vote." ........................................................................................ 22

        4.    "I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements." ............................................................................ 23

    B.    Plaintiff Is Entitled to Summary Judgment as to the Element of Reliance. ........ 24

CONCLUSION ................................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

**Cases**

*In re Apple Sec. Litig.*,
  No. 19-cv-02033-YGR, 2020 U.S. Dist. LEXIS 206298 (N.D. Cal. Nov. 4, 2020) ............... 22

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ............................................................................................................. 23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................................. 16

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ............................................................................................... 17

*In re Celestica Inc. Sec. Litig.*,
  No. 07 Civ. 0312 (GBD), 2014 U.S. Dist. LEXIS 116562 (S.D.N.Y. Aug. 20, 2014) .......... 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................................................. 23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................................. 23

*In re Infineon Techs. AG Sec. Litig.*,
  266 F.R.D. 386 (N.D. Cal. 2009) ......................................................................................... 24

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) ............................................................................................... 23

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ............................................................................................... 17

*McCrary v. Elations Co. LLC*,
  No. EDCV 13-0242 JGB (SPx), 2014 U.S. Dist. LEXIS 190468 (C.D. Cal. Dec. 8, 2014) ... 24

*S.E.C. v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ...................................................................................... passim

*S.E.C. v. Sourlis*,
  851 F.3d 139 (2d Cir. 2016) ................................................................................................ 20

*In re Tesla, Inc. Securities Litig.*,
  477 F. Supp. 3d 903 (N.D. Cal. 2020) ............................................................................ 2, 17

**Rules**

FED. R. CIV. P. 56 ..................................................................................................... 16, 25

**Regulations**

17 C.F.R §240.10b-5 ............................................................................................................. 22

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on March 10, 2022 at 1:30 p.m., or as soon thereafter as this matter may be heard, in Courtroom 5 – 17th Floor of the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Plaintiff Glen Littleton, by his counsel, will move, and hereby does move, to enter partial summary judgment in favor of Plaintiff and against Defendants Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice ("Defendants") pursuant to Federal Rule of Civil Procedure 56.

PLEASE TAKE FURTHER NOTICE that Plaintiff seeks partial summary judgment against Defendants on the following elements of his alleged violations of Securities Exchange Act §10(b), 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5: (1) material misrepresentations or omissions; (2) scienter; and (3) reliance upon the misrepresentations or omissions.

PLEASE TAKE FURTHER NOTICE that this motion is based on the Memorandum of Points and Authorities below, the Declaration of Adam M. Apton and the exhibits attached thereto, the arguments of counsel, and any other matters properly before this Court. Pursuant to Paragraph 11 of the Court's Civil Standing Order – General, Plaintiff also submits herewith a proposed order.

## ISSUES TO BE DECIDED

1.     Should the Court grant partial summary judgment in Plaintiff's favor against Defendants where the record indisputably shows that Elon Musk falsely represented with scienter "Funding secured," "Investor support is confirmed," and "Only reason why this is not certain is that it's contingent on a shareholder vote" on August 7, 2018 and made materially misleading statements with scienter in his blog post on August 13, 2018?

2.     Should the Court grant partial summary judgment in Plaintiff's favor against Defendants on the element of "reliance" where the record indisputably shows that Plaintiff has established the presumption of reliance set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

1  and this presumption has not, and cannot, be rebutted?

2  **MEMORANDUM OF POINTS AND AUTHORITIES**

3  **INTRODUCTION**

4  On August 7, 2018, at 9:48 a.m. PDT, Elon Musk ("Musk"), Chairman and Chief

5  Executive Officer of Tesla, Inc., shocked its investors and the public by announcing through his

6  Twitter account: "Am considering taking Tesla private at $420. Funding secured." No one

7  expected this announcement, including Tesla's Board of Directors and its management who

8  instantly scrambled to respond to media and investor inquiries. Tesla's stock price immediately

9  rocketed upwards leading to a temporary suspension of its trading by NASDAQ. Musk followed

10 up his earlier tweet by tweeting at 12:36 p.m. PDT: "Investor support is confirmed. Only reason

11 why this is not certain is that its contingent on a shareholder vote." Tesla's stock continued its

12 rise, closing on August 7, 2018 at $379.57 per share, 6.36% higher than its price at 9:47 a.m. PDT

13 immediately before Musk's tweets. As this Court noted in its opinion denying Defendants' motion

14 to dismiss the complaint: "The statement could be read by a reasonable investor to mean complete

15 funding for the transaction was unconditionally secured" and "as something more than a

16 speculative amorphous opinion about future possibilities" but instead "implying a more concrete

17 state of affair." *In re Tesla, Inc. Securities Litig*., 477 F. Supp. 3d 903, 922-25 (N.D. Cal. 2020).

18 Musk's tweets created a frenzy of media and investor attention on Tesla and his proposal.

19 In the following ten days, over 2400 articles were published concerning it. After providing a

20 further "update" on August 13, 2018 that continued to omit key information regarding the

21 proposed transaction's structure, funding, and level of investor support, Musk sat for an interview

22 with the *New York Times*, published on August 16, 2018, which revealed that funding was not

23 secured, investor support was far from confirmed, and the basic feasibility of the transaction was

24 still uncertain. Tesla's stock price plummeted and analysts quickly discounted completely the

25 likelihood of any going private transaction. On August 23, 2018, Musk informed Tesla's Board

26 that he was no longer pursuing the transaction, just 16 days after his tweet that the only remaining

27 step to finalizing the transaction was a shareholder vote.

28

1    The evidence shows that Musk's August 7, 2018 tweets were false at the time they were

2    made. Specifically, the undisputed facts, based almost exclusively on testimony and documents

3    from Musk and other members of Tesla management are:

4    **1. Funding was not secured on August 7, 2018.** Musk had one 30-minute conversation

5    about potentially taking Tesla private with the Saudi Arabia Public Investment Fund ("Saudi

6    PIF") on July 31, 2018. No price was discussed, no structure for the transaction was proposed, no

7    amount of funding was agreed. There was no legally binding agreement and no recourse to Musk

8    or Tesla if the Saudi PIF backed out. The Saudi PIF representatives left the meeting expecting

9    further information about a potential transaction. Musk and Tesla never provided this additional

10   information and never intended to use the Saudi PIF to fund more than 25% of any going private

11   transaction. Following the tweet, Musk and his financial advisors spent two weeks developing a

12   plan to obtain funding from numerous sources. This plan would have been completely

13   unnecessary if funding was "secured" on August 7, 2018.

14   **2. Investor support was not confirmed by August 7, 2018.** Musk had not discussed

15   taking Tesla private at $420 per share with any outside Tesla investor prior to his tweets on August

16   7, 2018.  Under no circumstance could investor support have been confirmed when Musk had not

17   communicated even the potential of a going private transaction to outside investors, aside from

18   the Saudi PIF. Only after his tweet did Musk begin discussing the going private transaction with

19   investors and he discovered that most opposed rather than supported it.

20   **3. A shareholder vote was not the only contingency for the proposed transaction.**

21   Tesla going private would be one of the largest corporate transactions in American history. In

22   addition to a shareholder vote, it would require extensive deliberation by Tesla's Board,

23   independent legal and financial advice, negotiation of comprehensive legal documentation, and

24   extensive regulatory approval. By August 7, 2018, none of this had happened. Musk had merely

25   started discussions with Tesla's Board by email on August 2, 2018 and at a meeting held on

26   August 3, 2018 but the Board did not have a formal proposal to evaluate, let alone something that

27   could be presented for a shareholder vote. Neither Musk nor the Board had retained legal or

28

1   financial advisors and the proposed structure of any going private transaction was still

2   undetermined.

3       These undisputed facts show that the statements made by Musk in his August 7, 2018

4   tweets were false when made. The immediate market reaction as well as the intense media and

5   investor scrutiny over the ensuing ten days, allows no dispute over their materiality. Finally, there

6   is no dispute that Musk knew every fact that rendered his statements untrue: he was present at the

7   July 31, 2018 conversation with the Saudi PIF and knew there was no funding secured; he knew

8   he had not discussed taking Tesla private at $420 per share with any outside Tesla investor and,

9   accordingly, investor support could not possibly be confirmed; and he knew that Tesla going

10  private was contingent on much more than a shareholder vote. Yet on August 7, 2018, he

11  nevertheless made these tweets to his then over 22 million followers.

12      Musk has stated that the August 7, 2018 tweets were not misleading or fraudulent because

13  he subjectively believed they accurately represented his thinking at the time they were made. But

14  this subjective belief is legally insufficient to avoid liability under Rule 10b-5.  If Musk's

15  subjective belief were sufficient, there could be never be liability for making a false statement

16  absent a complete confession of guilt. The law imposes an objective standard for assessing falsity

17  and holds defendants liable when they know the facts that render their statements objectively

18  false. Objectively, Musk knew his statements here were false.

19      Similarly, the August 13, 2018 blog post authorized by Musk and published by Tesla

20  purportedly giving an update on the proposed going private transaction omitted material

21  information about it. It represented that discussions with the Saudi PIF were continuing and

22  consensual whereas Musk had numerous arguments with its principal and just the day before had

23  sought to cut them out from the deal entirely. Further, at the time of the blog post, the structure

24  of the proposed transaction was still uncertain, the amount of funding needed was still unknown,

25  and Musk was still assembling his team of legal and financial advisors. Discussions with investors

26  had commenced, but support was lukewarm and still far from confirmed. These critical facts were

27  omitted from the blog post which continued to present certainty that the transaction would

28

proceed. Once again, Musk was in full possession of the contradictory and omitted facts but chose not to disclose them.

Finally, Plaintiff is entitled to summary judgment on the element of reliance. Plaintiff invokes the fraud-on-the-market doctrine to create a presumption of reliance by every class member on the public statements alleged to be misleading in this case. Under binding Supreme Court precedent, reliance is presumed on material public statements made regarding a security that trades in an efficient market. Tesla's securities are some of the most highly traded on the NASDAQ and Tesla is one of the most closely followed companies in the world. If there were any doubt regarding the efficiency of the market for its securities, Plaintiff's expert, Dr. Michael Hartzmark, conducted a detailed analysis of the trading in Tesla securities during the class period and concluded they traded in an efficient market. Defendants have offered no testimony or evidence, expert or otherwise, to the contrary. Accordingly, Plaintiff is entitled to summary judgment on this element of his claim.

From August 7, 2018 to August 17, 2018, Musk's tweets that he had a fully funded proposal to take Tesla private at $420 per share with confirmed investor support roiled the market for Tesla stock and other securities. No part of this unconventional announcement was true: Musk had not secured funding to take Tesla private at $420 per share nor confirmed investor support. Furthermore, Musk knew that, as of August 7, 2018 when he impulsively tweeted to over 22 million followers, his going private proposal was little more than a preliminary, half-baked concept. When the truth about the haphazard and misleading nature of the statements was revealed, Tesla's investors lost billions of dollars. Based on the evidentiary record in this case, no reasonable juror could conclude that the August 7 and August 13, 2018 statements were *not* materially false and misleading, that Musk did *not* make those statements with scienter, and that class members did *not* rely on those statements. Partial summary judgment should be entered in Plaintiff's favor.

## STATEMENT OF UNDISPUTED FACTS

**A.      Tesla Background.**

In July 2018, Tesla was a NASDAQ-listed company with approximately $50 billion in market capitalization.[1] Musk served as its Chairman and Chief Executive Officer.[2] Its Board of Directors consisted of Defendants Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice.[3] On July 31, 2018, Tesla's stock price closed at $298.14.[4]

**B.      July 31, 2018 Meeting with the Saudi Arabia Public Investment Fund.**

On July 31, 2018, Musk met with the Saudi PIF at the Tesla Fremont Factory.[5] Musk's Executive Assistant, Sam Teller, also attended the meeting and Tesla's Chief Financial Officer, Deepak Ahuja, attended for the last ten minutes; no one else from or on behalf of Tesla was present.[6] On behalf of the Saudi PIF, Yasir Al-Rumayyan, Saad Al Jarboa, and Naif Al-Mogren attended.[7] Al-Mogren took contemporaneous notes of the meeting.[8] The meeting lasted approximately 30 minutes. During the meeting, Al-Rumayyan expressed support for Tesla and said he "would like to listen more about [Musk's] plan to take it private."[9] As Al-Rumayyan described the meeting in subsequent texts sent to Musk on August 11 and 12: "We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia . . . . Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction" and "the agreement as was minuted by my people is to wait for the information to be sent be [sic] you within a week, on how we will

---

[1] M. Hartzmark Dep. at 34:8-36:15; *see also* Hartzmark Report (ECF No. 291-1) at ¶51 & Appendix C; Defendants' Answer to Consolidated Complaint for Securities Fraud ("Answer") (ECF No. 264) at ¶16.
[2] Answer at ¶17.
[3] *Id*. at ¶¶ 20-26.
[4] Hartzmark Report (ECF No. 291-1) at Appendix C.
[5] E. Musk Dep. at 89:19-24, 99:7-14; E. Musk SEC Tr. at 143:10-13.
[6] E. Musk Dep. at 99:4-6; Teller Dep. at 131:3-9, 163:13-17; Ahuja Dep. at 82:6-11.
[7] Teller Dep. at 132:2-17; E. Musk SEC Tr. at 110:8-10; Exhibit 80.
[8] Teller Dep. at 143:24-144:3, 148:21-24; Ahuja Dep. at 278:14-20.
[9] Teller Dep. at 134:18-23, 156:16-157:16; Exhibit 80.

1   move forward together." [10] At the close of the meeting, Al-Rumayyan asked Musk to share his

2   thoughts on the structure for the transaction, the percentage of ownership that would be needed

3   to complete the deal, and his "financial calculations to take it private."[11] Although Musk did not

4   communicate it to the Saudi PIF, he had no intention of letting the Saudi PIF obtain majority

5   control of Tesla and wanted to limit its investment stake to 20 to 30 percent.[12]

6          Importantly, critical terms were not discussed with the Saudi PIF on July 31, 2018. The

7   price to be paid for Tesla stock in a going private transaction, later proposed by Musk as $420 per

8   share, $120 or 40% higher than its closing price on July 31, 2018, was never discussed.[13] The

9   percentage of any private Tesla that the Saudi PIF might own was not discussed, nor was the

10  overall structure of the transaction.[14] The total amount of funding, or even a range, was also not

11  discussed.[15] Indeed, as Ahuja testified, this could not be discussed until the structure of the

12  transaction was "refined further by Elon and his team."[16] No legally binding document was

13  created as a result of the July 31, 2018 meeting with the Saudi PIF; Musk conceded he had no

14  legal recourse against the Saudi PIF if they refused to provide funding and that funding might not

15  be available at certain price levels.[17]

16  **C.      "Offer to Take Tesla Private at $420."**

17         Musk never provided any further information to the Saudi PIF. On August 2, 2018,

18  however, Musk sent an email to Tesla's Board with the subject line reading: "Offer to Take Tesla

19  Private at $420."[18] Musk did not provide any additional information or terms for the transaction,

20

21  [10] Exhibit 121; Teller Dep. at 145:7-21; Ahuja Dep. at 97:7-98:1; E. Musk Dep. 225:11-230:23,
    249:12-250:7; *see also* Exhibit 80 (notes indicating that Al-Rumayyan concluded the meeting by
22  saying, "I would like to listen to your plan Elon and what are the financial calculations to take it
    private in the next week and if I did not receive anything, I will call you.").
23  [11] Ahuja Dep. at 97:18-98:1; Teller Dep. at 145:7-21.
    [12] E. Musk Dep. at 125:9-25.
24  [13] E. Musk Dep. at 109:23-110:1; E. Musk SEC Tr. at 231:22-232:10; Ahuja Dep. at 100:22-
    101:14; Ahuja SEC Tr. at 93:20-24.
25  [14] E. Musk Dep. at 112:3-16; Ahuja SEC Tr. at 104:20-25.
    [15] E. Musk Dep. at 110:22-24; E. Musk SEC Tr. at 136:9-13; Ahuja Dep. at 84:2-6; 102:14-16;
26  Ahuja SEC Tr. at 93:3-5; Teller Dep. at 164:20-24.
    [16] Ahuja Dep. at 104:21-105:5.
27  [17] E. Musk Dep. at 132:24-133:13; 220:7-11; Ahuja Dep. at 108:22-110:8.
28  [18] E. Musk Dep. at 129:14-131:1; Exhibit 81.

such as the structure or source of funding.[19] There is no discussion of the price or how it was determined in the body of the email; it is solely referred to in the subject line.[20] Musk also wrote that the "offer expires in 30 days."[21] Musk drafted this email by himself without any help, review, or advice from counsel.[22] The "offer" price referenced in the subject line represented a 20% premium to the then-market price, rounded up to $420 "for karma."[23] The premium was calculated based on the market price for Tesla stock on August 2, 2018 which had risen substantially following Tesla's second quarter earnings call held on August 1, 2018.[24]

On August 2, 2018, after receiving Musk's email, the Board convened a special telephonic meeting (excluding Musk and his brother, Kimbal Musk).[25] During the meeting, Tesla's General Counsel, Todd Maron, told the Board that Musk did not intend to buy out all of Tesla's shareholders, "but instead to have a private structure with as many existing Tesla shareholders remaining shareholders as possible, and with any shareholders who did not want to be part of a private company being bought out."[26] The Board asked Maron to schedule a further meeting at which time Musk would "provide additional details regarding his proposal and explain to the Board his thinking."[27] Ahuja also provided some context for the proposal contained in Musk's email but testified that the transaction "was in the very, very early days."[28] Given the absence of material terms from Musk's email, this was not a formal proposal for the Board to evaluate and analyze.[29]

On August 3, 2018, Tesla's Board convened a meeting with Musk to discuss his email.[30] Musk did not provide any further details in terms of the funding or structure for the transaction,

---

[19] Exhibit 81.
[20] *Id.*
[21] *Id.*
[22] E. Musk Dep. at 129:20-130:9.
[23] *Id*. at 131:25-132:5.
[24] *Id*. at 137:24-138:2; E. Musk SEC Tr. at 178:16-179:25.
[25] Exhibit 82.
[26] *Id.*
[27] *Id.*
[28] Ahuja Dep. at 131:17-132:5.
[29] E. Musk Dep. at 159:6-10, 213:8-12; *see also* Denholm Dep. at 44:25-45:16.
[30] Exhibit 83.

except that he wanted "current shareholders . . . to remain shareholders" after the transaction if they desired while those that did not could be "bought out at an appropriate premium."[31] With regard to the premium, Musk reiterated his proposed price of $420 per share which was "about a 20% premium over the current price of the stock, which had just undergone a recent run up after the [Tesla's] Q2 earnings call."[32] The Board told Musk that "a detailed proposal regarding a going private transaction had not yet been made and that one would be needed in order for the Board to properly analyze and evaluate it."[33] Finally, the Board authorized Musk "to have initial, conceptual conversations with a few of the Company's top shareholders to explore their interest and gauge their reaction to a private corporate structure."[34]

Musk did not have any communications with the Saudi PIF or any other Tesla investor immediately following the August 3, 2018 Board meeting.[35] In fact, Musk had not even received Tesla's capitalization table showing its largest institutional and retail shareholders as of August 7, 2018.[36] Nor did he formally retain any advisors to assist him with the going private transaction at any point between July 31, 2018 and August 7, 2018.[37] In fact, the only conversations he had about the transaction during this time frame were short conversations with (*i*) Michael Dell of Dell Technologies, (*ii*) Steve Rosenblum from Wachtell, Lipton, Rosen & Katz, and (*iii*) Egon Durban from Silver Lake Partners. On August 4, 2018, Musk spoke with Dell briefly about his experience on taking Dell private and obtained from Dell the names of his advisors when he took Dell Technologies private.[38] Dell told Musk that he was "glad . . . to have taken Dell Computer private" but that it was "a very difficult process" that took "something like a year" to complete.[39]

---

[31] *Id.*

[32] *Id.* at 2.

[33] *Id.* at 3.

[34] *Id.* at 3; E. Musk Dep. at 159:20-160:2.

[35] Musk's Amended and Supplemental Responses to Lead Plaintiff's First Set of Interrogatories dated September 10, 2021 ("Musk Interrogatory Responses") at 27, 28, 30, and 35; E. Musk Dep. at 165:15-17, 189:10-16; Ahuja Dep. at 172:8-173:1; Viecha Dep. at 159:6-161:17; *see also* Exhibits 121, 151, 165.

[36] Exhibit 91; Ahuja Dep. at 224:10-224:19.

[37] E. Musk SEC Tr. at 165:1-5.

[38] E. Musk Dep. at 167:7-169:10.

[39] *Id.* at 167:14-168:14; E. Musk SEC Tr. at 161:6-21.

1    Dell suggested to Musk that he speak with his counsel, Rosenblum, which Musk did shortly

2    afterwards, and Durban.[40]

3            During their conversation on August 6, 2018, Musk indicated to Durban his interest in

4    taking Tesla private at a 20% premium and allowing current investors to remain investors after

5    the transaction despite having to keep the number of shareholders below 300.[41] Musk also told

6    Durban that he preferred to have a "broader investor base" in a private Tesla and wanted to limit

7    the Saudi PIF to "something on the order of 15 percent, maybe up to 20 percent."[42] Durban

8    regarded Musk's intended structure for the transaction as "unprecedented."[43] With regard to

9    funding, Durban's notes of his conversation with Musk refer to "Saudis & UAE" but do not

10   indicate that there was any commitment from the Saudi PIF to provide funding for Tesla going

11   private.[44] Durban  understood that there was no binding legal contract for any entity to provide

12   funding to Musk to take Tesla private as of August 6, 2018, something Silver Lake requires before

13   it describes funding as "secured."[45]

14   **D.     August 7, 2018 Statements.**

15           On August 7, 2018 at 9:48 a.m. PDT, Musk tweeted "Am considering taking Tesla private

16   at $420. Funding secured."[46] Musk included the $420 per share price to "make it clear that funding

17   was secured at that level."[47] At 10:40 a.m. PDST, Musk tweeted "I don't have a controlling vote

18   now & wouldn't expect any shareholder to have one if we go private. I won't be selling in either

19   scenario."[48] At 11:00 a.m. PDT, Musk tweeted "My hope is *all* current investors remain with

20   Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla.

21   Already do this with Fidelity's SpaceX investment."[49] At 11:13 a.m. PDT, Musk tweeted

22

23   [40] E. Musk Dep. at 169:11-23; E. Musk SEC Tr. at 162:7-11, 175:22-176:6.
     [41] Durban SEC Tr. at 76:2-5, 81:15-18, 82:9-10, 86:25-88:10.

24   [42] E. Musk SEC Tr. at 170:2-11.
     [43] Durban SEC Tr. at 89:14-89:24.

25   [44] Durban Dep. at 28:8-29:10; Exhibit 175.
     [45] Durban Dep. at 43:6-11.

26   [46] Exhibit 8.
     [47] E. Musk Dep. at 133:6-9.

27   [48] Exhibit 9.
     [49] Exhibit 10.

28

1  "Shareholders could either to sell at 420 or hold shares & go private."[50]

2      Shortly after Musk's initial tweet at 9:48 a.m. PDT, Ahuja texted Musk: "Elon, am sure

3  you have thought about a broader communication on your rationale and structure to employees

4  and potential investors. Would it help if Sarah [Sarah O'Brien, head of Tesla Global

5  Communications], Todd, and I draft a blog post or employee email for you?"[51] Ahuja had been

6  surprised by Musk's initial tweet as it was generally Tesla's policy to keep significant transactions

7  extremely confidential to a small group of people until the day of the transaction.[52] Musk accepted

8  Ahuja's offer and for the next few hours Ahuja, Maron, and O'Brien worked on a draft email for

9  Musk.[53] After approving the draft, Musk sent it to Tesla's employees and posted it on Tesla's

10  website.[54] The email reiterated, "First, I would like to structure this so that all shareholders have

11  a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per

12  share, which is a 20% premium over the stock price following our Q2 earnings call (which had

13  already increased by 16%)."[55] It stated further that, "Basically, I'm trying to accomplish an

14  outcome where Tesla can operate at its best, free from as much distraction and short-term thinking

15  as possible, and where there is as little change for all of our investors, including all of our

16  employees, as possible."[56] Musk explained that he meant current shareholders when he wrote

17  "investors".[57] The email did not mention funding or the Saudi PIF.[58]

18      At 12:36 p.m. PDT, Musk tweeted a link to his email to Tesla employees adding the

19  statement: "Investor support is confirmed. Only reason why this is not certain is that it's

20  contingent on a shareholder vote."[59] Musk later testified that at the time of this last tweet, his level

21  of certainty that the transaction would be consummated was "probably roughly 50 percent."[60]

22  [50] Exhibit 11.
23  [51] Exhibit 121 at 4.
   [52] Ahuja Dep. at 58:15-59:6, 171:8-24.
24  [53] Exhibit 121 at 4; Ahuja Dep. at 182:19-185:21.
   [54] Exhibit 301; E. Musk Dep. at 196:16-197:3, 208:5-7; Exhibit 12.
25  [55] Exhibit 12.
   [56] *Id*.
26  [57] E. Musk Dep. at 210:15-25.
   [58] *Id*. at 208:18-20.
27  [59] Exhibit 13.
28  [60] E. Musk SEC Tr. at 258:1-4.

**E.     The Public's Response to Musk's Tweets.**

Analysts and investors immediately responded to Musk's tweets. For example, Itay Michaeli, an analyst at Citi Research, emailed Tesla's Director of Investor Relations, Martin Viecha, on August 7, 2018 to inquire whether there was "an actual transaction on the table (with secured financing)" or if going private was "more of a strategic announcement" to which Viecha responded that "the very first Tweet mentioned a firm offer."[61] ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ ████████████████████████████

████████████████████[63] Bradley Erickson, an analyst at KeyBanc Capital Markets, emailed Viecha on August 7, 2018 asking for him to "clarify" whether "financing is secured." Viecha responded by confirming that "the first Tweet clearly stated that 'financing is secured.' Yes, there is a firm offer."[64] And, Toni Sacconaghi, an analyst at AllianceBernstein, emailed Viecha on August 7, 2018 for "questions/clarifications on today's news and blog post." Viecha stated in response that "apart from what has been tweeted and what was written in a blog post, we can't add anything else. I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct" and that "financing is secured regardless of other assumptions."[65]

Most analysts following Tesla interpreted Musk's tweets as indicating a going private transaction was likely. JP Morgan's analyst, Ryan Brinkman, wrote on August 8, 2018:

> As surprising to us as these developments are, and as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured. Therefore, we are incorporating into our valuation the

---

[61] Exhibit 146; *see also* Viecha Dep. at 129:8-129:18.
[62] Exhibit 58; *see also* Viecha Dep. at 137:13-138:21.
[63] Koney Dep. at 116:8-116:15.
[64] Exhibit 150; *see also* Viecha Dep. at 154:13-155:11.
[65] Exhibit 151 at 1-2; *see also* Viecha Dep. at 156:21-158:15.

real possibility the equity will be taken out at $420 per share.[66]

On August 9, 2018, Teller began emailing Tesla's largest investors, including Tencent, Primecap, Jennison Associates, Capital World, Allianz, Fidelity, Baillie Gifford, and T. Rowe Price, to get their "thoughts and feedback" on the going private transaction.[67] ███████

████████████████████████████████████████████████████████████

███████████████████████████████ █ ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[71].

Ultimately, according to Musk, "roughly half of the investors were supportive of – or they – they would continue to remain investors as [sic] Tesla – with Tesla as a private company, but most preferred that we would remain public."[72]

**F.      Musk's Attempts to Secure Funding and Confirm Investor Support.**

Musk met with Durban on August 10, 2018.[73] Silver Lake Partners had created a presentation to show "the process and sort of diligence that you would need to do to raise the capital."[74] Silver Lake Partner's "Illustrative Public-to-Private Process Timeline" lists as the first item "Submit formal proposal to board following arrangement of committed financing" given that committed financing for the transaction had not yet been arranged.[75] At this time, according to

---

[66] Brinkman Dep. at 72:18-75:10; Exhibit 15.
[67] Exhibits 113-120; Exhibit 147.
[68] Viecha Dep. at 149:25-150:20.
[69] Exhibit 90.
[70] Fath Dep. at 48:13-49:7, 53:24-54:13; *see also* Exhibits 44-47.
[71] Koney Dep. at 113:13-114:5.
[72] E. Musk Dep. at 297:5-23; *see also* Viecha Dep. at 171:21-178:3, 189:19-190:22, 191:12-193:14, 194:4-201:10; Exhibits 79, 155, 157, 158 (discussing investor feedback).
[73] Durban SEC Tr. at 126:18-22.
[74] *Id*. at 127:10-17.
[75] Durban Dep. at 48:21-56:23; Exhibit 179 at 29.

Durban, the proposed Tesla going private transaction had not even reached this first stage.[76] In fact, on August 10, 2018, the same day as the Silver Lake Partners' presentation, Al-Rumayyan on behalf of the Saudi PIF sent Musk a text message stating, "We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia that serves MENA, Europe, Asia and Africa, with the right incentives on all fronts (subsidies on energy and land, tax exemptions, support in obtaining financing, etc.). Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction."[77]

On August 12, 2018, Al-Rumayyan followed up with Musk about the transaction, texting him: "Let's see the numbers and get our people to meet and discuss. We cannot approve something that we don't have sufficient information on. We've agreed that you will send the financial information and the way going forward within a week and no thing [sic] happened since."[78] Musk conceded at his deposition that he had agreed to provide this information on July 31, 2018 and the Saudi PIF needed to have this information before it could commit funding.[79] Musk never provided the Saudi PIF with the deliverables he agreed to at the end of the July 31, 2018 meeting. Instead, disappointed with the Saudi PIF's public statements regarding the transaction, Musk told Al-Rumayyan that he was no longer interested in taking Tesla private with the Saudi PIF, saying "I'm sorry, but we cannot work together," "Sorry. It's over," and "[p]lease extend an offer to the Crown Prince that I would like to apologize personally and explain why Tesla will not [sic] with PIF in this transaction."[80]

On August 13, 2018, Musk posted an "Update on Taking Tesla Private" on Tesla's website.[81] In this update, Musk stated that the Saudi PIF "has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining

---

[76] Durban Dep. at 57:10-20.
[77] E. Musk Dep. 225:11-230:23; Exhibit 121 at 8.
[78] E. Musk Dep. 244:1-248:15; Exhibit 121 at 11-2.
[79] E. Musk Dep. at 247:5-248:15.
[80] *Id*. at 244:1-245:1; Exhibit 121.
[81] Exhibit 16.

1    approvals. He has also asked for additional details on how the company would be taken private,

2    including any required percentages and any regulatory requirements."[82] Musk then stated "I

3    continue to have discussions with the Saudi fund, and I also am having discussions with a number

4    of other investors, which is something that I always planned to do since I would like for Tesla to

5    continue to have a broad investor base."[83] With respect to the next steps, Musk wrote: "If and

6    when a final proposal is presented, an appropriate evaluation process will be undertaken by a

7    special committee of Tesla's board . . . . If the board process results in an approved plan, any

8    required regulatory approvals will need to be obtained and the plan will be presented to Tesla

9    shareholders for a vote."[84] The blog post did not indicate that Musk had sought to terminate

10   discussions with the Saudi PIF just one day earlier. In fact, in response to the blog post, Al-

11   Rumayyan texted Musk: "Elon, I am personally surprised. You have signed an NDA while we

12   are waiting for you and your team to provide us with information to move forward, you post an

13   ill-advised blog with loose information."[85]

14   **G.      Musk Announces the Withdrawal of the Going-Private Transaction.**

15          As of August 16, 2018, Musk still had not secured funding or investor support for the

16   transaction. Silver Lake Partners, on Musk's behalf, was in the process of obtaining "formal

17   permission to make the following calls to respond / engage potential interested / existing

18   investors: Saudi Arabia, UAE, ten cent [sic], google, Ron Barron, Silver Lake affiliates (gic,

19   Temasek, cpp, ADIA and Kia)."[86] The email then said "No solicitation will be made other than

20   testing their interest to participate in the Tesla going private initiative led by Elon."[87]

21          On August 16, 2018, the *New York Times* published a lengthy interview with Musk.[88] The

22   article described the events of August 7, 2018, including his tweets as well as facts such as the

23   August 7, 2018 tweets were not approved in advance by Tesla's Board and that "funding, it turned

24   _____

25   [82] *Id*. at 2.
     [83] *Id*. at 2.

26   [84] *Id*. at 2.
     [85] E. Musk Dep. at 257:9-258:20; Exhibit 121 at 13.

27   [86] Durban Dep. at 134:1-135:18; Exhibit 194.
     [87] Durban Dep. at 135:20-136:3; Exhibit 194

28   [88] Exhibit 19.

1   out, [was] far from secure."[89] This article led analyst Brinkman of JP Morgan to discount entirely

2   the possibility of a going private transaction for Tesla and conclude that the August 7, 2018 tweets

3   were not true.[90]

4         On August 23, 2018, the Board held an in-person meeting.[91] Silver Lake Partners and

5   Goldman Sachs attended and discussed the availability of funding for a going private

6   transaction.[92] Their discussion materials demonstrate that neither the price per share nor the

7   amount of capital required had been determined; each was indicated by "[*]".[93] At the meeting,

8   Silver Lake Partners and Goldman Sachs outlined a process to obtain the necessary funding for

9   the going private transaction.[94] Musk also discussed with the Board "information he had learned

10   in recent weeks following his announcement, including but not limited to, the negative views of

11   many of the Company's current stockholders regarding the prospect of the Company going

12   private, the difficulties the Company's current stockholders would have in continuing to own

13   Tesla's stock if the Company went private . . . ."[95] Musk then informed the Board "that he was

14   withdrawing his offer to try and take [Tesla] private."[96]

15                         **LEGAL STANDARD**

16         Summary judgment is proper where there is "no genuine dispute as to any material fact

17   and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute

18   is material only when it "might affect the outcome of the suit under the governing law," and is

19   genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

20   party based upon it." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role

21   in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth

22   of the matter, rather "to determine whether there is a genuine issue for trial." *Id*. at 249. There is

23

---

24   [89] *Id*. at 4.

     [90] Brinkman Dep. at 100:9-106:15; Exhibit 23 at 1-2.

25   [91] Exhibit 101.

     [92] *Id*. at 2.

26   [93] Durban Dep. at 149:12-22; Exhibit 201 at 9, 58.

     [94] Exhibit 101 at 2-3.

27   [95] *Id*. at 1.

28   [96] *Id*. at 4.

1    no issue for trial unless there is sufficient evidence supporting a jury verdict for the nonmoving

2    party, meaning that the evidence must be more than merely colorable but probative and

3    persuasive. *Id*. at 249-250. A defendant cannot defeat summary judgment by "the mere denial of

4    subjective knowledge of the risk that a statement could be misleading. Summary judgment

5    requires a statement that is materially misleading such that no reasonable jury could conclude

6    otherwise." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010). "When

7    the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts

8    and plead ignorance of the risk.'" *Id*. at 1094 (internal quotations omitted).  When analyzed under

9    this rubric, the discovery record leads undeniably to one conclusion: that Musk acted with scienter

10   when making the false and materially misleading tweets on August 7, 2018 and blog post on

11   August 13, 2018.

12   **ARGUMENT**

13   **A.**      **Plaintiff Is Entitled to Summary Judgment as to the Elements of Falsity and Scienter.**

14          1.     <u>"Am considering taking Tesla private at $420. Funding secured."</u>

15        Discovery has confirmed what the Court plausibly inferred when denying Defendants'

16   motion to dismiss, *i.e.*, Musk's tweet "could be read by a reasonable investor to mean complete

17   funding for the transaction was unconditionally secured." *In re Tesla, Inc. Securities Litig.*, 477

18   F. Supp. 3d at 922. This is precisely what happened. Indeed, as Durban testified, Silver Lake

19   uses the term "secured" to reference binding legal contracts committing capital.[97] Tesla's

20   Director of Investor Relations echoed this understanding, telling analysts that "the first Tweet

21   clearly stated that 'financing is secured.' Yes, there is a firm offer"[98]; "the offer is as firm as it

22   gets"[99]; and that "financing is secured regardless of other assumptions."[100] Brinkman, JP

23   Morgan's analyst, concluded that "Either funding is secured or it is not secured, and Tesla's CEO

24   says funding is secured."[101] This was not true.

25

---

26   [97] Durban Dep. at 42:12 – 43:2.

      [98] Exhibit 150; *see also* Viecha Dep. at 154:13-155:11.

27   [99] Exhibit 58; *see also* Viecha Dep. at 137:13-138:21.

      [100] Exhibit 151 at 1-2; *see also* Viecha Dep. at 156:21-158:15.

28   [101] Exhibit 15 at 1.

No offer for funding had been discussed, extended, or accepted as of August 7, 2018, the date of the tweet, or at any point thereafter. Musk had only a preliminary conversation with the Saudi PIF on July 31, 2018. This meeting is notable for what did not occur: price was not discussed, structure was not discussed, percentage of ownership by the Saudi PIF was not discussed, and regulatory approvals were not discussed.[102] Musk did not even intend to use the Saudi PIF to fund all or even a majority of any going private transaction.[103] Yet this was the only potential source of funding that Musk had spoken to before tweeting out that funding was "secured". Musk knew this. He was present at the July 31, 2018 meeting with the Saudi PIF, knew that nothing had been agreed, knew his own intentions about limiting their involvement, and, therefore, knew that his tweet was false.

A statement is misleading if it creates an "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotations omitted). As demonstrated, Musk created the impression that funding had been "secured" to take Tesla private when, in reality, there was no agreement to fund the transaction at any price let alone $420 per share. Musk, of course, knew this when he tweeted on August 7, 2018 because he was the one conversing with the Saudi PIF on July 31, 2018. Thus, the evidentiary record indisputably establishes both falsity and scienter in favor of Plaintiff's claims against Musk. *See Platforms Wireless*, 617 F.3d at 1095 (granting summary judgment where defendants' statement left investors with the "unmistakable impression" that product "exist[ed]"); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (holding that numerous contingencies to "fund-raising effort" directly contradicted statement that $25 million offering had been "completed").

The Ninth Circuit's holding in *Platforms Wireless*, *supra*, is instructive. There, the defendants issued a press release that left investors with the impression that they had actually developed a viable ARC system, when in fact at the time, Platforms had only a design of the

---

[102] Exhibit 80; *see also* Teller Dep. at 134:19-23, 156:16-157:16; E. Musk Dep. at 109:23-110:1; Ahuja Dep. at 100:22-101:10; Ahuja SEC Tr. at 93:20-94:4; Viecha Dep. at 135:10-135:19.
[103] E. Musk Dep. at 125:9-25.

system and no operational prototype. 617 F.3d at 1094-95. In affirming the grant of summary judgment to plaintiff on the Section 10(b) and Rule 10b-5 claims based on this press release, the court held that considering the press release as a whole, the press release was "deceptive, an absolute and unequivocal falsehood" in that it left the "unmistakable impression that the ARC System exists." *Id*. at 1095. Similarly, Musk's "funding secured" tweet is an explicit and unambiguous representation that Musk had secured funding for a going-private transaction at $420 per share when, in fact, he had had only a preliminary and cursory discussion with the Saudi PIF that did not mention any purchase price let alone one at $420 per share. "Funding secured" created the unmistakable impression that funding for a going-private transaction at $420 was in place; it does not reflect Musk's mere nascent discussions of funding in an uncertain and unknowable amount for a going private transaction at some unknown price using an uncertain structure. The numerous analyst reports and inquiries in response to the tweet, *e.g.*, JP Morgan, Jennison Associates, bolster this conclusion. *See No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (relying on analyst statements when determining cause of stock price movement); *see also United States v. Ferguson*, 676 F.3d 260, 274 n.10 (2d Cir. 2011) (placing "substantial" weight on "stock analysts" when evaluating statement).

Musk has stated that his tweets were true because he was confident funding could be obtained. This is unavailing. A defendant cannot defeat a fraud claim merely by asserting that he believed the statements were true. "If such a self-serving assertion could be views as controlling, there would never be a successful prosecution or claim for fraud." *Id*. at 1095. With no price per share discussed with the Saudi PIF at the July 31, 2018 meeting and Musk's basis for selecting the $420 per-share offer not occurring until days later following Tesla's quarterly earnings report, the undisputed facts demonstrate that funding was not secured at $420 per share as he represented in his tweet. Musk's testimony clearly demonstrates that he was aware of this.[104] Accordingly, while Musk may presently claim "that the [Saudi PIF] was ready, willing, and able

---

[104] E. Musk SEC Tr. at 231:22-232:10 ("No, there was no – there was nothing with explicitly a 420 deal price document.")

1    to fund the transaction at a standard, reasonable price premium," this does not translate into

2    "Funding secured."[105] Given that Musk knew the lack of any binding commitment to provide

3    "secured funding" by the Saudi PIF for a going-private transaction at $420, there can be no

4    genuine issue of material fact that Musk acted with scienter when he tweeted that funding was

5    secured. *See id.* (finding defendant acted with scienter when he had knowledge that the statement

6    at issue was false and still authorized its release).

7            The events and conversations transpiring after the July 31, 2018 meeting with the Saudi

8    PIF underscore Plaintiff's point on this issue. On August 10, 2018, three days after the tweet,

9    Silver Lake Partners told Musk that arranging "committed financing" was the first step in the

10   going private transaction process, meaning that it had yet to be done.[106] Meanwhile, that same

11   day, Al-Rumayyan on behalf of the Saudi PIF sent Musk a text expressing interest in "explor[ing]

12   a potential transaction," demonstrating the preliminary posture of their discussions.[107] On August

13   12, 2018, two days later, Al-Rumayyan texted Musk to once again ask for his financial

14   calculations on the transaction, saying "Let's see the numbers and get our people to meet and

15   discuss. We cannot approve something that we don't have sufficient information on."[108] Nothing

16   had been approved by the Saudi PIF as of August 12, 2018 and, therefore, nothing could have

17   possibly been approved by the Saudi PIF almost a week earlier on August 7, 2018. If the Saudi

18   PIF did not have enough information on August 12 and had not approved any funding as of that

19   time, there can be no dispute that it had not agreed to provide funding on August 7.

20           Weeks later Musk and his bankers were still trying to obtain funding for the transaction.

21   On August 23, 2018, Goldman Sachs and Silver Lake Partners discussed with the Board

22   financing sources for a going private transaction "including the time and resources that process

23   would take," indicating that financing had not yet been secured and that securing it would take

24   time.[109] Additionally, the discussion materials provided by Goldman Sachs and Silver Lake

---

25   [105] Musk Interrogatory Responses at 25.
26   [106] Exhibit 179 at 29.
27   [107] Exhibit 121 at 8.
     [108] *Id.* at 11.
28   [109] Exhibit 101 at 2.

---

1   Partners indicated that the total amount of capital necessary was still to be determined.[110] If

2   funding had been secured at $420 per share, this price would have been utilized by the bankers

3   and the amount of capital committed to the going-private would have reflected that and there

4   would have been no need to launch a campaign to raise funds for a transaction.

5       2.      "Investor support is confirmed."

6       Contrary to Musk's tweet, discovery shows that "investor support" had not been

7   "confirmed." In fact, Musk had not spoken with any of Tesla's outside investors regarding a

8   potential going private transaction at $420 per share; that price had only been mentioned to

9   Tesla's Board.[111] Under no circumstances could investor support have been "confirmed" when

10  Musk had not even communicated the possibility of a going private transaction to any outside

11  investors, aside from the brief conversation with the Saudi PIF. There was a stark difference

12  between what Musk represented publicly and what actually existed at the time, thereby

13  demonstrating that the tweet was "deceptive, an absolute and unequivocal falsehood." *See*

14  *Platforms Wireless*, 617 F.3d at 1094-95; *see also S.E.C v. Sourlis*, 851 F.3d 139 (2d Cir. 2016)

15  (affirming judgment for violating Section 10(b) and Rule 10b-5 where defendant represented she

16  spoke with certain "note-holders" in connection with proposed transaction when, in fact, she

17  indisputably did not).

18      Any effort by Musk to avoid summary judgment on this issue should be rejected. Even

19  support from the Saudi PIF had not yet been confirmed. There had been no discussion at the July

20  31, 2018 meeting about price per share, structure, or percentage of ownership.[112] In light of the

21  fact that Musk did not discuss percentage of ownership at the meeting, he had no way of knowing

22  whether the Saudi PIF would even still be interested in investing in Tesla if capped at, for

23  example, 20%, as Musk intended.[113] Further, this representation of "investor support" is

24

---

25  [110] Exhibit 201 at 9.

26  [111] E. Musk Dep. at 218:19-219:2; Musk Interrogatory Responses at 25, 26, 27, 30, and 35.

26  [112] Exhibit 80; *see also* Teller Dep. at 134:19-23, 156:16-157:16; E. Musk Dep. at 109:23-110:1,

27  112:3-16; Ahuja Dep. at 100:22-101:10; Ahuja SEC Tr. at 93:20-94:04; Viecha Dep. at 135:10-135:19.

28  [113] E. Musk SEC Tr. at 116:20-22.

unsupported by (and, in fact, contrary to) what occurred in the days that followed. On August 9, 2018, two days after the tweet, Teller sent emails to Tesla's largest shareholders, including Tencent, Primecap, Jennison Associates, Capital World, Allianz, Fidelity, Baillie Gifford, and T. Rowe Price.[114] The emails stated that "Elon would like to speak with you about the Tesla go-private transaction to get your thoughts and feedback."[115] If support had been confirmed, Musk would not need "thoughts and feedback" from these investors. As Musk later discovered, these investors did *not* support the transaction.[116] Likewise, the Saudi PIF had not confirmed support for the transaction at this point, given the fact that it was only "explor[ing] a potential transaction" with Musk as of August 10, 2018 and still asking for his financial calculations in support of the transaction as of August 12, 2018; indeed, Al-Rumayyan explicitly told Musk in his text message dated August 12, 2018, that "[the Saudi PIF] cannot approve something that we don't have sufficient information on."[117]

        3.     <u>"Only reason why this is not certain is that it's contingent on a shareholder vote."</u>

Not only was investor support not confirmed, but there were also numerous contingencies to the transaction before even getting to a shareholder vote. The Board had nothing in the way of a formal offer to review at this point, making it impossible to consider or negotiate a final agreement that could be presented for a shareholder vote.[118] As of August 7, 2018 when Musk made this tweet, he had not even given Tesla's Board the formal "detailed proposal" that they needed and requested days earlier "to properly analyze and evaluate" the transaction.[119] Additionally, as Musk admitted under oath, his level of certainty that the transaction would be consummated at the point in time that he tweeted this statement was "*probably roughly 50 percent.*"[120] As discussed by Silver Lake Partners in their meeting with Musk on August 10, 2018,

---

[114] Exhibits 113-120.
[115] Exhibits 113-120.
[116] Exhibit 101 at 1; E. Musk Dep. at 292:15-293:9.
[117] Exhibit 121 at 8, 11.
[118] E. Musk Dep. at 159:6-10, 213:8-12; Ahuja Dep. at 127:17-128:13; Denholm Dep. at 44:25-45:16.
[119] Exhibit 83 at 3.
[120] E. Musk SEC Tr. at 258:1-4 (emphasis added).

1   the following steps still needed to be completed before a shareholder vote could even take place:

2   (1) submit a formal proposal to board following arrangement of committed financing; (2)

3   negotiate with independent directors; (3) sign a merger agreement and announce deal; (4) hire

4   proxy advisors and engage communications teams; (5) file regulatory and other approvals; and

5   (6) draft, file, and clear a proxy statement.[121] Musk recognized that a special committee would

6   need to be created to evaluate the transaction too.[122] He also knew that regulatory approval would

7   be required.[123] Thus, a shareholder vote was not the "only reasons why this is not certain," and

8   Musk knew that at the time of his tweet.

9           4.    <u>"I have continued to communicate with the Managing Director of the Saudi fund.</u>

10               <u>He has expressed support for proceeding subject to financial and other due</u>

11               <u>diligence and their internal review process for obtaining approvals. He has also</u>

12               <u>asked for additional details on how the company would be taken private, including</u>

13               <u>any required percentages and any regulatory requirements."</u>

14       On August 13, 2018, Musk used a blog post on Tesla's website to purportedly "answer

15   some of the questions" that had been asked in response to his tweets from the previous week.[124]

16   The blog post was titled "Update on Taking Tesla Private" and discussed *inter alia* why he wanted

17   to take Tesla private, why he said "funding secured," and what his next steps would be. In

18   pertinent part, Musk described the history of his communications with the Saudi PIF. While Musk

19   wrote about his conversations with the Saudi PIF at length, he did not disclose that over the

20   previous weekend he had sought to end all negotiations with the Saudi PIF.[125]

21       Rule 10b-5(b) prohibits the making of "any untrue statement of a material fact or to omit

22   to state a material fact necessary in order to make the statements made, in the light of the

23   circumstances under which they were made, not misleading." 17 C.F.R §240.10b-5(b). Musk was

24   under no obligation to provide the public with an update on his conversations with the Saudi PIF.

---

[121] Exhibit 179 at 29.
[122] Exhibit 16 at 2.
[123] *Id*. at 2.
[124] *See generally id*.
[125] Exhibit 121.

However, once Musk chose to do so, he was "bound to do so in a manner that wouldn't mislead investors as to what [those conversations] consisted of." *Berson*, 527 F.3d at 987. The temporal proximity between Musk's conversation with Al-Rumayyan and his blog post to investors underscores the scienter with which he acted when making this statement. *See In re Apple Sec. Litig.*, No. 19-cv-02033-YGR, 2020 U.S. Dist. LEXIS 206298, at *29 (N.D. Cal. Nov. 4, 2020) ("the law is clear that close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of scienter").

**B.      Plaintiff Is Entitled to Summary Judgment as to the Element of Reliance.**

Where, as here, Plaintiff relies on the fraud-on-the-market doctrine, reliance by every class member is presumed where: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*"). Indeed, the Supreme Court has repeatedly held that "courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) ("*Halliburton I*"); *Basic Inc. v. Levinson*, 485 U.S. 224, 249-50 (1988). The discovery record at hand shows without question that each of the above factors is met.

First, there is no dispute that Musk's false and misleading statements were publicly known as they were made on the public platform, Twitter, by Musk who had over 22 million followers at the time. Second, the statements at issue were material.[126] Tesla's stock price reaction to the tweets was instantaneous and the market quickly reacted to further developments during the class period.[127] Third, Plaintiff's expert, Dr. Michael Hartzmark, opined that the market for Tesla's securities traded in an open, developed, and efficient market during the class period.[128] This

---

[126] Hartzmark Report (ECF No. 291-1) at ¶¶71-76.
[127] *Id*. at ¶74.
[128] *Id*. at ¶¶1, 92, 155, 179.

1  opinion is supported by detailed analysis of trading in Tesla securities utilizing the factors widely

2  accepted by federal courts across the country.[129] This evidence "affords . . . [P]laintiff[] a

3  presumption of reliance," and to defeat summary judgment, Defendants have "the burden of

4  producing evidence to rebut the presumption" such that "no rational jury could find for [Plaintiff]

5  on this issue." *Kaplan v. Rose*, 49 F.3d 1363, 1376 (9th Cir. 1994), *overruled on other grounds

6  by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605

7  (9th Cir. 2017). But Defendants have made no effort to challenge the finding of market efficiency.

8  At class certification, Defendants did not contest any of Dr. Hartzmark's findings or Plaintiff's

9  contention that Tesla's securities traded in an efficient market.[130] While Defendants have

10  introduced three expert reports since then, none opines on the issue of market efficiency or the

11  applicability of the *Basic* presumption. Finally, there is no dispute that Plaintiff and the Class

12  traded Tesla securities between when the misrepresentations were made and when the truth was

13  revealed.

14  　　As Plaintiff has "put forth unrebutted evidence that [Tesla] securities traded on an efficient

15  market," summary judgment is warranted "on the issue of class-wide reliance." *In re Celestica

16  Inc. Sec. Litig.*, No. 07 Civ. 0312 (GBD), 2014 U.S. Dist. LEXIS 116562, at *39-40 n.15

17  (S.D.N.Y. Aug. 20, 2014); *see also McCrary v. Elations Co. LLC*, No. EDCV 13-0242 JGB (SPx),

18  2014 U.S. Dist. LEXIS 190468, at *10 (C.D. Cal. Dec. 8, 2014) (where "'under the governing

19  law, there can be but one reasonable conclusion as to the [issue],'" summary judgment is

20  appropriate); *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 389 (N.D. Cal. 2009) ("where

21  a rational trier of fact could not find for the nonmoving party based on the record as a whole, there

22  is no 'genuine issue for trial'").

23  ## CONCLUSION

24  　　The discovery in this case is one-sided on the issues of falsity, scienter, and reliance.

25  Defendants cannot point to anything in the record capable of creating a "genuine dispute as to any

26  material fact." FED. R. CIV. P. 56(a). Plaintiff's motion should be granted in its entirety.

27

---

[129] *Id*. at ¶¶22-92, 93-155.

28  [130] *See* Stipulation and Order for Class Certification dated November 25, 2020 (ECF No. 298).

1   Dated: January 11, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: akrot@zlk.com
(*admitted pro hac vice*)

-and-

Joseph Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Email: jlevi@zlk.com
Email: ek@zlk.com
(*admitted pro hac vice*)

*Attorneys for Plaintiff and Counsel for the Class*

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT – REDACTED

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
       Alex Spiro (*appearing pro hac vice*)
2      alexspiro@quinnemanuel.com
       Kyle Batter (Bar No. 301803)
3      kylebatter@quinnemanuel.com
4  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California 94065
5  Telephone: (650) 801-5000

6      Michael T. Lifrak (Bar No. 210846)
       michaellifrak@quinnemanuel.com
7      Jeanine Zalduendo (Bar No. 243374)
       jeaninezalduendo@quinnemanuel.com
8  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
9  Telephone: (213) 443-3000

10
   *Attorneys for Defendants Tesla, Inc., Elon Musk,*
11 *Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,*
   *Antonio J. Gracias, James Murdoch, Kimbal Musk,*
12 *And Linda Johnson Rice*

13

14                 UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16

17 IN RE TESLA, INC. SECURITIES          Case No. 3:18-cv-04865-EMC
   LITIGATION
18                                       **DEFENDANTS' OPPOSITION TO**
19                                       **PLAINTIFF'S MOTION FOR PARTIAL**
                                         **SUMMARY JUDGMENT**
20
21                                       Date: March 10, 2022
                                         Time: 1:30 p.m.
22                                       Location: Courtroom 5, 17th Floor
                                         Judge: Hon. Edward Chen
23
                                         **FILED UNDER SEAL**
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................1

ISSUES TO BE DECIDED .....................................................................................................2

STATEMENT OF MATERIAL FACTS ...................................................................................3

    A.    The Public Investment Fund Has Long Desired to Take Tesla Private. ...................3

    B.    The PIF Agreed to Fund a Transaction to Take Tesla Private. ................................5

    C.    Mr. Musk Discussed Going Private at $420 with Tesla's Board. ............................6

    D.    Mr. Musk Discussed Going Private With His Financial and Legal Advisors...........7

    E.    Mr. Musk Disclosed the Potential Go-Private Transaction Publicly on
        August 7. ................................................................................................................7

    F.    Mr. Musk Spoke with Investors and Advisors. ......................................................9

    G.    Mr. Musk Confirmed His Understanding that Funding Was Secured in
        Numerous Communications with Mr. Al-Rumayyan. .............................................11

    H.    Mr. Musk Updated Shareholders With Additional Information on August
        13. .........................................................................................................................12

    I.    Given Shareholder Feedback, Mr. Musk Decided Tesla Should Remain
        Public. ...................................................................................................................13

LEGAL STANDARD .............................................................................................................13

ARGUMENT ..........................................................................................................................14

I.      SUMMARY JUDGMENT SHOULD BE DENIED AS TO FALSITY.............................14

    A.    Plaintiff Ignores Material Facts Showing it was Reasonable for Mr. Musk to
        State "Funding [Was] Secured" and "Investor Support [Was] Confirmed." ..........14

    B.    Plaintiff Ignores Material Facts Showing That Mr. Musk's Statement
        Regarding a "Shareholder Vote" Was Not Misleading............................................17

    C.    Plaintiff's New Argument that Discussions with the PIF Had Ended as of
        August 13, 2018 is Baseless. ................................................................................18

II.     SUMMARY JUDGMENT SHOULD BE DENIED AS TO SCIENTER. .........................20

    A.    Scienter is a Question for the Jury. ......................................................................20

    B.    There Is Ample Evidence that Mr. Musk Believed His Statements Were
        True. .....................................................................................................................20

III.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO RELIANCE. .........................21

A. There is a Genuine Dispute of Fact Regarding Materiality. ....................................22

B. There is a Genuine Dispute of Fact Regarding Defendants' Ability to Rebut Any Fraud-On-The-Market Presumption.................................................................24

CONCLUSION .........................................................................................................................26

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### Cases

*In re Allied Cap. Corp. Sec. Litig.*,
2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ............................................................ 23

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ............................................................................. 24, 25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................. 13

*Antonetti v. Skolnik*,
2014 WL 1308626 (D. Nev. Mar. 31, 2014) ........................................................... 15

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ............................................................................... 20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................. 19, 24, 25

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................ 19

*Buxbaum v. Deutsche Bank AG*,
196 F. Supp. 2d 367 (S.D.N.Y. 2002) ............................................................... 16, 21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................................ 24

*Davis v. Yelp, Inc.*,
2021 WL 4923359 (N.D. Cal. Sept. 17, 2021) ........................................ 2, 18, 20, 21

*Durning v. First Bos. Corp.*,
815 F.2d 1265 (9th Cir. 1987) .......................................................................... 2, 22

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ............................................................................................. 20

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ................................................................................ 14

*U.S. v. Ferguson*,
676 F.3d 260 (2d Cir. 2011) ................................................................................. 17

*Garcia v. J2 Glob., Inc.*,
2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) ........................................................... 15

*Gebhart v. S.E.C.*,
595 F.3d 1034 (9th Cir. 2010) .............................................................................. 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................................................... 21, 22, 24

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) .......................................................................... 2, 20

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
2018 WL 4945703 (C.D. Cal. Oct. 5, 2018) ........................................................... 24

*In re Infineon Techs. AG Sec. Litig.*,
266 F.R.D. 386 (N.D. Cal. 2009) .......................................................................... 24

*Janus Cap. Grp., Inc. v. First Derivative Traders,*
  564 U.S. 135 (2011) ...................................................................................................... 25

*In re JDS Uniphase Corp. Sec. Litig.,*
  2007 WL 2429593 (N.D. Cal. Aug. 24, 2007) ............................................................... 14

*Jelinek v. Am. Nat'l Prop. & Cas. Co.,*
  747 F. App'x 513 (9th Cir. 2018)............................................................................... 2, 13

*Kaplan v. Rose,*
  49 F.3d 1363 (9th Cir. 1994) ........................................................................................ 24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
  416 F.3d 940 (9th Cir. 2005).......................................................................................... 16

*Marucci v. Overland Data, Inc.,*
  1999 WL 1027053 (S.D. Cal. Aug. 2, 1999) ................................................................. 15

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ......................................................................................................... 19

*McCrary v. Elations Co. LLC,*
  2014 WL 12561600 (C.D. Cal. Dec. 8, 2014) ......................................................... 22, 24

*McGovney v. Aerohive Networks, Inc.,*
  2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ................................................................ 21

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,*
  320 F.3d 920 (9th Cir. 2003) ................................................................................... 17, 23

*Oran v. Stafford,*
  226 F.3d 275 (3d Cir. 2000) .......................................................................................... 23

*Reese v. BP Expl. Inc.,*
  643 F.3d 681 (9th Cir. 2011) ......................................................................................... 14

*In re REMEC Inc. Sec. Litig.,*
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................................................... 16

*S.E.C. v. Bankatlantic Bancorp, Inc.,*
  661 F. App'x 629 (11th Cir. 2016)................................................................................. 15

*S.E.C. v. Jasper,*
  2009 WL 10701938 (N.D. Cal. Dec. 10, 2009) ................................................... 2, 20, 21

*S.E.C. v. Phan,*
  500 F.3d 895 (9th Cir. 2007) .............................................................................. 15, 18, 21

*S.E.C. v. Platforms Wireless Int'l Corp.,*
  617 F.3d 1072 (9th Cir. 2010) ................................................................................. 14, 16

*S.E.C. v. Sourlis,*
  851 F.3d 139 (2d Cir. 2016) .......................................................................................... 16

*S.E.C. v. Todd,*
  642 F.3d 1207 (9th Cir. 2011) ....................................................................................... 14

*In re Skechers USA, Inc. Sec. Litig.,*
  444 F. Supp. 3d 498 (S.D.N.Y. 2020) ........................................................................... 18

*In re Sun Microsystems Sec. Litigation,*
  1992 WL 226898 (N.D. Cal. July 10, 1992) .................................................................. 15

*In re Tesla, Inc. Sec. Litig.,*
  477 F. Supp. 3d 903 (N.D. Cal. 2020) ........................................................................... 17

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ............................................................................................... 18

*In re Twitter, Inc. Sec. Litig.*,
    2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ................................................. 2, 20, 21

*In re Volkswagen*,
    2017 WL 6041723 (N.D. Cal. Dec. 6, 2017) ........................................... 2, 15, 20, 21

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
    739 F.2d 1434 (9th Cir. 1984) ........................................................................ 20, 21

*Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*,
    2021 WL 5083756 (N.D. Ill. Nov. 2, 2021) ...................................................... 16, 21

## Rules and Regulations

Fed. R. Civ. P. 56(a) ............................................................................................... 13

# MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Plaintiff has litigated this case for nearly three years, taken numerous depositions, received hundreds of thousands of pages of documents, and now must contend with one basic truth: Elon Musk's August 7, 2018 tweet informing the public that he was considering taking Tesla private was entirely truthful and cannot support the claims that Plaintiff brings—much less a motion for summary judgment. Mr. Musk *was* considering taking Tesla private at $420 a share. Funding *was* secured. There *was* investor support. These conclusions are supported by extensive contemporaneous evidence, including discussions with Saudi Arabia's sovereign wealth fund (the "PIF") and Tesla's Board, as well as the undisputed fact that there *was* sufficient funding for a go-private transaction, from the PIF or otherwise. Plaintiff ignores all of this, ignores what Mr. Musk actually said (and when), ignores what Mr. Musk truly believed, and instead creates strawman arguments that overlook large swaths of evidence adduced during discovery. Far from "fraud," Mr. Musk's statements were an effort to be open about a potential go-private transaction and to provide equal information to all Tesla shareholders. Plaintiff has no valid claims, never mind ones that can be decided in his favor on summary judgment. Plaintiff's transparent attempt to avoid a trial on the merits should be rejected, and the Court should deny Plaintiff's motion in its entirety.

To obtain summary judgment, a plaintiff must show that there are *no* disputes as to *any* material facts. A plaintiff cannot cherry pick certain facts and sweep the remaining inconvenient and unhelpful facts under the rug. But that is precisely what Plaintiff does here, disregarding material facts demonstrating, among other things, that: (1) the PIF had expressed its desire to fund a Tesla go-private transaction for years; (2) the PIF acquired 5% of Tesla stock leading up to a July 2018 meeting; (3) at the meeting, the PIF's decisionmaker, Yasir Al-Rumayyan, again expressed the PIF's desire to fund a Tesla go-private transaction, including saying expressly, "I am the decision maker. So long as the Crown Prince supports me, and he does, that's it. ***It's done***."; (4) the PIF had the resources to fund a go-private transaction, with Mr. Al-Rumayyan saying "it's not a problem"; (5) Mr. Musk believed that funding was secured with the PIF, as evidenced by numerous contemporaneous non-public statements by Mr. Musk, including to Mr. Al-Rumayyan directly; and (6) Mr. Musk's advisors

1    confirmed sufficient funding would be available from sources even outside the PIF.

2           These material facts go to the key elements of Plaintiff's claims, and Plaintiff does not say a

3    word about them.  "A fact is material if it *might* affect the outcome of the case."  *Jelinek v. Am. Nat'l*

4    *Prop. & Cas. Co.*, 747 F. App'x 513, 514 (9th Cir. 2018) (emphasis added).  The material facts

5    detailed herein relate directly to the alleged falsity of Mr. Musk's statements and thus must be

6    evaluated by the jury.  Moreover, the facts demonstrate that Mr. Musk believed his statements were

7    true.  Countless courts—including this Court—have held that "[g]enerally, scienter should not be

8    resolved by summary judgment" and have denied summary judgment on that basis.  *Davis v. Yelp,*

9    *Inc.*, 2021 WL 4923359, at *13 (N.D. Cal. Sept. 17, 2021) (Chen, J.).[1]  This is because "materiality

10   and scienter are both fact-specific issues which should ordinarily be left to the trier of fact."  *Id.*

11          Plaintiff's motion on the element of reliance fares no better.  Plaintiff cannot obtain summary

12   judgment on reliance without first establishing that Mr. Musk's alleged misstatements were material.

13   But materiality is a question for the jury (*see, e.g.*, *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268

14   (9th Cir. 1987)), and it is easy to see why.  It is not enough to point out that Tesla's stock price moved

15   after Mr. Musk's statements, as Plaintiff does here.  That movement could have been caused by Mr.

16   Musk's *other* indisputably true statements (e.g., that he was considering taking Tesla private or that

17   the PIF had heavily invested in Tesla).  Indeed, when Mr. Musk disclosed further details concerning

18   the discussions about funding after his initial tweets, Tesla's stock price hardly moved, suggesting that

19   the alleged misstatements were not material.  Plaintiff has not even attempted to meet his burden on

20   this necessary element.  This too is a question for the jury, not summary adjudication.

21          Defendants respectfully request that the Court deny Plaintiff's motion in its entirety.

22                                    **ISSUES TO BE DECIDED**

23          (1)  Numerous courts, including this one, have recognized that scienter is a question for the

24   jury.  Plaintiff in this case ignores the abundance of documentary and contemporaneous evidence

25   demonstrating that Mr. Musk was considering taking Tesla private, that a premium of 20% over the

26   _____

27          [1] *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1060 (9th Cir. 2000); *In re Volkswagen*, 2017 WL 6041723, at *12 (N.D. Cal. Dec. 6, 2017); *S.E.C. v. Jasper*, 2009 WL 10701938, at *3 (N.D. Cal. Dec.

28   10, 2009); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *12 (N.D. Cal. Apr. 17, 2020).

1   share price was reasonable, that funding was secured at the time of the tweet, and that there was

2   investor support for the transaction.  Should the Court deny partial summary judgment on falsity and

3   scienter where the evidence creates numerous triable issues of fact?

4         (2)  The rebuttable fraud-on-the-market presumption requires Plaintiff to prove that the alleged

5   misrepresentations were material.  Plaintiff argues that Mr. Musk's statement "funding secured" was

6   material because Tesla's stock price changed following the statement, but ignores that Mr. Musk made

7   *other* indisputably true statements that could account for stock price changes (e.g., "am considering

8   taking Tesla private").  Days later, Mr. Musk clarified what "funding secured" meant and Tesla's

9   stock price hardly moved.  Should the Court deny partial summary judgment on the element of

10   reliance where Plaintiff has not attempted to prove the materiality of the challenged statements?

11   **STATEMENT OF MATERIAL FACTS**

12       **A.**    **The Public Investment Fund Has Long Desired to Take Tesla Private.**

13         The PIF is Saudi Arabia's sovereign wealth fund.  (Batter Decl., Ex. A.)[2]  The PIF's purpose

14   is to provide financing support for strategic projects on behalf of the Saudi government.  (*Id.*)  As of

15   August 2018, it was reported to have $225 billion in assets.  (*Id.*)  As part of the Saudi government's

16   efforts to "transform Saudi Arabia from a staid petrostate to a technology-focused economy" (*id.*), the

17   PIF has tried to convince Mr. Musk to take Tesla private for years.  (Ex. B at 277:2-20; Ex. P at 68:22-

18   70:23; Ex. Q at 30:7-31:6, 51:2-52:19, 55:4-10.)  At multiple meetings between Mr. Musk and Mr. Al-

19   Rumayyan, the PIF's Managing Director, Mr. Al-Rumayyan expressed a desire not only to invest

20   substantial sums in Tesla, but to fund a take-private transaction.  (Ex. B at 277:2-20 ("From the very

21   beginning, the very first interaction was about a take private.").)  Sam Teller, Mr. Musk's then-Chief

22   of Staff, was present at these meetings and confirmed that the purpose was to discuss taking Tesla

23   private.  (Ex. C at 74:11-15, 129:3-130:23, 133:5-8; Ex. P at 74:2-76:7, 77:8-14, 80:24-81:13, 82:9-13,

24   83:10-84:3, 88:9-18, 92:15-93:6, 94:21-95:1, 100:2-20, 107:15-109:15, 110:9-15.)[3]  Deepak Ahuja,

25   _____

26      [2]  Deposition exhibits are marked with numbers (e.g., 1-400); new exhibits in support of this opposition are marked with letters (e.g., A-Z).  All cited exhibits are to the Batter Declaration.

27      [3]  Likewise, Mr. Musk believed—and expressed publicly—that Tesla would operate more

28   efficiently as a private company, benefiting its employees and shareholders.  (Ex. D.)

1   Tesla's former Chief Financial Officer, was similarly present during a meeting where "the concepts of

2   taking Tesla private were discussed [with the PIF]."  (Ex. Q at 55:4-21.)

3        The PIF's pursuit to convince Mr. Musk to take Tesla private began in November 2016 when

4   Mr. Al-Rumayyan first sought a meeting with the Tesla chairman and CEO, but Mr. Musk was

5   unavailable.  (Ex. 105.)  The PIF reached out again in early 2017, and Mr. Al-Rumayyan met Mr.

6   Musk on January 31, 2017.  (Ex. 106; Ex. C at 129:5-16.)  The express purpose of the meeting was "to

7   discuss the possibility of them working with us to take Tesla private."  (Ex. C at 130:12-16.)  At that

8   meeting, Mr. Al-Rumayyan expressed great interest and excitement in taking Tesla private and

9   working with Mr. Musk.  (*Id.* at 134:25-135:11.)  Eager to close the deal, Mr. Al-Rumayyan directed

10  the PIF's Director of Investment to follow up with Tesla to "take the conversation forward."  (Ex. 76

11  at 5.)  Soon thereafter, on March 7, 2017, Mr. Al-Rumayyan met Mr. Musk at Tesla's factory in

12  California.  (Ex. E at 62:23-67:10; Ex. Q at 30:7-31:6.)  Masayoshi Son, the CEO of SoftBank, also

13  attended.  (*Id.*)  At the dinner meeting, the group discussed an investment that would allow Tesla to go

14  private.  (*Id.*)  They also discussed the potential capital required, estimating that $30-60 billion would

15  be needed.  (*Id.*; *see also* Ex. Q at 51:2-53:17.)  Mr. Al-Rumayyan expressed that the PIF could easily

16  provide the funding necessary.  (*Id.*)  During these discussions, Mr. Musk expressed interest in the

17  potential transaction and conveyed that going private would enable Tesla to better focus on its long-

18  term strategy.  (Ex. E. at 71:3-10.)  Mr. Al-Rumayyan and Mr. Musk met again on May 1, 2017 to

19  discuss the PIF's desire to fund a transaction to take Tesla private.  (Ex. C at 150:23-151:7, 152:10-21,

20  154:4-155:8; Exs. F, G, H.)

21       Over the next several months, Mr. Musk had further discussions with Mr. Al-Rumayyan about

22  a take-private transaction for Tesla, and Mr. Al-Rumayyan reiterated his interest in closing the deal.

23  (Ex. C at 152:15-21; Ex. B at 278:18-20 ("[R]eally in every meeting Mr. Al-Rumayyan had been, we

24  want to help you take the company private.").)  Although Mr. Musk remained interested in taking

25  Tesla private, he had grown more skeptical about the possibility of working with the PIF due to his

26  belief at the time that the PIF and SoftBank would necessarily be partners in that transaction.  (Ex. C

27  at 152:22-153:20; Ex. B at 278:20-279:1.)  Mr. Musk was hesitant to work with Masayoshi because

28  his interactions with him left Mr. Musk with the impression that Masayoshi did not understand Tesla's

1  mission.  (Ex. C at 160:20-161:9; Ex. Q at 33:14-35:8.)  Because of Mr. Musk's reluctance to include

2  Masayoshi in the negotiations, Mr. Musk pulled back from pursuing a transaction with the PIF in the

3  first half of 2018.  (*Id.*)  Nevertheless, Mr. Musk encouraged the PIF to demonstrate its commitment to

4  Tesla by purchasing Tesla stock in the open market.  (Ex. C at 169:15-19.)

5          **B.**      <u>**The PIF Agreed to Fund a Transaction to Take Tesla Private.**</u>

6        The PIF contacted Mr. Musk again in July 2018 to request another meeting.  (Ex. 109.)  On

7  July 31, Mr. Musk and Mr. Teller met with Mr. Al-Rumayyan and his colleagues at the Tesla factory.

8  (Ex. B at 108:2-21.)  Mr. Al-Rumayyan informed Mr. Musk that the PIF had already invested billions

9  of dollars in Tesla—acquiring roughly five percent of the company.  (*Id.* at 113:1-5.)  Mr. Musk,

10  surprised to learn this, told Mr. Al-Rumayyan he was under the impression that Mr. Al-Rumayyan had

11  delegated the responsibility of investing in Tesla to Masayoshi.  (*Id.* at 114:4-115:7.)  Mr. Al-

12  Rumayyan said, "definitely not" and explained that "the only thing that was limiting them at 5 percent

13  was the reporting requirement[,] [a]nd they wished to have a much larger stake and wanted to help

14  Tesla go private."  (*Id.*)  Mr. Al-Rumayyan reiterated that "he had wanted to do so from the very

15  beginning," since their first meeting in January 2017.  (*Id.*)

16        Given the import of Mr. Al-Rumayyan's proposal, Mr. Musk asked whether any other

17  decision-makers were needed to move forward with a transaction.  (*Id.* at 115:16-21.)  Mr. Al-

18  Rumayyan said, ***"No, that's the advantage of PIF.  I am the decision maker.  So long as the Crown***

19  ***Prince supports me, and he does, that's it.  It's done."***  (*Id.* (emphasis added); *see also* Ex. O at

20  89:19-22, 92:12-22, 93:11-94:9, 99:17-100:5, 100:11-101:8, 102:2-10, 102:18-20, 103:1-15, 107:22-

21  108:1, 109:17-110:7, 113:6-7, 221:2-14.)  Mr. Musk understood Mr. Al-Rumayyan to be offering to

22  purchase up to all outstanding Tesla shares other than those owned by Mr. Musk, or roughly 80

23  percent of the common stock.  (Ex. B at 120:9-20.)  But Mr. Musk did not think nearly this much

24  capital would be required, as he believed that a majority of Tesla shareholders would want to remain

25  with the private company.  (*Id.*)  Mr. Teller then met Mr. Ahuja outside the meeting room and told

26  him that the PIF expressed interest in taking Tesla private and that the conversations were getting

27  serious.  (Ex. Q at 77:3-79:9.)  When Mr. Ahuja joined the meeting, Mr. Musk similarly told him, in

28  the presence of Mr. Al-Rumayyan, that PIF was interested in taking Tesla private and had the funding

1   necessary to do so.  (*Id.* at 84:2-86:8.)

2          As the meeting wrapped up, Mr. Al-Rumayyan emphasized to Mr. Musk how serious the PIF's

3   proposal was: "[L]et us know how you want to do this. We want to do this." (Ex. B at 155:23-156:1.)

4   Mr. Al-Rumayyan was enthusiastic about the prospect of taking Tesla private and told Mr. Musk he

5   would reach out in a week if he did not hear back.  (Ex. P at 162:2-163:12.)  Based on everything Mr.

6   Musk knew at the time, including almost two years of lobbying by the Saudis, he had every reason to

7   believe they were ready, willing, and able to fund a take-private transaction:

8          [T]hey were extremely clear that they wanted to take Tesla private.  . . .  They had
           invested billions of dollars with no written agreement, no agreement of any kind, just
9          as a good faith gesture to show that they're serious.  And if I were to say what I
           wanted to do they would do it.  ***So there was no question in my mind whatsoever that***
10         ***the funding was secure for this deal***.

11  (Ex. B at 146:1-13 (emphasis added).)   Other witnesses confirmed Mr. Musk's account of the

12  discussions.  (Ex. P at 132:19-136:6, 137:2-16, 140:8-22, 141:8-143:23, 144:15-145:13.)  Mr. Teller

13  recalled that when Mr. Musk mentioned the transaction would take a lot of capital, Mr. Al-Rumayyan

14  responded, "it's not a problem." (Ex. C at 206:17-207:8.)  Mr. Teller also recalled Mr. Al-Rumayyan

15  saying that taking Tesla private was not just an investment, but a strategic priority for Saudi Arabia.

16  (*Id.* at 216:23-217:11.)  And Mr. Teller, like Mr. Musk, left the meeting with the understanding that

17  "this was a handshake agreement to have the Saudis finance a private transaction for Tesla." (Ex. P at

18  161:7-162:1.)

19         Mr. Ahuja joined the meeting after Mr. Teller summoned him.  (Ex. C at 194:21-204:7.)

20  Based on the way Mr. Musk was acting, it was clear to Mr. Ahuja that Mr. Musk felt strongly that the

21  PIF's offer was genuine.  (Ex. E at 92:7-93:14.)  Mr. Ahuja also testified that Mr. Musk often made

22  significant business transactions based on a verbal commitment and a handshake.  (*Id.* at 121:18-

23  124:13.)  Similarly, the PIF is well known for orally committing to transactions and moving quickly in

24  making large investments.  For example, the PIF orally agreed to commit $45 billion to SoftBank's

25  technology fund after a 45-minute conversation and similarly bought a $3.5 billion stake in Uber

26  within weeks of meeting its CEO.  (Ex. A at 5-6.)

27  **C.     Mr. Musk Discussed Going Private at $420 with Tesla's Board.**

28         On August 2, 2018, Mr. Musk emailed Tesla's Board after the close of trading and proposed to

take Tesla private for $420 per share.  (Ex. 81.)  He arrived at the price by adding a 20 percent premium to the stock price and rounding up from $419. (Ex. B at 192:10-14.) He expressed his "firm belief that Tesla can operate more effectively as a private company for the next several years." (Ex. 81.)  He also emphasized that he supported "any shareholders who wish to remain shareholders of Tesla as a private company retaining their shares." (*Id.*)  That evening, the Board held a meeting without Mr. Musk. (Ex. Q at 129:13-23.)  Mr. Ahuja attended and briefed the Board on Mr. Al-Rumayyan's proposal to fund a take-private transaction.  (*Id.* at 132:6-15.)

The Board held another meeting on August 3, this time including Mr. Musk.  (Ex. B at 205:11-25.)  Mr. Musk explained that the PIF was willing to fund the transaction.  (*Id.* at 206:6-23.)  Mr. Musk emphasized his desire to allow existing Tesla shareholders to remain with the company, if they wished to do so.  (*Id.* at 208:11-20.)  The Board agreed that Mr. Musk should reach out to large investors to see if they would remain in a private Tesla. (*Id.* at 212:13-23.)  Mr. Musk believed that to avoid selective disclosure there would need to be a public disclosure first.  (*Id.*)

### D.     Mr. Musk Discussed Going Private With His Financial and Legal Advisors.

On August 3, Mr. Musk contacted Michael Dell to discuss his experience in taking Dell private.  (Ex. B at 161:13-21.)  Mr. Musk also spoke to Steve Rosenblum of Wachtell, who represented Mr. Dell in that transaction.  (*Id.* at 162:7-11.)  Mr. Musk asked him to be counsel on a potential take-private transaction.  (*Id.* at 175:8-25.)  On August 6, Mr. Musk also spoke with Egon Durban of Silver Lake regarding the transaction.  (*Id.* at 167:5-12.)  Mr. Musk told Mr. Durban that the PIF wanted to take Tesla private, but he would prefer to have a broader investor base.  (*Id.* at 170:3-21.)  Mr. Durban was confident many investors would be interested in participating.  (*Id.*)  Mr. Durban told Mr. Musk that the structure Mr. Musk was envisioning would be "a lot easier than what was done with Dell," and that if many investors retained their ownership, "the actual amount of capital needed to take it private may be relatively small compared to other deals."  (*Id.* at 173:11-174:10.)

### E.     Mr. Musk Disclosed the Potential Go-Private Transaction Publicly on August 7.

Mr. Musk did not want to take Tesla private if shareholders opposed the idea.  (Ex. B at 100:13-17.)  This presented an issue for Mr. Musk.  He understood that the law limited his ability to speak with select shareholders about a potential transaction.  (*Id.* at 213:13-24.)  Mr. Musk therefore

decided that the best way to gauge investors' interest in his proposal was to make a public announcement. (*Id.*)  Mr. Musk wanted "a fair playing field," where "[p]eople can make their own assessment about whether there would be a take private at a premium or not."  (*Id.*)  Mr. Musk planned to do an after-hours disclosure on the night of August 7 or 8.  (*Id.* at 219:24-220:6.)  Mr. Musk reasoned that certain "salient points" should be included in the disclosure:

> I strongly believed [it] to be the case that funding was certain and that the reasonable price to do this at was $420. . . .  So it just seems as though there were three salient points that were necessary for all cards to be on the table. "Funding secured," the price conveyed to the board and that . . . I'm considering taking the company private.

(*Id.* at 233:22-234:8; Ex. O at 187:15-21, 195:6-25.)

On August 7 at 9:18 a.m., the *Financial Times* reported that the PIF had acquired a $2 billion stake in Tesla. (Ex. 225.)  Tesla's stock immediately began to rise sharply.  Mr. Musk was concerned about the leak. (Ex. B at 220:7-221:2.)  Given that the PIF had just told Mr. Musk they wanted to take Tesla private, he worried that whoever had leaked the investment would also leak the PIF's interest in taking Tesla private and that such a leak might include *inaccurate* information that could cause confusion in the market (e.g., if the article stated that Mr. Musk had *committed* to taking Tesla private, or if it included purported deal terms). (Ex. O at 127:6-18, 128:15-25, 174:2-11, 182:17-24, 184:8-16, 185:1-18, 202:12-203:3, 281:4-7.)  Mr. Musk felt obligated to disclose his consideration of a potential take private without delay so that all investors would receive the same information:

> In the normal course of business we would have done an after-hours disclosure of take private.  And I actually intended to do that on the Tuesday night of the tweet. . . . Then on Tuesday morning the news of the Saudi investment broke . . . , which like rang a huge alarm bell in my head.  This is like, whoa, how is this information getting out there? . . . I thought that most likely if the Saudi news investment had leaked then probably the take private news is also leaking or at least is at great risk of leaking.  And so it was like [I'm] going to make sure there's a fair playing field here. . . . [T]here's a few facts that need to be out there.  And that is that I am considering taking Tesla private.  In my view funding is secured.  And the price that I proposed to the board was $420.  These seemed like critical facts for a level playing field for investors.

(Ex. B at 219:24-221:2.)

At 9:48 a.m., 30 minutes after the *Financial Times* report, Mr. Musk tweeted: "Am considering taking Tesla private at $420. Funding secured." (Ex. 8.)  Over the next few hours, in response to questions from his Twitter followers, Mr. Musk provided additional information, including his "hope

1   [that] *all* current investors remain with Tesla even if we're private," and that the rationale for the

2   take-private transaction was that it would be "way smoother & less disruptive as a private company."

3   (Exs. 10, 11.)  Some investors interpreted "funding secured" consistently with what had occurred, as

4   "a strong verbal commitment, with funds available and parties willing to execute quickly." (Ex. 33.)

5   　　　Later that day, Mr. Musk emailed Tesla's employees, a copy of which was then posted on

6   Tesla's blog, entitled "Taking Tesla Private." (Ex. 12.) Mr. Musk reiterated, "I'm considering taking

7   Tesla private at a price of $420/share," and went on to explain his rationale.  (*Id.*)  He added that, "a

8   final decision has not yet been made," and the proposal "would ultimately be finalized through a vote

9   of our shareholders." (*Id.*)  Mr. Musk linked to this blog post on his Twitter account, including a short

10  cover note: "Investor support is confirmed. Only reason why this is not certain is that it's contingent

11  on shareholder vote." (Ex. 13.)  "Investor support is confirmed" was intended to be "synonymous

12  with 'funding secured'"; it reiterated Mr. Musk's view that there was "more than sufficient investor

13  support to take the company private."  (Ex. B at 249:21-250:3; Ex. O at 216:2-217:24.)

14  　　　On the evening of August 7, Mr. Musk relayed to Mr. Ahuja the portion of the July 31 meeting

15  that Mr. Ahuja had not attended.  (Ex. E at 248:4-249:17.)  Mr. Al-Rumayyan "very affirmatively"

16  told Mr. Musk that he was the decision maker at the PIF to invest in the take-private transaction and

17  he had the full support of the Crown Prince.  (*Id.*)  Mr. Musk told Mr. Ahuja that, based on Mr. Al-

18  Rumayyan's statements, Mr. Musk believed the PIF had made a verbal commitment, which gave Mr.

19  Musk confidence in tweeting "funding secured." (*Id.*)  The next morning, before the market opened,

20  Tesla's Board announced that Mr. Musk had opened a discussion about taking Tesla private, and that

21  the Board was "taking the appropriate next steps to evaluate this."  (Ex. 26.)

22  　　　**F.      Mr. Musk Spoke with Investors and Advisors.**

23  　　　Over the next several days, and consistent with his belief that shareholders should have a say,

24  Mr. Musk spoke with several institutional investors.  While Mr. Musk initially believed that most

25  investors would want Tesla to go private, he eventually learned that they were, on average,

26  "lukewarm" about the idea.  (Ex. B at 258:23-259:12; Ex. O at 297:7-23.)

27  　　　At the same time, Mr. Musk continued his discussions with Mr. Al-Rumayyan.  On August 10,

28  Mr. Al-Rumayyan told Mr. Musk that the transaction would have to be approved by certain

1   committees within the PIF.  (Ex. C at 296:19-297:18.)  Mr. Musk was surprised; after all, Mr. Al-

2   Rumayyan told Mr. Musk at the July 31 meeting that he was the PIF's decision-maker and had the

3   support of the Crown Prince.  (*Id.*)  Mr. Teller was equally surprised.  (*Id.* ("[I]t was the first that I had

4   heard of this and . . . as far as I understand the first that Elon had. . . .  [T]his was inconsistent with

5   what was communicated to us in the July 31st meeting.").)  Mr. Musk conveyed to Mr. Al-Rumayyan

6   that this was not what he understood from the July 31 meeting, and Mr. Al-Rumayyan apologized for

7   the misunderstanding.  (*Id.* at 298:8-299:2 ("I read it as a little bit of [Mr. Al-Rumayyan] almost

8   covering his ass a little bit . . . he kind of fronted a little too hard in the [July 31] meeting about his

9   unilateral power and . . . he was now forced to walk it back.  Because, in fact, he was not . . . a

10  unilateral decision maker.").)  Mr. Al-Rumayyan reiterated that he was "unequivocal" about his desire

11  to invest in Tesla.  (*Id.*)[4]

12        Also on August 10, Mr. Musk met with Mr. Durban to discuss the take-private transaction.

13  (Ex. 121 at 7.)  The next day, Mr. Musk told the Board that he had engaged Mr. Durban to lead the

14  deal team, had engaged Wachtell, and may also engage Munger Tolles.  (Ex. 94.)  Mr. Musk also met

15  with investment bankers from Goldman Sachs.  (Ex. 255.)  On August 12, Mr. Musk texted Todd

16  Maron, Tesla's then-General Counsel, and Mr. Durban: "Todd, I have engaged Silver Lake to lead the

17  Tesla go-private initiative." (Ex. 182 at 9.)  Two hours later, Mr. Durban confirmed to Mr. Musk that

18  he had spoken to Mr. Maron and that a special committee was being formed.  (*Id.* at 10.)  Among

19  other things, Silver Lake and Goldman Sachs confirmed that there was sufficient capital to fund a go-

20  private transaction.  (Ex. E at 240:16-243:20.)  Multiple sources were willing to invest in Tesla in a

21  take-private, including Silver Lake, the PIF, Google, and fund manager Ron Baron.  (*Id.*) ████

22  ████████████████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████  (*Id.*)

24

25

26  _____

27        [4]  As Plaintiff points out, Mr. Al-Rumayyan expressed a desire to have a Tesla production hub
    in Saudi Arabia; however, the  PIF's willingness to fund Tesla's go-private transaction was never

28  contingent on Tesla building such a factory.  (Ex. O at 123:21-124:10; Ex. P at 114:22-115:12.)

1

### G.    Mr. Musk Confirmed His Understanding that Funding Was Secured in

2

### Numerous Communications with Mr. Al-Rumayyan.

3        In the days following his tweet regarding "funding [being] secured," and after news outlets

4  began to question the PIF's level of involvement in the potential transaction, Mr. Musk communicated

5  with Mr. Al-Rumayyan to confirm that the PIF had committed to fund Tesla to go private.  Mr.

6  Musk's non-public statements to Mr. Al-Rumayyan demonstrate his belief that funding *was* secured.

7  (Ex. 121; Ex. O at 226:2-24, 234:8-21, 239:2-25, 240:15-242:22, 243:9-25, 251:15-21, 252:18-25,

8  254:4-255:4; 256:18-22, 258:8-20.)

9        Specifically, on August 10, 2018, Mr. Musk sent a text message to Mr. Al-Rumayyan

10  expressing how important it was that he confirm his statements during their July 31 meeting that the

11  PIF had committed to take Tesla private: "This is a major problem [i.e., speculation that the PIF did

12  not agree to take Tesla private].  It is extremely important that you confirm that you are in discussions

13  with me regarding the take private transaction." (Ex. 121 at 8.)[5]  Two days later, Mr. Musk texted Mr.

14  Al-Rumayyan a link to a Reuters article that speculated the PIF would not be funding Tesla's

15  transaction to go private.  (*Id.* at 10; Ex. 323.)  Mr. Musk wrote, "This is false."  "Please refute this

16  false statement that PIF has no interest in Tesla.  This is outrageous." (Ex. 121 at 10.)  Mr. Musk then

17  texted Mr. Al-Rumayyan a link to a Bloomberg article that stated that Tesla and the PIF were "in

18  talks" regarding a go-private transaction.  (*Id.*; Ex. 332.)  Mr. Musk wrote, "This is an extremely weak

19  statement ***and does not reflect the conversation we had at Tesla.  You said you were definitely***

20  ***interested in taking Tesla private and had wanted to do so since 2016.  You also made it clear that***

21  ***you were the decision-maker***, moreover backed strongly by the Crown Prince, who regards this as

22  strategically important at a national level."  (Ex. 121 at 10 (emphasis added).)

23        Later that day, Mr. Musk wrote Mr. Al-Rumayyan, "when we met at Tesla recently, you said

24  that you were the decision-maker for PIF, ***that you had wanted to do the Tesla take-private deal for***

25  ***two years, and that this was supported directly by the Crown Prince.  I checked with my team who***

26  _____

27      [5]  On a phone call that same day, Mr. Al-Rumayyan was "clear and unequivocal about his intent
with regard to doing the transaction, which was he and they remained totally excited, on board.  Their
28  intent to complete the transaction had not changed in any way."  (Ex. P. at 242:24-244:12.)

1    *were in that meeting in case I remembered something wrong and they confirmed this exactly*." (*Id.*

2    at 11 (emphasis added).)  Mr. Musk went on, "I will not work with an organization who's [sic] public

3    statement to the media do not match their private statements to me and my team." (*Id.* at 12.)  The

4    Bloomberg article "makes me sound like a liar.  It is filled with equivocation and in no way indicates

5    the strong interest you conveyed in person [i.e., that the PIF committed to fund the go-private

6    transaction]." (*Id.*)  Mr. Musk continued, "I am sorry, but there will be no further communication

7    unless you fix the public perception of wishy washy support and interest from PIF.  *That is not what*

8    *you said to me and my team privately*.  Someone is either a friend or not a friend and no friend says

9    one thing privately [i.e., that the PIF committed to fund the go-private transaction] and another thing

10   publicly. This is not right." (*Id.*)  Mr. Al-Rumayyan responded that he would "work on [a] PIF

11   statement" to fix the incorrect public perception.  (*Id.*)

12          **H.       Mr. Musk Updated Shareholders With Additional Information on August 13.**

13          Before the markets opened on August 13, Mr. Musk posted an "Update on Taking Tesla

14   Private" on Tesla's blog.  (Ex. 16.)  The post included additional details regarding, among other

15   things, Mr. Musk's funding discussions with the PIF, the potential structure of the transaction, and the

16   various actions that would need to be completed before the transaction could move forward.  (*Id.*)  Mr.

17   Musk explained why he said "funding secured" in his August 7 tweet.  (*Id.*)  Mr. Musk noted that he

18   had "engaged advisors to investigate a range of potential structures and options" to get to a "more

19   precise understanding" on how many shareholders might remain if Tesla became private.  (*Id.*)  The

20   market did not view this information as revelatory—Tesla's stock price barely moved at all, and in

21   fact *rose* slightly in response to it, increasing from $355.49 to $356.41.  (Ex. I.)

22          On August 13, Mr. Musk held a "kick-off call" with Goldman Sachs, Wachtell, and Munger

23   Tolles.  (Ex. J.)  After the call, Mr. Teller sent an email to multiple individuals from these institutions

24   as well as Mr. Durban, proposing language for Mr. Musk's tweet: "I'm excited to work with Silver

25   Lake and Goldman Sachs as financial advisors, plus Munger, Tolles & Olson and Wachtell, Lipton,

26   Rosen & Katz as legal advisors, on the proposal to take Tesla private." (*Id.*)  Later that night, after the

27   close of trading, Mr. Musk posted that statement on his Twitter account.  (Ex. K.)

28

**I.**     **Given Shareholder Feedback, Mr. Musk Decided Tesla Should Remain Public.**

After the market closed on August 16, the *New York Times* published an article based on an interview with Mr. Musk.  (Ex. 19.)  The article made a number of unfounded assertions without providing any supporting evidence, including a statement by the reporter that funding for a take-private "was far from secure."  (*Id.*)  The next day, Tesla's stock price declined 9%.  (Ex. I.).  In contrast to the *New York Times* reporter's claim, not only did Mr. Musk firmly believe funding was secured when he tweeted, in reality (per Mr. Musk's discussions with the PIF) it *was* secured.

But Mr. Musk learned through his discussions with existing investors that many wanted Tesla to remain public.  (Ex. B at 258:23-259:12.)  And for some institutional investors, it would have been much harder for them to maintain stock in a private Tesla than Mr. Musk had anticipated.  (*Id.* at 126:1-10.)  Mr. Musk also came to learn, contrary to his understanding on August 7, that he may not be able to structure the transaction in a way that allowed all existing retail shareholders to remain.  (*Id.* at 132:22-133:3.)  In light of these considerations, at the August 23 Board meeting, Mr. Musk announced that he had decided not to move forward with a take-private transaction.  (Ex. E at 242:1-10.)  Mr. Musk explained his decision to shareholders in a blog post the next day.  (Ex. 229.)

## LEGAL STANDARD

Summary judgment must be denied unless the moving party can demonstrate that (1) "there is *no* genuine dispute as to *any* material fact" and (2) "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added).  "A fact is material if it *might* affect the outcome of the case." *Jelinek*, 747 F. App'x at 514 (emphasis added).  When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgement is not appropriate where "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Courts may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Id.* at 255.  This is especially so given that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*

1

## ARGUMENT

2

## I.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO FALSITY.

3    Despite ample support in the record showing Mr. Musk's August 7 tweet being true, Plaintiff

4    nonetheless persists in claiming that the following statements were false: (1) "Am considering taking

5    Tesla private at $420. Funding secured." (2) "Investor support is confirmed." (3) "Only reason why

6    this is not certain is that it's contingent on a shareholder vote." (4) "I have continued to communicate

7    with the Managing Director of the Saudi fund. . . ." (Mot. at 17-23.)

8    In securities cases, a statement is not false unless it "affirmatively creates an impression of a

9    state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. Inc.*,

10   643 F.3d 681, 687 (9th Cir. 2011) (citation and alteration omitted). Summary judgment on the

11   element of falsity must be denied if *any* reasonable jury could conclude that the statement at issue is

12   truthful. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010). This is

13   because whether a statement is false "is a mixed question to be decided by the trier of fact." *Fecht v.*

14   *Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995); *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

15   Summary judgment is thus improper where "there are triable questions of fact related to whether

16   statements . . . were misleading." *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 2429593, at *20

17   (N.D. Cal. Aug. 24, 2007) (denying summary judgment).

18   Plaintiff has failed to show that there are *no* disputed facts concerning the truth of Mr. Musk's

19   statements concerning a go-private transaction, and has failed to show that *no* reasonable jury could

20   find in Mr. Musk's favor. Indeed, as the evidence ignored by Plaintiff shows, Mr. Musk's statements

21   concerning a go-private transaction were truthful. Plaintiff's motion therefore must be denied.

22   ### A.    Plaintiff Ignores Material Facts Showing it was Reasonable for Mr. Musk to State

23   ### "Funding [Was] Secured" and "Investor Support [Was] Confirmed."

24   Plaintiff argues that Mr. Musk's statements about funding being secured were false because

25   they were based on "one 30-minute conversation [with the PIF] about potentially taking Tesla

26   private." (Mot. at 3.) That is incomplete and false. The full facts demonstrate that, among other

27   things: (1) The PIF approached Mr. Musk in 2016 to discuss investing in Tesla (Statement of Material

28   Facts at 3); (2) Mr. Al-Rumayyan, on behalf of the PIF, met with Mr. Musk throughout 2017 to

1    discuss taking Tesla private (*id.* at 3-4); (3) Mr. Al-Rumayyan and Mr. Musk discussed the potential

2    capital required for such a transaction (*id.*); (4) Mr. Al-Rumayyan met with Mr. Musk on July 31,

3    2018 and told Mr. Musk that the PIF had just invested billions of dollars in Tesla, the PIF continued to

4    want to take Tesla private and would take whatever steps necessary to achieve that outcome, and Mr.

5    Al-Rumayyan expressed that he had carte blanche authority from the Crown Prince of Saudi Arabia to

6    devote the capital necessary to do so (*id.* at 5-6); (5) Mr. Musk reasonably understood Mr. Al-

7    Rumayyan and the PIF to be committing whatever funding was necessary to complete the go-private

8    transaction (*id.* at 5-12); and (6) Mr. Musk confirmed his understanding that funding was secured in

9    numerous communications with Mr. Al-Rumayyan (*id.* at 11-12).[6]

10          Plaintiff is "not permitted to cherry pick allegations that entitle them to summary judgment"

11   while ignoring other material facts. *Antonetti v. Skolnik*, 2014 WL 1308626, at *25 (D. Nev. Mar. 31,

12   2014).  The full factual picture demonstrates a sufficient basis for a jury to conclude that, as the PIF

13   represented to Mr. Musk, "funding [was] secured" and "investor support [was] confirmed."  Because

14   there are triable issues of fact, summary judgment must be denied.  *See, e.g.*, *S.E.C. v. Phan*, 500 F.3d

15   895, 907 (9th Cir. 2007) (reversing summary judgment where the district court "refused to credit"

16   defendant's testimony about events at issue); *In re Volkswagen*, 2017 WL 6041723 at *6 ("the Court

17   DENIES partial summary judgment with respect to the falsity of the 31 investor-report statements"

18   because "a reasonable trier of fact could conclude that Plaintiffs have not met their burden of proving

19   that [the] statements were false"); *In re Sun Microsystems Sec. Litigation*, 1992 WL 226898, at *6

20   (N.D. Cal. July 10, 1992) (denying summary judgment and stating that question of falsity was for the

21   jury); *Marucci v. Overland Data, Inc.*, 1999 WL 1027053, at *1 (S.D. Cal. Aug. 2, 1999) (denying

22   summary judgment where "[m]aterial questions of fact existed concerning whether statements . . .

23   were misleading"); *Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *15 (C.D. Cal. Mar. 5, 2021)

24   (whether statements were misleading "raises questions of fact"); *S.E.C. v. Bankatlantic Bancorp, Inc.*,

25

26      [6]  Plaintiff also makes a number of strawman arguments in an effort to muddy the waters.  For
        example, Plaintiff asserts that Mr. Musk did not discuss the $420 stock price with the PIF during their
27      July 31 meeting, that Mr. Musk never obtained a signed commitment from the PIF, and that there had
        been no discussion about structure or percentage ownership.  (Mot. at 6, 19, 21.)  But Mr. Musk *never*
28      *made any public representations on any of these issues.*

1   661 F. App'x 629, 637 (11th Cir. 2016) (where a defendant presents evidence demonstrating that a

2   factual dispute exists, "the court has an obligation to allow a jury or judge to resolve the parties'

3   differing versions of the truth *at trial*.") (internal citation omitted, emphasis added).

4        Not only must the jury decide factually whether "funding [was] secured," the jury must also

5   decide between the parties differing interpretations of what "funding secured" even means in this

6   context.  *See, e.g., Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, 2021 WL 5083756, at *7

7   (N.D. Ill. Nov. 2, 2021) (jury must decide disputed meaning of "unusual activity," as well as

8   application of facts to that definition); *Buxbaum v. Deutsche Bank AG*, 196 F. Supp. 2d 367, 373

9   (S.D.N.Y. 2002) (disagreement "as to the correct translation of 'Übernahmegespräche'" (i.e., whether

10  it meant preliminary merger talks or advanced stage discussions) raised an issue of material fact and

11  therefore "is not a basis for summary judgment."); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d

12  1202, 1223 (S.D. Cal. 2010) ("a jury must decide" whether the defendant's statement that its gross

13  profit margin was "consistent" with its business plan was true or false).[7]

14       The cases cited by Plaintiff, on the other hand, do not support granting summary judgment as

15  to falsity.  *Platforms*, 617 F.3d 1072, is the ***only case*** cited by Plaintiff in which a court granted

16  summary judgment on the issue of falsity.  (Mot at 18-19.)  In that case, the challenged press release

17  described a product with nine pages of detail, even though ***the product did not even exist and the***

18  ***defendants even lacked the funding to build a single prototype***.  617 F.3d at 1082, 94-95.  It was thus

19  undisputed that the press release was false, the defendants knew it, and the defendants had no

20  evidence to the contrary.  *Id.*

21       In *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005) (Mot. at

22  18), the defendants created an offering memorandum falsely stating that a corporation had *already*

23  *received* a $25 million investment.  *Id.* at 945.  The defendants and the corporation then used that

24  memorandum to solicit additional investors.  *Id.*  The court held only that the plaintiff's allegations

---

[7]  In the motion, Plaintiff references the hearsay opinions of Egon Durban (Silver Lake) and Ryan Brinkman (J.P. Morgan) in an effort to establish a self-serving definition of what the term "secured" means. (Mot. at 17.)  First, neither Mr. Durban nor Mr. Brinkman was at the July 31 meeting between Mr. Musk and Mr. Al-Rumayyan, so they have no first-hand knowledge as to the PIF's commitment to take Tesla private.  Second, their opinions cannot supplant the role of the jury.

were sufficient to survive *dismissal* (i.e., summary judgment was not at issue). *Id.* at 952.  In *S.E.C. v. Sourlis*, 851 F.3d 139 (2d Cir. 2016) (Mot. at 21), the defendant affirmatively represented that she "had spoken to the original note-holders." *Id.* at 145.  The defendant's statement was false because *"no original note-holders existed and indeed no notes existed." Id.* (emphasis added).[8]

These cases stand in stark contrast to the facts here, which demonstrate a sufficient basis for Mr. Musk's statements that "funding [was] secured" and "investor support [was] confirmed."

**B.    Plaintiff Ignores Material Facts Showing That Mr. Musk's Statement Regarding a "Shareholder Vote" Was Not Misleading.**

On August 7, 2018, Mr. Musk tweeted, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." (Ex. 13.)  This tweet was truthful, but Plaintiff argues that it was false because "there were also numerous contingencies to the transaction before even getting to a shareholder vote." (Mot. at 22.)  However, Mr. Musk publicly disclosed these other "contingencies" and clarified that Tesla was still considering the transaction.

Specifically, Mr. Musk linked a Tesla blog post to his August 7 tweet, which stated clearly that he was "*considering* taking Tesla private," "a final decision ha[d] not yet been made," and "[t]his proposal to go private would ultimately *be finalized* through a vote of [Tesla's] shareholders." (Ex. 12 (emphasis added).)  Mr. Musk then posted additional details regarding the various actions that would need to be completed, including "a final proposal," "an appropriate evaluation process" by Tesla's special committee, "required regulatory approvals," and ultimately "the plan [to] be presented to Tesla shareholders for a vote." (Ex. 53.[9])  Additionally, Tesla's stock price closed *up* from the prior day's

---

[8]  Plaintiff cites two cases in support of his argument that the Court should consider the opinions of analysts in defining "funding secured." (Mot. at 19.)  However, in *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), the court did not "rely[] on analyst statements when determining cause of stock price movement," as Plaintiff suggests. (Mot. at 19.)  Instead, the court held simply that the plaintiff's arguments were sufficient to withstand *dismissal on the pleadings. Id.* at 933, 936, 946.  Plaintiff asserts that in *U.S. v. Ferguson*, 676 F.3d 260 (2d Cir. 2011), the court "plac[ed] 'substantial' weight on 'stock analysts' when evaluating [the allegedly false] statement." (Mot. at 19.)  That is false, as the Court was evaluating materiality, not falsity, and the Court said nothing about the weight of the stock analyst evidence. *Id.* at 274.

[9]  The Court previously acknowledged Mr. Musk's disclosure of this additional information: "Mr. Musk then proceeds to identify significant hurdles that stand in the way of finalizing the transaction—

1   close (increasing from $355.49 to $356.41) after Mr. Musk disclosed these additional "contingencies"

2   concerning the potential go-private transaction (Ex. I), so Plaintiff cannot argue that (1) stockholders

3   were harmed by Mr. Musk's initial tweet, or that (2) stockholders viewed Mr. Musk's additional

4   disclosure of information as material.  Plaintiff's motion ignores these facts.[10]  "The key question in

5   considering the misleading nature of a statement is whether defendants' representations, *taken*

6   *together and in context*, would have misle[d] a reasonable investor, not whether it is susceptible to any

7   interpretation that could generate misleading impressions *when read in isolation*."  *In re Skechers*

8   *USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (emphasis added, citation omitted).

9   Given the numerous factual disputes and the full context, Plaintiff cannot possibly meet this burden.

10          **C.      Plaintiff's New Argument that Discussions with the PIF Had Ended as of August**

11                  **13, 2018 is Baseless.**

12          On August 13, 2018, Mr. Musk posted on Tesla's blog that, "[f]ollowing the August 7th

13   announcement [i.e., his initial tweet], [he] continued to communicate with the Managing Director of

14   [the PIF].  He has expressed support for proceeding subject to financial and other due diligence and

15   their internal review process for obtaining approvals.  He has also asked for additional details on how

16   the company would be taken private, including any required percentages and any regulatory

17   requirements."[11]  (Ex. 53.)  Everything Mr. Musk wrote is indisputably true.  (*See* Ex. 121 at 8-13

18   (post August 7 communications between Mr. Musk and Mr. Al-Rumayyan).)  Plaintiff argues *only*

19   that in the blog post, Mr. Musk did not disclose that "he had sought to end all negotiations with the

20   Saudi PIF."  (Mot. at 23.)  Plaintiff's argument is nothing more than misdirection, and these issues are

21   "for the trier of fact."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *see also Davis*,

22

23   namely, 'financial and other due diligence' and an 'internal review process' among other conditions."
     *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 925 (N.D. Cal. 2020).

24          [10]  Mr. Musk's testimony that he believed there was "probably [a] roughly 50 percent" chance that
25   the transaction would occur (Mot. at 22) is consistent with his public statements, where he indicated
     that the transaction was contingent on a shareholder vote, a final proposal, and regulatory compliance.
26   While Musk was confident in his *desire* to take Tesla private and he had the *funding* to do so, these
     contingencies made the transaction 50% likely in Mr. Musk's mind.  (Ex. B at 257:19-260:15.)

27          [11]  In his Complaint and addendum thereto (ECF Nos. 184, 224), Plaintiff does not allege that this
28   statement was false or misleading.  Accordingly, it is not properly the subject of summary judgment.

1   2021 WL 4923359 at *13; *Phan*, 500 F.3d at 908.

2   *First*, Plaintiff misstates the facts, as Mr. Musk and Mr. Al-Rumayyan did not "end all

3   negotiations." (Mot. at 23.)  Rather, on August 12, 2018, Mr. Musk texted Mr. Al-Rumayyan and

4   expressed disappointment that the PIF's public statements regarding the go-private transaction were

5   inconsistent with what Mr. Al-Rumayyan had represented to Mr. Musk during their July 31, 2018 in-

6   person meeting. (Ex. 121 at 10.)  Mr. Musk texted Mr. Al-Rumayyan that "there will be no further

7   communication **unless** you fix the public perception of wishy washy support and interest from PIF.

8   *That is not what you said to me and my team privately*." (*Id.* at 12 (emphasis added).)  In response,

9   Mr. Al-Rumayyan agreed to "work on [a] PIF statement" so that the PIF and Tesla could **continue**

10  negotiations, not "end all negotiations," as Plaintiff incorrectly suggests.  (*Id.*)

11  *Second*, even though Mr. Musk suggested that he might no longer communicate with Mr. Al-

12  Rumayyan unless he rectified the PIF's public statements, that was not material to shareholders.

13  Omitted information is actionable only if it is material. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32

14  (1988) ("to fulfill the materiality requirement there must be a substantial likelihood that the disclosure

15  of the omitted fact would have been viewed by the reasonable investor as having significantly altered

16  the total mix of information made available") (citation and quotation omitted).  Mr. Musk's text to Mr.

17  Al-Rumayyan is not material because (1) Mr. Al-Rumayyan *agreed* to fix the incorrect public

18  perception, and (2) Tesla already had more than enough support to take Tesla private *without the PIF*,

19  so the PIF's support was not necessary.  (Ex. B at 217:4-15; Ex. E at 242:1-243:20.)

20  *Third*, the securities laws "prohibit *only* misleading and untrue statements, not statements that

21  are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in

22  original).  "No matter how detailed and accurate disclosure statements are, there are likely to be

23  additional details that could have been disclosed but were not." *Id.*  The securities laws "do not create

24  an affirmative duty to disclose any and all material information.  Disclosure is required . . . only when

25  necessary 'to make . . . statements made, in the light of the circumstances under which they were

26  made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Here, that Mr.

27  Musk was disappointed with the PIF's public statements and demanded that they rectify them is

28  entirely consistent with his disclosure that he continued to communicate with the PIF.

1  II.       **SUMMARY JUDGMENT SHOULD BE DENIED AS TO SCIENTER.**

2         A.       **Scienter is a Question for the Jury.**

3         Countless courts—including this Court—have held that "[g]enerally, scienter should not be

4  resolved by summary judgment" and have denied summary judgment on that basis.  *Davis*, 2021 WL

5  4923359 at *13 (Chen, J.) (denying summary judgment where "there is a genuine issue of material

6  fact as to whether Defendants made false or misleading statements, with scienter"); *Howard*, 228 F.3d

7  at 1060; *In re Volkswagen*, 2017 WL 6041723 at *12 ("Court DENIES Plaintiffs' motion for partial

8  summary judgment on the issue of scienter" "because material issues of fact remain"); *Jasper*, 2009

9  WL 10701938 at *3 (denying summary judgment and stating, "[a]lthough the SEC may ultimately

10  prove scienter with circumstantial evidence, the conflicting evidence here does not allow for a finding

11  that as a matter of law, Defendant possessed the requisite mental state to establish a securities fraud

12  claim"); *In re Twitter*, 2020 WL 4187915 at *12 (denying summary judgment where "a genuine

13  dispute exists as to whether Defendants acted with scienter in making the challenged statements").

14         As this Court noted, summary judgment is typically improper in such cases because

15  "[m]ateriality and scienter are both fact-specific issues which should ordinarily be left to the trier of

16  fact."  *Davis*, 2021 WL 4923359 at *13 (Chen, J.) (citation omitted); *Vucinich v. Paine, Webber,*

17  *Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (reversing summary judgment where "the

18  facts before the court were sufficient to raise factual questions as to defendant's state of mind"); *In re*

19  *Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

20         B.       **There Is Ample Evidence that Mr. Musk Believed His Statements Were True.**

21         To prevail on his motion, Plaintiff must show—as a matter of law—that Mr. Musk either

22  *intended* to "deceive, manipulate, or defraud" the public, or his behavior was a "reckless" and

23  "extreme departure from the standards of ordinary care" that goes beyond "even inexcusable

24  negligence."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *Howard*, 228 F.3d at 1063.

25         Mr. Musk has presented numerous facts, including facts proving his state of mind at the time,

26  that demonstrate he had no such intent.  Among other things, (1) on August 2, 2018, Mr. Musk

27  emailed Tesla's Board regarding an "offer to take Tesla private at $420 [per share]" (Ex. 81); (2) on

28  August 3, Mr. Musk attended a board meeting and explained that the PIF was willing to fund the

transaction (Ex. B at 205:11-25, 206:6-23); (3) Mr. Musk then reached out to financial and legal advisors about the transaction (*id.* at 161:13-21, 162:7-11, 167:5-12, 175:8-25); and (4) Mr. Musk had private communications with Mr. Al-Rumayyan wherein Mr. Musk confirmed his intent to take Tesla private as well as his understanding that funding was secured through the PIF (Ex. 121 at 8-13).

These facts demonstrate beyond a shadow of a doubt that Mr. Musk reasonably believed funding was secured, reasonably believed his public disclosures were accurate, and that Mr. Musk had the genuine desire to take Tesla private.  Plaintiff may disagree with Mr. Musk's beliefs and conclusions, which only underscores that these issues must go to the jury.  *Vucinich*, 739 F.2d at 1436 (reversing summary judgment in action alleging securities fraud and noting that motion can be denied where "the defendant presents affidavits or other evidence establishing a lack of scienter"); *Davis*, 2021 WL 4923359 at *13 (Chen, J.) (denying summary judgment due to disputed material facts); *In re Volkswagen*, 2017 WL 6041723 at *12 (N.D. Cal. Dec. 6, 2017); *Jasper*, 2009 WL 10701938 at *3; *In re Twitter*, 2020 WL 4187915 at *12; *Washtenaw*, 2021 WL 5083756 at *7; *Buxbaum*, 196 F. Supp. 2d at 377.[12]  To the extent Plaintiff's theory is that Mr. Musk revealed new and negative information to investors regarding the status of funding through the August 13, 2018 blog post  (Ex. 16), that further undermines scienter for the August 7 tweets.  *See, e.g.*, *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019) (defendant's disclosure of additional information "on the very topics they supposedly concealed undermines an inference of a deliberate omission").

## III.   SUMMARY JUDGMENT SHOULD BE DENIED AS TO RELIANCE.

To prevail on his Section 10(b) claims, Plaintiff must prove that he relied upon Defendants' alleged misrepresentations.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263

---

[12]   Plaintiff argues that "[a] defendant cannot defeat a fraud claim merely by asserting that he believed the statements were true."  (Mot. at 19.)  But Mr. Musk does not simply state that he "believed" his statements were true.  Rather, Mr. Musk has put forth *evidence* showing that Mr. Al-Rumayyan represented that funding was secured, as well as contemporaneous evidence that Mr. Musk believed it.  *See Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 n.11 (9th Cir. 2010) (rejecting argument that defendants' statements "are so false that defendants must have known they were false and must have intended to mislead the public" where defendants "submitted sworn declarations testifying that they believed in good faith that their statements were true") (quotation omitted).  Summary judgment is improper where the parties disagree as to the interpretation of the evidence, as the evidence must be viewed "in the light most favorable to the nonmoving party."  *Phan*, 500 F.3d at 901.

1    (2014).  Plaintiff has not put forward any evidence of direct reliance.  Instead, Plaintiff seeks to invoke

2    the *rebuttable* fraud-on-the-market presumption.  (Mot. at 24.)  The fraud-on-the-market presumption

3    is based on the theory that an "investor who buys or sells stock at the price set by the market does so

4    in reliance on the integrity of that price."  *Halliburton*, 573 U.S. at 268.  Therefore, if an allegedly

5    material fraudulent misrepresentation impacted the market price of the security, an investor can be

6    presumed to have relied on the purportedly material misrepresentation.  *Id.*

7            As Plaintiff concedes, to invoke the fraud-on-the-market presumption, a plaintiff must prove

8    by a preponderance of the evidence that "(1) the alleged misrepresentations were publicly known, (2)

9    ***they were material***, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock

10   between when the misrepresentations were made and when the truth was revealed."  (Mot. at 24

11   (emphasis added).)  Even where Plaintiff proves these requirements, a defendant can rebut the

12   presumption through "***[a]ny showing*** that severs the link between the alleged misrepresentation and

13   . . . the price received (or paid) by the plaintiff."  *Halliburton*, 573 U.S. at 269 (emphasis added).

14           Here, Plaintiff is not entitled to summary judgment on the element of reliance for at least two

15   independent reasons.  *First*, there is a genuine dispute of material fact regarding at least one of the

16   requirements necessary to invoke the fraud-on-the-market presumption: materiality.  *Second*, even if

17   there were no dispute the presumption could be invoked, there is a genuine dispute of material fact

18   regarding whether Defendants can rebut that presumption by, among other things, demonstrating that

19   when the purported "truth" was revealed, there was no price impact.

20           **A.      There is a Genuine Dispute of Fact Regarding Materiality.**

21           There is no dispute that Plaintiff must prove materiality to invoke the fraud-on-the-market

22   presumption for purposes of proving reliance.  There also does not appear to be any dispute that

23   questions regarding materiality "are peculiarly ones for the trier of fact."  *Durning*, 815 F.2d at 1268

24   (quotation omitted).  Indeed, Plaintiff's own authorities say as much.  (*See* Mot. at 25 (citing *McCrary*

25   *v. Elations Co. LLC*, 2014 WL 12561600, at *12 (C.D. Cal. Dec. 8, 2014) ("Materiality is generally a

26   question for the jury") (internal quotation marks omitted)).)  Plaintiff's own expert likewise concedes

27   that "Materiality . . . is a fact question to be answered at trial."  (Ex. L at ¶ 47.)  Despite this uphill

28   battle, Plaintiff spends all of ***two*** sentences—citing six paragraphs in an expert report—to support its

1   claim that there are no genuine disputes of fact regarding whether the purportedly false portion of Mr.

2   Musk's tweet, "funding secured," was material.  (Mot. at 24 (citing Hartzmark Class Cert. Report,

3   ECF No. 291-1 at ¶¶ 71.76).))[13]  Those cited paragraphs say nothing more than that there was a stock

4   movement following Mr. Musk's allegedly false tweet.  But as a matter of law, a stock price

5   movement alone is insufficient to prove materiality.  *See, e.g.*, *In re Allied Cap. Corp. Sec. Litig.*, 2003

6   WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003).

7        Moreover, inferring materiality from stock movements in this case would be particularly

8   inappropriate since there is no dispute that Mr. Musk's tweet also contained the undisputedly true

9   disclosure that Mr. Musk was considering taking Tesla private.  The jury is entitled to conclude that

10   Tesla's stock price increase—which is the evidence Plaintiff relies upon to prove materiality to invoke

11   the presumption—was not attributable to the allegedly false portion of Mr. Musk's tweet.  This is

12   particularly true where, as noted above, there is a dispute regarding what a reasonable investor would

13   understand Mr. Musk's allegedly false statements to mean.  Therefore, the jury will be required to

14   determine what "funding secured" even meant, and that determination will obviously impact the jury's

15   determination of the materiality of the statement (and the allegedly undisclosed information).

16        Notably, the evidence actually supports the conclusion that—whatever the market believed the

17   statement meant—it was the indisputably true portion of Mr. Musk's tweet that the market deemed

18   material rather than the allegedly false information.  For example, on August 13, 2018, Mr. Musk

19   provided further detail regarding the proposed transaction.  Plaintiff's expert cites public news articles

20   that claimed that "Musk's definition of 'funding secured' appears to be, to assess it charitably, a

21   stretch." (Ex. L at ¶ 104.)  Similarly, a public sell-side analyst from Barclays noted that Mr. Musk's

22   August 13, 2018 blog post "made it clear that the funding was in its very early stages." (Ex. M.)  Yet,

23   despite the purported revelation that funding was far different than Plaintiff's theory of what the

24   market understood "funding secured" to mean, Tesla's stock did not decline in a statistically

25   significant manner.  (Ex. L at ¶¶ 100-108.)  In fact, Plaintiff's own expert determined that Tesla's

26

27        [13]    Because Plaintiff does not even attempt to produce evidence regarding the purported
         materiality of any of the other alleged misstatements—another basis to deny summary judgment—
28   Defendants respond solely to the materiality allegations regarding "funding secured."

1    stock *increased* by .95% after controlling for market and industry factors.  (*Id.*)

2          Thus, the jury is entitled to conclude that the lack of *any decline* following these purported

3    revelations regarding the meaning of "funding secured" proves that the "funding secured" portion of

4    Mr. Musk's tweet was immaterial.  *Teamster*, 320 F.3d at 949 ("[T]he static or dynamic nature of

5    a stock price after the disclosure of previously withheld information is strong evidence of how

6    reasonable investors view the significance of the information.") (Tallman, J., dissenting); *Oran v.*

7    *Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[I]f a company's disclosure of information has no effect

8    on stock prices, 'it follows that the information disclosed . . . was immaterial as a matter of law.'")

9    (Alito, J.) (citation omitted).  Accordingly, because there is a genuine issue of dispute regarding the

10   materiality of the allegedly false information, there is a genuine issue of dispute regarding whether the

11   fraud-on-the-market presumption can be invoked and whether reliance can be established.  *Hsingching*

12   *Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at *4-5 (C.D. Cal. Oct. 5, 2018) (denying

13   summary judgment on reliance through fraud-on-the-market presumption where material disputes

14   regarding materiality).[14]

15   **B.    There is a Genuine Dispute of Fact Regarding Defendants' Ability to Rebut Any**

16        **Fraud-On-The-Market Presumption.**

17        Even assuming Plaintiff had established all of the necessary requirements to invoke the fraud-

18   _____

19        [14]   Plaintiff's authorities are not to the contrary.  In the sole case in which a court granted a

20   plaintiff summary judgment on the issue of reliance, *In re Celestica Inc. Sec. Litig.*, 2014 WL
     4160216 (S.D.N.Y. Aug. 20, 2014), "Defendants opposed Plaintiffs' motion [solely] on the basis that

21   the Supreme Court's decision in *Halliburton . . .* , might overrule *Basic* and change the law regarding
     the fraud on the market presumption," which did not occur.  *Id.* at *5 n.3.  They did not oppose the

22   motion on the basis that the allegedly false information was immaterial, as Defendants do here.  In
     *Kaplan v. Rose*, 49 F.3d 1363, 1378 (9th Cir. 1994), *abrogated on other grounds by City of Dearborn*

23   *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017), the court
     partially affirmed *defendants'* motion for summary judgment on the *inapplicability* of the fraud-on-

24   the-market presumption and overturned in part noting that "claims based on fraud on the market
     theory are fact-specific and generally for the trier of fact to decide."  Similarly, in *McCrary*, 2014 WL

25   12561600 at *12, the court *denied* plaintiff's request for summary judgment on the issue of reliance
     precisely because the presumption of reliance under the relevant law in that case, like this one,

26   required proof of materiality, which "is generally a question of fact for the jury." (quotation omitted).
     Finally, in *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386 (N.D. Cal. 2009) did not even involve

27   a summary judgment motion on the issue of reliance.

28

1   on-the-market presumption—he has not—that would still be insufficient to grant summary judgment

2   on the issue of reliance since the presumption is *rebuttable*.  Although Plaintiff claims that

3   "Defendants did not contest any of Dr. Hartzmark's findings or Plaintiff's contention that Tesla's

4   stock traded in an efficient market" (Mot. at 24), Plaintiff overlooks that Defendants can also rebut the

5   presumption if the "'market makers' were privy to the truth" about information allegedly concealed,

6   or second, if "news of [the allegedly concealed truth] credibly entered the market and dissipated the

7   effects of the misstatement." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 606 (7th Cir. 2020)

8   (citation omitted).  "Under the first option, the defense shows that only true information was

9   impounded in the market price at the time of purchase; the second option does the same by the time of

10  sale." *Id.*  Here, there are genuine issues of fact with respect to both defenses.

11       First, Defendants' expert put forward evidence that the market understood from the beginning

12  that the entire proposal and source of funding was uncertain.  (Ex. N at ¶¶ 15-22.)  Thus, there is

13  sufficient evidence from which the jury can infer that market understood that funding secured did not

14  mean that there was some sort of signed term sheet or formal agreement regarding funding.

15       Second, as noted above, following Mr. Musk's August 13 blog post, Tesla's stock did not

16  decline.  Thus, the jury is entitled to infer that either the original statement was immaterial to begin

17  with—in which case the presumption does not apply—or that by virtue of, among other things the

18  evidence detailed in the Fischel Report, the market understood the truth regarding the meaning of

19  "funding secured" prior to the August 13 blog post—in which case the presumption is also rebutted.

20  Either way, as the Supreme Court has recognized, these defenses should be heard at trial.  *Basic*, 485

21  U.S. at 249 & n. 29 (proof that information "credibly entered the market and dissipated the effects of

22  the misstatements" "is a matter for trial.").  Accordingly, Plaintiff's request for summary judgment

23  with respect to the element of reliance should be denied.[15]

24

25       [15]   Plaintiff's Motion is defective on other grounds as well.  First, Plaintiff seeks summary
    judgment against both Tesla and Mr. Musk, but Plaintiff failed to include any evidence that Tesla had
26  "ultimate authority over [Mr. Musk's] statement [concerning going private], including its content and
    whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S.
27  135, 142 (2011).  On this basis alone Plaintiff's Motion must be denied as to Tesla.  Second, while the
    Motion purports to be against Tesla's board members (as well as Tesla and Mr. Musk), the relief

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny in its entirety Plaintiff's Motion for Partial Summary Judgment.

DATED:  February 1, 2022

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Alex Spiro*
Alex Spiro *(appearing pro hac vice)*
*Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,*
*Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,*
*James Murdoch, Kimbal Musk, And Linda Johnson Rice*

## ATTESTATION

I, Kyle K. Batter, am the ECF user whose ID and password are being used to file the above document.  In compliance with Local Rule 5-1(h)(3), I hereby attest that Alex Spiro has concurred in the filing of the above document.

*/s/ Kyle K. Batter*
Kyle K. Batter

sought is limited to the claims against Tesla and Mr. Musk.  (Notice of Motion.)  The director defendants have no place in Plaintiff's Motion.

# PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT – REDACTED

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
        amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE TESLA, INC. SECURITIES
LITIGATION

Case No. 3:18-cv-04865-EMC

**PLAINTIFF'S REPLY IN FURTHER
SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT**

**ORAL ARGUMENT REQUESTED**

Date: March 10, 2022
Time: 1:30 p.m.
Location: Courtroom 5, 17th Floor
Judge: Hon. Edward Chen

***FILED UNDER SEAL***

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION. ...................................................................................... 1

II.     RESPONSE ON STATEMENT OF UNDISPUTED FACTS. ........................................ 2

III.    THERE IS NO GENUINE DISPUTE THAT FUNDING WAS NOT
        SECURED ON AUGUST 7, 2018. .......................................................................... 6

IV.     THERE IS NO CREDIBLE DISPUTE THAT INVESTOR SUPPORT
        WAS NOT CONFIRMED ON AUGUST 7, 2018. ......................................................... 10

V.      THERE IS NO GENUINE DISPUTE THAT THE AUGUST 13
        BLOGPOST MISREPRESENTED THE STATUS OF NEGOTIATIONS
        WITH THE PIF ...................................................................................................... 13

VII.    THERE IS NO GENUINE DISPUTE THAT PLAINTIFF HAS
        ESTABLISHED RELIANCE BY THE CLASS ON THE ALLEGED
        MISREPRESENTATIONS. .......................................................................................... 13

VIII.   CONCLUSION. ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*In re Allstate Corp. Securities Litigation*,
966 F.3d 595 (7th Cir. 2020) ........................................................................... 14, 15

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................................. 7, 11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................ 14

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................... 7

*Brody v. Transitional Hospitals Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................... 7

*Buxbaum v. Deutsche Bank AG*,
196 F. Supp. 2d 367 (S.D.N.Y. 2002) ..................................................................... 7

*Carmen v. S.F. Unified Sch. Dist.*,
237 F.3d 1026 (9th Cir. 2001) ..................................................................... 9, 11, 14

*Erica P. John Fund v. Halliburton Co.*,
563 U.S. 804 (2011) ................................................................................................ 15

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .................................................................................................... 9

*Pommer v. Medtest Corp.*,
961 F.2d 620 (7th Cir. 1992) ................................................................................. 12

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................................... 7

*S.E.C. v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ........................................................................... 8, 11

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020) ........................................................................... 15

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007) ............................................................................. 9, 13

*In re Tesla, Inc. Sec. Litig.*,
477 F. Supp. 3d 903 (N.D. Cal. 2020) ..................................................................... 7

*TSC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) .................................................................................................. 9

*In re Vantive Corp. Sec. Litig.,*
  283 F.3d 1079 (9th Cir. 2002) ................................................................................. 12

*In re VeriFone Sec. Litig.,*
  11 F.3d 865 (9th Cir. 1993) ........................................................................................ 7

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,*
  739 F.2d 1434 (9th Cir.1984) ...................................................................................... 8

*Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.,*
  2021 WL 5083756 (N.D. Ill. Nov. 2, 2021) ............................................................... 7

1    **I.     INTRODUCTION.**

2         Plaintiff's motion for summary judgment aimed precisely at four key misrepresentations

3    as well as the discrete issue of reliance. It set forth discrete and objective evidence showing that

4    statements by Elon Musk, including key statements that he had "funding secured" to take Tesla

5    Inc. private at $420 per share, that "investor support is confirmed," and "only reason why this is

6    not certain is that it's contingent on a shareholder vote" were indisputably false when made. It also

7    showed that Plaintiff had proven the necessary facts to create a presumption of reliance on material

8    public misstatements regarding Tesla during the Class Period. Defendants do not contradict any

9    of the key facts underlying Plaintiff's motion; instead, they present an entirely subjective and

10   sometimes speculative version of events where words mean only what Musk thinks, regardless of

11   their plain meaning. Under this alternative reality, "funding secured" is true because Musk now

12   says he thought funding was secure, "investor support is confirmed" refers to funding rather than

13   actual "investor support," and a tweet about the need for only a shareholder vote is not misleading

14   because of statements made six days later.

15        Defendants' proposed subjective approach to disclosures by public companies is not the

16   law. The securities laws impose an objective test for falsity, looking to what a reasonable investor

17   would understand a statement to mean. A reasonable investor does not interpret "investor support

18   is confirmed" to mean "funding secured," nor does he understand "funding secured" to mean

19   simple entrepreneurial optimism, as opposed to funding that is legally committed. Viewed

20   objectively, the misrepresentations subject to this motion are indisputably false. In addition, Musk

21   knew they were false when he made them. The law does not accept *ex post* statements of integrity

22   and "honest belief" as excuses for making false statements while knowing the true state of affairs.

23        Plaintiff has also presented unrebutted evidence that the market for Tesla stock and other

24   securities was efficient during the Class period of August 7, 2018 to August 17, 2018. Plaintiff

25   and the class, accordingly, are entitled to the legal presumption that they relied on material public

26   misrepresentations made during that period. To rebut this presumption, Defendants must show that

27   the truth about the proposed going-private transaction, its funding, and level of investor support

28   credibly entered the market. Defendants have utterly failed to put forth the required evidence to

---

do this and their attempt to utilize the proposed report of their expert on loss causation as evidence rebutting the presumption of reliance should be rejected.

## II.   RESPONSE ON STATEMENT OF UNDISPUTED FACTS.

Despite Defendants' submission of a 10-page "Statement of Material Facts", the material facts underlying Plaintiff's motion for summary judgment remain undisputed. On August 7, 2018, when Musk tweeted he was contemplating taking Tesla private at $420 per share with "funding secured," where "investor support is confirmed," and "only reason why this is not certain is that it's contingent on a shareholder vote," Musk had, at most, an expression of interest from one investor, the Saudi PIF, in a potential transaction. Nothing had been secured or confirmed.

Critically, it is undisputed that at the July 31, 2018 meeting between Musk and the Saudi PIF, there was no legally-binding agreement to fund a going-private transaction involving Tesla.[1] From July 31 until August 7, 2018, Musk did not have any further substantive conversations with the Saudi PIF or discuss the proposed price of $420 with the Saudi PIF or any other potential investor. The tentative and preliminary nature of the discussions between Musk and the Saudi PIF is confirmed by the descriptions of them by Yasir Al-Rumayyan in texts sent to Musk on August 11 and 12, 2018: "We would like to *explore investing* in Tesla…. Therefore, as discussed, we would like our teams *to start working together* … *to explore a potential transaction*" (emphasis added).[2] Al-Rumayyan also emphasized the need of the Saudi PIF to receive additional information from Tesla before proceeding further.[3] This is confirmed by contemporaneous notes taken at the meeting by Saudi PIF representatives which reflect that the meeting ended with Al-Rumayyan telling Musk "I would like to listen to your plan Elon and what are the financial calculations to take it private in the next week."[4] Musk never provided the additional information.[5]

Prior to the August 7 tweets, Musk had not mentioned the potential transaction to any other outside investors or existing Tesla shareholders.[6] Musk had also not provided Tesla's Board with

---

[1] E. Musk Dep. at 126:10-13; Ahuja Dep. at 108:22-110:8.
[2] Exhibit 121 at 8.
[3] *Id.* at 11-12 ("We cannot approve something that we don't have sufficient information on.").
[4] Exhibit 80.
[5] E. Musk Dep. at 244:1-248:15; Exhibit 121 at 11; Ahuja Dep. at 82:12-23.
[6] Musk Interrogatory Responses at 27, 28, 30, and 35; E. Musk Dep. at 165:15-17, 189:10-16.

a specific proposal to take the company private that the Board could then consider and review.[7] Musk was aware that any transaction would involve lengthy legal and financial analysis and documentation, yet neither he nor the Board had formally retained any legal or financial advisors.[8]

In addition, while Musk had in mind a novel legal structure for a private Tesla where retail investors would be able to remain shareholders, he had not determined either legally or practically if such a structure was feasible, nor had he determined whether there were restrictions on illiquid holdings, such as investments in private companies, by Tesla's institutional investors.[9] Musk was determined to limit the Saudi PIF investment in a private Tesla to no more than 30 percent (including its current 5 per cent stake),[10] yet Musk had not spoken to any other source for the remaining funding he might require to take Tesla private. Finally, Musk had not determined what regulatory approvals would be necessary for any going-private transaction, especially one involving a foreign sovereign wealth fund such as the Saudi PIF.[11]

The subsequent actions by Musk's financial advisors, Silver Lake Partners and Goldman Sachs, are also entirely inconsistent with funding being "secured" on July 31, 2018, as they spent the period from August 10 to August 23, 2018 creating a strategy to raise financing for a going-private transaction.[12] This included obtaining "signed commitment documents."[13] They also began the process of gauging support for a going-private transaction with existing Tesla shareholders, days after Musk had tweeted that "investor support is confirmed."[14] They discovered that many investors *did not* support a going-private transaction.[15]

Defendants also do not discuss, and therefore, concede, the strong reaction to Musk's August 7, 2018 tweets from the market, financial analysts, Tesla investors, and even Tesla's own investor relations team. Martin Viecha, Tesla's Director of Investor Relations, understood Musk's

---

[7] Exhibit 83; E. Musk Dep. at 159:6-10, 213:8-12; Denholm Dep. at 44:22-45:16.
[8] Musk Interrogatory Responses at 33; E. Musk SEC Tr. at 165:1-5.
[9] E. Musk Dep. at 140:21-145:15.
[10] E. Musk Dep. at 125:9-25.
[11] E. Musk Dep. at 101:9-20; E. Musk SEC Tr. at 128:20-129:17, 260:2-15.
[12] Exhibits 101 and 179; *see also* Fath Dep. at 91:8-92:5 ("If a deal had been done and funding had been secured, why reach out to us [T. Rowe Price]?").
[13] Exhibit 265 at 5; *see also* Exhibit 179 at 29.
[14] Durban Dep. at 134:1-135:18, 135:20-136:3; Exhibit 194.
[15] Exhibit 101 at 3.

tweet to mean "this is a firm offer," "the offer is as firm as it gets," and "financing is secured regardless of other assumptions."[16]  Ryan Brinkman, a JP Morgan analyst, wrote "Either funding is secured or it is not secured, and Tesla's CEO says funding is secured."[17] Joseph Fath at T. Rowe Price understood "funding secured" to mean it was "locked and loaded and no question at all a hundred percent that you have funding ready to go."[18]  As Fath testified: "There's nothing left for interpretation in those statements."[19] Tesla's stock price responded within seconds of Musk's tweets, rising to $379.57 per share by close of trading on August 7, 2018, a statistically significant increase.[20] For the remainder of the Class Period, Musk's proposed going-private transaction was heavily followed in the financial media, with over 2,400 articles published over just ten days.[21]

Defendants' attempt to concoct an "agreement" with PIF from a preliminary expression of interest is unavailing and distorts the factual record. First, Defendants paint a picture of a "pursuit" of Tesla by the Saudi PIF from November 2016 to July 2018.[22] Opp. Br. at 4-5. This "pursuit" consisted of a dinner and two other meetings in Spring 2017, where one meeting was primarily about OpenAI, another Musk company, not Tesla.[23] The outcome of this "pursuit" was that Musk was not interested in exploring a transaction with the Saudi PIF.[24]

With regard to the July 31, 2018 meeting itself, Defendants rely on three witnesses to present their version of events. Yet none contradicts the fact that this was a meeting to start a process of exploring a potential transaction, not a commitment of funding. Deepak Ahuja, Tesla's Chief Financial Officer, explicitly testified that the message he received at the July 31, 2018 meeting was that the Saudi PIF was interested in taking Tesla private and "***want to explore this***

---

[16] Exhibits 58 and 151.
[17] Exhibit 15.
[18] Fath Dep. at 28:18-29:5.
[19] *Id.* at 32:26-33:8; *see also* Exhibit 41 ████████████████████████████
████████████████████████████████████████████████████████████████████
[20] Hartzmark Rpt., ¶64.
[21] Hartzmark Rpt., ¶56.
[22] Defendants note that the Saudi PIF is reported to have over $225 billion in assets under management, citing a *Wall Street Journal* article dated August 15, 2018. *See* Batter Ex. A. Defendants fail to note that the same article also reports that "The PIF is scrambling to raise money for its investments. The fund is in talks with banks to raise billions of its own debt…" *Id.* at 5.
[23] Exhibit 107.
[24] Ahuja Dep. at 45:20-46:9.

1    *further.*"[25] Sam Teller similarly testified that Al-Rumayyan's conveyed his "***desire***" and

2    "***ability,***"[26] but that the discussions were not "near final" and "the details of like how to proceed in

3    this process" still needed to be addressed.[27] Musk, meanwhile, admitted in his deposition that any

4    "offer to purchase" Tesla shares by the Saudi PIF existed only in his mind.[28] Musk also conceded

5    that he agreed to provide additional information to the Saudi PIF following the July 31, 2018

6    meeting, that the Saudi PIF would want to review that information before investing further in

7    Tesla, that the availability of funding from Saudi PIF would depend on the price of Tesla shares

8    in any going-private transaction but price had not yet been discussed, and that he had no legal

9    recourse against the Saudi PIF if they refused to provide any funding.[29]

10          Regarding subsequent discussions of the July 31, 2018 meeting, Defendants' facts belie

11   the record. Defendants state that at a Tesla Board meeting on August 3, 2018, Ahuja "briefed the

12   Board on Mr. Al-Rumayyan's proposal to fund a take-private transaction." Opp. Br. at 7. In fact,

13   the minutes reflect that Ahuja briefed the Board on ***Musk's*** proposal, not the Saudi PIF.[30] With

14   regard to the Saudi PIF, Ahuja merely informed the Board that "PIF was interested in helping Mr.

15   Musk take the Company private."[31] Notably, Ahuja helped draft Musk's email to Tesla employees

16   dated August 7, 2018, sent after Musk's initial tweet that funding was "secured" but that email,

17   however, does not reference any commitment to funding by the Saudi PIF.[32]

18          Defendants present a similarly misleading version of the text messages exchanged between

19   Musk and Al-Rumayyan between August 10 and August 13, 2018. Al-Rumayyan's texts clearly

20   and consistently reflect the absence of any agreement but instead an intent to start working towards

21   one. He asks for the Saudi PIF to receive financial information from Tesla and the two parties to

22   start working towards a potential transaction.[33] The texts also show that Musk purported to cut off

23

24   _____
     [25] Ahuja Dep. at 84:2-14. Defendants omit this testimony from their brief.
     [26] Teller Dep.  at 143:10-13.
25   [27] Teller SEC Tr. at 225:18-24; 227:1-2.
     [28] E. Musk SEC Tr. at 120:21-25. Defendants omit this testimony from their brief.
26   [29] E. Musk Dep. at 109:23-110:24; 132:24-133:13; 220:7-11; 247:5-248:15.
     [30] Exhibit 82; *see also* Ahuja Dep. at 132:16-23 (confirming accuracy of minutes (Ex. 82)).
27   [31] Exhibit 82 at 1; *see also* Ahuja Dep. at 131:17-132:5 (transaction was at early stage).
     [32] Exhibits 12; 121 at 3; 301; Ahuja Dep. at 182:19-185:21.
28   [33] Exhibit 121 at 7.

discussions with the Saudi PIF on August 12, 2018.[34] While Defendants state that the subsequent blogpost dated August 13, 2018 merely provided additional details about the going-private transaction, including purported discussions with the Saudi PIF, they omit that Al-Rumayyan immediately complained to Musk about it, calling it "an ill-advised blog with loose information."[35]

## III.   THERE IS NO GENUINE DISPUTE THAT FUNDING WAS NOT SECURED ON AUGUST 7, 2018.

As the undisputed facts demonstrate, no funding was secured by Musk to take Tesla private at $420 per share at his meeting on July 31, 2018 with the Saudi PIF. No price was discussed, no specific amount of funding was agreed, no legal commitment was made, and no documents were signed. Instead, there was merely, as Al-Rumayyan stated, a desire by the Saudi PIF "to start working together to explore a potential transaction."[36] Ahuja's recollection is also consistent with this, as is the conduct of Musk's advisors Silver Lake and Goldman Sachs who spent the two weeks following the tweet developing a strategy to obtain financing, a completely unnecessary task if funding is already secure.

In response, Defendants point to the subjective belief of Musk that the Saudi PIF "was ready, willing, and able to fund a take-private transaction." Opp. Br. at 6. Even if true, this is insufficient to justify Musk's tweeting "funding secured" because he had no intention of using the Saudi PIF to fund the entire going-private transaction.[37] Whether or not the Saudi PIF expressed interest in funding a going-private transaction, Musk still had to obtain billions of dollars of funding for the portion of the transaction he would not give to the Saudi PIF. No discussions regarding such funding had occurred with any other investor.[38]

But there is a greater flaw with Musk's "subjective belief" defense of his otherwise false tweet: it is not the law. "We apply the objective standard of a 'reasonable investor' to determine

---

[34] *Id*. at 9.
[35] *Id*. at 12.
[36] Exhibit 121 at 8.
[37] E. Musk Dep. at 125:9-25.
[38] In addition, Musk's belief on the amount of funding needed depended on the ability of existing Tesla shareholders to rollover their investment into a private Tesla. *See*, *e*. *g*., E. Musk Dep. at 216:6-220:11. By August 7, 2018, Musk had undertaken no work to determine how many, if any, Tesla investors would roll over their shareholding or if it was even feasible for them to do so.

1  whether a statement is misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir.

2  2021)(*citing In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993)). "[A] statement is

3  misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in

4  a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d

5  982, 985 (9th Cir. 2008)(*quoting Brody v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th

6  Cir. 2002)). As this Court found in denying Defendants' motion to dismiss this case: "a reasonable

7  stock investor could believe that Tesla had secured funding for the going-private transaction at

8  $420 per share." *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 924 (N.D. Cal. 2020)(identifying

9  13 facts supporting falsity). This is especially the case because, "notably Mr. Musk used the past

10  tense in this regard. The word 'secured' implicitly negates any condition." *Id*. at 923.[39]

11      Furthermore, the evidence indisputably shows that reasonable investors did conclude that

12  funding for a going-private transaction had been committed to Musk unconditionally. Viecha,

13  Tesla's own Director of Investor Relations, understood Musk's August 7, 2018 tweet to mean that

14  "financing is secured regardless of other assumptions."[40] Itay Michaeli, an analyst at Citi Research,

15  confirmed with Viecha that it was "an actual transaction on the table (with secured funding),"[41]

16  and JP Morgan's Brinkman revised his target price for Tesla upwards to account for the fact that

17

18  [39] Defendants' citations do not support their argument that the jury must decide the meaning of

19  "funding secured." Opp. Br. at 16:4-13. In *Washtenaw*, to defeat summary judgment, Defendants
   put forth evidence that generic price inflation was well-known in the industry and had been

20  publicly remarked upon by their competitors and other market participants to demonstrate that
   Walgreens had not seen any "unusual activity" regarding generic inflation "compared to the rest

21  of the industry." *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, 2021 WL 5083756, at *8

22  (N.D. Ill. Nov. 2, 2021). The Court in *Buxbaum* found that the parties' experts put forth two equally
   plausible translations of a German word that precluded summary judgment. *Buxbaum v. Deutsche*

23  *Bank AG*, 196 F. Supp. 2d 367, 373 (S.D.N.Y. 2002). Finally, in *REMEC,* the Court denied
   summary judgment finding that a reasonable jury could accept "Defendants' explanation and take

24  the 5% depreciation into account to reconcile the different figures in the current budget and the
   goodwill impairment test," and there was room for the parties to argue whether these numbers fall

25  within the definition of the word "consistent." *In re REMEC Inc. Sec. Litig.,*702 F. Supp. 2d 1202,

26  1226 (S.D. Cal. 2010). Here, Defendants offer no evidence—expert or otherwise—that the term
   phrase "funding secured" should be interpreted other than by its plain meaning or that a reasonable

27  investor would agree with their novel interpretation.

28  [40] Exhibit 151 at 1; *see also* Viecha Dep. at 156:21-158:22.
   [41] Exhibit 146 at 1.

1   a going-private transaction is a real possibility because "Tesla's CEO says funding is secured."[42]

2          Under these circumstances, summary judgment in favor of Plaintiff on the falsity of the

3   August 7, 2018 tweet is supported as there is no genuine factual dispute that it was false when

4   issued: funding was not secured as of August 7, 2018. Furthermore, Musk knew it was false and

5   subsequent self-serving statements of "belief" are insufficient under the securities laws. *S.E.C. v.*

6   *Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010)("When the defendant is aware

7   of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of

8   the risk'")(internal quotations omitted). Indeed, this argument runs squarely into black letter law

9   holding that "a defendant will ordinarily not be able to defeat summary judgment by the mere

10  denial of subjective knowledge of the risk that a statement could be misleading." *Platforms*

11  *Wireless*, 617 F.3d at 1094. Where, as here, "no reasonable person could deny that the statement

12  was materially misleading, a defendant with knowledge of the relevant facts cannot manufacture

13  a genuine issue of material fact merely by denying (or intentionally disregarding) what any

14  reasonable person would have known." *Id.* at 1094.

15         Defendants' attempt to distinguish *Platforms Wireless* is unavailing. The funding

16  "secured" by Musk was exactly as illusory as the product described in *Platforms Wireless*. Musk

17  had the same level of knowledge about his unconditional claims of secured funding as the

18  defendants had about the product in *Platforms Wireless*. Whatever he now claims was his

19  subjective belief at the time cannot be sufficient to overcome the patently and objectively false

20  statement he made. "If such a self-serving assertion could be viewed as controlling, there would

21  never be a successful prosecution or claim for fraud." *Id.* at 1095.

22         Defendants' lengthy citations to cases holding that summary judgment is generally

23  inappropriate on the issue of scienter are inapposite here. *See* Opp. Br. at 21. As one of their own

24  cases provide, "Summary judgment is generally inappropriate when mental state is an issue, ***unless***

25  ***no reasonable inference supports the adverse party's claim.***" *Vucinich v. Paine, Webber, Jackson*

26  *& Curtis, Inc.,* 739 F.2d 1434, 1436 (9th Cir.1984) (emphasis added).  There is no conflicting

27  evidence here and no reasonable inference to be made, only Musk's purported belief. The

28  ---

[42] Exhibit 14 at 1.

undisputed facts demonstrate that Musk acted with scienter.

Defendants' other arguments may be easily dismissed. First, Defendants state that "The full factual picture demonstrates a sufficient basis for a jury to conclude that, **as the PIF represented to Mr. Musk**, 'funding [was] secured' and 'investor support [was] confirmed.'" Opp. Br. at 15 (emphasis added). There is no evidence that such representations were made by any representative of the Saudi PIF to Musk at the July 31, 2018 meeting or at any other time. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (affirming the grant of summary judgment where non-movant failed to identify any parts of record that established a genuine dispute of material fact).

Second, Defendants argue that, regarding the proposed price of $420 per share never being discussed with the Saudi PIF, Musk "**never made any public representations on any of these issues**." The initial August 7, 2018 tweet itself, however, explicitly references the $420 price and Musk himself testified that his intention in issuing the tweet was to communicate that funding was secured at $420.[43] Since Musk never discussed the $420 share price with the Saudi PIF, this was impossible. Defendants' attempt to redirect the Court's attention from this fact fails.

Finally, Defendants make the bizarre argument that Musk's August 7, 2018 tweet was not material to Tesla investors. Opp. Br. at 22-24. A statement is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). Musk's August 7, 2018 tweets had an immediate impact on Tesla's stock price,[44] led to a trading halt of its shares on Nasdaq,[45] and quickly became one of the most keenly followed stories in financial media. Numerous analysts issued reports discussing the tweets, including the importance of the phrase "funding secured" as

---

[43] E. Musk Dep. at 132:24-133:13.
[44] Hartzmark Rpt., ¶64.
[45] Exhibits 149 and 204.

well as other tweets issued by Musk on August 7, 2018.[46] Over 2,400 news articles or mentions about the tweets were published over the next ten days.[47] To argue that the tweet did not "significantly alter the total mix of information" available to Tesla investors is absurd.

Defendants' argument on materiality appears to be based solely on a tendentious interpretation of the stock price reaction to a blog post issued six days later, on August 13, 2018. This argument, however, is fundamentally a loss causation argument as it appears to assert there is a genuine factual dispute over the loss caused by Musk's August 7, 2018 tweet because Plaintiff cannot show Tesla's stock price **only** reacted to the statement "funding secured." This is fundamentally different from materiality which requires a statement altering the "total mix" of information, not that it is the only statement affecting a company's stock price on a particular day. Defendants' materiality argument may be summarily dismissed.

## IV.    THERE IS NO CREDIBLE DISPUTE THAT INVESTOR SUPPORT WAS NOT CONFIRMED ON AUGUST 7, 2018.

The evidence of the falsity of Musk's statement on August 7, 2018 that "investor support is confirmed" is simple and undisputed. When he issued that tweet, Musk had not discussed taking Tesla private at $420 per share with a single outside investor. The tweet is written in the past tense, yet no investor had confirmed support, let alone sufficient investors to ensure approval of a going-private transaction.[48] It is logically impossible to confirm support without actually speaking or communicating with the purported supporter. Indeed, Musk would not begin discussions with Tesla investors until days **after** his tweet.[49] He then discovered that many investors, in fact, did not support a going-private transaction. It was primarily for this reason that Musk ultimately withdrew his proposal on August 23, 2018. *See* Opp. Br. at 13.

Faced with this undisputed evidence, Defendants largely try to pretend this misrepresentation does not exist. The only arguments offered are two conclusory statements: (1)

---

[46] Hartzmark Rpt., ¶56; Class Certification Report, ¶32 and Appendix D; *see also* Exhibit 15.

[47] Hartzmark Rpt., ¶56.

[48] *See* Fath Dep. at 45:13-46:8 (interpreting "investor support is confirmed" as meaning "he had it lined up, whatever investors that may be, to support the transaction and be able to take them private.")

[49] Exhibits 113 to 120.

that "the full factual picture demonstrates a sufficient basis for a jury to conclude that, as the PIF represented to Mr. Musk [sic], … "investor support [was] confirmed" (Opp. Br. at 15); and (2) "the facts here … demonstrate a sufficient basis for Mr. Musk's statements that … "investor support [was] confirmed." Opp. Br. at 17. Neither of these statements form any cogent argument in favor of the position, nor do they identify specific evidence to rebut the evidence put forward by Plaintiff. *See Carmen*, 237 F.3d at 1031. Indeed, Defendants appear to simply treat "investor support is confirmed" as synonymous with "funding secured." *See* Opp. Br. at 9.[50]

Putting to one side the fact that "funding secured" was indisputably false, there is no way consistent with the English language to treat the two statements as synonymous. The truth or falsity of Musk's statements is assessed against an objective standard of a reasonable investor not his *ex post* stated "intended meaning." *See Alphabet, Inc.*, 1 F.4th at 699. Musk, admittedly, had no communications with other Tesla investors regarding a going private transaction prior to making this tweet.[51] Under any objective standard, no reasonable person could deny that that the statement was materially misleading when made. *See Platforms Wireless*, 617 F. 3d at 1094.

Defendants also argue that the second sentence in Musk's final tweet on August 7, 2018, that "[o]nly reason why this is not certain is that it's contingent on a shareholder vote" is true. Opp. Br. at 17. Defendants do not dispute that numerous contingencies existed before the transaction could be put to a shareholder vote. Nor could they. On August 3, 2018, the Tesla Board told Musk that "a detailed proposal regarding a going private transaction had not yet been made and that one would be needed in order for the Board to properly analyze and evaluate it."[52] On August 4, 2018, Michael Dell told Musk that going private was "a very difficult process" that took "something like a year" to complete.[53] On August 10, 2018, Silver Lake outlined for Musk the detailed process that

---

[50] Musk himself has offered contradictory explanations of what he meant by "investor support is confirmed." *Compare* E. Musk Dep. at 215:25-216:5 (refers to Musk and PIF) *with* Musk Interrogatory Responses at 20 ("statement []'***investor support is confirmed***' to be synonymous with '***funding secured***'"). In any event, Musk's shifting explanations are irrelevant as the law imposes an objective test for falsity. *See Alphabet, Inc.*, 1 F.4th at 699.

[51] Musk Interrogatory Responses at 27, 28, 30, and 35; E. Musk Dep. at 165:15-17, 189:10-16.

[52] Exhibit 83 at 3.

[53] E. Musk Dep. at 167:7-168:14; E. Musk SEC Tr. at 161:6-21.

1    would need to be followed; Musk had not reached even the initial stage of that process.[54] Thus,

2    there is no credible argument that Musk's statement that a shareholder vote was the only remaining

3    contingency was true on August 7, 2018. And while Musk's belief is not relevant given his

4    knowledge of relevant facts, Musk testified that at the time of this last tweet, his level of certainty

5    that the transaction would be consummated was "probably roughly 50 percent."[55]

6        Defendants do not dispute these facts but instead point to statements made by Musk and

7    Tesla on August 13, 2018 in a blogpost. In this blogpost, Musk and Tesla gave more details on the

8    process being followed, including the formation of a special committee. Defendants argue that this

9    blogpost, published six days *after* his tweet, somehow creates a genuine dispute whether the tweet

10   was false at the time it was made. It is axiomatic that misrepresentations are assessed based on the

11   facts that existed at the time they were made. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086

12   (9th Cir. 2002). Subsequent disclosures may correct, in whole or in part, an earlier

13   misrepresentation but they cannot travel backwards in time to render a prior misrepresentation not

14   misleading. *See*, *e.g.*, *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) (Easterbrook

15   J.) (misrepresentation regarding patent was false when made notwithstanding fact that defendant

16   ultimately obtained patent two years later). In any event, the record shows that Tesla investors

17   were still misled about the status of the transaction even after the August 13, 2018 blogpost.

18   Morningstar, for example, understood the August 13, 2018 blogpost, read together with Musk's

19   August 7, 2018 tweets, to indicate that Musk had approximately 60% of shareholders supporting

20   the transaction.[56] Musk would pull the going-private transaction for lack of investor support ten

21   days later. Tesla and Musk may now wish they had made more disclosure about the process on

22   August 7, 2018 along the lines later contained in the subsequent blogpost, but that wish does not

23   make the August 7, 2018 tweet any more truthful at the time it was made.[57]

24
     ────────────────
25   [54] Exhibit 179 at 29. *See also* Exhibit 265 at 7.
     [55] E. Musk SEC Tr. at 258:1-4.
26   [56] Morningstar, *Tesla Buyout Looks Likely to Us, but Timing and Structure Uncertain*, August 13,
     2018, 4:50 p.m. cited in Hartzmark Rpt., ¶106.
27   [57] Defendants also point to the Tesla stock price reaction to the August 13, 2018 blogpost as
     evidence that the August 7, 2018 tweet was either not misleading or immaterial. This argument is
28   again a loss causation argument dressed up as a dispute over falsity. The suggestion that a

1

## V.   THERE IS NO GENUINE DISPUTE THAT THE AUGUST 13 BLOGPOST MISREPRESENTED THE STATUS OF NEGOTIATIONS WITH THE PIF.

The critical facts for determining the truthfulness of the August 13, 2018 blogpost are not disputed: they are contained in the text messages exchanged between Al-Rumayyan and Musk from August 10, 2018 to August 13, 2018. These texts show that the blogpost's description of the discussions between Musk and Al-Rumayyan does not fairly or accurately convey the state of the discussions as of August 13, 2018 when it was published. The blogpost portrays a cordial and mutually supportive discussion between Musk and the Saudi PIF to engage in a process whereby the Saudi PIF would help take Tesla private. In fact, the going-private process was now being run by Goldman Sachs and Silver Lake with a minimal role, if any, for the Saudi PIF, and the relationship between Musk and Al-Rumayyan would be more accurately described as hostile and angry.[58] This is obviously material information for investors to understand whether the funding was or was not in place for the going-private transaction and the role the Saudi PIF would play. The August 13, 2018 blogpost deliberately omitted the conflict between Musk and Al-Rumayyan to give a misleading impression of an orderly and planned process for taking Tesla private.

## VII.   THERE IS NO GENUINE DISPUTE THAT PLAINTIFF HAS ESTABLISHED RELIANCE BY THE CLASS ON THE ALLEGED MISREPRESENTATIONS.

Defendants offer two arguments against Plaintiff's motion on reliance: 1) that there is a genuine dispute of material fact that Defendants' statements were material; and 2) that there is a genuine dispute of material fact regarding whether Defendants can rebut the fraud-on-the-market presumption by, purportedly, demonstrating that when the purported "truth" was revealed, there was no price impact. Opp. Br. at 22. However, Defendants offer no facts, let alone material facts, to rebut the presumption of reliance. *See Soremekun*, 509 F.3d at 984.

As shown above, Defendants have failed to show any genuine dispute as to whether Musk's statements were material. Indeed, the entire argument is baseless and an attempt to repackage arguments regarding loss causation, which is not at issue on this motion, with materiality. Musk's tweets had an immediate and observable impact on Tesla's stock price and were front page news

---

statement by Musk that the only remaining step before taking Tesla private is a shareholder vote is somehow immaterial is absurd.
[58] Exhibit 121 at 11-13.

1   for the next two weeks. To suggest they were not material is ridiculous.[59] Defendants also fail to

2   show a genuine dispute of fact as to their ability to rebut the fraud-on-the-market presumption.

3   This presumption may be rebutted by a showing that "the 'market makers' were privy to the truth

4   . . . and thus that the market price would not have been affected by their misrepresentations", or

5   that the truth "credibly entered the market and dissipated the effects of the misstatements." *Basic*

6   *Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988).[60] Defendants have offered no evidence that either

7   of these conditions applies here. *See Carmen*, 237 F.3d at 1031.

8          On the first condition, Defendants have not offered the name of a single market maker who

9   was "privy to the truth." Mere speculation that one of the many market makers active in Tesla's

10  stock might have known the truth (but have remained invisible in the documents produced in this

11  case) is insufficient to defeat summary judgment on this issue. On the second *Basic* condition,

12  Defendants again offer no evidence. Instead, Defendants rely solely on unsworn and unverified

13  statements from their expert indicating "that the market understood from the beginning that the

14  entire proposal and source of funding was uncertain." Opp. Br. at 25. First, Defendants' expert

15  report is aimed at loss causation, an element not at issue in this motion, rather than reliance or

16  market efficiency. Second, even the "evidence" contained in Defendants' expert report fails to

17  support their point: the analyst reports cited by Defendants' expert accepted Musk's representation

18  that funding was "secured" and questioned only whether the transaction would ultimately be

19  consummated.[61] In other words, Defendants do not point to a single market participant who ***knew***

20  that funding was not secured or that investor support had not been confirmed. Indeed, even after

21  the August 13, 2018 blogpost, analysts still, mistakenly, believed that Musk had 60% investor

---

22  [59] Notably, at no point in his two reports, does Defendants' expert opine that Musk's August 7,

23  2018 tweets were immaterial. Indeed, he offers no opinion on materiality at all. *See* McCall Decl. Exhibits V and W.

24  [60] *In re Allstate Corp. Securities Litigation*, 966 F.3d 595 (7th Cir. 2020), does not assist

25  Defendants. *See* Opp. Br. at 25. In *Allstate*, the Seventh Circuit simply went on to prohibit district courts from deciding "materiality and loss causation" at the class certification stage while still

26  requiring them to consider evidence relative to whether the alleged misrepresentations "affect[ed] the price of the securities" at issue. *Allstate*, 966 F.3d at 608-09. This issue is not presented here.

27  [61] Defendants' expert cites Brinkman's JP Morgan report even though Brinkman expressly relied on Musk's tweet "funding secured" as a basis to increase his target price for Tesla stock. Exhibit

28  15. The other analysts similarly accepted Musk's representations as accurate. *See* McCall Decl., Exhibits S, T, and U.

---

1   support for a going-private transaction.[62] There is no systematic analysis of market movement or

2   any attempt to identify when the truth "credibly entered the market and dissipated the effects of

3   the misstatements." *See c.f. Allstate*, 966 F.3d at 613 (directing district court on remand to "square"

4   defendants' price impact argument with "10 percent price drop" at end of class period). This is

5   fatal to their argument. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951,

6   1962 (2021) ("The defendant must 'in fact' 'seve[r] the link' between a misrepresentation and the

7   price paid by the plaintiff—and a defendant's mere production of *some* evidence relevant to price

8   impact would rarely accomplish that feat." (internal quotations omitted)).

9          Defendants' argument that the market understood the truth regarding the meaning of

10   "funding secured" prior to the August 13, 2018 blog post because the stock did not decline

11   afterwards, similarly fails. Opp. Br. at 25. As an initial matter, whether "the alleged

12   misrepresentations impacted [Tesla's] stock price" improperly "present[s] loss causation issues."

13   *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 287 (N.D. Cal. 2020) (citing *Erica P.*

14   *John Fund v. Halliburton Co.*, 563 U.S. 804, 807 (2011)). Further, it disregards the indisputable

15   fact that Tesla's stock price declined 19.5% at the end of the Class Period.[63] The extent to which

16   Musk's misrepresentations caused Plaintiff's losses is not at issue here because, as previously

17   stated, Plaintiff has not moved for summary judgment on loss causation. *See Halliburton*, 563 U.S.

18   at 813 ("The fact that a subsequent loss may have been caused by factors other than the revelation

19   of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation

20   in the first place, either directly or presumptively through the fraud-on-the-market theory. Loss

21   causation has no logical connection to the facts necessary to establish the efficient market predicate

22   to the fraud-on-the-market theory.").

23   **VIII.   CONCLUSION.**

24          For the foregoing reasons and the reasons set forth in Plaintiff's opening brief, his motion

25   for summary judgment should be granted.

26

27   ───────────────────
     [62] *See* McCall Decl. Exhibit R ("It sounds to us that he is not done talking to shareholders to gauge
     interest, but his estimate of about 66% of shareholders not tendering is not far off from our own

28   assumption of 60%.")
     [63] Hartzmark Rpt. ¶65.

1   Dated: February 15, 2022                    Respectfully submitted,

2                                               **LEVI & KORSINSKY, LLP**

3                                                s/ Adam M. Apton
4                                               Adam M. Apton (SBN 316506)
                                                Adam C. McCall (SBN 302130)
5                                               75 Broadway, Suite 202
                                                San Francisco, CA 94111
6                                               Tel.: (415) 373-1671
                                                Email: aapton@zlk.com
7                                               Email: amccall@zlk.com

8
                                                -and-
9
10                                              Nicholas I. Porritt
                                                Elizabeth K. Tripodi
11                                              Alexander A. Krot III
                                                LEVI & KORSINSKY, LLP
12                                              1101 30th Street N.W., Suite 115
                                                Washington, D.C. 20007
13                                              Tel.: (202) 524-4290
                                                Email: nporritt@zlk.com
14                                              Email: akrot@zlk.com
15                                              (*admitted pro hac vice*)

16                                              -and-

17                                              Joseph Levi
                                                Eduard Korsinsky
18                                              LEVI & KORSINSKY, LLP
19                                              55 Broadway, 10th Floor
                                                New York, New York 10006
20                                              Tel.: (212) 363-7500
                                                Email: jlevi@zlk.com
21                                              Email: ek@zlk.com
                                                (*admitted pro hac vice*)
22
23                                              *Attorneys for Plaintiff and Counsel for the Class*

24

25

26

27

28

EXHIBIT 41

| | |
|---|---|
| **From:** | Fath, Joseph <Joseph_Fath@troweprice.com> |
| **Sent:** | Tuesday, August 07, 2018 1:17 PM |
| **To:** | Marcotte, Robert |
| **Cc:** | Poussard, Adam; Holcomb, Ann; Doran, Christopher; Eiswert, David; Giroux, David; Rooth, David; Rowlett, David; Peters, Don; Veiel, Eric; Solomon, Gabriel; Balkrishna, Hari; Nogueira, Jason; Polun, Jason; Rottinghaus, Jeff; Grant, Joel; Nelson, Josh; Slater, Josh; Spencer, Josh; Allen, Ken; Uematsu, Ken; Puglia, Larry; Muschamp, Mark; Weigman, Mark; Snowling, Matt; Wehn, Michael; Welsh, Nick; Bates, Peter; Burger, Philip; de los Reyes, Rick; Harlow, Robert; Berg, Scott; Livingston, Scott; Mallet, Sebastien; Hubrich, Stefan; Tamaddon, Taymour; ICG Trades; Mcdonald, Jamie; Crawford, Katherine; Dopkin, Anna; Moffett, Eric; Klaiber, Gretchen; Sinn, Angela; Taylor, Ron; To, Christine; Von Paris, Lyn; Watson, Thomas; Tse, Connie; Chan, Nicole; Wong, Stanley; Baig, Kamran; Amieva, Paulina; Berghuis, Brian; Pinnington, Richard; Childs, Jacqueline; Blanca, Omar; Collins, Davis; Traders; TRPI HK Dealing; London Trading Group; Portfolio Modeling Group; TRPI AU Dealing |
| **Subject:** | Re: TSLA (Tesla) Update |



Joe

Sent from my very stable genius iPhone


On Aug 7, 2018, at 12:57 PM, Marcotte, Robert <Robert_Marcotte@troweprice.com> wrote:

> (BFW) *MUSK TWEETS 'AM CONSIDERING TAKING TESLA PRIVATE AT $420'...stock traded as high as $371.15 on this
>
> **IF YOU ARE REPLYING TO THIS TRADING ALERT WITH AN ACTIONABLE ORDER, PLEASE INCLUDE EITHER 'TRADERS'/'EQTA' FOR THE AMERICAS, 'LONDON TRADING GROUP', 'TRPI HK DEALING', OR 'TRPI AU DEALING' ***



**Exhibit 41**

Confidential Treatment
CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

TRP00002
TRP_000002

EXHIBIT 58

| From: | Owuraka Koney </O=JENNISON/OU=JENNISON/CN=RECIPIENTS/CN=OKONEY> |
|---|---|
| To: | Martin Viecha |
| Sent: | 8/7/2018 9:03:06 PM |
| Subject: | RE: call me back |

-----Original Message-----
From: Martin Viecha [mailto:mviecha@tesla.com]
Sent: Tuesday, August 07, 2018 4:55 PM
To: Owuraka Koney <OKoney@jennison.com>
Subject: RE: call me back

I actually don't know, but I would assume that given we went full-on public with this, the offer is as firm as it gets.

-----Original Message-----
From: Owuraka Koney <OKoney@jennison.com>
Sent: Tuesday, August 7, 2018 13:47
To: Martin Viecha <mviecha@tesla.com>
Subject: RE: call me back

Firm offer means there is a commitment letter or is this a verbal agreement?

-----Original Message-----
From: Martin Viecha [mailto:mviecha@tesla.com]
Sent: Tuesday, August 07, 2018 4:45 PM
To: Owuraka Koney <OKoney@jennison.com>
Subject: RE: call me back

The very first tweet simply mentioned "Funding secured" which means that this is a firm offer. Elon did not disclose details of who the buyer is.

Martin

-----Original Message-----
From: Owuraka Koney <OKoney@jennison.com>
Sent: Tuesday, August 7, 2018 13:29
To: Martin Viecha <mviecha@tesla.com>
Subject: Re: call me back

I did. Nothing on funding though?

On Aug 7, 2018, at 16:27, Martin Viecha <mviecha@tesla.com<mailto:mviecha@tesla.com>> wrote:

Hey, I'm on a plane to NYC. I'm online though. Did you read our official blog post on this topic?

From: Owuraka Koney <OKoney@jennison.com<mailto:OKoney@jennison.com>>
Sent: Tuesday, August 7, 2018 13:20
To: Martin Viecha <mviecha@tesla.com<mailto:mviecha@tesla.com>>
Subject: call me back

**Exhibit 58**

This e-mail, including any attachment(s), is intended solely for use by the named addressee(s). If you are not the intended recipient, you are not authorized to disclose, copy, distribute or retain this message, without written authorization from Jennison Associates LLC ("Jennison"). This e-mail may contain proprietary, confidential or privileged information. If you have received this message in error, please notify the sender immediately. If you have requested Jennison to e-mail any account information to you or your designee, you are deemed to have consented to electronic delivery of information from Jennison. E-mail messages are not secure and may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient.

Please note that your personal information may be stored and processed in any country where we have facilities or in which we engage service providers. If you provide personal information to us by email or otherwise, you consent to the transfer of that information to countries outside of your country of residence and these countries may have different data protection rules than your country. To learn how we protect privacy, please use this link (https://urldefense.proofpoint.com/v2/url?u=https-3A__www.jennison.com_gdpr&d=DwIFEA& c=m5pJjvhoJ8du6Q8es33zcrlMoqSJBzBMtZh4icn4nJ8&r=bjrpqU5hfbNitpwhsopl_cn-Q9ZKu09xplshElUu1uo&

m=2XE9NqIIGEngM-AGc4gq5utBYuILaOktDiXj0YE-uBI&s=hu2B4txpgSRGuLL0LqRz0LbYZuE5h7gco6JgrcJ9qh8&
e=<https://urldefense.proofpoint.com/v2/url?u=https-3A__www.jennison.com_gdpr&d=DwQFAg&
c=m5pJjvhoJ8du6Q8es33zcrlMoqSJBzBMtZh4icn4nJ8&r=bjrpqU5hfbNitpwhsopI_cn-Q9ZKu09xpIshElUu1uo&m=tZcUqJ-
FE3ZsGP2nBcG9YrNZbXsvkgI1C4USnWtFpxM&s=LE2mmpuKm-LeAAaDpHdVv6jUDzM2smWMdPFpURacBmQ&e=>)
to read our Privacy Notice.
This e-mail, including any attachment(s), is intended solely for use by the named addressee(s). If you are not the
intended recipient, you are not authorized to disclose, copy, distribute or retain this message, without written
authorization from Jennison Associates LLC ("Jennison"). This e-mail may contain proprietary, confidential or privileged
information. If you have received this message in error, please notify the sender immediately. If you have requested
Jennison to e-mail any account information to you or your designee, you are deemed to have consented to electronic
delivery of information from Jennison. E-mail messages are not secure and may contain computer viruses or other
defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the
knowledge of the sender or the intended recipient.

Please note that your personal information may be stored and processed in any country where we have facilities or in
which we engage service providers. If you provide personal information to us by email or otherwise, you consent to the
transfer of that information to countries outside of your country of residence and these countries may have different data
protection rules than your country. To learn how we protect privacy, please use this link
(https://urldefense.proofpoint.com/v2/url?u=https-3A__www.jennison.com_gdpr&d=DwIFEA&
c=m5pJjvhoJ8du6Q8es33zcrlMoqSJBzBMtZh4icn4nJ8&r=bjrpqU5hfbNitpwhsopI_cn-Q9ZKu09xpIshElUu1uo&
m=2XE9NqIIGEngM-AGc4gq5utBYuILaOktDiXj0YE-uBI&s=hu2B4txpgSRGuLL0LqRz0LbYZuE5h7gco6JgrcJ9qh8&e=)
to read our Privacy Notice.

This e-mail, including any attachment(s), is intended solely for use by the named addressee(s). If you are not the
intended recipient, you are not authorized to disclose, copy, distribute or retain this message, without written
authorization from Jennison Associates LLC ("Jennison"). This e-mail may contain proprietary, confidential or privileged
information. If you have received this message in error, please notify the sender immediately. If you have requested
Jennison to e-mail any account information to you or your designee, you are deemed to have consented to electronic
delivery of information from Jennison. E-mail messages are not secure and may contain computer viruses or other
defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the
knowledge of the sender or the intended recipient.

Please note that your personal information may be stored and processed in any country where we have facilities or in
which we engage service providers. If you provide personal information to us by email or otherwise, you consent to the
transfer of that information to countries outside of your country of residence and these countries may have different data
protection rules than your country. To learn how we protect privacy, please use this link
(https://urldefense.proofpoint.com/v2/url?u=https-3A__www.jennison.com_gdpr&d=DwIFAg&
c=m5pJjvhoJ8du6Q8es33zcrlMoqSJBzBMtZh4icn4nJ8&r=bjrpqU5hfbNitpwhsopI_cn-Q9ZKu09xpIshElUu1uo&
m=v5FLVPIv_w6UQ9FS7P084VxQI1SjUQ1bxv8ereaO7Is&s=ALkNfGW0zwRzXYgMxAQ-
RQxYwjEIsqzb8ivAbA1ZtWI&e=) to read our Privacy Notice.

CONFIDENTIAL

JENN0000075

EXHIBIT 79

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|-----|---------|-----------|------|---------|---------|--------|--------------|-------------|-----------|----------------|--------|----------------|
| SMS | Incoming | 8/1/2018 1:23 | Yasir from Saudi PIF here. Says they own almost 5% of Tesla (?)! | | Sam Teller (████) | Martin Viecha (████), Sam Teller (████), Self | 0 | 8/1/2018 1:23 | | | No |
| SMS | Incoming | 8/1/2018 1:23 | Feel free to come meet in 15 mins and walk him out | | Sam Teller (████) | Martin Viecha (████), Sam Teller (████), Self | 0 | 8/1/2018 1:23 | | | No |
| SMS | Incoming | 8/1/2018 1:23 | No pressure but you are welcome | | Sam Teller (████) | Martin Viecha (████), Sam Teller (████), Self | 0 | 8/1/2018 1:23 | | | No |
| SMS | Outgoing | 8/1/2018 1:24 | Will do. Not surprised. We had heard that from GS that a "Saudi investor had been buying our stock all the way to 5%" | | Self | Martin Viecha (████), Sam Teller (████), Unknown, Self | 0 | | | | No |
| SMS | Incoming | 8/1/2018 1:26 | Deepak you may want to join | | Sam Teller (████) | Martin Viecha (████), Sam Teller (████), Self | 0 | 8/1/2018 1:26 | | | No |
| SMS | Incoming | 8/1/2018 1:26 | In Jupiter now | | Sam Teller (████) | Martin Viecha (████), Sam Teller (████), Self | 0 | 8/1/2018 1:26 | | | No |
| SMS | Incoming | 8/1/2018 1:27 | Or be ready when we leave. You should meet | | Sam Teller (████) | Martin Viecha (████), Sam Teller (████), Self | 0 | 8/1/2018 1:27 | | | No |
| SMS | Outgoing | 8/1/2018 1:27 | Coming over. | | Self | Martin Viecha (████), Sam Teller (████), Unknown, Self | 0 | | | | No |
| SMS | Incoming | 8/1/2018 1:32 | Lmk when here | | Sam Teller (████) | Martin Viecha (████), Sam Teller (████), Self | 0 | 8/1/2018 1:32 | | | No |
| SMS | Outgoing | 8/1/2018 1:33 | Outside now. | | Self | Martin Viecha (████), Sam Teller (████), Unknown, Self | 0 | | | | No |
| iMessage | Incoming | 8/1/2018 2:09 | Todd stopped by looking for you | | Ann 🖤 Seid (████) | Ann 🖤 Seid (████), Self | 0 | 8/1/2018 2:14 | | | No |
| iMessage | Incoming | 8/3/2018 15:24 | Good morning Deepak 😊 I saw that you will be missing the Powerwall call. In your email you said 9:30 but it's at 9:00. Is that due to the call with TRP at 8:30? | | Ann 🖤 Seid (████) | Ann 🖤 Seid (████), Self | 0 | 8/3/2018 15:26 | | | No |





TSLA_AHUJA0000447 Page 1

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | iMessage | Outgoing | 8/3/2018 15:27 | I won't attend the 9 am powerwall call. My mistake in the email. | | Self | Ann 🖤 Seid ( ), Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/3/2018 15:39 | Got it. We are just waiting on James Murdoch now. | | Ann 🖤 Seid ( ) | Ann 🖤 Seid ( ), Self | 0 | 8/3/2018 15:50 | | | No |
| | iMessage | Incoming | 8/3/2018 17:35 | Hi Deepak - it's Elissa. Is 10:45 ish ok with you for the call w/ Elon? | | Elissa Butterfield ( ) | Elissa Butterfield ( ), Self | 0 | 8/3/2018 17:35 | | | No |
| | iMessage | Outgoing | 8/3/2018 17:36 | Yes! | | Self | Elissa Butterfield ( ), Self | | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/3/2018 17:36 | Great - I'll keep you updated | | Elissa Butterfield ( ) | Elissa Butterfield ( ), Self | 0 | 8/3/2018 17:36 | | | No |
| | iMessage | Outgoing | 8/3/2018 17:37 | Ok | | Self | Elissa Butterfield ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/3/2018 17:48 | I have called in and will wait. | | Self | Elissa Butterfield ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/3/2018 17:48 | Thank you | | Elissa Butterfield ( ) | Elissa Butterfield ( 5 ), Self | 0 | 8/3/2018 17:48 | | | No |
| | iMessage | Incoming | 8/3/2018 17:51 | He's going to jump in the car, so about 10 min | | Elissa Butterfield ( ) | Elissa Butterfield ( -  ), Self | 0 | 8/3/2018 17:51 | | | No |
| | iMessage | Incoming | 8/3/2018 17:51 | 11 AM 😊 | | Elissa Butterfield ( ) | Elissa Butterfield ( ), Self | 0 | 8/3/2018 17:51 | | | No |
| | iMessage | Outgoing | 8/3/2018 17:51 | Got it. | | Self | Elissa Butterfield ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/3/2018 19:45 | + | | Ann 🖤 Seid ( ) | Ann 🖤 Seid ( ), Self | 0 | 8/3/2018 19:46 | | | No |
| | iMessage | Incoming | 8/3/2018 19:45 | James' number | | Ann 🖤 Seid ( ) | Ann 🖤 Seid ( ), Self | 0 | 8/3/2018 19:46 | | | No |
| | iMessage | Outgoing | 8/3/2018 19:47 | Hi James, Deepak here. Want to confirm that 7pm PST Board call tonight is ok with you. Everyone else has confirmed. Thanks. | | Self | James Murdoch ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/3/2018 20:46 | Yes it's fine. | | James Murdoch ( ) | James Murdoch ( ), Self | 0 | 8/3/2018 20:46 | | | No |
| | iMessage | Outgoing | 8/3/2018 20:46 | Thanks | | Self | James Murdoch ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/4/2018 2:17 | We are all on the call ready for Elon | | Self | , Self | 0 | | 5828963-12-20 00:00:00 | | No |

TSLA_AHUJA0000447 Page 2

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | iMessage | Incoming | 8/4/2018 2:18 | Hi Deepak! Elon is jumping on shortly. He will be dialing himself in. | | ▮ | ▮, Self | 0 | 8/4/2018 2:18 | | | No |
| | iMessage | Outgoing | 8/4/2018 2:18 | Thanks. | | Self | ▮, Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/7/2018 17:16 | Hi Deepak.  Give me a call when you can please.  I assume things are a bit hectic for you!! | | Dan Dees ▮ ) | Dan Dees (▮), Self | 0 | 8/7/2018 17:16 | | | No |
| | iMessage | Outgoing | 8/8/2018 3:32 | Still good for 9:30? | | Self | Sam Teller (▮), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/8/2018 3:32 | Yeah | | Sam Teller (▮ | Sam Teller (▮), Self | 0 | 8/8/2018 3:43 | | | No |
| | iMessage | Incoming | 8/8/2018 3:32 | Maybe couple late but not much | | Sam Teller (▮ | Sam Teller (▮), Self | 0 | 8/8/2018 3:43 | | | No |
| | iMessage | Outgoing | 8/8/2018 3:43 | Thanks! | | Self | Sam Teller (▮), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/8/2018 3:44 | 945 perhaps :) | | Sam Teller (▮ | Sam Teller (▮), Self | 0 | 8/8/2018 4:00 | | | No |
| | iMessage | Outgoing | 8/8/2018 4:00 | Ok :) | | Self | Sam Teller (▮), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/8/2018 4:07 | Elon's dinner is now at 9:45 | | Ann 🍃 Seid (▮ | Ann 🍃 Seid (▮), Self | 0 | 8/8/2018 4:28 | | | No |
| | iMessage | Incoming | 8/8/2018 4:12 | I know you must had a long day.  Can we chat for few min? | | Sanjay Shah (▮ | Sanjay Shah (▮), Self | 0 | 8/8/2018 4:28 | | | No |
| | iMessage | Outgoing | 8/8/2018 4:28 | Will call you shortly | | Self | Sanjay Shah (▮), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/8/2018 4:28 | Thanks! | | Self | Ann 🍃 Seid (▮), Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/8/2018 4:29 | I'm sorry it's such a late night of meetings for you! | | Ann 🍃 Seid (▮ | Ann 🍃 Seid (▮), Self | 0 | 8/8/2018 4:31 | | | No |
| | iMessage | Outgoing | 8/8/2018 4:31 | Another day :) | | Self | Ann 🍃 Seid (▮), Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| SMS | | Incoming | 8/8/2018 21:04 | any major updates...free to talk | | Brad Buss (▮ ) | Brad Buss (▮), Self | 0 | 8/8/2018 21:13 | | | No |
| | iMessage | Incoming | 8/8/2018 21:06 | Would you like coffee now? | | Ann 🍃 Seid (▮ ) | Ann 🍃 Seid (▮), Self | 0 | 8/8/2018 21:13 | | | No |
| | iMessage | Outgoing | 8/9/2018 14:43 | Hi Dan, sorry for the delay in my response! Didn't mean to ignore. Will call you in a couple of days. | | Self | Dan Dees (▮), Self | 0 | | 5828963-12-20 00:00:00 | | No |

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMS | Outgoing | 8/9/2018 15:12 | How is it going with investors, beyond the messages forwarded by Aaron? | | Self | Martin Viecha ( ▮ ), Self | 0 | | | | No |
| | SMS | Incoming | 8/9/2018 16:01 | My meeting just finished | | Martin Viecha ( ▮ ) | Martin Viecha ( ▮ ), Self | 0 | 8/9/2018 16:04 | | | No |
| | SMS | Incoming | 8/9/2018 16:01 | Many people simply don't believe this is real | | Martin Viecha ( ▮ ) | Martin Viecha ( ▮ ), Self | 0 | 8/9/2018 16:04 | | | No |
| | SMS | Incoming | 8/9/2018 16:02 | People are quite desperate for more info, which is what we're working on as far as I'm aware | | Martin Viecha ( ▮ ) | Martin Viecha ( ▮ ), Self | 0 | 8/9/2018 16:04 | | | No |
| | SMS | Outgoing | 8/9/2018 16:04 | Yes, thanks. Helpful to know this sentiment. | | Self | Martin Viecha ( ▮ ), Self | 0 | | | | No |
| | iMessage | Incoming | 8/9/2018 16:21 | Understood!!!  U have a lot going on, I suspect!!  We are standing by and ready to help.  I have exchanged an email with elon and as he says, will catch up when he comes up for air! | | Dan Dees ( ▮ ) | Dan Dees ( ▮ ), Self | 0 | 8/9/2018 17:00 | | | No |
| | SMS | Incoming | 8/9/2018 16:28 | The other thing that I hear a lot is that for those shareholders who are unable to hold a stake in a private company, $420 is way too little. Especially now that we're about to turn corner on profitability. | | Martin Viecha ( ▮ ) | Martin Viecha ( ▮ ), Self | 0 | 8/9/2018 16:33 | | | No |
| | SMS | Outgoing | 8/9/2018 17:00 | Understood | | Self | Martin Viecha ( ▮ ), Self | 0 | | | | No |
| | iMessage | Incoming | 8/9/2018 17:22 | Will text you when he's getting closer to rolling | | Elissa Butterfield ( ▮ ) | Elissa Butterfield ( ▮ ) Self | 0 | 8/9/2018 17:27 | | | No |
| | iMessage | Outgoing | 8/9/2018 17:27 | Sounds good. I will be ready. Would you want me to call his cell then? | | Self | Elissa Butterfield ( ▮ ) Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/9/2018 17:28 | Yes, that would work! | | Elissa Butterfield ( ▮ ) | Elissa Butterfield ( ▮ ), Self | 0 | 8/9/2018 17:28 | | | No |
| | iMessage | Outgoing | 8/9/2018 17:29 | Thanks | | Self | Elissa Butterfield ( ▮ ) Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/9/2018 17:58 | He's rolling - feel free to give him a call | | Elissa Butterfield ( ▮ ) | Elissa Butterfield ( ▮ ) Self | 0 | 8/9/2018 17:58 | | | No |
| | iMessage | Outgoing | 8/9/2018 17:58 | Doing now. | | Self | Elissa Butterfield ( ▮ ) Self | 0 | | 5828963-12-20 00:00:00 | | No |

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | iMessage | Outgoing | 8/9/2018 18:13 | I understand the Kuwaities have reached out to you to invest in Tesla. I haven't heard from them at all. Elon wants me to reach out to them. Please send me their info asap. | | Self | JB Straubel ( ▇▇▇ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/9/2018 18:21 | Unfortunately I did not get their contact info. It was a blocked number and their phone dropped and then mine did also before I could get their info. They did say they want to invest $2-4 B and that they had tried to reach you but could not for some reason. That's all I know!  They haven't called back. Very strange. | | JB Straubel ( ▇▇▇ ) | JB Straubel ( ▇▇▇ ), Self | 0 | 8/9/2018 18:20 | | | No |
| | iMessage | Outgoing | 8/9/2018 18:25 | Did they provide the full information of their fund? Yesterday my wife got a blocked call on her cell from a "Saudi investor" wanting to talk to me. She said it sounded like a hoax call. | | Self | JB Straubel ( ▇▇▇ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/9/2018 18:26 | No, they didn't give me any firm background. I did sound strange to be sure and I didn't tell them anything. | | JB Straubel ( ▇▇▇ ) | JB Straubel ( ▇▇▇ ), Self | 0 | 8/9/2018 18:33 | | | No |
| | iMessage | Outgoing | 8/9/2018 18:26 | Can I call you later? | | Self | Sam Teller ( ▇▇▇ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/9/2018 18:26 | About to speak w him and could use a read out | | Sam Teller ( ▇▇▇ ) | Sam Teller ( ▇▇▇ ), Self | 0 | 8/9/2018 18:27 | | | No |
| | iMessage | Incoming | 8/9/2018 18:26 | But he's | | Sam Teller ( ▇▇▇ ) | Sam Teller ( ▇▇▇ ), Self | 0 | 8/9/2018 18:27 | | | No |
| | iMessage | Incoming | 8/9/2018 18:26 | Yes* | | Sam Teller ( ▇▇▇ ) | Sam Teller ( ▇▇▇ ), Self | 0 | 8/9/2018 18:27 | | | No |
| | iMessage | Incoming | 8/9/2018 18:27 | Want to make game plan for today | | Sam Teller ( ▇▇▇ ) | Sam Teller ( ▇▇▇ ), Self | 0 | 8/9/2018 18:27 | | | No |
| | iMessage | Outgoing | 8/9/2018 19:41 | Please call when you get a chance. Want to give you an update. Not urgent. | | Self | Sam Teller ( ▇▇▇ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | SMS | Incoming | 8/9/2018 20:05 | Hi Deepak and Sam, I wanted to ask you if you could please keep me in the loop about any Investor communication. Just so I'm aware of what we're up to. Martin | | Martin Viecha ( ▇▇▇ ) | Martin Viecha ( ▇▇▇ ), Sam Teller ( ▇▇▇ ), Self | 0 | 8/9/2018 20:05 | | | No |

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMS | Incoming | 8/9/2018 20:06 | Elon reaching out personally | | Sam Teller ( ) | Martin Viecha ( ), Sam Teller ( ), Self | 0 | 8/9/2018 20:10 | | | No |
| | SMS | Incoming | 8/9/2018 20:06 | Got it. Top 10 or top 3 or so? | | Martin Viecha ( ) | Martin Viecha ( ), Sam Teller ( ), Self | 0 | 8/9/2018 20:10 | | | No |
| | SMS | Incoming | 8/10/2018 4:24 | Hi Deepak, I landed, but I'm stuck in the plane. We're waiting for our gate | | Martin Viecha ( ) | Martin Viecha ( ), Self | 0 | 8/10/2018 4:25 | | | No |
| | SMS | Incoming | 8/10/2018 4:24 | Would prefer to speak when I'm outside, too many people arout... | | Martin Viecha ( ) | Martin Viecha ( ), Self | 0 | 8/10/2018 4:25 | | | No |
| | SMS | Outgoing | 8/10/2018 4:25 | No worries. Call me when you are out. | | Self | Martin Viecha ( ), Self | 0 | | | | No |
| | SMS | Incoming | 8/10/2018 20:29 | Hi Deepak, I'm still waiting for Blackrock. Any chance you might have 10 minutes to chat? | | Martin Viecha ( ) | Martin Viecha ( ), Self | 0 | 8/10/2018 20:48 | | | No |
| | iMessage | Outgoing | 8/11/2018 20:03 | Please call me when you get a chance. Thanks. | | Self | Sam Teller ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/12/2018 17:10 | Apologies. Went to bed late and set my alarm for 10am | | Sam Teller ( ) | Sam Teller ( ), Self | 0 | 8/12/2018 17:46 | | | No |
| | iMessage | Incoming | 8/12/2018 20:33 | Will call you back in a few! | | Sam Teller ( ) | Sam Teller ( ) Self | 0 | 8/12/2018 21:45 | | | No |
| | SMS | Outgoing | 8/13/2018 9:53 | Still planning to release the blog before market opens. Todd will send you a copy. | | Self | Martin Viecha ( ), Self | 0 | | | | No |
| | SMS | Outgoing | 8/13/2018 15:32 | How is it going with investor reaction to the blog? | | Self | Martin Viecha ( ), Self | 0 | | | | No |
| | SMS | Incoming | 8/13/2018 15:37 | Just had a fairly heated meeting with JPM | | Martin Viecha ( 9 ) | Martin Viecha ( ), Self | 0 | 8/13/2018 15:44 | | | No |
| | SMS | Incoming | 8/13/2018 15:38 | Their view is: once we start showing profitability, shorts will go away. We cannot have such a drastic measure because of few quarters of excessive scrutiny | | Martin Viecha ( ) | Martin Viecha ( ) | 0 | 8/13/2018 15:44 | | | No |
| | SMS | Outgoing | 8/13/2018 15:45 | They aren't happy about the going private initiative! | | Self | Martin Viecha ( ), Self | 0 | | | | No |
| | SMS | Incoming | 8/13/2018 15:46 | Yep, they made it pretty clear | | Martin Viecha ( ) | Martin Viecha ( ), Self | 0 | 8/13/2018 15:49 | | | No |

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | iMessage | Outgoing | 8/13/2018 21:41 | Is there a room for me to take the 3 pm board meeting? You had mentioned I recall that there was one. | | Self | Ann 🕊 Seid (█████) Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/13/2018 21:42 | Yes you have Hemlock. | | Ann 🕊 Seid (█████) | Ann 🕊 Seid █████ Self | 0 | 8/13/2018 21:53 | | | No |
| | iMessage | Outgoing | 8/13/2018 21:53 | Thanks. | | Self | Ann 🕊 Seid (█████) Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/13/2018 23:29 | Todd said to dial back in | | Ann 🕊 Seid (█████) | Ann 🕊 Seid █████ Self | 0 | 8/13/2018 23:29 | | | No |
| | iMessage | Outgoing | 8/13/2018 23:29 | I am back on | | Self | Ann 🕊 Seid █████ Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| | SMS | Incoming | 8/14/2018 1:03 | I'll call you back. | | Brad Buss (█████) | Brad Buss (█████) Self | 0 | 8/14/2018 1:03 | | | No |
| | SMS | Outgoing | 8/14/2018 1:03 | Sounds good. Boarding the flight from Reno in 20 min | | Self | Brad Buss (█████), Self | 0 | | | | No |
| | SMS | Outgoing | 8/14/2018 1:05 | Call you back in 5 min | | Self | Brad Buss (█████), Self | 0 | | | | No |
| | SMS | Incoming | 8/14/2018 1:05 | okay...free now | | Brad Buss (█████) | Brad Buss (█████) Self | 0 | 8/14/2018 1:05 | | | No |
| | SMS | Incoming | 8/14/2018 1:40 | Hi, I just arrived to Denver Airport after my conference. | | Martin Viecha (█████) | Martin Viecha (█████), Self | 0 | 8/14/2018 1:41 | | | No |
| | SMS | Incoming | 8/14/2018 1:41 | The message from investors is pretty consistent. Happy to discuss on the phone whenever you have time. Or tomorrow, we can catch up in Fremont | | Martin Viecha (█████) | Martin Viecha (█████), Self | 0 | 8/14/2018 1:41 | | | No |
| | SMS | Outgoing | 8/14/2018 1:41 | Will call you later tonight or tomorrow. Just departing Reno. | | Self | Martin Viecha (█████), Self | 0 | | | | No |
| | SMS | Incoming | 8/14/2018 1:41 | Ok | | Martin Viecha (█████) | Martin Viecha (█████), Self | 0 | 8/14/2018 1:42 | | | No |
| | SMS | Outgoing | 8/14/2018 14:01 | Are you in Fremont today? I can call you or we can chat in person. | | Self | Martin Viecha (█████), Self | 0 | | | | No |
| | SMS | Incoming | 8/14/2018 14:14 | Hi Deepak, I'm about to leave my apartment. I have this huge factory tour with test drives and 1-hour lunch with Evercore ISI | | Martin Viecha (█████) | Martin Viecha (█████), Self | 0 | 8/14/2018 14:31 | | | No |
| | SMS | Incoming | 8/14/2018 14:14 | Starts at 9, finishes at 4pm | | Martin Viecha (█████ 69 ) | Martin Viecha (█████), Self | 0 | 8/14/2018 14:31 | | | No |

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SMS | Incoming | 8/14/2018 14:14 | I can speak anytime before 9am. Would that be ok? | | Martin Viecha ( ███ ██████ | Martin Viecha ( ████████ ██ lf | 0 | 8/14/2018 14:31 | | | No |

TSLA_AHUJA0000447 Page 8

EXHIBIT 91

Message

| | |
|---|---|
| **From**: | Martin Viecha [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9CC9996113C94CA3894A94684BC8EEF5-MARTIN VIEC] |
| **Sent**: | 8/7/2018 11:31:54 PM |
| **To**: | Deepak Ahuja [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d53a90ce5c09416485c13b2a9ba1f8b3-Deepak Ahuj] |
| **Subject**: | RE: sanity check |

I would say that the base case is that our top funds will recall their shares from hedge funds for this particular vote. Additionally, as we share more data, shorts will cover in my view. As a result, I think we can say that this is the breakdown of 170m voting shares out there. That said, predominantly retail owns shares that are shorted. Those shorted shares are likely to be recalled once we officially announce this vote.

Martin

---

**From:** Deepak Ahuja
**Sent:** Tuesday, August 7, 2018 16:29
**To:** Martin Viecha <mviecha@tesla.com>
**Subject:** Re: sanity check

So are we still comfortable sharing with Elon the cap table total at 170M shares or grow it to ~200M based on ownership rather than voting power?

Deepak

---

**From:** Martin Viecha <mviecha@tesla.com>
**Date:** Tuesday, August 7, 2018 at 4:27 PM
**To:** "deepak@tesla.com" <deepak@tesla.com>
**Subject:** FW: sanity check

Hi Deepak, just got some very interesting info from Art.

He confirmed that in total 170+34m shares are owned by someone, due to high short interest. Naturally, only 170m shares can vote. If Baron lends shares, they temporarily lose that vote. That's why, for big votes, they recall their shares back from hedge funds.

I explained to Art that I added Saudi PIF due to this morning's news.

While I would take their retail commentary seriously, I wouldn't necessarily look at their top 10 holders. ████████████████████████

██████████████████████



Deepak Ahuja
8/5/2021
**Exhibit 91**
Lisa Moskowitz, CSR 10816, CRR, RPR

TSLA_PROD0024397
TESLA_LITTLETON_00004131

Hope this helps,

Martin

---

**From:** Patrick Foley <pfoley@innisfreema.com>
**Sent:** Tuesday, August 7, 2018 16:17
**To:** Martin Viecha <mviecha@tesla.com>; Arthur Crozier <acrozier@innisfreema.com>
**Cc:** Nydia Ramos <NRamos@innisfreema.com>; Lloyd Lefcourt <llefcourt@innisfreema.com>; Meredith Cole <mcole@innisfreema.com>
**Subject:** RE: sanity check

Hi Martin,

We looked at the latest DTC and here is our estimate of your shareholder base:
We estimate that index-based funds are currently holding approximately 21.2 million shares, while retail accounts account for 47.5 million shares (excluding Elon). Our retail estimate is significantly higher than your estimate. The difference is related to short interest. As you mentioned, there are currently 34 million shares short in TSLA. These shares have been borrowed from existing holders (normally passive index funds) and sold to new buyers. Custodial data indicates that a significant amount of these shares have settled at retail custodians. Please note some smaller hedge owners and family offices (that may be too small to file) could also be included in the Retail estimate.

You estimated that institutional (active and passive) holders own 94.5 million shares (based on the file you sent us). However, if there was a shareholder vote today, the 34 million shares that have been sold short would not be voted by them, and would be assigned to the new buyers – which in your case appear to be the larger retail ownership.

Additionally, we found a few difference in your top non-index holders. Our current estimate is included below.

We have not included the Saudi Public Investment Fund in this estimate. However, based on changes at the fund's custodian, it could have acquired up to 8.0 million shares.

Finally, your math is correct:



TSLA_PROD0024398
TESLA_LITTLETON_00004132



Additionally, based on custodial changes, ███████████████████ (or its shares have likely been lent for shorting).

Please let us know if you have any other questions.

Thanks,

Pat


Patrick J. Foley, CFA, CMT
*Director*
Innisfree M&A Incorporated
T 212-750-2480
C 203-216-5374
pfoley@innisfreema.com
www.innisfreema.com

501 Madison Avenue, 20th Floor
New York, NY 10022



---

**From:** Martin Viecha [mailto:mviecha@tesla.com]
**Sent:** Tuesday, August 07, 2018 10:37 AM

Confidential - Rule 6e Materials
CONFIDENTIAL

**To:** Arthur Crozier
**Cc:** Nydia Ramos; Lloyd Lefcourt; Patrick Foley; Meredith Cole
**Subject:** RE: sanity check

Thank you very much!

The last thing I wanted to check with you is that my math is correct. If we have 170m registered shares, but there are 30m shares shorted, then 200m shares are owned by someone. Is that correct? ███████████████████████████████
███████████████

Thanks for your help,

Martin

---

**From:** Arthur Crozier <acrozier@innisfreema.com>
**Sent:** Tuesday, August 7, 2018 05:40
**To:** Martin Viecha <mviecha@tesla.com>
**Cc:** Nydia Ramos <NRamos@innisfreema.com>; Lloyd Lefcourt <llefcourt@innisfreema.com>; Patrick Foley <pfoley@innisfreema.com>; Meredith Cole <mcole@innisfreema.com>
**Subject:** RE: sanity check

Martin,

Let us pull a current DTC list and give you our view based on that

Art

---

**From:** Martin Viecha [mailto:mviecha@tesla.com]
**Sent:** Tuesday, August 07, 2018 1:09 AM
**To:** Arthur Crozier
**Subject:** sanity check

Hi Art,

I just wanted to check with you if you'd be able to sanity check this holders list. Especially Retail & Passive holder list. I got to roughly 20m shares for index funds and 32m shares for retail + other individuals aside from Elon.

Did I tag some institutions in an incorrect way?

TSLA_PROD0024400
TESLA_LITTLETON_00004134

Thanks,

Martin


**Martin Viecha** | Sr. Director – Investor Relations
Mobile: +1 650 480 0069

Confidential - Rule 6e Materials
CONFIDENTIAL

TSLA_PROD0024401
TESLA_LITTLETON_00004135

EXHIBIT 121

# Native File Produced

**Exhibit 121**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY ELON MUSK,
NOT SUBJECT TO DISCLOSURE PURSUANT TO 5 U.S.C. § 552(b)
CONFIDENTIAL

ERM_SECAUG7_00000006

TESLA_LITTLETON_00000320

| Tag | Service | Direction | Date | Content | Subject | Sender | Participants | Attachments | Date Read | Date Delivered | Failed | Deleted Record |
|-----|---------|-----------|------|---------|---------|--------|--------------|-------------|-----------|----------------|--------|----------------|
| | iMessage | Incoming | 8/1/2018 22:52 | Jesus our schedules suck. We'll figure it out (heading to LA tomorrow and around for a bit) — but most importantly: great call and tone today. You're putting some of the noise in the background and letting the work show. Well done. | | James Murdoch ( ▮▮▮▮ ) | James Murdoch ( ▮▮▮ ), Self | 0 | 8/1/2018 23:05 | | | No |
| | iMessage | Outgoing | 8/1/2018 23:06 | Drinks tomorrow night in LA? | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/1/2018 23:36 | We are moving in to the house tomorrow night (so no art or books but hopefully some booze manageable) — would you come over? Just K and I (and Anneka lurking around). Come and see the new place! What time works for you? | | James Murdoch ( ▮▮▮ ) | James Murdoch ( ▮▮▮ ), Self | 0 | 8/1/2018 23:45 | | | No |
| | iMessage | Outgoing | 8/1/2018 23:45 | Great, will head over | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/1/2018 23:47 | Does 10pm work? | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/2/2018 11:38 | That may be a little late for us … we're still on Europe time! Can you make it by nine? Or Friday? | | James Murdoch ( ▮▮▮ ) | James Murdoch ( ▮▮▮ ), Self | 0 | 8/2/2018 15:55 | | | No |
| | iMessage | Outgoing | 8/2/2018 15:56 | Sure, see you at 9 | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/2/2018 16:23 | Perfect! ▮▮▮▮ . Shouldn't be too far from you (fifteen minutes?) See you tonight. | | James Murdoch ( ▮▮▮ ) | James Murdoch ( ▮▮▮ ), Self | 0 | 8/2/2018 16:29 | | | No |
| | iMessage | Incoming | 8/2/2018 22:56 | I think Tesla being private would be awesome! | | Kimbal Musk ( ▮▮▮ ) | Kimbal Musk ( ▮▮▮ ), Self | 0 | 8/2/2018 23:01 | | | No |
| | iMessage | Outgoing | 8/2/2018 23:01 | Yes | | Self | Kimbal Musk ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Incoming | 8/3/2018 4:09 | Ok maybe we've both been busy. Anyway – text me when you are at the gate because the system is t working as well as I'd like… | | James Murdoch ( ▮▮▮ ) | James Murdoch ( ▮▮▮ ), Self | 0 | 8/3/2018 4:13 | | | No |
| | iMessage | Outgoing | 8/3/2018 4:13 | About 15 mins away | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/3/2018 4:14 | Just landed 10 mins ago | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/3/2018 4:33 | Here | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/3/2018 4:33 | I think | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| | iMessage | Outgoing | 8/3/2018 4:35 | At the gate | | Self | James Murdoch ( ▮▮▮ ), Self | 0 | | 5828963-12-20 00:00:00 | | No |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| iMessage | Incoming | 8/3/2018 4:36 | On the way! | James Murdoch ( ) | James Murdoch ( ), Self | 0 | 8/3/2018 4:36 | | No |
| iMessage | Incoming | 8/3/2018 17:09 | Pushed Jared to later or tomorrow given other priorities - but call w/ Dell is at 10:30, followed by the call w/ Deepak and Design. | Elissa Butterfield ( ) | Elissa Butterfield ( ), Self | 0 | 8/3/2018 17:13 | | No |
| iMessage | Incoming | 8/3/2018 17:25 | Good to take call w/ Dell in 5? | Elissa Butterfield ( ) | Elissa Butterfield ( ), Self | 0 | 8/3/2018 17:30 | | No |
| iMessage | Outgoing | 8/3/2018 17:30 | Yes | Self | Elissa Butterfield ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/3/2018 19:08 | Good to see you. Apologies for progressively muddier thinking. Combination of bourbon and no sleep always something to be mindful of. I guess we're doing the board call tonight but if you and C and the boys want to get together over the weekend (or next) or for dinner some night for grown-ups, let me know! We're here until the 18th pretty much. | James Murdoch ( ) | James Murdoch ( ), Self | 0 | 8/3/2018 19:36 | | No |
| iMessage | Outgoing | 8/3/2018 22:00 | Can I call you later? | Self | Antonio Gracias ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/3/2018 22:01 | Yes. Would like to speak before the call tonight please. LMK a good time please. Thx | Antonio Gracias ( ) | Antonio Gracias ( ), Self | 0 | 8/3/2018 22:22 | | No |
| iMessage | Incoming | 8/4/2018 2:15 | +1866-528-2256,,5609068# | Elissa Butterfield ( ) | Kimbal Musk ( ), Elissa Butterfield ( ), Self | 0 | 8/4/2018 2:18 | | No |
| iMessage | Incoming | 8/4/2018 2:55 | Also — this makes an enormous amount of sense. | James Murdoch ( ) | James Murdoch ( ), Self | 0 | 8/4/2018 3:12 | | No |
| iMessage | Outgoing | 8/5/2018 20:17 | :) | Self | James Murdoch ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/6/2018 22:37 | Do you have a moment to talk later today? | Self | Egon ( ) | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/6/2018 22:37 | Yes - what works best for you ? | Egon ( ) | Egon ( ), Self | 0 | 8/6/2018 22:38 | | No |
| iMessage | Outgoing | 8/6/2018 22:38 | How about 7? | Self | Egon ( ), Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/6/2018 22:38 | Done | Egon ( ) | Egon ( ), Self | 0 | 8/6/2018 22:38 | | No |
| iMessage | Incoming | 8/7/2018 2:00 | Reminder to call Egon | Elissa Butterfield ( ) | Elissa Butterfield ( ), Self | 0 | 8/7/2018 2:03 | | No |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| iMessage | Outgoing | 8/7/2018 2:04 | Ok | | Self | Elissa Butterfield ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/7/2018 17:23 | Elon, am sure you have thought about a broader communication on your rationale and structure to employees and potential investors. Would it help if Sarah, Todd and I draft a blog post or employee email for you? | Deepak Ahuja ( ) | Deepak Ahuja ( ), Self | 0 | 8/7/2018 17:26 | | No |
| iMessage | Outgoing | 8/7/2018 17:26 | Yeah, that would be great | | Self | Deepak Ahuja ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/7/2018 17:31 | Working on it. Will send you shortly. | Deepak Ahuja ( ) | Deepak Ahuja ( ), Self | 0 | 8/7/2018 17:43 | | No |
| iMessage | Outgoing | 8/7/2018 17:43 | Ok | | Self | Deepak Ahuja ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/7/2018 18:25 | Way to just light the torch paper! Would love five minutes to talk before next official board discussion/etc. | James Murdoch ( ) | James Murdoch ( ), Self | 0 | 8/7/2018 18:28 | | No |
| iMessage | Outgoing | 8/7/2018 18:29 | Everything's better with fire | | Self | James Murdoch ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/7/2018 18:29 | Sure | | Self | James Murdoch ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/7/2018 18:52 | Happy to be helpful in any way I can. | Gavin Baker ( 3 ) | Gavin Baker ( ), Self | 0 | 8/7/2018 19:10 | | No |
| iMessage | Incoming | 8/7/2018 20:11 | Baller move | Joe Gebbia ( ) | Joe Gebbia ( ), Self | 0 | 8/7/2018 20:11 | | No |
| iMessage | Outgoing | 8/7/2018 20:12 | ⚽🔮 | | Self | Joe Gebbia ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/7/2018 20:13 | Sucks being public | | Self | Joe Gebbia ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/7/2018 20:16 | <Attachment - image/jpeg> | Sam Teller ( ) | Sam Teller ( ), Self | 2 | 8/7/2018 20:20 | | No |
| iMessage | Incoming | 8/7/2018 20:19 | https://twitter.com/nycsouthpaw/status/1026919832594403328?s=12 | Sam Teller ( ) | Sam Teller ( ), Self | 0 | 8/7/2018 20:20 | | No |
| iMessage | Incoming | 8/7/2018 20:20 | Sucks being private without IPO alternative for inst investors/employees with RSU's | Joe Gebbia ( ) | Joe Gebbia ( ), Self | 0 | 8/7/2018 20:32 | | No |
| iMessage | Outgoing | 8/7/2018 20:32 | Works for SpaceX | | Self | Joe Gebbia ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/7/2018 20:33 | We do a liquidity event every 6 months | | Self | Joe Gebbia ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |

| Type | Direction | Date/Time | Message | Sender | Recipient | | | | |
|---|---|---|---|---|---|---|---|---|---|
| iMessage | Outgoing | 8/7/2018 20:34 | You might have similar problem I had with Tesla though. Too many individual financing rounds with aggravating terms. Only way to clear out the stupid assholes was to go public. | Self | Joe Gebbia ( ■■■ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/7/2018 21:56 | Exactly. No other IPO alternative exists at the moment. | Joe Gebbia ( ■■■ 5 ) | Joe Gebbia ( ■■■ ), Self | 0 | 8/7/2018 22:29 | | No |
| iMessage | Incoming | 8/7/2018 22:01 | SpaceX must be RSU free... | Joe Gebbia ( ■■■ ) | Joe Gebbia ( ■■■ ), Self | 0 | 8/7/2018 22:29 | | No |
| iMessage | Outgoing | 8/7/2018 22:29 | No, we mostly issue RSUs | Self | Joe Gebbia ( ■■■ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/7/2018 23:17 | 420 makes me laugh btw.  Millennial knowledge | Gavin Baker ( ■■■ ) | Gavin Baker ( ■■■ ), Self | 0 | 8/7/2018 23:57 | | No |
| iMessage | Incoming | 8/7/2018 23:30 | And easy for me to sign NDA if necessary | Gavin Baker ( ■■■ ) | Gavin Baker ( ■■■ ), Self | 0 | 8/7/2018 23:57 | | No |
| iMessage | Outgoing | 8/7/2018 23:57 | Good karma :) | Self | Gavin Baker ( ■■■ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/8/2018 0:30 | I'm at Giga working on improving the production rate. Will call when I'm done. | Self | Gavin Baker ( ■■■ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/8/2018 0:59 | Karma is important.  I'll be up for another hour or so.  If we miss each other, let's talk tomorrow. | Gavin Baker ( ■■■ ) | Gavin Baker ( ■■■ ), Self | 0 | 8/8/2018 1:33 | | No |
| iMessage | Outgoing | 8/8/2018 3:00 | Just leaving Giga now. Are you up? | Self | Gavin Baker ( ■■■ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/8/2018 4:26 | Hey.  Can you call me for 2 min | Scott Painter ( ■■■ ) | Scott Painter ( ■■■ ), Self | 0 | 8/8/2018 4:27 | | No |
| iMessage | Outgoing | 8/8/2018 4:27 | Is this time-critical? I'm supposed to be on a call with lawyers. | Self | Scott Painter ( ■■■ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/8/2018 4:32 | Yes.  Brief. | Scott Painter ( ■■■ ) | Scott Painter ( ■■■ ), Self | 0 | 8/8/2018 4:34 | | No |
| iMessage | Outgoing | 8/8/2018 4:35 | Need to do this call. Will call after. | Self | Scott Painter ( ■■■ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/8/2018 4:40 | Kk | Scott Painter ( ■■■ ) | Scott Painter ( ■■■ ), Self | 0 | 8/8/2018 5:39 | | No |
| iMessage | Incoming | 8/8/2018 5:22 | Still up to grab a drink? | Adeo Ressi ( ■■■ ) | Adeo Ressi ( ■■■ ), Self | 0 | 8/8/2018 5:38 | | No |
| iMessage | Outgoing | 8/8/2018 5:39 | Dealing with Tesla drama | Self | Adeo Ressi ( ■■■ ), Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |

| Type | Direction | Date/Time | Message | From | To | | | | |
|---|---|---|---|---|---|---|---|---|---|
| iMessage | Outgoing | 8/8/2018 5:40 | Will have to call v late | Self | Scott Painter ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/8/2018 6:18 | That's ok.  2 min when you have a sec | Scott Painter ( ) | Scott Painter ( ), Self | 0 | 8/8/2018 7:32 | | No |
| iMessage | Incoming | 8/8/2018 6:20 | May the drama end. | Adeo Ressi ( ) | Adeo Ressi ( ), Self | 0 | 8/8/2018 7:32 | | No |
| iMessage | Incoming | 8/8/2018 7:08 | ? | Scott Painter ( ) | Scott Painter ( ), Self | 0 | 8/8/2018 7:32 | | No |
| iMessage | Outgoing | 8/8/2018 7:32 | Yes. | Self | Adeo Ressi ( ), Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/8/2018 14:08 | I had just gone to sleep.  I'm free all day - please call anytime | Gavin Baker ( ) | Gavin Baker ( ), Self | 0 | 8/8/2018 16:17 | | No |
| iMessage | Incoming | 8/8/2018 15:45 | If you can, please try me before you speak to existing investors.  Will only take 5 minutes - | Gavin Baker ( ) | Gavin Baker ( ), Self | 0 | 8/8/2018 16:17 | | No |
| iMessage | Incoming | 8/8/2018 16:57 | Reminder to call Antonio on your drive in :) | Reyna ( ) | Reyna ( ), Self | 0 | 8/8/2018 17:04 | | No |
| iMessage | Incoming | 8/8/2018 17:14 | https://www.cnbc.com/video/2018/08/08/tesla-short-sellers-are-shorting-the-game-of-being-public-former-truecar-ceo-tsla-stock-elon-musk-tweet-private-shareholders-investors-capital.html | Scott Painter ( ) | Scott Painter ( ), Self | 0 | 8/8/2018 17:19 | | No |
| iMessage | Outgoing | 8/8/2018 17:19 | Final boss battle ... | Self | Scott Painter ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/8/2018 17:20 | 😂 | Scott Painter ( ) | Scott Painter ( ), Self | 0 | 8/8/2018 17:20 | | No |
| iMessage | Incoming | 8/9/2018 3:02 | Dial in for the call with Ron and Mark -   888-204-5987,1679814# | Reyna ( ) | Reyna ( ), Sam Teller ( ), Self | 0 | 8/9/2018 3:03 | | No |
| iMessage | Incoming | 8/9/2018 3:02 | | Reyna ( ) | Reyna ( ), Self | 0 | | | No |
| iMessage | Incoming | 8/9/2018 3:02 | | Reyna ( ) | Reyna ( ), Self | 0 | | | No |
| iMessage | Incoming | 8/9/2018 3:23 | How are they structured that selling them in a liquidity event doesn't trigger tax on the entire holding of the employee | Joe Gebbia ( ) | Joe Gebbia ( ), Self | 0 | 8/9/2018 3:26 | | No |
| iMessage | Outgoing | 8/9/2018 3:28 | Tax is paid as they vest. For the first 5 or 6 years, people just got options, so this wasn't an issue. | Self | Joe Gebbia ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/9/2018 3:28 | so it was a blend | Joe Gebbia ( ) | Joe Gebbia ( ), Self | 0 | 8/9/2018 3:28 | | No |
| iMessage | Incoming | 8/9/2018 3:29 | Their not selling rsu's.. | Joe Gebbia ( ) | Joe Gebbia ( ), Self | 0 | 8/9/2018 3:29 | | No |

| Type | Direction | Date/Time | Message | Sender | Recipients | | Received | ID | |
|---|---|---|---|---|---|---|---|---|---|
| iMessage | Outgoing | 8/9/2018 3:29 | Thing is that I have a ton of stock and haven't had to pay tax on it | Self | Joe Gebbia ( ▮ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/9/2018 3:29 | SpaceX is 16 years old, so vast majority of people have RSUs | Self | Joe Gebbia ( ▮ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/9/2018 3:30 | Most of last decade has been RSUs | Self | Joe Gebbia ( ▮ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/9/2018 6:26 | https://www.theinformation.com/articles/what-tesla-shareholders-could-learn-from-spacex | Self | Joe Gebbia ( ▮ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/9/2018 6:36 | Would Bret be down to chat with our cfo | Joe Gebbia ( ▮ ) | Joe Gebbia ( ▮ ), Self | 0 | 8/9/2018 6:36 | | No |
| iMessage | Outgoing | 8/9/2018 6:36 | Sure | Self | Joe Gebbia ( ▮ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/9/2018 6:38 | Cool. Send him over to me and I'll add her. joe@airbnb.com | Joe Gebbia ( ▮ ) | Joe Gebbia ( ▮ ), Self | 0 | 8/9/2018 7:03 | | No |
| iMessage | Incoming | 8/9/2018 6:49 | also, this is exceptional for a group of 10 | Joe Gebbia ( ▮ 985 ) | Joe Gebbia ( ▮ ), Self | 0 | 8/9/2018 7:03 | | No |
| SMS | Outgoing | 8/9/2018 19:54 | Just called. Btw, this is Elon. Not sure if you have my new number. | Self | Larry Page ( ▮ ), Self | 0 | | | No |
| iMessage | Incoming | 8/10/2018 15:21 | Call is in 10 - I'll send you the dial in a few before so you can be on before him as to not keep him waiting. | Elissa Butterfield ( ▮ ) | Elissa Butterfield ( ▮ ), Self | 0 | 8/10/2018 15:21 | | No |
| iMessage | Outgoing | 8/10/2018 15:21 | Ok | Self | Elissa Butterfield ( ▮ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/10/2018 15:30 | 888-204-5987p6494027# | Elissa Butterfield ( ▮ ) | Elissa Butterfield ( ▮ ), Self | 0 | 8/10/2018 16:12 | | No |
| iMessage | Incoming | 8/10/2018 15:31 | ▮ | Elissa Butterfield ( ▮ ) | Elissa Butterfield ( ▮ ), Self | 0 | 8/10/2018 16:12 | | No |
| iMessage | Incoming | 8/10/2018 15:31 | FYI | Elissa Butterfield ( ▮ ) | Elissa Butterfield ( ▮ ), Self | 0 | 8/10/2018 16:12 | | No |
| iMessage | Incoming | 8/10/2018 16:31 | +1866-528-2256,,3342268# | Sam Teller ( ▮ ) | Sam Teller ( ▮ ), Self | 0 | 8/10/2018 16:31 | | No |
| iMessage | Incoming | 8/10/2018 17:13 | Egon here in sun room | Sam Teller ( ▮ ) | Sam Teller ( ▮ ), Self | 0 | 8/10/2018 18:39 | | No |

| Type | Direction | Date | Message | | Sender | Recipient | | | Read | Other | Flag |
|---|---|---|---|---|---|---|---|---|---|---|---|
| iMessage | Incoming | 8/10/2018 18:08 | ███████ | | Gavin Baker ( ███ ) | Gavin Baker ( ), Self | 0 | 8/10/2018 18:28 | | | No |
| iMessage | Outgoing | 8/10/2018 18:37 | ███████ . | Self | Gavin Baker ( Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/10/2018 18:41 | ███████ | | Gavin Baker ( ) | Gavin Baker ( ), Self | 0 | 8/10/2018 19:30 | | | No |
| iMessage | Incoming | 8/10/2018 19:01 | 888-394-8197,946667# | | Sam Teller ( ███ ) | Sam Teller ( Self | 0 | 8/10/2018 19:30 | | | No |
| iMessage | Outgoing | 8/10/2018 19:31 | Sounds good, have a great wedding! | Self | Gavin Baker ( Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/10/2018 19:55 | <Attachment - image/jpeg> | Self | Yasir ( Self | 1 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/10/2018 19:56 | This is a major problem. It is extremely important that you confirm that you are in discussions with me regarding the take private transaction. Nothing more needs to be said. If this is not said, we will never speak again. Never. | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/10/2018 20:30 | 866-982-8346,2564529# | | Sam Teller ( ) | Sam Teller ( ), Self | 0 | 8/10/2018 20:36 | | | No |
| iMessage | Incoming | 8/10/2018 21:20 | Thanks my friend | | Gavin Baker ( ) | Gavin Baker ( ), Self | 0 | 8/10/2018 21:20 | | | No |
| iMessage | Incoming | 8/10/2018 21:31 | ███████ | | Sam Teller ( ) | Sam Teller ( ), Self | 0 | 8/10/2018 21:31 | | | No |
| iMessage | Outgoing | 8/10/2018 21:31 | Ok, will call | Self | Sam Teller ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/10/2018 22:45 | Elon,  As you know, PIF purchased a passive stake in shares of Tesla on the market in April 2018 as part of our investment strategy to diversify away from oil and increase our investment in emerging technologies, including electronic vehicles.  PIF remains interested in potential investment opportunities that are consistent with its investment strategy and the EV space is one of interest. We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia that serves MENA, Europe, Asia and Africa with the right incentives on all fronts (subsidies on energy and land, tax exemptions, support in obtaining financing, etc).  Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction.  All the best,  Yasir | Yasir ( ) | Yasir ( ), Self | 0 | 8/10/2018 23:08 | | | No |

| Type | Direction | Date/Time | Message | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| iMessage | Outgoing | 8/10/2018 23:13 | Thank you, this is much appreciated. Very important that media inquiries confirm this statement. | | Self | Yasir (▮▮), | | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/10/2018 23:19 | Please note that any SAUDI venture will be 100% owned by Tesla And no strains attached. | Yasir (▮▮) | Self | Yasir (▮▮), | | 0 | 8/10/2018 23:19 | | No |
| iMessage | Outgoing | 8/10/2018 23:19 | Got it, thanks | | Self | Yasir (▮▮), | | 0 | | 5828963-12-20 00:00:00 | No |
| SMS | Incoming | 8/11/2018 0:26 | Nope didn't have it...am traveling.  Nice block 5! | Larry Page (▮▮) | Self | Larry Page (▮▮), | | 0 | 8/11/2018 0:27 | | No |
| SMS | Outgoing | 8/11/2018 0:27 | Thanks! | | Self | Larry Page (▮▮), | | 0 | | | No |
| SMS | Outgoing | 8/11/2018 0:28 | Wanna invest in Tesla 😊 | | Self | Larry Page (▮▮), | | 0 | | | No |
| iMessage | Incoming | 8/11/2018 1:21 | Thank you for spending the time. | Egon (▮▮) | Self | Egon (▮▮), Self | | 0 | 8/11/2018 2:42 | | No |
| iMessage | Incoming | 8/11/2018 1:22 | ▮▮ We said nothing.    This can be done | Egon (▮▮) | Self | Egon (▮▮), Self | | 0 | 8/11/2018 2:42 | | No |
| iMessage | Outgoing | 8/11/2018 2:42 | That's great to hear | | Self | Egon (▮▮), Self | | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |
| SMS | Incoming | 8/11/2018 2:49 | I'll ask David Drummond to reach out to your folks. | Larry Page (▮▮) | Self | Larry Page (▮▮), | | 0 | 8/11/2018 3:02 | | No |
| SMS | Outgoing | 8/11/2018 3:03 | Sorry, I'm kinda into emojis these days | | Self | Larry Page (▮▮), | | 0 | | | No |
| SMS | Outgoing | 8/11/2018 3:04 | 😊 | | Self | Larry Page (▮▮), | | 0 | | | No |
| iMessage | Incoming | 8/11/2018 12:02 | Hi, Elon. I can call you Sunday night TOKYO time, which is BOSTON Sunday morning.  Let me know your availability. I will be traveling back to TOKYO tomorrow. | ▮▮ | Self | ▮▮, Self | | 0 | 8/11/2018 16:02 | | No |
| iMessage | Incoming | 8/11/2018 12:02 | Hiro | ▮▮ | Self | Self | | 0 | 8/11/2018 16:02 | | No |
| iMessage | Outgoing | 8/11/2018 19:17 | Sounds good. 11am would be ideal, but I can talk earlier if need be. | | Self | Self | | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/11/2018 20:05 | Called your cell | | Self | Egon (▮▮), Self | | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/11/2018 20:06 | Hi - landing with my three daughters in 3 hr 45 mins.  Will try when landing but  flexible at your convenience | Egon (▮▮) | Self | Egon (▮▮), Self | | 0 | 8/11/2018 20:34 | | No |
| iMessage | Outgoing | 8/11/2018 20:35 | No problem, I'm with my kids at my brother's place in Boulder. Any time later today is fine. | | Self | Egon (▮▮), Self | | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/12/2018 0:10 | Will call back shortly | | Self | Egon (▮▮), Self | | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | No |

| Type | Direction | Date | Message | From | To | | Date | Date | | Read |
|---|---|---|---|---|---|---|---|---|---|---|
| iMessage | Incoming | 8/12/2018 0:10 | Sounds good | Egon ( ) | Egon ( ) Self | 0 | 8/12/2018 0:22 | | | No |
| iMessage | Incoming | 8/12/2018 0:10 | Text if doesn't ring. On big island Hawaii. | Egon ( ) | Egon ( ) Self | 0 | 8/12/2018 0:22 | | | No |
| iMessage | Outgoing | 8/12/2018 0:24 | At my kids' birthday. Quite noisy for next few hours. Will call later tonight. | Self | Egon ( ) Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/12/2018 0:26 | https://apple.news/AMD306Am6Q3y1mpEMnfqCKA | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/12/2018 0:26 | What the hell is going on here? This is false. | Self | Yasir ( ) Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 0:34 | Nice. Enjoy. | Egon ( ) | Egon ( ), Self | 0 | 8/12/2018 0:36 | | | No |
| iMessage | Outgoing | 8/12/2018 2:43 | Good to call in 5 mins? | Self | Egon ( , Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 2:44 | Yes | Egon ( ) | Egon ( , Self | 0 | 8/12/2018 2:52 | | | No |
| iMessage | Incoming | 8/12/2018 6:59 | It's not true. No body talked to them. | Yasir ( ) | Yasir ( ), Self | 0 | 8/12/2018 7:48 | | | No |
| iMessage | Incoming | 8/12/2018 7:00 | Good morning Elon, Just wanted to check-in and see when your team would be able to start sending us information and perhaps have a kickoff call with our International Investments Team. If Sam can organize, that would be great. Best, Yasir | Yasir ( ) | Yasir ( ), Self | 0 | 8/12/2018 7:48 | | | No |
| iMessage | Outgoing | 8/12/2018 7:49 | Please refute this false statement that PIF has no interest in Tesla. This is outrageous. | Self | Yasir ( ) Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/12/2018 7:51 | I am deeply offended | Self | Yasir ( 3 ), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 14:53 | Elon. Sorry but may I call you tomorrow morning here. I can call you any time after 7pm EST on your Sunday. | | Self | 0 | 8/12/2018 16:55 | | | No |
| iMessage | Incoming | 8/12/2018 14:55 | I am tied up now with my sick daughter. | | Self | 0 | 8/12/2018 16:55 | | | No |
| iMessage | Outgoing | 8/12/2018 16:55 | No problem | Self | Self | 0 | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 17:00 | https://www.bloomberg.com/news/articles/2018-08-12/saudi-fund-is-said-to-be-in-talks-to-invest-in-tesla-buyout-deal | Yasir ( ) | Yasir ( ) Self | 0 | 8/12/2018 17:05 | | | No |
| iMessage | Outgoing | 8/12/2018 17:12 | This is an extremely weak statement and does not reflect the conversation we had at Tesla. You said you were definitely interested in taking Tesla private and had wanted to do so since 2016. You also made it clear that you were the decision-maker, moreover backed strongly by the Crown Prince, who regards this as strategically important at a national level. | Self | Yasir ( ) Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/12/2018 17:13 | I'm sorry, but we cannot work together | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | | No |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| iMessage | Incoming | 8/12/2018 17:13 | It's up to you Elon | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:13 | | No |
| iMessage | Outgoing | 8/12/2018 17:13 | You are throwing me under the bus | Self | Yasir ( ███████ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/12/2018 17:13 | It takes two to tango We haven't received any thing yet | Yasir ( ███████ 3 ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:13 | | No |
| iMessage | Incoming | 8/12/2018 17:14 | Let's get on the phone and discuss | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:14 | | No |
| iMessage | Incoming | 8/12/2018 17:14 | Are available now | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:14 | | No |
| iMessage | Outgoing | 8/12/2018 17:14 | Sorry | Self | Yasir ( ███████ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/12/2018 17:14 | It's over | Self | Yasir ( ███████ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/12/2018 17:29 | Let's see the numbers and get our people to meet and discuss.  We cannot approve something that we don't have sufficient information on.  We've agreed that you will send the financial information and the way going forward within a week and no thing happened since.  The last thing I want to do is the "through you under the bus"  I am your friend. So, please don't treat me like an enemy.  I'm willing to fly to you or we can meet somewhere in Europe and discuss a constructive next steps. | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:30 | | No |
| iMessage | Outgoing | 8/12/2018 17:31 | Tesla is a publicly traded company and there is detailed information in our earnings newsletter and Q&A afterwards | Self | Yasir ( ███████ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/12/2018 17:31 | You bought 5% based on that | Self | Yasir ( ███████ ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/12/2018 17:31 | Details on how we can take the company private | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:31 | | No |
| iMessage | Incoming | 8/12/2018 17:32 | That's what we agreed on | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:32 | | No |
| iMessage | Incoming | 8/12/2018 17:32 | What is the required percentage and so on | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 17:32 | | No |
| iMessage | Incoming | 8/12/2018 17:33 | What are required regulatory thresholds for taking it private | Yasir ( ███████ ) | Yasir ( ███████ ), Self | 0 | 8/12/2018 18:08 | | No |
| iMessage | Outgoing | 8/12/2018 18:50 | Yasir, when we met at Tesla recently, you said that you were the decision-maker for PIF, that you had wanted to do the Tesla take-private deal for two years, and that this was supported directly by the Crown Prince. I checked with my team who were in that meeting in case I remembered something wrong and they confirmed this exactly. | Self | Yasir ( ███████ ), Self | 0 | | 5828963-12-20 00:00:00 | No |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| iMessage | Outgoing | 8/12/2018 18:52 | You are extremely experienced financially and are well-aware of what a go-private would require, which is that there would need to be at least a 20% premium to market in order to buy out any shareholders who don't want to remain part of the company when it is private. This is all standard practice. Nothing unusual at all. | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/12/2018 18:56 | There are many other investment funds who want to be part of this deal. We do not need your fund to get this done. I will not work with an organization who's public statement to the media do not match their private statements to me and my team. | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 18:57 | We haven't taken any company private yet in the us or any where els and the agreement as was minuted by my people is to wait for the information to be sent be you within a week, on how we will move forward to gather. | Yasir (　　　　) | Yasir (　　　　), Self | 0 | 8/12/2018 18:57 | | | No |
| iMessage | Outgoing | 8/12/2018 18:57 | Please extend an offer to the Crown Prince that I would like to apologize personally and explain why Tesla will not with PIF in this transaction. | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 18:58 | We haven't gone to the media yet | Yasir (　　　　) | Yasir (　　　　), Self | 0 | 8/12/2018 18:58 | | | No |
| iMessage | Incoming | 8/12/2018 18:58 | Read the article please | Yasir (　　　　) | Yasir (　　　　), Self | 0 | 8/12/2018 18:58 | | | No |
| iMessage | Outgoing | 8/12/2018 19:02 | I read the article. It is weak sauce and still makes me sound like a liar. It is filled with equivocation and in no way indicates the strong interest you conveyed in person. | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 19:03 | Let's meet ASAP. Please let me know what works for you | Yasir (　　　　) | Yasir (　　　　), Self | 0 | 8/12/2018 19:04 | | | No |
| iMessage | Outgoing | 8/12/2018 19:17 | I am sorry, but there will be no further communication unless you fix the public perception of wishy washy support and interest from PIF. That is not what you said to me and my team privately. Someone is either a friend or not a friend and no friend says one thing privately and another thing publicly. This is not right. | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/12/2018 19:18 | In light of these actions and nothing meaningful done to correct them, Tesla will be moving forward with Silver Lake, Goldman and other investors to take Tesla private. | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Outgoing | 8/12/2018 19:19 | Please let them know if you wish to retain or sell your current position in Tesla | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 19:50 | I will ask Shihana to call Sam so they can work on PIF statement. | Yasir (　　　　) | Yasir (　　　　), Self | 0 | 8/12/2018 20:01 | | | No |
| iMessage | Outgoing | 8/12/2018 20:01 | Thank you. This means a great deal. | Self | Yasir (　　　　), Self | 0 | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/12/2018 20:58 | 🙏 | Yasir (　　　　) | Yasir (　　　　), Self | 0 | 8/12/2018 21:08 | | | No |
| iMessage | Outgoing | 8/12/2018 23:27 | Sorry, I can't talk right now. | Self | Self | | 5828963-12-20 00:00:00 | 5828963-12-20 00:00:00 | | | No |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| iMessage | Incoming | 8/12/2018 23:30 | Any problem?  Do you want to call back later? | | Rene ( | Self | 0 | 8/12/2018 23:30 | | No |
| iMessage | Incoming | 8/13/2018 7:14 | I don't know what is true or not... I read this | | Rene ( ) | Rene ( ) | 0 | 8/13/2018 12:21 | | No |
| iMessage | Incoming | 8/13/2018 7:14 | <Attachment - image/jpeg> | | Rene ( ) | Rene ( ), Self | 1 | 8/13/2018 12:21 | | No |
| iMessage | Incoming | 8/13/2018 16:37 | Morning Elon - Good to dial you into Exec Staff at 10am? | | Reyna ( | Reyna ( ), Self | 0 | 8/13/2018 17:01 | | No |
| iMessage | Incoming | 8/13/2018 19:17 | Elon,  I am personally surprised. You have signed an NDA and while we are waiting for you and your team to provide us with information to move forward, you post an ill-advised blog with loose information.   Anyway, we hope that you and your team work on gathering the information as soon as possible and send that to us to move forward.  Yasir | | Yasir ( ) | Yasir ( ), Self | 0 | 8/13/2018 19:22 | | No |
| iMessage | Outgoing | 8/13/2018 19:23 | You shouldn't be | | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/13/2018 19:23 | I'm still upset | | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/13/2018 19:24 | You allowed people to think that I was a liar | | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/13/2018 19:28 | Reuters reported that two sources from PIF confirmed no interest in Tesla, which is absolutely false, and yet you did nothing until I forced the issue | | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Outgoing | 8/13/2018 20:46 | Regarding the take-private proposal, I have engaged Silver Lake and Goldman. We will have documents ready in about a week. Since we are a publicly traded company, any non-public information about Tesla will need to be vetted carefully and, if considered material by legal counsel, will need to be provided to all shareholders simultaneously. | | Self | Yasir ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/13/2018 23:50 | Lawyers + Goldman and Egon all on the line ready in exec | | Sam Teller ( | Sam Teller ( ), Self | 0 | 8/14/2018 0:29 | | No |
| iMessage | Incoming | 8/14/2018 1:00 | I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private | | Sam Teller ( | Sam Teller ( Self | 0 | 8/14/2018 1:00 | | No |
| iMessage | Incoming | 8/14/2018 1:00 | Reply to | | Sam Teller ( ) | Sam Teller ( ), Self | 0 | 8/14/2018 1:01 | | No |
| iMessage | Incoming | 8/14/2018 1:00 | https://twitter.com/tesla/status/1028990114267987968?s=21 | | Sam Teller ( 60 ) | Sam Teller ( ), Self | 0 | 8/14/2018 1:01 | | No |

| Type | Direction | Date | Message | From | To | | Read Date | | |
|---|---|---|---|---|---|---|---|---|---|
| iMessage | Incoming | 8/14/2018 17:21 | The Morgan Stanley guys mentioned they may have a call with you today.  A few things worth mentioning in anticipation of that call:  -They obviously want to be involved in the go private transaction.  They expect GS to be heavily involved, but they hope to be recognized for being a strong resource for Tesla and you personally over the years.  -They've been our best resource on the personal side, by far.  They provide you with the largest ($350M) of all the lines and each time we have pressed them for more borrow power or a lower rate, they've come through.  -Just prior to the announcement of the go private, they were in the final stages of approving a SpaceX backed line, in addition to the current line.  I think we can get them to completely replace the current line - and then some, if incentivized and 'encouraged'.  -They have provided all our letters of credit and letters of guarantee at little to no charge.  -They've done a lot of work for TBC at no charge and specifically helped quite a bit with the Chicago application.  I also think we should press GS to lend vs. private stock post transaction.  If they are going to be given one of the few seats at the table, they need to be prepared to help on the lending side. | Jared Birchall ( ) | Jared Birchall ( Self | 0 | 8/14/2018 17:24 | 5828963- | No |
| iMessage | Outgoing | 8/14/2018 17:25 | That seems fair | Self | Jared Birchall ( Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/15/2018 2:32 | You holding up ok? | Jason Calacanis ( ) | Jason Calacanis ( Self | 0 | 8/15/2018 3:20 | | No |
| iMessage | Incoming | 8/15/2018 2:32 | Sounds like you've been having an intense week... | Jason Calacanis ( ) | Jason Calacanis ( ), Self | 0 | 8/15/2018 3:20 | | No |
| iMessage | Outgoing | 8/15/2018 3:21 | For some bizarre reason, I feel good | Self | Jason Calacanis ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/15/2018 3:24 | The promise of Never having to talk to analysts on a quarterly call again perhaps 😂 | Jason Calacanis ( ) | Jason Calacanis ( ), Self | 0 | 8/15/2018 4:21 | | No |
| iMessage | Outgoing | 8/15/2018 4:21 | The short negative propaganda problem is massive | Self | Jason Calacanis ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/15/2018 4:30 | Yeah. They are spreading crazy FUD — just making nonsense up. It's nuts.... | Jason Calacanis ( ) | Jason Calacanis ( ), Self | 0 | 8/15/2018 4:35 | | No |
| iMessage | Outgoing | 8/15/2018 4:44 | They are losing their mind | Self | Jason Calacanis ( ), Self | 0 | | 5828963-12-20 00:00:00 | No |
| iMessage | Incoming | 8/15/2018 4:44 | I think checkmated those little bitches.... | Jason Calacanis ( ) | Jason Calacanis ( ), Self | 0 | 8/15/2018 5:27 | | No |
| iMessage | Incoming | 8/15/2018 4:45 | (You) checkmated | Jason Calacanis ( ) | Jason Calacanis ( Self | 0 | 8/15/2018 5:27 | | No |
| iMessage | Incoming | 8/15/2018 4:46 | What type of life is it to bet against human progress... like how does that give someone pleasure?! I don't get it.... to try and make a couple of bucks betting against the Humanity is just pathetic | Jason Calacanis ( ) | Jason Calacanis ( Self | 0 | 8/15/2018 5:27 | | No |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| iMessage | Outgoing | 8/15/2018 5:29 | Not checkmate yet. They are doing their best to destroy my credibility. | | Self | Jason Calacanis ( ██████ Self | 0 | | | 5828963-12-20 00:00:00 | | No |
| iMessage | Incoming | 8/15/2018 14:01 | Elon, Good to talk to you.  I following up on my promise.  How far is your factory from San Francisco or STANFORD? Hiro | | ████████ | ██████, Self | 0 | | 8/15/2018 15:42 | | | No |
| iMessage | Outgoing | 8/15/2018 15:44 | Our factory is in Fremont, which is about 20 mins from Stanford and 40 mins from SF in light traffic. It is quite big. Third largest building by footprint in the world. I look forward to seeing you. | | Self | ████████ Self | 0 | 5828963-12-20 00:00:00 | | 5828963-12-20 00:00:00 | | No |

EXHIBIT 157

**Exhibit 157**

Message

**From:** Martin Viecha [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9CC9996113C94CA3894A94684BC8EEF5-MARTIN VIEC]

**Sent:** 8/13/2018 10:09:45 PM

**To:** Elon Musk [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b3d59f261f6f431aa9d679f79478e3ab-Elon
Musk_7]; Todd Maron I /o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=675a7aa9c8c0416ab00fcd1e6c89b810-Todd Maron]
Deepak Ahuja [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d53a90ce5c09416485c13b2a9ba1f8b3-
Deepak Ahuj]; Sam Teller [/o=ExchangeLabs/ou=Exchange Administrative Group

**CC:** (FYDIBOHF23SPDLT)/cn=Recipients/cn=3bbd889935194be5bf3603b89339f2ae-Sam Teller]; Aaron Chew [/o=ExchangeLabs/ou=Exchange Administrative
Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b5a491d99cf04e1cadee229de54e142d-Aaron Chew]

**Subject:** RE: T Rowe Price

Elon,

After having several conversations about our recent efforts, investors are curious to know what are the exact mechanics of trading shares in a private Tesla. Who
will be able to buy/sell, how often, could non-holders be involved, who sets the price, etc. Their decision will be impacted by those details.

Hope this helps,
Martin

**From:** Elon Musk
**Sent:** Monday, August 13, 2018 15:59
**To:** Todd Maron <todd@tesla.com>; Martin Viecha <mviecha@tesla.com>
**Cc:** Deepak Ahuja <deepak@tesla.com>; Sam Teller <steller@tesla.com>; Aaron Chew <achew@tesla.com>
**Subject:** Re: T Rowe Price

And, relatively speaking, this would be a far more liquid position. Like SpaceX, there would be the opportunity to buy/sell every six months or more frequently
upon request.

On Aug 13, 2018, at 2:57 PM, Elon Musk <erm@tesla.com> wrote:

CONFIDENTIAL

TESLA_LITTLETON_00018643

On Aug 13, 2018, at 2:47 PM, Todd Maron <todd@tesla.com> wrote:

Elon,

FYI

**From:** Martin Viecha
**Sent:** Monday, August 13, 2018 2:43 PM
**To:** Deepak Ahuja <deepak@tesla.com>; Sam Teller <steller@tesla.com>; Aaron Chew <achew@tesla.com>
**Subject:** T Row Price



Hope this helps,

Martin

**Martin Viecha** | **Sr. Director – Investor Relations**
Mobile: +1 650 480 0069

CONFIDENTIAL

EXHIBIT 158

| | |
|---|---|
| **From**: | Todd Maron [todd@tesla.com] |
| **Sent**: | 8/15/2018 8:26:00 AM |
| **To**: | Elon Musk [erm@tesla.com] |
| **CC**: | Deepak Ahuja [deepak@tesla.com]; Sam Teller [steller@tesla.com] |
| **Subject**: | Fwd: Feedback |

**Exhibit 158**

Fyi

-------- Original message --------
From: Martin Viecha <mviecha@tesla.com>
Date: 8/15/18 8:21 AM (GMT-08:00)
To: Deepak Ahuja <deepak@tesla.com>, Todd Maron <todd@tesla.com>
Subject: FW: Feedback

Hi Deepak and Todd,

I'm forwarding this email because it encapsulates exactly what most investors I speak to feel. I've been in heavy investor meeting mode since late last week, so I'm getting constant feedback during factory tours, roadshows and conferences.

Hope this helps,

Martin

**From:** Hamish Chamberlayne <hamish.chamberlayne@janushenderson.com>
**Sent:** Wednesday, August 15, 2018 00:43
**To:** Martin Viecha <mviecha@tesla.com>
**Subject:** Feedback

Hi Martin,



Best wishes
Hamish


**Hamish Chamberlayne, CFA**
Investment Manager, Head of SRI

**Janus Henderson Investors**
201 Bishopsgate, London, EC2M 3AE, United Kingdom
**E** hamish.chamberlayne@janushenderson.com
**W** janushenderson.com

This electronic message, including its attachments, contains information from Janus Henderson Investors. Janus Henderson Investors is the name under which various entities, including Janus Capital International Limited, Henderson Global Investors Limited, Henderson Investment Funds Limited and AlphaGen Capital Limited (each incorporated and registered in the United Kingdom and authorised and regulated by the United Kingdom Financial Conduct Authority) provide investment products and services. Janus Capital International Limited is authorised and regulated in Dubai by the Dubai Financial Services Authority as a Representative Office. All of these companies are wholly owned subsidiaries of Janus Henderson Group plc (incorporated in Jersey, registered no.101484, registered office 47 Esplanade, St Helier, Jersey JE1 0BD).

This email contains information which is confidential and may be privileged and attorney work product, intended solely for the use of the individual or entity named above. Personal data provided by you in any email communication may be stored and accessible in countries other than countries in which you are located, and which may not have equivalent levels of protection for personal data.

If you are not the intended recipient, be aware that you must not read this email and that any disclosure, copying, distribution or use of the contents of this email is prohibited. If you have received this email in error, please immediately notify the sender and delete the original email and its attachments without reading or saving in any manner.

TESLA_LITTLETON_00019027

EXHIBIT 165



| Tag | Type | Direction | Date | Contact | Duration | Status | Favorite | Service |
|---|---|---|---|---|---|---|---|---|
| | Audio | In | 7/3/18 13:23 | Ira Ehrenpreis ( ████ ) | | 0:00:00 | | Missed |
| Carrier | FaceTime | Deleted Record | | | | | No | |
| | Phone | Out | 7/4/18 17:26 | <Encrypted Blob> | 0:16:21 | | | iPhone |
| Yes | | | | | | | | |
| | Phone | In | 7/5/18 20:23 | Nick Gicinto ( ████ ) | 0:19:05 | | | |
| iPhone | | Yes | | | | | | |
| | Phone | In | 7/5/18 20:40 | SpaceX Office ( ████ ) | | 0:14:11 | | |
| iPhone | | Yes | | | | | | |
| | Phone | In | 7/5/18 21:30 | SpaceX Office ( ████ ) | | 0:01:38 | | |
| iPhone | | Yes | | | | | | |
| | Phone | In | 7/5/18 21:46 | SpaceX Office ( ████ ) | | 0:21:17 | | |
| iPhone | | Yes | | | | | | |
| | Phone | In | 7/5/18 22:20 | SpaceX Office ( ████ ) | | 0:08:32 | | |
| iPhone | | Yes | | | | | | |
| | Phone | Out | 7/5/18 23:26 | Lynn Miller ( ████ ) | 0:13:59 | | | |
| iPhone | | Yes | | | | | | |
| | Phone | In | 7/5/18 23:43 | SpaceX Office ( ████ ) | | 0:35:53 | | |
| iPhone | | Yes | | | | | | |
| | Phone | Out | 7/5/18 23:43 | Omead ( ████ ) | | 0:04:31 | | |
| iPhone | | Yes | | | | | | |
| | Video | In | 7/6/18 0:36 | Robert Sumwalt ( ████ ) | | 0:00:00 | | Missed |
| | FaceTime | | | | | | No | |
| | Video | Out | 7/6/18 2:56 | Omead ( ████ ) | | 0:00:00 | | Cancelled |
| FaceTime | | No | | | | | | |
| | Phone | Out | 7/6/18 3:03 | Omead ( ████ ) | | 0:24:26 | | |
| iPhone | | Yes | | | | | | |
| | Phone | Out | 7/6/18 4:26 | Lynn Miller ( ████ ) | | 0:07:10 | | |
| iPhone | | Yes | | | | | | |
| | Phone | Out | 7/6/18 6:23 | Steve Davis ( ████ ) | 0:51:17 | | | |
| iPhone | | Yes | | | | | | |
| | Audio | In | 7/6/18 9:55 | Ira Ehrenpreis ( ████ ) | | 0:00:00 | | Missed |
| | FaceTime | | | | | | No | |
| | Audio | Out | 7/6/18 16:06 | Ira Ehrenpreis ( ████ ) | | 0:00:00 | | |
| Cancelled | | FaceTime | | | Yes | | | |
| | Audio | Out | 7/6/18 16:11 | Ira Ehrenpreis ████ | | 0:00:00 | | |
| Cancelled | | FaceTime | | | No | | | |
| | Phone | In | 7/6/18 18:53 | Lyndon Rive ( ████ ) | 0:04:58 | | | |
| iPhone | | Yes | | | | | | |
| | Phone | In | 7/7/18 4:53 | Steve Davis ( ████ ) | 0:11:56 | | | |
| iPhone | | Yes | | | | | | |
| | Video | Out | 7/12/18 21:16 | C* ( ████ ) | 0:00:00 | | | Cancelled |
| FaceTime | | Yes | | | | | | |
| | Video | Out | 7/12/18 21:18 | C* | 0:00:00 | | | Cancelled |
| FaceTime | | No | | | | | | |
| | Video | Out | 7/12/18 23:56 | C* ( ████ ) | 0:00:00 | | | Cancelled |
| FaceTime | | No | | | | | | |
| | Audio | In | 7/14/18 23:29 | Sam Teller ( ████ ) | 0:01:25 | | | |
| FaceTime | | No | | | | | | |
| | Audio | In | 7/16/18 2:47 | Ira Ehrenpreis ( ████ ) | | 0:00:00 | | Missed |
| | FaceTime | | | | | | No | |
| | Phone | Out | 7/20/18 18:10 | House Security Cell ( ████ ) | | 0:00:08 | | |
| iPhone | | Yes | | | | | | |
| | Phone | In | 7/20/18 18:26 | C* ( ████ ) | 0:03:15 | | | iPhone |
| Yes | | | | | | | | |

**Exhibit 165**



| Phone | In | 7/20/18 20:06 | Deepak Ahuja ( ███████ ) | 0:00:54 | | |
| iPhone | | Yes | | | | |
| Phone | In | 7/20/18 20:06 | Deepak Ahuja ( ( ███████ ) | 0:01:43 | | |
| iPhone | | Yes | | | | |
| Phone | Out | 7/20/18 20:40 | Deepak Ahuja ( ( ███████ ) | 0:19:27 | | |
| iPhone | | Yes | | | | |
| Phone | Out | 7/21/18 0:00 | <Encrypted Blob> | 0:06:14 | | iPhone |
| Yes | | | | | | |
| Phone | In | 7/21/18 0:00 | ██████████ | 0:08:46 | | iPhone |
| Yes | | | | | | |
| Phone | In | 7/21/18 4:10 | Kimbal Musk ( ███████ ) | 0:00:08 | | |
| iPhone | | Yes | | | | |
| Phone | Out | 7/21/18 19:10 | Nick Gicinto ( ( ███████ ) | 0:47:42 | | |
| iPhone | | Yes | | | | |
| Phone | Out | 7/21/18 21:23 | Todd Maron ( ( ███████ ) | 0:00:05 | | |
| iPhone | | Yes | | | | |
| Phone | In | 7/21/18 21:40 | ( ███████ | 0:23:00 | | iPhone |
| Yes | | | | | | |
| Phone | In | 7/21/18 21:56 | Omead ( ( ███████ ) | 0:00:41 | | |
| iPhone | | Yes | | | | |
| Phone | Out | 7/21/18 22:13 | <Encrypted Blob> | 0:09:25 | | iPhone |
| Yes | | | | | | |
| Phone | Out | 7/21/18 23:03 | <Encrypted Blob> | 0:30:44 | | iPhone |
| Yes | | | | | | |
| Phone | In | 7/22/18 0:05 | Sean Parker ( ( ███████ ) | 0:20:16 | | |
| iPhone | | No | | | | |
| Phone | In | 7/22/18 0:10 | Sean Parker ( ███████ ) | 0:20:16 | | |
| iPhone | | Yes | | | | |
| Phone | In | 7/22/18 3:29 | Antonio Gracias ( ███████ ) | 0:02:49 | | |
| iPhone | | No | | | | |
| Phone | In | 7/22/18 3:30 | Antonio Gracias ( ███████ ) | 0:02:49 | | |
| iPhone | | Yes | | | | |
| Phone | In | 7/22/18 18:20 | Antonio Gracias ( ███████ ) | 0:00:00 | | Missed |
| | iPhone | No | | | | |
| Phone | Out | 7/22/18 18:46 | Antonio Gracias ( ███████ ) | 0:00:52 | | |
| iPhone | | Yes | | | | |
| Phone | Out | 7/22/18 18:48 | Antonio Gracias ( ( ███████ ) | 0:00:52 | | |
| iPhone | | No | | | | |
| Phone | In | 7/22/18 20:20 | Sam Teller ( ( ███████ | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | Out | 7/22/18 20:22 | Sam Teller ( ███████ ) | 0:00:00 | Cancelled | |
| iPhone | | No | | | | |
| Phone | In | 7/22/18 20:22 | Sam Teller ( ███████ ) | 0:00:53 | | |
| iPhone | | No | | | | |
| Phone | In | 7/22/18 20:26 | Elissa Butterfield ███████ ) | 0:00:21 | | |
| TRUE  iPhone | | Yes | | | | |
| Phone | In | 7/22/18 20:26 | Sam Teller ( ███████ | 0:00:53 | | |
| iPhone | | Yes | | | | |
| Phone | In | 7/22/18 20:30 | Elissa Butterfield ( ( ███████ ) | 0:00:21 | | |
| TRUE  iPhone | | No | | | | |
| Phone | Out | 7/23/18 3:06 | Todd Maron ( ███████ ) | 0:00:00 | Cancelled | |
| iPhone | | No | | | | |
| Phone | In | 7/23/18 3:06 | ( ███████ | 0:14:47 | | iPhone |
| Yes | | | | | | |
| Phone | In | 7/23/18 3:07 | ( ███████ | 0:14:47 | | iPhone |
| No | | | | | | |

| Phone | In | 7/23/18 3:22 | ███████ | | 0:08:40 | | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 3:23 | ███████ | | 0:08:40 | | | iPhone |
| Yes | | | | | | | | |
| Phone | In | 7/23/18 3:33 | ███████ | | 0:23:55 | | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 3:40 | ███████ | | 0:23:55 | | | iPhone |
| Yes | | | | | | | | |
| Phone | In | 7/23/18 13:08 | Unknown | 0:00:00 | | Missed | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 14:40 | ███████ | | 0:00:00 | | Missed | |
| iPhone | | | | No | | | | |
| Phone | Out | 7/23/18 17:03 | Ari Emanuel ( ██████ | ) | 0:02:10 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/23/18 17:04 | SpaceX Office ( ████████ | | 0:00:00 | | Missed | |
| | iPhone | | No | | | | | |
| Phone | In | 7/23/18 17:07 | SpaceX Office ( ████████ | ) | 0:08:50 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/23/18 17:16 | ███████ | | 0:03:44 | | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 17:22 | ███████ | | 0:00:44 | | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 17:53 | ███████ | | 0:00:15 | | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 18:33 | ███████ | | 0:11:06 | | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 19:02 | Steve Burns ( ███████████ | :00 | | Missed | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/23/18 19:05 | ███████ | | 0:02:05 | | | iPhone |
| No | | | | | | | | |
| Phone | Out | 7/23/18 22:00 | ███████ | | 0:14:44 | | | iPhone |
| No | | | | | | | | |
| Phone | In | 7/23/18 22:57 | Steve Wynn ( ██████ | ) | 0:00:00 | | Missed | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 2:51 | Sam Teller ( ██████ | ) | 0:20:45 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 3:12 | Sam Teller ( ██████ | ) | 0:00:00 | | Missed | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 3:13 | Sam Teller ( ██████ | ) | 0:00:00 | | Missed | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 5:17 | Sam Teller ( ██████ | ) | 0:13:04 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 5:47 | Steve Wynn ██████ | ) | 0:33:10 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 14:56 | Steve Wynn ██████ | ) | 0:01:04 | | | |
| iPhone | | | | No | | | | |
| Phone | Out | 7/24/18 15:01 | Todd Maron ( ██████ | ) | 0:00:04 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 15:07 | Steve Wynn ██████ | ) | 0:01:35 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 15:12 | Todd Maron ( ██████ | ) | 0:00:16 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 15:13 | Todd Maron ( ██████ | ) | 0:00:36 | | | |
| iPhone | | | | No | | | | |
| Phone | In | 7/24/18 15:14 | Todd Maron ( ██████ | ) | 0:00:20 | | | |
| iPhone | | | | No | | | | |



| Phone | Out | 7/24/18 15:15 | Todd Maron ( ) | 0:08:21 | |
| iPhone | | | | No | |
| Phone | In | 7/24/18 17:46 | | 0:10:01 | iPhone |
| No | | | | | |
| Phone | Out | 7/24/18 18:21 | Brian Sandoval ( ) | 0:00:00 | |
| Cancelled | | iPhone | | No | |
| Phone | In | 7/24/18 22:52 | Steve Wynn ( ) | 0:01:04 | |
| iPhone | | | | No | |
| Phone | In | 7/25/18 0:18 | SpaceX Office ( ) | 0:08:33 | |
| iPhone | | | | No | |
| Phone | In | 7/25/18 6:24 | Antonio Gracias ( ) | 0:00:25 | |
| iPhone | | | | No | |
| Phone | Out | 7/25/18 20:45 | Sarah O'Brien ( ) | 0:03:37 | |
| iPhone | | | | No | |
| Phone | In | 7/25/18 21:15 | Steve Burns ( ) | 0:09:27 | |
| iPhone | | | | No | |
| Phone | Out | 7/25/18 21:25 | Steve Burns ( ) | 0:04:23 | |
| iPhone | | | | No | |
| Phone | In | 7/26/18 17:31 | Antonio Gracias ( ) | 0:03:02 | |
| iPhone | | | | No | |
| Phone | In | 7/26/18 17:35 | Antonio Gracias ( ) | 0:00:55 | |
| iPhone | | | | No | |
| Phone | In | 7/26/18 18:50 | SpaceX Office ( ) | 0:03:15 | |
| iPhone | | | | No | |
| Phone | In | 7/26/18 18:53 | SpaceX Office ( ) | 0:04:39 | |
| iPhone | | | | No | |
| Phone | In | 7/26/18 20:13 | Unknown | 0:07:38 | iPhone |
| No | | | | | |
| Audio | In | 7/26/18 20:30 | Omead ( ) | 0:05:05 | |
| FaceTime | | No | | | |
| Phone | In | 7/27/18 5:20 | C* ( ) | 0:00:00 | Missed |
| iPhone | | | | No | |
| Phone | In | 7/27/18 5:28 | Unknown | 0:08:31 | iPhone |
| No | | | | | |
| Phone | In | 7/27/18 5:33 | C* ( ) | 0:00:00 | Missed |
| iPhone | | | | No | |
| Phone | In | 7/27/18 16:53 | Ira Ehrenpreis ( ) | 0:06:23 | |
| iPhone | | | | No | |
| Phone | In | 7/28/18 20:18 | Solar Sanjay ( ) | 0:05:28 | |
| iPhone | | | | No | |
| Phone | In | 7/28/18 20:50 | Xavier Musk ( ) | 0:00:00 | Missed |
| iPhone | | | | No | |
| Phone | Out | 7/28/18 22:17 | Tahir Awan ( ) | 0:00:03 | |
| iPhone | | | | No | |
| Phone | In | 7/29/18 4:07 | Omead ( ) | 0:00:00 | Missed |
| iPhone | | | | No | |
| Phone | Out | 7/29/18 4:08 | <Encrypted Blob> | 0:28:14 | iPhone |
| No | | | | | |
| Phone | In | 7/29/18 4:09 | Omead ( ) | 0:00:00 | Missed |
| iPhone | | | | No | |
| Audio | Out | 7/29/18 6:09 | Charles Roberts ( ) | 0:00:00 | |
| Cancelled | | FaceTime | | No | |
| Phone | In | 7/29/18 21:48 | Omead ( ) | 0:00:48 | |
| iPhone | | | | No | |
| Video | In | 7/29/18 22:09 | Robert Sumwalt ( ) | 0:00:00 | Missed |
| FaceTime | | | | No | |

| Type | Direction | Date/Time | Contact | Duration | Status | Device |
|---|---|---|---|---|---|---|
| Video FaceTime | In No | 7/29/18 22:09 | Robert Sumwalt ( ████████ ) | 0:00:00 | Missed | |
| Phone iPhone | In No | 7/30/18 16:53 | SpaceX Office ( ████████ | 0:00:00 | Missed | |
| Phone iPhone | In No | 7/30/18 17:03 | SpaceX Office ( ████████ ) | 0:00:00 | Missed | |
| Phone iPhone | In No | 7/30/18 17:08 | SpaceX Office ( ████████ | 0:00:00 | Missed | |
| Phone iPhone | Out No | 7/30/18 17:24 | SpaceX Office ( ████████ | 0:50:41 | | |
| Phone iPhone | In No | 7/30/18 18:43 | ( ████████ | 0:00:00 | Missed | |
| Phone iPhone | In No | 7/30/18 18:44 | ████████ | 0:00:00 | Missed | |
| Phone No | Out | 7/30/18 18:45 | ( ████████ | 0:00:12 | | iPhone |
| Phone iPhone | In No | 7/31/18 2:38 | SpaceX Office ( ████████ | 0:22:08 | | |
| Phone iPhone | Out No | 7/31/18 4:40 | C* ( ████████ ) | 0:00:00 | Cancelled | |
| Phone iPhone | In No | 7/31/18 19:00 | D. Wallach ( ████████ ) | 0:00:00 | Missed | |
| Phone Cancelled | Out iPhone | 8/1/18 5:03 | Richard Miller ( ████████ ) No | 0:00:00 | | |
| Phone iPhone | In No | 8/1/18 5:04 | Richard Miller ( ████████ ) | 0:00:12 | | |
| Phone iPhone | In No | 8/1/18 5:34 | Richard Miller ( ████████ ) | 0:01:02 | | |
| Phone iPhone | In No | 8/1/18 15:58 | Antonio Gracias ( ████████ | 0:00:00 | Missed | |
| Phone iPhone | Out No | 8/2/18 8:15 | ████████ | 0:00:00 | Cancelled | |
| Phone iPhone | Out No | 8/2/18 8:16 | Shivon Zilis ( ████████ ) | 0:00:00 | Cancelled | |
| Phone iPhone | Out No | 8/2/18 17:30 | Dan Roelker ( ████████ ) | 0:01:15 | | |
| Audio FaceTime | In No | 8/2/18 17:30 | Dan Roelker ( ████████ ) | 0:00:00 | Missed | |
| Phone Cancelled | Out iPhone | 8/2/18 17:35 | Nagesh Saldi ( ████████ ) No | 0:00:00 | | |
| Phone iPhone | In No | 8/2/18 22:54 | Kimbal Musk ( ████████ | 0:00:00 | Missed | |
| Phone iPhone | Out No | 8/2/18 22:57 | Kimbal Musk ( ████████ ) | 0:01:17 | | |
| Phone iPhone | In No | 8/2/18 22:57 | Kimbal Musk ( ████████ ) | 0:00:00 | Missed | |
| Phone iPhone | In No | 8/3/18 3:29 | Kimbal Musk ( ████████ ) | 0:00:00 | Missed | |
| Phone iPhone | Out No | 8/3/18 4:08 | Todd Maron ( ████████ ) | 0:04:52 | | |
| Phone iPhone | In No | 8/3/18 4:18 | Ira Ehrenpreis ( ████████ ) | 0:00:00 | Missed | |
| Phone iPhone | In No | 8/3/18 16:42 | Kimbal Musk ( ████████ ) | 0:00:00 | Missed | |
| Phone iPhone | In No | 8/3/18 17:01 | SpaceX Office ( ████████ | 0:00:00 | Missed | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Phone iPhone | In No | 8/3/18 17:31 | SpaceX Office ( ████ ) | | 0:09:31 | | |
| Phone iPhone | In No | 8/3/18 17:41 | Sam Teller ( ████ | | 0:09:33 | | |
| Phone iPhone | In No | 8/3/18 18:05 | SpaceX Office (████ ) | | 0:28:23 | | |
| Phone | In iPhone No | 8/3/18 22:00 | Antonio Gracias ( ████ ) | | 0:00:00 | | Missed |
| Phone No | Out | 8/4/18 2:18 | <Encrypted Blob> | 0:54:01 | | | iPhone |
| Phone iPhone | In No | 8/4/18 3:12 | Ira Ehrenpreis ( ████ | | 0:06:19 | | |
| Phone TRUE iPhone | In No | 8/4/18 3:19 | Elissa Butterfield (████ | | 0:00:00 | | Missed |
| Phone No | Out | 8/4/18 3:19 | <Encrypted Blob> | 0:07:13 | | | iPhone |
| Phone TRUE iPhone | In No | 8/4/18 17:03 | Elissa Butterfield (████ ) | | 0:00:13 | | |
| Phone TRUE iPhone | In No | 8/4/18 17:03 | Elissa Butterfield (████ ) | | 0:10:48 | | |
| Phone iPhone | In No | 8/6/18 16:34 | SpaceX Office (████ ) | | 0:00:00 | | Missed |
| Phone iPhone | In No | 8/6/18 17:03 | SpaceX Office (████ | | 0:00:00 | | Missed |
| Phone iPhone | In No | 8/6/18 17:10 | SpaceX Office (████ ) | | 0:00:00 | | Missed |
| Phone iPhone | Out No | 8/6/18 17:14 | SpaceX Office (████ | | 0:37:03 | | |
| Phone iPhone | In No | 8/6/18 18:02 | SpaceX Office (████ ) | | 0:14:22 | | |
| Phone iPhone | In No | 8/6/18 21:55 | (████ | 0:00:00 | | Missed | |
| Phone iPhone | Out No | 8/7/18 2:04 | Egon ( ████ | 0:26:22 | | | |
| Phone iPhone | In No | 8/7/18 16:55 | Todd Maron (████ ) | 0:00:00 | | Missed | |
| Phone iPhone | In No | 8/7/18 17:03 | Todd Maron (████ | 0:00:00 | | Missed | |
| Phone No | In | 8/7/18 17:06 | (████ | 0:00:21 | | | iPhone |
| Phone iPhone | In No | 8/7/18 17:43 | Todd Maron (████ ) | 0:04:31 | | | |
| Phone iPhone | In No | 8/7/18 19:40 | James Murdoch (████ ) | | 0:16:30 | | |
| Phone iPhone | In No | 8/7/18 20:18 | (████ | 0:00:00 | | Missed | |
| Phone No | Out | 8/8/18 4:35 | <Encrypted Blob> | 0:59:23 | | | iPhone |
| Phone iPhone | In No | 8/8/18 7:18 | Scott Painter (████ | | 0:00:07 | | |
| Phone iPhone | Out No | 8/8/18 7:47 | Scott Painter (████ | | 0:03:20 | | |
| Phone iPhone | In No | 8/8/18 17:03 | (████ | 0:00:00 | | Missed | |
| Phone No | In | 8/8/18 17:04 | ████ | 0:00:30 | | | iPhone |



| Audio | Out | 8/8/18 17:05 | Antonio Gracias ( ███████ ) | 0:00:00 | | |
| Cancelled | | FaceTime | No | | | |
| Audio | Out | 8/8/18 17:06 | Antonio Gracias ( ███████ ) | 0:00:00 | | |
| Cancelled | | FaceTime | No | | | |
| Phone | Out | 8/8/18 17:06 | Antonio Gracias ( ███████ ) | 0:12:15 | | |
| iPhone | | | No | | | |
| Phone | Out | 8/8/18 17:21 | Gavin Baker ( ████████ ) | 0:16:34 | | |
| iPhone | | | No | | | |
| Phone | In | 8/8/18 19:53 | JB Straubel ( ███████ ) | 0:01:55 | | |
| iPhone | | | No | | | |
| Phone | Out | 8/9/18 3:03 | <Encrypted Blob> | 0:21:57 | | iPhone |
| No | | | | | | |
| Phone | In | 8/9/18 17:21 | SpaceX Office ( ████████ ) | 0:00:00 | | Missed |
| | iPhone | | No | | | |
| Phone | In | 8/9/18 17:53 | SpaceX Office ( ████████ ) | 0:00:00 | | Missed |
| | iPhone | | No | | | |
| Phone | In | 8/9/18 17:59 | ( ██████ ) | 0:23:54 | | iPhone |
| No | | | | | | |
| Phone | Out | 8/9/18 18:25 | Dan Dees ( ██████ ) | 0:00:00 | Cancelled | |
| iPhone | | | No | | | |
| Phone | Out | 8/9/18 18:35 | Yasir ( ██████ ) | 0:00:00 | Cancelled | |
| iPhone | | | No | | | |
| Phone | In | 8/9/18 18:55 | Dan Dees ( ███████ ) | 0:00:00 | Missed | |
| iPhone | | | No | | | |
| Phone | Out | 8/9/18 18:58 | Dan Dees ( ██████ ) | 0:22:20 | | |
| iPhone | | | No | | | |
| Phone | Out | 8/9/18 19:53 | Larry Page ( ███████ ) | 0:00:00 | Cancelled | |
| iPhone | | | No | | | |
| Phone | Out | 8/9/18 19:54 | Larry Page ( ███████ ) | 0:00:00 | Cancelled | |
| iPhone | | | No | | | |
| Phone | In | 8/9/18 21:03 | Ira Ehrenpreis ( ████████ ) | 0:00:00 | | Missed |
| | iPhone | | No | | | |
| Phone | In | 8/10/18 4:28 | Ira Ehrenpreis ( ████████ ) | 0:00:00 | | Missed |
| | iPhone | | No | | | |
| Phone | In | 8/10/18 5:32 | Elissa Butterfield ( ████████ ) | 0:01:11 | | |
| TRUE | iPhone | | No | | | |
| Phone | Out | 8/10/18 5:36 | ████████ | 0:06:04 | | iPhone |
| No | | | | | | |
| Phone | In | 8/10/18 15:16 | Elissa Butterfield ( ████████ ) | 0:00:00 | | Missed |
| TRUE | iPhone | | No | | | |
| Phone | In | 8/10/18 15:32 | Elissa Butterfield ( ████████ ) | 0:39:32 | | |
| TRUE | iPhone | | No | | | |
| Phone | Out | 8/10/18 16:31 | <Encrypted Blob> | 0:21:15 | | iPhone |
| No | | | | | | |
| Phone | In | 8/10/18 16:58 | ████████ | 0:22:27 | | iPhone |
| No | | | | | | |
| Phone | In | 8/10/18 18:30 | ███████ | 0:07:13 | | iPhone |
| No | | | | | | |
| Phone | In | 8/10/18 19:03 | Sam Teller ( ████████ ) | 0:26:23 | | |
| iPhone | | | No | | | |
| Phone | Out | 8/10/18 20:36 | <Encrypted Blob> | 0:31:02 | | iPhone |
| No | | | | | | |
| Phone | In | 8/10/18 20:46 | ( ██████ ) | 0:00:00 | | Missed |
| iPhone | | | No | | | |
| Phone | Out | 8/10/18 21:09 | Yasir ( ██████ ) | 0:00:00 | Cancelled | |
| iPhone | | | No | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Phone<br>iPhone | In<br> | 8/10/18 21:11<br>No | Yasir ( ⬛ ) | | 0:01:36 | | |
| Phone<br>No | Out | 8/10/18 21:31 | \<Encrypted Blob\> | | 0:25:39 | | iPhone |
| Phone<br>iPhone | In<br> | 8/10/18 22:15<br>No | Ari Emanuel ( ⬛ | ) | 0:03:19 | | |
| Phone<br>iPhone | In<br> | 8/11/18 0:13<br>No | Todd Maron ( ⬛ | ) | 0:07:54 | | |
| Phone<br>iPhone | In<br> | 8/11/18 0:36<br>No | Antonio Gracias ( ⬛ | | 0:00:32 | | |
| Phone<br>iPhone | In<br> | 8/11/18 4:58<br>No | Sam Teller ( ⬛ | ) | 0:06:14 | | |
| Video<br>FaceTime | In<br> | 8/11/18 17:34<br>No | Sam Teller ( ⬛ | ) | 0:00:00 | Missed | |
| Audio<br>FaceTime | In<br> | 8/11/18 17:34<br>No | Sam Teller ⬛ | | 0:00:13 | | |
| Audio<br>FaceTime | In<br> | 8/11/18 17:35<br>No | Sam Teller ( ⬛ | | 0:00:23 | | |
| Phone<br>iPhone | In<br> | 8/11/18 17:35<br>No | Sam Teller ( ⬛ | | 0:00:16 | | |
| Phone<br>iPhone | In<br> | 8/11/18 17:47<br>No | Sam Teller ( ⬛ | ) | 0:33:59 | | |
| Phone<br>iPhone | In<br> | 8/11/18 18:16<br>No | Ari Emanuel ( ⬛ | ) | 0:00:00 | Missed | |
| Audio<br>FaceTime | In<br> | 8/11/18 18:49<br>No | Antonio Gracias ( ⬛ | ) | 0:23:01 | | |
| Phone<br>iPhone | Out<br> | 8/11/18 19:14<br>No | Ari Emanuel ( ⬛ | ) | 0:00:02 | | |
| Phone<br>iPhone | Out<br> | 8/11/18 19:15<br>No | Egon ( ( ⬛ | ) | 0:00:00 | Cancelled | |
| Phone<br>iPhone | In<br> | 8/11/18 19:17<br>No | Ari Emanuel ( ⬛ | | 0:01:35 | | |
| Audio<br>FaceTime | In<br> | 8/11/18 21:01<br>No | Antonio Gracias ( ⬛ | ) | 0:16:27 | | |
| Phone<br>iPhone | In<br> | 8/12/18 0:10<br>No | Egon ( ( ⬛ | | 0:00:00 | Missed | |
| Audio<br>FaceTime | Out<br> | 8/12/18 2:57<br>No | Egon ( ⬛ | ) | 0:12:11 | | |
| Phone<br>iPhone | Out<br> | 8/12/18 3:10<br>No | Todd Maron ( ( ⬛ | ) | 0:00:03 | | |
| Phone<br>iPhone | Out<br> | 8/12/18 3:15<br>No | Todd Maron ( ( ⬛ | | 0:08:16 | | |
| Phone<br>iPhone | In<br> | 8/12/18 3:32<br>No | Sam Teller ( ( ⬛ | | 0:10:09 | | |
| Phone<br>iPhone | In<br> | 8/12/18 17:26<br>No | Sam Teller ( ⬛ | ) | 0:01:46 | | |
| Phone<br>No | Out | 8/12/18 17:36 | \<Encrypted Blob\> | | 0:31:48 | | iPhone |
| Phone<br>No | Out | 8/12/18 18:09 | \<Encrypted Blob\> | | 0:31:41 | | iPhone |
| Phone<br>iPhone | In<br> | 8/12/18 18:41<br>No | Sam Teller ( ⬛ | | 0:05:32 | | |
| Audio<br>FaceTime | In<br> | 8/12/18 19:06<br>No | Yasir ( ⬛ | ) | 0:00:00 | Missed | |
| Audio<br>FaceTime | In<br> | 8/12/18 19:08<br>No | Yasir ( ⬛ | ) | 0:00:00 | Missed | |





| Phone | Out | 8/12/18 20:21 | Sam Teller (████████) | 0:01:02 | | |
| iPhone | | No | | | | |
| Phone | In | 8/12/18 20:32 | Sam Teller (████████) | 0:13:41 | | |
| iPhone | | No | | | | |
| Audio | In | 8/12/18 23:17 | ████████ | 0:09:47 | | FaceTime |
| No | | | | | | |
| Audio | In | 8/12/18 23:27 | ████████ | 0:00:00 | Missed | |
| FaceTime | | No | | | | |
| Audio | In | 8/12/18 23:27 | ████████ | 0:01:25 | | FaceTime |
| No | | | | | | |
| Phone | Out | 8/12/18 23:30 | ████████ | 0:40:00 | | iPhone |
| No | | | | | | |
| Phone | Out | 8/13/18 1:05 | (████████ | 0:11:52 | | iPhone |
| No | | | | | | |
| Phone | In | 8/13/18 3:12 | (████████ | 0:06:55 | | iPhone |
| No | | | | | | |
| Phone | In | 8/13/18 6:20 | Rene (████████) | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 12:05 | (65████████ | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 12:05 | Todd Maron (████████) | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 12:17 | Todd Maron (████████) | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | Out | 8/13/18 12:22 | Todd Maron (████████) | 0:03:44 | | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 15:52 | Sam Teller (████████) | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 16:02 | Sam Teller (████████) | 0:01:14 | | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 16:52 | Reyna (████████ | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 16:53 | Reyna (████████ | 0:00:00 | Missed | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 17:01 | SpaceX Office (████████) | 1:19:39 | | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 18:43 | Sam Teller (████████) | 0:10:18 | | |
| iPhone | | No | | | | |
| Phone | Out | 8/13/18 19:52 | Ari Emanuel (████████) | 0:02:34 | | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 19:58 | Ari Emanuel (████████ | 0:00:11 | | |
| iPhone | | No | | | | |
| Phone | Out | 8/13/18 20:03 | Sam Teller (████████) | 0:00:19 | | |
| iPhone | | No | | | | |
| Phone | Out | 8/13/18 22:39 | Egon████████) | 0:00:04 | | |
| iPhone | | No | | | | |
| Phone | In | 8/13/18 22:45 | Egon (████████ | 0:21:37 | | |
| iPhone | | No | | | | |
| Phone | Out | 8/14/18 1:46 | Sean Parker (████████) | 0:07:52 | | |
| iPhone | | No | | | | |
| Phone | In | 8/14/18 2:11 | Sean Parker (████████) | 0:00:04 | | |
| iPhone | | No | | | | |
| Phone | In | 8/14/18 3:26 | Egon████████) | 0:07:27 | | |
| iPhone | | No | | | | |
| Phone | In | 8/14/18 4:09 | Dan Dees (████████) | 0:12:20 | | |
| iPhone | | No | | | | |



| Phone | Out | 8/14/18 5:06 | Elissa Butterfield ( ▮▮▮▮▮▮ ) | 0:01:53 | |
| TRUE | iPhone | No | | | |
| Phone | In | 8/14/18 5:48 | Unknown | 0:36:13 | iPhone |
| No | | | | | |
| Phone | In | 8/14/18 6:33 | Sam Teller ( ( ▮▮▮▮▮▮ ) ) | 0:18:14 | |
| iPhone | | No | | | |
| Phone | In | 8/14/18 6:58 | Sam Teller ( ( ▮▮▮▮▮▮ ) | 0:13:14 | |
| iPhone | | No | | | |
| Phone | In | 8/14/18 15:58 | Egon ( ▮▮▮▮▮▮ ) | 0:24:10 | |
| iPhone | | No | | | |
| Phone | In | 8/14/18 16:29 | Dan Dees ( ▮▮▮▮▮ ) | 0:09:05 | |
| iPhone | | No | | | |
| Phone | In | 8/14/18 17:20 | Unknown | 0:00:00 | Missed | iPhone |
| No | | | | | |
| Phone | In | 8/14/18 18:33 | Egon ( ( ▮▮▮▮▮ ) | 0:02:26 | |
| iPhone | | No | | | |
| Phone | Out | 8/14/18 18:36 | ▮▮▮▮▮▮▮▮▮ | 0:14:36 | |
| iPhone | | No | | | |
| Phone | In | 8/15/18 6:12 | Egon ( ( ▮▮▮▮▮ | 0:08:51 | |
| iPhone | | No | | | |
| Phone | In | 8/15/18 16:19 | Sam Teller ( ( ▮▮▮▮▮ ) | 0:00:00 | Missed |
| iPhone | | No | | | |
| Phone | In | 8/15/18 16:19 | Sam Teller ( ( ▮▮▮▮▮ ) | 0:00:10 | |
| iPhone | | No | | | |
| Phone | In | 8/15/18 16:20 | Sam Teller ( ( ▮▮▮▮▮ ) | 0:00:42 | |
| iPhone | | No | | | |
| Audio | In | 8/15/18 16:21 | Sam Teller ( ( ▮▮▮▮▮ ) | 0:10:03 | |
| FaceTime | | No | | | |
| Phone | In | 8/15/18 16:39 | ( ▮▮▮▮▮ | 0:01:48 | iPhone |
| No | | | | | |

EXCERPTS FROM THE DEPOSITION OF
JOSEPH FATH
TAKEN JULY 12, 2021

1   UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   SAN FRANCISCO DIVISION

4   ------------------------------)

5   IN RE TESLA, INC.

6   SECURITIES LITIGATION        Civil Action No.

7                                3:18:cv-04865-EMC

8   ------------------------------)

9

10

11

12        REMOTE DEPOSITION OF JOSEPH FATH

13             New York, New York

14              July 12, 2021

15

16

17

18

19

20

21

22

23

24   Reported by:
     Linda Salzman
25   JOB NO. 196636

```
 1                    July 12, 2021

 2                    12:15 p.m.

 3

 4         Remote deposition of JOSEPH

 5    FATH, the witness herein, held

 6    remotely before Linda Salzman, a

 7    Notary Public of the State of New

 8    York.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2

 3       LEVI & KORSINSKY

 4       Attorneys for Plaintiffs

 5            1101 30th Street, Northwest

 6            Washington, D.C.  20007

 7       BY:  NICHOLAS PORRITT, ESQ.

 8            KATHY AMES VALDIVIESO, ESQ.

 9

10       COOLEY

11       Attorneys for Tesla

12            3175 Hanover Street

13            Palo Alto, California 94304

14       BY:  PATRICK GIBBS, ESQ.

15            BINGXIN WU, ESQ.

16

17       T. ROW PRICE

18       Attorneys for the Witness

19            100 East Pratt Street

20            Baltimore, Maryland 21202

21       BY:  CHRIS SHAHEEN, ESQ.

22

23

24   Also Present:

25   LEM LATTIMER, Videographer
```

```
 1              STIPULATIONS

 2         IT IS HEREBY STIPULATED AND

 3   AGREED by and among counsel for the

 4   respective parties hereto, that the

 5   sealing and certification of the

 6   within deposition shall be and the

 7   same are hereby waived;

 8         IT IS FURTHER STIPULATED AND

 9   AGREED all objections, except as to

10   the form of the question, shall be

11   reserved to the time of the trial;

12         IT IS FURTHER STIPULATED AND

13   AGREED that the within deposition may

14   be signed before any Notary Public

15   with the same force and effect as if

16   signed and sworn to before the Court.

17

18

19

20

21

22

23

24

25
```

```
 1          THE VIDEOGRAPHER:  Good morning,
 2   Counselors.  My name is Lem Lattimer.
 3   I am a legal videographer in
 4   association with TSG Reporting, Inc.
 5          Due to the severity of COVID-19
 6   and following the practice of social
 7   distancing, I will not be in the same
 8   room with the witness.  Instead, I
 9   will record this videotaped deposition
10   remotely.  The reporter, Linda
11   Salzman, also will not be in the same
12   room and will swear the witness in
13   remotely.
14          Do all parties stipulate to this
15   video recording and remote swearing
16   and that it will be admissible in the
17   courtroom as if it had been taken
18   following Rule 30 of the Federal Rules
19   of Civil Procedures and the state's
20   rules where this case is pending?
21          Counselors, I need you to
22   stipulate.
23          MR. PORRITT:  Oh, yes.  So
24   stipulate.
25          MR. GIBBS:  So stipulated.
```

1          THE VIDEOGRAPHER:  Thank you.

2     This is the start of media labeled No.

3     1 of the video-recorded deposition of

4     Joseph Fath in the matter of In re:

5     Tesla, Inc. Securities Litigation on

6     July 12, 2021, at approximately 12:16

7     p.m.

8          All appearances are noted on the

9     record.  Will the court reporter

10     please swear in the witness.

11 J O S E P H   F A T H,

12     called as a witness, having been duly

13     sworn by a Notary Public, was examined

14     and testified as follows:

15 EXAMINATION BY

16 MR. PORRITT:

17     Q.   Good afternoon, Mr. Fath.  My

18 name is Nicholas Porritt.  I'm with the

19 law firm of Levi & Korsinsky representing

20 the plaintiff Glen Littleton and the class

21 in this action.

22          Could you start off by just

23 stating your full name and position at T.

24 Rowe Price?

25     A.   Joseph Fath, F-A-T-H.  I run the

1    growth stock fund here, and I'm

2    technically a vice president.

3        Q.    And how long have you worked at

4    T. Rowe Price?

5        A.    Since the intern in 2001.  I

6    started full-time in August of 2002, so

7    going on 19 years.

8        Q.    And you said you are the

9    portfolio manager for the U.S. Growth

10   Stock Equity Strategy Fund; is that

11   correct?

12       A.    That's correct.

13       Q.    Okay.  Could you briefly

14   describe your responsibilities as a

15   portfolio manager for that fund.

16       A.    Yes.  I'm the lead portfolio

17   manager.  Product now is about $130

18   billion.  I run retail money in the United

19   States, as well as I have separate account

20   clients, a number of different

21   institutions.

22          Our strategy is focused on large

23   cap U.S. growth equities, but we also

24   invest internationally.  It's typically

25   companies over $10 billion in market cap.

1    the witness a document previously

2    marked as Exhibit 13.

3       Q.    Do you see that, Mr. Fath?

4       A.    I do.

5       Q.    Do you recognize this document?

6       A.    I recognize that Tweet, yes.

7       Q.    Okay.  Do you recall when you

8  first saw that Tweet?

9       A.    Again, it was a frenzy that day,

10  but I see it's August 7th.  I remember

11  seeing it.  But, again, I was on vacation.

12  I saw it sometime during the day.

13      Q.    Do you recall reading the

14  statement there on the top of -- beginning

15  of the Tweet in Exhibit 13, "Investor

16  support is confirmed"?

17      A.    Absolutely.

18      Q.    Do you recall what your reaction

19  was to seeing those words?

20      A.    Yes.  I was shocked because I

21  said to myself, well, I know it's not us

22  because we haven't spoken to them.

23      Q.    What was your understanding of

24  the meaning of the words "investor support

25  is confirmed"?

```
 1   have an interest to do that if that came

 2   to bear.

 3       Q.    And is that something you had

 4   considered before?

 5       A.    Yes.  We've been private

 6   investors in our public mutual funds for

 7   many years.  I believe beginning back in

 8   2007, we started private investing, as

 9   well as public investing.

10       Q.    Is that something you considered

11   before with regard to Tesla?

12       A.    No, it was not.

13
```

13     A.    I do.

14     Q.    As of this time August 18, 2018,

15 11:11 a.m., had you spoken to Elon Musk

16 about this potential transaction?

17     A.    I had not.

18     Q.    Do you know if anyone from T.

19 Rowe Price had spoken to Elon Musk

20 directly about this transaction?

21     A.    I know they did not.   There's

22 emails that you have in your other

23 documentation.

24          His chief of staff, his name was

25 Sam -- I can't recall his last name --

```
 1   reached out to me when I was in Nevis
 2   after the initial Tweets, and I knew right
 3   away that I needed to contact our head of
 4   equities, Eric Veiel, as well as our
 5   in-house counsel, which I did.
 6              And I stepped back completely
 7   from them in case I did get this call and
 8   we would have needed to be restricted.  So
 9   I turned it over to them to deal with it
10   directly, and they handled all
11   conversations from there.
12              So I know once that transpired,
13   no one else in the organization, other
14   than Eric and/or our in-house counsel,
15   would have spoken to the company directly.
16   I never spoke with Elon after that Tweet.
17      Q.    Okay.  In this sentence here on
18   Exhibit 44, you say, "Companies reaching
19   out to their large holders now."
20              Do you see that?
21      A.    Yes.
22      Q.    What's your basis for that
23   statement?
24      A.    IR, I believe, again, it was
25   Martin Viecha and may have been Eric Chew.
```

1          So he was willing -- if it were

2    to go private, he would be willing to take

3    exposure to only 50 basis points.  Given

4    we all factor in illiquid securities and

5    how much exposure we have there, illiquid

6    securities clearly have more risk than

7    liquid securities, given our inability to

8    sell.

14    Q.    So he would reduce his holding?

15    A.    Correct.

16          MR. PORRITT:  Kathy, would you

17    bring over 16, Bates-stamp 16.

18          MS. VALDIVIESO:  Yes, Nick.  16

19    is uploaded.  It's there.

20          (Fath Exhibit 46, Email, Bates

21    No. TRP_000016, marked for

22    identification, as of this date.)

23          MR. PORRITT:  So I've placed

24    before the witness a document marked

25    as Exhibit 46.

```
 1   transaction to get your thoughts and

 2   feedback."

 3           Do you see that?

 4      A.   I do.

 5      Q.   Was this the first contact you

 6   received from anyone at Tesla regarding

 7   the go-private transaction?

 8      A.   No.  The earlier discussions

 9   that we spoke about -- or that we just

10   discussed before this was with the

11   investor relations folks, so again, Martin

12   Viecha and Eric Chew.

13      Q.   That was a bad question.  I

14   apologize.

15           Was this the first contact you

16   received from Elon Musk or someone acting

17   on his behalf regarding the go-private

18   transaction?

19      A.   Yes.

20      Q.   ████████████████████████████
```

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

```
 1              C E R T I F I C A T E

 2   STATE OF NEW YORK     )

 3                          : ss

 4   COUNTY OF NEW YORK    )

 5

 6           I, Linda Salzman, a Notary

 7      Public within and for the State of

 8      New York, do hereby certify:

 9           That JOSEPH FATH, the witness

10      whose deposition is hereinbefore set

11      forth, was duly sworn by me and that

12      such deposition is a true record of

13      the testimony given by the witness.

14           I further certify that I am not

15      related to any of the parties to

16      this action by blood or marriage,

17      and that I am in no way interested

18      in the outcome of this matter.

19           IN WITNESS WHEREOF, I have

20      hereunto set my hand this 18th day

21      of July, 2021.
                          Linda Salzman
22                   _____

23                        Linda Salzman

24

25
```

EXCERPTS FROM THE DEPOSITION OF
MARTIN VIECHA
TAKEN AUGUST 23, 2021

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 1

1           UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5                              )   Civil Action

6    IN RE TESLA, INC.         )   No. 3:18-cv

7    SECURITIES LITIGATION     )   -04865-EMC

8                              )   Page 1-234

9

10       THIS TRANSCRIPT IS DESIGNATED CONFIDENTIAL

11         PURSUANT TO THE PROTECTIVE ORDER

12

13

14    REMOTE VIDEOTAPED DEPOSITION OF MARTIN VIECHA

15                   TAKEN ON

16            MONDAY, AUGUST 23, 2021

17

18

19

20

21

22   Reported by:

23   BRENDA R. COUNTZ, RPR-CRR

24   CSR NO. 12563

25   JOB NO. 198694

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 2

1

2

3

4

5

6

7

8

9

10        Remote Videotaped deposition of MARTIN VIECHA

11   taken via Zoom or teleconference in Los Angeles,

12   California, on Monday, August 23, 2021, before

13   Brenda R. Countz, CSR No. 12563.

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   APPEARANCES OF COUNSEL:

 2           (All counsel and participants present

 3            via Zoom and/or teleconference.)

 4

 5   FOR THE PLAINTIFFS:

 6           LEVI & KORSINSKY

 7           BY:  NICHOLAS PORRITT, ESQ.

 8                ELIZABETH TRIPODI, ESQ.

 9                KATHY AMES, ESQ.

10           1101 30th Street NW

11           Washington, D.C. 20007

12

13

14

15

16   FOR THE DEFENDANT TESLA AND THE DEPONENT:

17           COOLEY

18           BY:  PATRICK GIBBS, ESQ.

19                BINGXIN WU, ESQ.

20           3175 Hanover Street

21           Palo Alto, California 94304

22

23

24

25
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    APPEARANCES (Continued)

2

3    ALSO PRESENT:

4            BRENT JORDAN, Videographer

5            CANDACE JACKMAN, Tesla In-house Counsel

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

 1          LOS ANGELES, CA - MONDAY, AUGUST 23, 2021

 2                    9:06 A.M.

 3

 4          THE VIDEOGRAPHER:  Good morning,

 5   counselors.  My name is Brent Jordan.  I'm the

 6   Certified Legal Videographer in association with

 7   TSG Reporting, Inc.  Due to the severity of the

 8   Covid-19 and following the practices of social

 9   distancing, I will not be in the same room with

10   the witness.

11          Instead I will record this videotaped

12   deposition remotely.  The reporter, Brenda

13   Countz, also will not be in the same room and

14   will swear the witness remotely.

15          Do all parties stipulate to the

16   validity of this video recording and remote

17   swearing and that it will be admissible in the

18   courtroom as if it had been taken following Rule

19   30 of the Federal Rules of Civil Procedures and

20   the State's rules where this case is pending?

21          MR. PORRITT:  Yes.

22          MR. GIBBS:  Yes.

23          THE WITNESS:  Yes.

24          THE VIDEOGRAPHER:  Thank you.  This is

25   the start of media number one in the videotape

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1   deposition of Martin Viecha taken In Re The

2   Tesla, Inc. Securities Litigation filed in the

3   United States District Court for the Northern

4   District of California, San Francisco Division,

5   Case No. 3:18-cv-04865.

6            This deposition is being taken on

7   August 23, 2021 at approximately 9:06 a.m.

8            My name is Brent Jordan.  I'm the legal

9   video specialist from TSG Reporting, Inc.

10  headquartered at 228 East 45th Street, New York,

11  New York.  The court reporter is Brenda Countz in

12  association with TSG Reporting.

13           Will counsel please introduce

14  yourselves for the record.

15           MR. PORRITT:  Good morning, Nicholas

16  Porritt of Levy & Korsinsky on behalf of the

17  Plaintiff and the class.  With me are Elizabeth

18  Tripodi and Kathy Ames.

19           MR. GIBBS:  Good morning, this is

20  Patrick Gibbs from Cooley for the Defendants and

21  for the witness, and with me is Bing Wu also from

22  Cooley.

23           THE VIDEOGRAPHER:  Will the court

24  reporter please swear in the witness.

25

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1                           MARTIN VIECHA,

2              having been first duly sworn, was

3              examined and testified as follows:

4

5                           EXAMINATION

6    BY MR. PORRITT:

7         Q.   Good morning, Mr. Viecha.  As I just

8    introduced myself, my name is Nicholas Porritt.

9    I'm with the lawfirm of Levy & Korsinsky, one of

10   the attorneys representing the Plaintiff, Glenn

11   Littleton and her class, in this action.

12              Could you state your full name for the

13   record?

14        A.   My full name is Martin Viecha.

15        Q.   And what's your residential address?

16        A.   My residential address is 327 Waverly

17   Street, Palo Alto, California.

18        Q.   And where are you located for today's

19   deposition?

20        A.   At my home address.

21        Q.   Is anyone else present there with you

22   today?

23        A.   No.

24        Q.   Have you been deposed before?

25        A.   Yes.

1   Tesla?

2       A.   Yes.

3       Q.   Do you recall receiving this e-mail

4   inquiry from Mr. -- am I pronouncing his name

5   correctly, Itay Michaeli?

6       A.   Michaeli.  No, I do not recall this

7   e-mail.

8       Q.   And do you recall sending -- responding

9   to his question saying, "Hi Itay, the very first

10  tweet mentioned a firm offer"?

11      A.   I don't recall that e-mail.

12      Q.   Okay.  Do you know why you referred him

13  to the first tweet in reference to firm offer?

14      A.   I cannot recall at that time, but in my

15  mind, given I have witnessed a visit by the Saudi

16  PIF that had been consistently trying to take

17  over our company for some time, I had no doubt in

18  my mind that this is a firm offer.

19      Q.   And that was based purely on the

20  existence of a meeting that you had seen happen

21  even though you didn't participate in, in July

22  31st, 2018?

23           MR. GIBBS:  Object to the form,

24  argumentative.

25           THE WITNESS:  No.  I answered no.

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    of that article.

2        Q.   So you had the conversation with Mr.

3    Ahuja.  You have your independent research on the

4    Saudi PIF.

5            What else is your basis for believing

6    this was a firm offer?

7        A.   Yes, it was my conversation and

8    understanding the size of this fund.  Those were

9    the reasons.

10       Q.   Had you seen anything in writing from

11   Saudi PIF regarding an offer?

12       A.   No.

13       Q.   Did you know whether the Saudi PIF had

14   agreed on the $420 per share price?

15       A.   No.

16       Q.   Do you know whether anyone had even

17   discussed the $420 per share price with the Saudi

18   PIF?

19       A.   No.

20       Q.   Do you know if there had been any

21   discussion with the Saudi PIF about the overall

22   amount of funds needed to fund the go-private

23   transaction?

24       A.   No.

25       Q.   Other than the market cap of Tesla

Page 137

1          A.    Yes.

2          Q.    Do you recall receiving a request from

3     Mr. Koney that you call him back?

4          A.    No.

5          Q.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

██████████████████████████

████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



22          That was my understanding.

23          Q.   So your understanding was that Saudi

24     PIF were committed to taking Tesla private at

25     $420 per share?

Page 150

21      Q.   Do you know if this information was

22   communicated to Elon Musk?

23      A.   I can't recall.

24           MR. PORRITT:  Elizabeth, why don't you

25   bring over 4179.

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1          THE WITNESS:  4010.  (Perusing.)

2          (Viecha Exhibit 150, Document

3          Bates Stamped TESLA_LITTLETON

4          _00004010 to 00004011, was marked

5          for identification.)

6          MR. PORRITT:  I'm placing before the

7    witness a document marked as Exhibit 150, Bates

8    Stamped TESLA_LITTLETON_00004010 to 4011.

9    BY MR. PORRITT:

10         Q.   Have you had a chance to review

11   Exhibit 150?

12         A.   Yes.

13         Q.   Who is Bradley Erickson?

14         A.   He used to be a sell-side analyst at

15   Key Bank.

16         Q.   Is he someone you communicated with in

17   2018 as director of investor relations at Tesla?

18         A.   Yes.

19         Q.   Do you recall Mr. Erickson sending you

20   this e-mail inquiry in the tweet?

21              "He said financing is secured but in

22   the letter he doesn't address this.  Can you

23   clarify?"

24              Do you see that?

25         A.   Yes.

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    Q.   Do you recall receiving that question

2    from Mr. Erickson?

3    A.   No.

4    Q.   And you responded, "I can only say that

5    the first tweet clearly stated that 'Financing is

6    secured.'  Yes, there is a firm offer."

7         Do you see that?

8    A.   Yes.

9    Q.   And that's what you responded back to

10   Mr. Erickson?

11   A.   Yes.

12   Q.   Was there any basis for your statements

13   here back to Mr. Erickson beyond what we

14   previously discussed, your understanding of the

15   PIF offer?

16   A.   No, not beyond what we previously

17   discussed.

18   Q.   So during the afternoon of August 7,

19   2018 you weren't receiving additional information

20   from individuals at Tesla regarding the status of

21   the offer?

22   A.   No.

23   Q.   What about any updates from anyone

24   working for Elon Musk regarding the status of the

25   offer?

1        A.    No.  I don't know.

2             MR. PORRITT:  Okay, why don't we bring

3   over 4253, Exhibit 151.

4             I'm placing before the witness a

5   document marked 151.

6             THE WITNESS:  I have it in front of me.

7             MR. PORRITT:  I'm placing before the

8   witness a document marked Exhibit 151, a

9   three-page document Bates stamped TESLA_LITTLETON

10  _00004253 to 4255.

11            Let me know when you have had a chance

12  to review that exhibit.

13            (Viecha Exhibit 151, Document

14            Bates Stamped TESLA_LITTLETON

15            _00004253 to 00004255, was marked

16            for identification.)

17            THE WITNESS:  I have it the other way

18  around but I can still read it.  (Perusing.)

19            Yes, okay.

20  BY MR. PORRITT:

21        Q.    First of all, who is Tony Sakanagi?

22        A.    Tony Sakanagi is a sell-side analyst

23  for Bernstein.

24        Q.    Do you recall receiving his questions

25  on the afternoon of August 7, 2018?

1    A.    No.

2    Q.    But these are e-mails that you received

3  from him contained in Exhibit 151?

4    A.    Yes.

5    Q.    And in the middle of the second page of

6  Exhibit 151 in response to Mr. Sakanagi's

7  questions you say, "Hi Tony, apart from what has

8  been tweeted and what was written in a blog post

9  we can't add anything else."

10    A.    Yes.

11    Q.    Okay.  Then you continue, "I only

12  wanted to stress that Elon's first tweet which

13  mentioned 'financing secured' is correct."

14         Do you see that?

15    A.    Yes.

16    Q.    Why did you add that second sentence?

17    A.    I think -- I don't remember, to be

18  honest.

19    Q.    Because you say, "I can't add anything

20  else" and then you add a second sentence.

21         Do you remember why you did that?

22    A.    No, I don't.

23    Q.    At the time you wrote this e-mail back

24  to Mr. Sakanagi, had you received any additional

25  information about the financing for any

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 158

1    going-private transaction?

2        A.    No, not that I recall.

3        Q.    And Mr. Sakanagi responds on the first

4    page of Exhibit 151, "What does 'financing

5    secured' actually mean?  Are you assuming Tesla

6    will need 60 billion plus in financing or

7    assuming that many shareholders don't take the

8    offer and Tesla needs less?  Big difference.

9    'Financing secured' implies the former."

10            Do you see that?

11       A.    Yes.

12       Q.    And you respond, "It means that

13   financing is secured regardless of other

14   assumptions."

15       A.    Yes.

16       Q.    Do you see that?

17       A.    Yup.

18       Q.    So this e-mail to Mr. Sakanagi in

19   Exhibit 151, so that reflects your understanding

20   based on the tweets and your other information

21   you had available to you?

22       A.    Correct.

23       Q.    So you understood there to be

24   potentially $60 billion-plus in financing

25   available to Tesla?

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      A.    Correct.

2      Q.    Again, that's based only on your

3  conversations with Mr. Ahuja and your private

4  research into their PIF assets under management?

5      A.    Correct.

6      Q.    Mr. Sakanagi on the first page of

7  Exhibit 151 also asked, "Has this possible buyer

8  been discussed with Tesla's board or shareholders

9  prior to today?"

10          And you said, "This wasn't discussed

11  with any shareholders prior to today's tweet."

12          Do you see that?

13     A.    Yes.

14     Q.    So that confirms your understanding or

15  your knowledge that there had been no discussions

16  with shareholders about the going-private

17  transaction prior to August 7, 2018?

18     A.    Yes.

19     Q.    We can go back to just Exhibit 144

20  which is 4099.  Exhibit 144 is the exchange with

21  Mr. Spurling.

22     A.    Um-hum.

23     Q.    You've got that exhibit back in front

24  of you, Mr. Viecha?

25     A.    Yes, it doesn't download so I need to

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    read it the other way around.

2        Q.   Oh, I apologize.

3        A.   Okay, I just read it.

4        Q.   So Mr. Spurling had asked you once

5    again following on your inquiry in our

6    conversation that you testified about, the

7    question ultimately saying when do you expect the

8    final decision to be made.

9             And you responded, "Elon also tweeted

10   this and just to support as confirmed, the only

11   reason why this is not certain is that it's

12   contingent on a shareholder vote."

13            Do you see that?

14       A.   Yes.

15       Q.   As you just testified, you had not

16   spoken to any investors yet regarding this

17   going-private transaction, correct?

18       A.   Correct, but that's not what this is

19   referring to.  That's what I wanted to say.

20       Q.   Well, you are the director of investor

21   relations, correct?

22       A.   Yes.

23       Q.   So you speak to current Tesla

24   investors, correct?

25       A.   Correct, but I haven't spoken to all of

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 161

1    them.  I haven't spoken to Saudi PIF, for

2    example.

3         Q.    Sorry, go ahead.

4         A.    There would be shareholders that would

5    never reach out and I would not speak to them.

6         Q.    You understood that others had spoken

7    to investors regarding this going-private

8    transaction?

9         A.    I'm sorry, could you say that again?

10        Q.    You understood that others at Tesla had

11   spoken to investors regarding this going-private

12   transaction?

13        A.    That others have spoken to investors

14   regarding the transaction?  Do you mean on the

15   August 7th or afterwards?

16        Q.    On August 7th.

17        A.    No.  Not that I'm aware of.

18              MR. PORRITT:  All right.  I think we've

19   been going a reasonable time.  Now might be a

20   decent time for a break if that's okay, Brenda?

21              THE REPORTER:  That's great.

22              THE VIDEOGRAPHER:  Going off the video

23   at 2:34 p.m.

24              (Break taken.)

25              THE VIDEOGRAPHER:  Back on video at

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1        Q.   And then if you turn over and go to the

2   next page, in the middle of the page there's some

3   further exchange with Sam Teller where you

4   state --

5        A.   The consulting firm, yup.

6        Q.   Mr. Teller tells you that tomorrow is

7   okay.

8             And you say, "I'm sure they will send

9   it to us first thing in the morning.  I'll make

10  it clear that it's super important."

11            Do you see that?

12       A.   Yes.

13       Q.   Do you recall if you sent that

14  information to Mr. Teller?

15       A.   No, I don't recall.

16       Q.   All right, now we can turn to

17  Exhibit 155, 4625.

18       A.   4625, yes.  I'm just turning it around.

19  I'm just going to read the e-mail.  (Perusing.)

20  Okay.

21       Q.   Have you had a chance to review

22  Exhibit 155?

23       A.   Yes.

24       Q.   So Exhibit 155 is an e-mail from Aaron

25  Chew to you and Mr. Ahuja titled, "Investor

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 172

1    feedback."

2              Do you see that?

3         A.   Yes.

4         Q.   And it contains quotes from existing

5    shareholders with regard to the going-private

6    transaction, correct?

7         A.   Correct.

8              (Viecha Exhibit 155, Document

9              Bates Stamped TESLA_LITTLETON

10             _00004625 to 00004646, was marked

11             for identification.)

12             MR. PORRITT:  Exhibit 155 is a document

13   Bates Stamped TESLA_LITTLETON_00004625 to 4646.

14   BY MR. PORRITT:

15        Q.   Does Exhibit 155 reflect any

16   conversations that you had with existing Tesla

17   shareholders on August 7, 2018?

18        A.   Yes.

19        Q.   It does reflect some conversations?

20        A.   Well, sorry.  Let me correct that.

21        Q.   Okay.

22        A.   It reflects conversations I've had in

23   general.  I wouldn't be able to tell the dates of

24   those conversations.

25        Q.   Okay.  So this e-mail is sent on August

1



1



CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 175

1        Q.    So is it fair to say that over the

2   course of the weeks after the August 7th tweet

3   you learned more and more as time went on?

4        A.    I learned more and more about Tesla

5   specifically.  I built some understanding of

6   private versus public even before August, just

7   based on other conversations with the investment

8   community.

9        Q.    Okay.  If you look at -- there's a

10  heading at the bottom of the first page of

11  Exhibit 155 entitled "Frustrated Feedback" and

12  then there are five bullet points on the second

13  page of Exhibit 155.

14              Do you see those?

15       A.    Um-hum.

16       Q.    Were these comments that you received?

17       A.    Yes.

18       Q.    Do you recognize which ones that you

19  remember receiving?

20       A.    I don't remember the specifics but I do

21  remember institutions which were unable to own

22  private stakes being frustrated that they cannot

23  participate in all the upside that is yet to

24  come.

25       Q.    Do you recall any reaction to investors

1 



4                MR. PORRITT:  Elizabeth, why don't you

5    pull up previously marked Exhibit 79.

6                THE WITNESS:  Which document is that?

7                MR. PORRITT:  Exhibit 79.

8                THE WITNESS:  Exhibit 79, yes.

9                MR. PORRITT:  This one is from Deepak

10   Ahuja and I'm going to refer you to page 4 of the

11   exhibit.

12                THE WITNESS:  Okay, which page?

13                MR. PORRITT:  Page 4.

14                THE WITNESS:  Okay.  Yeah, I'm here.

15   Yup.

16   BY MR. PORRITT:

17       Q.   At the top you can see the top five

18   texts are an exchange between you and Deepak

19   Ahuja.

20                Do you see that?

21       A.   Um-hum, yeah.

22       Q.   Do you recall receiving this inquiry

23   from Mr. Ahuja about how's it going with

24   investors?

25       A.   I don't recall it, no.

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 189

1    time.

2         Q.    And then Mr. Ahuja writes back, "They

3    aren't happy about the going-private initiative."

4              And you respond, "Yup, they made it

5    pretty clear."

6              Do you see that?

7         A.    Yes, I do.

8         Q.    Do you recall J.P. Morgan making it

9    pretty clear that they weren't happy about the

10   going-private initiative?

11        A.    No.

12        Q.    You don't recall one way or the other?

13        A.    No, I don't recall this conversation.

14        Q.    If we can -- just turn over to the next

15   page, I guess it's page 7 of Exhibit 79.

16        A.    Page 7?

17        Q.    Yes.

18        A.    Yup.

19        Q.    You see in the middle there there is a

20   message from you to Mr. Ahuja on August 14th.

21   You write, "The message from investors is pretty

22   consistent."

23              Do you see that?

24        A.    Yes.

25        Q.    Do you recall the message from

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    investors being pretty consistent as of August

2    14, 2018?

3        A.   No.

4        Q.   Do you recall what that message was?

5        A.   No.

6        Q.   Do you recall overall were investors

7    generally supportive or opposed to the

8    going-private transaction?

9        A.   Yes.  I remember there was a camp of

10   investors who supported that this is the best way

11   to go.  And there was a camp of people who said

12   that this is unnecessary.

13            Sorry, there were really three camps.

14   One, that this is the right way to go.  The

15   second one, this is not the right way to go but

16   we can still hold a private stake.

17            And the third camp would be no, we are

18   very upset with this because we are not allowed

19   to hold a private stake.

20       Q.   Do you recall the approximate relative

21   sizes of those three camps?

22       A.   No.

23            MR. PORRITT:  Let's mark up 18643.

24   This will be 157.

25            THE WITNESS:  (Perusing.)  18643, yup.

```
 1            (Viecha Exhibit 157, Document

 2            Bates Stamped TESLA_LITTLETON

 3            _00018643, was marked for

 4            identification.)

 5            MR. PORRITT:  So the witness has before

 6   him a document marked Exhibit 157 marked

 7   TESLA_LITTLETON_00018643.

 8            THE WITNESS:  Okay.  I'm just reading

 9   the document.  (Perusing.)

10            Okay, I just read it.

11   BY MR. PORRITT:

12        Q.   ████████████████████████████████
```

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

███████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████

██████████████████████████████████████

█████████████████████████

████████████████████████████████████████████

████████████████████████████████████████



1       Q.      ███████████████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

███████████████████████████████

███████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████

████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████

███████████████████████████████

███████████████

15              MR. PORRITT:  Elizabeth, bring over

16      19026.

17              THE WITNESS:  19026, yup.

18              MR. PORRITT:  So the witness has before

19      him a document marked Exhibit 158, a two-page

20      document Bates Stamped TESLA_LITTLETON_00019026

21      to 27.

22              THE WITNESS:  (Perusing.)

23              (Viecha Exhibit 158, Document

24              Bates Stamped TESLA_LITTLETON

25              _00019026 to 00019027, was marked



1            for identification.)

2            THE WITNESS:  Yup, I just read it.

3    BY MR. PORRITT:

4        Q.  ███████████████████

5    ██████████████

6        A.  ███

7        Q.  ████████████████████

8    ██████████████

9        A.  ███

1      Q.   ████████████████████



1      Q.

1       A.

1 

1





1     A.   ██████████

██████████████████████████████████

████████████████████████████████████

████████████████████████

██████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████

11          MR. PORRITT:  Elizabeth, would you

12     bring over 10832, Bates Exhibit 159.  Oh, sorry,

13     before we finish with 158.

14     BY MR. PORRITT:

15          Q.   You see at the top of Exhibit 158 you

16     see that Mr. Marin forwarded this on to Elon

17     Musk?  Do you see that?

18          A.   Yes, I did see that.

19          Q.   Did you understand when you forwarded

20     it to Mr. Ahuja and Mr. Marin that they would

21     then forward it to Elon Musk?

22          A.   Not necessarily.  I didn't know what

23     exactly are they going to do with this e-mail, I

24     just wanted to make sure that they were aware.

25          Q.   Did you have any further

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 1

1   NAME OF CASE:  In re Tesla Inc. Securities Litigation

2   DATE OF DEPOSITION: August 23, 2021

3   NAME OF WITNESS:  Martin Viecha

4

5          Reason Codes:

6          1.  To clarify the record.

7          2.  To conform to the facts.

8          3.  To correct transcription errors.

9

10  Page 11    Line 16    Reason 3

11  From Waverly              to Waverley

12  Page 53    Line 7    Reason 3

13  From Niaf              to Naif

14  Page 54    Line 5    Reason 1

15  From in operational          to in operation

16  Page 86    Line 23-24    Reason 1

17  From I reached out to the board of directors to "I reached out to the board of directors"

18  Page 92    Line 21 and 23    Reason 3

19  From Bloomburg          to Bloomberg

20  Page 93    Line 1, 4 and 15    Reason 3

21  From Bloomburg          to Bloomberg

22  Page 108    Line 7    Reason 3

23  From Doug              to Todd

24  Page 134    Line 1    Reason 3

25  From He              to It

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 2

1   NAME OF CASE:  In re Tesla Securities Litigation

2   DATE OF DEPOSITION:  August 23, 2021

3   NAME OF WITNESS:  Martin Viecha

4

5            Reason Codes:

6        1.  To clarify the record.

7        2.  To conform to the facts.

8        3.  To correct transcription errors.

9

10  Page 134    Line 3      Reason 3

11  From He                 to It

12  Page 161    Line 14-15  Reason 1

13  From the August 7th     to August 7th

14  Page 166    Line 22 and 23  Reason 3

15  From Ground             to Grant

16  Page 207    Line 23     Reason 3

17  From Bloomburg          to Bloomberg

18  Page 215    Line 19     Reason 3

19  From calender           to calendar

20  Page 217    Line 3      Reason 3

21  From FITO               to Fido

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

Page 3

1   NAME OF CASE:  In re Tesla Securities Litigation

2   DATE OF DEPOSITION:  August 23, 2021

3   NAME OF WITNESS:  Martin Viecha

4

5           Reason Codes:

6           1.  To clarify the record.

7           2.  To conform to the facts.

8           3.  To correct transcription errors.

9

10  Page _21___  Line __11__  Reason _3_____

11  From _Marone_____  to  _Maron_____

12  Page _____  Line _____  Reason _____

13  From _____  to  _____

14  Page _____  Line _____  Reason _____

15  From _____  to  _____

16  Page _____  Line _____  Reason _____

17  From _____  to  _____

18  Page _____  Line _____  Reason _____

19  From _____  to  _____

20  Page _____  Line _____  Reason _____

21  From _____  to  _____


_____
Martin Viecha

Page 233

1   STATE OF CALIFORNIA        )   SS

2   COUNTY OF LOS ANGELES      )

3           I, BRENDA R. COUNTZ, Certified Shorthand

4   Reporter No. 12563 for the State of California,

5   do hereby certify:

6           That prior to being examined, the

7   witness named in the foregoing deposition was

8   duly sworn to testify the truth, the whole truth,

9   and nothing but the truth;

10          That said deposition was taken down by

11  me in shorthand at the time and place therein

12  named and thereafter transcribed and that the

13  same is a true, correct, and complete transcript

14  of said proceedings.

15          Before completion of the deposition,

16  review of the transcript [  ] was [  ] was not

17  requested.  If requested, any changes made by the

18  deponent during the period allowed are appended

19  hereto.

20          I further certify that I am not

21  interested in the outcome of the action.

22  Witness my hand this 2nd day of September, 2021.

23

24  _____

25          Brenda R. Countz, CSR No. 12563

# EXCERPTS FROM THE DEPOSITION OF ELON MUSK TAKEN AUGUST 29, 2018

# EXHIBIT B

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

| In the Matter of: | ) | File No. SF-04082-A |
| | ) | AMENDED 9-5-2018 |
| | ) | 9-10-2018 |
| TESLA MOTORS, INC. | ) | CONFIDENTIAL |

WITNESS: Elon Musk

PAGES:   1 through 283

PLACE:   44 Montgomery Street
         Suite 2800
         San Francisco, California

DATE:    Wednesday, August 29, 2018

The above-entitled matter came on for hearing, pursuant to notice, at 9:17 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

Page 100

1    would ultimately have a counterparty that would be
2    involved in the financing, et cetera, correct?
3         A    Not exactly.  One of the things that we could
4    have done would just be to delist.  There's no
5    counterparty.
6         Q    Is that something that you were actively
7    considering?
8         A    Yes.
9         Q    During what time period?
10        A    From the taking Tesla private tweets -- well, you
11   know, basically, since when -- I didn't know all of the ways
12   that one could go private.
13            So in order to explore these ways and to be able
14   to do so, without creating a selective disclosure issue, I
15   felt I needed to talk to our major investors, and to
16   understand, is there a path to being private that they
17   would be -- that they would support, that they would think
18   is a good idea?  Would they be able to stay with the
19   company?  Because if they were not able to stay with the
20   company, that's a big deal.  I believe strongly in
21   loyalty.  And if they have been loyal investors in Tesla and
22   are unable to remain, that's a big factor, if they
23   wanted to.
24            So -- so one of the considerations was what if we
25   simply delist, no counterparty.

```
 1            BY MR. NEWELL:
 2        Q    So the time here is 8-1-2018, at
 3   1:00 a.m.  If we subtract seven hours, that gets
 4   us to 7-31-18, 6:00 p.m.  Does that sound right to you?
 5        A    Umm -- about right, yeah.  I'm not sure if
 6   that's when the meeting actually occurred,
 7   but that's certainly is what's referenced on
 8   the calendar.
 9        Q    When it was scheduled?
10        A    Yeah.
11        Q    Where did you work from on the day of July 31st?
12        A    The factory, the car factory.
13        Q    In Fremont, California?
14        A    Yes.
15        Q    And the meeting invite again references
16   Location: Jupiter, at column G-20 in the factory.
17   Do you see that?
18        A    Yeah.  I mean, it's just a conference room in
19   the middle of the factory.
20        Q    Jupiter is a conference room?
21        A    Yes.
22        Q    Did you hold any meetings in the Jupiter
23   conference room immediately prior to the meeting with the
24   PIF?
25        A    Possibly.  There's a lot of meetings in that
```

1      A   I think Yasir had some kind of tablet thing.  I'm

2  not sure if it was an iPad or something else.

3      Q   **Something like an iPad --**

4      A   Yeah, yeah.  Some sort of tablet device.

5      Q   **Any of them have physical notepads?**

6      A   Maybe.  I'm not sure.

7      Q   **Did Yasir, do you remember?**

8      A   I don't think so.  I don't know.

9      Q   **Possibly the other two?**

10     A   Possibly the other two.  I do remember them, like,

11  writing things down, but I'm not sure what they wrote.

12     Q   **Do you remember if they were writing things down**

13  **in hard copy or typing away on a laptop?**

14     A   I'm not certain.

15     Q   **Was anyone else present at the outset of the**

16  **meeting from Tesla, apart from you and Mr. Teller?**

17     A   Not that I'm aware of.

18     Q   **Sounds like you may have had a greeting with the PIF**

19  **outside the conference room; is that right?**

20     A   Literally might have said "Hello" as they walked

21  in.

22     Q   **Went into the conference room and closed the**

23  **door?**

24     A   Yes.

25     Q   **What happened next?**

Page 113

1        A      I don't remember everything about the meeting.

2    It was like pleasantries.  We exchanged pleasantries.  And

3    then he was very excited to tell me that they had made a

4    substantial investment in Tesla, through the public markets,

5    right up to the absolute limit of just below 5 percent.

6        Q      On that -- on that point,

7    was that the first substantive comment anyone

8    made after the exchange of pleasantries?

9        A      That I recall, yes.

10       Q      Mr. Al-Rumayyan told you that the PIF had built

11   up a large stake in Tesla common stock on the public

12   markets?

13       A      That's correct.

14       Q      Did you have any prior knowledge before that

15   meeting that PIF had done that?

16       A      No, I was surprised to learn this.

17       Q      What was your reaction when he said that?

18       A      I was like, great, thank you for being a

19   shareholder, that's awesome.

20       Q      You thanked him?

21       A      As I do anyone who places their funds in our

22   trust.

23       Q      Did you say anything else in response apart from

24   expressing your gratitude for the support of the company?

25       A      No, I don't think so.

Page 114

```
 1      Q      And then did Mr. Al-Rumayyan continue speaking?
 2      A      Mm-hmm.
 3      Q      What did he say?
 4      A      Umm, he, as I recall, he said -- that the only
 5   thing that was limiting them at 5 percent was the
 6   reporting requirement.  And they wished to have a much
 7   larger stake, and wanted to help Tesla go private.  Wanted
 8   to take Tesla private, essentially.
 9           Yeah, wanted to help take Tesla -- wanted to make
10   it happen, wanted to make Tesla -- the take private,
11   happen.
12           We'd had, prior conversations in the
13   approximately 18 months preceding that, in this general
14   direction.  I had told him I was interested in taking the
15   company private, and he  -- but he volunteered that -- he
16   volunteered that he wanted to take -- he wanted to take Tesla
17   private, and moreover that he had wanted to do so from the
18   very beginning, from our first meeting.
19           I was surprised to learn this, because I had
20   thought that he had delegated this -- delegated
21   investments, and certainly -- any large investments and any
22   take private initiative for Tesla goes to Masayoshi Son.
23           THE COURT REPORTER:  To --
24           THE WITNESS:  To Masayoshi.  Masa.  He goes by
25   Masa.
```

Page 115

```
 1        A    And so I was like quite surprised to learn this.
 2   And he said that -- yeah, he said that he had always
 3   wanted to do this.  And I was like, "Really?  I thought you
 4   delegated it to Masa."  And he said "Definitely not."  In
 5   fact, he would not want to do a take private through Masa,
 6   because then they would have to pay a percentage to Masa,
 7   and they didn't want to do that.
 8             I was like, okay.  That was surprising to me,
 9   because in prior meetings, which I'm assuming we'll get to in
10   your questioning, I had the mistaken impression that this --
11   they had delegated this responsibility to Masa.  I was like,
12   "Okay.  Okay."  So that's quite -- that's quite exciting.
13   Is there --
14             I said, "Are you sure you want to do this?"  He was
15   like, "Definitely."
16             And then I said, "Well, are there any other
17   decision makers needed?"  He says, "No, that's the advantage
18   of PIF.  I am the decision maker.  So long as the Crown
19   Prince supports me, and he does, that's it.  It's done."  I
20   was like, "Okay.  That sounds great.  Let's try to pursue
21   this."  That sounds like a very exciting thing to pursue.
22   We should at least understand what is possible here.  So --
23        Q    You said a lot there, and I want to go back
24   and take it in pieces.
25        A    Sure.
```

Page 119

1      Q    What's your basis for saying that they would like
2  a controlling stake, aspirationally?
3      A    It's just strategically obvious.
4      Q    So based on your knowledge of the situation, not
5  something that they have said to you directly?
6      A    They would not say something like that to me
7  directly, but it's strategically obvious.
8      Q    Let's get back to the words that Mr. Al-Rumayyan
9  used.
10         Did anyone else -- did anyone else from the PIF speak
11  during the meeting?
12     A    No.  Hardly at all.
13     Q    Do you remember whether Mr. Al-Rumayyan used the
14  term "take private" or the term "go private"?
15     A    I think, "take private".
16     Q    That was the exact phraseology he used?
17     A    I'm not certain, but I think "take private".  Like
18  I said, sort of like -- obviously, like, in a typical
19  take private, as you know, the -- there is a very
20  large stake that is acquired by the entity
21  taking things private.  For example, in the case of Dell,
22  that was an acquisition of, I think, something on the
23  order of 80 percent of the non-Dell shareholders --
24  something like that.  That is a typical take private.
25         So it is an acquisition of a super majority, if

1    not all of the assuming shares of the company.  That would

2    be the typical template for a take private.

3            In my mind I was like hell no, I don't want to do

4    that.  I want to retain all the shareholders we have right

5    now, up to anyone who doesn't -- as long as they want to be

6    in the company, I want to have them be in the company.  It

7    should be a free choice.  I don't like this whole squeeze-out

8    thing.

9            So in my mind I was like -- you know, maybe

10   there's 20 to 25 percent of shareholders who would not want be

11   in Tesla as a private company, and then given that -- the

12   template -- the assumed template in a take private would

13   be more on the order of triple that number.  Certainly I

14   wouldn't be selling my shares either way.  But they were

15   thinking more on the order of potentially 80 percent; that's

16   effectively a 3X coverage of what's necessary to take

17   private.  If you have -- effectively you have a threefold

18   over subscription.  Assuming all the standard elements of

19   a take private, this is plenty of coverage to make a

20   statement like funding secured.

21       Q    So I apologize, Mr. Musk.  You lost me a little

22   bit there.  You're referencing what was in your mind.  Are

23   you talking about what was in your mind during the July 31st

24   meeting?

25       A    Yes.

So I had to get -- this news had to be,
you know, made broadly.  People had to be broadly aware
of this news.  I could not have conversation
with all of these investors, or some of them, and, of
course, it would occur sequentially.  I could not talk to
them all simultaneously.

This had to be -- there had to be transparency here,
there had to be some awareness of a take private
in order for me to have these conversations.

So I subsequently --

MR. NEWELL:  We're getting to that.  We're not
there yet.

THE WITNESS:  I subsequently learned that it was
much harder for them to maintain an ownership
stake in a private company than I had anticipated.

MR. NEWELL:  We'll get back to that.  I want to stay on the

Page 131

1    Asia, which was in Shanghai specifically, one in Europe,

2    location to be determined, so that we're not in this crazy

3    position of trying to make affordable cars and then

4    transport them halfway around the world, contrary to

5    affordability.

6              MR. NEWELL:  So we're getting close to lunch.  I

7    have about ten more minutes of questions, and I think that

8    would be a good time to take a break.

9              Is that all right with everyone?

10        A    Sure.

11             BY MR. NEWELL:

12        Q    **I asked what was in your mind at the time of the**

13   **meeting about a potential physical presence in Saudi Arabia.**

14   **What did you say in response to Mr. Al-Rumayyan raising that**

15   **prospect?**

16        A    I'm not sure what I said exactly.  I would have

17   probably said something along the lines of what I just

18   said, which is that we're open to doing something,

19   provided the time frame is not in the near term.

20             MR. BUCHHOLZ:  Did you get the sense from Mr.

21   Al-Rumayyan that that was something they wanted to discuss

22   further down the road?

23             THE WITNESS:  Yeah, it was something that they

24   wanted to discuss further.  If I -- I can elaborate -- I'm

25   told I shouldn't elaborate -- the degree to which they

1    would insist on a Tesla presence in Saudi Arabia would be

2    roughly proportionally to their investment, at 5 percent, nothing,

3    they did 5 percent with no obligation on Tesla's part at

4    all.

5            Now at say 15 percent, probably still nothing

6    too extreme.  But if I did actually want them to do, say, 40

7    percent, then I bet it would be pretty intense in terms of

8    the requirements.

9            And then once we start getting past a control

10   position, now CFIUS becomes a real issue.

11           So in my mind it was like -- you know -- this is

12   going to work, because they certainly are willing to commit

13   large sums of money.  They have a gigantic fund, they

14   certainly have the money to do it, the money and principal

15   to acquire Tesla completely.  But that wouldn't be --

16   wouldn't be necessary, because we could do something where

17   they had maybe 15 percent of the company, at 15 percent

18   versus 5 percent.  Then, you know, they could -- that probably

19   wouldn't require -- onerous -- there wouldn't be any onerous

20   requirements at that sort of 15 percent level.  Nor

21   would it encounter a CFIUS obstacle.

22           And then I thought, well, there's going to be --

23   I thought the vast majority of existing investors would

24   want to retain their stake, and then we would find a vehicle

25   for small investors to participate.  That latter part was

Page 133

1   a fundamental misunderstanding that I just did not know --

2   I thought there would be some way to retain small

3   investors, but there isn't.

4          And, you know, this is not part of today's

5   testimony, but I do think that some mechanism for this

6   would be advisable in the regulatory structure.  But I

7   think something where they're protected by a fiduciary,

8   like there's -- like a lot of the wealth creation that

9   occurs, occurs when companies are private.  And, but smaller

10  investors are only able to access that when the companies

11  are public.  And by that time, most of the wealth creation

12  has occurred.

13         And this is exacerbating the wealth divide.  This

14  is not good.

15         I certainly understand the intentions behind the

16  original regulations.  We do not want swindling.  This is

17  like anti-swindling regulations; these are good.  We don't

18  want people being conned out of their money.  This is bad.

19         I think if there's perhaps a trusted fiduciary

20  like a Fidelity or something like that, and very plain

21  language disclosures, then I think -- like, private company

22  money should be more accessible to investors who are

23  not already wealthy.  That million dollar limit is tricky.

24         Sorry to digress.  My apologies.

25         BY MR. BUCHHOLZ:

1    Q    Did you have any discussion with the PIF about

2    keeping your discussions about a going private transaction

3    involving Tesla confidential?

4         MR. FARINA:  At any point in time?

5    Or during that meeting?

6         BY MR. NEWELL:

7    Q    During that meeting.

8    A    Not during that meeting.

9    Q    Let's situate ourselves towards the end of the

10   meeting.  Walk us through what you recall about how the

11   meeting closed.

12   A    Sure.  I mean, from what I recall, essentially as

13   I mentioned, was that they disclosed that they had made a

14   multi-billion dollar investment in Tesla up to the limit

15   of 5 percent.  This was new information to me.

16        And that the only reason they had not gone above

17   the 5 percent was the disclosure constraint.  And they

18   obviously had done this without any written agreements or

19   without any requirements or anything at all.

20        And they had done this -- they had at one point,

21   I think in prior meetings, said that they would invest in

22   Tesla.  And I was like, hum, okay.  And they said, okay.

23   They did what they said they would do.  Okay.  These are

24   people where you can take their word, they say they're

25   going to do something they are going to do it.

Page 146

1          So they were extremely clear that they wanted to
2    take Tesla private; that I could set the terms,
3    essentially any reasonable terms I could set; that they
4    had been interested in taking Tesla private for two years.
5    They corrected my misunderstanding that this had been
6    delegated to Masa, and said for two years they had
7    wanted to take Tesla private.
8          They had invested billions of dollars with no
9    written agreement, no agreement of any kind, just as a
10   good faith gesture to show that they're serious.
11         And if I just say what I wanted to do they
12   would do it.  So there was no question in my mind
13   whatsoever that the funding was secure for this deal.
14      Q     So let's go back to my question.  I asked if you
15   could walk through the close of the meetings.
16      A     Right.  That was the closing sentiment.
17      Q     Step away from sentiment.  What do you recall
18   being discussed specifically at the end of the meeting?
19      A     I recall that they wanted -- they were
20   unequivocal in their desire to take Tesla private; that
21   they were willing to take essentially whatever terms I
22   asked for within the bounds of reason, that a larger
23   investment would require a larger strategic involvement,
24   meaning factories and that kind of thing.  And so it's
25   really just a question of what do you want to -- they were

Page 155

1        A     They already had -- spoken with their funds and

2     invested 5 percent.

3        Q     Do you think they might have had reason to want a

4     larger stake in Tesla and that a smaller stake would have

5     been less attractive to them?

6        A     I think no, because they already had a smaller

7     stake in Tesla, and that the only thing that inhibited

8     their stake from being more than 5 percent, was the

9     reporting requirement.  So they were clearly willing to

10    have a larger stake in the company but -- it just happens

11    that U.S. reporting requirements start at 5 percent.

12          So that's what they would -- they were clearly

13    happy to have 5 percent with no terms and conditions or

14    requirements, nothing.

15       Q     So from your perspective it would not have been

16    an egregious term to them for you to come back and propose

17    anything from 6 percent of Tesla up to and including the

18    entire market cap of Tesla?

19       A     Umm, yes.

20       Q     Did you show Mr. Al-Rumayyan and his PIF

21    colleagues out of the Tesla factory after you left the

22    Jupiter conference room?

23       A     No.  I think I spoke to Yasir for maybe ten

24    seconds as he was leaving the conference room, and the

25    substance of that conversation was just, more repeating,

Page 156

1   let us know how you want to do this.   We want to do this.

2   Something to that effect.

3        Q    That's what he said?

4        A    Yes.

5        Q    What did you respond?

6        A    I said, I'll get back to you.

7        Q    Did you pick a specific timeframe during which you'd

8   get back to him?

9        A    No.

10       Q    Do you remember any specific timeframe for you

11  getting back to the PIF being discussed at any point

12  during the July 31st meeting?

13       A    No.

14       Q    Do you recall if Mr. Ahuja showed the PIF

15  representatives out of Tesla facilities?

16       A    Umm -- I think he did.

17       Q    Did he subsequently relay to you any

18  conversations he'd had with them as he walked them out?

19       A    I don't think so.

20            MR. BUCHHOLZ:  Did he tell you how long he spent

21  with them?

22            THE WITNESS:  No.

23            MR. BUCHHOLZ:  Did you learn at some point that

24  they had toured part of the facility?

25            THE WITNESS:  Yeah.  I heard they saw -- I had

1    think it's going to be more effective if we do it this way,

2    and we can show you documents --

3        A    That would be helpful.  If there's some documents

4    that would help anchor specific dates that would be

5    helpful.

6        Q    Okay.  Why don't we do a couple of things here.

7    Let's, if we could, Mr. Musk, before we start showing you

8    documents, you had referenced that you have some recollection

9    of discussing the PIF or a going private transaction with

10   some individuals at some time.  Do you recall discussing

11   those topics with anyone in the period from August 1st,

12   2018 through the morning of August 7, 2018?

13       A    My recollections are, my conversation with Steve

14   Rosenblum, a conversation with -- which is on the

15   Saturday, I believe, a conversation with Egon Durban on

16   the Monday before the tweet.  I think I talked to Michael

17   Dell on Saturday, as well, but did not mention anything

18   specific about the Saudis -- I was really asking him about, did he

19   find being private was good.  Like -- did he think that --

20   did he regret going private?  Did he thinks it was a good

21   idea?  Yeah.

22           MR. FARINA:  You've already asked about the board

23   meeting, so the board would obviously be included in that

24   time period?

25           MR. NEWELL:  Let's set aside the board meetings

Page 162

1    for now.  That's a good carve out, and I appreciate it.

2    Let's set aside anyone on Tesla's board, individual

3    communications or official board communications.  We're

4    still in that period from August 1st, 2018 through the

5    morning of August 7, 2018, when you published the tweets

6    we've been discussing today.

7        Q    Do you recall having a conversation with Steve

8    Rosenblum -- and for the record can you refresh us on who

9    Mr. Rosenblum is?

10       A    He was the legal counsel that Michael Dell used

11   in the take private.

12       Q    Do you recall having communications with Egon

13   Durban right?

14       A    Yes.

15       Q    Where does Mr. Durban work?

16       A    Silver Lake.

17       Q    You recall having conversations or communications

18   with Michael Dell?

19       A    Just a conversation.

20       Q    A phone conversation?

21       A    Yes.

22       Q    Anyone else you recall, setting aside individual

23   members of Tesla's board or board meetings or groups of

24   Tesla's board having discussions with -- strike that.

25           Did you have discussions during the period from

Page 167

1        A     Yes.

2        Q     Did you have any calls with Mr. Durban about a

3   going private transaction before August 6, 2018?

4        A     Pardon?  What?  Sorry.

5        Q     So it appears from this document, let me know if

6   you're reading it differently, that there's communications

7   here between you and Mr. Durban to set up a conversation.

8   Am I reading that right, high level?

9        A     Yes, of course.

10       Q     Did that conversation ultimately take place on

11  August 6th?

12       A     Yes.

13       Q     Before we get into what you discussed, did you

14  have any prior conversations with Mr. Durban before

15  August 6th about a going private transaction?

16       A     Yes.

17       Q     What's the first time you recall discussing a going

18  private transaction with Mr. Durban?

19       A     This was some months earlier this year, I think.

20  We met at SpaceX and I said, you know, I've always wanted

21  to consider taking Tesla private.  That was it pretty

22  much.

23            And he said, well, if you're ever thinking about

24  doing that seriously you should give me a call.

25       Q     Anything else you remember about that

Page 170

```
 1      A    I did.

 2      Q    What did you tell him?

 3      A    I told him about the -- that the Saudis wanted to

 4   take Tesla private; that they were super supportive, like

 5   they wanted to do this deal, that I could pretty much

 6   dictate the terms and -- but I did say that my preference

 7   would be to have a broader investor base, and not have too

 8   much -- not have the Saudis be too large of a shareholder,

 9   you know, and I think I actually did say like, I think,

10   maybe something on the order of 15 percent, maybe up to 20

11   percent would be okay.  But from my standpoint -- not from

12   theirs, purely from my standpoint, and that -- but I told

13   Egon, look, I think most of our investors are going to

14   remain in the company, and so what does he think about

15   bringing other investors in to have a more diversified

16   investor base, so there wouldn't be excessive influence

17   from any one investor.

18      Q    And what did he say in response?

19      A    He said absolutely, there's a lot of interest,

20   and he's confident that there's many others that would step up

21   and join this take private.

22      Q    Do you know whether he had communications with

23   any other potential investors at the time of your call?

24      A    I don't.  I don't think so but -- he did not

25   mention it.  So he was going -- I think he was going
```

Page 173

1    know, we don't have all these like class action lawsuits.

2    Like every time the stock moves they -- they assume

3    correlation is causation and then file a bloody lawsuit,

4    and our legal bills are very high.  It would be really

5    tragic about this examination with the take private -- by

6    the way this is as an aside -- if our legal bills are so

7    high ironically it's the reason we're not profitable,

8    okay? We're ironically not profitable this quarter,

9    because of the legal bills.  That would be tragic.  But

10   fate loves irony.

11       Q    Do you recall Mr. Durban, during that August 6th

12   discussion, expressing any uncertainties as to whether

13   small retail investors would be able to continue on in a

14   private Tesla?

15       A    No.

16       Q    Do you recall expressing any other concerns

17   about -- strike that.

18            Do you recall him expressing any concerns about

19   your proposed transaction strategy?

20       A    No.  He, actually was, as I recall he said, well

21   that's going to make it a lot easier yes, if lots of

22   investors remain, that's going to be a lot easier than what

23   was done with Dell.  And he said, it actually means that

24   you may actually need less capital than Dell, ironically

25   despite being a more valuable company than was required in

```
 1    the Dell transaction.
 2            I told him, I believe, most, if not all of our
 3    major investors would retain their ownership.  And I
 4    thought that most -- most investors, not even the large
 5    ones, but the small ones too would retain their ownership.
 6    And he said, in that case, this is really going to be --
 7    even though it is nominally a very large take private on a
 8    dollar value, the actual amount of capital needed to take
 9    it private may be relatively small compared to other
10    deals.
11            BY MR. NEWELL:
12        Q    Based on the assumption that particularly large
13    shareholders would continue on in a go-private scenario?
14        A    Large and -- shareholders in general.  The
15    concern -- the concern of like, can non-high net worth
16    small retail investors remain with the company was not
17    raised.  This was -- you know, in terms of -- you know, my
18    counsels advise me, don't get into mistakes and
19    everything -- but like a fundamental misunderstanding that
20    I had was that there would be some means of retaining the
21    small shareholders.  That was a fundamental
22    misunderstanding on my part.
23        Q    No one ever, setting aside the conversation with
24    Mr. Durban, no one ever conveyed to you from the time of
25    the July 31st meeting to the time you sent your tweets on
```

1   August 7th, that there might be some issue with the

2   ability of the small retail investors to remain in a

3   private Tesla?

4       A    No.

5       Q    Did the topic of short sellers come up in your

6   call with Mr. Durban on August 6th?

7       A    No.

8       Q    You referenced a conversation with Steve

9   Rosenblum.  Do you remember when that one took place?

10      A    I don't want to mis-remember this, but I think

11  it was the Saturday before the Tuesday tweet, if I am

12  not -- is that correct?  I'm not sure exactly.

13      Q    Was Mr. Rosenblum your attorney at the time you

14  reached out to him?

15          MR. FARINA:  Hang on.  The conversation is -- I

16  am going to assert a privilege over that conversation.  He

17  was reaching out to him for purposes of ultimately

18  engaging him as his legal counsel.  He did engage him as

19  his legal counsel.  So any communications with Mr.

20  Rosenblum are privileged.

21          MR. NEWELL:  Okay.

22      Q    So you were reaching out to Mr. Rosenblum for the

23  purpose of seeking legal advice?

24      A    Yes, as -- as a lead or co-lead counsel on a potential

25  take private, on the advice of Michael Dell.  I had actually

Page 176

1    talked to Steve Rosenblum I think almost two years ago.  I

2    had a brief conversation with him then.

3         Q    Mr. Dell advised you in the conversation you had

4    with him that you referenced a few minutes ago to talk to

5    Mr. Rosenblum?

6         A    He did.

7         Q    During this same time period -- strike that.

8              At what point -- let me ask you this, Mr. Musk.

9    At the time the August -- strike that.

10             At the time the July 31st meeting with the PIF

11   concluded had you made a decision one way or the other as

12   to whether you were going to make an offer to Tesla's

13   board to take the company private?

14        A    I'm sorry.  The first part of that -- can you

15   repeat?

16        Q    Absolutely.

17             At the time that the PIF left Tesla on the

18   evening of July 31st, had you made a decision as to

19   whether you were going to make an offer to Tesla's board

20   to take Tesla private?

21        A    No.

22        Q    When did you decide to make that offer?

23        A    On Friday when I wrote the email.  I think it was

24   a Friday.

25        Q    Before we get to Friday --

1    on August 2nd?

2        A    Yes, I believe so.

3        Q    And you testified earlier that Tesla's share

4    price had trended upward in response to the August 1st

5    earnings call, right?

6        A    Yes.

7        Q    Over the course of the trading day on August 2nd

8    there was a substantial increase in Tesla price?

9        A    Yes.

10       Q    Walk us through your process in putting together

11   this 420 per share offer.

12       A    As I recall, the share price ended at around 348

13   and 20 percent of that would have been around 419 and I

14   rounded up to 420.

15       Q    And you did that sometime after the market closed

16   on August 2nd?

17       A    Yeah.

18       Q    Seems like you find the number 420 somewhat

19   humorous; is that fair to say?

20       A    Yes.

21       Q    Have you joked on Twitter in the past about 420,

22   setting aside July and August 2018?

23       A    I think I made some minor comment about 420, yes.

24       Q    What specifically about 420 is humorous?

25       A    Well, it is -- I learned this recently -- so I'm

Page 205

1    official board process?

2        A    With Mr. Murdoch I didn't have any

3    discussions at all.  It was specifically not a topic of

4    discussion.  So that's purely personal.

5            With Antonio, I don't recall the exact -- what

6    exactly was discussed.  I think it was sort of general

7    advice about, like we need to now engage.  We need to form

8    a special committee.  There needs to be counsel for the

9    special committee.  We need to engage, you know.  Everyone

10   needs to engage financial advisors, that kind of thing.

11       Q    Do you remember roughly what time of day the

12   August 3rd board call was held?

13       A    Umm, I think it was late afternoon.

14       Q    Sorry for memory testing.

15       A    Exactly.

16       Q    We can show you a document.  I'm just trying to

17   move things along rather than -- so sometime later in the day on

18   August 3rd?

19       A    Yeah, not in the morning.  Evening or afternoon.

20       Q    Who do you remember being present on that call?

21   It was a call?

22       A    It was a call.

23       Q    Who do you remember being present on the call?

24       A    I think everyone was -- I think all board members

25   were present and Todd.

1    Q    What about Mr. Ahuja?

2    A    I think he was there.  I think he was there, but

3    I'm not certain.

4    Q    What did you tell the members of the Tesla board

5    on that call about funding for your proposed transaction?

6    A    My recollection is that, oh, okay.  I'll get back

7    to -- there's something I should add, although I'm not

8    supposed to add anything -- but maybe this is worth adding.

9    I do need to check my memory though.

10        On that call I said the Saudis wanted to fund the

11   take private.  I believe I also mentioned that Silver Lake

12   was interested in supporting it and had confidence that

13   this could be done on terms that we would like, most

14   likely.  And that -- mostly like, look, let's, just -- we

15   need to move this along rapidly and figure out if it makes

16   sense or not.

17        But the one thing I didn't want to do was have

18   some very laboriously long consideration process.  I

19   think I thought that could be too damaging to the execution

20   of the company.

21   Q    What did you tell the board members the nature of

22   the PIF's commitment?

23   A    I said they wanted to do it.

24   Q    Anyone ask any questions about whether you had

25   anything from the PIF in writing?

1      A    I don't think so.  I don't recall. I don't think

2  so.

3      Q    **Anyone ask you if you discussed with PIF the**

4  **anticipated size of their investment, might be in a range**

5  **of dollar amounts?**

6      A    I think that did come up and -- we're really

7  going on best efforts recall here.  But I think there was

8  some concern expressed about them having too large of a

9  stake in the company, and effectively having a de facto

10  control position or de facto extremely influential position.

11          And I think I said that in a take private we would

12  limit their ownership to approximately 15 to 20 percent.

13      Q    **Do you recall using that range with the board, 15**

14  **to 20 percent ownership for the PIF?**

15      A    That's my best recollection, yes.

16      Q    **Do you recall discussing with the board your**

17  **desire that any Tesla shareholders who wanted to do so**

18  **could continue in a private Tesla?**

19      A    Yes.  In fact -- I really do want to be careful

20  about conflating one memory with another.  So -- but -- so

21  I'm doing my best here to not have like one memory

22  combined with another memory or something.

23          Human memory is just -- man, it's hard to

24  remember if you meet someone at a party, or what you had

25  for lunch last week.  So it's tricky, compared to

1    computers.  Computers are very good at memory.

2           So I did -- I think I clarified on that call that

3    this was not going to be an LBO.  So I want to really

4    frame that -- there's a lot of, "I think", like I'm not

5    certain.  I think I said, this is not going to be like an

6    LBO, where there's a massive amount of leverage against

7    the company, where 80 percent of the company is bought

8    out.

9           I said it was not going to be -- the initial

10   assumption was, even by Antonio, this was some sort of --

11   like the Dell take private.

21      Q    Do you remember anyone from the board reacting to

22   that?

23      A    I think there was some skepticism on the board as

24   to whether that could -- on the board call  as to whether

25   that could be achieved.  But -- what -- what was not

Page 212

1    level of investment to the concreteness of a Tesla

2    presence in Saudi Arabia that was made by anyone at the

3    PIF?

4         A    Yes.  They never -- they were really quite

5    careful not to link it explicitly.  It was linked

6    implicitly.  Like they didn't want to force me to do

7    something that I really didn't want to do.  They just

8    essentially seemed to want my help in transitioning their

9    economy.  That was what they -- and so -- obviously, if I

10   was -- I would need to be excited about doing that

11   otherwise they wouldn't -- it wouldn't really work.  So

12   they would want something that I would be excited about.

13        Q    At the board meeting on August 3rd, did the board

14   agree or authorize you to contact Tesla's existing

15   shareholders to discuss a going private transaction?

16        A    That was my understanding, yes.

17        Q    How did that agreement or approval manifest at

18   the board meeting?

19        A    My recollection is that it simply came as a natural

20   consequence, the next step is, okay, let's see who wants

21   to stay with the company if we go private.  And like,

22   okay, then I'm going to need to go talk to investors and make

23   sure to avoid any selective disclosure.

24             So obviously there would need to be some kind of

25   public document -- we need to basically -- just

1    basically -- something would need to happen to make it

2    clear that there is a take private under consideration.

3         Q    Was there an official board vote on that topic?

4         A    I don't think so.

5         Q    Did you poll the board members and did each

6    indicate their assent, or was there a general impression

7    that they assented?

8         A    I had a general impression that this was a

9    natural next step.

10             MR. BUCHHOLZ:  As of that board meeting on

11   August 3rd, what was your understanding of the term

12   selective disclosure?

13             THE WITNESS:  Just you know, I mean, I'm familiar

14   with Reg FD because it's been public for eight years.

15   So -- I always have to be like, remind people of this a

16   lot, especially with Tesla.  Yeah, so obviously a take

17   private particularly with a premium, this is very big information.

18             So, you know, so it's something that needs to be

19   disclosed to the public so that everyone has the same

20   information and there's a fair playing field.  People can

21   make their own assessment about whether there would be a

22   take private at a premium or not and -- but it wouldn't be

23   obviously.  It would not be fair if just some investors

24   knew about it and others did not.

25             MR. BUCHHOLZ:  Are you familiar with the concept



Page 217

1    did.  If I encountered strong position I would not want

2    to do the deal; not that it couldn't be done but I

3    wouldn't want to do the deal.

4        Q    The deal in your view could have been done

5    because the PIF would have filled in any necessary funding

6    gap?

7        A    The PIF would have filled in any necessary funding gap

8    and I think it also would have been quite easy to bring in

9    other investors, and that also turned out to be true.

10            So my guess that the existing large

11   institutionals would retain their full stake and perhaps

12   increase was wrong.  That was incorrect.

13            My guess that there would be many other

14   strategics and sovereigns who would be interested was

15   correct.

1   participation in a going private transaction?

2   [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

10          I thought these facts were clearly indicated, a

11  high comfort level withholding shares in a private

12  company.

13      Q   When you discussed with the board that you would

14  go forward and speak to existing Tesla investors about the

15  prospect of a going private transaction, was there any

16  discussion of the manner in which you would have those

17  discussions with existing investors?

18      A   No.  No.  I think I said I would call them.  And

19  we would have to figure out some way to disclose that a take

20  private is under consideration.  I mean, I can say -- I know

21  you're getting to it, of course.  But the -- in the normal

22  course of business what I would have done -- I may be

23  preempting your question, but perhaps helpful.

24          In the normal course of business we would have

25  done an after-hours disclosure of a take private.  And I

1   actually intended to do that on the Tuesday night of the

2   tweet.  So that would have been approximately -- if not

3   the Tuesday night certainly the Wednesday night.

4           It served as a disclosure of the salient facts

5   that I was investigating a take private at $420 and that

6   in my opinion, funding was secured for this.

7           Then on Tuesday morning the news of the Saudi

8   investment broke and I saw that -- I first got an email

9   Tuesday morning from Tesla Communications saying that

10  Financial Times has an inquiry about the Saudi investment,

11  which like rang a huge alarm bell in my head.  This is

12  like, whoa, how is this information getting out there?

13          And then I saw that the news, the Financial Times

14  published this information, and then the stock started

15  rising quite rapidly after the news of the Saudi 5 percent

16  investment.

17          My thought was, this is -- this is very

18  problematic.  I thought that most likely if the Saudi news

19  investment had leaked then probably the take private news

20  is also leaking, or at least is at great risk of leaking.

21          And so it was like, okay.  This is going to make

22  sure there's a fair playing field here.  And so I --

23  there's a few facts that need to be out there.  And that

24  is that I am considering taking Tesla private.  In my view

25  funding is secured.  And the price that I proposed to the

Page 221

1    board was $420.   These seemed like critical facts for a
2    level playing field for investors.

3            Like I said, it would otherwise if not for the
4    Saudi news leaking would have been through a standard
5    disclosure form after hours.

6            But I was like, hum, better get those facts out
7    there.   So that was my thinking.   I'm preempting some of
8    your questions, but this may be helpful.

9            MR. BUCHHOLZ:   Before sending the first tweet
10   did you consult with anyone else at Tesla?

11           THE WITNESS:   No.

12           MR. BUCHHOLZ:   So no one else reviewed the
13   content of the first tweet before it went out?

14           THE WITNESS:   No, since -- I would be essentially
15   the bidder.   It didn't make sense -- seems like -- in the
16   multi hat scenario, if I'm the bidder it doesn't make
17   sense to consult with the bidee.   Sorry.

18           So, you know, and I had not had time to formally
19   engage advisors, and whatnot.   So, you know, it was
20   like -- this very important information of the Saudi
21   investment is leaking.   Well, they're the ones that want
22   to help the take private, help make the take private happen.
23   Good chance that news is out there too, but selectively, so
24   let's put all the cards on the table right now.

25           MR. BUCHHOLZ:   And is it also the case that for the

Page 233

```
 1        A    Yes.

 2        Q    Did you consider providing more specificity in

 3   your tweet about sources of funding?

 4        A    I did.  At the time I did not want to.  I thought

 5   if I said the Saudis without checking with them they would

 6   be pretty upset.  So I thought I would not mention their

 7   name but, you know, but the FT article had come out with

 8   the big news "Saudi Multiple Million Dollar Investment."

 9   So a lot of people put two and two together.

10        Q    And why not just issue a tweet that says, "I'm

11   considering taking Tesla private at 420"?  Why was the

12   "funding secured" piece necessary in your mind?

13        A    I thought it was an important piece of

14   information that the public should be aware of.

15        Q    Is that from a fairness perspective?

16        A    Yes.

17        Q    Do you think you needed to disclose that

18   information specifically in order to go to existing Tesla

19   investors and assess their interest in a potential deal?

20        A    Yes.  I mean there would be really two questions

21   that would be quite critical in talking to investors.  Is

22   the money available?  And then at what price?  And so I

23   felt like -- this is what I strongly believed to be the

24   case that funding was certain and that the reasonable

25   price to do this at was $420.  So it wasn't, you know,
```

Page 234

1    $350, it wasn't $500, which was something in the sort of

2    reasonableness range.  And it was the number that I

3    conveyed to the board.

4           So it just seems as though there were three

5    salient points that were necessary for all cards to be on

6    the table.  "Funding secured", the price conveyed to the

7    board and that I'm -- obviously I'm considering taking the

8    company private.  But those were the most salient points.

9        Q    Let's turn back to EM Exhibit 10 which is text

10   messages, bearing Bates number 0006.  And I direct your

11   attention to Page 4 of the exhibit.  Let me know when

12   you're there.  You don't need to review the whole thing.

13   I'm just going to ask a few quick questions.

14       A    Right.  Yeah.

15       Q    Do you see the communication subtracting seven

16   hours, 10:23 Pacific time from Mr. Ahuja to you?

17       A    "Broader communication on your rationale and structure?"

18       Q    Right.  That text message, do you see that one?

19       A    Yes.

20       Q    The second text message down on Page 4 of

21   the exhibit for the record.

22           At the time that you received that text do you

23   think that additional information needed to be conveyed on

24   top of what you'd already tweeted?

25           MR. FARINA:  Sorry.  Can you repeat the question?

1   A   No.

2   Q   What's your understanding, if any, Mr. Musk, of

3   what happened to Tesla's stock price in the hours

4   following your initial tweet on August 7th around 9:48 a.m.?

5        MR. FARINA:  For the rest of the trading day?

6        MR. NEWELL:  Let's take in the two or three hours

7   approximately, and I'll represent for the record it's our

8   understanding that eventually trading in Tesla stock was

9   halted for a certain period on August 7th.  So let's take

10   from the time of your initial tweet up until the time trading

11   was halted.

12   Q   What was your understanding of what happened to

13   Tesla stock during that period?

14   A   I think it rose.  I'm not sure exactly think what

15   the delta was.  It had already risen because of the leak of the

16   Saudi investment.  And it did continue to rise after my

17   tweet, although I'm not sure to what degree that was --

18   that would have continued or -- it's difficult to say.  It

19   was rising because of the Saudi investment news quite a

20   bit already.

21        So, okay better get the rest of the information

22   out there.  And then NASDAQ halted the trading at some

23   point and then resumed trading.

24        MR. BUCHHOLZ:  You said that you were aware the price

25   rising after the news came out about the Saudi investment,

Page 242

1    correct?

2            THE WITNESS:   Yes, the stock rose quite a bit

3    after the Saudi news broke.

4            MR. BUCHHOLZ:   Do you follow the stock price

5    closely?

6            THE WITNESS:   Not normally that closely, but because

7    the news had broken on my phone -- I was looking at the

8    news and sort of -- Apple kind of stock thing.   And it was

9    like Saudi news -- multi-million dollar

10   Saudi investment breaking -- stock is

11   going up very strongly.   It was okay.   Like sounds like

12   the cat's out of the bag here.   Better make sure everybody

13   knows what's going on.

14           BY MR. NEWELL:

15       Q    Do you recall whether $420 a share was still a

16   significant premium to where the stock price was trading

17   at the time that you first published on August 7th tweet?

18           MR. FARINA:   I'm sorry.   Can you repeat that

19   question?

20           MR. NEWELL:   Sure.

21       Q    At the time you sent your first August 7th tweet

22   that we've been discussing that included the phrasing

23   "funding secured" and the dollar amount 420, do you know

24   roughly where Tesla stock price was trading?

25       A    On that morning --

Page 249

1       Q    Did you write this and publish it on Twitter
2   around 12:36 Pacific Time?
3       A    Yes.
4       Q    What did you mean by -- strike that.
5            Looks like you linked to the August 7th blog that
6   we've been discussing; is that right?
7       A    Yes.
8       Q    Why did you do that?
9       A    Well, I thought it was important to get this blog
10  out there; certainly one could just do a retweet or
11  retweet with comment and so this was a retweet with
12  comment.  But of course this should be read in the context
13  of the tweets that precede it.  It's not something all by
14  itself.
15      Q    The tweet, you mean, should be read in the context
16  of the previous tweets --
17      A    With the stream of tweets, the connected tweets.
18      Q    Did you also intend the tweet be read in the
19  context of the blog?
20      A    Yes.
21      Q    What did you mean by "investor support is
22  confirmed"?
23      A    Essentially this was somewhat synonymous --
24  synonymous with "funding secured".  I felt like there was
25  sufficient -- in fact, more than sufficient investor

1    support to take the company private and that we would

2    be -- as I said -- quite dramatically over subscribed in a

3    take private scenario.

4         Q    And we just looked at an incidence in the

5    August 7th blog post where you use the term investors.

6    Here it sounds like you're using the term investor to

7    refer to the PIF; is that right?

8         A    Yes.  This is a different context of investor.

9         Q    How would a reader of this tweet know that?

10        A    I think if they read the full set of tweets it

11   would be clear.

12        Q    What aspect of the full set of tweets would make

13   it clear?

14        A    That "investor support" is confirmed is

15   consistent with "funding secured".

16        Q    Your intention was that's effectively conveying

17   the same message as "funding secured"?

18        A    Yeah.

19        Q    Why did you feel a need to reiterate that point?

20        A    I thought it was important that the stock -- that

21   the blog not convey uncertainty with respect to there

22   being sufficient investment to take the company private.

23   Yeah.

24        Q    Why not include that --

25        A    As you read this it is the case that in the blog and

Page 256

1   shareholders' interests.  They would be breaching their
2   fiduciary duty.
3           So if shareholders were very much in favor of
4   going private, based on our conversations with them, the
5   board really wouldn't have any choice but to put that to a
6   shareholder vote because that's what they're supposed to
7   do.
8           Now when I did canvass them the response was much
9   more negative than I expected, and so we decided not to do it.
10  It's pretty straightforward.
11          MR. BUCHHOLZ:  Sorry.  Go ahead.  Were you done?
12          THE WITNESS:  Yes.
13          MR. BUCHHOLZ:  When you wrote the tweet you did
14  understand there would need to be a board vote or special
15  committee vote of some kind, right?
16          THE WITNESS:  I did but, you know, by the same
17  token if we canvass shareholders and there's a very strong
18  desire to go public, the board would be breaching their
19  fiduciary duty if they did not give shareholders the
20  opportunity to do that.  It's is not like the shareholders
21  really have a choice.  It's not like directors can just go
22  wholesale against the desire of shareholders.
23          MR. BUCHHOLZ:  Right.  Did you -- were you
24  planning to participate in that vote?
25          THE WITNESS:  No.  As with prior votes this would

1   be -- would exclude my vote and any affiliates, if you

2   will.

3              MR. FARINA:  So to be clear, can we just clarify?

4   Are you asking the board vote or a shareholder vote or

5   both, in terms of his participation.

6              MR. BUCHHOLZ:  The board vote.

7              MR. FARINA:  Thank you.

8              MR. BUCHHOLZ:  I think you answered the

9   question.

10             THE WITNESS:  Yeah.  The board would be -- if

11  shareholders -- if canvassing after canvassing

12  shareholders they strongly wanted to go private, it would

13  be a breach of fiduciary duty for the board not to at

14  least put that to a shareholder vote.  They cannot

15  whimsically decide not to do so.

16             MR. BUCHHOLZ:  Did you believe as of August 7

17  that there would be a process of putting together the

18  details of the formal proposal?

19             THE WITNESS:  I knew that there would be some

20  complex process.  It was more complex than I expected, but

21  I knew that this would not be a trivial exercise.

22             BY MR. NEWELL:

23       Q    We discussed your overarching level of certainty

24  about whether or not a going private transaction would

25  ultimately be consummated at a previous moment in time.

1    Same question here.  What was your level of certainty that
2    the transaction would be consummated at the time that you
3    wrote this tweet?
4        A     I mean, probably roughly 50 percent.  Maybe a
5    little -- maybe a little higher than 50 percent, but
6    something close to that.  At the time I would have
7    probably said more likely than not but, you know.  Like I
8    wasn't sure if I would even want to finalize a proposal to
9    the board.  That's why I said considering.  If I said I'm
10   going to put -- I didn't say I was going to give some like
11   final proposals to the board, I was considering it, it's a
12   lot to consider.  Especially the opinions of long-time
13   shareholders.
14             So that's really, that's it.  It was really --
15   it's pretty straightforward.
16             It was like, I wonder what people think
17   about going private?  And, like I said, with the benefit of
18   hindsight of course -- if I had a hindsight machine that
19   would be really great.  That would be like --
20             MR. HEALY:  Your next project?
21             THE WITNESS:  Yes, a hindsight machine
22   would be really helpful.  But --
23   but with the benefit of hindsight, I was wrong about the
24   desire of -- or the interest in the existing shareholders
25   to go private.  That was incorrect.  They were about --

Page 259

1    they were lukewarm.  They weren't super against it, but

2    they were lukewarm.  Some were very against it; some were

3    like "it's great."  But on average, I would characterize their

4    support as around the 50 to 60 percent interest level

5    on average.

6          Because I asked them without attribution or not

7    holding them to anything.  For their firm as a whole, what

8    would their holdings look like in a private situation?

9    Generally, the answer I got was 40 to 60 percent.  One

10    major investor said a hundred, which is cool, and one said

11    maybe ten percent, but most were in the 40 to 60 percent

12    range.

13          MR. FARINA:  You don't want to get ahead of

14    yourself on this.  They were still talking about where you were

15    as of this August 7th time period.  So you're talking

16    about later.  So just hold off on that until he gets to

17    questioning you on that.

18          THE WITNESS:  Okay.

19          MR. FARINA:  There is no question pending.

20          THE WITNESS:  Sure.  But yeah, just -- there's

21    like -- certainly you were right about the funding.  That

22    was proven -- that was unequivocal.  The funding was

23    there, no question, funding was definitely there.  Times a

24    lot.  But I was wrong about the level of enthusiasm that

25    existing shareholders would have for going private.  That

1  was incorrect.  That's with the benefit of hindsight.

2          MR. BUCHHOLZ:  At the time of the tweets on

3  August 7 were you aware that there would also likely be

4  regulatory approvals like CFIUS, or at least scrutiny?

5          THE WITNESS:  Yeah.  I didn't anticipate a CFIUS

6  block because I thought we would do this with -- would

7  not, you know I would want to do that with a broad

8  shareholder base, where we're not hitting CFIUS limits or

9  having undue foreign influence, which is the fundamental

10  premise of the CFIUS laws.

11          So I didn't anticipate CFIUS being an issue and,

12  yeah, so that didn't seem like an issue.  Of course there

13  would be a process to follow from regulatory standpoint

14  but you know if you have overwhelming shareholder support

15  it may take time, but it's not a question of if but rather when.

16          MR. BUCHHOLZ:  With regard -- were you done?

17  Sorry.

18          THE WITNESS:  Yes.

19          MR. BUCHHOLZ:  With regard to the CFIUS

20  question, you did understand that the likelihood of issues

21  would increase with the size of the Saudi investment,

22  correct.

23          THE WITNESS:  Yes.

24          MR. BUCHHOLZ:  That hadn't been determined at

25  the time, correct?

Page 276

1              BY MR. BUCHHOLZ:

2        Q    **Let's go forward in time then.  What is the next time**

3   **you remember meeting with Mr. Al-Rumayyan or anyone from**

4   **PIF?**

5              THE WITNESS:  I don't remember the exact dates.

6   I just remember there were approximately three meetings.

7   I guess this is one of them.

8              One would have been just with Yasir and his team

9   I think earlier last year; i guess one was this dinner.

10  And I think one later after this, I think.  Yeah.

11             MR. BUCHHOLZ:  Were any of those in 2018 do you think?

12             THE WITNESS:  Could have been 2018.

13             MR. BUCHHOLZ:  But significantly earlier than

14  July 2018?

15             THE WITNESS:  Yes.  They basically went radio

16  silent for many months, and then out of the blue told me --

17  came in and met me and told me about the investment.

18             MR. BUCHHOLZ:  I think your testimony earlier

19  was that none of those meetings had any more specific

20  discussion about a potential investment or transaction

21  than the July 31st meeting, correct?

22             MR. FARINA:  Let's make sure the question was

23  clear.

24             There was nothing that was more specific than what was at

25  the -- what was discussed in July 31st?

```
 1              MR. BUCHHOLZ:  Yes.
 2              THE WITNESS:  From the very beginning, the very
 3    first interaction was about a take private with Yasir,
 4    which is the reason I got connected with him.  That would
 5    have been -- you know -- approaching two years ago.  Like
 6    20 months ago or something like that.
 7              So that was the whole premise for connecting with
 8    him, and contacting with him is the whole -- there wasn't
 9    any other reason.  And yeah, so really every meeting was
10    about take private and every meeting included interest in
11    a factory in Saudi Arabia, and except for that one weird
12    meeting where he wasn't there, but Masa went on about
13    the India factory.  Very weird.
14              And then -- so a longstanding interest in taking
15    Tesla private; then, in that July 31st meeting he said he
16    has always wanted to do this.  He clarified that he
17    at no point actually wanted to delegate this
18    to Masa, which was my mistaken impression
19    that he did.  And just said, "Tell us how you want to do
20    it.  We want to do it."
21              MR. BUCHHOLZ:  Right.  And that was as specific
22    as it had gotten in any of the meetings?
23              THE WITNESS:  Pretty much.  That's -- you know --
24    the things got sort of derailed because of Masa coming
25    into the picture, or at least my perception was that they
```

1   got derailed.  And Masa kind of confused the picture

2   there, at least with respect to me, for awhile.  And Yasir

3   clarified no, this entire time, they wanted to take us private.

4   And the first meeting they had been consistent, wanted to

5   do that from the first meeting to the July 31st meeting, and

6   they just wanted to make it happen.  "Just tell us how we

7   can do it."

8           And then they said, you know, even if we've now

9   invested 4 or 5 percent of the company and the only thing that's

10  holding us back for more is this 5 percent disclosure requirement,

11  obviously they didn't require any promises of anything to do

12  the five percent.  This is not just like some offhand

13  interest, you know.  You don't invest billions of dollars

14  in a company if it's a casual consideration.

15          MR. BUCHHOLZ:  Okay.  And do you recall any

16  specifics of that nature from prior meetings that were

17  different?

18          THE WITNESS:  No.  Actually -- really in every

19  meeting Yasir had been, we want to help you take the

20  company private.  Tell us how -- we want to do it.  And

21  then like I said I mistakenly thought he'd delegated that

22  responsibility to Masa and Masa got all bizarre with the

23  Indian factory thing, it was like.  So -- but I didn't

24  realize that their interest had been unwavering through

25  this entire period of time, and he only clarified that in the July

1    31 meeting.

2              MR. FARINA:  I think we have covered this ground, and

3    it's getting rather late.

4              MR. BUCHHOLZ:  So to be clear, what changed for

5    you in the July 31st meeting was that he said they would be

6    prepared to potentially proceed without Mr. Son; is that

7    correct?

8              THE WITNESS:  Not potentially.  It's like they

9    said -- we absolutely don't want you to have Masa Son in the deal.

10             MR. BUCHHOLZ:  Okay.

11             THE WITNESS:  That was -- not only did they not

12   potentially proceed without him, absolutely not, which

13   is weird.

14             MR. BUCHHOLZ:  That was a change from earlier --

15             THE WITNESS:  It was a change in my perception.

16             MR. FARINA:  And they made the investment, that

17   was the other new information.

18             THE WITNESS:  That's a pretty -- they were voting

19   with a large -- billions of dollars to say that they

20   wanted to invest in Tesla.  It was clearly, you know, not

21   casual interest.

22             They put their money where their mouth

23   was and billions of dollars and the only thing holding me

24   back is the 5 percent limit, tell us what you want to do

25   and we'll do it.  Basically.

1                  PROOFREADER'S CERTIFICATE

2

3    In the Matter of:   TESLA MOTORS, INC.

4    Witness:            Elon Musk

5    File Number:        SF-04082-A

6    Date:               Wednesday, August 29, 2018

7    Location:           San Francisco, California

8

9        This is to certify that I, Christine Boyce,

10   (the undersigned) do hereby swear and affirm that the

11   attached proceedings before the U.S. Securities and

12   Exchange Commission were held according to the record,

13   and that this is the original, complete, true and

14   accurate transcript, which has been compared with the

15   reporting or recording accomplished at the hearing.

16

17

18   _Chr E.Boyce_                    _8-30-18_

19   (Proofreader's Name)             (Date)

20

21

22

23

24

25

CONFIDENTIAL

```
1    STATE OF CALIFORNIA      )
2                             )    ss
3    COUNTY OF SAN FRANCISCO )
4         I hereby certify that the investigative hearing
5    was reported by me in the within-entitled cause; that said
6    hearing was taken at the time and place herein named; that
7    the hearing is a true record of the witness' testimony as
8    reported by me, a duly certified shorthand reporter and a
9    disinterested person, and was thereafter transcribed into
10   typewriting by computer.
11        I further certify that I am not interested in the
12   outcome of the said action, nor connected with, nor
13   related to any of the parties in said action, nor to their
14   respective counsel.
15        IN WITNESS WHEREOF, I have hereunto set my hand
16   this 30th day of August, 2018.
17
18
19                    Mary Bardellini, CSR 2976
20             MARY BARDELLINI, CSR No. 2976
21                STATE OF CALIFORNIA
22
23
24
25
```

CONFIDENTIAL

EXCERPTS FROM THE DEPOSITION OF
DEEPAK AHUJA TAKEN AUGUST 28, 2018

# EXHIBIT E

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:            )

                             )   File No. SF-04082-A

TESLA MOTORS, INC.           )   CONFIDENTIAL


WITNESS:  Deepak Ahuja

PAGES:    1 through 254

PLACE:    44 Montgomery Street, Suite 2800

          San Francisco, California

DATE:     Tuesday, August 28, 2018


        The above-entitled matter came on for hearing,

pursuant to notice, at 9:13 a.m.


Diversified Reporting Services, Inc.

(202) 467-9200

Page 62

1          THE WITNESS:  It was really related to legal

2     advice.  It -- our general, Todd Maron, so -- and

3     generally about the process and timeline and so

4     forth.

5          BY MR. BUCHHOLZ:

6          Q    Okay.  Yeah.  And again I don't want to get

7     into any substance --

8          A    Nothing more.

9          Q    -- of those communication.

10         A    Yeah.

11         Q    But it related to legal advice that you were

12    seeking or Mr. Maron was providing --

13         A    Yeah.

14         Q    -- with regard to Tesla, correct?

15         A    That's correct.

16         Q    Okay.  All right.  Shifting gears now, since

17    Tesla has been public, has it, to your knowledge,

18    considered going private?

19         A    On and off, there have been some very

20    informal -- informal conversations about it.

21         Q    When is the first time you recall those

22    communications or conversations?

23         A    The first time -- well, the first time there

24    was any sort of meaningful recollection that I have,

25    I think, you know, it felt -- or that stuck in my

1    memory was, in fact, related to this whole thing

2    about -- about a -- it was about a year and a half

3    or so ago in a meeting with the Saudi PIF Fund that

4    occurred at Tesla.

5         Q    Okay.  And for the record, PIF is the Public

6    Investment Fund of Saudi Arabia?

7         A    That is correct.

8         Q    Okay.  So if we refer to that as "PIF,"

9    you'll know what we mean?

10        A    (Witness nods head.)

11        Q    And that's what you mean?

12        A    That is correct.

13        Q    Okay.  What do you recall about the first

14   meeting you were aware of with PIF?

15        A    Yeah.  Yasir, who's the managing director --

16   the last name is long, but he is the managing

17   director of the Saudi PIF Fund, Elon -- came to

18   visit Tesla and to meet Elon.  He came along with

19   Masa Son, who is the head of SoftBank, and Larry

20   Ellison, the CEO of Oracle, and it was a meeting --

21   it was a -- he had a tour, I understand, of the --

22   they had a tour of the factory, and then it was a

23   dinner meeting at the factory.

24        Q    And is it correct this was in or about

25   March 2017?

1      A    That's correct.

2        Q    You were present for all of that or parts of

3   that?

4      A    I was present only for the dinner.

5        Q    Who else was present at the dinner?

6      A    It was Elon Musk, JB Straubel, from Tesla,

7   and the three other individuals I named:  Larry

8   Ellison, Masa Son, and Yasir.

9        Q    And for the record, that's Masayoshi Son

10   from SoftBank, correct?

11      A    That is correct.

12        Q    And you're referring to him as "Masa Son"?

13      A    That's correct.

14        Q    And Yasir, Y-a-s-i-r?

15      A    That's correct.

16        Q    All right.  Was there discussion at the

17   dinner about a potential going private transaction

18   with Tesla?

19      A    The discussion at -- over dinner was

20   essentially about making a very significant

21   investment in Tesla, and there were a range of

22   options discussed, from -- the lowest being a very

23   substantial amount, in the billions of dollars, to

24   the full gamut of potentially taking Tesla private.

25        Q    Which options were discussed the most?

1      A    A lot of discussion happened.  I cannot say

2  which was one discussed the most, but I can --

3  coming back to the original thread of your question,

4  there was a lot of discussion that occurred on the

5  going private option as well.

6      **Q    Who first raised one of these options?**

7      A    I cannot recall fully, but I have -- my best

8  recollection is that it was probably Yasir or Masa

9  who brought that up as a suggestion.

10      **Q    Did they bring up an investment in Tesla or**

11  **a going private transaction?**

12      A    They brought up the idea of an investment in

13  Tesla that enabled Tesla to go private, with the

14  expectation that they had the funding capacity to be

15  able to do that.

16      **Q    What amounts were discussed, if any, that it**

17  **would take?**

18      A    Yeah.  To the best of my -- the discussion

19  always -- so the minimum investment, if I recall

20  right, that Elon would even consider was a few

21  billion dollars.  It was not in the hundreds of

22  millions.  And then in the going private, the

23  conversation was always in, you know, 30, 50, 60,

24  whatever billions of dollars was needed.  You know,

25  there's full understanding of the valuation of Tesla

1    at the time and that there would be a certain amount

2    of premium to take the company private.

3             So the numbers were very large that were

4    potentially being suggested, and they were -- there

5    was not a specific number thrown out because it was

6    just, you know, you -- this was exploratory and

7    these were conversations, but the numbers were large

8    enough that it was clear that we're talking about

9    tens of billions of dollars here.

10        Q    Did that -- was that clear from Yasir or Son

11   or both of them?

12        A    From both of them.

13        Q    And also Mr. Musk?

14        A    Yes.

15        Q    Were they talking about some sort of

16   combined joint investment between SoftBank and PIF?

17        A    That was my sense the way they were talking.

18   We -- the conversation did not get into details of

19   the structure.  This was -- since this was coming

20   up -- these are pretty big, you know, topics.  This

21   was -- essentially, the feeling -- the way I would

22   put it is essentially Masa and Yasir were offering

23   different options to Elon and saying, hey, we are

24   very interested in Tesla, we would like to partner

25   with you, we see you as the vision and the future of

1   what should be in electric cars and energy storage

2   and generation, we are very excited about that

3   global prospect of the impact Tesla can have, and we

4   want to partner with you any way you feel you want

5   our role and the options can be anywhere from a few

6   billion dollars of investment to going private, it's

7   really your choice what you want.  They were

8   throwing those options out for Elon to consider and

9   so it was a conversation about figuring out a way to

10  partner and having the funding to do it.

11       Q    So did you consider those to be preliminary

12  discussions?

13       A    That was the first time I was sitting in

14  those conversations.  So I cannot say from Elon's

15  point of view whether he had a -- any pre -- you

16  know, a sense that this was coming or whatever.  So

17  I cannot comment on Elon's point of view.

18            From my point of view, that was the first

19  time I'd heard, and I had just returned to Tesla at

20  that time.  It was just a few weeks after I'd

21  started -- rejoined Tesla.  So for me it was

22  certainly the first time to be involved in such a

23  conversation.

24       Q    Did you get a sense from the conversation

25  that the other participants had talked about it

Page 71

1    percent who exactly brought that up.

2          BY MR. BUCHHOLZ:

3          Q    **Was there any discussion at that March 2017**

4    **meeting about potential reasons or advantages of**

5    **going private?**

6          A    If I recall right, Elon did comment about

7    potentially his life being easier as a private

8    company of Tesla to focus on the longer term

9    strategy of the company like he does on -- at

10   SpaceX.

11         Q    **Do you have any specific recollection of**

12   **anything he said about that, or you just have a**

13   **general --**

14         A    Just general impressions of that.

15         Q    **Was there any discussion at that meeting**

16   **about whether -- or what going private meant,**

17   **whether it meant delisting, deregistering, or also**

18   **ceasing SEC reporting?**

19         A    There was no specific conversation about

20   that level of detail.

21         Q    **Was there any discussion about potential**

22   **regulatory or legal hurdles to going private?**

23         A    Again, there was no discussion at that level

24   of detail.

25         Q    **Was there negotiation over price per share**

Page 92

1      Q      How did you know that?

2      A      I don't know that.  It could have been that

3  Elon invited him, but the fact that he had come

4  personally and he was sitting in Elon's office

5  suggested a level of interest different from if we

6  were sitting in Yasir's office.

7             So my sense was here is a man who has come

8  with two other folks, he's invested in Tesla, he's

9  had long meetings with us before, and he's sitting

10  here in this room, clearly -- and clearly this is a

11  very serious offer.  The other -- and I can talk to

12  what happened after the meeting because I gave a

13  tour to Yasir and I had a bit of a conversation with

14  Yasir --

15      Q      Okay.

16      A      -- after the meeting.

17      Q      M-hm.

18      A      But during the meeting, the only other thing

19  that I would add is, in my mind, Elon does not have

20  time for -- for silly or half-baked ideas.  He has a

21  very high -- I would say in plain language, a very

22  high bullshit filter in judging people and

23  conversations.  And it was very clear that the way

24  he was interacting, he felt very strongly that this

25  was genuine and real, the conversation that was

1   happening with Yasir.  That was -- I'm just sharing

2   with you my impressions of watching.

3       Q    M-hm.  Okay.  Did -- did they talk

4   specifically about the dollar amount of funding?

5       A    Not while I was there.

6       Q    Did Yasir talk about what process they would

7   be going through to evaluate and come to a final

8   decision?

9           MR. BONDI:  Object to the form.  That's not

10  what he said.  You can answer.

11          THE WITNESS:  He did not describe any

12  further details on the process other than the sense

13  I had, as I said -- my impression of that was they

14  were ready to act and do the deal at that time.

15          MS. CRUMPTON:  Can you remember any specific

16  words that Yasir said, not your impression, but

17  words he actually said?

18          THE WITNESS:  I do not.

19          BY MR. BUCHHOLZ:

20      Q    Did they talk at all, Mr. Musk and Yasir,

21  about a price per share?

22      A    I answered that already.  We -- there was

23  no -- while I was there, any conversation on the

24  price per share.

25      Q    Okay.  Was there any discussion about a

1          So a little before 7:00 o'clock you would

2     have -- the meeting broke?

3          A    6:45, 6:50 --

4          Q    6:45 to 6:50?

5          A    -- at best, 7:15, yeah.

6          Q    And then you did the walking for about

7     40 minutes?

8          A    30-40 minutes, yeah.  So by 7:30, they

9     were -- they had departed, roughly.

10         Q    Okay.

11         A    Yeah.

12         Q    All right.  That's all I had on that right

13    now.  I did want to ask just a couple of final

14    questions on the meetings.  So this covers both the

15    one with Mr. Musk and Mr. Teller in the Jupiter

16    conference room and your walking around with

17    Mr. Yasir.

18         Was there any discussion of documenting the

19    PIF commitment to fund a potential transaction that

20    you heard?

21         MR. BONDI:  You can answer.

22         THE WITNESS:  Okay.  There was no discussion

23    about that, about documenting, to answer your

24    question precisely.  Elon's approach of doing

25    business is minimum level of documentation, in

1    general.  He's generally very adverse to term sheets

2    and legal conversations.  He really does do business

3    based on a verbal commitment and a handshake and so

4    I was not surprised that Elon was not asking for a

5    term sheet or a document to proceed.

6              It just -- if I think of how Tesla has done

7    much of the big deals and the transactions, it felt

8    along those lines, without asking for a specific a

9    document.  Again, I'm sharing just an impression.

10             BY MR. BUCHHOLZ:

11        Q    Okay.  So you didn't hear any discussion of

12   documenting the interest of the Saudis, correct?

13        A    That is correct.

14        Q    And was it your sense that this was

15   something that had some urgency but would move

16   forward into a more formal phase with documentation?

17        A    Clearly, when the transaction is

18   consummated, there will be documentation, no

19   question about it.  Would there be documentation on

20   the way in the form of a term sheet or anything

21   else, I would -- I wouldn't be surprised -- I -- in

22   my mind, it would not have been surprising at that

23   point to say that we wouldn't do that, we would go

24   straight into a final document.

25        Q    What do you mean by "final document"?

1      A    Of a stock purchase agreement, of some sort

2   of a privatization, whatever is the culmination of

3   that process to make that transaction happen.

4      Q    Okay.  And your belief was that Tesla might

5   well do all the other steps without any

6   documentation?

7      A    To be clear, we would not do -- I mean, I

8   would not be -- let me rephrase this.  I would not

9   have been surprised had we proceeded down this path

10  without doing a term sheet.

11     Q    Okay.  So you're talking about a term sheet

12  specifically?

13     A    Yes.

14     Q    Did you have any discussions with Mr. Musk

15  about that?

16     A    No, I did not.  So I'm only speaking to my

17  own impressions of how, based on past experience of

18  doing business, I would have expected the next steps

19  to be is to get into the -- if Elon decides to

20  proceed, we would get into the nitty-gritty of doing

21  the transaction rather than starting in the early

22  stages of trying to build a term sheet and so forth.

23  But that's very early preliminary sort of

24  impressions that I had and as a very unsophisticated

25  person involved in a private transaction.

1      Q    **Did you understand that there would likely**

2   **be a due diligence process?**

3      A    In any transaction there is a due diligence

4   process, clearly.  The question, which was open at

5   that time, is the nature and the extent and whether

6   the decision -- because often you would make the --

7   the due diligence process in some cases is not meant

8   to do a decision on the transaction but to be sure

9   there are no surprises and there are no skeletons in

10  the cupboard, and my sense was that the due

11  diligence would be about the latter where it is to

12  make sure there are no surprises rather than due

13  diligence to decide on doing the transaction.

14     Q    **You didn't believe that Mr. Musk had a**

15  **legally enforceable right to a certain amount of**

16  **money from the PIF after that meeting that you**

17  **attended, did you?**

18         MR. BONDI:  Object to the form.  That calls

19  for a legal conclusion.  Mr. Ahuja is not an

20  attorney.

21         THE WITNESS:  Yeah.  I cannot speak to what

22  Elon had or did not have at that meeting or after.

23         BY MR. BUCHHOLZ:

24     Q    **Is it fair to say that, from what you heard,**

25  **there were still questions that hadn't been finally**

Page 240

```
 1      A     That's right.

 2      Q     It doesn't look like Mr. Maron is.

 3            So do you believe that you or Mr. Viecha

 4   passed this along to Mr. Musk?

 5      A     I do not recall if we passed this specific

 6   set of feedback to Elon.

 7      Q     But, in general, around this time -- this is

 8   August 8 -- was it your practice to pass along the

 9   feedback to Mr. Musk?

10      A     That is correct.  Our goal was to keep him

11   informed as much as we can for any passive feedback

12   coming to us, incoming.

13      Q     Right, right.  And that included both

14   encouraging and frustrated?

15      A     Correct.

16      Q     Did you attend a board meeting on

17   August 23rd, last Thursday?

18      A     Yes, I did.

19      Q     Who else attended the meeting?

20      A     It included all the board members, Todd

21   Maron, myself, counsel, outside counsel from Wilson

22   Sonsini, and I believe Sam Teller was there.  And

23   during the meeting, in the early half, we had Egon,

24   E-g-o-n, from Silver Lake and Dan Dees from Goldman

25   Sachs.
```

Page 241

1      Q      Did they make presentations at the meeting?

2      A      They -- Egon -- and sorry.  I believe we had

3  someone else from Goldman Sachs on the conference

4  call along with -- Dan Dees was in person.  They --

5  Egon summarized his efforts over the last several

6  days with how -- making a formal presentation or

7  flipping through a text -- or a slide deck in that

8  meeting.

9      Q      Okay.  You mentioned there were two parts to

10  the meeting.

11      A      Yes.

12      Q      What were the purposes of both parts?

13      A      The first part was for Elon to provide the

14  context to the board that I would like you to hear

15  from my financial advisors what they have to say and

16  then after that we can discuss the next steps, and

17  he wanted to set that context before inviting Silver

18  Lake and Goldman Sachs into the meeting.  And after

19  they left, then there were -- there was discussion

20  about what are the right next steps and -- and board

21  approval and approval after -- including the

22  resolution on the social media policy.

23      Q      Right.  Did Mr. Musk state his intent not to

24  proceed with a going private transaction during the

25  meeting?

Page 242

1      A      Mr. Musk indicated, after -- if I recall

2   correctly, after Egon -- so after Silver Lake and

3   Goldman Sachs representatives left the room, he --

4   he essentially summarized what they said, that is,

5   we have more than sufficient funding available to do

6   this transaction, however there are certain

7   considerations that should be taken into account as

8   we proceed, and based on those considerations and

9   after giving it considerable thought, he had come to

10   the conclusion that he would not like to proceed.

11      Q      **Okay.**

12          **Did the funding that he discussed**

13   **include more than the Saudis?**

14      A      What the -- what Silver Lake and Goldman

15   Sachs shared was that there are several investors

16   willing to invest in Tesla in a go private

17   transaction.

18          They named a few investors.  They

19   mentioned clearly that with multiple investors -- so

20   Silver Lake said they would participate, first of

21   all, themselves in such a transaction.  Regarding

22   the Saudi PIF Fund, they said if they -- their

23   indication was if there are multiple investors

24   involved, they still want to be one of the top

25   investors in the transaction.



Page 243

1      Q     **This is Silver Lake stating what PIF wanted?**

2      A     Correct.

3      Q     **Okay.**

4      A     Yeah.

5           So if they're not the sole investor,

6 they still wanted to be among the top investors if

7 there were multiple investors --

8      Q     **Okay.**

9

21      Q     Right.

22           So it sounds like a very different

23 anticipated structure that was presented there than

24 the -- just the Saudis kind of initial discussion

25 that Mr. Musk presented on the 3rd.  Is that

1   home?

2        A    Yes, I did.

3             MR. BONDI:  Okay.

4             What was the occasion that brought

5   you to Mr. Musk's home on the evening of August 7th,

6   2018?

7             THE WITNESS:  It was a planned event from several

8   days ago for some of the key senior executives to meet with

9   Elon and talk about our product development strategy

10  over the next several years.

11            MR. BONDI:  And at Mr. Musk's home on the evening of

12  August 7th, 2018, did you have an occasion to speak

13  to him about the Saudi private investment fund?

14            THE WITNESS:  Yes, I did.

15            MR. BONDI:  And could you describe that

16  conversation for us?

17            THE WITNESS:  After the meeting ended among the

18  executives and Elon, I had a chance to talk to Elon one-on-one

19  when the executives had departed -- the other

20  executives had departed.  And in that

21  conversation -- it was a brief conversation.

22            In that conversation, I asked Elon if he had

23  reached out back to the Saudi PIF Fund, to Yasir,

24  after the July 31st meeting.  Elon responded by

25  saying no, he had not.

1          However, he went on to

2    clarify what had happened in the meeting before I

3    entered the meeting on July 31st, and what he

4    indicated was Yasir very affirmatively told him that

5    he is the decision maker for the fund to invest in

6    Tesla in the going private transaction and that he

7    had the full support of the crown prince of Saudi

8    Arabia and that he was ready to go.  And based on

9    those comments, Elon felt that this was an extremely

10   strong indication of a commitment -- a verbal

11   commitment from the Saudi PIF Fund, and he felt --

12   and he explained -- which is -- this is what gave me

13   full confidence or full justification in my comment

14   of saying secured -- "financing secured" in my

15   tweet.  And he said that with so much emotion and

16   conviction that I felt myself convinced that this

17   made sense and this was appropriate.

18          MR. BONDI:  Is there anything -- were there any

19   other discussions relating to either the Saudi PIF Fund or

20   going private that you had with Mr. Musk on the

21   evening of August 7th, 2018?

22          THE WITNESS:  I did not.

23          MR. BONDI:  I don't have any further questions.

24          MR. BUCHHOLZ:  Okay.  Thank you.  I have a

25   couple of questions.

Page 252

1    discussions.

2        **Q    Okay.  Okay.  We have no further questions**

3    **at this time.  As I said before, if we need to speak**

4    **with you again, we'll contact your counsel.**

5        A    Okay.

6        **Q    We'll go off the record at 6:35 p.m.**

7        A    Okay.  Thank you.

8            THE VIDEOGRAPHER:  We're off the record.

9    The time is 6:36 p.m.

10           The time -- this will be the

11   end of Video 4, Volume 1, in the testimony of Deepak

12   Ahuja.

13           (Whereupon, at 6:36 p.m., the examination

14   was concluded.)

15                    *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

EXCERPTS FROM THE DEPOSITION
OF JOSEPH FATH
TAKEN JULY 12, 2021

1   UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   SAN FRANCISCO DIVISION

4   ------------------------------)

5   IN RE TESLA, INC.

6   SECURITIES LITIGATION        Civil Action No.

7                                3:18:cv-04865-EMC

8   ------------------------------)

9

10

11

12        REMOTE DEPOSITION OF JOSEPH FATH

13             New York, New York

14             July 12, 2021

15

16

17

18

19

20

21

22

23

24   Reported by:
     Linda Salzman
25   JOB NO. 196636

1                    July 12, 2021

2                    12:15 p.m.

3

4          Remote deposition of JOSEPH

5     FATH, the witness herein, held

6     remotely before Linda Salzman, a

7     Notary Public of the State of New

8     York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2

 3       LEVI & KORSINSKY

 4       Attorneys for Plaintiffs

 5            1101 30th Street, Northwest

 6            Washington, D.C.  20007

 7       BY:   NICHOLAS PORRITT, ESQ.

 8            KATHY AMES VALDIVIESO, ESQ.

 9

10       COOLEY

11       Attorneys for Tesla

12            3175 Hanover Street

13            Palo Alto, California 94304

14       BY:   PATRICK GIBBS, ESQ.

15            BINGXIN WU, ESQ.

16

17       T. ROW PRICE

18       Attorneys for the Witness

19            100 East Pratt Street

20            Baltimore, Maryland 21202

21       BY:   CHRIS SHAHEEN, ESQ.

22

23

24   Also Present:

25   LEM LATTIMER, Videographer
```

1                STIPULATIONS

2          IT IS HEREBY STIPULATED AND

3    AGREED by and among counsel for the

4    respective parties hereto, that the

5    sealing and certification of the

6    within deposition shall be and the

7    same are hereby waived;

8          IT IS FURTHER STIPULATED AND

9    AGREED all objections, except as to

10   the form of the question, shall be

11   reserved to the time of the trial;

12         IT IS FURTHER STIPULATED AND

13   AGREED that the within deposition may

14   be signed before any Notary Public

15   with the same force and effect as if

16   signed and sworn to before the Court.

17

18

19

20

21

22

23

24

25

```
 1          THE VIDEOGRAPHER:  Good morning,
 2    Counselors.  My name is Lem Lattimer.
 3    I am a legal videographer in
 4    association with TSG Reporting, Inc.
 5          Due to the severity of COVID-19
 6    and following the practice of social
 7    distancing, I will not be in the same
 8    room with the witness.  Instead, I
 9    will record this videotaped deposition
10    remotely.  The reporter, Linda
11    Salzman, also will not be in the same
12    room and will swear the witness in
13    remotely.
14          Do all parties stipulate to this
15    video recording and remote swearing
16    and that it will be admissible in the
17    courtroom as if it had been taken
18    following Rule 30 of the Federal Rules
19    of Civil Procedures and the state's
20    rules where this case is pending?
21          Counselors, I need you to
22    stipulate.
23          MR. PORRITT:  Oh, yes.  So
24    stipulate.
25          MR. GIBBS:  So stipulated.
```

Page 6

```
 1                THE VIDEOGRAPHER:  Thank you.
 2        This is the start of media labeled No.
 3        1 of the video-recorded deposition of
 4        Joseph Fath in the matter of In re:
 5        Tesla, Inc. Securities Litigation on
 6        July 12, 2021, at approximately 12:16
 7        p.m.
 8             All appearances are noted on the
 9        record.  Will the court reporter
10        please swear in the witness.
11  J O S E P H   F A T H,
12        called as a witness, having been duly
13        sworn by a Notary Public, was examined
14        and testified as follows:
15  EXAMINATION BY
16  MR. PORRITT:
17        Q.   Good afternoon, Mr. Fath.  My
18  name is Nicholas Porritt.  I'm with the
19  law firm of Levi & Korsinsky representing
20  the plaintiff Glen Littleton and the class
21  in this action.
22             Could you start off by just
23  stating your full name and position at T.
24  Rowe Price?
25        A.   Joseph Fath, F-A-T-H.  I run the
```

1   Q. Do you recall that the Musk

2 Tweet also mentioned the words "funding

3 secured"?

4   A. I do remember that.

5   Q. Okay.  Do you recall what your

6 reaction was to seeing those words in his

7 Tweet?

8   A. Again, shock and surprise.

9 Again, at that price point, it would have

10 been a very healthy amount of capital you

11 would need to raise to take the company

12 private.  So I was surprised.

13    And I know we'll talk about

14 following emails, but we all internally

15 tried to speculate who would have the

16 wherewithal to do that type of

17 transaction.

18   Q. And what was your interpretation

19 of the meaning of "funding secured"?

20   A. Just as it states.  When I read

21 that, I assumed he had secured sources or

22 financial sources to fund a go-private

23 transaction.

24   Q. And what does it mean by

25 "secured" in your mind?

1    A.    To have locked and loaded and no

2  question at all a hundred percent that you

3  have funding ready to go and you're

4  prepared to move forward with this

5  transaction.

6    Q.    So we can talk to -- back to

7  Exhibit 41.

8         You start off mentioning that

9  you were on vacation in Nevis.  Then you

10  say, "I just spoke to IR."

11         Do you see that?

12    A.    I do.

13    Q.    Who did you speak to in IR?

14    A.    I believe I spoke to Martin

15  Viecha.

16    Q.    Okay.  Do you recall what Martin

17  Viecha told you?

18    A.    He was as shocked as I was, and

19  I just, as you would as any portfolio

20  manager or analyst ask, I saw the Tweet.

21  Is there a press release coming with more

22  details?

23         And I got the sense they thought

24  the same thing I did, that that wouldn't

25  have been Tweeted unless there was

Page 32

1          Q.     Okay.  Do you recall at this

2     time reaching out through that contact to

3     see to get information from Saudi Arabia

4     regarding potentially investment in Tesla?

5          A.     Absolutely not.  We don't have

6     communication with them.  They direct all

7     communication to us.  We don't have an

8     open line.

9          Q.     ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

████████████████████

██████████████████████████████████

████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████

██████████████████████

22    ██████████████████████████████████

23    ██████████████████████████████████

24    ██████████████████████████████████████

25    ██████████████████████████████████

1 ████████████████████████

2 ████████████████████

3 ████████████████████████

4 ████████████████

5 ██████████████████████

6 █████████████████████████

7 ███████████████████

8 ██████████

9          MR. PORRITT:  Kathy, if you can

10     bring over Bates-stamp 6, 6 through 8.

11          MS. VALDIVIESO:  Did you say 6,

12     Nick?

13          MR. PORRITT:  Yes, 6.

14          MS. VALDIVIESO:  By the way,

15     Exhibit 8 was uploaded, and if you

16     need the other exhibits previously

17     marked, just clarify the date and hour

18     of the Tweet to be able to upload the

19     previously marked exhibit, Nick.

20          MR. PORRITT:  Okay.  Thank you.

21          I'll refer the witness -- and

22     you may have to go through the

23     submitted folder to Exhibit 8.  It's a

24     document previously marked as Exhibit

25     8.

1        the witness a document previously

2        marked as Exhibit 13.

3        Q.    Do you see that, Mr. Fath?

4        A.    I do.

5        Q.    Do you recognize this document?

6        A.    I recognize that Tweet, yes.

7        Q.    Okay.  Do you recall when you

8   first saw that Tweet?

9        A.    Again, it was a frenzy that day,

10   but I see it's August 7th.  I remember

11   seeing it.  But, again, I was on vacation.

12   I saw it sometime during the day.

13        Q.    Do you recall reading the

14   statement there on the top of -- beginning

15   of the Tweet in Exhibit 13, "Investor

16   support is confirmed"?

17        A.    Absolutely.

18        Q.    Do you recall what your reaction

19   was to seeing those words?

20        A.    Yes.  I was shocked because I

21   said to myself, well, I know it's not us

22   because we haven't spoken to them.

23        Q.    What was your understanding of

24   the meaning of the words "investor support

25   is confirmed"?

1        A.     Well, with the funding secured

2    Tweet followed by this, that he had it

3    lined up, whatever investors that may be,

4    to support the transaction and be able to

5    take them private.

6             That was my, you know -- and

7    again, I think it just reinforced the

8    funding secured.

9             MR. PORRITT:  So, Kathy, if you

10        can bring up Bates-stamp 12.

11             MS. VALDIVIESO:  Yes, Nick.

12        It's uploading and it's there.

13             MR. PORRITT:  Is this Exhibit

14        44?  I think so.  Yes.

15             (Fath Exhibit 44, Email, Bates

16        No. TRP_000012, marked for

17        identification, as of this date.)

18             MR. PORRITT:  I've placed before

19        the witness a document marked as

20        Exhibit 44.  It's an email dated

21        August 8, 2018, Bates-stamped

22        TRP_000012.

23        Q.    Do you have that document in

24    front of you, Mr. Fath?

25        A.    I do.

1     Q.    Is Josh Spencer also in the

2  Baltimore office?

3     A.    He is.

4     Q.    What about Joel Grant?

5     A.    He was.  He is now located in

6  London.  But at the time, he was here in

7  Baltimore.

8     Q.    Do you recall -- what do you

9  recall next following your return from

10  vacation about the Tesla go-private

11  transaction?

12     A.    Well, I think as the days passed

13  and given they were reaching out, I think

14  I became much more suspicious that the

15  funding was secured and that, you know,

16  they were clearly probably trying to set

17  up funding to consummate the transaction.

18         But I don't recall the

19  conversations that ensued in the days that

20  followed.

21     Q.    So what's the basis for the sort

22  of understanding that you just described?

23     A.    Well, I think that email that

24  you referenced before this, him just

25  reaching out and wanting to speak with me,

1   started to raise yellow flags in my mind

2   that a deal was done.

3           If a deal had been done and

4   funding had been secured, why reach out to

5   us.

6           MR. PORRITT:  Why don't we --

7       Kathy, why don't you bring up the

8       previous Exhibit 19.  It's the New

9       York Times article.

10          MS. VALDIVIESO:  It's uploading.

11      It's taking some time.  And it's

12      there.

13          MR. PORRITT:  The witness has in

14      front of him a document previously

15      marked as Exhibit 19, a New York Times

16      article dated August 16, 2018.

17      Q.   Do you recall reading this

18   newspaper article, Mr. Fath?

19      A.   I don't.  I don't.  There were

20   so many -- I may have.  There were so many

21   publications that had articles out.  I

22   read some and some I didn't.

23      Q.   When do you recall first

24   reaching the conclusion that the

25   go-private transaction was probably not

```
 1              C E R T I F I C A T E

 2   STATE OF NEW YORK      )

 3                          : ss

 4   COUNTY OF NEW YORK     )

 5

 6            I, Linda Salzman, a Notary

 7       Public within and for the State of

 8       New York, do hereby certify:

 9            That JOSEPH FATH, the witness

10       whose deposition is hereinbefore set

11       forth, was duly sworn by me and that

12       such deposition is a true record of

13       the testimony given by the witness.

14            I further certify that I am not

15       related to any of the parties to

16       this action by blood or marriage,

17       and that I am in no way interested

18       in the outcome of this matter.

19            IN WITNESS WHEREOF, I have

20       hereunto set my hand this 18th day

21       of July, 2021.

22                      _____

23                      Linda Salzman

24

25
```