<pre>
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3   Before The Honorable Edward M. Chen, Magistrate Judge

 4

 5   IN RE: TESLA INC. SECURITIES  )
     LITIGATION.                   )
 6                                 )   No. C 18-04865-EMC
                                   )
 7   _____)

 8
                                       San Francisco, California
 9                                     Thursday, March 10, 2022

10
       TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
11              RECORDING  2:00 - 2:31 = 31 MINUTES

12
     APPEARANCES:
13
     For the Plaintiffs:
14                                     Levi & Korsinsky LLP
                                       1101 30th Street NW, Suite 115
15                                     Washington, D.C. 20007
                                       (202) 524-4290
16                                BY:  NICHOLAS PORRITT, ESQ.
                                  BY:  ADAM MCCALL, ESQ.
17                                BY:  ADAM APTON, ESQ.

18
     For the Defendants:
19                                     Quinn Emanuel Urquhart &
                                          Sullivan LLP
20                                     51 Madison Avenue, 22nd Floor,
                                       New York, New York 10010
21                                     (212) 849-7000
                                  BY:  ALEX SPIRO, ESQ.
22                                BY:  MICHAEL LIFRAK, ESQ.
                                  BY:  KYLE BATTER, ESQ.
23

24

25
</pre>

2

1  Transcribed by:              Echo Reporting, Inc.
                                Contracted Court Reporter/
2                               Transcriber
                                echoreporting@yahoo.com
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  Thursday, March 10, 2022                                    2:00 p.m.

2                       P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4          THE CLERK:  The Court is now calling In Regarding

5  Tesla Inc. Securities Litigation, Case Number 18-04865.

6      Counsel, please state your appearance for the record,

7  beginning with the plaintiff.

8          MR. PORRITT (via Zoom):  Good afternoon, your

9  Honor.  Nicholas Porritt of Levi and Korsinsky on behalf of

10  plaintiff Glen Littleton and the class.  With me, Adam

11  McCall and Adam Apton, also of Levi and Korsinsky

12          THE COURT:  All right.  Thank you, Mr. Porritt.

13          MR. SPIRO (via Zoom):  Good afternoon, your Honor.

14  This is Alex Spiro, and I'm joined by Michael Lifrak and

15  Kyle Batter on behalf of the defendants.

16          THE COURT:  Thank you, Mr. Spiro.

17      Let's talk about falsity.  And I briefly viewed the

18  slides that the plaintiffs have submitted.  I don't think we

19  have time, and I don't need to go through all those.  You

20  use those to illustrate if you want at some point.  But it

21  seems to me, it's not factually very complicated.  What the

22  legal conclusion is, perhaps we can debate.

23      But take the first statement.  "Am considering taking

24  Tesla private at 420.  Funding secured."

25      We know that in fact to lease in the usual sense of the

4

1  word "secured," funding had not been secured.

2      My understanding is that the discussions with the Saudi

3  investors were still -- there was obvious interest, but

4  there had been no term sheet.  There had been no discussion

5  about ownership structure, percentage.  No discussion of

6  price, as I recall.  No discussion about conditions.

7      A lot of things hadn't been discussed.  It seemed quite

8  preliminary, even though there was a strong indication of

9  interest.

10     But the fact that a number was put on the table in this

11 tweet, an actual number, 420, and "funding secured" seems to

12 imply something, something more than "Oh, I've got somebody

13 interested."

14     I understand there's some softness around that.  And

15 some of the commentators, you know, may have commented that,

16 well, it could be a strong verbal commitment, maybe some

17 just initial term sheets agreed to or something in that

18 neighborhood.

19     But even that softness -- I guess I want to hear from

20 the defense, what else could it mean, if it means anything

21 at all, "funding secured"?  It must mean something.

22          MR. SPIRO:  Well, it can mean that there is a

23 supposition, a principal at this point that funding is not

24 going to be an issue.  That I'm considering doing this.  I'm

25 considering taking Tesla private at 420.  That statement I

5

1  think is demonstrably true and it's not claimed to be false,

2  right?  He is, in the present tense, considering doing this.

3       And so all he's saying is the issue here or the issue

4  at bay here is that you don't have to worry about funding.

5  I'm not here to talk about funding.  Funding is secured.

6  Funding is not an issue.

7            THE COURT:  Well --

8            MR. SPIRO:  And it was --

9            THE COURT:  -- it's not an issue because -- not

10  that I'm not interested or we don't need it.  It's because

11  it's been, quote, secured.  It's an issue because I got it,

12  it's in the bag or something like that.

13            MR. SPIRO:  Well, there's contemporaneous

14  statements in this case and evidence that supports that

15  there was a handshake deal at that meeting.  So it certainly

16  doesn't have -- I mean the only way that the plaintiffs an

17  survive on their theory here is if it means essentially

18  legally binding term sheet.

19       That's not what he said.  What he said was secured.  He

20  has a handshake deal leaving that meeting and it could be

21  secured in any number of other ways.

22       Your Honor --

23            THE COURT:  But what was the handshake deal?

24            MR. SPIRO:  Funding is not an issue.  We have

25  unlimited money.  We've already looked at this company.

6

1  We've seen the diligence because it's a public company.

2  We've already invested a billion dollars and up to our limit

3  of what we can invest.  It's not -- it doesn't require

4  disclosure.

5       We've been courting you for years and this is "We're

6  ready to move forward.  Let's go."

7               THE COURT:  But was there discussion about 420 as

8  the purchase price?

9               MR. SPIRO:  No, but there's been ample evidence in

10  this case that 420 is where he's considering taking it

11  private, right --

12               THE COURT:  "He" being Mr. Musk?

13               MR. SPIRO:  Correct.  And that --

14               THE COURT:  But not necessarily on the other side

15  of equation.  It takes two to tango.

16               MR. SPIRO:  Well, again, we're starting to read in

17  other commitments to this tweet that I don't know is

18  necessarily present, your Honor.

19               THE COURT:  Well, but you use the word "handshake

20  deal."  A deal means there's an understanding.  And if you

21  don't even have an understanding of price or what the

22  structure is, whether they're going to demand 30 percent

23  ownership, 51 percent ownership or something else, how can

24  there be a, quote, "deal," even if it's just a handshake

25  deal?

7

1         MR. SPIRO:  Well, this is -- I'm repeating to you

2    what one witness said under oath, which is that there was

3    a -- "handshake agreement" was the term.  Handshake

4    agreement is what was testified to under oath.

5         Okay.  So it doesn't have to be a formal deal.  It

6    doesn't have to be a term sheet deal.  It doesn't have to

7    have all terms worked out.

8         It's analogous to the analogy that your Honor heard at

9    motion to dismiss, which is that you are told by your bank

10   that it's not going to be a problem for you to get a

11   mortgage, mortgage is not going to be an issue.

12        And so you go to buy the house and you say, "I don't

13   need a condition."  That's not going to be an issue.  You

14   don't know the rate, you don't know the term of years, you

15   don't have a binding contract.  You don't have anything, but

16   you know it's not going to be an issue.

17        And so there's nothing -- a reasonable jury could

18   conclude that all this means is that funding is not an

19   issue.  Don't worry.  You people I'm talking to, don't

20   worry, that's not the issue.

21        And we are focused on the PIF, but it's not the only

22   possible reason that he can or would want to say that.

23        And again, as your Honor pointed out, there are folks

24   in the marketplace who say unequivocally that this could be

25   a strong verbal commitment and could be less than that.

1        So that is affirmative evidence that reasonable people

2 at the time, seasoned people in the marketplace did not take

3 it to mean binding term sheet, which is what they really

4 have to allege in order to --

5            THE COURT:  But even take the looser one.  The RTC

6 Capital Markets article stating that "Elon's tone and

7 messaging regarding a potential transaction lead us to

8 believe there could be significant outside funding lined

9 up."  "Lined up."

10            MR. SPIRO:  Could be.  Could be.  Significant

11 funding lined up.

12        And then others say that it could be far less than

13 that, right?  And that's Exhibit 33, among other places.

14            THE COURT:  All right.  So let me hear from -- I

15 don't know if it's Mr. Porritt or who on your team.

16        Why is it enough elasticity there -- I mean you've got

17 some evidence that some of the commentators are not reading

18 this too strictly.  They're saying, well, it could be that

19 there's significant outside funding lined up or it could be

20 a strong verbal commitment with funds available, parties

21 willing to execute quickly, but it could be less than that.

22        That suggests a little bit of looseness there.  Then

23 why isn't it enough -- maybe that just says, you know, we've

24 got enough interest in this thing that I'm not too worried.

25 We're going to get it one way or the other.

9

1       MR. PORRITT:  Well, your Honor, I wanted to --

2  thank you, your Honor.  Nicholas Porritt, again, on behalf

3  of the plaintiffs.

4       Your Honor, in the motion to dismiss order, rightly

5  identified that this is in the past tense.  Funding is

6  secured.  And your Honor has also make that point here today

7  as well.

8       So that delivers, suggests, and Joseph Fath, the

9  testimony we pointed to in our papers, the portfolio manager

10  for T. Rowe Price, noticed that it means secure.  It means

11  it is in the bag.  It is locked and loaded.  It's ready to

12  go without condition.

13      Your Honor, while they think about -- while there's

14  reference to a verbal commitment or maybe less than that, I

15  don't think -- you cannot point to a single -- and

16  defendants have not and cannot point to a single market

17  participant who believes that that means that price has not

18  been discussed with any potential investors, that the amount

19  of funding is not being discussed with potential investors,

20  that the percentage, even the range of percentages is not

21  even agreed upon.  It's anywhere between 80 and 20 percent

22  that might be arranged.

23      So it's one thing to say there's a little bit of

24  looseness there.  It's another thing to say that this really

25  is illusory.  There's been discussions and no more than that

10

1  is all that you can say at this particular point in time.

2      Another point that -- and just to raise a couple of

3  points that counsel for defense made, he talks about how PIF

4  had seen the diligence.  There had been no due diligence.

5      One thing that is clear and undisputed out of the

6  meeting on July 31st between Elon Musk and a representative

7  of the Saudi PIF is that they wanted more information.  And

8  Elon Musk himself admitted he agreed to give it to them but

9  then never did and that they couldn't go forward until they

10  got that information.

11      So it's just simply incorrect to say they had seen the

12  diligence and were ready to go there and back.  That's just

13  not true.

14      In terms of what was actually discussed at that

15  meeting, we have no contemporaneous documents from Tesla.

16  We purely have Mr. Musk's testimony.  The only

17  contemporaneous documents come from what is revealed from

18  the Saudi PIF, revealed in the text messages, Exhibit 121,

19  exchanged with Mr. Musk and then their notes taken at the

20  meeting, which we've submitted to your Honor, and they

21  clearly show a far more -- a willingness to explore a

22  potential transaction.

23      That is far as it has got.

24      And then the final, I think critical point here, when

25  talking about funding secured, is that Mr. Musk says very

11

1 clearly, as testified, that that funding secured refers to

2 PIF.  He didn't speak to any other investors regarding this

3 transaction at this particular point in time before his

4 tweet on August 7th.

5      And yet he also admits and says -- you know, it's

6 undisputed that he had no intention of using the Saudi PIF

7 to fund the entire transaction, that he intended to cap it

8 at 20 percent, no more, at a maximum of 30 percent which

9 still left a large gulf.  We don't know precisely how much

10 left because we still don't know and we never -- the team

11 never found out how much percentage of actual funding was

12 actually required to close this transaction because the

13 whole thing was so tentative and so pie-in-the-sky at this

14 point in time that he never had a clear idea how much money

15 he needed or would be needed.

16      So Mr. Musk by all means does feel optimistic about

17 there would be funding available if he put together a

18 transaction that people could then participate in.  But he

19 was nowhere near saying that it was -- that's a long way

20 from saying secured.

21           THE COURT:  All right.  Let me ask defendants on

22 this second quote about the, quote, "investor support is

23 confirmed.  The only reason why this is not certain is that

24 it's contingent on the shareholder vote."

25      Again, that suggest that everything -- similarly that

12

1 the investor support is lined up, ready to go, that it's

2 really just a matter of Tesla shareholders saying yes, that

3 there is no contingency on the other side of the equation.

4     Isn't that a fair reading?

5         MR. SPIRO:  Yes, your Honor.  I understand the

6 Court's question.

7     I just want to take a step back and point out that this

8 entire grouping of tweets, right, has to be looked at in

9 context and with each other, right?  And so the entire

10 series of tweets -- and these are all on the same date, the

11 statements that we're talking about here.  It starts with "I

12 am considering," meaning "I am not close to final," meaning

13 "Not everything is documented.  I am just at this point

14 considering something," right?

15     So the idea that other things within this are loose is

16 presupposed by the way this starts.  And so I do worry that

17 by dissecting too much, which is how the plaintiffs organize

18 their submission, we do miss the fact that context matters.

19     The second thing is, obviously the question is could a

20 reasonable juror read that in a different way.  And as I

21 made the point with the funding secured, there is a -- and

22 as the Court said at the motion to dismiss stage, there is a

23 lay meaning to many things that is different than a formal

24 meaning, right?  And so -- and lay meaning to any of these

25 things could mean something slightly differently than what

13

1 one's gut instinct is.  And that's what the real question is

2 before the Court.

3      In terms of the second statement of issue, the other

4 thing I want to point out is the market reaction to both of

5 these statements is that when more information trickles into

6 the marketplace, the market does not react as if the market

7 has been misled or some bomb has been dropped.

8           THE COURT:  And that goes to the reliance

9 question, which I want to get to right after this.

10           MR. SPIRO:  It does, but the Supreme Court has

11 also said that it has to do with whether it can be used to

12 look at other elements of the case, right, so that it

13 doesn't have to just be limited to its all fours.

14           THE COURT:  Although there was a -- if you're

15 going to say market reaction is relevant, there was market

16 reaction right after the 7th when the tweet was made.

17 Something happened.

18           MR. SPIRO:  Well, there was.  But our view is not

19 that that market reaction is necessarily to this funding

20 secured throwaway, don't worry about funding.  None of Mr.

21 Musk's deals have ever had a funding issue.

22      Mr. Musk is in a position to personally fund, right?

23 They point out that Mr. Musk is talking about, "Oh, well,

24 the only investor I spoke to at that point was PIF."

25      Okay.  Well, he had spoken to his board.  We know that.

14

1  That's without dispute.  He has great personal resources

2  that he can bring to bear.  That's without dispute.  So it's

3  just not as simple as they make it sound by cherry-picking

4  certain facts.

5          THE COURT:  My point is if you're going to rely on

6  market reaction for the adverse inference, you've got to

7  take the good with the bad or the bad with the good.

8          MR. SPIRO:  Fair enough, your Honor.  And I would

9  put to the Court that the truth is, if the market reacted

10 based on this tweet, what they're reacting to is:  I, Elon

11 Musk, am considering taking this private.

12      That's what matters in this tweet, not funding secured.

13 That's not what matters in this tweet.  That's not the

14 gravamen of this.

15      It's Elon deciding that there's never been an issue

16 with funding any of his companies across any context.

17 That's not the issue.  The issue isn't whether or not anyone

18 is going to be interested in funding him.  And as you see,

19 at the end of the rainbow when this is all done, he did have

20 ample funding.  It wasn't even close.

21      So the market is reacting to Tesla might go private, if

22 they're reacting to anything, because Elon might be taking

23 them private.  Elon might be making a bid to make them

24 private.

25          So in terms of the investor support confirmed -- and,

15

1  again, you know, we can tease out what does "confirmed"

2  mean, what does "support" mean, is "investor" plural or

3  singular.  These are questions for a jury.  It is what's

4  their interpretation of those words in the same time frame,

5  in the same context as the tweet.  And it's not --

6          THE COURT:  Well, who else could "investor

7  support" be referring to in context besides the Saudi

8  investment group?

9          MR. SPIRO:  So let's take that interpretation of

10 it.  I don't concede that it's the only possible

11 interpretation a reasonable juror could have.

12      But if that's the case, then all he's saying

13 contemporaneously -- again, these are contemporaneous,

14 right?  A jury would even have to find that you don't read

15 these various tweets together, that they're even independent

16 statements in and of themselves.  We don't concede that.

17      So "funding secured, investor support confirmed,"

18 right?  Okay.  So there's an investor that's clearly behind

19 this and there's an investor that, you know, seems like he's

20 willing to do this is, is absolutely --

21          THE COURT:  What about the only reason why it's

22 not certain that it's contingent on shareholder vote.  That

23 means one contingency shareholder vote.  That's not exactly

24 accurate.

25          MR. SPIRO:  Well, again, exactly accurate is --

16

1  well, one thing I just point out, this is linked to then a

2  blog post, right?  There's a limit of characters in Twitter.

3  This is linked to a blog post that explains all of this,

4  that's explicit, that goes into detail, right?  And the

5  whole thing --

6          THE COURT:  Well, the details explaining why, what

7  the advantage is and the fact that it's a premium -- 20

8  percent premium, I'm not going to do more than 20 percent

9  myself.  The proposal will go -- finalize through vote of

10  shareholders.

11      So there's nothing in there that suggests, well, we've

12  got about five hurdles to get over before we get to the

13  shareholder vote.

14          MR. SPIRO:  Well --

15          THE COURT:  You know, there's going to be due

16  diligence of the Saudi -- and come to some agreement with

17  them, there's going to be regulatory -- you know, all sorts

18  of stuff.  But that's not mentioned.

19          MR. SPIRO:  Well, what is mentioned is we would

20  like to structure this, it's not even structured yet, there

21  are steps ahead.  A "final decision," quote-unquote, has not

22  been met.  We're investigating a range of potential

23  structures and options.  He had said moments before, "I am

24  considering."

25      So it's not even a fully baked -- what he's saying is

17

1    what this is ultimately coming down to is what the

2    shareholders think.  And he is saying within the same exact

3    tweet, after saying "I'm considering it," "I haven't made a

4    decision.  I am considering it."  Okay?

5        The ultimate decision is going to be that of the

6    shareholders.  This blog post reads as if this is a

7    forward-looking-maybe, in every material respect.  It says

8    it five times in five different ways.

9        We don't have the structure yet.  We haven't figured

10   out all the details.  Ultimately at the end of the rainbow,

11   this is going to come down to a shareholder vote.

12           THE COURT:  All right.  Let me hear the response.

13       Mr. Porritt?

14           MR. PORRITT:  Thank you, your Honor.

15       Mr. Musk said that investor support is confirmed, once

16   again in the past tense.  He had not spoken to a single

17   outside investor about a potential transaction at $420 per

18   share.   I mean I do know much clearer you can get.

19       And listening to counsel for defendants, they never put

20   out any evidence that contradicts that or gives any possible

21   justification for that statement.

22       Investor support was not confirmed.  I mean you cannot

23   confirm something with support when you don't speak to the

24   supporter.  It's as simple as that.  He had no basis

25   whatsoever for making the statement, and the statement is

18

1  false.  And in fact we know it's false because he later told

2  the board that it was false, that in fact the investor

3  support was not there.  And he told the SEC quite

4  explicitly.

5      And this is at -- if I may, at page 258 of this

6  transcript of his SEC testimony:  I was wrong about the

7  desire or the interest in the existing shareholders to go

8  private.  That was incorrect.

9      And he had previously told the board at the board

10  meeting on August 23rd, as reflected in the minutes, Exhibit

11  101, he had learned in recent weeks following his

12  announcement, including but not limited to the negative

13  views of many of the company's current stockholders

14  regarding the prospect of the company going private, and

15  that many of them -- many of Tesla's investors preferred

16  that the company to stay public.

17      So it's simply undisputable, in our opinion, that

18  that's a false statement and that Mr. Musk cannot have

19  confirmed investor support, because if he had confirmed it,

20  he would have found out that the investor support was not

21  there.

22      If I may briefly talk about the question of materiality

23  which defendants appear to have brought up.  To the extent

24  that they are arguing that the tweets on August 7th,

25  "funding secured, investor support is confirmed" and the

19

1  only reason it's contingent is because it's subject to a

2  shareholder vote are not material, really just totally

3  misunderstands the concept of materiality as established by

4  the Supreme Court in Basic v. Levinson, TSC v. Northway.

5  And it's been well-established ever since then.

6      It just has to change the overall -- the total mix of

7  information available to a reasonable investor, considered

8  by a reasonable investor in making an investment decision.

9      And the suggestion that Elon Musk tweeting "funding

10 secured" or "investor support is confirmed" for going

11 private transaction does not somehow alter the total mix of

12 information is really utterly unreal and it's not supported

13 by their own expert.  It's not supported by any evidence.

14     The Court rightly pointed to the market reaction on

15 August 7th, which shows an immediate, instantaneous, within

16 a second, increase in price in responding to this.  It led

17 to a trading halt on the NASDAQ, and then was followed over

18 the next 10 days by over 2400 news articles.

19     It was the most followed news story -- I think we all

20 remember it.  But even so, our expert, in his report that

21 was submitted to you, went through a database and counted

22 the number of reports that were in there, over 2400 --

23         THE COURT:  What about the point that the reaction

24 was to his announcement of an intent, not so much the

25 securing of the funding but just the fact that he's

20

1  intending or seriously looking at going private, which is a

2  big deal, and that he's got a number on it, 420?

3       That's going to make news, that's going to influence

4  people.  Even if he never said anything about funding, the

5  argument is going to be that would have impacted the market.

6            MR. PORRITT:  Well, I have two responses, your

7  Honor.

8       First of all, if you look at the news items, they all

9  mentioned the words "funding secured."  If you look at the

10 analyst's reports that we submitted, "funding secured" --

11           THE COURT:  Right.  But we don't know -- I mean

12 why is there a question of fact as to which portion of that

13 sentence was the one that really moved the market?

14      I understand your argument.  It sure looks like a

15 material part of the mix of information that a reasonable

16 investor would consider, funding secured versus no funding.

17 But, you know, we don't know.

18           MR. PORRITT:  Well, fundamentally that's a loss

19 causation item, and that's not subject of this motion.

20      So of course, yes, there are other elements to the

21 statements, and there was more information coming into the

22 market during the class period, even though it's a short

23 class period, 10 days.

24      So the degree to which the market moved, how much the

25 market moved in response to the particular statements and

21

1  statements that may be found to be false or fraudulent, and

2  those that weren't, that is going to be a question for the

3  jury.  We concede that.  We haven't moved on that issue.

4       And that -- their expert offers a loss causation

5  report.  Their expert never mentioned the word

6  "materiality."  There was no opinion out there from their

7  expert saying that the August 7th tweets are immaterial.

8       So this argument is, as I say, I think fundamentally

9  misunderstands the whole test for materiality.  I don't

10 think there can really -- there's really no other -- you

11 know, this is really the financial equivalent of, you know,

12 shouting fire in a crowded cinema.

13      It's hard to I think -- if these statements are not

14 material, it's hard to think what a public statement

15 regarding a public company --

16           THE COURT:  So you're asking for summary judgment

17 on the question of materiality, not necessarily of the

18 question of reliance or loss causation?

19           MR. PORRITT:  Well, we also move on the question

20 of reliance.  We do not move on loss causation.

21      And I know those three concepts are interrelated, and

22 there is a lot of very often I think not particularly

23 illuminating jurisprudence on the question of how they

24 relate to one another and passing them through both the

25 class certification and a motion to dismiss and summary

22

1 judgment.

2     So I agree that they all mix together, but I think that

3 we have sufficiently differentiated them now.  I think these

4 statements are clearly material, so material should be -- we

5 should receive summary judgment on materiality.

6     I think if they're material, the market was efficient,

7 I think we've established reliance, the presumption of

8 reliance.  And I don't think defendants have any evidence to

9 rebut that.  They've not come forward with any evidence to

10 rebut that.

11     And then there are issues of loss causation, which is

12 how much of the market reaction that could be measured, you

13 know, is attributable as caused by the tweets and by the

14 forward and how much of that is recoverable by the class.

15     And so those are questions that would be ultimately

16 decided by the jury, guided by expert testimony.

17         THE COURT:  All right.  Let me hear the response

18 on materiality, briefly.

19         MR. SPIRO:  Yes.  And if I could just take a step

20 back and respond to one other piece of this, which is just,

21 again, if you look at the blog post, what's clear about this

22 is one thing that is not certain -- we have many steps to

23 do, this is still in an early phase, but one thing that is

24 not certain is shareholder approval, right?  That's what

25 that really means, is that -- when it says "contingent upon

23

1  shareholder approval," because he talks about all the other

2  steps.

3      The other thing is that plaintiffs' reading of it is

4  internally inconsistent.  I think this is very important.

5  This is why juries exist, because what they're saying in one

6  breath is:  Investor support is confirmed.  You see, he's

7  telling everybody that the investors are supporting this.

8      And then in the same sentence, they're saying:  Oh,

9  look, he's saying it's contingent on investor support in

10  this absolute sense.

11      Well, if he really is saying what they want him to

12  regarding investor support being confirmed, then how could

13  the same contingency be the only contingency?  It's not as

14  they say it and it's not what a reasonable jury would

15  conclude.

16      In terms of materiality --

17          THE COURT:  Well, wait a minute.  That assumes --

18  investor support I would assume was meant to be directed

19  toward the prospective investor, whether it's the Saudi PIF

20  or whoever, not the shareholders.

21          MR. SPIRO:  Well, I don't know.  We don't know and

22  a jury could interpret it as either.

23      The way I understood it, at least at one point, is the

24  plaintiffs arguing that, look, we have investor support, as

25  if what he's telling the marketplace is, look, we have -- I

24

1  mean investors are shareholders, that we have all --

2          THE COURT:  No, that doesn't make sense.

3          MR. SPIRO:  I agree that it doesn't make sense.  I

4  agree.

5          THE COURT:  When it says investor support is

6  confirmed, the only reason why it's not certain, it's on

7  shareholders, it's obviously talking about two things.

8      You've got one-half tab down because that part is

9  confirmed, it's like the investor, whoever is going to

10  invest.  But we still need the existing shareholder.

11      I mean that seems obvious you're talking about two

12  different -- the first reference to "investor support" is

13  not the shareholders.  That wouldn't make any sense to say,

14  well, it's confirmed but we've got to get their vote.

15          MR. SPIRO:  I -- let's just -- I will just agree

16  that I agree it doesn't make any sense.  And I agree that

17  there is some internal inconsistency there to suggest that

18  one means something absolute and one means something

19  absolute in a direction that I think is at least contrary to

20  it.

21      But the other point I wanted to make is that the fact

22  that the market reacts by the stock going up when more

23  information, more detail is revealed on the 13th is evidence

24  of -- your Honor rightly pointed out, what's good for the

25  stock price -- if you want to look at the stock price to

25

1  glean other things about what's really going on here, it

2  works in both directions.

3      Well, it certainly does and on the 13th when more

4  information comes in, the stock goes up.  It does not go

5  down.  It does not react as if it's been injected with new

6  information.

7      It reacts as if the market understood Mr. Musk's words

8  to be what they were.  And the only people that were in that

9  room when this conversation had with the PIF and its

10 three -- it's three different witnesses under oath.  The

11 only ones that have come in have supported Mr. Musk's

12 assertion as to what happened in that meeting and that those

13 words that he spoke were consistent with what happened in

14 that meeting.

15     No one else has testified or laid a finger on that

16 interpretation, nobody from the PIF and nobody from

17 plaintiffs' side.

18     In terms of additional comments on materiality, if

19 we're going to move to materiality, again, your Honor -- and

20 I've said it before, the question is what's material.  None

21 of Mr. Musk's deals that have occurred, the funding of it or

22 that funding is or isn't at issue is not what's material

23 about them just as a general matter.

24     But here it's clear that Mr. Musk's words and the power

25 that they have and the idea that Tesla would transform into

26

1 a private entity is what the market is reacting to.  And

2 these are expert issues that still need to be fully vetted

3 and discovered as -- plaintiffs' counsel keeps pointing out,

4 well, the experts said this or the experts said that.

5     I feel an obligation to tell the Court, the expert

6 witnesses aren't even done being deposed yet in this case.

7 So the idea that -- I don't leave the Court with the

8 impression, well, the experts have said one thing absolutely

9 never to change.

10     Not only have they not testified at trial, they haven't

11 even been deposed to much of what plaintiffs' counsel is

12 speaking to.

13     Materiality is almost always a question to the jury, as

14 is all of these questions.  I mean it is -- you find almost

15 no cases that take this out of the providence of the jury,

16 any of these issues, frankly.  But materiality is almost

17 always -- and all that plaintiffs say basically is a line in

18 their brief that says, well, it must have been material.

19 And they don't really ever address the issue of which part

20 of it is material if any of it is material.

21     They don't address that.  There's nothing.  There's

22 nothing in the record they've done, no study, no expert

23 opinion, nothing to tease this out.  And so they certainly

24 can't move for summary judgment on it, in our view.

25          THE COURT:  Thank you, Counsel.  I'll take it

27

1   under submission.  I appreciate it.  It's helpful.

2           MR. PORRITT:  Thank you, your Honor.

3           MR. SPIRO:  Thank you, your Honor.

4       (Proceedings adjourned at 2:31 p.m.)

28

<u>                          CERTIFICATE OF TRANSCRIBER</u>

     I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

     I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.

                    Echo Reporting, Inc., Transcriber

                        Wednesday, March 16, 2022