1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
       Alex Spiro (*appearing pro hac vice*)
2      alexspiro@quinnemanuel.com
       Kyle Batter (Bar No. 301803)
3      kylebatter@quinnemanuel.com
4  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California 94065
5  Telephone: (650) 801-5000

6      Michael T. Lifrak (Bar No. 210846)
       michaellifrak@quinnemanuel.com
7      Jeanine Zalduendo (Bar No. 243374)
       jeaninezalduendo@quinnemanuel.com
8  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
9  Telephone: (213) 443-3000

10
   *Attorneys for Defendants Tesla, Inc., Elon Musk,*
11 *Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,*
   *Antonio J. Gracias, James Murdoch, Kimbal Musk,*
12 *And Linda Johnson Rice*

13

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16

17 | IN RE TESLA, INC. SECURITIES | Case No. 3:18-cv-04865-EMC |
   | LITIGATION | |
18 | | **DEFENDANTS' OPPOSITION TO** |
   | | **PLAINTIFF'S MOTION FOR PARTIAL** |
19 | | **SUMMARY JUDGMENT** |
20 | | |
   | | Date: March 10, 2022 |
21 | | Time: 1:30 p.m. |
   | | Location: Courtroom 5, 17th Floor |
22 | | Judge: Hon. Edward Chen |

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ISSUES TO BE DECIDED.......................................................................................................2

STATEMENT OF MATERIAL FACTS ...................................................................................3

     A.    The Public Investment Fund Has Long Desired to Take Tesla Private. ...................3

     B.    The PIF Agreed to Fund a Transaction to Take Tesla Private. ................................5

     C.    Mr. Musk Discussed Going Private at $420 with Tesla's Board. ...........................6

     D.    Mr. Musk Discussed Going Private With His Financial and Legal Advisors............7

     E.    Mr. Musk Disclosed the Potential Go-Private Transaction Publicly on August 7. ...............................................................................................................7

     F.    Mr. Musk Spoke with Investors and Advisors. .......................................................9

     G.    Mr. Musk Confirmed His Understanding that Funding Was Secured in Numerous Communications with Mr. Al-Rumayyan. .............................................11

     H.    Mr. Musk Updated Shareholders With Additional Information on August 13. ......................................................................................................................12

     I.    Given Shareholder Feedback, Mr. Musk Decided Tesla Should Remain Public.......................................................................................................................13

LEGAL STANDARD ...............................................................................................................13

ARGUMENT ............................................................................................................................14

I.     SUMMARY JUDGMENT SHOULD BE DENIED AS TO FALSITY.............................14

     A.    Plaintiff Ignores Material Facts Showing it was Reasonable for Mr. Musk to State "Funding [Was] Secured" and "Investor Support [Was] Confirmed." ...........14

     B.    Plaintiff Ignores Material Facts Showing That Mr. Musk's Statement Regarding a "Shareholder Vote" Was Not Misleading.............................................17

     C.    Plaintiff's New Argument that Discussions with the PIF Had Ended as of August 13, 2018 is Baseless. ..................................................................................18

II.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO SCIENTER. ..........................20

     A.    Scienter is a Question for the Jury. .......................................................................20

     B.    There Is Ample Evidence that Mr. Musk Believed His Statements Were True. .......................................................................................................................20

III.   SUMMARY JUDGMENT SHOULD BE DENIED AS TO RELIANCE. .........................21

A.   There is a Genuine Dispute of Fact Regarding Materiality. ....................................22

B.   There is a Genuine Dispute of Fact Regarding Defendants' Ability to Rebut
Any Fraud-On-The-Market Presumption................................................................24

CONCLUSION ........................................................................................................................26

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Allied Cap. Corp. Sec. Litig.*,
  2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ................................................................ 23

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) ............................................................................ 24, 25

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................... 13

*Antonetti v. Skolnik*,
  2014 WL 1308626 (D. Nev. Mar. 31, 2014) ................................................................ 15

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ............................................................................ 20

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .............................................................................. 19, 24, 25

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ............................................................................ 19

*Buxbaum v. Deutsche Bank AG*,
  196 F. Supp. 2d 367 (S.D.N.Y. 2002) ................................................................ 16, 21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ............................................................................ 24

*Davis v. Yelp, Inc.*,
  2021 WL 4923359 (N.D. Cal. Sept. 17, 2021) ................................................. 2, 18, 20, 21

*Durning v. First Bos. Corp.*,
  815 F.2d 1265 (9th Cir. 1987) ...................................................................... 2, 22

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) .......................................................................................... 20

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ............................................................................ 14

*U.S. v. Ferguson*,
  676 F.3d 260 (2d Cir. 2011) .............................................................................. 17

*Garcia v. J2 Glob., Inc.*,
  2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) ................................................................ 15

*Gebhart v. S.E.C.*,
  595 F.3d 1034 (9th Cir. 2010) ............................................................................ 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .............................................................................. 21, 22, 24

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ...................................................................... 2, 20

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
  2018 WL 4945703 (C.D. Cal. Oct. 5, 2018) ................................................................ 24

*In re Infineon Techs. AG Sec. Litig.*,
  266 F.R.D. 386 (N.D. Cal. 2009) ........................................................................ 24

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ............................................................................................. 25

*In re JDS Uniphase Corp. Sec. Litig.*,
  2007 WL 2429593 (N.D. Cal. Aug. 24, 2007) ...................................................... 14

*Jelinek v. Am. Nat'l Prop. & Cas. Co.*,
  747 F. App'x 513 (9th Cir. 2018)...................................................................... 2, 13

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) ................................................................................ 24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ................................................................................ 16

*Marucci v. Overland Data, Inc.*,
  1999 WL 1027053 (S.D. Cal. Aug. 2, 1999) ........................................................ 15

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................................ 19

*McCrary v. Elations Co. LLC*,
  2014 WL 12561600 (C.D. Cal. Dec. 8, 2014) ................................................ 22, 24

*McGovney v. Aerohive Networks, Inc.*,
  2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ........................................................ 21

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ......................................................................... 17, 23

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ................................................................................. 23

*Reese v. BP Expl. Inc.*,
  643 F.3d 681 (9th Cir. 2011) ................................................................................ 14

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................................ 16

*S.E.C. v. Bankatlantic Bancorp, Inc.*,
  661 F. App'x 629 (11th Cir. 2016)........................................................................ 15

*S.E.C. v. Jasper*,
  2009 WL 10701938 (N.D. Cal. Dec. 10, 2009) ........................................... 2, 20, 21

*S.E.C. v. Phan*,
  500 F.3d 895 (9th Cir. 2007) ................................................................... 15, 18, 21

*S.E.C. v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ........................................................................ 14, 16

*S.E.C. v. Sourlis*,
  851 F.3d 139 (2d Cir. 2016) ................................................................................. 16

*S.E.C. v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) .............................................................................. 14

*In re Skechers USA, Inc. Sec. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020) .................................................................. 18

*In re Sun Microsystems Sec. Litigation*,
  1992 WL 226898 (N.D. Cal. July 10, 1992) ........................................................ 15

*In re Tesla, Inc. Sec. Litig.*,
  477 F. Supp. 3d 903 (N.D. Cal. 2020) .................................................................. 17

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) .......................................................................................................... 18

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ................................................... 2, 20, 21

*In re Volkswagen*,
   2017 WL 6041723 (N.D. Cal. Dec. 6, 2017) ........................................... 2, 15, 20, 21

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
   739 F.2d 1434 (9th Cir. 1984) ................................................................................ 20, 21

*Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*,
   2021 WL 5083756 (N.D. Ill. Nov. 2, 2021) ....................................................... 16, 21

**Rules and Regulations**

Fed. R. Civ. P. 56(a) ................................................................................................................ 13

1

2

# MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

3    Plaintiff has litigated this case for nearly three years, taken numerous depositions, received

4    hundreds of thousands of pages of documents, and now must contend with one basic truth: Elon

5    Musk's August 7, 2018 tweet informing the public that he was considering taking Tesla private was

6    entirely truthful and cannot support the claims that Plaintiff brings—much less a motion for summary

7    judgment.  Mr. Musk *was* considering taking Tesla private at $420 a share.  Funding *was* secured.

8    There *was* investor support.  These conclusions are supported by extensive contemporaneous

9    evidence, including discussions with Saudi Arabia's sovereign wealth fund (the "PIF") and Tesla's

10   Board, as well as the undisputed fact that there *was* sufficient funding for a go-private transaction,

11   from the PIF or otherwise.  Plaintiff ignores all of this, ignores what Mr. Musk actually said (and

12   when), ignores what Mr. Musk truly believed, and instead creates strawman arguments that overlook

13   large swaths of evidence adduced during discovery. Far from "fraud," Mr. Musk's statements were an

14   effort to be open about a potential go-private transaction and to provide equal information to all Tesla

15   shareholders.  Plaintiff has no valid claims, never mind ones that can be decided in his favor on

16   summary judgment.  Plaintiff's transparent attempt to avoid a trial on the merits should be rejected,

17   and the Court should deny Plaintiff's motion in its entirety.

18   To obtain summary judgment, a plaintiff must show that there are *no* disputes as to *any*

19   material facts.  A plaintiff cannot cherry pick certain facts and sweep the remaining inconvenient and

20   unhelpful facts under the rug.  But that is precisely what Plaintiff does here, disregarding material

21   facts demonstrating, among other things, that: (1) the PIF had expressed its desire to fund a Tesla go-

22   private transaction for years; (2) the PIF acquired 5% of Tesla stock leading up to a July 2018

23   meeting; (3) at the meeting, the PIF's decisionmaker, Yasir Al-Rumayyan, again expressed the PIF's

24   desire to fund a Tesla go-private transaction, including saying expressly, "I am the decision maker.  So

25   long as the Crown Prince supports me, and he does, that's it. ***It's done***."; (4) the PIF had the resources

26   to fund a go-private transaction, with Mr. Al-Rumayyan saying "it's not a problem"; (5) Mr. Musk

27   believed that funding was secured with the PIF, as evidenced by numerous contemporaneous non-

28   public statements by Mr. Musk, including to Mr. Al-Rumayyan directly; and (6) Mr. Musk's advisors

1    confirmed sufficient funding would be available from sources even outside the PIF.

2         These material facts go to the key elements of Plaintiff's claims, and Plaintiff does not say a

3    word about them.  "A fact is material if it *might* affect the outcome of the case."  *Jelinek v. Am. Nat'l*

4    *Prop. & Cas. Co.*, 747 F. App'x 513, 514 (9th Cir. 2018) (emphasis added).  The material facts

5    detailed herein relate directly to the alleged falsity of Mr. Musk's statements and thus must be

6    evaluated by the jury.  Moreover, the facts demonstrate that Mr. Musk believed his statements were

7    true.  Countless courts—including this Court—have held that "[g]enerally, scienter should not be

8    resolved by summary judgment" and have denied summary judgment on that basis.  *Davis v. Yelp,*

9    *Inc.*, 2021 WL 4923359, at *13 (N.D. Cal. Sept. 17, 2021) (Chen, J.).[1]  This is because "materiality

10   and scienter are both fact-specific issues which should ordinarily be left to the trier of fact."  *Id.*

11        Plaintiff's motion on the element of reliance fares no better.  Plaintiff cannot obtain summary

12   judgment on reliance without first establishing that Mr. Musk's alleged misstatements were material.

13   But materiality is a question for the jury (*see, e.g.*, *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268

14   (9th Cir. 1987)), and it is easy to see why.  It is not enough to point out that Tesla's stock price moved

15   after Mr. Musk's statements, as Plaintiff does here.  That movement could have been caused by Mr.

16   Musk's *other* indisputably true statements (e.g., that he was considering taking Tesla private or that

17   the PIF had heavily invested in Tesla).  Indeed, when Mr. Musk disclosed further details concerning

18   the discussions about funding after his initial tweets, Tesla's stock price hardly moved, suggesting that

19   the alleged misstatements were not material.  Plaintiff has not even attempted to meet his burden on

20   this necessary element.  This too is a question for the jury, not summary adjudication.

21        Defendants respectfully request that the Court deny Plaintiff's motion in its entirety.

22                              **ISSUES TO BE DECIDED**

23        (1)  Numerous courts, including this one, have recognized that scienter is a question for the

24   jury.  Plaintiff in this case ignores the abundance of documentary and contemporaneous evidence

25   demonstrating that Mr. Musk was considering taking Tesla private, that a premium of 20% over the

26   _____

27        [1]  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1060 (9th Cir. 2000); *In re Volkswagen*, 2017 WL
     6041723, at *12 (N.D. Cal. Dec. 6, 2017); *S.E.C. v. Jasper*, 2009 WL 10701938, at *3 (N.D. Cal. Dec.

28   10, 2009); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *12 (N.D. Cal. Apr. 17, 2020).

share price was reasonable, that funding was secured at the time of the tweet, and that there was investor support for the transaction.  Should the Court deny partial summary judgment on falsity and scienter where the evidence creates numerous triable issues of fact?

(2)  The rebuttable fraud-on-the-market presumption requires Plaintiff to prove that the alleged misrepresentations were material.  Plaintiff argues that Mr. Musk's statement "funding secured" was material because Tesla's stock price changed following the statement, but ignores that Mr. Musk made *other* indisputably true statements that could account for stock price changes (e.g., "am considering taking Tesla private").  Days later, Mr. Musk clarified what "funding secured" meant and Tesla's stock price hardly moved.  Should the Court deny partial summary judgment on the element of reliance where Plaintiff has not attempted to prove the materiality of the challenged statements?

## STATEMENT OF MATERIAL FACTS

### A.    The Public Investment Fund Has Long Desired to Take Tesla Private.

The PIF is Saudi Arabia's sovereign wealth fund.  (Batter Decl., Ex. A.)[2]  The PIF's purpose is to provide financing support for strategic projects on behalf of the Saudi government.  (*Id.*)  As of August 2018, it was reported to have $225 billion in assets.  (*Id.*)  As part of the Saudi government's efforts to "transform Saudi Arabia from a staid petrostate to a technology-focused economy" (*id.*), the PIF has tried to convince Mr. Musk to take Tesla private for years.  (Ex. B at 277:2-20; Ex. P at 68:22-70:23; Ex. Q at 30:7-31:6, 51:2-52:19, 55:4-10.)  At multiple meetings between Mr. Musk and Mr. Al-Rumayyan, the PIF's Managing Director, Mr. Al-Rumayyan expressed a desire not only to invest substantial sums in Tesla, but to fund a take-private transaction.  (Ex. B at 277:2-20 ("From the very beginning, the very first interaction was about a take private.").)  Sam Teller, Mr. Musk's then-Chief of Staff, was present at these meetings and confirmed that the purpose was to discuss taking Tesla private.  (Ex. C at 74:11-15, 129:3-130:23, 133:5-8; Ex. P at 74:2-76:7, 77:8-14, 80:24-81:13, 82:9-13, 83:10-84:3, 88:9-18, 92:15-93:6, 94:21-95:1, 100:2-20, 107:15-109:15, 110:9-15.)[3]  Deepak Ahuja,

---

2   Deposition exhibits are marked with numbers (e.g., 1-400); new exhibits in support of this opposition are marked with letters (e.g., A-Z).  All cited exhibits are to the Batter Declaration.

3   Likewise, Mr. Musk believed—and expressed publicly—that Tesla would operate more efficiently as a private company, benefiting its employees and shareholders.  (Ex. D.)

1   Tesla's former Chief Financial Officer, was similarly present during a meeting where "the concepts of
2   taking Tesla private were discussed [with the PIF]." (Ex. Q at 55:4-21.)

3         The PIF's pursuit to convince Mr. Musk to take Tesla private began in November 2016 when
4   Mr. Al-Rumayyan first sought a meeting with the Tesla chairman and CEO, but Mr. Musk was
5   unavailable. (Ex. 105.) The PIF reached out again in early 2017, and Mr. Al-Rumayyan met Mr.
6   Musk on January 31, 2017. (Ex. 106; Ex. C at 129:5-16.) The express purpose of the meeting was "to
7   discuss the possibility of them working with us to take Tesla private." (Ex. C at 130:12-16.) At that
8   meeting, Mr. Al-Rumayyan expressed great interest and excitement in taking Tesla private and
9   working with Mr. Musk. (*Id.* at 134:25-135:11.) Eager to close the deal, Mr. Al-Rumayyan directed
10  the PIF's Director of Investment to follow up with Tesla to "take the conversation forward." (Ex. 76
11  at 5.) Soon thereafter, on March 7, 2017, Mr. Al-Rumayyan met Mr. Musk at Tesla's factory in
12  California. (Ex. E at 62:23-67:10; Ex. Q at 30:7-31:6.) Masayoshi Son, the CEO of SoftBank, also
13  attended. (*Id.*) At the dinner meeting, the group discussed an investment that would allow Tesla to go
14  private. (*Id.*) They also discussed the potential capital required, estimating that $30-60 billion would
15  be needed. (*Id.*; *see also* Ex. Q at 51:2-53:17.) Mr. Al-Rumayyan expressed that the PIF could easily
16  provide the funding necessary. (*Id.*) During these discussions, Mr. Musk expressed interest in the
17  potential transaction and conveyed that going private would enable Tesla to better focus on its long-
18  term strategy. (Ex. E. at 71:3-10.) Mr. Al-Rumayyan and Mr. Musk met again on May 1, 2017 to
19  discuss the PIF's desire to fund a transaction to take Tesla private. (Ex. C at 150:23-151:7, 152:10-21,
20  154:4-155:8; Exs. F, G, H.)

21        Over the next several months, Mr. Musk had further discussions with Mr. Al-Rumayyan about
22  a take-private transaction for Tesla, and Mr. Al-Rumayyan reiterated his interest in closing the deal.
23  (Ex. C at 152:15-21; Ex. B at 278:18-20 ("[R]eally in every meeting Mr. Al-Rumayyan had been, we
24  want to help you take the company private.").) Although Mr. Musk remained interested in taking
25  Tesla private, he had grown more skeptical about the possibility of working with the PIF due to his
26  belief at the time that the PIF and SoftBank would necessarily be partners in that transaction. (Ex. C
27  at 152:22-153:20; Ex. B at 278:20-279:1.) Mr. Musk was hesitant to work with Masayoshi because
28  his interactions with him left Mr. Musk with the impression that Masayoshi did not understand Tesla's

mission. (Ex. C at 160:20-161:9; Ex. Q at 33:14-35:8.) Because of Mr. Musk's reluctance to include Masayoshi in the negotiations, Mr. Musk pulled back from pursuing a transaction with the PIF in the first half of 2018. (*Id.*) Nevertheless, Mr. Musk encouraged the PIF to demonstrate its commitment to Tesla by purchasing Tesla stock in the open market. (Ex. C at 169:15-19.)

**B.   The PIF Agreed to Fund a Transaction to Take Tesla Private.**

The PIF contacted Mr. Musk again in July 2018 to request another meeting. (Ex. 109.) On July 31, Mr. Musk and Mr. Teller met with Mr. Al-Rumayyan and his colleagues at the Tesla factory. (Ex. B at 108:2-21.) Mr. Al-Rumayyan informed Mr. Musk that the PIF had already invested billions of dollars in Tesla—acquiring roughly five percent of the company. (*Id.* at 113:1-5.) Mr. Musk, surprised to learn this, told Mr. Al-Rumayyan he was under the impression that Mr. Al-Rumayyan had delegated the responsibility of investing in Tesla to Masayoshi. (*Id.* at 114:4-115:7.) Mr. Al-Rumayyan said, "definitely not" and explained that "the only thing that was limiting them at 5 percent was the reporting requirement[,] [a]nd they wished to have a much larger stake and wanted to help Tesla go private." (*Id.*) Mr. Al-Rumayyan reiterated that "he had wanted to do so from the very beginning," since their first meeting in January 2017. (*Id.*)

Given the import of Mr. Al-Rumayyan's proposal, Mr. Musk asked whether any other decision-makers were needed to move forward with a transaction. (*Id.* at 115:16-21.) Mr. Al-Rumayyan said, ***"No, that's the advantage of PIF. I am the decision maker. So long as the Crown Prince supports me, and he does, that's it. It's done."*** (*Id.* (emphasis added); *see also* Ex. O at 89:19-22, 92:12-22, 93:11-94:9, 99:17-100:5, 100:11-101:8, 102:2-10, 102:18-20, 103:1-15, 107:22-108:1, 109:17-110:7, 113:6-7, 221:2-14.) Mr. Musk understood Mr. Al-Rumayyan to be offering to purchase up to all outstanding Tesla shares other than those owned by Mr. Musk, or roughly 80 percent of the common stock. (Ex. B at 120:9-20.) But Mr. Musk did not think nearly this much capital would be required, as he believed that a majority of Tesla shareholders would want to remain with the private company. (*Id.*) Mr. Teller then met Mr. Ahuja outside the meeting room and told him that the PIF expressed interest in taking Tesla private and that the conversations were getting serious. (Ex. Q at 77:3-79:9.) When Mr. Ahuja joined the meeting, Mr. Musk similarly told him, in the presence of Mr. Al-Rumayyan, that PIF was interested in taking Tesla private and had the funding

1    necessary to do so.  (*Id.* at 84:2-86:8.)

2          As the meeting wrapped up, Mr. Al-Rumayyan emphasized to Mr. Musk how serious the PIF's

3    proposal was: "[L]et us know how you want to do this. We want to do this." (Ex. B at 155:23-156:1.)

4    Mr. Al-Rumayyan was enthusiastic about the prospect of taking Tesla private and told Mr. Musk he

5    would reach out in a week if he did not hear back.  (Ex. P at 162:2-163:12.)  Based on everything Mr.

6    Musk knew at the time, including almost two years of lobbying by the Saudis, he had every reason to

7    believe they were ready, willing, and able to fund a take-private transaction:

8              [T]hey were extremely clear that they wanted to take Tesla private.  . . .  They had
               invested billions of dollars with no written agreement, no agreement of any kind, just
9              as a good faith gesture to show that they're serious.  And if I were to say what I
               wanted to do they would do it.  ***So there was no question in my mind whatsoever that***
10             ***the funding was secure for this deal***.

11   (Ex. B at 146:1-13 (emphasis added).)   Other witnesses confirmed Mr. Musk's account of the

12   discussions.  (Ex. P at 132:19-136:6, 137:2-16, 140:8-22, 141:8-143:23, 144:15-145:13.)  Mr. Teller

13   recalled that when Mr. Musk mentioned the transaction would take a lot of capital, Mr. Al-Rumayyan

14   responded, "it's not a problem." (Ex. C at 206:17-207:8.)  Mr. Teller also recalled Mr. Al-Rumayyan

15   saying that taking Tesla private was not just an investment, but a strategic priority for Saudi Arabia.

16   (*Id.* at 216:23-217:11.)  And Mr. Teller, like Mr. Musk, left the meeting with the understanding that

17   "this was a handshake agreement to have the Saudis finance a private transaction for Tesla." (Ex. P at

18   161:7-162:1.)

19         Mr. Ahuja joined the meeting after Mr. Teller summoned him.  (Ex. C at 194:21-204:7.)

20   Based on the way Mr. Musk was acting, it was clear to Mr. Ahuja that Mr. Musk felt strongly that the

21   PIF's offer was genuine.  (Ex. E at 92:7-93:14.)  Mr. Ahuja also testified that Mr. Musk often made

22   significant business transactions based on a verbal commitment and a handshake.  (*Id.* at 121:18-

23   124:13.)  Similarly, the PIF is well known for orally committing to transactions and moving quickly in

24   making large investments.  For example, the PIF orally agreed to commit $45 billion to SoftBank's

25   technology fund after a 45-minute conversation and similarly bought a $3.5 billion stake in Uber

26   within weeks of meeting its CEO.  (Ex. A at 5-6.)

27   **C.    Mr. Musk Discussed Going Private at $420 with Tesla's Board.**

28   On August 2, 2018, Mr. Musk emailed Tesla's Board after the close of trading and proposed to

1   take Tesla private for $420 per share.  (Ex. 81.)  He arrived at the price by adding a 20 percent

2   premium to the stock price and rounding up from $419. (Ex. B at 192:10-14.) He expressed his "firm

3   belief that Tesla can operate more effectively as a private company for the next several years." (Ex.

4   81.)  He also emphasized that he supported "any shareholders who wish to remain shareholders of

5   Tesla as a private company retaining their shares."  (*Id.*)  That evening, the Board held a meeting

6   without Mr. Musk.  (Ex. Q at 129:13-23.)  Mr. Ahuja attended and briefed the Board on Mr. Al-

7   Rumayyan's proposal to fund a take-private transaction.  (*Id.* at 132:6-15.)

8          The Board held another meeting on August 3, this time including Mr. Musk.  (Ex. B at 205:11-

9   25.)  Mr. Musk explained that the PIF was willing to fund the transaction.  (*Id.* at 206:6-23.)  Mr.

10  Musk emphasized his desire to allow existing Tesla shareholders to remain with the company, if they

11  wished to do so.  (*Id.* at 208:11-20.)  The Board agreed that Mr. Musk should reach out to large

12  investors to see if they would remain in a private Tesla.  (*Id.* at 212:13-23.)  Mr. Musk believed that to

13  avoid selective disclosure there would need to be a public disclosure first.  (*Id.*)

14          **D.      Mr. Musk Discussed Going Private With His Financial and Legal Advisors.**

15          On August 3, Mr. Musk contacted Michael Dell to discuss his experience in taking Dell

16  private.  (Ex. B at 161:13-21.)  Mr. Musk also spoke to Steve Rosenblum of Wachtell, who

17  represented Mr. Dell in that transaction.  (*Id.* at 162:7-11.)  Mr. Musk asked him to be counsel on a

18  potential take-private transaction.  (*Id.* at 175:8-25.)  On August 6, Mr. Musk also spoke with Egon

19  Durban of Silver Lake regarding the transaction.  (*Id.* at 167:5-12.)  Mr. Musk told Mr. Durban that

20  the PIF wanted to take Tesla private, but he would prefer to have a broader investor base.  (*Id.* at

21  170:3-21.)  Mr. Durban was confident many investors would be interested in participating.  (*Id.*)  Mr.

22  Durban told Mr. Musk that the structure Mr. Musk was envisioning would be "a lot easier than what

23  was done with Dell," and that if many investors retained their ownership, "the actual amount of capital

24  needed to take it private may be relatively small compared to other deals."  (*Id.* at 173:11-174:10.)

25          **E.      Mr. Musk Disclosed the Potential Go-Private Transaction Publicly on August 7.**

26          Mr. Musk did not want to take Tesla private if shareholders opposed the idea.  (Ex. B at

27  100:13-17.)  This presented an issue for Mr. Musk.  He understood that the law limited his ability to

28  speak with select shareholders about a potential transaction.  (*Id.* at 213:13-24.)  Mr. Musk therefore

decided that the best way to gauge investors' interest in his proposal was to make a public announcement.  (*Id.*)  Mr. Musk wanted "a fair playing field," where "[p]eople can make their own assessment about whether there would be a take private at a premium or not."  (*Id.*)  Mr. Musk planned to do an after-hours disclosure on the night of August 7 or 8.  (*Id.* at 219:24-220:6.)  Mr. Musk reasoned that certain "salient points" should be included in the disclosure:

> I strongly believed [it] to be the case that funding was certain and that the reasonable price to do this at was $420. . . . So it just seems as though there were three salient points that were necessary for all cards to be on the table. "Funding secured," the price conveyed to the board and that . . . I'm considering taking the company private.

(*Id.* at 233:22-234:8; Ex. O at 187:15-21, 195:6-25.)

On August 7 at 9:18 a.m., the *Financial Times* reported that the PIF had acquired a $2 billion stake in Tesla.  (Ex. 225.)  Tesla's stock immediately began to rise sharply.  Mr. Musk was concerned about the leak.  (Ex. B at 220:7-221:2.)  Given that the PIF had just told Mr. Musk they wanted to take Tesla private, he worried that whoever had leaked the investment would also leak the PIF's interest in taking Tesla private and that such a leak might include *inaccurate* information that could cause confusion in the market (e.g., if the article stated that Mr. Musk had *committed* to taking Tesla private, or if it included purported deal terms).  (Ex. O at 127:6-18, 128:15-25, 174:2-11, 182:17-24, 184:8-16, 185:1-18, 202:12-203:3, 281:4-7.)  Mr. Musk felt obligated to disclose his consideration of a potential take private without delay so that all investors would receive the same information:

> In the normal course of business we would have done an after-hours disclosure of take private.  And I actually intended to do that on the Tuesday night of the tweet. . . . Then on Tuesday morning the news of the Saudi investment broke . . . , which like rang a huge alarm bell in my head.  This is like, whoa, how is this information getting out there? . . . I thought that most likely if the Saudi news investment had leaked then probably the take private news is also leaking or at least is at great risk of leaking.  And so it was like [I'm] going to make sure there's a fair playing field here. . . . [T]here's a few facts that need to be out there.  And that is that I am considering taking Tesla private.  In my view funding is secured.  And the price that I proposed to the board was $420.  These seemed like critical facts for a level playing field for investors.

(Ex. B at 219:24-221:2.)

At 9:48 a.m., 30 minutes after the *Financial Times* report, Mr. Musk tweeted: "Am considering taking Tesla private at $420. Funding secured."  (Ex. 8.)  Over the next few hours, in response to questions from his Twitter followers, Mr. Musk provided additional information, including his "hope

1   [that] *all* current investors remain with Tesla even if we're private," and that the rationale for the

2   take-private transaction was that it would be "way smoother & less disruptive as a private company."

3   (Exs. 10, 11.)  Some investors interpreted "funding secured" consistently with what had occurred, as

4   "a strong verbal commitment, with funds available and parties willing to execute quickly." (Ex. 33.)

5       Later that day, Mr. Musk emailed Tesla's employees, a copy of which was then posted on

6   Tesla's blog, entitled "Taking Tesla Private." (Ex. 12.) Mr. Musk reiterated, "I'm considering taking

7   Tesla private at a price of $420/share," and went on to explain his rationale.  (*Id.*)  He added that, "a

8   final decision has not yet been made," and the proposal "would ultimately be finalized through a vote

9   of our shareholders." (*Id.*)  Mr. Musk linked to this blog post on his Twitter account, including a short

10  cover note: "Investor support is confirmed. Only reason why this is not certain is that it's contingent

11  on shareholder vote." (Ex. 13.)  "Investor support is confirmed" was intended to be "synonymous

12  with 'funding secured'"; it reiterated Mr. Musk's view that there was "more than sufficient investor

13  support to take the company private."  (Ex. B at 249:21-250:3; Ex. O at 216:2-217:24.)

14      On the evening of August 7, Mr. Musk relayed to Mr. Ahuja the portion of the July 31 meeting

15  that Mr. Ahuja had not attended.  (Ex. E at 248:4-249:17.)  Mr. Al-Rumayyan "very affirmatively"

16  told Mr. Musk that he was the decision maker at the PIF to invest in the take-private transaction and

17  he had the full support of the Crown Prince.  (*Id.*)  Mr. Musk told Mr. Ahuja that, based on Mr. Al-

18  Rumayyan's statements, Mr. Musk believed the PIF had made a verbal commitment, which gave Mr.

19  Musk confidence in tweeting "funding secured." (*Id.*)  The next morning, before the market opened,

20  Tesla's Board announced that Mr. Musk had opened a discussion about taking Tesla private, and that

21  the Board was "taking the appropriate next steps to evaluate this."  (Ex. 26.)

22      **F.      Mr. Musk Spoke with Investors and Advisors.**

23      Over the next several days, and consistent with his belief that shareholders should have a say,

24  Mr. Musk spoke with several institutional investors.  While Mr. Musk initially believed that most

25  investors would want Tesla to go private, he eventually learned that they were, on average,

26  "lukewarm" about the idea.  (Ex. B at 258:23-259:12; Ex. O at 297:7-23.)

27      At the same time, Mr. Musk continued his discussions with Mr. Al-Rumayyan. On August 10,

28  Mr. Al-Rumayyan told Mr. Musk that the transaction would have to be approved by certain

1    committees within the PIF.  (Ex. C at 296:19-297:18.)  Mr. Musk was surprised; after all, Mr. Al-

2    Rumayyan told Mr. Musk at the July 31 meeting that he was the PIF's decision-maker and had the

3    support of the Crown Prince.  (*Id.*)  Mr. Teller was equally surprised.  (*Id.* ("[I]t was the first that I had

4    heard of this and . . . as far as I understand the first that Elon had.  . . .  [T]his was inconsistent with

5    what was communicated to us in the July 31st meeting.").)  Mr. Musk conveyed to Mr. Al-Rumayyan

6    that this was not what he understood from the July 31 meeting, and Mr. Al-Rumayyan apologized for

7    the misunderstanding.  (*Id.* at 298:8-299:2 ("I read it as a little bit of [Mr. Al-Rumayyan] almost

8    covering his ass a little bit . . . he kind of fronted a little too hard in the [July 31] meeting about his

9    unilateral power and . . . he was now forced to walk it back.  Because, in fact, he was not . . . a

10   unilateral decision maker.").)  Mr. Al-Rumayyan reiterated that he was "unequivocal" about his desire

11   to invest in Tesla.  (*Id.*)[4]

12        Also on August 10, Mr. Musk met with Mr. Durban to discuss the take-private transaction.

13   (Ex. 121 at 7.)  The next day, Mr. Musk told the Board that he had engaged Mr. Durban to lead the

14   deal team, had engaged Wachtell, and may also engage Munger Tolles.  (Ex. 94.)  Mr. Musk also met

15   with investment bankers from Goldman Sachs.  (Ex. 255.)  On August 12, Mr. Musk texted Todd

16   Maron, Tesla's then-General Counsel, and Mr. Durban: "Todd, I have engaged Silver Lake to lead the

17   Tesla go-private initiative." (Ex. 182 at 9.)  Two hours later, Mr. Durban confirmed to Mr. Musk that

18   he had spoken to Mr. Maron and that a special committee was being formed.  (*Id.* at 10.)  Among

19   other things, Silver Lake and Goldman Sachs confirmed that there was sufficient capital to fund a go-

20   private transaction.  (Ex. E at 240:16-243:20.)  Multiple sources were willing to invest in Tesla in a

21   take-private, including Silver Lake, the PIF, Google, and fund manager Ron Baron.  (*Id.*) ████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████

24

25

26   _____

27        [4]  As Plaintiff points out, Mr. Al-Rumayyan expressed a desire to have a Tesla production hub
     in Saudi Arabia; however, the  PIF's willingness to fund Tesla's go-private transaction was never

28   contingent on Tesla building such a factory.  (Ex. O at 123:21-124:10; Ex. P at 114:22-115:12.)

**G.      Mr. Musk Confirmed His Understanding that Funding Was Secured in Numerous Communications with Mr. Al-Rumayyan.**

In the days following his tweet regarding "funding [being] secured," and after news outlets began to question the PIF's level of involvement in the potential transaction, Mr. Musk communicated with Mr. Al-Rumayyan to confirm that the PIF had committed to fund Tesla to go private.  Mr. Musk's non-public statements to Mr. Al-Rumayyan demonstrate his belief that funding *was* secured. (Ex. 121; Ex. O at 226:2-24, 234:8-21, 239:2-25, 240:15-242:22, 243:9-25, 251:15-21, 252:18-25, 254:4-255:4; 256:18-22, 258:8-20.)

Specifically, on August 10, 2018, Mr. Musk sent a text message to Mr. Al-Rumayyan expressing how important it was that he confirm his statements during their July 31 meeting that the PIF had committed to take Tesla private: "This is a major problem [i.e., speculation that the PIF did not agree to take Tesla private].  It is extremely important that you confirm that you are in discussions with me regarding the take private transaction." (Ex. 121 at 8.)[5]  Two days later, Mr. Musk texted Mr. Al-Rumayyan a link to a Reuters article that speculated the PIF would not be funding Tesla's transaction to go private.  (*Id.* at 10; Ex. 323.)  Mr. Musk wrote, "This is false."  "Please refute this false statement that PIF has no interest in Tesla.  This is outrageous." (Ex. 121 at 10.)  Mr. Musk then texted Mr. Al-Rumayyan a link to a Bloomberg article that stated that Tesla and the PIF were "in talks" regarding a go-private transaction.  (*Id.*; Ex. 332.)  Mr. Musk wrote, "This is an extremely weak statement ***and does not reflect the conversation we had at Tesla.  You said you were definitely interested in taking Tesla private and had wanted to do so since 2016.  You also made it clear that you were the decision-maker***, moreover backed strongly by the Crown Prince, who regards this as strategically important at a national level."  (Ex. 121 at 10 (emphasis added).)

Later that day, Mr. Musk wrote Mr. Al-Rumayyan, "when we met at Tesla recently, you said that you were the decision-maker for PIF, ***that you had wanted to do the Tesla take-private deal for two years, and that this was supported directly by the Crown Prince.  I checked with my team who***

---

[5]  On a phone call that same day, Mr. Al-Rumayyan was "clear and unequivocal about his intent with regard to doing the transaction, which was he and they remained totally excited, on board.  Their intent to complete the transaction had not changed in any way."  (Ex. P. at 242:24-244:12.)

***were in that meeting in case I remembered something wrong and they confirmed this exactly***." (*Id.* at 11 (emphasis added).)  Mr. Musk went on, "I will not work with an organization who's [sic] public statement to the media do not match their private statements to me and my team." (*Id.* at 12.)  The Bloomberg article "makes me sound like a liar.  It is filled with equivocation and in no way indicates the strong interest you conveyed in person [i.e., that the PIF committed to fund the go-private transaction]." (*Id.*)  Mr. Musk continued, "I am sorry, but there will be no further communication unless you fix the public perception of wishy washy support and interest from PIF.  ***That is not what you said to me and my team privately***.  Someone is either a friend or not a friend and no friend says one thing privately [i.e., that the PIF committed to fund the go-private transaction] and another thing publicly. This is not right."  (*Id.*)  Mr. Al-Rumayyan responded that he would "work on [a] PIF statement" to fix the incorrect public perception.  (*Id.*)

### H.      Mr. Musk Updated Shareholders With Additional Information on August 13.

Before the markets opened on August 13, Mr. Musk posted an "Update on Taking Tesla Private" on Tesla's blog.  (Ex. 16.)  The post included additional details regarding, among other things, Mr. Musk's funding discussions with the PIF, the potential structure of the transaction, and the various actions that would need to be completed before the transaction could move forward.  (*Id.*)  Mr. Musk explained why he said "funding secured" in his August 7 tweet.  (*Id.*)  Mr. Musk noted that he had "engaged advisors to investigate a range of potential structures and options" to get to a "more precise understanding" on how many shareholders might remain if Tesla became private.  (*Id.*)  The market did not view this information as revelatory—Tesla's stock price barely moved at all, and in fact *rose* slightly in response to it, increasing from $355.49 to $356.41.  (Ex. I.)

On August 13, Mr. Musk held a "kick-off call" with Goldman Sachs, Wachtell, and Munger Tolles.  (Ex. J.)  After the call, Mr. Teller sent an email to multiple individuals from these institutions as well as Mr. Durban, proposing language for Mr. Musk's tweet: "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Munger, Tolles & Olson and Wachtell, Lipton, Rosen & Katz as legal advisors, on the proposal to take Tesla private."  (*Id.*)  Later that night, after the close of trading, Mr. Musk posted that statement on his Twitter account.  (Ex. K.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      <u>**Given Shareholder Feedback, Mr. Musk Decided Tesla Should Remain Public.**</u>

After the market closed on August 16, the *New York Times* published an article based on an interview with Mr. Musk.  (Ex. 19.)  The article made a number of unfounded assertions without providing any supporting evidence, including a statement by the reporter that funding for a take-private "was far from secure."  (*Id.*)  The next day, Tesla's stock price declined 9%.  (Ex. I.).  In contrast to the *New York Times* reporter's claim, not only did Mr. Musk firmly believe funding was secured when he tweeted, in reality (per Mr. Musk's discussions with the PIF) it *was* secured.

But Mr. Musk learned through his discussions with existing investors that many wanted Tesla to remain public. (Ex. B at 258:23-259:12.)  And for some institutional investors, it would have been much harder for them to maintain stock in a private Tesla than Mr. Musk had anticipated.  (*Id.* at 126:1-10.)  Mr. Musk also came to learn, contrary to his understanding on August 7, that he may not be able to structure the transaction in a way that allowed all existing retail shareholders to remain.  (*Id.* at 132:22-133:3.)  In light of these considerations, at the August 23 Board meeting, Mr. Musk announced that he had decided not to move forward with a take-private transaction. (Ex. E at 242:1-10.)  Mr. Musk explained his decision to shareholders in a blog post the next day.  (Ex. 229.)

<u>**LEGAL STANDARD**</u>

Summary judgment must be denied unless the moving party can demonstrate that (1) "there is *no* genuine dispute as to *any* material fact" and (2) "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added).  "A fact is material if it *might* affect the outcome of the case."  *Jelinek*, 747 F. App'x at 514 (emphasis added).  When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgement is not appropriate where "a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Courts may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial."  *Id.* at 255.  This is especially so given that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*

1

**ARGUMENT**

2

**I.      SUMMARY JUDGMENT SHOULD BE DENIED AS TO FALSITY.**

3          Despite ample support in the record showing Mr. Musk's August 7 tweet being true, Plaintiff

4    nonetheless persists in claiming that the following statements were false:  (1) "Am considering taking

5    Tesla private at $420. Funding secured."  (2) "Investor support is confirmed."  (3) "Only reason why

6    this is not certain is that it's contingent on a shareholder vote."  (4) "I have continued to communicate

7    with the Managing Director of the Saudi fund. . . ."  (Mot. at 17-23.)

8          In securities cases, a statement is not false unless it "affirmatively creates an impression of a

9    state of affairs that differs in a material way from the one that actually exists."  *Reese v. BP Expl. Inc.*,

10   643 F.3d 681, 687 (9th Cir. 2011) (citation and alteration omitted).  Summary judgment on the

11   element of falsity must be denied if *any* reasonable jury could conclude that the statement at issue is

12   truthful.  *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010).  This is

13   because whether a statement is false "is a mixed question to be decided by the trier of fact."  *Fecht v.*

14   *Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995); *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

15   Summary judgment is thus improper where "there are triable questions of fact related to whether

16   statements . . . were misleading."  *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 2429593, at *20

17   (N.D. Cal. Aug. 24, 2007) (denying summary judgment).

18          Plaintiff has failed to show that there are *no* disputed facts concerning the truth of Mr. Musk's

19   statements concerning a go-private transaction, and has failed to show that *no* reasonable jury could

20   find in Mr. Musk's favor.  Indeed, as the evidence ignored by Plaintiff shows, Mr. Musk's statements

21   concerning a go-private transaction were truthful.  Plaintiff's motion therefore must be denied.

22          **A.      Plaintiff Ignores Material Facts Showing it was Reasonable for Mr. Musk to State**

23                  **"Funding [Was] Secured" and "Investor Support [Was] Confirmed."**

24          Plaintiff argues that Mr. Musk's statements about funding being secured were false because

25   they were based on "one 30-minute conversation [with the PIF] about potentially taking Tesla

26   private."  (Mot. at 3.)  That is incomplete and false.  The full facts demonstrate that, among other

27   things: (1) The PIF approached Mr. Musk in 2016 to discuss investing in Tesla (Statement of Material

28   Facts at 3); (2) Mr. Al-Rumayyan, on behalf of the PIF, met with Mr. Musk throughout 2017 to

1    discuss taking Tesla private (*id.* at 3-4); (3) Mr. Al-Rumayyan and Mr. Musk discussed the potential

2    capital required for such a transaction (*id.*); (4) Mr. Al-Rumayyan met with Mr. Musk on July 31,

3    2018 and told Mr. Musk that the PIF had just invested billions of dollars in Tesla, the PIF continued to

4    want to take Tesla private and would take whatever steps necessary to achieve that outcome, and Mr.

5    Al-Rumayyan expressed that he had carte blanche authority from the Crown Prince of Saudi Arabia to

6    devote the capital necessary to do so (*id.* at 5-6); (5) Mr. Musk reasonably understood Mr. Al-

7    Rumayyan and the PIF to be committing whatever funding was necessary to complete the go-private

8    transaction (*id.* at 5-12); and (6) Mr. Musk confirmed his understanding that funding was secured in

9    numerous communications with Mr. Al-Rumayyan (*id.* at 11-12).[6]

10          Plaintiff is "not permitted to cherry pick allegations that entitle them to summary judgment"

11   while ignoring other material facts. *Antonetti v. Skolnik*, 2014 WL 1308626, at *25 (D. Nev. Mar. 31,

12   2014).  The full factual picture demonstrates a sufficient basis for a jury to conclude that, as the PIF

13   represented to Mr. Musk, "funding [was] secured" and "investor support [was] confirmed."  Because

14   there are triable issues of fact, summary judgment must be denied.  *See, e.g.*, *S.E.C. v. Phan*, 500 F.3d

15   895, 907 (9th Cir. 2007) (reversing summary judgment where the district court "refused to credit"

16   defendant's testimony about events at issue); *In re Volkswagen*, 2017 WL 6041723 at *6 ("the Court

17   DENIES partial summary judgment with respect to the falsity of the 31 investor-report statements"

18   because "a reasonable trier of fact could conclude that Plaintiffs have not met their burden of proving

19   that [the] statements were false"); *In re Sun Microsystems Sec. Litigation*, 1992 WL 226898, at *6

20   (N.D. Cal. July 10, 1992) (denying summary judgment and stating that question of falsity was for the

21   jury); *Marucci v. Overland Data, Inc.*, 1999 WL 1027053, at *1 (S.D. Cal. Aug. 2, 1999) (denying

22   summary judgment where "[m]aterial questions of fact existed concerning whether statements . . .

23   were misleading"); *Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *15 (C.D. Cal. Mar. 5, 2021)

24   (whether statements were misleading "raises questions of fact"); *S.E.C. v. Bankatlantic Bancorp, Inc.*,

25   

26          [6]  Plaintiff also makes a number of strawman arguments in an effort to muddy the waters.  For
     example, Plaintiff asserts that Mr. Musk did not discuss the $420 stock price with the PIF during their

27   July 31 meeting, that Mr. Musk never obtained a signed commitment from the PIF, and that there had
     been no discussion about structure or percentage ownership.  (Mot. at 6, 19, 21.)  But Mr. Musk *never*

28   *made any public representations on any of these issues.*

1    661 F. App'x 629, 637 (11th Cir. 2016) (where a defendant presents evidence demonstrating that a

2    factual dispute exists, "the court has an obligation to allow a jury or judge to resolve the parties'

3    differing versions of the truth *at trial*.") (internal citation omitted, emphasis added).

4          Not only must the jury decide factually whether "funding [was] secured," the jury must also

5    decide between the parties differing interpretations of what "funding secured" even means in this

6    context.  *See, e.g., Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, 2021 WL 5083756, at *7

7    (N.D. Ill. Nov. 2, 2021) (jury must decide disputed meaning of "unusual activity," as well as

8    application of facts to that definition); *Buxbaum v. Deutsche Bank AG*, 196 F. Supp. 2d 367, 373

9    (S.D.N.Y. 2002) (disagreement "as to the correct translation of 'Übernahmegespräche'" (i.e., whether

10   it meant preliminary merger talks or advanced stage discussions) raised an issue of material fact and

11   therefore "is not a basis for summary judgment."); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d

12   1202, 1223 (S.D. Cal. 2010) ("a jury must decide" whether the defendant's statement that its gross

13   profit margin was "consistent" with its business plan was true or false).[7]

14         The cases cited by Plaintiff, on the other hand, do not support granting summary judgment as

15   to falsity.  *Platforms*, 617 F.3d 1072, is the ***only case*** cited by Plaintiff in which a court granted

16   summary judgment on the issue of falsity.  (Mot at 18-19.)  In that case, the challenged press release

17   described a product with nine pages of detail, even though ***the product did not even exist and the***

18   ***defendants even lacked the funding to build a single prototype***.  617 F.3d at 1082, 94-95.  It was thus

19   undisputed that the press release was false, the defendants knew it, and the defendants had no

20   evidence to the contrary.  *Id.*

21         In *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005) (Mot. at

22   18), the defendants created an offering memorandum falsely stating that a corporation had *already*

23   *received* a $25 million investment.  *Id.* at 945.  The defendants and the corporation then used that

24   memorandum to solicit additional investors.  *Id.*  The court held only that the plaintiff's allegations

25   _____

26   [7]  In the motion, Plaintiff references the hearsay opinions of Egon Durban (Silver Lake) and Ryan
     Brinkman (J.P. Morgan) in an effort to establish a self-serving definition of what the term "secured"
27   means. (Mot. at 17.) First, neither Mr. Durban nor Mr. Brinkman was at the July 31 meeting between
     Mr. Musk and Mr. Al-Rumayyan, so they have no first-hand knowledge as to the PIF's commitment
28   to take Tesla private.  Second, their opinions cannot supplant the role of the jury.

were sufficient to survive *dismissal* (i.e., summary judgment was not at issue). *Id.* at 952.  In *S.E.C. v. Sourlis*, 851 F.3d 139 (2d Cir. 2016) (Mot. at 21), the defendant affirmatively represented that she "had spoken to the original note-holders." *Id.* at 145.  The defendant's statement was false because *"no original note-holders existed and indeed no notes existed." Id.* (emphasis added).[8]

These cases stand in stark contrast to the facts here, which demonstrate a sufficient basis for Mr. Musk's statements that "funding [was] secured" and "investor support [was] confirmed."

**B.    Plaintiff Ignores Material Facts Showing That Mr. Musk's Statement Regarding a "Shareholder Vote" Was Not Misleading.**

On August 7, 2018, Mr. Musk tweeted, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." (Ex. 13.)  This tweet was truthful, but Plaintiff argues that it was false because "there were also numerous contingencies to the transaction before even getting to a shareholder vote." (Mot. at 22.)  However, Mr. Musk publicly disclosed these other "contingencies" and clarified that Tesla was still considering the transaction.

Specifically, Mr. Musk linked a Tesla blog post to his August  7 tweet, which stated clearly that he was "*considering* taking Tesla private," "a final decision ha[d] not yet been made," and "[t]his proposal to go private would ultimately *be finalized* through a vote of [Tesla's] shareholders." (Ex. 12 (emphasis added).)  Mr. Musk then posted additional details regarding the various actions that would need to be completed, including "a final proposal," "an appropriate evaluation process" by Tesla's special committee, "required regulatory approvals," and ultimately "the plan [to] be presented to Tesla shareholders for a vote." (Ex. 53.[9])  Additionally, Tesla's stock price closed *up* from the prior day's

---

[8]  Plaintiff cites two cases in support of his argument that the Court should consider the opinions of analysts in defining "funding secured." (Mot. at 19.)  However, in *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), the court did not "rely[] on analyst statements when determining cause of stock price movement," as Plaintiff suggests. (Mot. at 19.)  Instead, the court held simply that the plaintiff's arguments were sufficient to withstand *dismissal on the pleadings. Id.* at 933, 936, 946.  Plaintiff asserts that in *U.S. v. Ferguson*, 676 F.3d 260 (2d Cir. 2011), the court "plac[ed] 'substantial' weight on 'stock analysts' when evaluating [the allegedly false] statement." (Mot. at 19.)  That is false, as the Court was evaluating materiality, not falsity, and the Court said nothing about the weight of the stock analyst evidence. *Id.* at 274.

[9]  The Court previously acknowledged Mr. Musk's disclosure of this additional information: "Mr. Musk then proceeds to identify significant hurdles that stand in the way of finalizing the transaction—

---

1   close (increasing from $355.49 to $356.41) after Mr. Musk disclosed these additional "contingencies"

2   concerning the potential go-private transaction (Ex. I), so Plaintiff cannot argue that (1) stockholders

3   were harmed by Mr. Musk's initial tweet, or that (2) stockholders viewed Mr. Musk's additional

4   disclosure of information as material.  Plaintiff's motion ignores these facts.[10]  "The key question in

5   considering the misleading nature of a statement is whether defendants' representations, *taken*

6   *together and in context*, would have misle[d] a reasonable investor, not whether it is susceptible to any

7   interpretation that could generate misleading impressions *when read in isolation*."  *In re Skechers*

8   *USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (emphasis added, citation omitted).

9   Given the numerous factual disputes and the full context, Plaintiff cannot possibly meet this burden.

10           **C.      Plaintiff's New Argument that Discussions with the PIF Had Ended as of August**

11                   **13, 2018 is Baseless.**

12           On August 13, 2018, Mr. Musk posted on Tesla's blog that, "[f]ollowing the August 7th

13   announcement [i.e., his initial tweet], [he] continued to communicate with the Managing Director of

14   [the PIF].  He has expressed support for proceeding subject to financial and other due diligence and

15   their internal review process for obtaining approvals.  He has also asked for additional details on how

16   the company would be taken private, including any required percentages and any regulatory

17   requirements."[11]  (Ex. 53.)  Everything Mr. Musk wrote is indisputably true.  (*See* Ex. 121 at 8-13

18   (post August 7 communications between Mr. Musk and Mr. Al-Rumayyan).)  Plaintiff argues *only*

19   that in the blog post, Mr. Musk did not disclose that "he had sought to end all negotiations with the

20   Saudi PIF." (Mot. at 23.)  Plaintiff's argument is nothing more than misdirection, and these issues are

21   "for the trier of fact."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *see also Davis*,

22

23   namely, 'financial and other due diligence' and an 'internal review process' among other conditions."
     *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 925 (N.D. Cal. 2020).

24           [10]  Mr. Musk's testimony that he believed there was "probably [a] roughly 50 percent" chance that
25   the transaction would occur (Mot. at 22) is consistent with his public statements, where he indicated
     that the transaction was contingent on a shareholder vote, a final proposal, and regulatory compliance.
26   While Musk was confident in his *desire* to take Tesla private and he had the *funding* to do so, these
     contingencies made the transaction 50% likely in Mr. Musk's mind.  (Ex. B at 257:19-260:15.)

27           [11]  In his Complaint and addendum thereto (ECF Nos. 184, 224), Plaintiff does not allege that this
28   statement was false or misleading.  Accordingly, it is not properly the subject of summary judgment.

1   2021 WL 4923359 at *13; *Phan*, 500 F.3d at 908.

2   *First*, Plaintiff misstates the facts, as Mr. Musk and Mr. Al-Rumayyan did not "end all

3   negotiations." (Mot. at 23.) Rather, on August 12, 2018, Mr. Musk texted Mr. Al-Rumayyan and

4   expressed disappointment that the PIF's public statements regarding the go-private transaction were

5   inconsistent with what Mr. Al-Rumayyan had represented to Mr. Musk during their July 31, 2018 in-

6   person meeting. (Ex. 121 at 10.) Mr. Musk texted Mr. Al-Rumayyan that "there will be no further

7   communication **unless** you fix the public perception of wishy washy support and interest from PIF.

8   *That is not what you said to me and my team privately*." (*Id.* at 12 (emphasis added).) In response,

9   Mr. Al-Rumayyan agreed to "work on [a] PIF statement" so that the PIF and Tesla could **continue**

10  negotiations, not "end all negotiations," as Plaintiff incorrectly suggests. (*Id.*)

11  *Second*, even though Mr. Musk suggested that he might no longer communicate with Mr. Al-

12  Rumayyan unless he rectified the PIF's public statements, that was not material to shareholders.

13  Omitted information is actionable only if it is material. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32

14  (1988) ("to fulfill the materiality requirement there must be a substantial likelihood that the disclosure

15  of the omitted fact would have been viewed by the reasonable investor as having significantly altered

16  the total mix of information made available") (citation and quotation omitted). Mr. Musk's text to Mr.

17  Al-Rumayyan is not material because (1) Mr. Al-Rumayyan *agreed* to fix the incorrect public

18  perception, and (2) Tesla already had more than enough support to take Tesla private *without the PIF*,

19  so the PIF's support was not necessary. (Ex. B at 217:4-15; Ex. E at 242:1-243:20.)

20  *Third*, the securities laws "prohibit *only* misleading and untrue statements, not statements that

21  are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in

22  original). "No matter how detailed and accurate disclosure statements are, there are likely to be

23  additional details that could have been disclosed but were not." *Id.* The securities laws "do not create

24  an affirmative duty to disclose any and all material information. Disclosure is required . . . only when

25  necessary 'to make . . . statements made, in the light of the circumstances under which they were

26  made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Here, that Mr.

27  Musk was disappointed with the PIF's public statements and demanded that they rectify them is

28  entirely consistent with his disclosure that he continued to communicate with the PIF.

1   **II.      <u>SUMMARY JUDGMENT SHOULD BE DENIED AS TO SCIENTER.</u>**

2      **A.      <u>Scienter is a Question for the Jury.</u>**

3          Countless courts—including this Court—have held that "[g]enerally, scienter should not be

4   resolved by summary judgment" and have denied summary judgment on that basis.  *Davis*, 2021 WL

5   4923359 at \*13 (Chen, J.) (denying summary judgment where "there is a genuine issue of material

6   fact as to whether Defendants made false or misleading statements, with scienter"); *Howard*, 228 F.3d

7   at 1060; *In re Volkswagen*, 2017 WL 6041723 at \*12 ("Court DENIES Plaintiffs' motion for partial

8   summary judgment on the issue of scienter" "because material issues of fact remain"); *Jasper*, 2009

9   WL 10701938 at \*3 (denying summary judgment and stating, "[a]lthough the SEC may ultimately

10  prove scienter with circumstantial evidence, the conflicting evidence here does not allow for a finding

11  that as a matter of law, Defendant possessed the requisite mental state to establish a securities fraud

12  claim"); *In re Twitter*, 2020 WL 4187915 at \*12 (denying summary judgment where "a genuine

13  dispute exists as to whether Defendants acted with scienter in making the challenged statements").

14         As this Court noted, summary judgment is typically improper in such cases because

15  "[m]ateriality and scienter are both fact-specific issues which should ordinarily be left to the trier of

16  fact."  *Davis*, 2021 WL 4923359 at \*13 (Chen, J.) (citation omitted); *Vucinich v. Paine, Webber,*

17  *Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (reversing summary judgment where "the

18  facts before the court were sufficient to raise factual questions as to defendant's state of mind"); *In re*

19  *Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

20         **B.      <u>There Is Ample Evidence that Mr. Musk Believed His Statements Were True.</u>**

21         To prevail on his motion, Plaintiff must show—as a matter of law—that Mr. Musk either

22  *intended* to "deceive, manipulate, or defraud" the public, or his behavior was a "reckless" and

23  "extreme departure from the standards of ordinary care" that goes beyond "even inexcusable

24  negligence."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *Howard*, 228 F.3d at 1063.

25         Mr. Musk has presented numerous facts, including facts proving his state of mind at the time,

26  that demonstrate he had no such intent.  Among other things, (1) on August 2, 2018, Mr. Musk

27  emailed Tesla's Board regarding an "offer to take Tesla private at $420 [per share]" (Ex. 81); (2) on

28  August 3, Mr. Musk attended a board meeting and explained that the PIF was willing to fund the

transaction (Ex. B at 205:11-25, 206:6-23); (3) Mr. Musk then reached out to financial and legal advisors about the transaction (*id.* at 161:13-21, 162:7-11, 167:5-12, 175:8-25); and (4) Mr. Musk had private communications with Mr. Al-Rumayyan wherein Mr. Musk confirmed his intent to take Tesla private as well as his understanding that funding was secured through the PIF (Ex. 121 at 8-13).

These facts demonstrate beyond a shadow of a doubt that Mr. Musk reasonably believed funding was secured, reasonably believed his public disclosures were accurate, and that Mr. Musk had the genuine desire to take Tesla private. Plaintiff may disagree with Mr. Musk's beliefs and conclusions, which only underscores that these issues must go to the jury. *Vucinich*, 739 F.2d at 1436 (reversing summary judgment in action alleging securities fraud and noting that motion can be denied where "the defendant presents affidavits or other evidence establishing a lack of scienter"); *Davis*, 2021 WL 4923359 at *13 (Chen, J.) (denying summary judgment due to disputed material facts); *In re Volkswagen*, 2017 WL 6041723 at *12 (N.D. Cal. Dec. 6, 2017); *Jasper*, 2009 WL 10701938 at *3; *In re Twitter*, 2020 WL 4187915 at *12; *Washtenaw*, 2021 WL 5083756 at *7; *Buxbaum*, 196 F. Supp. 2d at 377.[12] To the extent Plaintiff's theory is that Mr. Musk revealed new and negative information to investors regarding the status of funding through the August 13, 2018 blog post (Ex. 16), that further undermines scienter for the August 7 tweets. *See, e.g.*, *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *23 (N.D. Cal. Aug. 7, 2019) (defendant's disclosure of additional information "on the very topics they supposedly concealed undermines an inference of a deliberate omission").

## III. SUMMARY JUDGMENT SHOULD BE DENIED AS TO RELIANCE.

To prevail on his Section 10(b) claims, Plaintiff must prove that he relied upon Defendants' alleged misrepresentations. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263

---

[12] Plaintiff argues that "[a] defendant cannot defeat a fraud claim merely by asserting that he believed the statements were true." (Mot. at 19.) But Mr. Musk does not simply state that he "believed" his statements were true. Rather, Mr. Musk has put forth *evidence* showing that Mr. Al-Rumayyan represented that funding was secured, as well as contemporaneous evidence that Mr. Musk believed it. *See Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 n.11 (9th Cir. 2010) (rejecting argument that defendants' statements "are so false that defendants must have known they were false and must have intended to mislead the public" where defendants "submitted sworn declarations testifying that they believed in good faith that their statements were true") (quotation omitted). Summary judgment is improper where the parties disagree as to the interpretation of the evidence, as the evidence must be viewed "in the light most favorable to the nonmoving party." *Phan*, 500 F.3d at 901.

(2014).  Plaintiff has not put forward any evidence of direct reliance.  Instead, Plaintiff seeks to invoke the *rebuttable* fraud-on-the-market presumption.  (Mot. at 24.)  The fraud-on-the-market presumption is based on the theory that an "investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."  *Halliburton*, 573 U.S. at 268.  Therefore, if an allegedly material fraudulent misrepresentation impacted the market price of the security, an investor can be presumed to have relied on the purportedly material misrepresentation.  *Id.*

As Plaintiff concedes, to invoke the fraud-on-the-market presumption, a plaintiff must prove by a preponderance of the evidence that "(1) the alleged misrepresentations were publicly known, (2) ***they were material***, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed."  (Mot. at 24 (emphasis added).)  Even where Plaintiff proves these requirements, a defendant can rebut the presumption through "***[a]ny showing*** that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff."  *Halliburton*, 573 U.S. at 269 (emphasis added).

Here, Plaintiff is not entitled to summary judgment on the element of reliance for at least two independent reasons.  *First*, there is a genuine dispute of material fact regarding at least one of the requirements necessary to invoke the fraud-on-the-market presumption: materiality.  *Second*, even if there were no dispute the presumption could be invoked, there is a genuine dispute of material fact regarding whether Defendants can rebut that presumption by, among other things, demonstrating that when the purported "truth" was revealed, there was no price impact.

### A.    There is a Genuine Dispute of Fact Regarding Materiality.

There is no dispute that Plaintiff must prove materiality to invoke the fraud-on-the-market presumption for purposes of proving reliance.  There also does not appear to be any dispute that questions regarding materiality "are peculiarly ones for the trier of fact."  *Durning*, 815 F.2d at 1268 (quotation omitted).  Indeed, Plaintiff's own authorities say as much.  (*See* Mot. at 25 (citing *McCrary v. Elations Co. LLC*, 2014 WL 12561600, at *12 (C.D. Cal. Dec. 8, 2014) ("Materiality is generally a question for the jury") (internal quotation marks omitted)).)  Plaintiff's own expert likewise concedes that "Materiality . . . is a fact question to be answered at trial."  (Ex. L at ¶ 47.)  Despite this uphill battle, Plaintiff spends all of ***two*** sentences—citing six paragraphs in an expert report—to support its

claim that there are no genuine disputes of fact regarding whether the purportedly false portion of Mr. Musk's tweet, "funding secured," was material.  (Mot. at 24 (citing Hartzmark Class Cert. Report, ECF No. 291-1 at ¶¶ 71.76).)[13]  Those cited paragraphs say nothing more than that there was a stock movement following Mr. Musk's allegedly false tweet.  But as a matter of law, a stock price movement alone is insufficient to prove materiality.  *See, e.g.*, *In re Allied Cap. Corp. Sec. Litig.*, 2003 WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003).

Moreover, inferring materiality from stock movements in this case would be particularly inappropriate since there is no dispute that Mr. Musk's tweet also contained the undisputedly true disclosure that Mr. Musk was considering taking Tesla private.  The jury is entitled to conclude that Tesla's stock price increase—which is the evidence Plaintiff relies upon to prove materiality to invoke the presumption—was not attributable to the allegedly false portion of Mr. Musk's tweet.  This is particularly true where, as noted above, there is a dispute regarding what a reasonable investor would understand Mr. Musk's allegedly false statements to mean.  Therefore, the jury will be required to determine what "funding secured" even meant, and that determination will obviously impact the jury's determination of the materiality of the statement (and the allegedly undisclosed information).

Notably, the evidence actually supports the conclusion that—whatever the market believed the statement meant—it was the indisputably true portion of Mr. Musk's tweet that the market deemed material rather than the allegedly false information.  For example, on August 13, 2018, Mr. Musk provided further detail regarding the proposed transaction.  Plaintiff's expert cites public news articles that claimed that "Musk's definition of 'funding secured' appears to be, to assess it charitably, a stretch." (Ex. L at ¶ 104.)  Similarly, a public sell-side analyst from Barclays noted that Mr. Musk's August 13, 2018 blog post "made it clear that the funding was in its very early stages." (Ex. M.)  Yet, despite the purported revelation that funding was far different than Plaintiff's theory of what the market understood "funding secured" to mean, Tesla's stock did not decline in a statistically significant manner.  (Ex. L at ¶¶ 100-108.)  In fact, Plaintiff's own expert determined that Tesla's

---

[13]  Because Plaintiff does not even attempt to produce evidence regarding the purported materiality of any of the other alleged misstatements—another basis to deny summary judgment— Defendants respond solely to the materiality allegations regarding "funding secured."

1    stock *increased* by .95% after controlling for market and industry factors.  (*Id.*)

2            Thus, the jury is entitled to conclude that the lack of *any decline* following these purported

3    revelations regarding the meaning of "funding secured" proves that the "funding secured" portion of

4    Mr. Musk's tweet was immaterial.  *Teamster*, 320 F.3d at 949 ("[T]he static or dynamic nature of

5    a stock price after the disclosure of previously withheld information is strong evidence of how

6    reasonable investors view the significance of the information.") (Tallman, J., dissenting); *Oran v.*

7    *Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[I]f a company's disclosure of information has no effect

8    on stock prices, 'it follows that the information disclosed . . . was immaterial as a matter of law.'")

9    (Alito, J.) (citation omitted).  Accordingly, because there is a genuine issue of dispute regarding the

10   materiality of the allegedly false information, there is a genuine issue of dispute regarding whether the

11   fraud-on-the-market presumption can be invoked and whether reliance can be established.  *Hsingching*

12   *Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at *4-5 (C.D. Cal. Oct. 5, 2018) (denying

13   summary judgment on reliance through fraud-on-the-market presumption where material disputes

14   regarding materiality).[14]

15        **B.**      **There is a Genuine Dispute of Fact Regarding Defendants' Ability to Rebut Any**

16                **Fraud-On-The-Market Presumption.**

17           Even assuming Plaintiff had established all of the necessary requirements to invoke the fraud-

18

19           [14]   Plaintiff's authorities are not to the contrary.  In the sole case in which a court granted a
20   plaintiff summary judgment on the issue of reliance, *In re Celestica Inc. Sec. Litig.*, 2014 WL
     4160216 (S.D.N.Y. Aug. 20, 2014), "Defendants opposed Plaintiffs' motion [solely] on the basis that
21   the Supreme Court's decision in *Halliburton . . .* , might overrule *Basic* and change the law regarding
     the fraud on the market presumption," which did not occur.  *Id.* at *5 n.3.  They did not oppose the
22   motion on the basis that the allegedly false information was immaterial, as Defendants do here.  In
     *Kaplan v. Rose*, 49 F.3d 1363, 1378 (9th Cir. 1994), *abrogated on other grounds by City of Dearborn*
23   *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017), the court
     partially affirmed *defendants'* motion for summary judgment on the *inapplicability* of the fraud-on-
24   the-market presumption and overturned in part noting that "claims based on fraud on the market
     theory are fact-specific and generally for the trier of fact to decide."  Similarly, in *McCrary*, 2014 WL
25   12561600 at *12, the court *denied* plaintiff's request for summary judgment on the issue of reliance
     precisely because the presumption of reliance under the relevant law in that case, like this one,
26   required proof of materiality, which "is generally a question of fact for the jury." (quotation omitted).
     Finally, in *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386 (N.D. Cal. 2009) did not even involve
27   a summary judgment motion on the issue of reliance.

28

1    on-the-market presumption—he has not—that would still be insufficient to grant summary judgment

2    on the issue of reliance since the presumption is *rebuttable*.   Although Plaintiff claims that

3    "Defendants did not contest any of Dr. Hartzmark's findings or Plaintiff's contention that Tesla's

4    stock traded in an efficient market" (Mot. at 24), Plaintiff overlooks that Defendants can also rebut the

5    presumption if the "'market makers' were privy to the truth" about information allegedly concealed,

6    or second, if "news of [the allegedly concealed truth] credibly entered the market and dissipated the

7    effects of the misstatement."  *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 606 (7th Cir. 2020)

8    (citation omitted).   "Under the first option, the defense shows that only true information was

9    impounded in the market price at the time of purchase; the second option does the same by the time of

10   sale."  *Id.*  Here, there are genuine issues of fact with respect to both defenses.

11       First, Defendants' expert put forward evidence that the market understood from the beginning

12   that the entire proposal and source of funding was uncertain.  (Ex. N at ¶¶ 15-22.)  Thus, there is

13   sufficient evidence from which the jury can infer that market understood that funding secured did not

14   mean that there was some sort of signed term sheet or formal agreement regarding funding.

15       Second, as noted above, following Mr. Musk's August 13 blog post, Tesla's stock did not

16   decline.  Thus, the jury is entitled to infer that either the original statement was immaterial to begin

17   with—in which case the presumption does not apply—or that by virtue of, among other things the

18   evidence detailed in the Fischel Report, the market understood the truth regarding the meaning of

19   "funding secured" prior to the August 13 blog post—in which case the presumption is also rebutted.

20   Either way, as the Supreme Court has recognized, these defenses should be heard at trial.  *Basic*, 485

21   U.S. at 249 & n. 29 (proof that information "credibly entered the market and dissipated the effects of

22   the misstatements" "is a matter for trial.").   Accordingly, Plaintiff's request for summary judgment

23   with respect to the element of reliance should be denied.[15]

24

25       [15]   Plaintiff's Motion is defective on other grounds as well.  First, Plaintiff seeks summary
26   judgment against both Tesla and Mr. Musk, but Plaintiff failed to include any evidence that Tesla had
     "ultimate authority over [Mr. Musk's] statement [concerning going private], including its content and
27   whether and how to communicate it."  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S.
     135, 142 (2011).  On this basis alone Plaintiff's Motion must be denied as to Tesla.  Second, while the
28   Motion purports to be against Tesla's board members (as well as Tesla and Mr. Musk), the relief

1

## **CONCLUSION**

2      For the foregoing reasons, Defendants respectfully request that the Court deny in its entirety

3  Plaintiff's Motion for Partial Summary Judgment.

4

5  DATED:  February 1, 2022              Respectfully submitted,

6                                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

7
                                     By: */s/ Alex Spiro*
8                                        Alex Spiro *(appearing pro hac vice)*
                                         *Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,*
9                                        *Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,*
                                         *James Murdoch, Kimbal Musk, And Linda Johnson Rice*
10

11

12

13                                   **ATTESTATION**

14      I, Kyle K. Batter, am the ECF user whose ID and password are being used to file the above

15  document.  In compliance with Local Rule 5-1(h)(3), I hereby attest that Alex Spiro has concurred

16  in the filing of the above document.

17                                        */s/ Kyle K. Batter*

18                                        Kyle K. Batter

19

20

21

22

23

24

25

26

27
_____
28  sought is limited to the claims against Tesla and Mr. Musk.  (Notice of Motion.)  The director
defendants have no place in Plaintiff's Motion.