1

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
    amccall@zlk.com

2

3

4

5

6

*Attorneys for Plaintiff and Counsel for the Class*

7

[Additional Counsel on Signature Block]

8

9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10

11

IN RE TESLA, INC. SECURITIES
LITIGATION

Case No. 3:18-cv-04865-EMC

12

**PLAINTIFF'S NOTICE OF MOTION
AND MOTION FOR PARTIAL
SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT**

13

14

15

**ORAL ARGUMENT REQUESTED**

16

Date: March 10, 2022
Time: 1:30 p.m.
Location: Courtroom 5, 17th Floor
Judge: Hon. Edward Chen

17

18

19

20

21

22

23

**\*\*\*FILED UNDER SEAL\*\*\***

24

25

26

27

28

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ................ 1

ISSUES TO BE DECIDED ................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

INTRODUCTION .......................................................................................................... 2

STATEMENT OF UNDISPUTED FACTS ................................................................... 6

    A.    Tesla Background. ............................................................................... 6

    B.    July 31, 2018 Meeting with the Saudi Arabia Public Investment Fund. ............... 6

    C.    "Offer to Take Tesla Private at $420." ................................................. 7

    D.    August 7, 2018 Statements. ................................................................ 10

    E.    The Public's Response to Musk's Tweets. ......................................... 12

    F.    Musk's Attempts to Secure Funding and Confirm Investor Support. ................ 13

    G.    Musk Announces the Withdrawal of the Going-Private Transaction. ............... 15

LEGAL STANDARD ................................................................................................... 16

ARGUMENT ................................................................................................................ 17

    A.    Plaintiff Is Entitled to Summary Judgment as to the Elements of Falsity and Scienter. ........................................................................................................ 17

        1.    "Am considering taking Tesla private at $420. Funding secured." ............... 17

        2.    "Investor support is confirmed." ................................................ 21

        3.    "Only reason why this is not certain is that it's contingent on a shareholder vote." ........................................................................................ 22

        4.    "I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements." ............................................................................... 23

    B.    Plaintiff Is Entitled to Summary Judgment as to the Element of Reliance. ........ 24

CONCLUSION ............................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Cases**

*In re Apple Sec. Litig.*,
3     No. 19-cv-02033-YGR, 2020 U.S. Dist. LEXIS 206298 (N.D. Cal. Nov. 4, 2020)...............22

4  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
      568 U.S. 455 (2013) .................................................................................................................23

5
   *Anderson v. Liberty Lobby, Inc.*,
6     477 U.S. 242 (1986) .................................................................................................................16

7  *Berson v. Applied Signal Tech., Inc.*,
      527 F.3d 982 (9th Cir. 2008) ...................................................................................................17

8  *In re Celestica Inc. Sec. Litig.*,
9     No. 07 Civ. 0312 (GBD), 2014 U.S. Dist. LEXIS 116562 (S.D.N.Y. Aug. 20, 2014) ..........24

10 *Erica P. John Fund, Inc. v. Halliburton Co.*,
      563 U.S. 804 (2011) .................................................................................................................23

11 *Halliburton Co. v. Erica P. John Fund, Inc.*,
      573 U.S. 258 (2014) .................................................................................................................23

12
   *In re Infineon Techs. AG Sec. Litig.*,
13    266 F.R.D. 386 (N.D. Cal. 2009) .............................................................................................24

14 *Kaplan v. Rose*,
      49 F.3d 1363 (9th Cir. 1994).....................................................................................................23

15 *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
      416 F.3d 940 (9th Cir. 2005).....................................................................................................17
16
   *McCrary v. Elations Co. LLC*,
17    No. EDCV 13-0242 JGB (SPx), 2014 U.S. Dist. LEXIS 190468 (C.D. Cal. Dec. 8, 2014) ...24

18 *S.E.C. v. Platforms Wireless Int'l Corp.*,
      617 F.3d 1072 (9th Cir. 2010)............................................................................................passim
19
   *S.E.C. v. Sourlis*,
20    851 F.3d 139 (2d Cir. 2016)......................................................................................................20

21 *In re Tesla, Inc. Securities Litig.*,
      477 F. Supp. 3d 903 (N.D. Cal. 2020) .............................................................................. 2, 17

22 **Rules**

23 FED. R. CIV. P. 56 ..........................................................................................................16, 25

   **Regulations**
24 17 C.F.R §240.10b-5 ................................................................................................................22

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on March 10, 2022 at 1:30 p.m., or as soon thereafter as this matter may be heard, in Courtroom 5 – 17th Floor of the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Plaintiff Glen Littleton, by his counsel, will move, and hereby does move, to enter partial summary judgment in favor of Plaintiff and against Defendants Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice ("Defendants") pursuant to Federal Rule of Civil Procedure 56.

PLEASE TAKE FURTHER NOTICE that Plaintiff seeks partial summary judgment against Defendants on the following elements of his alleged violations of Securities Exchange Act §10(b), 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5: (1) material misrepresentations or omissions; (2) scienter; and (3) reliance upon the misrepresentations or omissions.

PLEASE TAKE FURTHER NOTICE that this motion is based on the Memorandum of Points and Authorities below, the Declaration of Adam M. Apton and the exhibits attached thereto, the arguments of counsel, and any other matters properly before this Court. Pursuant to Paragraph 11 of the Court's Civil Standing Order – General, Plaintiff also submits herewith a proposed order.

**ISSUES TO BE DECIDED**

1.      Should the Court grant partial summary judgment in Plaintiff's favor against Defendants where the record indisputably shows that Elon Musk falsely represented with scienter "Funding secured," "Investor support is confirmed," and "Only reason why this is not certain is that it's contingent on a shareholder vote" on August 7, 2018 and made materially misleading statements with scienter in his blog post on August 13, 2018?

2.      Should the Court grant partial summary judgment in Plaintiff's favor against Defendants on the element of "reliance" where the record indisputably shows that Plaintiff has established the presumption of reliance set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

1    and this presumption has not, and cannot, be rebutted?

2                    **MEMORANDUM OF POINTS AND AUTHORITIES**

3                                      **INTRODUCTION**

4          On August 7, 2018, at 9:48 a.m. PDT, Elon Musk ("Musk"), Chairman and Chief

5    Executive Officer of Tesla, Inc., shocked its investors and the public by announcing through his

6    Twitter account: "Am considering taking Tesla private at $420. Funding secured." No one

7    expected this announcement, including Tesla's Board of Directors and its management who

8    instantly scrambled to respond to media and investor inquiries. Tesla's stock price immediately

9    rocketed upwards leading to a temporary suspension of its trading by NASDAQ. Musk followed

10   up his earlier tweet by tweeting at 12:36 p.m. PDT: "Investor support is confirmed. Only reason

11   why this is not certain is that its contingent on a shareholder vote." Tesla's stock continued its

12   rise, closing on August 7, 2018 at $379.57 per share, 6.36% higher than its price at 9:47 a.m. PDT

13   immediately before Musk's tweets. As this Court noted in its opinion denying Defendants' motion

14   to dismiss the complaint: "The statement could be read by a reasonable investor to mean complete

15   funding for the transaction was unconditionally secured" and "as something more than a

16   speculative amorphous opinion about future possibilities" but instead "implying a more concrete

17   state of affair." *In re Tesla, Inc. Securities Litig.*, 477 F. Supp. 3d 903, 922-25 (N.D. Cal. 2020).

18         Musk's tweets created a frenzy of media and investor attention on Tesla and his proposal.

19   In the following ten days, over 2400 articles were published concerning it. After providing a

20   further "update" on August 13, 2018 that continued to omit key information regarding the

21   proposed transaction's structure, funding, and level of investor support, Musk sat for an interview

22   with the *New York Times*, published on August 16, 2018, which revealed that funding was not

23   secured, investor support was far from confirmed, and the basic feasibility of the transaction was

24   still uncertain. Tesla's stock price plummeted and analysts quickly discounted completely the

25   likelihood of any going private transaction. On August 23, 2018, Musk informed Tesla's Board

26   that he was no longer pursuing the transaction, just 16 days after his tweet that the only remaining

27   step to finalizing the transaction was a shareholder vote.

28

The evidence shows that Musk's August 7, 2018 tweets were false at the time they were made. Specifically, the undisputed facts, based almost exclusively on testimony and documents from Musk and other members of Tesla management are:

**1. Funding was not secured on August 7, 2018.** Musk had one 30-minute conversation about potentially taking Tesla private with the Saudi Arabia Public Investment Fund ("Saudi PIF") on July 31, 2018. No price was discussed, no structure for the transaction was proposed, no amount of funding was agreed. There was no legally binding agreement and no recourse to Musk or Tesla if the Saudi PIF backed out. The Saudi PIF representatives left the meeting expecting further information about a potential transaction. Musk and Tesla never provided this additional information and never intended to use the Saudi PIF to fund more than 25% of any going private transaction. Following the tweet, Musk and his financial advisors spent two weeks developing a plan to obtain funding from numerous sources. This plan would have been completely unnecessary if funding was "secured" on August 7, 2018.

**2. Investor support was not confirmed by August 7, 2018.** Musk had not discussed taking Tesla private at $420 per share with any outside Tesla investor prior to his tweets on August 7, 2018.  Under no circumstance could investor support have been confirmed when Musk had not communicated even the potential of a going private transaction to outside investors, aside from the Saudi PIF. Only after his tweet did Musk begin discussing the going private transaction with investors and he discovered that most opposed rather than supported it.

**3. A shareholder vote was not the only contingency for the proposed transaction.** Tesla going private would be one of the largest corporate transactions in American history. In addition to a shareholder vote, it would require extensive deliberation by Tesla's Board, independent legal and financial advice, negotiation of comprehensive legal documentation, and extensive regulatory approval. By August 7, 2018, none of this had happened. Musk had merely started discussions with Tesla's Board by email on August 2, 2018 and at a meeting held on August 3, 2018 but the Board did not have a formal proposal to evaluate, let alone something that could be presented for a shareholder vote. Neither Musk nor the Board had retained legal or

1   financial advisors and the proposed structure of any going private transaction was still

2   undetermined.

3       These undisputed facts show that the statements made by Musk in his August 7, 2018

4   tweets were false when made. The immediate market reaction as well as the intense media and

5   investor scrutiny over the ensuing ten days, allows no dispute over their materiality. Finally, there

6   is no dispute that Musk knew every fact that rendered his statements untrue: he was present at the

7   July 31, 2018 conversation with the Saudi PIF and knew there was no funding secured; he knew

8   he had not discussed taking Tesla private at $420 per share with any outside Tesla investor and,

9   accordingly, investor support could not possibly be confirmed; and he knew that Tesla going

10  private was contingent on much more than a shareholder vote. Yet on August 7, 2018, he

11  nevertheless made these tweets to his then over 22 million followers.

12      Musk has stated that the August 7, 2018 tweets were not misleading or fraudulent because

13  he subjectively believed they accurately represented his thinking at the time they were made. But

14  this subjective belief is legally insufficient to avoid liability under Rule 10b-5.  If Musk's

15  subjective belief were sufficient, there could be never be liability for making a false statement

16  absent a complete confession of guilt. The law imposes an objective standard for assessing falsity

17  and holds defendants liable when they know the facts that render their statements objectively

18  false. Objectively, Musk knew his statements here were false.

19      Similarly, the August 13, 2018 blog post authorized by Musk and published by Tesla

20  purportedly giving an update on the proposed going private transaction omitted material

21  information about it. It represented that discussions with the Saudi PIF were continuing and

22  consensual whereas Musk had numerous arguments with its principal and just the day before had

23  sought to cut them out from the deal entirely. Further, at the time of the blog post, the structure

24  of the proposed transaction was still uncertain, the amount of funding needed was still unknown,

25  and Musk was still assembling his team of legal and financial advisors. Discussions with investors

26  had commenced, but support was lukewarm and still far from confirmed. These critical facts were

27  omitted from the blog post which continued to present certainty that the transaction would

28

1    proceed. Once again, Musk was in full possession of the contradictory and omitted facts but chose

2    not to disclose them.

3         Finally, Plaintiff is entitled to summary judgment on the element of reliance. Plaintiff

4    invokes the fraud-on-the-market doctrine to create a presumption of reliance by every class

5    member on the public statements alleged to be misleading in this case. Under binding Supreme

6    Court precedent, reliance is presumed on material public statements made regarding a security

7    that trades in an efficient market. Tesla's securities are some of the most highly traded on the

8    NASDAQ and Tesla is one of the most closely followed companies in the world. If there were

9    any doubt regarding the efficiency of the market for its securities, Plaintiff's expert, Dr. Michael

10   Hartzmark, conducted a detailed analysis of the trading in Tesla securities during the class period

11   and concluded they traded in an efficient market. Defendants have offered no testimony or

12   evidence, expert or otherwise, to the contrary. Accordingly, Plaintiff is entitled to summary

13   judgment on this element of his claim.

14        From August 7, 2018 to August 17, 2018, Musk's tweets that he had a fully funded

15   proposal to take Tesla private at $420 per share with confirmed investor support roiled the market

16   for Tesla stock and other securities. No part of this unconventional announcement was true: Musk

17   had not secured funding to take Tesla private at $420 per share nor confirmed investor support.

18   Furthermore, Musk knew that, as of August 7, 2018 when he impulsively tweeted to over 22

19   million followers, his going private proposal was little more than a preliminary, half-baked

20   concept. When the truth about the haphazard and misleading nature of the statements was

21   revealed, Tesla's investors lost billions of dollars. Based on the evidentiary record in this case, no

22   reasonable juror could conclude that the August 7 and August 13, 2018 statements were *not*

23   materially false and misleading, that Musk did *not* make those statements with scienter, and that

24   class members did *not* rely on those statements. Partial summary judgment should be entered in

25   Plaintiff's favor.

26

27

28

**STATEMENT OF UNDISPUTED FACTS**

**A.     Tesla Background.**

In July 2018, Tesla was a NASDAQ-listed company with approximately $50 billion in market capitalization.[1] Musk served as its Chairman and Chief Executive Officer.[2] Its Board of Directors consisted of Defendants Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice.[3] On July 31, 2018, Tesla's stock price closed at $298.14.[4]

**B.     July 31, 2018 Meeting with the Saudi Arabia Public Investment Fund.**

On July 31, 2018, Musk met with the Saudi PIF at the Tesla Fremont Factory.[5] Musk's Executive Assistant, Sam Teller, also attended the meeting and Tesla's Chief Financial Officer, Deepak Ahuja, attended for the last ten minutes; no one else from or on behalf of Tesla was present.[6] On behalf of the Saudi PIF, Yasir Al-Rumayyan, Saad Al Jarboa, and Naif Al-Mogren attended.[7] Al-Mogren took contemporaneous notes of the meeting.[8] The meeting lasted approximately 30 minutes. During the meeting, Al-Rumayyan expressed support for Tesla and said he "would like to listen more about [Musk's] plan to take it private."[9] As Al-Rumayyan described the meeting in subsequent texts sent to Musk on August 11 and 12: "We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia . . . . Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction" and "the agreement as was minuted by my people is to wait for the information to be sent be [sic] you within a week, on how we will

---

[1] M. Hartzmark Dep. at 34:8-36:15; *see also* Hartzmark Report (ECF No. 291-1) at ¶51 & Appendix C; Defendants' Answer to Consolidated Complaint for Securities Fraud ("Answer") (ECF No. 264) at ¶16.
[2] Answer at ¶17.
[3] *Id*. at ¶¶ 20-26.
[4] Hartzmark Report (ECF No. 291-1) at Appendix C.
[5] E. Musk Dep. at 89:19-24, 99:7-14; E. Musk SEC Tr. at 143:10-13.
[6] E. Musk Dep. at 99:4-6; Teller Dep. at 131:3-9, 163:13-17; Ahuja Dep. at 82:6-11.
[7] Teller Dep. at 132:2-17; E. Musk SEC Tr. at 110:8-10; Exhibit 80.
[8] Teller Dep. at 143:24-144:3, 148:21-24; Ahuja Dep. at 278:14-20.
[9] Teller Dep. at 134:18-23, 156:16-157:16; Exhibit 80.

move forward togetherI ." [10] At the close of the meeting, Al-Rumayyan asked Musk to share his thoughts on the structure for the transaction, the percentage of ownership that would be needed to complete the deal, and his "financial calculations to take it private."[11] Although Musk did not communicate it to the Saudi PIF, he had no intention of letting the Saudi PIF obtain majority control of Tesla and wanted to limit its investment stake to 20 to 30 percent.[12]

Importantly, critical terms were not discussed with the Saudi PIF on July 31, 2018. The price to be paid for Tesla stock in a going private transaction, later proposed by Musk as $420 per share, $120 or 40% higher than its closing price on July 31, 2018, was never discussed.[13] The percentage of any private Tesla that the Saudi PIF might own was not discussed, nor was the overall structure of the transaction.[14] The total amount of funding, or even a range, was also not discussed.[15] Indeed, as Ahuja testified, this could not be discussed until the structure of the transaction was "refined further by Elon and his team."[16] No legally binding document was created as a result of the July 31, 2018 meeting with the Saudi PIF; Musk conceded he had no legal recourse against the Saudi PIF if they refused to provide funding and that funding might not be available at certain price levels.[17]

**C.    "Offer to Take Tesla Private at $420."**

Musk never provided any further information to the Saudi PIF. On August 2, 2018, however, Musk sent an email to Tesla's Board with the subject line reading: "Offer to Take Tesla Private at $420."[18] Musk did not provide any additional information or terms for the transaction,

---

[10] Exhibit 121; Teller Dep. at 145:7-21; Ahuja Dep. at 97:7-98:1; E. Musk Dep. 225:11-230:23, 249:12-250:7; *see also* Exhibit 80 (notes indicating that Al-Rumayyan concluded the meeting by saying, "I would like to listen to your plan Elon and what are the financial calculations to take it private in the next week and if I did not receive anything, I will call you.").

[11] Ahuja Dep. at 97:18-98:1; Teller Dep. at 145:7-21.

[12] E. Musk Dep. at 125:9-25.

[13] E. Musk Dep. at 109:23-110:1; E. Musk SEC Tr. at 231:22-232:10; Ahuja Dep. at 100:22-101:14; Ahuja SEC Tr. at 93:20-24.

[14] E. Musk Dep. at 112:3-16; Ahuja SEC Tr. at 104:20-25.

[15] E. Musk Dep. at 110:22-24; E. Musk SEC Tr. at 136:9-13; Ahuja Dep. at 84:2-6; 102:14-16; Ahuja SEC Tr. at 93:3-5; Teller Dep. at 164:20-24.

[16] Ahuja Dep. at 104:21-105:5.

[17] E. Musk Dep. at 132:24-133:13; 220:7-11; Ahuja Dep. at 108:22-110:8.

[18] E. Musk Dep. at 129:14-131:1; Exhibit 81.

such as the structure or source of funding.[19] There is no discussion of the price or how it was determined in the body of the email; it is solely referred to in the subject line.[20] Musk also wrote that the "offer expires in 30 days."[21] Musk drafted this email by himself without any help, review, or advice from counsel.[22] The "offer" price referenced in the subject line represented a 20% premium to the then-market price, rounded up to $420 "for karma."[23] The premium was calculated based on the market price for Tesla stock on August 2, 2018 which had risen substantially following Tesla's second quarter earnings call held on August 1, 2018.[24]

On August 2, 2018, after receiving Musk's email, the Board convened a special telephonic meeting (excluding Musk and his brother, Kimbal Musk).[25] During the meeting, Tesla's General Counsel, Todd Maron, told the Board that Musk did not intend to buy out all of Tesla's shareholders, "but instead to have a private structure with as many existing Tesla shareholders remaining shareholders as possible, and with any shareholders who did not want to be part of a private company being bought out."[26] The Board asked Maron to schedule a further meeting at which time Musk would "provide additional details regarding his proposal and explain to the Board his thinking."[27] Ahuja also provided some context for the proposal contained in Musk's email but testified that the transaction "was in the very, very early days."[28] Given the absence of material terms from Musk's email, this was not a formal proposal for the Board to evaluate and analyze.[29]

On August 3, 2018, Tesla's Board convened a meeting with Musk to discuss his email.[30] Musk did not provide any further details in terms of the funding or structure for the transaction,

---

[19] Exhibit 81.
[20] *Id.*
[21] *Id.*
[22] E. Musk Dep. at 129:20-130:9.
[23] *Id.* at 131:25-132:5.
[24] *Id.* at 137:24-138:2; E. Musk SEC Tr. at 178:16-179:25.
[25] Exhibit 82.
[26] *Id.*
[27] *Id.*
[28] Ahuja Dep. at 131:17-132:5.
[29] E. Musk Dep. at 159:6-10, 213:8-12; *see also* Denholm Dep. at 44:25-45:16.
[30] Exhibit 83.

except that he wanted "current shareholders . . . to remain shareholders" after the transaction if they desired while those that did not could be "bought out at an appropriate premium."[31] With regard to the premium, Musk reiterated his proposed price of $420 per share which was "about a 20% premium over the current price of the stock, which had just undergone a recent run up after the [Tesla's] Q2 earnings call."[32] The Board told Musk that "a detailed proposal regarding a going private transaction had not yet been made and that one would be needed in order for the Board to properly analyze and evaluate it."[33] Finally, the Board authorized Musk "to have initial, conceptual conversations with a few of the Company's top shareholders to explore their interest and gauge their reaction to a private corporate structure."[34]

Musk did not have any communications with the Saudi PIF or any other Tesla investor immediately following the August 3, 2018 Board meeting.[35] In fact, Musk had not even received Tesla's capitalization table showing its largest institutional and retail shareholders as of August 7, 2018.[36] Nor did he formally retain any advisors to assist him with the going private transaction at any point between July 31, 2018 and August 7, 2018.[37] In fact, the only conversations he had about the transaction during this time frame were short conversations with (*i*) Michael Dell of Dell Technologies, (*ii*) Steve Rosenblum from Wachtell, Lipton, Rosen & Katz, and (*iii*) Egon Durban from Silver Lake Partners. On August 4, 2018, Musk spoke with Dell briefly about his experience on taking Dell private and obtained from Dell the names of his advisors when he took Dell Technologies private.[38] Dell told Musk that he was "glad . . . to have taken Dell Computer private" but that it was "a very difficult process" that took "something like a year" to complete.[39]

---

[31] *Id*.
[32] *Id*. at 2.
[33] *Id*. at 3.
[34] *Id*. at 3; E. Musk Dep. at 159:20-160:2.
[35] Musk's Amended and Supplemental Responses to Lead Plaintiff's First Set of Interrogatories dated September 10, 2021 ("Musk Interrogatory Responses") at 27, 28, 30, and 35; E. Musk Dep. at 165:15-17, 189:10-16; Ahuja Dep. at 172:8-173:1; Viecha Dep. at 159:6-161:17; *see also* Exhibits 121, 151, 165.
[36] Exhibit 91; Ahuja Dep. at 224:10-224:19.
[37] E. Musk SEC Tr. at 165:1-5.
[38] E. Musk Dep. at 167:7-169:10.
[39] *Id*. at 167:14-168:14; E. Musk SEC Tr. at 161:6-21.

1    Dell suggested to Musk that he speak with his counsel, Rosenblum, which Musk did shortly

2    afterwards, and Durban.[40]

3            During their conversation on August 6, 2018, Musk indicated to Durban his interest in

4    taking Tesla private at a 20% premium and allowing current investors to remain investors after

5    the transaction despite having to keep the number of shareholders below 300.[41] Musk also told

6    Durban that he preferred to have a "broader investor base" in a private Tesla and wanted to limit

7    the Saudi PIF to "something on the order of 15 percent, maybe up to 20 percent."[42] Durban

8    regarded Musk's intended structure for the transaction as "unprecedented."[43] With regard to

9    funding, Durban's notes of his conversation with Musk refer to "Saudis & UAE" but do not

10   indicate that there was any commitment from the Saudi PIF to provide funding for Tesla going

11   private.[44] Durban  understood that there was no binding legal contract for any entity to provide

12   funding to Musk to take Tesla private as of August 6, 2018, something Silver Lake requires before

13   it describes funding as "secured."[45]

14   **D.    August 7, 2018 Statements.**

15           On August 7, 2018 at 9:48 a.m. PDT, Musk tweeted "Am considering taking Tesla private

16   at $420. Funding secured."[46] Musk included the $420 per share price to "make it clear that funding

17   was secured at that level."[47] At 10:40 a.m. PDST, Musk tweeted "I don't have a controlling vote

18   now & wouldn't expect any shareholder to have one if we go private. I won't be selling in either

19   scenario."[48] At 11:00 a.m. PDT, Musk tweeted "My hope is *all* current investors remain with

20   Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla.

21   Already do this with Fidelity's SpaceX investment."[49] At 11:13 a.m. PDT, Musk tweeted

22

23   [40] E. Musk Dep. at 169:11-23; E. Musk SEC Tr. at 162:7-11, 175:22-176:6.
     [41] Durban SEC Tr. at 76:2-5, 81:15-18, 82:9-10, 86:25-88:10.
24   [42] E. Musk SEC Tr. at 170:2-11.
     [43] Durban SEC Tr. at 89:14-89:24.
25   [44] Durban Dep. at 28:8-29:10; Exhibit 175.
     [45] Durban Dep. at 43:6-11.
26   [46] Exhibit 8.
     [47] E. Musk Dep. at 133:6-9.
27   [48] Exhibit 9.
     [49] Exhibit 10.
28

1  "Shareholders could either to sell at 420 or hold shares & go private."[50]

2  Shortly after Musk's initial tweet at 9:48 a.m. PDT, Ahuja texted Musk: "Elon, am sure

3  you have thought about a broader communication on your rationale and structure to employees

4  and potential investors. Would it help if Sarah [Sarah O'Brien, head of Tesla Global

5  Communications], Todd, and I draft a blog post or employee email for you?"[51] Ahuja had been

6  surprised by Musk's initial tweet as it was generally Tesla's policy to keep significant transactions

7  extremely confidential to a small group of people until the day of the transaction.[52] Musk accepted

8  Ahuja's offer and for the next few hours Ahuja, Maron, and O'Brien worked on a draft email for

9  Musk.[53] After approving the draft, Musk sent it to Tesla's employees and posted it on Tesla's

10  website.[54] The email reiterated, "First, I would like to structure this so that all shareholders have

11  a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per

12  share, which is a 20% premium over the stock price following our Q2 earnings call (which had

13  already increased by 16%)."[55] It stated further that, "Basically, I'm trying to accomplish an

14  outcome where Tesla can operate at its best, free from as much distraction and short-term thinking

15  as possible, and where there is as little change for all of our investors, including all of our

16  employees, as possible."[56] Musk explained that he meant current shareholders when he wrote

17  "investors".[57] The email did not mention funding or the Saudi PIF.[58]

18  At 12:36 p.m. PDT, Musk tweeted a link to his email to Tesla employees adding the

19  statement: "Investor support is confirmed. Only reason why this is not certain is that it's

20  contingent on a shareholder vote."[59] Musk later testified that at the time of this last tweet, his level

21  of certainty that the transaction would be consummated was "probably roughly 50 percent."[60]

22  [50] Exhibit 11.
23  [51] Exhibit 121 at 4.
    [52] Ahuja Dep. at 58:15-59:6, 171:8-24.
24  [53] Exhibit 121 at 4; Ahuja Dep. at 182:19-185:21.
    [54] Exhibit 301; E. Musk Dep. at 196:16-197:3, 208:5-7; Exhibit 12.
25  [55] Exhibit 12.
    [56] *Id*.
26  [57] E. Musk Dep. at 210:15-25.
    [58] *Id*. at 208:18-20.
27  [59] Exhibit 13.
28  [60] E. Musk SEC Tr. at 258:1-4.

**E.     The Public's Response to Musk's Tweets.**

Analysts and investors immediately responded to Musk's tweets. For example, Itay Michaeli, an analyst at Citi Research, emailed Tesla's Director of Investor Relations, Martin Viecha, on August 7, 2018 to inquire whether there was "an actual transaction on the table (with secured financing)" or if going private was "more of a strategic announcement" to which Viecha responded that "the very first Tweet mentioned a firm offer."[61] Nii Owuraka Koney, a Managing Director at Jennison Associates, a significant Tesla investor, emailed Viecha on August 7, 2018 requesting a telephone call to discuss the "funding" for the transaction. Viecha responded that "[t]he very first tweet simply mentioned 'Funding secured' which means that this is a firm offer" and that "the offer is as firm as it gets."[62] According to Koney, his "view all along" was that the "offer at $420" was a "real offer."[63] Bradley Erickson, an analyst at KeyBanc Capital Markets, emailed Viecha on August 7, 2018 asking for him to "clarify" whether "financing is secured." Viecha responded by confirming that "the first Tweet clearly stated that 'financing is secured.' Yes, there is a firm offer."[64] And, Toni Sacconaghi, an analyst at AllianceBernstein, emailed Viecha on August 7, 2018 for "questions/clarifications on today's news and blog post." Viecha stated in response that "apart from what has been tweeted and what was written in a blog post, we can't add anything else. I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct" and that "financing is secured regardless of other assumptions."[65]

Most analysts following Tesla interpreted Musk's tweets as indicating a going private transaction was likely. JP Morgan's analyst, Ryan Brinkman, wrote on August 8, 2018:

> As surprising to us as these developments are, and as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured. Therefore, we are incorporating into our valuation the

---

[61] Exhibit 146; *see also* Viecha Dep. at 129:8-129:18.
[62] Exhibit 58; *see also* Viecha Dep. at 137:13-138:21.
[63] Koney Dep. at 116:8-116:15.
[64] Exhibit 150; *see also* Viecha Dep. at 154:13-155:11.
[65] Exhibit 151 at 1-2; *see also* Viecha Dep. at 156:21-158:15.

real possibility the equity will be taken out at $420 per share.[66]

On August 9, 2018, Teller began emailing Tesla's largest investors, including Tencent, Primecap, Jennison Associates, Capital World, Allianz, Fidelity, Baillie Gifford, and T. Rowe Price, to get their "thoughts and feedback" on the going private transaction.[67] Some investors responded that they would not be able to support the transaction because of restrictions or mandates against owning shares in private companies.[68] ███████████████████████████████████
████████████████████████████████████████████████████ ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████ ███████████ ███████████████████████████████████████
████████████████████████████ ███████. Ultimately, according to Musk, "roughly half of the investors were supportive of – or they – they would continue to remain investors as [sic] Tesla – with Tesla as a private company, but most preferred that we would remain public."[72]

**F.   Musk's Attempts to Secure Funding and Confirm Investor Support.**

Musk met with Durban on August 10, 2018.[73] Silver Lake Partners had created a presentation to show "the process and sort of diligence that you would need to do to raise the capital."[74] Silver Lake Partner's "Illustrative Public-to-Private Process Timeline" lists as the first item "Submit formal proposal to board following arrangement of committed financing" given that committed financing for the transaction had not yet been arranged.[75] At this time, according to

---

[66] Brinkman Dep. at 72:18-75:10; Exhibit 15.
[67] Exhibits 113-120; Exhibit 147.
[68] Viecha Dep. at 149:25-150:20.
[69] Exhibit 90.
[70] Fath Dep. at 48:13-49:7, 53:24-54:13; *see also* Exhibits 44-47.
[71] Koney Dep. at 113:13-114:5.
[72] E. Musk Dep. at 297:5-23; *see also* Viecha Dep. at 171:21-178:3, 189:19-190:22, 191:12-193:14, 194:4-201:10; Exhibits 79, 155, 157, 158 (discussing investor feedback).
[73] Durban SEC Tr. at 126:18-22.
[74] *Id*. at 127:10-17.
[75] Durban Dep. at 48:21-56:23; Exhibit 179 at 29.

Durban, the proposed Tesla going private transaction had not even reached this first stage.[76] In fact, on August 10, 2018, the same day as the Silver Lake Partners' presentation, Al-Rumayyan on behalf of the Saudi PIF sent Musk a text message stating, "We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia that serves MENA, Europe, Asia and Africa, with the right incentives on all fronts (subsidies on energy and land, tax exemptions, support in obtaining financing, etc.). Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction."[77]

On August 12, 2018, Al-Rumayyan followed up with Musk about the transaction, texting him: "Let's see the numbers and get our people to meet and discuss. We cannot approve something that we don't have sufficient information on. We've agreed that you will send the financial information and the way going forward within a week and no thing [sic] happened since."[78] Musk conceded at his deposition that he had agreed to provide this information on July 31, 2018 and the Saudi PIF needed to have this information before it could commit funding.[79] Musk never provided the Saudi PIF with the deliverables he agreed to at the end of the July 31, 2018 meeting. Instead, disappointed with the Saudi PIF's public statements regarding the transaction, Musk told Al-Rumayyan that he was no longer interested in taking Tesla private with the Saudi PIF, saying "I'm sorry, but we cannot work together," "Sorry. It's over," and "[p]lease extend an offer to the Crown Prince that I would like to apologize personally and explain why Tesla will not [sic] with PIF in this transaction."[80]

On August 13, 2018, Musk posted an "Update on Taking Tesla Private" on Tesla's website.[81] In this update, Musk stated that the Saudi PIF "has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining

---

[76] Durban Dep. at 57:10-20.
[77] E. Musk Dep. 225:11-230:23; Exhibit 121 at 8.
[78] E. Musk Dep. 244:1-248:15; Exhibit 121 at 11-2.
[79] E. Musk Dep. at 247:5-248:15.
[80] *Id*. at 244:1-245:1; Exhibit 121.
[81] Exhibit 16.

1    approvals. He has also asked for additional details on how the company would be taken private,

2    including any required percentages and any regulatory requirements."[82] Musk then stated "I

3    continue to have discussions with the Saudi fund, and I also am having discussions with a number

4    of other investors, which is something that I always planned to do since I would like for Tesla to

5    continue to have a broad investor base."[83] With respect to the next steps, Musk wrote: "If and

6    when a final proposal is presented, an appropriate evaluation process will be undertaken by a

7    special committee of Tesla's board . . . . If the board process results in an approved plan, any

8    required regulatory approvals will need to be obtained and the plan will be presented to Tesla

9    shareholders for a vote."[84] The blog post did not indicate that Musk had sought to terminate

10   discussions with the Saudi PIF just one day earlier. In fact, in response to the blog post, Al-

11   Rumayyan texted Musk: "Elon, I am personally surprised. You have signed an NDA while we

12   are waiting for you and your team to provide us with information to move forward, you post an

13   ill-advised blog with loose information."[85]

14   **G.    Musk Announces the Withdrawal of the Going-Private Transaction.**

15          As of August 16, 2018, Musk still had not secured funding or investor support for the

16   transaction. Silver Lake Partners, on Musk's behalf, was in the process of obtaining "formal

17   permission to make the following calls to respond / engage potential interested / existing

18   investors: Saudi Arabia, UAE, ten cent [sic], google, Ron Barron, Silver Lake affiliates (gic,

19   Temasek, cpp, ADIA and Kia)."[86] The email then said "No solicitation will be made other than

20   testing their interest to participate in the Tesla going private initiative led by Elon."[87]

21          On August 16, 2018, the *New York Times* published a lengthy interview with Musk.[88] The

22   article described the events of August 7, 2018, including his tweets as well as facts such as the

23   August 7, 2018 tweets were not approved in advance by Tesla's Board and that "funding, it turned

24   _____

25   [82] *Id*. at 2.
     [83] *Id*. at 2.
     [84] *Id*. at 2.
26   [85] E. Musk Dep. at 257:9-258:20; Exhibit 121 at 13.
     [86] Durban Dep. at 134:1-135:18; Exhibit 194.
27   [87] Durban Dep. at 135:20-136:3; Exhibit 194
28   [88] Exhibit 19.

1    out, [was] far from secure."[89] This article led analyst Brinkman of JP Morgan to discount entirely

2    the possibility of a going private transaction for Tesla and conclude that the August 7, 2018 tweets

3    were not true.[90]

4            On August 23, 2018, the Board held an in-person meeting.[91] Silver Lake Partners and

5    Goldman Sachs attended and discussed the availability of funding for a going private

6    transaction.[92] Their discussion materials demonstrate that neither the price per share nor the

7    amount of capital required had been determined; each was indicated by "[*]".[93] At the meeting,

8    Silver Lake Partners and Goldman Sachs outlined a process to obtain the necessary funding for

9    the going private transaction.[94] Musk also discussed with the Board "information he had learned

10   in recent weeks following his announcement, including but not limited to, the negative views of

11   many of the Company's current stockholders regarding the prospect of the Company going

12   private, the difficulties the Company's current stockholders would have in continuing to own

13   Tesla's stock if the Company went private . . . ."[95] Musk then informed the Board "that he was

14   withdrawing his offer to try and take [Tesla] private."[96]

15                                  **LEGAL STANDARD**

16           Summary judgment is proper where there is "no genuine dispute as to any material fact

17   and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute

18   is material only when it "might affect the outcome of the suit under the governing law," and is

19   genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

20   party based upon it." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role

21   in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth

22   of the matter, rather "to determine whether there is a genuine issue for trial." *Id.* at 249. There is

---

[89] *Id.* at 4.
[90] Brinkman Dep. at 100:9-106:15; Exhibit 23at 1-2.
[91] Exhibit 101.
[92] *Id.* at 2.
[93] Durban Dep. at 149:12-22; Exhibit 201 at 9, 58.
[94] Exhibit 101 at 2-3.
[95] *Id.* at 1.
[96] *Id.* at 4.

1   no issue for trial unless there is sufficient evidence supporting a jury verdict for the nonmoving

2   party, meaning that the evidence must be more than merely colorable but probative and

3   persuasive. *Id*. at 249-250. A defendant cannot defeat summary judgment by "the mere denial of

4   subjective knowledge of the risk that a statement could be misleading. Summary judgment

5   requires a statement that is materially misleading such that no reasonable jury could conclude

6   otherwise." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010). "When

7   the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts

8   and plead ignorance of the risk.'" *Id*. at 1094 (internal quotations omitted).  When analyzed under

9   this rubric, the discovery record leads undeniably to one conclusion: that Musk acted with scienter

10  when making the false and materially misleading tweets on August 7, 2018 and blog post on

11  August 13, 2018.

12  <u>**ARGUMENT**</u>

13  **A.     Plaintiff Is Entitled to Summary Judgment as to the Elements of Falsity and Scienter.**

14          1.     <u>"Am considering taking Tesla private at $420. Funding secured."</u>

15          Discovery has confirmed what the Court plausibly inferred when denying Defendants'

16  motion to dismiss, *i.e.*, Musk's tweet "could be read by a reasonable investor to mean complete

17  funding for the transaction was unconditionally secured." *In re Tesla, Inc. Securities Litig.*, 477

18  F. Supp. 3d at 922. This is precisely what happened. Indeed, as Durban testified, Silver Lake

19  uses the term "secured" to reference binding legal contracts committing capital.[97] Tesla's

20  Director of Investor Relations echoed this understanding, telling analysts that "the first Tweet

21  clearly stated that 'financing is secured.' Yes, there is a firm offer"[98]; "the offer is as firm as it

22  gets"[99]; and that "financing is secured regardless of other assumptions."[100] Brinkman, JP

23  Morgan's analyst, concluded that "Either funding is secured or it is not secured, and Tesla's CEO

24  says funding is secured."[101] This was not true.

25  _____

26  [97] Durban Dep. at 42:12 – 43:2.

    [98] Exhibit 150; *see also* Viecha Dep. at 154:13-155:11.

27  [99] Exhibit 58; *see also* Viecha Dep. at 137:13-138:21.

    [100] Exhibit 151 at 1-2; *see also* Viecha Dep. at 156:21-158:15.

28  [101] Exhibit 15 at 1.

_____

No offer for funding had been discussed, extended, or accepted as of August 7, 2018, the date of the tweet, or at any point thereafter. Musk had only a preliminary conversation with the Saudi PIF on July 31, 2018. This meeting is notable for what did not occur: price was not discussed, structure was not discussed, percentage of ownership by the Saudi PIF was not discussed, and regulatory approvals were not discussed.[102] Musk did not even intend to use the Saudi PIF to fund all or even a majority of any going private transaction.[103] Yet this was the only potential source of funding that Musk had spoken to before tweeting out that funding was "secured". Musk knew this. He was present at the July 31, 2018 meeting with the Saudi PIF, knew that nothing had been agreed, knew his own intentions about limiting their involvement, and, therefore, knew that his tweet was false.

A statement is misleading if it creates an "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotations omitted). As demonstrated, Musk created the impression that funding had been "secured" to take Tesla private when, in reality, there was no agreement to fund the transaction at any price let alone $420 per share. Musk, of course, knew this when he tweeted on August 7, 2018 because he was the one conversing with the Saudi PIF on July 31, 2018. Thus, the evidentiary record indisputably establishes both falsity and scienter in favor of Plaintiff's claims against Musk. *See Platforms Wireless*, 617 F.3d at 1095 (granting summary judgment where defendants' statement left investors with the "unmistakable impression" that product "exist[ed]"); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (holding that numerous contingencies to "fund-raising effort" directly contradicted statement that $25 million offering had been "completed").

The Ninth Circuit's holding in *Platforms Wireless*, *supra*, is instructive. There, the defendants issued a press release that left investors with the impression that they had actually developed a viable ARC system, when in fact at the time, Platforms had only a design of the

---

[102] Exhibit 80; *see also* Teller Dep. at 134:19-23, 156:16-157:16; E. Musk Dep. at 109:23-110:1; Ahuja Dep. at 100:22-101:10; Ahuja SEC Tr. at 93:20-94:4; Viecha Dep. at 135:10-135:19.
[103] E. Musk Dep. at 125:9-25.

system and no operational prototype. 617 F.3d at 1094-95. In affirming the grant of summary judgment to plaintiff on the Section 10(b) and Rule 10b-5 claims based on this press release, the court held that considering the press release as a whole, the press release was "deceptive, an absolute and unequivocal falsehood" in that it left the "unmistakable impression that the ARC System exists." *Id*. at 1095. Similarly, Musk's "funding secured" tweet is an explicit and unambiguous representation that Musk had secured funding for a going-private transaction at $420 per share when, in fact, he had had only a preliminary and cursory discussion with the Saudi PIF that did not mention any purchase price let alone one at $420 per share. "Funding secured" created the unmistakable impression that funding for a going-private transaction at $420 was in place; it does not reflect Musk's mere nascent discussions of funding in an uncertain and unknowable amount for a going private transaction at some unknown price using an uncertain structure. The numerous analyst reports and inquiries in response to the tweet, *e.g.*, JP Morgan, Jennison Associates, bolster this conclusion. *See No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (relying on analyst statements when determining cause of stock price movement); *see also United States v. Ferguson*, 676 F.3d 260, 274 n.10 (2d Cir. 2011) (placing "substantial" weight on "stock analysts" when evaluating statement).

Musk has stated that his tweets were true because he was confident funding could be obtained. This is unavailing. A defendant cannot defeat a fraud claim merely by asserting that he believed the statements were true. "If such a self-serving assertion could be views as controlling, there would never be a successful prosecution or claim for fraud." *Id*. at 1095. With no price per share discussed with the Saudi PIF at the July 31, 2018 meeting and Musk's basis for selecting the $420 per-share offer not occurring until days later following Tesla's quarterly earnings report, the undisputed facts demonstrate that funding was not secured at $420 per share as he represented in his tweet. Musk's testimony clearly demonstrates that he was aware of this.[104] Accordingly, while Musk may presently claim "that the [Saudi PIF] was ready, willing, and able

---

[104] E. Musk SEC Tr. at 231:22-232:10 ("No, there was no – there was nothing with explicitly a 420 deal price document.")

1   to fund the transaction at a standard, reasonable price premium," this does not translate into

2   "Funding secured."[105] Given that Musk knew the lack of any binding commitment to provide

3   "secured funding" by the Saudi PIF for a going-private transaction at $420, there can be no

4   genuine issue of material fact that Musk acted with scienter when he tweeted that funding was

5   secured. *See id.* (finding defendant acted with scienter when he had knowledge that the statement

6   at issue was false and still authorized its release).

7          The events and conversations transpiring after the July 31, 2018 meeting with the Saudi

8   PIF underscore Plaintiff's point on this issue. On August 10, 2018, three days after the tweet,

9   Silver Lake Partners told Musk that arranging "committed financing" was the first step in the

10  going private transaction process, meaning that it had yet to be done.[106] Meanwhile, that same

11  day, Al-Rumayyan on behalf of the Saudi PIF sent Musk a text expressing interest in "explor[ing]

12  a potential transaction," demonstrating the preliminary posture of their discussions.[107] On August

13  12, 2018, two days later, Al-Rumayyan texted Musk to once again ask for his financial

14  calculations on the transaction, saying "Let's see the numbers and get our people to meet and

15  discuss. We cannot approve something that we don't have sufficient information on."[108] Nothing

16  had been approved by the Saudi PIF as of August 12, 2018 and, therefore, nothing could have

17  possibly been approved by the Saudi PIF almost a week earlier on August 7, 2018. If the Saudi

18  PIF did not have enough information on August 12 and had not approved any funding as of that

19  time, there can be no dispute that it had not agreed to provide funding on August 7.

20         Weeks later Musk and his bankers were still trying to obtain funding for the transaction.

21  On August 23, 2018, Goldman Sachs and Silver Lake Partners discussed with the Board

22  financing sources for a going private transaction "including the time and resources that process

23  would take," indicating that financing had not yet been secured and that securing it would take

24  time.[109] Additionally, the discussion materials provided by Goldman Sachs and Silver Lake

---

[105] Musk Interrogatory Responses at 25.
[106] Exhibit 179 at 29.
[107] Exhibit 121 at 8.
[108] *Id*. at 11.
[109] Exhibit 101 at 2.

Partners indicated that the total amount of capital necessary was still to be determined.[110] If funding had been secured at $420 per share, this price would have been utilized by the bankers and the amount of capital committed to the going-private would have reflected that and there would have been no need to launch a campaign to raise funds for a transaction.

2.    "Investor support is confirmed."

Contrary to Musk's tweet, discovery shows that "investor support" had not been "confirmed." In fact, Musk had not spoken with any of Tesla's outside investors regarding a potential going private transaction at $420 per share; that price had only been mentioned to Tesla's Board.[111] Under no circumstances could investor support have been "confirmed" when Musk had not even communicated the possibility of a going private transaction to any outside investors, aside from the brief conversation with the Saudi PIF. There was a stark difference between what Musk represented publicly and what actually existed at the time, thereby demonstrating that the tweet was "deceptive, an absolute and unequivocal falsehood." *See Platforms Wireless*, 617 F.3d at 1094-95; *see also S.E.C v. Sourlis*, 851 F.3d 139 (2d Cir. 2016) (affirming judgment for violating Section 10(b) and Rule 10b-5 where defendant represented she spoke with certain "note-holders" in connection with proposed transaction when, in fact, she indisputably did not).

Any effort by Musk to avoid summary judgment on this issue should be rejected. Even support from the Saudi PIF had not yet been confirmed. There had been no discussion at the July 31, 2018 meeting about price per share, structure, or percentage of ownership.[112] In light of the fact that Musk did not discuss percentage of ownership at the meeting, he had no way of knowing whether the Saudi PIF would even still be interested in investing in Tesla if capped at, for example, 20%, as Musk intended.[113] Further, this representation of "investor support" is

---

[110] Exhibit 201 at 9.
[111] E. Musk Dep. at 218:19-219:2; Musk Interrogatory Responses at 25, 26, 27, 30, and 35.
[112] Exhibit 80; *see also* Teller Dep. at 134:19-23, 156:16-157:16; E. Musk Dep. at 109:23-110:1, 112:3-16; Ahuja Dep. at 100:22-101:10; Ahuja SEC Tr. at 93:20-94:04; Viecha Dep. at 135:10-135:19.
[113] E. Musk SEC Tr. at 116:20-22.

1   unsupported by (and, in fact, contrary to) what occurred in the days that followed. On August 9,

2   2018, two days after the tweet, Teller sent emails to Tesla's largest shareholders, including

3   Tencent, Primecap, Jennison Associates, Capital World, Allianz, Fidelity, Baillie Gifford, and

4   T. Rowe Price.[114] The emails stated that "Elon would like to speak with you about the Tesla go-

5   private transaction to get your thoughts and feedback."[115] If support had been confirmed, Musk

6   would not need "thoughts and feedback" from these investors. As Musk later discovered, these

7   investors did *not* support the transaction.[116] Likewise, the Saudi PIF had not confirmed support

8   for the transaction at this point, given the fact that it was only "explor[ing] a potential

9   transaction" with Musk as of August 10, 2018 and still asking for his financial calculations in

10   support of the transaction as of August 12, 2018; indeed, Al-Rumayyan explicitly told Musk in

11   his text message dated August 12, 2018, that "[the Saudi PIF] cannot approve something that we

12   don't have sufficient information on."[117]

13          3.    <u>"Only reason why this is not certain is that it's contingent on a shareholder vote."</u>

14         Not only was investor support not confirmed, but there were also numerous contingencies

15   to the transaction before even getting to a shareholder vote. The Board had nothing in the way of

16   a formal offer to review at this point, making it impossible to consider or negotiate a final

17   agreement that could be presented for a shareholder vote.[118] As of August 7, 2018 when Musk

18   made this tweet, he had not even given Tesla's Board the formal "detailed proposal" that they

19   needed and requested days earlier "to properly analyze and evaluate" the transaction.[119]

20   Additionally, as Musk admitted under oath, his level of certainty that the transaction would be

21   consummated at the point in time that he tweeted this statement was "*probably roughly 50*

22   *percent*."[120] As discussed by Silver Lake Partners in their meeting with Musk on August 10, 2018,

23

---

24   [114] Exhibits 113-120.

  [115] Exhibits 113-120.

25   [116] Exhibit 101 at 1; E. Musk Dep. at 292:15-293:9.

  [117] Exhibit 121 at 8, 11.

26   [118] E. Musk Dep. at 159:6-10, 213:8-12; Ahuja Dep. at 127:17-128:13; Denholm Dep. at 44:25-

27   45:16.

  [119] Exhibit 83 at 3.

28   [120] E. Musk SEC Tr. at 258:1-4 (emphasis added).

---

1    the following steps still needed to be completed before a shareholder vote could even take place:

2    (1) submit a formal proposal to board following arrangement of committed financing; (2)

3    negotiate with independent directors; (3) sign a merger agreement and announce deal; (4) hire

4    proxy advisors and engage communications teams; (5) file regulatory and other approvals; and

5    (6) draft, file, and clear a proxy statement.[121] Musk recognized that a special committee would

6    need to be created to evaluate the transaction too.[122] He also knew that regulatory approval would

7    be required.[123] Thus, a shareholder vote was not the "only reasons why this is not certain," and

8    Musk knew that at the time of his tweet.

9            4.    "I have continued to communicate with the Managing Director of the Saudi fund.

10                 He has expressed support for proceeding subject to financial and other due

11                 diligence and their internal review process for obtaining approvals. He has also

12                 asked for additional details on how the company would be taken private, including

13                 any required percentages and any regulatory requirements."

14    On August 13, 2018, Musk used a blog post on Tesla's website to purportedly "answer

15    some of the questions" that had been asked in response to his tweets from the previous week.[124]

16    The blog post was titled "Update on Taking Tesla Private" and discussed *inter alia* why he wanted

17    to take Tesla private, why he said "funding secured," and what his next steps would be. In

18    pertinent part, Musk described the history of his communications with the Saudi PIF. While Musk

19    wrote about his conversations with the Saudi PIF at length, he did not disclose that over the

20    previous weekend he had sought to end all negotiations with the Saudi PIF.[125]

21    Rule 10b-5(b) prohibits the making of "any untrue statement of a material fact or to omit

22    to state a material fact necessary in order to make the statements made, in the light of the

23    circumstances under which they were made, not misleading." 17 C.F.R §240.10b-5(b). Musk was

24    under no obligation to provide the public with an update on his conversations with the Saudi PIF.

---

25    [121] Exhibit 179 at 29.

26    [122] Exhibit 16 at 2.

27    [123] *Id*. at 2.

    [124] *See generally id*.

28    [125] Exhibit 121.

1  However, once Musk chose to do so, he was "bound to do so in a manner that wouldn't mislead

2  investors as to what [those conversations] consisted of." *Berson*, 527 F.3d at 987. The temporal

3  proximity between Musk's conversation with Al-Rumayyan and his blog post to investors

4  underscores the scienter with which he acted when making this statement. *See In re Apple Sec.*

5  *Litig.*, No. 19-cv-02033-YGR, 2020 U.S. Dist. LEXIS 206298, at *29 (N.D. Cal. Nov. 4, 2020)

6  ("the law is clear that close temporal proximity between an allegedly fraudulent statement or

7  omission and a later disclosure may bolster an inference of scienter").

8  **B.    Plaintiff Is Entitled to Summary Judgment as to the Element of Reliance.**

9        Where, as here, Plaintiff relies on the fraud-on-the-market doctrine, reliance by every class

10  member is presumed where: "(1) the alleged misrepresentations were publicly known, (2) they

11  were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock

12  between when the misrepresentations were made and when the truth was revealed." *Halliburton*

13  *Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*"). Indeed, the Supreme

14  Court has repeatedly held that "courts may presume that investors trading in efficient markets

15  indirectly rely on public, material misrepresentations through their 'reliance on the integrity of

16  the price set by the market.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462

17  (2013); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011)

18  ("*Halliburton I*"); *Basic Inc. v. Levinson*, 485 U.S. 224, 249-50 (1988). The discovery record at

19  hand shows without question that each of the above factors is met.

20        First, there is no dispute that Musk's false and misleading statements were publicly known

21  as they were made on the public platform, Twitter, by Musk who had over 22 million followers

22  at the time. Second, the statements at issue were material.[126] Tesla's stock price reaction to the

23  tweets was instantaneous and the market quickly reacted to further developments during the class

24  period.[127] Third, Plaintiff's expert, Dr. Michael Hartzmark, opined that the market for Tesla's

25  securities traded in an open, developed, and efficient market during the class period.[128] This

---

[126] Hartzmark Report (ECF No. 291-1) at ¶¶71-76.
[127] *Id*. at ¶74.
[128] *Id*. at ¶¶1, 92, 155, 179.

1    opinion is supported by detailed analysis of trading in Tesla securities utilizing the factors widely

2    accepted by federal courts across the country.[129] This evidence "affords . . . [P]laintiff[] a

3    presumption of reliance," and to defeat summary judgment, Defendants have "the burden of

4    producing evidence to rebut the presumption" such that "no rational jury could find for [Plaintiff]

5    on this issue." *Kaplan v. Rose*, 49 F.3d 1363, 1376 (9th Cir. 1994), *overruled on other grounds*

6    *by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605

7    (9th Cir. 2017). But Defendants have made no effort to challenge the finding of market efficiency.

8    At class certification, Defendants did not contest any of Dr. Hartzmark's findings or Plaintiff's

9    contention that Tesla's securities traded in an efficient market.[130] While Defendants have

10   introduced three expert reports since then, none opines on the issue of market efficiency or the

11   applicability of the *Basic* presumption. Finally, there is no dispute that Plaintiff and the Class

12   traded Tesla securities between when the misrepresentations were made and when the truth was

13   revealed.

14          As Plaintiff has "put forth unrebutted evidence that [Tesla] securities traded on an efficient

15   market," summary judgment is warranted "on the issue of class-wide reliance." *In re Celestica*

16   *Inc. Sec. Litig.*, No. 07 Civ. 0312 (GBD), 2014 U.S. Dist. LEXIS 116562, at *39-40 n.15

17   (S.D.N.Y. Aug. 20, 2014); *see also McCrary v. Elations Co. LLC*, No. EDCV 13-0242 JGB (SPx),

18   2014 U.S. Dist. LEXIS 190468, at *10 (C.D. Cal. Dec. 8, 2014) (where "'under the governing

19   law, there can be but one reasonable conclusion as to the [issue],'" summary judgment is

20   appropriate); *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 389 (N.D. Cal. 2009) ("where

21   a rational trier of fact could not find for the nonmoving party based on the record as a whole, there

22   is no 'genuine issue for trial'").

23                              **CONCLUSION**

24          The discovery in this case is one-sided on the issues of falsity, scienter, and reliance.

25   Defendants cannot point to anything in the record capable of creating a "genuine dispute as to any

26   material fact." Fed. R. Civ. P. 56(a). Plaintiff's motion should be granted in its entirety.

27

28   ---

[129] *Id*. at ¶¶22-92, 93-155.
[130] *See* Stipulation and Order for Class Certification dated November 25, 2020 (ECF No. 298).

Dated: January 11, 2022                          Respectfully submitted,

                                                 **LEVI & KORSINSKY, LLP**

                                                  s/ Adam M. Apton
                                                 Adam M. Apton (SBN 316506)
                                                 Adam C. McCall (SBN 302130)
                                                 75 Broadway, Suite 202
                                                 San Francisco, CA 94111
                                                 Tel.: (415) 373-1671
                                                 Email: aapton@zlk.com
                                                 Email: amccall@zlk.com

                                                         -and-

                                                 Nicholas I. Porritt
                                                 Elizabeth K. Tripodi
                                                 Alexander A. Krot III
                                                 LEVI & KORSINSKY, LLP
                                                 1101 30th Street N.W., Suite 115
                                                 Washington, D.C. 20007
                                                 Tel.: (202) 524-4290
                                                 Email: nporritt@zlk.com
                                                 Email: akrot@zlk.com
                                                 (*admitted pro hac vice*)

                                                         -and-

                                                 Joseph Levi
                                                 Eduard Korsinsky
                                                 LEVI & KORSINSKY, LLP
                                                 55 Broadway, 10th Floor
                                                 New York, New York 10006
                                                 Tel.: (212) 363-7500
                                                 Email: jlevi@zlk.com
                                                 Email: ek@zlk.com
                                                 (*admitted pro hac vice*)

                                                 *Attorneys for Plaintiff and Counsel for the Class*