EXCERPTS FROM THE DEPOSITION OF
ELON MUSK
TAKEN NOVEMBER 5, 2021

Confidential

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4   IN RE TESLA, INC. SECURITIES) Case No.
    LITIGATION                   ) 3:18-cv-04865-EMC
5                                )
                                 )
6                                )
                                 )
7                                )
                                 )
8   _____)

9        _____

10                    CONFIDENTIAL

11        ORAL AND VIDEOTAPED DEPOSITION OF

12                     ELON MUSK

13                 NOVEMBER 5, 2021
         _____

14

15        ORAL AND VIDEOTAPED DEPOSITION OF ELON MUSK,

16   produced as a witness at the instance of the Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on November 5, 2021, from 10:32 a.m. to

19   8:04 p.m., before Candice Andino, Certified Shorthand

20   Reporter in and for the State of Texas, reported by

21   machine shorthand, at Armbrust & Brown, PLLC, 100

22   Congress Avenue, Suite 1300, Austin, Texas, pursuant to

23   Notice and in accordance with the Federal Rules of Civil

24   Procedure.

25   JOB NO. 202221

Confidential

1            A P P E A R A N C E S

2   FOR THE PLAINTIFFS:

3       LEVI & KORSINSKY
        BY:  MR. NICHOLAS PORRITT
4            MS. ELIZABETH TRIPODI
             MS. KATHY AMES VALDIVIESO
5       1101 30th Street N.W.
        Washington, DC 20007
6

7

8

    FOR THE DEFENDANTS:
9
        COOLEY
10      BY:  MR. STEPHEN NEAL
        3175 Hanover Street
11      Palo Alto, California 94304

12

13  ALSO PRESENT:

14      CASEY MUMMERT, Videographer

15      CANDACE JACKMAN, Tesla in-house counsel

16      JOSHUA WALDEN (appearing telephonically)

17

18

19

20

21

22

23

24

25

1          FRIDAY, NOVEMBER 5, 2021, 10:32 A.M.

2                    AUSTIN, TEXAS

3          THE VIDEOGRAPHER:  Good morning.  This is

the start of media labeled Number 1 of the video

recorded deposition of Mr. Elon Musk, in the matter in

re Tesla, Inc. Securities Litigation, in the US District

Court Northern District of California, San Francisco

Division, No. 3:18-cv-04865-EMC.

9          This deposition is being held at the law

offices of Armbrust & Brown on November 5th, 2021, at

approximately 10:32 a.m.

12          My name is Casey Mummert.  I'm the legal

video specialist from TSG Reporting, Inc. headquartered

in 228 East 45th Street, Suite 810, New York, New York

10017.

16          The court reporter is Candice Andino in

association with TSG Reporting.

18          Counsel, please introduce yourselves.

19          MR. PORRITT:  Excuse me.  Nicholas Porritt

of the firm of Levi & Korsinsky on behalf of the

Plaintiff and the Class.

22          MS. AMES VALDIVIESO:  Kathy Ames on behalf

of Plaintiff.

24          MS. TRIPODI:  And Elizabeth Tripodi with

Levi & Korsinsky on behalf of Plaintiff.

1              MR. NEAL:  And I'm Stephen Neal of Cooley

2  representing Mr. Musk and the other defendants in this

3  case.

4              MS. JACKMAN:  Candace Jackman, in-house

5  counsel with Tesla.

6              (Witness sworn.)

7              THE WITNESS:  I do.

8                     ELON MUSK,

9  having been first duly sworn, was examined and testified

10  as follows:

11                    EXAMINATION

12  BY MR. PORRITT:

13     Q.  Good morning, Mr. Musk.

14     A.  Good morning.

15     Q.  As you just heard, my name is Nicholas Porritt.

16  I'm one of the counsel for the plaintiffs in this

17  matter.

18     A.  Okay.

19     Q.  I'll be taking your deposition today.  I know

20  you've been deposed before, but I'll just quickly go

21  over a couple of ground rules just to -- just to make

22  sure we're all on the same page.  Excuse me.

23              One is we are creating a written record.

24  You can see Candice here is writing down what I say and

25  will write down what you say.  So, with that in mind,

1  what was that?  Yeah, we're off the record.  Yeah, let's

2  go off the record.

3                THE VIDEOGRAPHER:  The time is 12:48.  We

4  are off the record.

5                (A lunch recess was taken from 12:48 p.m.

6                to 1:40 p.m.)

7                THE VIDEOGRAPHER:  The time is 1:40.  We

8  are on the record.

9       Q.  (BY MR. PORRITT)  Welcome back, Mr. Musk.

10      A.  Yeah.

11      Q.  On July 31st, 2018, you met with

12  representatives of the Saudi Arabia PIF at the Tesla

13  Fremont Factory?

14      A.  Sorry.  Is this related to an exhibit or

15  just --

16      Q.  No, no.  I'm just starting.

17      A.  Can you say that again.

18      Q.  Yes.

19            On July 31st, 2018, you met with

20  representatives of the Saudi Arabia PIF at the Tesla

21  Fremont Factory?

22      A.  Yes.

23      Q.  Okay.  Meeting was in the evening?

24      A.  Yes.

25      Q.  Okay.  Did you do anything to prepare for that

1          A.   I don't recall the exact number of

2     representatives, but there was Yasir, and there were at

3     least a few others.

4          Q.   Okay.  And it was you and Sam Teller at the

5     beginning and then Deepak Ahuja joined midway through?

6          A.   Yes.

7          Q.   Okay.  And the meeting lasted approximately

8     30 minutes; is that correct?

9          A.   I'm not sure of the exact time, but -- but it

10    may have been longer than 30 minutes, but 30 minutes to

11    an hour.

12         Q.   Okay.  So less than an hour, maybe more than

13    30 minutes?

14         A.   Something like that.

15         Q.   Okay.  In the meeting, you -- you talked about

16    current Tesla performance?

17         A.   At the meeting, we talked about primarily

18    the -- the idea of taking Tesla private.  That was the

19    primary subject of discussion continuing on prior

20    discussions to that effect.  They informed me that they

21    had followed through with taking a 5 percent stake in

22    Tesla, and I was, like, Well, this is great.

23              So based on a verbal discussion and a

24    verbal agreement and no discussion of price, they

25    went -- they moved forward and took a 5 percent stake in

Confidential

1        A.   Yes.

2        Q.   Okay.   Which I think comes out about to be the

3   same level, once you take out --

4        A.   Yeah.

5        Q.   So...

6             Was it clear that the PIF were assuming

7   that other investors would not participate in this

8   going-private transaction?

9        A.   No.   In fact, I was sure that there would be

10  many investors who would support the take-private.

11       Q.   I'm going to refer you to 1 -- page 135 of your

12  transcript.

13       A.   Yeah.

14       Q.   And, particularly, you testified that PIF were

15  not under the assumption that the other investors would

16  participate.   That's what you told the SEC there.

17       A.   Yeah.   The -- the -- the PIF fund was

18  supportive of a take-private however it needed to be

19  done.   They were -- they were not attaching strings to

20  the take-private.   They were unequivocally supportive of

21  a take-private however it -- however I would like it to

22  be done.

23       Q.   But, as you said, no price was discussed,

24  correct, for the potential go-private?

25       A.   No price was discussed for the potential

Confidential

1    take-private, just as -- just as no price was discussed

2    when I said take a 5 percent stake in Tesla, and they

3    did it nonetheless.  And there was no contract.  There

4    was no written agreement.  They did it nonetheless.  And

5    they are well aware that taking a company private

6    implies a premium, and that premium would be on the

7    order of 20 percent, if not higher.

8         Q.  What was -- how would they know that that

9    was -- that there was a premium for taking private?

10        A.  Because they are experienced investors, and

11   every take-private has a premium.

12        Q.  Had the Saudi PIF ever done a take-private

13   before?

14        A.  I don't know if they've done a take-private or

15   not, but they are experienced investors, and they are

16   well aware that you cannot acquire a company or take a

17   company private without a premium.

18        Q.  And that's something they said to you?

19        A.  That is not something they said to me, but it

20   is something that every experienced investor is aware

21   of.  And they are an experienced investor.

22        Q.  And no total amount of funding was discussed at

23   this July 31st meeting; correct?

24        A.  No.

25        Q.  So it could be anything from 60 to $80 billion,

1      Isn't that -- isn't that what you testified

2  to?

3      A.  There were -- there were -- the -- there were

4  no strings attached to the take-private.  Did I think

5  that it would require anything on the order of

6  80 percent?  Of course not.  I make it very clear in the

7  SEC testimony that I thought 20 or 25 percent would be

8  sufficient.

9      Q.  But you didn't discuss 20 to 25 percent with

10  them.  You said you didn't discuss percentages with the

11  PIF.

12          MR. NEAL:  That's been asked and answered.

13          MR. PORRITT:  Yeah.

14      A.  Yeah.  It was just clear that they were

15  supportive unconditionally of -- of a take-private.

16      Q.  (BY MR. PORRITT)  Right.  Up to any percentage.

17      A.  No.  You're conflating what -- what would be an

18  aspirational ownership percentage of theirs -- or what I

19  thought might be an aspirational ownership percentage

20  versus what would be their actual ownership percentage.

21  Aspirationally, I'm sure any one of our investors would

22  like to own 100 percent of the company, if not

23  80 percent, but it's not meaningful in -- in the context

24  of this.

25      Q.  What was the --

1        A.   Yes.   And if they, for -- for -- for example,

2   had majority control of Tesla, they could simply mandate

3   it.

4        Q.   And to be clear --

5        A.   And to be clear, I am not -- I was not opposed

6   to having a factory in Saudi Arabia, but it would have

7   to be when the timing was right, just not, you know,

8   before the timing was right.

9        Q.   And to be clear, at the July 31, 2018, meeting,

10  internally, to yourself, you had no intention of letting

11  Saudi Arabia obtain majority control of Tesla; correct?

12       A.   Yeah, I did -- I did not think it would be good

13  to have Saudi Arabia have majority control of Tesla.

14       Q.   Okay.   You -- I think, as we talked about

15  earlier, you mentally had a 20 percent sort of cap for

16  their involvement; correct?

17       A.   No, not a 20 -- I said -- I think I said that

18  probably what would be desirable would be around 20 to

19  30 percent, ideally, on the order -- ideally,

20  20 percent, since that would require the least amount of

21  legal review.

22       Q.   But, again, these percentages were not

23  communicated to PIF.   These were you -- your internal

24  calculations.

25       A.   Yes.

1      Q.  My question is:  Why didn't you do that on

2  August 1?

3      A.  Well, I was --

4              MR. NEAL:  I think he just asked and

5  answered that, but go ahead.

6      A.  Yeah.  No, I -- exactly.  I did ask and answer

7  you -- I did answer that.

8      Q.  (BY MR. PORRITT)  So, in your view, you could

9  have issued that tweet on August 1, and that would have

10  been fine?

11      A.  Yes.

12      Q.  Okay.

13              (Previously marked Exhibit 81 referred to.)

14              MR. PORRITT:  Placing before the witness a

15  document previously marked as Exhibit 81, an email from

16  Mr. Musk to the Tesla board of directors dated

17  August 2nd, 2018.

18      A.  (Witness reviews document.)

19              Yes.

20      Q.  (BY MR. PORRITT)  Do you recognize this email?

21      A.  Yes.

22      Q.  Did you draft this email?

23      A.  Yes.

24      Q.  Okay.  Did anyone assist you in drafting this

25  email?

Confidential

1      A.   No.

2      Q.   You didn't consult with any legal advisor?

3      A.   I don't recall -- I'm not certain, but I don't

4   recall.   I don't -- I don't think I ran this email by

5   anyone.

6      Q.   Did you consult with any financial advisor?

7      A.   I don't -- I don't think so.   I simply draft

8   this email based on what I believed to be the case on

9   August 2nd.

10      Q.   All right.   Do you recall how long it took you

11   to draft this email?

12      A.   No.

13      Q.   Did you draft it, let it sit, review it, and

14   then send it, or do you just draft it and send it

15   straightaway, if you remember?

16           MR. NEAL:   And what do you mean by that?

17   You mean did he reread it before he sent it?

18           MR. PORRITT:   Yes, did he reread it.

19      A.   Yeah, I think I probably reread it after

20   drafting it.

21      Q.   (BY MR. PORRITT)   Did you stop drafting it on

22   August 2nd, 2018?

23      A.   I think so.

24      Q.   Do you know where you were when you sent this

25   email?

1        A.  No.

2              It sounded like the Kennedy assassination.

3   Where were you when Kennedy was assassinated?  I wasn't

4   alive.

5        Q.  Well, that's next.  There is still the Hoffa

6   disappearance that needs to be explored, too.

7        A.  Yeah, but I think that's uncertain as to when

8   he disappeared and where he is.  Under -- somewhere

9   under the Giants Stadium or something, I think is the

10  speculation.

11       Q.  I think that is widely -- I think it is widely

12  speculated but with a reasonable amount of -- a

13  reasonable amount of basis.

14             Do you recall that on August 1 you had

15  the -- well, strike that.

16             Do you know why you sent it to the board on

17  August 2nd, 2018, as opposed to August 1st, 2018, after

18  the meeting with PIF?

19       A.  No.

20       Q.  Do you recall that Tesla had a conference call,

21  earnings call on August 1st?

22       A.  I guess so.  I mean, it's obviously very

23  difficult to recall, you know, three -- what exactly

24  happened on which day and which hour in 2018.

25       Q.  And you said the 420 per share, I think you've

1    indicated previously, was just a 20 percent premium on

2    the then-market price; is that correct?

3        A.   Approximately, yes.

4        Q.   And then round it up for 420?

5        A.   For karma.

6        Q.   Yes.  Okay.  Was that going to be your final

7    price?

8        A.   Karma is real.

9        Q.   Was that going to be -- was that your final

10   price for going private?

11       A.   No.  That's why I said "considering."

12       Q.   All right.  Were you prepared to go higher than

13   420 per share going private?

14       A.   Probably.

15       Q.   Okay.  Had you even thought about that at the

16   time when you sent this email?

17       A.   There was a limit to, you know, how high one

18   could go, so that's why I said "considering at 420."

19       Q.   Why was there -- why would there be a limit as

20   to how far you could go?

21       A.   Well, there would conceivably be some very high

22   number where it would be difficult to take the company

23   private.

24       Q.   But you previously testified that the PIF had

25   committed to funding going private without condition,

1    including price.

2              So how does that work if -- therefore,

3    there couldn't be a limit, could there?

4    A.   Well, the funding would be secured provided

5    there was a reasonable premium to the take-private, but

6    not if the stock went to some exorbitant number.  The

7    reason I included the number of 420 -- $420 per share

8    was to make it clear that the funding was secured at

9    that level, but not at some much higher level.

10             That is why I specifically mentioned a

11   20 percent premium over the stock price.  Funding was

12   secured at that level, a reasonable premium, to the

13   take-private, but not at some much higher premium.

14             And, if I wanted to really burn the shorts,

15   if that -- if that was my goal, I would not have put a

16   price number in there.  I would have left the price

17   open-ended.  That would have been the way to actually

18   burn the shorts.  That would have been the way to cause

19   them the most amount of harm would be to leave that

20   number open-ended.  By putting a number in there that

21   was a 20 percent premium over the short -- over the --

22   the stock price actually reduced the harm to the shorts.

23   Q.   And it also had the effect of potentially

24   reducing what you might pay for a going-private

25   transaction; correct?

1  round number and roughly a 20 percent premium to the

2  stock price.

3       Q.  And this calculation you did on August 2nd?

4       A.  I don't know exactly when that -- it could have

5  been around that time.

6       Q.  Well, did you do that before the earnings call

7  on August 1st or not?

8       A.  I don't recall exactly when it was.

9       Q.  I'll represent to you that the stock price

10  increased significantly after the August 1st earnings

11  call, and that this 20 -- 20 percent premium is

12  calculated on the post-increase.

13            Does that refresh your recollection as to

14  when you -- how you calculated the 420?

15       A.  That -- that could be correct.

16       Q.  Okay.  And I'm correct -- I apologize if I'm

17  repeating myself -- that the 420 price was never

18  mentioned to the PIF on July 31st; correct?

19       A.  Just as no price was discussed when they agreed

20  to do -- to take a 5 percent stake in Tesla, no price

21  was discussed at the take-private, nor did they indicate

22  that they had a price limit in any way.  They were just

23  unequivocally supportive of a take-private.

24       Q.  But I think that was a long way of saying, yes,

25  you did not discuss 420 with the PIF on July 31st, 2018.

1       A.   No, but the PIF was well aware that any

2   take-private would involve a reasonable premium.   A

3   reasonable premium, in my view, was 20 percent.   And

4   they would be well aware that you don't take a company

5   private simply at the price that it is currently

6   trading.   There would have to be some premium.   They, as

7   experienced investors, were well aware of this.

8       Q.   What did you expect to happen after you gave

9   this email -- sent this email to the board on

10  August 2nd, 2018?

11      A.   I -- I felt it was important to convey the

12  reasons for taking Tesla private.

13      Q.   Convey it to whom?

14      A.   To the board.

15      Q.   Okay.   My question was:   What did you expect to

16  happen following the transmission of this email to the

17  board?

18      A.   I expected the board to consider the

19  take-private offer.

20      Q.   And what would that involve?

21      A.   That would involve creating a special committee

22  to consider the take-private.

23      Q.   Okay.   And what is the purpose of the special

24  committee in this scenario?

25      A.   To decide whether or not to put the matter to a

1        A.   What's that conclusion?

2        Q.   That a detailed proposal had not yet been made

3   and would need -- be needed in order for the board to

4   properly analyze and evaluate it.

5        A.   Yes.

6        Q.   Okay.  So you -- you agreed to this -- the

7   email you had sent, Exhibit 81, was not a detailed

8   proposal that the board could properly analyze and

9   evaluate.

10       A.   Yes.

11       Q.   Okay.

12            MR. NEAL:  I think we've been going about

13   an hour and a half.

14            MR. PORRITT:  Yeah.  I was just going to

15   finish up these minutes and then take a break, if that's

16   okay.

17            MR. NEAL:  Okay.  Yeah.

18            MR. PORRITT:  As you can see, I'm on the

19   last page.  So...

20       Q.   (BY MR. PORRITT)  The minutes then continue

21   (as read) As an initial step, the board authorized

22   Mr. Musk to have initial, conceptual conversations with

23   a few of the company's top shareholders to explore their

24   interest and gauge their reaction to a private corporate

25   structure.

1          Do you see that?

2      A.  Yes.

3      Q.  Okay.  At this board meeting on August 3rd, did

4  you discuss your intent to make a public disclosure of

5  your consideration of a going-private transaction?  Did

6  you discuss that with the board?

7      A.  Sorry.  What was the question?

8      Q.  Did you discuss your intent to make a public

9  disclosure of your consideration of a going-private

10  transaction at 420 per share with the board?

11      A.  No, I don't think so.

12      Q.  Okay.  Why not?

13      A.  I don't recall.

14      Q.  Did you think you would need board approval to

15  make a public disclosure of your consideration of a

16  going-private transaction for Tesla at 420 per share?

17      A.  No, because it -- doing so would be in my

18  capacity as an individual, not -- this would not -- the

19  board would be a counterparty in this situation.  So I

20  would need to act in my capacity as an individual in

21  proposing the take-private.

22      Q.  But you --

23      A.  It's not up to the board as to whether I

24  propose to take the company private; it's up to me.

25      Q.  But you understood that that proposal may have

1   is described is -- is actually not -- it's slightly

2   inaccurate in that the board really does not have the

3   authority, nor should they have the authority, to

4   constrain the actions of me as an individual proposing

5   to take the company private, because I'm a counterparty.

6   They are not there to authorize or not authorize me.

7              So I think, in this case, the word

8   "authorize" is -- is the wrong word.  They -- it's

9   really not up to the board.  The -- the important thing

10  here, I think, is that "do not selectively disclose

11  things."  And I came to the conclusion that it was

12  really impossible to have conversations with some

13  investors but not others without creating a selective

14  disclosure problem.

15      Q.  Did you try to have a conversation with an

16  investor between August 3rd and August 7th?

17      A.  I don't recall.

18      Q.  All right.  Well, yeah, that was -- why don't

19  we take a break and then come back.

20              THE VIDEOGRAPHER:  The time is 3:27.  We

21  are off the record.

22              (A recess was taken from 3:27 p.m.

23               to 4:08 p.m.)

24              THE VIDEOGRAPHER:  The time is 4:08.  We

25  are on the record.

1      Q.  Okay.  I'm going to represent to you that

2  August 3rd was a Friday.

3              So, over the weekend, do you recall

4  discussing the potential going-private transaction with

5  anyone?  This will be August 4th, August 5th, 2018.

6      A.  I don't recall.

7      Q.  Okay.  At some point over the weekend, did you

8  have a telephone conversation with Michael Dell?

9      A.  I may have had -- yes, actually, I -- I think I

10  did.

11      Q.  Okay.  And I think that was on the weekend.

12              Do you recall anything about that

13  conversation?

14      A.  Yes.  I -- I asked him, did -- was he glad to

15  have done the -- to have taken Dell Computer private,

16  did he -- did he think that that was a good idea, and

17  had that allowed him to operate the company more

18  effectively.  And he said he -- he did.  He said it was

19  a very difficult process, but it was one that he did not

20  regret doing.

21      Q.  When he said it was a very difficult process,

22  did he give any further detail as to what the process

23  entailed for him in taking Dell private?

24      A.  Just that there were -- there were significant

25  legal challenges that he had to face from lawyers like

1  yourself, and that I think he had to spend a fair bit of

2  time in Delaware.  So -- and I think -- I think, in that

3  case, the -- the judge -- the initial judgment actually

4  was against him in the take-private transaction but was

5  subsequently overturned on appeal.

6      Q.  Did he give an indication of the amount of time

7  the transaction took?

8      A.  I think he said maybe a year or something.  I'm

9  not sure of the exact -- it's also -- it's like --

10  I'm -- I don't -- I don't -- I don't recall there being

11  a specific time frame, but I think -- yeah.  So I -- you

12  know, when I say, like, do I actually remember it or do

13  I think I remember it, I think I remember him saying

14  something like a year, but I'm not sure.

15     Q.  Okay.  Did you talk -- did he talk to you about

16  the disclosure of -- when you disclose the potential

17  going-private transaction?

18     A.  No.  I just want -- I just wanted to see if

19  he -- if he thought it was a good idea to take his

20  company private.  And he -- he thought -- despite the

21  difficulty, he thought that it was -- nonetheless had

22  been worth doing.

23     Q.  And Dell was a conventional

24  going-private; correct?  Michael Dell took majority

25  control of the company?

1       A.   In that case, it was Michael Dell taking

2   majority control of the company, not exclusive control,

3   but majority control.  But he received financial

4   support, I believe, from Silver Lake and some others.

5   And so he may be beholden to them in some way.  I don't

6   know.

7       Q.   Did Michael Dell discuss with you the

8   importance of the timing of when you disclose the price

9   of which you propose to take a company private?

10      A.   No.

11      Q.   Did you also talk to -- and before your

12  counsel leaps all over me, I'm just -- at this point,

13  I'm just talking about whether a conversation took place

14  and the topic.

15              Did you also talk to a lawyer from Wachtell

16  over the course of the weekend?

17              MR. NEAL:  Just yes or no on that, if you

18  remember.

19      A.   It's difficult to remember the exact timing of

20  conversations three years ago and, you know, exactly

21  what day they occurred and when they occurred.  I think

22  I talked to a lawyer from Wachtell.  Yeah, I'm not

23  certain.

24      Q.   (BY MR. PORRITT)  Okay.  Fair enough.

25              And then, on the Monday, you had a

1    provision at this point, but yeah.

2         A.  I think he's probably aware of it.

3         Q.  After you sent this tweet -- well, no.  Let's

4    just finish off.  Sorry.

5              The reference here to "funding secured,"

6    that refers to the Saudi Arabia PIF; is that correct?

7         A.  Yes.

8         Q.  Okay.  And I don't want to rehash our

9    discussion at length.

10             And that was based on your discussion you'd

11   had with the PIF on your July 31st, 2018,

12   meeting; correct?

13        A.  Correct.

14        Q.  You had not had any subsequent communications

15   with the PIF?

16        A.  I don't think so.

17        Q.  Okay.  After you sent this tweet, do you know

18   what happened next?  Can you -- do you remember what

19   happened next?

20             MR. NEAL:  Well, in -- in what respect?

21        Q.  (BY MR. PORRITT)  Well, immediately thereafter,

22   you know, between -- there is a --

23             MR. NEAL:  Like he said, he got on the

24   airplane and flew it.

25        Q.  (BY MR. PORRITT)  Did anyone call you?  I guess

1      Q.   Okay.  Although, just to go back to Exhibit 8,

2   it doesn't say "funding secured at 420"; right?

3             MR. NEAL:  It speaks for itself.  You don't

4   need -- he's arguing with you now.  You don't need to

5   argue with him.

6      A.   Yeah.

7      Q.   (BY MR. PORRITT)  Well, was funding secured if

8   the price was 421?

9      A.   Probably.

10     Q.   Okay.  What about 425?

11     A.   I mean, some number that would -- that would

12  not be some much larger premium of the stock price, but

13  I want it -- you know, I want it to be clear that it was

14  not -- I would not consider taking Tesla private at any

15  price, but I'm considering taking Tesla private at $420.

16     Q.   And did, in fact, Sarah O'Brien, Todd Maron,

17  and you -- and Mr. Ahuja, rather, draft a blog post or

18  email for you?

19     A.   Yeah, we worked on a blog post.

20     Q.   Okay.  And how did you -- how was that work

21  undertaken?

22     A.   We aerated on -- on a blog post and -- and

23  posted one.

24     Q.   Okay.  So -- but how -- how was the work --

25  who -- who -- who drafted the preliminary draft?

```
 1      A.  I don't recall.
 2      Q.  Was it you?
 3      A.  No.  I think they sent me a draft.
 4      Q.  Okay.  Do you remember if you made any comments
 5  to it?
 6      A.  I don't recall.
 7      Q.  Okay.  Do you recall how it was sent to you?
 8      A.  Probably by email.
 9      Q.  Okay.  Were Ms. O'Brien, Mr. Maron, and
10  Mr. Ahuja also at Fremont on this day, on this morning?
11      A.  I think so, but I'm not certain.
12      Q.  All right.
13              MR. PORRITT:  Why don't we get the -- so
14  let's mark this as the next -- what are we up to?
15  Sorry.
16              THE REPORTER:  331.
17              MR. PORRITT:  331.
18              (Exhibit 331 marked.)
19              MR. PORRITT:  So I'm placing before the
20  witness a document marked as Exhibit 331, a document
21  Bates-stamped TESLA_LITTLETON_00020197.  I think it was
22  a native file, so I think it just has one -- oh, sorry.
23  Okay.
24      A.  (Witness reviews document.)
25      Q.  (BY MR. PORRITT)  I'll represent to you these
```

1  this -- this email?  What I'm describing as an email was

2  titled "The following email was sent to Tesla employees

3  today."

4       A.  Yes.

5       Q.  Okay.  This was an email you sent on

6  August 7th, 2018?

7       A.  Yes.

8       Q.  Okay.  Again, reading this, does it refresh

9  your recollection about any particular part of this that

10  you drafted or wrote?

11      A.  This actually does look like the sort of -- the

12  way that I would write things.

13      Q.  Okay.  But you don't have any recollection of

14  writing any of it?

15      A.  I mean, I don't have any specific recollection

16  except that this certainly reads like an email that is

17  in my voice.

18      Q.  Okay.  First of all, this email doesn't mention

19  funding; correct?

20      A.  It does not seem to mention funding.

21      Q.  Okay.  Do you know -- do you know why funding

22  wasn't included in this email?

23      A.  No.

24      Q.  Do you recall asking or suggesting that funding

25  be discussed in this email?

```
 1                  THE VIDEOGRAPHER:  The time is 5:33.  We
 2   are on the record.
 3       Q.  (BY MR. PORRITT)  So before the break,
 4   Mr. Musk, I just -- we were looking at Exhibit 12, the
 5   email dated August 7th, 2018.  I just have a couple of
 6   follow-up questions.
 7                  So, in this -- in this email, you refer to
 8   shareholders, and you also refer to investors.
 9                  Is there any difference between the two in
10   this email?
11       A.  Well, shareholders would be those that are
12   currently shareholders.  Investors could be either
13   current, prospective -- current shareholders,
14   prospective shareholders, or both.
15       Q.  Okay.  And when you're using it -- so, for
16   instance, I see it in the second-to-last paragraph here.
17   Where -- you write, in Exhibit 12, (as read) ...where
18   there is as little change to all of our investors,
19   including all of our employees, as possible.
20                  Do you see that?
21       A.  Yeah.
22       Q.  All right.  Who -- what -- in what use are you
23   using it there?
24       A.  Investors would be shareholders, yeah, current
25   shareholders.
```

1   transaction by August 7th, 2018?

2       A.  I don't recall.

3       Q.  The second sentence is -- well, the second

4   sentence says "Only reason why this is not certain is

5   that it's contingent on a shareholder vote."

6               Do you see that?

7       A.  Yes.

8       Q.  Okay.  Now, we'd already seen in the August 3rd

9   board meeting that there currently was not a proposal, a

10  formal proposal for the board to evaluate and analyze.

11              Do you recall that?

12      A.  Yes.

13      Q.  And you had testified that there would need to

14  be a special committee appointed who would negotiate the

15  terms of the final transaction; correct?

16      A.  They would -- they would negotiate what would

17  be proposed to shareholders.

18      Q.  Okay.  And that hadn't been -- that process

19  hadn't been even started by this point; correct?

20      A.  I'm not certain.

21      Q.  Okay.  Was there a special committee appointed

22  by August 7th, 2018?

23      A.  I'm not sure.

24      Q.  So what was -- there was nothing in existence

25  on August 7th, 2018, for the shareholders to vote

1  if the Saudi Public Investment Fund did not give you the

2  funding to purchase over 51 percent?

3      A.  Well, the -- in talking with Silver Lake,

4  Goldman Sachs, and Morgan Stanley, they were confident

5  that the funding could be raised whether or not the

6  Saudi investment fund wanted to proceed.

7      Q.  If it had -- well, two things:  What would

8  happen with the -- what would happen with the funding

9  from the Saudi pension investment -- Public Investment

10  Fund?

11              MR. NEAL:  Can I hear that question again.

12              (Record read.)

13              MR. NEAL:  Object to the form.  I don't

14  understand that question.

15      Q.  (BY MR. PORRITT)  If the Saudi Public

16  Investment Fund refused to provide the funding that you

17  discussed on July 31st, 2018, what would -- what would

18  you have -- what recourse could you take?

19      A.  Well, I think I would work with Silver Lake,

20  Goldman Sachs, and Morgan Stanley, all of whom agreed to

21  support the take-private and raise money from other

22  investors.

23      Q.  Had they -- had you spoken to them by

24  August 7th, 2018?

25      A.  I'm not sure exactly -- no, no.  In this -- in

1   this case, the August 7th one, I'm referring to the

2   Saudis.

3        Q.  Okay.  But --

4        A.  And the August 24th one, I specifically mention

5   Silver Lake, Goldman Sachs, and Morgan Stanley

6   explicitly.

7        Q.  So -- but the August 7th --

8        A.  But you're conflating the two, but there is a

9   big difference in time here.

10       Q.  Understood.

11            So we can put -- in the August 7th, you

12  write "Investor support is confirmed," referring to the

13  Saudi Public Investment Fund; correct?

14       A.  Yes.

15       Q.  Okay.  My question is:  If the Saudi Public

16  Investment Fund did not provide you with the funding,

17  what was your recourse going to be?

18            MR. NEAL:  What do you mean?  Recourse

19  against PIF?  He just answered that question.

20       Q.  (BY MR. PORRITT)  Yes.  What would your

21  recourse be against PIF?

22            MR. NEAL:  If any.

23       Q.  (BY MR. PORRITT)  Well, that's the question.

24       A.  Well, on August 7th, I believe that the -- we

25  had their full support.  Subsequent to that, whether or

1    not they -- there was support -- whether or not they

2    wanted to increase their investment beyond 5 percent was

3    not necessary to take the company private.  I --

4    Silver Lake, Goldman Sachs, and Morgan Stanley were

5    highly confident that we could raise the money to take

6    Tesla private whether or not the Saudis participated.

7        Q.  But you -- once again, you're not answering my

8    question, which is that:  Did you have any legal

9    recourse against the PIF if they refused to provide you

10   funding for a going-private transaction?

11       A.  No, I don't think so.

12       Q.  Okay.  Did you have any -- did you ever obtain

13   a contractual commitment letter for any funding for the

14   going-private transaction at any time?

15               MR. NEAL:  A letter?

16               MR. PORRITT:  Just a contractual

17   commitment.

18               MR. NEAL:  Well, I object to the form of

19   that question.  What do you mean by "contractual

20   commitment"?

21               MR. PORRITT:  Okay.  An enforceable

22   commitment.

23               MR. NEAL:  It call -- that calls for a

24   legal speculation on his part.

25               MR. PORRITT:  Well, as he understands it.

Confidential

```
 1    view?

 2         A.  I -- I think, yes, in this -- in this context,

 3    it is a synonym for -- yeah.

 4         Q.  Okay.  You think there is a thesaurus in the

 5    world that lists secured as a -- as a synonym for

 6    confident?

 7              MR. NEAL:  This is getting silly.

 8         A.  I suspect there probably is.

 9         Q.  (BY MR. PORRITT)  Okay.  Well...

10         A.  I'm confident there is.

11         Q.  Why don't we go to -- back to Exhibit 121, your

12    text messages.  And if I can refer you to --

13              MR. NEAL:  That thick --

14         A.  Oh.

15         Q.  (BY MR. PORRITT)  Yeah, it's just -- there you

16    are.  I think that's it.  And then if you can go forward

17    to -- let's see.  It's the one, two, three, four, five,

18    six, seven -- eighth page of Exhibit 121 on

19    August 10th, 2018.  The time stamp on here is 22:45.

20    Actually, if you just go up to --

21         A.  Sorry.  Where?

22         Q.  Yeah.  It's 8/10/2018, 19:56.  Sorry.

23         A.  Yes.

24         Q.  Okay.  Do you see a text there from you to

25    Yasir?
```

Confidential

```
 1        A.  Yes.

 2        Q.  All right.  Saying "This is a major problem.

 3   It's extremely important that you confirm that you are

 4   in discussions with me regarding the take-private

 5   transaction."

 6        A.  Yes.

 7        Q.  "Nothing more needs to be said."

 8            Do you see that?

 9        A.  Yes.

10        Q.  Okay.  Do you recall sending that text to

11   Yasir?

12        A.  Yes.

13        Q.  Okay.  What prompted you to send that text?

14        A.  I think there was some press or statement

15   about -- from the -- the Saudi PIF that they were less

16   committed to the -- to supporting a take-private then,

17   was my understanding.

18        Q.  In your text, you don't ask Yasir to confirm

19   that they have committed to funding or that they've --

20   you have secured funding.

21        A.  Well, I'm certainly asking that they confirm

22   discussions.  That's -- they don't need to say more than

23   that, even though I felt that they had committed to more

24   than that.

25        Q.  Well, why didn't you ask them to say more than
```

Confidential

 1   that?

 2        A.  I was trying to make the least difficult ask of

 3   them.

 4        Q.  Okay.  Was it because you knew that they

 5   wouldn't confirm that they had committed funding?

 6        A.  No.

 7        Q.  Later down on that page, there is a lengthy

 8   text from Yasir.  If you could just read that.

 9        A.  "Elon, as you know, PIF purchased a passive

10   stake" --

11        Q.  You can read it to yourself.  I don't --

12        A.  Okay.  Great.

13        Q.  Don't read it out loud.  Sorry.

14        A.  Okay.

15        Q.  If you could just read it to yourself.  I'm

16   sorry.  I didn't want to read it out -- I was going to

17   read it out loud and thought that's a bit of a long

18   read.  So I'll let you read it to yourself.

19        A.  (Witness reads document.)

20               Yes.

21        Q.  Okay.  Yasir describes his understanding as

22   "PIF remains interested" as -- well, sorry.  First of

23   all, he describes his -- his -- his status as owning a

24   passive stake in Tesla.

25        A.  Yes.

Confidential

1      Q.   Do you see that?

2             And then it "remains interested in

3   potential investment opportunities."

4             Do you see that?

5      A.   Yes.

6      Q.   And that they would explore investing in Tesla.

7   Correct?

8      A.   Yes.

9      Q.   Okay.  There is no reference in there to a

10  commitment to funding; correct?

11     A.   I mean, they -- they -- they say very clearly

12  that they're interested in investment opportunities.

13     Q.   It says --

14     A.   I mean, they're -- they're explicit about --

15  they're very clear that they are interested in

16  investment opportunities with Tesla.

17     Q.   Right.  Contingent upon Tesla creating a

18  production hub in the Kingdom of Saudi Arabia; correct?

19     A.   Yes, that's what the text says.

20     Q.   Okay.

21     A.   Which I was not opposed to.  It's just a

22  question of the timing.

23     Q.   Okay.  But does this -- this suggests that any

24  significant investment by Public Investment Fund was

25  contingent upon Tesla opening a production facility in

Confidential

1   the -- in the Kingdom of Saudi Arabia?

2        A.  At some point in the future, which I was not

3   opposed to.  I thought that would be quite reasonable.

4   In fact, I thought it could be helpful to Saudi Arabia

5   to have a -- something that employed people that was

6   with -- that -- for sustainable energy.  I was

7   sympathetic to their need to transition away from a

8   dependency on oil.

9        Q.  Do you know -- is opening a production facility

10  in Saudi Arabia something you would need board approval

11  before you could do?

12       A.  Not -- I don't think so.

13       Q.  Okay.  So you can open up a production facility

14  anywhere in the world without board approval?

15       A.  Yeah.  Perhaps if it was beyond a certain

16  scale, there might need to be board approval.  But

17  generally, the board is -- does not operate the company;

18  I operate the company.

19       Q.  Yasir's text then says, "We would like our

20  teams to start working together in a confidential manner

21  to explore a potential transaction."

22               Do you see that?

23       A.  Yes.

24       Q.  Okay.  Is that consistent with committing

25  financing for a going-private transaction?

Confidential

1       A.  I mean, he's clearly saying that he wants to

2   pursue investment opportunities.

3       Q.  Okay.

4       A.  So that's -- that's consistent with investment

5   support.

6       Q.  Okay.  Is it consistent with -- starting to

7   work together, is that consistent with securing funding?

8       A.  I mean, they're very clear about being

9   interested in investment opportunities.  They state that

10  explicitly.

11      Q.  Okay.  But --

12      A.  They wouldn't have said that if they weren't

13  interested in investment opportunities.

14      Q.  Right.

15      A.  So they're interested in investment

16  opportunities.

17      Q.  Okay.

18      A.  They wanted to invest.

19      Q.  Okay.  Is that the same as committing to

20  invest?

21      A.  I mean, they're -- they're very clear about

22  wanting to invest.  Why would we not take them at their

23  word?

24      Q.  Did you have a conversation with Yasir on

25  August 10th, 2018?  That's a Friday, point of reference.

1      Q.   So if you can just turn down after the --

2   immediately after the "It's over" text.  There is

3   another lengthy text from Yasir.  He says (as read)

4   Let's see the numbers and get our people to meet and

5   discuss.  We cannot approve something when we don't --

6   that we don't have sufficient information on.  We've

7   agreed that you will send the financial information and

8   the way going forward within a week and nothing happened

9   since.  The last thing I want to do is "through you

10   under the bus."  So please don't treat me like an enemy.

11            You forgot there was a change of position

12   from July 31st, 2018?

13      A.   My concern was with what they were saying

14   publicly or what was getting leaked publicly.  It

15   certainly would be fine to provide them with additional

16   information, but I felt it was important that they

17   correct any public misperception that they were not

18   interested in investing when, in fact, they were

19   interested in investing.

20            They needed to correct in the public

21   perception, because they were interested in investing,

22   and they would not -- Yasir would not be wanting to meet

23   with me and talk with me and be pushing me for

24   information if he wasn't interested in investing.  So,

25   obviously, he is privately interested in investing.  He

1    simply needs to confirm that publicly.

2        Q.  Well, wasn't it also true that following

3    July 31st, 2018, they needed to get additional

4    information before they could approve any funding for

5    Tesla?

6                    MR. NEAL:  Is it true, or is that what that

7    tweet says?  That's what the tweet says.

8        Q.  (BY MR. PORRITT)  Well, I'm asking:  Isn't it

9    true?

10       A.  I mean, he's saying that he wants additional

11   information, which is completely fine.  It is normal to

12   get additional information, just like when you make an

13   offer on a house and you want to buy a house, you

14   look -- you want additional information.

15                   Your intent, however, is to follow through

16   with the investment.  That, I don't have a problem with.

17   I do have a problem with not being clear publicly that

18   the PIF was interested in increasing their investment,

19   which they were.

20       Q.  So --

21       A.  They would not be pushing me for conversations

22   and meetings and documents if they were not interested

23   in investing, if they did not want to invest.  They're

24   very clear about wanting to invest privately.  I just

25   wanted them to make that consistent publicly.

Confidential

1        Q.  The statement here, "We cannot approve

2    something that we don't have sufficient information on,"

3    that was the understanding, comment of July 31st, 2018?

4        A.  No, that was not the understanding of

5    July 31st.

6        Q.  Is this statement consistent with secured

7    funding from PIF?

8        A.  The -- the very clear understanding that I had

9    on July 31st was that they would support a take-private.

10       Q.  Is the statement "PIF cannot approve something

11   that we don't have sufficient information on" consistent

12   with securing funding from them?

13       A.  I think the -- the July 31st -- the tweet is

14   based off of what I said on July 31st.  On July 31st --

15   or the tweet -- the tweet is based on the meeting that

16   we had on July 31st.  In that meeting, they were -- they

17   were unequivocal in their support for taking Tesla

18   private.  Yeah.

19       Q.  That didn't really answer my question.

20           Is someone not approving something when

21   they don't have sufficient information on consistent

22   with securing funding for that person?

23           MR. NEAL:  Object to the form of the

24   question.  It's argumentative, unclear.

25       A.  The tweet is based on the conversation we had

 1   on July 31st.  In that conversation, they -- they --

 2   they were unequivocally supportive of Tesla -- of taking

 3   Tesla private.  That's what that tweet was based on.

 4   And, on that basis, I felt funding was secured.

 5        Q.  (BY MR. PORRITT)  So looking down here, just

 6   two more -- two or three texts down, you have more from

 7   Yasir, saying (as read) Details on how we can take the

 8   company private.  That's what we agreed on.  What is the

 9   required percentage and so on?  What are required

10   regulatory thresholds for taking it private?

11             Do you see that?

12        A.  Yes, that's -- those are entirely reasonable

13   questions.

14        Q.  Okay.  That -- you agreed to provide that

15   information to Yasir at the July 31st, 2018, meeting?

16        A.  I mean, it's reasonable, in -- in taking a

17   company private, to say, okay, what percentage of the --

18   the company does Saudi PIF have to provide?  That is a

19   reasonable question.  It could be 15 percent,

20   20 percent, 25 percent.  But there was no equivocation

21   in the July 31st meeting regarding their support for

22   taking Tesla private, none.

23        Q.  But they would need to have that additional

24   information before they could commit funding?

25        A.  I think you're just trying to be tricky here.

1        Q.   I'm just asking a question.

2                  MR. NEAL:   What's the question?

3                  MR. PORRITT:   Could you read the question

4     back, please.

5                  (The record was read as

6                    follows:

7                      "Q.   But they would need to

8                      have that additional

9                      information before they could

10                     commit funding?")

11       A.   Yes, but that is not saying that they are not

12    willing to commit funding.   They're simply -- it's,

13    like, quite reasonable for them to ask, okay, so do you

14    want us to invest 20 percent?   25 percent?   That's in no

15    way undermining their desire to invest.

16       Q.   (BY MR. PORRITT)   Okay.

17       A.   It's typically like saying, well, how big --

18    you know, should we write a check for 20 percent or

19    25 percent or what?   It's not saying they won't write

20    the check.

21       Q.   If you could -- let's go on to the next page.

22    And please read the texts in between -- yes, the texts

23    in between for additional context.   But I want to focus,

24    again, on --

25                  MR. NEAL:   What exhibit are you working off

1    of?

2                    MR. PORRITT:  121.

3                    MR. NEAL:  Okay.  Yep.

4                    MR. PORRITT:  Still 121.

5                    MR. NEAL:  Yeah.  You got the right page?

6                    MR. PORRITT:  Has the witness got the right

7    page?  I don't want to point him to another.

8                    MR. NEAL:  Yeah, this is

9    Exhibit 121; right?

10                   MR. PORRITT:  Okay.

11                   MR. NEAL:  Yeah.

12        Q.  (BY MR. PORRITT)  This is now a text dated

13   August 12th, 2018, time stamped 18:57.  Yasir writes

14   (as read) We haven't taken any company private yet in

15   the US or anywhere else, and the agreement, as was

16   minuted by my people, is to wait for the information to

17   be sent by you within a week on how we will move forward

18   together.

19                   Do you see that?

20        A.  No, I'm sorry.  I must be on the wrong page.

21        Q.  Oh, I apologize.  It's August 12th, 18 -- that

22   was at 18:57.  And, as your counsel pointed out, read

23   any intervening texts that you want to obtain whatever

24   context you want.

25        A.  Yes, I don't think this -- this -- this is

1   consistent with them saying that -- I mean, he's saying

2   he wants to move forward together.

3        Q.  Okay.

4        A.  That's -- like, clearly, he's saying he wants

5   to move forward together.

6        Q.  Okay.  After obtaining additional information.

7        A.  Yes.

8        Q.  Okay.

9        A.  He wants to move forward together.  That's

10  obviously expressing strong interest in literally moving

11  forward together.

12       Q.  Okay.  So this is -- this statement here in

13  this text we're just looking at is consistent with

14  saying funding is secured from PIF?

15       A.  This is not the same as the conversation that

16  we had on July 31st.  July 31st, it was "we will support

17  you in going private."  That was it.  And, on that

18  basis, I felt funding was secured.  You -- you can't,

19  like, look at something on -- that's, like, 12 days

20  later, 13 days later, and say that somehow I would have

21  had foreknowledge of something 12 days later.

22       Q.  This is referring to the minutes made of -- by

23  PIF at the meeting on July 31st; correct?

24       A.  I mean, he's saying that there were minutes,

25  but I don't recall any minutes being made of that

1       Q.   Okay.  Do you recall at one point in time

2   executing a nondisclosure agreement with the PIF?

3       A.   I don't recall.

4       Q.   Okay.  If the tweets that we looked at on

5   August 7th had disclosed the pertinent information about

6   going private, why would you need to sign a

7   nondisclosure agreement with the PIF?

8       A.   I don't know.

9       Q.   If we can go back to Exhibit 121, your text

10  messages, onto the subsequent page, where we were

11  before.  So this is now stamped August 13th, 2018,

12  19:17.  Do you see there is a text from

13  Yasir to -- Yasir to you?

14       A.   Yes.

15       Q.   Okay.  Yasir writes (as read) Elon, I'm

16  personally surprised.  You've signed an NDA, and while

17  we are waiting for you and your team to provide us with

18  information to move forward, you post an ill-advised

19  blog with loose information.  Anyway, we hope that you

20  and your team work on gathering the information as soon

21  as possible and send that to us to move forward, Yasir.

22              Do you see that?

23       A.   Yes.  I mean, he's saying, once again, that he

24  wants to move forward with the transaction.  I mean,

25  this is good.

Confidential

1      Q.  Do you agree that the blog --

2      A.  He's reaffirming his interest in investing.

3      Q.  Do you agree with Yasir, that the blog was

4   ill-advised with loose information?

5      A.  No.

6      Q.  Do you know what Yasir's referring to there?

7      A.  No.

8      Q.  You respond "You shouldn't be.  I'm still

9   upset."

10                 Do you see that?

11     A.  Yes.

12     Q.  Okay.  What were you upset about with Yasir?

13     A.  I was upset that the -- the -- what the press

14   was reporting was not consistent with our private

15   discussions.  In the private -- he, once again,

16   reaffirms via text that he's interested in moving

17   forward as soon as possible.  He says that in the text.

18   I simply want that to be reflected in the media.  I

19   simply want that to be the same.  That is entirely

20   reasonable.

21     Q.  We leapt ahead a little bit, but going back

22   following your August 7th tweets that we were looking

23   at, Exhibits 8 through 13, I believe they are.

24                 Do you recall what the market reaction was

25   to your tweets?

1      A.   Okay.

2      Q.   I apologize.  That was a little trick.

3      A.   Last page just has a signature on it.

4      Q.   Okay.  First page.

5      A.   (Witness reviews document.)

6      Q.   So it's really the section titled "1,

7   Discussion of a Potential Going-Private Transaction."

8      A.   Yeah, okay.  I'll read that.

9      Q.   Thank you.

10     A.   (Witness reads document.)

11              Yes, I've read it.

12     Q.   Okay.  So if I can direct you back to the first

13  page of Exhibit 101.

14     A.   Yes.

15     Q.   The -- the last paragraph, the carry-over

16  paragraph, starting on page 1 of Exhibit 101, where you

17  say -- or the minutes say (as read) Mr. Musk next

18  discussed with the board information that he had learned

19  in recent weeks following his announcement, including,

20  but not limited to, the negative views of many of the

21  company's current stockholders regarding the prospect of

22  the company going private, the difficulties the

23  company's current stockholders would have in continuing

24  to own Tesla's stock if the company went private, as

25  well as the procedural difficulties of any going-private

1    transaction, including the extended length of time such

2    a transaction would require, and how it may distract and

3    negatively impact the company's focus on its core

4    business.

5                    Do you see that?

6        A.  Yes.

7        Q.  Does that accurately summarize your discussion

8    with the board on August 23rd, 2018?

9        A.  I think it does, yeah.

10       Q.  If I -- on to the next page of Exhibit 101,

11   just after the --

12                   MR. NEAL:  And when you say "the next

13   page," you mean page 2 or --

14                   MR. PORRITT:  Page 2.  Sorry.

15                   MR. NEAL:  Page 2.

16                   MR. PORRITT:  Page 2.  Sorry.

17       Q.  (BY MR. PORRITT)  Midway through, or about a

18   quarter of the way through that paragraph, after the

19   redactions, the minutes say (as read) As part of this

20   discussion -- or no.  Sorry.  Well, yeah.  (As read) As

21   part of this discussion, Mr. Musk reminded the board

22   that one of his preferences when considering a

23   going-private transaction was to allow Tesla's long-term

24   investors to continue to keep their equity positions in

25   Tesla, but he had recently heard from numerous investors

Confidential

1   off responding to these inquiries?

2        A.  Well, I thought it would be best to schedule

3   calls with investors and talk to them about the

4   take-private.  Yeah.

5        Q.  And did you -- did you actually schedule those

6   calls?

7        A.  Yeah, we sched- -- I sched- -- we scheduled

8   calls with a number of the major investors.  I think

9   most of the major investors I talked to at some point in

10  the following weeks.  And that's where, you know, I

11  asked them what their interest would be in remaining as

12  an investor in Tesla as a private company, whether they

13  thought this was a good idea, whether they'd be

14  supportive of that.

15            And, yeah, I -- on balance, about, you

16  know, roughly half of the investors were

17  supportive of -- or they -- they would continue to

18  remain investors as Tesla -- with Tesla as a private

19  company, but most preferred that we would remain public.

20  But that did not -- so they -- they would be willing to

21  be a private investor -- they were willing to -- would

22  be willing to be part of Tesla as a private company, but

23  they would prefer that we remain public.

24       Q.  Okay.  I think, with that, I don't have any

25  further questions.

NAME OF CASE:   In re Tesla, Inc. Securities Litigation

DATE OF DEPOSITION:   November 5, 2021

NAME OF WITNESS:   Elon Musk

Reason Codes:

    1.   To clarify the record.

    2.   To conform to the facts.

    3.   To correct transcription errors.

Page 17   Line 23-24   Reason 3

From voting on -- voting on   to verging on -- verging on

Page 130   Line 7   Reason 3

From draft   to drafted

Page 154   Line 20   Reason 3

From the end by   to Dubai

Page 164   Line 12   Reason 3

From consummate   to [inaudible]

Page 188   Line 5   Reason 3

From would start   to was not

Page 196   Line 22   Reason 3

From aerated   to iterated

Page 244   Line 20   Reason 3

From correct in the   to correct the

Page _____   Line _____   Reason _____

From _____   to _____

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4  IN RE TESLA, INC. SECURITIES) Case No.
    LITIGATION                  ) 3:18-cv-04865-EMC
 5                              )
                                )
 6                              )
                                )
 7                              )
                                )
 8  _____)
```

9               REPORTER'S CERTIFICATION

10          ORAL AND VIDEOTAPED DEPOSITION OF

11                    ELON MUSK

12               NOVEMBER 5, 2021

13

14      I, CANDICE ANDINO, Certified Shorthand Reporter in

15  and for the State of Texas, hereby certify to the

16  following:

17      That the witness, ELON MUSK, was duly sworn by the

18  officer and that the transcript of the oral deposition

19  is a true record of the testimony given by the witness;

20      I further certify that pursuant to FRCP Rule

21  30(f)(1) that the signature of the deponent:

22      _____ was requested by the deponent or a party

23  before the completion of the deposition and returned

24  within 30 days from date of receipt of the transcript.

25  If returned, the attached Changes and Signature Page

1    contains changes and the reasons therefor;

2         __X__ was not requested by the deponent or a party

3    before the completion of the deposition.

4         I further certify that I am neither attorney nor

5    counsel for, related to, nor employed by any of the

6    parties to the action in which this testimony was taken.

7         Further, I am not a relative or employee of any

8    attorney of record in this cause, nor do I have a

9    financial interest in the action.

10        Subscribed and sworn to on this 10th day of

11   November, 2021.

12

13        _____
                    CANDICE ANDINO, Texas CSR No. 9332, RMR
14                  Expiration Date:  8/31/23
                    TSG Reporting, Inc.
15                  Firm Registration No. 615
                    747 Third Avenue, 10th Floor
16                  New York, New York 10017
                    (877) 702-9580
17

18

19

20

21

22

23

24

25