EXCERPTS FROM THE SEC TESTIMONY OF
ELON MUSK
TAKEN AND RECORDED AUGUST 29, 2018

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                )   File No. SF-04082-A
                                 )   AMENDED 9-5-2018
                                 )            9-10-2018
TESLA MOTORS, INC.               )   CONFIDENTIAL

WITNESS:  Elon Musk
PAGES:    1 through 283
PLACE:    44 Montgomery Street
          Suite 2800
          San Francisco, California
DATE:     Wednesday, August 29, 2018

     The above-entitled matter came on for hearing,
pursuant to notice, at 9:17 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200



EXHIBIT 330
Elon Musk
11/5/2021

Reported by: Candice Andino
TX CSR No. 9332, RMR

CONFIDENTIAL

SEC-EPROD-000016109

1   APPEARANCES:

2

3

4   On behalf of the Securities and Exchange Commission:

5       WALKER NEWELL, ESQ.

6       STEVEN D. BUCHHOLZ, ESQ.

7       E. BARRETT ATWOOD, ESQ.

8       BRENT SMYTH, ESQ.

9       44 Montgomery Street, 28th Floor

10      San Francisco, California 94104

11      (415) 705-2325

12      newellw@sec.gov

13      buchholzs@sec.gov

14

15

16      CHERYL L. CRUMPTON, ESQ.

17      TED YU, ESQ.

18      100 F Street, N.E.

19      Washington, D.C. 20549

20      (202) 551-5000

21      crumptonc@sec.gov

22

23

24

25

CONFIDENTIAL

Page 3

```
 1    APPEARANCES(CONT.):
 2
 3    On behalf of the Witness:
 4
 5        STEVEN FARINA, ESQ.
 6        DANE BUTSWINKAS, ESQ.
 7        Williams & Connolly
 8        725 Twelfth Street, N.W.
 9        Washington, D.C. 2005
10        (202) 434-5000
11        sfarina@wc.com
12
13
14
15        TERENCE M. HEALY, ESQ.
16        ROEL C. CAMPOS, ESQ.
17        Hughes Hubbard &  Reed
18        1775 I Street, N.W. Suite 600
19        Washington, D.C 20006
20        (202) 721-4600
21        terence.healy@hugheshubbard.com
22
23
24
25
```

CONFIDENTIAL

Page 4

```
1     APPEARANCES(CONT):

2

3     On behalf of the Witness(cont.):

4          BRADLEY J. BONDI, ESQ.

5          Cahill Gordon & Reindel, LLP

6          1990 K Street, N.W. Suite 950

7          Washington, D.C. 20006

8          (202) 862-8900

9          bbondi@cahill.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

SEC-EPROD-000016112

Page 5

1    APPEARANCES (CONT.):

2

3    Also Present:

4         Lucien Newell, Video Operator

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

SEC-EPROD-000016113

Page 9

```
 1                    P R O C E E D I N G S
 2                   (SEC Exhibit No. 1 was marked
 3                    for identification.)
 4           VIDEO OPERATOR:  Here begins DVD No. 1 in the
 5   testimony of Elon Musk in the investigation by the U.S.
 6   Securities and Exchange Commission in the Matter of:
 7   Tesla Motors, Inc., File SF-04082-A
 8           Today's date is August 29th, 2018.  The time on the
 9   video monitor is 9:17.  The video operator today is Lucien
10   Newell, employed by Behmke Reporting and Video Services, Inc.,
11   subcontracted by Diversified Reporting Services, Inc.
12           This video investigation is taking place at 44
13   Montgomery Street, Suite 2800, San Francisco.  The court
14   reporter today is Mary Bardellini, Certified Shorthand
15   Reporter, contracted by Behmke Reporting and Video
16   Services, Inc., and subcontracted by Diversified Reporting
17   Services.
18           Counsel, please voice identify yourselves for the
19   record.
20           MR. FARINA:  Steve Farina, Williams and Connolly,
21   on behalf of the witness.
22           MR. HEALY:  Terence Healy, Hughes Hubbard & Reed,
23   LLP, on behalf of the witness.
24           MR. CAMPOS:  Roel Campos, Hughes Hubbard & Reed,
25   on behalf of the witness.
```

CONFIDENTIAL

SEC-EPROD-000016117

1         MR. BONDI:  Brad Bondi, Cahill, Gordon &

2    Reindel on behalf of the witness and the company.

3         MR. BUTSWINKAS:  Dane Butswinkas, Williams and

4    Connolly, on behalf of Mr. Musk.

5         MR. NEWELL:  I'm Walker Newell, Securities and

6    Exchange Commission.  With me are Steven Buchholz, Cheryl

7    Crumpton, Barrett Atwood and Brent Smyth, and with us via

8    the video is Ted Yu.

9         Mr. Musk, please raise your right hand.

10   Whereupon,

11                    ELON MUSK

12   was called as a witness and, having been first

13   duly sworn, was examined and testified as follows:

14                    EXAMINATION

15        BY MR. NEWELL:

16   Q    Please state your full name and spell it for the

17   record.

18   A    Elon Reeve Musk, E-L-O-N, R-E-E-V-E, M-U-S-K.

19   Q    We're going to do a little redux of what we just

20   did for the record again.  So, apologies for the

21   redundancy.

22        Again, my name is Walker Newell.  With me are

23   Steven Buchholz, Cheryl Crumpton, Barrett Atwood, Brent

24   Smyth and Ted Yu on video from Washington, D.C.  We're

25   officers of the Commission for purposes of this

CONFIDENTIAL

Page 110

```
 1              THE COURT REPORTER:  Say it one more --
 2              MR. NEWELL:  Naif Al-Mogren.
 3              THE COURT REPORTER:  Uh-huh.
 4              UNKNOWN SPEAKER:  The usual spelling.
 5              (Laughter.)
 6              THE COURT REPORTER:  Thanks.
 7              BY MR. NEWELL:
 8         Q    But do you recall there being three representatives
 9    from the PIF at the meeting?
10         A    Yes.
11         Q    Do you recall who escorted them to the Jupiter
12    conference room?
13         A    No.
14         Q    Is it a long walk from the front desk at the
15    Tesla factory in Fremont to the Jupiter conference room?
16         A    Yes.
17         Q    Someone escorted them, you're just not sure who?
18         A    Correct.  It's about a 10, 15-minute walk.
19         Q    Who attended the meeting with PIF alongside you
20    at the outset of the meeting?
21         A    I think Sam Teller.  I mean, I know Sam Teller was
22    there.  I'm not sure if he was there or not for the entire
23    meeting.
24         Q    Do you recall approximately when the meeting
25    began?  We're looking at a calendar invite that says
```

CONFIDENTIAL

Page 113

1      A    I don't remember everything about the meeting.
2    It was like pleasantries. We exchanged pleasantries. And
3    then he was very excited to tell me that they had made a
4    substantial investment in Tesla, through the public markets,
5    right up to the absolute limit of just below 5 percent.
6      Q    On that -- on that point,
7    was that the first substantive comment anyone
8    made after the exchange of pleasantries?
9      A    That I recall, yes.
10     Q    Mr. Al-Rumayyan told you that the PIF had built
11   up a large stake in Tesla common stock on the public
12   markets?
13     A    That's correct.
14     Q    Did you have any prior knowledge before that
15   meeting that PIF had done that?
16     A    No, I was surprised to learn this.
17     Q    What was your reaction when he said that?
18     A    I was like, great, thank you for being a
19   shareholder, that's awesome.
20     Q    You thanked him?
21     A    As I do anyone who places their funds in our
22   trust.
23     Q    Did you say anything else in response apart from
24   expressing your gratitude for the support of the company?
25     A    No, I don't think so.

CONFIDENTIAL

SEC-EPROD-000016221

```
 1        Q    Do you recall Mr. Al-Rumayyan using the specific
 2   term "take private", or "going private", or some derivation thereof?
 3        A    "Take private", "going private", this was mentioned
 4   several times.
 5        Q    Did he ever use the term "investment"?
 6        A    Yes.  I mean, he mentioned that he had invested
 7   5 percent -- he purchased 5 percent of the company
 8   already, just on the open market, and that the only thing
 9   that was inhibiting a higher ownership was the reporting
10   requirements, 4.99 percent.  And he wanted to go considerably
11   higher but did not want to do that without checking with
12   me.  And obviously, this would create a splash because of
13   the reporting requirement.
14             So -- but that's -- their interest was much
15   higher than 5 percent, by a lot.
16        Q    So did you have an understanding of whether their
17   interest was to take a larger stake in Tesla --
18        A    Yes, definitely.
19        Q    -- at some point?
20        A    They were extremely explicit that they wanted to
21   have a much larger stake in Tesla, not a slightly larger
22   stake, but a much larger stake.
23             Now this is pretty obvious, because they need to
24   figure out the plan for when oil runs out.  And so they need
25   to -- they really wanted to figure out how they can be part
```

CONFIDENTIAL

Page 117

1  of energy in the future, even when it is solar power and

2  batteries and electric cars, and that kind of thing.

3          So this is of fundamental strategic importance to

4  them.  From their standpoint, their ideal situation, if

5  they could do it, would be a total acquisition of Tesla.

6  I just --

7      Q    How did you know -- I'm sorry to cut you off.

8  I didn't realize you weren't finished.

9      A    Obviously --

10     Q    How did you know they didn't want simply to

11 purchase another 5 percent, and bring their position up

12 to 10 percent?

13     A    This is not -- this sort of investment is not

14 merely a financial investment.  This is something that is

15 of a national security importance to them.  It's not just

16 a matter of getting some return on investment.  They need

17 to figure out what the hell the country is going to do

18 when they run out of oil.

19     Q    And you think that having a substantial stake,

20 short of taking Tesla private, would not further those

21 goals?

22     A    I mean, I don't want to, you know,

23 guess entirely what's in their minds.  It's pretty

24 obvious, if you are in the position of Saudi Arabia, that

25 you need to find a solution for what the hell you're going

CONFIDENTIAL

SEC-EPROD-000016225

Page 118

1   to do when the oil runs out.  Obviously, this is a very big

2   deal.

3            You know, they will run out of money.  They're

4   very dependent on oil.  This is not a good situation.  So

5   they've got to figure out something.  And energy --

6   they're currently a big provider of energy in the form of

7   oil and natural gas.  So from their standpoint, continuing

8   in the energy business, albeit renewable, seems like a

9   good thing.  And there's a wide range of things they could

10  do.

11           They've got a lot of desert, a lot of sun.  So they

12  could put a lot of solar panels up, and then transport that

13  energy to ultra high voltage, electrical connections to

14  other parts of the world.  They could have an electric car

15  factory or a battery factory.  These things are all quite

16  important.

17           Now these things don't come with just a financial

18  investment in a company.  You have to really have a much

19  bigger stake in the company for that to be the case.

20       Q    A controlling stake?

21       A    Not necessarily controlling but certainly much

22  more influential than 5 percent.  But aspirationally, if they

23  had their druthers -- aspirationally, they would like a

24  controlling stake, but this would obviously generate

25  concern on a number of levels.

CONFIDENTIAL

SEC-EPROD-000016226

Page 127

1    July 31st meeting for some more time.

2          BY MR. NEWELL:

3       Q   Do you recall anyone at the meeting --

4    you, Mr. Teller, or any of the PIF

5    representatives making reference to

6    an acquisition premium that would be required in a going

7    private transaction?

8       A   Not specific numbers.

9       Q   What about a percentage premium?

10      A   No.

11      Q   You don't recall anyone raising that during the

12   meeting?

13      A   No, but, of course, in any kind of acquisition

14   like this, a premium is standard, there's going to be a non-zero

15   premium.

16      Q   But no discussion of whether that premium would

17   be 15 percent, 20 percent, 25 percent?

18      A   I think it's -- no, but I think everyone knows the

19   exact premium is unknowable, until there is a negotiation,

20   but that there is a probable premium on the order of 20

21   percent.

22      Q   But there was no discussion of that probable

23   premium during the July 31st meeting?

24      A   No.  But they would not have been

25   under the assumption that there would be no premium

CONFIDENTIAL

SEC-EPROD-000016235

Page 128

1   nor that there would be an egregious premium.

2   And so, a reasonable expectation in the absence

3   of a specific number would be 20 percent.

4       Q    What's your basis for saying that?

5       A    A typical number for, you know, take privates or

6   acquisitions is 20, 20-ish percent.

7       Q    At the time of the July 31st meeting, were you

8   aware of the dollar magnitude of the largest prior

9   standard go private transaction that had ever been

10  accomplished?

11      A    No.

12      Q    And I'm using your phraseology there.  I hope

13  that's all right.

14      A    Yeah.

15      Q    "Standard" go private to refer to a

16  leveraged buyout where all outstanding shares are

17  purchased?

18      A    No; well, I wasn't aware of it.  I don't really

19  necessarily base things I do on prior precedent.

20      Q    Do you recall any discussion at the July 31st

21  meeting regarding potential regulatory requirements to a

22  going private transaction?

23      A    Sorry, at that -- the meeting with the PIF?

24      Q    With the PIF?

25      A    No.

CONFIDENTIAL

Page 129

```
 1        Q    Are you familiar with the Committee on Foreign
 2   Investments --
 3        A    CFIUS.
 4        Q    We'll use the term CFIUS to refer to the
 5   Committee on Foreign Investments in the United States.
 6   Sounds like you're familiar with that acronym?
 7        A    Yes.
 8        Q    Rolls off the tongue?
 9        A    Sounds like a disease, but yes.
10        Q    Did CFIUS, during July --
11        A    You've got CFIUS?  Oh, no, that's tragic.
12        Q    Let me ask it again.  Did CFIUS come up during
13   the July 31st meeting?
14        A    No.  I don't think so, the word CFIUS didn't come
15   up, but it's possible -- no, I don't think so.  I don't
16   think any restrictions -- the notion of restrictions on
17   percentage of ownership came up during that meeting.
18        Q    Did the topic of Tesla establishing a physical
19   presence in Saudi Arabia come up during the meeting?
20        A    Yes.
21        Q    Who brought that up?
22        A    Yasir.
23        Q    Do you remember roughly when in the meeting he
24   raised that?
25        A    I mean -- towards the -- maybe towards the end, I
```

CONFIDENTIAL

SEC-EPROD-000016237

Page 136

1    prepared to provide it, than was actually needed in my

2    mind.  I thought that they thought a lot of capital would

3    be needed, and they would provide it.  Much more than I

4    thought the capital would be needed.

5           And that was why, in my mind, they

6    effectively oversubscribed the deal in order to take Tesla

7    private, is what -- they were prepared to put a lot more

8    money in than I thought was actually necessary.

9        Q    But they never referenced a specific dollar

10   amount or a range of dollar amounts, right?

11       A    No.  But in the absence of that, one would assume

12   that their template would be a standard take private,

13   which would certainly imply buying out those investors.

14       Q    And again, there was no reference to any specific

15   number for a premium that would be associated with the deal,

16   right?

17       A    No specific premium.  But they were also aware

18   that there would be a premium.

19           BY MR. BUCHHOLZ:

20       Q    Was there discussion about the level of control

21   or influence that they would have?

22       A    No.

23       Q    Was there any discussion about --

24       A    They were pretty clear that they wanted me to

25   stay running the company.  Yeah.

CONFIDENTIAL

SEC-EPROD-000016244

Page 143

1      Q    It may have happened, but you don't have a specific
2  recollection?
3      A    Yeah.
4           MR. BUCHHOLZ:  Did you, Mr. Ahuja or Mr. Teller
5  take notes during the meeting?
6           THE WITNESS:  No. I didn't, I don't know if they
7  did.
8           MR. BUCHHOLZ:  You didn't notice them doing it?
9           THE WITNESS:  I didn't notice them doing it, if they did.
10          MR. BUCHHOLZ:  About how long did it last?
11          MR. FARINA:  The entire meeting?
12          MR. BUCHHOLZ:  Yes.
13          THE WITNESS:  I think about 40 minutes-ish.
14          BY MR. NEWELL:
15     Q    Did the PIF give you anything in writing, a
16  physical copy of anything during the course of the
17  meeting?
18     A    No.  Well -- I don't think so.  I don't think so.
19  I don't recall getting anything.
20     Q    Looked like maybe you weren't sure, you had some
21  recollection of something?
22     A    Well, every now and again people give me things
23  but -- I usually just put them on my desk and don't read
24  them.  Usually it's like some sort of generic document.
25  He didn't give me anything that was like -- I don't think

CONFIDENTIAL

SEC-EPROD-000016251

Page 149

1   term?

2           THE WITNESS:  I believe so.  It was something

3   like that, yes.  Just that it's -- it can't be like $8,000

4   a share, it can't be, you know, something completely crazy

5   and outside the bounds of a normal take private.

6           MR. BUCHHOLZ:  To the best of your ability, can

7   you describe what Mr. Al-Rumayyan said when he used the

8   term reasonable terms?

9           THE WITNESS:  He said like, tell me how you want

10  to do it and we'll do it.  And there was like just some --

11  I think it was reasonable but may have been -- it may have

12  been a synonym of reasonable, but it was like tell me how

13  you want to do it and as long as the terms are

14  reasonable -- I don't know if it was exactly the word

15  reasonable.  If not it was something of an equivalent

16  meaning and we'll do it.

17          MR. BUCHHOLZ:  Did you have any more discussion

18  about what that meant, what reasonable meant?

19          THE WITNESS:  No.  No.

20          BY MR. NEWELL:

21      Q    Was there any discussion of what you would do as

22  a next step if you elected to continue speaking with the

23  PIF about a potential transaction?

24      A    The next step would be for me to tell them what

25  terms I wanted.

CONFIDENTIAL

Page 161

1     think it's going to be more effective if we do it this way,

2     and we can show you documents --

3          A     That would be helpful.  If there's some documents

4     that would help anchor specific dates that would be

5     helpful.

6          Q     Okay.  Why don't we do a couple of things here.

7     Let's, if we could, Mr. Musk, before we start showing you

8     documents, you had referenced that you have some recollection

9     of discussing the PIF or a going private transaction with

10    some individuals at some time.  Do you recall discussing

11    those topics with anyone in the period from August 1st,

12    2018 through the morning of August 7, 2018?

13         A     My recollections are, my conversation with Steve

14    Rosenblum, a conversation with -- which is on the

15    Saturday, I believe, a conversation with Egon Durban on

16    the Monday before the tweet.  I think I talked to Michael

17    Dell on Saturday, as well, but did not mention anything

18    specific about the Saudis -- I was really asking him about, did he

19    find being private was good.  Like -- did he think that --

20    did he regret going private?  Did he thinks it was a good

21    idea?  Yeah.

22              MR. FARINA:  You've already asked about the board

23    meeting, so the board would obviously be included in that

24    time period?

25              MR. NEWELL:  Let's set aside the board meetings

SEC-EPROD-000016269

Page 162

1    for now.  That's a good carve out, and I appreciate it.
2    Let's set aside anyone on Tesla's board, individual
3    communications or official board communications.  We're
4    still in that period from August 1st, 2018 through the
5    morning of August 7, 2018, when you published the tweets
6    we've been discussing today.
7        Q    Do you recall having a conversation with Steve
8    Rosenblum -- and for the record can you refresh us on who
9    Mr. Rosenblum is?
10       A    He was the legal counsel that Michael Dell used
11   in the take private.
12       Q    Do you recall having communications with Egon
13   Durban right?
14       A    Yes.
15       Q    Where does Mr. Durban work?
16       A    Silver Lake.
17       Q    You recall having conversations or communications
18   with Michael Dell?
19       A    Just a conversation.
20       Q    A phone conversation?
21       A    Yes.
22       Q    Anyone else you recall, setting aside individual
23   members of Tesla's board or board meetings or groups of
24   Tesla's board having discussions with -- strike that.
25            Did you have discussions during the period from

CONFIDENTIAL

SEC-EPROD-000016270

Page 165

1            From the time the July 31st meeting ended

2     through the morning of August 7th, when you first tweeted

3     about a going private transaction, did you retain any advisors

4     to assist you with the going private transaction?

5         A    No.

6         Q    Let's talk a little bit about your conversation

7     with Egon Durban.

8            Sounds like your recollection is that

9     conversation took place the Monday before August 7th?

10        A    Yes.

11           MR. FARINA:  I think there's an entry in the

12    phone log that does pin it down.

13           MR. NEWELL:  Please mark this as EM Exhibit 10

14              (SEC Exhibit No. 10 was

15              marked for identification.)

16           BY MR. NEWELL:

17        Q    Mr. Musk, we're handing you a document that's

18    been marked as EM Exhibit 10.  It is an exhibit, a multi

19    page printout of a spread sheet that was produced to the

20    SEC in this matter bearing Bates number ERM underscore SEC, AVG 7

21    underscore, series of zeroes and then 6.  I'll represent to you

22    that's the same Bates number associated with the entire

23    document.  We've not altered it but we've blown it up for

24    purposes of today's testimony.

25        A    Sorry.  The second page --

CONFIDENTIAL

Page 170

```
 1        A    I did.

 2        Q    What did you tell him?

 3        A    I told him about the -- that the Saudis wanted to

 4   take Tesla private; that they were super supportive, like

 5   they wanted to do this deal, that I could pretty much

 6   dictate the terms and -- but I did say that my preference

 7   would be to have a broader investor base, and not have too

 8   much -- not have the Saudis be too large of a shareholder,

 9   you know, and I think I actually did say like, I think,

10   maybe something on the order of 15 percent, maybe up to 20

11   percent would be okay.  But from my standpoint -- not from

12   theirs, purely from my standpoint, and that -- but I told

13   Egon, look, I think most of our investors are going to

14   remain in the company, and so what does he think about

15   bringing other investors in to have a more diversified

16   investor base, so there wouldn't be excessive influence

17   from any one investor.

18        Q    And what did he say in response?

19        A    He said absolutely, there's a lot of interest,

20   and he's confident that there's many others that would step up

21   and join this take private.

22        Q    Do you know whether he had communications with

23   any other potential investors at the time of your call?

24        A    I don't.  I don't think so but -- he did not

25   mention it.  So he was going -- I think he was going
```

CONFIDENTIAL

Page 175

```
 1    August 7th, that there might be some issue with the
 2    ability of the small retail investors to remain in a
 3    private Tesla?
 4        A    No.
 5        Q    Did the topic of short sellers come up in your
 6    call with Mr. Durban on August 6th?
 7        A    No.
 8        Q    You referenced a conversation with Steve
 9    Rosenblum.  Do you remember when that one took place?
10        A    I don't want to mis-remember this, but I think
11    it was the Saturday before the Tuesday tweet, if I am
12    not -- is that correct?  I'm not sure exactly.
13        Q    Was Mr. Rosenblum your attorney at the time you
14    reached out to him?
15            MR. FARINA:  Hang on.  The conversation is -- I
16    am going to assert a privilege over that conversation.  He
17    was reaching out to him for purposes of ultimately
18    engaging him as his legal counsel.  He did engage him as
19    his legal counsel.  So any communications with Mr.
20    Rosenblum are privileged.
21            MR. NEWELL:  Okay.
22        Q    So you were reaching out to Mr. Rosenblum for the
23    purpose of seeking legal advice?
24        A    Yes, as -- as a lead or co-lead counsel on a potential
25    take private, on the advice of Michael Dell.  I had actually
```

Page 176

1   talked to Steve Rosenblum I think almost two years ago. I

2   had a brief conversation with him then.

3        Q     Mr. Dell advised you in the conversation you had

4   with him that you referenced a few minutes ago to talk to

5   Mr. Rosenblum?

6        A     He did.

7        Q     During this same time period -- strike that.

8              At what point -- let me ask you this, Mr. Musk.

9   At the time the August -- strike that.

10             At the time the July 31st meeting with the PIF

11  concluded had you made a decision one way or the other as

12  to whether you were going to make an offer to Tesla's

13  board to take the company private?

14       A     I'm sorry.  The first part of that -- can you

15  repeat?

16       Q     Absolutely.

17             At the time that the PIF left Tesla on the

18  evening of July 31st, had you made a decision as to

19  whether you were going to make an offer to Tesla's board

20  to take Tesla private?

21       A     No.

22       Q     When did you decide to make that offer?

23       A     On Friday when I wrote the email.  I think it was

24  a Friday.

25       Q     Before we get to Friday --

CONFIDENTIAL

SEC-EPROD-000016284

Page 178

1   August 2nd, did you make that decision?

2               MR. FARINA:  Can you show him the email?

3               THE WITNESS:  Oh, yeah.

4               MR. NEWELL:  I'd just like to ask for Mr. Musk's

5   recollection and then we'll bring the email and let him

6   take a look.

7               THE WITNESS:  Part of what would inform my

8   decision for any potential take private would be the

9   results of how the market would react to the earnings

10  call.  If the price went stratospheric then a take private

11  would not be feasible.

12              It did increase quite a lot, but not to the

13  degree it would make a take private, you know, impossible

14  or at like some crazy price.

15              BY MR. NEWELL:

16     Q        Why did you think that a substantial increase in

17  Tesla's share price in the wake of the earnings call would

18  put a take private transaction out of reach?

19     A        Well, if there was a very big spike in the stock,

20  I don't know.  Like let's say the stock went to $500 or

21  something crazy -- or went into like just a very steep day

22  over day change, then it's -- there's -- not realistic to

23  do any kind of take private transaction, because people

24  would want to see, is this -- where does this steep

25  increase level off?  Where does it stop?  How, you know --

CONFIDENTIAL

Page 179

1    like we couldn't be at -- there are times in Tesla's

2    history where we've had these quite big spikes in the value of

3    the company, including times when I thought the value of

4    the company was -- the serial price was way too high, and

5    I said that publicly.  And I thought this could be one of

6    those times.

7              And it's -- it wouldn't be reasonable to expect a

8    take private to take place -- if there was

9    a premium on a spike, like if the stock

10   spiked and on top of that you had a premium.  Then you've

11   got like -- that wouldn't be feasible.

12        Q    Do you think that wouldn't be feasible from the

13   perspective of the PIF?

14        A    Or anyone really.  Like -- it would exceed the

15   bounds of reasonability.  If the stock had spiked say 50

16   percent instead of 15 percent then it would not have been,

17   I think, viable to consider take private.

18        Q    Your recollection is that Tesla's price, stock

19   price ultimately increased by something on the order of 15

20   percent on the trading day after the earnings call?

21        A    Yes.

22        Q    Did you contact anyone at the PIF to determine

23   whether in light of the increase in Tesla share price they

24   were still interested in the going private transaction?

25        A    No.

CONFIDENTIAL

SEC-EPROD-000016287

Page 231

1       Q    Everything we've just discussed with respect to
2    your bases for writing "funding secured" were based on
3    historical conversations that you had that were nonpublic,
4    right?
5       A    Correct.
6       Q    Do you think the term "funding secured" made
7    clear to readers of your tweet who weren't privy to those
8    conversations that that's what you meant?
9       A    I think it's very clear that funding is not an
10   obstacle.  That's exactly what I intended to convey, it
11   was definitely not.
12      Q    Why didn't you write funding is not an obstacle
13   rather than "funding secured"?
14      A    Well, because generally -- like "funding secured"
15   is a shorter way of saying that.
16      Q    So was is it based on the exigencies of Twitter and
17   the character limit?
18      A    Well, we're not approaching the character limit
19   but things on Twitter are not -- if there's two choices
20   and one less verbose you'd go with the one that's less
21   verbose.
22          MR. BUCHHOLZ:  So is it correct you understood
23   when you wrote this that there was no documentation of any
24   funding with a deal price or the $420 price?
25          THE WITNESS:  No, there was no -- there was

CONFIDENTIAL

SEC-EPROD-000016339

Page 232

1   nothing withexplicitly, a 420 deal price document.
2          MR. BUCHHOLZ:  And you knew that when you wrote
3   the tweet, right?
4          MR. FARINA:  Hang on.  You're referring to
5   anything with the Saudis at 420.  Because we know the email to the
6   board says 420.
7          MR. BUCHHOLZ:  Right.  But your own offer.
8   So other than your own offer to the board there was no
9   documentation at 420, correct?
10         THE WITNESS:  Correct.
11         MR. BUCHHOLZ:  Did you think that readers would
12  understand that from your tweet?
13         THE WITNESS:  I think the -- if the question is
14  like should people be of the mindset that funding is
15  uncertain or certain that they should be of the latter.
16  The funding is certain.  Funding is certain and that was
17  proven when we talked to investors, this was confirmed.
18  It was certain.  There was zero -- and oversubscribed
19  exactly as expected.
20         But I do say considering.  So of the things that
21  are important in a take private situation, one of those
22  things is funding, but that is not enough to go private.
23         BY MR. NEWELL:
24     Q   Were you using the term secured as a synonym for
25  certain?

CONFIDENTIAL

Page 258

1   Same question here.   What was your level of certainty that

2   the transaction would be consummated at the time that you

3   wrote this tweet?

4       A     I mean, probably roughly 50 percent.   Maybe a

5   little -- maybe a little higher than 50 percent, but

6   something close to that.   At the time I would have

7   probably said more likely than not but, you know.   Like I

8   wasn't sure if I would even want to finalize a proposal to

9   the board.   That's why I said considering.   If I said I'm

10  going to put -- I didn't say I was going to give some like

11  final proposals to the board, I was considering it, it's a

12  lot to consider.   Especially the opinions of long-time

13  shareholders.

14              So that's really, that's it.   It was really --

15  it's pretty straightforward.

16              It was like, I wonder what people think

17  about going private?   And, like I said, with the benefit of

18  hindsight of course -- if I had a hindsight machine that

19  would be really great.   That would be like --

20              MR. HEALY:   Your next project?

21              THE WITNESS:   Yes, a hindsight machine

22  would be really helpful.   But --

23  but with the benefit of hindsight, I was wrong about the

24  desire of -- or the interest in the existing shareholders

25  to go private.   That was incorrect.   They were about --

CONFIDENTIAL

SEC-EPROD-000016366

```
 1                    PROOFREADER'S CERTIFICATE

 2

 3   In the Matter of:   TESLA MOTORS, INC.

 4   Witness:            Elon Musk

 5   File Number:        SF-04082-A

 6   Date:               Wednesday, August 29, 2018

 7   Location:           San Francisco, California

 8

 9      This is to certify that I, Christine Boyce,

10   (the undersigned) do hereby swear and affirm that the

11   attached proceedings before the U.S. Securities and

12   Exchange Commission were held according to the record,

13   and that this is the original, complete, true and

14   accurate transcript, which has been compared with the

15   reporting or recording accomplished at the hearing.

16

17

18   ___Chr. E.Boyce___           ___8-30-18___

19   (Proofreader's Name)            (Date)

20

21

22

23

24

25
```

CONFIDENTIAL

SEC-EPROD-000016390

```
 1   STATE OF CALIFORNIA      )

 2                            )   ss

 3   COUNTY OF SAN FRANCISCO )

 4          I hereby certify that the investigative hearing

 5   was reported by me in the within-entitled cause; that said

 6   hearing was taken at the time and place herein named; that

 7   the hearing is a true record of the witness' testimony as

 8   reported by me, a duly certified shorthand reporter and a

 9   disinterested person, and was thereafter transcribed into

10   typewriting by computer.

11          I further certify that I am not interested in the

12   outcome of the said action, nor connected with, nor

13   related to any of the parties in said action, nor to their

14   respective counsel.

15          IN WITNESS WHEREOF, I have hereunto set my hand

16   this 30th day of August, 2018.

17

18

19                    Mary Bardellini, CSR 2976

20             MARY BARDELLINI, CSR No. 2976

21                STATE OF CALIFORNIA

22

23

24

25
```

CONFIDENTIAL

SEC-EPROD-000016391