**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
         amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Date: March 10, 2022<br>Time: 1:30 p.m.<br>Location: Courtroom 5, 17th Floor<br>Judge: Hon. Edward Chen |

**\*\*\*FILED UNDER SEAL\*\*\***

# TABLE OF CONTENTS

I. INTRODUCTION. ................................................................................................... 1

II. RESPONSE ON STATEMENT OF UNDISPUTED FACTS. ....................................... 2

III. THERE IS NO GENUINE DISPUTE THAT FUNDING WAS NOT SECURED ON AUGUST 7, 2018. .................................................................................. 6

IV. THERE IS NO CREDIBLE DISPUTE THAT INVESTOR SUPPORT WAS NOT CONFIRMED ON AUGUST 7, 2018. ........................................................ 10

V. THERE IS NO GENUINE DISPUTE THAT THE AUGUST 13 BLOGPOST MISREPRESENTED THE STATUS OF NEGOTIATIONS WITH THE PIF. ............................................................................................................... 13

VII. THERE IS NO GENUINE DISPUTE THAT PLAINTIFF HAS ESTABLISHED RELIANCE BY THE CLASS ON THE ALLEGED MISREPRESENTATIONS. ............................................................................................ 13

VIII. CONCLUSION. ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*In re Allstate Corp. Securities Litigation*,
    966 F.3d 595 (7th Cir. 2020) ............................................................................................... 14, 15

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) .................................................................................................... 7, 11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ..................................................................................................................... 14

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ........................................................................................................ 7

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997 (9th Cir. 2002) ........................................................................................................ 7

*Buxbaum v. Deutsche Bank AG*,
    196 F. Supp. 2d 367 (S.D.N.Y. 2002) .......................................................................................... 7

*Carmen v. S.F. Unified Sch. Dist.*,
    237 F.3d 1026 (9th Cir. 2001) ......................................................................................... 9, 11, 14

*Erica P. John Fund v. Halliburton Co.*,
    563 U.S. 804 (2011) ..................................................................................................................... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ......................................................................................................................... 9

*Pommer v. Medtest Corp.*,
    961 F.2d 620 (7th Cir. 1992) ...................................................................................................... 12

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ....................................................................................... 7

*S.E.C. v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ............................................................................................... 8, 11

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
    335 F.R.D. 276 (N.D. Cal. 2020) .............................................................................................. 15

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ................................................................................................. 9, 13

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) ........................................................................................ 7

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ....................................................................................................................... 9

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ............................................................................................... 12

*In re VeriFone Sec. Litig.*,
  11 F.3d 865 (9th Cir. 1993) ...................................................................................................... 7

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
  739 F.2d 1434 (9th Cir.1984) ................................................................................................... 8

*Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*,
  2021 WL 5083756 (N.D. Ill. Nov. 2, 2021) ............................................................................. 7

## I. INTRODUCTION.

Plaintiff's motion for summary judgment aimed precisely at four key misrepresentations as well as the discrete issue of reliance. It set forth discrete and objective evidence showing that statements by Elon Musk, including key statements that he had "funding secured" to take Tesla Inc. private at $420 per share, that "investor support is confirmed," and "only reason why this is not certain is that it's contingent on a shareholder vote" were indisputably false when made. It also showed that Plaintiff had proven the necessary facts to create a presumption of reliance on material public misstatements regarding Tesla during the Class Period. Defendants do not contradict any of the key facts underlying Plaintiff's motion; instead, they present an entirely subjective and sometimes speculative version of events where words mean only what Musk thinks, regardless of their plain meaning. Under this alternative reality, "funding secured" is true because Musk now says he thought funding was secure, "investor support is confirmed" refers to funding rather than actual "investor support," and a tweet about the need for only a shareholder vote is not misleading because of statements made six days later.

Defendants' proposed subjective approach to disclosures by public companies is not the law. The securities laws impose an objective test for falsity, looking to what a reasonable investor would understand a statement to mean. A reasonable investor does not interpret "investor support is confirmed" to mean "funding secured," nor does he understand "funding secured" to mean simple entrepreneurial optimism, as opposed to funding that is legally committed. Viewed objectively, the misrepresentations subject to this motion are indisputably false. In addition, Musk knew they were false when he made them. The law does not accept *ex post* statements of integrity and "honest belief" as excuses for making false statements while knowing the true state of affairs.

Plaintiff has also presented unrebutted evidence that the market for Tesla stock and other securities was efficient during the Class period of August 7, 2018 to August 17, 2018. Plaintiff and the class, accordingly, are entitled to the legal presumption that they relied on material public misrepresentations made during that period. To rebut this presumption, Defendants must show that the truth about the proposed going-private transaction, its funding, and level of investor support credibly entered the market. Defendants have utterly failed to put forth the required evidence to

do this and their attempt to utilize the proposed report of their expert on loss causation as evidence rebutting the presumption of reliance should be rejected.

## II.     RESPONSE ON STATEMENT OF UNDISPUTED FACTS.

Despite Defendants' submission of a 10-page "Statement of Material Facts", the material facts underlying Plaintiff's motion for summary judgment remain undisputed. On August 7, 2018, when Musk tweeted he was contemplating taking Tesla private at $420 per share with "funding secured," where "investor support is confirmed," and "only reason why this is not certain is that it's contingent on a shareholder vote," Musk had, at most, an expression of interest from one investor, the Saudi PIF, in a potential transaction. Nothing had been secured or confirmed.

Critically, it is undisputed that at the July 31, 2018 meeting between Musk and the Saudi PIF, there was no legally-binding agreement to fund a going-private transaction involving Tesla.[1] From July 31 until August 7, 2018, Musk did not have any further substantive conversations with the Saudi PIF or discuss the proposed price of $420 with the Saudi PIF or any other potential investor. The tentative and preliminary nature of the discussions between Musk and the Saudi PIF is confirmed by the descriptions of them by Yasir Al-Rumayyan in texts sent to Musk on August 11 and 12, 2018: "We would like to *explore investing* in Tesla…. Therefore, as discussed, we would like our teams *to start working together* … *to explore a potential transaction*" (emphasis added).[2] Al-Rumayyan also emphasized the need of the Saudi PIF to receive additional information from Tesla before proceeding further.[3] This is confirmed by contemporaneous notes taken at the meeting by Saudi PIF representatives which reflect that the meeting ended with Al-Rumayyan telling Musk "I would like to listen to your plan Elon and what are the financial calculations to take it private in the next week."[4] Musk never provided the additional information.[5]

Prior to the August 7 tweets, Musk had not mentioned the potential transaction to any other outside investors or existing Tesla shareholders.[6] Musk had also not provided Tesla's Board with

---

[1] E. Musk Dep. at 126:10-13; Ahuja Dep. at 108:22-110:8.
[2] Exhibit 121 at 8.
[3] *Id*. at 11-12 ("We cannot approve something that we don't have sufficient information on.").
[4] Exhibit 80.
[5] E. Musk Dep. at 244:1-248:15; Exhibit 121 at 11; Ahuja Dep. at 82:12-23.
[6] Musk Interrogatory Responses at 27, 28, 30, and 35; E. Musk Dep. at 165:15-17, 189:10-16.

a specific proposal to take the company private that the Board could then consider and review.[7] Musk was aware that any transaction would involve lengthy legal and financial analysis and documentation, yet neither he nor the Board had formally retained any legal or financial advisors.[8]

In addition, while Musk had in mind a novel legal structure for a private Tesla where retail investors would be able to remain shareholders, he had not determined either legally or practically if such a structure was feasible, nor had he determined whether there were restrictions on illiquid holdings, such as investments in private companies, by Tesla's institutional investors.[9] Musk was determined to limit the Saudi PIF investment in a private Tesla to no more than 30 percent (including its current 5 per cent stake),[10] yet Musk had not spoken to any other source for the remaining funding he might require to take Tesla private. Finally, Musk had not determined what regulatory approvals would be necessary for any going-private transaction, especially one involving a foreign sovereign wealth fund such as the Saudi PIF.[11]

The subsequent actions by Musk's financial advisors, Silver Lake Partners and Goldman Sachs, are also entirely inconsistent with funding being "secured" on July 31, 2018, as they spent the period from August 10 to August 23, 2018 creating a strategy to raise financing for a going-private transaction.[12] This included obtaining "signed commitment documents."[13] They also began the process of gauging support for a going-private transaction with existing Tesla shareholders, days after Musk had tweeted that "investor support is confirmed."[14] They discovered that many investors *did not* support a going-private transaction.[15]

Defendants also do not discuss, and therefore, concede, the strong reaction to Musk's August 7, 2018 tweets from the market, financial analysts, Tesla investors, and even Tesla's own investor relations team. Martin Viecha, Tesla's Director of Investor Relations, understood Musk's

---

[7] Exhibit 83; E. Musk Dep. at 159:6-10, 213:8-12; Denholm Dep. at 44:22-45:16.
[8] Musk Interrogatory Responses at 33; E. Musk SEC Tr. at 165:1-5.
[9] E. Musk Dep. at 140:21-145:15.
[10] E. Musk Dep. at 125:9-25.
[11] E. Musk Dep. at 101:9-20; E. Musk SEC Tr. at 128:20-129:17, 260:2-15.
[12] Exhibits 101 and 179; *see also* Fath Dep. at 91:8-92:5 ("If a deal had been done and funding had been secured, why reach out to us [T. Rowe Price]?").
[13] Exhibit 265 at 5; *see also* Exhibit 179 at 29.
[14] Durban Dep. at 134:1-135:18, 135:20-136:3; Exhibit 194.
[15] Exhibit 101 at 3.

tweet to mean "this is a firm offer," "the offer is as firm as it gets," and "financing is secured regardless of other assumptions."[16] Ryan Brinkman, a JP Morgan analyst, wrote "Either funding is secured or it is not secured, and Tesla's CEO says funding is secured."[17] Joseph Fath at T. Rowe Price understood "funding secured" to mean it was "locked and loaded and no question at all a hundred percent that you have funding ready to go."[18] As Fath testified: "There's nothing left for interpretation in those statements."[19] Tesla's stock price responded within seconds of Musk's tweets, rising to $379.57 per share by close of trading on August 7, 2018, a statistically significant increase.[20] For the remainder of the Class Period, Musk's proposed going-private transaction was heavily followed in the financial media, with over 2,400 articles published over just ten days.[21]

Defendants' attempt to concoct an "agreement" with PIF from a preliminary expression of interest is unavailing and distorts the factual record. First, Defendants paint a picture of a "pursuit" of Tesla by the Saudi PIF from November 2016 to July 2018.[22] Opp. Br. at 4-5. This "pursuit" consisted of a dinner and two other meetings in Spring 2017, where one meeting was primarily about OpenAI, another Musk company, not Tesla.[23] The outcome of this "pursuit" was that Musk was not interested in exploring a transaction with the Saudi PIF.[24]

With regard to the July 31, 2018 meeting itself, Defendants rely on three witnesses to present their version of events. Yet none contradicts the fact that this was a meeting to start a process of exploring a potential transaction, not a commitment of funding. Deepak Ahuja, Tesla's Chief Financial Officer, explicitly testified that the message he received at the July 31, 2018 meeting was that the Saudi PIF was interested in taking Tesla private and "***want to explore this***

---

[16] Exhibits 58 and 151.
[17] Exhibit 15.
[18] Fath Dep. at 28:18-29:5.
[19] *Id*. at 32:26-33:8; *see also* Exhibit 41 (Fath email stating "I can't imagine he would Tweet this if not truth to it because that would seem to me like pretty black-and-white stock manipulation.").
[20] Hartzmark Rpt., ¶64.
[21] Hartzmark Rpt., ¶56.
[22] Defendants note that the Saudi PIF is reported to have over $225 billion in assets under management, citing a *Wall Street Journal* article dated August 15, 2018. *See* Batter Ex. A. Defendants fail to note that the same article also reports that "The PIF is scrambling to raise money for its investments. The fund is in talks with banks to raise billions of its own debt…" *Id*. at 5.
[23] Exhibit 107.
[24] Ahuja Dep. at 45:20-46:9.

*further.*"[25] Sam Teller similarly testified that Al-Rumayyan's conveyed his "*desire*" and "*ability,*"[26] but that the discussions were not "near final" and "the details of like how to proceed in this process" still needed to be addressed.[27] Musk, meanwhile, admitted in his deposition that any "offer to purchase" Tesla shares by the Saudi PIF existed only in his mind.[28] Musk also conceded that he agreed to provide additional information to the Saudi PIF following the July 31, 2018 meeting, that the Saudi PIF would want to review that information before investing further in Tesla, that the availability of funding from Saudi PIF would depend on the price of Tesla shares in any going-private transaction but price had not yet been discussed, and that he had no legal recourse against the Saudi PIF if they refused to provide any funding.[29]

Regarding subsequent discussions of the July 31, 2018 meeting, Defendants' facts belie the record. Defendants state that at a Tesla Board meeting on August 3, 2018, Ahuja "briefed the Board on Mr. Al-Rumayyan's proposal to fund a take-private transaction." Opp. Br. at 7. In fact, the minutes reflect that Ahuja briefed the Board on *Musk's* proposal, not the Saudi PIF.[30] With regard to the Saudi PIF, Ahuja merely informed the Board that "PIF was interested in helping Mr. Musk take the Company private."[31] Notably, Ahuja helped draft Musk's email to Tesla employees dated August 7, 2018, sent after Musk's initial tweet that funding was "secured" but that email, however, does not reference any commitment to funding by the Saudi PIF.[32]

Defendants present a similarly misleading version of the text messages exchanged between Musk and Al-Rumayyan between August 10 and August 13, 2018. Al-Rumayyan's texts clearly and consistently reflect the absence of any agreement but instead an intent to start working towards one. He asks for the Saudi PIF to receive financial information from Tesla and the two parties to start working towards a potential transaction.[33] The texts also show that Musk purported to cut off

---

[25] Ahuja Dep. at 84:2-14. Defendants omit this testimony from their brief.
[26] Teller Dep. at 143:10-13.
[27] Teller SEC Tr. at 225:18-24; 227:1-2.
[28] E. Musk SEC Tr. at 120:21-25. Defendants omit this testimony from their brief.
[29] E. Musk Dep. at 109:23-110:24; 132:24-133:13; 220:7-11; 247:5-248:15.
[30] Exhibit 82; *see also* Ahuja Dep. at 132:16-23 (confirming accuracy of minutes (Ex. 82)).
[31] Exhibit 82 at 1; *see also* Ahuja Dep. at 131:17-132:5 (transaction was at early stage).
[32] Exhibits 12; 121 at 3; 301; Ahuja Dep. at 182:19-185:21.
[33] Exhibit 121 at 7.

discussions with the Saudi PIF on August 12, 2018.[34] While Defendants state that the subsequent blogpost dated August 13, 2018 merely provided additional details about the going-private transaction, including purported discussions with the Saudi PIF, they omit that Al-Rumayyan immediately complained to Musk about it, calling it "an ill-advised blog with loose information."[35]

### III. THERE IS NO GENUINE DISPUTE THAT FUNDING WAS NOT SECURED ON AUGUST 7, 2018.

As the undisputed facts demonstrate, no funding was secured by Musk to take Tesla private at $420 per share at his meeting on July 31, 2018 with the Saudi PIF. No price was discussed, no specific amount of funding was agreed, no legal commitment was made, and no documents were signed. Instead, there was merely, as Al-Rumayyan stated, a desire by the Saudi PIF "to start working together to explore a potential transaction."[36] Ahuja's recollection is also consistent with this, as is the conduct of Musk's advisors Silver Lake and Goldman Sachs who spent the two weeks following the tweet developing a strategy to obtain financing, a completely unnecessary task if funding is already secure.

In response, Defendants point to the subjective belief of Musk that the Saudi PIF "was ready, willing, and able to fund a take-private transaction." Opp. Br. at 6. Even if true, this is insufficient to justify Musk's tweeting "funding secured" because he had no intention of using the Saudi PIF to fund the entire going-private transaction.[37] Whether or not the Saudi PIF expressed interest in funding a going-private transaction, Musk still had to obtain billions of dollars of funding for the portion of the transaction he would not give to the Saudi PIF. No discussions regarding such funding had occurred with any other investor.[38]

But there is a greater flaw with Musk's "subjective belief" defense of his otherwise false tweet: it is not the law. "We apply the objective standard of a 'reasonable investor' to determine

---

[34] *Id*. at 9.
[35] *Id*. at 12.
[36] Exhibit 121 at 8.
[37] E. Musk Dep. at 125:9-25.
[38] In addition, Musk's belief on the amount of funding needed depended on the ability of existing Tesla shareholders to rollover their investment into a private Tesla. *See*, *e. g.*, E. Musk Dep. at 216:6-220:11. By August 7, 2018, Musk had undertaken no work to determine how many, if any, Tesla investors would roll over their shareholding or if it was even feasible for them to do so.

whether a statement is misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021)(*citing In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993)). "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)(*quoting Brody v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002)). As this Court found in denying Defendants' motion to dismiss this case: "a reasonable stock investor could believe that Tesla had secured funding for the going-private transaction at $420 per share." *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 924 (N.D. Cal. 2020)(identifying 13 facts supporting falsity). This is especially the case because, "notably Mr. Musk used the past tense in this regard. The word 'secured' implicitly negates any condition." *Id*. at 923.[39]

Furthermore, the evidence indisputably shows that reasonable investors did conclude that funding for a going-private transaction had been committed to Musk unconditionally. Viecha, Tesla's own Director of Investor Relations, understood Musk's August 7, 2018 tweet to mean that "financing is secured regardless of other assumptions."[40] Itay Michaeli, an analyst at Citi Research, confirmed with Viecha that it was "an actual transaction on the table (with secured funding),"[41] and JP Morgan's Brinkman revised his target price for Tesla upwards to account for the fact that

---

[39] Defendants' citations do not support their argument that the jury must decide the meaning of "funding secured." Opp. Br. at 16:4-13. In *Washtenaw,* to defeat summary judgment, Defendants put forth evidence that generic price inflation was well-known in the industry and had been publicly remarked upon by their competitors and other market participants to demonstrate that Walgreens had not seen any "unusual activity" regarding generic inflation "compared to the rest of the industry." *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, 2021 WL 5083756, at *8 (N.D. Ill. Nov. 2, 2021). The Court in *Buxbaum* found that the parties' experts put forth two equally plausible translations of a German word that precluded summary judgment. *Buxbaum v. Deutsche Bank AG*, 196 F. Supp. 2d 367, 373 (S.D.N.Y. 2002). Finally, in *REMEC,* the Court denied summary judgment finding that a reasonable jury could accept "Defendants' explanation and take the 5% depreciation into account to reconcile the different figures in the current budget and the goodwill impairment test," and there was room for the parties to argue whether these numbers fall within the definition of the word "consistent." *In re REMEC Inc. Sec. Litig.,* 702 F. Supp. 2d 1202, 1226 (S.D. Cal. 2010). Here, Defendants offer no evidence—expert or otherwise—that the term phrase "funding secured" should be interpreted other than by its plain meaning or that a reasonable investor would agree with their novel interpretation.
[40] Exhibit 151 at 1; *see also* Viecha Dep. at 156:21-158:22.
[41] Exhibit 146 at 1.

a going-private transaction is a real possibility because "Tesla's CEO says funding is secured."[42]

Under these circumstances, summary judgment in favor of Plaintiff on the falsity of the August 7, 2018 tweet is supported as there is no genuine factual dispute that it was false when issued: funding was not secured as of August 7, 2018. Furthermore, Musk knew it was false and subsequent self-serving statements of "belief" are insufficient under the securities laws. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010)("When the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk'")(internal quotations omitted). Indeed, this argument runs squarely into black letter law holding that "a defendant will ordinarily not be able to defeat summary judgment by the mere denial of subjective knowledge of the risk that a statement could be misleading." *Platforms Wireless*, 617 F.3d at 1094. Where, as here, "no reasonable person could deny that the statement was materially misleading, a defendant with knowledge of the relevant facts cannot manufacture a genuine issue of material fact merely by denying (or intentionally disregarding) what any reasonable person would have known." *Id.* at 1094.

Defendants' attempt to distinguish *Platforms Wireless* is unavailing. The funding "secured" by Musk was exactly as illusory as the product described in *Platforms Wireless*. Musk had the same level of knowledge about his unconditional claims of secured funding as the defendants had about the product in *Platforms Wireless*. Whatever he now claims was his subjective belief at the time cannot be sufficient to overcome the patently and objectively false statement he made. "If such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud." *Id.* at 1095.

Defendants' lengthy citations to cases holding that summary judgment is generally inappropriate on the issue of scienter are inapposite here. *See* Opp. Br. at 21. As one of their own cases provide, "Summary judgment is generally inappropriate when mental state is an issue, ***unless no reasonable inference supports the adverse party's claim.***" *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir.1984) (emphasis added). There is no conflicting evidence here and no reasonable inference to be made, only Musk's purported belief. The

---

[42] Exhibit 14 at 1.

1 undisputed facts demonstrate that Musk acted with scienter.

2 Defendants' other arguments may be easily dismissed. First, Defendants state that "The full factual picture demonstrates a sufficient basis for a jury to conclude that, *as the PIF represented to Mr. Musk*, 'funding [was] secured' and 'investor support [was] confirmed.'" Opp. Br. at 15 (emphasis added). There is no evidence that such representations were made by any representative of the Saudi PIF to Musk at the July 31, 2018 meeting or at any other time. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (affirming the grant of summary judgment where non-movant failed to identify any parts of record that established a genuine dispute of material fact).

Second, Defendants argue that, regarding the proposed price of $420 per share never being discussed with the Saudi PIF, Musk "*never made any public representations on any of these issues*." The initial August 7, 2018 tweet itself, however, explicitly references the $420 price and Musk himself testified that his intention in issuing the tweet was to communicate that funding was secured at $420.[43] Since Musk never discussed the $420 share price with the Saudi PIF, this was impossible. Defendants' attempt to redirect the Court's attention from this fact fails.

Finally, Defendants make the bizarre argument that Musk's August 7, 2018 tweet was not material to Tesla investors. Opp. Br. at 22-24. A statement is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). Musk's August 7, 2018 tweets had an immediate impact on Tesla's stock price,[44] led to a trading halt of its shares on Nasdaq,[45] and quickly became one of the most keenly followed stories in financial media. Numerous analysts issued reports discussing the tweets, including the importance of the phrase "funding secured" as

---

[43] E. Musk Dep. at 132:24-133:13.
[44] Hartzmark Rpt., ¶64.
[45] Exhibits 149 and 204.

PLAINTIFF'S REPLY IN FURTHER SUPPORT OF  9  CASE NO. 3:18-CV-04865-EMC
MOTION FOR PARTIAL SUMMARY JUDGMENT

well as other tweets issued by Musk on August 7, 2018.[46] Over 2,400 news articles or mentions about the tweets were published over the next ten days.[47] To argue that the tweet did not "significantly alter the total mix of information" available to Tesla investors is absurd.

Defendants' argument on materiality appears to be based solely on a tendentious interpretation of the stock price reaction to a blog post issued six days later, on August 13, 2018. This argument, however, is fundamentally a loss causation argument as it appears to assert there is a genuine factual dispute over the loss caused by Musk's August 7, 2018 tweet because Plaintiff cannot show Tesla's stock price *only* reacted to the statement "funding secured." This is fundamentally different from materiality which requires a statement altering the "total mix" of information, not that it is the only statement affecting a company's stock price on a particular day. Defendants' materiality argument may be summarily dismissed.

## IV. THERE IS NO CREDIBLE DISPUTE THAT INVESTOR SUPPORT WAS NOT CONFIRMED ON AUGUST 7, 2018.

The evidence of the falsity of Musk's statement on August 7, 2018 that "investor support is confirmed" is simple and undisputed. When he issued that tweet, Musk had not discussed taking Tesla private at $420 per share with a single outside investor. The tweet is written in the past tense, yet no investor had confirmed support, let alone sufficient investors to ensure approval of a going-private transaction.[48] It is logically impossible to confirm support without actually speaking or communicating with the purported supporter. Indeed, Musk would not begin discussions with Tesla investors until days *after* his tweet.[49] He then discovered that many investors, in fact, did not support a going-private transaction. It was primarily for this reason that Musk ultimately withdrew his proposal on August 23, 2018. *See* Opp. Br. at 13.

Faced with this undisputed evidence, Defendants largely try to pretend this misrepresentation does not exist. The only arguments offered are two conclusory statements: (1)

---

[46] Hartzmark Rpt., ¶56; Class Certification Report, ¶32 and Appendix D; *see also* Exhibit 15.
[47] Hartzmark Rpt., ¶56.
[48] *See* Fath Dep. at 45:13-46:8 (interpreting "investor support is confirmed" as meaning "he had it lined up, whatever investors that may be, to support the transaction and be able to take them private.")
[49] Exhibits 113 to 120.

1    that "the full factual picture demonstrates a sufficient basis for a jury to conclude that, as the PIF
2    represented to Mr. Musk [*sic*], … "investor support [was] confirmed" (Opp. Br. at 15); and (2)
3    "the facts here … demonstrate a sufficient basis for Mr. Musk's statements that … "investor
4    support [was] confirmed." Opp. Br. at 17. Neither of these statements form any cogent argument
5    in favor of the position, nor do they identify specific evidence to rebut the evidence put forward
6    by Plaintiff. *See Carmen*, 237 F.3d at 1031. Indeed, Defendants appear to simply treat "investor
7    support is confirmed" as synonymous with "funding secured." *See* Opp. Br. at 9.[50]

8    Putting to one side the fact that "funding secured" was indisputably false, there is no way
9    consistent with the English language to treat the two statements as synonymous. The truth or falsity
10   of Musk's statements is assessed against an objective standard of a reasonable investor not his *ex*
11   *post* stated "intended meaning." *See Alphabet, Inc.*, 1 F.4th at 699. Musk, admittedly, had no
12   communications with other Tesla investors regarding a going private transaction prior to making
13   this tweet.[51] Under any objective standard, no reasonable person could deny that that the statement
14   was materially misleading when made. *See Platforms Wireless*, 617 F. 3d at 1094.

15   Defendants also argue that the second sentence in Musk's final tweet on August 7, 2018,
16   that "[o]nly reason why this is not certain is that it's contingent on a shareholder vote" is true. Opp.
17   Br. at 17. Defendants do not dispute that numerous contingencies existed before the transaction
18   could be put to a shareholder vote. Nor could they. On August 3, 2018, the Tesla Board told Musk
19   that "a detailed proposal regarding a going private transaction had not yet been made and that one
20   would be needed in order for the Board to properly analyze and evaluate it."[52] On August 4, 2018,
21   Michael Dell told Musk that going private was "a very difficult process" that took "something like
22   a year" to complete.[53] On August 10, 2018, Silver Lake outlined for Musk the detailed process that

---

[50] Musk himself has offered contradictory explanations of what he meant by "investor support is confirmed." *Compare* E. Musk Dep. at 215:25-216:5 (refers to Musk and PIF) *with* Musk Interrogatory Responses at 20 ("statement []'***investor support is confirmed***' to be synonymous with '***funding secured***'"). In any event, Musk's shifting explanations are irrelevant as the law imposes an objective test for falsity. *See Alphabet, Inc.*, 1 F.4th at 699.
[51] Musk Interrogatory Responses at 27, 28, 30, and 35; E. Musk Dep. at 165:15-17, 189:10-16.
[52] Exhibit 83 at 3.
[53] E. Musk Dep. at 167:7-168:14; E. Musk SEC Tr. at 161:6-21.

1  would need to be followed; Musk had not reached even the initial stage of that process.[54] Thus,
2  there is no credible argument that Musk's statement that a shareholder vote was the only remaining
3  contingency was true on August 7, 2018. And while Musk's belief is not relevant given his
4  knowledge of relevant facts, Musk testified that at the time of this last tweet, his level of certainty
5  that the transaction would be consummated was "probably roughly 50 percent."[55]

6  Defendants do not dispute these facts but instead point to statements made by Musk and
7  Tesla on August 13, 2018 in a blogpost. In this blogpost, Musk and Tesla gave more details on the
8  process being followed, including the formation of a special committee. Defendants argue that this
9  blogpost, published six days *after* his tweet, somehow creates a genuine dispute whether the tweet
10 was false at the time it was made. It is axiomatic that misrepresentations are assessed based on the
11 facts that existed at the time they were made. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086
12 (9th Cir. 2002). Subsequent disclosures may correct, in whole or in part, an earlier
13 misrepresentation but they cannot travel backwards in time to render a prior misrepresentation not
14 misleading. *See*, *e.g.*, *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) (Easterbrook
15 J.) (misrepresentation regarding patent was false when made notwithstanding fact that defendant
16 ultimately obtained patent two years later). In any event, the record shows that Tesla investors
17 were still misled about the status of the transaction even after the August 13, 2018 blogpost.
18 Morningstar, for example, understood the August 13, 2018 blogpost, read together with Musk's
19 August 7, 2018 tweets, to indicate that Musk had approximately 60% of shareholders supporting
20 the transaction.[56] Musk would pull the going-private transaction for lack of investor support ten
21 days later. Tesla and Musk may now wish they had made more disclosure about the process on
22 August 7, 2018 along the lines later contained in the subsequent blogpost, but that wish does not
23 make the August 7, 2018 tweet any more truthful at the time it was made.[57]

---

[54] Exhibit 179 at 29. *See also* Exhibit 265 at 7.
[55] E. Musk SEC Tr. at 258:1-4.
[56] Morningstar, *Tesla Buyout Looks Likely to Us, but Timing and Structure Uncertain*, August 13, 2018, 4:50 p.m. cited in Hartzmark Rpt., ¶106.
[57] Defendants also point to the Tesla stock price reaction to the August 13, 2018 blogpost as evidence that the August 7, 2018 tweet was either not misleading or immaterial. This argument is again a loss causation argument dressed up as a dispute over falsity. The suggestion that a

## V. THERE IS NO GENUINE DISPUTE THAT THE AUGUST 13 BLOGPOST MISREPRESENTED THE STATUS OF NEGOTIATIONS WITH THE PIF.

The critical facts for determining the truthfulness of the August 13, 2018 blogpost are not disputed: they are contained in the text messages exchanged between Al-Rumayyan and Musk from August 10, 2018 to August 13, 2018. These texts show that the blogpost's description of the discussions between Musk and Al-Rumayyan does not fairly or accurately convey the state of the discussions as of August 13, 2018 when it was published. The blogpost portrays a cordial and mutually supportive discussion between Musk and the Saudi PIF to engage in a process whereby the Saudi PIF would help take Tesla private. In fact, the going-private process was now being run by Goldman Sachs and Silver Lake with a minimal role, if any, for the Saudi PIF, and the relationship between Musk and Al-Rumayyan would be more accurately described as hostile and angry.[58] This is obviously material information for investors to understand whether the funding was or was not in place for the going-private transaction and the role the Saudi PIF would play. The August 13, 2018 blogpost deliberately omitted the conflict between Musk and Al-Rumayyan to give a misleading impression of an orderly and planned process for taking Tesla private.

## VII. THERE IS NO GENUINE DISPUTE THAT PLAINTIFF HAS ESTABLISHED RELIANCE BY THE CLASS ON THE ALLEGED MISREPRESENTATIONS.

Defendants offer two arguments against Plaintiff's motion on reliance: 1) that there is a genuine dispute of material fact that Defendants' statements were material; and 2) that there is a genuine dispute of material fact regarding whether Defendants can rebut the fraud-on-the-market presumption by, purportedly, demonstrating that when the purported "truth" was revealed, there was no price impact. Opp. Br. at 22. However, Defendants offer no facts, let alone material facts, to rebut the presumption of reliance. *See Soremekun*, 509 F.3d at 984.

As shown above, Defendants have failed to show any genuine dispute as to whether Musk's statements were material. Indeed, the entire argument is baseless and an attempt to repackage arguments regarding loss causation, which is not at issue on this motion, with materiality. Musk's tweets had an immediate and observable impact on Tesla's stock price and were front page news

---

statement by Musk that the only remaining step before taking Tesla private is a shareholder vote is somehow immaterial is absurd.
[58] Exhibit 121 at 11-13.

1    for the next two weeks. To suggest they were not material is ridiculous.[59] Defendants also fail to
2    show a genuine dispute of fact as to their ability to rebut the fraud-on-the-market presumption.
3    This presumption may be rebutted by a showing that "the 'market makers' were privy to the truth
4    . . . and thus that the market price would not have been affected by their misrepresentations", or
5    that the truth "credibly entered the market and dissipated the effects of the misstatements." *Basic*
6    *Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988).[60] Defendants have offered no evidence that either
7    of these conditions applies here. *See Carmen*, 237 F.3d at 1031.

8    On the first condition, Defendants have not offered the name of a single market maker who
9    was "privy to the truth." Mere speculation that one of the many market makers active in Tesla's
10   stock might have known the truth (but have remained invisible in the documents produced in this
11   case) is insufficient to defeat summary judgment on this issue. On the second *Basic* condition,
12   Defendants again offer no evidence. Instead, Defendants rely solely on unsworn and unverified
13   statements from their expert indicating "that the market understood from the beginning that the
14   entire proposal and source of funding was uncertain." Opp. Br. at 25. First, Defendants' expert
15   report is aimed at loss causation, an element not at issue in this motion, rather than reliance or
16   market efficiency. Second, even the "evidence" contained in Defendants' expert report fails to
17   support their point: the analyst reports cited by Defendants' expert accepted Musk's representation
18   that funding was "secured" and questioned only whether the transaction would ultimately be
19   consummated.[61] In other words, Defendants do not point to a single market participant who **knew**
20   that funding was not secured or that investor support had not been confirmed. Indeed, even after
21   the August 13, 2018 blogpost, analysts still, mistakenly, believed that Musk had 60% investor

---

[59] Notably, at no point in his two reports, does Defendants' expert opine that Musk's August 7, 2018 tweets were immaterial. Indeed, he offers no opinion on materiality at all. *See* McCall Decl. Exhibits V and W.

[60] *In re Allstate Corp. Securities Litigation*, 966 F.3d 595 (7th Cir. 2020), does not assist Defendants. *See* Opp. Br. at 25. In *Allstate*, the Seventh Circuit simply went on to prohibit district courts from deciding "materiality and loss causation" at the class certification stage while still requiring them to consider evidence relative to whether the alleged misrepresentations "affect[ed] the price of the securities" at issue. *Allstate*, 966 F.3d at 608-09. This issue is not presented here.

[61] Defendants' expert cites Brinkman's JP Morgan report even though Brinkman expressly relied on Musk's tweet "funding secured" as a basis to increase his target price for Tesla stock. Exhibit 15. The other analysts similarly accepted Musk's representations as accurate. *See* McCall Decl., Exhibits S, T, and U.

support for a going-private transaction.[62] There is no systematic analysis of market movement or any attempt to identify when the truth "credibly entered the market and dissipated the effects of the misstatements." *See c.f. Allstate*, 966 F.3d at 613 (directing district court on remand to "square" defendants' price impact argument with "10 percent price drop" at end of class period). This is fatal to their argument. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1962 (2021) ("The defendant must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff—and a defendant's mere production of *some* evidence relevant to price impact would rarely accomplish that feat." (internal quotations omitted)).

Defendants' argument that the market understood the truth regarding the meaning of "funding secured" prior to the August 13, 2018 blog post because the stock did not decline afterwards, similarly fails. Opp. Br. at 25. As an initial matter, whether "the alleged misrepresentations impacted [Tesla's] stock price" improperly "present[s] loss causation issues." *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 287 (N.D. Cal. 2020) (citing *Erica P. John Fund v. Halliburton Co.*, 563 U.S. 804, 807 (2011)). Further, it disregards the indisputable fact that Tesla's stock price declined 19.5% at the end of the Class Period.[63] The extent to which Musk's misrepresentations caused Plaintiff's losses is not at issue here because, as previously stated, Plaintiff has not moved for summary judgment on loss causation. *See Halliburton*, 563 U.S. at 813 ("The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory. Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory.").

**VIII. CONCLUSION.**

For the foregoing reasons and the reasons set forth in Plaintiff's opening brief, his motion for summary judgment should be granted.

---

[62] *See* McCall Decl. Exhibit R ("It sounds to us that he is not done talking to shareholders to gauge interest, but his estimate of about 66% of shareholders not tendering is not far off from our own assumption of 60%.")

[63] Hartzmark Rpt. ¶65.

| | | |
|---|---|---|
| 1 | Dated: February 15, 2022 | Respectfully submitted, |
| 2 | | **LEVI & KORSINSKY, LLP** |
| 3 | | |
| 4 | |  s/ Adam M. Apton<br>Adam M. Apton (SBN 316506) |
| 5 | | Adam C. McCall (SBN 302130)<br>75 Broadway, Suite 202 |
| 6 | | San Francisco, CA 94111<br>Tel.: (415) 373-1671 |
| 7 | | Email: aapton@zlk.com<br>Email: amccall@zlk.com |
| 8 | | |
| 9 | |        -and- |
| 10 | | Nicholas I. Porritt |
| 11 | | Elizabeth K. Tripodi<br>Alexander A. Krot III |
| 12 | | LEVI & KORSINSKY, LLP<br>1101 30th Street N.W., Suite 115 |
| 13 | | Washington, D.C. 20007<br>Tel.: (202) 524-4290 |
| 14 | | Email: nporritt@zlk.com<br>Email: akrot@zlk.com |
| 15 | | (*admitted pro hac vice*) |
| 16 | |        -and- |
| 17 | | Joseph Levi |
| 18 | | Eduard Korsinsky<br>LEVI & KORSINSKY, LLP |
| 19 | | 55 Broadway, 10th Floor<br>New York, New York 10006 |
| 20 | | Tel.: (212) 363-7500<br>Email: jlevi@zlk.com |
| 21 | | Email: ek@zlk.com<br>(*admitted pro hac vice*) |
| 22 | | |
| 23 | | *Attorneys for Plaintiff and Counsel for the Class* |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |