**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
         amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION (ECF NO. 401)** |

# **TABLE OF CONTENTS**

I.     INTRODUCTION. .................................................................................................1

II.    PLAINTIFF'S FACTUAL STATEMENT. ............................................................1

III.   DEFENDANTS' MOTION FOR RECONSIDERATION SIMPLY RECYCLES
ARGUMENTS AND EVIDENCE THE COURT HAS ALREADY CONSIDERED. ......9

      A.     Reconsideration is an Extraordinary Remedy that Should Be Rarely Granted. ......9

      B.     The Court Did Not Overlook Material Facts Related to Falsity and Scienter. ......10

IV.   THE COURT DID NOT APPLY DIFFERENT MATERIALITY STANDARDS WHEN
DECIDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT. ........16

      A.     Defendants' Motion Confuses Law Regarding Materiality, Reliance, and Loss
Causation. ............................................................................................16

      B.     The August 7, 2018 Tweets by Musk Were Indisputably Material at the Time They
Were Made. ...........................................................................................18

      C.     The Effect of Musk's August 7, 2018 Tweets on the Price of Tesla Securities
Throughout the Class Period Was Not the Subject of Plaintiff's Motion for
Summary Judgment. ...............................................................................20

V.    CONCLUSION. ...................................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*389 Orange St. Partners v. Arnold*,
179 F.3d 656 (9th Cir. 1999) ................................................................. 9

4

*Aguirre v. California*,
5    2017 WL 6350290 (N.D. Cal. Dec. 13, 2017) ..................................... 11, 14, 15

6    *Alphabet Sec. Litig., R.I. v. Alphabet, Inc.*,
1 F.4th 687 (9th Cir. 2021) ................................................................. 14

7

8    *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........................................................................... 17

9
*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
10    955 F.3d 254 (2d Cir. 2020) ............................................................... 16

11    *Backlund v. Barnhart*,
778 F.2d 1386 (9th Cir. 1985) ..................................................... 9, 10, 14
12

13    *Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................... 17

14    *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
2015 WL 8477293 (N.D. Cal. Dec. 10, 2015) ....................................... 9
15

16    *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
No. 12-CV-04000-EMC, 2016 WL 2593654 (N.D. Cal. May 5, 2016) ........ 9

17    *Fuller v. M.G. Jewelry*,
950 F.2d 1437 (9th Cir. 1991) ....................................................... 13, 14
18

19    *Garcia v. City of Napa*,
2014 WL 342085 (N.D. Cal. Jan. 28, 2014) ........................................ 11

20    *Glickenhaus & Co. v. Household International, Inc.*,
787 F.3d 408 (7th Cir. 2015) ............................................................. 20
21

22    *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
___ U.S. ___, 141 S. Ct. 1951 (2021) ........................................... 16, 17, 21

23
*Halliburton Co. v. Erica P. John Fund, Inc.*,
24    573 U.S. 258 (2014) ........................................................................... 16

25    *Kaiser-Frazer Corp. v. Otis & Co.*,
195 F.2d 838 (2d Cir. 1952) ............................................................... 18
26

27    *Kona Enters. v. Estate of Bishop*,
229 F.3d 877 (9th Cir. 2000) ............................................................... 9

28

- ii -

*In re LeapFrog Enter., Inc. Sec. Litig.*,
  No. 15-cv-00347-EMC, 2016 U.S. Dist. LEXIS 117635 (N.D. Cal. Aug. 31, 2016) .................. 9

*Miller v. Thane Int'l, Inc.*,
  615 F.3d 1095 (9th Cir. 2010) ...................................................................................... 17, 21

*S.E.C. v. Reyes*,
  491 F. Supp. 2d 906 (N.D. Cal. 2007) ................................................................................ 17

*SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ............................................................................................ 15

*Stromberg v. Ocwen Loan Servicing, LLC*,
  2017 WL 3727233 (N.D. Cal. Aug. 30, 2017) .................................................................... 10

*Toombs v. Leone*,
  777 F.2d 465 (9th Cir. 1985) .............................................................................................. 17

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ............................................................................................................ 16

United States v. Rezzonico,
  32 F.Supp.2d 1112 (D. Ariz. 1998) .................................................................................... 11

*Wireless Access, Inc. v. Research in Motion, Ltd.*,
  2001 WL 1218744 (N.D. Cal. Sept. 12, 2001) .................................................................... 12

*Worthy v. City of Berkeley*,
  No. 20-CV-05558-EMC, 2021 WL 5758887 (N.D. Cal. Dec. 3, 2021) ................................ 9

*ZPR Inv. Mgmt. v. SEC*,
  861 F.3d 1239 (11th Cir. 2017) .......................................................................................... 18

**Rules**

Civ. L.R. 7-9 ............................................................................................................................ 10

Fed. R. Civ. P. 59(e) ................................................................................................................ 10

## I.   INTRODUCTION.

Motions for reconsideration are rarely granted. They are not intended to provide dissatisfied litigants with the opportunity to rehash old arguments already rejected by the court.  Only when there has been a true change in the controlling law or a genuine misapplication of the facts is reconsideration appropriate. Defendants fail to meet this standard. The Court has not overlooked critical record evidence demonstrating the existence of a triable issue of fact on falsity and scienter. The Court considered all this evidence and correctly rejected Defendants' arguments. Any effort to revive those arguments here is inappropriate. Defendants also argue that because the Court denied Plaintiff's motion for summary judgment on the element of reliance, this is inconsistent with the grant of summary judgment on the elements of falsity and scienter. Defendants request that the Court therefore reconsider its decision on falsity and scienter. Defendants, however, misconstrue the Court's ruling and the law on the related issues of reliance and materiality. There is no reason why a Court, applying a consistent standard of materiality, cannot reach different decisions at summary judgment on the issues of falsity, scienter, and reliance. The Court appropriately preserved the Defendants' ability to challenge the degree to which Defendants' fraudulent statements on August 7, 2018 affected the price of Tesla, Inc. securities during the Class Period, an issue that was not covered by Plaintiff's motion for partial summary judgment. This does not affect in any way its ruling in Plaintiff's favor on the issue of falsity and scienter. Furthermore, Defendants' argument is contradicted by both the record evidence and the deposition testimony of their own expert, who agrees that Musk's August 7, 2018 tweets were material at the time they were made and continued to have some impact on the price of Tesla's securities throughout the Class Period. Defendants' motion, accordingly, lacks any foundation and should be denied by the Court.

## II.   PLAINTIFF'S FACTUAL STATEMENT.

The Class Period commences with Defendant Elon Musk's tweet published at 12:48 p.m. (EDT): "Am considering taking Tesla private at $420. Funding secured."[1] As the Court held in its

---

[1] The entire factual background relevant to this motion was extensively briefed in relation to Plaintiff's motion for partial summary judgment (ECF Nos. 352, 365, 370) and discussed at length by the Court in its Order Granting in Part and Denying in Part Plaintiff Littleton's Motion for Partial

MSJ Order, this tweet was false. Musk concedes that this tweet refers solely to discussions he had had with representatives of the Saudi Arabia Public Investment Fund on July 31, 2018. Yet, as the Court found: "there was nothing concrete about funding from the PIF; rather; discussions between Tesla and the PIF were clearly at the preliminary stage."[2] Importantly, "there had been no discussion about what the purchase price for a share of stock"[3] even though Musk claimed in his tweet that funding had been "secured" at $420 per share.[4] Other crucial details such as the overall percentage of a private Tesla that the PIF might own, the corporate structure of the private Tesla, and the total amount of funding required were also undetermined.[5]

The potential corporate structure was critical because Musk was envisioning a novel structure which would allow many investors in Tesla as a public company to roll over their investment into a private Tesla.[6] The percentage of existing Tesla investors who would be willing and able to roll over their investments would determine the total amount of funding required to successfully close the going-private transaction.[7] By August 7, 2018, Musk had obtained no legal advice whether this structure was even feasible under federal and Delaware law; indeed, he had not even retained any legal advisors,[8] and had undertaken no analysis of the ability or willingness of existing Tesla stockholders to roll over their investments into a private company.[9]

Tesla's stock price reacted instantaneously to Musk's tweet, increasing $8.18 (from $356.85 to $365.03) on volume of over 800,000 shares in the minute immediately afterwards.[10] It continued to trade heavily with the price increasing further to $367.25 on volume of over 10 million shares

---

Summary Judgment dated April 1, 2022 (ECF No. 387) ("MSJ Order"). Plaintiff does not burden the Court with another lengthy recitation of the facts but refers the Court to the entire summary judgment record.

[2] MSJ Order at 24.
[3] *Id.*
[4] E. Musk Dep. at 133:6-9 ($420 included in August 7, 2018 tweet to "make it clear that funding was secured at that level.").
[5] MSJ Order at 24.
[6] Durban SEC Tr. at 89:14-24.
[7] Ahuja Dep. at 104:21-105:5.
[8] E. Musk SEC Tr. at 165:1-5.
[9] E. Musk Dep. at 140:21-145:15.
[10] Hartzmark Damages Report at ¶69.

- 2 -

before NASDAQ halted trading at 2:08 p.m.[11] The prices of options for Tesla stock also reacted immediately. Investors, analysts, and the media grasped the significance of Musk securing funding for the transaction. During the trading halt, Michael Santoli, a commentator on CNBC, commented on Musk's tweet stating that "having secured funding, to me, is the big number right there."[12] Toni Sacconaghi, an analyst at AllianceBernstein emailed Martin Viecha, Tesla's Director of Investor Relations, asking "what does 'financing secured' [sic] actually mean?"[13] Viecha responded: "it means that financing is secured regardless of other assumptions."[14]

At 3:16 p.m., Musk sent an email (drafted for him by Tesla management and quickly posted on Tesla's corporate blog) to Tesla employees explaining his reasons why Tesla would be better off as a private company.[15] No details of funding or Musk's discussions with the PIF were provided. At 3:36 p.m., Musk tweeted a link to his email together with the statement: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."[16] In its MSJ Order, the Court determined this tweet was false because Musk had not confirmed support for taking Tesla private at $420 per share with any investor, whether current or future, including the PIF.[17] Further, Musk knew there were many contingencies to be addressed before the proposed transaction would reach a shareholder vote.[18]

Even after Musk's email was published, investors still focused on the question of "funding secured". On the afternoon of August 7, 2018, Nii Owuraka Koney, a Managing Director at Tesla investor Jennison Associates wanted clarification from Viecha on the meaning of "funding secured"

---

[11] *Id.*

[12] https://www.cnbc.com/video/2018/08/07/was-elon-musks-tweet-market-manipulation-tesla-tsla-stock-elon-musk-private-capital-investors-sec.html cited in Hartzmark Damages Report at Appendix 6, p.1 (Ex. X); *see also* Hartzmark 3/18/22 Dep. at 122:13-123:25. A transcript of the CNBC segment is attached to the Declaration of Adam McCall submitted with this opposition as Exhibit B.

[13] Ex. 151.

[14] *Id.*

[15] Ex. 12.

[16] Ex. 13.

[17] MSJ Order at 26-27.

[18] *Id.* at 29

- 3 -

even after reading Musk's email which, Koney noted, said nothing about funding.[19] Koney concludes that Twitter "is hardly the right place to confirm the funding is secure."[20] Similarly, Bradley Erickson, an analyst at Keybanc Capital Markets, asked Viecha for clarification because "in the tweet, he said financing is secured but in the letter he doesn't address this."[21] Viecha responded: "yes, there is a firm offer."[22] In an email to Musk, Tesla's Chief Financial Officer, Deepak Ahuja, advised that "we are getting a lot of enquiries from investors, SEC and the media to better understand the comment 'funding secured'."[23]

Tesla stock resumed trading at approximately 3:45 p.m. It ultimately closed at $379.57 per share on additional heavy volume of over 6 million shares.[24] The chart below was prepared by Plaintiff's expert, Dr. Michael Hartzmark, and shows the changes in Tesla's stock price as well as the volume of shares traded on August 7, 2018:[25]



---

[19] Ex. 58.
[20] *Id.*
[21] Ex. 158.
[22] *Id.*
[23] Ex. 337 (attached to Declaration of Adam McCall filed herewith).
[24] Hartzmark Damages Report at ¶71.
[25] *Id.* at ¶75.

Prices for options on Tesla stock also reacted strongly to Musk's tweets. On August 7, 2018, the implied volatility for Tesla's stock, as reflected below by the long-term[26] option prices sharply declined after being relatively stable for the period preceding Musk's tweets.[27] Announcement of a strategic investment would be expected to reduce the implied volatility of a company's stock options, particularly long term options.[28] The following chart shows the price of the at-the-money forward straddles for Tesla stock options during August 6 and 7, 2018:



Financial analysts issued reports during the afternoon and evening of August 7, 2018 and the morning of August 8, 2018. Analysts again focused on Musk's statements that funding was secured

---

[26] Long-term options for the purposes of Dr. Hartzmark's report as defined as those with expiries on or after October 19, 2018. *See id.* at ¶221 n.316.

[27] *Id.* at ¶¶184-94. The implied volatility of a company's stock price, which reflects the market expectations of the range of future stock prices over the term of the option, is a key component of option prices along with the current market price for the stock, the time to maturity of the option, its strike price, and other factors not relevant here. *See id.* at ¶190 (stating that implied volatilities may be derived from at-the-money forward straddle prices and that these straddle prices reflect implied volatility).

[28] *Id.* at ¶¶187-89. Changes in implied volatility are best observed by analysis of long term options whose price is least affected by other factors such as the option's time to maturity.

and that investor support was confirmed. Morningstar noted that based on Musk's tweets it thought that "execution [of a deal] is more likely than not" and speculated that "funding comes mostly from tech investors".[29] RBC Capital Markets stated that "Elon's tone and messaging regarding a potential transaction lead us to believe that there could be significant outside funding lined up."[30] Evercore stated that Tesla's stock price was reflecting the belief that funding was secured and the transaction will be completed.[31] Both JP Morgan and Jefferies increased their price target for Tesla following Musk's tweets with JP Morgan stating: "as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nonetheless declarative statements from the CEO of a public company which we feel should be considered seriously. *Either funding is secured or it is not secured, and Tesla's CEO says funding is secured*."[32]

After a short statement from the Tesla Board of Directors on the morning on August 8, 2018, no further statement was made by Musk or Tesla about the potential going-private transaction until August 13, 2018. Media speculation, however, was rampant and the period from August 7 to August 13, 2018 was filled with news stories either supporting the veracity of Musk's tweets (*i. e.*, confirming that funding was secured and investor support lined up) or undermining them (*i. e.*, questioning the existence of funding and investor support). Notably, on August 8, 2018, the *New York Times* and *Wall Street Journal* began reporting that the Securities & Exchange Commission was investigating Musk's August 7, 2018 tweets as potential securities fraud.[33] From August 8, 2018 to the morning of August 13, 2018, Tesla's stock price declined to $355.49 while the implied volatility for its stock options increased.

On the morning of August 13, 2018, Tesla published a blogpost by Musk (again drafted by Tesla management and counsel).[34] The blogpost provided some additional detail regarding the

---

[29] Hartzmark Damages Report at ¶73.
[30] *Id*.
[31] *Id*. at ¶84.
[32] Ex. 15 (emphasis added); Hartzmark Damages Report at ¶81.
[33] Hartzmark Damages Report at ¶¶78-102.
[34] Ex. 16.

history of discussions between Musk and the PIF while omitting information about the evident "friction" between them.[35] The blogpost also stated that "My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla." As Musk later admitted: "I was wrong about the desire of - - or the interest in the existing shareholders to go private. ***That was incorrect***."[36]

The market and analysts generally acted positively to the blogpost. Tesla's stock price increased modestly by $0.92 (from $355.49 to $356.41).[37] CFRA wrote in an analyst note: "the blog also explains how the deal could be more likely than we previously thought" and Morningstar stated that Musk's August 7, 2018 tweet that "investor support is confirmed" meant "Musk believes he has enough votes to go private" and "his estimate of about 66% of shareholders not tendering [from the August 13, 2018 blogpost] is not far off from our own assumption of 60%."[38] Morningstar concluded: "our impression of his words is that he thinks it can happen, and we agree."[39] In an August 14, 2018 presentation, JP Morgan maintained its price target for Tesla that it increased after Musk's August 7, 2018 tweet that "funding is secured" and on August 16, 2018, AllianceBernstein raised its target price for Tesla based on its assessment of the likelihood of a successful take-private transaction.[40] At the same time, reports regarding regulatory investigations and rumors regarding the involvement of the PIF, Silver Lake Partners, and Goldman Sachs continued to be published.[41] By August 16, 2018, Tesla's stock price had declined further to $338.69. The implied volatility derived from Tesla stock option prices for the January 17, 2020 expiry, the longest dated expiry during the Class Period and the most sensitive to changes in implied volatility, had increased from 32.57% at market close on August 7, 2018 to 40.87%, which was still below the long-term level of 50.52% immediately prior to the tweets on August 7, 2018, at 12:47 p.m.[42]

---

[35] MSJ Order at 30.
[36] E. Musk SEC Tr. at 258:23-25(emphasis added); *see also* E. Musk Dep. at 297:5-23; Ex. 101.
[37] Hartzmark Damages Report at ¶108.
[38] *Id*. at ¶106.
[39] *Id*.
[40] Hartzmark Damages Report at ¶122.
[41] *Id*. at ¶¶101-24.
[42] *Id.* at ¶¶191-97 and Appendix 8.

On the evening of August 16, 2018, the *New York Times* published a lengthy article regarding Tesla, Musk, and the potential going-private transaction.[43] Other than his tweets and official Tesla disclosures such as the August 13, 2018 blogpost, these were the first on-record statements by Musk regarding his tweets. In the article Musk confirmed details that had been rumored earlier: that he had published the tweets while driving to the airport, that no-one had reviewed them before he published them, and that the Board was unaware that he was going to publicly disclose the potential take-private at $420 per share.[44] The article also noted that "funding, it turned out, was far from secure."

The market immediately reacted to the new reporting from the *New York Times*. Tesla's stock price declined $29.95 to $305.50 on volume of 19 million shares.[45] The implied volatility derived from Tesla stock option prices for the January 17, 2020 expiry increased to 48.65%, virtually identical to its level on August 7, 2018 immediately before Musk's tweets thus indicating that the market no longer considered a take-private transaction to be likely. JP Morgan responded to the *New York Times* article by reducing its price target back to its August 6, 2018 level.[46] JP Morgan wrote: "our interpretation of subsequent events leads us to believe that funding was not secured for a going private transaction, nor was there any formal proposal."[47] JP Morgan also noted that Tesla and Musk still appeared to be exploring a going-private transaction but the "process appears much less developed than we had earlier presumed (more along the lines of high level intention)".[48]

On August 24, 2018, Tesla and Musk formally announced that they were no longer exploring a take-private transaction.[49] The August 24, 2018 announcement led analysts such as CFRA and Canaccord to reduce their price target for Tesla, but the price for Tesla stock barely moved, declining just $3.55 from $322.82 to $319.27, indicating that the critical information regarding the take-private

---

[43] Ex. 19.
[44] *Id.*
[45] Hartzmark Damages Report at ¶135.
[46] Ex. 23; Brinkman Dep. at 100:9-106:15.
[47] Ex. 23.
[48] *Id.*
[49] Hartzmark Damages Report at ¶¶136-39.

transaction concerned funding being secured and investor support being confirmed was revealed to the market on August 17, 2018, by the New York Times.[50]

## III. DEFENDANTS' MOTION FOR RECONSIDERATION SIMPLY RECYCLES ARGUMENTS AND EVIDENCE THE COURT HAS ALREADY CONSIDERED.

### A. Reconsideration is an Extraordinary Remedy that Should Be Rarely Granted.

A motion for reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, 2015 WL 8477293, at *2 (N.D. Cal. Dec. 10, 2015) (quoting *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)). Thus, "a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999); *accord In re LeapFrog Enter., Inc. Sec. Litig.*, No. 15-cv-00347-EMC, 2016 U.S. Dist. LEXIS 117635, at *2 (N.D. Cal. Aug. 31, 2016); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-CV-04000-EMC, 2016 WL 2593654, at *2 (N.D. Cal. May 5, 2016), *aff'd on other grounds*, 743 F. App'x 883 (9th Cir. 2018).

Defendants moved for leave to file a motion for reconsideration pursuant to Local Civil Rule 7-9 which requires the movant to show that "a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought" or identify "a manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before the interlocutory order." *Worthy v. City of Berkeley*, No. 20-CV-05558-EMC, 2021 WL 5758887, at *1 (N.D. Cal. Dec. 3, 2021) (quoting L.R. 7-9(b)). Defendants cannot meet their burden under this standard. It is unclear from Defendants' motion under which rule it would be seeking reconsideration, but Plaintiff assumes it is Rule 59(e).[51] *See Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985) ("A

---

[50] *Id.*

[51] A motion for reconsideration may also be brought under Fed. R. Civ. Pro. 60(b) if the moving party can show (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud

motion for reconsideration of summary judgment is appropriately brought under Rule 59(e).").

While the standards under Civ. L.R. 7-9 (manifest failure to consider material facts) and Fed. R.

Civ. P. 59(e) (clear error or manifestly unjust decision) differ, analysis under both leads to the same

conclusion here – Defendants cannot meet their burden.

### B. The Court Did Not Overlook Material Facts Related to Falsity and Scienter.

Defendants assert that reconsideration is warranted because the Court overlooked critical

record evidence demonstrating the existence of a triable issue of fact on falsity and scienter.[52] In

requesting that the Court reconsider its order on summary judgment, Defendants unfoundedly claim

that the "Court overlooked record evidence that is nowhere discussed in the Court's order and that

places significant facts in dispute that preclude summary judgment for Plaintiff on falsity and

scienter."[53] Yet ***all*** of the record evidence Defendants claim was overlooked by the Court was

included in their opposition briefing, many of the same arguments were made by counsel at the

motion's hearing, and most of the evidence was referenced in the Court's order. The Court's order

explicitly states that "[h]aving considered the parties' briefs and accompanying submissions, as

well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Mr.

Littleton's motion.[54] For this reason alone, Defendants' motion for reconsideration should be

denied. *See Backlund*, 778 F.2d 1388 (holding that the motion for reconsideration was properly

denied because it presented no arguments that had not already been raised in opposition to summary

judgment).

In making this motion, Defendants completely ignore clear precedent holding that "[a]

motion for reconsideration is not a vehicle to re-assert arguments already considered and rejected

in an earlier order." *Stromberg v. Ocwen Loan Servicing, LLC*, 2017 WL 3727233, at *2 (N.D. Cal.

Aug. 30, 2017) (citing Civ. L.R. 7-9(c)). Defendants inappropriately seek another bite at the apple.

---

or other misconduct; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other
reason justifying relief from operation of judgment. *Backlund*, 778 F.2d at 1388. Defendants do not
argue that their case falls within any of these exceptions.  Nor could they do so successfully.
[52] ECF No. 401 at 2.
[53] *Id*. at 12.
[54] MSJ Order at 1.

*See Garcia v. City of Napa*, 2014 WL 342085, at *1 (N.D. Cal. Jan. 28, 2014) ("Nor is reconsideration to be used to ask the Court to rethink what it has already thought.") (citing *United States v. Rezzonico*, 32 F.Supp.2d 1112, 1116 (D. Ariz. 1998)). Defendants' motion amounts to no more than a repetition and rehashing of the arguments made at summary judgment, through both briefing and oral argument. Rather than demonstrate a "manifest failure" on the Court's part to "consider material facts," Defendants simply take issue with the Court's decision, and how the Court considered those facts and evidence. The Court did not overlook these facts; the Court considered these facts and decided against Defendants on the issues of falsity and scienter. A motion for reconsideration is not an appropriate vehicle by which to relitigate arguments made at summary judgment simply because of a disagreement with the outcome. *See Aguirre v. California*, 2017 WL 6350290, at *1 (N.D. Cal. Dec. 13, 2017) (denying motion for reconsideration of summary judgment order where Plaintiff was simply relitigating arguments previously made).

Defendants argue that the Court overlooked evidence that would permit a jury to conclude that PIF knew what funding would entail, and that the funding was "not a problem."[55] The Court's Order, however, explicitly references PIF purchase of just under 5% of Tesla's outstanding shares, and Musk's belief that PIF was willing to fund the entire going private transaction.[56] Defendants' opposition brief argued that the investment was a "strategic priority" for PIF.[57] And Defendants' counsel stated explicitly at oral argument that "Funding is not an issue."[58] Defendants also assert that the Court overlooked Mr. Al-Rumayyan's alleged statement to Musk as the July 31 meeting was ending of "Let us know how you want to do this. We want to do this," which according to them would permit a reasonable inference of a "verbal commitment."[59] Again, Defendants made this exact argument at the hearing.[60] As the Court found, the record evidence, including this, shows that discussions between PIF and Tesla were at the preliminary stage, and could not possibly

---

[55] ECF No. 401 at 12.
[56] MSJ Order at 4, 6.
[57] ECF No. 365 at 6.
[58] Ex. A at 5:24-25 (attached to the Declaration of Adam McCall filed herewith).
[59] ECF No. 401 at 12-13.
[60] Ex. A at 5:24-6:6.

demonstrate a verbal commitment because no details about what funding would entail were discussed.[61]

Making these arguments again because they disagree with the Court's holding is an improper basis for a motion for reconsideration. *See Wireless Access, Inc. v. Research in Motion, Ltd.*, 2001 WL 1218744, at *2 (N.D. Cal. Sept. 12, 2001) (denying plaintiff's motion for reconsideration of the summary judgment order where the same arguments made for reconsideration were made and rejected at summary judgment). None of the evidence offered again by Defendants contradicts the fact that the PIF's initial investment in Tesla and discussion on July 31, 2018 started the process of exploring a potential transaction; it did not commit PIF to a specific amount of funding for the potential transaction. Based on the evidence before it, including that which Defendants argue the Court overlooked, the Court concluded that "[t]he evidence of record shows that there was nothing concrete about funding coming from the PIF; rather, discussions between Tesla and the PIF were clearly at the preliminary stage."[62]

Defendants' argument that the Court overlooked evidence of a "handshake" deal which would permit a jury to find a "verbal commitment" is entirely unfounded. While the Court's order does not specifically reference Defendants' assertion of a "handshake deal," it does state that Musk believed "no written agreement was necessary, and no discussion of price was necessary."[63] The fact that the Court's order does not explicitly address a "handshake deal" does not mean it was overlooked; the evidence was used both in Defendants' briefing and at oral argument and accordingly, was considered by the Court. *See Wireless Access*, 2001 WL 1218744, at *2 (presuming that Court considered evidence in denying motion for reconsideration where such evidence was not referenced in Court's order but the order indicated court had reviewed parties' submissions and arguments). Moreover, arguing that the Court overlooked this evidence is simply dishonest; the Court had extensive colloquy with counsel for Defendants on the issue at the

---

[61] MSJ Order at 24-25.
[62] MSJ Order at 24.
[63] MSJ Order at 5.

summary judgment hearing.[64] The Court questioned how there could be even a "handshake deal" when a specific price and a structure for a potential deal were not discussed.[65]

Musk's subsequent, self-serving text messages to Mr. Al-Rumayyan on August 12, 2018 stating that "You said you were definitely interested in taking Tesla private," and "You also made it clear that you were the decision-maker, moreover backed strongly by the Crown Prince, who regards this as strategically important at a national level" do not support a verbal commitment having existed on August 7, 2018. While they might show Musk believed PIF was interested in funding the potential transaction, they are not evidence of secured funding. Moreover, as of August 12, 2018, Musk already knew that he was under investigation by the United States Securities and Exchange Commission for his August 7 tweets, and may have been motivated to create a text chain that supported his version of the story. Nevertheless, the Court's Order extensively references these text communications.[66] And Defendants' opposition made this exact argument.[67] Given that this evidence was previously presented and argued before the Court, a motion for reconsideration should be denied on these grounds. *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1442 (9th Cir. 1991) (holding that the repetition of arguments which the district court already considered and rejected is not a proper basis for reconsideration).

Evidence of Musk's beliefs as to his understanding that Mr. Al-Rumayyan had verbally committed to financing the transaction, and PIF's previous oral agreements in other transactions was set forth by Defendants in their opposition.[68] The Court included evidence regarding Musk's belief that PIF was willing to fund the potential transaction in its Order.[69] The Court clearly considered these facts, and still ruled that no reasonable jury could find the statement "Funding secured" accurate and not misleading.[70] Given that there was no discussion of price or structure, even PIF's interest to continue discussions regarding funding does not mean "Funding secured" at

---

[64] Ex. A at 5:13-7:7.
[65] *Id*. at 6:19-25.
[66] MSJ Order at 12-13.
[67] ECF No. 365 at 11.
[68] ECF No. 365 at 6.
[69] MSJ Order at 5-7.
[70] *Id*. at 24.

$420. Defendants take issue with the Court's interpretation of the evidence because it is not Musk's interpretation, but a motion for reconsideration is not the appropriate means for relitigating Mr. Musk's position. *See Aguirre*, 2017 WL 6350290, at *1 (finding Plaintiff's issue with the Court's characterization of her argument to be an inappropriate basis for a motion for reconsideration).

Defendants' arguments that the Court did not address certain statements in the blog post linked to the "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." do not support their motion. Defendants made these same arguments at the summary judgment hearing.[71] In fact the Court's order discusses the interplay between the linked blog and the tweet. "While the blog post makes clear that a final decision on taking Tesla private had not been made, it did not specify any contingencies other than the 'finaliz[ation] through a vote of our shareholders.'"[72] Considering the blog post, the Court still found that "a reasonable investor could only conclude that the sole contingency left for taking Tesla private was a shareholder vote. The post used the word "only," implying that the only contingency was a shareholder vote, not, e.g., uncertainty of investor support."[73] Once again, Defendants cannot be permitted to make the same arguments they made to the Court at summary judgment which the Court rejected in support of a motion for reconsideration. *See Fuller*, 950 F.2d at 1442; *see also Backlund*, 778 F.2d at 1388 (finding that motion for reconsideration was "properly denied" because it "presented no arguments that had not already been raised in opposition to summary judgment").

Only the arguments regarding Plaintiff Glen Littleton's testimony on what he understood "Funding secured" to mean were not before the Court on summary judgment, but they do not support a motion for reconsideration. Courts use the "objective standard of a 'reasonable investor' to determine whether a statement is misleading." *Alphabet Sec. Litig., R.I. v. Alphabet, Inc.*, 1 F.4th 687, 699 (9th Cir. 2021). Mr. Littleton is the class representative. While his testimony is important for many reasons, it legally has no bearing on whether Musk's statements were false at the time they were made and whether he made those statements with scienter. Nevertheless, Mr. Littleton's

---

[71] Ex. A at 17:6-11.
[72] MSJ Order at 28.
[73] MSJ Order at 28-29.

testimony actually squares perfectly with the existing record. When asked during the deposition how he interpreted the initial "Funding secured" tweet, Mr. Littleton testified that he understood Musk's words to mean that the "[m]oney was there, funding was certain." Mr. Littleton reiterated this understanding several times during questioning.[74] How this testimony creates an issue of fact is unknown. It matches with how the vast majority of the investing world interpreted the tweet, which was that the money was "in the bag" as the Court so aptly put it on March 10.[75]

Defendants also misplace reliance on Mr. Littleton's testimony about Musk's blog posts on August 13, 2018. Mr. Littleton testified to his belief that "Funding secured" was confirmed by the August 13, 2018 blog post, which continued to misrepresent the state of affairs of the going private. In fact, as Mr. Littleton testified, he believed the deal was still proceeding until Musk renounced it on August 24, 2018. Nothing about this testimony conflicts with record before the Court at summary judgment or in any way supports Defendants' motion for reconsideration. The record has demonstrated indisputably that Musk had not "secured" funding or "confirmed" investor support, contrary to what he said publicly. Similarly, Musk's knowledge of this nonpublic, adverse fact is what drives scienter and, therefore, Mr. Littleton's testimony is entirely irrelevant on that issue too. *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093-94 (9th Cir. 2010).

The Court did not overlook any evidence in its summary judgment order. All of the evidence Defendants contend was overlooked was before the Court through Defendants' opposition, and most of the evidence was addressed at oral argument and in the Court's order. A motion for reconsideration is an extraordinary remedy that is not appropriate for relitigating the evidence Defendants put forth in opposition to summary judgment. *See Aguirre*, 2017 WL 6350290, at *1. Thus, the Court should deny Defendants' Motion for Reconsideration requesting that the Court consider evidence it baselessly contends was overlooked.

---

[74] *See* Glen Littleton Dep. at 115:6-17 ("I just knew that he said there was funding certain."); 116:12-21 ("I just knew he had funding secured…I had no idea – at the time I had no idea how it would happened, it was just going to be done.") (attached to Declaration of Adam C. McCall filed herewith).

[75] Ex. A at 5:9-12.

1  **IV.   THE COURT DID NOT APPLY DIFFERENT MATERIALITY STANDARDS**
2  **WHEN DECIDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**
3  **JUDGMENT.**

4  **A. Defendants' Motion Confuses Law Regarding Materiality, Reliance, and Loss**
5  **Causation.**

6  Defendants argue that because the Court denied Plaintiff summary judgment on the question
7  of reliance, it somehow erred when granting Plaintiff summary judgment on the issues of falsity and
8  scienter regarding Musk's August 7, 2018 tweets. Defendants argue that this shows that the Court
9  applied a different standard for materiality when considering falsity and scienter compared to its
10 analysis of reliance.[76] Defendants are mistaken.

11 Materiality, reliance, and loss causation are distinct but related elements that frequently draw,
12 at least in part, on common evidence. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258,
13 282-83 (2014) ("materiality is a discrete issue that can be resolved in isolation from the other
14 prerequisites" and "wholly confined to the merits stage" even though related to "price impact"); *see*
15 *also Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 269 (2d Cir. 2020) ("even
16 though defendants may not challenge materiality at the Rule 23 stage, they may present evidence to
17 disprove price impact when seeking to rebut the Basic presumption"), *vacated and remanded by*
18 *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, ___ U.S. ___, 141 S. Ct. 1951 (2021). Each
19 element concerns the degree to which a misrepresentation or omission affected the market for the
20 relevant security. Materiality and loss causation are most frequently addressed in the contexts of
21 motions to dismiss while reliance is usually addressed in the context of class certification.

22 The test for materiality across all federal securities laws was established by the Supreme
23 Court in *TSC Industries, Inc. v. Northway, Inc.* where a fact is material "if there is a substantial
24 likelihood that a reasonable shareholder would consider it important". 426 U.S. 438, 449 (1976).
25 This requires "a showing of a substantial likelihood that, under all the circumstances, the omitted
26 fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id*.

27

28 ---
[76] *See* ECF No. 401 at 8-11.

The Court continued: "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*. Importantly, this is an objective test, assessing the significance of a piece of information to a "reasonable investor". *Id*. at 445; *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) (noting materiality is an objective test). Materiality is also assessed at the time the misrepresentation or omission occurs. *S.E.C. v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007) ("The law assesses the materiality of a misrepresentation at the time it is made, not after intervening events or remedial action have rendered it harmless."); *see also Toombs v. Leone*, 777 F.2d 465, 469 (9th Cir. 1985) ("Materiality, of course, must be determined in light of facts existing at the time of nondisclosure or misinformation.")

The question of reliance, specifically the issue of whether a defendant has rebutted the presumption of reliance established by *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), is, in contrast, a subjective test. A defendant must prove that a misrepresentation or omission ***in fact*** had no impact of a security's price at a particular point in time. "The defendant must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff—and a defendant's mere production of *some* evidence relevant to price impact would rarely accomplish that feat." *Goldman Sachs*, 141 S. Ct. at 1962; *see also Basic*, 485 U.S. at 249 (presumption rebutted where it is shown truth "credibly entered the market and dissipated the effects of the misstatements"). The same is true for the issue of loss causation. Unlike the test for materiality which is "hypothetical and objective . . . the loss causation inquiry assesses whether a particular misstatement *actually* resulted in loss. It is historical and context-dependent." *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1101-02 (9th Cir. 2010) (citations omitted). The two inquiries of reliance and loss causation essentially intersect when the "price impact" or "actual loss" caused by a misrepresentation equal $0.00 which will typically be at the end of a class period.[77]

---

[77] There may also be instances where an individual plaintiff or class member may possess actual knowledge of defendants' fraud before it is publicly known that might sever the relationship between the decision to purchase or sell a security and the misrepresentation or omission thus rebutting reliance. No such instance like this is suggested in this case.

Examining the jurisprudence on these inter-related concepts *in toto* reveals the differences between them as well as the fallacy underlying Defendants' motion. Though they claim that their materiality argument based on Tesla's stock price movement should have precluded summary judgment entirely, the implications and significance of that evidence changes markedly depending on whether it is being viewed in the context of falsity or reliance, as explained above. Had the price of Tesla's stock not moved at all in response to Musk's August 7, 2018 tweets, the facts of the case would be very different and Defendants' materiality argument might have some merit. Needless to say, the absence of movement in Tesla's stock price several days later on August 13, 2018 does not retroactively negate the materiality of the tweets in the first instance. *See*, *e.g.*, *ZPR Inv. Mgmt. v. SEC*, 861 F.3d 1239, 1250 (11th Cir. 2017) ("Materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred. Because our inquiry is limited to what investors knew at the time the false statements were made, ZPRIM's later disclosures cannot negate the materiality of the earlier misrepresentations.") (internal citations and quotations omitted); *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843 (2d Cir. 1952) (concluding an overstatement of earnings in a quarterly report was not rendered immaterial simply because in the end "profits for the year as a whole were substantially unaffected by the overstatement"). Thus, while their argument might create a question as to price impact, it does not go any further than that and certainly does not require reconsideration of the Court's holdings on falsity and scienter.

## B. The August 7, 2018 Tweets by Musk Were Indisputably Material at the Time They Were Made.

Based on the evidence introduced on Plaintiff's motion for summary judgment as well as the expert reports and testimony from experts for both Plaintiff and Defendants, there is no dispute that Musk's August 7 tweets were material at the time they were made. In his lengthy report, Plaintiff's expert, Dr. Michael Hartzmark, catalogues the quantitative and qualitative evidence demonstrating materiality. This includes the immediate stock price reaction to the August 7, 2018 tweets, the equally rapid reaction of stock option prices, and the reaction of news media, investors, and analysts. Within hours of Musk's initial tweet, while trading in Tesla securities was suspended due to the news, Michael Santoli, a commentator on CNBC, commented that "having secured funding, to me,

is the big number right there." Overnight, JP Morgan adjusted its price target for Tesla stock explicitly in reliance on Musk's tweets, especially the statement "funding secured". Dr. Hartzmark describes the evidence of materiality of Musk's August 7, 2018 tweets as "incontrovertible".[78]

To his credit, Defendants' expert, Professor Daniel Fischel, does not controvert this proposition. In his two expert reports, Professor Fischel offers no opinion on the materiality or otherwise of Musk's August 7, 2018 tweets.[79] In his deposition, Professor Fischel agreed that Musk's August 7, 2018 tweets were "clearly material".[80] Specifically, with regard to the two tweets on which the Court entered summary judgment in favor of Plaintiff, Professor Fischel believes the 12:48 p.m. tweet "certainly was material" and the 3:36 p.m. tweet was "new information in the sense that it resulted in a huge price increase, a statistically significant price increase, on that day."[81] Even after Musk and Tesla's August 13, 2018 blogpost, Professor Fischel believes that the August 7, 2018 tweets "were still part of the total mix of information that was present on August 13th … I would say they're material."[82] Indeed, Professor Fischel believes the impact of Musk's August 7, 2018 tweets persisted all the way to August 17, 2018 and the market reaction following Musk's *New York Times* interview. When asked if there was a connection between the stock price reaction seen on August 17, 2018 and the Musk August 7, 2018 tweets, Professor Fischel unambiguously replied: "yes, I think there's a connection because the August 17th interview that Musk gave comes into context of the events that were occurring at the time, which include the August 7th tweet – or tweets. So, yes, I think there's that connection."[83]

Thus, on the issue of the materiality of the August 7, 2018 Musk tweets and whether they had some impact on the price of Tesla's securities during the Class Period up to August 17, 2018, there is no disagreement between Dr. Hartzmark and Professor Fischel and, indeed, no other contradicting evidence in the record.

---

[78] Hartzmark 3/18/22 Dep. at 122:13-123:25.
[79] McCall Decl. Exs. V and W (ECF Nos. 371-20 & 371-21).
[80] Fischel Dep. at 39:18-40:15.
[81] *Id*. at 57:22-58:5 ("funding secured") and 141:11-142:2 ("Investor support is confirmed").
[82] *Id*. at 201:16-202:14.
[83] *Id*. at 160:17-161:2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C. The Effect of Musk's August 7, 2018 Tweets on the Price of Tesla Securities Throughout the Class Period Was Not the Subject of Plaintiff's Motion for Summary Judgment.**

Where Dr. Hartzmark and Professor Fischel do disagree is the extent to which the Musk August 7, 2018 tweets impacted the price of Tesla's securities from August 7 to August 17, 2018. Dr. Hartzmark presents a detailed analysis based on an event study of the Class Period, an analysis of the changes in implied volatility observed for Tesla stock options and a painstaking review of over 2,400 news reports and mentions during the Class Period to identify any non-Tesla specific and nonfraud related information that might have contributed to any adverse change to the price of Tesla securities during that period. Dr. Hartzmark determined that from August 7 to August 17, 2018, there was no negative, unanticipated information published about Tesla that was not related to the take-private transaction first disclosed in the Musk August 7, 2018 tweets.[84] Defendants may present any alternative analysis and the jury will reach its decision. As the Seventh Circuit explained in *Glickenhaus & Co. v. Household International, Inc.*, where Professor Fischel testified for the plaintiff:

> If the plaintiffs' expert testifies that no firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period and explains in nonconclusory terms the basis for this opinion, then it's reasonable to expect the defendants to shoulder the burden of identifying some significant, firm-specific, nonfraud related information that could have affected the stock price. If they can't, then the leakage model can go to the jury; if they can, then the burden shifts back to the plaintiffs to account for that specific information or provide a loss-causation model that doesn't suffer from the same problem, like the specific-disclosure model.

787 F.3d 408, 422 (7th Cir. 2015).

The Court concluded that the differences of opinion over the impact of the Musk August 7, 2018 tweets, especially following the August 13, 2018 blogpost, prevented the entry of summary judgment in Plaintiff's favor on the issue of reliance.[85] Specifically, the Court held that "Defendants are still entitled to rebut the presumption [of reliance]."[86] Plaintiff submits that this inquiry is

---

[84] Hartzmark Damages Report at ¶¶146-169.
[85] MSJ Order at 30-32.
[86] *Id.* at 32.

properly regarded as an issue of loss causation rather than reliance, especially as Defendants' own expert concedes that the August 7, 2018 Musk tweets still had some effect on the prices of Tesla securities even after the August 13, 2018 blogpost. Thus, there is no evidence to support Defendants' argument that the price effect of the August 7, 2018 Musk tweets after August 13, 2018 was $0.00, which would be necessary to completely sever the connection between the tweets and securities prices and rebut the presumption of reliance. *Goldman Sachs*, 141 S. Ct. at 1962. But this distinction has little, if any, practical effect as the evidence presented to the jury will be the same and the question for the jury is essentially identical: to what extent did the August 7, 2018 Musk tweets affect the price of Tesla securities during the Class Period, including after August 13, 2018.

The decision by the Court on this issue, however, does not suggest that the Court applied different meanings of materiality when assessing falsity, scienter, and reliance, as Defendants suggest. Indeed, the Court was explicit that it did not even address the question of materiality in reaching its decision on reliance as it was not necessary to do so.[87] Nor does allowing Defendants to present evidence at trial rebutting the *Basic* presumption of reliance require the Court to revisit its well-reasoned findings on falsity and scienter. As the Ninth Circuit explained in *Miller*, the inquiries are different, one being objective, the other subjective, and there is no necessity under the law that they must always be decided in the same way. *Miller*, 615 F.3d at 1101-02.

Furthermore, Defendants' argument is incoherent and fails to correspond to the objective facts as presented by Dr. Hartzmark and accepted by Defendants' own expert, Professor Fischel. It is undisputed that Tesla's stock price increased significantly on August 7, 2018 following Musk's tweets. Defendants have offered no theory or narrative as to how that price inflation dissipated that is not connected with the take-private transaction and disclosures of the falsity of Musk's tweets. In other words, neither they, nor their expert, have identified any significant, Tesla-specific, nonfraud related information that could have significantly affected its stock price between August 7 and August 17, 2018. Defendants point to the price reaction to the August 13, 2018 blogpost but ignore the fact that there had already been negative information published regarding the Musk August 7,

---

[87] *Id.* at 32.

2018 tweets, most notably details regarding an SEC investigation into whether those tweets constituted securities fraud. Thus, as Dr. Hartzmark explains with the sort of detail that is completely lacking from Defendants, even before August 13, 2018 some of the inflation and harm caused by Musk's fraudulent August 7, 2018 tweets had begun to be realized in Tesla's stock price and the prices of other securities.

Defendants' alternative theory, that the fact that Musk announced he was considering taking Tesla private was the only material information in the August 7, 2018 tweets, also has no support in the facts. It ignores the extensive media and investor inquiries about the statement "funding secured" that started immediately after the tweet and continued throughout the Class Period. It ignores the importance of the statement regarding investor support being confirmed that was also the subject of extensive media and analyst commentary. Finally, it ignores the quantitative evidence that when Musk finally disclosed that he was no longer considering taking Tesla private on August 24, 2018, prices of Tesla securities barely moved. Accordingly, the evidence shows that this aspect of Musk's August 7, 2018 was the least important part of the tweet and, indeed, entirely consistent with prior public statements that Musk had given about wishing to take Tesla private.

## V.    CONCLUSION.

Defendants' Motion for Reconsideration largely consists of arguments repackaged from their briefing on Plaintiff's motion for partial summary judgment combined with a plea to the Court to reach a different decision. They identify no manifest error in law nor any material evidence that the Court overlooked or was unaware of when it made its initial decision. The attempt to find some inconsistency between the Court's conclusions on falsity and scienter on one hand and reliance on the other also fails as neither the law nor the factual record requires exact congruity between these two issues at the summary judgment phase. Accordingly, Defendants' motion should be denied.

//

//

//

//

//

Dated: May 6, 2022

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 s/ Adam M. Apton          .
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: akrot@zlk.com
(*admitted pro hac vice*)

-and-

Joseph Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: jlevi@zlk.com
Email: ek@zlk.com
(*admitted pro hac vice*)

*Attorneys for Plaintiff and Counsel for the Class*