EXCERPTS FROM THE DEPOSITION OF
ELON MUSK
TAKEN NOVEMBER 5, 2021

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4   IN RE TESLA, INC. SECURITIES) Case No.
    LITIGATION                  ) 3:18-cv-04865-EMC
5                               )
                                )
6                               )
                                )
7                               )
                                )
8   _____)

9        _____

10                   CONFIDENTIAL

11        ORAL AND VIDEOTAPED DEPOSITION OF

12                    ELON MUSK

13                NOVEMBER 5, 2021
         _____

14

15        ORAL AND VIDEOTAPED DEPOSITION OF ELON MUSK,

16   produced as a witness at the instance of the Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on November 5, 2021, from 10:32 a.m. to

19   8:04 p.m., before Candice Andino, Certified Shorthand

20   Reporter in and for the State of Texas, reported by

21   machine shorthand, at Armbrust & Brown, PLLC, 100

22   Congress Avenue, Suite 1300, Austin, Texas, pursuant to

23   Notice and in accordance with the Federal Rules of Civil

24   Procedure.

25   JOB NO. 202221

```
 1              A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         LEVI & KORSINSKY
           BY:  MR. NICHOLAS PORRITT
 4              MS. ELIZABETH TRIPODI
                MS. KATHY AMES VALDIVIESO
 5         1101 30th Street N.W.
           Washington, DC 20007
 6

 7

 8
      FOR THE DEFENDANTS:
 9
           COOLEY
10         BY:  MR. STEPHEN NEAL
           3175 Hanover Street
11         Palo Alto, California 94304

12

13    ALSO PRESENT:

14         CASEY MUMMERT, Videographer

15         CANDACE JACKMAN, Tesla in-house counsel

16         JOSHUA WALDEN (appearing telephonically)

17

18

19

20

21

22

23

24

25
```

Confidential

1          FRIDAY, NOVEMBER 5, 2021, 10:32 A.M.

2                    AUSTIN, TEXAS

3          THE VIDEOGRAPHER:  Good morning.  This is

4   the start of media labeled Number 1 of the video

5   recorded deposition of Mr. Elon Musk, in the matter in

6   re Tesla, Inc. Securities Litigation, in the US District

7   Court Northern District of California, San Francisco

8   Division, No. 3:18-cv-04865-EMC.

9          This deposition is being held at the law

10  offices of Armbrust & Brown on November 5th, 2021, at

11  approximately 10:32 a.m.

12          My name is Casey Mummert.  I'm the legal

13  video specialist from TSG Reporting, Inc. headquartered

14  in 228 East 45th Street, Suite 810, New York, New York

15  10017.

16          The court reporter is Candice Andino in

17  association with TSG Reporting.

18          Counsel, please introduce yourselves.

19          MR. PORRITT:  Excuse me.  Nicholas Porritt

20  of the firm of Levi & Korsinsky on behalf of the

21  Plaintiff and the Class.

22          MS. AMES VALDIVIESO:  Kathy Ames on behalf

23  of Plaintiff.

24          MS. TRIPODI:  And Elizabeth Tripodi with

25  Levi & Korsinsky on behalf of Plaintiff.

1          MR. NEAL:  And I'm Stephen Neal of Cooley

2  representing Mr. Musk and the other defendants in this

3  case.

4          MS. JACKMAN:  Candace Jackman, in-house

5  counsel with Tesla.

6          (Witness sworn.)

7          THE WITNESS:  I do.

8                    ELON MUSK,

9  having been first duly sworn, was examined and testified

10  as follows:

11                  EXAMINATION

12  BY MR. PORRITT:

13     Q.  Good morning, Mr. Musk.

14     A.  Good morning.

15     Q.  As you just heard, my name is Nicholas Porritt.

16  I'm one of the counsel for the plaintiffs in this

17  matter.

18     A.  Okay.

19     Q.  I'll be taking your deposition today.  I know

20  you've been deposed before, but I'll just quickly go

21  over a couple of ground rules just to -- just to make

22  sure we're all on the same page.  Excuse me.

23          One is we are creating a written record.

24  You can see Candice here is writing down what I say and

25  will write down what you say.  So, with that in mind,

1   it's -- I don't recall such a case.

2       Q.  And you understand that Twitter has been

3   identified by Tesla as a source of corporate

4   information?

5       A.  Yes.

6       Q.  Okay.  Whose idea was that, to make it an

7   official corporate channel?

8       A.  Well, that was -- I believe it was a collective

9   decision.  You know, there is -- it's good to have some

10  means of interacting directly with investors that --

11  such that it does not go through a media filter.

12           So it could be, obviously -- you know, it

13  could be through Reddit would be one way to do it as

14  well.  It could be through -- and, in fact, sometimes it

15  is through blog pieces that are posted to the Tesla

16  website.  But some -- some means of interaction is --

17  it's good to have direct interaction instead of just

18  have everything pass through a media filter.

19      Q.  But do you recall who made the first

20  suggestion -- well, strike that.

21           First of all, did your Twitter account

22  already exist before it was recognized as a corporate

23  channel of communication by Tesla?

24      A.  Yes.

25      Q.  Okay.  So do you recall now who suggest- --

Confidential

1    be 140 characters, you know.

2        Q.  And how do you decide what to -- what to tweet?

3               MR. NEAL:  Object to the form of that

4    question.  Mighty broad.

5        A.  I just -- you know, it's -- I guess I decide to

6    tweet whatever seems important to convey to the public

7    with, you know -- as with if one was speaking verbally

8    or, you know, I think -- it -- sorry.

9               If -- the -- you know, there is -- you

10   know, when -- when you -- when you speak to people, you

11   have to -- you say, like, okay -- there is -- there is a

12   mixture of things that are serious and things that are

13   humorous.  And the -- you know, there's -- this is

14   essentially -- Twitter is like -- like me speaking.

15            So, you know, how do you decide when you

16   want to say something?  You know, I guess you -- your

17   mind decides to say something, and you say it.

18       Q.  (BY MR. PORRITT)  When you're tweeting

19   something about Tesla and you know that retail investors

20   are following you on Twitter, do you think about what

21   its effect will be on those investors before you tweet

22   it?

23       A.  Yes.

24       Q.  Okay.  How long does it typically take you to

25   draft a tweet?

1          A.  It varies, but since it -- it is essentially an

2     expression of thoughts that I have, it's -- you know, I

3     wouldn't say that it -- it's not like writing an essay.

4     So it's essentially, here's a -- here's a thought that I

5     think is worth expressing, and then I express it.

6          Q.  Do you ever do threads on Twitter?

7          A.  Do you mean a whole series of tweets, connected

8     tweets?

9          Q.  Yes.  Correct.

10         A.  At times.

11         Q.  Okay.  Have you ever done those on topics

12    relating to Tesla?

13         A.  Yes.

14         Q.  Okay.  How do you go about drafting a thread on

15    Twitter?

16         A.  Well, you -- you think about something, and

17    then you may want to add to it.  And then you may want

18    to add to it again.  And then you -- that's how you come

19    up with a thread.

20         Q.  You don't draft a lengthy -- a statement that

21    goes beyond the character limit on Twitter and then

22    break it up into separate tweets?

23         A.  Uh, no.

24         Q.  Okay.  So, if you do a thread on Twitter, it's

25    just a series of consecutive thoughts?

1    question.  It's pure speculation.

2        A.  Yeah, I don't know.  I mean, what little I know

3    of Brian Johnson is that his predictions about Tesla

4    stock have been remarkably inaccurate.

5        Q.  (BY MR. PORRITT)  Okay.  So you wouldn't say

6    that interest in Tesla stock is driven by cult

7    psychology?

8        A.  No.  And Brian Johnson's predictions about

9    Tesla have, I think, been a contraindicator.  And so, if

10   you just did the opposite of whatever Brian Johnson

11   recommended, you would do well.

12       Q.  Okay.

13              MR. NEAL:  A synthetic short.

14       A.  Yes, literally.  I think if you just literally

15   did the opposite of what Brian Johnson said, you would

16   be very -- have a great return.

17       Q.  (BY MR. PORRITT)  Were you aware at this time

18   in 2018 that people would trade based on --

19       A.  That's straight facts.  Sorry.

20       Q.  That people would -- could trade based on the

21   tone of your tweets?

22       A.  It certainly would be possible for people to

23   trade based on tweets.

24              MR. PORRITT:  Also, 127.

25              MS. AMES VALDIVIESO:  127?

1  private entity, we would need to ask them, but we could

2  not ask them without creating a selective disclosure

3  issue.

4             And so there needed to be a public

5  disclosure that -- that I was considering taking Tesla

6  public -- private.  Sorry.  There would have to be a

7  public disclosure that I was taking Tesla private.  This

8  would then enable me to have conversations with all of

9  the investors where there was not selective disclosure,

10  where there was -- everyone was aware of the

11  desire to -- my desire to take the company private.

12  Then I could talk to all the investors without giving

13  any one of them selective information, and thus

14  determine who would be part of Tesla as a -- as a

15  private company versus a public company.

16             I was also aware at the time that SpaceX

17  had, for example, Fidelity as an investor, a significant

18  investor in SpaceX as a private company.  And so if

19  Fidelity, for example, as an example of an institutional

20  investor, was comfortable having a significant private

21  stake -- a significant stake in SpaceX as a private

22  company, it seemed likely that they would also retain a

23  significant stake in Tesla as a private company.  Yeah.

24      Q.  Was that Fidelity fund the same fund that

25  invests in Tesla?

1   that -- that I felt confident that we had funding

2   secured.

3           Q.  So you thought it was important -- as of

4   July 31st, 2018, you thought it was important to rapidly

5   make a public announcement of this plan?

6           A.  Not necessarily rapidly, but the -- there was

7   an information leak with a London newspaper,

8   Financial Times, I believe, that I was informed about

9   where the 5 percent investment by PIF was about to

10  be -- they were about to write an article about it.  And

11  I was concerned that if there was a leak regarding the

12  5 percent ownership of -- of PIF, then perhaps there

13  would be also a leak about the take-private.

14              And so it was important to get ahead of

15  that article and -- and just state that Tesla was

16  considering -- that I was considering taking Tesla

17  private, and that I felt that -- confident that funding

18  was secured.

19      Q.  All right.  Well, we're getting ahead of

20  ourselves, so I'm afraid we have to slow down a bit,

21  but -- chronologically.

22              But my real question was:  Between making a

23  public announcement of any potential -- of you

24  considering taking Tesla private, what do you think had

25  to happen between the July 31st, 2018, meeting and such

1    retail base, investor base?

2         A.   Well, I was aware that Fidelity owned -- that a

3    Fidelity fund was an investor in SpaceX, that they only

4    counted as one investor, but there were thousands,

5    perhaps tens of thousands of investors in that Fidelity

6    fund.

7         Q.   And is SpaceX the only investment of that

8    Fidelity fund?

9         A.   No.

10        Q.   Okay.  But the special purpose vehicle you're

11   contemplating here would only invest in Tesla; is that

12   correct?

13        A.   No, not necessarily.

14        Q.   Okay.  Had you had any discussions with

15   Fidelity or any other institutional institution about

16   the viability of such a fund or funds?

17        A.   No.  It was -- I did not feel it was possible

18   to engage in discussions about taking Tesla private

19   without publicly disclosing that this is something I was

20   considering.  I thought it was important to disclose

21   publicly that I was considering taking Tesla private at

22   $420, not at some much higher number.

23             And -- and, in doing so, then I could gauge

24   the interest of shareholders in taking Tesla private and

25   do so without selectively disclosing to some

1  shareholders but not others that Tesla is considering --

2  that I was considering taking Tesla private.  I thought

3  it was important that there be -- that all shareholders

4  be on an equal footing in their awareness of the

5  possibility that Tesla would go private.  This was the

6  fair and right thing to do.

7      Q.  But going back to the August 2nd, 2018, email

8  that you sent to the board, my question is:  What basis

9  did you have for stating that you would support any

10 shareholders, remaining shareholders of Tesla as a

11 private company?

12          MR. NEAL:  He just answered that.

13          MR. PORRITT:  No, he didn't.  He argued

14 about how he needed to talk to investors.

15     Q.  (BY MR. PORRITT)  But had you done any actual

16 research into this?

17     A.  As I said, I was aware of a significant case

18 example with Fidelity being an investor in SpaceX as a

19 private company.  So it seemed very likely that Fidelity

20 would be willing to invest in Tesla as a private

21 company, whether it was in one fund or another fund, but

22 they -- they -- they clearly did not have a fundamental

23 problem with investing in a private company.

24     Q.  All right.  That's about Fidelity.

25          But has -- has SpaceX ever had a

1  is described is -- is actually not -- it's slightly

2  inaccurate in that the board really does not have the

3  authority, nor should they have the authority, to

4  constrain the actions of me as an individual proposing

5  to take the company private, because I'm a counterparty.

6  They are not there to authorize or not authorize me.

7           So I think, in this case, the word

8  "authorize" is -- is the wrong word.  They -- it's

9  really not up to the board.  The -- the important thing

10  here, I think, is that "do not selectively disclose

11  things."  And I came to the conclusion that it was

12  really impossible to have conversations with some

13  investors but not others without creating a selective

14  disclosure problem.

15  Q.  Did you try to have a conversation with an

16  investor between August 3rd and August 7th?

17  A.  I don't recall.

18  Q.  All right.  Well, yeah, that was -- why don't

19  we take a break and then come back.

20           THE VIDEOGRAPHER:  The time is 3:27.  We

21  are off the record.

22           (A recess was taken from 3:27 p.m.

23            to 4:08 p.m.)

24           THE VIDEOGRAPHER:  The time is 4:08.  We

25  are on the record.

1     Q.  Okay.  Do you recall where you were when you

2  sent this tweet?

3     A.  I think I was -- I just arrived at the airport.

4  So, yeah, I think it was -- I -- as I recall, I had

5  driven to the airport and then written the tweet and

6  then taken off for the Bay Area.

7     Q.  Now, you said -- you've previously testified,

8  and I think you testified today, that you sent this

9  tweet in response -- this -- yes, this tweet in response

10  to the Financial Times article; is that correct?

11     A.  Not in response to the Financial Times article,

12  but in response to the note from Dave Arnold that they

13  were likely to publish an article.  So I don't think I

14  read the Financial Times article at this time.

15     Q.  Okay.  How long did it take you to -- to draft

16  this tweet?

17     A.  Well, I was thinking about the -- you know,

18  making an announcement.  I had been thinking about

19  making an announcement for a few days, and the -- the

20  fact that there would be some article in the

21  Financial Times about the Saudi investment made me think

22  that I should probably announce that we're considering

23  taking Tesla private -- or I am considering taking Tesla

24  private.

25     Q.  But why tweet it at 9:48 a.m. on the morning of

1   August 7th, 2018?

2        A.   In my judgment, I thought that was the right

3   timing.

4        Q.   What was going to happen in -- strike that.

5             So 9:48 a.m. Pacific time is 12:48 p.m.

6   Eastern time; correct?

7        A.   I suppose so, yeah.

8        Q.   Okay.  And the markets close at 4:00 p.m.

9   Eastern time.

10            You understand?

11       A.   Yes.

12       Q.   Okay.  So there was just over three hours of

13   trading time left after this tweet; correct?

14       A.   Yes.

15       Q.   What did you think was going to happen in those

16   three hours of trading time that required you to send

17   out this tweet at 9:48 a.m. Pacific time?

18       A.   Well, I mean, I expected that there would

19   probably be some increase in the stock price.  It seemed

20   likely.  If you say that you're considering taking a

21   company private or acquiring a company, people know that

22   there is going to be some premium.  In this case, I'm

23   being clear about what that premium would be.  And so,

24   most likely, there would be an increase in the stock

25   price proportionate to people's belief that the

1    take-private would happen.

2         Q.   So thank you for that answer.   So I obviously

3    asked a bad question.

4              So before -- absent this tweet, so at -- at

5    9:47 a.m. Pacific, what did you think was going to

6    happen in the market if you did not tweet anything about

7    the transaction?

8         A.   I didn't know what would happen in the market,

9    but I thought it was important to clarify -- clarify my

10   position that I was considering taking Tesla private in

11   case that was part of the leak from the Financial Times,

12   in the Financial Times article.

13        Q.   So you were worried that the Financial Times

14   article, which you hadn't read yet, would reference you

15   considering going private?

16        A.   I thought it was possible, yeah.

17        Q.   All right.   So you thought you would tweet this

18   ahead of time without even knowing that it would, in

19   fact, be included in the Financial Times article?

20        A.   Yeah, I -- I mean, I thought that it would

21   actually make sense for me to make some kind of public

22   disclosure about the fact that I'm considering taking

23   Tesla private, because I was considering taking Tesla

24   private.   So it's just a question of what is the right

25   timing.

Confidential

1                   And so this just seemed like, okay, this --

2    this -- probably now is the right timing in case the --

3    this should leak and -- and -- and people don't know

4    what the actual situation is.

5                   So just so there wouldn't be any confusion,

6    or perhaps selective information that some investors

7    could take advantage of and others could not, that the

8    right thing to do would be to state publicly my

9    position.

10        Q.  Why not wait until after the market closed?

11        A.  Well, the -- this -- I thought the leak could

12   occur sooner than market close.

13        Q.  And what was your basis for that?

14        A.  Because the -- you don't know when the

15   article's going to come out.  It could come out before

16   market close or after.  So this -- I thought better to

17   get this information out as soon as possible in case

18   there is a leak and then that leak is inaccurate.

19        Q.  Dave Arnold's email to you didn't say that they

20   were going to -- that the article was going to address a

21   potential going-private transaction for Tesla, did it?

22        A.  No.  It just said that there was a leak of

23   information that was not public.

24        Q.  Regarding the PIF's --

25        A.  Yes.

Confidential

1        Q.   -- 5 percent ownership?

2        A.   Yes.

3        Q.   Was this the first of a series of intended

4   tweets regarding the going-private transaction?

5                   MR. NEAL:   Wait.   Do you mean did he plan

6   right from this time to follow it up?

7        Q.   (BY MR. PORRITT)   Yeah, let me ask -- let me

8   ask a better question.

9                   At the time when you were writing this

10  tweet, did you intend to issue further tweets regarding

11  the going-private transaction on August 7th, 2018?

12       A.   I thought there would probably be subsequent

13  tweets, but I didn't know necessarily what those would

14  be.

15       Q.   Okay.   So, as far as you're concerned, this

16  disclosure contained in this opening top tweet on

17  Exhibit 8 was, you know, complete and sufficient?

18       A.   No.   As I said, I thought there would probably

19  need to be additional tweets where I elaborated and --

20  on the first tweet, depending upon what questions people

21  had or what concerns were raised.

22       Q.   What if no one asked any questions?   You were

23  going to -- were you going to disclose any

24  information -- more information?

25       A.   Yes.   If no one asked any questions, I wouldn't

Confidential

Page 281

1                    MR. PORRITT:  Okay.  Well, I'm just -- it's

2    now in the context of this -- now of the rationale

3    expressed in this blog -- in this blog post, Exhibit 16.

4         A.  Well, I mean, what drove the timing of

5    August 7th was the Financial Times article that was

6    coming out and my concern about what that article would

7    contain.

8         Q.  (BY MR. PORRITT)  Okay.  But that's nothing to

9    do with -- first of all, that's not referenced here in

10   Exhibit 16, is it?

11        A.  Do you want me to read the whole exhibit?

12        Q.  Well, you read it before, but feel free to read

13   it again.

14        A.  Okay.  It's going to take me a moment.

15                   (Witness reads document.)

16                   MR. PORRITT:  Oh, sorry.

17        A.  Okay.  I've read it.

18        Q.  (BY MR. PORRITT)  It doesn't mention tweeting

19   in response to the Financial Times article, does it?

20        A.  It doesn't.

21        Q.  Okay.  Do you know why not?

22        A.  No.

23        Q.  Wouldn't that be a complete statement as to why

24   you made a public announcement?

25        A.  I mean, this just says that I needed to make an

1  announcement in order to have discussions with

2  shareholders and avoid selective disclosure to some

3  shareholders but not others.

4      Q.  This article also doesn't mention anything

5  about a Saudi Arabia production facility; correct?

6      A.  I didn't read anything in there about that.

7      Q.  Okay.  Again, do you know why that wasn't

8  included in this blog post when you were discussing your

9  communications with the managing director of the Saudi

10  fund?

11      A.  I don't think that was necessarily a hard

12  requirement.

13              (Exhibit 336 marked.)

14              MR. PORRITT:  Yes.  I'm placing before the

15  witness a document marked Exhibit 336.  I'm not quite

16  sure what the proper Bates number is here.  I'll just do

17  SEC-EPROD-000005623.

18      A.  (Witness reviews document.)

19      Q.  (BY MR. PORRITT)  Have you had a chance to

20  review?  My question's about the top email, but review

21  the entire exhibit, 336.

22      A.  (Witness reviews document.)

23      Q.  Have you had a chance to review Exhibit 336,

24  Mr. Musk?

25      A.  I'll read it.

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4   IN RE TESLA, INC. SECURITIES) Case No.
    LITIGATION                   ) 3:18-cv-04865-EMC
5                                )
                                 )
6                                )
                                 )
7                                )
                                 )
8   _____)

9                     REPORTER'S CERTIFICATION

10            ORAL AND VIDEOTAPED DEPOSITION OF

11                         ELON MUSK

12                      NOVEMBER 5, 2021

13

14       I, CANDICE ANDINO, Certified Shorthand Reporter in

15   and for the State of Texas, hereby certify to the

16   following:

17       That the witness, ELON MUSK, was duly sworn by the

18   officer and that the transcript of the oral deposition

19   is a true record of the testimony given by the witness;

20       I further certify that pursuant to FRCP Rule

21   30(f)(1) that the signature of the deponent:

22       _____ was requested by the deponent or a party

23   before the completion of the deposition and returned

24   within 30 days from date of receipt of the transcript.

25   If returned, the attached Changes and Signature Page

Confidential

1    contains changes and the reasons therefor;

2        __X__ was not requested by the deponent or a party

3    before the completion of the deposition.

4        I further certify that I am neither attorney nor

5    counsel for, related to, nor employed by any of the

6    parties to the action in which this testimony was taken.

7        Further, I am not a relative or employee of any

8    attorney of record in this cause, nor do I have a

9    financial interest in the action.

10       Subscribed and sworn to on this 10th day of

11   November, 2021.

12

13   _____

          CANDICE ANDINO, Texas CSR No. 9332, RMR
14        Expiration Date:  8/31/23
          TSG Reporting, Inc.
15        Firm Registration No. 615
          747 Third Avenue, 10th Floor
16        New York, New York 10017
          (877) 702-9580

17

18

19

20

21

22

23

24

25