**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
   amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC <br><br> **PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO PRECLUDE EVIDENCE, OPINION, AND ARGUMENT OF IMMATERIALITY** |
|---|---|

I.     **INTRODUCTION**

This case commences with tweets published by Elon Musk on August 7, 2018, two in particular: "Am considering taking Tesla private at $420. Funding secured." and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." The Court has already determined that that these two tweets were knowingly false. Defendants have indicated their intent to argue that these knowingly false tweets were immaterial, and to rely on such argument in disputing damages. Yet, there is no evidence in the record that these tweets were immaterial. In fact, the record, including Defendants' own expert, makes it crystal clear that these tweets were material. Elon Musk admittedly intended these tweets to convey important information to investors and the market. The prices for Tesla, Inc. securities reacted immediately and the content of these tweets was the subject of discussion and analysis for the next ten days by the media, financial analysts, and investors. All experts, including one retained by Defendants, agree that the tweets were material and impacted Tesla's stock price from August 7, 2018 to August 17, 2018. Defendants should be precluded from arguing that the tweets were immaterial.

Defendants' apparent position regarding materiality also flows through to other arguments presented by the counsel on loss causation. Defendants, however, should be precluded from making any arguments based on the unsupportable assertion that the August 7 tweets were immaterial. One such argument concerns the reaction of Tesla's stock price in response to the August 13, 2018 blogpost in which Musk provided additional information about the going-private transaction and his previous statements about it. They posit that the absence of a decline in Tesla's stock price in response to the later blogpost shows that the "funding secured" component of the earlier tweet was immaterial. This argument is contrary to the evidentiary record which demonstrates unquestionably that the August 7 tweets were material to investors and remained so even after the August 13 blogpost. It also runs contrary to Ninth Circuit law holding that the absence of a decline in the price of a stock after a partial corrective disclosure does *not* establish that a prior misrepresentation was immaterial. *See In re Gilead Sciences Securities Litigation*, 536

F.3d 1049, 1058 (9th Cir. 2008). Consequently, allowing Defendants to make this argument would only lead to confusion and prejudice, given the absence of any factual or legal support.

A second argument relates to the August 7 tweets themselves and, in particular, attempts to charge Plaintiff with the burden of proving that the "funding secured" portion of the initial tweet on August 7 affected Tesla's stock price. Defendants should be precluded from arguing that this statement was immaterial. The record clearly demonstrates that the portion of Musk's August 7 tweet stating "funding secured" was material and that it caused or at the very least was a substantial cause of the immediate, significant increase in Tesla's stock price. Permitting Defendants to argue that "funding secured" was immaterial belies the record, and erroneously conflates materiality with causation. To establish causation, a plaintiff only needs to show that a misrepresentation was a "substantial cause" of his or her loss. *See In re Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005). Thus, there is no basis for requiring Plaintiff to prove which part of the tweet caused his damages. The amount of those damages will be properly determined by the jury based on the evidence presented by both Plaintiff and Defendants at trial.

Federal Rule of Evidence 403 allows courts to exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. FED. R. EVID. 403. Without any evidence in the record demonstrating that Musk's August 7 tweets were immaterial, and with their own experts testifying to the opposite, Defendants intend to claim otherwise in front of the jury and make at least two causation arguments premised on this unsupported assertion. Allowing any argument of immateriality at trial would be prejudicial because it would be made without any factual underpinning and would only mislead and confuse the jury on critical aspects of the case.

## II. ARGUMENT

### A. Elon Musk's August 7 Tweet Was Indisputably Material.

A statement is "material" when there is a "substantial likelihood that a reasonable shareholder would consider it important." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("Put another way, there must be a substantial likelihood that the disclosure of the

1    omitted fact would have been viewed by the reasonable investor as having significantly altered
2    the 'total mix' of information made available."). This is an objective test, assessing the
3    significance of a piece of information to a "reasonable investor." *Id.* at 445; *accord Amgen Inc.*
4    *v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) (noting materiality is an
5    objective test); *S.E.C. v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007) ("The law assesses the
6    materiality of a misrepresentation at the time it is made, not after intervening events or remedial
7    action have rendered it harmless."). Given the evidentiary record here, there can be no question
8    that Musk's August 7 tweets were "material" to investors.

9        The evidence in support of this conclusion is absolute. Tesla's stock price reacted
10   instantaneously to Musk's initial tweet on August 7, 2018, increasing $8.18 (from $356.85 to
11   $365.03) on volume of over 800,000 shares in the minute immediately afterwards. Hartzmark
12   Damages Report at ¶69. It continued to trade heavily with the price increasing further to $367.25
13   on volume of over 10 million shares before NASDAQ halted trading at 2:08 p.m. *Id.* Elon Musk
14   testified that he intended his tweet to contain "the most important points" about the going-private
15   transaction. E. Musk Dep. Tr. at 195:3-195:25. An hour after the trading halt was in effect, at 3:11
16   p.m., Deepak Ahuja, Tesla's Chief Financial Officer, emailed Musk informing him that "[w]e are
17   getting a lot of enquiries from investors, SEC and media to better understand the comment
18   'funding secured'." Ex. 337. During the trading halt, Michael Santoli, a commentator on CNBC,
19   also commented on Musk's tweet stating that "having secured funding, to me, is the big number
20   right there." Hartzmark Damages Report at Appendix 6, p.1. Toni Sacconaghi, an analyst at
21   AllianceBernstein emailed Martin Viecha, Tesla's Director of Investor Relations, asking "what
22   does 'financing secured' [sic] actually mean?" Ex. 151. Viecha responded: "it means that
23   financing is secured regardless of other assumptions." *Id.*

24       At 3:16 p.m., Musk sent an email to Tesla employees explaining his reasons why Tesla
25   would be better off as a private company. Ex. 12. At 3:36 p.m., Musk tweeted a link to his email
26   stating: "Investor support is confirmed. Only reason why this is not certain is that it's contingent
27   on a shareholder vote." Ex. 13. However, investors still focused on the question of "funding
28

PLAINTIFF'S MOTION *IN LIMINE* NO. 1                    3                    CASE NO. 3:18-CV-04865-EMC
RE IMMATERIALITY

secured." On the afternoon of August 7, 2018, Nii Owuraka Koney, a Managing Director at Tesla investor Jennison Associates wanted clarification from Viecha on the meaning of "funding secured" even after reading Musk's email which, Koney noted, said nothing about funding. Ex. 58. Koney concluded that Twitter "is hardly the right place to confirm the funding is secure."

Tesla stock resumed trading at approximately 3:45 p.m. It ultimately closed at $379.57 per share on additional heavy volume of over 6 million shares. Hartzmark Damages Report at ¶71 (Ex. 375). The chart below was prepared by Plaintiff's expert, Dr. Michael Hartzmark, and shows the changes in Tesla's stock price as well as the volume of shares traded on August 7, 2018:



*Id*. at ¶75.

Financial analysts issued reports during the afternoon and evening of August 7, 2018 and the morning of August 8, 2018. For example, Morningstar thought that "execution [of a deal] is more likely than not" and speculated that "funding comes mostly from tech investors." *Id*. at ¶73. RBC Capital Markets stated that "Elon's tone and messaging regarding a potential transaction lead us to believe that there could be significant outside funding lined up." *Id*. Evercore stated that Tesla's stock price was reflecting the belief that funding was secured and the transaction will

be completed. *Id*. at ¶84. Both JP Morgan and Jefferies increased their price target for Tesla following Musk's tweets with JP Morgan stating: "as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nonetheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured." Ex. 15; Hartzmark Damages Report at ¶81.

On the morning of August 13, 2018, Tesla published a blogpost by Musk. Ex. 53. Specifically, the blogpost provided some additional detail regarding the history of discussions between Musk and the PIF while omitting information about the evident "friction" between them so that PIF's own representative called the blogpost misleading. *See* Order, ECF No. 387 at 16, 30. The blogpost also stated that "My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla." As Musk later admitted: "I was wrong about the desire of - - or the interest in the existing shareholders to go private. ***That was incorrect***." E. Musk SEC Tr. at 258:23-25 (emphasis added).

Analysts continued to be misled following the blogpost. CFRA wrote: "the blog also explains how the deal could be more likely than we previously thought" and Morningstar stated that Musk's August 7, 2018 tweet that "investor support is confirmed" meant "Musk believes he has enough votes to go private" and "his estimate of about 66% of shareholders not tendering [from the August 13, 2018 blogpost] is not far off from our own assumption of 60%." Hartzmark Damages Report at ¶106. Morningstar concluded: "our impression of his words is that he thinks it can happen, and we agree." *Id*. Analysts continued to maintain or increase their price targets for Tesla's stock, relying on the August 7, 2018 tweets. *Id*. at ¶122. The implied volatility derived from Tesla stock option prices for the January 17, 2020 expiry, the longest dated expiry during the Class Period and the most sensitive to changes in implied volatility, had only increased from 32.57% at market close on August 7, 2018 to 38.54%, which was still below the long-term level of 50.52% immediately prior to the tweets on August 7, 2018 and indicated a continuing belief in the truth of the August 7, 2018 tweets. *Id.* at ¶¶191-97 and Appendix 8.

On the evening of August 16, 2018, the *New York Times* published a lengthy article regarding Tesla, Musk, and the potential going-private transaction. Ex. 171. The market immediately reacted to the new reporting from the *New York Times*. Tesla's stock price declined $29.95 to $305.50 on volume of 19 million shares. Hartzmark Damages Report at ¶¶ 125-35. The implied volatility derived from Tesla stock option prices for the January 17, 2020 expiry increased to 48.65%, virtually identical to its level on August 7, 2018 immediately before Musk's tweets. This indicated that the market no longer considered a take-private transaction to be likely. JP Morgan responded to the *New York Times* article by reducing its price target back to its August 6, 2018 level. Ex. 23; Brinkman Dep. at 100:9-106:15. JP Morgan wrote: "our interpretation of subsequent events leads us to believe that funding was not secured for a going private transaction, nor was there any formal proposal." Ex. 23. JP Morgan also noted that Tesla and Musk still appeared to be exploring a going-private transaction but the "process appears much less developed than we had earlier presumed (more along the lines of high level intention)."

Dr. Hartzmark describes the evidence of materiality of Musk's August 7, 2018 tweets as "incontrovertible." Hartzmark Dep. at 122:13-123:25. Defendants' expert, Professor Daniel Fischel, agreed. In his two expert reports, Professor Fischel offers no opinion on the materiality or otherwise of Musk's August 7 tweets. ECF Nos. 371-20 & 371-21. In his deposition, Professor Fischel agreed that Musk's August 7, 2018 tweets were "clearly material." Fischel Dep. at 39:18-40:15. Specifically, with regard to the two tweets on which the Court entered summary judgment in favor of Plaintiff, Professor Fischel believes the 12:48 p.m. tweet "certainly was material" and the 3:36 p.m. tweet was "new information in the sense that it resulted in a huge price increase, a statistically significant price increase, on that day." *Id*. at 57:22-58:5 ("funding secured") and 141:11-142:2 ("Investor support is confirmed"). Even after Musk's and Tesla's August 13, 2018 blogpost, Professor Fischel believes that the August 7, 2018 tweets "were still part of the total mix of information that was present on August 13th … I would say they're material." *Id*. at 201:16-202:14. Indeed, Professor Fischel believes the impact of Musk's August 7, 2018 tweets persisted all the way to August 17, 2018 and the market reaction following Musk's *New York*

*Times* interview. When asked if there was a connection between the stock price reaction seen on August 17, 2018 and the Musk August 7, 2018 tweets, Professor Fischel unambiguously replied: "yes, I think there's a connection because the August 17th interview that Musk gave comes into context of the events that were occurring at the time, which include the August 7th tweet – or tweets. So, yes, I think there's that connection." *Id*. at 160:17-161:2.

      **B.**      **Evidence, Testimony, and Argument Premised on the Immateriality of Elon Musk's August 7 Tweets Should Be Excluded.**

            1.      <u>Defendants do not have any admissible evidence to show a jury that proves the August 7 tweets are immaterial.</u>

Plaintiff has prepared his case for trial based on the evidentiary record as it exists, including the totality of the evidence showing that Musk's August 7 tweets were material. Defendants have not introduced any evidence, including any expert opinion, contradicting this reality and, therefore, should not be allowed to do so at trial. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105-07 (9th Cir. 2001) (affirming exclusion of rebuttal expert testimony where report was provided after close of discovery). Nevertheless, Defendants have already indicated their intent to make arguments to this effect. Without any factual basis for these arguments, they stand only to confuse the jury and prejudice Plaintiff's case at trial. Defendants should be precluded from arguing that the August 7 tweets were immaterial.

Defendants appear to argue that Tesla stock price reaction to the August 13, 2018 blogpost somehow demonstrates the immateriality of Elon Musk's tweets published six days earlier. Specifically, Defendants' expert, Professor Fischel, apparently intends to testify that: the August 13, 2018 blogpost completely revealed that funding had not been secured as of August 7, 2018; because Tesla's stock price did not decline in response to that revelation, the initial representation regarding secured funding did not inflate the stock price; therefore, the initial representation did not cause investors damage. *See* Fischel Rebuttal Rep. at ¶24 (Ex. 423); *see also* Fischel Tr. at 118:21-119:17, 198:25-200:11. This is an argument on loss causation, not materiality on which Professor Fischel expressly offers no opinion. It also simply ignores large parts of the record that completely contradict it.

It ignores the fact that Tesla's stock price had already declined from August 7 to August 13, 2018 as some of the harm from Defendants' misrepresentations on August 7, 2018 was realized by Tesla investors. *See* Hartzmark Damages Report at ¶¶ 78-99. It ignores that the blogpost contained additional false statements which added to or prevented inflation from exiting the stock price. Indeed, even after the August 13 blogpost, market analysts continued to operate under the false belief that Musk had taken substantive steps towards executing a going-private transaction and had investor support. *See* Ex. 429 (Morningstar Report). Defendants' argument also ignores the economic evidence showing that implied volatility levels observed from Tesla stock option prices did not return to pre-Class Period norms until after August 16, 2018, thereby proving that the market did not fully discount the contents of Elon Musk's August 7, 2018 tweets until that time. This is confirmed by the testimony of JP Morgan analyst, Ryan Brinkman. Brinkman Dep. at 100:9-106:15. Finally, this argument ignores the fact that the market was essentially indifferent to the historical fact that Elon Musk would like to take Tesla private, which was known well before August 7, 2018 according to Professor Fischel, *see* Fischel Report at ¶¶ 12-19 (Ex. 378), as Tesla's stock price barely reacted when Musk and Tesla finally withdrew the transaction on August 24, 2018. Hartzmark Damages Report at ¶¶ 136-139.

Thus, any argument on immateriality based on the stock price reaction to the August 13 blogpost is unfounded and contradicts the undisputed evidence and even Professor Fischel's own testimony to the contrary.

> 2. <u>Tesla's stock price following the August 13 blogpost does not provide Defendants with evidence to argue that Elon Musk's August 7 tweets did not cause damages to investors.</u>

Defendants also intend to argue that the lack of a stock price decline immediately after the August 13 blogpost shows that Plaintiff cannot establish loss causation for Musk's "funding secured" tweet. As set forth above, this argument is contradicted by the factual evidence in this case. It is also contrary to law. In *Gilead*, *supra*, the Ninth Circuit held that the absence of a decline in the price of a stock following a corrective disclosure does not prove that a prior misrepresentation was immaterial or otherwise disprove that the misrepresentation caused

damages. The plaintiffs in *Gilead* alleged violations of the federal securities laws based on statements about the defendants' pharmaceutical sales and, in particular, concealing that they were being driven by off-label marketing practices. *Id*. at 1052-53. Early on in the class period, the FDA released a "Warning Letter" directing the defendants to cease off-label marketing. *Id*. The defendants' stock price, however, did not decline but instead increased because the public did not "appreciate the extent of Gilead's off-label marketing, and thus could not foresee the letter's impact on Viread's sales." *Id*. at 1053. Only at the end of the class period several months later did the public "finally realize the impact" of the off-label marketing when the defendants reported a sharp decrease in drug sales (as a result of lower demand caused by the cessation of the off-label marketing). *Id*. at 1054. It was only at this point that the defendants' stock price declined. *Id*.

The Ninth Circuit in *Gilead* expressly rejected the argument being posited by Defendants here, which is that a stock price decline must occur immediately following a corrective disclosure. In pertinent part, the court held that "[a] limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible." *Id*. at 1058. Given the case law on this point combined with complete absence of any evidence of immateriality, Defendants cannot be allowed to impugn Plaintiff's theory of causation by pointing to Tesla's stock price movement on August 13, 2018. The fact that Tesla's stock price did not decline in response to the blogpost does not, as a matter of law, bar Plaintiff's theory of causation nor does it constitute evidence that Musk's August 7 "funding secured" tweet was immaterial. If Defendants were to make this argument in spite of the binding case law standing against it and the overwhelming facts demonstrating the materiality of the August 7 tweet in the first instance, they will be able to confuse the jury and prejudice Plaintiff at trial.

        3.    <u>Defendants do not have any legal or factual basis for arguing that Plaintiff needs to specify which part of Elon Musk's August 7 tweet caused Tesla's stock price to increase.</u>

Defendants also intend to argue that only a portion of Musk's August 7 tweet affected

Tesla's stock price, specifically that Tesla's stock price increased solely because Musk tweeted "Am considering taking Tesla private at $420" and not for any reason relating to the "funding secured" portion of the tweet. Defendants' expert, Professor Daniel R. Fischel, will testify that Plaintiff needs to specify how much Tesla's stock price increased due to the "funding secured" component of the August 7 tweet. Fischel Rebuttal Rep. at ¶9 (Ex. 423); *see also* Fischel Tr. at 114:11-118:2, 146:21-150:9. This argument is premised on an incorrect statement of the law and assumes without evidence that the "funding secured" part of the tweet was immaterial.

A misrepresentation needs only to be a "substantial factor" in causing economic loss. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *21 (N.D. Cal. Nov. 27, 2018)(Chen, J.). Thus, to recover out-of-pocket damages under Section 10(b) and Rule 10b-5, Plaintiff does not need to dissect and allocate which portions of Musk's August 7 tweets caused Tesla's stock to increase to $379.57 per share that day. The fact of the matter is that the tweets were material, contained false statements, and without question caused Tesla's stock price to increase. Thus, Defendants cannot dispute that "funding secured" played a "substantial cause" in Plaintiff's damages. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005). Given the undisputed testimony in this case that the tweets were material, Defendants should not be allowed to impose a burden where none exists requiring Plaintiff to specify which portion of the tweets caused Tesla's securities prices to react. Regardless of which part of the tweets affected Tesla's securities, it does not "bar recovery under the loss causation requirement." *In re Daou Sys.*, 411 F.3d at 1025 (internal quotations omitted).[1]

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion *in limine* should be granted and Defendants should be precluded from introducing any evidence, testimony or argument claiming that Musk's August 7 tweets were immaterial.

---

[1] The precise quantum of damages caused by Defendants' misrepresentations during the Class Period will be an issue for the jury at trial.

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: June 16, 2022 | Respectfully submitted, |
| 3 | | |
| 4 | | **LEVI & KORSINSKY, LLP** |
| 5 | | s/ Adam M. Apton |
| | | Adam M. Apton (SBN 316506) |
| 6 | | Adam C. McCall (SBN 302130) |
| | | 75 Broadway, Suite 202 |
| 7 | | San Francisco, CA 94111 |
| | | Tel.: (415) 373-1671 |
| 8 | | Email: aapton@zlk.com |
| 9 | | Email: amccall@zlk.com |
| 10 | | -and- |
| 11 | | Nicholas I. Porritt |
| 12 | | Elizabeth K. Tripodi |
| | | Alexander A. Krot III |
| 13 | | LEVI & KORSINSKY, LLP |
| | | 1101 30th Street N.W., Suite 115 |
| 14 | | Washington, D.C. 20007 |
| | | Tel.: (202) 524-4290 |
| 15 | | Email: nporritt@zlk.com |
| 16 | | Email: akrot@zlk.com |
| | | (admitted pro hac vice) |
| 17 | | |
| 18 | | -and- |
| 19 | | Joseph Levi |
| | | Eduard Korsinsky |
| 20 | | LEVI & KORSINSKY, LLP |
| | | 55 Broadway, 10th Floor |
| 21 | | New York, New York 10006 |
| 22 | | Tel.: (212) 363-7500 |
| | | Email: jlevi@zlk.com |
| 23 | | Email: ek@zlk.com |
| | | (admitted pro hac vice) |
| 24 | | |
| 25 | | *Attorneys for Plaintiff and Counsel for the Class* |