1  QUINN EMANUEL URQUHART & SULLIVAN, LLP

2    Alex Spiro (*appearing pro hac vice*)
3    alexspiro@quinnemanuel.com
     Andrew J. Rossman (*pro hac vice* forthcoming)
4    andrewrossman@quinnemanuel.com
     Ellyde R. Thompson (*appearing pro hac vice*)
5    ellydethompson@quinnemanuel.com
     Jesse Bernstein (*pro hac vice* forthcoming)
6    jessebernstein@quinnemanuel.com
7  51 Madison Avenue, 22nd Floor
   New York, New York 10010
8  Telephone: (212) 849-7000

9    Michael T. Lifrak (Bar No. 210846)
     michaellifrak@quinnemanuel.com
10  865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
11  Telephone: (213) 443-3000

12
     Kyle Batter (Bar No. 301803)
13   kylebatter@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
14  Redwood Shores, California 94065
    Telephone: (650) 801-5000
15

16  *Attorneys for Defendants Tesla, Inc., Elon Musk,*
    *Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,*
17  *Antonio J. Gracias, James Murdoch, Kimbal Musk,*
    *And Linda Johnson Rice*
18

19                    UNITED STATES DISTRICT COURT

20                   NORTHERN DISTRICT OF CALIFORNIA

21

22  IN RE TESLA, INC. SECURITIES          Case No. 3:18-cv-04865-EMC
23  LITIGATION
                                          **MOTION *IN LIMINE* NO. 1**
24
                                          **DEFENDANTS' MOTION *IN LIMINE* TO**
25                                        **EXCLUDE DAMAGES EVIDENCE**
                                          **AFTER AUGUST 13, 2018**
26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................................. 1

ARGUMENT .................................................................................................................................... 2

I.      PLAINTIFF SHOULD NOT BE ALLOWED TO PRESENT EVIDENCE OF
ALLEGED DAMAGES AFTER AUGUST 13, 2018 ........................................................ 2

      A.     The Accuracy Of Mr. Musk's August 7 Tweets Was Revealed By August 13 ......... 3

      B.     No Additional Corrective Information Was Revealed After August 13 ................... 6

CONCLUSION ............................................................................................................................... 10

1

**INTRODUCTION**

2  As of August 13, 2018, the market already had the information necessary to assess the accuracy of

3 the statements Plaintiff alleges were untrue in Mr. Musk's August 7, 2018 tweets.  Yet Plaintiff seeks

4 damages based on the assumption that the purported falsity of Mr. Musk's tweets was not revealed until

5 four days later, on August 17, 2018.  But the evidence shows that all relevant information was available

6 to the market, and therefore reflected in the market price, as of August 13.  As a result, the alleged

7 misrepresentations cannot have affected the market price after that date.[1]  Plaintiff's claim for damages

8 should be cut off as of August 13, and evidence and argument concerning damages for subsequent stock

9 price declines excluded.

10  In a securities class action under Section 10(b) of the Exchange Act, plaintiffs are limited to losses

11 caused when new, corrective factual information reveals the existence of an earlier material misstatement

12 or omission.  That is because, once investors have the information necessary to deem the earlier statement

13 false, the material misstatements or omissions no longer affect the stock price.  Plaintiffs may not recover

14 damages based on the market's reaction to negative opinions subsequently formed based on the factual

15 information.

16  Here, Plaintiff alleges that, on August 7, 2018, Mr. Musk sent tweets falsely representing in

17 connection with a potential go-private transaction under consideration that "funding [was] secured,"

18 "[i]nvestor support is confirmed," and the "[o]nly reason why this is not certain is that it's contingent on

19 a shareholder vote."  The Court ruled that these statements were technically inaccurate because (a) the

20 term "funding secured" "suggest[s] that funding was . . . rather fairly concrete and reasonably certain;"

21 (b) "investor support confirmed" suggested something more than "preliminary" "discussions between the

22 PIF and Tesla;" and (c) "there were, in fact, a number of contingencies that had to be addressed before the

23 matter could reach a shareholder vote."  (Dkt. 387 at 24-29.)  In doing so, the Court rejected Plaintiff's

24

25

---

26 [1]  Defendants are not waiving the argument that the allegedly false portions of Mr. Musk's tweets did
not affect Tesla's stock price and therefore did not cause any losses.  Defendants' argument here is that
27 to the extent the allegedly materially false portions caused *any* losses, such losses necessarily must have
been fully realized by August 13, 2018.
28

proffered interpretation of the August 7, 2018 tweet (that "funding secured" meant a binding legal contract).  (*Id.* at 24.)

Yet, by no later than August 13, 2018, all of the information the market needed to assess the accuracy of these statements had been revealed.  Specifically, on that date, Mr. Musk published a blog post that disclosed that (a) he stated "funding secured" on August 7, 2018 following a meeting with Saudi Arabia's sovereign wealth fund ("PIF") that left Mr. Musk with no doubt a deal ***could be reached***; (b) PIF was interested in a potential go-private ***subject to*** financial and other due diligence and following receipt of answers to specific questions regarding the logistics of any go-private; and (c) there were numerous additional steps needed before a shareholder vote could take place, including the formation of a special committee, approval by a special committee, and clearance of regulatory hurdles.

Thus, under either the Court's interpretation or Plaintiff's rejected interpretation of the August 7 tweets, the August 13, 2018 blog post cuts off any claim for losses stemming from the August 7 tweet.  In making the blog post, Mr. Musk provided the factual information necessary for investors to ascertain the accuracy of his August 7 tweets.  Any later characterization of that information—such as in the newspaper article upon which Plaintiff premises the August 17 damages cutoff date—cannot extend the damages period because all of the relevant factual information already had been revealed.  Plaintiff should be precluded from seeking damages based on stock-price declines occurring after August 13, 2018.

## **ARGUMENT**

## I.   **PLAINTIFF SHOULD NOT BE ALLOWED TO PRESENT EVIDENCE OF ALLEGED DAMAGES AFTER AUGUST 13, 2018**

The law is clear that "[n]ew information is critical to demonstrating loss causation because it is assumed that the 'market price of shares traded on well-developed markets reflects'" all previously disclosed information.  *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)).  In other words, "[c]orrective disclosures ***must present facts to the market that are new***, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price.  Once the deception is publicly revealed for the first time by a corrective disclosure, a reasonable investor cannot be said to have relied on the company's misrepresentation or omission in deciding to invest."  *W. Va. Pipe Trades*

*Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 291 (D. Minn. 2018) (emphasis added and quotations and citations omitted); *see also In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 133 (S.D.N.Y. 2019) (noting "[i]n a securities fraud class action, courts are required to cut off the class period on the date of a statement or event that cures the market") (quotations and citations omitted).

Thus, if a piece of information is not properly a corrective disclosure, a plaintiff cannot claim any damages related to stock price movements caused by or correlated with that information. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512-14 (2d Cir. 2010) (news coverage was not corrective disclosure, as all of the relevant facts had been known previously); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1270 (N.D. Okla. 2007) (stock price changes on dates after fraud was revealed and where no "material, new, company-specific and fraud-related information became available to the efficient market" could not be used to prove damages), *aff'd sub nom. In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009).  For example, courts have not permitted recovery for declines in stock prices based on negative news coverage or lawsuits that result from alleged misrepresentations. *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 188 (4th Cir. 2007) (decline in stock price following lawsuit "is not one for which the plaintiffs in this case are entitled to compensation"); *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017) ("The mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."); *Omnicom*, 597 F.3d at 512 (losses from negative media coverage not recoverable).

Here, accepting Plaintiff's theory and the Court's summary judgment findings regarding the technical accuracy of the alleged misrepresentations, all "corrective" information was revealed by August 13, 2018.  Thus, any declines in Tesla's stock price after August 13, 2018 cannot constitute a proper corrective-disclosure event, and any losses arising from those declines must be excluded.

## A.    The Accuracy Of Mr. Musk's August 7 Tweets Was Revealed By August 13

Plaintiff contends that, on August 7, 2018, Mr. Musk made certain misleading representations in connection with a potential go-private transaction—a transaction Plaintiff admits Mr. Musk was considering.  Specifically, Plaintiff claims it was materially misleading for Mr. Musk to state "funding secured," "investor support is confirmed," and "only reason why this is not certain is that it's contingent on a shareholder vote."  (Dkt. 352 at 1.)  In an effort to add billions of dollars in unwarranted potential

damages, Plaintiff asks his damages expert, Dr. Michael Hartzmark, to assume that the falsity of these statements was revealed only on August 17, 2018, following the publication of an August 16 New York Times article.  (Ex. 375 ¶ 3 n.9.)[2]  Plaintiff's claim is baseless, and Dr. Hartzmark's reliance on that assumption is flawed.

*First*, Plaintiff claims that Mr. Musk's statement "funding secured" was false because Mr. Musk had not obtained "binding legal contracts committing capital."  (Dkt. 352 at 17.)  The Court determined that such a reading was "too narrow," but held as a matter of law that the tweet meant that funding "was not something amorphous or speculative but rather fairly concrete and reasonable certain."  (Dkt. 387 at 24 (further defining "secured" as a "GUARANTEE").)

Either way, any necessary information regarding the state of negotiations was revealed no later than August 13, 2018.  Specifically, on the morning of August 13, Mr. Musk published a blog post in which he confirmed there were no binding legal contracts committing capital.  Instead, Mr. Musk explained that he said "funding secured" because, following a July 31 meeting with Saudi Arabia's sovereign wealth fund ("PIF") in which the possibility of taking Tesla private was discussed, Mr. Musk "left the [ ] meeting with no question that a deal with the Saudi sovereign fund *could be closed, and that it was just a matter of getting the process moving*."  (Ex. 53 at 1 (emphasis added).)  Mr. Musk further explained that the PIF had "expressed support for proceeding *subject to* financial and other due diligence and their internal review process for obtaining approvals" and that the PIF had "asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements."  (*Id.* at 1-2.)  Thus, to the extent funding was not "fairly concrete and reasonably certain" and rather the PIF had made an "expression of support" subject to "financial and other due diligence" *and* "an internal review process for obtaining approvals," that was fully revealed on August 13.  Indeed, Plaintiff's own expert, Professor Subramanian, opined that Mr. Musk's August 13 blog post revealed the "falsity" of the initial tweet.  (Ex. A at 74:18-75:12.)  And Plaintiff also argued that Mr. Musk "admit[ted] [f]unding is [n]ot [s]ecured" in his August 13 blog post.  (Ex. 377 at 7.)

---

[2]  Deposition exhibits are marked with numbers (e.g., 1-400); new exhibits in support of this motion are marked with letters (e.g., A-Z).  All cited exhibits are to the Batter Declaration.

*Second*, the Court ruled that the statement "investor support is confirmed" was technically inaccurate "for essentially the same reasons" as "funding secured." (Dkt. 387 at 26-27.)  In other words, the Court found that the discussions between the PIF and Tesla were too "preliminary" for support from the Saudi PIF to technically be "confirmed."  As with "funding secured," however, Mr. Musk's August 13 blog post disclosed that the PIF had made an "express[ion] of support" that was subject to "financial and other due diligence," as well as an "internal review process for obtaining approvals."  (Ex. 53 at 2.)  Dr. Hartzmark also does not identify a single corrective disclosure that revealed the "falsity" of "investor support is confirmed" after August 9, 2018.  (*See* Ex. 375 at App'x 3.)  Thus, there can be no question that the information regarding the accuracy of "investor support is confirmed" was also revealed no later than August 13, 2018.

*Third*, Plaintiff claims Mr. Musk's statement "only reason why this is not certain is because it's contingent on a shareholder vote" was materially false and misleading because "there were also numerous contingencies to the transaction before even getting to a shareholder vote," including providing the Board with "a formal offer to review."  (Dkt. 352 at 22.)  The Court similarly held that, based on Mr. Musk's statement, investors "could *only* conclude that the sole contingency left for taking Tesla private was a shareholder vote," which the Court found was technically inaccurate because "there were, in fact, a number of contingencies that had to be addressed before the matter could reach a shareholder vote." (Dkt. 387 at 28-29.)  Under either interpretation, the accuracy of this statement was also revealed no later than August 13, 2018.

Specifically, Mr. Musk's August 13 blog post explicitly identified numerous contingencies before even getting to a shareholder vote, including "continu[ing] to talk with investors," "investigat[ing] a range of potential structures and options," "an appropriate evaluation process . . . undertaken by a special committee of Tesla's board" *if* "a final proposal is presented" to them, and "required regulatory approvals" "[i]f the board process results in an approved plan." (Ex. 53 at 2.)  Thus, based on Plaintiff's understanding and the Court's determination regarding the meaning of "only reason why this is not certain is that it's contingent on a shareholder vote," the information needed to assess the accuracy of that statement was known as of August 13, 2018 when Mr. Musk disclosed additional steps before reaching a shareholder vote.

At bottom, under Plaintiff's theory of this case and the Court's summary judgment decision, all of the allegedly inaccurate information on August 7, 2018 had been "corrected" by August 13, 2018. Notably, one of the first complaints filed related to Mr. Musk's statements, filed on August 14, 2018, alleged Mr. Musk's statements in the August 13 blog post "confirm that Musk knew at the time of his August 7, 2018 tweets that he had engaged in nothing more than some abstract discussions . . . and that funding was not secured as there was no binding term sheet." *Maia v. Musk et al.*, No. 18-cv-4939, Dkt. 1 ¶¶ 37-38 (N.D. Cal. Aug. 14, 2018).   Accordingly, no stock declines after August 13, 2018 can be attributed to Mr. Musk's alleged misstatements on August 7, 2018, and any alleged damages attributable to those misrepresentations after August 13, 2018 must be excluded.

## B.    No Additional Corrective Information Was Revealed After August 13

As noted above, the factual evidence necessary for Plaintiff to determine the accuracy of Mr. Musk's statements was revealed by August 13, 2018.  This alone justifies excluding any damages evidence after August 13, 2018.  The need for exclusion is further confirmed by the lack of any new curative information after August 13, 2018.  Although Defendants expect Plaintiff to argue that new information was disclosed between August 14, 2018 and August 17, 2018, a simple review of the information reveals it is not new curative information.  Defendants expect Plaintiff to rely most heavily on an August 16, 2018 New York Times article that Plaintiff contends caused Tesla's stock decline on August 17, 2018.  Dr. Hartzmark observes that, according to the Consolidated Complaint, this article supposedly revealed that PIF "'had not committed to provide any cash,'" that "funding for the proposed going private transaction 'was far from secure,'" and that "'no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it.'"  (Ex. 375 ¶ 125.)  But none of this largely editorialized opinion was new curative information.

With respect to the purported revelation that PIF "had not committed to provide any cash," Mr. Musk disclosed this information in his August 13 blog post when he stated that PIF had not yet committed to provide cash as their investment was "subject to [PIF's] financial and other due diligence and their internal review process for obtaining approvals."  (Ex. 53 at 2.)

Similarly, the statement that "funding was far from secure" is not new curative information.  It is not in quotes nor is it attributed to anyone other than the article's authors.  It is nothing more than a "negative journalistic characterization of previously disclosed facts," *i.e.*, the August 13 blog post, which

1   "does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d

2   at 512.   Dr. Hartzmark reached a virtually identical conclusion based on the August 13 blog post.

3   Specifically, Dr. Hartzmark opined that the August 13 blog post revealed to investors that Mr. Musk's

4   statement "funding secured" "was premature at best."   (Ex. 375 ¶ 100.)   Simply, the New York Times'

5   characterization of the status of funding reveals no additional *facts* above what had already been disclosed.

6          Finally, the report that "no one had seen or reviewed" Mr. Musk's tweet before he posted it is

7   virtually identical to a report on August 13 that Mr. Musk's tweet "was dashed off with little forethought,

8   and had not been cleared ahead of time with the company's board."   (Ex. 375 ¶ 105.)   Moreover, it is

9   unclear how this statement could possibly be curative of anything.   The speed at which Mr. Musk

10  published a tweet on August 7 does not alter what occurred on July 31.   Nor is it relevant in any way to

11  whether the events of July 31 were sufficient to render the funding "fairly concrete and reasonably

12  certain."[3]   (Dkt. 387 at 24.)   Because the New York Times article contains no new curative information,

13  it cannot serve as a corrective disclosure.[4]

14         When pressed at his deposition for the curative information in the article, Dr. Hartzmark pointed

15  to an analyst at J.P. Morgan, Ryan Brinkman, who Dr. Hartzmark claims changed his price target back to

16  its pre-August 7 tweet price target based on the article.   (Ex. B at 89:17-90:15, 95:3-96:24.)   But Mr.

17  Brinkman's actual report *did not* mention the New York Times article at all.   Instead, he explicitly

18  identified Mr. Musk's statement in the August 13 blog post as the basis of his new belief that "any deal is

19  potentially far from even being formally proposed."   (Ex. 22 at -047-048.)   Indeed, at his deposition, Mr.

20  Brinkman testified that the August 13 blog post "seemed to be a ***complete walk-back*** of the earlier Tweets

21  that funding was secured and the only reason why it wasn't happening was because it was contingent on

22  a shareholder vote."   (Ex. E at 79:19-84:2.) (emphasis added).   Thus, Mr. Brinkman's report further proves

23  _____

24  [3]   To the extent Plaintiff argues that the disclosure that no one had seen Mr. Musk's tweet revealed that

25  the Board had not yet received a formal proposal, that too was disclosed in the August 13 blog post.

26  [4]   Thus, although this Court accepted Plaintiff's allegations at the pleading stage that the New York Times

27  article contained new information (Dkt. 251 at 39-40), the evidence—including Plaintiff's own assertions at summary judgment—now shows it simply did not contain new curative information.   All of the *factual* information that is purportedly *curative* of Mr. Musk's tweets—as interpreted by Plaintiff and the Court—

28  was disclosed no later than August 13, 2018.

1   that the New York Times article did not contain curative information not already disclosed in the blog

2   post.

3       The remaining information disclosed between August 14 and August 17 is similarly not curative.

4   For example, Plaintiff may point to a report on August 15, 2018 that Tesla received a subpoena regarding

5   Mr. Musk's tweets.  But, if Mr. Musk's tweets were already demonstrated to be inaccurate—as they must

6   have been if Plaintiff's theory and the Court's summary-judgment order are accepted—then a subpoena

7   by the SEC in an already-public investigation cannot possibly constitute "curative" information.  Instead,

8   the risk of a subpoena would have been a "known risk" based on the purported "revelation" that Mr. Musk

9   had made an inaccurate statement.  *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120,

10  146 (S.D.N.Y. 2021) (event does not constitute a "corrective disclosure" where it is a "materialization of

11  a known risk, rather than the disclosure of a concealed one"); *In re Nuveen Funds/City of Alameda Sec.*

12  *Litig.*, 2011 WL 1842819, at *11 (N.D. Cal. May 16, 2011) (ruling materialization of risk cannot constitute

13  a corrective disclosure event unless the risk was concealed at the time it materialized), *aff'd sub*

14  *nom. Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111 (9th Cir.

15  2013).[5]

16      Plaintiff also may point to reports on August 13 and August 14 that Mr. Musk had not formally

17  retained Silver Lake and Goldman Sachs despite an earlier tweet by Mr. Musk on August 13 that he was

18  "excited to work with" them.  At most, this information would be curative of Mr. Musk's August 13 tweet,

19  which Plaintiff has abandoned as a misstatement.  (*See* Ex. 431 (Plaintiff's Interrogatory Responses) at 5-

20  6.)  Thus, the revelation that Mr. Musk supposedly had not formally retained Silver Lake and Goldman

21  Sachs cannot constitute a curative disclosure of Mr. Musk's August 7 alleged misrepresentation or any

22  other alleged misrepresentation still at issue in this case.

23      Notably, as part of the meet-and-confer process in connection with the motions *in limine*,

24  Defendants asked Plaintiff to identify the "curative information" Plaintiff contends "was disclosed to

25  investors after August 13 that was not already disclosed to investors on or before August 13[.]"  (Ex. C.)

26

27  _____

28  [5]  Even if the subpoena could be curative, this would, at most, justify extending the damages period to
    August 15, 2018.

In response, Plaintiff did not identify any other information and simply directed Defendants to pages of Dr. Hartzmark's report and deposition transcripts.  Many of the pages referenced by Plaintiff merely show news and analyst coverage *of the August 13 blog post*.  (*See, e.g.*, Ex. 375 ¶¶ 102, 104, 106, 112.)  The other information contained in the pages Plaintiff cited include the very non-curative information described above, i.e., the August 16, 2018 New York Times article (Ex. 375 ¶ 127), Tesla's receipt of a subpoena from the SEC (Ex. 375 ¶ 117), and the commentary regarding Mr. Musk's tweet concerning Goldman Sachs and Silver Lake (Ex. 375 ¶ 111).[6]  Thus, there is no serious question that, by no later than August 13, 2018, Plaintiff was aware of all information necessary to assess accuracy of Mr. Musk's August 7 tweets.

Finally, to the extent Plaintiff claims, as he did at summary judgment, that the August 13 blog post was itself misleading because it omitted a purported "conflict between Mr. Musk and Mr. Al-Rumayyan" to give a "misleading impression of an orderly and planned process for taking Tesla private" (Dkt. 370 at 13), such allegations were never pleaded and therefore should not be considered.  (*See* MIL No. 3.)  Indeed, Dr. Hartzmark did not even identify the August 13 blog post as a misrepresentation in his report.  (Ex. 375, App'x 3 at 2, 4.)  More fundamentally, however, Plaintiff does not explain how the alleged misrepresentations in the blog post itself were revealed following August 13, 2018.  Plaintiff does not point to a single disclosure following August 13, 2018 where the supposed conflict between Mr. Musk and Mr. Al-Rumayyan was revealed.  Thus, even if the August 13, 2018 blog post could constitute a

---

[6]    Plaintiff also pointed to pages of Mr. Brinkman's testimony where Plaintiff claims Mr. Brinkman specifically discussed his evaluation of the August 16 New York Times article.  However, the sole reference to the New York Times article in those pages is Mr. Brinkman's testimony that, leading up to the New York Times article, he did not recall discussing revising his note with anyone at JP Morgan other than his team.  (Ex. E at 102:3-11.)  In any event, elsewhere in his deposition Mr. Brinkman testified that the important portion from a New York Times article (and he could not recall which specific New York Times article) was that the board of directors was unaware of the Tweets (*id.* at 81:8-12).  Importantly, later in his deposition Mr. Brinkman admitted that a New York Times article from August 13 had already contained the information that the board was surprised by the tweet (*id.* at 122:18-124:4.)  Thus, it is unclear how this testimony demonstrates that the August 16 New York Times article contained any new curative information, particularly given the fact that Mr. Brinkman did not cite the New York Times article at all in his analyst report.

misrepresentation—it cannot—Plaintiff would still lack a corrective disclosure after August 13, 2018 for any alleged misrepresentation.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the Court grant this motion to exclude any evidence related to damages purportedly sustained after August 13, 2018.

DATED:  June 16, 2022                    Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Alex Spiro*
    Alex Spiro *(appearing pro hac vice)*

*Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,*
*Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,*
*James Murdoch, Kimbal Musk, And Linda Johnson Rice*