**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
         amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC |
|---|---|
| | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE DAMAGES EVIDENCE AFTER AUGUST 13, 2018** |

## I.      INTRODUCTION.

Defendants' Motion in Limine No. 1 to exclude evidence of damages suffered by Tesla, Inc. investors after August 13, 2018 is mistaken both in law and fact and should be denied. Legally, it relies on a narrow version of loss causation that is contrary to binding Supreme Court and Ninth Circuit law. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008). Loss causation is a context-dependent inquiry that may occur over time through a series of partial disclosures and other events and may be based on information that is already publicly available but presented with increased credibility or significance. Defendants' approach is, in contrast, simplistic and conclusory.

Factually, Defendants' motion is premised on the misguided notion that Elon Musk's blog post on August 13, 2018 constituted a complete and full "corrective disclosure" of the misrepresentations made on August 7, 2018. The factual record amply demonstrates, however, that the August 13 blog post was not a complete and full "corrective disclosure" of the misrepresentations made on August 7, 2018. While it provided additional information about Musk's announcement of the going-private transaction and suggested that funding was not as "secured" as Musk initially let on, the August 13 blog post also misrepresented the status of Musk's efforts to secure funding and was misleading on many of the operative facts that ultimately caused investors damages, such as the level of investor support for the transaction and the process being followed in structuring the transaction. For example, Morningstar issued an analyst note stating that the August 13, 2018 blog post confirmed Elon Musk's August 7, 2018 tweet that "investor support is confirmed". As shown by the detailed analysis undertaken by Plaintiff's expert, Dr. Michael Hartzmark, Tesla investors and analysts did not appreciate the full extent of Musk and Tesla's lies about the going-private transaction until August 17, 2018. Importantly, Defendants' own expert, Professor Daniel Fischel, agrees. Thus, the record evidence and expert opinion, including Defendants' own expert, show, at a minimum, a factual dispute over whether the misrepresentations made on August 7, 2018 had been completely corrected by Musk and Tesla on August 13, 2018. On that basis, even under Defendants' misleading version

1    of Ninth Circuit law on loss causation, Motion in Limine No. 1 must be denied.

2    **II.     <u>ARGUMENT</u>.**

3         **A.     Defendants' Argument Is Contrary to Binding Ninth Circuit Law.**

4         Defendants' motion rests entirely on the legal premise that "[securities] plaintiffs are

5    limited to losses caused when new, corrective factual information reveals the existence of an

6    earlier material misstatement or omission." Def. Motion in Limine No. 1 at 1. This is explicitly

7    ***not*** the law in the Ninth Circuit. "Disclosure of the fraud is not a *sine qua non* of loss causation,

8    which may be shown even where the alleged fraud is not necessarily revealed prior to the

9    economic loss." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d

10   1111, 1120 (9th Cir. 2013). In this Circuit, "loss causation is simply a variant of proximate cause,

11   the ultimate issue is whether the defendant's misstatement, as opposed to some other fact,

12   foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881

13   F.3d 750, 753 (9th Cir. 2018); *see also Dura*, 544 U.S. at 342 (Loss causation is simply "a causal

14   connection between the material misrepresentation and the loss."). A market reaction to a partial

15   or total corrective disclosure is just one of the "infinite variety" of "context-dependent" ways that

16   a plaintiff may establish loss causation. *Lloyd*, 811 F.3d at 1210. Other ways include

17   "materialization of the risk", *see In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1026-27 (9th

18   Cir. 2005), and "leakage", *see Lloyd*, 811 F.3d at 1210.

19        Even considering loss causation in the context of corrective disclosures involves a broader

20   and more contextual inquiry than the simplistic approach advocated by Defendants. As the Ninth

21   Circuit recently observed: "deciding what qualifies as a corrective disclosure has proved more

22   challenging than might have been expected". *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781,

23   790 (9th Cir. 2020). A corrective disclosure can come from any source and does not have to be

24   an admission of fraud by a defendant. *Id*. It may occur over time through a series of partial

25   disclosures and other events. *Id*. Notably, the announcement or report of a government

26   investigation may constitute a corrective disclosure. *Lloyd*, 811 F.3d at 1210. Further, a corrective

27   disclosure may be based on information that is already publicly available where it presents "new

28   information to the market that is not yet reflected in the company's stock price". *BofI*, 977 F.3d

at 795. This may be the result of analysis of previously available technical information or the republication of existing public information with increased credibility or significance. *Gilead*, 536 F.3d at 1058 (stock price decline was caused by FDA warning letter published three months earlier when "the public failed to appreciate its significance"); *see also Public Employees' Retirement System v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (upholding plaintiff's loss causation theory where stock price declined following *Wall Street Journal* article, even though article was based on publicly available Medicare records). Finally, the corrective disclosure or disclosures do not have to be the *sole* reason for an investment's decline in value. "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *Daou*, 411 F.3d at 1025; *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027-28 (9th Cir. 1999) ("misrepresentation or omission must relate to that which caused the investment to lose value.").

As discussed below, Dr. Hartzmark showed in his painstaking analysis of both the qualitative and quantitative data that the market price for Tesla securities continued to reflect the impact of Musk's August 7, 2018 tweets until August 17, 2018. The August 13, 2018 blog post was one stage on the path taken before the market fully realized that the August 7, 2018 tweets were false. This path included not just statements by Musk and Tesla but also media and analyst reports, some of which were later confirmed, some remaining unsubstantiated, as well as reports of government investigations and, importantly, the failure of Musk and Tesla to provide information in response to inquiries. In the context of the deluge of often contradictory information regarding the Tesla going-private transaction during the Class Period, this analysis is entirely consistent with the evidence and Ninth Circuit law.

### B.    The August 13 Blog Post Was Not a "Full Corrective Disclosure".

The evidentiary record shows that the August 13 blog post did not fully "correct" the misleading statements in Musk's August 7 tweets, and the investing public continued to trade Tesla securities based on false information. Defendants argue that after the August 13, 2018 blog post, no investor could be misled about the status of funding for the proposed transaction,

specifically with negotiations with the Saudi Arabia Public Investment Fund, the degree of investor support, or the process being undertaken to consummate the transaction. Yet Yasir Al-Rumayyan, the Saudi PIF's managing director at the time, wrote to Musk on August 13, 2018 stating that he was "personally surprised" by the statements Musk made in the blog post, which Al-Rumayyan referred to as "an ill-advised blog with loose information." Ex. 121 at 13. Al-Rumayyan was correct that the blog post was misleading about the status of negotiations with PIF as the record shows they were on the verge of collapse. Not more than 24 hours prior to the blog post, Musk had threatened to end talks with the Saudi PIF and was no longer considering it as a source of funding for the transaction. *See* Ex. 121 at 10-11.  The blog post, however, led a Morgan Stanley managing director to conclude that it was "impossible" that PIF was not funding the going-private transaction. Ex. 279. A Jennison Associates analyst told a colleague after reading the blog post, "The offer at $420 is real…", and advised purchasing Tesla shares. Ex. 68. Glen Littleton testified that even after reading the August 13, 2018 blog post, he believed Musk had funding secured for a going-private transaction. G. Littleton Dep. at 150:16-152:21. Thus, even in the narrow context of Musk's initial tweet on August 7, 2018 stating the funding was secured to take Tesla private at $420 per share, the August 13, 2018 blog post did not operate as a complete corrective disclosure.

Defendants' argument is even less credible regarding Musk's August 7, 2018 tweet stating that "investor support is confirmed".[1] The August 13, 2018 blog post essentially repeats that message, stating he "believes two-thirds of current shareholders would remain with the company, lessening the capital needed to make a deal work." Ex. 53. As Musk has subsequently admitted, his statements regarding investor support for the transaction were "incorrect". E. Musk SEC Tr. at 258:23-25. Furthermore, Musk and Tesla were aware by August 13, 2018 that many investors opposed the going-private transaction. *See*, *e.g.*, Exs. 90 (August 7, 2018 email from a top 30

---

[1] Defendants continue to treat this statement as synonymous with "funding secured" and note the Court discussed the statement in those terms when granting Plaintiff summary judgment on the falsity of this statement. In its summary judgment ruling, however, the Court noted the possibility of other meanings but held that the statement was indisputably false under both Plaintiff's and Defendants' interpretations. ECF No. 387 at n.9.

shareholder to Tesla, "We will not support a buyout… We can't own private entities." Musk replied the same day: "Why can't you own shares in a private company?"); 215 (Tesla received additional frustrated feedback from institutional investors in response to Elon tweets on August 8, 2018: "We can't own private investments because we need the liquidity." (Diametric), "We feel betrayed, [] but now we will be excluded from the upside." (HHR), and "we can no longer participate because we aren't allowed to own private companies." (unnamed)). There is nothing in the record whatsoever supporting that Musk had any basis in fact to claim support for the transaction from 66% of Tesla's then-existing shareholders. Notably, after its publication, Tesla CFO Deepak Ahuja reached out to Tesla IR Martin Viecha to monitor investors' reaction to the August 13 blog post. "How is it going with investor reaction to the blog?" "They aren't happy about the going private initiative!" "[T]hey made it pretty clear". Ex. 79. The August 13, 2018 blog post also continued to omit important details regarding the shambolic nature of the going-private transaction as of August 7, 2018 that continued to August 13, 2018: that Musk had still not received legal advice on his unprecedented structure (which proved to be illegal and impracticable); that he had still not determined how much financing was needed and on what terms (which ultimately was never determined); and that he had received no financial advice on the proposed price of $420 per share (which was never received).

It is therefore unsurprising that Professor Fischel and Dr. Hartzmark both agree that the August 7, 2018 tweets continued to impact the price of Tesla securities even after the August 13, 2018 blog post. *See* Ex. 375 at ¶¶ 100-135, 191-97 & Appx. 8; D. Fischel Dep. at 201:16-202:14. This is confirmed by statements made by analysts following the blog post. Morningstar regarded it as confirmation of the August 7, 2018 tweets, reporting that the prior tweet that "investor support is confirmed" means "Musk believes he has enough votes to go private" and "his estimate of about 66% of shareholders not tendering is not far off from our own assumption of 60%." Ex. 429. Morningstar concluded: "our impression of his words is that he thinks it can happen, and we agree." *Id*. A Bernstein research note of August 16, 2018 increased Tesla target price from $265 to $325 per share based on Elon August 7 tweets and the August 13 blog post detailing prospective funding from the Saudis. Ex. 375, ¶¶56, 160. JP Morgan maintained its price target that it

increased after the August 7, 2018 tweets to reflect a going-private transaction at $420 per share. Ex. 17.

The ongoing impact of the August 7, 2018 tweets as observed by both experts is further corroborated by the changes in implied volatility measured from the prices for Tesla stock options during the Class Period. Implied volatility indicates the range of anticipated future prices for Tesla stock. An anticipated transaction at an announced price such as $420 per share will narrow the range and reduce implied volatility. As explained by Dr. Hartzmark, the implied volatility for Tesla stock options immediately and significantly declined following the August 7, 2018 tweets after being stable for the preceding period. *See* Ex. 375 at ¶¶ 185-186, 189, 190, 194; Hartzmark Tr. 153:15-23. This is exactly what is expected with the announcement of a funded going-private transaction. The implied volatility remained at a lower level even after the August 13, 2018 blog post, consistent with stated views of analysts such as Morningstar and JP Morgan that the proposed transaction as announced on August 7, 2018 remained likely with funding and investor support. Exs. 429, 17. The NY Times Article Introduced New, Corrective Information into the Market.

Defendants argue that no additional corrective information entered the market after August 13, 2018. Def. Mot. in Limine No. 1 at 6-10. This again ignores the record.

Any analysis of disclosures regarding Tesla from August 13, 2018 to August 17, 2018 must reflect that after being volatile following the August 7, 2018 tweets, Tesla's stock price reached an equilibrium price on August 17, 2018 that was then largely maintained. Ex. 375 at Appendix 5. This is also true regarding the implied volatility observed from Tesla stock option prices; it returned to pre-August 7, 2018 levels. *Id*. at ¶¶ 191-197.[2] Dr. Hartzmark examined every public news report and announcement regarding Tesla from August 13, 2018 to August 17, 2018 and determined that the only Tesla-specific news during that period that would have materially impacted its securities prices was news related to the August 7, 2018 tweets and the going-private

_____

[2] The implied volatility observed from Tesla's stock option prices before August 7, 2018 included the possibility that Musk might take Tesla private as his intent to do so had been previously reported. Immediately after August 17, 2018, Musk was still apparently contemplating taking Tesla private but the market was assigning the same likelihood to this as before Musk announced he had funding to do so.

transaction. *Id*. at ¶¶168-169; *see also id.* at ¶¶ 146-167. In particular, Dr. Hartzmark found a statistically significant price reaction following publication by *The New York Times* of an interview with Musk where he provided "a detailed timeline of the events leading up to the Twitter postings on Aug. 7." Ex. 171. The article also noted that "funding, it turned out, was far from secure." *Id*.

Tellingly, analysts also regarded the *New York Times* article as showing that the August 7, 2018 tweets were false. JP Morgan responded to the article by reducing its price target back to its August 6, 2018 level, writing "our interpretation of subsequent events leads us to believe that funding was not secured for a going private transaction, nor was there any formal proposal." Ex. 23. Ryan Brinkman, the JP Morgan analyst who wrote this report testified that it was prompted by the *New York Times* article which "very much undermined the veracity of the August 7 Tweets." R. Brinkman Dep. 92:22-96:23 and 100:9-106:15.[3] Thus, Dr. Hartzmark is able to conclude that it was on August 17, 2018 that the price impact of the August 7, 2018 tweets was finally eliminated from the price of Tesla securities. Hartzmark Tr. at 91:8-92:10 (describing "economic analysis" including, *inter alia*, "statistical significance of both the tweet as well as the movements in [the stock price]," the "trading volume," the "scrutiny of regulatory agents," the "analyst coverage," and "short-term and long-term implied volatility," and concluding that "the final corrective disclosure took place on August 17th, which corresponds with the – with 'The New York Times' article"). Once again, Professor Fischel agrees, testifying that "there's a connection because the August 17th interview that Musk gave comes into context of the events that were occurring at the time, which includes the August 7th tweet – or tweets." D. Fischel Dep. 160:17-161:2.

Defendants further assert that all the information regarding the going-private transaction contained in the August 16, 2018 *New York Times* article had been previously disclosed. Def.

---

[3] Defendants suggest that JP Morgan modified its target price in response to the August 13, 2018 blog post rather than the *New York Times* article. But this ignores the fact that the analyst note was not published until August 20, 2018, a whole week after the blog post, that JP Morgan issued a client alert on August 14, 2018 discussing the blog post that did ***not*** change its target price, and Brinkman testified that he changed the target price after reading the *New York Times* article.

Mot. in Limine No. 1 at 6-7. But the *New York Times* article included information such as: "that the funding for the proposed going private transaction 'was far from secure' and the Public Investment Fund 'had not committed to provide any cash'", "that no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it indicating that no going private transaction was imminent", and that the probability of a Tesla going private transaction was now 0%. Ex. 375, ¶¶125-126; Ex. 375, ¶205, Table 10 (showing that the market's perception of the deal probability declined from 23% on August 13, 2018, to 17% on August 16, 2018, and 0% on August 17, 2018). Importantly, the fact that this information came directly from Musk during his "hourlong interview" held special weight in the eyes of investors. *See* Hartzmark Tr. at 98:8-98:18 (noting the fact that this was Musk's interview "is very powerful evidence that there is new information that's disclosed" in the *New York Times* article). The fact that some of the information may have been previously rumored or speculated on does not preclude it causing a loss to investors when presented with the extra credibility or significance that attaches to an interview with Musk.[4] *See Gilead*, 536 F.3d at 1058 (stock price decline was caused by FDA warning letter published three months earlier when "the public failed to appreciate its significance"); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)(courts should weigh the intensity and credibility of source of statement noting that "the investing public justifiably places heavy reliance on the statements and opinions of corporate insiders.").

Accordingly, the *New York Times* article was much more than a "negative journalistic characterization of previously disclosed facts," as Defendants contend (Def. Motion in Limine No. 1 at 6), primarily due to the fact that it contained admissions directly from Musk that had not been made public prior to August 16, 2018. This is markedly different than the facts in the *Omnicom* case cited by Defendants in their brief. Unlike the "conclusory suspicions" voiced in an article supposedly serving as a corrective disclosure, Musk himself made the statements that caused Plaintiff's damages by revealing new, material information to the market. *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (rejecting article as corrective

---

[4] Prior reporting had been based on "unnamed sources" and "people familiar with the situation". Exs. 27 and 344.

1    disclosure because it contained "conclusory suspicions" from "accounting professors" based on

2    "already-public information").

3           Furthermore, Defendants cannot credibly explain the reaction of the prices of Tesla

4    securities on August 17, 2018 if they were not responding to the undermining of the veracity of

5    the August 7, 2018 tweets by the *New York Times* article. Defendants point to no other material

6    information disclosed in the article or elsewhere that would explain the statistically significant

7    price movements seen on August 17, 2018. In their second motion in limine, Defendants reference

8    reporting in the *New York Times* article regarding Musk's mental health as well as a report in the

9    *Wall Street Journal* regarding an SEC subpoena to a Tesla parts supplier. Def. Mot. in Limine

10   No. 2 at 7. Yet both these pieces of information had been previously reported; indeed *The New*

11   *York Times* itself had published a report focusing solely on Musk's mental health on August 15,

12   2018 and Tesla stock price had not reacted. Ex. 426; D. Fischel Dep. 135:4-137:16. Furthermore,

13   neither Musk's mental health nor an SEC probe of Tesla's suppliers would explain the change in

14   the implied volatility observed from the prices for Tesla stock options on August 17, 2018 when

15   it went back to August 6, 2018 levels. Dr. Hartzmark's analysis, however, does do that.

16          Defendants' failure to refute Plaintiff's economic evidence on the impact of the August 7,

17   2018 tweets precludes excluding evidence of price impact after August 13, 2018. *See In re*

18   *Parmalat Sec. Litig.*, 2008 U.S. Dist. LEXIS 64296, at *36-37 (S.D.N.Y. Aug. 20, 2008) (holding

19   in favor of plaintiff's economic analysis where defendants attempted to counter without any

20   economic analysis of their own).

21   **III.    CONCLUSION.**

22          Defendants' motion presents, at best, closing arguments challenging the proper

23   interpretation of the factual record by Dr. Hartzmark (even though Defendants' own expert largely

24   has the same interpretation). Such arguments are the province of the jury rather than the Court on

25   a motion in limine. *See Smilovits v. First Solar, Inc.,* No. CV12-0555-PHX-DGC, 2019 WL

26   7282026, at *9 (D. Ariz. Dec. 27, 2019)("Defendants' criticisms that [plaintiff's expert]

27   discounted the confounding information and exaggerated the impact of the alleged fraud go to his

28   credibility and the weight of his opinions, not their admissibility."). In this type of situation,

1  "district courts, in general, should avoid passing judgment on the 'factual underpinnings of the

2  expert's analysis and the correctness of the expert's conclusions.'" *Clear-View Techs., Inc. v.*

3  *Rasnick*, No. 13-CV-02744-BLF, 2015 WL 3505003, at \*2 (N.D. Cal. June 2, 2015) (denying

4  motion to exclude opinions based on attacks of expert's assumptions); *see also  Fujifilm Corp. v.*

5  *Motorola Mobility LLC*, 2015 WL 1737951, at \*2 (N.D. Cal. Apr. 8, 2015) ("When the

6  methodology is sound and the evidence relied upon is sufficiently related to the case at hand,

7  disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the

8  testimony's weight, but not its admissibility."). For these reasons, the Ninth Circuit has stressed

9  that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence,

10  and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th

11  Cir. 2010).

12  Defendants' Motion *in Limine* No. 1 to preclude evidence of damages after August 13,

13  2018, disregards the evidentiary record, fails to dispute uncontroverted economic evidence, and

14  ignores binding Ninth Circuit law. Consequently, Plaintiff is entitled to present its theory of loss

15  causation caused by Defendants from August 7, 2018 to August 17, 2018 to the jury together with

16  supporting evidence. This motion should be denied.

17

18  Dated: June 30, 2022                    Respectfully submitted,

19

20  **LEVI & KORSINSKY, LLP**

21   s/ Adam M. Apton
Adam M. Apton (SBN 316506)
22  Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
23  San Francisco, CA 94111
Tel.: (415) 373-1671
24  Email: aapton@zlk.com
Email: amccall@zlk.com
25

26  -and-

27  Nicholas I. Porritt
Elizabeth K. Tripodi
28

Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: akrot@zlk.com
(admitted pro hac vice)

-and-

Joseph Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Email: jlevi@zlk.com
Email: ek@zlk.com
(admitted pro hac vice)
Attorneys for Plaintiff and Counsel for the Class