QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (*appearing pro hac vice*)
  alexspiro@quinnemanuel.com
  Andrew J. Rossman (*pro hac vice* forthcoming)
  andrewrossman@quinnemanuel.com
  Ellyde R. Thompson (*appearing pro hac vice*)
  ellydethompson@quinnemanuel.com
  Jesse Bernstein (*pro hac vice* forthcoming)
  jessebernstein@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

  Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000

*Attorneys for Defendants Tesla, Inc., Elon Musk,
Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,
Antonio J. Gracias, James Murdoch, Kimbal Musk,
And Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**MOTION *IN LIMINE* NO. 2**<br><br>**DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE OPINIONS OF MICHAEL HARTZMARK** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................................................................................1

FACTUAL BACKGROUND..........................................................................................................1

ARGUMENT ..................................................................................................................................3

I.    DR. HARTZMARK'S OPINION SHOULD BE EXCLUDED BECAUSE HE EMPLOYS AN UNRELIABLE METHODOLOGY ............................................................3

    A.    Dr. Hartzmark Fails To Separate Any Loss Caused By Corrective Information From Disclosure Of Other Company-Specific Information. .....................................4

    B.    Dr. Hartzmark's Leakage Model Is Unprecedented And Unreliable. .......................5

II.    THE COURT SHOULD EXCLUDE IMPROPER CONSEQUENTIAL DAMAGES ........8

CONCLUSION.............................................................................................................................10

## INTRODUCTION

The Court should exclude the unreliable expert opinion of Dr. Michael Hartzmark, Plaintiff's loss causation and damages expert, on which Plaintiff bases a claim for damages-per-share of three times the August 7 stock-price increase. Dr. Hartzmark fails to separate any inflation caused by the alleged misstatements from accurate statements, neglects to account for the effect of information unrelated to the alleged misstatements, and wrongly includes consequential damages invented out of thin air. Dr. Hartzmark's damages model is unreliable, and thus his opinion should be excluded.

A reliable damages and loss causation model must (a) isolate the inflation (price increase) attributable to the alleged material misrepresentations, (b) identify corrective disclosures resulting in statistically significant declines in the stock price, and (c) disaggregate confounding information, that is, information unrelated to the alleged misrepresentations that could have affected the stock price. Dr. Hartzmark's model does none of that. Specifically, his model does not distinguish between stock price increases caused by the undeniably truthful information in Mr. Musk's tweets and allegedly inaccurate information in those tweets. Nor does his model isolate losses due only to statistically significant declines resulting from corrective disclosures. While Dr. Hartzmark purports to apply a novel "leakage" theory to assume that *all* of the price declines through August 17 were caused by an amalgam of "curative" information and "consequential effects," in doing so he assumes the very loss causation on which he is supposed to opine. And, in any event, such an assumption sweeps so broadly as to include "curative" disclosures regarding an alleged "misstatement" that Plaintiff has since abandoned, as well as declines wholly unrelated to the alleged misstatements. The end result is an overly-simplistic model in which Dr. Hartzmark takes the total price declines and merely backfills inflation and damages. Given these foundational flaws in Dr. Hartzmark's model, the Court should exclude his testimony, or alternatively, hold a Rule 104 hearing prior to trial to consider its admissibility.

## FACTUAL BACKGROUND

Plaintiff has proffered Dr. Hartzmark as an expert on loss causation and damages. In his report, Dr. Hartzmark begins his analysis by calculating the amount of purported "artificial inflation" that was

"caused" by Mr. Musk's tweets on August 7. (Ex. 375 ¶¶ 64, 66, 77, 177.)[1] To do so, Dr. Hartzmark conducted an event study that removed the impact of "market" and "industry" effects to create "predicted" results for Tesla's stock during the Class Period. (*Id.*) Although Plaintiff does not dispute that certain portions of Mr. Musk's August 7 tweets were true, Dr. Hartzmark assumes that *100%* of the difference between the "predicted return" and the actual Tesla return the "abnormal return" or "residual" on August 7 following the tweets constituted "direct artificial inflation." (Ex. 375 ¶ 77.) Dr. Hartzmark does not attempt to isolate the stock increase due to Mr. Musk's indisputably true statements as opposed to his allegedly materially false ones. (Ex. B at 205:12-21; 226:10-229:8; 229:18-231:4.) Based on Dr. Hartzmark's assumption, he calculates $23.27 of inflation directly caused by Mr. Musk's tweets on August 7. (Ex. 375 ¶ 77.)

Dr. Hartzmark also purports to calculate the subsequent declines supposedly "caused" by the revelation of the alleged fraud. To accomplish this, Dr. Hartzmark created an event study to measure Tesla's residual returns on each day of the "corrective interval" (*i.e.*, the period when the purported falsity of Mr. Musk's tweets was "revealed" to the market). (Ex. 375 ¶ 66.) In doing so, Dr. Hartzmark does not identify a single day with a statistically significant decline at the 5% level—the generally accepted level required to show causation. As a result, he turns to a "leakage model," but assumes that the information regarding the inaccuracy of the August 7 statements caused the entirety of the actual price movement on each day in the "corrective interval" without excluding any information unrelated to the alleged misstatements that could have caused a change in stock price (that is, confounding information). For example, while the stock market absorbed new information concerning SEC investigations unrelated to Mr. Musk's tweets and concerns regarding Mr. Musk's health during the relevant timeframe, Dr. Hartzmark has not excluded any price change related to such information from his model. (Ex. 375 ¶¶ 65, 150; Ex. B 76:4-77:21.) Based on his assumption that information regarding the accuracy of the August 7 tweets caused all price movement during the class period, Dr. Hartzmark reaches the conclusion that Mr. Musk's tweets caused $66.67 in damages, nearly three times the amount of direct artificial inflation Dr. Hartzmark measured on August 7 as a result of Mr. Musk's tweets. (Ex. 375 ¶ 171.)

---

[1] Deposition exhibits are marked with numbers (*e.g.*, 1-500); new exhibits in support of this motion are marked with letters (*e.g.*, A-Z). All cited exhibits are to the Batter Declaration.

Dr. Hartzmark attributes the difference between the $23.27 per share of inflation and the $66.67 per share damages figure to "consequential effects," such as shareholder lawsuits and negative news articles. (Ex. 375 ¶¶ 54, 171.) In an attempt to divide these damages between damages due to the "direct effects" and the "consequential effects," Dr. Hartzmark uses stock volatility of long-term options as a proxy for the direct effects and categorizes the remainder as "consequential." (Ex. 375 ¶¶ 191-204.)

## ARGUMENT

### I. DR. HARTZMARK'S OPINION SHOULD BE EXCLUDED BECAUSE HE EMPLOYS AN UNRELIABLE METHODOLOGY

To prove loss causation, a plaintiff must show the price of the securities was "inflated"—that is, it was higher than it would have been without the false statements—and that it declined once the truth was revealed. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-45 (2005). The aim of the securities laws is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 345. Thus, "a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010). For a stock decline to constitute the required "economic loss," "the decline in stock price [must be] caused by the revelation of that truth [and it] must be statistically significant." *Id.*

To show a decline caused by the revelation of the truth, an expert must reliably "separate the loss caused by the disclosure of corrective information . . . from loss caused by the disclosure of other company-specific information." *Id.* at 1273-74. Thus, where an expert's model does not disaggregate between the loss caused by the disclosure of corrective information and the loss caused by other truthful company-specific or market information (*i.e.*, confounding information), the expert's model is unreliable and cannot be presented to a jury. *Id.* at 1275; *see also In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary judgment to defendant where plaintiffs' expert's failure to disaggregate all confounding factors left "no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss"), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379 (N.D. Ga. 2010) (expert's "failure to disentangle the effect of the new [fraudulent] information" from the confounding "negative characterization" of truthful non-fraudulent

news did not enable jury to "determine how much, if any, of Plaintiffs' loss is attributable to Defendants'" misrepresentations), *aff'd*, 489 F. App'x 339 (11th Cir. 2012).

### A. Dr. Hartzmark Fails To Separate Any Loss Caused By Corrective Information From Disclosure Of Other Company-Specific Information.

Dr. Hartzmark's damages analysis is flawed from the start because he does not isolate the impact of the allegedly false statements from the other company-specific information. This failure alone warrants exclusion under Federal Rule of Evidence 702. *See REMEC*, 702 F. Supp 2d at 1273-75.

***True Statements.*** To start, Dr. Hartzmark fails to account for the impact of Mr. Musk's undeniably true statements. Specifically, Dr. Hartzmark admits he did nothing to isolate how much of the purported inflation he calculated on August 7, 2018 was due to Mr. Musk's undeniably true statement that he was "considering taking Tesla private at $420" from the allegedly false statement "funding secured." (Ex. B at 205:12-21; 226:10-229:8; 229:18-231:4.) Thus, Dr. Hartzmark's analysis "provides no method by which a jury can determine how much, if any, of Plaintiffs' loss is attributable to" Mr. Musk's truthful statement versus his allegedly untruthful statement. *In re Sci. Atlanta*, 754 F. Supp. 2d at 1379.[2]

Similarly, Dr. Hartzmark measures an increase in "Direct Artificial Inflation" on August 14, which he attributes to the "fairly straightforward" explanation that Mr. Musk's August 13 tweet that he was "excited to work with Silver Lake and Goldman Sachs as financial advisers" increased the deal probability and, in turn, the "Direct Artificial Inflation." (Ex. B at 214:6-215:3.) But Plaintiff abandoned this alleged misstatement because, like Mr. Musk's statement that he was "considering taking Tesla private," Mr. Musk's August 13 tweet was undeniably true. (Ex. 431 (Plaintiff's Interrogatory Responses) at 5-6.) In other words, not only does Dr. Hartzmark fail to isolate the impact of certain of Mr. Musk's truthful statements, he attributes inflation to a tweet Plaintiff admits contains no false information.

***Other Causes Of Stock Price Movement.*** Dr. Hartzmark's model also is unreliable because it fails to address other potential causes of stock movement. Rather than running an event study that identifies and isolates statistically significant declines due to the revelation of the purported misstatements, Dr.

---

[2] Dr. Hartzmark offers no analysis to dispute that the truthful sentence caused some stock increase, which caused Professor Fischel to criticize the model as "fundamentally flawed from the outset because he makes no attempt to isolate the effect of the allegedly misleading information from the uncontested true statement." (Ex. 423 ¶¶ 9-14.)

-4-   Case No. 3:18-cv-04865-EMC
DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE OPINIONS OF MICHAEL HARTZMARK

Hartzmark simply assumes that *100%* of what he deems Tesla's residual in his event study on each day of the "corrective interval" is due to the alleged fraud as opposed to confounding information or random noise. (Ex. 375 ¶ 65; Ex. C 76:3-77:21.) This alone requires exclusion of Dr. Hartzmark's opinion. *REMEC*, 702 F. Supp. 2d. at 1273-75; *see infra* at 8. But then, based on this sweeping assumption, Dr. Hartzmark reaches the conclusion that Mr. Musk's tweets caused $66.67 in damages despite simultaneously finding they only directly caused $23.27 in damages, denoting the remainder "consequential results" of the direct harm. (Ex. 375 ¶ 171.) The end result demonstrates the unreliability of his methodology. Dr. Hartzmark calculates that, "but for" Defendants' allegedly wrongful conduct, Tesla's stock price would have been $43.95 ***below*** the $356.85 price one minute before the tweets existed. (Ex. 375 ¶ 175.) As a result, his model does not even try to measure the relevant question: what the stock price would have been had Mr. Musk disclosed on August 7 what Plaintiff contends is the truth about a contemplated take-private transaction. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021) ("[P]rice impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement.") (quotations omitted).

Accordingly, Dr. Hartzmark's analysis is unreliable and must be excluded. *REMEC*, 702 F. Supp. 2d at 1273-75 (excluding damages expert who failed to disaggregate between inflation caused by misrepresentation as opposed to other information); *Omnicom*, 541 F. Supp. 2d at 554 (granting summary judgment where plaintiffs' expert only disaggregated some of the evidence).

**B.     Dr. Hartzmark's Leakage Model Is Unprecedented And Unreliable.**

Even setting aside these foundational flaws, Dr. Hartzmark's model fails to connect the asserted economic loss to a curative disclosure or to the leakage of such information over the Class Period.

The traditional methodology for calculating loss causation and damages requires statistically significant stock reactions following specific corrective disclosures. *REMEC*, 702 F. Supp. 2d at 1266. A decline must be statistically significant because a certain level of randomness is expected in stock price movements. *Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.5 (2d Cir. 2018). A stock decline that is not statistically significant "is indistinguishable from random price fluctuations." *Id.* Thus, when a decline is not statistically significant, it "cannot be attributed to company-specific

information announced on the event date." *Id.* The level of statistical significance generally required to attribute a stock-price movement to specific information rather than random fluctuations is the 5% level (also known as the 95% confidence level), as Dr. Hartzmark acknowledges. *See* Ex. B 111:17-23.

Here, Dr. Hartzmark does not identify a single disclosure that contained new material information about the alleged misstatements and resulted in a statistically significant decline. Thus, under the traditional methodology, all of the "corrective" days' returns (other than August 17, which contained no curative information, as discussed *infra*, at 8) are indistinguishable from random price fluctuations that cannot ground damages. Likely because of this, Dr. Hartzmark abandons this methodology in favor of a "leakage model" that rests on the premise that, although there were no individual statistically significant declines, the truth leaked out gradually over the Class Period. But Dr. Hartzmark's leakage model must be excluded not only for the reasons above but also because his justification for deviating from the traditional methodology is baseless and his leakage model is inherently unreliable.

As an initial matter, no case in the Ninth Circuit has endorsed a leakage theory that attributes every penny of decline to the alleged fraud. *See, e.g.*, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) (rejecting leakage model attributing nearly all declines to fraud). Indeed, certain courts have explicitly rejected the theory as not having "achieved 'general acceptance' within the relevant scientific community or 'been subjected to peer review and publication.'" *In re the Bear Stearns Companies, Inc. Sec.*, 2016 WL 4098385, at *9 (S.D.N.Y. July 25, 2016) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993)).

Even if acceptable in theory, "[a] plaintiff cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud." *Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009). That is particularly true here, where Dr. Hartzmark claims damages three times the initial inflation (*see* Ex. B 76:3-77:21), and only one statistically significant decline on a day without any curative information, *see* Defendants' Motion *In Limine* No. 1 at 6-8.[3]

*First*, Dr. Hartzmark does not disaggregate confounding information. As described, *supra*, at 4-5,

---

[3] This alone distinguishes Dr. Hartzmark's model from Professor Fischel's model in *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015).

Dr. Hartzmark fails to isolate between declines due to the purported revelation that Mr. Musk's "funding secured" statement was allegedly untrue or other company-specific information. During the meet-and-confer process, Plaintiff indicated he would try to shift his burden to Defendants. (*See* Ex. C.) But even the case on which Plaintiff intends to rely confirms a plaintiff must show in "nonconclusory terms" that "no firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015). Dr. Hartzmark makes no effort to eliminate any contribution from "firm-specific, nonfraud related information." For example, in treating the August 16 New York Times article as a corrective disclosure (assuming it could qualify as one), Dr. Hartzmark fails to isolate the impact on the stock price of nonfraud related information in that article, including news regarding Mr. Musk's emotional and physical health that Dr. Hartzmark's own sources connected to a decline in Tesla's stock. (Ex. 375 ¶ 128; Ex. B 268:8-269:25.) While Dr. Hartzmark opines that "the beginning of the revelation of the truth" was a New York Times article at 10:24 a.m., he inexplicably includes declines that occurred *prior* to the 10:24 a.m. article that, under his own theory, must have been caused by something else. (Ex. 375 ¶¶ 82, 88 & n.160.) And Dr. Hartzmark does not disaggregate the effect of a Wall Street Journal report—published the same day as the New York Times article—regarding the SEC's subpoena to a Tesla parts supplier in an investigation into whether Tesla had misrepresented Model 3 production issues. (Ex. 375 ¶ 165.) Dr. Hartzmark makes a conclusory attempt to brush this aside by pointing to an August 9, 2018 disclosure that the SEC "had been gathering information about Tesla's public pronouncements regarding manufacturing goals and sales targets," but he did not disaggregate that news during the "corrective interval" either. (Ex. 375 ¶¶ 91, 166 & n.269; Ex. B 242:10-244:25.)

Indeed, in a feat of inconsistency, Dr. Hartzmark claims the issuance of a subpoena *is* new material information with respect to the already-disclosed SEC investigation into the tweets but not new material information with respect to the Model 3 production investigation. (*Compare* Ex. 375 ¶¶ 115-120 *with id.* ¶¶ 165-166.) Because Dr. Hartzmark's does not disaggregate between "the loss caused by the disclosure of corrective information . . . from loss caused by the disclosure of other company-specific information," his model is unreliable. *REMEC*, 702 F. Supp. at 1273-75; *Omnicom*, 541 F. Supp. 2d at 554 ("[T]here is simply no way for a juror to determine whether the alleged fraud caused any portion of

Plaintiffs' loss" where expert failed to disaggregate all confounding factors.).

*Second*, Dr. Hartzmark's selection of an inappropriate "corrective interval" that runs through August 17, 2018 distinguishes his model from any theoretically appropriate leakage model. Dr. Hartzmark identifies no new corrective information on August 17 (or any time after August 13), and Plaintiff offered nothing further during the meet-and-confer process. (*See* Ex. C.) As explained in Defendants' motion *in limine* No. 1, the New York Times article to which Dr. Hartzmark attributes the August 17 decline must be excluded because it contained **no** new corrective information regarding the alleged fraud. Resting on the Complaint, Dr. Hartzmark asserts that the article revealed that the "Public Investment Fund 'had not committed to provide any cash,'" that "funding for the proposed going private transaction 'was far from secure,'" and that "no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it." (Ex. 375 ¶ 125.) But none of this—largely editorialized opinion—was new. (*See* MIL No. 1 at 6-9.) Dr. Hartzmark's leakage model should be excluded because it rests on an inappropriate corrective window. *See In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016) (rejecting at class certification stage claim based on disclosure that did not contain corrective information).

*Third*, absent the August 17 decline, Dr. Hartzmark's leakage model does not satisfy the requirement of demonstrating a statistically significant decline at the 5% level. Dr. Hartzmark bases his assumption regarding the appropriateness of his "corrective interval," in part, on the fact that the interval as a whole is statistically significant at the 5% level. (Ex. 375 ¶ 65.) But the interval only reaches that level because of the decline on August 17. Dr. Hartzmark's leakage model fails to identify statistically significant declines for any narrowed corrective window (*e.g.*, August 8 through August 16). (Ex. 423 ¶ 30.) In other words, the aggregate stock decline under any appropriate window is indistinguishable from random price movements not caused by specific news and therefore unhelpful to the jury in assigning any decline to the alleged misstatements. *See REMEC*, 702 F. Supp. 2d at 1266; *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (rejecting at class certification stage claim based on disclosure for which price decline did not meet the 95% confidence level as "not sufficient evidence of a link between the corrective disclosure and the price").

## II. THE COURT SHOULD EXCLUDE IMPROPER CONSEQUENTIAL DAMAGES

Dr. Hartzmark's model also improperly includes "consequential effects" as "artificial inflation,"

-8-   Case No. 3:18-cv-04865-EMC
DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE OPINIONS OF MICHAEL HARTZMARK

which should be excluded. Specifically, although Dr. Hartzmark calculates $23.27 in artificial inflation *directly* caused by Mr. Musk's tweet, Dr. Hartzmark claims $66.67 in total inflation by relying on his flawed "leakage model." (Ex. 375 ¶ 171.) Rather than recognize that this discrepancy calls into question his model and its premise that the market had the necessary information only as of August 17 (Ex. 375 ¶ 4 n.9), he assumes the difference is explained by "consequential effects," such as shareholder lawsuits. (Ex. 375 ¶¶ 54, 171.) But consequential damages are not permitted under the circumstances here.

In contrast to Dr. Hartzmark's methodology, "courts have generally used an 'out-of-pocket' measure of damages in securities fraud actions premised on a seller's fraud." *Chassin Holdings Corp. v. Formula VC Ltd.*, 2017 WL 66873, at *13 (N.D. Cal. Jan. 6, 2017) (Chen, J.). In other words, the proper measure of damages is the difference between what the buyer paid and what the buyer would have paid "had there been no fraudulent conduct." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972). That is because investors are not entitled to recover if known risks materialize. *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021) (event not a "corrective disclosure" where it is a "materialization of a known risk, rather than the disclosure of a concealed one"); *In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *11 (N.D. Cal. May 16, 2011) (ruling materialization of risk cannot constitute a corrective disclosure event unless risk concealed at the time it materialized), *aff'd*, 730 F.3d 1111 (9th Cir. 2013). Thus, courts have rejected "consequential damages" linked to negative news coverage or subsequent lawsuits, the very sorts of events Dr. Hartzmark treats as consequential damages. *Tchrs' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 188 (4th Cir. 2007) (stock decline following lawsuit "is not one for which the plaintiffs in this case are entitled to compensation."); *Omnicom*, 597 F.3d at 512 (similar for negative media coverage).[4]

Finally, even if consequential damages could be recoverable in this action, Dr. Hartzmark's model is unreliable and therefore unhelpful to the jury in assigning any purported consequential damages. Once again, Dr. Hartzmark does not disaggregate between consequential effects due to Mr. Musk's truthful statements and Mr. Musk's allegedly false statements. *See supra*, at 4-5. Thus, the model is unhelpful to

---

[4] In the rare case where consequential damages under Section 10(b) can be obtained, they "are defined as outlays attributable to the defendant's wrongful conduct." *Meyers v. Moody*, 693 F.2d 1196, 1212 (5th Cir. 1982); *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999) (similar).

1    the jury in assigning any consequential damages due to the allegedly false statements.

2    In addition, however, Dr. Hartzmark's assumption produces absurd and contradictory results, underscoring the unreliability of his model. Specifically, Dr. Hartzmark uses the volatility of Tesla stock as a proxy for direct inflation and, therefore the market's expectation that Tesla would go private, and attributes the remainder of the stock-price movement to "consequential effects." (Ex. 375 ¶¶ 191-204.) But Dr. Hartzmark conducted no empirical analysis to support this assumption. In fact, this assumption produces results in conflict with Plaintiff's own theory. For example, Dr. Hartzmark's reliance on the changes in volatility leads him to find an *increase* in "Direct Artificial Inflation" on August 13. (Ex. 375 ¶ 204.) That means that, under Dr. Hartzmark's theory, the market believed a deal was *more likely* on August 13 relative to the prior trading day (and, therefore, the market believed it more likely the August 7 tweets were accurate than it had before publication of the August 13 blog post). But August 13 is the day that Plaintiff contended at summary judgment that Mr. Musk admitted funding was not secured. (Ex. 377 at 7.) Even Dr. Hartzmark opines that the August 13 blog post revealed to the market that Mr. Musk's statement "funding secured" was "premature at best." (Ex. 375 ¶ 100.) Mr. Musk's blog post cannot have both revealed that his tweets were false and simultaneously caused investors to believe those tweets more.

Likewise, using the framework of Dr. Hartzmark's model but changing the final corrective disclosure to August 13 results in **negative** direct inflation on August 9 and August 10. Under such circumstances, Dr. Hartzmark's model shows the inflation resulting from the alleged misstatements had dissipated by August 9, even before the August 13 blog post. Instead of confronting this flaw in his methodology, Dr. Hartzmark testified he would conveniently switch his model to characterize such damages as direct, instead of consequential (Ex. B 231:25-232:24), despite opining that he observed such consequential effects on August 8, 9, 10, and 13 (Ex. 375 ¶ 204). The fact that Dr. Hartzmark's purported consequential effects simply vanish if the jury chooses a final corrective disclosure different than Dr. Hartzmark's assumption shows that Dr. Hartzmark's model is no model at all, but rather a wholly unreliable string of assumptions used to backfill damages.

## CONCLUSION

Defendants respectfully request that the Court grant this motion to exclude the opinions of Dr. Michael Hartzmark or, in the alternative, hold a Rule 104 hearing to determine their admissibility.

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

DATED:  June 16, 2022

By: */s/ Alex Spiro*
    Alex Spiro *(appearing pro hac vice)*

*Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, And Linda Johnson Rice*