**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE TESLA, INC. SECURITIES LITIGATION

Case No. 3:18-cv-04865-EMC

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE THE OPINIONS OF MICHAEL HARTZMARK**

## I. INTRODUCTION

During a period of just nine trading and eleven calendar days the market was consumed by over 2,400 news articles and analyst reports concerning Elon Musk's August 7, 2018 tweets stating that he secured funding at $420 for his well-known interest to take Tesla, Inc. private, that he had confirmed investor support for the going-private transaction, and that the only reason that deal was not certain as it was subject to a shareholder vote. During the same period, there were just twelve stories regarding other topics relating to Tesla. Dr. Michael Hartzmark submitted a comprehensive damages report with appendices totaling 452 pages wherein he analyzed the quantitative and qualitative evidence. He concluded that the information allegedly misrepresented and/or omitted in the August 7, 2018 tweets caused an immediate increase in Tesla's stock price of $23.27 as well as additional foreseeable harmful effects that collectively proximately caused harm to investors up to $66.67 per share of Tesla common stock. Ex. 375.[1] The analysis included a review of every piece of information relating to Tesla that was published during the Class Period as well as minute-by-minute analysis of the impact on the prices of Tesla securities. Dr. Hartzmark applied well-recognized and widely accepted financial methods in his analysis to construct a highly robust and unusually precise damages report.

Defendants' arguments to exclude Dr. Hartzmark's opinions, however, are mere conjecture devoid of any empirical evidence, or are veiled factual arguments that are not only incorrect, but are properly reserved for a determination by the jury. Notably, Defendants offer no alternative methodology or analysis of damages but simply raise tendentious and ill-founded criticisms. While Defendants accept that Musk's misleading August 7, 2018 tweets had a measurable and material impact on the price of Tesla securities, including inflating its stock price, Defendants and their experts offer no theory or explanation as to how or when that inflation dissipated. Instead, Defendants criticize Dr. Hartzmark for not applying the same methodology used in other cases even though the facts and circumstances of those cases are very different from the facts involved here. Defendants' arguments simply fail to rise to the level to exclude Dr. Hartzmark's testimony

[1] Dr. Hartzmark also identified damages proximately caused to investors in Tesla options as well as notes. Defendants' motion does not challenge these separate aspects of Dr. Hartzmark's opinion.

and therefore, their motion must be denied.

## II. ARGUMENT

### A. Dr. Hartzmark's Methodology is Well-Recognized and Accepted.

Dr. Hartzmark's methodology is reliable and meets the requirements for admissibility. In this Circuit, "loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 753 (9th Cir. 2018). A "plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013).

Applying the principles of financial and economic theory, Dr. Hartzmark evaluated both the quantitative and qualitative evidence concerning the effects of the alleged misstatements, including Elon Musk's August 7, 2018 tweets, throughout the Class Period. As part of his quantitative analyses, Dr. Hartzmark employed the gold standard in securities class action, an event study. *In re Lendingclub Sec. Litig*., 282 F. Supp. 3d 1171, 1184 (N.D. Cal. 2017). From his analyses, Dr. Hartzmark found stark quantitative evidence that the market immediately reacted to the misstatements in the Musk Tweets which caused Tesla's stock price to artificially increase by $23.27 on August 7, 2018. Ex. 375, ¶¶75, 77. Dr. Hartzmark evaluated the market for Tesla securities over subsequent days and observed that the data showed that the market had realized the falsity of Musk's August 7, 2018 tweets and incorporated that information into Tesla's stock price, including related harm addressing corporate governance concerns, litigation and regulatory risk etc., by August 17, 2018. *Id*. ¶¶ 78-139; Appendix 3. Two quantitative facts drove that conclusion: (1) Tesla's stock price reached a (reduced) stable level after the volatility caused by the August 7, 2018 tweets; and (2) the implied volatility observed from the prices of Tesla's stock options returned to pre-August 7, 2018 levels after dropping immediately after Musk's tweets. *Id*. ¶¶ 189-190, 194; Hartzmark Dep. 153:15-23. These observations derived from market data were confirmed by the factual record showing that Tesla analysts modified their price targets for Tesla to reflect the falsity of the August 7, 2018 tweets immediately after August 17, 2018. *Id*. ¶133.

Dr. Hartzmark examined the eight trading days from the close of trading on August 7, 2018 through the close of trading on August 17, 2018. *Id.* ¶¶36-39, 65. From his evaluation of this period, Dr. Hartzmark not only found that there was a statistically significant stock price decline at the 5% level for the entire period (Ex. 375, ¶65), but that the final corrective disclosures disseminated to the market in a *New York Times* article on August 16-17th (the "NYT Article") resulted in a statistically significant decline at the 1% level (Ex. 375, ¶135).

To calculate the but-for price of Tesla stock, the price that reflects all the related information (both direct and consequential effects) that arose from the false August 7, 2018 tweets, Dr. Hartzmark adjusted the closing price of Tesla stock on August 17, 2018 to account for any market and industry factors using data from his event study. *Id.* ¶¶ 146-148. This resulted in a but-for price of Tesla stock of $312.90. Dr. Hartzmark then conducted a comprehensive quantitative and qualitative analysis seeking to identify and account for any statistically significant stock price declines from new Tesla-specific information entering the market during the Class Period that were unrelated to the allegations of fraud by conducting a comprehensive review of not only the 2,400 plus news articles and analyst reports that entered during the Class Period but by also analyzing Tesla's stock price in 1-minute and 15-minute intervals. *Id.* ¶149 & n.238, ¶¶150-169. As result of these exhaustive efforts, Dr. Hartzmark concluded that there was no Tesla-specific, unanticipated, new, material information that was unrelated to the August 7, 2018 tweets that caused a statistically significant price decline. *Id.* at 168. Thus, only then, did he conclude that no further adjustment was necessary to the $312.90 price. Ex. 375, ¶¶168-169.

Dr. Hartzmark concludes that this is the price Tesla stock would have traded at if all the information regarding the fraud had been disclosed on August 7, 2018. *Id.* ¶174. From this conclusion, damages can be easily calculated for any transaction in Tesla stock by subtracting $312.90 from the price paid. This precise calculation is feasible in this case due to (1) the distinct and measurable price impact of the fraudulent statements at the beginning of the Class Period; (2) the identification of a date when the fraudulent impact had been dissipated (which also happens to have been accompanied by a statistically significant stock price decline); and (3) a short class period in which it was possible to determine that no Tesla-specific, unanticipated, new, material

information that was unrelated to the fraud entered the market. One or more of these factors is typically absent from securities class actions but the methodology adopted by Dr. Hartzmark is fundamentally no different from the familiar "backcasting" approach adopted in most securities class action where an "inflation ribbon" is created based on the closing price of the relevant security at the end of the class period. This method is widely accepted. *See*, *e. g.*, *In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *11 (S.D. Cal. Oct. 25, 2013)(finding "Steinholt's backcasting method appears reasonable and logical"); *see also Glickenhaus & Co. v. Household Int'l, Inc.,* 787 F.3d 408, 415 (7th Cir. 2015) ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect. (Put more simply: what goes up, must come down.").

**B. Defendants' Criticisms Are Unfounded and Contrary to the Law and Evidence.**

***1. Defendants' Arguments Regarding Disaggregation are Conjecture or Factual Questions for the Jury that go to the Weight of the Testimony not Admissibility.***

Defendants seek to exclude Dr. Hartzmark's opinions as "unreliable" based on their disagreements with his ultimate conclusions, second-guessing his evaluation of certain facts (which are disputed), and by improperly making factual determinations entirely in their favor. Defendants' issues with Dr. Hartzmark's conclusions go to their weight, not their admissibility.

Defendants' expert, Prof. Daniel Fischel, presented a mere 25-page rebuttal report in response to Dr. Hartzmark's damages report. *See* Ex. 423. In his rebuttal report, Prof. Fischel did not proffer an alternative event study or present any empirical evidence there was a non-fraudulent statement that statistically significantly impacted the price of Tesla securities during the Class Period. *See id.* Notably, Prof. Fischel conceded at his deposition that "there really wasn't a dispute on the pure statistics ***as opposed to the interpretation of them***" "because there wasn't any meaningful difference between the event study that [Dr. Hartzmark] did and the results that we got ourselves." *See* D. Fischel Dep. 9:5-23 (emphasis added).[2] This admission shows that Defendants'

[2] Prof. Fischel also does not dispute there was a statistically significant increase of $23.27 per share "because of the tweet and related disclosures on August 7th about the proposed going-private transaction that Musk was considering" (*id.* at 98:15-20.). *Id.* at 23:3-6 (not disputing).

arguments go to Dr. Hartzmark's conclusions and also concedes the reliability of his methodology.

Notwithstanding, Defendants argue that Dr. Hartzmark's opinions are unreliable because he failed to disaggregate the price impact from the purportedly "undeniably true statement" that Musk was "considering to take Tesla private at $420" from the "funding secured" language. Motion No. 2, at 4. Notably, Defendants and Prof. Fischel have neither conducted any empirical analyses whether this statement alone caused any statistically significant price impact nor have they even estimated one. The reason for Defendants' failure to do such is evidenced by Prof. Fischel's concession that it may be impossible for him to disaggregate this purported true sentence from the second sentence: "Funding secured." D. Fischel Dep. 118:4-17. This alone fails to warrant exclusion. *See Boyd v. City & Cty. of San Francisco*, 576 F.3d 938, 946 (9th Cir. 2009) (affirming admission of testimony because challenging party "present[ed] no evidence, outside of their own assertions, that the theory is unreliable" and finding that although they "criticize the methodology used . . . they present no alternative, [or] more reliable methods . . . to rebut [the expert's] conclusions.").[3] This also reflects the fact that the tweet's author intended the two statements to be read together, communicating funding was secured at $420 per share. *See* E. Musk Dep. 133:6-13 ("The reason I included the number of 420 -- $420 per share was to make it clear that the funding was secured at that level, but not at some much higher level.").

Moreover, Dr. Hartzmark's and Prof. Fischel's reports evidence that this portion of the tweet had no material impact on the market. First, in his opening report, Prof. Fischel unequivocally opines that the market was well aware of Musk's interest to take Tesla private when in his summary of his opinions he states "Musk's actions were consistent with his prior-stated interest in taking Tesla private." Ex. 378, ¶11. In this same report, Prof. Fischel further opined that the $420 offer price was "reasonable" based on public information from "similar going-private transactions" announced to the market. *Id.* at ¶27.

---

[3] The absence of empirical analyses showing how an event study is incorrect by a rebuttal expert tips the weight of the evidence towards the proffering expert. *See In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *9–10 (S.D.N.Y. Aug. 21, 2008) (weighing competing experts and accepting plaintiffs' expert's findings when defendants' expert "did no event study to show how [Plaintiffs' expert's] analysis would have differed had the claimed flaws in his work been corrected").

Given that the market was already well aware of Musk's consideration of taking Tesla private and a reasonable price for such a transaction, as admitted by Prof. Fischel, one would not expect disclosure of this information to materially impact Tesla's stock price without the added information regarding funding. While it is not possible to isolate the impact of just "taking private" on August 7, 2018, one can examine its impact on Tesla's stock price from August 17, 2018 to August 24, 2018 when Musk was still purportedly considering taking Tesla private but market participants had understood that funding was not secured and investor support was not confirmed. Considering that Musk's desire to take Tesla private was old news, it is unsurprising that Dr. Hartzmark found no significant market reaction after the market closed on August 24, 2018 when Musk announced Tesla was "Staying Public". Ex. 375, ¶¶136-37, 139; *see also,* Ex. 229; M. Hartzmark Dep. 58:8-60:22. On August 27, 2018, the first trading day after, Tesla' stock price dropped a non-statistically significant amount of 1.1% or a mere $3.55. Ex. 375, ¶139.

This lack of impact for the initial statement is further supported by Dr. Hartzmark's analyses concerning the significant decrease in the implied volatility observed from the prices of Tesla's longest-term options following the August 7, 2018 tweets. Ex. 375, ¶¶148-205. Specifically, Dr. Hartzmark observed that, by the close of trading on August 17, 2018 following the NYT Article, the market removed the remaining expectations that Tesla's stock price movements were affected by Musk's misstatements including "funding secured" "investor support confirmed" and "only reason this is not certain is that is contingent upon a shareholder vote" as the implied volatility had returned to its pre-August 7, 2018 equilibrium despite that Musk did not state he was no longer considering taking Tesla private until August 24, 2018. *See id.*; M. Hartzmark Dep. 93:5-94:1; 105:13-107:2; 153:15-23. In summary, Defendants have provided no evidence that these statements had any impact that required disaggregation and Dr. Hartzmark's evidence establishes that there is simply no need to do so. *See* M. Hartzmark Dep. 144:25-146:25.

Thus, Defendants conjecture regarding confounding information does not rise to the level to exclude Dr. Hartzmark's opinions. *See Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *8 (D. Ariz. Dec. 27, 2019) at *9 (collecting cases and finding "Defendants' criticisms that [plaintiff's expert] discounted the confounding information and exaggerated the impact of the alleged fraud

go to his credibility and the weight of his opinions, not their admissibility.")[4] In this type of situation, "district courts, in general, should avoid passing judgment on the 'factual underpinnings of the expert's analysis and the correctness of the expert's conclusions." *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3505003, at *2 (N.D. Cal. June 2, 2015); *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1737951, at *2 (N.D. Cal. Apr. 8, 2015) ("When the methodology is sound and the evidence relied upon is sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."). For these reasons, the Ninth Circuit has stressed that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016) (concluding that the district court did not abuse its discretion in admitting expert testimony while noting "[i]t was up to the *jury* to determine how much, if any, of the artificial inflation identified by [expert] was caused by Vivendi's alleged fraud (and thus by the various statements Vivendi released in the relevant period), by assessing the alleged misstatements and their connection to the misconception in question.").

***2. Loss Causation is Not Limited to Statistically Significant Declines in Stock Price.***

Defendants criticize Dr. Hartzmark's methodology for not limiting damages to amounts equivalent to statistically significant declines in Tesla's stock price. This is incorrect.[5] A

[4] Defendants' raise a similar argument that Musk's tweet concerning Silver Lake and Goldman Sachs needs to be disaggregated without evidencing that this had an impact on Tesla's stock price. Defendants did not show that there was a statistically significant increase from that news or even an increase from that news as compared to other news. Dr. Hartzmark showed that the abnormal stock price increase of 0.95% on August 14, 2018 was not statistically significant and that other news entered the market that day concerning the going private transaction. Ex. 375, ¶¶107-108.

[5] Defendants heavily rely on *In re REMEC Inc. Securities Litigation,* 702 F. Supp. 2d 1202 (S.D. Cal. 2010) which, in turn, relies upon *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049 (9th Cir. 2008) for the premise that a statistically significant decline is necessary for proving loss causation. This, however, does not accurately reflect the law in this Circuit. *First Solar*, 881 F.3d 750, clarified two conflicting lines of Ninth Circuit law concerning the standard for loss causation, including those from *Metzler* and *Daou*. The Ninth Circuit clarified the applicable rule is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss". *Id.* at 754; *see id.* at 753-54 (stating that *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) clarifies the rule). Thus, the Ninth Circuit found that the more restrictive lines of cases, including *Metzler*, "should be understood as fact-specific variants of the basic proximate

statistically significant stock price decline is necessary when there is no observable stock price impact at the time of the initial misrepresentation or where there is a significant amount of confounding but unrelated information. But where a misrepresentation like the August 7, 2018 tweets caused a material increase in a company's stock price and was the only subject of information during the class period, a statistically significant price decline is not necessary. Prof. Fischel has himself stated that it is appropriate to consider all price movements where there is "a steady stream and extensive amount of incomplete information related to Defendants' alleged fraud was disclosed . . ., but only some of these disclosures were associated with statistically significant residual returns." *See* Ex. 428, at ¶39. This is precisely the situation in this case.

That expert opinion by Prof. Fischel followed the decision by the Seventh Circuit where it held that plaintiffs show that "no firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period and explain[] in nonconclusory terms the basis for this opinion." *Glickenhaus*, 787 F.3d at 422.[6] The Seventh Circuit stated if the plaintiffs' meet their burden, then the "burden of identifying some significant, firm-specific, nonfraud related information that could have affected the stock price" shifts to the defendants and if defendants fail to satisfy this burden, "the leakage model can go to the jury." *Id.* Defendants subsequent motion

---

cause test, as clarified by *Lloyd*." *Id.* at 753-54. Accordingly, Defendants' reliance upon the strict rule advocated by *REMEC* is misplaced. *See Lloyd* 811 F.3d at 1210 ("loss causation is a 'context-dependent' inquiry,… as there are an 'infinite variety' of ways for a tort to cause a loss").

[6] Defendants incredibly argue that "Dr. Hartzmark makes no effort to eliminate any contribution from 'firm-specific, nonfraud related information'". Motion at 7. This is a blatant false statement which completely disregards an entire section spanning 17 pages of his report, his evaluation of over 2,400 news and analyst articles and Tesla stock price movements at one-minute and 15-minute intervals, and the testimony he provided at his deposition Ex. 375, ¶¶146-169; M. Hartzmark Dep. 320:19-322:2. Specifically, Defendants argue Dr. Hartzmark must eliminate the impact of Musk's emotional and physical health discussed in the NYT Article. Motion at 7. As discussed in opposition to Motion in Limine No. 1, the health information in the NYT Article was not new firm specific information and had been discussed by *The New York Times* the day before. Thus, to the extent that if any of this health information was new material information, this a highly contested factual question to be resolved by the jury and not a basis for exclusion of opinions. Defendants also point to an August 16, 2018 *Wall Street Journal* article concerning a subpoena issued to a parts supplier regarding model 3 production issues. They, however, fail to note that this investigation had been disclosed in 2017 and again in July 2018. Exs. L and M. Simply put, Defendants failed to evidence that any of the news they identified caused a negative statistically significant price reaction or that Dr. Hartzmark has not accounted for it.

to exclude Fischel's supplemental opinions was denied as defendants failed to provide evidence of any "statistically" "significant, firm-specific, nonfraud related information". *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 2016 WL 374132, at *2-4 (N.D. Ill. Feb. 1, 2016).

The viability of this "leakage" theory has been repeatedly been noted by other courts outside the Seventh Circuit, including in the Ninth Circuit. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (acknowledging that relevant truth can "leak out"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) ("We do not take issue with the plausibility of Plaintiffs' 'leakage' theory."); *Lendingclub*, 282 F. Supp. 3d at 1181 ("our court of appeals has recognized a 'leakage' damages model, under which a plaintiff may recover for interim manifestations of later-disclosed fraud that begin to 'leak out' prior to the corrective disclosure.").

Defendants' authorities do not support the exclusion of Dr. Hartzmark's testimony. Defendants cite to only one Ninth Circuit case, *Nuveen*, which is easily distinguishable. In *Nuveen*, the Ninth Circuit rejected a novel standard for loss causation for notes traded in an inefficient market "namely that loss causation is satisfied if 'the Notes could never have been sold but for the City's fraud.'" *Id.* at 119. This is clearly not the situation here. Furthermore, *Nuveen* does not invoke or discuss the leakage theory as presented by Dr. Hartzmark. Defendants' other cases are inapposite. *See In re Williams Sec. Litigation-WCG Subclass,* 558 F.3d 1130, 1135 (10th Cir. 2009) (expert failed to account for market and industry effects); *In re the Bear Stearns Cos., Sec.*, 2016 WL 4098385, at *9-11 (S.D.N.Y. July 25, 2016) (opinion excluded where expert failed to properly account for non-fraud information). Here, Dr. Hartzmark employs the same methodology that Defendant's own expert created that was accepted by the 7th Circuit accounting for the non-fraud information by reviewing over 2,400 news and analyst reports issued over 11 days.

***3. Defendants' Consequential Harm Arguments Fail.***

As admitted by Defendants, the measure of out-of-pocket damages is difference paid and what they "would have paid had there been no fraudulent conduct." Motion at 6. This is how Dr. Hartzmark calculates damages. *See, e.g.,* Ex. 375, ¶¶207-08 & n.300 (noting that "out--of-pocket damages are, economically, the amount overpaid for the security"). For the convenience of the jury, Dr. Hartzmark explains that the amount of artificial inflation consists of two components: the

Direct Artificial Inflation of $23.27 measured through his event study for the August 7, 2018 tweets on August 7, 2018 and the Consequential Artificial Inflation consisting of the additional $43.40 per share decline proximately caused by the tweets. The sum of the Direct Artificial Inflation and Consequential Artificial Inflation, $66.67, merely represents the "measures the difference between actual transaction prices and the "but-for" price[.]" Ex. 375, ¶172; *see e.g.,* ¶169, 174-75 (noting the $66.67 is the stock decline attributable to the alleged fraud). This is the widely-accepted out-of-pocket method. *Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975) ("Under the out of pocket standard each purchaser recovers the difference between the inflated price paid and the value received"). Defendants' own authority agrees. *See Chassin Holdings Corp. v. Formula VC Ltd.*, No. 15-CV-02294-EMC, 2017 WL 66873, at *13 (N.D. Cal. Jan. 6, 2017) (Chen. J.) ("This measure of damages is 'purely compensatory, and it focuses on the plaintiff's actual loss'").[7] Furthermore, consequential damages that "with reasonable certainty … have resulted from the fraud" may be recovered under Rule 10b-5. *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999). Here, the market-adjusted decline from August 7, 2018 to August 17, 2018 is solely attributable to the fraudulent August 7, 2018 tweets as there was no other material, Tesla-specific information disclosed to the market during this time period. It reflects the direct inflation introduced by the tweets as well as damage to the stock price as a result of reputational harm, concerns over poor corporate governance, and litigation and regulatory risk. As Prof. Fischel conceded, these are harms that result from making fraudulent misrepresentations in violation of the securities laws and, accordingly, they may be recovered by investors. D. Fischel Dep. 172:21-174:12. Thus, this accurately captures the harm suffered versus what would have happened if there had not been any fraudulent conduct.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion in Limine No. 2 should be denied.

---

[7] Defendants contend that the increase in implied volatility on August 13, 2018 produces an "absurd and contradictory results". Motion, 10. Defendants fail to take into account the other information entering the market on August 13, 2018 within the blogpost including the alleged misleading information. *See, e.g.,* M. Hartzmark Dep. 49:19-24; 82:17-83:12.

Dated: June 30, 2022

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: etripodi@zlk.com
Email: akrot@zlk.com
(admitted *pro hac vice*)

-and-

Joseph Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Email: jlevi@zlk.com
Email: ek@zlk.com
(admitted *pro hac vice*)
*Attorneys for Plaintiff and Counsel for the Class*