**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
       amccall@zlk.com

Attorneys for Plaintiff and Counsel for the Class

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 3 TO PRECLUDE EVIDENCE OR ARGUMENT CONCERNING AN UNPLED AUGUST 13 PURPORTED MISREPRESENTATION** |

## I. INTRODUCTION

The evidence in this case show that Elon Musk and Tesla lied to investors in the August 13 blog post. Defendants want to keep this evidence from the jury, arguing that it should be excluded because it relates to misrepresentations that were either already dismissed by the Court at the pleading stage or not previously pleaded and therefore off-limits for the purposes of the trial. Defendants' motion is meritless. Far from "float[ing] for the first time" a new theory of liability, Plaintiff has consistently pled omissions from the August 13 blog post. In his complaint, Plaintiff alleged that that the blog post "continued to omit and/or conceal" material information about the transaction, including but not limited to Musk's supposed agreement with the Saudi PIF as well as Tesla's shareholder support for the deal. Dkt. 184 at ¶138. Plaintiff then pursued this theory of liability through discovery and summary judgment. In fact, the evidence of fraud with respect to at least one of the misleading statements in the blog post was so strong that Plaintiff moved for partial summary judgment. Contrary to Defendants' argument, they have been on notice of these claims for months, if not years, and face no undue prejudice in terms of mounting a defense or responding to the evidence when it comes time for trial.

Plaintiff served responses to Defendants' First Set of Interrogatories ("Interrogatory Responses") on November 4, 2021. These responses echoed Paragraph 138 of Plaintiff's complaint regarding the August 13 blog post, describing with particularity the reasons why it was materially misleading. These reasons included, *inter alia*, the following omitted facts: (a) Musk had not obtained any commitment to any level of funding during the July 31, 2018 meeting with the Saudi PIF and had not materially discussed funding a going-private transaction with any other source of funding; (b) after August 7, 2018, Musk had attempted to exclude the Saudi PIF from participating in any going-private transaction; (c) Musk did not know the overall level of funding required for any going-private transaction and had not discussed the overall amount of funding required for any going-private transaction involving Tesla with any potential investor; (d) Musk had not discussed the legal structure of the proposed going-private transaction involving Tesla with the any potential investor; (e) Musk had provided Tesla's Board with only a tentative offer that was missing many critical terms and, according to Musk, had only 50% likelihood of

1  success; (f) Tesla's Board had not taken any steps to consider any proposal by Musk to take Tesla
2  private at $420 per share; (g) that investors had reacted negatively to the transaction prior to
3  August 13, with large investors telling Musk and/or Tesla that they could not or would not
4  participate in or support such a transaction; (h) Musk had not determined whether retail investors
5  would be able to remain shareholders; and (i) Musk had not determined what regulatory approvals
6  would be necessary for the transaction. Ex. 431 at 9-10.

7        Plaintiff also provided Defendants with an extensive list of supporting evidence. This
8  included text messages between Musk and Yassir Al-Rumayyan on behalf of the Saudi PIF
9  wherein Musk told Al-Rumayyan that the Saudi PIF's opportunity to invest was "over" and Al-
10 Rumayyan later confronted Musk for misrepresenting their negotiations in the August 13 blog
11 post, telling Musk that it was an "ill-advised blog with loose information." Plaintiff's
12 Interrogatory Responses also identified responses received from Tesla's investors indicating that
13 they did not support the transaction and would not participate in the deal. This evidence
14 contradicts what Musk said in the blog post, as evidenced by analyst reports like the one from
15 Morningstar dated August 13, 2018 saying that they believed Musk when he represented that he
16 had enough votes to go private.

17       On January 11, 2022, Plaintiff relied on this substantive evidence to move for partial
18 summary judgment, arguing that the August 13 blog post omitted material information regarding
19 Musk's discussions with the Saudi PIF, thereby rendering his representations in the blog post
20 about such communications materially misleading. Out of several misleading statements within
21 the blog post, Plaintiff focused on this one because he believed at the time it was supported by
22 the strongest evidence of fraud. Although the Court did not grant Plaintiff's motion on this issue,
23 it held that the issue was ripe for a jury's consideration.

24       Plaintiff has pled that the August 13 blog post was misleading from the outset of the
25 litigation. Plaintiff did not need to amend his pleadings because he was not obligated to offer
26 evidentiary proof of his omission allegations at that stage. Defendants' attempt to characterize
27 Plaintiff's omission allegations relating to the August 13 blog post as a "secret, undisclosed
28 change in plaintiff's theory of liability" should not be countenanced. The August 13 blog post is

1  and always has been central to liability and damages. Defendants' motion should be denied.

2  **II.  BACKGROUND**

3  Defendants ignore the allegations in Plaintiff's complaint regarding omissions from the August 13 blog post. On January 16, 2019, Plaintiff alleged in his complaint that the August 13 blog post omitted material information necessary to make the statements in this blog post not misleading. Dkt. 184 at ¶138. With respect to the August 13 blog post, the Court's ruling on the motion to dismiss in April 2020 stated: "[the] [b]log post is not independently actionable as a misleading statement because while it claimed on the one hand that the deal was viable and imminent, it eventually (and truthfully) revealed that the deal was subject to further scrutiny." *In re Tesla Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 925 (N.D. Cal. 2020). The Court ultimately held that it "DENIES Defendants' motion to dismiss the Consolidated Complaint. Plaintiff has adequately pled with particularity his theory that Defendants violated the securities laws. Defendants' arguments regarding falsity, scienter, loss causation, and control more appropriately go to the merits." *Id*. at 936. Thus, while the Court addressed the alleged "misleading statement" from the August 13 blog post in its decision, the order did not dismiss Plaintiff's omission allegations.

On May 31, 2020, the Court entered the Case Management and Pretrial Order setting a July 31, 2020 deadline for Plaintiff to amend the pleadings. Dkt. 261 at 2. However, Defendants' document production did not even begin until mid-October 2020. As Defendants point out, the text messages between Musk and Al-Rumayyan that formed the basis for Plaintiff's omission argument in his summary judgment papers were not produced until October 28, 2020 – three months after the deadline to amend. Further, Musk's deposition, which discussed in depth the text messages at issue, did not take place until November 5, 2021.

Defendants' background of events wholly omits mention of Plaintiff's Interrogatory Responses dated November 4, 2021. Plaintiff identified the entire August 13 blog post as a source of both challenged statements and omissions. In their first interrogatory to Plaintiff, Defendants asked Plaintiff to identify every challenged statement and omission; Plaintiff responded, *inter alia*, "(g) The August 13 Blog Post." *See* Ex. 431 at 6. In Interrogatory No. 2, Defendants asked

Plaintiff "for each and every challenged omission, identify the affirmative statement you contend it rendered false or misleading" and why the omission rendered the affirmative statement misleading. *Id*. at 6. With respect to the August 13 blog post, Plaintiff responded that: "the August 13 blog post left investors with a misleading impression of the nature and status of Musk's proposal to take Tesla private at $420 per share as well as mispresented the status of Musk and Tesla's discussions with the Saudi Arabia Public Investment Fund and other existing or potential investors." *Id.* at 8.

Plaintiff then provided *18 pages* of reasons as to why the August 13 blog post omitted material information and detailed the specific record evidence supporting his position. *Id*. at 9-26. This evidence included a text message from Al-Rumayyan stating that the Saudi PIF "would like to explore investing in Tesla subject to being able to create a production hub in the Kingdom of Saudi Arabia," and "would like . . . to start working together . . . to explore a potential transaction." *Id*. at 24. The evidence also included the text messages from Musk to Al-Rumayyan that he was excluding them from participating in any going private transaction, texting "we cannot work together." "Sorry" and "It's over." *Id.* at 25.

With respect to omissions regarding responses from investors as of August 13 that they did not support the transaction and would not participate in the deal, Plaintiff's Interrogatory Responses provided that Joseph Fath testified on July 12, 2021 that certain of T. Rowe Price's funds would be unable to hold shares in Tesla if it were private due to "mandates on their accounts that do not allow privates" or, alternatively, fewer shares due to "illiquidity" concerns; that Nii Owuraka Koney testified on July 14, 2021 that Jennison Associates had restrictions against holding private companies and, therefore, would not be able to remain a shareholder in a private Tesla;" that Martin Viecha testified that, as of August 7, 2018 he understood that the "majority" of Tesla's institutional shareholders "do not have a mandate to own private companies;" and that Matt Fassnacht on behalf of HHR Asset Management LLC emailed Aaron Chew on August 7, 2018 advising that he would "not support a buyout" because he was not permitted to "own private entities." *Id*. at 21. Plaintiff also noted in his Interrogatory Responses that Musk acknowledged before the SEC that he was aware as of July 31, 2018 that institutional shareholders had

1   restrictions against owning shares in private companies. *Id.* at 13.

2         Plaintiff's Motion for Partial Summary Judgment (Dkt. 352) argued, in line with his
3   complaint and Interrogatory Responses, that the August 13 blog post "omitted material
4   information" about the going private transaction. *Id*. at 4. The motion specifies that the August
5   13 blog post omitted information that Musk had numerous arguments with Al-Rumayyan and just
6   the day before Musk had sought to cut the Saudi PIF out of the deal entirely while representing
7   that discussions were continuing and consensual. Ex. 121 at 10-11. Indeed, just after Musk
8   published the blog post, Al-Rumayyan confronted Musk for writing what he believed was an "ill-
9   advised blog with loose information." Ex. 121 at 13. Further, at the time of the August 13 blog
10  post, the structure of the proposed transaction was still uncertain, the amount of funding needed
11  was still unknown, and Musk was still assembling his team of legal and financial advisors.
12  Discussions with investors had commenced, but support as of August 13 had been negative from
13  certain of Tesla's most important investors. *See*, *e.g.*, Joseph Fath Tr. at 48:13-49:7, 54:9-54:13;
14  Exs. 44-47; Nii Owuraka Koney Tr. at 113:13-114:5; Martin Viecha Tr. at 149:25-150:20; Ex.
15  215 ("We can't own private investments," "we can no longer participate because we aren't
16  allowed to own private companies." "We feel betrayed."); Ex. 147 ("they will oppose the
17  transaction."); Ex. 90 ("We will not support a buyout."). Instead of updating the public about the
18  negative feedback from investors, Musk omitted this material information. Ex. 53. These and
19  other critical facts were omitted from the blog post which portrayed the events leading up to and
20  taking place after the August 7 tweets as a deliberate, thought-out process that was continuing as
21  envisioned by Musk and Tesla's board. Although Musk was in full possession of the contradictory
22  facts, he chose not to disclose them. Dkt. 352 at 4-5. The Court at summary judgment held that
23  the issue was too close to decide as a matter of law, stating that a "reasonable jury could well find
24  that the blog post did not give an impression of a state of affairs that was materially different from
25  the one that actually existed." Dkt. 387 at 30.

## III. ARGUMENT

### A. PLAINTIFF PLED OMISSIONS FROM THE AUGUST 13 BLOG POST AND PROVIDED EXTENSIVE EVIDENTIARY DETAILS REGARDING THE OMISSIONS IN HIS INTERROGATORY RESPONSES.

Plaintiff pled both misrepresentations and omissions in the August 13 blog post. *Compare* Dkt. 184 at ¶137 (alleging that the statement ". . . no question that a deal with the Saudi sovereign fund could be closed . . ." was false and misleading) *with* Dkt. 184 at ¶138 (alleging that the blog post contained omissions because it "continued to omit and/or conceal that an agreement had not yet been secured from any potential source of funding to fund a going-private transaction at a price of $420 per share or that is was unlikely that current shareholders of the public company could remain shareholders once it went private"). In ruling on the motion to dismiss, the Court dismissed Plaintiff's misrepresentation allegation (as opposed to the omission), holding that "the blog post on August 13 is not independently actionable as a misleading statement . . . ." *In re Tesla Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 925 (N.D. Cal. 2020). Plaintiff based his omission allegations on facts and beliefs known at the time of the complaint, thereby satisfying the PSLRA's pleading requirements. 15 U.S.C. § 78u–4(b)(1) ("if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"). Plaintiff was not required to plead proof regarding these omissions. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002) ("the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence").

Since then, however, Plaintiff amassed a substantial amount of evidence in support of his omission allegations. Plaintiff identified this evidence with particularity when responding to Defendants' interrogatories on November 4, 2021. This evidence included text messages from Al-Rumayyan to Musk stating that the Saudi PIF "would like to explore investing in Tesla subject to being able to create a production hub in the Kingdom of Saudi Arabia" and "would like . . . to start working together . . . to explore a potential transaction." Ex. 431 at 24. The Interrogatory Responses also included the text messages from Musk to Al-Rumayyan that he was excluding them from participating in any going private transaction, texting "we cannot work together." "Sorry" and "It's over." *Id.* at 25. These text messages occurred not more than 24 hours prior to

the blog post where Musk stated that he had "continued to communicate with [Saudi PIF]" while omitting any mention of the fact that these communications were on the brink of collapse. Ex. 53 at 2.

Plaintiff's Interrogatory Responses also identified responses from investors as of August 13 showing that they did not support the transaction and would not participate in the deal, including Joseph Fath who testified that certain of T. Rowe Price's funds would be unable to hold shares in Tesla if it were private due to "mandates on their accounts that do not allow privates" or, alternatively, fewer shares due to "illiquidity" concerns; that Nii Owuraka Koney testified on July 14, 2021 that Jennison Associates had restrictions against holding private companies and, therefore, would not be able to remain a shareholder in a private Tesla;" that Martin Viecha testified that, as of August 7, 2018 he understood that the "majority" of Tesla's institutional shareholders "do not have a mandate to own private companies;" and that Matt Fassnacht on behalf of HHR Asset Management LLC emailed Aaron Chew on August 7, 2018 advising that he would "not support a buyout" because he was not permitted to "own private entities." Ex. 431 at 21. Plaintiff also noted in his Interrogatory Responses that Musk acknowledged before the SEC that he was aware as of July 31, 2018 that institutional shareholders had restrictions against owning shares in private companies. *Id.* at 13. This evidence directly contradicted Musk's claim in the blog post that he thought "approximately two-thirds of shares owned by all current investors would roll over into a private Tesla." Ex. 53 at 2. The importance of this claim is emphasized by the fact that Morningstar and other analysts relied on this false statement in the blog post when reporting to investors. *See, e.g.*, Ex. 429 at 2-3 ("Musk in an Aug. 7 tweet said, 'Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote.' We think this statement means Musk believes he has enough votes to go private. Musk also said in the Aug. 13 blog post that he estimates about two thirds of shareholders would go private and therefore not sell at $420. It sounds to us that he is not done talking to shareholders to gauge interest, but his estimate of about 66% of shareholders not tendering is not far off from our own assumption of 60%.").

The Court's motion to dismiss decision is not, as Defendants suggest, an "outright bar" to

litigating the falsity of any and all statements in the August 13 blog post. Indeed, at summary judgment in considering the omission concerning Musk's "communicat[ions]" with the Saudi PIF, the Court found that a "reasonable jury could well find that the blog post did not give an impression of a state of affairs that was materially different from the one that actually existed." Dkt. 387 at 30. The Court considered this one particular aspect of Plaintiff's omission theory and decided to allow it to go to the jury. Hence, omissions regarding the August 13 blog post are not "secret, undisclosed change[s] in plaintiff's theory of liability" as Defendants attempt to argue.

### B. EVEN IF PLAINTIFF WERE REQUIRED TO AMEND HIS PLEADINGS, HE CAN DEMONSTRATE GOOD CAUSE TO DO SO.

Plaintiff alleged in his complaint that the August 13 blog post omitted material information necessary to make the statements in the blog post not misleading. Dkt. 184 at ¶138. He then identified the evidence in support of that allegation when responding to Defendants' interrogatories. Thus, even though Plaintiff clearly pleaded omissions from the August 13 blog post in his complaint, the inclusion in the Interrogatory Responses of specifically what Defendants omitted from the August 13 blog post based on the evidentiary record supports the inclusion of claims relating to these omissions. In *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 2429593 (N.D. Cal. Aug. 24, 2007), the court addressed at the summary judgment phase whether many of the misstatements challenged by plaintiff were properly at issue because defendants argued that they were not identified in the complaint, or plaintiff had abandoned them. *Id*. at *5. With respect to the statements not appearing in the complaint, the plaintiffs in *JDS Uniphase* argued that defendants were on notice of certain disputed statements because they had included them in their response to defendants' contention interrogatories. Using its discretion under F.R.C.P. 15(a), the Court ruled that the statements included in the interrogatory responses were deemed part of the complaint. *Id*. at 6.

*JDS Uniphase* stands squarely at odds with Defendants' argument. Not only did Plaintiff plead the omission in his complaint, he also included the omission and evidence in support of it in his Interrogatory Responses. Additionally, Defendants examined Plaintiff's experts regarding the August 13 blog post's impact on the damages theory. The August 13 blog post was also the

topic in all of the depositions taken by Plaintiff. Indeed, the August 13 blog post and its contents have been the subject of much heated debate regarding the litigation – it is the subject of two of Defendants' three early motions *in limine*. Defendants cannot claim to be harmed by Plaintiff's pursuit of actionable omissions in the August 13 blog post because such omissions are certainly not a surprise to Defendants.

This background renders the situation entirely distinguishable from *In re Twitter, Inc. Securities Litigation*, 2020 WL 4188787 (N.D. Cal. 2020), on which Defendants so heavily rely. In their Motion to Preclude Plaintiffs' Unpled Allegations, the defendants in *Twitter* argued that the plaintiffs included unpled misrepresentations on their proposed verdict form. *Twitter*, No. 4:16-cv-05314-JST, ECF. No. 469 at 1. The plaintiffs in *Twitter* conceded that neither the original complaint, nor the consolidated amended complaint included the statement at issue. *Twitter*, 2020 WL 4188787, at *3. The *Twitter* plaintiffs, instead, asked the court to "deem the Complaint to include" the statements at issue because they referred to the misrepresentations in an effort to create a triable issue of fact when opposing the defendants' motion for summary judgment. *Id*. Here, Plaintiff has clearly pled both misstatements in and omissions from the August 13 blog post as a basis for liability, and even sought partial summary judgment on one of the omissions with evidence regarding the status of discussions with the Saudi PIF. Dkt. 352 at 23-24.

Yet, if the Court determines that Plaintiff had not adequately pled omissions from the August 13 blog post, Defendants recognize that a court may, in its discretion, treat "[t]he addition of new issues during the pendency of a summary judgment motion … as a motion for leave to amend the complaint." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994) (quoting *Roberts v. Ariz. Bd. Of Regents*, 661 F.2d 796, 798 n.1 (9th Cir. 1981)), *overruled on other grounds by Cty. of Dearborn Heights Act 345 Police & Fore Ret. Sys. V. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). While Defendants argue that it is Rule 16 of the F.R.C.P. that governs any request to amend at this point, they overlook the fact that the operative scheduling order in this case set the deadline for filing an amendment at July 31, 2020. Discovery had not even commenced at this time.

Under Rule 16, Plaintiff must demonstrate "good cause" for amending of a scheduling order, which "primarily considers the diligence of the party seeking the amendment." *Johnson v.*

*Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Any argument that Plaintiff was not diligent in prosecuting this action or in seeking a necessary amendment is meritless. First, Plaintiff did not believe an amendment was necessary because he pled omissions from the August 13 blog post in his operative complaint. Second, Plaintiff expeditiously reviewed the discovery produced from numerous parties and third parties in this litigation, took 21 depositions in order to crystalize his theories of liability, and served voluminous responses to interrogatories after the conclusions of the depositions (except for Elon Musk's which had been postponed), detailing the omissions from the August 13 blog post and providing a fulsome evidentiary record regarding why those omissions rendered the statements in the August 13 blog post misleading. Defendants did not move to strike these interrogatory responses. Plaintiff served these responses over two months before the summary judgment deadline.

The August 13 blog post has been and continues to be at the core of the parties' dispute over damages in the action. The parties questioned all experts extensively regarding the August 13 blog post, its contents, omissions from it, and its impact on the stock price. Given Defendants' notice of the numerous omissions from the August 13 blog post and its centrality to the parties' damages theory, exclusion of any part of it would be confusing to the jury and highly prejudicial to Plaintiff. Plaintiff's decision not to amend his pleadings does not reflect a lack of diligence, but rather assiduous attention to processing the evidentiary record and preparing for trial with a well-supported understanding that the August 13 blog post was fair game.

## IV. CONCLUSION

Plaintiff pled omissions in the August 13 blog post, Defendants have been on notice of the evidentiary support for those omissions since Plaintiff's Interrogatory Responses, and the Court has ruled that those omissions should go to the jury. Plaintiff is not attempting to proceed to trial on a new material misrepresentation, as Defendants posit. Defendants' motion seeking to preclude evidence of fraud in the August 13 blog post must be denied. If granted, Defendants' motion would unfairly deprive Plaintiff of the right to introduce admissible evidence of Musk's and Tesla's fraud at trial.

| | | |
|---|---|---|
| 1 | Dated: June 30, 2022 | Respectfully submitted, |
| 2 | | |
| 3 | | **LEVI & KORSINSKY, LLP** |
| 4 | | /s/ Adam M. Apton |
| | | Adam M. Apton (SBN 316506) |
| 5 | | Adam C. McCall (SBN 302130) |
| | | 75 Broadway, Suite 202 |
| 6 | | San Francisco, CA 94111 |
| 7 | | Tel.: (415) 373-1671 |
| | | Email: aapton@zlk.com |
| 8 | | Email: amccall@zlk.com |
| 9 | | -and- |
| 10 | | Nicholas I. Porritt |
| 11 | | Elizabeth K. Tripodi |
| | | Alexander A. Krot III |
| 12 | | LEVI & KORSINSKY, LLP |
| | | 1101 30th Street N.W., Suite 115 |
| 13 | | Washington, D.C. 20007 |
| 14 | | Tel.: (202) 524-4290 |
| | | Email: nporritt@zlk.com |
| 15 | | Email: etripodi@zlk.com |
| | | Email: akrot@zlk.com |
| 16 | | (admitted *pro hac vice*) |
| 17 | | -and- |
| 18 | | Joseph Levi |
| 19 | | Eduard Korsinsky |
| | | LEVI & KORSINSKY, LLP |
| 20 | | 55 Broadway, 10th Floor |
| | | New York, New York 10006 |
| 21 | | Tel.: (212) 363-7500 |
| 22 | | Email: jlevi@zlk.com |
| | | Email: ek@zlk.com |
| 23 | | (admitted *pro hac vice*) |
| 24 | | *Attorneys for Plaintiff and Counsel for the Class* |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |