**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: 415-373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: 202-524-4290
Email: nporritt@zlk.com
Email: etripodi@zlk.com
Email: akrot@zlk.com

*Attorneys for Lead Plaintiff Glen Littleton
and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Alex Spiro (*admitted pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: 212-849-7000
Email: alexspiro@quinnemanuel.com

-and-

Michael T. Lifrak (SBN 210846)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90014-2543
Tel.: 213-443-3000
Email: michaellifrak@quinnemanuel.com

*Attorneys for Defendants Tesla, Inc., Elon
Musk, Brad W. Buss, Robyn Denholm, Ira
Ehrenpreis, Antonio J. Gracias, James
Murdoch, Kimbal Musk, and Linda Johnson
Rice*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC <br><br> <u>CLASS ACTION</u> <br><br><br> **JOINT PRETRIAL STATEMENT** |

## A.     THE ACTION

**Substance of the Action.**

The lead plaintiff and class representative in this case is Glen Littleton. Mr. Littleton is an investor who formerly traded for the Kansas City Board of Trade and the Chicago Mercantile Exchange. He holds a Bachelor of Arts degree in finance. He retired from the Kansas City Board of Trade in 2005 and has been trading securities on behalf of himself ever since. Mr. Littleton has traded Tesla, Inc. securities since 2015. In this Action, Mr. Littleton represents a certified class of all individuals and entities who purchased or sold Tesla stock, options, and other securities from 12:48 p.m. EDT on August 7, 2018 to August 17, 2018 (the "Class Period"), and allegedly were damaged thereby (the "Class").

The defendants in this case are Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice. Tesla designs, develops, manufactures, and sells electric vehicles and energy generation and storage systems. Tesla stock is listed on the NASDAQ Global Select market under the ticker symbol "TSLA." Elon Musk ("Musk") was Tesla's Chief Executive Officer and Chairman of the Board of Directors during the Class Period. Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice each served as a director of Tesla's Board during the Class Period. Defendant Denholm replaced Musk as Tesla's Chairman of the Board in November 2018.

Plaintiff intends to prove at trial that Musk and Tesla violated Sections 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j, 78t) and SEC Rule 10b-5(b) (17 C.F.R. §240.10b-5) promulgated thereunder. Specifically, on August 7, 2018, at 12:48 p.m. EDT, Musk tweeted the following message to over 22 million followers: "Am considering taking Tesla private at $420. Funding secured." Musk made additional, subsequent tweets about the potential transaction including: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."  On April 1, 2022, the Court issued an order granting in part Plaintiff's motion for partial summary judgment regarding these statements.  (Dkt. No. 387.)

1        Further, Plaintiff alleges that these tweets were material and artificially affected the price of
2   Tesla's stock and other securities immediately after they were made. Defendants contend that
3   Plaintiff has not and cannot prove that any of Mr. Musk's statements were materially false, and that
4   these statements did not result in any artificial price inflation, particularly in light of the unchallenged
5   statement that Mr. Musk was considering taking Tesla private at $420 per share. On August 13,
6   2018, Musk published an "update" contained in a blog post regarding the potential going private
7   transaction.  Plaintiff alleges that this blog post was materially misleading by omitting information
8   regarding the proposed going-private transaction's structure, funding, and level of investor support.
9   Defendants contend that the Court has excluded the blog post from being considered as an alleged
10  material misstatement. Further, Defendants contend that the blog post disclosed further information
11  about the potential transaction and is further evidence that Mr. Musk did not make any materially
12  false statements in violation of the securities laws.

13       Following the tweets on August 7, 2018, there was intense media and investor scrutiny of
14  the proposed going-private transaction. After reaching a high of $386.48 on August 7, 2018, Tesla's
15  stock price declined to $335.45 by close on August 16, 2018. On August 17, 2018, *The New York*
16  *Times* published an article based on a lengthy interview with Musk and others, which included a
17  statement by the reporter that funding for a Tesla take-private "was far from secure." Plaintiff alleges
18  that *The New York Times* article corrected the false and/or materially misleading information
19  previously disseminated by Defendants about the going-private transaction and, as a result, finally
20  dissipated the artificial impact on the prices of Tesla stock and other securities. Defendants disagree
21  and note that the article also reported on Musk's health, level of exhaustion due to the intensity of
22  Tesla's efforts to produce the Model 3 vehicle, and did not disclose any new information regarding
23  the potential go-private transaction.

24       Plaintiff intends to prove that Defendants' false and/or materially misleading statements
25  damaged Plaintiff and the Class (*i.e.*, caused economic losses) and losses were realized by the Class
26  during the Class Period. Plaintiff further intends to prove that the members of Tesla's Board are
27  liable under Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §78t) as control persons
28  for securities laws violations by Tesla.

Defendants deny that Musk or Tesla made any materially false or misleading statements, deny that they did anything wrong, and intend to prove at trial that Plaintiff's claims have no merit. Among other things, Defendants intend to prove that Plaintiff and the Class cannot prove the material falsity of the challenged statements or reliance thereon; cannot prove the challenged statements were material; cannot prove that Mr. Musk acted with the requisite scienter with respect to a materially false statement; cannot show damages or loss causation; and cannot show that there is control person liability.

**Relief Prayed.**

Plaintiff seeks the following relief concerning his claims against Defendants:

1.     Find that Tesla and Musk violated §10(b) and of the Exchange Act and SEC Rule 10b-5(b);

2.     Find that members of the Tesla Board violated §20(a) of the Exchange Act;

3.     Award Plaintiff and the Class actual damages in an amount to be determined at trial. Specifically, Plaintiff and the Class seek an award of compensatory damages against all Defendants, joint and severally, measured by the artificial inflation or deflation present in Tesla's securities prices during each day of the Class Period;

4.     Award Plaintiff and the Class pre-judgment and post-judgment interest at the maximum rate permitted by law;

5.     Award Plaintiff his reasonable costs, including attorneys' fees; and

6.     Provide such other relief as the Court may deem just and proper.

**B.     FACTUAL BASIS OF THE ACTION**

**Undisputed Facts.**

The following material facts are admitted by the parties and may be incorporated into the trial record without supporting testimony or exhibits.

1.     Tesla designs, develops, manufactures, and sells electric vehicles and energy generation and storage systems.

2.     Defendant Elon Musk co-founded Tesla in July 2003.

3.      Tesla filed its Form S-1 to register its stock with the Securities and Exchange Commission on January 29, 2010.

4.      Tesla became a publicly traded company on June 29, 2010.

5.      From June 29, 2010, and thereafter including through the end of the Class Period, Tesla's common stock was listed and traded on NASDAQ Global Select market under the symbol TSLA.

6.      Plaintiff made trades in Tesla securities during the Class Period.

7.      Musk has served as Tesla's Chief Executive Officer of Tesla since 2008 and served as Tesla's Chairman of the Board of Directors from February 2004 to October 2018.

8.      Musk created a profile on the social media platform Twitter under the handle "@elonmusk" (twitter.com/elonmusk) in June 2009.

9.      On July 31, 2018, Musk met with Yasir Al-Rumayyan, Saad Al Jarboa, and Naif Al-Mogren of the Saudi Public Investment Fund at the Tesla Fremont Factory.

10.     On July 31, 2018, Tesla's stock price closed at $298.14.

11.     On August 2, 2018, Musk sent an email to Tesla's Board with the subject line reading "Offer to Take Tesla Private at $420."

12.     On August 2, 2018, after receiving Musk's email, the Board convened a special telephonic meeting (excluding Musk and his brother, Kimbal Musk).

13.     On August 3, 2018, Tesla's Board convened a meeting with Musk to discuss his email from the previous day titled "Offer to Take Tesla Private at $420."

14.     As of August 7, 2018, approximately 22 million people "followed" Musk's Twitter account.

15.     On August 7, 2018, as of 12:47 p.m. EDT, Tesla's stock price traded at $356.85 per share.

16.     On August 7, 2018, at 12:48 p.m. EDT, Musk tweeted:



17.     At 1:40 p.m. EDT, Musk tweeted:



18.     At 2:00 p.m. EDT, Musk tweeted:



1    19.    At 2:13 p.m. EDT, Musk tweeted:



20.    On August 7, 2018, at 3:17 p.m. EDT, Musk sent the following email to Tesla's employees:

> Earlier today, I announced that I'm considering taking Tesla private at a price of $420/share. I wanted to let you know my rationale for this, and why I think this is the best path forward.
>
> First, a final decision has not yet been made, but the reason for doing this is all about creating the environment for Tesla to operate best. As a public company, we are subject to wild swings in our stock price that can be a major distraction for everyone working at Tesla, all of whom are shareholders. Being public also subjects us to the quarterly earnings cycle that puts enormous pressure on Tesla to make decisions that may be right for a given quarter, but not necessarily right for the long-term. Finally, as the most shorted stock in the history of the stock market, being public means that there are large numbers of people who have the incentive to attack the company.
>
> I fundamentally believe that we are at our best when everyone is focused on executing, when we can remain focused on our long-term mission, and when there are not perverse incentives for people to try to harm what we're all trying to achieve.
>
> This is especially true for a company like Tesla that has a long-term, forward-looking mission. SpaceX is a perfect example: it is far more operationally efficient, and that is largely due to the fact that it is privately held. This is not to say that it will make sense for Tesla to be private over the long-term. In the future, once Tesla enters a phase of slower, more predictable growth, it will likely make sense to return to the public markets.
>
> Here's what I envision being private would mean for all shareholders, including all of our employees.
>
> First, I would like to structure this so that all shareholders have a choice. Either they can stay investors in a private Tesla or they can be bought out at $420 per share, which is a 20% premium over the stock price following our Q2 earnings call (which had already increased by 16%). My hope is for all shareholders to remain, but if they prefer to be bought out, then this would enable that to happen at a nice premium.

Second, my intention is for all Tesla employees to remain shareholders of the company, just as is the case at SpaceX. If we were to go private, employees would still be able to periodically sell their shares and exercise their options. This would enable you to still share in the growing value of the company that you have all worked so hard to build over time.

Third, the intention is not to merge SpaceX and Tesla. They would continue to have separate ownership and governance structures. However, the structure envisioned for Tesla is similar in many ways to the SpaceX structure: external shareholders and employee shareholders have an opportunity to sell or buy approximately every six months.

Finally, this has nothing to do with accumulating control for myself. I own about 20% of the company now, and I don't envision that being substantially different after any deal is completed.

Basically, I'm trying to accomplish an outcome where Tesla can operate at its best, free from as much distraction and short-term thinking as possible, and where there is as little change for all of our investors, including all of our employees, as possible.

This proposal to go private would ultimately be finalized through a vote of our shareholders. If the process ends the way I expect it will, a private Tesla would ultimately be an enormous opportunity for all of us. Either way, the future is very bright and we'll keep fighting to achieve our mission.

Thanks,
Elon

21.     On August 7, 2018, at 3:36 p.m. EDT, Musk tweeted a link to his email to Tesla employees adding the statement:



22.     On August 7, 2018, Tesla's stock price closed at $379.57 per share.

23.     On August 8, 2018, Tesla's stock price opened at $369.09 per share.

1    24.    On August 8, 2018, Tesla's stock price closed at $370.34 per share.

2    25.    On August 9, 2018, Tesla's stock price opened at $365.55 per share.

3    26.    On August 9, 2018, Tesla's stock price closed at $352.45 per share.

4    27.    On August 10, 2018, Tesla's stock price opened at $354.00 per share.

5    28.    On August 10, 2018, Tesla's stock price closed at $355.53 per share.

6    29.    Before markets opened on August 13, 2018, Musk published the blogpost in Exhibit

7    53, titled "Update on Taking Tesla Private," on Tesla's website.

8    30.    On August 13, 2018, Tesla's stock price opened at $361.13 per share.

9    31.    On August 13, 2018, Tesla's stock price closed at $356.41 per share on volume of

10   over 10.4 million.

11   32.    On August 13, 2018, at 9:02 p.m. EDT, Musk tweeted:



20   33.    On August 14, 2018, Tesla's stock price opened at $358.45 per share.

21   34.    On August 14, 2018, Tesla's stock price closed at $347.64 per share.

22   35.    On August 15, 2018, Tesla's stock price opened at $341.91 per share.

23   36.    On August 15, 2018, Tesla's stock price closed at $338.69 per share.

24   37.    On August 16, 2018, Tesla's stock price opened at $339.91 per share.

25   38.    On August 16, 2018, Tesla's stock price closed at $335.45 per share.

26   39.    On August 17, 2018, Tesla's share price opened at $323.50 per share.

27   40.    On August 17, 2018, Tesla's stock price closed at $305.51 per share on volume of

28   over 18.9 million shares.

41.     On August 23, 2018, the Tesla Board held an in-person meeting.

42.     On August 24, 2018, Tesla's stock price opened at $320.70 per share.

43.     On August 24, 2018, Tesla's stock price closed at $322.82 per share.

44.     On August 24, 2018, Musk posted the following blogpost on Tesla's website:

Earlier this month, I announced that I was considering taking Tesla private. As part of the process, it was important to understand whether our current investors believed this would be a good strategic move and whether they would want to participate in a private Tesla.

Our investors are extremely important to me. Almost all have stuck with us from the time we went public in 2010 when we had no cars in production and only a vision of what we wanted to be. They believe strongly in our mission to advance sustainable energy and care deeply about our success.

I worked with Silver Lake, Goldman Sachs and Morgan Stanley, who have world-class expertise in these matters, to consider the many factors that would come into play in taking Tesla private, and to process all the incoming interest that we received from investors to fund a go-private transaction. I also spent considerable time listening to current shareholders, large and small, to understand what they think would be in the best long-term interests of Tesla.

Based on all the discussions that have taken place over the last couple of weeks and a thorough consideration of what is best for the company, a few things are clear to me:

1.  Given the feedback I've received, it's apparent that most of Tesla's existing shareholders believe we are better off as a public company. Additionally, a number of institutional shareholders have explained that they have internal compliance issues that limit how much they can invest in a private company. There is also no proven path for most retail investors to own shares if we were private. Although the majority of shareholders I spoke to said they would remain with Tesla if we went private, the sentiment, in a nutshell, was "please don't do this."

2.  I knew the process of going private would be challenging, but it's clear that it would be even more time-consuming and distracting than initially anticipated. This is a problem because we absolutely must stay focused on ramping Model 3 and becoming profitable. We will not achieve our mission of advancing sustainable energy unless we are also financially sustainable.

3.  That said, my belief that there is more than enough funding to take Tesla private was reinforced during this process.

After considering all of these factors, I met with Tesla's Board of Directors yesterday and let them know that I believe the better path is for Tesla to remain public. The Board indicated that they agree.

Moving forward, we will continue to focus on what matters most: building products that people love and that make a difference to the shared future of life on Earth. We've shown that we can make great sustainable energy products, and we now need to show that we can be sustainably profitable. With all the progress we've made on Model 3, we're positioned to do this, and that's what the team and I are going to be putting all of our efforts toward.

Thank you to all of our investors, customers and employees for the support you've given our company. I'm incredibly excited to continue leading Tesla as a public company. It is a privilege.

45.     On August 27, 2018, Tesla's stock price opened at $320.70 per share.

46.     On August 27, 2018, Tesla's stock price closed at $319.27 per share.

**Plaintiff's Statement of Disputed Factual Issues**

The following is a list of issues of fact that Plaintiff believes are contested and remain to be litigated at trial:

Count I: Section 10(b) and SEC Rule 10b-5(b) against Musk and Tesla.

Whether the statement made on August 7, 2018, "Am considering taking Tesla private at $420. Funding secured.", was material to Tesla investors during the Class Period.

Whether the statement made on August 7, 2018, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." was material to Tesla investors during the Class Period.

Whether the statement made on August 7, 2018, "Am considering taking Tesla private at $420. Funding secured.", was a statement made by Tesla.

Whether the statement made on August 7, 2018, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." was a statement made by Tesla.

Whether any false statement made by Tesla on August 7, 2018, was made with either knowledge of its falsity or with deliberate recklessness.

Whether some or all of the blogpost published on August 13, 2018, was false or misleading.

Whether the blogpost published on August 13, 2018, was a statement made by Tesla.

Whether the blogpost published on August 13, 2018, was material to Tesla investors during the Class Period.

Whether the blogpost published on August 13, 2018, was published by Musk with knowledge of its falsity or with deliberate recklessness.

Whether the blogpost published on August 13, 2018, was made by Tesla with knowledge of its falsity or with deliberate recklessness.

Whether any false or misleading statements made by Musk and/or Tesla on August 7 and/or 13, 2018, affected the price of Tesla's stock and other securities.

Whether Plaintiff's experts are correct that Tesla securities traded in an efficient market during the Class Period.

Whether any false or misleading statements made by Musk and/or Tesla on August 7 and/or 13, 2018, were a substantial factor in economic losses suffered by Plaintiff and Class members.

The amount of damages Plaintiff and Class members sustained caused by the false and/or misleading statements on August 7 and/or 13, 2018.

Count II: Section 20(a).

Whether the individual Defendants (excluding Musk) were control persons of Tesla during the Class Period.

Proportionate Liability.

The proportionate share of liability among the Defendants in accordance with 15 U.S.C. § 78u-4(f).

**Defendants' Statement of Disputed Factual Issues**

The following is a list of issues of fact that Defendants believe are contested and remain to be litigated at trial:

Count I: Section 10(b) and SEC Rule 10b-5(b) against Mr. Musk and Tesla.

1.      Whether the statement "[f]unding secured" in Mr. Musk's tweets on August 7, 2018 was materially false and misleading.

2.      Whether the statements in Mr. Musk's tweet on August 7, 2018 that "[i]nvestor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder

vote" were materially false and misleading, including in light of the contingencies disclosed by Mr. Musk and Tesla.

3.     Whether the alleged misstatements were material, including in light of the other information simultaneously disclosed, which was undisputedly true, and the fact that Tesla's stock price rose after further details were released in the August 13, 2018 blog post, among other evidence.

4.     Whether or not Mr. Musk acted knowingly or with deliberate recklessness in making a materially false misstatement.

5.     Whether the alleged misrepresentations directly and materially affected the market price of the stock in light of the other, undisputedly true information already available to the market, as well as whether Plaintiff can demonstrate reliance or whether Defendants have rebutted the fraud-on-the-market presumption.

6.     Whether the injury alleged by plaintiffs was the proximate, direct and reasonably foreseeable result of any of the alleged material misstatements.  This includes, among other things: (a) whether the alleged misstatements concealed a fact or a risk from the market that, when disclosed, caused the price of Tesla stock to change; (b) whether the alleged loss by the class was the direct result and foreseeable consequence of the alleged material misstatements; (c) whether the information allegedly omitted ultimately was disclosed to the market and that such corrective disclosure affected the value of Tesla's securities; (d) whether plaintiff has provided sufficient evidence to attribute a proportion of their losses to the disclosure of the allegedly omitted information, as opposed to other factors for which the plaintiffs cannot recover losses.

7.     The proper measure of actual damages, if any, including a measure of the value of the stock if there had been no material misstatement.

Count II: Section 20(a).

1.     Whether there was a primary violation of 10(b).

2.     Whether the Board of Director defendants were controlling persons of Tesla.  This includes, among other things, whether the Board of Director defendants directly or indirectly controlled Tesla and/or Mr. Musk's Twitter account.

3.     Whether the Board of Director defendants acted in good faith and without scienter.

**C.     DISPUTED LEGAL ISSUES**

**Plaintiff's Statement of Disputed Legal Issues**

The following is a list of legal issues that Plaintiff believes are contested and remain to be litigated at trial:

**1.     Whether Musk and Tesla's statements on August 7 and August 13, 2018 were "material" pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976).**

For the purposes of a 10b-5 claim, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988). This requirement is satisfied if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id*. The August 7, 2018 tweets and August 13, 2018 blogpost were both "material" under this standard for the reasons set forth by Plaintiff in his EARLY MIL #1 (ECF No. 448).

**2.     Whether Musk's and Tesla's statements on August 7 and 13, 2018 caused economic losses to Plaintiff and the Class.**

To establish a Section 10(b) violation, Plaintiff must also prove that Musk and Tesla's misrepresentations and omissions were the proximate cause of Plaintiff's economic loss . 15 U.S.C. § 78u-4(b)(4). In the Ninth Circuit, "loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 753 (9th Cir. 2018); *see also Dura*, 544 U.S. at 342 (Loss causation is simply "a causal connection between the material misrepresentation and the loss."). A market reaction to a partial or total corrective disclosure is just one of the "infinite variety" of "context-dependent" ways that a plaintiff may establish loss causation. *Lloyd*, 811 F.3d at 1210. Other ways include "materialization of the risk", *see In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1026-27 (9th Cir. 2005), and "leakage", *see Lloyd*, 811 F.3d at 1210.

A corrective disclosure can come from any source and does not have to be an admission of fraud by a defendant. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).  It may occur over time through a series of partial disclosures and other events. *Id*. Notably, the announcement or report of a government investigation may constitute a corrective disclosure. *Lloyd*, 811 F.3d at 1210. Further, a corrective disclosure may be based on information that is already publicly available where it presents "new information to the market that is not yet reflected in the company's stock price". *BofI*, 977 F.3d at 795. This may be the result of analysis of previously available technical information or the republication of existing public information with increased credibility or significance. *Gilead*, 536 F.3d at 1058 (stock price decline was caused by FDA warning letter published three months earlier when "the public failed to appreciate its significance"); *see also Public Employees' Retirement System v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (upholding plaintiff's loss causation theory where stock price declined following *Wall Street Journal* article, even though article was based on publicly available Medicare records). Finally, the corrective disclosure or disclosures do not have to be the ***sole*** reason for an investment's decline in value. "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *Daou*, 411 F.3d at 1025; *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027-28 (9th Cir. 1999) ("misrepresentation or omission must relate to that which caused the investment to lose value.").

Musk's tweets on August 7, 2018, prompted an immediate rise in the price of Tesla's stock and also affected the prices of other Tesla securities. The stock price declined during the course of the Class Period as further information was revealed about the going-private transaction and the circumstances of the August 7, 2018 tweets was disclosed by Musk, Tesla, and financial media and analysts. In addition, harm was realized by Tesla investors through the commencement and disclosure of government investigations into the August 7, 2018 tweets by, amongst others, the Unites States Securities & Exchange Commission. The stock price remained artificially inflated through the August 13, 2018, blog post and the price impact of the false and misleading statements by Musk and Tesla did not fully dissipate from the prices of Tesla stock and other securities until

August 17, 2018, following publication by *The New York Times* of an article titled "*Elon Musk Details 'Excruciating' Personal toll of Tesla Turmoil*".

### 3. The amount of damages Plaintiff and the Class can recover as a result of Musk's and Tesla's statements on August 7 and 13, 2018.

The typical calculation of actual damages under Section 10(b) and Section 20(a) is the out-of-pocket calculation, which is "is the difference between the fair value of all that the [plaintiff] [paid] and the fair value of what he would have [paid] had there been no fraudulent conduct."[1] *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) ("Damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions"), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005). This is not limited to the increase, if any, observed in a stock price immediately following a false or misleading statement, *see Goldman Sachs Grp. Inc. V. Ark. Teacher Ret. Sys.*, ___ U.S.___, 141 S.Ct. 1951, 1961 (2021); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015), and may include out-of-pocket losses realized from stock price declines attributable to regulatory and other litigation risk, reputational harm, and other collateral concerns that would not have materialized without the actionable fraud. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (approving damages methodology that provided plaintiffs with ability to recover losses caused by "concern[s] with lack of management honesty and control" and holding that "the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered, and the failure to disaggregate the action and fines did not preclude class certification."); *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 908-09 (S.D. Cal. 2019) (denying defendants' motion to exclude where plaintiffs' expert explained that revelation of alleged fraud resulted in stock drop because of harm to "corporate brand and corporate reputation," which "constitutes a structural change in value and demand for the company's products or services"); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 371–72 (S.D.N.Y. 2009)(denying summary

---

[1] The inverse is true for sales of securities at price deflated by a defendant's fraud.

judgment on loss causation and holding that losses from stock price declines following credit ratings downgrades and attributed to concerns about management were recoverable as a result of misrepresentations regarding corporation's liquidity).

Thus, while the out-of-pocket rule remains the ordinary standard in Rule 10b-5 cases, "it is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages". *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975); *see also in re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 350 (E.D. Pa. 2006)("Rule 10b-5 and the PSLRA do not endorse any economic theory or methodology that should be used to quantify/demonstrate economic loss.") Thus, it may be appropriate that some or none of any transactions by plaintiffs in the same security that resulted in a gain be offset against losses suffered as a result of the fraud. *See Cigna*, (rejecting any offsetting noting that "aggregation (*i.e.*, offsetting) undermines a major goal of the securities laws – namely, deterrence of fraud.") 459 F. Supp. 2d at 351 (gathering cases); *see also In re Vivendi Universal S.A. Sec. Litig.*, 284 F.R.D. 144, 159 (S.D.N.Y. 2012)(ordering partial offsetting). Consequential damages one-step removed from actual stock price declines, such as borrowing costs may also be recoverable in appropriate cases where it is proven "with reasonable certainty to have resulted from the fraud". *Ambassador Hotel*, 189 F.3d at 1030.

Plaintiff's proposed methodology for the calculation of the amount of damages incurred by purchasers and sellers of Tesla stock and other securities has been set forth in the expert reports of his expert: Dr. Michael Hartzmark, and is entirely consistent with Ninth Circuit and other authority discussed above.

**4.      Whether the individual defendants (other than Musk) are liable for Tesla's false and/or materially misleading statements as control-persons of Tesla.**

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), imposes liability on "every person who, directly or indirectly, controls any person liable" under Rule 10b-5. "Control person liability exists irrespective of the control person's scienter." *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 31874, at *45 (N.D. Cal. Feb. 27, 2018) (internal quotations omitted); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) ("[W]e hold that a plaintiff is not required to show 'culpable participation' to establish that a broker-dealer

was a controlling person . . . . The statute does not place such a burden on the plaintiff."). Thus, given the Board's ability and, indeed, responsibility to control Tesla and its public communications, the individual defendants (except for Musk) are liable control-persons.

**Defendants' Statement of Disputed Legal Issues**

The following is a list of legal issues that Defendants believe are contested and remain to be litigated at trial:

**1.     Whether Tesla and/or Mr. Musk made a materially false misstatement of fact.**

To establish a Section 10(b) violation, Plaintiff must prove that: (1) Tesla and/or Mr. Musk made a materially false or misleading statement; and (2) that the misstatement involved a material fact. *McGonigle v. Combs*, 968 F.2d 810, 817 (9th Cir. 1992) (Section 10(b) claim fails where allegedly misleading statement is not material).  A misstatement or omission concerning a security is material only if there is a substantial likelihood a reasonable investor would consider the fact important in deciding whether to buy or sell that security, *i.e.*, if a reasonable investor would have regarded what was not disclosed to him as having significantly altered the total mix of information he took into account in deciding whether to buy or sell the security.  *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996).  A statement is materially false only if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017).

**2.     Whether Tesla and/or Mr. Musk was the maker of such statement.**

To establish a Section 10(b) violation, Plaintiff must prove that Tesla (or Mr. Musk) was the *maker* of the alleged false or misleading statement, that is that Tesla and/or Mr. Musk was the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (where false statements included in mutual fund prospectuses were made by investment fund, investment adviser and parent capital group could not be held liable); *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 694 n.8 (9th Cir. 2011) ("maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it").

**3.**      **Whether Tesla and/or Mr. Musk acted with scienter, *i.e.* knowingly, in making the material misstatement or omission.**

To establish a Section 10(b) violation, Plaintiff must prove that Tesla and/or Mr. Musk acted with scienter as to a materially false statement. If Plaintiff proceeds on a knowledge theory, Plaintiff must prove that Tesla and/or Mr. Musk had actual knowledge that a statement was materially false or misleading, *i.e.*, that Tesla and/or Mr. Musk acted with "intent to deceive or defraud." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc*., 739 F.2d 1434, 1435 (9th Cir. 1984); *Robin v. Arthur Young & Co*., 915 F.2d 1120, 1126 (7th Cir. 1990) (scienter in Section 10(b) context means "intent to deceive, manipulate, or defraud").

**4.**      **If Plaintiff chooses to proceed on a recklessness theory of scienter, whether Tesla and or Mr. Musk acted with reckless disregard for the truth.**

To establish a Section 10(b) violation, Plaintiff must prove that Tesla and/or Mr. Musk acted with scienter as to a materially false statement. If Plaintiff proceeds on a recklessness theory on his Section 10(b) claims, Plaintiff must prove that Tesla and/or Mr. Musk acted with "deliberate or conscious recklessness" as to the material falsity of a misstatement. *In re Aspeon, Inc. Sec. Litig.*, 168 F. App'x 836, 838 (9th Cir. 2006); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (scienter satisfied by "a reckless omission of material facts").

**5.**      **Whether Plaintiffs justifiably relied on Tesla's material misstatements or omissions.**

To establish a Section 10(b) violation, Plaintiffs must prove that they relied on Tesla's and/or Mr. Musk's alleged materially false misstatements and that they were justified in doing so.  Plaintiffs do not have to prove that they individually relied on the alleged misrepresentations in deciding to purchase Tesla securities only if they meet the requirements for invoking a presumption that they relied on the integrity of the market price, otherwise known as the "fraud-on-the-market" presumption.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  In order to rely on the fraud-on-the-

market presumption, plaintiffs must prove that the alleged misrepresentations were publicly known, that the security traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 811 (2011). Plaintiffs must also prove the materiality of the alleged misrepresentations in order to rely on the fraud-on-the-market presumption. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) (describing materiality as "another fraud-on-the-market predicate").

### 6. Whether Defendants have rebutted the fraud-on-the-market presumption.

Tesla and/or Mr. Musk may rebut the fraud-on-the-market presumption by making any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the Plaintiffs, or their decision to trade at a fair market price. Any such showing will be sufficient to rebut the presumption of reliance. *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988) ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption reliance"); *Ganino v. Citizen Utils. Co.,* 228 F.3d 154, 167 (2d Cir. 2000) ("A defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known. However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.") (internal quotation marks and citations omitted); *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2405 (2014) ("We also held . . . that a defendant could rebut this presumption [that the price of stock traded in an efficient market reflects all public, material information] in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'").

1

2

**7.      Whether Plaintiff has proven loss causation as a result of Tesla's misstatements.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

To establish a Section 10(b) violation, Plaintiff must also prove that Tesla's acts and omissions were the proximate cause of the economic loss ("loss causation").  15 U.S.C. § 78u-4(b)(4).  To prove loss causation, Plaintiff must prove that Tesla's and/or Mr. Musk's alleged misstatements concealed a fact or a risk from the market that, when disclosed, caused the price of Tesla to change, and that the loss suffered by the class was either a direct result, or a foreseeable consequence of Tesla's misstatements.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-48 (2005); *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) ("[t]ypically, to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.") (quotation omitted). Plaintiff must "reasonably distinguish the impact of those risks [or facts] from other economic factors" that may have caused Tesla's stock to decline.  *Nuveen*, 730 F.3d at 1123; *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal. 2010) (Plaintiff must "separate the loss caused by the disclosure of corrective information (new, negative, company-specific, revealing a prior misrepresentation or omission) from loss caused by the disclosure of other company-specific information").

19

20

**8.      Whether the Board of Director Defendants directly or indirectly controlled Tesla and/or Mr. Musk.**

21

22

23

24

25

26

To establish a Section 20(a) violation as to the Board of Director Defendants, Plaintiff must prove that the Board of Director Defendants directly or indirectly controlled Tesla and/or Mr. Musk. To do so, Plaintiff must show that the Board of Director Defendants possessed the power to direct or cause the direction of the actions of Tesla or Mr. Musk.  *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1579 (9th Cir. 1990) (no control person liability where individual did not "exercise[] actual 'power and influence' over [Section 10(b) defendant's] actions").

27

28

**9.      Whether the Board of Director defendants acted in good faith and did not directly or indirectly induce the acts resulting in Tesla or Mr. Musk's liability, if any is found.**

If the Board of Director Defendants acted in good faith and did not directly or indirectly induce the acts resulting in Tesla or Mr. Musk's liability, then they are not liable under Section 20(a). 15 U.S.C. 78t(a); *see Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (no control person liability where defendants show they acted in good faith).  The Board of Director Defendants are "entitled to a good faith defense if [they] can show no scienter and an effective lack of participation." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

**10.      The measure of damages, if any.**

Claims under the Securities Exchange Act of 1934 are limited to "actual damages."  15 U.S.C. § 78bb(a)(1).  The typical calculation of actual damages under Section 10(b) and Section 20(a) is the out-of-pocket calculation, which is "is the difference between the fair value of all that the [plaintiff] [paid] and the fair value of what he would have [paid] had there been no fraudulent conduct." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) ("Damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions"), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005).

Thus, under the out-of-pocket rule, if a plaintiff establishes that a misleading statement or omission has artificially inflated the price of the security, he or she may recover the losses *directly attributable* to that artificial inflation (but not any losses caused by non-fraud related events).  *In re Imperial Credit Indus.*, 252 F. Supp. 2d at 1014–15 (C.D. Cal. 2003) ("A proper measure of damages in the securities context thus requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong") (citing *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1341–46 (9th Cir.1976)).  In addition, "it is appropriate to measure damages by netting the gains and losses from a Plaintiff's 'ongoing trading strategy,' and to find a Plaintiff

was not injured if the strategy netted a profit." *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 793 F. Supp. 2d 1138, 1143 (C.D. Cal. 2011).

> **11.     In what proportion Tesla, Mr. Musk, and the Board of Director Defendants are liable for any reckless liability found.**

If Plaintiffs proceed on a theory of recklessness, then there remains a dispute as to the percentage of responsibility of the Defendants as opposed to any other persons responsible for the losses suffered by Plaintiffs as a result of the Section 10(b) or Section 20(a) violation. If any person's actions and omissions did not proximately contribute to the loss incurred by Plaintiffs, then 0% responsibility should be assigned to that person. *In re WorldCom Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 335201, at *4-7 (S.D.N.Y. Feb. 14, 2005) (holding "all Exchange Act claims result in proportionate liability for all defendants," except where a defendant is specifically found to have "knowingly committed a violation of the securities laws") (citing 15 U.S.C. § 78u-4(f)(2)(A)).

**D.     ESTIMATE OF TRIAL TIME**

The Court allotted the parties 10 trial days. ECF No. 261. The parties anticipate using the entire allotted time for trial with the understanding that each trial day will begin at 8:30am and end at 2:00pm with 55 minutes of break-time (*i.e.*, 275 minutes/day of trial time). The parties estimate approximately 45 hours of total trial time and propose to divide it equally.

**E.     TRIAL ALTERNATIVES AND OPTIONS**

**Settlement Discussions.**

The parties engaged in one private mediation session but were unable to reach a resolution. On July 5, 2022, this case was referred to Magistrate Judge Donna M. Ryu for a settlement conference to be conducted under ADR Local Rule 7. The settlement conference is scheduled to take place on October 2, 2022.

**Consent to Trial Before a Magistrate Judge.**

The parties do not consent to a trial before a magistrate judge.

**Amendments or Dismissals.**

The parties do not seek any amendments or dismissals.

**Bifurcation or Separate Trial of Issues.**

The parties do not request bifurcation of trial. However, in the event that a verdict is returned in Plaintiff's favor on the class claims against one or more of the Defendants, there will likely need to be a post-trial process for determining the amount of any final judgment to be entered.  *See Vivendi*, 284 F.R.D. at 155-162 (discussing process for determining amount of final judgment); *Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 934–38 (N.D. Ill. 2010)(same). Plaintiff has already obtained through discovery a significant amount of price and other trading data relating to Tesla securities purchased and sold during the Class Period by Class members, and that data has been provided to Defendants. While this data was produced by non-parties too late to be incorporated into the Parties' expert reports and analyses, Plaintiff does anticipate that this data will assist in the calculation of overall class damages and allow any post trial proceedings to avoid being unduly lengthy or complex.  Defendants do not consent to this approach, particularly to the extent it is inconsistent with the time for expert disclosures, and otherwise reserve all rights with respect to appropriate post-trial procedures, if any.

## F.   APPENDICES AND EXHIBITS

Attached hereto are the following documents, as required by the Court's Civil Pretrial Instructions:

Exhibit A:   Plaintiff's and Defendants' Witness Lists

Exhibit B:   Plaintiff's and Defendants' Joint Exhibit Lists. The parties have submitted a joint exhibit list with their respective exhibits. The parties recognize there is substantial overlap of exhibits, and the parties will work cooperatively to make the list more streamlined and aim to do so before the final pre-trial conference.

Exhibit C:   Plaintiff's and Defendants' Joint Statement/Request for Evidentiary Rulings

Exhibit D:   Plaintiff's and Defendants' Deposition Designations, Counter-Designations, and Objections.

DATED:  September 20, 2022

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: 415-373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

 - and -

Elizabeth K. Tripodi (*admitted pro hac vice*)
Alexander A. Krot III (*admitted pro hac vice*)
**LEVI & KORSINSKY, LLP**
Email: nporritt@zlk.com
Email: etripodi@zlk.com
Email: akrot@zlk.com
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: 202-524-4290

- and -

Joseph Levi (*admitted pro hac vice*)
Eduard Korsinsky (*admitted pro hac vice*)
Nicholas I. Porritt (*admitted pro hac vice*)
**LEVI & KORSINSKY, LLP**
Email: jlevi@zlk.com
Email: ek@zlk.com
55 Broadway, 10th Floor
New York, NY 10006
Tel: 212-363-7500

*Attorneys for Plaintiff and Counsel for the Class*

September 20, 2022

**QUINN   EMANUEL   URQUHART   & SULLIVAN, LLP**

*/s/ Alex Spiro*
Alex Spiro (admitted *pro hac vice*)
Andrew J. Rossman (admitted *pro hac vice*)
Ellyde R. Thompson (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor

New York, New York 10010
Tel: 212-849-7000
Email: alexspiro@quinnemanuel.com
Email: andrewrossman@quinnemanuel.com
Email: ellydethompson@quinnemanuel.com

- and -

Michael T. Lifrak (SBN 21846)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90014-2543
Tel.: 213-443-3000
Email: michaellifrak@quinnemanuel.com

- and -

Kyle Batter (SBN 301803)
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel: 650-801-5000
Email: kylebatter@quinnemanual.com

*Attorneys for Defendants Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice*

## **FILER'S ATTESTATION**

Pursuant to Civil L. R. 5-1(h)(3), regarding signatures, I hereby attest that concurrence in the filing of the document has been obtained from all of the signatories above.

Dated: September 20, 2022          */s/ Adam M. Apton*
                                   Adam M. Apton