QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (*appearing pro hac vice*)
  alexspiro@quinnemanuel.com
  Andrew J. Rossman (*appearing pro hac vice*)
  andrewrossman@quinnemanuel.com
  Ellyde R. Thompson (*appearing pro hac vice*)
  ellydethompson@quinnemanuel.com
  Jesse Bernstein (*pro hac vice* forthcoming)
  jessebernstein@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

  Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendants Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**DEFENDANTS' TRIAL BRIEF** |
|---|---|

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

I.  KEY EVIDENCE................................................................................................................2

    A.  Evidence On Negotiations Concerning The Ability To Take Tesla Private ..............2

    B.  Evidence Concerning Mr. Musk's Discussion With Tesla's Board Concerning A Take-Private Transaction At $420 Per Share ....................................3

    C.  Evidence On The August 7 Statements About A Potential Go-Private Transaction ...................................................................................................................3

    D.  Evidence Concerning Mr. Musk's Discussions With Investors And Advisors Following The August 7 Tweets...................................................................4

    E.  Evidence On Mr. Musk's August Update To Shareholders And Board Meeting..........................................................................................................................5

    F.  Evidence Going To The Legal Elements Of Materiality And Scienter .....................6

II.  THEORY OF THE CASE....................................................................................................7

    A.  Plaintiff Will Not Be Able To Prove His 10(b) And 10b-5 Claim ............................7

        1.  Plaintiff Will Not Prove Any Material Misrepresentations Or Scienter................................................................................................................7

        2.  Plaintiff Will Not Be Able To Prove Loss Causation ................................10

    B.  Plaintiff Cannot Prove Damages ................................................................................11

    C.  Plaintiff Will Not Be Able To Prove His 20(A) Claim.............................................12

III.  CONTROLLING ISSUES OF LAW.................................................................................13

    A.  Legal Elements Of Falsity And Scienter...................................................................13

    B.  Reliance On The Fraud-On-The-Market Presumption............................................14

    C.  Disaggregation For Purposes Of Loss Causation.....................................................14

    D.  Good Faith Defense For Directors Under Section 20(a).........................................15

    E.  Apportionment Of Liability ........................................................................................15

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) .................................................................................................. 14

*Arthur Children's Trust v. Keim*,
  994 F.2d 1390 (9th Cir. 1993) .................................................................................. 13

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................ 7, 9, 14

*Burgess v. Premier Corp.*,
  727 F.2d 826 (9th Cir. 1984) .................................................................................... 13

*Curry v. Yelp Inc.*,
  875 F.3d 1219 (9th Cir. 2017) .................................................................................. 11

*Dura Pharma, Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................. 6, 10, 14, 15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) .................................................................................................... 9

*Gebhart v. S.E.C.*,
  595 F.3d 1034 (9th Cir. 2010) .................................................................................. 15

*GIA-GMI, LLC v. Michener*,
  No. C06-7949 SBA, 2007 WL 2070280 (N.D. Cal. July 16, 2007) .......................... 9

*Halliburton Co. v. Erica P. John Fund Inc.*,
  573 U.S. 258 (2014) .............................................................................................. 7, 14

*Hollinger v. Titan Cap. Corp.*,
  914 F.2d 1564 (9th Cir. 1990) .................................................................................. 13

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ................................................................... 7, 12, 13, 15

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) .................................................................................. 7, 14

*In re Energy Recovery Inc. Sec. Litig.*,
  No. 15-CV-00265-EMC, 2016 WL 324150 (N.D. Cal. Jan. 27, 2016) .................... 13

*In re Intrexon Corp. Sec. Litig.*,
  No. 16-CV-02398-RS, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017) .................. 10, 11

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) .................................................................................... 11

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .................................................................................... 8

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) .................................................................... 11

*In re Sci. Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010) .................................................................... 11

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ...................................................................................... 7

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) .................................................................................................. 12

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ................................................................................................. 15

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ......................................................................................... 10, 11

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) ....................................................................................... 10, 12

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ................................................................................................ 13

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ................................................................................................ 10

*Rok v. Identiv, Inc.*,
    No. 15-CV-5775-CRB, 2016 WL 4205684 (N.D. Cal. Aug. 10, 2016) ................................ 11

*Sgarlata v. PayPal Holdings, Inc.*,
    No. 17-CV-06956-EMC, 2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ............................. 13

*Special Situations Fund III QP, LP v. Brar*,
    No. 14-CV-04717-SC, 2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ................................. 12

*Tarapara v. K12 Inc.*,
    No. 16-CV-4069-PJH, 2017 WL 3727112 (N.D. Cal. Aug. 30, 2017) .................................. 8

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ............................................................................................................... 8

*United States v. Goyal*,
    629 F.3d 912 (9th Cir. 2010) .................................................................................................. 9

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................................................ 12

**Statutory Authorities**

Rule 10(a)-(b) ............................................................................................................................... 15
Rule 13(b)2-2 ............................................................................................................................... 10
15 U.S.C. § 78t ......................................................................................................................... 7, 12
15 U.S.C. § 78t(a) .................................................................................................................... 7, 13
15 U.S.C. § 78u-4(b)(4) ............................................................................................................... 10
15 U.S.C. § 78u-4(f) ................................................................................................................ 7, 15
15 U.S.C. § 78u-4(f)(3)(A)(iii) .................................................................................................... 16

**PRELIMINARY STATEMENT**

On August 7, 2018, Elon Musk conveyed the truthful message to the public that he was considering taking Tesla private at $420 per share. He followed this statement with details of the proposed funding for the transaction that the Court considered to be "literal[ly]" false. But those details were not materially false or materially misleading because they did not differ in any material way from the actual state of affairs, as evidenced by the market's own reaction to subsequent disclosures. Yet Plaintiff seeks billions of dollars in this case based on unprecedented theories of market impact and loss causation that are divorced from both the facts and the established case law.

As this Court has confirmed, Plaintiff must prove—and the jury must decide—that the challenged statements about the potential go-private transaction were materially false and misleading. To prove material falsity, Plaintiff must demonstrate that the statements about funding gave the impression of a state of affairs that differed in a material way from the one that actually existed. He cannot meet this burden in light of, among other things, (1) the actual content of Mr. Musk's statements and those of others (which indicated the remaining contingencies of the potential transaction), (2) Mr. Musk's conversations with the Saudi sovereign wealth fund (the "PIF"), and (3) the reports of multiple witnesses and numerous contemporaneous communications that the PIF's Managing Director indicated that it was committed to whatever funding (and structure) was necessary to take Tesla private. Similarly, Plaintiff will be unable to prove that Mr. Musk knew or recklessly disregarded that his statements were materially false, as needed to meet his burden on scienter.

Relatedly, Plaintiff will not be able to establish reliance through the fraud-on-the-market presumption. Plaintiff will be unable to prove that the statements the Court found to be literally false were material, as he is required to do to invoke the presumption. As Defendants will show at trial, any inaccurate statement regarding the status of funding did not move the market, given that Tesla's stock price *increased* after Mr. Musk subsequently gave further details on the steps remaining before any go-private transaction could occur. The increase in response to Mr. Musk's initial tweets was thus a reaction to his indisputably true statement that he was considering taking Tesla private at $420 per share and demonstrates that Mr. Musk's other statements in the tweets were immaterial to the market.

As to loss causation, the facts and the price movements of Tesla's securities, including those

discussed above, will demonstrate that Mr. Musk's statements were not the proximate cause of any economic loss. Among other things, Plaintiff must (a) isolate the inflation due to the alleged misrepresentations, (b) identify corrective disclosures of those alleged misrepresentations that resulted in statistically significant price declines, and (c) disaggregate confounding information. Plaintiff has not (and cannot) do any of that. And Plaintiff will not be able to establish damages with any reasonable certainty. His entire theory rests on a flawed model that fails to disaggregate increases in stock price caused by Mr. Musk's true statement that he was considering taking Tesla private from the allegedly false statements and relies on an unprecedented "leakage" theory seeking recovery for all declines in stock price—even those not caused by a corrective disclosure.

Finally, Plaintiff's claim against the members of Tesla's Board of Directors under Section 20(a) fails for the independent reason that Tesla's directors did not exercise "actual power or control" over Mr. Musk's alleged misstatements. In any event, they did not induce any violation and acted in good faith, that is, without knowledge or reckless disregard that any statement was materially false.

I. **KEY EVIDENCE**

    A. **Evidence On Negotiations Concerning The Ability To Take Tesla Private**

The PIF is Saudi Arabia's sovereign wealth fund, with $225 billion in assets as of August 2018. The PIF had tried to persuade Mr. Musk to take Tesla private for years. At multiple meetings between Mr. Musk and Yasir Al-Rumayyan, the PIF's Managing Director, Mr. Al-Rumayyan expressed a desire to fund a take-private transaction. For example, on March 7, 2017, Mr. Al-Rumayyan met Mr. Musk for dinner at Tesla's factory. At the dinner meeting, the group discussed an investment that would allow Tesla to go private. They also discussed the estimated $30-60 billion that would be needed. Mr. Al-Rumayyan expressed that the PIF could easily provide the necessary funding. Mr. Musk expressed interest in the potential transaction and conveyed that going private would enable Tesla to better focus on its long-term strategy.

A week before the August 7 tweets, Mr. Musk and Sam Teller, Mr. Musk's chief of staff, met with Mr. Al-Rumayyan and his colleagues at the Tesla factory. At that time, Mr. Al-Rumayyan informed Mr. Musk that the PIF had already invested billions of dollars in Tesla—acquiring roughly five percent of the company. Mr. Al-Rumayyan explained that "the only thing that was limiting them

-2-   Case No. 3:18-cv-04865-EMC
DEFENDANTS' TRIAL BRIEF

at 5 percent was the reporting requirement[,] [a]nd they wished to have a much larger stake and wanted to help Tesla go private." Mr. Al-Rumayyan reiterated that "he had wanted to do so from the very beginning," since their first meeting in January 2017. Mr. Al-Rumayyan stated: "I am the decision maker. So long as the Crown Prince supports me, and he does, that's it. It's done." Mr. Al-Rumayyan emphasized that Mr. Musk should "let us know how you want to do this. We want to do this." Mr. Musk understood based on these conversations that, if he wanted to take Tesla private, the PIF would do it. Other witnesses confirm Mr. Musk's account of the discussions.

**B.   Evidence Concerning Mr. Musk's Discussion With Tesla's Board Concerning A Take-Private Transaction At $420 Per Share**

On August 2, 2018, Mr. Musk emailed Tesla's Board after the close of trading and proposed to take Tesla private for $420 per share. He arrived at the price by adding a 20 percent premium to the stock price and rounding up from $419. He expressed his "firm belief that Tesla can operate more effectively as a private company for the next several years." That evening, the Board held a meeting (without Mr. Musk) where Tesla's CFO, Deepak Ahuja, briefed the Board on the PIF's proposal to fund a take-private transaction. The Board held another meeting on August 3, this time including Mr. Musk. Mr. Musk explained that the PIF was willing to fund the transaction. The Board agreed that Mr. Musk should reach out to large investors to see if they would remain in a private Tesla. Mr. Musk believed that, to avoid selective disclosure, there would need to be a public disclosure first.

In early August 2018, Mr. Musk met with prospective legal counsel who could assist with a take-private transaction. On August 6, Mr. Musk also spoke with Egon Durban of Silver Lake regarding the transaction. Mr. Musk told Mr. Durban that the PIF wanted to take Tesla private, but he would prefer to have a broader investor base.

**C.   Evidence On The August 7 Statements About A Potential Go-Private Transaction**

On August 7 at 9:18 a.m., the *Financial Times* reported that the PIF had acquired a $2 billion stake in Tesla. Mr. Musk was worried that whoever had leaked the investment would also leak the PIF's interest in taking Tesla private and that such a leak might include inaccurate information that could cause confusion in the market. Mr. Musk felt obligated to disclose his consideration of a potential take-private transaction to create "a fair playing field," where "[p]eople can make their own

assessment about whether there would be a take private at a premium or not" and decided that the best way to gauge investors' interest in his proposal was to make a public announcement. Thirty minutes after the *Financial Times* report, Mr. Musk tweeted: "Am considering taking Tesla private at $420. Funding secured." Some investors interpreted "funding secured" as "a strong verbal commitment, with funds available and parties willing to execute quickly." (Ex. 33) Others, including the class representative and an investor witness whom Plaintiff has designated for trial, understood "funding secured" to mean that somebody "was willing to write a check…Money was there, funding was certain" (Littleton Dep. 120:11-19) or that a buyer "expressed a strong interest" and that Mr. Musk confirmed the buyer "had the financial means" to take Tesla private. (Fries Dep. 65:1-8; 63:9-24.)

Later that day, Mr. Musk sent Tesla's employees an email, a copy of which was then posted on Tesla's blog, entitled "Taking Tesla Private." In it, Mr. Musk reiterated, "I'm considering taking Tesla private at a price of $420/share," and went on to explain why. He added, "a final decision has not yet been made," and the proposal "would ultimately be finalized through a vote of our shareholders." He linked to this post on his Twitter account, including a short cover note: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on shareholder vote." The next morning, Tesla's Board announced that Mr. Musk had opened a discussion about taking Tesla private, and that it was "taking the appropriate next steps to evaluate this."

**D.  Evidence Concerning Mr. Musk's Discussions With Investors And Advisors Following The August 7 Tweets**

Over the next several days, and consistent with his belief that existing shareholders should have a say, Mr. Musk spoke with several institutional investors. While Mr. Musk initially believed that most institutional shareholders would want Tesla to go private, he eventually learned that they were, on average, "lukewarm" about the idea.

At the same time, Mr. Musk continued his discussions with Mr. Al-Rumayyan. On August 10, Mr. Al-Rumayyan told Mr. Musk for the first time that the transaction would have to be approved by certain committees within the PIF. Mr. Musk was surprised; Mr. Al-Rumayyan told Mr. Musk at the July 31 meeting that he was the PIF's decision-maker and had the support of the Crown Prince. Mr. Musk conveyed to Mr. Al-Rumayyan that this was not what he understood from the July 31 meeting.

Mr. Al-Rumayyan apologized for the misunderstanding and reiterated that he was "unequivocal" about his desire to invest in Tesla. Also on August 10, Mr. Musk met with Mr. Durban to discuss the take-private transaction. The next day, Mr. Musk told the Board that he had engaged Mr. Durban to lead the deal team, had hired deal counsel, and was considering retaining a second law firm. Mr. Musk also met with Goldman Sachs about a go-private transaction. Both Goldman Sachs and Silver Lake identified a number of potential investors, independent of the PIF, interested in taking Tesla private and confirmed there was sufficient capital to fund such a transaction.

In the days following the "funding secured" tweet, and after news outlets began to question the PIF's level of involvement in the potential transaction, Mr. Musk communicated with Mr. Al-Rumayyan to confirm that the PIF had committed to fund Tesla to go private. Mr. Musk's non-public statements to Mr. Al-Rumayyan demonstrate his belief that funding *was* secured as a practical matter after their meeting. For example, on August 10, Mr. Musk wrote Mr. Al-Rumayyan, "when we met at Tesla recently, you said that you were the decision-maker for PIF, that you had wanted to do the Tesla take-private deal for two years, and that this was supported directly by the Crown Prince. I checked with my team who were in that meeting in case I remembered something wrong and they confirmed this exactly." Mr. Al-Rumayyan responded that he would "work on [a] PIF statement" to fix the incorrect public perception that the PIF was not working on a go-private a deal with Tesla.

E. **Evidence On Mr. Musk's August Update To Shareholders And Board Meeting**

Before the markets opened on August 13, Mr. Musk posted an "Update on Taking Tesla Private" on Tesla's blog. The post included additional details regarding Mr. Musk's funding discussions with the PIF and the various actions that would need to be completed before the transaction could move forward. Mr. Musk explained why he said "funding secured" in his August 7 tweet. Mr. Musk noted that he had "engaged advisors to investigate a range of potential structures and options" to get to a "more precise understanding" on how many shareholders might remain if Tesla became private. The market did not view this information as revelatory—Tesla's stock price barely moved at all, **and in fact rose slightly** from the prior day's close.

Mr. Musk learned through his discussions with existing investors that many wanted Tesla to remain public. For some institutional investors, it would have been much harder for them to maintain

stock in a private Tesla than Mr. Musk had anticipated. Mr. Musk also came to learn, contrary to his understanding on August 7, that he may not be able to structure the transaction in a way that allowed all existing retail shareholders to remain. In light of these considerations, Mr. Musk announced at the August 23 Board meeting that he had decided not to move forward with a take-private transaction. Mr. Musk explained his decision to shareholders in a blog post the next day.

### F. Evidence Going To The Legal Elements Of Materiality And Scienter

On April 1, 2022, the Court granted partial summary judgment, finding that the statements "Funding secured," "Investor support is confirmed," and "Only reason why this is not certain is that it's contingent on a shareholder vote," were literally false and/or misleading and that Musk had knowledge of the underlying facts when he made them. (Dkt. No. 387.)

However, as the Court made clear at a June 16, 2022 hearing, its holding was limited to finding that the challenged statements were "false statement[s]…in a literal sense, not in a legal sense." (6/16/22 Hr'ing Tr. at 4:14-23.) The Court made the same finding as to scienter. (*Id.* ("[A]nd similarly with scienter, no reasonable juror could find that Mr. Musk did not know or didn't act in disregard to the inaccuracy—the factual inaccuracy, not the legal.")). To avoid any doubt, the Court stated "[t]o be clear, I did not find materiality with respect to the misrepresentation or a reckless disregard or knowingly scienter with regard to any such material representation." (*Id.* at 5:4-8.)

It thus remains up to Plaintiff to prove and the jury to resolve if the statements were "materially false" and made with scienter as to their "material falsity." *See Dura Pharma, Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (plaintiff must prove defendant made a "material misrepresentation (or omission)"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (scienter satisfied by "a reckless omission of material facts"). Additionally, the jury must make specific determinations regarding Mr. Musk and the Tesla directors' states of mind. To determine whether the directors acted in "good faith" and are absolved of Section 20(a) control person liability, the jury must decide whether they acted with scienter. 15 U.S.C. § 78t(a); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). And the jury also must determine whether Mr. Musk or any other Defendant violated securities laws either "knowingly" *or* "reckless[ly]" to apportion liability, which again requires the evaluation of state of mind evidence. 15 U.S.C. § 78u-4(f).

The Tesla directors, at the time Plaintiff alleges they "adopted" the tweets, understood, based on the information they had, that Mr. Musk's statements meant that funding for a go-private transaction was available. Mr. Musk also understood, as Mr. Teller testified, that Mr. Al-Rumayyan was the decision maker for the PIF and that, based on Mr. Al-Ramayyan's representations, the PIF was committed to taking Tesla private and would provide the necessary funding.

## II.  THEORY OF THE CASE

### A.  Plaintiff Will Not Be Able To Prove His 10(b) And 10b-5 Claim

To prevail on a claim under Section 10(b) or Rule 10b–5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (emphasis added, quotations omitted). Plaintiff will not prove the required elements.

#### 1.  Plaintiff Will Not Prove Any Material Misrepresentations Or Scienter

A misstatement concerning a security is material only if there is a substantial likelihood a reasonable investor would consider the fact important in deciding whether to buy or sell that security. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996). A statement is not materially false unless it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exist[s]." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017); *Tarapara v. K12 Inc.*, No. 16-CV-4069-PJH, 2017 WL 3727112, at *15 (N.D. Cal. Aug. 30, 2017) (same).

Mr. Musk's August 7 statement that he was "considering taking Tesla private at $420 [per share]" is undisputedly true, and his statements that "[f]unding [was] secured," as well as his related statements that followed, were not materially false. Among other things: (1) The PIF approached Mr. Musk in 2016 to discuss investing in Tesla; (2) Mr. Al-Rumayyan, on behalf of the PIF, met with Mr. Musk throughout 2017 to discuss taking Tesla private; (3) Mr. Al-Rumayyan met with Mr. Musk on July 31, 2018 and told Mr. Musk that the PIF had just invested billions of dollars in Tesla to communicate its seriousness, that the PIF continued to want to take Tesla private and would take

1  whatever steps necessary to achieve that outcome, and that Mr. Al-Rumayyan had carte blanche
2  authority from the Crown Prince of Saudi Arabia to devote the capital necessary to do so; (4) Mr.
3  Musk and other Tesla executives present at the meeting reasonably understood Mr. Al-Rumayyan and
4  the PIF to be committing whatever funding was necessary to complete the go-private transaction; and
5  (5) Mr. Musk confirmed his understanding that funding was secured in numerous communications
6  with Mr. Al-Rumayyan.

7  Mr. Musk's August 7 statement that "Investor support is confirmed.  Only reason why this is
8  not certain is that it's contingent on a shareholder vote" is likewise not materially false and was made
9  with additional context that Plaintiff attempts to ignore.  Specifically, Mr. Musk publicly disclosed
10 other "contingencies" in a Tesla blog post linked to his August 7 tweet, which stated clearly that he
11 was "*considering* taking Tesla private," and that "[t]his *proposal* to go private would ultimately *be*
12 *finalized* through a vote of [Tesla's] shareholders."

13 Plaintiff will not be able to prove to a jury that the statements were materially false—that the
14 difference between what Mr. Musk stated and the actual state of affairs would be important to a
15 reasonable investor's decision to buy or sell Tesla securities.  *See TSC Indus., Inc. v. Northway, Inc.*,
16 426 U.S. 438, 449 (1976).  The key piece of information in the tweets was true—Mr. Musk was
17 considering taking Tesla private at $420 per share.  The other information communicated, even if
18 "literally false" as the Court found, was not so different from the actual state of affairs to be important
19 to a shareholder's decision.  While Mr. Musk may not have had a binding commitment to finance the
20 transaction in hand, he did have representations from the purported decisionmaker of one of the
21 largest sovereign wealth funds that he would do all that was necessary to take Tesla private.

22 Defendants' position that the statements were not materially false is not based on mere
23 argument or speculation; it is supported by hard evidence.  The market's reaction to Mr. Musk's
24 purported corrective disclosure on August 13, 2018 shows that investors did not view the August 7
25 tweets as materially false.[1]  Tesla's blog post on August 13 provided additional details regarding the
26
27    [1] It is undisputed that Mr. Musk was considering taking Tesla private at $420 per share, and
28 Plaintiff has not attempted to disaggregate Tesla's stock price reaction to Mr. Musk's August 7

-8-  
Case No. 3:18-cv-04865-EMC  
DEFENDANTS' TRIAL BRIEF

various actions that would need to be completed before the transaction was finalized, including "a final proposal," "an appropriate evaluation process" by Tesla's special committee, "required regulatory approvals," and ultimately that "the plan [would] be presented to Tesla shareholders for a vote." Tesla's stock price closed *up* on August 13 from the prior day's close (increasing from $355.49 to $356.41) after Mr. Musk disclosed these additional "contingencies," so Plaintiff cannot argue that stockholders were harmed by Mr. Musk's initial tweets on August 7, or that stockholders viewed Mr. Musk's additional disclosure of information as material. Had investors been materially misled by Mr. Musk's August 7 tweets, Tesla's stock price would have dropped by a statistically significant amount on August 13 after Mr. Musk's published undisputedly true statements about the contingencies that remained in taking Tesla private. Instead, the stock price went up.[2]

As to scienter, Plaintiff must prove that Mr. Musk "knew that a statement was materially false or misleading" or acted with deliberate recklessness as to its material falsity. *GIA-GMI, LLC v. Michener*, No. C06-7949 SBA, 2007 WL 2070280, at *9 (N.D. Cal. July 16, 2007); *cf. United States v. Goyal*, 629 F.3d 912, 917 (9th Cir. 2010) (requiring proof that statements "were materially false or misleading, and that [defendant] knew that" to establish "knowingly" element of Rule 13(b)2-2). Defendants will be able to show Mr. Musk had no such state of mind. The context demonstrates that Mr. Musk did not believe the challenged statements were materially false. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999) (failure to allege "that defendants' statements were [materially] false . . . obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making statements").

---

statement on that score from any putative stock price reaction to Mr. Musk's other statements on that day. Plaintiff will not be able to prove at trial that the alleged misrepresentations directly and materially affected the market price of Tesla's stock in light of this undisputedly true information.

[2] For the same reasons, Plaintiff cannot prove reliance. In order to trigger the "fraud-on-the-market" presumption, Plaintiff must also prove that the alleged misrepresentations were material. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011). And even if he were able to prove materiality, the Defendants will be able to rebut the presumption by proving, as demonstrated by the market reaction to the August 13 corrective disclosure, that the statements regarding funding—as opposed to those announcing the intention to go-private—did not affect the market price of Tesla securities. *See Basic*, 485 U.S. at 248-49; *see also* Dkt. No. 387 at 32.

2.     Plaintiff Will Not Be Able To Prove Loss Causation

To establish a Section 10(b) violation, Plaintiff must also prove that Tesla's acts and omissions were the proximate cause of economic loss ("loss causation"). 15 U.S.C. § 78u-4(b)(4). To do so, Plaintiff must prove that Mr. Musk's alleged misstatements concealed a fact or a risk from the market that, when disclosed, caused the price of Tesla securities to fall, and that the loss suffered was either a direct result, or a foreseeable consequence of Mr. Musk's misstatements or omissions. *See Dura Pharma*, 544 U.S. at 342-48; *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013).

As to the August 7 statements, Plaintiffs will not be able to show that any disclosed information revealed a purported misrepresentation and caused Tesla's stock price to drop. While the stock price declined on August 8 and 9 (Compl. ¶¶ 191, 192), Plaintiff does not tie those drops to a "corrective disclosure." The only identified disclosure on August 8 was a press release noting the Board was in discussion with Mr. Musk about his possible interest in taking Tesla private. Nothing in that statement is alleged to be inconsistent with Mr. Musk's statements; Plaintiff merely notes that the independent directors "did not state that funding . . . had been 'secured.'" But *silence* on funding is not a "revelation of fraudulent activity." *See Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014); *see also In re Intrexon Corp. Sec. Litig.*, No. 16-CV-02398-RS, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017) (disclosures did not "reveal . . . something previously hidden or actively concealed").

Plaintiff also suggests Tesla's stock price dropped on August 9 following a report that the SEC had asked for information regarding Mr. Musk's August 7 statements. But the mere "announcement of an investigation [by the SEC] does not 'reveal' fraudulent practices to the market," and "without more, is insufficient to establish loss causation." *See Loos*, 762 F.3d at 890; *see also Curry v. Yelp Inc.*, 875 F.3d 1219, 1225-26 (9th Cir. 2017).

As for Mr. Musk's August 13 blog post (Compl. ¶ 193), it only underscores the inability to prove loss causation. There, Mr. Musk directly addressed the issues purportedly misrepresented on August 7. Thus, even if Plaintiff could show investors were misled on August 7, any misperceptions were removed—and the "truth" was revealed—by August 13. But critically, **Tesla's stock price did**

*not fall* in response; instead, the price *rose* from the prior day's close. As a result, the August 13 blog post (and market reaction) preclude Plaintiff from establishing loss causation. *See Rok v. Identiv, Inc.*, No. 15-CV-5775-CRB, 2016 WL 4205684, at *3-4 (N.D. Cal. Aug. 10, 2016) (no loss causation where stock did not decline after alleged corrective disclosure).

Nor will Plaintiff be able to prove that any post-August 13 drop in Tesla's stock price was caused by the disclosure of any *new* information correcting Mr. Musk's purported misstatements. The information contained in the August 16 *New York Times* article summarizing an interview with Mr. Musk was not new but rather a "negative journalistic characterization of" facts "previously disclosed" in the August 13 blog post. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *7 ("The mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."). The decline in share price following the publication of the article is attributable not to its repetition of facts already in the public record, but the article's discussion of Mr. Musk's health and description of his purported demeanor during the interview.

### B. Plaintiff Cannot Prove Damages

As detailed in Defendants' Motion *In Limine* No. 2, which is under submission with the Court, Plaintiff's entire damages theory rests on an unreliable and unprecedented so-called "leakage" model. (Dkt. No. 451.) Tesla's stock price rose $23 in the day of the challenged tweets then steadily decreased during the class period (but did rise slightly on August 13). Yet, Plaintiff does not even attempt to disaggregate the impact of the allegedly misleading statements on that $23 price increase from the impact of the undisputedly true fact that Mr. Musk was considering taking Tesla private at $420 per share. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379 (N.D. Ga. 2010) (model must separate effect of fraud from truthful statements). Moreover, Plaintiff seeks not just the $23 per share in alleged inflation, but also $40 additional per share in alleged "consequential harm." Thus, approximately two-thirds of the damages Plaintiff seeks are these "consequential effects" that do not reflect investors overpaying for a stock because the investors were misled, but rather reflect stock price declines that Plaintiff attributes to subsequent events such as regulatory actions. This approach

has been rejected by the Ninth Circuit, *Nuveen,* 730 F.3d at 1123, and would likely be rejected by the jury if the Court even allows it to be presented.

### C. Plaintiff Will Not Be Able To Prove His 20(A) Claim

Section 20(a) of the '34 Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t. To prevail under Section 20(a), "a plaintiff must prove: (1) a primary violation of federal securities laws . . . and (2) that the defendant exercised actual power or control over the primary violator." *Howard*, 228 F.3d at 1065. Plaintiff asserts a Section 20(a) claim against members of Tesla's Board of Directors. (Compl. ¶¶ 214-220.)

As noted in Section I, Plaintiff's underlying Section 10(b)/Rule 10b-5 claim fails for a number of independent reasons. Thus, unable to establish an underlying violation, Plaintiff's Section 20(a) claim fails too. *See, e.g.*, *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993) ("[I]n light of our conclusion that no violation of the '34 Act has been stated, the § 20A claim was properly dismissed."); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

Even if Plaintiff could establish an underlying violation of Section 10(b)/Rule 10b-5 (he cannot), his claim under Section 20(a) fails for the independent reason that Tesla's board members did not exercise "actual power or control" over Mr. Musk's alleged misstatements. *Howard*, 228 F.3d at 1065. Bare conclusions of power and control do not suffice. *Special Situations Fund III QP, LP v. Brar*, No. 14-CV-04717-SC, 2015 WL 1393539, at *10 (N.D. Cal. Mar. 26, 2015) (no control person claim). Nor is status as a director sufficient. *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993). *Specific facts* showing the defendant's exercise of actual power or control are required. *Sgarlata v. PayPal Holdings, Inc.*, No. 17-CV-06956-EMC, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018) (no control person claim).

Plaintiff has not adduced any evidence showing the directors' control over the tweets. This is far from surprising. Mr. Musk was not speaking *for Tesla* when he tweeted; he was speaking *as*

*Tesla's counterparty.* Where no statement *by the Company* is at issue, there is no predicate corporate action on which to premise Section 20(a) liability. *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1161-64 (9th Cir. 1996); *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984).

Plaintiff's own theory undermines his control person claim. Plaintiff expressly alleges that "no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it" (Compl. ¶¶ 6, 112) and that Mr. Musk "did not discuss the content of his August 7, 2018 tweets with anyone else prior to publishing them." (*Id.* ¶ 166.) Those positions and allegations dispose of any claim that the directors "directed or exercised control over [Mr. Musk] who allegedly made the false and misleading statements." *In re Energy Recovery Inc. Sec. Litig.*, No. 15-CV-00265-EMC, 2016 WL 324150, at *26 (N.D. Cal. Jan. 27, 2016) (Chen, J.). Further, the director defendants have acted in good faith and without knowledge or reckless disregard of the tweets' alleged material falsity, and therefore are not liable under Section 20(a). 15 U.S.C. § 78t(a); *see Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (no control person liability where defendants show they acted in good faith); *Howard*, 228 F.3d at 1065 (good faith is shown through a lack of scienter). In addition to not viewing the tweets before their publication, the directors will testify that they had a good faith belief that the tweets were accurate based on the information available to them. Accordingly, Plaintiff's claim under Section 20(a) fails.

### III.   CONTROLLING ISSUES OF LAW

#### A.   Legal Elements Of Falsity And Scienter

The Court did not determine on summary judgment that Plaintiff proved the elements of material falsity or scienter, but rather only that Plaintiff proved the statements at issue were "literal[ly] false" and that Mr. Musk acted in reckless disregard to their "factual inaccuracy." Despite the Court's clarification, Plaintiff has attempted on multiple occasions, in motions *in limine* and jury instructions, to remove from the jury its duty to determine if the statements were "materially false" or made with either knowledge or reckless disregard to their "material falsity." *See e.g., Dura Pharma,* 544 U.S. at 341; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 701. In light of Plaintiff's erroneous view of the issues before the jury, Defendants expect this Court may need to issue rulings confirming that the legal

elements of material falsity and scienter are for the jury to resolve, including in connection with motions *in limine*, objections, and the jury instructions.

### B.     Reliance On The Fraud-On-The-Market Presumption

Plaintiff seeks to prove reliance through the rebuttable fraud-on-the-market presumption. This is a two-step analysis.  First, Plaintiff must prove that the presumption applies by establishing "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund Inc.*, 573 U.S. 258, 277-78 (2014) (*Halliburton II*). As this Court has recognized, materiality (which in the reliance analysis is "directed at price impact—whether the alleged misrepresentations affected the market price in the first place") is an essential predicate of the fraud-on-the-market theory. *See id.* at 278; *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 466-67 (2013); Dkt. No. 387 at 30-31.

This presumption may be rebutted by showing that Plaintiff bought or sold Tesla securities "without relying on the integrity of the market," *Basic*, 485 U.S. at 249, or that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Haliburton II*, 573 U.S. at 279-80 (*citing Basic*, 485 U.S. at 248).  Fraud-on-the-market reliance is only presumed for the period of time between when the "misrepresentations were made and when the truth was revealed." *Haliburton II*, 573 U.S. at 267-68; *Basic*, 485 U.S. at 248-49 (because "news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud.").

In light of the disclosures in the August 13 blog post, Defendants expect this Court may need to issue rulings confirming that, to maintain the presumption of reliance for the entire class period, Plaintiff must show not only materiality but also that the market did not already have the information necessary to assess the accuracy of the claimed misstatements.

### C.     Disaggregation For Purposes Of Loss Causation

To prove loss causation, Plaintiff must establish the existence of a concealed piece of information that inflates the price of a security that, when revealed to be false, causes the price of the

security to decline in a significant manner.  *Dura Pharma*, 544 U.S. at 347; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) ("[T]o establish loss causation, a plaintiff must allege . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.").

In light of Plaintiff's calculation of alleged damages, which does not distinguish between the alleged misstatements at issue and any true statements or other market-moving information, the Court should ensure the jury follows the law in this regard.

### D. Good Faith Defense For Directors Under Section 20(a)

Plaintiff has asserted a Section 20(a) claim against Tesla's directors, which is subject to the defense of good faith.  "A defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Howard*, 228 F.3d at 1065.  Evidence of the Tesla directors' states of mind is relevant to their defense to Section 20(a).  *See id.*; *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010) ("Scienter, however, is a subjective inquiry. It turns on the defendant's actual state of mind.").  Defendants anticipate the Court may be called to rule upon issues that bear upon the directors' good faith defense and the ability of the directors to give evidence relevant to scienter, including state-of-mind testimony.

### E. Apportionment Of Liability

Defendants who "the trier of fact specifically determines…knowingly committed a violation of the securities laws" are jointly and severally liable for all damages, whereas those who merely engaged in "reckless conduct" are liable proportionate to the percentage of their responsibility.  15 U.S.C. §§ 78u-4(f); 10(a)-(b) (defining "knowingly"). The jury must therefore assess whether each defendant engaged in a knowing or reckless violation in this case.  *See* 15 U.S.C. §§ 78u-4(f)(3)(A)(iii) (jury shall answer special interrogatories concerning "whether such person knowingly committed a violation of the securities laws").  Here, the Court should ensure that the jury applies the correct legal standard, and is permitted to hear the necessary evidence, for apportioning liability.

| | | |
|---|---|---|
| 1 | DATED:  October 4, 2022 | Respectfully submitted, |
| 2 | | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 3 | | |
| 4 | | By: */s/ Alex Spiro* |
| 5 | | Alex Spiro *(appearing pro hac vice)* |
| | | *Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,* |
| 6 | | *Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,* |
| | | *James Murdoch, Kimbal Musk, and Linda Johnson Rice* |