**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
   amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC |
|---|---|
| | **PLAINTIFF'S TRIAL BRIEF** |

## I. INTRODUCTION.

Plaintiff's theory of the case is straightforward. On August 7, 2018, at 12:48 p.m. EDT, Defendant Elon Musk, Chairman and Chief Executive Officer of Tesla, Inc., tweeted the following message to over 22 million followers: "Am considering taking Tesla private at $420. Funding secured." Musk made additional, subsequent tweets about the potential transaction including: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." As the Court has already found, these tweets were false and Musk was deliberately reckless about their falsity when he made those statements. Furthermore, those tweets were material to Tesla investors as shown by the stock price reaction following their publication as well as the intense investor, media, and analyst discussion and analysis that followed. While some market participants expressed skepticism about Musk's tweets, many also accepted them as accurate and truthful as seen by the increase in Tesla's stock price towards the announced deal price of $420 as well as the movement in prices of Tesla stock options and bonds which also reflected an expectation of a going-private transaction at $420 per share.

On August 13, 2018, Tesla published a blogpost by Musk titled "Update on Taking Tesla Private". This blogpost failed to disclose material information regarding the proposed going-private transaction especially regarding the level of investor support and the status of negotiations for funding between Musk and the Saudi Arabia Public Investment Fund. Like his August 7, 2018 tweets, Musk was aware of the information he deliberately omitted from his blogpost. Analysts treated the blogpost as confirmation of the accuracy of Musk's August 7, 2018 tweets and Tesla's stock, option, and bond prices continued to reflect the probability of Tesla going private at $420 per share.

On August 16, 2018, *The New York Times* published a lengthy article based on an interview with Musk. The article discussed the circumstances of the August 7, 2018 tweets at length, including noting that funding had not been secured by August 7, 2018, as well as other previously-reported aspects of Tesla's business and Musk's circumstances. Following the publication of this article, the price of Tesla stock declined significantly. Even though Musk and Tesla were still exploring a possible going-private transaction, analysts began revising their price

targets to remove any impact from a possible going-private transaction and prices of Tesla stock options stopped reflecting any likelihood of a going-private transaction at $420 per share. On August 24, 2018, Musk and Tesla announced they were no longer considering a going-private transaction. Tesla's stock price did not react significantly.

As a result of the turmoil in the prices for Tesla stock, options, and bonds caused by Musk and Tesla's statements, investors lost billions of dollars from August 7, 2018 to August 17, 2018. These damages include losses resulting from the effect on the prices of Tesla securities immediately following the August 7, 2018 tweets, that was then corrected from August 8, 2018 to August 17, 2018 as the falsity of the tweets was realized by investors. The damages also include losses suffered by the impact on the prices of Tesla securities resulting from the direct consequences of Musk and Tesla's false statements such as increased litigation and regulatory risk, exposure of serious flaws in Tesla's corporate governance, etc., again realized over the course of the class period as the falsity of their representations was appreciated by the market. Absent Musk and Tesla's fraudulent statements, these losses would not have been suffered by Tesla investors.

Plaintiff alleges that Musk and Tesla violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b). Plaintiff further alleges that Tesla's Board of Directors are liable pursuant to Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), as "control persons" of Tesla.

## II. SUMMARY OF KEY EVIDENCE.

The Court has already determined that Musk's August 7, 2018 tweets contain misrepresentations and were made by Musk with scienter. Key evidence on the remaining issues for the jury[1] is summarized below:

### A. Background.

Tesla had previously identified Musk's twitter account as a duly authorized channel for corporate communications. Ex. 103. Following controversy in July 2018 regarding Musk's exchange of tweets with Vernon Unsworth, a British diver based in Thailand, that had led to a

---

[1] The remaining issues are set forth in the Joint Pretrial Statement (ECF No. 474) at 10-11.

decline in Tesla's stock price, investors asked Musk to stop or reduce his tweeting. Exs. 39-40, 140, 329. Despite awareness of this issue, Tesla's Board of Directors put in place no controls over Musk's tweets such as requiring prior review by Tesla management or counsel.

On July 31, 2018, Musk met with representatives of the Saudi PIF, including Yasir Al-Ramayyan. During this meeting, the idea of taking Tesla private was discussed although the specific price, amount of funding, or any other material term was not discussed nor agreed. Ex.80. On August 2, 2018, Musk made an informal proposal to the Tesla Board of Directors to take Tesla private at $420 per share. Ex. 81. The Board met with Musk the following day. The Board told Musk that "a detailed proposal regarding a going private transaction had not yet been made and that one would be needed in order for the Board to properly analyze and evaluate it." Ex. 83. Finally, the Board authorized Musk "to have initial, conceptual conversations with a few of the Company's top shareholders to explore their interest and gauge their reaction to a private corporate structure." *Id*

**B. August 7, 2018.**

On August 7, 2018, without receiving any further legal or financial advice or speaking with any investors, Musk published his initial tweet: "Am considering taking Tesla private at $420. Funding secured." Ex. 8. The tweet was published at 9:48 a.m. PDT or 12:48 p.m. EDT, during the trading day. Following this tweet, Tesla's stock price reacted instantaneously, increasing $8.18 (from $356.85 to $365.03) on volume of over 800,000 shares in the minute immediately afterwards. Ex. 375 at 37-38. It continued to trade heavily with the price increasing further to $367.25 on volume of over 10 million shares before NASDAQ halted trading at 2:08 p.m. *Id*. An hour after the trading halt was in effect, at 3:11 p.m., Deepak Ahuja, Tesla's Chief Financial Officer, emailed Musk informing him that "[w]e are getting a lot of enquiries from investors, SEC and media to better understand the comment 'funding secured'." Ex. 337. During the trading halt, Michael Santoli, a commentator on CNBC, also commented on Musk's tweet stating that "having secured funding, to me, is the big number right there." Ex. 521. Bradley Erickson, an analyst at KeyBanc Capital Markets, emailed Viecha asking for him to "clarify" whether "financing is secured." Viecha responded by confirming that "the first Tweet clearly

stated that 'financing is secured [sic].' Yes, there is a firm offer." Ex. 150. Toni Sacconaghi, an analyst at AllianceBernstein, emailed Viecha on August 7, 2018 for "questions/clarifications on today's news and blog post." Viecha stated in response that "apart from what has been tweeted and what was written in a blog post, we can't add anything else. I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' [sic] is correct" and that "financing is secured regardless of other assumptions." Ex. 151.

Immediately following the 12:48 p.m. tweet, Ahuja had offered to draft an email to Tesla employees on behalf of Musk. Ex. 121. At 3:16 p.m., Musk sent the email drafted by Ahuja as well as other members of Tesla management to Tesla employees explaining his reasons why Tesla would be better off as a private company. Ex. 12. At 3:36 p.m., Musk tweeted a link to his email stating: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." Ex. 13. However, investors still focused on the question of "funding secured." On the afternoon of August 7, 2018, Nii Owuraka Koney, a Managing Director at Tesla investor Jennison Associates wanted clarification from Viecha on the meaning of "funding secured" even after reading Musk's email which, Koney noted, said nothing about funding. Ex. 58. Koney concluded that Twitter "is hardly the right place to confirm the funding is secure."

Tesla stock resumed trading at approximately 3:45 p.m. It ultimately closed at $379.57 per share on additional heavy volume of over 6 million shares. Ex. 375 at 39.

Financial analysts issued reports during the afternoon and evening of August 7, 2018 and the morning of August 8, 2018 discussing Musk's tweets. For example, Morningstar thought that "execution [of a deal] is more likely than not" and speculated that "funding comes mostly from tech investors." Ex. 931. RBC Capital Markets stated that "Elon's tone and messaging regarding a potential transaction lead us to believe that there could be significant outside funding lined up." Ex. 934. Evercore stated that Tesla's stock price was reflecting the belief that funding was secured and the transaction will be completed. Ex. 33. JP Morgan increased its price target for Tesla following Musk's tweets stating: "as lacking as the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nonetheless declarative statements from the CEO of a public company which we feel should be considered

seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured." Ex. 15.

Testimony will further demonstrate the materiality of Musk's tweets on August 7, 2018. Plaintiff Glen Littleton and class member Tim Fries will testify about the importance of the tweets, especially the statement "Funding secured" and how it immediately affected their investing decisions for Tesla securities. Musk will testify that he intended his tweet "Am considering taking Tesla private at $420. Funding secured." to contain "the most important points" about the going-private transaction and that he expected Tesla's stock price to increase after it was published. Joseph Fath, at T. Rowe Price, another significant Tesla investor, and Koney will testify (via deposition) about their reaction to Musk's August 7, 2018 tweets and Ryan Brinkman, J.P. Morgan's analyst, will testify (also via deposition) regarding his reaction to the tweets and what caused him to revise his price target in response.

On August 8, 2018, members of the Tesla Board issued a press release disclosing that Musk had "opened a discussion with the board about taking the company private." Ex. 26. The Board stated that its discussions with Musk had "addressed the funding for this to occur" and it was "taking the appropriate next steps to evaluate this." *Id*. CNBC noted that the press release "lend[ed] some legitimacy" to Musk's August 7, 2018 tweets. The Board press release did not disclose that "a detailed proposal regarding a going private transaction had not yet been made and that one would be needed in order for the Board to properly analyze and evaluate it" as communicated by the Board to Musk on August 3, 2018. Ex. 83. Meanwhile, Antonia Gracias, Tesla's Lead Independent Director, spoke with Musk and directed him to stop tweeting about the proposed transaction without the Board's prior approval. Musk complied.

**C. Musk Seeks Funding and Investor Support.**

From August 8, 2018 to August 23, 2018, Musk, with the assistance of Silver Lake Partners, Goldman Sachs, and Morgan Stanley, began the process of determining the amount of funding required, identifying potential sources for that funding, and measuring investor support. Egon Durban of Silver Lake (in person) and Dan Dees of Goldman Sachs (via deposition) will testify as to the efforts they made during this period. Both Durban and Dees met with Musk on

August 10, 2018 to discuss the process. Both emphasized how early and preliminary the process was. Dees provided Musk with a presentation which showed that Goldman Sachs projected approximately 40% of Tesla investors would roll over their investment into a private Tesla. Ex. 254. Viecha and Aaron Chew, who also worked for Tesla's Investor Relations, will testify that they had numerous discussions with Tesla investors from August 8 to August 10, 2018 and many Tesla investors were opposed to going private or would be unable to participate in a private Tesla due to restrictions on the terms of their investment funds. Exs, 79, 90, 113-20, 147, 155-58. Fath and Koney will also testify over the inability or reluctance to continue their investment in a private Tesla. Exs. 44-47.

Over the weekend of August 10 to 12, 2018, Musk exchanged text messages with Al-Ramayyan. On August 10, 2018, Al-Rumayyan sent Musk a text message stating, "We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia that serves MENA, Europe, Asia and Africa, with the right incentives on all fronts (subsidies on energy and land, tax exemptions, support in obtaining financing, etc.). Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction." Ex. 121. Al-Rumayyan then described the July 31, 2018 meeting: "We would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia .... Therefore, as discussed, we would like our teams to start working together in a confidential manner to explore a potential transaction" and "the agreement as was minuted by my people is to wait for the information to be sent be [sic] you within a week, on how we will move forward together." *Id*. On August 12, 2018, Al-Rumayyan followed up with Musk about the transaction, texting him: "Let's see the numbers and get our people to meet and discuss. We cannot approve something that we don't have sufficient information on. We've agreed that you will send the financial information and the way going forward within a week and no thing [sic] happened since." *Id*. Musk never provided the Saudi PIF with the deliverables he agreed to at the end of the July 31, 2018 meeting. Instead, disappointed with the Saudi PIF's public statements regarding the transaction, Musk told Al-Rumayyan that he was no longer interested in taking Tesla private with the Saudi PIF, saying "I'm sorry, but we

cannot work together," "Sorry. It's over," and "[p]lease extend an offer to the Crown Prince that I would like to apologize personally and explain why Tesla will not [sic] with PIF in this transaction." *Id*.

### D. August 13, 2018 Blogpost.

On the morning of August 13, 2018, Tesla published a blogpost by Musk that had also been written on his behalf by Tesla management. Ex. 53. Specifically, the blogpost provided some additional detail regarding the history of discussions between Musk and the PIF and concluding: "I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement." *Id*. It omitted any reference to the disagreements between Musk and Al-Ramayyan or Musk's failure to provide information to the Saudi PIF as reflected in the text messages exchanged just the day earlier. Ex. 121. The blogpost also stated that "My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla." The blogpost omitted that Goldman Sachs estimated a much lower percentage of Tesla investors would roll into a private Tesla and many investors had expressed reluctance or inability to participate in a private Tesla to Viecha and Chew.

Al-Rumayyan wrote to Musk on August 13, 2018 stating that he was "personally surprised" by the statements Musk made in the blog post, which Al-Rumayyan referred to as "an ill-advised blog with loose information." Ex. 121. The blog post, however, led a Morgan Stanley managing director to conclude that it was "impossible" that PIF was not funding the going-private transaction. Ex. 279. A Jennison Associates analyst told a colleague after reading the blog post, "The offer at $420 is real…", and advised purchasing Tesla shares. Ex. 68. Other analysts also continued to be misled following the blogpost. CFRA wrote: "the blog also explains how the deal could be more likely than we previously thought" and Morningstar stated that Musk's August 7, 2018 tweet that "investor support is confirmed" meant "Musk believes he has enough votes to go private" and "his estimate of about 66% of shareholders not tendering [from the August 13, 2018 blogpost] is not far off from our own assumption of 60%." Ex. 429. Morningstar concluded: "our

impression of his words is that he thinks it can happen, and we agree." *Id*. Analysts, including Brinkman at J.P. Morgan, continued to maintain or increase their price targets for Tesla's stock, relying on the August 7, 2018 tweets. Ex. 17.

### E. *New York Times* Articles and End of Class Period.

On the morning of August 16, 2018, *The New York Times* published a lengthy article titled "A Question for Tesla's Board: What Was Elon Musk's Mental State?" Ex. 426. The article discussed at length Musk's potential mental state on August 7, 2018, especially in the context of the extreme stress experienced recently in his work at Tesla, his lack of sleep, and whether he may be bipolar. *Id*. Tesla's stock price showed little reaction to this reporting, dropping from $338.69 to $335.45. Ex. 375 at 86. On the evening of August 16, 2018, the *New York Times* published an even longer article regarding Tesla, Musk, and the potential going-private transaction. Ex. 171. The article was based on an interview with Musk where he confirmed previously rumored details of the circumstances surrounding the August 7, 2018 tweets such as the initial tweet being sent while driving to the airport, that it was not reviewed by the Tesla board before being published, and the $420 price was an arbitrary choice. *Id*. The article also commented with regard to the tweets: "What Mr. Musk meant by 'funding secured' has become an important question. Those two words helped propel Tesla's shares higher. But that funding, it turned out, was far from secure." *Id*. The article also repeated in less detail some of the issues regarding Musk's stress at work and anxiety over his mental health that had appeared in the earlier article published on April 16, 2018. *Id*.

The market immediately reacted to the new reporting from the *New York Times*. Tesla's stock price declined $29.95 on August 17, 2018 to $305.50 on volume of 19 million shares. Ex. 375 at 86-94. J.P. Morgan responded to the *New York Times* article by reducing its price target back to its August 6, 2018 level. Ex. 23; J.P. Morgan wrote: "our interpretation of subsequent events leads us to believe that funding was not secured for a going private transaction, nor was there any formal proposal." *Id*. JP Morgan also noted that Tesla and Musk still appeared to be exploring a going-private transaction but the "process appears much less developed than we had earlier presumed (more along the lines of high level intention)." Brinkman will testify that it was

the information from the *New York Times* interview with Musk that caused him to revise his price target because it completely undermined Musk's August 7, 2018 statements.

### F. The Going-Private Transaction is Cancelled.

On August 23, 2018, the Board held an in-person meeting. Ex. 101. Silver Lake Partners and Goldman Sachs attended and discussed the availability of funding for a going private transaction. *Id*. Their discussion materials demonstrate that neither the price per share nor the amount of capital required had been determined; each was indicated by "[*]". Ex. 201. At the meeting, Silver Lake Partners and Goldman Sachs outlined a process to obtain the necessary funding for the going private transaction. Ex. 101. Musk also discussed with the Board "information he had learned in recent weeks following his announcement, including but not limited to, the negative views of many of the Company's current stockholders regarding the prospect of the Company going private, the difficulties the Company's current stockholders would have in continuing to own Tesla's stock if the Company went private . . . ." *Id*. Musk then informed the Board "that he was withdrawing his offer to try and take [Tesla] private." *Id*. This decision was announced on August 24, 2018. Ex. 139. Tesla's stock price declined just $3.55 (from $322.87 to $319.27) following the news that Musk was no longer considering taking Tesla private at $420 per share. Ex. 375 at 94-98. Without funding secured or investor support confirmed, this information was simply not material to investors.

### G. Expert Testimony.

Plaintiff will offer testimony from four experts. Professor Joshua Mitts of Columbia University will testify regarding the impact of Musk tweets on Tesla's stock price before August 7, 2018 as well as the short interest in Tesla stock in August 2018. Professor Guhan Subramanian of Harvard University will testify regarding the Musk's proposal to take Tesla private as communicated to the Board on August 2, 2018, the Board's response, and the process followed up to August 23, 2018 especially with regard to public disclosures regarding the proposed transaction. Professor Steven Heston of the University of Maryland will testify regarding option pricing, the movements in Tesla stock options following the Musk tweets on August 7, 2018, and the appropriate method for measuring the impact of the Musk tweets on Tesla stock option prices.

Finally, Dr. Michael Hartzmark will testify regarding the efficiency of the market for Tesla securities, the impact of the Musk tweets and other disclosures on those prices, and the appropriate quantum of price inflation and other effects on the prices for Tesla securities during the Class Period.

### H. Damages.

The testimony of Professor Heston and Dr. Hartzmark will show that their financial analysis corroborates the narrative that can be taken from analyst and media reaction to Musk's August 7, 2018 tweets: that they had an immediate impact on the prices of Tesla securities that gradually diminished following August 7, 2018 as rumors spread about the lack of funding, SEC investigations were announced, and, importantly, Musk and Tesla failed to provide additional details or documentation about the transaction. The market then finally stopped relying on the truth of the August 7, 2018 tweets on August 17, 2018, following *The New York Times* article. This can be seen quantitatively in the implied volatility derived from Tesla long term stock options. Implied volatility measures the anticipated distribution of future prices for Tesla stock over the term of the option. A smaller implied volatility indicates a tighter spread of future prices. When a transaction is announced at a specific price, such as $420 per share, one would expect the spread of future prices to tighten and implied volatility to diminish. This is exactly what is observed in the implied volatility derived from prices for Tesla stock options on August 7, 2018. The implied volatility dramatically drops from 50.52% to 32.57%. It then increases slightly to 38.54% by August 16, 2018, indicating increased skepticism about the going-private transaction but still well below its pre-tweet level. Ex. 375 at 130-32. On August 17, 2018, however, following *The New York Times* article, it bounces back to 48.65%, virtually identical to its level on August 7, 2018 immediately before Musk's tweets. Similarly, Tesla's stock price was relatively stable following August 17, 2018. This strongly indicates that by August 17, 2018, the market no longer considered a take-private transaction to be likely even though Musk was still considering a going-private transaction at this time.

Dr. Hartzmark will also testify as to the causal relationship between Musk's and Tesla's fraudulent statements and the damages sustained by Plaintiff and other Class members. Dr.

Hartzmark will explain his calculations of the amount of inflation in the price of Tesla's stock and impact on the price of other securities on each day of the Class Period, which the jury can then adopt in whole or in part when awarding damages using Plaintiff's proposed verdict form. Dr. Hartzmark will explain how he measured the immediate increase in Tesla's stock price following the August 7, 2018 tweets and how that declined to zero by August 17, 2018. He will also explain how a company's stock price is further negatively affected by fraud committed by its management as a result of increased litigation and regulatory risk, loss of confidence in management, and realization of ineffective internal controls. This negative impact can be seen in the movement of Tesla's stock price from August 7 to August 17, 2018 where its stock price ultimately declines below its pre-tweet level.

Dr. Hartzmark does not address Defendants' expert's damages analysis or calculation for stock or options or any other Tesla security because Defendants' expert has not offered any such analysis or calculation.

### III. LEGAL ISSUES.

#### A. Materiality.

In its summary judgment order, the Court held "based on the evidence presented, there is no genuine dispute that the [the statements "Am considering taking Tesla private at $420. Funding secured." and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."] were false and that Mr. Musk recklessly made those representations." The Court has concluded that the materiality of those statements is still an issue for the jury. "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information. *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). A statement is "material" when there is a "substantial likelihood that a reasonable shareholder would consider it important." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). This is an objective test, assessing the significance of a piece of information to a "reasonable investor." *Id.* at 445; *accord Amgen Inc. v. Connecticut Ret. Plans*

*& Tr. Funds*, 568 U.S. 455, 467 (2013) (noting materiality is an objective test); *S.E.C. v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007) ("The law assesses the materiality of a misrepresentation at the time it is made, not after intervening events or remedial action have rendered it harmless.").

The issue of materiality does not require the jury to re-examine the falsity of the misrepresentations subject to the Court's summary judgment order or Musk's scienter when he made them. As the Supreme Court in *Basic* noted, falsity, materiality, and scienter, are three different questions: "This case required resolution of several common questions of law and fact concerning ***the falsity or misleading nature of the three public statements*** made by Basic, ***the presence or absence of scienter***, and ***the materiality of the misrepresentations***, if any." *Basic*, 485 U.S. at 242 (Emphasis added).

Given the evidentiary record here, the jury should not hesitate in determining that Musk's August 7, 2018 tweets were "material" to investors and that the August 13, 2018 blogpost omitted material information.

### B. Loss Causation.

In the Ninth Circuit, "loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 753 (9th Cir. 2018); *see also Dura*, 544 U.S. at 342 (Loss causation is simply "a causal connection between the material misrepresentation and the loss."). A market reaction to a partial or total corrective disclosure is just one of the "infinite variety" of "context-dependent" ways that a plaintiff may establish loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Other ways include "materialization of the risk", *see In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1026-27 (9th Cir. 2005), and "leakage", *see Lloyd*, 811 F.3d at 1210.

A corrective disclosure can come from any source and does not have to be an admission of fraud by a defendant. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). Further, a corrective disclosure may be based on information that is already publicly available where it presents "new information to the market that is not yet reflected in the company's stock

price". *BofI*, 977 F.3d at 795. This may be the result of analysis of previously available technical information or the republication of existing public information with increased credibility or significance. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (stock price decline was caused by FDA warning letter published three months earlier when "the public failed to appreciate its significance"). Finally, the corrective disclosure or disclosures do not have to be the ***sole*** reason for an investment's decline in value. "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *Daou*, 411 F.3d at 1025; *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027-28 (9th Cir. 1999) ("misrepresentation or omission must relate to that which caused the investment to lose value.").

Musk's tweets on August 7, 2018, prompted an immediate rise in the price of Tesla's stock and also affected the prices of other Tesla securities. The stock price declined during the course of the Class Period as further information was revealed about the going-private transaction and the circumstances of the August 7, 2018 tweets was disclosed by Musk, Tesla, and financial media and analysts. In addition, harm was realized by Tesla investors through the commencement and disclosure of government investigations into the August 7, 2018 tweets by, amongst others, the SEC. The stock price remained artificially inflated through the August 13, 2018, blog post and the price impact of the false and misleading statements by Musk and Tesla did not fully dissipate from the prices of Tesla stock and other securities until August 17, 2018, following publication of *The New York Times* article.

### C. Damages.

The typical calculation of actual damages under Section 10(b) and Section 20(a) is the out-of-pocket calculation, which is "is the difference between the fair value of all that the [plaintiff] [paid] and the fair value of what he would have [paid] had there been no fraudulent conduct."[2] *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). This is not limited to the increase, if any, observed in a stock price immediately following a misleading statement, *see Goldman Sachs Grp. Inc. v. Ark. Teacher Ret. Sys.*, ___ U.S.___, 141 S.Ct. 1951, 1961 (2021);

---

[2] The inverse is true for sales of securities at price deflated by a defendant's fraud.

*Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015), and may include out-of-pocket losses realized from stock price declines attributable to regulatory and other litigation risk, reputational harm, and other collateral concerns that would not have materialized without the actionable fraud. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (plaintiffs may recover losses caused by "concern[s] with lack of management honesty and control" and holding that "the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered, and the failure to disaggregate the action and fines did not preclude class certification."); *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 908-09 (S.D. Cal. 2019) (loss recoverable where stock price dropped because of harm to "corporate brand and corporate reputation," which "constitutes a structural change in value and demand for the company's products or services"); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 371–72 (S.D.N.Y. 2009)(losses from stock price declines following credit ratings downgrades and attributed to concerns about management were recoverable as a result of misrepresentations regarding corporation's liquidity). Consequential damages one-step removed from stock price declines, such as borrowing costs may also be recoverable in appropriate cases where it is proven "with reasonable certainty to have resulted from the fraud". *Ambassador Hotel*, 189 F.3d at 1030.

      Plaintiff's proposed methodology for the calculation of the amount of damages incurred by purchasers and sellers of Tesla stock and other securities has been set forth in the expert reports of his expert: Dr. Michael Hartzmark, and is entirely consistent with Ninth Circuit and other authority discussed above. Based on Plaintiff's presentation at trial, the jury will be able to easily "make reasonable estimates based on evidence they credited" and award damages in the amount being sought by Plaintiff. *Gruber v. Gilbertson*, No. 16-CV-9727 (JSR), 2022 WL 4232834, at *12 (S.D.N.Y. Sept. 14, 2022); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 664-65 (1986) ("Congress' aim in enacting the 1934 Act was not confined solely to compensating defrauded investors. . . . This deterrent purpose is ill served by a too rigid insistence on limiting plaintiffs to recovery of their 'net economic loss.'" (internal citations omitted)); *Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir. 1982) ("Although damages need not be proved to a mathematical certainty, 'sufficient facts must be introduced so that a court can arrive at an intelligent estimate without

speculation or conjecture.'"); *Garvin v. Greenbank*, 856 F.2d 1392, 1401 (9th Cir. 1988) ("Damages need not be proven to a mathematical certainty.").

### D. Tesla Liability.

The maker of a statement is "the person or entity with ultimate authority over the statement". *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Here, while all the alleged misleading statements were by or nominally by Musk, they can be attributed to Tesla for the purposes of Section 10(b). The statements were immediately identified as having been made by Tesla's CEO. The initial tweet stating "funding secured" was confirmed and essentially adopted by Tesla through the comments of Viecha, its Director of Investor Relations. The final tweet on August 7, 2018 stating that "investor support is confirmed" linked to an email from Musk that had been written for him by Tesla management and the August 13, 2018 blogpost was also drafted by Tesla management. Further, in general a corporation is responsible for the acts of its officers performed within the scope of their authority and Musk's statements on August 7, 2018 and in the August 13, 2018 were seen as being made in the scope of his authority. Thus, there is evidence supporting liability for Tesla for the misleading statements in this case.

### E. Control Person Liability.

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), imposes liability on "every person who, directly or indirectly, controls any person liable" under Rule 10b-5. "Control person liability exists irrespective of the control person's scienter." *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 31874, at *45 (N.D. Cal. Feb. 27, 2018) (internal quotations omitted); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) ("[W]e hold that a plaintiff is not required to show 'culpable participation' to establish that a broker-dealer was a controlling person . . . . The statute does not place such a burden on the plaintiff."). Thus, given the Board's ability and, indeed, responsibility to control Tesla and its public communications, the individual defendants (except for Musk) are liable control-persons.

Plaintiff looks forward to addressing any issues related to the above at the upcoming Final Pretrial Conference on October 25, 2022, if the Court should have any questions.

Dated: October 4, 2022                         Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: akrot@zlk.com
(admitted pro hac vice)

-and-

Joseph Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Email: jlevi@zlk.com
Email: ek@zlk.com
(admitted pro hac vice)

*Attorneys for Plaintiff and Counsel for the Class*