# EXHIBIT A

**LEVI & KORSINSKY, LLP**
Adam M. Apton (316506)
Adam C. McCall (302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
        amccall@zlk.com

*Lead Counsel for Plaintiff and the Class*

[Additional counsel on signature block]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TESLA INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>JUDGE: THE HONORABLE EDWARD M. CHEN |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff Glen Littleton hereby responds as follows to Defendants' s First Set of Interrogatories to Lead Plaintiff dated August 27, 2021 ("Interrogatories") pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of California.

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

Plaintiff makes the following general and continuing objections to Defendants' Interrogatories. All general and continuing objections apply to the response to each request, and specific reference to these objections in the particular response is intended for emphasis only. Failure to list a general and continuing objection is not intended, nor should it be construed as a waiver of that objection.

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

1

<u>**RESPONSES**</u>

2

<u>**INTERROGATORY NO. 1:**</u>

3

IDENTIFY each and every CHALLENGED STATEMENT and CHALLENGED

4

OMISSION.

5

<u>**RESPONSE NO. 1:**</u>

6

Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as

7

though set forth fully herein, including in particular the Objections to the terms "Identify,"

8

"Challenged Statement," and "Challenged Omission." Plaintiff objects further to this Interrogatory to

9

the extent it requires the production of information that is already provided in the Complaint and, as a

10

result, is duplicative and unduly burdensome. To the extent this Interrogatory requests that Plaintiff

11

specify material facts proving his allegations, this Interrogatory is premature and presumptively

12

improper because this action is still in active discovery with document productions and/or depositions

13

ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below,

14

at any time, in light of additional facts revealed through subsequent inquiry or otherwise brought to

15

Plaintiff's attention.

16

Subject to and without waiver of the foregoing objections, the following statements are a basis

17

for liability of Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and

18

SEC Rule 10b-5:

19

      (a)     "Am considering taking Tesla private at $420. Funding secured." Elon Musk made this

20

             statement via Twitter on August 7, 2018.

21

      (b)     "420." Elon Musk made this statement via Twitter on August 7, 2018 when responding

22

             to another Twitter user who had asked at what price he would be taking Tesla private.

23

      (c)     "Yes, but liquidity events would be limited to every 6 months . . . ." Elon Musk made

24

             this statement via Twitter on August 7, 2018 when responding to another Twitter user

25

             who had asked whether the public could still invest in Tesla once it was private.

26

      (d)     "Shareholders could either to [sic] at 420 or hold shares & go private." Elon Musk made

27

28

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

this statement via Twitter on August 7, 2018.

(e)    The email titled "Taking Tesla Private" purportedly from Elon Musk to Tesla employees on August 7, 2018. Tesla published the statement on its publicly available blog on August 7, 2018.

(f)    "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." Elon Musk made this statement via Twitter on August 7, 2018.

(g)    The AUGUST 13 BLOG POST.

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 2:**

  **For each and every CHALLENGED OMISSION, IDENTIFY the affirmative statement that YOU contend it rendered false or misleading, IDENTIFY why YOU contend it rendered the affirmative statement false or misleading, including IDENTIFYING all facts supporting that contention.**

**RESPONSE NO. 2:**

  Plaintiff incorporates the General Objections and Objections to Definitions and Instructions as though set forth fully herein, including in particular the Objections to the terms "Identify," "You," and "Challenged Omission." Plaintiff further objects to this Interrogatory as requesting Plaintiff "Identify" (as defined by Defendants) "all facts supporting the contention". This request is unduly burdensome and beyond the proper scope of discovery and contention interrogatories as set forth in Federal Rules of Civil Procedure 26 and 33. Plaintiff objects further to this Interrogatory to the extent it requires the production of information that is already provided in the Complaint and, as a result, is duplicative and unduly burdensome. Plaintiff also objects to this Interrogatory to the extent it prematurely requests that Plaintiff provide a list of exhibits for use at trial. Plaintiff will respond to this interrogatory to the extent that his answer will help clarify what the issues in the case are, improve the focus of discovery, and prevent discovery excesses. Notwithstanding its response to this Interrogatory, Plaintiff reserves the right to use any document or other information obtained in discovery at trial, in accordance with the Federal Rules of Evidence.

  To the extent this Interrogatory requests that Plaintiff specify material facts proving his allegations, this Interrogatory is premature and presumptively improper because this action is still in active discovery with document productions and/or depositions ongoing. Plaintiff therefore reserves the right to supplement, amend, or modify the responses below, at any time, in light of additional facts revealed through subsequent inquiry or otherwise brought to Plaintiff's attention.

  Subject to and without waiver of the foregoing objections, the statements made by Elon Musk and Tesla on August 7, 2018 as set forth in Plaintiff's Response to Interrogatory No. 1 were false and

capable of being evaluated, only a tentative offer that was missing many critical terms, had "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(i) The Tesla Board of Directors had not taken any steps to consider any proposal by Musk to take Tesla private at $420 per share; no special committee had been formed and no legal or financial advisors had been appointed;

(j) Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

(k) Musk had not confirmed the support of any investor for a transaction that would take Tesla private at $420 per share;

(l) There was no proposal or agreement to take Tesla private at $420 per share or any other price that could be presented to Tesla's shareholders for approval;

(m) Musk had not formally retained any legal or financial advisors to assist with the transaction;

(n) Musk had not determined whether retail investors would be able to remain shareholders but had been advised that it would be unlikely and "unprecedented";

(o) Musk had not determined whether there were restrictions on investment in private companies by Tesla's institutional investors that would prohibit their involvement in a private Tesla;

(p) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(q) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

The AUGUST 13 BLOG POST left investors with a misleading impression of the nature and status of Musk's proposal to take Tesla private at $420 per share as well as misrepresented the status of Musk and Tesla's discussions with the Saudi Arabia Public Investment Fund and other existing or potential investors. Following the AUGUST 13 BLOG POST investors were still unaware that:

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(a) Complete funding for going-private transaction involving Tesla had not been unconditionally secured from the Saudi Arabia Public Investment Fund or from any other funding source. At their meeting with Musk held on July 31, 2018, representatives of the Saudi Arabia Public Investment Fund had only communicated that it was "interested in potential investment opportunities," "would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia," and "would like . . . to start working together . . . to explore a potential transaction". No commitment to any level of funding was made at the July 31, 2018 meeting or thereafter. Musk had not materially discussed funding a going-private transaction with any other source of funding;

(b) In discussions with representatives with the Saudi Arabia Public Investment Fund after August 7, 2018, Musk had attempted to exclude the Public Investment Fund from participating in any going-private transaction;

(c) Musk still did not know the overall level of funding required for any going-private transaction and had not discussed the overall amount of funding required for any going-private transaction involving Tesla with any potential investor;

(d) Musk had not discussed the legal structure of the proposed going-private transaction involving Tesla with the any potential investor;

(e) Musk had not provided Tesla's Board with a proposal to take Tesla private that was capable of being evaluated, only a tentative offer that was missing many critical terms, had "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

(f) The Tesla Board of Directors had not taken any steps to consider any proposal by Musk to take Tesla private at $420 per share; no special committee had been formed and no legal or financial advisors had been appointed;

(g) Responses to Musk's August 7, 2018 communications about a potential going private transaction at $420 per share from existing Tesla investors had been mixed with large

Case 3:18-cv-04865-EMC

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

investors telling Musk and/or Tesla that they could not or would not participate in or support such a transaction;

(h) There was no proposal or agreement to take Tesla private at $420 per share or any other price that could be presented to Tesla's shareholders for approval;

(i) Musk had not determined whether retail investors would be able to remain shareholders;

(j) Musk had not determined what regulatory approvals would be necessary for the transaction; and

(k) Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.

Subject to further review and analysis of discovery, these contentions are based on the following facts which Plaintiff discovered during the course of discovery. This is a non-exclusive list of the facts and/or documents that may be introduced in evidence at trial:

(a) Elon Musk and Tesla were experienced and sophisticated participants in corporate transactions having conducted numerous offerings of debt and equity as a public company as well as making acquisitions, including the acquisition of SolarCity, another public company;

(b) On or around November 5, 2013, Tesla stated in a current report on Form 8-K that investors should "follow Elon Musk's and Tesla's Twitter accounts" for additional information concerning the company. (Robyn Denholm Tr. at 37:15-37:22)

(c) On August 7, 2018, in response to an inquiry from a Reuters reporter about Elon tweets, Dave Arnold, Tesla's Sr. Director of Global Communications, replied—on background only—that no 8K was needed and that Tesla had previously made an SEC disclosure about disseminating information to shareholders via social media including Elon Musk's and Tesla's Twitter accounts. (TESLA_LITTLETON_00014393)

(d) Dave Arnold further testified on September 30, 2021 that he was aware that Elon Musk's Twitter account was recognized as a channel of corporate communication by

1   Tesla. (Dave Arnold Tr. at 32:17-32:20)

2   (e) Denholm testified further that Tesla's Audit Committee "periodically talked about the

3   use of Twitter [] as a disclosure vehicle" and that when Elon was "tweeting as the CEO

4   of Tesla [] there [was] a [] general disclosure requirement to ensure that material

5   nonpublic information [was] not disclosed without a review process has gone through."

6   (Robyn Denholm Tr. at 17:3-17:8; 28:22-29:6) According to Denholm, "the use of [Elon]

7   Twitter account as a means of disclosing information" about the company dated back to

8   a Form 8-K of 2013, when Tesla "incorporated [Elon Twitter account] as one of the

9   disclosure areas in terms of what the investors and the population should look at in terms

10  of disclosures that the company might make." (Robyn Denholm Tr. at 17:13-17:19)

11  Denholm's testimony shows that Tesla's Audit Committee as part of Tesla Board had an

12  oversight role vis-à-vis material information disseminated by Elon through his Twitter

13  account.

14  (f) Martin Viecha testified on August 23, 2021 that negative media coverage relating to Elon

15  Musk's tweets could negatively impact demand for Tesla's products. (Martin Viecha Tr.

16  at 218:2-218:22; *see also* TESLA_LITTLETON_00019023-24) Mr. Viecha testified

17  further that the tweets also negatively impacted Musk's credibility, according to

18  investors. (Martin Viecha Tr. at 197:19-198:9, 223:3-223:10; *see also*

19  TESLA_LITTLETON_00012777 at 4; TESLA_LITTLETON_00019026)

20  (g) Martin Viecha testified on August 23, 2021 that following Musk's tweets concerning the

21  "cave diver in Thailand" in July 2018, investors became "upset" and "unhappy with the

22  way that [had] been handled." Viecha thought it was "very likely" that Musk was advised

23  to "modify his tweeting behavior" in response to these tweets. (Martin Viecha Tr. at

24  35:22-36:11; *see also* TESLA_LITTLETON_00019247)

25  (h) David Arnold testified on September 30, 2021 that at least some of Musk's tweets were

26  not positive for Tesla. (David Arnold Tr. at 35:17-35:23) Arnold testified further that he

27

28

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

"heard" that Musk was asked to "take a break from Twitter" in July 2018. (David Arnold Tr. at 34:16-34:20)

(i) Sam Teller testified on August 11, 2021 that Elon Musk would have "saved . . . a bunch of time and energy and would have been better for public perception" if he had not engaged in tweeting about "the rescue efforts in Thailand." (Sam Teller Tr. at 45:8-45:23) Teller further testified that he suggested Musk take "a break from Twitter" after conferring with Deepak Ahuja, Sarah O'Brien, Antonio Gracias, and several Tesla employees. (Sam Teller Tr. at 57:23-58:14; *see also* MUSK_001706);

(j) Deepak Ahuja testified on August 5, 2021 that he had a "vague recollection of potentially some conversations of some of the board members with Elon" about Musk "tak[ing] a break from Twitter in July 2018." (Deepak Ahuja Tr. at 26:10-27:3);

(k) Martin Viecha testified on August 23, 2021 that there is a requirement against disclosing material information while the market is open. (Martin Viecha Tr. at 64:3-64:18);

(l) Robyn Denholm testified on October 5, 2021 that "trading hours" are "not the right time to be publishing anything material," including in particular Musk's August 7, 2018 tweets. (Robyn Denholm Tr. at 79:9-79:13);

(m) On May 4, 2018, Musk tweeted "oh and uh short burn of the century comin soon. Flamethrowers should arrive just in time." Musk added, "Looks like sooner than expected. The sheer magnitude of short carnage will be unreal. If you're short, I suggest, tiptoeing quietly to the exit . . . .";

(n) On May 7, 2018, Musk bought approximately $9.85 million worth of Tesla shares in the pre-market to generate a rise in Tesla's stock price and, in turn, force a substantial amount of covering of short positions.

(o) On June 12, 2018, Musk bought approximately $24.9 million worth of Tesla stock to maintain Tesla's stock price against negative announcements concerning cuts to Tesla's

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

workforce.

(p) On June 17, 2018, Musk tweeted that "[the shorts] have about three weeks before their short position explodes."

(q) On July 5, 2018, Musk released a series of tweets attacking *Reuters* and *Business Insider* for being "relentlessly negative about Tesla," publishing "bogus" articles, and "serving as an insider trading source for one of Tesla's biggest short-sellers"

(r) On July 24, 2018, Musk contacted Lawrence Fossi's employer in an attempt to prevent Mr. Fossi from writing any further articles that were adverse to or critical of Tesla;

(s) On July 30, 2018, a WSJ reporter emailed Musk informing him that the WSJ was "doing a story about your use of Twitter and how you have taken aim with your tweets at short sellers in Tesla shares." Among other questions, the WSJ reporter asked Musk: "Do you think it is wise to go head to head with short sellers?" (TESLA_LITTLETON_00019689);

(t) Martin Viecha testified on August 23, 2021 that "highly negative piece[s] in the mainstream press" were discussed frequently internally at Tesla, that the "short interest" was an "ongoing theme" at Tesla, and that he and his colleagues perceived short sellers as having a "significant incentive to cause harm [to Tesla] to make money on a short-term gain." (Martin Viecha Tr. at 71:21-74:6)

(u) The meeting minutes from the July 31, 2018 meeting indicate that: Yasir Al-Rumayyan on behalf of the Public Investment Fund told Musk that he "would like to listen more about [Musk's] plan to take [Tesla] private," "listen to [Elon's] plan and . . . the financial calculations to take it private in the next week," and he would call Musk "if [he] did not receive anything." (SEC-EPROD-000009477 at 2);

(v) Elon Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that he was aware as of July 31, 2018 that institutional shareholders had restrictions against owning shares in private companies. (Elon Musk SEC Tr. at 126:1-126:24);

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(w) Elon Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that there was no discussion of transaction structure, investment dollar amounts, acquisition premium, regulatory requirements, level of control, or the board approval process during the July 31, 2018 meeting with the Public Investment Fund, except to the extent that Musk said he wanted to retain Tesla's current shareholder base. (Elon Musk SEC Tr. at 121:4-122:23, 127:3-128:3, 128:20-129:17, 134:22-135:8, 136:9-136:22, 160:17-160:19) The meeting ended with Musk agreeing to provide these and other terms for the transaction. (Elon Musk SEC Tr. at 149:21-149:25, 155:20-156:6);

(x) Elon Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that he did not contact anyone at the Saudi Arabia Public Investment Fund to determine whether it was still interested in the going private transaction after Tesla's stock price increased 15% on August 2, 2018. (Elon Musk SEC Tr. at 178:16-179:25);

(y) Egon Durban testified on September 7, 2021 that the per share purchase price or overall funding for the going private transaction was never finalized. (Egon Durban Tr. at 156:4-156:16; *see also* TESLA_LITTLETON_00006169 at 58);

(z) Deepak Ahuja, Tesla's former Chief Financial Officer, testified on August 5, 2021 that Elon Musk did not discuss substantive terms or a "specific funding amount" during the meeting on July 31, 2018, but instead agreed to "continue the conversation" and discuss "the structure and what's required" to take Tesla private. (Deepak Ahuja Tr. at 81:19-82:5, 84:2-84:6, 97:15-98:1, 100:22-101:7, 102:14-102:16) Ahuja testified further that he was "not aware" of "any financial calculations that were shared with [the Public Investment Fund]" after the meeting and was also never asked to provide any calculations to the Public Investment Fund. (Deepak Ahuja Tr. at 82:12-83:15);

(aa) Martin Viecha, Tesla's Head of Investor Relations, testified on August 23, 2021 that he never saw anything "in writing" from the Public Investment Fund, was unaware of any agreement on the "$420 per share price" with the Public Investment Fund, and did

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

not know "whether anyone had even discussed the $420 per share price" with the Public Investment Fund prior to Musk's tweets on August 7, 2018. (Martin Viecha Tr. at 135:10-135:19);

(bb)     Sam Teller testified on August 11, 2021 that there was no discussion of "an exact dollar amount" or a specific transaction structure during the July 31, 2018 meeting with the Public Investment Fund. (Sam Teller Tr. at 164:17-166:2) Teller also testified that he was unaware of whether any research had been done to determine whether existing investors could remain investors in Tesla if it were private. (Sam Teller Tr. at 166:3-166:8);

(cc)     Robyn Denholm testified on October 5, 2021 regarding Musk's account of the July 31 meeting with the Saudi Arabia Public Investment Fund, that there was a question "around our existing shareholders because [] the board wasn't sure about the quantum of money would be required to take [] the company private. So the question was: How do we know [] whether [our shareholders] would be in favor of this type of transaction or not." (Robyn Denholm Tr. at 59:12-59:19);

(dd)     Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that he believed only 20% to 25% of Tesla's existing shareholders would not want to own shares in Tesla if it were a private company. (Elon Musk SEC Tr. at 120:3-120:17)

(ee)     Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that he did not want the Saudi Arabia Public Investment Fund to be too large of a shareholder and that he wanted the Public Investment Fund to own "something on the order of 15 percent, maybe up to 20 percent." (Elon Musk SEC Tr. at 170:6-170:11; *see also id.* at 207:3-207:15. 261:1-261:5)

(ff) Musk further testified that he would "ensure that any single foreign entity did not come close to the CFIUS limits, meaning that [the Public Investment Fund] would not be in a control or de fact control position." (Elon Musk SEC Tr. at 210:10-210:16);

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(gg)     In the August 13 Blog Post, Musk stated: "I would like for Tesla to continue to have a broad investor base." "My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla";

(hh)     Meeting minutes from the Board of Directors' Special Meeting on August 3, 2018 state that Elon "noted his desire for current shareholders [] to remain shareholders in [Tesla] after any proposed privatization … and stated that it was not his intention to provide shareholder control in a private [Tesla] to any single entity, but rather to have ownership of [Tesla] be dispersed over a broad base of shareholders, including many of [Tesla]'s current shareholders." (TESLA_LITTLETON_00012812 at 2);

(ii)     Elon Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that his process for deriving the $420 per share offer price consisted of adding 20% to Tesla's closing stock price of $348 on August 2, 2018 and then adding $1 to coincide with the "420" symbol for marijuana. (Elon Musk SEC Tr. at 192:10-193:11, 194:11-194:21);

(jj)     On August 2, 2018, Musk identified the "constant defamatory attacks by the short-selling community" as one of the main drivers behind his attempt to take Tesla private when communicating his offer to Tesla's board. (TESLA_LITTLETON_00000078);

(kk)     Meeting minutes from the Board of Directors' Special Meeting on August 3, 2018 state that Musk's "basis for his price of $420 per share" was to provide an approximate 20% premium over the current price of the stock, which had just undergone a recent run up after [Tesla's] Q2 earnings call." (TESLA_LITTLETON_00012812 at 2);

(ll)     Robyn Denholm testified that during the Board meeting on August 2, 2018, Ahuja explained to the Board that Elon based the $420 share price on "a 20 percent premium" over "the last published price the day before." (Denholm Tr. at 50:21-51:9)

(mm)     Meeting minutes from the Board of Directors' Special Meeting on August 2, 2018 state that Musk "believed Tencent and other large Tesla shareholders" would support the

going    private    transaction,    but    "had    not    yet    spoken    with    them."
(TESLA_LITTLETON_00012790 at 1-2);

(nn)      Musk testified before the U.S. Securities & Exchange Commission on August 29,
2018 that on August 3, 2018 he was told by Tesla's Board of Directors that it would be
"really difficult for small investors" to remain shareholders in the company after it was
taken private. (Elon Musk SEC Tr. at 208:13-208:25);

(oo)      James Murdoch, a Tesla Board Director, testified on August 17, 2021 that, as of
the August 3, 2018 board meeting there was no written commitment from the PIF to
provide any level of financing. (James Murdoch Tr. at 91:2, 9 -15);

(pp)      Deepak Ahuja testified on August 5, 2021 that, as of the adjournment of the
August 3, 2018 board meeting, Elon Musk was still in the process of identifying his legal
and financial advisors. (Deepak Ahuja Tr. at 153:2-5);

(qq)      Martin Viecha wrote in an email to Deepak Ahuja, dated August 5, 2018, that
institutional shareholders are subject to "[i]nternal mechanisms" that would force them
to reduce their positions in Tesla if it were to "become too large of a weight within a
portfolio." (TESLA_LITTLETON_00004239);

(rr) Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018
that an agreement to fund the going private transaction at a deal price of $420 per share
did not exist when tweeting "funding secured" on August 7, 2018. (Elon Musk SEC Tr.
at 231:22-232:10);

(ss) Martin Viecha and Deepak Ahuja had not yet provided Musk with Tesla's capitalization
table showing its largest institutional and retail shareholders as of August 7, 2018,
according    to    Viecha's    email    to    Ahuja    dated    August    7,    2018.
(TESLA_LITTLETON_00004131);

(tt) Elon Musk testified before the U.S. Securities & Exchange Commission on August 29,
2018 that he did not retain any advisors to assist him with the going private transaction

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

at any point between his meeting with the Public Investment Fund on July 31, 2018 and his tweets on August 7, 2018. (Elon Musk SEC Tr. at 165:1-165:5);

(uu)    Meeting minutes from the Board of Directors' Special Meeting on August 3, 2018, indicate that, as of August 3, 2018, Musk had not yet retained legal counsel or a financial advisor to assist with the going private transaction. (TESLA_LITTLETON_00012812 at 2);

(vv)    Meeting minutes from the Board of Directors' Special Meeting on August 3, 2018 state that a "detailed proposal regarding a going private transaction had not yet been made and that one would be needed in order for the Board to properly analyze and evaluate it." (TESLA_LITTLETON_00012812 at 3);

(ww)    Elon Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that he was aware as of August 7, 2018 that the process for putting together a formal proposal for the going private transaction would be complex and not a "trivial exercise." (Elon Musk SEC Tr. at 257:16-257:21);

(xx)    Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that as of August 7, 2018 his overarching level of certainty about whether or not a going private transaction would ultimately be consummated was "roughly 50 percent" or "maybe a little higher than 50 percent." (Elon Musk SEC Tr. at 257:16-258:5);

(yy)    Egon Durban testified on September 27, 2021 that as of August 7, 2018 there was nothing in terms of a formal proposal to be voted on by shareholders. (Egon Durban Tr. at 45:7-45:9) He testified further that as of August 10, 2018, Musk had not yet submitted a formal proposal to Tesla's board. (Egon Durban Tr. at 55:22-56:6, 57:9-57:20; *see also* SL_3P00000001 at 29) Additionally, as of August 14, 2018, Durban and Musk had not yet determined funding sources for the going private transaction or the structure of the transaction. (Egon Durban Tr. at 106:18-106:20; *see also* SL_3P00000261);

(zz)    Deepak Ahuja testified on August 5, 2021 that he was not aware of a proposal

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

from Musk to take Tesla private that was capable of being voted on by shareholders as of August 7, 2018. (Deepak Ahuja Tr. at 194:14-194:17);

(aaa)    Ira Ehrenpreis, a Tesla Board Director, testified on August 25, 2021 that, as of August 7, 2018 there had not yet been a formal proposal made and there were a number of steps that would need to unfold.  He further testified that, as of August 18, 2018 a formal go private transaction bid had not been submitted to the board, nor was there ever one submitted. (Ira Ehrenpreis Tr. at 87:15-24, 140:4-19)

(bbb)    Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that he did not do anything prior to August 7, 2018 to assess whether institutional investors, including T. Rowe Price, Fidelity, Baillie Gifford, or Capital Group, would support a going private transaction. (Elon Musk SEC Tr. at 217:16-218:6, 218:22-219:2);

(ccc)    Musk testified before the U.S. Securities & Exchange Commission on August 29, 2018 that no one at Tesla reviewed his August 7, 2018 tweets before sending them. (Elon Musk SEC Tr. at 221:9-222:11);

(ddd)    On August 7, 2018, at approximately 8:16 a.m. PT, the *Financial Times* asked Tesla for a comment on their report that the Public Investment Fund had built "a 3-5% stake in Tesla after buying shares on the open market." Dave Arnold notified Elon Musk of the story and indicated that Tesla was planning to "decline comment." Musk approved the plan by responding "Ok."

(eee)    On August 7, 2018, at approximately 9:17 a.m. PT, the *Financial Times* published its report. At 9:48 p.m. PT, Musk tweeted "Am considering taking Tesla private at $420. Funding secured." This prompted a sharp 5% rise in Tesla's stock price, ensuring that short sellers would be forced to cover positions given the overall increase in price from the opening of the market that morning.

(fff)    Egon Durban testified on September 7, 2021 that announcements of going private transactions are typically announced after a definitive agreement has been signed. (Egon

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Durban Tr. at 56:20-56:23; *see also* SL_3P00000001 at 29) Durban further testified that he had "never worked on a public-to-private process where the CEO announced everything" prior to retaining Silver Lake Partners as its advisor. (Egon Durban Tr. at 84:3-84:10);

(ggg)      Deepak Ahuja testified on August 5, 2021 that he had not seen Musk's tweets on August 7, 2018 before they were published. (Deepak Ahuja Tr. at 169:18-170:11);

(hhh)      Martin Viecha testified on August 23, 2021 that he did not have "any responsibility for reviewing" Musk's tweets before they were posted on Twitter and had never done so in the past. (Martin Viecha Tr. at 35:7-35:17) Viecha testified further that there was "no official policy" requiring review of Musk's tweets prior to publishing them before August 2018. (Martin Viecha Tr. at 23:21-24:5);

(iii) David Arnold testified on September 30, 2021 that he "[v]ery rarely" reviewed Musk's tweets before they were posted on Twitter. (David Arnold Tr. at 34:1-34:9)

(jjj) Robyn Denholm testified on October 5, 2021 that she did not recall Musk discussing making the tweet with anyone prior to publishing it. (Robyn Denholm Tr. at 76:6-76:9);

(kkk)      On August 7, 2018, Musk tweeted that Tesla "[will] be way smoother & less disruptive as a private company. Ends negative propaganda from shorts" if it became a private company;

(lll) On August 7, 2018, Sam Teller texted it was "satisfying to obliterate" the shorts. (SEC-EPROD-000017148) Teller testified on August 11, 2021 that he also sent a "cartoon with someone on fire" representing the "shorts." (Sam Teller Tr. at 205:24-206:11);

(mmm)      Nii Owuraka Koney testified on July 14, 2021 that he regarded Elon Musk's "funding secured" tweet as an "epic f u to the shorts." (Nii Owuraka Koney Tr. at 48:16-48:24; *see also* JENN0000037) Mr. Koney testified further that Musk was historically "not happy about people who short – or investors who short the stock." (Nii Owuraka Koney Tr. at 52:12-53:17);

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(nnn)    Joseph Fath testified on July 12, 2021 that Musk executed a "short squeeze" with his tweets on August 7, 2018, writing in an email that "The Tesla shorts go up and close with napalm yesterday." (Joseph Fath Tr. at 43:1-44:18; *see also* TRP_001087);

(ooo)    The email purportedly from Elon Musk published by Tesla on August 7, 2018 titled "Taking Tesla Private" was initially suggested to Mr. Musk by Deepak Ahuja and was drafted by Tesla employees Mr. Ahuja, Sarah O'Brien, and Todd Maron. (Deepak Ahuja    Tr.    at    177:18-187:7;    *see    also*    TESLA_AHUJA0000448; TESLA_LITTLETON_00000320);

(ppp)    On August 7, 2018, Musk wrote in his email to Tesla's employees that Tesla was "the most shorted stock in the history of the stock market" and stated that "being public means there are large numbers of people who have incentive to attack the company";

(qqq)    Joseph Fath testified on July 12, 2021 that certain of T. Rowe Price's funds would be unable to hold shares in Tesla if it were private due to "mandates on their accounts that do not allow privates" or, alternatively, fewer shares due to "illiquidity" concerns. (Joseph Fath Tr. at 48:13-49:7, 54:9-54:13; *see also* TRP_000012, TRP_000013, TRP_000016, TRP_000017);

(rrr)    Nii Owuraka Koney testified on July 14, 2021 that Jennison Associates had restrictions against holding private companies and, therefore, would not be able to remain a shareholder in a private Tesla. (Nii Owuraka Koney Tr. at 113:13-114:5);

(sss)    Martin Viecha testified on August 23, 2021 that, as of August 7, 2018 he understood that the "majority" of Tesla's institutional shareholders "do not have a mandate to own private companies." (Martin Viecha Tr. at 149:25-150:20; *see also* TESLA_LITTLETON_00004008);

(ttt)Matt Fassnacht on behalf of HHR Asset Management LLC emailed Aaron Chew on August 7, 2018 advising that he would "not support a buyout" because he was not permitted to "own private entities." (TESLA_LITTLETON_00004015);

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(uuu)    Joseph Fath testified on July 12, 2021 that Musk had not spoken with T. Rowe Price about the going private transaction prior to Musk's tweets on August 7, 2018. (Joseph Fath Tr. at 45:13-45:22, 49:14-50:16) The first contact he received about the going private transaction was on August 9, 2018, when Sam Teller asked for his availability to speak with Musk. (Joseph Fath Tr. at 86:5-86:19; *see also* TRP_002031);

(vvv)    Sonu Kalra at Fidelity did not speak with Musk about the going private transaction until after Musk tweeted about it on August 7, 2018. (SEC-EPROD-000000425);

(www)    Nii Owuraka Koney testified on July 14, 2021 that he had not had any conversations with Elon Musk prior to August 7, 2018 about the go-private transaction. (Nii Owuraka Koney Tr. at 162:7-162:16)

(xxx)    Deepak Ahuja testified on August 5, 2021 that he did not believe Musk spoke to any shareholders to assess their interest in a private Tesla prior to Musk's tweets on August 7, 2018. (Deepak Ahuja Tr. at 172:8-173:1) Ahuja testified further that he did not provide Musk with a list of Tesla's top shareholders until after August 7, 2018. (Deepak Ahuja Tr. at 224:10-224:19);

(yyy)    Martin Viecha testified on August 23, 2021 that there had been "no discussions with shareholders about the going-private transaction" prior to August 7, 2018. (Martin Viecha Tr. at 159:6-161:17; *see also* TESLA_LITTLETON_00004253);

(zzz)    Robyn Denholm testified on October 5, 2021 that she did not believe that Elon had any conversations with shareholders prior to the tweet going out. (Robyn Denholm Tr. at 69:21-69:23)

(aaaa)    On August 8, 2018, Elon Musk's personal public relations consultant informed him that a NYT reporter had contacted her seeking to talk to Elon off the record and noting that "he ha[d] talked to 'all' the large investors and none of them ha[d] been approached." (TESLA_LITTLETON_00019654);

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(bbbb)     Ryan Brinkman testified on May 4, 2021 that he understood "funding secured" to mean that "funding is secured . . . [t]hat the funding has been lined up" and "not in question." (Ryan Brinkman Tr. at 64:6-64:12);

(cccc)     Ryan Brinkman testified on May 4, 2021further that "funding secured" meant that "there has been a Wall Street bank or more likely consortium of banks that have lined up or committed to lining up this financing or . . . it was already there because it was such a deep pocketed acquirer" and that "[e]ither a commitment to funding or that it was already there . . . ." (Ryan Brinkman Tr. at 64:13-64:23, 65:6-65:12);

(dddd)     Brinkman wrote on behalf of J.P. Morgan in his analyst report dated August 8, 2018 that, "Either funding is secured or it is not secured, and Tesla's CEO says funding is secured." (JPMS_00000047 at 1);

(eeee)     Nii Owuraka Koney testified on July 14, 2021 that he interpreted Elon Musk's "funding secured" tweet to mean that Mr. Musk had secured either a "verbal commitment" or "an offer letter of some sort" to fund the go-private transaction. (Nii Owuraka Koney Tr. at 21:20-22:6, 44:7-45:13, 56:1-56:13, 57:14-57:21; *see also* JENN0000048) Additionally, Koney testified that this necessarily included a total purchase price or amount of financing that had been agreed to by the source of funding. (Nii Owuraka Koney Tr. at 79:24-80:17);

(ffff)     Nii Owuraka Koney testified on July 14, 2021that he believed funding was in fact secured based on subsequent communications with Martin Viecha. (Nii Owuraka Koney Tr. at 71:8-72:24; *see also* JENN0000090);

(gggg)     Joseph Fath testified on July 12, 2021 that he interpreted "funding secured" to mean, "[j]ust as it states," that Musk "had secured sources or financial sources to fund a go-private transaction." (Joseph Fath Tr. at 28:18-28:23);

(hhhh)     Joseph Fath testified on July 12, 2021 that "secured," as used in the context of Musk's tweet, meant that funding was "locked and loaded and no question at all a

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

hundred percent that you have funding ready to go and you're prepared to move forward with this transaction." (Joseph Fath Tr. at 28:24-29:5);

(iiii)     Joseph Fath testified on July 12, 2021 that there was "nothing left for interpretation" because Musk's tweet "talk[ed] about the company being taken private, has a specific dollar amount, along with the verbiage funding secured" and that it was "pretty black-and-white." (Joseph Fath Tr. at 32:22-33:8);

(jjjj)     Joseph Fath testified on July 12, 2021 that Musk's subsequent tweets, including in particular that "investor support is confirmed," in his opinion "reinforced the funding secured" tweet. (Joseph Fath Tr. at 45:23-46:8);

(kkkk)     Egon Durban testified on September 7, 2021 that he had previously used the word "secured" when discussing capital commitments and funding when it was "[c]ontractual" and there was a binding commitment pertaining to the capital. (Egon Durban Tr. at 42:12-43:2).

(llll)     On August 8, 2018, Musk acknowledged to another Tesla employee that I "[h]ave to be very careful what I say. Shorts want me dead *real* bad. They are losing their minds." (TESLA_LITTLETON_00019654);

(mmmm)     On August 10, 2018, Musk mocked short sellers by tweeting that "Short shorts [were] coming soon to Tesla merch[andise]."

(nnnn)     Yasir Al-Rumayyan text messaged Musk on August 10, 2018 stating that the Public Investment Fund "remains interested in potential investment opportunities," "would like to explore investing in Tesla subject to being able to create a Tesla production hub in the Kingdom of Saudi Arabia," and "would like . . . to start working together . . . to explore a potential transaction," which demonstrates the absence of any agreement to finance a go-private transaction. (TESLA_LITTLETON_00006164-65; *see also* SEC-EPROD-000015424 at 9)

(oooo)     Pursuant to the Mutual Non-Disclosure Agreement between the Public

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Investment Fund and Tesla, which was signed by Elon Musk, any go-private transaction as of August 10, 2018 was only a "Potential Project" being explored by PIF and Musk. (TESLA_LITTLETON_00005310 at 1)

(pppp)   Sam Teller testified on August 11, 2021 that Yasir Al-Rumayyan told Musk during their call on August 10, 2018 that the transaction was still pending approval from others within the Public Investment Fund and that additional work was necessary. (Sam Teller Tr. at 242:24-244:12). On August 12, 2018, two days later, Musk told Yasir Al-Rumayyan that he was excluding them from participation in any going private transaction, texting "we cannot work together." "Sorry" and "It's over." (TESLA_LITTLETON_00000320 at 11);

(qqqq)   Martin Viecha, Tesla's Head of Investor Relations, testified on August 23, 2021 that he never saw anything "in writing" from the Public Investment Fund, was unaware of any agreement on the "$420 per share price" with the Public Investment Fund, and did not know "whether anyone had even discussed the $420 per shar price" with the Public Investment Fund prior to Musk's tweets on August 7, 2018. (Martin Viecha Tr. at 135:10-135:19);

(rrrr)   In an email dated August 11, 2018, Elon Musk acknowledged that he should probably tweet less and agreed to the statement that Twitter was hurting his reputation. (TESLA_LITTLETON_00019664);

(ssss)   On August 15, 2018, Martin Viecha forwarded to Deepak Ahuja and Todd Maron an email from Janus Henderson Investors, an institutional investor, providing feedback. Viecha noted that this email "encapsulates what most investors I speak to feel." In this email, the institutional investor said "The fact that Elon has been using Twitter really undermines credibility—to put it bluntly his tweets have been nothing short of disastrous over the last few months and I don't think it is unreasonable to say that they are at risk of becoming a significant liability to the Tesla brand/story."

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

(TESLA_LITTLETON_00019026);

(tttt)      Nii Owuraka Koney testified on July 14, 2021 that the August 13, 2018 blog post "did not make [him] think it was less likely funding was available" after he read it. (Nii Owuraka Koney Tr. at 159:15-159:22);

(uuuu)      Egon Durban of Silver Lake Partners received "talking points" from Steven Rosenblum on August 16, 2018 concerning conversations with Tesla's investors about the going private transaction. (SEC-EPROD-000009934 at 2);

(vvvv)      On August 19, 2018, Martin Viecha informed Deepak Ahuja and Todd Maron that he had met in the past few days with Fidelity, TRowe, Jennison, Capital World, Capital International, PrimeCap, Baron Capital, UBS O'Connor, and others. The feedback from investors regarding privatization was that they "can't hold private entit[ies]." Viecha further informed that "quite a few mid-sized investors shared their frustration that they don't have a mandate to hold a stake in a private company." Ahuja forwarded the investors' feedback to Elon Musk. (TESLA_LITTLETON_00019023);

(wwww)   On August 20, 2018, Musk's advisors submitted a Power Point presentation to the Tesla Board's Special Committee setting forth Musk's going private transaction objectives and process outline. The "Next Steps" slide, among others, listed "Reach out to Potential Investors" and "Confirm Investor interest." According to this document, as of August 20, 2018, "[Elon Musk was still] evaluating various transaction structures [to] [c]onfirm investor financing that has a broad cap table." (TESLA_LITTLETON_00019960 at 3, 6);

(xxxx)      On August 23, 2018, Musk's advisors made a presentation regarding the potential going-private transaction to the Tesla Board. The price for the transaction was still undetermined. (TESLA_LITTLETON_00006626).

In response to this Interrogatory, Plaintiff further refers to the documents contained in Exhibit A, hereto.

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

1    Dated:    November 4, 2021          As to objections,

2                                        **LEVI & KORSINSKY, LLP**

3                                        _/s/ Adam M. Apton_

4                                        Adam M. Apton (SBN 316506)
                                         Adam C. McCall (SBN 302130)

5                                        75 Broadway, Suite 202
                                         San Francisco, CA 94111

6                                        Telephone: (415) 373-1671

7                                        Email: aapton@zlk.com
                                         Email: amccall@zlk.com

8
                                         Nicholas I. Porritt
9                                        **LEVI & KORSINSKY, LLP**
                                         1101 30th Street N.W., Suite 115
10                                       Washington, D.C. 20007

11                                       Tel:     (202) 524-4290
                                         Email: nporritt@zlk.com

12                                       (_admitted pro hac vice_)

13                                       _Lead Counsel for Plaintiff and the Class_

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2021 copies of the foregoing Plaintiff's Response to Defendants' First of Interrogatories to Lead Plaintiff were served by electronic mail upon counsel as follows:

COOLEY LLP
Bingxin Wu
bwu@cooley.com

Patrick Edward Gibbs
pgibbs@cooley.com

Sarah Malke Lightdale
slightdale@cooley.com

s/ Adam M. Apton
Adam M. Apton

PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

EXHIBIT "A"

| Exhibit # | Document Date | Exhibit Description | Bates Range | Deponent |
|---|---|---|---|---|
| 1 | 9/22/2020 | Expert Report of Michael L. Hartzmark | | Hartzmark |
| 2 | 1/16/2019 | Plaintiff's Glen Littleton's Consolidated Complaint for Violations of the Federal Securities Laws | | Hartzmark |
| 3 | 11/11/2019 | Notice of Lodging of Addendum To the Consolidated Class Action Complaint | | Hartzmark |
| 4 | 9/22/2020 | Exhibit B, attached to Plaintiff Glen Littleton's Declaration, representing his transactions in Tesla securities during the period August 7th to August 17th of 2018. | | Hartzmark |
| 5 | 7/9/2018 | Email from Ryan Brinkman to Aayush Gupta and Auto Guys, Re: Tesla's Musk Said to Visit China for Event With Government | JPMS_00013270-JPMS_00013271 | Brinkman |
| 6 | 7/20/2018 | JP Morgan (Ryan Brinkman) Presention "Auto Under 40" Chase Auto Event in New York | JPMS_00010270-JPMS_00010326 | Brinkman |
| 7 | 8/1/2018 | Email from Ryan Brinkman to Ryan Brinkman, Re: TSLA [earnings] call questions (backup) | JPMS_00004716 | Brinkman |
| 8 | 8/7/2018 | Elon Musk tweet at 9:48 am, "Am considering taking Tesla private at $420. Funding secured." | | Brinkman |
| 9 | 8/7/2018 | Elon Musk tweet at 10:40 am, "I don't have a controlling vote now & wouldn't expect any shareholder to…" | | Brinkman |
| 10 | 8/7/2018 | Elon Musk tweet at 11:00 am, " My hope is *all* current investors remain with Tesla even if we're private..." | | Brinkman |
| 11 | 8/7/2018 | Elon Musk tweet at 11:13 am," Shareholders could either to sell at 420 or hold shares & go private." | | Brinkman |
| 12 | 8/7/2018 | Tesla Blog Post: Elon Musk email to Tesla employees "Taking Tesla Private" August 7, 2018 | | Brinkman |
| 13 | 8/7/2018 | Only reason why this is not certain is that it's contingent on a shareholder vote." | | Brinkman |
| 14 | 8/8/2018 | Email from Ryan Brinkman to EQR - Aprroval Request, Re: Request approval to raise Tesla (TSLA) price target by +58% | JPMS_000016045-JPMS_00016047 | Brinkman |

| 109 | 7/29/2018 | Email from Sam Teller to Saad Aljarboa, Re: Yasir Meeting with Elon, 7/29/2018 at 3:48amUTC | TESLA_LITTLETON_00003927 | Teller |
|---|---|---|---|---|
| 110 | 7/31/2018 | Sam Teller text messages | TESLA_LITTLETON_00006319 | Teller |
| 111 | 8/7/2018 | Email from Antonio Gracias to Sam Teller; Cc: Todd Maron; Reyna Ortiz re Board feedback | TESLA_LITTLETON_00001066-TESLA_LITTLETON_00001067 | Teller |
| 112 | 8/8/2018 | Email from Sam Teller to Saad Aljarboa; Cc: Noha Zagzoug; Reyna Ortiz, Re: Yasir Meeting with Elon | TESLA_LITTLETON_00005090 | Teller |
| 113 | 8/9/2018 | Teller email reaching out to investor re going private - Tencent | TESLA_LITTLETON_00014812 | Teller |
| 114 | 8/9/2018 | Teller email reaching out to investor re going private - Primecap | TESLA_LITTLETON_00014813 | Teller |
| 115 | 8/9/2018 | Teller email reaching out to investor re going private - Jennison | TESLA_LITTLETON_00014814 | Teller |
| 116 | 8/9/2018 | World | TESLA_LITTLETON_00014815 | Teller |
| 117 | 8/9/2018 | Teller email reaching out to investor re going private - AllianzGI | TESLA_LITTLETON_00014816 | Teller |
| 118 | 8/9/2018 | Teller email reaching out to investor re going private - Fidelity | TESLA_LITTLETON_00015990 | Teller |
| 119 | 8/9/2018 | Gifford | TESLA_LITTLETON_00016050 | Teller |
| 120 | 8/9/2018 | Teller email reaching out to investor re going private - T. Rowe | TESLA_LITTLETON_00016051 | Teller |
| 121 | 8/1/2018 8/15/2018 | Elon Musk Text messages - Spreadsheet | TESLA_LITTLETON_00000320 | Teller |
| 122 | 8/10/2018 | Email from Sam Teller to Dave Arnold, Re: comment please on story we publishing on Saudi fund, 8/10/18 at 2:51pm | TESLA_LITTLETON_00015997-TESLA_LITTLETON_00015998 | Teller |
| 123 | 8/12/2018 | Email from Elon Musk to Sam Teller re ok for counsel, 8/12/18 at 6:14amUTC | TESLA_LITTLETON_00005738 | Teller |
| 124 | 8/11/2018 | Ahuja, Re: Egon Durban of Silver Lake, 8/11/2018 at 9:27 PM PST | TESLA_LITTLETON_00000106 | Teller |
| 125 | 8/10/2018 | Email from Sam Teller to Shihana (PIF) re Elon's signed NDA at 11:18am PST | TESLA_LITTLETON_00005205 | Teller |
| 126 | 7/13/2017 | Murdoch-Tesla Indemnification Agreement, dated July 13, 2017 | TESLA_LITTLETON_00006539-TESLA_LITTLETON_00006547 | Murdoch |
| 127 | 5/4/2018 | Sarah O'Brien email to ExecStaff about media coverage of Elon tweets | TESLA_LITTLETON_00015902-TESLA_LITTLETON_00015904 | Murdoch |
| 128 | 8/2/2018 | Maron forwarding Elon's email to individual board members, 8.3.18 at 2:33am UTC – 8.2.18 at 7:33pm PST | TESLA_LITTLETON_00000375 | Murdoch |