Pages 1 - 145

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | | |
|---|---|---|
| IN RE TESLA, INC. SECURITIES | ) | No. C 18-4865 EMC |
| LITIGATION | ) | |
| | ) | |
| | ) | San Francisco, California |
| | ) | Tuesday |
| | ) | October 25, 2022 |
| _____ | ) | 9:30 a.m. |

<u>**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:              LEVI AND KORSINSKY
                             1101 30th Street NW
                             Suite 115
                             Washington, DC 20007
                    BY:  **NICHOLAS I. PORRITT, ESQ.**
                         **ELIZABETH K. TRIPODI, ESQ.**
                         **ALEXANDER A. KROT, ESQ.**

                             LEVI & KORSINSKY LLP
                             75 Broadway
                             Suite 202
                             San Francisco, California 94111
                    BY:  **ADAM M. APTON, ESQ.**

For Defendants:              QUINN EMANUEL URQUHART & SULLIVAN LLP
                             865 South Figueroa Street
                             10th Floor
                             Los Angeles, California 90017
                    BY:  **MICHAEL T. LIFRAK, ESQ.**
                         **ANTHONY P. ALDEN, ESQ.**

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

1   **APPEARANCES:   (CONTINUED)**

2   **For Defendants:**          QUINN EMANUEL URQUHART & SULLIVAN LLP
                                  51 Madison Avenue
3                                 22nd Floor
                                  New York, New York 10010
4                          BY:   **ALEXANDER B. SPIRO, ESQ.**
                                 **ELLYDE R. THOMPSON, ESQ.**
5                                **JESSE A. BERNSTEIN, ESQ.**

6                                      – – –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Tuesday - October 26, 2022**</u>                                    <u>**9:31 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

  **THE CLERK:**  This court is now in session.  The Honorable Edward M. Chen is presiding.

  Court is calling the case In Regarding Tesla, Inc. Securities Litigation, Case No. 18-4861.

  Counsel, please state your appearance beginning with the plaintiffs.

  **MR. PORRITT:**  Good morning, Your Honor.  Nicholas Porritt of Levi and Korsinsky on behalf of the plaintiff and the class.

  With me are Adam Apton, Elizabeth Tripodi and Alexander Krot also of Levi and Korsinski.

  **THE COURT:**  All right.  Good morning, Mr. Porritt.

  **MR. PORRITT:**  Good morning, Judge.

  **MR. SPIRO:**  Good morning, Your Honor.  This is Alex Spiro.

  I'm joined by Ellyde Thompson, Anthony Alden, Michael Lifrak, Jesse Bernstein from my firm, Quinn Emanuel Urquhart and Sullivan.  Good morning.

  **THE COURT:**  All right.  Good morning, Mr. Spiro.

  Okay.  Well, there's a lot to cover here and this is probably going to be an iterative process to a certain extent. We do have a little bit of time between now and trial, but I do

1    want to get through some more major issues and set a chart, a

2    course for sort of where we go from here.

3        Let me just jump in while I have fresh in my mind a couple

4    of issues.  One is the question about the blog of August 13th

5    and whether that's on the table, so to speak, at this juncture

6    and sort of what's feasible and what could be at issue on the

7    omission theory that Mr. Littleton seeks to advance that's not

8    already covered or obviated by my earlier ruling dismissing the

9    affirmative misleading nature of that -- of that Tweet or that

10   blog.

11       And I guess I want to hear, and it's just a -- recall, I

12   had found that although there were some statements, namely the

13   statement by Mr. Musk that he had left the July 31st meeting

14   with, quote, no question that a deal with the Saudi sovereign

15   fund could be closed, it's just a matter of getting the process

16   moving.  As we said, that was potentially false and misleading,

17   was sort of obviated or cured by the latter part of that blog

18   that detailed some of those barriers and that, therefore, would

19   have disabused the reader of that otherwise misleading

20   statement.

21       So my question is:  How is -- to the plaintiffs.  How is

22   the theory of omission different?  How does it escape -- my

23   order only addressed the affirmative theory, but the question

24   is:  Is there something -- if you take the reasoning and my

25   analysis, why does that not preclude an omissions theory, with

```
1    the very same language about the "I left the July 31st meeting

2    with no question."

3              MR. PORRITT:  Thank you, Your Honor.

4         The reason why it's still an omission theory is because by

5    speaking about the negotiations and the current state of

6    negotiations with Saudi Arabia -- so they talked about both

7    July 31st meeting -- and then also says in the context of that

8    blog post that discussions with the Saudi Arabia PIF are still

9    ongoing.

10        As Your Honor is aware, under the law once you speak on a

11   subject, you must speak completely.  It's to avoid being

12   misleading.

13        Plaintiffs omitted the then status of the Lockheed

14   negotiations with the Saudi Arabia PIF fund, the most recent of

15   which occurred just the day before, the evening before that

16   blog post was published on the morning of August 13th.  And I

17   think it's demonstrated by PIF's only action to the blog post,

18   which they described it as -- as containing, I think, loose

19   information is how they -- how they described it.

20        So our theory, while his descriptions in the August 13th

21   blog post, as far as they went, may be technically true in

22   talking about the meeting on July 31st, they failed to present

23   the accurate -- they failed to accurately represent the state

24   of affairs then between Elon Musk, Tesla and the Saudi PIF.

25             THE COURT:  All right.  How would you characterize
```

1  precisely what that state of affairs was as of the 13th of

2  August?

3          **MR. PORRITT:**  I would say that it was extremely

4  early; that the -- Elon Musk was contemplating not going

5  forward with PIF at all; that Elon Musk certainly was committed

6  to not including PIF, allowing them to have a majority funding,

7  position in funding the overall transaction; that Elon Musk had

8  threatened to completely remove PIF from any funding involved

9  in the transaction.

10      So that's how I would -- I don't think that's a fair

11  impression derived from reading those words.

12          **THE COURT:**  So had it been -- to make it truthful,

13  what would it have said?  What more words should have been

14  added to that blog?

15          **MR. PORRITT:**  I think it would have been more saying:

16  It was never my intention to use the Saudi PIF to fund the

17  entire transaction amount.  I've had discussions with the Saudi

18  Arabia PIF.  We've had some disagreements with what their role

19  should be.  I am hopeful that I may be able to include them in

20  the transaction going forward, but at this stage it is still

21  very early and tentative.  Something along those lines.

22  Drafting on the fly, so to speak.

23      That I don't think is accurately captured in the blog

24  post.  The blog post says, you know, I -- you know, it's all on

25  track.  I -- I'm completely confident.  There's a bit more

1  paperwork than I thought, but it's all going forward.  And that

2  is in no way, shape or form an accurate reflection of where

3  things stood on August 13th.

4           **THE COURT:**  So instead of saying an intent to go

5  forward, the truth of the matter, in your view, is that there

6  was no intent to go forward, or is that overstated?

7           **MR. PORRITT:**  I mean, I think it's -- I mean, I don't

8  think you could say PIF had expressed an intent to go forward.

9  They expressed an interest in learning more about the

10  transaction, whatever that may be.

11      Of course, the other issue here is that the form of the

12  transaction was never finalized by Mr. Musk before he called

13  the transaction on August 24th.  There was never really

14  anything to really evaluate.

15           **THE COURT:**  Well, I understand that, but I'm looking

16  at as of the date of this blog --

17           **MR. PORRITT:**  Yes, sir.

18           **THE COURT:**  -- you know, given he did say that the

19  proceeding is subject to financial and other due diligence,

20  internal review, additional details.  You know, in talking with

21  the -- they indicated that the Saudi fund was asking for

22  additional details about how the company would be taken

23  private, including required percentage, regulatory

24  requirements.

25      He even admitted it's premature to give the full details

```
 1   of the plan.  He says, "I continue to have discussions with the
 2   fund and number of other investors.  It is appropriate to
 3   complete those discussions before representing in detail."
 4        So is it inaccurate to say he was continuing to have
 5   discussions with the Saudi fund?  Was that a misstatement?
 6        MR. PORRITT:  I mean, the point -- yes, he continued
 7   to have discussions.  Point being is that he does not disclose
 8   that.  Even as of August 7th he had no intention of giving the
 9   Saudi PIF any more than 20 percent of the overall financing.
10   That's not apparent.
11        So the tangential reference to "other investors" doesn't
12   give any indication that these investors are, in fact, the
13   majority investors or however going forward it was going to be
14   financed.
15        It doesn't -- it doesn't give a fair reflection of the
16   fact that just a day earlier Elon Musk had literally texted to
17   Yassir at the Saudi PIF, "It's over."
18        So this gives a sense of on ongoing consensual
19   negotiations when, in fact, the relationship was far more
20   stalling, far more different.  And, in fact, they are almost
21   really back to square one, I would say, on August 13th in terms
22   of -- in terms of where --
23        THE COURT:  Well, let me clarify because you say,
24   well, there was -- he had a secret intent never to allow an
25   acquisition of more than, you say, 20 percent.  He does say in
```

1  here that:  We have to have more discussions.  He asked for

2  additional detail from the Saudis, including any required

3  percentages, quote/unquote.

4      So, I mean, that comes pretty close.  It discloses they're

5  still talking about that.  You're saying he didn't give a

6  bottom line.  He didn't say he should have revealed that in my

7  view I'm not going to allow that percentage to ever exceed

8  20 percent and my guess that the Saudis are not going to go for

9  it, or what was their position?

10      **MR. PORRITT:**  I mean, I think he should have revealed

11  that Saudi -- he's always had in mind the Saudi PIF as a

12  minority investor.

13      I mean, this was in the context of the understanding from

14  the August 7th Tweets that the Saudi PIF were funding the whole

15  thing.

16      And, in fact, even after the August 13th blog post,

17  *Morning Star* reached exactly that conclusion, as I believe so

18  did Morgan Stanley, saying, "It seems to me clear now after

19  this blog post that the Saudis are completely behind us."  He

20  wouldn't have put out this blog post otherwise.

21      **THE COURT:**  All right.  So his role on the Saudis as

22  being a minor investor was not disclosed, which would have

23  indicated that it is less likely -- because that would have

24  prevented a -- presented a barrier to the Saudis and that

25  barrier was not disclosed.  That's one problem.

1           MR. PORRITT:  Well, it's one problem.  Not only of a

2   minority investor, but a minority investor that Elon Musk was

3   quite willing to cut out of the deal all together, in which

4   case the source that the market -- many market investors

5   believed was 100 percent behind the deal was, in fact, very

6   much an optional extra.

7           THE COURT:  Well, he does say, "I'm also having

8   discussion with a number of other investors."

9        That implies that the Saudis don't have a lock on it.

10          MR. PORRITT:  Not a lock on 100 percent, but it says

11  nothing to rebut the assumption, I think, on the street that

12  they were at least providing the majority of the funding

13  clearly one side.  Whether it was secured or not, what you

14  interpret that to mean.

15          THE COURT:  And let me ask you about the "it's over"

16  text.  Tell me about whether that comes into play.

17          MR. PORRITT:  Well, because during the course of --

18  August 13th is a Monday.  During the course of the weekend,

19  there was reports in the media that -- you know, there were

20  conflicting reports.  There were reports that Saudi Arabia were

21  completely behind this and were working to provide the funding

22  and arrange -- get it lined up and documented.  And then there

23  were other conflicting reports saying -- I think from

24  Bloomberg, saying:  Nobody at the Saudi PIF knows anything

25  about this transaction.

1          **THE COURT:**  I'm sorry.  Say it again.

2          **MR. PORRITT:**  Nobody -- people at Saudi PIF are not

3    on board, are not on board with this transaction.  It's not

4    been approved.  Funding is not available from the Saudi PIF.

5          And so Elon Musk had a series of exchanges with Yassir

6    over the weekend after this report and saying:  I want you to

7    put out a press release saying you are committed to doing this

8    transaction.

9          And when the PIF put out a -- they put out a statement,

10   which was not as strong as what Elon Musk wanted, initially

11   wanted, he complained.  He said:  This is no good.  This isn't

12   enough.  This is very weak.  It makes me look like a liar.

13         And Yassir writes back and says:  But it is where we are.

14   We haven't committed to anything.  You were going to send us

15   information.  You haven't done that.  We haven't exchanged any

16   information.  We haven't done any due diligence yet.  How do

17   you expect us to go forward when you haven't given us any

18   information?

19         And at that point he says:  I don't need you.  I'm talking

20   to lots of people, and so you're out.  Basically is what he

21   says to Yassir.

22         And Yassir says:  Please, no.  Let's carry on talking.

23         And so Elon Musk eventually says:  Okay.  We will carry on

24   talking.

25         But, you know, that's a very different state of mind than

1  what this gives, the impression the blog post gives, which is

2  clearly intended to try and resuscitate his August 7th Tweet,

3  written, as we know, by Tesla corporate relations and with

4  counsel heavily reviewing it at that point.

5      And it's clearly designed to make the funding secured

6  sound as secured as possible, and it makes it sound as if the

7  Saudis are on board.  We're completing the paperwork.  There

8  are other investors who might get involved, too.  But it does

9  not suggest that the Saudis were only ever minor investors who

10  may be dropped at any minute and then really all the funding is

11  going to come from other investors who are unnamed and to be

12  determined.

13          **THE COURT:**  Well, I'm still having some trouble with

14  materiality frankly.  There's already a report in the media,

15  Bloomberg, that things are not going so well; that PIF is not

16  necessarily there.

17      There is an indication here that they are continuing

18  discussions, along with discussion of a number of other

19  investors, and describing that there are some basic details

20  that need to be done and some review, financial due diligence,

21  even the question about percentages, which I had already found

22  discloses enough to take this thing out of the earlier

23  statement.

24      I'm still struggling to see what it is here that -- you

25  know, maybe it's a tad more rockier.  It's back and forth.  You

1  know, wanting more assurance.  Then give it.  Then said:

2  You're out.  No, let's continue talking.  I'm not sure how

3  material that is given what's been disclosed.

4         MR. PORRITT:  Well, as Your Honor has heard many

5  times over the course of the summer and into the fall,

6  materiality is a contested factual question.  We can point

7  to --

8         THE COURT:  Unless no reasonable juror could find

9  otherwise.

10        MR. PORRITT:  Unless no reasonable juror could find

11  otherwise, agreed.

12     We have -- we can point to, for instance, in, say, the

13  *Morning Star* report where they expressly connect this

14  August 13th blog post with the ongoing commitment, as they

15  understand it.  They said:  We think the chances of a deal with

16  the Saudi involvement is more certain than we thought before

17  the blog post.  So they took this impression.  Now, you know,

18  as it turns out, incorrectly, but they were certainly given the

19  impression.

20        You have other analysts saying that this August 13th blog

21  post, you know, reaffirms the truth or the credibility of the

22  August 7th Tweets.  They expressly tie the August 7th Tweets

23  that are -- you know, start off this case with the August 13th

24  blog post.

25        So we would submit that there is a question of

```
 1   materiality.  At a minimum it's a contested factual question
 2   that should go to the jury.
 3          THE COURT:  And that notwithstanding my ruling with
 4   respect to the affirmative misleading nature, the omission
 5   theory could get by here, get by summary judgment -- well, with
 6   the equivalent of -- it should go to the jury because you -- at
 7   the end of the day you say there is a difference here because
 8   there was more going on behind the scenes that would create, I
 9   don't know, greater uncertainty, a greater risk of this not
10   going forward even notwithstanding what was disclosed at the
11   back end of this blog.  Essentially that's what your theory is.
12          MR. PORRITT:  That's correct, Your Honor.  And
13   particularly in connection with the Saudi PIF, which, you know,
14   after we moved -- we moved for summary judgment in our favor
15   on, originally on different statements, but still the omitted
16   facts I was saying.  But also there's discussion there of
17   investor -- you know, ongoing talk with other investors.
18          The reality is he'd barely spoken to any investors and, in
19   fact, many investors were telling him that, you know, they
20   weren't able to participate.
21          So, you know, that is another reason why this blog post
22   gives it an entirely misleading impression of affairs as it
23   actually wasn't in the case in -- that it was in the case on
24   August 13th.
25          So both those reasons, we think, that's sufficient for the
```

1    jury to decide whether this blog post was materially misleading

2    or not.

3            THE COURT:  All right.  Let me hear from Tesla, your

4    views as to why this is different enough, the omission theory,

5    to at least make it a jury question.

6            MR. LIFRAK:  Thank you, Your Honor.  It's Michael

7    Lifrak for the defendants.

8        I think we have to take a step back and look at the

9    allegations we're talking about and whether or not they were

10   pled in the first instance.

11       The Court's order in securities class actions, the PSLRA

12   requires a pleading of specificity; not just of misleading

13   statements, but also of omissions.

14       But if we look at the consolidated complaint in this

15   action, particularly where the blog post is discussed in and

16   around Paragraph 138 of the Complaint, this omission theory

17   that Mr. Porritt discussed at length just now doesn't appear.

18   The notion that there was more going on behind the scenes, that

19   there was omission of discussion that were happening in the

20   days prior to the blog post, that doesn't appear in the

21   Complaint.  It doesn't appear in the addendum to the Complaint

22   that was filed.

23       And as the Court noted, the Court has determined that

24   there were no actionable misrepresentations in the bar post.

25   And so now we're at a question of whether there were omissions,

 1    but those haven't been identified by the plaintiff either.

 2        And in some ways we come back to the same point.

 3    Omissions are only actionable if they make another statement

 4    materially misleading.  What -- and what is that materially

 5    misleading statement?  Plaintiff hasn't pled anything other

 6    than what has been already rejected by the Court in terms of

 7    this blog post, in terms of this blog post.

 8        So we come back to the same point of the lack of any

 9    pleading that encapsulates this theory that -- of omission or

10    of affirmative misrepresentation that plaintiff is discussing

11    through the blog post.

12            **THE COURT:**  Well, I looked at 138.  Not only is it

13    not specific, the gravamen of that complaint is that it omitted

14    and concealed the fact that, quote, an agreement had not yet

15    been secured from any potential source of funding, which fact

16    was disclosed as I had held in the latter half of that blog.

17        It does not state sort of the more nuanced view; that it's

18    not just that funding had not been secured, but sort of the

19    level of enthusiasm, the potential loggerheads over

20    percentages, you know, that kind of thing.  There was still

21    negotiations to be had.  You know, that level of subtlety,

22    that's not described here.

23        What is described in Paragraph 138 is that agreement had

24    not been secured from any potential source, which was evident

25    at the end of the day from the blog.

 1          So let me -- let me ask Mr. Porritt.  I mean, especially

 2    given the pleading standards that apply here, the discussion

 3    you and I have just had for 15 minutes, I just don't see that

 4    in this Paragraph 138.

 5          **MR. PORRITT:**  Well, I think that Paragraph 138 also

 6    talks about investors and commitment to the deal, relationships

 7    with Saudi PIF.

 8          More importantly, obviously that was -- that complaint was

 9    drafted without benefit of discovery, as Your Honor is aware.

10    And we did serve -- so I think it was a danger of sort of

11    unduly putting form over substance.

12          And there is no question the defendants have been on

13    notice of this theory of misrepresentation and omission for the

14    blog post, for this -- even for these statements that were

15    directly identified in the Complaint throughout this case.  So

16    this can come as no surprise that we are suddenly changing our

17    theory on the eve of trial.

18          We served -- interrogatory responses were served back last

19    year before the close of fact discovery where we provided at

20    length page upon page upon page of detail, including the

21    specific text that Your Honor and I have just been discussing,

22    explaining why that -- it was misleading to omit reference to

23    the substance of those texts in the August 13th blog post.

24          **THE COURT:**  So these interrogatories -- was this a

25    response to a contention interrogatory or what kind of

1    interrogatory response was it?

2          **MR. PORRITT:**  It was an interrogatory served saying,

3    first of all, identify any misrepresentation or omission; and

4    then secondly, identify why each identified representation or

5    omission was -- was misleading.

6          And so we identified the August 13th blog post as

7    misleading by omission, and then we went through exhaustively

8    with the detail, with the facts.  I think this was before even

9    Mr. Musk's deposition, or it was otherwise close to the end of

10   fact discovery right before the cut-off, explaining exactly all

11   the details as to why we felt that we thought it was omitted --

12         **THE COURT:**  Including everything you have said today?

13         **MR. PORRITT:**  Yes, Your Honor.  Certainly including

14   all the Yassir attacks, which are fundamentally what we're

15   really talking about here.

16         **THE COURT:**  All right.  Let me get a response.

17         **MR. LIFRAK:**  We discussed I believe at the last

18   hearing these interrogatories responses, which, you know, go on

19   for 256 pages, I believe.  And it's not correct that in these

20   interrogatory responses the theory that you and Mr. Porritt --

21   Your Honor and Mr. Porritt have been discussing was disclosed.

22         The blog post is identified generally as something that

23   was the source of misleading statements, but the theory that's

24   being discussed now is not specifically disclosed or discussed

25   in those interrogatory responses.

 1          **THE COURT:**  Have those, the specific interrogatory

 2   dates and responses, been -- is that part of record now before

 3   me?

 4          **MR. LIFRAK:**  I believe it was part of the record on

 5   the motion -- one of the early Motions in Limine that was filed

 6   previously, particularly the one where we sought to exclude

 7   evidence related to the August 13th blog post.  So it is in

 8   that motion.

 9          **MR. PORRITT:**  Your Honor, I don't believe it's

10   included as part of the already rather extensive briefing for

11   today's hearing, Your Honor, but we would be happy to -- it's

12   one particular answer, I think, or section of an answer.

13          **THE COURT:**  All right.  Well, let's do this.  Even if

14   it's already in the record, I would like you to submit that,

15   and you can highlight where you think your, I'll put it, more

16   subtle theory of omissions has been adequately disclosed and

17   I'd like to look at that.

18          **MR. PORRITT:**  Very good, Your Honor.

19          **THE COURT:**  In the next couple days if you could

20   submit that.  I don't need to see everything.  I just want to

21   see the -- that response, and you can highlight the key

22   language for me.

23          **MR. PORRITT:**  Very good, Your Honor.  We'll --

24   there's two interrogatories, one of which is very brief, which

25   is:  Identify the statements within the much longer responses

 1   or reasons why.

 2           **THE COURT:**  All right.  Before we leave this subject,

 3   let me give Mr. Lifrak a chance.  Beyond the failure to

 4   disclose pleading problem, whether you have a substantive

 5   comment on whether or not -- on materiality.

 6           **MR. LIFRAK:**  Well, I believe the Court has already

 7   addressed that in the prior order on the August 13th blog post,

 8   and I don't think we have anything to add, unless one of my

 9   colleagues has, on the materiality point.

10           **THE COURT:**  All right.  Well, we've had a pretty

11   thorough discussion, and I'm familiar with what I did.  That's

12   why I start -- that is a starting point, it seems to me.  The

13   burden is on the plaintiff to demonstrate that there is

14   something different about this theory, assuming we get past the

15   pleading notice issue, but I think this discussion this morning

16   has been helpful.

17           Let me then turn to the -- sort of one of -- the big

18   question, and probably the most complicated question, having to

19   do with defendant's Motion in Limine No. 5, regarding the

20   opinions of Heston and Hartzmark.  And I -- I asked you in a

21   minute yesterday, the Clerk's notice, to be prepared to do a

22   little mini tutorial.

23           I mean, I've read the report, and I have to say the

24   mathematical formulas after about the third one got a little

25   bit dense for me.  I'm going to be the first to admit that.

```
 1   And I will give you all a chance to talk about the merits, but
 2   maybe it's helpful to explain a couple of things.
 3        So I'll tell you what I -- I think I don't need help on.
 4   I mean, I understand what an option is.  I understand what a
 5   put and a call are.  I understand the concept of straddle.  As
 6   we get much beyond that and the relationships and how this
 7   actually works in the market is perhaps -- that's getting
 8   towards the edge of my prior knowledge.
 9        So, for instance, there is reference to -- in the report
10   to a bid-ask spread.  I guess that exposes my ignorance about
11   how these markets work.  I understood that there's -- you can
12   buy -- you can buy through an exchange or not through an
13   exchange, and I'm not sure how that all plays out.
14        I don't know, for instance, how common straddles are.  Are
15   most of the options that are bought, for instance, in this
16   instance for Tesla, are they bought as part of a straddle
17   strategy or how does that actually work?
18        I don't quite understand the difference between so-called
19   short-term and long-term straddles.  Why a particular date --
20   the difference of an expiration date of, you know, 12 days
21   makes a difference.  I'm not sure I understand that.
22        And then there's some reference to model fitting biases.
23   Frankly, I don't know what that means.
24        So, you know, and I know there's going to be a big
25   discussion about confounding factors.  I'll have a specific
```

1   question about that, but if there's -- maybe, you know, how

2   these things actually work in the real market, how are they

3   purchased, how are they sold, maybe spending 10, 15 minutes on

4   that might prove useful.

5        I'll leave either one of you to start that process.

6             **MR. PORRITT:**  I will start, if I may, Your Honor.

7             **THE COURT:**  Yeah.

8             **MR. PORRITT:**  So dealing with the basics of how

9   options are traded, these were mostly -- these were exchange

10  traded options, and so they are purchased or sold rather like a

11  stock.

12       So like a stock it's a straight on exchange.  At any given

13  point in time there's -- market makers post a bid and an ask

14  for a particular option, like they do for a particular stock.

15  And then when you seek to trade, your broker will then execute

16  your trade, typically within that bid and ask spread.

17       So the issue with bid-ask spreads for options is the

18  bid-ask spread for options tends to be wider than the bid-ask

19  spread for stock, particularly for a very highly traded stock

20  like Tesla.  And also because the price of options is lower,

21  the bid-ask spread is more meaningful in terms of the price

22  paid.

23       So the bid-ask spread for -- for the price of the Tesla

24  stock, for instance, which was trading, say, around $350 might

25  be one or two cents.  So that's really not -- maybe less than a

 1  cent.  That's obviously not very meaningful.

 2          THE COURT:  So let me ask a dumb question.  When you

 3  have a bid-ask spread, how does that result in a closed

 4  transaction?

 5          MR. PORRITT:  Well, that's -- oh, boy.  That's

 6  getting into the plumbing of the markets.

 7      I mean, the exchange will match -- you know, the person

 8  who is looking to buy an option will put in a bid, and the

 9  person will -- market makers are posting bid-ask spreads, and

10  they are essentially agreeing to execute trades within that

11  spread.

12      So if you then bid to ask -- you then bid by the option

13  below what the ask is, you know, within the range of what the

14  ask is from the market maker, then you will -- which the market

15  maker on the other side is matching it against someone who is

16  looking to sell at that particular price, that's how the buyer

17  and the seller are put together.

18          THE COURT:  So when one puts in a bid, it is a range

19  or not just a single point?

20          MR. PORRITT:  Well, the bid is put in by the person

21  looking to buy.  The ask is put in by people wishing to sell.

22          THE COURT:  Right.

23          MR. PORRITT:  The market maker publishes a bid-ask

24  spread and says basically:  We will meet bids above this level,

25  and we will meet asks below this level.  And they then -- the

bids and asks come in and if they are within the range, then
they will get filled.

Or you may put in a limit order that's outside the bid-ask
spread and the bid-ask spread's not moves -- if no one is
meeting the bids or the asks that are currently posted, then
the bid or the ask will move to try and meet the -- you know,
try and meet transactions.  That's sort how I understand how
the markets work.

THE COURT:  So the maker is stating a spread; is that
right?  Is that what you just said?

MR. PORRITT:  Yes.

THE COURT:  And that in practice for options, that is
a wider spread percentage-wise or dollar-wise?

MR. PORRITT:  Well, I -- sorry.

THE COURT:  Yeah.  Go ahead.

MR. PORRITT:  I mean, they are mentioned -- they are
still mentioned in cents, I think, rather than in dollars, or
maybe not.

But, yes, certainly not -- it's larger in absolute terms
and certainly -- and also larger as a percentage of the
overall -- the transaction cost, if you like, or the -- the
over price.  Options on the whole at face value is cheaper than
what the then stock does, always by definition.

THE COURT:  Okay.

MR. PORRITT:  But to really step back, you know, the

1   real issue here, Your Honor, and the approach here, you know,

2   concerns how to calculate damages for stock -- investors in

3   stock options.

4       We know calculating damages for the purchases of stock is

5   sort of understood.  The jury -- the price was inflated.  The

6   jury will determine how much, the level of that inflation for

7   every day of the class period, if any.  And that will then be

8   used when all the trading data comes in to calculate that he

9   paid $350 and it should be -- you know, it was inflated at that

10  time by $40, say, you will get $40 per share.

11      So you take -- the jury will determine through the

12  inflation ribbon a but-for price, you know, but-for the fraud

13  price of what the stock should be.

14      And the approach Dr. Hartzmark posed to the stock options

15  is basically the same, which is you take the prices -- all

16  based on transactive prices.  You take the transactive prices

17  and you compare it to a but-for price.  To generate -- the

18  complication that's slightly more complicated for stock options

19  because to -- well, I'll go back a step.

20      The way the model -- stock option pricing in terms of

21  forecasting or modeling stock option prices, really the gold

22  standard is the Black-Scholes method, which -- which is used

23  by -- which is the most cited and tested formula in the history

24  of finance.  It's used by hundreds, if not thousands, of public

25  companies in the valuation of their stock options, in their

```
 1   accounting statements filed every year.  Won the Nobel prize in
 2   economics.
 3       So what the -- what the Black-Scholes formula tells us, it
 4   identifies seven different variables that go into stock option
 5   pricing, five of which aren't at issue in this case.  So that
 6   includes things such as dividend rate paid for by the company,
 7   underlying interest rate, the strike price of the actual
 8   option, those sorts of things, the term of the option, date to
 9   expiry.
10       So the two variables that really affect stock option
11   prices here as determined by the -- as indicated by the
12   Black-Scholes method are stock price and a metric called
13   implied volatility, which is a variable or metric determined
14   from the historical stock prices, stock option prices, and
15   which represents the expected range of distribution of the
16   price of the underlying security, in this case Tesla stock, for
17   the rest of the option.  So if it's a 12-month option, then it
18   reflects the markets anticipation of how -- the likely range of
19   the Tesla stock price for the remaining 12 months.
20           THE COURT:  Let me ask a basic question.  As I
21   understand it, the BSM method is to arrive at the option value.
22   Am I wrong that it's a tool to arrive -- derive option value
23   which then informs investment decisions?  It's not necessarily
24   the market -- it's not necessarily the actual price.  It is a
25   valuation, isn't it, or do I have that wrong?
```

1          **MR. PORRITT:**  Well, it is a way in which you can --

2    it's a way you can estimate or project valuations in the

3    future, depending on what your views of what the variables are.

4          It's also a way of understanding what the current -- so

5    the Black-Scholes method can be used to calculate, for

6    instance, implied volatility based on if all the other six

7    variables are known of a stock price, of an option price.  So

8    given a historical option price and if you know all the six

9    variables, other than implied volatility, you can then reverse

10   all for the implied volatility at that point in time.

11         And that is, in fact, done by the CBOE because implied

12   volatility numbers are reported for every option that's

13   exchange traded minute by minute.  So that is done and then is

14   a measure that traders use to help value the stock, value the

15   stock option.

16         **THE COURT:**  And when you derive as the seventh factor

17   the implied volatility, what's the utility of that?

18         **MR. PORRITT:**  I think it may -- over time you can

19   see -- it enables traders to -- to assess trends over time.  It

20   tells you -- it tells you what the market -- it provides real

21   information actually on what the market and what investors

22   think about the likely range of a stock price going forward

23   over, over, say, particularly of a long term.

24         Over the next week or so implied volatility is not, I

25   think, particularly meaningful in terms of stock option

```
1    pricing.  But when you're looking six months, nine months,
2    twelve months into the future, it tells you what investors who
3    are buying and selling those options thinks about the likely
4    distribution.
5         And it's particularly what is meaningful, and for this
6    case especially, as Professor Heston explained and as supported
7    in the academic literature -- and, in fact, Professor Basel,
8    defendant's expert, agreed with this in theory, in general --
9    is when you get an announced strategic transaction like a
10   merger or like a going private transaction, you will see
11   implied volatility will drop because the range tightens around
12   the announced price of the transaction.  And that is exactly --
13   that's exactly what finance theory would predict.  This is
14   exactly what is seen in other transactions, and this is exactly
15   what is seen in this transaction.
16        THE COURT:  So given --
17        MR. PORRITT:  That is one aspect in which it is used
18   by first Professor Heston and then by Dr. Hartzmark.
19        THE COURT:  Let me ask you.  I mean, I thought the
20   whole theory of straddles, the advantage of straddles is that
21   the greater of volatility, more likely -- the more valuable
22   that straddle becomes, right, because then you get to -- your
23   hedging is going to pay off.
24        MR. PORRITT:  Correct, yes.
25        THE COURT:  So if you want to measure -- isn't the
```

```
 1   measure of expected volatility already built into a straddle

 2   price?

 3           MR. PORRITT:  The use of straddles -- and if I may go

 4   back a step.

 5       So calculate a but-for price for Tesla stock options,

 6   taking into account trying to exclude the impact of Elon Musk's

 7   fraud or the defendant's fraud, we use the Black-Scholes method

 8   to forecast, which is the -- say, the most accepted method for

 9   calculating option pricing.  This isn't necessarily a

10   hypothetical price.

11       We need two variables.  One is a stock price, which we

12   have the but-for stock price, which will be determined by the

13   jury and which Dr. Hartzmark has testified at length about, how

14   you calculate that, but we also need an implied volatility.

15       And the implied -- the Black-Scholes method requires a

16   constant implied volatility by maturity date.  So it uses all

17   options with a maturity date of, say, September 28th, 2018

18   should have the same applied volatility for all -- maybe a

19   better example would be a longer term.  All January 2019

20   options would have the same implied volatility.  That's

21   required by the Black-Scholes method.

22       And so the question is when you are doing a but-for --

23   trying to generate or determine a but-for option price using

24   Black-Scholes method, you need an implied volatility for all

25   the options by maturity.  And there are 17 different maturities
```

```
 1    that were traded during the class period.

 2         So the question is where do you get that from?  You have

 3    to derive that from the observed trading data or options, of

 4    Tesla options, and that's what -- and you either -- you could

 5    either use just one as a representative, which would have all

 6    sorts of problems in terms of which ones you select, selection

 7    bias, et cetera, or you use some form of average, and the

 8    straddle is essentially using some sort of -- is a form of

 9    average that is being done to most accurately reflect the

10    implied volatility for that particular maturity of stock

11    option.

12         Because as Your Honor identified, it is indifferent as to

13    a stock price movement up or down, and it is only -- it

14    isolates.  Its value is totally derived on the potential

15    volatility.  So it gives the best measure or reflection of

16    implied volatility.

17         But you could -- I mean, there are other averages you

18    could use, but I think that would end up with -- could you not

19    use -- you could use some sort of volume weighted average

20    across all the options, but I think you would end up with

21    something very similar to the after-money straddle in any event

22    because the after money -- options just above and below the

23    money, as Professor Heston explained in his report, were the

24    most traded options anyway.

25              THE COURT:  So what I'm trying to figure out, if
```

1    you're trying to derive implied volatility rather than going

2    through a somewhat seemly complicated BSM model, why wouldn't a

3    straddle pricing already reflect that; that reflects the

4    anticipated volatility; right?  The greater volatility, the

5    higher the price.  The less the expected volatility, the lower

6    price, seems to me.  So why not use that as a measure?

7         I guess I'm not -- I'm still -- maybe I'm missing

8    something fundamental here.  I'm not sure why BSM is helpful.

9              **MR. PORRITT:**  Well, what is needed here,

10   unfortunately -- so in most cases involving options, you just

11   apply -- the only variable that matters is the stock price

12   because there is no -- implied volatility doesn't really change

13   as a result of the fraud, at least not in any meaningful sense

14   or material sense.  So you can just simply calculate a but-for

15   price for the option by using the BSM model with the but-for

16   price for the stock.

17        The issue we have here in this case is that the August 7

18   Tweets did have an impact, a material impact on the implied

19   volatility observed certainly for a significant minority of the

20   stock options.  For a number of the stock options they are not

21   particularly sensitive to implied volatility.  It doesn't

22   really make a lot of difference in terms of what their but-for

23   price is going to be.

24        But for certain -- particularly for longer-term options

25   and for options that are out of money, implied volatility is a

```
 1    relevant factor.  And if you don't adjust for that, then the
 2    people who will be trading -- people who invested in those
 3    particular options, you are not fully capturing the damages.
 4    They will be under compensated if you only take in account the
 5    change in price.
 6        So that requires, as in this case, to go that extra step
 7    and generate -- use implied volatility also as a variable in
 8    the Black-Scholes model to calculate, to --
 9            THE COURT:  You say certain stock options are going
10    to be more affected by implied volatility shifts; namely, for
11    instance, long-term options; right?  Is that what you just
12    said?
13            MR. PORRITT:  Correct, Your Honor.
14            THE COURT:  More so than short terms?
15            MR. PORRITT:  Correct.
16            THE COURT:  So you would expect to see more price
17    movement, I guess downward movement, in long-term options, or I
18    don't know up or down.  I mean, wouldn't -- wouldn't that
19    pricing that you see in the market be informed by the expected
20    volatility?
21            MR. PORRITT:  So, I mean, this is exactly what --
22    it's an interplay between the stock price and -- changes in
23    stock price and then these changes in implied volatility, which
24    are market -- where the price is likely to go in the future.
25    That's really what drives.
```

```
 1          So to take some examples.  A very in-the-money option is
 2   not really going to be affected by implied volatility because
 3   the implied volatility would have to be very great to
 4   jeopardize a very in-the-money option, for instance, because
 5   you'd have to -- if you had a 250 option, for instance, when
 6   the price is at 350, you would need extreme implied volatility
 7   to expect that the price would go down from 350 below 250 to
 8   affect your option price.
 9          And, obviously, that gets even less if that's a short-term
10   option, you know, only a week or two weeks.  It's unlikely a
11   stock is going to lose a hundred dollars in value in -- within
12   two weeks.
13          And obviously the longer-term, the volatility increases.
14   And, likewise, the more out of the money you are, the
15   volatility is more a relevant price.  The price is less if you
16   -- if you have a 650 option and the price is at 350, the price
17   moving from 350 to 400 will affect the price of your option,
18   but it's -- it's just going to have less of an effect than if
19   you had a -- than a $400 option, for instance.
20          So each option has a different way, but you can -- it's
21   reflected by using the Black-Scholes method because you can
22   use -- basically you have the prices and you have the implied
23   volatility by maturity and that is sufficient to generate
24   but-for prices for all the 2400 options series that were traded
25   during the class period, using again the most widely accepted
```

1  financial, you know, theory -- you know, financial formula in

2  finance.

3          THE COURT:  Well, here there are 17 particular

4  options; right?  There were --

5          MR. PORRITT:  Seventeen maturities, Your Honor, yes.

6          THE COURT:  Seventeen maturities.

7      I guess I'm still trying to understand why not track the

8  prices of those options, each of those 17 options at different

9  points with the 17, you know, different maturities because

10 those option prices are going to already incorporate in a real

11 world sense, I would think, expected volatility, you know,

12 et cetera, et cetera, et cetera.

13     I guess I'm still having trouble understanding why we need

14 a formula to derive an evaluation when you have a real world

15 evaluation.

16         MR. PORRITT:  Well, as in the -- as in when you back

17 cast for the stock, we -- the but-for value is then used -- is

18 then compared to the market price.  It's transacted to

19 determine the amount of inflation or deflation for any

20 particular option.

21         THE COURT:  Yeah.

22         MR. PORRITT:  Just as we take the market price of the

23 stock as paid by a class member, compare it to what we think a

24 -- to compare it to the but-for price as determined by the jury

25 after determining the amount of -- you know, fraudulent price

1    inflation and that generates damages.

2        So here, for instance, you bought the stock at 350 and the

3    jury determines it really should be -- there's $40 worth of

4    inflation, so it should be 310.  Then, you know, that's the

5    difference.  You compare 310 to the 350.

6        This is for the person with the stock option generating

7    that 310 price.

8            THE COURT:  Why can't you just take, as you do in

9    this -- as in regular stock prices, as the but-for, the minute

10   before the Tweet, whatever the option price was, something that

11   had a expiry date of, you know, 10/28 or whatever it is, 9/28

12   or 10/9 or whatever.  It had a price.  And then you could see

13   what happened, you know, two minutes after the Tweet.

14       I guess what's the difference between -- I mean, the

15   treatment of stock and options in that regard?  I understand

16   options -- the option valuation is informed by a lot of other

17   things.  There are things that go into it, as perhaps the BSM

18   calculation demonstrates, but at the end of the day it is what

19   it is.

20       I mean, whatever the market is, it presumably takes into

21   account, you know, volatility, expected changes in stock

22   prices.  It affects, you know, interest rates, all that.  You

23   assume most investors would -- you know, the market is going to

24   reflect that.  So why not just take real world prices before

25   and after?

 1           As I understand the model that Dr. Heston used, I mean, he

 2    took everything -- his volatility, you know, implied volatility

 3    rates and all sorts of stuff was taken before the Tweet and

 4    then you look at what happens after the Tweet.  That's how he

 5    got his differential; right?  I mean, it's the same principle,

 6    his but-for was based on the pre-Tweet circumstances.  Do I

 7    have that right?

 8           **MR. PORRITT:**  What you described, Your Honor, is

 9    basically what Professor Heston and Dr. Hartzmark do.  I mean,

10    they do take the price beforehand, and that's the implied

11    volatility that Dr. Hartzmark uses, and then -- or you could

12    take it at the end.

13           I mean, essentially at the end, on August 17th the

14    volatility goes back to kind of where it was on August 7th, so

15    it's kind of a distinction without a difference.

16           And we use those implied volatilities to calculate but-for

17    option prices, and then we compare that to the option prices

18    that were actually transacted during the class period.

19           **THE COURT:**  I guess my simple question is why not use

20    the actual option prices, which are already -- presumably takes

21    into account the expected volatility?  There is a certain

22    expectation of volatility before the Tweet and expected

23    volatility after the Tweet, as there was an expected price

24    direction of stock before the Tweet versus after the Tweet.

25           Why doesn't real world pricing already take -- why do we

1    need to start deriving formula -- formulaic implied

2    volatilities and then, therefore, calculated value?

3            **MR. PORRITT:**  The -- I'm trying to follow.  I mean,

4    that's what we do do.  We calculate the price that existed pre

5    the Tweet, and then we compare that to the price after the

6    Tweet.  We take the price that would have existed if there had

7    been no fraud or if the fraud was revealed immediately,

8    instantaneously on August 7th, which is where the consequential

9    damages come in, and we compare that to the price actually paid

10   and that gives you the damages.

11          We also look at how -- the damages, how the option prices

12   did react to the Tweet and that's -- Professor Heston gives

13   three opinions on that point, which are not challenged by

14   defendants, observations about how particular options reacted

15   to the Tweets, which is evidence of materiality as well as, I

16   guess, foundation for the argument on damages.  So -- on

17   calculating the impact on damages.

18          **THE COURT:**  As I recall, he -- did he not or -- I

19   don't recall seeing his looking at price reactions as to

20   various events, including the so-called partial disclosures and

21   further non-disclosures, et cetera, et cetera?

22          **MR. PORRITT:**  Well, there is no -- despite what

23   defendants say, there is no method of doing an event study for

24   implied volatility.  I mean, defendants have cited none.  We're

25   not aware of any means or academic literature suggesting how

1    that is done.

2         You can do, if you like, event studies on stock option

3    prices, but there's no suggestion -- I don't think that's

4    required, and we -- between Professor Heston and Dr. Hartzmark

5    the equivalent of that study for these eight trading days is

6    effectively done.  You see the reaction.  You see the

7    relationship between use -- particularly the Tweets -- and

8    stock option prices, which is really what counts, and then

9    disclosures about the stock option prices.

10        So Professor Heston looks at how stock option prices

11   react, change over the course of the class period.

12        Dr. Hartzmark compares those to the news that comes in,

13   you know, all the various disclosures.  And as he says in his

14   report and he testified to at his deposition, you know, there

15   is no -- and it's consistent with his opinion on stock.  He

16   sees no evidence that there is any impact on the option prices

17   or the -- or implied volatility or the stock prices other than

18   news about -- you know, stemming from the Tweets and the going

19   private transaction.

20        Defendants disagree.  They have their different view, but

21   that will be -- you know, that will be -- if they -- defendants

22   themselves have provided no evidence regarding the impact of

23   any other news on the impact on stock option prices or

24   certainly the implied volatility of stock option prices.

25        And, you know, the evidence is all, as Dr. Hartzmark

```
 1   explained, very consistent, that all the change in implied
 2   volatility in the class period as it relates to the -- it
 3   relates to this potential transaction, which is exactly what
 4   you would expect and what the academic literature --
 5        THE COURT:  So if there is no effect on stock prices,
 6   at least a claim that there is no confounding effect on stock
 7   prices, that also applies to prices of options and volatility
 8   rates; that you can make the same assumption that there are no
 9   relevant events, causative events?
10        MR. PORRITT:  I mean, I hesitate to say for all
11   cases, but certainly in this case.
12        I mean, there is no evidence to suggest -- there is no
13   data.  There's no change in implied volatilities as calculated
14   from the historic -- from the recorded stock option prices to
15   indicate that there is anything other than -- that there is
16   anything, any market data, any -- anything else connected with
17   Tesla that somehow affected volatility, implied volatility
18   derived from stock options other than the announcement of this
19   potential transaction.
20        THE COURT:  All right.  Let me hear from the other
21   side.  We probably have more to talk about, but I want to give
22   a pause here and hear any other comments.
23        MR. ALDEN:  Good morning, Your Honor.  Anthony Alden
24   from Quinn Emanuel.  It's a pleasure to meet you, Your Honor.
25        There are a number of things that, not surprisingly, we
```

```
 1   disagree with.  The first is -- I think the two fundamental
 2   things, I think, what Your Honor hit on.
 3        The first is that they don't -- they purport to use the
 4   out-of-pocket methodology for calculating options damages.
 5   Not paying for the -- or the out-of-pocket methodology is
 6   actually the event study methodology, which requires, and this
 7   is well settled, a comparison of the actual price to a but-for
 8   price.
 9        The difference, the fundamental difference between what
10   Dr. Hartzmark did on stock prices and did with respect to
11   options is he did not use actual prices and compare them to
12   but-for prices.
13        As Your Honor said, and I think Mr. Porritt said, there is
14   data that shows you actual option prices.  There's certainly
15   data that shows you bid-ask spreads for which a mid price could
16   be calculated and that they could have done the calculation on
17   2400 options.
18        I mean, these are different securities.  Each one is a
19   different security.  Each one has different characteristics.
20   You have calls and puts.  You have buys of calls and sells of
21   calls.  You have buys of puts and calls of puts.  You have
22   multiple different strike prices.  You have 17 different
23   maturities.  And they are required legally to value the
24   difference between what the class member paid or sold the
25   option for and the but-for price, and they didn't do it.
```

 1          And the reason they didn't do it was because they felt it
 2     was too complicated.  It was simply too complicated to do that
 3     for 2400 different options.  But they are the ones who decided
 4     to sue on 2400 difference options that have different
 5     characteristics, that are different securities.
 6          So instead of actually comparing the actual value to a
 7     but-for value, Professor Heston uses, as Your Honor
 8     characterizes, an unseemingly complicated model to derive
 9     adjusted actual prices on new actual prices.  I think he calls
10     them refitted values.  And those refitted values are not the
11     actual prices that people traded at.
12          He does this by applying the Black-Scholes formula and
13     coming up with one -- using straddles to come up with one
14     implied volatility for each maturity, even though each maturity
15     may -- you know, there are potentially tens, if not hundreds,
16     of options, different instruments within each maturity, and
17     says:  You know what?  I'm just going to apply the same implied
18     volatility across the board to each maturity regardless of the
19     strike price, regardless of whether it was a put or a call,
20     regardless of -- and, Your Honor, there is no support in the
21     law that we have been able to find, and certainly none that
22     plaintiffs have cited, that allows the calculation of damages
23     as the difference between two theoretical prices.
24          The calculation has to be between what the -- if there are
25     going to be damages, it has to be based on what the buyer

1    actually paid or sold, not a new calculation of a theoretical

2    price based on a straddle, which was not an instrument even

3    traded during the class period.

4         And the notion that they do actually calculate actual

5    prices is just not true.  I mean, you can read Professor

6    Heston's report that shows he does not use -- propose using

7    actual prices.  He adjusts them.

8         And there was -- there was absolutely no reason that they

9    couldn't have done it, expect they chose shortcut.  And that

10   shortcut has led to errors.  Errors that they admit.

11        And, you know, we're not attacking on -- to be clear, I'm

12   not challenging Professor Heston's results, although I believe

13   they are incorrect.  What I'm arguing is that those results

14   facially show that the methodology is unreliable.  No reliable

15   methodology would come up with damages figures where the amount

16   of damages is greater than the amount than the person purchased

17   the option for.  That makes absolutely no sense.  And the

18   examples we gave are just examples that are facially obvious.

19        Professor Sariol provides other examples in his report

20   that I won't go into, but by using -- by using a model as

21   opposed to the actual prices, they have introduced -- they have

22   taken a shortcut which has led to nonsensical results.

23        The other point that I wanted to address, Your Honor, is

24   the one Your Honor made about reaction to market events.  As I

25   said, this -- this study is -- method of calculating damages is

 1   called an event study method.   There was no event study done

 2   for option prices.   None.

 3        What essentially the plaintiff argues is that

 4   Dr. Hartzmark and Professor Heston looked at the -- looked at

 5   the changes in implied volatilities, looked at the Musk Tweet,

 6   looked at the August 16th, 17th *New York Times* article and

 7   said:  Well, we don't see -- you know, we see changes in

 8   implied volatility.  We don't see anything else.   And so it

 9   must be that what caused the changes in implied volatility were

10   the Tweets and the *New York Times* article.

11        I mean, that's plainly insufficient.   The law says that's

12   insufficient.   You have to actually do an analysis.   You have

13   to actually employ a regression and an event study that

14   statistically tries to tease out what the impact of the market

15   is.   You can't just eyeball it and say:  Well, the implied

16   volatility fell after the Tweet.   That must mean that the Tweet

17   was the sole cause of the drop in implied volatility.   That's

18   not good enough.

19        And what's particularly remarkable is that Dr. Hartzmark

20   does this for stocks.  And Dr. Hartzmark -- in fact, as Your

21   Honor recently observed in Your Honor's order on

22   Dr. Hartzmark's methodology, Dr. Hartzmark does do an event

23   study that then isolates -- at least attempts to isolated and

24   eliminate the effect of market factors during the class period.

25   That was not done here.

1        There were two days that were observed, August 7th and

2    August -- and August 17th.  Nothing between those.  There was

3    no analysis of any event between those dates.  And even as to

4    those dates there was no attempt to say:  Okay.  Maybe the

5    proportion -- maybe we agree or we think that the implied

6    volatility dropped due to the Tweet and rose due to the *New*

7    *York Times* article, but we have to do some analysis.  We have

8    to actually see if there were other components.  That was not

9    done.  It was simply *ipse dixit* to say:  We don't think there

10   is any.

11        **THE COURT:**  Is there any reason why one could not

12   imply or import Dr. Hartzmark's study with respect to event

13   study in the price, the stock price arena into the options

14   arena?  Is there a reason to think that you could get two

15   different results; that there is something about those two

16   instruments that would make one or more differentially

17   sensitive to confounding factors?

18        **MR. ALDEN:**  Yes and no, Your Honor.  So as you

19   discussed with Mr. Porritt, option prices have two variables

20   that are -- that are not inherent to the option itself, the

21   stock price and the implied volatility.

22        So just because the stock price may have reacted in a

23   certain way to events during the class period doesn't mean

24   implied volatility reacted the same way.

25        And it was necessary -- and given that there were two

```
 1    inputs that Professor Heston uses in calculating option prices,

 2    stock price and implied volatility, he needed to analyze

 3    whether the changes in implied volatility were also subject to

 4    market factors, not just the stock price.  By failing to do

 5    that, he simply assumed that the differences in implied

 6    volatility were caused by the Tweets and, thus, he simply

 7    assumed causation, which plainly isn't allowed.

 8         Now, is there reason to think that had they done the

 9    analysis that the results would have changed?  Of course there

10    is.  Because when Dr. Hartzmark actually attempted to do the

11    analysis on stock prices, he did attempt to -- he did find a

12    confounding variable, but he didn't even do that here on option

13    prices.

14             THE COURT:  So your view is that the proper -- what

15    would have been the proper methodology here to determine effect

16    on stock option or option prices?

17             MR. ALDEN:  I -- well, Your Honor, I'm not personally

18    an expert in option pricing, but at very least they had to look

19    at each instrument.  They couldn't just lump together the

20    instruments, you know, based on 17 maturities.  There are 2400

21    different instruments that they sued on that were bought and

22    sold during the class period, and they should have looked at

23    actual prices and used those actual prices to compare to

24    but-for prices.  And then they -- they should have done an

25    event study.  And, by the way, event studies are done on option
```

```
 1   prices.

 2        The plaintiffs aren't a consultant.  We submitted with our

 3   motion a publication from the plaintiff's own consultant that

 4   confirms that event studies can be done on option pricing and,

 5   thus, you can extrapolate implied volatility as well.  And then

 6   compared actual prices to but-for prices and done an event

 7   study and said:  Well, I see that this change occurred as --

 8   you know, looked at the implied volatilities before.  Looked

 9   during the class period, compared them, and eliminated what

10   would otherwise have been, you know, normal or statistically

11   normal changes in implied volatility based on the market

12   factors from the results during -- from the changes in the

13   class period, which is what he attempted to do with stock

14   prices.

15        I have never seen a methodology such as this endorsed by

16   any Court, and plaintiffs have not submitted one either.

17             THE COURT:  All right.  So you don't take issue with

18   the model itself, but the way it's being used here; is that a

19   fair --

20             MR. ALDEN:  I don't -- well, Your Honor, I don't take

21   issue -- it depends what Your Honor means by "model."

22        I don't take issue with what the legal principle that

23   they -- that to show damages, they need to do an analysis of

24   actual versus but-for and they need to eliminate any

25   confounding variables.
```

1      I do take issue with the way that they have attempted to

2  do that analysis.

3      And I do take issue with the use of the Black-Scholes

4  model to try to simplify it by calculating new theoretical

5  prices and coming up with other theoretical prices and saying

6  damages is the difference between the two.

7           **THE COURT:**  Well, I guess that's what I was asking.

8  The BSM model itself, you don't have at least a theoretical

9  objection in -- of its existence and its recognition.  It's

10  more the way it is used here as a shortcut; is that a fair --

11           **MR. ALDEN:**  Yes, Your Honor.  We agree that the BSM

12  model can be used and is used in certain circumstances to

13  estimate option prices.  It is the way that it has been

14  employed here that is so -- that is frankly unprecedented.

15           **THE COURT:**  What's a proper use of a BSM model?  Can

16  you give me an example?  When is it appropriately used?

17           **MR. ALDEN:**  Well, for example -- I think, for

18  example, companies use the BSM model to value options that are

19  granted to the employees, for example, when they don't have

20  actual -- when the option is just being granted and they don't

21  have actual market data.  You have to make assumptions about

22  what the option would be, would be worth.

23      Here we have actual market data that could have been used

24  and that in 97 percent of the cases wasn't used.

25           **THE COURT:**  Are there other uses of the BMS -- BSM,

1    I'm sorry, model?

2            MR. ALDEN:  Oh, Your Honor, not -- I mean, obviously

3    academics use the BSM model, you know, in trying to come up

4    with better ways or more accurate ways to estimate option

5    pricing, but I'm not aware off the top of my head of other

6    uses.

7            THE COURT:  But from your perspective it would be

8    unprecedented as a legal matter to use it to assess options --

9    damages with respect to options.

10           MR. ALDEN:  I think it would be unprecedented to use

11   it in this way, yes, where one is calculating basically not

12   using actual prices, but instead using estimated prices

13   calculated by the BSM model and comparing them to other

14   estimated prices calculated by the BSM model.

15           THE COURT:  Has the BSM model, in your review of the

16   cases, ever been used in any way in a case such as this where

17   one is trying to estimate option damages?

18           MR. ALDEN:  I believe that the plaintiff cited one

19   case where the BSM model was used to calculate or -- as part of

20   a market efficiency calculation, but was not used in that case

21   to calculate damages.

22           THE COURT:  All right.  Let me go back to the

23   plaintiff and first find out from you whether this is, in fact,

24   a rather unprecedented use of the model to directly calculate

25   or to calculate actual damages with respect to options.

 1            And, two, do you -- why not do it the old-fashioned way?

 2            MR. PORRITT:  So if I understand defendant's argument

 3      as just presented to the Court, I think they agree that it's

 4      appropriate to use the Black-Scholes model to forecast the

 5      but-for price, which after all isn't necessarily a theoretical

 6      price.  It's not an observed market price.  It's a price that

 7      would have been there if the fraud had not occurred.  And the

 8      BSM model is the most accepted option pricing formula.

 9            And I don't understand defendants to be challenging using

10      the use of the Black-Scholes model of generating that but-for

11      price.

12            THE COURT:  Well, let me stop you right there and

13      find out whether there is a point of contention on that.

14            MR. ALDEN:  Yes, Your Honor, because, again, they are

15      using it and assuming that the implied volatility would be

16      decided across 2400 different options, or certainly across at

17      least 17 maturities that encompass 2400 different options

18      whereas we know that that's not the case.

19            So, again, even on the but-for prices it would be a gross

20      oversimplification.  But I do agree that the problem is even

21      more pronounced when they ignore actual prices and attempt to

22      recalculate them.

23            MR. PORRITT:  Well, the issue Mr. Alden just

24      identified is inherent in the Black-Scholes model, which, as I

25      am repeating endlessly, is widely accepted, widely used and won

 1   the Nobel prize for economics in 1997.  It continues to be used

 2   to this day by the entire financial industry, as well as

 3   academics.

 4       So, and the Black-Scholes model assumes, requires constant

 5   implied volatility over all options with the same maturity.  So

 6   just add, if you like, a simplifying assumption inherent in a

 7   model, yes, but it is a widely accepted one.

 8       And Professor Heston discussed this.  Professor Heston has

 9   spent his entire career trying to come up with a better model.

10           THE COURT:  So how is it typically used?  How is the

11   model typically used?

12           MR. PORRITT:  It is used, I believe, every time --

13   certainly for valuation of options and for the purposes of

14   recording expenses on financial statements.  It is used in

15   pricing in terms of setting up portfolios.  It is used for

16   predicting pricing in terms of setting up trading strategies.

17   It is used in damages cases.

18       I mean, every time -- almost any time that you involve a

19   but-for price when you are changing, say, a variable, typically

20   the price that goes into a stock option, you will use either

21   the Black-Scholes method or a variation on it to calculate a

22   theoretical option price.  It is the starting point for every

23   time you're generating, rather than simply looking up on

24   Bloomberg what the option price or implied volatility was and

25   trying to calculate it in a -- in some form of theoretical

1   world, such as a but-for price.

2          THE COURT:  Well, that raises the question:  Why do

3   we need a theoretical option price when we have real world data

4   here?  We're looking retrospectively, not prospectively.  We're

5   looking at something that has a market, as opposed to something

6   that doesn't have a market, like an employee stock option.  We

7   have event.  You have the before and the after.

8       Why do we need to go to a theoretical option valuation

9   pricing mode?

10         MR. PORRITT:  Well, because the actual inflated --

11   the actual post fraud prices, of course, are impacted and

12   harmed by the fraud.  So we need a but-for unharmed price to --

13         THE COURT:  Right.  No, I understand that.  It's a

14   delta between those two.

15         MR. PORRITT:  Right.

16         THE COURT:  Why not use real world -- as in the stock

17   market, why not use that same methodology?

18         MR. PORRITT:  So that would -- so in calculating the

19   but-for price, we use the Black-Scholes method.  I believe

20   that's completely supportable, completely robust.

21         THE COURT:  Why do you need to do that?  You have --

22         MR. PORRITT:  Well, but we --

23         THE COURT:  You have -- but you have prices at 7:48

24   in the morning on August 7th or whatever it is.

25         MR. PORRITT:  Well, but we need to -- you need to

```
 1   compare the but-for price on August 8th, August 9th, August
 2   10th, August 11th.  So you can't just use the -- you just can't
 3   carry the price forward.  So for generating the but-for price,
 4   you need a model, and we use the Black-Scholes model.
 5        I mean, I think the defendants then complain -- primarily
 6   complaint, as I understand it, is comparing that but-for price
 7   generated using the Black-Scholes model against not comparing
 8   that to actual trading prices, as recorded in the market.
 9        Professor Heston adjusts that to take account for -- to
10   make them more comparable to the modeled prices for the but-for
11   prices, to take account of whether market structure is used,
12   present in -- from bid-ask spreads, to go back full circle to
13   where we started off this morning on options, and other aspects
14   that are present in option pricing, that this -- that -- so
15   there was a risk that some of the price paid in the actual
16   market price isn't a result of the fraud.  We would -- you
17   know, for defendants -- defendants are responsible for, but is
18   simply just the way in which the trade was executed.
19        And what we proposed was -- Professor Heston admitted
20   this -- to eliminate that potential over recovery of damages by
21   a class member under those circumstances.  It's not likely to
22   be a massive amount, but this was seen as a better, more robust
23   way of doing that.
24        If you want to compare them to actual prices, that would
25   be a very minor change.  We could certainly do that.  The
```

1    actual prices can be observed.  They're there.

2         So that could be done to compare them, but we could

3    calculate -- we are going to calculate but-for prices for every

4    single one of the 2400 option series.

5         It's not like damages are going to be calculated based on

6    an aggregate basis, which is sort of what defendants implied.

7    They will be calculated -- implied volatility will be assessed

8    as required by the Black-Scholes method across -- by maturity,

9    but then that will then be used in what is a completely

10   arithmetic exercise to then generate but-for prices for all

11   2400 option series, which will then be used to calculate

12   damages for every single one of the 2400 option series.

13        So if it's the difference between we think the adjusted

14   price that Professor Heston did, he eliminates some of the

15   noise, what he describes as noise in the data.  But if the --

16   if the Court's concern is that's not sufficiently supported and

17   would rather -- if the Court's preference is that we use actual

18   prices, we use actual prices.  That would be very easy to do,

19   and I don't think would make really that much of a difference

20   in the whole scheme of things.

21            **THE COURT:**  Have you done a -- remind me.  Have you

22   done that comparison between the actual prices and the

23   generated --

24            **MR. PORRITT:**  In this one?  When we were evaluating

25   the model, I believe Professor Heston looked at that.  I don't

```
 1   believe there was that material a difference, but it was just
 2   seen that -- this was seen as more robust and a better
 3   approach, so it seemed.  We've worded it -- it was all for a
 4   reason.  It's not like we gained some great advantage, nor were
 5   we -- nor was it beneficial to us from, like, trial strategy to
 6   present a more complicated model or a simple model that could
 7   be presented.
 8       Trust me, we are looking to simplify this as much as
 9   possible.  So if there is -- if there is -- if it's comparing
10   it to actual prices versus, say, the but-for price calculated
11   through the Black-Scholes model, which is the simplest of all,
12   even though it's still the best of the pricing models for stock
13   options, then that's what we would do.
14       THE COURT:  And the disadvantage of using actual
15   prices is what you call the noise factor that's not filtered
16   out because of, what, some inefficiencies in the actual --
17       MR. PORRITT:  Just how it gets executed.  It's
18   present in stock, but usually it's measured in fractions of a
19   penny in stock, so you don't have to worry about it.
20       But here it might be five cents or ten cents on a $10
21   option.  You know, it might be, you know, depending on where it
22   was executed between the bid-ask spread rather than any
23   inflation to do with fraud.
24       THE COURT:  So what I'm hearing is that the main
25   point of contention is the but-for counter factual price, and
```

```
 1   you say that the BSM model is the appropriate way of taking
 2   that pre-Tweet data and carrying that through to derive the
 3   but-for price for each of the various dates in question when
 4   there is a transaction.
 5           MR. PORRITT:  So to calculate a but-for price, you
 6   must either use the Black-Scholes model or some other model
 7   because it's not something you can just look up.
 8           THE COURT:  All right.  Then let me ask Mr. Alden.
 9   What is the -- what other models -- if you have a starting
10   point, but you have to then carry that through, what other --
11   is there -- what other model is there and what's wrong -- I
12   guess you're saying that the one problematic area of the BSM
13   model is that an assumption of a constant volatility; is that
14   your main critique?
15           MR. ALDEN:  Of the use of BSM, yes, but the main
16   critiques are they shouldn't have used the BSM model at all,
17   and they used it twice.  They used it to try to generate
18   adjusted actual prices and then but-for prices.  They should
19   have just used factual prices and compared them to but-for
20   prices.
21       We do believe that there are -- that the Black-Scholes
22   model will not be -- is not actually the best model to use, but
23   for the purposes of Daubert we agreed that that was a
24   disagreement among experts and where we think that the -- the
25   methodology is fundamentally unreliable or just kind of
```

```
 1   shouldn't even be presented to a jury is the failure to use
 2   actual prices and the failure to do an event study.  And that's
 3   kind of the crux of our disagreement.
 4           THE COURT:  I see.
 5           MR. PORRITT:  If I may just when you -- when there's
 6   an option to be heard?
 7           THE COURT:  I'm sorry.  Go ahead.
 8           MR. PORRITT:  On the point of the -- so two points.
 9       One is in their expert report they -- defendants do not
10   propose any alternative model for calculating but-for prices.
11   So Mr. Alden concedes that a but-for price must be generated,
12   but they don't propose any method of doing that.  So -- so it's
13   really the -- so that's point one.
14       On the event study, there is no case law saying an event
15   study is required before you can do out-of-pocket damages.
16   That's just incorrect.  It is one way of doing it.
17       You need to do -- you need show some relationship between
18   movements in stock price and news coming into the market, first
19   the fraudulent news -- fraudulent information, and then as the
20   impact is greater, you submit it.
21       And we did -- say we did this without analysis.  We just
22   assumed it, which is really just nonsense.  Your Honor, like
23   all of us, has had to wade through hundreds of pages of
24   analysis doing exactly that.
25       And it is also -- it's also disingenuous just to say all
```

the analysis on stock needs to be repeated all over again for
options when the stock price, the price of the underlying
security, is one of the key variables, if not the key variable
in determining option pricing.  So, of course, you can draw a
connection between the two, and we've cited case law to that
effect.

So, and they cited not one piece of evidence or academic
literature suggesting why the implied volatility for stock
options would -- was different, was due to any other event
during the course of this class period.

And what is more, it's not -- it's just incorrect to say
that Dr. Hartzmark ignored this, because he looked at the
implied volatility before leading up to August 7th and it was
flat and stable, and he looked at it afterwards and it was flat
and stable, at approximately the same level.  And he looked at
the event on every single day during the class period and notes
that it's different.

And his -- based on his exhaustive review, which the Court
is aware of, of the -- all the news, 2400-plus news articles,
et cetera, he concludes that there was nothing indicating that
any change in the implied volatility would be attributable to
any factor, firm specific or market, or general market
conditions, other than the reaction to the Tweets and the
general -- and then the development of news afterwards.

Then, finally, to the extent that there were market

factors, supposed markets factors to be considered, that is

reflected, of course, in the stock price, which is then

reflected in the option price.  So, of course, it is considered

in exactly the same way.

So when it comes to determining the but-for price for

stock options, Dr. Hartzmark doesn't propose to use the

$305.50, which is the observed market price of the stock.  He

uses the 312.90, which is his adjusted price to adjusted market

factors, an adjustment, by the way, which defendants accept.

So that's my point on -- my argument on event study.  And

when it comes to -- I think that as far as I -- as I now hear

it, the difference is between -- in calculating the damages,

it's comparing the but-for price with an adjusted actual price

or with the actual price.  And I don't believe that's really a

difference worth fighting over, to be honest.

And if the Court wants us to use actual prices, then we

would use actual prices.  We adjusted actual price.  We

adjusted them for a reason.  We think that would be more

robust, but I think the changes would be relatively immaterial.

**THE COURT:**  You are correct that there is no judicial

precedence, case precedence for using adjusted prices adjusted

under the BSM method for calculating damages?  No Court has

done that yet, or at least --

**MR. PORRITT:**  Well, I mean, I don't think any case

has presented a similar fact scenario as this case, Your Honor.

```
 1   So, unfortunately, we're in the unfortunate position of trying
 2   to break new ground, which is never -- never somewhere I'm
 3   particularly comfortable with.
 4        So I'm not aware of any case, Your Honor.  I mean,
 5   certainly the Black-Scholes method has been used in a
 6   widespread way.
 7             MR. ALDEN:  Your Honor, could I just respond to one
 8   Mr. Porritt said?
 9             THE COURT:  Yes.
10             MR. ALDEN:  Mr. Porritt said that there is no case
11   that requires an event study.  I will refer Mr. Porritt to his
12   own case, In Re Novatel Wireless Securities Litigation, 2013,
13   WL 12144150, Southern District of California, October 25th,
14   2013.
15        And I quote:
16             "Federal courts have required event studies to
17         establish loss causation and damages.  The absence of
18         an event study for damages in particular will result
19         in summary judgment in favor of defendants."
20             THE COURT:  Well, his response is that there is an
21   event study in a -- with respect to stock prices.  And the
22   question I had raised is:  Can you import that?  Can you rely
23   on that?
24        So this is little different because it's not like there
25   was nothing done.  And then that's why I asked the question:
```

1   What is the likelihood that an event study would yield a

2   different result as applied to stock options as opposed to

3   stock prices.  And you point out, well, there's a volatility

4   factor that's not -- you know, that's different than stock

5   prices.  And then he comes back saying, well, if you look at

6   volatility, there has been no real change before or after.  It

7   doesn't seem like volatility as background, confounding factor

8   is likely to have played a role, et cetera, et cetera.

9       So I understand the debate.  So we're in a little bit of a

10  gray area here because it's not as if there was nothing ever

11  done, and I think he's relying on the event study that was done

12  to say that that is a sufficient basis to assume that

13  volatility was not affected by confounding events.

14      **MR. ALDEN:**  Right.  Although, Your Honor, the -- even

15  their experts admit the implied volatility.  There is not a

16  linear relationship between stock prices and implied

17  volatility.  So only looking at stock prices does not tell you

18  whether there were confounding variables on implied volatility.

19      And, in fact, Professor Heston himself says that when

20  there was a drop, there was a rise in stock prices on

21  August 7th, implied volatility on so-called short-term options

22  either didn't change or increased, whereas implied volatility

23  on long-term options, according to him, decreased.

24      And so it's plainly not good enough to just look at stock

25  option prices when there are two fundamental variables that go

1   into option prices.

2         THE COURT:  All right.  Well, let me go on -- thank

3   you.  This has been helpful actually.

4       Let me go on to a couple of the other MILs.  I'm not going

5   to just go through every single one of them, but I'm going to

6   raise -- have some questions about some of this that sort of

7   overlap.

8       So one is -- has to do -- I guess it's plaintiff's motions

9   three and four.  That -- has to do with testimony that the

10  plaintiff contends would contradict or dispute the Court's

11  factual findings on falsity and recklessness.  But it seems to

12  me that there are -- to the extent that there is evidence of

13  the actual state of the world at various points, that could

14  inform materiality.

15      Second of all, there does seem to be -- although I found

16  as a matter of law recklessness for the statements that I found

17  were false, the difference between knowing and recklessness

18  still appears to be at issue here because that goes to the

19  question of joint or several versus allocated responsibility.

20  And if that is true, Mr. Musk's knowledge, as opposed to

21  recklessness, is still at play, the difference between those,

22  and, therefore, evidence that goes to his knowledge and his

23  state of mind as a general matter would seem to be relevant.

24      So I'll take -- I guess the ball is in your court,

25  Mr. Porritt.  Explain whether I'm wrong here.

```
 1            MR. PORRITT:  No, Your Honor.  I wouldn't say you're

 2   wrong.  I think our concern was the -- the requirement for a

 3   specific interrogatory or special interrogatory to the jury on

 4   knowing violation is a statutory requirement.  So we are stuck.

 5   We have to do it.

 6        So what -- what are we -- the concern behind these two

 7   motions primarily was we do not wish -- we do not think we

 8   should have to relitigate the subject matter of the summary

 9   judgment motion and summary judgment ruling over a trial.  So

10   that was -- some of that will be -- I think we can be -- will

11   be affected by whatever Jury Instruction Your Honor gives on

12   the question of the summary judgment order, and some of that

13   may be in the context of how exactly the testimony comes in.

14        But that was really our concern on all those, both these

15   motions.

16            THE COURT:  All right.  Well, I think -- yes.  I

17   think instructions, it may require a limiting instruction at

18   some point during the trial, and certainly the instructions at

19   the end I think will address that concern.

20        But it does seem to me that I'm going to have to look at

21   any piece of evidence, any testimony through the lens of

22   Mr. Musk's state of mind since the issue of knowing versus

23   recklessness is still at play.  And then there is the question

24   about materiality.  We do have to look at the whole context,

25   the actuality.
```

 1      I will say in that regard if witnesses are going to

 2  testify about certain things, their testimony about events,

 3  communications, correspondence, et cetera, may be relevant; but

 4  sort of their perceptions or understandings, their subjective

 5  understandings, less likely to be relevant.

 6      So in other words, when we get to materiality, the

 7  objective facts and testimony about those facts and statements

 8  and events and correspondence and things like that, it's much

 9  more likely to be relevant and admissible with respect to

10  materiality.  But subjective views of that, I don't see that,

11  unless it goes to the state of mind of the speaker or the

12  listener or something that is relevant.

13      So I'm just going to lay that -- I will issue rulings on

14  these, but I just want to tell you what -- that's my analysis

15  of that particular question.

16      There is a question about the 90-day look-back and

17  excluding evidence.  It seems to me that evidence beyond the

18  class period, I have trouble seeing why that's -- you know, in

19  terms of any statements made, any things that were done after

20  the close of the class period, I have trouble seeing how that

21  is relevant.

22      The 90-day look-back is a method of putting a limit on the

23  quantification of damages, which is -- but that has nothing to

24  do with what's relevant in terms of things that may have been

25  said, et cetera, et cetera.  At least that's how I see that.  I

```
1   mean, I will take a comment looking at if you think I'm off
2   point, but that's my general view.
3              MR. PORRITT:  The only -- I'm sorry.  If I may, and
4   then I'll be brief.
5        The only exception that comes to mind, Your Honor, is the
6   August 24th announcement that the deal was being formally ended
7   and the stock price would actually go back, which is just seven
8   days later.  I think that is relevant, and certainly
9   Dr. Hartzmark talks about that, that evidence.  I don't think
10  it's a substantial part of the -- and the board meeting that
11  led up to that, Your Honor.
12       So with that exception.  Obviously, it's our motion, so we
13  would agree.  That's why we sort of kept it to the 90-day
14  look-back, to give a little leeway for some post information --
15  you know, events that occurred immediately -- you know, very
16  shortly after August 17th may be relevant going backwards,
17  looking back.
18             THE COURT:  All right.  Any comment about that?
19             MR. LIFRAK:  Your Honor, I believe that -- we agree
20  that those specific items of evidence can probably -- in
21  context would be relevant to the issue.
22       But there are a couple of other categories of evidence I'd
23  like to discuss that are post the class period that we believe
24  will or may, depending on how the evidence comes in, be
25  relevant to the claims.  And I can go through these quickly.
```

1    The first is evidence to counter plaintiff's theory of

2 consequential harm, which is -- as the Court is well aware, is

3 Dr. Hartzmark's -- one of Dr. Hartzmark's approaches to

4 damages, and that theory is based on the notion that fraud,

5 likely alleged fraud here does lasting long-term damage to the

6 reputation of a company, like Tesla here.

7    And he says specifically in his report, and I'm quoting

8 from Paragraph 46.  He said:

9        "In other words, there would be consequential

10       harm upon the failure of the actions proposed in the

11       Musk Tweets stemming from a loss of management

12       credibility and ongoing distrust in public

13       statements."

14    So those issues, the issues of ongoing management

15 credibility, issues of ongoing distrust of management, issues

16 of the reputation of Tesla going forward, in the future those

17 issues have been made relevant by Dr. Hartzmark's consequential

18 harm theory.  And evidence related to those issues to in

19 certain circumstances, depending on how they are presented at

20 trial by the plaintiff, we should have -- we should be

21 permitted to counter that evidence.

22    We should be permitted to cross examine Dr. Hartzmark on

23 those conclusions and the basis for what are billions of

24 dollars in damages that he has made relevant.

25    And to create a cutoff that assumes that everything after

1   the class period is irrelevant, such a bright line rule, I

2   think, is a little -- goes a step too far, because we don't

3   know exactly what is going to be said at trial.  We don't know

4   what Dr. Hartzmark will say.  But at least as to that issue in

5   particular, we should be permitted to test that.  We should be

6   permitted to talk about whether Dr. Hartzmark's assumptions

7   about ongoing reputational harm to the company are valid in the

8   real world.

9           And beyond that, as we discussed I think a little bit in

10   the motion, is Mr. Littleton, the named plaintiff, his trading

11   after the class period has ended.  He purchased -- starting 18

12   months after the class period, he purchased additional -- he

13   made additional investments in Tesla.  And that is relevant for

14   a couple of reasons.

15           Number one, on the issue that I just talked about,

16   countering the assumption that Dr. Hartzmark makes about

17   consequential long-term harm to the company.  Number one.

18           Number two, it's probative to whether the

19   misrepresentations that are alleged in this case were material.

20   Because we have the named plaintiff, who is the purported

21   reasonable investor, after allegedly being defrauded by the

22   company and Mr. Musk making substantial investment in the

23   company after the fact, 18 months after the fact.  And the

24   cases that we cite make it clear that such post class period

25   trading is relevant.  It's relevant to materiality, to

```
 1   rebutting the fraud in the market --

 2            THE COURT:  Let me -- let me stop you right there.

 3       I have trouble.  I understand if somebody bought stock the

 4   next day after the close, but 18 months later.  So many reasons

 5   why.  I mean, one could decide that notwithstanding the

 6   problems and the fraud that cause a loss of money, you know, a

 7   deal is still a deal.  And 18 months later, you know, the

 8   production of Tesla 3s are going crazy and people are buying

 9   them or whatever.

10       I mean, I -- at that point I don't -- it seems to have

11   such marginal value, probative value on materiality.  I have

12   trouble.  If it's very proximate in time, like the day after,

13   then one could doubt.  You know, that could shed some light.

14       And then on the issue of the ongoing management issues, I

15   -- my understanding is that the theory is that as of during the

16   class period, there was additional sort of depression or effect

17   on stock prices not only because of the value -- the reality of

18   the -- they are not going to go private at 420.  It's not a

19   secured deal.  It's not going to happen.

20       But to the extent that that revealed an expectation of

21   potential problems in terms of management and things in the

22   future, there is an assessment made by shareholders in their --

23   the way they vote with their feet or not in the marketplace.

24   The fact that ultimately it turns out that these problems don't

25   come to fruition, I don't see how that's material.  It's really
```

1  what happened in the real market and did these other factors

2  have a causative, proximate causative effect.

3       The fact that at the end of the day, for instance, Tesla

4  is able to get back on its feet and prove they have the

5  controls and all sort of stuff, I don't see how that's material

6  to what happened during the class period.

7       So I guess I have fundamental problems with both those

8  propositions.

9            **MR. LIFRAK:**  So on the materiality issue, I

10  understand what Your Honor is saying about the time limits, but

11  that's something that Mr. Littleton can say in response to

12  cross examination.  But to preclude us all together from even

13  asking the question we think is prejudicial to us.

14       In addition to that, it's really a basic issue of

15  credibility.  Mr. Littleton is going to take the stand and say:

16  Mr. Musk defrauded me.  The Board of Directors don't have --

17  does not have proper controls in place for Mr. Musk and his

18  Tweeting.

19       And for us to not be able to say:  But wait a minute.  You

20  put in a hundred -- hundreds of thousands of dollars in

21  additional investment in the company later, that goes to his

22  basic credibility, and it's something that we believe we should

23  be permitted to explore at a high level with Mr. Littleton.

24       And as to the -- Dr. Hartzmark's theory, Your Honor is

25  correct; that is -- it is the theory that that kind of

1  consequential harm is baked into the price of the stock at the

2  time of the -- in the class period.  But again, it's based on

3  this motion that fraud, such as the fraud here, would lead to

4  that consequential harm in the future.  And exploring what

5  happened in the real world, we should be permitted to test that

6  theory in the real world.

7       And I'll submit on that.

8          THE COURT:  I'll give you a brief chance to respond,

9  Mr. Porritt, if you have something to say.

10         MR. PORRITT:  I think both those arguments by

11 Mr. Lifrak, with respect, are great stretches.

12      I think, as the Court identified, the reasons

13 Mr. Littleton purchasing stock or investing in Tesla securities

14 18 months after the events, as Your Honor identified, you know,

15 really have nothing to do, no implication on his credibility.

16 I think the risk of confusion and prejudice to plaintiff far

17 outweighs any limited probative value that such testimony may

18 have.

19      And likewise, Your Honor is exactly right in terms of the

20 consequential harm that is measured by the impact on stock

21 price at the end of the class period and, again, I think

22 between August 24th when the final deal is closed, sort of the

23 final -- sort of an indication of that.

24      I note also defendants are taking a somewhat inconsistent

25 position in that they are seeking to exclude evidence of the

1    SEC settlement, complaint and settlement reached in September,

2    which directly is relevant to management credibility and this

3    management sort of harm and decisions perhaps from investors to

4    invest in Tesla, you know, well after the stock market -- well

5    after the class period.  They are seeking to exclude that,

6    whereas you could well imagine that investors are relying on

7    the fact of an SEC settlement to justify their investment.

8            **THE COURT:**  Well, that brings me to defendants.  The

9    last one I want to talk about is MIL No. 4, excluding the SEC

10   complaints and settlement.

11          The problem with the complaint is that it is not -- as I

12   see, it's not a finding.  And so -- so, you know, admissibility

13   on that front, it's not an agency determination.  I know there

14   are some cases that sort of go both ways on that, but I'm not

15   convinced that a complaint alone is there.  This is not, I

16   don't think, file enough.

17          On the other hand, I see the argument that this feeds into

18   the consequential harm.  Maybe it's not the -- it's not to be

19   taken as probative value on the actual question of the merits,

20   but it goes to the public perception and, therefore, the kind

21   of consequential harm since it followed so closely on the heels

22   of the -- of, you know, the Tweet that started all this.

23          So I guess I want to get your views that even if -- if I

24   find -- and then, of course, the issue of the settlement.

25   There are 403 questions about that and that raises some

```
 1   questions, but how does -- how is the Court supposed to draw

 2   the line between something that -- I think there is a potential

 3   403 risk here by introducing settlements and complaints.

 4        And I guess one question in that regard is, is it enough

 5   that there would be evidence of an SEC undertaking and

 6   investigation with respect to -- you know, that seems to be

 7   less prejudicial from a 403 perspective and yet could fulfill

 8   the basis of a claim of consequential harm.

 9        So let me first hear from Mr. Porritt.  Why, for instance,

10   should we not allow evidence of an SEC investigation, but not

11   go further than that with respect to complaints and

12   settlements.

13        MR. PORRITT:  Well, I think any clarifying

14   instruction would certainly also need to make -- ensure that

15   the jury doesn't make any conclusion one way or the other that

16   an investigation started, the fact that the jury may not --

17   will not hear -- may not hear the outcome or the endpoint of

18   that investigation.  So I don't -- there would be a risk, I

19   think.  The jury may hear about an investigation, but if they

20   don't hear about a case, conclude that the SEC found no

21   wrongdoing or no reason to bring a case against Mr. Musk or

22   Tesla and, obviously, that would be an incorrect assumption.

23        So that's what my first point is.  I think that we need

24   some instruction.  We need to make sure that's very loud and

25   clear and understood on behalf of the jury.
```

1     Secondly, on the 403 point, on the settlement, in light of

2     the summary judgment ruling, there is really nothing from the

3     complaint and the settlement that really adds any additional

4     prejudice that isn't already present for the summary judgment,

5     which is from the undisputed view of the facts.

6         So, I mean, the SEC complaint lays out misrepresentations

7     and lays out that they were made with scienter.  Doesn't make

8     any allegations about loss causation because -- or reliance

9     because the SEC isn't required to prove those elements.

10        And so we're struggling -- our view would be any 403

11    prejudice would be very minimal, if any, and not worth the sort

12    of administrative difficulties that the Court has outlined.

13            **THE COURT:**  All right.  Response?

14            **MR. LIFRAK:**  Yes, Your Honor.

15        I will start by agreeing with Mr. Porritt that the fact of

16    the investigation during the class period that will be coming

17    into evidence, that's part case.  And I would agree also that

18    the jury should be instructed that it should not be -- it

19    should not make any assumptions about what happened with that

20    investigation.

21        But as to the complaint itself, it's hearsay.  And as the

22    Court noted, the exception to hearsay requires there be a

23    factual finding from a legally authorized investigation.  This,

24    what we're talking about, is an SEC complaint that doesn't

25    consist of factual findings, but is only unproven assertions.

 1            The other part of Rule 803, which is what we're talking

 2     about, requires that the circumstances of the investigation

 3     can't indicate a lack of trustworthiness.  And the -- advisory

 4     to the notes and cases that plaintiff has cited make it clear

 5     what that means in this context is that there should be a

 6     hearing and there should be final findings that are issued in

 7     order for anything under this exception to be admitted into

 8     evidence.  And obviously the complaint here, just allegations,

 9     not final.  There was no hearing.

10            And to the extent that Your Honor brought up an issue of

11     harm going forward, the fact that the jury will hear that there

12     was an investigation is sufficient, as Dr. Hartzmark had noted,

13     to do that analysis.

14            As to the settlement itself, what we haven't discussed is

15     Rule 408.  It's barred by Rule 408.  It is a settlement.  It is

16     the compromise of a disputed claim that falls squarely within

17     Rule 408, and what we're talking about are not exceptions of

18     408.

19            But one exception that plaintiff presents in the papers is

20     to show Mr. Musk's bias, which for reasons that we discussed in

21     the papers doesn't make sense.  But Mr. Porritt indicated the

22     real purpose of introducing this evidence when he said:  Well,

23     the Court has already decided against scienter, so adding

24     the -- adding the settlement to the mix doesn't give the jury

25     any additional information.

1        Well, that proves the point.  That proves the point that

2   plaintiff is seeking to introduce this evidence to prove the

3   validity of their claim, to go to the merits of the case.  And

4   that's why it's prejudicial.  That's why a jury should not hear

5   that the government brought these claims and that they were

6   settled because it would be prejudicial.  They are the same

7   essentially claims.

8        And there has been no case cited where a complaint like

9   this has been admitted against a defendant in a related civil

10  case, and there certainly has been no situation where a

11  settlement, particularly one where the party doesn't admit

12  liability, again, is admitted in any way against the defendant

13  in a related civil action.

14       So for those reasons and for the prejudice point, we

15  believe that both should be precluded.

16            **THE COURT:**  What about letting the jury know that --

17  without knowing the content, but knowing -- letting the jury

18  know that there was a complaint, you know, that was instituted

19  and the matter was settled, just those facts.

20            **MR. LIFRAK:**  Again, the fact of a settlement, the

21  only purpose of that would go to proving the validity of

22  plaintiff's claim, particularly the causation element.  So

23  that's barred by Rule 408.

24       And in terms of a complaint, that doesn't add anything to

25  the causation point.  That doesn't add anything to the

1  consequential harm point that the active investigation already

2  has and the jury will already hear.  The fact that there was a

3  complaint only adds prejudice.  It doesn't add anything that's

4  relevant to any of the issues that the jury will determine.

5        **THE COURT:**  All right.  Your view on that, my

6  question, Mr. Porritt, if you have any.

7        **MR. PORRITT:**  We have no -- I think that would be an

8  excellent suggestion, Your Honor.  So we have no -- I don't

9  think that unduly prejudices defendants in any way.  And I

10 think it does accurately, very objectively, sets forth the

11 state of the record.

12     So I think in the overall context of the evidence

13 presented at trial, I think that the risk of prejudice is

14 really diminimus.

15       **THE COURT:**  All right.  Again, this is all very

16 helpful.  And it's now 11:23.

17     First of all, let me ask the court reporter whether you

18 need a break.

19     (Discussion held off the record between the Court and

20      the Court Reporter.)

21       **THE COURT:**  Let's take 10 minutes.  Then what I want

22 to do is talk about a few of the bellwether exhibits and then

23 talk about where we go from here with respect to Jury

24 Instructions and the actual pretrial -- the actual course of

25 the trial in terms of timelines and everything else, as well as

1    a word about some of the Jury Instructions and verdict form.

2        So why don't we go ahead and take a 10-minute break.  Give

3    the reporter a break and we'll come back.

4        **MR. PORRITT:**  Very good, Your Honor.

5        **THE COURT:**  Thank you.

6        (Whereupon there was a recess in the proceedings

7         from 11:23 a.m. until 11:36 a.m.)

8        **THE COURT:**  Okay.  Why don't we resume.  Welcome

9    back, everyone.

10       I want to go over -- I don't have time to go over

11   everything, but I want to go over some of the bellwether

12   exhibits.

13       So let me just go through -- a lot of these I just want to

14   figure out exactly what the relevance is.  So document

15   number -- Exhibit No. 430, the email exchange between

16   Mr. Littleton and Mr. Morris.  This is back in 2017.  So maybe

17   I can try to get some understanding as to what the relevance of

18   this is.

19       **MR. SPIRO:**  Yes.  Certainly, Your Honor.  This is,

20   again, Alex Spiro.  Good morning.

21       The -- and I think this kind of harkens back to something

22   that the Court was just commenting with the idea that the time

23   period that's at issue in this case is a defined one.

24       These two exhibits that I think are listed amongst these

25   for Mr. Littleton were exhibits that were entered into during

 1   his deposition and were just wholly collected and included in

 2   part of the exhibit list.

 3        The reality is that Mr. Littleton is going to testify.

 4   He's going to be cross examined.  I don't know what exactly

 5   he's going to say.  Depending on what he says or doesn't say,

 6   cross examination and credibility don't have clean lines and

 7   clean rules in terms of periods; right?

 8        So if Mister -- just to go back to the comment that the

 9   Court was discussing earlier, if Mr. Littleton would say, you

10   know, "Once a liar, always a liar.  I would never invest in an

11   Elon Musk company," then it would be fair game under the rules

12   and under, you know, the way trials work to say, "Well, sir.

13   That's not really a fair statement.  Isn't it true that you did

14   bet on Mr. Musk again."  Now, if he didn't say that and he

15   says, "Listen, I didn't believe that, but I believe him

16   generally," it doesn't suggest that.

17        So, you know, I answer the Court's question by bringing

18   that back up because I think cross examination and issues of

19   credibility are just different.

20        The defense does not intend into enter into evidence at

21   this time, you know, certain of these exhibits.  It's just more

22   that you have a plaintiff.  They have credibility.  They

23   testified.  And it may be that we press them on, "Well, you

24   said X.  Is X true given Y?"  Then it's just -- that's all that

25   that is.

1           **THE COURT:**  All right.  So it's possible use of -- on

2  cross for essentially impeachment purposes.

3           **MR. SPIRO:**  Yes, Your Honor.

4           **THE COURT:**  All right.  And we won't know that until

5  we hear the testimony.

6      But you're not intending to introduce this affirmatively

7  because on its own it doesn't seem particularly relevant unless

8  it's made relevant by his testimony.

9           **MR. SPIRO:**  Yes, Your Honor.  And I just -- I wanted

10  to bring it up in the context in which I did to make sure that

11  because, you know -- and I'm somebody -- I don't like these

12  Zoom remote hearings because I find it harder to make sure our

13  points are getting across in a matter of this importance, but

14  maybe that's just my own limitations.

15      But in any event, the reality is I totally understand the

16  Court's, you know, class period cut-off and what we were just

17  discussing in terms of affirmative evidence.  But, of course,

18  credibility is always at issue.

19      So, right?  If Mr. Littleton says, "I've never met with my

20  attorneys before."

21      "Well, Mr. Littleton, isn't it true that you were prepared

22  for this trial with your attorneys?"  Right?

23      One could say, well, that came outside of the class

24  period, but that's not, I don't think, what the Court means.

25           **THE COURT:**  I understand.  I understand.

```
 1              MR. SPIRO:  Yeah.

 2              THE COURT:  Okay.  Thank you.

 3        Exhibit -- the Depo 437 about this email chain regarding,

 4   I guess, unhappy transaction with respect to his purchase.

 5   That is same thing?

 6              MR. SPIRO:  Same comments.  That, you know, we will

 7   be cross examining the witness on credibility.

 8        These were deposition exhibits.  If the Court will of

 9   course recall, we came into the case.  The only factual witness

10   we had an opportunity to cross examination was Mr. Littleton.

11   We entered exhibits.  We ran right into this trial process, and

12   they were superimposed into our exhibit list, and that's why

13   they are here more than that we have any intention of right now

14   to use them affirmatively.  So I don't think this is --

15              THE COURT:  All right.  So no formative use, but

16   could come up on cross if it's relevant.

17              MR. SPIRO:  Right.

18              THE COURT:  Okay.

19              MR. SPIRO:  Yes.

20              THE COURT:  This chart, D-0094, where there is a

21   dispute whether this exhibit shows price levels rather than

22   change in price levels.  I may not be able to read this chart,

23   but maybe someone can enlighten me as to what the dispute here

24   is.

25              MR. SPIRO:  Yeah.  I didn't understand this one from
```

 1  plaintiffs.  I -- I mean, they didn't -- I'm just pulling up

 2  the chart, if the Court will give me just a moment.

 3      I mean, there wasn't a *Daubert* challenge.  This is just

 4  one exhibit like all of the exhibits in their expert reports

 5  and their expert opinions.

 6      I guess the plaintiff's position is that they think that

 7  this is a mischaracterization, this document in his report.

 8  Well, we think all of the exhibits in their expert reports are

 9  a, quote/unquote, mischaracterization.  That's why we have

10  trials.

11      So their experts testify with their territory reports.

12  Our experts testify with ours.  They didn't move to challenge

13  us on *Daubert* grounds.  This isn't a proper objection to an

14  exhibit.

15          **THE COURT:**  This is your expert's chart derived from

16  the Heston and Hartzmark reports?

17          **MR. SPIRO:**  Yes, Your Honor.

18          **THE COURT:**  Response?

19          **MR. PORRITT:**  Your Honor, I don't think it

20  accurately -- I mean, it's just misleading, is essentially what

21  we're asking.  It's not an objective presentation of the -- of

22  it.  It's not like a summation or a summary of the chart or an

23  Excel spreadsheet or anything along those lines.  This is like

24  hand-selected, you know, excerpts that say more -- more

25  prejudicial than probative at this point.

1          **THE COURT:**  Is the intent to use this as a

2     demonstrative or have this actually entered as an exhibit?

3          **MR. SPIRO:**  Well, this isn't in the expert reports.

4     I mean, I have a view as to whether expert reports are

5     admissible in courtrooms, and I think the law says they are

6     not.

7          **THE COURT:**  Yeah.  That's right.

8          **MR. SPIRO:**  So as of now this is a -- I believe the

9     way that this -- and the reason why it's D-094 is it's just --

10    they are just picking a page out of our expert report.

11         I mean, suffice it to say, well, I didn't do this to their

12    expert reports.  There's dozens and dozens of pages within

13    their expert reports in isolation that I view as misleading.

14    I just don't see this as an issue for today or -- and, again,

15    an affirmative exhibit outside of the expert report.

16         I will just also say that, again, there wasn't a *Daubert*

17    challenge to this in any way, shape or form.  So the way that

18    this gets tested with an expert is cross examination.  If this

19    is misleading or mischaracterizes something according to them

20    and their expert, then that's why we have juries.

21         **THE COURT:**  Yeah.  All right.  Well, I don't think

22    this is a proper in limine motion.

23         First of all, I don't even know if there is even going to

24    be an attempt to admit this into evidence.  The report itself

25    is hearsay.  Whether it comes up as a demonstrative or

1   something, it will be subject to cross examination.  So at

2   least I know the context of that.

3        D-197, the Isaacs complaint, what's the role of that?

4        **MR. SPIRO:**  I don't know that we have any affirmative

5   interest in -- again, that the -- we included it on our Exhibit

6   List.  I don't think it -- we don't have any present intention

7   to offer it into evidence at this time.

8        **THE COURT:**  Okay.  Well, I'm having trouble seeing

9   how that is relevant, but it sounds like that may not be at

10  play anyway, so.

11       Then we have D-369.

12       **MR. SPIRO:**  Yes.  This is a photograph of one of the

13  individuals that's in the room that makes statements regarding

14  the PIF.

15       Sometimes in cases witnesses are going to describe people.

16  They may know their names.  They may not know their names, if

17  they are not present at trial.

18       If somebody wants to say, you know:  You claim, sir, that

19  this person said this.  You know, what was that person's name?

20  I don't remember.  Is this the person?  This happens,

21  obviously, in trials every day.

22       That's the way it would come up so that you make sure that

23  two people are saying that the same person said something.  If

24  it comes up, then it becomes relevant and important so that we

25  can confirm that two witnesses are talking about the same

 1  individual.  It does.  If it doesn't, it becomes unnecessary.

 2  Again, it's just a photograph of the person and, of course, in

 3  that -- that made statements in this case and a person that may

 4  not be at trial, so...

 5          **THE COURT:**  So it will only come up if there is a

 6  dispute or some question about whether witnesses are

 7  identifying the same person?  Otherwise it doesn't seem like

 8  it's relevant.

 9          **MR. SPIRO:**  Yeah.  His personal appearance is only

10  relevant in terms of just making sure that we're identifying --

11  if that is at all an issue, to make sure that we have the --

12  that if two people from a room testify -- we're at a meeting.

13  I don't know -- you know, you remember who said what?  Is this

14  the person?  Yeah.

15      The Court, I think, follows.

16          **THE COURT:**  Okay.  All right.  Sounds unlikely that

17  this will come into play, but you never know.

18      Then we have the P-31 through P-0407.  These are -- I take

19  it these are newspaper articles and journals and websites that

20  were examined by Dr. Hartzmark in his testimony of the market

21  response.

22      Is there an intent?  I guess I'm trying to figure out, are

23  these -- what's the intent here?  Are these going to be --

24  someone going to seek to actually admit these?  What do we have

25  here?

1            **MR. SPIRO:**  These are a lot of newspaper articles.

2    You know, we have just under 100 here out of the 2400 that

3    Dr. Hartzmark refers to in his report.  These are the major

4    ones.

5         We certainly don't intend to discuss all hundred-odd in

6    front jury at trial.  I think that would take three weeks in

7    and of itself.  So this is mainly just to -- we will certainly

8    present selection or selected portions of the newspaper

9    articles, et cetera.  So this is really just -- these are the

10   underlying materials that are supporting his expert opinion.

11           **THE COURT:**  Well, he's entitled under 702 or 703 to

12   explain the basis of his opinion and if it's -- if the

13   probative value is significant enough under 703, he can

14   describe them or disclose them.

15        Are you -- is there an issue here?  Is there going to be

16   an attempt to actually admit these as independent exhibits?

17           **MR. PORRITT:**  I think we -- possibly, Your Honor.  In

18   terms of -- but I think we are working -- I think they are

19   admissible, and I think they are self authenticating and all

20   those things, and I think they are clearly relevant.  And they

21   are not really being offered for the truth of what's in them.

22   Just the fact that they were published.

23        So, and I'm not sure if -- we included this really as a --

24   just to flag this issue for Your Honor.  I think we are having

25   discussions with defendants about how to treat all the various

```
 1   -- you know, there's a lot of technical materials and other
 2   data referred to in expert reports, and we just -- I think we
 3   ought to continue to discuss with defendant's counsel, you
 4   know, very professionally, as to the best way to which that
 5   gets into -- what needs to get in the record gets in the record
 6   without unnecessarily cluttering up the courtroom.
 7          THE COURT:  All right.  Well, I don't think there is
 8   a lot of controversy in terms of 703, basis of the opinion.  I
 9   think these articles, since he does rely on it, can be
10   described.
11          Whether they could be admissible or not, I don't know if
12   the defense has a view or if the plaintiff does seek to admit
13   these as independently admissible exhibits, whether you have an
14   objection?
15          MR. SPIRO:  Yes, Your Honor.  We would have a strong
16   objection.  And because of how voluminous and how prejudicial
17   this set of exhibits are, I think it is something that we ought
18   to make sure that we're on the same page with.
19          I mean, there's over -- I think there's approximately 100
20   exhibits on the Exhibit List, which are cherry picked articles
21   that the plaintiffs would seek to introduce.  And the members
22   of the media choose all sorts of headlines and make all sorts
23   of comments.  Some of it is true, some of it is not.  A lot of
24   it has hearsay-within-hearsay.  And it would just be an
25   end-around a trial and proving up all of the issues at trial.
```

 1          You could just introduce over the 15 days that matter to

 2     you an article a day that you think summarizes what happened

 3     that day and have sources and quotes within it and just -- you

 4     know, that's not how trials work.  That's the reason why

 5     hearsay is not allowed.

 6          And so, no, we would strongly object.  These articles are

 7     very prejudicial and have hearsay and hearsay-within-hearsay.

 8          So if they want to use it in the 703 sense, I take the

 9     Court's point.  But, no, you can't just replace a trial with

10     media stories.

11          **THE COURT:**  All right.  Well, I think the comeback

12     from the -- the technical comeback on the hearsay is this goes

13     to the effect on the listener which, is the public, and,

14     obviously, that's at issue here and the impact on the market

15     potentially.  And so that's a non-hearsay purpose, even if

16     contains sort double hearsay, whatever it is that's presented

17     in the market.

18          It seems to me your main argument is really a 403; that,

19     you know, the probative value, but these particular ones or

20     these set of ones could be outweighed by the prejudicial value

21     because the jury may take it beyond just effect on the

22     listener.

23          Well, I don't know if I would concede this sort of hearsay

24     issue or that it's just not just an end-around hearsay; right?

25     I mean, you have -- Your Honor has stated, and you may very

 1   well be right, that that is the sort of knee jerk reaction from

 2   the plaintiffs.  But what that response really is about in our

 3   judgment, Your Honor, is an end-around hearsay; right?

 4        Just because somebody can come up with a non-hearsay

 5   purpose for something in some theoretical way doesn't make it

 6   so.  And those are exactly the kinds of exhibits that a Court

 7   should be extra skeptical about.

 8        **THE COURT:**  Well, it's a 403 problem.

 9        **MR. SPIRO:**  Well -- well, but a 403, it sort of

10   presumes that it is relevant and admissible in the first place.

11        I don't really know why cherrypicking 100 of the 10,000

12   articles that occurred during the time frame that you like the

13   headlines of, where you have no evidence; right?

14        It's not as if, Your Honor, they are going to be able to

15   point to:  Oh, look at article 17 and don't you see -- the

16   second it comes out you see this movement.  You see this little

17   peak in the stock.  There's no testimony regarding that.

18        So, no, to just go:  Well, we're going to pick the hundred

19   of the 10,000 articles we like the headlines best of and

20   end-around hearsay.  Because theoretically some of these

21   articles could have had some impact on people's knowledge, and

22   so we have something to say.  That's not -- that's not an

23   exception to hearsay and that's not a non-hearsay purpose.

24   That's just something that lawyers say when they have a hearsay

25   problem.

1        **THE COURT:**  Well, all right.  I'm going to direct the

2   parties to meet-and-confer, as Mr. Porritt, I think, was

3   indicating, to see how you might approach this.  If in the

4   final analysis, you know, there's a dispute over admissibility,

5   I guess I'll have to rule on that, and we'll have to rule on

6   that a little closer to trial.

7        I will say I'm a little skeptical of the idea of

8   introducing as 100 exhibits 100 articles unless there is

9   something that makes these empirically relevant; that it's a

10  showing that these -- one of these or some of these were actual

11  events that may have had some impact, et cetera, et cetera.

12       I do think it is largely a 403 question, but a serious 403

13  question.

14       So let me ask about, let's see, 164.  That's the thing

15  about acquiring Solar City, back to point 16.

16       **MR. SPIRO:**  Right.  Yeah.  We don't understand the

17  relevance, and it seems to create a trial-within-a-trial sort

18  of issue where I don't think we want to try to litigate every

19  Tesla-related issue in two weeks, but -- so we think this is an

20  obvious reason to exclude it in and of itself.  We don't see

21  the relevance.

22       **THE COURT:**  What's the relevance of this?

23       **MR. PORRITT:**  Your Honor, it goes to -- we're not

24  remotely seeking to litigate the Solar City acquisition.  This

25  is a press release by Tesla on Tesla letterhead, you know,

1  taken from their corporate website.  And it goes -- it's a --

2  when it comes to liability of Tesla and liability of the board,

3  their approach to corporate communications and disclosures and

4  awareness of the importance of the corporate information and

5  how corporate information should be disseminated to the market

6  is highly relevant.

7      And this is an example of a -- it was really close in

8  time, 2017, so within a year or so of the August 7th Tweets, of

9  a not dissimilar significant transaction, where Elon Musk is

10  centrally involved.  And it was done.  They issued a formal

11  press release indicating the offer.

12      They did not issue a 65 character Tweet, and that

13  indicates that the board new the importance of corporate -- of

14  controls over corporate information and disclosures; that Elon

15  Musk knew it as well.  And that those were -- those standards

16  were just violated.  So we think that's a relevant purpose --

17          THE COURT:  So it goes to the board liability, is the

18  ultimate question, because of their prior knowledge of how

19  corporate -- important corporate information was being

20  disseminated by Mr. Musk.

21          MR. PORRITT:  I think, and Mr. Musk's knowledge as

22  well and general corporate scienter too.

23          MR. SPIRO:  Every press release that's issued by

24  Tesla ever in and around the years of this somehow indicates

25  that the Tweets are different and then have different

 1 | accentuated features.  I don't understand the argument even,
 2 | let alone the relevance.
 3 |        **THE COURT:**  I mean, this is -- I'm not sure this is
 4 | the proper way it's supposed to be done, and this is one
 5 | instance in when it was done the proper way, and the way it was
 6 | done in 2018 was not the proper way; is that the theory?
 7 |        **MR. PORRITT:**  Yes.  Quite so, in a nutshell.  I mean,
 8 | we will hopefully present it perhaps with more -- with a bit
 9 | more context, but I think it's more pattern that our expert,
10 | Professor Subramanian from Harvard, you know, looks at the
11 | pattern, the history, if you like, of corporate disclosures,
12 | which indicates that there is -- you know, the board had an
13 | awareness and knowledge of -- of more usual ways, more
14 | conventional ways of which information was disclosed and knew
15 | the risks of having essentially, you know, an uncontrolled
16 | Twitter communication channel.
17 |        **MR. SPIRO:**  Just one other factual thing that the
18 | Court should be aware of this.
19 |     This is actually from 2016.  So the board members I don't
20 | even think are frankly the same.  I'd have to check that, but I
21 | don't believe they are all even the same.  I just think this
22 | is -- I'm still having a hard time with it.
23 |     I actually -- I understood their theory more to be that
24 | Tesla had committed that his Tweet channel was a formal means
25 | of communication.  That was their theory.  This is the first

```
 1    I'm sort of understanding this spliced theory.

 2            THE COURT:  All right.  Well, it seems -- probative

 3    value seems a little weak because it's anecdotal.  It's one

 4    example, although, you know, I guess one would argue it's a

 5    comparable example because it's a major transaction,

 6    acquisition, a major acquisition, and although there's -- you

 7    know, I guess we'd have to see if there are common board

 8    members.  So you may have to lay a predicate to that.  Because

 9    if they are completely different board members, then it's a

10    little harder sell it seems to me.

11            MR. SPIRO:  Yeah.  I mean, and I would just simply

12    say to the Court I hope and trust that we're not going to go

13    press release by press release, Tweet by Tweet for years to

14    sort of -- I don't see what that kaleidoscope shows as to this

15    issue in this case.

16            THE COURT:  Yeah.  Well, I think that will raise a

17    403 question because I'm -- and I'm going to talk about time

18    limits in a moment.  We don't have all year to try this case.

19            MR. PORRITT:  And, Your Honor, we haven't listed

20    every press release from 2016 to 2018 on the Exhibit List.  So

21    Mr. Spiro's concern is just completely unfounded.

22            THE COURT:  All right.  Let me ask about

23    Exhibit 30-320, the June 7th Tweet.  What's the purpose there?

24            MR. PORRITT:  I'm -- what's the -- this is the --

25            THE COURT:  This is from Depo Exhibit 320.
```

1          **MR. PORRITT:**  Exhibit 320, okay.

2      It's very straightforward, Your Honor.  The defendants

3  have said in arguments of loss causation that concerns about

4  Elon Musk's mental health and drug use, which are referenced in

5  the August 16th *New York Times* article, will really -- really

6  moved the stock price reaction of August 17th.  Nothing to do

7  with the post transaction.

8      This evidence directly refutes this because it shows that

9  the year prior Elon Musk's mental health and potential use of

10  Ambien to sleep -- that's the specific drug, I think,

11  referenced in the *New York Times* article -- was known to the

12  market.  So it can't be new.  So it goes directly to rebut

13  their alternative loss causation theory, I guess, if you want

14  to call it.

15          **THE COURT:**  Okay.  I understand the relevance.

16      321.

17          **MR. SPIRO:**  It will go without saying -- and I won't

18  go Tweet by Tweet here, Your Honor -- that we see zero

19  relevance and complete prejudicial value and strong prejudice

20  to any discussion of all of these -- this -- how these

21  Tweets -- those -- there may be cases about other Tweets.

22  That's not this case, and this case doesn't come into that

23  case, and I don't know why those cases would come into this

24  case.

25      So that's sort of our blanket objection to all of this.

 1    You really have to look deep, deep at the horizon to try to

 2    find some tangential relevance to any of this, and it's --

 3            THE COURT:  This one you don't have to look quite as

 4    deep.  I mean, it's a bit of a stretch because he mentions

 5    Ambien and that doesn't necessarily mean that that's a problem

 6    of the extent to which the *New York Times* piece then describes

 7    it.

 8            MR. SPIRO:  Correct.  That's like saying, you know, a

 9    year earlier in a whimsical -- this is clearly a whimsical

10    comment where he's saying "a little red wine and magic."  Okay?

11    The whimsical comment well, well, well earlier.

12        I mean, you're talking over a year earlier in time has

13    anything to do with the fact that there is an article that

14    talks about an essential mental health and mental wellness

15    breakdown of sad and monumental proportions.  No, there is

16    nothing.

17        You could pull any comment that anybody says:  Hey, one

18    night I couldn't sleep.  You know, I want to watch some TV.

19    Somebody says that.  Then a year later they're -- you're

20    talking about profound issues?  No.  I don't see even relevance

21    on the horizon.

22            THE COURT:  What about 321, the diver Thai rescue

23    thing.  What's the relevance of this?

24            MR. PORRITT:  The -- again, we don't have any

25    interest in litigating out the circumstances of the exchange

```
 1   between Mr. Unsworth and Mr. Musk at this trial.  We have more
 2   than enough to cover.
 3        But this was a Tweet that generated -- this is July 2018.
 4   So less than a month prior to the August 7th Tweet.  These are
 5   Tweets by Mr. Musk that generated considerable public
 6   controversy that had a direct impact Tesla's stock price and
 7   resulted in questions and discussion about Elon Musk's Twitter
 8   habits and its relevance to Tesla at the board level by
 9   investors and amongst senior management.  The CFO spoke to
10   Mr. Musk about this.  The board spoke to Mr. Musk about this.
11   Individual investors sent Mr. Musk emails and sent to -- and
12   sent -- had discussions with him asking him to stop his Twitter
13   habit.  This is three weeks before he then issued the
14   August 7th Tweet.
15        So we think it's highly relevant towards certainly the
16   board's state of mind and culpability under Section 20(a), as
17   well as we talked about earlier today knowing violations by
18   Elon Musk as to a potential --
19             THE COURT:  So that -- there is a context that's
20   going to be laid, a foundation, to show that there had been
21   discussions before and after about his use of Twitter?
22             MR. PORRITT:  Correct, Your Honor.  I mean, this --
23   this exhibit arises in the context of, say, various investors
24   and board members who had raised concerns about what this means
25   about Elon Musk's Twitter habit and its impact on Tesla.
```

1          Of course, nothing was then done by the board in response,

2     but, you know, that's probably what that case is about.

3          **MR. SPIRO:**  That's sort of like an interesting

4     subject matter, but not the subject matter of this trial.

5          The knowledge and scienter element here has to do with the

6     falsity.  The good faith has to do with the -- whether or not

7     they understood the falsity of the Tweet.

8          It has nothing to do with whether or not his Twitter

9     habits are good, bad or otherwise.  It has nothing to do with

10    whether or not they had spoken to him previously about his

11    Tweeting.  That is not what the case law or the law is at all

12    with regards to the scienter elements we're here to discuss.

13         So I think what I just heard is classic character

14    evidence.  Classic character assassination saying once a bad

15    Tweeter, always a bad Tweeter.  You see you got in trouble

16    before.

17         But ultimately when the Tweet goes out that's at issue in

18    this case, the board's reaction to that and the liability they

19    face has to do with whether or not they knew that it was false

20    or not.  It -- any other Tweet that they have ever assessed

21    doesn't have anything to do with this.

22         So Mr. Porritt either is just -- again, this is just a

23    character assassination attempt or a misunderstanding of the

24    law, but I don't see how it's possibly relevant.

25         **MR. PORRITT:**  Well, there is no scienter requirement

 1  for the board.  So I don't know where Mr. Spiro is getting that

 2  from.

 3          THE COURT:  Why then is the board's reaction to this

 4  Tweet or discussions about Mr. Musk's Tweet habit relevant?

 5  Isn't the issue their reaction to the Tweet in question on

 6  August 7th?  I mean, why is all this -- even if it's days

 7  before, so what?

 8          MR. PORRITT:  It goes to a good faith -- they have

 9  asserted a good faith defense.

10          THE COURT:  Well, what's the --

11          MR. PORRITT:  A good faith defense --

12          THE COURT:  -- good faith defense?

13          MR. PORRITT:  What's that?  Sorry.

14          THE COURT:  Good faith is about the belief and the

15  accuracy of what he said, not necessarily good faith in

16  allowing him to Tweet?

17          MR. PORRITT:  And allowing a him -- allowing a

18  channel of corporate communications to exist without controls,

19  which as a board they are required to impose and allowing that

20  to go forward.

21      I don't think that's good faith.  Our expert certainly

22  doesn't think it's good faith.  So that is -- that directly

23  rebuts their good faith defense.  If they want to waive their

24  good faith defense and admit that if Tesla committed a

25  misrepresentation they are automatically liable under 20(a) as

1  control persons, then fine.  We can move on from the -- you

2  know, we can perhaps not present this evidence.  But as I

3  understand it, they are not willing to do that.

4          **MR. SPIRO:**  If I may respond very briefly.

5          **THE COURT:**  Yeah.

6          **MR. SPIRO:**  Yeah.  Your Honor stated the law exactly

7  correctly, and what Mr. Porritt is summarizing as his basis for

8  trying to enter in all of this evidence is exactly an incorrect

9  statement of the law.  It's not -- the way he would put it is

10  it's some moral conundrum where you have to assess their good

11  faith generally in their historical assessment of his Tweeting.

12  That's not the law.

13      The law is exactly what the Court said, which is how does

14  this have any impact on whether or not they had a good faith to

15  believe the Tweet at issue in this case is true or false.

16  That's the analysis.

17      And so nothing could possibly be relevant about this.  And

18  even if you could, again, look at the horizon and find a speck

19  of relevance, the prejudice is extreme.  And so we don't see

20  this as a very close question, and it has nothing to do with

21  good faith.

22          **THE COURT:**  So any good faith that you would assert

23  on behalf of the board members is good faith belief in the

24  accuracy and the non-misleading nature of the content of the

25  Tweet, not with respect to the process by which that

 1    information was disseminated.

 2              **MR. SPIRO:**  Certainly not with the -- with the --

 3    correct.  Your Honor, just restated the law again correctly.

 4    That is what good faith means in the -- in the 20 context.

 5         The -- the -- we are not claiming good faith, nor would it

 6    even be relevant to this trial frankly, as to -- it's just not

 7    a subject matter for this trial.  Whether or not their

 8    historical assessment of his Tweeting, their historical

 9    oversight of his Tweeting and the channels upon which he uses

10    to communicate is good faith in the colloquial sense.  That's

11    just not what good faith means in this case.

12              **THE COURT:**  Right.  But I asked you to try to get

13    confirmation from you because in a sense you are framing the

14    good faith defense as your defense, your client's defense.

15         And if it is framed in terms of a good faith belief in the

16    accuracy of the information that was disseminated, not

17    necessarily how it was disseminated, then that seems to me that

18    circumscribes the response to that good faith assertion.

19              **MR. SPIRO:**  Yes.  I think again, yes, Your Honor is

20    staying the law correctly and our view correctly and how we

21    plan on asserting good faith.

22         I mean, the only reason I haven't just reacted in an

23    absolute sense is because I don't want my statements to be

24    taken to mean that I think that the way he did it was right or

25    wrong.  That's just not what we believe is part of the good

 1   faith defense.

 2           **THE COURT:**  And you're not going to assert that?

 3           **MR. SPIRO:**  I am not going to assert that press

 4   releases versus Tweets are more good faith or less good faith.

 5   I'm only going to assert that they are good faith.

 6       What their good faith is is that when he made the

 7   statements to the market, whether or not they believed them to

 8   be true or whether or not they believed them to be false.  That

 9   is good faith.

10           **MR. PORRITT:**  Your Honor, if I may.  Mr. Spiro is

11   saying that the controls in place for a board over public

12   communications by a CEO of a public company are not relevant to

13   assessing whether they acted in good faith in their conduct as

14   control persons of that issuer?  I mean, that's so far beyond

15   what the law imposes that it really is.

16       I mean, if they had no controls over the public statements

17   of Tesla, that wouldn't clearly make them liable and rebut any

18   good faith defense they may have for any fraudulent statements

19   in violation of 10(b)(5) that may be contained in such public

20   statements.  In fact, this is --

21           **THE COURT:**  Well, all right.  So let me ask.  You're

22   saying there's almost a strict liability; that is, even if they

23   had no reason to believe that the information was inaccurate.

24   If, in fact, it was inaccurate, but -- but the fault lay not in

25   their assessment of the accuracy of the information but in the

```
 1    controls by which that information was disseminated, that is
 2    the basis for control liability?
 3              MR. PORRITT:  That's a the difference between primary
 4    and secondary liability.  Between Section 10(b) and Section
 5    20(a).  Otherwise Section 20(a) would have almost no content.
 6    That is the very -- that's the very statutory scheme that
 7    Section 20(a) omits to address.  You have obligations as a
 8    board member.  And it is ameliorated somewhat by the
 9    proportionate liability scheme put in place by the PSLRA, so
10    there was that, but -- and it is subject to a good faith
11    defense, which you can meet.  This is -- so, you know, you can
12    show that by having good faith controls, that they broke down
13    for no -- you know, for whatever reason.  They were --
14              THE COURT:  But if you don't have the controls and
15    yet you had a good faith belief in the accuracy of the
16    information, if you had no idea that this was inaccurate,
17    there's still liability.  Essentially strict liability for lack
18    -- because of lack of controls; is that your view?
19              MR. PORRITT:  I would say so, yes, subject to a good
20    faith.  I mean, if they -- maybe if they were advised by
21    counsel that you don't need controls as a public company,
22    though it's hard to imagine such a circumstance, or -- or
23    what-have-you.
24              THE COURT:  So it's the controls or lack thereof
25    that's dispositive.
```

```
1              MR. PORRITT:  I would submit in this particular fact
2   scenario.  I mean, 20(a) only attaches if there is already an
3   intentional fraudulent statement on behalf of the issuer, i.e.,
4   Tesla.  So you're already -- you're already a board member,
5   say, or control person of an issuer that has issued --
6   intentionally issued fraudulent statements to the market.  And
7   so the question is, to what extent -- how can you avoid
8   liability of that control person?
9        And the question is, you have a good faith defense, which
10  I think can be put in place, controls, or at least it's
11  relevant to that, whether you have controls of prior review of
12  public statements that would -- you know, et cetera.
13             MR. SPIRO:  May I respond briefly?
14             THE COURT:  Yeah.
15             MR. SPIRO:  Just like I said with the good faith and
16  what Mr. Porritt would have good faith mean in its context,
17  it's -- the understanding of whether or not somebody is a
18  control person is just flat out wrong under the law.  This is
19  black letter law.  And, in fact, in our Jury Instructions both
20  sides agree that he's wrong.
21       So this isn't a close question, and I would encourage the
22  Court to look at the law on this and look at our Jury
23  Instructions.  What a control person is in this context is a
24  person that can direct the management or policies of a business
25  or enterprise.  That's a stipulated instruction.  Do they have
```

```
 1   the actual power to direct?  If they don't have the actual
 2   power to direct, then that's it.
 3       The only case that I think where Mr. Porritt is getting
 4   his misapprehension of the law is a case in which there is a
 5   broker-dealer and a broker-dealer has different obligations
 6   than, say, a public board.  And so the case has to do with
 7   internal controls differently.
 8       But in this case a controlling person, it means just what
 9   I said that it means.  It has nothing to do with no.  So, in
10   other words, no, it is not as if you're on a board.  You have
11   insufficient controls, and you are then liable under the
12   securities law for anything that anybody says.  It's just not
13   how it works, subject to some minor good faith exception.
14             MR. PORRITT:  That's exactly how it works.
15             THE COURT:  So you're saying power to direct, even if
16   it's just theoretical, is enough to get you under 20(a);
17   correct?
18             MR. SPIRO:  The Court is asking -- I'm not sure
19   which --
20             THE COURT:  You're saying what's dispositive is a
21   power to direct, not the implementations or failure to
22   implement controls.
23             MR. SPIRO:  Correct.  The cases are --
24         (Court reporter clarification.)
25             MR. SPIRO:  I apologize.
```

1      And these cases stand for the absolute proposition that

2  this is not a -- it's not an internal control test, which is

3  *Howard versus Everex Systems, Inc.* and *Arthur Children's Trust*

4  *versus Keim*, K-E-I-M.

5          **THE COURT:**  All right.  So you're saying you're view

6  of the law is that the issue is the power to direct, not the

7  quality of controls imposed by those in power.

8          **MR. SPIRO:**  Correct.

9          **THE COURT:**  And, in fact, you would say that's

10  irrelevant.

11          **MR. SPIRO:**  Other than in the broker-dealer context

12  where there's an additional set of duties or context such as

13  that, the case that talks about that in the Ninth Circuit is

14  *Hollinger*.

15      But, no.  The subsequent cases make it clear that you're

16  not strictly liable just because your controls are improper,

17  even if your controls were improper.

18          **THE COURT:**  All right.  I will take a look at the

19  case law.  We've got to move on.

20      324, Mr. Musk's May Tweet.  And this is to show bias

21  against short sellers?

22      (Brief pause.)

23          **MR. PORRITT:**  Is Your Honor asking me?

24      It's really a -- it's more to do with -- again, this

25  partly depends a little bit, as Mr. Spiro briefly said, about

1    it depends how the evidence comes in.

2        But it's partly to show Mr. Musk's awareness of his Tweet,

3    how it affects stock price, you know, the importance of the

4    channel, as well as -- as well as it shows he's aware of how

5    his Tweets can effect the stock price and how short sellers,

6    short interest in the stock may affect that.

7            THE COURT:  Well, so is the main point about his

8    knowledge of that his Tweets affect the market?

9            MR. PORRITT:  Not just that they did affect the

10   market, because that's observable by objective fact, but more

11   that he -- you know, this is evidence that he knows -- he

12   looks -- he follows stock price.  He follows short interest.

13   He has a well-known animus towards shorts.  And that he knows

14   that, for instance, a rapid increase in stock price will have

15   the effect or may have the effect of harming short sellers,

16   which he dislikes.

17           THE COURT:  So that knowledge of the ability to hurt

18   short sellers, what's the relevance of that in regard to the

19   Tweet in question on August 7th?

20           MR. PORRITT:  It once again shows the willfulness, I

21   think, of the August 7th Tweets.

22           THE COURT:  That by showing -- are you saying because

23   he had an intent, part of his intent was to --

24           MR. PORRITT:  And also that he --

25           THE COURT:  -- harm short sellers?

```
 1              MR. PORRITT:  And also that he knows that putting out

 2    misleading information which will increase stock price, which

 3    he knows in his August 7th Tweet -- he anticipates that it will

 4    increase stock price -- you know, will hurt, will harm market

 5    participants.  Including if it's false, then that will have --

 6    that will fraudulently harm.

 7              THE COURT:  Is that part of a theory of your case,

 8    that this was done with, in mind, the purpose of hurting short

 9    sellers as opposed to just for any other reason?

10              MR. PORRITT:  I don't think we can say that the --

11    that entirely this was a scheme devised purely to harm short

12    sellers.  So I wouldn't go that far.  But I do think that

13    Mr. Musk was not unaware that the effect of his Tweet would be

14    to harm short sellers.

15              THE COURT:  Are you saying it was a partial

16    motivating factor?

17              MR. PORRITT:  I think that's fair.  Partial

18    motivation, yes.

19         If nothing else, its context.  Furthermore, puts --

20    putting the August 7th Tweets in context.  It's only a few

21    months prior, so.

22              THE COURT:  All right.  What's the response to that?

23              MR. SPIRO:  I'm not really -- I mean, I'm trying to

24    break up sort of the comments I heard.

25         The fact that he knows his Tweets move the market, I sort
```

 1   heard said and then withdrawn and then said and then conceded

 2   that that's already proven in other ways.

 3        And then the last thing I heard was something about

 4   something happening many months earlier, putting something else

 5   in context.  That didn't really make much sense today.

 6        So what I really hear, which is what I think the Court

 7   came back to several times, is that the purpose of this is to

 8   show motive; right?

 9        And Mr. Porritt, I think he conceded that the purpose is

10   to show partial motive; that their theory of motive is that the

11   Tweet was sent out because of an animus towards short sellers.

12   So that's now clear.

13        The -- you know, the truth about this Tweet from months

14   earlier, of course, is that there is an intervening event,

15   which is the earnings call.  And so there is just -- again, the

16   idea that we're going to go through -- right.

17        If they were to enter into this Tweet, we would then have

18   to take the earnings call.  We would have to -- I don't know

19   what happened there.  We'd have to take the earnings call and

20   lots of other subsequent Tweets potentially and put them into

21   evidence to contextualize everything.

22        I mean, Mr. Porritt just said it's to put it in context.

23   I think that's -- that's a dangerous bridge to go down because

24   it's obviously -- it's not like it's the day before; right?

25   There is a lot of intervening events, a lot of comments, a lot

1    of water under that bridge.

2        And so if these sorts of things come into evidence, I

3    think it would only be fair for the defense, because right?  We

4    don't get to pick their case and their motive.  You know, that

5    the Court would entertain, right, because we have a right to a

6    fair trial too of course, any and all applications to put in

7    other evidence that responds to these theories.

8            **THE COURT:**  I'll give you a very short chance to

9    respond to the trial, the trial problem.

10           **MR. PORRITT:**  The number of Tweets we're talking

11   about here, to give sort of the history of Elon Musk leading up

12   to the August 7th Tweet and explaining -- partly explaining why

13   the market reacted the way it did and took the Tweets

14   seriously, we're talking about a handful, if that.  They are

15   listed.  It's not like any surprise by Mr. Spiro.  And the

16   defendants have had the opportunity to add to that list any

17   documents that they want to to put them in context.

18       So I think that's overstated.  I don't think -- this is

19   not -- we're not looking to -- we've got quite good enough a

20   case and enough of a case to put on in our time that we don't

21   want to waste time going over what Mr. Musk said in May 2018.

22   This is just listed on the Exhibit List purely as an

23   opportunity to present, say, some sort of context for his

24   Tweeting habit.  Again, largely in the context of what our

25   expert talks about in terms of whether this is an

 1   appropriate -- you know, from a board -- especially from a

 2   board perspective, whether this is an appropriate way of which

 3   -- you know, should the company still be continuing to

 4   recognize this as an official corporate channel.

 5          THE COURT:  All right.  Let me ask about P-64 and

 6   P-84.  These are Tweets, one of them about the Model 3.

 7       Again, what is this?  What's the relevance here?

 8          MR. PORRITT:  These are listed by -- used by --

 9   looked at by our expert.  I don't think we have any current

10   intent to use them at trial.

11       Again, even further, I guess, if you like context just

12   discussed, but obviously less close in time.  And so it's not

13   something we were actually looking to use, but we have listed

14   them for potential, you know, examination purposes or

15   bolstering, following cross -- reexamination purposes,

16   depending on what the -- where the cross of -- of our expert

17   goes.

18          THE COURT:  And your expert -- remind me.  How does

19   your expert use -- how do these Tweets play into the expert's

20   opinion?

21          MR. PORRITT:  He uses these as examples of history of

22   Elon Musk being very acutely aware, in his view, of the impacts

23   of his Tweets and the timing of them and the context with price

24   movements and market movements and short interest and the like.

25          THE COURT:  All right.  But you're not intending --

1    it doesn't sound like you're intending to introduce these

2    affirmatively as separate exhibits, but that they would be

3    alluded to in the expert's testimony.

4            MR. PORRITT:  Correct, Your Honor.  And they are

5    listed in a matter of caution in case they should want to be --

6    for whatever reason, currently not anticipated, but for

7    somewhat unanticipated reason.

8            THE COURT:  All right.  So you're saying use these as

9    a 703 basis of the expert essentially.

10           MR. PORRITT:  Yes, Your Honor.

11           THE COURT:  All right.  335 is a *New York Times*

12   article.  And, again, is this something that Hartzmark is going

13   to -- intending to rely on?  What's the --

14           MR. PORRITT:  I mean, it's not one of the major news

15   articles, so -- that he will be relying on.  It's something he

16   refers to in his report.

17       So we will definitely refer to it amongst others, as we've

18   talked about a few times earlier today, but I really don't

19   think it's something we -- we admit itself into -- itself

20   independently into evidence.

21       But we would want -- we certainly want our expert to have

22   the ability, obviously, refer to his opinion and describe the

23   basis for his opinion.

24           THE COURT:  And this particular document goes to

25   which part of his opinion?  Is this on the consequential

1    damages, the lack of confounding effect?

2         **MR. PORRITT:**  Yeah.  I mean, it really -- sort of an

3    all -- answer all of the above, but yes.

4         It really goes into -- as you know, Dr. Hartzmark did an

5    exhaustive review of all the information coming into -- into

6    the market during this time period.  So this is part of that

7    overall mix, total mix of information, to quote the Supreme

8    Court.  And so on that basis it supports this.

9         And it's clearly relevant or relates to the subject matter

10   of this lawsuit.  So it clearly supports his opinion that there

11   was no other confounding information, stock price movements or

12   other movements of other securities during the class period.

13        **THE COURT:**  Again, your intent at this point is that

14   it could be alluded to under 703, but you're not seeking to

15   introduce this document.

16        **MR. PORRITT:**  Not separately, Your Honor, no.

17        **THE COURT:**  Response.

18        **MR. SPIRO:**  Yes.  Yes, Your Honor, and I appreciate

19   the opportunity.

20        It's probably not lost on the Court the headline being

21   "Did Elon Musk Violate Securities Laws."  Right?  And, you

22   know, Courts are loathe to not take these -- the ultimate

23   question away from a jury that's being instructed by Your Honor

24   and seen facts play out in a courtroom and replace it with a

25   media headline that gets a lot of clips; right?

1        I made this point earlier, and I'm glad that the Court's

2   attention went to this article because what I heard

3   Mr. Porritt say is this is one of, like, a hundred and it adds

4   a little bit to each category.  But basically it's not that

5   critical.  That's basically what he just said.

6        The idea that that is the purpose, amongst another

7   hundred, but this is the one that gets pointed out because of

8   its headline, of course.  That's why it made it in there, Your

9   Honor.  We know that.

10       So the idea that the probative value of this would so

11  outweigh the prejudice as to allow this into a trial about that

12  very issue is beyond me.

13       There is another point that Mr. Porritt just made that I

14  would like to go back to.  And I would ask to be heard, whether

15  it be today -- because I know we're sort of -- it feels like

16  we're at the end of the Exhibit List that Your Honor wanted to

17  talk to, but I do need to be heard, if it's okay with the

18  Court, on a couple of the other ones.  And I would ask to be

19  heard.

20       If the Court wants to hear it another -- I don't know what

21  our timing restrictions are, but I would like to be heard on a

22  couple of the other ones.

23           THE COURT:  By "couple" do you mean more than two?

24           MR. SPIRO:  Well, the related *New York Times* article,

25  I would like to use that as a related one, and then I can just

 1   pick a couple.

 2            **THE COURT:**  So which exhibit are we talking about?

 3         **MR. SPIRO:**  Oh, the -- the other *New York Times*

 4   article -- let me find the -- and as I'm finding which exhibit

 5   number that is, I would just point out -- yeah, I found it.

 6            **THE COURT:**  That's 171?

 7         **MR. SPIRO:**  Yes.

 8       You know, Mr. Porritt just pointed out how overwhelming

 9   his case is, and the Court has pointed out how short a time we

10   have to try this.  And Mr. Porritt has the Court's ruling,

11   which he's mentioned a couple of times, which is as favorable

12   as a -- of a summary judgment ruling that somebody could have

13   in a securities fraud case.

14       So, you know, it's hard for me to hear all of that and

15   hear Mr. Porritt, you know, noting the slam dunk that he finds

16   himself in and then asking myself:  Why are we -- why would we

17   taint what he believes to be an already rock crushing case with

18   these things?

19       In this situation, in this related *New York Times* article,

20   there is a statement in the article that funding was,

21   quote/unquote, far from secured.  Okay?  By an unnamed person.

22   Could have been anybody.  Could have been planted by somebody.

23   Could have been a plaintiff's attorney.  Could have been

24   anybody, Your Honor; right?  But it won't be a witness at this

25   trial.  It won't be a witness at this trial.

1      And so if you let things like this into a case, which,

2   again, everyone is telling me is, you know, according to

3   Mr. Porritt rock crushing and beyond all dispute, and he has

4   his summary judgment ruling, to allow something like this, to

5   allow a witness who is not a witness to basically testify

6   through a news article as to the state of funding, to me,

7   destroys, in essence, our opportunity for a fair trial.  It

8   doesn't taint it.  It destroys it.

9      And so I don't understand why that would come into

10  evidence in a United States courtroom, and we are moving to

11  exclude it.  And I don't want to not be heard on that before

12  this trial starts because it's clear, clear hearsay.  And it is

13  essentially letting in the most powerful fact in this entire

14  case, back dooring it in in an uncrossable way through a news

15  article; right?  Where Mr. Musk generates hundreds and hundreds

16  and hundreds of news articles.  So anybody that wants to sue

17  him could find an article, find some unnamed, uncorroborated

18  source within the article and inject a statement into a

19  courtroom.  That can't be the law.  That can't allow for a fair

20  trial.

21          THE COURT:  This is -- just remind me now.  171 is

22  the August -- it's dated August 16.  The -- the article that

23  closes the date of the class is the 17th.

24          MR. PORRITT:  That's this article, Your Honor.

25          THE COURT:  It has the same statement.  "This is far

```
 1    from secured;" right?  And the theory is that that's when the
 2    full corrective disclosure obtains and, therefore, no damages
 3    after that.
 4         So if we don't -- if you're suggesting we exclude this,
 5    what's the end of the -- what are we saying is the end of the
 6    class period?
 7              MR. SPIRO:  The plaintiff can put -- we have
 8    suggested days in which, and periods in which the class period
 9    we think realistically is.
10              THE COURT:  Well, I know, but the other -- but if the
11    jury doesn't find that and I say that it's a matter for the
12    jury, that there wasn't the full disclosure until this occurs,
13    what else would -- would you have the class period just
14    continue or what?
15              MR. SPIRO:  That's up to the plaintiff and the Court.
16    What I am saying to the Court is what a plaintiff does not get
17    to do is enter in evidence that is not allowed under the Rules
18    of Evidence in order to determine what he wants to cherry pick
19    as his class period.  Meaning, if he has a way under the Rules
20    of Evidence to prove what he wants to prove and the Court
21    accepts his theory as passing legal muster, so be it.
22         This is a Rule of Evidence issue.  This is rank hearsay.
23    It's not allowed in a courtroom.  And that's my position on
24    this.  The rest of it is for him to figure out.  He gets to put
25    on his case.
```

 1          I'm telling the Court that you can't allow a -- the key

 2     sentence in a trial, a fraud trial, of a matter of this

 3     importance to be not -- not come from the witness stand and

 4     cross examination.  Not come from corroborative facts and

 5     evidence that happens in courtrooms.  But to come from a line

 6     in a news article from an unnamed person who could just as

 7     easily have been one of the dozens and dozens of plaintiff's

 8     counsel circling around this.

 9          I mean, this does -- this is the opposite of hallmark of

10     reliability.  Not only is it hearsay, but it is not -- it is

11     the most unreliable of all hearsay statements.

12          So I'm saying to the Court that he doesn't really -- this

13     could be a murder trial or a trial about his class period or

14     whatever it is.  That statement can't come into court.

15               THE COURT:  All right.  Let me hear your response,

16     Mr. Porritt.

17               MR. PORRITT:  Yeah.  First of all, Your Honor, he's

18     -- the fact statement he's allowing is so -- "is the funding

19     secured," which, of course, we won summary judgment as a fact

20     -- as a false statement.  And the Court has found that no

21     reasonable jury could find the funding was, in fact, secured.

22          So I don't see where the prejudice is from this

23     article coming -- from that particular statement in this

24     article.  Point one.

25          I won't indulge in responding to Mr. Spiro's sort of

1    fevered speculation as to the source of this particular

2    statement that comes from plaintiff's lawyers.  It's a report

3    in the *New York Times*, a paper of record.  It is not offered

4    for the truth of this matter asserted.  It is offered of the

5    fact that the statement was made following an interview by Elon

6    Musk in the paper of record and the market reacted accordingly.

7         We have, of course, presented to the Court and will

8    present at trial the testimony from, say, the JPMorgan analyst,

9    who in response to this article and this statement, in part,

10   revised his price target and issued an analysis report on the

11   next trading day, on a Monday, in which he was the first to do

12   so.  So, and he has testified to that effect, of the impact of

13   this, in fact, *New York Times* article.

14        We have also provided our expert testimony regarding

15   expert analysis showing that this is the -- this newspaper

16   article in the whole, not necessarily just that particular

17   statement, you know, corresponds to the decline in share price,

18   the -- the general disbelief or -- by the market and the truth

19   of the statements in August 7th, and that is why this class

20   period ends.

21        We -- you know, our expert has opined that following this

22   newspaper article and the stock price reaction to it, there was

23   no longer artificial price inflation induced by Elon Musk's

24   fraud or Tesla's fraud.

25        So to suggest that that evidence cannot come in is, you

know, a bold reach by Mr. Spiro, but is clearly just -- clearly improper.  So I don't know how else he's meant to explain -- I guess the argument is that this stock price reaction happened in a vacuum and we're not able to present and to explain why the stock price reacted as it did on August 17th.

THE COURT:  So, Mr. Spiro, if there is evidence that this article was the event that moved the needle on the price and served as the -- sort of the end of the class period, and if this Court had already found that indeed funding was not secured, I guess I don't understand why this doesn't come in.

I'm not sure I understand the prejudice.  This is not saying suddenly:  Oh, you're going to take the position that -- your client will take the position that no, no, no, it was secured.  It was not far from secured, contrary to the *New York Times*, which a position would be contrary to what I've already ruled.  And this -- you know, there's going to be evidence, it appears, that this document had an operative effect on the market and on damages.

So how could it not -- I understand your point of hearsay. It's -- you know, it's not like Mr. Musk said it, but it was an operative document.

MR. SPIRO:  I understand the question.  Just to -- Mr. Porritt did not, I don't actually think, address the concern, but the Court has pointed to direct questions to me, which I will answer, which are as follows.

 1          First, if the article comes in -- you know,

 2   Mr. Porritt conflated issues of hearsay.  If the article comes

 3   in as a non-hearsay event that effects the stock market, so be

 4   it.  The article on its face -- like in a privilege log, the

 5   article that it occurred can come into evidence in theory.  In

 6   theory.  Now, I'm not saying that it should, and I'm not

 7   conceding that it should, but it could.

 8          The problem for Mr. Porritt is that there's

 9   hearsay-within-hearsay.  And as the Court just pointed out,

10   it's not Mr. Musk's statement.  It's another line in the

11   article, which is rank hearsay, Hearsay 101.

12          So then the question becomes:  What's the prejudice?

13   Well, frankly, you don't get to that question because it's

14   hearsay.  It doesn't come in.  We objected.  It's hearsay.  It

15   doesn't come in.

16          But I will answer the question, because I think it's an

17   important one, and I think it crystalizes exactly why this is a

18   critical issue to them.  Because the Court did not rule that

19   funding was far from secured; right?  The Court ruled that

20   funding -- that the statement "funding is secured" was

21   literally false.

22          What goes to materiality is the difference between the

23   reality of the world as it existed and the reality of that

24   Tweet.  What that all comes down to, in essence, in essence, is

25   was funding getting close to secured?  Was funding within reach

1  of secured?  Was funding far, far, far from secured?  These are

2  the questions that this entire trial of great importance are

3  coming down to.  So, and --

4      **THE COURT:**  To put it simply, why can't the Court

5  just issue, as I always do, a limiting instruction?  That

6  this -- that the jury is not to take that statement for the

7  truth of the matter stated.  It is relevant only because the

8  effect it may have had on the listener, i.e., the market.

9      **MR. SPIRO:**  I'll tell you what, Your Honor.  Because

10  on the key quote of a case, you can't take a news article;

11  right?

12      Let's -- I always use this because -- maybe because I was

13  a prosecutor.  Maybe because it's the easiest way for me to

14  understand it these -- these the criminal contexts.  But

15  imagine that the case was about a murder, and we wanted to show

16  that after an article came out, Joe fled.  So you want to be

17  able to say:  Hey, look.  There's an event.  The article comes

18  out.  Joe flees.  Right?  You say it's fair.  Flight shows

19  consciousness of guilt.

20      This article shows movement in the market.  If there was

21  an article in the paper and it was -- somewhere within that

22  article it said "Joe killed Susan," "an anonymous source says

23  Joe murdered Susan" --

24      **THE COURT:**  And in this case --

25      **MR. SPIRO:**  Your Honor, the --

```
 1              THE COURT:  The difference --

 2              MR. SPIRO:  You haven't --

 3              THE COURT:  -- is in this case I've already found Joe

 4   killed Susan.  I'm going to so instruct the jury.

 5              MR. SPIRO:  You haven't found.  You have not found

 6   that funding was far from secured.

 7              THE COURT:  Well, what difference --

 8              MR. SPIRO:  You have not found that --

 9              THE COURT:  What difference does that make --

10              MR. SPIRO:  You --

11              THE COURT:  -- from a -- hold on.  Let me speak,

12   please.

13         What difference does that make because the element is, was

14   it falls?

15         Now, how false it was, whether it was 150 percent false or

16   only 100 percent false, so what?  It was false.

17         Maybe you don't like to hear a newspaper saying it was

18   150 percent false, but legally it seems to me immaterial

19   whether it's 101 percent false or 100 percent false.  So what?

20              MR. SPIRO:  I understand the Court's point, but,

21   frankly, that's what the materiality analysis is.  Meaning,

22   that it does -- it does matter.

23         If the statement was that -- if the statement mirrored the

24   summary judgment opinion and the summary judgment clarification

25   or whatever the Court's language has been, then that would be
```

1    one thing.

2        If the article said:  An anonymous source says -- I don't

3    know, pick another phrase -- Mr. Musk never had any chance of

4    getting funded.  Right?  We would all say that is different.

5    That changes the state of the world.

6        And if somebody wants to come into a courtroom and testify

7    to that and be subject to cross examination under the Rules of

8    Evidence, so be it.  They can't be an anonymous source in a

9    newspaper.

10            THE COURT:  But the article goes on then to describe

11   what happened.  They had extensive talks with representatives

12   about the $250 billion fund about possible financing.  Maybe in

13   a manner that they would have most of the ownership.  Then they

14   had this session that took place on January -- on July 31st at

15   the factory, according to a person at the meeting, but they had

16   not committed to provide any cash.  Two people briefed on the

17   discussions.

18       I mean, there is going to be substantive testimony, isn't

19   there, I assume in this case about what did happen and what

20   were the conversations and all sort of stuff?

21            MR. SPIRO:  I take it that's a question to me.  Sure.

22            THE COURT:  So this newspaper article is just a

23   characterization of what is to follow.

24            MR. SPIRO:  But Your Honor, most respectfully, that's

25   not -- just because some of the contours of this article may be

```
1   somewhat consistent with some of the testimony doesn't make
2   this article evidence; right?
3        I mean, sure.  If people want to come into the witness
4   stand and put on evidence that's allowed in courtrooms to many
5   of the facts that are somewhat similar to some of the things
6   said in this article, so be it.  That's why we're having the
7   trial.
8        I think we're -- honestly, to me, it's -- we're almost
9   frankly saying the same thing, which is one could view this
10  article as a summary of the state of affairs depending -- maybe
11  if that's how the trial plays out, but the point is the trial
12  has to be allowed to play out.
13           THE COURT:  And the trial will play out.  And when
14  the jury hears this article, which when you get to the
15  substance of what happened, I think it's probably not going to
16  be that much different.  I don't know.
17       But in any event, they can be instructed that they are not
18  to take the truth of the matter asserted in there.  They are to
19  determine what happened.  They are supposed to judge it on the
20  actual evidence that comes in, not this article.
21           MR. SPIRO:  And our -- and our view is that this, in
22  fact, close to the evidence that's going to come in.  We don't
23  know yet, because the trial hasn't happened, how close or not
24  close this article is.  And that to allow a competing narrative
25  to come into evidence that is based on hearsay is per se -- is
```

 1   improper, per se improper, and that given that it is the key

 2   seminal issue, a limiting instruction as to that only

 3   highlights it.  It doesn't do anything to diminish it.  And --

 4   and --

 5         THE COURT:  Well, that's debatable.  The jury has

 6   heard the facts.  They've heard from witnesses.  They look at

 7   documents, and they see a *New York Times* piece that sort of

 8   summarizes it in three sentences, and they are instructed that,

 9   hey, you know, whatever the *New York Times* says is not to be

10   taken as the truth.  I'm only allowing this in because of the

11   potential or at least the alleged effect it has on the market,

12   accurate or not accurate.

13         MR. SPIRO:  Again, just to hit the final point.  And

14   I know I've said this and appreciate the Court's indulgence on

15   this issue.  We think it's -- we believe we're right on the

16   law, and we believe that this is improper to allow it in.

17         But one of the things I would just say to the Court is

18   simply this.  What is the harm of redacting the part of it that

19   is classic hearsay, that is unquestionable hearsay,

20   hearsay-within-hearsay; that even under everything that Your

21   Honor and Mr. Porritt have said today remains classic

22   unquestionable hearsay-within-hearsay.

23         THE COURT:  And what would you -- what are you

24   proposing to redact?

25         MR. SPIRO:  "Funding was far from secured."

1          **THE COURT:**  Just that sentence?

2          **MR. SPIRO:**  Well, I mean, that would be a very

3    obvious -- I stand by everything that I've said today, but I'm

4    asking the Court, couldn't the Court have -- I hear the Court's

5    leanings on these issues, but why couldn't the parties submit

6    to the Court -- okay.  The Court's saying in essence, as I

7    understand the Court, this article that they want to claim it's

8    part of the class period.  You want to allow the jury to accept

9    that it could be part of the class period.  Why can't the

10   defense give a redacted version of the article or a limited

11   version of the article that allows the same comment that this

12   was the article that then led to the stock issues, but does not

13   create all of the other issues that we have been discussing.

14         **THE COURT:**  All right.  Response?

15         **MR. PORRITT:**  So defendants argue that the statement

16   "funding secured" is not material.  That's one of their

17   arguments, and they are making it loud and strong.

18       And now they want to say that the closing disclosure for

19   the class period where it says that funding was not, in fact,

20   secured, and that's --

21         **THE COURT:**  Far, far, far from secured.

22         **MR. PORRITT:**  Was far from secured.

23         **THE COURT:**  Yes.

24         **MR. PORRITT:**  Shouldn't come in.  Should be redacted

25   out.

525

```
 1        I don't know how they can argue that -- they can argue

 2   that "funding secured" was not material and then they prohibit

 3   plaintiffs from putting on evidence of that --

 4        THE COURT:  Well, I think his argument is that saying

 5   it's not secured may not be material; but if -- but if in

 6   reality was not only not secured but it was far from secured,

 7   that might inform materiality because the state of affairs is

 8   one of the factors you look at compared to the statement.

 9        MR. PORRITT:  But more fundamentally, this article is

10   not being offered for the truth that funding wasn't secured.

11   That will be proven through all the other evidence, that

12   funding was not secured, of which there is a lot.

13        So this isn't -- the New York Times article isn't evidence

14   that funding was not secured.  It is being offered as evidence

15   that the market became aware through the New York Times article

16   in the context of a lengthy interview by Elon Musk that

17   funding -- that a statement was made funding was not secured.

18        THE COURT:  Well, all right.  So do you have -- I

19   mean, if the rest of the article comes in, but there is a

20   redaction or perhaps an annotation so it says that -- but that

21   funding it turned out, so you're saying was far from.  You say,

22   was, bracket, not, close bracket, secured.

23        MR. PORRITT:  I mean, I just don't understand why we

24   will be modifying documents that are in the public record that

25   other witnesses have testified to.
```

```
 1          THE COURT:  You know, because of the potential 403,
 2   the jury might read it for more than what they should or -- I
 3   mean, I'm not saying I agree with that.  I'm just saying I want
 4   to know what your position would be and what's the harm in
 5   that?
 6          MR. PORRITT:  Well, I think, the harm is is that
 7   it -- it -- it has witnesses who have testified and --
 8   particularly as to statements coming in by deposition
 9   testimony, who have testified about this article in unredacted
10   form.  Redactions, I think, always raise questions in jury's
11   minds about what was it -- what did it really say.
12          And here I don't think the words being redacted out have
13   any prejudice to defendants or any prejudice as to so diminimus
14   in the context of this trial that I really just fail to see the
15   objection here to redact out five or six words out of a lengthy
16   piece.
17          An article which, by the way, is front and center, was
18   discussed at length by their expert.  So this is front and
19   center to their loss causation and materiality defenses.  It's
20   critical for this newspaper article.
21          So for them to say:  Oh, the real cause of the decline
22   were all these -- all these things we like to point to, this
23   newspaper article, and for the counter argument we're going to
24   redact them out because -- so plaintiff can't even refer to
25   them is frankly ridiculous.
```

```
 1              THE COURT:  All right.  Let me -- Mr. Spiro, you had
 2    something.  We have got to get moving.  If there is one other
 3    thing you wanted to touch on, I will let you.
 4              MR. SPIRO:  Yes.  There was a couple other key
 5    exhibits.  And, again, if the Court -- you know, these are the
 6    sorts of things that, yes, they can be dealt with in limine.
 7    But, you know, they could also -- we would -- we don't want to
 8    waive our opportunity to be heard because I think a few of them
 9    need further explanation.
10         I mean, one of them was -- and my colleague well argued
11    the SEC, you know, issue, and our view is that there is nothing
12    that is more prejudicial in a civil case than anything that
13    shows the imprint of government action.
14              THE COURT:  Yeah.  No, I understand that, but -- and
15    I do have the objections and the response.  So if there is
16    something -- one of these that you feel compelled to add
17    something other than what's already been, I'm going to give you
18    one more chance before we move on.  So you pick one out and you
19    tell me what it is.
20              MR. SPIRO:  Okay.  So let me find the -- Mister --
21    Deposition Exhibit 58.
22              THE COURT:  Okay.
23              MR. SPIRO:  And this is somebody that works in the
24    investor relations department of Tesla.
25              THE COURT:  Yeah.
```

1          MR. SPIRO:  And there was arguments earlier in this

2     case or, you know, that are in the law about the reasonable

3     investor and their impression of what something means to the

4     market and publicly disseminated statements and what they mean

5     to the market in cases -- securities fraud cases where there is

6     a fraud on the market theory.  This is neither.

7          Okay.  This is somebody that works internally at Tesla and

8     not a public statement, but rather a private email

9     communication.  His statements, the statements in these emails

10    are hearsay, and there is no exception to hearsay.  And they

11    are not outward statements or interpretations of reasonable

12    investors.  They do not meet those exceptions.

13         So we believe these should not be allowed to come into

14    evidence.  And I wanted to make sure and make sure that we have

15    an opportunity to specifically speak to this exhibit.

16         THE COURT:  And so these are statements of the

17    investor relations person at Tesla; correct?

18         MR. SPIRO:  Yes.

19         THE COURT:  And the statement of -- the statement of

20    concern is, "The very first Tweet simply mentioned funding

21    secured, which means that this is a firm offer."  Is that the

22    main -- is that the critical statement?

23         MR. SPIRO:  Yes, Your Honor.  That a lay witness

24    cannot -- it's the jury's decision and the public market's

25    decision what that statements -- what those statements and in

529

```
 1   what context they mean or not mean.  It is not us to have
 2   snippets of private email communications where other people are
 3   weighing in on what they mean or don't mean.
 4        Your Honor's ruling is what Your Honor's ruling is.  So we
 5   don't really see the purpose of this.  And it's -- we believe
 6   it to be against the Rules of Evidence.  It is not an outward
 7   public statement, so it could not have affected the market as a
 8   whole, and it -- it's just that simple.
 9             THE COURT:  Okay.  Response?
10             MR. PORRITT:  Well, Mr. Spiro mentioned hearsay
11   there, which is not an objection they raised.  And these are
12   obviously admissions of a party opponent, so hearsay clearly
13   doesn't fly.
14        So the real objection is relevance and -- which is what
15   they stated in the bellwether submission.  And as I mentioned
16   already today, defendants have front and squarely said that
17   "funding secured" was not material.  They intend to run with
18   that argument.  And here is evidence of what a market
19   participant viewed as important in the August 7th Tweet.  And
20   he is raising questions about "funding secured."
21        So that is clearly evidence that a reasonable investor
22   used -- regarding "funding secured," as material.  So on that
23   basis it's very plainly relevant.
24             MR. SPIRO:  If I may respond briefly?
25             THE COURT:  Yeah.
```

1          **MR. SPIRO:**  Yeah.  This is not an executive of the --

2     this is not the CEO of a company speaking.  So, no, it is not a

3     party admission.

4          But beyond that, no.  The private views in a moment of

5     somebody reacting are not indicative of materiality.  He's not

6     the reasonable investor.  He's an employee within the company.

7     And he even says -- and, you know, this is where and this is

8     why I wanted more attention on this exhibit.  He says, "I

9     actually didn't know."  When he's talking about does he know

10    what this means?  He says, "I actually didn't know."

11         So he doesn't know what it means.  He says it right in the

12    same exhibit; right?  And this is where we are hoping that the

13    Court can be gatekeeper because the -- the harm of this when

14    it's -- we don't believe it relevant at all.  We believe it

15    objectionable under the Rules of Evidence.  It's not relevant.

16    It's prejudicial.

17         And the document on its face goes to lack of reliability.

18    It's literally somebody just reacting in a private

19    conversation.  I don't know what this means, but maybe it means

20    this.

21         Those are exactly the kinds of things that we don't want

22    in front of juries because, again, it is the key issue.  I keep

23    hearing how impenetrably strong their case is.  I don't

24    understand why they need the:  I don't know what this means in

25    my private email, but it could mean this.  Why that's

1  necessary.  And it's violative of the Rules of Evidence.

2         **THE COURT:**  Well, I guess my question is:  If I've

3  already found and the jury somehow will be instructed that

4  "funding secured" is false, was a false statement, so you don't

5  need more evidence.  Even if this was relevant evidence and

6  even if this person was not just some -- not just a nobody off

7  the street, but obviously somebody who had some knowledge and

8  sophistication of the field, I don't -- if I've already made a

9  finding, why do we need this?

10      If the comeback is, well, this goes to materiality, I'm

11  not sure how this goes to materiality.  This goes to how secure

12  the -- you know, the perception that this was inaccurate, which

13  I've already found.  I'm not sure how this goes to whether, you

14  know, a reasonable investor would have been influenced by this.

15         **MR. SPIRO:**  Your Honor, it goes directly to that

16  point, because here you have -- this is after -- this is at the

17  end of August 7th, after the final blog post that was posted --

18  the email, Mr. Musk's email to the employees, which was posted

19  on the Tesla blog post on the end of August 7th, which he then

20  re-Tweeted around.

21      Once again, I come back to defendant's view, position,

22  stated position and what they intend to argue at trial is that

23  "funding secured" was an immaterial statement.  It was

24  meaningless.  It did not change the total mix that investors

25  considered when investing in Tesla or not.  And it's their

1    argument.  We're entitled to rebut that.

2        Here is an investor, having read everything, is only

3    asking questions about "funding secured."  He's not asking

4    questions about "I'm considering taking private at 420," which

5    is what defendants argue is the only meaningful material

6    content in that opening Tweet.  He's asking is all funding

7    secured.

8        So that suggests the materiality of a funding secured.

9    And you have to show -- to show a reasonable investor

10   objectively, you have to allow some circumstantial evidence.

11   There is no reasonable investor he can put on the stand.  You

12   only have to look through other market participants.

13           THE COURT:  So it is not just a statement.  It is the

14   lack of any express concern about going private or 420.

15           MR. PORRITT:  It's the focus of the inquiries.

16           THE COURT:  Well, it's the fact that it only focuses

17   on this one thing that makes it, in your view, probative of

18   materiality.  It shows what is important to this particular

19   person.

20           MR. PORRITT:  Correct, Your Honor.

21           THE COURT:  Rather than -- rather than showing the

22   falsity that, well, if Elon Musk says funding secured, it must

23   be, quote, as firm as it gets.  That's not the issue.

24           MR. PORRITT:  Correct, Your Honor.

25           THE COURT:  It's the singularity of the subject.

1          **MR. PORRITT:**  Yes, Your Honor.

2          **MR. SPIRO:**  May I respond briefly?

3          **THE COURT:**  Yep.

4          **MR. SPIRO:**  First of all, I don't think that's the

5     logical import of this.  He's asking the question because it's

6     less clear.  He doesn't know what it means.  It's obvious from

7     the email.  Nobody knew what it meant at that time.  Everybody

8     is asking the question.  Everybody testifies that it meant

9     something different to them.  That doesn't show importance,

10    that shows lack of clarity.  Right?

11          Second of all, they do have lots and lots of actually

12    admissible evidence as to whether it's material or not; right?

13    They have their experts.  They have stock movements.  They have

14    their two plaintiffs coming in to testify.  They can call this

15    witness.  They could have called this witness to come in and

16    say:  This is what is important to me.  This is what it's not.

17          What they can't do -- what they can't do is -- is -- and

18    I'm glad he's -- I'm glad my adversary said what he said,

19    because he shows the real -- the real meaning of this, which is

20    that they are trying to get essential -- the admissible

21    testimony of this investor through this misleading channel.

22          They are going to argue to the jury that this person, who

23    is not taking the witness stand, who is not subject to cross

24    examination, that his hearsay question -- forget his statement.

25    His question means, means that he think it's material; that he

1    thinks it's important to the total mix of information.  That's

2    what they are trying to do with this.  He's exposed the very

3    reason why this is objectionable.  That's not how the Rules of

4    Evidence work.

5         This email is far more consistent with a lack of

6    understanding of what it means, which is why you ask questions

7    about it.

8         And to be honest with you, the recipient of this email

9    agrees with me.  Because the recipient says:  Actually, I don't

10   know what it means.  Meaning, not actually I think it's really,

11   really important, too.  I'm so glad you asked.  Not, no wonder

12   you're focused on it.  This is so material.  He's saying:  Hey,

13   you're confused.  I'm confused, too.

14        This is a question.  It is not proof of materiality at

15   all.  And the way that it works in courtrooms is that if he

16   wants to get a witness to say that something was really

17   important to him and if that's the total mix of information,

18   you call the witness to the witness stand.  He looks at the

19   email.  He puts the email into evidence.  And he's

20   cross-examined about which of the two he means.

21            **MR. PORRITT:**  Your Honor, Mr. Kearney is testifying

22   by deposition at trial.  He was cross examined by counsel for

23   defendants.

24        So I don't get Mr. Spiro's objection.  And this email was

25   marked at his deposition.

```
 1          THE COURT:  Well, no.  But was -- but his -- if he
 2   testified at deposition, the -- the point is that the email
 3   itself has -- doesn't have a whole lot of probative value on
 4   the question of whether he was singularly concerned with
 5   "funding secured" or whether he was trying to get clarification
 6   because that's the term that was ambiguous.
 7          And if he testified at deposition, why not -- I mean, if
 8   he were to testify:  Yeah, the thing that -- that -- you know,
 9   that was most important to me was "is funding secured," because
10   I already knew, you know, Mr. Musk wanted to go private, blah,
11   blah, blah.  We have been waiting and now the thing broke.
12   Then that's one thing.
13          But this email by itself, to the extent it goes to show
14   state of mind, because otherwise it can't come in, because this
15   is not a statement -- at least his statement, the investor's
16   statement is not a party opponent.  It's hearsay.  And if it
17   comes in, it goes to state of mind.  It shows state of mind of
18   an investor.  It's not very probative.
19          MR. PORRITT:  Your Honor, Mr. Spiro complained that
20   we should have the witness in.  He should be cross-examined.
21   Well, that's exactly what's going to happen.  So --
22          THE COURT:  Well, and that's --
23          MR. PORRITT:  -- there will be testimony to the jury.
24          THE COURT:  And that's --
25          MR. PORRITT:  -- about why he thought it was
```

```
1    important, which is what he testified to.

2              THE COURT:  Well, if --

3              MR. PORRITT:  So that's -- trials work the way that

4    Mr. Spiro says they work, which is that evidence comes in when

5    it's -- you know, and we believe, as we submitted, this is

6    relevant.  It goes directly to Mr. Kearney's view of the

7    importance of the statements made in that particular Tweet and

8    the August 7th --

9              THE COURT:  Well, if he testifies, he may not even

10   need this.  I mean, he can testify as to what he saw and what

11   was important to him.

12             MR. PORRITT:  I mean, the objection is relevance,

13   Your Honor.  It's not any other objection.  The only objection

14   is relevance.

15        So, and we have the -- you know, the foundation and all

16   the testimony established by the witness, because he sent the

17   email.  And so I'm struggling to see what the valid objection

18   is here.  You know, Mr. Spiro keeps saying it's completely

19   barred by the Rules of Evidence.

20        The other side of the conversation is clearly a party

21   admission stated by a Tesla employee in the course of their

22   employment.  And so he's director of investor relations.

23   Reports directly to the CFO.  So he's not just someone who is

24   making cars on the line.  And so this is his job to respond to

25   investor inquiries, and he did so.
```

 1        And so I'm just struggling to see the reason for the

 2   objection here and why this would not come in.

 3        **MR. SPIRO:**  Again, the Court had it exactly right.

 4   It's not that the testimony can't come in.  It's that the

 5   exhibit itself isn't admissible without a live witness being

 6   cross examined about it or sworn testimony on it.

 7        So it's just the exhibit is what's objectionable.  His

 8   testimony as to what mattered to him at the time, just like the

 9   Court said, could very well come into court.  It's just this,

10   this document could not.

11        **THE COURT:**  All right.

12        **MR. PORRITT:**  This document would not even be offered

13   in the context of his testimony or in the context plaintiff of

14   Mr. Viecha's testimony.

15        So both sides of this email exchange will be testifying at

16   trial, one by deposition and one not.

17        **THE COURT:**  Well, then, I guess we'll have to see.

18   It may be that you don't need this document.  I will have to

19   judge that when we get there.

20        All right.  So I need to button this up with a few things.

21        One is the scheduling question.  I am going to run the

22   trial from 8:30 to 1:30, which is our usual time, with 15 to

23   20-minute breaks every 90 minutes.  In my experience that --

24   even though I'm hopeful that yields 4.3 to 4.5 hours of

25   testimony, there always seems to be some delay.  Juror wandered

 1   and didn't get back to the courtroom, et cetera, et cetera.  So

 2   we usually get around four hours, maybe slightly over four

 3   hours of testimony.

 4       I have allotted ten court days.  That's two and a half

 5   weeks, and that -- when you do the math, then we've got -- but

 6   that includes jury voir dire and selection.  That leaves a

 7   limited amount of time, in my calculus at best 38 hours,

 8   probably a little less than that, but 38 hours or 36 hours or

 9   so depending how long voir dire takes.  So if I were to default

10   to the usual formula of allocating that 50 percent to each

11   side, that means each side is going to have somewhere between

12   18 and 19 hours.

13       Now, your Witness Lists suggest a longer time than that.

14   In fact, the defense lists -- when you add up the hours, it's

15   significantly more than that.  So you're going to have to look

16   at that and, you know, sort of deal with the limitations.

17       I think the plaintiff's Witness List, at least direct

18   examination and case-in-chief, was around 20 hours, and I think

19   it was around 30 hours for the defense.  Although there's

20   probably some overlap there, but you're going to have to be a

21   little more economical in that regard.

22       My intent is to get out the bellwether rulings, at least

23   on the ones that I can adjudicate, with the idea that that --

24   doing that may help the parties guide your selection of

25   exhibits and, hopefully, in good faith understand, on the basis

```
 1    of my bellwether rulings, what's likely to come in and what's

 2    not and be more selective, because we're obviously not going to

 3    have -- I don't know how many exhibits you've got, but with the

 4    pages and pages of table, all that's not coming in obviously.

 5    You know that as well as I do.  I would like the parties to

 6    work on a more realistic list of exhibits prior to trial.

 7         In terms of the Jury Instructions, what I'm going to do

 8    is, number one, I'm going to -- I'll rule on the question about

 9    the viability of the August 13th blog post, which will be

10    instructive on the instructions when I get out my ruling here.

11         I will also say that the Ninth Circuit model instructions

12    are the default and any party that wants to add or subtract

13    from that is going to have the burden, in my view, of

14    demonstrating good cause why we should deviate from the model

15    instruction.  Not to say it's impossible, but that is the

16    starting point.  That's my default.  And so that's going to

17    be -- if there is a bias, that's going to be my bias.

18         What I'm going to ask you to do is -- I'm going to ask my

19    Law Clerk who is working on this case to meet with you to go

20    over and have a Jury Instruction conference to see if you can

21    resolve or at least limit the number of differences and to see

22    if those can be worked out with -- once I get these in limine

23    rulings out, then you'll see what's in play and what's not, and

24    the evidentiary objections, as well as my guidance on the -- my

25    presumed adherence to model instructions and see if something
```

 1   can be worked out in that regard.

 2        Similarly I would like you to discuss the verdict form.

 3   I will tell you right now my inclination is not to have a

 4   filled in blanks and say yeah or no.  I think that's -- I don't

 5   want to suggest anything to the jury.  And so to the extent

 6   that the proposed verdict from the plaintiff has an already

 7   table to be prepared and you just have to check a box to say

 8   yes, I don't look too favorably on that.

 9        And with respect to voir dire, I do want to get these --

10   we will have a little bit of time, but I want to get out in

11   advance the set of jury questions.  I have those.

12        I see there was one dispute about the plaintiff wanting to

13   ask whether jurors currently have or own a Tesla, and there is

14   an objection.  But I'm not sure what the dispute is there.

15   Maybe someone can comment on that really quickly.  Anybody have

16   any specific thoughts on that?

17        **MR. PORRITT:**  We obviously think it's proper, Your

18   Honor, but we will wait for defendants.

19        **MR. SPIRO:**  Yeah.  I don't -- I mean, this is an

20   unusual way to sort of pry into the minds of jurors.  I don't

21   think -- you know, you're in a California courtroom, and we're

22   going to try to tease out their -- what is the relevance of

23   that?

24        It strikes us as just an attempt to try to ferret out

25   properly unbiased jurors and just seek further discovery into

```
 1    jurors.  We don't see the basis and how it can form a related

 2    opinion to the securities fraud trial.

 3              THE COURT:  All right.  What I'm going to do is

 4    prepare a -- the set of jury -- the jury questionnaire and --

 5    that we will want to send out in advance.

 6         Because of the length of this trial and because perhaps of

 7    the notoriety of the participants, I'm going to try to get

 8    dispensation from our jury administrator to not just send out

 9    the usual questionnaire with ten case specific questions, which

10    is kind of automatic, but treat this as a more complex case and

11    give the full questionnaires to be sent out to the jury in

12    advance.

13         My process is to get that out, for us to get it back.  Go

14    over, kind of do initial vetting to see whether there are

15    any -- anybody in that pool that clearly cannot serve or should

16    not serve and need not even come in for live voir dire, because

17    we don't want to waste people's time.  And then shortly after

18    that, we would do the in-court voir dire.  But you would have

19    all those questions -- questionnaires in hand.

20         And my process is -- these days is for me to take a lead

21    on hardships and excusals for hardship reasons and then give a

22    little more free rein to the attorneys to conduct the sort of

23    attitudinal cause questions.  And we can talk about that, but

24    that's generally what I do.

25         So I do give a fair amount of jury time, but knowing that
```

1   you -- by then you would have had extensive questionnaires in

2   hand.  So I would expect your questions to be fairly, you know,

3   responsive to those questions and pretty pinpointed and not

4   just sort of start from scratch.

5       And my goal is for us to select a jury by the morning, by

6   the noon hour our first day of trial and start in in the

7   afternoon with your openings and closings.

8       And by the way, the time limits that I impose will include

9   openings and closings.  It's opening and closing and any time

10  you're questioning a witness.

11      So let me ask -- I think those are the points I wanted to

12  cover at this point.  I do want to set probably, given the

13  complexity of this trial, one more session before we launch

14  into trial in January.

15      But let me ask, are there any procedural questions at this

16  point?

17          **MR. SPIRO:**  Not from the defense.  And we think

18  another conference is probably a good idea.

19      I mean, one of the things that I would just note for the

20  Court is we obviously represent many individuals and the

21  company, Mr. Musk and the directors.  It's that that maybe

22  seams to cause the time that is indicated on our proposal

23  because each of the director's good faith basis is relevant

24  here.

25      And so because of that, I just wanted to make sure that

```
1    the Court understood that.  That's sort of where -- where and

2    how we reached the numbers that we did.

3        But we don't have any further questions.

4             THE COURT:  All right.  From the plaintiffs?

5             MR. PORRITT:  Nothing at this time, Your Honor.  But,

6    yes, certainly agree that another conference close to the time

7    to really talk about, nail down logistics would be

8    advantageous.

9             THE COURT:  All right.  So if we -- well, we only

10   have two weeks in January in advance of the trial.  That first

11   week, it's a partial week because of the holidays, but I'm

12   willing to get right into it.  For instance, we could either

13   meet on the 3rd, the morning of the 3rd?

14            MR. SPIRO:  Would it be possible to have later in

15   that week, Your Honor, just because a lot of folks on my side

16   are going to be in transit from wherever they live after the

17   holidays towards the San Francisco area.

18            THE COURT:  All right.  How about the 4th.  The

19   morning of the 4th?

20            MR. PORRITT:  Fine with plaintiff.

21            MR. SPIRO:  That's better than the 3rd.  Thank you,

22   Your Honor.

23            THE COURT:  I would like to accommodate you, but I've

24   got other matters Thursday and Friday.  So let's do the morning

25   of the 4th.  People are going to be in transit.  We can do it
```

```
1    at 10:00 o'clock California time?

2             MR. SPIRO:  Yes, Your Honor.

3             MR. PORRITT:  Very good.  We'll be there.

4             THE COURT:  Then, you know, to the extent I haven't

5    tied up every loose end, that will give us a chance to do that.

6         Let me just ask, I always ask in these matters, in terms

7    of ADR.  Is there any further ADR process in place, plan?

8    Because as you get more and more information about how I'm

9    ruling on these things, obviously, you now have more and more

10   information about what's in and what's out.

11            MR. PORRITT:  Yes, Your Honor.  We have two more

12   settlement conferences already scheduled by Magistrate Judge

13   Ryu, one on November 8th, I believe, and another one in

14   December.  It was December 6th, but I think it got moved to

15   December 16th, where Elon Musk has been asked to attend in

16   person.

17        So as you well know, Magistrate Judge Ryu is very dogged

18   and very thorough.  Everyone is putting in their best efforts,

19   I think it's safe to say.  That's all we can really say at this

20   point.

21            THE COURT:  Good.  Well, all I can say is you're in

22   good hands, as you probably already indicated, and I'm going to

23   get you as much information as I can.  Hopefully, with the set

24   of rulings and we get the Jury Instructions hammered out, you

25   know, you'll have less uncertainty to deal with in terms of the
```

1    trial.

2            **MR. PORRITT:**  Very good, Your Honor.

3            **THE COURT:**  All right.  So we'll get to work in

4    getting out a ruling for you all and then we'll see you in

5    January.

6            **MR. SPIRO:**  Thank you, Your Honor.

7            **MR. PORRITT:**  Thank you, Your Honor.

8            **THE COURT:**  Great.  Thanks everyone.

9         (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, November 2, 2022