QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Alex Spiro (appearing *pro hac vice*)
    alexspiro@quinnemanuel.com
    Andrew J. Rossman (appearing *pro hac vice*)
    andrewrossman@quinnemanuel.com
    Ellyde R. Thompson (appearing *pro hac vice*)
    ellydethompson@quinnemanuel.com
    Jesse Bernstein (appearing *pro hac vice*)
    jessebernstein@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

    Michael T. Lifrak (Bar No. 210846)
    michaellifrak@quinnemanuel.com
    Anthony P. Alden (Bar No. 232220)
    anthonyalden@quinnemanuel.com
    Kyle Batter (Bar No. 301803)
    kylebatter@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendants Tesla, Inc., Elon Musk,*
*Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,*
*Antonio J. Gracias, James Murdoch, Kimbal Musk,*
*and Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC |
| | **DECLARATION OF KYLE BATTER IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION TO COMPEL SUPPLEMENTAL EXPERT REPORTS AND DEPOSITIONS** |
| | Date: TBD<br>Time: TBD<br>Location: Courtroom 5, 17th Floor<br>Judge: Hon. Edward Chen |

**<u>DECLARATION OF KYLE BATTER</u>**

I, Kyle Batter, declare as follows:

1.      I am an attorney at the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Defendants in this action.  I make this declaration in support of Defendants' Emergency Motion to Compel Supplemental Expert Reports and Depositions.  I know the facts stated herein of my own personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.      Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of the Expert Report of Steven L. Heston, dated November 8, 2021.

3.      Attached hereto as **<u>Exhibit B</u>** is a true and correct copy of the Expert Damages Report of Michael L. Hartzmark, dated November 10, 2021.

4.      Attached hereto as **<u>Exhibit C</u>** is a true and correct copy of excerpts from the October 25, 2022 transcript from the Final Pretrial Conference.

5.      Attached hereto as **<u>Exhibit D</u>** is a true and correct copy of a December 11-19, 2022 email chain between Plaintiff's counsel and Defendants' counsel.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 21st day of December, 2022 in Moraga, California.

_____
Kyle Batter

# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

IN RE TESLA, INC. SECURITIES LITIGATION

Case No. 3:18-cv-04865-EMC

Hon. Edward M. Chen

**EXPERT REPORT OF STEVEN L. HESTON, Ph.D.**

**November 8, 2021**

**Table of Contents**

1    Introduction .................................................................................................................. 4
  1.1    Qualifications and Compensation ........................................................................ 4
  1.2    Summary of Relevant Facts ................................................................................. 5
  1.3    Statement of Assignment ..................................................................................... 5
2    Summary of Opinions .................................................................................................. 6
3    Background on Equity Options ..................................................................................... 7
  3.1    General Rights and Terms Concerning Equity Options ....................................... 7
    3.1.1    Call Options ................................................................................................. 11
    3.1.2    Put Options .................................................................................................. 13
    3.1.3    Put-Call Parity ............................................................................................ 16
    3.1.4    Factors Affecting Option Prices ................................................................. 18
  3.2    Option Straddle ................................................................................................... 23
  3.3    Options Markets and Exchange-traded Options ................................................. 27
    3.3.1    Options Markets .......................................................................................... 27
    3.3.2    Exchange-traded Options – Specifications ................................................. 28
    3.3.3    Exchange-traded Options – Clearing and Settlement ................................. 29
4    The Black-Scholes-Merton Model .............................................................................. 31
  4.1    Background of Options Theory and the Black-Scholes-Merton Model ............. 31
  4.2    BSM Formulas .................................................................................................... 32
  4.3    The BSM Model Revolutionized Options Markets ............................................ 33
  4.4    The BSM Model is the Accepted Industry and Academic Standard ................... 34
5    Equity Options on Tesla Common Stock during the Class Period ............................... 35
  5.1    The Market for Tesla Options was Substantial ................................................... 35
  5.2    Tesla Common Stock Price Movements Affect the Value of Tesla Options ........ 36
  5.3    Most Tesla Options were Traded Near-the-Money – Implied Volatility is Quantifiable
         38
  5.4    Long-Term ATM-forward Straddle Prices Fell on August 7, 2018 ..................... 41
  5.5    The Decrease in Long-term Implied Volatility Beginning after 12:48 p.m. on August 7,
  2018 Affected Long-term Tesla Options of All Moneyness ...................................... 49
    5.5.1    Long-Term Option Values Diverged on August 7, 2018 ............................. 49
    5.5.2    Implied Volatility Dropped, Causing All Long-Term Options to Lose Value .......... 52
6    The BSM Model Can Calculate Counterfactual Option Prices ................................... 55
  6.1    Measuring Implied Volatility Using ATM-forward Straddle Prices ................... 58
  6.2    The BSM Model Provides an Impact Quantum ................................................. 59
    6.2.1    Re-Valued Fitted Option Value .................................................................. 60
    6.2.2    But-for Fitted Option Value ........................................................................ 60
  6.3    The Black-Scholes Impact Quantum is Reliable, Reasonable and Robust Methodology
         61
7    Appendix A .................................................................................................................. 64
8    Appendix B .................................................................................................................. 68
9    Appendix C .................................................................................................................. 70
10   Appendix D .................................................................................................................. 73
  10.1   IVolatility Data ................................................................................................... 73
  10.2   Bloomberg Data .................................................................................................. 73

10.3    CBOE Data ................................................................................................. 73
10.4    Data Source Summary ................................................................................ 74
11    Appendix E .......................................................................................................... 75
11.1    Standardized ATM-Forward Straddle Price ............................................ 75
11.2    Constant Maturity ATM-Forward Straddle Price .................................... 75
11.3    Constant Maturity Straddle ...................................................................... 76
11.4    Raw Maturity Straddle .............................................................................. 76
11.5    Scatter Plot ................................................................................................ 77
11.6    Trading Volume by Moneyness ................................................................ 77
11.7    Spread Change Plots ................................................................................. 78
11.8    Regression ................................................................................................. 79
11.9    Option Bid-Ask Spread Curves ................................................................ 79
11.10    Mid Prices on Consecutive Days .......................................................... 80
11.11    Mid-Price Drop ...................................................................................... 80
11.12    Spread Widening on August 7 ............................................................... 80
11.13    Black Scholes Charts ............................................................................. 80
11.14    Overnight Returns .................................................................................. 81

# 1   INTRODUCTION

## 1.1   Qualifications and Compensation

1.   I have taught at the University of Maryland, Robert H. Smith School of Business from 2002. Since 2012, I have held the position of Professor of Finance. Prior to that, I held the position of Associate Professor of Finance. I have held previous faculty positions at Washington University in St. Louis as Assistant Professor of Finance (1994 to 1998), Columbia Business School as Visiting Assistant Professor of Finance (1993 to 1994), and Yale School of Organization and Management as Assistant Professor of Finance (1989 to 1993).

2.   I hold a Ph.D. in Finance, awarded in 1990 by the Carnegie Mellon University, Graduate School of Industrial Administration. In addition to my Ph.D., I hold an M.S. degree in Finance and an M.S degree in Industrial Administration ("M.B.A."), awarded Carnegie Mellon University in 1987 and 1985 respectively. I also hold a B.S. degree from the University of Maryland, College Park, awarded in 1983, where I majored in Mathematics and Economics.

3.   I have taught introductory Corporate Finance and Corporate Governance courses as well as Ph.D. classes on asset pricing theory, Options and Derivatives, International Finance, and Fixed Income. The majority of classes I have taught have been at the masters (M.B.A., Masters in Finance, Masters in Quantitative Finance) or undergraduate level.

4.   Between 1998 and 2002 I worked in the private sector at Goldman Sachs in New York. I initially held the position of Vice President on the U.S. Arbitrage desk in the Fixed Income Division. I then moved to Quantitative Equities in Goldman Sachs' Asset Management division, where my position was Vice President.

5.   As detailed in my curriculum vitae, I have authored or co-authored more than 20 published peer-reviewed scholarly articles.

6.   A current copy of my curriculum vitae, including professional appointments and publications, is included as Appendix A.

7.   My work in this matter is billed at the rate of $700 per billable hour. In this matter I am also supported by staff from Fideres Partners LLP. My compensation does not depend in any way

on my opinions or the outcome in this matter or any other. I have no financial or other interest in Fideres Partners' billings in this matter.

## 1.2     Summary of Relevant Facts

8.     It is my understanding that a securities litigation class action was brought on behalf of the Class against Defendants Tesla, Inc. ("Tesla"), Elon Musk (Tesla's CEO and Chairman), and certain members of Tesla's Board of Directors for violations of the federal securities laws.

9.     It is further my understanding that the Class Period: (a) begins on August 7, 2018 at 12:48 p.m. EDT when Mr. Musk tweeted "Am considering taking Tesla private at $420. Funding secured."; and (b) ends on August 17, 2018, after the publication of a *New York Times* article.[1]

## 1.3     Statement of Assignment

10.     I have been retained by Court-appointed Lead Counsel and Class Counsel ("Counsel")[2] for Lead Plaintiff and Class Representative Glen Littleton and the putative Class[3] in the matter of *In re Tesla, Inc. Securities Litigation* to analyze the price movements of options on Tesla common stock during the Class Period from 12:48 p.m. EDT[4] on August 7, 2018 to August 17, 2018. As part of this engagement, I have reviewed historical Tesla stock and options data to evaluate: a) the effect of Tesla stock price movements on Tesla option values; and b) additional movements in Tesla option prices beyond the effect of stock price.

---

[1] *See, e.g.,* Consolidated Complaint for Violations of the Federal Securities Laws, *In re Tesla, Inc. Secs Litig.*, ¶¶1-2, 6, Case No. 18-CV-04865 (EMC) (N.D. Cal. Jan. 16, 2019), ECF No. 184 (hereinafter, "Complaint"). *See also Stipulation And Order For Class Certification,* Case No. 18-CV-04865 (EMC) (N.D. Cal. Jan. 16, 2019), ECF No. 298.

[2] Levi & Korsinsky, LLP.

[3] It is my understanding the "Class" has been certified as "All individuals and entities who purchased or sold Tesla stock, options, and other securities from 12:48 p.m. EDT on August 7, 2018 to August 17, 2018 and were damaged thereby" (the "Class"). Stipulation and Order for Class Certification, ¶4, *In re Tesla, Inc. Secs. Litig.*, 3-18-cv-04865-EMC (N.D. Cal.), ECF No. 298. Additionally, "Excluded from the Class are: Defendants; the officers and directors of Tesla, Inc. at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest." ibid., ¶5.

[4] All times are Eastern Daylight Time unless otherwise noted.

## 2   SUMMARY OF OPINIONS

11.   *At-the-money-forward Tesla option prices, including straddles, provide a reasonable and reliable measurement of option prices relative to underlying stock prices.* Section 3.2 explains that a "straddle" options position is when an investor buys both a put and a call with the same strike and maturity date simultaneously. Straddle holders bet that there will be a large change in the stock price, either upward or downward, but are neutral with respect to stock movements. Straddle prices therefore reflect "implied volatility," or the market's expectation of future stock price volatility.

12.   *Following 12:48 p.m. on August 7, 2018, Tesla stock prices rose, and long-term ATM-forward Tesla option straddle prices fell sharply.* Section 5.4 shows that on August 7, 2018, following 12:48 p.m., long-term ATM-forward Tesla option straddles lost value.[5] This decline in price is substantial and rare. This decline can be directly translated into a significant decrease in implied volatility using standard Black-Scholes-Merton formulas. I observe that at the same time, Tesla stock prices rose from around $356.79, to $385.93 during the Class Period, then dropped to $305.5 at the close of August 17, 2018.[6]

13.   *All long-term Tesla put options lost value on August 7, 2018.* Option theory predicts that rising stock prices and declining volatility will reduce the value of put options. As reflected in the Tesla options data, put options lost value on August 7, 2018, after 12:48 p.m.

14.   *Prices of long-term out-of-the money Tesla call options fell, while prices of long-term in-the-money Tesla call options rose on August 7, 2018.* Call options benefitted from the rise in Tesla stock price but were negatively impacted by the fall in implied volatility. Consequently, the price of in-the-money and out-of-the-money Tesla call options diverged on August 7, 2018. These two countervailing effects during the Class Period must be netted to determine the combined impact on option prices.

---

[5] Long-term expires include October 19, 2018; November 16, 2018; December 21, 2018; January 18, 2019; February 15, 2019; March 15, 2019; June 21, 2019; August 16, 2019; and January 17, 2020. Short-term expiries include August 10, 2018; August 17, 2018; August 24, 2018; August 31, 2018; September 7, 2018, September 14, 2018; September 21, 2018; and September 28, 2019. I explain this distinction further in Section 5.4.

[6] I do not further analyze Tesla stock prices, beyond the observations of historical prices reported.

15. ***The combined impact of the alleged misstatements on Tesla option prices can be reliably and reasonably calculated using the Black-Scholes-Merton model***. I present a reliable, reasonable, and robust method to convert ATM-forward straddle prices into implied volatilities for any given maturity in the but-for world and to calculate the impact on option prices using the Black-Scholes-Merton formulas given the changes in the underlying stock price and implied volatilities. If asked to do such, I can measure the impact of the alleged misstatements on Tesla options by inputting the following variables into the Black-Scholes-Merton model: a) but-for implied volatilities (estimated from but-for straddle prices) and b) but-for Tesla stock prices. I have not been asked to opine as to the appropriate but-for ATM-forward straddle prices for Tesla options (and therefore but-for implied volatility) or the but-for price of Tesla common stock, but could calculate the combined impact of the alleged misstatements on Tesla option prices using the method I present in my report if provided with these figures by Dr. Michael L. Hartzmark and/or the finder of fact.

16. In summary, on August 7, 2018, following 12:48 p.m., the price of Tesla common stock rose which generally increased the prices of Tesla call options and decreased the prices of Tesla put options. Simultaneously, long-term ATM-forward straddle prices fell significantly as a percentage of the stock price (*i.e.*, implied volatility fell). Given but-for stock prices and but-for implied volatilities, the Black-Scholes-Merton formulas can quantify the impact of but-for stock prices and implied volatilities on all Tesla options traded during the Class Period.

17. To reach the above opinions, I have relied on the materials listed in the appendices and have cited in this report. The research and analysis upon which my opinions are based has been conducted by me and the personnel working under my direction and supervision. My conclusions are based on information available to me as of the date of this report. I may review, evaluate, and analyze relevant material that becomes available to me in the future. I reserve the right to amend, supplement, or otherwise modify my findings and conclusions as appropriate.

# 3   BACKGROUND ON EQUITY OPTIONS

## 3.1   General Rights and Terms Concerning Equity Options

18. An option gives the buyer (or "holder") the right – but not the obligation, to buy (in the case of a "call option") or to sell (in the case of a "put option") a particular underlying commodity

or financial instrument ("underlying" or "underlying asset"), at a predetermined price ("strike price" or "strike"), at or until a specified date and time in the future ("expiry date" or "expiry").[7]

19.  The options relevant to my analyses are stock options, meaning their underlying asset is equity in a publicly traded company - Tesla. The underlying asset in question is therefore common stock in Tesla.

20.  When the holder of an option exercises their right to buy or sell the stock and settle the option, it is said that the buyer "exercises" their right, or the option is "exercised".

21.  Options can be "in-the-money" ("ITM"), "at-the-money" ("ATM") or "out-of-the-money" ("OTM"). A *call* option is in-the-money when spot price *exceeds* the strike price, at-the-money when the spot price *equals* the strike price, and out-of-the-money when the spot price is *below* the strike price. A *put* option is in-the-money when the spot price is *below* the strike price, at-the-money when the spot price *equals* the strike price, and out-of-the-money when the spot price *exceeds* the strike price. Options will only be exercised when they are in-the-money. [8]

22.  There are two types of exercise rights, referring to when option holders buy or sell the underlying stock: American options and European options. An American option can be exercised any time up to and including the expiry date. A European option can only be exercised on the expiry date.

23.  It is not optimal to exercise an American call option early unless the stock pays a substantial dividend – Tesla did not during the Class Period and has never declared. But it can be optimal to exercise an American put option on a non-dividend-paying stock early when it is sufficiently deep in-the-money.[9] However, as numerically shown by Heston and Zhou (2000)[10], the positive impact of the option to early exercise is almost negligible for American put options when compared to European put options with the same specifications.

---

[7] Hull, John C. *Option, Futures and Other Derivatives*. Pearson Education, 2015 (hereinafter, "Hull"), p. 213.

[8] ibid., p. 220.

[9] ibid., p. 245-250.

[10] Heston, Steve, and Guofu Zhou. "*On the Rate of Convergence of discrete-time Contingent Claims.*" Mathematical Finance, vol. 10, no. 1, 2000, pp. 53-75.

24.   An option class refers to all options of the same type (*i.e.,* call or put) that have the same underlying stock. An option series comprises all options in a particular class that have the same strike price and expiry date.[11]

25.   The price of an option contract is also known as the "premium." This is paid by the holder to the writer in consideration for the right to buy or sell the stock. An option is a "derivative" security because its value depends on, *i.e.*, is *derived* from: the value of the underlying asset, in this case a stock. An option's price is determined by the current price of the stock ("spot price" or $S$), the strike price ($K$), the time to expiry ($T$), the volatility of the stock price, the interest rate, and the dividend yield of the stock.

26.   The holder of an option will use their right to exercise the option when the final payoff is positive. For call options, this occurs when the strike price is below the prevailing stock price on the exercise date and the holder can acquire the stock for less than the spot price. For put options, this occurs when the strike price is above the prevailing stock price on the exercise date, and the holder gets a higher price for delivering the stock to the writer, than how much the stock could be acquired on the market.

27.   The value of an option is comprised of "intrinsic" and "time value." The intrinsic value of an option is its value if the holder had to immediately decide whether to exercise it or not. For a call option, this is spot minus strike price when an option is in-the-money, or zero if the option is at or out-of-the-money, given by $\max(S - K, 0)$. For a put option, the intrinsic value is the strike minus the spot price when the option is in-the-money, otherwise zero if the option is at or out-of-the-money, defined as $\max(K - S, 0)$. An out-of-the-money option has zero intrinsic value as the holder will choose not to exercise the option.[12]

28.   Option time value refers to the portion of an option's premium that is attributable to the amount of time remaining until option expiry. Time value arises from the possibility that the stock price will favorably increase or decrease by the expiration date. For example, it is often optimal for the holder of an in-the-money American option not to exercise before expiry because their

---

[11] Hull, p. 220.

[12] ibid.

option has time value.[13]

29.   American options are always worth at least their intrinsic value as the holder can choose to exercise the option at any time before the expiration date. The holder usually prefers to wait due to their option's time value. For call options, it is only preferable to exercise the option early if stock's dividend exceeds the option's time value. However, for put options, the holder might benefit by exercising early because spot prices have a zero lower bound and they can earn risk-free returns. Imagine the spot price for a stock is $1, the strike price is $10, and there is risk-free interest rate. The holder may exercise early, get $9, and earn risk-free interest on their $9. The difference between the strike price and stock price can only increase by $1, so depending on the volatility and risk-free return, the holder may earn more by exercising the option early. Generally, exercising a put option early becomes more attractive as the spot price decreases, the interest rate increases, or volatility decreases.[14]

30.   For example, if a holder has a call option to buy 100 shares of underlying stock at a strike price of $60, and the market price for the share is $70, the option is in-the-money as the share could be sold straight after exercising the option for a profit. Conversely, if a holder has a put option to sell a share for $60, and the market price for the share is $70, the option is out-of-the-money because it would not be economical for the holder to sell at the lower price. Whether an option is ITM/ATM/OTM depends on the relevant prevailing market price of the underlying stock. All options additionally have an extrinsic value, a/k/a "time value." Table 1 below provides a summary:

| Spot vs Strike | Call Option | Put Option |
| --- | --- | --- |
| Spot > Strike | In-the-Money (ITM) | Out-of-the-Money (OTM) |
| Spot = Strike | At-the-Money (ATM) | At-the-Money (ATM) |
| Spot < Strike | Out-of-the Money (OTM) | In-the-Money (ITM) |

Table 1

31.   A physically settled option requires delivery of the stock. For example, if the asset is a

---

[13] ibid.

[14] ibid., p. 247.

listed equity, settlement requires transfer of shares to the holder if they exercise the option. Options can also be cash-settled, meaning the writer of the option makes a cash payment to the holder based on the difference between the spot and the strike price.

32.  If the holder does not exercise an option, the option position is deemed expired or closed. For exchange traded options, an option position can also be closed if the holder sells an "offsetting option" prior to the expiry date, *i.e.*, the holder buys another option with the opposite position. Conversely the writer of an option can close out the option position by purchasing an offsetting option.

### 3.1.1   Call Options

33.  An investor purchases a call option alone when they believe the stock price will increase. A holder will only exercise the option if it is in-the-money. Call options become more valuable as the stock price increases, and less valuable as the strike price increases.[15] Similarly, call options gain value if investors think the volatility of a stock will increase.

34.  If a holder of a call option exercises their right to buy the stock, the writer is obligated to sell it at the strike price. The holder can then sell the asset at the current market value for a profit.

35.  Consider a call option with a strike price of $70 to buy 100 shares in company X. If the stock price is less than $70 at expiration, the holder will allow the option to expire without exercising it. However, if the share price was $80 at expiration, the holder will exercise their option, buy at $70 from the option writer, and then sell at $80, receiving a payoff of $10 per share.

36.  In a call options contract, the holder takes a long position, meaning they anticipate the spot price will rise above the strike price, while the writer takes a short position, believing the spot price will be at or below the strike price.

37.  If the holder of a call option exercises their right to buy the stock, the proceeds will be the amount by which the asset's price exceeds the strike price.[16] The payoff for call option holder can

---

[15] ibid., p. 214.

[16] ibid.

therefore be calculated as follows (where $S_T$ is the stock's spot price on the exercise date):

$$\max\left(S_T - K, 0\right)$$

38.   In determining whether the holder will make a profit, the premium paid also needs to be considered. To break even, the stock's price will need to have increased by at least the premium paid. The net profit for a call buyer can be calculated as follows (where $C$ is the call premium):

$$\max\left(S_T - K, 0\right) - C$$

39.   A call option holder is protected from losses arising from extreme downward movements in prices of the stock, as he/she will let the option expire. As a result, a call option holder's losses are limited to the premium paid for the option contract. The maximum profit is, in theory, unlimited[17].





Figure 1

40.   Writers of call options take a short position on the underlying stock, meaning they believe its price will fall, or at least be less than the strike price. Writers benefit from a short position

---

[17] Note that the usual practice is to ignore the time value of money when showing the gain or loss from options (*See* Hull p. 213).

through the call premium. Like call options, put options also gain value when investors think volatility will rise.

41.  The payoff of a short call option position is exactly the opposite of a long call option position. The maximum payoff for a call option writer is the premium received. However, the maximum loss is, in theory, unlimited.



Figure 2

### 3.1.2   Put Options

42.  An investor purchases a put option alone when they believe the stock price will decrease. A holder will only exercise the option if it is in-the-money (*i.e.*, the strike price is greater than the asset's current market price). Put options therefore become more valuable as the strike price increases and less valuable as the stock price increases.

43.  If a holder of a put option exercises their right to sell the stock, the writer is obligated to buy at the strike price. In put options, writer's take a long position on the underlying stock, but a short position on the option itself. Inversely, holder's take a short position on the underlying stock, but a long position on the option itself. This is because the value of the put option rises as the spot price declines, so each party's position on the put option is antithetical to their position on the

underlying stock.

44.   As an example, consider a European put option with a strike price of $70 to sell 100 shares in company X, with a premium of $5 per share. If the stock price is $80 at expiration, it would not make sense to sell at $70, and so the option will expire. However, if the share price reaches $60 at expiration, the holder will exercise the option.

45.   There are two basic put option positions: a short position (taken by the writer) and a long position (taken by the holder).

46.   If the holder of a put option exercises his/her right to sell the stock, the proceeds will be the amount by which the strike price exceeds the stock price. On the exercise date, the payout for a put option holder can therefore be calculated as follows:

$$\max\left(K - S_T, 0\right)$$

47.   In determining whether the holder will make a profit, the premium paid also needs to be considered. The profit for a put option holder can be calculated as follows (where $P$ is the put premium):

$$\max\left(K - S_T, 0\right) - P$$

48.   A put option holder is protected from losses arising from extreme increases in the stock price, as he/she could let the option expire. However, if the stock price remains unchanged at the expiry date, the holder would lose the entire investment, (*i.e.*, the premium paid). The maximum possible benefit for the put option holder is the full strike price, because the spot price will not fall below zero.



Figure 3

49.  The payoff of a short put option position is exactly the opposite of a long put option position, and is received by the writer. The maximum profit for a put option writer is the premium received. The writer's maximum loss is bound at the full strike price because the minimum possible spot price is zero (and the strike price minus zero is simply the strike price).



Figure 4

### 3.1.3   Put-Call Parity

50.  The above graphs demonstrate that calls are bullish and puts are bearish about the underlying price, and the two consequently behave in opposite ways.[18] Payoffs from options trading are a "zero-sum game" – when the option holder makes a profit, the option writer loses the equal amount.

51.  However, options allow both parties to hedge their risk, and so both parties may nonetheless benefit from an options contract. For example, an investor who owns stock in a company may write (sell) a covered call to limit their risk if the stock price declines. Similarly, an investor may buy (hold) a protective put, which they would exercise if the stock price fell.

52.  "Put-call parity" refers to the relationship between European call options and put options with the same underlying asset, strike price and expiry date. If this equilibrium is violated, an

---

[18] A bullish investor believes a security will gain value, *i.e.*, takes a long position, whereas a bearish investor believes the security will lose value, *i.e.*, takes a short position.

arbitrage opportunity arises, whereby an investor can theoretically earn risk-free profits.[19]

53.  Put-call parity provides that:

$$C = S + P - PV(K)$$

where,

$C$ is the premium of the European call option with strike price $K$ and expiry $T$;

$P$ is the premium of the European put option with strike price $K$ and expiry $T$;

$S$ is the spot price of the current market value of the underlying asset; and

$PV(K)$ is the present value of the strike price $K$, discounted from the value on the expiry at the risk-free interest rate.

54.  The above formula can be alternatively written below. The rewritten formula shows that the price of a call option minus the price of a put option is equivalent to a levered stock position, because either the long call or short put will be exercised, so that this position will inevitably receive the stock and pay the exercise price.

$$C - P = S - PV(K)$$

55.  Put-call parity also indicates that owning the present value of the strike price plus the opportunity to exchange it for stock is equivalent to owning the stock plus the opportunity to exchange it for the strike price.

$$C + PV(K) = P + S$$

56.  Put-call parity implies that call and put prices will be equal when the stock price equals the present value of the strike price. More broadly, it also shows that the time value of a call is equivalent to the time value of the corresponding put.

57.  When stock prices are higher than the present value of strike price, call options will be in-the-money (with respect to the present value of the strike), and will be worth more than the corresponding out-of-the-money puts, and vice versa. Because of put-call parity, an out-of-the-

---

[19] "Theoretical" in the sense that the market should be liquid enough to allow for arbitrage trades.

money option can be converted into an in-the-money option. Therefore, when pricing option series, one can focus on the cheaper out-of-the-money options, which have no intrinsic value.

58.  Put-call parity is complicated by early exercise rights in American options. In the case of Tesla common stock, this is a fringe issue. Call options are only exercised early if the stock pays sufficiently large dividends, however Tesla common stock pays no dividends.[20] Put options might be exercised early despite a lack of dividends if they are sufficiently deep in-the-money,[21] however at no point during the relevant period were a significant number of Tesla put options deep enough in-the-money for early exercise to be optimal, see Section 5.2.

### 3.1.4   Factors Affecting Option Prices

59.  Prices for put and call options are affected by six factors:[22]

- The current (or spot) stock price, $S_0$;
- The strike price, $K$;
- The time to expiration, $T$, also denoted as $T - t$ where $T$ is the expiration date and $t$ is the current date;
- The implied volatility of the underlying stock price, $\sigma$;
- The risk-free interest rate, $r$; and
- Expected dividends.

60.  Implied volatility is distinct from the actual volatility of the underlying stock and is the only variable listed above that is not directly observable. Actual, or historical, volatilities are backward looking, meaning they are based on the previous level of volatility observed in a stock's price movements. Implied volatility, on the other hand, is forward looking, meaning it shows the level of volatility investors expect in the future.[23] It is possible that the historic volatility of a stock is very low, whereas the implied volatility is high. This would occur when investors expect substantial future changes in the stock price. In reality, implied volatility tends to be less variable

---

[20] Tesla's 2017 Annual report, stating "We have never declared or paid cash dividends on our common stock. We currently do not anticipate paying any cash dividends in the foreseeable future." https://www.annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TSLA_2017.pdf, p.36.

[21] Hull, pp. 245-251.

[22] ibid., pp. 234-235.

[23] ibid., pp. 341-342.

than the price of the option itself.[24]

61.  Implied volatility is also a "risk-neutral" measure of volatility, *i.e.*, it looks at the probability of a stock price movement within a distribution, rather than analyzing the risk of a particular stock. In the original Black-Scholes-Merton formulas (see Section 4 for more details), implied volatility is assumed to be constant across stock and strike prices, but other versions of the formula relax this assumption. Throughout this report, wherever I refer to volatility, I mean implied volatility unless otherwise specified.

62.  With the exception of time to expiration and implied volatility, put and call options have opposite reactions to each of these variables, summarized below in Table 2.[25]

| Variable | Call | Put |
|---|---|---|
| Current Stock Price | + | – |
| Strike Price | – | + |
| Risk-Free Rate | + | – |
| Future Dividends | – | + |
| Time to Expiration | + | + |
| Volatility | + | + |

*"+" Indicates Positive Impact on Option Value*
*"-" Indicates Negative Impact on Option Value*

Table 2

63.  Recall that the payoff for a call option is how much greater the spot price is than the strike price. Consequently, call options become more valuable as the stock price rises, and less valuable as it declines, all else equal. Call options also lose value with higher strike prices, all else equal.

64.  Conversely, the value of a put option falls as the stock price rises, because the payoff on a put option is the amount the strike price exceeds stock price, all else equal. This also means put options are more valuable the higher their strike price is, all else equal. The inverse relationships call and put options have with the stock and strike prices is depicted in the first panel of Figure 5

---

[24] ibid.

[25] ibid., pp. 234-235. Note, when dividends are sufficiently high, exercising an American option early may be profitable despite its time value.

below.

65.  Each chart below shows how the value of an option responds to the variable shown on the horizontal axis, holding everything else constant. Values are calculated using the Black-Scholes-Merton formula, detailed in Section 4. I use constants of 30% implied volatility, $50 strike, $50 spot, 5% risk-free return, and one period to expiration. *E.g.*, the first plot, titled "Stock Price," shows how the value of an option responds to changes in stock (spot) price between $0 and $100, with implied volatility fixed at 30%, a strike price at $50, risk-free returns at 5%, and one period to expiration. Put/call options have opposite reactions to stock and strike prices.



Figure 5

66.   Unlike stock and strike prices, both put and call options have a positive relationship with the time to expiration. That is, the longer the time to expiration, the more valuable the options become, all else equal. The more time until the option expires, the greater chance of a favorable price movement.

67.   The fifth relevant variable is the interest rate. The value of call options increases with the interest rate because, holding the current spot price, or $S_0$ constant, investors expect the *future* stock price, $S_{t+1}$, to increases with the interest rate. This same effect causes the put option value to decline with the interest rate. In reality, interest rates tend not to change significantly over the lifespan of an option. This is especially true for the Class Period – see Figure 6 below and Table 10 in Appendix C.[26] As a result, I use a fixed 2.4% interest rate for the calculations in Section 5 and Section 6 of this report. Because of the impact methodology I describe in Section 6.2, the choice of interest rate has little effect on my conclusions.



---

[26]  The constant maturity Treasury yields data was obtained from the Federal Reserve Board database, https://fred.stlouisfed.org/categories/115, Methodology found here, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/yieldmethod.aspx

Figure 6

68.   As depicted in Figure 7 below, implied volatility also raises both put and call option values, all else equal. Put and call options protect their holders from downside risk. The most a holder can ever lose with an option is the premium. However, their upside potential is unlimited in the case of call options, and only limited by zero spot price in put options. Options holders therefore benefit from implied volatility, because they stand to rake in large profits given extreme favorable price movements, but are protected against similarly extreme unfavorable price changes.



Figure 7

69.   The relationship between implied volatility and option values is visualized above as a shift from the solid to the dotted lines. An increase in implied volatility shifts the entire option curve up, meaning for *any* given stock or strike price, an increase in volatility raises the option value. This is true for *both* call and put options.

70.   Option value's sensitivities are also conventionally called option Greeks, because the symbols used to represent the sensitivities of these complex derivatives come from calculus and

use the Greek Alphabet.[27] The following are the most common option Greeks:

vega (or $\nu$) measures impact of a change in volatility in option prices;

theta (or $\Theta$) measures impact of a change in time remaining on option prices;

delta (or $\Delta$) measures impact of a change in the price of underlying; and

gamma (or $\Gamma$) measure impact of rate of change of Delta.

71.   Although there are six inputs that are used to calculate the value of option under the BSM model, only two variables change randomly that have a large impact on option value – stock price and implied volatility. Given that other option inputs remain relatively constant overtime, knowing how implied volatility and the underlying stock price changes over time, I can effectively isolate and explain their corresponding impact on option values.

## 3.2   Option Straddle

72.   A straddle is a widely applied option strategy and are commonly studied by practitioners and in academia.[28] Notably, the original VIX index was calculated by inverting Black-Scholes-Merton formulas using prices of ATM-forward straddles.[29]

73.   A "long straddle" is when an investor buys both a call and put option of the same underlying asset, each with the same strike price and expiry date.[30] Investors buy a straddle when they think the stock price will change substantially, but are not sure in which direction, *i.e.,* they think there will be a general increase in volatility of the underlying stock. Straddle holders bet that the implied volatility of the stock will increase.

74.   A "short straddle" is when an investor sells both a call and put option of the same underlying asset, each with the same strike price and expiry date. In contrast, to a holder of a

---

[27] Vega itself is not a Greek letter, but is denoted by the Greek letter nu ($\nu$).
   https://corporatefinanceinstitute.com/resources/knowledge/trading-investing/vega-%CE%BD/

[28] *See for example*, Goyal, A. and Saretto, A., 2009. *Cross-section of option returns and volatility*. Journal of Financial Economics, 94(2), pp.310-326.

[29] *See* Carr, Peter and Liuren Wu. "*A Tale of Two Indices.*" The Journal of Derivatives 13.3 (2006): 13-29. Print.

[30] Bodie, Zvi, Alex Kane, and Alan Marcus. *Investments.* McGraw-Hill, 1999, p. 628. (hereinafter, "Investments").

straddle, the straddle writer is betting that the asset's price will remain stable, (*i.e.*, less volatile).

75.   Because an option holder's loss risk is bound at the call premium, holders can purchase both a put and call option simultaneously (*e.g.*, a straddle position), and benefit from a large change in the stock price, regardless of the direction. Imagine a holder who buys a straddle, then the stock price increases. They will exercise their call option and allow their put option to expire. When an investor enters into a long straddle, they risk the loss of the value of their premium, but as long as the stock price increases to exceed the sum of the premiums paid to create the straddle (because they purchased two options), they will profit. Similarly, if the stock price declines, the holder will exercise their put option, allowing their call option to expire. If the stock price falls by more than the sum of the premiums (again because they purchased two options and therefore paid two premiums), the holder will make a profit. The straddle strategy relies on the bounded risk of the option holder.

76.   A straddle holder's payoff increases regardless of whether the stock price increases or decreases (also known as "delta neutral"), so long as the stock price moves substantially in either direction. The straddle holder's payoff therefore benefits from increased implied volatility. If implied volatility is low and there ultimately no movement in stock price, the holder will lose the premiums paid for both options. While the value of the portfolio at expiry can never be negative, it must still exceed the premiums paid for the holder to make a profit.[31]

77.   A long straddle position has unlimited profit potential and a limited loss potential (*i.e.*, the sum of the premiums paid to purchase both the call and put options to create the straddle). The potential payoff and loss for a can by depicted as the following:

---

[31] ibid.



Figure 8

78.  Conversely, a short straddle position has unlimited risk (loss) potential in both directions and has a maximum profit potential equal to the sum of the premiums received for selling both the call and put options. The potential payoff and loss for a straddle writer can by depicted as the following:



Figure 9

79.  Mathematically, the payoff for straddles can be calculated as:

$$max(S_T - K, 0) + max(K - S_T, 0) = \begin{cases} S_T - K, if\ S_T > K \\ K - S_T, if\ K \geq S_T \end{cases}$$

where,

$S_T$ = Underlying stock price at expiry $T$

$K$ = Strike price

80.  In addition to regular ATM straddles, there are also ATM-forward straddles. An ATM-forward straddle, as opposed to a simple ATM straddle, means the forward (rather than spot) price equals the strike for both option positions in the straddle.[32] Equivalently, the present value of the

---

[32] ATM-forward is the same as ATM, except that the strike price equals the prevailing forward price rather than the prevailing spot price. The forward price is roughly equal to the spot price, but includes storage costs and interest rates. https://onlinelibrary.wiley.com/doi/10.1002/9781118793251.ch4

strike price equals the spot price.

81.   ATM-forward straddle prices represent the total price of a portfolio of ATM-forward options for a particular maturity. As we will show in section 5.5, a drop in ATM-forward straddle prices means a uniform drop in prices of this portfolio of ATM options.[33]

82.   According to the Black–Scholes-Merton model,[34] implied volatility of an option can be derived given the price of an ATM-forward straddle, the current stock price, and the time to expiration.[35] This is mainly because the value of a call and put are equal when the underlying stock price equals the present value of the strike.

83.   ATM options also have the highest time value and vega. Therefore, as discussed in further detail in Section 6.1, by analyzing changes in prices of ATM-forward straddles, I can measure changes in implied volatility.[36]

### 3.3   Options Markets and Exchange-traded Options

#### 3.3.1   Options Markets

84.   An option can either be traded on exchanges or off exchange (a.k.a. the over-the-counter or "OTC market").

85.   In OTC markets, option trades are negotiated through a dealer, and the terms of the option contract can be individually tailored. There are no membership requirements for trading.[37] Counterparty risk (*i.e.*, the risk of the other party to a transaction defaulting on their obligations) is a key factor in OTC markets.

86.   Exchange-traded options, as their name indicates are traded on option exchanges such as

---

[33] Hull, pp. 104-131.

[34] *See* Section 4 introducing and discussing the Black–Scholes-Merton model.

[35] *See* Brenner, Menachem, and Marti G. Subrahmanyam. "*A Simple Formula to Compute the Implied Standard Deviation.*" Financial Analysts Journal, vol. 44, no. 5, 1988, pp. 80-83. *See also* Corrado, Charles J., and Thomas W. Miller Jr. "*A Note on a Simple, Accurate Formula to Compute Implied Standard Deviations.*" Journal of Banking & Finance, vol. 20, no. 3, 1996, pp. 595-603.

[36] For simplicity of presentation, future references to straddles, or ATM straddles, means ATM-forward straddles unless otherwise specified.

[37] Investments, p. 74.

The Chicago Board Options Exchange ("CBOE").[38] Exchange-traded options use standardized contract terms for strike prices, expiry dates and deliverable specifications. Exchange traded options also settle through an exchange clearing house, who guarantees that options writers will fulfill their obligations under the terms of option contracts and keeps a record of all long and short positions.

### 3.3.2   Exchange-traded Options – Specifications

87.   In the United States, some of the exchanges that trade stock options include the CBOE, the Philadelphia Stock Exchange, and the American Stock Exchange.[39] CBOE operates four U.S.-listed cash equity options markets, including the largest options exchange in the U.S. – CBOE Options Exchange.

88.   The CBOE's standard terms for equity options provide that the underlying asset is generally 100 shares for each option contract.[40]

89.   Strike prices are typically set at 2.5-point intervals when the strike price is between $5 and $25; 5-point intervals when the strike price is between $25 and $200; and 10-point intervals when the strike price is over $200.[41]

90.   The CBOE's trading hours are 8:30 a.m. to 3 p.m. Central Time.[42]

91.   The expiration date is the third Friday of the expiration month. The expiration months consist of two near-term months (the current month, plus the following month), and two additional months depending on whether the stock is assigned to the January, February or March cycle. The January expiration cycle uses the first months in each quarter, (January, April, July, October), the February cycle uses the second months in each quarter, (February, May, August, November), and

---

[38] A derivative exchange is a market where individuals trade standardized contracts that have been defined by the exchange. *See* Hull, p. 2.

[39] Hull, p. 218.

[40] "*Equity Options Product Specifications*." CBOE, available at https://www.cboe.com/exchange_traded_stock/equity_options_spec/, hereinafter ("Equity Options Product Specifications"), (accessed November 4, 2021).

[41] ibid.

[42] ibid.

the March cycle uses the third months in each quarter (March, June, September, December). For example, an option issued in March assigned to the January cycle would have available expiration months of March (the current month), April (the following month), and July and October (the next two months after April in the January cycle).[43]

92.   The premium is quoted on a per share basis and is stated in decimals, with one point equaling $100. For example, a quoted price of $3.00 would result in a total premium of $300 ($3 multiplied by 100).

### 3.3.3   Exchange-traded Options – Clearing and Settlement

93.   Given that exchange-traded options are subject to standardized parameters, this permits exchange-traded options to be cleared through a central clearing counterparty. As such, exchange-traded options have no counterparty risk as all exchange-traded options are cleared through a central counterparty, the Options Clearing Corporation ("OCC"). As the issuer of exchange listed options, OCC in effect becomes the buyer to every clearing member representing a seller and the seller to every clearing member representing a buyer.[44]

94.   The OCC provides clearing and settlement services to multiple exchanges, including the CBOE. A firm must be a member of the OCC to use its services. In order to protect against member default, the OCC imposes several requirements to qualify for membership. An applicant must: be a broker dealer or futures commission merchant registered with the SEC or Commodity Futures Trading Commission, or a non-U.S. securities firm; have minimum net capital of $2,500,000; and have qualified staff and adequate facilities to self-clear options.[45] The OCC charges a clearing fee.[46]

95.   Clearing is the process by which option trades settle. In the case of shares, this involves physical delivery of the shares to the buyer. A clearinghouse acts as an intermediary between the parties to an option contract, and effectively becomes the "opposite party to every trade," (*i.e.*, the

---

[43] https://www.cboe.com/us/options/trading/codes/.

[44] https://www.cboe.com/investor_protection/.

[45] https://www.theocc.com/Company-Information/Becoming-a-Clearing-Member.

[46] https://www.theocc.com/Company-Information/Schedule-of-Fees.

buyer for the short position and the seller for the long position).[47] Parties on each side of an option contract deal only with the clearinghouse, which acts as the guarantor.[48]

96.   This arrangement also allows traders to liquidate or terminate an option position at any time before expiry, by issuing an "offsetting" order. For example, an investor with a long position can close its position by selling the option and assuming a short position. The exchange then "nets out" the investor's long and short positions, effectively reversing the trade.[49]

97.   Investors trade with the exchange and not necessarily with the same buyer and seller in a particular transaction. When an option holder exercises an option, the OCC assigns a member "at random" with a short position in the same option, who must then fulfil the terms of the option. This is known as "assignment."[50]

98.   Trading volume refers to the number of options contracts that have changed ownership during a particular period, regardless of the actual number of contracts. Trading volume can increase or decrease without a change in the total number of options contracts.

99.   Exchange traded option volume can also be measured through "open interest." Open interest counts the number of outstanding options contracts, meaning contracts which have not been settled. Open interest counts each contract once, so it could be measured either by the volume of long positions or by the volume of short positions (which must necessarily be equal), but not by the sum of the two. This differs from volume traded as it only accounts for *new* contracts, rather than the exchange of existing contracts. *I.e.*, if two investors agreed to open a new option contract with each other, open interest would rise by one contract. If one of those investors then sold their position to another investor, open interest would be unaffected, but volume traded would rise.[51]

---

[47] https://www.cboe.com/investor_protection/.

[48] Investments, p. 614, p. 695.

[49] Investments, p. 695.

[50] https://www.theocc.com/getmedia/0cdda3c2-ab81-450f-b8b8-7ce84d88fce7/standard-assignment-procedures.pdf, (accessed November 8, 2021).

[51] Hull, p. 37. *See also* https://www.cftc.gov/MarketReports/CommitmentsofTraders/ExplanatoryNotes/index.htm, (accessed November 2021, 2021).

# 4   THE BLACK-SCHOLES-MERTON MODEL

## 4.1   Background of Options Theory and the Black-Scholes-Merton Model

100. The start of modern-day option theories goes back to the 1960's when Paul Samuelson[52], winner of the 1970 Nobel Memorial Prize in Economic Sciences, rediscovered French mathematician Louis Bachelier's work[53] from the 1900's. Aside from Paul Samuelson's own work, some of the key works around the same time include Case Sprenkle[54] and James Boness.[55]

101. The BSM model was the first theoretical mathematical valuation of an option contract. It shows how options react to changes in the underlying stock price, strike price, risk-free returns, implied volatility, and time to expiration.

102. The first BSM model, *The Pricing of Options and Corporate Liabilities*[56] was published by Fisher Black and Myron Scholes in 1973. It was then widely adopted by the financial world. The creation of a sound mathematical framework for option pricing provided legitimacy to option trading and led to a sharp increase in option trading. Around one month after its publication, the CBOE started to trade call options on 16 stocks. Scholes stated that "There were many young traders who either had taken courses at MIT or Chicago in using the option pricing technology. On the other hand, there was a group of traders who had only intuition and previous experience. And in a very short period of time, the intuitive players were essentially eliminated by the more systematic players who had this pricing technology."[57] The early success of this model prompted academics to start working on variations, which were used to price different financial instruments.

103. In 1973, Merton published an equally important version of the model which could account

---

[52] Samuelson, Paul A. "*Rational Theory of Warrant Pricing.*" IMR; Industrial Management Review (Pre-1986), vol. 6, no. 2, 1965, pp. 13.

[53] Bachelier, Louis. "*Theory of Speculation (Théorie de la Spéculation)."* Annales Scientifiques de l'École Normale Supérieure, Sér 3, 17 (1900), pp. 21-86, translated by D. May.

[54] Sprenkle, Case M. "*Warrant Prices as Indicators of Expectations and Preferences.*" Yale Economic Essays, Vol. 1, No. 2 (Fall 1961), pp. 179-231.

[55] Boness, James A. "*Elements of a Theory of Stock-Option Value.*" Journal of Political Economy, Vol. 72, No. 2 (April 1964), pp. 163-175.

[56] Black, Fischer, and Myron Scholes. "*The Pricing of Options and Corporate Liabilities.*" Journal of Political Economy, vol. 81, no. 3, 1973, pp. 637-654.

[57] https://www.bbc.co.uk/news/magazine-17866646.

for dividend payments.[58] Merton shows, as discussed in Section 3.1, that an option holder might choose to exercise their option early, despite its time value, when dividends are high enough. Merton's contribution to the literature is equality important despite the fact that the Black-Scholes-Merton model is most commonly referred to as the Black-Scholes or BS model.

104. Since its inception, economists have further generalized the model, but the original BSM model forms the foundation of modern option pricing. The original BSM model nonetheless remains a powerful tool. Multiple academics and papers independently converged to the same formula. For example, Rubinstein (1976) generalized BSM with no hedging arguments and showed the same formulas.[59] The BSM is also a limiting case of Cox, Ross and Rubenstein's binomial model.[60] The academic community converged on the BSM model in the 1970s, and even with the modern adjustments, BSM was instrumental in establishing the current academic paradigm for valuing options.

## 4.2   BSM Formulas

105. The Black Scholes model allows market participants to price a put or call option with the following equation:

$$C = S_t N(d_1) - K e^{-r(T-t)} N(d_2)$$

$$P = K e^{-r(T-t)} N(-d_2) - S_t N(-d_1)$$

where:

$$d_1 = \frac{ln\frac{S_t}{K} + \left(r + \frac{\sigma^2}{2}\right)(T-t)}{\sigma\sqrt{T-t}}$$

$$d_2 = d_1 - \sigma\sqrt{T-t}$$

---

[58] Merton, Robert C. "*Theory of Rational Option Pricing.*" The Bell Journal of Economics and Management Science, 1973, pp. 141-183. (hereinafter, "Merton 1973").

[59] Rubinstein, Mark. "*The Valuation of Uncertain Income Streams and the Pricing of Options.*" The Bell Journal of Economics, 1976, pp. 407-425.

[60] Cox, John C., Stephen A. Ross and Mark Rubinstein. "*Option Pricing: A Simplified Approach.*" Journal of Financial Economics 7.3 (1979): 229-263. Print.

and:

$C, P$ = call/put option price
$S_t$ = underlying security market price at time t
T = option expiry
$t$ = current date
$K$ = strike price
$r$ = risk-free interest rate
$T - t$ = time to expiration
$N(\cdot)$ = cumulative normal distribution probability function
$\sigma$ = implied volatility of the underlying stock

106. This formula readily offers considerable insight on the factors that influence the price of an option. As an example, keeping the other variables constant, an increase in strike price, and time to expiration tends to decrease the price of a call, while an increase in the price of the asset or its volatility will cause the call option's price to increase. In the case of the strike price and underlying price, the logic behind these relationships is rather simple – an option to buy something for cheap is more valuable than an option to buy something at a higher price. As for the volatility, a higher standard deviation means that there is a higher chance of the stock increasing or decreasing by a large margin. This benefits options holders because they only benefit from the upside, while their losses are capped at zero (if the underlying were to decrease in price, the option would not be exercised)

107. The BSM model also obeys Put-Call Parity explained in Section 3.1.3. For example, when the stock price is zero, price of call option equals zero and when stock price is infinity price of put option is infinity. This can be algebraically derived, as represented below:

$$C = S_t N(d_1) - K e^{-r(T-t)} N(d_2) = S_t\big(1 - N(-d_1)\big) - K e^{-r(T-t)}\big(1 - N(-d_2)\big)$$
$$= S_t + K e^{-r(T-t)} N(-d_2) - S_t N(-d_1) - K e^{-r(T-t)} = S_t + P - K e^{-r(T-t)}$$

## 4.3    The BSM Model Revolutionized Options Markets

108. Beyond simply describing options markets, the adoption of the BSM model supported development of options markets. The first modern options exchange, the CBOE, opened in Chicago in 1973, the same year Black and Scholes released their seminal paper.

109. As Burton R. Rissman, former counsel for the CBOE stated "Black-Scholes was really what enabled the exchange to thrive. [I]t gave a lot of legitimacy to the whole notion of hedging

and efficient pricing, whereas we were faced, in the late 60s/early 70s with the issue of gambling. That issue fell away, and I think Black-Scholes made it fall away. It wasn't speculation or gambling, it was efficient pricing. I think the SEC [Securities and Exchange Commission] very quickly thought of options as a useful mechanism in the securities markets and it's probably - that's my judgement - the effects of Black-Scholes. I never heard the word "gambling" again in relation to options."[61]

110. Since Black, Scholes, and Merton's original work, variations of the BSM model have proliferated. BSM is a special case of stochastic volatility (see Hull and White (1987),[62] Heston (1993)), and discrete-time GARCH models (see Heston and Nandi (2000)).[63]

## 4.4    The BSM Model is the Accepted Industry and Academic Standard

111. Because of the fundamental importance of the BSM model for managing risk and laying the foundation of derivatives markets, Robert Merton and Myron Scholes were awarded the 1997 Nobel Memorial Prize in Economics. Fischer Black would also have been a recipient, but he passed away two years prior.[64]

112. In its award, the Nobel Committee stated "Black, Merton and Scholes made a vital contribution" and that they had "developed a pioneering formula for the valuation of stock options."[65] Going on to note "thousands of traders and investors now use this formula every day to value stock options in markets throughout the world."[66] The Black Scholes formula "thus laid the foundation for the rapid growth of markets for derivatives."[67]

113. While many variations of the BSM model have emerged in the decades following its

---

[61] MacKenzie, Donald, Fabian Muniesa, and Lucia Siu, editors. "*Do Economists make Markets?: On the Performativity of Economics.*" Princeton University Press, 2020. p. 64.

[62] Hull, John, and Alan White. "*The Pricing of Options on Assets with Stochastic Volatilities.*" Journal of Finance, 1987, pp. 281-300. (hereinafter, "Hull and White 1987").

[63] Heston, Steven L., and Saikat Nandi. "*A Closed-Form GARCH Option Valuation Model.*" The Review of Financial Studies, vol. 13, no. 3, 2000, pp. 585-625. (hereinafter, "Heston and Nandi 2000").

[64] https://www.nobelprize.org/prizes/economic-sciences/1997/press-release/.

[65] ibid.

[66] ibid.

[67] ibid.

original publication, each author is fundamentally standing on the shoulders of Black, Merton, and Scholes. As the Nobel Committee found, "Their method has more general applicability, however, and has created new areas of research."[68] As Rubinstein states, Black-Scholes option pricing model is the most widely used formula, with embedded probabilities, in human history.[69]

## 5   EQUITY OPTIONS ON TESLA COMMON STOCK DURING THE CLASS PERIOD

### 5.1   The Market for Tesla Options was Substantial[70]

114. Tesla options were actively traded during the Class Period and represented a substantial portion of options trading on the CBOE. 2,443 unique Tesla option series were traded during the Class Period on the CBOE, 1,141 of which were call options and 1,302 of which were put options. The strike prices of these option series ranged from $10 to $700, and the maturities ranged from August 10, 2018 to January 17, 2020.[71]

115. The underlying shares represented by Tesla options trading were a larger market than Tesla equities trading during the Class Period. As Table 3 shows, during the Class Period, underlying shares represented by Tesla options trading were consistently 1.6-3.6 times the level of Tesla equities trading.

---

[68] ibid.

[69] Rubinstein, Mark. "*Implied Binomial Trees.*" The Journal of Finance 49.3 (1994): 771-818. Print.

[70] For this section, I relied on Option Intervals data for options on Tesla common stock obtained for one-minute intervals from the Cboe Exchange, Inc., Cboe DataShop. I understand that this underlying data is the same as what Michael L. Hartzmark used in his class certification report (Case 3:18-cv-04865-EMC, Document 291). The underlying ticker for the Tesla options considered is "TSLA".

[71] In total 17 maturity dates were traded: August 10, 2018; August 17, 2018; August 24, 2018; August 31, 2018; September 7, 2018; September 14, 2018; September 21, 2018; September 28, 2018; October 19, 2018; November 16, 2018; December 21, 2018; January 18, 2019; February 15, 2019; March 15, 2019; June 21, 2019; August 16, 2019; and January 17, 2020.

| Date | Volume Traded | | Percent |
|---|---|---|---|
| | Equities | Options | |
| 07 August 2018 | 30,875,770 | 49,975,500 | 162% |
| 08 August 2018 | 24,571,163 | 53,065,900 | 216% |
| 09 August 2018 | 17,183,811 | 50,786,200 | 296% |
| 10 August 2018 | 11,552,044 | 41,118,700 | 356% |
| 13 August 2018 | 10,463,881 | 20,441,200 | 195% |
| 14 August 2018 | 6,986,427 | 18,392,100 | 263% |
| 15 August 2018 | 9,101,258 | 25,218,100 | 277% |
| 16 August 2018 | 6,064,033 | 18,501,100 | 305% |
| 17 August 2018 | 18,958,611 | 59,569,300 | 314% |
| TOTAL: | 135,756,998 | 337,068,100 | **248%** |

*Equities data are from Bloomberg and Options data are from CBOE*

Table 3

116. The volume of Tesla call and put options traded during the Class Period was 1,772,322 and 1,598,359 contracts respectively. In total, these transactions represent around 337 million underlying shares or approximately 2.48 times of the trading volume of Tesla shares listed on NASDAQ during the Class Period.

117. The open interest (defined in Section 3.3.3) for all Tesla options that traded was 718 thousand contracts for call options, and 1.3 million contracts for put options.[72] In total, these option open interests represent around 199 million underlying shares or approximately 1.56 times of the average float of Tesla shares listed on NASDAQ during the Class Period.

## 5.2   Tesla Common Stock Price Movements Affect the Value of Tesla Options

118. As described in detail in Section 3.1.4, changes in the underlying spot price affect option prices. This is not only based on well-documented option theories (*i.e.*, mathematical derivations) but can be clearly and simply observed in Tesla option price data.

119. Almost all stock option formulas are "homogeneous" in the stock price and strike price.

---

[72] Measured as the average open interest for each option series during the Class Period, then summed across all Tesla options series.

This means that when the stock price and strike price increase proportionately, the option value also increases proportionately. By looking at the *ratio* of the spot to the strike price, I show how option values react to the spot price while normalizing for the strike price.

120. Figure 10 below shows the curves of Tesla put and call options with 30 days to maturity on three distinct dates by their strike price.[73] These curves clearly follow the same shape, but are shifted to different levels. The key factor explaining these differences is the stock price on each date. A higher stock price shifts the call option curve up, but the put option curve down, at any given strike price.



Figure 10

121. Figure 11 below shows Tesla option premiums and spot prices divided by their strike prices.[74] It demonstrates that option curves are relatively stable on different days. In other words, most movements in option prices divided by their strike prices are caused by movements in

---

[73] For details on the construction of Figure 10, *see* Appendix E, Section 11.9.

[74] For details on the construction of Figure 11, *see* Appendix E, Section 11.9.

underlying stock prices (*i.e.*, move along the option curves) unless the entire option curve shifts (*i.e.*, a change in implied volatility).

122. Both curves demonstrate that an increase/decrease in underlying prices commensurately increases/decreases prices of call/put options, regardless of expiry or time to maturity.



Figure 11

123. Moreover, Figure 11 shows that, once the stock price has been standardized on any given date by the strike price, the option curves for Tesla are uniform. Thus, any change in Tesla stock prices can be uniformly translated into changes in option prices, by moving along the option curves.

## 5.3    Most Tesla Options were Traded Near-the-Money – Implied Volatility is Quantifiable

124. During the Class Period, Tesla options with strikes within a 20% range of the underlying price accounted for 85% of the trading volume.[75] Figure 12 and Figure 13 below illustrate this

---

[75] 85% as measured by option values, *e.g.*, premium-intrinsic value. *See* Appendix C.

observation for two example expiries.[76] These examples are representative of all maturities that traded during the Class Period.[77]



Figure 12

---

[76] For details on construction of Figure **12** and Figure **13**, *see* Appendix E, Section 11.6.

[77] Appendix C shows the percent of options traded within 20% of the money for each expiration date traded during the period of 12:48 p.m. on August 7 to the close of trading on August 17, 2018. For the shortest maturing options, *e.g.*, those expiring August 10, 2018, 99.96% of options were traded within 20% of the money. Throughout all maturities, at least 63.21% were traded near-the-money, *see* the June 21, 2019 expiry.



Figure 13

125. It is suboptimal to exercise American options early unless they are deep in-the-money puts. Figure 12 and Figure 13  above show that most Tesla options are traded near-the-money. For these options, any early exercise premium is tiny, and insensitive to stock or volatility movements – *see* Section 3.1. Therefore, we can apply the BSM option formulas to approximate the values of these options.[78]

126. During the Class Period, Tesla stock price rose from around $356.79 to $385.93 and then closed at $305.5 on August 17, 2018. Therefore, options that were near-the-money before the Class Period most likely stayed near-the-money throughout. Empirically, most Tesla options were traded within 20% of the money, as shown in Figure 12 and Figure 13, during the Class Period.

127. The intrinsic value of an option falls to zero as the stock price approaches the strike price. The remaining value of the option is therefore its time value. Time value is determined by implied

---

[78] Mathematically, the BSM model only applies options that do not have early exercise right (*i.e.*, European options). Tesla options are American options (with early exercise right embedded) but the vast majority of Tesla options were too close to the money for it to make sense to exercise early. Therefore, the BSM model can be applied.

volatility and time to maturity. Of these, only implied volatility is truly variable, as maturity is built into the options contract. ATM-forward straddles are therefore neutral with respect to the underlying stock price movements, and any value they have is indicative of the time value of these options (*i.e.*, implied volatility of the stock).

128. Put-call parity holds for ATM options, and I can consequently use ATM-forward straddle prices to calculate implied volatility (because the entirety of their value is time value), as shown in Section 6.1. This allows me to evaluate the impact of implied volatility on options prices, while controlling for spot and strike prices. I explain this process in more detail in Section 5.5.2.

## 5.4   Long-Term ATM-forward Straddle Prices Fell on August 7, 2018

129. Unlike changes in the underlying stock price, a decline in implied volatility affected call and put options alike – as measured by the prices of ATM-forward straddles as a proportion of the stock price. Sections 3.2 and 6.1 explain that ATM-forward straddles can be used to accurately and reliably calculate implied volatility over time. These positions are neutralized against fluctuations in the underlying stock price (*i.e.*, delta neutral). Instead, they are increasing functions of implied volatility. ATM-forward straddles have zero intrinsic value by definition and measure the pure time value. In the BSM model, ATM-forward straddles are approximately proportional to implied volatility and to the square-root of time to maturity.

130. As shown in Figure 14 below,[79] the price of long-term ATM-forward straddles (which represent implied volatility) dropped sharply after 12:48 p.m.[80]

---

[79] For details on construction of Figure 14, *see* Appendix E, Section 11.4.

[80] On August 7, 2018, at approximately 2:08 p.m., Nasdaq issued a trading halt on Tesla common stock that lasted until approximately 3:45 p.m., https://www.cbsnews.com/news/elon-musk-proposes-taking-tesla-private-sending-share-prices-soaring/. The break in the graphed lines on the afternoon of August 7 reflects the halt of the trading in the CBOE data.



Figure 14

131. Based on Figure 14, I distinguish between short and long-term Tesla options based on which options depreciated following 12:48 p.m. on August 7, 2018, and which appreciated, or were at least constant. I define "long-term" Tesla options as those expiring on or after October 19, 2018.[81] Figure 14 depicts that there is notable decline in the long-term Tesla options ATM-forward straddle prices following 12:48 p.m.[82] "Short-term" Tesla options are those expiring on or before September 28, 2018, which saw flat to moderately increasing ATM-forward straddles following 12:48 p.m.[83]

132. Short-term options depend on immediate information releases to gain value, while long-term options pay a premium for the possibility that new information will come out over a longer period. Short-term options benefit from news released shortly before their exercise date. Long-

---

[81] Long-term expiries include: October 19, 2018; November 16, 2018; December 21, 2018; January 18, 2019; February 15, 2019; March 15, 2019; June 21, 2019; August 16, 2019; and January 17, 2020.

[82] For details on construction of Figure 15, *See* Appendix E, Section 11.3.

[83] Short-term expiries include August 10, 2018; August 17, 2018; August 24, 2018; August 31, 2018; September 7, 2018, September 14, 2018; September 21, 2018; and September 28, 2019.

term options instead lose value from a reduction in long-term volatility and the ensuing reduction in long-term payout prospects. This is consistent with ATM-forward straddle price movements on August 7, 2018.

133. Figure 15 below constructs the prices of ATM-forward Tesla straddles using constant time to maturity at each point during the Class Period.[84] The prices shown are also standardized by dividing the straddle prices with the corresponding strike prices. It similarly shows that the 1-year, 180-day, and 90-day options lost value following 12:48 p.m., while shorter term options (30 days or less to expiry) slightly gained.



Figure 15

134. This drop in long-term option prices is consistent with the academic literature on merger and buyout announcements. Following a merger or buyout announcement, stock prices usually rise while option prices fall. Bester, Martinez, and Rosu (2011) examined the impact of mergers on

---

[84] There are no "constant maturity" options. Figure 15 shows a floating portfolio that is continually adjusted to show ATM-forward straddles that are 15, 30, 90, 180, and 360 days to maturity respectively. For details *see* Appendix E, Section 11.3.

options values to show that "the Black–Scholes implied volatility decreases when the deal is close to being successful: a success probability close to one leads to an implied volatility close to zero."[85] Similarly, Brown, Barone-Adesi, and Harlow (1994) argue that "an informationally efficient option market would predict that the volatilities implied for a target firm must decline for options with successively longer expiration dates if the market ultimately expects the deal to consummated."[86]

135. This *exact* pattern is visible in the Tesla options data. Following 12:48 p.m., the longest maturing options lost the most value and recovered the slowest, while the very short-term options saw little effect. This could indicate both that the Tesla options market was informationally efficient, and that the market, at least initially, viewed Musk's tweet "Am considering taking Tesla private at $420. Funding secured." and any other alleged misstatements as credible.

136. Figure 16 below shows the relationship between changes in price on short-term (30 days) versus long-term (360 days) Tesla ATM-forward straddles.[87] The grey points show the previous relationship between changes in long- and short-term straddles in the six months leading up to August 7, 2018. The colored points show days in the Class Period that deviate significantly from the previously observed relationship between short and long-term ATM-forward straddle returns.[88]

---

[85] Bester, C. A., Victor H. Martinez, and Ioanid Roşu. "*Option Prices and the Probability of Success of Cash Mergers.*", forthcoming, Journal of Financial Econometrics.

[86] Brown, Keith C., Giovanni Barone-Adesi, and W. V. Harlow. "*On the use of Implied Volatilities in the Prediction of Successful Corporate Takeovers.*" Advances in Futures and Options Research, vol. 7, 1994, pp. 147-165.

[87] For details on construction of Figure **16**, *see* Appendix E, Section 11.5.

[88] *See* further details on "normal" relationship in the ensuing discussing of t-statistics.



Figure 16

137. Figure 16 demonstrates a substantial and significant departure in the relationship between long-term and short-term ATM-forward straddles on four days: August 7, 2018; August 8, 2019; August 9, 2018; and August 17, 2018. Figure 16 demonstrates that August 7, 2018, August 8, 2018, August 9, 2018, and August 17, 2018, were the largest four outliers of the stable relationship between long-term and short-term ATM-forward straddle price movements on a daily level, when compared to all other days February 13, 2018 to August 17, 2018. Moreover, the deviations on these days were statistically significant at all conventional confidence levels (*e.g.*, above 99%).[89]

138. On August 7, 2018 the large long-term ATM-forward straddle price *decreases* accompanied large short-term ATM-forward straddle price *increases*. This movement was not observed during

---

[89] The t-statistic values are 22.00 on August 7, 2018, 9.01 on August 8, 2018, 7.97 on August 9, 2018 and 7.05 on August 17, 2018. T-statistic is a type of inferential statistic used to determine if there is a significant difference between the mean of two groups that may be related. For details on this regression, *see* Appendix E, Section 11.8.

the six-month periods prior to or after August 7, 2018.[90]

139. Between August 8 and August 17, 2018, long-term straddle prices grew more than anticipated from their previous relationship with short-term straddle prices. This pattern was unusual compared to the previous six months of returns. It was not until August 17, 2018 that the relationship between short- and long-term straddles returned to the normal levels observed historically.

140. This pattern shows a clear divergence between short- and long-term implied volatility that was not observed in the daily observations in the six months before and after before August 7, 2018.[91] The absence of similar prior movements further reinforces that the observed movements on the afternoon of August 7, 2018, were unusual. Figure 16 shows day-to-day movements, but as I show below, on August 7, 2018, the unusual movements in ATM-forward straddle prices began specifically after 12:48 p.m. on August 7, 2018.

141. Figure 16 further indicates that the drop in long-term implied volatility was not due to market-wide forces, but rather was specific to Tesla. The short-term ATM-forward straddles serve as a control group for the long-term straddles. Were there an event that reduced implied volatilities across the entire options market, or even just the automotive options market, this should have been reflected in the short-term Tesla options data. Instead, long-term volatility fell by a statistically significant amount while short-term volatility was comparatively constant.

142. Further, I observe that up until the minute of the tweet, ATM-forward straddle prices were almost perfectly flat across all but the shortest-term options on the morning of August 7, 2018. Between 12 p.m. and 12:30 p.m., the shortest-term options gained value, but there were no perceptible movements in long-term straddle prices. Immediately following 12:48 p.m., long-term straddle prices began to fall.

143. Further, the ATM-forward straddle prices during the morning of August 7, 2018 were

---

[90] Figure 16 only shows the prior six months, but the regression detailed in Appendix E, Section 11.8 additionally analyzes the following six months.

[91] Figure **16** shows observations for the six months before August 7, 2018, however I also ran a regression for both the six months before and the six months after August 7, 2018 (detailed in Section 11.8) which similarly shows that these dates were a statistically significant departure from the norm.

perfectly flat for long-term options (defined above). Figure 17 zooms in from Figure 14 to show ATM-forward straddle prices on August 6 and August 7, 2018.[92] During trading on August 6 and the morning of August 7, 2018, long-term ATM-forward straddle prices saw no significant movements, however immediately after 12:48 p.m. on August 7, 2018, their prices began to fall.



Figure 17

144.  As demonstrated above in Figure 14 and Figure 15, long-term option values fell on August 7, 2018. Figure 17 further shows that this drop occurred immediately after 12:48 p.m. on August 7, 2018.[93] As a result of general movements in a stock price from day to day, a straddle that is ATM one day will not be ATM the next, particularly when there are large movements in stock price like those that occurred on August 7. I therefore standardized these figures by the stock price and reconstruct the portfolio of ATM-forward straddles based on which options were ATM-forward at each point in time. This is useful because it allows me to cancel out the impact of the stock price movement on the ATM-forward straddles and focus on implied-volatility, but does not show the

_____

[92] For details on the construction of Figure **17**, *see* Appendix E, Section 11.4.

[93] Trading day starts at 9:30 a.m. Eastern Time.

simple change in price that occurred between August 6 and August 17, 2018.

145. I therefore also compared the overnight returns on an ATM-spot straddle that an investor could purchase at 12:47 p.m. on August 7, 2018 to the close of trading for each day during the Class Period. This shows how the prices of ATM-spot straddles purchased at 12:47 p.m. changed during the Class Period. Table 4 reflects this analysis:[94]

| Date | Expiring March 15, 2019 | | Expiring Jan 17, 2020 | |
|---|---|---|---|---|
| | Price | Return | Price | Return |
| Aug 07, 2018 12:57 | $ 108.90 | | $ 167.95 | |
| Aug 07, 2018 16:00 | $ 89.95 | -17.40% | $ 121.28 | -27.79% |
| Aug 08, 2018 16:00 | $ 93.28 | 3.70% | $ 131.30 | 8.27% |
| Aug 09, 2018 16:00 | $ 101.50 | 8.82% | $ 139.93 | 6.57% |
| Aug 10, 2018 16:00 | $ 99.23 | -2.24% | $ 136.00 | -2.81% |
| Aug 13, 2018 16:00 | $ 97.40 | -1.84% | $ 129.70 | -4.63% |
| Aug 14, 2018 16:00 | $ 94.65 | -2.82% | $ 126.02 | -2.83% |
| Aug 15, 2018 16:00 | $ 92.83 | -1.93% | $ 127.13 | 0.87% |
| Aug 16, 2018 16:00 | $ 92.35 | -0.51% | $ 128.93 | 1.42% |
| Aug 17, 2018 16:00 | $ 103.90 | 12.51% | $ 144.90 | 12.39% |

Table 4

146. Table 4 shows change in portfolio value for a hypothetical investor who bought ATM-spot straddles expiring March 15, 2019, and January 17, 2020, at 12:47 p.m. Their ATM-spot straddle expiring March 15, 2019, lost 17.40% value overnight.[95] Their option expiring January 17, 2020, instead lost 27.79% overnight.[96] This difference (17.40% versus 27.79%) shows that the impact on investors scales with the time to maturity. In other words, the longer term an option was, the more its price fell on the afternoon of August 7, 2018.

---

[94] For details on the construction of Table 4, *see* Appendix E, Section 11.14.

[95] The ATM-spot straddle expiring March 15, 2019 traded at $108.90 at 12:57 p.m. on August 7, 2018, but fell to $89.95 by the close of trading August 7, 2018.

[96] The ATM-spot straddle expiring January 17, 2020 traded at $167.95 at 12:57 p.m. on August 7, 2018, and fell to $121.28 by the close of trading August 7, 2018.

**5.5   The Decrease in Long-term Implied Volatility Beginning after 12:48 p.m. on August 7, 2018 Affected Long-term Tesla Options of All Moneyness**

### 5.5.1   Long-Term Option Values Diverged on August 7, 2018

147. As illustrated in Section 5.2, option curve movements are typically small, and result in parallel shifts that graphically appear overlapping rather than intersecting. Figure 18 provides an example of the parallel shifts of the option curves for Tesla options with a January 17, 2020 expiry between four dates.[97]



Figure 18

148. This parallel shift, however, was not observed after the increase in Tesla stock price following 12:48 p.m. on August 7, 2018. Rather, given the impact of implied volatility shifts on the options pricing, the options curve tilted near the spot price of Tesla stock. The shift between August 6, 2018 and August 7, 2018 consequently shows an unusual pattern where ITM call option prices increased, but OTM call option prices decreased.

---

[97] For details on construction of Figure 18, *see* Appendix E, Section 11.10.

149. Figure 19 shows how the call options curve (as a function of strike price) changed before and after 12:48 on August 7, 2018. The curve inflected around at-the-money call options (where strike price equals stock price). This change cannot be explained by changes in the stock price alone. As previously established, when holding all else constant, call options will gain value given an increase in the underlying stock price. The fact that OTM options prices decreased demonstrates that something beyond stock price was impacting the price of the OTM options on August 7, 2018. Specifically, this chart demonstrates that there are two countervailing effects on August 7, 2018: the increase in Tesla's stock price and the decrease in the implied volatility for the January 17, 2020 expiry.



Figure 19

150. In Figure 19, the option curves were constructed using actual option data. In Figure 20, the option curves are fitted by the BSM model. A comparison of Figure 19 and Figure 20 shows that the BSM model captures/reflects the movement/change very well – or similar.[98]

---

[98] For details on the construction of Figure 19, *see* Appendix E, Section 11.11. For details on the construction of Figure 20, *see* Appendix E, Section 11.13.



Figure 20

151. Figure 21 plots the exact same data as Figure 19 (which shows the shift from before and after 12:48 p.m. on August 7, 2018). It normalizes option prices by dividing them by their strike prices (*i.e.*, showing moneyness on the horizontal axis).[99] After accounting for the change in the stock price on August 7, 2018 after 12:48 p.m., Figure 21 illustrates that the entire options curve dropped due to the decline in implied volatility for the January 17, 2020 expiry:

---

[99] For details on construction Figure 21, *see* Appendix E, Section 11.11.



Figure 21

152. The yellow dots are at-the-money $340 strike call options with an initial midpoint value of $92.08. This midpoint subsequently *fell* to $81.05 by the close of trading August 7, 2018, while the stock price *rose* from $356.94 to $379.58. Because of the decline in implied volatility, some call options actually lost value despite the rise in stock price. Even some options that were at-the-money at 12:47 p.m. lost value after 12:48 p.m. on August 7, 2018.

153. This effect is starker for the out-of-the-money call options. The red points show an out-of-the-money call option with $450 strike. This option fell in value from $50.58 to $28.90. Long-term call options of all moneyness were negatively impacted by the drop in implied volatility, though for in-the-money options this was all or partially offset by a rise in the stock price. The larger a call option's strike price on August 7, 2018, the more it lost value after 12:48 p.m.

### 5.5.2   Implied Volatility Dropped, Causing All Long-Term Options to Lose Value

154. Section 5.2 established that option curves are *typically* stable and shift in parallel. In other words, changes in implied volatility affects option prices of all moneyness.

155. Section 5.4 further showed that long-term implied volatilities fell in the afternoon immediately following 12:48 p.m., while short-term implied volatilities rose or stayed flat. This movement was unique in the sense that it was not observed anywhere other than August 7, 2018 over Tesla option's data six month before and after August 7, 2018.

156. In Figure 22 and Figure 23, below, the decrease in implied volatility examined in Section 5.4 is graphically represented by option curves for puts and calls for the January 18, 2019 and January 17, 2020 expiries. They show the shift in implied volatility measured during the five minutes before (back to 12:43 p.m.) and the final five minutes of the trading day.[100] The difference between the curves between these two periods shows that the decrease in implied volatilities lowered long-term option prices across *all* stock and strike prices (or alternatively moneyness). Simply put, the decrease in implied volatility between these two periods shifted the entire option curve down.

157. Figure 22 shows observed Jan 18, 2019 expiry Tesla option curves five minutes before 12:48 p.m. for options expiring January 18, 2019 and five minutes before closing on the same day. Each point on the chart represents an actual transaction while the shaded area around the transaction represents the average bid-ask spread around the time of transaction.

158. Long-term Tesla option curves fell during intraday trading on August 7, 2018. This was accompanied by a clear expansion in the bid-ask spread on these options. However, even accounting for an expansion of the bid-ask spreads, the curve still clearly fell across strike and stock prices.

---

[100] For details on construction of Figure 22 and Figure 23, *see* Appendix E, Section 11.7.



Figure 22

159. This effect occurred across all options with a long-term maturity. For example, Figure 23 shows precisely the same downward shift in the option curve, but for options expiring January 17, 2020 – one year later.



Figure 23

160. Because all the curves are taken from the same day, one before and one after 12:48 p.m., these shifts cannot be explained by changes in time to expiration or risk-free returns.

161. Furthermore, because the curves all control for shifts in the underlying stock price by dividing the strike prices by the spot price, these shifts cannot be explained by changes in stock price. Therefore, pursuant to the BSM model, the only factor that is impacting the curves in the Figure 22 and Figure 23, is changes in implied volatility.

# 6   THE BSM MODEL CAN CALCULATE COUNTERFACTUAL OPTION PRICES

162. In this section, I present a reliable, reasonable, and robust methodology to calculate the impact on option prices given changes in underlying stock price and implied volatility.

163. In general, there are two ways to calculate the impact on traded options. One possibility is to calculate a unique but-for price, and then compare that to the transacted price. Another is to calculate an impact quantum, *i.e.,* a dollar or percentage amount by which an option would have been more or less expensive.

164. In my methodology, I utilize an impact quantum to calculate the difference between option prices based on actual option transactions and the calculated price for an option using a counterfactual stock price and implied volatility. Choosing a quantum over a simple but-for price has two main benefits.

    a.   It allows me to account for differences in outcomes investors experienced in the real world. Following 12:48 p.m. on August 7, 2018, the bid-ask spread of traded Tesla option values grew, so some investors, either by happenstance or acumen, achieved better prices. By applying an impact quantum, I can equitably show the difference in the amount of option price paid or received as compared to a counterfactual price across investors regardless of their independent and individual circumstances. I discuss this more in detail in Section 6.3; and

    b.   It allows me to difference out potential model fitting biases in the levels. Like all models, the BSM model and its extensions have biases in the levels. If I were to simply calculate a but-for price, the impact could vary based on which model I used. We apply the BSM model with a robust methodology that measures *changes* in value, thereby differencing out potential biases in levels.

165. For each Tesla option traded, I can calculate an impact quantum using the BSM model[101] as follows:

    a.   First, I find the price of the ATM-forward straddle that has the same expiry and transaction date as the option in question, and calculate the implied volatility using the BSM formulas. I refer to this calculated implied volatility as the "Actual Implied Volatility."

    b.   Second, using the Actual Implied Volatility and the actual spot price of Tesla stock at the time of the option transaction in question (the "Actual Underlying Price"), I

---

[101] For the purpose of this report, I have chosen the BSM model to construct option curves. Dumas, Fleming and Whaley (1998) have shown that the overparametrized Implied Binomial Tree approach predicts option price changes worse than Black-Scholes one week out of the data sample. They also show that Practitioner Black-Scholes models do not provide important improvement over the BSM model in calculating option prices. *See* Dumas, Bernard, Jeff Fleming, and Robert E. Whaley. "*Implied Volatility Functions: Empirical Tests.*" The Journal of Finance, vol. 53, no. 6, 1998, pp. 2059-2106.

construct a re-valued BSM option curve (the "Actual BSM Option Curve"). I then locate the option in question on the Actual BSM option Curve to find its value. I refer to this as the "Re-Valued Fitted Option Value."

c.   Third, using the but-for implied volatility and but-for Tesla stock price at the time of the option transaction in question, I construct a but-for option curve - the "But-for BSM Option Curve." I then locate the option in question on the But-for BSM Option Curve to show its but-for value – the "But-for Fitted Option Value."

d.   The impact quantum for the option in question is the difference between Re-Valued Fitted Option Value and But-for Fitted Option Value.

166. Table 5 below provides an example of how the impact quantum on Tesla option prices is calculated for call and put options traded at 9:34 a.m. on August 8, 2018, with a January 17, 2020 expiry and $400 strike price. If we assume that the 50.52% BSM model implied volatility on August 7, 2018, at 12:47 p.m.[102] is the counterfactual implied volatility (the but-for implied volatility) and $305.50 is the counterfactual Tesla stock price (the but-for price of Tesla common stock), the impact quantum calculates that the call option is $11.91 less valuable and a put option is $54.54 more valuable.

---

[102] As listed in Table 6.

| Variable | Illustrative Impact Example Option Value | | | | | |
|---|---|---|---|---|---|---|
| | Re-Valued | | But-For | | | Impact |
| Trade Date | | Aug 8, 2018 09:34 | | Aug 8, 2018 09:34 | | - |
| Expiry Date | | Jan 17, 2020 | | Jan 17, 2020 | | - |
| Days to Expiration | | 527 | | 527 | | - |
| Assumed Interest Rate | | 2.4% | | 2.4% | | - |
| Tesla Price | $ | 371.95 | $ | 305.50 | $ - | 66.45 |
| Forward Tesla Price | $ | 385.08 | $ | 316.28 | $ - | 68.80 |
| Strike | $ | 400.00 | $ | 400.00 | $ | - |
| BSM Implied Volatility | | 37.08% | | 50.52% | | 13.45% |
| BSM Call price | $ | 59.89 | $ | 47.98 | $ - | 11.91 |
| BSM Put price | $ | 74.30 | $ | 128.84 | $ | 54.54 |

Table 5

## 6.1   Measuring Implied Volatility Using ATM-forward Straddle Prices

167. Based on the BSM model, I can precisely quantify the BSM implied volatility using the price of ATM-forward straddles across a range of option maturities. Specifically, the algebraic calculation shows that:

$$\sigma = \frac{2 * N^{-1}\left(\frac{Y}{4} + 0.5\right)}{\sqrt{\frac{T - t}{365}}}$$

where:

$Y$ = price of ATM-forward straddle, as a fraction of underlying price at time $t$
T = option expiry
$T - t$ = time to expiration measured in calendar days
$N^{-1}(\cdot)$ = inverse function of cumulative normal distribution probability function
$\sigma$ = implied volatility of the underlying

168. To illustrate, the ATM-forward Jan 17, 2020 expiry Tesla straddle was worth 48.15% of the underlying stock price at the close of trading on August 6, 2018, which corresponds to an annualized BSM implied volatility of 50.91%. At close of trading of August 7, 2018, the same straddle was worth only 31.06% of the new stock price, which corresponds to a BSM volatility of 32.57%.

169. I apply this formula to the close of trading standardized ATM-forward straddle prices for each maturity traded during the Class Period shown in Table 8 in Appendix C. The result is shown in Table 6 below and repeated in Appendix C.[103]

| Maturity Date | BSM Implied Volatility | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | At Close 06-Aug | 12:47 07-Aug | At Close 07-Aug | At Close 08-Aug | At Close 09-Aug | At Close 10-Aug | At Close 13-Aug | At Close 14-Aug | At Close 15-Aug | At Close 16-Aug | At Close 17-Aug |
| Aug 10, 2018 | 43.19% | 53.65% | 66.99% | 61.90% | 70.04% | NA | NA | NA | NA | NA | NA |
| Aug 17, 2018 | 41.87% | 45.87% | 53.58% | 52.11% | 61.74% | 54.83% | 56.07% | 49.24% | 49.46% | 44.36% | NA |
| Aug 24, 2018 | 42.43% | 44.70% | 45.77% | 49.55% | 59.30% | 54.83% | 52.74% | 48.59% | 51.35% | 47.74% | 66.54% |
| Aug 31, 2018 | 42.91% | 44.06% | 45.58% | 47.81% | 56.97% | 54.06% | 51.79% | 49.77% | 51.77% | 49.45% | 64.71% |
| Sep 7, 2018 | 42.51% | 43.14% | 44.82% | 46.08% | 54.98% | 52.08% | 49.76% | 48.67% | 50.01% | 48.58% | 61.08% |
| Sep 14, 2018 | 43.03% | 43.39% | 41.50% | 45.39% | 53.88% | 51.55% | 49.63% | 48.96% | 50.09% | 49.24% | 59.88% |
| Sep 21, 2018 | 43.40% | 43.70% | 41.08% | 44.25% | 52.88% | 50.86% | 49.21% | 48.93% | 49.91% | 49.18% | 58.99% |
| Sep 28, 2018 | NA | NA | NA | NA | 52.11% | 50.29% | 48.55% | 48.60% | 49.70% | 49.33% | 58.46% |
| Oct 19, 2018 | 45.90% | 45.79% | 40.09% | 43.44% | 51.40% | 49.49% | 48.18% | 48.41% | 49.46% | 49.56% | 57.54% |
| Nov 16, 2018 | 49.45% | 49.22% | 41.33% | 44.12% | 51.55% | 50.29% | 49.14% | 49.51% | 50.06% | 50.28% | 59.05% |
| Dec 21, 2018 | 48.88% | 49.10% | 37.96% | 41.82% | 49.42% | 47.66% | 46.99% | 47.49% | 47.90% | 48.16% | 56.68% |
| Jan 18, 2019 | 48.82% | 48.97% | 36.75% | 40.92% | 48.36% | 46.69% | 45.94% | 46.41% | 46.85% | 47.00% | 55.39% |
| Feb 15, 2019 | 49.90% | 49.97% | 38.03% | 40.48% | 47.77% | 46.50% | 45.44% | 45.77% | 46.19% | 46.60% | 54.62% |
| Mar 15, 2019 | 50.16% | 50.14% | 36.80% | 39.96% | 47.17% | 45.65% | 44.99% | 45.17% | 45.50% | 45.94% | 53.92% |
| Jun 21, 2019 | 50.58% | 50.36% | 35.71% | 38.72% | 44.95% | 43.88% | 42.63% | 42.77% | 43.52% | 43.76% | 51.65% |
| Aug 16, 2019 | 50.96% | 50.63% | 34.78% | 38.46% | 44.73% | 43.04% | 41.65% | 41.90% | 42.74% | 42.95% | 50.88% |
| Jan 17, 2020 | 50.91% | 50.52% | 32.57% | 37.08% | 42.02% | 40.43% | 38.54% | 38.37% | 39.96% | 40.87% | 48.65% |

Table 6

## 6.2   The BSM Model Provides an Impact Quantum

170. To calculate the impact of any Tesla stock price inflation and implied volatility deflation as a result of the alleged fraud, two options curves are fitted using the BSM Model:

    a.   A "re-valued" curve based on observed stock prices and implied volatilities (*i.e.*, the "Actual BSM Option Curve" defined above); and

    b.   A "but-for" curve based on counterfactual stock prices and counterfactual implied volatilities (*i.e.*, the "But-for BSM Option Curve" defined above).

171. With the Actual BSM Option Curve and But-for BSM Option Curve created, I calculate the impact of fluctuations in underlying stock price and implied volatility on option prices in two steps. First, I calculate the vega impact (or loss arising from the fall in implied volatility) as the shift from the Actual BSM Option Curve to the But-for BSM Option Curve. Second, I calculate

---

[103] Minute-by-minute BSM implied volatility can be calculated based on the CBOE DataShop Data using the same formulas.

the delta impact (or loss arising from the allegedly inflated stock price) as the movement along the But-for BSM Option Curve.

172. This two-step process requires two formulas, one for each curve. These formulas are identical to the BSM formula detailed in Section 4.2, and only differ based on the stock price and implied volatility values used.

### 6.2.1   Re-Valued Fitted Option Value

173. The re-valued call and put option value ($Call_{re-valued}$ and $Put_{re-valued}$ respectively) are given by:

$$Call_{re-valued} = S_{observed}N(d_{1\ observed}) - Ke^{-r(T-t)}N(d_{2\ observed})$$

$$Put_{re-valued} = Ke^{-r(T-t)}N(-d_{2\ observed}) - S_{observed}N(-d_{1\ observed})$$

where:

$$d_{1\ observed} = \frac{ln\frac{S_{observed}}{K} + \left(r + \frac{\sigma^2_{observed}}{2}\right)(T-t)}{\sigma_{observed}\sqrt{T-t}}$$

$$d_{2\ observed} = d_{1\ observed} - \sigma_{observed}\sqrt{T-t}$$

174. The key variables in the equation above are: $S_{observed}$, denoting the actual allegedly inflated stock price and $\sigma_{observed}$, denoting the actual allegedly deflated implied volatility. For my calculations, I take $\sigma_{observed}$ based on the observed ATM-forward straddle prices presented in Table 8.

### 6.2.2   But-for Fitted Option Value

175. The but-for call and put option fitted value ($Call_{but-for}$ and $Put_{but-for}$, respectively) are given by:

$$Call_{but-for} = S_{but-for}N(d_{1\ but-for}) - Ke^{-r(T-t)}N(d_{2\ but-for})$$

$$Put_{but-for} = Ke^{-r(T-t)}N(-d_{2\ but-for}) - S_{but-for}N(-d_{1\ but-for})$$

where:

$$d_{1\,but-for} = \frac{ln\frac{S_{but-for}}{K} + \left(r + \frac{\sigma^2_{but-for}}{2}\right)(T-t)}{\sigma_{butf-for}\sqrt{T-t}}$$

$$d_{2\,but-for} = d_{1\,but-for} - \sigma_{but-for}\sqrt{T-t}$$

176. Again, the key variables in the equation above are: $S_{but-for}$ denoting the counterfactual stock price and $\sigma_{but-for}$, denoting the counterfactual implied volatility.

## 6.3   The Black-Scholes Impact Quantum is Reliable, Reasonable and Robust Methodology

177. Figure 22 and Figure 23 in Section 5.5.2 show that on August 7, 2018, the actual option curves based on the mid point of CBOE Datashop bid and ask quotes for the January 18, 2019 and Jan 17, 2020 expiries shifted due to a drop in implied volatility. Figures 22 and 23 shows this is a clear and uniform effect.

178. Zooming in on these figures to see the bid-ask spread shows that variation around the midpoint grew in the afternoon August 7, 2018.

179. Figure 24 shows the bid-ask spread at 12:47 p.m. on August 7, 2018, and compares it with the bid-ask spread at the close of trading that same day. In addition to a drop in implied volatility, the bid-ask spreads expanded following 12:48 p.m. on August 7, 2018.[104]

---

[104] For more details on the construction of Figure 24, *See* Appendix E, Section 11.12.



Figure 24

180. Someone who sold an option at the *top* of the 16:00 blue shaded area managed to achieve, either by luck or guile, a better price than someone who simply by misfortune sold at the *bottom* of the 16:00 blue shaded area. But between 12:47 p.m. and 16:00 p.m., the price of all trades shifted down. There is typically a distribution of prices lying within the bid-ask spreads. I account for this by applying the impact quantum methodology detailed in Section 6.2.

181. Given the existence of bid-ask spreads, a reasonable way to measure the difference between an actual option trade and a counterfactual option trade is to place both on equal footing, *i.e.*, an apples-to-apples comparison. I achieve this through an impact quantum. An impact quantum measures the magnitude of the shift without being affected by the bid-ask spread. If I measured impact as the difference between a unique but-for price and an actual transaction price, then the impact would vary based on where the actual transaction fell within the bid-ask spread. An impact quantum, however, is not affected by the bid-ask spread as it fits both actual and counterfactual transactions to the BSM curve.

182. Therefore, it is important to account for *both* the fact that each extension to the BSM model predicts a different price level *and* the fact that trades are exercised within a bid-ask spread.

Applying a simple but-for option price would ignore these level effects, and erroneously show larger losses for people who paid closer to the bid price, and lower losses for someone who transacted closer to the ask price.

183. To account for this, the actual option transactions are used to fit a re-valued actual option curve, *i.e.*, the "Re-Valued Fitted Option Value." Specifically, the observed strike price, stock price, risk-free return, time to maturity, and implied volatility are used to calculate an option's value according to the BSM model. The but-for option curve is then fitted by substituting in the counterfactual implied volatility and stock price, *i.e.*, the "But-for Fitted Option Value." The difference between the re-valued and the counterfactual curves is measured as the price impact.

I declare under penalty of perjury that the foregoing is true and correct.

***RESPECTFULLY SUBMITTED THIS EIGHTH DAY OF NOVEMBER 2021***

*Steven L. Heston*
_____

Steven L. Heston, Ph.D.

# 7  APPENDIX A

**Steven L. Heston**
4447 Van Munching Hall
University of Maryland
College Park, MD 20742
(301) 405-9686
sheston@rhsmith.umd.edu
Website: www.rhsmith.umd.edu/faculty/sheston/index.htm

## 1. Personal Information

### Present Employment

**Professor of Finance**, Smith School of Business, University of Maryland, College Park,

2012-2018

### Education

1. Ph.D. in Finance, Carnegie Mellon University, Graduate School of Industrial Administration, 1990
2. M.S. in Finance, Carnegie Mellon University, 1987
3. M.S. in Industrial Administration ("M.B.A."), Carnegie Mellon University, 1985
4. B.S. in Mathematics and Economics, University of Maryland, College Park, 1983

### Employment History

1. **Professor of Finance**, Robert H. Smith School of Business, 2012-2018
2. **Associate Professor of Finance**, Robert H. Smith School of Business, 2007-2012
3. **Assistant Professor of Finance**, Robert H. Smith School of Business, 2002-2007
4. Goldman Sachs (New York), 1998-2002
   i. **Vice President** (U.S. Arbitrage)
   ii. **Vice President** (Quantitative Equities)
5. **Assistant Professor of Finance**, Washington University in St. Louis, 1994-1998
6. **Visiting Assistant Professor of Finance**, Columbia Business School, 1993-1994
7. **Assistant Professor of Finance**, Yale School of Organization and Management,
8. 1989-1993

## 2. Research & Publications

### a. Books

1. w/ Blair Rodman and Lee Nelson, Kill Phil, Huntington Press, 2005.
2. w/ Blair Rodman and Lee Nelson, Kill Elky (French Translation), Huntington Press, 2009.
   - Designed approximate optimal strategies for this book using combinatorial optimization.

3.  w/ Lee Nelson and Tysen Streib, Kill Everyone, Huntington Press, 2007.
    -    Analyzed equilibrium strategies using game theory.

## b. Book Chapters

- Heston, Steven L. and Guofu Zhou, "Exploring the Relation Between Discrete-time Jump Processes and the Finite Difference Method," **Advanced Fixed-Income Valuation Tools** (edited by N.Jegadeesh and B.Tuckman), 2000.

## c. Scholarly (Refereed) Articles

1. "A Closed-Form Solution for Options with Stochastic Volatility, with Applications to Bond and Currency Options," **Review of Financial Studies** 6, No. 2 (1993) 327- 343 (Reprinted in Stochastic Volatility (Neil Shephard ed.), Oxford University Press, 2005).

2. "Invisible Parameters in Option Prices," **Journal of Finance** 48, No. 3 (1993) 933- 947.

3. Heston, Steven L. and K. Geert Rouwenhorst, "Does Industrial Structure Explain the Benefits of International Diversification," **Journal of Financial Economics** 36 (1994) 3-27 (featured in December 17th 1994 Economist magazine).

4. Heston, Steven L., K. Geert Rouwenhorst, and Roberto Wessels, "The Structure of International Stock Returns and the Integration of Capital Markets," **Journal of Empirical Finance** 2, (1995) 173-197.

5. Heston, Steven L. and K. Geert Rouwenhorst, "Industry and Country Effects in International Stock Returns," **Journal of Portfolio Management** 21, No. 3 (1995) 53-58.

6. Heston, Steven L. and K. Geert Rouwenhorst, "The Role of Beta and Size in the Cross-Section of European Stock Returns," **European Financial Management** 5, No. 1 (1999) 9-28.

7. "Valuation and Hedging of Risky Lease Payments," **Financial Analysts Journal** 55, No. 1 (1999) 88-94.

8. Heston, Steven L. and Guofu Zhou, "On the Rate of Convergence of Discrete Time Contingent Claims," **Mathematical Finance** 10, No. 1 (2000) 53-75.

9. Heston, Steven L. and Saikat Nandi, "A Closed Form GARCH Option Valuation Model," **Review of Financial Studies** 13, No. 3 (2000) 585-625.

10. "Option Pricing with Infinitely Divisible Distributions," **Quantitative Finance** 4 (October 2004), 515-524.

11. Christoffersen, Peter, Steven L. Heston, and Kris Jacobs, "Option Valuation with Conditional Skewness," **Journal of Econometrics**, 131, No. 2 (2006), 253-285.

12. Heston, Steven L, Mark Loewenstein, and Greg Willard, "Options and Bubbles," **Review of Financial Studies**, 20, No. 2 (2007), 359-390.

13. "A Model of Discontinuous Interest Rate Behavior, Yield Curves and Volatility," **Review of Derivatives Research**, 10, No. 3 (2007), 205-225.

14. Heston, Steven L. and Ronnie Sadka, "Seasonality in the Cross-Section of Stock Returns," **Journal of Financial Economics**, 85, (2008), 418-445.

15. Camara, Antonio and Steven L. Heston, "Closed Form Option Pricing Formulas with Extreme Events," **Journal of Futures Markets**, 28, No. 3 (2008), 213-230.

16. Heston, Steven L., Peter Christoffersen and Kris Jacobs, "The Shape and Term Structure of the Volatility Smirk," **Management Science** 55, No. 12 (2009), 1914-1932.

17. Heston, Steven L. and Dan Bernhardt, "Point Shaving in College Basketball: A Cautionary Tale for Forensic Economics," **Economic Inquiry**, 48, No. 1 (2010), 14-25.

18. "Common Patterns of Predictability in the Cross-Section of International Stock Returns," **Journal of Financial and Quantitative Analysis** 45 (2010), 1133-1160.

19. Heston, Steven L., Robert Korajczyk, and Ronnie Sadka, "Intraday Patterns in the Cross-Section of Stock Returns," **Journal of Finance**, 65, (2010) 1369-1407.

20. Christoffersen, Peter, Steven L. Heston, and Kris Jacobs, "Capturing Option Anomalies with a Variance-Dependent Pricing Kernel," **Review of Financial Studies** 26, No. 8 (2013), 1963-2006.

21. Heston, Steven L. and Alberto G. Rossi, "A Spanning Series Approach to Options," **Review of Asset Pricing Studies** 7, No. 1 (2016), 2-42.

22. Babaoğlu, Kadir, Peter Christoffersen, Steven L. Heston, and Kris Jacobs, "Option Valuation with Volatility Components, Fat Tails, and Nonmonotonic Pricing Kernels," **Review of Asset Pricing Studies** rax021 (2017).

23. Heston, Steven L. and Nitish R. Sinha, "News vs. Sentiment: Predicting Stock Returns from News Stories," **Financial Analysts Journal** 73, No. 3 (2017), 67-83.

**d. Other Articles**

- "Discrete-Time Versions of Continuous-Time Interest Rate Models," **Journal of Fixed-Income** 5 (1995) 86-88.
- "A Two-Factor Term Structure Model under GARCH Volatility" (with Saikat Nandi), **Journal of Fixed Income** 13, No. 1 (2003) 87-95.

**e. Research Prizes and Awards**

1. **Panagora Crowell Prize finalist**, 2008-2009
2. **Chicago Quantitive Alliance Award** (top 3 finalist), 2007
3. Top 15% Teaching, R.H. Smith School, 2005-2006
4. **Best Paper on Derivatives**, Montreal Financial Econometrics Conference, 2005

5.  **Q-Group Funding Award for Option Valuation with a Multifactor Term Structure of Volatility**, 2005
6.  **Risk Magazine Risk Management Hall of Fame**, 2002

\*

# 8   APPENDIX B

## Works Considered

Bachelier, Louis; *Theory of Speculation (Théorie de la Spéculation)*, Annales Scientifiques de l'École Normale Supérieure, Sér 3, 17 (1900), pp. 21-86, translated by D. May.

Bester, C. A., Victor H. Martinez, and Ioanid Roşu. "*Option Prices and the Probability of Success of Cash Mergers.*" Journal of Financial Econometrics.

Black, Fischer, and Myron Scholes. "*The Pricing of Options and Corporate Liabilities.*" Journal of Political Economy, vol. 81, no. 3, 1973, pp. 637-654.

Bodie, Zvi, Alex Kane, and Alan Marcus. *Investments.* McGraw-Hill, 1999.

Boness, A. James. "*Elements of a Theory of Stock-Option Value.*" Journal of Political Economy 72.2 (1964): 163-175. Print.

Brenner, Menachem, and Marti G. Subrahmanyam. "*A Simple Formula to Compute the Implied Standard Deviation.*" Financial Analysts Journal, vol. 44, no. 5, 1988, pp. 80-83.

Brown, Keith C., Giovanni Barone-Adesi, and W. V. Harlow. "*On the use of Implied Volatilities in the Prediction of Successful Corporate Takeovers.*" Advances in Futures and Options Research, vol. 7, 1994, pp. 147-165.

Carr, Peter and Liuren Wu. "*A Tale of Two Indices.*" The Journal of Derivatives 13.3 (2006): 13-29. Print.

Corrado, Charles J., and Thomas W. Miller Jr. "*A Note on a Simple, Accurate Formula to Compute Implied Standard Deviations.*" Journal of Banking & Finance, vol. 20, no. 3, 1996, pp. 595-603.

Cox, John C., Stephen A. Ross and Mark Rubinstein. "*Option Pricing: A Simplified Approach.*" Journal of Financial Economics 7.3 (1979): 229-263. Print.

Dumas, Bernard, Jeff Fleming, and Robert E. Whaley. "*Implied Volatility Functions: Empirical Tests.*" The Journal of Finance, vol. 53, no. 6, 1998, pp. 2059-2106.

Goyal, Amit and Alessio Saretto. "*Cross-Section of Option Returns and Volatility.*" Journal of Financial Economics 94.2 (2009): 310-326. Print.

Heston, Steve, and Guofu Zhou. "*On the Rate of Convergence of discrete-time Contingent Claims.*" Mathematical Finance, vol. 10, no. 1, 2000, pp. 53-75.

Heston, Steven L., and Saikat Nandi. "*A Closed-Form GARCH Option Valuation Model.*" The Review of Financial Studies, vol. 13, no. 3, 2000, pp. 585-625.

Heston, Steven L. "*Invisible Parameters in Option Prices.*" The Journal of Finance, vol. 48, no. 3, 1993, pp. 933-947.

Hull, John, and Alan White. "*The Pricing of Options on Assets with Stochastic Volatilities.*" Journal of Finance, 1987, pp. 281-300.

Hull, John C. *Option, Futures and Other Derivatives.* Pearson Education, 2015.

MacKenzie, Donald, Fabian Muniesa, and Lucia Siu, editors. "*Do Economists make Markets?: On the Performativity of Economics.*" Princeton University Press, 2020. p. 64.

Merton, Robert C. "*Theory of Rational Option Pricing.*" The Bell Journal of Economics and Management Science, 1973, pp. 141-183.

Rubinstein, Mark. "*The Valuation of Uncertain Income Streams and the Pricing of Options.*" The Bell Journal of Economics, 1976, pp. 407-425.

Rubinstein, Mark. "*Implied Binomial Trees.*" The Journal of Finance, vol. 49, no. 3, 1994, pp. 771-818.

Samuelson, Paul A. "*Rational Theory of Warrant Pricing.*" IMR; Industrial Management Review (Pre-1986), vol. 6, no. 2, 1965, pp. 13.

Sprenkle, Case M. "*Warrant Prices as Indicators of Expectations and Preferences.*" Yale economic essays 1.2 (1961): 179-232. Print.

# 9   APPENDIX C

**Additional Exhibits**

| Expiration | Option Value Traded Within 20% of Moneyness |
|---|---|
| Aug 10, 2018 | 99.96% |
| Aug 17, 2018 | 99.52% |
| Aug 24, 2018 | 98.89% |
| Aug 31, 2018 | 96.72% |
| Sep 07, 2018 | 95.73% |
| Sep 14, 2018 | 96.63% |
| Sep 21, 2018 | 91.46% |
| Sep 28, 2018 | 97.24% |
| Oct 19, 2018 | 85.25% |
| Nov 16, 2018 | 78.53% |
| Dec 21, 2018 | 78.86% |
| Jan 18, 2019 | 75.37% |
| Feb 15, 2019 | 77.22% |
| Mar 15, 2019 | 80.00% |
| Jun 21, 2019 | 63.21% |
| Aug 16, 2019 | 77.31% |
| Jan 17, 2020 | 64.52% |

Table 7

| Maturity Date | Standardized ATM-Forward Straddle Prices | | | | | | | | | | |
| | At Close | 12:47 | At Close | At Close | At Close | At Close | At Close | At Close | At Close | At Close | At Close |
| | 06-Aug | 07-Aug | 07-Aug | 08-Aug | 09-Aug | 10-Aug | 13-Aug | 14-Aug | 15-Aug | 16-Aug | 17-Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aug 10, 2018 | 3.61% | 3.97% | 4.84% | 3.66% | 2.92% | NA | NA | NA | NA | NA | NA |
| Aug 17, 2018 | 5.80% | 6.10% | 7.07% | 6.53% | 7.29% | 6.06% | 4.68% | 3.56% | 2.92% | 1.85% | NA |
| Aug 24, 2018 | 7.52% | 7.72% | 7.88% | 8.27% | 9.59% | 8.56% | 7.30% | 6.42% | 6.43% | 5.64% | 7.35% |
| Aug 31, 2018 | 8.96% | 9.04% | 9.32% | 9.57% | 11.15% | 10.34% | 9.17% | 8.57% | 8.64% | 7.99% | 10.10% |
| Sep 7, 2018 | 10.04% | 10.05% | 10.41% | 10.53% | 12.35% | 11.50% | 10.38% | 9.95% | 10.01% | 9.51% | 11.68% |
| Sep 14, 2018 | 11.21% | 11.18% | 10.68% | 11.52% | 13.49% | 12.72% | 11.72% | 11.37% | 11.45% | 11.06% | 13.22% |
| Sep 21, 2018 | 12.28% | 12.25% | 11.50% | 12.25% | 14.46% | 13.75% | 12.82% | 12.58% | 12.66% | 12.31% | 14.55% |
| Sep 28, 2018 | NA | NA | NA | NA | 15.37% | 14.68% | 13.74% | 13.60% | 13.75% | 13.49% | 15.80% |
| Oct 19, 2018 | 16.46% | 16.33% | 14.28% | 15.37% | 18.05% | 17.26% | 16.44% | 16.39% | 16.62% | 16.53% | 19.03% |
| Nov 16, 2018 | 20.80% | 20.61% | 17.31% | 18.39% | 21.36% | 20.73% | 19.95% | 19.99% | 20.11% | 20.09% | 23.44% |
| Dec 21, 2018 | 23.80% | 23.84% | 18.45% | 20.24% | 23.80% | 22.88% | 22.30% | 22.45% | 22.56% | 22.59% | 26.45% |
| Jan 18, 2019 | 26.07% | 26.08% | 19.61% | 21.75% | 25.59% | 24.64% | 24.03% | 24.19% | 24.34% | 24.34% | 28.55% |
| Feb 15, 2019 | 28.79% | 28.77% | 21.94% | 23.28% | 27.36% | 26.57% | 25.77% | 25.88% | 26.05% | 26.21% | 30.58% |
| Mar 15, 2019 | 30.95% | 30.87% | 22.72% | 24.60% | 28.92% | 27.94% | 27.35% | 27.39% | 27.53% | 27.73% | 32.41% |
| Jun 21, 2019 | 37.38% | 37.17% | 26.47% | 28.63% | 33.13% | 32.30% | 31.25% | 31.30% | 31.79% | 31.91% | 37.50% |
| Aug 16, 2019 | 40.76% | 40.46% | 27.94% | 30.83% | 35.72% | 34.35% | 33.13% | 33.27% | 33.89% | 34.01% | 40.11% |
| Jan 17, 2020 | 48.15% | 47.75% | 31.06% | 35.25% | 39.83% | 38.31% | 36.45% | 36.26% | 37.70% | 38.50% | 45.60% |

Table 8

| Maturity Date | BSM Implied Volatility | | | | | | | | | | |
| | At Close | 12:47 | At Close | At Close | At Close | At Close | At Close | At Close | At Close | At Close | At Close |
| | 06-Aug | 07-Aug | 07-Aug | 08-Aug | 09-Aug | 10-Aug | 13-Aug | 14-Aug | 15-Aug | 16-Aug | 17-Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aug 10, 2018 | 43.19% | 53.65% | 66.99% | 61.90% | 70.04% | NA | NA | NA | NA | NA | NA |
| Aug 17, 2018 | 41.87% | 45.87% | 53.58% | 52.11% | 61.74% | 54.83% | 56.07% | 49.24% | 49.46% | 44.36% | NA |
| Aug 24, 2018 | 42.43% | 44.70% | 45.77% | 49.55% | 59.30% | 54.83% | 52.74% | 48.59% | 51.35% | 47.74% | 66.54% |
| Aug 31, 2018 | 42.91% | 44.06% | 45.58% | 47.81% | 56.97% | 54.06% | 51.79% | 49.77% | 51.77% | 49.45% | 64.71% |
| Sep 7, 2018 | 42.51% | 43.14% | 44.82% | 46.08% | 54.98% | 52.08% | 49.76% | 48.67% | 50.01% | 48.58% | 61.08% |
| Sep 14, 2018 | 43.03% | 43.39% | 41.50% | 45.39% | 53.88% | 51.55% | 49.63% | 48.96% | 50.09% | 49.24% | 59.88% |
| Sep 21, 2018 | 43.40% | 43.70% | 41.08% | 44.25% | 52.88% | 50.86% | 49.21% | 48.93% | 49.91% | 49.18% | 58.99% |
| Sep 28, 2018 | NA | NA | NA | NA | 52.11% | 50.29% | 48.55% | 48.60% | 49.70% | 49.33% | 58.46% |
| Oct 19, 2018 | 45.90% | 45.79% | 40.09% | 43.44% | 51.40% | 49.49% | 48.18% | 48.41% | 49.46% | 49.56% | 57.54% |
| Nov 16, 2018 | 49.45% | 49.22% | 41.33% | 44.12% | 51.55% | 50.29% | 49.14% | 49.51% | 50.06% | 50.28% | 59.05% |
| Dec 21, 2018 | 48.88% | 49.10% | 37.96% | 41.82% | 49.42% | 47.66% | 46.99% | 47.49% | 47.90% | 48.16% | 56.68% |
| Jan 18, 2019 | 48.82% | 48.97% | 36.75% | 40.92% | 48.36% | 46.69% | 45.94% | 46.41% | 46.85% | 47.00% | 55.39% |
| Feb 15, 2019 | 49.90% | 49.97% | 38.03% | 40.48% | 47.77% | 46.50% | 45.44% | 45.77% | 46.19% | 46.60% | 54.62% |
| Mar 15, 2019 | 50.16% | 50.14% | 36.80% | 39.96% | 47.17% | 45.65% | 44.99% | 45.17% | 45.50% | 45.94% | 53.92% |
| Jun 21, 2019 | 50.58% | 50.36% | 35.71% | 38.72% | 44.95% | 43.88% | 42.63% | 42.77% | 43.52% | 43.76% | 51.65% |
| Aug 16, 2019 | 50.96% | 50.63% | 34.78% | 38.46% | 44.73% | 43.04% | 41.65% | 41.90% | 42.74% | 42.95% | 50.88% |
| Jan 17, 2020 | 50.91% | 50.52% | 32.57% | 37.08% | 42.02% | 40.43% | 38.54% | 38.37% | 39.96% | 40.87% | 48.65% |

Table 9

| Constant Maturity US Treasury Yield (%) | | | | | |
|---|---|---|---|---|---|
| Date | 1-Month | 3-Month | 6-Month | 1-Year | 2-Year |
| August 7, 2018 | 1.96 | 2.06 | 2.23 | 2.45 | 2.68 |
| August 8, 2018 | 1.93 | 2.06 | 2.24 | 2.44 | 2.68 |
| August 9, 2018 | 1.91 | 2.06 | 2.25 | 2.44 | 2.64 |
| August 10, 2018 | 1.92 | 2.05 | 2.23 | 2.42 | 2.61 |
| August 13, 2018 | 1.93 | 2.06 | 2.22 | 2.42 | 2.61 |
| August 14, 2018 | 1.96 | 2.08 | 2.25 | 2.44 | 2.63 |
| August 15, 2018 | 1.96 | 2.07 | 2.23 | 2.45 | 2.61 |
| August 16, 2018 | 1.96 | 2.07 | 2.24 | 2.45 | 2.63 |
| August 17, 2018 | 1.95 | 2.05 | 2.24 | 2.44 | 2.61 |

Table 10

# 10  APPENDIX D

## Data Sources

## 10.1  IVolatility Data

1.   IVolatility Historical Intraday Options Trades Data is available from January 2018 to December 2018 and includes full trade by trade data for options on Tesla common stock. The IVolatility data includes the following data:

- Options' trade prices with sizes during trading market hours
- Options' bid and ask quotations at the time of transaction
- Underlying's bid, ask, and trade prices at the time of option's trade
- Options' Implied Vols and Greeks

## 10.2  Bloomberg Data

2.   Bloomberg volume data (field: PX_VOLUME) for Tesla common stock, August 2018 was used.

## 10.3  CBOE Data

3.   CBOE DataShop Option Intervals data is available from February 12, 2018 to February 11, 2019 and includes data for options on Tesla common stock obtained for one-minute intervals from the CBOE Exchange, Inc., CBOE DataShop.

4.   The raw data was cleaned as follows:

- Any entry with a symbol different from "TSLA" was discarded
- Bid and ask prices of 0 were ignored
- Mid prices were computed as the average of bid and ask
- Time to maturity was computed as the time to 4pm on the day of the expiry / 365 days
- The forward price of the underlying price (with maturity equal to the maturity of the option) is computed using a flat interest rate of 2.4% over 365 days, continuously compounded
- Quotes collected during the trading halt of the underlying were discarded (14:08 to 15:45 on Aug 7, 2018)

## 10.4  Data Source Summary

| Table/Figure | CBOE DataShop | IVolatility | Bloomberg | Fideres |
|---|---|---|---|---|
| Table 1 | - | - | - | based on Hull |
| Table 2 | - | - | - | based on Hull |
| Table 3 | yes | - | yes | - |
| Table 4 | yes | - | - | - |
| Table 5 | yes | - | - | - |
| Table 6 | yes | - | - | - |
| Table 7 | yes | - | - | - |
| Table 8 | yes | - | - | - |
| Table 9 | yes | - | - | - |
| Table 10 | - | - | - | from Federal Reserve Board |
| Figure 1 | - | - | - | based on Hull |
| Figure 2 | - | - | - | based on Hull |
| Figure 3 | - | - | - | based on Hull |
| Figure 4 | - | - | - | based on Hull |
| Figure 5 | - | - | - | based on Hull |
| Figure 6 | - | - | - | from Federal Reserve Board |
| Figure 7 | - | - | - | based on Hull |
| Figure 8 | - | - | - | based on Hull |
| Figure 9 | - | - | - | based on Hull |
| Figure 10 | yes | - | - | - |
| Figure 11 | yes | - | - | - |
| Figure 12 | yes | - | - | - |
| Figure 13 | yes | - | - | - |
| Figure 14 | yes | - | - | - |
| Figure 15 | yes | - | - | - |
| Figure 16 | yes | - | - | - |
| Figure 17 | yes | - | - | - |
| Figure 18 | yes | - | - | - |
| Figure 19 | yes | - | - | - |
| Figure 20 | yes | - | - | - |
| Figure 21 | yes | - | - | - |
| Figure 22 | yes | yes | - | - |
| Figure 23 | yes | yes | - | - |
| Figure 24 | yes | - | - | - |

# 11  APPENDIX E

## Further Explanations

### 11.1  Standardized ATM-Forward Straddle Price

1.   Given an expiration date $m_0$, an ATM-forward straddle $\theta_{m0}$ is a portfolio of the two straddles with the strike prices $K_0, K_1$ closest to the forward price $F$ as of the given expiration date such that $K_0 < F < K1$. These two straddles are weighted such that more weight is given to the straddle whose strike price is closer to the computed forward price $F$, and divided by the contemporaneous active underlying stock price.

$$F = S_0 e^{rt}$$

$$w_{K0} = \frac{(K_1 - F)}{K_1 - K_0}$$

$$w_{K1} = 1 - w_{K0}$$

$$\theta_{m0} = \frac{w_{K0} * (c_{K0} + p_{K0}) + w_{K1} * (c_{K1} + p_{K1})}{S_0}$$

2.   The forward price $F$ is computed using the formula above, where $r$ is the continuously compounded interest rate (2.4% over 365 days), $t$ is the time to maturity of the option expressed as a fraction of 365 days $t = \frac{days\ to\ maturity}{365}$, and $S_0$ is the current active underlying price at the time of the creation of the straddle. Lastly, $c$ and $p$ represent respectively the mid-prices of a put and of a call option on Tesla shares, with maturity indicated in the subscript. The mid-prices are computed as the average of the bid and ask spread for that option.

### 11.2  Constant Maturity ATM-Forward Straddle Price

3.   Given a desired time to maturity $t_{mx}$, a constant maturity straddle portfolio $\theta_{mx}$ is a portfolio of the two standardized ATM-forward straddle portfolios  (see above) $\theta_{m0}$ and  $\theta_{m1}$ such that $t_{m0} < t_{mx} < t_{m1}$ with time to maturity closest to $t_{mx} = \frac{days\ to\ maturity}{365}$. The two straddle portfolios are weighted accordingly to their distance from the desired time to maturity, with the straddle closest to the desired maturity being given a larger weight.

$$w_{m0} = \frac{t_{m1} - t_{mx}}{t_{m1} - t_{m0}}$$
$$w_{m1} = 1 - w_{m0}$$
$$\theta_x = \frac{\sqrt{t_{mx}}}{\sqrt{t_0}} w_{m0} \theta_{m0} + \frac{\sqrt{t_{mx}}}{\sqrt{t_1}} w_{m1} \theta_{m1}$$

4.   The value of an ATM-forward straddle is increasing with expiration and roughly proportional to the squared root of maturity. Although we do not assume any model, both the BSM model and the data show that ATM-forward straddle price scaled by the square-root of maturity is almost constant. Therefore, a portfolio of longer and shorter options can be rebalanced to maintain a constant weighted-average maturity. While we cannot interpret the changes in this price as returns, we can interpret the changes as fluctuations in market prices of similar options over time.

## 11.3  Constant Maturity Straddle

5.   The constant maturity line in Figure 15 is constructed from the CBOE DataShop minute-by-minute quote data and portray the change in the price of a constant maturity straddle portfolio over the course of the Class Period.

6.   The straddles are constructed on a five-minute basis - by taking the last available quotes in each five-minute window and plotting each resulting standardized straddle. Each line represents a series of constant maturity straddles with different time to maturity, as illustrated in the legend.

## 11.4  Raw Maturity Straddle

7.   The raw maturity lines in Figure 14 and Figure 17 are constructed from the CBOE DataShop minute-by-minute quote data and portray the change in the price of a fixed maturity date straddle portfolio over the course of the Class Period.

8.   Figure 14 is constructed on a five-minute basis - by taking the last available quotes in each five-minute window and plotting the price of each resulting standardized straddle. Each line represents a series of constant maturity straddles with different expirations, as illustrated in the legend.

9.   Figure 17 is constructed on a minute-by-minute basis on raw data, and shows data only for August 6 and 7, 2018.

## 11.5  Scatter Plot

10.   The straddle figure (Figure 16) is constructed from the CBOE DataShop minute-by-minute quote data and portray the relationship between changes in the prices of long- and short-term straddles (vertical and horizontal axis, respectively). For the purpose of this figure, I discarded all quote data following the end of the Class Period, and only used the last quote of the trading day.

11.   The constant maturity straddles are first computed as per Section 11.2, for the times to maturity indicated in the axis, for each day of the data selected. Then on each day, the percentage change is computed against the previous day – each point on the chart has coordinates corresponding to the percentage change in price on long- and short-term straddles.

12.   A simple linear regression is then run, regressing the long-term straddle changes against the short-term straddle changes, excluding the colored points in the chart (*i.e.*, August 7, 8, 9, and 17). The shaded area represents the regression line ± 5 times the sample standard deviation of the residuals of the regression.

## 11.6  Trading Volume by Moneyness

13.   These histograms (Figure 12 and Figure 13) are constructed from the IVolatility Data. Each bar chart shows the option value traded from 12:48 p.m. on August 7 to the close of trading on August 17, 2018 for a given option expiry. The option value is shown as a function of moneyness, such that each bar represents the total option value traded for that bucket of moneyness (strike price / stock price). For each chart, 50 equally sized moneyness buckets were created, covering the whole range of observed moneyness for that option in that time period.

14.   Option value is here computed as the difference between the total option premium and the intrinsic value of that option. As an example, for any trade on a put option the option value $OV$ will be the put premium $p$, less the maximum of 0 and the difference between the present value of the strike K, and the active underlying stock price $S_o$. As with other calculations, t is the time to maturity for that option, and r is the interest rate.

15.   Consequently, each bar height will be computed as the sum of the $OV$ traded across all the set $X$ of options traded in period specified above, with the stated maturity and moneyness. Please note that the premiums stated in the dataset refer to the price of an option on a single TSLA share,

while the option underlying is 100 contracts – the bar height has been adjusted accordingly.

$$OV = \begin{cases} if \; put & p - max\left(0, \; \dfrac{K}{e^{rt}} - S_0\right) \\ if \, call & c - max\left(0, \; S_0 - \dfrac{K}{e^{rt}}\right) \end{cases}$$

$$bar\; height = \sum_{i \, \in \, X} 100 \; OV_i$$

## 11.7  Spread Change Plots

16.  The figures (Figure 22 and Figure 23) are constructed using both the CBOE DataShop data and IVolatility data, subset to quotes and trades from August 7. Each plot shows bid-ask spreads and trades occurring before and after 12:48 p.m. In particular, the blue dots represent trades which occurred in the five minutes before the tweet (12:43 p.m. to 12:47 p.m.), while the red dots represent trades which occurred in the last five minutes of the trading day (15:56 to 16:00). Similarly, the orange ribbons represent the bid-ask spread before 12:48 p.m., while the blue ribbons represent the bid-ask spread at the end of the trading day (16:00). Each trade and quote price is standardized by the contemporaneous active stock price. Similarly on the horizontal axis, the strike price is divided by the contemporaneous active underlying stock price, from the same dataset.

17.  For each of the two points in time, the chart shows two ribbon-curves, representing spreads on calls and puts respectively. Each ribbon is composed of two lines, representing the bid and ask premium, across different strikes – the colored area between the two lines represents the bid-ask spread.

18.  I present the bid-ask spread in the CBOE DataShop minute-by-minute data because the individual bid-ask spread associated with each transaction does not necessarily reflect market liquidity when the underlying price is changing quickly. The widening of bid-ask spread for many individual trades were likely a result of market makers protecting themselves from losing money on their hedges because of the rapid change in underlying prices.[105] In fact, August 7, 2018 had large trading volume, indicating a liquid market, as shown in Table 3.

---

[105]  *See*   https://tickertape.tdameritrade.com/trading/large-bid-ask-spreads-volatile-markets-15241   (accessed November 8, 2021).

## 11.8  Regression

19.   The t-statistics shown in footnote 89 were based on regression analysis that relies on CBOE DataShop data, and captures the relationship between changes in the prices of long- and short-term constant maturity straddles (dependent and independent variables, respectively).

20.   For the purpose of this analysis, we have only used data from the last quote of each day, throughout the whole dataset.

21.   The constant maturity straddles are first computed as per Section 11.2, for each day, separately for a fixed time to maturity. Then, on each day, the percentage change in straddle price is computed against the previous day. The resulting two variables are then entered in a regression in which the changes in long-term straddle price are modelled as the dependent variable. The independent variables are respectively the short-term straddle prices, and four dummy variables representing respectively August 7, 8, 9, and 17, as well as an intercept.

22.   The t-values of each coefficient are computed as the coefficient itself, divided by its standard error.

## 11.9  Option Bid-Ask Spread Curves

23.   Figure 10 and Figure 11 represent the bid-ask spreads, on the last minute of the trading day, across different strikes and/or underlying stock price, on options with exactly 30 days to maturity. These figures are created using the CBOE DataShop data.

24.   For each day, Figure 10 show two ribbon-curves, representing spreads on calls and puts respectively. Each ribbon is composed of two lines, representing respectively the current bid and ask premium, across different strikes – the colored area between the two lines represents the bid-ask spread.

25.   Figure 11 is identical to Figure 10 except for the scaling – in this chart, bids and asks are expressed as bid price/stock price and ask price/stock price, where the "stock price" is the contemporaneous active underlying stock price, as per the CBOE DataShop data.

## 11.10  Mid Prices on Consecutive Days

26.  Figure 18 represents the mid prices of Tesla call options on two pairs of consecutive days – the first two trading days of March and June, respectively. The chart was constructed using the 4 p.m. quotes from the CBOE DataShop data on the relevant dates. Mid prices are computed as the average of bid-ask spreads

## 11.11 Mid-Price Drop

27.  Figure 19 and Figure 21 represent the mid-prices of Tesla call options on August 7, before and after 12:48, across different strikes. The charts are constructed using CBOE DataShop quote data, and the mid-price is computed as the average of the bid and ask prices.

28.  In Figure 21, both the mid-prices and strikes are standardized by the contemporaneous active underlying price, as per the same dataset. In this figure, the two red and yellow points represent the same option on two different days – *i.e.*, call options with a strike of $450 and $340, respectively.

## 11.12 Spread Widening on August 7

29.  Figure 24 represents the option prices of Tesla call options at and after 12:47 p.m. on August 7, across different strikes. The chart shows two ribbon-curves, representing spreads on calls at different points in time, as well as a line within them, representing the mid-price (computed as the average of the bid and ask). Each ribbon is composed of two lines, representing the bid and ask premium, across different strikes – the colored area between the two lines represents the bid-ask spread. The red points are placed at the mid-price for a $450 call option, at the two different points in time

30.  These charts are created using the CBOE DataShop data.

## 11.13 Black Scholes Charts

31.  This figure (Figure 20) displays two theoretical option curves computed using the standard BSM formula presented in Section 4.2, representing the BSM prices implied by the ATM-forward straddles at the end of August 6 and 7. The following inputs were used:

| Variable | August 7, 2018 | |
| --- | --- | --- |
| | 12:47 | COB |
| Stock Price | $    356.94 | $    379.58 |
| Straddle Price | 47.75% | 31.06% |
| Implied Volatiity | 50.52% | 32.57% |
| Time to Maturity | 1.4469* | 1.4466* |
| Interest Rate | 2.4% | 2.4% |

*Time to Maturity measured in years*

## 11.14 Overnight Returns

32.   Table 4 shows the change in value over the Class Period of two straddles expiring March 15, 2019 and Jan 17, 2020, had they been purchased by an investor at 12:47 p.m. on August 7, 2018. Unlike most of my analysis, these are ATM-spot, not ATM-forward straddles.

33.   The straddle returns represent the percentage decline in the *same* straddle. For example, suppose that a $360 straddle drops from $120 to $100 when the stock price rises from $360 to $400, and the new $400 straddle costs $120. Although the ATM straddle/stock changes from 33.3% to 30%, the old $360 straddle lost 16.67% of its value. Therefore, the return is -16.67%.

34.   The strikes of the straddles were selected to be the closest strikes to ATM-spot and are taken from CBOE DataShop data.

# **<u>Exhibit B</u>**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

IN RE TESLA, INC. SECURITIES
LITIGATION

Case No. 18-cv-04865-EMC

Hon. Edward M. Chen

**Expert Damages Report of Michael L. Hartzmark, Ph.D.**

**November 10, 2021**

**CONFIDENTIAL**

**Table of Contents**

I.     Introduction ..................................................................................................1

II.    Qualifications and Compensation ................................................................5

III.   Summary of Opinions ..................................................................................8

IV.    Brief Summary of Plaintiff's Allegations and Relevant Background ......................12

   A.    Background on Tesla ....................................................................................12

   B.    Tesla Was a Volatile Growth Stock with High Short Interest and a CEO at Odds with Short Sellers and Analysts .................................................13

   C.    Defendant Musk's Tweets Were Considered to Be Appropriate Channels for the Dissemination of Corporate Information ...............................17

   D.    Plaintiff's Alleged Misrepresentations and/or Omissions ....................................19

   E.    The Alleged Partial Corrective Disclosures and the Event Window ..............23

   F.    Other Indicators of the Importance of the Alleged Misstatements to Investors ..................................................................................................26

V.     Economic Materiality of the Information Revealed During the Class Period ........28

   A.    Introduction .................................................................................................28

   B.    Overview of Information Revealed During the Class Period ............................30

     1.    Empirical Event Study Results for the Class Period Event Window ............34

     2.    August 7, 2018 and the Tweets Interval .........................................37

     3.    Stock Price Movements on August 7, 2018 .....................................46

     4.    August 8, 2018 and the Commencement of the Corrective Interval .............50

     5.    August 9, 2018 and the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction and the Continued Materialization of Consequential Harm .................................................59

     6.    August 10, 2018 and the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction and the Continued Materialization of Consequential Harm .................................................64

     7.    August 13, 2018 and the Defendants' Update on Taking Tesla Private and the Continued Materialization of Consequential Harm .........................67

     8.    August 14, 2018 and Musk's Tweets on the Purported Hiring of Financial Advisers, along with the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction and the Continued Materialization of Consequential Harm ..........................76

9.    August 15, 2018 and the Issuance of Subpoenas by the SEC, along with the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction and the Continued Materialization of Consequential Harm ..............................................................................................81

10.   August 16, 2018 and the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction ........................................................................85

11.   August 17, 2018 and the *NYT* Article, which the Market Interprets that Funding was NOT Secured, Nor Was there Any Formal Proposal .........86

C.   Post Class Period: August 27, 2018 (Impact Day) - Staying Public ..................94

D.   Post Class Period: September 28, 2018 and October 1, 2018 (Impact Days) - SEC Settlements ........................................................................98

VI.   Loss Causation Isolating the Impact of the Allegations by Accounting for Market-Wide and Industry Influences, as well as Potentially Confounding Information Released over the Class Period and the Construction of the Artificial Inflation Ribbon ........................................................................102

A.   Statistical Analysis of the Price Movements Following the Alleged Partial Corrective Disclosure ........................................................................102

1.    Accounting for Market-Wide and Industry Influences on Tesla Stock Price Movements ........................................................................103

2.    Company-specific information unrelated to the alleged misstatements .......104

3.    Summary Regarding Potential Confounding Information...........................118

B.   Separating the Abnormal Price Decline of $66.67 into the Amount Directly Caused by the Misrepresentations in the Musk Tweets from the Amount Caused by Consequential Harm ........................................................119

C.   Construction of the Artificial Price Inflation Ribbons Attributed to the Musk Tweets and Consequential Harm........................................................120

1.    Introduction........................................................................120

2.    Calculation of the Artificial Inflation Related to the *Direct* and *Consequential Effects* ........................................................................121

3.    Calculation of the Direct Artificial Inflation Utilizing the *Direct Effect* Caused by the Musk Tweets ........................................................123

4.    The Flexibility of the Damages Model ........................................136

VII.   Calculation of Per Share Damages ........................................................137

A.   Damages for Short Sellers ........................................................139

VIII.   Artificial Inflation and Deflation in Call and Put Options on Tesla Common Stock ........................................................................140

A.    Introduction to Options on Tesla Common Stock .............................................140

B.    Computing Artificial Inflation and Deflation in Tesla Call and Put Prices ......141

IX.    Artificial Inflation and Damages Calculations for Tesla Debt Securities .............147

A.    Introduction to Corporate Bonds and Bond Pricing Theory ...........................147

   1.    Background Information on Corporate Bonds .............................................147

   2.    Bond and Stock Prices Often Move in Different Directions .......................151

   3.    Differences in Price Movements between Notes with Different
          Coupons and Maturities ............................................................................153

B.    Description of the Tesla Notes ........................................................................153

   1.    The 2019 Note ..........................................................................................153

   2.    The 2021 Note ..........................................................................................155

   3.    The 2022 Note ..........................................................................................156

   4.    The 2025 Note ..........................................................................................157

C.    Event Study for the Tesla Notes .....................................................................158

D.    Results of Event Study for the Notes .............................................................163

E.    Artificial Inflation in Note Prices ...................................................................164

F.    Artificial Inflation in Note Prices Caused Directly by the Musk Tweets..........165

## I.   INTRODUCTION

1.   On September 22, 2020, I submitted a report in this matter (the "Class Certification Report"), in which I opined:[1]

> (1) Tesla, Inc. ("Tesla" or the "Company") common stock and options on Tesla common stock traded in open, well-developed and efficient markets (hereinafter referred to as "efficient markets") throughout the proposed class period of 12:48 p.m. ET August 7, 2018 to August 17, 2018 (the "Class Period");[2] and

> (2) The calculations of damages for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 for both the Tesla common stock and the options on Tesla common stock in this case are subject to common methodologies and may be computed on a class-wide basis.

2.   On November 25, 2020, the Court issued a Stipulation and Order for Class Certification.[3]   In the Class Certification Order, the Court approved the stipulation and agreement by counsel for Plaintiff and Defendants of, among other things:

> Based on the foregoing [agreements between parties], the following class is certified: "All individuals and entities who purchased or sold Tesla stock, options, and other securities from

---

[1]   Class Certification Report, ¶10.  I was also deposed on November 19, 2020 wherein I reiterated the same opinions ("Hartzmark Dep").

[2]   Consolidated Complaint for Violation of the Federal Securities Laws filed January 16, 2019, ¶1 (the "Complaint").  The Complaint (¶2) alleges that the Class Period begins "On August 7, 2018, at 12:48 p.m. ET, [when] Musk tweeted the following message to over 22 million people: 'Am considering taking Tesla private at $420.'"  The Class Period ends on August 17, 2018 after the final alleged corrective disclosure that appeared in *The New York Times* online edition after the conclusion of trading on August 16, 2018 and in the print edition on August 17, 2018 before market hours (Complaint, ¶196).

[3]   Stipulation and Order for Class Certification, ECF No. 298, filed November 25, 2020 (the "Class Certification Order").

12:48 p.m. EDT on August 7, 2018 to August 17, 2018 and were damaged thereby" (the "Class").[4]

3.   I note that, as part of the stipulation and agreement:

WHEREAS, for purposes of class certification only, Defendants stipulate that Tesla, Inc. common stock, options, and other securities traded in an efficient market at all relevant times and do not seek to rebut the presumption of reliance.[5]

4.   For this report (the "Damages Report"), Lead Counsel for Plaintiff[6] ("Counsel") has asked me to:

(1)   examine and opine on the economic materiality[7] of Defendants' alleged false and misleading statements related to the "Musk Tweets"[8] at issue in the litigation, including: (a) the information allegedly misrepresented and/or omitted in the Musk Tweets, as well as (b) foreseeable consequential effects caused by disclosures following the Musk Tweets exposing their falsity (*e.g.,* Tesla's reduced management credibility and revealed failures of corporate governance and internal controls, as well as Tesla's increased legal risks and scrutiny from U.S. Securities and

---

[4]   Class Certification Order, ¶4.  In addition, "Excluded from the Class are: Defendants; the officers and directors of Tesla, Inc. at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest." Class Certification Order, ¶5.

Note, unless otherwise indicated all times are Eastern Time.

[5]   Class Certification Order, p. 2.

[6]   Levi & Korsinsky, LLP.

[7]   When I refer to materiality or "economic materiality," it is from the perspective of a financial economist and includes a fully developed evaluation that includes an empirical examination of the stock price movements in response to the disclosure of new information, *along with* an examination of analysts' commentary, media discussion, relationship to government regulations and academic research, among other factors.

[8]   Complaint (¶2) alleges that the Class Period begins "On August 7, 2018, at 12:48 p.m. ET, [when] Musk tweeted the following message to over 22 million people: "Am considering taking Tesla private at $420."  Defendant Musk made further tweets during the August 7, 2018 trading day, as well as sending an email to employees at 3:16 p.m., which was then subsequently posted on a public Tesla blog that was linked to a Musk tweet at 3:28 p.m.   I refer to these tweets and emails as the "Musk Tweets." Class Certification Report, ¶71; Complaint, ¶84; *see also* Complaint at ¶¶120, 122, 124, 126, 128, 130.

Exchange Commission ("SEC") investigations), which are inextricably bound and causally-linked to the Musk Tweets (I refer to these foreseeable consequences as the "Consequential Harm");

(2) opine on whether investor losses were proximately caused by the information allegedly misrepresented and/or omitted in the Musk Tweets, as well as the Consequential Harm (*i.e.*, "loss causation");[9]

(3) quantify the amount of loss attributable to the revelation of the allegedly misrepresented and/or omitted facts in the Musk Tweets, as well as the losses attributable to the Consequential Harm;

(4) construct the artificial inflation or deflation ribbons, as appropriate, so as to quantify the artificial inflation or deflation per share for Tesla common stock, per contract for call and put stock options and per Note for Tesla debt securities[10] for each day of the Class Period attributable to the information allegedly misrepresented and/or omitted in the Musk Tweets, as well as the Consequential Harm;

---

[9] The Complaint references multiple stock price declines over the Class Period, culminating with a final price decline on August 17, 2018 (Complaint, ¶¶188-196). As will be discussed in detail, I assume for the purposes of this Damages Report that the finder of fact will determine that the period between the Musk Tweets on August 7, 2018 starting at 12:48 p.m. and the close of trade of August 17, 2018 is filled with numerous statements and partial corrective disclosures revealing curative information; and that there was a final corrective disclosure on August 17, 2018. As discussed in this Damages Report, my framework for estimating damages per share, including disaggregation of price movements and scaling over the Class Period, which are the foundation of the inputs for calculating daily artificial inflation, offer flexibility in that alternative figures can be used if additional evidence is presented. An electronic file will be turned over that allows for adjusting my inputs to create alternative artificial inflation ribbons and damages scenarios based on different findings by the finder of fact, including any findings concerning the effects of the myriad of disclosures made throughout the period between the Musk Tweets starting on August 7, 2018 at 12:48 p.m. and the close of trade of August 17, 2018.

[10] The debt securities I have been asked to examine are: (i) 0.25% Convertible Senior Notes due in 2019 (the "2019 Note"); (ii) 1.25% Convertible Senior Notes due in 2021 (the "2021 Note"); (iii) 2.375% Convertible Senior Notes due in 2022 (the "2022 Note"); and (iv) 5.30% Senior Notes due in 2025 (the "2025 Note"). I refer to these collectively as the "Tesla Notes" or the "Notes."

(5)    provide a model to quantify Rule 10b-5 damages on Tesla common stock on a per share basis that can be applied to each Class Member based on the Out-of-Pocket ("OOP") methodology I described in my Class Certification Report;[11]

(6)    provide a model to quantify Rule 10b-5 damages on options on Tesla common stock on a per contract basis that can be applied to each Class Member based on the OOP methodology I described in my Class Certification Report;[12] and

(7)    provide a model to quantify Rule 10b-5 damages on the Tesla Notes on a per Note basis that can be applied to each Class Member based on the OOP methodology I describe below.

5.     In this Damages Report, I detail my research and findings that I have carried out in response to the request above.  My Damages Report applies generally accepted and widely utilized economic, financial, and statistical analyses to form opinions regarding materiality, loss causation, and damages under Rule 10b-5.  This Damages Report does not contain a verbatim account of every detail of my expected testimony, and I may address additional topics in response to arguments or assertions offered by Defendants and their experts during the course of the proceedings.   Because my conclusions are based on information available to me as of the date of this Damages Report and I understand that fact discovery and expert discovery are ongoing, and I might be asked to review, evaluate and analyze relevant material that is produced, brought to my attention or otherwise becomes available to me, I reserve the right to amend, supplement, or otherwise modify my findings and conclusions, after service of this Damages Report, as appropriate. Particularly, I am aware that Defendant Musk's deposition in this matter took place on November 5, 2021, shortly before the date of this report, and I reserve the right to revise this report, as needed, based on his testimony.

---

[11]    Class Certification Report, ¶¶158-169.

[12]    Class Certification Report, ¶¶170-174.

6.     My Expert Damages Report is organized as follows: in Section II, I present my qualifications as an expert.  In Section III, I summarize my opinions.  In Section IV, I provide a summary overview of Plaintiff's allegations, as set forth in the Complaint and Plaintiff's Responses to Defendants' First Set of Interrogatories.[13]   In Section V, I demonstrate that the alleged misstatements and/or omissions in the Musk Tweets, as well as the Consequential Harm were material to the price of Tesla common stock.  In Section VI, I establish loss causation and determine the magnitude of the price impact of the alleged partial corrective disclosures on Tesla common stock, which enables me to quantify the artificial inflation per share and its evolution on each day of the Class Period in Tesla common stock.  In Section VII, I calculate per share damages for Tesla common stock under Rule 10b-5, including an examination of losses to short sellers.  In Section VIII, I quantify the artificial inflation and/or deflation per contract and its evolution on each day of the Class Period in options on Tesla common stock and provide my analysis of damages for options on Tesla common stock.  In Section IX, I quantify the artificial inflation per Note and its evolution on each day of the Class Period in the Tesla Notes and provide my analysis of damages for the Tesla Notes.

## II.     QUALIFICATIONS AND COMPENSATION

7.     I am President of Hartzmark Economics Litigation Practice, LLC and prior to this I was a Principal and Director at Navigant Economics (formerly dba Chicago Partners, LLC, a subsidiary of Navigant Consulting, Inc.).  Both firms specialize in the application of economics and finance to legal, commercial and regulatory issues, including issues such as those addressed in this report.  I also am currently engaged as an independent contractor the Office of the Attorney General of the State of New Jersey and was previously engaged by the Office of the Attorney General of the State of New York, to assist in investigations of the mortgage-backed securities market.[14]

---

[13]   Plaintiff's Responses to Defendants' First Set of Interrogatories dated November 4, 2021 ("Plaintiff's Responses").

[14]   "A residential *mortgage-backed security* (MBS) is an instrument whose cash flow depends on the cash flows of an underlying pool of mortgages." Frank J. Fabozzi and Steven V. Mann, The

8.     I have served as a testifying and consulting expert in numerous securities class actions.  In addition, I have published scholarly articles on a multitude of issues in financial economics including those associated with securities class actions, including the topic of market efficiency.  I have spent considerable time as an economic consultant evaluating issues related to market efficiency and damages.  My primary focus has been on securities such as common stock, options, corporate bonds, Treasury and energy futures, swaps, swaptions, and asset-backed securities.  My expert reports which included the topics of market efficiency and common damages methodology have been cited with approval by the respective courts in *In re: CenturyLink Sales Practices and Securities Litigation*,[15] *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*,[16] *In re Signet Jewelers Limited Securities Litigation*,[17] *West Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et al.*,[18] *In re Cobalt International Energy, Inc. Securities Litigation*,[19] and *William D. Wallace, et al. v. IntraLinks Holdings, Inc., et al.*[20]  I also wrote a series of reports cited in the district court's opinion granting class certification of DVI common stock and corporate bonds in *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), which was affirmed by the Third Circuit in *In re DVI, Inc. Securities Litigation*,

---

Handbook of Fixed Income Securities, Seventh Edition, McGraw-Hill Education (2005), p. 16 ("Handbook").

[15]   *In re: CenturyLink Sales Practices and Securities Litigation*, 2020 WL 5517483 (D. Minn. Sept. 14, 2020).

[16]   *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, Memorandum and Recommendation, (S.D. Tx., Nov. 13, 2019), Dkt. 125 (which was adopted by the Court in Order Adopting Magistrate Judge's Memorandum and Recommendation entered December 20, 2019, Dkt. 131).

[17]   *In re Signet Jewelers Limited Sec. Litig.*, 2019 WL 3001084 (S.D.NY. 2019).

[18]   *W. Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et al.*, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016).

[19]   *In re Cobalt Intl. Energy, Inc., Sec. Litig.*, 2017 WL 2608243 (S.D. Tex. 2017).

[20]   *William D. Wallace, et al. v. IntraLinks et al.*, Opinion (S.D.N.Y., September 30, 2014), Dkt. 99.

639 F.3d 623 (3d Cir. 2011).   I have also co-authored three law review publications discussing the commonly used empirical tests applicable to securities class actions.[21]

9.     I earned my B.A. in economics from The University of Michigan and my M.A. and Ph.D. in economics from The University of Chicago.   I have taught economics and financial economics in the Department of Economics at The University of Chicago and jointly in the Michigan Business School (now the Ross School of Business) and the Department of Economics at the University of Michigan.

10.    At the University of Michigan, I created and taught courses on financial and commodity futures markets.   While an Assistant Professor at the University of Michigan, I received a research grant from the University of Chicago Center for the Study of Futures Prices, as well as the John M. Olin Faculty Fellowship to further my research in financial markets.   In addition, I published articles in peer-reviewed journals related to financial markets.   Prior to my tenure track appointment at the University of Michigan, I was employed as a Financial Economist at the Commodity Futures Trading Commission, Division of Economics and Education.

11.    I have been a holder of the Series 7 and 63 registered representative licenses and have served as a Financial Advisor at Fahnestock & Co., Inc. (now Oppenheimer & Co., Inc.).   I was also founder and President of DARMA, LLC, a wealth and asset advisory company affiliated with Oppenheimer & Co., Inc.

12.    My qualifications, publications, and expert engagements are summarized in detail in my *curriculum vitae*, which is attached to this report as **Appendix 1**.   Hartzmark Economics Litigation Practice, LLC is being compensated at a rate of $800 per hour for my work in this matter.   Neither my compensation nor the compensation of Hartzmark Economics Litigation Practice, LLC is any way contingent upon the outcome of this case or upon the opinions that I express.

---

[21]   Michael L. Hartzmark, Cindy A. Schipani, H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev., 654-716 (2011); Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev., 415-66 (Winter 2012); Michael L. Hartzmark, H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev., 149-230 (Spring 2014).

## III.   SUMMARY OF OPINIONS

13.   Based on my analysis to date, I have formed the opinions that follow.   In reaching these opinions, I have relied upon various materials, which are listed throughout this Report and/or in **Appendix 2** (which lists materials that I relied upon for this Damages Report).   The research and analysis upon which my opinions are based have been conducted by me with the assistance of personnel working under my direction and supervision.

**OPINION 1:** In the Class Certification Report, I described and proposed a market model for Tesla's common stock to control for market and industry effects and to form the basis of an appropriate event study.[22]   It is my opinion that this market model serves as an appropriate basis to begin the calculation of artificial inflation.

**OPINION 2:** The alleged misrepresentations and/or omissions in the Musk Tweets and the related Consequential Harm were economically material because they substantially altered the total mix of information available to investors.

**OPINION 3:** There is an economic link, which can be reliably measured, between the alleged misrepresentations and/or omissions in the Musk Tweets and the revelation of the truth, as well as the Consequential Harm, which when realized throughout the Class Period proximately caused losses to investors.   The quantification of the negative repercussions and the harm to investors can be reliably measured by examining the price movements as market participants learned the truth about the Musk Tweets and Consequential Harm.   The harm to investors can also be reliably measured by calculating the differences between observed prices and true or "but-for" prices that account for the price impact of the revelation of the truth and the Consequential Harm, along with appropriate adjustments for market-wide, industry and confounding influences.

**OPINION 4:** The alleged misrepresentations and/or omissions in the Musk Tweets caused the price of Tesla securities to be at artificially inflated levels throughout the Class Period[23] and the curative information revealing the truth concerning Defendants' alleged misstatements in the Musk Tweets and the revelations related to the Consequential Harm realized throughout the Class Period proximately caused the artificially inflated price of Tesla's securities to decline.[24]

---

[22]   Class Certification Report, Appendix E.

[23]   In **OPINIONS 3-6**, "artificial inflation" would refer to "artificial deflation" (and the curative information causing the deflated prices to rise) as it relates to securities that are put option contracts and certain call option contracts.

[24]   My opinions regarding amounts of inflation (and deflation in the put options and certain call options) and damages per Tesla security under Rule 10b-5 are based upon my assumption of

**OPINION 5:** Based on a formulaic procedure that can accommodate any modification determined to be necessary by the finder of fact, I calculate the levels of artificial inflation (or deflation) in all of Tesla's securities that are related to Plaintiff's allegations for the close on each day of the Class Period as presented in **Table 1** through **Table 3**. Moreover, I am able to separate the levels of artificial inflation (or deflation) that is directly and proximately caused by the Musk Tweets from the artificial inflation caused by the Consequential Harm. The amounts of Direct Artificial Inflation are also presented in **Table 1** through **Table 3**. **Appendix 8** provides artificial inflation and deflation in Tesla options on a daily basis for a range of options.

**Table 1**

| Date | Price | Total Artificial Inflation | Direct Artificial Inflation |
|------|-------|---------------------------|-----------------------------|
| 8/7/2018 | $379.57 | $66.67 | $23.27 |
| 8/8/2018 | $370.34 | $57.44 | $16.75 |
| 8/9/2018 | $352.45 | $39.55 | $9.59 |
| 8/10/2018 | $355.49 | $42.59 | $11.90 |
| 8/13/2018 | $356.41 | $43.51 | $14.64 |
| 8/14/2018 | $347.64 | $34.74 | $14.88 |
| 8/15/2018 | $338.69 | $25.79 | $12.57 |
| 8/16/2018 | $335.45 | $22.55 | $11.27 |
| 8/17/2018 | $305.50 | --- | --- |

---

Defendants' liability for violations of Section 10(b) of the Exchange Act, as is standard in a damages analysis.

**Table 2**

| Date | Price | Total Artificial Inflation | Direct Artificial Inflation |
|---|---|---|---|
| ***2019 Note*** | | | |
| 8/7/2018 | $114.69 | $11.21 | $4.49 |
| 8/8/2018 | $110.56 | $7.07 | $3.23 |
| 8/9/2018 | $108.27 | $4.78 | $1.85 |
| 8/10/2018 | $108.60 | $5.12 | $2.30 |
| 8/11/2018 | $109.29 | $5.81 | $2.83 |
| 8/12/2018 | $108.12 | $4.63 | $2.87 |
| 8/13/2018 | $106.63 | $3.15 | $2.43 |
| 8/14/2018 | $106.10 | $2.61 | $2.17 |
| 8/17/2018 | $102.16 | --- | --- |
| ***2021 Note*** | | | |
| 8/7/2018 | $122.55 | $17.56 | $6.17 |
| 8/8/2018 | $116.14 | $11.15 | $4.44 |
| 8/9/2018 | $112.31 | $7.32 | $2.54 |
| 8/10/2018 | $112.74 | $7.75 | $3.16 |
| 8/11/2018 | $114.64 | $9.65 | $3.88 |
| 8/12/2018 | $111.76 | $6.77 | $3.95 |
| 8/13/2018 | $109.79 | $4.80 | $3.34 |
| 8/14/2018 | $108.80 | $3.81 | $2.99 |
| 8/17/2018 | $103.44 | --- | --- |
| ***2022 Note*** | | | |
| 8/7/2018 | $130.41 | $18.35 | $6.26 |
| 8/8/2018 | $123.61 | $11.55 | $4.50 |
| 8/9/2018 | $120.81 | $8.75 | $2.58 |
| 8/10/2018 | $121.19 | $9.13 | $3.20 |
| 8/11/2018 | $122.32 | $10.26 | $3.94 |
| 8/12/2018 | $120.27 | $8.21 | $4.00 |
| 8/13/2018 | $117.47 | $5.41 | $3.38 |
| 8/14/2018 | $116.79 | $4.73 | $3.03 |
| 8/17/2018 | $110.07 | --- | --- |

**Table 3**
**Panel A: Daily Total Artificial Inflation (Deflation) per Underlying Share in Tesla**
**Januay 17, 2020 Options, Select Strike Prices**

| | Calls | | | | Puts | | | |
|---|---|---|---|---|---|---|---|---|
| Date | $300 | $340 | $380 | $420 | $300 | $340 | $380 | $420 |
| 8/7/2018 | $27.05 | $17.96 | $10.50 | $4.78 | ($39.61) | ($48.70) | ($56.16) | ($61.89) |
| 8/8/2018 | $25.46 | $18.54 | $12.76 | $8.18 | ($31.97) | ($38.90) | ($44.67) | ($49.25) |
| 8/9/2018 | $18.57 | $14.32 | $10.74 | $7.83 | ($20.98) | ($25.23) | ($28.80) | ($31.71) |
| 8/10/2018 | $18.63 | $13.81 | $9.80 | $6.61 | ($23.95) | ($28.78) | ($32.78) | ($35.98) |
| 8/13/2018 | $16.78 | $11.47 | $7.17 | $3.85 | ($26.72) | ($32.03) | ($36.34) | ($39.66) |
| 8/14/2018 | $10.06 | $5.54 | $2.03 | ($0.53) | ($24.67) | ($29.19) | ($32.70) | ($35.26) |
| 8/15/2018 | $5.78 | $2.40 | ($0.15) | ($1.97) | ($20.01) | ($23.38) | ($25.94) | ($27.75) |
| 8/16/2018 | $4.73 | $1.80 | ($0.41) | ($1.96) | ($17.82) | ($20.75) | ($22.95) | ($24.51) |

**Panel B: Daily Direct Artificial Inflation (Deflation) per Underlying Share in Tesla**
**January 17, 2020 Options, Select Strike Prices**

| | Calls | | | | Puts | | | |
|---|---|---|---|---|---|---|---|---|
| Date | $300 | $340 | $380 | $420 | $300 | $340 | $380 | $420 |
| 8/7/2018 | ($6.12) | ($12.15) | ($16.61) | ($19.47) | ($29.39) | ($35.42) | ($39.88) | ($42.74) |
| 8/8/2018 | ($5.70) | ($9.76) | ($12.71) | ($14.61) | ($22.44) | ($26.51) | ($29.46) | ($31.36) |
| 8/9/2018 | ($4.78) | ($6.93) | ($8.44) | ($9.35) | ($14.37) | ($16.52) | ($18.03) | ($18.94) |
| 8/10/2018 | ($5.22) | ($7.91) | ($9.78) | ($10.93) | ($17.13) | ($19.81) | ($21.68) | ($22.83) |
| 8/13/2018 | ($5.76) | ($9.05) | ($11.35) | ($12.73) | ($20.39) | ($23.69) | ($25.98) | ($27.37) |
| 8/14/2018 | ($6.08) | ($9.25) | ($11.39) | ($12.61) | ($20.96) | ($24.13) | ($26.27) | ($27.49) |
| 8/15/2018 | ($5.73) | ($8.27) | ($9.93) | ($10.84) | ($18.31) | ($20.84) | ($22.50) | ($23.41) |
| 8/16/2018 | ($5.45) | ($7.68) | ($9.13) | ($9.91) | ($16.72) | ($18.95) | ($20.40) | ($21.18) |

**OPINION 6:** Under Rule 10b-5, damages per share, option or bond (before any statutory limitations) for any Class member may be calculated as the difference between (i) inflation[25] in the security price when the Class member purchased the security and (ii) inflation in the security price when the investor sold the security.[26]  For example, if an investor bought[27] Tesla common stock with the price artificially inflated shown above in

---

[25]    My opinions regarding amounts of inflation and damages per security under Rule 10b-5 are based upon my assumption that Defendants will be found liable for violating Section 10(b) of the Exchange Act.  In particular, I assume that Plaintiff will be able to prove that the Defendants knew or recklessly disregarded that they were issuing materially false or misleading statements or making statements that omitted material facts during the Class Period.

[26]    In the case of short sellers, the stock has already been sold at the time of the purchase.

[27]    This example describes a typical open-market purchase of stock.  A similar calculation applies to a purchaser of any Tesla security whose purchase price was artificially inflated during the Class Period.  The inverse calculation can be made for any investor who sold a Tesla security when their sale price was artificially deflated as a result of Defendants' misrepresentations or omissions.  As discussed below, this was the case for certain options on Tesla stock.

**Table 1** and held through August 17, 2018, the investor was harmed by the amount of artificial inflation per share shown in **Table 1** for the purchase date.[28]

## IV.   BRIEF SUMMARY OF PLAINTIFF'S ALLEGATIONS AND RELEVANT BACKGROUND

14.   In this section, I provide a brief summary of relevant facts and claims that I rely upon in my analysis of the allegations, as well as the calculation of harm associated with those allegations made by Plaintiff.  To be clear, this section is not meant to recite every fact or claim I relied upon or every allegation at issue in the case.  Instead, this summary of the allegations is intended to provide background and contextual information relevant to my later analysis of materiality, loss causation, the measurement of artificial inflation, and damages.

### A.   Background on Tesla

15.   In its Form 10-K filed for the fiscal year ending December 31, 2018, Tesla described itself as follows:

> We design, develop, manufacture and sell high-performance fully electric vehicles ("EVs") and energy generation and storage systems, and also install and maintain such energy systems and sell solar electricity.  We are the world's first vertically integrated sustainable energy company, offering end-to-end clean energy products, including generation, storage and consumption.[29]

16.   Tesla is a Delaware corporation with headquarters in California.[30] Throughout the Class Period, Tesla common stock was listed on The NASDAQ Global Select Market under the "TSLA" trading symbol, where it began trading in June 2010.[31]

---

[28]   In addition, I examine and account for the 90-day period following the end of the Class Period. I understand that under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff may not recover more than the difference between the purchase price and the mean trading price of the stock during the 90-day lookback period.  *See* 15 U.S.C. § 78u-4(e)(1).

[29]   Tesla SEC Form 10-K filed February 19, 2019, p. 1.

[30]   Tesla SEC Form 10-K filed February 19, 2019, cover.

[31]   Tesla SEC Form 10-K filed February 19, 2019, p. 39.

17.    On July 27, 2018, approximately two weeks before the start of the Class Period, Tesla had 170.6 million shares outstanding.[32]   On September 30, 2018 (about one and a half months after the end of the Class Period), Tesla had 171.6 million shares outstanding.[33]   As of June 30, 2018, Tesla and its subsidiaries had outstanding $10.91 billion in aggregate principal amount of indebtedness, including convertible and long-term debt.[34]

**B.   <u>Tesla Was a Volatile Growth Stock with High Short Interest and a CEO at Odds with Short Sellers and Analysts</u>**

18.    In 2018, Tesla stated the "trading price of our common stock has been highly volatile and could continue to be subject to wide fluctuations…"[35]   Tesla was a growing company in a capital intensive business[36] with negative cash flow from operating and investment activities of over $4.4 billion in 2017[37] and faced several business growth challenges that included  ramping up production and sales of its Model 3 vehicle, a lower priced sedan designed for the mass market, at "significantly higher volumes than our present production capabilities for the Model S or Model X vehicles."[38]

19.    The Company stated that it had "… been able to generate significant media coverage of our company and our vehicles … media coverage and word of mouth have been the primary drivers of our sales leads."[39]   Tesla also stated it "… was highly dependent on the services of Elon Musk, our Chief Executive Officer, Chairman of our Board of Directors and largest stockholder."[40]

---

[32]   Tesla SEC Form 10-Q filed August 6, 2018, cover.

[33]   Tesla SEC Form 10-Q filed November 2, 2018, p. 4.

[34]   Tesla SEC Form 10-Q filed August 6, 2018, pp. 24, 59.

[35]   Tesla SEC Form 10-K filed February 23, 2018, p. 32.

[36]   Tesla SEC Form 10-K filed February 23, 2018, pp. 1, 30.

[37]   Tesla SEC Form 10-K filed February 23, 2018, p. 56.

[38]   Tesla SEC Form 10-K filed February 23, 2018, p. 15.

[39]   Tesla SEC Form 10-K filed February 23, 2018, p. 6.

[40]   Tesla SEC Form 10-K filed February 23, 2018, p. 24.

CONFIDENTIAL

20.    Articles in *The Wall Street Journal* described Defendant Musk as someone who is very demanding, though sometimes displaying an erratic management style and controversial use of Twitter, including taunting short sellers of Tesla common stock who were betting against the Company's success.[41]  Prior to the Musk Tweets, there had been extensive coverage on Defendants Musk and Tesla as described below:

> Mr. Musk … sets a high bar with the hope that if he reaches a fraction of his goal, Tesla will be successful, people familiar with his thinking said.  For all his success, Mr. Musk can be his own worst enemy, setting unrealistic expectations publicly and at times displaying an erratic management style that add to Tesla's challenges, say investors, former Tesla executives and close observers.  …
>
> After Mr. Musk inflamed Wall Street in May during Tesla's quarterly financial call by cutting off analysts—"Boring bonehead questions are not cool," he said—he sought to make amends by calling some of Tesla's largest shareholders, including Baillie, Fidelity Investments and T. Rowe Price to assuage concerns, people familiar with the matter said.[42]

*****

> The outburst was the latest example of Mr. Musk's aggressive and sometimes controversial use of Twitter.  In recent months, he has used the platform to criticize regulators, taunt short sellers and debate people who criticized his political donations.[43]

*****

---

[41]   At the start of the Class Period the value of short interest in Tesla stock was higher than any other S&P 500 stock.  "Tesla Short Selling Update - IHS Markit," Exchange News Direct, August 7, 2018.  The article stated: "In dollar terms, today's price move took Tesla's equity short position above $13bn for the first time, the previous peak being $12.8bn on June 14th. The short interest equates to 20.7% of outstanding shares, down from a YTD peak of 23% observed in June.  The short value is higher than any S&P 500 stock, only Under Armor has a higher percentage of outstanding shares short with 24%."

[42]   "Elon Musk Races to Exit Tesla's 'Production Hell'," *The Wall Street Journal*, June 27, 2018, 9:36 p.m.

[43]   "Elon Musk Apologizes for Calling Thai Cave Rescuer a Pedophile," *The Wall Street Journal*, July 18, 2018, 3:15 p.m.

Elon Musk's swagger has helped win admirers and embolden Tesla Inc. TSLA +1.65% investors. This time, the billionaire chief executive may have gone too far.

On Thursday, Tesla's shares fell 5.6%, erasing about $3 billion in market value a day after Mr. Musk sparred with Wall Street analysts in a show of defiance rare for traditionally staid conference calls to discuss a company's quarterly results.

Several analysts reconsidered their outlooks for the Silicon Valley auto maker struggling to take on the century-old automotive industry….

Mr. Musk's bravado has polarized investors, pitting short sellers who are sure Tesla is headed for demise, against the "longs" who believe his vision will win out. The backers have so far prevailed, giving Mr. Musk room to make, and sometimes miss, overly ambitious goals and lifting Tesla's market value to rival those of General Motors Co. and Ford Motor Co., much larger auto makers….

Following the call, which was broadcast for investors online, analysts sent notes to clients that characterized Mr. Musk's exchange as "bizarre theatrics" and "odd," and said Mr. Musk might have struck some as being "dismissive" and "unhinged." At least three analysts dropped their price targets….

Following the call, Mr. Spak lowered his price target to $280 from $305, telling clients the "performance shook confidence" on the part of investors "which we'd argue is an important piece of the Tesla story."[44]

21.     Just before the start of the Class Period, Tesla announced second quarter 2018 results that were mixed, reporting higher than expected quarterly losses but better than expected negative cash flow, and its stock price increased over 16% on August 2, 2018. Some news articles attributed much of the stock price increase to Mr. Musk restoring his reputation and credibility after he apologized to two analysts for comments made on the prior earnings call. This demonstrates the impact that Defendant Musk could have on Tesla's stock price and how important his credibility and reputation was to market participants' valuation of Tesla. For example:

[44] "Tesla's Elon Musk Turns Conference Call Into Sparring Session," *The Wall Street Journal*, May 3, 2018, 12:47 p.m.

Tesla CEO Elon Musk extended an olive branch to Wall Street during a conference call with analysts, fueling a big rally in the company's shares Thursday.

The electric car maker also continues to target positive cash flow and quarterly profits in the second half of the year amid expanded production of the Model 3. Despite reporting a record quarterly loss Wednesday, Tesla burned through less cash than Wall Street feared in the second quarter.[45]

*****

Tesla CEO Elon Musk stunned analysts a few months ago by refusing to answer their "boring" questions on a Tesla earnings call, choosing instead to field questions from a YouTuber. Tesla's stock price took a hit.

But on Wednesday, Musk said he was said he was sorry for the testy exchange. He spent more than an hour on this quarter's earnings call taking questions from analysts and journalists.

**His amenable tone appeared to win investors over. Tesla's after-hours stock price climbed more than 10% around the time he offered his apology.**

It's a sign Tesla fans on Wall Street may have had their faith restored in Musk after a rocky few weeks.[46]

*****

As Fortune reported:

Although Tesla stock rose slightly upon the release of the financial results themselves, **it wasn't until Musk started talking that it really took off,** boosting Tesla's market value by more than $5 billion in after-hours trading.[47]

*****

---

[45] "Tesla stock rallies as Elon Musk apologizes, promises future profits," Fox Business, August 2, 2018.

[46] "Elon Musk apologizes for brushing off analysts on past earnings call," CNN Money, August 1, 2018, 9:19 p.m. (emphasis added).

[47] "Tesla's Elon Musk Just Gave a $5 Billion Apology," Inc., August 2, 2018 (emphasis added).

Chief Executive Elon Musk was more muted during the post-earnings call with analysts Wednesday, personally apologizing to the two he had lashed out back in May.

That behavior, plus a renewed promise of profitability in the second half of the year, helped send Tesla (TSLA, US) shares up 16% in Thursday trading, marking their highest close since June 28. It was the stock's best single-day percentage gain since December 2013. Since Tuesday, Tesla shares had their best three-day stretch since early April, rising 20.5% over the past three days.

"**The CEO worked to restore some faith and credibility with investors that he can be a plus to the investment narrative, not a minus,**" wrote KeyBanc Capital Markets analyst Brad Erickson, who has the equivalent of a neutral rating on the stock. Musk delivered what Erickson called "maybe the most valuable apology of all time."[48]

### C. Defendant Musk's Tweets Were Considered to Be Appropriate Channels for the Dissemination of Corporate Information

22. *The Wall Street Journal* also documented Defendant Musk's Twitter habits stating, "Among big-company tech CEO's, only Salesforce CEO Marc Benioff tweets more than Musk."[49]

23. Prior to the beginning of the Class Period, the Board of Directors of Tesla had acknowledged and adopted Defendant Musk's tweeting and disclosed that his tweeting should be treated much like formal press releases and other normal and commonly used channels to disseminate corporate information. These tweets would represent bona fide Tesla disclosures. This was formalized in 2013:

### Tesla Disclosure Channels To Disseminate Information

Tesla investors and others should note that we announce material information to the public about our company, products and services and other issues through a variety of means, including Tesla's website, press releases, SEC filings, blogs and social media, in order to achieve broad, non-exclusionary

---

[48] "Elon Musk's apology was worth more than $8 billion to Tesla shareholders—but questions linger," MarketWatch, August 6, 2018, 3:42 p.m. (emphasis added).

[49] "4,925 Tweets_Elon Musk's Twitter Habit, Dissected," *The Wall Street Journal*, July 31, 2018, available at http://graphics.wsj.com/elon-musk-twitter-habit-analysis/.

distribution of information to the public.  We encourage our investors and others to review the information we make public in the locations below as such information could be deemed to be material information.  Please note that this list may be updated from time to time.

Interested in keeping up with Tesla?

For more information on Tesla and its products, please visit: teslamotors.com

For more information for Tesla investors, please visit: ir.teslamotors.com

For the latest information from Tesla, including press releases and the Tesla blog, please visit: teslamotors.com/press

**For additional information, please follow Elon Musk's and Tesla's Twitter accounts: twitter.com/elonmusk and twitter.com/TeslaMotors**[50]

24.   Tesla's disclosure about its use of social media was consistent with the SEC's announcement earlier in 2013 that social media outlets were acceptable channels to disseminate information to investors, stating:

The Securities and Exchange Commission today issued a report that makes clear that companies can use social media outlets like Facebook and Twitter to announce key information incompliance with Regulation Fair Disclosure (Regulation FD) so long as investors have been alerted about which social media will be used to disseminate such information.

The SEC's report of investigation confirms that Regulation FD applies to social media and other emerging means of communication used by public companies the same way it applies to company websites… Today's report clarifies that company communications made through social media channels could constitute selective disclosures and, therefore, require careful Regulation FD analysis.[51]

---

[50]   Tesla SEC Form 8-K filed November 5, 2013 (emphasis added).

[51]   "SEC Says Social Media Ok for Company Announcements if Investors Are Altered," https://www.sec.gov/news/press-release/2013-2013-51htm.

25.   It would also be expected by market participants that as a public company, Tesla would have had in place internal controls and corporate governance mechanisms to monitor and review, so as to modify edit and amend (as appropriate) all corporate disclosures of material information, which by virtue of its 2013 policy also included information published via tweets from Defendant Musk.[52]   Moreover, NASDAQ also had in place controls with rules specifying that its listed companies must notify the exchange ten minutes prior to publicly releasing material information, which Defendant Musk did not do before disseminating the Musk Tweets.[53]

26.   Overall, with the SEC and NASDAQ rules, along with the expected Tesla internal controls and corporate governance mechanisms, I conclude that investors would have considered the Musk Tweets to have been evaluated prior to dissemination.

### D.   Plaintiff's Alleged Misrepresentations and/or Omissions

27.   For the purposes of this Report, I assume that Plaintiff will prove that Defendants misled the market when making certain misstatements regarding the potential to take Tesla private.   Specifically, Plaintiff alleges that Defendant Musk made the following misstatements in the Musk Tweets, among others:[54]

> a) On August 7, 2018 at 12:48 p.m., Musk tweeted: "Am considering taking Tesla private at $420.  Funding secured."[55]

---

[52]   TESLA_LITTLETON_00006293 (Exhibit 318).

[53]   "Except in unusual circumstances, a Nasdaq-listed Company shall make prompt disclosure to the public through any Regulation FD compliant method (or combination of methods) of disclosure of any material information that would reasonably be expected to affect the value of its securities or influence investors' decisions.  The Company shall, prior to the release of the information, provide notice of such disclosure to Nasdaq's MarketWatch Department at least ten minutes prior to public announcement if the information involves any of the events set forth in IM-5250-1 and the public release of the material information is made between 7:00 a.m. to 8:00 p.m.  If the public release of the material information is made outside the hours of 7:00 a.m. to 8:00 p.m, Nasdaq Companies must notify MarketWatch of the material information prior to 6:50 a.m. ET.  As described in IM-5250-1, prior notice to the MarketWatch Department must be made through the electronic disclosure submission system available at www.nasdaq.net, except in emergency situations."  https://listingcenter.nasdaq.com/rulebook/nasdaq/  rules/nasdaq-5200-series.

[54]   *See* Complaint, ¶¶74, 77, 82, 84-85, 124 and Plaintiff's Responses, pp. 5-6.

[55]   Complaint, ¶2; Elon Musk on Twitter.com, August 7, 2018, 12:48 p.m., available at: https://twitter.com/elonmusk/status/1026872652290379776?lang=en.

b) On August 7, 2018 at 1:15 p.m., Musk tweeted "420" when responding to another Twitter user who had asked at what price he would be taking Tesla private.

c) On August 7, 2018 at 2:13 p.m., Musk tweeted "Shareholders could either to [sic] at 420 or hold shares & go private."

d) On August 7, 2018 at 3:00 p.m., Musk tweeted "Yes, but liquidity events would be limited to every 6 months . . . ." when responding to another Twitter user who had asked whether the public could still invest in Tesla once it was private.

e) An email titled "Taking Tesla Private" purportedly from Elon Musk to Tesla employees was published by Tesla on its publicly available blog on August 7, 2018 at 3:22 p.m.

f) Musk forwarded the email titled "Taking Tesla Private" via Twitter at 3:36 p.m., commenting: "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote."[56]

28.     As stated in the MTD,

> … Plaintiff's claim is directed at the phrase that funding was "secured" for a going private transaction at $420 per share.  The statement could be read by a reasonable investor to mean complete funding for the transaction was unconditionally secured.  So read, the statement is not true.  Plaintiff alleges that Mr. Musk and Tesla had not, in fact, secured funding for the transaction to convert Tesla into a private company at the time of this tweet (or ever) …."[57]

29.     In summary, Plaintiff alleges that Musk's and Tesla's statements were false and misleading because:

a) There was no agreement to fund a going private transaction involving Tesla;

b) Musk had not discussed the potential price of $420 with the Saudi Arabian Public Investment Fund  ("PIF") or any other potential investor;

---

[56]   Complaint, ¶2; Elon Musk on Twitter.com, August 7, 2018, 3:36 p.m., available at: https://twitter.com/elonmusk/status/1026914941004001280?lang=en.

[57]   Order Denying Plaintiff's Motion to Convert or, Alternatively, to Strike; Granting Defendants' Request for Judicial Notice; and Denying Defendants' Motion to Dismiss dated April 15, 2020 (the  "MTD"), p. 22.

c)  Musk had not had any further substantive conversations with the PIF since his meeting on July 31, 2018;

d)  Musk had not discussed interest in participating in the transaction with any potential strategic investors;

e)  Musk had not provided Tesla's Board with a specific proposal to take the company private, only a tentative offer with "a lot of uncertainty" that Musk believed only had a 50% likelihood of success;

f)  Musk had not contacted existing Tesla shareholders to assess their interest in participating in the transaction;

g)  Musk had not formally retained any legal or financial advisors to assist with the transaction;

h)  Musk had not determined whether retail investors would be able to remain shareholders but had been advised that it would be unlikely and "unprecedented";

i)  Musk had not determined whether there were restrictions on illiquid holdings by Tesla's institutional investors;

j)  Musk had not determined what regulatory approvals would be necessary for the transaction; and

k)  Musk had no formal agreement, commitment, or plan for Tesla to go private at $420 per share or at any other price.[58]

30.    The MTD also upheld the actionability of an alleged misrepresentation in an August 13, 2018 tweet by Musk that named financial advisors (Silver Lake and Goldman Sachs) for the going private transaction.[59]

31.    There was also an entry posted on Tesla's blog on August 13, 2018 published at 8:59 a.m., purportedly authored by Musk, titled "Update on Taking Tesla Private." (the

---

[58]   MTD, pp. 22-23, citing to Complaint, ¶150; Complaint, ¶¶121, 123, 125, 127, 129, 131, 135, 137 (detailing the above and additional reasons; Plaintiff's Responses, pp. 6-47.

[59]   MTD, p. 26 ("Accordingly, the Consolidated Complaint sufficiently pleads that the August 7, 2018 tweet was a false or misleading statement because funding was not secured.  Mr. Musk's tweet less than a week later (August 13, 2018) continued to send mixed, inaccurate signals to the public by claiming to have hired financial consultants when, in fact, he had not.  Both of these representations were false or misleading.").

It is my understanding that the statement regarding Silver Lake and Goldman Sachs was upheld as a misrepresentation in the MTD.

"August 13 Blog Post"; *see* paragraph 103 below for the full text).  This purported Update on Taking Tesla Private included vague discussions by Defendant Musk on: (1) What has happened so far? (2) Why did I make a public announcement? (3) Why did I say "funding secured"? and (4) What are the next steps?  However, the Court found that this blog post was not "independently actionable as a misleading statement because while it claimed on the one hand that the deal was viable and imminent, it eventually (and truthfully) revealed that the deal was subject to further scrutiny."[60]

32.   In addition, the Complaint states:

> … Musk was deliberately reckless in publishing his tweets and other statements regarding the potential going private transaction.  He published his statements knowing that there were no formal agreements to secure funding or to document a proposal to go private at $420 per share that was ready to be voted on by stockholders.  He did not discuss the content of his August 7, 2018 tweets with anyone else prior to publishing them to his over 22 million Twitter followers and anyone else with access to the Internet.  He also did not inform NASDAQ that he intended to make his initial public announcement, as NASDAQ rules required.[61]

> Musk's conduct represented an extreme departure from the standards of ordinary care, and presented a danger of misleading purchasers or sellers of Tesla securities that was either known to Musk or else was so obvious that Musk must have been aware of it.[62]

> On September 29, 2018, the SEC filed a Complaint against Tesla alleging that it violated SEC Rule 13a-15 issued pursuant to the Securities Exchange Act by failing to maintain adequate controls and procedures over its SEC filings.[63]

33.   In summary, Plaintiff alleges that the Defendants allegedly misled the market by making misstatements concerning taking Tesla private and related follow-on disclosures failed to include important information clarifying the structure of the potential deal, its

---

[60]   MTD, p. 26.

[61]   Complaint, ¶166.

[62]   Complaint, ¶167.

[63]   Complaint, ¶172.

CONFIDENTIAL

funding, the response and purported support of shareholders and the role of the Board. Moreover, once the Musk Tweets were released, Consequential Harm surfaced as to Tesla's lack of adequate internal controls or corporate governance mechanisms in place to prevent such misstatements, and other causally-linked problems emerged, which upon revelation resulted in foreseeable consequences that caused investor losses. This is also consistent with the SEC's complaints against Tesla and Musk, wherein the SEC concluded that the Musk Tweets led to significant market disruption.[64]

### E.  The Alleged Partial Corrective Disclosures and the Event Window

34.    As discussed later, and as described in the Class Certification Report,[65] my analysis is based on the commonly utilized and widely accepted event study methodology. The event study methodology examines the security price reaction to an "event" such as the information released with the Musk Tweets. The event study methodology employs statistical analysis and uses a scientific approach to examine these price movements to determine within a specified degree of certainty whether they are caused by the event being studied. When evaluating the price impact from an event like the Musk Tweets, an appropriate event window is selected to encompass the period over which the event affected the security's price. For example, in the Class Certification Report, I performed an event study relying on data with daily intervals when examining (a) the price movements on the initial day of the Musk Tweets (August 7, 2018), and (b) the price movements on the terminal day of the Class Period when the alleged corrective disclosure revealed to the market the truth about the Musk Tweets (August 17, 2018).[66] Moreover, as I demonstrate in this Damages Report using the results from the event study presented in the Hartzmark Class Certification Report, the price movements following August 7, 2018 were cumulatively larger than what would be expected to be observed by chance.

---

[64]    Complaint, ¶173; Complaint in U.*S. Securities and Exchange Commission vs. Elon Musk* filed September 27, 2018, ¶¶75-77; *Complaint in U.S. Securities and Exchange Commission vs. Tesla, Inc.* filed September 29, 2018, ¶¶32-33.

[65]    Class Certification Report, Appendix E.

[66]    Class Certification Report, ¶¶70-72, 77.

35.   Not only did I evaluate each date and the period as a whole, but in this Damages Report, I have expanded my event study methodology and applied it to numerous events throughout the Class Period with appropriate event windows for each.  For example, I perform an event study to the reaction of the Musk Tweets with an appropriate event window spanning the minute-by-minute intervals from when the first Tweet was sent through the close of trading on August 7, 2018.

36.   I also employ an appropriate event window when examining the alleged price decline that caused losses to investors.  Plaintiff alleges that the price decline in Tesla's common stock commencing on August 8, 2018 caused losses to investors.[67]  Specifically, in the Plaintiff's Responses, Plaintiff describes his contentions regarding damages as follows:

> Damages resulted from artificial inflation introduced and then maintained in the price for Tesla securities by the [Musk Tweets].  The artificial inflation was reduced during the Class Period as a result of questions publicly raised about the potential going-private investigation by financial analysts and journalists, disclosure in the media regarding the circumstances of the August 7, 2018 statements, disclosure of regulatory investigations, and the persistent failure by Elon Musk, Tesla, or the other Defendants to provide additional information regarding the potential going-private transaction except for the [Musk Tweets] despite widespread and public requests for additional information. Members of the class suffered harm when they purchased Tesla securities at an inflated price and then (1) held their Tesla securities to the end of the Class Period, (2) sold their Tesla securities at a lower price reflecting reduced inflation; or (3) used the Tesla stock purchased at an artificially inflated price to close an existing short position.
>
> The [Musk Tweets] also artificially reduced the price of certain Tesla securities and members of the Class suffered harm when they sold those securities at artificially deflated prices.  The artificial deflation was reduced during the Class Period as a result of questions publicly raised about the potential going-private investigation by financial analysts and journalists, disclosure in the media regarding the circumstances of the August 7, 2018 statements, disclosure of regulatory investigations, and the persistent failure by Elon Musk, Tesla, or

---

[67]   MTD, p. 34, citing to Complaint, ¶¶94, 99, 108, 110, 114.

> the other Defendants to provide additional information
> regarding the potential going-private transaction except for the
> [Musk Tweets] despite widespread and public requests for
> additional information.
>
> Members of the class also suffered losses when the price of their
> Tesla securities declined as a result of reputational harm, loss of
> management credibility, and an increase in regulatory and legal
> risk caused by the [Musk Tweets].[68]

37.   Given the immense flow of information throughout the Class Period related to the alleged misstatements in the Musk Tweets, the continued failure by Defendants to clarify the situation, and the revelations related to the Consequential Harm, as explained below, I consider the entire Class Period as an appropriate event window in which to measure investor harm, with separate event windows for the initial positive reaction to the Musk Tweets and a separate event window for the decline in Tesla's stock price after the initial reaction to the Musk Tweets through the end of the Class Period.

38.   As I show below there is substantial evidence that the price movements on August 8, 2018 through August 17, 2018 are inextricably linked to the Musk Tweets.  Thus, given the nature and characteristics of the material, unanticipated information in the Musk Tweets and the lack of detailed information that followed, it was the case that the price impact from the Musk Tweets dominated the price movements throughout the Class Period.

39.   Clearly, a critical part of the financial and news commentary and the reaction of the market prices during the Class Period relates to the *absence* of disclosures of meaningful, reliable and clear information describing the proposed going private transaction.  Following the Musk Tweets on August 7, 2018, there was intense scrutiny from investors, financial analysts, and the media, as well as ultimately the SEC, into the potential going private transaction.  A constant theme of the commentary was the lack of information about the structure of the potential deal, its funding, the response and purported support of shareholders and the role of the Board.  Despite this continuous barrage of questions from market participants, Defendants Musk and Tesla provided no meaningful, reliable and clear information following a brief and relatively non-substantive Board statement issued pre-open on August 8, 2018 to Defendant Musk's blog post on August

---

[68]   Plaintiff's Responses, pp. 85-86.

13, 2018 – four trading days.  Subsequent to the August 13, 2018 Blog Post, disclosures from Defendants Musk and Tesla were sparse and limited to process rather than clarity regarding funding or structure.  This failure to offer meaningful, reliable and clear information persisted over days when the potential going private transaction was one of the most high-profile news stories in the U.S.  The failure to offer meaningful, reliable and clear information steadily contributed to and increased skepticism about the true (and concealed) status of the proposed transaction and the veracity of the Musk Tweets.

40.   I offer further details on the event windows and results in my analysis Sections V and VI of this Report

F.  **Other Indicators of the Importance of the Alleged Misstatements to Investors**

41.   There is a long history of academic research that stresses the importance of strong internal controls and corporate governance mechanisms in assessing the value of a corporation.   In addition, there is academic research that evaluates the impact on a corporation's value related to takeover bids, going private transactions (their success and failure), and the credibility of management statements (their success and failure).   This academic research demonstrates the importance of the alleged misstatements to investors in their valuation of Tesla.

42.   Specifically, there has been extensive peer-reviewed academic literature on the valuation effects on a corporation's stock price that quantifies the reputational harm caused by disclosures of investigations of financial misconduct, including securities-related lawsuits, and regulatory enforcement actions for financial misrepresentation.[69]

43.   Amiram *et al*. (2018) also explain the importance of reputation in economic theory:

> Economists have long realized the importance of trust as a foundation for contracting, exchange, and production.   …

---

[69]   For example, Amiram *et al.* cite to 28 papers published since 1984 measuring the share price impact related to the revelation of financial misconduct.  Dan Amiram, Zahn Bozanic, James D. Cox, Quentin Dupont, Jonathan M. Karpoff and Richard Sloan, *Financial reporting fraud and other forms of misconduct: a multidisciplinary review of the literature*, 23 Rev. Acctg. Stds., 732, 758, footnote 21 (2018) ("Amiram *et al.* (2018)").

> Reputational capital is the present value of the improvement in net cash flow and lower cost of capital that arises when the firm's counterparties trust that the firm will uphold its explicit and implicit contracts and will not act opportunistically to their counterparties' detriment.[70]

44.     Karpoff *et al.* (2008) succinctly describe the theory on the effect of reputation loss such as those at issue in this case:

> … the revelation of misconduct can have real effects on the firm's cost and operations.  We refer to the present value of such effects as the firm's reputation loss.  Reputation can be lost if customers change the terms on which they are willing to do business with the firm because of an increased probability of cheating or the perception that the firm cannot support warranties or supply compatible parts in the future.  Diminished reputation also can reflect an increase in the firm's cost of capital or trade credit, as input suppliers change the terms with which they do business with the firm.  In addition, the firm can suffer real losses as managers are required to divert resources to the investigation and away from company business.  The revelation of financial reporting problems could also force the firm to implement new monitoring and control policies, increasing the cost of operations.  We group all such real effects on firm value into the reputation loss.[71]

45.     Jiraporn *et al.* (2004) document that, consistent with prior studies, the stock market reacts negatively to the withdrawal announcement in a management buyout ("MBO"), *i.e.,* a failed attempt to go-private:

> The stock market responds negatively when an MBO that was announced earlier is cancelled.  The two-day cumulative abnormal return over the day before and the day of the announcement is -2.41 percent and statistically significant at the 1 percent level, suggesting that shareholders, on average, lose 2.41 percent of their wealth over the two-day period.  The evidence shows that cancelling an MBO is viewed as detrimental to shareholders.  This evidence is consistent with DeAngelo, DeAngelo and Rice (1984).  Using a sample of 18

---

[70]   Amiram *et al.* (2018) at 757-758.

[71]   Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43 Jnl. Finl. & Quant. Analysis, 581, 598-599 (2008) (citation omitted) ("Karpoff *et al*. (2008)").

withdrawn MBO's from 1973 to 1980, DeAngelo, DeAngelo and Rice (1984) document adverse stock market reactions to the withdrawal announcement.  Lee (1992) and Marais, Shipper, and Smith (1989) also report similar negative reactions for their samples of MBO withdrawals.  Our study uses a more recent sample and produces similar results.[72]

46.    In summary, academic research supports the conclusion that if Plaintiff is successful in proving that the Defendants allegedly misled the market by making misstatements concerning taking Tesla private, its subsequent revelation would communicate important information concerning the lack of adequate internal controls or corporate governance mechanisms in place to prevent such misstatements, and there would be a material impact on the value of the corporation and foreseeable investor losses.  In other words, there would be Consequential Harm upon the failure of the actions proposed in the Musk Tweets stemming from a loss of management credibility and ongoing distrust in Tesla's public statements.  In addition, there are well known negative consequences from making false public statements as a publicly traded company, primarily the increased regulatory scrutiny from the SEC, as well as the potential for litigation from both the SEC and private investors.  The price impact from this Consequential Harm could be anticipated to be particularly strong in the case of Tesla, which is so dependent on Defendant Musk for publicity and is so closely associated with him.

## V.    ECONOMIC MATERIALITY OF THE INFORMATION REVEALED DURING THE CLASS PERIOD

### A.  Introduction

47.    Materiality or whether the revelation of the misrepresented or omitted information would likely have altered the total mix of information available to investors is a fact question to be answered at trial.  However, from an economic perspective, it is reasonable to conclude that the information disseminated throughout the event window, with its series of alleged partial corrective disclosures, and the absence of information

---

[72] Pornsit Jiraporn, Wallace N. Davidson III and Hong Qian, *MBO Withdrawals and Determinants of Stockholders' Wealth*, 42 Qtrly. Jnl. Bus. & Econ., –13, 23 (2004) ("Jiraporn *et al.* (2004)").

clarifying the Musk Tweets would be considered important to investors because the disclosures (or lack thereof) directly related to the alleged misstatements made by Defendants, and thus would be expected to impact the performance of Tesla's common stock, options and Notes.  In any case, I evaluate whether there is evidence supporting this conclusion that "there [was] a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having substantially altered the 'total mix' of information made available."[73]

48.   My investigation about whether (a) the alleged misrepresentations and/or omissions in the Musk Tweets and related disclosures, and (b) the Consequential Harm were material, is broken into three parts.

49.   In the first part, I describe the information (or lack thereof) released throughout the Class Period related to the Musk Tweets (including the Consequential Harm) along with certain empirical results from my event study analyses.  Next, I use these analyses, along with an evaluation of other factors, to determine whether the alleged misstatements and information disclosed related to the Consequential Harm were economically material.  Finally, in the third part in Section VI, I investigate loss causation to isolate and quantify the impact of the alleged misstatements and information disclosed related to the Consequential Harm on the price decline during the Class Period event window, including adjusting for market and industry influences and accounting for any potentially confounding information, to estimate the level of artificial inflation in Tesla common stock.  I then separate and calculate the levels of artificial inflation in Tesla common stock caused by the misstatements in the Musk Tweets and related disclosures and those caused by information disclosed related to the Consequential Harm.  Finally, I make any adjustments necessary to reliably account for day-by-day or minute-by-minute changes in the magnitude of artificial inflation in Tesla common stock over the Class Period.

---

[73]   *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988).

50.    In later sections of this Damages Report, I then apply the results of my analyses of artificial inflation in Tesla common stock to calculate the levels of artificial inflation (deflation) in Tesla Notes, as well as call and put options on Tesla common stock.

**B.  Overview of Information Revealed During the Class Period**

51.    The Class Period in this action begins at 12:48 p.m. ET on August 7, 2018, when Defendant Musk tweeted:

> **Am considering taking Tesla private at $420.   Funding secured.**[74]

52.    The Class Period ends on August 17, 2018, after the publication of a *New York Times* article ("*NYT* Article") that Plaintiff alleges:

> …reported that the Public Investment Fund had not committed to provide any cash, so funding was not "secured."  *The New York Times* article further disclosed that no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it indicating that no going private transaction was imminent.[75]

53.     During the Class Period, there was a large flow of news and information released related to the question of Defendant Musk taking Tesla private, with some of the major topics being:

a)  whether or not funding was secured for the transaction;

b)  company news and actions about going private;

c)  whether or not there was shareholder support;

d)  articles about funding by the PIF and other potential sources of funding; and

e)  articles about advisors providing services to Musk and Tesla and the process followed both before and after the Musk Tweets.

54.    In addition, during the Class Period, there was a large amount of news and information released related to the Consequential Harm that surfaced after the Musk

---

[74]   Complaint, ¶74 (emphasis added); Elon Musk on Twitter.com, August 7, 2018, 12:48 p.m., available at: https://twitter.com/elonmusk/status/1026872652290379776?lang=en.

[75]   Complaint, ¶6.

Tweets, which are inextricably bound and causally linked to the Musk Tweets, with some of the major topics being:

   a)   lawsuits filed against Tesla and Musk due to the Musk tweets;

   b)   information about the SEC probing and investigating the accuracy of the Musk tweets;

   c)   apparent failure to comply with NASDAQ rules;

   d)   lapses in internal controls that purportedly existed in Tesla, such as the failure to review the Musk Tweets before they were published;

   e)   lapses in corporate governance at the Company; and

   f)   loss in credibility and reputation of Tesla management and the Board of Directors.

55.   **Appendix 3** is a summary of some of the main news related to the Musk Tweets and follow-on disclosures and the Consequential Harm.

56.   As discussed in the Class Certification Report, there was a voluminous amount of media coverage during the Class Period, with approximately 2,400 articles obtained from a search of Factiva and over 500 Bloomberg News or Bloomberg First Word articles based on a search of Bloomberg.[76]   Based on my review of these headlines, the predominant news coverage over the Class Period related to the going private transaction, with approximately 70% of the article titles related in some way to the going private transaction or its funding.[77]   In addition, based on available analyst reports, the analyst reports' coverage also thoroughly (and almost exclusively) discussed the going private transaction.

---

[76]   Class Certification Report, ¶32 and Appendix D.

[77]   Based on a review of news article headlines in **Appendix 14**, after excluding duplicate headlines (matching on date of article and headline), and including headlines that contain terms such as "private," "fund," "Musk," "tweet," "lawsuit," "SEC investigation," and *The New York Times* interview of Musk published on August 16, 2018, amongst other headlines considered related to the going private transaction and possible funding.  **Appendix 14** is Appendix D to the Class Certification Report that has been supplemented with articles in Bloomberg (based on a search of Bloomberg News or Bloomberg First Word articles for "Tesla Inc" with medium relevance), *The Financial Times* and Seeking Alpha, as well as with Musk tweets and blog posts that were provided by Counsel.

57.    The news and analyst coverage following the Musk Tweets was also notable for a lack of information sourced from Defendants Musk or Tesla.  After the Musk Tweets on August 7, 2018, the independent directors of the Tesla Board issued a rather brief press release pre-open on August 8, 2018 which merely stated:

> Last week, Elon opened a discussion with the board about taking the company private.  This included discussion as to how being private could better serve Tesla's long-term interests, and also addressed the funding for this to occur.  The board has met several times over the last week and is taking the appropriate next steps to evaluate this.[78]

58.    The press release gave no substance regarding the proposed transaction such as funding or structure.  Following this press release, Defendants Musk and Tesla were silent with no direct communications or formal disclosures regarding the proposed going private transaction until August 13, 2018.  Thus, for, nearly a week that covered four trading days where Tesla stock and options were being actively traded, there were numerous unanswered questions that abounded about the proposed going private transaction.

59.    Tesla finally published the blog post on August 13, 2018 providing an update on going private, and the following day the Tesla Board announced the formation of a Special Committee.  Other than these disclosures, no further details regarding Defendant Musk's proposal, the source or amount of funding, or a proposed structure for a going private transaction were disclosed.  Indeed, no further information was provided by Defendants Musk or Tesla regarding the proposed going private transaction until *after* the Class Period.

60.    The ***absence*** of information from Defendants Musk and Tesla contributed to investors uncertainty, with financial media and analysts focusing on gossip, speculation, and rumor by, and an increased skepticism about the veracity of the Musk Tweets and the true substance of the proposed deal — especially as seemingly straightforward information such as the source of the "secured funding" that was not confirmed by Defendants Musk

---

[78]   "Statement from the following members of Tesla's Board of Directors: Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch," GlobeNewswires, August 8, 2018, 9:00 a.m.

or Tesla. This can clearly be seen in analyst commentary (as summarized below) and was reflected in Tesla's securities prices.

61.  Given the critical importance of the Musk Tweets and follow-on information (or lack thereof) that led to widespread speculation regarding the potential going private transaction, including its possible funding, corporate governance and regulatory issues raised due to the Musk Tweets, it is my opinion that it is reasonable and appropriate to consider the entire 10-calendar-day Class Period from August 7, 2018 (at 12:48 p.m.) to August 17, 2018 (at the market close of 4:00 p.m.) as the proper "event window" to evaluate for the purposes of examining loss causation.[79]  As discussed later, I sub-divide this event window into two separate periods of analysis: (i) the initial positive reaction the Musk Tweets on August 7, 2018 starting at 12:48 p.m.; and (ii) the decline in Tesla's stock price from the close on August 7, 2018 through the end of the Class Period on August 17, 2018.

62.  In the Class Certification Report, I described the event study methodology.[80] In the event study methodology, the event window is the period of interest over which the impact (or lack thereof) of an event is measured.  Academics will expand an event window to include the time over which the event of interest may affect the subject company's security prices.  Thus, given the ongoing continuous flow of news, analyst reports, frequency of corporate and other disclosures and trading volume (which is a proxy for the

---

[79]  Throughout this Damages Report I will refer to "4:00 p.m.," "the market close," and "the closing of trade," "the end of the trading day" interchangeably as the end of the trading day for common stocks on U.S. stock exchanges.

[80]  Class Certification Report, ¶¶61-63 and Appendix E.

CONFIDENTIAL

flow of information)[81] throughout the Class Period,[82] it is my opinion that it is appropriate to look at the entire Class Period as one event window.

63.     When using a longer event window, it allows the researcher to capture the full effect of the event, but it also adds to the possibility that information unrelated to the event may be impacting the subject security's prices.  Therefore, when analyzing loss causation and calculating artificial inflation in this matter, I account for any such unrelated information that may have affected Tesla's security prices.  This includes adjusting for market-wide and industry influences as well as accounting for Tesla-specific confounding information.

## 1.     Empirical Event Study Results for the Class Period Event Window

64.     The first period of the Class Period I analyze is the initial positive reaction to the Musk Tweets on August 7, 2018.  As of 12:47 p.m. on August 7, 2018, just prior to the start of the Class Period (at 12:48 p.m.), Tesla's stock price was $356.85 per share.[83]  At 12:48 p.m. on August 7, 2018 the Musk Tweets began to be disseminated, which caused the price of Tesla common stock to rapidly increase such that it closed the trading day at

---

[81]   For example, *see* Class Certification Report, ¶¶82-85 (citing to Jonathan M. Karpoff, *The Relation between Price Changes and Trading Volume: A Survey*, 22 J. of Fin. and Quantitative Analysis, 109 (1987); William H. Beaver, *The Informational Content of Annual Earnings Announcements*, 6 J. of Accounting Research, 67 (1968); Daniella Acker, *Implied Standard Deviations and Post-Earnings Announcement Volatility*, 29 J. of Bus., Fin. and Accounting, 429 (2002).

[82]   The average daily trading volume of Tesla's common stock over this period was 15.1 million shares, while average daily trading volume over the prior 120 days was 8.3 million shares (*see* Class Certification Report, Appendix C).  The average daily trading volume of Tesla's call and put stock options over this period was approximately 197,000 and 178,000, respectively (based on total Class Period option volume divided by nine trading days, *See* Hartzmark Class Certification Report, Exhibit XI), while average daily trading volume over the prior 120 days was approximately 104,000 and 93,000, respectively (based on Bloomberg data fields "Volume_Total_Call" and "Volume_Total_Put").  The average daily trading volume (in face value) of Tesla's for Notes over this period was $29.4 million, $37.7 million, $28.3 million, and $48.5 million for the 2019 Note, 2021 Note, 2022 Note, and 2025 Note, respectively, while average daily trading volume over the prior 120 days was $11.2 million, $14.7 million, $13.7 million, and $20.5 million for the 2019 Note, 2021 Note, 2022 Note, and 2025 Note, respectively.

[83]   Based on Bloomberg intraday data, GIT function, 1-minute intervals (closing price for 1-minute interval 12:47-12:48).

$379.57 per share.[84]   As detailed in the Class Certification Report, this $22.72 per share increase of 6.37%, which after adjusting for market and industry effects is an abnormal price increase of $23.27 or 6.52% is statistically significant at the 1% level.[85]

65.   Other than for a few minutes in early trading on August 8, 2018, for the remainder of the Class Period after August 7, 2018, Tesla's stock traded at prices lower than $379.57,[86] closing on August 17, 2018 at $305.50 per share.[87]   Based on the information (or lack of information) released from the close of August 7, 2018 through the close of August 17, 2018, I analyze the price reaction over this entire period.   The 8-day return from the close on August 7, 2018 through the close of August 17, 2018 is *negative* 19.5%, with a cumulative abnormal return that adjusts for market and industry influences of *negative* 17.6%, which is statistically significant at the 5% level.[88]   It is my opinion that

---

[84]   Based on Bloomberg intraday data, GIT function, 1-minute intervals (closing price for 1-minute interval 15:59-16:00), I refer to this as Bloomberg GIT data.

[85]   Class Certification Report, ¶75; the abnormal return is based on compounded one-minute level abnormal returns over the 192-minute period (including a trading halt).   The calculation of intraday abnormal returns throughout this Damages Report follows the same procedure described in the Class Certification Report.   For this analysis, I obtain one-minute interval returns on August 6, 2018 for Tesla, the XCMP Index and the DJUSAP index from Bloomberg GIT data (based on closing prices at each minute interval).   I remove Tesla's return from the DJUSAP index per my methodology in Appendix E to my Class Certification Report.   I run a market model of the one-minute returns on August 6, 2018 to obtain beta estimates for the market and industry.   These beta estimates are applied for each 1-minute interval to obtain abnormal returns for each minute (I also calculate a minute level return from the open price obtained from Bloomberg to the first minute interval closing price).   Over a specified interval, I compound the one-minute level abnormal returns to obtain a cumulative abnormal return for a given period.   I calculate t-statistics for the cumulative abnormal return by dividing it by the product of the standard error of the August 6, 2018 minute-level regression and the square root of the number of minutes in the specified interval.   I calculate the two-tailed p-value of the t-statistic based on 386 degrees of freedom.

[86]   According to Bloomberg, the high price for Tesla's stock on August 8, 2018 was $382.64. Based on Bloomberg one-minute level GIT data, Tesla's stock price was $382.55 at the close of the 10:10-10:11 a.m. interval on August 8, 2018 and had a high trading price of $382.64 in both the 10:10-10:11 and 10:11-10:12 a.m. intervals.

[87]   Based on daily close prices.

[88]   The cumulative abnormal return is calculated by compounding the daily abnormal return.   The confidence level is calculated based on a t-statistic that is calculated by dividing the cumulative abnormal return by the product of: (i) the daily standard error of the market model regression; and (ii) the square root of 8 (the number of trading days).

it is reasonable and appropriate to consider the entire Class Period as the relevant event window based upon:

    a) the economically material, including statistically significant (below the 5% level), stock price increase after the Musk Tweets starting at 12:48 p.m. through the close on August 7, 2018;

    b) the economically material, including statistically significant (below the 5% level), stock price decline from Tesla's August 7, 2018 close through its August 17, 2018 close;

    c) the high level of trading volume after the Musk Tweets starting at 12:48 p.m. through the close on August 7, 2018;

    d) the high level of trading volume over the remainder of the Class Period;

    e) scrutiny of regulatory agents/agencies related to the Musk Tweets over the Class Period;

    f) focus of the Tesla Board of Directors and other Tesla personnel on the Musk Tweets;

    g) substantial analyst coverage related to the Musk Tweets over the Class Period; and

    h) substantial news coverage related to the Musk Tweets over the Class Period.

66.    For the purposes of examining loss causation and calculating damages, I divide the Class Period into two time intervals. The initial "Tweets Interval" covers the period commencing on August 7, 2018 immediately after the Musk Tweets started at 12:48 p.m. to the market close at 4:00 p.m. on August 7, 2018.[89] The second "Corrective Interval" covers the period from the market close on August 7, 2018 through the market close at 4:00 p.m. on August 17, 2018.[90] **Table 4** shows daily statistics based on my event study over the Corrective Interval, with extremely active trading throughout the Class Period.

---

[89]    I note that the convertible Notes also increased in value during the initial Tweets Interval. The options call prices generally increased in the initial Tweets Interval, except for longer term call options that decreased (which will be discussed below), while the put prices declined. *See* Expert Report of Steven L. Heston, Ph.D., November 8, 2021 (the "Heston Report"), ¶¶13-14.

[90]    I note that the convertible Notes also decreased in value during the Corrective Interval. The options call prices generally decreased during the Corrective Interval, while the put prices generally increased.

**Table 4[91]**

| Date | Volume | Price | Return | Abnormal Return | Cumulative Return | Cumulative Abnormal Return |
|---|---|---|---|---|---|---|
| 8/7/2018 | 30,875,768 | $379.57 | | | | |
| 8/8/2018 | 24,571,163 | $370.34 | -2.43% | -2.36% | -2.43% | -2.36% |
| 8/9/2018 | 17,183,811 | $352.45 | -4.83% | -4.67% | -7.14% | -6.92% |
| 8/10/2018 | 11,552,044 | $355.49 | 0.86% | 2.11% | -6.34% | -4.96% |
| 8/13/2018 | 10,463,881 | $356.41 | 0.26% | 0.95% | -6.10% | -4.06% |
| 8/14/2018 | 6,986,427 | $347.64 | -2.46% | -3.32% | -8.41% | -7.24% |
| 8/15/2018 | 9,101,258 | $338.69 | -2.57% | -0.71% | -10.77% | -7.89% |
| 8/16/2018 | 6,064,033 | $335.45 | -0.96% | -1.54% | -11.62% | -9.31% |
| 8/17/2018 | 18,958,612 | $305.50 | -8.93% | -9.10% | -19.51% | -17.56% |

67.     I next discuss in more detail the information released throughout each day of the Class Period.

## 2.     August 7, 2018 and the Tweets Interval

### a)     The Rapid Reaction to the Information in the Musk Tweets

68.     On Tuesday, August 7, 2018, Tesla's CEO, Elon Musk, tweeted at 12:48 p.m.:

**Am considering taking Tesla private at $420.   Funding secured.**[92]

69.     This tweet caused an immediate price reaction in Tesla's stock, with Tesla's stock price increasing to $365.03 per share (just prior to 12:49 p.m.) from $356.85 per share (just prior to 12:48 p.m.) on volume of over 800,000 shares in this first minute of trading after the Musk Tweets.[93]   Tesla's stock continued to be heavily traded on August

---

[91]   Source: Class Certification Report, Appendix F.

[92]   Elon Musk on Twitter.com, August 7, 2018, 12:48 p.m., available at: https://twitter.com/elonmusk/status/1026872652290379776?lang=en.

[93]   Based on Bloomberg GIT data (closing prices for 1-minute intervals 12:47-12:48 and 12:48-12:49, and volume for 1-minute interval 12:48-12:49).

7, 2018 with volume of over 10 million shares until a trading halt at 2:08 p.m.,[94],[95] when the price was $367.25.[96]

      70.   Defendant Musk made further tweets during the August 7, 2018 trading day, as well as sending an email to employees at 3:16 p.m.[97]  This email was then subsequently posted on a public Tesla blog that was linked by Musk in a tweet at 3:28 p.m.[98]  In the email, Defendant Musk explained his reasons for wanting to take Tesla private, including asserting that Tesla was "the most shorted stock in the history of the stock market" and stating that "being public means there are large numbers of people who have incentive to attack the company."[99]  Then at 3:36 p.m. Defendant Musk tweeted:

> **Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote.**[100]

---

[94]   "Tesla Inc. (TSLA) Halted due to pending news," Dow Jones Institutional News, August 7, 2018, 2:08 p.m.  A later news article reported "Update, 11:14 p.m. PT: NASDAQ has halted Tesla's trading at 2:08 p.m. Eastern for 'pending news' following Musk's tweet."  See "Elon Musk 'considering' taking Tesla private, trading resumed," CNET News.com, August 7, 2018.

[95]   I note that Nasdaq can halt trading "when a company has pending news that may affect the security's price (a "news pending" halt or delay)."  See "Trading Halts and Delays," available at https://www.sec.gov/fast-answers/answerstradinghalthtm.html.  Nasdaq rules also state: "In circumstances in which Nasdaq deems it necessary to protect investors and the public interest, Nasdaq, pursuant to the procedures set forth in paragraph (c): (1)   may halt trading on Nasdaq of a Nasdaq-listed security to permit the dissemination of material news."  See Nasdaq rule 4120.   Limit Up-Limit Down Plan and Trading Halts available at https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/nasdaq-equity-4.

[96]   Based on Bloomberg GIT data (sum of volume of 1-minute intervals starting 12:49 through 14:08; closing price for 1-minute interval of 14:08-14:09).

[97]   Complaint, ¶84; SPACEX_LITTLETON_00000127.

[98]   Elon Musk on Twitter.com, August 7, 2018, 3:28 p.m., available at: https://twitter.com/Tesla/status/1026912973120462848 and blog post on Tesla website available at: https://www.tesla.com/blog/taking-tesla-private.

[99]   Elon Musk on Twitter.com, August 7, 2018, 3:28 p.m., available at: https://twitter.com/Tesla/status/1026912973120462848 and blog post on Tesla website available at: https://www.tesla.com/blog/taking-tesla-private.

[100]   Elon Musk on Twitter.com, August 7, 2018, 3:36 p.m., available at: https://twitter.com/elonmusk/status/1026914941004001280?lang=en.

71.    Tesla stock resumed trading at approximately 3:45 p.m.,[101] quickly increasing to over $386 per share before closing at $379.57 per share with additional volume of over 6 million shares.[102]

72.    During and after market trading hours on August 7, 2018, news articles reported that the Musk Tweets caused an increase in Tesla's share price on August 7, 2018, for example:

> "Am considering taking Tesla private at $420.   Funding secured," Tesla CEO Elon Musk says in tweet.  **Tesla climbs to session high, up 8.2%, on Musk's tweet**.[103]

*****

> **Tesla Inc. (TSLA) jumped as much as 8% midday Tuesday after Chief Executive Elon Musk tweeted he was "considering" taking the Silicon Valley car maker private at $420 a share**.   "Funding secured," the tweet continued, garnering calls to "dewit" and love yous from Musk supporters on Twitter.   The price would represent a 16% upside from Tuesday's prices.[104]

*****

> **Tesla shares jumped after midday on Tuesday following a tweet by Chief Executive Elon Musk that he was considering taking the electric automaker private**.   Shares were up 5.9 percent to $361.87 around 1700 GMT after spiking to $371.15 shortly after Musk's tweet.[105]

*****

---

[101]   "Tesla Inc. (TSLA) Resumed Trading," Dow Jones Institutional News, August 7, 2018, 3:45 p.m.

[102]   Based on Bloomberg GIT data (minute-level intervals starting 15:44 through 15:59).

[103]   "Tesla Jumps After Musk Tweets He Could Take Co. Private at $420," Bloomberg News, August 7, 2018, 1:00 p.m. (emphasis added).

[104]   "Tesla's Musk Tweets He's 'Considering' Taking Company Private – MarketWatch," Dow Jones Institutional News, August 7, 2018, 1:07 p.m. (emphasis added).

[105]   "Tesla shares jump on Musk tweet on taking company private," Agence France Presse, August 7, 2018, 1:09 p.m. (emphasis added).

What's in a tweet?  About $500 million of potential losses to short sellers, when it comes to Tesla's Chief Executive Officer Elon Musk.  **A tweet that he's considering taking the company private "at $420" sent an already elevated stock higher**.  From around $355 it jumped above $371 just after the post, before the gains were pared.[106]

\*\*\*\*\*

The Nasdaq rose for a sixth day in a row, its longest winning streak since March, led by Tesla Inc., which **spiked following a tweet from Chief Executive Elon Musk that he was considering a move to take the company private, which was followed by confirmation from the company**.[107]

\*\*\*\*\*

Key takeaways from the TOPLive blog on Tesla Inc. after CEO Elon Musk tweeted he's considering taking the automaker private.

**Elon Musk tweeted that he wants to take Tesla private at $420 a share and said he had "funding secured."**

**Shares initially rose as much as 8% until trading was halted for an hour and a half.**

Musk in a series of tweets said he doesn't have a controlling vote and wouldn't expect any shareholder to have one if the company goes private.  He said people could still invest in Tesla once it's private.

Musk later put out a letter that, in essence, said that the company would be better off focusing on its goals without the scrutiny of investors and the "attacks" from short sellers.

Still, Musk said, a final decision hasn't been made.

Investors and analysts, even Musk himself, all seemed a little uncertain whether this will happen.  The same with the market: Tesla shares closed up 11% to $379.57.  That was a great run,

---

[106]   "Afternoon of Terror for Tesla Shorts Fomented by Musk's Tweet," Bloomberg News, August 7, 2018, 1:54 p.m. (emphasis added).

[107]   "MW UPDATE: Stocks close higher as earnings news trumps trade-war fear; Tesla soars 11% on Musk's going-private tweet," MarketWatch, August 7, 2018, 4:39 p.m. (emphasis added).

but still about $40 shy of what Musk would want to offer shareholders to get a deal done.  Shares were coming down by about $5 in after-market trades.[108]

*****

**Going private, Musk said, would end "negative propaganda from shorts," referring to his hated short-sellers**.  Around 3:30 ET, Tesla released a statement via its blog, titled "Taking Tesla Private."  It contained a letter from Musk sent to Tesla employees. … **Musk then tweeted the blog post with his own commentary.  "Investor support is confirmed**.  Only reason why this is not certain is that it's contingent on a shareholder vote," he said.[109]

*****

Shares of Tesla were halted in afternoon trading on Tuesday after CEO Elon Musk tweeted that he's considering taking the electric car company private at $420 a share - a significant jump from the stock's current price of roughly $379.

**Musk said the take-private transaction has received investor support** and now rests on a shareholder vote in order for it to become official.[110]

73.   Analysts also commented on the Musk Tweets, for example:

**Shares up 6% on tweet from CEO**

• Tesla's Chairman and CEO, Elon Musk, tweeted that he is "considering taking Tesla private at $420," and that he has "Funding secured."

• This tweet epitomizes the reason we have a HOLD rating on Tesla shares and not a Buy.  If true, and his account was not

---

[108]   "Crazy Ride for Tesla Watchers as Musk Tweets: TOPLive Takeaways," Bloomberg First Word, August 7, 2018, 4:25 p.m. (emphasis added).

[109]   "Elon Musk tweets a lot.  This time was different," CNN Wire, August 7, 2018, 6:09 p.m. (emphasis added).

[110]   "Is Tesla going private?  Elon Musk claims 'investor support is confirmed' after tweeting plans to privatize at $420 per share, in shock announcement that HALTED the stock for almost two hours," Mail Online, August 7, 2018, 6:41 p.m. (emphasis added).

hacked, this reinforces the rationale behind our market neutral stance.

• As the company matures or on pullbacks we would look to become more constructive but remain on sidelines at current levels.[111]

***** 

Tesla CEO Elon Musk tweeted around midday on Aug. 7 the following: "Am considering taking Tesla private at $420. Funding Secured." A buyout price of $420 per share would be for about $71.6 billion based on the July 27 outstanding share count of 170.6 million in the latest 10-Q filing, though it's unclear if Musk's roughly 22% ownership stake would be part of the deal or just converted into equity of a new private company. **If a deal is announced and we think its execution is more likely than not**, we will raise our fair value estimate to the deal price, but for now we are leaving our fair value estimate of $179 in place.

We find it odd that Musk would disclose that he is considering doing a deal and specifying a price rather than not saying anything until Tesla actually announces it is going private. **It is possible that he wants to hurt short sellers of Tesla now**. He has been very vocal against them recently, including posting a satire video on Twitter on Aug. 5. We think it is also possible that he wants to get a price higher than $420, else we would expect him to simply announce he is considering going private with funding secured and leave the $420 number out of the tweet. **We speculate that the funding comes mostly from tech investors, such as possibly SoftBank or Tencent (the latter bought 5% of Tesla in 2017), sovereign wealth funds, and wealthy Silicon Valley investors**.[112]

***** 

This is out there even for Tesla

---

[111] Canaccord Genuity, *Shares up 6% on tweet from CEO*, August 7, 2018, 1:52 p.m. (source of timestamp: Capital IQ).

[112] Morningstar, *Musk Tweets Tesla May Go Private at $420 a Share but Stockholders May Not Have to Sell at That Price*, August 7, 2018, 3:06 p.m. (source of timestamp: Capital IQ; emphasis added).

Elon's tweet and blog post around going private at $420/share was certainly a disruptor this afternoon.  What was looking to us to be a quiet afternoon digesting the earnings results of auto rental companies was disrupted by Elon Musk's tweet …

**We're not clear where the funding would come from – would have to be largely equity**

Buyout would require ~$70bn - ~$60bn for equity and ~$10bn to take out debt.  With 145mn shares (including shares for comp, but subtracting Musk's 34mn shares), a buyout at $420/share would require $60bn to take out all public shareholders.  Even with the Saudi fund taking a 3-5% stake (see "Tesla shares move higher on Saudi Arabia fund stake" FT, Aug 7, 2018), that leaves a large funding gap.

And credit markets may not be that receptive.  The Tesla unsecured bonds trade at a yield of ~6.7% -- so even if say $40bn could be financed in the high yield market (never mind old fashioned things like interest coverage ratios), the annual interest bill would consume $2.7bn in cash.  …

And not clear how public shareholders stay in a private company.  Musk promised that existing shareholders "can stay investors in a private Tesla" – but we're not clear how that would work under current registration rules/caps on non-accredited and total investors (the JOBS act requirement) – although Musk hinted at a special purpose vehicle structure that might be able to avoid the caps.[113]

\*\*\*\*\*

Earlier today, CEO Elon Musk started tweeting about "considering taking Tesla private at $420/share.  Funding secured." This was later followed up with a letter to employees detailing the rationale.  The structure would apparently be to create a special purpose fund enabling current shareholders to remain shareholders or cash out at $420.  This would be subject to a shareholder vote.  …

Success of consummation contingent on who goes along for the ride.  The ability to convince shareholders to stay involved is likely critical to the success of Tesla going private which would be the biggest buyout in history (over $70bn).  Musk owns

---

[113]   Barclays, *Musing about going private is the latest strange twist*, August 7, 2018, 4:57 p.m. (source of timestamp: Capital IQ; emphasis added and omitted).

~20% of the shares, so all else equal, they may need to get committed financing for the remaining ~80% (~$57bn). **Given Tesla's financials, we don't believe lenders would sign up to support the deal.** …

And there are some chunky page 1 holders that collectively make up ~30% of the shares. However, some of those holders may not be able to hold Tesla (or as much as they currently hold) should Tesla go private. A preliminary review of some of the big mutual fund holders indicates holding limits on illiquid securities. At the very least it could cause broader portfolio reviews. That's not to say that a private Tesla can't find its way into other funds at those holders.

**Elon's tone and messaging regarding a potential transaction lead us to believe that there could be significant outside funding lined up.** Learning who this is will be important (and relevant for shareholders deciding whether they should stay involved should the deal consummate). We note an unconfirmed FT article from today indicates that Saudi Arabia's sovereign fund took a 3-5% stake on the public markets, it was also noted they approached Tesla about new shares. **In our view, sovereign funds (broadly), cash rich tech companies, Chinese sources and large VCs could all be potential candidates to provide funding**.[114]

*****

Earlier today, CEO Musk tweeted that he is "considering" taking TSLA private at $420/share and noted funding was secured. Following his tweet, an email sent to employees was shared publicly outlining the motivation including noting that volatile stock prices are distracting to TSLA employees.

**Disclosure method in question** Typically, a company would disclose this kind of news via a detailed press release while the market is closed or halt their stock in advance of the announcement. **Disclosing news of this nature via twitter is unprecedented and, according to a former SEC chairman, may constitute fraud if Tesla does not already have the financing lined up.** The deal would likely require participation from numerous banks and institutional investors, and we think

---

[114] RBC Capital Markets, *On Tesla $420*, August 7, 2018, 8:53 p.m. (source of timestamp: Capital IQ; emphasis added and omitted).

- 44 -
CONFIDENTIAL

it likely that news of the deal would have leaked had Tesla already held discussions to secure funding.

**Post announcement, shares closed at ~$380, with the take-out price implying ~10.7% upside from here. In past deals that terminated adversely, ~70% trade down over 10% with 1/3rd trading down more than 30%.**[115]

*****

Even if no deal for Tesla materializes, the stock bounce following Mr. Musk's tweet could help the company preserve needed cash. Tesla has more than $1.1 billion in convertible bonds that will come due over the next seven months absent a sustained rise in its share price.

That starts with $230 million of convertible bonds set to mature in November if its stock doesn't reach a conversion price of $560.64, followed by $920 million that mature in March, if shares remain below the trigger price of $359.87.

The March notes would be convertible into Tesla stock instead of redeemable for cash -- a scarce resource for the company.[116]

74.     As will be discussed in detail below, news articles also reported on the chance that Defendant Musk would be successful taking Tesla private. For example:

According to Gene Munster of Loup Ventures, **Musk has a one-in-three shot of taking Tesla private**, given the 16% premium he would pay to shareholders. … "Fundamentally, Tesla is not a good LBO candidate given it's not profitable, not cashflow heavy, and has high R&D and capex. However, the structure of the pending deal is unknown and may not take the form of an LBO."[117]

---

[115] UBS Securities, *A Disruptive Approach to Disclosing Material Info*, August 7, 2018, 10:28 p.m. (source of timestamp: Capital IQ; emphasis added and in original).

[116] "Elon Musk Says in Tweet He Is Considering Taking Tesla Private -- 3rd Update," Dow Jones Institutional News, August 7, 2018, 4:51 p.m.

[117] "Musk Makes Startling Proposal to Take Tesla Private," The Deal August 7, 2018. *See also*, "MUSK HAS '1 IN 3 CHANCE' OF TAKING TESLA PRIVATE: GENE MUNSTER," Bloomberg First Word, August 7, 2018 , 1:42 p.m. (emphasis added).

3.     **Stock Price Movements on August 7, 2018**

75.   **Chart 1** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 7, 2018.

**Chart 1**



a)     **Accounting for the *Financial Times* report that a fund from Saudi Arabia was investing a large amount in Tesla**

76.   News articles also reported, and my empirical results from my minute-by-minute event study confirmed, that Tesla's stock price increased on August 7, 2018 after news at 12:17 p.m. (approximately 30 minutes prior to the start of the Class Period at 12:48 p.m.), when the *Financial Times* reported that a fund from Saudi Arabia was investing a large amount in Tesla (the "*FT* Article").[118]   In the 10-minute interval between 12:17 p.m.

---

[118]   "Saudi Arabia's sovereign fund builds $2b Tesla stake," *The Financial Times*, August 7, 2018 (It is my understanding from Counsel that the source code for the article shows that it was published at 16:17:28 GMT, indicating publication at 12:17 pm ET).  News outlets reported on the price movements following the *Financial Times* article, for example: "Tesla Climbs to Session High; FT Reports Saudi Fund Has Stake," Bloomberg News, August 7, 2018, 12:35

and 12:27 p.m. Tesla's stock price rose from $342.26 to $354.38.[119]   This $12.12 (3.5%) per-share increase in ten minutes is statistically significant at the 1% level based on using one-minute intervals for an event study analysis.[120]   In addition, the volume over the ten minutes of 1,284,993 shares[121] was over 7 times the average volume per 10-minute interval of 164,453 shares over the time period from the open of trade to 12:10 p.m. on August 7,

p.m.; "12:27 EDT Tesla jumps 3% to $352.37 after FT says Saudi fund built $2B stake," Theflyonthewall.com, August 7, 2018.

Additional news articles during and after the close of trading on August 7, 2018 reported on the investment by the Saudi fund, for example:

"Tesla Climbs to Session High; FT Reports Saudi Fund Has Stake," Bloomberg News, August 7, 2018, 12:35 p.m.:  "Saudi's Public Investment Fund (PIF) built the undisclosed stake of between 3-5% of Tesla's shares this year, FT reports, citing unidentified people with direct knowledge of the matter…Tesla climbs to session high, gains as much as 3.8%... PIF initially approached co. and CEO Elon Musk to express interest in new co. shares.  Co. did not act on the interest, according to one unidentified person…Saudi state fund acquired the position in secondary markets with JPMorgan help… Exact timing of purchase not known; believed to have taken place after the crown prince's tour of the US in March… Musk, Tesla are aware of the PIF shareholding, one of the people said … Stake makes PIF one of Tesla's eight biggest shareholders…"

"MW Saudi Arabia's mega-fund builds stake in Tesla: report," MarketWatch, August 7, 2018, 12:45 p.m.:): "Saudi Arabia's sovereign wealth fund, which has more than $250 billion under management, has built an undisclosed stake in Tesla Inc. (TSLA) of 3% to 5%, the Financial Times reported … Tuesday, citing people with direct knowledge of the issue.  The position fell below the 5% threshold that requires disclosure, and would be worth between $1.7 billion and $2.9 billion, the report said…"

"MW UPDATE: Tesla confirms intention to go private, sending stock up 11%," MarketWatch, August 7, 2018, 4:52 p.m.: "Tesla shares were up 7.4% before the halt Tuesday, and earlier in the day got a boost from news that Saudi Arabia's sovereign-wealth fund has taken a significant stake in the company."

"Tesla boss Musk weighs go-private deal for electric car maker," Agence France Presse, August 7, 2018, 5:01 p.m.: "Shares surged 11 percent to $379.57 at the closing bell after being suspended for about 90 minutes following a series of Musk statements on Twitter in which he initially floated the idea of going private….Tuesday's gains following the tweet added to upward movement on the stock after The Financial Times reported earlier Tuesday that a Saudi Arabian sovereign wealth fund had built a stake of between three and five percent in the company."

[119]  Based on Bloomberg GIT data (last prices for 12:16-12:17 and 12:26-12:27 minute intervals).

[120]  For this analysis, the number of intervals is 10.

[121]  Based on Bloomberg GIT data (volume from the 12:17-12:18 through 12:26-12:27 intervals).

2018.[122]  In the next 10-minute interval between 12:27 p.m. and 12:37 p.m. Tesla's stock price rose from $354.38 to $357.97.[123]  This $3.59 (1.0%) per-share increase in ten minutes is also statistically significant at the 1% level based on using one-minute intervals for an event study analysis.[124]  In addition, the volume over the ten minutes between 12:27 p.m. and 12:37 p.m. of 1,676,623 shares[125] was approximately 10 times the average volume per ten-minute interval of 164,453 shares over the time period from the open of trade to 12:10 p.m. on August 7, 2018.[126]  Finally, in the next 10-minute interval between 12:37 p.m. and 12:47 p.m. — the period immediately prior to the Musk Tweets — Tesla's stock price fell from $357.97 to $357.00.[127]  This $0.97 (0.3%) per-share decrease over the last ten minutes before the Musk Tweets is <u>not</u> statistically significant at the 5% level based on using one-minute intervals for an event study analysis.[128]  In addition, the volume over the last ten minutes before the Musk Tweets  minutes between 12:37 p.m. and 12:47 p.m. of 842,053 shares[129] was less than the volume in each of the prior two ten-minute intervals (12:17 to 12:27 p.m. and 12:27 to 12:37 p.m.).  Moreover, after the *FT* Article although there were changes in the prices of the shortest term options, there were no changes in long-term straddle prices suggesting that there was no impact of the news in the *FT* Article on implied volatility observed by Professor Heston, as he notes: "Between 12 p.m. and 12:30 p.m., the shortest-term options gained value, but there were no perceptible movements in long-term straddle prices.  Immediately following 12:48 p.m., straddle prices began to fall."[130]  These

---

[122]  Source: Bloomberg GIT data based on non-overlapping 10-minute intervals.  I obtained new GIT data since the Class Certification Report.  There was only one difference in volume for one interval over the Class Period – the 9:30-9:31 interval on August 7, 2018.  I use the updated data which yields a slightly lower average than reported in the Class Certification Report of 168,381 shares.

[123]  Based on Bloomberg GIT data (last prices for 12:26-12:27 and 12:36-12:37 intervals).

[124]  For this analysis, the number of intervals is 10.

[125]  Based on Bloomberg GIT data (volume from the 12:27-12:28 through 12:36-12:37 intervals).

[126]  Source: Bloomberg GIT data based on non-overlapping 10-minute intervals.

[127]  Based on Bloomberg GIT data (last prices for 12:36-12:37 and 12:46-12:47 intervals).  It further declined at the close of the 12:47-12:48 interval at $356.85.

[128]  For this analysis, the number of intervals is 10.

[129]  Based on Bloomberg GIT data (volume from the 12:37-12:38 through 12:46-12:47 intervals).

[130]  Expert Report of Steven L. Heston, Ph.D., November 8, 2021 (the "Heston Report"), ¶142.

financial factors would suggest that the price impact from the information revealed in the *FT* Article had taken place prior to start of the Musk Tweets at 12:48 p.m. when the volume over the next ten minutes after the start of the Musk Tweets between 12:48 p.m. and 12:58 p.m. increased to 3,576,429 shares[131] that was over 21 times the average volume per ten-minute interval of 164,453 shares over the time period from the open of trade to 12:10 p.m. on August 7, 2018.[132]  In addition, implied volatility for long-term options observed by Professor Heston declined significantly following the Musk Tweets.[133]

> **b)**      **Stock price movements following the Musk Tweets**

77.   As shown in **Appendix 4**, on August 7, 2018, Tesla's common stock price increased 6.37%, from $356.85 per share at 12:47 p.m. (just prior to the start of the Musk Tweets) to a close of $379.57 per share on August 7, 2018 on volume of over 18 million shares,[134] which even though it is less time than in a full trading day, was over two times the average daily volume of 8,293,907 shares during the 120 trading days prior to the start of the Class Period.[135]  The abnormal return is positive 6.52%, which is statistically significant at the 1% level.[136]  **The abnormal price increase of $23.27 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock**.[137]

---

[131]   Based on Bloomberg GIT data (volume from the 12:48-12:49 through 12:57-12:58 intervals).

[132]   Source: Bloomberg GIT data based on non-overlapping 10-minute intervals.

[133]   Heston Report, ¶12.

[134]   Based on Bloomberg GIT data (volume from the 12:48-12:49 through 13:59-16:00 intervals).

[135]   In the Hartzmark Opening Class Certification (¶26), I referred to the "PreCP" as the 120 trading days prior to the start of the Class Period ("the 'PreCP Period;' as described later, the PreCP Period is used as the estimation period for my event study analysis").

[136]   Based on 192 intervals.

[137]   Tesla's common stock price increased 10.99%, from a close of $341.99 per share on August 6, 2018 to a close of $379.57 per share on August 7, 2018.  The abnormal return is positive 10.61%, which is statistically significant at the 1% level.  The total abnormal price increase of $36.28 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock, but does include the price impact from the FT Article.  *See* Hartzmark Opening Class Certification Report, Appendix F.

#### 4.      August 8, 2018 and the Commencement of the Corrective Interval

78.    On Wednesday, August 8, 2018, Tesla's share price opened at $369.09, a 2.8% decline from the prior day close of $379.57, but then quickly increased to $382.64 at approximately 10:10 a.m.[138] before declining on news reports that the SEC was probing Tesla over Defendant Musk's tweets.  I show below a summary of news articles and analyst commentary this day.

##### a)      News prior to the opening of trade

79.    It is important to point out that *after* the market closed on Tuesday, August 7, 2018, Tesla's Senior Director of Investor Relations replied to emails related to Defendant Musk's tweets and apparently buttressing the information disclosed on August 7, 2018.  His response included:

a)   "I can only say that the first Tweet clearly stated that 'financing is secured.'  Yes, there is a firm offer."[139]

b)   "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else.  I only want to stress that Elon's first tweet, which mentioned 'financing secured' is correct."[140]

c)   "The very first tweet simply mentioned 'Funding secured' which means there is a firm offer.  Elon did not disclose details of who the buyer is. … I actually don't know [whether a verbal agreement or commitment letter], but I would assume that given we went full-on public with this, the offer is as firm as it gets."[141]

80.    Before the market opened on Wednesday, August 8, 2018, certain members of Tesla's board issued a statement that said:

Last week, Elon opened a discussion with the board about taking the company private.  This included discussion as to how being private could better serve Tesla's long-term interests, and also addressed the funding for this to occur.  The board has met

---

[138]   Based on the high traded price during both the 10:10-10:11 and 10:11-10:12 minute intervals from Bloomberg GIT data.  Source for market open price: Bloomberg.

[139]   TESLA_LITTLETON_00004010 (Exhibit 150).

[140]   TESLA_LITTLETON_00004253 at 4254 (Exhibit 151).

[141]   JENN0000074 (Exhibit 58).

several times over the last week and is taking the appropriate
next steps to evaluate this.[142]

81.    Also, before the market opened on August 8, 2018, news articles reported that

both Jefferies and J.P. Morgan analysts had raised their target prices on Tesla stock

following the Musk Tweets, for example:

> **Tesla going private 'feels like the right thing to do,' says
> Jefferies.  Jefferies analyst Philippe Houchois raised his
> price target for Tesla to $360 from $250 after CEO Elon
> Musk suggested taking the company private**.  The stock
> closed yesterday up 11%, or $37.58, to $379.57.  Going private
> "feels like the right thing to do," Houchois tells investors in a
> research note.  "Distraction or not, the move feels right even if
> Musk is downplaying how supportive public markets have
> been," the analyst adds.  However, with Tesla unable to take on
> more debt, he wonders who may fund the potential deal and end
> up as a new large shareholder.  Houchois raised his estimates to
> reflect a "better outlook" post Tesla's Q2 results.  **His
> discounted cash flow fair value points to $300 per share and
> his new $360 price target "bridges the gap" to the $420
> potential going private bid.**  The analyst keeps a Hold rating
> on Tesla.[143]
>
> *****
>
> **JP Morgan analysts raised their stock price target for Tesla
> Inc. (TSLA) to $308 from $195 on Wednesday**, a day after
> Chief Executive Elon Musk said he is thinking of taking the
> company private, but said they are sticking with an underweight
> rating, "on chance the shares could again trade on
> fundamentals."  "As surprising to us as these developments are,
> and as lacking as the statements are in any details regarding who
> is expected to provide the required amount of financing and on
> what terms, **they are nevertheless declarative statements
> from the CEO of a public company which we feel should be
> considered seriously**," analyst Ryan Brinkman wrote in a note.
> Musk said he had already secured the funding for a deal,
> without offering any further detail.  Banks and private-equity

---

[142]    "Statement from the following members of Tesla's Board of Directors: Brad Buss, Robyn
Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch,"
GlobeNewswires, August 8, 2018, 9:00 a.m.

[143]    "07:59 EDT Tesla going private 'feels like the right thing to do,' says...," Theflyonthewall.com,
August 8, 2018 (emphasis added).

firms were surprised at that news and questioned how it could
be done, given the company is cash flow negative, is loss
making and saddled with about $10 billion of debt.

"We continue to believe Tesla's valuation based on
fundamentals alone (i.e., a 50/50 blend of discounted cash flow
and 2020-based multiples analysis - itself consisting of a blend
of P/E, EV/EBITDA, and Price-to-Sales) is worth no more than
$195 (our previous price target)," said Brinkman.  **"But
introducing a new 50% weighting of $420 suggests a large
upward revision to our price target is warranted, and we
newly value Tesla at $308 per share (i.e., 50/50 blend of $195
and $420)."** Tesla shares were down 1% in premarket trade, but
have gained 22% in 2018, while the S&P 500 has gained 7%.[144]

**b)**     **After the market opened for trade: The beginning of the
revelation of the truth about the likelihood of the going private
transaction and the materialization of Consequential Harm**

82.     Beginning with a *New York Times* article at 10:24 a.m. on August 8, 2018,
news articles reported that the SEC was probing Tesla over the Musk Tweets, which along
with reports of skepticism of the deal, caused the stock price to decline:

Elon Musk had better be right.

Mr. Musk's audacious offer Tuesday to take private Tesla, the
innovative auto company he founded and leads as chairman and
chief executive, will surely go down as one of the most
unorthodox takeover bids ever. …

**But it was Mr. Musk's "funding secured" statement on
Twitter that may put the iconoclastic founder most at risk**.
He provided no details about how much funding had been
secured, from whom or under what conditions.  His email to
employees did not mention anything about the funding.

"That's a clear factual statement," said John C. Coffee Jr., a
professor at Columbia Law School who specializes in corporate
law and securities fraud.  "**If it's not fully secure, that's
potentially a very material misrepresentation, and a very
straightforward violation of Rule 10b-5 of the securities
law**" in short, securities fraud.

---

[144]   "MW UPDATE: JP Morgan raises Tesla price target but stays underweight in case shares trade
on fundamentals again," MarketWatch, August 8, 2018, 7:58 a.m. (emphasis added).

It is illegal for a director or officer of a public company "to knowingly or recklessly make material misstatements about that company," said John Coates, a professor at Harvard Law School who teaches mergers and acquisitions. Mr. Musk's "tweets seem cryptic at best, and it is hard to see how he has complied with his duty to not be misleadingly incomplete."

A Tesla spokeswoman declined to comment.

**The Securities and Exchange Commission contacted Tesla on Wednesday to inquire about the accuracy of Mr. Musk's tweets and why the announcement was not made in a regulatory filing**, according to a person briefed on the inquiry, who was not authorized to speak publicly on behalf of the S.E.C. **Such questions typically precede the launch of any formal investigation**.[145]

\*\*\*\*\*

**Securities regulators have inquired with Tesla Inc. about Chief Executive Elon Musk's surprise announcement that he may take the company private and whether his claim was factual**, people familiar with the matter said.

The Securities and Exchange Commission has asked whether Musk's unusual announcement on Tuesday was factual, the people said. **The regulator also asked Tesla [] about why the disclosure was made on Twitter rather than in a regulatory filing, and whether the company believes the announcement complies with investor-protection rules, the people said**. …

The SEC's inquiries, which originated from its San Francisco office, **suggest Tesla could come under an enforcement investigation if regulators develop evidence that Musk's statement was misleading or false**. It wasn't immediately clear on Wednesday whether the regulator had opened a formal enforcement investigation based on the answers it received from the company. An SEC spokesman declined to comment.[146]

---

[145] "Did Elon Musk Violate Securities Laws With Tweet About Taking Tesla Private?," NYTimes.com Feed, August 8, 2018, 10:24 a.m. (emphasis added).

[146] "SEC questions Tesla over Elon Musk's tweets to take the company private; Regulators said to be inquiring whether CEO's claim was factual," MarketWatch, August 8, 2018, 1:32 p.m. (emphasis added).

\*\*\*\*\*

**… people close to SoftBank tell the FT that the fund considers Tesla to be overvalued and there are no indications it wants to invest**.  Even if it did want to add Tesla to its stable, SoftBank might face an obstacle in the form of the Committee on Foreign Investment in the US (Cfius), given its close links to China and record of previous hold-ups on other deals.[147]

\*\*\*\*\*

Regulator examining whether Tesla CEO Elon Musk's statement on Tuesday was truthful, DJ reported, citing unidentified people with knowledge of the matter.  SEC also inquired why disclosure was made on Twitter.[148]

\*\*\*\*\*

Tesla stock rallied on CEO Elon Musk saying he wants to take the company private. … But shares fell 2.4% on Wednesday to 370.34, amid reports that the SEC is probing Tesla over Musk's tweets.[149]

---

[147] "Who could fund Elon Musk's Tesla buyout?," *Financial Times*, August 8, 2018, 1:59 p.m. (emphasis added).

[148] "SEC Is Said to Have Made Inquiries to Tesla Over Musk Tweet: DJ," Bloomberg First Word, August 8, 2018, 3:49 p.m. *See also* "SEC IS SAID TO BE LOOKING AT WHETHER MUSK STATEMENT TRUTHFUL:DJ," Bloomberg News, August 8, 2018, 3:45 p.m.

After the market closed on August 8, 2018, the full updated text of the article reported:  "U.S. regulators are asking Tesla Inc. whether Chief Executive Elon Musk was truthful when he tweeted that he had secured funding for what would be the largest-ever corporate buyout, people familiar with the matter said.  Officials at the Securities and Exchange Commission want to know whether Mr. Musk had a factual basis for tweeting Tuesday that the going-private transaction was all but certain, with only a shareholder vote needed to pull it off, the people said.  The SEC's inquiries, which originated from the agency's San Francisco office, suggest Tesla could come under an enforcement investigation if regulators suspect that Mr. Musk's statement was misleading or false.  It couldn't be learned on Wednesday whether the agency had opened a formal enforcement investigation."  "SEC Probes Tesla CEO Musk's Tweets; The regulator is examining whether Musk's statement was truthful and why the disclosure was made on Twitter," *The Wall Street Journal* Online, August 8, 2018, 7:27 p.m.

[149] "Dow Futures: Roku Soars Near Buy Point; This Breakout Stands Out Vs. Apple, Alphabet, Tesla," Investor's Business Daily, August 9, 2018.

*****

One day after Chief Executive Elon Musk stirred investors with a surprise proposal to take Tesla Motors private, shares of the electric automaker fell 2.4 percent as some analysts expressed skepticism.[150]

*****

Tesla shares rallied 11% on Tuesday, but lost 2.4% Wednesday as **Wall Street faulted the plan for being lean on funding details**.[151]

*****

**Analysts are taking Musk at his word that he has indeed secured funding, has investor support, and is seriously considering taking the company private - he could face serious legal consequences if he wasn't entirely truthful**. But many nonetheless find the $420 a share price tag he's floated exceptionally high given that Tesla ended trading on Wednesday at $370.34 a share.[152]

83.   In addition to the Jefferies and J.P. Morgan analyst reports raising price targets and summarized in news articles above, Bernstein stated:

We see upside risk in the near term to perhaps $400, but downside risk to $340 (yesterday's low price) or below **if no firmer details emerge, as investors would likely increasingly debate Musk's credibility and over-focus on the shares' price and volatility.**

…

Was this solely Musk's idea?   Or does he already have the support of his board / major shareholders?  Given the haphazard process of disclosure last afternoon, our initial impression was that Elon Musk sprung his plan of going private upon the public without consulting Tesla's board of directors or major

---

[150]   "US stocks end near flat; Tesla retreats," Agence France Presse, August 8, 2018, 4:22 p.m.

[151]   "SEC Looks Into Musk's Taking-Tesla-private Tweets: WSJ – MarketWatch," Dow Jones Institutional News, August 8, 2018, 4:06 p.m. (emphasis added).

[152]   "A couple reasons why Elon Musk could actually pull off his wild plan to take Tesla private (TSLA)," Business Insider, August 8, 2018, 6:28 p.m. (emphasis added).

shareholders. **On the other hand, Musk's tweets that "Investor support is confirmed" and "Funding secured" would suggest that he has spoken with some few stakeholders. Here, as with nearly everything else, we remain with more questions than answers. What does Musk mean by "investor support" – has he already gotten a go-ahead from Tesla's major institutional shareholders, and in what form? If so, why is the deal still "contingent on a shareholder vote" (as he noted within the same tweet)?** Did Tesla's board of directors or management team already know about these plans? If so, why was the announcement so abrupt and seemingly "unofficial"? Has Musk run his plan of maintaining retail shareholders within a private Tesla by his legal team? And so forth.[153]

84.   Evercore commented that:

What happened? The above are two of a series of tweets by Tesla CEO Elon Musk yesterday, where the company announced that it is considering going private.

Could this happen? It is important to note that, as of today, no details have been provided with regards to what "Funding secured" means, who is providing that funding and what any potential funding structure might look like. Our view is that "Funding secured" should be interpreted as a strong verbal commitment, with funds available and parties willing to execute quickly.

Stock Implications The majority of the move towards $420 is now done, with the share price sitting within 11%. As a result, unless there is evidence to suggest that the funding is not secured and a transaction cannot be completed, we believe there is little to be done with the stock at these levels. More broadly, if Tesla has attracted a strategic investor who is willing to not only help take the company private but also to provide material funding going forward, it should enable the company to execute and move faster as it seeks to complete its mission to move the world to a solar electric future.[154]

---

[153]   Bernstein, *Tesla: Going private? Who knows... does Elon?*, August 8, 2018 (emphasis added).

[154]   Evercore ISI, *A Private Life is a Happy Life*, August 8, 2018, 4:26 a.m. (source of timestamp: Capital IQ, emphasis omitted).

85.   Piper Jaffray questioned the likelihood of the deal succeeding:

> We note that many important details are still unknowable, given the precedent-setting nature of this proposal as well as the vague verbiage used to describe it.  **As a result, we believe this deal is unlikely to succeed in the very near-term, if it succeeds at all**.  We also note that, for true believers with a multi-year time horizon, the suggested go-private valuation of $420/share is probably unpalatable (especially if they cannot invest in illiquid, private securities), but gaining 50%+ shareholder approval may nonetheless prove easier than funding and structuring the deal in a way that is legal and executable.  …

> We are unsure about the legal implications and procedural requirements associated with transitioning public equity into a widely-held private security through a special-purpose entity similar to the SpaceX equity arrangement.

> In our view, creating this novel shareholding structure in compliance with securities laws may constitute the biggest hurdle to formalizing an offer.

> The other major hurdle relates to funding the $420/share buyout, because some form of funding would be necessary for all shares that select cash instead of new equity.

> Funding the deal with debt (an LBO) seems difficult, given the levered state of TSLA's balance sheet, the company's junk (B-) rating, and its history of negative cash flow.

> Musk may have lined up "big thinker" equity investors with deep pockets and generous investment time horizons, but if these are sovereign wealth funds or foreign partners, then Tesla may face a review from the Committee on Foreign Investment (CFIUS).[155]

86.   **Chart 2** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 8, 2018.  As shown in **Appendix 5**,[156] Tesla's common stock price declined 2.43%, from a close of $379.57 per share on August 7, 2018 to a close of $370.34 per share on August 8, 2018 on volume of 24.6 million shares, which

---

[155]   Piper Jaffray, *Questions Remain; Overweight-rated TSLA Not Going Private Anytime Soon*, August 8, 2018, 12:24 p.m. (source of timestamp: Capital IQ).

[156]   **Appendix 5** is Appendix F to the Class Certification Report extended through October 1, 2018.

was 3.0 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is *negative* 2.36%, which is not statistically significant at the 5% level.  The abnormal price decrease of $8.97 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

87.    **Chart 2** also shows that the additional information discussed above, including the emails from Tesla's Investor Relations, before the disclosure of the SEC inquiry, was followed by an increase of Tesla's stock price from $369.09 at the opening to 382.55 at 10:10 a.m., with volume of 5,679,850 shares through 10:10 a.m.[157]  The $13.46 price change (3.65%) is statistically significant at the 1% level based on using one-minute intervals for an event study analysis.[158]

88.    I also note that **Chart 2** shows at approximately 10:10 a.m., the price of Tesla common stock peaked and fell from $382.55 to close at $370.34 on volume of 11.8 million shares.[159]  Based on the minute-by-minute event study this 3.2% decline is statistically significant at the 6% level.[160] **Chart 2** also shows the price impact of news articles and a *Wall Street Journal* report issued beginning at 3:45 P.M. on August 8, 2018 stating, "on Wednesday that the U.S. Securities and Exchange Commission was asking Tesla why Musk announced his plans on Twitter and whether his statement was truthful."[161]  This

---

[157]   Volume is based on Bloomberg GIT data for intervals 9:30-9:31 through 10:10-10:11.  $382.55 is the close price of the 10:10-10:11 interval, while the high price during this 1-minute interval is $382.64 as discussed in paragraph 78.

[158]   For this analysis, there are 41 intervals.

[159]   Volume is based on Bloomberg GIT data for intervals 10:11-10:12 through 15:59-16:00.  Price is close price in interval 10:10-10:11 and 15:59-16:00 based on Bloomberg GIT data.

[160]   For this analysis, there are 349 intervals.

   I note, that between 10:10 a.m. and 10:30 a.m. the stock price declined from $382.55 (1-minute interval of 10:10-10:11 a.m.) to $377.01 (1-minute interval of 10:30-10:31 a.m.).  This abnormal return of *negative* 3.27% is statistically significant at the 1% level (20 intervals).

[161]   "SEC Is Said to Have Made Inquiries to Tesla Over Musk Tweet: DJ," Bloomberg First Word, August 8, 2018, 3:49 p.m.  *See also* "SEC IS SAID TO BE LOOKING AT WHETHER MUSK STATEMENT TRUTHFUL:DJ," Bloomberg News, August 8, 2018, 3:45 p.m. and "SEC Probes Tesla CEO Musk's Tweets; The regulator is examining whether Musk's statement was truthful and why the disclosure was made on Twitter," *The Wall Street Journal* Online, August

report was followed by a decrease of Tesla's stock price from $371.76 at 3:45 p.m. to an open of $365.55 on August 9, 2018, with volume of 1,331,422 shares on August 8, 2018.[162]

### Chart 2

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 8, 2018



*Source: Bloomberg*

5.   **August 9, 2018 and the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction and the Continued Materialization of Consequential Harm**

89.   On Thursday, August 9, 2018, Tesla's share price opened at $365.55, a 1.3% decline from the prior day close of $370.34, and further declined to close at $352.45 on reports that the SEC probe was intensifying and doubt the deal could be done.  I show below a summary of news articles and analyst commentary this day.

---

8, 2018, 7:27 p.m.; "Tesla Shares Fell 5% on Wall Street Skepticism; SEC Probe Reports," Reuters News, August 9, 2018, 4:54 p.m.

[162]   Based on Bloomberg GIT data for intervals 3:45-3:46 through 15:59-16:00 (volume starting 3:46-3:47 interval) and Bloomberg open prices.

90.   News articles reported, for example:

**Doubts about Elon Musk's ability to take Tesla Inc. private mounted across Wall Street on Thursday, driving the stock down as much as 4 percent in what's shaping up to be the worst rout in a month.**

The stock slipped to $356.66 in late morning trading, well below the $420 at which Musk said shareholders would be bought out.  It's now dropped on back-to-back days after having jumped 11 percent on Tuesday, when Musk vowed that he had "funding secured" for a spectacular $82 billion deal.

**Since that initial tweet, though, he has offered no evidence to back up the statement.**  Nor has anyone stepped forward publicly -- or privately – to say they're behind the plan.  People with or close to 15 financial institutions and technology firms who spoke on the condition of anonymity said they weren't aware of financing having been locked in before Musk's tweet.

"I don't really understand the idea of what was suggested in the potential for them to go private," Dick Weil, CEO of Janus Henderson Group, said in an interview with Bloomberg Television.  "That's obviously an incredibly large valuation to somehow take into the private market."

**All of which could be problematic as the Securities and Exchange Commission starts investigating the matter**.  Regulators have asked the company if what Musk tweeted was factual and why such a disclosure was made via social media rather than in a filing, according to the Wall Street Journal, citing unidentified people familiar with the matter.  Judith Burns, an SEC spokeswoman, declined to comment.  Tesla also declined to comment.[163]

\*\*\*\*\*

**Musk said he had the funding for such a deal secured and merely needed the proposal to pass a shareholder vote before it could go through.  (He indicated via Twitter that he had investor support.)**

**But nearly two days later, it's unclear where that funding will come from**.  Tesla has yet to submit any regulatory filings

---

[163]   "Tesla Shares Sink as Pressure Mounts on Musk to Show the Money," Bloomberg News, August 9, 2018, 11:40 a.m. (emphasis added).

that provide more detail into Musk's proposal, and, according to The New York Times, some top executives at major Wall Street Banks, like JPMorgan Chase and Citigroup, were not familiar with Musk's intention to convert Tesla into a private company before he tweeted about it.

**That raises the question: Where's the money coming from?**[164]

*****

Tesla shares drop as much as 4.6% to $353.33 as of 12:31 p.m. in New York, as skepticism mounts that Elon Musk has the ability to take the co. private.  Stock traded at ~$356.64 before Musk tweeted on Aug. 7…[165]

*****

**The Securities and Exchange Commission is "intensifying" its inquiry into Tesla, Bloomberg reports**.

The agency on Wednesday asked Tesla about whether one of CEO Elon Musk's tweets regarding the possibility of taking the company private was truthful, *The Wall Street Journal* reported, citing people familiar with the matter.

According to the Journal, the SEC is also looking into why Musk's first statement about the potential of taking Tesla private was made on Twitter instead of in a regulatory filing.  The agency also asked the company whether it believes Musk's tweet follows SEC rules about protecting investors, The Journal reported.

**Bloomberg reports that the agency was gathering information about statements Tesla has made regarding sales and manufacturing targets before its most recent inquiry**.

An inquiry from the SEC does not necessarily mean an investigation will follow.

---

[164]  "A deal to take Tesla private probably won't come from Wall Street or Silicon Valley (TSLA)," Business Insider, August 9, 2018, 12:09 p.m.

[165]  "Tesla Erases Gain Since Musk Tweeted He May Take Co. Private," Bloomberg First Word, August 9, 2018, 12:49 p.m.

CONFIDENTIAL

The SEC and Tesla declined Business Insider's requests for comment.[166]

*****

Tesla will need to access the capital markets in order to fund its operating requirements and repay the maturing convertible debt obligations, Moody's Investors Service said in a statement.

**CEO's note to employees that he is considering taking Tesla private is credit negative**, but does not affect the ratings at this time, the agency said.

Moody's expect the company's cash generation will improve during the second half of 2018 and over the coming year as its Model 3 production improves.[167]

*****

Tesla shares tumbled Thursday following a report the company faces intensifying scrutiny from securities regulators as US stocks finished a quiet session mostly lower.[168]

*****

Tesla Inc's <TSLA.O> **shares slipped nearly 5 percent** on Thursday, wiping out the gains fueled by Chief Executive Elon Musk's announcement of a plan to take the company private, **after reports of concern by regulators and on doubt the deal could be done**.

**Shares fell early in the day, weighed by Wall Street's skeptical response to Musk's idea of going private and a Wall Street Journal report on Wednesday that the U.S.**

---

[166] "SEC reportedly 'intensifying' examination of Tesla after Elon Musk tweets about taking the company private (TSLA)," Business Insider, August 9, 2018, 2:42 p.m. (emphasis added). *See also* "TESLA IS SAID TO FACE BROADER SEC SCRUTINY OVER MUSK STATEMENTS," Bloomberg News, August 9, 2018, 2:19 p.m.; "SEC SCRUTINY OF TESLA CONFIRMED BY PEOPLE FAMILIAR WITH MATTER, Bloomberg News, August 9, 2018, 2:19 p.m. and "AGENCY WAS SAID TO BE LOOKING AT TESLA BEFORE TAKEOVER TWEETS," Bloomberg News, August 9, 2018, 2:19 p.m.

[167] "Tesla Will Still Need to Access Capital Markets, Moody's Says," Bloomberg First Word, August 9, 2018, 3:06 p.m.

[168] "Tesla tumbles as US stocks end mostly lower," Agence France Presse, August 9, 2018, 4:22 p.m.

**Securities and Exchange Commission was asking Tesla why Musk announced his plans on Twitter and whether his statement was truthful**.

91.    **The shares slipped further on Thursday after Bloomberg reported that the SEC already had been looking at Tesla's public statements, citing two unnamed people it said were familiar with the matter**.[169]One analyst stated that as of August 8, 2018, Tesla's share price moves implied a 34.4% deal probability of going private:

> **As of yesterday, TSLA share prices were implying a market deal probability of 34.4% after Elon Musk's publicly suggested a go-private deal for the electric vehicle company**. … While many instantly denounced the deal as impossible, the rise in the share price staying below the purported deal price of $420 shows that the market is implying a certain probability of success. … By assuming the average price on Monday as the market price, $348.79, we can infer that the market is pricing a 34.4% of the deal going through.[170]

92.    **Chart 3** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 9, 2018.

---

[169]  "Tesla shares fall 5 percent on Wall Street skepticism, SEC probe reports," Reuters News, August 9, 2018, 4:54 p.m. (emphasis added).

[170]  Macro Risk Advisors, *MRA- Does the options market believe Elon Musk?*, August 9, 2018, 9:51 a.m. (emphasis added).

**Chart 3**

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 9, 2018



*Source: Bloomberg*

93.   As shown in **Appendix 5**, Tesla's common stock price declined 4.83%, from a close of $370.34 per share on August 8, 2018 to a close of $352.45 per share on August 9, 2018 on volume of 17.2 million shares, which was 2.1 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is negative 4.67%, which is statistically significant at the 8% level.  The total abnormal price decrease of $17.28 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

**6.     August 10, 2018 and the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction and the Continued Materialization of Consequential Harm**

94.   On Friday, August 10, 2018, Tesla's share price opened at $354.00, a 0.4% increase from the prior day close of $352.45, and further increased slightly to close at $355.49 likely on reports that the Tesla board would meet with advisers next week on the go private deal.

- 64 -
CONFIDENTIAL

95.   I show below a summary of news articles on August 10, 2018.

96.   News articles reported that Tesla's board of directors plans to meet with advisers next week, for example:

> The Tesla Inc. (TSLA) board of directors plans to meet with advisers next week to make formal the process of exploring Chief Executive Elon Musk's proposal to take the company private, according to a CNBC report that cited people familiar with the matter.  The board is likely to ask Musk to recuse himself, and the board told him that he'd need his own set of advisers, the report said.[171]

*****

> Tesla (NASDAQ: TSLA) is trimming some gains on a report that the automaker is seeking a "wide" investor pool in its go-private plan.  That's in an apparent move to avoid concentrating ownership of the stock, Bloomberg notes.  It's also raising chatter among investors questioning just how "secured" the funding is that CEO Elon Musk was tweeting about.  Shares are back to flat after rising as much as 2.1% to $360 today.[172]

*****

> Tesla Inc's <TSLA.O> board has not yet received a detailed financing plan from CEO Elon Musk, and is seeking more information about how he will take the U.S. electric car maker private in a proposed deal worth $72 billion, people familiar with the matter said on Thursday.

> While Tesla's board has held multiple discussions about Musk's proposal, which first became public on Tuesday, it has not yet received specific information on who will provide the funding, one of the sources said.[173]

---

[171]  "Tesla Board To Ramp Up Going-private Talks: Report – MarketWatch," Dow Jones Institutional News, August 9, 2018, 5:18 p.m.

[172]  "Bloomberg: Tesla seeking 'wide' investor pool for go-private plan," Bloomberg News, August 10, 2018, 3:05 p.m. *See also* "TESLA IS SAID TO SEEK WIDE INVESTOR POOL FOR TAKE-PRIVATE PLAN," Bloomberg First Word, August 10, 2018, 2:56 p.m.

[173]  "Exclusive: Tesla's board seeking more information on Musk's financing plan – sources," Reuters News, August 9, 2018, 8:26 p.m.

97.    .One analyst noted the decline in long-term option volatility after the Musk tweet:

> TSLA Options Takeaways
>
> In Wednesday's Derivatives Daily we looked at the shift in Tesla's (TSLA: Not Covered) term structure, and particularly the significant decline in long-term volatility, following CEO Elon Musk's tweet indicating that he was considering taking the company private.  Given the widespread interest in the name, alongside this morning's headlines indicating that the company's board will meet with financial advisers next week, here we circle back to TSLA options to now see what they can tell us about the potential for moves in the stock price in the weeks ahead.  As we noted on Wednesday, aside from the very short-term 30-Day options, implied volatility levels generally declined in response to the potential for a take-private outcome. That said, 90-Day volatility has since rebounded higher, and at ~52%, 90-Day implied volatility in the name is still higher than all but a handful of names within the Russell 1000.[174]

98.    **Chart 4** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 10, 2018.

---

[174]  Susquehanna International Group, *PTEN Calls and TSLA Takeaways*, August 10, 2018.

**Chart 4**

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 10, 2018



99.   As shown in **Appendix 5**, Tesla's common stock price increased 0.86%, from a close of $352.45 per share on August 9, 2018 to a close of $355.49 per share on August 10, 2018 on volume of 11.6 million shares, which was 1.4 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is positive 2.11%, which is not statistically significant at the 5% level.   The total abnormal price increase of $7.42 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

### 7.    August 13, 2018 and the Defendants' Update on Taking Tesla Private and the Continued Materialization of Consequential Harm

100.  On Monday, August 13, 2018, Tesla's share price opened at $361.13, a 1.6% increase from the prior day close of $355.49.   Thereafter, the stock price declined during the day to close at $356.41 on news that said shares shot up more than 3% on Musk's blog post (before the markets opened) explaining his August 7th tweet, but then turned down as

investors parsed the statement and that investors now know that his "funding secured" tweet last week was premature at best.

101.  I show below a summary of news articles and analyst commentary over the weekend (August 11 and 12, 2018) and on August 13, 2018.

102.  News articles reported, for example:

> **Two new lawsuits accuse Tesla and its CEO Elon Musk of violating federal securities law by allegedly making false statements to boost the company's stock price**.
>
> The complaints, filed in federal court in San Francisco this week, claim Musk sought to mislead investors when he said on Twitter that he had secured the funding to take Tesla private. …
>
> Both lawsuits accused Musk or Tesla of harming short sellers with false information.[175]
>
> *****
>
> While Tesla CEO Elon Musk teased last week about taking the company private, several suitors may have already been courting the electric car giant months ago.
>
> Saudi Arabia's Public Investment Fund, the country's sovereign wealth fund, is in talks with Tesla about becoming a significant investor as part of the move towards privatization, sources with knowledge of the fund's plans told Bloomberg Sunday.
>
> The Saudi investment fund approached Musk months ago to discuss acquiring a minority stake but was turned down as the company did not plan on issuing new shares at the time, a source close to the discussions told Bloomberg.  In turn, the fund bought nearly $2 billion worth of Tesla shares on the market with the help of an investment bank, building up a stake just short of 5% in the company.
>
> **The fund has not yet made any concrete plans with Tesla on increasing its stake**, sources told Bloomberg, but talks are ongoing, and continued investment in the company is seen as a

---

[175]  "Two lawsuits accuse Elon Musk of false statements to boost Tesla share price," CNN Wire, August 11, 2018, 5:59 p.m.

strategic step toward diversifying the Saudi economy away from oil.[176]

103.    Before markets opened on Monday, August 13, 2018, Musk posted an "Update on Taking Tesla Private" on Tesla's website and stated:

> As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy.  As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.
>
> **What has happened so far?**
>
> On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share.  This was a 20% premium over the ~$350 then current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st)  My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.
>
> After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal), a full board meeting was held.  During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.
>
> At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders.  Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me.  They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future.  I told the board that I would report back after I had these discussions.
>
> **Why did I make a public announcement?**

---

[176]   "Report: Saudi Arabia is looking to invest big in Tesla as the company teases going private," Business Insider, August 12, 2018, 8:45 p.m. (emphasis added).

The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private. However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time. As a result, it was clear to me that the right thing to do was announce my intentions publicly. To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**

Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction. Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

Recently, after the Saudi fund bought almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting. That meeting took place on July 31st. During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed.

I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement.

Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements."

Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used.  However, it would be premature to do so now.  I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base.  It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.

It is also worth clarifying that most of the capital required for going private would be funded by equity rather than debt, meaning that this would not be like a standard leveraged buyout structure commonly used when companies are taken private.  I do not think it would be wise to burden Tesla with significantly increased debt.

Therefore, reports that more than $70B would be needed to take Tesla private dramatically overstate the actual capital raise needed.  The $420 buyout price would only be used for Tesla shareholders who do not remain with our company if it is private.  My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla.

### What are the next steps?

As mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time.  I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options.  Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected.  If the board process results in an approved plan, any required

CONFIDENTIAL

regulatory approvals will need to be obtained and the plan will
be presented to Tesla shareholders for a vote.[177]

104. Market commentary discussed the content of Elon Musk's August 13, 2018
blog post:

> Shares of Tesla surged as much as 3% in early-trading Monday,
> before paring their gains, after CEO Elon Musk published an
> update on his plans to take the company private at $420 a share.
>
> **Despite tweeting on Tuesday that funding had been secured,
> Musk's newest blog post appears to contradict that claim**.[178]
>
> *****
>
> In his statement on Monday, Musk said that following his
> August 7 tweet, he has been in communication with the
> managing director of the Saudi fund.
>
> "He has expressed support for proceeding subject to financial
> and other due diligence and their internal review process for
> obtaining approvals.  He has also asked for additional details on
> how the company would be taken private, including any
> required percentages and any regulatory requirements," Musk
> said.[179]
>
> *****
>
> Saudi Arabia's desire to take a big stake in Tesla Inc. reflects
> its ambitious plan to build a base in the kingdom for electric-
> car production and diversify away from oil.
>
> Its sovereign-wealth fund is considering raising its nearly 5%
> holding in Tesla, people familiar with the matter said.
> Discussions among Saudi officials about increasing the Public
> Investment Fund's stake accelerated after Tesla Chief

---

[177] "Update on Taking Tesla Private," Elon Musk blog post, August 13, 2018, 8:59 a.m., available at https://www.tesla.com/blog/update-taking-tesla-private.  *See also* "Update on Taking Tesla Private," Elon Musk tweet, August 13, 2018, 9:02 a.m.

[178] "Tesla surges after Elon Musk offers details about his 'funding secured' tweet (TSLA)," Business Insider, August 13, 2018, 10:09 a.m. (emphasis added).

[179] "Elon Musk reveals what he meant by his 'funding secured' tweet (TSLA)," Business Insider, August 13, 2018, 10:45 a.m. (emphasis added).

Executive Elon Musk last week proposed to take the car company private in a tweet, the people said.[180]

*****

All of Wall Street, and MarketWatch along with it, wanted to know more about Elon Musk's claims last week that he had the funding to take Tesla Inc. private.

**After Musk explained himself Monday morning, investors now know that his "funding secured" tweet last week was premature at best**.  They showed that they were not buying his explanation by not buying Tesla (TSLA) stock at going rates well lower than the $420 level Musk quoted in that now-infamous tweet.

In a blog post early Monday, Musk responded to the doubts that have arisen since he created havoc among investors last Tuesday with the tweet that he was considering taking Tesla private at $420 a share. …

**Taken together, Musk's definition of "funding secured" appears to be, to assess it charitably, a stretch.  And it certainly does not live up to what was required after his original tweet.[181]**

*****

Tesla Inc. shares wavered between gains and losses Monday as the boost from Chief Executive Elon Musk's blog post detailing his proposal to take the Silicon Valley car maker private faded.

Tesla (TSLA) shares shot up more than 3% in pre-market trading as Musk's blog post on the company's website went up, but then turned down more than 1% in midday trade as investors parsed the statement.  They ended the session 0.3% higher at $356.41.[182]

---

[180] "Saudi Arabia Weighs Larger Tesla Stake as Part of Plan to Make Electric Cars," Dow Jones Institutional News, August 13, 2018, 1:13 p.m.

[181] "MW UPDATE: Wall Street has spoken: Tesla funding is not 'secured'," MarketWatch, August 13, 2018, 3:39 p.m. (emphasis added).

[182] "MW UPDATE: Tesla shares swing higher amid confusion about Musk's going-private plan," MarketWatch, August 13, 2018, 5:03 p.m. (emphasis added).

105.  An article in *The New York Times* on August 13, 2018 stated that, according to sources, the Musk Tweets had not been cleared with the Tesla Board and that some members of the board were blindsided by the tweet:

> **An abrupt tweet last week by Elon Musk about the prospect of taking Tesla private was dashed off with little forethought, and had not been cleared ahead of time with the company's board**, two people familiar with the chain of events said Monday….
>
> But three people familiar with the workings of the Saudi fund cast doubt on his account.  They said the fund had taken none of the steps that such an ambitious transaction would entail, like preparing a term sheet or hiring a financial adviser to work on the deal....
>
> A person with direct knowledge of the Tesla board's thinking said **some members of the board had been totally blindsided** by Mr. Musk's decision to air his plan on Twitter....[183]

106.  Analyst commentary on August 13, 2018 included CFRA stating the going private deal could be more likely than previously thought and Morningstar, which was also positive on the likelihood of the deal happening:

> **We think Elon Musk's blog post likely reduces legal risk fallout for TSLA and helps clarify the potential going private situation, even if a transaction is ultimately not consummated**.  In the post, Mr. Musk explains how the Saudi Arabia Public Investment Fund had repeatedly expressed interest in taking Tesla private, something the fund could likely afford, leading Musk to believe that funding for a transaction was "secured." **The blog also explains how the deal could be more likely than we previously thought**, as it would ideally be structured to be less leveraged via greater than expected use of equity versus debt.  We would prefer this given TSLA's already plentiful cash needs.[184]

                              *****

---

[183]  "Tesla Board Surprised by Elon Musk's Tweet on Taking Carmaker Private," NYTimes.com Feed, August 13, 2018, 10:05 a.m. (emphasis added).

[184]  CFRA, *CFRA REITERATES HOLD OPINION ON SHARES OF TESLA, INC*., August 13, 2018, 11:36 a.m. (source of timestamp: Capital IQ) (emphasis added).

- 74 -
CONFIDENTIAL

Tesla CEO Elon Musk issued a blog post Aug. 13 that states he is still gauging shareholder interest in Tesla going private at $420 a share, but **our impression of his words is that he thinks it can happen, and we agree**. Tesla's board still must receive a formal proposal and then will have to evaluate it, so we think a deal will not happen this week but will eventually be announced. Musk also said the Saudi Arabian sovereign wealth fund has taken almost a 5% stake in Tesla, and he met with it recently about going private. All shareholders would have the choice of having their stock bought out at $420 a share or remaining invested in a private Tesla. We speculate that retail investors may have their equity moved to a publicly traded special-purpose vehicle while accredited investors would only be able to buy or sell shares every six months.

…

**Musk in an Aug. 7 tweet said, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." We think this statement means Musk believes he has enough votes to go private.** Musk also said in the Aug. 13 blog post that he estimates about two thirds of shareholders would go private and therefore not sell at $420. It sounds to us that he is not done talking to shareholders to gauge interest, but his estimate of about 66% of shareholders not tendering is not far off from our own assumption of 60%.[185]

107. **Chart 5** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 13, 2018.

---

[185] Morningstar, *Tesla Buyout Looks Likely to Us, but Timing and Structure Uncertain*, August 13, 2018, 4:50 p.m. (source of timestamp: Capital IQ) (emphasis added).

**Chart 5**

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 13, 2018



*Source: Bloomberg*

108.   As shown in **Appendix 5**, Tesla's common stock price increased 0.26%, from a close of $355.49 per share on August 10, 2018 to a close of $356.41 per share on August 13, 2018 on volume of 10.5 million shares, which was 1.3 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is positive 0.95%, which is not statistically significant at the 5% level.  The total abnormal price increase of $3.37 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

**8.   August 14, 2018 and Musk's Tweets on the Purported Hiring of Financial Advisers, along with the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction and the Continued Materialization of Consequential Harm**

109.   On Tuesday, August 14, 2018, Tesla's share price opened at $358.45, a 0.6% increase from the prior day close of $356.41.  Thereafter, the stock price declined to close at $347.64 on reports questioning the accuracy of Musk's latest tweets on hiring advisers

- 76 -
CONFIDENTIAL

Goldman Sachs and Silver Lake.  I show below a summary of news articles and analyst commentary this day.

110.   After the markets closed on August 13, 2018, Musk tweeted:

> I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private.[186]

111.   News articles reported on the Musk tweet after the markets closed on August 13, 2018 and on August 14, 2018, which was then followed by reports that denied Silver Lake and Goldman Sachs had been hired:

> Tesla Inc Chief Executive Officer **Elon Musk said on Monday he was working with Silver Lake Partners and Goldman Sachs Group Inc** for financial advice on his proposal to take the electric car company private.
>
> "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private," Musk said in a tweet.[187]
>
> \*\*\*\*\*
>
> **Silver Lake not hired by Tesla in official capacity**, Reuters reports Silver Lake is offering its assistance to Elon Musk in his exploration of taking Tesla private without compensation, and has not been hired as a financial adviser in an official capacity, Reuters reports, citing a source familiar with the matter. Further, Silver Lake is not currently discussing participating in the potential Tesla deal as an investor, the source added.  The firm is known for putting together leveraged buyouts in the technology sector rather than providing investment banking advice, Reuters added.   Musk last night tweeted that he's

---

[186]   Elon Musk tweet, August 13, 2018, 9:02 p.m., available at: https://twitter.com/elonmusk/status/1029171381584314368?lang=en.

[187]   "Musk says working with Silver Lake, Goldman on proposal to take Tesla private," Reuters News, August 13, 2018, 9:15 p.m. (emphasis added).

working Silver Lake and Goldman Sachs on taking the automaker private.[188]

*****

Tesla, Inc. (the "Company") announced today that its Board of Directors has formed a special committee comprised of three independent directors to act on behalf of the Company in connection with Elon Musk's previously announced consideration of a transaction to take the Company private (the "Going Private Transaction"). The special committee has not yet received a formal proposal from Mr. Musk regarding any Going Private Transaction nor has it reached any conclusion as to the advisability or feasibility of such a transaction.[189]

*****

Tesla Inc. (TSLA) Chief Executive **Elon Musk hadn't officially tapped Goldman Sachs Group Inc. as its financial advisor** when he revealed plans last week to take the car maker private and said he had secured funding for the deal, according to a Bloomberg News report that cited people with knowledge of the matter. **The bank still hadn't signed on when Musk tweeted late Monday he was working with Goldman and Silver Lake**, the people told Bloomberg. Conversations between Musk and Goldman Sachs representatives are ongoing, the report said. Silver Lake also is in a similar situation, Bloomberg said, citing one person familiar with the matter. Silver Lake isn't officially working for Musk and isn't being compensated, the report said.[190]

*****

In corporate news, shares of Tesla Inc. (TSLA) ended 2.3% lower after CEO Elon Musk late Monday said in a tweet that he

---

[188] "04:52 EDT Silver Lake not hired by Tesla in official capacity, Reuters…," Theflyonthewall.com, August 14, 2018, 4:52 a.m. (emphasis added).

[189] "Tesla Announces Formation of Special Committee to Evaluate Potential Going Private Transaction," GlobeNewswire, August 14, 2018, 8:30 a.m.

[190] "MW Goldman, Silver Lake not officially on board with Musk's plan: report," MarketWatch, August 14, 2018, 3:36 p.m. (emphasis added). *See also* "GOLDMAN SACHS IS SAID TO HAVE HAD NO MANDATE WHEN MUSK TWEETED" Bloomberg News, August 14, 2018, 12:53 p.m.

CONFIDENTIAL

was working with Goldman Sachs and private-equity firm Silver Lake on the electric-car maker's go-private plan.[191]

\*\*\*\*\*

Elon Musk again caught the financial world by surprise with an announcement on Twitter about his desire to take Tesla Inc. private, this time revealing a list of advisers before arrangements with all of them were completed.[192]

112.   Analysts commented on Musk's blog post on August 13 including Barclays stating that the go-private deal was still in its early stages, Evercore ISI stating that investors were awaiting more detail on any potential Saudi funding and the structure of the deal, and J.P. Morgan questioning whether the deal was ever near the finish line and not sure what to believe:

> **Tesla's blog post on Monday 8/13/18 makes it clearer buyout is still in early stages, and board has much work to do**; ... Yesterday Elon Musk's blog post made it clear - as we suspected last week - that any go-private transaction still had numerous hurdles in front of it. …
>
> And on Monday 13 August 2018, an updated blog post on the Tesla site from Mr. Musk made it **clear that the funding was in its very early stages**.[193]

\*\*\*\*\*

> Elon returns to Twitter: Yesterday, Elon released 2 statements (TSLA blog & twitter): 1) Background to "Funding Secured" comment – the full release is included here and we invite investors to come to their own semantic conclusions regarding 1) Saudi PIF verbal commitments and 2) Undisclosed details regarding the potential structure of a deal where current shareholders would opt-in to a "roll over" from public to private equity, 2) Corporate Advisors – Elon tweeted "I'm excited to

---

[191]   "MW Dow, S&P 500 halt 4-session skid as Turkish lira angst takes a breather," MarketWatch, August 14, 2018, 4:08 p.m.

[192]   "Elon Musk Tweets Another Surprise, Saying Goldman and Silver Lake Are Tesla Advisers; Electric-car maker's CEO and the investment firms hadn't completed any financial deals, though," *The Wall Street Journal* Online, August 14, 2018, 7:30 p.m.

[193]   Barclays, *Time for even 'Blue Pillers' to Cash Out?*, August 14, 2018, 12:15 a.m. (source of time stamp: Capital IQ) (emphasis added, footnote omitted).

work with Silver Lake and Goldman Sachs as financial advisors, plus Wachtell, Lipton, Rosen & Katz and Munger, Tolles & Olson as legal advisors, on the proposal to take Tesla private". Reuters later reported that Silver Lake appears to be "offering assistance to Musk without compensation" and has not been hired as a financial adviser in an official capacity. Complicated to say the least…investors clearly await more detail on size of any potential Saudi funding (and any strategic/secondary sponsors?) in addition to what the structure of any complicated roll over tender would look like?[194]

\*\*\*\*\*

**We significantly raised our price target based upon assertions of fact from Tesla CEO Elon Musk that "funding is secured**"

…

**We raised our price target from $195 to $308, but are ready to again value the firm on fundamentals alone should a deal not be cobbled together**.

**Already, it seems, such a deal is in trouble and may never have been anywhere near the finish line in the first place**:

Monday, August 13 morning **blog post to us seems a walk-back** aimed more at providing legal cover for Mr. Musk than at providing additional details to the financial community;

Monday, August 13 afternoon report by NYTimes says Musk 4/20 tweet took Board by surprise;

Monday, August 13 evening tweet by Elon Musk says excited to work with Silver Lake and Goldman Sachs as financial advisors on proposal to take Tesla private.

WE [ARE] NOT SURE WHAT TO BELIEVE![195]

---

[194] Evercore ISI, *EvrISI Autos Pitstop: NIO IPO / Elon returns to Twitter*, August 14, 2018, 3:12 a.m. (TESLA_LITTLETON_00005109).

[195] J.P.Morgan, U.S. Autos, Auto Parts, Tires, & Auto Auction, Presentation for 2018 "Summer Lunch Series," August 14, 2018, p. 28 at JPMS_00002934 at 2961 (emphasis added and in original).

113. **Chart 6** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 14, 2018.

**Chart 6**

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 14, 2018



*Source: Bloomberg*

114. As shown in **Appendix 5**, Tesla's common stock price declined 2.46%, from a close of $356.41 per share on August 13, 2018 to a close of $347.64 per share on August 14, 2018 on volume of 7.0 million shares, which was 0.8 times the average volume during the 120 trading days prior to the start of the Class Period. The abnormal return is negative 3.32%, which is not statistically significant at the 5% level. The total abnormal price decrease of $11.82 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

9. **August 15, 2018 and the Issuance of Subpoenas by the SEC, along with the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private**

**Transaction and the Continued Materialization of Consequential Harm**

115.   On Wednesday, August 15, 2018, Tesla's share price opened at $341.91, a 1.6% decrease from the prior day close of $347.64.  Thereafter, the stock price declined further to close at $338.69 on reports that the SEC had issued a subpoena to Tesla and news that the SEC probe was now a formal investigation regarding the Musk Tweets.

116.   I show below a summary of news articles on August 15, 2018.

117.   News articles reported for example:

> **The SEC sent subpoenas to Tesla on privatization plans and Musk's statements involving funding**, Fox's Charles Gasparino tweeted citing sources.
>
> **Subpoenas signal investigation has reached the 'formal' stages**, tweet said.  Tesla extends losses, falls to session low, down as much as 4.5%.[196]

                                        *****

> **US authorities have intensified an investigation into Tesla's privatisation plan by issuing formal summons** to the electric car manufacturer's chief executive Elon Musk.  …
>
> The SEC investigation into the company stepped up a gear on Wednesday when **the SEC issued a formal subpoena to Tesla** officials and Mr Musk, the company's billionaire founder, according to Fox News.  …
>
> **Tesla's share price dropped 3.9pc following the reports of the subpoenas**, which are likely to complicate any discussions about taking the group private.[197]

---

[196]   "SEC Is Said to Send Subpoenas to Tesla on Privatization: Fox," Bloomberg First Word, August 15, 2018, 10:50 a.m. (emphasis added).

The Gasparino tweet stated: "SCOOP: SEC ramps up investigation into Tesla privatization plans; sends subpoenas to Tesla regarding privatization plans and Musk's statements involving "funding secured"--sources  Subpoenas signal investigation has reached the "formal" stages -- sources more now @FoxBusiness." *See* Charles Gasparino tweet, August 15, 2018, 10:42 a.m. available at: https://twitter.com/cgasparino/status/1029740099339268096?lang=en

[197]   "Tesla and Elon Musk under fire as SEC issues subpoenas," The Telegraph Online, August 15, 2018, 1:03 p.m. (emphasis added).

\*\*\*\*\*

**Elon Musk will likely need clearance from U.S. national security officials for any proposal to take Tesla Inc. private with financing from Saudi Arabia**, just as the Trump administration steps up scrutiny of foreign investment in American technology.

The deal, if it becomes reality, would be among the first to be reviewed by U.S. officials since President Donald Trump signed legislation this week that expands the government's authority to investigate and potentially block foreign takeovers of domestic companies.[198]

\*\*\*\*\*

**Shares of Tesla fell Wednesday following reports US securities regulators have subpoenaed the electric car maker's Chief Executive Elon Musk over his statements about taking the company private.**

Shares finished down 2.6 percent at $338.69 after news of the formal demand for information was published by Fox Business and The New York Times.  Shares fell as much as 4.5 percent earlier in the session.

**The development suggests the oversight by the US Securities and Exchange Commission -- which was characterized in previous news articles as an inquiry -- has "advanced to a more formal, serious stage,"** said The Times, which cited a person familiar with the matter.

A subpoena "typically requires the approval of top SEC officials," the newspaper added.

A Wall Street Journal story published after the stock market closed said the subpoena sought information from each of Tesla's directors.

A Tesla spokesperson declined comment.[199]

---

[198] "Musk Seen Facing National Security Review in a Tesla-Saudi Deal," Bloomberg News, August 15, 2018, 12:48 p.m. (emphasis added).

[199] "Tesla shares fall on reports of SEC subpoena," Agence France Presse, August 15, 2018, 5:33 p.m. (emphasis added).

118.  There were no new analyst reports available to me this day.

119.  **Chart 7** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 15, 2018.

**Chart 7**

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 15, 2018



120.  As shown in **Appendix 5**, Tesla's common stock price decreased 2.57%, from a close of $347.64 per share on August 14, 2018 to a close of $338.69 per share on August 15, 2018 on volume of 9.1 million shares, which was 1.1 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is negative 0.71%, which is not statistically significant at the 5% level.  The total abnormal price decrease of $2.46 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

> **10.** **August 16, 2018 and the Continued Absence of Disclosures of Meaningful, Reliable and Clear Information Describing the Proposed Going Private Transaction**

121.  On Thursday, August 16, 2018, Tesla's share price opened at $339.91, a 0.4% increase from the prior day close of $338.69.  Thereafter, the stock price declined during the day to close at $335.45 on mixed news and analyst commentary on Tesla's Model 3 production forecast (favorable news)[200] and base Model 3 future profitability (unfavorable news). [201,202]

122.  News articles reported for example:

> Tesla's odds of a successful take-private transaction are less than 50%, Bernstein analyst Toni Sacconaghi writes in a note raising the automaker's PT to $325 from $265.

> See Tesla as a challenging company to value given lack of cash flow, high capital intensity and explosive growth

> Sees a valuation range of $300 to $400 and current share prices imply margins and market share in 2050 that are higher than Mercedes and BMW

> Believe questions around a take-private transaction and the clarity of Model 3 quality and profitability will likely be answered over the next few quarters

> Maintain market-perform[203]

123.  **Chart 8** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 16, 2018.

---

[200]  "Tesla Analyst Who Toured Plant Bets on 8,000-a-Week Model 3 Pace," Bloomberg News, August 16, 2018, 8:38 a.m. (emphasis added).

[201]  "Is a $35,000 Tesla Model 3 Envisioned by Musk Profitable? UBS Says No; Current claims of profitability are based on higher-price version of the sedan, the brokerage says," *The Wall Street Journal* Online, August 16, 2018, 12:20 p.m.

[202]  *See also* discussion in paragraphs 155 to 161 below on potential confounding information disclosed on August 16, 2018, as well as on other dates.

[203]  "Tesla's Odds of Going Private Less Than 50%, Bernstein Says," Bloomberg First Word, August 16, 2018, 7:11 a.m. (emphasis added).

**Chart 8**

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 16, 2018



*Source: Bloomberg*

124.   As shown in **Appendix 5**, Tesla's common stock price decreased 0.96%, from a close of $338.69 per share on August 15, 2018 to a close of $335.45 per share on August 16, 2018 on volume of 6.1 million shares, which was 0.7 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is negative 1.54%, which is not statistically significant at the 5% level.  The total abnormal price decrease of $5.21 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

**11.   August 17, 2018 and the *NYT* Article, which the Market Interprets that Funding was NOT Secured, Nor Was there Any Formal Proposal**

125.   On Friday, August 17, 2018, Tesla's share price opened at $323.50, a 3.6% decrease from the prior day close of $335.45, and continued to decline to close at $305.50 on reports of an Elon Musk interview in the *NYT* Article linked the Musk Tweets to previously stated concerns about Musk's health and its impact on his ability to lead the company.  Further, in addition to reporting on Musk's health issues, according to the

- 86 -
CONFIDENTIAL

Complaint, *NYT* Article also "noted that the funding for the proposed going private transaction 'was far from secure' and the Public Investment Fund 'had not committed to provide any cash'"[204] and "that no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it indicating that no going private transaction was imminent."[205] According to the Order on Defendants' Motion to Dismiss, the *NYT* Article

> ... revealed that (1) Mr. Musk posted the tweet while driving himself to the airport; (2) he had been under a lot of work-related stress; (3) the PIF did not commit any cash; (4) funding was far from secure; and (5) people were concerned about his drug use at the time.[206]

126. Thus, the likelihood of the going private transaction was substantially reduced. I show below a summary of news articles and analyst commentary this day.

127. The news articles starting late at night on August 16, 2018 begin with the Musk interview in the *NYT* Article (published in print on August 17, 2018)[207]

> Elon Musk was at home in Los Angeles, struggling to maintain his composure. "This past year has been the most difficult and painful year of my career," he said. "It was excruciating."
>
> The year has only gotten more intense for Mr. Musk, the chairman and chief executive of the electric-car maker Tesla, since he abruptly declared on Twitter last week that he hoped to convert the publicly traded company into a private one. The episode kicked off a furor in the markets and within Tesla itself, and he acknowledged on Thursday that he was fraying.
>
> In an hourlong interview with The New York Times, he choked up multiple times, noting that he nearly missed his brother's wedding this summer and spent his birthday holed up in Tesla's offices as the company raced to meet elusive production targets on a crucial new model.

---

[204]   Complaint, ¶112, citing to "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," NYTimes.com Feed, August 16, 2018, 11:22 p.m.

[205]   Complaint, ¶6.

[206]   MTD, p. 39.

[207]   "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," NYTimes.com Feed, August 16, 2018, 11:22 p.m.

Asked if the exhaustion was taking a toll on his physical health, Mr. Musk answered: "It's not been great, actually.  I've had friends come by who are really concerned." …

For two decades, Mr. Musk has been one of Silicon Valley's most brash and ambitious entrepreneurs, helping to found several influential technology companies.  He has often carried himself with bravado, dismissing critics and relishing the spotlight that has come with his success and fortune.  But in the interview, he demonstrated an extraordinary level of self-reflection and vulnerability, **acknowledging that his myriad executive responsibilities are taking a steep personal toll**.

In the interview, Mr. Musk provided a detailed timeline of the events leading up to the Twitter postings on Aug. 7 in which he said he was considering taking the company private at $420 a share.  He asserted that he had "funding secured" for such a deal a transaction likely to be worth well over $10 billion.

That morning, Mr. Musk woke up at home with his girlfriend, the musician known as Grimes, and had an early workout.  Then he got in a Tesla Model S and drove himself to the airport.  **En route, Mr. Musk typed his fateful message.** …

Mr. Musk has said he was referring to a potential investment by Saudi Arabia's government investment fund.  Mr. Musk had extensive talks with representatives of the $250 billion fund about possibly financing a transaction to take Tesla private -- maybe even in a manner that would have resulted in the Saudis' owning most of the company.  One of those sessions took place on July 31 at the Tesla factory in the Bay Area, according to a person familiar with the meeting.  **But the Saudi fund had not committed to provide any cash, two people briefed on the discussions said**.

128. News media commented:

Tesla's stock tumbled after CEO Elon Musk said he's working himself to the bone and relies on Ambien to sleep.

In a[] tearful interview with The New York Times, Musk said this has been "the most difficult and painful year" of his career.  He said he works 120 hours some weeks and has trouble sleeping.  Musk is also CEO of SpaceX and The Boring Company.

Investors weren't sympathetic.

The stock fell 8% on Friday, and it's down more than 20% since the day Musk tweeted he had secured funding for a private takeover of Tesla.

**Musk hasn't exactly given investors confidence that he's on the ball.**

**He admitted in the Times interview that he hadn't cleared his tweet with anyone at Tesla before firing it off midday August 7.  He also said that the price he chose " $420 a share" was somewhat arbitrary.**  He wanted it to be a 20% premium, which would have been around $419.  So he tweeted $420 because it was "better karma."[208]

\*\*\*\*\*

**Tesla Inc's shares slumped 9 percent on Friday after Chief Executive Officer Elon Musk told the New York Times he was under major emotional stress and was preparing for "extreme torture" from short sellers**.

Tesla stock was on track for its biggest daily slump in two years **as Wall Street questioned Musk's ability to lead the electric car maker.  Investors also were worried about reports that regulators were pressuring Tesla's directors for details about how much information he shared with them**.[209]

**What Mr. Musk meant by "funding secured" has become an important question.  Those two words helped propel Tesla's shares higher.  But that funding, it turned out, was far from secure**.[210]

129.   The *NYT* Article brought to light the foreseeable consequence of the Musk Tweets, as it revealed information that would indeed cause investor concern about regulators pressuring directors for details on how much he shared with them:

---

[208]   "Tesla's stock falls sharply after Elon Musk's tearful interview," CNN Wire, August 17, 2018, 11:51 a.m. (emphasis added).

[209]   "Tesla stock sinks after Musk gives tearful NYT interview," Reuters News, August 17, 2018, 4:00 p.m. (emphasis added).

[210]   "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," NYTimes.com Feed, August 16, 2018, 11:22 p.m. (emphasis added).

Mr. Musk has said he saw the tweet as an attempt at transparency. He acknowledged Thursday that no one had seen or reviewed it before he posted it. …[211]

The SEC is pressing Tesla's directors on how much info CEO Elon Musk shared with them ahead of his tweet last week about a potential deal to take the company private, the WSJ reported, citing an unidentified person with knowledge of the matter.[212]

130. The *NYT* Article brought to light the foreseeable consequence of the Musk Tweets, as it revealed information that would indeed cause investor concern related to corporate governance as it angered some board members, according to people familiar with the matter:

The events set in motion by Mr. Musk's tweet have ignited a federal investigation and have angered some board members, according to people familiar with the matter. Efforts are underway to find a No. 2 executive to help take some of the pressure off Mr. Musk, people briefed on the search said. And some board members have expressed concern not only about Mr. Musk's workload but also about his use of Ambien, two people familiar with the board said. …

Mr. Musk said in the interview that board members had not complained to him about his tweet. "I don't recall getting any communications from the board at all," he said. "I definitely did not get calls from irate directors."

But shortly after the Times published its interview with Mr. Musk, he added through a Tesla spokeswoman that Antonio Gracias, Tesla's lead independent director, had indeed contacted him to discuss the Aug. 7 Twitter post, and that he had agreed not to tweet again about the possible privatization deal unless he had discussed it with the board.[213]

---

[211] "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," NYTimes.com Feed, August 16, 2018, 11:22 p.m.

[212] "SEC Is Said Asking How Much Musk Shared With Tesla Directors:WSJ," Bloomberg First Word, August 16, 2018, 4:19 p.m.

[213] "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil," NYTimes.com Feed, August 16, 2018, 11:22 p.m. (emphasis added).

131.  News media commented on the *NYT* Article and whether Musk should still be the CEO:

> Shares of Electric car maker Tesla Inc. tumbled about 9 percent Friday after CEO Elon Musk conceded in a newspaper interview that job stress may be getting the best of him.  **Tesla shares closed at $305.50, their lowest level since Aug. 1, as analysts and business professors questioned whether the company's board should grant Musk a leave or even replace him with a more seasoned CEO.**[214]
>
> *****
>
> Elon Musk's erratic behavior was front and center again this week as the CEO of Tesla conceded that he's overwhelmed by job stress, pushing his electric car company's stock down and bringing pressure on its board to take action.
>
> Musk's revelation, in a Thursday interview with The New York Times, came as government regulators are reportedly investigating whether his recent out-of-the-blue tweet about taking Tesla private violated disclosure requirements.
>
> **Now, experts say Tesla has reached an intersection where the board must decide the direction of its leadership. Among their suggestions: Remove Musk as CEO, permanently or via a temporary leave of absence, or appoint a No. 2 executive who could act as a steadying hand.**[215]

132.  Comments by the Barclays analysts about the need for a COO are also related to the questioning of the ability of Defendant Musk to lead the company:

> The NY Times interview gets to the question of a COO – an issue we pressed Mr. Musk on two years ago
>
> Need for a COO raised in Times article.  We'll leave it to others to debate the psychology of Mr. Musk revealed in the lengthy NY Times interview that appears to have sent the shares sharply down today … For us, an important point was the

---

[214]  "Business Highlights," Associated Press Newswires, August 17, 2018, 6:07 p.m. (emphasis added).

[215]  "As Musk admits to job stress, Tesla's board may have to act," Associated Press Newswires, August 17, 2018, 6:08 p.m. (emphasis added).

acknowledgement that the company/board has, and may be searching for a COO…[216]

133. J.P. Morgan stated that subsequent events led the analyst to believe that funding was not secured for going private:

> **We are reverting to valuing Tesla shares on the basis of fundamentals alone, which entails a $113 reduction in our price target back to the $195 level where it stood prior to our August 8 note in which we newly weighted 50% in our valuation analysis a go-private scenario for which funding was at that time said to have been secured to take the company private at $420 per share** …In reference to statements on Twitter on August 7 by Tesla CEO Elon Musk that "funding has been secured", we wrote in our August 8 note, "As surprising to us as these developments are, and as lacking as the statements are in any details regarding whom is expected to provide the required amount of financing and on what terms, they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured." We also stated, "Our price target could move up or down based upon further developments affecting the likelihood the transaction will or will not go through."
>
> **Our interpretation of subsequent events leads us to believe that funding was not secured for a going private transaction, nor was there any formal proposal.** On August 13, Mr. Musk posted a statement to Tesla's website in which he explained that the comment relative to funding being secured was based upon a July 31 meeting with the Saudi Arabian sovereign wealth fund in which its representative expressed support for funding a transaction to go private. However, it was also stated, "Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements." We had imagined following the surprise August 7 announcement that another party (e.g., the Saudi fund) had already firmly decided (including having completed any

---

[216] Barclays, *Potential for a COO: Good for the company, but won't help the stock*, August 17, 2018, 2:08 p.m. (source for time stamp: Capital IQ, emphasis omitted).

internal review process) to fund a going private transaction. The revelation the Saudi fund is subsequently asking Tesla for details of how the company would be taken private suggests to us that any deal is potentially far from even being formally proposed, which is different from our understanding on August 8 which was based on Mr. Musk's statement on Twitter that, "Only reason why this is not certain is that it's contingent on a shareholder vote".[217]

134. **Chart 9** below shows the intraday trading activity (including price and volume) of Tesla common stock on August 17, 2018.

---

[217]   J.P. Morgan, *Reverting to Valuing TSLA Shares on Fundamentals Alone Given Funding Appears to Not Have Been Secured; PT Back to $195*, August 20, 2018, 6:15 a.m. (emphasis in original and added).  I note that in an email dated August 17, 2018 at 8:59 a.m., the J.P. Morgan analyst, Ryan Brinkman, wrote "I'm thinking on Monday to perhaps remove the 50% "go private" weighting, taking price target back down to $195.  Obviously a tough call."  Source:  JPMS_00004543 (Exhibit 21 to Deposition of Ryan Brinkman, May 4, 2021 ("Brinkman Dep.").  I note the time stamp in the email is 12:59 p.m. but Mr. Brinkman stated in deposition that the time stamp is four hours ahead so the correct time is 8:59 a.m. Brinkman Dep. 99:2 - 99:8.  When asked what made the price target reduction a tough call, Mr. Brinkman stated "I think I was the first analyst to come out and say -- or one of the first, that these Tweets weren't true and essentially it would be tantamount to say the CEO had lied or mislead investors which is, you know, something that's impolitic and I think I handled it in the best way possible." Brinkman Dep. 100:9 - 100:18.

I also note the analyst stated, when asked about the *NYT* Article, "I don't know if this is for sure the one, but it might have been the article where there was reference to board of directors not having known about the go-private Tweet, which certainly would have been impactful for my research and understanding of the situation."  Brinkman Dep. 93:7-93:13.  Further, when asked about the following statement in the NY Times: "Board members blind-sided by the chief executive's market-moving statement were angry they had not been briefed…", Mr. Brinkman stated this was important because "…CEOs just don't come out with announcements that the company is being taken private or acquired by another company or even acquiring another company without the board of directors being at least aware. So it -- it very much undermined the veracity of the August 7 Tweets."  Brinkman Dep. 95:15 - 96:23.

**Chart 9**

Tesla Intraday Stock Price at End-of-Minute Intervals and Volume during Each Minute
August 17, 2018



*Source: Bloomberg*

135.  As shown in **Appendix 5**, Tesla's common stock price decreased 8.93%, from a close of $335.45 per share on August 16, 2018 to a close of $305.50 per share on August 17, 2018 on volume of 19.0 million shares, which was 2.3 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is negative 9.10%, which is statistically significant at the 1% level.  The total abnormal price decrease of $30.53 accounts for and thus eliminates the effects of all market-wide and industry-wide factors that might influence the price of Tesla common stock.

### C.  Post Class Period: August 27, 2018 (Impact Day) - Staying Public

136.  After the markets closed on Friday, August 24, 2018, Elon Musk announced via tweet and blog post on the company's website that Tesla would remain a public company.  The blog post stated:

> Given the feedback I've received, it's apparent that most of
> Tesla's existing shareholders believe we are better off as a

- 94 -
CONFIDENTIAL

> public company. … I'm incredibly excited to continue leading
> Tesla as a public company.[218]

137. A statement was also released by the independent members of Tesla's Board which said:

> Elon communicated to the Board that after having done this
> work and considered all factors, he believes the better path is to
> no longer pursue a transaction for taking Tesla private.  After
> discussing this, we dissolved the Special Committee.  The
> Board and the entire company remain focused on ensuring
> Tesla's operational success, and we fully support Elon as he
> continues to lead the company moving forward.[219]

138. Analyst reaction included CFRA lowering their target price to $325 from $380, reflecting the removal of the premium ($30 per share) for the potential going private transaction and a valuation penalty ($25 per share) for reduced management credibility and increased legal risk (SEC investigations and investor lawsuits) and distraction; RBC stating the stock could return to trading on fundamentals but acknowledged it trades on sentiment; Jefferies stating the stock could take a hit and the go-private episode had resulted in an SEC investigation, lawsuits and more damage to the standing of management and board; and Canaccord stating the recent distractions increased  its risk profile, reduced outlook for Model 3 production and decreased their price target for the stock to $316 from $336:

> **We lower our 12-month target price to $325 from $380.
> This reflects the removal of the premium ($30 per share) we
> added for the then potential going private transaction and
> a valuation penalty ($25 per share) that we asses** [sic] **for
> reduced management creditability and increased legal risk
> (SEC investigations and investor lawsuits) and distraction**.
> …
>
> We are not surprised that the bid failed, as there were many
> hurdles to leap.  Also, as noted previously, we believe that there
> are more benefits for TSLA by staying public than by going

---

[218]  "Staying Public," Tesla Blog Post by Elon Musk, August 24, 2018, and Twitter post "Staying Public," @Tesla, August 24, 2018, 11:15 p.m.

[219]  "Statement from Independent Members of Tesla's Board of Directors (Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch)," GlobeNewswire, August 24, 2018, 11:11 p.m.

private and adding additional debt to a leveraged balance sheet.[220]

\*\*\*\*\*

Late Friday night, Tesla announced they would remain a public company. **With a potential bid of $420/share out of the way, we'd like to say the stock will return to trading on fundamentals, but the truth is the stock trades on sentiment.** Each side of this polarizing stock may feel emboldened by the "stay public" announcement. ... **It has become clear to us that funding was not secured or there was not sufficient interest to take the company private at $420/share**. And we think **credibility has taken a hit**. Recall, **Elon initially stated "investor support is confirmed" but now shareholder sentiment is "please don't do this."** The letter also indicated that institutional shareholders explained they have limits on private investments and there is no proven path for retail investors to remain in a private Tesla (which Elon wanted) - two ideas many sussed out quickly.

**This reinforces the idea that this whole episode was not planned or fully thought out and thus could get added to the list of debatable statements from the company over the years. Further, we see potential ramifications from an SEC investigation and shareholder lawsuits.** Though these are admittedly unquantifiable, they would be an incremental call on cash for a company with a weak balance sheet.

Given the events of the past few weeks, we believe even rational bulls would have to admit that **Tesla and CEO Elon Musk have lost some of their luster**. **This is a non-trivial point considering that investor belief in Musk and wanting to invest with him, has to date, arguably been the largest driver of the stock**. In our view, Musk's involvement in the company is critical, but now more than ever a solid #2 - someone with strong operational background that can help Tesla move from ideas to execution - is crucial. We could also see more investor pressure for improved corporate governance.[221]

---

[220] CFRA, *CFRA MAINTAINS HOLD OPINION ON SHARES OF TESLA MOTORS, INC.*, August 27, 2018, 10:40 a.m. (source of time stamp: Capital IQ) (emphasis added).

[221] RBC Capital Markets, *What a long strange trip it's been*, August 26, 2018, 4:00 p.m. (source of time stamp: Capital IQ) (emphasis added).

*****

**Shares may be hit today as a result of more erratic corporate behavior at Tesla**, However, we wonder if the "going private" tweet has effectively put Tesla in play and may lead to additional discussions with other investors, mainly corporates, that value Tesla's vision and can help bridge gaps in growth and execution skills.  In any scenario, we think Tesla needs new capital to fund midterm growth or risk a de-rating of its valuation multiples.  …

The targeted $420 price was also, understandably, deemed too low by many bulls.  **The only tangible results so far from that episode seem to be an SEC investigation, lawsuits and more damage to the standing of management and board**.[222]

*****

Tesla announced late Friday that the company would remain public; Elon Musk cited a consensus shared between both retail and institutional shareholders that remaining a public company would be in its best interest.  Those institutional investors also indicated regulatory guidelines would prevent them from maintaining their full stakes.

We believe the drama associated with this endeavor, which includes tweeting "funding secured," is a great example of why even a great company may need different leaders during its life cycle.

Our greatest concern is that while TSLA leads the market with brand and technology, a series of self-inflicted problems could open the door for new entrants with greater financial backing, such as the Toyota/Uber opportunity, for example.

**The recent distractions at TSLA increase our risk profile and affect our outlook for Model 3 production.  With a modest trim of our Model 3 production estimates from 52K to 48K, our PT decreases to $316 from $336 previously**.[223]

---

[222]   Jefferies, *Is Tesla still in play?*, August 27, 2018, 4:45 a.m. (source of time stamp: Capital IQ) (emphasis added).

[223]   Canaccord Genuity, *Going private off the table; trimming Model 3 expectations for Q3; HOLD, PT to $316*, August 28, 2018, 5:04 a.m. (source of time stamp: Capital IQ) (emphasis added).

139.   As shown in **Appendix 5**, Tesla's common stock price decreased 1.10%, from a close of $322.82 per share on August 24, 2018 to a close of $319.27 per share on August 27, 2018 on volume of 13.1 million shares, which was 1.6 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is *negative* 2.64%, which is not statistically significant at the 5% level.[224]

### D.   Post Class Period: September 28, 2018 and October 1, 2018 (Impact Days) - SEC Settlements

140.   According to the Complaint:

> On September 27, 2018, the SEC filed a complaint against Musk alleging violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Two days later, on September 29, 2018, the SEC filed a complaint against Tesla alleging violations of Rule 13a-15 under the Securities Exchange Act of 1934.  Both Musk and Tesla later consented to judgments being entered against them.  The judgments ordered Musk to resign as Tesla's Chairman, ordered Tesla to appoint additional independent directors, and required Tesla and Musk to each pay a $20 million penalty ($40 million total).  The United States District Court for the Southern District of New York approved the settlements and the accompanying judgments and consents on October 16, 2018.[225]

141.   The SEC complaint against Musk was filed after the markets closed on Thursday September 27, 2018[226] and the SEC complaint against Tesla, as well as the Musk and Tesla settlements, were filed on Saturday, September 29, 2018.[227]

---

[224]   The same regression specification has been applied to the period following the end of the Class Period as was employed for the dates during the Class Period.  *See* Appendix E to Class Certification Report for description of the market model.

[225]   Complaint, ¶116.

[226]   *See,* for example, "Elon Musk Sued by the SEC for Securities Fraud," Dow Jones Institutional News, September 27, 2018, 4:20 p.m.

[227]   *See,* for example, "Elon Musk Forced To Step Down As Tesla Chairman To Settle SEC Fraud Charges – MarketWatch," Dow Jones Institutional News, September 29, 2018, 5:47 p.m.  and "Elon Musk Settles SEC Fraud Charges; Tesla Charged With and Resolves Securities Law Charge," Securities and Exchange Commission Documents, September 29, 2018.

142.  After the SEC complaint filed against Musk on September 27, 2018, analyst commentary was negative especially because the SEC was pursuing barring Elon Musk from acting as an officer or director of any public companies in the future:

> After market close, the SEC filed a complaint against Elon Musk, alleging he committed securities fraud by knowingly Tweeting false and misleading statements regarding taking Tesla private and whether funding was secured, among other complaints.  Tesla shares have dropped over 10% in after-hours trading.
>
> We believe this will raise the cost of capital to fund the two upcoming tranches of debt, which include $230M in November and $920M in March 2019.  This will also likely pressure the shares with the ongoing lawsuit, due to many institutional investors limiting the amount of shares they hold with an active SEC lawsuit.
>
> Beyond suing for any ill-gotten gains and civil penalties surrounding the Securities and Exchange Act, the SEC is pursuing barring Elon Musk from acting as an officer or director of any public companies in the future.
>
> While we agree Musk's talent could likely be used in a different capacity than Chairman and CEO, we also believe that a complete removal from the company poses a risk to the shares.[228]
>
> *****
>
> The SEC filed a civil action against Elon Musk alleging he made "false and misleading statements" when tweeting about taking Tesla private, causing "significant confusion and disruption in the market for Tesla stock and resulting harm to investors." The SEC seeks to disgorge any ill-gotten gains, civil fines, and an order prohibiting Mr. Musk from acting as an officer or director of a public company.  Without a doubt, we see that last demand as the one mattering most.[229]

---

[228]  Canaccord Genuity, *SEC files lawsuit against Musk*, September 27, 2018, 6:33 p.m (source for time stamp: Capital IQ).

[229]  Guggenheim Securities, *TSLA – Taking the Bad with the Good*, September 27, 2018, 11:10 p.m. (source for time stamp: Capital IQ, emphasis omitted).

***** 

SEC lawsuit against CEO Elon Musk adds further uncertainty to Tesla story.[230]

*****

We reiterate our Underweight rating on Tesla shares, including after the US Securities and Exchange Commission (SEC) filed a complaint Thursday with the US District Court for the Southern District of New York alleging that Tesla CEO Elon Musk violated federal securities law by making a series of false and misleading statements on August 7 relative to the prospect of taking the company private.[231]

*****

The SEC civil action may lead to Musk's exit from Tesla (either permanently or temporarily) and the Musk premium in the shares dissipating. … TSLA share have ~$130 of Musk premium for future success that might dissipate.[232]

143.   After the news on Saturday, September 29, 2018 that Musk and Tesla had settled with the SEC, analyst commentary was positive though noting risks remain elevated:

We view Elon Musk and Tesla's settlement with the SEC as a positive change, as it should improve corporate governance and allow investor focus squarely on the operations.[233]

*****

Elon Musk settled with the SEC after last week's claims that his go-private tweets misled investors, agreeing to step down as

---

[230]   RBC Capital Markets, *Lawsuit Secured*, September 27, 2018, 6:27 p.m. (source for time stamp: Capital IQ).

[231]   J.P. Morgan, *Reiterate Underweight as SEC Seeks CEO Removal After Alleged Securities Law Violation, Adding to Pre-Existing Pressures*, September 28, 2018, 6:00 a.m. (source for time stamp: Capital IQ).

[232]   Barclays, *Lawsuit Secured*, September 28, 2018., 12:59 a.m. (emphasis omitted, source for time stamp: Capital IQ).

[233]   Canaccord Genuity, *SEC settlement should be a positive for shares; maintain HOLD*, September 30, 2018, 11:06 p.m. (source for time stamp: Capital IQ).

chairman for 3 years and add 2 new independent directors, with him and Tesla each paying a $20mil fine and Tesla establishing new oversight of his tweets, but Musk importantly remaining CEO.[234]

\*\*\*\*\*

Given the circumstances, we view Elon Musk's and Tesla's settlement with the SEC as a positive outcome.[235]

\*\*\*\*\*

The Securities and Exchange Commission (SEC) on Saturday announced a settlement of the securities fraud charges it had brought against Tesla CEO Elon Musk only last Thursday … and announced additional charges against Tesla itself that were simultaneously also settled. …

We regard the settlement with Mr. Musk as a positive relative to the situation Tesla found itself in after the SEC charges were initially brought last Thursday, as it reduces uncertainty as to who will lead Tesla and avoids a distracting and potentially lengthy trial. …

We estimate Tesla's legal risks remain elevated, given the plethora of now potentially bolstered shareholder class actions and any potential Department of Justice investigation.[236]

\*\*\*\*\*

Back to the bull/bear debate with bulls likely to declare near-term victory: With the unexpected SEC/Tesla/Musk settlement announced on Saturday, we are back to the "red pill vs. blue pill debate" over the underlining fundamentals for the stock. We on the red pill side will continue to focus on what we see the longer-term over-valuation of the shares, while those on the blue pill side will probably see the settlement as vindication,

---

[234] Guggenheim Securities, *TSLA – Staying CEO and Now Back to Business*, October 1, 2018, 12:00 a.m. (source for time stamp: Capital IQ).

[235] RBC Capital Markets, *Settlement Secured*, September 30, 2018, 2:52 p.m. (source for time stamp: Capital IQ).

[236] J.P. Morgan, *Tesla and Tesla CEO Elon Musk Settle Charges with SEC, Reducing Uncertainty, Although Legal Risk Remains Elevated – ALERT*, October 1, 2018, 12:16 a.m. (emphasis omitted, source for time stamp: Capital IQ).

esp. as the shares Monday should regain their Friday losses. With 90 days to comply with the settlement, Tesla is likely in our view to strike a typically bullish tone on the 3Q sales release, shareholder letter and conference call.  As a result, we would not be surprised to see the stock rebound over the next few weeks.  Nevertheless, we reiterate our UW and $210 price target.[237]

144.  As shown in **Appendix 5**, Tesla's common stock price decreased 13.90%, from a close of $307.52 per share on September 27, 2018 to a close of $264.77 per share on September 28, 2018 on volume of 33.6 million shares, which was 4.1 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is negative 13.84%, which is statistically significant at the 1% level.

145.  As shown in **Appendix 5**, Tesla's common stock price increased 17.35%, from a close of $264.77 per share on Friday, September 28, 2018 to a close of $310.70 per share on Monday, October 1, 2018 on volume of 21.8 million shares, which was 2.6 times the average volume during the 120 trading days prior to the start of the Class Period.  The abnormal return is 17.53%, which is statistically significant at the 1% level.

## VI.   LOSS CAUSATION ISOLATING THE IMPACT OF THE ALLEGATIONS BY ACCOUNTING FOR MARKET-WIDE AND INDUSTRY INFLUENCES, AS WELL AS POTENTIALLY CONFOUNDING INFORMATION RELEASED OVER THE CLASS PERIOD AND THE CONSTRUCTION OF THE ARTIFICIAL INFLATION RIBBON

### A.   Statistical Analysis of the Price Movements Following the Alleged Partial Corrective Disclosure

146.  In this section, I analyze the impact, if any, of potentially confounding information (*i.e.*, the disclosure of unanticipated, material information that is unrelated to the allegations) on the observed price movements during the Class Period.  I begin by repeating that, as of the close on August 17, 2018, the value of Tesla reflected *all* the information that had been incorporated into Tesla's market price during the Class Period. Although I find that the price movements over the Class Period predominantly related to

---

[237]   Barclays, *Back to the previously scheduled red pill v blue pill debate*, October 1, 2018, 12:18 a.m. (emphasis omitted, source for time stamp: Capital IQ).

the information allegedly misrepresented and omitted in the Musk Tweets, as well as the foreseeable consequential effects caused by those concerns that surfaced after the Musk Tweets (*e.g.*, reduced management credibility and failures of corporate governance and internal controls, as well as increased legal risk from SEC investigations and investor lawsuits), I isolate any of the overall price decline during the Class Period that could be attributable to factors unrelated to Plaintiff's allegations in this matter.

### 1.    Accounting for Market-Wide and Industry Influences on Tesla Stock Price Movements

147.   Over the Class Period, there was a general decline in the market and industry indexes.  I therefore first remove these market-wide and industry influences on Tesla's stock price movements between the market close on August 7, 2018 when the stock price was $379.57 per share and the market close on August 17, 2018 when the stock price was $305.50 per share.  I show in **Table 5** below that after removing market-wide and industry influences on Tesla's stock price movements, the "adjusted" stock price of Tesla would have been $312.90 per share.  For this calculation I start with the closing price on August 7, 2018 of $379.57, and then apply the daily abnormal return on August 8, 2018 of *negative* 2.36% — *i.e.,* the return to Tesla that eliminates market and industry effects for August 8, 2018 —  and calculate the adjusted price for August 8, 2018 of $370.60.  This adjusted price removes the August 8, 2018 market-wide and industry influences on Tesla's stock price movements.

**Table 5**

| Date | Price | Return | Abnormal Return | Adjusted Price |
|---|---|---|---|---|
| 8/7/2018 | $379.57 | | | $379.57 |
| 8/8/2018 | $370.34 | -2.43% | -2.36% | $370.60 |
| 8/9/2018 | $352.45 | -4.83% | -4.67% | $353.31 |
| 8/10/2018 | $355.49 | 0.86% | 2.11% | $360.75 |
| 8/13/2018 | $356.41 | 0.26% | 0.95% | $364.17 |
| 8/14/2018 | $347.64 | -2.46% | -3.32% | $352.10 |
| 8/15/2018 | $338.69 | -2.57% | -0.71% | $349.61 |
| 8/16/2018 | $335.45 | -0.96% | -1.54% | $344.24 |
| 8/17/2018 | $305.50 | -8.93% | -9.10% | $312.90 |

*Adjusted Price after 8/7/2018 is prior Adjusted Price multiplied by  1 + Abnormal Return.*

148.  I next use this adjusted price of $370.60 on August 8, 2018 and the abnormal returns for each of the seven following days (*i.e.,* August 9, 2018 to August 17, 2018), to calculate an adjusted stock price for Tesla as of August 17, 2018 of $312.90 per share, which accounts for and removes the market and industry influences on Tesla stock price movements during the Corrective Interval or my event window.  This derivation is also shown in **Table 5**, where I demonstrate that of the total $74.07 per share decline in Tesla's stock price — from $379.57 per share on August 7, 2018 to $305.50 per share on August 17, 2018 — $7.40 per share (or $312.90 - $305.50, which is approximately 10% of the total decline) is due to market-wide and industry influences.

## 2.    Company-specific information unrelated to the alleged misstatements

149.  After removing the market-wide and industry influences from the Tesla stock price movements over the Class Period, I next carefully examined the news sources and the analyst reports, as well as the minute-by-minute results from my event study to determine whether Tesla's stock price might have been impacted by contemporaneous disclosures of other Tesla-specific, unanticipated, material information that was unrelated to the Musk Tweets or Consequential Harm.  By examining the price movements in minute detail, I am able to determine whether any of the observed price decline over the Corrective Interval was caused by unrelated material, unanticipated information or factors.  I note that positive material, unanticipated news that would have caused stock price to rise would have cushioned the observed price decline.[238]

150.  In **Table 6** below, I identify news that is not associated with the Musk Tweets and the Consequential Harm (*i.e.*, potentially confounding information) and that might have resulted in price impact.  The date and time of the news recorded in **Table 6**  below specifies when the articles first reported on the matter.  I also present the abnormal returns and statistical significance measures for the one-minute and fifteen-minute intervals

---

[238]  I examine all potential confounding information, but note that that positive material, unanticipated news that would have caused stock price to rise would have cushioned the observed price decline over the Corrective Interval.  Thus, if this was incorrectly accounted for it would means my calculation of artificial inflation is too low and damages are understated.

following these disclosures.[239]   Based on my statistical analysis of the one-minute and fifteen-minute intervals as well as my thorough analysis of the news, I did not identify any materially, negative, new, unanticipated confounding information that should be incorporated into my "adjusted" price of Tesla common stock.   I explain my analysis of the potentially confounding news in **Table 6** below.

---

[239]   I use 1-minute and 15-minute intervals in my potentially confounding news analysis and note that the abnormal returns for the 1-minute and 15-minute intervals following the Musk Tweets at 12:48 p.m. on August 7, 2018 are positive and statistically significant at the 1% level.  The 1-minute (close to open) and 15-minute (close to 9:45 a.m.) intervals following the  interview in the *NYT* Article after the market close on August 16, 2018 are negative and statistically significant at the 5% and 1% level, respectively.

## Table 6[240]
## Disclosures with Potentially Confounding News

| Impact Date | Date | Time | News Summary | Abnormal Return | | p-value | |
|---|---|---|---|---|---|---|---|
| | | | | 1-minute interval | 15-minute interval | 1-minute interval | 15-minute interval |
| 8/6/18 | 8/6/2018 | | | | | | |
| 8/7/18 | 8/7/2018 | 12:17 PM | Saudi Arabia's Public Investment Fund Builds $2 Bln Stake. | 0.01% | 4.17% | 95.43% | 0.00% |
| 8/8/18 | 8/8/2018 | 1:00 AM | Tesla's production of solar roof tiles has been delayed by assembly-line problems. | -2.65% | -0.81% | 6.04% | 60.63% |
| 8/9/18 | 8/9/2018 | | | | | | |
| 8/10/18 | 8/10/2018 | 8:55 AM | Return of an experienced engineer like Field suggests Apple could still be looking to produce its own autonomous vehicles. | 1.51% | -0.81% | 28.10% | 60.63% |
| 8/13/18 | 8/10/2018 | 6:01 PM | Tesla blog post: What You Need to Know about the Federal EV Tax Credit Phase Out explains phase out of tax credits for buyers after Tesla sold 200,000 vehicles. | 1.50% | -0.51% | 28.46% | 74.45% |
| 8/14/18 | 8/14/2018 | | | | | | |
| 8/15/18 | 8/15/2018 | | | | | | |
| 8/16/18 | 8/16/2018 | 4:20 AM | Tesla backs off solar panel deal; latest sign of the uncertain outlook for Tesla's solar business. | -0.51% | -0.64% | 71.47% | 68.46% |
| | 8/16/2018 | 7:14 AM | Tesla whistleblower (Tripp) tweets claims that the firm's car batteries are faulty. | -0.51% | -0.64% | 71.47% | 68.46% |
| | 8/16/2018 | 8:38 AM | Musk's plan to become profitable, is on track and an 8,000 a week production rate is "well within reach,". Evercore forecast Model 3 production of 123,000 vehicles during the second half of the year, but the analysts said they may need to boost that by as much as 7 percent after the tours. | -0.51% | -0.64% | 71.47% | 68.46% |
| | 8/16/2018 | 12:20 PM | Tesla making profit of more than $3,000 on each sale of the current low-price version of its Model 3 sedan, but would likely lose nearly twice that amount if it sold the vehicle at its long-promised $35,000 price tag, according to a new estimate from UBS. | -0.14% | -0.33% | 11.68% | 35.62% |
| | 8/16/2018 | 2:29 PM | Ex-Tesla worker (Hansen): Gigafactory workers involved in drug trafficking. | 0.12% | 0.28% | 18.35% | 42.93% |
| 8/17/18 | 8/16/2018 | 4:03 PM | Another whistleblower (Hansen) filed tip with the SEC.  The tip alleges that Tesla did not disclose to shareholders the theft of raw materials and unauthorized surveillance and hacking of employee devices and that the company did not tell federal authorities about information it received from former employee Karl Hansen about alleged drug trafficking at the company's Gigafactory in Nevada. [Musk later responds calling whistleblower super nuts]. | -3.13% | -5.66% | 2.67% | 0.04% |
| | 8/16/2018 | 4:30 PM | SEC Said to Probe Tesla on Model 3 Disclosures Last Yr: WSJ. | -3.13% | -5.66% | 2.67% | 0.04% |
| | 8/16/2018 | 5:54 PM | Whistleblower (Hansen) says Tesla's security team is staffed with former members of a notorious group from Uber that allegedly spied on rivals. | -3.13% | -5.66% | 2.67% | 0.04% |

---

[240] The 1-minute and 15-minute intervals are based on the closing price of the 1-minute interval starting before the news and ending at the first and fifteenth 1-minute interval following the news.  For news after the market close and prior to the next market open, the 1-minute and 15-minute abnormal returns and p-values are measured from prior close to the next market open for the 1-minute interval and to 9:45 a.m. for the 15-minute interval.  Source for news: **Appendix 14**.  For news released within a trading day, 1-minute and 15-minute abnormal returns are calculated based on minute-level abnormal returns, with t-statistics and p-values for the 15-minute abnormal returns based on 15 intervals.   Abnormal returns for news released outside of market hours are calculated as follows:  1-minute returns are equal to the close-to-open returns as described in footnote 122 of the Class Certification Report; and 15-minute

### a)      August 7, 2018 at 12:17 p.m.

151.   As discussed above, news of the Saudi Arabia PIF investment in Tesla[241] had a positive stock price impact, as shown by the fifteen-minute stock price reaction.  The ten-minute price and volume analysis in paragraph 76above shows that the price and volume increase was most prevalent in the first 20 minutes after the news and had been incorporated into the market price prior to and at least ten minutes before the Musk Tweets. Therefore, I have appropriately accounted for this information, which was disclosed before the start of the Class Period.

### b)      August 8, 2018 at 1:00 a.m.

152.  News that Tesla's production of solar roof tiles had been delayed by assembly-line problems[242] might be considered negative news to Tesla investors.  However, a complete examination of the discussions following this disclosure and empirical evidence suggests it was not unanticipated, material adverse information.  Although the Tesla stock opened down 2.8% at $369.09, it quickly rebounded to $382.55 by 10:10 a.m.,[243] which was above the prior day's close.  Moreover, the one-minute (close to open) and the fifteen-minute stock price reaction (close to 9:45 a.m.) were not statistically significant at the 5% level and the full day stock price reaction is also not statistically significant at the 5% level. More critically, a full analysis shows that news articles before the market open noting the pre-market stock price decline mentioned and focused on the going-private deal, while there was no mention of the information disclosed about solar roof tiles.  Indeed, news sources attributed the full day stock decline of 2.4% to news that the SEC was probing the Musk Tweets,[244] while I was unable to find even a single news article or analyst

---

returns are based on a similar methodology using returns calculated from the close to the 9:44-9:45 closing interval price (obtained from Bloomberg GIT data).

[241]  "Saudi Arabia's sovereign fund builds $2bn Tesla stake," *Financial Times*, August 7, 2018, 12:17 p.m.

[242]  "INSIGHT-Inside Tesla's troubled New York solar factory," Reuters News, August 8, 2018, 1:00 a.m.

[243]  Based on the closing 1-minute interval price, *see* paragraph 87.

[244]  "SEC Looks Into Musk's Taking-Tesla-private Tweets: WSJ -- MarketWatch," Dow Jones Institutional News, August 8, 2018, 4:06 p.m.; "US stocks end near flat; Tesla retreats," Agence

commentary attributing any of the price decline to the delay in solar roof tile production. Nor did I find any analysts decreasing their estimates based on solar-related revenues. Therefore, from an economic perspective I do not consider this disclosure to include *negative*, unanticipated, material information; in other words, it is not confounding information.

      **c)**      **August 10, 2018 at 8:55 a.m.**

153. News that Apple could be looking to produce autonomous vehicles[245] was disclosed before the market open might be considered negative news to Tesla investors. However, the price opened 0.4% *higher* than its prior day close, the one-minute (close to open) and fifteen-minute (close to 9:45 a.m.) stock price reactions were not statistically significant at the 5% level, and the full day stock price reaction was *positive* and not statistically significant at the 5% level.  Further, no news sources attributed any price impact to the Apple news, nor did I find any analysts commenting on this news in my search of analyst reports available to me.  Therefore, from an economic perspective I do not consider this disclosure to include *negative*, unanticipated, material information; in other words, it is not confounding information.

      **d)**      **August 10, 2018 at 6:01 p.m. (August 13 impact day)**

154. A Tesla blog post about the phase out of the EV tax credit after selling 200,000 vehicles[246] was not unanticipated, material, *new* information because similar information was reported in July 2018 after Tesla had reported the sale of 200,000 vehicles.[247]  Moreover, the one-minute (close to open) and fifteen-minute (close to 9:45 a.m.) stock price reactions were not statistically significant at the 5% level, and the full day

---

France Presse, August 8, 2018, 4:22 p.m.; and "Dow Futures: Roku Soars Near Buy Point; This Breakout Stands Out Vs. Apple, Alphabet, Tesla, Paycom," Investor's Business Daily, August 8, 2018.

[245]  "Tesla's former head of engineering Doug Field has left the company to work on Apple's secretive 'Project Titan' self-driving car experiment," Mail Online, August 10, 2018, 8:55 a.m.

[246]  "What You Need to Know about the Federal EV Tax Credit Phase Out," Musk Blog Post, August 10, 2018, 6:01 p.m.; and "What you need to know about the Federal EV Tax Credit phase out," Musk Tweets, August 10, 2018, 6:04 p.m.

[247]  *See* for example: "Tesla delivers 200,000 cars, tax credit for future buyers to be lower," Reuters News, July 12, 2018, 9:47 a.m.

stock price reaction was *positive* and not statistically significant at the 5% level. Therefore, from an economic perspective I do not consider this disclosure to include *negative*, unanticipated, material information; in other words, it is not confounding information.

     e)     **August 16, 2018 before the opening of trade (at 4:20 a.m., 7:14 a.m. and 8:38 a.m.)**

155.  Prior to the opening of trade in the stock market, news sources and analysts discussed three issues, including: (a) Tesla's solar panel business outlook;[248] (b) whistleblower claims of faulty batteries;[249] and (c) an Evercore analyst report on Model 3 production.[250]  The one-minute (close to open) and fifteen-minute (close to 9:45 a.m.) stock price reactions were not statistically significant at the 5% level, and the full day stock price reaction was not statistically significant at the 5% level.

156.  The following is from the news article about the Evercore analyst who was positive on Tesla's production of Model 3 sedan and may need to increase their production forecast by as much as 7 percent.[251]

> It's been a wild ride for Tesla Inc. recently, but **production of the Model 3 sedan -- a previous point of concern -- is going swimmingly**.
>
> Output of the more mass-market vehicle, a key plank in Chief Executive Officer Elon Musk's plan to become profitable, is on track and an 8,000 a week production rate is "well within reach," despite extra spending demands, Evercore ISI analysts George Galliers and Arndt Ellinghorst wrote Thursday in a

---

[248]  "Tesla backs off solar panel deal with Panasonic; The news is the latest sign of the uncertain outlook for Tesla's solar business, which has taken a back seat to the electric car business," MarketWatch, August 16, 2018, 4:20 a.m.

[249]  "Tesla whistleblower tweets claims that the firm's car batteries are faulty," *The Telegraph* Online, August 16, 2018, 7:14 a.m.

[250]  "Tesla Analyst Who Toured Plant Bets on 8,000-a-Week Model 3 Pace," Bloomberg News, August 16, 2018, 8:38 a.m.

[251]  I note that this news is unrelated to the alleged wrongdoing and possibly caused some increase in Tesla's stock price.  The news is before the market open on August 16, 2018 and Tesla's stock price increase at the open is $1.22 (open price of $339.91 minus prior close price of $338.69) or 0.4%; the close-to-open abnormal return is negative 0.51%, which is not significant at the 5% level.  I also note there are 8 negative and 4 positive statistically significant abnormal returns at the 5% significance level for 1-minute intervals just after open between 9:30 – 10:00 a.m.

note. Their report came after a site visit at the company's Fremont, California, plant this week.

**In more of a mixed report on the automaker, Bernstein analyst Toni Sacconaghi raised his target price to $325 from $265, saying the chances Tesla will go private are less than 50 percent**. …

"**We are incrementally positive on Tesla** having just returned from a 48-hour trip to Tesla's Fremont facility," the analysts wrote, after completing three separate tours at the site. "Tesla seems well on the way to achieving a steady weekly production rate."

The analysts saw nothing that would suggest Tesla isn't able to produce 5,000 Model 3 cars per week currently and increase that by 1,000 per week "very shortly."

**Evercore forecast Model 3 production of 123,000 vehicles during the second half of the year, but the analysts said they may need to boost that by as much as 7 percent after the tours**.

Tesla shares rose 1.1 percent to $342.50 at 8:30 a.m. in New York before regular trading.[252]

157. Therefore, from an economic perspective I do not consider this disclosure to include *negative*, unanticipated, material information; in other words, it is not confounding information.

      **f)**       **August 16, 2018 at 12:20 p.m.**

158. A negative UBS analyst report on base Model 3 profitability was disseminated and reported on by a news article during mid-day trading.[253] The one-minute

---

[252] "Tesla Analyst Who Toured Plant Bets on 8,000-a-Week Model 3 Pace," Bloomberg News, August 16, 2018, 8:38 a.m. (emphasis added).

[253] "Is a $35,000 Tesla Model 3 Envisioned by Musk Profitable? UBS Says No; Current claims of profitability are based on higher-price version of the sedan, the brokerage says," *The Wall Street Journal* Online,  August 16, 2018, 12:20 p.m.

and fifteen-minute stock price reactions were not statistically significant at the 5% level, and the full day stock price reaction was not statistically significant at the 5% level.

159. The following is from the news article that reported a UBS analyst was negative on the future profitability of Tesla's base of Model 3 sedan and could have an operating loss of approximately $6,000 per vehicle if it sold at its long-promised $35,000 price.[254]

> **Tesla Inc. is making an operating profit of more than $3,000 on each sale of the current low-price version of its Model 3 sedan, but would likely lose nearly twice that amount if it sold the vehicle at its long-promised $35,000 price tag**, according to a new estimate from UBS Securities LLC.
>
> The Model 3's profitability is a critical issue for the electric-car maker, which began selling the vehicle a year ago as it sought to move from a luxury niche into the mass market, and end years of losses.
>
> The vehicle's price currently ranges from $49,000 to about $80,000, well above the more-affordable target long envisioned by Chief Executive Elon Musk.
>
> At the low end of that range, Tesla's operating profit is likely $3,420 a vehicle, according to the UBS estimate, which is based on analysis of a Model 3 vehicle the firm deconstructed in order to understand how it was made.  That would help explain why Mr. Musk is forecasting a profit in the third quarter.
>
> The lack of a $35,000 base model in Tesla's lineup, as well as early demand for the more expensive versions, should set up the company for its best quarter of profitability from the vehicle ahead of less-costly versions down the road that will reduce the lineup's margins, Colin Langan, who wrote the UBS report, said Thursday in an interview.

---

[254] I note that this news is unrelated to the alleged wrongdoing and possibly caused some decline in Tesla's stock price.  The first UBS news is at 12:20 p.m. on August 16, 2018 and the 1-minute and 15-minute abnormal returns are not statistically significant at the 5% level.  I also note there are 2 negative and 1 positive statistically significant abnormal returns at the 5% significance level for 1-minute intervals after 12:20 p.m. through the market close this day.

"Q3 is Tesla's best shot because of this pricing dynamic," he said of profitability.  "I'm very clear that I don't think that's sustainable."

A Tesla spokeswoman declined to comment on the report.

Tesla's finances are in a brighter spotlight now as Mr. Musk considers taking the auto maker private, in part to shed intense scrutiny of the company's finances as it grows its business globally.

Before Tesla began Model 3 production in July 2017 and revealed its pricing strategy, UBS estimated the Model 3 at $35,000 would lose about $2,300 a car, while a more expensive version at $42,000 would eke out $670 of profit.

The teardown of the Model 3, however, resulted in a higher estimated cost of the vehicle's batteries.

Tesla has spent the past 12 months struggling to ramp up production to reach a rate that would give it enough vehicles to sell to generate cash.  At the end of June, Tesla finally reached its long-delayed goal of making 5,000 Model 3s in a single week, a pace that if continued should help it be profitable this quarter and next, Mr. Musk has said.

**A $35,000 version will come later this year, Mr. Musk has promised.  In May, on Twitter, he suggested Tesla first needed to ramp up production to help lower costs, saying shipping the $35,000 version then would cause the company "to lose money & die."**

**Tesla needs three to six months after being able to reach a build rate of 5,000 sedans a week before being able to sell the $35,000 version and "live," he said.**[255]

---

[255]  "Is a $35,000 Tesla Model 3 Envisioned by Musk Profitable? UBS Says No; Current claims of profitability are based on higher-price version of the sedan, the brokerage says," *The Wall Street Journal* Online, August 16, 2018, 12:20 p.m. (emphasis added).

160.  A news article summarizing Tesla's stock price move on August 16, 2018 mentioned the positive Evercore report, Bernstein raising its target price, and Tesla suing Ontario (Canada) for canceling incentives for electric-vehicle purchases:

> Industrials outpaced the broader market's advance, as Boeing, Caterpillar and Lockheed each climbed more than 2.5 percent. Tesla would have no problem bumping up Model 3 output to 8,000 a week, according to Evercore ISI.  …
>
> Tesla's (TSLA -1%) production of the Model 3 sedan at 8,000 a week is "well within reach," according to Evercore ISI.  After touring Tesla's Fremont facility, the firm determined that the carmaker could produce 5,000 a week and increase that by 1,000 per week "very shortly."
>
> Tesla's odds of successfully going private are less than 50 percent, Bernstein said as it raised its price target on the carmaker to $325 from $265.
>
> Tesla sued Ontario for canceling incentives for electric-vehicle purchases.[256]

161.  Analyst commentary on August 15-16, 2018 included Evercore's favorable comments on the Model 3 production outlook, UBS's unfavorable comments on the profitability of a base Model 3 (that would be released in the future), and UBS's comments that laid out three possible paths for enforcement by the SEC investigating the Musk Tweets:

> **Model 3 on track, positive revisions to production forecasts may be required** – We are incrementally positive on Tesla having just returned from a 48 hour trip to Tesla's Freemont facility to see Model 3 production.  **Tesla seems well on the way to achieving a steady weekly production rate of 5 to 6k units per week.  In addition, the capex required and constraints that need to be overcome to reach 7 to 8k units per week seem well within reach**.  While, we forecast H2 Model 3 production of 123k units, following our trip, **we believe our estimate could be 4 to 7% too low**.  …
>
> Focusing on the fundamentals and setting aside talk of privatization, we are incrementally positive on Tesla following

---

[256]  "Tesla Model 3 Line Is Humming; Boeing Climbs: Industrials Wrap," Bloomberg First Word, August 16, 2018, 4:49 p.m.

our visit.  We have confidence in their production.  We did not see anything to suggest that Model 3 cannot reach 6k units per week, and 7k to 8k with very little incremental Capex.  HOWEVER, to materially move our numbers and our TP, we would need to positively revise our Model 3 RpU and gross margin assumptions, with the key questions being can Model 3 RpUs hold through 2019 and can a 25% gross margin be realized.  The company seems confident about both.  For us, further analysis is required and we would like to see continued evidence of gross margin expansion in 2H.  However, taking such projections into consideration would likely see mid-teen percentage positive gross profit revisions for 2019 and 2020.  If we were to apply this to our blended TP methodology, it would result in a TP of closer to $380; materially higher than our $301 and within 10% of Musk's tweeted privatization price.[257]

*****

All-in, our base case estimate for a 75kWh battery at a $49,000 price point would imply a 31% contribution margin, a 19% gross margin, and a 9% operating margin.  … The teardown results imply this model would get only a 29% contribution margin, a 17% gross margin, and a 7% operating margin.  With multiple factors including but not limited to volatile commodity prices and manufacturing efficiency influencing the per cell price, we realize that our estimates could be off from actual prices and with total cell cost equal to almost 1/3rd of the cost of the car the margins are ultimately very sensitive to cell pricing.  With that, we highlight that based on a range of cell costs of $105-185kWh, the EBIT rate could be between 1.7%-14.0%.  …

Valuation: Reiterate Sell rating and $195 price target.  We are maintaining our $195 DCF based price target.  …

The market should not ignore fundamental headwinds that persist with regards to TSLA's Model 3 profitability, stationary storage, and solar.  …

---

[257]  Evercore ISI, *Just got back from Tesla…*, August 16, 2018, 6:44 a.m. (source of time stamp: Capital IQ) (emphasis added).

**Our math suggests that a base $35k version has a gross margin of -3%** and that a fully loaded performance version has a 42% GM.[258]

*****

We hosted a call with Ronald Kiima, former Assistant Chief Accountant at the US Securities & Exchange Commission (SEC), to discuss the ramifications of Elon Musk's tweet about taking Tesla private. ...

Mr. Kiima highlighted two issues with the tweet: 1) disclosing the info via twitter, & 2) disseminating speculative information. While the SEC has previously stated it is acceptable to disseminate info via social media, there is a potential conflict due to Musk's reported blocking of short sellers on twitter (Reg FD says info must be universally available). Also, the use of the phrase "funding secured" presents a far greater potential liability, according to Mr. Kiima, as regulations forbid companies from speculating about a tender offer unless there is significant documentation to support any assertion. If Tesla is unable to produce legal documents showing a deal was actually in place, Mr. Kiima believes that the SEC could move forward with enforcement action.

**Mr. Kiima laid out three possible paths for enforcement: 1) Elon pays a monetary fine, 2) the SEC suspends Elon from participation in a public company, or 3) the DOJ pursues criminal charges**. The SEC only has the power to bring civil charges, while the DOJ brings charges in the criminal arena. The severity of any potential punishment likely would come down to whether the tweet is determined to be merely gross negligence or if it crossed the line into market manipulation. Mr. Kiima noted that to prove market manipulation the SEC would need to demonstrate that the tweet was intended to manipulate the stock price (i.e., prove he tweeted to hurt the short sellers). Ultimately, the decision will come down to SEC Chairman Jay Clayton.[259]

---

[258] UBS Securities, *Teardown Gives Us a View on Model 3 P&L*, August 15, 2018, 4:56 p.m. (source of time stamp: Capital IQ) (emphasis added and omitted).

[259] UBS Securities, *SEC Expert Recaps Tesla Twitter Drama*, August 15, 2018, 6:46 p.m. (source of time stamp: Capital IQ) (emphasis added).

CONFIDENTIAL

162.   Therefore, from an economic perspective even if these disclosures did include unanticipated, material information, they offset one another and therefore, as a package would not be confounding information.

### g)   August 16, 2018 at 2:29 p.m.

163.   News sources reported claims of workers involved in drug trafficking.[260]  The one-minute and fifteen-minute stock price reactions were not statistically significant at the 5% level, and the full day stock price reaction was not statistically significant at the 5% level.  Therefore, from an economic perspective I do not consider this disclosure to include negative, unanticipated, material information; in other words, it is not confounding information.

### h)   August 16, 2018 at 4:03 p.m., 4:30 p.m. and 5:54 p.m. (August 17 impact day)

164.   After the market trading closed for the day on August 16, 2018, news sources reported whistleblower claims[261,262] and the SEC probe of Model 3 production claims.[263]  However, the SEC probe was not unanticipated, material information because similar news was reported in July 2018,[264] and news articles during and after trading overwhelmingly attributed the stock price reaction on August 17, 2018 to the *NYT* Article.[265]

165.   The news article about the SEC probe stated:

---

[260]  "14:29 EDT Ex-Tesla worker: Gigafactory workers involved in drug trafficking," Theflyonthewall.com, August 16, 2018, 2:29 p.m.

[261]  "Ex-Tesla employee alleges Elon Musk authorized spying on workers in bombshell SEC tip (TSLA)," Business Insider, August 16, 2018, 4:03 p.m.

[262]  "A Tesla whistleblower says the electric car maker's security team is staffed with former members of a notorious group from Uber that allegedly spied on rivals (TSLA)," Business Insider, August 16, 2018, 5:54 p.m.

[263]  "Tesla Was Under Regulator Scrutiny Prior to Musk's Tweet," Dow Jones Institutional News, August 16, 2018, 4:30 p.m.

[264]  "Tesla 'whistleblower' tells SEC company misled investors and put customers at risk," CNN Wire, July 11, 2018, 5:19 p.m.

[265]  For example: "Tesla's stock falls sharply after Elon Musk's tearful interview," CNN Wire, August 17, 2018, 11:51 a.m. and "Tesla stock sinks after Musk gives tearful NYT interview," Reuters News, August 17, 2018, 4:00 p.m.

CONFIDENTIAL

> SEC last year subpoenaed a parts supplier for Tesla as it looked at whether the auto maker misled investors about Model 3 car production problems, WSJ reports, citing unidentified person familiar with the matter.
>
> Probe of Tesla's disclosures about Model 3 production preceded its latest demand for information related to CEO Elon Musk's tweets.  An SEC spokesman declined to comment; Tesla didn't respond to request for comment: WSJ.[266]

166.   But the SEC probe and the whistleblower claims were not new information on August 17, 2018 because similar information (*i.e.*, the SEC had been gathering information about Tesla's public pronouncements regarding manufacturing goals and sales targets) was reported earlier on before August 17, 2018, for example:

> A former Tesla employee who calls himself a whistleblower has filed a formal tip with the Securities and Exchange Commission that alleges Elon Musk's electric car start-up misled investors and put its customers at risk.
>
> Martin Tripp — who has been sued by Tesla and accused by Musk of attempting to sabotage the company — claims Tesla installed faulty batteries into some vehicles and placed battery cells dangerously close together.
>
> Tripp also alleges Tesla has drastically overstated to investors how many Model 3 vehicles the company produces.  Tesla allegedly inflated its statistics by as much as 44%.
>
> The tip was filed with the SEC on July 6, and a press release about its contents was made public by Tripp's attorney, Stuart Meissner, on Wednesday.[267]

*****

---

[266]  "SEC Said to Probe Tesla on Model 3 Disclosures Last Yr: WSJ (1)," Bloomberg First Word, August 16, 2018, 6:56 p.m.

[267]  "Tesla 'whistleblower' tells SEC company misled investors and put customers at risk," CNN Wire, July 11, 2018, 5:19 p.m. (emphasis omitted).  *See also* "The ex-Tesla employee Elon Musk called a 'horrible human being' just slapped the company with a countersuit alleging defamation," Business Insider, July 31, 2018, 7:19 p.m. and "Internal documents reveal Tesla is blowing through an insane amount of raw material and cash to make Model 3s, and production is still a nightmare," Business Insider, June 4, 2018, 3:42 p.m.

A fired Tesla employee who CEO Elon Musk has described as a disgruntled saboteur is being granted a meeting with the U.S. Securities and Exchange Commission, after filing a whistleblower complaint against his former employer.

Martin Tripp made four separate allegations of corporate misconduct against Tesla in his complaint, notably that the company lied to investors by overstating its weekly Model 3 production numbers by as much as 44 percent.[268]

\*\*\*\*\*

Bloomberg reports that the agency [SEC] was gathering information about statements Tesla has made regarding sales and manufacturing targets before its most recent inquiry.[269]

\*\*\*\*\*

The Securities and Exchange Commission already had been gathering general information about Tesla's public pronouncements regarding manufacturing goals and sales targets, according to two people who asked not to be named because the review is private.  Now the attorneys are also examining whether Musk's tweet about having funding to buy out the company was meant to be factual, according to one of the people.[270]

167.  Therefore, this SEC probe news cannot be considered new information.

### 3.    Summary Regarding Potential Confounding Information

168.  Over the nine-day Class Period, from an economic perspective there was no confounding information in any of the sources that would be considered *negative* material, new, and unanticipated.  Therefore, no further adjustment of Tesla's stock price movements is required and $312.90 per share represents the adjusted price that reflects the revelation

---

[268]  "Former Tesla employee the company called a saboteur is granted a meeting with SEC over whistleblower claims," *San Francisco Business Times Online*, July 27, 2018 (emphasis omitted).

[269]  "SEC reportedly 'intensifying' examination of Tesla after Elon Musk tweets about taking the company private (TSLA)," Business Insider, August 9, 2018, 2:42 p.m.

[270]  "BUSINESS BEAT; Tesla's stock surge fizzles; Tumble erases gains triggered by Musk's tweet on privatizing electric car maker," *Los Angeles Times*, August 10, 2018.

of the truth in the Musk Tweets and Consequential Harm.  I note, however, that should there be any support that *negative*, unanticipated, material and confounding information was released and did have a *negative* and material impact on Tesla's stock price, I would simply add the abnormal stock price impact caused by this confounding disclosure to Tesla's adjusted stock price of $312.90 per share.  By increasing the adjusted price of Tesla common stock, I would reliably remove not only all market-wide and industry influences, but also all price impact of confounding information on Tesla's share price movements.[271]

169.  In summary, I attribute $66.67[272] of the $74.07 decline in Tesla's stock price to the Musk Tweets and Consequential Harm.  Another way to describe this price decline is that after adjusting for market-wide and industry influences as well as accounting for any potential non-allegation related, confounding sources of information causing price declines, I find that the decline in value of Tesla from *all allegation-related* information released throughout the Class Period and the failure of the going private transaction is $66.67 per share.  This also means that the value of Tesla common stock that reflects the removal of all the *allegation-related* information revealed throughout the Class Period is $312.90, or $379.57 minus $66.67.

## B.  Separating the Abnormal Price Decline of $66.67 into the Amount Directly Caused by the Misrepresentations in the Musk Tweets from the Amount Caused by Consequential Harm

170.  For the purposes of the empirical analysis to follow, I have separated the price impacts (and related artificial inflation) directly caused by the Musk Tweets from the price impacts (and related artificial inflation) caused by the Consequential Harm.  I refer to these effects as the *direct effect* and *consequential effects*, respectively.

---

[271] Thus, for example, assume it were found that my minute-by-minute event study and an economic examination of the information suggested a specific news release with information unrelated to the Musk Tweets or Consequential Harm was material and caused an abnormal price movement of negative $5.00.  In this hypothetical situation, I would simply add this $5.00 amount to Tesla's adjusted stock price of $312.90, to calculate a new adjusted price of $317.90, which removes not only the market-wide and industry influences, but the price impact of the specific hypothetical confounding information as well.

[272] $66.67 is equal to $74.07 less $7.40 per share attributed to market-wide, industry and confounding influences.  *See* paragraph 148.

171. I measure the *direct effect* of the alleged misrepresentations and/or omissions in the Musk Tweets and calculate the artificial inflation directly caused by the Musk Tweets during the Tweets Interval, as the abnormal increase in Tesla's stock price after the proposed going private transaction was initially disclosed on August 7, 2018 at 12:48 p.m. As discussed above, I find that the information disclosed in the Musk Tweets caused an abnormal price increase of $23.27 per share, when during the Tweets Interval the actual share price increased from $356.85 at 12:48 p.m. to $379.57 at the close of trade on August 7, 2018. Thus, of the $66.67 per share abnormal price decline I calculated over the Class Period (equal to $74.07 less market and industry effects of $7.40 and confounding Tesla-related effects of zero dollars), I calculate $23.27 as being directly caused by the alleged misrepresentations and/or omissions in the Musk Tweets and related disclosures. Therefore, the remaining $43.40 per share (= $66.67 less $23.27) was caused by the Consequential Harm. In other words, in my opinion as of the close of trade on August 7, 2018 the level of artificial inflation related to the *direct effect* was $23.27 per share and the level of artificial inflation related to the *consequential effects* was $43.40.

## C. Construction of the Artificial Price Inflation Ribbons Attributed to the Musk Tweets and Consequential Harm

### 1. Introduction

172. It is almost universally accepted in securities fraud litigation that an artificial price inflation ribbon represents a daily, or in this matter possibly the minute-by-minute, series of differences between the actual share price paid and the so-called "but-for" price. The "but-for" price represents a state-of-world wherein the fraudulent misrepresentation or omission did not occur, all the truthful information is known and thus the market price reflects the incorporation of the truths about the alleged misrepresentations, omissions and consequential harm. In this matter the "but-for" price would represent the price that would reflect all the Musk Tweets-related information (both *direct* and *consequential effects*) from the moment the Musk Tweets were issued until the information was revealed in the final disclosures in the *NYT* Article that was published, disseminated, processed by market participants and incorporated into the closing price on August 17, 2018. In other words, had the truths about the alleged misrepresentations and/or omissions in the Musk Tweets (and the resulting Consequential Harm) been revealed at any point earlier in the Class

Period, the market price (at the time of the revelation) would have fallen to the "but-for" price. Calculating this "but-for" price within the Class Period allows me to calculate the level of artificial inflation — which measures the difference between actual transaction prices and the "but-for" prices. The differences between the actual transaction prices and the "but-for" prices throughout the Class Period represent the artificial inflation and measure the harm to Class members that flowed from the misstatements in the Musk Tweets and the depressing impact of the Consequential Harm that emerged due to the Musk Tweets.

173. Because of the nature of this matter where there are both *direct* and *consequential effect*s, I am able to separate the artificial inflation ribbon into two sub-ribbons that separately measure the harm to investors from the *direct* and *consequential effect*s. Moreover, I am able to calculate daily "but-for" prices associated with the alleged misrepresentations and/or omissions of the Musk Tweets (*i.e.,* the *direct effect*), as well as daily "but-for" prices associated with the combined effects (*direct effect* plus *consequential effect*s).

### 2.   Calculation of the Artificial Inflation Related to the *Direct* and *Consequential Effects*

174. As described above the Musk Tweets and the ensuing market reaction to the Consequential Harm related to the Musk Tweets over the Class Period caused a price decline of $74.07, which, after removing market-wide, industry and confounding effects resulted in an abnormal price decline of $66.67. Therefore, in this matter the measurement of the artificial inflation is properly based on the adjusted closing price of Tesla common stock on August 17, 2018, which was $312.90 (*i.e.*, $379.57 closing price on August 7, 2018 minus $66.67). This adjusted stock price is the "but-for" price and represents the value of Tesla common stock after accounting for the impact of the *direct* and *consequential effect*s on Tesla's market stock price from the Musk Tweets. It is my opinion that this $312.90 price is a reliable, reasonable and robust calculation of the "but-for" price throughout the Class Period. In other words, in my opinion had all the information concerning the misrepresentations and/or omissions in the Musk Tweets and the causally-linked Consequential Harm been revealed at any time during the Class Period, market participants who bought and sold Tesla common stock would have understood the

economic materiality and the risks associated with investing in Tesla common stock and the stock price would have reacted to this information in such a manner that the adverse information would been reflected in a market price of $312.90; a price that incorporates and adjusts for any market-wide, industry and confounding influences.

175.   Therefore, should Plaintiff's allegations be found true by the fact finder, then the daily artificial inflation related to Defendants' alleged misrepresentations and/or omissions would cover the period from August 7, 2018 at 12:48 p.m. through August 17, 2018 at 4:00 p.m.; and at any point in time the level of artificial inflation is equal to the actual stock price at that time less the adjusted stock price of $312.90.   This amount represents the harm to the investors caused by the Musk Tweets in total.   In **Table 7** below, I calculate the level of artificial inflation based on the closing price on each date in the Class Period.

**Table 7**

| Date | Price | But-For Price | Artificial Inflation |
|---|---|---|---|
| 8/7/2018 | $379.57 | $312.90 | $66.67 |
| 8/8/2018 | $370.34 | $312.90 | $57.44 |
| 8/9/2018 | $352.45 | $312.90 | $39.55 |
| 8/10/2018 | $355.49 | $312.90 | $42.59 |
| 8/13/2018 | $356.41 | $312.90 | $43.51 |
| 8/14/2018 | $347.64 | $312.90 | $34.74 |
| 8/15/2018 | $338.69 | $312.90 | $25.79 |
| 8/16/2018 | $335.45 | $312.90 | $22.55 |
| 8/17/2018 | $305.50 | --- | --- |

176.   Because of the nature of the alleged misstatements and the process in which speculation about going private would affect a company's stock price, in my opinion, it is reasonable and appropriate to calculate artificial inflation throughout the Class Period based on the relative difference between the actual stock price and the price that Tesla common stock would have traded at had all the information in the Class Period related to the allegations been released at the time the actual stock price is measured.

CONFIDENTIAL

**3.     Calculation of the Direct Artificial Inflation Utilizing the *Direct Effect* Caused by the Musk Tweets**

**a)     The Abnormal Price Response Caused by the Musk Tweets Is Related  to the Market's Perception of the Probability the Going Private Deal Is Completed**

177.  As discussed above, for the purposes of my loss causation analysis I have divided the Class Period into two intervals — the Tweets Interval and the Corrective Interval.  Using the price movements and the information disclosed within these intervals I can reliably separate the level of artifical inflation caused directly from the Musk Tweets from the level of artifical inflation caused by the Consequential Harm.

178.  The Class Period begins on August 7, 2018 at 12:48 p.m. with the start of the Musk Tweets, which as discussed previously, caused Tesla's stock price to rise throughout the remainder of August 7, 2018.  Based on an intraday event study analysis, the Musk Tweets caused an increase in Tesla's stock price by $23.27 per share after accounting for market-wide, industry and confounding effects.  Academic research demonstrates that once a potential going private deal is announced, which is similar to a cash takeover announcement, the price of a company's common stock will no longer reflect the value of that company as a public entity, but rather will reflect ***an expected value*** of the company under what economists refer to as two states of the world — a combination of the value if the going private deal is completed and the value if the going private deal is <u>not</u>  completed. In the case of Tesla and the Musk Tweets, this ***expected value*** reflects the market consensus about three basic quantitative elements that emerged from the Musk Tweets — namely:

a) the expected transaction price should the going private deal be completed ($P_{Private}$);

b) the public entity value should the going private deal fail or not be completed ($P_{Public}$); and

c) the probability the going private transaction would be completed Prob(DC).  Note that the probability the going private deal would fail to take place and Tesla remains a public company is Prob(ND) = 1 -

Prob(DC) = probability of the going private transaction fails or is not completed and Tesla remains a public entity.[273]

179. This relationship and the ***expected value*** reflected in the market price ($P_M$) following the Musk Tweets can be written as the formula:[274]

$$P_M = [P_{Private} * Prob(DC)] + [P_{Public} * Prob(ND)]$$

180. Therefore, when Defendant Musk tweeted a price of $420, the market price ($P_M$) went up as $P_{Private}$ would have increased to at least $420, while Prob(DC) would have increased as well. I assume for the purposes of this analysis that immediately after the Musk Tweets the market price before the initial tweet of $356.85 would be a reasonable estimate of $P_{Public}$. Using all this information along with the market price of $379.57 (=$P_M$) following the Musk Tweets and the going private price of $420 (=$P_{Private}$),[275] I can calculate a reasonable estimate of the probability of the going private transaction being completed (Prob(DC)). Rearranging the formula above I get:[276]

$$\mathbf{Prob(DC) = [P_M - P_{Public}] / [P_{Private} - P_{Public}]}$$

---

[273]  I use "DC" to represent the going private deal being completed and "ND" to represent the going private deal not being completed.

[274]  *See* J. Fred Weston, Kwang S. Chung and Susan E. Hoag, Mergers, Restructuring, and Corporate Control (Prentice-Hall, 1990), Chapter 22, p. 556; David F. Larcker and Thomas Lys, *An Empirical Analysis of the Incentives to Engage in Costly Information Acquisition: The Case of Risk Arbitrage*, 18 Jnl. of Fin. Econ. 111 (1987); and Keith C. Brown and Michael V. Raymond, *Risk Arbitrage and the Prediction of Successful Corporate Takeovers*, 15 Finl. Mgmt. 54 (1986) for discussion of this equation.

[275]  Using the expected transaction or deal price of $420 is supported by: (a) the fact it was made by Defendant Musk, Tesla's largest shareholder; and (b) at the time there was little discussion in the press or by analysts of higher prices.

[276]  I derive this using the following sequence of equations:

$P_M = [P_{Private} * Prob(DC)] + [P_{Public} * Prob(ND)]$

$P_M = [P_{Private} * Prob(DC)] + [P_{Public} * \{1 - Prob(DC)\}]$

$P_M = [P_{Private} * Prob(DC)] - [P_{Public} * Prob(DC)] + P_{Public}$

$P_M - [P_{Public}] = [P_{Private} * Prob(DC)] - [P_{Public} * Prob(DC)]$

$P_M - P_{Public} = Prob(DC) * [P_{Private} - P_{Public}]$

181. I can then calculate the measure of the probability of the going private transaction being completed immediately after the Musk Tweets (*i.e.*, at the close of trade on August 7, 2018) as approximately 36%, or:

**Prob(DC) = [$379.57 – $356.85] / [$420.00 – $356.85] = 35.98%**

182. This probability of the deal being completed is consistent with the analyst commentary that followed.  For example, Macro Advisors on August 9, 2018 at 9:51 a.m. wrote:

> As of yesterday [August 8, 2018], TSLA share prices were implying a market deal probability of 34.4% after Elon Musk's publicly suggested a go-private deal for the electric car company.[277]

183. Therefore, once Defendant Musk issued the series of tweets the market increased its perception of a going private deal to approximately 36% as of August 7, 2018 at 4:00 p.m.

> **b)    The Musk Tweets Caused a "Unusual" Event Wherein There Were "Large Movements"  in Implied Volatility of Tesla Options, Movements that Reflect the Market's Perception of the Probability the Going Private Deal Will Be Completed**

184. Academic research demonstrates that:

> Generally speaking, any market for securities whose values are contingent on movements in stock prices will also contain information about investor beliefs.  Of course, this classification could include both the market for stock index options and futures and the market for individual equity options.[278]

185. Therefore, the market's perception of the probability of the going private deal being completed would not only have been reflected in the increase in the price of Tesla

---

[277]  Macro Risk Advisors, *MRA- Does the options market believe Elon Musk?*, August 9, 2018, 9:51 a.m.  *See* **Appendix 6**, for a chronology of news and analyst commentary to see that my calculation is consistent with the reaction of market participants.

[278]  Giovanni Barone-Adesi, Keith C. Brown and W.V. Harlow, *On the use of implied volatilities in the prediction of successful corporate takeovers*, 7 Advances in Futures and Options Res., 147, 148 (1994) ("Barone-Adesi *et al.* 1994").

common stock, but also was reflected, as described by Professor Steven Heston, in his finding that:

> Following 12:48 p.m. on August 7, 2018, Tesla stock prices rose, and long-term ATM-forward Tesla option straddle prices fell sharply.  Section 5.4 shows that on August 7, 2018, following 12:48 p.m., long-term ATM-forward Tesla option straddles lost value.  This decline in price is substantial and rare.  This decline can be directly translated into a significant decrease in implied volatility using standard Black-Scholes-Merton formulas.[279]

186.   In other words, as Professor Heston demonstrates, there were large and unusual movements in options prices (and related implied volatility) following the Musk Tweets.  My loss causation analysis has demonstrated these movements were caused by the Musk Tweets and reflected an increased probability of a going private deal being completed.

187.   Academic research supports this conclusion about option prices and implied volatility movements in response to announcements of potential corporate events, such as a going private transaction.  The research shows:

> …that through the collective actions of the arbitrage community it is possible to use the post announcement prices from the stock and option markets to infer both the probability of success and timing of a proposed acquisition.  While the former notion is well established in the literature, the latter is not. … Specifically, we showed that traders effectively shorten the life of options scheduled to expire beyond the resolution date of the tender offer by setting their prices so as to reduce the implied stock volatility below its normal level.[280]

---

[279]   Heston Report, ¶12 (emphasis omitted).

[280]   Barone-Adesi *et al.* 1994 at 150.  Also, "This will be the case because efficient option prices must be set in such a way as to effectively shorten the maturity date of the longer-term instrument relative to that of the shorter-term.  Further, we demonstrate a technique for exploiting the extent to which these implied volatilities decline as a means of predicting *when* the takeover will be completed.  When coupled with earlier work, this latter point has the potential to be extremely important in that it will allow risk arbitrageurs to make more precise speculations against the market as to both the probability of success *and* the timing of a proposed takeover.  This approach is fully consistent with the work of Cox and Rubinstein (1985), who suggested that different options on the same underlying stock may have different

188.   In other words, the analysis presented by Professor Heston illustrates and offers a measure of the market reaction to the Musk Tweets and how the options prices and implied volatility reflected the probability of the deal being completed.   In addition, "by examining the information implicit in option prices for firms targeted for acquisition"[281] (in this case Tesla), I can infer the market's perception of changes over the Class Period in the probability the deal will be completed.[282]   Specifically, I examine the changes in implied volatility of Tesla's long-dated options.   Indeed, this is consistent with academic research that shows:

> In applying this model to the market for corporate control, Hutson and Kearney (1998) argued that for targets of successful takeover bids, the dispersion in traders' opinion as to the value of the stock diminishes as the bid progresses.   This explained the observed reduction in trading volume and price volatility…As the bid proceeds, the dispersion in traders'

---

implied volatilities in response to different economic events." Barone-Adesi *et al.* 2004 at 149 (footnote omitted).

[281]   Barone-Adesi *et al.* 1994, p. 149.

[282]   *See* C. Alan Bester, Victor H. Martinez, and Ioanid,Roşu, *Option Prices and the Probability of Success of Cash Mergers*, forthcoming Jnl. of Finl. Econometrics (working paper, April 12, 2021, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1364491): "However, when a firm undergoes a merger attempt, its options are known to become informative about the underlying stock (see, e.g., Cao, Chen, and Grin (2005)).   A natural explanation is that during merger attempts, the merger's probability of success can fluctuate, thus creating an additional source of uncertainty that can no longer be determined only by the underlying price, but that options can potentially capture. …

The advantage of our approach is that the stochastic volatility is not exogenously specified but arises endogenously as a function of the success probability and other variables in the model.

… our model also predicts that the return volatility of the target is stochastic and is proportional to the failure probability.   This is illustrated in Figure 2, which shows that when the success probability is closer to 1, the target's implied volatility is closer to 0. …

… we show that the return volatility of the target company in a cash merger, $\sigma_B(t)$, is proportional to the failure probability, 1- q(t). …

As predicted by our model, we find that the target firms of cash mergers should display a pronounced pattern in their implied volatility curve during the life of the deal. This volatility smile is more pronounced when the merger is more likely to being successful.

beliefs regarding value tends to collapse around the offer price.[283]

189.  This relationship between changes in volatility of Tesla's long-dated options and the possible going private deal also was discussed by analysts.  For example, in a Susquehanna report in its section on *TSLA Options Takeaways*:

> In Wednesday's Derivatives Daily we looked at the shift in Tesla's (TSLA: Not Covered) term structure, and particularly the significant decline in long-term volatility, following CEO Elon Musk's tweet indicating that he was considering taking the company private.  Given the widespread interest in the name, alongside this morning's headlines indicating that the company's board will meet with financial advisers next week, here we circle back to TSLA options to now see what they can tell us about the potential for moves in the stock price in the weeks ahead.  As we noted on Wednesday, aside from the very short-term 30-Day options, implied volatility levels generally declined in response to the potential for a take-private outcome. That said, 90-Day volatility has since rebounded higher, and at ~52%, 90-Day implied volatility in the name is still higher than all but a handful of names within the Russell 1000.[284]

190.  Moreover, Professor Heston demonstrates that for longer-term options the volatility over the Class Period immediately declines and then rises by August 17, 2018.[285] To calculate how this probability of the deal being completed varied over the Class Period, I am able to isolate the impact of the Musk Tweets by using the information described in the Heston Report that measures the changes in the price of Standardized At-The-Money (ATM)-Forward Straddles (for simplicity I will refer to these as the "ATM Straddles") and

---

[283]  Elaine Hutson, *Takeover targets and the probability of bid success: Evidence from the Australian market*, 9 Intl. Jnl. of Finl. Analysis, 45, 62 (2000).

In his Report, Professor Heston states: "This drop in long-term option prices is consistent with the academic literature on merger and buyout announcements.  … This exact pattern [found in the academic literature] is visible in the Tesla options data.  Following 12:48 p.m., the longest maturing options lost the most value and recovered the slowest, while the very short-term options saw little effect."  Heston Report, ¶¶134-135 (emphasis omitted).

[284]  Susquehanna International Group, *PTEN Calls and TSLA Takeaways*, August 10, 2018.

[285]  This is evident in the Heston Report, Figure 14, and Professor Heston's conclusion that: "It was not until August 17, 2018 that the relationship between short- and long-term straddles returned to the normal levels observed historically."  Heston Report, ¶139.

the implied volatility based on the ATM Straddle prices. I utilize the price calculated and the implied volatility derived from the ATM Straddles because as Professor Heston states:

> At-the-money-forward Tesla option prices, including straddles, provide a reasonable and reliable measurement of option prices relative to underlying stock prices.  Section 3.2 explains that a "straddle" options position is when an investor buys both a put and a call with the same strike and maturity date simultaneously.  Straddle holders bet that there will be a large change in the stock price, either upward or downward, but are neutral with respect to stock movements.  Straddle prices therefore reflect "implied volatility," or the market's expectation of future stock price volatility.[286]

> A straddle is a widely applied option strategy and are commonly studied by practitioners and in academia.  Notably, the original VIX index was calculated by inverting Black-Scholes-Merton formulas using prices of ATM-forward straddles.[287]

> ATM options also have the highest time value and vega.  Therefore, as discussed in further detail in Section 6.1, by analyzing changes in prices of ATM-forward straddles, I can measure changes in implied volatility.[288]

> Because all the curves are taken from the same day, one before and one after 12:48 p.m., these shifts cannot be explained by changes in time to expiration or risk-free returns.

> Furthermore, because the curves all control for shifts in the underlying stock price by dividing the strike prices by the spot price, these shifts cannot be explained by changes in stock price.  Therefore, pursuant to the BSM model, the only factor that is impacting the curves in the Figure 22 and Figure 23, is changes in implied volatility.[289]

---

[286]   Heston Report, ¶11 (emphasis omitted).

[287]   Heston Report, ¶72 (footnotes omitted).

[288]   Heston Report, ¶83 (footnote omitted).

[289]   Heston Report, ¶¶160-161.

c)   **Using the Implied Volatility Based on the ATM Straddle Price for January 2020 Options to Measure the Changes in the *Direct Effect* of and Direct Artificial Inflation Caused by the Musk Tweets**

191.  Using information on the implied volatility derived from ATM Straddles, I am able to hold Tesla's stock price constant and isolate the changing price impact directly related to the Musk Tweets (as opposed to the *consequential effects*) via the changing long-term option implied volatility.  The changes incorporate and reflect the market's perception of the changes in the likelihood the going private deal would be completed following the Musk Tweets.

192.  I have chosen for my analysis to use the longest term ATM Straddles — namely the January 2020 ATM Straddle — as this is also the least affected by the change in the time-to-maturity over the Class Period and has the largest variation.[290]

193.  By examining the price movements of this January 2020 ATM Straddle and related movements of the implied volatilities over the Corrective Interval, I am able to measure or proxy for the relative variation in the probability of deal completion throughout the Class Period.  Examining how the relative probability of deal completion varies throughout the Corrective Interval and the Class Period allows me to infer how the price impact of the Musk Tweets *would have* varied throughout the Class Period, holding all else constant.  In other words, it enables me to adjust the level of artificial inflation as the multitude of tweets, corporate disclosures, articles and analysis sequentially and partially corrects for the alleged misrepresentations and/or omissions in the Musk Tweets.

194.  In **Table 8** below, I show Professor Heston's calculation of implied volatility based on the January 2020 ATM Straddle price at the end of the Class Period to be

---

[290]   Professor Heston states: "Following 12:48 p.m. on August 7, 2018, Tesla stock prices rose, and long-term ATM-forward Tesla option straddle prices fell sharply.  Section 5.4 shows that on August 7, 2018, following 12:48 p.m., long-term ATM-forward Tesla option straddles lost value.  This decline in price is substantial and rare.  This decline can be directly translated into a significant decrease in implied volatility using standard Black-Scholes-Merton formulas." Heston Report, ¶12 (emphasis omitted).

48.65%.[291] After the Musk Tweets, the implied volatility declines to 32.57% by the close of trade on August 7, 2018.  This demonstrates, that as would be expected, when there is the disclosure of a possible takeover, the fundamental properties of options pricing theory suggests that all else constant, options prices will go down and the standardized price distribution (and the implied volatility) will become narrower.[292]

195.  The difference between the implied volatility on August 7, 2018 and August 17, 2018 is 16.08%.  In other words, as the probability of completion — Prob(DC) in the equation above — falls over the Corrective Interval, while the implied volatility returns to a higher level.  Therefore, I use this difference of 16.08% between the *initial* implied volatility (on August 7, 2018 at 4:00 p.m.) and the *terminal* implied volatility (on August 17, 2018 at 4:00 p.m.) to reflect the impact of the Musk Tweets and the initial level of probability of the deal being completed; or (Prob(DC) of 35.98%).  I also associate this deviation of the *initial* implied volatility from the *terminal* implied volatility with the $23.27 in artificial inflation caused by the Musk Tweets.  In other words, the Musk Tweets cause artificial inflation of $23.27, as well as a deviation in implied volatility of 16.08% because they cause the probability of the deal being completed to rise to 35.98%.

196.  With this foundation, I can then use this benchmark deviation in implied volatility between the initial and terminal levels relative to the deviations in implied volatility throughout the Corrective Interval to calculate how the $23.27 of artificial inflation caused by the Musk Tweets would have varied over the Class Period.  I use this benchmark deviation in implied volatility relative to the deviations in implied volatility throughout the Corrective Interval to calculate how the probability of deal completion perceived by the market and the *direct effect* of the Musk Tweets changed over the Corrective Interval.

---

[291]   Heston Report, Table 6.  I note that this 48.65% is approximately equal to the implied volatility based on the ATM Straddle price for January 2020 options of 50.52% calculated as of 12:47 p.m. on August 7, 2018.

[292]   The going private transaction would reduce the price of the option (holding the stock price constant) by (a) decreasing the time value of the option and (b) decreasing the price volatility of the option.

197.  To adjust the *direct effect* based on changes in implied volatility based on the January 2020 ATM Straddle price, I use Professor Heston's calculations day-by-day in **Table 8** below.  These same calculations could be performed on a minute-by-minute basis given minute-level calculations of the implied volatility.[293]  Using this information from the Heston Report and measuring how the implied volatility varies over time, I calculate how the artificial inflation *directly* related to the Musk Tweets changes throughout the Class Period.  In **Table 8**, the implied volatility based on the January 2020 ATM Straddle price at the close of trade each day are shown in Row [1].

**Table 8**

| | Aug. 7 | Aug. 8 | Aug. 9 | Aug. 10 | Aug. 13 | Aug. 14 | Aug. 15 | Aug. 16 | Aug. 17 |
|---|---|---|---|---|---|---|---|---|---|
| [1] Heston Implied Volatility for January 2020 Options | 32.57% | 37.08% | 42.02% | 40.43% | 38.54% | 38.37% | 39.96% | 40.87% | 48.65% |
| [2] Difference with Aug. 17, 2018 | 16.08% | 11.57% | 6.63% | 8.22% | 10.11% | 10.28% | 8.69% | 7.78% | 0.00% |
| [3] Amount of Difference [2] Relative to Aug. 7 Close Difference | 100.0% | 72.0% | 41.2% | 51.1% | 62.9% | 63.9% | 54.0% | 48.4% | 0.0% |
| [4] Daily Direct Artificial Inflation Based on $23.27 on 8/7/2018 | $23.27 | $16.75 | $9.59 | $11.90 | $14.64 | $14.88 | $12.57 | $11.27 | $0.00 |

198.  **Table 8** also shows in Row [2] the difference between implied volatilities relative to the implied volatility on August 17, 2018 at 4:00 p.m.  The difference between the *terminal* implied volatility of 48.65% and the *initial* implied volatility at 4:00 p.m. on August 7, 2018 of 32.57% is 16.08%.  There are two pieces of information that flow from this.  I also know that the artificial inflation on August 7, 2018 at 4:00 p.m. is equal to 100% of the $23.27 of artificial inflation caused directly by the Musk Tweets.

199.  Next, I look at the implied volatility on August 8, 2018 at 4:00 p.m.  The difference between the *terminal* implied volatility and the August 8, 2018 implied volatility of 37.08% is lower than the initial level and is equal to 11.57%.  In other words, after the information disclosed on August 8, 2018, the implied volatility based on the January 2020 ATM Straddle price begins its upward journey to the terminal level of 48.65% observed at the end of the Class Period.  This is consistent with the probability of the deal going down during the Corrective Interval.  Indeed, as **Appendix 6** shows, the differences in **Table 8**

---

[293]  In his report, Professor Heston notes that: "Minute-by-minute BSM implied volatility can be calculated based on the CBOE DataShop Data using the same formulas."  Heston Report, ¶169, fn 103.

Row [2] are consistent with the content in many of the news releases and analyst reports over the period that discuss the probability of the Tesla going private transaction being completed.

200.  Using these movements in the deviations of the implied volatilities relative to the terminal value, I derive and present in **Table 8** the movements in the daily levels of the portion of artificial inflation related to the *direct effect* for each day of the Class Period.[294] For this I note that in **Table 8** Row [3] I calculate the deviations on each date of the Corrective Interval relative to the *terminal* implied volatility as a percent of that same deviation on August 7, 2018.  This shows, for example, that on August 9, 2018 at 4:00 p.m., the level of inflation due to the *direct effect* is 41.2% of the level of the *direct effect* observed on August 7, 2018 at 4:00 p.m.  Given that 100% of the *direct effect* is equal to $23.27, this means that on August 9, 2018 at 4:00 p.m. the artificial inflation due to the *direct effect* is $9.59 or 41.2% of $23.27.

201.  Using all this information I am able to calculate the artificial inflation due to the *direct effect* each day.  In **Table 8** Row [4], I show how artificial inflation related to the *direct effect* caused by market participants' reactions to the information disclosed in the Musk Tweets varies over the Class Period.  I show that as of August 7, 2018 at 4:00 p.m., the artificial inflation related to the *direct effect* begins at $23.27.  Then, throughout the Corrective Interval as the failure to offer meaningful, reliable and clear information steadily contributed to and increased skepticism about the true (and concealed) status of the proposed transaction and the veracity of the Musk Tweets and the market participants reflected upon the possible deal, the inflation related to the *direct effects* (excluding the *consequential effects* caused by the Consequential Harm) falls to $11.27 on August 16, 2018 — the date prior to the release of the *NYT* Article — before going to zero on August 17, 2018.  This row also offers what economists commonly referred to as a "scalar."  A scalar is used to gauge changes in  artificial inflation over time based on a reasonable metric.

---

[294]  This calculation could similarly be employed on any time interval, such as minute-by-minute, using the implied volatility based on the January 2020 ATM Straddle price at each respective time interval.

202.  The increase in the *direct effect* I observe and measure from August 10, 2018 to August 14 are attributable to the market's evaluation of the potential going private transaction disclosed in the Musk tweets which, as stated above, was subject to near-continuous media coverage, reporting, and analysis during this period.[295]  The increase in *direct effect* I observe and measure from August 10, 2018 to August 14, 2018 is attributable to the market's changing evaluation of the potential going private transaction and the probability of completion as disclosed in the Musk Tweets which, as stated above, was subject to near-continuous media coverage, reporting, and analysis during this period. Should, however, the finder of fact or the Court determine that any changes in the level of the *direct effect* that I measure using the implied volatilities calculated by Professor Heston, were not proximately caused by the Musk Tweets (*i.e.*, were caused by unrelated factors), then I can account for these unrelated factors and adjust the level of direct effects. Adjusting the level of the direct effects will also induce a change in the direct but-for price.

203.  From these artificial inflation measures, I then derive the "but-for" prices based on the actual stock closing prices observed on each date; where the but-for prices represent a "true" price level had the information in the Musk Tweets been revealed on that day.  In other words, these measures of the daily direct artificial inflation and daily direct but-for prices exclude the *consequential effect*s caused by the Consequential Harm.

204.  Based on the combined levels of daily artificial inflation calculated in the previous section and the daily direct artificial inflation proximately caused by the Musk Tweets, I calculate the daily consequential artificial inflation caused by the Consequential Harm, as well as the daily direct "but-for" prices excluding the price impact of the Consequential Harm.  This is shown below in **Table 9**.

---

[295]  If the finder of fact or the Court determines that any changes in the level of the *direct effect* that I measure using the implied volatilities calculated by Professor Heston were not proximately caused by the Musk Tweets, I could adjust the measured *direct effect* to exclude such changes.

**Table 9[296]**

| Date | Artificial Inflation | Direct Scalar | Direct Artificial Inflation | Consequential Artificial Inflation | Direct But-For Price |
|---|---|---|---|---|---|
| 8/7/2018 | $66.67 | 1.00 | $23.27 | $43.40 | $356.30 |
| 8/8/2018 | $57.44 | 0.72 | $16.75 | $40.69 | $353.59 |
| 8/9/2018 | $39.55 | 0.41 | $9.59 | $29.96 | $342.86 |
| 8/10/2018 | $42.59 | 0.51 | $11.90 | $30.68 | $343.59 |
| 8/13/2018 | $43.51 | 0.63 | $14.64 | $28.87 | $341.77 |
| 8/14/2018 | $34.74 | 0.64 | $14.88 | $19.86 | $332.76 |
| 8/15/2018 | $25.79 | 0.54 | $12.57 | $13.21 | $326.12 |
| 8/16/2018 | $22.55 | 0.48 | $11.27 | $11.28 | $324.18 |
| 8/17/2018 | --- | 0.00 | --- | --- | --- |

205.   Finally, in **Table 10** I show how the probability of the deal being completed (PROB(DC)) varies over time, because it too is reflected in the deviations of the implied volatilities relative to the terminal implied volatility.  For **Table 10** I apply the same scalar I derived and presented in **Table 9** to estimate the changes in the probability of deal completion.  **Table 10** shows that as the deviations in implied volatility grow smaller (*i.e.*, the level of implied volatility grows larger), the probability of deal completion falls as does the artificial inflation and the "but-for" price related to the *direct effect* of the Musk Tweets.[297]   I note that the scalars in **Table 9** used to reflect the market perception and concerns of the changing probability the deal would be completed are generally consistent with news and analyst commentary at the time, as shown in **Appendix 6**, and in the examples below in **Table 10**.  I also show that much of the analyst commentary and news corresponds to the relative movements in the probability of deal completion, lending support for the procedure I undertake to calculate the movements of the direct effect throughout the Corrective Interval.

---

[296]   *See* Table 7 for Total Artificial Inflation; *see* Table 8 for Direct Artificial Inflation; Consequential Artificial Inflation equals Total Artificial Inflation minus Direct Artificial Inflation; Direct But-For Price equal Price minus Direct Artificial Inflation.

[297]   The calculation of the direct effects on Tesla's stock price from 12:48 p.m. through the close of trade can be calculated on a minute-by-minute basis similar to the calculation of the full $23.27 per share abnormal price change from 12:48 p.m. through the 4:00 p.m. close on August 7, 2018 (*i.e.*, by compounding the minute-level abnormal returns provided in **Appendix 4** and multiplying that compounded return by the $356.85 price prior to 12:48 p.m.).

**Table 10**
**News and Analyst Commentary on Probably of Deal Completion[298]**

| Date | Probability of Deal Completion | Analysis | Excerpts from News and Analyst Commentary That Reflect Probability of Deal Completion as Proxied for by Changes in Implied Volatility |
|---|---|---|---|
| 8/7/2018 | 36% | Immediate Response To Musk Tweets | "30%"; "Musk has '1 In 3 Chance' of Taking Tesla Private"; "there do seem to be avenues to do this sort of transaction"; "reasonable assertion… it's not inconceivable". |
| 8/8/2018 | 26% | Skepticism plus SEC Investigation Emerge | "less than 50%";  "it will never happen"; "Morgan Stanley's Adam Jonas questions the feasibility"; "doubts that the deal would ever take off"; "an apparent firm offer… Tesla is intent on pursuing this proposal". |
| 8/9/2018 | 15% | Skepticism continues plus SEC Subpoenas | "do bond traders think it's possible? No."; "extremely low probability"; "big challenge"; "looks close to a fiction". |
| 8/10/2018 | 18% | Skepticism still remains, but confidence in deal and veracity of Musk Tweets increases due to Board comments | "Doubts have mounted"; "market is skeptical"; ""Funding secured' should be interpreted as a strong verbal commitment… it could be less than this."; "unlikely… He probably can't"; "far from certain that he pulls it off"; "questioning just how 'secured' the funding is"; "reason it is trading at a discount is because of uncertainty as to whether the deal will come to fruition". |
| 8/13/2018 | 23% | Defendant Musk blog post increases confidence in deal and veracity of Musk Tweets | "these talks are almost certainly very real"; "a bit optimistic";  "The blog also explains how the deal could be more likely than we previously thought"; "we think it will end in the next year with Tesla going private". |
| 8/14/2018 | 23% | Impact from Musk Tweets on Deal Advisers, and residual impact from Musk Blog Post | "blog post on Monday 8/13/18 makes it clearer buyout is still in early stages"; "theoretically possible"; "our impression of his words is that he thinks it can happen, and we agree". |
| 8/15/2018 | 19% | No meaningful update appears to lead to more skeptical press | "there still isn't any formal offer to take Tesla private". |
| 8/16/2018 | 17% | No meaningful update appears to lead to more skeptical press | "less than 50 percent; "if a viable blueprint is made available to the public, it could push the stock higher". |
| 8/17/2018 | 0% | NYT Article and confidence in deal down to zero as Musk tweets shown to be false | "Most investors feel they won't get it done". |

## 4.    The Flexibility of the Damages Model

206.  In my opinion, the predominant cause of Tesla's stock price declines and anomalous changes in implied volatility over the Class Period was the continual incorporation of news (or lack thereof) correcting the alleged misrepresentations and/or omissions of the Musk Tweets and the revelations about the Consequential Harm.  This information, as detailed earlier, included stock price reductions due to the release of

---

[298]  Probability of deal completion equals 35.98% multiplied by the daily scalar in **Table 9**.  Source of news and analyst commentary: **Appendix 6**.

information that altered the market's perception of the probability of the going private deal would actually be completed, as well as the revelation of Consequential Harm.  Tesla's stock price increased from $356.85 at the start of the Class Period to $379.57 at the close on August 7, 2018 and further increased to peak at $382.55 at 10:10 a.m. on August 8, 2018,[299] which is when the impact of the Consequential Harm began to affect the stock price.  Investors then suffered losses as the stock price declined further throughout the Class Period  and closed at $305.50 on August 17, 2018.  Should the fact finder determine that the initial false and misleading statements in the Musk Tweets were not fully reflected in the market price until August 8, 2018 at 10:10 a.m., my damages model can account and adjust for this change in timing of the end of the Tweets Interval and the beginning of the Corrective Interval I have used in my calculations.  The formulas all remain the same, only the inputs would change.  Moreover, should the fact finder determine the allegations and the risks associated with the revelation of the truth about these issues occurred on dates other than those dates or times discussed specifically in this Expert Damages Report, then the artificial inflation measures can be easily modified to adjust for different times and dates.

## VII.   CALCULATION OF PER SHARE DAMAGES

207.  The measure of per share damages traditionally applied in Rule 10b-5 cases is often referred to as out-of-pocket damages, or the difference between the actual purchase price of the security and what would have been the purchase price of the security had there been no fraud or misrepresentation:

> [M]any courts have adopted the out-of-pocket rule as the traditional measure of damages in Rule 10b-5 cases.  The out-of-pocket measure rule defines damages as "the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct.  Or, in other words, the difference between the amount parted with and the value of the thing received." Typically, courts measure this as the Plaintiffs' purchase price less the true value at the time of

---

[299]  Based on the closing 1-minute interval price, *see* paragraph 87.

the transaction.  The true value is the price of the security in the
absence of fraud or misrepresentation ….[300]

208.   As discussed above, the standard "out-of-pocket" method of calculating
damages per share for each member of the Class under Section 10(b) involves a measure
of the net minute-by-minute or daily inflation in the price of the security at the time of the
purchase and at the time of the sale.  For an investor who bought a security on a given day
in the Class Period (but not to cover a short sale) when the measure of the artificial inflation
in the security price is $39.55 (for the example below, August 9, 2018) the "out-of-pocket"
damages per share can be calculated under Section 10(b):[301]

(1)   If the investor sells the security during the Class Period, the investor's damages
per share are equal to the inflation at purchase less the inflation at sale.[302]

(2)   If the investor sold a security during the 90-day lookback period and the Court
and/or the finder of fact were to apply the PSLRA dollar limits, then the
investor's damages per share are equal to the artificial inflation on the purchase
date (for example, $39.55 if purchased on August 9, 2018) capped by the
difference between the price at which the security was purchased during the
Class Period and the average closing price of the security from the last alleged
partial corrective disclosure to the date of sale (i.e., investment loss based on
the terminal price being the average closing price through the date of sale).  The

---

[300]   Nicholas I. Crew, Kevin L. Gold, and Marnie A. Moore, "Federal Securities Acts and Areas of
Expert Analysis," chapter 18 in Litigation Services Handbook: The Role of the Financial
Expert, 4th edition, edited by Roman Weil, Peter Frank, Christian Hughes, and Michael J.
Wagner, John Wiley & Sons (2007), p. 18.6 (internal citations omitted).  I note that the out-of-
pocket damages are, economically, the amount overpaid for the security.  Thus, even if the
price of the security appreciates over time leading to a market profit, the investor would have
an out-of-pocket loss due to having purchased at an inflated price (i.e., the investor would have
an even greater profit if they had purchased at a lower price).

[301]   If the Court or finder of fact determines that only shares held across certain time periods are
eligible to recover damages, my artificial inflation ribbon would still be applicable to such
shares.

[302]   If the Court and/or finder of fact determined that damages are limited to only the investment
loss on such shares, this would be an additional calculation that would be based on the
investor's transaction prices.

statutory 90-day lookback price for each day starting on the end of the Class Period is shown **Appendix 7**.[303]

(3) If the investor sold the security <u>after</u> the 90-day lookback period, then his or her damages per share are equal to the artificial inflation on the purchase date (for example, $39.55 if purchased on August 9, 2018) capped by the difference between the purchase price and the average price of the Tesla common stock during the 90-day lookback period (*i.e.,* $300.73 as shown in **Appendix 7**). For example, if Investor A sold his security on November 16, 2018, after the 90-day lookback period, then Investor A's damages per share cannot exceed the difference between the purchase price paid and $300.73, Tesla's common stock average price during the 90-day lookback period.

A. <u>**Damages for Short Sellers**</u>

209.  The Class definition also includes short sellers.[304]  A short seller borrows the stock and sells it in the market.  Later, the short seller will close the position by "covering" the short position through a purchase of the stock.  A short seller is damaged if the artificial inflation when covering the position is greater than the artificial inflation when selling the position.

210.  Here, it is my understanding that damages are recoverable only for those investors who had shorted the stock prior to the start of the Class Period (*i.e.*, when no artificial inflation had yet been introduced into the stock) and then covered such positions during the Class Period at artificially inflated prices.  The measure of damages remains the same for these Class members: the artificial inflation at the time of purchase (covering) less the artificial inflation at the time of the short sale (here, zero).[305]

---

[303]  I begin on August 17, 2018 because that is the date on which the information correcting the alleged wrongdoing is reflected in the market.  The 90-day lookback period then runs through November 14, 2018.

[304]  Class Certification Order, ¶4.

[305]  These damages could also be limited by the PSLRA as determined by the Court and/or finder of fact.

## VIII. ARTIFICIAL INFLATION AND DEFLATION IN CALL AND PUT OPTIONS ON TESLA COMMON STOCK

### A. __Introduction to Options on Tesla Common Stock__

211.   As discussed in my Class Certification Report, a Tesla call option gives the holder the right, but not the obligation, to purchase or call shares of Tesla common stock at a specified strike or exercise price, on or before the specified expiration or maturity date. A Tesla put option gives the holder the right, but not the obligation, to sell or put shares of Tesla common stock at the specified exercise price on, or possibly before, the expiration date.  If exercised, these shares are purchased/called from or sold/put to sellers of call (put) options, who are commonly referred to as the option writers.[306]

212.   Further, when a Tesla stock option is exercised, the call holder is contractually obligated to buy the Tesla common stock at the specified strike price, while the put holder is contractually obligated to sell the Tesla common stock at the specified strike price. Because most stock options are closed out or offset (*i.e.,* sold, if previously purchased or purchased if previously sold), when stock options are exercised the calls (puts) are assigned randomly to and possibly apportioned among several different call (put) writers. Assignment on a written put means that the put writer is contractually obligated to purchase the stock from the put holder at the specified strike price, while assignment on a written call means that the call writer is contractually obligated to sell the stock to the call holder at the specified strike price.  In either case, when the option is assigned to the put (call) writer, it is comparable to the put (call) writer purchasing (selling) Tesla common stock.

213.   As it relates to calculating artificial inflation (deflation) in call (put) prices, it is important to consider that options are "derivative" securities, where:

> [S]tock options are considered "derivative" securities because they derive their value from the value of the underlying asset, which in the case of Tesla put and call options is the share price of Tesla common stock.  In other words, at any given point in time, the ultimate price of a particular option is primarily dependent on the magnitude of the difference between the fixed strike price of that option and the variable price of Tesla's

---

[306]   Class Certification Report, ¶94.

common stock (in particular, the variability of the price over the life of the option).  Therefore, holding all else constant, as the price of Tesla common stock changes, so too will the prices of the put and call options.  When the price of Tesla common stock rises, *all else constant*, in an efficient market it is expected that the prices of call options will rise, while the prices of put options will fall.  Conversely, when the price of Tesla common stock falls, *all else constant*, in an efficient market it is expected that the prices of call options will fall, while the prices of put options will rise.[307]

### B.   Computing Artificial Inflation and Deflation in Tesla Call and Put Prices

214.  To calculate the artificial inflation (or deflation) in each of the options that were traded at some point during the Class Period, I employ the Black-Scholes-Merton options pricing model.  Utilizing the Black-Scholes-Merton options pricing model,  I am able to calculate but-for option values and compare them to fitted options values from observed options data that are adjusted (as discussed below) to account for items, such as bid-ask spreads.  The differences between these values equates to the levels of artificial inflation (or deflation) in each of the options values.

215.  For the purposes of calculating the levels of artificial inflation (or deflation) in each of the options I employ the "impact quantum" methodology presented in the Heston Report.[308]   Based on Professor Heston's procedure, I am able to derive the two inputs required to calculate artificial inflation (deflation), namely: "[a] 're-valued' curve, based on observed stock prices and implied volatilities [defined by Professor Heston as the "Actual BSM Option Curve"] [and] [a] 'but-for' curve based on counterfactual stock prices and counterfactual implied volatilities [defined by Professor Heston as the "But-for BSM Option Curve."]"[309]

---

[307]   Class Certification Report, ¶98 (footnote omitted).

[308]   Heston Report, Section 6.

[309]   Heston Report, ¶170.

216.   These two curves provide a method of calculating a Re-Valued Fitted Option Value and a But-for Fitted Option Value, with the difference (*i.e.*, quantum) between the two being the artificial inflation/deflation in the value of the option.[310]

217.   For the purposes of this report and my damages calculation, I have used the daily Re-Valued Fitted Option Values based on the Black-Scholes-Merton model described by Professor Heston.[311]  I use these Re-Valued Fitted Option Values as opposed to actual transaction prices, because of the two benefits described by Professor Heston:

> It allows me to account for differences in outcomes investors experienced in the real world.  Following 12:48 p.m. on August 7, 2018, the bid-ask spread of traded Tesla option values grew, so some investors, either by happenstance or acumen, achieved better prices.  By applying an impact quantum, I can equitably show the difference in the amount of option price paid or received as compared to a counterfactual price across investors regardless of their independent and individual circumstances.  I discuss this more in detail in Section 6.3; and

> It allows me to difference out potential model fitting biases in the levels.  Like all models, the BSM model and its extensions have biases in the levels.  If I were to simply calculate a but-for price, the impact could vary substantially based on which model I used.  We apply the BSM model with a robust methodology that measures *changes* in value, thereby differencing out potential biases in levels.[312]

218.   In other words, employing this technique to calculate values for the purposes of calculating artificial inflation, eliminates (or minimizes) any profits or losses caused by market micro-structure issues or other imperfections, and enables me to apply an apples-to-apples calculation when I use in tandem the Re-Valued Fitted Option Value and But-for Fitted Option Value to calculate the artificial inflation, as described below.

---

[310] For options that expire within the Class Period (expirations of August 10, 2018 and August 17, 2018), on the day of expiration the Re-Valued Fitted Option Value is simply the intrinsic value of the option the But-for Fitted Option Value is simply the intrinsic value of the option given the But-for stock price.

[311] Heston Report, Section 4.  This methodology could be applied at any time interval such as minute-by-minute.

[312] Heston Report, ¶164 (emphasis in original).

219. To calculate the individual Re-Valued Fitted Option Values each day, I use the closing Tesla stock price and the implied volatility calculated by Professor Heston for that option maturity for that day.

220. To calculate the individual daily But-for Fitted Option Values I use as inputs into the Black-Scholes option pricing model the but-for prices in **Table 9**. Professor Heston:

> … established that option curves are *typically* stable and shift in parallel. In other words, changes in implied volatility affects option prices of all moneyness.[313]

221. Therefore, given the stability of the implied volatility measures prior to the start of the Musk Tweets, when calculating the But-for Fitted Option Price related directly to the Musk Tweets (*i.e.*, based on the daily direct artificial inflation in Tesla common stock), I use as the but-for implied volatility the levels observed (and measured by Professor Heston) immediately prior to the Class Period for the long-term options.[314,315] Similarly, when calculating the But-for Fitted Option Price related to the Musk Tweets and the Consequential Harm (*i.e.*, based on the daily direct and consequential artificial inflation in Tesla common stock), I use as the but-for implied volatility the levels observed (and measured by Professor Heston) at the end of the Class Period for the long-term options.[316] I use the end, because this volatility measure would incorporate all the *direct* and *consequential effects*, discussed above.

---

[313] Heston Report, ¶154 (emphasis in original).

[314] Heston Report, Table 6. Again, the methodology and formulas in Professor Heston's report can be applied at any time interval such as minute-by-minute.

[315] For options expiring prior to October 2018, I use the Actual volatility calculated by Professor Heston on the day because, as found by Professor Heston, "I define 'long-term' Tesla options as those expiring on or after October 19, 2018. Figure 14 depicts that there is notable decline in the long-term Tesla options ATM-forward straddle prices following 12:48 p.m." Heston Report, ¶131 (footnotes omitted).

[316] For options expiring prior to October 2018, I use the Actual volatility calculated by Professor Heston on the day because, as found by Professor Heston, "I define 'long-term' Tesla options as those expiring on or after October 19, 2018. Figure 14 depicts that there is notable decline in the long-term Tesla options ATM-forward straddle prices following 12:48 p.m." Heston Report, ¶131 (footnotes omitted).

222.  Employing Professor Heston's "impact quantum" approach is consistent with the out-of-pocket damages methodology for options I presented in the Class Certification Report, where I stated:

> Because the options prices are derived primarily based on the price level of Tesla common stock and the expected dispersion of Tesla stock prices, the level of artificiality for the options' prices will primarily depend on the levels of artificiality (or daily inflation) in Tesla's common stock price and any levels of artificiality (or daily inflation/deflation) induced by the changes in the expected dispersion of Tesla stock prices.[317]

> …the daily level of artificiality in prices (either inflation or deflation) can be established for each option on Tesla common stock by taking into account the artificial inflation in Tesla common stock prices and any artificial option price levels induced by changes in the expected dispersion of Tesla stock prices as a result of the alleged misrepresentations and omissions.

> Because option prices are derived from the share price of Tesla common stock and other factors like the expected future volatility of Tesla's stock, if the price of Tesla common stock is artificially inflated (and all other option inputs are constant), then a call option would likewise be artificially inflated because the call option would be worth less if the Tesla common stock price was lower.  If the price of the Tesla common stock is artificially inflated (and all other option inputs are constant), a put option would be artificially deflated because the put option would be worth more if the Tesla common stock price was lower.  More generally, if the price of the Tesla common stock is artificially distorted because the Musk Tweets impacted the price level of Tesla common stock, as well as causing other option pricing inputs to be distorted (*e.g.*, implied volatility), then the prices of call and put options would be artificially distorted and the level of the artificial distortion (whether inflation or deflation) would then be applied class-wide to

---

[317]  Class Certification Report, ¶163.  Some have argued that the U.S. Supreme Court decision in *Dura Pharmaceuticals* v. *Broudo*, 544 U.S. 336 (2005) caps the amount of per share damages to the dollar drop in the security price that was caused by the corrective disclosure of the alleged wrongdoing.  *See*, *e.g.*, David Tabak, *Inflation and Damages in a Post-Dura World*, NERA white paper, September 25, 2007.

purchases and sales of the specific options to determine out-of-pocket damages.[318]

223. As discussed above, to calculate the daily level of artificial inflation and deflation in each of the multitude of call and put option prices, I measure the difference between the daily Re-Valued Fitted Option Value and the But-for Fitted Option Value based on the Black-Scholes-Merton option pricing model and the inputs of the but-for price of Tesla stock and the but-for implied volatility.[319]

224. In the Black-Scholes-Merton option pricing model (adjusted for dividends), the option price is based on the underlying stock price, the exercise price of the option, the risk-free interest rate over the life of the option, the time to the expiration of the option, the implied volatility of the underlying stock price, and the dividend yield of the underlying stock.

225. Specifically, the Black-Scholes-Merton model is as follows:[320]

$$c = Se^{-qt}N(d_1) - Xe^{-rt}N(d_2)$$
$$and$$
$$p = Xe^{-rt}N(-d_2) - Se^{-qt}N(-d_1)$$
$$where,$$
$$d_1 = \frac{ln(S/X) + (r - q + \sigma^2/2)T}{\sigma\sqrt{T}}$$
$$and$$
$$d_2 = d_1 - \sigma\sqrt{T}$$

and:   $c$ = the price of a call option;
$p$ = the price of a put option;
$S$ = the current stock price underlying the option;
$\sigma$ = the volatility of the underlying stock;

---

[318] Class Certification Report, ¶¶170-171 (footnotes omitted).  As with the common stock, the PSLRA limit would also apply (*see* Class Certification Report, footnote 197).

[319] No adjustment for dividends is necessary because Tesla did not pay any dividends.  Tesla SEC Form 10-K filed February 19, 2019, p. 39.  ("We have never declared or paid cash dividends on our common stock.  We currently do not anticipate paying any cash dividends in the foreseeable future.").

[320] For example, *see* John C. Hull, Options, Futures, and Other Derivatives, 7th ed., Pearson Prentice Hall (2009), 291 (without dividends), 331 (with dividends); Fischer Black and Myron Scholes, *The Pricing of Options and Corporate Liabilities*, 81 Jnl. of Political Econ. 637 (1973).

X = the exercise price of the option;
T = the time to expiration of the option (in years);
q = the dividend yield on the underlying stock;
r = the risk-free interest rate; and
N denotes the cumulative probability density function for a
standardized normal distribution.

226.  To calculate damages, I first calculate the Re-Valued Fitted Option Value by using the actual closing stock price and implied volatility calculated by Professor Heston. I next calculate the  But-for Fitted Option Value by inserting into the Black-Scholes-Merton formula the but-for stock price (*i.e.*, the stock price less the daily artificial inflation in the stock price) and the but-for implied volatility.[321,322]  For each option, I subtract the But-for Fitted Option Price from the Re-Valued Fitted Option Price to obtain the daily level of artificial inflation (a positive result) or deflation (a negative result) in each option.[323,324]

227.  The daily results for a selection of options are provided in **Appendix 8**.[325]  I note that it is possible that the model results could yield inflation or deflation higher than the transaction price due to market micro-structure effects, but any such issue would be mitigated should the finder of fact determine that the application of a cap on damages as prescribed by the PSLRA as appropriate.[326]  This methodology could be applied on any

---

[321]  The true option price is set equal to the intrinsic value (based on the true stock price) if the date is the expiration date of the option.

[322]  I use the interest rates obtained from the Federal Reserve Board database.  The following cut-offs were used in assigning interest rates to time to maturity: 1-60 days, 1-month rate; 61-136 days, 3- month rate; 137-273 days, 6-month rate; and 274-547 days, 1-year rate; and 548-912 days, 2-year rate.  I converted the interest rates to continuous compounding using the formula: $2 \times ln(1+r/2)$, where *r* is the interest rate based on semiannual compounding.

[323]  In general, the call options have artificial inflation, except for longer-term options where the effect of the Musk Tweets and the possibility of going private caused the option price to be deflated due to the reduction in implied volatility.  In general, the put options have artificial deflation.

[324]  I note that for certain out-of-the money options that had effectively no value, they would also not have any measurable artificial inflation or deflation.

[325]  I separately provide an electronic file with the daily calculations for all options that traded over the Class Period.

[326]  I separately provide an electronic file that provides the daily rolling average price of the options that traded over the Class Period for the 90-day period based on closing bid-ask spreads from CBOE data.

time interval such as minute-by-minute by implementing the formulas in Professor Heston's report to calculate the appropriate implied volatility at the time interval.

228. As discussed above, the standard "out-of-pocket" method of calculating damages per contract for each member of the Class under Section 10(b) involves a measure of the net minute-by-minute or daily inflation (or deflation) in the price of the option contract at the time of the purchase and at the time of the sale.

## IX.   ARTIFICIAL INFLATION AND DAMAGES CALCULATIONS FOR TESLA DEBT SECURITIES

### A.   Introduction to Corporate Bonds and Bond Pricing Theory

#### 1.   Background Information on Corporate Bonds

229. A corporate bond is a security issued in connection with a corporation's borrowing activity.   The borrower (the corporation) receives a lump sum payment (generally denominated in $1,000 amounts per single bond) in return for a promise to make periodic payments to the lender in the future.   These periodic payments typically include semiannual payments of interest to lenders (called coupon payments), as well as a lump sum payment at maturity (called principal payment).[327]

230. The corporate bond market is primarily an institutional market, meaning that most of the participants are large institutions rather than retail clients.   Furthermore, most trading takes place over-the-counter, where the bond trader cannot observe quotes on a centralized or electronic exchange.[328]   Instead, for quotes, the institution or customer contacts one or more dealers or alternatively accesses through Bloomberg or other price providers an electronic broadcast of a list of bonds and quotes.

---

[327] Corporate bonds frequently have covenants or terms whereby the bond may be put to the company by the investor or called by the company.  They can also be convertible or secured by specified assets.

[328] Corporate bonds also trade on the NYSE, a centralized exchange where there are readily available price quotes.  Estimates suggest that only a small proportion of all corporate bond trades are made on the NYSE.

231.   The price of a bond is calculated as the present value of the expected future cash flows it generates.[329]   In turn, the present-value calculation depends upon the magnitude and timing of promised bond payments and the likelihood of repayment, as well as the market interest rates for comparable securities.

232.   The value[330] of a corporate bond is then determined by six components:

a)   The expected rate of return on similar maturity, riskless debt (*i.e.*, U.S. government bonds);

b)   The various provisions and restrictions associated with the particular bond (*e.g.*, call terms, convertibility features, seniority in the event of default, maturity date, etc.);

c)   The default risk, or the probability that the company will be unable to satisfy some or all of the indenture requirements given current and expected future economic conditions;

d)   The likely recovery rate of the bonds in case of bankruptcy or liquidation given current and expected future economic conditions;

e)   The tax considerations of the bond payments; and

f)   The likelihood of being able to sell the corporate bond in a liquid market.[331]

---

[329]   Corporate bonds are generally issued with a par value (which is also sometimes referred to as face value or original principal balance) of $1,000.  Most corporate bonds (like the Tesla Debt Securities) have a par value, face value or original principal balance that is fixed and does not change over the life of the corporate bond.  On the other hand, the market value of a bond will change based on the market price of the bond.  Bond pricing convention is such that bonds are priced relative to $100 par value, face value or original principal balance.  Therefore, a bond price of $96 represents a market value of a bond of $960 or 96% times $1,000.

[330]   The value of a bond with a fixed coupon is expressed as a price relative to $100 par value.  This price relative to par value is inversely related to its yield.  This means that as the bond price falls, the yield rises.

[331]   The first three components of the value of a corporate bond are discussed in detail in Robert C. Merton, *On the Pricing of Corporate Debt: The Risk Structure of Interest Rates*, 29 J. Fin., 449 (1974).  Other articles discuss tax effects, but that discussion is not important in this report, as taxes remained stable over the period.  With respect to components (4) and (6) above and general discussions on factors affecting corporate bonds, *see* Edwin J. Elton, Martin J. Gruber, Deepak Agrawal, and Christopher Mann, *Factors Affecting the Valuation of Corporate Bonds*, 28 J. Banking and Fin. 2747 (2004); Merton H. Miller, *Debt and Taxes*, 32 J. Fin. 261 (1977); Merton H. Miller and Myron S. Scholes, *Dividends and Taxes*, 6 J. Fin. Econ. 333 (1978);

233.  Changes in these variables explain most of the variation in the prices and yields of corporate bonds.  However, *daily changes* in corporate bond prices and yields are most often a function of changes in risk-free rates of interest, in risk premia for similar-risk bonds, and in the company's likelihood of default on its obligations.[332]

234.  Furthermore, because the bondholder receives only a return of principal (in the case of a non-convertible bond or convertible bond[333] trading well below its conversion price), there is generally less upward movement in a bond price than downward movement. In essence, unlike common stock, there can be an asymmetry of price movements – almost like something bumping up against a ceiling.

235.  While U.S. Government obligations are typically viewed as free from default risk, the same is not true for corporate bonds.  Corporations can and do default on their promises to make future payments, or otherwise abide by the bond indentures and covenants.  Bond default risk, also called credit risk, is measured by various rating agencies, such as Moody's Investors Service ("Moody's") and Standard and Poor's Corporation ("S&P").[334]  Bonds are generally separated into two groups: investment-grade bonds, with Standard and Poor's ratings BBB- or higher, and speculative-grade bonds with ratings BB+ or lower.[335]  Certain bonds are not rated.[336]

---

Harry DeAngelo and Ronald W. Masulis, *Leverage and Dividend Irrelevancy under Corporate and Personal Taxation*, 35 J. Fin. 453 (1980).

[332] Typically, tax, recovery rate, and liquidity factors are stable on a day-to-day basis.  Another variable that can affect the valuation of the bonds, the age of the bond, is deterministic (*i.e.*, known in advance).  Thus, while all of these factors affect bond prices, they will have only a small effect day-to-day.

[333] It is my understanding that three of Tesla's senior unsecured public debt securities discussed in Section IX.B below were convertible into Tesla common stock.

[334] *See* **Appendix 9** for a description of the bond ratings provided by Moody's and S&P.

[335] An investment-grade bond is assigned a rating in the top categories by commercial credit rating companies.  S&P classifies investment-grade bonds as BBB- or higher, and Moody's classifies investment-grade bonds as Baa or higher.  *See* Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments, Ch. 14, 468-469 (McGraw-Hill, Irwin, 10th ed. 2013).

[336] The rating agencies charge fees to issuing firms to rate corporate bonds, therefore some corporations choose not to have their corporate bond offerings rated.  In fact, according to data in the Issue Information from the 2018 TRACE Fact Book, in 2018, 88.29% of the corporate convertible bond issues and 66.16% of the non-convertible corporate bond issues were not rated.  https://www.finra.org/filing-reporting/trace/trace-fact-book.

236. Highly rated investment-grade bonds rarely default.  In other words, firms issuing investment-grade bonds have adequate cash flows to cover interest payment obligations and sufficient assets to back up the principal payment obligations.  The relative safety of investment-grade bonds in effect separates the pricing of "straight" or non-convertible investment-grade bonds from day-to-day stock-price fluctuations of the issuing firm.  Consequently, the price of a straight investment-grade bond is generally not very sensitive to day-to-day stock-price fluctuations of the issuer, nor will it always react to corporate announcements.

237. Defaults on non-investment-grade, high-yield or speculative-grade bonds (also called junk bonds) are more common.  About half of all bonds that are rated CCC by Standard and Poor's Corporation have defaulted within ten years.[337]  Although high-yield bonds, like investment-grade bonds, are also sensitive to changes in interest rates and credit market conditions, in an efficient market stock-price behavior of the issuing firm and other firm-specific announcements are expected to have a greater impact on the value of high-yield bonds.

238. This also demonstrates an important observation about corporate bonds. Straight investment-grade bond prices are expected to be sensitive only to bond-pricing factors, such as risk-free interest rates, the default premium and the term spread. Speculative-grade bond prices are expected to be sensitive not only to these same bond-pricing factors, but also to stock-market pricing factors, such as stock returns for the underlying firm.  This dichotomy of variables that explain variations in bond prices is explained by Fama and French in their seminal article.[338]

---

[337]  *See* Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments, Ch. 14, 468-469 (McGraw-Hill, Irwin, 10th ed. 2013).

[338]  Eugene F. Fama and Kenneth R. French, *Common risk factors in the returns on stocks and bonds*, 33 J. Fin. Econ. 3 (1993).

239.  Moreover, it is common for corporate bonds to trade less frequently than stocks because the outside influences and internal financial factors have less impact on pricing.[339]

### 2.    Bond and Stock Prices Often Move in Different Directions

240.  Simon Kwan has explained why a company's stock and bond prices may move in opposite directions in response to new company-specific information:

> Depending on the type of firm-specific information disseminated over time, individual stocks and bonds can be either positively or negatively correlated.  Information about the mean value of the firm's underlying assets affects the values of the firm's stocks and bonds in similar directions, resulting in a negative [positive] relationship between individual stock returns and changes in individual bond yield [price].  On the other hand, if we view equity as similar to a call option on the firm's underlying assets … then information about the variance of the firm's asset return has opposite effects on the values of the firm's stocks and bonds, resulting in a positive [negative] relationship between individual stock returns and bond yield [price] changes.  Hence, examining the correlation between individual stocks and bonds can reveal the dominant type of firm-specific information that drives these investments.[340]

---

[339]  Sriketan Mahanti, Amrut Nashikkar, Marti Subrahmanyam, George Chacko and Gaurav Mallik, *Latent Liquidity: A New Measure of Liquidity, with an Application to Corporate Bonds*, 88 J. Fin. Econ. 272 (2008) ("*Latent Liquidity*"); *see also* Michael L. Hartzmark, Cindy A. Schipani and H. Nejat Seyhun, *Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market*, 3 Colum. Bus. L. Rev., 654, 674-675 (2011).

[340]  Simon H. Kwan, *Firm-Specific Information and the Correlation between Individual Stocks and Bonds*, 40 J. Fin. Econ. 63, 64 (1996) (citations omitted).  In general, then, two factors affect the value of stocks and bonds.

Dr. Kwan asks, "What is the dominant type of firm-specific information that drives individual stocks and bonds?"  (*Id.* at 65.)  This is an understanding of the domination of one type over the other on average and does not conclude that if one type dominates the other on average that it always dominates.  In other words, these factors include the business prospects of the firm and the business risks of the firm.  Economists use the mean value (or level) of the firm's assets to describe the business prospects of the firm.  If the business prospects improve or the value of the assets increase generally, that means that the value of both the firm's stock and bonds will rise.  Economists use the variance of the firm's assets to describe the business risks.  If the business risks or the variance of the assets increase this may mean an increase in the value of the firm's common stock (as the upside is enhanced, while the downside of zero dollars has not

241.   In addition to the widely accepted theory of the relationship between stock and bond returns being a function of the nature of the information, "[t]he wealth redistribution hypothesis, which stems from the conflict of interests between bondholders and stockholders, differs from the information content hypothesis by stating that an increase (decrease) in the equity market value is accompanied by a decrease (increase) in the debt market value.   Indeed, wealth can be redistributed from bondholders to stockholders by increasing the risk of the outstanding bonds.  Higher bond risk can result from increasing the variance of the firm's possible future values."[341]   Thus, "the wealth redistribution hypothesis predicts offsetting changes in the values of individual classes of securities and no change in firm value."[342]   This means that stock and bond returns will be inversely related.

242.   One of the more common examples of the wealth redistribution effect that is important in examining the Notes, as well as why stock and bond returns may be inversely related, is that:

> An increase in the corporation's debt, keeping the total value of the corporation constant, will increase the probability of default and will thus reduce the market value of one of the corporation's bonds.  If the company changes its capital structure by issuing more bonds and using the proceeds to retire common stock, it will hurt the existing bond holders, and help

---

changed), while this may mean a decrease in the value of the firm's corporate bonds as the likelihood of bankruptcy rises.

Even if changes in the business prospects (or level of the assets) are more often the dominant type of firm-specific information, this does not preclude the changes in a firm's business risks (or the variance of assets) as being an important factor determining the directional relationship between a firm's stock and bond returns.  For example, the changes in the business prospects (or the level of assets) might dominate the changes in the business risks (or the variance of assets) in six of ten events, and thus be "dominant," such that one observes the prices of stocks and bonds moving in the same direction on six of ten days.  However, this does not preclude the business risks (or the variance of assets) from dominating the business prospects (or the level of assets) in the other four events and the prices of stocks and bonds moving in inverse relation on four of ten days.

[341]   George Handjinicolaou and Avner Kalay, *Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders around Dividend Announcements*, 13 J. Fin. Econ. 35, 38 (1984) (citations omitted) ("*Wealth Redistributions*").

[342]   Ronald W. Masulis, *The Effects of Capital Structure Change on Security Prices: A Study of Exchange Offers*, 8 J. Fin. Econ. 139, 143 (1980).

the existing stockholders.  The bond price will fall, and the stock price will rise.  In this sense, changes in the capital structure of a firm may affect the price of its common stock.  The price changes will occur when the change in the capital structure becomes certain, not when the actual change takes place.[343]

243.  There does not need to be a corporate transaction or major event for these differential effects to emerge, however, they will generally be important in announcements of going private transactions as is the case for Tesla.

### 3.    Differences in Price Movements between Notes with Different Coupons and Maturities

244.  As discussed above, a bond's price is determined by calculating the present value of all future cash flows.  When exogenous economic factors such as market interest rates change, two primary factors will differentially influence a bond's price.  These are the coupon rates and time to maturity.  All else constant, bonds with higher coupon rates tend to fluctuate less in price as they have less interest-rate risk, while bonds with lower coupons have greater price sensitivity and interest-rate risk.  All else constant, longer-term bonds have greater risk, which results in greater price sensitivity than shorter-term bonds.

### B.  Description of the Tesla Notes

245.  Tesla had four Notes outstanding during the Class Period.  These included the following: (i) 0.25% Convertible Senior Notes due in 2019 (the "2019 Note"); (ii) 1.25% Convertible Senior Notes due in 2021 (the "2021 Note"); (iii) 2.375% Convertible Senior Notes due in 2022 (the "2022 Note"); and (iv) 5.30% Senior Notes due in 2025 (the "2025 Note").

### 1.    The 2019 Note

246. In March 2014, Tesla issued $800 million in principal amount of 0.25% Convertible Senior Notes due in March 2019, and in April 2014, issued an additional $120

---

[343]  Fischer Black and Myron Scholes, *The Pricing of Options and Corporate Liabilities*, 81 J. Political Econ. 637, 650 (1973) (citations omitted).

million pursuant to the exercise in full of the overallotment option by the underwriters, for a total of $920 million in principal amount.[344]

247.   Each $1,000 of principal of these notes was initially convertible into 2.7788 shares of Tesla common stock, which is equivalent to an initial conversion price of $359.87 per share, subject to adjustment upon the occurrence of specified events.  Holders of these notes could elect to convert on or after December 1, 2018.[345]  Further, holders of these notes could convert, at their option, prior to December 1, 2018, only under the following circumstances:

> (1) during a quarter in which the closing price of our common stock for at least 20 trading days (whether or not consecutive) during the last 30 consecutive trading days immediately preceding the quarter is greater than or equal to 130% of the conversion price; (2) during the five- business day period following any five- consecutive trading day period in which the trading price of these notes is less than 98% of the product of the closing price of our common stock for each day during such five- consecutive trading day period or (3) if we make specified distributions to holders of our common stock or if specified corporate transactions occur.[346]

248.   If a fundamental change occurred (as described in the prospectus supplement) prior to the applicable maturity date, holders of these notes could require the Company to repurchase all or a portion of their notes for cash at a repurchase price equal to 100% of the principal amount plus any accrued and unpaid interest.  In addition, if specific corporate events occurred (as described in the prospectus supplement) prior to the applicable maturity date, the Company would increase the conversion rate for a holder who elected to convert their notes in connection with such an event in certain circumstances.[347]

---

[344]   Tesla SEC Form 10-K filed February 19, 2019, pp. 110-111.

[345]   Tesla SEC Form 10-K filed February 19, 2019, p. 111.

[346]   Tesla SEC Form 10-K filed February 19, 2019, p. 111.

[347]   Tesla SEC Form 10-K filed February 19, 2019, p. 111.

CONFIDENTIAL

249.  The amount outstanding during the Class Period equaled the amount issued.[348] The 2019 Note was not redeemable by Tesla.[349]  During the Class Period, the 2019 Note was rated "B-" by S&P.[350]

## 2.    The 2021 Note

250.  In March 2014, Tesla issued $1.2 billion in principal amount of 1.25% Convertible Senior Notes due in March 2021, and in April 2014, issued an additional $180 million pursuant to the exercise in full of the overallotment option by the underwriters, for a total of $1.38 billion in principal amount.[351]

251.  Each $1,000 of principal of these notes was initially convertible into 2.7788 shares of Tesla common stock, which is equivalent to an initial conversion price of $359.87 per share, subject to adjustment upon the occurrence of specified events.  Holders of these notes could elect to convert on or after December 1, 2020.[352]  Holders of these notes could convert, at their option, prior to December 1, 2020, only under the same three circumstances as outlined above for the 2019 Note.[353]  As of December 31, 2018, none of the conditions permitting the holders of 2021 Notes to early convert had been met.[354]

252.  If a fundamental change occurred (as described in the prospectus supplement) prior to the applicable maturity date, holders of these notes could require the Company to repurchase all or a portion of their notes for cash at a repurchase price equal to 100% of the principal amount plus any accrued and unpaid interest.  In addition, if specific corporate events occurred (as described in the prospectus supplement) prior to the applicable maturity date, the Company would increase the conversion rate for a holder who elected to convert their notes in connection with such an event in certain circumstances.[355]

---

[348]  Source: Bloomberg.

[349]  Tesla Prospectus Supplement filed February 28, 2014, p. S-5.

[350]  Source: Bloomberg.

[351]  Tesla SEC Form 10-K filed February 19, 2019, pp. 110-111.

[352]  Tesla SEC Form 10-K filed February 19, 2019, pp. 110-111.

[353]  Tesla SEC Form 10-K filed February 19, 2019, p. 111.

[354]  Tesla SEC Form 10-K filed February 19, 2019, p. 111.

[355]  Tesla SEC Form 10-K filed February 19, 2019, p. 111.

CONFIDENTIAL

253.  The amount outstanding during the Class Period equaled the amount issued.[356] The 2021 Note was not redeemable by Tesla.[357]  During the Class Period, the 2021 Note was rated "B-" by S&P.[358]

### 3.   The 2022 Note

254.  In March 2017, Tesla issued $977.5 million in aggregate principal amount, including the over-allotment option by underwriters, of 2.375% Convertible Senior Notes due in March 2022.[359]

255.  Each $1,000 of principal of the 2022 Notes is initially convertible into 3.0534 shares of Tesla common stock, which is equivalent to an initial conversion price of $327.50 per share, subject to adjustment upon the occurrence of specified events.  Holders of the 2022 Notes may convert, at their option, on or after December 15, 2021.[360]  Further, holders of the 2022 Notes may convert, at their option, prior to December 15, 2021 only under the following circumstances:

> (1) during any quarter beginning after June 30, 2017, if the closing price of our common stock for at least 20 trading days (whether or not consecutive) during the last 30 consecutive trading days immediately preceding the quarter is greater than or equal to 130% of the conversion price; (2) during the five-business day period following any five- consecutive trading day period in which the trading price of the 2022 Notes is less than 98% of the product of the closing price of our common stock for each day during such five- consecutive trading day period or (3) if we make specified distributions to holders of our common stock or if specified corporate transactions occur.[361]

256.  If a fundamental change occurs (as described in the prospectus supplement) prior to the applicable maturity date, holders of these notes could require the Company to

---

[356]  Source: Bloomberg.

[357]  Tesla Prospectus Supplement filed February 28, 2014, p. S-5.

[358]  Source: Bloomberg.

[359]  Tesla SEC Form 10-K filed February 19, 2019, pp. 111-112; Tesla Prospectus Supplement dated March 16, 2017, cover page.

[360]  Tesla SEC Form 10-K filed February 19, 2019, p. 112.

[361]  Tesla SEC Form 10-K filed February 19, 2019, p. 112.

repurchase all or a portion of their notes for cash at a repurchase price equal to 100% of the principal amount plus any accrued and unpaid interest.  In addition, if specific corporate events occurred (as described in the prospectus supplement) prior to the applicable maturity date, the Company would increase the conversion rate for a holder who elected to convert their notes in connection with such an event in certain circumstances.[362]

257.  As of December 31, 2018, none of the conditions permitting the holders of the 2022 Notes to early convert had been met.[363]

258.  The amount outstanding during the Class Period equaled the amount issued.[364]  The 2022 Note was not redeemable by Tesla.[365]  During the Class Period, the 2021 Note was rated "B-" by S&P.[366]

### 4.    The 2025 Note

259.  In August 2017, Tesla issued $1.80 billion in aggregate principal amount of unsecured 5.30% Senior Notes due in August 2025 pursuant to Rule 144A and Regulation S under the Securities Act.[367]  The 2025 Note is governed by an indenture and guaranteed on a senior unsecured basis by SolarCity.[368]  The 2025 Note is redeemable by Tesla, in whole or in part, prior to the maturity date by paying a price equal to:

> (i) if the redemption is prior to August 15, 2020, 100% of the principal amount thereof and accrued and unpaid interest, if any, plus a "make-whole" premium calculated pursuant to the Indenture; (ii) if the redemption is on or after August 15, 2020 and before August 15, 2023, a specified price that annually declines ratably from 103.975% of the principal amount thereof to 101.325% of the principal amount thereof, plus accrued and unpaid interest, if any; and (iii) if the redemption is on or after

---

[362]  Tesla SEC Form 10-K filed February 19, 2019, p. 112.

[363]  Tesla SEC Form 10-K filed February 19, 2019, p. 112.

[364]  Source: Bloomberg.

[365]  Tesla Prospectus Supplement filed March 16, 2017, p. S-5.

[366]  Source: Bloomberg.

[367]  Tesla SEC Form 10-K filed February 19, 2019, p. 112.

[368]  Tesla SEC Form 8-K filed August 23, 2017.

August 15, 2023, 100% of the principal amount thereof and accrued and unpaid interest, if any.[369]

260.  The 2025 Note is <u>not</u> convertible.[370]  The amount outstanding during the Class Period equaled the amount issued.[371]  During the Class Period, the 2025 Note was rated "B-" by S&P and "Caa1" by Moody's.[372]

261.  **Table 11** below summarizes the terms of these bonds.

**Table 11[373]**

| Note | Issue Date | Maturity Date | Issued Amount | Coupon Rate | S&P Rating | Moody's Rating | Convertible | Redeemable |
|------|-----------|---------------|---------------|-------------|-----------|----------------|-------------|------------|
| 2019 Note | 3/5/2014 | 3/1/2019 | $920,000,000 | 0.25% | B- | n/a | Yes | No |
| 2021 Note | 3/5/2014 | 3/1/2021 | $1,380,000,000 | 1.25% | B- | n/a | Yes | No |
| 2022 Note | 3/22/2017 | 3/15/2022 | $977,500,000 | 2.38% | B- | n/a | Yes | No |
| 2025 Note | 8/18/2017 | 8/15/2025 | $1,800,000,000 | 5.30% | B- | Caa1 | No | Yes |

## C.  <u>Event Study for the Tesla Notes</u>

262.  As discussed in the Class Certification Report, to perform an event study, one begins by separating the impact on security price movements of market- and industry-wide factors from the impact of firm-specific factors.[374]  For bonds, an event study uses the same approach, but a slightly different specification of the regression model.  As with a single-issuer common stock, this approach uses a so-called market model to partition a single company's bond price movement on each trading day into various components.  For common stock, there are three parts: the movement caused by market-wide factors, or the "market effect"; the movement caused by industry-wide factors, or the "industry effect"; and the movement caused by the "firm-specific effect."  For bonds, especially convertible bonds, these three components are relevant along with two additional elements: the credit-risk effect and the time-to-maturity effect.

---

[369]  Tesla SEC Form 8-K filed August 23, 2017.

[370]  Source: Bloomberg.

[371]  Source: Bloomberg.

[372]  Source: Bloomberg.

[373]  Source: Bloomberg.

[374]  Class Certification Report, Appendix E.

CONFIDENTIAL

263.  Furthermore, as discussed above, bond-pricing theory tells us that changes in prices will take place based on discounted cash flows.  The price is a function of these two factors (in addition to others):

a)  The expected rate of return on similar maturity, riskless debt (*i.e.*, U.S. government bonds); and

b)  The default risk or the probability that the company will be unable to satisfy some or all of the indenture requirements given current and expected future economic conditions.

264.  Therefore, to run the market model regression I add explanatory variables that account for these exogenous factors.  Thus, the specification is as follows:

$N_t = a + \beta_1(Rm_t) + \beta_2(INDUSTRY_t) + \beta_3(CREDIT_t) + \beta_4(MATURITY_t) + e_t.$

265.  In this equation, $N_t$ is the daily return to the Note, $Rm_t$ is a proxy for the daily market return, $INDUSTRY_t$ is a proxy for the daily industry return, $CREDIT_t$ is the daily return of an index of comparably risky bonds, and $MATURITY_t$ is the daily return of a treasury security with the same time-to-maturity as each of the Tesla Notes.  In each of the Tesla Note regressions, the explanatory variables are:

$Rm_t$: the Nasdaq Composite Total Return Index return (Bloomberg ticker "XCMP");

$INDUSTRY_t$: the Dow Jones US Automobiles & Parts Industry Total Return Index (Bloomberg ticker "DJUSAPT");

$CREDIT_t$: various ICE BofAML CCC & Lower US Cash Pay High Yield Indexes with different term to maturity matched with Tesla Notes' term to maturity as of the start of the Class Period;[375, 376] and

---

[375]  For the 2019 Note and 2021 Note, I use the ICE BofAML 1-3 Year CCC & Lower US Cash Pay High Yield Index (Bloomberg ticker "J1A3"); for the 2022 Note, I use the ICE BofAML 3-5 Year CCC & Lower US Cash Pay High Yield Index (Bloomberg ticker "J2A3"); for the 2025 Note, I use the ICE BofAML 7-10 Year CCC & Lower US Cash Pay High Yield Index (Bloomberg ticker "J4A3").

[376]  Because the Tesla Notes were rated B- by S&P, I also tested using various ICE BofAML B US Cash Pay High Yield Indexes matched to each Note's time to maturity at the start of the Class Period.  For the 2019 Note and 2021 Note, I use the ICE BofAML 1-3 Year B US Cash Pay

MATURITY$_t$: the return of a Treasury Note with due date closest to the maturity date of each Tesla Note.[377]

266. The return for INDUSTRY$_t$ is net of the Nasdaq Composite Total Return and the return for CREDIT$_t$, is net of the Notes' respective Treasury Note returns.

267. Econometric regression methods are used to estimate the parameters or coefficients in the equation above, namely a, $\beta_1$, $\beta_2$, $\beta_3$ and $\beta_4$. As for the stock, for each Note, I use a single control period of 120 trading days ending on August 6, 2018, the day prior to the start of the Class Period, to estimate the parameters or coefficients of the market model. As for the stock, I also include "dummy" variables to account for possible anomalous Note price reactions on the impact dates of days on which the Company announced earnings results.[378]

268. To calculate the returns for the Notes, I use Bloomberg evaluated prices.[379, 380] The results of the regression models for Tesla Notes are presented in Panel A of **Appendix 11**.

---

High Yield Index (Bloomberg ticker "J1A2"); for the 2022 Note, I use the ICE BofAML 3-5 Year B US Cash Pay High Yield Index (Bloomberg ticker "J2A2"); for the 2025 Note, I use the ICE BofAML 7-10 Year B US Cash Pay High Yield Index (Bloomberg ticker "J4A2"). I chose the CCC & Lower indexes because the R-squared for market models with CCC & Lower indexes are higher than that with B rating indexes for all but the 2025 Notes.

[377] The treasury note has to be issued as of February 14, 2018, which is 120 trading days prior to the start of the Class Period. If multiple treasury notes mature at the same time, I use the treasury note with coupon rate closer to that of Tesla. The CUSIPs of treasury notes I used are as follows: 2019 Note: 912828W30; 2021 Note: 912828P87; 2022 Note: 912828W55; 2025 Note: 912828K74.

[378] The impact dates for the 2 earnings-related dates are: May 3, 2018 and August 2, 2018.

[379] "Bloomberg's BVAL Evaluated Pricing Service provides transparent and highly defensible prices across the liquidity spectrum for a variety of fixed income securities …. The key to BVAL's methodology is its real-time access to market observations from a wealth of contributed sources. The accumulated mass of market data serves as the main driver of an innovative and quantitative approach that first corroborates market levels on actively traded bonds and then derives a comparable relative value price on those securities that are less liquid." Source: Bloomberg.

[380] I also tested market models using daily Volume Weighted Average Prices ("VWAPs") calculated using transactions data during stock trading hours available from Trade Reporting and Compliance Engine ("TRACE"). *See* **Appendix 10** for methodology to compute TRACE VWAPs. Because there was not TRACE VWAP on each day during the 120 stock trading days

269.  As discussed above, corporate bonds do not generally trade as frequently as common stocks.  Therefore, it can often take longer for the bond price to respond to new information.  Although in a recent *Monroe County* Court decision the focus was on common stock, the court made clear that it is not uncommon for a financial security to take longer than a single trading day to absorb and reflect all publicly available information.[381]  The *Monroe County* Court laid out the arguments as follows:[382]

> First, using exclusively one-day event windows does not change [] conclusion[s] concerning market efficiency.  As a result, the debate about event windows in this case is largely academic.  Second, there are many cases that find that multi-day event windows are appropriate for event study analysis in securities fraud class actions.[citations footnoted][383]  Third, and more broadly, the Supreme Court has expressly refused to "adopt any particular theory of how quickly and completely publicly available information is reflected in market

---

prior to the Class Period and the Class Period for all Tesla Notes, I used BVAL prices to estimate market models for Tesla Notes.

[381]  *Monroe Cty Empls . Retirement Syst., et al. v. The Southern Co., et al.,* 332 F.R.D 370, 391 (N.D. Ga. 2019).

[382]  *Monroe* 332 F.R.D. 370, 391-392.

[383]  *Monroe* citations:

*See, e.g., In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 513 n.11 (1st Cir. 2005) (rejecting argument that a two-day event window is inconsistent with an efficient market); *In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 635 (3rd Cir. 2011) ("That some information took two days to affect the price does not undermine a finding of efficiency."), *abrogated on other grounds by Amgen Inc. v. Connecticut Retirement Plains and Trust Funds,* 133 S. Ct. (2013); *In re Vivendi Universal, S.A., Sec. Litig.,* 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (using a three-day window for analysis); *In re Diamond Foods, Inc.,* 295 F.R.D. 240, 249 (N.D. Cal. 2013) (citing defense expert's assertion that a "proper test of market efficiency" required analyzing whether the market price reacted to new information over more than one trading day in order to "assess[] whether there are delayed price responses to the events of interest"); *Fogarazzo v. Lehman Bros.,* 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (accepting event study with three-day event window and rejecting argument that this rule only applied "where the timing of discrete events was [not] ascertainable"); *Aranaz v. Catalyst Pharm. Partners,* 302 F.R.D. at 669 (citing significant two-day stock decline as "strong empirical evidence of market efficiency").  In another securities fraud case, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* the court explicitly considered and rejected Professor Gompers' exact same argument against two-day windows that he offers in this case, finding that "[a] two-to three-day window is *common* in event studies" because "it is standard for experts to utilize an event window including both the day of the event and the day following an event." 310 F.R.D. at 96. The *Barclays* court noted that Professor Gompers "agree[d] that event studies often use a two-day window, the date of the announcement and the day after." *Id.* at 96 n.183.

price."[citations footnoted][384]   Fourth, academic literature supports the use of two-day (or more) event windows.[citations footnoted][385]   Fifth, the Court finds, in accordance with the academic literature, that when the particular facts and circumstances justify investigating multi-day event windows, such analysis is appropriate…. Finally, the Court rejects Defendants' suggestion that [multi-day] analysis should be disregarded because [it] did not analyze only one-day windows or only two-day windows.  The Court is unaware of any rule, and Defendants cite none, requiring that one must commit at the outset, before analyzing the data, to investigate only one-day or only two-day event windows.  Professor Feinstein testified that event study analysis is "an investigation, and the results might compel you to look at a larger window."[citations footnoted][386]

---

[384] *Monroe* citations:

*Basic*, 485 U.S. at 249 n.28.  Following its decision in *Basic*, the Supreme Court in *Halliburton II* reiterated that it would not "enter the fray" of academic debates about the speed at which information is impounded into a stock price, and reconfirmed that market efficiency is based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Halliburton Co, et al. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2410 (2014).  (quoting Basic, 485 U.S. at 247 n.24).

[385] *Monroe* citations:

For example, MacKinlay explains that two-day event windows are appropriate when analyzing earnings announcements.  (Craig A. MacKinlay, *Event Studies in Economics and Finance*, 35 Jnl. of Econ. Lit., 1997, pp. 14-15:  MacKinlay makes clear that examination of stock price effects that occur on the second trading day is perfectly appropriate in event study analysis.).  Professor Feinstein cited multiple other legal and academic papers endorsing the use of multi-day event windows and explaining that price reactions to news sometimes occur over two or more trading days, including a paper by David I. Tabak, who explains that "[i]n securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement." (footnote omitted)  And although Defendants and Professor Gompers cite academic literature for the proposition that stock price reactions generally *begin* quickly, this does not necessarily mean that stock price reactions always *end* quickly.  Rather, as Professor Feinstein explained, "[i]t is not settled science that an efficient market price reaction is over within a matter of minutes," and "the articles [Professor Gompers cites] do not conclude that the stock price reaction in an efficient market necessarily ends quickly and cannot continue on the day after an earnings announcement." [Doc. 113-2, ¶¶60, 65].

[386] *Monroe* citations:

Day 1 Tr. at 138:4-11; *see also id.* at 143:7-10 ("[T]o commit to one-day windows only and disregard the possibility that the reaction will be evident on the second day is not reliable investigative research."); *id.* at 143:17-24 ("Because the literature says that the reaction might

### D. **Results of Event Study for the Notes**

270.  Based on my event studies, daily statistics for the four Tesla Notes over the Corrective Interval are shown in **Appendix 12**.  As expected, the convertible notes react much like the stock, with cumulative abnormal returns ranging between negative 9.8% and negative 14.3%, as compared to the stock's cumulative abnormal return of negative 17.6%. Although the cumulative abnormal return for the 2025 Note is negative 2.5% over the Corrective Interval, because the 2025 Note is not convertible and the cumulative abnormal return was not statistically significant at the 5% level, I do not implement my damages analysis for the 2025 Note.

271.  In **Table 12** below, for each of the convertible Notes, I present the closing prices, returns, and abnormal returns based on the market models discussed above, and the adjusted price (*i.e.*, the Note price after removing market-wide and industry influences, as calculated for the stock).

---

be on the second day, it's imperative to look on the second day before concluding that there was no reaction.")

Table 12[387]

| Date | Price | Return | Abnormal Return | Adjusted Price |
|------|-------|--------|-----------------|----------------|
| **_2019 Note_** | | | | |
| 8/7/2018 | $114.69 | | | $114.69 |
| 8/8/2018 | $110.56 | -3.6% | -3.5% | $110.67 |
| 8/9/2018 | $108.27 | -2.1% | -2.0% | $108.45 |
| 8/10/2018 | $108.60 | 0.3% | 0.8% | $109.36 |
| 8/13/2018 | $109.29 | 0.6% | 0.9% | $110.36 |
| 8/14/2018 | $108.12 | -1.1% | -1.3% | $108.94 |
| 8/15/2018 | $106.63 | -1.4% | -0.6% | $108.29 |
| 8/16/2018 | $106.10 | -0.5% | -0.8% | $107.45 |
| 8/17/2018 | $102.16 | -3.7% | -3.7% | $103.48 |
| **_2021 Note_** | | | | |
| 8/7/2018 | $122.55 | | | $122.55 |
| 8/8/2018 | $116.14 | -5.2% | -5.1% | $116.26 |
| 8/9/2018 | $112.31 | -3.3% | -3.3% | $112.38 |
| 8/10/2018 | $112.74 | 0.4% | 0.9% | $113.41 |
| 8/13/2018 | $114.64 | 1.7% | 2.1% | $115.74 |
| 8/14/2018 | $111.76 | -2.5% | -2.7% | $112.56 |
| 8/15/2018 | $109.79 | -1.8% | -0.7% | $111.73 |
| 8/16/2018 | $108.80 | -0.9% | -1.2% | $110.35 |
| 8/17/2018 | $103.44 | -4.9% | -4.9% | $104.99 |
| **_2022 Note_** | | | | |
| 8/7/2018 | $130.41 | | | $130.41 |
| 8/8/2018 | $123.61 | -5.2% | -5.1% | $123.74 |
| 8/9/2018 | $120.81 | -2.3% | -2.1% | $121.17 |
| 8/10/2018 | $121.19 | 0.3% | 1.0% | $122.35 |
| 8/13/2018 | $122.32 | 0.9% | 1.5% | $124.14 |
| 8/14/2018 | $120.27 | -1.7% | -2.1% | $121.56 |
| 8/15/2018 | $117.47 | -2.3% | -1.2% | $120.13 |
| 8/16/2018 | $116.79 | -0.6% | -0.9% | $119.03 |
| 8/17/2018 | $110.07 | -5.8% | -5.9% | $112.06 |

## E.  Artificial Inflation in Note Prices

272.  Using the same methodology as used for Tesla common stock, I next compute the artificial inflation in the prices of the convertible Notes during the Class Period.  The artificial inflation or the _consequential effects_ for the 2019, 2021 and 2022 Notes begin at $11.21, $17.56 and $18.35, respectively and are presented in **Table 13** below.

---

[387] _See_ **Appendix 12** for prices, returns, and abnormal returns.  The adjusted price after August 7, 2018 is equal to the adjusted price on the prior date multiplied by (1 + abnormal return).

Table 13[388]

| Date | Price | But-for Price | Artificial Inflation |
|------|-------|---------------|----------------------|
| ***2019 Note*** | | | |
| 8/7/2018 | $114.69 | $103.48 | $11.21 |
| 8/8/2018 | $110.56 | $103.48 | $7.07 |
| 8/9/2018 | $108.27 | $103.48 | $4.78 |
| 8/10/2018 | $108.60 | $103.48 | $5.12 |
| 8/13/2018 | $109.29 | $103.48 | $5.81 |
| 8/14/2018 | $108.12 | $103.48 | $4.63 |
| 8/15/2018 | $106.63 | $103.48 | $3.15 |
| 8/16/2018 | $106.10 | $103.48 | $2.61 |
| 8/17/2018 | $102.16 | --- | --- |
| ***2021 Note*** | | | |
| 8/7/2018 | $122.55 | $104.99 | $17.56 |
| 8/8/2018 | $116.14 | $104.99 | $11.15 |
| 8/9/2018 | $112.31 | $104.99 | $7.32 |
| 8/10/2018 | $112.74 | $104.99 | $7.75 |
| 8/13/2018 | $114.64 | $104.99 | $9.65 |
| 8/14/2018 | $111.76 | $104.99 | $6.77 |
| 8/15/2018 | $109.79 | $104.99 | $4.80 |
| 8/16/2018 | $108.80 | $104.99 | $3.81 |
| 8/17/2018 | $103.44 | --- | --- |
| ***2022 Note*** | | | |
| 8/7/2018 | $130.41 | $112.06 | $18.35 |
| 8/8/2018 | $123.61 | $112.06 | $11.55 |
| 8/9/2018 | $120.81 | $112.06 | $8.75 |
| 8/10/2018 | $121.19 | $112.06 | $9.13 |
| 8/13/2018 | $122.32 | $112.06 | $10.26 |
| 8/14/2018 | $120.27 | $112.06 | $8.21 |
| 8/15/2018 | $117.47 | $112.06 | $5.41 |
| 8/16/2018 | $116.79 | $112.06 | $4.73 |
| 8/17/2018 | $110.07 | --- | --- |

## F.  Artificial Inflation in Note Prices Caused Directly by the Musk Tweets

273. To calculate the *direct effect* on the Note prices of the Musk Tweets, I calculate the abnormal return observed for the Tweets Interval using Note transaction data from TRACE.  **Appendix 10** describes the data and my methodology to clean the data.  I first calculate a price  prior to the Musk Tweets, as the volume weighted average price ("VWAP") based on transactions on August 7, 2018 *prior to* 12:48 p.m.  I then calculate a

---

[388] *See* **Table 12** for prices and but-for prices.  Artificial inflation is equal to price less but-for price.

price *following* the initial Musk tweet, as the VWAP after the initial 12:48 p.m. tweet based on transactions on or after 12:48 p.m.[389]  To measure the *direct effect* on the Note prices of the Musk Tweets, I start with the difference between the post-Musk Tweets VWAP price and the pre-Musk Tweets VWAP price.  Finally, I remove the impact of market-wide and industry influences from the price change.  The abnormal price change is a measure of the *direct effect* on the Note prices of the Musk Tweets.[390]  I note that the abnormal price change is equal to abnormal return multiplied by the pre-Musk Tweets VWAP.  The abnormal price changes for all three Notes are statistically significant at the 1% level.[391]  These abnormal price changes or the *direct effect* for the 2019, 2021 and 2022 Notes are $4.49, $6.17 and $6.26, respectively and are shown in **Table 14** below.

274.  I then apply the analysis from **Table 8** above that uses the direct scalar to measure the *direct effect* of the Musk Tweets over the Class Period.  The results of this analysis are presented in **Table 14** below.

---

[389]  For the calculation of these intraday VWAPs, I considered all transactions during the day and did not limit the analysis to stock trading hours.

[390]  For each Note, I calculate two volume-weighted times (one for trades before 12:48 pm and one for trades on or after 12:48 pm).  I then compute the intraday market return and intraday industry return between these two points of time.  The intraday abnormal return is computed as intraday return on the Note, less market beta times the intraday market return, less industry beta times the intraday industry return.  For each Note, the market beta and industry beta are measured from the same regression specification as used in the market model discussed above, except that I run an alternative regression over the prior 120 days wherein the industry return is not net of market.  See Panel B of **Appendix 11**.  In the calculation of the intraday abnormal return, I assume intraday Credit and Treasury variable movements are close to zero.

If the volume-weighted time is before market open or after market close, I use the open and close price respectively for the market and industry to calculate the intraday returns.  Industry return is calculated after removing the impact of Tesla based on Tesla's weights in the index.  Source for minute-level price and open/close prices for market and industry indexes: Bloomberg.

[391]  The t-statistic for each abnormal return is computed as the abnormal return divided by the adjusted standard error, which is equal to the standard error of the regression discussed in the previous footnote multiplied by the squared root of the ratio of the number of minutes between the two points of volume weighted times divided by 390 (*i.e.*, the number of minutes between 9:30 am and 4:00 pm).  The ratio is set to be less than or equal to one.

**Table 14**[392]

|  | Aug. 7 | Aug. 8 | Aug. 9 | Aug. 10 | Aug. 13 | Aug. 14 | Aug. 15 | Aug. 16 | Aug. 17 |
|---|---|---|---|---|---|---|---|---|---|
| **Direct Scalar** | 100.0% | 72.0% | 41.2% | 51.1% | 62.9% | 63.9% | 54.0% | 48.4% | 0.0% |
| *Daily Direct Artificial Inflation* | | | | | | | | | |
| **2019 Note** | $4.49 | $3.23 | $1.85 | $2.30 | $2.83 | $2.87 | $2.43 | $2.17 | $0.00 |
| **2021 Note** | $6.17 | $4.44 | $2.54 | $3.16 | $3.88 | $3.95 | $3.34 | $2.99 | $0.00 |
| **2022 Note** | $6.26 | $4.50 | $2.58 | $3.20 | $3.94 | $4.00 | $3.38 | $3.03 | $0.00 |

275. Finally, based on the combined levels of artificial inflation in **Table 13** and the artificial inflation directly caused by the Musk Tweets in **Table 14**, I calculate the artificial inflation related to the Consequential Harm or the *consequential effects* and the "but-for" price excluding the price impact of the Consequential Harm. This is shown below in **Table 15** below.

---

[392] *See* **Table 8** for the Direct Scalar. The direct artificial inflation on each day equals the direct effect on August 7, 2018 multiplied by the direct scalar each day.

**Table 15[393]**

| Date | Total Artificial Inflation | Direct Scalar | Direct Artificial Inflation | Consequential Artificial Inflation | Direct But-For Price |
|---|---|---|---|---|---|
| **_2019 Note_** | | | | | |
| 8/7/2018 | $11.21 | 1.00 | $4.49 | $6.72 | $110.20 |
| 8/8/2018 | $7.07 | 0.72 | $3.23 | $3.84 | $107.33 |
| 8/9/2018 | $4.78 | 0.41 | $1.85 | $2.93 | $106.42 |
| 8/10/2018 | $5.12 | 0.51 | $2.30 | $2.82 | $106.31 |
| 8/13/2018 | $5.81 | 0.63 | $2.83 | $2.98 | $106.47 |
| 8/14/2018 | $4.63 | 0.64 | $2.87 | $1.76 | $105.25 |
| 8/15/2018 | $3.15 | 0.54 | $2.43 | $0.72 | $104.21 |
| 8/16/2018 | $2.61 | 0.48 | $2.17 | $0.44 | $103.92 |
| 8/17/2018 | --- | 0.00 | --- | --- | --- |
| **_2021 Note_** | | | | | |
| 8/7/2018 | $17.56 | 1.00 | $6.17 | $11.39 | $116.38 |
| 8/8/2018 | $11.15 | 0.72 | $4.44 | $6.71 | $111.70 |
| 8/9/2018 | $7.32 | 0.41 | $2.54 | $4.77 | $109.76 |
| 8/10/2018 | $7.75 | 0.51 | $3.16 | $4.59 | $109.58 |
| 8/13/2018 | $9.65 | 0.63 | $3.88 | $5.76 | $110.75 |
| 8/14/2018 | $6.77 | 0.64 | $3.95 | $2.83 | $107.82 |
| 8/15/2018 | $4.80 | 0.54 | $3.34 | $1.47 | $106.46 |
| 8/16/2018 | $3.81 | 0.48 | $2.99 | $0.82 | $105.81 |
| 8/17/2018 | --- | 0.00 | --- | --- | --- |
| **_2022 Note_** | | | | | |
| 8/7/2018 | $18.35 | 1.00 | $6.26 | $12.10 | $124.16 |
| 8/8/2018 | $11.55 | 0.72 | $4.50 | $7.04 | $119.10 |
| 8/9/2018 | $8.75 | 0.41 | $2.58 | $6.17 | $118.23 |
| 8/10/2018 | $9.13 | 0.51 | $3.20 | $5.93 | $117.99 |
| 8/13/2018 | $10.26 | 0.63 | $3.94 | $6.33 | $118.39 |
| 8/14/2018 | $8.21 | 0.64 | $4.00 | $4.21 | $116.27 |
| 8/15/2018 | $5.41 | 0.54 | $3.38 | $2.03 | $114.09 |
| 8/16/2018 | $4.73 | 0.48 | $3.03 | $1.70 | $113.76 |
| 8/17/2018 | --- | 0.00 | --- | --- | --- |

276. As discussed above, the standard "out-of-pocket" method of calculating damages per Note for each member of the Class under Section 10(b) involves a measure

---

[393] *See* **Table 8** for and the Direct Scalar.  *See* **Table 14** for Direct Artificial Inflation. Consequential Artificial Inflation is equal to Artificial Inflation in **Table 13** minus Direct Artificial Inflation.  Direct But-For Price is equal to Price minus Direct Artificial Inflation.

of the net minute-by-minute or daily inflation in the price of the Note at the time of the purchase and at the time of the sale.[394]

I declare under penalty of perjury that the foregoing is true and correct.

***RESPECTFULLY SUBMITTED THIS TENTH DAY OF NOVEMBER 2021***


Michael L. Hartzmark, Ph.D.

---

[394] As with the common stock, the PSLRA limit would also apply.

# **<u>Exhibit C</u>**

Pages 1 - 145

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

IN RE TESLA, INC. SECURITIES ) 
LITIGATION ) No. C 18-4865 EMC
)
) San Francisco, California
) Tuesday
) October 25, 2022
) 9:30 a.m.

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:            LEVI AND KORSINSKY
                          1101 30th Street NW
                          Suite 115
                          Washington, DC 20007
                   BY:    **NICHOLAS I. PORRITT, ESQ.**
                          **ELIZABETH K. TRIPODI, ESQ.**
                          **ALEXANDER A. KROT, ESQ.**

                          LEVI & KORSINSKY LLP
                          75 Broadway
                          Suite 202
                          San Francisco, California 94111
                   BY:    **ADAM M. APTON, ESQ.**

For Defendants:            QUINN EMANUEL URQUHART & SULLIVAN LLP
                          865 South Figueroa Street
                          10th Floor
                          Los Angeles, California 90017
                   BY:    **MICHAEL T. LIFRAK, ESQ.**
                          **ANTHONY P. ALDEN, ESQ.**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendants:          QUINN EMANUEL URQUHART & SULLIVAN LLP
                              51 Madison Avenue
 3                            22nd Floor
                              New York, New York 10010
 4                      BY:  ALEXANDER B. SPIRO, ESQ.
                             ELLYDE R. THOMPSON, ESQ.
 5                           JESSE A. BERNSTEIN, ESQ.

 6                                  – – –

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          As I understand the model that Dr. Heston used, I mean, he

2    took everything -- his volatility, you know, implied volatility

3    rates and all sorts of stuff was taken before the Tweet and

4    then you look at what happens after the Tweet.  That's how he

5    got his differential; right?  I mean, it's the same principle,

6    his but-for was based on the pre-Tweet circumstances.  Do I

7    have that right?

8          MR. PORRITT:  What you described, Your Honor, is

9    basically what Professor Heston and Dr. Hartzmark do.  I mean,

10   they do take the price beforehand, and that's the implied

11   volatility that Dr. Hartzmark uses, and then -- or you could

12   take it at the end.

13         I mean, essentially at the end, on August 17th the

14   volatility goes back to kind of where it was on August 7th, so

15   it's kind of a distinction without a difference.

16         And we use those implied volatilities to calculate but-for

17   option prices, and then we compare that to the option prices

18   that were actually transacted during the class period.

19         THE COURT:  I guess my simple question is why not use

20   the actual option prices, which are already -- presumably takes

21   into account the expected volatility?  There is a certain

22   expectation of volatility before the Tweet and expected

23   volatility after the Tweet, as there was an expected price

24   direction of stock before the Tweet versus after the Tweet.

25         Why doesn't real world pricing already take -- why do we

1    actual prices can be observed.  They're there.

2        So that could be done to compare them, but we could

3    calculate -- we are going to calculate but-for prices for every

4    single one of the 2400 option series.

5        It's not like damages are going to be calculated based on

6    an aggregate basis, which is sort of what defendants implied.

7    They will be calculated -- implied volatility will be assessed

8    as required by the Black-Scholes method across -- by maturity,

9    but then that will then be used in what is a completely

10   arithmetic exercise to then generate but-for prices for all

11   2400 option series, which will then be used to calculate

12   damages for every single one of the 2400 option series.

13       So if it's the difference between we think the adjusted

14   price that Professor Heston did, he eliminates some of the

15   noise, what he describes as noise in the data.  But if the --

16   if the Court's concern is that's not sufficiently supported and

17   would rather -- if the Court's preference is that we use actual

18   prices, we use actual prices.  That would be very easy to do,

19   and I don't think would make really that much of a difference

20   in the whole scheme of things.

21           THE COURT:  Have you done a -- remind me.  Have you

22   done that comparison between the actual prices and the

23   generated --

24           MR. PORRITT:  In this one?  When we were evaluating

25   the model, I believe Professor Heston looked at that.  I don't

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, November 2, 2022

# **Exhibit D**

**Kyle Batter**

| | |
|---|---|
| **From:** | Nicholas I. Porritt <nporritt@zlk.com> |
| **Sent:** | Monday, December 19, 2022 9:21 PM |
| **To:** | Anthony Alden |
| **Cc:** | Michael Lifrak; Elizabeth K Tripodi; Adam M Apton; Adam C McCall; Alexander Krot; Maxwell Weiss; Pamela Hunter; Kathy Ames Valdivieso; Alex Bergjans; Alex Spiro; Jesse Bernstein; Kyle Batter; Phillip Jobe; Ellyde Thompson; Andrew J. Rossman |
| **Subject:** | Re: [External]RE: [External]RE: [External]RE: [External]Heston Analysis |

**[EXTERNAL EMAIL from nporritt@zlk.com]**

Anthony:

As we explained in our discussion on Friday, this is not a new methodology by Dr. Hartzmark but is exactly the out-of-pocket methodology described in Dr. Hartzmark's and Professor Heston's reports and discussed at length during their depositions. Plaintiff is simply accepting Defendants' proposal made by Prof. Seru and by Defendants' counsel to the Court to use unadjusted transaction data rather than data adjusted for market noise etc. to calculate option prices for the purposes of the out-of-pocket methodology. Any calculation of damages for options will also utilize the but-for price for Tesla stock determined by the jury at trial. Plaintiff is prepared to provide revised calculations showing the but-for prices for Tesla options assuming a but-for price for Tesla stock of $312.90 which is the price identified by Dr. Hartzmark and described in his report. This is a straightforward calculation that Defendants are more than capable of running themselves  but nonetheless we are prepared to provide it to you.

With regards to additional depositions of Dr. Hartzmark and Prof. Heston, we are prepared to discuss this further with Defendants' counsel if you can identify areas of inquiry that were unable to be addressed in their depositions taken to date. For instance, see Hartzmark 3/18/22 Dep. Tr.  at 298:21-299:1 (noting that to the "extent that these values [in Appendix 8 showing the levels of inflation or deflation in Tesla options] are replaced, say, for example, with defendants' values, then the methodology and the out-of-pocket methodology to calculate damage would remain the same"). There are numerous other examples of similar testimony.

Sincerely

Nick

Nicholas Porritt
Partner
LEVI&KORSINSKYLLP
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
nporritt@zlk.com | www.zlk.com
--

**From:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Date:** Friday, December 16, 2022 at 7:51 PM
**To:** Nicholas I. Porritt <nporritt@zlk.com>
**Cc:** Michael Lifrak <michaellifrak@quinnemanuel.com>, Elizabeth K Tripodi <etripodi@zlk.com>, Adam M Apton <aapton@zlk.com>, Adam C McCall <amccall@zlk.com>, Alexander Krot <akrot@zlk.com>, Maxwell Weiss <mweiss@zlk.com>, Pamela Hunter <phunter@zlk.com>, Kathy Ames Valdivieso <kavaldivieso@zlk.com>, Alex Bergjans <alexbergjans@quinnemanuel.com>, Alex Spiro <alexspiro@quinnemanuel.com>, Jesse Bernstein <jessebernstein@quinnemanuel.com>, Kyle Batter <kylebatter@quinnemanuel.com>, Phillip Jobe <phillipjobe@quinnemanuel.com>, Ellyde Thompson <ellydethompson@quinnemanuel.com>, Andrew J. Rossman <andrewrossman@quinnemanuel.com>
**Subject:** [External]RE: [External]RE: [External]RE: [External]Heston Analysis

Nick:  Thank you for talking today.  During the call, you stated that Professor Heston would not be offering any new opinions as a result of the Court's Final Pre-Trial Conference Order; instead, certain opinions contained in his reports will not be offered at trial.  We requested and you agreed to advise us in writing, and by reference to sections in his reports, which opinions Professor Heston will no longer be offering at trial.  Please provide this by Wednesday, December 21.

We also requested (1) a supplemental report from Dr. Hartzmark explaining his new methodology for calculating damages on Tesla options, the bases for the new methodology, and all supporting calculations; and (2) supplemental depositions of Professor Heston and Dr. Hartzmark.  Defendants are entitled to depose Professor Heston and Dr. Hartzmark about the obvious inconsistencies between Dr. Hartzmark's newly disclosed options damages methodology and their prior opinions.  You stated that you would consider our requests and that it might be reasonable for plaintiff to at least serve a supplemental Hartzmark report containing a description of the methodology and revised Appendix 8.  Please let us know by Monday whether plaintiff will agree to our request and by when plaintiff will serve the supplemental report.  Absent agreement, we intend to promptly seek relief from the Court.


Thanks,
Anthony


**Anthony P. Alden** | Partner | **Quinn Emanuel Urquhart & Sullivan, LLP**

865 S. Figueroa St 10th Floor
Los Angeles, Ca 90017
213-443-3159 Direct
213.443.3000 Main Office Number
213.443.3100 FAX
anthonyalden@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.


**From:** Nicholas I. Porritt <nporritt@zlk.com>
**Sent:** Thursday, December 15, 2022 8:48 AM
**To:** Anthony Alden <anthonyalden@quinnemanuel.com>
**Cc:** Michael Lifrak <michaellifrak@quinnemanuel.com>; Elizabeth K Tripodi <etripodi@zlk.com>; Adam M Apton <aapton@zlk.com>; Adam C McCall <amccall@zlk.com>; Alexander Krot <akrot@zlk.com>; Maxwell Weiss <mweiss@zlk.com>; Pamela Hunter <phunter@zlk.com>; Kathy Ames Valdivieso <kavaldivieso@zlk.com>; Alex Bergjans

<alexbergjans@quinnemanuel.com>; Alex Spiro <alexspiro@quinnemanuel.com>; Jesse Bernstein <jessebernstein@quinnemanuel.com>; Kyle Batter <kylebatter@quinnemanuel.com>; Phillip Jobe <phillipjobe@quinnemanuel.com>; Ellyde Thompson <ellydethompson@quinnemanuel.com>; Andrew J. Rossman <andrewrossman@quinnemanuel.com>
**Subject:** Re: [External]RE: [External]RE: [External]Heston Analysis

[EXTERNAL EMAIL from nporritt@zlk.com]

Yes that is fine.

Sent from my iPhone

On Dec 15, 2022, at 11:07 AM, Anthony Alden <anthonyalden@quinnemanuel.com> wrote:

Nick:  Is it possible to move this call to 9 a.m. PT / 12 p.m. ET tomorrow?  A couple of people on our side have had conflicts arise today.

**From:** Nicholas I. Porritt <nporritt@zlk.com>
**Sent:** Tuesday, December 13, 2022 9:58 AM
**To:** Michael Lifrak <michaellifrak@quinnemanuel.com>; Elizabeth K Tripodi <etripodi@zlk.com>; Adam M Apton <aapton@zlk.com>; Adam C McCall <amccall@zlk.com>; Alexander Krot <akrot@zlk.com>; Maxwell Weiss <mweiss@zlk.com>; Pamela Hunter <phunter@zlk.com>; Kathy Ames Valdivieso <kavaldivieso@zlk.com>
**Cc:** Alex Bergjans <alexbergjans@quinnemanuel.com>; Alex Spiro <alexspiro@quinnemanuel.com>; Jesse Bernstein <jessebernstein@quinnemanuel.com>; Kyle Batter <kylebatter@quinnemanuel.com>; Phillip Jobe <phillipjobe@quinnemanuel.com>; Ellyde Thompson <ellydethompson@quinnemanuel.com>; Anthony Alden <anthonyalden@quinnemanuel.com>; Andrew J. Rossman <andrewrossman@quinnemanuel.com>
**Subject:** Re: [External]RE: [External]Heston Analysis

[EXTERNAL EMAIL from nporritt@zlk.com]

Thursday is better for me. I am generally available all day.

**From:** Michael Lifrak <michaellifrak@quinnemanuel.com>
**Date:** Tuesday, December 13, 2022 at 12:43 PM
**To:** Nicholas I. Porritt <nporritt@zlk.com>, Elizabeth K Tripodi <etripodi@zlk.com>, Adam M Apton <aapton@zlk.com>, Adam C McCall <amccall@zlk.com>, Alexander Krot <akrot@zlk.com>, Maxwell Weiss <mweiss@zlk.com>, Pamela Hunter <phunter@zlk.com>, Kathy Ames Valdivieso <kavaldivieso@zlk.com>
**Cc:** Alex Bergjans <alexbergjans@quinnemanuel.com>, Alex Spiro <alexspiro@quinnemanuel.com>, Jesse Bernstein <jessebernstein@quinnemanuel.com>, Kyle Batter <kylebatter@quinnemanuel.com>, Phillip Jobe <phillipjobe@quinnemanuel.com>, Ellyde Thompson <ellydethompson@quinnemanuel.com>, Anthony Alden <anthonyalden@quinnemanuel.com>, Andrew J. Rossman

<andrewrossman@quinnemanuel.com>
**Subject:** [External]RE: [External]Heston Analysis

Thanks, Nick.

Can we schedule a call for tomorrow or Thursday to discuss further?

Could you let us know available times?

Thanks,
Mike

---

**From:** Nicholas I. Porritt <nporritt@zlk.com>
**Sent:** Monday, December 12, 2022 7:19 PM
**To:** Michael Lifrak <michaellifrak@quinnemanuel.com>; Elizabeth K Tripodi <etripodi@zlk.com>; Adam M Apton <aapton@zlk.com>; Adam C McCall <amccall@zlk.com>; Alexander Krot <akrot@zlk.com>; Maxwell Weiss <mweiss@zlk.com>; Pamela Hunter <phunter@zlk.com>; Kathy Ames Valdivieso <kavaldivieso@zlk.com>
**Cc:** Alex Bergjans <alexbergjans@quinnemanuel.com>; Alex Spiro <alexspiro@quinnemanuel.com>; Jesse Bernstein <jessebernstein@quinnemanuel.com>; Kyle Batter <kylebatter@quinnemanuel.com>; Phillip Jobe <phillipjobe@quinnemanuel.com>; Ellyde Thompson <ellydethompson@quinnemanuel.com>; Anthony Alden <anthonyalden@quinnemanuel.com>; Andrew J. Rossman <andrewrossman@quinnemanuel.com>
**Subject:** Re: [External]Heston Analysis

**[EXTERNAL EMAIL from nporritt@zlk.com]**

---

Michael:

Based on the Court order and our revisions to verdict form that we sent through earlier today, we are not sure there are any revised calculations for our experts. None of Professor Heston's calculations changes (although some will not be presented at trial). As discussed in the context of the verdict form, we propose to just use actual reported implied volatility for all calculations of option damages. The actual but-for option price for each option series will depend on the amount of inflation for the underlying Tesla stock that is found by the jury (as was always the case) but there is now no additional variable of implied volatility being calculated by Dr. Hartzmark and presented to the jury for determination.

We are happy to discuss further tomorrow or on Wednesday this week together with our proposed revised verdict form.

Sincerely,


Nicholas Porritt
Partner
LEVI&KORSINSKYLLP
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171

nporritt@zlk.com | www.zlk.com
--

**From:** Michael Lifrak <michaellifrak@quinnemanuel.com>
**Date:** Sunday, December 11, 2022 at 11:49 AM
**To:** Elizabeth K Tripodi <etripodi@zlk.com>, Nicholas I. Porritt <nporritt@zlk.com>, Adam M Apton <aapton@zlk.com>, Adam C McCall <amccall@zlk.com>, Alexander Krot <akrot@zlk.com>, Maxwell Weiss <mweiss@zlk.com>, Pamela Hunter <phunter@zlk.com>, Kathy Ames Valdivieso <kavaldivieso@zlk.com>
**Cc:** Alex Bergjans <alexbergjans@quinnemanuel.com>, Alex Spiro <alexspiro@quinnemanuel.com>, Jesse Bernstein <jessebernstein@quinnemanuel.com>, Kyle Batter <kylebatter@quinnemanuel.com>, Phillip Jobe <phillipjobe@quinnemanuel.com>, Ellyde Thompson <ellydethompson@quinnemanuel.com>, Anthony Alden <anthonyalden@quinnemanuel.com>, Andrew J. Rossman <andrewrossman@quinnemanuel.com>
**Subject:** [External]Heston Analysis

Counsel:

In the Court's December 7, 2021 Final Pretrial Conference Order, the Court noted that "in response to the concerns expressed by the Court [regarding Professor Heston's analysis], Plaintiff agreed to use actual, not adjusted data to calculate the 'actual' (not but-for) curve" and to "rerun his calculations using actual market data for each particular stock option."  (Dkt. 508 at 47).

It has now been nearly seven weeks since the Final Pretrial Conference.  In light of the upcoming trial date, please immediately provide the new report and disclosure by Professor Heston (and Professor Hartzmark, if he is amending any of his calculations).  If you do not provide the new reports and disclosures within a week of the Court's order, we will treat them as untimely and prejudicial, and we will move to exclude them.  Moreover, even if you do provide them immediately, we believe any new opinions/calculations are independently inadmissible (including on the basis of untimeliness), and we reserve the right to seek exclusion and to have our experts rebut them at trial.

Please also let us know dates in the next few weeks on which you will make Professor Heston and Professor Hartzmark available for deposition regarding any new calculations.

Thanks,

Mike

**Michael Lifrak**
*Partner,*
**Quinn Emanuel Urquhart & Sullivan LLP.**

865 S. Figueroa St 10th Floor
Los Angeles, Ca 90017
213-443-3153 Direct
213.443.3000 Main Office Number
213.443.3100 FAX
michaellifrak@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.