QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (appearing *pro hac vice*)
  alexspiro@quinnemanuel.com
  Andrew J. Rossman (appearing *pro hac vice*)
  andrewrossman@quinnemanuel.com
  Ellyde R. Thompson (appearing *pro hac vice*)
  ellydethompson@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

  Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
  Anthony P. Alden (Bar No. 232220)
  anthonyalden@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendants Tesla, Inc., Elon Musk,
Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,
Antonio J. Gracias, James Murdoch, Kimbal Musk,
And Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**DEFENDANTS' MOTION TO TRANSFER VENUE**<br><br>Date: February 16, 2023<br>Time: 1:30 PM<br>Location: Courtroom 5, 17th Floor<br>Judge: Hon. Edward Chen<br><br>**REQUEST TO BE HEARD ON SHORTENED NOTICE ON JANUARY 13, 2023** |

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 2

INTRODUCTION ............................................................................................................................ 2

BACKGROUND .............................................................................................................................. 3

    A.    Local Media And Politicians Target Mr. Musk With Negative Publicity .................. 3

    B.    Negative Impacts To The Potential Jury Pool In Reaction To Recent Business Decisions ................................................................................................... 6

ARGUMENT .................................................................................................................................... 7

I.    THIS CASE CANNOT BE FAIRLY TRIED IN THE NORTHERN DISTRICT OF CALIFORNIA ............................................................................................................ 7

II.    THE COURT SHOULD TRANSFER THIS ACTION TO ANOTHER VENUE ................ 9

    A.    The Court Should Transfer This Trial To A Venue It Deems Appropriate ............... 9

    B.    The Western District Of Texas May Be An Appropriate Venue For Transfer ......... 9

III.    IN THE ALTERNATIVE, THE TRIAL SHOULD BE DELAYED TO ALLOW TIME FOR NEGATIVE VIEWS TO DISSIPATE. ........................................................... 11

CONCLUSION .............................................................................................................................. 12

# TABLE OF AUTHORITIES

**Page**

### Cases

*Bolin v. Chappell*,
  No. 1:99-cv-5279-LJO, 2012 WL 3646894 (E.D. Cal. Aug. 120, 2012) .................................. 8

*Cordova v. Michael J. Reed & Protected Cargo Transp. LLC*,
  No. DR-20-CV-024-AM, 2021 WL 2568138053525 (W.D. Tex. Mar. 3, 2021) ..................... 10

*United States v. Croft*,
  124 F.3d 1109 (9th Cir. 1997) ................................................................................. 1, 3, 4, 5, 10

*United States v. Croft*,
  124 F.3d at 1109 (9th Cir. 1997) ............................................................................................. 6

*Difusion, Inc. v. Difusion Venture Grp., LLC*,
  No. A-13-CV-258-LYx, 2014 WL 12580438 (W.D. Tex. Jun. 24, 2014) ............................... 10

*United States v. First Nat'l Bank*,
  652 F.2d 882 (9th Cir. 1981) ................................................................................................. 10

*Jones v. GNC Franchising, Inc.*,
  211 F.3d 495 (9th Cir. 2000) ............................................................................................... 6, 9

*Los Angeles Memorial Coliseum Com. v. Nat. Football League*,
  89 F.R.D. 497 (C.D. Cal. 1981) .............................................................................................. 6

*Martinez v. City of Fresno*,
  No. 1:06-CV-00233 OWW GSA, 2009 WL 2151907 (E.D. Cal. Jul. 16, 2009) ...................... 6

*Ponomarenko v. Shapiro*,
  287 F. Supp. 3d 816 (N.D. Cal. 2018) ..................................................................................... 9

*Ririe v. Claritas Corp.*,
  No. C-89-3731 MHP, 1990 WL 126559 (N.D. Cal. Apr. 27, 1990) ........................................ 9

*Trendsettah U.SA., Inc. v. Swisher Int'l, Inc.*,
  No. SACV 14-1664 JVS(DFMx), 2020 WL 1224288 (C.D. Cal. Jan. 21, 2020) .............. 10, 11

*Williams v. Vasquez*,
  817 F. Supp. 1443 (E.D. Cal 1993) ..................................................................... 1, 6, 7, 8, 10, 11

### Statutory Authorities

28 U.S.C. § 1404 ............................................................................................................... 1, 6, 9

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on February 16, 2023 at 1:30 PM,[1] or as soon thereafter as this matter may be heard, in Courtroom 5 – 17th Floor of the United States Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Defendants, through their counsel, will move, and hereby do move pursuant to 28 U.S.C. § 1404 and the inherent power of the Court for a transfer of venue from this Court to the United States District Court for the Western District of Texas on the grounds that such a transfer is in the interest of justice as the population of potential jurors in the Northern District of California have exposed to excessive and adverse pretrial publicity concerning Defendant Elon Musk that will deprive him of an impartial jury and his constitutional right to a fair trial or, in the alternative, for a trial continuance to allow time the passions that have been inflamed in the District's population by recent events and biased local media coverage to dissipate before trial in this action.

This motion is based on the Memorandum of Points and Authorities below, the Declaration of Michael Lifrak and the exhibits attached thereto, the arguments of counsel, and any other matters properly before this Court. Pursuant to Paragraph 11 of the Court's Civil Standing Order, Defendants also submit a proposed order.

## ISSUES TO BE DECIDED

1. Should the Court transfer this case from the United States District Court for Northern District of California to ensure Defendant Elon Musk be tried by an impartial jury in a venue not tainted by excessive and adverse pretrial publicity?

2. In the alternative, should the Court grant a continuance to allow time for the negative sentiments caused by the adverse pretrial publicity against Mr. Musk in this District to dissipate?

---

[1] Trial in this matter begins on January 17, 2023. In light of the pending trial date, Defendants, pursuant to Local Rule 6-3, request that this matter be heard on shortened notice at the Pretrial Conference scheduled for January 13, 2023 at 9:00 a.m. and are concurrently filing an administrative motion to that effect.

-1-

Case No. 3:18-cv-04865-EMC
DEFENDANTS' MOTION TO TRANSFER VENUE

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The United States Constitution guarantees the rights to an impartial jury and fair trial to all of its residents. Those rights are compromised when a venue is "saturated with prejudicial and inflammatory publicity" concerning a defendant so severe that courts *presume* that a jury impaneled in that forum cannot be impartial. See *Williams v. Vasquez*, 817 F. Supp. 1443, 1474 (E.D. Cal 1993); *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997). This presumption can be applied to Defendant Elon Musk in the Northern District of California today. For the last several months, the local media have saturated this District with biased and negative stories about Mr. Musk that have fostered two distinct and highly prejudicial biases in the jury pool: (1) a bias concerning one of the key issues in this case: Mr. Musk's use of Twitter and (2) a personal and material bias against Mr. Musk by potential jurors who have been impacted by recent business decisions and staff reductions.

To be clear, this motion is not being brought simply because Mr. Musk has been the subject of negative news coverage. Mr. Musk has been a public figure for more than a decade and recognizes that being the subject of negative and even unfair media attention comes with the territory. Instead, this motion is brought to remedy a unique set of circumstances, specific to this time and place, that imperil Mr. Musk's right to a fair trial in this action and in this District in the coming weeks.

*First*, the recent local media coverage has created an environment that encourages the District's jury pool to hold negative biases against Mr. Musk's use of Twitter. Since October 2022, the local press has published stories accusing Mr. Musk of encouraging and personally participating in the purported spread of misinformation on the platform, including by posting the Tweets at issue in this case. This negative and prejudicial publicity thus infects a core issue in this case. Potential jurors that hold negative opinions about Mr. Musk's use and relationship with Twitter generally as a result of this coverage will be unable to separate this baseline bias from the facts in this case and thus be unable to impartially evaluate Mr. Musk's conduct in connection with the August 7 Tweets.

*Second*, like many tech companies dealing with adverse macroeconomic conditions, one of Mr. Musk's companies recently had to make substantial reductions in employees in the Bay Area. While these decisions alone have already created substantial bias in the jury pool in those who were personally impacted or are close to those personally impacted, the response from local politicians and media to these decisions have heightened and expanded the prejudice. The local media, in a deviation from how they typically cover these stories, have blamed Mr. Musk personally for the reductions and even accused him of violating the law. Local politicians, including the Mayor of San Francisco, have participated in protests against him. The local media and political establishment have attempted to depict Mr. Musk as personally responsible for causing material economic harm to the significant number of potential jurors impacted by the layoffs and to the City of San Francisco as a whole.

The media environment and recent circumstances in this District have biased the jury pool in two separate and independently prejudicial ways. In light of these conditions, the Court should transfer this case or grant a continuance to allow the passions and prejudice to fade.

## BACKGROUND

Mr. Musk has long been a subject of fascination to the media. His position as a leading figure in important and cutting-edge technology—including climate change mitigation and electric vehicles, space travel, neurotechnology, and artificial intelligence, his status as one of the wealthiest people in the world, and his unfiltered personal engagement with fans and members of the media have all contributed to make him a fixture of stories in the tech, business, and general press for years. In the last several months, however, the volume and negativity of stories about Mr. Musk within the Northern District of California has created an environment in this District that risks prejudicing the jury pool.

A.   **Local Media And Politicians Target Mr. Musk With Negative Publicity**

Over the past year, and increasing in recent months, Mr. Musk's business decisions and personal life have been the subject of substantial negative attention by the local media and politicians in this District. For instance, the *San Francisco Chronicle*, this District's newspaper of record, has published 677 articles covering Mr. Musk and his activities from 2022 to the present.

(Declaration of Michael T. Lifrak ("Lifrak Decl."), Ex. D.)  Since October 2022 alone, the *San Francisco Chronicle* has published **121** stories about Mr. Musk—nearly half of which are negative.  (*Id.*, Ex. D at p. 13-36.)  Other local news outlets—such as SFGATE, NBC Bay Area, and KRON4—share a similar focus on Mr. Musk and publish content about him on a weekly and sometimes daily basis.  (*Id.*, Exs. F, W, E).  The outlet SFGATE even has a page dedicated entirely to Mr. Musk, aggregating "the latest news on Tesla and SpaceX CEO Elon Musk, his latest tweets, business decisions, money/net worth and much more."  (*Id.*, Ex. V.) These stories are not limited to Mr. Musk's businesses, but also focus on his personal life and scrutinize nearly every public statement he makes—even on matters as trivial as his remarks on the size of his calves.  (*Id.*, Ex. G.)

The coverage includes a substantial amount of attention to reporting and commenting on Mr. Musk's use of Twitter.  The press regularly writes entire news articles about Mr. Musk's Tweets that include purported fact-checks claiming that the information published is inaccurate.  The local press has also recently published a series of articles accusing, in response to a controversial Tweet following his acquisition of the platform, Mr. Musk of purportedly promoting misinformation on the platform.  (*See e.g.,* Lifrak Decl., Ex. T (Headline: "'It's gonna get a lot worse': What Musk misinfo means for Twitter's future.")).  Some of these stories expressly identify the August 7 Tweets at issue in this trial as examples of the type of "misinformation" that Mr. Musk has purportedly spread or encouraged.  (*Id.*, Ex. U).

The local media's coverage of Mr. Musk and his businesses is unique not only in volume but in content and tone.  Unlike in its coverage of other locally-based tech companies and executives, the local press writes stories on even minor internal concerns at Mr. Musk's businesses with little obvious local interest, such as logistical payroll issues with international employees (Lifrak Decl., Ex. H.), and focuses its coverage on Mr. Musk personally as opposed to the corporate entity.  This deviation is reflected in its recent coverage of tech industry layoffs.  In stories on layoffs at other tech companies, such as Lyft and Meta, the local press reported that the ***companies***—not any specific officer or manager—conducted the reductions and attributed the decisions to sector-wide conditions.  (*Id.*, Ex. L.)  On the other hand, the press attributed

reductions at one of Mr. Musk's companies to him personally.  (*Compare id.*, Ex. I ("Meta's mass layoffs of 11,000 employees on Wednesday — or 13% of its workforce — the largest in company history, were the culmination of a financial roller-coaster ride during the pandemic.") *with* Ex. K ("Elon Musk has begun laying off as many as half of the company's 7,500 employees Friday morning.")).  This difference is highlighted in the following excerpt from a November 3, 2022 article in the *San Francisco Chronicle* reporting on layoffs across a number of Bay Area based-tech companies:

> Ride-hailing company Lyft is cutting 13% of its employees, or nearly 700 workers, according to a memo released Thursday. Stripe, an online payment processing company and the second most valuable private U.S. startup, is laying off around 14% of its staff, or more than 1,000 workers.
>
> - **Live Updates:** Elon Musk begins massive Twitter layoffs
>
> Earlier this week, digital bank Chime said it was laying off 12% of workers, or around 160 people. The startup, valued at $25 billion, signed a major 192,000-square-foot lease at 101 California St. last year, in one of the only major downtown San Francisco office expansions of the pandemic.

(*Id.*, Ex. L.)

Local media stories about Mr. Musk's companies are also more inflammatory and negative than similar stories about other local businesses.  In one story about reductions at one of Mr. Musk's companies, the *San Francisco Chronicle* noted that reductions were "likely to exact an emotional toll" on former employees and that "losing a job can lead to substance use and suicidal thoughts."  (Lifrak Decl., Ex. K.)  The *Chronicle* did not include similar comments on its stories about other tech industry layoffs.  (*See id.*, Ex. N.)  In other stories, the local media accused Mr. Musk of violating the WARN Act for purportedly failing to file proper notices with the California Employment Development Department, but did not level similar charges against another tech

company when reporting that it did not file the same notices in advance of its own announcements. (*Compare id.* Ex. O *with* Ex. I.)

The local negativity toward Mr. Musk is not isolated to the press. There are regular protests and picketing activity in front of Mr. Musk's offices in San Francisco, some of which are endorsed and encouraged by local political figures, including San Francisco's Mayor. (Lifrak Decl., Ex. P.) In recent months, the Mayor has stated, referring to Tesla's decision to move its headquarters, that he "got a ton of tax breaks in California and decided to take that money and run." (*Id.*, Ex. Q.) Other local politicians have similarly leveled public criticism against Mr. Musk, with one local assemblymember describing business decisions made at one of his companies as "wrong, mean & dangerous." (*Id.*, Ex. R.) By contrast, there have not been similar reports of protests and criticism leveled at other local companies who engaged in layoffs—in some cases far more layoffs—during this same period.

  **B.**  **Negative Impacts To The Potential Jury Pool In Reaction To Recent Business Decisions**

In recent months, macroeconomic conditions have led to significant layoffs throughout the tech sector and, according to recent reports, Bay Area-based tech companies have laid off more than 44,000 people nationwide since November 1, 2022. (Lifrak Decl., Ex. A). Thousands of residents in the Northern District of California have been laid off from tech companies during this same time period. (*Id.*) Twitter has not been immune to these industry-wide conditions. For instance, from late October to the present, it made substantial staff reductions including laying off almost 1,000 employees in this District. (*Id.* Ex. B.) These reductions have personally impacted a substantial portion of the jury pool, including the former employees themselves and their friends and families. In addition to these recent reductions, Mr. Musk's companies have made business decisions that have been negatively characterized by the media and have impacted the jury pool in this District, including moving Tesla's headquarters from Silicon Valley to Austin, Texas in late 2021. (*Id.* Ex. C.)

# ARGUMENT

## I. THIS CASE CANNOT BE FAIRLY TRIED IN THE NORTHERN DISTRICT OF CALIFORNIA

Cases may be transferred in the "interest of justice" where, as here, information related to the local public reveals "prejudice among prospective jurors." *See Martinez v. City of Fresno*, No. 1:06-CV-00233 OWW GSA, 2009 U.S. Dist. WL 2151907, at *6 (E.D. Cal. Jul. 16, 2009)*; see also Williams*, 817 F.Supp. at 1474 ("The relevant question is…whether the jurors ha[ve] such fixed opinions that they c[an] not judge impartially."). Such prejudice can be shown where "the trial venue was saturated with prejudicial and inflammatory publicity." *See id*. at 1473. And "[p]rejudice *is presumed* when the adverse publicity is so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial." *Croft*, 124 F.3d at 1109, 1115 (emphasis added).

Prejudice can be presumed in this case. Over the past several months, the potential jury pool in the Northern District has been "exposed to excessive and adverse pretrial publicity" concerning Mr. Musk. *See Los Angeles Memorial Coliseum Com. v. Nat. Football League*, 89 F.R.D. 497, 502 (C.D. Cal. 1981); 28 U.S.C. § 1404(a). The excessiveness of the pretrial publicity cannot be reasonably disputed here. Over the past year, the local press has published or broadcast an average of nearly two stories a day about Mr. Musk. In the same period in which the *San Francisco Chronicle* published more than 100 stories about Mr. Musk, it published just two about Amazon founder Jeff Bezos. (*Compare* Lifrak Decl. Ex. E *with* Ex. M.) Based on Mr. Musk's pre-existing fame and relentless pretrial publicity about his activities in the District, it is unlikely that the Court will find jurors who do not already hold strong opinions about Mr. Musk. The heavy volume of stories and the local media's focus on Mr. Musk over the last several months weigh in favor of a presumption that the juror pool has been prejudiced. *See Williams*, 817 F.Supp. at 1473 (courts consider "volume, content and timing" of news coverage to determine if it has had a prejudicial effect).

So too does the nature of the publicity. Potential jurors are highly likely, as a result of local media coverage, to already hold strong opinions about an issue central to this case: Mr.

Musk's conduct and activity on Twitter.  Jurors at this trial will be asked to determine whether Mr. Musk's August 7 Tweets were untrue statements of material facts published knowingly or with reckless disregard.  *See* ECF. No. 535 at 7-8.  The jury's ability to impartially weigh the evidence necessary to answer those questions—one of which necessarily requires making a judgment as to Mr. Musk's state of mind—will be impaired by pre-existing opinions about Mr. Musk's use of the platform.  These opinions have likely been shaped by recent coverage in the District claiming that Mr. Musk promotes and spreads misinformation on the platform, including stories that assert that the August 7 Tweets are part of that pattern.  (*See* Lifrak Decl. Ex. U.)  A potential juror who already holds the opinion that Mr. Musk uses Twitter inappropriately or is not honest on the application is unlikely to untangle that bias from his or her evaluation of the evidence in this case and render an impartial verdict.  Based on the local media's coverage of Mr. Musk's use and management of the platform, it is likely that the jury pool have "such fixed opinions" on Mr. Musk's Twitter use "that they [can]not judge impartially."  *See Williams*, 817 F.Supp. at 1474.

Moreover, a substantial portion of the jury pool in this District is likely to hold a personal and material bias against Mr. Musk as a result of recent layoffs at one of his companies as individual prospective jurors—or their friends and relatives—may have been personally impacted.  The existing baseline bias has been compounded, expanded, and reinforced by the negative and inflammatory local publicity surrounding the events.  Local stories reporting on the staff reductions blamed Mr. Musk personally for the decisions, accused him of acting unlawfully, and suggested that layoffs at his companies could lead to "substance use and suicidal thoughts" by former employees.  (Lifrak Decl., Ex. K.)  These stories, particularly when contrasted with reporting from the same outlets on larger layoffs by other companies during the same time period, anomalously single out Mr. Musk.  This conclusion is magnified by prominent local political leaders who have described Mr. Musk's business decisions as "dangerous" and accused him of taking taxpayer money and "run[ning]" from the state. (*See id.*, Ex. J.)  This prejudicial coverage and the subsequent political pile-on have increased the likelihood that members of the jury pool in this District harbor personal bias and even animus toward Mr. Musk.

In light of the personal and issue-specific bias likely present in this District—as evidenced by the local media coverage of and recent public response to Mr. Musk—the Court may presume prejudice and transfer this trial.  *See Williams*, 817 F.Supp. at 1473; *see e.g., Bolin v. Chappell*, No. 1:99-cv-5279-LJO, 2012 WL 3646894, at *33, 101 (E.D. Cal. Aug. 10, 2012) (holding a change of venue would have been appropriate "in light of the continuing public and media interest in the case up to jury selection and through guilt phase proceedings, [and] the inflammatory nature of both the broadcast and printed media information published in Kern County").

## II. THE COURT SHOULD TRANSFER THIS ACTION TO ANOTHER VENUE

### A. The Court Should Transfer This Trial To A Venue It Deems Appropriate

The Northern District of California is uniquely ill-suited for this trial due to the prejudice against Mr. Musk created by the volume of negative pretrial coverage.  Defendants believe they are far more likely to receive a fair trial in any other District in the United States and would respectfully defer to the Court's judgment as to a suitable forum for transfer.

### B. The Western District Of Texas May Be An Appropriate Venue For Transfer

Alternatively, Defendants propose the United States District Court for the Western District of Texas would be appropriate venue for transfer.

***First and foremost,*** Mr. Musk is far likelier to receive a fair trial in the Western District of Texas.  Mr. Musk has not been the subject of overwhelming, pervasive, and inflammatory press coverage by the local media in the Western District of Texas, like he has in this District.  Texas news outlets publish far fewer stories about Mr. Musk.  For example, *The Texas Tribune* only posted two articles about Mr. Musk in 2022—a far smaller number than the 677 articles that have been published by the *San Francisco Chronicle*.  (*Compare* Lifrak Decl. Ex. D *with* Ex. S.)  The risk that members of the jury pool will be personally biased against Mr. Musk due to recent business decisions is also far smaller, as the reduction at one of his companies is very unlikely to have impacted people in that District.  To the extent that this trial must proceed as scheduled, the Western District of Texas provides a forum where an impartial jury can be impaneled.

***Second,*** the traditional transfer factors under Section 1404 indicate that the Western District of Texas is a suitable forum.  When evaluating a Section 1404 motion to transfer venue

based on practical considerations, the Ninth Circuit commonly considers factors such as (1) the facts of the case relating to the forum; (2) the state most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the parties' contacts with the forum; (5) the cost of litigation in each potential forum; and (6) the relative ease of access to sources of proof, including the ability to subpoena witnesses. *See Jones*, 211 F.3d at 499.

Factors four through six weigh heavily in favor of the Western District of Texas. Mr. Musk and Tesla are both located in Texas, and many of the witnesses reside outside of California. *See Friends of Scot., Inc. v. Carroll*, 2013 WL 1192955, at * 3 (N.D. Cal. Mar. 21, 2013) (granting motion to transfer where only two or three of 30 witnesses could be compelled to provide testimony in the original venue). As such, the cost of trial and ease of access to witnesses will both be improved by a change in venue to the Western District of Texas. Factor two is irrelevant since the case involves a claim under federal law. *See Friends of Scot., Inc.*, 2013 WL 1192956 at *2 ("[T]his action involves a federal question, and neither [federal court] is more familiar than the other with the governing law."). While factors one and two may have marginally favored this District in most cases, that weight is limited by the fact that the statements giving rise to this action were published online and thus have no connection to a particular geographic area, *see id.* at *3, and neither Plaintiff nor Defendants are domiciled in this District, *see Ririe v. Claritas Corp.*, No. C-89-3731 MHP, 1990 WL 126559, at *2 (N.D. Cal. Apr. 27, 1990) (discounting plaintiff's choice in forum where parties were not domiciled and no significant connection to the facts of the case). In any event, the prejudice caused by the local media in this District outweighs either of those considerations.

*Finally,* this action could have been brought in the Western District of Texas. A court may only transfer the case to a venue in which "it might have been brought." *See* 28 U.S.C. § 1404(a). This element is satisfied when the transferee district has "personal jurisdiction over all of the Defendants" and where "venue would be proper." *Ponomarenko v. Shapiro*, 287 F. Supp. 3d 816, 834 (N.D. Cal. 2018). Mr. Musk is a resident of the Western District of Texas and Tesla is headquartered there, and therefore that District has personal jurisdiction over all Defendants and is a proper venue. *See Cordova v. Michael J. Reed & Protected Cargo Transp. LLC*, No. DR-20-

CV-024-AM, 2021 U.S. Dist. 2021 WL 8053525, at *2 (W.D. Tex. Mar. 3, 2021); *Difusion, Inc. v. Difusion Venture Grp., LLC*, No. A-13-CV-258-LY, 2014 WL 12580438, at *2 (W.D. Tex. Jun. 24, 2014) (holding court where company was headquartered had personal jurisdiction over member of its board of directors).

### III. IN THE ALTERNATIVE, THE TRIAL SHOULD BE DELAYED TO ALLOW TIME FOR NEGATIVE VIEWS TO DISSIPATE.

In the alternative, a continuance is appropriate in this case to prevent the "manifest injustice" of a partial jury influenced by the recent prejudicial local media coverage concerning Mr. Musk. The Ninth Circuit evaluates four factors to determine whether a modification of a final pretrial order is necessary to prevent "manifest injustice": "(1) the degree of prejudice to the party seeking modification resulting from failure to modify; (2) the degree of prejudice to the opposing party from the modification; (3) the impact of modification at the stage of the litigation on the orderly and efficient conduct of the case and (4) the degree of willfulness, bad faith or inexcusable neglect on the part of the party seeking modification." *See Trendsettah USA, Inc. v. Swisher Int'l, Inc.*, No. SACV 14-1664 JVS (DFMx), 2020 WL 1224288, at *7-8 (C.D. Cal. Jan. 21, 2020) (granting motion to amend final pretrial conference order). When a "refusal to allow a modification might result in injustice while allowance would cause no substantial injury to the opponent and no more than slight inconvenience to the court, a modification should ordinarily be allowed." *See id.* at *7 (quoting *United States v. First Nat'l Bank*, 652 F.2d 882, 887 (9th Cir. 1981)).

In this case, the degree of prejudice to Defendants warrants a continuance (or venue transfer). Although inflammatory media coverage of the defendant raises a presumption of prejudice within a jurisdiction, the presumption may be rebutted when media coverage is "old by the time of [] trial." *See Croft*, 124 F.3d at 1115. Where the most recent publicity occurred as recently as a few months prior to the trial date, there is little risk that the "trial venue was [] saturated with publicity." *See Williams*, 817 F. Supp. at 1474 (holding prejudice could not be presumed where most recent media coverage was three months before trial). The critical mass of negative press and sentiments surrounding Mr. Musk stems from recent business decisions. The

1 trial is currently scheduled to occur less than three months after the events giving rise to much of
2 the inflammatory and negative coverage occurred. Even a short continuance will allow the
3 prejudice caused by the local media's coverage to fade.
4      As currently scheduled, the Bay Area will still be "saturated with prejudicial publicity" of
5 this nature at the time of the trial, and Defendants will be at substantial risk of prejudice. *See*
6 *Williams*, 817 F. Supp. at 1474. Despite the scheduling inconvenience to Plaintiffs and the Court,
7 a continuance is warranted to prevent injustice. *See Trendsettah USA, Inc*, WL 1224288 at *7-8.

## CONCLUSION

     For the foregoing reasons, Defendants respectfully request that the Court transfer this action from the Northern District of California or, in the alternative, grant a brief trial continuance.

DATED: January 6, 2023       Respectfully submitted,

                                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                    By: */s/ Alex Spiro*
                                        Alex Spiro (appearing *pro hac vice*)

                                        *Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, And Linda Johnson Rice*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 6th day of January 2023.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Alex Bergjans
Alex Bergjans

*Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice*