Pages 1 - 68

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

IN RE TESLA, INC. SECURITIES       )
LITIGATION                          ) No. C 18-4865 EMC
                                    )
                                    )  San Francisco, California
                                    )  Wednesday
                                    )  January 4, 2023
_____ )  10:00 a.m.

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**           LEVI AND KORSINSKY
                              1101 30th Street, NW
                              Suite 115
                              Washington, DC 20007
                        BY:   **NICHOLAS I. PORRITT, ESQ.**
                              **ELIZABETH K. TRIPODI, ESQ.**


                              LEVI & KORSINSKY LLP
                              75 Broadway
                              Suite 202
                              San Francisco, California 94111
                        BY:   **ADAM M. APTON, ESQ.**



**For Defendants:**           QUINN EMANUEL URQUHART & SULLIVAN LLP
                              865 South Figueroa Street
                              10th Floor
                              Los Angeles, California 90017
                        BY:   **MICHAEL T. LIFRAK, ESQ.**
                              **ANTHONY P. ALDEN, ESQ.**
                              **MATTHEW A. BERGJANS, ESQ.**
                              **WILLIAM C. PRICE, ESQ.**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendants:           QUINN EMANUEL URQUHART & SULLIVAN LLP
                               51 Madison Avenue
 3                             22nd Floor
                               New York, New York 10010
 4                       BY:   ALEXANDER B. SPIRO, ESQ.
                               ELLYDE R. THOMPSON, ESQ.
 5

 6                             QUINN EMANUEL URQUHART SULLIVAN
                               555 Twin Dolphin Drive
 7                             5th Floor
                               Redwood Shores, California 94065
 8                       BY:   KYLE K. BATTER, ESQ.

 9                                   – – –

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>**Wednesday - January 4, 2023**</u>                        <u>**9:56 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  This Court is now in session.  The |
| 5 | Honorable Edward M. Chen presiding. |
| 6 | Court is calling the case In Regarding Tesla, Inc. |
| 7 | Securities Litigation, Case No. 18-4865. |
| 8 | Counsel, please state your appearance for the record |
| 9 | beginning with the plaintiff. |
| 10 | **MR. PORRITT:**  Good morning, Your Honor.  Nicholas |
| 11 | Porritt of Levi and Korsinsky on behalf of the plaintiff and |
| 12 | the class.  With me is Adam Apton and Elizabeth Tripodi. |
| 13 | **THE COURT:**  All right.  Good morning, Mr. Porritt. |
| 14 | **MR. PORRITT:**  Good morning, Your Honor. |
| 15 | **THE COURT:**  Everyone. |
| 16 | **MR. SPIRO:**  On behalf of the defendants good morning, |
| 17 | Your Honor.  This is Alex Spiro, Quinn Emanuel.  And with me |
| 18 | are my colleagues, several of them:  Michael Lifrak, William |
| 19 | Price, Ellyde Thompson -- |
| 20 | (Court reporter clarification.) |
| 21 | **THE COURT:**  It's breaking up. |
| 22 | **MR. SPIRO:**  I apologize.  Let me try something. |
| 23 | (Brief pause.) |
| 24 | **MR. SPIRO:**  Can the Court hear me now? |
| 25 | **THE COURT:**  Yeah, but it's no better.  Do you have an |

1    alternative microphone or different input?

2          **MR. SPIRO:**  I will set that up while Mr. Lifrak

3    introduces us. All right?

4          **MR. LIFRAK:**  Sure.  For the defendant it's Mr. Spiro,

5    myself, Alex Bergjans, Ellyde Thompson, Kyle Batter, Anthony

6    Alden, William Price.

7          **THE COURT:**  All right.  Thank you, Mr. Lifrak.

8    Hopefully, Mr. Spiro can get that straightened out.

9          So I wanted to -- I have a list of items that I want to go

10   through with you, and I know there have been some late filings.

11   I want to talk about the trial timing and some adjustment in

12   hours that I want to talk about in terms of the German time,

13   and a couple other things.

14        I want to talk about the voir dire process and the jury

15   questionnaires.  And I want to raise the question, if I hadn't

16   already, about the issue of whether we should excuse those

17   jurors who are not vaccinated.

18        There are some Jury Instruction issues.  I appreciate the

19   fact that you met with Ms. Hirsch.  I have some basic questions

20   I want to raise and discuss with you.  Verdict form as well.  I

21   know that there have been several now versions, including one

22   that was just recently filed I want to talk about.

23        And then there are the late-filed motions regarding Heston

24   and Hartzmark, and then just a few logistical things.

25        So let me start with -- first of all, with the timing.  We

1  are going to convene on the 17th for jury selection.  I do want

2  to set a date before that where we can go over the

3  questionnaires.  We're expecting to get the questionnaires back

4  by the 10th so that you can do your spreadsheets and look at

5  them.

6       My process is for us to look at those and then convene,

7  and it could be by remote, sometime before the 17th and go over

8  the questions, the survey responses, and determine whether

9  there are folks that are simply clearly not in a position to

10 serve as jurors in this case because of hardships or travel or

11 other reasons where it's not even worth voir diring them.

12       And I find that there are often people like that we can

13 agree in advance.  And, therefore, when we get the group in on

14 the 17th, there would have been a bit of pre-screening,

15 pre-clearance, and we can really focus in on people and not

16 sort of diffuse our time on people who are highly unlikely or

17 clearly unlikely going to make it.  So I need to set that up,

18 but that's the process.  We'll go through that.

19       Then on the day of the trial, we will spend some time voir

20 diring.  We are going to call in -- we're going to send out as

21 many as 200 questionnaires.  A lot more than we normally would,

22 partly because of health concerns with the flu and COVID rates

23 the way they are.  And given the notoriety of the participants

24 in this trial, we want to cast that net fairly widely.

25       And so how many we'll have that actually come in, we'll

1 have to see after we do our vetting prior to the 17th, but we

2 may have to do this in possibly two sessions.  I hope not.

3     My intent right now is to use the larger ceremonial

4 courtroom to do the voir dire.  I do try to maintain some

5 social distancing, so we don't pack everybody in there.  And

6 we'll see what we can do.  I think we can probably fit 100

7 people in there, 100 prospective jurors fairly easily and still

8 maintain some social distancing and, hopefully, we can derive a

9 jury from that.

10     My plan, and I'm going to tell the prospective jurors

11 that they should plan on spending the full day on that first

12 day, on the 17th, because it may take a couple sessions.  And

13 if we are fortunate enough to get through fairly quickly and we

14 have time left, I want to get started.  So you should be

15 prepared to start with your opening statement on the 17th if

16 voir dire proceeds efficiently and quickly and we have a couple

17 hours at the end of day, but I want to use the entire day

18 for that.

19     I also want to go to 2:00 o'clock instead of 1:30.  I have

20 been doing this more recently.  Partly because -- because we

21 are situating jurors in another courtroom as their jury room

22 and not right in back because our jury rooms, as you may know,

23 are really small and not ideal at all, and it takes logistical

24 time to get in and out, back and forth.  And given the -- the

25 desire to get this case completed by the third week, I'm going

1    to add an extra half hour each day to give us -- make sure that

2    we have enough hours to get this done.  So the trial days will

3    run from 8:30 to 2:00 o'clock, instead of 1:30.

4         On the 30th, which is January, January 30th, which is a

5    Monday, I have a Ninth Circuit meeting that I'm going to

6    attend.  I'm actually going to miss most of that meeting, but

7    I'm going to take the 30th.  We'll be dark that day.  Which is

8    another reason why I wanted to go until 2:30 because I'm hoping

9    to make up some time.

10        And so, but we're back on the following day, on the 31st,

11   and the 1st and, if necessary, on February 3rd.  But if the

12   hours go and we can get a start on the first day, I'm hoping we

13   can get to the jury by the 1st, by Wednesday, which means that

14   they get the case by Wednesday.

15        If they opt to come in on a Thursday the 2nd, they can do

16   that.  Even though we don't have trials on Thursdays, I always

17   tell the jurors that once it's in their hands, they set the

18   hours.  If they want to work, you know, into the evening, if

19   they want to work on days that we would normally be dark, they

20   are welcome to do that.

21        So my hope is that we get this to the jury by the 1st.

22   That's the target date.  So that's the scheduling.

23        I will also note that if we're getting close and if the

24   jury is able, Friday the 27th I don't have anything in the

25   afternoon that requires a hearing.  We could devote -- provided

1  the jurors are available, we could get some hours in on the

2  27th of January.  So you should keep that day open and don't

3  plan to do something in the afternoon just in case we need

4  those extra hours.

5      Any questions so far?

6          **MR. PORRITT:**  No, your Honor.

7          **MR. SPIRO:**  No, your Honor.

8          **THE COURT:**  And so the timing of the questionnaires,

9  we will get those -- like I said, the jury administrator is

10 hoping to get that to us by the 10th so you've got plenty of

11 time to look those over.

12     We should set a date prior to the 17th where we can get on

13 Zoom and discuss what we have seen, whether there are folks

14 that we can relieve of the burden of coming in and give us a

15 more productive pool.  We could do it Friday morning.  I have

16 Friday morning on the 13th.

17     Does that work with counsel?

18         **MR. PORRITT:**  That works for plaintiff, Your Honor.

19         **MR. SPIRO:**  And defendants.

20         **THE COURT:**  All right.  Why don't we plan on 9:00

21 o'clock on the 13th.  We'll do this by remote.

22     By then you'll have had a couple days to go over all the

23 questionnaires, and we can see if there are some that are --

24 some of those jurors that could be excused.  And then we need

25 to let the jury administrator know by the afternoon so we can

1  give them notice, give people notice basically don't come in.

2  So that will work.

3      Okay.  I'm getting feedback.  I don't know if it's yours,

4  Mr. Spiro.  Oops, what happened?

5      (Mr. Spiro exits the conference.)

6          MR. LIFRAK:  I think he's trying to fix his audio

7  connection.  He'll be right back.

8          THE COURT:  Okay.  Yeah.  Maybe he can fix it in a way

9  that -- we're getting a secondary feedback.  Maybe he could use

10  his phone or something.

11          MR. BATTER:  Your Honor, if I could suggest.  I think

12  that's what he was doing.  He had audio on his phone and video

13  and it was duplicating.

14      So if he has patchy internet service, if I could suggest

15  maybe he appear via video, but then mute himself and use his

16  phone for audio if there's a way to do that.

17          THE COURT:  Yeah.  All right.  We'll expect him back

18  shortly and we will catch him up.

19      So let me ask the question.  I don't recall now -- I've

20  got so many trials and have done so many pretrial conferences,

21  I can't remember whether we discussed the question of the

22  vaccination requirement, which is something that I've done --

23      (Mr. Spiro rejoins the conference.)

24          THE COURT:  Can you hear us, Mr. Spiro?

25          MR. SPIRO:  I can, thank you.

| | |
|---|---|
| 1 | **THE COURT:**  Good, good.  Okay. |
| 2 | The question I was just beginning to raise is the issue of |
| 3 | the vaccination requirement.  We've worked through that in both |
| 4 | criminal and civil trials. |
| 5 | Fortunately, in the Bay Area, if you apply, let's say, |
| 6 | regardless of booster status, just a vaccination status, there |
| 7 | is a very high percentage of people, at the end of the day it's |
| 8 | usually just a handful, small handful of people who either |
| 9 | decline to state or are not vaccinated.  If you add a booster |
| 10 | requirement, at least one booster, then you lose another five, |
| 11 | ten percent.  But it's a very low percentage. |
| 12 | But there are folks who decline to state and who are not |
| 13 | vaccinated or are not vaccinated.  And I have found that the |
| 14 | jurors who are selected are much more comfortable once we go |
| 15 | through the whole litany of all the protocols, including the |
| 16 | vaccination requirement.  People who have risk conditions or |
| 17 | live with people who have risk conditions are much more willing |
| 18 | and comfortable serving when they know that their fellow jurors |
| 19 | are vaccinated.  I will say that there are also court staff who |
| 20 | are in high risk situations and, obviously, they feel more |
| 21 | comfortable, too. |
| 22 | So I've also looked at it in term of any demographic |
| 23 | impact and in all the cases that I've done so far, probably |
| 24 | four of them, four or five, we've not seen any noticeable |
| 25 | differential disparate impact on any demographic group, whether |

```
 1    gender -- at least by gender or race.

 2         So I did want to raise that with you and get your

 3    thoughts.

 4              MR. SPIRO:  Yes, your Honor.  Again this is Alex Spiro

 5    on behalf of the defense.

 6         I appreciate the Court's comments and concerns and,

 7    obviously, health and safety is important, but we would need a

 8    bit of time to discuss that internally.

 9         I do have concerns in this case regarding demographics and

10    the jury pool, given Mr. Musk's and the media's coverage in

11    San Francisco.  Those concerns are very serious.  And I'm

12    reticent to do other things at this moment, or certainly on the

13    fly, that could even further alter the jury pool, which I'm

14    already deeply concerned about.

15              THE COURT:  All right.  What about on the plaintiff's

16    side?

17              MR. PORRITT:  Your Honor, I think -- this is Nicholas

18    Porritt.  I appreciate the Court raising it.

19         I think we would be comfortable.  I think the -- we would

20    be comfortable maintaining the Court's experience on having a

21    vaccination and booster requirement.

22         I think it would probably net net.  You know, if it makes

23    the jury to appear comfortable, I think that will be more

24    beneficial and lead to a better trial and better selection of

25    jurors than if we allow in -- than allowing in the unvaccinated
```

1    or the unboosted.  So we would certainly have no problem

2    including that requirement.

3        **THE COURT:**  Okay.  Well, let's do this.  Why don't --

4    Mr. Spiro, if you would talk to your team and your client and

5    see what you think and get back to me if you have a position.

6        If we can't come to an agreement, then I will probably

7    make a decision, or we can look at it once we get the

8    questionnaires and maybe that's -- maybe that's what you'll

9    want to do, is look at the questionnaires and then after you

10   see how the demographics and the numbers play out, because if

11   you see that it's, you know, five percent, eight, nine,

12   ten percent of the people would be excluded and we don't see a

13   demographic pattern, which typically is the case, you know,

14   that may inform your position.

15       So I'm going to leave that question open for now.  If you

16   decide, if your client is willing to stipulate, if you could

17   indicate that to us as soon as you can.  That way we can

18   actually filter out and apply that filter to the -- to the

19   questionnaires so, you know, we don't have to -- that will make

20   it more efficient.

21       **MR. SPIRO:**  Understood.

22       **THE COURT:**  Okay.  I will also tell you in advance, as

23   you consider your options, that the research I've done and the

24   orders that I've issued, I have found that on a constitutional

25   basis it's very unlikely that though vaccination status would

1    constitute a distinctive group, quote/unquote, in the community

2    within the meaning of the Sixth Amendment, I think Courts have

3    held that in those with certain philosophical views, et cetera,

4    et cetera, are not distinctive groups as would, for instance, a

5    racial group or a gender group might be.

6        I think the case law is clear on that, and I will say that

7    I've yet to find a case that's said that excusing unvaccinated

8    individuals violates the Sixth Amendment.  In fact, almost all

9    the cases that I have found, unless I missed something, have

10   ruled to the contrary.

11       In any event, like I said, I will await word from the

12   defense; and if I need to, I will reserve this question until

13   we look at the actual questionnaires that come in and see what

14   that's like.

15       Okay.  So let's talk about Jury Instruction issues.

16   Again, I appreciate the fact that you've met with my Law Clerk.

17   I think that was helpful and productive.

18       Oh, one more thing I will say about the protocol.  I

19   appreciate your stipulation that you've reached with regard to

20   the witness and exhibit disclosure consistent with my 48-hour

21   rule and your refining that.  I think that's fine.

22       The only thing I'm going to change is that I'd like the

23   response to any objection by 3:00 o'clock, not 4:00 o'clock,

24   because I -- I need time and I don't want to have to commit

25   myself to working evenings every trial day.

1    So I know that puts a little bit of a time crutch on you

2    because you're in trial until 2:00 o'clock, but you have teams.

3    So I'm going to require -- I'm going to accept your

4    stipulation, but change the response time from 4:00 o'clock to

5    3:00 o'clock.

6    I would also like you to present your objections in a

7    table format, much like you did on the bellwether so that, you

8    know, I can see what the exhibit is, the sponsor or the

9    purpose, et cetera, et cetera, the objection, the response, in

10   some kind of a matrix form that allows me to rule on it more

11   quickly as well.  So if you could do that in that table format,

12   I would really appreciate that.

13   **MR. SPIRO:**  Your Honor, one issue just going back a

14   second to the juror questionnaire issue.

15   **THE COURT:**  Yeah.

16   **MR. SPIRO:**  It is just simply, would the Court, given

17   the complexities of the case, given the jury pool concern I

18   raised, given the high profile nature, consider additional voir

19   dire time for the parties?

20   I found in cases such as these -- and this case has unique

21   issues.  You know, Your Honor points out case law regarding a

22   Sixth Amendment.  We've certainly never seen that law

23   overlapped onto a case quite like this one.

24   And all I would simply say is I think certainly the

25   defense is requesting additional time for voir dire.  We don't

```
1    think the current amount of time is adequate.  And if we know

2    that information now, it can better inform some of our planning

3    preparation and our answer to Your Honor's question.

4          THE COURT:  Yeah.  I was -- I can't remember what I

5    did.  Did I set forth a specific time frame on voir dire?

6          MR. SPIRO:  Fifteen minutes.  And, Your Honor, when

7    we -- you know, when I was a prosecutor, we used to try, you

8    know, DNBY trials.  We used to get the 15-minute clock.  And I

9    would simply say it's a bit more complicated and a bit more

10   complicated at the posture in which this case finds itself, and

11   so we would be asking for more time than that.

12         THE COURT:  And that's the standard.  You're, right.

13   In this case I was planning to give you more time.

14      What I intend to do is I usually -- once we get the jurors

15   in, I would conduct the hardship voir dire.  I will lead that

16   discussion.

17      Once we get to the for cause and attitude stuff, I changed

18   my practice, and basically with the questionnaires I'm going to

19   turn that over to you all and I'm going to give you more time.

20   You know, half an hour, maybe a little longer, depending on how

21   it goes.  Depending how big the pool is.  If we get 120 people

22   in that room -- you know, normally for 50 people, 60 people I

23   give you 30 minutes, maybe 40 minutes to go through each side.

24   If we have 120 people in there, I'll extend that.

25      I understand your point, and this is an important case,
```

 1  and I think each side will want to explore attitudes.  You will

 2  have the benefit of the questionnaire, of course, and I did --

 3  I think I kind of invited comments so that you would have a

 4  basis to start your voir dire.  So you'll have something to go

 5  on.  But it will be longer.  You know, I would say a half hour

 6  to 45 minutes.

 7          **MR. SPIRO:**  Understood.  Thank you.

 8      And just so I understand the Court, when you say sort of

 9  the way in which the parties get to be involved in the process,

10  can you just explain a little bit what you mean by that?  We

11  address the panel one at a time or do you mean up at the bench?

12          **THE COURT:**  Okay.  So I -- I'll conduct from the bench

13  and a lot of it will be essentially follow-up on hardships

14  based on the questionnaires that identify people who have, you

15  know, child care issues, work issues, et cetera, et cetera.  I

16  want to inquire into that to see whether there's really a basis

17  or not.

18      I will then hand it over to the attorneys, who you can --

19  from the podium, from your counsel table whatever, I'll let you

20  conduct voir dire.

21      During COVID times, we used to -- at the height we would

22  have a central or two microphones and ask -- try to ask all

23  your questions of juror number one and before you go on to

24  number two rather than having people step all over each other

25  and say "raise your hand," you know, and then start calling on

1    people and having a lot of movement.

2       We've since gone back to the roving microphone, wireless

3    mic.  So I'm not going to structure that.  So if you want to

4    ask individual questions at targeted prospective jurors based

5    on the questionnaire, you can do that.  If you want to ask

6    open-ended questions and show of hands and then follow up, you

7    can do that.  It does take a little longer.

8       You know, I prefer to not have that microphone circulate a

9    lot just for health reasons and for timing.

10      I don't know, Vicky, will we have two mics, do you know?

11          **THE CLERK:**  Your Honor, I'm not sure.  I have an email

12   regarding that.

13          **THE COURT:**  Okay.  If we can get two mics, that will

14   be a lot easier.  Especially if we have the ceremonial

15   courtroom.  It may take forever to move the mic.

16      So if you're just mindful of just the logistics, but it's

17   however you want to do it.  The floor will be yours.  Okay?

18          **MR. SPIRO:**  Thank you.

19      And it depends, I guess, on the panel size, how many you

20   pull into the box at a time, the ones that you would be

21   addressing; or do you have a standard, you know, I call 24 into

22   the box and that's who you address at first.

23          **THE COURT:**  I am -- normally if I don't have, you

24   know, 200 people, I -- I would allow to you voir dire the

25   entire room and not just use the box, because I will take all

 1    the challenges at once.

 2        If we do it in two groups, then we'll have to take the

 3    tranches, and you exercise your challenges for the first

 4    tranche and the second tranche; but I don't use the box in that

 5    method.  I use the whole room.

 6        Now, one advantage you will have, you will have the

 7    list -- let me explain this.  You will have the jury list,

 8    the -- my judge's list.  So you'll know the order of people.

 9    And whoever is left surviving after for cause, hardship,

10    peremptory challenges, it's numerical.  One, you know, take it

11    from the top.  So at least that's the -- each tranche, you

12    know, we're going to do that.

13        So it's going to be numerical.  So you can prioritize

14    where you're going to focus in.  We will have people in the

15    box, or actually in that courtroom we have two boxes.  I don't

16    know if we're going to use both, but you can gauge for yourself

17    where you want to spend your time.

18            **MR. SPIRO:**  Understood.

19            **THE COURT:**  Yeah, yeah.  So I no longer keep secret

20    the order.

21            **THE CLERK:**  Excuse me, Your Honor.  There are two

22    mics.

23            **THE COURT:**  All right.  That will help.  And we are

24    going to use the ceremonial courtroom; correct?

25            **THE CLERK:**  Correct.

1          **THE COURT:**  Good.  Good, good, good.

2      Let's see.  Did I have any other comment?  I think that's

3    the only comment I had on that.

4      Oh, one question about the protocol for disclosure in

5    advance.  If you're going to disclose the witness who is

6    appearing by video, I take it that disclosure will include the

7    clips, the exact segment that is going to be played.

8      The only question I have is if I get your objections and

9    response objections at 3:00 and, you know, I -- I don't get out

10   a ruling on the objections until in the evening or first thing

11   in the morning, will you -- are you all in a technical position

12   to do the editing and slicing and cutting on fairly short

13   notice?  I assume you are.

14         **MR. PORRITT:**  I'm going to answer and say I would hope

15   so, Your Honor.

16         **THE COURT:**  All right.  All right.

17         **MR. PORRITT:**  But I'm not prepared to make a

18   representation or warranty that that's the case.

19      So we will check on -- we will check with our tech people

20   to see how long they need and how quickly they can make edits.

21   Then if it turns out they need more time than the current

22   schedule allows, then we will talk to defense counsel and

23   perhaps propose a revised protocol that would allow for that.

24         **THE COURT:**  All right.  All right.  I just want to

25   make sure that, you know, there is enough time there for you to

```
 1   do logistically what you need to do after you get my ruling.
 2          MR. BATTER:  The timing won't be a problem for
 3   defense, Your Honor.
 4          THE COURT:  All right.  Good.
 5          MR. SPIRO:  Can I ask a follow-up question on depo
 6   designations?
 7          THE COURT:  Yes.
 8          MR. SPIRO:  Does the Court have a preference for how
 9   the Court wants those to proceed?  Different judges have
10   different habits.  Chronologically one side plays one
11   designation, the other side plays another.  I don't know if the
12   Court has a system by which the Court prefers to do that.
13          THE COURT:  So you're talking about if there are
14   issues of -- you mean on cross?  You mean different -- how we
15   would arrange the direct and the cross?
16          MR. SPIRO:  Yes, your Honor.  Exactly.  Yes.  To
17   over-simplify, that's basically what I'm saying, yes.
18          THE COURT:  My process is to make it as simple and
19   coherent as possible for the jury.  It seems to me rather than
20   chopping it up and, you know, pretend there's going to be
21   cross, let's just play it chronologically through.  That would
22   be the default, unless there is good reason to make it more
23   coherent.  If for some reason there is a better way of doing
24   it, but it seems to me that's the natural progression.
25          MR. PORRITT:  That is how we assumed it would be
```

1    working, Your Honor.  We think that would be the best approach,

2    otherwise it will be very hard to follow in places.

3            **THE COURT:**  Yeah.  All right.  So, yes.  My preference

4    is to as smoothly as possible, probably the chronological

5    sequence as it naturally appears, rather than chopping it up

6    into, you know, direct and cross and redirect and that sort of

7    thing.  Okay?

8        Let's talk about one of the issues -- a couple of issues

9    that I want your guidance on.  And what I'm going to do is get

10   out my proposed set of instructions.  I like to generally do

11   this pretrial so you know what the instructions look like

12   before you start your openings.

13       I will -- after hearing your comments and what we

14   discussed today, hopefully, within the next two days get out a

15   preliminary -- my proposed set of instructions, and then give

16   you a couple of days to get your comments, and then -- and

17   issue is kind of a final set, knowing "final" means it's

18   subject to change during trial and this sort of stuff or other

19   developments.

20       But I want to get your thoughts on a couple of major

21   issues.  One of them is in the pretrial statement about --

22   early on, the opening instructions, short set of instructions I

23   give at the outset of this case, the debate about how much we

24   should talk about this Court's findings and how much we should

25   pre-instruct on the elements of the claims so that the jury

1    knows what the issues are in this case; that at least they are

2    not the issue of -- they don't need to decide the issue of

3    falsity, but they do need to decide the issue of materiality.

4        On scienter they don't need to decide on recklessness, but

5    they do have to decide on knowing.

6        And I want to hear -- and part of that may turn on how

7    much you are going to cover in your openings, because if you do

8    a good job in your openings and you set up -- and you frame it,

9    then that takes a little bit of heat off of the instructions.

10       On the other hand, I have had cases where, frankly,

11   counsel did not cover the elements very well, did not frame it

12   very well and I didn't give pre-instructions on the law, and I

13   got comments from the jury back that, well, we didn't know what

14   this case was about until about halfway through.  And we don't

15   want that to happen in this case.

16       So I want to get your thoughts about sort of how much

17   pre-instruction on the law and the issues sort of not at issue

18   and that are at issue should be highlighted.

19       I'll start with the plaintiff.

20       **MR. PORRITT:**  Well, thank you, your Honor.

21       You know, obviously, we submitted a proposed summary which

22   we thought reached the right, appropriate level.  So we think

23   some preliminary instruction on the basic elements of what a

24   10(b)(5) claim is will be helpful.

25       And we also think some preview of the Court's rulings on

1    summary judgment, what you found and what you didn't find,

2    would also be helpful.

3        I don't think it should be, you know, lengthy.  Obviously,

4    nothing approaching what you will do for your closing, you

5    know, pre-deliberation Jury Instructions, but we do think

6    something will be helpful.

7        This is a complex case.  It's not intuitive.  It's not

8    something that many of the jurors will be familiar with.  And I

9    think it would help.

10        And, yes, we can present it in openings, but they will

11    have two competing versions of that, from myself and from

12    defense counsel.  And I think sort of having it from the judge

13    as a sort of -- you know, as a referee setting the basic ground

14    rules would be helpful.

15        **THE COURT:**  Let me ask on the defense side.  I know

16    there is the concern about putting the imprimatur of the Court

17    too early and having an undue influence on the jury.  You

18    addressed that by part with the alternate that was suggested,

19    and that is just neutral terms.  Don't say anything about the

20    Court, but JUST say "you are assume that" or, you know,

21    something along those lines.

22        If that's the case, wouldn't it be helpful for the jury to

23    know at the outset what are the issues they are supposed to be

24    focusing on?  There is probably about four or five key issues.

25        **MS. THOMPSON:**  Good morning, Your Honor.  Ellyde

```
 1   Thompson.

 2         Our position is that no instruction on the rulings from

 3   summary judgment should be given at all.  I think Your Honor

 4   understands that.

 5         But if anything is given, one, it should not have the

 6   imprimatur of the Court, but, also, it should not be given

 7   until closing, and that's primarily because it risks the jury

 8   disregarding testimony on these issues that go to materiality

 9   and material falsity as opposed to factual or -- factual or

10   literal falsity and as to knowledge.

11         And, of course, for the director defendants, there is the

12   possibility of the good faith defense, the absence of scienter.

13   So there is a risk of confusion there as well.

14         The Court's summary judgment order and clarification made

15   very clear that materiality, material falsity, had not been

16   decided and that the -- of course, our position is that

17   scienter is only as to a material misstatement.  There is no

18   scienter if it is only as to --

19         **THE COURT:**  That I will -- I understand that

20   statement.  I reject it.  I think you're wrong.  So you're not

21   going to win on that one.

22         **MS. THOMPSON:**  Understood, Your Honor.

23         And so our -- regardless, I think it leads to confusion by

24   the jury as to what it is that they are supposed to be paying

25   attention to, they are supposed to be deciding.
```

1      If they are ignoring everything as to materiality because

2   they think it falls within the rubric of literal or actual

3   falsity, then giving that instruction at the start of the trial

4   could end up confusing the jury rather than alleviating

5   confusion or focusing the jurors in on the issues that they

6   need to decide.

7          **THE COURT:**  You think that would be so even if the --

8   that preliminary instruction said:  You're not supposed to

9   consider X, but you are -- the issues that you do need to

10  decide are state of mind and knowledge or not of the

11  defendant's absence of scienter or good faith, et cetera, on

12  the other defendants, the materiality of the statements, which

13  you are to assume to be false.

14     Why -- if that's given as well, wouldn't that help them

15  actually focus rather than confuse them?

16         **MS. THOMPSON:**  No, your Honor.  I don't think it would

17  help them.  It would essentially -- you know, for a few

18  reasons.

19     One, because as your Honor just said it, you're to assume

20  they are false.  The jurors, until we get to argument and

21  instruction on material misrepresentation, may not know the

22  distinction between false and materially false, and I think

23  there is a huge risk of confusion.

24     In fact, I think we've seen this -- this sort of piece of

25  confusion introduced by plaintiff's in their proposed

```
1   instruction.  We've seen it time and again misinterpreting the
2   Court's -- the Court's (audio distortion) as deciding material
3   falsity.  So I think there's a very large risk.
4       But the other problem I think is that it would seem to try
5   to undermine Mr. Musk's credibility.  If you're telling the
6   jurors before the trial begins, "Mr. Musk made a false
7   statement," and asking them to distinguish between a technical
8   inaccuracy, a literal inaccuracy and a material false
9   statement, it actually is allowing the jury to pre-judge
10  Mr. Musk's credibility before he even gets onto the stand.
11          THE COURT:  It's almost unavoidable, because if he
12  starts to testify, you know, why he thought this -- you know,
13  this statement was true, and then they are later told, "Well,
14  you ever to assume it was false," it seems like they are going
15  to think, well, why wasn't I told that at the outset.
16      I mean, there's going to be objections and there's going
17  to be -- plus, what do you do about the opening statements,
18  because you can't -- you can't -- I don't think you can
19  preclude the plaintiffs from arguing that you are to assume
20  that.
21      I mean, so it's going to come out, and wouldn't it be
22  better coming out from an objective neutral source like me as
23  opposed to hearing it from counsel, its spin and then your
24  counter spin?  I just -- I'm concerned that this case will get
25  off on a, frankly, confusing foot if it's not clarified what
```

1    the markers are at the outset.

2         **MS. THOMPSON:**  Your Honor, I think even if -- I don't

3    think it would be helpful for it to come from the Court as

4    opposed to the parties.  Neither party can contradict in their

5    argument the Court's prior rulings.  That's very clear.  I

6    think we're all committed to making sure that we abide by the

7    Court's prior ruling.

8         I think there's, also, the issue (audio distortion)

9    because regardless, regardless of whether the Court says "This

10   is from my summary judgment ruling and I have determined as a

11   matter of law," simply the Court saying "this is false," gives

12   the imprimatur of the Court.  It's unavoidable.

13        We've suggested ways that can be minimized.  And Your

14   Honor understands our position that it shouldn't be given at

15   all, but having it come out of the Court's mouth in an

16   instruction to the jury "this is false," is extremely

17   prejudicial to the defendants and confusing to the jurors.  I

18   think it could very well make them disregard relevant testimony

19   that they think may only go to falsity, when, in fact, it goes

20   to material -- the materiality.

21        It could make them think that Mr. Musk is not credible

22   because the Court's determined he was reckless.  The Court's

23   determined that he made a false statement.

24        Beyond that, I actually think in any instruction there

25   shouldn't be no use of the word "false" regardless.

```
 1        Now, again, I have sort of a standing objection here that
 2   we don't think any such instruction should be given at all, but
 3   there -- even the parties have been including, as I said from
 4   plaintiff, interpreting "false" or "falsity" to mean material
 5   falsity.  It is a problem.  And you even see it, frankly, in
 6   other cases in which it is -- "falsity" or "false" is used to
 7   mean material falsity.
 8        This case is different from other cases because there is a
 9   distinction.  However, it's not a distinction that the jurors
10   need to be focused on at the beginning before any party has
11   said a word, before any witness has given any testimony.
12        So defendants do object that any instruction in the
13   opening instructions as to technical inaccuracy or literal
14   inaccuracy or recklessness because it would be confusing and
15   prejudicial and would give the imprimatur of the Court.
16        THE COURT:  Well, let me ask.  I'm going to give
17   instructions on Rule 10(b)(5) and all the elements, you know,
18   material misrepresentation, scienter, reliance, causation.  A
19   lot of Courts in a complicated case will read the substantive
20   instructions at the outset.  So the jury has that frame.
21        And, frankly, in my interviews with jurors afterwards,
22   that is a common refrain I get.  They say:  Well, why did you
23   wait until the end of the case?  We didn't know what we were
24   supposed to be looking for, what we're supposed to be applying.
25        So if we are going to give instructions anyway at the end,
```

1   why not give at least the elements of the Rule 10(b)(5) and

2   some explication of what "materiality" means, what "scienter"

3   means, what "reliance" means, what "loss causation" is.  So

4   they know that there are some -- you know, what the basic

5   elements are, so they -- as they listen to testimony and as

6   they hear argument on each side, they will have a better

7   framework.

8        What's wrong with that?

9        MS. THOMPSON:  I think that certainly is -- is less

10  concerning to us, to go through some of the basic elements.

11  Obviously, we would want to look at what it was.

12       I do also know that certainly there is a concern about the

13  length of the instructions, and we would want to make sure no

14  nuance is missed, and if they're sort of short form

15  instructions and that there's no inconsistency between what

16  they hear at the beginning and what they hear at the end.

17       But, in general, the concern would be that there would be

18  instructions given that would indicate to the jurors that there

19  are elements taken out of their consideration.

20       I'm not envisioning a way in which the Court is planning

21  to give an instruction on the law minus the Court's

22  instructions, whatever it plans to give on summary judgment,

23  that would assist the jury.

24       I think the way we set it out is sort of the elements of

25  the claim in the opening instruction, the element of the

1    10(b)(5) claim, without lengthy instructions on how to

2    determine all of those.  And that's what we think is most

3    important in this instance.

4        Certainly, the parties will be focusing on certain of the

5    elements and as the evidence comes in, but I don't -- we don't

6    see, frankly, any benefit here to giving the jurors what may be

7    lengthy instructions from the closing at the outset and would

8    worry about any inconsistency between the opening instructions

9    and the closing instructions in that regard.

10            **THE COURT:**  All right.  Thank you.

11       Let me hear from Mr. Porritt.  Do you have any views if

12   the Court were to read these, the element instructions early?

13           **MR. PORRITT:**  No.  I think that would be helpful, Your

14   Honor.

15       I do have a few comments to -- on Ms. Thompson's saying.

16   I mean, I think it's pretty clear they are expressing a desire

17   to essentially relitigate at trial matters that have been

18   decided by the summary judgment order.  I mean, I think that's

19   been laid out very clearly by Ms. Thompson.  And, obviously, we

20   object to that and we think that's entirely proper.

21       They complain that it's prejudicial, that the jury might

22   think that Mr. Musk made a false statement, factually false

23   statement with scienter.  Well, he made that factually false

24   statement with scienter.  Of course, that's prejudicial to

25   their client, but it's also the fact the Court has found.  It's

```
 1   not subject to dispute.

 2        And thirdly, we do have a concern.  We stated this at the

 3   conference with your clerk.  Saying that the jury should just

 4   assume that the statement is false, I don't think accurately

 5   states the impact or the outcome of the summary judgment

 6   ruling.  The Court has found that the statement is false.  Not

 7   that it's assumed to be false, it is false.  That's what the

 8   facts show.  And it was made recklessly, at least recklessly,

 9   by Mr. Musk.  That is what the facts show.  That is what the

10   Court has found.

11        So I think using assumed language, I don't think is

12   accurate and I think it really prejudices the plaintiff.  We

13   would be better off in some senses showing the facts and then

14   the jury makes its own conclusion, which no reasonable juror

15   could find otherwise.

16        I think the Court's ruling is that he made a false

17   statement, rather than having simply jurors thinking that

18   they're making a decision on materiality based on an assumed

19   set of facts that the defendant and the parties have somehow

20   agreed on.

21        So that is our statement on the summary judgment.  I

22   think -- we think an appropriate statement.

23        The evidence that is coming in after summary judgment

24   ruling is different, necessarily so, than the evidence that

25   would have been presented if there had been -- if you hadn't
```

1   denied our motion for summary judgment.

2       And the jury needs to understand that there will be some

3   evidence they will not hear as a result because the summary

4   judgment ruling has been entered.

5           THE COURT:  All right.  All right.  I get your views.

6   Thank you.

7           MR. PORRITT:  Thank you.

8           THE COURT:  I will make a decision.  I've done it

9   before.  Many courts have done it.  Many modern commentators

10  have also suggested, you know, that it is worth considering

11  giving substantive instructions early.

12      I understand there's a -- you know, there's a downside

13  because we don't want to say:  Well, these instructions are

14  more important than others, because I give the overall

15  instruction that they are all equally important, et cetera,

16  et cetera.

17      On the other hand, if the case has some subtleties to it

18  and some complexities, there may be some justification.  But I

19  will consider that.  And, obviously, the form of the

20  instructions are in debate and I understand that.

21      And on that front let me ask you another major question,

22  and that is on the reliance stuff.  There are reliance

23  defenses, rebuttals that can be individualized, and then there

24  are reliance responses that are class based.  And this is --

25  you know, assuming the sort of fraud on the market theory, the

1   *Halliburton* factors and the basic presumption, there is some

2   tension here between trying this case on a class-wide basis

3   largely and on the reliance factor, largely relying on the

4   basic presumption, presumption or basic, subject to rebuttal on

5   that basis, on the class-wide basis, and focusing on the

6   individual -- in this case the individual plaintiff and facts

7   that are particular to that plaintiff.

8       And a number of Courts, in particular the *Smilovits versus*

9   *First Solar* case out of Arizona, which cites the *Vivendi* case

10  out of New York, which cites other cases, have dealt with this

11  and said that individual defenses to rebut the basic

12  presumption are -- should await a different stage of the case

13  and not be introduced here.

14      And so I wanted to have a discussion and to hear your

15  thoughts on that.  I guess I should put the ball in the -- on

16  the defendant's court first and see what your views are.

17          **MS. THOMPSON:**  Yes, your Honor.

18      I think here we should have every opportunity to rebut the

19  presumption of reliance here, and that would include something

20  that may otherwise be interpreted as an individualized basis

21  because it -- if that is something that the jury determines

22  rebuts the presumption of reliance on a class-wide basis, then

23  the jury should be allowed to determine that the presumption

24  has been rebutted based on such evidence.

25      So to us it seems like the question really is one for the

1    jury as to whether the presumption has been rebutted.  If the

2    evidence relevant to rebutting that presumption is also

3    evidence that would be relevant to rebutting reliance as to an

4    individual, then it is certainly something that the jury should

5    be permitted to consider in determining, you know, reliance as

6    a whole, and specifically here, where there is a plaintiff who

7    is serving as a representative of the entire class and sits as

8    a representative of the reasonable investor.  Certainly, if

9    there's something that would be individualized, but is

10   applicable to the class representative, the jury should be

11   permitted to -- to hear that.

12       **THE COURT:**  And would this be accomplished -- in other

13   words, you would allow both class-based rebuttal and

14   individualized, Mr. Littleton rebuttal; correct?  That's what

15   you're asserting.

16       **MS. THOMPSON:**  Yes, your Honor.

17       **THE COURT:**  That the -- there would be a special -- we

18   would have to have some kind of verdict form that gives a juror

19   that option?  That it's possible there is not rebuttal on the

20   class-wide stuff because, you know, the way the market worked

21   et cetera, et cetera.

22       But in Mr. Littleton's case, and he shows such devotion to

23   Tesla or he had access to other information or something that's

24   sort of unique to him, that they could find no reliance on his

25   part.  We would have two separate potential verdict questions?

1          **MS. THOMPSON:**  Well, your Honor, I don't think that

2     was our original intent.  That's not the way we proposed our

3     verdict form.

4          But it is an interesting question in that I suppose that

5     would go, of course, to class certification issues; right?  And

6     we would be able to make arguments as to whether the class

7     certification is proper if the individual defendant -- I'm

8     sorry, the individual plaintiff has no reliance.

9          So I think that's something that may be worth considering,

10    but in general I think the evidence as to the class

11    representative is relevant to whether plaintiff has established

12    reliance and whether the fraud on the market presumption has

13    been rebutted.  I don't think it's simply narrowed as to the

14    individual plaintiff because that plaintiff is here as a

15    representative of the class.

16         **THE COURT:**  All right.  Plaintiff's response?

17         **MR. PORRITT:**  Well, certainly, Your Honor, we accept

18    our burden to prove at trial that the -- basic presumption,

19    that we're entitled to the basic presumption that Tesla stopped

20    trading in an efficient market.  So that, obviously, is an

21    appropriate matter for the jury to decide.

22         There is the Ninth Circuit standard instruction, which we

23    think is very good and adequately states the law on that and

24    adequately frames the issue for the jury to decide.

25         Just as an aside, defendant's expert agrees the market was

```
1   efficient.  So that's really not an issue that's at issue.

2       And some of this may be addressed when we are finalizing

3   the Jury Instruction and the verdict form once the evidence

4   comes in because a lot of what Ms. Thompson was talking about,

5   I'm not aware of any evidence in the record that suggests this

6   will be remotely presented at trial.

7       So, you know, we can engage in a hypothetical academic

8   debate here, but I really don't think, frankly speaking, this

9   is going to be an issue.

10      If they want to raise issues with Mr. Littleton, ask

11  questions about whether he, you know, relied on the integrity

12  of the market price, they can do so.  I mean, defendants can do

13  so.  I guess that is something that could be addressed.

14      Again, I don't think there will be any evidence remotely

15  suggesting that he didn't rely on the integrity of the market

16  price.  He was deposed and nothing like that came up.

17      And in that case if there is no evidence to suggest that

18  he did not rely on the integrity of the market price, then I

19  think that's a question that does not need to be presented to

20  the jury.

21          THE COURT:  Right.  Now, I understand that.  But if

22  there is enough evidence to support that, then the proper way

23  to handle that, would you agree, might be a special

24  interrogatory question that's separate from the basic

25  presumption?
```

1          **MR. PORRITT:**  I think that's -- I mean, certainly, you

2     can -- obviously, basic itself establishes it.  You can

3     establish the presumption on a class-wide basis, but individual

4     class members, including the named plaintiff, you know, may be

5     rebutted for individual class members, including the named

6     plaintiff.

7          So, yes.  I can -- I don't see any other way of addressing

8     it than the way Your Honor has proposed.  I just don't think we

9     necessarily need to address that now.  It is something that can

10    be addressed either -- at trial, because I don't think there's

11    going to be any evidence to suggest this.

12         **THE COURT:**  All right.

13         **MR. PORRITT:**  It's a very hard burden for defendants

14    to prove that you don't rely -- until you have knowledge of

15    the -- you know, inside knowledge indicating that the market

16    statements were false, you knew they were false at the time,

17    that's really the only way to rebut the presumption for an

18    individual plaintiff or for an individual class member.  And

19    there was simply no evidence that Mr. Littleton --

20         **THE COURT:**  Right.  Well, this discussion is helpful

21    because it -- I think it crystallizes the fact that there are

22    -- there could be two things going on here.

23         One is the class and the basic presumption and whether

24    that's been met, et cetera, et cetera.  But there appears to be

25    room also to -- I assume he's going to be asked about this,

1  possible rebuttal or negating reliance by Mr. Littleton.  And I

2  think the instructions in my mind should make that clear, and I

3  think the verdict form should make that clear.  Because they

4  can find one way in one and one way in the another, you know.

5      Now, what the implication of that, whether that warrants

6  class decertification post trial, I have my doubts, but that --

7  you know, that may be.  But I think we need to get the jury

8  determination on those issues.

9          MS. THOMPSON:  Your Honor, I do just want to be clear.

10 There certainly are factors that the case law is uniformly

11 clear on rebutting the presumption on a class-wide basis.

12     We're only talking here about the rebuttable presumption

13 that in certain instances has been viewed as something that

14 would be on an individualized reliance basis.  So I think we'd

15 have to distinguish that as well.  And at the end of the day

16 this may end up, you know, more confusing and sort of ending up

17 with an inconsistency in the verdict form.

18     We do think that the evidence goes to the class as a

19 whole, particularly since element this is a class

20 representative.  But I just want to make sure we were clear

21 that we were talking about -- there are ways to rebut the

22 presumption for the class as a whole and we're talking only

23 about those instances in which plaintiff has said, "no, that's

24 individualized, that's not class."

25         THE COURT:  It's already in the language.  I think

1    this was stipulated to.

2              "Defendants may prove by a preponderance of the

3         evidence:  One, that the plaintiff didn't rely

4         et cetera, et cetera, when he purchased" -- I think

5         that's particular to the named plaintiff -- "or, two,"

6         which is the class-wide one, "the alleged

7         misrepresentation did not affect market price of Tesla

8         stock."

9         That's one way to rebut on a class-wide basis.  I mean,

10   that's in the instruction.  I mean, that's -- I mean, that

11   makes your point.  There's a rebuttal that's particular to

12   Mr. Littleton.  There's a rebuttal that goes to the class.

13             MS. THOMPSON:  I think actually that "the plaintiff"

14   has been used throughout the instruction to mean "the class,"

15   at least the instructions that were given.

16        So maybe if we're going -- there may be a need to revisit

17   multiple other instructions if the Court is intending to

18   distinguish between the named class representative and --

19             THE COURT:  Yeah.  We may have to do that for this

20   reliance.  I mean, for the rest of it it's clear, but this one

21   may be -- because of this, I think, bifurcated nature of the

22   rebuttal, that you may have to use a different terminology or

23   something.

24        I just wanted to get a sense of structure and your sense

25   of where the law is on this.

1          **MS. THOMPSON:**  Sure.  And certainly to the extent it

2     would be helpful to have another conference with the Clerk, I

3     think that -- that actually was helpful we hope for the Court,

4     but also the parties.  We would be willing to do that at any

5     point in time.

6          **THE COURT:**  All right.  I may take you up on that.

7          **MR. PORRITT:**  Your Honor, if I could just add one

8     other.

9          I mean, the question of individualized rebuttal -- you

10    know, rebuttal of the basic presumption for individual class

11    members, I think the case law is pretty clear that that's --

12    and *Smilovits* makes clear that that's usually addressed post

13    verdict because you're talking about just individual -- you

14    know, small numbers of the class members, if any.  And I don't

15    think -- you know, there's no reason necessarily that

16    Mr. Littleton couldn't be addressed in the context of that.

17         **THE COURT:**  Well, but there is no reason that it has

18    to be addressed post trial.  He's here.  He's being questioned.

19    We've got a finder of fact.

20         **MR. PORRITT:**  Understood, Your Honor.

21         **THE COURT:**  You know, I think I understand why you

22    would prefer not to, but I see a reason to do it.

23         So that's my inclination and, I may take you up on an

24    offer maybe to meet-and-confer, at least on this part of it,

25    because it's a little bit tricky.

 1          The last substantive question I want to raise is this sort

 2   of disaggregation of causation.  Obviously, there has to be --

 3   the plaintiff needs to prove that the alleged

 4   misrepresentations, if they -- if so found, played a

 5   substantial part in causing the injury.  So that's kind of a

 6   floor.

 7          But that doesn't mean that, you know, 100 percent would be

 8   allocated to that cause if there are other concurrent causes.

 9   You get to -- in the door.  You don't have to prove sole cause,

10   you just have to prove substantial cause.

11          But I do notice that the damages instruction -- I forget

12   who proposed this, but there is a proposed language that:

13               "The plaintiff also has the burden of separating

14          out the price decline, if any, caused by factors other

15          than the alleged misrepresentation."

16          So it appears to me that there should be -- the jury

17   should look at disaggregation if there are multiple causes.

18          I think the way it's set up right now is loss causation

19   states the general rule about, you know, substantial cause, not

20   sole calls.  But when you get into the nitty gritty of, well,

21   how much, I think it's properly handled by the damages

22   instruction, at least if it contains what I would call a

23   disaggregation or, you know, a provision in there.

24          So I want to see if there is any disagreement with at

25   least my framework here.

```
 1              MR. PORRITT:  Yes, your Honor.  I think -- well, so,
 2    first of all, once again, we think the model instruction, which
 3    we essentially adopted with a few additions, should -- is
 4    adequate.
 5         I think there is a danger of trying to get -- trying to
 6    slice the salami too thin when it comes to these.  These are
 7    matters that are classically for the jury to determine.  They
 8    will hear all the evidence.  They know that the damages have to
 9    be -- they determine the damages that were caused by the
10    misrepresentation.  The proposed instructions are very clear on
11    that.
12         So whether we get into what degree of scientific precision
13    is necessary to disaggregate, I think you would start getting
14    into very difficult territory --
15              THE COURT:  Well, not that.  It's not that --
16              MR. PORRITT:  So, I'm --
17              THE COURT:  The instruction doesn't address the
18    preciseness.  There's another instruction that says it doesn't
19    have to be mathematically certain, blah, blah, blah.
20         I think the point is if there are multiple causes found by
21    the jury, they do have to get into some disaggregation.
22         Just like attribution in an infringement case.  You've
23    got to figure out how much of it is attributable to the market,
24    et cetera.  So you have to do some -- you could call it
25    causation.  You could call it damages, but somewhere in there
```

1   there should be.  And I think there's already some language, at

2   least as proposed, in the damages, and I -- that's how I would

3   see it.

4       As long as it's there and the jury knows that's its task,

5   if they were to find multiple factors, they need to get into

6   that.

7           **MR. PORRITT:**  So I would -- I mean, we made it very

8   clear in our instruction.  You may find that the jury has

9   proved that all deflation claimed by the plaintiff was caused

10  by misrepresentation, only some of it, or none of it.

11      So I think that sort of captures, I think, the jury's

12  task.  And I think, obviously, this will be, one can

13  anticipate, a fairly major portion of the closing arguments on

14  both sides, which will presumably help inform the jury as to

15  their task and how they should approach it.

16      So we think what we proposed is adequate and sufficiently

17  framed the issue on the jury's task here, and we're loathe to

18  suggest to the Court to get more into directing what the jury

19  should be doing.

20          **THE COURT:**  All right.  Defense?

21          **MS. THOMPSON:**  Yes, your Honor.  We do think that

22  there needs to be a disaggregation instruction in the loss

23  causation instruction, and that it's particularly relevant here

24  because there's a leakage model.

25      It's not that plaintiff has said:  Here is a specific

 1  disclosure and, therefore, you know, loss causation is a

 2  substantial factor.  It's this, the idea of the leakage model,

 3  and that is the way they are seeking to prove the loss

 4  causation.

 5       Here it's not sufficient to put this disaggregation in

 6  damages, the damages instruction.  It also has to be in loss

 7  causation.

 8       And I do think that the Seventh Circuit decision in

 9  *Glickenhaus* goes to this point.  They have to specifically

10  disaggregate within the context of the leakage model for

11  purposes of loss causation; and if they can't do that, there

12  can be no finding that they have satisfied the loss causation

13  element.  So in our view it's necessary to have disaggregation

14  in the context of the loss causation instruction as well.

15       THE COURT:  And the key language here is to prove --

16  the proposed language:

17            "To prove loss causation the plaintiff must

18       separate out any security price reaction to a

19       disclosure of allegedly concealed information from the

20       market's reaction to other information affecting

21       Tesla's security prices."

22       MS. THOMPSON:  I'm not -- yes.  I think that is in

23  accordance with what the Court said in the order on the

24  Hartzmark motion; that the Court has already recognized that

25  the law requires plaintiff to reasonably distinguish the impact

```
 1    of the risk, the asserted risk, from other economic factors to
 2    prove loss causation.
 3         So because of this leakage model approach, it's necessary
 4    for plaintiff to adequately distinguish the -- you know, the
 5    loss purportedly caused by the material misrepresentations as
 6    opposed to any other economic loss.
 7              MR. PORRITT:  And, Your Honor, we would say that's
 8    adequately captured by the model instruction, which is the
 9    substantial -- played a substantial part in causing the
10    inquiry -- the injury and loss that the plaintiff suffered.  I
11    mean, I think that's --
12              THE COURT:  All right.
13              MR. PORRITT:  I don't think what Ms. Thompson
14    suggested is adding anything to that.  I don't think what she
15    just said is necessarily an accurate statement of the law on
16    loss causation.
17         So I think it is better addressed in damages, as your
18    Honor thought, rather than in loss causation, but I think the
19    proposed model instruction is a fair statement of the law.
20              THE COURT:  All right.  I understand your respective
21    positions.  Thank you.
22         Let me ask, I know there's a dispute about defense to
23    control personal liability, whether the Court should import the
24    failure to supervise and have internal controls, which is a --
25    a broker/seller.  The cases kind of derive from the
```

```
 1   broker/seller context, although there is some suggestion that
 2   that should be applied more universally.
 3        I understand that there's some ambiguity in the law, and I
 4   will just have to make a decision on that.  So I understand the
 5   issues on that.  I think you all have argued that previously.
 6        I will take a closer look at that question.
 7        The one I do want to get your clarification on is the
 8   apportionment of liability.  My understanding is that because
 9   of the wording of the statute, any defendant that acts
10   knowingly, as opposed to merely, quote, recklessly is jointly
11   and severally liable for the entire amount of the loss;
12   correct?  I mean, that's an accurate statement of the law.
13             MR. PORRITT:  Correct, Your Honor.  That's how I read
14   the statute, too.
15             THE COURT:  All right.  So the question arises:  What
16   happens if the jury were to find, let's say, one defendant
17   knowingly engaged in knowing -- knowingly issued a false
18   statement and all the other elements are met.  But let's say
19   two other defendants were also responsible, but their scienter
20   only reaches recklessness.  So you have to do some
21   apportionment at that point.
22        So I take it that all three would be thrown into the
23   apportionment?  In other words, you don't take out the person
24   who has been found to be jointly and severally liable and then
25   have a separate allocation between those who are just
```

1  recklessly liable.  I assume, based on your verdict form,

2  that -- and other verdict forms that I have seen is that

3  everybody who's found to be liable gets thrown into that hopper

4  and gets the allocation.  So even though one is jointly and

5  severally liable, they could be 30 percent liable on an

6  apportionment basis.

7          **MR. PORRITT:**  I mean, they would still be 100 percent

8  liable because they knowingly violated.

9          **THE COURT:**  You would be asking the jury to be part of

10  the calculus.

11          **MR. PORRITT:**  Yes.  I think their apportionment is

12  amongst all of the defendants.  So, yes, you could have an

13  individual who was found to be a knowing violator, but was only

14  given 30 percent, say, with the another 70 percent distributed

15  amongst the other defendants.  They would still be, obviously.

16  Liable for 100 percent.

17      But then there is various kind of complicated attempts to

18  recover different portions of the liability between defendants,

19  you know, once it's been paid by some and then can you have

20  contribution claims and all that sort of...

21      There's a sort of complex and I'm not sure a necessarily

22  coherent scheme set forth in the statute for that, which I'm

23  not sure has ever actually been put into place, was ever

24  actually followed through on a business example of it ever

25  being applied in practice.

```
 1        But, yes, I think -- I think the way your Honor has

 2   expressed it is correct.

 3            THE COURT:  All right.  Do you agree, Ms. Thompson?

 4            MS. THOMPSON:  Yes.  I think that's our understanding

 5   as well.

 6            THE COURT:  Okay.  So I think that is -- and your form

 7   is fine.  The actual wording of this, it's a little bit of a --

 8   you know, sort of two circumstances is are some defendants, you

 9   know, engaged in knowing violation; and if so, we need to know

10   who that is.  And then are there other defendants who are

11   liable but on a reckless basis, we need to know who that.  And

12   then the jury needs to be instructed then as to those -- well,

13   as to all -- assuming there are some who have less than

14   knowing, they have to engage in this apportionment exercise.

15        I may have to tweak the wording of this so it's clear how

16   they are supposed to go about this.

17            MR. PORRITT:  Your Honor, if I may.  I mean, the way

18   we presented it, which I think is consistent with the statute,

19   and as we expressed in the conference with the Clerk, it would

20   be wonderful if the Ninth Circuit could come up with a model

21   instruction on this, but it's present in every securities case,

22   but there isn't one.

23        I think it's just yes/no on knowing violation.  It's

24   really the -- I think that is what the statute requires.  It

25   requires a special interrogatory as to whether any defendants
```

1   committed a knowing violation.

2        And then separately for every defendant you need to have a

3   special interrogatory setting forth their percentage of overall

4   fault, which must add up to 100 percent.

5             THE COURT:  Right.

6             MR. PORRITT:  So I don't think you necessarily need a

7   designation between -- I mean, by definition if they were

8   liable and they weren't a knowing violator, they are reckless,

9   you know, deliberately reckless.  We know that because that's

10  just a logical output of the legal standard.  But I'm not sure

11  necessarily we need to present the question to the jury, and it

12  may end up being confusing.

13       So I think just -- I think what we suggested, which is

14  consistent with the statute, is just up/down on knowing

15  violation.

16            THE COURT:  All right.  Well, maybe the combination of

17  the verdict form it will be -- I mean, in some ways that

18  simplifies it when you see what you have to fill on it.

19       All right.  I will take a closer look at that.  I may

20  schedule something.  Maybe it would be helpful, now that you've

21  heard my comments, to meet one more time with Ms. Hirsch and

22  see if we can iron out -- because I would rather have your

23  interactive input rather than me just putting it out there.  So

24  don't be surprised if you get a call this afternoon --

25            MS. THOMPSON:  Yes, your Honor.

```
 1            THE COURT:  -- to set up something.

 2        Okay.  So the verdict form, I will tell you this, I think

 3    I have indicated this before.  I favor simplicity and something

 4    that approaches a general verdict form more than a detailed

 5    form, let's say, breaking down every element:  Do you find that

 6    there was a duty here?  Do you find that there was negligence?

 7    Do you find that -- you know.  I -- I prefer sort of the bottom

 8    line.

 9        Although here there are nuances that will have to be

10    broken out as there are different defendants.  There are

11    different claims and all that.  I will -- but the big question

12    in my mind, because I've indicated initially that on the

13    tables, that I did not -- was not favorably disposed to having

14    filled out tables.  I think the defendant said that they were

15    overly suggestive.

16        On the other hand, you know, the defendants submittals

17    have tables with numbers in them.  And it occurred to me that

18    -- and the numbers are the same; right?  I mean, at least where

19    there are numbers, they line up based on the -- I assume the

20    expert report.  Do I have that correct?

21            MR. PORRITT:  Yes, your Honor.  The difference -- so

22    we have revised our proposed verdict form taking into account

23    Your Honor's comments to take out the prefilled tables.

24        We still prefer our initial report that we -- verdict form

25    that we submitted.  So it would have the prefilled tables and
```

1  then the difference is that plaintiff also had an opportunity

2  with defendants to construct their own table based on the

3  evidence essentially allowing for disaggregation.

4       **THE COURT:**  All right.  The way the defense has it,

5  they've got at least two of the tables are filled out.  And

6  it's a "yes" or "no."  It's kind of an all or nothing; right?

7  Either you -- the jury buys it or it doesn't.  And if they say

8  "no," that's it.  They say "yes," that's it.  There is no sort

9  of in between.

10      It seems to me that there is -- is there any evidence to

11  support a number that's different from either "no" or these

12  numbers?  Because if not, then maybe it makes sense to just

13  say:  Here it is, "yes" or "no."

14      **MR. PORRITT:**  Yes, your Honor.  I mean, Dr. Hartzmark,

15  our expert, presents how he calculates the numbers that we

16  included.

17      So he ultimately says, "I think these effort best

18  numbers," and he explains his reasons, but he also recognizes

19  the complexity of the issue, the multiple factors involved.  So

20  he's done his best in his expert -- applied his expert opinion

21  as to what he thinks is the appropriate result.

22      But he himself acknowledges -- you know, we had this

23  debate, as your Honor may recall, between the direct versus the

24  consequential impact.  So, for instance, he allocates,

25  calculates the direct impact of the stock, of the Tweets on the

1  stock price for every day during the class period, which is

2  different every day, and the consequential effect.  And, of

3  course, they add up to the overall number, which is what is

4  presented in the prefilled table.  So that is one very clear

5  example.

6       And, of course, the jury can decide based on the evidence

7  that, in fact, you know, not 100 percent of the stock price

8  movements during the class period was attributable before.  You

9  know, only 70 percent of it was or 50 percent of it or whatever

10 any other percentage between 100 percent.  And then they can

11 come up with their own number that can fit in -- that could

12 place in there.  Obviously, Dr. Hartzmark acknowledges that in

13 his damages methodology, so.

14      And defendants, in fact, in their rebuttal report from

15 Mister -- from Professor Vischel says I don't think all of the

16 (audio distortion) would alter the fraud on, say, August 17th.

17 Some of it was attributable to other factors, or all of it was

18 attributable to other factors.

19      So there's lots of evidence, competing evidence -- expert

20 testimony as to what exactly was responsible for the increases

21 or decreases in stock price.  And the jury has to apply its

22 wisdom and come up with the number.  So that is why we

23 included -- they can accept, completely accept plaintiff's

24 opinion, we think the number is complete as presented; but if

25 not, then they have the opportunity to, you know, discount it

 1   down to -- down to zero, if necessary, on particular days.

 2          **THE COURT:**  So you would want the jury to give the

 3   option of yes to these, what you would consider the hundred

 4   percent numbers, the optimal numbers; or no, accept any of it;

 5   or something in between, which they would then calculate if

 6   they feel like they are not going to give credence to the

 7   consequential impact, but only direct.  Is there going to be

 8   testimony that says and that number would be?

 9          **MR. PORRITT:**  Yes.

10          **THE COURT:**  Is there something the jury could use to

11   quantify?

12          **MR. PORRITT:**  Yes.  Dr. Hartzmark calculates the

13   amount of direct inflation, direct impact on inflation for

14   every day during the class period on stock price.  It starts

15   off at $20.57.  I think it's approximately $12 by August 16th,

16   and then it's zero by -- on August 17.  And, you know, then

17   it's differing numbers in between.

18          **THE COURT:**  I see.

19      All right.  Defense response?

20          **MS. THOMPSON:**  Yes, your Honor.

21      Our position certainly is that there should not be two

22   alternatives; here is one that's filled out and here is one

23   that's blank.  And, in fact, that the only evidence that will

24   come in is Dr. Hartzmark's testimony, which is the direct and

25   consequential combined, such that that will be all that the

1    jury has to rely upon in determining -- in determining stock

2    inflation, determining damages.

3         If Dr. Hartzmark is going to start changing his approach

4    from direct and consequential to only direct, we think that

5    there are problems with Dr. Hartzmark's methodology in which he

6    essentially is converting what in one instance he says is a

7    consequential damage to then:  Oh, no.  Now if you only want to

8    do direct, then this is direct damages.

9         So I think that there's -- there's a problem with

10   Dr. Hartzmark's testifying as to sort of an either/or approach

11   in that regard because it renders his methodology unreliable

12   absolutely, but that, you know, it -- I suppose if they are

13   putting forward an alternative damages based on Dr. Hartzmark's

14   methodology that is not what Dr. Hartzmark opines, the sort of

15   consequential and direct combined based on the August 7th

16   through August 17th class period, then there may be reasons.

17   And I know that there's, you know, already a pending request

18   related to Dr. Hartzmark in this regard, but that Dr. Hartzmark

19   shouldn't be allowed to testify in that regard because his

20   methodology is unreliable.

21        So there will be no reliable evidence in the record from

22   which the jury could conclude something other than what is in

23   the filled-in chart.

24        Your Honor is exactly correct, that it is -- their

25   approach is an all-or-nothing approach, and there will be

1  nothing from which a juror could determine a different number

2  of damages -- for damages to debate this.  What they really

3  want to do is sort of invite the jury to make up their own

4  assessment of what damages should be, which would not have any

5  support in the record evidence.

6       So our view is that it would be most appropriate to put in

7  the chart.  It's a single chart.  It's filled in.  It's an

8  all-or-nothing approach.  If the Court determines that the

9  chart should not be all or nothing, then certainly it should

10  not be both the all-or-nothing chart and then something in the

11  alternative with a blank chart.

12       **THE COURT:**  Okay.  I got you.  And that was my initial

13  take, in that if there is a range of, you know, more than one

14  potential answers to this, to put in numbers on one I think

15  runs the risk of being unduly suggestive.

16       But when I saw the numbers aligned, and if the parties had

17  agreed it's a binary decision -- yes, no, it's either all or

18  nothing -- then it certainly simplifies it for the jury, but it

19  sounds like from the plaintiff's perspective it's not quite

20  that simple.  There are gray -- shades of gray and something

21  intermediary.

22       I think this one we'll have to wait trial.  I want to --

23  you know, we'll have to see.  His testimony comes out, then any

24  testimony he gives about something different, it gets excluded

25  for some reason so that the answer really is binary, then the

 1    verdict form will look one way.

 2         On the other hand, if Mr. Porritt is right, it will

 3    probably look like blank forms.

 4         But I agree with the general proposition we should have

 5    both.  I don't think it's appropriate to have:  Here is an open

 6    slate, but, by the way, you can check this box and make it

 7    easy.  So we'll await on that one.

 8         All right.  We are running out of time here.  Let me just

 9    ask about the -- there is the emergency motion regarding

10    Dr. Hartzmark's depo because of, I guess, some questions about

11    whether he's changed his position or is not -- that his

12    declaration in his report is not fully -- is not a full

13    disclosure.

14              **MR. ALDEN:**  Yes, Your Honor.

15              **MR. PORRITT:**  Your Honor --

16              **THE COURT:**  Let me hear from the defense why you need

17    an additional deposition.

18              **MR. ALDEN:**  Thank you, Your Honor.  Anthony Alden,

19    Quinn Emanuel, for the defendants.

20         So the reason is that Professor Heston -- Your Honor's

21    final pretrial conference order allowed the plaintiff to make

22    one change to their methodology, which was to use actual

23    transaction prices to compare to but-for prices.

24         What Professor Heston then did was actually adopt a

25    different methodology.  Professor Heston's report, his November

8, 2021 report in Paragraph 163 says that there were two

potential methodologies.  He says one possibility is capture

the unique but-for price and then compare that to the

transaction.

Another is to calculate an impact quantum; i.e., the

dollar or percentage amount by which an option would have been

more or less expensive.

And in his opening report Professor Heston adopted the

impact quantum methodology.

**THE COURT:**  What is the impact quantum methodology?

How does that differ from the straight comparison of

transaction versus but-for?

**MR. ALDEN:**  That's a great question, Your Honor, and

it's a critical distinction.

The impact quantum method -- what the impact quantum

methodology attempted to do at least, we didn't obviously

believe it did so reliably, but what it attempted to do was to

say almost like an inflation or de- -- come up with almost like

an inflation or deflation with it.  I think that's how

plaintiffs described it in their opposition to our Motion in

Limine No. 5, which is to derive an amount by which each

option, irrespective of the transaction price, was impacted by

Mr. Musk's Tweet.

And so whether it was an option that was -- required the

$40 or $50, for example, that option, there would be a constant

```
 1   inflation or deflation that sought to isolate the impact of
 2   Mr. Musk's Tweet.
 3       In the new methodology, the out-of-pocket methodology,
 4   there is -- now there is no attempt to come up with an
 5   inflation or deflation ribbon, if you like.  It is simply a
 6   comparison between what the investor bought the option at and a
 7   single but-for price.  And that's a critical distinction,
 8   because I can illustrate with a simple example, Your Honor.
 9       Let's say one investor -- let's say the but-for price that
10   Dr. Hartzmark proposes for the call -- for call option is $30.
11   Let's say one investor bought that option for $40 because that
12   investor went through a broker.  The broker is a sophisticated
13   trader and was able to get a $40 price.  Another investor, less
14   sophisticated, went online to -- went to a trading account and
15   bought the option for $50.  Okay?
16       Under the new methodology one investor suffered $10 in
17   damages.  Another investor who bought exactly the same option
18   at exactly the same time suffered $20 in damages.  Even though
19   the reason that the one investor suffered more damages had
20   nothing to do with Mr. Musk's Tweet.  It had to do solely with
21   the fact that that investor obtained a worse price because that
22   investor happened to trade online rather than using a broker.
23       And Professor Heston testified to this, admitted to this
24   in his deposition yesterday.  And we're happy to submit the
25   entire transcript.  Admitted that he had changed his
```

 1   methodology.

 2        And now Dr. Hartzmark has, in fact, implemented a

 3   different methodology and come up with completely different

 4   numbers.  And we've never had the opportunity to ask

 5   Dr. Hartzmark about those numbers.  We've never had the

 6   opportunity to ask Dr. Hartzmark why are you posing numbers so

 7   radically different than the numbers he originally came up

 8   with.

 9        There are investors who previously suffered -- apparently

10   suffered no damages who now do suffer damages and vice-versa.

11        And what's more, remarkably, Dr. Hartzmark comes up with

12   if you -- one applies this new methodology to before the class

13   period, Dr. Hartzmark would come up with damages.

14        So under Dr. Hartzmark's new methodology -- Professor

15   Heston's new methodology is implemented by Dr. Hartzmark,

16   apparently, investors suffered damages before Mr. Musk even

17   Tweeted.  And we've never had the opportunity to ask

18   Dr. Hartzmark about why that could possibly be the case, nor

19   have we had the opportunity to argue to the Court via a *Daubert*

20   motion that such a methodology is quite obviously unreliable.

21   How could an investor possibly have suffered damages as a

22   result of a Tweet before the Tweet even came out?

23        And, you know, I know -- I know plaintiff's counsel will

24   say it was a -- just a change in a day to use.  There's no

25   change in methodology.  All false.  And we would be happy to

1  submit Professor Heston's entire transcript where he

2  straight-out admitted this is a new methodology and he

3  straight-out admitted that there could be differences in the

4  amounts of damages simply because a person traded -- happened

5  to trade at a different price using a different methodology.

6      **THE COURT:**  Can you briefly explain from your

7  perspective what the new methodology is?

8      **MR. ALDEN:**  Yes, your Honor.

9      The new methodology, as far as we understand it, is to

10  take the actual, is that plaintiffs are proposing that each

11  class member would submit their actual transactive prices and

12  then that actual transactive price would be compared to a

13  but-for price that Dr. Hartzmark has -- that Professor Heston

14  has calculated and that Dr. Hartzmark adopts, and that the

15  but-for price would be compared to the class member's actual

16  transactive price and the entire difference between the two

17  would be damages, even if the reason that a person transacted

18  at a particular price, as opposed to another price, had

19  absolutely nothing to do with Mr. Musk's Tweet or any

20  purportedly corrected information, as I was trying to

21  illustrate in my example.

22      So one person happens to trade at $50 simply because they

23  had gone on a website that gave them a worse price, they would

24  have one set of damages; whereas, another person who traded at

25  $40, who got on -- who used a brokerage, would have a different

1    set of damages simply because they used a brokerage, which,

2    obviously, has nothing to do with Mr. Musk's Tweet or any issue

3    in this case.

4         THE COURT:  So notwithstanding any potential flaw with

5    that analysis, it seems to me what was done is consistent with

6    what the Court ordered; and that is, not use this calculated

7    transaction price, but use real world prices.

8         You know, and I don't think anybody disagreed.  I don't

9    think there was any discussion about what are the nuances of --

10   you know, it's not a perfect market.  It's not like the stock

11   market where you buy everything -- everybody is paying the same

12   thing; right?

13        MR. ALDEN:  That's true, Your Honor, except that

14   criticism didn't apply before, because before at least

15   Professor Heston was purporting to take into account what he

16   called "market noise."  In fact, that's the reason he proposed

17   his original methodology.

18        THE COURT:  Right.  And you objected to it

19   strenuously, and I -- I acceded to that, saying why are we

20   constructing all these things?

21        And so anyway, I'm not sure what the new methodology -- it

22   seems like this methodology that was discussed, at least

23   acceded to by the plaintiffs -- this wasn't their preferred

24   methodology -- it was in light of my comments in response to

25   your side's objections.

```
 1        And so I don't see -- well, so now you know what he did.
 2   You're certainly free to cross-examine.  You can use this very
 3   example and you can do that.  Why do you need a deposition?
 4   I'm not sure what's new here.
 5        MR. ALDEN:  Because, Your Honor, we don't know --
 6   we're not going to know what he's going to say on these new
 7   numbers.  I have no idea.
 8        When we get up to trial and say to Dr. Hartzmark, you
 9   know:  Why do some investors now have damages and others don't
10   as opposed to your original methodology, or vice-versa; or:
11   Why does your methodology result in damages prior to the class
12   period?  I have no idea what Dr. Hartzmark is going to say.
13        Surely, I mean, that's the very purpose of discovery, is
14   that we're entitled to know what he's going to say about these
15   new numbers before he gets up on the stand.
16        THE COURT:  All right.  Let me hear from the
17   plaintiff.  Why shouldn't there be -- since -- even though you
18   may argue this was consistent with what was discussed, now that
19   he's done it, why shouldn't the defense have at least an
20   opportunity to get some pretrial cross-examination and
21   information about it?
22        MR. PORRITT:  I mean, Your Honor, what has been --
23   there is no new methodology.  All right.  Let's be very, very
24   clear.  And defendants keep saying that as kind of their
25   repeated refrain, but it's just every single time they say it
```

 1    it's false.

 2         It's an out-of-pocket methodology comparing a but-for

 3    calculated price to initially we proposed an adjusted price to

 4    take account, as your Honor noted, from noise, now using actual

 5    prices, which was defendant's own proposal.  So admittedly

 6    nothing more than modifying the methodology to allow for

 7    defendant's proposal.

 8         So to my view, this is a stipulated approach at this point

 9    in time in terms of using actual prices.

10         **THE COURT:**  Well, let's say the approach is stipulated

11    to, or at least this is one that I've already approved based on

12    the discussions of the parties.  Still, why shouldn't the

13    defendant be able to ask questions about it pretrial?

14         I mean, had this been in a report in the outset, the --

15    you know, normally you disclose.  You have expert report and

16    then you get expert, you know, discovery, often to ask and test

17    the nuances and hypotheticals.  So why shouldn't -- in the

18    normal course of things there would have been some depo

19    opportunity.

20         **MR. PORRITT:**  There has already been examination on

21    this point, because in his deposition back in March they asked

22    Dr. Hartzmark:  What would happen if the adjusted prices are

23    incorrect?  And he said quite -- then and there said:  You can

24    use actual prices or some other prices and, you know, the

25    methodology is the same.

1    So all of this change, one thing is -- we presented an

2   appendix where he calculated but-for prices using direct and

3   direct and consequential.  Those have not changed at all.  They

4   are identical.

5    Previously he subtracted them from the actual fitted --

6   adjusted actual prices.  All he had done is replace the

7   adjusted prices with actual prices, which comes from data which

8   has been deemed produced to defendants over a year ago.

9    So, and then this idea that somehow people pre-class

10   period have damages.  I don't know where that's coming from,

11   because that's not in his report.  I think Mr. Alden just

12   seemed to have made that up in an attempt to try and get a

13   deposition where he's not otherwise entitled.

14          **THE COURT:**  Well, all right.  The --

15          **MR. PORRITT:**  The question at deposition would be:

16   How did you subtract Number A from Number B and get, you know,

17   Result C?

18          **MR. ALDEN:**  Your Honor, that's completely false.  The

19   questions at the deposition would be:  How did you implement

20   this new methodology?

21    Why is your appendix now completely different in form and

22   in substance to your previous appendix cited?

23    How did you come up with this -- how did you implement

24   Professor Heston's new methodology which you didn't do before?

25    Why are your damages numbers different now?

```
 1         How can you explain the differences?

 2         Which numbers are more accurate?

 3         He's never had to answer any of those questions because we

 4    have never had the opportunity to ask him.

 5              THE COURT:  All right.

 6              MR. ALDEN:  All we're asking for, Your Honor, is

 7    literally -- you know, if Your Honor wants to limit it again, I

 8    think we could use -- it would be fair to give us more time,

 9    but if Your Honor wanted to limit us to an hour, I hardly see

10    what prejudice that would be to the defense -- to the

11    plaintiffs.  Whereas, denying it would be extremely prejudicial

12    to us because we will have no idea what he's going to say when

13    we get into trial.

14              THE COURT:  All right.  I'm going to give you the

15    hour.  I think although -- I don't think there has been a

16    change in methodology.  At least this is all consistent.

17         On the other hand, in the normal course of things had he

18    done this in his -- you know, had it been the report,

19    originally there would have been an opportunity to question him

20    through a discovery deposition process; but given the limited

21    scope of this, an hour is sufficient, as you indicated, and I

22    think that's fair.  So I'm going to allow a one-hour deposition

23    of this witness.

24              MR. ALDEN:  Thank you, your Honor.

25              THE COURT:  All right.  So is there anything else that
```

1  we need to discuss before we reconvene just before trial starts

2  on the 13th?

3       **MR. ALDEN:**  Your Honor, this is Anthony Alden again.

4       Your Honor did ask that we raise during this conference

5  the possibility of the opportunity to file another *Daubert*

6  motion.  We think that we could do that in short order.  We

7  think it would not be long.

8       Obviously, we would like to have Dr. Hartzmark's short

9  deposition beforehand, but if the Court is concerned about

10  timing, I think we could file something no longer than five

11  pages this week.

12       We think that there is fundamental flaws with this new

13  implementation that have not been addressed by the Court, and

14  we would like the opportunity to present them.  Again, we could

15  do so quickly and we think in a short brief.

16       **THE COURT:**  All right.  Well, what I said was I'm

17  going to want to see a request to do so first.  Even if you're

18  suggesting a five-page brief, that's going to invite another

19  answer and more briefing.

20       And so I'll give you a chance to file a two-page letter

21  asking for permission.  And I'll -- you know, you're going to

22  have to do so by the end of this week because there's not much

23  time left.

24       And then I'll give the other side a day to respond.

25  Again, no more than two pages. Just a preview.  And I will

 1   decide whether it's worth a candle here to hear yet another

 2   *Daubert* motion.

 3          **MR. ALDEN:**  Thank you, your Honor.  Appreciate it.

 4   Thank you.

 5          **THE COURT:**  All right.  And we can handle other

 6   clean-up matters on the 13th, as well as the jury selection

 7   screening, too, if there's some last minute stuff.

 8          I'm hoping, frankly, to not see more emergency motions.

 9   Let's get this -- try to get this show on the road.

10          So I will see you on the 13th.  And, again, the goal there

11   will be to eliminate those who obviously don't need to come in.

12   So that will make our process efficient.

13          In terms of logistics, I have to think twice.  I have to

14   look at the room and see how many people actually show up, how

15   many we can accommodate.  If we do get, let's say, in excess of

16   a hundred people, again -- although I don't use the box because

17   you have the list and I have the list, it makes sense for us to

18   concentrate on the first, you know -- I don't want to divide

19   people in tranches, but you will know that if you're -- if

20   there's juror No. 123 back there, I wouldn't spend a lot of

21   time with that.  So I'm going to try to concentrate on those.

22          Because at the end of the day we want -- I think I decided

23   on two -- two more jurors, a jury of eight, maybe nine, but

24   eight is preferable because we can get them all in the box.

25   Three peremptories each.  So we need -- before you exercise

```
 1   your peremptories, we need to get to 14.

 2        If we can salvage or find 14 people who can be willing and

 3   able and impartial jurors in this, hopefully, we won't need 150

 4   people to get that, but you never know.  But I am taking them

 5   from the top.  So you will have the list.  So, hopefully, you

 6   can figure out where to concentrate your questions.

 7        All right?  Good.  So we'll see you on the 13th.  I take

 8   it in terms of -- I've got to raise the question of any more

 9   efforts of ADR?  Is there any interest at all in talking to a

10   magistrate judge or having any further of these discussions

11   with her?

12        MR. PORRITT:  We have a check-in scheduled for

13   tomorrow, Your Honor, which we scheduled at the end of the last

14   session.

15        THE COURT:  That's right.

16        MR. PORRITT:  That is in hand.

17        THE COURT:  All right.  Good.  Well, hopefully, that

18   will bear some fruit; but if not, I guess I'll see you on the

19   13th.

20        MR. PORRITT:  Very good, your Honor.

21        THE COURT:  Thanks everyone.

22        (Proceedings adjourned.)

23

24

25
```

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Sunday, January 15, 2023