Pages 1 - 180

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

```
IN RE TESLA, INC. SECURITIES      )
LITIGATION.                       ) No. 18-cv-04865-EMC
_____  )
```

San Francisco, California
Friday, January 13, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Movants:

              LEVI & KORSINSKY, LLP
              1101 30th Street NW
              Suite 115
              Washington, D.C.  20007
     BY:  **NICHOLAS IAN PORRITT, ESQ.**
         **ELIZABETH K. TRIPODI, ESQ.**
         **ALEXANDER A. KROT, ESQ.**

              LEVI & KORSINSKY LLP
              75 Broadway
              Suite 202
              San Francisco, California  94111
     BY:  **ADAM M. APTON, ESQ.**

For Defendants:

              QUINN EMANUEL URQUHART & SULLIVAN, LLP
              51 Madison Avenue
              22nd Floor
              New York, New York  10010
     BY:  **ALEXANDER B. SPIRO, ESQ.**
         **ANDREW JOHN ROSSMAN, ESQ.**
         **PHILLIP B. JOBE, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
         Official Reporter, U.S. District Court

    (Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants:

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        865 South Figueroa Street
        10th Floor
        Los Angeles, California  90017
  BY:  **MICHAEL T. LIFRAK, ESQ.**
        **MATTHEW ALEXANDER BERGJANS, ESQ.**
        **WILLIAM C. PRICE, ESQ.**


        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        51 Madison Avenue
        22nd Floor
        New York, New York  10010
  BY:  **ALEXANDER B. SPIRO, ESQ.**
        **ELLYDE R. THOMPSON, ESQ.**

1    **Friday, January 13, 2023**                               **8:54 a.m.**

2                        **P R O C E E D I N G S**

3           **THE COURTROOM DEPUTY:**  All rise.

4       Court is calling the case in regarding Tesla, Inc.,

5    Security Litigation, Case No. 18-4865.  Counsel, please state

6    your appearances for the record, beginning with plaintiffs.

7           **THE COURT:**  Getting a little feedback there.

8           **THE COURTROOM DEPUTY:**  Is anybody on Zoom?  Do they

9    have their mikes muted?

10          **THE COURT:**  No, I think yours is too loud.

11          **THE COURTROOM DEPUTY:**  I'll turn it down.

12          **THE COURT:**  Yeah.  You can see, we are still adjusting

13   our systems here.  It's a brand-new video-audio system that you

14   have been working with, which apparently didn't work, the next

15   day.

16          **MR. PORRITT:**  We have been spending some time getting

17   familiar with it, Your Honor.

18          **THE COURT:**  That's what happens when you go with the

19   low bidder.

20          **MR. PORRITT:**  Nicholas Porritt of Levi and Korsinsky,

21   Your Honor, on behalf of the plaintiff and the class.  With me

22   is Adam Apton and Elizabeth Tripodi.  And Stephanie Quinonez is

23   our paralegal.

24          **THE COURT:**  All right.  Good morning.

25          **MR. SPIRO:**  Good morning, Your Honor.  It's nice to

1    see you in person.  On behalf of the defendants it's Alex

2    Spiro, Quinn Emmanuel.  I'm joined by Bill Price, Mike Lifrak,

3    Phil Jobe, Alex Bergjans, Ellyde Thompson and Andrew Rossman.

4              **THE COURT:**  Thank you.  I appreciate your coming in

5    live.  I know our technician thought it would be a safer bet to

6    do that.  But it also gives us a chance to see us face to face,

7    and deal with matters.  And we have a number of matters to deal

8    with.

9              This morning, the main purpose was to go over the

10   questionnaires to see who we really want to bring in.  After

11   reviewing this I think you might agree with me, we don't need

12   to bring in 190 or 200 people.  There are enough folks who say

13   they can serve, in terms of not having scheduling problems, and

14   I think there are enough people who also say -- and I know

15   there is going to be some voir dire on this, but say either

16   they don't have a view of the defendants, of Mr. Musk or Tesla,

17   or if they do, it wouldn't interfere with their ability to be

18   fair and impartial.  And we can do that without going through

19   200 people.

20             And so my goal this morning is to work with you to figure

21   out which group we want to bring in.  Those jurors that really

22   show most promise in terms of their ability to serve, and there

23   are a lot of people, I think about two-thirds, kind of like 120

24   or something that said they had some problems, childcare,

25   travel, work, health.  But there are a lot of people who said

1    they could serve.  And some of the people who said they

2    couldn't serve may warrant some further discussion.  Somebody

3    will say "I work."  Or "I come a long ways; if I had a hotel,

4    that might be different."  Well, we may have hotels available

5    for those who come from distance.  Others who may have

6    childcare problems haven't quite articulated whether there's

7    anybody else available.  On the other hand, I don't see a need

8    to be extremely tough on folks if we have plenty of folks.

9         And obviously -- we are going to talk about this -- there

10   are a number of people who express some attitude or some view

11   about the parties in this case, including Mr. Musk, and

12   nonetheless, say they could be fair.  There are a couple of

13   people who equivocated whether they could.  And the question is

14   whether it is worth bringing, you know, people in.

15        And I think we can safely, in my view, bring in maybe 50

16   people.  Because at the end of the day we only need nine.  We

17   need 15.  Because that's the magic number.  We are going to

18   seat nine.  Each side gets three peremptories.  So if we can

19   find 15 eligible folks who are qualified to serve, and you each

20   exercise all the strikes that you have available, we'll have

21   our nine.  So it's not that hard, it seems to me, to find 15

22   people or to get to the point where we have 15.  If we brought

23   in, you know, around 50, I'm certain we can find 15 qualified

24   jurors out of that.  And that will make the voir dire more

25   efficient, rather than bring in two groups doing a hundred at a

1    time.  I don't think we need to do that.

2        I did send out 200 questionnaires just in case, knowing

3    this is a fairly lengthy trial.  We are still in the middle of

4    a potential COVID wave.  And the notoriety of the parties,

5    Mr. Musk and Tesla, I wanted to make sure we had a big enough

6    pool so that we'd have -- we could get some assurance that we

7    would be able to find qualified jurors.  So we are going to

8    talk about that.

9        And also it interrelates to the venue motion which I think

10   is the first thing we need to address logically.  Before I do

11   that I do want to make a disclosure.  I have two law externs or

12   law students this semester, Valentina Liu and Diana Lee, who

13   are going to Quinn at the end of their career, which is later

14   this year, I think.  I have walled them off and separated them.

15   They're not working on this case.  And any time I have a

16   discussion about this case, they do not participate.

17       So I did want to disclose that.

18          **MR. PORRITT:**  (Nods head)

19          **THE COURT:**  They will not have any role in this case.

20       So let's talk about the venue motion.  It seems to me that

21   the question, when you get down to it, is:  In light of -- and

22   however you characterize the press, the fact that it is more

23   factual, and not editorial, how evasive, how inflammatory it

24   was or wasn't, I think the proof is in the pudding.

25       When you actually look at the responses to the

1    questionnaires, I know that the defendants submitted in their

2    briefing after their reply, after looking at the

3    questionnaires, characterizes you had a very large number that

4    you -- somewhere like 116 negative and 26 favorable.

5         When I looked at it, I think it is a little more nuanced

6    than that.  I found that there are -- out of the 190, 27 had

7    solely positive comments.  Mr. Musk does have a lot of fans out

8    there.  Thirty-eight I would say were neutral.  Forty-nine were

9    kind of mixed.  And you saw that.  There are a lot of folks who

10   say: Well, he did a tremendous job the way he ran Tesla or I

11   like what he did in that regard but not so hot about the way

12   he's handling Twitter.  So it's both positive and negative.

13   And then there are 76 that were pretty straight negative.  So,

14   it's a more nuanced view, and it's not one that is

15   overwhelmingly monolithic in any way.  It is a rather diverse

16   response.  But in any event, the fact that we have -- and what

17   I did is I created two spreadsheets looking only at the: In

18   light of what you know or don't know, is there any reason why

19   you couldn't serve as a fair juror in this case?

20        And of those who don't have a problem time-wise, I created

21   two charts.  One who say they can't serve during the three

22   weeks.  And then one that says they could.  And I have, I

23   think, 129 say they got a problem, out of the 190.  Sixty-one

24   said -- indicated -- did not indicate they had a problem in

25   serving during this three-week period.

1      Of those 61, I looked at those who said they couldn't be

2 fair.  And I found that there was a large number, roughly 40,

3 41 or so, who appeared not to have any impediment.

4      So I don't know what your charts show.  I show about a

5 little over 40 people who both don't have a problem with the

6 time, and two, don't have a problem with respect to the

7 identity of the defendants in this case.

8      So the bottom line is if the Court can find a requisite

9 number of jurors -- and in this case the magic number is 9 or

10 even 15 since that's the strike pool -- I don't see any reason

11 why a trial can't be held here.

12      I also note that the motion was filed, in a way, late, and

13 in a way, early.  It was filed significantly after the press

14 that's complained about, which largely was in November because

15 that's when a lot of the Twitter stuff happened.  There was no

16 motion, no hint of a request to move this trial or delay this

17 trial until just days before this trial was about to begin.

18      And interestingly, it was also filed before we got the

19 jury responses back, and sought to rely on presumptions and all

20 sort of stuff, when it seems obvious that if you are going to

21 make a motion and not make it early, and you're just days away

22 from seeing the actual real-world results, why not wait until

23 you get that?

24      But in any event, that's sort of neither here nor there.

25 I'm more interested in the substance of this.  And the bottom

1    line is, I don't think the standard's been met to transfer.   It

2    seems to me that the proof is in the pudding.   We have got

3    jurors who can serve.   Both time-wise and attitude-wise.

4         Now, stuff may come out in voir dire.   That's why I'm not

5    just going to say let's bring in 15 people.   Let's bring in 50.

6    And I'm confident we will be able to yield from that a fair

7    panel of jurors.

8         But since I've already indicated my general ruling, I'll

9    let the defendants respond.

10        I'll say one more thing.   And that is the question about

11   transfer to Austin, I don't think that's consistent with the

12   law.   That Austin is not the venue where this case could have

13   been brought.   And I think the law is you look at when the case

14   was filed and you look at where the case could have been

15   brought.

16        And I can see a policy reason for that.   Not as the case

17   as it evolves, because if you allow -- if you open the door to

18   transfer based on evolving things after the case is filed, that

19   allows the parties to then -- cynically, could manipulate and

20   forum-shop by changing their headquarters, moving, and, and it

21   seems to me that that is not -- not a favorable policy that the

22   Court wants to encourage at all.

23        So the idea of moving it to a specific forum that

24   otherwise has no connection with this case, no better

25   connection than anybody else, seems to me a non-starter.

1        So, the ball's in your court.

2        **MR. SPIRO:**  Given the Court's indicative or tentative

3    ruling, I'm going to be brief, Your Honor.

4        I would simply say, sort of working backwards, that 1404

5    allows for a transfer of venue in these circumstances.  And it

6    allows for a transfer of venue, even to somewhere where the

7    case could not have been brought originally, if you even accept

8    the premise this could be -- could not have been brought there

9    originally.

10        In addition, just to be clear, our request was to transfer

11    to any other district.  It was not simply to the Western

12    District of Texas.  So I don't think, as a technical matter,

13    the Court could not, and obviously the Court has discretion to

14    delay the start of the trial.

15        As to the timing of the bringing of the motion, the Court

16    is right that you are sort of left in a Hobson's choice because

17    we wanted to see the questionnaires.  We did not know exactly,

18    frankly, whether or not we would get the questionnaires.  And

19    so we waited as long as we thought we reasonably could in that

20    time period, but we also were left in a position where the

21    media did not dissipate after November.  It is not as if, if

22    one were to chart these things, the takeover happened and

23    San Francisco moved on from the issue.  The issue is very much

24    alive.  And it's here and around us and in the media here every

25    day.  And it's going to remain so throughout this trial, we

```
 1   expect.  And we don't believe that we can get a fair trial in
 2   this district.  Period, full stop.
 3        And we think that that's self-evident.  I mean, we can
 4   talk all we want about the law and the policy and everything
 5   else.  Mr. Musk cannot get a fair trial in this district right
 6   now.  I don't think anybody really thinks that he can, frankly.
 7   And I'm trying to find a way to articulate why that is so.  But
 8   I think the easiest way to think about it is that the media
 9   reports are character assassinations.  It's basically character
10   evidence.  Right?  It's not --
11            THE COURT:  Well, a lot of it is factual.  The point
12   of the -- if you look at it, a lot of it is just factually what
13   happened, and decisions that are made at Twitter, et cetera, et
14   cetera.  To say that's all character assassination, to me
15   that's a bit rhetorical.
16            MR. SPIRO:  Well, with all due respect to the
17   plaintiff, with all due respect to the media, with all due
18   respect to the Court, I don't think any of you are in the
19   meetings at Twitter to know whether it is factual or not.
20        But whether it's factual -- I'm not saying some of it --
21   some of it isn't factual.  A lot of it, a lot of the flavor and
22   tenor of it isn't just:  This is what happened.  It's:  This is
23   what happened, and this is what it means.  This is the
24   take-away from a character, from a -- who is this human being
25   who's making firing decisions?
```

1      So, and the problem with character type of reporting,

2  because some of it unequivocally is, is that it doesn't really

3  dissipate through evidence.  Meaning it's not like reporting on

4  a specific thing that either is factually true or not true, and

5  then there's a trial about it where the jury can be overtaken

6  by the evidence and lose their thoughts.  Their thoughts are,

7  as they're reminded every day in the papers of record and the

8  news here, that this person is not somebody who should be

9  liked, believed, or what have you.

10      And so that --

11      **THE COURT:**  Well, interesting.  Your tactic sort of is

12  off-point, compared to *Daniels versus Woodford* and the other

13  authorities that say you look at whether the trial was held --

14  was, quote, "saturated with prejudicial and inflammatory media

15  publicity about the crime."

16      So if you're in a small town and it's all this stuff about

17  a kidnap or a murder or something, and you've got a population

18  of 10,000, and every day something is flooded about this

19  defendant and what he did, et cetera, et cetera, yeah, maybe I

20  guess that is a concern.  That people will disregard the

21  evidence about that very crime at trial because they can't put

22  it out of their mind, because they've seen something in the

23  paper, they've seen photos.  They've heard witnesses that

24  testify.

25      But in this case, there's almost no -- no publicity about

1   this particular case, of that nature.  It's about something

2   collateral.  So you have to rely on the idea that, well, people

3   are going to be so inflamed and hate Mr. Musk so much that they

4   cannot put aside that and judge this case based on this

5   evidence, and they are not hearing other evidence about this

6   case through the media.  They're just hearing stuff about what

7   Mr. Musk is doing in another arena.  That is -- that is

8   different.

9          **MR. SPIRO:**  It is dif- --

10         **THE COURT:**  And, not only is it different; this is not

11  a small town.  This is a large venue.  A large district, over

12  5 million people.  And the diversity of the views that you saw

13  with some people who think he's a god and other people who

14  think otherwise shows that there is a great diversity out

15  there.  And if you -- so I think that makes it harder in a case

16  to prove the burden that you have to show that the publicity is

17  so, quote, "pervasive and inflammatory that the jurors cannot

18  be believed when they say they can act impartially."  They take

19  an oath.

20         And I've been through many trials.  Some with high

21  publicity value.  The Oscar Grant case, for instance, or my

22  colleague with Elizabeth Holmes.  We take that oath seriously,

23  when they say "Yes, I know a little bit about this case; yes,

24  I've heard about what happened on BART.  Yes, I've heard about

25  the Meserle situation.  But I can put that aside."In my

1    experience, when they say they can do that, they do that.

2        So tell me why this should be moved from a large

3    metropolitan venue with lots of people, lots of views, and for

4    the Court to conclude that folks are going to be disregarding

5    the oath they take.

6        **MR. SPIRO:**  The media here on this issue is just as

7    pervasive in this large district as the analogies to the small

8    town in the other cases.  Second, this case is about Mr. Musk,

9    whether to believe him or not, and Twitter.  The media is about

10   Mr. Musk, whether you believe him or not, and Twitter.

11       And third, in terms of the oath, in terms of the

12   questionnaires -- which I was going to come to last, but --

13       **THE COURT:**  You know, interestingly, the way you all

14   have framed this case and the issues and the fight about the

15   instructions, yeah, there is something about Mr. Musk and his

16   scienter.  But there's a lot about the economics.  Causation,

17   loss causation, what the experts are going to say.  Did it have

18   an effect on the market.  What he said is public.  This is not

19   a question of what he said or didn't say.

20       So this case, my prediction, is going to hinge on all the

21   stuff you have been fighting about.  The many, many *Daubert*

22   motions, in limine motions about the theories, about whether

23   option prices are affected and volatility, and all, all of the

24   very complex issues that you are presenting with regard to

25   whether or not what he said really had an impact.  Really

 1   caused a loss.  And if so, to the extent, what loss?  So this

 2   is not a murder case, whodunit.

 3        So yes, there is some -- something to do with his

 4   credibility, because there is a question of whether he acted in

 5   reckless disregard with respect to the truth of the matter,

 6   which I already found that he did.  Or whether he acted

 7   knowingly, a step higher in the scienter.  And so that's why I

 8   ruled in pretrial:  Yes, his credibility, his state of mind, is

 9   a factor.  But that's not the only factor in this case.  And a

10   lot of this is about the -- the economics and the financial

11   analysis.

12        **MR. SPIRO:**  In any event, turning to -- again, we

13   think the case is going to be largely determined by a jury,

14   based on their impressions of Mr. Musk, their impressions of

15   Twitter usage, and that is overwhelmingly what the media

16   coverage is about, either directly or indirectly.

17        I will simply say -- and I very much appreciate and

18   respect the Court's experience with jurors.  I understand the

19   oath, right, that oath is given in every case.  This law about

20   transferring venue still exists.

21        I have some experience picking juries, I have some

22   experience representing high-profile people.  And I will tell

23   the Court that human experience tells us that not everybody who

24   dislikes somebody puts it in writing.  They don't.  Right?  We

25   all know that.  So the fact that so many of them did put it so

1    vividly in writing should tell the Court something.

2        In addition, I don't remove people from that list of those

3    jurors that cannot be impartial when they say something like

4    "He seems to be a good designer of cars, but I hate him."  I

5    don't view that as a mixed signal as to whether or not that

6    juror can be or cannot be a fair juror.

7        In addition, we all know from human experience and

8    selecting juries, when you talk to them in the back they may

9    say they have a hardship, they may give a different reason, but

10   a lot of the reason that people try to get off of juries is

11   when there is something about the case that makes them

12   uncomfortable.  And the number of hardships that you see here

13   certainly suggests as much --

14       **THE COURT:**  That's why we ask the range of questions.

15   And you have a spreadsheet, I'm sure, where you can see

16   somebody's expressed a hardship, and also expressed some view

17   of the case, perhaps, and you can draw whatever inference you

18   can.  But the data is there.

19       **MR. SPIRO:**  The data is there.  And we think the data

20   overwhelmingly supports, and so does just common sense of being

21   in the district, that he can't get a fair trial here.

22       But the final point I want to make about the other

23   question on the questionnaire that the Court raised is:  Some

24   people obviously think they can be fair, but that's, you know,

25   something that is not always the case.

1    So somebody can take an oath saying "I think I can be

2    fair," but that's when implicit bias comes in; that's when

3    media attention that is just seeping through the environment

4    here comes in.  And that actually, what the Court points out in

5    the oath, is the scariest part about this entire process,

6    because a person can come in here and say "I think I can be

7    fair," when they don't realize they can't be.  That in this

8    climate, in this environment, with this man -- which is a

9    situation that's probably never existed before.

10    So the Court can point to other cases and say:  Well,

11    these are rare.  This confluence of events I think we can all

12    say, the amount of media attention, this situation, this

13    recently in San Francisco, we can -- I think we can all

14    concede, is a unique situation.  It's not an everyday

15    picking-a-jury kind of situation.

16    **THE COURT:**  Well, I beg to differ.  We've had many,

17    many very high-profile cases that are in many ways much more

18    emotional, including the Oscar Grant case.  Where somebody was

19    killed.  And somebody was charged with murder.  And there was a

20    lot of publicity.  There was a trial in that case, an earlier

21    trial.  And, and, and I firmly believe that those who survived

22    voir dire and took an oath and said they may have heard about

23    it, were able to put that aside, and base their ruling on the

24    evidence.

25    And so I don't think this is so unique that it's never

1    been done in history, and I'm not going to comment much about
2    the *Elizabeth Holmes* case because that is still pending, but I
3    don't know if there is any less publicity there than here.   And
4    there are many other cases like that.   So, I don't think this
5    is that unique.

6        I would just say this.   One of the reasons why we do
7    written questionnaires is, in my experience -- and I think the
8    studies show this -- people are more forthcoming in
9    questionnaires than they are if you just ask them out of the
10   blue.   That's one reason why I try to use questionnaires in
11   large complex cases.

12       Nonetheless, even if that's the case, we are going to have
13   a chance to voir dire.   You are going to have a chance to
14   question these people.   And if stuff is brought out that causes
15   doubt about their ability to be fair, I certainly will hear
16   that, and I will take that into account.

17       It is true that implicit bias is something that resides,
18   and sometimes people are not willing to admit.   But that's
19   going to be true in every single case, whether it involves a
20   law-enforcement excessive-force case in which someone is beaten
21   or killed, or a patent case where it's a small inventor against
22   a giant corporation, or, you know, many other cases where we
23   have a foreign corporation and there's issues about potential
24   implicit bias based on nationality, et cetera, et cetera.   We
25   see this every day in this court.   Which is one reason why we

have, as part of our jury orientation, inserted a very lengthy

segment about implicit bias, and to make sure that all the

prospective jurors who see this video that is shown to

everyone, is educated.  And this topic is discussed.

And as you can see from my instructions, I'm using both

the Ninth Circuit as well as my own enhancement on the question

of implicit bias, which I now give in every case.

And so I'm not sure what more we can do.  It exists.  And

the process of oral voir dire is designed to uncover that, as

best we can.

MR. SPIRO:  The final comment, because obviously the

Court has indicated its ruling here, is in a normal situation

where I have these dynamics, one would, frankly, move to strike

a panel that has this overwhelming feelings of negativity.

I understand that the Court is going to do a subsection of

this panel.  I have concerns that even in that subsection,

public comments and the media throughout is going to be

irreversibly problematic.

But we understand the Court's ruling.  And, we understand

that the Court's going to rule that the trial proceeds and

proceeds now with no delay.

THE COURT:  That's correct.  Thank you.  I appreciate

your comments.  And I understand, you know, it is important

that we get this right.  And so I don't fault you for bringing

up the issue.  But I have taken every precaution I can think of

```
 1   to try to ensure that whoever gets -- is tried in this court,
 2   whoever has an issue before this Court, gets a fair shake.  And
 3   I think the questionnaire process in which you all participated
 4   as well as the oral voir dire is -- is -- is, in addition to
 5   what I mentioned about the instructional videos and everything
 6   else to the jury, is the best that we can do.
 7        And my assessment is that, based not only on the nature
 8   and the quantity and quality of the press reports, which I
 9   don't think rises to the level of creating that presumption,
10   even if there was a potential presumption, I think there was --
11   the actual questionnaires is where the rubber meets the road.
12   And so I base my ruling in large part upon what I've seen now
13   in the 200 questionnaires that have come back.
14        So let's talk about how we're going to proceed.  Let me
15   first ask whether you have any issue with the idea of not
16   bringing in 200 people, but bringing in maybe a pool of --
17   trying to target about 50.
18             MR. SPIRO:  No issue from the defense.
19             THE COURT:  Okay.  How can from the plaintiffs?
20             MS. TRIPODI:  No issue from plaintiffs, Your Honor.
21             THE COURT:  Okay.  So I don't know how you organized
22   it.  I've got these Excel charts here.  If we for a moment
23   focus on the people who don't say they can't serve, that is,
24   the people who can serve, and not asking to be excused for
25   travel, economic, health, childcare, other reasons, so one
```

1   thing we do is look at those.  And probably we want to look at

2   those on the big question:  Are these people who can -- that we

3   think at least seem to be able to be fair enough that they

4   could serve, or at least subject them -- have them come in so

5   we can question them?

6        I think everybody needs to be questioned, even somebody

7   who says -- I mean, a number of people say: Well, yeah, I've

8   got some views on Mr. Musk or Tesla, but I can be fair.

9   Obviously you will want a chance to voir dire them and find out

10  more and see if they really can be fair.

11       So I think anybody who says, answers no to the question

12  "Does the fact that this case involves Elon Musk and Tesla

13  prevent you from serving as a juror," they're going to come in,

14  seems to me.  And we want to hear from them.

15       And if we just look at the pool of, I think, 61 or so,

16  there's about 41 people who -- around 40 or so indicate that.

17  We may not need all of them.  It depends how we want to

18  proceed.  But that would be one way, to focus on the people who

19  are -- who are qualified in terms of time and ability.

20       And then from there, out of that 60, I think there are

21  about 40 -- there's probably about 20 who have some pretty

22  clear attitudes that -- or for one reason or another, they own

23  stock or something, that we can say:  Just don't even -- don't

24  even bother coming in.  So that's one approach.

25       Now, that means -- so one way to do that is look at that

```
1   group.  And it sort of takes things a little out of order,
2   because there's a juror number, it goes up to 190-something, I
3   think, Juror No. 198.  And then we go to the list to fill out,
4   to get the 50 after we have gone through that.  Go back through
5   the list of those who say they can't do it, and maybe look at
6   those who -- a little bit questionable whether they really
7   can't do it.  Some are more clear than others.  And, and fill
8   out the jury pool by looking at perhaps the first 10, 20, who
9   meet that test.  And also who don't indicate -- if they've said
10  they can't be fair, I suggest we not waste time bringing them
11  in.
12      So that's one way to do it.  The other way to do it is to
13  go numerically, kind of the less efficient way, but --
14          MR. SPIRO:  I like the Court's way.
15          THE COURT:  Let's do it that way.  So we know that we
16  may take some things out of order, but at least we are taking
17  the pool of jurors who say they can serve, and then we're going
18  to look at those to see which ones we want to tell,
19  nonetheless:  Don't bother coming in.
20          MR. SPIRO:  (Nods head)
21          THE COURT:  So, I don't know how your chart's arranged
22  but I'll just go through mine sort of numerically.
23      And the first one that comes up who doesn't have a
24  problem, it doesn't look like they have a problem, to me is
25  Juror No. 3, who -- What do you think of Elon Musk?  Nothing.
```

1          What do you think about Tesla?  Nothing.

2          Is there anything about this case, prevents you from

3     serving?  No.

4          Anything you would like to tell the judge?  No.

5               **MR. SPIRO:**  No issue, Your Honor.

6               **THE COURT:**  So, probably want to question him, I

7     imagine.

8               **MR. SPIRO:**  (Nods head)

9               **THE COURT:**  How about from the plaintiffs' side?

10              **MS. TRIPODI:**  We have no issues with that juror,

11    Your Honor.

12              **THE COURT:**  Okay.  So all we are deciding is where

13    they come in.  We're not seating anybody at this point.  Unless

14    you want to stipulate today; then we can save a lot of time.

15         (Laughter)

16              **THE COURT:**  No. 4, kind of similar, no comment, no

17    comment.  No.  And I'm going to put aside the vaccination.

18         Actually, do you have -- you have reviewed this; do you

19    have a position on the vaccination question?

20              **MR. SPIRO:**  Yes.  We're -- given all the other issues

21    that we have raised today, we are not in a position where we

22    can unilaterally excuse all unvaccinated jurors.

23              **THE COURT:**  All right.  So you would object.

24              **MR. SPIRO:**  (Nods head)

25              **THE COURT:**  And you don't object.

1              **MS. TRIPODI:**  We do not object, Your Honor.

2              **THE COURT:**  All right, so that will be the decision I

3    have to make.  So let's go through and see what we have got.

4    At the end of the day, we may be talking about a very small

5    pool, I suspect.

6              **MR. SPIRO:**  (Nods head)

7              **THE COURT:**  All right.  Juror No. 6, there's something

8    about had prior experience, sibling charged with fraud; we

9    don't know more about that.

10        In terms of attitudes, Teslas are expensive; I guess

11   that's -- one could also take judicial notice of that point, I

12   guess.

13        What do you think about Elon Musk?  Don't really have an

14   opinion.

15        No reason why they can't serve.

16        Any objection to at least questioning this person?

17             **MR. SPIRO:**  No issue.

18             **MS. TRIPODI:**  No issue, Your Honor.

19             **THE COURT:**  Okay.  Juror No. 7, I'm not sure whether

20   she belongs in this group or not, but she has extreme fear of

21   crowds and can't be on BART.  And says that she was shaking and

22   took an hour just to answer this question.  Seems to me, I

23   would rather not force her to come in.

24             **MR. SPIRO:**  I defer to the Court's judgment on that.

25             **THE COURT:**  Okay.

1          **MS. TRIPODI:**  Your Honor, we are fine with striking

2     Juror 7.

3          **THE COURT:**  All right.  So then there is Juror No. 20.

4     Has some experience with the law, was a witness in an ADA case,

5     auto accident.  And lots of things to say about Tesla and

6     Mr. Musk, and says -- he says he can't be fair.

7        I suggest we not bring this person in.

8          **MR. SPIRO:**  Agreed.

9          **THE COURT:**  Any objection?

10          **MS. TRIPODI:**  No, Your Honor.

11          **THE COURT:**  Okay.  24 doesn't know, no -- no

12     particular attitude.  Now, that's a question for somebody who

13     is not fully vaccinated.  I don't know, maybe that means they

14     are partially vaccinated.  If I were to apply a vaccination

15     rule, that person would be out.  Otherwise, that person would

16     come in.

17        Any -- any thoughts on this prospective juror?

18          **MS. TRIPODI:**  We are fine with 24, Your Honor.

19          **THE COURT:**  Okay.  You are, too?  Or --

20          **MR. SPIRO:**  We -- we defer to the Court's judgment.

21          **THE COURT:**  I'll put a flag on that one.

22        27.  Some choice words there.  I think his feelings are

23     pretty strong, so I would suggest we not -- we excuse this

24     juror from coming in.

25          **MR. SPIRO:**  Yes, Your Honor.

1              **THE COURT:**  Any objection to that?

2          **MS. TRIPODI:**  No objection, Your Honor.

3              **THE COURT:**  All right.  And then No. 30, no opinion,

4     no opinion, no, but not -- no, not fully vaccinated.  So that

5     is another person who's -- no vaccination.  Any thoughts, any

6     further thoughts about that person?

7          **MR. SPIRO:**  Your Honor, I mean, if we're only bringing

8     in 50 folks, then I would defer to the Court's judgment on this

9     juror.

10             **THE COURT:**  All right.  Well, let's pass that for now.

11    And let's see how many we're going to come up with.

12         No. 31.  Other than Teslas are expensive, doesn't really

13    have an opinion.  And she is vaccinated.  So any objection to

14    bringing her in?

15         **MR. SPIRO:**  No, Your Honor.

16         **MS. TRIPODI:**  No, Your Honor.

17             **THE COURT:**  All right.  No. 32.  Nice cars.

18    Fast-rising businessman, et cetera, et cetera, she says no

19    reason -- or he -- no reason to -- that they couldn't be a

20    juror.

21         So bring that person in, I take it?

22         **MR. SPIRO:**  Yes, Your Honor.

23         **MS. TRIPODI:**  Yes, Your Honor.

24             **THE COURT:**  Okay.  And 36 is a person who generally

25    likes the look and convenience of the car.  Thinks they're

overrated.  Seems to think somewhat highly of Mr. Musk.

I take it no objection to bringing that person in.

**MR. SPIRO:**  No issue.

**THE COURT:**  Okay.

**MS. TRIPODI:**  No objection, Your Honor.

**THE COURT:**  39, again, no real opinion, other than he refers to Mr. Musk as an interesting business figure, and Teslas are good cars.  But may have stock as part of an IRA index.

My understanding, certainly, the rules of judicial ethics say that if something is part of a fund, that's not a direct enough conflict.  It's not like owning shares.

So I don't think this person is disqualified just because an IRA fund may --

**MR. SPIRO:**  I agree.

**THE COURT:**  Any objection?

**MS. TRIPODI:**  No objection, Your Honor.

**THE COURT:**  Okay, we'll bring that person in.  Adrian -- I'm sorry, No. 40.  Nice-looking, but the cars, they are too expensive.  "I think he's not a very likeable person," but says no reason why they couldn't serve.

I think that person is worth questioning.

**MR. SPIRO:**  This is, Your Honor, the type of person that we don't think -- especially if we are only bringing in 50 but even without that condition, that we would bring in.  If

1   the person says to the defendant they formed enough of an

2   opinion about the defendant that they do not believe them to be

3   likeable, we don't think that juror should be brought in and

4   they risk polluting the rest of the panel, frankly.

5          THE COURT:  All right.  Comments from plaintiffs?

6          MS. TRIPODI:  Your Honor, I'm just looking at Juror

7   40's questionnaire where the juror has explicitly indicated

8   that they could be impartial.  So it is the plaintiffs'

9   position that the juror should be included in the voir dire

10  process.

11         THE COURT:  All right.  My view, some of this depends

12  on the intensity, when they say "I think he's not a very

13  likeable person," that's a very low and fairly low intensity

14  compared to some of the other comments.  And if they say they

15  can be fair, I think that person is worth questioning.

16     So --

17         MR. SPIRO:  My only comment, and final comment on this

18  juror, Your Honor, for your consideration --

19         THE COURT:  Yeah.

20         MR. SPIRO:  Is I think that there was an important

21  phrase in Your Honor's remark which is compared to some of the

22  other comments, I think if the Court takes a step back and says

23  this juror has written on the questionnaire that "Mr. Musk is

24  not likeable," that that's not -- you wouldn't in a normal case

25  continue questioning a juror that says that in essence that

```
 1    they do not like or they do not think that the defendant is
 2    likeable.
 3         THE COURT:  Well, there's a difference between saying
 4    "I don't think this is a truthful person, I think this
 5    person's..."  they could be not like -- that could be an
 6    objective statement of fact that a lot of people don't seem to
 7    like him, or, you know, some people -- they say a candidate for
 8    office is not very likeable, but they vote for them.  So
 9    likeability is not at the core.  And given the "I think," this
10    one's a very low-intensity one.  So I'm going to bring this
11    person in, and we can question this person.
12         41.  Mixed opinions.  "I think he's very intelligent, but
13    some of his business decisions have not been rational."  They
14    also have a compromised immunity system because of cancer
15    treatment, so there is a health concern there.
16         MR. SPIRO:  For that reason, Your Honor, I would
17    excuse this juror.
18         MS. TRIPODI:  Your Honor, we would agree to excuse
19    Juror 41.
20         THE COURT:  All right.  And then 43, again, a mix.
21    "He is a little different person with really great ideas."
22    Now, he declines to answer on the question of vaccination.  So
23    at best I put a flag on that, but I take it -- is there any
24    other objection to bringing him in?
25         MR. SPIRO:  No, Your Honor.
```

1        **MS. TRIPODI:**  No, Your Honor.

2        **THE COURT:**  Okay.  No. 46.  A long explanation,

3   essentially distinguishing the way Mr. Musk is running the

4   manufacturing of physical things, versus running the social

5   media company.

6        **MR. SPIRO:**  Your Honor, this is a juror that expressly

7   discusses his views on Musk's activities on Twitter.  And we

8   think, certainly, this is not somebody that should be brought

9   in.

10       **THE COURT:**  All right.  Comments?

11       **MS. TRIPODI:**  Your Honor, Juror No. 46 has also

12   expressed impartiality, so it would be our position that he

13   could be brought in for questioning at voir dire.

14       **THE COURT:**  Again, there is enough phraseology there

15   that it seems like a more subtle analysis.  For instance, he

16   used the word "he" -- referring to Mr. Musk -- "seems to know a

17   lot less about running a social media company."  And so

18   although some of his comments are more specific, it doesn't

19   seem to me that it's so obvious that he's not even worth

20   talking to.  So I will bring No. 46 in.

21       49.  She owns stock so I think that is disqualifying.

22   Right?

23       **MS. TRIPODI:**  Yes, Your Honor.

24       **THE COURT:**  She and her husband own stock.  So, any

25   objection to excusing 49?

1      **MR. SPIRO:**  No, Your Honor.

2      **THE COURT:**  Okay.  No. 50.  Mixed feelings.  Can

3  serve, as good and bad.  "Bit of a mercenary personality which

4  can serve both good and bad for himself and others in society,"

5  and thinks he can be fair.

6      I think he should be brought in.  Any objection?

7      **MR. SPIRO:**  We object.

8      **MS. TRIPODI:**  We do not object.

9      **THE COURT:**  All right.  I think again, it's not clear

10  enough to totally exclude him from questioning so I will bring

11  in No. 50.

12      No. 55.  Looks like this person maybe had been involved in

13  some kind of class-action suit related to stock holding, but

14  has no strong opinions.  Seems to me he's worth questioning.

15      **MS. TRIPODI:**  No objection, Your Honor.

16      **THE COURT:**  Any objection?

17      **MR. SPIRO:**  We don't believe that he's participated in

18  a class-action case like this.  He's likely to be an acceptable

19  juror.  We would submit.

20      **THE COURT:**  Okay.  All right.  I will bring him in.

21      No. 65.  "Don't know anything about him."  Talk about a

22  blank slate.  Any objection to bringing him in?

23      **MR. SPIRO:**  The number Your Honor's referring to?

24      **THE COURT:**  65.

25      **MS. TRIPODI:**  No objection from plaintiffs,

1   Your Honor.

2          **MR. SPIRO:**  No objection.

3          **THE COURT:**  All right.  67.  Positive views about the

4   car.  And refers to Mr. Smart -- I mean -- Mr. Smart --

5   Mr. Musk as "futuristic vision, smart person, don't understand

6   why he got involved with Twitter."  But, seems to me he's worth

7   bringing in.

8          **MR. SPIRO:**  No objection.

9          **MS. TRIPODI:**  No objection.

10         **THE COURT:**  Okay.  No. 69 has a long position on

11  Twitter -- I mean, on Tesla.  I think that's a problem.

12         **MR. PORRITT:**  (Nods head)

13         **MS. TRIPODI:**  Yes, Your Honor.  We object.

14         **THE COURT:**  All right.  Defendants agree?

15         **MR. SPIRO:**  No, no, Your Honor.  Although I would be

16  remiss if I didn't point out that it doesn't seem to me that

17  it's any more positive than the ones that I'm questioning on

18  the negative end.

19       This person, you know, we're dismissing people on the

20  positive end, even when they can be fair and impartial.  But

21  when they're negative, if they say they can be fair and

22  impartial, we haven't been, but the record will reflect --

23         **THE COURT:**  I'm not dismissing because of attitude;

24  it's because he's holding stock.  He's got a long position on

25  Tesla stock.  At least, that's how I interpret his answer.

1    Otherwise I would not -- I would bring him in.

2          **MR. SPIRO:**  Okay, we don't insist on him coming in.

3          **THE COURT:**  Yeah.  I think if he owns stock or in a

4    position, the financial interest is too close.

5          73.  Not unlike some of the other comments, "Impressed

6    with lifetime accomplishments, unimpressed with social media

7    presence."

8          **MR. SPIRO:**  Yes.  Again, Your Honor, this case is

9    about Mr. Musk's use on social media.  When this juror says

10   that they are unimpressed with his social media usage, again,

11   jurors use different words.  Some say "I think he is not

12   likeable," some say "unimpressed."

13         That is a very unfavorable view, and I don't see how that

14   juror can sit, and we would not bring that juror in.

15         **THE COURT:**  Okay.  Plaintiffs?

16         **MS. TRIPODI:**  Your Honor, it appears that the juror

17   has categorized his views as favorable, and has also indicated

18   that he could be impartial.  So plaintiffs do not object to

19   bringing in Juror 73.

20         **THE COURT:**  All right.  73 I think is worth examining.

21   So we'll bring 73 in.

22         79, a lot of comments about the car.  And the positive

23   aspects of that.  And, similar comments.  Brilliant,

24   groundbreaking, at least until the Twitter thing.  Not a fan of

25   the changes he's made at Twitter.  And then comments about

1  perhaps the need for government regulation of social media.

2  But he doesn't follow Musk on Twitter.

3       **MR. SPIRO:**  Your Honor, this juror, again, it's the

4  similar comment I have been making throughout, says "Most of

5  Mr. Musk's tweets are 'ill-informed.'"  It would be like a

6  juror in a questionnaire on a case about an assault saying, you

7  know, they just had a feeling that the defendant is violent.  I

8  don't believe this juror can sit.  I don't believe this juror

9  should be brought in.

10      **THE COURT:**  All right.  So, this one's a little more

11  specific.  What about -- what's the plaintiff's response?

12      **MS. TRIPODI:**  Your Honor, we don't have any objection

13  to bringing in Juror No. 79 for questioning.  The juror does

14  not appear to follow Mr. Musk on Twitter.

15      **THE COURT:**  Well, it's interesting.  In his

16  explanation about why he can be fair, he -- he reiterates or

17  iterates that "I will always follow the facts of the case and

18  only make my decision on those facts," almost tracks the

19  instruction that we give.  "I believe strongly in being

20  innocent until proven guilty."  Although that's a criminal

21  concept, at least it shows that he understands the burdens.

22      "I listen and will always follow the judge's direction."

23  Of course, that's music to judges' ears.

24      The question is do you think he can do that, or is there

25  enough of a chance that he could actually do that.  And it

1    seems to me that's exactly what voir dire is for.  We can test

2    him or you can test him and we could find out.  But he seems

3    very committed to the trial process and confining himself to

4    the facts.  So I think he's worth bringing in and examining.

5              **MR. SPIRO:**  Can I ask a question about the question,

6    Your Honor?

7              **THE COURT:**  Yeah.

8              **MR. SPIRO:**  Which is, in the voir dire process, am I

9    supposed to be asking him how one who has that view of

10   Mr. Musk's tweets can sit in a case about Mr. Musk's tweets, in

11   front of the rest of the panel?

12             **THE COURT:**  Well, we can ask generally, yes.  Unless

13   it's so inflammatory, you want to do that at sidebar or take

14   some of these individually, some you want to single out, I will

15   consider that.

16       You know, if I think that a private sidebar voir dire is

17   warranted, for fear of irrevocably tainting the pool, it's

18   something I would -- I mean, I would listen to that request.

19   Can't say for sure I would grant it, but maybe I would.

20             **MR. SPIRO:**  Yeah.  I would just reiterate my concerns

21   that by taking this -- the line, we do risk that the entire

22   panel could be polluted.  But I guess we will see what happens

23   on Tuesday.

24             **THE COURT:**  Okay.  All right.  No. 83.  Another one of

25   these, "Can't tell if he's extremely smart or completely crazy,

1    but he's politically motivated.  I don't spend much time

2    thinking about him."

3         This person worked at RVC Capital Markets.  Did talk to

4    somebody about the IPO of Tesla, but don't know any of the

5    details of that deal.  So, a bit on the sidelines of advising,

6    I guess, an investor about Tesla.  And has sort of mixed views.

7         Comments?

8              MR. SPIRO:  No issue bringing this person in.

9              MS. TRIPODI:  No objection.

10             THE COURT:  Okay.  89.  "Stable company," in referring

11   to Tesla, "with great products," and no opinion regarding

12   Mr. Musk.  So, bring that person in?

13             MR. SPIRO:  No issue.

14             THE COURT:  Okay.

15             MS. TRIPODI:  No issue.

16             THE COURT:  No. 92.  Now, this is, I think, a defense

17   point.  This is somebody who has very negative views, says that

18   Mr. Musk is a narcissist and a terrible person.  Wouldn't buy a

19   car.  And said they would try their best to be neutral, but

20   could potentially be unconsciously biased against Tesla.

21        That's good self-awareness.  And I think illustrates the

22   defendant's point.  This is a person who is aware of potential

23   bias and is indicating, I think in pretty strong terms, their

24   feelings and doubt about their ability to overcome their

25   unconscious bias.  So I'm inclined to not bring that person in.

```
 1           But if the plaintiffs feel otherwise, I'll hear your
 2   comments.
 3           MS. TRIPODI:  No, Your Honor; we're fine with it.
 4           THE COURT:  Okay.  No. 93.  That's another one that's
 5   pretty obvious.  Again, this is a nice contrast to some of the
 6   other more ambiguous and subtle comments.  This person says
 7   they can't be fair.  Thinks he's deplorable; can't trust him.
 8   So that's rather central to this case.  Central to some of the
 9   issues in this case.
10           So, I would propose that we not bring this person in.  Any
11   objection?
12           MS. TRIPODI:  No, Your Honor.
13           THE COURT:  All right.  I assume defendants agree.
14           MR. SPIRO:  We do, Your Honor.  94.  This is more of a
15   -- well, just, comment that we've heard somewhat before about
16   "I thought he was a genius before he lost" -- he says "my
17   marbles," I think he means "his marbles," but thinks he can be
18   fair.
19           But, got some health issues with family.  An 80-year-old
20   mother staying with him.  So --
21           MR. SPIRO:  The jury also notes a COVID concern.  We
22   would excuse this juror.
23           THE COURT:  Yeah.  I think given the -- it's going to
24   be hard for her to concentrate, if she's concerned about
25   catching COVID and giving it to her 80-something-year-old
```

1   mother.

2           **MS. TRIPODI:**  We agree, Your Honor.

3           **THE COURT:**  Okay.  97.  Again, well, has a close

4   friend that works at Tesla.  Feels that the cars have nice

5   design, better than other EVs, but Mr. Musk is arrogant,

6   unpredictable and irrational at times, but can be fair.

7       That same category, I think, what I would call for no

8   better -- for lack of a better term, kind of a soft negative or

9   soft -- yeah.

10          **MR. SPIRO:**  Again, the defense would object to

11  bringing this juror in.  This juror also risks polluting the

12  rest of the panel.

13      And we think that the only way one could characterize this

14  as a, quote-unquote, soft response would be in comparison to

15  other more harsh responses.  Again, I've never seen a juror sat

16  in any case that has a pre-formed specific view about the

17  defendant and his character or personality.  I've never seen

18  that before.  So I don't understand how this juror could ever

19  be sat in this trial.  And I would not bring this juror in.

20          **THE COURT:**  All right.  Comments?

21          **MS. TRIPODI:**  Your Honor, we don't have any problem

22  bringing in Juror No. 97.  The comments, opinions regarding

23  Mr. Musk were qualified by the times and the juror indicates

24  that they could be impartial, pursuant to Question 47.

25          **THE COURT:**  All right.  I think 97 is worth

1    questioning.

2        99.  Doesn't know much about Tesla, doesn't really have an

3    opinion.  However, her son works, I guess, for logistics for

4    Tesla or in logistics for Tesla.  Is that a reason to

5    disqualify this person?

6            **MS. TRIPODI:**  Plaintiffs would say yes, Your Honor.

7            **THE COURT:**  What's the defense view?

8        **MR. SPIRO:**  It -- I make the same comment I've made a

9    few times, that it strikes me that it's far, far less in the

10   other direction than the comments that we're sitting --

11   bringing jurors in for in the other direction, if they say they

12   can be fair.

13       That said, given we're only looking for 50, if the Court

14   wants to excuse this juror, we defer to the Court.

15           **THE COURT:**  What's your view about the -- the interest

16   conflict?  That's my main -- if you have a son that works for a

17   company that's a defendant, does that disqualify?

18           **MR. SPIRO:**  I don't believe -- I don't know that to be

19   a per se disqualifying condition.  But, but again, given the

20   concerns, and again, given that we are pulling 50 from 200, I

21   think it would be fine to excuse that person.

22           **THE COURT:**  All right.  Okay.  All right.  Well, then,

23   I will, just in case.

24       Now, the next person, interestingly, has a friend that

25   works at Tesla.  And I don't think that is enough.  I mean it's

1    worth bringing in.  Ends up being such a close friend, then

2    they're like a family member, and that kind of thing -- this is

3    No. 104, I'm sorry.

4           **MR. SPIRO:**  Sorry, yeah.

5           **THE COURT:**  I lost you there.  104 has a friend that

6    worked for Tesla, and, interestingly, thinks it's a good

7    company.  Thinks Mr. Musk is eccentric and speaks his mind.

8    Which is not necessarily a negative.  Some people view that as

9    a positive.

10      Seems to me that person's worth bringing in.

11          **MS. TRIPODI:**  No objection, Your Honor.

12          **MR. SPIRO:**  No objection.

13          **THE COURT:**  Okay.  110.  Likes the car.  Does not know

14   Mr. Musk.  "He does not have a positive image in the news."

15   That is an objective statement, not a subjective statement,

16   seems to me.

17      So it seems like that person's worth asking questions to

18   see whether that news may have affected her in some way.

19          **MS. TRIPODI:**  We agree, Your Honor.

20          **MR. SPIRO:**  We have the same concerns.  But

21   comparatively, and given the Court's prior indications, we

22   understand that the Court's likely to include this juror.

23          **THE COURT:**  Okay.  116 has a negative view.  Thinks of

24   him as the next Trump.  "His wealth has created delusional

25   narcissist, and I worry his impact -- about the impact he has

1    on society."  Although he says "No, I can be fair," on the

2    scale of things, this one seems to me a lot more certain and

3    more -- higher on that scale that I mentioned.

4        So do the plaintiffs have any objection to not bringing

5    this person in?

6        **MS. TRIPODI:**  We'll defer to the Court on 116,

7    Your Honor.

8        **THE COURT:**  All right, I'm going to not bring that

9    person in.  We will excuse that person.

10       118.

11       Well, "Wouldn't buy a car, I don't like him."  But says he

12   can be fair.  And then goes on to say "I believe the jury

13   process is an important part of our jury system."  Said they

14   can be fair.

15       **MR. SPIRO:**  Yes, Your Honor.  I'm going to say the

16   same thing.  And I know it may seem like a broken record, but I

17   think the record here is important.  I respect the jury system,

18   also.  I'm not a biased person, but I shouldn't sit on a jury

19   of someone I don't like.  This person is saying "I don't like

20   him."

21       As Your Honor pointed out during the venue transfer

22   motion, this is a huge district.  We've got 200 people here.  I

23   do not understand why we would even attempt to sit a juror who

24   has told us in writing that they do not like the defendant.

25       **THE COURT:**  All right.  Comments?

1      **MS. TRIPODI:**  Your Honor, it is our position you don't

2   need to like someone to be able to treat them fairly at trial.

3   The juror has indicated pursuant to the question, that they can

4   be impartial, and has further made comments about the

5   importance of the judicial system.  So plaintiffs move to keep

6   Juror 118.

7      **THE COURT:**  All right.  I'm going to bring that person

8   in.  And it may be that we excuse that person for cause, once

9   we explore a little more.  But liking is not necessarily the

10   same as distrusting, and -- and so I do think that's worth some

11   inquiry.

12      121, this person owns five shares.  And I think that's

13   enough to say you can't serve.  So, what, if there's any --

14   without objection, I will excuse 121?

15      **MS. TRIPODI:**  No objection, Your Honor.

16      **THE COURT:**  Okay.  No objection from the defense, I

17   assume?

18      **MR. SPIRO:**  No.

19      **THE COURT:**  Okay.  124.  There is an issue about his

20   comments.  He says "He sucks."  In any event, says he just had

21   a scheduled vacation starting February -- well, February 25th

22   is not a problem.  Right?  This case will be over before then.

23      So the question, again, what do you make of this two-word

24   response?

25      **MR. SPIRO:**  I'll repeat the same comments that I've

made several times today.  You cannot sit a juror like that in

a federal securities fraud trial.  And we would ask that he not

be brought in.

    **MS. TRIPODI:**  Your Honor, while the commentary is

colorful, the juror has indicated that he can remain impartial.

So we are not opposed to bringing Juror 124 in.

    **THE COURT:**  All right.  Again, since this is just

qualifying for voir dire, not -- this person may not survive,

but it's worth the inquiry.

    125.  Long explanation about treating employees, the way

employees are treated, poor decisions at Twitter, which is its

side issue.  And giving him credit for his ambitiousness and

success in advancing the electric car and private space

industry in the U.S.

    So, a rather nuanced view.  There are obviously some

negatives there.  But says they can be fair.

    **MR. SPIRO:**  Yes, Your Honor.  Again, the defense is

very concerned about the -- saying in the questionnaire that

they could be fair, given the type of comments we're seeing.

And we're concerned that if these type of statements -- that --

that the Court may be answering ultimately the wrong question.

Because if we're saying we'll deal with cause later,

essentially, as to people that are this clear in their views,

then we don't understand -- I don't, frankly, understand what's

going to happen at the next level.  Right?

1          So the juror comes in, says -- just to use the last

2     example, "Mr. Musk sucks," or "I don't like him," and then they

3     just reiterate this -- and everybody thinks they can be fair,

4     says "I can be fair."  I don't understand how we could sit such

5     a juror, so I'm having a hard time a bit with the process.

6          But as to this specific juror, he -- he -- he, again, is

7     speaking directly on pre-formed views of issues that are

8     directly relevant in this case.  I don't understand how we

9     could ever sit a juror such as that.

10         "He's prone to making controversial and irresponsible

11    public statements and rash decisions."

12         **THE COURT:**  But he may be referring to what has

13    happened at Twitter, alone, where he's got very positive views

14    of what happened at Tesla.  So it's not the same issue.  There

15    may be some overlap in terms of the character assessment that

16    you have raised, but he's not saying, um -- you know -- the

17    question is and the whole point of voir dire is you will be

18    able to probe that, and what his views are, and I have to make

19    an assessment.

20         When a person says "Yeah, Judge, I believe I can be fair,"

21    I don't have to believe that person.  I can always say "Well,

22    given the depth of what you said, I have too much doubt that

23    you really can be."  So I'll make that judgment, and I'm going

24    to take into account these things.

25         But it seems to me, you know, he's making a comment about

1    poor decisions made at Twitter, and disagrees with some of the

2    policy decisions made at Twitter.  That doesn't necessarily

3    mean this person can't judge whether or not Mr. Musk had a

4    particular state of mind when he made the statement about Tesla

5    stock.

6            **MR. SPIRO:**  I most respectfully do not agree with the

7    Court.  I don't understand how one could question these things

8    in voir dire without polluting the panel.  I don't --

9            **THE COURT:**  Well, that is a second question.  And it

10   may be, in a case like this, we do a different voir dire

11   process.

12           **MR. SPIRO:**  So even moving that to the side, I still

13   do not understand what the Court is suggesting in their second

14   step of analysis on the day of jury selection.  The Court seems

15   to be suggesting, and, and -- that because the person says "I

16   can be fair," the Court has to presume that that is --

17           **THE COURT:**  No, I didn't say that.  I just said if

18   they say they can be fair and the comments are ambiguous enough

19   that -- they are not unambiguous where it is totally

20   disqualifying on its face, we should not bother even bringing

21   the person in.

22        One, the person comes in.  Step 2 is you will have the

23   chance to thoroughly ask this question.  Perhaps we do this in

24   camera or sidebar, or we do a different process, and I have to

25   make a judgment.

1      You know, the person may say "You know what?"  And this

2   has happened, you know.  "Now that I think about it, maybe I'm

3   not the right person for this.  Maybe I can't be fair."

4   There's a dynamic process.  And I'm sure you understand that.

5   That's the point of voir dire.  And, I have to make a decision.

6      So even if the person, after you voir dire him and you

7   uncover that these are pretty deeply-held attitudes that are

8   pretty intense, that they may spill over into this, and the

9   person still professes:  Well, I can still be fair, I might

10  make a judgment that:  I'm sorry, I'm not convinced that you

11  can be fair.  See you in the next case.

12      That's this next step.

13      **MR. SPIRO:**  I understand that, Your Honor.  I just

14  can't solve for the concept of a person saying "I don't like

15  the defendant, he sucks, but I can be fair."  I don't

16  understand how that juror could ever sit.

17      That being said, as to this specific juror on specific

18  statements that we don't think rise to this -- this issue of

19  are they ambiguous, this juror says, not about any specific

20  company or not, "I also think that he is prone to making

21  controversial and irresponsible public statements and rash

22  decisions."  That is an issue in this case.  And we do not

23  believe a juror that has that view of the defendant should ever

24  sit in a securities fraud lawsuit.

25      We don't believe that -- to my knowledge, a juror that has

1   that view doesn't -- has never set in a securities fraud trial.

2        THE COURT:  Let me ask plaintiffs.  This one gets

3   closer to home.  Making rash statements, making irresponsible

4   public and rash decisions, doesn't seem to be confined

5   necessarily to one entity or another.

6        Doesn't that get close to the issue as opposed to just

7   general, you know, "I don't like him"?

8        MS. TRIPODI:  Well, I would agree, Your Honor, that it

9   may get close to the issue here in the case.  The particular

10  juror also expresses positive sentiments regarding Musk's

11  ambition, his entrepreneurialship.  And I think that goes to

12  Tesla here.  We're talking about Tesla, the company, a decision

13  here for potentially going private.  So we would not say that

14  125 is disqualified.

15       THE COURT:  All right.  I'm going to excuse this

16  person, because I think that's different from saying "I don't

17  like the person."  You can not like the person, but still

18  believe what they say.  But if you come with a preconceived

19  view that this person is prone to making irresponsible public

20  statements and rash decisions, that is getting close.  And

21  given the number of people we have here, I don't think there's

22  need to bring this person in.

23       127, any objection?

24       MS. TRIPODI:  No objection from plaintiff.

25       THE COURT:  This person has no comments.  No opinions.

1    So --

2              **MR. SPIRO:**  I was just simply looking at the hardship

3    piece of it.

4              **THE COURT:**  Yeah.

5              **MR. SPIRO:**  The Court's in a better position to judge

6    the childcare concern.

7              **THE COURT:**  Yeah, let me look at that.  Childcare's

8    always one of those -- it's tricky because I find that upon

9    probing, sometimes people say they don't have an alternative,

10   you know, sometimes there is, there's carpooling, there's

11   somebody else.

12       Let me see exactly what --

13       (The Court examines document)

14             **THE COURT:**  I think it's worth asking this person to

15   come in.  So I will bring in 127.

16       Let's see, 130.  Says they can't be fair.  And on top of

17   that, she's got some healthcare -- serious healthcare problems.

18   So I propose we excuse No. 130.

19             **MS. TRIPODI:**  No objection, Your Honor.

20             **THE COURT:**  All right.  Any objection?

21             **MR. SPIRO:**  No, Your Honor.

22             **THE COURT:**  All right.  131 has two very close friends

23   that worked previously, I guess, at Tesla.  But thinks the

24   car's overrated and Mr. Musk is overrated.  But, feels they can

25   be a fair juror in this case.  Any objection to having that

1  person come in?

2            **MS. TRIPODI:**  No objection, Your Honor.

3            **MR. SPIRO:**  Your Honor, even for a juror like this, I

4  don't -- I think that the voir dire process is going to descend

5  into a question of Mr. Musk's -- you know, judgments about him

6  generally.  And I don't know why we would risk that and risk an

7  impartial -- a partial juror.  So I wouldn't bring in a lot of

8  the jurors that we are bringing in, including this one.  But I

9  understand the Court's prior rulings.

10           **THE COURT:**  Okay, we'll bring that person in.  No.

11  133, very strong feelings and says they can't be fair.  Seems

12  to like neither the cars nor Mr. Musk.  So I propose we excuse

13  that person.

14           **MS. TRIPODI:**  No objection, Your Honor.

15           **THE COURT:**  Okay, 135 owns stock, looks like.

16           **MR. SPIRO:**  Yes, Your Honor, based on the Court's

17  prior determinations, that person should be removed.

18           **THE COURT:**  Okay.

19           **MS. TRIPODI:**  We concur.

20           **THE COURT:**  All right.  149.  Fairly strong views.

21  Prior views about him being forward-thinking, but has been

22  essentially corrupted, and losing his grip on reality,

23  et cetera, et cetera.  So, says they can't be fair.  I think

24  that person should be excused.

25       Anybody disagree?

1          **MR. SPIRO:**  We don't believe this juror should be

2     brought in.

3          **THE COURT:**  Okay.  Plaintiffs agree?

4          **MS. TRIPODI:**  We concur.

5          **THE COURT:**  Okay.  We're going to excuse that person.

6        155 seems to have a positive view of Mr. Musk and can be

7     fair.  But bought and sold some stocks in 2021, within a

8     two-month period.  Is there any reason why that should

9     disqualify this person?

10         **MS. TRIPODI:**  Your Honor, we would say because he was

11    a prior stock owner, yes.

12         **THE COURT:**  But this stock is not within the class

13    period.  Correct?

14         **MS. TRIPODI:**  Correct.

15      (Off-the-Record discussion between counsel)

16         **MR. SPIRO:**  Yeah, I don't think -- if you are during

17    the class period and a current holder I don't think that

18    disqualifies you.  So, I don't think they should be excused.

19         **THE COURT:**  This person is not affected.  They are

20    outside the class period, correct?  And the fact that they

21    don't own current stock means they don't have skin in the game,

22    so I don't know why that would disqualify somebody.

23         **MS. TRIPODI:**  Your Honor, he previously traded in

24    Tesla stock, and likely made money.  So it is our position that

25    he should be qualified, based on that.

1      **MR. SPIRO:**  I mean, while I would agree that the

2   stockholders of Tesla have done very well I don't know that we

3   know exactly what the plaintiff is claiming.  We don't know

4   that from this.  So, I don't think there's a reason to excuse

5   this juror.

6      **THE COURT:**  All right.  I'm going to bring that person

7   in.  I don't see an obvious reason.  They are not a current

8   stockholder -- they last owned stock two-and-a-half-years ago

9   and they owned it for a short period of time and not in any

10  period affected by this case.  So I don't really see a

11  disqualifying fact there.

12      156.  A little uncertain about funds having invested in

13  stock, but that would not disqualify this person.  She says

14  she's admired the cars.  "I am not a fan."  That's all she

15  says.  So that, I put in that soft category.  And she says she

16  can be fair.  But I'm not sure I understand this comment about

17  concern about retaliation.

18      **MR. SPIRO:**  Given that comment, and the fact that they

19  don't like -- they decided they don't like the defendant, I

20  don't think that the juror should be sitting in judgment of the

21  defendant.

22      **THE COURT:**  I'm not sure I understand what it is.  But

23  she -- she believes that Mr. Musk is capable of engaging in

24  retaliation.  And she's concerned about retaliation.  I don't

25  know if she means concern about herself or concern -- but that

1   seems fairly central here.  So I, I think that this person is

2   not worth bringing in.

3          **MS. TRIPODI:**  Your Honor, I'm unclear as to what the

4   retaliation aspect of her comment is.  She does indicate that

5   she thinks she could be impartial.  So I would not be opposed

6   to bringing her in.  But I will defer to the Court.

7          **THE COURT:**  Okay.  Well, I'm going to excuse her.  I

8   think we have enough people.  I think her concerns are intense

9   enough that -- that I think they would be problematic here.

10      157.  Don't have strong opinions, likes the cars.  Was

11  involved in a personal injury lawsuit; that's her experience

12  with the legal system.  Or his, actually.

13      So, any objection to bringing this person in?

14         **MS. TRIPODI:**  No objection to 157.

15         **MR. SPIRO:**  No objection, Your Honor.

16         **THE COURT:**  All right.  No. 60 --

17         **MS. TRIPODI:**  160, Your Honor?

18         **THE COURT:**  1-6-0 is the next one I have.  Has a

19  pretty negative view and says they can't be fair.  Although he

20  doesn't know the facts or she doesn't know the facts, she's

21  already predisposed, so I think that person's not worth

22  bringing in.

23      (Reporter clarification)

24         **THE COURT:**  They cannot be fair.  So any objection to

25  excusing No. 160?

1          **MR. SPIRO:**  No, Your Honor.

2          **MS. TRIPODI:**  No, we defer to the Court.

3          **THE COURT:**  Okay.  165?  Neutral about the company.

4    Thinks he's innovative, not afraid to take big chances.  "I'm

5    not sure he's a nice person," but thinks he can be fair.  It's

6    about as soft as --

7          **MS. TRIPODI:**  No objection.

8          **THE COURT:**  -- a negative comment can be.  So no

9    objection from the plaintiffs?

10          **MS. TRIPODI:**  No objection.

11          **THE COURT:**  How about from the defense?

12          **MR. SPIRO:**  Your Honor, while this one is not as

13    extreme as many of the others that we have kept, I again don't

14    understand why we would sit jurors that have any preformed

15    negative or positive opinions that have to do with Mr. Musk's

16    sort of character or likability.

17          That being said, given the Court's prior determinations on

18    more extreme cases, we assume that this juror's coming in.

19          **THE COURT:**  All right.

20          (Off-the-Record discussion between the Court and Clerk)

21          **THE COURT:**  All right.  So the word from the jury

22    office is 165 just had a medical emergency.  The husband's in

23    the hospital.  So, that sort of answers that question.  I think

24    we will have to excuse No. 165.

25          All right.  No. 168, simply says the cars are

1   well-designed, and describes Mr. Musk as "controversial,

2   wealthy businessman."  That seems pretty innocuous.

3        **MS. TRIPODI:**  No objection from plaintiff.

4      (Off-the-Record discussion between counsel)

5        **THE COURT:**  Any objection from the defense?

6        **MR. SPIRO:**  Just a moment, Your Honor.

7   No, Your Honor.

8        **THE COURT:**  Okay.  So that's -- No. 168 is coming in.

9        169, describes Mr. Musk as "a busy man with a vision."

10  And thinks they can be fair.  Did own stock years ago, but sold

11  it after holding it for two years, doubling his investment.  No

12  indication whether that was during -- unlikely, but it's

13  possible that it was somehow during the class period.  I think

14  that is worth inquiring, if the person can remember.  But if

15  it's not within the class period, I don't see why that person,

16  at least, is not worth looking at.

17      He may be questioned about whether that makes his view of

18  Tesla so positive that he can't be fair to the plaintiffs, but

19  I don't think it's disqualifying, on its face.

20        **MS. TRIPODI:**  We agree, Your Honor.  We can question

21  about that.

22        **THE COURT:**  All right.  I take it defendants have no

23  objection to bringing this person in?

24        **MR. SPIRO:**  No issue, Your Honor.

25        **THE COURT:**  Okay.  170 is a person who -- disappointed

1    about his handling of Twitter, and says "Can't be fair -- put

2    "Yes," but says "Depends.  I have a low opinion of the man, but

3    I think I could pay attention to the facts."

4         So there's some equivocation there.  But, his first

5    instinct is to say he cannot be fair.  But there's a

6    possibility that he could be fair.

7         And I think under these circumstances, I would be inclined

8    to excuse this person.

9              MS. TRIPODI:  Plaintiffs are fine with that.

10             THE COURT:  I take it defense agrees?

11             MR. SPIRO:  Yes, Your Honor.

12             THE COURT:  Okay.  175, again, sort of disappointment

13   in his handling of Twitter and how he's handled the takeover

14   and treated people who work there.  But feels he could be fair.

15   Does like the car, and, and, and Tesla.  So, but says they can

16   be fair.

17        Kind of the same category, I take it.  That you object --

18             MR. SPIRO:  We object.  And just, I said this earlier

19   during the venue motion, and once, briefly, but I want to say

20   it again, and perhaps more clearly, that we don't view jurors

21   that like the car or think that he is a successful businessman

22   as -- and then have negative views of him personally as jurors

23   that have ambiguous views.  So we would not include this juror

24   in a panel.

25             THE COURT:  And plaintiffs?

1          MS. TRIPODI:  We would keep Juror 175, Your Honor.

2          THE COURT:  All right.  I'm going to bring that person

3   in for questioning.

4       No. 178, don't have much of an opinion, very neutral

5   towards him.  No objection, I take it, to bringing this person

6   in?

7          MR. SPIRO:  No objection.

8          THE COURT:  Okay.

9          MS. TRIPODI:  No objection.

10         THE COURT:  All right.  185.  "Own a few stock in

11  Tesla."  I think even one share is a problem, theoretically.

12  So I think that person cannot serve.

13         MS. TRIPODI:  We agree, Your Honor.

14         THE COURT:  All right.  I'm going to exclude that --

15  any objection to excluding him?

16         MR. SPIRO:  No, based on the Court's prior rulings.

17         THE COURT:  Okay.  186, "Brilliant visionary

18  struggling with his people management, and maybe his ego.  I'm

19  impressed with Tesla, concerned about Twitter."  And then goes

20  on to say they can be fair.  "I believe in the jury system in

21  the United States, honored to serve.  Having served on a

22  Federal Court case in the past I found the case and the process

23  interesting."  So they've been a juror in Federal Court,

24  understands, I assume, the oath and the responsibility.

25      Again, I would say sort of the low-level -- you call it

1  negative, but it's the soft negative.  So you will continue to

2  voice the same view you have?

3       **MR. SPIRO:**  No, this juror, I can understand the Court

4  bringing this juror in.  It's the ones that say, flat-out, "I

5  don't like him" that I have an issue with.

6       **THE COURT:**  All right.

7       **MS. TRIPODI:**  Your Honor we have no issue.

8       **THE COURT:**  All right.  189 owns Tesla stock.  So I

9  guess that ends that discussion.

10     190.  Okay.  So, again, this is a fairly subtle view.

11 "Clearly a really bright fellow.  Not certain that his purchase

12 of Twitter was totally thought through carefully.  My opinion

13 of him would not prevent me from serving on the jury.  I'm

14 open-minded both about Musk in general and when on the jury."

15     So they are professing their commitment and that they can

16 be open-minded.  And, again, expressing concern about the

17 purchase of Twitter, but nothing more specific about him as a

18 character.

19      **MR. SPIRO:**  That would not be a juror that we would be

20 concerned with bringing into the panel.

21      **THE COURT:**  Okay?

22      **MS. TRIPODI:**  We are fine with that, Your Honor.

23      **THE COURT:**  Okay.  192.  "I think highly of Mr. Musk

24 as an innovator."  Says he can be fair.  Any objection?

25      **MR. SPIRO:**  No, Your Honor.

1             **MS. TRIPODI:**  No objection, Your Honor.

2             **THE COURT:**  Okay.  And then 196.  "I think it's great

3     he is so successful but is definitely addicted to power."  But

4     says they can be fair.  So again, that doesn't necessarily

5     touch on their views of his honesty or his ability to tell the

6     truth or untruth.

7             **MR. SPIRO:**  Yes, Your Honor.  It's the same comment

8     I've made before, that if you have a strong view about his

9     character or any preformed view that is negative about his

10    character, I don't know why in seeking an impartial jury in a

11    matter of this importance, you would sit such a juror.  So we

12    would object.

13            **THE COURT:**  Okay.  Plaintiffs?

14            **MS. TRIPODI:**  It is our position that she's expressed

15    a view that she could be impartial, and so she should be

16    brought in.

17            **THE COURT:**  All right.  So at this point, let me visit

18    the question of vaccination.  There were three people so far

19    who, out of this whole group, who I intend to bring in but are

20    not vaccinated.  I don't know if your count is different from

21    mine, but I flagged the ones.

22        They are No. 24, who doesn't have a view one way or the

23    other about Mr. Musk or Tesla.  There is 30, who has no opinion

24    one way or the other about Tesla.  And then there is 43, who

25    says he's a little different with really great ideas.  So at

1  least on the question of honesty we can't tell what -- what

2  their views are.

3       **MR. SPIRO:**  Well, 43 is a decline to answer

4  vaccination status?

5       **THE COURT:**  Yeah, right.  And I'm treating decline as

6  not vaccinated.  So I'll say that.  Because the idea, as I

7  mentioned to you, is if we're going to do this and if I make

8  the decision to excuse those who are not at least vaccinated,

9  if not boosted, is that it gives the jury who is selected a

10  sense of some public health protection and confidence and

11  comfort.  It goes a long ways when I can rattle off all the

12  things that we have done, including vaccination.  If they

13  decline to state, then I can't make that representation.  And

14  so I treat decline to state, when I've done this, as the same

15  as not being fully vaccinated.  So if I did decide to excuse, I

16  would excuse all those who are either not vaccinated or decline

17  to state.

18       And in this case, out of the 40 or so -- I haven't made a

19  count -- there are three.  And in terms of the attitude issue,

20  these are the sort of no-opinion folks.  In terms of looking at

21  diversity issues, one is African-American, one is multiracial,

22  and one is Caucasian.  So --

23       **MR. SPIRO:**  What I would say to the Court, with no

24  prejudice to taking a different position depending on how the

25  first attempted jury selection goes, is that, again, I have

1    concerns that of the 40 or so, at least a third of them can't

2    possibly, no matter what they say after they've said what

3    they've said, sit on this jury for this man.

4         That said, the two that have stated affirmatively that

5    they are unvaccinated, given that it's a small percentage, and

6    given we're just talking about the four corners of this

7    selection process, I'm fine with excusing those two.

8         I don't want to and the defense is not consenting to folks

9    that decline to answer that question.  I would be willing to

10   revisit that, --

11             THE COURT:  Okay.

12             MR. SPIRO:  -- perhaps, but not at this time.

13             THE COURT:  Any comments at this time?

14             MS. TRIPODI:  Your Honor, obviously, the two that are

15   unvaccinated, we would move to excuse from the jury.  But given

16   that the one person -- it's one person that has declined to

17   state the vaccination status, in considering the safety and

18   concern felt by the other potential jurors, we would want the

19   juror who has indicated that they decline to say their status

20   excused.

21             THE COURT:  Okay.  Well, let's do this.  I have your

22   views.  I think it might be worth going through the other pile

23   a little bit, and see how deep we get into that, and then get a

24   total picture of what the vaccination situation is.

25         I'm still inclined, because so far I don't see an effect,

1    at least one that rises to a constitutional effect in terms of

2    a cross-section along demographic lines, at least so far.  I

3    also don't see a -- although it's not a -- attitudes and

4    philosophies is not a distinct community within the meaning of

5    the Sixth Amendment cross-section requirement.

6        In the interest of trying to get a fair jury, I think I am

7    also looking at, you know, if we did this would we tend to

8    exclude those who are sympathetic to one side or the other, and

9    so far I'm not seeing much.  So let's go a little deeper.

10       But so far, the people we are bringing in, just so we have

11   our -- is No. 1, okay, No. 1 -- I'm sorry, No. 3, No. 2, No. 3,

12   -- I'm sorry.  No. 3, 4, and 6 -- look at my other numbers

13   here.  I'm going to leave out the vaccinated people for now.

14   Unvaccinated people.  No. 31, No. 32, No. 36, 39, No. 40,

15   No. 46, No. 40- -- oh, no.  No. 50, No. 55, No. 65, No. 67,

16   No. 73, No. 79, No. 83, No. 89, No. 97, No. 104, No. 110,

17   No. 118, No. 124, No. 127, No. 131, No. 155, No. 157, No. 34,

18   Number -- I'm sorry, 168, and 169, 175, 178, 38 -- no, I'm

19   sorry, 186, 190, 192, and 196.

20       Does everybody have that agreement?  The numbers I've

21   identified?

22           **MR. SPIRO:**  Yes, we believe that's correct.

23           **THE COURT:**  So excluding -- if I didn't bring in the

24   unvaccinated or decline to state, that's one, two, three, four,

25   five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17,

```
 1    18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33
 2    -- that's 34, not including the vaccination issue.  30 -- what
 3    did I say?  What, 30 --
 4               THE COURTROOM DEPUTY:  34.
 5               THE COURT:  Thirty-four, plus the three.  So it would
 6    be -- we assume there's 34, so we will maybe add 16 more as a
 7    base to get to our 50 from the next group?  That's one way to
 8    proceed.
 9         So my suggestion is we just start looking at the ones
10    where perhaps their hardships are worth inquiring into, and
11    they don't have a disqualifying philosophical issue.  See if we
12    can find another 16 of those?
13               MR. SPIRO:  That's fine, Your Honor.
14               THE COURT:  Okay.  Why don't we do that.
15               MR. SPIRO:  Is it worth the parties conferring on
16    whether or not, in their own lists, they know of a certain way
17    to make that process simpler?  And take a brief --
18               THE COURT:  Yeah, we could do that.  I'm happy to do
19    that.  We could just agree to take this first group, and
20    stipulate to your nine.  That would be another way to do it.
21         I mean, you do it -- whatever makes this efficient.  So if
22    we are going to proceed this way, that make some sense.  That
23    will give me a few minutes to look at these.  And I started
24    circling somewhere, I thought:  Well, their hardship sounds
25    like a problem but maybe from further inquiry, you know, we
```

```
 1   have them come in.
 2           MR. SPIRO:  Well, that's another way, Your Honor.  Let
 3   us confer.
 4           THE COURT:  Why don't you confer.  Why don't we go
 5   ahead and take a break anyway, a 15-minute break or so.
 6           MR. SPIRO:  That'll be good.
 7           MS. TRIPODI:  Thank Your Honor.
 8           THE COURT:  Thanks.
 9           THE COURTROOM DEPUTY:  Court is in recess.
10       (Recess taken from 10:35 a.m. to 10:59 a.m.)
11           THE CLERK:  All rise.  Court is back in session.
12           THE COURT:  Well, have a seat by the way.  Sorry.
13   Didn't realize you all were standing.
14       Okay, back in session?  Are we on?  Vicky?  Are we all
15   right?
16           THE COURTROOM DEPUTY:  Court is reconvened.
17           MR. ROSSMAN:  Seems that folks are filtering in,
18   Your Honor.
19           THE COURT:  All right.  Anything to report in your
20   meet-and-confer?
21           MS. TRIPODI:  Your Honor, I think there were -- we
22   didn't make very much progress, but I think there were three
23   candidates early on that both plaintiff and defendant can agree
24   on.
25           THE COURT:  Okay.  Which ones are those?
```

1          **MS. TRIPODI:**  Those numbers were 8 --

2          **THE COURT:**  Hold on.  No. 8.  That's the one whose

3    mother passed away and now the father -- is that the one?  Lung

4    cancer?

5          **MR. SPIRO:**  Yes, Your Honor.

6          **THE COURT:**  Okay.  And maybe going back, but it's not

7    clear when, I think is the thought she -- she's still applying

8    for the visa, this case will be done before that eventuality?

9    That --

10          **MR. SPIRO:**  That was -- that was the quick-study

11    thinking, Your Honor.

12          **THE COURT:**  Yeah, okay.  All right.  I think that's

13    certainly worth asking, and see, at most she would delay her

14    trip by a week or something, maybe.

15       Okay, and which other one?

16          **MS. TRIPODI:**  We have 9.

17          **MR. SPIRO:**  Yeah.  Again, Your Honor, this is the

18    defense, we wouldn't include jurors that make statements such

19    as this, regarding Mr. Musk.

20       It was more a comment on the hardship issues.

21          **THE COURT:**  I see, you still object because he -- he

22    or she uses the word "buffoon," I guess, in describing

23    Mr. Musk?  Is that the one?

24          **MR. SPIRO:**  Yes, Your Honor.

25          **THE COURT:**  So the hardship there is coming down from

1   NorthBay, Rohnert Park.  There is, there is public
2   transportation, there is the SMART Train.  Although, it is a
3   multi-legged trip.  You have to get to the train, and the train
4   gets you down to Larkspur, and then you have to take the ferry
5   or the bus to San Francisco.  So it's probably a three-tiered
6   trip.
7       Well, all right.  Let me think about that.
8       And there's a third?
9          MS. TRIPODI:  I think we were agreed on 13, is that
10  correct?
11         MR. SPIRO:  Yes, Your Honor.
12         THE COURT:  Okay.  So we don't know much more other
13  than they say they have to pay their bills.
14         MR. SPIRO:  Yes, Your Honor.
15         THE COURT:  I guess that's worth -- and I have that
16  person circled, because I don't know -- you know, a lot of
17  times -- I do find, depending on the job, because we have sort
18  of a half-day, some people can still take care of a lot in --
19  after 2:00.  This person is a community facilitator.  I'm not
20  sure what that is, exactly.  But in any event, we can find out
21  more.
22      All right.  So those are the three that you have
23  identified?
24         MS. TRIPODI:  Yes, Your Honor.
25         THE COURT:  Okay.

1          MS. TRIPODI:  Actually, we have some that we have not

2     conferred with defendants about.

3          THE COURT:  Yeah, so why don't we do that.  Let's take

4     the first -- go by tens, if anybody wants to bring up potential

5     candidates who we think whose hardships are not so blatant that

6     we can just say don't bother, if you can -- anybody, 1 through

7     10 that we haven't already discussed, let me know.  Then I'll

8     go to the next ten.  And if I find I have some people too, I'll

9     bring it up.

10          But 1 through 10, anybody -- anybody want to bring up a

11     candidate there?  No?

12          MR. SPIRO:  Just a moment, Your Honor.

13          (Off-the-Record discussion between counsel)

14          MR. SPIRO:  Juror No. 2, I --

15          THE COURT:  She's the one who said she can't be fair.

16          MR. SPIRO:  I see.  That's not on --

17          THE COURT:  I assume -- you know.

18          MR. SPIRO:  No, I think we have got enough, we have

19     got enough of those.

20          THE COURT:  All right.  Any others, through 1 through

21     10, that anybody wants to visit?

22          MS. TRIPODI:  No. 10, Your Honor?

23          THE COURT:  No. 10.  Okay.  Childcare and -- only has

24     childcare until 2:00.  She lives in San Francisco.  Of course,

25     she is also one of the ones that says she can't be fair.  So we

1    -- she's got a number of hurdles for her.

2         And what's your thinking?

3         **MS. TRIPODI:**  Oh Your Honor, I apologize.  In the

4    spreadsheet that I was looking at, the Question 47 was actually

5    blank.  So that might be my mistake.

6         **THE COURT:**  All right.  So I'm not -- she's got enough

7    problems.  If it was just the one, I may be, but she's got both

8    -- I'll call it philosophical issues as well as hardship issues

9    there.

10        If there's nobody else, let's got to the next group, see

11   if -- 11 through 20, besides No. 13?  There's one here that

12   says -- No. 17 just simply says "My wife is handicapped."  This

13   is a person from Castro Valley, office, head clerk, works with

14   Kaiser.  Doesn't have an opinion on -- with respect to

15   Mr. Musk.

16        I had circled her -- him, I think it's a him -- to find

17   out a little bit more about whether he's a sole caregiver or

18   what -- I didn't see much more explanation.  So I would

19   nominate No. 17.

20        **MR. SPIRO:**  Yes, Your Honor.  I interpreted, given his

21   age and the comment, that it likely was a hardship, the way --

22   again, I combined those two variables, to think it was a

23   hardship.  Not to force the gentleman in, but --

24        **THE COURT:**  Well, let me see.

25        Well, actually, 76 does qualify -- if somebody, I think

1    under our rules, if they ask to be excused, that's generally

2    70, over 75, they do.  So I think you're right.  So we should

3    not ask -- force that person to come in.

4        There's No. 19.  A general manager, says "No one to

5    replace my position at work."   And we can only have so many

6    general managers, I guess, but the question is -- also the wife

7    is not vaccinated, so that is a concern.  And, did check "yes"

8    about mixed feelings.

9        So although I thought about that person, I think there is

10   three problems there.  And I don't think that would be a good

11   candidate to bring in.

12       MR. SPIRO:  I mean, does the Court have a position on

13   -- on -- I know we skipped over 16, because I guess we don't

14   have a questionnaire; is that the reason?

15       THE COURT:  Yeah, if we don't have a questionnaire --

16   now, there's a possibility.  We do still summon people to come

17   in.  So even if they don't do the questionnaire, what we try to

18   do -- if they get there early they'll hand-write, they'll fill

19   out the questionnaire, and you'll get it.  So it's always

20   possible we'll get a couple of strays.  So --

21       MR. SPIRO:  I just noted that we skipped 16 which

22   doesn't have a questionnaire, as a possible, right?  They've

23   got no disqualifying factors; there's no questionnaire.  Um --

24       THE COURT:  So our process is to call those -- I mean,

25   they're on call to be --

1          **MR. SPIRO:**  That's what --

2          **THE COURT:**  They've got a summons.  And I'm just

3    saying as a matter of experience, we often do get two or three

4    or four who will come in, never responded otherwise, but do

5    come in.  So we may supplement, you know, if we have 42 or

6    something we may get a supplement.

7          Counter to that, the people we think that we are going to

8    call in, there's also the self-described symptoms problem.  If

9    you start to develop a fever and a cough and all that sort of

10   stuff, we tell them:  Don't come in.  And so there are -- and I

11   have to tell you, these days there is a higher percentage of

12   no-shows than there used to be.  There used to be maybe one or

13   two and now we're seeing 10 percent of the pool not showing up.

14   So we'll get a couple of extra people that we didn't

15   expect who have to fill out last-minute questionnaires.  And

16   then we'll get some people who we thought were going to come

17   in, may not come in.  So you should be aware of that.  But 16

18   is on call to come in.

19         We just don't know anything about this person at that

20   point, other than the information sheet that you have got.

21         So in terms of folks we might want to recruit, I'll call

22   it that way, or invite, any more from the first 20?  Any

23   candidates that you can identify?

24      (No response)

25         **THE COURT:**  All right.  What about 20 through 30?

1          **MR. SPIRO:**  23, Your Honor.  Although I note, this

2     transportation to court, I don't know my San Francisco-related

3     geography.  So distance from the courthouse may be an issue.

4          **THE COURT:**  It is within the subpoena zone, and we do

5     have people serve.  It is a long ways.

6          I will say this.  Sometimes if it's -- people can make a

7     demonstrated hardship, it is possible to provide a hotel.  And

8     maybe we could call this person in and explore some more about:

9     Yeah, you do have to get up early but, you know, it is part of

10    civil -- civic duty.

11         But the bigger problem -- well, one of the problems,

12    though, this person is self-employed, DoorDash.  And so there's

13    obviously no jury pay for that.  And generally, if someone is

14    not -- if they are going to lose income and they are kind of

15    living and depending on that, that's a hardship.  I think

16    that's the bigger problem.

17         Is there anybody else in, up through No. 30?

18         **MR. SPIRO:**  28 and 29.  Or 28, at least.

19         **THE COURT:**  28.

20         **MR. SPIRO:**  It's a vacation hardship.

21         **THE COURT:**  Okay.  It's already fully paid for.

22    Generally that's an -- that's excusable.  Now, they didn't say

23    whether it was refundable.  And if it's refundable, then we --

24    we don't excuse people.  Generally, unless it's like their

25    son's wedding or something, or -- so we don't know.  But my

1   guess is if it's already fully paid for, they're implying it's

2   money spent.

3        And you said 29.  So they're also out of state, starting

4   on the 23rd.

5        **MS. TRIPODI:**  And Your Honor, I'll point out, 29 is

6   not fully vaccinated.

7        **MR. SPIRO:**  Oh, right.  That was the reason.  Okay.

8        **THE COURT:**  All right.  Well, I think the vacation

9   thing is, she's right in the middle of this.  That's

10  problematic.

11       All right.  How about the next group, up through 40?

12       **MS. TRIPODI:**  We had 34, Your Honor, but I don't know

13  if that commute is disqualifying.

14       **MR. SPIRO:**  Yeah, that's the reason that we were

15  concerned.  And they indicated they would not be able to focus

16  on the case, which was enough for me.

17       **THE COURT:**  Yeah, I think that's a -- that's a

18  problem.  Healdsburg is even further than Santa Rosa.  That is

19  a very long commute.  And if it does impair their mental --

20  their focus ability, that wouldn't be good, especially in a

21  case like this.

22       I was looking at 33 who has these early hours, they're a

23  customer rep.

24       **MR. SPIRO:**  I think they said they -- they don't think

25  they can be fair.

1          **THE COURT:**  Yeah, that's right.  They said they

2     couldn't be fair.  Okay.  Right.  That's why I have that.

3          And 35, hardship wasn't necessarily convincing, but that

4     person has very strong views.  So I don't think we should

5     invite 35.

6          37 is somebody who's got -- works at the library, and it's

7     a critical time, and also has -- thinks they can't be fair and

8     commented on trustworthiness, which is central to this case.  I

9     think they would be not appropriate to bring in.

10         Anybody else through 40 that you see that's worth bringing

11    in?

12         **MR. SPIRO:**  No, Your Honor.

13         **MS. TRIPODI:**  No, Your Honor.

14         **THE COURT:**  Okay.  Let's go up through 50 now.

15         No. 42 maybe didn't quite understand the question.

16    Doesn't know much about Mr. Musk, no opinion of Tesla.  And

17    then circled "yes" why they couldn't serve but that's only

18    because they're not so knowledgeable, maybe they thought they

19    had to be knowledgeable in order to serve.  So it's not "Yes, I

20    can't be fair."  So I don't think that is necessarily

21    disqualifying.

22         The problem is they work from 7:00 to 10:00, 7:00 a.m. up

23    to 10:00 in the evening, caregiving for the elderly.  So this

24    is a service provider, it looks like.  I think that's a

25    problem.

 1          44.  I will say this.  We have had a number of mothers who

 2     are doing breastfeeding.  We have been able to accommodate

 3     them, because we do break every 90 minutes.  They can use our

 4     jury conference room for privacy.  So if that's the only

 5     problem, I would be inclined to bring the person in, see if our

 6     combinations would work.

 7               MS. TRIPODI:  We're not opposed, Your Honor.

 8          THE COURT:  Okay.  Any objection to bringing this

 9     person in?

10          (No response)

11          THE COURT:  All right.  Hearing none, I think we will

12     invite No. 44.

13          45 is an equipment operator.  So the question is whether

14     they get a -- I guess they are implying they don't get

15     compensated for jury time by their employer.  That looks like a

16     hardship.

17          MR. SPIRO:  That wasn't clear to us.  We included him

18     in somebody we thought should be brought in.

19          THE COURT:  Well, we could.  We could.  I can kind of

20     guess what the answer is going to be in that field, but you

21     never know, maybe they work for a big construction company;

22     there is some compensation.  I'll circle that person for now,

23     since -- and see.

24          Anybody else through 50?

25          MR. SPIRO:  48, Your Honor.

1          **THE COURT:**  Yeah, I was looking at that.  Person is

2     not far distance-wise, but has ADHD and takes medication.  The

3     question is whether they can function with that medication.

4     They are a paraprofessional working for the school district, so

5     apparently they can work.  I would think this is worth

6     exploring.

7          **MR. SPIRO:**  Agreed.

8          **MS. TRIPODI:**  That's fine, Your Honor.

9          **THE COURT:**  Okay, so we will invite that person in.

10         **MS. TRIPODI:**  Your Honor, we also looked at Juror 47.

11         **THE COURT:**  Yeah.  Says "Difficult, though not

12    impossible."  So that opens the door.

13         **MR. SPIRO:**  It was the answer to Question 46 which

14    disqualifies this juror.

15         **THE COURT:**  "Extremely smart but unethical."  But

16    says they can be fair.

17         **MR. SPIRO:**  Again, Your Honor, most respectfully I

18    don't understand how that juror could sit in judgment of

19    another person in a matter of this importance.

20         **THE COURT:**  All right.  Well, the nature of the

21    opinion here is not like he's made bad decisions or, you know,

22    he's laying off people he shouldn't or he's making a bad

23    decision in the way he's handling it, but saying he's

24    unethical, which is -- strikes fairly close to the issue of

25    truthful -- truthfulness.  So I'm not going to -- I think

1    that's over the line.  So I won't invite 47.

2        Any more?  I guess, now we have got to go through the next

3    group, through 60.

4        51 is an entrepreneur.  Not clear -- well, but now they

5    have an issue -- that's interesting.  This person has a very

6    positive view.  Well, it's kind of mixed.  Not sure what to

7    make of it, on the attitude issue.

8        I would say normally I would bring in a person who is an

9    entrepreneur to find out a little bit more about what it is

10   they do, can somebody else work. I don't know, I don't know

11   what this business is.  ML something, Mirage ML.

12       So normally, on the hardship, that would be another

13   question.  On the attitude issue, I'm not sure what to make of

14   it.  Whether they can't be fair because they have such a

15   positive view of Mr. Musk, or they have a negative view about

16   the way he's been acting on social media.

17       **MS. TRIPODI:**  Your Honor, it is our position that

18   anyone saying they cannot be impartial should not be included.

19       **THE COURT:**  And I take it we've not done that yet.

20   We've -- anybody says -- is it -- have I --

21       **MS. TRIPODI:**  Well, I'm sorry, I should clarify.  For

22   this tranche of persons that we are looking at in terms of

23   whether -- they don't have a hardship, but they are claiming

24   that they can not be impartial.

25       **THE COURT:**  Have I -- in that first tranche, did I --

1   trying to remember.  Is there anybody that said they can't --

2           **MS. TRIPODI:**  No.

3           **THE COURT:**  -- be impartial, but we are going to bring

4   them in any way?  I want to be consistent.

5           **MR. SPIRO:**  I don't believe so.

6           **THE COURT:**  So I've deferred to the "I can't be

7   impartial."  Whichever way it is.

8           **MS. TRIPODI:**  Yes, Your Honor.

9           **THE COURT:**  Well, then, I think we should be

10  consistent.

11          **MR. SPIRO:**  Thank you, Your Honor.

12          **THE COURT:**  All right.  52, her husband is part of the

13  class, so that doesn't work.

14          **MR. SPIRO:**  54 was the next one we saw.

15          **THE COURT:**  54.  Okay, this is a director of quality.

16  They are going to be audited on March 1 and 2, which is more

17  than a month away.  So I think the hardship is not enough to

18  say don't bother, although they have an issue about breathing.

19  They don't know whether they can wear a mask more than a few

20  hours at a time.

21          **MS. TRIPODI:**  And Your Honor, this juror also

22  responded to Question 47 with a yes, that they could not be

23  impartial.

24          **THE COURT:**  Oh, all right.  All right.  Well, then I

25  won't invite 54.

1          56 also said they've got a problem of being fair, plus

2     they have got some major health issues.

3          57?  Contract administrator for a roofing company.

4          **MS. TRIPODI:**  We think 57 is a possibility,

5     Your Honor.

6          **THE COURT:**  Okay.  They don't have -- they

7     characterize Mr. Musk as eccentric, but that's all they say,

8     and they say they can be fair.  So I don't think that that's

9     disqualifying.

10         I suspect, when all is said and done, that there's no --

11    they would lose compensation and wouldn't get anything, but I

12    don't know that for sure.  Probably depends on how big the

13    roofing company is, and whether they -- as a contract

14    administrator, maybe they can do the work remotely or in the

15    evenings, if it's paperwork.  So I think it's worth bringing

16    that person in.

17         Anybody else?

18         **MS. TRIPODI:**  Your Honor, possibly 58, although I'm

19    unclear how much of the care for the sick parent, how much time

20    that takes up.

21         **THE COURT:**  Yeah.  That's not clear to me, either.

22    The mother has liver issues.  But -- and this person has to

23    take the mother to appointments, but I don't know if there's an

24    appointment during this period, and how critical it is, and

25    whether those appointments can be scheduled for the afternoon.

```
 1   So if that's the only issue, I would call that person in.

 2        Any objections?

 3             MS. TRIPODI:  No objection from the plaintiff.

 4             MR. SPIRO:  I don't have an objection to calling this

 5   person in.

 6             THE COURT:  Okay.  Now, 60, go to No. 60, this is

 7   another breastfeeding mother, and would need to be able to pump

 8   often enough.  And our schedule does permit that.  That does

 9   mean our breaks are a little longer, typically.  Sometimes

10   they're like 20 minutes instead of 15; 25 minutes.  They need

11   access to a refrigerator.

12        Did we do that before in the last one, Vicky?  Do we have

13   a --

14             THE COURTROOM DEPUTY:  We do, Your Honor.  We let them

15   use the little mini refrigerator in the jury room.

16             THE COURT:  There's a refrigerator in there?

17             THE COURTROOM DEPUTY:  Uh-huh.

18             THE COURT:  Okay.  So I think, I think -- now, she's

19   made a comment, "The cars are beautiful but Mr. Musk..." but as

20   to Mr. Musk, says "He's an idiot."  Which is different than

21   saying "He's not trustworthy and I wouldn't believe what he

22   says."  I mean, obviously she is worth questioning, but I don't

23   think that's disqualifying.  So I'm going to invite her in and

24   find out whether we can accommodate her, and what her attitudes

25   are.
```

```
 1        All right then, through 70, any comments there?

 2             MR. SPIRO:  Just for the record, we have an objection

 3   to 60.

 4             THE COURT:  Okay.  61.  Student.  Normally we let

 5   students out, unless their schedule permits.  I don't know what

 6   the schedule is, although this person is now at the UC Santa

 7   Cruz and lives in Scotts Valley.  So I'm not even sure how they

 8   got into our pool, because that's outside of this division.

 9             MS. TRIPODI:  Your Honor, 61 declined to answer on the

10   vaccination status.

11             THE COURT:  All right, so you have that, too.

12             MR. SPIRO:  That's obviously not something that the

13   defense is agreeing to, as --

14             THE COURT:  Right.  But I think the fact that they are

15   in Scotts Valley is, frankly, beyond our zone.

16             MR. SPIRO:  Then that's that.

17             THE COURT:  Then that's that.  So that's -- that's

18   that problem.  Any others?

19             MS. TRIPODI:  62.

20             THE COURT:  Okay.  Well, I'm not even sure this

21   person's got a -- they say an important prenatal appointment on

22   Tuesday at 2:00, so I don't even know how long they'll be here.

23   Unless I don't excuse them.  But -- and then they've got

24   childcare responsibilities.  Although I'm not sure -- this

25   person is a software production manager at Google.
```

```
 1        I mean, we could have them come in, but knowing they have
 2   already represented to us they have got a prenatal appointment
 3   on the very day of jury selection.
 4        MR. SPIRO:  Yeah.  I would also just note for the
 5   record that while plaintiff and everybody seems okay with this
 6   juror, this juror has negative views of Musk and also doesn't
 7   answer vaccination status.  I don't know whether --
 8        THE COURT:  Oh.
 9        MR. SPIRO:  -- that's not bothering plaintiff --
10        MS. TRIPODI:  Declined.
11        THE COURT:  Yeah.
12        MR. SPIRO:  -- due to the negative opinions of
13   Mr. Musk, or why the change, but that's the status.
14        THE COURT:  All right.  I think, since they've already
15   stated they have got an appointment -- it's prenatal, and I
16   assume those are not easy to change -- that's going to
17   interfere directly with jury selection.  So I think we should
18   not bring that person in.
19        Anybody else up through 70?
20        MR. SPIRO:  Yes, Your Honor.  66.
21        THE COURT:  Well, they're 83.
22        MS. TRIPODI:  Yeah.
23        MR. SPIRO:  Oh, I see the age.
24        THE COURT:  Yeah.
25        MR. SPIRO:  68.
```

1              **THE COURT:**  68.  Okay.  Gas station owner.  Feels like

2    they need to be there, but depending on staff, maybe they've

3    got an assistant manager or somebody.

4              **MS. TRIPODI:**  Your Honor, the questionnaire indicates

5    that his son provides staffing for Tesla.

6              **MR. SPIRO:**  That's not a disqualifier.

7              **THE COURT:**  Well, we had the other one where the son

8    worked for Tesla, and I said that that was disqualifying.  And

9    I think we drew a distinction between a son or daughter working

10   for Tesla versus a friend working for Tesla.  So I did already

11   disqualify a person because they had a child.

12             **MR. SPIRO:**  But this is just a person who has a

13   contract with Tesla that would disqualify --

14             **THE COURT:**  I see, it's a staffing company.  You're

15   right, that's a step removed, so I think that is different.

16   And they may have stock through a mutual fund, which I've

17   already said is not disqualifying.

18             **MR. SPIRO:**  Correct.

19             **THE COURT:**  All right.  I'm going to call this person

20   in because, you know, if there are other people who can run the

21   gas station, at least during the hours that he's here -- or

22   she, I don't know if it's a he or she.  So we'll call 68 in.

23        What about -- no, never mind.  I was looking at that 64.

24   They have trouble traveling on highways, but then this person

25   also says they -- diagnostic as autistic.  And that could

 1   interfere with their ability to serve as a juror.  So I think

 2   that's probably disqualifying.

 3       There's also the clinical professor at Stanford.  But

 4   sounds like a hardship because she's the only one running the

 5   clinic, and she supervises students.

 6       Any comments on that?

 7           **MR. SPIRO:**  What number are you on, Your Honor?

 8           **THE COURT:**  I'm sorry, that's 63.

 9           **MR. SPIRO:**  Yeah.  I took the student-professor rule

10   that I'm used to following in jury selection caused me to

11   eliminate this person when I went through it.

12           **THE COURT:**  I agree with that.  Next group, through

13   80.

14       No. 74 just says "I have a job."  That's not very

15   descriptive.  I would normally bring that person in to find out

16   more, and whether they could work around it, et cetera, et

17   cetera.  And this person doesn't seem to have any philosophical

18   impediments, at least not on their face.  So --

19           **MR. SPIRO:**  Yeah, that's fine, Your Honor, to bring

20   that person in.

21           **THE COURT:**  Okay.  Bring in 74.

22       Let's see.  Anybody else that you can identify as

23   candidates going through No. 80?

24           **MR. SPIRO:**  No, Your Honor.

25           **MS. TRIPODI:**  No, Your Honor.

1          **THE COURT:**  Okay.  How about through 90?

2          **MR. SPIRO:**  81 is --

3          **THE COURT:**  Yeah, okay, an engineer.

4          **MR. SPIRO:**  Yeah.

5          **THE COURT:**  Worried about falling behind.  But that's

6    where, you know, especially if you're an engineer, I assume

7    there's a lot you can do remote -- maybe I'm overestimating

8    that -- and there's stuff that you can do at other hours.

9         He did answer "Yes," though, right?  On whether he could

10   be fair -- not fair.  Then it says "maybe."  Not sure what that

11   means.  So if we make an exception for somebody who says yes,

12   this would be it, because of the ambiguity.  It's not evident

13   why they said yes.

14         **MR. SPIRO:**  Right, but they said "maybe" and again, I

15   think we're, as I said a few times, putting a little bit too

16   much weight on that binary question.  I think the people's

17   words are their words.  And when people are stating very

18   clearly their opinions, we should be focused more on that.

19   That being said, I take his "Yes, maybe," as more reflective of

20   a lot of deep thought, and I would bring him in.

21         **MS. TRIPODI:**  Your Honor, I would interpret "Yes,

22   maybe," to mean that yes, he cannot be impartial.

23         **MR. SPIRO:**  I don't know where you get that from, but

24   we disagree.

25         **THE COURT:**  Yeah.  I think the "maybe" raises -- it

```
 1    puts him in a different category.  So I think it's worth the

 2    inquiry.  And I think -- although he says it would be a hassle,

 3    he is not saying it's impossible.  And frankly, being a

 4    software engineer, we've had a lot of software engineers that

 5    can serve, especially since we are in session for only a

 6    partial day.  So I think it's worth bringing this person in and

 7    asking him some more questions.

 8         Anybody else in the -- up to 90?

 9         MR. SPIRO:  82.

10         THE COURT:  Sorry about that.

11         Business owner.  Not sure what they do.  Counting

12    logistics.  Father passed away.  So, yes, not clear.  "I work

13    Monday through Friday and half a day Saturday to keep up with

14    my current work."  So I often ask, well, can you do that work

15    after 2:00?  Depending on the nature of the business.

16         Also assists with disabled relatives.  So they've got

17    several things going on.

18         MS. TRIPODI:  Your Honor, if I may, the Question 52

19    they declined to answer, regarding vaccination.

20         THE COURT:  Oh.

21         MR. SPIRO:  But that is not a reason to remove

22    somebody.  It's our -- that is our position.  We understand

23    Your Honor has presided over cases where one side disagreed

24    about removing people with vaccination statuses, and the Court

25    declined to do that in the *GM* case.
```

1    We would ask Your Honor to abide by that ruling, unless

2   there is consent of both parties.  And we would not be willing

3   to excuse jurors --

4          **THE COURT:**  All right.

5          **MR. SPIRO:**  -- who do not even answer the question of

6   whether or not they have vaccination status.

7          **THE COURT:**  Well, we are going to cross that bridge at

8   the end of this process, see what we've got.  We'll see how

9   relevant it is, how many times that becomes the factor.  We

10  know it's a factor in that first group, in one of them, for

11  sure.

12    In this case, this person's got two things going on.

13  They're taking care of disabled relatives.  They're trying to

14  run a business; the father just passed away.  Is working on

15  weekends.  Seems to me that's a lot of hardship.

16    If it was just, just the work or just taking care of

17  relatives, maybe.  But I think you are not going to get their

18  full attention in a case like this.  So I'm going to not bring

19  that person in, because of that hardship.

20          **MR. SPIRO:**  Again, he comments -- she comments, "If

21  I'm selected I can do my best to be focused on the case."  I

22  don't see a significant difference between this and other

23  hardships we have accepted.  I think this person should be

24  brought in and spoken to.

25    And as to the no comment on the -- or the not answering on

the vaccination status, we're accepting -- people are going to

show up, as we have already talked about, that didn't even fill

out the form.  And people are showing up where they didn't

answer certain questions.

So I don't know why we would have a different rule just

because they didn't answer that question.

**THE COURT:**  Well, they may not be the same.  Because

when they do come, they are going to fill out, downstairs, as

best they can, hand-filled questions, answering the same

questions.  And if I do decide to implement the vaccination

rule, somebody who just says "I'm either not vaccinated or I

decline to answer," they're going to be treated like everybody

else.

It is true, if they are unvaccinated, they will be in the

building for some period of time.  But at least the jury, when

they're seated will know if I implement this rule that they're

not going to be in a three-week trial, day-in and day-out, with

somebody who's not vaccinated.  That's the difference.

So I'm not treating them differently.  Other than they

have to come in to tell us that they're not vaccinated.

**MR. SPIRO:**  Right.  But a person who declines not to

answer, then they've kept their private medical status private.

They're not -- the jurors are not going to be told:  You're

here with somebody unvaccinated.  They're not going to be told

anything.

1        **THE COURT:**  Well, but I can't tell them:  Don't worry,

2   everybody that you're sitting with and you're going to be

3   deliberating with and taking breaks with, everybody at least

4   has been vaccinated.  I can't not tell them.  That's the

5   problem.

6        **MR. SPIRO:**  But the problem, most respectfully, with

7   that is nobody -- we didn't do that for everybody who's here

8   today.

9        **THE COURT:**  Well, and I have that on my list.

10       **MR. SPIRO:**  Well, but Your Honor, if the Court finds

11   out that I'm not vaccinated, are we going to --

12       **THE COURT:**  No.  What I'm going to do is what I've

13   done in all my other cases.  Then I want either a

14   representation that all the attorneys, staff and witnesses are

15   either vaccinated, or take a negative test.  And I've done that

16   in every case.

17       Because I -- you know, I don't want a witness up there,

18   five feet from the jury, and I can't -- that's one thing I want

19   to be able to tell them.  If they're not vaccinated -- you need

20   to certify they're vaccinated, which is fine.  Or, take a

21   negative test.

22       (Off-the-Record discussion between counsel)

23       **MR. SPIRO:**  I get the -- I follow the Court.  I didn't

24   -- I didn't know that rule.

25       **THE COURT:**  Yeah.  I'm sorry.  I should have -- I

1    should put it in my standing order.  And I apologize for --

2          **MR. SPIRO:**  No, no, not at all.  I'm just saying, as

3    my mind is thinking about it, I'm thinking:  Look at all these

4    nice people in the gallery (Indicating), and there's going to

5    be a lot of people coming and going.

6          It seems to me we're -- we may not by solving for

7    something that we're really solving for.  That's all.

8          **THE COURT:**  Yeah.

9          **MR. SPIRO:**  So, I could be wrong.  I'm just telling

10   the Court, candidly, my view.  And I certainly can't --

11   somebody that doesn't want to answer that question, I don't see

12   how we can sort of remove them for that purpose.  So --

13         **THE COURT:**  Okay.  Well, in any event, let's move on.

14   We'll cross that bridge.  But I am not going to bring in 82

15   because of the -- I do think it is a double hardship there.

16         Anybody else?

17         **MS. TRIPODI:**  Your Honor, I don't know if 85 is worth

18   bringing in to inquire about the childcare issues.

19         **THE COURT:**  I've done that.  Says "No one to pick up

20   my child from school."  And often I ask:  Are you sure there's

21   no one?  Is there carpooling available?  Is there a neighbor?

22   Is there somebody else in the class?  Do you have a

23   mother-in-law or somebody, even for this three-week period?

24         **MR. SPIRO:**  Yes.  Your Honor, I feel the need to point

25   out that this -- again, this is a -- the plaintiffs are, most

1    respectfully, suggesting somebody that has exactly the same

2    types of issues that we have been excusing for.  And I would be

3    very surprised if it's not because the juror says "Mr. Musk

4    seems like a jerk."

5              THE COURT:  Uh-huh.

6              MR. SPIRO:  And I don't think we should be putting the

7    weight we're putting on certain things here, and not other

8    things.  You know, Mr. Musk has a right to a fair trial and an

9    impartial jury.  And we seem to be, I'm concerned, littering

10   the panel with lots of people that feel that way, readily, and

11   then paying undue attention to other factors.

12             THE COURT:  At this point I'm not going to ask that

13   person in.  But I may revisit the question of childcare,

14   because as I've said before, putting aside -- I'm not even

15   looking at the right-hand side columns here.  Sometimes it is

16   worth the inquiry.  And, it partly depends on where they live.

17   The closer they live to the courthouse, sometimes the easier it

18   is to make childcare arrangements.

19        In this case the person is in Hercules, which to get here

20   by car is about an hour.  And by BART it's also probably an

21   hour.  So if they were in Oakland or San Francisco, South

22   San Francisco, might be a little more.  But let me -- I'm going

23   to flag that one.

24        Okay, anybody else?

25        (No response)

```
 1              THE COURT:  Okay.  If not, we'll go to the next group.

 2    Through 100.

 3              MS. TRIPODI:  We don't have any, Your Honor.

 4         (Off-the-Record discussion between counsel)

 5              THE COURT:  Okay.  Any -- anybody else?  Yeah, that

 6    group doesn't look real promising.

 7         If not, let's go to the next group, starting with 101.

 8              MS. TRIPODI:  Yes, Your Honor, we had 101 on the list.

 9              THE COURT:  Okay.  That's the one that's -- plans to

10    visit her mother, once she gets a visa.  So that's similar to

11    the other one, wants to visit parents in China.  And does have

12    one negative commentary about Mr. Musk, "Arrogant," which, to

13    me, is not in the same category as some of the others.  Says

14    they can be fair.

15              MR. SPIRO:  We object.

16              THE COURT:  Okay.  Well, I'm going to bring that

17    person in.  102 -- anybody else?  How about --

18              MS. TRIPODI:  Yes, Your Honor, we had both 102 and 103

19    on our list.

20              THE COURT:  Okay, 102 lives in San Francisco.  Three

21    young children.  Mother-in-law has Stage 4 cancer.  Well, that

22    seems like a pretty good hardship.  Got a mother-in-law with

23    cancer, got three kids got to get to school.

24              MR. SPIRO:  Yeah, we think this is an obvious hardship

25    case.  I think -- again, I think plaintiffs are probably
```

1   looking at the answers to what this juror thinks about

2   Mr. Musk.  But we think this is an obvious hardship case.

3           THE COURT:  All right.  103.  This is an architect

4   that's leading a team in a huge construction case with a team

5   of 100.

6       Seems to me, if you are working with a team of 100, and

7   you're available every 90 minutes to handle Zoom calls or

8   whatever, and you get out at 2:00, and you don't -- and you are

9   free on Thursday, I think it's worth finding out just how

10  impossible it is for this person to serve.  So I'm inclined to

11  bring this person in.

12      All right.  Anybody else?

13          MS. TRIPODI:  Not from us, Your Honor.

14          MR. SPIRO:  105.

15          THE COURT:  105.

16          MR. SPIRO:  If the rule is no-pay employment, then

17  they would be out.  I'm not sure what the Court's position is

18  on that.

19          THE COURT:  Yeah, we -- if they are going to be out,

20  especially for a three-week trial, we don't force people in

21  unless they're getting compensated by their employer.  And this

22  person is a realtor, so it's probably eat what you kill.

23          MR. SPIRO:  Yeah.  I didn't see if a realtor was of

24  the same ilk as some of the other jobs.  They often have, you

25  know, co-realtors that can show and other things.  It did not

1    seem to be a sole practitioner or something like that.

2        I understand that it's a commission-based business, but

3    did not strike me to be somebody that would be removed for

4    cause in a traditional case.

5            THE COURT:  Well, says "Only get paid when I'm helping

6    and serving others."  That's like saying when she's actually

7    working.  She?  Is it a she?  I can't tell.

8        And it's hard to relocate and show people when you're not

9    -- when you're sitting in a courtroom.  So I think in this

10   case, she's shown enough of a hardship.

11       106 -- no, there's a "Yes" there, so, yeah, that doesn't

12   work.

13       Anybody else in that group?

14           MS. TRIPODI:  No, Your Honor.

15           THE COURT:  Okay.  Next group, through 120.

16           MS. TRIPODI:  Your Honor, maybe 112?

17           THE COURT:  Okay.  Taking -- working and taking care

18   of grandsons.  Grounds worker.  Don't know if it's full-time.

19   Work for the school district.  And often school districts do

20   pay, I think, for jury service.  So that one may be worth

21   asking.  And whether she's a sole caregiver for the grandson or

22   not, that's not clear.

23       So, any objection to bringing in that person?

24           MR. SPIRO:  No, that's fine.

25           THE COURT:  And, anybody else?

1          **MR. SPIRO:**  113, on the same basis.

2          **THE COURT:**  Okay.

3          **MS. TRIPODI:**  Your Honor, 113, I was confused as to

4     the comment of "My wife is not away until March 2023."

5          **THE COURT:**  I think they meant "is away."

6          **MS. TRIPODI:**  Right.

7          **THE COURT:**  So, but, that doesn't mean that there

8     isn't an in-law or somebody else, that can help.  So I think

9     it's worth bringing that person in, to see if there is outside

10    help.

11         **MS. TRIPODI:**  Perhaps the same for 114, Your Honor?

12         **THE COURT:**  Okay, so 114, in the same boat?  Seems

13    like it.  I mean, seems unlikely, because they're probably

14    going to say "I don't have anybody else," but I don't know

15    that.  We don't know about the availability of help.  So I'm

16    going to invite 114.

17       Anybody else?

18       (No response)

19         **THE COURT:**  Okay.  There is, I will say, No. 120 who

20    has a business trip scheduled, but business trips may be a

21    little different, because often those are refundable.  And I

22    don't know how essential that is.  This person's a scientist

23    for Chevron, so, you know, if it's just a conference or

24    something, it's not mandatory.  So I'm inclined to invite that

25    person in.

1            **MR. SPIRO:**  That's fine, Judge.

2            **MS. TRIPODI:**  We have no objection.

3            **THE COURT:**  Okay.  Well, let's see how many we got.

4    Anybody been keeping track?  How many we said we would invite.

5        So to go over that, I have -- which is the first one that

6    we said we would do?  No. 8?  What did we decide on No. 8?

7        Did I say yes or no on 8 and 9?

8            **MR. SPIRO:**  Just 8, Your Honor.

9            **MS. TRIPODI:**  Yes.

10           **THE COURT:**  8?

11           **MS. TRIPODI:**  Uh-huh.

12           **MR. SPIRO:**  Yes, Your Honor.

13           **THE COURT:**  Is that the first one of the group?

14           **MR. SPIRO:**  Of this second tranche, yes.

15           **THE COURT:**  Yeah.  All right.  So No. 8.  And then the

16   next one I have is No. 44, is that right?

17           **MR. SPIRO:**  No, Your Honor.  13.

18           **THE COURT:**  13?  Okay.  Sorry.  My -- my symbols have

19   changed here.

20       Okay, 13.  And then, then there's No. 44.  Right?

21           **MR. SPIRO:**  Yes.

22           **THE COURT:**  And then, there's number -- did we say 45?

23           **MR. SPIRO:**  Yes, Your Honor.

24           **THE COURT:**  We'll look into that.

25           **MS. TRIPODI:**  Yes.

1          **THE COURT:**  Okay.  Then there is 48, the HD -- the

2    anxiety person, we are going to look into.  And then there's 57

3    and 58.  And 60.  Another breastfeeding mom.

4          And then there's 68, the gas station owner.  And there's

5    the 74, "I have a job."

6          And then there's the software engineer, No. 81.

7          And then there's the person who wants to visit her mother

8    in China, No. 101.  And the architect with the big team, 103.

9          And then there's the taking care of the grandson, 112.

10   Two kids, 113.  Three kids, 114.

11         The business-trip person, No. 120.  Is that how far we

12   have gotten so far?

13         **MR. SPIRO:**  Yes, Your Honor.

14         **MS. TRIPODI:**  Yes.

15         **THE COURT:**  So I count 17.  And that actually gets us

16   to a group of 34, putting aside the vaccination question, 51

17   people.  And so I think that's enough.  Anyone think we need

18   more?

19         **MS. TRIPODI:**  No, Your Honor.

20         **THE COURT:**  Gosh, I hope we don't need more.  That

21   would be a problem.  So if we invite in 51 -- and I understand

22   we've got the vaccination question, there's three people in

23   question.  I guess there's no objection -- the real question is

24   the decline-to-state person.

25         **MR. SPIRO:**  Well, the defense would -- for the

1    purposes of this 51, for the sake of compromise and expediency

2    without wedding myself to this position, given this grouping, I

3    have far more serious concerns than removing the two that say

4    that they are unvaccinated.  We would object to removing people

5    that either did not answer or declined to answer that question.

6        So that would be our compromise position that we would

7    suggest to the Court, as to this grouping.

8            **THE COURT:**  All right.

9            **MR. SPIRO:**  So we are left with 49.

10           **THE COURT:**  All right.  So with respect to that, it

11   makes a difference of one out of the first tranche, because we

12   only had one person that would otherwise come, but for that

13   answer.

14           **MR. SPIRO:**  Well, but by our count, there's -- there's

15   just enough actual jurors that do not already have a pre-formed

16   view of not liking Mr. Musk.  So the Court is -- has the number

17   49 versus 48 in their mind.  I have the numbers 13 versus 14 in

18   my mind, because we believe that the vast majority of the

19   jurors who have strong personal views of Mr. Musk, even if they

20   checked the box that they can be fair, are not appropriate

21   jurors in a case of this importance.

22           **THE COURT:**  So you are looking at it in terms of the

23   first -- making certain assumptions of how, how it's going to

24   play out, totally?

25           **MR. SPIRO:**  Well, I don't -- they -- I'm not -- I

1   don't even view them as assumptions.  I mean, if I'm being told

2   that a person feels comfortable enough in writing to say "I do

3   not like Mr. Musk," then I don't see how that person, given

4   concerns over fairness in a matter of this importance, how we

5   can all, frankly, in good conscience, no matter what that

6   person then says, say "Yes, we are all comfortable that this

7   person can be fair, totally unbiased, brings nothing to this

8   courtroom that could sway them even slightly in any direction

9   other than the evidence and the law."

10       I don't see how we can ever say that.  So yes, I am

11   excluding those people as people who can't possibly sit on this

12   jury.

13          **THE COURT:**  Well, you can slice it different ways.

14   When I look at the 34 of the first group, which does not

15   include the unvaccinated or decline to state, I would say a lot

16   of those have no opinions, et cetera, et cetera.  There are

17   some that have very mild opinions about the investment in -- in

18   Twitter.  There are maybe about ten out of that 34 which is

19   more -- closer to your category.  That is, "I don't like him,

20   he sucks, he's a jerk," which are more character things.  But

21   even if those are not -- you know, I may end up excluding those

22   people.  You don't know that.

23       But even if I did exclude all those people, there's still

24   24 out of just the first group before we got to the second

25   group of 17, that either have no opinion -- positive opinion,

```
 1    or a negative view about the way he's handled certain things
 2    but not going to truth-telling, you know, sort of character,
 3    core character issues.  And so the idea that none of those
 4    would be able to be seated because they indicated that initial
 5    view even though they say they could be fair, I don't accept
 6    that proposition, that assumption.
 7            MR. SPIRO:  Well, that's why I get to a number, once
 8    you eliminate the ones that say "I don't like the man," in sum
 9    and substance, and you assume that some of the ones that say
10    "Well, I think this was horrible, I think that was horrible and
11    I don't understand what he's doing," you assume maybe half of
12    them should certainly not sit on a jury of this man.  There's
13    lots of other juries, lots of other cases they could sit on.
14    They shouldn't sit on this one.  You get down to teens.
15            THE COURT:  Well, all right.  Comments from the
16    plaintiffs?
17            MS. TRIPODI:  Your Honor, we feel like the pool that
18    we have created is sufficient, and that we will be able to
19    explore the cause issues at voir dire.
20            THE COURT:  All right.  So, I'm going to invite the 34
21    -- or indicate to our jury administrator that she should call
22    in the 34 that we have identified from the first list, first
23    tranche, 17 in the second tranche.
24        With respect to the non-vaccinated and the
25    decline-to-states -- and there were three jurors who fall in
```

1  that category in the first group 24, 30, and 43 -- I'm going to

2  exclude those because I am going to apply the rule.  I find

3  that the application of the vaccination requirement over the

4  objection as stated by the defense is warranted in this case.

5       Number one, there is no constitutional violation, because

6  I find that there's no substantial impact in terms of excluding

7  any cognizable group, distinctive group from the jury pool,

8  looking at the demographics.  And only three people involved

9  out of 54.  And some are white, some are black, some are mixed.

10      I find that to the extent that there is an impact that's

11 been alluded to of excluding the one decline-to-answer person

12 because that's somebody who seems to have a positive view of

13 Mr. Musk is not a constitutional violation, because

14 philosophies, political views, that kind of thing, is not a

15 cognizable distinctive group within the cross-section

16 requirement of the Sixth Amendment, and therefore, there's no

17 constitutional violation.

18      I also find as a matter of fact that any impact is minimal

19 here.  We're talking about one juror, prospective juror, out of

20 -- there are 51 others.  Many of whom have -- all of whom

21 actually have stated they can be fair.  I've excluded everybody

22 who said they can't be fair.

23      And the process of voir dire will help discern, help us

24 discern whether there are people who really truly can be fair,

25 or alternatively, cannot be fair, once through the examination

1   process and the voir dire process that their views about

2   Mr. Musk or the way he's handled certain businesses would

3   interfere with their ability to play a role of a truth-finder

4   in this case.  So, that is my ruling.

5          **MR. SPIRO:**  May I be heard briefly?

6          **THE COURT:**  Yep.

7          **MR. SPIRO:**  In terms of an exception?

8       First, a juror, just as easily as the rule for the rest of

9   us in this courtroom, could be given and asked to take a test,

10  a COVID test.

11      And I would just also point out that Your Honor came out

12  the other way in the *GM* case, and did not allow one side over

13  the objection of the other to exclude vaccinated --

14  unvaccinated jurors.  And --

15         **THE COURT:**  I'm sorry; which case?

16         **MR. SPIRO:**  The *General Motors* case.

17         **THE COURT:**  In that case, I believe the parties

18  stipulated to -- to removing -- I've never had -- since COVID

19  started, I've not had a single jury in which I have seated

20  people who are not vaccinated or decline to state.

21         **MR. SPIRO:**  In addition, the Court brought up

22  something a moment ago which is that another concern we have,

23  which is related, is that courts sometimes, you bring in 50,

24  you want to get the jury seated.  And I have great respect for

25  that.  I want to get the jury seated, and I understand judicial

```
 1    efficiency.
 2        But what ends up happening is courts, you know, when they
 3    -- they need people, right, and a lot of the for-cause people,
 4    you know, a court can end up sitting people around the edges to
 5    make sure that we have enough.  And so, again, given how many
 6    of these folks share strong views about Mr. Musk, again, we
 7    just have concern that we are going to ever get a fair and
 8    impartial jury here.
 9            THE COURT:  Well, all right.  You've made your point.
10    And all I can say is part of the reason why I have gone through
11    this very extensive process, more extensive I think than any
12    other case that I have handled in terms of jury trial --
13    handing out or sending out 200 questionnaires when we only need
14    six on a jury, that's rather extraordinary -- is precisely to
15    make sure, number one, we get people who can -- who can take
16    the time and are able to serve without undue hardship, and can
17    be fair jurors in this case.
18        And I believe my decision has been vindicated, because
19    there are plenty of people here who have indicated they can.
20    And the vast majority of those have no views at all, right, of
21    Mr. Musk or Tesla.  Some that have views I have found worth
22    bringing in, because their views are not so strongly stated or
23    not on point with the issue in this case or the character of
24    truth-telling, that at least it's worth bringing them in.  And,
25    and we'll see.
```

1    If you do an excellent job of voir dire and, and I'm

2  convinced that these people, notwithstanding their

3  representation they can serve, feel that they cannot be fair,

4  they're not going to be sitting on the jury.  And I've got

5  enough -- that's why I ask, is 50 enough to get to 15?  I would

6  hope so.  That's more than three times the number of the

7  ultimate pool I need, drawn down from a pool of 200.

8    So sort of the pressures that one might face as a judge to

9  seat people who are questionable on cause I think is alleviated

10 precisely because of the process that I followed here.  To make

11 sure we've got a filtered pool, a vetted pool to start with, a

12 large enough pool, so when you start there will be people here,

13 some of them still will have hardship issues, some of them will

14 have attitude questions that we need to question.

15    But the idea that we can't get to 15 out of 50 -- I mean,

16 I could expand it, we could go -- I could probably fit 60 in

17 this courtroom if the parties want to do that.  You know, we

18 could invite a few more.  Maybe that's not a bad alternative,

19 since we're here.

20        **MS. TRIPODI:**  We're not -- we're not opposed to that,

21 Your Honor.

22        **THE COURT:**  Well, let's see.  Where did I leave off?

23        **MS. TRIPODI:**  I believe we were at 120, Your Honor.

24        **THE COURT:**  120.  Okay.  Let's see if there's anybody

25 else in this group.  Here, we had 120.  Is anybody -- can you

1    identify anybody else in the next tranche of 10, through 130?

2          MS. TRIPODI:  Your Honor, perhaps 126, although I am

3    cognizant of the fact that this is a healthcare worker who

4    works the graveyard shift.

5          THE COURT:  Yeah, I was worried about that.  That's

6    hard to ask somebody to do graveyard, and then come serve as a

7    juror.  And then -- especially if they are in the healthcare

8    field.  Although this is a radiologist, which is important, but

9    at least they are not a neurosurgeon or heart surgeon.

10         We could find out, because maybe their normal sleeping

11   time is a swing shift.  This would be essentially like their

12   evening.

13         MS. TRIPODI:  We would be open to bringing them in.

14         MR. SPIRO:  Your Honor, I didn't hear the number.

15         MS. TRIPODI:  Oh.

16         THE COURT:  Oh.  126.

17         MR. SPIRO:  Yeah, the -- the graveyard-shift medical

18   worker is normally a hardship in the cases -- courtrooms I am

19   normally in, but I don't know what the Court here is

20   determining.

21         THE COURT:  Well, I think it is worth inquiring,

22   because number one, this person is a radiologic technologist,

23   and so it is not quite -- I mean, it is important that they

24   need to be alert, but it's not quite like they are a surgeon.

25   And I don't know what the person's sleep habits are.  Some

1    people work graveyard, and then they're awake in the day, but

2    then they go to sleep at 4:00 in the afternoon or something.

3    So I think it's worth inquiry.  So we will add No. 126 to the

4    list.

5          Now, 128 is a person who lives in Napa, and it's a far

6    way, but they say -- they seem to be hinting that if they had a

7    hotel provided, that they may be able to do it.  Says:  I don't

8    know where to go after or during, have to stay in the area,

9    will I have to pay for it.

10         **MR. SPIRO:**  Yeah.  This is a young juror, and he had

11   some answers on his questionnaire that made us think he's

12   probably perhaps not ready for a matter of this importance, or

13   has, you know, unique views that would not get him through the

14   voir dire process.

15         **THE COURT:**  Okay, let's see.

16         **MR. SPIRO:**  But we can bring him in.

17         **THE COURT:**  Let's see, 128.  Is there like an example

18   where he communicates that he doesn't have the -- either the

19   maturity or something that --

20         **MR. SPIRO:**  Well, I just note his -- his age, in a

21   couple of the answers.  I mean, he said he believes God has the

22   verdict.  That -- it's not a youth-based view, but it was an

23   answer that I saw.  But we have no problem bringing him in.

24         **THE COURT:**  Okay.  Well, let's bring him in, and see.

25   You never know.  Because we may be able to offer -- at least as

```
 1   to the hardship issue there is a potential answer, the hotel.
 2        Anybody else through 130?
 3             MR. SPIRO:  No, Your Honor.
 4             MS. TRIPODI:  No, Your Honor.
 5             THE COURT:  Okay.  How about through 140?
 6             MS. TRIPODI:  I'll note 136 has childcare issues that
 7   we've discussed, but appears to be impartial under 47, and is
 8   fully vaccinated.
 9             THE COURT:  136, you say?
10             MS. TRIPODI:  Yes, Your Honor.
11             MR. SPIRO:  Again, the plaintiff is skipping over a
12   couple of individuals with the exact same situation, like Juror
13   No. 132.
14             THE COURT:  Well this one says -- actually affirms it,
15   she says affirmatively "I'm the only person to drop off."  And
16   so I'm going to take the person at their word.  So I don't
17   think that they should be brought in.
18        Anybody else?
19             MS. TRIPODI:  I will note with respect to Juror 132
20   the response to Question 47 was "Yes," regarding bias.
21             THE COURT:  132.  Yeah, okay.  I'm not sure what that
22   means, but -- plus there is a hardship.  Got a special-needs
23   son.  So I'm not going to bring that person in.
24        Anybody else through 140?
25        (No response)
```

1          THE COURT:  Okay --

2          MS. TRIPODI:  Your Honor, I recognize 140 has a

3    two-hour commute.  Not sure that that is something that's

4    disqualifying.

5          THE COURT:  That's where the person says "I would need

6    a hotel room."  And we actually may be able to accommodate

7    that.  So I think it's worth bringing in, saying "If we can get

8    you a hotel, can you do it?"  And I've had people say that

9    makes a difference.  People who live way out in, you know, more

10   than two hours away.  So that would not be disqualifying.

11         MR. SPIRO:  This juror also calls Mr. Musk "an

12   asshole."

13         THE COURT:  Or "a bit of an asshole."

14         MR. SPIRO:  Again, we would object.

15         THE COURT:  All right.  Well, those are pretty

16   strongly-held views, so I think I'm not going to ask that

17   person, given the intensity of those views.

18        Anybody else?

19        (Off-the-Record discussion between counsel)

20        (No response)

21         THE COURT:  Okay.  If not, then through 150?

22         MS. TRIPODI:  Your Honor, 144.

23         THE COURT:  An attorney.  Santa Rosa.

24        Well, we do compensate for miles, right, Vicky?  We do

25   compensate for mileage, right, as well as toll?

1          **THE CLERK:**  Yeah.   (Inaudible)

2          **MR. SPIRO:**  I couldn't hear Your Honor.

3          **THE COURT:**  I was asking my staff about whether or not

4    we compensate for mileage as well as toll.  And we do.  And the

5    jurors will be told that.

6          And so if her concern is, quote, "the lack of affordable

7    transport," I'm not sure what she means by that.

8          **MR. SPIRO:**  I'm sorry.  I didn't hear the number,

9    Your Honor.

10         **THE COURT:**  Oh, I'm sorry, 144.  The Santa Rosa

11   attorney.  Doesn't have any strong views on Mr. Musk or Tesla.

12   I'm inclined to bring the person in and tell them what benefits

13   we offer, and if that makes a difference to them.  So we'll

14   bring in 144.

15         Anybody else through 150?

16         There is No. 150.  Data scientist at Intel.  Does have

17   pickup, but doesn't say that she's the only possible source of

18   transport.  So we could ask this person to come in.

19         **MS. TRIPODI:**  Your Honor, we are open to 150.

20         **MR. SPIRO:**  Again, same concern from the defense.  He

21   has very strong and, you know, strongly-held-enough views to

22   write them on a jury questionnaire about Mr. Musk's mental

23   state.

24         **THE COURT:**  Well --

25         **MR. SPIRO:**  And a person that has those views should

1    not be sitting in judgment of Mr. Musk.  We should find people

2    that are completely neutral and unbiased.

3         **THE COURT:**  Well, again, this is a judgment call.

4    This is not -- I mean, it's a very short comment.  "Talented

5    but crazy," that could mean lots of things.  And it could mean

6    things other than being unethical or being a liar, et cetera,

7    et cetera.  Be crazy to invest, you know, the kind of money

8    he's investing into something like Twitter.  It could be crazy

9    because his ideas are so innovative, nobody understands -- we

10   don't know for sure what that means.  And so it's not as clear

11   as some of the other ones.

12        So I think, because this person hasn't stated definitively

13   they have no other source of child transportation, I think it's

14   worth calling in.

15        So now we have added -- so what did we add since the last?

16   I want to say 122, 120, were the last ones.  So we have added

17   126, 128, 144, and 150.  So that's 21, I think.  If my numbers

18   are right.

19        So if they all come in, that would be -- that would give

20   us 55.  And I think that's good, because there is a good chance

21   of 10 percent no-show.  Hopefully that will yield 50.  And from

22   that, I think that is a -- a vetted pool of 55 ought to get us

23   the number we need.

24        **MS. TRIPODI:**  We concur, Your Honor.

25        **THE COURT:**  So -- all right.  So that's what I'm going

to do.  The record is made with respect to the vaccination question, the decline-to-state.

And I will reiterate that the reason why I'm doing that is, number one, for public health concerns, that to those who are going to be in close quarters like the jurors are who will be in proximity to each other and will take breaks with each other, that it is, I think, advisable from a public-health perspective.

It is also advisable in my experience in terms of jury comfort and willingness to serve.  And making sure that their attention is focused on the trial, and not being concerned about sitting next to somebody who is not assuredly vaccinated.  And so, based on the experience of this Court, that is a critical factor.  I have voir dired many jurors on this, and that is a consistent result.

And because of that, both in terms of ensuring the commitment, the attention, the focus of the jury, as well as their health and safety, and given the minimal cost here, at the end of the day we are excluding essentially three people out of 55 on this basis.  And I think the offer of compromise to exclude those who are not vaccinated, and be able to seat the one who is, has a minimal impact on this trial.

And so given the balance there, I am going to exclude those three jurors and ask them -- not invite them to come in.

So in terms of the process, I think the big thing we have

1   to decide is whether for some of those who have more

2   potentially controversial comments to make, whether we should

3   design a process to take those outside the hearing of the other

4   jurors to prevent inflaming or tainting the pool.

5       So one thing we could do is simply, when it comes to

6   asking those questions about their attitudes, just take that at

7   sidebar, or recess the jury and have them come in one at a

8   time.

9       **MR. SPIRO:**  Our request would be to have the jurors be

10  spoken to one at a time.

11      **THE COURT:**  And the way I would do that, if we were to

12  do that is I would start off with the hardships as I normally

13  do, and make the query about the hardships, and ask them

14  questions about the childcare, transport, all that type of

15  stuff.  And then when we get to, you know, the questions you

16  want to ask either follow up or attitudinal questions, you can

17  do that.

18      But if we get to a jury -- maybe we should list beforehand

19  who we think those are, where we think there is a risk, an

20  unreasonable risk of tainting -- we could then recess and then

21  call them in one at a time.

22      **MR. SPIRO:**  That is our request.

23      **THE COURT:**  For that question.  You ask everything

24  else.  I don't want to keep them going in and out, in and out.

25      **MR. SPIRO:**  I would, at the -- my recommendation,

frankly, would be at the outset to address those jurors that
have these strongly-held views.  We call them up one at a time.
That way it doesn't taint the pool.  We have an independent
assessment of them.  The Court has my views on that.  And, they
either stay or not.  And then you know what numbers you are
dealing with.

       **MS. TRIPODI:**  Your Honor, we're not opposed.  I think
we're concerned about efficiency and making sure we're not
wasting the jury's time and the Court's time.  But in the
Court's experience, I'm not certain what the best and most
efficient way to proceed would be.

       **THE COURT:**  Well, this is unusual because I normally,
you know, take -- it's -- occasionally somebody wants to say
something private.  So that this would be unusual in this case.
 And if we are going to take it privately, does it make sense
to do it at the outset as you say -- either way, the pool's
going to be waiting.  They either wait in the beginning --
they're going to be waiting at some point.

       **MR. SPIRO:**  Correct.  But it reduces the danger of
prejudice to our client, and the risk of prejudice from the
tainting of the pool.  And so our strong recommendation is to
just do it at the outset.

    The Court has wanted those people to come in.  The defense
has raised an objection.  We deal with them.  I think we can do
it efficiently.  It will take minutes, not hours.  And that

1   gives us the best chance to try to get a fair trial.

2          **THE COURT:**  Well --

3          **MR. PORRITT:**  Your Honor (Inaudible) --

4       (Reporter clarification)

5          **MR. PORRITT:**  I'm sorry.  I think what Your Honor

6   suggested in terms of hardship first is the obvious thing to

7   do.  We can do that as a group.  Eliminate those, excuse those

8   who obviously have hardship, and then we will be down to, say,

9   45, 40.

10      And then I think we need to talk about the most efficient

11  way.  I can see, you could do the ones, perhaps, where you

12  could rank them -- I think we should rank them, either the most

13  concerning first or the least concerning first.

14         **THE COURT:**  And I do have two categories in mind.

15         **MR. PORRITT:**  Yeah.

16         **THE COURT:**  Because I'm not going to necessarily do

17  individual voir dire or private voir dire for every single

18  person who says anything.  But the ones who said "He's an

19  asshole, he's a jerk," that kind of stuff, versus "I think he's

20  done a bad job in running Twitter," I think there's a

21  distinction there.  And I think there are about a dozen people

22  who are in that hot zone, ten to 12, who are more radioactive.

23         **MR. PORRITT:**  We could do the other ones first.  Once

24  we get to 15, we're set.  That's the point.  We may never get

25  to them all, the controversial ones.  That would be my thought.

1    But --

2            THE COURT:  Yeah, I got a feeling we're going to get

3    to them, because --

4            MR. SPIRO:  Well, to Mr. Porritt's point, we would

5    also be fine with that system, right.  So you take the ones

6    that the Court's calling radioactive, you don't seat them.  You

7    don't seat them in the same order as everybody else.  They're

8    here as backup.

9        You seat the other 35 or however many the Court views are

10   remaining.  And if we can get the jury from those, we can get

11   it down to 15 from that 35, we never have to deal with the

12   radioactive.  And I think that's a good suggestion.

13           THE COURT:  Is that --

14           MS. TRIPODI:  We're not opposed to that, Your Honor.

15           THE COURT:  Okay.  Let me make sure I understand what

16   the parties are proposing.

17       Instead of going just sort of numerically, that we would

18   identify the -- keep calling them "radioactive" or the hot

19   ones -- and save their individual voir dire to see if they are

20   really needed for this pool.

21           MR. PORRITT:  (Nods head)

22           MR. SPIRO:  Yes.

23           THE COURT:  So we can just proceed like we're going

24   to.  And knowing you've got some people you don't want to --

25   you don't want to unbox at this point.

1           **MR. SPIRO:**  Correct.

2           **THE COURT:**  And then we'll take a break and see if

3    we've got 15.

4           **MR. SPIRO:**  Correct.

5           **THE COURT:**  Well, that's an efficient way of doing it.

6    Okay.  So then the only question is:  Are we going to identify

7    those -- how do we classify those, the ones that are

8    particularly sensitive, I should say?

9           **MR. SPIRO:**  I think perhaps outside the presence of

10   the Court we could --

11       (Reporter clarification)

12          **MR. SPIRO:**  Outside of the presence of the Court, we

13   could create a list, compare it with our friends on the other

14   side, and then come up with a list that we agreed to.  And

15   there may be a couple of --

16          **THE COURT:**  Okay.

17          **MR. SPIRO:**  -- closer calls that the Court can decide.

18   And we send an email to, perhaps, the Court.

19          **THE COURT:**  All right.  And then we can take that up,

20   maybe we get together a little early on Monday -- or Tuesday,

21   and look at that, so we've got a clear plan.  But I think that

22   makes sense.

23          **MR. SPIRO:**  Okay.  So if that's what we end up --

24   assuming that's what we end up doing, they're just pulled out.

25   Are we to assume that the rest of the jurors remain in

1    numerical order, in essence?  And so they go, you know, Juror

2    3, 4, 6 --

3              THE COURT:  I can keep them all in numerical order.

4    It's just you don't question them.  We don't have to physically

5    segregate them, you just --

6              MR. SPIRO:  No, right, but is it going to be selected

7    that way?  Meaning --

8              THE COURT:  Oh.  Well, I assume that that's what the

9    proposal is.  Since, since, if we're trying to see --

10             MR. SPIRO:  Correct.

11             THE COURT:  -- the pool, minus the radioactive ones,

12   can yield a fair pool.  We never have to voir dire them.  So

13   yes, one of them was No. 3 or whatever, we wouldn't have to --

14             MR. SPIRO:  Yeah, I'm asking a slightly different

15   question.  I'm saying:  Forget the radioactive, you know,

16   slight change to the normal jury selection process here.  I am

17   correct that the way the Court does it is they are in numerical

18   order.

19             THE COURT:  Yes.

20             MR. SPIRO:  Okay.

21             THE COURT:  That's the normal way.  Your top 15.

22   Whoever's left standing after for-cause challenges.

23             MR. SPIRO:  (Nods head)

24             THE COURT:  And my understanding is the proposal is a

25   little different this time, knowing that there's some people

1  who are going to cause a more complicated voir dire process,

2  that they would be sort of removed from that normal order.  But

3  we're going to see after we do the voir dire process before we

4  get to any individualized voir dire, whether the top -- the 15,

5  minus those folks, whether we've got 15.

6          **MR. SPIRO:**  Yes, Your Honor.  Yes.

7          **THE COURT:**  Okay.  Is that agreed to?

8          **MR. PORRITT:**  I think so, Your Honor.  I mean,

9  we'll -- we can talk about it, I think we (Inaudible)

10      (Reporter clarification)

11          **MR. PORRITT:**  I'm sorry.

12      We may want to think about a numerical list -- limit on

13  how many of this so-called hot list (Indicating quotation

14  marks) --

15          **THE COURT:**  Well, that's why you're going to get

16  together and see, and see if you can stipulate to that.

17          **MR. PORRITT:**  I mean, if it's 45 out of 55, which I

18  understand Mr. Spiro may feel that way now, then in fact the

19  proposal kind of collapses.

20          **THE COURT:**  I assume not.  And I've already indicated

21  when I looked through this, the ones that I think that I would

22  choose to voir dire individually, it's probably about ten or

23  12, or something.

24      It's not -- you know, there are still people who have some

25  views, not too happy about the way he's run Twitter, but that's

```
 1    not the radioactive -- "I think he's a jerk, I think he's a..."

 2    you know.

 3              MR. SPIRO:  We understand the Court's guidance.

 4              THE COURT:  All right.  So why don't you see if you

 5    can come together, and then that's the way we'll do it.  I

 6    think that's an efficient way.  Hopefully, actually, we'll have

 7    a jury selected well before noon, which was my goal, and we can

 8    start the trial.

 9              MR. PORRITT:  (Nods head)

10              THE COURT:  So be prepared for your opening

11    statements.

12        I do want to talk to you about the jury instructions, but

13    we probably should take a little break at this point.  For the

14    court reporter, for you, for me.  There's still the jury

15    instructions.  I want to talk to you about Daubert.

16        There's an issue about -- is there an issue about

17    subpoenas?  I don't know if that's taken care of itself, but --

18              MR. SPIRO:  Yeah.  Your Honor, as to that, just to

19    take one thing off of your plate, which is Document 562 which

20    is a subpoena to the TIF.  We have been trying to subpoena the

21    TIF to convince them to come to this trial for a long time.

22    They have claimed sovereign immunity and a host of other

23    things.  We are not going to be pursuing the subpoena at this

24    time; we're just going to moot this issue.

25              THE COURT:  Okay.  Great, thank you.
```

1       All right.  So the main thing we have to talk about is the

2   request for leave to file *Daubert* and the objection to the jury

3   instructions.  I guess -- I just got the exhibit list, and are

4   there objections to the Tuesday exhibit list?  I can't remember

5   now.

6           **MR. PORRITT:**  That would be correct, I think,

7   Your Honor.  Yes, that would be from defendants, yes.

8           **THE COURT:**  All right.  I may have to defer that to

9   first thing, you know -- I'll see if I have a chance to look at

10  it now, but I -- I do want to get to the jury instructions and

11  the *Daubert* question and then if we can get to the specific

12  objections.  How many, how many exhibits are at issue in terms

13  of objections?

14          **MR. PORRITT:**  To be honest, Your Honor, I came in at

15  8:30, and I was here, so I haven't seen it yet, so -- for the

16  objections.

17          **THE COURT:**  Okay.

18          **MR. PORRITT:**  So I'm not sure.  Knowing the exhibits

19  that we listed, I don't think there's -- I'm not sure -- most

20  of them I thought were fairly noncontroversial.  So I actually

21  don't think they will be too difficult.

22          **THE COURT:**  All right.  All right.  So I think those

23  are the -- the two things we need to talk -- three things.

24  *Daubert*, instructions, and objections.

25          **MR. PORRITT:**  (Nods head)

1          **THE COURT:**  And are you using -- are you planning to

2     use a demonstrative for the opening?

3          **MR. PORRITT:**  I was planning to, Your Honor.  We just

4     got the objections this morning from defendants.

5          **THE COURT:**  All right, so you have shown that, so we

6     will have to resolve that question as well.

7          **MR. PORRITT:**  We respond -- under the protocol we

8     respond by 3:00.  We got the objections this morning at 8:30,

9     and we respond by 3:00.

10          **THE COURT:**  Okay.  All the more reason why we may need

11     to take this up early Tuesday morning.  Because I want to see

12     your response.

13          **MR. PORRITT:**  Yes, Your Honor.

14          **THE COURT:**  Of course, you're also going to meet and

15     confer and see what you can resolve, right?

16          **MR. PORRITT:**  Very good, yes, Your Honor.

17          **THE COURT:**  All right.  But I think the plan, thanks

18     to your insight and I think the efficiency, there is probably

19     -- we spent a lot of time today, but that makes Tuesday, I

20     hope, expeditious.

21          **MR. PORRITT:**  Hopefully so, Your Honor.

22          **THE COURT:**  Better than having 200 people in the room,

23     and do voir dire from the seat of your pants for days.

24          **MR. PORRITT:**  (Nods head)

25          **THE COURT:**  So, all right.  So, I'm fully anticipating

```
1   to start trial and clocking some hours on Tuesday.
2           MR. PORRITT:  Very good, Your Honor.
3           THE COURT:  Good.  Great.  So, why don't you guys can
4   grab lunch?  Should we -- the next hearing, Vicky, is that at
5   3:00?
6           THE COURTROOM DEPUTY:  2:30.
7           THE COURT:  2:30?
8           THE COURTROOM DEPUTY:  Uh-huh.
9           THE COURT:  All right, why don't we come back at 1:30.
10          MR. PORRITT:  Very good, Your Honor.
11          THE COURT:  Thank you.
12          THE COURTROOM DEPUTY:  Court is in recess.
13      (Recess taken from 12:34 p.m. to 1:41 p.m.)
14          THE COURT:  Have a seat.  Have a seat, everybody.
15          THE COURTROOM DEPUTY:  Court is reconvened.
16          THE COURT:  Okay.  Anything to report with respect to
17  -- did you meet and confer to talk about the jury stuff at all?
18          MR. PORRITT:  Nothing to -- regarding the jurors,
19  Your Honor?  Or the --
20          THE COURT:  The question about identifying those
21  jurors that we don't need to --
22          MR. PORRITT:  I confess we did not.  I contemplated
23  getting a sandwich, I apologize.
24          THE COURT:  I didn't know if you were going to do
25  that, so that will be done after hours.
```

1          **MR. PORRITT:**  We will do it this afternoon or this

2     weekend, yes, Your Honor.

3          **THE COURT:**  If you can inform the Court --

4     unfortunately our systems are -- we will be able to get emails,

5     though, right, Vicky?

6          **THE COURTROOM DEPUTY:**  It's down.  You will have to go

7     on to the application.

8          **THE COURT:**  We still can retrieve emails.

9          **THE COURTROOM DEPUTY:**  Through the application, yes.

10          **THE COURT:**  So if you would let Ms. Ayala know if you

11     have some kind of arrangement or where you are at, you know,

12     over the weekend.

13          **MR. PORRITT:**  Yes, we will.  Yes, Your Honor.

14          **THE COURT:**  You have the email, her email, that you

15     can mail it to?

16          **MR. PORRITT:**  Yes, we have been in frequent contact.

17          **THE COURT:**  Okay.  Good.  Good, good, good.

18     All right.  So let's talk about the next thing to talk

19     about, which is the objections to jury instructions.  What I

20     want to do is get out a set to you of instructions I intend to

21     give after taking into account your comments.  And thank you

22     for meeting with my law clerk.

23     I'm not going to go through every single thing.  I've gone

24     through the objections and some of these I'm going to accept,

25     some of the things I don't accept.  But you will see that.  I

will make one comment, and that is, with respect to materiality

and the 10(b)(5) description which I intend to read, I am going

to include a section on materiality.  To elaborate on that,

borrowing from the materiality instruction.  So that was one of

the structural things that I thought that I would mention.  But

I will give you the wording on that as we wordsmith that a

little bit.

      And I know there is some controversy about the law on

certain things, and I have heard the arguments several times.

And I'm going to make my decision.

      The area that -- there are two areas that I do want to

hear your comments on, so I can get some clarity.  And that is

the defendants -- with respect to the corporate entity

liability, defendant wants us to include the language "If you

find against Mr. Musk but do not find Mr. Musk was acting

within the scope of authority as an officer of Tesla, then you

must find Tesla is not liable."

      So, and my understanding is that the rationale for that is

that even if it's theoretically possible for corporate

liability to be found in other ways, under the facts of this

case, it's only Mr. Musk who made the representation.  It

wasn't a series of people, it wasn't a corporate -- formal

corporate communication, et cetera, et cetera.

      So the only way, as the evidence is being presented, would

be through -- through, I guess, the imputation through the

1   scope-of-authority issue.

2       So I want to hear from the plaintiffs.  Why shouldn't that

3   be given?

4       **MR. PORRITT:**  Thank you, Your Honor.  Nicholas Porritt

5   on behalf of the plaintiff.

6       This is the context of the scienter -- imputation of

7   scienter instruction, I believe.

8       **THE COURT:**  Yeah.

9       **MR. PORRITT:**  You know, the issue that you have just

10  described is really -- also touches upon the issue of whether

11  they made a misrepresentation.

12      And before the jury even reaches this query or this

13  question, they must have already found that Tesla has made a

14  statement, which involves many of the -- we have two

15  misrepresentations here.  So I don't think that's really any

16  great secret.  So they would have already found that Tesla was

17  the maker of one or both of those statements.

18      And so, based on that finding, if they are addressing the

19  question of scienter, it's really only the question of the --

20  it's the imperative, that that's the only way in which Elon

21  Musk -- that Tesla could have been found to have acted with

22  scienter in connection with the statement that the jury must

23  necessarily have found that Tesla, itself, has made.  So that

24  is really only our objection to that.

25      There was --

1          THE COURT:  So how --

2          MR. PORRITT:  There was already an instruction saying

3     a statement must be made, you know, talking about the scope of

4     authority and the imputation and so on.

5          THE COURT:  Well, so we have, at least, my -- my

6     initial proposal had the imputation of scienter as a separate

7     instruction.  And said that if he was -- acted with scienter

8     and within the scope, then imputation is permissible.

9          MR. PORRITT:  Yes, Your Honor.

10         THE COURT:  But there was also an instruction about

11    maker.  And so are you saying that there's going to be evidence

12    from which the jury could find, independent, somehow

13    independent of Mr. Musk acting within the scope of his

14    authority, that Tesla was a maker?

15         MR. PORRITT:  I mean, I think it's -- I mean, there

16    was evidence, of course, that one of the misrepresentation

17    contains an email, an internal email that was then published by

18    Tesla on its blog post, that was written by Tesla corporate

19    executives for Mr. Musk, said that under his name.  (Inaudible)

20    Musk then is contained within, if you like, the

21    misrepresentation.  That was not the false.  That's the

22    second -- the final tweet on August 7th, investor supporters

23    confirmed it contains a corporate statement, essentially, or

24    corporate-drafted statement.

25         So, could -- we would submit that's enough for a jury --

1    and of course, that the Tesla also Corporate Relations endorsed

2    and repeated the statement about "funding secured" to various

3    investors during the course of the afternoon of August 7th.

4        So, those two pieces of evidence -- I'm not saying that's

5    an exhaustive, list but those are the two pieces of evidence

6    that easily come to mind, may be sufficient for the jury to

7    find, under the current law, that they were the maker of those

8    statements.  In addition to Elon Musk being the CEO of Tesla,

9    and identified as such, when he makes those statements.

10        **THE COURT:**  So independent of Mr. Musk's authority

11   within the scope, which then you could do attribution and

12   imputation, your view is that there will be evidence from which

13   the jury could find Tesla liable.

14        **MR. PORRITT:**  Yes, Your Honor.

15        **THE COURT:**  And therefore, their proposed instruction

16   that "If they don't find that he was acting in the scope, you

17   must find Tesla not liable" is wrong, because it disregards

18   these other alternative means of establishing Tesla's

19   liability.

20        Is that your argument?

21        **MR. PORRITT:**  Correct, Your Honor.  I think it's too

22   limiting, in the context of giving essentially just one path

23   for us to prove corporate scienter.

24        **THE COURT:**  Okay.  Response?

25        **MS. THOMPSON:**  Ellyde Thompson on behalf of

1  defendants, Your Honor.  There are several errors in what

2  Mr. Porritt is saying here.  And in fact, I think the Court's

3  instinct is correct here.

4       First, as to the maker question, the only

5  misrepresentations alleged here are the three tweets.  There is

6  no allegation that there was a misrepresentation in the

7  August 7th blog post.  And so I don't think there is any basis

8  for Tesla to be a maker of a statement, based on that.

9       In addition, I think ultimately, Mr. Porritt is correct

10 that whether Tesla can be held liable does come down to

11 scienter.  And that is simply because the only pleaded way in

12 which Tesla can be found to have scienter is through Mr. Musk.

13      Now, I'll point the Court to plaintiffs' interrogatory

14 responses, which is Exhibit 431 at Pages 163 to -64.  It

15 explains the theory of the scienter for the August 7th tweets.

16 And it's all about Mr. Musk's knowledge.  There is no general

17 recklessness theory included there.

18      And then the Court, of course, can look to the complaints.

19 The consolidated complaint, scienter is alleged in Paragraphs

20 141 to 151.  It is all about Mr. Musk's scienter.  The same

21 thing with the complaint, original complaint, Paragraphs 152 to

22 164, 166 to 167, 178 to 182.  It talks about Mr. Musk's motive.

23 Mr. Musk was reckless; Mr. Musk's scienter is imputed.

24      And that's why it's necessary and we have requested that

25 the Court give the instruction, both in imputation of scienter

1    and in the corporate entity, that Tesla cannot be liable if

2    Mr. Musk is not acting within the scope of his authority --

3          **THE COURT:**  Not, there's not another basis pled for

4    establishing scienter and liability of Tesla, other than

5    through Mr. Musk acting in his -- within his authority.

6          **MS. THOMPSON:**  That's correct, Your Honor, yes.

7          **THE COURT:**  Let me seek a clarification, where in the

8    pleadings or where -- what is the theory that's not dependent

9    on Mr. Musk?

10          **MR. PORRITT:**  Well, I believe it is -- I apologize, I

11    don't have a copy of my complaint immediately to hand to refer

12    to the paragraphs.  But, there's certainly this sort of idea or

13    the theory that Tesla is liable directly for the statements

14    that alleged to be misrepresentations to the August 7th blog

15    post -- the August 7th tweet --

16          **THE COURT:**  Say it again, liable for what?

17          **MR. PORRITT:**  For the August 7th tweets as primarily

18    violative, was due to the fact of its actions of its corporate

19    relations department, due to the fact that it was involved in

20    drafting portions of that tweet, was reflected in our pretrial

21    statement.  For instance, our statement of the issues for the

22    trial.  We don't believe this --

23          **THE COURT:**  So the Corporate Relations or public

24    relations department drafted parts of?  Or, what role?

25          **MR. PORRITT:**  So the final tweet on August the 7th is

 1   a tweet by Mr. Musk which starts off "Investor support is
 2   confirmed," and it attaches an email from Mr. Musk purportedly
 3   to Tesla employees, which was drafted for him by Tesla
 4   Corporate Relations.  It was drafted by a combination of --
 5   Tesla Global Communications, Tesla general counsel, and the
 6   Tesla CFO collectively drafted that email.  So --

 7        **THE COURT:**  So you're saying that part of the
 8   misrepresentation is the attachment.  That attachment, though
 9   it was an email from Mr. Musk, was actually drafted by Tesla,
10   and therefore, Tesla was a maker of that particular email which
11   is attached, and therefore, part of the misrepresentation?

12        **MR. PORRITT:**  Yeah, it's not -- and the fact that
13   Corporate endorsed, if you like, the statement that "funding is
14   secured," numerous times during the course of that afternoon.

15        **THE COURT:**  Endorsed, in what way?

16        **MR. PORRITT:**  Well, in the sense that investors asked:
17   Is funding secured?  And Corporate Relations said:  Yes, there
18   is a firm -- they said:  Yes, there was a firm offer; the offer
19   is as firm as it gets, funding is --

20        **THE COURT:**  That's not an asserted misrepresentation
21   that is the basis of the cause of action here.

22        **MR. PORRITT:**  Correct, no, because it was made a --
23   but we would view it as evidence that -- you know, you we get
24   into this evidence of intertwining of Corporate Relations when
25   they intertwine with comments by non-specific corporate actors.

1      (Reporter clarification)

2          **MR. PORRITT:**  Non-corporate actors.

3      So we would submit that there is sufficient evidence

4   that -- in the context of both that Tesla is the maker, that's

5   additional evidence, in addition to the fact Elon Musk is

6   Tesla's CEO when he made these statements, which obviously is

7   the primary -- I mean, the primary evidence supporting Tesla's

8   liability for the misrepresentations in this case is the fact

9   that Elon Musk made them, we would submit, in the scope as CEO

10  of Tesla.

11         **THE COURT:**  Right.

12         **MR. PORRITT:**  So, everything we're talking about is in

13  addition to that, just to be clear.

14         **THE COURT:**  Right, right.  And your opponent doesn't

15  want an addition; you want an addition.

16         **MR. PORRITT:**  Correct.  That's exactly right,

17  Your Honor.

18         **THE COURT:**  Well, maybe this is the kind of thing that

19  I'll have -- the final instruction may await what comes out at

20  trial.

21         **MS. THOMPSON:**  Your Honor, I don't think that's

22  possible, because this theory has not been pleaded.  So even if

23  we set aside the maker, if we go to imputation of scienter and

24  corporate entity, it's absolutely accurate that, um, that Tesla

25  cannot be held liable unless Mr. Musk is acting within the

1   scope of his authority, because there is no other basis for

2   scienter on behalf of Tesla.

3          THE COURT:  How do you set aside the maker?  How do

4   you set aside the maker argument?

5       See, the way it's framed right now is that's -- it's just

6   one of potentially other ways.  You want to make it the

7   exclusive way.  Everything rises and falls on the imputation

8   question via scope of authority.

9          And, and what Mr. Porritt is saying is that:  Well, that's

10  not the only way that scienter can be established in this case.

11         MS. THOMPSON:  It is the only pleaded theory in this

12  case.  And it would be quite dramatic if, you know, the final

13  day before the trial begins, they're allowed to add a new

14  theory of scienter.

15      I have gone through exactly the interrogatory response.

16  There was nothing that Mr. Porritt is saying now, related to a

17  theory of Tesla's scienter.  I've gone through the complaint as

18  it was pleaded.

19      I think this has, frankly, been understood that the theory

20  of Tesla's liability was Mr. Musk acting within the scope of

21  his authority.

22         THE COURT:  All right.  So that raises an issue of

23  whether you're bound by the pleadings, and whether what -- your

24  sort of theory of alternative ways of establishing scienter by

25  Tesla is something that should be not countenanced because it

1  wasn't pled.

2       **MR. PORRITT:**  Well, I think it is covered by the

3  pleadings, Your Honor.  I don't think this is a novel theory.

4  Defendants are very fond of saying we're constantly changing

5  our theory at the last minute, when we're really not.

6       I think this has been the case since the very get-go.  I

7  don't think this is hiding the ball.  I do not think this is a

8  -- a surprise.

9       **THE COURT:**  Is there a contention interrogatory --

10  there usually is in these cases.  Is there some kind of

11  interrogatory response that indicates the theory that you're

12  advancing now?

13       **MR. PORRITT:**  If Your Honor could give me a moment, I

14  could -- I will have a look at the answers which my

15  colleague -- my opponent says they have looked through very

16  carefully, and try and identify a relevant paragraph.  I don't

17  want to bog down the proceedings too much.

18       **THE COURT:**  Let me ask you.  I don't think I need to

19  decide this particular issue by Tuesday morning.

20       **MR. PORRITT:**  Correct, Your Honor.

21       **THE COURT:**  It may turn on what -- what the evidence

22  is.

23       (Off-the-Record discussion between counsel)

24       **MS. THOMPSON:**  Well, first of all, I think we should

25  know if there's is going to be an entirely new theory of

1    Tesla's scienter before opening statements.

2          But second of all, no, it does not depend on the evidence

3    that comes into the case as to imputation of liability,

4    imputation of scienter, and corporate entity, because the only

5    pled theory, the only theory in that interrogatory response is

6    that Mr. Musk was acting within the scope of his authority.

7    And there will be no evidence that anyone else at Tesla had

8    anything to do with the August 7th tweets, anyway.

9          This idea that linking to a blog post from an entity

10   somehow can get you to this point I think is quite remarkable,

11   as well, and would be a dramatic expansion of primary liability

12   under the securities laws.

13          THE COURT:   Okay, let's do this.  Let's do this.

14   Mr. Porritt, I'm going to give you a chance by this afternoon

15   to highlight for me somewhere in the complaint where you

16   believe this has been pled, or somewhere in an interrogatory

17   response where you've given notice, fair notice to the other

18   side of this alternative means of establishing corporate

19   scienter, other than through Mr. Musk and his tweet and his

20   scope-of-authority question.  And, a proffer of the evidence

21   you think supports that theory.

22          And I'll have to make an assessment whether there's enough

23   there in terms of pleading notice, and substance, to leave this

24   theory open.  Otherwise, I may say:  The motion is sufficiently

25   pled; go with your main theory.

1          **MR. PORRITT:**  Very good, Your Honor.

2          **THE COURT:**  But at least it's teed up.  I understand

3    what the issue is.  And that's what I was hoping to get from

4    you, also.  Thank you on that.

5          The other big one has to do with the good faith question,

6    and the model instruction.  And whether we stick with the model

7    instruction that permits good faith -- I think it's phrased

8    only by establishing enforcement of a reasonable and proper

9    supervision and internal control.  I've seen the cases that you

10   have now submitted, even as of last night.

11         I do note that the cases that the plaintiff cited, and to

12   which the defendant sort of responded, some of my brother and

13   sister courts have given this instruction, but a slight

14   variance -- of course, now I don't know where it is.  Here it

15   is.

16         That the word "only" may be -- well, first, I understand

17   the law about broker-dealers, whether it should apply or not.

18   And I understand that there is some ambiguity.  I am faced with

19   a clear model instruction that interprets the law so as to

20   bring in this element.

21         I think the question is, when it says that's the only way

22   to prove good faith, I'm not sure.  Because that -- that

23   becomes quite mandatory under those circumstances.

24         So I want to hear your comments on that, and whether one

25   approach would be to take the instruction, but not use the word

1    "only."

2          MR. PORRITT:  And Your Honor, I had the same reaction

3    when I reread it with your clerk yesterday afternoon.  I think

4    "only," which is in the model instruction, which is why we

5    proposed it -- but I think, after reading some more of the case

6    law, I think that is perhaps slightly going beyond the law in

7    the model instruction.  So we would consent to removing the

8    word "only" but otherwise leaving the instruction as it is

9    written.

10         THE COURT:  Okay.  Comments?

11         MS. THOMPSON:  Well, you know, certainly -- and I

12   won't rehash the whole broker-dealer point at all.  But

13   certainly that is not, um -- that is not the law in the Ninth

14   Circuit, regardless.

15       I do want to raise those, but -- that issue.  And so if it

16   just omitted the word "only," I don't think it would be

17   following Ninth Circuit law.  And so that would not address our

18   concern.

19       Now, Ninth Circuit binding precedent, or binding on this

20   court, unlike these other jury instructions, supports the

21   instruction defendants have proposed.  And we've cited case law

22   that following a model instruction, especially one that's sort

23   of untested like this one, will not insulate this Court from

24   reversible error on appeal.

25       Now, the issue I think, as this Court has explained it, is

1    that there's a policy issue.  And this Court relied on a

2    District Court case, *Allstate*, that looks to a Ninth Circuit

3    case, *Kirsch*.  But the Court I don't think needs to use the

4    securities laws here to reach the policy point that the Court

5    articulated in its jury instruction responses, because there

6    are other laws that cover that policy.  And it's inconsistent

7    with the Ninth Circuit.

8         So if the Court is concerned about the fiduciary duties of

9    the directors, and that is why the Court doesn't want to follow

10   binding Ninth Circuit precedent on the good faith defense for

11   directors, then the Court, of course, should be aware that

12   there are ways in which shareholders, through derivative

13   actions, can bring fiduciary duty claims against board of

14   directors.

15        **THE COURT:**  Let me ask you, I mean, policy

16   considerations are secondary.  I don't see a Ninth Circuit

17   case, unless I missed something, where a court has said

18   affirmatively that the broker-dealer standard of looking at the

19   question of maintenance of internal control is -- is not

20   relevant to good faith.  There are decisions that use good

21   faith sort of divorced from that, and not including that.

22   Those are in cases where, like, the defendant, although a

23   member of the board, actively engaged in the fraud, in the

24   alleged fraud.  I mean, that wasn't the issue.

25        The question, was that good faith when they went out and

1    did X, Y and Z, the issue wasn't an assertion of liability

2    based on -- or exculpation based on maintenance of records of

3    things.  So they don't seem to be on point.

4         I'm wondering, is there actually a case that takes this in

5    the Ninth Circuit, and rejects broker-dealer liability?

6         MS. THOMPSON:  Are you asking:  Is there a case that

7    rejects the model instruction?

8         THE COURT:  Yeah.

9         MS. THOMPSON:  I mean, I don't -- I'm not aware of a

10   case that says:  Don't give this model instruction for the good

11   faith defense in, you know, Section 20(a) liability cases.  But

12   what we do have are three decades of Ninth Circuit cases

13   articulating the good faith defense in cases involving control

14   person liability for corporate officers and directors, and it's

15   what we have proposed, the absence of scienter and the failure

16   to directly or indirectly induce the violations at issue.  And

17   so I think that is a clear indication to the Court that that is

18   the proper standard.  It is binding on this Court.

19        And you know, I think from the policy perspective, just to

20   go back to that, there is a difference -- not only a statutory

21   difference but there is a difference between the board of

22   directors which is not dealing with, say, customers of Tesla on

23   a day-to-day basis, and the broker-dealer context where it's

24   customer-facing, and there is an aspect of that fiduciary

25   relationship there.

1          This is not primary liability.  It is secondary liability.

2     And the Supreme Court has articulated, including in *Ernst &*

3     *Ernst,* decades ago in Footnote 28, how it's not a negligent

4     standard under Section 20(a), but it requires more than

5     negligence here.

6          And that is, of course, consistent with what the Ninth

7     Circuit has articulated, that there -- you know, absence of

8     scienter and not directly induce -- directly or indirectly

9     inducing the violation is good faith on behalf of the

10    directors.

11              **THE COURT:**  All right.  What's your response?

12              **MR. PORRITT:**  Your Honor --

13              **THE COURT:**  That there is a difference, the lack of

14    customer-facing context.  And therefore, responsibility

15    suggests a difference between broker-dealers and board members.

16              **MR. PORRITT:**  Well, Your Honor, first of all, it's the

17    same statute, Section 20(a), which itself contains no

18    distinction.  It's not a statute directed to broker-dealers.

19    The Ninth Circuit in the *Arthur Children's Trust* case

20    explicitly says *Hollinger*, which is a broker-dealer case and is

21    the standard here talking about control person liability,

22    extends beyond that context of broker-dealers, quite

23    explicitly.

24         So the Ninth Circuit understands that the standard as

25    articulated in the model instruction applies to all cases

1    involving 20(a), including those not involved in

2    broker-dealers.  There's no real reason why it should be

3    limited to those involving broker-dealers.  It involves people

4    who control and have the ability to control primary violators

5    of the Rule 10b-5, which is a rule of general application,

6    applies to all people making representations in connection with

7    the purchase or sale of a security.

8         And finally, the statute in Section 20(a) doesn't use the

9    word "scienter," which I think in this case would be confusing;

10   uses the word "good faith."  So the statute is quite explicit

11   that a defense can be established if the defendant acted in

12   good faith and did not directly or indirectly induce the act or

13   acts constituting the violation or cause of action.  So, that's

14   exactly what the instruction says, what the model instruction

15   says, and what your proposed instruction says.

16        So I think adhering to the language in the statute and

17   that this (Indicating) provides, particularly now with removal

18   of the word "only," provides an explanation to the jury as to

19   how you can establish that good faith.  So I don't know how

20   that could be unfavorable to defendants here, when it's

21   providing the jury an idea about how you can establish in good

22   faith, which, if you have established adequate corporate

23   controls, a reasonable proper system of supervision and

24   internal control, then that would be sufficient to establish

25   good faith.

1      So it's a way of -- it's providing a pathway to the

2   defense, for the defense not establishing a standard of

3   liability.

4      **THE COURT:**  All right.  Well, let me ask.  By removing

5   the word "only," why doesn't that become suddenly advantageous?

6   That's just saying here's one way -- it doesn't preclude other

7   ways.  Now you've got several choices.  One more choice than

8   you would have.

9      "Only," I understand, that constricts you to one

10  prescriptive way out.  And now, without the word "only" to

11  which the plaintiffs are consenting to by deleting that -- you

12  don't want to use it, fine.

13     I mean, I guess I'm trying to figure, what's the

14  prejudice?

15     **MS. THOMPSON:**  The rest of this instruction, I -- I

16  suppose if you're just giving one example, but perhaps then the

17  Court needs to say that this is one example.  I think then,

18  then, I think perhaps we just limit it to not saying anything

19  at all, if that's not the only way, and it just says "directly

20  or indirectly induce the Section 10(b)(5) violation and acted

21  in good faith," and end it there, which is of course what some

22  of the proposed instructions -- some of the instructions that

23  we sent along yesterday do.  They ended after "he or she acted

24  in good faith."

25     So, you know, I think that "only" -- removing the word

1    "only" doesn't resolve the concern here, because I think it

2    implies that it's the only way because it's the only way

3    listed.

4         If the Court wanted to remove that, I think that would be

5    some improvement.  And, and, you know, perhaps help alleviate

6    our concerns.  And address -- you know, not be entirely

7    inconsistent with Ninth Circuit law, at least.

8              THE COURT:  What if the words "a director can, for

9    instance, prove good faith by establishing..." so it shows it's

10   an e.g., not an i.e.

11             MS. THOMPSON:  Well, we're certainly -- again, that

12   helps.  We're moving in the right direction.  I think we're

13   entitled to the idea that, you know, good faith, the idea that

14   there's sort of an honest belief that there's a lack of

15   scienter, which is exactly how the Ninth Circuit has

16   interpreted it, I think we're entitled to that as well.

17        So perhaps if you wanted to include both, both examples,

18   that might --

19             THE COURT:  Which is the other example?

20             MS. THOMPSON:  It would be "can prove good faith, for

21   instance, by establishing that he or she maintained and

22   enforced..."

23        (Reporter clarification)

24             MS. THOMPSON:  Well, I guess "for instance, by

25   establishing that he or she maintained and enforced a

1  reasonable and proper system of supervision and internal

2  control, or acted with a lack of scienter.  That is, a lack of

3  knowledge or reckless disregard of falsity."

4      **MR. PORRITT:**  Well, Your Honor, obviously we would

5  object to that extra gloss, because I don't think that's what

6  the law is.  And I think the statute says "good faith," and we

7  should stick to the statutory language.

8      **THE COURT:**  There's already -- there's already a

9  scienter instruction.  If they find that there was no scienter,

10  I don't even think you get to a defense.  I mean, you win.

11      **MR. PORRITT:**  No scienter on behalf of the primary

12  violator, that's correct.  I don't think the scienter --

13      **MS. THOMPSON:**  That's right.  So that's why the

14  problem with this, the Court's formulation of good faith

15  defense is that it holds the secondary violators liable without

16  a showing of scienter on their part, even though the primary

17  violator cannot be held liable without a finding of scienter.

18      **MR. PORRITT:**  And that's what Section 28 provides.  So

19  if --

20      **THE COURT:**  Well, it starts off by saying "Even if you

21  find a Tesla director is a controlling person..."  That means

22  you've got to go through all the prior stuff that was

23  discussed.  This is kind of like you've gone through all this

24  stuff and you find liability, there's still a way out.  It's

25  like an affirmative defense.  It doesn't obviate all the

```
 1   elements that have to be shown.
 2        MS. THOMPSON:  Right.  But the way it's drafted in the
 3   proposed instruction makes it a negligence standard, which I
 4   think the Supreme Court warned against in *Ernst and Ernst*,
 5   which the Ninth Circuit in *Kirsch*, which *Allstate* cited, warned
 6   against.  And for that reason, of course, is why three decades
 7   of Ninth Circuit precedent says that good faith is not directly
 8   or indirectly inducing the violation, and the absence of
 9   scienter.
10        MR. PORRITT:  Well, it says that the "acting in good
11   faith" is what the standard is.  So I think we're having a
12   disagreement.  I don't think the case law represents what
13   Ms. Thompson says.
14        THE COURT:  Well, there's already an instruction on
15   scienter.  And if you're going to hold Tesla liable, you've got
16   to show Tesla acted with scienter.  There is that thing about
17   the imputation, which we talked about.
18      So that scienter element, to repeat that again, it seems
19   to me it's confusing.  It's already there.
20        MS. THOMPSON:  Well, but Your Honor, we're talking not
21   about Tesla, which is -- which they're trying to hold Tesla
22   liable as a primary violator, but as the board members.  The
23   individuals, the individual board members who served on Tesla's
24   board, they are trying to hold them liable under Section 20(a).
25      The Supreme Court, the Ninth Circuit, have all indicated
```

1    that this is not a negligence standard.  That mere inaction

2    should not be enough to defeat a good faith defense on behalf

3    of a control person.

4        And that's why the Ninth Circuit has formulated -- and

5    again, over decades, when it talks about the good faith defense

6    for control person liability, it talks about the absence of

7    scienter, and it has those two elements, which is what

8    defendants have proposed in their jury instruction.

9            MR. PORRITT:  And Your Honor, the relevant scienter

10   for 20(a) is good faith.  Which is more than negligence.  So if

11   you can show good faith, then that's a higher -- absence of

12   good faith is a higher standard than negligence.  So the

13   statutory language is very clear.

14       I think this -- the safe path, the safe harbor for the

15   Court is to stick to the statutory language, which is good

16   faith.  And I don't see any reason -- I think the word "good

17   faith" is understandable, and not ambiguous.

18       And I don't think we are adding anything by including this

19   element of scienter, which is certainly a less-common-used

20   concept than the concept of good faith, which is, again, in the

21   statute.

22           THE COURT:  Well --

23           MR. PORRITT:  I don't think there's any risk of

24   illegal error by using the words in the statute.

25           THE COURT:  If you look at the controlling person

1    liability instruction which is from the Ninth Circuit

2    instruction that I proposed, the last paragraph says (As read):

3                    "On this claim" -- which is the Section 28

4                    claim -- "plaintiff has the burden of proving

5                    by a preponderance of the evidence that each

6                    Tesla director possessed, directly or

7                    indirectly, the actual power to direct or

8                    cause the direction of the management

9                    policies of Tesla where Tesla is liable on

10                   plaintiffs' 10(b)(5) claim."

11       So you have to -- --  it's all predicated on Tesla being

12   liable on plaintiffs' 10(b)(5) claim.

13       You go back, 10(b)(5) claim does talk about scienter.

14   Whether it's Tesla and/or Mr. Musk.  So that -- that scienter

15   is required.  When you add it all up, you've got to have a

16   10(b)(5) claim to start with.  10(b)(5) claim requires

17   scienter, as well as everything else.  And then, you can be

18   liable if you possessed, directly or indirectly, the actual

19   power to direct the conduct which was at issue.

20       So there is -- I admit, maybe you have to kind of go

21   backwards a little bit, but there is a scienter requirement

22   that's implicit in this thing.  And the -- the good faith is

23   just a safety valve at the end of all that.

24               MS. THOMPSON:  Yes, it is a safety valve, but beyond.

25   And one way it's a safety valve is if these individuals, the

1   ones serving on the board of directors, did not act with

2   scienter, then they should not be liable.

3          THE COURT:  So even if Tesla had scienter, even if

4   Tesla is liable under 10(b)(5), even if plaintiff has proven

5   that each -- a director possessed control to direct the

6   management and policies where Tesla was found liable, you still

7   have to prove individual director scienter on top of that?

8          MS. THOMPSON:  Yes, Your Honor.  But it's the -- the

9   good faith defense is the combination so did not directly and

10  indirectly induce, and the absence of scienter.  So it's not

11  simply one or the other.  Both are required for the good faith

12  defense.

13         THE COURT:  All right.  And your opponent says

14  scienter in that context has sort of a safety valve, as defined

15  by good faith.

16         MS. THOMPSON:  Right.  And just to be clear, the

17  burden shifts, so -- right, because it is a defense, the

18  defendants, the individual directors, have the burden to prove

19  they meet the requirements of the good faith defense.

20         THE COURT:  Well, let me ask Mr. Porritt.  Can the

21  defense by an individual director obtain, if what the director

22  shows -- nothing to do with controlling the internal controls,

23  but they didn't know anything.  They didn't know -- they had no

24  scienter in any typical sense.  They weren't recklessly

25  disregarding; they weren't knowing.  Tesla might have been

1    deemed knowing, as a corporation, as an entity under 10(b)(5).

2        But under 20(a) that individual -- I mean let's say it was

3    a lackadaisical board member, never went -- didn't read the

4    emails, didn't go to board meetings.

5        **MR. PORRITT:**  I don't think that makes a good faith

6    defense.  I don't think that's inconsistent with the act.  I

7    don't think that's inconsistent with Ninth Circuit law.

8        **THE COURT:**  All right.  So then we have a substantive

9    difference.  You think that person --

10       **MR. PORRITT:**  If there was an absence of other

11   internal controls.  I mean -- I think one reason why I think

12   the model instruction is written the way that it is, is because

13   for control persons, they -- the way they can show good faith

14   to -- so that the control person complies with the federal

15   securities laws is to establish good controls.

16       And that may not necessarily be in the corporate context.

17   That could be for any individual.

18       **THE COURT:**  Is there any other way that a director can

19   escape liability?

20       **MR. PORRITT:**  Um, other than establishing -- I think

21   if they -- I mean, it obviously gets fact-determinant, but I

22   think if they had -- maybe not to the extent of -- I mean, of

23   internal controls, if they were putting in place measures, if

24   they were, um, trying to make efforts to either propose

25   internal controls, if those were rejected by the other board

1    members or the management, if they were trying to informally

2    influence and try and encourage and prevent material

3    misrepresentations being made by the control person, those

4    sorts of things -- I mean, trying to think here of --

5          THE COURT:  But mere lack of individual scienter would

6    not be enough.

7          MR. PORRITT:  Well, under that basis, it shows very

8    clearly that -- let me just -- you know, the case of *Nordstrom*

9    says quite clearly that the good faith defense is unavailable,

10   even when defendants who induced the fraud believed in good

11   faith they were not perpetuating a fraud.

12       So, I think it's --

13         THE COURT:  So your answer is no.  That is, even a

14   good faith belief, i.e. lack of scienter about the fraud, is

15   not a defense.

16         MR. PORRITT:  Well --

17         THE COURT:  Once you have proven everything else.

18         MR. PORRITT:  And I think it gets very close to the

19   sort of once again trying to run with the sort of

20   pure-heart/empty-head type defense, which is, again, a

21   consistent attempted defense under securities laws, but also a

22   consistently rejected defense under the securities laws.

23   Because, A, it's too easy to assert, just to sit there and say

24   "I know nothing," you know, kind of Sergeant Schultz-like.  And

25   secondly, because it has all very bad policy implications

1    because it encourages ignorance and encourages lack of

2    controls.

3            **THE COURT:**  Let me ask your opponent.

4        What's the strongest case authority, if there is, in the

5    Ninth Circuit that says, under 20(a), even if corporate

6    scienter is established, even if liability is established,

7    there still has to be not only, you know, non-inducement,

8    et cetera, et cetera, but if -- if there's not individual

9    scienter, the individual director gets out under Rule 20?

10           **MS. THOMPSON:**  Sure.  It is cited on Page 7 of Docket

11   548.  There are a line of cases.  And of course, you only get

12   -- the jury will only get to director liability, control person

13   liability if Tesla is found to be a primary violator.  So all

14   of these cases cited on Page 7 refer to the instance in which

15   the company, there is corporate liability.  But there is this

16   good faith defense, quote, the absence of scienter, end quote,

17   and, quote, the failure to direct or indirectly induce the

18   violations at issue, end quote.  That's *Howard*, there is *SEC v*

19   *Todd* or *Arthur Children's*, *Kaplan versus Rose*.  And those

20   cases, again, span from 1994 up, you know, to the present,

21   essentially.

22           **MR. PORRITT:**  Just to be clear, Your Honor, *Arthur*

23   *Children's Trust* says the defense is established if the

24   defendant proves that they acted in good faith, and did not

25   directly or indirectly induce the act or acts constituting the

1   violation --

2            **THE COURT:**  How about *Howard* --

3            **MS. THOMPSON:**  Correct.

4            **THE COURT:**  Excuse me.  How about *Howard*?  Says the

5   defendant is entitled to a good faith defense if he can show no

6   scienter, and an effective lack of preparation.

7            **MR. PORRITT:**  But that is in the context of -- in the

8   context of the statute which describes the relevant state of

9   mind as good faith or lack of good faith.  And so --

10           **THE COURT:**  I'm sorry, which statute?

11           **MR. PORRITT:**  20(a).

12           **THE COURT:**  So what's wrong with that?  I'm not sure I

13   understand.  Why isn't that --

14           **MR. PORRITT:**  What defendants are trying to do is

15   that -- is bring over the intent or deliberate recklessness,

16   which is the relevant scienter under 10(b)(5), an intentional

17   fraud statute, and insert that into the good faith -- explicit

18   good faith standard in 20(a).

19           **THE COURT:**  But you are saying that -- the good faith,

20   that that -- I think you've argued that lack of scienter is no

21   defense.  Exercising --

22           **MR. PORRITT:**  Correct, yes.

23           **THE COURT:**  You know, whether you knew or not.  And

24   I'm reading a quote from *Howard* that says a defendant is

25   entitled to a good faith defense, as they put it, if it can

1   show or he can show no scienter.

2           **MR. PORRITT:**  And I think --

3           **THE COURT:**  Not just, you know, you know, diligent

4   preparation, blah, blah, blah, but also no scienter.

5           **MR. PORRITT:**  But when they say "scienter" in the

6   context of 20(a), they mean no good faith.  Or acting in good

7   faith.  My submission.  Particularly if you are referring

8   explicitly to this quote from the Ninth Circuit in *Howard*, and

9   it's on Page 1064 of 228 Federal Reporter 3d, it says,

10  immediately before that quote (As read):

11              "*Hollinger*, although not entirely abandoning

12              the participation element, shifted the burden

13              to the defendant to show that 'she acted in

14              good faith and did not directly or indirectly

15              induce the violations.'"

16      Then it says:

17              "Thus, in order to make out a *prima facie* case" --

18      and this was a case involving the burden on the

19      plaintiff rather than what the defense was within the

20      defendants, that's really what *Howard* is talking about

21      -- "it is not necessary to show actual participation or

22      the exercise of actual power.  However, a defendant is

23      entitled to a good faith defense if he can show no

24      scienter and an effective lack of participation."

25      I don't believe that is adding anything or modifying the

good faith which, again, as I keep repeating, is the standard
in the statute.  The Ninth Circuit can't add a scienter
requirement that is not in the statute, Your Honor.  With
respect.

      **THE COURT:**  Well, I'm not sure that these cases don't
say that.  It says the defendant's entitled to a good faith
defense if he can show no scienter.  So one way to show good
faith is no scienter.  Another way is saying:  I came up and
tried to enforce a reasonable good internal control situation.
So both *Todd* and *Howard* do make reference to good faith, quote,
"based on the absence of scienter."

    And so that's a bit troubling to say:  Well, if we suggest
whether expressly or implicitly that the only way you show it
is having a good system in place.

      **MR. PORRITT:**  Well, we have agreed that it's not the
only way to show assistance.  I think we have taken care of
that by modifying the jury instruction.

      **THE COURT:**  Well, that helps.  I guess the question
is, your opponent wants to add something to the effect of:  and
or by showing a lack of scienter.

      **MS. THOMPSON:**  (Nods head)

      **MR. PORRITT:**  Right, which means an intent or a
deliberate recklessness, which essentially is the second prong
of the good faith defense, which is directly or indirectly
induces the misrepresentation.

1    **THE COURT:**  Well, inducing, that's conduct.  That's

2    not state of mind.  So, hm.  That's funny how it's phrased.  I

3    will take a second look at that, and I'll rule on that.

4    **MS. THOMPSON:**  The only thing, if I may add,

5    Your Honor, just to take it out of the abstract, in the *Kaplan*

6    case, the Ninth Circuit, from 1994, 49 F.3d 1363, a

7    determination from the successor CEO was able to show good

8    faith through a declaration stating to his knowledge, all the

9    information made public was true.  So that is a concrete

10   example of what the Ninth Circuit has found to satisfy.  And

11   that, of course, is the absence of scienter.

12   **THE COURT:**  All right.  Those are the two ones that --

13   and I'm glad we had this discussion, because it's been

14   enlightening.  I will rule -- I will get out, hopefully, the

15   instructions some time today or shortly thereafter, so you'll

16   have it before your opening statements.  You'll at least know

17   what the ground rules are on that.

18   **MR. PORRITT:**  Very good, Your Honor.

19   **THE COURT:**  All right.

20   **MS. THOMPSON:**  Thank you, Your Honor.

21   **THE COURT:**  Thank you.  So that leaves -- I believe we

22   have covered most of what I want -- oh, the *Daubert* question.

23   Let's talk about that in the next few minutes.

24   So I won't say there's a formal estoppel notion here, but

25   there's -- there's sort of talking out of both sides a bit.

1    Because to quote from the earlier brief of Tesla, rather than

2    compare the actual transaction price of Tesla options during

3    the class period to the but-for option prices, it calculated on

4    17 theoretical instruments using theoretical prices, blah,

5    blah, blah, blah, blah.

6         Here, Heston did not rely on actual market prices for the

7    overwhelming majority of Tesla options during the class period.

8    Instead, he calculated theoretical prices for only 13

9    theoretical Tesla instruments, and then applied them to over

10   2,400 different Tesla options, and it's repeated again.

11        So certainly the gist of this is:  Well, that's improper.

12   If you have got actual prices, let's go with actual prices.

13   And so now to say that that use of actual price is so

14   fundamentally flawed that it shouldn't even go to the jury

15   seems like a bit of a hard pill to swallow.

16             **MR. ROSSMAN:**  May I, Your Honor?

17             **THE COURT:**  Yeah.

18             **MR. ROSSMAN:**  Andrew Rossman for the defendants.  So

19   it's not -- if you'll you give me a chance to explain why --

20   and it's fairly simple.  It's complex in detail, simple in

21   concept.

22        You should -- as Your Honor recognized in the first

23   *Daubert* hearing, you should, as your starting point, use actual

24   prices.  Okay?  It doesn't solve the problem that's created by

25   their model here, because the question is:  What are you

1    comparing it to?  Are you comparing an apple to an apple?  Are

2    you comparing an apple to an orange?

3        So they solve one of the problems that we identified in

4    our *Daubert* motion, okay, by instead of using a theoretical

5    constructed price, what they call the "refitted value," okay,

6    they are now proposing to use actual transaction prices as

7    their starting point for 2,400 options.  But they are not

8    comparing it -- when they take their but-for value, they are

9    not comparing it to something that's comparable.  Okay?

10       And this problem, Your Honor, is not merely a problem that

11   we observed.  This is a problem that their own experts observed

12   at the time they put in their first reports.  Okay?  What they

13   said was the reason why they had a preference, the reason why

14   they thought it was more accurate to create this refitted,

15   revalued option price as the starting point, okay, is because

16   if you don't do that, then you aren't comparing this on the

17   same plane.

18           **THE COURT:**  What do you mean by the same -- first of

19   all, but-for is inherently theoretical.  So what are they

20   supposed to compare it to?

21           **MR. ROSSMAN:**  Correct.  No, no, correct, Your Honor.

22   Okay?  But you have to compare the same thing, but for.

23           **THE COURT:**  Okay.  So what is the thing that's not

24   being compared?

25           **MR. ROSSMAN:**  The thing that has to be compared the

1    same is the same option, okay?  So you've got 2,400 different

2    options.  It's described by Professor Heston as 2,400 unique

3    securities, okay, with different characteristics.  Different

4    maturities, different strike prices, okay?

5        And he observes that they not only have different implied

6    volatilities -- okay, we can see that, we use his own data that

7    comes from CBOE, okay?  They have different volatilities.

8    Depending on where you are on the maturity scale, okay,

9    longer-term ones have different volatility than shorter.

10   That's fairly self-evident.  It's also different, depending on

11   what the strike price is.  Okay?  And he draws distinctions in

12   his report.

13       So what you see, Your Honor, is it's not one flat curve

14   where it's the same volatility for every option (Indicating).

15   Different options have different volatilities (Indicating).

16   It's more of a curve that looks like this (Indicating).  And I

17   can show you a picture from our expert's report if Your Honor

18   would allow me to hand up what is the supplemental

19   Professor Seru report dated January 12, 2023.  Plaintiffs have

20   a copy of it.

21       **MR. PORRITT:**  Your Honor, this is a report, an expert

22   report submitted yesterday at midnight, well after the deadline

23   for any expert discovery.

24       **MR. ROSSMAN:**  If I may, Your Honor, the history is

25   important here.  October 25th was the *Daubert* argument.  Okay,

1   October 25th, you observed the problem that they had by not

2   using actuals as a starting point.  They had no precedent --

3   zero precedent, they had to admit -- for ever using something

4   other than actuals as a starting point.  It was a *Daubert*

5   problem for them.  They said --

6        **THE COURT:**  I don't have time to just -- get to the

7   substance.

8        **MR. ROSSMAN:**  The substance is they said on

9   October 25th that they could fix it by using actuals.  We asked

10  them for two months -- two months, we asked them to provide a

11  revised report that gave us the data that they were going to

12  use.  How were they going to calculate it?  How were they going

13  to take something that their own expert said was apples and

14  oranges, and make it comparable?  Okay?  We didn't know how

15  that was going to happen.

16       We didn't get the recalculated numbers, okay, until New

17  Year's Eve.  New Year's Eve, we received it.  We immediately

18  filed our letter request for a renewed *Daubert* motion and we,

19  within a week, provided them with a supplemental report from

20  Professor Seru, identifying all the problems.

21       And Your Honor, if I can, you know, jump to the punchline

22  for you, what this new methodology, okay, their third

23  methodology now shows, okay, is dramatic differences.  Eighteen

24  percent of the time, okay, 18 percent of the options that were

25  traded, they turned a winner into a loser, or vice-versa.  They

1   come up with someone who has damages, who previously they

2   determined didn't have damages, or the opposite.  Okay?

3        Twenty-two percent of the remaining -- of the remaining

4   ones where they didn't change a winner into a loser, okay,

5   22 percent of the time, the damage number is off by more than

6   50 percent.  The majority of them, two thirds of them, the

7   damage number's different by more than 10 percent.

8        Mr. Porritt told you that if you want the actual -- actual

9   prices, that it would be a very minor change.  Those were his

10  exact words at the argument on October 25th.  When we got their

11  numbers on December 31st, it was shocking.  Okay?  It's a sea

12  change in the numbers.  It's as if --

13       **THE COURT:**  What is -- get to the -- what is the

14  defect that warrants *Daubert* with respect --

15       **MR. ROSSMAN:**  Two, Your Honor.

16       **THE COURT:**  -- with respect to the comparison here?

17       **MR. ROSSMAN:**  And let me try to make it as simple

18  conceptually as I can.  And then whatever more detail you want,

19  Your Honor, we can supply, including making a full-blown

20  motion.  Okay?

21       Number one, okay, actual transacted prices in the

22  marketplace happen -- as was explained to you in the first

23  argument by Mr. Porritt, okay, can happen at a bid price, can

24  happen at an ask price, or can happen somewhere in between.

25  Okay?

1      When it comes to stock that's *de minimus*, okay, we are

2   talking about pennies.  When it comes to options, it's measured

3   in dollars, and many dollars.  It's a big number, the bid-ask

4   spread.  Okay?  And the bid-ask spread can be, depending on

5   where you trade, whether you're buying at the bid or buying at

6   the ask or somewhere in the middle, it can determine the

7   outcome of whether you actually are considered to have damage

8   through their model, or not have damage.

9      And that's because actual trades happen within this range,

10  but the but-for price that they assign has a single price to

11  it.  So whether someone buys -- happens to be lucky and buys

12  cheaply, or happens to be sloppy and buys expensive, okay, will

13  make the difference in their model between whether that person

14  is considered to --

15          **THE COURT:**  What about in the aggregate?

16          **MR. ROSSMAN:**  Okay.

17          **THE COURT:**  What about in the aggregate?  Because this

18  is going to be an aggregate -- if we get to that point, an

19  aggregate verdict.  Right?

20          **MR. ROSSMAN:**  Well, I don't know that, Your Honor.  I

21  mean, right now the verdict form -- we haven't settled the

22  verdict form on this, right?

23      But right now what's being asked is for the verdict form

24  to supply two things, as I understand it.  One is what the

25  stock price inflation should be on a daily basis, okay.  And

1    then that gets added, you know, or subtracted through whatever

2    the person's actual sales are for stock.  That's less

3    complicated.

4         More complicated, when it comes to options, okay, they're

5    being asked to supply -- the jury is being asked to supply what

6    the implied volatility should be.  And the theory that

7    plaintiffs are giving you, which we, you know, think, creates a

8    mess here, Your Honor, is that you should be able to take the

9    implied volatility.

10        (Reporter clarification)

11             MR. ROSSMAN:  May I continue, Your Honor?

12             THE COURT:  Yeah.

13             MR. ROSSMAN:  Seemed like there was an interruption in

14   the courtroom.  Apologies.

15        So they're basically saying:  We'll have the jury fill in

16   the blank on what the implied volatility should be.  And if you

17   then also have what the stock price inflation should be, then

18   they should be able to calculate or some third-party

19   administrator some time in the future should be able to

20   calculate damages for each class member for 2,400 unique series

21   of put and call options on this stock.  Okay?

22        I think there is no -- no reliability, whatsoever, of the

23   model that they're going to give to the jury on which the jury

24   could base a decision about how to evaluate what that implied

25   volatility should be, because they are not comparing, okay?

1    They're taking an actual option.

2        So for example, very concrete example, a call option at

3    $360 that expires January, 2020.  Okay, the right to buy the

4    stock any time between now and January, 2020, at 360.  They're

5    taking that particular option with those parameters, and

6    they're comparing it to this theoretical at-the-money straddle.

7    That's the problem.

8        So the problem they fix is --

9            **THE COURT:**  Well, is the problem because there's a

10   bid-ask spread?  I mean, it's inherent you have to take

11   something that's transactionally reality, something, some

12   actual transaction, and compare it to a -- to a but-for.

13       So I'm trying to understand:  What is the problem?  I

14   thought you started to say, and you stated at the least

15   hearing:  Well, somebody bought it at 30, somebody at 40, and

16   that's because one -- one person enacted efficiently in a

17   transaction, and another one didn't.  And essentially, why does

18   that get factored into the damages?

19       That's what I understood your argument to be.  There's no

20   correction for that.

21           **MR. ROSSMAN:**  So if -- there's no correction for that

22   is exactly what's the problem, Your Honor.  There's no

23   calibration of their model or their scale.

24           **THE COURT:**  So it's not the mere fact of comparing an

25   actual with the theoretical.  It's the lack of correction or

1    accounting for factors other than extraneous factors in the

2    actual.

3              MR. ROSSMAN:  That is exactly right, Your Honor.  And

4    the bid-ask you've identified as one of them, okay, we

5    shouldn't be responsible as fraud damages, okay, for the --

6              THE COURT:  I think you argued that.

7              MR. ROSSMAN:  Well -- I'm sorry, Your Honor.

8              THE COURT:  Isn't that a matter of -- it's typically

9    argued that they didn't take into account a certain factor that

10   should have been taken into account, should have been some

11   adjustment -- some averaging or something, I don't know what

12   the solution is.

13             MR. ROSSMAN:  I don't know how the jury would be able

14   to do that because they're not going to be shown actual

15   transaction prices.  That's not something that's in the case.

16   We don't know what unnamed class member bought.  Right?

17        What I don't think is appropriate is for the jury to be

18   told that they can fill in the blanks on what the implied

19   volatility should be for some options transactions, they don't

20   even know what they were.  And but -- and the bid-ask is one

21   problem.

22        The other problem, Your Honor, is, as I was explaining,

23   there's different volatility levels at different strike prices

24   and for -- you know, not just for different maturities, but

25   also for different strike prices and different volatilities for

1    puts versus calls.

2        By using a straddle, Professor Heston squishes those two

3    together and has this theoretical number for something that is

4    neither a put nor a call.  He has -- uses a flat line

5    (Indicating) that assumes it is going to be the same exact

6    volatility across every strike price.

7        Now, when you are comparing a but-for flat line to a

8    theoretical flat line, okay, that was one thing.  Okay, at

9    least all the scales are on the same currency, if you will.

10   When you're comparing a theoretical flat line to actual prices

11   in the real world which are all over a curve, okay, it's --

12   you're not using the same unit of measure, if you will.

13       And the example Professor Cerrou gives I think is very

14   clear.  It would be as if, Your Honor, I gave you, you know,

15   two different scales to use.  And one scale you stepped on, and

16   you weighed, you know, 200 pounds, and the other scale you

17   stepped on, and you weighed 400 pounds.  Okay?  You might say:

18   I've never weighed 200 pounds; that scale's obviously wrong.

19   The one at 400 pounds is absurd.  Both of those are scales are

20   no good.  I certainly can't compare Scale 1 weight to Scale 2

21   weight, in trying to assess whether I'm losing weight or

22   gaining weight.

23       Here, for Mr. Littleton, their named plaintiff, just so

24   Your Honor understands, under their original methodology, they

25   claim he lost $1.1 million.  Okay?  Under their second

1  methodology, where they said we'll just use the stock price and

2  ignore changes in volatility, he lost only -- I think it's

3  $100,000, okay.

4      Under their latest methodology where they're going to ask

5  the jury to make changes to implied volatility, they're

6  claiming that he lost $2 million.  All over the place.

7      I'm sorry, Your Honor, I got it wrong.  On the second

8  methodology, Mr. Littleton actually made money as a result of

9  the alleged fraud.  He gained $100,000.

10      So you can't ascribe any reliability as gatekeeper,

11  Your Honor, to this array of methodologies that produces wildly

12  different and conflicting results, even for their own lead

13  plaintiff.  That's the issue that we have, Your Honor.  We do

14  want to make motion on it.

15          **THE COURT:**  Let me hear from Mr. Porritt.

16          **MR. PORRITT:**  Thank you, Your Honor.

17          **THE COURT:**  Two defects that --

18          **MR. PORRITT:**  What's that?

19          **THE COURT:**  There are two alleged defects that warrant

20  a *Daubert* --

21          **MR. PORRITT:**  Understood, Your Honor.  And what we

22  have here is just either, as Your Honor pointed out, simply the

23  consequences of the tweak to -- so first of all, there was only

24  one methodology.  It's all out of pocket, as we've talked about

25  at length.  And for out of pocket, you need to compare the

1  but-for price, which, as the Court has observed, is necessarily

2  hypothetical, against an actual.  Or against something else.

3  Here we have proposed the current methodology is the actual

4  price.

5      Let me talk about the but-for price.  There has been no

6  change in how plaintiff is proposing to calculate the but-for

7  price, since all the *Daubert* motions which Your Honor has

8  decided.  The methodology is exactly the same, and it uses the

9  Nobel Prize-winning Black-Scholes-Merton method, which the

10  Court has accepted as reasonable, robust and reliable.

11      Defendants are repeating -- this is the exact same

12  criticism they made about using the Black-Scholes-Merton model

13  in their original motion in limine which a judge has already

14  denied.  And all this is doing is wrapping it up and repeating

15  it.  So -- and it was improper then, and it was unfounded then,

16  and it's unfounded now.

17      **THE COURT:**  Well, the argument that I'm hearing this

18  time is that when now you're comparing with actual transaction

19  prices, with the but-for derived number, that's when you get

20  into apples and oranges.

21      **MR. PORRITT:**  Well, so I'll -- if I may complete the

22  discussion of the Black-Scholes model, Black-Scholes-Merton

23  model, you need a model to calculate but-for prices.  And we

24  propose the Black-Scholes-Merton model, which is the most

25  accepted in the history of finance, and the courts accept as

```
1   reasonable.
2        Defendants haven't proposed any alternative way of doing
3   but-for.  So in their view, you can never calculate a but-for
4   price, which means you'd have no damages.  Which obviously is
5   their preferred solution.  Except there can be no option
6   damages.
7        Their argument here on volatilities, once again, different
8   volatilities that can be observed, derived from observed prices
9   of different strike prices with the same maturity, that was the
10  precise argument they made in their motion in limine filed.
11       And the rebuttal which is, I think, conclusive and which
12  the Court has already accepted, is that the
13  Black-Scholes-Merton model assumes constant implied volatility
14  for all options of the same maturity across all strikes.
15  That's an assumption built in to the Black-Scholes-Merton
16  model.  It is accepted.  It won the Nobel Prize.
17       And so if you are not -- if you are trying to tweak the
18  implied volatilities against strike prices with the same
19  maturity in the but-for prices, you're not applying the
20  Black-Scholes-Merton model.  You're applying some other model.
21       THE COURT:  I understand that applies to the but-for.
22  What about the --
23       MR. PORRITT:  So the only change in the materials we
24  provided to the Court after the hearing on October 25th, the
25  only difference is taking the -- when we previously had the
```

1    fitted actuals, and we replace that in the calculation with

2    actual transacted market data, which defendants have had since

3    November, 2020.

4         So to argue that they had no idea how this was going to

5    work is nonsense.  It's just not true.  They could have

6    performed this very simple arithmetic calculation themselves.

7    Instead, they insisted that our expert do it, and put it in the

8    schedule, which we did.  And that is what this is all about.

9         So --

10        **THE COURT:**  So, but the issue is not the data.

11   They're saying the methodology of now comparing a theoretical

12   model that assumes constant volatility against actual prices

13   that don't adhere to that same assumption or which has some

14   variations that are independent of the fraud, in a sense,

15   that's what's defective about this.

16        **MR. PORRITT:**  Two responses.  One, it's not clear --

17   by the time we get to damages, defendants are fraud-doers.  So

18   if they get the reverse, we get the benefit of the doubt on all

19   damages, a reasonable estimate of damages.  The fraud-doer --

20   this isn't a negligence case; this isn't a contract case --

21   they are disfavored, under the law.  It is far better that they

22   pay more money and that the victims of fraud get compensated

23   than the other way around.  So that's point one.

24        So all we're after is a reasonable estimate of damages.

25   Mathematical certainty is not required.

1          Two, we proposed a method to deal with this exact issue,

2     which was called the impact quantum method, which defendants

3     attacked --

4          **THE COURT:**  Called what?

5          **MR. PORRITT:**  The impact quantum method.  That was the

6     initial proposed methodology to address this precise point.

7     And defendants attacked it and said it was unreliable,

8     unreasonable, lacked any basis.  Shouldn't be presented to the

9     jury.  So -- you should use actual prices instead.

10         So we said we will use actual prices, then.  And now

11    they're turning back and saying:  No, no, you should use

12    impact -- something like the impact quantum.  Although what

13    they really mean is:  You shouldn't have any damages at all.

14         So -- and Your Honor's asked what it means in the

15    aggregate.  Putting this all together, don't forget, the

16    examples we're looking at, the jury will make determinations

17    for the but-for price that will be used to calculate -- used to

18    calculate the but-for stock option prices, as well as the

19    implied volatility.  We don't know what the jury is going to

20    decide.  There's going to be a range.

21         So, frankly, we have presented as if -- our expert will

22    present his opinion on what the but-for price should be for

23    both the stock, and he presents his opinion on what the but-for

24    volatility should be.  But the jury may find different results.

25    So we have calculated what the effect would be.  It's an

1    estimate of damages.

2        In aggregate, these methodologies do not make, based on

3    our assessments and our, you know, estimations -- and I've

4    never seen anything alternative from the defendants.  They pick

5    on individual options.  But this will be done in aggregate,

6    Your Honor.  And in aggregate, it does not make a significant

7    material change.

8        **THE COURT:**  How are damages ultimately going to be

9    calculated in this?

10       **MR. PORRITT:**  So it's a mechan- you can use -- once we

11   have what the jury's being asked to find, the but-for price,

12   stock price for everything in the class day, and when we have

13   the but-for implied volatility for each maturity for every

14   single on class day, both of which are reflected in our current

15   verdict form, you can use those two variables to mechanically

16   calculate, using the Black-Scholes-Merton method, but-for

17   prices for 2,400 option series, for every day of the class

18   period.

19       That price can then be subtracted from the actual

20   transaction price, and that will generate an amount of

21   inflation or deflation, which, depending on whether you're a

22   purchaser or a seller, will calculate the damages.  That last

23   process can be done, it's a mechanical calculation.  And it can

24   be done just like as in stock, and just as what we've done for

25   convertible bonds --

1          **THE COURT:**  Your view of the -- I'll call it the

2     $30-$40 bid spread problem is that that's really the

3     defendant's problem -- that's a wrongdoer.  So what, if

4     somebody paid 40, they -- they bear that risk.

5          **MR. PORRITT:**  The but-for value -- the -- based on the

6     estimate of the -- you know, the findings of the jury, will be

7     able to say that the option they were buying should have been

8     worth 20, absent the fraud, so if you paid pay 30, you get $10

9     of damage.  If you paid 40, you get $20 in damage.

10        That's not -- the defendant doesn't get the benefit.  you

11    know, they have to pay the difference, because they're the

12    fraud-doer.  And that's how we propose calculating it.  And

13    it's a function of using actual transacted prices, which is

14    what defendants wanted.

15         **THE COURT:**  So will that ultimate calculation for each

16    of these options then be made -- when does that get made?

17         **MR. PORRITT:**  Post-verdict, Your Honor.

18         **THE COURT:**  Pardon?

19         **MR. PORRITT:**  Post-verdict, Your Honor.  Just like as

20    in the stock.  Because we would need -- we have a substantial

21    amount of the data in terms of what the -- how the options were

22    traded, but I don't think it's robust enough to be able to

23    present an aggregate.

24        We would love to present an aggregate damages number to

25    the jury, but I don't think -- the data isn't there.  And it's

1    hard to get discovery.

2         **THE COURT:**  So, at the end of the day, this is a

3    *Daubert* motion.  Why aren't the arguments you are making kind

4    of arguments that would be typically used to impeach a model,

5    to try to undermine a model, or try to take some -- trying to

6    impair the efficacy of that model, as opposed to saying:  This

7    is so fundamentally flawed that it's not even science.

8         **MR. ROSSMAN:**  Well, Your Honor, I think it is so

9    fundamentally flawed that it's not science for sure.  It's not

10   economic science to have a model that, depending on which

11   method they pick, can either show Mr. Littleton to have gained

12   $100,000 or lost $2 million.  That shows no --

13        **THE COURT:**  Nothing is going to be -- when you're

14   dealing with theoretical, inherently, half of this equation is

15   theoretical.  So you're not going to get it down to the exact.

16   And so you're going to get some variabilities.

17        That fact, alone, that you're getting some variabilities,

18   does not necessarily prove that the model and their methodology

19   is so defective that it doesn't even get past the front door.

20        **MR. ROSSMAN:**  Well, I think the two theoretical

21   problems that I've identified, Your Honor, is you're not

22   comparing the same thing.  You're comparing a straddle, okay,

23   which is a theoretical amalgam of a put and a call, okay, to

24   either a put or a call.  Which are the actual options that are

25   traded in the marketplace.

1          So it's -- you're not comparing the right trade to begin

2    with, okay.  You're comparing the theoretical at-the-money

3    straddle, so at the price at which the -- at which the stock is

4    trading at the moment, to puts and calls that are at a variety

5    of strike prices.  Okay, and which, as a result of the

6    different strike prices, will have different implied

7    volatilities.  That is something Mister -- Professor Heston

8    agrees with, for sure.

9          And you are -- you are taking a theoretical value for this

10   theoretical trade with no bid-ask at a theoretical midpoint

11   value, and comparing it to trades in the marketplace that

12   actually happen somewhere between bids and asks.

13         And the example that Mr. Porritt gave, okay, you would be

14   asking -- you would be saddling the defendants with liability

15   for damages that they did not cause, okay, if you are making

16   them pay for the difference between someone who pays $40 for

17   something versus $30 for the same thing.  That's a matter of

18   their execution.  That is not a matter --

19              **THE COURT:**  Well, it depends --

20              **MR. ROSSMAN:**  -- of fraud.  It is, Your Honor.

21              **THE COURT:**  You can say that, but also, if you cause a

22   drop from whatever it is -- you know, causation can be

23   interpreted in a number in of ways.

24              **MR. ROSSMAN:**  Not on that one, Your Honor.

25              **THE COURT:**  You're saying that it's not Tesla's fault

1    that they overpaid, and therefore, they shouldn't have to, to

2    pay.  Well, you know --

3            MR. ROSSMAN:  It's not.

4            THE COURT:  -- I'm not so clear about that.  Because

5    in a way, you know, when a wrongdoer commits a wrong, a

6    violation of tort law or statute, it is not uncommon to take

7    the victim as he finds them.

8        Yes, if you happen to break somebody's leg, and they

9    require $1 million of medical bills, not your fault that they

10   had a heart condition, they had a -- you know, some other

11   thing.  But --

12           MR. ROSSMAN:  So I'm not quarreling with the general

13   proposition of the law, Your Honor.  I'm quarreling with it as

14   it relates to how -- how the securities markets work.  Okay?

15   And the problem that we have here fundamentally is we're not on

16   the same playing field --

17           THE COURT:  Let me ask Mr. Porritt.

18       I think your more interesting point is the comparing --

19   the assertion that being compared are apples and oranges, a

20   straddle with a put or call with different volatilities.

21   What -- isn't that a problem?

22           MR. PORRITT:  It might be a problem if that's what

23   we're proposing, but it's not what we're proposing.  The

24   at-the-money straddle is, as Professor Heston has testified,

25   and which I think is undisputed by Professor Seru, is the most

1    accurate way of isolating the impact of unimplied volatility.

2    That enables you to identify the -- it's going to be the most

3    sensitive instrument to implied volatility.  So it enables you

4    to isolate the changes in implied volatility most accurately.

5         And so that is what he does for every single maturity.

6    And he uses that, because otherwise, any impact on implied

7    volatility is going to be drowned out by impacts -- by changes

8    in the stock price.  And the changes in the stock price, by the

9    way, is by far the most important variable that's driving

10   changes in option prices during the class period.

11        So that is one reason -- there was a brief allusion to our

12   second proposed methodology.  That was something that counsel

13   suggested in an attempt to take implied volatility out of this

14   trial.  Because defendants were arguing at that point that we

15   need to disaggregate changes in implied volatility.  Some of it

16   due to the fraud, some of them might be due to true statements.

17   And we said:  Fine.  Basically, use actual applied volatility

18   for every calculation.  And we'll assume that there was -- none

19   of the change of the implied volatility was due to the fraud.

20   We'll accept that.  You know.  And that will take this issue

21   away from the jury completely.

22        And the defendants said:  No, no, no, that's unacceptable

23   too.

24        So the stock price is the biggest driver.  Change in the

25   stock price is the biggest driver of stock option changes here,

1   and stock option damages.  No question.

2       Implied volatility, we have proposed a method for doing

3   this.  The at-the-money straddles is the way of studying,

4   enabling the jury to find the implied volatility for every

5   maturity.

6       Then, actual but-for prices for 2,400 option series will

7   by compared -- the but-for 2,400 series, calculated, will be

8   compared to the actual traded prices of the 24 option series.

9   That's the comparison.  And they'll be expressed in dollars,

10  and it'll be -- so that will be -- that is the out of pocket

11  methodology.

12          **THE COURT:**  All right.  We have run out of time.

13          **MR. ROSSMAN:**  Yeah.  Thank you, Your Honor.

14          **THE COURT:**  Thank you.

15          **MR. ROSSMAN:**  Okay.  Very good.  Thank you.

16          **MR. PORRITT:**  Thank you, Your Honor.

17          **THE COURT:**  I'm going to deny the motion to renew a

18  *Daubert* challenge.

19      There are certainly a lot to talk about, certainly many

20  grounds for cross-examination, grounds for questioning the

21  methodology here, some of which may have more merit than

22  others.  But, I don't find that it reaches a level of such

23  fundamental unreliability and unsoundness that it should be

24  totally precluded from being presented at trial.  And so I'm

25  going to leave it to the lawyers and their dueling experts to

1    -- to battle it out.  I think that the basic methodology here

2    is sufficiently sound, accepted and reliable, subject to, of

3    course, the kind of cross-examination that I expect to hear in

4    this case.

5            **MR. ROSSMAN:**  (Nods head)

6            **THE COURT:**  So those are the rulings.  That leaves --

7    I've got to get out the jury instructions, which I want to get

8    to you hopefully by within the next reasonable number of hours.

9    And then I have -- I guess I'll have to rule on the objections

10   to exhibits.

11       My -- I'll say this much, and I don't know if you've met

12   and conferred yet, about --

13           **MR. PORRITT:**  We hope so, too, Your Honor.

14           **THE COURT:**  You have or haven't?

15           **MR. PORRITT:**  We have not yet.  No, Your Honor.

16           **THE COURT:**  Okay.  Well, I hope you do.

17       I am -- I'll tell you this much.  I see there's some

18   objections that appear to be based on some exhibits for which

19   there may be questions about whether they are going to be

20   admitted.

21       And so I am reluctant, since this is not closing argument,

22   this is opening statement, to put in a whole bunch of exhibits

23   and things where we don't know -- there's some doubt that this

24   they're going to come in.  I -- I tend to say no.

25           **MR. PORRITT:**  Very good, Your Honor.  I don't think --

1    it was not -- we understood that sort of approach.  And so I

2    don't think we included anything.  We didn't intend to exclude

3    anything that was in doubt.  But maybe defendants have a

4    different view --

5            **THE COURT:**  I just glanced at the rather lengthy

6    thing, and there's some -- it looked like just objections at

7    trial.  So -- but I just -- when you meet and confer -- and I

8    want you to meet and confer to see if you can work something

9    out.

10       I will say that on both sides, that if there are exhibits

11   that you want to try to display, there is not closing argument.

12   If there are a couple of key things, sometimes, and it's

13   clearly going to come in, like the contract in a contract

14   dispute or something like that, that's one thing.

15       You start getting into the weeds with correspondence when

16   there's hearsay objections, I think we're getting on a ground

17   that kind of -- supposed to be the roadmap, not the case.

18           **MR. PORRITT:**  Very good.  Understood, Your Honor.  But

19   many things -- we have objections on foundation for things such

20   as Tesla board minutes, from Tesla, for board minutes that

21   they've produced, which I think creates a bit of a problem.

22   We've been trying to meet and confer to get an agreement on

23   that because --

24           **THE COURT:**  Right.  I don't want frivolous objections.

25   If things are likely to come in -- you know.  But if there is a

1  serious question about whether it comes in, I'd rather not have

2  that shown to the jury, only then to have that not come in.

3          **MR. PORRITT:**  I don't want to show our jury a document

4  that I can't then deliver and actually produce at trial.

5          **THE COURT:**  Right.

6          **MR. PORRITT:**  It was that -- the presentation was

7  designed with that rule in mind.  And we will certainly meet

8  and confer over the weekend.

9      And I guess we will be here -- when would you like us on

10  Tuesday morning?

11         **THE COURT:**  Well, first of all, generally -- time has

12  now passed.  You were supposed to submit your responses to

13  objection at 3:00, but obviously you're not going to do that.

14         **MR. PORRITT:**  Well, I think my team should be

15  submitting them as we speak.  That's why I was left here just

16  with Mr. Krot, alone, this afternoon.  So they've been working

17  on them, so --

18         **THE COURT:**  I would rather have you meet and confer

19  and see if you can obviate and minimize the number of issues I

20  have to resolve.  So I'll give you until the end of the day to

21  file a revised -- to file your responses, hopefully with an

22  indication that certain things have been worked out.

23         **MR. PORRITT:**  Very good.  We will endeavor to do that.

24  I'm not sure what's been going on back at the office while I

25  have been here, so hopefully that conversation has been going

1    on.  If not, we can have it before -- we've got two hours left.

2    Hopefully we can get a lot of these resolved.

3            THE COURT:  Good.  In terms of Tuesday, the -- the

4    jury is usually brought down here what time?

5            THE COURTROOM DEPUTY:  It's up to you.  8:30, 9:00,

6    whatever time you want them there.

7            THE COURT:  Why don't we have them come at 9:00 down

8    here.  And we should meet, let's say, at 8:30, so I can give

9    you my -- if there's any last-minute rulings, rulings on the --

10   on the objections, and if there's any other thing we've got to

11   clean up.  Plus, we may get some stray jurors who come.

12           THE COURTROOM DEPUTY:  Correct.

13           THE COURT:  And you may have a few more questionnaires

14   to look at.  So before they come down here, maybe we should

15   make it 8:00, actually.

16           MR. PORRITT:  I think that would be wise, Your Honor.

17           THE COURTROOM DEPUTY:  Courtroom 5?

18           THE COURT:  This courtroom.

19           THE COURTROOM DEPUTY:  Yes.  We are not going to do

20   the ceremonial courtroom.

21           THE COURT:  Yes.  So we are not going the use the

22   ceremonial courtroom, because I thought I needed that if we

23   were going to bring in 200 people.  We are not going to bring

24   in 200.  I can fit -- as you see, we tried to do some social

25   distance, and give places where people can sit.  We can easily

```
 1   fit the 52 or 55 or whatever.
 2            MR. PORRITT:  Very good, Your Honor.
 3            THE COURT:  Okay?
 4            MR. PORRITT:  All right, so we will see you here --
 5            THE COURT:  You'll let me know about how we want to
 6   proceed on the jury thing.  You're going to meet and confer
 7   about that question as well.
 8            MR. SPIRO:  Yes.
 9            MR. PORRITT:  Yes, Your Honor.
10            MR. SPIRO:  We will send the Court an email.
11            THE COURT:  Good.  I just want to make sure I know
12   what we're going to do, the order.  But I think the idea is to
13   try to avoid or at least minimize the individual voir dire of
14   the -- you know, what I call the radioactive folks.
15            MR. PORRITT:  Very good, Your Honor.
16            THE COURT:  All right?  All right.  Thanks, everyone.
17            MR. PORRITT:  Thank you, Your Honor.
18            MR. SPIRO:  Thank you, Your Honor.
19      (Off-the-Record discussion)
20            THE COURT:  Hold on.
21      On the scienter thing, Mr. Porritt, that I asked you to
22   file on the notice, the pleading.
23            MR. PORRITT:  Yes, Your Honor.
24            THE COURT:  Can you file that by -- again, by the end
25   of today?
```

1          **MR. PORRITT:**  I'll do it by 5:00.  Yes, Your Honor.

2          **THE COURT:**  Great.  Thank you.

3      (Proceedings concluded)

<u>**CERTIFICATE OF REPORTER**</u>

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Saturday, January 14, 2023