**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
           amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**PLAINTIFF'S RENEWED EMERGENCY MOTION FOR CAUTIONARY JURY INSTRUCTION** |

PLEASE TAKE NOTICE that on January 27, 2023 at 8:00 AM, or as soon thereafter as this matter may be heard, in Courtroom 5 – 17th Floor of the United States Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Plaintiff, through his counsel, will move, and hereby does renew his motion for a cautionary jury instruction in response to questioning and testimony heard by the jury on Days 5 and 6 (January 24 and 25, 2023). The testimony elicited by Defendants went directly to the issue of "falsity" relating to the "funding secured" tweet and, if left unchecked, will leave the jury confused as the trial progresses into its last few days.

## ISSUES TO BE DECIDED

1) Should the Court remind the jury of its prior rulings on summary judgment to cure and/or prevent confusion created by Elon Musk, Deepak Ahuja, and Antonio Gracias when they testified that the "funding secured" tweets were true and that Mr. Musk was acting in good faith?

1 **MEMORANDUM OF POINTS AND AUTHORITIES**

2   Following Defendants' opening statement, the Court correctly reminded the jury it was to "assume" that the "funding secured" tweets were false. The Court gave this cautionary instruction to the jury because, as it explained, it recognized that Defendants were likely to "elicit testimony . . . listing all the things that suggest -- you don't have to ask the magic question, but everything that suggests indeed it was secured because of the representations from PIF, the engagement, the excitement, the 'We're interested,' dollar signs, et cetera, so all of these exhibits that you seek to admit -- that I'm going to allow, by the way, for the most part -- you know, it's going to be taken as: *Oh, well, maybe funding was secured*." 1/20 Tr. at 474:15-24 (emphasis added). This has now happened. What the Court anticipated has now come to pass. Moreover, while defense counsel asked that no one be allowed to ask the "trapping question" of whether "funding secured" was false (*id*. at 474:3-24), this question was put to Mr. Musk (as well as Messrs. Ahuja and Gracias) repeatedly by his attorneys and elicited the precise testimony that Plaintiff was initially concerned about. Plaintiff respectfully requests that the jury be instructed accordingly to keep them focused on the issues they will ultimately need to decide and keep this trial on track to a successful and fair conclusion.

   On Day 5, Defense counsel examined Mr. Musk for nearly two hours at which time the jury heard extensive testimony from Mr. Musk as to why "funding secured" was *not* false and how he did *not* act with scienter (but instead intentionally with non-culpable or good faith reasons). Excerpts of his testimony are below:

   #1   Q Okay. When you said the message "Am considering taking Tesla private at $420. Funding secured," *did you doubt this message and its accuracy when you sent it*?

        A No. That's absolutely what I believed.

        1/24 Tr. at 926:14-17.

   #2   Q When you sent the "Am considering" tweet, did you intend to mislead investors?

        A Absolutely not.

        Q When you sent the "Am considering" tweet, were you trying to defraud

|   |   |
|---|---|
| 1 | investors, Mr. Musk? |
| 2 | A No. Quite the opposite. My intention with the tweet was to make sure that all investors were aware of what the board was aware of, and what the Saudi investment fund was aware of. So I was considering, when receiving that email about the Financial Times article, that there would be -- that the information had leaked and that some investors would be aware of the fact that I was considering taking the company private. And this would disadvantage other investors, especially small investors. |

Q Did you intend to deceive your shareholders?

A No, *I intended to inform them*. To make sure that all shareholders were on equal footing, and there weren't some that were aware of it and some that were not.

1/24 Tr. at 927:25-928:17

#3    Q Now, when you said -- this tweet with the blog post attached, okay, toward the end of the day on the 7th, did you doubt it when you sent it? Did you doubt its accuracy?

A No.

Q Did you believe it to be accurate?

A Absolutely. *I said exactly what I felt to be true*.

Q Were you intending to deceive your shareholders?

A No, the -- the exact opposite. I was trying my best to keep shareholders informed, and ensure that all shareholders had the same information.

1/24 Tr. at 941:17-942:6

#4    Q You were shown some of these text messages between you and Yasir. But you weren't shown all of them. And you said something, and I just want to make sure that this is clear as I turn to Exhibit 121, which is -- (Document displayed)

Q -- were you afraid of being outed as a liar? Or were you afraid of being falsely accused of being a liar when you are fighting or arguing or discussing this with Yasir?

A The latter. I was concerned that it would appear -- it would appear that I was not truthful, when in fact, *I was 100 percent truthful*.

1/24 Tr. at 952:12-22

#5    Q Okay. And did you run this statement by them before you issued it?

|   |     |                                                                                                                                                                                                                                                                                                                                                                                                 |
|---|-----|---|

A No. *It's factually true*.

1/24 Tr. at 967:25-968:2

#6     Q Was that what they said at the board meeting?

A Yes. They made it clear that there was -- it was quite literal. Not -- not merely that there would be enough funding, but that there would be far more than enough funding. Over-subscribed.

Q So fair to say, just like you said on August 7th, funding wasn't an issue?

A *Funding was absolutely not an issue. Quite the opposite. More funding was available than was necessary for the transaction*.

1/24 Tr. at 969:23-970:7

#7     Q Okay. During those two weeks that we have been talking about, did you ever try to deceive your investors?

A No.

1/24 Tr. at 972:11-13

#8     Q Okay. Did you ever tell them that this whole "Am considering" was a hoax and *a lie you created to deceive investors*?

A Not at all.

Q Did you ever tell them that there was no funding you were in touch with, funding was far from -- far from secured?

A No.

1/24 Tr. at 975:7-13

#9     Q Okay. And you said at one point that it wasn't possible, as of the meeting of July 31st, to discuss specific numbers. Can you just explain the third and final time for the jury why that question, when everybody was going back and forth, that there was a commitment but not a specific number, can you just explain why at that time it wasn't possible to know a specific number?

A Because we needed to talk to all the investors to find out which ones wanted to be part of Tesla as a private company, versus stay as a public company. That is unknowable until you talk to the investors. But what really matters there is that the Saudi PIF, my understanding was they were committed to take Tesla private, no matter what.

      Q And when you say "*no matter what*," you mean the whole thing.

      A Yes.

      1/24 Tr. at 1033:6-22

#10    Q Well, was $2 trillion enough to take Tesla private, twenty times over?

      A Um, 2 trillion would have been enough to take Tesla private 150 times over.

      1/24 Tr. at 1037:25-1038:3[1]

The Court granted Plaintiff's motion for the cautionary instruction, it did so to prevent the jury from concluding "Oh, well, maybe funding was secured." 1/20 Tr. at 474:15-24. Now, through Mr. Musk's testimony, Defendants have elicited testimony that unquestionably gives rise to that conclusion. On no less than ten occasions, Mr. Musk testified to the accuracy and truthfulness of the "funding secured" tweets. Moreover, even though this Court already held Mr. Musk acted with recklessness, he testified that his intentions were pure. Having already determined Mr. Musk's state of mind at the time of the tweet was at least reckless, the jury cannot be permitted to believe that he acted for non-culpable reasons (*i.e.*, no scienter). Any testimony about his supposed good intentions is irrelevant, given that he has already been found to have acted with scienter and the "good faith" defense relates only to directors sued under Section 20(a) of the Exchange Act.

Defendants compounded the prejudice caused by Mr. Musk with the testimony of Deepak Ahuja and Antonio Gracias. In pertinent part, Mr. Ahuja testified in response to questioning from Defendants, as follows:

#1    Q What did you understand Yasir to be saying on behalf of Saudi PIF when he said "We are ready to act"?

      A My impression when he said that was that the Saudi PIF fund is ready to do a deal.

---

[1] Similar questioning and testimony was heard by the jury on Day 4 (Jan. 23, 2023). *See*, *e.g.*, 1/24 Tr. at 888:2-7 ("Q: ". . . was it your understanding that, you know, . . . that that was as clear a commitment as there could be . . . ? A: Ye" before objection); *id*. at 895:13-21("Q: . . . Was that truthful? A: Yes").

> Q Ready to do a deal –
>
> A Ready to do this deal of the private transaction, was my impression of it.
>
> Q *And to provide sufficient funding to do it*?
>
> A That is correct.
>
> . . .
>
> Q Okay. Provide whatever funding needed, was that your impression?
>
> A Yes. He had already heard the 50 percent, you know, potential 50 percent, and so he certainly was comfortable with it. And it's consistent with the conversation I had with him while walking during the tour.
>
> 1/25 Tr. at 1183:18-1184:11

#2
> Q Okay. Now, if you continue back to the next paragraph, I want to focus you on the sentence beginning "Finally." It says (As read): "Finally Mr. Ahuja noted that, based on the statements made by the PIF to Mr. Musk during the meeting, Mr. Musk believed that the PIF was willing to fund the entire transaction." Was that what you told the board that night?
>
> A I did.
>
> Q *And it was a truthful statement*?
>
> A It was.
>
> Q Based on all of your interactions with the Saudi PIF to that date, your personal interactions, was it consistent with your understanding of the facts?
>
> A It was completely consistent.
>
> 1/25 Tr. at 1197:14-1198:3

#3
> Q Okay. When you saw this tweet, sir, *did you think it was a lie*?
>
> A To me, the contents of this tweet [referring to "funding secured"] were -- were consistent with everything I had known or heard until then.
>
> Q Very good. And when you say everything that you'd known or you heard up until that time, what are you referring to?
>
> A I'm referring to the conversations with the Saudi PIF fund. My interactions from 2017, the July 31st meeting, the tour that I gave to Yasir, as well as the comments that Elon made that same evening after meeting.

1/25 Tr. at 1204:1-10

#4  Q Okay. You saw this tweet when Mr. Musk sent it out?

A I did.

Q When you saw this tweet, *did you think it was a lie*, sir?

A I did not.

Q Okay. Was it consistent with your understanding of the facts?

A It was consistent with my understanding of the investor support from the Saudi PIF fund. That was the only one I was aware of. And, yeah. So this was consistent with the facts I knew, from the information I had.

1/25 Tr. at 1204:16-25

#5  Q Very good. And to be clear, sir, we looked at the two tweets that Mr. Musk sent out that day. We looked at the blog post that was referenced in those tweets. Were those consistent with your understanding of the facts, based on your own personal interaction with the PIF and with Mr. Musk?

A It was, in the sense that the -- my sense was the -- the only real hurdle in the process is the shareholder vote, while recognizing that there would be other approvals internally or externally needed.

Q Very good, sir.

1/25 Tr. at 1207:7-17

#6  Q (As read) "I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to 'Funding secured' in the August 7th announcement." Okay, when you read that in the blog post, was that statement consistent with your understanding of the facts?

A From the interactions that I had with the Saudi PIF fund on July 31st -- in addition to earlier, but specifically to that -- this was consistent with it.

1/25 Tr. at 7-18

Mr. Gracias testified similarly:

#1  Q And was there sufficient funding two weeks after the tweet to take the company private?

A Yes, there was.

1/25 Tr. at 1247:4-6

#2 Q Okay. Have you done business with the Saudi PIF and others in that region? A I have done business in the –

MS. TRIPODI: Objection, Your Honor.

THE COURT: Overruled.

BY MR. SPIRO Q You can finish your answer, Mr. Gracias.

A I have done business in the Middle East, and I have done business with a subsidiary of the Saudi PIF. Yes.

Q And were you concerned at all that there wasn't a signed written agreement to this at this juncture?

A Not at all, no.

Q Why?

A *This is a part of the world where you do business on a handshake. And if they say they're going to do it, they're going to do it*.

1/25 Tr. at 1264:12-1265:2

The above testimony has left the jury with the erroneous impression that Mr. Musk had obtained the funding to take Tesla private which, in turn, gives rise to the false conclusion that funding was "secured." Respectfully, the jury must be reinstructed as to their role in this trial. To date, they have been told to "assume" that the "funding secured" tweets were false but that instruction requires additional clarity in light of Mr. Musk's testimony and the testimony provided by Messrs. Ahuja and Gracias. Plaintiff does not have control over the witnesses in this case (for the most part) and therefore cannot counter the narrative being provided to the jury. At the same time, though Plaintiff secured partial summary judgment on the issues of falsity and scienter, the Court has prevented the jury from knowing that and/or Plaintiff from telling them so. Plaintiff pleads for the Court's assistance on this issue and requests that the jury be instructed first thing Friday morning that the Court already decided at summary judgment that the "funding secured" tweets were false and that Mr. Musk acted with the necessary state of mind (*i.e.*, scienter). *See* ECF No. 573 at 9 (" . . . But the jury *should* defer to the Court's summary judgment ruling. The

Court has already decided that the statements at issue were false and that Mr. Musk made them with at least reckless disregard as to their falsity. These findings of fact are not open to revisitation by Defendants or the jury.").

Dated: January 26, 2023                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 *s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: etripodi@zlk.com
Email: akrot@zlk.com
(admitted *pro hac vice*)

-and-

Joseph Levi
Eduard Korsinsky
Max Weiss
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Email: jlevi@zlk.com
Email: ek@zlk.com
(admitted *pro hac vice*)

*Attorneys for Plaintiff and Counsel for the Class*