QUINN EMANUEL URQUHART & SULLIVAN, LLP
 Alex Spiro (appearing *pro hac vice*)
  alexspiro@quinnemanuel.com
 Andrew J. Rossman (appearing *pro hac vice*)
  andrewrossman@quinnemanuel.com
 Ellyde R. Thompson (appearing *pro hac vice*)
  ellydethompson@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

 Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
 Anthony P. Alden (Bar No. 232220)
  anthonyalden@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendants Tesla, Inc., Elon Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, And Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**DECLARATION OF MICHAEL T. LIFRAK IN OPPOSITION TO PLAINTIFF'S "EMERGENCY" MOTION TO COMPEL** |

**DECLARATION OF MICHAEL T. LIFRAK**

I, Michael T Lifrak, declare as follows:

1. I am a partner at the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Defendants in this action. I make this declaration in support of Defendants' Opposition to Plaintiff's Motion to Compel the Testimony of Dave Arnold. I know the facts stated herein of my own personal knowledge, and if called as a witness, I could and would testify competently thereto.

2. Consistent with the Court's directive that the parties meet and confer regarding the order and timing of witnesses, on the evening of Tuesday, January 24, 2022, I spoke with Plaintiff's counsel by telephone regarding upcoming Plaintiff's witnesses and the order in which they would be called to testify.

3. During that conversation, Mr. Apton advised me that Plaintiff intended to call the following witnesses on the following days:

   **Wednesday, January 25:** Deepak Ahuja, Joseph Fath (by designation), and Antonio Gracias.

   **Friday, January 27:** Egon Durban, Dan Dees, Robyn Denholm, Ryan Brinkman (by designation), and Brad Buss.

   **Tuesday, January 31:** Steve Heston, Michael Hartzmark.

4. Mr. Apton did not mention Mr. Arnold on the call.

5. As a result, Defendants informed Mr. Arnold that he would no longer be needed as a witness in the case.

5. Attached hereto as **Exhibit A** is a true and correct copy of excerpts from Volumes 1 and 2 of the Transcript from the Deposition of Dave Arnold in this case.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

[*signature page follows*]

-1-   Case No. 3:18-cv-04865-EMC
DECLARATION OF MICHAEL T. LIFRAK IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

1 | Executed this 26th day of January, 2023 in San Francisco, California.

By: */s/ Michael T. Lifrak*
Michael T Lifrak

# EXHIBIT A

1  UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF CALIFORNIA

3  SAN FRANCISCO DIVISION

4  ------------------------------)
                                 )
5  IN RE TESLA, INC.             ) Civil Action No.
                                 ) 3:18-cv-04865-EMC
6  SECURITIES LITIGATION         )
                                 )
7  ------------------------------)

8

9

10

11

12      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13        VIDEOTAPED DEPOSITION OF DAVID ARNOLD

14                      VOLUME I

15        APPEARING VIA VIDEOCONFERENCE FROM

16             PALM SPRINGS, CALIFORNIA

17           THURSDAY, SEPTEMBER 30, 2021

18            9:01 A.M. - 2:17 P.M. PST

19

20

21

22

23  STENOGRAPHICALLY REPORTED BY:
    CHERYL ASADA
24  CA CSR NO. 13496
    WA CCR NO. 21000937
25  FILE NO. 200187

1  were, and so yes, that was in person when we met with
2  them.
3      Q    Okay.  Where did that meeting take place?
4      A    That would've been in the Dumbarton office as
5  well.
6      Q    Okay.  That was in a conference room?
7      A    Yes.  As far as I recall, yes.
8      Q    Okay.  And you had one meeting with Todd
9  Maron and Deepak Ahuja together?
10     A    I don't recall if it was one meeting or if
11 it -- you know, one or both of them may have gone in
12 and out, but it was -- those are the two that I
13 remember, yeah.
14     Q    And at this time, did you develop a strategy
15 for responding to media inquiries that might come in
16 as a result of this tweet?
17     A    My recollection is that we were discussing a
18 potential blog post that would have more information.
19     Q    Do you recall whose idea it was to do a blog
20 post?
21     A    I don't recall.
22     Q    Was it your idea?
23     A    I -- I -- again, I don't recall.
24     Q    And -- and who -- who drafted this blog post?
25     A    I believe it was largely Todd.  I think it

1  was, sort of, a collaborative process, as I recall.
2      Q    Did you have -- did you review the draft blog
3  post before it was posted?
4      A    I did.
5      Q    Okay.  Did you make any edits to it?
6      A    I don't recall.  I -- I imagine I weighed-in
7  on it.
8      Q    You imagine you weighed-it on it?
9      A    Yeah, correct.
10     Q    Okay.
11     A    Offered my perspective.
12     Q    Do you recall how that draft was circulated?
13     A    I don't.  I imagine it would've been over
14  e-mail.
15     Q    Okay.  Did it come in -- did it come as a
16  Word document, which you then edited, or how did you
17  provide your comments?
18     A    I don't recall.  I think it -- we may have
19  just been in the room doing it together.
20     Q    Okay.  So you're in a room with Mr. Ahuja and
21  Mr. Maron and Sarah O'Brien?
22     A    Correct.
23     Q    And one person who was just writing down the
24  collective ideas or thought of the group?
25     A    Again, I don't recall exactly the mechanics

 1   of it, but something to that effect, I believe.
 2       Q   Do you know if the document was being shown
 3   up on a screen that you could all see?
 4       A   I don't recall.
 5       Q   Do you recall how long it took to draft the
 6   blog post?
 7       A   I don't.  I -- maybe an hour or two.  I don't
 8   recall exactly.
 9       Q   While -- while you were drafting the blog
10   post, you were receiving media inquiries at the same
11   time?
12           You need to say "yes" or "no."  Sorry.
13       A   Yes, yes.
14       Q   Okay.  And what were you doing with those
15   media inquiries?
16       A   Nothing.
17           MR. PORRITT:  Elizabeth, can you bring up
18   Exhibit 9.
19           You know what, strike that.  Sorry, Skip
20   Exhibit 9.  Go back to Exhibit 8.
21   BY MR. PORRITT:
22       Q   Did you know -- well, on the morning of
23   August 7th, where was -- do you know where Elon Musk
24   was?
25       A   I don't recall.

 1   list?
 2       A    I don't know exactly who was on that, but it
 3   was our executive team, as I recall.
 4       Q    Okay.  Was Elon Musk on that distribution
 5   list?
 6       A    I believe so.
 7       Q    You'll see here in Exhibit 303 -- well, first
 8   of all, this paragraph is saying -- you know, you
 9   start off "FYI," and then you say, "following up blog
10   post."  And then there's a remaining paragraph.
11            Are those -- is that something that you
12   wrote?
13       A    Most likely, that is something -- as we saw
14   in some previous e-mails, there's an employee named
15   Erica Chen who, one of her responsibilities was to,
16   sort of, collate coverage.  I suspect that she -- she
17   drafted this.
18       Q    Okay.  But you would have read it before
19   putting it into this e-mail around to the ExecStaff?
20       A    I would have likely scanned it.  Probably
21   unlikely that I read the whole thing word-for-word.
22       Q    You'll see here in that first paragraph, it's
23   written:
24                "The predominant theme throughout
25            coverage is that the e-mail 'did not make

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 129

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4    ------------------------------)
                                     )
 5    IN RE TESLA, INC.              ) Civil Action No.
                                     ) 3:18-cv-04865-EMC
 6    SECURITIES LITIGATION          )
                                     )
 7    _____)

 8

 9

10

11

12        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13          VIDEOTAPED DEPOSITION OF DAVID ARNOLD

14                       VOLUME II

15         APPEARING VIA VIDEOCONFERENCE FROM

16               PALM SPRINGS, CALIFORNIA

17             THURSDAY, FEBRUARY 24, 2022

18                8:04 A.M. - 11:11 A.M.

19

20

21

22

23   Stenographically Reported by:

24   Tami L. Le, CSR No. 8716, RPR

25   Job No. 207086
```

```
 1                 Yes, I have it now.
 2       Q.    BY MR. PORRITT:  Okay.  And you recall
 3  receiving this email from Ms. Mumtaz?
 4       A.    I'm reading it now.  I don't -- I don't
 5  recall this at the time, but I see it now.
 6       Q.    Okay.  You'll see there in the email,
 7  third line down -- or third paragraph down, it says:
 8                 "A Tesla spokesman declined to
 9                  comment."
10                 Do you see that?
11       A.    Yes.
12       Q.    Is that you?
13       A.    I don't recall who that would have been.
14  It could have been me or another member of the
15  communications team.
16       Q.    Do you recall having communication with
17  Reuters regarding this news article?
18       A.    Vaguely, not off the top of my head.
19  There were a lot of -- as you can imagine, at the
20  time there were hundreds of media inquiries, surely
21  several from Reuters.  I don't recall this
22  specifically.
23       Q.    What do you recall generally about
24  newspaper inquiries at this time in connection with
25  the involvement of the Saudi Public Investment Fund.
```

Page 142

```
 1        A.    I know that was a -- obviously a topic
 2   of interest among media.  I mean, they were -- you
 3   know, following the tweets of August 7th, there were
 4   lines of questioning from seemingly every
 5   conceivable angle, from all sorts of reporters and
 6   outlets, including Reuters.
 7        Q.    What do you mean by "every conceivable
 8   angle"?
 9        A.    Surely not every conceivable angle, but
10   it's -- we were getting, like I said, dozens, if not
11   hundreds, of inquiries asking, you know, numerous
12   questions about the tweets, about what was -- you
13   know, the events leading up to it, wanting more
14   information, so on, so forth.
15        Q.    Okay.  Do you recall what some of those
16   questions were?
17        A.    I mean, again, there were dozens, if not
18   hundreds, you know, primarily people wanting more
19   information.  It seemed that reporters were trying
20   to track down every, you know, source that they had
21   that might be able to provide more information, and
22   then coming to us and, you know, asking for
23   confirmation or statements.  You know, this was the
24   news topic of interest, obviously, for a number of
25   outlets.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 143

 1       Q.    And were these inquiries concerning the
 2   funding for the proposed transaction?
 3       A.    As I recall, some were, yes.
 4       Q.    Were they also about the investor
 5   support for the transaction?
 6       A.    I believe some were, yes.
 7       Q.    Do you recall any other specific topics
 8   that came up about the transaction?
 9       A.    I mean, there were -- it was a bit of a
10   blur.  I mean, again, there was a flurry of
11   inquiries.  There were questions about, you know,
12   the board and what they thought about it.  There
13   was, you know, questions about whether we were going
14   to have any more information we were sharing.  There
15   was -- there was a number of inquiries.
16       Q.    And what -- at this time, so this is
17   over the weekend, this is on Saturday, August
18   the 11th, but at this time what was your approach to
19   responding to these media inquiries?
20       A.    Primarily it was to refer people back to
21   the blog that we had.  I believe we had published a
22   blog on the 7th.  I know there were -- again,
23   apologies, my memory is a little bit hazy in terms
24   of the cadence and the timeline.  But I know at some
25   point, there was another follow-up blog that we had,

1    MR. PORRITT: All right. So I placed

2  before the witness a document previously

3  marked as Exhibit 16.

4  Q. BY MR. PORRITT: Do you recognize this

5 document, Mr. Arnold?

6  A. I do. This would have been, I believe,

7 the second, but, you know, one of the blog posts

8 that we posted on the Tesla website about the

9 going-private transaction and sharing an update in

10 more detail.

11  Q. Okay. And I think you testified that

12 your -- in your first -- well, you know, forget

13 about what you testified to first. Let's just go

14 with what you remember now.

15    Were you involved in drafting this blog

16 post?

17  A. I, as I recall, worked with Todd Maron,

18 our general counsel, my -- one of my colleagues on

19 the comms team. As I recall, Todd was the primary

20 drafter. But, you know, we, as in we on the comms

21 team, would have weighed in and offered our

22 perspective and perhaps -- perhaps helped with some

23 of the language and so on and so forth. But, yes, I

24 was involved.

25  Q. Okay. Who else -- who was the other

1  colleague?

2       A.   As I recall, Sarah O'Brien worked on
3  this as well.

4       Q.   Okay.  Do you know anyone else who
5  worked on it other than Sarah O'Brien and Todd
6  Maron?

7       A.   I -- not specifically.  I -- I imagine
8  Deepak Ahuja would have worked on this, but I don't
9  recall.  That's speculation.

10      Q.   Do you recall how long it took to draft
11 this statement, Exhibit 16?

12      A.   I don't, I'm afraid.

13      Q.   What was your basis for the -- for
14 assessing the factual statements contained in this
15 blog post?

16      A.   Well, I'm clearly not subject-matter
17 expert on this, so, you know, we, on the
18 communications team, were relying on -- on others
19 for the information.  And so I think, you know, Todd
20 Maron was the primary -- the primary person who was
21 providing the factual and substantive information,
22 as I recall.

23      Q.   Okay.  Do you recall if anyone else was
24 providing substantive factual information for this
25 blog post?

Page 162

1    A.    I -- I -- I don't recall specifically.
2  It -- it wouldn't surprise me if there was others,
3  but I -- I think it was primarily Todd.
4    Q.    Okay.  Now, this is -- this blog post is
5  written in the first person; correct?
6    A.    It is.
7    Q.    Okay.  And it's -- Elon Musk has the
8  byline, so to speak?
9    A.    Correct.
10   Q.    Do you know why Todd Maron and yourself
11 and Sarah O'Brien were drafting a document that was
12 being issued in the name of Elon Musk?
13   A.    I don't think -- in my experience,
14 anyway, speaking generally, I don't think that's
15 particularly unusual if, you know, an executive is
16 going to put out -- if you see a blog post or a
17 statement from an executive, you know, sometimes --
18 not always, but that's -- that's not infrequently
19 drafted with the assistance of, you know, members of
20 the communications team, legal, so on and so forth.
21 And so I sort of put this in that same category.
22   Q.    What do you mean by the "same category"?
23 As a statement by Tesla's CEO?
24   A.    Yeah, correct, a statement by Elon Musk
25 that, you know, he, as I recall, you know, would