Volume 1
Pages 1 - 261

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES          )
LITIGATION.                           ) No. 18-cv-04865-EMC
_____)
                                       San Francisco, California
                                       Tuesday, January 17, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:

                    LEVI & KORSINSKY, LLP
                    1101 30th Street NW
                    Suite 115
                    Washington, D.C.  20007
            BY:     **NICHOLAS IAN PORRITT, ESQ.**
                    **ELIZABETH K. TRIPODI, ESQ.**
                    **ALEXANDER A. KROT, III, ESQ.**
                    **JOSEPH LEVI, ESQ.**

                    LEVI & KORSINSKY LLP
                    75 Broadway
                    Suite 202
                    San Francisco, California  94111
            BY:     **ADAM M. APTON, ESQ.**

                    LEVI & KORSINSKY LLP
                    55 Broadway
                    10th Floor
                    New York, New York  10016
            BY:     **MAX EDWARD WEISS, ESQ.**
                    **KATHY AMES VALDIVIESO, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

        (Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants:

                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    51 Madison Avenue
                    22nd Floor
                    New York, New York  10010
        BY: **ALEXANDER B. SPIRO, ESQ.**
             **ANDREW JOHN ROSSMAN, ESQ.**
             **PHILLIP B. JOBE, ESQ.**
             **ELLYDE R. THOMPSON, ESQ.**
             **JESSE A. BERNSTEIN, ESQ.**


                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    865 South Figueroa Street
                    10th Floor
                    Los Angeles, California  90017
        BY: **MICHAEL T. LIFRAK, ESQ.**
             **ANTHONY P. ALDEN, ESQ.**
             **MATTHEW ALEXANDER BERGJANS, ESQ.**
             **WILLIAM C. PRICE, ESQ.**


Also Present:

             **MAITHILEE PATHAK**
             **NICK FUENTES**

PROCEEDINGS

| | |
|---|---|
| 1 | **Tuesday, January 17, 2023**                                    **8:10 a.m.** |
| 2 | P R O C E E D I N G S |
| 3 | (The following proceedings were held outside of the |
| 4 | presence of the Jury Venire) |
| 5 | **THE COURTROOM DEPUTY:**  The Court is calling the case |
| 6 | In Regarding Tesla Inc. Securities Litigation, Case |
| 7 | No. 18-4865.  Court is now in session, the Honorable Edward M. |
| 8 | Chen presiding. |
| 9 | Does everybody have their laptops muted?  I muted yours. |
| 10 | **THE COURT:**  Now try it. |
| 11 | **THE COURTROOM DEPUTY:**  Court is now in session, the |
| 12 | Honorable Edward M. Chen presiding.  Court is calling the case |
| 13 | regarding Tesla Securities Litigation, Case No. 18-4865. |
| 14 | Counsel, please state your appearances for the record, |
| 15 | beginning with the plaintiff. |
| 16 | **MR. PORRITT:**  Good morning, Your Honor.  Nicholas |
| 17 | Porritt, Levi & Korsinsky, on behalf of plaintiff and the |
| 18 | class.  With me is Adam Apton, Elizabeth Tripodi, Joseph Levi |
| 19 | also of Levi & Korsinsky, Mr. Littleton, the plaintiff.  And |
| 20 | also with us are Maithilee Pathak and Nick Fuentes, who are the |
| 21 | jury consultants. |
| 22 | **THE COURT:**  You might want to bring that mic onto the |
| 23 | podium so it's closer to you. |
| 24 | **MR. PORRITT:**  I apologize, Your Honor. |
| 25 | **THE COURT:**  I could hear you, but the court reporter |

**PROCEEDINGS**

1  needs to hear you very clearly.  Thank you.  Good morning.

2          **MR. PORRITT:**  Good morning.

3          **MR. SPIRO:**  Good morning, Your Honor.  On behalf of

4  the defendants this is Alex Spiro, and my colleagues at Quinn

5  Emanuel.  Thank you.

6          **THE COURT:**  All right.  Thank you.

7      All right.  Good morning, everyone.  This is the time that

8  we've set to voir dire the jury, and hopefully are in a

9  position to select a jury this morning.

10     As we have been discussing, we have gone through a fairly

11 extended process of sending out over 200 or about 200

12 questionnaires.  And last Friday, as you recall, we went

13 through those, and vetted this group that we've called in

14 today.  My recollection we are calling in about 55 or so, I

15 forget the exact number, 54, 55, somewhere around there.  We're

16 waiting to hear from our Jury Administrator, how many have

17 actually made it here.

18     There are also the possibility, as I mentioned, that some

19 who did not fill out questionnaires will appear and will be

20 asked to fill out questionnaires, so there may be a plus or

21 minus.  We'll see.  But I expect about 50 people.

22     And just to remind us of the context, we have vetted and

23 asked not to come in those jurors who on the questionnaire

24 indicated they could not be fair to either side because of

25 their views, whether it's about the case or about the

**PROCEEDINGS**

 1   litigants.

 2        And so everybody who appears here are those who have

 3   indicated they thought they could be fair and impartial jurors,

 4   even if they have some knowledge or views about some of the

 5   parties including Tesla and Mr. Musk.  And so we are going to

 6   go through the process today to voir dire them and to see

 7   whether I can be satisfied that particular individuals,

 8   prospective members of the jury, can in fact serve as fair and

 9   impartial jurors in this case.

10        We've also tried to select those who either indicated they

11   could serve for the three-week, plus or minus, period for this

12   trial but there are a number of individuals, I think, we're

13   calling in about 20, 21 individuals who indicated they might

14   have a problem.  But these are the ones who we thought were

15   worth questioning to see whether there's some way that they can

16   be accommodated or they can accommodate this schedule.  So we

17   have a mix here.

18        But essentially, we have 50 of the top contenders, we've

19   tried to do.  The parties did agree to meet and confer to see

20   if there were certain prospective jurors whose views seemed to

21   be so strongly held that they should be voir dired outside of

22   the presence of the other jurors as to prevent any kind of what

23   we call sort of contamination, cross-contamination or taint,

24   influencing other jurors in a way that might cause a problem.

25        And my hope and I think your hope was that we could agree,

1  we could identify those -- or you could identify those jointly.

2  We could save those for potential voir dire, put them at the

3  back of the list.

4      Having received your lists, I see there is overlap on four

5  of those jurors, Prospective Jurors No. 60, 126, 175 and 196.

6  But there's -- the lists don't overlap with respect to others.

7  So the plaintiff has identified several others, I think four

8  others, who are not part of that group of four.  And the

9  defendants have identified nine.  So there's -- we have some

10  disagreements.

11      Let me ask whether the parties have any further thoughts,

12  or have you met and conferred about that process?

13      MR. SPIRO:  Good morning again, Your Honor.  When we

14  left court at our last session, and as the Court is aware, I

15  raised the concern and objected many times to certain of these

16  individuals sitting.  One reason was, of course, that I don't

17  think that somebody that professes a strong dislike or a

18  personal animus towards another person should be sitting in

19  judgment of them.

20      But the other issue I raised was the concern that those

21  jurors would pollute, essentially, the panel.  And --

22      THE COURT:  Which is why you went through this

23  process.  Go ahead.

24      MR. SPIRO:  Which is exactly why we went through this

25  process.  And the Court shared -- plaintiffs, frankly, shared

**PROCEEDINGS**

1  that concern.  The Court shared that concern.  And we all had

2  an understanding and an agreement that the "radioactive"

3  jurors, as we were referring to them, would not be -- would be

4  pushed to the end simply so that we could do an efficient

5  process here, and not risk contaminating the rest of the panel.

6      Obviously the Court is aware we moved to change venue.  We

7  have grave concerns in this case about sitting a fair and

8  impartial jury.  And it seemed to us that the solution that we

9  all agreed to on the last court appearance made sense, and

10  alleviated at least some of the concerns we had.  And we didn't

11  make various other applications in reliance upon that

12  agreement.

13      So, we were surprised to see the plaintiff retreading that

14  and trying to add other categories of individuals to their

15  list.  Didn't make much sense to us; wasn't in line with the

16  agreement that we reached.

17      So what I would say is sure, as to the four we have

18  agreement about, they can go to the end.  But I think that the

19  Court should also do what the Court was intending to do, which

20  is to use the Court's own judgment to move certain people that

21  are at risk of contaminating the jury -- and in line with our

22  agreement -- to the back of the group so that we can proceed in

23  an orderly and fair fashion.

24      You know, in cases, it's always -- it's always going to be

25  that not all sides agree on something, and I'm sure that there

1  will be Court rulings that affect both sides and that both

2  sides aren't happy about.  But it strikes me that at this part

3  of the process, fairness has to be of paramount importance.  I

4  think this is what we ought to do.  It's what we agreed on

5  doing, and frankly, the defense relied and would have made

6  other applications, had we not agreed.

7       So that is what we're asking.  We're asking the four that

8  we agreed to, sure.  I mean, I don't have to tell the Court

9  that the plaintiffs are agreeing to folks that are already at

10 the end of the list, sort of to feign agreement, but it's

11 neither here nor there.

12      The Court had a list that the Court put in the record of

13 jurors that the Court identified as radioactive.  Those jurors,

14 we asked not to even be here.  But if they're going to be here

15 they should be at the end, per the parties' agreement, and --

16 and for fairness.

17      **THE COURT:**  All right.  So I have a plan, and then I

18 want both sides to react.

19      I think one way to do this, a good way to do this is take

20 the four that you all agree on and do to them or with them what

21 we had talked about.  They would be put at the end of the list,

22 and called upon only if we need to reach that part of the list.

23      There are others who I think can be voir dired without a

24 substantial risk of contamination.  I've identified seven of

25 those.  I'll give you those in a minute.

1        Then there are six or so in addition to those four, who I

2   think have expressed strong enough views that they should be

3   voir dired out of the presence of the other jurors.

4        I think that -- I will tell you who they are.  They are

5   Jurors No. 36, identified by the plaintiff, who has said

6   positive things about Mr. Musk.  37 -- 39 -- so 36, 39.  65 --

7   I'm not even sure why 65 is on the list, unless I'm missing

8   something.  That person didn't seem to have any particular

9   views.

10       74, who simply said "Up in the air."   40, who simply said

11  that Mr. Musk appears to be not liked by a lot of people, or

12  something to that effect, but not very specific.

13       No. 50, who said they had mixed feelings, positive and

14  negative, not particularly happy with what has gone on at

15  Twitter.  But nonetheless, I don't think those views are

16  particularly intense.

17       And then 131 who simply said -- he used the word

18  "overrated."  Whatever that means.  Those to me seem like soft

19  questions that can be examined without a substantial risk of

20  contamination.

21       Other jurors -- 79, who is a little more intense, 97 who

22  used the word "arrogant, irrational."  101 -- actually, 101 --

23  I have 101, I've forgotten what -- "arrogant," they used the

24  word "arrogant."

25       118, "don't like him."  As opposed to saying he's not

1      liked by many, is saying "I don't like him."

2          24, "He sucks."

3          And 150, who used the adjective "crazy."

4          And so when feelings are that personal -- we don't know

5      what the basis is, and it may be, you know, we'll find out.

6      Those are the ones that I think should be voir dired separately

7      outside the presence of the pool.

8          So let me get your reaction to that.

9              MR. APTON:  Your honor, one of the things we wanted to

10     do when we agreed to this agreement the other day was avoid

11     having to spend a lot of time on voir dire for particular

12     jurors to make this an efficient process.  So that is why we

13     submitted the list that we did, because it included people who

14     did express soft feelings, as you say, against Musk, but as

15     well as people who expressed harder feelings towards this case

16     in general that we thought we would want to question a little

17     bit more.

18         The list that Your Honor proposed of the soft voir dire,

19     is it the Court's intention that we voir dire these folks with

20     the rest of the group in general?

21             THE COURT:  Yes.

22             MR. APTON:  And then the stronger, the second pronged

23     category, we push those to the end and then --

24             THE COURT:  We would bring them in individually after

25     we've excused the rest of the pool, give the pool a break.  And

1  rather than trying to do a sidebar, which I think is awkward,

2  and having people sit around, we would just simply have them

3  come in the courtroom one at a time.

4        MR. APTON:  Sure.  Your Honor, with respect to one of

5  the jurors that you listed in the soft.

6        THE COURT:  Yeah.

7        MR. APTON:  No. 65.

8        THE COURT:  Yeah.

9        MR. APTON:  There is a particular issue that we wanted

10  to raise with the Court.

11        THE COURT:  Okay.

12        MR. APTON:  Whether it be now or through a sidebar.

13        THE COURT:  Well, unless there's something

14  particularly sensitive and personal, that should not be raised

15  in public.  Maybe tell me what that is.

16        MR. APTON:  It may be better just to do the sidebar,

17  out of caution.

18        THE COURT:  Okay.  All right.  Other than that.

19        MR. APTON:  Other than that, Your Honor's proposal

20  sounds -- sounds okay.

21        THE COURT:  Okay.  Mr. Spiro?

22        MR. SPIRO:  Yes.  I understand the Court's proposal.

23  I would sort of note at the outset, I think it has certainly

24  changed since where we left things in the last session.

25        And I want to be clear about something that I think I have

**PROCEEDINGS**

1   repeated many times but -- because I think it goes to issues of

2   fundamental fairness, I'm going to say it once more, which is

3   simply that this is a concern that is really in this case, and

4   based on the vast majority of the responses that we saw in the

5   jury questionnaires, an issue anti-Mr. Musk, a visceral

6   reaction and a personal reaction that we saw throughout.

7        So what I would urge the Court to do is the Court's,

8   again, high-level plan, fine, and we don't have many objections

9   or concerns.  There were two responses to two people that the

10  Court is now deeming soft that I would just ask, it would not

11  take more than probably two minutes total to simply ask Juror

12  No. 40 when they say that he's not likeable:  What do you mean?

13       "Likeable," to the Court's point, could mean:  I don't

14  like him but I could be fair, and it's a soft not-like.  "Not

15  likeable" could also mean a soft way of writing into a

16  questionnaire:  I hate him.

17       So I think that, again, we're talking a couple of minutes

18  -- this case has been proceeding for a very long time, it's a

19  very serious matter -- to just simply ask that person outside

20  of the presence of the panel what they mean.  And then --

21            THE COURT:  You want to move that person from soft to

22  hard?

23            MR. SPIRO:  Again, I think it only takes a moment.

24            THE COURT:  And then something else.

25            MR. SPIRO:  And then the other person had a response

**PROCEEDINGS**

1  that said he has a mercenary personality.  I don't know exactly

2  what that means.  But to the degree that neither the Court nor

3  I is exactly sure what the juror means by that, I don't want to

4  have to ask in front of a full panel:  What does a mercenary

5  personality mean to you, and do you think you can be fair?

6  This is Juror No. 50.

7       I don't know how to ask that question in a room of people.

8  And I don't want to trigger inadvertently a situation where

9  then I have to ask the Court to remove the panel or whatever

10  else.

11       I don't see why we wouldn't take 60 seconds to just ask

12  that person:  "When you say 'mercenary,' what do you mean?"

13  And again, what I'm suggesting is a very slight change to the

14  Court's plan.  And that's what we're asking for.

15            **THE COURT:**  Okay.

16            **MR. APTON:**  Your Honor, if I may, what Mr. Spiro is

17  suggesting is we take people out of order, push them to the

18  back of the line, and reorder the venires, we have it.  The

19  same could be said from our perspective.  For example --

20            **THE COURT:**  Let me clarify.  The ones that I propose

21  to voir dire outside the presence -- I'm not reorganizing them.

22  They keep their number.  The ones you all have agreed to,

23  they're essentially going to the back of the list.  So they're

24  -- 40 is still 40.  So once we voir dire the person and they

25  say "Well, not likeable, I mean, a lot of people don't like

PROCEEDINGS

 1   him; I actually think he's a good guy but..." you know, he's

 2   staying in.  Or she.  Or whoever that is.

 3        **MR. SPIRO:**  We agree with that approach.  That

 4   approach is how we understand it, so I don't think it's --

 5        **THE COURT:**  It's just a question of whether we hear

 6   that person in front of everybody, or hear that person --

 7        **MR. APTON:**  So Your Honor, with that, I understand.

 8   But from our perspective, No. 74 has some very strong views.

 9   And to voir dire that person in front of the pool, while they

10   may not be anti-Musk, so to speak, they do have very strong

11   views about class actions, tort reform.  And that could be

12   problematic for the jury pool, for the same reason Mr. Spiro is

13   complaining about the folks that don't care for Mr. Musk.

14        **MR. SPIRO:**  That's just not the case, Your Honor.  And

15   most respectfully, that issue of some people like lawsuits,

16   some people don't like lawsuits, is -- is in every case.

17        We've all noted that this case is unique for the

18   consideration that we're talking about.  The consideration we

19   reached agreement about last week, the consideration that the

20   Court has, itself, acknowledged.  And because of that unique

21   consideration, we are doing something to protect this process,

22   and make it fair.

23        You're starting to talk about, you know, some people don't

24   like defense lawyers, some people don't like plaintiffs'

25   lawyers.

PROCEEDINGS

1          **THE COURT:**  Right.  Let me cut this off.  I'm not

2    going to take some people out and individually voir dire them

3    because of their views about the criminal justice -- justice

4    system, class actions.  Plaintiffs often -- you know, these

5    cases that damages are too high and that sort -- I understand

6    there is an issue there.  That happens in every case I have.

7    There's always people who talk about McDonald's, the coffee

8    case, all that sort of stuff.  We don't take them out of the

9    room just to ask them that.  This is specifically because of

10   this case, the notoriety of the litigants in this case, that's

11   why I'm doing the extraordinary step.

12          So out of an abundance of caution, although I don't think

13   it's frankly necessary, I'll take 40 and 50 -- not going to

14   change the order, their numbers, but I will hear them outside

15   the presence of the -- of the pool.  So that means we're going

16   to need one, two, three, four, five, six, seven, eight people.

17   I assume we're going to only spend three or four minutes on

18   each.

19          **MR. SPIRO:**  (Nods head)

20          **THE COURT:**  So what we'll do is after we've done what

21   we can, I'm going to excuse the jury, ask those eight to wait

22   out in the hall.  We'll bring them in one at a time.

23          And out of respect for the time that people have to wait,

24   we're not going to spend hours on each -- you know, we're going

25   to zero in on it.  I may ask the first question or something,

**PROCEEDINGS**

1   get it going, and then I'll hand it over to you all.

2           **MR. APTON:**  So Your Honor, just one question for

3   clarification.  Is it still the Court's intention to go through

4   hardship first?

5           **THE COURT:**  Yes.

6           **MR. APTON:**  Okay.  And will the jurors be excused if

7   they do have a hardship exception at that point, and done?

8           **THE COURT:**  I think that's probably what I'll do,

9   so -- rather than having people having to sit through, if it's

10  clear they have a hardship.  Now, if there's -- there may be a

11  couple I may reserve judgment on.  But my intent is to excuse

12  people.

13      So we'll probably take the hardship challenges first.  And

14  I would like to do that outside of the presence of the jury.

15  We'll give them a break, go through the hardships, see what we

16  have got left.

17          **MR. APTON:**  Very good.

18          **THE COURT:**  And that will inform how deep -- deeply

19  this pool --

20          **MR. SPIRO:**  Yes, Your Honor.  Thank you.

21          **THE COURT:**  All right.

22          **THE COURTROOM DEPUTY:**  So we've got 44 so far.

23      (Off-the-Record discussion between the Court and Clerk)

24          **THE COURT:**  Okay.  So, so far we only have 44.  As I

25  predicted, we were going to be a little short.  I didn't think

**PROCEEDINGS**

1    we'd be that short.  But, it is still a little early.  There

2    was heavy traffic today.  We'll give them a little bit of time.

3        The seven who did not fill out the questionnaires, of

4    those, I think none have shown?

5            THE COURTROOM DEPUTY:  Correct.

6            THE COURT:  Okay.  So we're probably going to be on

7    the minus side, rather than the plus side.  So we'll see what

8    we have.  They were supposed to report at 8:00 or 8:30?

9        (Off-the-Record discussion between the Court and Clerk)

10           THE COURT:  They were supposed to report at 8:00, so

11   we're half an hour behind and still missing 11 people.

12       Why don't we give them ten minutes or so, and we'll

13   reconvene at that point.

14       (Off-the-Record discussion between the Court and Clerk)

15           THE COURT:  So we had told the Jury Administrator to

16   bring the jurors down at 9:00.  So I guess that gives a half an

17   hour -- we'll give you an update as to how many show up.  And

18   we will have -- maybe in about 15 minutes we'll get a sense of

19   numbers, which, which ones have shown, which ones haven't, so

20   we know who on the list is live, sort of.

21           THE COURTROOM DEPUTY:  Yes.

22           THE COURT:  All right.  Anything else we need to

23   cover?

24           MR. SPIRO:  Your Honor, can I just ask, as long as we

25   have a moment of down time?

1          THE COURT:  Yeah.

2          MR. SPIRO:  So that once the jury is here we don't

3    disrupt the process, just, if we could just explain visually

4    sort of how they sit.  I assume it's that they just -- they go

5    in every other seat.  And then where?

6          THE COURT:  Okay, so one is going to be in the crier's

7    box (Indicating).  They can also see the screen.  Then they'll

8    be in these -- staggered, so we can fit eight in the box.  The

9    ninth juror will have a chair right --

10          THE COURTROOM DEPUTY:  No, we put nine there.  With

11    the crier's box it'll fit nine.

12          THE COURT:  Okay.  We're going to fit all nine up

13    here.  We're going to figure out a way of fitting nine up

14    there.  There'll be some space between each one, hopefully.

15    That's my goal.  But you don't have to look around the room

16    like some cases we have where they're seated around the

17    gallery.  So they'll all be in the box.

18          MR. SPIRO:  Got it.  And then for selection it would

19    be once we're down to -- once the Court picks the first 15 or

20    once, through hardships, it goes 1 through 9, and then we go

21    all the way up 15 in this first row here, basically

22    (Indicating)?

23          THE COURT:  Let me ask, which order are we going to be

24    in?

25          THE COURTROOM DEPUTY:  After the box we start in the

**PROCEEDINGS**

1  first row over here.

2          **THE COURT:**  On the left.

3          **THE COURTROOM DEPUTY:**  On the left.

4          **THE COURT:**  And then over to the right?

5          **THE COURTROOM DEPUTY:**  Yes.

6          **THE COURT:**  So you go all the way back on the left

7  side.  And then the last group --

8          **THE COURTROOM DEPUTY:**  It's going to go across.

9          **THE COURT:**  -- to be on the right side.  So first

10  group -- in sequence, the first group is here, second group

11  will be on the left side in the gallery, and the third,

12  numerically, will be on the right (Indicating).

13          **MR. SPIRO:**  But will we -- it'll just be 15 at that

14  point?

15          **THE COURT:**  No, I'm just thinking when they all come

16  in, all 44 or whatever we have.  But they'll be in order.

17          **MR. SPIRO:**  Right.

18          **THE COURT:**  It'll be according to that list.  So you,

19  you can direct your attention accordingly.  So --

20          **MR. SPIRO:**  I'll try.

21          **THE COURT:**  So, what is your question, then?

22          **MR. SPIRO:**  Once hardships are moved and we're through

23  that part of the process, I take it the Court is then saying

24  that we question -- let's say there's then 30 left.

25          **THE COURT:**  Yes.

PROCEEDINGS

1    **MR. SPIRO:**  The Court's not going to say we're going

2    to do 15; the Court's going to say whoever's left, they're all

3    live.

4         **THE COURT:**  Yeah, they're all live.  I don't do the

5    box thing where you just fill the box.  It's a small enough

6    group where everybody's live.

7         **MR. SPIRO:**  Okay.

8         **THE COURT:**  But you know the order, so if you want to

9    spend a lot of time on No. 30, that's up to you, but --

10        **MR. SPIRO:**  Fair enough.  And then the way that

11   strikes work, I just want to make sure I understand, they

12   strike, and then we have two, and then they have --

13        **THE COURT:**  Two.

14        **MR. SPIRO:**  -- two, and then I have one.

15        **THE COURT:**  Yeah.

16        **MR. SPIRO:**  And you just do the first eight to sit the

17   jury, so you say:  Do you have any challenges, 1 through 8?

18   They give one, I give two, and so on and so forth.

19     Is that --

20        **THE COURT:**  Whoever's left standing after you've

21   exercised your challenges is the first -- I'm going to seat

22   nine.  First nine will be our jury.

23        **MR. SPIRO:**  You're seating nine, and then plus

24   alternates?

25        **THE COURT:**  No alternates.

PROCEEDINGS

1          **MR. SPIRO:**  You're not using alternates.

2          **THE COURT:**  Nine, in civil court, is just -- there are

3   no alternates.  Not like criminal.  So it's just nine.

4          **MR. SPIRO:**  Right.  Well, I mean -- right.  I mean,

5   the Court's obviously -- some do it slightly differently, so

6   I'm just making sure I follow.

7          **THE COURT:**  Yeah.  All nine will participate.

8          **MR. SPIRO:**  Understood.

9          **THE COURT:**  So my math, you should be -- once we

10  excuse for cause and hardship and all that sort of stuff, you

11  should be concerned about the first 15.  If you want to use a

12  strike on -- on the last one, that's up to you.  But everybody

13  beyond 15, frankly, will be irrelevant.

14         **MR. SPIRO:**  Right.  So, so do you ask:  Do you have

15  any strikes, 1 through 9?  They do one, if --

16         **THE COURT:**  You can strike anybody you want.  You can

17  strike No. 14, if you want.  I mean --

18         **MR. SPIRO:**  So, so, if they -- do I forfeit one or

19  both strikes if I don't use them?  I don't think I do, right?

20         **THE COURT:**  No, you don't forfeit, but if you pass --

21  if you're talking about if you pass and then they pass, then

22  that's it.

23         **MR. SPIRO:**  Right.  Of course.

24         **THE COURT:**  But if you pass, and they exercise, you

25  still --

PROCEEDINGS

1          **MR. SPIRO:**  Get them, right.

2          **THE COURT:**  -- keep yours.

3          **MR. SPIRO:**  Okay.  Now I understand the system.  I

4   appreciate it.  Thank you.

5          **THE COURT:**  Right.

6          **MR. APTON:**  So Your Honor, if Mr. Spiro passes twice

7   in a row, he can then use all three at the end?

8          **MR. SPIRO:**  Yeah.  I don't forfeit --

9          **THE COURT:**  That's right.  There's no forfeiture.  But

10   if he passes, every time he passes, he risks your passing and

11   saying:  That's it, I'm happy.  And vice-versa.

12          **MR. APTON:**  Question.  If 79, who's on the strong

13   list, we want to voir dire I guess individually --

14          **THE COURT:**  Yeah.

15          **MR. APTON:**  So if 79 enters the courtroom, should

16   Mr. Spiro and I avoid asking questions to 79?

17          **THE COURT:**  Yeah, yeah.  I mean, you can ask

18   questions, other questions.  But attitudinal questions that

19   might elicit why that person feels strongly one way or the

20   other, yeah, let's save that until -- until we get that person

21   individually voir dired.

22          **MR. SPIRO:**  Well, they're going to go before we do our

23   more fulsome voir dire.  They're going to see the Court private

24   -- they're going to see the Court at sidebar before we do our

25   fulsome voir dire.  So that if they are not suitable jurors for

**PROCEEDINGS**

 1   this case, we all don't waste --

 2           **THE COURT:**  Okay, well, that's interesting.

 3           **MR. SPIRO:**  That's how I assume the Court is doing

 4   that.

 5           **THE COURT:**  Well, that makes sense.  After we do

 6   hardships --

 7           **MR. SPIRO:**  Exactly.

 8           **THE COURT:**  -- it makes sense, get these folks out of

 9   the way so we don't have to ask them again.  Or they might, in

10   your questioning of the whole panel, something -- they blurt

11   out something, we can address that.

12       So after we have individually voir dired -- up to ten or

13   whatever the number is, nine, then we will do the cause

14   voir dire for the whole panel.

15           **MR. SPIRO:**  Understood.  Thank Your Honor.

16           **THE COURT:**  We may have excused some of them, or we

17   may not have, at that point.

18           **MR. SPIRO:**  Understood.  Thank you.

19           **THE COURT:**  Okay?

20           **MR. APTON:**  And Your Honor, the nine that we will be

21   voir diring individually, can we get that list one more time?

22           **THE COURT:**  Yeah.  No. 40, 50, 79, 97, 101, 118, 124,

23   and 150.  That's actually eight, isn't it?

24           **MR. APTON:**  Yeah.

25           **THE COURT:**  Good.

PROCEEDINGS

1          MR. APTON:  Your Honor, can we discuss Juror No. 65

2     quickly?

3          THE COURT:  Yeah.  And you want to do that at sidebar,

4     for privacy purposes?

5          MR. APTON:  Yeah.  It may not be necessary but --

6          THE COURT:  Just in case.  I don't want to cause a --

7     well, give us a chance to try our sidebar equipment here.

8        (The following proceedings were heard at sidebar)

9          THE COURT:  Can you hear us?  Okay.

10         MR. APTON:  Your Honor --

11       (Reporter clarification)

12         MR. APTON:  Sorry, Adam Apton.

13      We were doing background research on Dennis McClinton,

14    Juror 65.

15         THE COURT:  Yeah.

16         MR. APTON:  He appears to have prior criminal

17    convictions, felony convictions.

18         THE COURT:  Yeah.

19         MR. APTON:  And so we're not quite sure whether that

20    disqualifies him as a juror.

21         THE COURT:  Yeah, normally does.

22         MR. APTON:  So we don't know how he made it into the

23    pool.  But --

24         THE COURT:  Unless he got -- I'm not sure what the

25    federal system is, whether you can have that expunged for

1  rehabilitation, whatever it is to get back your civil rights, I

2  don't know if --

3          **MR. APTON:**  We just want to make sure that we are not

4  baking into this trial a serious problem.

5          **THE COURT:**  Yeah, so we didn't ask that question on

6  the survey.  That's why he didn't answer it.

7          **MR. APTON:**  That's correct.

8          **THE COURT:**  Well, but he should have been asked that.

9          **MR. SPIRO:**  I would think -- normally, in the ordinary

10  course, and then they have the -- they have better information

11  than we have.  In the ordinary course, a juror about

12  citizenship and things like that is asked if there are any

13  disqualifying factors.  So I don't know -- you know, I can't

14  say as I'm familiar with San Francisco, but --

15          **THE COURT:**  Yeah.  We normally ask the question:  Are

16  you a citizen, blah, blah, blah.  Maybe he missed it, or maybe

17  he somehow -- I don't know if either of you are familiar with

18  whether there is a recertification or rehab?

19          **MR. SPIRO:**  Sure.

20          **THE COURT:**  We could take him, sidebar.

21          **MR. APTON:**  Okay.

22          **THE COURT:**  Clear that one out.  I could add him to

23  the individual voir dire list for that question.

24          **MR. SPIRO:**  Okay.  That would be -- I don't object.

25  There's no objection if the Court wants to take something at

1  sidebar.

2       **MR. APTON:**  Is there any way to find out whether he

3  has these convictions or -- or -- you know, at the outset, so

4  we don't have to waste time with him at sidebar?

5       **THE COURT:**  I don't have that ability.

6       **MR. SPIRO:**  Okay.  And then, anything related to

7  opening, if we wanted to be heard briefly, do you want to get

8  that over with now?

9       **THE COURT:**  Yeah, might as well do that now.  Okay,

10  thank you.

11     (Conclusion of sidebar discussion; the following

12  proceedings were held in the presence and hearing of the Jury

13  Venire)

14       **THE COURT:**  Okay.  For the record, we are going to add

15  No. 65 to the voir dire list.  So that, that will be 9.

16       **MR. APTON:**  Your Honor, you mean the individual

17  voir dire?

18       **THE COURT:**  The individual voir dire, yeah.

19     All right.  Any other issues, housekeeping matters

20  regarding openings, since we've got a few minutes, that we want

21  to take up at this point?

22       **MR. SPIRO:**  Yes, Your Honor.  Again, this is Alex

23  Spiro on behalf of the defendants.  One of these issues is a

24  more general point, one is a specific evidentiary point.

25     On the general, as the Court's aware, plaintiffs in some

1    of their original slides mentioned the summary-judgment ruling.

2    And the Court we think properly excluded those.

3         In light of the Court's various rulings in this case, I

4    would rather be safe than sorry and just front that we assume

5    that the plaintiffs are not going to mention other things that

6    -- or, or around the edges of other things, that would be

7    problematic in terms of the pretrial rulings and issues of

8    fairness.

9         So for example, you know, we assume that the issues

10   regarding any and all disputes with the SEC would not be in

11   opening.  We assume that, you know, that recent events at

12   Twitter are not going to be in the opening or any questioning

13   of any witnesses, and that subject is not going to be part of

14   this trial.

15        And then finally, you know, I just want to point out,

16   obviously, plaintiffs have the burden.  We don't have the

17   burden to even put on a case.  The -- no mention should be of

18   our witnesses that they don't intend to call or elicit

19   testimony from.

20        So for example, we may or may not call expert witnesses.

21   We may or may not call certain individuals.  And I see

22   sometimes -- improperly, candidly -- that in openings

23   plaintiffs' attorneys will reference that.  It is actually

24   improper burden-shifting.  But beyond that, they don't actually

25   know that we're going to call those witnesses.

1        Those people are on our witness list, but they should not

2   be commenting on that testimony because they can't possibly

3   have a good-faith basis or ability to say that that's what's

4   going to happen, because they don't even know that we're going

5   to, in fact, have a case or call those individuals.

6        So those are the sort of high-level points of certain

7   topics that should just not be in the opening.  There was one

8   specific comment -- and forgive me, obviously we're getting

9   used to the Court's procedures with objections.  And I was able

10  to review Your Honor's objections, and it seems like a very

11  efficient process, frankly.  While one I'm not used to, it was

12  very helpful to get that out of the way with the Court's order,

13  and we appreciate the time the Court took.

14       The Court ruled as to Exhibit 121, which are the text

15  message communications between Mr. Yasir and Mr. Musk.  And I

16  understood the Court's ruling, I understood the Court's ruling

17  to essentially be is that Mr. Musk, as a party opponent, these

18  are his statements, and that the text messages that come to him

19  affect his mind, his state of mind, et cetera.  There's a

20  couple, and I don't know if the Court's had a chance to look at

21  the entire text chain.  You just see snippets in their opening

22  presentation.

23       So if the Court was willing, I would like to provide at

24  some point the entire text chain so that the Court can

25  perfectly see what I'm referring to.  But there are some

**PROCEEDINGS**

1   messages that are not part of a colloquy.  They are just sort

2   of, I mean, I would submit, self-serving statements but they

3   are just their own statement on the state of the world, Right?

4   From Yasir.

5        And one particularly, just to give you an example, that is

6   such a statement, not part of a conversation, and number two,

7   has nothing to do with scienter, is one of these, which is

8   Exhibit 121 at TE121-13, which is in the slide presentation.

9   And that's the message on August 13th.  So almost a week after

10  the tweets in question.  And it's just his assessment, whether

11  truthful or not, of his opinion of a blog post.  Again,

12  truthful or not.

13             **THE COURT:**  What is the number?

14        **MR. SPIRO:**  It's Exhibit 121 at TE121-13.

15             **THE COURT:**  Dash-13?

16        **MR. SPIRO:**  Yes, Your Honor.

17             **THE COURT:**  So which line?

18        **MR. SPIRO:**  It's the message that starts:

19         "Elon, I'm personally surprised..."

20        Does the Court have the message in front of the Court?

21             **THE COURT:**  Yep.

22        **MR. SPIRO:**  So this is simply this individual's just

23  giving his view, again, truthful or not, of the blog post.

24  That's exactly the kind of statement that courts do not allow

25  because it's rank hearsay.  It's not part of a conversation.

1    It's not anything but a witness who's decided not to appear in

2    court, who the plaintiffs have not called or even attempted to

3    call.

4         And you're just back-dooring his statement about a blog

5    post, again, truthful or not, into this trial for the truth of

6    the matter asserted.  It can't possibly be for anything else.

7    And any suggestion --

8         **THE COURT:**  Well, it's just not about the blog post,

9    it's about his -- his statement at the time about where things

10   are at, what he was waiting for, where -- what information was

11   -- you know, where that information stream is.

12        **MR. SPIRO:**  But that is exactly the point.  That is,

13   the Court is making my exact point, which is that's for the

14   truth of the matter asserted, and that's actually not true.

15   What he is saying in this message is demonstrably not true.

16   And if he had come to court, we would have proven it's not

17   true.

18        And we're using a message -- in opening statement, no

19   less -- to say -- to put something in front of the jury which

20   is demonstrably false, of a witness that we know right now is

21   not going to be called.  And again, it's not part of -- it has

22   to do with the accuracy of a blog post, which is not even a

23   charged statement in this case, so scienter about the blog post

24   is not an issue in this case.  There's no response from

25   Mr. Musk to this.

PROCEEDINGS

```
 1          THE COURT:  Let me hear quickly your response, on --
 2   on both the avoiding direct reference to court rulings; number
 3   two, the question about any comment on the defendant's
 4   expecting evidence in your opening.  And then this 121.
 5          MR. PORRITT:  Thank you, Your Honor.  I can -- I fully
 6   understood the limitations --
 7          THE COURT:  You can take the mask off if you're --
 8          MR. PORRITT:  Thank you.  Just want to make sure.
 9   We've had some audio issues a bit this morning.
10      We fully understood the limitations on opening statement
11   so that's -- Mr. Spiro's concerns are -- you know, understood,
12   he hasn't seen my opening statement, so he can make them in the
13   abstract.  But --
14          THE COURT:  Just to make clear, my ruling applies
15   during trial, too.  You're not -- you know, not supposed to
16   make any direct references to court rulings.  The substance is
17   okay, but what -- what they have to assume.  But, no statement
18   about:  The Court ruled that.
19          MR. PORRITT:  Okay.  Understood.
20          THE COURT:  Okay?
21          MR. PORRITT:  That is -- and, although we can refer to
22   the Court's directions that you will have made to the juror
23   before -- before my opening statements.
24          THE COURT:  Yeah.  That you are to assume, yes.
25          MR. PORRITT:  Okay.  But we can say "As you heard --
```

1   as the Court has directed you, you are to assume," for

2   instance?

3          THE COURT:  That's okay, as long as you're not saying

4   that the Court made a ruling earlier.

5          MR. PORRITT:  Understood.  The words "ruling,"

6   "found," "findings" do not appear in reference to the Court.

7   And the other interest in the general comments Mr. Spiro made,

8   as I understand the Court's ruling, reference to the fact of an

9   ACC investigation is legitimately part of the factual record in

10  this case, because that is obviously part of it.  But we don't

11  make any reference, of course, to the fact that a complaint was

12  brought, the fact that the settlement was reached.  There will

13  be no reference to that, which we fully understand, and have

14  incorporated.  So that's --

15         THE COURT:  What about -- what about reference to

16  their experts?

17         MR. PORRITT:  Yeah, I'm not making -- not proposing to

18  make any reference to their experts, so --

19         THE COURT:  So you're not going to make any reference

20  to their -- reference in your opening -- to their experts in

21  your opening statement.

22         MR. PORRITT:  No.  No, Your Honor.

23         THE COURT:  Okay.  What about 121, this issue about --

24         MR. PORRITT:  Your Honor, I think it's sort of -- you

25  have set forth an efficient process.  And if we're going to be

**PROCEEDINGS**

1  keeping on re-litigating endlessly objection after objection

2  after objection once Your Honor has ruled, this is going to be

3  a very long trial.  This is long enough already.

4      **THE COURT:**  Yeah.  And I may not hear any more after

5  I've ruled, but I do want to get your response.  This one is --

6  why isn't this rank hearsay?

7      **MR. PORRITT:**  Well, I don't think it's rank -- I mean,

8  essentially I think it's effect on the listener, for instance,

9  Your Honor.  We listed -- made submissions on this already, on

10  effect of why we think it is not necessarily hearsay.

11      It's also -- literally probably also meets the definition

12  of an excited utterance, as it's literally probably within

13  minutes of seeing the blog post come out.  It is in the context

14  of a conversation; it is a response to the blog post, which is

15  a statement by Mr. Musk.  So that while it may not all be

16  contained within the text messages, it is in the context of

17  public statements, statements being made in connection with

18  this blog post by Mr. Musk regarding the transaction.

19      It is also relevant in terms of their materiality

20  argument, in terms of the current status of negotiations with

21  the public investment firm.

22      **THE COURT:**  Well, that's where -- then you're taking

23  it for the truth of the matter asserted, and that's where you

24  get into a hearsay problem.

25      **MR. PORRITT:**  Well, it shows that they are asking for

**PROCEEDINGS**

 1   information, continuing to ask for information, Your Honor.

 2   Because that request which has been made earlier and which --

 3   another text that Your Honor has also allowed to be mentioned

 4   to be --

 5        THE COURT:  Well, that's where I'm hearing from the

 6   other side that that's a false portrayal of what was going on

 7   at the time.  So any statement about information expected to be

 8   exchanged and complete, et cetera, et cetera, is an assertion

 9   of fact by a witness who is not appearing, and that sounds like

10   using it for the truth of the matter asserted.

11        MR. PORRITT:  I mean, the request is apparent in the

12   document, itself, Your Honor, so I'm not quite sure how they

13   can say the request wasn't made, when it's sitting there on the

14   face of the document.

15        THE COURT:  Here's what I'll do.  I ruled on this.

16   And if I didn't clarify then, this is going to be admitted

17   because it goes to the state of mind of Mr. Musk.

18        But, if you're going to use this, you need to explain,

19   because I'm not -- you know, this is not evidence, and I would

20   normally give a limiting instruction, it can't be used for the

21   truth of the matter asserted.  So you're going to have to

22   qualify that.

23        And if you don't, I'll hear an objection, and I'll make

24   that clarification.  So you would be wise to incorporate that

25   into your statement.

1      **MR. PORRITT:**  Understood.

2      **MR. SPIRO:**  Your Honor, one final comment, just for

3  the record.  Again, I understood the Court's ruling, but it

4  referred to several messages.  And so I think it's fair, given

5  the stage that we're at and these things are not admitted, to

6  raise this.  So I don't think it runs afoul of the general

7  edict.

8      The other thing is, again, and just so the record's very

9  clear on this, plaintiff's counsel has just told the Court that

10 the reasons that he believes it irrelevant are inadmissible

11 hearsay reasons.

12     **THE COURT:**  Not all of them.

13     **MR. SPIRO:**  And --

14     **THE COURT:**  Not all of them.  Not all of them.  Some

15 of them.

16     **MR. SPIRO:**  Well, I mean, I do know he -- I do concede

17 he threw some other things against the wall, like that it's an

18 excited utterance, which of course it's not, because he doesn't

19 have a reason it would be admissible in a courtroom.

20     But I would finally say this.  It can't be at this stage

21 for the affected hat on Mr. Musk.  It's not possible.  There's

22 no message after it, Your Honor, right?  So they're ending the

23 text message chain without even including responses.  So it's

24 also incredibly misleading.

25     During this text exchange, which is why I'm offering to

**PROCEEDINGS**

1  show the Court the entire exchange, Mr. Musk is saying in sum

2  and substance to the PIF:  This isn't true; you're a liar; you

3  know we had a deal.  And they are not showing those messages to

4  the jury at this phase.

5       A court would never allow, because of the rule of

6  completeness and other rules, ever, snippets of text messages

7  that are otherwise hearsay to come into evidence.  And again, I

8  will just say again, it can't possibly be the effect on the

9  listener when there's no message after it --

10       **THE COURT:**  All right, Mr. Porritt, is there -- just

11  on that question, the effect of listener is the one non-hearsay

12  analysis that you've provided, and yet this is after the

13  tweets, and so there are no further tweets that are subject of

14  the -- of the claim here.

15       So how, how was the listener, i.e. Mr. Musk's state of

16  mind relevant at that point?

17       **MR. PORRITT:**  Um, I think it once again goes to the --

18  it's -- it once again goes to the effect of what Mr. Musk then

19  did after that.  It goes to his statements to the board.  It

20  goes to his statements -- his state of mind for the rest of

21  that week, for the rest of the class period, Your Honor.

22       So I think it's -- it's -- there is a continuation of the

23  tweets, Your Honor.  So I mean, to be honest, Your Honor, this

24  is not a major part of my opening.  So I'm quite happy; I'll

25  just pull the slide.  I don't want to bog down the Court.

**PROCEEDINGS**

 1    We've got a jury to select in five minutes so --

 2          **THE COURT:**  Yes.  Let's pull that slide.  And we will

 3    have to litigate this --

 4          **MR. PORRITT:**  We'll park it.  In the context of

 5    testimony, I think it will be more effective, Your Honor.

 6          **THE COURT:**  Thank you.  Appreciate that.

 7       All right.  So, any further word from the jury?

 8       (Off-the-Record discussion between the Court and Clerk)

 9          **THE COURT:**  All right.  There was a little bit of

10    delay at the jury office.  We're not getting all the numbers.

11    So I'm going to wait to get a complete list of who is there.  I

12    don't want to give you an incomplete list at this point.

13       So we will recess for a bit.  And as soon as we get

14    further word, we will be back on.  Okay?

15          **MR. PORRITT:**  Thank you, Your Honor.

16          **THE COURT:**  Thank you.

17          **THE COURTROOM DEPUTY:**  Court is in recess.

18       (Recess taken from 8:58 a.m. to 9:18 a.m.)

19          **THE COURT:**  Okay.  All right.  Back on the record.  We

20    do have the -- stay seated.  We have the list now, which

21    Vicky's going to print out, and we'll go through that so you'll

22    know who's here.

23          **MR. APTON:**  Your Honor, there is one issue that I

24    wanted to raise.  It's an open issue about vaccine and booster.

25    What did the Court decide to do?  Because that is important, at

**PROCEEDINGS**

 1   least with respect to Juror 65 -- I'm sorry, 39.

 2           **THE COURT:**  39?

 3           **MR. APTON:**  He is vaccinated, but not boosted yet.  He

 4   works in a hospital, and so could be exposed.

 5           **THE COURT:**  I'm accepting people who are vaccinated,

 6   even if not boosted.

 7           **MR. APTON:**  Understood.

 8    (Document tendered)

 9           **MR. APTON:**  Your Honor, this is the list of the jurors

10   who --

11           **THE COURT:**  Who are actually here.

12           **MR. APTON:**  Okay.

13           **THE COURT:**  Yeah.

14    Okay.  My quick read is they're all here except for

15   Prospective Jurors -- No. 65, I don't see on the list, 127, and

16   128.  So I get 52.

17    Do your numbers agree?

18           **MR. APTON:**  Yes, Your Honor, looks right.

19           **THE COURT:**  All right.  So that's pretty good,

20   actually.  So, that obviates No. 65, having to voir dire 65.

21   And otherwise, I think we're set to go.

22    So unless you see any reason not to, I think we should

23   proceed.  And, bring the jurors down if you're done with their

24   orientation.

25           **THE COURTROOM DEPUTY:**  I have her bringing them up.

1          **THE COURT:**  Okay.  So I'll go off the bench.  Bring

2     them in, give them the oath, and then bring me in when they are

3     ready.

4          **THE COURTROOM DEPUTY:**  Court is in recess.

5          (Recess taken from 9:23 a.m. to 9:59 a.m.)

6          (Jury venire panel brought in and placed under oath.)

7          **THE COURTROOM DEPUTY:**  All rise.  Court is now in

8     session, the Honorable Edward M. Chen presiding.

9          **THE COURT:**  Please be seated.  Thank you.

10         **THE COURTROOM DEPUTY:**  Court is calling the case In

11    Regarding Tesla Securities Litigation, Case No. 18-4865.

12         Counsel, please state your appearance for the record,

13    beginning with plaintiffs.

14         **MR. APTON:**  Good morning, Your Honor.  My name is Adam

15    Apton, counsel for plaintiffs.  And with me are my colleagues

16    from Levi & Korsinsky, as well as Mr. Fuentes and Ms. Patrick.

17         **THE COURT:**  All right.  Thank you, Mr. Apton.

18         **MR. SPIRO:**  Good morning, Your Honor.  My name is Alex

19    Spiro, and I'm here on behalf of the defendants, with my

20    colleagues.  Thank you.

21         **THE COURT:**  All right, thank you, Mr. Spiro.

22         All right.  Good morning, ladies and gentlemen.  On behalf

23    of the Federal District Court for the Northern District of

24    California, let me welcome you.  I am Judge Chen and I will --

25    I am a District Judge for this Court, and will be presiding

1  over the trial in this case.

2      You are summoned as for possible jury service in a civil

3  case.  As you know from the questionnaires that you've filled

4  out, this case is expected to last approximately three weeks,

5  starting today, with the presentations of evidence we hope to

6  be completed, we expect to be completed by either February 1st

7  or February 3rd, followed by jury deliberations.  So this is

8  the time set for the selection of jurors in Civil Case No.

9  C-18-4866 (sic), In Re Tesla Securities Litigation.

10      Are the plaintiffs ready?

11          **MR. APTON:**  Yes, Your Honor.  Plaintiffs are ready.

12          **THE COURT:**  All right.  Is the defense ready?

13          **MR. SPIRO:**  Yes, Your Honor.

14          **THE COURT:**  Thank you.

15      Ladies and gentlemen, the remarks that I'm about to make

16  apply to those of you that have been summoned to jury service.

17  As I mentioned, the term of court for which you have been

18  requested to serve as jurors is anticipated to last

19  approximately three weeks.

20      After the jury is selected, we will start trial.  We start

21  each morning at 8:30 a.m., and we will generally go until

22  2:00 p.m. each day that we are in trial.  So you are free after

23  2:00.

24      We will take about 20-minute breaks every hour and a half.

25  And we will have trial every day except Thursdays, when the

1    Court will be occupied with other matters.

2        Also, we will not have trial on Monday, January 30th, the

3    one exception.

4        So you will be free each day by 2:00, and on Thursdays,

5    when you will have the entire day free.

6        So let me begin by saying that the Court understands and

7    appreciates that being summoned to service as a potential juror

8    is an imposition on your time.  The Court is also aware of your

9    concerns that you may have about health and safety in light of

10   the COVID-19 pandemic.  I've read each of your questionnaires

11   and understand fully your concerns, and indeed, the parties and

12   the staff of this Court shares those concerns as well.  So I

13   want to emphasize the immense gratitude of the Court and on

14   behalf of the parties for your willingness to respond to this

15   call for jury duty.

16       I do want to assure you that we have taken a number of

17   steps to address the COVID risks.  First, we are only going to

18   seat jurors who have been vaccinated.  We also will maintain

19   social distance between the jurors.  As you can see, normally

20   we have 14 people in that box and we are spacing people out to

21   provide for some social distancing.

22       Second, we ask each attendee to self-screen.  So if you

23   have any of the symptoms appearing on the list that previously

24   was given to you, you are asked to report this and not come to

25   court.  This applies to jurors even if they have already been

1  seated in the case.

2      Third, all participants, including the attorneys, Court

3  staff, jurors will wear masks except for witnesses and the

4  attorney examining the witness and me when I'm giving you

5  instructions.  The witness box, as you can see, has a Plexiglas

6  barrier and a high-grade HEPA filter next to the witness.

7      Attorneys and witnesses will either be vaccinated or show

8  proof of a negative test before entering the courtroom.

9      Fourth, the Court has consulted with outside specialists

10  to review our protocols and ventilation system.  We have worked

11  with the GSA, the federal agency which manages the building, to

12  turn on the air prior to the start of the each day and run it

13  after everyone leaves.  Our system utilizes high office-quality

14  air filters and the system is designed to bring in fresh air

15  continuously.  We have also placed additional HEPA-grade

16  filters, portable filters around the courtroom.

17      Fifth, you will be here at the courthouse only half a day,

18  between 8:30 and 2:00, and not all the day, so we are limiting

19  the hours in the courtroom.

20      Finally, should you serve on the jury, you will be

21  reimbursed for mileage, whether you drive or take public

22  transportation.  For those of you who can and choose to drive

23  instead of taking public transportation, in addition to mileage

24  reimbursement, we will also reimburse for bridge tolls and

25  validated parking at nearby garages.

 1      Nonetheless, we are aware that the imposition of jury

 2    service imposes on you -- we are aware of the imposition jury

 3    service imposes on you, especially if you feel that there are

 4    added safety risks.  But I ask you to consider not only the

 5    steps we have taken to minimize that risk, but also the

 6    importance of jury service and the rights of those that are at

 7    issue.  Litigants have the right to have their cases decided by

 8    a jury of their peers, not by high government officials.  Trial

 9    by jury embodies in real-world terms the concept of government

10    by the people and for the people and of the people.

11      Laws keep -- jurors keep law in the United States close to

12    the people, preserving a guarantee in freedom and democracy

13    that many in the world are still struggling to achieve.  The

14    jury process reflects the collective conscience of the

15    community.

16      Now, our system entitles the parties to an impartial jury

17    of their peers to resolve factual issues raised in the case.

18    In order to obtain such a jury, we call on persons throughout

19    the area which comprises this federal judicial district.  These

20    persons are selected at random to assure that they represent a

21    fair cross-section of the community.  It was this random

22    process that brought you here today.

23      It is important that all of you who are called make every

24    effort to accept the responsibility to serve even in these

25    challenging times.  Only in this way will the litigants in this

1    court receive the trial by their peers which is so fundamental

2    to our judicial system.  Thus, your willingness to serve as

3    jurors is not only appreciated by the Court and the parties,

4    but is also necessary in order for our judicial system to

5    continue to work.

6         Ms. Ayala, has the oath been administered?

7              **THE COURTROOM DEPUTY:**  Yes, it has, Your Honor.

8              **THE COURT:**  All right.  Ladies and gentlemen, as I've

9    stated, the case for which we are selecting the jury today is a

10   civil trial.  A jury for a civil trial in this case will be

11   composed of nine persons.  So our task today is to select among

12   you nine persons to serve as jurors to try this case.

13        Now, we have the questionnaires that all of you have

14   filled out and I -- we appreciate that and the time that you

15   spent doing so.  We will use the questionnaires to find out

16   additional information, to clarify your answers and explore

17   some issues that you may have raised.

18        The attorneys will be given an opportunity to ask you

19   questions as well.  If there is something private that you

20   would like to explain outside the presence of the other

21   prospective jurors, please say so, and we will give you a

22   chance to do so.

23        Our goal is to complete the questioning process this

24   morning.  The purpose of this questioning process is to allow

25   the Court and the parties to ensure that the jurors selected

1    will be able to serve and will be fair and impartial.  Each

2    question is designed to assist the attorneys in selecting the

3    fairest jury possible.  So please do not withhold information

4    in order to be seated on this jury, nor should you provide

5    inaccurate information in order to avoid service.  Be

6    straightforward in your answers rather than answering in the

7    way you feel the lawyers or I expect you to answer.

8         After we complete our questioning of prospective jurors,

9    the law permits the Court and each side to excuse some jurors

10   from this case.  When prospective jurors are excused in this

11   process, it is not because of any personal dislike or distrust,

12   but in order to get a final jury panel that is impartial and

13   that has the kind of balance that the parties feel is

14   appropriate for this case.

15        The procedure whereby members of the jury are chosen is

16   part of our system of justice and it has evolved with the

17   purpose of fairness to both sides.

18        You have done your full duty by your presence and your

19   readiness to serve, if called.

20        So first, I'm going to introduce the participants in this

21   case and find out whether any of you, by chance, know any of

22   the participants.  So let me start with court personnel.

23        My secretary is Leni Doyle.  The courtroom deputy who

24   swore you in is Vicky Ayala.  The court reporter is Belle Ball.

25   My law clerks are Shao-Bai Wu, Alicia Lai, Caroline Hirst,

1    Yuqing Cui and Nathaniel Kristel.

2        My law externs, who are students, are Diana Lee, Yihan

3    Valentina Liu, Eric Ramoutar, and Audrey Vas.

4        Do any of you know me or any of the persons I've just

5    named?

6        (No response)

7            **THE COURT:**  All right.  Now, let me introduce the

8    lawyers and their clients.  The plaintiffs are represented by

9    Nicholas Porritt, Adam Apton, Elizabeth Tripodi, Adam McCall,

10   Alexander Krot, Kathy Ames Valdivieso, Max Weiss, Joseph Levi,

11   and Eduard Korsinsky; and their support staff, Stephanie

12   Quinonez, Derek Palisoul, and Craig Veconi.

13       Do any of you know any of these individuals on a social or

14   professional basis?

15       (No response)

16           **THE COURT:**  All right.  Thank you.

17       Counsel, please introduce your client -- clients.

18           **MR. PORRITT:**  Thank you, Your Honor.  Nicholas Porritt

19   on behalf of the plaintiff.  And Mr. Glen Littleton is here

20   (Indicating).

21           **THE COURT:**  All right.  Do any of you know

22   Mr. Littleton?

23       (No response)

24           **THE COURT:**  All right.  Thank you.

25       The defendants are represented by Alex Spiro, Alex

1  Bergjans, Andrew Rossman, Anthony Alden, Doug Post, Ellyde

2  Thompson, Jesse Bernstein, Kyle Batter, Michael Lifrak, Phillip

3  Jobe, Stephanie Keleman, and William Price; and their support

4  staff, Gabby Trevino, Kayla Fleming, Mario Gutierrez, and Ken

5  Kotarski.

6      Do any of you know these individuals on a social or

7  professional basis?

8      (No response)

9      THE COURT:  All right.  Counsel, if you could

10 introduce your client or clients and representative -- client

11 representatives.

12     MR. SPIRO:  To make room for the jury, the client

13 representatives have stepped out, just so everybody could have

14 a seat.  So they're not here, presently.

15     THE COURT:  All right.  Why don't I name the clients

16 and let's see if anybody knows them.

17     Elon Musk, Brad Buss, Robyn Denholm, Ira Ehrenpreis,

18 Antonio Gracias, James Murdoch, Kimbal Musk, Linda Johnson

19 Rice.

20     Do any of you know any of these individuals on a personal

21 or a professional basis?

22     (No response)

23     THE COURT:  All right.  Next thing I want to do is go

24 through a list of potential witnesses in this case to see if

25 you -- any of you know any of these potential witnesses.  So

1    I'm going to read the names and then see if any -- if you

2    recognize somebody, just raise your hand.  All right?

3         Deepak Ahuja, Dave Arnold, Ryan Brinkman, Brad Buss, Aaron

4    Chew, Dan Dees, Robyn Denholm, Egon Durban, Joseph Fath,

5    Timothy Fries, Antonio Gracias, Michael Hartzmark, Steven

6    Heston, Nii Owuraku Koney, Glen Littleton, Joshua Mitts, Elon

7    Musk, Kimbal Musk, Rick Polhemus, Guhan Subramanian, Martin or

8    Martín Viecha, Sam Teller, Ira Ehrenpreis, James Murdoch, Linda

9    Johnson Rice, Larry Ellison, J. B. Straubel -- Straubel, Daniel

10   Fischel, Amit Seru, Yasir Al-Rumayyan, Saad Al Jarboa, Naif

11   Al Mogren, and Turqi Alnowaiser -- Alnowaiser.

12        (No response)

13        **THE COURT:**  All right.  Let me give you a brief

14   description of this case, and then I'm going to ask whether you

15   have any direct knowledge about this case.

16        The lead plaintiff and class representative in this case

17   is Glen Littleton.  Mr. Littleton represents a class of all

18   individuals and entities who purchased or sold Tesla stock

19   options or other securities from 12:48 p.m. Eastern daylight

20   time on August 7, 2018, to August 17, 2018.  That period is

21   known as the class period.

22        The defendants in this case are Tesla, Inc., Elon Musk,

23   and Tesla's board of directors from the time of the class

24   period.

25        Tesla designs, develops, manufactures and sells electric

1   vehicles and energy generation and storage systems.

2       Elon Musk was Tesla's chief executive officer and chairman

3   of the board of directors during the class period.  Plaintiff

4   intends to prove at trial that Elon Musk and Tesla violated the

5   securities laws.  Specifically, on August 7, 2018, at

6   12:48 p.m. Eastern daylight time, Elon Musk tweeted, quote, "Am

7   considering taking Tesla private at $420.  Funding secured."

8       Elon Musk later tweeted, quote, "Investor support is

9   confirmed.  Only reason why this is not certain is that it's

10  contingent on shareholder vote."

11      Plaintiff alleges that these tweets were materially false

12  and artificially affected the price of Tesla's stock and other

13  securities after they were made.  Defendants contend that

14  plaintiff has not and cannot prove that any of Elon Musk's

15  statements were materially false, and that these statements did

16  not result in any artificial price inflation, particularly in

17  light of the unchallenged statement that Mr. Musk was

18  considering taking Tesla private at $420 per share.

19      On August 13, 2018, Elon Musk published a blog post

20  regarding the potential going-private transaction.  Defendants

21  contend that the blog post disclosed further information about

22  the potential transaction, and is further evidence that

23  Mr. Musk did not make any materially false statements in

24  violation of the securities laws.

25      Following the tweets on August 7, 2018, there was media

 1   and investor interest in the proposed going-private

 2   transaction.  After reaching a high of $386.48 on August 7th,

 3   2018, Tesla's stock declined to $335.45 by close on August 16,

 4   2018.  Plaintiff intends to prove that defendants' allegedly

 5   false and/or materially misleading statements damaged the

 6   plaintiff and the plaintiff classes, and losses were realized

 7   by the class during the class period.

 8        Plaintiff further intends to prove that member of the

 9   Tesla -- of Tesla's board are liable as control persons for

10   securities laws violations by Tesla.

11        Defendants deny that Elon Musk or Tesla made any

12   materially false or misleading statements, deny that they did

13   anything wrong, and intend to prove at trial that plaintiff's

14   claims have no merit.

15        Among other things, defendants intend to prove that

16   plaintiff and the class cannot prove the material falsity of

17   the Challenged Statements or reliance thereon, cannot prove the

18   challenged transactions were material, cannot prove that

19   Mr. Musk acted with the requisite scienter with respect to

20   materially false statements, cannot show damages or loss

21   causation, and cannot show that there's a controlling -- that

22   there is controlling personal liability for Tesla's board

23   members.

24        Now, other than what I've just stated, do any of you have

25   any direct knowledge of this case other than reading or hearing

1    about it through the media?

2        (No response)

3        **THE COURT:**  All right.  Let me ask, for those of

4    you -- let me just, a show of hands, how many of you have heard

5    about this particular case?

6        (Show of hands)

7        **THE COURT:**  All right.  I will ask you later, but let

8    me ask if there's anybody here who have raised your hand,

9    believe that would you not be able to follow my instructions

10   that will tell you that you are to disregard what you've heard

11   and base your verdict solely on the evidence that is presented

12   in the courtroom.

13       Is there anybody who feels that they can't follow those

14   instructions, based on your understanding of what you've heard

15   through the media?

16       (No response)

17       **THE COURT:**  All right.  We'll ask some questions later

18   and the attorneys will have a chance to ask you some more

19   questions, but I just wanted to get a show of hands.  Thank you

20   for doing that.

21       Now, I'm going to ask some questions, and at some point

22   the attorneys will be able to ask some questions.  But I first

23   want to talk to those people who have indicated that they may

24   have difficulty serving during these three weeks.  Most of you

25   say you can serve, but there are a number of you who indicated

 1   there may be some problems.  And I kind of want to explore that

 2   with you.

 3        So let me first ask that you listen to my questions

 4   carefully, tell me anything that each question comes to mind.

 5   It is your duty to answer truthfully and completely.  None of

 6   these questions are intended to embarrass you or invade your

 7   privacy, so if you feel your answer to a particular question

 8   might embarrass you, please let me know and I will give you an

 9   opportunity to answer privately outside the hearing of the

10   other members of the jury panel.

11        Now, as I mentioned, a typical day will begin at 8:30 and

12   end at 2:00 with 20-minute breaks every 90 minutes and that

13   this case is expected to last approximately three weeks.

14   Possibly a bit longer, depending on jury deliberations.

15        So let me, based on the questionnaires, follow up with

16   some questions that I have.  So let me just start with Juror

17   No. 8, be right -- hi.  We have a microphone that we're going

18   to try to pass around.

19             **PROSPECTIVE JUROR LIU:**  Yes.

20             **THE COURT:**  Hi, good morning, Ms. Liu.

21             **PROSPECTIVE JUROR LIU:**  Good morning.

22             **THE COURT:**  I'm sorry about your mother's passing and

23   I understand the difficulty, and I think you indicated that you

24   would like to go back and help your dad --

25             **PROSPECTIVE JUROR LIU:**  Uh-huh.

1          **THE COURT:**  -- who has some health issues.

2          **PROSPECTIVE JUROR LIU:**  Uh-huh.

3          **THE COURT:**  Do you -- can you tell us more about the

4    timing of when you're planning -- you were going to apply for a

5    visa and what's happening at this point?

6          **PROSPECTIVE JUROR LIU:**  I have my visa already.  I

7    already bought ticket on January 24th.

8          **THE COURT:**  So you already have a flight planned on

9    the 24th.

10         **PROSPECTIVE JUROR LIU:**  Yeah.  Before the summons I

11   received.

12         **THE COURT:**  I see.  I understand why you want to get

13   back to see your dad.  I was curious, is are your -- is your

14   flight a ticket that can be changed without penalty?

15         **PROSPECTIVE JUROR LIU:**  Um, if I can, so -- because my

16   dad is -- has lung and the brain cancer, so he's hospitalized.

17   I don't know.  It's called a small -- small molecule lung

18   cancer is fast-developed.

19         **THE COURT:**  Small-cell lung cancer?

20         **PROSPECTIVE JUROR LIU:**  Yeah, small-cell, yeah.

21         **THE COURT:**  So he's in the hospital now?

22         **PROSPECTIVE JUROR LIU:**  He is in the hospital and he

23   got affected by the -- infected by the COVID-19.  So, you know,

24   currently in Beijing, many, many people got infected by the --

25         **THE COURT:**  I see.

```
 1          PROSPECTIVE JUROR LIU:  Yes.

 2          THE COURT:  So he's currently --

 3          PROSPECTIVE JUROR LIU:  Hospitalized.

 4          THE COURT:  -- ill with COVID-19 as well?

 5          PROSPECTIVE JUROR LIU:  COVID-19 as well, too, yeah.

 6          THE COURT:  Okay.

 7      All right.  Any questions, follow-up questions from

 8  counsel of this particular --

 9          MR. SPIRO:  No, Your Honor.

10          MR. APTON:  No, Your Honor.

11          THE COURT:  All right.  Thank you, Ms. Liu.  I

12  appreciate that.

13          PROSPECTIVE JUROR LIU:  Thanks.

14          THE COURT:  Okay.  Juror No. 13?  Juror No. 13.  Oh,

15  we need a microphone there.  We are going to get that to you.

16      All right.  Thank you, Ms. Jahan, is it?

17      Your -- tell us about what your current work is.  I know

18  you have concern about the financial circumstances.  Maybe you

19  can tell me a little bit more about your situation.

20          PROSPECTIVE JUROR JAHAN:  Yeah.  I'm working --

21          THE COURT:  Put the microphone --

22          PROSPECTIVE JUROR JAHAN:  Oh.

23          THE COURT:  Yeah.

24          PROSPECTIVE JUROR JAHAN:  I'm working for the

25  community, like, nonprofit organization.
```

1          **THE COURT:**  Uh-huh.

2          **PROSPECTIVE JUROR JAHAN:**  And working for the

3    individuals with the development disabilities.  And I'm not

4    paid that much.  So, only two of us are just living in a house

5    and I have a lot to pay.  And I'm just, like, um, can't pay all

6    the bills and stuff like that.

7          **THE COURT:**  And so if you're not at work, do you get

8    any kind of jury pay?

9          **PROSPECTIVE JUROR JAHAN:**  No.  I won't be paid.

10         **THE COURT:**  So you would lose your salary?

11         **PROSPECTIVE JUROR JAHAN:**  Yeah.

12         **THE COURT:**  All right.  Thank you.

13     Any follow-up questions?

14         **MR. SPIRO:**  No, Your Honor.

15         **MR. APTON:**  No, Your Honor.

16         **THE COURT:**  All right.  Thank you, Ms. Jahan.  I

17   appreciate that.

18         **PROSPECTIVE JUROR JAHAN:**  Thank you.

19         **THE COURT:**  Okay, Juror No. 44.

20         **PROSPECTIVE JUROR NUKU:**  Hi, Your Honor.

21         **THE COURT:**  Hi.  Good morning.  Ms. Nuku; is that

22   right?

23         **PROSPECTIVE JUROR NUKU:**  Yes.

24         **THE COURT:**  Hi.  You have an infant son?

25         **PROSPECTIVE JUROR NUKU:**  Yes.

1        THE COURT:  And I understand his -- that you're

2  breastfeeding and providing --

3        PROSPECTIVE JUROR NUKU:  Yes.

4        THE COURT:  Now, we've had a number of jurors who were

5  exactly in the same situation as you are.  What we've done, and

6  I want to ask you if that works for you if you are called to

7  serve, we take breaks every 90 minutes, so maybe -- and the

8  breaks sometimes are a little bit longer.  If you have to pump,

9  we have a private room that's closed, and that's what people

10  have used.  If you need refrigeration, I think we have a

11  refrigerator.

12     If we offer those services, would you be able to serve?

13        PROSPECTIVE JUROR NUKU:  The thing is, he doesn't

14  feed -- feed the bottle.

15        THE COURT:  Oh.

16        PROSPECTIVE JUROR NUKU:  So I have to directly give

17  him.

18        THE COURT:  I see.

19        PROSPECTIVE JUROR NUKU:  Yeah.

20        THE COURT:  So it's not just the milk, but he needs

21  you?

22        PROSPECTIVE JUROR NUKU:  Yes.

23        THE COURT:  All right, so you are -- are you

24  currently -- I'm just curious, are you working remotely or how

25  do you --

1          **PROSPECTIVE JUROR NUKU:**  I'm working from home.

2          **THE COURT:**  I see.  And how many months is your son

3   now?

4          **PROSPECTIVE JUROR NUKU:**  He's actually one year and --

5   one year old and one month.

6          **THE COURT:**  Okay.  And he -- but he still needs you?

7          **PROSPECTIVE JUROR NUKU:**  Yeah.  But he -- he eats

8   solid food, but he always asks for milk from me.

9          **THE COURT:**  Okay.

10         **PROSPECTIVE JUROR NUKU:**  Yeah.

11         **THE COURT:**  All right.  Any questions, Counsel?

12         **MR. SPIRO:**  No, Your Honor.

13         **MR. APTON:**  Your Honor, just one.

14      Good morning, Ms. Nuku.

15         **PROSPECTIVE JUROR NUKU:**  Good morning.

16         **MR. APTON:**  How old is your son?  You said one year?

17         **PROSPECTIVE JUROR NUKU:**  Yes, one year old.

18         **MR. APTON:**  And does he still take naps?

19         **PROSPECTIVE JUROR NUKU:**  Yes, he does.

20         **MR. APTON:**  And do you put him down for naps?

21         **PROSPECTIVE JUROR NUKU:**  Yes.

22         **MR. APTON:**  How many naps a day?

23         **PROSPECTIVE JUROR NUKU:**  Three times a day.

24         **MR. APTON:**  Three times?

25         **PROSPECTIVE JUROR NUKU:**  Like the morning, in between

 1  breakfast and lunch, after lunch, and like before 5:00.  Yeah.

 2          **MR. APTON:**  Understood.  Thank you.  Thank you.

 3          **PROSPECTIVE JUROR NUKU:**  Uh-huh.

 4          **THE COURT:**  All right.  Thank you, Ms. Nuku.

 5  Appreciate it.

 6      Juror No. 45, Mr. Buckley?

 7          **PROSPECTIVE JUROR BUCKLEY:**  Good morning, Your Honor.

 8          **THE COURT:**  Hi, good morning.  You're an equipment

 9  operator?

10          **PROSPECTIVE JUROR BUCKLEY:**  That's true.

11          **THE COURT:**  And so you do heavy construction?

12          **PROSPECTIVE JUROR BUCKLEY:**  Yes.

13          **THE COURT:**  And does your -- who is your employer?

14  It's --

15          **PROSPECTIVE JUROR BUCKLEY:**  Pacific Engineering,

16  they're here in the city.

17          **THE COURT:**  Okay.  Do they provide any pay for jury

18  service?

19          **PROSPECTIVE JUROR BUCKLEY:**  Not that I'm aware of.

20          **THE COURT:**  Have you ever served on a jury before?

21          **PROSPECTIVE JUROR BUCKLEY:**  No, I have not.

22          **THE COURT:**  So you haven't put them to the test of

23  whether they pay at this point?

24          **PROSPECTIVE JUROR BUCKLEY:**  We're a very small

25  company, Your Honor.

1          THE COURT:  I see.  How many employees are there?

2          PROSPECTIVE JUROR BUCKLEY:  It varies, but full-time,

3     maybe seven.

4          THE COURT:  Oh.  And how many folks are -- is

5     everybody doing equipment operation or --

6          PROSPECTIVE JUROR BUCKLEY:  No, I'm the only union

7     equipment operator in the firm.

8          THE COURT:  Hm.  And are you currently on a job?

9          PROSPECTIVE JUROR BUCKLEY:  I am not.

10          THE COURT:  Okay.  Do you anticipate any jobs coming

11     up?

12          PROSPECTIVE JUROR BUCKLEY:  Yes.

13          THE COURT:  In the next three weeks?

14          PROSPECTIVE JUROR BUCKLEY:  Well, I don't know, with

15     the rain.  We do state work, CalTrans and private work.

16          THE COURT:  Okay.  All right.  So as far as you know,

17     there's -- would you just simply lose salary?  There's no -- no

18     compensation, then?

19          PROSPECTIVE JUROR BUCKLEY:  Exactly.

20          THE COURT:  All right.  And do you get paid sort of

21     whether you are on the job or not?  Or do you get paid when you

22     are on the job?

23          PROSPECTIVE JUROR BUCKLEY:  No, it's basically hourly.

24          THE COURT:  Hourly?

25          PROSPECTIVE JUROR BUCKLEY:  Yes.

1          THE COURT:  So if you're not on a construction

2     project, do they pay you?

3          PROSPECTIVE JUROR BUCKLEY:  No.  No.

4          THE COURT:  So it's only when you're --

5          PROSPECTIVE JUROR BUCKLEY:  Correct.

6          THE COURT:  All right.  And so I know jobs come and

7     go, and hopefully they come for your purpose.

8          PROSPECTIVE JUROR BUCKLEY:  I can find work,

9     Your Honor.  I've got a lot of talent.

10          THE COURT:  Okay.  So, but the bottom line is, within

11     these next three weeks, you think there would be some jobs that

12     you would miss if you were here?

13          PROSPECTIVE JUROR BUCKLEY:  I'm not really -- I'd

14     rather serve, Your Honor, than work.

15          THE COURT:  So you --

16          PROSPECTIVE JUROR BUCKLEY:  I'd rather serve on the

17     jury.

18          THE COURT:  So you would be able to afford to serve?

19          PROSPECTIVE JUROR BUCKLEY:  Yes.

20          THE COURT:  Okay.  Well, that's the critical question

21     because it's -- yeah.  Yeah.  So you can make it financially?

22          PROSPECTIVE JUROR BUCKLEY:  Yes, Your Honor.

23          THE COURT:  All right.  Appreciate that.

24      Any questions, follow-up questions?

25          MR. SPIRO:  No, Your Honor.

1           **MR. APTON:**  No, Your Honor.

2           **THE COURT:**  All right.  Thank you.  Appreciate that.

3      Okay, Juror No. 48?

4           **PROSPECTIVE JUROR DE LA CRUZ:**  Hi, Your Honor.  Good

5      morning.

6           **THE COURT:**  Hi, good morning.  I think you have some

7      hesitancy, sounds like, some medical issues?

8           **PROSPECTIVE JUROR DE LA CRUZ:**  Yes, Your Honor.  I was

9      diagnosed with anxiety and ADHD and I take medication daily.

10     I'm still consistently going to therapy monthly, just to make

11     sure that I'm steady and I'm doing well, but sometimes I do get

12     anxiety attacks often -- or not often, but occasionally, under

13     stress and when I'm overwhelmed.

14          **THE COURT:**  Uh-huh.  Would serving as a juror in this

15     case, you think, might trigger -- would that cause you anxiety?

16          **PROSPECTIVE JUROR DE LA CRUZ:**  Yes.  Yes, Your Honor.

17          **THE COURT:**  So you think there's a good chance that

18     you'd end up having an episode if you were to serve?

19          **PROSPECTIVE JUROR DE LA CRUZ:**  Yes.

20          **THE COURT:**  And you're currently working for the

21     Unified School District?

22          **PROSPECTIVE JUROR DE LA CRUZ:**  Yes, sir.  I actually

23     have two jobs as well.

24          **THE COURT:**  What is your other job?

25          **PROSPECTIVE JUROR DE LA CRUZ:**  Martial arts

1   instructor, actually.

2          THE COURT:  Oh.  All right.  But you are able to

3   negotiate those jobs and do those jobs?

4          PROSPECTIVE JUROR DE LA CRUZ:  Yes.  I have learned to

5   try and take deep breaths and take breaks when I feel stressed

6   out or overwhelmed.

7          THE COURT:  Okay.  And does the medication prevent you

8   from -- does it cloud your mind at all or can you -- you can

9   still work with medication?

10          PROSPECTIVE JUROR DE LA CRUZ:  Yes, sir.

11          THE COURT:  Okay.  So the main concern is that serving

12   might put stress on you; it's different from your work

13   stress --

14          PROSPECTIVE JUROR DE LA CRUZ:  Yes, very -- very

15   different, yes.  And this is my first time being in a jury.

16          THE COURT:  Okay.  So you've never served before?

17          PROSPECTIVE JUROR DE LA CRUZ:  No, sir.

18          THE COURT:  Okay.  Any questions, follow-up questions?

19          MR. APTON:  No, Your Honor.

20          MR. SPIRO:  No, Your Honor.

21          THE COURT:  All right.  Thank you, Ms. De La Cruz,

22   appreciate it.

23          PROSPECTIVE JUROR DE LA CRUZ:  Thank you.

24          THE COURT:  Juror No. 58.  Mr. Xi.

25          PROSPECTIVE JUROR XI:  Good morning, Your Honor.

1          THE COURT:  Hi, good morning, Mr. Xi.  So you're

2    taking care of a parent --

3          PROSPECTIVE JUROR XI:  Correct.

4          THE COURT:  -- sounds like.

5       And you've got to take her -- this is your mom, I take it,

6    or --

7          PROSPECTIVE JUROR XI:  That's correct.

8          THE COURT:  And you take her to doctor appointments?

9          PROSPECTIVE JUROR XI:  Yes.  I'm actually her

10   designated driver, so...

11         THE COURT:  Okay.  And how often do you need to drive

12   her?

13         PROSPECTIVE JUROR XI:  So usually it's -- every month

14   type of thing, I usually basically drive her to her doctors'

15   appointment for follow up.  And basically also helping her

16   refill medications.

17         THE COURT:  And if you were to serve during the next

18   three weeks, is there a way that someone can help her or

19   someone else can help her with -- does she have any doctor

20   appointments in the next three weeks?

21         PROSPECTIVE JUROR XI:  I have to check my schedule,

22   so...

23         THE COURT:  Okay.  Is -- do you have other relatives,

24   either siblings or anybody else that can help take her if she

25   needs to go?

1        **PROSPECTIVE JUROR XI:**  I -- well, actually, I have a

2    sister but she's pretty much a full-time mom, so she has her,

3    you know, family to take care of, so I'm usually -- I'm single

4    so I'm actually the one who will be taking care of her instead.

5        **THE COURT:**  So it's always you who takes her?

6        **PROSPECTIVE JUROR XI:**  Correct.

7        **THE COURT:**  And is there anybody else in your family?

8        **PROSPECTIVE JUROR XI:**  I have a dad but he doesn't

9    drive so...

10       **THE COURT:**  Okay.  Any other relatives or friends?

11       **PROSPECTIVE JUROR XI:**  No.

12       **THE COURT:**  The answer is no?

13       **PROSPECTIVE JUROR XI:**  No.

14       **THE COURT:**  Tell me just roughly how often you have to

15   take her to doctors' appointments.  Is it once every several

16   months or once a month or --

17       **PROSPECTIVE JUROR XI:**  Usually once a month type of

18   thing.

19       **THE COURT:**  But you don't know whether she's got

20   something planned in the next three weeks?

21       **PROSPECTIVE JUROR XI:**  Supposedly there's going to be

22   something within tomorrow, I have to actually take her but,

23   unfortunately, I -- I told -- pretty much have her schedule her

24   doctor to see whether or not she is actually able to do like a

25   teleconference rather than stipulate for, like, an in-office

1    type of visit, which she's actually supposed to be there.

2         THE COURT:  Oh.  So all the visits, though, have been

3    live and not teleconference?

4         PROSPECTIVE JUROR XI:  It's usually live.  Once in a

5    while it's teleconference, depending on how she's feeling.

6         THE COURT:  Okay.  And I don't want to pry too much,

7    and you can tell me to stop, but she has a medical condition

8    that requires often -- often visits?

9         PROSPECTIVE JUROR XI:  Correct.

10        THE COURT:  And the preference for the doctor is for a

11   visual, a live visit?

12        PROSPECTIVE JUROR XI:  Correct.

13        THE COURT:  Okay.  And there's nobody else in your

14   family or friends that could take her during the next couple of

15   weeks?

16        PROSPECTIVE JUROR XI:  No.  It would just be me.

17   Because a lot of time the doctor prefer me, just to have me be

18   there with her while during the doctor visits because in case

19   if there's anything, I can actually make the decision for her.

20        THE COURT:  I see.  So you help make her decisions?

21        PROSPECTIVE JUROR XI:  Correct.

22        THE COURT:  Medical decisions?

23        PROSPECTIVE JUROR XI:  Correct.

24        THE COURT:  All right.  And you're working -- are you

25   working full-time at the city and county?

1     **PROSPECTIVE JUROR XI:**  Correct, sir.

2     **THE COURT:**  And are you doing that remote or in person

3  or what's your --

4     **PROSPECTIVE JUROR XI:**  I'm actually in person.  I

5  can't do remote.

6     **THE COURT:**  So you take time off, then, to take

7  your --

8     **PROSPECTIVE JUROR XI:**  Yes.  I'm actually on FMLA so a

9  lot of times I have to actually use that.

10    **THE COURT:**  Okay.  And the last question I have is, is

11 it possible to schedule her appointments in the afternoon so

12 that you could serve up until 2:00?  Or is that not possible?

13    **PROSPECTIVE JUROR XI:**  It depends, because a lot of

14 time it's really not up to me, it's up to the doctor, whether

15 or not there's, like, doctors' appointment slots that's

16 available for her.

17    **THE COURT:**  Okay.  All right.  Any follow-up

18 questions?

19    **MR. SPIRO:**  No, Your Honor.

20    **MR. APTON:**  No, Your Honor.

21    **THE COURT:**  All right.  Thank you, Mr. Xi.  Appreciate

22 it.

23    Juror No. 60.

24    **PROSPECTIVE JUROR GEOGHEGAN:**  Hello.

25    **THE COURT:**  Hi.  Ms. Geoghegan.

**JURY VOIR DIRE**

```
 1          PROSPECTIVE JUROR GEOGHEGAN:  Geoghegan.

 2          THE COURT:  Geoghegan.

 3          PROSPECTIVE JUROR GEOGHEGAN:  Uh-huh.

 4          THE COURT:  Hi, good morning.

 5          PROSPECTIVE JUROR GEOGHEGAN:  Good morning.

 6          THE COURT:  Well, you've heard the conversation.

 7   You're also a breastfeeding mom.

 8          PROSPECTIVE JUROR GEOGHEGAN:  I actually was having a

 9   really hard time pumping and so I stopped breastfeeding

10   recently.

11          THE COURT:  Oh.

12          PROSPECTIVE JUROR GEOGHEGAN:  Like -- so I'm not

13   pumping anymore.  But I do have childcare issues, which I

14   thought for some reason that the Court didn't meet on Fridays,

15   so I -- I have consistent caregiver availability on Tuesday,

16   Wednesday, Thursday.  And I tried finding some Mondays, because

17   I thought you guys were closed on Friday.  I don't know where I

18   read that, or obviously I made it up.  But I would have to

19   coordinate some sort of care for her on Fridays and I can't

20   find anyone for next Monday, the 23rd.

21          THE COURT:  Okay.  So, the people you normally rely on

22   are not available on Fridays?

23          PROSPECTIVE JUROR GEOGHEGAN:  Exactly, yeah.  And they

24   sometimes do Mondays but no one's available on this coming

25   Monday.
```

1    **THE COURT:**  Okay.  What are the chances of finding any

2  other backup source?

3    **PROSPECTIVE JUROR GEOGHEGAN:**  For the Fridays, it's

4  possible, I just haven't tried coordinating, but there's no --

5  I mean, I reached out to the four people that watch her and no

6  one can on next Monday.  But the Fridays, if you give me time

7  to coordinate, I might be able to coordinate Fridays.

8    **THE COURT:**  Okay.

9    **PROSPECTIVE JUROR GEOGHEGAN:**  But not the 23rd.

10    **THE COURT:**  So the 23rd, you've exhausted all --

11    **PROSPECTIVE JUROR GEOGHEGAN:**  I've exhausted all

12  resources on the 23rd, unfortunately.

13    **THE COURT:**  Okay.

14    **PROSPECTIVE JUROR GEOGHEGAN:**  Sorry.  They're

15  available the 30th if you change the day we're not meeting on

16  Monday.

17    **THE COURT:**  I wish I could do that.  I wish I could do

18  that.  But there are limits to even what a judge can do,

19  unfortunately.

20    Okay.  Any follow-up questions?

21    **MR. SPIRO:**  No, Your Honor.

22    **MR. APTON:**  Just one question.  The availability or

23  the unavailability for next Monday, that's in light of us

24  ending at 2:00 or maybe even a little bit earlier?

25    **PROSPECTIVE JUROR GEOGHEGAN:**  It's -- yeah, because

```
 1    somebody needs to watch her -- I can bring her.  She doesn't

 2    move really yet, so she could just sit on my lap.  But, no, I

 3    don't -- my husband works.  It's my two -- it's my mother, my

 4    mother-in-law or my friend Kelly are the people who watch her

 5    and none of them are available on Monday.

 6            MR. APTON:  Understood.  Thank you.

 7            PROSPECTIVE JUROR GEOGHEGAN:  Yeah.

 8            THE COURT:  Well, that would be a first.  I haven't

 9    tried that one yet.

10            PROSPECTIVE JUROR GEOGHEGAN:  Yeah.  She's really

11    cute.

12            THE COURT:  Might be interesting.  Okay.  Thank you.

13         Juror No. 68.

14            PROSPECTIVE JUROR DAING:  Good morning.

15            THE COURT:  Hi, good morning.  Mister -- is it Daing

16    or --

17            PROSPECTIVE JUROR DAING:  Daing.

18            THE COURT:  Daing, okay.  So you own a gas station?

19            PROSPECTIVE JUROR DAING:  I do.

20            THE COURT:  So it's important for you to be there, it

21    sound like?

22            PROSPECTIVE JUROR DAING:  I have some employees but

23    issues can crop up any moment, so I have to be available.

24            THE COURT:  Okay.  So you do have employees who could

25    physically be there but you want to be available in case stuff
```

 1   comes up?

 2              **PROSPECTIVE JUROR DAING:**  Correct.

 3        **THE COURT:**  If you are available every 90 minutes by

 4   phone or Facetime or something like that, would that work?

 5              **PROSPECTIVE JUROR DAING:**  Possibly, unless it's an

 6   urgent issue that needs resolution right away.

 7        **THE COURT:**  Okay.  I'm sort of curious.  I don't know

 8   the business that well other than going to gas stations, but

 9   what -- what kind of -- obviously, if there's a crime or

10   something like that, or a windstorm that blows over your -- we

11   saw what happened the other day.  Are there things that often

12   come up that need urgent --

13              **PROSPECTIVE JUROR DAING:**  Unpredictably, they can.

14   For example, the pumps can go down, you know, the car wash

15   break down, there could be some customer issues.  Cars can get

16   stuck or some resolution that these employees don't know much

17   about.

18        **THE COURT:**  Okay.  And your station, is it in Danville

19   or out --

20              **PROSPECTIVE JUROR DAING:**  Lafayette.

21        **THE COURT:**  In Lafayette?  Okay.  So it could work but

22   there's an issue of emergencies where you would have to

23   respond?

24              **PROSPECTIVE JUROR DAING:**  That's exactly right.

25        **THE COURT:**  Okay.  And is there anybody else that's

 1    helping you manage the gas station, so like if you are not

 2    there, they could make decisions for you?

 3              **PROSPECTIVE JUROR DAING:**  Not really, but my wife is

 4    there but she's not well-versed in every aspect of it.

 5              **THE COURT:**  Okay.  Has she been working there a long

 6    time?

 7              **PROSPECTIVE JUROR DAING:**  She hasn't worked there.

 8    She occasionally goes there, but she doesn't regularly go

 9    there.

10              **THE COURT:**  She is not a regular there.

11              **PROSPECTIVE JUROR DAING:**  No.

12              **THE COURT:**  All right.  Thank you.

13        Any follow-up questions?

14              **MR. SPIRO:**  No, Your Honor.

15              **MR. APTON:**  Yes, just -- Mr. Daing, one quick

16    question.  What sort of issues or emergencies crop up that

17    require you to physically by present to fix them?

18              **PROSPECTIVE JUROR DAING:**  Yeah.  As I said, the pumps

19    can go down, especially given the rains.  And the inflow of the

20    water from the soil can stop everything in its tracks.  Car

21    wash operations, if it's not raining, thankfully, now, the cars

22    can get stuck.  The machine can stop in its tracks

23    unpredictably and some resolution would need to be enforced.

24              **MR. APTON:**  So with further bad weather on the

25    horizon, that's potentially an issue that's more pertinent --

1      **PROSPECTIVE JUROR DAING:**  It's possible.  It's

2   unpredictable.

3      **MR. APTON:**  Understand.  Thank you.

4      **THE COURT:**  Let me just, before I let you go, is --

5   are there -- are the folk that are working for you, can they

6   deal with the car stuck in the car wash or --

7      **PROSPECTIVE JUROR DAING:**  They can but the first thing

8   they do is resort to calling me and looking for directions.

9      **THE COURT:**  I see.

10      **PROSPECTIVE JUROR DAING:**  I may not get a call or I

11   might get six in a row and there is no knowing.

12      **THE COURT:**  Yeah, I see.  And they need your

13   direction?

14      **PROSPECTIVE JUROR DAING:**  They absolutely do.

15      **THE COURT:**  You don't have, like, an assistant manager

16   who can say hey --

17      **PROSPECTIVE JUROR DAING:**  No, it's them and then they

18   escalate it to me right away.

19      **THE COURT:**  Okay.  All right.  Thank you, Mr. Daing.

20      Juror No. 74.

21      **PROSPECTIVE JUROR BRANSFIELD:**  Your Honor, I've

22   resolved everything so I'm available.

23      **THE COURT:**  Oh, you are available?

24      **PROSPECTIVE JUROR BRANSFIELD:**  Yes.

25      **THE COURT:**  Oh, good.  Great.  Thank you.

```
 1        (Reporter clarification)

 2            THE COURT:  All right.  And that's Ms. Bransfield,

 3   right?

 4            PROSPECTIVE JUROR BRANSFIELD:  Yes.

 5            THE COURT:  Great.  Thank you.  Appreciate that.

 6        Juror No. 81.

 7            PROSPECTIVE JUROR AMUR:  Good morning, Your Honor.

 8            THE COURT:  Hi, good morning, Mr. Amur?

 9            PROSPECTIVE JUROR AMUR:  Yes.

10            THE COURT:  So you are an engineer.

11            PROSPECTIVE JUROR AMUR:  Yes.

12            THE COURT:  And who do you work for?

13            PROSPECTIVE JUROR AMUR:  Analog Devices.

14            THE COURT:  Okay.  How big of a company is that?

15            PROSPECTIVE JUROR AMUR:  Um, 20,000 employees or so.

16            THE COURT:  Oh, okay.  And your concern is you've got

17   some time-sensitive projects?

18            PROSPECTIVE JUROR AMUR:  That's correct.

19            THE COURT:  And can you tell us a little bit more

20   about what the time sensitivity is?

21            PROSPECTIVE JUROR AMUR:  Well, deadlines, and taking a

22   lot of time off will probably affect that.

23            THE COURT:  Do you have some close deadlines that are

24   imminent or what's --

25            PROSPECTIVE JUROR AMUR:  Yeah, yeah.
```

1          THE COURT:  What's an example of -- do you have one

2     coming up within the next month or something?

3          PROSPECTIVE JUROR AMUR:  There's some, like, customer

4     issues that there are -- to be resolved, like, really soon,

5     within weeks or as soon as possible.

6          THE COURT:  And what is it that you -- you provide

7     software?  Or --

8          PROSPECTIVE JUROR AMUR:  Yes, that's correct.

9          THE COURT:  What kind of software is that?

10          PROSPECTIVE JUROR AMUR:  It's embedded software.

11          THE COURT:  Is that for enterprise users or business?

12     What kind of --

13          PROSPECTIVE JUROR AMUR:  No, so as of potential

14     issues, one of -- some of the customers of -- some of our

15     customers are electric vehicle manufacturers.  So they think

16     if, like, outcome of this case could negatively affect our

17     business, which could affect my employment and such.

18          THE COURT:  I'm sorry, what could affect their

19     business?

20          PROSPECTIVE JUROR AMUR:  So, the customers of our --

21     some of the customers are electric vehicle manufacturers.  So

22     some negative -- some outcome of this -- of this case could

23     affect the business of my employer.

24          THE COURT:  Oh.  Okay.  So it's not -- now you are

25     talking about not the time problem, but --

```
 1          PROSPECTIVE JUROR AMUR:  The schedule, yes.

 2         THE COURT:  -- the case itself --

 3          PROSPECTIVE JUROR AMUR:  Yes.

 4         THE COURT:  -- you think what happens in this case

 5   could affect some of your customers, which then it would affect

 6   your employer?

 7          PROSPECTIVE JUROR AMUR:  Correct.

 8          THE COURT:  Well, let me put that aside for a moment.

 9     But let me go back to the time problem.  If you were to

10   serve on this case for three weeks, what would happen to the

11   various projects?  And is there anybody else that could --

12          PROSPECTIVE JUROR AMUR:  Yeah, probably some people

13   will get reassigned and, like, my manager will have to deal

14   with that.  But -- but that will -- yeah.

15          THE COURT:  Okay.  It's a fairly big company, I take

16   it?

17          PROSPECTIVE JUROR AMUR:  But there's only, like,

18   certain group that works on my project itself, yeah.

19          THE COURT:  Right.  But if worse came to worse, your

20   manager could reassign somebody?

21          PROSPECTIVE JUROR AMUR:  I think they will have to.

22          THE COURT:  Okay.  And I know commuting in from Walnut

23   Creek is no fun, but, of course, a lot of our staff actually

24   live out that way.  It is a hassle but you would be able to do

25   it?
```

```
 1              PROSPECTIVE JUROR AMUR:  Yeah.

 2              THE COURT:  Okay.  All right.  So your main concern is

 3    how this might affect your customers, this case itself might

 4    affect some --

 5              PROSPECTIVE JUROR AMUR:  That's -- yeah, that's an

 6    issue, yes.

 7              THE COURT:  Okay.  Well, we may ask you some questions

 8    about that.

 9              PROSPECTIVE JUROR AMUR:  Sure.

10              THE COURT:  Right now I'm just trying to get a sense

11    of who's available during the three weeks.  So thank you.

12    Appreciate it.

13         Okay.  Let's see.  Juror No. 101, Ms. Xu?

14              PROSPECTIVE JUROR XU:  Hi, Your Honor.

15              THE COURT:  Hi, good morning, Ms. Xu.

16              PROSPECTIVE JUROR XU:  Good morning.

17              THE COURT:  So you also are planning to visit your

18    mother?

19              PROSPECTIVE JUROR XU:  Correct.

20              THE COURT:  And do you have -- do you know when?

21              PROSPECTIVE JUROR XU:  I don't.  I just started the

22    visa application because the 8th, China lifted the COVID

23    quarantine policy --

24              THE COURT:  Right.

25              PROSPECTIVE JUROR XU:  -- and kind of opened up the
```

1    visa, so I just started.  But I really -- but from what I

2    heard, I can get a visa just maybe within a week, so I do --

3            THE COURT:  Within a week?

4            PROSPECTIVE JUROR XU:  Yeah.  So I kind of apply for

5    the expedite because my mom is 92.  So, with her health, she's

6    really, like, on her kind of last -- um, yeah, but I haven't

7    purchased the ticket or anything because I'm still waiting for

8    the visa.

9            THE COURT:  All right.  And is your plan, as soon as

10   you get the visa, to go immediately?

11           PROSPECTIVE JUROR XU:  Yeah, yeah.

12           THE COURT:  And so you would prefer not to wait for

13   three weeks?

14           PROSPECTIVE JUROR XU:  It -- it's kind of -- so I kind

15   of had a video chat with her every day so --

16           THE COURT:  Yeah.

17           PROSPECTIVE JUROR XU:  -- it's kind of hard to say.

18   So, I mean, some day she is kind of okay, can talk, but some

19   other days, she can't.

20           THE COURT:  Okay.

21           PROSPECTIVE JUROR XU:  So I kind of wanted to be able

22   to.  But again, I have to wait for the visa first.  I haven't

23   gotten it yet.

24           THE COURT:  But you have applied for an expedited

25   visa?

1              **PROSPECTIVE JUROR XU:**  Yes, I did.

2              **THE COURT:**  Okay.  And you said she's exposed, COVID

3       is -- does she have COVID?

4              **PROSPECTIVE JUROR XU:**  She had.  She had last week,

5       yeah.  No, the 16th, so two weeks back, she had.

6              **THE COURT:**  Okay.  Is she okay now?

7              **PROSPECTIVE JUROR XU:**  She is safe but she's still

8       kind of -- like she's just tired.

9              **THE COURT:**  I see.

10             **PROSPECTIVE JUROR XU:**  I mean, she is old.  She's

11      already always tired, now.

12             **THE COURT:**  Yeah, yeah.

13             **PROSPECTIVE JUROR XU:**  Yeah.  But she is at nursing

14      home, so she does have kind of basic medical support.

15             **THE COURT:**  Okay.  So she's in a nursing home, not in

16      an acute hospital, but she's in a nursing home?

17             **PROSPECTIVE JUROR XU:**  Yeah, because the hospital --

18      yeah, she -- yeah, the hospital couldn't really do much because

19      of her age.

20             **THE COURT:**  Okay.

21             **PROSPECTIVE JUROR XU:**  So they sent her to the nursing

22      home, yeah.  And earlier I couldn't visit her because of the

23      quarantine policy.

24             **THE COURT:**  I see.  But now you could go if --

25             **PROSPECTIVE JUROR XU:**  Yeah, just changed it on the

1  January 8th.

2          **THE COURT:**  Okay.  All right.  Thank you.

3      Any follow-up questions?

4          **MR. SPIRO:**  No, Your Honor.

5          **MR. APTON:**  No, Your Honor.

6          **THE COURT:**  All right.  Thank you.

7      Juror No. 103.  All right.  Ms. Young?

8          **PROSPECTIVE JUROR B. YOUNG:**  Good morning, Your Honor.

9          **THE COURT:**  Hi, good morning.  You are an architect?

10         **PROSPECTIVE JUROR B. YOUNG:**  Yes.

11         **THE COURT:**  And you have -- you are working on, sounds

12 like on a huge project?

13         **PROSPECTIVE JUROR B. YOUNG:**  Yep.

14         **THE COURT:**  Is that local?

15         **PROSPECTIVE JUROR B. YOUNG:**  It's up in Roseville.

16         **THE COURT:**  Roseville?

17         **PROSPECTIVE JUROR B. YOUNG:**  Uh-huh.

18         **THE COURT:**  So, I know you're leading -- you're the

19 lead person on a team of 100?

20         **PROSPECTIVE JUROR B. YOUNG:**  Yeah.  I'm the architect

21 of record.  But, actually, I also thought that we had Fridays

22 off, but if it's Thursdays off, that's when my big meeting is.

23         **THE COURT:**  Oh.  So that actually works for you?

24         **PROSPECTIVE JUROR B. YOUNG:**  Yeah.

25         **THE COURT:**  All right.  So I know it is an imposition,

 1 | but if you were called, you could serve?

 2 |         **PROSPECTIVE JUROR B. YOUNG:** I could, yeah.  I can

 3 | work after 2:00 and then Thursdays I can go up there.

 4 |         **THE COURT:** All right.  Great.  Okay.  Thank you.

 5 |         **PROSPECTIVE JUROR B. YOUNG:** You're welcome.

 6 |         **THE COURT:** Let me ask.  No follow-up questions, I

 7 | take it?

 8 |         **MR. APTON:** No, Your Honor.

 9 |         **MR. SPIRO:** No, Your Honor.

10 |         **THE COURT:** All right, thank you.  Appreciate it,

11 | Ms. Young.

12 |         **PROSPECTIVE JUROR B. YOUNG:** You are welcome.

13 |         **THE COURT:** Juror No. 112.  Mr. Fajardo?

14 |         **PROSPECTIVE JUROR FAJARDO:** Yes.

15 |         **THE COURT:** Hi, good morning.

16 |         **PROSPECTIVE JUROR FAJARDO:** Good morning.

17 |         **THE COURT:** So you are -- well, one, you're -- you are

18 | working for Sequoia Unified High School District?

19 |         **PROSPECTIVE JUROR FAJARDO:** Correct.

20 |         **THE COURT:** Do you know if they -- if they pay jury

21 | pay?

22 |         **PROSPECTIVE JUROR FAJARDO:** Well, yeah, they do it,

23 | but I have to bring some paperwork to them.

24 |         **THE COURT:** Okay.  And so, one of the issues is you

25 | take care of your grandson?

 1              **PROSPECTIVE JUROR FAJARDO:**  Yeah, that's correct.

 2              **THE COURT:**  Is that --

 3              **PROSPECTIVE JUROR FAJARDO:**  That's correct.

 4              **THE COURT:**  Okay.  So you are working full-time or

 5      part-time?

 6              **PROSPECTIVE JUROR FAJARDO:**  Full-time.

 7              **THE COURT:**  So you take care of your grandson after

 8      work, before work, or --

 9              **PROSPECTIVE JUROR FAJARDO:**  Yeah, that's correct,

10      after work.

11              **THE COURT:**  After work?

12              **PROSPECTIVE JUROR FAJARDO:**  Yeah.

13              **THE COURT:**  So if -- and when do you get of -- what

14      time do you get off work?

15              **PROSPECTIVE JUROR FAJARDO:**  2:00.

16              **THE COURT:**  So if you were here instead of the school

17      district, you could still take care of yourself grandson?

18              **PROSPECTIVE JUROR FAJARDO:**  That can be possible.  I

19      can take some time off maybe.

20              **THE COURT:**  Okay.  And how old is your grandson?

21              **PROSPECTIVE JUROR FAJARDO:**  He's four.

22              **THE COURT:**  Four?  Okay.

23          And are there other family members around that could help?

24      Or --

25              **PROSPECTIVE JUROR FAJARDO:**  Well, not in this time

 1  because his father move away from Redwood City.

 2       **THE COURT:**  Uh-huh.

 3       **PROSPECTIVE JUROR FAJARDO:**  And I'm the one who's

 4  taking care of him now, Tuesdays and Thursdays.

 5       **THE COURT:**  Oh.  Well, Thursdays we're off, so you

 6  could actually go to work and you -- so it's just Tuesday

 7  afternoon.  But if you get off at 2:00, we'll just -- when you

 8  normally get off work, you could --

 9       **PROSPECTIVE JUROR FAJARDO:**  Yeah, that's correct.

10       **THE COURT:**  That would work?

11       **PROSPECTIVE JUROR FAJARDO:**  Yeah.

12       **THE COURT:**  All right.  Any follow-up questions?

13       **MR. SPIRO:**  No, Your Honor.

14       **MR. APTON:**  No, Your Honor.

15       **THE COURT:**  Great.  Okay.  Thank you, Mr. Fajardo.

16       **PROSPECTIVE JUROR FAJARDO:**  Thank you.

17       **THE COURT:**  Juror No. 113?

18    All right.  Good morning, Mr. Bolivar.

19       **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  Good morning.

20       **THE COURT:**  You drive two kids, is it to school or

21  what -- tell me a little bit more about the situation.

22       **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  Well, actually,

23  something came up this morning that is different.  My wife just

24  got her citizenship, so she cannot travel overseas.  And I have

25  to fly my kiddo, he's 13 years old and he's going to school in

 1  Venezuela, so I may have to resolve that.  Otherwise, I'm happy

 2  to serve and make it happen.  I just have to resolve that.

 3          THE COURT:  Oh.

 4          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  She has to go --

 5  when you get a citizenship, you get your green card taken away

 6  while you get a passport.

 7          THE COURT:  Oh.

 8          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  So she was due to

 9  take him this week back to Venezuela.  Now it will have to be

10  me if she doesn't have a passport, so I'll have to resolve

11  that.

12          THE COURT:  When is he supposed to be in Venezuela?

13          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  January 20th.

14          THE COURT:  Oh, you're going to have the resolve that

15  one pretty quick.

16          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yeah, yeah, so I

17  got to work that out.  Again, I'm super excited to be here and

18  help out, so I just need to resolve that.

19          THE COURT:  Is -- will you know when --

20          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  It's happening

21  right now.  So I can let you know by, like, 3:00 p.m. this

22  afternoon.

23          THE COURT:  Okay.  All right.  So you will know

24  whether you made alternate arrangements by this afternoon?

25          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yep, yep.

 1              THE COURT:  Okay.  Other than that, that's the only

 2     problem?

 3              PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yep.

 4              THE COURT:  All right.  Any counsel want to follow up

 5     with any questions?

 6              MR. SPIRO:  No, Your Honor.

 7              MR. APTON:  Mr. Bolivar, what would a resolution look

 8     like?  You have to transport your child to Venezuela?

 9              PROSPECTIVE JUROR BOLIVAR SEGOVIA:  So if my wife gets

10     a passport, she can take him.  If she doesn't get a passport, I

11     will have to travel with him.

12              MR. APTON:  And that has to be on January 20th?

13              PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yep.  We could

14     delay it a week or so but he has to be in school before

15     February starts.

16              MR. APTON:  Thank you.

17              PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yep.

18              THE COURT:  So the key is whether your wife can get

19     the passport?

20              PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yep.  It happens

21     in this building, by the way.

22              THE COURT:  Yeah, I was going to say, can I help in

23     any way?  No.

24              PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Please.

25              THE COURT:  All right.  Well, good luck.

1      Let's see, Juror No. 114.  All right.  Ms. Kumar?

2              **PROSPECTIVE JUROR KUMAR:**  Hi, good morning.

3          **THE COURT:**  Good morning.  So you have three kids?

4          **PROSPECTIVE JUROR KUMAR:**  Yes.

5          **THE COURT:**  And you do pick up and drop off every day?

6          **PROSPECTIVE JUROR KUMAR:**  Yes.

7          **THE COURT:**  And you live in Pleasanton?

8          **PROSPECTIVE JUROR KUMAR:**  Yes.

9          **THE COURT:**  And are you working outside the home or a

10     full-time mom or --

11             **PROSPECTIVE JUROR KUMAR:**  Yeah, I'm full-time mom.

12         **THE COURT:**  Okay.  And how old are your children?

13             **PROSPECTIVE JUROR KUMAR:**  My older one is 17 years old

14     and the younger ones are twins, so they are 12.

15         **THE COURT:**  Twelve and 17?

16         **PROSPECTIVE JUROR KUMAR:**  Yes.

17         **THE COURT:**  Does your 17-year-old have a driver's

18     license?

19             **PROSPECTIVE JUROR KUMAR:**  Oh, he didn't take it.  Next

20     week he has test, driving test.

21         **THE COURT:**  Oh, okay.  Too bad he didn't take it last

22     week, maybe there's your answer.

23     Is there anybody else that can drive your kids?

24             **PROSPECTIVE JUROR KUMAR:**  Actually, I didn't ask my

25     friends.  And my husband, he can, but it's hard because he does

```
 1    late work, so he wake -- wakes up late, around 8:00, so it's

 2    hard to drop him -- them, sorry.

 3              THE COURT:  So it's hard for your husband, and you do

 4    not have friends, or you do have friends --

 5              PROSPECTIVE JUROR KUMAR:  I have friends, but I didn't

 6    ask them.

 7              THE COURT:  You haven't asked them yet?

 8              PROSPECTIVE JUROR KUMAR:  Yeah, yeah, I didn't ask

 9    them.

10              THE COURT:  And what time do they go to school and --

11              PROSPECTIVE JUROR KUMAR:  Oh, they go -- my twins go

12    7:50, and then the older one goes 8:30.

13              THE COURT:  And what time do they get off school?

14              PROSPECTIVE JUROR KUMAR:  3:00, 3:05 and 3:22.

15              THE COURT:  Hmm.  And you live -- they're out in

16    Pleasanton.

17              PROSPECTIVE JUROR KUMAR:  Yes.

18              THE COURT:  Yeah, that would be hard to get out there.

19              PROSPECTIVE JUROR KUMAR:  Yeah.  (Inaudible)

20              THE COURT:  So you need somebody else.

21              PROSPECTIVE JUROR KUMAR:  Yeah.

22              THE COURT:  So the bottom line is, right now, you're

23    kind of it in terms of driving?

24              PROSPECTIVE JUROR KUMAR:  No.  I took public transport

25    today.
```

 1           THE COURT:  No, I mean driving your children to

 2   school, you're the only one?

 3           PROSPECTIVE JUROR KUMAR:  Oh, yeah.  Yeah.

 4           THE COURT:  All right.  Any follow-up questions?

 5           MR. SPIRO:  No, Your Honor.

 6           MR. APTON:  No, Your Honor.

 7           THE COURT:  All right.  Thank you.

 8           PROSPECTIVE JUROR KUMAR:  Thank you.

 9           THE COURT:  Juror No. 120.

10           PROSPECTIVE JUROR CHEN:  Good morning.

11           THE COURT:  Thank you.  Good morning, Mr. Chen.

12   You're a scientist with Chevron?

13           PROSPECTIVE JUROR CHEN:  Yes.

14           THE COURT:  And you say you have a business trip

15   planned, well, between today and --

16           PROSPECTIVE JUROR CHEN:  It's tomorrow and Thursday.

17           THE COURT:  And is that -- where is that to?

18           PROSPECTIVE JUROR CHEN:  It's to Houston.

19           THE COURT:  So you have a trip planned for Houston

20   starting tomorrow?

21           PROSPECTIVE JUROR CHEN:  Yes.

22           THE COURT:  All right.  And is it the kind of trip

23   that absolutely requires your physical presence?

24           PROSPECTIVE JUROR CHEN:  I would say yes.  I mean, the

25   issue is -- to me, the real issue is the three weeks is kind of

 1   too long, considering my situation.

 2          **THE COURT:**  Maybe you can tell me a little more,

 3   because obviously --

 4          **PROSPECTIVE JUROR CHEN:**  My issue really is not my

 5   personal issue.  I can overcome my personal issue.

 6          **THE COURT:**  Yeah.

 7          **PROSPECTIVE JUROR CHEN:**  It's the support I ordinarily

 8   provide to my organization, because I'm a manager for an

 9   organization of about 55 people and I provide support to them.

10   They support on many different things.  This is the beginning

11   of the year.  This is the most important time for the year.  We

12   do the project planning, funding, including other things,

13   employee salary treatment, rating, promotions, such and such.

14   if I'm not in there, my folks are not represented.  So that's

15   why I said it's -- they are not going to be happy.

16          **THE COURT:**  So there's planning going on at this

17   point; is that what you're -- your unit is part of a planning

18   process --

19          **PROSPECTIVE JUROR CHEN:**  Yeah, there are many things

20   happening now.  It's the planning on the funding project, the

21   budget, which project will go, which project will be killed,

22   you know.  Also we look at the last year's performance, the

23   rating of each employee, the salary treatment, the promotion,

24   all kind of happening in the next few weeks.

25          **THE COURT:**  So you represent the 55 people in your

**JURY VOIR DIRE**

```
1  unit?

2              PROSPECTIVE JUROR CHEN:  Yes.

3         THE COURT:  And that is representing them in a larger

4  meeting that goes on?

5              PROSPECTIVE JUROR CHEN:  Yes.

6         THE COURT:  A planning meeting?

7              PROSPECTIVE JUROR CHEN:  Yes.

8         THE COURT:  And is there a meeting planned in the next

9  three weeks?

10             PROSPECTIVE JUROR CHEN:  Yeah, that's what I'm talking

11  about on the next three weeks, so many things, it's planned.

12  Because they're not going to change because I can't be in

13  there.

14        THE COURT:  And if you're not there, is there -- do

15  you have a second in command that could take over?

16             PROSPECTIVE JUROR CHEN:  It won't work well.  I can

17  send a person to be in the meeting.  But if the person doesn't

18  have the knowledge and experience as I have, you know, they

19  can't do much.

20        THE COURT:  So you're the only one with all the

21  knowledge, that has all the knowledge.

22             PROSPECTIVE JUROR CHEN:  It's -- pretty much, for the

23  specific situation, what's going to happen in the next few

24  weeks.

25        THE COURT:  And this is all happening in the next
```

1    three weeks.

2           **PROSPECTIVE JUROR CHEN:**  Yeah, yeah, because that's

3    the beginning of the year.  That's what we already do every

4    year.

5           **THE COURT:**  All right.  Any followup questions?

6           **MR. SPIRO:**  No, Your Honor.

7           **MR. APTON:**  Mr. Chen, just real quick, I assume these

8    meetings occur throughout the day, not just during a particular

9    portion of the day?

10          **PROSPECTIVE JUROR CHEN:**  Yeah.  It's during the day.

11   It's, you know, it's scheduled every -- any hours in the day,

12   depending on the availability of the leadership people.

13          **MR. APTON:**  Thank you.

14          **PROSPECTIVE JUROR CHEN:**  Yeah.

15          **THE COURT:**  All right.  Thank you, Mr. Chen.

16          **PROSPECTIVE JUROR CHEN:**  Thank you.

17          **THE COURT:**  Juror No. 126.

18          **PROSPECTIVE JUROR LEUNG:**  Good morning.

19          **THE COURT:**  Hi.  Good morning, Mr. Leung.  You work

20   graveyard.

21          **PROSPECTIVE JUROR LEUNG:**  Yeah, they actually switched

22   it because of jury duty.  So that's good, it's fine.

23          **THE COURT:**  Oh, so you would be able to serve, then?

24          **PROSPECTIVE JUROR LEUNG:**  Yeah.

25          **THE COURT:**  Okay.  I appreciate your making that

 1 | effort.

 2 |         **PROSPECTIVE JUROR LEUNG:**  Uh-huh.

 3 |         **THE COURT:**  Thank you.  And thank you for your service

 4 | in the medical field.

 5 |    Okay.  So there's no reason in terms of scheduling --

 6 |         **PROSPECTIVE JUROR LEUNG:**  No, it's all fine.

 7 |         **THE COURT:**  Okay, great, thank you.

 8 |    Juror No. 128.

 9 |         **THE COURTROOM DEPUTY:**  128?

10 |         **THE COURT:**  Is 128 here?

11 |         **MR. SPIRO:**  No, Your Honor.

12 |         **THE COURT:**  Oh, that's the one -- okay, no, not here.

13 |    Okay.  Number 144?

14 |         **PROSPECTIVE JUROR GALLAGHER WHITE:**  Good morning.

15 |         **THE COURT:**  Good morning, Ms. Gallagher-White, is that

16 | the --

17 |         **PROSPECTIVE JUROR GALLAGHER WHITE:**  Yes.

18 |         **THE COURT:**  You're an attorney?

19 |         **PROSPECTIVE JUROR GALLAGHER WHITE:**  Yes.

20 |         **THE COURT:**  Are you -- do you do litigation, or

21 | transactional, or what kind of work do you do?

22 |         **PROSPECTIVE JUROR GALLAGHER WHITE:**  I'm actually

23 | retired from the D.A.'s office.  And I am in-house counsel for

24 | a company that is located here in San Francisco.

25 |         **THE COURT:**  And it looks like it is some kind of

 1   environmental company?

 2          **PROSPECTIVE JUROR GALLAGHER WHITE:**  That's correct.

 3          **THE COURT:**  Do they do environmental cleanup or

 4   planning --

 5          **PROSPECTIVE JUROR GALLAGHER WHITE:**  Yes, remediation

 6   in buildings like this one.

 7          **THE COURT:**  Oh, well, luckily this building was done

 8   very extensively a number of years ago.  Hopefully they did a

 9   good job because I have been here 21 years.

10      So, you have a long ways to go.  Is that the main issue,

11   is transportation to get here from Santa Rosa?

12          **PROSPECTIVE JUROR GALLAGHER WHITE:**  Yeah, I just -- I

13   don't know, I think other people are driving just as far, but

14   Santa Rosa is a pretty good haul.  Like, I left my house at

15   6:00 this morning.

16          **THE COURT:**  Right.  But you can drive.

17          **PROSPECTIVE JUROR GALLAGHER WHITE:**  I can do it, yeah.

18   I can do it; I'm just not loving it.

19          **THE COURT:**  Yeah.  Well, and I -- you know, we

20   appreciate that.  It's a large judicial district.  And, and

21   sometimes people do have to come, and I know the commute down

22   101 is no fun.

23          **PROSPECTIVE JUROR GALLAGHER WHITE:**  No.  And

24   particularly with the weather that we've been having, that is a

25   concern.  I just don't want to, having done jury trials, hold

1   anybody up, make anybody late.  I'm pretty mortified of that.

2   So I'll just get here early.

3          THE COURT:  Well, I appreciate your effort doing that.

4   Hopefully, it's looking like the long-term forecast for the

5   next couple of weeks is drier than normal, so we will see if

6   that happens.

7          PROSPECTIVE JUROR GALLAGHER WHITE:  Thank you.

8          THE COURT:  Thank you.

9      Any followup questions?

10         MR. SPIRO:  No, Your Honor.

11         MR. APTON:  No, Your Honor.

12         THE COURT:  All right.  Thank you, Ms. Gallagher

13  White.

14     Juror No. 150.

15         PROSPECTIVE JUROR DOLRUEDEJ:  I actually resolved my

16  problem, so I should be okay.

17         THE COURT:  So you had some child care issues but it's

18  okay now.

19         PROSPECTIVE JUROR DOLRUEDEJ:  Yeah, I make an

20  arrangement.

21         THE COURT:  I appreciate that, Ms. Dolruedej.

22         PROSPECTIVE JUROR DOLRUEDEJ:  Oh, okay.

23         THE COURT:  All right.  Let's see here.  All right.

24  According to my -- now, those of you who didn't say you had an

25  -- indicated that you are okay or didn't say you couldn't

```
 1   serve, is there anybody that hasn't said anything yet that

 2   thinks they have got a problem in serving during the three-week

 3   period?

 4        (A hand is raised)

 5             THE COURT:  Okay.  If we can bring the microphone up

 6   to the front row here.  Raise your hand, ma'am?  And then tell

 7   me your -- and --

 8             PROSPECTIVE JUROR CAZESSUS:  I'm Q, my name is Yolanda

 9   Cazessus.

10             THE COURT:  Do you know what Juror No. you are?

11             PROSPECTIVE JUROR CAZESSUS:  Oh goodness, 57.

12             THE COURT:  57.  Okay.

13             PROSPECTIVE JUROR CAZESSUS:  Yes.

14             THE COURT:  Hold on.  Okay.  57.  Okay.  Yes, if you

15   could tell me what's happening.

16             PROSPECTIVE JUROR CAZESSUS:  So I don't necessarily

17   have an issue doing the three weeks.  But you mentioned earlier

18   that it might go longer.  And that's where, where I have a

19   concern.  My boyfriend is having radiation during the week of

20   February 8th.  Now, truth be told, he will be in the hospital

21   for 14 days.  But that's the only thing.

22        So during the first three weeks, I'm good.  But past that

23   is where I run into a problem.

24             THE COURT:  Okay.  And we are hoping to conclude this

25   case and get it to the jury by the week that ends on the 3rd,
```

1  so, you know, we'll see how it goes.  It could go earlier, we

2  could get it to the jury earlier.

3          **PROSPECTIVE JUROR CAZESSUS:**  Uh-huh.

4          **THE COURT:**  If deliberations goes over to the next

5  week, which would be the 6th, the 7th, I know he's going in on

6  the 8th, would that be a problem?

7          **PROSPECTIVE JUROR CAZESSUS:**  No.  As long as -- as

8  long as I can reach him by then, during that week at least.

9          **THE COURT:**  Okay.  So the 8th is kind of the important

10  day for you?

11          **PROSPECTIVE JUROR CAZESSUS:**  Yeah.  He's in there for

12  a good -- a while.

13          **THE COURT:**  Okay.  So you would be able to -- sounds

14  like you're iffy if it goes a lot longer, and you want to be

15  there with your boyfriend?

16          **PROSPECTIVE JUROR CAZESSUS:**  Correct.

17          **THE COURT:**  All right.  Okay.  Anybody else that we

18  haven't spoken to?

19      (Hands raised)

20          **THE COURT:**  Oh, well, there's a gentleman -- Number --

21          **PROSPECTIVE JUROR CAVENDER:**  Hi, I'm Kevin Cavender,

22  I'm in seat O and I'm No. 50.

23          **THE COURT:**  You are No. 50?

24          **PROSPECTIVE JUROR CAVENDER:**  Yes, sir.

25          **THE COURT:**  All right hold on.  Just hold on.

1          **PROSPECTIVE JUROR CAVENDER:**  Sure.

2          **THE COURT:**  Let me get organized here.

3       All right.  Yes, Mr. Cavender.

4          **PROSPECTIVE JUROR CAVENDER:**  I didn't realize we were

5    making excuses but anyway I'm an ICU nurse at UCSF.  I'm not

6    aware that they will pay, but I'm a bit concerned for financial

7    hardship just because I missed a few months from August to

8    December, out with COVID, myself.  Other than that, have been a

9    night-shift worker for 36 years.  I work a 7p to 7a and I'm

10   usually home in bed right now by 8:30.  So I don't know if it

11   would be a problem.  Otherwise, it would be an honor to serve.

12         **THE COURT:**  All right.  Well, let's take one thing at

13   a time.  So in terms of the night shift, you normally go to bed

14   after work.

15         **PROSPECTIVE JUROR CAVENDER:**  Yes, sir.

16         **THE COURT:**  Have you had experience of having to sort

17   of shift things around and use your working -- your waking

18   hours after work, and then sleep afterward?

19         **PROSPECTIVE JUROR CAVENDER:**  I mean, if there's a

20   special circumstance, but generally not.

21         **THE COURT:**  I'm just wondering if you have tried that,

22   and how you do under those circumstances.

23         **PROSPECTIVE JUROR CAVENDER:**  Okay.  I can try.  I

24   can't think of anything that comes to mind that I particularly

25   had to stay awake during the daytime, no.

1          THE COURT:  But it would be a shift in your routine.

2          PROSPECTIVE JUROR CAVENDER:  Yes, correct.

3          THE COURT:  And the jury pay, I would be surprised if

4    UCSF does not pay, but --

5          PROSPECTIVE JUROR CAVENDER:  Me, too.  It is my

6    understanding that they do not, no, as a -- speaking to someone

7    last week.

8          THE COURT:  During the break could you --

9          PROSPECTIVE JUROR CAVENDER:  Absolutely.

10         THE COURT:  -- make a call and find out?

11         PROSPECTIVE JUROR CAVENDER:  Absolutely.

12         THE COURT:  Might tell whoever you are talking to that

13   would set a bad example if they didn't pay, but --

14         PROSPECTIVE JUROR CAVENDER:  Agreed.

15         THE COURT:  Okay.  Thank you.

16         PROSPECTIVE JUROR CAVENDER:  Yes, sir.

17         THE COURT:  We had a hand over here.

18      (A hand is raised)

19         THE COURT:  Hi.  In front.  If you could tell us your

20   name and jury number?

21         PROSPECTIVE JUROR GOMEZ:  Good afternoon, Your Honor.

22         THE COURT:  Hi.

23         PROSPECTIVE JUROR GOMEZ:  My number is 31.

24         THE COURT:  31.  And you are Ms. Gomez?

25         PROSPECTIVE JUROR GOMEZ:  Yes.

1          THE COURT:  Okay.  Hold on for a second here.

2      Okay.

3          PROSPECTIVE JUROR GOMEZ:  Okay.  My big concern is my

4  brother just passed away on Sunday.

5          THE COURT:  Oh, I'm sorry.

6          PROSPECTIVE JUROR GOMEZ:  In Mexico.  And -- I'm

7  sorry.  My mom was alone in Mexico and she's 89.  That's why I

8  want to go to stay with her.  This -- difficult days.

9          THE COURT:  So you want to travel --

10         PROSPECTIVE JUROR GOMEZ:  Yeah.

11         THE COURT:  Immediately.

12         PROSPECTIVE JUROR GOMEZ:  Yeah.

13         THE COURT:  To be with your mother.

14         PROSPECTIVE JUROR GOMEZ:  Yes.

15         THE COURT:  All right, I'm sorry for your loss.

16         PROSPECTIVE JUROR GOMEZ:  Thank you.

17         THE COURT:  Any questions?  Any followup?

18         MR. SPIRO:  No, Your Honor.

19         MR. APTON:  No, Your Honor.

20         THE COURT:  Okay.  Thank you.  Anybody else?

21     (No response)

22         THE COURT:  All right.  What we're going to do then is

23  we're going to take a break.  And we're going to break for

24  probably about 20 minutes, or maybe half an hour.  And I would

25  like to ask the following jurors to be ready to come back here

 1   because we may have some questions for you that we're going to

 2   ask individually.  And then, so if you could come back in half

 3   an hour, I'll read out the numbers in a second.

 4        And those of you who aren't in this group, if you could

 5   come back in one hour.  You can have a one-hour break.  There

 6   is a cafeteria downstairs, you can actually have an early

 7   lunch.  Or there are restaurants across the street in various

 8   places.  But the group I'm going to name, you'll have a half

 9   hour, I guess.  Sorry about that.

10        So that's Jurors No. 40, 50, 79, 97, 101, 118, 124, and

11   150.  I'll read those again.  40, 50, 79, 97, 101, 118, 124,

12   and 150.  If you just come back a half hour early, appreciate

13   it.  Got a couple of questions for you.  And then the rest of

14   the group will come back in an hour.

15        So while you are out there, please do not talk about this

16   case with anyone.  Don't talk about this case amongst

17   yourselves.  We want to make sure you keep sort of an open

18   mind.  You will get some instructions later.  If you are

19   excused then you can talk to anybody you want.  But for now I

20   would like you to keep to yourselves, not talk to anyone, talk

21   amongst yourselves, don't go on Google or don't try to read

22   anything about this case.

23        We really want people to -- if you are selected as a

24   juror, to -- to base your verdict only on what's happened in

25   this courtroom, what you hear in this courtroom.  So if you

 1   could, for the next bit of time try to insulate yourself, I

 2   would appreciate that.

 3        So we'll see that group of, I think it's eight of you, in

 4   half an hour.  And the rest of you have one hour.  Thank you.

 5             **THE COURTROOM DEPUTY:**  All rise for the jury.

 6        (Jury venire excused from the courtroom)

 7        (The following proceedings were held outside of the

 8   presence of the Jury)

 9             **THE COURT:**  Okay.  Have a seat, everyone.  I realize I

10   didn't build in any time for us to have lunch.  But the faster

11   we get through this phase the more time you have for lunch.

12   That is the incentive.

13        On the hardships.  Let's talk about that.  So I'm going to

14   go through the list in order as I have them.  First is Juror

15   No. 8, Ms. Liu, who's got the visa with the father in the

16   hospital now, and she's got a flight.  Seems to me that's a

17   hardship.  Any objection?

18             **MR. APTON:**  No, Your Honor, we agree.

19             **THE COURT:**  All right.  Mr. Spiro?

20             **MR. SPIRO:**  Just so I -- just a followup question,

21   just so I understand the Court's reasoning.

22             **THE COURT:**  Um.

23             **MR. SPIRO:**  So that I don't necessarily make the same

24   mistake twice, I just want to make sure that I understand the

25   Court's thinking.

1          **THE COURT:**  Sure.  I think here there's an urgency

2    because her father is in the hospital with COVID.  She's got

3    the visa, she's got the flight.  And frankly, if I had said

4    "No, you've got to sit through this trial," number one, she may

5    not have her full attention.  Number two, I'm not sure how we

6    would all feel if her father passes.

7          **MR. SPIRO:**  Understood.  There is no objection.

8          **THE COURT:**  Okay.  So we will relieve her.

9          No. 13 is Ms. Jahan, who does the community nonprofit for

10   developmentally disabled, there.  Is only two there, and she

11   gets no jury pay.  So the no jury pay is sufficient under our

12   jury rules, we don't make people serve for three weeks without

13   pay unless they have some way around it like different hours or

14   something.  I didn't hear that from her.

15         **MR. APTON:**  Your Honor, plaintiff would excuse her.

16         **THE COURT:**  All right.

17         **MR. SPIRO:**  Yes, Your Honor.  We agree.

18         **THE COURT:**  Okay.  Good.  Then we have No. 31 who's

19   looking good until we just found out her brother just passed

20   away, and her mother's alone, and she wants to travel now to

21   Mexico to be with her mother.  Given the family circumstance,

22   and the unexpected death or the intervening death, seems to me

23   that's a good reason to excuse that juror.

24         Any objection?

25         **MR. APTON:**  No, Your Honor.

1           **MR. SPIRO:**  No, Your Honor.

2           **THE COURT:**  Okay, we will excuse No. 31.

3       Then we have got No. 44.  Oh, she's the one with the

4   one-year-old that still feeds, not out of a bottle, but by

5   breast.  So I'm hesitant to second-guess motherhood and

6   parenthood.

7           **MR. SPIRO:**  I am normally, too, Your Honor.  But of

8   course, some of the answers -- and I didn't want to pry in

9   front of the other jurors -- suggested that while imperfect, it

10  would not be unfeasible.  It doesn't strike me that it

11  necessarily checks any of the proper for-cause boxes.  The

12  child is, you know, over one year old, and doesn't just

13  breastfeed.

14      So I -- I think we would have to examine further if we

15  were going to excuse that juror for cause, for cause based on

16  hardship.

17          **THE COURT:**  All right.  Any comments from the

18  plaintiffs?

19          **MR. APTON:**  Yeah, Your Honor, I mean, based on the

20  limited few questions I asked her, it's more than just food,

21  it's the baby's napping schedule.  And I know that my wife,

22  when she's concerned about the baby's nap, that's it.  And me

23  too, frankly, because a tired, hungry baby does not work.  So I

24  don't understand how she would even be able to pay attention to

25  the trial, honestly.

1          **THE COURT:**  I'm going to excuse her.  I think she

2     stated a hardship.  I'm not going to second-guess why the baby

3     is still breastfeeding, but it sounds like he won't take it

4     from a bottle; that's how he feeds, in part.  And, and she's

5     there for his naps, et cetera.  So I think the parenting

6     issues, obligations are a reason to excuse her.  So I'm going

7     to excuse No. 44.

8          45 is the equipment operator, but he says he could serve.

9          **MR. APTON:**  Your Honor, I was a little confused by his

10    response, because initially he said he had a hardship and

11    wouldn't, and then he seemed to reverse course at a certain

12    point during Your Honor's examination.  So, I'm just not quite

13    sure whether he can or cannot --

14         **THE COURT:**  Well, bottom line says he basically gets

15    paid for jobs he does.  When I questioned him initially he

16    wasn't able to identify any upcoming jobs.  He said well,

17    maybe, you know, because he's not getting paid except when he

18    is working.  And if he doesn't have anything scheduled, and

19    then he's not losing anything, and then he also commented, "I

20    can find other ways to make up for it."

21         So I have to take him at his word.  You know, if he says

22    he can serve, I've never excused somebody because I don't

23    believe them, they -- now, there may be other -- if you are

24    getting at his motivation, whether he may have a bias, we will

25    get to that later.

1        **MR. APTON:**  No, my concern, Your Honor, is right now

2   he has no job scheduled, and so he can serve.  But if he hasn't

3   worked in a while and a week goes by and all of a sudden a good

4   job comes in, he is going to want to take it, and we might lose

5   him in the middle of the process.

6        **THE COURT:**  Well, he says he could just serve.  And I

7   told him it's three weeks, I repeated that several times.  He

8   knows he can't just up and leave.

9        Comments from the defense?

10       **MR. SPIRO:**  No.  Obviously it is not a hardship.

11       **THE COURT:**  So, I mean, I'm not going to excuse him on

12  hardship.  Whether he has other motives, I don't know, but as

13  far as hardship goes he is still in.

14       No. 48 is Ms. De La Cruz, that's got the anxiety issue,

15  which, it's not a certainty, but there's a chance, seems to me

16  a significant chance that jury service could be stressful and

17  trigger an anxiety attack.

18       **MR. SPIRO:**  Your Honor, the bar to hardship is a very,

19  very high one.  And based on -- I don't have as much concern

20  for this juror as some of the others that -- that made possible

21  hardship statements.  But this juror has monthly therapy,

22  doesn't know whether or not -- monthly therapy is not

23  particularly unusual, and doesn't know whether or not this

24  would cause an issue.  She's never done it before, so it's

25  causing some concern.  I think that's the case for many, if not

1   most, jurors.  And she works multiple jobs that involve lots of

2   decision-making and difficulties.

3        I don't see how, just because a juror has some ADD or

4   feelings of anxiety, that that -- that doesn't seem to me to be

5   a hardship, frankly.

6             THE COURT:  All right.  Response?

7             MR. APTON:  Your Honor, she's sitting quite close to

8   us.  I did notice that she was shaking.  And part of the

9   concern with her is that she said she might be triggered.  And

10  I don't know how that would affect her ability to pay

11  attention, whether at some point she might decide not to pay

12  attention so as to avoid a panic attack.  And so there's some

13  concern there.  And if we're taking her at her word, she says

14  she can't serve.

15            THE COURT:  All right, I'm going to excuse her,

16  because I do take her at her word.  I found that her concerns

17  seem credible.  She didn't seem to be making something up just

18  to get out of service.  And the risk of anxiety, the risk would

19  mean she might have to -- she might not be able to continue to

20  serve which then jeopardizes our jury, or she's not able to pay

21  full attention, which would not be ideal in a case such as

22  this.  So I'm going to excuse her.

23            No. 50 is the nurse that works night shift.  Usually

24  sleeps during these hours, would have to shift.  But is looking

25  into jury pay.

1        So I think the night shift is not a sufficient reason, but

2    the pay, if, in fact, UCSF does not pay, then -- well, I guess

3    there is -- I would want to find out more, because if they're

4    still working, they're not losing any pay.

5            **MR. SPIRO:**  Right.  I would suggest with this juror,

6    if the Court's -- obviously it's the Court's judgment here, but

7    given he's coming back in the group that comes back on the

8    early side, we can -- we can address this with him.

9            **THE COURT:**  Yeah.

10            **MR. SPIRO:**  One on one, then.

11            **THE COURT:**  I think that is fair.

12            **MR. APTON:**  I think that makes sense, Your Honor.

13            **THE COURT:**  All right.  Okay.  Thank you.

14        51 can serve, she is the one with the boyfriend that is

15    going in for radiology.  Radiation.  But I think her concern is

16    if this goes deep into the fourth week.

17            **MR. APTON:**  Sorry, Your Honor, you said 51?

18            **THE COURT:**  -7?  Did I say 51?  I meant 57.  Sorry to

19    have misspoke.  Ms. Yolanda Cazessus.  So.

20        It seems to me she's eligible.

21            **MR. APTON:**  Yes, Your Honor.  And especially if we

22    move quickly, hopefully we will be done the week before her

23    boyfriend goes --

24            **THE COURT:**  Hope so, too.  Any objection to keeping

25    her in?

1          MR. SPIRO:  No.  The bar to hardship is a high one,

2    and we don't think this meets the bar to hardship.

3          THE COURT:  All right.  58, the designated driver for

4    the mom, I guess it is.

5          MR. SPIRO:  Right.  This was also not the type of

6    circumstance that jurors are excused for hardship.  It was

7    nothing in it that made no other possible arrangement

8    available.  None, none of those other possible arrangements,

9    did he say unequivocally he could not do.  And it just does not

10   meet the bar for hardship.  So we would have to object.

11         THE COURT:  He did say there's an appointment

12   tomorrow.

13         MR. SPIRO:  Correct, but he also indicated that

14   virtual is possible, moving appointments is possible, the

15   timing of appointments, that it was a non-urgent appointment.

16   So in these circumstances, jurors are just not excused for

17   hardship.  It's hard to ask jurors who have a lot going on to

18   stay, but in our judgment, it doesn't even come close, frankly,

19   to meeting the very, very high bar to excuse for hardship.

20         THE COURT:  All right.  Plaintiff's view?

21         MR. APTON:  Your Honor, if the Court wanted to ask

22   some followup questions perhaps during the break he could find

23   out whether the appointments are movable.  But otherwise, I

24   tend to agree that without any definite appointments other than

25   tomorrow, he seems like he could serve.

1       **THE COURT:**  Yeah, I wasn't convinced that -- I mean

2   maybe I should ask exactly what the mother's health condition

3   is.  I was a little hesitant to ask.  But in any event, I'm not

4   convinced that he has to be there every day for three weeks.

5   So I'm not going to excuse him. I don't want to be too

6   hard-nosed, but it doesn't seem to me that he's met the burden.

7   If we get down to him I may ask him one more time, but let's

8   see if he comes into play.

9       No. 60 doesn't have the pumping problem, but has the

10  childcare problem.  And it seems like everything's good except

11  Monday.  I mean, she thinks she can get care on Friday.

12      **MR. SPIRO:**  Your Honor, this was somebody, I don't

13  know whether the Court is -- because I've never tried a case

14  before Your Honor I wasn't going to start using nonverbal body

15  signals, but she was one of the -- the early juror that we

16  agreed to put back, both sides agree, so I think given that

17  when I heard the issues, I thought we -- we might as well err

18  on the side, I agree with the Court's --

19      **THE COURT:**  Well, she's coming back anyway.

20      **MR. SPIRO:**  Right.

21      **THE COURT:**  She's coming in with the group so we don't

22  have to --

23      **MR. SPIRO:**  Right.

24      **THE COURT:**  If we have more questions, we'll see.  May

25  be moot.

1        68.

2            **MR. SPIRO:**  Your Honor --

3            **MR. APTON:**  Your Honor, this juror, I mean, he -- he

4    is in a predicament.  He has a gas station.  He is seemingly

5    the single point of failure within the organization.  And if

6    anything were to go wrong he needs to be able to attend, so he

7    says.

8        And if that's the case I just -- I don't feel confident

9    that he's going to either, A, attend the full trial despite

10   having to do so, and B, being able to actually focus on the

11   conflicts, issues that are going to be tried before the Court.

12           **MR. SPIRO:**  Yes, Your Honor.  This is another example

13   of plaintiff seeing that somebody is making a comment that is

14   net positive of Mr. Musk and then sort of embellishing reasons.

15   He -- what he really said was he has a job, sometimes there are

16   emergencies.  If there is an emergency he might have to take a

17   phone call.  The gas station is operating right now.

18       This is not hardship under any circumstance.  He did not

19   say his livelihood was dependent on it in any way.  He didn't

20   say that the property was in danger or that he has some duty to

21   society.  None of the reasons given for hardship --

22           **THE COURT:**  I'm going to keep him in.  I'm denying the

23   hardship.  He can -- his wife is there; he's got employees.  If

24   something comes up, every 90 minutes he can make a call.  He

25   can do Zoom or something.  You know.

 1        Now, if there is an explosion or something he really has

 2    to be there, but I'm not convinced that during the three weeks,

 3    that that is something that is sufficiently likely to happen

 4    that would disqualify him.  So I'm not going to give him a

 5    hardship excuse.

 6        No. 74.  She says she is now available, Ms. Bransfield.

 7        81, we've got issues to talk about with him.  I probably

 8    should call him in.  I'm not sure what he's talking about.  I

 9    guess in terms of the hardship he could commute, he could get

10    reassigned.  He works for -- I mean, he could get the manager

11    to reassign somebody, so I don't see a financial, I don't see a

12    work-related hardship.

13        I'm not sure what he's getting at when he says something

14    about the outcome of this case could affect his customers, who

15    could then affect his employee -- or his employer and then

16    affect him.

17        **MR. APTON:**  Your Honor, I think what he's getting at

18    is if he rules against Tesla, it could in turn affect him

19    directly on some level.

20        **THE COURT:**  So some of his customers, his employer's

21    customers may do -- work for Tesla, sounds like, or provide

22    parts or something?

23        **MR. APTON:**  Whether or not it's actually likely to

24    happen, he feels that way.  So perhaps it's a conversation for

25    later in the day with him.  I think there's probably grounds

1   for a for-cause choice.  But as far as the hardship argument

2   goes or the hardship issues go, I would agree that he probably

3   does not have a hardship.

4          **THE COURT:**  I'm not going to excuse him for hardship

5   but we will find out if there's more there.

6      Let's see.  No. 101, her mother's 92.  She wants to go as

7   soon as she gets the visa.  Her mother's recovering from COVID,

8   is in a nursing care home.  This one's not quite as compelling

9   in the sense that she doesn't have a visa in hand, but the

10  mother is elderly and in some form of healthcare, and she

11  thinks she can get the visa in a week.

12     So if that's realistic, to delay her by two extra weeks,

13  under the circumstances, my instinct is to believe her.  Any

14  objection?

15         **MR. SPIRO:**  No, Your Honor.

16         **MR. APTON:**  No, Your Honor.

17         **THE COURT:**  All right, we will excuse 101.

18     103 is the architect that says now that we are off

19  Thursday, she can make it work.

20     Oh, No. 112, they don't -- let's see.  He says they do get

21  jury pay, interestingly.  And that he could make it work, given

22  the 2:00.  It's only Tuesdays.  And he works until 2:00 anyway.

23  So it seems to me he's okay.

24         **MR. APTON:**  Yeah.  I think the next couple had issues

25  but said they were okay, yes.  Including him.

```
 1            THE COURT:  Okay.

 2            MR. APTON:  I don't believe 112 or 113 even asked to

 3      be relieved for hardship by the end of the colloquy.

 4            THE COURT:  Well, Mr. Bolivar will know if the wife

 5      can get the passport.  Otherwise he has to bring his son to

 6      Venezuela, and nobody else can, so that is still an open

 7      question.  He's who we need to hear back from.

 8            MR. APTON:  For 112, I, I would agree he can probably

 9      serve; the hardship is limited.

10         For 113, are we going to proceed throughout the course of

11      the day, and then if his wife doesn't get the passport we will

12      replace him --

13            THE COURT:  I'm going to keep him in for now.  You'll

14      know before you have to get to strikes.

15            MR. APTON:  Well, he said 3:00 was --

16            THE COURT:  Well, I may -- we may need to know an

17      answer earlier than that.

18            MR. APTON:  I'm waiting on a renewal for a passport as

19      well.  Is it possible --

20            THE COURT:  Yeah, I can help you out.  Talk to me

21      during the break and we'll...

22         (Laughter)

23            THE COURT:  We may have to -- you know, if we don't

24      know, we will have to fish or cut bait on him.

25            MR. APTON:  Okay.
```

1        **THE COURT:**  And I think it may be, frankly, too big of

2  a chance.  I don't want to seat somebody and then we find out

3  he can't serve.  I want to start with nine.

4        **MR. APTON:**  And keep them, right.

5        **MR. SPIRO:**  I didn't interpret his answers that way.

6  When somebody wants to get out of jury duty, he could -- he

7  could see from watching the rest of this room how to get out.

8  He seemed like he thought it was fine.

9     He did also not say that there were additional

10  alternatives.  Obviously, the wife being one of them.

11     And then third, he said they could delay when they went to

12  Venezuela.

13        **THE COURT:**  Well, by a week, not by three weeks.

14  That's the problem.

15        **MR. SPIRO:**  So in any event, hopefully he solves it.

16  If not, perhaps we can ask some further questions when the

17  Court feels the need.

18        **MR. APTON:**  I suppose this is more for-cause.  I mean,

19  he expressed some excitement to be here.  And with his other

20  comments about Elon, perhaps --

21        **THE COURT:**  Well, that's a cause.  I'm looking at

22  hardships.

23        **MR. APTON:**  Uh-huh.

24        **THE COURT:**  All right, 114.  She's a full-time mom

25  with the twins and the other.  And she seemed rather uncertain

 1    whether she could get help with the kids.  And she lives in

 2    Pleasanton.  So it's not like she's in San Francisco and could

 3    get back and pick up the kids.

 4         MR. APTON:  Your Honor, I would accept her hardship

 5    request.

 6         THE COURT:  Any objection?

 7         MR. SPIRO:  We don't think it rises to the level of

 8    hardship because she indicated, again, hardship is for

 9    situations where there's absolutely no possible alternative.

10    It is a very, very high burden.  That being said, given where

11    she is in the positioning of this, if the Court, in its

12    discretion, removes her, the Court can exercise its judgment,

13    obviously.

14         THE COURT:  All right.  I will remove her.  I mean, we

15    didn't ask, and it seems like she just doesn't have any

16    alternatives that are certain enough.  So I'm going to remove

17    No. 114.

18       120 is the guy that works for -- is it Chevron?  A lot of

19    planning going on.  Needs to be there, everything's happening

20    in the next three weeks.  He doesn't have a second in command

21    that has all the information, and so his unit would suffer.

22         MR. APTON:  Your Honor, I thought he made a

23    compelling, substantiated reason for hardship.  I don't see how

24    he's going to be here, mentally, if physically.

25         MR. SPIRO:  Again, this is an example of plaintiffs

1    sort of embellishing the state of affairs because this juror

2    has a cause challenge that they would like to make.  Under no

3    circumstances did Mr. Chen's statements qualify for hardship.

4    Never seen a juror who works at a major corporation who says

5    that they are busy or have things going on at work, I've never

6    seen a juror excused like that for hardship.  There was simply

7    no basis to it.

8        His employment is not contingent on it.  It's not as if

9    his survival is based on it.  He didn't say he would be fired

10   or the entire massive corporation would be shut down.  He said

11   he's needed.  That's the case of all busy people that work at

12   major corporations.  And it is clearly not a hardship.

13       **MR. APTON:**  Your Honor, if I could just comment, I'm

14   not embellishing.  In response to the opinion of Musk, he says

15   "Don't know."  In response to his opinion of Tesla, he says

16   "Good car."  So this isn't --

17       **THE COURT:**  All right.  I've made up my mind.  I'm not

18   going to do an excusal.  I think it's bad precedent, if

19   somebody works for a major institution, to excuse somebody.

20   There's no personal hardship.  It's a company hardship.  And

21   I'm not convinced that things will fall apart if he's not

22   there.

23       I understand he says critical three weeks, et cetera,

24   et cetera, et cetera.  But it doesn't rise to the level, in my

25   view, so I'm denying hardship.

1          **MR. APTON:**  Your Honor, just one point on that.  He

2    does have a business trip tomorrow, so I don't know how that

3    gets communicated.

4          **THE COURT:**  Well, he's going to have to cancel his

5    business trip.

6          **MR. APTON:**  Okay.

7          **THE COURT:**  Because, you know, he's got the summons.

8    He -- should not come in here assuming:  I'm going to get out

9    of it.  When you get summonsed for jury service in Federal

10   Court, you had better assume to the contrary.  So if he's made

11   arrangements that are unchangeable, that is his problem.

12         126 says he can serve.

13         144 says she doesn't like driving, but she could do it.

14   And so I don't think she has an excuse.

15         150 says she's okay.

16         And, I believe that's it.  So that leaves -- double-check,

17   here are the people still in play -- 3, 4, 6, 32, 36, 39, 40,

18   45, 46, 50, 55, 57, 58 -- 60 I guess we're still going to have

19   come in, right?  Did we say?  So 60, we're still, for now,

20   bringing her in.

21         65, 67 --

22         **MR. APTON:**  Your Honor, 65 is not --

23         **THE COURT:**  Oh, not here.  That's right.  Sorry.  67,

24   68, 73, 74, 79, 81 for now.  83, 89, 97, 103, 104, 110, 113 for

25   now --

 1          **MR. APTON:**  Your Honor, is 101 still in?

 2          **THE COURT:**  101 is not.  I excused her.  So 113 for

 3   now.  118, 120, 124, 126, 127 --

 4          **MR. APTON:**  Your Honor, 127 and -28 are out.  They

 5   didn't appear today.

 6          **THE COURT:**  Oh, they didn't appear.  Okay.  127, 128,

 7   got it.

 8        131, 144, 150, 155, 157, 168, 169, 175, 178, 186, 190, 192

 9   and 196.  Are all of you aligned?

10          **MR. SPIRO:**  One thing that will take at least some of

11   the burden off the Court is 60 is one of the four that we

12   agreed to move to the back.  Both sides agreed.

13          **THE COURT:**  Yeah.

14          **MR. SPIRO:**  So the jurors come up several times, I

15   think I'd make the Court aware of that.

16          **THE COURT:**  So let me make that a little circle.  So

17   the four jurors that we're going to put to the back are 60,

18   126, 175, and 196.

19          **MR. SPIRO:**  Yes, Your Honor.

20          **MR. APTON:**  Your Honor, you said we put them to the

21   back.  But if I understood  your instructions earlier, they're

22   not going out of order.  We're just --

23          **THE COURT:**  No, those are going out of order, because

24   you all agreed.  Those are the four.  The ones that each of you

25   identified as you wanted to go to the back but you couldn't

1   agree, I'm going to take some of those in one-on-one voir dire

2   but not move them out of order.

3            **MR. APTON:**  Understood.  Thank you.

4            **THE COURT:**  Because there was no agreement on them.

5            **MR. APTON:**  Understood.  And Your Honor, 112 is in.

6   Correct?

7            **THE COURT:**  112 is in, yep.

8            **MR. APTON:**  Okay.

9            **THE COURT:**  So, when we come back, I don't know -- has

10  a half hour run?  I think it has.

11           **THE COURTROOM DEPUTY:**  Just about.

12          **THE COURT:**  Okay.  Why don't we start bringing in the

13  first one, be No. 40.

14          **MR. APTON:**  Your Honor, is it possible to take a quick

15  two-minute recess?

16          **THE COURT:**  Well, I could play hard-nosed, but I'm

17  going to be humane about this and say yes.  Let's take a quick

18  ten-minute break.  I don't want to take too long, because then

19  the other jurors are waiting.

20          **MR. APTON:**  Thank you.

21          **THE COURT:**  Take a quick break.

22         **THE COURTROOM DEPUTY:**  Court is in recess.

23     (Recess taken from 11:44 a.m. to 11:55 a.m.)

24     (The following proceedings were held outside of the

25  presence of the Jury Venire)

```
 1            THE COURT:  Have a seat, everyone.

 2       Hopefully they're out there.  Vicky, if you could just

 3   tell all of them, just hang out there, we're going to bring

 4   them in one at a time, be patient, appreciate it.  Hopefully it

 5   won't take too long.

 6       That's right, start with No. 40.

 7            THE COURTROOM DEPUTY:  Okay.

 8       (Prospective Juror enters the courtroom)

 9            THE COURT:  Okay, Ms. Harris?

10            PROSPECTIVE JUROR HARRIS:  Good morning.

11            THE COURT:  Good morning.  So, what we're doing is

12   we're asking some people to clarify some of the things they

13   have stated here.  And we thought we would take some comments

14   directly instead of as a group.

15            PROSPECTIVE JUROR HARRIS:  Okay.

16            THE COURT:  And so we had some questions for you.  You

17   had a -- the question was asked about your views of Tesla and

18   of Mr. Musk.  And you said something to the effect "I think he

19   is not a very likeable person."

20            PROSPECTIVE JUROR HARRIS:  Correct.

21            THE COURT:  Although you think the Teslas are

22   nice-looking cars, and too expensive.

23            PROSPECTIVE JUROR HARRIS:  Exactly.

24            THE COURT:  Maybe -- could you explain what you mean

25   when you said you think he's not a likeable -- very likeable
```

1   person?

2          PROSPECTIVE JUROR HARRIS:  Well, basically from

3   everything I've ever heard -- don't know the man personally --

4   he seems to be a bit arrogant and narcissistic.  And that's

5   just how he comes off in interviews.  Not saying that is how he

6   is, but the particular interviews, that's how he seems to come

7   off.

8          THE COURT:  Um-hmm.  And are these are interviews that

9   -- just not in the recent couple of months, like -- was it

10  mainly from the last couple of months, like what's happened at

11  Twitter?  Or was it from long before, nor --

12         PROSPECTIVE JUROR HARRIS:  I'll say the majority of it

13  is Twitter.  you know, he's not really a person I keep up with,

14  so yeah, basically that.  I mean, I work right down the street

15  from Twitter, so that was something we were kind of keeping an

16  eye on.

17         THE COURT:  Okay.  All right.  And prior to the

18  Twitter stuff that was happening, did you have any strong views

19  about him?

20         PROSPECTIVE JUROR HARRIS:  No, no.  No reason to.

21         THE COURT:  All right.  I'm going to give the

22  attorneys a chance to ask some followup, but let me ask you a

23  question.

24      As you know, this case doesn't involve Twitter stock.

25         PROSPECTIVE JUROR HARRIS:  Correct.

1          **THE COURT:**  It doesn't involve tweets that were made

2    in his capacity as -- with respect to Tesla.  And you said you

3    indicated that you thought you could still be a fair and

4    impartial juror, even though you had some views.

5          Are you convinced that you could follow the instructions

6    of this Court, listen to only the evidence here that comes out

7    in the courtroom, and render a fair and impartial verdict?

8          **PROSPECTIVE JUROR HARRIS:**  Oh, without a doubt.  I

9    mean, a lot of people aren't necessarily likeable people, but

10   that doesn't mean that you should judge them on that.  I mean,

11   sometimes I don't like my husband.

12   (Laughter)

13         **THE COURT:**  But you judge him fairly, right?

14         **PROSPECTIVE JUROR HARRIS:**  Right.  Exactly.  Exactly.

15         **THE COURT:**  There you go.  Thank you.

16         **PROSPECTIVE JUROR HARRIS:**  You're welcome.

17         **THE COURT:**  All right.  Followup questions, first from

18   the plaintiff, then defendant?

19         **MR. APTON:**  Ms. Harris, thank you for coming in today.

20   I don't have any questions.  Thank you.

21         **THE COURT:**  All right.  Mr. Spiro.

22         **MR. SPIRO:**  Yeah.  And thank you for being so candid

23   with us, Ms. Harris.

24         Essentially, the point of this is that, you know, as His

25   Honor said, how important the jury system is and how important

1   it is to get this right.  Right?

2          **PROSPECTIVE JUROR HARRIS:**  Uh-huh.

3          **MR. SPIRO:**  That's really where this comes from.  And

4   so we have to ask jurors to be brutally honest with us.

5      You know, some people would say that if you have a view

6   towards somebody and you think that they are, you know,

7   narcissistic, it's a strong view and it's a negative view which

8   you're more entitled to have.  That what ends up happening is

9   the juror sways a little, right?  Before the person even

10  testifies, before the trial starts, they're a littler closer to

11  the other side.  All things equal.  Right?

12         **PROSPECTIVE JUROR HARRIS:**  Uh-huh.

13         **MR. SPIRO:**  There is a sway.  Right?  So you could be

14  a very fair person, you could be a great juror.  But it could

15  be if you have a strong feeling, if you're working down from

16  Twitter headquarters and you see layoffs, whether it's his

17  fault or not or his doing or not, the combination of these

18  factors causes you to sway, essentially.  And what it would

19  just mean is even a fair person, it wouldn't be the right case

20  for them, because of that.  That's really what we're getting

21  at.

22         **PROSPECTIVE JUROR HARRIS:**  I understand.

23         **MR. SPIRO:**  So what I have to ask is I represent

24  Mr. Musk and all the other folks and Tesla, and, I have to sort

25  of ask:  Can you be sure, can you give us a full commitment

1  that that view wouldn't in any way, consciously, implicitly,

2  subconsciously, ooze in at all to you, as the case starts?

3       **PROSPECTIVE JUROR HARRIS:**  I would assume -- and I'm

4  just going to tell you the type of person that I am.  I truly

5  believe that you can't judge a person until you've walked a

6  mile in their shoes.  Now, I can say what I have seen and what

7  I have projected him to be.  But until I really hear any facts,

8  I can't make a judgment.  On paper, it's telling me what I've

9  seen.  It has nothing to do with this case.

10      I mean, does that make any sense to you?

11       **MR. SPIRO:**  It makes a ton of sense.

12       **PROSPECTIVE JUROR HARRIS:**  Okay.

13       **MR. SPIRO:**  I very appreciate your answers and candor.

14  I don't have any further questions.

15       **PROSPECTIVE JUROR HARRIS:**  Okay.

16       **THE COURT:**  Great.  All right.  Thank you, Ms. Harris.

17  Appreciate it.

18       **PROSPECTIVE JUROR HARRIS:**  You're welcome.

19       **THE COURT:**  You probably want to take -- this is going

20  to take us probably another 25, 30 minutes before we get

21  through the others, so if you want --

22       **PROSPECTIVE JUROR HARRIS:**  So I can go back upstairs

23  and eat now.

24       **THE COURT:**  If you want to get something to eat, this

25  is your chance.  We will see you here probably in about a half

 1    an hour.  Thank you.

 2         Vicky, if you could get No. 50.

 3         (Prospective Juror leaves the courtroom, and Prospective

 4         Juror enters the courtroom)

 5              THE COURTROOM DEPUTY:  Okay, No. 50 is here.

 6         THE COURT:  Okay, you can sit anywhere.  Have you

 7    found out anything more about the jury pay situation?

 8         PROSPECTIVE JUROR CAVENDER:  Yes, sir, I did.  I

 9    called my manager.  Basically they do cover jury pay, but it

10    would be at a smaller percentage than what I usually work.  In

11    other words, I'm at 60-percent employee position, working

12    part-time.  So that's what they would pay me.  But I usually

13    work 40 to 60 hours a week over my percentage.

14         THE COURT:  Hm.  They don't pay you that extra?

15         PROSPECTIVE JUROR CAVENDER:  They do not pay the

16    extra.  And my manager also asked me to plead a case that they

17    are very busy, ICU, short-staffed, and she really needs me to

18    work.

19         THE COURT:  Let me ask, since you work night shift,

20    would you be able to continue just working your regular shift?

21    I know it's almost like doing double-time, but then come here

22    and serve as a juror?

23         PROSPECTIVE JUROR CAVENDER:  Well, I have considered

24    that.  I mean I work 7p to 7a, that's 12 hours through the

25    night, and then I would be coming to this until 2:00.  So I can

1   say that I can try, but I can't guarantee that I would stay

2   awake the whole time, or be as attentive as --

3          **THE COURT:**  So you work a 12-hour shift.

4          **PROSPECTIVE JUROR CAVENDER:**  Yes, sir.  Sometimes I

5   work 16 hours, if I go in at 3:00 in the afternoon and work

6   through the night.

7          **THE COURT:**  And how many days a week do you work that

8   12-hour shift?

9          **PROSPECTIVE JUROR CAVENDER:**  Usually four per week.

10  Sometimes five.

11         **THE COURT:**  All right.  Let me ask you a question

12  about some other things that you said.

13     As to Mr. Musk, who's obviously, you know, one of the

14  parties here, you said you had mixed feelings; seems like he is

15  a bit of a mercenary personality.  Which can be sort of good or

16  bad.

17         **PROSPECTIVE JUROR CAVENDER:**  Right.

18         **THE COURT:**  Can you elaborate what you mean when you

19  say he is kind of a mercenary personality?

20         **PROSPECTIVE JUROR CAVENDER:**  Well, I can say that I

21  don't know Mr. Musk personally, of course.  What I get is from

22  the news and what other people say and everything.

23     I just see him as a younger person that's done pretty well

24  for himself, in many ways.  He seems to kind of be a strong

25  personality, and do what he wants.  And like I said, that can

```
 1    work out for good or bad for someone, individually and for
 2    society.
 3            THE WITNESS:  And the word "mercenary," can you
 4    explain --
 5            PROSPECTIVE JUROR CAVENDER:  I'm just using that to
 6    say that he's willing to take a risk, chances, and do things
 7    that maybe some other people don't have the gumption to do very
 8    well.  And that is just a judgment.  I don't know that for
 9    sure.  That's just from what I've seen in the news, et cetera.
10    That's my image of him.
11            THE COURT:  Okay.  And that's fair.  Everybody has an
12    image, if you know something.
13            PROSPECTIVE JUROR CAVENDER:  Correct.
14            THE COURT:  And that's why we show you the video on
15    implicit bias.
16            PROSPECTIVE JUROR CAVENDER:  Correct.
17            THE COURT:  The important question is knowing what you
18    know about what this case is about, which is about some tweets
19    about Tesla stock, is there any reason why you think your image
20    of him would get in the way of you being able to follow my
21    instructions of listening only to the evidence at trial,
22    applying the law as I explain it to the jury, and to deliberate
23    impartially and fairly?
24            PROSPECTIVE JUROR CAVENDER:  I don't think so.  I
25    don't pay close attention to his tweets, whatever, because I
```

 1   don't care for Twitter.  But I would see it the same as I do a

 2   patient.  I just walk in on a patient and I don't know them, I

 3   do my job, try to take care of them and be non-judgmental.  So

 4   I think it is a similar situation.

 5          THE COURT:  And you say you don't think so.  Obviously

 6   it is hard to predict because you are not there, but are you

 7   confident that you could judge his case based on the evidence,

 8   and not be affected by earlier images?

 9          PROSPECTIVE JUROR CAVENDER:  Yes, sir.

10          THE COURT:  All right.  So I'll ask the parties if you

11   have any -- first, plaintiff -- any followup?

12          MR. APTON:  Yes.

13      Mr. Cavender, I understand the work situation.  I have a

14   question.  Are you able to switch shifts and perhaps pick up

15   extra shifts on Thursday or the weekends?  Or is that not a

16   possible?

17          PROSPECTIVE JUROR CAVENDER:  If I did Thursdays that

18   would be just the one day per week I'd be working, or the

19   weekends.  But like I said, I'm financially depending on

20   working extra.  I've worked 40 to 60 hours a week for years and

21   years now.  So it would be asking a bit to rearrange my

22   schedule that way.

23          MR. APTON:  Sure.

24          PROSPECTIVE JUROR CAVENDER:  And I don't know --

25   depending on what the unit need is, I don't know that they

1    would definitely need someone on Thursday as opposed to other

2    days, necessarily.  Would not be a guarantee, you can work

3    Thursdays.

4         **MR. APTON:**  I understand.

5    I don't have any questions, Your Honor.

6         **THE COURT:**  All right.

7         **MR. SPIRO:**  I don't have any questions, Your Honor.

8    Thank you.

9         **THE COURT:**  All right.  Appreciate that, Mr. Cavender.

10   Thank you for coming in.

11        **PROSPECTIVE JUROR CAVENDER:**  Yes.

12        **THE COURT:**  Vicky, could you ask No. 79 to come in?

13   (Prospective Juror leaves the courtroom, and Prospective

14   Juror enters the courtroom)

15        **THE COURT:**  Hi, good morning.

16   **PROSPECTIVE JUROR MCGOWN:**

17   **PROSPECTIVE JUROR MCGOWN:**  Good morning.

18        **THE COURT:**  Mr. McGown?

19   **PROSPECTIVE JUROR MCGOWN:**  Yes.

20        **THE COURT:**  We are asking people to come in because

21   the people -- we want to explore some statements in your

22   questions and comments.  And so one of the things we ask is

23   what people's reactions were or views are of Tesla and of

24   Mr. Musk.  And you had quite a bit to say.

25        Sounded like you generally have a positive view of the

 1    car.  And that your views of Mr. Musk, a lot of it kind of is

 2    based on what's happened with Twitter, sounds like?

 3              **PROSPECTIVE JUROR MCGOWN:**  Yeah, I don't -- yeah,

 4    basically I didn't really even really know his name, really,

 5    until fairly recently.

 6              **THE COURT:**  Hm.  So you weren't --

 7              **PROSPECTIVE JUROR MCGOWN:**  Or paid attention, really.

 8              **THE COURT:**  So you didn't have -- before the recent

 9    months, you didn't really have much of an impression of him.

10              **PROSPECTIVE JUROR MCGOWN:**  Exactly.

11              **THE COURT:**  All right.  What's -- in terms of what's

12    happening at Twitter, if you were to summarize your view of him

13    from what you have now heard, do you have any views, one way or

14    the other, of Mr. Musk?

15              **PROSPECTIVE JUROR MCGOWN:**  Not -- not really, not

16    really, no.

17              **THE COURT:**  Do you have any strong feelings about him,

18    positive or negative?

19              **PROSPECTIVE JUROR MCGOWN:**  Not that I really have

20    given a lot of thought about.  Again, other than stuff that's

21    come out in the news and so forth.  But it -- it doesn't really

22    affect me, so I didn't really put a lot of thought into it.

23              **THE COURT:**  Okay.

24              **PROSPECTIVE JUROR MCGOWN:**  Other than, you know, just

25    -- was a slight concern about, like I mentioned in there about

1    what he was doing with allowing certain groups to talk on

2    Twitter again, to have access to Twitter again, that might have

3    been a little irresponsible, but again, that's his right.

4           THE COURT:  Okay.  Does that action that's happened at

5    Twitter or anything else about your views of Mr. Musk prevent

6    you from following my instructions that, as a juror, if you are

7    seated, you have to base everything on the evidence you hear

8    here, the laws as I instruct it, and that you need to maintain

9    -- and to be fair and impartial in judging the evidence?  Could

10   you do that?

11          PROSPECTIVE JUROR MCGOWN:  Oh, absolutely.

12          THE COURT:  Pretty certain about that?

13          PROSPECTIVE JUROR MCGOWN:  Oh, yeah and, like, as far

14   as Twitter goes as I mentioned as well, I'm not a big Twitter

15   person.  I fairly recently started using it just to get some

16   news but other than that it's -- probably spend maybe five

17   minutes on it a day.

18          THE COURT:  Okay.  All right.  Thank you.  Any

19   followup questions?

20          MR. APTON:  Yes, Your Honor.  So, Mr. McGowan, the

21   events in this case precede this whole Twitter management stuff

22   by years.  Are you able to take what you have learned very

23   recently and just completely wall it off from how you are going

24   to see the facts of this case and then assess and apply the

25   judge's instructions carefully and accurately?

 1        **PROSPECTIVE JUROR MCGOWN:**  Absolutely.  Yeah.

 2        **MR. APTON:**  Okay.

 3        **PROSPECTIVE JUROR MCGOWN:**  Without a doubt.

 4        **MR. APTON:**  Thank you, sir.

 5        **THE COURT:**  All right.  Mr. Spiro?

 6        **MR. SPIRO:**  Good afternoon, thanks for coming in and

 7  thanks for your candor.  This process as the judge said at the

 8  outset is very important so what we are doing is talking to

 9  jurors because a person could be fair and be a great juror but

10  if they have, you know, ideas and thoughts that precede the

11  case there is always a risk, right, either consciously or

12  subconsciously that makes its way into the courtroom, right?

13  And I'm sure you know about that.  People have biases and they

14  have implicit biases, right?  So some of your comments on the

15  questionnaire, right, and you felt comfortable enough to put

16  them down, right --

17        **PROSPECTIVE JUROR MCGOWN:**  Uh-huh.

18        **MR. SPIRO:**  -- so they were at the forefront of your

19  mind, you know, not a fan of the hate speech and letting folks

20  back on, right?  But also you said, you know, that his tweets,

21  you said most of his tweets are ill-informed and he is going

22  for shock.

23        **PROSPECTIVE JUROR MCGOWN:**  I said "most"?

24        **MR. SPIRO:**  Yeah.  But I don't want to quibble on --

25        **PROSPECTIVE JUROR MCGOWN:**  I shouldn't have put that

 1  because I don't have enough reference to put that.  If I did, I

 2  did it by accident.

 3          MR. SPIRO:  Understood.  That may be what, you know,

 4  that's -- not to put you on the hot seat but you know that is

 5  what people are talking about when they say "implicit," right?

 6          PROSPECTIVE JUROR MCGOWN:  That is --

 7          MR. SPIRO:  So it may be that a few of them that you

 8  saw is that you thought were ill-informed, right, that have

 9  some shock value, I noticed you said he seems to be going for

10  shock, right?

11          PROSPECTIVE JUROR MCGOWN:  Yes.

12          MR. SPIRO:  And all of a sudden you write "most"

13  because that's how the mind --

14          PROSPECTIVE JUROR MCGOWN:  I apologize for that.

15          MR. SPIRO:  No don't apologize, we want absolute --

16  right, this process involves absolute candor and brutal

17  honesty.

18      So this case is about a tweet, right?  And a tweet about

19  what he was thinking at the time when he made the tweet.

20  Right?  So if a person comes into that case with a view that

21  some of his tweets, even a couple of his tweets are,

22  quote-unquote, ill-informed or, you know, are done for shock

23  value, right?

24      And the case is about that, the concern would be that you

25  would come into the case and you would be swaying even a little

1    bit, right, even 51 percent, 49 percent, that you could sway a

2    little bit implicitly, even and if that's the case it wouldn't

3    be the right case for you.

4              **PROSPECTIVE JUROR MCGOWN:**  Right, I understand.

5              **MR. SPIRO:**  So that is all we are trying to get at,

6    not putting you on the hot seat.  It just strikes me, we talked

7    about how it says "most," again, can you be sure in a matter of

8    this importance?

9              **PROSPECTIVE JUROR MCGOWN:**  Absolutely.

10             **MR. SPIRO:**  That in no way could that, what these

11   opinions, these things you've seen, seen recently, has no

12   impact on any of your thoughts, subconscious or otherwise, as

13   you --

14             **PROSPECTIVE JUROR MCGOWN:**  True.  Yeah, I can honestly

15   say that because really I don't know enough about him, like I

16   said, other than that statement, I probably -- I shouldn't have

17   put that, but I was trying to be honest at the time.  And I

18   think I did see something on the news where someone said most

19   of his tweets are -- are shock value or ill informed and I

20   think that must have been what I was thinking about at that

21   moment.

22        But when it comes to the trial, I mean it has to be what

23   surrounds this case, that tweet, I shouldn't be -- well, one, I

24   have to go by whatever the judge instructs me to do.  But from

25   what I understand, is any input I have has to be around this

 1  case, that tweet, and the -- the evidence moved forward on

 2  that.  That's all I can do.

 3       **MR. SPIRO:**  And you can give, you can give me your

 4  commitment that you can put those thoughts and feelings, leave

 5  them at the courthouse --

 6       **PROSPECTIVE JUROR MCGOWN:**  100 percent, yeah.

 7       **MR. SPIRO:**  Thank you very much.  Thank you for your

 8  candor.

 9       **THE COURT:**  Thank you Mr. McGowan, appreciate it.

10       **PROSPECTIVE JUROR MCGOWN:**  Thank you.

11       **THE COURT:**  We'll probably convene in about a half

12  hour or so -- I keep moving it back -- so if you want to get

13  something to eat or something it's on the second floor.

14       **PROSPECTIVE JUROR MCGOWN:**  Sure, no problem.

15       **THE COURT:**  Thank you.

16     And No. 97, Vicky.

17       **THE COURTROOM DEPUTY:**  Yes, Your Honor.  Thank you.

18     (Prospective Juror leaves the courtroom, and Prospective

19     Juror enters the courtroom)

20       **THE COURT:**  Hi.

21       **PROSPECTIVE JUROR HUI:**  Hello.

22       **THE COURT:**  Thank you for waiting.  We had a couple

23  followup questions.  One is, you had some close friend that

24  worked, works at Tesla?

25       **PROSPECTIVE JUROR HUI:**  A friend.

1        **THE COURT:**  Friend.

2        **PROSPECTIVE JUROR HUI:**  Yeah.

3        **THE COURT:**  Does that fact, would that prevent you

4    from being a juror who could assess this case neutrally and

5    fairly?

6        **PROSPECTIVE JUROR HUI:**  No, it wouldn't affect me.

7        **THE COURT:**  Okay you wouldn't be swayed one way or the

8    other by that?

9        **PROSPECTIVE JUROR HUI:**  No.

10        **THE COURT:**  And then we asked questions about your

11   views of both Tesla and Mr. Musk.  And I think, sounds like you

12   like the Tesla, from what you know.  But you describe Mr. Musk

13   as being arrogant, unpredictable, irrational at times.  So

14   maybe you can elaborate on that.  Is that based on stuff that's

15   happened at Twitter or your views, are these long-held views

16   that you had?  Or --

17        **PROSPECTIVE JUROR HUI:**  Mainly Twitter and also when

18   we had to shelter in place where he still had the Tesla factory

19   open, in operation.

20        **THE COURT:**  Okay.  Does that knowledge or your

21   perception of him, do you think that would prevent you from

22   being an impartial juror in this case and be able to assess the

23   evidence that you hear in this courtroom and follow the

24   instructions on the law?

25        **PROSPECTIVE JUROR HUI:**  No, it wouldn't affect me in

1    that.

2         THE COURT:  Would not affect you.

3         PROSPECTIVE JUROR HUI:  No.

4         THE COURT:  So even though there's some things he's

5    done that you don't approve of, you could give Mr. Musk a fair

6    trial and follow the rules and the instructions here?

7         PROSPECTIVE JUROR HUI:  Yes.

8         THE COURT:  And are you confident you can do that?

9         PROSPECTIVE JUROR HUI:  Yes.

10        THE COURT:  Okay.  Followup questions?

11        MR. APTON:  Yes.  Ms. Hui, so this case is about the

12   tweet that Mr. Musk sent back in 2018.  So well before the

13   Twitter management goings-on, well before COVID, or pandemic.

14   So we just want to make sure that the jurors who ultimately do

15   sit on the jury are able to disregard and wall off anything

16   that they might have learned recently, and really judge and

17   assess the facts and the law fairly about what occurred years

18   prior to all that.  And so I just want to make sure you are

19   able to do that.  Are you able to do that?

20        PROSPECTIVE JUROR HUI:  Yes.

21        MR. APTON:  Thank you.

22        THE COURT:  All right.  Mr. Spiro?

23        MR. SPIRO:  Yes.  So, you know, the reason this

24   process is so important and I appreciate you coming in and your

25   candor, is, you know, what we want is to seat a fair and

1  impartial jury.  And you strike me as somebody who could sit on

2  many juries and be fair and impartial.  But the concern, right,

3  with the comments, and these are pretty strong words,

4  "Arrogant, unpredictable, irrational," and you know, you note

5  the issue with the factory which could have, I take it from

6  your statement, it's a public-safety issue to you?

7           PROSPECTIVE JUROR HUI:  I'm sorry?

8      MR. SPIRO:  The issue with him keeping the factory

9  open during the pandemic, was that a public safety concern?

10 Or --

11          PROSPECTIVE JUROR HUI:  Yeah, more of public safety.

12     MR. SPIRO:  Yeah, so what we're concerned about or

13 what, you know, we want to get this right.  Okay?  And so what

14 we're trying to figure out is if a juror is swaying a little

15 bit to either side.  Right?  Even 51 percent would be too much

16 of a sway, so that when you come in, you know, there's, people

17 have views and there's also implicit, right?  Subconscious

18 views that people have.  And so if there's somebody that you

19 think is arrogant, unpredictable and irrational at times and

20 there's specific events that you can think of that they have

21 done, you know, it's hard to, at least for some people, to

22 imagine that you could put all of that to the side, and come in

23 and everybody starts dead even, that there's not even a little

24 bit of a sway.  And so what I'm asking is how can you -- again

25 you think you can, but, you know, how do you know that you can

1  or how can you give me your commitment that you could.  Or do

2  you think that there is something that could trickle in?

3      PROSPECTIVE JUROR HUI:  Well, the case is based on

4  evidence and this is based on his tweet of the shares of Tesla,

5  taking it private.  Yeah, I don't know much about that so, you

6  know, I will be listening to all the evidence and make my

7  judgment based on that.

8      MR. SPIRO:  And so you can give me a commitment that

9  you can put those things that you have talked about --

10      PROSPECTIVE JUROR HUI:  Uh-huh.

11      MR. SPIRO:  -- to the side and look at this case on

12  its (Inaudible) fours, right?

13      PROSPECTIVE JUROR HUI:  Correct.

14      MR. SPIRO:  The other thing that I just have to ask

15  you is, you know, the plaintiffs in this case could sort of

16  argue to you certain things that may be consistent with the way

17  you view him, right?  They could say, well, don't you think

18  that this was, you know, unpredictable, right?  You used the

19  word unpredictable.  Given that you already hold that view at

20  some level, you don't think you would be more receptive to an

21  argument of a view that you already held?

22      PROSPECTIVE JUROR HUI:  Maybe, but, you know, try not

23  to.

24      MR. SPIRO:  No I get it and I very much appreciate you

25  being brutally honest with us.  It is exactly that maybe,

1   right, that makes jurors that can't give sort of unequivocal --

2   understandably, an unequivocal assurance.  Just think about it

3   in your own life, you shouldn't be sitting in judgment of

4   people on an issue that you already have a view on, right?

5   That is the same for all of us, me too.  So if you have a

6   previous view on that topic, right, and you think maybe it

7   would influence you, maybe it wouldn't, then isn't it the case

8   that you can't, you know, fairly can't give an unequivocal

9   assurance?  Because I don't see how you could give an

10  unequivocal assurance since the answer's maybe.  Do you

11  understand what I'm saying?

12          **PROSPECTIVE JUROR HUI:**  Uh-huh.

13      **MR. SPIRO:**  So what is your reaction to that?  Don't

14  you think that if maybe the argument that you already believe

15  is presented to you, that you would come in 51/49, maybe a lot

16  more but at least 51/49 against in terms of the way you are

17  leaning?

18          **PROSPECTIVE JUROR HUI:**  Possibly, I guess, if you put

19  it that way.

20      **MR. SPIRO:**  Okay.  Um, then I have no further

21  questions.

22          **THE COURT:**  All right, let me ask a followup question.

23  One of the things you will be instructed is that the plaintiff

24  will have the burden of proving certain things in this case.

25  And so you will have to sit and listen to the evidence and

1    there may be evidence on one side, evidence on the other side,

2    you know, sometimes people remember things differently, and

3    there would be competing testimony.  That is why we have trials

4    but you will be instructed about, you know, the burden of

5    proof.  And the burden of proof's generally, like for instance

6    the plaintiff will have to prove certain things that are more

7    likely true than not.  And you will listen to evidence.

8        Do you have some doubt that if it comes to some disputed

9    fact about what Mr. Musk knew or did, that you might not be

10   able to judge that neutrally and fairly and listen only to the

11   evidence here, because you had some views about his prior

12   tweets?

13           **PROSPECTIVE JUROR HUI:**  No, I feel that I can just

14   listen to the facts and make the judgment based on that.

15           **THE COURT:**  Okay.  You think you can.

16           **PROSPECTIVE JUROR HUI:**  Yeah.

17       **THE COURT:**  Would you say, trying to get a sense --

18   know it's hard to gauge because you haven't heard it yet but

19   are you certain, pretty certain, or probably can do that?

20   Where on the scale of confidence are you?

21           **PROSPECTIVE JUROR HUI:**  Pretty certain.

22       **THE COURT:**  Pretty certain.  Okay.  Not absolute but

23   pretty certain.  Okay.  All right, anything further, counsel.

24       **MR. SPIRO:**  No, Your Honor.

25       **MR. APTON:**  No, Your Honor.

 1              THE COURT:  All right.  Thank you, Ms. Hui.  I

 2     appreciate it.

 3              PROSPECTIVE JUROR HUI:  Thank you.

 4          THE COURT:  And we're next going to call?

 5          THE COURTROOM DEPUTY:  101.

 6          THE COURT:  101 is -- we are not going to call 101.

 7     We can excuse 101.

 8          THE COURTROOM DEPUTY:  Okay.

 9          THE COURT:  Skip 101 for now.

10          THE COURTROOM DEPUTY:  118?

11          THE COURT:  118.

12       (Prospective Juror leaves the courtroom, and Prospective

13          Juror enters the courtroom)

14          THE COURT:  Good -- it's afternoon now, Mr. Vincent.

15          PROSPECTIVE JUROR VINCENT:  Yes, it is.

16          THE COURT:  Appreciate you coming in.  We are asking

17     some followup questions of folks based on the questionnaire.

18     One of them is sort of the comments on either Tesla or Mr. Musk

19     and you commented "Nice cars" but you don't like Mr. Musk and

20     you wouldn't buy a Tesla.  Maybe you can tell us a little bit

21     more about your views, you say you don't like him, maybe you

22     can tell us why and how strongly you feel about it.

23          PROSPECTIVE JUROR VINCENT:  He's arrogant as I see it.

24     I know he is a genius.  But just his approach over the last few

25     years.  I mean from the free speech stuff with Twitter, free

1    speech is something that's supposed to protect us from the

2    federal government, not something to say that everybody can say

3    whatever they want at any time.  So that bothers me.  And I

4    think since the Twitter thing started that's made me have more

5    negative feelings toward him.  Before that I think it was more

6    just he just seemed like another arrogant rich guy.  But --

7              **THE COURT:**  Okay.  Do you feel that -- sounds like

8    your views of him as a result of Twitter are pretty strong?

9              **PROSPECTIVE JUROR VINCENT:**  Yes.

10             **THE COURT:**  Would that prevent you, because of the

11   critical question -- I know you answered no on the

12   questionnaire but I want to make sure, obviously it is pretty

13   important that people be able to set aside their biases and

14   preconceptions and listen only to the evidence that comes out

15   at trial and not some other image they may have had before, and

16   follow the instructions, which I will give.  And then, render

17   an impartial verdict based only on the evidence here.  Do you

18   think, notwithstanding your strong views about Mr. Musk, you

19   could do that?

20             **PROSPECTIVE JUROR VINCENT:**  Yes.  They're completely

21   separate.  I mean, the law is law, and what I think of somebody

22   is, it's separate.  I don't know if it's worth any personal

23   examples of where I think I've done that in the past, or not.

24   But...

25             **THE COURT:**  Well, that might be kind of interesting.

1   Is there an example that demonstrates that?

2        **PROSPECTIVE JUROR VINCENT:**  It's not anything close to

3   this level but just, I used to be -- worked with a guy, he and

4   I were friend then we got to where we weren't friends, then he

5   became the boss and he was trying to fire me, he made stuff up

6   to try to fire me.  Didn't work.  Finally he bored me, and I

7   left.  Years later, I went to work for the union, and I was his

8   representative, and he called me and I helped him.  Didn't have

9   any hesitation, didn't want revenge.  And even after I left the

10  union he used to call me for advice.  And I still thought it

11  was rather interesting but I didn't hold back.  So, I can

12  separate.

13       **THE COURT:**  And so you fully believe in principle, --

14       **PROSPECTIVE JUROR VINCENT:**  Yes.

15       **THE COURT:**  -- in following the rules.  Thank you.

16  Any followup?

17       **MR. APTON:**  Yes.  Mr. Vincent, so I understand that

18  some of your feelings toward Mr. Musk relate to how he has

19  managed Twitter and certain speech that's been on the platform

20  as of late.  This case in a way relates to speech made by Elon

21  Musk, and whether a statement was false, knowingly false at the

22  time he made it.

23       And so your preconceived notions, your understanding of

24  how Musk governs speech of others and his speech, would that

25  somehow taint your ability or prevent you from rendering a fair

1    judgment as to what he did four-and-a-half years ago?

2            PROSPECTIVE JUROR VINCENT:  No.  Because we're going

3    to be talking about the law, Judge Chen is going to explain the

4    law.  And I think it's in black and white what Mr. Musk said or

5    didn't say.  So that's not up for debate.  It's just, was the

6    law broken?  Or -- I don't know if there's something beyond the

7    law being broken but, were things done wrong that the Court

8    says shouldn't have been done?  Did he do it or didn't he do

9    it?  And that's two different things.

10           MR. APTON:  Sure.  Thank you.  So if the principle

11   that you are to follow is to hear the facts and apply the law

12   fairly, you will do that.  Is that correct?

13           PROSPECTIVE JUROR VINCENT:  Yes.

14           MR. APTON:  Thank you, sir.

15           PROSPECTIVE JUROR VINCENT:  You are welcome.

16           THE COURT:  All right.  Mr. Spiro?

17           MR. SPIRO:  Thanks.

18       And thank you for coming in and thank you for your

19   honesty.  The reason we are doing this is, of course it is a

20   very important process, right, and if there is not a full jury

21   that is fair and impartial it creates obviously major problems.

22   So I appreciate you coming in and your honesty.  And it doesn't

23   sort of surprise me the story that you tell.  You seem like a

24   thoughtful person where you were able to see somebody from your

25   past and move on and do right by them.  Mr. Musk isn't sort of

 1  going to get that opportunity to sort of interact with you,

 2  right?

 3          PROSPECTIVE JUROR VINCENT:  (Nods head)

 4      MR. SPIRO:  And so the concern would be that if you go

 5  into sitting on judgment of somebody and it's somebody you

 6  don't like, that all things equal, right, whether it's

 7  conscious or subconscious, you sway even a little bit.  Right?

 8  You, you don't like the person, and you've -- I could see even

 9  the way you were reacting to the questions, you -- you want --

10  you want -- you are a fair person and you want to say that you

11  just don't like him, but the not liking is pretty strong,

12  right?

13      And so what we have to ask jurors is you could probably be

14  a fair juror on, like, every other case in the building, right,

15  a perfect juror.  But it may be that, you know, given what's at

16  stake, that it's not the perfect case for you, right?  Because

17  of all of the cases and all the people, if you already start

18  off not liking -- strongly not liking the person accused, you

19  know, it's hard to give a complete assurance, subconscious,

20  conscious, that you don't sway even a little.

21      Do you understand what I'm sort of getting at?

22          PROSPECTIVE JUROR VINCENT:  I do.

23      MR. SPIRO:  And do you have a reaction to that?

24          PROSPECTIVE JUROR VINCENT:  Um, I agree with what

25  you're saying, that, you know, anything in life, that can come

1   up.  Kind of like the video we watched in the jury room
2   about -- I'm so bad with names -- unconscious bias, is that the
3   right terminology?
4           **MR. SPIRO:**  Yeah.
5           **PROSPECTIVE JUROR VINCENT:**  So, yeah, that -- I can
6   see that.  See your point.
7           **MR. SPIRO:**  Right, yeah, and this is not just, you
8   know, a possibility that you, you know --
9           **PROSPECTIVE JUROR VINCENT:**  Right.
10          **MR. SPIRO:**  That something happened when you were a
11  kid and it may still impact you.  This is something that you've
12  thought about, you have read news about, you have opinions
13  about, you probably talked to other people about.  You know,
14  it's a lot.  Right?  And so it strikes me that somebody that
15  holds views that strongly about the person accused in this
16  case, that it probably isn't the right case for you.
17      I mean --
18          **THE COURT:**  Are you asking a question?
19          **MR. SPIRO:**  Well, I'm asking for a reaction that, um,
20  you know -- you know, it's not -- as you put it before, you
21  know, it's like black and white, did he say it, did he not,
22  does it break the law?  But this case isn't going to be black
23  and white.  It's going to be a lot about do you believe him, do
24  you trust him, what's in his mind, why did he do certain
25  things.  So if you come in with that view and that implicit

 1  bias we were talking about, you know -- you know, I assume you

 2  can't be sure that that doesn't impact the way you evaluate his

 3  testimony and the facts and circumstances around it.

 4      I mean, can you be sure that that's not going to happen?

 5          **PROSPECTIVE JUROR VINCENT:**  I can't be sure of

 6  anything.  Do I feel that I could listen to the law and follow

 7  it and come to a fair decision?  Yes.

 8          **MR. SPIRO:**  Okay.  And -- and you think, if -- if --

 9  you know, the plaintiffs may argue specifically something that

10  comports with your previously held view, right?  You would be

11  what some people say is a receptive audience to a view you

12  already hold.  So do you think that that, you know -- I think

13  all people, if you're being told something you already agree

14  with, you don't think that you would come in at least

15  51 percent, 49 percent swaying at all to one side?

16      Or you don't know?

17          **PROSPECTIVE JUROR VINCENT:**  I don't know.

18          **THE COURT:**  I think the question is how certain are

19  you that you can be fair and objective, given past -- I mean,

20  as you learned from the video and, you know, from life,

21  everybody has preconceived views of everything.  Everything you

22  see, just by sight, that was one of the lessons of implicit

23  bias, you see an animal, you immediately think are they

24  dangerous or not dangerous.  You see somebody and you have

25  certain impressions and you have -- we all come to that.  And

 1   our struggle is to try to find people who can confidently say:

 2   Even if I have some predisposed views in the past about

 3   somebody or something -- it might be about a corporation, might

 4   be about anything -- can I put that aside with enough

 5   confidence that the Court feels that you've got the confidence

 6   to be able to do that.  So it's kind of a question of degree.

 7   I think you're saying, you know, can't be sure of anything,

 8   something like that.  And that's probably true of everything.

 9            **PROSPECTIVE JUROR VINCENT:**  (Nods head)

10            **THE COURT:**  But how certain can you be that you would

11   judge the evidence, really, based on what you hear and not give

12   it some special credence, for instance, because you already had

13   some views about Mr. Musk or about corporations or about

14   whatever.  Do you think you could -- how confident are you that

15   you could do that?

16            **PROSPECTIVE JUROR VINCENT:**  I'm extremely confident

17   because I'm not going to make it personal, what we're doing

18   here.  Going back to my story a moment ago, this guy spent a

19   lot of time trying to fire me, take away my livelihood,

20   including have his assistant make things up.  And it was, like,

21   um -- and that guy, it was -- I had no hesitation to help the

22   guy out.

23        Elon Musk has not tried to harm me in any way.  And I -- I

24   feel extremely confident that I could pass fair judgment.  But

25   I completely understand where you are coming from.  I -- I -- I

1   feel like I'm fortunate in that sense, that I can, as a human

2   being, do that.

3         **MR. SPIRO:**  I guess the difference between the story,

4   the real-life experience you keep coming back to where you were

5   still willing to help somebody, right --

6         **PROSPECTIVE JUROR VINCENT:**  Uh-huh.

7         **MR. SPIRO:**  -- if you saw Mr. Musk fall on the ground,

8   you would pick him up.  If he was thirsty, you would give him a

9   glass of water.  Right?  In this case you are going to be

10  asked, right, in high level, right, may say something and some

11  other witness something different.  So it's not just the spirit

12  to help, which is an honorable one --

13        **MR. APTON:**  Your Honor --

14        **MR. SPIRO:**  Is not -- isn't, obviously, complete

15  apples to apples.  So what I have to ask is, you know, can you

16  commit -- can you commit a hundred -- again, you know, nothing

17  is for certain, but can you commit that you won't look at two

18  witnesses at all and prejudge them by one -- by not coming in

19  liking one of them?  Right?  Because a lot of people would say

20  their experience would cause that, right?  It's not exactly the

21  same as helping.  So I just wanted to make that distinction and

22  sort of just ask for your reaction to that.

23        **MR. APTON:**  Your Honor, can we pause this and

24  approach, real quick?

25        **THE COURT:**  No, I want to conclude this.  Let's move

1  on.  And I'd like to just answer that question.  If you had two

2  witnesses and one of them is Mr. Musk and somebody else says

3  something different, given your views of Mr. Musk in the past,

4  could you weigh that testimony neutrally based on what you hear

5  on the stand and what you see on stand as opposed to something

6  you've seen earlier?

7          **PROSPECTIVE JUROR VINCENT:**  I'll base this on, I

8  haven't seen that Elon Musk lies.  I've seen him do things I

9  don't agree with, like I said, about the way he's running

10 Twitter and free speech.  I haven't seen him -- maybe I'm wrong

11 but I haven't seen in the press that he lies.  So, based on

12 that, I believe I could weigh the two -- testimony from the two

13 different people equally.

14         **THE COURT:**  All right.  So it's not just -- there may

15 be an issue about truth or not -- you know, somebody believing

16 one witness over another, but there may be also questions about

17 what was in his mind, for instance, when he did certain things.

18  And if you think that he acts impulsively, generally, or

19 arrogantly or something like that, would you be able to make

20 some judgment just based on the evidence that comes out in this

21 courtroom and not anything else you've seen or heard in the

22 past?

23         **PROSPECTIVE JUROR VINCENT:**  I could do that.

24         **THE COURT:**  With confidence?

25         **PROSPECTIVE JUROR VINCENT:**  Yes.

1          **THE COURT:**  All right.  Thank you, Mr. Vincent.  I

2    appreciate it.

3          **PROSPECTIVE JUROR VINCENT:**  You're welcome.

4          **MR. APTON:**  Your Honor, before we bring in the next

5    witness, can I make a quick statement?

6          **PROSPECTIVE JUROR VINCENT:**  Am I out of here?

7          **THE COURT:**  Yeah.  Yeah.  We're going to come back in

8    about 15 minutes, so if you want to try to grab something real

9    quick or --

10         **PROSPECTIVE JUROR VINCENT:**  Okay, thank you.

11      (Prospective Juror leaves the courtroom)

12         **THE COURT:**  And then, Vicky, we'll pause for a second,

13   but the next one will be No. 124.

14      All right, Mr. Apton.

15         **MR. APTON:**  Thank you, Your Honor.  Your Honor, the

16   purpose of this portion of voir dire was to avoid tainting the

17   rest of the pool, according to Mr. Spiro.  What I've seen so

18   far is badgering, repeated questions --

19         **THE COURT:**  Well, all right.

20         **MR. APTON:**  -- of the witness.

21         **THE COURT:**  I've been tempted a couple of times to

22   intervene.  We're not here to give speeches.  I understand you

23   want to get certain concepts through, but I'm going to put a

24   limit.  I don't want long speeches.  I understand you're trying

25   to make your point, but at some point you're passing the line.

 1           So I'm just warning you.  Let's move.  Let's move.  I

 2      don't need to hear anything else.  Let's move.

 3           This is No. 120?  No.  124.  Sorry.

 4           (Off-the-Record discussion between the Court and the

 5      Courtroom Deputy)

 6                THE COURTROOM DEPUTY:  Judge, No. 31?

 7                THE COURT:  It's 124 --

 8                THE COURTROOM DEPUTY:  No, no.  Are you excusing No.

 9      31?  She has a plane ticket for today, the one whose brother

10      passed away on Sunday.

11                THE COURT:  Yes.  That's the one who's got a -- yes.

12      You can excuse her.

13                THE COURTROOM DEPUTY:  We're excusing, correct?

14                THE COURT:  You can excuse her.

15                THE COURTROOM DEPUTY:  Thank you.

16                MR. PORRITT:  That's 31.

17                THE COURT:  Wait, is that the one?  She says that's

18      the one with the plane ticket?

19                THE COURTROOM DEPUTY:  She's the one whose brother

20      passed away.  She --

21                THE COURT:  It's not 131, it's --

22                MR. PORRITT:  31.

23                THE COURTROOM DEPUTY:  No, 31.

24                THE COURT:  Oh, 31.  Yeah.

25                THE COURTROOM DEPUTY:  Yes.

```
 1            THE COURT:  All right.  Everybody agrees we've

 2   already -- I've already ruled on her so she should go catch a

 3   plane.

 4            THE COURTROOM DEPUTY:  Thank you.

 5            THE COURT:  Yeah.

 6       (Prospective Juror enters the courtroom)

 7            THE COURT:  Okay.  Good afternoon, Mrs. Davidson.

 8            PROSPECTIVE JUROR DAVIDSON:  Hi.

 9            THE COURT:  Thank you for your patience, appreciate

10   it.  We just had some follow-up questions about some of your

11   answers, and we're taking that from various folks.  In

12   particular, your view about Tesla and Mr. Musk, obviously,

13   since this case concerns those matters.

14       You said the car is a good car but overpriced.  And then

15   with respect to Mr. Musk, you simply said "He sucks."

16            PROSPECTIVE JUROR DAVIDSON:  Yeah.

17            THE COURT:  So I have to ask you to elaborate.  What

18   do you mean by that?

19            PROSPECTIVE JUROR DAVIDSON:  Yeah.  I mean, just,

20   obviously, everything that's been in the media recently, I

21   think he is a little off his rocker on a personal level.  With

22   respect to laws or any laws he might have broken, I wouldn't

23   know, but not so much a fan.

24            THE COURT:  And are you speaking mainly of --

25   primarily of Tesla -- I mean, of Twitter?  His --
```

1      **PROSPECTIVE JUROR DAVIDSON:**  No.  I mean, just I think

2  his public behavior and his ego.

3      **THE COURT:**  And you say you think he's broken the law?

4      **PROSPECTIVE JUROR DAVIDSON:**  No, no, no.  I said I do

5  not know if he has.

6      **THE COURT:**  Oh, oh, oh.

7      **PROSPECTIVE JUROR DAVIDSON:**  But just on a personal

8  level, I think he's -- yeah.

9      **THE COURT:**  And does that stem from public statements

10  he's made or things he's done with respect to Twitter or Tesla

11  or other things?

12      **PROSPECTIVE JUROR DAVIDSON:**  Mostly everything.

13      **THE COURT:**  Everything?

14      **PROSPECTIVE JUROR DAVIDSON:**  Yeah.  I mean, just

15  everything you see in the media, I think he's -- his persona

16  has changed over the last few years.

17      **THE COURT:**  Okay.  So the change in the last few

18  years, that you think?

19      **PROSPECTIVE JUROR DAVIDSON:**  Yeah.

20      **THE COURT:**  Okay.  Would you say that your views of

21  him are strong?

22      **PROSPECTIVE JUROR DAVIDSON:**  Um, I don't know about

23  that.  I mean, I have formed opinions of him personally that

24  they could be changed if there was different facts.

25      **THE COURT:**  Okay.  Well, if you are seated in a -- as

1    a juror in this case, you would be instructed that you would

2    have to kind of start with a clean slate and you have to listen

3    to the evidence, the testimony, look at the documents, and --

4    and view only the evidence in this case, and then follow the

5    law as I'm going instruct the jury about what the law and the

6    rules are.

7         Do you think you -- notwithstanding your negative views

8    about Mr. Musk, and since he's a party in this case and a

9    possibility he may end up testifying, others will testify, that

10   you could judge the evidence fairly and base it solely on what

11   happens in this courtroom?

12             **PROSPECTIVE JUROR DAVIDSON:**  I do.

13             **THE COURT:**  And how confident are you about that?

14             **PROSPECTIVE JUROR DAVIDSON:**  I mean, I do believe

15   everyone has their own inherent biases, and I'm aware of those.

16   So, I tend to think more logically about things, so I would

17   obviously do my best.

18             **THE COURT:**  And everybody has inherent bias and I

19   appreciate your recognition of that.  And you may have an

20   inherent bias as we sit here right now about Mr. Musk, right?

21             **PROSPECTIVE JUROR DAVIDSON:**  Uh-huh.

22             **THE COURT:**  What is your strategy for kind of putting

23   that aside and being a juror if you were chosen as a juror in

24   this case?

25             **PROSPECTIVE JUROR DAVIDSON:**  It's really solely based

1    on the facts presented, right?  Like you either did or didn't

2    break the law, so it should be hopefully pretty crystal clear

3    from what these lawyers are presenting.

4          THE COURT:  Well, the evidence will come out and there

5    may be conflicting evidence and it may not be crystal clear.

6    Maybe there may be some gray areas about either what was done,

7    why it was done, what was in his mind and others' minds, so it

8    may be a little more subtle.  So if it's -- if you just pretend

9    for a moment that there's going to be some difficult decisions

10   you'll have to figure out, so difficult things you'll have to

11   resolve, because there's going to be a fair amount of evidence,

12   do you think you could do that if it's not just a

13   black-and-white situation?

14         PROSPECTIVE JUROR DAVIDSON:  I think so.

15         THE COURT:  And how confident are you about that?

16         PROSPECTIVE JUROR DAVIDSON:  Pretty confident.

17         THE COURT:  Okay.  So pretty confident, not certain

18   but pretty confident?

19         PROSPECTIVE JUROR DAVIDSON:  Yeah.  I mean, again, I

20   think we all have our own biases but I'm a firm believer of

21   innocent until proven guilty.

22         THE COURT:  Okay.  All right.  Follow-up questions?

23         MR. APTON:  Yes.  Ms. Davidson, hi.  I understand

24   that -- well, I remember, you just referred to Mr. Musk as

25   being off his rocker lately.  He's going to testify in this

 1   case, he's going to give his opinions.

 2        Are you going to be able to accept the testimony he gives

 3   as evidence and weigh it separate and apart from him

 4   potentially being off his rocker as of late?

 5             **PROSPECTIVE JUROR DAVIDSON:**  Um, yeah.

 6        **MR. APTON:**  So on your questionnaire you said you

 7   would be able to apply the law, receive the facts, open mind,

 8   act impartially.  Are you willing to do that going forward?

 9             **PROSPECTIVE JUROR DAVIDSON:**  Yeah.

10        **MR. APTON:**  And you're sure?

11             **PROSPECTIVE JUROR DAVIDSON:**  Yes.

12        **MR. APTON:**  Thank you.

13        **MR. SPIRO:**  May I, Your Honor?

14        **THE COURT:**  Yes.

15        **MR. SPIRO:**  You know, what we are trying to figure out

16   here -- and I appreciate your honesty -- is, you know, not

17   whether -- you seem like a fair person, you can be a fair

18   person -- but is this the right case and can you be fair in

19   this specific case, right?  And we're talking about -- his

20   Honor was talking about implicit bias and things, but this is

21   something that's not just, you know, implicit like you might

22   have some reaction to something.  This is somebody that you

23   know you don't like and have strong feelings about.

24        And so what my colleague on the other side is asking you

25   is sort of, if he were to testify, how would you react to that?

1   And, and this -- this -- the question is really if Mr. Musk was

2   to say something and somebody else was to say something,

3   right --

4          PROSPECTIVE JUROR DAVIDSON:  Uh-huh.

5          MR. SPIRO:  -- do you think that even 51 percent,

6   49 percent, you could come into this swaying at all, right?

7   Because if you're swaying, then this may not be the right case

8   for you.  And it may be impossible to give an unequivocal

9   assurance that you can be fair and impartial.

10      Do you think you can give an unequivocal assurance of

11  that, given your feelings about Mr. Musk?

12         PROSPECTIVE JUROR DAVIDSON:  That's a really valid

13  question.  I mean, I'd like to say yes and I believe I --

14  again, pretty logically minded, but then again, I do think

15  everyone has some inherent bias.  Granted, I mean, if you're

16  sworn under oath, you should not be lying, so unless there was

17  evidence to prove he was lying, then you would have to take him

18  on his word.

19         MR. SPIRO:  Well, I -- I appreciate you saying you

20  can't give an unequivocal assurance.  The question isn't even

21  necessarily, you know, black and white.  Again, back to that.

22         PROSPECTIVE JUROR DAVIDSON:  Yeah.

23         MR. SPIRO:  Is he lying, is he not lying.  But if a

24  couple of other witnesses said something different from him and

25  said, you know, he's only saying that because of some factor

1  that you already believe about him, don't you think that oath

2  or not, best you can do or not, you know, even if you're giving

3  your best, that you would -- you would be swayed ever so

4  slightly?

5           **PROSPECTIVE JUROR DAVIDSON:**  I mean, it's possible,

6  but if there's not evidence to support other people's

7  assertions, then, like, how do I know they're not lying?  So I

8  guess I'm not really giving you a great answer, but, yeah.

9           **THE COURT:**  So sounds like, in the end, you think you

10 can --

11          **PROSPECTIVE JUROR DAVIDSON:**  Yeah.

12          **THE COURT:**  You're not certain but you're -- I think

13 you used the word pretty -- what did you say -- you -- you're

14 pretty confident?

15          **PROSPECTIVE JUROR DAVIDSON:**  Yes.

16          **THE COURT:**  But not completely confident?

17          **PROSPECTIVE JUROR DAVIDSON:**  Correct.

18          **THE COURT:**  All right.  Thank you.  Appreciate it.

19          **PROSPECTIVE JUROR DAVIDSON:**  Thank you.

20     (Prospective Juror leaves the courtroom)

21          **THE COURT:**  Finally, Vicky, No. 150.

22          **THE COURTROOM DEPUTY:**  No. 150?

23          **THE COURT:**  Yeah.

24     (Prospective Juror enters the courtroom)

25          **THE COURT:**  Hi.

1          **PROSPECTIVE JUROR DOLRUEDEJ:**  Hello.

2          **THE COURT:**  Hi.  Thank you for coming in.  We just had

3    a couple of follow-up questions to ask you.

4          One of the things that was asked on the questionnaire is

5    your views about Tesla and about Mr. Musk.  And I think you

6    used the words that he was talented but crazy.

7          **PROSPECTIVE JUROR DOLRUEDEJ:**  Okay, yeah.

8          **THE COURT:**  So we want to get a little clarification

9    from you about what you meant that.

10         **PROSPECTIVE JUROR DOLRUEDEJ:**  Oh, okay.  So I think

11   the talented is clear.  He is obviously talented.  Tesla as a

12   good breakthrough for the EV technology.  Crazy is just, um,

13   talented -- I never see the person in that position, you know,

14   like a CEO, and kind of like doing some tweeting thing and

15   sometime kind of like a create -- it's nothing wrong, but for

16   something this big, I would expect something more professional

17   to handle, not really through the social media with a lot of

18   the, um -- sometime, what you say, a personal opinion kind of

19   thing.  And I think to me, the person, the social media is more

20   like for the professional life, and not -- oh, I mean, for the

21   personal life, not the professional life.  And I think that

22   what I meant.

23         **THE COURT:**  All right.  So the fact that he's saying

24   things about -- business things by tweet as opposed to a formal

25   process, that's unusual in your view?

1      **PROSPECTIVE JUROR DOLRUEDEJ:**  Yes.  And also the

2  content, right.  I mean, if it's -- I mean, when you read it,

3  you can tell right away whether this is, like, a professional

4  message or just the personal view.  Or the -- more like a

5  formal thing, yeah, like that what I mean.

6      **THE COURT:**  So as you know, this case is about tweets

7  that the -- that one side, the plaintiff claims was misleading

8  and -- and had an effect on the market.  And there may be some

9  question about whether the board, for instance, of Tesla is

10  responsible in one way or another.

11      **PROSPECTIVE JUROR DOLRUEDEJ:**  Uh-huh.

12      **THE COURT:**  Does that, your view of how Mr. Musk has

13  been using Twitter and his, I guess, casualness in using that,

14  would that color your views in a way that would prevent you

15  from listening to the evidence and only listening to the

16  evidence in this courtroom and judging that fairly and

17  neutrally?  Or do you think that might affect the way you hear

18  the evidence, see the evidence and maybe the way you might see

19  this case?

20      **PROSPECTIVE JUROR DOLRUEDEJ:**  Honestly I don't know.

21  I would think that, I mean, without evidence, I probably can be

22  neutral.  And honestly, I answer that questionnaire and --

23  because after I answer the questionnaire, I figure out that

24  this probably about this case, then I kind of like search up

25  the news and some across this news.  I didn't know about this

 1  case before, but I think I can try to be neutral and fair.

 2         THE COURT:  So you think you can try to be, which I

 3  appreciate, because that's what we ask of people but how

 4  confident would you be?  Are you certain you could be neutral?

 5  Or do you have some doubt?

 6         PROSPECTIVE JUROR DOLRUEDEJ:  Personal view, I still

 7  think the social media is not probably the outlet to handle the

 8  professional thing.  That I think -- I mean, with the way I

 9  work, I can get news right out and try to be -- and be neutral,

10  yeah.

11         THE COURT:  So you can try to be neutral.

12         PROSPECTIVE JUROR DOLRUEDEJ:  Yeah.

13         THE COURT:  But there's a chance you may not be able

14  to?

15         PROSPECTIVE JUROR DOLRUEDEJ:  I try my best.

16         THE COURT:  Okay.  All right.  Follow-up?

17         MR. APTON:  Yes.  What we're looking for is a juror

18  who is confident that they can act impartially, who's confident

19  that they can see the facts now as they are presented and not

20  be influenced by what they may have learned prior to coming

21  here.

22      And so prior to coming here today, are you aware of

23  Mr. Musk engaging in any important business transactions over

24  Twitter?

25         PROSPECTIVE JUROR DOLRUEDEJ:  Not in this particular

 1   case.

 2          **MR. APTON:**  Okay.

 3          **PROSPECTIVE JUROR DOLRUEDEJ:**  Not in this particular

 4   case.  But, I mean -- I mean, the news with Mr. Musk and

 5   Twitter is kind of on and off, on and off for quite some time,

 6   so I kind of see that sometime.  But not in this particular

 7   case.

 8          **MR. APTON:**  So this case has nothing to do with

 9   Mr. Musk's management of Twitter.  This case is about a tweet

10   that he made four and a half years ago.  Are you sure, are you

11   confident -- and that's what we need to know -- are you

12   confident that you will be able to assess the evidence fairly

13   and apply the law accurately and be impartial?

14          **PROSPECTIVE JUROR DOLRUEDEJ:**  Yeah, I think I can.

15          **MR. APTON:**  Okay.  Is -- I mean, that's -- on this

16   scale of confidence, we've seen some answers that vary.  On a

17   scale of 1 to 10, where would you rate yourself?  10 being,

18   yes, I can absolutely do it, no question about it,

19   unequivocally; 1 being I definitely can't do it.

20          **PROSPECTIVE JUROR DOLRUEDEJ:**  I think what I'm trying

21   to say is when I know that the bias kick in, I would try to

22   recalibrate myself and be fair.  Put it that way.  I'm not

23   going to say that I'm not going to have a bias at all

24   whatsoever, because it's kind of like the way I view things for

25   so many years and I don't want to lie here, but what I can do

```
 1    is when that thing kick in, I would try to realize and
 2    recalibrate myself back.
 3              MR. APTON:  Okay, thank you.
 4              PROSPECTIVE JUROR DOLRUEDEJ:  Uh-huh.
 5              THE COURT:  Thank you.
 6              MR. SPIRO:  Is it necessary to ask follow-up
 7    questions?
 8              THE COURT:  I'll let you ask a couple.  Yeah.
 9              MR. SPIRO:  Okay.  It's -- thank you for coming in,
10    thanks for being so honest, we appreciate it.  We are trying to
11    get a fair jury here.  And, you know, part of that is not
12    coming in to the case with any views, right?  Because those
13    views could then affect your judgment of the case.  Because,
14    you know, we're not -- people are not robots.  It's hard to
15    leave everything on the outside.
16        It sounded to me from your questions and answers with His
17    Honor that you have, you know, strongly held views that the way
18    that he uses Twitter for business is not the appropriate way to
19    do that.  Is that fair?
20              PROSPECTIVE JUROR DOLRUEDEJ:  I think that's fair, for
21    my personal view, yeah.
22              MR. SPIRO:  Okay.  That's exactly -- that's a lot to
23    do with what this case is about.  Do you understand?
24              PROSPECTIVE JUROR DOLRUEDEJ:  Uh-huh.
25              MR. SPIRO:  Yeah, so is it your feeling -- and I think
```

1  you have already said this -- that it's probably not the

2  easiest case for you to be fair and impartial on because you

3  already hold those views, that maybe in a different case that

4  you didn't have a previous view on would be easier?

5          **PROSPECTIVE JUROR DOLRUEDEJ:**  That's probably fair,

6  yeah.

7          **MR. SPIRO:**  So you can't give, right, and you haven't

8  given -- you can't be positive that those -- since you have the

9  views about his use of Twitter in business, that that won't

10 impact you here.  You can't be positive of that?

11         **PROSPECTIVE JUROR DOLRUEDEJ:**  Like I said, I probably

12 have some bias.  If I get picked and have to do this, all I can

13 do is just remind myself and recalibrate and look at the

14 evidence and try to be fair.  I mean, I -- my personal view is

15 one thing, but I don't say that my personal view is the way to

16 go.  So I respect that different people do different thing, so

17 that is what I just remind myself.  And, I mean, that's true

18 for anything in life, anyway.

19         **MR. SPIRO:**  Thank you very much.

20         **THE COURT:**  All right.  Thank you, I appreciate that.

21 Thank you very much.

22     (Prospective Juror leaves the courtroom)

23         **THE COURT:**  Okay.  We've kept the rest of the pool

24 waiting.  And rather than discussing taking challenges, I think

25 we have the information.  I want to bring the pool back and see

1    if you have any follow-up questions with anybody else.  And --

2    and then -- and then I think we will be in a position, unless

3    there's some -- a couple of follow-ups we still may need, like

4    the -- on one or two of them where I think we would be in

5    position to then take a break to take challenges for cause and

6    then exercise your peremptories.

7         So, if everybody's still there, like them to come back.

8    And I'm going to excuse some of them.  There's about eight of

9    them I will excuse.

10           **THE COURTROOM DEPUTY:**  Correct.

11           **MR. APTON:**  Judge, approximately how much time do we

12   have?

13           **THE COURT:**  How much time do we have?

14           **MR. APTON:**  For voir dire?

15           **THE COURT:**  Well, I'm going to give you 15 minutes

16   each at this point because we've been through a lot already.

17        (The following proceedings were held in the presence of

18   the jury venire.)

19           **THE COURT:**  Okay.  First of all, let me thank you for

20   your patience.  The process took a little longer than we

21   thought so I'm sorry to keep you waiting.  And again,

22   appreciate your cooperation.  At this point there are a number

23   of you that I'm going to thank and excuse and ask you to report

24   back to the jury office to let them know you've been relieved

25   of serving in this case.  So I'll read out that list.

1      Juror No. 8, Ms. Liu, thank you for your service and good

2  luck.

3      Ms. Jahan, thank you.  Report to the jury administrator.

4      Juror No. 31 I think we've already excused, Ms. Gomez, she

5  did have that plane to catch.

6      Juror No. 44, Ms. Nuku, thank you.  Thank you for your

7  service.  You can go to the jury room and report back.

8      Juror No. 49, Ms. De La Cruz.

9          **PROSPECTIVE JUROR DE LA CRUZ:**  Thank you.

10         **THE COURT:**  Thank you.

11     Juror No. 101, Ms. Xu, you are excused, thank you.  Thank

12 you for your service and good luck.

13     Juror No. 114, Ms. Kumar, thank you.

14     Let's see.  127 and 128 aren't here, right?  Right.

15 They're not here.  Okay.

16     And, okay, those are the ones for now.  The rest of you

17 are still with us.  We hope to complete this process pretty

18 quickly now.  This is the point at which the attorneys will

19 have a chance to ask some questions to the rest of you, and we

20 are going to start with the plaintiffs.  If you have some

21 questions, I'll give you 15 minutes.

22         **MR. APTON:**  Thank you, Judge.

23     Again, my name is Adam Apton.  I represent the plaintiff

24 here.  And I want to ask you a few of you questions.  I won't

25 be able to ask all of you questions, nor would you want that.

 1   But let me try to move through as quickly as possible.  And if

 2   you can't hear me, and/or if you want me to speak up, just ask

 3   me.  Okay?

 4           THE COURT:  You can remove your mask for purposes of

 5   speaking.  Thank you.

 6           MR. APTON:  Thank you, Your Honor.

 7       First, is there Mr. Buckley?

 8           PROSPECTIVE JUROR BUCKLEY:  Yes.

 9           MR. APTON:  How are you, sir?

10           PROSPECTIVE JUROR BUCKLEY:  Good.

11           MR. APTON:  Mr. Buckley, I understand, based on your

12   questionnaire -- sorry, based on your --

13           THE COURT:  Which number?  Could you give us the

14   number.

15           MR. APTON:  45.

16           THE COURT:  All right.  Thank you.

17           MR. APTON:  Based on your questionnaire, you may be

18   having some difficulties at home right now?  And I just wanted

19   to know if that was a problem for you in terms of time

20   constraints in the next three weeks?

21           PROSPECTIVE JUROR BUCKLEY:  No, it isn't.

22           MR. APTON:  And follow-up question.  On your

23   questionnaire you did indicate that you had potentially

24   difficulty serving on the jury based on a work situation

25   earlier when we were talking.  And then you seemed to change

1  your mind during the course of that questioning.  I just wanted

2  to know a little bit more information as to why, why you

3  changed your mind.

4       PROSPECTIVE JUROR BUCKLEY:  This might be historical,

5  we'll wait and see.  If I'm in a -- if I'm sitting on the

6  sidelines in history, I would like to be -- I'd like to be

7  there, if possible.

8       MR. APTON:  And do you view this case as -- I don't

9  know -- making history, I guess?

10      PROSPECTIVE JUROR BUCKLEY:  It might.

11      MR. APTON:  And why do you say that?

12      PROSPECTIVE JUROR BUCKLEY:  Well, it involves so many

13  different things.  Social media, a major corporation,

14  securities, a lot of things going on here.

15      MR. APTON:  I understand.  And do you, yourself, use

16  social media?

17      PROSPECTIVE JUROR BUCKLEY:  I do -- well, a little bit

18  of Facebook but not -- not that much.

19      MR. APTON:  Understood.  Okay.  Thank you, sir.

20      PROSPECTIVE JUROR BUCKLEY:  You are welcome.

21      MR. APTON:  Appreciate that.

22    Is there a Mr. Marshall?

23      PROSPECTIVE JUROR MARSHALL:  Right here.

24      MR. APTON:  How are you, sir?

25      PROSPECTIVE JUROR MARSHALL:  Hi.

 1            MR. APTON:  Nice to see you.

 2            PROSPECTIVE JUROR MARSHALL:  Yes.

 3            MR. APTON:  I understand that you have an IRA, based

 4    on your questionnaire?

 5            PROSPECTIVE JUROR MARSHALL:  Say that again?  I'm

 6    sorry.

 7            MR. APTON:  That you have an IRA or a retirement fund?

 8            PROSPECTIVE JUROR MARSHALL:  Yes.

 9            MR. APTON:  And in your IRA you own an index fund, you

10    have shares in an index fund, and you are under the impression

11    that that index fund has Tesla in it, is that right?

12            PROSPECTIVE JUROR MARSHALL:  Well, it's an index fund

13    that follows, I think, the Standard & Poor 500 or -- so, yeah,

14    I'm sure it has some Tesla.

15            MR. APTON:  I see.  But you don't know how much or how

16    it's weighted?

17            PROSPECTIVE JUROR MARSHALL:  No, it basically tracks

18    the stock market.

19            MR. APTON:  I understand.  And, I have to ask, you

20    listed as one of your news sources was the Doug Jones Report.

21    Is that right?

22            PROSPECTIVE JUROR MARSHALL:  The what?

23            MR. APTON:  The Doug Jones Report?

24            PROSPECTIVE JUROR MARSHALL:  Doug Ross.

25            MR. APTON:  Doug Ross, excuse me.  Can you tell me

1    about that?

2             PROSPECTIVE JUROR MARSHALL:  Oh, it's -- it groups

3    various news media from both left and right, a selected -- you

4    know, like, things like *The Hill*, *Wall Street Journal*, *The*

5    *Post*, *The Washington Post*.  A whole bunches of news sources and

6    subject matter.

7             MR. APTON:  And so you appreciate that it provides you

8    with content from both sides, is that right?

9             PROSPECTIVE JUROR MARSHALL:  Yes, uh-huh.

10            MR. APTON:  And if selected to serve on this jury,

11   would you do that, you would look at both sides equally?

12            PROSPECTIVE JUROR MARSHALL:  Oh, yeah, uh-huh.

13            MR. APTON:  And not give anyone an edge, so to speak?

14            PROSPECTIVE JUROR MARSHALL:  Oh, no disproportionate.

15            MR. APTON:  How are you able to say that with such

16   definitiveness?

17            PROSPECTIVE JUROR MARSHALL:  Well, I know my mind and

18   I feel like I'm pretty responsible and open-minded.

19            MR. APTON:  I understand.  Thank you.  Thank you.

20       I'm going to move on.  Ms. Yonan?

21            THE COURT:  Which number?

22            MR. APTON:  36.

23       How are you?

24            PROSPECTIVE JUROR YONAN:  Good, how are you?

25            MR. APTON:  Good, thank you.  So I have a question.  I

```
 1  understand you work at TJ Maxx?

 2          PROSPECTIVE JUROR YONAN:  Actually, Ross Dress for

 3  Less.

 4          MR. APTON:  I'm sorry?  Oh, Ross.

 5          PROSPECTIVE JUROR YONAN:  Ross, yeah.

 6          MR. APTON:  And you have shifts there?

 7          PROSPECTIVE JUROR YONAN:  I do.  I'm a store manager

 8  so it's any time.

 9          MR. APTON:  Okay.  And what is your plan for the next

10  three weeks?

11          PROSPECTIVE JUROR YONAN:  Well, I just found out that

12  my assistant during our lunch will be going on an LOA, so a

13  leave of absence, due to some family stuff.  So the original

14  plan was for her to take over for the next few weeks while this

15  is all happening, but now that I just got that call, I'm going

16  to see if I can have other arrangements made, but I don't think

17  my boss will be able to do that, unfortunately.

18          MR. APTON:  I understand.  And are you aware of

19  whether Ross pays for -- will pay you while you're on jury

20  service?

21          PROSPECTIVE JUROR YONAN:  I'm not sure, actually.  My

22  boss was going to find that out for me, but as far as I'm

23  aware, no.

24          MR. APTON:  Okay.  And if you did have to cover shifts

25  in the afternoon, because we end at 2:00, you live where again?
```

1        **PROSPECTIVE JUROR YONAN:**  Bay Point, Pittsburg area.

2        **MR. APTON:**  How long did it take you to get here

3    today?

4        **PROSPECTIVE JUROR YONAN:**  Well, I left really early so

5    I missed the traffic, but it took me about like 30 to 45

6    minutes or so.

7        **MR. APTON:**  And if you have to go back after court?

8        **PROSPECTIVE JUROR YONAN:**  I will probably be hitting

9    traffic so maybe over an hour, to an hour 15.

10       **MR. APTON:**  Do you think it might be a problem for you

11   to be on this jury, given your work situation?

12       **PROSPECTIVE JUROR YONAN:**  Possibly, because sometimes

13   my managers leave at 2:00 and then I have some managers that

14   leave at 3:00 or 3:30, so I'll either be cutting it close or I

15   will be getting there as soon as they're leaving.

16       **MR. APTON:**  Okay.  Thank you.

17       **PROSPECTIVE JUROR YONAN:**  Uh-huh.

18       **THE COURT:**  So let me ask, Ms. Yonan, bottom line is,

19   is there a possible that you would not be able to serve given

20   what's happened with your assistant manager?

21       **PROSPECTIVE JUROR YONAN:**  I'll be finding out more

22   information probably later, in the next few hours, but as far

23   as I'm aware, my boss is trying to figure out if he can get

24   somebody to cover my store.

25       **THE COURT:**  So you won't know -- the problem is we're

```
 1   going to be --
 2            PROSPECTIVE JUROR YONAN:  Yeah, I know.
 3            THE COURT:  So as you sit here right now, what is the
 4   chance that the boss -- that you are going to be needed?
 5            PROSPECTIVE JUROR YONAN:  Yeah, probably, most likely
 6   I will be needed.  He'll be --
 7            THE COURT:  Most likely you'll be needed?
 8            PROSPECTIVE JUROR YONAN:  Yeah.
 9            THE COURT:  And the hours of this Court doesn't allow
10   you to get back in time?
11            PROSPECTIVE JUROR YONAN:  No, not necessarily, no.
12            THE COURT:  Okay, thank you.
13            PROSPECTIVE JUROR YONAN:  Uh-huh.
14            MR. APTON:  Mr. Sharma, how are you?
15            THE COURT:  Juror number, please?
16            MR. APTON:  32, Your Honor.
17            THE COURT:  Thank you.
18            MR. APTON:  Mr. Sharma, so one thing we are trying to
19   do today with you all is make sure that whomever is on our jury
20   will be able to assess the facts fairly.  And you saw the
21   video, you went through the orientation.
22        There was a comment on your questionnaire, you described
23   -- excuse me -- Elon Musk as a fast-rising businessman, and I
24   wonder if you could tell me a little bit about why you think
25   that.
```

1        **PROSPECTIVE JUROR SHARMA:**  Just a general impression.

2 I mean, I don't follow much on social media about rich and

3 famous but just came across, and I know I saw a documentary a

4 long time back where he pretty much rose from, you know, from

5 the grass roots.

6        **MR. APTON:**  Uh-huh.

7        **PROSPECTIVE JUROR SHARMA:**  So that was my general

8 impression.  Nothing more than that.

9        **MR. APTON:**  Would you say in that regard you have some

10 respect or admiration for him?

11        **PROSPECTIVE JUROR SHARMA:**  I -- I don't know in the

12 context of the case, I won't be able to comment on that,

13 because, um, everyone has their good and bad side.  But I won't

14 say like any admiration, I would get an admiration for somebody

15 just because he's rich or something like that.

16        **MR. APTON:**  Uh-huh.

17        **PROSPECTIVE JUROR SHARMA:**  Yeah.

18        **MR. APTON:**  I want to make sure that your personal

19 opinions about Musk will not influence the way you see or hear

20 his testimony, that you won't give him an edge or you won't let

21 his rise, as you put it, from grass roots, regardless of

22 whether that's true or false, but your understanding of how he

23 came to where he is, that you won't let that influence you, you

24 won't let it color your perception of the testimony.  And if

25 you do, that's okay, this isn't the right case for you, then.

1    So --

2                **PROSPECTIVE JUROR SHARMA:**  No, it won't.  It won't

3    color, I promise.  Yeah.

4           **MR. APTON:**  Okay.  Thank you.

5        If we could please speak with Mr. Daing, number 68.

6                **PROSPECTIVE JUROR DAING:**  Hi.

7           **MR. APTON:**  Hello.  How are you, sir?

8                **PROSPECTIVE JUROR DAING:**  Pretty good.  Yourself?

9           **MR. APTON:**  Pretty good, thank you.  So your -- if I

10   remember correctly, on your questionnaire, similar to

11   Mr. Sharma, you referred to Musk as a smart, successful

12   pioneer.  So I want to see if, given what you know or what

13   you've read about Mr. Musk, if that's going to influence the

14   way you see his testimony or hear his testimony and how much

15   importance you give it.

16               **PROSPECTIVE JUROR DAING:**  It's irrelevant, really.

17          **MR. APTON:**  Why do you say that, sir?

18               **PROSPECTIVE JUROR DAING:**  Impressions about him being

19   a successful rich person is obvious, everybody knows that.  But

20   the merits of the case will have to be decided on principle.

21          **MR. APTON:**  And the facts too, of course.

22               **PROSPECTIVE JUROR DAING:**  Of course.

23          **MR. APTON:**  So there are a number of facts in this

24   case, some are complex.  I understand that you have concerns

25   about being out from work.  Would those concerns distract you

1    at all or interfere with your ability to pay close attention to

2    the evidence?

3            **PROSPECTIVE JUROR DAING:**  Only to the extent that if

4    it's so unpredictable, I don't know if I'll get a call right

5    here and now, or it may not happen at all.  Like it hasn't

6    happened all day today, so far.  So --

7            **MR. APTON:**  Yeah.  What if you are not able to have

8    your phone while you're in the jury box?  Or you're not able to

9    look at it?

10           **PROSPECTIVE JUROR DAING:**  Um, depends on the urgency

11   of the issue, how urgently it need to be tackled.  If somebody

12   wants an advance against his pay, that can wait.  But if it's a

13   customer-related issue or a mechanical issue or stuck -- as I

14   explained earlier, it's just so unpredictable, there is no way

15   of knowing what might come up.

16           **MR. APTON:**  So does that give you uncertainty as to

17   whether you're going to be able to serve on this jury for the

18   full three weeks?

19           **PROSPECTIVE JUROR DAING:**  To the extent, that, you

20   know, again, I don't know if I'm going to get a call, it

21   doesn't happen every day, it hasn't happened all day today so

22   far, so there is no real way to answer that question.

23           **MR. APTON:**  Understood.  Thank you.

24           **THE COURT:**  If I could ask one follow-up question.  I

25   understand that, you know, you want to be on call for obvious

1  reasons, but I think the rule is during the trial time, during

2  that 90-minute segment, we all have to turn our phones off.

3  You can turn it on during a break, every 90 minutes you will

4  get a break and you can -- is that okay with you?

5          **PROSPECTIVE JUROR DAING:**  Possibly.  Most -- more than

6  likely, yes.

7          **THE COURT:**  Okay.  Well, you'll have to follow the

8  rules, so I guess the question is --

9          **PROSPECTIVE JUROR DAING:**  Yes.  If I put the phone

10  away for 90 minutes, I have to tell them that I'm not

11  accessible for 90 minutes, this is an alternate solution,

12  depending on the issue.  I really can't predict.

13          **THE COURT:**  Okay.  But you could follow my rule about

14  putting the phone away for 90 minutes?

15          **PROSPECTIVE JUROR DAING:**  Sure.

16          **THE COURT:**  All right.  Thank you.

17      **MR. APTON:**  Appreciate it.

18      If I could speak with, please, Mr. Amur, No. 81.

19      How are you?  Good afternoon.

20          **PROSPECTIVE JUROR AMUR:**  Thank you.

21      **MR. APTON:**  Mr. Amur, when you were speaking earlier,

22  you had said, if I remember correctly, that the ruling in this

23  case could potentially affect you personally, negatively,

24  because of your work in the EV industry.

25          **PROSPECTIVE JUROR AMUR:**  Yeah, that's correct.

1          **MR. APTON:**  Regardless of -- putting aside whether

2    that would actually happen or whether you are just scared that

3    it would, how would you go about preventing that fear from

4    influencing how you view the evidence, if you can?

5          **PROSPECTIVE JUROR AMUR:**  I think it would be in the

6    back of my mind but I'll try to push it away, but just wanted

7    to be honest.

8          **MR. APTON:**  Sure, no, it's a valid concern from your

9    perspective.  So, how confident are you that you could hear the

10   testimony and -- and if you do, in fact, at the end of the

11   case, think that the plaintiffs deserve to win, so to speak,

12   can you or will you be able and how confident are you that you

13   will be able to rule in the plaintiff's favor?

14         **PROSPECTIVE JUROR AMUR:**  I am not sure.

15         **MR. APTON:**  Okay.  It sounds like you do want to

16   fulfill your jury service but perhaps this case might not be

17   the one for you?

18         **PROSPECTIVE JUROR AMUR:**  That's correct.

19         **MR. APTON:**  Understood.  Thank you, sir.

20         **THE COURT:**  I'm going to give you three more -- I'm

21   going to extend your time, but three more minutes.

22         **MR. APTON:**  Okay.  I do have a question for

23   Ms. Bransfield.

24         **THE COURT:**  No. 74.

25         **MR. APTON:**  74.

 1              **THE COURT:**  Okay.

 2              **MR. APTON:**  Ms. Bransfield, how are you this

 3    afternoon?

 4              **PROSPECTIVE JUROR BRANSFIELD:**  Doing great.  Thank

 5    you.

 6              **MR. APTON:**  Okay.  I understand that -- do you have

 7    any experience with class actions?

 8              **PROSPECTIVE JUROR BRANSFIELD:**  Just a little.  A

 9    former employer was in a class action lawsuit.

10              **MR. APTON:**  And which employer was that?

11              **PROSPECTIVE JUROR BRANSFIELD:**  Encore Marketing.

12              **MR. APTON:**  Encore.  And were you named as a defendant

13    in that case?

14              **PROSPECTIVE JUROR BRANSFIELD:**  No, I don't believe so.

15              **MR. APTON:**  Were you involved in discovery?

16              **PROSPECTIVE JUROR BRANSFIELD:**  I did do a deposition.

17    Never went to trial.

18              **MR. APTON:**  And do you recall the name of the -- the

19    firm that represented Encore?

20              **PROSPECTIVE JUROR BRANSFIELD:**  Mike Cherry was the

21    attorney.  I do not remember the firm.  Out of the Chicago.

22              **MR. APTON:**  Were you deposed?

23              **PROSPECTIVE JUROR BRANSFIELD:**  Yes.

24              **MR. APTON:**  How was that experience?

25              **PROSPECTIVE JUROR BRANSFIELD:**  It was interesting.

1            **MR. APTON:**  Okay.  Given your experience in that

2    process, how are you feeling about potentially sitting on the

3    jury in this case?

4            **PROSPECTIVE JUROR BRANSFIELD:**  Um, I think I have some

5    experience in it so I kind of understand both sides.

6            **MR. APTON:**  So, are you able to -- what experience is

7    that?  Are you talking about the class action lawsuit?

8            **PROSPECTIVE JUROR BRANSFIELD:**  Yeah.

9            **MR. APTON:**  Yes.

10           **PROSPECTIVE JUROR BRANSFIELD:**  Also, you know, just

11   some of the things that are being brought up, having been a

12   broker at SEC.

13           **MR. APTON:**  Okay.  So separate and apart from what you

14   know, the laws at issue here relate to the Securities Exchange

15   Act of 1934 and particular provisions relating to

16   misrepresentations and fraudulent statements.  Do you have

17   experience with those particular laws?

18           **PROSPECTIVE JUROR BRANSFIELD:**  No.

19           **MR. APTON:**  So would you be able to put your other

20   legal experience aside and start fresh, completely clean slate,

21   going forward in this case?

22           **PROSPECTIVE JUROR BRANSFIELD:**  Absolutely.

23           **MR. APTON:**  Okay.  And I have to ask, on your

24   questionnaire, you -- you say that class actions are horrible.

25   Why do you say that?

1          **PROSPECTIVE JUROR BRANSFIELD:**  I just believe in tort

2    reform.  So again, I just believe in personal class -- personal

3    actions, not so much classes or groups that are suing

4    individuals or companies.

5          **MR. APTON:**  So your comment relates to class actions

6    like securities frauds class actions?

7          **PROSPECTIVE JUROR BRANSFIELD:**  No, not securities.

8          **THE COURT:**  If you can bring the mic closer.

9          **PROSPECTIVE JUROR BRANSFIELD:**  Yeah, I'm just saying

10   in just general class action lawsuits.

11         **THE COURT:**  And I think the answer is, is you weren't

12   applying that to securities class actions?

13         **PROSPECTIVE JUROR BRANSFIELD:**  Yeah, I'm not tying the

14   two together.

15         **THE COURT:**  Okay.

16         **MR. APTON:**  So in this case, if let's say you are on

17   the jury and the jury does find liability against the

18   defendants --

19         **PROSPECTIVE JUROR BRANSFIELD:**  Uh-huh.

20         **MR. APTON:**  -- and the plaintiffs are requesting a

21   sizable damages amount, would you have any reservations in

22   awarding that if you thought it was the fair thing to do?

23         **PROSPECTIVE JUROR BRANSFIELD:**  No, I would go by the

24   Court's instructions.

25         **MR. APTON:**  Thank you.

 1           **PROSPECTIVE JUROR BRANSFIELD:**  Sure.

 2           **MR. APTON:**  Your Honor, mindful of the time, I don't

 3    have any further --

 4           **THE COURT:**  All right.

 5           **MR. APTON:**  -- right now.

 6           **THE COURT:**  Twenty minutes, so I'm going to give 20

 7    minutes to the other side as well.

 8           **MR. SPIRO:**  Good afternoon, everybody.  I know it's

 9    been a long day so I'm going to get right to it.  I'm going to

10    ask you all for the same thing that you did on your

11    questionnaires, which is simply for brutal honesty.  Right?

12    That is all that this is about.

13         This is a serious case.  As my colleague on the other side

14    just said, it is a securities fraud case.  These are serious

15    matters and we need to make sure that we get this right, and we

16    need to make sure that we have a fair and impartial jury.  And

17    something else that my adversary said that I agree with is that

18    if this case isn't right for you, there might be another case,

19    this is the time.  Once the doors close and you are on the

20    jury, it's too late to come back and say: You know, I harbor

21    this feeling.  It would be unfair.  It would be too late for

22    that.  This is the time.  And so, let's jump right in.

23         The -- the questionnaires that you filled out, you know,

24    made you swear sort of around oath that you gave accurate

25    answers; there were a lot of important questions on that.  You

1  know, you may remember -- I don't know if you remember

2  Mr. Martinez, the question about making split-second decisions

3  in life.  You know, when something can happen quickly,

4  everybody remember that question?  That was an important

5  question.  There were a lot of important questions on there.

6  And I assume that everybody doesn't have anything that they

7  need to change or tell us, that we can count on your answers to

8  those questions and that we can count on them when selecting a

9  fair and impartial juror.

10       You know, I don't want to sort of, you know, hide the lede

11  here.  This case involves Mr. Musk and people have feelings

12  about Mr. Musk.  And so, you know, some people on the form, you

13  know, they said "no comment."  You know, I don't know if that's

14  like a sports -- like, you know, sometimes a sports guy, "no

15  comment," but he wants to say something but didn't say -- you

16  know, and some folks -- you know, Mr. Margoulis (sic), not

17  going to put you on the spot, Juror No. 46, but you shared

18  that, you know, you're in an industry related to something he's

19  working on so you're in, you know, like -- I don't know whether

20  it's, you know, group discussions or whatnot but you're privy

21  to information, you know, and if you need to share something,

22  you can also ask to share something at the bench, you don't

23  have it to do it out loud.  But if there's something that

24  you've learned and experienced that you feel you bring with you

25  into the courtroom, right, that would not allow you to be

1    perfectly, fair, even, right, not leaning or swaying to one

2    side, this is the time because you're going to have to judge

3    credibility and -- and who's being more accurate and things

4    like that.  So, you really have to be very forthright with us

5    at this time.

6         So, what I'm basically asking is if you have something,

7    that you bring it to our attention.  And that you commit to us

8    that you come into this without bias, implicit bias, swaying of

9    any kind because of the ways that you feel about Mr. Musk and

10   can sort of -- I'm not going to have time and it's late in the

11   day to go through everybody, but -- but everybody who sits and

12   I'm sort of looking out at the room, I'm not trying to ignore

13   this group (Indicating) but it's dissipated a little, of folks

14   out here -- can everybody commit to that, right?

15        So I'm sort of looking around for head nods and assurances

16   and eye contact to just sort of say can you commit, right?

17   Because the system only works if everybody agrees with that,

18   right?  It only works if everybody is fair.  So I'm taking

19   everybody who's sort of nodding and looking at me that they can

20   commit to that.

21        So one of the things I want to jump into is, you know,

22   you're going to be told to assume in this case that a couple of

23   Mr. Musk's tweets, you know, when he -- you know, sort of

24   short-form statements that he made, are -- were inaccurate,

25   were untrue.  And so in this trial, you are going to be asked

1   to decide -- not that question.  You assume that question.

2   They were untrue, they were inaccurate.  You're going to be

3   asked to decide whether in the context in which they were made,

4   were they important to a reasonable investor in buying and

5   selling securities.  Right?

6        So what I have to ask you is, you know, once -- I am now

7   telling you, assume that they are untrue and inaccurate.  Does

8   anything -- does learning that make you think, you know, I'm

9   going to have a hard time, right?  So you have to be honest

10  with yourself.  I can't peer into your mind, hearts and souls.

11  You have to be honest with yourself.  If I'm telling you that

12  and you are going to assume that, is that something that you

13  think is going to cause you to have a hard time listening to

14  the judge's other instructions?  It's an untrue statement.  I

15  now feel differently.  I feel now, you know -- I know it's

16  untrue; I'm going to have a hard time hearing the rest of the

17  evidence because I know he said something that is inaccurate.

18       Does anybody feel that way?  Right?  You don't have to be

19  shy.  I mean, it's going to be hard for the first person to

20  raise their hand, but if you feel that you would have a hard

21  time listening to what this case is about, right, which is

22  essentially, right, with the way that securities law works, is

23  would the real state of affairs, right, have been different

24  than what he said inaccurately in the short-form tweet.  Right?

25  So that's what you're here to -- that's a big part of what you

1    are here to decide.

2        So the question is, is there anyone here that thinks:  Now

3    that I've heard that one of his tweets is untrue, inaccurate,

4    that I can't keep an open mind to hear the rest of the case?

5        (No response)

6            **MR. SPIRO:**  Okay.  So I'm going to take everybody --

7    and I'm going to ask everybody to commit to me that when you

8    are told to assume that, that that is not going to make it so

9    that you can't sit and be fair and impartial about the rest of

10   the case.  And so I'm going to sort of look around and sort of

11   see if everybody can commit that to me.  Can you commit to me

12   to follow the law and answer the question presented to you,

13   even when you found out, which I'm telling you, assume it's

14   untrue, can you do that?

15       (Some Prospective Jurors nod heads.)

16           **MR. SPIRO:**  And I'm looking at the front row.  And

17   over here, can everybody commit?

18           **PROSPECTIVE JUROR L. YOUNG:**  I guess if I understand

19   you correctly, you are saying --

20           **THE COURT:**  Well, let's -- we need to get your name

21   and number and get you the microphone, so if you could tell us

22   your name and jury number.

23           **PROSPECTIVE JUROR L. YOUNG:**  Yes, I'm Juror No. 110.

24   My name is Lucian Young.

25       To understand your point completely, are you saying that

1  if I tell you it's untrue, that's what we have to believe?  Or

2  are you saying is if you see this statement, you interpret it,

3  as is?  Just so I understand you correctly.

4      **MR. SPIRO:**  I'm telling you that in this case you're

5  going to be told to assume that it's not true.  Right?  You're

6  going to be told the tweet is not true.  It is not technically

7  accurate.

8      **PROSPECTIVE JUROR L. YOUNG:**  But it's a tweet.  It

9  says what it says, right?  So you have to take it by face

10  value, it's what it says.  If somebody tweeted "I went to the

11  store," you take it as:  I went to the store.  So, whatever is

12  tweeted, are you telling me not to interpret it, but just say

13  it's not true?

14      **MR. SPIRO:**  I'm telling that it's -- to assume that

15  it's not true, the person didn't go to the store in your

16  example, right, and to assume that that's not true.  But keep

17  your -- just because they said something that turned out to be

18  in that short-form tweet technically inaccurate, can you keep

19  your open mind and decide the case about what it's about?

20      So, some people could say, right:  Well, now that I know

21  that that person tweeted something untrue, my mind is closed.

22  That's untrue, that's wrong, I'm done here.

23      **PROSPECTIVE JUROR L. YOUNG:**  If the courts are saying

24  that it's untrue and they made that determination, then I

25  believe so.

1          **MR. SPIRO:**  So, right.  So let's use a real-world

2     example, right.  In your store -- let's say somebody tells you

3     it's raining outside.  Right?  You should get a jacket.  Let's

4     say that wasn't true.  You learn it wasn't true.  The person,

5     they were wrong.  They were incorrect, inaccurate, untrue.  But

6     it was snowing outside.  Right?  The question then to you would

7     be, you still wore your jacket, right?  You wore your jacket in

8     the snow?  Okay.

9          So the question would be for you jurors:  Is the state of

10    affairs that you knew, right, different, materially different

11    from what ended up happening.  Right?  So the information was

12    wrong.  It wasn't raining; it was snowing.  Right?

13         So the question for you is -- for you jurors to decide is

14    the difference between the two.  The difference between the

15    technically inaccurate tweet, right, and what really happened.

16    That's the question.

17         So some people might say:  Once I find out it's

18    inaccurate, I'm done, my mind is closed.  And what we're hoping

19    and what I need your commitment on, is that in this case,

20    that's just the start of the journey.  Your job is to decide --

21    a big part of getting it to you to decide:  Does that matter?

22    Is it material, the example here, raining versus snowing?

23         Do you understand?

24              **PROSPECTIVE JUROR L. YOUNG:**  Yeah, I sort of get it.

25              **MR. SPIRO:**  Okay.

1           **PROSPECTIVE JUROR L. YOUNG:**  I guess my viewpoint

2   would be, if that's the case, then to me it's credibility,

3   right?  Then whatever might be said, or beyond that, you would

4   then have to decipher on your own what the validity of it is.

5           **MR. SPIRO:**  Right.  And you would look to other

6   evidence, right?  You would look to other witnesses, right?

7   You would look to documents that you see?  You would look to

8   whether it matters in human experience, right?  Does it matter

9   when you're making a decision about putting a jacket on, is it

10  raining, is it snowing, right?  True or untrue, does it matter,

11  because you ultimately wore your jacket.  Right?  So those are

12  the questions you jurors will be asked to decide.

13      Does everybody follow enough at this point to -- to sort

14  of give me their commitment?  And I'm sort of looking...

15      (A hand is raised)

16          **MR. SPIRO:**  Yes.

17      **THE COURT:**  If you can state your name and jury

18  number, please.  This is Juror No. 46.

19          **PROSPECTIVE JUROR MAGOULIS:**  John Magoulis, 46.

20      **THE COURT:**  All right.

21      **PROSPECTIVE JUROR MAGOULIS:**  Yeah, I expected to get a

22  question before we committed to this so that's why I haven't

23  raised my hand until now.  But I don't think I'm right for this

24  case, necessarily.  That's -- I don't know if that's -- this is

25  the time to go for that, but --

1          MR. SPIRO:  Is it related to something that I raised

2   when I sort of -- I wasn't picking on you.

3          PROSPECTIVE JUROR MAGOULIS:  No, no, no.  It's --

4   well, I have a lot of opinions.

5          MR. SPIRO:  Okay.  Well, then, if I could ask, I don't

6   think we're going to -- I have a very short clock.  I think I

7   know your opinions.  You were very candid on your form and I

8   appreciate it.  I would ask the Court that maybe you could

9   express your opinions at the sidebar, like away from the rest

10  of the jurors, just so that we -- but I get it.  You don't

11  think this case is right for you, and you don't know that you

12  can be fair and impartial.

13         PROSPECTIVE JUROR MAGOULIS:  That's all I wanted to

14  say, yeah.

15         THE COURT:  All right.  Let me ask this much.  Is it

16  because of your opinions about the people involved as opposed

17  to the subject matter or --

18         PROSPECTIVE JUROR MAGOULIS:  Yes.

19         THE COURT:  Yeah, all right.  So we'll take that at

20  another point.  Thank you.

21         MR. SPIRO:  Okay.  The other thing that came up during

22  the earlier questions was this idea of class actions and

23  plaintiffs' lawyers and things like that.  And there were some

24  questions, you know, could you give a lot of money out, things

25  like that.  Some of you have actually served as plaintiffs in

 1    cases.  Right?  So I'm not -- again, I'm not picking on people

 2    here.  I don't think -- I hope this is not -- I don't want to

 3    ask personal questions.  I'd rather ask about hiking and

 4    fishing and everything that you all do on your spare time, but

 5    I have to ask these questions.

 6        So, Mr. Moore, Juror No. 55, right, you have -- you

 7    haven't had a chance to talk today so I wanted to pick on you a

 8    little.  You know, you've been a plaintiff, I take it?  Or part

 9    of a --

10        **PROSPECTIVE JUROR MOORE:**  I was part of a class.  And

11    they sent me a letter and I filled it out and -- so that's all

12    my involvement.

13        **MR. SPIRO:**  So it's one of those, like a solicitation,

14    like an alert online or a letter that cames out and says, hey,

15    you want to be part of this case, fill out a form, that sort of

16    thing?

17        **PROSPECTIVE JUROR MOORE:**  It was after the case was

18    settled, and I was told I was part of the class.

19        **MR. SPIRO:**  I see.  And, you know, does being part of

20    that, right -- you opted in, that's fine, you get the form, you

21    cease and desist it maybe you got a check, I don't know.

22        **PROSPECTIVE JUROR MOORE:**  Not yet.

23        **MR. SPIRO:**  Well, you know.  Talk about that.  Does --

24    does being part of that process, I mean, do you think that you

25    lean in any way closer to this table (Indicating) because it's

 1    a class action, plaintiffs -- does that sway you at all?

 2            **PROSPECTIVE JUROR MOORE:**  No.

 3        **MR. SPIRO:**  I didn't think so from your original

 4    reaction but, I mean, I'm going to ask your, your juror-mate to

 5    the left, you know, do you think you -- 'cause this -- can you

 6    say your name for me so I don't mispronounce it.

 7            **PROSPECTIVE JUROR CAZESSUS:**  Yolanda Cazessus, No. 57.

 8        **MR. SPIRO:**  Juror No. 57, thank you so much.

 9        So, I mean, did -- you know, your fellow juror, Mr. Moore,

10    you know, he signed one of those forms.  He was part of one of

11    them.  You know, he doesn't have any leanings towards class

12    actions, plaintiffs' firms.

13        I mean, do you?  Do you have a view that makes you

14    think -- or a strongly held view that, you know, listen,

15    they're, you know, suing on behalf of an individual, or on

16    behalf of a class, that I want to try to root for them, or

17    anything like that?

18        Do you lean that way at all?  Or can you be fair, even,

19    and not lean?

20            **PROSPECTIVE JUROR CAZESSUS:**  I would need to listen to

21    the entire -- or read or review, whatever it is that I need to,

22    in order for me to make an educated decision.  I can't just go

23    one way or the other.  Like right here, right now, I couldn't

24    do that.

25            **MR. SPIRO:**  Great.  And that's what we want.  And I

1    appreciate you committing to that.

2          And back to Mr. Moore for a second.  You know, some

3    people -- I was teasing about the "No comment."  Some people

4    say:  Listen, I have opinions but I don't have strong opinions

5    about Mr. Musk.  Right?  I don't know if you remember, you said

6    that on your questionnaire.

7          I mean, there's no opinion that you hold that either side

8    needs to worry about, or you think --

9                **PROSPECTIVE JUROR MOORE:**  No.

10          **MR. SPIRO:**  Right?  You don't -- you leave that at the

11   door and you're here to be fair and impartial?

12               **PROSPECTIVE JUROR MOORE:**  Yes, sir.

13          **MR. SPIRO:**  Okay.  I appreciate that.

14          You know, one of the things that you all are going to see,

15   if you've never been through a case, is, you know, the judge is

16   going to instruct you that you have to keep an open mind.

17   Okay?  And the plaintiff goes first.  Right?  They have the

18   burden of proof.  Okay?  So they get to go first.  Wouldn't

19   want it any other way.

20          But some people, you know, they hear one side of the story

21   and they tend to make up their minds.  Some jurors said it when

22   they were being asked questions, you know, things can be black

23   and white.  Let's assume this isn't black and white.  Okay?

24   Let's assume -- the defense is saying he's innocent, right?

25   They're innocent.

1        You know, what I need is an assurance that you can keep an

2   open mind.  Right?  A commitment that you can keep an open

3   mind.  Because we don't get to decide which witnesses they call

4   when they're on direct examination.  We don't control what

5   questions get asked.  You are going to hear one side of the

6   story first.  Does everybody understand the way that process

7   works?  Right?

8        I don't know, you know, you are a 49ers fan, I take it?

9           **PROSPECTIVE JUROR YONAN:**  Yes.

10          **MR. SPIRO:**  Good win.  I -- you know, some people, if

11  you're not even a -- you know, you're watching the game --

12  we've got a lot of sports fans here.  You are watching a game

13  and you start rooting for one side.  Even if you are not -- you

14  know, you just start -- people like to root for one side,

15  right?  And they start seeing things in a certain way.  In

16  sports like, right, you see a foul called, you say that's not

17  fair.  And then you see another foul called and you say that's

18  not fair.  And it sort of depends on which team you're rooting

19  for.

20       So what I'm asking you is it's just a commitment -- and

21  you've got to kind of have you to remind yourself, a commitment

22  to keep an open mind while the plaintiffs put on their case.

23  Can you give me that commitment?

24          **PROSPECTIVE JUROR TINAPAY:**  (Inaudible)

25          **MR. SPIRO:**  And I'm sort of looking because I know

1    we're short on time and everybody's -- it's towards the end of

2    the day and I don't -- I'm just sort of looking for an eye

3    contact, a head nod, sort of asking everybody to give me that

4    commitment.  Can you give me that commitment?

5        And I'm looking at the first row and second rows, and even

6    deeper into the gallery.  Okay, everybody can give me their

7    commitment that they will wait to hear all of the evidence and

8    keep an open mind?

9        (Heads nod)

10        **MR. SPIRO:**  Okay.  You know, because, you know,

11    they're going to stand up and say, you know, he's wrong, it's a

12    lie, it's fraud, it's bad.  Right?  And you're not going to get

13    to hear from me until after.  They go first.  But everybody's

14    telling me they can keep an open mind.

15        Okay.  And, ultimately, I'm going to end sort of where I

16    started, which is, you know, some people have said, you know,

17    sort of less strong feelings about certain of the issues we've

18    been discussing all day.  Right?

19        Some people write like in less strong, you know, ways

20    about people, right?  They just say "I kind of feel," even

21    though they feel really strongly.  Or they say, you know, "I

22    have not a strong opinion," when they really do.

23        And so all I'm going to say at the end is, you know, we're

24    here, you know, obviously, to give everybody a fair trial.  You

25    know, it's really, really, really important that we get this

 1   right.  And if there's anything that anybody else needs to say,

 2   or to tell the Court, whether it's now or one on one, that I --

 3   that I -- all I can do is implore you to do that.

 4       And I thank everybody very much for their attention today.

 5   Thank you.

 6           THE COURT:  All right.  Thank you, Mr. Spiro.

 7       We're going to take a break, but --

 8           THE COURTROOM DEPUTY:  Your Honor?

 9           THE COURT:  Yes?

10           THE COURTROOM DEPUTY:  We have a hand up over here

11   (Indicating).

12           THE COURT:  Oh, there's a hand up.  Yes.

13           PROSPECTIVE JUROR GEOGHEGAN:  Do you need to have kind

14   of like a general understanding of the terms you guys are using

15   to be on this jury?

16           THE COURT:  Okay.

17           PROSPECTIVE JUROR GEOGHEGAN:  Like securities and

18   whatnot.

19           THE COURT:  Okay.  I'll answer your question, but if

20   you could state your name and number.

21           PROSPECTIVE JUROR GEOGHEGAN:  Oh, sorry.  I'm Allie

22   Geoghegan, Alicia Geoghegan, and I'm No. 60.

23           THE COURT:  60.

24           PROSPECTIVE JUROR GEOGHEGAN:  Just because some of the

25   terms that are being said, I'm --

1          THE COURT:  Yeah.

2          PROSPECTIVE JUROR GEOGHEGAN:  I don't know anything

3    about securities.

4          THE COURT:  Yes, I -- we don't expect you to have any

5    knowledge of securities or securities law.

6          PROSPECTIVE JUROR GEOGHEGAN:  Great.

7          THE COURT:  That's part of why we have trials, that

8    the parties will explain to you.  I will give instructions.

9    I'm going to give -- once the jury is seated, I'm going to give

10   them an overview of what the legal structure is of this case.

11   It's just kind of a preview.

12         PROSPECTIVE JUROR GEOGHEGAN:  Okay.

13         THE COURT:  And then, yeah, there's probably a lot of

14   terms that you may not know.  And unless you're a lawyer or

15   you're a broker or something, you may not.  So we don't -- and

16   we're looking for -- that is why we do this.  We call on

17   everybody from the public.  We don't just ask for all the

18   people who are lawyers or who have a broker, or -- you know,

19   and so that's true of every case.

20         PROSPECTIVE JUROR GEOGHEGAN:  Great.

21         THE COURT:  So it is the job of the lawyers and this

22   Court to hopefully make things clear for you.

23         PROSPECTIVE JUROR GEOGHEGAN:  Okay, perfect.

24         THE COURT:  All right?  Is there anybody else that

25   wants to say anything that -- or let me know of anything that

1   you haven't said that might be relevant to your ability to

2   serve in this case that you haven't already said?

3        Anybody else has anything else that we should know?

4        (Show of hands)

5             **THE COURT:**  Okay.  We've got a couple of hands.  If

6   you could state your name and number again?

7             **PROSPECTIVE JUROR FITZPATRICK:**  Hi, I'm No. 192, Ryan

8   Fitzpatrick.

9             **THE COURT:**  192.  Okay.  Let me --

10            **PROSPECTIVE JUROR FITZPATRICK:**  And again, I'm not

11  sure if this is the right forum for this, but in listening to

12  what they have to say there and --

13            **THE COURT:**  Yeah.

14            **PROSPECTIVE JUROR FITZPATRICK:**  -- thinking through it

15  and being a part of this, I also don't feel that I can be an

16  impartial part of this process.

17            **THE COURT:**  All right.  And that's because of your

18  view of the parties --

19            **PROSPECTIVE JUROR FITZPATRICK:**  Based on my specific

20  view of the parties, yes.

21            **THE COURT:**  Okay.  All right.  All right.  Thank you.

22       Anybody else?

23       (A hand is raised)

24            **THE COURT:**  There's a hand raised over here.

25            **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  Jesus Bolivar,

 1  113.  My wife was able to get an appointment for passport as of

 2  noon.

 3          THE COURT:  Oh.  So you're good.

 4          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yeah, I just need

 5  to pay late fees and spend a bunch of money, but, yeah, she'll

 6  be able -- should go.

 7          THE COURT:  Well, it was worth it, sounds like, so

 8  congratulations to both you and your wife.  And your son.

 9      How old is your son?

10          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Thirteen.

11          THE COURT:  Great.  Well, that's good news for all

12  around.  So thank you.  I was going to ask about that update.

13          MR. APTON:  Your Honor?

14          THE COURT:  Yes.

15          MR. APTON:  In light of Mr. Bolivar's able to be

16  present, may I ask two questions?

17          THE COURT:  Yeah, okay.

18          MR. APTON:  Thank you.  Thank you.

19      Mr. Bolivar, Adam Apton for plaintiffs.  That's good news,

20  I appreciate that.  Earlier today you intimated that you were

21  super excited to be here on the jury here, potentially, and I

22  just wanted to hear why that was.

23          PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Should I stand up

24  or should I stay seated?

25          MR. APTON:  Yeah, whatever you're more comfortable

1    with.

2              **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  I recently became

3    a U.S. citizen in December.  This is my first time to fulfill a

4    duty.

5              **MR. APTON:**  Okay.  So it's not because of any personal

6    feelings towards any of the parties in this case?

7              **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  Not really.

8              **MR. APTON:**  Do you follow Mr. Musk on Twitter?

9              **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  I do.

10             **MR. APTON:**  Okay.  How long have you followed him for?

11             **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  No idea.

12             **MR. APTON:**  Are you a recent fan, or are you a fan at

13   all, or no?

14             **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  Not really.

15             **MR. APTON:**  And did you have any understanding of what

16   this case was about prior to today?

17             **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  I follow him on

18   Twitter so I saw the tweet.

19             **MR. APTON:**  When it came out?

20             **PROSPECTIVE JUROR BOLIVAR SEGOVIA:**  I think so.

21             **MR. APTON:**  Uh-huh.  And so how do you anticipate

22   hearing evidence in this case if you are, in some sense, a

23   witness to the underlying events here?

24             **THE COURT:**  Well, that's a misstatement.

25             **MR. APTON:**  Oh.

 1            THE COURT:  He's not a witness.  He's read about it,

 2    heard about it or read something about it.  So --

 3            MR. APTON:  About --

 4            THE COURT:  I think the question is, given your

 5    knowledge and what you've read, will that influence your

 6    ability to start this case on a clean slate and judge this

 7    neutrally based on the evidence you hear solely in court?

 8            PROSPECTIVE JUROR BOLIVAR SEGOVIA:  I'll do my best to

 9    base it only on the evidence that I see during the trial.

10            THE COURT:  And when you say you'll do your best, are

11    you confident?

12            PROSPECTIVE JUROR BOLIVAR SEGOVIA:  I am confident

13    that I'll do it.

14            THE COURT:  Very confident?

15            PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yes, very.

16            THE COURT:  Very confident.

17            PROSPECTIVE JUROR BOLIVAR SEGOVIA:  I mean, after

18    seeing all the implicit biases, it's sort of like once you're

19    conscious of them, you're like, well, are we all really truly

20    biased?

21            THE COURT:  That's a fair point.  That's a fair point.

22    But now that you know there are such things as unconscious bias

23    and you've heard others talk about how they will struggle with

24    it, you are confident you can deal with that and --

25            PROSPECTIVE JUROR BOLIVAR SEGOVIA:  I am confident I

```
 1    can deal with that.
 2              THE COURT:  And be a neutral and impartial juror?
 3              PROSPECTIVE JUROR BOLIVAR SEGOVIA:  Yep.
 4              THE COURT:  Thank you.
 5              MR. APTON:  All right.  Thank you.  Thanks,
 6    Your Honor.
 7              THE COURT:  Okay.  Anybody else that has anything else
 8    to share?
 9         (No response)
10              THE COURT:  Okay.  And, just by chance, Juror No. 36,
11    Ms. Yonan, no more word from your boss?
12              PROSPECTIVE JUROR YONAN:  (Shakes head)
13              THE COURT:  Okay.  All right.  Then I think there is
14    one juror that we wanted to talk to individually and it's
15    No. 46.  Is that right, Counsel?
16              MR. SPIRO:  If the --
17              THE COURT:  That it is the only one if we do?
18              MR. SPIRO:  Yes.  If the Court needs to talk to that
19    juror, yes.
20              THE COURT:  Okay.  Other than that, I believe we've
21    completed this process of questioning you and I want to thank
22    you for your forthrightness.  Actually, it's been a very good
23    discussion.  Makes me doubly glad that we do show that video,
24    because I think it stimulates some discussion and maybe some
25    insight, hopefully, for all of us.
```

1          So what I'm going to do at this point is take a break

2     because now the -- after we have a short session with Juror

3     No. 46, I have to meet with the lawyers and go through the

4     selection process.  When you come back, it's my expectation

5     that we will have the list of jurors in this case.  But it does

6     take a little bit of time.  So, I'm going to give ourselves an

7     hour so you don't stand around waiting again.  Sorry about

8     that.  And I don't know if -- the cafeteria is probably not

9     open, unfortunately, but there are places around the courthouse

10    and you can use that second floor area to sit and relax, even

11    though they're not necessarily serving anything, but there's a

12    coffee place, there's -- there's a couple of coffee places

13    around here, actually, if you want.  So, I appreciate your

14    patience.  We'll see you back here in one hour, and Juror

15    No. 46, if you could just hang on for a minute and stay with

16    us.

17          **THE COURTROOM DEPUTY:**  All rise for the jury.

18          (The following proceedings were held outside of the

19    presence of the jury venire, with Prospective Juror Magoulis

20    present)

21          **THE COURT:**  Okay.  Mr. Magoulis?

22          **PROSPECTIVE JUROR MAGOULIS:**  Yeah, I'm here.

23          **THE COURT:**  Oh, hi.  Okay.  I just wanted to give you

24    a chance to voice your views.  Your questionnaire, you had said

25    some fairly extensive things about Tesla and Mr. Musk.  And you

1  made a comment about he's embarrassed himself in software

2  engineering circles, resorts to name-calling, and, not very

3  impressed with the way he's running social media.

4      Do you want to just briefly elaborate on your views of

5  Mr. Musk?

6      **PROSPECTIVE JUROR MAGOULIS:**  Um, I don't know how deep

7  you want me to go, because with Musk, it -- that rabbit hole

8  goes pretty deep.

9      **THE COURT:**  Well, all right, before we get into the

10 details of the rabbit hole, let me ask you the bottom-line

11 question and that is, given how much you apparently know about

12 Mr. Musk and -- and have your views, which sound like they're

13 pretty strongly held views?

14     **PROSPECTIVE JUROR MAGOULIS:**  I would say so.

15     **THE COURT:**  Okay.  You said that in your questionnaire

16 that you could still be a fair and impartial juror, but I -- we

17 want to explore that, obviously.  Sitting here, as -- if you've

18 heard through this process how important it is that we find

19 jurors who can put aside prior views, knowledge, impressions,

20 and sit and hear the evidence kind of on a clean slate as best

21 you can, is that something that you think you can do?  And if

22 you are, how confident are you?

23     **PROSPECTIVE JUROR MAGOULIS:**  I mean, I would be

24 willing to give it a shot, but I -- I don't think it would be

25 fair to Mr. Musk to have me on the jury.

1    THE COURT:  Okay.  Sound like in the end you are not

2  that certain you could be fair.

3    PROSPECTIVE JUROR MAGOULIS:  That's right, yeah.  I

4  mean, there's also the billionaire factor, I'm not a big fan of

5  those, either, so...

6    THE COURT:  Right.  Unless you win the lottery, of

7  course.

8    PROSPECTIVE JUROR MAGOULIS:  Of course, yeah.

9    THE COURT:  All right.  Let me ask the plaintiffs if

10  you have any follow-up questions.

11    MR. APTON:  No, Your Honor.

12    THE COURT:  Okay.  From the defense?

13    MR. SPIRO:  No, Your Honor.

14    THE COURT:  All right.  Thank you, Mr. Magoulis, I

15  appreciate it.  Thank you for your honesty.

16    PROSPECTIVE JUROR MAGOULIS:  Thank you.

17    (Prospective Juror leaves the courtroom)

18    (Off-the-Record discussion between the Court and Clerk)

19    THE COURT:  All right, 131 has asked to speak to the

20  Court.

21    MR. SPIRO:  Your Honor, I don't think we're going to

22  get -- just for the Court's awareness, I don't think, just

23  looking at the numbers --

24    THE COURT:  Yeah, I don't think so either, but maybe

25  she wants to be relieved or something.

 1              MR. SPIRO:  Yeah.

 2              THE COURT:  Why don't we find out in case she has an

 3    emergency or something.

 4              MR. SPIRO:  Always the Court's -- I'm just pointing

 5    out that --

 6              THE COURT:  Yeah, we won't spend a lot of time with

 7    her.  You're right, we're not going to get to the -- I don't

 8    think we'll get past around 80, is my guess.

 9              MR. SPIRO:  I don't think we're getting anywhere close

10    to 80.

11              THE COURT:  Yeah.

12         (Prospective Juror enters the courtroom)

13              THE COURT:  Hi, Ms. Suey.

14              PROSPECTIVE JUROR SUEY:  Hello, Your Honor.

15              THE COURT:  Hi.

16              PROSPECTIVE JUROR SUEY:  How are you doing?

17              THE COURT:  Good, how are you?

18              PROSPECTIVE JUROR SUEY:  Good.  I just wanted to bring

19    up to everybody that I cannot be one-sided about this case

20    because I had two very close friends of mine work at Tesla, and

21    one of them, um, was a case of racism, he was trying to get

22    promoted, and even though people who worked there that worked

23    there less than him got promoted before him, and they were

24    Caucasian.

25         And then another one of my friends that worked there, he

**PROCEEDINGS**

1  got hurt on the job, and even five years after to right now,

2  he's emotionally and mentally not the same.  Because even when

3  he's hurting or just doing anything, trying to sleep, his back

4  is still in pain.  The only thing that he can do is surgery but

5  his insurance doesn't cover it.

6      So I don't think that I can be -- take that out about --

7  my thoughts about Tesla, unfortunately.

8      **THE COURT:**  Thank you for sharing that with us.  I

9  understand.  Thank you.  Appreciate it.

10     **PROSPECTIVE JUROR SUEY:**  Thank you.

11     (Prospective Juror leaves the courtroom)

12     **THE COURT:**  Okay.  So what I would like to do is go

13 through in sequence the ones that are in play, and you tell me

14 if there's a challenge for cause or hardship.  I think we have

15 done the hardships.  So let's see where we're at.

16     First in play is Juror No. 3, Tinapay, any objection --

17 any challenge?

18     **MR. APTON:**  Nothing from plaintiff, Your Honor.

19     **MR. SPIRO:**  No, Your Honor.

20     **THE COURT:**  Okay.  Juror No. 4, Martinezal.

21     **THE COURTROOM DEPUTY:**  It's Martinez.

22     **THE COURT:**  Martinez?

23     **THE COURTROOM DEPUTY:**  Yeah, they combined the letters

24 together.

25     **THE COURT:**  Oh, Martinez.  Okay.  Any challenge?

1          **MR. APTON:**  No, Your Honor.

2          **MR. SPIRO:**  No, Your Honor.

3          **THE COURT:**  Okay.  No. 6, Rickard?

4          **MR. APTON:**  Nothing from plaintiff, Your Honor.

5          **MR. DEF3:**  No, Your Honor.

6          **THE COURT:**  Okay.  That brings us to the next one I

7    have is No. 32, Sharma.

8          **MR. APTON:**  Nothing from plaintiff, Your Honor.

9          **MR. SPIRO:**  No, Your Honor.

10         **THE COURT:**  Okay.  Then, we still have No. 36, who's

11   the one who now with this Ross assistant manager going out,

12   could be a problem.

13         **MR. APTON:**  Your Honor, I would say we have more than

14   enough jurors, probably, let's let her go.

15         **MR. SPIRO:**  Yeah.  Your Honor, that's obviously not

16   the standard for hardship and we would object.  And she's not

17   indicated anything that's -- rises even close to hardship.

18   She's suggested no economic hardship.  She's a managerial-level

19   individual.  She doesn't even know that she won't get paid.  In

20   fact, I think working for a corporation like that, she likely

21   will.  Even if she weren't for a short period of time, there is

22   no indication that that would be a hardship.  We don't know

23   that she can't just -- in fact, she indicated she could go in

24   at 2:00 or 2:30 or 3:00 and work a later shift potentially.  So

25   we clearly do not have sufficient information to excuse a juror

**PROCEEDINGS**

1    such as this for hardship and that's the only question, I take

2    it, and we would, of course, object because we don't think

3    there's any basis to do that.

4           **MR. APTON:**  Your Honor, she said she can't do it.  She

5    said that she needs to be at work.  She said that she can't get

6    necessarily from here to work in the time she needs to.  She

7    was going to do this before but now that her manager is out,

8    she has a clear problem and we need to sit a jury.

9           **THE COURT:**  All right.  I'm going to excuse her

10   because of the emergent situation at her work.  The fact also

11   that there's -- she didn't say she gets jury pay and it's not

12   clear that all retailers provide --

13          **MR. SPIRO:**  Your Honor, the defense objects.

14          **THE COURT:**  Yeah, your objection is noted.  Overruled.

15      39, any objection?

16          **MR. APTON:**  No, Your Honor.

17          **MR. SPIRO:**  No, Your Honor.

18          **THE COURT:**  Okay.  40, any objection?

19          **MR. APTON:**  No, Your Honor.

20          **MR. SPIRO:**  No, Your Honor.

21          **THE COURT:**  45?

22          **MR. APTON:**  No, Your Honor.

23          **THE COURT:**  Mr. Buckley.

24          **MR. SPIRO:**  No, Your Honor.

25          **THE COURT:**  Okay.  Mr. Magoulis is -- I think we'd

1   agree, he's -- can't -- he's not eligible to serve.  Challenge

2   for cause, I assume?

3        **MR. APTON:**  That is correct, Your Honor.

4        **THE COURT:**  Is that right?

5      I'm going to sustain that.  I assume everybody agrees?

6        **MR. SPIRO:**  Yes, Your Honor.

7        **THE COURT:**  Okay.  No. 50, the night-shift nurse, not

8   sure about jury -- oh, he did find out about jury pay but it's

9   less, it's not totally compensatory.

10        **MR. APTON:**  So, Your Honor, in this situation he said

11   he could do it.  He's clearly -- I think he prefers not to, but

12   I would defer to the Court on this.

13        **MR. SPIRO:**  Your Honor, I -- again, I'm -- these

14   comments, I don't -- I just want the record to be clear.  I

15   don't see any -- I see less of a difference, frankly, from the

16   juror that we just excused.  This seems to be far greater of a

17   case of hardship and we -- we have inquired far more, so I

18   don't --

19        **THE COURT:**  Okay.  I'm going to excuse Juror No. 50.

20   I think there's both a hardship in terms of his hours and

21   having to work after 12-hour shifts, that's going to be very

22   difficult.  Plus he's not getting full compensation for jury

23   pay because it's based on some percentage and he's losing out,

24   and for him to lose out over a three-week period is a financial

25   hardship, so he's excused.

**PROCEEDINGS**

1      No. 55?

2              **MR. APTON:**  I have no objection, Your Honor.

3              **MR. SPIRO:**  No objection.

4              **THE COURT:**  Okay.  Number 57, Cazessus?

5              **MR. APTON:**  Yolanda Cazessus.  No objection,

6      Your Honor.

7              **THE COURT:**  Cazessus.  Okay.

8              **MR. SPIRO:**  No objection, Your Honor.

9              **THE COURT:**  All right.  No. 59, Mr. Xi.

10              **MR. APTON:**  No objection from plaintiff, Your Honor.

11              **MR. SPIRO:**  No objection.

12              **THE COURT:**  Okay.  No. 60, that's the one who doesn't

13      have childcare on Monday and I said I would reserve questioning

14      on that.  What is your final view?

15              **MR. SPIRO:**  This was a juror that we both agreed to

16      move to the end, Your Honor.

17              **THE COURT:**  Oh, we did?  Okay.

18              **MR. SPIRO:**  Yeah.

19              **THE COURT:**  That's not -- then she's irrelevant.  So

20      far.

21      Juror No. 67.

22              **MR. APTON:**  No objection, Your Honor.

23              **MR. SPIRO:**  No objection.

24              **THE COURT:**  Okay.  Juror No. 68, Ms. Daing, or

25      Mr. Daing.

1    **MR. APTON:**  Your Honor, I do think this juror has a

2  hardship.  I think he has expressed his reservations with kind

3  of being incommunicado with his staff, his employees, his wife.

4  It's a problem.

5    **THE COURT:**  Comment?

6    **MR. SPIRO:**  We didn't excuse him for hardship earlier.

7  This was well-addressed and he said he could be here and is

8  fine.  It's clearly not a hardship.

9    **THE COURT:**  All right.  I'm not going to excuse him.

10  He said he could live with his phone being off for 90 minutes.

11  Seems to me that was the key, and so I'm not convinced that he

12  has presented a sufficient hardship to be excused.  So any

13  objection to him or challenge to him is overruled.

14    73, Cadogan.

15    **MR. APTON:**  No objection from plaintiff.

16    **MR. SPIRO:**  No objection.

17    **THE COURT:**  74, Ms. Bransfield.

18    **MR. APTON:**  No objection, Your Honor.

19    **MR. SPIRO:**  No objection.

20    **THE COURT:**  And 79, Mr. McGown.

21    **MR. APTON:**  No objection, Your Honor.

22    **MR. SPIRO:**  No objection.

23    **THE COURT:**  Well, I count 15.  So let me go through

24  who they are, I think.  No. 3, Tinapay; No. 4, Martinez; No. 6,

25  Rickard; No. 32, Sharma; No. 39, Marshall; No. 40, Harris;

1    No. 45, Buckley; No. 55, Moore; No. 57, Cazessus; No. 10, Xi --

2    I'm sorry, not No. 10, that's No. 58.  Number 67, Torres

3    Rosado; No. 68, Daing; no. 73, Cadogan; No. 74, Bransfield; and

4    No. 79, McGown.  I get 15.  Do you all agree?

5            **MR. APTON:**  Yes, Your Honor.

6            **MR. SPIRO:**  Yes, Your Honor.

7            **THE COURT:**  All right.  Well, then we have our top 15

8    from which you can exercise your three peremptories each.

9    Plaintiff starts, and then peremptory 2 and 3 go to the

10   defense, and -- no, 1 and 2 go to the -- they're 1 and 2 and

11   then 2 and 3 back to the plaintiff, and then the third one on

12   the defense.  If there's -- and you can save it, you don't lose

13   it if you don't use it, but if you don't use it and the other

14   side passes, that's it.

15       I -- I will say this much.  This is a fairly diverse pool

16   that we have, which I'm pleased because we don't always get

17   diverse pools.

18       And let me just say, I hope there's not going to be a

19   *Batson* issue.  I do keep an eye on these things.  So just a

20   word to the wise that I don't want to have to cross that

21   bridge.

22       So, we'll pass the sheet around and give you, I don't

23   know, 20 minutes?  Something like that?

24           **MR. SPIRO:**  I'm ready now, Your Honor.

25           **THE COURT:**  Pardon?

PROCEEDINGS

```
 1              MR. SPIRO:  We're ready now.
 2              THE COURT:  Then -- I meant 20 minutes to pass the
 3    sheet back and forth.  I don't -- I don't -- we can take it
 4    orally, but I do it --
 5              MR. SPIRO:  Oh, oh.
 6              THE COURT:  I just do it by sheet.  They get the sheet
 7    and give it to you and --
 8              MR. SPIRO:  I see.  That sounds good.
 9              THE COURT:  -- I give you 20 minutes to pass it back
10    and forth.  Okay?
11              MR. APTON:  Thank you, Your Honor.
12              THE COURT:  Thank you.
13              THE COURTROOM DEPUTY:  Court is in recess.
14        (Recess taken from 2:12 p.m. to 2:39 p.m.)
15        (The following proceedings were held outside of the
16    presence of the jury venire.)
17              THE COURTROOM DEPUTY:  Please remain seated, Court is
18    back in session.  Court is reconvened.
19              THE COURT:  All right.  I have your strikes, and let
20    me just make sure I got them all here.
21        Okay.  Plaintiffs strike Juror No. 39, Mr. Marshall.
22    Correct?
23              MR. APTON:  Correct, Your Honor.
24              THE COURT:  And defendants strike No. 40, Ms. Harris.
25    And 79, Mr. McGown.
```

**PROCEEDINGS**

1       And the plaintiffs challenge -- or strike No. 74,

2   Ms. Bransfield.

3       Let me make sure I've got -- and then, challenge No. 68,

4   Mr. Daing.  And then the final strike from the defendant is

5   No. 45, who is Mr. Buckley.

6       So that leaves the following:  Jurors No. 1, Tinapay;

7   No. 2, Martinez; No. 3, Rickard.  And the fourth juror is

8   No. 32, Sharma.  The fifth is No. 55, Mr. Moore.  The sixth is

9   Ms. Cazessus.  The seventh is Mr. Xi.  And the eighth is Mr. or

10  Ms. -- Mr. Torres Rosado.  And the last one is Mister -- is

11  Juror No. 73, Mr. Cadogan.  Do I have that right?

12          **MR. SPIRO:**  Yes, Your Honor.

13          **THE COURT:**  Do you all agree?  Okay.  Excellent.  So

14  before we call the jurors in, given the time, it's going to be

15  a little bit of a stretch to seat the jurors, get them sworn,

16  and for me to instruct.  I have to give some instructions, that

17  will take about 15 minutes.  It's going to be past the 3:00

18  hour.  So if I knew that you were going to confine your

19  statements to 20 minutes, 25 minutes, we could do it.

20  Otherwise, maybe I should just instruct and start with argument

21  -- not argument, opening statements, first thing tomorrow

22  morning.

23          **MR. SPIRO:**  I think that makes the most sense,

24  Your Honor.

25          **MR. PORRITT:**  We would agree, Your Honor.

1      **THE COURT:**  All right.  Let me ask you before I

2  instruct, there was a renewed objection.  The one I'm

3  interested in is the footnote in the defense objection about

4  the issue of scienter and whether or not indicating -- I'm not

5  sure what you were indicating but it seemed like you were

6  indicating you would consider waiving any argument that

7  scienter requires knowing, and that if it doesn't require

8  knowing, then I've already found scienter, and, therefore, that

9  might obviate some instructions on that, although that doesn't

10 answer the question what about apportionment.

11     But let me just hear the first part, make sure I

12 understand.  Because you sort of said that, and then you also

13 said we're not waiving our rights under matrix.

14     **MS. THOMPSON:**  Yes, Your Honor.  So we were picking up

15 on a line on Page 43 of the Court's final jury instructions in

16 which the Court said, um, in any event, the jury should still

17 be instructed as to scienter because if it's knowing -- there's

18 this open question under Supreme Court case law as to whether

19 scienter must be knowing, and the Court has only found

20 reckless.

21     And I think there were some interpretation on our side

22 that perhaps the Court was inviting us to say, well, if we're

23 no longer -- you know, if we waive our arguments as to scienter

24 must be knowing, then the Court would be inclined not to give

25 any scienter instruction, not to instruct the jury to assume

1    recklessness, and to take that out entirely, you know, making

2    it a securities fraud claim that doesn't require scienter

3    because that would just be removed entirely from the jury's

4    consideration.

5        I think that is something that may make sense here given

6    the prejudice from the recklessness instruction that, you know,

7    we have asserted.  But I do think that we wanted to be assured

8    that that was not, you know, now defendants concede scienter

9    entirely, an instruction of that to the jury.  But rather, the

10   issue is just removed entirely from the jury's consideration.

11   The instructions are removed as to scienter, as to reckless, as

12   to imputation of scienter.

13       On apportionment, I think there's a way that the

14   instruction can be done such that the question is anyone you

15   found liable.  And then as to anyone you found liable, have

16   you -- have you found knowing as to, you know, X, Y, Z, as, you

17   know, the directors or whatnot.

18       So I think there is a way to do it where that is removed

19   entirely from the jury's consideration.  That would, yes, waive

20   arguments as to requiring knowledge for scienter, and also our

21   exception as to requiring recklessness as to materiality, which

22   the Court has rejected.  But to obviate the prejudice that

23   would be caused by instructing the jury they're to assume

24   recklessness, we think that on our side that makes sense to

25   remove it from the jury's consideration entirely, since the

1  Court has found that element met since the jury will not be

2  instructed that recklessness requires scienter as to -- or,

3  sorry, that scienter requires recklessness as to materiality.

4        **THE COURT:**  All right.  Response?

5        **MR. PORRITT:**  I would, first of all, preface my

6  remarks by saying this is a very late-hour kind of radical

7  restructuring, removing an entire instruction which is present

8  in every securities case, and is contained in the model

9  instruction.  And I think it would have implications beyond

10  simply just on the scienter instruction.

11      We would then want -- we would want to look at how that

12  played through.  It's such a central concept, we'd want to see

13  how that plays through the other instructions.

14      I think if you were going to remove the scienter

15  instruction, I think you would need a specific, custom-made

16  instruction for this case.  Essentially, it's telling the jury

17  that if you find that the two tweets -- either of the two

18  tweets were material, then you must find Elon Musk liable.

19      So, if the defendants are willing to stipulate to such an

20  instruction, then, you know, but I think that is now getting so

21  far beyond where we are and what we've been talking about, I

22  don't understand their argument and I think it's really a

23  little bit late in the game, unless we can meet and confer and

24  agree upon -- agree upon a set of instructions along those

25  lines, but which I'm not optimistic we could do that, to be

1    honest, Your Honor.

2         So I would leave the instructions as they are.  I think it

3    is a very novel, new approach that the defendants have proposed

4    and it's very difficult at this late hour.  We have

5    well-developed and kind of integrated instructions that we've

6    had numerous conferences with, to now suddenly start taking out

7    very central ones.  And I think it does have implications for

8    other instructions such as apportionment, such as knowing

9    violation, all those sorts of things.  So we'd have to

10   deconstruct the scienter and then reinsert it where it makes

11   sense.  And it just seems a little bit too radical surgery to

12   be doing this late.

13        **MS. THOMPSON:**  If I may briefly respond, Your Honor.

14   I know it's late.

15        **THE COURT:**  Yeah.

16        **MS. THOMPSON:**  First of all --

17        (Reporter clarification)

18        **MS. THOMPSON:**  Yes, sorry.  Ellyde Thompson for the

19   defendants.  Thank you.

20        First of all, as to the time of this, of course, the issue

21   that led to this is that there can be no Tesla scienter.

22   Absent Elon Musk scienter, there is no separate theory of

23   scienter for Tesla, which is what led to this.  Otherwise, this

24   certainly would have been raised earlier.

25        And the second point is there may be perhaps a way to give

1  the parties and the Court more time to assess this, because

2  really what the Court is going to be giving now is the 10b-5

3  preliminary instruction.  I do think that there would have to

4  be a tweaking of the elements there, and removing reckless, the

5  you are to assume reckless.  But otherwise there certainly

6  would be time to modify the other instructions to

7  incorporate -- you know, to incorporate the removal of the

8  scienter aspect from the jury's determination.

9          MR. PORRITT:  Well, it would obviously -- sorry,

10  Your Honor.  It would obviously be highly prejudicial to remove

11  the instruction on the finding of the Court on summary judgment

12  that Mr. Musk acted recklessly when he issued the tweet to then

13  remove it from the initial instruction.  That's been a baffle

14  along.  Obviously, defendants have done their best to

15  obliterate your summary judgment order from history, and

16  certainly from these jury instructions.  So -- and this is,

17  once again, an ongoing sort of campaign --

18          THE COURT:  Well, here's what I want to do.  I'd like

19  you to meet and confer to really think through this

20  possibility.  Because if there's a stipulation, essentially it

21  would be a stipulation as to scienter.  We wouldn't have to get

22  into the dichotomy between knowing and reckless disregard,

23  because the only reason why that is relevant, putting aside

24  apportionment for a minute, is because of the outstanding case

25  law and the Supreme Court's reserving the question whether

1    reckless disregard is enough.  And if we don't know that for

2    sure, we want the jury to opine.

3        Now, if there is a's stipulation that whatever the Supreme

4    Court may do and revisiting the *Matrixx* question, that's a

5    waiver.  They've essentially -- then the defendants will have

6    essentially waived any opposition to a finding of scienter,

7    period.  We don't have to get into it.  And then the

8    instruction could be simplified, just like we said that the

9    jury is to find that the statement was inaccurate, we can also

10   say that the -- and we don't have to describe scienter or break

11   it down between reckless disregard and knowingly.  It's

12   irrelevant to the jury.  We just say that scienter and state of

13   mind, that's not an issue for you, jury.  And then, but the

14   issue for you -- then it's going to be highlighted, it's going

15   to be all the other elements:  Reliance, materiality,

16   et cetera, et cetera.

17       And -- and the -- that would obviate a jury instruction on

18   scienter, state of mind.  You'd simply say that you need not

19   address this issue or something to that effect.

20       I mean, that's what it would look like in my mind if you

21   were to stipulate to something like that.  And how the

22   apportionment -- I mean, unfortunately, because the

23   apportionment, that doesn't obviate all the evidence about

24   Mr. Musk's state of mind because it's still going to be

25   relevant, but they won't be instructed on that on the

1  substantive 10b-5, it only comes in on the back end on the

2  apportionment question.

3        **MR. PORRITT:**  And, Your Honor, I think it would just

4  be very unmanageable in terms of the evidence.  I think we --

5  you're going to end up buying an awful lot of relevance

6  objections now about that's really only to scienter or

7  recklessness or does it go to knowing.

8        **THE COURT:**  Well, I just said I think it is -- the

9  evidence will still come in because state of mind is relevant.

10 It's on the apportionment question.

11       **MR. PORRITT:**  And I just have a very difficult time

12 thinking about how this is going to be managed in the trial in

13 real time and whether the jury -- we already heard today a

14 juror being confused on what is, in fact, a much more simpler

15 assumption, that the statements were untrue.  We had one juror

16 with a colloquy with Mr. Spiro about, I thought, demonstrating

17 quite severe confusion on that point.  And so, once we get to

18 state of mind, I think it's also a real risk about how we

19 manage this and the evidence coming in.  I just think this is

20 far more --

21       **THE COURT:**  My preliminary view is that it would still

22 come in because it's still relevant.  It's relevant on the

23 apportionment question.  So you don't have to change your

24 evidence, but the instruction --

25       **MR. PORRITT:**  But the jury -- sorry, Your Honor, I

**PROCEEDINGS**

 1   didn't mean to interrupt.  Sorry.  I think the jury may end up

 2   being really confused as to how they're meant to weigh that

 3   evidence and what the use they're meant use of it and all those

 4   sorts of -- and those sorts of issues.

 5        **THE COURT:**  Well, frankly, there are a lot of trials

 6   when we start -- don't give any instructions on the law and

 7   they've got to -- you know, they are going to be confused about

 8   all sorts of things.  And part of it is your job on openings to

 9   provide that so-called roadmap.  But --

10        **MR. PORRITT:**  And we've -- I've done -- you know, I

11   think I've done and I hope Mister -- but, you know, I was

12   having -- already having concerns about the extent to which,

13   after listening to the -- some of their questioning today with

14   Mr. Spiro is exactly how they are going to -- defendants are

15   going to be talking in their opening about your summary

16   judgment order, and there did seem to be already invitations to

17   re-litigate the question of falsity.

18        **THE COURT:**  All right.  Well, let me ask.

19        **MR. PORRITT:**  And so --

20        **THE COURT:**  I'm hearing you're not going to get a

21   stipulation from the other side.  That doesn't necessarily

22   prevent you from filing a -- something with the Court, stating

23   that you are waiving the *Matrixx* knowing potential argument and

24   asking the Court to adjust the instructions with or without the

25   help of the plaintiff.

1        But if you are going to do that, I need to know that,

2   like, soon.

3        **MS. THOMPSON:**  Yes, Your Honor.  I think -- I mean,

4   we're happy to meet and confer, although perhaps we will not

5   find agreement on that.  Perhaps we can meet and confer sort of

6   in the alternative, if -- if the Court is, you know, it seems,

7   willing to consider this, how would you like this to be

8   phrased?  Would you like it this way, such that you're not done

9   giving exceptions to what we propose, if we can agree on that.

10  But I think there is time to get that done.  The main issue is

11  just not jumping the gun and instructing the jury, you know,

12  today or tomorrow in the preliminary statement in a way that

13  obviates the ability of the Court to streamline the issues that

14  the jury needs to decide.

15       **THE COURT:**  Well, the only reference in the opening

16  statement -- in the opening statement -- in the opening

17  preliminary instruction is the Rule 10b-5 claim that lays out

18  the five elements.  I intend to set that out.  What I would do

19  is take out the i.e., the parenthetical, just simply say that

20  Elon Musk or Tesla acted with necessary state of mind, and not

21  saying anything more.  I'm ticking off the five elements, so

22  it's not committal.  So if you decide to stipulate, then that

23  can be stated in opening statements.  That'll be -- that'll be

24  clear in the closing instructions.  But I'm not going to just

25  delete that now, without --

1      **MS. THOMPSON:**  Yes -- yes, Your Honor.  But then I

2   guess the question is deleting the "you are to assume," yeah --

3      **THE COURT:**  I won't say anything right -- no, I'm not

4   going to touch the "you are" -- the things that I already said

5   they're going to assume, I've already found, I'm keeping the

6   "you are to assume."  So if you're using this to try to remove

7   every single reference to every single element, the answer is

8   no, I'm not going to revisit it.

9      I'm not going to add, because there's no stipulation, "you

10  are to assume that Mr. Musk or Tesla acted" -- I guess it's

11  just Mr. Musk in this case -- "with the necessary state of

12  mind."  I'm not going to give that because there's no such

13  stipulation at this point.  I'm just not going to say anything

14  about that.

15     **MS. THOMPSON:**  Right.  And I think part of the reason

16  we were raising this is, again, you know, we understand and

17  appreciate the Court's attention on this issue.  But having the

18  Court instruct that the jury's to assume recklessness we think

19  is prejudicial.  We're looking for a way to obviate that

20  prejudice.

21     **THE COURT:**  Well, --

22     **MS. THOMPSON:**  The Court has suggested a way --

23     **THE COURT:**  -- I am giving it and there's one way to

24  obviate that, and that is -- I mean, I still have to say that

25  you are to assume that the scienter requirement is -- has been

1    met.

2            **MS. THOMPSON:**  Right, and I think there --

3            **THE COURT:**  We don't have to get into the details and

4    use the word -- if your concern is using the word "reckless

5    disregard," that may be.  If you're stipulating, or at least

6    conceding, that scienter is met, then the jury doesn't have

7    to -- they don't have to know whether it's reckless disregard

8    or knowing, it's just met.

9            **MR. PORRITT:**  As with falsity, Your Honor.  So, I

10   mean, it's going to change the verdict form.

11           **THE COURT:**  Yes.

12           **MR. PORRITT:**  As with falsity, it would change the

13   verdict form because at the moment they're asked to say it's in

14   the context of a 10b-5 Claim.

15           **THE COURT:**  Yes.

16           **MR. PORRITT:**  So we would have to radically change the

17   verdict form.  And again, we would intentionally -- it would

18   become a trial on materiality, Your Honor.  So if they are

19   willing to stipulate that if the jury finds it's material, then

20   all elements of the claim are essentially met, that's -- but

21   that's a very different set of instructions than what we

22   currently have.

23           **THE COURT:**  Well, it --

24           **MR. PORRITT:**  So --

25           **THE COURT:**  I think it can be redone.  I'm not --

 1   that's not -- I'm not intimidated by that, but I'm not going to

 2   do anything without a clear decision.

 3          **MR. PORRITT:**  I mean, if defendants are going to

 4   stipulate that the only issue in doubt really is materiality,

 5   and if we establish --

 6          **THE COURT:**  Well, there's reliance, there's damages,

 7   there's --

 8          **MR. PORRITT:**  All of which are -- all of which

 9   governed by materiality, Your Honor, essentially.  So --

10          **MS. THOMPSON:**  Again, I think probably the -- the

11   easiest way to do this is to remove the "You are to assume

12   recklessness" from the preliminary instruction and then the

13   parties can confer, and absent agreement, defendants can put

14   forth a proposal.  I do think this would streamline, you know,

15   first of all, the instructions that the Court needs to give the

16   jury at the end of the day, and also the issues that the jury

17   needs to decide.

18       But, for now, our only request is to simply preserve the

19   ability of defendants to make that decision as to waiver if the

20   instructions can be done in a way that we think sufficiently

21   removes the issue from the -- from the jury by not instructing

22   in the preliminary instruction today or tomorrow morning, as

23   to -- as to "You are to assume recklessness."

24          **THE COURT:**  So it's the last paragraph of the

25   preliminary instruction.

1        **MS. THOMPSON:**  Yes, Your Honor.

2        **THE COURT:**  That you would want removed because it may

3   be that you stipulate to and we wouldn't get into the term

4   "reckless disregard" or "knowing"?

5        **MS. THOMPSON:**  Yes, Your Honor.

6        **THE COURT:**  When will you be making your decision?

7        **MS. THOMPSON:**  Well -- well, we -- we can make it on

8   the timeline the Court gives us, but we do need to just confer

9   not only with the client, but also how the other instructions

10  fall out if that scienter element is removed.

11       **THE COURT:**  Well, I can tell you without having gone

12  through it line by line, my intent is if there is a stipulation

13  that scienter has been met, I would change the "You are to

14  assume -- "You are to assume that Mr. Musk acted with the

15  necessary state of mind," without saying anything more, as well

16  as assuming that the statement was not true.

17       I would remove, as a result, I think, the instructions on

18  scienter and state of mind, since it's already been found, and

19  maybe say something like "You need not determine scienter," or

20  "You need not resolve that question.  You are to assume that

21  that element has been met."  And we would remove probably the

22  imputation -- well, let's see.  Scope of authority is still --

23  you haven't stipulated to that, or would you stipulate to that?

24       **MS. THOMPSON:**  No, no, Your Honor.  No.

25       **THE COURT:**  Okay.  So that -- we still have to give

1  the imputation, so that one would be still there.  But

2  scienter, you know, again, we'd say that "You should assume

3  that scienter on Mr. Musk's part has been met."  Then the

4  question is can you impute that to Tesla, and that depends on

5  scope of authority.  And I think those are the main --

6  that's -- I think that's where it comes out.  I mean, we'd have

7  to look at it, but those are the --

8      MR. PORRITT:  Yeah, I would want to review in a bit

9  more detail, Your Honor, on the -- I just didn't have a copy of

10  the -- of those jury instructions with me sitting here right

11  now.

12      THE COURT:  And we'd have to change the verdict form,

13  obviously.

14      MR. PORRITT:  I think it would be very dangerous,

15  Your Honor, in terms of trying to them to under -- for the jury

16  to understand and make sure that they are properly instructed

17  by removing an element of the claim from -- seemingly from the

18  instructions altogether, without -- without more of a

19  stipulation or more of a concession or admission on behalf of

20  defendants, about what that actually means.

21      And I think using the word "scienter" I think is just very

22  dangerous on behalf of the jury -- I mean --

23      THE COURT:  Well, I'll say "necessary state of mind."

24  That is the wording of the instruction.

25      MR. PORRITT:  But I think, getting an understanding of

1    the conduct that's at issue here, you need an element of

2    recklessness or intent.  I think they need to understand that

3    it's a fraud claim, and that this is their finding him liable

4    for fraud --

5            **THE COURT:**  I think the issue is materiality and

6    reliance.  I'm not sure why you need to know whether he acted

7    recklessly or knowingly in that regard.

8            **MR. PORRITT:**  If they -- if we are limiting this --

9    the only issues to be decided by the jury for the 10b-5 claim

10   are issues of materiality and reliance and it is clearly set

11   forth in the instructions and as clearly set forth in the jury

12   form, which is, again, very different than what is currently

13   presented, then, you know, that's something we can -- I can't

14   concede it sitting here today because it's such a big change

15   and it's just been proposed, but that's -- you know, that

16   would -- I think that's where you end up having to go.  That is

17   the logical end point of where we're going right now, which is

18   dramatically slimmed-down set of instructions, a dramatically

19   slimmed-down verdict form.  A very different verdict form.

20   And, so that is where I think where would be -- where would we

21   be going on this.  So -- that's where we are.

22       So, I mean, maybe we need to fully understand what exactly

23   defendants are proposing in this.  And again, you know, because

24   doing this, you know, our goal was to be making opening

25   statements right now.  And, so these instructions would have

1    already been given and now this, so you say, well, a radical

2    proposal has just been made.

3         **MS. THOMPSON:**  And, Your Honor, I just -- I wanted to

4    say of course the goal is to slim down.  I think the Court

5    would be happy to slim down the issues for the jury and to slim

6    down the verdict form.  And if it can be done in a way that

7    just sort of removes the element from the jury's consideration,

8    and from defendant's perspective removes the sort of idea that

9    the jury has been instructed as to recklessness, and the very

10   first thing that the jury hears removes that prejudice, I think

11   that would be the benefit that defendants would be looking for.

12        **MR. PORRITT:**  And just one question, Your Honor.  If

13   you were to do that, I mean, would that mean that, in, say,

14   openings or in closings, you're not able to even reference the

15   idea of scienter?  You could not say they have stipulated that

16   he acted recklessly?

17       Would that be something that I would be unable to say?

18        **THE COURT:**  I -- well, one thing you could stipulate

19   to is you can just say that with respect to the element of

20   state of mind, there was an agreement that that's been met

21   here.  I don't think you have to use the word "reckless,"

22   "knowing."

23        **MR. PORRITT:**  Well, with respect, Your Honor, I think

24   defendants -- the jury should know exactly the level of conduct

25   that they have stipulated has occurred here.  So I think that

**PROCEEDINGS**

 1   plays into their assessment of the facts, it goes into

 2   assessment --

 3          **THE COURT:**  Well, you will be able to argue that in

 4   the context of apportionment, knowing -- knowing -- knowing --

 5          **MR. PORRITT:**  I mean, it certainly goes into

 6   credibility determinations the jury is going to make.  If the

 7   witness is there who has agreed, stipulated that he acted

 8   recklessly in issuing a false tweet, that's something, I think,

 9   the jury can -- should understand or should know when they're

10   assessing his credibility when he sits there and assume he

11   argues that, in fact, it was not misleading and it was, in

12   fact, true or whatever he's going to say under oath.

13          **MS. THOMPSON:**  And, Your Honor, this is part of the

14   reason why we want to remove this entirely from the case.  It's

15   because plaintiff is not looking to simply inform the jury that

16   this element is met.  They're looking to use it in a

17   prejudicial way, just like in the opening slide deck that they

18   submitted that had the Court's summary judgment order all our

19   over it.  What they're looking for is a prejudicial effect and

20   not simply that the Court decided this element.  And what would

21   be proper is for the Court to remove that from the jury's

22   consideration, and remove that likely prejudice from the case.

23          **MR. PORRITT:**  Well, obviously, it's prejudicial when

24   you lose a major element of a claim against you.  So, that's

25   the prejudice.  It's this -- there's prejudice and undue

1  prejudice, and I don't think this is an undue prejudice.

2       **THE COURT:**  Well, I want you to meet and confer and

3  see if you can come up with something.  I have to decide.

4       You want me to strike any reference to the term "reckless

5  disregard"?

6       **MS. THOMPSON:**  (Nods head)

7       **THE COURT:**  And you're saying that by stipulating,

8  that would obviate the need to get into it.  They're saying

9  that even if it's not an element of the 10b-5, it's -- it is

10 relevant to credibility -- you know, I guess what you are

11 saying is what's relevant to credibility is that there has

12 beans a stipulation that or a finding that.

13      And, in other words, you are to assume -- not referring to

14 any -- you are to assume that he acted -- they want you not to

15 say those words --

16      **MR. PORRITT:**  Agreed, Your Honor.

17      **THE COURT:**  -- essentially.

18      **MR. PORRITT:**  Which means, essentially, we have to

19 prove it all over again if we're not getting the benefit of the

20 finding.  We would have to show that he acted recklessly in

21 order for the jury to then understand, so we end up

22 re-litigating -- in an essence, we end up almost re-litigating

23 the whole element of scienter just so the jury understands the

24 exact nature of the conduct.  Unless we make this a scientific

25 trial, just on materiality, and we have -- we'll put up the two

 1   experts, we'll send it to the jury and we'll be done in two

 2   days.

 3            **MS. THOMPSON:**  Well --

 4            **THE COURT:**  All right, here's what we're going to do

 5   today.  Then I'm going to think about it.  I want to get the

 6   jury seated, want them sworn, I want to give these

 7   instructions, I want to get this out of the way so at least

 8   they understand.  I'm going to give the 10b-5 instruction, but

 9   I'm not going to -- I'm going to leave it more general as the

10   second element is that Elon Musk and/or Tesla acted with the

11   necessary state of mind.

12       At this point, since it's just opening, a big preliminary

13   instruction, I won't say anything about the "assume" part

14   because I haven't resolved that question.  I am going to keep

15   the part about that these were untrue.  You're to assume that

16   the statements were untrue.  And since I'm not, you know,

17   elaborating on what state of mind is or necessary state of

18   mind, and it's just one of several elements, that leaves the

19   door open.

20       And then if there is a stipulation, then I will tell you

21   will what I'm going to do tomorrow morning first thing and then

22   you can fashion your arguments accordingly.  And -- and, of

23   course, obviously, then the instructions will reflect it if I

24   do make any kind of change.  But that decision has to be made,

25   pronto.

1          **MR. PORRITT:**  Okay.

2          **MS. THOMPSON:**  Yes, Your Honor.

3          **THE COURT:**  And I'm not -- and I'm not -- you know, I

4    need to think about this question that Mr. Porritt has raised

5    and that is the words "Reckless disregard," because there was

6    such a finding, that -- that assumption, the fact that the

7    jury's supposed to assume that may be relevant to other issues

8    here.  And in which case I can't grant your wish, which is to

9    remove those words, which I understand is your objection.

10         **MS. THOMPSON:**  Yes, thank you, Your Honor.

11        One thing that may be helpful to the parties in conferring

12   is if we did have the Court's proposed verdict form, which I

13   don't think we've received yet, so if there is one that we

14   should be keeping in mind as we go through this process that,

15   would be helpful.

16         **THE COURT:**  Yeah.  Have we not circulated a form?

17         **THE LAW CLERK:**  (Inaudible).

18         **THE COURT:**  We -- we tried -- we do have -- we'll get

19   that out to you sometime --

20         **MS. THOMPSON:**  Thank you, Your Honor.

21         **THE COURT:**  -- today.

22         **MS. THOMPSON:**  Thank you.

23         **THE COURT:**  Before midnight.

24         **MR. PORRITT:**  All right, Your Honor.  I mean, okay,

25   we'll do our best to comply.  I mean, it's going to make --

**PROCEEDINGS**

1   right now, obviously, I reference in opening statement that

2   they are to use -- the jury should assume that Mr. Musk acted

3   with reckless disregard, which I think is a very important

4   thing to talk about.  And if --

5           **THE COURT:**  Well, if we don't resolve it --

6           **MR. PORRITT:**  -- and that's going to be out -- okay.

7           **THE COURT:**  If we don't resolve it, if I decide I'm

8   not going to change anything, you will be able to argue that

9   tomorrow.

10          **MR. PORRITT:**  All right.  Thank you, Your Honor.

11          **THE COURT:**  Okay?

12          **MR. PORRITT:**  All right.  Thank you, Your Honor.

13          **THE COURT:**  So we should convene early tomorrow.  I

14  think, 7:45.

15          **MR. PORRITT:**  Very good, Your Honor.

16          **THE COURT:**  Because we have evidence issues we have to

17  talk about and I don't want to keep the jury waiting.

18          **MR. PORRITT:**  Thanks, Your Honor.

19          **THE COURT:**  All right.  So we're going to bring the

20  jury in, and Ms. Ayala, if you could just tell everybody to sit

21  in the back and I'll just call up the lucky winners and we'll

22  have them seated.  How are we seating them?

23      (Off-the-Record discussion)

24          **MR. SPIRO:**  May I add one remark?

25          **THE COURT:**  Yes.

 1          **MR. SPIRO:**  This is Alex Spiro on behalf of the

 2   defendants.  We're going to -- what we're suggesting is that we

 3   remove the state of mind from the case.  So, of course, we

 4   would not argue the state of mind.  It's essentially an element

 5   they don't have to prove.  This happens all the time in trials,

 6   happens very frequently in criminal trials.  So what would

 7   happen is, you know, if somebody's a felon in possession, the

 8   felon has been decided, it's just a case about possession.

 9          I've tried many cases where there's an element that has

10   just been decided.  It makes the case simpler, it allows the

11   prosecutor or plaintiff to present their case simpler.  Unless

12   they are trying to use this assumed recklessness from the

13   Court's imprint for some improper purpose, I don't understand

14   why they wouldn't want it.

15          So the way it would work in a traditional trial would be

16   that there's just one less element for them to prove.  So,

17   again, I haven't seen the verdict form, but let's assume it has

18   five elements.  On this verdict form, it's going to have one

19   less elements.

20          **THE COURT:**  Yes, no, I understand.  That's why I

21   wanted you to meet and confer and see if you can reach an

22   agreement.  I understand you want to just remove it totally as

23   an element.

24          **MR. SPIRO:**  Correct.  And the reason I jumped up to

25   say it, Your Honor, is because in the -- in my experience, you

1    actually would not, at the beginning of a case, read that

2    element that ultimately won't go to them.  So that's the only

3    reason I wanted to make a quick -- just explain to the Court my

4    thinking and make it very clear, since I'm going to be opening,

5    that, no, of course, it's -- our hands are tied behind on your

6    back on the issue.  It's done.  It's decided.  We waive that

7    issue as to the way that Ms. Thompson explained.  And -- but

8    you wouldn't read that element at this juncture is how it would

9    traditionally go.  And I understand the Court's doing this on

10   the fly.  We learned about the imputation of scienter recently.

11   There's a lot of moving parts here; we're all doing our best.

12   The reality is, that's how -- that's how it would traditionally

13   continue and that's it.  It's decided.  They have one less

14   element.

15        THE COURT:  All right.  Well, I'll consider that, but

16   you see what you can work out.  But I'm going to go ahead and

17   give the instructions that I have already.  As it is already,

18   I'm going to leave out the element in but take out the

19   parenthetical about reckless versus knowing and I'm not going

20   to state the assume reckless disregard at this juncture.

21        MR. SPIRO:  Right, but then the -- the Court would

22   still be open at some point on the verdict form and at the

23   final instructions to removing the element entirely?  I just

24   want --

25        THE COURT:  Well, it's going to have to be decided

PROCEEDINGS

 1   tonight or tomorrow morning.

 2           **MR. SPIRO:**  Sure, sure, sure, sure.

 3           **THE COURT:**  Yeah.

 4           **MR. SPIRO:**  I didn't want to allow the ball to go

 5   further down the field without just explaining, making sure

 6   that the Court followed our thinking on the matter.  Thank you.

 7           **THE COURT:**  Yeah, yeah.  Okay.

 8       So, actually, can you help her with that?  Oh, she's

 9   almost done.

10       (Off-the-Record discussion)

11           **THE COURT:**  Social distancing with one exception.

12       (The following proceedings were held in the presence of

13   the Jury Venire)

14           **THE COURT:**  Okay, thank you for your patience,

15   everyone.  We have gone through the final process and have now

16   selected the nine persons who will serve as jurors in this

17   case.  So, I'm going to announce the names.  As you do, we'll

18   direct you where to sit.  So, Juror No. 1 in this case will be

19   Juror No. 3, Mr. Tinapay.  Hi, come on up.

20       And you can take that seat over there, says No. 1 in the

21   corner.  The second juror is Juror No. 4, Mr. Martinez.  You're

22   here (Indicating).  Thank you.  The third juror is Ms. Rickard,

23   No. 6.

24       Thank you.  And you can take the seat that says No. 3 up

25   there.

**PROCEEDINGS**

1      Juror No. 4 will be Deepak Sharma, No. 32.  And you can

2  sit in seat No. 4.

3      And then, Juror No. 5 is Juror No. 55, Mr. Moore.  Thank

4  you.

5      The sixth juror is Juror No. 57, Ms. Cazessus.  Thank you.

6      And Juror No. 7 is Juror No. 58, Mr. Xi.

7      And Juror No. 8 is -- is Mr. Torres, who is No. 67.

8      And the ninth juror is Juror No. 73, Mr. Cadogan.  Hi,

9  thank you.

10      Great, now congratulations.  You have been selected to

11  serve as jurors in this case.  And I want to make sure that all

12  of you are able and willing to serve.  Correct?

13      (Some Jurors nod)

14          **THE COURT:**  Okay.  Is the plaintiff satisfied with

15  this jury panel?

16          **MR. APTON:**  Yes, Your Honor.  Thank you.

17          **THE COURT:**  Defense?

18          **MR. SPIRO:**  Yes, we are, Your Honor.

19          **THE COURT:**  All right.  And Ms. Ayala, could you

20  administer the oath?

21          **THE COURTROOM DEPUTY:**  Yes.

22      (Jury Panel sworn in)

23          **THE COURTROOM DEPUTY:**  Thank you.

24          **THE COURT:**  All right.  Thank you, members of the

25  jury.  And again, congratulations.  And thank the rest -- I

1  want to thank the rest of the panel on behalf of the court and

2  the parties.  I know it's been a long day.  You have been

3  through a lot, you have answered questionnaires.  But you could

4  see why we go through this process, because we want to make

5  sure that the parties have a chance to question and go through

6  your responses and that we are able to select a jury that is

7  going to be fair and impartial.  And we often call more people

8  than we need because you never know what's going to happen.  So

9  even though you weren't selected for this jury, your

10 participation was essential to the process.  So thank you.  And

11 thank you for your time.

12     I do believe you get, one reward you get is you get an

13 exemption from this Court's jury service, I don't know if it's

14 for one year or two years, it's some meaningful period of time.

15 So, you get something out of it.  And hopefully learned

16 something too, from the process.  But thank you very much for

17 your participation.  You are excused.

18     Do they need to report back to the jury room or no?

19          **THE COURTROOM DEPUTY:**  Huh-uh.

20          **THE COURT:**  So thank you all.  You are free to leave.

21 So thank you all.  Appreciate it very much.

22     Okay.

23          **THE COURT:**  Okay as the prospective jurors are leaving

24 the room let me explain where we go from here.  I'm first going

25 to give you a preliminary set of instructions.  A little bit

1   about your duty and how things work.  A brief explanation about

2   the legal claims here.  And normally we would follow that up

3   with an opening statement from each of the parties.  An opening

4   statement is a chance for each party to describe to you what

5   they think the evidence will show.  Kind of give you a roadmap

6   to what this trial will look like.

7        Unfortunately because the way trials are we have to call

8   witness by witness and so sometimes it's just not in a

9   chronological order, you get people and you have to sort of

10  fill things in.  And as one of my colleagues describes it they

11  are going to describe to you, a trial is like a puzzle and you

12  get different pieces and put them all together and each side is

13  going to try to explain to you what they think that puzzle is

14  going to look like at the end.  But because of time what we are

15  going to do is have that process begin tomorrow, where they

16  will give their opening statements.  And then after that, we

17  will actually start hearing from witnesses and taking

18  testimony.

19       So, let me start with some preliminary instructions.

20                       **JURY INSTRUCTIONS**

21       **THE COURT:**  Members of the jury, you are now the jury

22  in this case and I want to take a few minutes to tell you

23  something about your duty as jurors and to give you some

24  preliminary instructions.  At the end of the trial I will give

25  you more detailed instructions that will control your

1   deliberations, when you deliberate it will be your duty to

2   weigh and to evaluate all the evidence received in the case and

3   in that process to decide the facts.  To the facts as you find

4   them, you will apply the law as I give it to you.  Whether you

5   agree with the law or not.  You must decide the case solely on

6   the evidence and the law before you.  Perform these duties

7   fairly and impartially.

8       You should not be influenced by any person's race, color,

9   religious beliefs, national ancestry, sexual orientation,

10   gender identity, like or dislikes, sympathy, prejudice, fear,

11   public opinion, or biases, including unconscious biases.

12   Unconscious biases are stereotypes, attitudes or preferences

13   that people may consciously reject but may be expressed without

14   conscious awareness, control or intention.  Like conscious

15   bias, unconscious bias can affect the way we evaluate

16   information and make decisions.  Do not be afraid to examine

17   any assumptions you or other jurors have made which are not

18   based on the evidence presented at trial.

19       Please do not take anything I may say or do during the

20   trial as indicating what I think of the evidence or what your

21   verdict should be.  That is entirely up to you.

22       A word about implicit bias.  We all have feelings,

23   assumptions, perceptions, fears and stereotypes about others.

24   Some biases we are aware of and others we may not be fully

25   aware of, which is why they're called implicit or unconscious

1    biases.  No matter how unbiased we think we are, our brains are

2    hardwired to make unconscious decisions.  We look at others and

3    filter what they say through our owner personal experience and

4    background.  Because we all do this we often see life and

5    evaluate evidence in a way that tends to favor people who are

6    like ourselves, who have had life experiences like our own.  We

7    can also have biases about people like ourselves.

8         One common example is automatic association of male with

9    career and female with family.  Biases can affect our thoughts,

10   how we remember what we see or hear, whom we believe or

11   disbelieve and how we make important decisions.  As jurors, you

12   are being asked to make an important decision in this case.

13        You must, one, take the time you need to reflect carefully

14   and thoughtfully about the evidence.

15        Two, think about why you are making the decisions you are

16   making and examine it for bias.  Reconsider your first

17   impression of the people and the evidence in this case.  If the

18   people involved in this case were from a different background,

19   were from different backgrounds, for example, richer or poorer,

20   or more or less educated, older or younger, or of a different

21   gender, gender identity, race, religion or sexual orientation,

22   would you still view them and the evidence the same way?

23        Three, listen to one another.  You must carefully evaluate

24   the evidence and resist and help each other to resist any urge

25   to reach a verdict influenced by bias for or against any party

1  or witness.  Each of you have different backgrounds and will be

2  viewing this case in light of your own insights, assumptions

3  and biases.  Listening to different perspectives may help you

4  better identify the possible effect, effects these biases may

5  have on decision-making.

6      And four, resist jumping to conclusions based on personal

7  likes or dislikes, generalizations, gut feelings, prejudices,

8  sympathies, stereotypes or unconscious biases.

9      The law demands that you make a fair decision based solely

10  on the evidence, your individual evaluations of that evidence,

11  your reason and common sense and these instructions.

12      A word about claims and defenses.  To help you follow the

13  evidence, I will give you a brief summary of the parties and

14  the positions of the parties.  That, the party that brings a

15  lawsuit is called the plaintiff.  This case is a class action,

16  in which a named plaintiff, called the class representative,

17  represents himself and a large number of unnamed persons called

18  the class.  The class representative in this case is Glen

19  Littleton, an individual investor who purchased Tesla

20  securities during the relevant time period in this case.

21  Mr. Littleton, as the class representative, represents a class

22  of investors who bought or sold Tesla securities during the

23  period August 7, 2018, through August 17, 2018, which is

24  referred to as the class period.  Unless I distinguish them I

25  will refer to the class representative and the class

 1  collectively as "the plaintiff."

 2      The parties against whom the lawsuit is brought are called

 3  the defendants.  In this case, the defendants are Elon Musk,

 4  Tesla's chief executive officer, members of Tesla's board of

 5  directors, and Tesla, Inc.  Unless I distinguish them, I will

 6  refer to them collectively as "defendants."

 7      In this case, plaintiff asserts that Elon Musk and Tesla

 8  violated Section 10(b) of the Securities Exchange Act of 1934

 9  and the SEC Rule 10b-5(b) by making materially false or

10  misleading statements regarding a potential going-private

11  transaction for Tesla that artificially affected the price of

12  Tesla's stock and other securities during the class period.

13  Specifically, on August 7, 2018, Elon Musk made the following

14  tweet, quote "Am considering taking Tesla private at $420.

15  Funding secured."  Mr. Musk tweeted later on August 7, 2018,

16  that quote, "Investor support is confirmed.  Only reason why

17  this is not certain is that it's contingent on shareholder

18  vote."

19      Plaintiff asserts that members of Tesla's board of

20  directors violated Section 20(a) of the Securities Exchange Act

21  of 1934 which imposes liability upon persons responsible for

22  controlling an entity that is found to have violated the

23  federal securities laws.

24      Plaintiff has the burden of proving these claims.

25  Defendant, defendants deny these claims.

1      A word about Rule 10b-5, which I just mentioned.  The

2   buying and selling of securities is controlled by the

3   securities laws.  A 10b-5 claim is a claim brought under a

4   federal statute, Section 10(b) of the Securities Exchange Act

5   of 1934, which in essence prohibits acts of deception in

6   connection with the purchase or sale of a security, and in

7   violation of the rules and regulations that the SEC has the

8   duty and power to issue.  The corresponding SEC rule, Rule

9   10b-5, prohibits the misrepresentation of material facts and

10  the omission of material facts in connection with a purchase or

11  sale of securities.  A person or business entity who violates

12  the securities laws, including Rule 10b-5, may be liable for

13  damages caused by the violation.

14      Plaintiff alleges that Elon Musk and Tesla, Inc., violated

15  Rule 10b-5 and harmed investors by making materially false and

16  misleading statements about the proposed going-private

17  transaction and its financing.  This is referred to as the

18  plaintiff's 10b-5 claim.

19      On this claim, plaintiff has the burden of proving each of

20  the following elements by a preponderance of the evidence.

21  One, Elon Musk and/or Tesla made untrue statements of a

22  material fact, in connection with the purchase or sale of

23  securities.

24      Two, Elon Musk and/or Tesla acted with the necessary state

25  of mind.

1      Three, Elon Musk and/or Tesla used an instrument of

2   interstate commerce in connection with the purchase and sale of

3   Tesla securities.

4      Four, plaintiff justifiably relied on Elon Musk and/or

5   Tesla's untrue statements of material fact in buying or selling

6   Tesla securities during the class period.

7      And five, Elon Musk and/or Tesla's misrepresentation

8   caused plaintiff to suffer damages.

9      An instrument of interstate commerce includes postal email

10  -- postal mails, emails, telephone, telegraph, telefax,

11  interstate highway system, internet, and similar methods of

12  communication and travel from one -- and travel from one state

13  to another within the United States.

14      You are to assume that the statements, quote, "Funding

15  secured" and "Investor support is confirmed,"  "Only reason why

16  this is not certain is that it's contingent on shareholder

17  vote" were untrue.  But you must still decide whether these

18  statements were of material facts.  A factual representation

19  concerning a securities material if there is a substantial

20  likelihood that a reasonable investor would consider that fact

21  important in deciding whether to buy or sell that security.  A

22  material misrepresentation gives a reasonable investor the

23  impression of a state of affairs that differs in a material way

24  from the one that actually exists.

25      Now, I just gave you one instruction, there will be other

1  instructions, more detailed instructions at the end of the case

2  but I wanted to give you at least one framework, so you can

3  listen to the evidence and understand a bit about what the --

4  some of the issues are.

5       Now getting to evidence, the definition of evidence.  The

6  evidence you are to consider in deciding what the facts are

7  consists of:

8       One, the sworn testimony of any witness;

9       Two, the exhibits that have been admitted into evidence;

10      Three, any facts to which the lawyers have alleged;

11      And four, any facts that I may instruct you to accept as

12  proved.

13      What is not evidence.  In reaching your verdict, you may

14  consider only the testimony and exhibits received into

15  evidence.  Certain things are not evidence, and you may not

16  consider them in deciding what the facts are.  I will list them

17  for you.

18      Number one, arguments and statement by lawyers are not

19  evidence.  The lawyers are not witnesses.  What they may say in

20  their opening statements, closing arguments and at other times

21  is intended to help you interpret the evidence but it is not

22  evidence.  If the facts as you remember them differ from the

23  way the lawyers have stated them, your memory of them controls.

24      Two, questions and objections by lawyers are not evidence.

25  Attorneys have a duty to their clients to object when they

1  believe a question is improper under the rules of evidence.

2  You should not be influenced by the objection, or by the

3  Court's ruling on it.

4      Three, testimony that is excluded or stricken or that you

5  are instructed to disregard is not evidence and must not be

6  considered.

7      In addition, some evidence may be received only for a

8  limited purpose.  When I instruct you to consider certain

9  evidence only for a limited purpose, you must do so, and you

10  must not consider that evidence for any other purpose.

11      Four, anything you may see or hear when court was not in

12  session is not evidence.  You are to decide the case solely on

13  the evidence received at trial.

14      Evidence for a limited purpose.  As I mentioned, some

15  evidence may be admitted for a limited purpose.  When I

16  instruct you that an item of evidence has been admitted only

17  for a limited purpose, you must consider that only for that

18  limited purpose, and not for any other purpose.

19      Direct and circumstantial evidence.  Evidence may be

20  direct or circumstantial.  Direct evidence is direct proof of a

21  fact, such as testimony by a witness about what that witness

22  personally saw or heard or did.  Circumstantial evidence is

23  proof of one or more facts from which you could find another

24  fact.  You should consider both kinds of evidence.  The law

25  makes no distinction between the weight to be given to either

1   direct or circumstantial evidence.  It is for you to decide how

2   much weight to give to any evidence.

3        So by way of example, if you wake up in the morning and

4   you see the sidewalk is wet, you may find from that fact that

5   it rained during the night.  However, other evidence, such as a

6   turned-on garden hose may provide a different explanation for

7   the presence of water on the sidewalk.  Therefore, before you

8   decide that a fact has been proved by circumstantial evidence

9   you must consider all the evidence in light of reason,

10  experience, and common sense.

11       Ruling on objections.  There are rules of evidence that

12  control what can be received into evidence.  When a lawyer asks

13  a question or offers an exhibit into evidence, and a lawyer on

14  the other side thinks that that is not permitted by the rules

15  of evidence, that lawyer may object.  If I overrule the

16  objection, the question may be answered or the exhibit

17  received.  If I sustain the objection, the question cannot be

18  answered and the exhibit cannot be received.  Whenever I

19  sustain an objection to a question, you must ignore the

20  question and must not guess what the answer might have been.

21       Sometimes I may order that evidence be stricken from the

22  record and that you disregard or ignore that evidence.  That

23  means when you are deciding the case, you must not consider the

24  stricken evidence for any purpose.

25       Credibility of witnesses.  In deciding the facts of this

case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.  In considering the testimony of any witnesses you may take into account:

One, the opportunity and ability of the witness to see or hear or know the things testified to;

Two, the witness's memory;

Three, the witness's manner while testifying;

Four, the witness's interest in the outcome of the case, if any;

Five, the witness's prejudice or bias, if any;

Six, whether other evidence contradicted the witness's testimony;

Seven, the reasonableness of the witness's testimony in light of all the evidence;

And eight, any other factors that bear on believability. Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember.  Also, two people may see the same event, but remember it differently.

You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

1  However, if you decide that a witness has deliberately

2  testified untruthfully about something important, you may

3  choose not to believe anything that witness said.  On the other

4  hand if you think the witness testified untruthfully about some

5  things but told the truth about others you may accept the part

6  you think is true and ignore the rest.  The weight of the

7  evidence as to a fact does not necessarily depend on the number

8  of witnesses who testify.  What is important is how believable

9  the witnesses were, and how much weight you think their

10 testimony deserves.

11  Conduct of the jury.  Let me say a few words about your

12 conduct as jurors.  First, keep an open mind throughout the

13 trial.  And do not decide what the verdict should be until you

14 and your fellow jurors have completed your deliberations at the

15 end of the case.

16  Second, because you must decide this case based only on

17 the evidence received in the case, and on my instructions as to

18 the law that applies, you must not be exposed to any other

19 information about the case, or to the issues it involves during

20 the course of your jury duty.  Thus, until the end of the case

21 unless I tell you otherwise, do not communicate with anyone in

22 any way and do not let anyone else communicate with you in any

23 way about the merits of the case or anything to do with it.

24 This includes discussing the case in person, in writing, by

25 phone, tablet, or a computer, or any other electronic means,

1  via email, text messaging, or any internet chatroom, blog,

2  website or application, including but not limited to Facebook,

3  YouTube, Twitter, Instagram, LinkedIn, Snapchat, Tik-Tok or any

4  other forms of social media.  This applies to communications

5  with your fellow jurors until I give you the case for

6  deliberation.  And it applies to communicating with everyone

7  else, including your family members, your employer, the media

8  or press, and the people involved in the trial.  Although you

9  may notify your family and your employer that you have been

10  seated as a juror in this case, and how long you expect the

11  trial to last.  But if you are asked or approached in any way

12  about your jury service or anything about this case you must

13  respond that you have been ordered not to discuss the matter

14  and report the contact to the Court.

15       Because you will receive all the evidence and legal

16  instruction you properly may consider to return a verdict do

17  not read or watch or listen to any news or media accounts or

18  commentary about the case or anything to do with it.  Do not do

19  any research such as consulting dictionaries, searching the

20  internet or using other reference materials and do not make any

21  investigation or in any way try to learn about the case on your

22  own.  Do not visit or view any place discussed in this case and

23  do not use internet programs or other devices to search for or

24  view any place discussed during the trial.  Also, do not do any

25  research about this case, the law or the people involved,

1   including the parties, the witnesses or the lawyers, until you

2   have been excused as jurors.  If you happen to read or hear

3   anything touching on the case in the media, turn away and

4   report it to me as soon as possible.

5       These rules protect each party's right to have this case

6   decided only on the evidence that has been presented here in

7   court.  Witnesses here in court take an oath to tell the truth.

8   And the accuracy of their testimony is tested through the trial

9   process.  If you do any research or investigation outside the

10  courtroom, or gain any information through improper

11  communications, then your verdict may be influenced by

12  inaccurate, incomplete, or misleading information that has not

13  been tested through the trial process.  Each of the parties is

14  entitled to a fair trial by an impartial jury and if you decide

15  the case based on information not present, presented in the

16  court, you will have denied the parties a fair trial.

17  Remember, you have taken an oath to follow to rules and it is

18  very important that you follow these rules.  A juror who

19  violates these restrictions jeopardizes the fairness of these

20  proceedings and a mistrial could result that would require the

21  entire trial process to start over.

22      If any juror is exposed to any outside information, please

23  notify the Court immediately.

24      Publicity during trial.  If there is any news media

25  account or commentary about the case or anything to do with it,

1    you must ignore it.  You must not read, watch, or listen to any

2    news media account or commentary about the case or anything to

3    do with it.  The case must be decided by you, solely and

4    exclusively on the evidence that will be received in this case,

5    and on my instructions as to the law that applies.  If any

6    juror is exposed to any outside information, please notify me

7    immediately.

8         No transcripts.  I urge you to pay close attention to the

9    trial testimony as it is given.  During deliberations, you will

10   not have a transcript of the trial testimony.

11        Taking notes.  If you wish you may take notes to help you

12   remember the evidence.  If you do take notes please keep them

13   to yourself until you go into the jury room to decide the case.

14   Do not let note-taking distract you.  When you leave, your

15   notes will be left in the jury room.  No one will read your

16   notes.  Whether or not you take notes you should rely on your

17   own memory of the evidence.  Notes are only to assist your

18   memory.  You are not to be overly influenced by your notes or

19   those of other jurors.

20        Bench conferences.  From time to time, during the trial,

21   it may be necessary for me to talk with the attorneys out of

22   the hearing of the jury, either by having a conference at the

23   bench when the jury is present in the courtroom, or by calling

24   a research (sic).  Please understand that while you are

25   waiting, we are working.  The purpose of these conferences is

1   not to keep relevant information from you, but to decide how

2   certain evidence is to be treated under the rules of evidence

3   and to avoid confusion and error.  Of course we will do what we

4   can to keep the number and length of these conferences to a

5   minimum.  And I may not always grant an attorney's request for

6   a conference.  Do not consider my granting or denying a request

7   for a conference as any indication of my opinion of the case,

8   or what your verdict should be.

9        Outline of the trial.  Trials proceed in the following

10  way.  First, each side makes an opening statement.  An opening

11  statement is not evidence.  It is simply an outline to help you

12  understand what that party expects the evidence will show.  A

13  party's not required to make an opening statement.

14       The plaintiff will then present evidence and counsel for

15  the defendant may cross-examine.  Then, the defendant may

16  present evidence and counsel for the plaintiff may

17  cross-examine.

18       After the evidence has been presented, I will instruct you

19  on the law that applies to the case, and the attorneys will

20  make closing arguments.

21       After that, you will go to the jury room to deliberate on

22  your verdict.

23       So, that brings us to the end of this day.  We will start

24  tomorrow morning at 8:30.  If you could get here early so we

25  could start promptly at 8:30 that would be greatly appreciated

1   because if any one of you are not here or late we can't get

2   started until everybody is here.  I think we will first start

3   off with the opening statements from each of the parties and

4   then we will begin as I mentioned, to hear witness testimony.

5       So Vicky will, I think, explain to you before you take off

6   where to go and may make sure we have your contact information

7   and give you a brief orientation.

8       And, but let me remind you that as you leave here, please

9   comply with my rule that you are not to do any research, talk

10  to anybody about this case, even family members, avoid anybody

11  from any press or any other organization or anybody, about

12  talking about this case and please do not read or listen to any

13  reportage of this case and I ask you to turn away from any

14  coverage so that you don't hear anything.  It's very important

15  that your evaluation of this case and your deliberations be

16  based solely on what you hear in this courtroom for the reasons

17  I've stated.

18      And so, and don't do any research, obviously, as I

19  mentioned.  So, with that direction, I'm going to excuse the

20  jury for the day.  And I expect that we will reconvene tomorrow

21  morning.

22      So, thank you for your service, and we look forward to

23  seeing you tomorrow.

24          **THE COURTROOM DEPUTY:**  All rise for the jury.

25      (Jury excused)

1    (The following proceedings were held outside of the

2    presence of the Jury)

3         **THE COURT:**  All right.  So, let's take up these

4    matters tomorrow morning, in terms of whether there's going to

5    be either a stipulated or non-stipulated withdrawal.  I guess I

6    need to think about the question that Mr. Porritt raised and

7    that is even if there's a stipulation as to scienter, whether

8    the jury should be instructed that they are to assume reckless

9    disregard is a matter that should be -- should be given anyway,

10   in any event.  And your argument is that it's relevant because

11   it goes to -- it may affect credibility.

12        And your argument is that it's prejudicial, it's not

13   necessary, it's not part of this case.

14        **MR. SPIRO:**  (Nods head)

15        **THE COURT:**  Interesting question.  So, let me know

16   what you decide as soon as possible.  Let me ask about the --

17   whether you -- maybe not have had a chance to meet and confer

18   about the objections, to the second day of trial.

19        **MR. SPIRO:**  We have not but we can do that shortly.

20        **THE COURT:**  Okay if you could do that I would

21   appreciate it.  And let me know what you respond.  I know you

22   wanted an extension of time, we're probably almost past that

23   time.  So I'm going to be merciful and give you until 5:00 to

24   file a response, give you a little bit of time to meet and

25   confer and see if you can resolve some issues.

PROCEEDINGS

1          **MR. APTON:**  Thank you, Your Honor.

2          **THE COURT:**  All right?

3          **MR. SPIRO:**  Thank you.

4          **THE COURT:**  So.  We're off to the races.

5          **MR. APTON:**  Thank you for today, Your Honor.

6          **THE COURT:**  All right.  Thank you.

7      (Proceedings concluded)

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, January 17, 2023