Volume 2
Pages 262 - 466

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES          )
LITIGATION.                           ) No. 18-cv-04865-EMC
_____)
                                       San Francisco, California
                                       Wednesday, January 18, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:

                LEVI & KORSINSKY, LLP
                1101 30th Street NW
                Suite 115
                Washington, D.C.  20007
       **BY:  NICHOLAS IAN PORRITT, ESQ.**
             **ELIZABETH K. TRIPODI, ESQ.**
             **ALEXANDER A. KROT, III, ESQ.**
             **JOSEPH LEVI, ESQ.**

                LEVI & KORSINSKY LLP
                75 Broadway
                Suite 202
                San Francisco, California  94111
       **BY:  ADAM M. APTON, ESQ.**

                LEVI & KORSINSKY LLP
                55 Broadway
                10th Floor
                New York, New York  10016
       **BY:  MAX EDWARD WEISS, ESQ.**
             **KATHY AMES VALDIVIESO, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
            Official Reporter, U.S. District Court

     (Appearances continued, next page)

**<u>APPEARANCES, CONTINUED:</u>**

For Defendants:

                  QUINN EMANUEL URQUHART & SULLIVAN, LLP
                  51 Madison Avenue
                  22nd Floor
                  New York, New York  10010
        BY:  **ALEXANDER B. SPIRO, ESQ.**
                  **ANDREW JOHN ROSSMAN, ESQ.**
                  **PHILLIP B. JOBE, ESQ.**
                  **ELLYDE R. THOMPSON, ESQ.**
                  **JESSE A. BERNSTEIN, ESQ.**


                  QUINN EMANUEL URQUHART & SULLIVAN, LLP
                  865 South Figueroa Street
                  10th Floor
                  Los Angeles, California  90017
        BY:  **MICHAEL T. LIFRAK, ESQ.**
                  **ANTHONY P. ALDEN, ESQ.**
                  **MATTHEW ALEXANDER BERGJANS, ESQ.**
                  **WILLIAM C. PRICE, ESQ.**

1    **Wednesday, January 18, 2023**                    **8:03 a.m.**

2                    **P R O C E E D I N G S**

3        (The following proceedings were held outside of the

4    presence of the Jury)

5        **THE COURTROOM DEPUTY:**  Court is calling the case In

6    Regarding Tesla Securities Litigation, Case No. 18-4865.

7    Counsel, please state your appearances for the record,

8    beginning with plaintiff.

9        **MR. PORRITT:**  Good morning, Your Honor.  Nicholas

10   Porritt on behalf of the plaintiffs, of Levi & Korsinsky.  With

11   me is Adam Apton and Elizabeth Tripodi.

12       **MR. SPIRO:**  Good morning, Your Honor.  Alex Spiro from

13   Quinn Emanuel on behalf of the defendants.

14       **THE COURT:**  Thank you, Mr. Spiro, and everyone else.

15       All right.  We've got a number of things I want to cover

16   before the jury comes in, and then we are going to have to take

17   a little bit of a break because we are having a problem with

18   the reporter equipment and realtime.  But I want to -- since we

19   only have limited time here, I want to get to some of the

20   issues that we need to talk about, prior to the start and your

21   opening statements.

22       So the first is the defendant's proposal regarding the

23   jury instruction and their indicated willingness to waive any

24   argument that something more than recklessness is required for

25   scienter.  And, and in exchange for that, they would like the

 1   instructions to essentially delete the scienter element, which

 2   is -- that's one way to do it.  The other way to do it is to

 3   say that there is a scienter element, but it's been met here.

 4   Their preference is to say nothing about that.  And then to

 5   alter the instructions so that the scienter issue which informs

 6   the question of -- of apportionment does get mentioned there.

 7   And the need to show willfulness.

 8       And, with an understanding that the evidence as to the

 9   state of mind of Mr. Musk and perhaps of those on the board

10   still comes in.  It's still relevant, because the issue has not

11   gone away.  But as an element of the substantive violation, it

12   would be no longer at issue.

13       So let me ask the plaintiffs, what's wrong with that?

14       MR. PORRITT:  Thank you.  Thank you, Your Honor.  Once

15   again, Nicholas Porritt on behalf of plaintiffs.  Once again we

16   just saw the submission that came in late last night.

17   Your Honor asked us to meet and confer on this point.  We asked

18   defendants for their proposal, and then we saw it when they

19   filed it with the Court late last night.  We had no input into

20   what their proposal was in any detail.

21       Can I remove my mask?

22       THE COURT:  Yes, you may remove your mask when you're

23   speaking.  Yes.

24       MR. PORRITT:  Thank you.  So as we stated last night,

25   you know, we do have some concerns about this.  We have

1    concerns about how this is going to affect the evidence coming

2    into trial.  They have suggested that evidence of state of mind

3    will still come in, but at the same time the jury will not be

4    told Your Honor's finding that Mr. Musk acted with deliberate

5    recklessness, and that is the minimum level of conduct that

6    should be ascribed --

7         THE COURT:  Why does the jury need to know that at the

8    outset?

9         MR. PORRITT:  What's that?

10        THE COURT:  Why does the jury need to know that now?

11        MR. PORRITT:  Well, I think it would have been helpful

12   to guide their receipt of the evidence, but Your Honor made

13   that decision, it's done, so that's --

14        THE COURT:  And you have opening statements.  Because

15   his state of mind is still relevant, and so if you say, for

16   instance that:  You, the jury may be called upon to, if you

17   find liability, to apportion liability, to see whether for

18   instance Mr. Musk is going to be responsible for all, jointly

19   and severally, and that if he acted knowingly, he would be.

20   And that's why you're going to hear evidence on his state of

21   mind.

22        MR. PORRITT:  I understand that.  What we don't --

23   what we are concerned about is that we will hear evidence, and

24   we're going to hear argument, directly or indirectly, that Elon

25   Musk acted innocently or in good faith or just merely

**PROCEEDINGS**

 1    negligently.  And that evidence and those argument and those

 2    implications are going to be made by defendants, and we were

 3    not going to be able to counter it with the:  No, the Court has

 4    found you are to assume that he acted with deliberate

 5    recklessness, and that is your assumption.

 6        So that is concern is that they are going to be

 7    presenting -- and we heard a little bit of that yesterday in

 8    the voir dire statements by Mr. Spiro.  And so at a minimum, I

 9    think that's improper now under the summary-judgment order,

10    frankly.  And we've -- we filed a motion in limine on that, to

11    that effect, and I think Your Honor confirmed that.

12        **THE COURT:**  But you'd be able to put on evidence, and

13    I'm sure you will, indicating or you think will indicate that

14    he did so knowingly that when he tweeted, as he knew darn well

15    that things were not secure.  There were many things up in the

16    air with PIF and everything else.  I'm sure you're going to

17    make an opening statements that will say the evidence will show

18    that, and you will close with that.

19        **MR. PORRITT:**  Understood.  But then we are essentially

20    litigation the issue of scienter at that particular point of

21    time, without the baseline of -- they're going to be arguing:

22    No, it wasn't, it was just innocent.  It was some sort --

23        **THE COURT:**  Why do we need a baseline?

24        **MR. PORRITT:**  Because we need the jury to understand

25    that this is what the Court has found, the evidence -- that

**PROCEEDINGS**

 1   anything less than deliberate recklessness is not an option for

 2   them in terms of their thinking about a state of mind.  So that

 3   is one concern.

 4       You know, the concern about credibility is an issue I

 5   raised yesterday; I think that's still an issue.  I think that

 6   matters.

 7           **THE COURT:**  You have plenty of stuff to argue

 8   credibility without a -- an instruction on the assumption of

 9   recklessness, seems to me.

10           **MR. PORRITT:**  And the final point I'm making, I think

11   it is risk of confusion -- the question of knowledge,

12   Mr. Musk's state of mind is an issue for the jury.

13           **THE COURT:**  Yes.

14           **MR. PORRITT:**  On the question of allocation.  You will

15   instruct them on knowledge versus -- the concern I have is that

16   if they find absence of knowledge, so they're going to be asked

17   to find knowledge.  They -- after we present our evidence, we

18   argue, of course, that he did act knowingly, they decide:  No,

19   he's not acting knowingly.  The question is going to be, well,

20   then what?  I think there is a risk of confusion that they will

21   then say:  Well, what does that mean in terms of liability for

22   Mr. Musk?  If we don't show "knowingly," what does that mean --

23           **THE COURT:**  They don't have to decide liability.

24   They've already stipulated liability.  If that's the only thing

25   that's problematic is that the jury did not find knowingly,

**PROCEEDINGS**

1   they would have waived the argument that the Supreme Court has

2   reserved under the *Matrixx* case that anything less than

3   knowingly doesn't cut it for scienter.  They've waived that.

4   Which is a huge advantage to you, it seems to me.

5          **MR. PORRITT:**  Well, frankly, the Supreme Court has had

6   plenty of opportunities to address this issue, and has declined

7   every one.  And that's the law -- and deliberate recklessness

8   is the standard in every circuit in the United States.  So I

9   don't think it's much of a waiver, with all due respect.

10         **THE COURT:**  Well, might be.  Might be.  Who knows?

11         **MR. PORRITT:**  Agreed, who knows?  I mean, you know,

12  law does change, as we know.  But, you know, but nonetheless, I

13  don't think that's really that much of a way.  But my concern

14  is more when, in the course of their deliberations when they're

15  thinking about knowingly, and if the jury decides:  We don't

16  think Mr. Musk acted knowingly here, does that mean that they

17  can't tick the box in terms of finding the 10b-5 claim?  And

18  they won't have the instructions on that.  They won't have the

19  benefit of the summary-judgment order.

20         So that is really our concern, is that we would much

21  rather -- and I don't think it's unduly prejudicial to

22  defendants to say it's an element.  And, you know, and it has

23  been met, and you are to assume it's been met.

24         That is not unduly prejudicial to defendants, and so we

25  would submit that's normally how it goes when you win summary

1    judgment on partial elements, is that the elements are

2    explained, and then the Court says "I have found," or "You are

3    to assume that Elements 1, 3 and 4, out of at least four

4    elements has been met.  You have to decide Element 2."

5        That's the way it is almost always done --

6        **THE COURT:**  Let me ask for a response.  Instead of

7    just silence, why not, which is not untypical, say:  Here are

8    five elements; you are to assume the first three are met.

9        Just like in a damages case where liability's been found,

10   jury often is told that:  It's already been determined that the

11   defendant is liable; your task is to determine damages.

12       What's wrong with -- even if we don't use the word

13   "reckless disregard" just say:  State of mind, there's a state

14   of mind element which the lawyers call scienter, and you are to

15   assume that that element has been met.  You don't need to

16   address that issue.

17       **MR. SPIRO:**  Yes.  Thank you, Your Honor.  Mr. Porritt

18   actually laid out quite well the reasons why that's

19   problematic.  His reasons for wanting this instruction are

20   essentially twofold, as I understand it.

21       One is he wants the imprimatur of the Court on this case.

22   He wants as much as he can to say --

23       **THE COURT:**  It would be a very limited imprimatur

24   because, number one, it's not going to say "The Court found,"

25   just "You are to assume."  But more importantly, it says -- the

**PROCEEDINGS**

1   words "reckless disregard" will not appear anywhere.

2       MR. SPIRO:  Right, but that is problematic in and of

3   itself, because for all they know, the Court found he did this

4   intentionally; he did this more than that.  It's sort of

5   impossible to tease it out, which is why courts traditionally

6   just leave out the element.  And the idea that we're not going

7   to assume the Court -- the jury follows the law and follows

8   your instructions is folly.  We always do that.  And this

9   actually makes it easier.

10      So the first reason that they give, again, which is

11  essentially that they want the Court's imprint on that case is

12  obviously an improper reason, and a reason that the Court has

13  rejected other requests by the plaintiff.

14      THE COURT:  So your best argument is that by making a

15  statement, by listing all the elements including scienter and

16  then saying:  Scienter has been met here, you are to assume

17  it's been met, the jury might construe that as meaning there's

18  been a determination that Mr. Musk knowingly made the

19  statement, and that the only way to clarify that is then draw

20  the distinction between recklessness and knowing, which is the

21  thing you want to avoid.

22      Is that --

23      MR. SPIRO:  Right.  Or even worse.  And again, it

24  would be the only time in the case that the Court is

25  instructing them essentially that there's been an element

 1  found.  So we would not have this stipulation and there would

 2  be no agreement from us on those terms.  We would not agree to

 3  move forward on this under those circumstances.

 4      The second reason that Mr. Porritt gives which is even

 5  more troubling and problematic is that he has told the Court

 6  now twice, yesterday, very clearly, that he intends to use the

 7  Court's finding as essentially improper character evidence and

 8  improper credibility evidence.  The Court surely knows that's

 9  improper.  There's -- this is not 404, this isn't like some

10  prior charged act.  Even if it were, right, which it's not,

11  recklessness doesn't even go to credibility, right?

12      Courts -- you know, you make an application to question

13  somebody about some prior issue that has to do with a reckless

14  incident, a DWI, things like that, and courts say no, of

15  course.  That does not go to credibility.

16      So we have an admission from plaintiffs that they intend

17  to weaponize this in both of these ways.  It's exactly why it

18  should be out of this case.  And there's ample precedent for

19  this.  Happens all the time.  And as the Court knows, it

20  happens all the time in criminal cases where there's great

21  concern that prior issues, the weaponizing of prior issues,

22  needs to be out of cases.  And that's why when there is a

23  bump-up offense, when there's a predicate offense, when

24  somebody is a felon in possession, the Court does not instruct

25  the jury, does not say:  You are assumed to find that the man

1    is a felon.  The Court leaves that out of the case, and then

2    it's just for the jury to decide these things.

3        This case is already concerning to the defense for all the

4    reasons we've made known to the Court.  And to add further

5    prejudice to it we think is problematic.  The same evidence is

6    going to come into the courtroom, so there's no real issue that

7    the plaintiffs can point to.  It's only the improper motives

8    that they have, that are making this an issue.

9        One final point, regardless of the Court's ruling on these

10   issues -- and again, just to say it again, if -- unless we --

11   and we structured our application this way.  Our only

12   willingness to this would be if it was done the way we

13   prescribed.  We cannot have or allow for the differences that

14   plaintiff suggested, because we think it even makes greater

15   prejudice than where we are today.

16       But the final point I wanted to make, leading into opening

17   statements, is Mr. Porritt a couple of times has suggested in

18   his language what he intends to say to the jury.  Our

19   understanding of the pretrial rulings and Your Honor's comments

20   are it's assumed:  Assume this, assume that.  At one point

21   Mr. Porritt said "You have been directed to assume."

22       That's improper.  That is in essence changing the Court's

23   rulings and weaponizing the ruling.  Because "directed" is

24   going to be imprinted:  Judge.  So again, as long as

25   Mr. Porritt says assume, assume, assume, the Court's ruled on

 1    that, and we understand the Court's ruling.

 2          THE COURT:  All right.  I'm going to rule.

 3       I'm going to accept the defendant's proposal, with a clear

 4    stipulation, I want to make this abundantly clear, that the

 5    defendants are waiving any argument that anything -- that

 6    scienter has not been established.  That you're agreeing that

 7    scienter's been established because I -- except you're taking

 8    issue and you can appeal my recklessness finding on summary

 9    judgment.  But you would agree that a finding of recklessness,

10    which I have found, satisfies the scienter requirement and that

11    a knowing -- knowingness is not required.

12       Correct?  I want to make sure that's clear.  Because

13    otherwise, you're not giving up anything.

14          MR. SPIRO:  Yes, Your Honor.  Again, this is -- this

15    is the directors, obviously -- and Mr. Musk is a director --

16    still have these issues live.

17          THE COURT:  Yeah.  Well, that's why -- well, the

18    knowing is going to -- that's his state of mind is still

19    relevant, because of the director liability question.

20       But in terms of the 10b-5 question, you are not going to

21    argue, and you're giving up the argument that even a finding by

22    the Court of recklessness, if upheld, if the summary judgment

23    holding is upheld, is not sufficient.  If I accept all the

24    other terms.

25          MR. SPIRO:  May I have a moment, Your Honor?

PROCEEDINGS

 1          **THE COURT:**  Yeah.

 2       (Off-the-Record discussion between counsel)

 3          **MR. PORRITT:**  I might clarify, Your Honor, there is no

 4   20(a) claim against Elon Musk in this case.  So I took from

 5   Mr. Spiro's comment --

 6          **THE COURT:**  Well, not against him, but I mean his --

 7   the -- well --

 8          **MR. PORRITT:**  I understood Mr. Spiro to be saying that

 9   they can argue absence of scienter, absence of recklessness on

10   behalf of the directors, which they can.

11          **THE COURT:**  Right.

12          **MR. PORRITT:**  For every director except Elon Musk.  He

13   said Elon Musk is a director.  I took that as an implication

14   that they're going to argue that as a director, Elon Musk left

15   scienter.  And that's a new development for consideration

16   because there's no 20(a) claim against Elon Musk.

17          **THE COURT:**  Right.  So his recklessness or not is not

18   an issue with respect to 20(a).

19          **MR. PORRITT:**  Right.  And I do want to make clear, as

20   I said, I mean, I noticed Mr. Spiro did not say in response to

21   my argument, "I'm not going to argue that Elon Musk acted

22   innocently; I'm not going to argue that Elon Mush had a

23   innocent state of mind."

24          **THE COURT:**  No, I understand that.  Because there's

25   going to be an issue whether he acted knowingly or not, and --

1          **MR. PORRITT:**  But I don't think Mr. Spiro should be

2     able to say that he acted in good faith, or he acted

3     negligently, because that's violating -- that's contrary to the

4     summary-judgment order.

5          **THE COURT:**  Well, to rebut a claim of -- of knowing,

6     of an assertion of knowingness, you've got to, you know, say

7     something.

8          **MR. PORRITT:**  Deliberate recklessness is the answer,

9     Your Honor.  They can only argue that Elon Musk acted either

10    recklessly or knowingly.  Those are the two choices, we would

11    submit, is available to counsel, if they're going to comply

12    with your --

13         **THE COURT:**  Well, they could argue that he acted even

14    less than recklessly.  That he -- he acted totally responsibly.

15         **MR. PORRITT:**  How can they do that, consistently with

16    Your Honor's order?

17         **THE COURT:**  Well, is that to rebut your argument of

18    knowingless -- knowingly?

19         **MR. PORRITT:**  The rebuttal of knowingness has to be he

20    only acted recklessly.  That's the argument.  I mean, that's --

21    this is the confusion I think, Your Honor, that we face.

22    That's the problem with their proposal.

23         **THE COURT:**  All right.  I don't know if you heard all

24    of Mr. Porritt's response, but that raises a concern about what

25    you would be arguing.  Are you precluded from arguing that he

**PROCEEDINGS**

 1 | didn't act knowingly but only recklessly or negligently, which

 2 | would be contrary to this Court's finding?

 3 |     **MR. SPIRO:**  Can I have a moment to speak to the

 4 | client?

 5 |     **THE COURT:**  Yes.

 6 |     **MR. SPIRO:**  About these issues that have been raised?

 7 | Hearing the Court's comments about the -- some of the issues

 8 | with the tech, the moment could be, I will take two or three

 9 | minutes, if the Court's okay with that.

10 |     **THE COURT:**  Okay, why don't we do that.  Let me cover

11 | a couple issues --

12 |     **MR. SPIRO:**  Sure.

13 |     **THE COURT:**  -- right now, because I don't want to

14 | delay the jury.  Who are the first -- what is the order of

15 | witnesses?

16 |     **MR. PORRITT:**  The first witness will be Glen

17 | Littleton.  The second witness is Tim Fries, third witness we

18 | would propose would be Professor Guhan Subramanian.  But I

19 | understand there is a motion or some objections pending on

20 | that.  We have -- a seventh motion in limine, frankly, has been

21 | filed.

22 |     **THE COURT:**  So I made my rulings with respect to this

23 | first set of objections with respect to Littleton and Fries,

24 | right?

25 |     **MR. PORRITT:**  Correct, they are good to go.

1          **THE COURT:**  Let me get -- so we can prepare with

2     respect to Mr. Subramanian, I did have the following comments.

3          One is I want to know from you, to the extent -- the gist

4     of his testimony is that this was a tremendous deviation,

5     extreme deviation from the norm.

6          What's the relevance?  How are you going to -- what's the

7     relevance of that?

8          **MR. PORRITT:**  I think it's relevant -- and Mr. Apton

9     may address some of the more details.  I'll give an overview,

10    and then I may have to defer to Mr. Apton if that's okay with

11    the Court.

12         It's relevant to Elon Musk's state of mind, in the

13    interest of knowingly.  He has been an experienced corporate

14    actor.  And the fact that this is such a massive departure from

15    established practice which he was aware of and which he was

16    told about certainly goes directly to the -- his state of mind,

17    regarding if -- I'll call it the third false statement that:

18    "Only reason why this is uncertain is that it's on contingent

19    on a shareholder vote."

20         So it's relevant to that.  It's relevant to the board's

21    state of mind, and their scienter, because they're also all

22    experienced corporate professionals, and are experienced in

23    deals.  And they saw what was going on and then they did -- you

24    know, they acted the way that they did.  Which we would argue

25    is certainly a complete violation of -- of their 20(a), and

**PROCEEDINGS**

1   shows a presence of scienter.

2          **THE COURT:**  All right.  So here's my ruling.  We've

3   got limited time.

4          Number one, this motion was filed on the eve of testimony.

5   His report, his rebuttal report has been known, has been out

6   for a long time.  So I'm troubled by a late filing,

7   late-evening filing which essentially is a *Daubert* motion,

8   motion in limine, at the eleventh hour.  So the timing of such

9   is tardy.  And not appreciated by this Court.

10         On that basis alone I could deny this, this objection.

11  Nonetheless, in the interest of justice, I'm going to address

12  the merits.  The testimony is relevant.  I think it does go

13  to -- it can go to state of mind.  It can go to board

14  liability.  And to the extent he testifies as to what sort of

15  the norm is in the industry, and how it's been done, and how

16  the facts of this case short-circuited many of those I think is

17  permitted.

18         However, there's something to the argument that to the

19  extent this turns into a narrative and a case summary that is

20  problematic, especially since this is going to be introduced so

21  early into the case.  I'm not going to allow this to be a

22  substitute for the evidence.

23         And, I think it's also problematic if you're intending to

24  introduce actual evidence and documents that he relied upon.

25  That doesn't come into evidence under 702 or 703 just because

1  he looked at it.  He can explain the basis of what he looked

2  at, the factual basis for his opinions.  He can describe it.

3  But when you start introducing evidence and correspondence,

4  this and that, emails, that looks like summation evidence.  And

5  I don't think that's appropriate.  Especially at the beginning

6  of the case.

7      So part of it is a level of detail.  So I'm going to give

8  him rein to explain what he saw, why he reached his conclusion,

9  to contrast and compare what happened here with what happens in

10  other transactions.  But if we start getting into details and

11  trying to introduce exhibits and this sort of thing, if I hear

12  an objection, it's likely to be sustained.

13      MR. PORRITT:  Understood, Your Honor.  That's not the

14  intent of his testimony.  The only internal -- the only

15  documents Professor Subramanian is going to be really referring

16  to are documents that are un-objected to.  So they're things

17  such as board minutes.  They're things such as the offer email

18  on August 2nd from -- from Mr. Musk to the board, which is part

19  of the undisputed facts that the parties stipulated to.

20      THE COURT:  Well, and I will also say that to the

21  extent he -- he begins to opine on what Mr. Musk's actual state

22  of mind was and his motives or whatever, that -- that's --

23  that's for the jury to determine.

24      MR. PORRITT:  Completely.

25      THE COURT:  That's not his expertise.

 1          **MR. PORRITT:**  Completely understood.  And that's not

 2    at all what he's going to be doing.  So he's mainly there to

 3    provide, A, an overview of how a management buyout process

 4    works for the jury because it's going to be novel to them, and

 5    to do the compare-and-contrast that Your Honor is expecting.

 6       Perhaps Mr. Apton can give a more, bigger handle on the

 7    details.

 8          **MR. BERGJANS:**  Good morning, Your Honor.  Alex

 9    Bergjans for the defendants.

10          **THE COURT:**  You can remove your mask if you would

11    like.

12          **MR. BERGJANS:**  Thank you.

13       First, I would like to correct Mr. Porritt's statement

14    professor Subramanian does not intend to just testify in

15    matters that have not been objected to.  He actually identifies

16    in his disclosures two highly objected-to pieces of evidence --

17    or two highly objected-to documents.  He includes the PIF

18    meeting notes, Exhibit 80.  So, and the text between Mr. Musk

19    and Mr. Al-Rumayyan of the Saudi PIF.

20          **MR. APTON:**  Your Honor, we're not using those.

21          **MR. BERGJANS:**  Okay.  They're not using those.

22       Furthermore, Your Honor, it's not just the factual

23    narrative that concerns defendants and is improper.  It's the

24    fact that Professor Subramanian, in order to make his opinion,

25    has to make personal judgments on the facts and what they mean.

1   He makes claims about Mr. Musk's intent.  He says Mr. Musk

2   intended to go to the shareholders and skip the board.

3       That is --

4       **THE COURT:**  That's why I already said, it's stuff

5   about his intent.  The factual questions and what inferences

6   can be drawn and factual conclusions, I'm not going to permit.

7   But, a statement about what actually happened and the sequence

8   and the chronologically..

9       **MR. BERGJANS:**  But within the statements of the

10  chronology, he embeds his own personal judgment.  So for

11  instance, his chart includes initial contact with shareholders

12  to the board, before board presentation.

13      In order to make the determination of initial contact he

14  judges what the initial contact was.  He makes the

15  determination that Mr. Musk's meetings with the PIF --

16      **THE COURT:**  Well, every expert is going to have some

17  personal judgment.  That's what an expert opinion does.

18      **MR. BERGJANS:**  But --

19      **THE COURT:**  He can -- if he draws inferences from

20  facts, he can do that, if an expert normally relies on such

21  things.  That's not unusual.  You have the right on

22  cross-examination to question the reliability of his

23  assumptions.

24      So, no.  No.  Just because he exercised some judgment is

25  not a good objection to totally bar that testimony.

1        **MR. BERGJANS:**  Respectfully, Your Honor, it's not the

2    fact that he's just exercising some judgment.  It's the fact

3    that he is making essentially lay determinations of what --

4        **THE COURT:**  There are some things that one has to

5    determine and assume.  I've told you, I'm not going to allow

6    him to invade the province of the jury on questions about

7    intent -- subjective intent.  But if his reconstruction of

8    events informs how this deviates in an objective way, I'm going

9    to allow him to do that.  You may take issue with his objective

10   understanding of the facts, as often is the case with experts.

11       **MR. BERGJANS:**  Understood, Your Honor.  But in

12   addition to laying out the facts, he also makes subjective

13   determinations as to the interpretations of what things mean.

14   He has a statement --

15       **THE COURT:**  I'll take it as it comes.

16       **MR. BERGJANS:**  -- which suggests --

17       **THE COURT:**  Counsel, I'll take it as it comes.  Okay?

18   You got the drift of where I'm going.  So if you want to lodge

19   an objection I'll, hear it at the time.

20       **MR. BERGJANS:**  Understood.

21       **THE COURT:**  So that brings me to the last subject

22   before I break, and you can talk with your client.

23       This Court took great pains to try to make this

24   streamlined and efficient.  I ruled on a slew of motions in

25   limine.  I created a process of bellwether objections, which, I

1    asked you to identify key documents and categories that would

2    illustrate certain points, and that would give you guidance in

3    working things out.  That process is not working.

4         To get a table of 108 pages the night before of objections

5    and responses, plus a late, tardy effective motion in limine on

6    the eve of trial, plus another set of 21 pages of objections to

7    the defendants is not what this Court was intending.

8         Now I'm just looking out there.  There's like ten on each

9    side of you, and one of me.  And I don't know how many people

10   are working on this case in your back offices.  But I've got

11   one staff.

12        And so what I'm going to do from now on -- and it becomes

13   apparent to me that neither of you have any incentive to try to

14   narrow these disputes, to try to be efficient, and to try to be

15   mindful of my rulings.  Instead, I get repeated efforts to try

16   to object to the *New York Times* article.  How many times do I

17   have to rule on that?

18        So what we're going to do is this.  I'm not going to

19   accept any filings after 6:00.  If you don't get it in by 6:00,

20   forget it.

21        Number two.  I'm not going to devote an hour every morning

22   -- we've already been here 45 minutes, and we're not even done.

23   I'm going to devote the usual 15 minutes before, to resolve

24   evidentiary problems.

25        Now, if we need more time because of the number of

1    objections, and I have to go through it and we run into jury

2    time, then that's time on you.  And I'm going to -- I will

3    allocate that time.  So you have some incentive to work things

4    out and be efficient, and be mindful of this Court's rulings.

5    So we don't keep repeating things.

6        But I'm not going to accept 150 pages of stuff every

7    night.  Because I don't know how many -- are you guys working

8    on any other cases, as we sit?

9        How many cases are you preparing trial for as we sit here?

10   Are you devoting any other time to cases?

11           **MR. PORRITT:**  No.

12           **THE COURT:**  Yeah, I didn't think so.  Well, I've got

13   300 cases.  I've got murder cases; I've got all sorts of cases

14   I'm dealing with and I'm preparing for trial.  So that's the

15   rule.

16       And let me give you some guidance again on my view of the

17   evidence.  With respect to Mr. Musk's state of mind -- which is

18   relevant, whether we accept this proposal or not -- and now I'm

19   sort of frankly inclined to not accept the proposal because of

20   some issues, I think it raises more issues.  But either way,

21   his state of mind is relevant.  His state of mind as revealed

22   by post-statement statements, that is, after the tweets in

23   question, are less relevant, but still are relevant because

24   what somebody says or does after the fact can shed light on

25   their state of mind, retrospectively.

**PROCEEDINGS**

1        But I'll have to exercise some judgment on that.   And

2    obviously, the -- the closer the proximity, the more relevant

3    it may be.   The further it is, may not.   But as a general

4    matter, Mr. Musk's state of mind is relevant, and

5    post-statement evidence is not necessarily irrelevant.

6        Number two.   The recurring theme about the -- the public's

7    state of mind, the effect on the listener, the market, if it's

8    during the class period, it's relevant.   If it's after the

9    class period, I have a hard time seeing how it's relevant.

10   Maybe you can devise some theory, but it's not apparent to me.

11   So the critical question is what was heard during the class

12   period.

13       Number -- the third reoccurring theme is that of -- I'll

14   call them opinion-makers, influencers -- you know, that's what

15   they're called on social media, but, but JP Morgan, and others

16   who are commenting.   Their comments during the class period is

17   relevant, because of the effect on the listener.   Their

18   comments after the class period in the nature of what I think I

19   would call sort of post-mortem as to what Mr. Musk was doing

20   and why, you know, he did it, or why it was wrong or why he was

21   way off the mark, is not relevant.   Because that's almost like

22   expert testimony.   The kind of expert testimony that, number

23   one, invades the province of the jury, two, that is coming from

24   a source, not, not a designated expert.   So the effect of the

25   listener doesn't fly, when it's after the fact.

1    So those are three benchmark points that should guide you

2    for 90 percent of these objections.  And now you've heard my

3    view about the expert and what I view in terms of experts.

4    What they can testify to, it's got to be relevant, and they can

5    testify as to the basis, the factual basis of their opinions.

6    But with limits.  It cannot be used as a substitute for

7    evidence.  What they say they relied upon is, itself, those

8    items are not automatically admitted.  They are not evidence

9    until they are independently admitted, unless there is a

10   special motion to admit those, for instance, under 703.  So

11   with that guidance, I expect that there will be less than 150

12   pages of tables.

13            **MR. PORRITT:**  (Nods head)

14            **MR. SPIRO:**  Understood, Your Honor.

15            **MR. PORRITT:**  Very good, Your Honor.

16            **MS. TRIPODI:**  Your Honor, can I approach and ask a

17   question?

18            **THE COURT:**  Yes.

19            **MS. TRIPODI:**  May it please the Court, Elizabeth

20   Tripodi on behalf of plaintiffs.

21       Your Honor, I apologize for the lengthy filings.  I just

22   want to clarify one thing that you just said regarding analyst

23   reports and other opinion makers.  Your Honor was just speaking

24   towards relevance.  And I know a number of the objections we've

25   received have also been hearsay objections.  I know you were

1   talking about the impact on the market, and the state of mind

2   of the market.

3       I just want to clarify that objections to hearsay with

4   respect to those analyst articles and opinion-maker pieces of

5   evidence, that those would also be things that Your Honor does

6   not want to see.

7           THE COURT:  Well, I said that they're relevant for

8   state of mind, which is a non-hearsay use.

9           MS. TRIPODI:  Correct.

10          THE COURT:  So I don't have a problem with that.  The

11  problem is, people always say "State of mind, Your Honor, state

12  of mind."  Well, sometimes state of mind is irrelevant.  And

13  state of mind of the public is relevant during class period.  I

14  have a hard time seeing its relevance after the class period.

15          MS. TRIPODI:  Understood, Your Honor.  I appreciate

16  the clarification.

17          THE COURT:  So that's why I don't want to keep seeing

18  these repeated objections -- I mean you can make your objection

19  for the record, but I don't need lengthy explanations, and you

20  can preserve your objections.  But -- so that's my view on

21  those things.

22      (Off-the-Record discussion between counsel)

23          THE COURT:  So with that --

24          MS. TRIPODI:  Excuse me.  One more question,

25  Your Honor.

1      By preserving the objection for the record, are you

2   indicating at the time we seek to introduce that specific

3   objection?

4          THE COURT:  Well, rather than bothering the jury with

5   a string of objections and -- and ruling, you can make those

6   objections known in advance.  I don't mind getting things in

7   advance, in time.  But I -- you know, I'm telling you what my

8   -- my ruling is.  And those objections ought to be made in good

9   faith.

10         MS. TRIPODI:  Understood, Your Honor.

11         THE COURT:  That's my point.  I expect to see fewer

12   objections.

13         MS. TRIPODI:  Your Honor, may I address one thing with

14   respect to opening statements?

15         THE COURT:  Yep.

16         MS. TRIPODI:  I know Your Honor has ruled on

17   objections to our slides.  I just want to point out for the

18   record that we have not received any demonstratives or slides

19   for defendant's opening.

20      So it's our understanding that -- I know they have some

21   exhibits they were intending to use with their opening, but I

22   just want to make the record clear that plaintiffs have not had

23   an opportunity to object to any demonstratives or slides.

24         THE COURT:  I take it there is no demonstrative.

25         MR. SPIRO:  Yeah.  I don't use one in opening

1   Your Honor.  I'm not good at technology, so I just --

2        **THE COURT:**  Good.  All right.  So I guess we're about

3   to take a break.  The jury is already waiting.

4        If you want to talk to your client about the proposed

5   instruction, I'm, frankly, noncommittal at this point, but I

6   need to know if you're still interested in pursuing it.

7        **MR. SPIRO:**  We understand, Your Honor.

8        **THE COURT:**  And in the meantime we're going to try to

9   fix this reporter problem, and I hate to start the first day

10  late.  But let's try to hopefully -- I don't know, Belle, do

11  you think ten minutes?  I don't know.  Ten or 15 minutes to get

12  this problem fixed, that gives you time to adjust your

13  exhibits.

14       Oh, the Silver Lake objection about redactions, and under

15  seal.  Is there a problem with redacting --

16       **MR. PORRITT:**  We sort of examined that, Your Honor.

17  We again saw the motion last night.  We were going to file a

18  response probably today.

19       **THE COURT:**  It's not going to come up before --

20       **MR. PORRITT:**  It's not coming up in openings.  Comint

21  up on a witness, I believe.  So it can be deferred for a day or

22  two.

23       **THE COURT:**  I'd like to look at that, because when I

24  looked at some of these exhibits and I saw the long string of

25  email, stuff much of which seemed totally irrelevant -- you

1    know you might want to look at that.

2         MR. SPIRO:  Yeah.  This is a down-the-road issue but

3    from our perspective, personal identifying information, no

4    problem redacting.  You know, but it's hard to start, you know,

5    moving things out of context and other things like that.  So

6    that's sort of where I typically draw the line when a third

7    party has an issue.

8         MR. PORRITT:  And I would agree, I think that's where

9    we are, too.  We have no issue at all with personal identifying

10   information.  But once you start with redacting documents --

11   this is a public courtroom, this is a public trial.  The

12   evidence should be public.  And frankly --

13        THE COURT:  What about email exchanges with other

14   parties that don't seem to be relevant to this topic?

15        MR. SPIRO:  Well, if they're not relevant we won't

16   seek to introduce them or we will redact them.  But there may

17   be, right, we're living this case, I mean, there may be

18   relevance to them that a third party doesn't know or the third

19   party may just want them redacted for whatever reason.

20        THE COURT:  Right.  I agree.  I'll leave it to you to

21   try to figure out what you really need.

22        MR. SPIRO:  We will.

23        MR. PORRITT:  Will do.  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        MR. SPIRO:  Thank you.

PROCEEDINGS

1          **THE COURTROOM DEPUTY:**  Court is in recess.

2

3      (Recess taken from 8:40 a.m. to 9:05 a.m.)

4      (The following proceedings were held outside of the

5   presence of the Jury)

6          **THE COURTROOM DEPUTY:**  Please remain seated.  Court is

7   back in session.

8          **THE COURT:**  All right.  The jury is ready.  I

9   understand that you -- you have reached a decision about the

10  proposed instruction?

11         **MR. SPIRO:**  Yes.  Given the Court's comments and

12  concerns about workability, we'll withdraw it at this time.

13         **THE COURT:**  Thank you.  That will be noted for the

14  record.

15      So, without further ado, let's bring the jury in.

16         **MR. PORRITT:**  Very good, Your Honor.

17         **THE COURT:**  Thank you.

18         **MR. SPIRO:**  Your Honor, as it's happening, if you use

19  a board for this, do you do it next to the podium?  Is that

20  okay?  Does the Court have a specific place where you put a

21  board?

22         **THE COURT:**  Board?

23         **MR. SPIRO:**  An easel?  Yeah.

24         **THE COURT:**  Um, where is it?

25         **MR. SPIRO:**  It's here (Indicating).

**PROCEEDINGS**

1          **THE COURT:**  Well, as long as the jury can see it and

2     -- I mean, I'd like to see it, in case there's some issue.

3          Maybe if you could put it right in the middle there?  Or

4     if --

5          **MR. SPIRO:**  It's just a calendar.  I don't think it's

6     going to be --

7          **THE COURT:**  All right.  Then you can just put it

8     anywhere you want.

9          **MR. SPIRO:**  Okay, thanks.

10          **MR. PORRITT:**  Once again, Your Honor, we have not seen

11     any demonstratives, so I don't know what this is, necessarily.

12          **MR. SPIRO:**  It's a blank calendar.

13          **MR. PORRITT:**  Okay.

14          **THE COURT:**  Okay.  By the way, I did receive your

15     stipulation about moving -- things not objected to being moved

16     into evidence, that list, the email.

17          Correct?

18          **MR. PORRITT:**  Yes, Your Honor.  That was our

19     understanding, though I gather apparently there was a --

20          **THE COURT:**  So the upshot of that is that you don't

21     have to formally move, we are going to deem these admitted, the

22     enumerated?

23          **MR. PORRITT:**  In and our list in Mr. Apton's email

24     dlast night; that is what I understand.  That's what

25     defendant's -- plaintiff's position is.

 1          **MR. LIFRAK:**  Yeah, I don't think it's that simple,

 2    Your Honor.  What we were proposing for each witness --

 3          (Reporter clarification)

 4          **MR. LIFRAK:**  I'm Mr. Lifrak, I'm sorry.

 5      For each witness that's testifying -- for example, when

 6    Mr. Musk testifies, if there are no objections to certain

 7    exhibits, that those that were entered into evidence right

 8    before his testimony, we're not agreeing at this point to a

 9    blanket admission of all exhibits because of the issue that we

10    discussed with Mr. Subramanian, we don't want him to --

11          **THE COURT:**  Let's just move, just so the record is

12    clear, go ahead and formally move.  And then you can say it's

13    stipulated.  In other words, I'm not going to admit anything

14    until you move.

15          **MR. LIFRAK:**  Yes, Your Honor.

16          **MR. PORRITT:**  Very good, Your Honor.

17          **THE COURT:**  Okay.

18      (The following proceedings were held in the presence of

19    the Jury)

20          **THE COURTROOM DEPUTY:**  All rise for the jury.

21          **THE COURT:**  All right.  Please be seated, everyone.

22      Good morning, everyone.  Good morning, members of the

23    jury.  Thank you for your patience.  I apologize for a late

24    start.  It's not my habit to begin later than 8:30, and I did

25    know you were here on time.  We had a number of matters we had

 1    to iron out.  Hopefully that's -- we will be starting every

 2    morning on time, so let me apologize for the late start.

 3         But now that we're here, we're going to commence with the

 4    next phase of the case.  And as I had mentioned yesterday,

 5    we're going to start with hearing opening statements from the

 6    parties.

 7         So, Mr. Porritt, you have the floor.

 8              **MR. PORRITT:**  Thank you, Your Honor.  May I proceed?

 9    May I take my mask off?

10              **THE COURT:**  Yes.

11                       **<u>OPENING STATEMENT</u>**

12    **BY MR. PORRITT**

13         Ladies and gentlemen of the jury, my name is Nicholas

14    Porritt.  With me are Elizabeth Tripodi and Adam Apton.

15    Mr. Apton, you have heard from yesterday.  We represent

16    plaintiff Glen Littleton, the man sitting over there

17    (Indicating), and a class of thousands of Tesla investors who

18    have brought this case against Elon Musk and Tesla.

19         Why did they bring this case?  Because Elon Musk, Tesla's

20    chairman and chief executive officer, who is not in court today

21    but you will see him sitting right there in the witness box

22    (Indicating), lied.  And his lies caused regular people like

23    Glen Littleton to lose millions and millions of dollars.

24         There is no dispute that Elon Musk lied.  As you heard,

25    you must accept that his statements -- Elon Musk's

**OPENING STATEMENT / PORRITT**

 1   statements -- were false.  They were untrue.  And there was no

 2   dispute that Tesla investors were hurt by these lies.

 3        How were they hurt?  They lost lots of money, in a short

 4   period from just August 7th to August 17th, ten days, because

 5   of Elon Musk's lies.

 6        After these lies on August 7th, 2018, Tesla's stock price

 7   shot up.  Millions of shares were bought.  But then the stock

 8   price tanked, almost as quickly as it went up.  And millions of

 9   dollars were lost when his lies were exposed.

10        The question for you, and it's a question only for you,

11   the jury, is to decide whether Elon Musk and Tesla and its

12   board of directors should be held responsible for the hurt and

13   the harm that they caused, that were caused by his lies.

14        Now, why is this important?  Why should you, the jury,

15   care about losses suffered by Tesla investors back in 2018?

16   Because although it may seem very remote and irrelevant to your

17   lives, the stock market matters.  It matters to all of us, for

18   better or for worse.  The largest investors in stock markets

19   are not Wall Street bankers that you might see on TV shows.

20   It's pension funds.  It's insurance companies.  They rely on

21   the stock market to provide for people's safety.  And for

22   people's retirement.  And there are millions of individuals who

23   also rely on a fair stock market to provide for their families'

24   future and for their retirement.  You will hear from one such

25   investor later on today.

1        That is why there are rules enacted, rules like Rule 10b-5

2   that Your Honor discussed yesterday, designed and enacted to

3   protect these investors.  Because for the stock markets to work

4   properly and fairly, you need accurate and reliable

5   information, a level playing field, information available to

6   everyone, a market that is not manipulated by lies.

7        After the Great Depression, 1930s, caused by a stock

8   market crash, Congress passed the laws, the federal securities

9   laws designed to protect every investor to make sure they had

10  access to truthful and accurate information on a timely basis.

11  That's the basis for the federal securities laws.  That's the

12  basis for the stock market.  And without those rules, without

13  that fairness, the stock markets won't work.  People won't be

14  able to invest and save for their future and for their

15  retirements.

16       Therefore it's important that when the CEO, the chief

17  executive officer of a public company like Tesla, when that

18  CEO, Elon Musk, lies about his company and hurts investors,

19  it's critical that he is held and the company's held

20  accountable for the harm that he causes.  Both to compensate

21  the investors harmed by his lies, and to discourage others.

22       So what were the lies told by Elon Musk?  Here's the

23  first.

24       (Document displayed)

25           MR. PORRITT:  I hope all of you can see.  This is a

1  tweet sent August 7 that starts the class period, 12:48 p.m.

2  Eastern time, August 7, 2018:

3            "Am considering taking Tesla private at $420.

4            Funding secured."

5       The time this was made, and in fact, throughout the class

6  period it's beyond dispute, the funding was not secured.

7  Mr. Musk has stated that this statement referred to discussions

8  he has been having with a Saudi Arabia Public Investment Fund,

9  an investment bank run by the Saudi Arabian government.  But

10 the evidence will show that the Public Investment Fund, in its

11 discussions with Mr. Musk, had never committed any funding in

12 those discussions.  The amount of funding had not even been

13 discussed, or had not been agreed.  The price at which Tesla

14 would go private had not even been discussed.  And how can you

15 discuss the amount of funding you need if you don't know the

16 price?

17      Certainly there had been no agreement as to the amount of

18 the price that Tesla was going to go private at.  Not a single

19 document was even reviewed at these meetings, let alone signed

20 by Mr. Musk or the Public Investment Fund or by anybody else.

21 Financial information critical before the Public Investment

22 Fund could even begin considering whether to invest in Tesla

23 was not provided to them.  Elon Musk and Tesla agreed to

24 provide some information and they never did.

25      Here is how one of the participants in that meeting who is

1   not being sued for securities fraud described it.

2       (Document displayed)

3           **MR. PORRITT:**  (As read)

4               "We would like to explore investing in

5               Tesla...we would like our teams to start

6               working together to investigate a potential

7               transaction."

8       That is what existed on July 31st and still existed on

9   August 7th.  A potential transaction, at most.  That's not

10  funding secured.  And no one would think that it was funding

11  secured.

12      Tesla investors, however, and the public were misled by

13  Elon Musk's statement "Funding secured."  You will hear Glen

14  Littleton describe how Elon Musk tweeting "Funding secured"

15  convinced him that Tesla was going to go private.  If Elon Musk

16  wanted it to go private and he had the money, then it would

17  have happened.  Having the funding was key.  And that drove

18  Mr. Littleton's investment decisions throughout the class

19  period.

20      You will hear evidence from Deepak Ahuja, Tesla's chief

21  financial officer, and Martin Viecha, Tesla's director of

22  investor relations about how immediately after that tweet

23  saying "Funding secured" they received question upon question

24  upon question from investors, from financial analysts who

25  follow stocks like Tesla, from the media, and even from the

 1   U.S. government, the Securities and Exchange Commission, all

 2   directed at what Elon Musk meant by "Funding secured."

 3        They recognized -- Mr. Ahuja, Mr. Viecha, analysts,

 4   investors, the market -- that this was a big deal.  And

 5   Mr. Ahuja and other Tesla executives immediately got involved

 6   to start communications policy, practice, a strategy to address

 7   the funding security.

 8        (Document displayed)

 9        **MR. PORRITT:**  Here is a text Mr. Ahuja sent

10   immediately within 30 minutes of the "Funding secured" tweet

11   going out -- the "Funding secured" tweet, by the way, that had

12   not been reviewed before it was sent by anyone on behalf of

13   Tesla -- saying:

14             "...am sure you thought about a broader

15             communication..."

16   Could we draft something for you?  They drafted a

17   statement from Mr. Musk.

18        Even though Mr. Ahuja had been involved in some of the

19   discussions with the Public Investment Fund, and knew the

20   contents of those discussions, the statement says nothing about

21   "Funding secured."  Doesn't say that funding is secured, but it

22   does not correct that funding's not secured.  The discussion

23   was just preliminary.  That this was a potential transaction.

24   They couldn't, because there was no funding.

25        (Document displayed)

 1          **MR. PORRITT:**  Mr. Musk tweeted out that statement

 2   written for him by Tesla executives, in this tweet.

 3          Once again, you are to assume that every word, every part

 4   of this tweet, is false.

 5          Elon Musk says that "Investor support is confirmed" in

 6   that tweet.  At this time, he had spoken to the Public

 7   Investment Fund.  They had not confirmed support at that

 8   meeting for any transaction.  There was no transaction for them

 9   to support.  And Mr. Musk also was never going to use the

10   Public Investment Fund to fund the entire transaction anyway.

11   Yet, no other investor at this point had been approached, to

12   even discuss going private.  Let alone actually confirmed their

13   support.

14          And you, the jury throughout this trial, also have to

15   assume that the second sentence in that tweet is false.

16   Another lie by Mr. Musk.

17          But Elon Musk knew that taking Tesla private would be a

18   long complicated process, which he had not even started.

19          Here is his central offer to take Tesla private at 420.

20   "This offer expires in 30 days."

21          (Document displayed)

22          **MR. PORRITT:**  That's it.  Two lines.

23          He's describing a potential $60 billion transaction.  And

24   he does two lines.

25          You will hear testimony from Professor Guhan Subramanian,

 1   professor from Harvard Business and Law Schools.  He will

 2   describe this offer as incomplete and incoherent.  That i is

 3   unprecedented in his experience for a potential $60 billion

 4   transaction like this to be disclosed, after such basic

 5   fundamental terms such as funding, price and structure are

 6   still unknown and not agreed to.  That disclosures about such

 7   an important transaction would be made before the bidder or the

 8   person making the proposal had even spoken to legal advisers or

 9   financial advisers, none of which Elon Musk had done.

10       Elon Musk knows this.  Elon Musk is an experienced

11   corporate executive.  He's done lots of transactions.  He's

12   bought and sold lots of companies.

13       He knows that other similar transactions have taken at

14   least a year to complete.  Not 30 days.  And that you go

15   through this process, proper disclosures, and you control the

16   disclosures after taking legal and financial advice.  None of

17   which he followed here.

18       Furthermore, he knew that in connection with this

19   particular transaction, at a board meeting on August 3rd,

20   August 3rd, the Tesla board of directors told Mr. Musk --

21       (Document displayed)

22       **MR. PORRITT:**  -- a detailed proposal had not been

23   received, so they could not even start to evaluate the

24   proposal.  Could not even start to evaluate the proposal.  Yet.

25       Yet, just four days later, without any further proposal

1   being made, no further communications with the board of

2   directors, still without any legal or financial advice, Elon

3   Musk tweets out the only reason this is not certain is because

4   it's contingent on the shareholder vote. A shareholder vote

5   which, as Professor Subramanian will explain, is the last step

6   in taking a company private.  A step that takes years to

7   happen.  And Elon Musk is saying it's all about to happen

8   within 30 days.

9        Now, following these tweets, as you might expect, and as

10  Elon Musk understood, Tesla's stock price exploded.

11       (Document displayed)

12       **MR. PORRITT:**  Here you can see the spikes up.

13  Increased from $356 to 380 in just a couple of hours.  The gap

14  there in the middle towards the end of that graph, you can see,

15  when Nasdaq -- the stock exchange on which Tesla stock is

16  listed -- suspended trading in Tesla stock during this

17  afternoon, because the news was so important and the reaction

18  was so extreme.

19       The significance?  Well, you're going to hear this term a

20  lot during the course of this trial.  The materiality of the

21  "Funding secured" tweet is shown so clearly by this chart, as

22  well as all the reactions of the Tesla executives, the Tesla

23  Investor Relations, the Tesla investors, themselves, and the

24  analysts.  The same is also true for the investor support

25  tweet.

 1       Regarding analysts, analysts are also very important

 2   participants in the markets.  They're employees of banks,

 3   financial advisers.  They follow companies, they follow the

 4   information.  They review it, they analyze it.  They publish

 5   reports that give their interpretation, their understanding of

 6   what's been disclosed, they give recommendations.  Lots of

 7   investors read them and follow their advice.  They're a way

 8   that information about companies gets broadcast throughout the

 9   markets.

10       You'll hear testimony from Ryan Brinkman, an analyst from

11   JP Morgan, one of the largest banks in the world, who follows

12   Tesla.  That was his job.  One of his jobs -- one of his

13   companies that he followed, was to follow Tesla.  Mr. Brinkman

14   and JP Morgan aren't parties in this case.  He has no axe to

15   grind.  Please pay attention to what he has to say about Elon

16   Musk's tweets when trying to assess the market reaction to the

17   tweets.

18       Mr. Brinkman did two things.  One, he had a target price

19   for Tesla, based on his analysis of Tesla's performance.  He

20   significantly increased that target price after the tweets to

21   reflect the fact that he thought there was a chance, a

22   probability, that the deal would go forward at 420 per share.

23       And he wrote in his report, published the next day,

24   August 8th, that these tweets were definitive statements by

25   Tesla's CEO, and that funding is either secured or not secured,

1   and Tesla's CEO says funding is secured.  It will not get any

2   clearer than that.

3       Any statement that funding was secured for such an

4   important big transaction, $60 billion, would be very important

5   to any investor.  Just as it is important to Glen Littleton,

6   just as it had significance to Ryan Brinkman, just as it had

7   significance to all the other investors and analysts who buried

8   Tesla with questions about "Funding secured" on August 7,

9   August 8th, and in fact, throughout the PSLRA class period.

10      This evidence together with the stock price reaction you

11  can see on this chart should confirm for you beyond any doubt

12  that the false information that Elon Musk tweets was material;

13  there was substantial likelihood that investors would consider

14  it important in deciding whether to invest in Tesla.

15      Now, one issue you will have to decide is whether Elon

16  Musk acted knowingly when he issued these tweets that we've

17  looked at, the two tweets.  The evidence will show that he knew

18  the Public Investment Fund had not committed funding at that

19  meeting on July 31st.  He knew no legal binding document had

20  been signed.  He knew that he did not intend to use the Public

21  Investment Fund for more than 20 percent of the transaction.

22  He knew he had not spoken to any other potential investors

23  about any additional funding that would be needed.  Yet, he

24  still tweeted out "Funding secured."  Past tense.  "Funding

25  secured."

**OPENING STATEMENT / PORRITT**

1          The evidence will also show that he knew that no investor

2     had confirmed support for the going-private transaction.  He

3     knew that he did not even have a potential list of investors at

4     this stage to call to ask for support.  He knew that he had

5     not -- obviously had not spoken to any of those investors about

6     whether they are willing to continue investing in a private

7     Tesla to provide additional funding.  Yet he tweeted out on

8     August 7th, "Investor support is confirmed."  Past tense.  How

9     can you confirm something with a person you don't even speak to

10    or communicate with?

11         And it will show that he knew that going private would be

12    a long process.  He knew that he had not even started that

13    process.  He had been told by the board four days earlier that

14    they can't even start the -- that they can't start their

15    process.  Yet he still tweeted out, "Only reason that it's not

16    certain is because it is contingent on a shareholder vote."

17    This is knowing conduct.

18         Then after dropping those bombshell tweets on August 7th

19    about funding being secured, and investor support is confirmed,

20    what did Elon Musk and Tesla do next after getting all these

21    inquiries on the market?  Did they provide more information to

22    answer those questions about the source of secured funding?

23    Did they provide details about the structure of what a private

24    trans- -- of Tesla, and what investors had been telling them?

25    No.  They did not say anything about any of those things.

 1      They said nothing about those things on August 8th.  They

 2  said nothing about those things on August 9th.  They said

 3  nothing about those things on August 10th.  Meanwhile, every

 4  financial journalist and analyst was writing stories and

 5  reports filled with speculation, gossip, rumors about this

 6  transaction.  Over 2,400 news articles, over ten days, were

 7  being published.

 8      The U.S. government, it was reported, was investigating

 9  whether these tweets were true.  And doubts began to creep in

10  whether the funding really was secured.  If funding was

11  secured, why couldn't Tesla and Elon Musk produce any documents

12  to prove it?  Why was the U.S. government investigating?  Yet

13  still many others believed the tweets, that Elon Musk would

14  never tweet out "Funding secured," something so categorical,

15  without actually having secured funding.  But that's exactly

16  what he had done.

17      Finally, on August 13th, almost a week after the initial

18  tweets, Tesla and Elon Musk finally provided an update.  Again,

19  it was written by Tesla.  And again, it was incomplete.

20      (Document displayed)

21      **MR. PORRITT:**  He talks about discussions with the

22  Public Investment Fund, but didn't disclose that the fund had

23  been begging him for information -- which he still had not

24  provided -- before they could ever consider a potential

25  transaction.  These requests had been made as recently as

1    August 12th, the day before.

2         (Document displayed)

3         **MR. PORRITT:**  Here's again the requests:  Please start

4    sending information so we can have a kickoff meeting.  We

5    cannot approve something if we don't have sufficient financial

6    information.  The agreement, as was minuted by my people --

7    "minuted" means recorded by the Public Investment Fund -- was

8    for you to provide information, and then we would start

9    talking.

10        It also failed to disclose -- the August 13th blog post

11   failed to disclose that Elon Musk had just started the process

12   of working with financial advisers to try and identify

13   potential sources of funding and how much funding was needed

14   and how the transaction would be put together.  Something that

15   anyone would need to know before they could agree -- before

16   they could confirm support.

17        Instead, the blog post says, I think two-thirds of --

18        (Document displayed)

19        **MR. PORRITT:**  "My best estimate right now is that two

20   thirds of the shares will participate."

21        In fact, Elon Musk and Tesla had been talking to

22   investors, and they had been telling him that they couldn't

23   participate.  They either were prevented by the terms of their

24   investments, or they did not like the idea of Tesla going

25   private.  They wanted it to stay public.

 1      This August -- this two-thirds number was simply made up

 2  by Elon Musk.  And it once again confirmed -- this blog post

 3  did its work.  It affirmed the truth of the tweets on

 4  August 7th.  The market believed yes, funding was secured.  The

 5  market believed investor support was confirmed.

 6      But once again, after this disclosure, this partial

 7  disclosure, Elon Musk and Tesla said nothing more about funding

 8  or investor support.  Nothing on August 14th.  Nothing on

 9  August 15th.  Nothing on August 16th.  Finally, late on

10  August 16th, the *New York Times*, "Paper of Record," published a

11  detailed on-the-record interview with Elon Musk about the

12  circumstances of the tweets.  This article confirmed from Elon

13  Musk, himself, the worst rumors that had been circulating about

14  the tweets.

15      (Documents displayed)

16      **MR. PORRITT:**  That no one at Tesla or its board of

17  directors had reviewed them before he sent them.  That he

18  tweeted them while driving his car to the airport.  That the

19  price of 420, $420, was a joke.

20      Now, think about that for a moment.  Elon Musk selected

21  the price for a possible $60 billion transaction as a joke.

22  And then he tweeted it to the world, and the markets went crazy

23  as a result.

24      I can tell you that it was no joke for Glen Littleton or

25  other Tesla investors who lost millions of dollars.  It's no

 1   joke to millions of investors who rely on true information

 2   going into the market, before they buy or sell stock.

 3       The article also reported that funding was far from

 4   secure.  And this was the proverbial straw that broke the

 5   camel's back.  Tesla's stock price plunged as people realized

 6   the August 7th tweets were, in fact, false.  That it had all

 7   been a lie.

 8       And then finally, a week later on August 23rd, Elon Musk

 9   finally confessed to the board that he, in fact, had no

10   investor support.

11       (Document displayed)

12       **MR. PORRITT:**  He had finally spoken to investors.

13   Remember, the investors that he said he had spoken to before

14   August 7th.  And rather than supporting -- rather than

15   confirming support, they had negative views about it.

16       So what did all this chaos mean to Tesla investors?

17       (Document displayed)

18       **MR. PORRITT:**  Here's a slide showing Tesla's stock

19   price and the harm per share -- that's the big blue bar or

20   bars -- suffered by any Tesla investor who purchased on that

21   particular day.

22       Plaintiff's expert, Dr. Michael Hartzmark, a reknowned

23   financial expert with a doctorate from the University of

24   Chicago, he has carefully analyzed the movements of Tesla

25   stocks during this period.  He has analyzed the over 2,400 news

1   articles, and looked at price movements literally minute by

2   minute through this class period.  And he has calculated these

3   amounts of inflation caused by the August 7th tweets.

4        And Dr. Hartzmark, together with another expert you will

5   hear from, Professor Steven Heston, has analyzed the impact of

6   the tweet on other Tesla securities, Such as securities mostly

7   traded by Mr. Littleton, stock options, and measured the impact

8   of the August 7 tweets.

9        Listen to the evidence from the experts carefully.  It

10  will be technical.  I appreciate your patience in advance of

11  listening to it, but it is so important.  When you listen to

12  their evidence carefully, you will find they have conducted,

13  Professor Heston and Dr. Hartzmark, a thorough and robust

14  analysis of data and fairly calculated the impact of the

15  August 7th tweets.  That is the impact we will be asking you to

16  find at the end of the evidence, and will be used to calculate

17  damages suffered by Tesla investors.

18       Defendants will argue, you heard a little bit yesterday,

19  that these price movements are not Elon Musk or Tesla's fault,

20  that they are due to -- but they are due to other innocent

21  causes.  These arguments are simply not credible.  The

22  statements contained in the August 7th tweets that you have

23  seen are not trivial statements about the weather.  Saying

24  "Funding secured" is not the same as saying it is raining

25  outside.  And saying "Funding secured" when you have no funding

1    is very different from saying it is raining rather than when it

2    is snowing.

3        Instead, the evidence will clearly show that this turmoil

4    (Indicating) in Tesla's stock price was due to one thing and

5    one thing only.  The August 7th tweets.  The lies told by Elon

6    Musk.  Without these tweets, none of the harm shown on this

7    chart is suffered.  And it was suffered by people like Glen

8    Littleton.

9        Now, Glen is a self-made man.  He rose up from the bottom.

10   He grew up on his family's farm in Washington state.  He and

11   his sisters were the first of his family to go to college.  He

12   learned trading while working at Pillsbury, protecting the cost

13   of their wheat that's used to manufacture products.  Based on

14   that training, he's been trading for himself, using his own

15   money, not others', for the last 50 years.  And he was a big

16   believer in Tesla and Elon Musk.  He believed in the

17   technology.  He supported the environmental message.

18       He will describe the pain and upset he suffered on

19   August 7 when almost his entire life savings, the product of 50

20   years of work, were almost wiped out by Elon Musk's lies in the

21   tweets about "Funding secured."

22       And you will hear from Tim Fries.  Tim is a hard-working

23   project manager who's investing what he can to pay for his

24   retirement.  He also liked Tesla, and was looking to buy their

25   shares.  He heard of Elon Musk's tweets, and thought it was a

 1   good time to buy their Tesla stock.  He lost thousands of

 2   dollars which he could not afford to lose, when the falsity of

 3   the August 7th tweets were revealed.

 4        And as I said at the start of my opening, there is no

 5   dispute that Elon Musk lied here.  And there's no dispute that

 6   investors like Glen Littleton, Tim Fries, and thousands of

 7   others lost money.  You can see the harm in dollars and cents

 8   right there in front of you.

 9        You, the jury, must decide whether Elon Musk, Tesla and

10   its board of directors will be held responsible for that harm.

11        Thank you for your time.

12        **THE COURT:**  All right.  Thank you, Mr. Porritt.

13        Mr. Spiro, you have the floor.

14        **MR. SPIRO:**  Thank you, Your Honor.  I'm going to bring

15   up a calendar, if it's okay with the Court, so we can keep

16   track of these dates.

17        This is my colleague, Andrew Rossman.

18        **THE COURT:**  If you can move it back just a bit so

19   counsel can see it too.

20        Thank you.  I think the jury can still see it.  Great.

21        **MR. SPIRO:**  Just a calendar, help keep track.

22        **THE COURT:**  Looks like it keeps falling over there.

23   Need to get that leg locked in.

24

25

1      <u>OPENING STATEMENT</u>

2    **BY MR. SPIRO**

3        Good morning.

4        Elon Musk was considering taking Tesla private.  That was

5    undisputably true.  And they cannot prove otherwise.  But here

6    we are, in a federal courtroom, with Mr. Musk accused of fraud.

7    Plaintiffs' lawyers have brought a case based on the meaning,

8    essentially, of two words.  And that's fine.  That's how the

9    system works.  But you, the jury, get to decide, was this

10   fraud?  Or is there another explanation?  And you'll come to

11   learn very soon, this was not fraud.  Not even close.

12       When you learn the facts of this case, many of which are

13   undisputed, you will learn that the inaccuracies and vagueness

14   in those tweets, they didn't materially matter to the market.

15   What Mr. Musk was communicating in those tweets was that he was

16   serious about taking Tesla private, and for very good reasons.

17   He was actively pursuing those serious considerations.

18       That revelation, itself, just that, which is indisputably

19   true, that he wanted to go private and was taking steps to make

20   that happen, would have unquestionably impacted the market

21   because of the widespread belief that Mr. Musk had already

22   demonstrated an ability to do what he set his mind to, to raise

23   capital for industries.  Industries that hadn't even existed

24   before, such as Tesla, and a private company sending rockets to

25   the moon.

1        What Mr. Musk was also trying to communicate is that

2    obtaining financing, crossing I's -- crossing T's and dotting

3    I's, things which he had been doing successfully for years

4    while building Tesla and SpaceX, they wouldn't be a roadblock.

5    In fact, his understanding was that the fact of financing was

6    not an issue.  And that the only real roadblock would be

7    shareholder approval, which was critical.  And it was critical

8    because of the unique structure he wanted to use to go private.

9    A structure that would protect Tesla shareholders who had

10   backed the mission of Tesla over the years.

11       If, instead of using those inaccurate shorthand tweets,

12   Mr. Musk had said in detail what the state of affairs was at

13   the time, his intentions and the actions he had taken, it would

14   have had the same impact on the market or even greater impact

15   on the market than the tweets that plaintiffs are pointing to.

16       Let me say that again.  If Mr. Musk had said at the time

17   all of the details of what was going on, his intentions, and

18   the steps that had been taken, it would have had a likely

19   greater impact on the market than the tweets that they're

20   pointing to.

21       In fact, on August 13th, the Monday after the tweets, --

22       (Document displayed)

23       **MR. SPIRO:**  -- Tesla, Mr. Musk, revealed the details

24   of what he meant by the phrase "Funding secured."

25       And when he described in detail what that phrase meant to

1    him, when the details were revealed, the stock went up.

2         In fraud cases, real fraud cases, when the truth is

3    revealed, the stock goes down.  Here, the stock went up.  The

4    details actually increased confidence that Tesla would go

5    private at 420.

6         Also, when investors like Mr. Littleton read that blog, he

7    concluded what the reasonable investor would conclude, which is

8    that the details that were revealed were, in his mind, no

9    different in any meaningful or material sense than the term

10   "Funding secured" (Indicating quotation marks).

11        That tweet, it communicated a basic truth.  Elon Musk was

12   considering taking Tesla private at 420.  And he was actively

13   working at making that happen.  The other tweets were no

14   different.  The tweet that the only thing standing in the way

15   was shareholder approval, the blogs suggest or the tweets later

16   suggest the board hadn't fully approved, was it still

17   analyzing?  The market simply didn't care.  Why?

18        Again, Mr. Littleton will explain that he didn't even

19   think about all the steps that had to be taken for Tesla to go

20   private because, in his words, Elon's a convincing guy, and in

21   charge of the company.  You would not bet against Elon Musk.

22        There was really only one thing standing in the way of

23   Tesla going private.  And it was revealed in those initial

24   tweets:  Shareholder approval.  And that is the main reason

25   Tesla did not go private at that time.  It wasn't because of a

1  lack of funding or crossing T's and dotting I's.  No.  Here,
2  shareholder approval was particularly important.  Mr. Musk said
3  from the beginning that this was not going to be a typical
4  go-private, one where he ousts the shareholders and takes more
5  control.  It was not his intent to squeeze the shareholders.
6  Mr. Musk wanted the existing shareholders, those who had shown
7  faith in Tesla, to be able to continue to participate, to be
8  part of the company.  This was always about the shareholders.

9      When he later learned that the structure, and certain
10 shareholders couldn't participate, they couldn't be
11 accommodated within the going-private structure, Mr. Musk and
12 the board, for that reason, decided to remain public.

13     Tesla went on to accomplish what it has accomplished.  Not
14 all deals that are considered come to pass.  But here we are.
15 So let me take you behind the scenes with a little more detail
16 so you know what was going on.

17     To properly understand August 7th and the tweets
18 plaintiffs point to, you have to take a step back to understand
19 Tesla.  You see, Tesla started out as a private company.  It
20 went public to access the capital markets so it could raise
21 money before it reached the point of profitability.  For years,
22 they worked and worked and worked.  The plan was you build a
23 sports car, use that money to build an affordable car, and use
24 that money to build an even more affordable car.  Working
25 towards a sustainable planet.

1          And in 2018, at this time, or before this time, Mr. Musk

2     and Tesla were focused on Model 3 production.  And Model 3 was

3     an affordable sedan that could be produced in mass quantity,

4     and it would allow for a mainstream electric vehicle.  By

5     ramping up Model 3 production, Tesla would have a pathway to

6     profitability.  They'd make electrical vehicles everywhere and

7     charging stations everywhere, and changing times.

8          But this was difficult.  And by early 2018, Tesla was

9     behind in its projection of 5,000 vehicles per week.  Mr. Musk,

10    alongside Tesla's executives, alongside the great employees of

11    Tesla, they were working around the clock, literally sleeping

12    in factory, to try to get this done.  But they were still

13    behind.

14         So what did Mr. Musk and Tesla do?  What they always do.

15    They were not stopped by artificial constraints.  They built a

16    tent in a matter of weeks the size of two and a half football

17    fields, in their parking lot.  They set up another assembly

18    line.  They worked through the nights.  They increased

19    production.  It was the type of thing no one else would have

20    done.  And everyone questioned them and doubted them, but it

21    worked.  They fought their way to 5,000 vehicles a week, and

22    the Model 3 and electric car were here to stay.

23         And by July, before the August 1st earnings call

24    (Indicating), Tesla had accomplished this goal, and they were

25    on their way.  And this accomplishment allowed Mr. Musk to

 1   think about this consideration of going private.  And he had

 2   reasons.  Wild swings in the stock price were a distraction for

 3   the employees, who owned shares.  That's how they're

 4   compensated.  And they were the long-term holders of Tesla

 5   stock.

 6       (Document displayed)

 7       **MR. SPIRO:**  The quarterlies, like the earnings call

 8   we're talking about, it created artificial deadlines and

 9   constraints.  It didn't allow them to focus on the long-term

10   mission.

11       And short sellers that bet against the company, that put

12   distorted facts into the market and attempt to take down the

13   stock, they were a distraction.  And they harmed the brand.

14       And so this earnings call where the Model 3 production

15   would be announced was an inflection point.  And Elon Musk was

16   not alone in this view.  Many shared this view.  In fact, all

17   the way across the world in the Kingdom of Saudi Arabia, they

18   shared this view.

19       Now, the Kingdom of Saudi Arabia, as you probably know, is

20   a wealthy country, much of its wealth built on hundreds of

21   billions of dollars of oil export.  But this country began to

22   see the necessary step, with changing times, of getting into

23   clean energy.  And the Kingdom of Saudi Arabia began to action

24   that plan.

25       Through their investment arm, the PIF, they began to

1   pursue Elon Musk and Tesla.  They had all the money that they

2   needed, because they had the Kingdom's money, and they had one

3   decision-maker.  A man named Yasir.

4        So they had tried to pursue Elon Musk and Tesla for some

5   time.  And, in fact, in January, 2017, Mr. Musk and Yasir meet.

6   And Yasir tells Mr. Musk:  The PIF is interested in a strategic

7   transaction, a priority for Saudi Arabia, to diversify away

8   from fossil fuels.

9        Mr. Musk says this is going to cost a lot of money.  And

10  Yasir says:  Doesn't matter.  We have a lot of money.

11       And so the PIF and Mr. Musk and his office and his chief

12  of staff, Sam Teller, and lawyers continued to speak and meet,

13  and there was a dinner in March of 2017 where they talked about

14  that the Kingdom wanted to take Tesla private.  And after that

15  dinner, after discussing certain details and facts, Mr. Ahuja,

16  the CFO of Tesla, takes Yasir on a car ride in a Tesla.  Yasir

17  wants to do this.  He's revving the engine; he thinks the deal

18  is his to have.  And the PIF continues to ask for meetings.

19       In the meetings, Yasir reiterates this desire.  And

20  Mr. Musk tells him at one point:  If you really want to do

21  this, if you want to take Tesla private, put your money where

22  your mouth is.  Buy stock in the open market.  You can show

23  your commitment by doing that.

24       Now, during this production ramp-up of Model 3, the PIF

25  and Mr. Musk don't meet for some time.  But there they are,

1   July 31st, at the end of the ramp-up of Model 3 production, the

2   day before the earnings call, there they are.  Sitting in a

3   conference room at Tesla, sitting with Mr. Musk at Tesla, and

4   they again discuss taking Tesla private.

5        Mr. Musk says it will cost a lot of money; Yasir says it

6   won't be a problem.  Mr. Musk says:  This is a different kind

7   of take-private.  I don't want to box the shareholders out.  I

8   want them to be included.

9        Yasir says:  It's fine with us.  We just want to get this

10  done.

11       And Mr. Musk says:  Well, who's in charge?  Am I talking

12  to the man in charge?

13       And Yasir says:  I'm the decision-maker.  The Crown Prince

14  supports me.  And if I say it's done, it's done.

15       Mr. Ahuja, the CFO is urgently summoned to this meeting

16  because a deal is on the horizon.  The earnings call, remember,

17  is the very next day.  The Kingdom of Saudi Arabia knows this.

18  And this was the time, if they were going to act, to act

19  convincingly and aggressively.

20       And so the Kingdom had a secret that they revealed in that

21  room, a secret that no one knew about.  Not Mr. Musk, not

22  anyone in the world.  And that was that despite their overt

23  attempts to try to gain some control over Tesla, year after

24  year, meeting after meeting, they had taken that step to buy

25  Tesla on the open market.  They had quietly begun accumulating

1   shares.  Lots of shares, billions of dollars of shares.  And

2   they got up close to 5 percent of the company.  But they

3   couldn't go over that hurdle because if they went over that

4   hurdle, there would be record -- reporting requirements

5   eventually where you have to report to the world that you own

6   so much of a companyU.

7        So they stayed just below that threshold so that no one

8   would learn of the plan.  They had told no one.  They built up

9   that position in secret.  They wanted a seat at that table.

10  And here they are the day before the earnings call, with

11  Mr. Musk, inside of Tesla.  And they had to get him to commit.

12  The earnings call, everything would be released.  The stock

13  could run; who knows what comes the day after.  They had to get

14  him to commit in that meeting.  This was of strategic

15  importance.

16       Now is the time, they told him.  They told him they put

17  their money where their mouth was.  They told him they would

18  make whatever steps were necessary to get this done.  They told

19  him that everyone who needed to make the decision was in that

20  room.

21       It's not just Mr. Musk that will tell you this.  Everyone

22  in the room will tell you that's what happened.  And they shook

23  hands, and this was a handshake of significance.

24       Following that meeting, Mr. Ahuja takes Yasir out again in

25  the factory.  Reminiscent of the test drive, where he was

1    revving the engine.  And he asks Yasir, inquired.  He says, you

2    know, there's other people you could partner with to take Tesla

3    private.  You know, they have funding too.

4        And Yasir says:  It's not necessary.  Funding's not going

5    to be an issue.

6        The earnings call goes forward the next day.  And there

7    was a clear signal to the market that Tesla had broken through.

8    Model 3 was here to stay, and so was the electric vehicle.  The

9    price of Tesla rises and rises.

10       And the reason I put up the calendar, because I was a

11   little -- I don't know why they were going out of order when

12   they were talking to you this morning, but the very next day

13   (Indicating), August 2nd, Mr. Musk sends that email, that bid,

14   that proposal.  However informal, he sent it to the board.

15       (Document displayed)

16       **MR. SPIRO:**  This was unbeknownst to the PIF at the

17   time.  This is his private email to the Tesla board, that no

18   one knew about.  He offered 420 a share, which again is a

19   20 percent premium, and was a clear commitment of an offer that

20   expired in 30 days.  That bid came from Mr. Musk in his

21   personal capacity and the board in this scenario was his

22   counter-party.

23       Now, the plaintiffs flashed this up out of order in their

24   opening, and there were some characterizations on the top of

25   it.  They were, like, calling the emails names.  They said it

1    was, like, illusory, unsophisticated, gibberish, whatever they

2    said.  And there's a reason they didn't like this email.  It's

3    just an email.  Looks like a perfectly fine email to me.  They

4    don't like this email because they can't prove their case

5    because of this email.  Never.  Never.

6        And the reason is because this email is clear as day that

7    Mr. Musk made this commitment.  That Mr. Musk wasn't just

8    considering going private, like he told the market.  He was

9    more than merely considering.  He had made a proposal to the

10   board.  And in this proposal, he's the bidder.  This happens,

11   okay?  A person involved in a company can become the bidder and

12   can attempt to buy the company, and the company and its board

13   becomes a counter-party.

14       The board will tell you that this email, while they can

15   call it names, was particularly formal for Mr. Musk.  That they

16   took it seriously.  He signed his name to it.  They immediately

17   convened an emergency board meeting.  They made legal

18   determinations.  They liaisoned with their CFO, Deepak Ahuja.

19   They took it seriously.  And they will also tell you they can't

20   control Mr. Musk when he's the bidder.  When he's the bidder

21   of -- to the company, he's the counter-party.

22       And that night, Mr. Musk had one concern.  And his concern

23   was what it always was at this time at Tesla.  His concern was

24   for his shareholders.  And he was told there's one impediment

25   to a fulsome process here.  And it was concern, in the law, of

1   what's known as "selective disclosure."

2       In essence, what this is is that you can't tell one market

3   participant one thing without another market participant

4   knowing, or it's unfair.  It creates an imbalance of

5   information in the market.  Every time somebody sells a stock,

6   there's a buyer on the other side.  And so you wouldn't want

7   one person knowing more than another.  And, of course, if

8   there's selective information out on the market, it often

9   benefits the bigger, richer investors.  Not the everyday

10  shareholder Elon Musk always wanted to protect.

11      So there was this rule.  And Mr. Musk was cautioned that

12  in speaking to investors one at a time, he had to be careful.

13  And it's better for everyone to have the same information.

14      So these meetings that happened on the 2nd and the 3rd

15  with the board, they happened, and this is progressing.

16  Mr. Musk, in private, is getting his ducks in a row to try to

17  execute.  He's contacting Michael Dell, who was the architect

18  of the -- Dell, the company Dell, take private.  He speaks to

19  Egon Durban at Silver Lake who had advised Mr. Dell to get more

20  information on how to get this done.  Dan Dees, Goldman Sachs'

21  star banker, was looped in at some point.

22      Mr. Musk was doing his homework.  And frankly, in all

23  these conversations, all of them leading up to August 7th,

24  funding wasn't really a topic of conversation.  Nobody was

25  really focused on funding because funding wasn't the issue.

1    They talked about the structure.  The structure was unique.

2    But nobody thought that the structure couldn't be done, either.

3    They thought it was unique, but possible.

4        But while these advisers and consultants and experts had

5    heard from Mr. Musk in the days following those four meetings,

6    the PIF hadn't heard a word, back in the Kingdom of Saudi

7    Arabia.  Probably makes sense.  Made sense to Mr. Musk; he

8    didn't need to talk to them.  The truth was clear in his mind.

9    He had confirmation, he had their word, and funding was never

10   an issue.  What did he need to follow up for?  But the PIF

11   waited.  And they waited.

12       So it's the morning of August 7th.  It's the morning in

13   California; it's the evening in the Kingdom of Saudi Arabia.

14   And all of a sudden, this breaking news happens that the

15   Kingdom of Saudi Arabia is now a major shareholder in Tesla.

16   It breaks in one of the most read financial papers, the

17   *Financial Times*.  And as the market opens that morning on

18   August 7th, the world learns that this country, rich in oil,

19   now owns the leading U.S. clean energy company, in large

20   numbers.  Three to five percent, billions of dollars' worth.

21       At the time -- and they didn't tell you this -- Mr. Musk

22   is driving to the airport.  He's driving to the airport, and he

23   sees this article.  He sees the leak that led to the article.

24   And remember, they only learned about this stake just a few

25   days earlier, in a closed-door meeting.  No one had known about

1   this, even though they had owned these shares for quite some

2   time.  It was the same meeting that the go-private was

3   discussed.  Very few people knew that this had happened.  And

4   now, the information is leaking.  And it's leaking.

5       What leak would come next?  Who would selectively disclose

6   what next?  What issues would that create?  The board had told

7   him information can't be selectively disclosed.  The lawyers

8   had told him information cannot be selectively disclosed.  The

9   next article could be that they're intending to take Tesla

10  private.  And the stock would go through the roof.  Who knows

11  what happens next?  What to do?

12      And in that split-second decision, Mr. Musk quickly

13  tweeted his thoughts on a take-private, in an effort to get the

14  full state of play as quickly as he could out to the world.

15      (Document displayed)

16      **MR. SPIRO:**  "Am considering..."  It's not even a full

17  sentence.  It's a thought bubble.  And then he shared the

18  things that he was considering and thinking.  And the market

19  always understood.  They always understood, from those very

20  first words, that this was a consideration.

21      Considerations aren't certain.  Everybody knows that.  And

22  this also was uncertain.  He was the bidder, so he could bid

23  420 a share with funding backstopped.  And everyone in the

24  market understood, there's always a premium to take a company

25  private.  It always is a little bit higher than where the stock

1   is trading.  And Mr. Musk's words, his consideration, the core

2   of what he was saying is undisputably true.  Undisputably true.

3        And let me be clear.  Because of the circumstances,

4   because of the leak, because Mr. Musk is thinking aloud, he

5   rushed.  He rushed.  And in his rushed, reckless state, he

6   tweeted the wrong word choice.  In his mind, funding wasn't an

7   issue.  It was secured.  But what he said in that tweet was

8   "Funding secured," without elaborating on what that meant to

9   him.

10       He could have-should have said:  Funding wouldn't be an

11  issue, they had met with the PIF; what had happened in that

12  meeting, that he made an offer to the board.  But instead, in a

13  shorthand tweet, he quickly said "Funding secured," which is a

14  phrase at the end, not a full sentence or thought.

15       This casual use of language, this rushed, reckless way, it

16  was the result of a feeling he had to send something.  He had

17  to immediately respond to that leak.  And in a rush, he used

18  the wrong words.

19       It wasn't reckless to assume he could get funding.  It was

20  reckless to use that choice of words.  Funding wasn't going to

21  be an impediment to getting this done.  This basically means:

22  I got it.

23       Given his intentions, given the discussions with the PIF

24  and the board, his ability to raise money, let alone his own

25  net worth, funding wasn't an issue.  And he expressed that,

1   inartfully.  Inaccurately.  His meaning, what it meant to him,

2   was true.  Funding was not an obstacle.

3       And guess what.  It didn't end up being an obstacle.  You

4   see, later, advisers, the ones he had met with before the

5   tweet, they did analysis.  They made presentations.  They spoke

6   to the world at large.  And funding wasn't an issue.  They had

7   enough funding to go private.  Ultimately, the reason that they

8   don't go private?  Well, it was the same consideration for the

9   shareholders.

10      Listen.  He hadn't planned to tweet this.  It was a

11  split-second decision, not a deceptive act.  It really is this

12  leak from the Kingdom of Saudi Arabia that could have ended

13  Tesla down two operate paths.  Mr. Musk could have remained

14  silent, and what would have come would have come.  Who knows?

15  We'll never know.

16      Or he could try to quickly get in front of it.  Make sure

17  the market knew his thinking.  And he decided in that rushed

18  moment, imperfect or not, that disclosure was a better route.

19      Now, he shared some other thoughts after that about how

20  there was investor support.

21      (Document displayed)

22      **MR. SPIRO:**  And that it was only contingent on a

23  shareholder vote.  And he linked to a blog post.  These tweets

24  are linked to a long-form blog post.  To his mind, the

25  handshake, the other investors, there was support.  And the

1    word "only" (Indicating quotation marks), again, is not

2    literally mathematically the correct word.  There are lots of

3    small and little contingencies that happen in these processes,

4    right?  Money has to be in escrow, forms have to be completed.

5    Of course there were lots of steps.  Everybody knows that.

6         The only potential show-stopper in Mr. Musk's mind and

7    consideration was the shareholders had to want to do this.

8    That's what he meant.  That's basically the same thing, but the

9    word "only," again, rushing and tweeting, should have probably

10   been "only major contingency" or "the ultimate contingency" or

11   "the ultimate only contingency."

12        Listen, these tweets, they're informal, sporadic thoughts.

13   And I want to say it again, there's technical inaccuracies.

14   Secured, confirmed, only (Indicating quotation marks).  Funding

15   wasn't going to be an issue.  There were investors in support.

16   And the only significant ultimate hurdle would be the

17   shareholders.  Because this was always for the shareholders.

18        But these technical wordsmith inaccuracies and these

19   shorthand tweets, that's not what mattered.  They matter to

20   plaintiff's lawyers.  They didn't matter to the market.  What

21   mattered was Elon Musk was considering a transformative

22   transaction at a formative time.  A consideration that the

23   world knew that Mr. Musk could make possible.  And what's

24   more -- and this is very, very important -- the difference

25   between the word choice he used and the more detailed precise

 1   state of affairs that existed at the time did not matter.

 2       In other words, if the market knew all the backdrop we've

 3   been discussing, and it wasn't in a short-form tweet, if they

 4   knew everything, it would have not made a material difference

 5   to a reasonable investor.  It would not have been, to use the

 6   operative word, "material."

 7       In other words, the plaintiff's theory, their whole case

 8   that this word "secured" suggests a firmer state of play and is

 9   an overstatement of the state of affairs, doesn't matter.

10   Because if the tweet had said: The Saudi PIF met with us and

11   told us they are interested in taking us private and have the

12   funding to do so, the difference between this short tweet and

13   that statement would not have materially mattered to the

14   market.

15       Now, when the market does react, what it's reacting to is:

16   I am considering taking something private at 420.  The

17   announcement of the possibility of the transaction.  Not the

18   throw-away "Funding secured."  Indeed, that throw-away was

19   unclear to the market, as the plaintiffs told you.  Nobody even

20   knew what it meant.  "Financing committed" is a term of art.

21   It isn't clear what "Funding secured" even means in a tweet

22   phrase.  It's not self-evident how one could be just

23   considering something, and yet all the details are set.  And

24   when the market doesn't understand something, it doesn't give

25   it the weight that the market gives to things it's sure of.

1          You know, Twitter haikus, they don't move the market.

2     CEOs who can accomplish what they set their mind to, stating

3     their considerations, that's what moves the market.  And this

4     was always about what Mr. Musk was considering.

5          But in order to flush out the sporadic tweets and leave no

6     question as to the complete picture, attached to the tweets --

7     attached -- is the blog post.  So to the degree these

8     inaccuracies weren't corrected by reading the tweets together

9     or using common sense, the blog post ended that discussion.

10         (Document displayed)

11         **MR. SPIRO:**  And so this blog post, remember, is

12    developed by the communications team, the finance team,

13    lawyers.  And it's attached to the tweets.  And it's posted the

14    same day.  It's consistent with the tweets.  It reveals nothing

15    materially new.  It's not even possibly fraudulent.  And the

16    market didn't react in any different way.  Which proves that

17    the market knew the correct state of affairs.

18         After this blog post on the 7th, the market knew.  And

19    what happened next is exactly what you would expect to happen

20    next.  With the media frenzy, and everybody around.

21         (Document displayed)

22         **MR. SPIRO:**  Everyone's wondering what's going to

23    happen.  As you look at this blog post, it's clear decisions

24    have not been made.  It says "A final decision has not been

25    made."  This didn't come a week later.  It's the same day.  He

1    says "I would," "my intention," "intention."

2        "I don't envision."  "I'm trying to accomplish."

3        It could ultimately be finalized through a vote of

4    shareholders.  "Either way, the future is very bright..."

5        Everybody knew this wasn't certain.  It's in every

6    paragraph, it's not certain.  But, of course, the media starts

7    circling.  Everybody starts circling.  And so the Kingdom of

8    Saudi Arabia, the leak, the media frenzy, they start to fade.

9    They start to re-trade.  They start to distance themselves.

10       Mr. Musk starts pushing away from them, also.  You know,

11   they flash up those text messages between Yasir and Mr. Musk?

12   You know, what they didn't tell you is that everybody who's in

13   the room on July 31st agrees with Mr. Musk's memory of that

14   meeting, to a T.

15       And those text messages, those aren't Yasir's words.

16   Mr. Teller will tell you that.  Mr. Ahuja will tell you that.

17   Everyone in the room will tell you that.  These are not Yasir's

18   words.  These are the words of a man in a media storm, with

19   lawyers around, trying to trade and re-trade.  He starts

20   saying, "It's subject to a factory in Saudi Arabia" (Indicating

21   quotation marks).  Did you catch that?  "Subject to a factory"

22   (Indicating quotation marks).  This wasn't the real Yasir.

23       And Mr. Musk, he was doing something real.  Even if it was

24   uncertain.  He's meeting with consultants and lawyers; he's

25   working on the procedures and structures.  The board, the

1   counter-party, continued the process of evaluating the

2   transaction.  All of these parties continued to work in the

3   coming weeks, and always work in good faith.

4        And what the two weeks of process proved, unequivocally,

5   beyond a doubt, is that Mr. Musk was genuine in his want to go

6   private.  His motivation was for the shareholders.  Say what

7   you want about Mr. Musk.  But 2018, Tesla, he was committed,

8   and committed to his shareholders.  They had the funding to

9   accomplish this.  Funding did not stop this, would not stop

10  this.  And so what he had wanted to do, he could have done.

11  And the reason he didn't, it was the shareholders who couldn't

12  be part of it, who he couldn't include, which is what mattered

13  to Mr. Musk all along.

14       Now, this is critically important.  During this process,

15  Mr. Musk didn't sell a single share.  Not a single share.  No

16  executive at Tesla sold a single share.  No board member sold a

17  single share.  In a real fraud case, people have motives.  They

18  want to make money.  They want to profit.  Here, there was no

19  motive; they did not profit.  That's how you know it wasn't

20  fraud.

21       Now, to simplify who was in the market, buying and selling

22  stock as Mr. Musk and Tesla worked on the deal, there were

23  three main groups.  There are long holders of stock, and that's

24  what you think of as a traditional investor.  They buy a stock,

25  they hold it.  Sometimes it goes up, sometimes it goes down.

1    But they're betting on the long-term value of the company.

2         Short sellers.  This is not a traditional investor.  This

3    group is betting against the company.  They want the company to

4    fail.  They want the company to lose value.  If the company

5    fails, if the company's harmed, if the company loses value,

6    they make money.

7         And then there are traders, and option traders.  These

8    people take bets on the long-term/short-term view of stock,

9    where the stock will end up after a specified amount of time.

10   And Tesla is a very volatile stock.  And you'll come to learn

11   that these people were making bets in all kinds of directions.

12        These were the groups that were out on the market.  And

13   remember, as I said earlier, every time somebody buys a stock,

14   somebody sells.  There's always two people on both the trade --

15   on both sides of a trade.  No, you can't win every time.

16        So these folks really were betting on Tesla, a

17   high-profile target.  And they saw an opportunity.  And it's an

18   opportunity that lots and lots and lots of people made a lot of

19   many on.  Some lost money.  And you'll learn that this Tesla

20   stock moved like no other stock.  It just was different.

21        And there was another group that saw an opportunity.

22   Because of the rushed, technically inaccurate tweets,

23   excitement around going private, plaintiffs' lawyer saw an

24   opportunity to bring a case.  It wasn't pension funds and the

25   Great Depression that brought this case.  Plaintiff's lawyers

1   concocted this case.

2        And these class actions, what they do is they work and

3   they have to pick a named plaintiff, and pick they did.  His

4   name is Glen Littleton.  He did nothing wrong here.  But what

5   he says happened, the truth of what happened, you will hear it.

6   And guess what?  He agrees with us.  His testimony also

7   supports that there was no fraud.

8        As to Elon Musk's consideration and the logic of going

9   private, his rationale made sense to Mr. Littleton.  Which was

10  a reason, in and of itself, to give emphasis to the

11  consideration.  The phrase "Funding secured," Mr. Littleton

12  thought it meant that -- well, he thought that it meant what

13  everybody thought, which is that this consideration has been

14  given thought, or it was moving along.  That Mr. Musk was

15  committed to doing this.

16       Mr. Littleton's formal sworn response in this case, before

17  he ever gave testimony, was that he interpreted it to mean

18  "committed to taking it private" (Indicating quotation marks).

19  That Mr. Musk was committed to taking it private.

20       Well, guess what?  He was.  He thought that "Funding

21  secured" meant that there might be a shortfall.  That it might

22  not mean all the money; that he might need a bank or others to

23  step in.  He also thought that "Funding secured" was no

24  different than the blog post.  He thought it was no different

25  from the blog post that comes out before the market on the

1   13th, that had more detail.  There was no difference; it was

2   not material.

3        He agrees that, regardless of anything, it's Mr. Musk.  He

4   was going to be able to raise the money like he'd always done

5   for his companies.  And I quote:

6            "If he said he was going to do something, he

7            pretty much did it."

8        It's Elon Musk, after all.  And, he said more.  He said in

9   terms of all those other steps, the T's and the I's, he didn't

10  give those much consideration.  Mr. Musk is a convincing guy.

11  And the market knew that Mr. Musk could accomplish this if he

12  set his mind to it.

13       And the other thing is that Mr. Littleton will tell you he

14  wasn't betting on some final deal when he saw that tweet.  He

15  knew there wasn't a final deal worked out.  And he knew the

16  price could go higher.

17       Of the thousands and thousands of investors that the

18  plaintiff refers to, they're going to call and play deposition

19  snippets of a couple of them.  Okay?  A few cherrypicked ones.

20  The ones they think that are best for them.  Some of them have

21  an axe to grind.  They'll fare no better.  And the reason is

22  you're all going to see this for what it is.  Because nothing

23  is going to change the ultimate truth.  Mr. Musk was

24  considering taking Tesla private.

25       You know, if you think about it, he was more than just

1    considering it.  He had made a bid, however informal, to his

2    board to take it private.  This was more than just a

3    consideration.  And he absolutely could have.

4        Nothing will ever change the fact that that "Funding

5    secured" statement, funding's not an issue, it turned out to be

6    right.  As they had sufficient funds to go private.  And

7    nothing will ever change the fact that this was no fraud.

8        But the plaintiff will then call expert witnesses.

9    Complicated doctors, to tell you about the stock movements.

10   They'll call expert Professor Guhan Subramanian.  He is going

11   to come into court soon, and he's going to tell you what

12   happened, even though he wasn't there.  And then he's going to

13   tell you this has never been done before this way.

14       Well, guess what?  We agree.  Nobody else ever wanted to

15   protect the shareholders as much as Mr. Musk did.  And Mr. Musk

16   tries to do things that have never been done before.  Everybody

17   knows that.

18       And what this testimony really does show is that this

19   structure that was unique, including every shareholder, that's

20   what stopped this from going forward.  Not the funding, not the

21   I's and the T's.  And then the paid damages expert will come in

22   here and they're going to cherrypick news articles and stock

23   movements and try to convince you that the stock movements

24   support the idea that this was a fraud.  Again, as I said, the

25   way it traditionally works is the market learns something

positive; stock goes up.  And then the truth is revealed to the

market, and the stock tanks.  That's how it normally works.

Well, guess what?  We agree.  But here's the problem.  In

this case, the stock movements, they prove just the opposite.

Again, the truth is revealed in fraud cases, and the market

tanks.  The truth is revealed here, the market goes up.  The

blog post of the 7th, when more information is attached to the

tweets, when more information comes out, the stock goes up.

Blog post of the 13th, more information, stock goes up.

So the plaintiff's lawyers are left to scramble.  They

have to find a stock drop.  Starts on the 7th, they announce to

the world on the 24th that they're not going to go private

(Indicating).

Like many potential deals, this didn't happen.  So the

plaintiff's lawyers look and what they find is that on the

17th, the stock goes down a lot.  Great.  Okay.  The stock goes

down, they can try to show fraud, stock goes down, they make

money.  So they look and they find this *New York Times* article

that they told you about that came out.  Right?  This article

has to be, for their case to work, has to be a revelation of

fraud.  It's the only way it works.  So they scour the article.

I can almost picture them doing it.  Each and every point in

the article is not about the transaction.  It's about Elon

Musk's personal struggles, about his health, about his

suffering.  But like on Page 2, Line 75, there's this

1   throw-away line that, like, an unidentified source has told the

2   reporter, maybe, that funding was far from secure.  Okay?  That

3   article, the word that they're trying to show you reveals

4   fraud, is "Far from secured."  This is the magic moment for

5   them.  The word "far."

6        But they have an even bigger problem.  You remember -- and

7   that's why we have this calendar.  Remember, it's on

8   August 13th where the details in the blog post are revealed.

9   Right?  Market knew the details days earlier, and they didn't

10  care.  More details, stock goes up.

11       So what happens in the *New York Times* article on the 17th

12  is just some reporter putting their characterization on

13  something, and using the word "far."  The market didn't care on

14  the 13th, because the truth will never change.  Mr. Musk was

15  considering taking Tesla private.  And he could have.  And

16  there was no fraud.

17       And finally, their damages experts will admit to you

18  something else that's fatal to their case.  Please remember

19  this.  Because of this, they also can never meet their burden

20  of proof.  They can never prove their case.  Their expert did

21  not do what is called "disaggregation."  Okay?  And what that

22  really means is it's separating the effect of two things.  The

23  "am considering," main sentence in the tweet, from the two

24  words at the end on which this case is built.  Their expert

25  never isolated the first sentence, which is unquestionably

1    true, from the throw-away "Funding secured."

2        So was it the main sentence, and Mr. Musk, the great

3    entrepreneur, announcing his considerations of a transaction?

4    Or the throw-away?  They have to prove which one it was.  Not

5    just which one had an impact, a substantial part.  They have to

6    prove it had a substantial part.  They have to reasonably

7    distinguish which of the two made the stock move.  They never

8    did that.  They didn't even try to do that.  Do you know why

9    the expert never tried?  Because he knew the truth, which will

10   never change, which is that he was considering taking Tesla

11   private.  That's what everybody cared about.  And he could

12   have.  And there was no fraud.

13       Now, listen.  Plaintiffs are also going to call Mr. Musk.

14   They'll call him in their case.  They're going to call him

15   right after their expert.  They're going to call him away from

16   all the other witnesses, all of the Tesla executives and

17   employees who would tell you the truth.  They want to leave him

18   alone on an island.  They want to question him first.  But I

19   know you will keep an open mind.  I know you will see that for

20   what it is.  And the truth will eventually come out in this

21   courtroom.

22       So after all of this, all of the wordsmithing and the

23   cherrypicked witnesses and the experts, you jurors are still

24   going to have questions.  If he was trying to do something

25   improper, why did he immediately flush it out, the same day, in

1   a blog post?

2       If he was not genuinely considering it, wouldn't he

3   immediately be, you know, shown to be not true?  Of course.

4   Why would he do that?  Why would he jeopardize that?  If he's

5   the largest shareholder, who's never sold a share, he has the

6   most to lose financially, what reason would he have to do that?

7   If Mr. Musk ultimately had the funding and it didn't matter,

8   how can they base their whole case around something he was

9   right about?

10      If Tesla ultimately did not go forward because of the

11  shareholder vote, how can they base their case about something

12  he was right about?

13      And how come when they issue more detailed statements, how

14  come the market does not do what plaintiffs would want?  Like

15  it was some big reveal of fraud.  The market goes up.

16      How can they prove disaggregation, separating the first

17  main sentence from the throw-away?

18      What illicit motive would Mr. Musk possibly have for doing

19  all this?

20      And what evidence is there, with all these sophisticated

21  lawyers and consultants and board members, that anybody was

22  committing fraud?

23      Because, you see, there was no fraud.  The plaintiff's

24  lawyers are marrying imperfect words in a stock drop about

25  Mr. Musk's mental state and his suffering.  They're trying to

1    patch it together to prove some harm.  Some wrongdoing.  But

2    it's clear as day, their bet is wrong.  It will be proven to be

3    wrong.  His imperfect words didn't matter, and the stock

4    dropped because of his suffering.  Nothing more.

5        Just like the market gets excited about what Elon Musk is

6    considering, they get worried when they see that his mind is

7    suffering.  And here in this case on August 7, 2018, his mind

8    was pure.  His intentions were sincere.  He was operating in

9    good faith, as were all the people around him.  As were those

10   of the lawyers and consultants who were helping him accomplish

11   his plan, as were the executives of Tesla, as were the board

12   members who were the counter-party here evaluating the

13   proposal.

14       And as you hear them testify -- they won't call them the

15   first week, it's their case, but you will hear them testify --

16   all with their different backgrounds, from different walks of

17   life, you will hear about this concept in the law that's called

18   "good faith."  They all had good faith.  Their motives and

19   their minds were pure.  This was all done for the mission, it

20   was all done for the shareholders, and it was all done in good

21   faith.  There was no fraud.

22       Thank you.

23           THE COURT:  All right.  Thank you, Mr. Spiro.

24       We are going to go ahead and take our first break of the

25   morning.  We'll break for, if we could do 15 minutes, come back

**PROCEEDINGS**

 1    at quarter to, and we will start with the evidence.

 2        In the meanwhile, please remember my admonition not to

 3    speak to anyone, including amongst yourselves, about the case,

 4    form any opinions, until this case is submitted to you for

 5    deliberation, or attempt to do any research.  We'll see you in

 6    15 minutes.  Thank you.

 7            **THE COURTROOM DEPUTY:**  All rise for the jury.

 8        (Jury excused)

 9        (The following proceedings were held outside of the

10    presence of the Jury)

11            **THE COURT:**  All right.  See you in 15.

12            **THE COURTROOM DEPUTY:**  Court is in recess.

13        (Recess taken from 10:31 a.m. to 10:49 a.m.)

14        (The following proceedings were held outside of the

15    presence of the Jury)

16            **THE COURTROOM DEPUTY:**  Court is back in session.

17        **MR. PORRITT:**  Your Honor, very mindful of the Court's

18    instruction, I'm keen to get started as quickly as possible.

19        But I just wanted to mention, during Mr. Spiro's opening,

20    we had exactly what we talked about before the jury came in

21    regarding statements about Elon Musk's pure heart, good faith,

22    innocent, all of which is inconsistent with your summary

23    judgment order.

24        And so I just want to note that now.  I don't know whether

25    it's appropriate to give some form of instruction now, or

 1  whether we save it to the end of trial, or --

 2          THE COURT:  I'm --

 3          MR. PORRITT:  I'm just flagging for Your Honor and the

 4  Court our concern.  Maybe I gave him ideas before the jury came

 5  in, in which case perhaps the fault is on me.

 6          THE COURT:  Well, at this point, they've withdrawn

 7  their request, and therefore, the instruction will be given

 8  about the assumption they are to make about reckless disregard.

 9  So I don't need to give an instruction at this point.

10          MR. PORRITT:  Thank you, Your Honor.

11          THE COURT:  Thank you.  Okay.  Let's go get the jury.

12          MR. PRICE:  Your Honor, this is Bill Price.  I just

13  wanted to confirm that during the cross-examination, that I'd

14  be using the same lectern that's closer to the witness?

15          THE COURT:  Yes, yes.

16          MR. PRICE:  All right.

17          THE CLERK:  All rise for the jury.

18      (The following proceedings were held in the presence of

19  the Jury)

20          THE COURT:  All right, have a seat, everyone.

21      Welcome back, ladies and gentlemen of the jury.  We will

22  now proceed with the taking of evidence.

23      And, you may call your first witness, Mr. Porritt.

24          MR. PORRITT:  Thank you, your Honor.  Plaintiff calls

25  the plaintiff, Glen Littleton.

1                    <u>**GLEN LITTLETON, PLAINTIFF'S WITNESS, SWORN**</u>

2           **THE WITNESS:**  I do.

3           **THE COURTROOM DEPUTY:**  Thank you.  Please be seated.

4           **THE WITNESS:**  Take the mask off?

5           **THE COURTROOM DEPUTY:**  Yes, you can take your mask

6      off.

7           Please speak clearly into the microphone.  State and spell

8      your first and last name for the record.

9           **THE WITNESS:**  Glen Littleton.

10          **MR. PORRITT:**  And Your Honor, I have a binder here for

11     the witness.

12          **THE COURT:**  All right.

13          **MR. PORRITT:**  I assume Your Honor has one.  We have

14     provided one to defendants.

15          **THE COURT:**  I have a binder.  You may approach.

16          **MR. PORRITT:**  May I approach the witness?

17          **THE COURT:**  Yes.  And Mr. Littleton, if you could

18     spell your last name for the record.

19          **THE WITNESS:**  L-I-T-T-L-E-T-O-N.

20          **THE COURT:**  Thank you.

21                         <u>**DIRECT EXAMINATION**</u>

22     **BY MR. PORRITT**

23     **Q**   Good morning, Glen.

24     **A**   Yeah, good morning.

25     **Q**   Could you tell us where you currently live?

1   **A**    Kansas City, Missouri.

2   **Q**    And how old are you?

3   **A**    Seventy-one.

4   **Q**    And are you employed?

5   **A**    I'm self-employed as an investor.

6   **Q**    And what is your role in this lawsuit?

7   **A**    I'm the class representative.

8   **Q**    And what does that mean, to be the class representative?

9   **A**    I represent all the investors in Tesla between August 7th

10  and August 17th.

11  **Q**    Could you please tell us a little bit about your

12  background?

13  **A**    Yeah, I grew up on a farm in Oakesdale, Washington, from

14  age 10, and learned a lot about the world.  And then when I

15  graduated from high school, I went to Washington State

16  University where I got a degree in a bachelor of finance.

17  **Q**    Were you the first member of your family to graduate from

18  college?

19  **A**    No, my two sisters who are much older graduated first.

20  **Q**    And then you?

21  **A**    Then me.

22  **Q**    Okay.  And where did you go to work after college?

23  **A**    I got a degree -- I got a job with Pillsbury in their

24  flour milling division.  Specifically, grain procurement.  And

25  as a part of that training, I spent several months in commodity

**LITTLETON - DIRECT / PORRITT**

1    analysis.

2    **Q**    What did that involve?

3    **A**    Learning the fundamentals of hedging, for one.  Learning

4    the fundamentals of grain pricing.  And it was there that I

5    discovered how compelling hedging can be.  I mean, it works for

6    the agribusiness community, it's worked for many, many decades.

7    And it was compelling.

8    **Q**    Can you explain what you mean by "hedging"?

9    **A**    If you have an inventory of wheat or corn or something

10   you're going to use for processing, you want that price to be

11   fixed.  So as much as the commodities move around, you need to

12   hedge that by taking a position in the futures or options

13   markets.  So that that value is protected.

14   **Q**    So how exactly would you go about that?

15   **A**    Well, I wasn't responsible, per se.  There was a central

16   hedge desk in Minneapolis that did it.  And you would call them

17   with your position, and they could take offsetting positions in

18   futures or options.

19   **Q**    And how would that hedge work to protect you?

20   **A**    Well, a put, for instance, is an instrument that protects

21   you on the down side.  You have a right to sell at that fixed

22   price for that strike price.  And the call is the same, only

23   it's on the up side.  And futures are a contract that's used

24   more for agribusiness, but I didn't use it that much.

25   **Q**    And, how long were you at Pillsbury for?

1   A    About four years.

2   Q    And what did you do after you left Pillsbury?

3   A    I went to work for a small firm in Chicago called Hennessy

4   and Associates.  They were a commodity brokerage firm, and they

5   had a lot of institutional accounts.  And I worked for them in

6   Kansas City.  I answered the phone, took orders.

7   Q    And what sort of trading did they do for their clients?

8   A    I'm sorry.  It was basically a commercial hedging

9   operation.  They would call and they would buy for covering the

10  cargo of corn, or they would sell the hedge versus a cargo of

11  corn that they owned, so that was a hedging, pretty much.  They

12  were all pretty much hedgers.

13  Q    And how long did you work at Hennessy for?

14  A    About four years.

15  Q    So, do you recall roughly what year you left Hennessy?

16  A    '79.

17  Q    Okay.  And what did you do then?

18  A    I bought a membership at the Kansas City Board of Trade,

19  where I filled orders for other companies, in the pit.

20  Q    Okay.  And how long did you do that for?

21  A    I did that for several months, and then I decided I could

22  do better by trading arbitrage, buying and selling one month

23  against another.  It was low-risk.

24  Q    And what do you mean by "It was low risk"?

25  A    Because you were never long or short.  You were always

**LITTLETON - DIRECT / PORRITT**

1   hedged one against the other.

2   **Q**     And were you doing this on behalf of clients?

3   **A**     No, I was doing it for my own money.

4   **Q**     And how long did you do that for?

5   **A**     I did that for about a decade, a decade and a half,

6   roughly.  And the movement to an electronic trading platform

7   was the biggest reason why I left the floor.

8   **Q**     And what did you do after you left the floor?

9   **A**     I traded stocks, lightly, trying to learn a lot about

10   them.  They were always my first love.

11   **Q**     Stocks were?

12   **A**     Yeah.

13   **Q**     And do you recall when you first started investing in

14   stocks?

15   **A**     It was in 2005, -6, -7, something like that.

16   **Q**     And how did you go about investing in stocks?

17   **A**     Oh, I bought the stock outright.  It was so small that I

18   didn't feel the need to hedge.  It was a very small position.

19   **Q**     Did there come a time when you decided to invest in Tesla?

20   **A**     Yeah, I think it was around 2015, roughly.

21   **Q**     And how did you first learn of Tesla?

22   **A**     Well, I heard about Elon Musk first, about his SpaceX

23   company.  And I've always been a fan of technology.  So it was

24   compelling to see what he was doing.  And then I realized the

25   only way I could invest with him was through Tesla.

**LITTLETON - DIRECT / PORRITT**

1    **Q**    And what was it about Elon Musk that you found compelling?

2    **A**    Um, he was just bringing new ideas to light.

3    **Q**    And did you do some research into Tesla at that point in

4    time?

5    **A**    Yeah.  I discovered it by accident, actually.

6    **Q**    Okay.  And what did you learn about Tesla?

7    **A**    Well, that it was a -- the best way to invest in electric

8    vehicle technology at this point.  So it was the only way you

9    really could invest in electric car technology.

10   **Q**    Was there anything else?

11   **A**    Um, it just seemed to be aggressive towards using

12   technology.

13   **Q**    Did you also purchase any Tesla vehicles?

14   **A**    Yeah, we've bought several for ourselves and family.

15   **Q**    Now, you said you started investing in Tesla around 2015,

16   you said?

17   **A**    Roughly, yeah.

18   **Q**    Okay.  What did that initial investment look like?

19   **A**    I'm sorry?

20   **Q**    What did that initial investment look like?

21   **A**    In terms of size?

22   **Q**    Yes.

23   **A**    Oh, I think we only -- I only invested like 25,000 or so,

24   something like that.

25   **Q**    And was that in stock or --

**LITTLETON - DIRECT / PORRITT**

1   **A**   Stock, yes.

2   **Q**   And did that change over time?

3   **A**   Yeah.  As I made money with the stock, I would invest

4   more.  And as the price of -- as the stock got more volatile, I

5   would use options as a hedge.

6   **Q**   And how would you use options as a hedge for your Tesla

7   investment?

8   **A**   Well, when I worked in commodity analysis at Pillsbury I

9   found out the compelling nature of puts.  They're like an

10  insurance policy.  You pay a premium for several months.  They

11  don't cover the full loss, like an insurance policy does.  The

12  insurance policy has a deduction.  They both have a

13  mathematical framework for pricing.  I think actuarial is for

14  insurance, and Black and Scholes is for options, two guys that

15  earned the Nobel Prize for discovering that.

16  **Q**   And do you recall when you started using stock options as

17  part of your investment in Tesla?

18  **A**   It was not until it got volatile.  So I can't really give

19  you an exact year.  But when it started getting too volatile

20  for my risk profile, I would start using hedges.

21  **Q**   And so if we move forward to August, 2018, early August

22  before the 7th, 2018 --

23  **A**   Uh-huh.

24  **Q**   Could you describe what your then-position was in Tesla?

25  **A**   On August 7th?  Is that what you asked me?

1   **Q**    Immediately before the tweets that we have seen.

2   **A**    Okay.  I was long, out-of-the-money calls and

3   out-of-the-money puts.  The calls represented the ownership of

4   Tesla.  The puts represented an insurance policy.  And I was

5   out about a year and a half, as far as I could go, in terms of

6   the Exchange allowing you to trade.  Because that was a

7   long-term -- I wanted to be a long-term investor in Tesla.

8   **Q**    And if Tesla's stock price went up, what would happen to

9   your investment position?

10  **A**    It would gain.  It was -- I was always long.  Excuse me.

11  I was always long, never short.

12  **Q**    And at this time, what were you doing to keep track of

13  information that might affect your investment in Tesla?

14  **A**    Well, I was following Musk on Twitter, because I wanted to

15  know what was going to come out of that.  But other than that,

16  it was Bloomberg, *Wall Street Journal*, *Financial Times*.  More

17  than anything I watched the market, because the market was a

18  great disseminator of information.

19  **Q**    When you say "watch the market," which market are you

20  referring to?

21  **A**    The stock market of -- the price of Tesla stock.

22          **MR. PORRITT:**  Your Honor, I would like to show the

23  witness Exhibit 8 at this time.

24          **THE COURT:**  All right.

25      (Document displayed)

```
 1              MR. PORRITT:  I don't believe there is an objection,

 2    but --

 3              THE COURT:  Are you moving it, formally moving it?

 4              MR. PORRITT:  We move it into evidence.

 5              THE COURT:  Any objection?

 6              MR. PRICE:  No objection.

 7              THE COURT:  All right.  Admitted.  And you may

 8    publish.

 9              MR. PORRITT:  Thank you, Your Honor.

10         (Trial Exhibit 8 received in evidence.)

11         (Document displayed)

12    BY MR. PORRITT

13    Q    So Glen, you have in front of you Exhibit 8.  Do you see

14    that?

15    A    Yes.

16    Q    Do you recognize this?

17    A    Yes, I do.  That was the tweet that started everything.

18    Q    Do you recall if you saw this tweet?

19    A    I'm sorry?

20    Q    Do you recall if you have seen this tweet before?

21    A    Oh, yes.  I saw it about a half hour after it came out, or

22    less.

23    Q    Okay.  And do you recall what your reaction was to this

24    tweet?

25    A    I was pretty shocked, because that put at risk almost all
```

**LITTLETON - DIRECT / PORRITT**

1  my positions.  And I was shocked at the -- the -- how -- how

2  complete a statement it was.  That was a complete statement

3  that he was taking it private.

4  **Q**   Okay.

5  **A**   Absolute.

6  **Q**   And what was the most important part of that tweet?

7  **A**   I'm sorry, the important -- "Funding secured."

8  **Q**   Why was that important to you?

9  **A**   Because that made the taking private more definite,

10 completely definite in my mind.

11 **Q**   And you said it would have an effect on your investment

12 position in Tesla at the time.  What did you think that impact

13 was going to be?

14 **A**   It was going to pretty much wipe me out.

15 **Q**   And why was that?

16 **A**   Because I was long out-of-the-money calls, which

17 represented by long, and I was out out-of-the-money puts, which

18 represented a hedge, an insurance policy.  And both of those

19 would expire worthless, because they were outside the 420 price

20 range.

21 **Q**   Okay.  So do you recall roughly what the prices were for

22 your call options at this point in time?

23 **A**   I believe the calls were 550 and 650, something like that.

24 And the puts were 250, around 250, on average.

25 **Q**   Can you explain what the strike price for a call option

1   means?

2   **A**    Well, for a strike price on a put, a 250 put allows you --

3   gives you the right to sell stock at that price.  You're hedged

4   at that price at 250.  If it goes below them, your insurance

5   policy goes up in value.

6   **Q**    What about for calls options?  Can you explain what the

7   strike price does?

8   **A**    Same with the calls.  If the strike -- price of the stock

9   goes up to 550 and beyond, then beyond 550, you're long.

10  You're making money.

11  **Q**    And why was it that the -- that the tweet, Exhibit 8,

12  would affect both calls and puts in your portfolio?

13  **A**    Because everybody that trades insurance policies like

14  this, and options, knows that the value would decline fairly

15  quickly.  Go to zero fairly quickly.

16  **Q**    Of both your sets of options?

17  **A**    Yeah, yeah.

18  **Q**    Okay.

19  **A**    Yes.

20  **Q**    So what did you do in response to these tweets?

21  **A**    I started selling the securities I owned, the insurance

22  policies that were most at risk, the puts, because it wasn't

23  going to go down if he was going to take it private at 420.

24  The ones -- the calls, the higher strike prices were at risk,

25  but I really believed he was going to have to pay more than 420

1   to go private.  So I rolled down some of my calls from 450 to

2   400, and that made me long at $400.  So I thought that was a

3   way to participate.

4   **Q**   Okay.  And, how quickly did you start doing this after

5   seeing the tweet?

6   **A**   I liquidated the puts within hours, I believe.  Within a

7   week, I was out of almost all the puts.  And a fair number of

8   the calls, too.

9   **Q**   Why did you react so quickly?

10  **A**   Because the first role of investing is:  Protect your

11  capital.  And in this case, it was like I wanted to ensure my

12  livelihood.  This represented a threat to my livelihood.

13  **Q**   Do you recall in general your state of mind at this point?

14  **A**   Um, a little bit of shock, and just mechanically doing

15  what I need to do, trying to be detached from the emotions of

16  it.

17  **Q**   How easy was that to be detached from the emotions?

18  **A**   It's tough.  But, you know, it's like when you are doing a

19  job, you become involved in that particular job, that thing.

20           **MR. PORRITT:**  At this point, Your Honor, I would like

21  to show the witness Exhibit 432.

22           **THE COURT:**  Okay.

23           **MR. PORRITT:**  I believe there's no objection.

24           **THE COURT:**  Is there any objection?

25           **MR. PRICE:**  There is no objection.

1          THE COURT:  Pardon?

2          MR. PRICE:  There's no objection, Your Honor.

3          THE COURT:  All right.  Moving it into evidence?

4          MR. PORRITT:  Yes, Your Honor.

5          THE COURT:  432 is admitted.  You may publish.

6      (Trial Exhibit 432 received in evidence.)

7      (Document displayed)

8  BY MR. PORRITT

9  Q    Do you see Exhibit 432?

10  A    Yeah.  Now it's blown up, yes.  I see it now, yeah.

11  Q    If you could turn to the last page.  Well, first of all

12  could you describe what Exhibit 432 is?

13  A    Page 432, it's a communication between myself and the

14  broker that handled my orders for Tesla.

15  Q    That's Mr. Morse?

16  A    Yeah, Mr. Morse.

17  Q    If I can refer you to the bottom of the first page of

18  Exhibit 432?

19  A    Okay.

20  Q    Actually, turn to the second page of Exhibit 432.  I

21  apologize.

22      (Document displayed)

23  Q    If you turn, there's an email.  Actually, it's not that.

24  There's an email about two-thirds of the way down, saying --

25  you write at 4:33 p.m., do you see that?

1   A      Um --

2          (Witness examines document)

3   A      Yes, I see it.

4   Q      Okay.  And what do you say to Mr. Morse in that email?

5   A      I was getting out of everything tomorrow, assuming there

6   are bids.  I was afraid there wouldn't be any bids at all,

7   because I wasn't the only one who was concerned about this.

8   And I wanted to give him a heads-up because I felt the

9   responsibility to let him know that I was taking a responsible

10  action.

11  Q      Okay.  And then, moving up that page, at 4:36 p.m.

12  August 7th, you sent another email to Mr. Morse.  Is that

13  correct?

14  A      Yes.

15  Q      And what are you telling Mr. Morse there?

16  A      I'm telling him that -- I'm informing him.  And he knew,

17  but I wanted to make sure that he knew what I -- that I told

18  him, that I had gotten out of the stuff I could get out of.

19  And sold and liquidated the things that actually had a bid.

20  Q      And is that what you're referring to when you write "the

21  obvious stuff"?

22  A      Yeah.  Yes.

23  Q      Now if I could refer you to the first page of Exhibit 432,

24  at the bottom there, at 5:02 p.m.  Do you see that?

25  A      Yes.

**LITTLETON - DIRECT / PORRITT**

1  **Q**     It's an email starting "My first trades tomorrow..."

2  **A**     Yes.

3  **Q**     Again, could you explain what you're telling Mr. Morse

4  there?

5  **A**     Yeah.  Again, I wanted to be responsible and let him know

6  that I was managing it, so that he wouldn't be at risk.

7  Because if I lost more money than I had in the account, that

8  would be a problem for him.  So I wanted to let him know that I

9  was being responsible.

10          **THE COURT:**  Could you move the mic closer to you?

11          **THE WITNESS:**  Yeah, okay.

12  **BY MR. PORRITT**

13  **Q**     And finally, that email that's dated at 6:14, do you see

14  that?

15  **A**     Yeah, I see it, yes.

16  **Q**     Okay.  That also uses the phrase which I think you also

17  used, "Roll the 450 calls down"?  Do you see that?

18  **A**     Yes.

19  **Q**     Can you give a little further explanation what that means?

20  **A**     Well, the 450 calls would not be worth much if the company

21  was taken private at 420.  But the 400 calls had a chance of

22  being worth something.  And I thought that -- I really thought

23  he was going to have to pay more to take it private.

24          I think most shareholders in Tesla weren't interested in a

25  five or 10 percent return.  They were in it for a significant

 1   stock move.  And so they would not settle for 420.  So I

 2   thought at least that might -- I might recap some of the losses

 3   I made.

 4   Q    Do you recall roughly how long it took you to sort of

 5   liquidate your positions?

 6   A    I'm sorry?

 7   Q    Do you recall roughly how long it took you to liquidate

 8   your position after the August 7th tweets?

 9   A    The majority of it, it took, um, several days, I think.

10   Q    And actually, let me turn.

11          MR. PORRITT:  Show the witness Exhibit 13.

12       (Document displayed)

13          THE COURT:  Any objection to that?

14          MR. PRICE:  No objection.

15          THE COURT:  Do you want to admit it?

16          MR. PORRITT:  Yes, formally move, thank you.

17       (Document displayed)

18       (Trial Exhibit 13 received in evidence.)

19   BY MR. PORRITT

20   Q    Do you have Exhibit 13 in front of you?

21   A    I'm sorry?

22   Q    Do you have Exhibit 13 in front of you?

23   A    Yes, I do.

24   Q    And do you recognize Exhibit 13?

25   A    Yes, I do.

1 **Q**    Okay.  And what is Exhibit 13?

2 **A**    It is a second tweet, I believe, the second one I saw,

3 that "Investor support is confirmed," which just reaffirmed my

4 belief that it was going to happen.

5 **Q**    Do you recall seeing this tweet on August 7th?

6 **A**    Yes.

7 **Q**    Do you recall roughly when you saw it?

8 **A**    No.

9 **Q**    Okay.  Did this change your approach to your portfolio in

10 any way towards Tesla?

11 **A**    No, because "Funding secured" was so definite to me, that

12 that was the primary driver.  This helped confirm that, but,

13 no, it didn't change anything.

14 **Q**    So other, after liquidating your position, did you do

15 anything else regarding investing in Tesla?

16 **A**    Yeah.  I was trying to salvage a disaster so I think I put

17 on a few more trades for a little while, a week or two, just

18 because I thought maybe there -- I might be right about him

19 going higher than 420.

20 **Q**    Did you buy any Tesla stock?

21 **A**    I'm sorry -- yeah, I bought 100 shares because I wanted to

22 go private with it.  And the options would not allow you to go

23 private; you would have to own the actual stock.

24 **Q**    Do you recall roughly what percentage of your investment

25 in Tesla prior to the tweets, you lost in the week afterwards?

1    **A**     North of 75 percent.  More than 75 percent.

2    **Q**     And at that stage, what percentage of your portfolio was

3    Tesla, compared to other investments?

4    **A**     Almost 100 percent, pretty close.

5    **Q**     You did not regard that as unduly risky to have

6    100 percent of the investment in one stock?

7    **A**     Well, no, because I had learned a lot about hedging,

8    working for Pillsbury.  And it's a very effective tool if you

9    know how to use it.  And so I would never trade Tesla without

10   options, without an insurance policy.

11          So as long as I could insure it, I thought that -- over a

12   period of two or three weeks, I decided that it was just too

13   expensive to hedge.  Because the tweet had disrupted the

14   pricing of the insurance market.  The put market.  It was just

15   too expensive.  So I ended up getting out of all of it,

16   September, something like that.

17          **MR. PORRITT:**  Again, at this point, if I could show

18   the witness Exhibit 524.  Again, I don't think it's -- there's

19   no objection, so we would formally move into evidence,

20   Your Honor.

21          **THE COURT:**  All right, any objection?

22          **MR. PRICE:**  Your Honor, I don't think I have an

23   objection, and I certainly don't think I have an objection as

24   to what part of it's going to be used.  But I'm not exactly

25   sure if all of it is proper entering, or --

1           THE COURT:  Well, my chart indicates there was no

2    objection.

3           MR. PRICE:  Yeah.

4           THE COURT:  And there was no request to limit it.  So

5    to the extent you are reserving some objection in that regard,

6    it's overruled.

7           MR. PRICE:  Yeah.

8           MR. PORRITT:  Thank you, Your Honor.

9           THE COURT:  You may publish.

10      (Trial Exhibit 524 received in evidence.)

11          MR. PORRITT:  Thank you.  And 524 is admitted,

12   Your Honor?

13          THE COURT:  Yes.  It is admitted.

14          MR. PORRITT:  Thank you.

15   BY MR. PORRITT

16   Q    Glen, do you have Exhibit 524 in front of you?

17   A    Yes, I do.

18   Q    Can you tell the jury what 524 is?

19   A    It is a brokerage report from my broker, telling me my

20   position, and the daily trades for the month.

21   Q    And for which month?

22   A    It would have been August.  August.

23   Q    August of which year?

24   A    2018.

25   Q    Does 524 contain all the trades that you executed in Tesla

1  securities in August, 2018?

2  **A**    Yes.

3  **Q**    Following the tweets, what were you doing to monitor

4  information regarding the potential going-private transaction

5  with Tesla?

6  **A**    You know, I didn't have time to follow all the news items,

7  because there were so many sources and so many bad rumors and

8  bad information, that -- I followed the market, because the

9  market was the best disseminator of information at that point.

10  **Q**    And what does it mean to follow the market at that point

11  in time?

12  **A**    Follow the price movements of the Tesla stock.

13  **Q**    And if you saw a movement in the Tesla stock price, what

14  would you do?

15  **A**    I would use, as -- if it was a good movement for me, I

16  would use it as an opportunity to get out of more stuff, more

17  of Musk's things.

18      (Reporter clarification)

19          **THE WITNESS:**  More, yeah.

20  **BY MR. PORRITT**

21  **Q**    Were you also following information that was published by

22  Tesla at this time?

23  **A**    You know, not in realtime.  But I would see it maybe that

24  night, or the next day, or something.  I was just -- I was just

25  focused on getting out of my position to save my livelihood, so

1  I didn't have the luxury.

2      And by then, the damage had been done.  Say the 13th, the

3  damage had been done.  There was nothing that would help my

4  position.  Help me stay in a position.  The damage to the

5  markets, the damage to my equity.  So I was just focused on

6  getting out.

7  **Q**    All right.  You referred to August 13th.  Are you aware of

8  a disclosure that Tesla made on August 13th?

9  **A**    Yeah.  Yes, I am.

10  **Q**    Okay.  What -- do you recall what Tesla published on

11  August 13th?

12  **A**    Um, no, I can't -- I don't remember.  I know it was

13  further -- further information.

14  **Q**    Okay.  Was this information important to you?

15  **A**    No.  I mean it was, historically, but no, because I was

16  already out, or out of most of the -- most at-risk positions.

17  And I was just focused on getting -- it was too late for me.  I

18  couldn't afford to stay in.

19  **Q**    Did there come a time when you understood that Tesla would

20  not in fact be going private, and would be staying public?

21  **A**    Yeah.  I don't know that timeframe, but yeah, there was a

22  time.

23  **Q**    Okay.  Do you recall anything in particular that

24  ultimately told you that that was the case?

25  **A**    Wasn't there a letter from Tesla and Musk saying that:  We

1  couldn't go private because there weren't enough existing

2  shareholders that could, legally?

3  **Q**    Yes.  Do you recall anything else about that disclosure?

4  **A**    Not really.  I mean, I was in a state of shock during this

5  time.  I was reading, I was listening, and I was -- I was

6  trying to get out of things.  But it was a strange time, and I

7  was in a lot of shock.

8  **Q**    You earlier testified that you're the class representative

9  in this lawsuit.

10     Correct?

11 **A**    Yes.

12 **Q**    Okay.  For your service as class representative, are you

13 receiving any sort of payment or special bonus?

14 **A**    No.

15 **Q**    Why are you serving as class representative?

16 **A**    I was picked by the court system, and I just felt an

17 obligation.  I felt it was my responsibility.

18 **Q**    What are you trying to accomplish, or what do you hope

19 this lawsuit accomplishes?

20 **A**    I hope to recover the losses --

21        **MR. PRICE:**  I object.  That is irrelevant.

22        **THE COURT:**  Overruled.

23        **THE WITNESS:**  I'm hoping to recover the losses that

24 were incurred because of the tweet.

25

```
 1    BY MR. PORRITT:

 2    Q     Losses by who?

 3    A     All the class, shareholders.

 4          MR. PORRITT:  Thank you, Your Honor.  At this point no

 5    further -- reserving my right for cross-examination -- for

 6    redirect.

 7          THE COURT:  All right, thank you.

 8          Cross?

 9                          CROSS-EXAMINATION

10    BY MR. PRICE

11    Q     Hi, Mr. Littleton.

12    A     Hello again.

13    Q     Yeah.  We've met at a deposition, right?

14    A     Yes.

15    Q     And I think we're going -- I don't think we have the

16    binders up for Mr. Littleton, or not?

17          (Off-the-Record discussion between counsel)

18          MR. PRICE:  Your Honor, may I approach the witness?

19          THE COURT:  Yes, you may.  And do you have a binder

20    for the Court?

21          MR. PRICE:  Yes.

22          THE COURT:  All righty.  Go around and pass that up.

23          (Binder handed up to the Court)

24          THE WITNESS:  I don't know; it reminds me an awful lot

25    of homework.  I don't know.
```

1          MR. PRICE:  (Inaudible)

2          THE WITNESS:  All right.

3     BY MR. PRICE

4     Q    And the other thing I want to make sure you have in front

5     of you is a copy of your deposition transcript.

6          MR. PRICE:  Do we have that up there?

7          THE COURT:  And one for the Court as well?

8          MR. PRICE:  Yes, Your Honor.  You might draw that

9     microphone a little closer to you, make sure you can be heard.

10         MR. PRICE:  Okay.

11         THE COURT:  Thank you.

12    (Document tendered)

13    BY MR. PRICE

14    Q    So now that we are situated, let me ask you about a few

15    things you said on your direct.  And let me talk a little bit

16    about your experience sort of as a -- as an investor.  And I

17    think you -- certainly, by 2012, you had for many years been

18    investing in stocks, commodities, options?

19    A    Yes.

20    Q    Various securities.  Correct?

21    A    Yes.

22    Q    And I think you said that you started investing in 2015.

23    And I just want to clarify.  Wasn't -- weren't the bulk of your

24    investments in Tesla as of 2012?

25    A    The bulk?

LITTLETON - CROSS / PRICE

1    Q    Yeah.

2    A    Oh, I -- it was -- I don't -- you know, I don't know.  I

3    don't remember exactly that far.  I don't think it was 2012.

4    Was it?

5    Q    Let me see if this refreshes your recollection.  If you

6    look at Page 49 of your deposition transcript.

7    A    49.

8         (Request complied with by the Witness)

9    Q    Tell me when you've had a chance to find that page.

10   A    I've got it, yeah.

11   Q    And this is just to see if it refreshes your recollection.

12   And you see at Line 4 there's the question:

13              "QUESTION:  Did there come a time when your

14              Tesla investments were the bulk of your

15              investment portfolio?"

16   A    Oh, okay, yeah.

17   Q    And then if you read on down to the answer at Line 12, do

18   you see that?

19   A    Yeah.

20   Q    So is it accurate that from 2012 on, the bulk of your

21   investments were in Tesla?

22   A    Yes.

23   Q    All right.  And, and just so we -- the jury knows what

24   this is, your deposition was taken around March 31st, 2022.  Do

25   you remember that?

**LITTLETON - CROSS / PRICE**

 1   **A**    Oh, yeah.

 2   **Q**    And you were asked questions, under oath, by me.  Correct?

 3   **A**    Yes.  Yes.

 4   **Q**    And your attorney was there, representing you.  Right?

 5   **A**    Oh, yes.  Yes.

 6   **Q**    Okay.  And you said in your direct examination that the

 7   court system selected you to be the lead plaintiff in this

 8   case.  Do you recall that?

 9   **A**    Um, just -- just now, you mean?

10   **Q**    Yes, just when --

11   **A**    Yes, yeah.

12   **Q**    And what happened is that your understanding is that

13   plaintiff's counsel selected you, and made an application for

14   you to be lead counsel in this case.  Right?

15   **A**    Yes.

16   **Q**    Okay.  So it wasn't at your request; you were picked by

17   your -- people who are now your counsel.  Right?

18   **A**    Um, you know, I'm not that clear about the process.  I

19   know I tried to get access to the class action.  But I am not

20   that clear on how it happened.  I'm not a legal person.

21   **Q**    Sure.  But you did have to sign a declaration in

22   connection with that.  Correct?

23   **A**    I'm sorry, what was that again?

24   **Q**    You had to sign a declaration under oath in order to be

25   chosen as the lead representative.  Correct?

**LITTLETON - CROSS / PRICE**

1  **A**   I -- I don't remember that.

2  **Q**   Okay.  Well, at the time, you thought that you in fact

3  possessed the characteristics necessary to be thought of as a

4  reasonable investor in connection with Tesla securities.

5  Right?

6  **A**   I'm sorry, what is that question, again?

7  **Q**   Sure.  At the time that you accepted being the lead

8  plaintiff here, --

9  **A**   Uh-huh.

10 **Q**   -- at that time, you thought you possessed the

11 characteristics that were necessary to be thought of as a

12 reasonable investor in connection with investing in Tesla.

13 **A**   I never -- I never reached that conclusion.  I never

14 reached that conclusion, no.

15 **Q**   Well, if -- again, going to try to refresh your memory.

16 If you look at Page 165.

17 **A**   165?

18 **Q**   Yes, 165.

19 **A**   Uh-huh.

20 **Q**   And this is -- let me get the specific line here.  I think

21 it's Line 20.

22       **THE COURT:**  I don't think it's Line --

23       **MR. PRICE:**  I'm sorry, it's not 165, I apologize.  It

24 is -- I'm sorry, it's Line 11.

25       **THE WITNESS:**  Line 11, okay.

1    BY MR. PRICE

2    Q    Yeah, 11 to 16.

3    A    Okay.

4         (Document displayed)

5    Q    And if I can just briefly read it (As read):

6              "QUESTION:  So you thought you had possessed,

7              you know, what was necessary to be thought of

8              as a reasonable investor in connection with

9              your investment decisions in the Tesla

10             securities, right?

11             "ANSWER:  Based on my limited knowledge of

12             how the process works, I thought yes."

13        You remember, you gave that testimony.  Right?

14   A    Yeah.  That's my testimony, yeah.

15   Q    Okay.  So I want to focus now on your knowledge and

16   thoughts about Tesla prior to the August 7th tweets.  Okay?

17   A    Okay.

18   Q    And first I want to talk about, you know -- well, let me

19   ask you this.  Certainly, before the tweets, for some period of

20   time, you made trades in connection with Tesla if not every

21   day, pretty much every other day.

22   A    I was always adjusting the portfolio, but I was not a --

23   an in-and-out trader.  But I was always making adjustments,

24   too.  Because it was a vol- -- it was a volatile stock.

25   Q    Well, I phrased that question the way I did; is it

1    accurate to say that prior to the August 12th -- August 7th

2    tweets, you would make trades to adjust your portfolio every

3    other day, every day.  Right?

4    **A**    There wasn't a timeframe.  It was what the market

5    dictated.  If it was moving a lot, if it had moved a lot, up or

6    down.  It wasn't -- it was a market dictate.  It wasn't a time

7    dictate.

8    **Q**    I know, but I'm just asking you, if the market dictated

9    that, that's great.  But the result is that you were making

10   trades in Tesla securities every day or every other day.

11   **A**    Well, it didn't seem that frequent, but I don't have it in

12   front of me to confirm that.  But it was -- it didn't seem that

13   frequent to me.

14   **Q**    Okay.  Well, again, if you'd look at your deposition

15   transcript, this is at Page 54.

16   **A**    Okay.

17       (Document displayed)

18   **Q**    And, if you look at Line 12.

19   **A**    Uh-huh.

20   **Q**    It says (As read):

21           "**QUESTION:**  So when you say that your

22           adjustment portfolio hedging was constant, do

23           you have any estimate, for example, in 2018,

24           prior to the August 7th, you know, how

25           frequently you were making trades concerning

LITTLETON - CROSS / PRICE

```
 1            Tesla?
 2            "ANSWER:  Well, it -- I would make trades to
 3            adjust it every other day, every day."
 4    A    Yeah.  And there should have been a caveat there.
 5    Depending on the market.
 6    Q    Sure.  So, and the way you were getting information --
 7    A    First --
 8            THE COURT:  Hold on.  If you're going read that, you
 9    should read the rest of the answer.
10            MR. PRICE:  Oh sure.  And then the rest is:
11            "In terms of substantive changes, that was
12            probably once a week, but again, it depended
13            on the price movement.  If the price movement
14            was dramatic.  And it started getting pretty
15            dramatic, that was the determinator of my
16            trading level -- trading activity."
17            THE WITNESS:  Yes.  That's correct.
18    BY MR. PRICE
19    Q    And you said Tesla was a volatile stock.
20    A    Uh-huh.
21    Q    Is that right?
22    A    Yes.
23    Q    And that would have moved you to be making these, these
24    adjustments frequently.
25            (Document taken off display)
```

**LITTLETON - CROSS / PRICE**

1   **A**    Well, it would depend what direction it went.

2   **Q**    Well, how long was it?  For how long a period of time

3   prior to August 7th were you, in terms of trades, adjusting

4   your portfolio every day or every other day?  For how long a

5   period before August 7th?

6   **A**    I can't answer.  I'm sorry, I do not have an answer to

7   that.

8   **Q**    Sure.

9   **A**    I will answer, but I don't know what that is.

10  **Q**    Okay, that's fine.  So let me talk to you about how you

11  got information about Tesla.

12  **A**    Uh-huh.

13  **Q**    You subscribe to Bloomberg, right?

14  **A**    Yes.

15  **Q**    The *Financial Times*, correct?

16  **A**    Uh-huh.

17  **Q**    You thought those were two of the most reliable sources in

18  the financial media.

19      Correct?

20  **A**    I'm not sure I would characterize that.  They were

21  affordable.  I could afford to buy a subscription.

22  **Q**    Okay.  And you looked at headlines, so that you could find

23  out what's going on in the news cycle.  Right?

24  **A**    I'm -- sure.  I look at some headlines, but that's not

25  all.

1  Q    And you also looked at what you call "the Greeks," which

2  are beta, theta, delta.  Can you even tell us what that means?

3  A    Well, I try to make it as simple as possible.  I treated

4  puts as an insurance policy.  And when the position would be

5  reflected in a higher mathematical expression, then I would

6  make adjustments.

7  Q    And you would -- you would look at as many headlines about

8  Tesla as you could.  Right?

9  A    Um, I wouldn't say that.  I would say I looked as often as

10  I could afford to.  I was doing a lot of other things.  I was

11  watching the market, more than the headlines.

12  Q    Well, let me direct your attention to your deposition.

13  This is at --

14  A    Okay.

15  Q    At Line 69.

16  A    69?

17  Q    I mean, Page 69.  And this is just to get a feel as to

18  what you were looking at.

19       (Document displayed)

20  A    Uh-huh.

21  Q    And it's Line 16.  And we'll go to 70, Line 5.  Okay?

22  A    Okay.

23  Q    (As read)

24            "QUESTION:  Okay.  So what would you do then

25            -- you know, after you wake up, you're going

1              to look at whether you need to make any

2              decisions about your Tesla portfolio."

3    A    Uh-huh.

4    Q    (As read)

5              "QUESTION:  What would you actually search

6              and look at?  You know, what was your

7              practice in being informed of the news cycle

8              and price movements and the Greeks, as you've

9              described it?

10             "ANSWER:  Well, the Greeks are something that

11             show up on my trading platform.  That's part

12             of the process.  That's what you pay for, for

13             a monthly subscription to a trading platform.

14             I would take -- I would try to peruse as many

15             headlines as I could:  Bloomberg, *Financial*

16             *Times*, *Wall Street Journal*, and see what the

17             headlines were."

18        Did I read that correctly?

19   A    Yeah, yeah.  I mean, I would.  I would.  But I was doing

20   other things.  I didn't -- I didn't -- excuse me.  I didn't

21   focus all my time on headlines.  But I watched them, yeah.

22   Q    And you would have on your monitor tabs open to these

23   publications, and just, like, leave them there all the time.

24   Right?

25   A    Some -- not all the time.  Sometimes, yeah.

1   Q    I mean, so they would refresh, and you'd wake in the

2   morning and you could see them.  Right?

3   A    Well, I don't do the same thing every day.  But, um, I did

4   that, I did that, yeah.

5   Q    So gathering all this information, then, let me kind of

6   focus on your -- the context in which you saw these tweets.

7   That is, you know, your knowledge and beliefs about Mr. Musk

8   and Tesla.

9   A    Uh-huh.

10  Q    As of that time.

11       And I think you said that you believed, based on your

12  research, that Mr. Musk was bringing new ideas to light.

13  Correct?

14  A    Sure.  Yes.

15  Q    And you thought by August 7th, that he had accomplished

16  things which had been unprecedented.  Right?

17  A    Um, yeah, I guess so.  I don't remember saying that.  Did

18  I say that?

19  Q    Well, I'm asking whether you believe it.  You believe it.

20  A    Unprecedented?  Yes, done some unprecedented things, yeah.

21  Q    And what are the unprecedented things that you had

22  observed that Mr. Musk had accomplished, prior to seeing these

23  tweets?

24  A    I'm sorry, I'm sorry to keep having to ask you to rephrase

25  it, but the sound in here kind of echoes.  What is the --

1  **Q**    Yeah.  There's a partition between us.

2  **A**    Yeah.

3  **Q**    What are some of the unprecedented things you saw Mr. Musk

4  accomplish?  This is before the August 7th tweets.

5  **A**    Mostly SpaceX.

6  **Q**    And, what about that?

7  **A**    Well, it impressed me that he was able to do it.

8  **Q**    I'm sorry?

9  **A**    I said I was impressed that he was able to do it.

10  **Q**    And you thought that was impressive, why?

11  **A**    Technology.

12  **Q**    Did you think it was also unprecedented that he was able

13  to actually create a company that, you know, could participate

14  in that market of sending rockets to outer space for the

15  government?

16  **A**    Oh, yeah, I had great respect for his technical skills.

17  Who wouldn't?  You know.  It's remarkable.  It's the other

18  stuff.

19  **Q**    Well, let me talk about the other side.  It's true that

20  your observation was that Mr. Musk and Tesla, itself, faced

21  significant headwinds to being a successful company.  Correct?

22  **A**    Did you say Tesla and SpaceX?

23  **Q**    Tesla and Mr. Musk.

24  **A**    Oh.  Well, when I say "headwinds," I'm thinking

25  volatility, disruption, all the sort of things that happen that

1    create volatility.  Turbulence.  So headwinds, turbulence,

2    volatility.  Yeah.

3    **Q**    So for example, if you would look at Exhibit 430 in your

4    binder --

5    **A**    The big book?

6    **Q**    I think it's in both binders, but it's the one that has

7    the exhibits in it (Indicating).

8    **A**    430, okay.

9    **Q**    Yeah, 4-3-0.

10   **A**    Huh.

11   **Q**    If it's not in the one your counsel provided, it's

12   certainly in ours.

13   **A**    This is the one you provided.  430?

14   **Q**    4-3-0.

15   **A**    Oh yeah, there it is.  Got it.

16   **Q**    And you see, those are communications between you and your

17   broker --

18   **A**    Uh-huh.

19   **Q**    -- around July 7 of 2017.  Right?

20   **A**    Yeah.  Right.

21        **MR. PRICE:**  Your Honor, may I move Exhibit 430 into

22   evidence.

23        **THE COURT:**  Any objection?

24        **MR. PORRITT:**  No objection.

25        **THE COURT:**  All right.  430 is admitted.

1          (Trial Exhibit 430 received in evidence.)

2              **THE COURT:**  And you may publish.

3          (Document displayed)

4    **BY MR. PRICE**

5    **Q**    I would like you to look at your email that starts the

6    chain.  At the bottom of the first page it shows, it's from you

7    to Mr. Morse, July 7, at 10:31, and it says "Hi Bob."  Do you

8    see that?

9    **A**    Okay.

10   **Q**    And we go to the next page.

11         (Document displayed)

12   **Q**    And I want you to look at that first full paragraph there.

13   **A**    Uh-huh.

14   **Q**    Says (As read):

15              "One of the reasons I choose to focus on

16              Tesla is because the headwinds they face are

17              immense: Legacy auto makers, fossil fuel

18              industry.  And most importantly, aggressive

19              well financed short sellers."

20         Do you see that?

21   **A**    I see that, yeah.

22   **Q**    And at that time, you thought that there was a lot of

23   skepticism in the investment community about Tesla.  Right?

24   **A**    Um, yeah.  There was.  Yes, there was.

25   **Q**    And that's because Tesla was trying to accomplish

1    something which had not been accomplished before, which was

2    kind of unprecedented, which was to take on the major car

3    manufacturers, and bring electric cars to the market.  Right?

4    A    Yeah.  I mean, he thinks out of the box.  No doubt about

5    that.

6    Q    And, and again, you thought by the time of the August 7th

7    tweets, that he had survived those headwinds, and accomplished

8    what many people would think was out of the box.  Right?

9    A    Um, what do you want from me as an answer about -- I'm

10   sorry.

11   Q    It was your belief, as of August 7th, that Mr. Musk was

12   going to succeed.  Right?

13   A    Well, um, yeah.  But more than anything, he was going to

14   introduce a lot of new technology.  Success has a lot of

15   different definitions.  You can say financially, you can say

16   technically, you can say personal.  Technically, yeah.

17   Q    And you mentioned here, "aggressive well financed short

18   sellers."

19   A    Uh-huh.

20   Q    Those are people who wanted Tesla to fail.  Right?

21   A    Yes.

22   Q    Okay.

23   A    Yes.

24   Q    And in fact, at your deposition, you said you wanted to

25   talk about short sellers.  You kind of volunteered that.  Do

LITTLETON - CROSS / PRICE

1  you remember?

2  **A**    Yeah, I probably did.

3  **Q**    And you said you thought that the short sellers, these

4  aggressive well financed short sellers were trying to destroy

5  the company, Tesla.  Right?

6  **A**    Yeah, absolutely.  Yes.

7  **Q**    And that one of the things they wanted to accomplish was

8  to decrease Mr. Musk's ability to raise money so that he could

9  run his company.

10  **A**    Um -- excuse me.  I don't know if I could agree with that.

11  I -- I just think they were trying to push the price down so

12  they could profit.

13  **Q**    Okay.  Let's see if we can refresh your recollection,

14  again.  This is at Page 62 of your deposition, when we talked

15  earlier.

16  **A**    Uh-huh.

17  **Q**    And you were testifying under oath:

18           "QUESTION:  And how were they -- in your

19           view, how were they trying to kill Tesla?

20           "ANSWER:  To drive their price to zero, the

21           stock price to zero, or, you know, as low as

22           possible, which would affect his ability to

23           raise money."

24       Did I read that correctly?

25  **A**    Yes, yes, that's right.  That's absolutely right.

**LITTLETON - CROSS / PRICE**

1  Q    Okay.  And you were focused on investments in Tesla,

2  despite these headwinds, because you believed in Elon Musk and

3  his vision.  Correct?

4  A    I -- I believed in my ability to hedge it.  That's what I

5  believed in.  No, I had great faith in his technical skills,

6  but I was involved because I knew I could hedge it.  Or I

7  thought I could, until the tweet came along.

8  Q    Let me go back to your deposition at Page 63.

9  A    Okay.

10  Q    This is Lines 9 through 15.

11       (Document displayed)

12  Q    (As read)

13            "QUESTION:  Why would you choose to focus on

14            Tesla, knowing there were headwinds that

15            magnified the movement of the stock?

16            "ANSWER:  Because I believed in Elon.  I

17            believed in the vision.  I believed in the

18            technology.  I knew that would prevail or

19            felt like it should prevail.  I hoped it

20            would prevail."

21       Did I read that correctly?

22  A    Yeah, right, uh-huh.

23  Q    Okay.  So your thought -- and this is talking about your

24  thought process before seeing these tweets -- was that if Elon

25  Musk said he was going to do something, he pretty much did it.

LITTLETON - CROSS / PRICE

1   **A**    Yes.

2   **Q**    And again, prior to the tweets, you thought if Elon Musk

3   said he's going to do it, he does.

4   **A**    Yes.

5   **Q**    And you had observed, prior to August 7th, that for

6   example, he had successfully raised hundreds of millions of

7   dollars, you know, for Tesla and for SpaceX.

8        Correct?

9   **A**    Uh-huh, yes.

10  **Q**    And what you'd observed is he had demonstrated this

11  ability to get funding to implement his vision.  Right?

12  **A**    I'm sorry; what are you asking me, again?

13  **Q**    Well, you said you observed his ability to raise millions

14  and millions of dollars for Tesla and SpaceX.

15  **A**    Raise capital, uh-huh.

16  **Q**    And that was to implement his vision.

17  **A**    Yes.

18  **Q**    And so what you had seen is that he had shown the ability

19  to get funding to implement his vision for Tesla and SpaceX.

20  **A**    Oh, yeah, yeah.  Absolutely.

21  **Q**    And also before these August 7th tweets, you had been

22  following what was happening with the Model 3?  Right?

23  **A**    Uh-huh, yeah.

24  **Q**    And that was a big event for Tesla, getting that Model 3

25  into production.  Right?

1    **A**    Yes.

2    **Q**    And you'd been reading about how Mr. Musk had been, like,

3    sleeping in the factory to try to -- try to solve the problems

4    with getting the Model 3 through the product line.

5         Correct?

6    **A**    I did see that, yes.

7    **Q**    And I assume then, you know, for the earning call,

8    earnings report for the call prior to August 7th, that you had

9    -- you had observed that; you had been a part of that?

10   **A**    I certainly watched it, yes.

11   **Q**    Okay.  And so as of August 7th, your view was that, to use

12   your words, if Mr. Musk wanted to do something -- if Mr. Musk

13   said he was going to do something, he pretty much did it.  If

14   he says he's going to do it, he does.  And that he had

15   demonstrated his ability to raise millions of dollars to

16   implement his visions.  Right?

17   **A**    Yes.  I mean, absolutely.  And that's why I believed the

18   tweet "Funding secured" so much, because I believed he would

19   make it happen.

20   **Q**    Then let's talk about that.  I want to focus on, then,

21   we're now August 7th.

22   **A**    Uh-huh.

23   **Q**    And you're looking at -- you saw a number of tweets and

24   you saw a blog post.  Right?

25   **A**    Yeah.

1  **Q**    And you were looking at Exhibit 8 previously, so pick a

2  binder, any binder.  Either of those two binders has Exhibit 8

3  in it.

4  **A**    Exhibit 8.  There we go.

5       (Document displayed)

6  **A**    All right.  Okay.  Yes.

7  **Q**    And you see, that's the one that says "Am considering

8  taking Tesla private at $420.  Funding secured."  Do you see

9  that?

10  **A**    Yes.

11  **Q**    Now, focusing on the first sentence, "Am considering

12  taking Tesla private at $420."

13  **A**    Uh-huh.

14  **Q**    Right?  If you had thought that he was committed to doing

15  that, you still would have liquidated.  Right?  Even without

16  "Funding secured."

17  **A**    Um, no, "Funding secured" is -- was the only thing that

18  mattered to me.  Because that was such a defining statement.

19  **Q**    Okay.  Let's put a bookmark on that.  Okay?

20       So, I want you to look at Exhibit 12.  And we'll come back

21  to Exhibit 8 in a second.

22  **A**    All right.

23  **Q**    Okay?

24       (Document displayed)

25  **Q**    Exhibit 12 is a blog post --

LITTLETON - CROSS / PRICE

1  **A**    Uh-huh.

2  **Q**    -- that Mr. Musk -- well, made public on August 7th, as

3  well.  And you told us you saw this.  Right?

4  **A**    Yeah.  I didn't see it in realtime, but I saw it some time

5  afterwards, yeah.

6  **Q**    All right.  And let's look at that.  And if you look at

7  the first paragraph there.

8      (Witness examines document)

9  **Q**    And in the first paragraph, Mr. Musk explains the reasons

10 he wants to take Tesla private.  Right?

11 **A**    Yes.

12 **Q**    Okay.  And you see the first sentence says:

13          "... a final decision has not yet been

14          made..."

15      Right?

16 **A**    Yes, that's what it says.

17 **Q**    So you understood as of this time, which is after the

18 first tweet, that a final decision had not yet been made?

19 **A**    Well, in my mind, it had been made.  "Funding secured" was

20 final.

21 **Q**    So you thought if you have funding secured, you have to do

22 the deal.

23 **A**    He would do it.  This is a way to backpedal from a

24 damaging bad statement.

25      (Off-the-Record discussion between counsel)

1          **MR. PRICE:**  And I'm sorry, Your Honor, I think this is

2   being displayed and it's not in evidence yet.  So I move

3   Exhibit 12 into evidence.

4          **THE COURT:**  I assume no objection.

5          **MR. PORRITT:**  No objection, Your Honor.

6          **THE COURT:**  I want to make sure.

7          **THE COURTROOM DEPUTY:**  It's not being displayed.

8          **THE COURT:**  Okay.  Only displayed to the witness.

9          **THE COURTROOM DEPUTY:**  The witness and the attorneys,

10  the jury doesn't see it.

11         **MR. PRICE:**  Thank you.

12         **THE COURT:**  Don't look at this.  But now, you've

13  moved?

14         **MR. PRICE:**  Yes.

15         **THE COURT:**  And no objection, so it will be admitted.

16  And now you can publish.

17      (Trial Exhibit 12 received in evidence.)

18      (Document displayed)

19         **MR. PRICE:**  Thanks.

20  **BY MR. PRICE**

21  **Q**   So you were telling us that you thought this was somewhat

22  of a back step?

23  **A**   Backpedaling.

24  **Q**   Let's look at the rest of it, and see how this affected

25  you.

```
1   A    All right.

2   Q    So he then states reasons.  And one is (As read):

3            "...the reason for doing this is all about

4            creating the environment for Tesla to operate

5            at its best."

6   Do you see that?

7   A    Yes.

8   Q    I want to talk about what he wrote here, and see what your

9   thought was.  He says:

10           "As a public company, we are subject to wild

11           swings in our stock price that can be a major

12           distraction for everyone working at Tesla,

13           all of whom are shareholders."

14  Do you see that?

15  A    Yes.

16  Q    And you agreed with that.  Right?

17  A    Um, the paragraph, or that one --

18  Q    That, that sentence right there, you agreed with.  Right?

19  A    Yeah.  I do.  Yes, I do.

20  Q    And if we go to the next sentence:

21           "Being public also subjects us to the

22           quarterly earning cycle that puts enormous

23           pressure on Tesla to make decisions that may

24           be right for a given quarter, but not

25           necessarily right for the long-term."
```

1        Do you see that?

2   **A**   I see it.

3   **Q**   And you agreed with that as well, right?

4   **A**   Um, I'm not sure if I agree with that or not.

5   **Q**   Okay.  If I could take you back to your -- the deposition

6   that occurred earlier.

7   **A**   Okay.

8   **Q**   If we look at Page 80.  This is Line 19.

9   **A**   Uh-huh.

10      (Document displayed)

11  **Q**   (As read)

12          ▪**QUESTION:**  And then his next statement:

13          Being public also subjects us to the

14          quarterly earning cycle that puts enormous

15          pressure on Tesla to make decisions that may

16          be right for a quarter but not necessarily

17          right for the long-term.

18          "Do you agree with that statement?"

19          ▪**ANSWER:**  Yes, I do."

20      I read that correctly, right?

21  **A**   Yeah, you did.

22  **Q**   And let's focus on Tesla.  Tesla, in your understanding as

23  of August 7th, was somewhat of a mission-driven company.

24  Right?

25  **A**   Um, a mission-driven -- explain yourself.  Explain what

1   you mean.

2   **Q**   Sure.  Sure.  I mean, obviously, companies want to make

3   profit.  Right?

4   **A**   Yeah.

5   **Q**   Okay.  But you understood that Tesla had a long-term

6   mission basically of providing a clean energy alternative in

7   the automobile market.  Right?

8   **A**   Yeah, that was one of their missions, yes.

9   **Q**   And you understood or recognized that having to be a slave

10  to, you know, quarterly earnings goals and having to worry

11  about all these changes in the stock could be a distraction for

12  Tesla in particular.

13  **A**   Yeah.  No, I absolutely understand why he wanted to go

14  private, and it would make sense.  I never had a problem with

15  that.  That's why I was able to believe the "Funding secured"

16  tweet so readily.

17  **Q**   Sure.  And I noticed you said "Funding secured" there.

18  I'm going to come back to that.

19      But my question is whether or not you understood that

20  Tesla, you know, was -- was a uniquely mission-driven company,

21  looking long-term, was -- could be distracted by these

22  quarterly earnings and having that kind of pressure.  Right?

23  **A**   Um, I'm not sure what you're asking me.

24  **Q**   Well, you know, I asked it.  So I apologize.  Let me just

25  go on to the next one, because I think that we already covered

 1   it.

 2        And then there's a statement here, the next statement:

 3             "Finally, as the most shortest stock in the

 4             history of the stock market, being public

 5             means that there are large numbers of people

 6             who have the incentive to attack the

 7             company."

 8        Do you see that?

 9   A   Yeah, uh-huh.

10   Q   And you certainly agreed with that statement.

11   A   Absolutely, yes.

12   Q   So having seen the tweet that Mr. Musk was considering

13   going private, you then saw these reasons he gave for going

14   private.  And you thought those were compelling reasons.

15   A   Sure.

16   Q   And indeed, in the next paragraph, he says:

17             "I fundamentally believe that we are at our

18             best when everyone is focused on executing

19             when we can remain focused on our long-term

20             mission, and when there are not perverse

21             incentives for people to try to harm what

22             we're all trying to achieve."

23        Do you see that paragraph?

24   A   I see that, yes.

25        (A Juror raises a hand)

 1          (Reporter clarification)

 2              **THE COURT:**  I'm sorry.

 3              **JUROR:**  So we can't see the exhibit on our screen.

 4              **MR. PRICE:**  Oh, that's a disadvantage.

 5              **THE COURT:**  Okay.

 6          (A pause in the proceedings)

 7              **MR. PRICE:**  You guys are not looking at this, the

 8      whole time?

 9              **THE COURT:**  So it's still not showing?

10              **JUROR:**  Still no, sir.

11              **THE COURTROOM DEPUTY:**  We are having issues with the

12      monitors.

13              **THE COURT:**  Oh, okay.  We have a new system, and

14      obviously it's not working the way it's supposed to.  But feel

15      free, anytime, to raise your hand --

16              **JUROR:**  (Inaudible)

17              **THE COURT:**  Just this one.

18              **JUROR:**  Earlier exhibits were showing up.

19              **THE COURT:**  Great.  Thank you.

20              **THE CLERK:**  I think the monitors are still not

21      showing, though.

22              **THE COURT:**  Can the audience see it?

23          (Thumbs up)

24              **THE COURT:**  Yeah, they can see it.

25              **THE CLERK:**  Okay.

1          THE COURT:  Reached it?

2          MR. PRICE:  There we are.

3          THE COURT:  All right?

4          MR. PRICE:  Thank you.

5   BY MR. PRICE

6   Q    So focusing on that last paragraph, that's something you

7   specifically agreed with.  What I just read, what the jury can

8   now see, I have been reading more slowly, right?  You agreed

9   with that statement as of August 7th, right?

10  A    I'm sure what you mean by do I agree.  Do I agree with

11  what?  I'm not sure what you're asking me.

12  Q    Well, let me call your attention to your deposition.  We

13  will short-circuit this a bit.

14  A    All right.

15  Q    And Page 81, Line 20 to 82, Line 6.

16  A    82.

17  Q    81, Line 20 (As read):

18          "QUESTION:  And you see the next paragraph

19          here, he says:  I fundamentally believe that

20          we are at our best when everyone is focused

21          on executing, when we can remain focused on

22          our long-term mission and when there are not

23          perverse incentives for people to try to harm

24          what we're all trying to achieve.

25          "Did you agree with that statement as of

 1             August 7th?

 2             **"ANSWER:**  Yeah, I do.  Yes, I do.

 3             **"QUESTION:**  And you agree with it today as

 4             well, correct?

 5   **A**    Yeah.

 6   **Q**       **"ANSWER:**  Yes."

 7       Now, so, in fact, as of August 7th when you saw these

 8   tweets, your view is you could understand him wanting to go

 9   private, and you really couldn't argue with those reasons.

10   Right?

11   **A**    Yeah, sure.  Yeah.

12   **Q**    All right.

13   **A**    Yeah.

14   **Q**    And, I want to take you quickly then to the other tweet

15   that you talked about before we go back to kind of this --

16   **A**    Okay.

17   **Q**    About Mr. Musk's intentions and him making the case that

18   made you think that he wanted to go private.  And that is

19   Exhibit 13.

20       (Document displayed)

21             **THE COURT:**  And that's already been admitted.

22             **MR. PRICE:**  That's been admitted, Your Honor, so if we

23   can show that to the jury.

24             **THE COURT:**  That may be published, okay.

25

1    BY MR. PRICE

2    Q    And we saw this.  It says "Investor support is confirmed.

3    Only reason why there's not certain -- this is not certain is

4    that it's contingent on a shareholder vote."

5         So at the time you saw this tweet, by August 7th, given

6    your experience as an investor, your -- the fact that you

7    followed Tesla for so long, you knew that there was a process

8    that would have to take place before Tesla actually went

9    private.

10        Correct?

11   A    I -- I am not familiar with that process.  I know that

12   something had to be done.  But I'm not an SEC person, I'm

13   not -- I'm not that kind of an investor, so I don't know.

14   Q    Well, in fact, you knew from your background that as a

15   matter of course for a deal like this to take place, there

16   would be several steps that would have to take place, including

17   informing the board, having a special committee, receiving

18   information, getting advisers, --

19   A    Uh-huh.

20   Q    -- the board approving it, there being a go-public

21   timeframe, getting funding, seeking shareholder approval.

22   A    Uh-huh.

23   Q    You were familiar as of August 7th that all those steps

24   would be required.  Right?

25   A    I knew there was a process.  I did not know the details of

1   that process.

2   **Q**   Okay.  Well, I'm not asking you about the details.  Let's

3   go to your deposition.

4   **A**   Okay.

5   **Q**   Okay.  Let's start, this is 108.  Let's start at Line 8.

6       (Document displayed)

7   **Q**   (As read)

8           "**QUESTION:**  Well, given your 50 years of

9           experience in dealing with investing, you

10          knew that for a deal like this to take place,

11          there would have to be shareholder approval,

12          correct?

13          "**ANSWER:**  Correct.

14          "**QUESTION:**  And in fact, you knew that, you

15          know, as a matter of course, for a deal like

16          this to take place, there would be several

17          steps that would have to take place,

18          including informing the board, the board

19          getting -- having a special committee,

20          receiving information, because you're (sic)

21          giving advisers, the board approving it,

22          there being a go-public timeframe, getting

23          funding, seeking shareholder approval; you're

24          familiar with the steps I just talked to you

25          -- I just mentioned, right?

**LITTLETON - CROSS / PRICE**

1              **"ANSWER:**  Yes."

2        Did I read that correctly.

3   **A**    You did, right, but I was speaking broadly, a broad

4   process.  I wasn't speaking about the details of it, because I

5   don't know.  I'm not that --

6   **Q**    So if we can keep this up here -- when you saw -- first of

7   all, when it says "Investor support is confirmed," you took

8   that to mean basically that funding was secured.  You took that

9   to mean the same thing.  Right?

10  **A**    No, "Funding secured" stands alone.

11  **Q**    I'm asking, though, what you got from "Investor support is

12  confirmed."  You didn't take from that that the shareholders

13  had approved it, right?

14  **A**    Um, I didn't know what to take from that.

15  **Q**    Well, is it correct --

16  **A**    I just assumed that he had talked to shareholders, so

17  perhaps, but I didn't know, you know.

18  **Q**    Okay.  Is it correct that when you read that portion of

19  the tweet, --

20  **A**    Uh-huh.

21  **Q**    -- that you took that as just another affirmation that

22  funding was secured?

23  **A**    Sure.

24  **Q**    Okay.

25  **A**    Sure.  That is tangential to "Funding secured."

1   **Q**    But you didn't -- what I'm saying is that's how you read

2   it.  You didn't read it to mean anything else.  That part.

3   **A**    I just knew that it meant further affirmation of going

4   private.

5   **Q**    And the second part, looking at that, you didn't read that

6   to mean that there had been board approval, there had been

7   advisers, there had been regulatory approval.  You didn't read

8   that to mean that, did you?

9   **A**    I can't -- I don't know.

10  **Q**    All right.  Well, I'm asking you to think back as to what

11  you thought when you saw this, what your reaction was.

12  **A**    That's four years ago.  I mean, I saw everything that came

13  out as affirming funding secured.  You know.

14  **Q**    Okay.  You know, there's a contention in this case that

15  this was untrue, because there were things that still would

16  have had to have been done to go private.  Do you understand

17  that?

18  **A**    Sure.

19  **Q**    Okay.

20  **A**    Sure.

21  **Q**    Did you take from this (Indicating) that -- did you read

22  this to mean everything has been done that needs to be done to

23  go private, including board approval, special committee,

24  regulatory approval, et cetera, except for shareholder vote?

25  Did you read that that way?

**LITTLETON - CROSS / PRICE**

1  **A**    I knew that I had a framework of understanding that

2  funding was secured, and Elon Musk was the CEO, largest

3  stockholder.  They basically did whatever he wanted.  That

4  there would be a process, but he would make that happen.

5  Because funding was secured.

6  **Q**    Okay.  And that's what I'm going.  The way you read this

7  is that -- I'm going to include funding secured.  You said

8  funding secured, --

9  **A**    Uh-huh.

10  **Q**    Elon wanted to make it happen.

11  **A**    Uh-huh.

12  **Q**    Right.  And if I could see the -- I want to make sure I

13  don't misquote this, so I'm trying to get the realtime

14  transcript here.

15  **A**    All right.

16  **Q**    Okay.  Funding was secured, Mr. Musk was a CEO, largest

17  shareholder.  That he did whatever he wanted, and that there

18  would be a process, but he would make that happen.  Right?

19  **A**    Sure.  Yes.

20  **Q**    And so you didn't read this to mean it had already

21  happened, but he was confident he could make that process

22  happen.  Except for maybe the shareholder vote.  Right?

23  **A**    I stand by my statement.

24  **Q**    And as you said, you thought that -- well, it didn't

25  matter much to you as to whether or not the board of directors

1 had approved or these other things had happened because, in

2 your words, "Elon is a convincing guy."

3 **A**     Yeah.   Yeah.   I knew they would rubber-stamp it, somehow.

4 **Q**     So what you took from this tweet was that Elon Musk's

5 belief was that the only thing standing in the way of him

6 taking Tesla private was getting shareholder approval.   Right?

7 **A**     You're asking me if that's what I thought stood in the

8 way?

9 **Q**     Yeah -- pardon?

10 **A**     You're asking me if I thought that's what stood in the

11 way?

12 **Q**     Actually, did you take from this that Elon Musk was

13 telling you that he was confident that the only thing that

14 would stand in the way of this would be a shareholder vote?

15 **A**     It was part of the process that he would make happen,

16 sure.

17 **Q**     Okay.   Now, in that connection -- okay.   So let's step

18 back now.

19 **A**     Okay.

20 **Q**     We're now, August 7th.   And you see these tweets in the

21 post.   And your thought was:   Going private at 420 is a done

22 deal.   Right?

23 **A**     Yes.

24 **Q**     And you recall, you remember you said that many times

25 during your deposition:   At this point, going private, 420 is a

**LITTLETON - CROSS / PRICE**

1   done deal.  Right?

2   **A**   Yes.

3   **Q**   And if it's a done deal --

4   **A**   Uh-huh.

5   **Q**   If you think that, then you think you have to liquidate

6   your positions.  Right?

7   **A**   Yes.

8   **Q**   And you thought that Tesla going private, you thought that

9   was a done deal up until August 24th, when Mr. Musk said he was

10  no longer pursuing going private.  Right?

11  **A**   Well, you know, past, past the 13th, past the 12th, past

12  the 11th, it was irrelevant.  Because I -- the damage had been

13  done.  It's like having your house on fire, and they cancel the

14  insurance policy the same day.  And you -- you lose on both

15  ends.  You have to get out before that gets worse.

16  **Q**   So let me ask you the question again.  You made a comment

17  on whether something is irrelevant.  I'm going to ask you if

18  you can focus on my question.

19  **A**   Okay.

20  **Q**   It was your conclusion that Tesla -- that Tesla going

21  private at 420 was a done deal, until August 24th when Mr. Musk

22  sent out the post saying he was no longer wanting to go

23  private.  Right?

24  **A**   Would you repeat that again?  I'm sorry.

25  **Q**   It was your conclusion that it was a done deal that Tesla

1   would go private at 420 --

2   **A**    Uh-huh.

3   **Q**    -- until August 24th, when Mr. Musk sent out a post saying

4   he was no longer wanting to go private.  Correct?

5   **A**    Yes.

6   **Q**    And nothing in between those dates changed your opinion

7   that it was a done deal that Tesla was going to go private at

8   420.  Correct?

9   **A**    I'm sorry; would you repeat that again?

10  **Q**    Sure.  And nothing in between those dates, August 7 and

11  August 24, --

12  **A**    Uh-huh.

13  **Q**    -- changed your opinion that it was a done deal that Tesla

14  was going to go private at 420.  Correct?

15  **A**    I want to reiterate the fact that it was irrelevant to me.

16  The damage had been done, the losses had been taken.  Sure --

17       **THE COURT:**  Mr. Littleton, Mr. Littleton, that's not

18  the question.

19       **THE WITNESS:**  Oh, that's not the question?

20       **THE COURT:**  That's not the question.  Please answer

21  the question.  Listen to it one more time.

22       Repeat the question.

23       And you're going to answer the question.

24       **THE WITNESS:**  Sure.

25       **THE COURT:**  What was your state of mind?  What did you

1    think?  When did you think --

2            THE WITNESS:  Oh, yeah.

3            THE COURT:  -- it wasn't going forward.

4            THE WITNESS:  There was some timeframe, but I don't

5    know exactly the 24th, because I didn't read things in

6    realtime, perhaps.  But in that timeframe, yeah.

7            MR. PRICE:  Let me make sure I have an answer to this

8    question.

9            THE WITNESS:  Okay.

10   BY MR. PRICE

11   Q    Nothing in between these dates of August 7th to

12   August 24th changed your opinion that it was a done deal that

13   Tesla was going to go private at 420.  Correct?

14   A    Correct.  I'm sorry.

15           MR. PRICE:  So if we can switch to the ELMO for just a

16   second, let's see if this is going to work.

17       (A pause in the proceedings)

18           THE COURT:  This is not being displayed to the jury?

19           MR. PRICE:  This a demonstrative.  Should be like a

20   drawing on a board.

21           THE COURT:  I'm sorry; what is it?

22           MR. PRICE:  It's like drawing on that thing

23   (Indicating), except it's easier.  So I'm going to go up and

24   write down what he says.  It's a demonstrative.

25           THE COURT:  Oh, oh.  This is your writing.

1          **MR. PRICE:**  Yes.

2          **MR. PORRITT:**  We would object.  Not an appropriate

3   demonstrative, at this point in time.  It wasn't disclosed

4   ahead of time, so --

5          **THE COURT:**  Well, this is not rocket science.  But, go

6   ahead.  You can -- this can be displayed.

7          **MR. PRICE:**  Sure.

8       (Document displayed)

9   **BY MR. PRICE**

10  **Q**    And by the way, before I move to this, sir, when -- before

11  your deposition --

12  **A**    Uh-huh.

13  **Q**    -- before you testified, you prepared for your deposition,

14  right?

15  **A**    Prepared for my deposition?

16  **Q**    Yes.

17  **A**    Um, yeah.

18  **Q**    You met with your counsel, right?

19  **A**    I -- yeah.  Yes.

20  **Q**    Your estimate at the time was that you had met with them,

21  like, 13-plus hours the day before your deposition, correct?

22  **A**    Oh, yes, yes.

23  **Q**    Right?  All right.  And you were asked questions at your

24  deposition as to, for example, whether anything changed your

25  mind about it being a done deal between August 7th and

**LITTLETON - CROSS / PRICE**

1    August 24th.

2    **A**    Uh-huh.

3    **Q**    Right?

4    **A**    Okay, yes.

5    **Q**    And you never said:  Oh, but that's irrelevant, did you?

6    **A**    I don't recall.  I don't know if I did or not.

7    **Q**    Well, let me give you just one example.  It's one we're

8    talking about.  If you look at Page 105 --

9    **A**    Okay.

10   **Q**    And you see Lines 3 to 6, when you were asked:

11                "**QUESTION:**  And that nothing in between those

12              dates changed your opinion that it was done

13              deal that Tesla was going to go private at

14              420, correct?"

15   **A**    Uh-huh.

16   **Q**    Your answer was "Correct."  Right?

17   **A**    Yes.

18   **Q**    You didn't say: Oh, but that's irrelevant.  Right?

19   **A**    I'm just saying in terms of my well-being, it was

20   irrelevant, yeah.

21   **Q**    Yeah, but you didn't say that in your deposition, did you?

22   **A**    I guess not.  No.

23   **Q**    And if you would look at Page 143.

24   **A**    Uh-huh.  Okay.

25   **Q**    And you look at Line 24.

1   **A**   All right.

2   **Q**   You said --

3   **A**   123, Line 24?

4   **Q**   143, Line 24.

5   **A**   Okay.

6        **THE COURT:**  What is the question?

7        **MR. PRICE:**  (As read)

8        "**QUESTION:**  Sure.  You told us previously

9        that prior to that August 24 blog post, that

10       you didn't see anything between August 7th

11       and August 24th that changed your mind that

12       the go-to private transaction at 420 per

13       share was a done deal?

14       "**ANSWER:**  No, that's --

15       "**QUESTION:**  Is that right?

16       "**ANSWER:**  That's correct, yes."

17  **BY MR. PRICE**

18  **Q**   You gave that answer to those questions.  Right?

19  **A**   Okay, so --

20  **Q**   Again, you didn't volunteer:  Oh, but that was irrelevant

21  to me.  Right?

22  **A**   I don't know.  I guess not, at deposition.

23  **Q**   Okay.  So if we can go to my somewhat illegible attempt at

24  this, so August 3rd you thought it was a done deal.  There's

25  nothing in between.  You thought it was a done deal all through

1  this time period (Indicating).  Right?

2  **A**   Um --

3  **Q**   That's what you told us.  Right?

4  **A**   Yeah.

5  **Q**   And if you -- and if you thought it was a done deal, you

6  had to liquidate.  Right?

7  **A**   Well, liquidate the stuff that was at risk.

8  **Q**   Yeah.  The stuff that you're saying you lost money on.

9  **A**   Yeah, the stuff that was at risk.  Yeah.

10  **Q**   Okay.  So let's then look at what happened in between.

11      I'm sorry, I got the wrong date on the --

12      (Counsel writes on document)

13  **Q**   So let's look at the information you did become aware of

14  in between August 7th and August 24th.  Okay?

15  **A**   All right.

16  **Q**   So if you would look at Exhibit 53.

17  **A**   Okay.  Did you say 5-3?

18  **Q**   It's Exhibit 5-3.

19  **A**   Okay.

20  **A**   Okay.  I can't -- don't see it.

21  **Q**   Did you find it?

22      **THE COURT:**  It's in the binder, should be in that big

23  binder.

24      **THE WITNESS:**  That's where I'm looking now.  Oh, I'm

25  sorry, hold on just a minute.  There we go.  I got it.  All

1   right.

2   **BY MR. PRICE**

3   **Q**   And you recognized that as the post that Elon Musk issued

4   publicly on August 13, 2018.  Correct?

5   **A**   Yes.

6   **Q**   And there's no question that you saw this post.  Correct?

7   **A**   Yes.  I just can't identify exactly when I saw it.

8   **Q**   All right.  And, and you said that you were -- I think you

9   said it might have been -- if it was on Tesla, on the Tesla

10  site, it might have been a few hours after it came out that you

11  saw it.

12  **A**   It might have been.

13  **Q**   All right.  And so if we look at this August 13th, and

14  that would be -- that would be somewhere around here,

15  August 13th.

16      (Counsel writes on document)

17  **Q**   Let's look at that, and see what that post reveals.

18          **MR. PRICE:**  And Your Honor, I move Exhibit 53 into

19  evidence.

20          **MR. PORRITT:**  No objection, Your Honor.

21          **THE COURT:**  All right, 53 is admitted.  You may

22  publish.

23      (Trial Exhibit 53 received in evidence.)

24          **THE COURT:**  Let me ask -- we're actually at the

25  breaking point.  Been going 90 minutes.  So if this is a good

1    breaking point, let's do that.

2              **MR. PRICE:**  Yeah.

3              **THE COURT:**  We'll take 20 minutes.  And, see you back

4    in 20 minutes.  Thank you.

5              **THE COURTROOM DEPUTY:**  All rise for the jury.

6        (Jury excused)

7        (The following proceedings were held outside of the

8    presence of the Jury)

9              **THE COURT:**  All right.  See you in 20 minutes.

10       (Recess taken from 12:20 p.m. to 12:46 p.m.)

11             **THE COURTROOM DEPUTY:**  Court is reconvened.

12       (The following proceedings were held in the presence of

13   the Jury)

14             **THE COURTROOM DEPUTY:**  All rise for the jury.

15             **THE COURT:**  All right.  Have a seat, everyone.  Thank

16   you, ladies and gentlemen.

17       We are going to resume with cross-examination of

18   Mr. Littleton.

19             **MR. PRICE:**  Thank you, Your Honor.

20             <u>**CROSS-EXAMINATION RESUMED**</u>

21   BY MR. PRICE

22   **Q**    Mr. Littleton, we were talking when we broke about

23   Exhibit 53, a blog post on August 13th, 2018.

24       (Document displayed)

25   **A**    Uh-huh.

**LITTLETON - CROSS / PRICE**

1  **Q**    And I believe I moved that into evidence, right?

2  **A**    You were drawing some --

3         **MR. PRICE:**  Did we --

4         **MR. BERNSTEIN:**  You moved it in.

5         **MR. PRICE:**  Okay, it's in evidence.

6  **BY MR. PRICE**

7  **Q**    So if you would look at that, you see on the first page,

8  there is a question "Why did I say 'Funding secured'?"

9         And you see here in this blog post that you read, Mr. Musk

10 reports that, in the paragraph beginning with "Recently," that

11 (As read):

12         "After the Saudi fund bought almost 5 percent

13         of Tesla stock...they reached out to ask for

14         another meeting."

15     Do you see that?

16 **A**    Yes.

17 **Q**    And then he described that there was a meeting on

18 July 31st.  Do you see that?

19 **A**    Yes.

20 **Q**    And you see in the third line from the bottom, he talks

21 about how the managing director of the Saudi fund strongly

22 expressed his support for funding a going-private transaction

23 for Tesla at that time.  Do you see that?

24 **A**    Yes.

25 **Q**    That does not say that there was a written agreement, does

LITTLETON - CROSS / PRICE

1   it?

2   **A**    Um, no.

3   **Q**    It says that he expressed his strong support.  Right?

4   **A**    Yes.

5   **Q**    And then it said (As read):

6            "I understood from him that no other

7            decision-makers were needed and that they

8            were eager to proceed."

9        Do you see that?

10  **A**    Yes.

11  **Q**    And then the next line (As read):

12           "I left the July 31st meeting with no

13           question that a deal with the Saudi sovereign

14           fund could be closed, and that it was just a

15           matter of getting the process moving."

16       Do you see that?

17  **A**    Yes.

18  **Q**    And you'll agree that having no question that a deal could

19  be closed is different than saying that there is a closed deal.

20  That's different, isn't it?

21  **A**    Um, yes.

22  **Q**    And then he says:

23           "This is why I referred to 'Funding secured'

24           in the August 7th announcement."

25       Right?  Do you see that?

1    **A**    I see that, yes.

2    **Q**    So on August 13th you knew that what Mr. Musk was

3    referring to by "Funding secured" is his belief that a deal

4    with the Saudi sovereign fund could be closed.  Right?

5    **A**    Right.

6    **Q**    And then if we go to the next paragraph on Page 2, it says

7    (As read):

8                  "Following the August 7th announcement, I

9                  have continued to communicate with the

10                 manager of the Saudi fund.  He has expressed

11                 support for proceeding subject to financial

12                 and other due diligence..."

13   Do you see that?

14   **A**    I do.

15   **Q**    So you learned on August 13th that this fund was saying

16   that they needed to have financial and due diligence, right?

17   **A**    Um, well, if you're -- first of all, I want to apologize

18   for making you ask me a question three times, and apologize to

19   Your Honor for making me answer it.

20        My problem is the timeline.  I've seen all this stuff

21   before.  At some point, I saw it.  But I was pretty beaten up

22   financially and emotionally back then, so I can't testify

23   accurately as to when I read it.  That's my problem.  I've seen

24   it then; I just don't know the timeline.  Okay?

25   **Q**    Didn't you say in your direct that if something had been

1  published by Tesla, that you might have seen it -- you thought

2  you saw it, but it might not have been immediately, it might

3  have been a few hours afterwards?

4  **A**   Well, or a few weeks.

5  **Q**   Oh, it's not a few hours now, it's a few weeks afterwards.

6  **A**   I'm just saying that I was so beaten up back then that I

7  don't remember accurately, I can't answer accurately when I

8  read it, but I can tell you I did read it.

9  **Q**   Well, at the time of this August 13th tweet, you're still

10  doing trades in Tesla, right?

11  **A**   Very small.  And I had gotten out of almost all of it.

12  The significantly risky stuff I had gotten out of.

13  **Q**   If we can look at the exhibit you were looking for -- at,

14  in your direct examination.  So this is in your binder.

15  **A**   Okay.

16  **Q**   And it was Exhibit, I believe, 524.

17      (Document displayed)

18  **A**   524?  Oh, okay.  524.

19          **THE COURT:**  That's the brokerage report?

20          **THE WITNESS:**  Uh-huh.

21          **MR. PRICE:**  Yeah.

22          **THE COURT:**  All right.

23          **MR. PRICE:**  Yes.

24  **BY MR. PRICE**

25  **Q**   Do you see Exhibit 524?

LITTLETON - CROSS / PRICE

```
 1   A     Yeah.

 2   Q     And let's go to -- I would like you to go to August 13th,

 3   524-33.  Do you see that?

 4   A     Hmm.

 5             THE COURT:  What page?

 6             MR. PRICE:  It's 524-33.

 7             THE COURT:  33.

 8             THE WITNESS:  Okay, yeah, I see it, uh-huh.

 9   BY MR. PRICE

10   Q     And you see on the bottom of that page --

11   A     Yes.

12             MR. PRICE:  Can you blow up the August 13?

13         (Document displayed)

14   BY MR. PRICE

15   Q     August 13th, you're making trades.  I've got one, two,

16   three, four, five, six -- six on August 13, right?

17   A     Right.  Uh-huh.

18   Q     And then you've got -- at the bottom of that page and the

19   next page you've got trades on August 14, right?

20   A     Uh-huh.

21   Q     You've got trades on August 15, right?

22         (Document displayed)

23   A     But I think they're all liquidation.  I'm pretty sure

24   they're all liquidation.

25   Q     And you're looking at the market, using your normal
```

1    process, --

2    **A**    Uh-huh.

3    **Q**    -- in order to make sure you're doing the right thing,

4    right?

5    **A**    Right, uh-huh.

6    **Q**    And so we've got -- it starts at 524-33, goes to 524- --

7    let's stop at August 24th.

8    **A**    Okay.

9    **Q**    524-40.  So we've got, like, seven pages here.  You're

10   still trading in Tesla, right?

11   **A**    Yeah, uh-huh.  Yeah.

12   **Q**    And in your -- you were asked about this exhibit.

13   Exhibit 53.

14        **MR. PRICE:**  If we can put that back up.

15   **BY MR. PRICE**

16   **Q**    You were asked about that exhibit in your deposition,

17   right?  It was shown to you.  Right?

18   **A**    Um, if you say so.

19   **Q**    And you were asked -- well, let's just -- let's just read

20   this into the record, if we can do this.  This is Page 148,

21   Line 19, to 149, Line 1.

22        And just to be clear, right here, you're saying that you

23   could have seen this August 13th blog weeks after it came out.

24   Right?

25        (Document displayed)

1   **A**    I'm -- it's possible.  I don't know.  I just don't

2   remember that far back, because there was such -- it was the

3   fog of war.  I mean, it was a -- it was a really tough time.

4   So I just don't know the timeline.  That's --

5   **Q**    The thing is, if you saw this August 13th tweet at the

6   time, and you read what we've just read to the jury, which is

7   there was no deal closed, that there were contingencies, and if

8   there -- if, after reading that, you thought that this was a

9   done deal, it was going to go forward, if -- if that's what

10  happened, then you realized that's going to prove that "Funding

11  secured," those -- that shorthand, was not material.  Right?

12  That's what you were afraid of.

13  **A**    I mean, I don't -- I'm not sure where you're going.  I'm

14  not sure what I'm supposed to -- to understand what you're

15  saying.  I just know that I got out of 95 percent, 90 percent

16  of my positions prior to this.

17      So when I read this, I don't know.  Because it didn't

18  matter to me, because I was -- I couldn't trade anymore, to

19  speak of.

20  **Q**    And let me read from Page 148 of your deposition, your

21  sworn testimony, starting at Line 19, to 149, Line 1 (As read):

22          "**QUESTION:**  And you see here, Mr. Littleton,

23          this is an August 13, 2018, blog post, Elon

24          Musk, Update on Taking Tesla Private.  Do you

25          see that?

1              "**ANSWER:**  Yes, I do.

2              "**QUESTION:**  And that's something you saw

3         around the time it was posted on August 13th,

4         correct?

5              "**ANSWER:**  I'm sure I did, yes."

6         Those were the answers you gave, under oath, at the time

7    of your deposition.  Correct?

8    **A**    Well, then, I saw it at that time.  I'm not saying I

9    didn't; I just don't remember the timeline specifically for all

10   these dates you are throwing at me.

11   **Q**    And I'm not asking what hour, but you have told us under

12   oath that you're sure you saw that around August 13th.  Right?

13   **A**    Okay, then, if that's -- I guess I did.

14   **Q**    You didn't say it could have been weeks later.  Right?

15   **A**    I'm sorry?

16   **Q**    You didn't say it could have been weeks later.

17   **A**    No, I -- you know, I'm just specific -- I'm just referring

18   to all the releases in general.  You know, I just don't know

19   the timeline.  But I did read them.

20        **MR. PRICE:**  Could we go back to this ELMO thingamajig?

21        (Document displayed)

22   **BY MR. PRICE**

23   **Q**    So on August 13th, around that time --

24   **A**    Uh-huh.

25   **Q**    -- you know, Mr. Musk has says what he meant by "Funding

**LITTLETON - CROSS / PRICE**

1    secured," (Inaudible) --

2        (Reporter clarification)

3    **BY MR. PRICE**

4    **Q**    When Mr. Musk said "Why did I say 'funding secured,'" he

5    says "because the PIF had said they had strong support," right?

6        (Counsel writes on document)

7    **Q**    And you read that he said --

8            **MR. PORRITT:**   Your Honor, he's creating a monster.   We

9    object to the use of this ELMO on this particular --

10           **THE COURT:**   All right.   I don't think that's helpful

11   at this point, so let's dispense with it.

12           **MR. PRICE:**   Okay.

13           **THE COURT:**   Move on.

14   **BY MR. PRICE**

15   **Q**    So let me ask you this question.

16   **A**    All right.

17       (Document taken off display)

18   **Q**    After reading this blog post, --

19   **A**    Uh-huh.

20   **Q**    -- your conclusion was that this blog post did not change

21   at all your view about funding being secured.   Right?

22   **A**    I'm -- I don't -- it didn't matter to me, that time.   So

23   it didn't have an effect on my opinion about it, because I

24   wasn't -- I wasn't able stay in the market anymore.   I'd lost

25   too much money.   So, I hope that's an answer.

1   Q    Well, when you were asked that very question at your

2   deposition, you gave a direct answer.  Correct?

3   A    If it's on there, I suppose I did.

4        (Document displayed)

5   Q    Let's go to 156, this is Line 13 through 17 (As read):

6             "QUESTION:  Nothing in these paragraphs that

7             we've reviewed has changed your view that

8             funding was secured for a go-to private

9             transaction at 420, right?

10            "ANSWER:  No, nothing changes that --"

11       That was your testimony at the time, correct?

12  A    Yes.

13  Q    And you said that you believe that the facts that were in

14  this blog post, which is that the PIF had strongly expressed

15  their support, and that a deal -- he thought a deal could be

16  closed, not wasn't closed, you thought that was -- confirmed to

17  you one version of "Funding secured."  Right?

18  A    Yes.

19  Q    You thought that this information that was in this blog

20  post, which is Mr. Musk saying "Funding secured," meant strong

21  support and his belief that a deal could be closed -- which you

22  said isn't the same as being closed -- you thought that checked

23  the box for "Funding secured" as far as you were concerned.

24  Right?

25  A    I'm sorry.  I really don't understand the question you

1   just asked.

2   **Q**   Sure.  You thought that this information where Mr. Musk

3   said what he meant by "Funding secured," --

4   **A**   Uh-huh.

5   **Q**   -- which is that is the PIF had expressed strong support,

6   and that Mr. Musk left the meeting with no question that a deal

7   could be closed, --

8   **A**   Uh-huh.

9   **Q**   -- which you said is different than it being closed, you

10   said that that -- that information in this post checked off, in

11   your mind, checked off the box that funding was secured.

12   Right?

13   **A**   Um, yeah.  Sure.

14   **Q**   So if that tweet -- and maybe we can go to it, Exhibit 8.

15      (Document displayed)

16   **Q**   The tweet has two words there, "Funding secured."  You see

17   that?

18   **A**   Yes, uh-huh.

19   **Q**   So if tweets didn't limit the number of characters and

20   that tweet had said: "I say that because the PIF expressed

21   strong support for a going-private transaction, and that a deal

22   could be closed," if that was at the end of this tweet

23   (indicating), "And that's why I used the words 'Funding

24   secured,'" if all that is in that tweet, in your mind --

25   **A**   That's an hypothetical, isn't it?  Isn't that --

**LITTLETON - CROSS / PRICE**

1  Q    It's a hypothetical, based upon the testimony you just

2  gave.  So --

3           MR. PORRITT:  I'd object, Your Honor.  It either calls

4  for speculation, or is an improper hypothetical.  It assumes a

5  fact --

6           THE COURT:  It -- all right.  It's incomplete.

7  Because you're picking certain things out of the blog post, and

8  not the entirety.

9           MR. PRICE:  Sure.

10          THE COURT:  So if you want to rephrase the question

11  and say --

12          MR. PRICE:  Sure.

13          THE COURT:  -- the entirety of the post were posted.

14          MR. PRICE:  Okay.

15          MR. PORRITT:  Retain my objection, Your Honor.  It's

16  still an improper line of questioning.

17          THE COURT:  Overruled.

18  BY MR. PRICE

19  Q    You've told us that --

20  A    Uh-huh.

21  Q    -- what was in the blog post is different than saying

22  there was a closed deal.  You've already told us that, right?

23  A    Okay, yes.

24  Q    Okay.  So if this tweet (Indicating) had, after "Funding

25  secured," said everything that's in the blog post, you still

 1  would have thought there was going to be a done deal.  Right?

 2  **A**    You're asking me what I would -- if that had been, I would

 3  have?

 4  **Q**    Yeah.

 5  **A**    Is that what you're asking me?

 6  **Q**    Yes.

 7  **A**    I can't -- I don't know.

 8  **Q**    Okay.

 9  **A**    I don't know.

10  **Q**    What we do know is that having seen this blog post, --

11  **A**    Uh-huh.

12  **Q**    I mean, this tweet, Exhibit 8, and having read this blog

13  post, Exhibit 53.2, --

14  **A**    Uh-huh.

15  **Q**    -- we do know that after that, you still thought it was a

16  done deal, and it was going to go forward.  Right?

17  **A**    Things were pretty foggy.  I mean, I might have had an

18  idea that was the thing, but I -- there was not much certainty

19  in that sort of thing.

20  **Q**    Well, you've told us and you said several times in your

21  deposition that between August 7th and August 24th, that

22  nothing you read -- and you read this blog post (Indicating) --

23  nothing you read changed your mind that this was a done deal

24  that was going to go forward at 420.

25       Haven't you said that many times?

1    **A**    If you say I have.  But the fact that "Funding secured"

2    was stated on the 7th was my driving argument.  My -- the only

3    thing I could really focus on, because that was all that

4    mattered to me.  So I got out of things to -- to save my

5    livelihood.

6    **Q**    So after seeing this evidence (Indicating), --

7    **A**    Uh-huh.

8    **Q**    -- you're going back to the phrase, that shorthand phrase,

9    "Funding secured."  Right?  You just talked about that.  Right?

10   **A**    It was just dominant in my thinking, because I was so sure

11   that it was deterministic.

12   **Q**    Isn't that a talking point that you came up with after

13   meeting with your counsel 13 to 14 hours prior to your

14   deposition?

15   **A**    You know, talking points, fundamental points, they were

16   reasons for the things that happened.

17          **MR. PRICE:**  Your Honor, if I could play -- I would

18   like to play the video of this.  It's Page 143, Line 24, to

19   145, Line 12.

20          **MR. PORRITT:**  Your Honor --

21      (Reporter clarification)

22          **MR. PORRITT:**  Your Honor, I object.  If we could we

23   approach?  This is really improper.

24          **THE COURT:**  Well, let me look at it.  143, Line 24.

25          **MR. PRICE:**  Yeah, to 145, Line 12.

```
 1        (The Court examines document)

 2        (Off-the-Record discussion between counsel)

 3             MR. PRICE:  I'm sorry, Your Honor; it's Line 8.

 4             THE COURT:  I'm sorry, where?

 5             MR. PRICE:  143, Line 24, to 145, Line 8.

 6             THE COURT:  Line 8 is still the question.

 7             MR. PRICE:  145, Line 8 -- my numbers might be off.

 8    It's between 8 and 9.

 9             THE COURT:  Oh, so the entirety of 144 and into 145?

10             MR. PRICE:  Yes.

11        MR. PORRITT:  We would object on relevance.  This is

12    just improper.  It's not contradicting anything he said here

13    today.

14             MR. PRICE:  Your Honor, it's a party admission.  And

15    we can argue about the relevance, obviously, in closing, but --

16    I mean, argue about whether it's inconsistent.

17        MR. PORRITT:  It's obviously being offered for a

18    Rule 403 purpose.

19             THE COURT:  All right.  Since it's a party's

20    statement, I'm going to admit it.

21        (Trial Exhibit Unnumbered Video Excerpt (Mr. Littleton's

22    deposition) received in evidence.)

23        (Off-the-Record discussion)

24        (Portion of video played, not reported)

25
```

1   **BY MR. PRICE**

2   **Q**    Mr. Littleton, in court today you have added to your

3   answers about the August 13th blog post a number of times, but

4   that was irrelevant.  Remember that?

5   **A**    I'm sorry?

6   **Q**    That the August 13th blog post was irrelevant, you added

7   that to your answers today, correct?

8   **A**    Yeah, irrelevant in terms of my investing, my ability to

9   make a living.  Yeah.

10  **Q**    And, and, and you didn't have that phrase, you didn't add

11  that phrase in your deposition when you were testifying under

12  oath at that time.  Correct?

13  **A**    No, I didn't.

14  **Q**    Okay.  That's a talking point, isn't it, that you have

15  created for the trial?

16  **A**    No.  There were no talking points; nobody's ever given me

17  talking points.  I had fundamental points, and sometimes I call

18  them "talking points," but fundamental issues, fundamental

19  points.  And I said that in my video.

20  **Q**    Well, you said -- in terms of saying that the August 13th

21  post wasn't relevant, I asked you about trades that you made in

22  Tesla stock after August 13th, --

23  **A**    Uh-huh.

24  **Q**    -- in the time period.

25  **A**    Uh-huh.

**LITTLETON - CROSS / PRICE**

1  **Q**    And you said they were minor amounts.  I would like you to

2  turn to your -- I think it's Exhibit 433.

3  **A**    Okay.

4  **Q**    And I think this is the document you were looking at

5  earlier, correct?

6  **A**    Yes, uh-huh.

7      (Off-the-Record discussion between counsel)

8  **BY MR. PRICE**

9  **Q**    Oh, it's a different document.  Look at 433, you see --

10  oh, I see it.  You saw this in your deposition, do you remember

11  that?

12  **A**    I'm sorry?

13  **Q**    You saw this in your deposition, Exhibit 433?

14  **A**    This page?

15  **Q**    Yeah, look starting at 15.

16        **THE COURT:**  433-15?

17        **MR. PRICE:**  Yes.

18        **THE WITNESS:**  433, okay.  Okay.

19  **BY MR. PRICE**

20  **Q**    And you recognize this from your deposition, this

21  summarizes your trades?

22  **A**    Yes.

23  **Q**    Okay.  And that's from 433-15 to this particular exhibit,

24  to 433-23.  Do you see that?

25  **A**    Uh-huh.  Yes.

1          **MR. PRICE:**  Your Honor, I would move those pages of

2    433 in, 433-15 to 433-23.

3          **THE COURT:**  Any objection?

4          **MR. PORRITT:**  There's a lot of (Inaudible) --

5      (Reporter clarification)

6          **THE COURT:**  You need to speak into a mic.

7          **MR. PORRITT:**  Sorry, I apologize.

8      I think the -- no objection.  No objection, Your Honor.

9          **THE COURT:**  All right.  Then, those select pages,

10   Page 15 through 23 -- is that right?

11         **MR. PRICE:**  Yes.

12         **THE COURT:**  -- of Exhibit 433 are admitted.

13     (Trial Exhibit 433, Pages 433-15 to 433-23, received in

14   evidence.)

15   **BY MR. PRICE**

16   **Q**    And if you look at Exhibit 433-16, you see there are a

17   number of trades on August 15th.

18   **A**    Uh-huh.  I'm sorry.

19     (Document displayed)

20   **Q**    Do you see that?

21   **A**    Yeah, I see it, uh-huh.

22   **Q**    Okay.  And could you tell the jury how much money you

23   spent on August 15th in those trades for Tesla securities?

24   **A**    Well, a lot of those were offsets, a lot of those were

25   liquidation, a lot of those were part of a spread.  So you

1    can't really look at that in isolation.

2    **Q**    Did you see here, it says "Price"?

3    **A**    Uh-huh.

4    **Q**    Under that column under "Price"?

5    **A**    Uh-huh.

6    **Q**    That is the price you paid, right?

7    **A**    Um --

8         (Witness examines document)

9    **A**    Yes.

10   **Q**    And these are --

11   **A**    At the lower part of the page, there are sales.

12   **Q**    These are buy to open, correct?

13   **A**    Um, --

14   **Q**    "BO"?

15   **A**    Chance 350 call -- yeah, but none of this could be taken

16   in isolation, because it's always part of a portfolio.  Part of

17   other stuff that I have, and part of things I'm going to be

18   doing in the next couple days.  So, yeah, buy to open, yeah.

19   But --

20   **Q**    And --

21   **A**    It was a 350 call.

22   **Q**    And what we're showing here on the buy to open, you are

23   actually paying for the right, correct?

24   **A**    Yes.

25   **Q**    And you are paying about $1 million for that.  Right?

**LITTLETON - CROSS / PRICE**

1   **A**    Um, let me see.

2       (Witness examines document)

3   **A**    Well, there are -- in the lower part of the page there are

4   sales, too.  That's an offset.  The net is $220,000.

5   **Q**    Okay.  Before you're selling, you're buying.  You're

6   spending a million bucks.

7   **A**    Well, you're talking about a few seconds, a millisecond

8   sometimes, between trades.

9   **Q**    Well, let me ask this.  Does Exhibit 430 accurately --

10  Exhibit 433, those pages accurately reflects your trading

11  activity up through -- within this class period.  Right?

12  **A**    They reflect something that's accurate for that day.

13  Let's see.  Yeah, those were an offset against something

14  that -- I know it was out.

15  **Q**    And by the way, the sales you are referencing, the

16  purchases of that -- and just to make sure we're clear, those

17  purchases are about a million bucks.  Right?

18  **A**    Yeah, but you can't take them in isolation, because below

19  that -- I'm sorry, yes.  The answer to your question, yes.

20  **Q**    And then what happens right below that, that's

21  September 12th, that's almost a month later.  Right?

22  **A**    Oh, yeah, yeah, right.  Okay.  Yeah.

23  **Q**    Okay.  It's fair to say that you were doing the best you

24  could as an investor to evaluate what Mr. Musk had said, what

25  was in the public, you know, before spending a million bucks in

1  connection with Tesla securities?

2  **A**    Well, I didn't have -- I didn't have a million dollars.

3  That was margin.  It's a fraction of that.

4  **Q**    Before making these trades --

5  **A**    I'm sorry?

6  **Q**    Before making these trades, you were still paying

7  attention to what was going on at Tesla.  Right?

8  **A**    Well, sure, I mean, but not in any way like I was before

9  the tweet.

10 **Q**    Now, if we look at Exhibit 53 --

11 **A**    Uh-huh.

12 **Q**    -- and we go a little bit further into that, there's a

13 section on 53-2, the last paragraph, "What are the next steps?"

14 Do you see that?

15 **A**    I'm sorry, what you -- what --

16 **Q**    It's Exhibit 53, it's that August 13th blog.

17 **A**    Uh-huh, yeah.

18 **Q**    And, if you look at the last paragraph there, it says

19 (As read):

20             "If and when a final proposal is presented,

21             an appropriate evaluation process will be

22             undertaken by a special committee of Tesla's

23             board, which I understand is already in the

24             process of being set up, together with the

25             legal counsel it has selected.  If the board

1              process results in an approved plan, any

2              required regulatory approvals will need to be

3              obtained and the plan will be presented to

4              Tesla shareholders for a vote."

5      Do you see that?

6  **A**   Uh-huh.

7  **Q**   Okay.  Now, when you saw that, I mean, that did not

8  surprise you in any way, correct, that that process was going

9  to be followed?

10 **A**   No, I don't think it surprised me, no.

11 **Q**   So if we can go back to -- well, it would have surprised

12 you if -- if you were given the interpretation to this earlier

13 tweet, Exhibit 13?  This is on August 7th.

14     (Document displayed)

15 **Q**   Remember, there was this tweet, "Only reason why this is

16 not certain is that it's contingent on a shareholder vote"?

17 **A**   Uh-huh.

18 **Q**   Again, you didn't -- as a reasonable investor, yourself,

19 didn't interpret that to mean that this process of approvals

20 was going to be bypassed.  Right?  You didn't read it that way.

21 **A**   I just can't tell you when I read it.

22 **Q**   Well, this is the August 7th tweet (Indicating).

23 **A**   Oh, the August 7th tweet.  Okay.

24 **Q**   Yeah.  You didn't read that last sentence.  I mean, step

25 back.  If you read this literally, it would mean that you don't

1    have to do anything else to go private.

2    **A**    Uh-huh.

3    **Q**    Right?  You don't have to, as the August 13th post says,

4    have an evaluation process by a special committee, get legal

5    counsel, regulatory approvals, et cetera.

6         If you read that literally, it might suggest that.  Right?

7    **A**    Um --

8         **THE COURT:**  Could you ask -- now, I'm confused now.

9    Read what literally?

10        **MR. PRICE:**  Yeah, I'm sorry.  Exhibit A.

11   **BY MR. PRICE**

12   **Q**    If you read that --

13        **MR. PRICE:**  It's Exhibit 13, sorry, Your Honor.

14   **BY MR. PRICE**

15   **Q**    If you read that Exhibit 13 literally, "The only reason

16   why this is not certain is that it's contingent on a

17   shareholder vote," you might conclude that Mr. Musk was saying

18   you don't -- he doesn't have to go through special committee or

19   regulatory approvals and submitting to the board.

20        **THE COURT:**  Are you asking the witness his

21   interpretation now?  Or his interpretation then?

22        **MR. PRICE:**  Then.

23        **THE COURT:**  Okay.  So the question is what you thought

24   that meant at the time.

25        **MR. PRICE:**  Yeah.

1    **THE WITNESS:**  Um, I didn't put much weight into it.  I

2    don't -- I'm sorry.  I mean, I don't mean to avoid the

3    question.  Um, I saw all of those as a subordinate to "Funding

4    secured."  Everything was subordinate to that tweet, in my

5    mind.

6    **BY MR. PRICE**

7    **Q**    And, therefore, when you saw -- when you read the blog

8    post which talked about that process being followed, that did

9    not surprise you in any way.  Correct?

10   **A**    No.  No, it didn't surprise me.

11   **Q**    Now, I want to step back to your views on August 7th,

12   then, when it said -- Mr. Musk said he wanted to take Tesla

13   private at 420.

14   **A**    Yes.

15   **Q**    Right?  And he had that -- that shorthand "Funding

16   secured."

17       (Document displayed)

18   **Q**    Your thought at that time was that there was -- I'm going

19   to use your words here, not mine -- no way in hell that a

20   going-private at $420 would be approved by the shareholders.

21   Right?

22   **A**    Um, I didn't think the price was high enough.

23   **Q**    Okay.

24   **A**    I thought they would approve something, but the price

25   would have to be higher.

1  **Q**    Well, if you would look at Exhibit 432.

2  **A**    Okay.

3  **Q**    And I apologize, I was slightly off in the quote, but I

4  think you'll see what I mean.  This is Exhibit 432.

5       Do you see this is an email exchange between you and your

6  broker on August 7th?

7  **A**    Yes.

8           **MR. PRICE:**  Your Honor, move Exhibit 432 into

9  evidence.

10          **THE COURT:**  Any objection?

11          **MR. PORRITT:**  It's already admitted, Your Honor.

12          **THE COURT:**  Okay.  It's is already admitted.

13          **MR. PRICE:**  Thank you.

14      (Document displayed)

15 **BY MR. PRICE**

16 **Q**    And if we look at 432-2 at the bottom, that starts your --

17 an email that starts the chain, right?

18 **A**    Yes.

19 **Q**    And, and you're right, this was -- your counsel showed you

20 this, I think.  See where it says (As read):

21           "Shit,

22           "There is so much more risk in these options

23           than you can imagine.  If this rumor of Elon

24           taking Tesla private at 420 is correct, then

25           all the strike prices except calls below 420

```
 1              become worthless."

 2      Correct?

 3      Do you see that?

 4  A   Yes.

 5  Q   And this used the word "rumor," correct?

 6  A   I don't trade on rumors, so it was a misuse of the term.

 7  I do not trade on rumors.  So, anybody can tell you that.

 8  Q   So let's go to the next line, then.  You said (As read):

 9              "I don't think there's a chance in hell that

10              the other shareholders would agree to that

11              price, but in the meantime I have tried to

12              whittle down the risk."

13      Do you see that?

14  A   Yes.

15  Q   Okay.  And it's true that even using the shorthand, that

16  inaccurate shorthand, "Funding secured" --

17  A   Uh-huh.

18  Q   Yeah, which was literally true, Mr. Musk never said

19  funding was secured at 425, right?

20  A   No.

21  Q   Or 430.

22  A   No.

23  Q   Or 450.

24  A   No.

25  Q   Right?  I mean, if you're going to think that a deal's
```

1  going to go through at 450 or 440, you'd be relying on the fact

2  that Mr. Musk just has the capability of raising that much

3  money.  Right?

4  **A**    I just know that typically all these buyouts go out at a

5  higher price than the initial offer, so that was part of my

6  thinking.  But, yeah.  I think if Elon wanted to make it

7  happen, he would pay a higher price, yeah.

8  **Q**    He could make that happen even if he didn't have that

9  funding secured, right?

10  **A**    I think you've got to have the funding first.

11  **Q**    Well, you bet, paid, $3 million the day after this tweet

12  (Indicating), betting that Elon Musk could raise billions of

13  dollars more than you would have to raise to take this company

14  private at 420.  Right?

15  **A**    That's wrong.

16  **Q**    What?

17  **A**    I had 450 calls.  I moved those down to 400.  I don't know

18  what the difference was, but it wasn't $3 million.

19  **Q**    Well --

20  **A**    The outright expenditure for the 400 might have been, but

21  I was selling something to offset that.  It was a spread.

22  **Q**    Okay.  First, before we get into the document, I'll ask

23  you what -- what your understanding is then.

24         On that next day, how much did you bet, how much money did

25  you put on a bet that Tesla was going to go private at an

**LITTLETON - CROSS / PRICE**

1  amount greater than 420?

2  **A**   Um, I had already placed an investment -- I don't call it

3  a "bet" -- at 450.  And I just thought it made sense to lower

4  it to $400, because 450 was more risky.

5  **Q**   Okay.  You were looking at Exhibit 433.  And if you would

6  go to 433-17.

7     (Document displayed)

8  **Q**   And if we could look at the top half there, you see there

9  are transactions dated August 8th.

10  **A**   Uh-huh.

11  **Q**   Do you see that?

12  **A**   Yeah.

13  **Q**   And you see these, these transactions are "BO."  Right?

14  **A**   Yeah.

15  **Q**   Which means you're -- which means you're --

16  **A**   This whole page is just -- is an offset, it's a spread,

17  selling one month, one strike price to buy another strike

18  price.

19  **Q**   Okay, let's look at this.  So we've got the amounts here.

20  You have -- the fourth column has the numbers that are being

21  bought.  52, 46, 50.  Do you see that?

22  **A**   Uh-huh, yes.

23  **Q**   Okay.  And what does that number represent?

24  **A**   Um, I would -- that's a part of the spread.  I was buying

25  400s and selling 450s.

LITTLETON - CROSS / PRICE

1   **Q**   These are the number of options, right?

2   **A**   Yeah, yes.

3   **Q**   And there are how many shares per option?

4   **A**   A hundred.

5   **Q**   And so you are buying here -- strike that.

6      These transactions have you paying for 25,000 shares,

7 options for 25,000 shares.  Right?

8   **A**   Uh-huh.  With an offset.

9   **Q**   And you've got here -- the next line, the next column,

10 you've got 35.  Do you see that?

11   **A**   Um, yes.

12   **Q**   Okay.  So these options give you the right to buy Tesla

13 before June of the next year, --

14   **A**   Uh-huh.

15   **Q**   -- at $400.  Right?

16   **A**   Yes.

17   **Q**   Okay.  And you do that only if you think you can make a

18 profit.  Well, one of the reasons you do that is so you think

19 you can make a profit.  You've got the right to buy at 400, but

20 I'll have the ability to sell it for more.  Right?

21   **A**   Well, you know, I would have rolled it eventually to

22 another month, to another six months out, a year out.  So at --

23 this specific trade does not have to make money, on its own.

24 And this is -- I'm selling something against that, I'm selling

25 a 450.  I'm rolling it down, so that I have a better chance of

1    fixing it, you know, fixing this mess that was created.

2    **Q**    Well, let's see what we can agree on.  You paid $900,000

3    for these options that we're showing on 433-17.  Right?

4    **A**    Uh-huh.

5         **THE COURT:**  On August 3rd.

6         **MR. PRICE:**  August 8th.

7         **THE COURT:**  August 8th?

8         **MR. PRICE:**  Yes.

9         **THE COURT:**  Okay, August 8th.

10        **THE WITNESS:**  But I also sold that much, the same day.

11   **BY MR. PRICE**

12   **Q**    My question is:  Is it true you paid $900,000 for these

13   options, on August 8th?

14   **A**    Yes.  But you can't take it in isolation.

15   **Q**    And it's true that the break-even price for those options,

16   the strike price, --

17   **A**    Uh-huh.

18   **Q**    -- would be the amount you paid -- was the 400 plus the

19   amount you paid for the share.  Right?

20   **A**    Right.

21   **Q**    Okay.  And so the strike price on this would be $435 per

22   share.  Right?

23   **A**    Not strike price, but area of profitability.

24   **Q**    Okay.  And by making these bets, you're betting on Tesla's

25   stock price going above $435 per share, prior to June, 2019.

LITTLETON - CROSS / PRICE

1  A    Well, these are an offset to a trade I made months prior,

2  probably; I don't know how long ago.  They were -- I was

3  selling that because that reflected a pre-tweet trade, and this

4  reflects a post-tweet trade that is more -- more profitable.

5  Q    Look at your deposition, and go to Page 136.

6  A    Uh-huh.

7  Q    I'm going to read Lines 5 through 17.  This is Page 136.

8  A    Uh-huh.

9       (Document displayed)

10 Q    (As read)

11           "QUESTION:  So your -- so on August 8th, you

12           are betting on Tesla's stock price going

13           above 435 per share prior to June 2019?

14           "ANSWER:  It would appear that way.

15           "QUESTION:  Now, Mr. Musk's tweets on

16           August 7th concerned a go-to private

17           transaction at 420 per share, correct?

18           "ANSWER:  That's correct, uh-huh.

19           "QUESTION:  And if that had happened and gone

20           through, you know, at the time that these

21           options expired, you'd be out about $15 per

22           share?

23           "ANSWER:  It would appear that way, yes."

24       I read that correctly.

25 A    Yes, uh-huh.

1  Q    And then if you look at Page 135, and read Lines 1 through

2  7, about how much you paid (As read):

3       (Document displayed)

4  Q    (As read)

5            "QUESTION:  So that amounts to 25,000 shares

6            at 400 per share is what you had the right to

7            purchase, right?

8            "ANSWER:  Yeah, yes."

9  A    Uh-huh.

10 Q    And (As read):

11           "QUESTION:  You paid 900,000 for these

12           options, right?

13           "ANSWER:  It looks like about the right

14           number."

15      That was your testimony during your deposition, correct?

16 A    Uh-huh.

17 Q    Now, if you thought there was no chance in hell that the

18 transaction was going to go through at 420 per share --

19 A    I thought it was going to go through at a higher price.

20 Q    Yeah, that it was going to have to go higher, maybe 435,

21 maybe -- you even made bets at 450, right?

22 A    That was pre-tweet.  That was before the tweet.  450, I

23 was -- I was raising it up.

24 Q    Well --

25 A    At least some of them were.

**LITTLETON - CROSS / PRICE**

1    Q    Okay.  These charts (Indicating) accurately reflect what

2    you were trading at the time.  Right?

3    A    Okay.

4         **THE COURT:**  I do have a question.  The number 435 is

5    mentioned.  And I'm a little confused, because it says 400 for

6    these August 8th trades.

7         Am I looking at something different?  I'm not sure I'm --

8         **MR. PRICE:**  I can ask that.

9    **BY MR. PRICE**

10   Q    Sir, when I was talking about betting on the price going

11   above 435, --

12   A    Uh-huh.

13   Q    -- that's because 400's what you had the right to buy it

14   for.  Right?

15   A    Uh-huh, yes.

16   Q    And if you look at the two columns over, that's the amount

17   you paid for that right.

18   A    Right, yes.

19   Q    Okay.  And so, for example, we take the first August 8th,

20   you were paying $435 for the right to buy it at 400.  Right?

21   A    No, I was paying $35.  I wasn't paying 435.

22   Q    All right.  But what you're betting on, because the idea's

23   not -- you're betting on --

24   A    I don't bet.  I don't bet.  I invest.

25   Q    Okay.  What you testified under oath in your deposition

1   was you were betting on Tesla's stock price going above 435 per

2   share.   You agreed with that.   That's what this (Indicating)

3   shows.   Right?

4   **A**   Yeah.   Uh-huh.

5   **Q**   Okay.

6        **THE COURT:**   Thank you.

7   **BY MR. PRICE**

8   **Q**   And you said that you weren't kind of betting on it going

9   above 450 per share.   If you look on that same page, 433-17,

10  and we go down to August 8th, on the lower part you see there

11  are a bunch of other buy orders which give you the right to buy

12  Tesla at 400 per share in January of the next year.   Right?

13  **A**   Um, yeah.

14  **Q**   Okay.   And you were paying on those, on average, about

15  $50 for the right to do that.   Right?

16  **A**   Yeah.

17  **Q**   Okay.   So that is, if the ones above are a bet that

18  Tesla's going to go above 435 per share, these (Indicating)

19  show you making a bet that it's going to go above 450 per

20  share.   Right?

21  **A**   You're taking trades in isolation.   Those were a spread.

22  I was selling something at the same time.   I was buying 400s,

23  and selling 450s.   So I was hoping to capture, like, ten bucks

24  or something, you know.

25  **Q**   All right.   Well, let's get to the bottom line.   You

1  didn't think a go-to private transaction would happen at 420;

2  it would have to be at some amount higher.  Right?

3  **A**    Yes.

4  **Q**    Okay.

5  **A**    If -- if it was going to happen, yes.

6  **Q**    And that that amount you were thinking could be up to 450,

7  right?

8  **A**    I didn't have an up side.  I just knew it was possible to

9  be up, yeah.

10 **Q**    And you knew that if that were to happen --

11 **A**    Uh-huh.

12 **Q**    -- for that to happen, Mr. Musk would somehow have to get

13 funding at some point for that, right?

14 **A**    Well, he said funding is secured, yeah, so --

15 **Q**    Well, he didn't say at 430 or 440 or 450, did he?

16 **A**    No.

17 **Q**    All right.  And so for you to bet that that's going to go

18 even higher, you're betting on Mr. Musk, based upon your

19 observation of what he has accomplished, --

20 **A**    Uh-huh.

21 **Q**    -- being able to raise even billions of dollars more to go

22 private.

23 **A**    Well, I just know from 50 years' experience that generally

24 the first buyout offer is not high enough, that it goes up from

25 there.  And I thought, given my optimism -- optimistic view of

1   Tesla, I thought it might go a lot higher, but I didn't know.

2   But I thought it was likely to be a higher price.

3   **Q**    Okay.  Now, we've talked about the August 24th

4   announcement by Mr. Musk that he wasn't going to continue to

5   pursue --

6   **A**    Uh-huh.

7   **Q**    -- this.  Correct?  And, if you look at Exhibit 229.

8        (Off-the-Record discussion between counsel)

9   **BY MR. PRICE**

10  **Q**    Do you recognize Exhibit 229 as Mr. Musk's announcement

11  that Tesla is not going to go private?

12  **A**    I'm sorry?

13  **Q**    Do you recognize that as the announcement he made?

14  **A**    Yes.

15  **Q**    Okay.  And, and you have testified this (Indicating) is

16  when you concluded that the going private was not a done deal

17  (Indicating quotation marks), right?

18  **A**    Um, that was a state at -- that was the state of the art,

19  at that point.  I always think it could change.  I mean, it's

20  -- Elon Musk is a fluid kind of thinker.  So, who knew if he

21  wouldn't come out two weeks from then and change his mind.

22  **Q**    And you see that there's a paragraph that begins that

23  "Based on all the discussions..."

24        **MR. PRICE:**  Oh, Your Honor, I move this into evidence.

25        **THE COURT:**  All right.  So first, he's moving this

1    into evidence.  Any objection?

2             MR. PORRITT:  No objection, Your Honor.

3             THE COURT:  Admitted.  Therefore, you may publish.

4         (Trial Exhibit 229 received in evidence.)

5         (Document displayed)

6             MR. PRICE:  Thank you, Your Honor.

7    BY MR. PRICE

8    Q    And you see in the fourth paragraph it says (As read):

9              "Based on all the discussions that have taken

10             place, a few things are clear..."

11        Do you see that?

12   A    Yes.

13   Q    And it says:

14             "Given the feedback I've received, it's

15             apparent that most of Tesla's existing

16             shareholders believe we are better off as a

17             public company."

18   A    Correct.

19   Q    And:

20             "Additionally, a number of institutional

21             shareholders have explained that they have

22             internal compliance issues that limit how

23             much they can invest in a private company."

24   A    Uh-huh.

25   Q    Do you see that?

**LITTLETON - CROSS / PRICE**

1    **A**    I see it, yeah.

2    **Q**    Okay.  And the very first tweets on August 7th, Mr. Musk

3    said that the thing that might stop this from happening is

4    shareholders.  Right?

5    **A**    Yes, uh-huh.

6    **Q**    Okay.  And here, he's saying that's why it didn't happen.

7    Right?

8    **A**    Um, yeah, it appears that way.

9    **Q**    And then we go to the third bullet point:

10              "That said, my belief that there is more than

11              enough funding to take Tesla private was

12              reinforced during this process."

13         Do you see that?

14   **A**    I see that.

15   **Q**    Your understanding is that the reason this deal didn't go

16   forward -- strike that.

17         Your understanding at the time when you read this was the

18   reason this deal didn't go forward is because he wasn't going

19   to get the shareholder approval.  Right?

20   **A**    That's what it says at this point, yeah.

21   **Q**    And that was your belief on August 24th, right?

22   **A**    Yeah, yes.

23   **Q**    And you said in your direct that you were part of this

24   class because you thought you had a responsibility.  Correct?

25   **A**    Yes.

**LITTLETON - CROSS / PRICE**

1   Q    Isn't it true that the tipping point that is what made you

2   join this class wasn't a sense of responsibility, it was an

3   argument you were having in October of 2018 with folks at Tesla

4   about difficult delivery experiences for cars that you had

5   purchased for some relatives?

6   A    Uh-huh.  That -- I'm sorry, yeah, that --

7   Q    That was your tipping point?

8   A    Oh.  Well, that was a moment of anger.  I -- I apologized

9   in that same email, I said:  It's not your fault, I said, but

10  people of great wealth and power sometimes take actions that

11  harm people who support them, buy their products, invest in

12  their companies.  And that was just wrong.  And I was moving

13  towards taking some action.

14  Q    What you said in October of 2018, --

15  A    Uh-huh.

16  Q    -- in writing, was that you knew there was a class-action

17  suit, and that you had until then to decide about participating

18  in it.

19  A    Yeah.

20  Q    And the tipping point in your participating in that was

21  your disappointment about the delivery experience you were

22  getting with Teslas.  That was the tipping point.

23  A    Well, let me -- let me elaborate on it that.

24  Q    Did you say that?

25  A    I said that, but it needs to be a context.  There should

**LITTLETON - CROSS / PRICE**

1    be a context here.  It was we bought -- or loaned money to two

2    -- two nephews and one niece in Minneapolis.  And they had to

3    take a whole day off from work to take delivery of their car.

4    And it was like, that was just upsetting to me.  After all the

5    things that had happened, it was upsetting to me.  That they

6    had to go through that.

7    **Q**    And so your responsibility did not drive you to become a

8    member of any class action, until you had this bad experience

9    about being delivered some Tesla cars.

10   **A**    Well, no; my wife and I had a long discussion about the

11   fact that we had a commitment to charities in Kansas City, we

12   had a moral commitment to the charities.  And we thought that

13   this is something that we were morally obligated to do, to take

14   action to recoup that money, so that the charities could get

15   the money.

16   **Q**    That's not what you --

17   **A**    That was a moral statement.

18   **Q**    I didn't mean to interrupt you.

19        That's not what you told your salesperson at Tesla in

20   October of 2018.  You said the tipping point was a

21   disappointment in that -- in that experience in getting

22   delivery of cars.  Right?

23   **A**    It was part of the calculus.  Yes.

24            **MR. PRICE:**  One second, Your Honor?

25            **THE COURT:**  Yep.

1          (Off-the-Record discussion between counsel)

2              **MR. PRICE:**  No further questions.  Thank you,

3     Mr. Littleton.

4              **THE COURT:**  All right, thank you.

5          Redirect?

6                        <u>**REDIRECT EXAMINATION**</u>

7     **BY MR. PORRITT**

8     **Q**    Good afternoon, Glen.

9     **A**    Good afternoon.

10    **Q**    I want to turn quickly to you just had some

11    back-and-forth-and-forth with Mr. Price regarding some options

12    you purchased, one on August 8th and some on August 15th,

13    looking at Exhibit 433.  So if I can refer you to Exhibit 433

14    again.  I want you to turn to specifically Page 433-16.

15    **A**    Okay.

16         Okay.  All right.

17    **Q**    Do you see that?

18    **A**    Yes.

19    **Q**    And in the middle of that page, there are some entries

20    which reflect your purchase.  350 calls.  Correct?  Price, 350

21    calls?

22    **A**    350 calls, yes.  Uh-huh.

23    **Q**    Okay.  If I can refer you to Page 18 of Exhibit 433, you

24    will see there are some transactions in the 400 calls.

25         (Document displayed)

1   A    Yes.

2   Q    Also on August 15th, marked "Sell to Close," do you see

3   that?

4   A    Yes.

5   Q    Is there any relationship between the transactions, the

6   sales that you were making on August 15th of 400 call options

7   on 433-18 --

8   A    Yeah.

9   Q    -- and the purchases you were making at -- for the 350

10  calls expressed on 433-16, on the same day?

11  A    Yes.

12  Q    Okay.  Could you please explain that relationship, please?

13  A    Well, I rarely made a trade that was one contract, because

14  it's so expensive.  So I would almost always take a trade, make

15  a trade that had an offsetting short so it was a spread.  It

16  was a long at a lower price, and something to help pay for it

17  at a higher price.  So I was either rolling, or I was putting

18  on a spread.

19  Q    Okay.

20  A    So it -- I was trying to -- I still believed in Tesla.  To

21  this day, I still believe in Tesla.  I do.  So I was trying to

22  figure out a way to stay engaged, to stay involved, and to

23  recoup some of the money, too, frankly.

24  Q    The fact that you were rolling 400 calls down to 350, what

25  does that tell you today about what the stock price was doing

1  or what -- the stock price movement you were seeing at that

2  time, on August 15, 2018?

3  **A**   It was cratering.  It was going down.  I think it went

4  down to $200, eventually.

5  **Q**   When you bought these option reflected here on 433-16,

6  January 350s, were you ever intending to hold them until they

7  expire?

8  **A**   No.  I never do.  It's just too -- you have too much of a

9  cost effect.  Two months before expiration, I'll roll it to the

10  next month.

11  **Q**   So it was never your intention to actually use these calls

12  to acquire Tesla stock at 350?

13  **A**   No.

14  **Q**   How about the 400s?  Would you ever intend to call -- buy

15  Tesla stock at 400?

16  **A**   Exercise them?

17  **Q**   Yes.

18  **A**   No.  No.  It ties up too much capital.

19  **Q**   Is that an appropriate way to look at these transactions

20  at all, to look at the trans- -- that exercise price?

21  **A**   All of these transactions, either they're closing or

22  they're having to have an offset, all of them.

23  **Q**   And if we can look at the transactions Mr. Price referred

24  to you on August 8th -- well, actually, before we go on, sorry.

25  Back to these transactions on 433-16 and 433-18.

**LITTLETON - REDIRECT / PORRITT**

1      So Mr. Price told that you spent approximately -- I think

2  it was $900,000 on buying the options on 433-16.  Do you recall

3  that?

4  **A**    Yeah, I do.

5  **Q**    Okay.

6  **A**    Yeah.

7  **Q**    Should that be offset by the proceeds of the sales that

8  you saw on 433-18?

9  **A**    I can't speak to that, specifically.  But I'm sure that's

10  what it was.

11  **Q**    Okay.  So you need to look at the net cost to determine

12  the cost of what you were --

13  **A**    Yes.

14  **Q**    -- investing at the time?

15  **A**    Yes.  Oh, absolutely, yeah.  It was too expensive to do

16  outright.

17  **Q**    And if I could refer you to the trades Mr. Price referred

18  you to on August 8th, which I think is on B33-17 (sic), it was

19  at the bottom of the page, I believe.

20      (Document displayed)

21  **A**    Okay.

22  **Q**    Actually, there's some on the middle of the -- top of the

23  page and on the middle of the page.  I apologize.

24      But do you see those, the buys to open?

25      (Witness examines document)

1   **A**     Yeah.  That was the offset.

2   **Q**     If I can refer you to 433-19, about two-thirds of the way

3   down the page, you see on August 8th, there's "Sell to Close"

4   of 450s.  Do you see that?

5   **A**     Yes.

6   **Q**     Okay.

7   **A**     "Sell to close," yeah.

8   **Q**     And also on the following page, on 433-20, the bottom of

9   the page, do you also see some more sells to close of 450s?

10  **A**     Yes.

11  **Q**     Okay.  Again, is there any relationship between the buys

12  to open on 433-17 and the sales to close on 433-19 and -20?

13  **A**     Yes, they are offsets.  Selling at a higher strike price.

14  **Q**     Okay.  And again, so could you explain what you're doing

15  by making this -- these --

16  **A**     Well, it's --

17  **Q**     -- related transactions?

18  **A**     Sorry.

19  **Q**     Go ahead.

20  **A**     I'm sorry.  It's a less expensive way to be long.  You

21  don't make as much, but it's far less risky and it's far less

22  expensive.  You might capture $25 instead of, you know,

23  whatever it might go to.  But it's far safer and far less

24  expensive.  So I would put on a spread.  Buy at a lower price,

25  and sell at a higher price.

**LITTLETON - REDIRECT / PORRITT**

1  **Q**    And is the appropriate way to look at the cost of the

2  transaction to look at these transactions collectively?

3  **A**    Yes.

4  **Q**    All right.

5  **A**    Absolutely.

6  **Q**    And again, for these options that you bought on 433-17 at

7  400, were you ever intending to hold them so that you could

8  actually acquire Tesla stock at 400?

9  **A**    No, I didn't have enough capital to do that.

10  **Q**    Okay.  Does the way that Mr. Price was reviewing this,

11  both in your deposition and here today, make any sense at all

12  in connection with your investment strategy?

13  **A**    No.

14          **MR. PRICE:**  Objection.  That's argumentative.

15          **THE COURT:**  Overruled.

16  **BY MR. PORRITT**

17  **Q**    You can answer.

18  **A**    Oh, um, yes.

19  **Q**    Does it --

20  **A**    Sorry.  What did you -- what'd you ask me, again?

21  **Q**    Does the way in which Mr. Price presented these trades and

22  the cost of these trades, both at your deposition and here

23  today, make any sense at all --

24  **A**    No.

25  **Q**    -- in connection your overall investment strategy?

**LITTLETON - REDIRECT / PORRITT**

 1   A     No.  No.

 2   Q     Okay.  In your deposition, did Mr. Price show you these

 3   other offsetting trades that we just discussed?

 4   A     No.

 5   Q     Yeah.  If we can briefly go back to Exhibit 432, which is

 6   your email exchange with Mr. Morse.

 7   A     Yes.

 8         (Document displayed)

 9   Q     And the last page of the exhibit, but the first -- first

10   email, do you see that?

11   A     Yes.

12         (Document displayed)

13   Q     You mentioned -- or Mr. Price mentioned to you that you

14   used the word "rumor" there to discuss the going private.  Do

15   you see that?

16   A     Um, yes.

17   Q     Could you explain why you used the word "rumor" in that

18   email?

19   A     Um --

20         (Witness examines document)

21   A     Why I said "rumor"?

22   Q     Yeah.

23   A     Bad use of words, I guess.

24   Q     I think you testified you don't trade on rumors, is that

25   correct?

LITTLETON - REDIRECT / PORRITT

1   A    Yeah, that's right.

2   Q    Okay.  Did you go ahead and trade on the basis of the

3   tweet saying "Going private at 420.  Funding secured"?

4   A    Yeah.  I would never make a liquidation process that I did

5   on a rumor.  I don't trade on rumors.  So that was a bad use of

6   words.

7   Q    Now, if I can refer you back to Exhibit 13.

8        (Document displayed)

9   Q    This is the email you said you saw on August 7th,

10  "Investor support is confirmed."  Correct?

11  A    Tweet.  Tweet.

12  Q    Tweet, I apologize.  Tweet.  Correct?

13  A    Yes.

14  Q    And then if we could go to Exhibit 229.

15       (Document displayed)

16  Q    The "Staying Public" blog.

17  A    Uh-huh.

18  Q    Or email.  And I guess, in particular, in that --

19  Mr. Price referred to that first bullet point.  Do you see

20  that?

21            "Given the feedback I've received..."

22  A    Uh-huh.  Yes.

23  Q    Do you recall Mr. Price looking -- referring you to that

24  paragraph?

25  A    Yeah.  Am I familiar with it?

**LITTLETON - REDIRECT / PORRITT**

1  **Q**    Yes.

2  **A**    Yes.

3  **Q**    Okay.  And this is on August 24th, 2018, correct?

4  **A**    Yes.

5  **Q**    When you read this, did you think this was consistent with

6  investor support being confirmed as of August 7th, 2018?

7  **A**    No.  Not at all.

8           **THE WITNESS:**  We are just about at our 2:00 point.

9           **MR. PORRITT:**  Oh.  I have maybe two more questions,

10  Your Honor?

11          **THE COURT:**  All right.

12          **MR. PORRITT:**  With leave, and leave of the jury.

13  Obviously, I understand we started late, and we are running a

14  little late.

15  **BY MR. PORRITT**

16  **Q**    But you had some questioning regarding what you -- whether

17  you understood the going-private transaction to be a, quote,

18  "done deal."  Do you recall that?

19  **A**    I'm sorry, I couldn't --

20  **Q**    There was some questioning by Mr. Price about your views

21  about whether the going-private transaction was a, quote, done

22  deal, close quote.  Do you recall that?

23  **A**    Yeah.

24  **Q**    Okay.  What importance did the going-private transaction

25  being a, quote, done deal have in your decisions on making

1    investments in Tesla during the class period?

2    **A**    Everything, you know.  It made me liquidate everything.

3    Most everything.

4    **Q**    And what to you, again, was the most important aspect of

5    deciding that it was a done deal?

6    **A**    What was the most important of -- "Funding secured"?

7    **Q**    Yes.  Okay.

8    **A**    Yeah.

9         **MR. PORRITT:**  At this point, that concludes my

10   examination, Your Honor.

11        **THE COURT:**  All right.  Anything on redirect, very

12   quickly?

13        **MR. PRICE:**  Yes, just less than two minutes, I think.

14        **THE COURT:**  Good.

15                    <u>**RECROSS-EXAMINATION**</u>

16   BY MR. PRICE

17   **Q**    Mr. Littleton, you were shown your trades on 433, Page 17.

18   Those -- those trades where, you know, in your deposition you

19   said it appeared that you were making a bet that the price

20   would be 435.  And you gave us, right now, the reasons for

21   doing that.  Right?

22   **A**    Yes.

23   **Q**    Okay.

24        **MR. PRICE:**  Your Honor, I would like to -- I don't

25   know if we can play this.

1          This was at your deposition, Page 136, Line 18 to -- 136,

2     Line 18, to 137, Line 1.

3          Can we play that, Ken?  Or should I just read it?

4              **THE COURT:**  Well --

5              **MR. KOTARSKY:**  I need a moment if you want to play it.

6              **MR. PRICE:**  I'll --

7              **THE COURT:**  Why don't you just read it.

8              **MR. PRICE:**  I'll read it.

9     **BY MR. PRICE**

10    **Q**    (As read)

11              **"QUESTION:**  So I guess, why did you make --

12                   you know, why did you spend over $900,000,

13                   you know, for these buy options where you'd

14                   be losing money if you know the transaction

15                   went through at 420, and it stayed at 420?

16              **"ANSWER:**  It was a fluid situation, as all

17                   markets are.  I must have had a reason.  I

18                   can't tell you what that reason is now.  That

19                   was four years ago.  But I must have had a

20                   reason."

21         And you recall, sir, I asked you under what circumstances,

22    in your view, would the price of Tesla's price per share have

23    reached 435 or more by June, 2019.

24         Do you recall that?

25    **A**    Uh-huh.

**PROCEEDINGS**

1   **Q**    And do you remember, you said that you knew that Tesla was

2   a volatile stock.   You were trying to recapture capital.   That

3   (As read):

4                    "...the same stock today is significantly

5                    higher than that, so it was one of those

6                    situations where I thought it was an

7                    opportunity and I was wrong.   I was wrong

8                    about that opportunity."

9        Do you remember that?

10  **A**    Yeah, vaguely, yeah.

11            **MR. PRICE:**   Okay.   Nothing else, Your Honor.

12            **THE COURT:**   All right, thank you.

13        Anything on reredirect?

14            **MR. PORRITT:**   Nothing further, Your Honor.

15            **THE COURT:**   All right.   Thank you.   That will conclude

16  our session for today.   Today is Wednesday, isn't it?

17        So, you're off tomorrow, but we'll see you back here first

18  thing Friday morning.   We'll start promptly -- and I promise

19  promptly this time -- at 8:30.

20        So until then, please remember not to discuss this case

21  with anyone.   Do not listen, read or watch any coverage of this

22  case.   Do not attempt to do any research on your own, and do

23  not form any opinions until this case has been submitted to you

24  for deliberation.

25        So have a good day off.   We'll see you on Friday.

**PROCEEDINGS**

1          **THE COURTROOM DEPUTY:**  All rise for the jury.

2     (Jury excused)

3     (The following proceedings were held outside of the

4     presence of the Jury)

5          **THE COURT:**  All right.  I've got a proceeding, a

6     sealed proceeding I've got to do right now.  As -- pursuant to

7     new procedure, we'll see you at 8:15 on Friday.  Okay?

8     Thank you.

9          **THE COURTROOM DEPUTY:**  Court is adjourned.

10     (Proceedings concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

Wednesday, January 18, 2023 - Volume 1

|  | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| Opening Statement by Mr. Porritt | 295 | 2 |
| Opening Statement by Mr. Spiro | 314 | 2 |

| <u>**PLAINTIFF'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**LITTLETON, GLEN**</u> | | |
| (SWORN) | 346 | 2 |
| Direct Examination by Mr. Porritt | 346 | 2 |
| Cross-Examination by Mr. Price | 368 | 2 |
| Redirect Examination by Mr. Porritt | 453 | 2 |
| Recross-Examination by Mr. Price | 462 | 2 |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| Unnumbered video excerpt (Mr. Littleton) | | 427 | 2 |
| 8 | | 354 | 2 |
| 12 | | 390 | 2 |
| 13 | | 361 | 2 |
| 53 | | 411 | 2 |
| 229 | | 449 | 2 |
| 430 | | 382 | 2 |
| 432 | | 358 | 2 |
| 433, Pages 433-15 to 433-23 | | 430 | 2 |
| 524 | | 364 | 2 |

<u>**CERTIFICATE OF REPORTER**</u>

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Wednesday, January 18, 2023