Volume 3

Pages 467 - 715

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES      )
LITIGATION.                        ) No. 18-cv-04865-EMC
_____)
                                   San Francisco, California
                                   Friday, January 20, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:

                LEVI & KORSINSKY, LLP
                1101 30th Street NW
                Suite 115
                Washington, D.C.  20007
     BY:  **NICHOLAS IAN PORRITT, ESQ.**
         **ELIZABETH K. TRIPODI, ESQ.**
         **ALEXANDER A. KROT, III, ESQ.**
         **JOSEPH LEVI, ESQ.**

                LEVI & KORSINSKY LLP
                75 Broadway
                Suite 202
                San Francisco, California  94111
     BY:  **ADAM M. APTON, ESQ.**
         **ADAM C. MCCALL, ESQ.**

                LEVI & KORSINSKY LLP
                55 Broadway
                10th Floor
                New York, New York  10016
     BY:  **MAX EDWARD WEISS, ESQ.**
         **KATHY AMES VALDIVIESO, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
         **DEBRA L. PAS, CSR 11916, CRR, RMR, RPR**
         Official Reporters, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants:

                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                51 Madison Avenue
                22nd Floor
                New York, New York  10010
      BY: **ALEXANDER B. SPIRO, ESQ.**
            **ANDREW JOHN ROSSMAN, ESQ.**
            **PHILLIP B. JOBE, ESQ.**
            **ELLYDE R. THOMPSON, ESQ.**
            **JESSE A. BERNSTEIN, ESQ.**

                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                865 South Figueroa Street
                10th Floor
                Los Angeles, California  90017
      BY: **MICHAEL T. LIFRAK, ESQ.**
            **ANTHONY P. ALDEN, ESQ.**
            **MATTHEW ALEXANDER BERGJANS, ESQ.**
            **WILLIAM C. PRICE, ESQ.**

For Third Party Egon Durban and Silver Lake:

                CONRAD METLITZKY KANE
                Four Embarcadero Center
                Suite 1400
                San Francisco, California  94111
      BY: **LIZ KIM, ESQ.**

                DEBEVOISE & PLIMPTON LLP
                801 Pennsylvania Avenue N.W.
                Suite 500
                Washington, D.C.  20004
      BY: **JULIE M. RIEWE, ESQ.**
            (Appearing telephonically)

**Friday, January 20, 2023**                              **8:01 a.m.**

## P R O C E E D I N G S

1     (The following proceedings were held outside of the

presence of the Jury)

        **THE COURTROOM DEPUTY:**  Court is now in session, the

Honorable Edward M. Chen presiding.

        Court is calling the case In Re Tesla Inc. Securities

Litigation, Case No. 18-4865.  Counsel, please state your

appearances for the record, beginning with plaintiff.

        **MR. PORRITT:**  Good morning, Your Honor.  Nicholas

Porritt of Levi & Korsinsky on behalf of the plaintiff and the

class.  And, with my team from Levi & Korsinsky.

        **THE COURT:**  Thank you, good morning.

        **MR. PORRITT:**  And we'll spare individual introductions

today.

        **MR. SPIRO:**  Good morning, Your Honor.  Alex Spiro of

Quinn Emanuel on behalf of defendants.

        **THE COURT:**  All right.  Thank you, Mr. Spiro.

        Let's address the things that we need to address prior to

certain witnesses going on, coming on.  I do want to start with

the issue about whether I should issue a proposed instruction

that I sent, delivered to you, I think early this morning, in

response to the plaintiff's filing.

        And I want to get your comments.  And I will tell you that

my view at this point is that without some instruction, I think

1   the jury may get confused because it appears that there's going

2   to be testimony from Mr. Musk to the effect that, you know,

3   what he said was essentially true, that there was -- from what

4   I can see from the evidence, I anticipate it will be something

5   along the lines of there was a series of communications and

6   interest and engagement between PIF and Tesla and he, and so --

7   and the sum and substance of it all I think was argued by

8   Mr. Spiro's opening, "Funding secured" was sort of shorthand

9   for "It's in the bag" kind of thing.  Which I've already ruled

10  was not true.  Technically not accurate.

11      So the jury has been instructed that they are to assume

12  that those statements, the two tweets, were untrue.  But if --

13  if it appears that there's going to be a bunch of evidence

14  coming in suggesting to the contrary, I think the jury may get

15  confused.

16      Now, any attempt to sort of say well, we should restrict

17  testimony and restrict Mr. Musk from saying anything that

18  contradicts the Court's order because there are issues of --

19  two issues, it seems to me.  His knowingness or not, which is

20  still at play; his state of mind with respect to knowing.

21  Therefore he truly believed, for instance, that funding was

22  secured in every sense of the word.  Even if it means he wasn't

23  even -- in his mind he wasn't even at the level of

24  recklessness, seems to me relevant.

25      It also seems potentially relevant to materiality because

1    one of the aspects of materiality is you compare what was

2    represented to the actual state of affairs.  At that delta

3    between those two, the size of that delta seems to me, one of

4    the factors of materiality and how important it was and whether

5    it impacted.

6        And so this is fairly subtle stuff, and without an

7    instruction to make sure the jury knows that it's coming in for

8    certain issues and not other issues, I think is important to,

9    to minimize juror confusion.

10        So I'll take comments.

11        **MX. KIM:**  Your Honor, I apologize for the

12    introduction.  This is Liz Kim, Conrad Metlitzky Kane, on

13    behalf of third party Mr. Egon Durban and Silver Lake.

14        We have an issue, an urgent issue that involves

15    confidential documents that the Court had ordered sealed that

16    the parties nonetheless filed unredacted on the docket, and now

17    propose to use as an exhibit for at least one if not both of

18    the witnesses today, so I assume the Court would like to take

19    that issue up after this instruction issue.

20        **THE COURT:**  Yep.  Parties respond?

21        **MR. SPIRO:**  Which issue do you --

22        **THE COURT:**  Let's -- since she's here, let's talk

23    about that issue then.  If it's coming up soon, we had better

24    deal with that.

25        **MR. SPIRO:**  Yeah, so it won't come up on the first

1  witness today, and I don't believe it's going to come up on the

2  second witness today.

3      **MR. PORRITT:**  (Inaudible)

4      **MR. SPIRO:**  Right.  So just to give the Court --

5      **THE COURT:**  In that case let me ask, have you met and

6  conferred at all?  Have you -- do you have a position, just on

7  whether or not these should be placed under seal?

8      **MR. SPIRO:**  Some of -- there may be some, but there

9  aren't as many as the third-party witness would like.  Because

10 it's a public trial, and some of this -- some of these issues

11 are relevant.  So the problem is there's a disconnect that we

12 are going to need the Court's guidance on.  I think the Court's

13 going to -- this is not really an issue, I don't think, between

14 plaintiff and defense here.

15     **MR. APTON:**  I agree with Mr. Spiro.

16     **THE COURT:**  Okay.  So have you met and conferred to go

17 over which documents you can agree on.

18     **MR. APTON:**  Your Honor, I spoke with Mx. Kim

19 yesterday.  And one of the issues, the issue that we're dealing

20 with right now, is this Exhibit 179 and 201 which is relevant

21 to today, essentially for Mr. Musk's testimony.  And these are

22 presentations from Silver Lake about capitalization for the

23 potential go-private, how the Saudi PIF could fit into that

24 transaction.  And what Silver Lake is proposing, is that broad

25 swaths of these documents are fully redacted and it effectively

**PROCEEDINGS**

 1  renders the document useless.  And so it's a problem.  And as

 2  Mr. Spiro said, this is a public trial.  We need these

 3  documents to cross-examine the witness.

 4          **THE COURT:**  All right.  Let's take it up -- I know

 5  you're here, but I've got other things to do right now.

 6          **MX. KIM:**  Okay.

 7          **THE COURT:**  It's not going to come up during the first

 8  session; we'll take it up during the break.

 9          **MX. KIM:**  Sounds good, Your Honor.

10          **THE COURT:**  All right.

11          **MR. SPIRO:**  On the other issue that the Court brought

12  up, you know, first, I just feel the need to sort of say at the

13  outset, you know, I must have said a half a dozen or more times

14  the statement was untrue.  I think I said it more times than

15  the plaintiff did.

16      So it strikes me that, as I hear the Court's reasoning,

17  it's this concern of how to deal with the issues that could

18  come up during Mr. Musk's testimony.  So it's really a

19  proactive approach.

20      You know, at the outset I'd also say that, you know,

21  courts are reluctant to give instructions, they were just

22  instructed yesterday or the last court day, and are generally

23  reluctant to instruct mid-trial.  And I think for good reason.

24  Especially when you're in a proactive perspective situation.  I

25  think there's an easy solution for this and I was going to

1    address it on my own before the Court raised the idea of in

2    instruction, which is just simply this.

3         They can't ask Mr. Musk a trapping question of "Is it

4    true," because that's an impossible question in this case and

5    it's an irrelevant question in this case.  The reason it's

6    irrelevant, taking the second point first, is the Court said

7    it's not true.  That's it.  It's done.

8         The second reason that it's an impossible question is --

9    the answer is Mister -- it was true to Mr. Musk.  So he has no

10   way to answer that question that comports with the Court's

11   ruling and comports with the truth.  So he can't testify under

12   oath and be asked a trapping question, that violates the

13   Court's order.  So the way this should work, in my view, is

14   they don't ask that question.  It's a fact.  It's not true.

15        **THE COURT:**  I thought the fear was you were going to

16   elicit testimony on cross or if we call it direct, about, to

17   listing all the things that suggest -- you don't have to ask

18   the magic question, but everything that suggests indeed it was

19   secured because of the representations from PIF, the

20   engagement, the excitement, the "We're interested," dollar

21   signs, et cetera, so all of these exhibits that you seek to

22   admit -- that I'm going to allow, by the way, for the most

23   part -- you know, it's going to be taken as:  Oh, well, maybe

24   funding was secured.

25        **MR. SPIRO:**  But, but the -- again, that goes to

**PROCEEDINGS**

 1   materiality.  It doesn't go to that issue.  And number two --

 2          **THE COURT:**  Yeah, that may be apparent to you and me.

 3          **MR. SPIRO:**  But the Court has --

 4          **THE COURT:**  What's the problem with letting the jury

 5   know this is maybe relevant to materiality, and I took pains to

 6   make sure I understand what part of materiality that it could

 7   be relevant to, to his knowingness or not, and not to falsity

 8   or not, which is an issue that they're not to concern

 9   themselves with.  This guides their attention.  And, I

10   studiously avoided reckless disregard, as you will note.

11          **MR. SPIRO:**  And I appreciate it.  And I could tell.

12   And I appreciate that we received this very late at night, and

13   how hard the Court's working, genuinely, because I can tell

14   that the Court considered all aspects when making this

15   proposal.

16      Let me just not lose my thread, which is just simply:

17   Does the Court agree that they should not be allowed to ask the

18   trapping question that has --

19          **THE COURT:**  Well, what is the trapping question?  I'm

20   not sure I get it.

21          **MR. SPIRO:**  "Is that true, Mr. Musk?  'Funding

22   secured.'  Is that true?"  It's irrelevant --

23          **THE COURT:**  I'm not sure I see the relevance of that

24   question.  They can ask, "Did you believe it was true at the

25   time?"

1          **MR. SPIRO:**  Agreed.  So therefore, we are on the same

2     page with that.  So moving to this issue, again, just to say it

3     again, courts are loath to instruct -- I think it's problematic

4     to instruct right before a key witness in a case testifies --

5          **THE COURT:**  And my proposal, by the way -- I should

6     clarify.  To avoid that precisely I would give that at the very

7     outset.  So it's not key to Mr. Musk.  As far as the jury

8     knows, it might be relevant to Mr. Subramanian or whoever else.

9     It's a general instruction.

10          **MR. SPIRO:**  And I hear the Court's leanings on that.

11     And so what I would ask is -- there was one word in the

12     instruction that we think is not the right word.

13          **THE COURT:**  Okay.

14          **MR. SPIRO:**  And if the Court were to accept that

15     singular edit and give it at the beginning, I don't have -- I

16     would withdraw my objection, in theory.  With one -- two other

17     caveats we're requesting.

18          One is, any time a court instructs the jury on an element,

19     they have to instruct the jury on the burden of proof.  The

20     plaintiff has the burden to prove.  That is hornbook, and I

21     would ask the Court to do that as well.

22          The second thing is if we're going to do this, then we

23     would urge the Court to also give a brief instruction on expert

24     witnesses.  This is a case where a few things are happening all

25     at once that are highly unusual.  You have got a court that's

**PROCEEDINGS**

1  made a summary-judgment ruling about things that are related to

2  facts.  You know, I don't want to digress into that, but there

3  is this summary-judgment ruling.

4      Two, before any factual witness testifies, they're calling

5  an expert witness who wasn't there, who is -- I mean -- yeah.

6  So all I'm asking is with those caveats, and hearing the

7  Court's thinking on this, um, that's what we would ask.

8      So the only change in the instruction -- and it's really

9  just to keep it consistent with what you said in the beginning,

10  and what we've relied on, frankly, in picking a jury and

11  opening and my comments to the jury, what is consistent with

12  your final instructions, is you just, you keep saying the word

13  "untrue," the statements were untrue, the statements were

14  untrue.  That's fine.  I said that, you said that.  Plaintiff

15  said that.  You then switch words to "misrepresentation."

16      And all I'm asking is that that word be "statement," like

17  every other word is "statement."

18          **THE COURT:**  So that -- the "untrue statements" instead

19  of "misrepresentations."

20          **MR. SPIRO:**  Yes.  So with that edit, the burden of

21  proof -- and I'm specifically requesting a minor instruction

22  which we have created about expert witnesses because, again,

23  they are waiting to hear what happened, and a person who

24  doesn't have a clue of what happened is about to walk in, give

25  his credentials and tell them what happened.

PROCEEDINGS

1          And so I think given that, given the summary-judgment

2     ruling, given how early in the case the expert is testifying --

3     and he is testifying this early in the case, right before

4     Mr. Musk, Your Honor, for that very purpose.  That is what's

5     going on.

6          **THE COURT:**  All right, so the instruction, I already

7     have the standard expert instruction.  You want something in

8     addition to that expert instruction.

9          **MR. SPIRO:**  What we penned up I think is, you know

10    (As read):

11               "During the trial you will hear testimony

12               from witnesses who will testify to opinions

13               and the reasons for their opinion.  These

14               witnesses do not have direct knowledge of the

15               facts at issue in this case.  Therefore, this

16               evidence is not to be used to establish the

17               facts in this case."

18          And I can hand up a copy of that.

19          **THE COURT:**  Hand up a copy.  Hopefully you have given

20    a copy to Mr. Porritt and his team.

21          Let me get your response.

22          **MR. PORRITT:**  This proposed additional expert

23    instruction we're seeing for the first time now so we are

24    reacting live.  So, I don't think that's an accurate statement.

25    Of course expert opinion enables the jury to -- jury's only

1    determining facts, expert opinion is to assist them in

2    determining facts.  It is not direct evidence, it is opinion

3    evidence.  So I don't think that is an accurate statement of

4    the law.  We've --

5            **THE COURT:**  Well, it isn't an inaccurate statement of

6    the law that an expert may base his opinion on facts as he or

7    she understands them.  But the reason why we're allowing the

8    recitation of those facts is so you understand the basis of

9    that expert's opinion.  Those -- statement as to the facts,

10   itself, is not admissible evidence for, for the truth of the

11   matter asserted.  But it is permissible to evaluate, to

12   understand the basis of the expert's opinion.  I mean, that's

13   the law.  Right?  It's not evidence.

14           **MR. PORRITT:**  I mean, I would say it's not direct

15   evidence of the facts.  I just think -- we have a standard,

16   Your Honor's crafted the standard expert opinion jury

17   instruction.  I don't see at this point -- it's not --

18   Mr. Spiro's suggesting this is the, you know, first time an

19   expert has testified early in a case.  I mean, the last, the

20   *General Motors* class action trial Your Honor had before you in

21   October, the very first witness was an expert witness.  So, so

22   it's not that unusual.

23       I don't see any need for this additional instruction on

24   experts.  It's going to be covered by and could be adequately

25   addressed when we're presenting the case for the jury in

1  closing arguments, they can explain who Professor Subramanian

2  is and how experts work.  Your Honor will instruct.  I don't

3  see any need to impose that right now.  It is simply looking to

4  sort of undermine the expert testimony ahead of time.

5           THE COURT:  Well, if I give it to one, I'm going to

6  give it to all.  So I don't know if you -- whoever you have,

7  it's going to apply to both sides.  It is not just a one-sided

8  thing.

9           MR. SPIRO:  That sounds fair to the defense.

10          MR. PORRITT:  The instruction is given now, and their

11  expert's not appearing for two weeks.  So -- more than likely.

12          THE COURT:  Well, before every expert I normally give

13  an expert instruction.

14          MR. PORRITT:  Okay.  So --

15          THE COURT:  So let's talk about -- I want to resolve

16  this, and we're going to run out of time soon.  So what's your

17  reaction to my supplemental instruction, as amended to use the

18  word "untrue statements" as opposed to "misrepresentations"?

19          MR. PORRITT:  We don't have an issue with "untrue

20  statement" versus "misrepresentation," so that's not an issue.

21  We are equally appreciative of Your Honor working late and

22  crafting this instruction.

23      We are concerned not just about the falsity issue but on

24  scienter, we heard a lot of statements in Mr. Spiro's opening

25  about how if it was innocent, it was in good faith, no one

**PROCEEDINGS**

 1   intended to commit fraud --

 2        **THE COURT:**  Let me just say right now, I'm not saying

 3   I'm not going to give the finding of reckless disregard at the

 4   end, now that they have withdrawn their, you know, their

 5   proposal.  So you will have room to argue that.  I don't think

 6   I need to do that now, because they're going to hear this

 7   stuff.  And my main goal is to avoid the confusion.  As we

 8   began to see during the voir dire a little bit, one juror was

 9   kind of confused, and I got kind of confused, myself.  And I

10   don't want this thing to unwind, especially with Mr. Musk

11   testifying, and probably others, and all the documents that are

12   coming in.  They should have some framework to understand why

13   this is coming in.

14        **MR. PORRITT:**  We asked for a clarifying instruction,

15   an additional instruction now, and Your Honor has crafted one.

16   So obviously, we support that.

17        We are concerned -- once again, I don't intend to ask --

18   it would be crazy of me to ask Mr. Musk, "This was untrue

19   wasn't it, Mr. Musk," and expect him to say --

20        **THE COURT:**  Well, you could ask "Do you think."  I

21   think the question is:  Is it untrue?  It's implied.  But, I

22   mean, I didn't think you would ask that question.  But if you

23   did, it's probably irrelevant since I made a finding.

24        **MR. PORRITT:**  I completely agree, Your Honor.

25        **THE COURT:**  Of what he thought is in play.

 1              **MR. PORRITT:**  Well, yes and no, Your Honor.  I mean, I

 2    would -- I'm also concerned that Mr. Spiro is going to ask and

 3    say:  Well, you honestly believed that you were saying the

 4    right thing.  And all these sorts of -- these sorts of

 5    concepts, which are frankly irrelevant to whether he knew or

 6    didn't know.  I don't think that goes to knowledge.

 7         So that is the --

 8              **THE COURT:**  I don't know.  The human mind, there's

 9    many ways to ask, to discern what somebody knew and what they

10    thought is probative of what they knew.  So I'll let you know

11    right now, I'm going to give fairly free rein on that question,

12    which is why I'm going to admit all the stuff that was objected

13    to -- all the transactional documents, even a year before, to

14    the extent that he was in meetings, et cetera, et cetera, with

15    PIF people, that that is relevant to his state of mind by the

16    time you get to August 7, 2018.

17              **MR. PORRITT:**  Very good -- oh, I understand that

18    ruling.  And so we're stating our concern.  We obviously don't

19    object to this particular supplemental jury instruction.  And

20    we're grateful for Your Honor crafting it.  We are going to

21    raise this concern, and we'll perhaps have to see how the --

22    how the evidence comes in, and how it's presented by the

23    defense.

24         But we were concerned about the tone of some statements

25    there and the sweeping nature of the tone of some statements

 1   that Mr. Spiro made in his opening.  And the risk of jury

 2   confusion on the scienter issue we think is also apparent and

 3   is a matter that we will -- you know, I think the Court -- we

 4   would appreciate the Court keeping an eye on, as I'm sure it

 5   will.

 6        **MR. SPIRO:**  Your Honor, related to this question that

 7   I take it Mister -- the Court agrees with me on and Mr. Porritt

 8   won't ask, which is: Is this true, the other concern I have or

 9   other sort of -- I'm calling them "trapping questions."  It's

10   not to cast aspersions necessarily at plaintiff.  But, such as

11   SEC-related issues.

12        I mean, one thing that I want to make sure of which is

13   standard in all cases is that the depositions -- there's two of

14   them, and I just wanted to flag this for the Court since we

15   have a moment now -- that they be referred to just as

16   deposition and date, and then the later deposition and date.

17   Not SEC deposition versus this case deposition.  That's

18   standard.  I didn't think anything differently would be done,

19   but I wanted to flag it for the Court's attention.

20        **THE COURT:**  What's the issue, again?

21        **MR. SPIRO:**  Yeah, I just -- again, this is standard so

22   I don't -- I'm raising it in an extra abundance of caution.

23   But there's two depositions in this case for some of the

24   witnesses, including Mr. Musk.  There's -- and they happen at

25   two different dates.  And so when you refer to them, you refer

1    to them as Deposition 1 or the date, and the deposition -- the

2    later deposition and the date.  You don't say "the SEC

3    deposition," right, because what you're really then doing is --

4    well, one --

5           **THE COURT:**  You don't need to use "SEC" to identify

6    the deposition.

7           **MR. SPIRO:**  Correct.  Correct.  They're different

8    dates, of course.  And so -- and the problem with any

9    questions -- and I hope that the Court keeps its antennae up --

10   is you're putting him again in a Hobson choice, because the

11   Court has ruled that certain things are not in this case.  The

12   only thing that the Court ruled that could be in this case was

13   something that happened in the market, for the affect on the

14   market related to governments and regulators.

15        So those questions can't be asked to Mr. Musk, and you

16   can't refer to the deposition, which you never do, right?  And

17   we deal with this all the time.  If it's a criminal an civil

18   case, if there's a retrial, you always reference the

19   depositions by dates to sanitize it.  So I just wanted to make

20   sure of that.  And I assume that's not an issue, either.

21        The other -- the other -- I don't want to take the Court's

22   comment -- although I do see we have a few minutes -- as an

23   invitation to discuss the one major issue that we have to

24   discuss in terms of exhibits for Mr. Musk.  And there's really

25   only one -- the parties have basically dealt with all issues

1    related to Mr. Musk's exhibit -- is the PIF notes.

2        In Mr. Porritt's opening statement not that I'm trying to,

3    you know, rehash things I didn't object to at the time which is

4    not really how this works, but he, he uses the notes and he

5    uses the PIF's text messages in essentially an improper way for

6    the truth of the matter asserted in violation of the rules

7    about hearsay.  And that's improper.

8        And he sort of, probably by accident, suggested to the

9    Court when we were discussing the PIF's text messages that he

10   did intend to use it for improper purpose.  I'm not sure if the

11   Court remembers that.  And then he said it was an excited

12   utterance.  In any event, I remember it.

13       The point is the PIF notes are not admissible in this

14   case, they can't be admissible because, as the Court knows, we

15   tried to get the PIF here; they didn't come.  Plaintiff didn't

16   even try to get the PIF here.

17       **THE COURT:**  Let me give you my view.  I think they are

18   relevant.  If there is a basis for authenticity, it gets in.

19       **MR. SPIRO:**  Right.

20       **THE COURT:**  And the key there is what's the evidence

21   of where it came from.  Obviously, PIF is not here.  They're --

22   not your standard custodial method of authenticating is not

23   available, but that's not the only way.

24       So if there was evidence of a chain of custody, that it

25   came from PIF to the SEC, to the plaintiffs, or to the

**PROCEEDINGS**

1    defendants, if that can be established, and you look at the --

2    within the four corners of the document, itself, does it appear

3    to be authentic, is there any reason to doubt the seal on

4    there, et cetera, et cetera, do the dates line up with

5    actual -- some corroboration there was indeed a meeting, at

6    that juncture I would say it's admissible.  But I need to hear

7    the foundation.

8         **MR. SPIRO:**  There is none of that foundation.  They

9    weren't even done contemporaneously, so that's my point.  I

10   agree with the Court.

11        If there was a PIF witness here who said these are fair

12   and accurate, they're business records, et cetera, et cetera,

13   but there's none of that.  Zero, none.  So it can't come into

14   evidence in a United States courtroom.

15        **THE COURT:**  Let me ask, what about the foundation of

16   authenticity?

17        **MR. PORRITT:**  Okay.  Sorry, Ms. Tripodi is prepared to

18   address that, Your Honor.

19        **THE COURT:**  Okay.

20        **MS. TRIPODI:**  Good morning, Your Honor.

21        **THE COURT:**  Good morning.

22        **MS. TRIPODI:**  Elizabeth Tripodi.

23        Your Honor, the PIF minutes were produced to us by the SEC

24   in the context of their investigation.  So the PIF provided

25   them to the SEC.  They provided them to us.

1       **THE COURT:**  What evidence do you have of how the SEC

2  got it?

3       **MS. TRIPODI:**  We do not have the chain of custody from

4  the PIF to the SEC, but that is something we could obtain.

5    The other things I want to the point out, Your Honor, with

6  respect to Mr. Spiro's comment that there were no

7  contemporaneous notes being taken, we have two -- we have two

8  witnesses on record at their deposition, both Mr. Teller and

9  Mr. Ahuja, noted that there was a PIF representative who was

10  taking notes on a laptop during the meeting.

11       **THE COURT:**  All right, so there was -- you have

12  evidence to support the claim that these were contemporaneous

13  notes, satisfying one of the elements of 803(6).

14       **MS. TRIPODI:**  Yes, Your Honor.

15       **THE COURT:**  And you say, you're proffering but you

16  don't have before the Court, evidence to show the sufficient

17  chain of custody that suggests -- that would establish the

18  authenticity of this document.  But you could produce that.

19       **MS. TRIPODI:**  We could.  We do have a transmittal

20  letter, Your Honor, from the SEC.

21       **THE COURT:**  Does it explain how the SEC got it?

22       **MS. TRIPODI:**  I believe we do...

23    (Off-the-Record discussion)

24       **MS. TRIPODI:**  And from Akin Gump, who was the PIF's

25  counsel in conjunction with the SEC investigation.

PROCEEDINGS

1          **THE COURT:**  This is what we're going to do.  During

2   the break, the next break -- this is not going to come up

3   before the break, right?

4          **MS. TRIPODI:**  I don't believe so, Your Honor.

5          **MR. SPIRO:**  No, Your Honor.  But I do want to get us,

6   like, back into the rules of evidence a little bit.  There's

7   nobody who knows who took the notes.  There's no evidence about

8   what the person they saw with the computer has anything to do

9   with this.  Meaning this is just some document.

10       This is -- it's not as if the witnesses are going to say:

11  Oh, yeah, that looks like -- I could tell by the way he was

12  hitting his computer it would have generated something that

13  looks like this.

14       These notes, the minutes of -- the minuted (Indicating

15  quotation marks) are done after the fact.  So even if they were

16  here, frankly, they wouldn't come into evidence.

17         **THE COURT:**  What's the exhibit number?

18         **MS. TRIPODI:**  It's Exhibit No. 80, Your Honor.

19         **THE COURT:**  80?

20         **MR. SPIRO:**  There's no evidence that they were kept in

21  the ordinary course of business, that it was the ordinary

22  course of business to keep these notes, that it was done

23  contemporaneously.  Not a single -- forget about -- there's not

24  a speck of evidence that they are authentic or that there is

25  any foundation for them at all.  Zero.

PROCEEDINGS

```
 1          THE COURT:  All right.  So what about the other

 2   elements of 803(6)?

 3          MS. TRIPODI:  Your Honor, there was a seal on the

 4   document.  The document was dated --

 5          THE COURT:  That goes to authenticity.  But you have

 6   other elements of 803(6), that these are documents produced by

 7   somebody with personal knowledge of whatever was stated in

 8   here, that they're contemporaneous and that it's done in the

 9   normal, regular course of business.

10          MS. TRIPODI:  Understood --

11          THE COURT:  Normally you have somebody who says that.

12          MS. TRIPODI:  I understand that, Your Honor.

13   Your Honor, as I explained to you, the chain of custody that we

14   have from these minutes was that they were produced to Akin

15   Gump by the PIF --

16          THE COURT:  That goes to authenticity, and you may

17   well be able to -- let's assume for a moment this is

18   authentic -- I find that there is enough here to say:  Yeah,

19   this is a PIF document.

20          MS. TRIPODI:  Yes, Your Honor.

21          THE COURT:  You're over that hurdle.  You've got

22   several other elements of 803(6).  How do you satisfy that

23   these were taken by somebody at the time with contemporaneous

24   knowledge?

25          MS. TRIPODI:  Your Honor, all we have on that element
```

**PROCEEDINGS**

1   is that there were two witnesses from Tesla who observed

2   someone from the PIF at the July 31st meeting, taking notes on

3   a laptop.

4           **MR. SPIRO:**  He could have been doodling, or writing

5   about sports he was seeing over here.  They have no idea.

6           And -- but, I know we're skipping authenticity for the

7   sake of the fact that they obviously can't show foundation.

8   But, just going back to authenticity for a second.  Somebody in

9   The Kingdom of Saudi Arabia sent a two-page Word typed document

10  to a lawyer at Akin Gump.  There's a -- there's not a raised

11  seal on this.  Even if there were, I'm sure the Court is not

12  taking this Saudi Arabian symbol that they're referring to on

13  this document as some sort of indicia of anything.  They send

14  this to a lawyer at Akin Gump.  He's talking to the SEC.  He

15  doesn't want the PIF having to talk to the SEC.  So he sends

16  them the two pages of notes.

17          The SEC has no idea, literally no idea whether these are

18  real, whether they're contemporaneous.  They don't use them for

19  any reason or purpose.  And then when all of their files are

20  turned over they now have these notes, that, again --

21          **THE COURT:**  All right.

22          **MR. SPIRO:**  Yeah.

23          **THE COURT:**  At this juncture, based on what I've seen,

24  authenticity has not been established, at least based on what I

25  have before me now.  There are elements of 803(6) for which

1   there's no real evidence.  The best you can do is inference,

2   somebody in the room saw somebody typing.  But we don't know

3   whether that person was the one actually typing this, or

4   whether this was done days later.  What purpose it was done

5   for.

6        That's not to say that this can't be used to refresh

7   recollection or other ways, perhaps, but not as affirmative

8   evidence, unless you satisfy 801(3).  So at this point my view

9   is that this doesn't meet admissibility standards.  And if you

10  can figure out a way to do that between now and then, I'll

11  entertain it at that point.

12       **MS. TRIPODI:**  Your Honor, could I ask you to consider

13  one other option, which is the residual hearsay exception under

14  807?

15       The minutes, while they don't have the raised seal that

16  Mr. Spiro is insisting on, they do have somewhat of a

17  sufficient guarantee of trustworthiness in that we can

18  establish this chain.

19       And we have a situation here, Your Honor, where there are

20  going to be numerous witnesses from the defense side who are

21  going to be telling their story, what happened at this

22  July 31st meeting.  And I think, as Your Honor can recognize,

23  looking at those minute -- those meeting minute notes in

24  Exhibit 80, there's a different story that's being told in

25  those.

**PROCEEDINGS**

1        There is no reason to believe that the PIF had a

2    motivation that was adverse to Tesla when they were providing

3    those meeting minutes.

4             **MR. SPIRO:**  Well, actually, I disagree.

5             **THE COURT:**  All right.  It's 8:30.

6             **MR. SPIRO:**  Okay.

7             **THE COURT:**  And we're going to take this up, and the

8    clock is going to run.  You've used your free 15 minutes.  Let

9    me just --

10            **MS. TRIPODI:**  Thank you, Your Honor.

11            **THE COURT:**  Let me just say that with respect if we

12   get to Mr. Subramanian, I do have an issue with some of the

13   slides.  Slide No. 2 that has references to what -- nice things

14   that people have said about him, that's hearsay.  That's not

15   coming in.

16            **MR. APTON:**  His qualifications, Your Honor?

17            **THE COURT:**  His qualifications, you know, if he's

18   earned an award, got a Nobel Prize, yeah, that comes in.  But

19   to say:  So and so says he's great, he's one of the best...

20   that's hearsay.

21            **MR. APTON:**  I assume you're referring to the Vice

22   Chancellors and Chancellors of the Delaware court, Your Honor?

23            **THE COURT:**  Well, Slide 2.  Yeah the vice Chancellor,

24   the Chancellor, so...

25            **MR. APTON:**  Okay.

 1          **THE COURT:**  Yeah.  That's out.

 2          **MR. APTON:**  But the other points of his qualifications

 3   on that slide are okay, Your Honor.

 4          **THE COURT:**  Well, because he's going to testify that:

 5   I've given so many depositions, and if it's just a summary of

 6   that, that's okay.

 7      And then Slide 11.

 8          **MR. APTON:**  Oh.

 9          **THE COURT:**  He starts getting into Musk's reason and

10   any -- opining about his motivation, subjective.  His testimony

11   is coming in for objective purposes.  What was done, how it

12   deviated, et cetera, et cetera, from the norm.

13          **MR. APTON:**  Your Honor, if I may, I exchanged with

14   counsel a revised slide deck.  So our page numbers are a little

15   bit off right now.

16          **THE COURT:**  This is the one that says "Tweets, no

17   defense, no explanation, no rationale."

18          **MR. APTON:**  Yeah, I think that's Slide 11.  I don't

19   think we're using that slide.

20          **THE COURT:**  Okay, then that obviates my issue.  Those

21   are the two.  I overrule any objections with respect to the

22   others.  At least from what I can see, stuff may come up during

23   testimony, but --

24          **MR. APTON:**  So Your Honor, we'll revise Slide 2 and

25   then go forward with that.

1    **THE COURT:**  Yeah.  And also I'm assuming my general

2  rule that you are not going to use -- show evidence that has

3  not already between admitted.  If something's already been

4  admitted, you can show that during his testimony.

5    But if something's not been admitted because of my concern

6  about him serving as kind of a summary witness at the outset of

7  the case, --

8    **MR. APTON:**  Sure.

9    **THE COURT:**  -- my ruling stands.

10    **MR. APTON:**  Your Honor, with respect to Exhibit 81

11  which was shown to the jury during openings, I intend to admit

12  that.  That is the Musk proposal to the board to take it

13  private.

14    **THE COURT:**  That was already shown?

15    **MR. APTON:**  Yes, Your Honor.  During openings.

16    **THE COURT:**  All right.  If it was already shown, then,

17  then --

18    **MR. PRICE:**  We have no objection to that, Your Honor.

19    **MR. APTON:**  There's a few other documents.  The 8-K

20  that was filed with the SEC, I think that would be subject to

21  judicial notice. I don't know if counsel --

22    **MR. PRICE:**  I have no objection to that either,

23  Your Honor.

24    **THE COURT:**  Okay.

25    **MR. APTON:**  That was Exhibit 101.  And there was a --

 1  his resume, which is 360.

 2          THE COURT:  And the resume can come in if he

 3  incorporates by reference, to shorthand.  Rather than having

 4  him recite all 20 pages or whatever it is, this is like a

 5  summary document.

 6          MR. APTON:  Yes, Your Honor.

 7          THE COURT:  So without that, it's hearsay.  But if he

 8  adopts it and incorporates it by reference, then I'm going to

 9  allow it.

10          MR. APTON:  No, Your Honor, my intent is to give a

11  general overview of his background qualifications, and then

12  move to admit the resume.

13          THE COURT:  Okay.

14          MR. APTON:  Let's see.  8, 12, and 13 are already in

15  evidence.  Those are -- I'm referring to exhibits.  And I think

16  that's the long and the short of it.  But Your Honor, with that

17  said, I don't know that we need the expert jury instruction,

18  because we are not giving a factual summary.  And the point of

19  this jury instruction is to take the wind out of the sails of

20  Professor Subramanian right before he testifies.

21          THE COURT:  Whatever I give is going to be given with

22  respect to all, I'm going to give equal treatment.  So he's

23  going to opine about certain things that -- that is within his

24  purview.  This is what experts can rely on, so under 703, he

25  can do that.

1    But I want to make clear to the jury that that doesn't

2    make it evidence, admitted evidence.  It is admitted for the

3    basis of their understanding the base of his testimony and

4    evaluating his testimony.

5         **MR. APTON:**  Sure.  Your Honor, defendant's proposed

6    jury instruction, though, does suggest that what he's saying

7    are not the facts --

8         **THE COURT:**  I'm not going to read it -- I'm going to

9    give my version of that.

10        **MR. APTON:**  Thank you.

11        **THE COURT:**  It'll have something like that.

12        **MR. PRICE:**  Your Honor, one other thing on the new

13   slides that we got, on -- I don't know the number; I don't

14   think you have this one.  But one of his opinions is going to

15   be:  Mr. Musk's tweets suggest that he wanted to make a first

16   and final offer, skip over the special committee approval

17   process, and proceed directly to a shareholder vote, all in 30

18   days.

19        He's making findings of fact as to the intent of those

20   tweets.  For example, the tweet that the only obstacle -- I'm

21   paraphrasing, you know -- of this happening is a shareholder

22   vote.  So he's making the conclusion for the intent.

23        **THE COURT:**  Mr. Musk's intent with respect to the

24   process is permissible.  Because we're going to talk about the

25   process.  Why he did it, because he did it because he wanted

1   to, you know, X, or gain, whatever advantage or -- that's the

2   stuff that's not pertinent.  So I'm going to allow, you know,

3   testimony about what the intent was, with respect to the

4   process.  The actual steps.  Not the whys.

5           **MR. PRICE:**  And I understand.  I think it's beyond his

6   expertise to testify as to Mr. Musk's intent.  He can say what

7   the documents say.  But after that, he's just trying to --

8           **THE COURT:**  Well, but it's an inference based on the

9   sequence of things.  You can object during the testimony, and

10  I'll hear it at that point.

11          **MR. PRICE:**  Sure.

12          **THE COURT:**  I need to hear it.  But my inclination at

13  this point is not to do so.

14          **MR. PRICE:**  Okay, very well.

15          **THE COURT:**  Okay?

16          **MR. APTON:**  Thank you, Your Honor.

17          **MR. SPIRO:**  And finally, Your Honor, just to confirm,

18  you're giving a burden of proof --

19          **THE COURT:**  Okay.  So what I'm going to do on the

20  burden of proof, I'm going to add the words after I say:  You

21  will hear testimony regarding circumstances and communications

22  relating to the two tweets on August -- blah, blah, blah, blah,

23  blah, and then I will say, "The plaintiff -- as I have stated,

24  the plaintiff has the burden of proving the elements of a 10b-5

25  claim.  However, you are to assume that the statements "Funding

1   secured," blah, blah, blah, blah, blah, were untrue.

2       So I'm going to slip it in there before I give the --

3   remind them of the untrue thing, because that's the context of

4   it.  Because they have the burden, but that is one area where

5   they don't have the burden, because they don't have to -- the

6   jury need not concern itself with that issue.

7       And then I'm going to continue to read:  Therefore this

8   evidence is not used to determine whether the statements are

9   untrue.  Rather it's relevant -- it may be relevant to such

10  issues as...

11      And I will use the word "untrue statements" instead of

12  "misrepresentation."

13          **MR. SPIRO:**  Yeah.  It hit my ear wrong because the

14  "burden of proof" is in the same sentence as "the statements

15  that you're assuming" so it kind of seems to have internal

16  tension.

17      Our preference would be just a standalone, that:  The

18  plaintiff has the burden to prove the elements of a 10b-5

19  claim.

20          **THE COURT:**  I only added "as I have stated" because I

21  already stated the burden that I think the plaintiff has the

22  burden of proving.  I mean, I can make it a separate sentence,

23  but there is a relationship.  I think the word is "however."

24          **MR. SPIRO:**  Yeah, to us, because again, it almost

25  contradicts what you're saying, with the "assuming these things

1  are untrue." It fits better where you are talking about what

2  they still need to prove.

3       So at the end, that differed in a material way, which the

4  plaintiff has the burden to prove. Right? Or where it says

5  "would be relevant to other issues and elements which the

6  plaintiff has the burden to prove." But not have it exactly

7  where you say this is something that is to be assumed, because

8  there's internal tension there.

9       And we have nothing further. Thank you, Your Honor.

10          **MR. PORRITT:** Your Honor, we haven't even seen this

11  instruction, so -- it's never been shared with us at this

12  point.

13          **THE COURT:** This is the instruction I gave you this

14  morning.

15          **MR. PORRITT:** Okay. Sorry.

16          **THE COURT:** And he want to add words reminding the

17  jury that the plaintiff has the burden of proving the elements.

18          **MR. PORRITT:** Understood. And I was trying to follow

19  what Mr. Spiro was saying, and I couldn't really --

20          **THE COURT:** Well, I think what he wants to say is

21  towards the end: Rather, such elements may be relevant to

22  other issues on which the plaintiff has the burden of proof,

23  such as knowing, materiality...

24          **MR. PORRITT:** Okay. I mean --

25          **THE COURT:** So those are simple words. I'll add

PROCEEDINGS

1   the...

2        All right.  So the jury is waiting, right, Vicky?

3             **THE COURTROOM DEPUTY:**  Yes.

4        **THE COURT:**  Let's bring them in.  We're already now

5   ten minutes late.  Make a note of that.  I'll let you know who

6   gets assessed.

7        (Recess taken from 8:41 a.m. to 8:45 a.m.)

8        **THE COURT:**  All right.  Have a seat everyone.

9        Good morning, ladies and gentlemen, members of the jury.

10  Thank you for your patience.  We're getting better.  Instead of

11  40 minutes late, we're about 13 minutes late today.  So

12  we're -- we're getting there.

13       So I want to get started.  Before I do, I do want to give

14  you a supplemental instruction to help you as we proceed and

15  hear additional evidence.

16       You will hear testimony regarding the circumstances and

17  communications relating to the two tweets by Elon Musk on

18  August 7th, 2018 and Mr. Musk's state of mind as to those

19  tweets.

20       As I've stated, you are to assume that the statements,

21  quote, "funding secured," close end, and quote, "Investor

22  support is confirmed.  Only reason why this is not certain is

23  that it's contingent on a shareholder vote," close quote, were

24  untrue.  Therefore, the evidence is not to be used to determine

25  whether the statements were untrue.

PROCEEDINGS

```
 1        Rather, such evidence may be relevant to other issues on

 2   which the plaintiff has the burden of proof, such as whether

 3   Mr. Musk knew the statements were untrue when he made them

 4   and/or whether the untrue statements gave a reasonable investor

 5   the impression of a state of affairs that differed in a

 6   material way from the one that actually existed.

 7        So, hopefully, that will give you a framework when you

 8   listen to the testimony.

 9        With that, I believe the plaintiff is prepared to call the

10   next witness.

11             MS. TRIPODI:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MS. TRIPODI:  Plaintiff is calling Timothy Fries to

14   the stand.

15             THE COURT:  All right.

16             MS. TRIPODI:  Your Honor, I have a witness binder for

17   the Court.

18             THE COURT:  Thank you.

19        (Whereupon exhibit binder tendered to the Court.)

20             THE CLERK:  Can you remain standing, please.  Please

21   raise your right hand.

22                         TIMOTHY FRIES,

23   called as a witness for the Plaintiff, having been duly sworn,

24   testified as follows:

25             THE WITNESS:  I do.
```

**FRIES - DIRECT / TRIPODI**

1    **THE CLERK:**  Thank you.  Please be seated.  You can

2    take off your mask to speak.

3        Please speak clearly into the microphone.  State your

4    first and last name for the record and, also, spell it.

5        **THE WITNESS:**  My name is Timothy Fries.

6    T-I-M-O-T-H-Y, F-R-I-E-S.

7        **THE COURT:**  All right.  Thank you, Mr. Fries.

8        You may start your examination.

9                      **DIRECT EXAMINATION**

10   BY MS. TRIPODI

11   **Q.**   Good morning, Mr. Fries.  And good morning, jurors.

12       My name is Elizabeth Tripodi, and I'm one of the attorneys

13   representing plaintiff Glen Littleton and in class.

14       Mr. Fries, can you please tell the jurors where you live

15   currently?

16   **A.**   I live in Flemington, New Jersey, or I have since 1995.

17   **Q.**   And are you married?

18   **A.**   Yes.  I have been married since 1996.

19   **Q.**   Do you and your wife have children?

20   **A.**   Yes.  We have three children.

21   **Q.**   How old are your children?

22   **A.**   I have a daughter who is 22, and I have twin boys who are

23   20.

24   **Q.**   Are your children in school at present?

25   **A.**   Yes, they are in school.  I have -- my daughter goes to

**FRIES - DIRECT / TRIPODI**

1   Ramapo State College in New Jersey.  I have a son at Fordham

2   University in New York, and my other son goes to George

3   Washington University in Washington D.C.

4   **Q.**   Will you tell the jurors about your educational

5   background, please?

6   **A.**   Yes.  After high school, I went on to Glassboro State

7   College, now called Rowan University.  There I obtained a

8   four-year degree in computer science.  That was in 1992.

9   **Q.**   Are you currently employed, Mr. Fries?

10   **A.**   Yes, I am, with Alight Solutions.

11   **Q.**   And what does Alight Solutions do?

12   **A.**   Alight Solutions does information services, specializing

13   in HR, benefits administration and professional consulting.

14   **Q.**   What is your position with Alight Solutions?

15   **A.**   My position is a senior delivery manager.

16   **Q.**   And so what do you do as a senior delivery manager?

17   **A.**   In that role I manage a team of software developers and

18   software testers.

19   **Q.**   How long have you held your position with Alight

20   Solutions?

21   **A.**   I started with Alight Solutions in 1995.  Back then it was

22   called Hewitt Associates.  I started in an internal systems

23   support role.  I did that for a couple years and then moved on

24   to various positions developing solutions for our clients.  So

25   I had roles in project management, software development and

1    consulting.  And then for the past eight to nine years I have

2    been managing a team of developers.

3    **Q.**   Approximately how many developers do you manage?

4    **A.**   I manage a team of ten.

5    **Q.**   Does your wife work?

6    **A.**   Yes.  My wife works as a nurse at an assisted living

7    facility.

8    **Q.**   Mr. Fries, what is your role in this lawsuit?

9    **A.**   My role in this lawsuit is a witness.  I'm also a member

10   of the class.  I'm here on behalf of other shareholders that

11   lost money as a result of the tweet.

12   **Q.**   Did you invest in Tesla stock?

13   **A.**   I did.

14   **Q.**   When was your first investment in Tesla stock?

15   **A.**   It was August 8th of 2018.

16   **Q.**   And what was the size of that investment in August of

17   2018?

18   **A.**   I purchased 50 shares of stock.  It was $18,000.

19          **MS. TRIPODI:**  Your Honor, I would like to show the

20   witness Exhibit 525.

21          **MR. SPIRO:**  No objection.

22          **THE COURT:**  All right.  You may.

23      (Document displayed.)

24   BY MS. TRIPODI

25   **Q.**  Mr. Fries, on the screen in front of you do you see what's

**FRIES - DIRECT / TRIPODI**

 1   been marked as Exhibit 525?

 2   **A.**   I do, yes.

 3   **Q.**   Do you recognize that exhibit?

 4   **A.**   Yes.   That's my Fidelity statement from August of 2018.

 5          **MS. TRIPODI:**   Your Honor, I would like to move to

 6   admit Exhibit 525 into evidence please.

 7          **THE COURT:**   No objection?

 8          **MR. SPIRO:**   Yes.   No objection.

 9          **THE COURT:**   All right admit.

10      (Trial Exhibit 525 received in evidence)

11   **BY MS. TRIPODI**

12   **Q.**   Mr. Fries, if we can look at Page 5 of your account

13   statement.

14      (Document displayed.)

15   **A.**   I see it.

16   **Q.**   Does that accurately reflect your investment in Tesla

17   stock in August of 2018?

18   **A.**   Yes.   I see 50 shares with a cost basis of around $18,000.

19   **Q.**   And does the statement indicate that the per share price

20   you paid for Tesla stock was $370?

21   **A.**   Yes.   I see that.

22   **Q.**   Now, Exhibit 525 provides a settlement date of

23   August 10th.   Do you see that?

24   **A.**   I see that.

25   **Q.**   Do you have an understanding of what the settlement date

1    is?

2    **A.**    Yes.   The settlement date is when the shares actually

3    change hands.

4    **Q.**    So would the settlement date be after you actually

5    purchased the shares?

6    **A.**    Yes.   The settlement date follows the purchase date.

7    **Q.**    And do you recall when you purchased these shares of Tesla

8    stock?

9    **A.**    Yes.   I purchased those shares on August 8th of 2018.

10   **Q.**    Aside from this investment in Tesla, in 2018 did you have

11   other investments?

12   **A.**    I may have had one or two other individual stocks at the

13   time.   The majority of my investments were, though, in my

14   401(k), where I held some mutual funds.

15   **Q.**    Can you describe for the jury what a 401(k) account is?

16   **A.**    Yes.   A 401(k) account is an employer-sponsored retirement

17   plan where a percentage of my paycheck goes in there so it

18   grows for my retirement years.

19   **Q.**    Did you actively manage your 401(k) plan in August of

20   2018?

21   **A.**    Yes, I did.

22   **Q.**    And how did you actively manage that?

23   **A.**    I would log in and choose those funds within that plan.

24   So it was maybe 10 to 12 funds I could choose among.

25   **Q.**    How would you choose the funds in your 401(k) plan?

**FRIES - DIRECT / TRIPODI**

1  **A.**   It was sort of a balanced portfolio, so with some mutual

2  funds in stocks and others in bonds.

3  **Q.**   How would you characterize the risk profile of your 401(k)

4  in August of 2018?

5  **A.**   I would say not risky.  The idea of my 401(k) is to grow

6  wealth over time.

7  **Q.**   And aside from your investment in Tesla stock, do you

8  recall whether you held any other stock investments in August

9  of 2018?

10  **A.**   I don't recall exactly.  There may have been one or two

11  other investments.

12  **Q.**   With respect to stocks you invest in, generally what are

13  your investment goals?

14  **A.**   Just purchasing individual stocks.  You know, make some

15  money, right, not lose money.

16  **Q.**   How do you prevent yourself from losing money with stocks

17  you invest?

18  **A.**   I chose companies I felt were promising based on

19  information I had at the time.

20  **Q.**   What led you to invest in Tesla in 2018?

21  **A.**   What led me to invest in it?  Well, I was looking at them

22  for some time, looking for a good entry point to get in on the

23  stock.

24       In 2018 I recall a news story on CNBC about Elon's tweet

25  about "taking Tesla private."  The tweet was specific with a

**FRIES - DIRECT / TRIPODI**

 1  share price of 420, $420 a share.  And it also mentioned that

 2  funding was secure.

 3  **Q.**   If we could back up for a minute.  You said you had been

 4  looking at Tesla stock and a good entry point for Tesla stock;

 5  is that correct?

 6  **A.**   That's correct.

 7  **Q.**   And what do you mean by "a good entry point"?

 8  **A.**   By "a good entry point," I mean relatively low stock

 9  price.

10  **Q.**   And prior to August of 2018, had you been looking for a

11  good entry point into Tesla?

12  **A.**   Yes.  I had been looking for a good entry point in Tesla

13  for some time.

14  **Q.**   And as you just testified, was it the tweet that you saw

15  that led you to invest in Tesla in August of 2018?

16          **MR. SPIRO:**  Objection.  Leading.

17          **THE COURT:**  Sustained.  Rephrase, please.

18  **BY MS. TRIPODI**

19  **Q.**   What led you to buy stock in Tesla on August 8th of 2018?

20  **A.**   It was the tweet.

21  **Q.**   Did you see Mr. Musk's tweet?

22  **A.**   Yes.  The tweet was displayed and quoted on the CNBC

23  program.

24  **Q.**   And what was your reaction to the news of this tweet?

25  **A.**   My reaction to the tweet was, you know, wow.  You know,

**FRIES - DIRECT / TRIPODI**

1   here we have Elon Musk telling the world that he plans to take

2   Tesla private at $420 a share with funding secured.  So

3   considering the stock price at the time, that felt like a good

4   entry point.

5   **Q.**   What did "funding secured" mean to you at that time?

6   **A.**   "Funding secured" to me meant that there had been some --

7   some vetting, some critical review of those funding sources.

8   **Q.**   When you say "vetting," what do you mean?

9   **A.**   I mean, a careful review of those funding sources.

10  **Q.**   Was the representation "funding secured" in that tweet

11  important to you at that time?

12  **A.**   Yes.  The phrase "funding secured" was critical.  Funding

13  secured gave me the confidence that I could get in and -- at

14  that 420 price.

15       So to me, "funding secured" along with "420," I felt that

16  there could be negotiations happening at that 420 price.  So I

17  looked at 420 as the baseline for further negotiations,

18  thinking that it could perhaps go higher than that.

19  **Q.**   And do you recall how soon after hearing the news of the

20  tweet that you purchased your shares?

21  **A.**   I purchased my shares that same day.

22  **Q.**   Did there come a time when you learned that "funding

23  secured," that portion of the tweet may have been false or

24  misleading?

25  **A.**   Yes.  In the days and weeks that followed, I learned

1  through additional reporting on CNBC that funding was not

2  secured and that Tesla would remain a public company.

3  **Q.**   Did Tesla ever become a private company, to your

4  knowledge?

5  **A.**   They never did.

6  **Q.**   Mr. Fries, why did you get involved in this lawsuit?

7  **A.**   I got involved in this lawsuit because I felt wronged.  I

8  felt that I lost money due to a misrepresentation.

9  **Q.**   And what do you hope to obtain through this lawsuit?

10  **A.**   I hope to have my -- my funds recovered, my losses

11  recovered.

12  **Q.**   Did you lose money as a result of Mr. Musk's tweet?

13  **A.**   I did.  I lost $5,000.

14  **Q.**   Did you receive any sort of special payment or bonus for

15  participating in this lawsuit?

16  **A.**   No.  There is no special payment or bonus for

17  participating.  I do expect to be reimbursed for my travel

18  expenses.

19  **Q.**   Mr. Fries, it has been said that one wouldn't bet against

20  Elon Musk.  Prior to purchasing your Tesla stock in August of

21  2018, would you have agreed with that statement?

22  **A.**   Yes.

23  **Q.**   Did you believe that Mr. Musk was going to take Tesla

24  private at $420 per share?

25  **A.**   Yes.

FRIES - CROSS / SPIRO

1    **Q.**   And why did you believe that?

2    **A.**   Because the funding was secured.

3    **Q.**   What happened because you believed Mr. Musk when he said

4    that funding was secured?

5    **A.**   I lost money.

6         **MS. TRIPODI:**  Your Honor, I have no further questions

7    for the witness.  I reserve to redirect.

8         **THE COURT:**  All right.  Thank you.

9         Cross?

10                    <u>**CROSS-EXAMINATION**</u>

11   **BY MR. SPIRO**

12   **Q.**   Good morning, Mr. Fries.

13   **A.**   Good morning.

14        **MR. SPIRO:**  Can we put up the "Am considering" tweet?

15   Exhibit 8, please.

16        Okay.  Can we just enlarge the top portion of that?

17        (Document displayed.)

18        **MR. SPIRO:**  I'm going to pass up a binder to you also.

19   I don't know if we need this, but there it is.

20        **THE WITNESS:**  Thank you.

21        (Whereupon exhibit binder was tendered to the witness.)

22   **BY MR. SPIRO**

23   **Q.**   And, Mr. Fries, you can see that on your screen?

24   **A.**   I can, yes.

25   **Q.**   Okay.  And I just want to talk about what was significant

**FRIES - CROSS / SPIRO**

1    about that tweet.

2        The first sentence, the main sentence in that tweet, "Am

3    considering taking Tesla private at $420," that first sentence

4    was important to you; true?

5    **A.**   Yes.

6    **Q.**   And it was significant to you; true?

7    **A.**   Yes.

8    **Q.**   Okay.  And the reason for that, at least in part, is

9    because the transaction that Mr. Musk was considering at the

10   time would be a major milestone for the company.  If the

11   consideration came to pass, it would no longer be a public

12   company.  It would be a private company; right?

13   **A.**   Correct.

14   **Q.**   And you had been watching the company for some time;

15   right?

16   **A.**   Yes, I did.

17   **Q.**   Since 2017, the year before; right?

18   **A.**   Yes.  At least that long.

19   **Q.**   And, in fact, in 2017 when you saw the stock price, which

20   was actually lower than it was in 2018, you thought that

21   Tesla's stock price was insane, the valuation was insane; true?

22   **A.**   Early on, when I was following them in 2017, they were

23   more of a fledgling startup, and the valuation at that time I

24   thought was getting a bit over -- over its skis.

25   **Q.**   Yes, over its skis.  And you used the word "insane;"

FRIES - CROSS / SPIRO

1  right?

2  **A.**   I did, in an email.

3  **Q.**   And you said there was a "bubble going on," right?

4  **A.**   At the time in 2017.

5  **Q.**   Right, right.  The stock price at the time wasn't an

6  accurate reflection of the company's market value to you;

7  right?

8  **A.**   That's correct.

9  **Q.**   And, you know, you're following Tesla.  You're looking at

10 the stock price; right?

11 **A.**   Yes.

12 **Q.**   And you're doing some research as you're following Tesla

13 from 2017 into 2018; right?

14 **A.**   Yes.

15 **Q.**   And you're reading articles about it from 2017 into 2018;

16 right?

17 **A.**   That's correct.

18 **Q.**   And before Mr. Musk's "Am considering" tweet, you thought

19 Tesla was a worthy investment?

20 **A.**   Could -- can you ask that again?

21 **Q.**   Sure.  Before Mr. Musk's "Am considering" tweet, you, sir,

22 thought that the Tesla was a worthy investment.  That's why you

23 were following it.

24 **A.**   Was it worthy?  Well, I wasn't ready to purchase shares

25 until I saw the tweet.

1  Q.   Well, we're going to talk about that, but -- but, I mean,

2  you've testified previously in this case; right?

3  A.   In a deposition.

4  Q.   Okay.  And so I'm just going to ask again:  Did you --

5  before Mr. Musk's tweet, before August 7th, did you believe

6  Tesla to be a worthy investment and one worth following and

7  considering purchasing?

8  A.   Yes.  I was considering purchasing; correct.

9  Q.   Okay.  And there were lots of reasons that you were

10  considering investing in Tesla; right?

11  A.   Yes.

12  Q.   You found the company interesting; right?

13  A.   Yes.  I thought they made innovative technology.

14  Q.   That's another reason.  You thought the company was

15  innovative?

16  A.   That's correct.

17  Q.   You thought they made innovative products?

18  A.   That's correct.

19        MR. SPIRO:  I don't know.  Does this easel easily work

20  in this courtroom or should I use the Elmo more easily?

21        THE COURT:  Well, are you going to draw something?

22        MR. SPIRO:  I'm going to write something in not very

23  good penmanship, if that's okay with the Court.

24     Let me use the easel.  That looks like it would be

25  difficult to --

1           **THE COURT:**  Yeah.  You can use it.  Just tilt it in a

2    way so that the jurors can see it, and you'll have to write big

3    enough so all the jurors at the end can see it.

4           **MS. TRIPODI:**  Your Honor, I'm going to object.

5    Mr. Spiro is going to create an exhibit, it appears.

6           **THE COURT:**  I'm going to overrule that until I see

7    what it is.  If you have an objection during the process.

8        So you'll have to move it so I can see it, too.

9           **MR. SPIRO:**  Jesse is going to come help me.

10       (Brief pause.)

11   **BY MR. SPIRO**

12   Q.  We talked about interesting.  We talked about worthy.  We

13   talked innovative, innovative products.

14       If your handwriting is better than mine, we can switch

15   roles.

16   **A.**  You don't want to see my handwriting.

17   **Q.**  And you had actually read reviews of the products; right?

18   **A.**  I had.

19   **Q.**  You were looking at reviews?

20   **A.**  Uh-huh.

21   **Q.**  You looked at -- you zeroed in on the specifications and

22   the progress of Model 3; true?

23   **A.**  I did, yeah.

24   **Q.**  And, in fact, you went out in July of 2018 and made a

25   purchase for a Model 3; right?

**FRIES - CROSS / SPIRO**

1    **A.**   I did.

2    **Q.**   In the weeks leading up to the tweet?

3    **A.**   I did.

4    **Q.**   Okay.  And that's a -- it was a good car?

5    **A.**   I liked the car.

6    **Q.**   Okay.  You didn't -- I mean, you haven't had, like, a

7    fight with customer service at Tesla that led you to join this

8    lawsuit, anything like that?

9    **A.**   I have not.

10   **Q.**   Okay.  Okay, good.  So Model 3 purchase.

11        And obviously, you know, liking the product in a company

12   that makes good products is likely to have good sales; right?

13   **A.**   That's correct.

14   **Q.**   You thought that Tesla had good growth potential?

15   **A.**   Yes.

16   **Q.**   Growth potential.

17   **A.**   Need help with that?

18   **Q.**   No.  Jesse is going to come help me.  This is like

19   floating in the air.

20        **THE COURT:**  It's a federal product.

21   (Laughter.)

22        **MS. TRIPODI:**  Your Honor, may I please renew my

23   objection to relevance.

24        **THE COURT:**  All right.  Well, at this point are we

25   going to just continue just making notes of all his testimony?

1           **MR. SPIRO:**  I'm almost done.

2           **THE COURT:**  All right.  I'll allow a little bit more,

3    but...

4           **MR. SPIRO:**  Okay.  Jesse is going to hold it.

5           **THE COURT:**  All right.  That's a good idea.

6           **MR. SPIRO:**  Quite an effort.

7    **BY MR. SPIRO**

8    **Q.**   And you had experience in investing in technology-focused

9    companies; right?

10   **A.**   I had invested in other technology-focused companies;

11   correct.

12   **Q.**   And you, yourself, viewed yourself as somebody that had

13   better than average sense of technology trends; right?

14   **A.**   Maybe slightly better.

15   **Q.**   So tech experience.  Expertise.

16        And those are just -- I'm just doing ten, just to keep

17   track of them for myself and for the jury.

18        You mentioned on -- stay there, Jesse, please -- the

19   direct examination that you were looking for a good entry

20   point?  Is that --

21   **A.**   That's correct, a good entry point.

22   **Q.**   And you didn't have, like, a precise process to determine

23   a good entry point; true?

24   **A.**   I'd say that's true.

25   **Q.**   And, in fact, as we talked about before, the price of

1    Tesla was less in 2017, when you decided to not purchase it,

2    than it was in 2018 before the tweets; true?

3    **A.**    Yes.  Circumstances had changed.

4    **Q.**    Okay.  And these things, obviously, that we're talking

5    about that predated the tweet, when you saw the tweet "Am

6    considering taking Tesla private," you saw it, you said, on TV?

7    **A.**    Yes, on CNBC.

8    **Q.**    And you purchased the next day; right?

9    **A.**    The same day, I believe.  Same day.

10   **Q.**    Well, I mean, do you remember at first when you were asked

11   on direct, you said August 8th?  I think you purchased on

12   August --

13   **A.**    Okay.  If the tweet was August 7th, then it must have been

14   the next day.

15   **Q.**    All right.  I just wanted to make sure we got that right.

16         And also, by the way, you saw that there was a -- the news

17   about Saudi Arabia being an investor; right?

18   **A.**    Ask that again.

19   **Q.**    Yeah.  You saw the news about a group from --

20   quote/unquote, a group from Saudi Arabia being an investor?

21   **A.**    I had heard that there was a possible group.  That was

22   something I had heard.  I didn't know how much faith I put into

23   that, that reporting.

24   **Q.**    You learned to discount things you read in the news?

25   **A.**    What's that?

FRIES - CROSS / SPIRO

1   **Q.**   Have you learned to discount things you read in the news?

2   **A.**   I just don't know how much credit I gave that, that Saudi

3   Arabia group was purchasing.   This tweet didn't mention Saudi

4   Arabia.

5   **Q.**   It didn't mention Saudi Arabia, that's true, but you knew

6   about it.   I mean, you gave it some weight; right?

7           **MS. TRIPODI:**   Objection, Your Honor.

8           **THE COURT:**   Sustained.   He didn't say that.

9           **MR. SPIRO:**   I'm asking a question.

10  **BY MR. SPIRO**

11  **Q.**   You gave it some weight; right?   You didn't believe it was

12  a total lie; did you?

13  **A.**   It's hard to get back into my mindset back then as to how

14  much weight I gave that.   Looking back, it's hard to say.

15          **THE COURT:**   It may be useful to clarify a time frame

16  here.   I'm not sure.   As of what date?

17  **BY MR. SPIRO**

18  **Q.**   Let's jump right to "funding secured," the end of the

19  tweet.   So you can see that -- the two words at the end of the

20  tweet on your screen?

21  **A.**   I do.

22  **Q.**   Okay.   And that statement to you meant that there was an

23  organization with funding and funding had been vetted; correct?

24  **A.**   Correct.

25  **Q.**   And funding vetted to you meant that the funds were

1   available; right?

2   **A.**   No.   More than just available.   To me, it meant that Elon

3   and Tesla had vetted those funding sources.

4   **Q.**   Okay.   Would you agree with this statement, that the

5   meaning to you is that it had been reviewed and that those

6   funds were available?   Is that an accurate statement?

7   **A.**   Beyond just available.   My feeling was that there had been

8   some critical review of those funding sources.

9   **Q.**   You didn't even really consider what it meant, though, to

10  check that the group had funds in terms of process; right?

11  **A.**   I saw the "funding secured" as part of the tweet.

12  **Q.**   Sure, sure.   But we're now talking about, right, "funding

13  secured" to you meant there was an organization that had

14  funding and the funding had been vetted by Tesla; right?

15  **A.**   Correct.

16  **Q.**   So what I'm asking you is, focusing on the vetting part,

17  you didn't even consider what it meant that -- what "vetted"

18  meant?   What they would do to vet it?

19          **MS. TRIPODI:**   Objection, Your Honor.

20          **THE COURT:**   Overruled.

21  **A.**   I thought that there was a critical examination of those

22  funding sources and they had been reviewed by Tesla and the

23  board.

24  **BY MR. SPIRO**

25  **Q.**   Well, did you have an understanding as to how they would

FRIES - CROSS / SPIRO

1  vet whether or not funding was secured?

2  **A.**   I didn't have a detailed understanding of how the vetting

3  process takes place.

4  **Q.**   Okay.  And isn't it true that you were just looking at

5  whether Tesla and Elon had ensured that the finances that were

6  stated were available?  Would you agree with that statement?

7  **A.**   Could you --

8  **Q.**   Sure.

9  **A.**   -- maybe rephrase that question?

10  **Q.**   Yeah.  In terms of what "vetted" meant, it meant to you,

11  quote, "Just Tesla and Elon ensuring that the finances that

12  were stated were available;" fair?

13  **A.**   No.  Beyond just available.  I -- I thought that there had

14  been a -- some critical analysis, some critical review of those

15  funding sources and those funding sources were committed.

16  **Q.**   Okay.  Well, let's look at what you said at your

17  deposition.  57, Line 25 to 58, Line 10.

18          **MR. SPIRO:**  If we could play that for the jury?

19          **THE COURT:**  Before you do, let me look at it.

20          **MR. SPIRO:**  Sure.

21          **THE COURT:**  57, Line 25, through what?

22          **MR. SPIRO:**  Through 58, Line 10.

23          **MS. TRIPODI:**  Your Honor, object.  Completeness.

24          **THE COURT:**  Well, what do you suggest to address

25  completeness?

 1          **MS. TRIPODI:**  Your Honor, this question was asked

 2   several times at the deposition in several different ways, and

 3   so counsel is selecting an answer here.

 4          **THE COURT:**  All right.  Is there another pairing that

 5   you would like to run in addition to this?

 6          **MS. TRIPODI:**  Yes, Your Honor.

 7          **THE COURT:**  Okay.  Tell us the page.

 8          **MS. TRIPODI:**  Page 64, Lines 16 through 25.

 9          **MR. SPIRO:**  There's another five times where he says

10   it the first way, so I'd ask to play all seven for the jury.

11   That would be agreed to.

12          **MS. TRIPODI:**  Objection, Your Honor.

13          **THE COURT:**  Okay.  Hold on.

14      Okay.  Play both.  Play both segments.  Okay.  Let's play

15   both segments.

16          **MR. SPIRO:**  Can we play -- can we do it in order?

17   We'll do the first one first, what he first said when he was

18   asked in his deposition.

19      (Videotape played in open court, not reported.)

20          **MR. SPIRO:**  Okay.  And can we just pause for a second,

21   Your Honor?

22      The second clip is actually -- the citations are not

23   correct for the full questions and answers.  You have to go

24   63/25 to 64/25.  So it's the same end point.  You just have to

25   start at 63/25.

1    I will give the Court a moment to look at that passage.

2    (Brief pause.)

3         THE COURT:  To page?  What's the end point?

4         MR. SPIRO:  64/25.

5         THE COURT:  So basically the entirety of Page 64 with

6    some beginning at Page 63.

7         MR. SPIRO:  Yes.

8         THE COURT:  All right.  Go ahead and play it.

9    (Videotape played in open court, not reported.)

10        MR. SPIRO:  We're frozen.

11        MR. KOTARSKI:  That's the end of it.

12        THE COURT:  That's the end of it.

13   BY MR. SPIRO

14   Q.   There were lots of things that you did not take the phrase

15   "funding secured" to mean.  You didn't consider whether or not

16   there was a written agreement?

17   A.   Yeah.  I think -- I had assumed at the time that there was

18   negotiations still taking place.

19   Q.   Okay.  You didn't consider what steps were completed?

20   A.   Well, I considered that the funding had been secured.

21   That was part of the tweet.

22   Q.   Sure.  Which means to you that the funding had been

23   vetted; right?  We talked about that.

24   A.   Yes.

25   Q.   But other than that the funding had been vetted, you

1    didn't have any view or consideration as to what other steps

2    had been taken?

3    A.    Yeah.  I had no knowledge of what steps were being taken.

4    Q.    And you didn't even consider in your mind at the time what

5    next steps had to be taken?

6    A.    It's hard to get in my mind back then exactly.

7    Q.    And what you really took away, other than that the funding

8    had been vetted, was that there -- that this company had an

9    interest in purchasing Tesla to take them private and that they

10   had the financial means to do that; right?

11   A.    Well, beyond just the means.  I believe that there was

12   some vetting just to -- you know, to reach that statement that

13   funding was secured.

14   Q.    And in terms of the board and their role in this, they are

15   not mentioned in the tweets; right?

16   A.    They are not mentioned in the tweet.

17   Q.    And from your perspective, you understood that the board

18   would be sellers in this deal; right?

19   A.    I had assumed in this case that Tesla spoke for the board.

20   I mean, Elon had spoke for the board.

21   Q.    I'm not sure I understood that.  You understood that Tesla

22   was the seller.  The Board of Directors and Tesla were the

23   seller of the company?

24   A.    That's correct, yes.

25   Q.    Okay.  And you did not believe that the board, the seller,

**FRIES - CROSS / SPIRO**

 1   had completed its steps for evaluating the transaction because

 2   the transaction hadn't closed yet and it was still being

 3   negotiated; right?

 4   **A.**   Could you ask that question again?

 5   **Q.**   Sure.  You believed that the board, as the seller, still

 6   had steps to go in evaluating the transaction and it had not

 7   closed yet?

 8        **MS. TRIPODI:**  Objection, Your Honor.  Misstates the

 9   testimony.

10        **THE COURT:**  Well, he's asking a question.  He's not

11   testifying.  So he's asking a question.  He can say "yes" or

12   "no."

13   **A.**   I knew the deal hadn't been finalized.

14   **BY MR. SPIRO**

15   **Q.**   And you believed it was still being evaluated; correct?

16   **A.**   I believed it was still being negotiated.

17        **MR. SPIRO:**  Well, let's play 69, Line 8 to 69, Line

18   16.

19        **THE COURT:**  Okay.  Hold on.

20        (Brief pause.)

21        **THE COURT:**  All right.

22        (Videotape played in open court, not reported.)

23        **THE COURT:**  I think you need to -- you need to -- we

24   need to replay it.  The sound went out.  You skipped something.

25        (Videotape replayed in open court, not reported.)

FRIES - CROSS / SPIRO

1          **THE COURT:**  I think that's as much as you wanted;

2   right?

3   **BY MR. SPIRO**

4   **Q.**   So, again, the board continuing to evaluate the potential

5   transaction would have been consistent with your understanding

6   of Mr. Musk's tweet; correct?

7   **A.**   Yeah.  I think -- you know, continued evaluation,

8   continued vetting.

9   **Q.**   Sure.  Because you assumed that an agreement had not been

10  reached; right?

11  **A.**   Yes.  I knew the deal hadn't been finalized.

12  **Q.**   They were just taking steps to evaluate the potential

13  transaction; right?

14  **A.**   It felt that the funding had already been vetted,

15  because -- because the tweet said "funding secured."

16  **Q.**   But other than that one thing which you've testified a few

17  times, that you thought the funding had been vetted, you

18  believed -- your assumption was the board was merely taking

19  steps to evaluate the potential transaction; true?

20  **A.**   Maybe the better word is "negotiating."

21  **Q.**   Okay.  Well, whether it's the better word today at your

22  testimony, when you were deposed in this case, you used the

23  worth "evaluating;" is that fair?

24  **A.**   Yeah.  My deposition is my deposition.

25  **Q.**   Okay.  And just again, to remind the jury, you did not buy

**FRIES - CROSS / SPIRO**

1   on August 7th.  You bought on August 8th; right?

2   **A.**   Yes, August 8th.

3   **Q.**   At the time of the tweet and your decision to make the

4   purchase, it is true that, quote, your thinking is for the

5   funding to be secured, that they would have expressed a strong

6   interest and they would have been vetted by Tesla and Tesla

7   would have come to the understanding that those funds were

8   available.

9        That was your conclusion; true?

10  **A.**   Can you rephrase the question?

11  **Q.**   Sure.  At the time of the purchase your thinking was for

12  the funding to be secured, that they would have expressed a

13  strong interest, and they would have been vetted by Tesla, and

14  Tesla would have come to the understanding that those funds

15  were available.  That was your conclusion; right?

16  **A.**   More than a strong interest.  My thinking at the time was

17  that there was an offer on the table.

18  **Q.**   Okay.  Well, let's look at your testimony.  65, Line 9 to

19  65/25.

20          **MR. SPIRO:**  And play it for the jury, please.

21       I will give the Court a moment, but that was a quote I

22  read from the deposition.

23  **BY MR. SPIRO**

24  **Q.**   And the quote -- while the Court is looking, the

25  deposition clip that I'm asking you about was at the end of all

**FRIES - CROSS / SPIRO**

 1    your other statements when you were asked to summarize.

 2         And so I'm going to see -- I'm going to wait for the

 3    Court's okay and then play that for you and see if that

 4    refreshes your memory.

 5              THE COURT:  Down to line what?  To Line 18 or 25?

 6              MR. SPIRO:  65, Line 9 to 65, Line 25.

 7              THE COURT:  All right.  You can play it.

 8         (Videotape played in open court, not reported.)

 9    BY MR. SPIRO

10    Q.   Is that the testimony you gave at your deposition?

11    A.   Yes, that is me.

12    Q.   You stand by that sworn testimony?

13    A.   I do.

14    Q.   Now, the following day when you purchased the Tesla

15    shares, at that time you believed Mr. Musk's tweets were

16    100 percent technically accurate; true?

17    A.   Correct.

18    Q.   Okay.  And as you testified, the funding being subject to

19    financial due diligence, that would have made that shorthand

20    statement in the tweet "funding secured" technically inaccurate

21    in your mind; right?

22    A.   Right.

23    Q.   And if, as you testified, the funding being subject to

24    other due diligence, that would have made Mr. Musk's shorthand

25    statement "funding secured" technically inaccurate in your

**FRIES - CROSS / SPIRO**

 1   mind; right?

 2   **A.**   Can you rephrase that question?

 3   **Q.**   Sure.  As you testified, the funding being subject to

 4   other due diligence, that would make Mr. Musk's shorthand

 5   statement "funding secured" technically inaccurate in your

 6   mind?

 7   **A.**   Yes.

 8   **Q.**   And --

 9       **MS. TRIPODI:**  Excuse me, Your Honor.  I think

10   Mr. Bernstein might be getting tired.  Do you think we can take

11   the board down?

12       **THE COURT:**  Yeah.  I don't think we need that any

13   more.

14       **MR. SPIRO:**  Well, I need it for one more minute and

15   then I will be done with it.  But I appreciate the concern.

16       He gave me the thumbs up.  I think he's okay for one more

17   minute.

18   **BY MR. SPIRO**

19   **Q.**   And as you testified, funding being subject to its own

20   review process of obtaining approvals, that would have made the

21   shorthand "funding secured" technically inaccurate in your

22   mind; right?

23   **A.**   Yeah.

24   **Q.**   Okay.

25       **MR. SPIRO:**  Can we put up Exhibit 53?

1          (Document displayed)

2   **BY MR. SPIRO**

3   **Q.**   So this is the blog post that's in evidence, "Update on

4   Taking Tesla Private" of August 13th where Mr. Musk explains

5   what the phrase "funding secured" means to him.  And it's

6   entitled "Why did I say 'funding secured'?"

7          And if we look down at the paragraph sort of following the

8   August 7th announcement, it says:

9               "I have continued to communicate with the

10              managing director of the Saudi fund.  He has

11              expressed support for proceeding subject to

12              financial and other due diligence and their

13              internal review process for obtaining

14              approvals."

15         Do you see that?

16  **A.**   I see that.

17  **Q.**   Okay.  And that's on August 13th.  And on August 13th you

18  were not influenced to sell your stock at that time.

19         So "funding secured" to you -- all these things are still,

20  there, but "funding secured" to you is technically inaccurate,

21  and you were not influenced to sell your --

22              **MS. TRIPODI:**  Objection, Your Honor.

23              **THE COURT:**  Let him finish the question.

24              **MR. SPIRO:**  Thank you, Your Honor.

25              **THE COURT:**  Maybe you should start all over.

1          MR. SPIRO:  Sure.

2  BY MR. SPIRO

3  Q.   And on August 13th, you were not influenced to sell your

4  stock; correct?

5          MS. TRIPODI:  Same objection.

6          THE COURT:  Wait, wait.  Hold on.  I'm not sure what

7  the objection is.

8          MR. SPIRO:  Neither am I.

9          MS. TRIPODI:  Objection, Your Honor.  He

10  mischaracterizes the witness's prior testimony.

11          THE COURT:  I didn't hear any characterization.

12      You can answer the question.  Overruled.

13  BY MR. SPIRO

14  Q.   Can you answer the question, please?

15  A.   I did not see the blog post.

16  Q.   Well, you're saying you didn't see this blog post?

17  A.   I don't recall seeing the blog post, no.

18  Q.   Okay.  So now you don't recall.  You don't recall one way

19  or the other?

20  A.   I don't believe I saw the blog post.

21  Q.   I don't mean to mix your words, but this is, you know, a

22  serious case.  We're in federal court.  I have to ask you

23  follow-up questions.

24      It's -- I take your testimony to mean that now you're

25  saying you don't remember one way or another whether you saw

**FRIES - CROSS / SPIRO**

1    the blog post?

2    **A.**    I have no recollection of seeing the blog post.

3    **Q.**    You didn't sell on August 13th; true?

4    **A.**    True.

5    **Q.**    Okay.  And, I mean, you testified on direct examination

6    about how you had been looking at the stock for some time;

7    right?

8    **A.**    That's correct.

9    **Q.**    Following it in the news; right?

10    (Brief pause.)

11    **Q.**    Correct?

12    **A.**    Correct.

13    **Q.**    You said for the month after Mr. Musk's tweet there was a

14    lot of activity going on related to Tesla; right?

15    **A.**    I believe there was some movement in the stock price, yes.

16    **Q.**    Okay.  And you were monitoring that activity; right?

17    **A.**    Yes.

18    **Q.**    And you were monitoring it because it was moving pretty

19    dramatically based on the news; right?

20    **A.**    Yes.

21    **Q.**    And you told this jury that while all these other things

22    were in your mind, this "funding secured" shorthand tweet was

23    this moment of importance in your decision, and you're telling

24    this jury that the major front page of CNBC announcement, where

25    Mr. Musk explains what "funding secured" means a few days

1   later, you're saying you don't remember seeing it?

2   **A.**   I don't remember seeing it.

3          **MS. TRIPODI:**  Objection.  Asked and answered.

4          **THE COURT:**  Overruled.

5   **BY MR. SPIRO**

6   **Q.**   And because you know, sir, that if you saw that blog post

7   and you didn't sell your stock, that that would greatly damage

8   the plaintiff's case; right?

9          **MS. TRIPODI:**  Objection.  Calls for speculation.

10          **THE COURT:**  Sustained.

11  **BY MR. SPIRO**

12  **Q.**   You don't sell your stock on August 14th either; right?

13  **A.**   Correct.

14  **Q.**   Or August 15th; right?

15  **A.**   Correct.

16  **Q.**   And, you know, you testified in direct about your reasons

17  for being here and doing this.

18          In September you started Googling around looking to see if

19  there was a lawsuit; right?

20  **A.**   After I sold my shares, I did Google to see if there was

21  any litigation as a result of the tweet.

22  **Q.**   So you're saying that the Googling started after you sold

23  your shares?

24  **A.**   Yes.  I believe so.

25  **Q.**   You're not positive that you didn't see the lawsuit before

 1  you sold your shares, are you?

 2  **A.**   No.  I didn't see a lawsuit prior.

 3  **Q.**   Okay.  So you're in September.  You're Googling.  And you

 4  saw a -- a solicitation, an advertisement pop up that you

 5  clicked on; right?

 6  **A.**   I don't think it was an advertisement.  I believe it was

 7  linked to their website, the law firm's website.

 8  **Q.**   Right.  The Levi and Korsinsky announcement about you

 9  having to fill out a form where you were -- where you then

10  signed up to be a potential plaintiff; right?

11  **A.**   Not signed up to be a plaintiff, but signed up to be part

12  of the class.

13  **Q.**   Okay.  And that link indicated that a suit was filed on

14  August 10th -- this is what Levi and Korsinsky is announcing --

15  that has the class period and the fraud revealed on August 8th;

16  right?

17  **A.**   I don't recall the dates.

18  **Q.**   Well, I can hand you up, which is 1030, the announcement

19  and draw your attention to that on September 5th Levi and

20  Korsinsky, same firm as here today --

21       **MS. TRIPODI:**  Objection, Your Honor.  This exhibit has

22  not been disclosed.

23       **MR. SPIRO:**  I'm just refreshing his recollection.

24       **THE COURT:**  If you're going to use it to refresh

25  recollection, you're not going to describe it.  You can't

 1   describe the contents.  You just give it to him.

 2           MR. SPIRO:  Right, right, right.  Correct.

 3           THE COURT:  Okay?  Where you started talking about the

 4   contents, that's not proper.

 5           MR. SPIRO:  In my previous question.

 6           THE COURT:  Yeah.  So just ask him to read it.

 7           MR. SPIRO:  Okay.

 8        (Whereupon document was tendered to the witness.)

 9   BY MR. SPIRO

10   Q.   Can you read what I've put in front of you?  At least the

11   first -- the top of the page, top left, "Levi and Korsinsky

12   Announcement."

13   A.   Yes, yeah.  It starts with "On August 10th" --

14           THE COURT:  You're not supposed to read it.

15           THE WITNESS:  Oh, I'm sorry.

16           THE COURT:  It's been given to you to see if it

17   refreshes your memory about whatever the question is.  You read

18   it and you put it down actually.  Don't look at it again.

19   BY MR. SPIRO

20   Q.   After you read that paragraph -- I won't make you read the

21   whole announcement -- you can put it down and I'll ask you one

22   more follow-up question on this.

23        The paragraph under the -- the September 5 time.

24        (Witness complied.)

25   A.   Okay.  I read the first paragraph.

**FRIES - CROSS / SPIRO**

1   **Q.**   Okay.  And does that refresh your recollection that the

2   suit that you were signing up for was filed on August 10th and

3   had the class period and fraud revealed on August 8th?

4   **A.**   That's what it states.

5   **Q.**   And that advertisement, solicitation, link, whatever you

6   want to call it, that's what was -- what influenced you to sign

7   up for -- sign the form and send in to Levi and Korsinsky your

8   interest in potentially participating in the shareholder

9   action; true?

10  **A.**   Yes.  True.

11  **Q.**   Now, from the time that you signed up for, based on this

12  announcement in September of 2018, to be part of a class where

13  the fraud was revealed on August 8th, you realized, sir, that

14  you bought on August 8th; true?

15  **A.**   True.  I bought on August 8th.

16  **Q.**   Okay.  And what you were signing up to be part of here was

17  a class and a case that had the fraud revealed on August 8th;

18  right?

19  **A.**   Correct.

20  **Q.**   But so interested were you in being part of this that you

21  still did sign up; right?

22  **A.**   Correct.

23  **Q.**   And two days after this September 5th announcement, two

24  days later, you, on September 7th, sold your shares; right?

25  **A.**   Correct.

1  Q.   And after that point in time, you didn't hear from

2  plaintiff's counsel.  Even though it was their announcement,

3  you didn't hear from them in 2018; right?

4  A.   I didn't hear from them in 2018, no.

5  Q.   Or 2019?

6  A.   That's correct.

7  Q.   Or 2020?

8  A.   That's correct.

9  Q.   Late 2021, three-some years later, you heard from

10  plaintiff's counsel?

11  A.   That's correct.

12  Q.   And fair to say that when you were influenced to sell your

13  shares in September of 2018, your memory of events and

14  circumstances and what you saw and didn't see was fresher in

15  your mind than when you first spoke to plaintiff's counsel;

16  fair?

17  A.   Can you rephrase the question?

18  Q.   Sure.

19       At the time in September of 2018 when you, sir, were

20  influenced to sell your shares, your mind of the events and

21  circumstances regarding this was fresher than it was three

22  years later when you first spoke to the plaintiff's lawyers;

23  true?

24  A.   That sounds like a fair statement.

25  Q.   I agree.

1        And since the time -- now four and a half years later

2    about -- after you began speaking with plaintiff's lawyers,

3    you've spent many days and many hours speaking with them in

4    preparation for your testimony here today; fair?

5    A.    That's correct.

6    Q.    And of all of the people that clicked on this form, saw

7    this advertisement, filled that out, of all those people they

8    pick you to testify; true?

9    A.    They picked me, yes.

10           MS. TRIPODI:  Objection, Your Honor.

11           THE COURT:  Overruled.

12           MR. SPIRO:  I have no further questions for this

13   witness.

14           THE COURT:  All right.  Redirect?

15                    REDIRECT EXAMINATION

16   BY MS. TRIPODI:

17   Q.    Mr. Fries, counsel referenced the "funding secured" tweet

18   as shorthand.  Did you consider "funding secured" to be

19   shorthand?

20   A.    No, I did not.

21   Q.    Now, during cross, Mr. Spiro asked you a number of

22   questions regarding how you interpreted "funding secured."  Do

23   you remember that?

24   A.    That's correct.

25   Q.    Was it your understanding from Mr. Musk's tweet that the

1   funding was merely available if Mr. Musk wanted it, or did

2   "funding secured" mean something different to you?

3   **A.**   To me, it meant more than that.

4   **Q.**   What did it mean to you?

5   **A.**   It meant that there was a committed party and that those

6   funds had been vetted.

7   **Q.**   Mr. Spiro also asked you about the Tesla board's

8   involvement with the going-private.  Do you remember that?

9   **A.**   Yes.

10  **Q.**   Did you have any knowledge of the Tesla board's

11  involvement in the going-private?

12  **A.**   No.

13  **Q.**   Did you make any assumptions regarding the Tesla board's

14  involvement in the going-private?

15  **A.**   Yeah.  I made an assumption that they were giving kind of

16  a careful consideration of the funding sources.  They were

17  committed to it and committed to a plan forward.

18  **Q.**   So if the board had taken no steps to evaluate whether

19  funding was secured, in your opinion, would "funding secured"

20  have been false?

21  **A.**   Correct.

22  **Q.**   Mr. Spiro also showed you the August 13th blog post.  Did

23  you see the August 13th blog post?

24  **A.**   I have no recollection of seeing that blog post.

25  **Q.**   And after August 13th, August 14th, August 15th, did you

**PROCEEDINGS**

1  still believe that funding was secured?

2  **A.**   I did.

3        **MS. TRIPODI:**  Your Honor, I have no further questions.

4        **THE COURT:**  Thank you.

5     Anything on recross?

6        **MR. SPIRO:**  No, Your Honor.  Thanks.

7        **THE COURT:**  All right.  Thank you, Mr. Fries.  You may

8  step down.

9     This witness is excused; correct?  There is no plan to

10  recall this witness?

11        **MS. TRIPODI:**  No, Your Honor.  No plan to recall the

12  witness.

13        **THE COURT:**  All right.

14        **MS. TRIPODI:**  Thank you.

15     (Witness excused.)

16        **THE COURT:**  All right.  Well, why don't we take a

17  short early -- we'll do an early break.  Normally we break at

18  10:00, but since we've got another witness, let's not chop it

19  up.

20     So we'll take our first morning break.  Reminder, please

21  do not discuss this case with anyone.  Do not attempt to do any

22  research on your own, and do not form any opinions until this

23  case is submitted to you for deliberation.

24     We'll see you in 20 minutes.

25        **THE CLERK:**  All rise for the jury.

1    (Recess taken from 9:45 a.m. to 10:01 a.m.)

2    (The following proceedings were held outside of the

3    presence of the Jury)

4         **THE COURTROOM DEPUTY:**  Court is reconvened.

5         **THE COURT:**  Okay.  Let's take up the issue of the

6    sealed dispute.

7    I don't know if you had any opportunity to meet and

8    confer.

9         **MX. KIM:**  Thank you, Your Honor.  Again, this is Mx.

10   -- M-X -- Liz Kim on behalf of Mr. Durban and Silver Lake.

11   We have attempted to meet and confer via email several

12   times prior to appearing this morning, but we have not had an

13   opportunity to speak, other than to confirm that the parties'

14   positions have not changed.

15   To be clear, Your Honor, the motion in limine and the

16   reason we're here is because these exhibits, you've already

17   ordered them sealed.  You ordered them sealed in connection

18   with the parties' summary judgment briefing.  And you had

19   issued an order specifically finding that both Silver Lake and

20   another third party, Goldman Sachs, had submitted narrowly

21   tailored redactions that satisfied the compelling reason

22   standard.

23   I understand the parties seem to think that the exhibit

24   should be presented to the jury.  As local counsel, I am not in

25   a position to argue about the merits of the substance of this

1   case.  Our lead attorneys at Debevoise are not able to be here

2   this morning because they're across the country.

3       Part of the problem here, Your Honor, is that the parties

4   have not been giving adequate notice to any of the third

5   parties whose confidential documents they're attempting to use.

6       **THE COURT:**  All right.  Let's get to it.  What are

7   the -- show me the -- what are they?

8       **MX. KIM:**  So the exhibit that's at issue today, I

9   believe, is No. 179.

10      **MR. APTON:**  Your Honor, if it would be easier, I have

11  a copy of 179 with highlights indicating what would be

12  redacted.

13      **THE COURT:**  Okay.  Pass it up, please.

14      **MR. APTON:**  If we could hand that up.

15      (Document handed up to the Court)

16      (The Court examines document)

17      **THE COURT:**  All right, so what is the highlighted

18  stuff?

19      **MX. KIM:**  So, Your Honor, before I dive into that,

20  while I will do my best, I do want to just note that Julie

21  Riewe, who's been admitted and is counsel of record in this

22  case for Mr. Durban, is available and standing by

23  telephonically to argue as to the merits of why this material

24  should be -- should remain under seal.

25      **THE COURT:**  Okay.  Is that person available by phone

1    right now?

2           **MX. KIM:**  Yes.  They're standing by, Your Honor.

3           **THE COURT:**  Can we admit them by some phone method?

4           **THE COURTROOM DEPUTY:**  I'd have to call them from our

5    phone to put them on the speaker.

6           **THE COURT:**  Well, why don't you do that.

7           **MR. APTON:**  Your Honor, if I may, this is relating to

8    a potential deal that never happened, from four and a half

9    years ago.  This is material that is relevant for one reason.

10   This case.  It has no proprietary or trade-secret or commercial

11   value.  Silver Lake's not at risk of losing business.  And, as

12   counsel pointed out, it has been publicly on the docket for the

13   last few months.  That was initially an oversight from counsel.

14   But, nonetheless --

15          **THE COURT:**  So this is about a potential scenario

16   involving Silver Lake, and Tesla?

17          **MX. KIM:**  Yes, Your Honor.

18          **MR. APTON:**  That's right.  Because Silver Lake was

19   involved in the potential go-private, and so they were working

20   with Tesla, late August, to put this material together.

21          **THE COURT:**  And why do you need this detail?

22          **MR. APTON:**  Elon Musk --

23          **THE COURT:**  I mean, why should this detail -- why does

24   it need to be -- need to be made public?

25          **MR. APTON:**  Well, Elon Musk received copies of this.

1   It's relevant for this case.  And we need it to be shown to the

2   jury.  So long as it's shown to the jury in evidence, we're

3   okay with that.  But if the public outside of this courtroom is

4   now allowed to see it, then that's for Your Honor --

5        **THE COURT:**  That's the issue.  Certainly, I don't

6   think the -- the argument that the jury can't see this.  As

7   long as it's kept under seal from the public.  I mean, that's

8   your concern, correct?

9        **MX. KIM:**  That is our primary concern, Your Honor.

10       **THE COURT:**  And so then the question I have as the

11  Court is whether the public has a compelling interest in seeing

12  this level of detail, at the higher standard that applies,

13  since this is dispositive against the trial.  Is there a

14  compelling interest not to allow the public to see it?  Because

15  generally the presumption is that the public has an interest in

16  seeing all the evidence.

17       **MR. APTON:**  Not just that, Your Honor.  Practically,

18  when the exhibit is introduced, is Your Honor going to clear

19  the courtroom and have people come back in?  I just don't see

20  the reason to keep it under seal and potentially interfere with

21  the pace of the trial or the examination.

22       **MX. KIM:**  I'd just note that we could have addressed

23  this in advance, had the parties provided adequate notice or

24  moved to unseal the document, which is still the subject of a

25  sealing order, Your Honor.  We're here --

 1            **THE COURT:**  Well, that's right.  This should have

 2   been -- since there was a sealing order, the proper method

 3   would have been to move to unseal, and do this in an orderly

 4   way.

 5            **MR. APTON:**  Understood, Your Honor.

 6            **THE COURT:**  So can we get counsel on the line?

 7            **THE COURTROOM DEPUTY:**  Counsel, can you hear us?

 8        (Attorney Julie Riewe appears telephonically)

 9            **MS. RIEWE:**  Yes.  Can you hear me?

10            **THE COURTROOM DEPUTY:**  We can.

11            **THE COURT:**  Yeah.  We're going to try turning you up

12   there.  Can you speak again?

13            **MS. RIEWE:**  Great.  Thank you very much.  Julie Riewe

14   from Debevoise for Mr. Durban.  I heard most of what was on the

15   Zoom audio link, but missed the last maybe minute or so when it

16   was being connected.

17        Your Honor, the -- Silver Lake's concern here is that

18   Your Honor has already ruled on -- on these redactions.  We do

19   think they are proprietary, and reveal Silver Lake's particular

20   methodology for evaluating companies.  And that remains true

21   today, not just five years ago or four and a half years ago at

22   the time of this transaction.

23        And as we noted in our brief at the time when Your Honor

24   ruled on this question, that that methodology is of significant

25   value to competitors because they could use Silver Lake's

1  analysis and perspectives to apply to other companies, and

2  stand in the way of Silver Lake winning -- winning

3  opportunities for investment.

4      So, you know, we think that Your Honor's ruling was

5  correct initially, and so we would ask that Your Honor revisit

6  that -- not revisit that, and continue to view these correctly

7  as proprietary information of Silver Lake.

8      I think -- when I lost the audio contact on to the Zoom

9  link, I think you all were discussing whether there was some

10  narrower approach.  And I think our primary concern is that

11  these exhibits would be filed on the ND Cal website,

12  (Inaudible) the rest of the jury, obviously.

13      But, you know, I think having these publicly released is

14  really our concern.  And we don't think the fact that these --

15  that these were filed improperly in contravention of the

16  Court's ruling at the time is relevant to this question.

17      We'll fix that on the docket now.  But, you know, we

18  absolutely were aware that that would happen.  And I think this

19  is a separate question, on the merits.

20      **THE COURT:**  All right.  Let me ask you.  If what is

21  filed on the ND Cal docket, which, where we're posting evidence

22  is the redacted copy, but the unredacted copy is used in the

23  courtroom so that the participants in the court and those who

24  are in the courtroom can see it, but obviously nobody outside

25  the courtroom -- and we do have an overflow courtroom with a

1     video.  But other than that, it's just people in the courthouse

2     can see it, but it would not be posted, it would be posted in

3     its redacted form for the greater public to see, would you have

4     any objection to that?

5           **MS. RIEWE:**  Obviously we'd prefer the narrower ruling,

6     Your Honor, but if otherwise the alternative is to admit them

7     unredacted, yes, we would certainly prefer a redacted posting

8     to the ND Cal.

9           **THE COURT:**  All right.  Then that's what I will order,

10     that -- for the purpose of the trial.  Because otherwise, if we

11     have to treat this as a sealed document that only the jury can

12     see, then we're going to have to make copies of this, and then

13     all that sort of the stuff.

14     And given that this is not being broadcast, we're not on

15     Zoom to the public other than audio, I'm going to allow the

16     parties to use the document, unredacted, but order our staff

17     that when we file this document with the repository which we've

18     made available to the public just so they can see all the

19     exhibits, that the redacted form will appear there.  Because I

20     think that they've made a fair argument that they show

21     methodology.  And even if it's specific to this deal,

22     there's -- there are some pretty strong interests.

23           **MX. KIM:**  Your Honor, so you are aware, there are at

24     least two, possibly three other exhibits that are Silver Lake

25     documents that the parties have disclosed on their joint

1    exhibit lists that are not at issue for today.  How would you

2    like us to address those?  I believe that some of them are text

3    messages that the Court briefly addressed yesterday.

4         And I hope that the parties and Silver Lake are able to

5    work out a mutually agreeable solution that tracks the guidance

6    you've just provided.  But if we are unable to do so, how would

7    you like us to make our --

8         **THE COURT:**  Well, what I'd like, you're going to have

9    to come back, and I'll have to rule on it.  I'm hoping, based

10   on today's discussion, you all can work that out.

11        **MX. KIM:**  (Nods head)

12        **THE COURT:**  I will say there is one document -- I

13   don't know if it concerns Silver Lake or not.  But there is a

14   document that -- that long email string that has a whole bunch

15   of stuff in there, some of which is relevant, but a lot of

16   which is about other people.  I assume that that's going to be

17   selectively used.

18        **MR. APTON:**  Is Your Honor referring to text messages?

19        **THE COURT:**  Yeah, the text messages.

20        **MR. APTON:**  Oh, I think we -- I've spoken to counsel,

21   and we'll redact personal informational and phone numbers.

22        **THE COURT:**  Well, there's also a number of exchanges

23   with people who seem to have nothing to do with this

24   transaction.  I mean, it was like pages long, as I recall.

25        **MR. APTON:**  Yeah.  Your Honor, without having the

1  exhibit in front of me, I don't want to commit to something,

2  but Your Honor's always --

3          THE COURT:  Well, that's one where I did want --

4          MR. APTON:  I think defense counsel and I are on the

5  same page on this, and so we will work it out.

6          THE COURT:  All right.

7          MX. KIM:  Because I believe you're looking at 182,

8  Your Honor.  And that is an exhibit that also was the subject

9  of a motion to seal in connection with the summary judgment

10  briefing.

11      And Your Honor granted Silver Lake's redactions, proposed

12  redactions of this document which would include, in addition to

13  the personally identifying information, other irrelevant

14  information.  Including, you know, the location of Mr. Durban's

15  children at some date and time, his personal cell phone number,

16  and the identity of a Silver Lake investor which the Court has

17  already ruled is proprietary and confidential business

18  information.

19          THE COURT:  Well, my understanding is that this big

20  document was keyed on certain exchanges between Mr. Musk and --

21  Yasir, or -- I forget who it was.

22          MR. APTON:  Your Honor, I believe these text messages

23  are between Mr. Durban, Egon Durban, who works at Silver Lake,

24  and various people.  Some of which are involved in this case,

25  some of which are not.  And so for the text messages that are

**PROCEEDINGS**

 1 | not relevant to this case, we could redact those out, and it's
 2 | not a problem.
 3 |       **THE COURT:**  Why don't you do that, show that to
 4 | counsel --
 5 |       **MR. APTON:**  Absolutely.
 6 |       **THE COURT:**  -- as soon as you can.
 7 |       **MR. APTON:**  Thank you, Your Honor.
 8 |       **THE COURT:**  And if there is a dispute, I guess I'll
 9 | see you back here.
10 |       **MX. KIM:**  Thank you very much, Your Honor.
11 |       **THE COURT:**  Thank you.
12 |       **MR. APTON:**  Thank you.
13 |       **THE COURT:**  All right.  Well, I think our 20 minutes
14 | has expired.  So let's bring the -- oh, let me -- I will read
15 | to you the expert instruction that I have crafted.
16 |    It will read as follows:
17 |       "During the trial, you will hear testimony
18 |       from witnesses who will testify to opinions
19 |       and reasons for their opinions.  This opinion
20 |       testimony is allowed because of the education
21 |       and experience of this witness.  The expert
22 |       may testify as to his or her understanding of
23 |       certain facts.  The expert is allowed to do
24 |       so in order to explain the basis of their
25 |       opinion, and to allow you to evaluate their

**PROCEEDINGS**

1              opinion.  The facts testified to, however,

2              are themselves not evidence."

3       And then the usual (As read):

4              "Such opinion should be judged like any other

5              testimony..."

6       Et cetera, et cetera.  So I think that's a fair and

7  neutral way of doing it.  And I intend to read that, to be

8  balanced, in front of every expert witness.

9              **MR. PORRITT:**  Thank you.

10             **MR. SPIRO:**  Understood.  Thank you, Your Honor.

11             **THE COURT:**  Okay.  Let's bring the jury back.

12      While the jury is coming back, on the Brinkman stuff,

13 we'll get out the formal ruling, but I'm overruling the

14 objections that were remaining with respect to the deposition.

15      Let's see.  So there was several objections that were

16 made.  And I will explain later.  But I -- for purposes of your

17 production, I am overruling the various -- yeah.  I don't think

18 there was an exception.  I mean, I have to sustain.

19             **MR. SPIRO:**  Yes, Your Honor.  The -- I think it would

20 be, if the Court was willing, useful to the parties if we could

21 discuss at some point Your Honor's views on the deposition

22 designations, to give us guidance for the rest of the depo

23 designations.  And the reason for that, among others, is it

24 allows us to plan better so that we know how much time.  Is it

25 going to be a day, is it going to be -- right?  Because they

1    are very lengthy designations.  So for witness planning

2    purposes, the earlier we can do that I think is helpful to

3    our --

4        THE COURT:  All right.  Yes, so the earlier you can

5    get it to me -- and if you don't besiege me with 5,000 other

6    things, the quicker I can get to it, so -- which is why -- and

7    it may be for depo excerpts, let's, you know, submit it earlier

8    if you already know what it's is going to be, so I have at

9    least a little time, because now I have to read all this and

10   figure out which segments are objectionable, if any, and which

11   are not.

12       MR. SPIRO:  Right.  We're trying to take the Court's

13   guidance as to the exhibits so that, for example, a document

14   produced or an opinion given during the class period versus

15   after is -- we're focusing on things like that, that we think

16   the Court has so indicated.

17       THE COURT:  Yeah.  Depo transcripts is a little

18   trickier, though, because the two-day/one-day thing means I

19   don't get, you know, the full objection and response, and then

20   I've got to read, if it's lengthy depo transcripts -- it's one

21   thing to look at exhibits and rule on those.  It's another

22   thing to read hundreds of pages of -- so I'm suggesting maybe

23   if you can advance that by a day, if we have a rule that if you

24   know you're going to present a witness by depo,

25   three-day/two-day instead of two-day/one-day?

1            **MR. SPIRO:**  So I think we should just give them all to

2     the Court, frankly.  I mean, and then --

3            **THE COURT:**  Even better.

4            **MR. SPIRO:**  And then if the Court would indulge us on

5     a brief, you know, 15-minute sort of -- just so we can explain

6     to the Court at least our thinking, and then that'll guide the

7     rest of the trial and make it efficient.

8            **MR. PORRITT:**  And I think with your first set of

9     rulings on Mr. Brinkman, we'll obviously take that, and we'll

10    use that as precedent, for want of better term, for this case.

11    And we can apply those rulings, we'll understand.

12           **MR. SPIRO:**  Well, hopefully after hearing a brief word

13    from the defense before it becomes, quote-unquote, precedent.

14    But with that, I understand.

15           **THE COURT:**  Right.

16           **MR. PORRITT:**  And we have effectively -- we've

17    exchanged them with the parties a long time ago and --

18           **THE COURTROOM DEPUTY:**  All rise for the jury.

19        (The following proceedings were held in the presence of

20    the Jury)

21           **THE COURT:**  All right.  Have a seat, everyone.

22    Welcome back.  Thank you.

23        We are going to proceed with the next witness.  But first

24    let me give you an additional instruction.

25

**<u>JURY INSTRUCTION</u>**

**BY THE COURT**

    During the trial, you will hear testimony from witnesses who will testify to opinions and reasons for their opinions. This opinion testimony is allowed because of the education and experience of the witness.

    Now, the expert may testify as to his or her understanding of certain facts.  The expert is allowed to do so in order to explain the basis of their opinion, and to allow you to evaluate their opinion.

    These facts -- the facts testified to, however, are, themselves, not evidence.  Opinion testimony should be judged like any other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

    So with that said, you may call your next witness.

        **MR. APTON:**  Your Honor, Adam Apton for plaintiff.  We call Professor Subramanian.

        **THE COURT:**  All right.

        **<u>GUHAN SUBRAMANIAN, PLAINTIFF'S WITNESS, SWORN</u>**

        **THE WITNESS:**  Yes.

        **THE COURTROOM DEPUTY:**  Thank you.  Please be seated. You can remove your mask.

    Please speak clearly into the microphone.  State and spell

1   your first and last name for the record, please.

2          **THE WITNESS:**  Guhan Subramanian.  First name

3   G-U-H-A-N, last name, S-U-B-R-A-M-A-N-I-A-N.

4          **THE COURT:**  All right.  Thank you, Professor.

5       You may proceed.

6          **MR. APTON:**  Your Honor, I have an exhibit binder for

7   the witness and one for the Court as well.  May I approach?

8          **THE COURT:**  All right.  Yep.

9          **THE COURTROOM DEPUTY:**  Thank you.

10      (Binder handed up to the Court)

11                         **DIRECT EXAMINATION**

12  **BY MR. APTON**

13  **Q**    Good morning, Professor Subramanian.  How are you?

14  **A**    Doing fine, thanks.

15  **Q**    Good, good, good.

16      Now, you are an expert for the plaintiff, is that correct?

17  **A**    Correct.

18  **Q**    And you are here today to give expert testimony, correct?

19  **A**    Correct.

20          **THE COURT:**  You might pull that microphone a little

21  closer to you, and it will pick you up better.  Thank you.

22  **BY MR. APTON**

23  **Q**    Professor, did you prepare PowerPoint slides for your

24  testimony today?

25  **A**    I did, yes.

1   **Q**   And before we see them, why did you do that?

2   **A**   Well, I've been a professor at Harvard for 23 years.  And

3   when I teach my students I almost always use PowerPoint slides,

4   especially when it's complicated information, because I think

5   the students can learn better when they see it on the screen,

6   but also they're hearing it from me.

7      Now, this isn't my classroom, but similarly, I'm trying to

8   help the jury understand certain complex issues, and so I

9   thought PowerPoint slides would be helpful in that process.

10   **Q**   Okay.  I appreciate that.

11         **MR. APTON:**  If I could introduce the Professor's slide

12   deck, please.  And may I publish this to the jury too?

13         **THE COURT:**  Yes, you may.

14   (Document displayed)

15   **BY MR. APTON**

16   **Q**   Professor, are these the slides you prepared for today?

17   **A**   They are, yes.

18   **Q**   Okay.  Why don't I ask you a little bit more about your

19   qualifications.  Can you describe them, please?

20   **A**   Sure.  And I'll use my slides for that purpose, if that's

21   okay?

22   **Q**   Yes.

23   **A**   I received an undergraduate degree in economics from

24   Harvard College in 1992.  I received my law degree from Harvard

25   Law School in 1998.  And also an MBA from Harvard Business

SUBRAMANIAN - DIRECT / APTON

1   School in 1998.

2       I have been on the Harvard faculty since 1999.  I

3   currently serve as the Joseph Flom Professor of Law and

4   Business at Harvard Law School, and the Douglas Weaver

5   Professor of Business Law at Harvard Business School.  I'm the

6   first person in the history of Harvard to hold tenured

7   appointments at both Harvard Law School, Harvard Business

8   School.

9       (Document displayed)

10  **A**    I'm the faculty chair for the program of negotiation, the

11  JD/MBA program, and the Advisory Committee on Shareholder

12  Responsibility at Harvard.  I've authored many books, and two

13  case books.  One is with the former Delaware Chancellor Bill

14  Allen.  Delaware is the home for many public corporations,

15  including Tesla, and so Delaware is a well-known place for

16  business disputes to be resolved.

17      (Document displayed)

18  **A**    I teach courses on mergers and acquisitions and corporate

19  law.  And also a course called Deals, which is joint before

20  Harvard Law School and Harvard Business School, where we study

21  lots of corporate deals.

22      With respect to management buyouts in particular, I've

23  done a lot of work on MBOs over the years.  This case is about

24  a proposed MBO.  In particular, one article I will flag for the

25  Court is called Deal Process Design in Management Buyouts.  It

1   was published in the Harvard Law Review in 2006.  My colleagues

2   in the field picked it as one of the top ten articles in 2016,

3   out of 565 articles that were published in that year.

4        As part of the research for this article, I examined and

5   studied permanently all the management buyouts of public

6   companies that were announced between 2006 and 2015.  It was

7   about 45 deals, total.  And I'll talk more about that data

8   shortly.

9        I'm also the chairman of the board at LKQ Corporation.

10  LKQ is a Fortune 500 company in the automotive sector.  We're

11  the largest recycler of car parts in the world.  We have about

12  50,000 employees, and we recycle the parts from about 800,000

13  cars per year.

14       I regularly advise corporate boards and management teams

15  on issues of negotiation and corporate deals.  And I've

16  testified in Delaware court but also other courts about 15

17  times at trial, and many more times in deposition.

18  **Q**   Professor, did you prepare a resume or CV in connection

19  with this case?

20  **A**   I did, yes.

21       **MR. APTON:**  May I please show the witness Exhibit 360,

22  Pages 48 to 54?

23       **THE COURT:**  Yes.

24       (Document displayed)

25

SUBRAMANIAN - DIRECT / APTON

1   BY MR. APTON

2   Q   Professor, are Pages 48-54 the CV that you prepared for

3   this case?

4   A   Yes.

5         MR. APTON:   Your Honor, may I move this portion of

6   Exhibit 360 into evidence?

7            THE COURT:   Yes.   Any objection or further objection?

8            MR. PRICE:   No further objection beyond hearsay.

9            THE COURT:   All right.   Admitted.

10      (Trial Exhibit 360, Pages 48 to 54, received in evidence.)

11      (Document displayed)

12  BY MR. APTON

13  Q   So Professor, can you explain how your professional

14  experience and background is relevant to the issues in this

15  particular case?

16  A   Sure.   This case is about a proposed management buyout.

17  I'll say more about what management buyouts are in a few

18  minutes, but it's a complicated, fairly intricate kind of

19  transaction.   It's heavily choreographed, heavily orchestrated,

20  generally speaking.   And I teach about it and I study

21  management buyouts in my research at Harvard.

22      So, for example, I have a course called Deals, which is

23  actually starting this Monday, and in that course Deals we

24  study MBOs frequently.

25      One particular MBO that I'm very familiar with is the

1    management buyout of the Dell Inc.  Dell was a buyout about

2    seven, eight years ago in which Michael Dell in that case

3    actually did take the company private.  It's significant in

4    lots of different ways, but one significant similarity is it

5    was a very large MBO.  It was about $20 billion.  This one

6    would actually have been much bigger than even Dell.  But if

7    you think about comparisons, Dell is a pretty decent

8    comparison.  So I know a lot about the Dell MBO because I was

9    involved as an expert witness in that situation as well.  And

10   I've written a Harvard Business School case study about Dell,

11   and people who were involved to come to my class to talk about

12   that particular MBO.

13       So I study MBOs, I teach about MBOs.  And one particular

14   MBO that's quite relevant here, which is Dell, is something

15   that I've studied quite extensively.

16       (Reporter clarification)

17           **THE WITNESS:**  Yes, I'll do my best.  Thank you.

18           **MR. APTON:**  Your Honor, in light of Professor

19   Subramanian's qualifications, we would move to admit him or

20   deem him an expert to give testimony in this case.

21           **THE COURT:**  You have to specify the subject.

22           **MR. APTON:**  Oh, relating to the proposed transaction

23   of -- in this case, and management buyouts in general, and

24   customs and practices.

25           **THE COURT:**  All right.  Any objection?

SUBRAMANIAN - DIRECT / APTON

1          **MR. PRICE:**  No objection.

2          **THE COURT:**  All right.  He's so certified.

3    **BY MR. APTON**

4    **Q**    So, Professor, when plaintiff first retained you as an

5    expert in this case, what is it that they asked you to do?

6    **A**    There were two things that I was asked to express opinions

7    about.  First was to describe the typical process in a

8    management buyout.  And then second, to compare this proposal

9    against that typical process.

10   **Q**    And could you tell the jury, generally speaking, what your

11   conclusions were?

12   **A**    Yes.  In the highest level, my conclusions were twofold.

13   First, there is a typical process for management buyouts.

14   There is some variation in some deals.  But that's -- there's a

15   standard template for MBOs.  And then, compared to that

16   standard template, this proposal was an extreme outlier.  It

17   was preliminary; it was incomplete.  It was incoherent in

18   certain ways.  It was illusory.  It was really very different

19   from the typical process of an MBO.

20   **Q**    So I would like you to help us, the Court and the jury,

21   understand those conclusions.  Can you advance and elaborate,

22   please?

23   **A**    Sure.  So there is a standard process for a management

24   buyout.  It's not the exact same process every single time, but

25   there's a pretty well-established set of steps.

SUBRAMANIAN - DIRECT / APTON

1        Just first of all, an MBO, what is it?

2        It's a situation where management, oftentimes the CEO but

3  maybe other managers as well -- in this case it's just the

4  CEO -- offers to buy the other shares of the company at a

5  price.  And so it's a going-private transaction.  It's a

6  management buyout of the public shares, and the company then

7  becomes private.

8        There are a very well-established set of steps that occur

9  in an MBO.  And I'll go through those steps as a typical matter

10  in this slide.  The basis for this set of steps is my own

11  research.  So I've mentioned already my 45 deals in my MBO

12  database; that is from 2006 to 2015.

13        I also, in connection with my testimony here, created a

14  new sample of MBOs from 2010 to 2021, so updated the sample.

15  It's about 30 deals in that sample.  So this broad template is

16  based on my own research, my own observation, but also those

17  more systematic datasets.

18        The first step is the initiation.  And this step is

19  important.  There's a lot of thought, preparation, care, work

20  that's done in advance of any initiation of an MBO.  The fact

21  is, an MBO is very disruptive to the company.  And so a CEO

22  doesn't do that casually.

23        What does that mean?  It typically means talking to

24  individuals within the company about what will it mean from the

25  company, as a business matter.  But almost always, it also

```
 1    means discussing with outside advisers.
 2         Bankers will give you a basic idea of how the financing
 3    will work, and maybe even run the model, using some
 4    illustrative pricing.  Lawyers will tell you about the process
 5    you need to go through in the MBO.  So it's a very
 6    thought-through, careful process before you even begin it and
 7    bring it to the board.
 8    Q    So, if I could just interrupt you.  So all that work is
 9    done before the, quote, initiation, correct?
10    A    Correct.
11    Q    And so what does an initiation normally look like in an
12    MBO?
13    A    Well, once you have done all this legwork in advance, you
14    would then take it to -- if it's a different person, you take
15    it to the chairperson of the board.  Or if you're the
16    chairperson, as was the case here, you would take it to the
17    lead director.
18         That's typically where you would begin the process, but
19    there's a lot of work that's done even before you take it to
20    that lead director or chairperson of the board.
21    Q    Okay.  So, thank you.  Continue, please.  What is the
22    second step?
23         (Document displayed)
24    A    So then there is a response.  The company will form what's
25    called a special committee of independent directors.  And this
```

1   is a very important piece because you've got management -- in

2   this case it's the CEO -- looking to buy the company.  So

3   they're a buyer; they will want a lower price.  The company

4   will want a higher price.  So there's an important

5   back-and-forth negotiation that will take place.

6        And in order to be meaningfully engaged in that

7   negotiation, the special committee will be authorized to hire

8   their own bankers and hire their own lawyers.  So the CEO would

9   have consulted with the bankers and lawyers, and they'll have

10  those people in place.  And then the special committee will be

11  formed, and they will hire their own lawyers, their owner

12  bankers, to help have a meaningful back-and-forth negotiation

13  with the prospective buyer.

14       The next step is a public disclosure of the MBO.

15       (Document displayed)

16  **A**   It can happen in different ways.  But there's two main

17  places that can happen.  First is when the CEO brings the

18  proposal to the special committee.  And so in my sample of

19  MBOs, sometimes it where the CEO brings the offer to the board,

20  the board forms a special committee, and they'll announce we

21  have a proposal from Mr. So-and-so or Ms. So-and-so to buy out

22  the company.

23       The other alternative, the big moment would be at the end

24  of that negotiation.  So, in general, they'll want to keep it

25  quiet, don't want to disrupt the market, don't want to disrupt

1    the company.  They will negotiate with the CEO and their

2    advisers, and they'll try to avoid a public announcement until

3    they've got to an actual deal.

4         The important feature, whether you disclose it at the

5    beginning of the process or the end of that negotiation, is

6    that the special committee really should control that process.

7    It should not be left to the CEO to unilaterally disclose it on

8    their own.

9         And in my sample that I assembled in connection with this

10   matter, I found only one other instance, it was a buyout of

11   Perry Ellis, I think it was, in which the CEO made a unilateral

12   disclosure.  Almost always you want the special committee to

13   make the disclosure, and that's for good business reasons.  The

14   CEO has their own incentives.  They may or may not be in line

15   with the company.  And so having the special committee control

16   the public disclosure is very important.  And as I said in my

17   sample, it happens almost always the special committee does it

18   and not the CEO.

19   Q    Professor, with respect to that one example, the Perry

20   Ellis buyout, before the disclosure, if I understood you

21   correctly, how much work was done in the lead-up to that

22   disclosure?

23   A    Well, that's a good example of the typical process in

24   which the CEO did consult with the bankers and did consult with

25   lawyers before bringing that disclosure to -- bringing that

1    proposal to the company.  So, it does follow the standard

2    template, other than this one piece of the public disclosure.

3    **Q**    And I don't want to belabor the point, but when you say

4    consult with lawyers and bankers, what does that typically look

5    like in this process?

6    **A**    It will be meaningful, substantive negotiation -- not --

7    substantive analysis by the banker and lawyers.  So the bankers

8    will be running financial models to explain how this will work

9    as a financial matter.  They may do illustrative deal prices

10   and present some analysis around illustrative deal prices.

11        The lawyers will be very involved as well, because it's a

12   carefully choreographed back-and-forth.  And so well before you

13   begin anything with the board or special committee, the CEO

14   will want to make sure they understand what are the different

15   steps involved to get from an initial proposal to a final deal.

16   It's a long list of steps, which the lawyers will advise on.

17   **Q**    So this analysis, this negotiation, can this be done in

18   something like a 20 or 30-minute phone call?

19   **A**    No.  It can't be.  It's really at least weeks, maybe even

20   months.

21        So as one example, I mentioned the Dell buyout earlier.

22   Michael Dell, who was the CEO -- is the CEO of Dell, Inc., got

23   an inbound inquiry from Southeastern Asset Management.  I

24   believe it was in June of 2012.  He then spent three or four

25   months talking to Silver Lake, which happens to be the same

1    firm that's involved here.  He talked to Wachtell Lipton, which

2    also, again, happened to be involved here.  He talked to other

3    firms as well.  And only brought to it his board -- in that

4    case, it was the lead director -- I believe it was in

5    September, October of 2012.  So three months between the

6    initial approach and his taking it to his board.  Lots of work

7    has to be done before you can make that first step.

8    **Q**    I see.  So I keep interrupting you.  We covered step one,

9    initiation; step two, response; step three, public disclosure.

10   What is step four?

11       (Document displayed)

12   **A**    Step four is shareholder engagement.  So, obviously,

13   shareholders have to be involved in this process.  As a formal

14   matter, they are the last step.  There's a shareholder vote

15   that would approve the deal.  The critical piece here is that

16   it is very rare, if not unheard of, to have outbound

17   shareholder -- shareholder engagement.

18       If you announce the proposal when the offer is first made

19   by the CEO, you might have inbound comments from shareholders.

20   Shareholders will say:  I like the deal, I don't like the deal.

21   There could be some inbound.

22       But it is very rare, I would say almost impossible or

23   almost unheard of, to have outbound from the special committee

24   or the CEO to shareholders.  And that's for good reasons.  In

25   general, the concern is you may be giving certain shareholders

1    some information you're not giving to other shareholders.  So

2    in general, you'll have to be very quiet.

3        If there's inbound, you will listen to it, but there's

4    never a back-and-forth with shareholders, because that raises

5    certain concerns about fairness and making sure shareholders

6    have the same information across the board.

7    Q    So you mentioned inbound versus outbound shareholder

8    engagement, but what does that look like?  What is that?

9    A    Well, so, for example, in the Dell buyout, just as an

10   illustration, the proposal went to the special committee.  It

11   was all kept quiet for a while.  That's the typical disclosure

12   or lack of disclosure.  But then there was a leak.  I believe

13   the leak was in January, 2013, so six months after the process

14   had begun.

15       Once that -- there was a leak, there was inbound

16   commentary to the board.  Carl Icahn didn't like the deal,

17   other shareholders didn't like the deal, so there was inbound

18   to the board.  But there was nothing outbound.  It was all just

19   information coming in.

20       So it's very important to be listening if shareholders

21   make inbound comments, but it's unheard of to make outbound

22   inquiries to or discussions with shareholders, because the

23   concern is you will be giving them things, information, that

24   other shareholders don't have.

25   Q    I see.  And so, if you can continue.  So step five, what

1    is step five?

2         (Document displayed)

3    **A**    The final -- well, and let's -- at least this process, the

4    final piece would be the negotiation with the special

5    committee.  And that's an important piece as well.  Because if

6    you think about it, the shareholders wouldn't have access to

7    all the non-public information.  So they can't meaningfully

8    say:  Is this a good offer or a bad offer?

9         If it's really bad, they'll vote it down.  But they don't

10   have the insight about what are the prospects of the company,

11   what's the outlook of the company.  All of that the board would

12   have, but the shareholders wouldn't have it.

13        So the special committee has that information.  They're

14   the directors of the company, and they will negotiate with that

15   information to get the full value they can get from the CEO or

16   the buyout group.

17        Now, in my data and my research, I find that about

18   20 percent of these proposals fail, because the special

19   committee and management don't reach an agreement.  So

20   management offers a certain amount, special committee says no,

21   and the deal goes away.

22        If they agree, there's almost always a bump, meaning the

23   first offer -- in this case it's 420 -- the first offer goes to

24   something higher.  And that bump in my data tends to be

25   somewhere between 10 percent and 15 percent on average.  But

1    there is also a bump if the deal gets done.  And as I said,

2    20 percent of the time there is no deal at all, because they

3    can't agree on the price term.

4    Q    And your basis for that is your data, you said?

5    A    (Nods head)

6    Q    I know you explained this previously, but what exactly was

7    your data, and how many deals over what period of time?

8    A    Well, it's two different datasets.  The one that I used in

9    my Harvard article which I mentioned earlier was all MBOs of

10   U.S. public companies announced between 2006 and 2015.  So I

11   think it's about 45 of deals -- 45 deals in that sample.

12        And then in connection with my report here, I created a

13   new sample to update it.  And that sample was roughly 30 deals

14   between 2010 and 2021.  So there's some overlap in the two

15   samples.  But I think, collectively, it's about 60 or 65 deals,

16   total.

17   Q    And how comprehensive was your dataset, relative to MBOs

18   in general?

19   A    It was all MBOs.  I believe I had a size threshold of

20   something like $50 million, but it was a fairly low threshold.

21   So I try to be as comprehensive as possible in my research, and

22   it was basically all MBOs that were economically meaningful.

23   Q    So all deals over 50 million, over what period of time?

24   A    2010 to 2021.

25   Q    I see.

1   **A**     That -- that 50 million could be off by a little bit, but

2   it was a fairly low threshold to try to capture more deals,

3   rather than fewer.

4   **Q**     Understood.  So, okay.  With that in mind, can you please

5   explain how you went ahead and analyzed the Musk proposal?

6   **A**     Well, I -- I examined the Musk proposal against this

7   template.  And what I found was this proposal was an extreme

8   outlier.  At almost every single step along the way, Mr. Musk

9   operated differently from this model.

10        And, I look at it, it's just incomplete.  It's

11  preliminary.  It's incoherent in certain ways, which I'll get

12  into.  It's illusory in certain ways.  So compared to the

13  standard template, it's an extreme outlier.

14  **Q**     I see.  Okay.  Do you have, perhaps, another slide you can

15  walk us through that analysis?

16  **A**     There's four different places where I want to focus on my

17  assessment of the Musk proposal, and I'll get into --

18        (Document displayed)

19        **MR. PRICE:**  Your Honor, at this point, the

20  specifics -- the question asked for a narrative that might go

21  on forever, so I object.

22        **THE COURT:**  So you should ask in a question-and-answer

23  format to elicit, rather than having him lecture.

24        **MR. APTON:**  Understood, Your Honor.

25

1  BY MR. APTON

2  **Q**    Professor Subramanian, can you describe your -- or what

3  was your assessment of the Musk proposal?

4  **A**    Well, on each of these different steps, it was very

5  different.  It was just a remarkably different process than the

6  typical template.

7       Now, just to be clear, it's not to say that every single

8  deal's the same.  There is minor variations from deal to deal.

9  But even those minor variations are just nothing compared to

10  this deal.  This was way out there on lots of different

11  dimensions, which I'll get into.  These are four of them that I

12  want to flag and discuss in more detail.

13  **Q**    So -- I see.  So point one, permitting Musk's Twitter feed

14  was egregious corporate governance.  Why is that part of your

15  conclusion?

16  **A**    Well, this is, I think, a -- one of the many extraordinary

17  features of this particular proposal.

18       (Document displayed)

19  **A**    The original thing was approval by the Tesla board in 2013

20  to allow Mr. Musk to use his Twitter feed as way of

21  communicating additional information about Tesla to the

22  shareholders and to the world.

23       Now, this, in itself, is not problematic.  Many companies,

24  especially tech companies, say to the CEO:  We want you to be

25  tweeting about the company; that's helpful for the business.

1    And it typically involves the CEO saying:  Look at our new

2    product, here's what we're doing in the market, this is great,

3    you should buy our products.  That's all perfectly fine.

4         But what's really different here is the communication of

5    material non-public information about a management buyout over

6    Twitter.  That's just never been done before.  And the specific

7    concern is that Mr. Musk could do it at a time that is

8    disruptive to the company.  And sure enough, at this time,

9    there was production problems, there was issues with Tesla.  So

10   there's a concern.  And because of that concern, you'd want the

11   board or the special committee to manage the disclosures, and

12   not the CEO.

13        So just from the get-go, this Twitter feed and making it a

14   way to communicate information, that in itself is not

15   troubling.  But what is troubling is material non-public

16   information that is massively important to the market being

17   communicated through this fairly casual channel.

18        (Document displayed)

19   **A**   What's further, I think, remarkable about it is that there

20   were no guardrails on the Twitter feed --

21        **MR. PRICE:**  I'm going to object.  Now we're getting

22   into a long narrative, without questions.

23        **THE COURT:**  All right.  Why don't you ask the

24   questions.

25

1  BY MR. APTON

2  **Q**    Professor, is there any other reason for your opinion that

3  the Musk Twitter feed was egregious corporate governance?

4  **A**    Well, there is.  And as chairmen of a board, we have to be

5  very careful in my company about what gets communicated to the

6  market, and when it goes out there.

7        What's striking to me is that Mr. Gracias, who was the

8  lead independent director, Ms. Denholm, she's another director,

9  they testified that there was overall policies, but no

10  monitoring of Mr. Musk's Twitter feed.  No guardrails of any

11  kind.

12        Now, sure enough, because there were no guardrails, there

13  is no indication in the record that anyone reviewed the tweet

14  before Mr. Musk sent it out, "420," "Funding secured," and then

15  the next tweet about the shareholder vote is the only thing

16  standing in the way.  So the lack of guardrails is deeply

17  troubling as a matter of corporate governance.  And what makes

18  it particularly troubling in this particular case is that

19  Mr. Musk had tweeted just one month prior, in July of 2018,

20  about one of the Thai cave divers being a pedophile.

21  Obviously, that was incredibly disruptive, very problematic for

22  that company --

23        **MR. PRICE:**  I object.  It's beyond the scope of the

24  question, and irrelevant.

25        **THE COURT:**  Overruled.

1          **THE WITNESS:**  And so when that tweet was out there,

2    one would think that as a matter of corporate governance, there

3    would be guardrails imposed to say to Mr. Musk:  You have to be

4    more careful, and here's a process by which your tweets can go

5    out, especially about the company.  But that wasn't done.

6    **BY MR. APTON**

7    **Q**    Professor, before we go on, you mentioned that the Twitter

8    feed was identified as a corporate channel of communication in

9    November of '13, correct?

10   **A**    Correct.

11   **Q**    Do you recall how that was done?

12   **A**    I believe it was done through an 8-K filing, which is

13   basically a filing with the SEC that communicates something

14   current about the company.  So there was an 8-K filing in

15   November, 2013, saying Mr. Musk's Twitter feed is a source of

16   additional information about the company.

17          **MR. APTON:**  Your Honor, may I show the witness

18   Exhibit 103?

19          **THE COURT:**  Okay.

20      (Document displayed)

21   **BY MR. APTON**

22   **Q**    And Professor, you could scroll through that, but I just

23   want to see if this is the 8-K to which you are referring.

24      (Witness examines document)

25   **A**    It is, yes.

1   Q    And do you see, where in this 8-K does it specify

2   Mr. Musk's Twitter as a corporate channel of communication?

3   A    I believe it's on the next page.  Can I turn -- oh.

4        (Document displayed)

5   A    There we go.  Okay.

6   Q    And if you needs us to zoom in on any --

7        (Document displayed)

8   Q    Yeah.

9   A    So it says close to the bottom -- can I -- yeah, here we

10  go.  Oops.

11          "For additional information, please follow

12          Elon Musk's Tesla Twitter accounts."

13       And you see the accounts listed there.

14       So that, in itself, is not problematic, but to have no

15  guardrails on it to me is very troubling, as a matter of

16  corporate governance.

17  Q    Understood.

18       MR. APTON:  Your Honor, I would like to move

19  Exhibit 103 into evidence.

20       THE COURT:  Any objection?

21       MR. PRICE:  No objection.

22       THE COURT:  Admitted.

23       (Trial Exhibit 103 received in evidence.)

24       MR. APTON:  Thank you.

25

1  BY MR. APTON

2  **Q**   If we could turn back to your slide deck, I believe we

3  were going to discuss a second point in your opinion.

4      (Document displayed)

5  **A**   Well, there's also a second point to this opinion.

6  **Q**   Please, continue.  Sorry.

7  **A**   Just, the -- the Twitter feed, no guardrails, one might

8  think as a matter of corporate governance that if there is no

9  guardrails, at least the board would have some kind of rapid

10  response plan.  That is to say, if Mr. Musk were to tweet about

11  Thai cave divers being pedophiles or something untrue about the

12  company, there would be a rapid response to that tweet to make

13  sure the market is properly informed.  But in this particular

14  case, there was nothing for six days.

15      Six days is a lifetime in this kind of transaction.  I

16  think there was hundreds, if not thousands, of news articles

17  published in those six days about the transaction.  And to have

18  no rapid response team, no commentary from the board in those

19  six days is, again, quite troubling as a matter of corporate

20  governance.

21  **Q**   And you're referring to "six-day period" as referring to

22  the six days following the "Funding secured" tweet?

23  **A**   Correct.  So between August 7th when the "Funding secured"

24  tweet was published, to August 13th when there was the blog

25  post from the company and from Mr. Musk.

1   **Q**    And which, which blog post?  The one -- I'm sorry.  Did

2   you say the one on the 7th?  Or the 13th?

3   **A**    The 13th.  That was the response, I think, from the

4   company, or at least was scripted by the company's attorneys to

5   publish about the offer.

6   **Q**    Understood.  Okay.  Professor, the second point in your

7   analysis was that Musk did not consult the legal or financial

8   advisers.  Is that correct?

9   **A**    Yes, correct.

10  **Q**    Okay.  Can you elaborate on that point, please?

11  **A**    Well, as I've said earlier, this is a very important part

12  of the process.  The bankers will advise you, as the buyout

13  team or buyout person:  Here's what we think is a good price;

14  here's how the process is going to play out.

15       They will typically do three kind of analyses.  One will

16  be what's called a discounted cash flow analysis, so they'll

17  take the cash flows and give you an evaluation based on that.

18  They'll do a comparable transactions analysis.  They'll say

19  here are some comparable deals; let's look at that.  They'll do

20  a comparable trading multiple analysis.

21       All that is very important at the outset as part of the

22  initial preparation by the bankers.  And none of that was done

23  in this particular situation.

24       (Reporter clarification)

25          **THE WITNESS:**  Yes, I'm sorry.  I'll do better.

1    There was the discussion with the PIF on July 31st.  And

2    then one week later, August 7th, there was the disclosure of

3    the 420 per share.  That was seven days.

4         Again, just taking the Dell case as a benchmark, Mr. Dell

5    took seven months from the initial connection to Southeastern

6    to the eventual public disclosure of the offer.  So it's

7    remarkably different, incredibly different from the typical

8    deal.  The Dell deal is, I think, the best comparison.  And

9    even that deal was just nowhere near as quick as this one was.

10   Didn't consult with banker or lawyers.

11        There was one, I think, 30-minute conversation with

12   Mr. Durban from Silver Lake, but that wasn't meant to be

13   substantive.  That was just setting up what Mr. Durban called a

14   kickoff meeting that would have happened later.

15        So it's striking how a typical process would require

16   banker and lawyer consultations but none of that was done in

17   this particular case until the "Funding secured" tweet as

18   happening, and even after the 7th there it is not any real

19   meaningful analysis done by the bankers in the way you

20   typically see before a deal is publicly announced.

21   Q    So just to clarify timeline, Musk, I guess, approached the

22   board.  His proposal was made on what day?

23   A    August 2nd.

24   Q    And the "Funding secured" tweet was several days later on

25   August 7, correct?

 1   **A**    August 7, correct.

 2   **Q**    Okay.  And the August 2nd proposal, can you tell us a

 3   little about that?

 4   **A**    Well, that email --

 5           **MR. PRICE:**  Objection, Your Honor.  That calls for a

 6   narrative.

 7           **THE COURT:**  Overruled.

 8           **THE WITNESS:**  The August 2nd email was the 420

 9   proposal to the board.  It was just three days after his

10   meeting with the PIF, so very, very short timeline.  The 420,

11   which I'll get into in more detail, was just a 20 percent

12   premium over the current market price.  That's just a number,

13   that's not the way these things are normally done.

14       And one particular piece that stood out to me in the email

15   was the 30-day what we call a fuse on the deal, meaning it

16   expired after 30 days.  That is stunningly short.  No deal in

17   my sample has been done in 30 days, it's just not possible.  So

18   to put a 30-day fuse on an offer to the board on August 2nd

19   makes it, I think in some ways, just an illusory offer, it's

20   not real.

21       And had he gotten meaningful legal advice or banker advice

22   prior to putting that proposal on the table on August 2nd, he

23   would have been told or would have been able to understand that

24   30 days is just not pretty realistic.

25   **Q**    And, I would like --

 1          **MR. APTON:**  Can I show the professor Exhibit 81,

 2   please?

 3          **THE COURT:**  You can show it to him.

 4      (Document displayed)

 5          **MR. APTON:**  Your Honor, this Exhibit 81 was the

 6   document that was previously showed to the jury during opening

 7   statements.  May I publish it to the jury and move it into

 8   evidence?

 9          **MR. PRICE:**  There's no objection.

10          **THE COURT:**  You may.  Admitted.

11      (Trial Exhibit 81 received in evidence.)

12   **BY MR. APTON**

13   **Q**    So, Professor, this is the August 2nd proposal to the

14   board, correct?

15   **A**    That's right.

16      (Document displayed)

17   **Q**    And can you just point out the aspects of the email that

18   you were just discussing, so we see it here and understand?

19   **A**    Sure.  The 420 is in the header.  And I'll come back to

20   that 420 in a few minutes.  But there was almost zero analysis

21   that went into that number.  It's just not how a price is put

22   on the table.  Especially in what would have been a 60 or 70 or

23   $80 billion MBO, that's just not how it's done.

24          And then I mentioned a minute ago, the offers expires in

25   30 days.  Anyone who was well-advised or even partially advised

1   in a situation like this would know that's just not possible.

2   There needs to be a process.  That process will take probably

3   at least three months, but in a deal of this size, probably

4   more like six months or even longer than that.

5        The Dell MBO took, I believe, a year, maybe even 18 months

6   before it went from the initiation to the final closing, so 30

7   days is just impossible.  And I know that's a strong word, but

8   it -- I think it's literally impossible to get a deal done of

9   this size in 30 days.

10  Q    So why do you say it's impossible?

11  A    Well, there's just so many steps, which I have gone

12  through already.  The special committee -- special committee

13  has to be constituted.  They've got to hire advisers.  There's

14  got to be a negotiation.  There's public communications.

15  There's then a shareholder vote.  And just that last step of a

16  shareholder vote can take three months, four months.  You've

17  got to put out a proxy statement.  Lots of thing have to go out

18  to the shareholders.

19       And then, one specific thing this 30 days goes to.  In any

20  deal like this, which is a cash deal, you're selling the

21  company for cash, there's an obligation to make sure you get

22  the best price.  And what that typically means is having some

23  canvass of the marketplace.  Seeing if somebody else can offer

24  more money.

25       For example, in the Dell MBO, there was an offer, I

1    believe it was thirteen-seventy-five per share.  And then there

2    was what's called a go-shop period, 45 days, where the board

3    could go shop for a higher offer.  So there would have been

4    some kind of similar process here, either pre-signing or

5    post-signing, where you've got to go and talk to other

6    potential buyers and see if they can offer more.  That takes at

7    least 30 days; in the Dell case it took 45 days.  So just that

8    step, on its own, would take longer than 30 days.

9    **Q**    I see.  And so this is the proposal, August 2nd -- oh, I'm

10   sorry.  Is there something --

11   **A**    And I want -- just to make sure I complete my answer to

12   your question, this last sentence I think is also important

13   because what he's envisioning, at least as of August 2nd, is a

14   very novel deal.  I think Mr. Durban said it was unprecedented.

15   In a typical MBO, the shareholders get cash in the exit of the

16   company.  Mr. Musk was contemplating some version of that in

17   which some shareholders would get cash and exit, but for

18   shareholders who want to continue, they could continue in the

19   private company.

20        That would have been unprecedented.  It's a variation of

21   an MBO.  But the complexity of that, figuring out how you can

22   do that, would take even more time.  So this is a monstrous

23   deal, 80 billion-dollar MBO, and then there's the further

24   complexity of a complicated structure that's never been done

25   before, it would require even more planning, even more

1    preparation, which wasn't that done.

2    **Q**    And so this is on August 2nd.  And August 3rd, 4, 5, 6,

3    7 -- five days later he tweets "Funding secured."

4         **MR. APTON:**  Can we show Exhibit 8, please?

5         (Document displayed)

6    **BY MR. APTON**

7    **Q**    Is this what you would refer to as the public disclosure

8    in your step three process?

9    **A**    Correct.  And yes, this is the public disclosure.

10   **Q**    Okay.  I believe the next point in your assessment was

11   that Mr. Musk's proposal, his unilateral announcement of the

12   offer was highly unusual.  Is that correct?

13   **A**    It is, yes.

14   **Q**    Can you please elaborate on that?

15   **A**    Well, it is what we just saw.  The August 7th "Funding

16   secured" tweet was a unilateral disclosure by the CEO from the

17   buy side of a major public company MBO.  That's never been done

18   before.  Certainly not by Twitter.  And as I mentioned in my

19   sample, there was only one other instance, it was a very --

20   well, I shouldn't say very small.  It was had a $400 million

21   MBO.  So, less than 1 percent, as large as it still would have

22   been, but it's very unusual.  And the risk is that Mr. Musk

23   would time the disclosure at a moment where it's going to

24   disrupt the company.

25        Now, in addition to that generally unique disclosure, it

1   was also done during the trading day and there's testimony from

2   the directors that most companies, my company, Tesla, most

3   companies don't make disclosures during the trading day.  That

4   makes it even more disruptive, and that was what was done here.

5   So incredibly, um, different from the usual process.  And then

6   it was unusual that the CEO would do it on his own,

7   unilaterally.

8   **Q**    Now, Professor, in your second bullet point here you say

9   that beyond funding secured, no details were provided about the

10  source or amount of financing for the going-private

11  transaction.  Do you see that?

12  **A**    Yes.

13  **Q**    And why do you make that point?

14  **A**    Well, it's a remarkable disclosure to say "Funding

15  secured" with no indication, at least in the tweet, about where

16  the funding is coming from.  Is it fully financed?  Is it

17  committed financing?  Nothing along those lines.

18       So that would be typical to at least talk to bankers and

19  maybe even have committed financing by the time you announce

20  it, but that wasn't done here.

21  **Q**    Now, Professor, there were at least two tweets about the

22  transaction on August 7th, correct?

23  **A**    Yes.

24       **MR. APTON:**  Can we show Exhibit 13, please?

25       This is already in evidence, Your Honor.

SUBRAMANIAN - DIRECT / APTON

1        (Document displayed)

2   **BY MR. APTON**

3   **Q**    Now, this tweet, "Investor support is confirmed.  Only

4   reason why this is not certain is that it's contingent on a

5   shareholder vote," did you review this tweet in the course of

6   your analysis?

7   **A**    I did, yes.

8   **Q**    And you see there that just below there is a link to a

9   blog post?

10  **A**    Yes, uh-huh.

11  **Q**    Are you familiar with the blog post to which that relates?

12  **A**    Yes.

13          **MR. APTON:**  Can we show Exhibit 12, please, already in

14  evidence?

15       (Document displayed)

16  **BY MR. APTON**

17  **Q**    Is this the blog post that was linked to that "Investor

18  support confirmed" tweet?

19  **A**    Yes, I believe it is.

20  **Q**    Now, this is certainly longer than the tweets.  But did

21  you take this into account when you said that there were no

22  details beyond "Funding secured" provided to the market that

23  day?

24  **A**    Yes, I did.  I did look at this blog post, and it doesn't

25  have any further details on where the financing is coming from

1  or whether it's committed.  It talks about other things, but

2  not about the financing.

3  **Q**    And why is that noteworthy, in your opinion?

4  **A**    Well, one possibility would be "Funding secured" was the

5  headline.  And then this would be in a lot more detail about

6  where the funding is coming from, what are the commitments,

7  what is it conditioned upon.  That would be a typical blog

8  post, I suppose, if it's being disclosed as a tweet, but

9  there's nothing along those lines.  It talks about Tesla and

10  SpaceX not merging.  It talks about shareholders continuing,

11  but it doesn't say anything about the financing at all.

12  **Q**    And -- and that -- that is -- in your opinion, is this in

13  line with -- with what a corporation should be disclosing after

14  a tweet such as "Funding secured"?

15         **MR. PRICE:**  Objection.  That is beyond the scope of

16  his opinion.

17         **MR. APTON:**  I'll withdraw the question, Your Honor.

18         **THE COURT:**  Okay.

19  **BY MR. APTON**

20  **Q**    Professor, let's move on.  The next point you made was

21  that Musk's proposal was substantively flawed, correct?

22  **A**    Correct.

23  **Q**    And why do you say that?

24     (Document displayed)

25  **A**    Well, there's at least a few different reasons.  One I've

1    already mentioned.  In any MBO, especially an MBO of this size,

2    you don't have careful banker analysis.  They would do

3    discounted cash flows, they would do comparable transactions.

4    They would give you a range of possible deal pricing.  Instead

5    of any of that, Mr. Musk just took the stock price and added

6    20 percent.  That's not how pricing gets done in a deal like

7    this.

8        I should also note, and you saw it on the blog post that

9    we just put on the screen, that Mr. Musk seemed to think that

10   that 420 was a first and final offer, and in the blog post it

11   said shareholders will have the choice to keep in the company

12   or take the 420.

13       What he's not describing is there's a whole process

14   involving a negotiation, that 10 to 15 percent bump I mentioned

15   earlier, that has to happen.  But he's simply saying:  No, take

16   it or leave it, 420, that's the offer to you.  Which is just

17   not correct, either.

18       So my data shows there's no standard premium in an MBO.

19   It could be very small, 5 percent, it could be 90 percent.

20   There is no standard premium.  But here, Mr. Musk applies this

21   allegedly standard 20 percent.  It's just not the way things

22   are done.

23       (Document displayed)

24   A    This point I already mentioned, I'll just make it very

25   briefly that a first and final offer is just not done.  There's

1    a first offer, there's a negotiation, but that is not what

2    Mr. Musk was describing his August 7 tweet or in his blog post.

3    And then, as I said already, 30 days, it's just not possible.

4    And so it was illusory, I think, for that reason.

5    **Q**    I see.  And so if you could, I guess, summarize or compare

6    it to the typical MBO process, how did Mr. Musk's proposal

7    compare?

8    **A**    Well, this is the process I put up earlier, that standard

9    template.

10       (Document displayed)

11   **A**    And this is not to say that every single deal follows this

12   template exactly.  There can be some minor variation from deal

13   to deal, but I have never seen in my 23 years studying

14   corporate deals a deal that was so far off the norm as was this

15   Musk proposal.

16       So the initiation, no consultation with bankers or lawyers

17   before the public announcement.  The board did form a special

18   committee, so that's the one green check I would give.  The

19   board formed a special committee.  I think they were in the

20   process of hiring bankers and lawyers, maybe they'd even

21   retained somebody, so that was one piece of the process that

22   was at least closer to the standard template.

23       But then the public disclosure was done unilaterally by

24   the CEO through a tweet.  That's unprecedented, not done.

25       There was significant outbound engagement with

1   shareholders.  Mr. Musk making the offer public in order to go

2   talk to shareholders, that's also not the norm.

3        And then, this idea that there's going to be no

4   negotiation with the special committee, it's just going to be

5   420, shareholder vote, take it or leave it, it just missed a

6   big process step, a very important process step of negotiation

7   between the special committee and Mr. Musk.  That didn't happen

8   here, either.

9   **Q**   And with respect to the deal -- I'm sorry.  With respect

10  to the Dell MBO that you mentioned previously, how did the Musk

11  proposal compare specifically to the Dell MBO?

12  **A**   Well, the Dell MBO --

13       (Document displayed)

14  **A**   -- had some process flaws that I've described in my

15  research.  But it was basically the standard template.  There

16  was a lot of deliberation, Mr. Dell talked to advisers, bankers

17  and lawyers.  He spent 60 days before he brought it to the

18  board.

19       In this case, it was two days, from July 31st to

20  August 2nd, from when Mr. Musk had his initial conversation

21  with the PIF to bringing it to the board.  Very, very short.

22       As I've already said, lots of consultation in the Dell

23  case with advisers; no consultation here.  Mr. Dell did not put

24  a deadline in his offer; Mr. Musk did, 30 days.  It just can't

25  be done in 30 days.  Mr. Dell expected a negotiation with the

SUBRAMANIAN - DIRECT / APTON

 1   special committee, he said I'll condition my offer on special

 2   committee approval.  No such expectation of negotiation here.

 3   To the contrary, Mr. Musk said: I want this to go to the

 4   shareholders, and they get to vote, and that's the only thing

 5   standing between us and a deal.  It's just not correct.

 6       Discussion with shareholders.  There was inbound to the

 7   board in the Dell process, but no outbound.  Here, there was

 8   outbound.  Again, very unusual.

 9       A final kind of two points.  The timing from the initial

10   presentation to the public disclosure, 150 days in Dell.  It

11   was five days here.  August 2nd to August 7th, incredibly short

12   timeline.

13       And then the special committee controlled the disclosures

14   in the Dell case, but Mr. Musk was making disclosures

15   unilaterally here.

16   **Q**    And in connection with your engagement in this matter,

17   you've reviewed deposition transcripts from the witnesses in

18   this case, correct?

19   **A**    Yes.

20   **Q**    And you've reviewed emails and internal documents,

21   correct?

22   **A**    Yes.

23   **Q**    And do you have any understanding of whether Elon actually

24   spoke with Michael Dell before the tweet?

25   **A**    I believe he did, correct.  So Mr. Musk called Mr. Dell

1   and spoke to him, I don't know how long.  But yes, before the

2   August 7th tweet, that conversation did happen is my

3   recollection.

4   **Q**    And I think you mentioned earlier, Elon also spoke with

5   Egon Durban of Silver Lake, who was also involved in the Dell

6   deal.  Correct?

7   **A**    Correct.

8   **Q**    And so he spoke with both those advisers before the tweet?

9   **A**    Yes.  That's my understanding.

10          **MR. APTON:**  And so, Professor, at this point I don't

11  have any further questions.

12          **THE COURT:**  All right.

13          **MR. APTON:**  I reserve for redirect.

14          **THE COURT:**  Thank you.

15          **MR. APTON:**  Thank you.

16          **THE COURT:**  All right.  Thank you.

17      Cross.

18                      <u>**CROSS-EXAMINATION**</u>

19  **BY MR. PRICE**

20  **Q**    Good morning, Professor Subramanian.

21  **A**    Good morning.

22  **Q**    So first of all, on your background I understand you are

23  the chairman of a company in the automobile industry.  Correct?

24  **A**    Correct.

25  **Q**    And that company is not Tesla, right?

1   **A**   Correct.

2   **Q**   And in your testimony you mentioned that one of your

3   qualifications, one of the things that qualifies you for

4   knowing about how MBOs work, one of the -- maybe it's a small

5   thing, but it was that you were actually an expert in the one

6   management buyout that you kind of used throughout your

7   analysis as being the typical management buyout.  Right?

8   **A**   I didn't say it was typical.  It was the most comparable

9   to this situation because it was so large.  So not typical, but

10  comparable to this deal.

11  **Q**   I think, as you've told us, you were actually involved as

12  an expert in that.  Right?

13  **A**   Correct.

14       **MR. PRICE:**  By the way, let me make sure everybody has

15  their binders.  I don't want to get ahead of myself here.

16  Could we have the binders handed out of the exhibits and the

17  deposition transcript.

18       May I approach, Your Honor?

19       **THE COURT:**  Yes.

20       (Document tendered)

21       **MR. PRICE:**  Let me check that everything is up there

22  now.

23  **BY MR. PRICE**

24  **Q**   So Professor Subramanian, as they are making sure we have

25  everything else in front of you, in addition to what your

1   counsel gave you, I did give you some exhibits, and I think we

2   are going to start talking about them.  So we were talking

3   about how you were involved as an expert in that Dell MBO.  And

4   just to give us some context, in that MBO, Mr. Dell and a

5   partner tried to take, and in fact, was successful in taking

6   Dell private, correct?

7   **A**    Correct.

8   **Q**    They bought out all of the shareholders, is that right?

9   **A**    Correct.

10  **Q**    And Mr. Dell's percentage in the company increased from

11  about 16 percent to about 75 percent?

12  **A**    That sounds about right.

13  **Q**    And his partner, Silver Lake, ended up with the remaining

14  25 percent?

15  **A**    That sounds right.

16  **Q**    Okay.  And in connection with that case, you said there

17  was a -- it's called a go-shop period in that case?

18  **A**    Correct.

19  **Q**    And a price was agreed upon as to what the shareholders

20  should be paid for basically getting them out of the company,

21  right?

22  **A**    Yes.

23  **Q**    And that go-shop provision was a method of making sure

24  that was a fair price, right?

25  **A**    That is generally correct.  I had my concerns about

1  whether that was meaningfully the case in the particular Dell

2  situation.

3  **Q**    So in that case, actually, you represented a group of

4  shareholders who were saying that that go-shop provision, where

5  they kind of did -- you know, made it available for shopping,

6  for auction, to let other people come in and bid, that you

7  represented shareholders saying that that did not result in a

8  fair appraisal of their shares.  Is that right?

9  **A**    No, I didn't represent anybody.  I was retained by

10  petitioners who were seeking an appraisal of their shares.  And

11  I reached the conclusion that the deal process was not

12  sufficient for price discovery.  I didn't say whether it was

13  fair value or not, but simply the deal process was deficient in

14  certain ways.

15  **Q**    Let me be clear.  The price per share was challenged by

16  what you said were petitioners, correct?

17  **A**    Correct.

18  **Q**    They were shareholders, correct?

19  **A**    Right.

20  **Q**    And you were an expert for that side of the case.  Right?

21  **A**    Correct.

22  **Q**    Okay.  And in that, you offered an opinion that that the

23  Dell go-shop process was not an effective process to ensure

24  fair value for these shareholders.  Right?

25  **A**    Correct.  Because of the match rate that Mr. Dell had,

1    among other things.

2    **Q**    And one of the reasons -- you gave your opinion.  One of

3    the reasons was you said Michael Dell brought value to that

4    deal so that Dell was worth more with him than without him.

5    Correct?

6            **MR. APTON:**  Objection, Your Honor.  Relevance.  He's

7    already been qualified as an expert.  I don't understand

8    what --

9            **MR. PRICE:**  Your Honor, he knows being qualified as an

10   expert does not mean you can't cross-examine the witness.

11           **THE COURT:**  Overruled.  I'll allow some of this.

12   **BY MR. PRICE**

13   **Q**    Is that right?

14   **A**    Can you repeat the question, please.

15   **Q**    Sure.  You gave an opinion that one of the reasons the

16   go-shop process did not -- was not an effective process to

17   ensure fair value was that Michael Dell brought private value

18   to the deal.  That the company Dell was worth more with him

19   than without him.  Correct?

20           **MR. APTON:**  Objection, Your Honor.  We're not

21   litigating the Dell MBO.

22           **THE COURT:**  Well, I understand.  I'm going to allow

23   some, for impeachment value.  But we're not going to have a

24   trial within a trial.

25           **MR. PRICE:**  No, this is very short.

1          THE COURT:  Good.

2          THE WITNESS:  I did do an event study in that report

3   which talked about how Mr. Dell added value to the company, and

4   that would have implications for both the pre-signing and the

5   post-signing process.

6   BY MR. PRICE

7   Q    If you could look -- I think there's -- Exhibit 363 is in

8   front of you.  I believe that's your report.  And I'm just

9   going to confirm what your opinion was.

10          MR. PRICE:  This is not to be displayed to the jury,

11   just to counsel and to Professor Subramanian.

12          MR. APTON:  Your Honor, I don't have a copy of 363

13   from defense counsel.

14          THE COURT:  I don't, either.

15          MR. APTON:  I'm not sure it was disclosed, Your Honor.

16          MR. PRICE:  This is impeachment.

17      (Document tendered)

18   BY MR. PRICE

19   Q    This is to refresh your memory about your opinion.  It's

20   363, Page 40, Paragraph 100.

21      (Document displayed to Court and Counsel)

22   A    You said Paragraph 100?

23   Q    Yeah, I think it's 363-40, Paragraph 100.

24   A    Okay.

25   Q    And your opinion was that Michael Dell brings private

 1   value to the deal --

 2           MR. APTON:  Objection.  He is reading the exhibit into

 3   the record while it's only being used to --

 4           THE COURT:  You're using it to refresh his

 5   recollection.  You can't read what's the refreshment document.

 6   You can ask him questions.

 7           MR. PRICE:  Let me ask him this.

 8   BY MR. PRICE

 9   Q    Isn't it correct that your opinion that you gave was

10   that -- that Michael Dell brought private value to the deal,

11   that Dell was worth more with him than without him?  Correct?

12   A    That's correct.  And it was based on an event study I had

13   done.  When Mr. Dell had unexpectedly left Dell and then

14   unexpectedly joined Dell, you saw the market reaction to that

15   announcement.

16   Q    All right.  And so you gave an opinion based upon -- it

17   was actually two event studies, right?

18   A    Correct.

19           MR. APTON:  Objection, Your Honor.

20           THE COURT:  Overruled.

21   BY MR. PRICE

22   Q    And the reason this is important is that -- just so we

23   understand to evaluate the process -- if Mr. Dell adds value,

24   then it might deter someone else from coming in and bidding,

25   and just bidding the same dollar amount.  Right?

1    **A**    It would depend.  It's a lot more complicated than what

2    you just said --

3    **Q**    Let me ask it this way:  As a result of him adding value

4    and opening up this auction, as a result of him adding value,

5    your conclusion was that third-party bidders couldn't come in

6    and simply bid a nickel more because they don't have Michael

7    Dell on their side.  Right?

8    **A**    This gets into some auction theory, which I will have to

9    take some time to explain.  If you want, I can do that.

10   **Q**    Well, no; tell you what.  Let me see if it refreshes your

11   recollection.  Look at that same paragraph, look at the last

12   sentence, you know.

13          Wasn't your opinion that as a result, third-party bidders

14   can't simply bid a nickel more because they don't necessarily

15   have Michael Dell?  That was your opinion.

16   **A**    I have to explain that, because there's a whole report

17   that goes to that particular sentence.

18          In general, if there's a common-value auction, I can

19   incrementally bid over your bid, and be confident that I'm not

20   overpaying.  In this Dell situation, there was a source of

21   private value that Mr. Dell brought to the table.  And so if

22   you don't have the commitment from Mr. Dell to work with you,

23   you can't do that incremental bidding as effectively as you

24   might in the common-value situation.

25   **Q**    Okay.  Okay.  Thank you for that.

1      And -- and your opinion was that -- I'm sorry.  Your

2  opinion was based upon the two event studies that you talked

3  about, right?  You mentioned that.

4  **A**    Yes.  I believe that's right.

5  **Q**    And your opinion was that those two event studies were,

6  quote, strong evidence that Mr. Dell brings significant value

7  to Dell, Incorporated.  Right?

8  **A**    I think that is generally correct, yes.

9  **Q**    Okay.  I mean, not just -- those events studies weren't

10  just sufficient to show that they were strong evidence that

11  Mr. Dell had value, right?

12  **A**    Yes.  I don't think it was too much of a claim to say that

13  Mr. Dell adds value to Dell, Inc.

14  **Q**    Okay.  And the Supreme Court of Delaware rejected that

15  opinion, saying that your conclusions were incorrect.  Right?

16  **A**    No, that's totally wrong.

17  **Q**    Well, looking at the two event studies that you used to

18  support your opinion that that was strong evidence that

19  Mr. Dell brought value, I would like you to look at

20  Exhibit 364.

21              **THE COURT:**  364?

22              **MR. PRICE:**  Yes.  Do you have that in front of you?

23              **THE COURT:**  It's not in my binder.

24              **MR. APTON:**  Your Honor, we don't have a copy of that.

25  I'm not sure it was disclosed.

1    BY MR. PRICE

2    Q    Professor Subramanian, do you have a copy?

3    A    Yes.

4    Q    Okay.

5         (Document handed up to the Court)

6         MR. APTON:  Your Honor, I object to this line of

7    questions.  This goes to qualifications.  We are way past any

8    semblance of relevance.

9         THE COURT:  Overruled.  But, again, we're not going to

10   do a full mini-trial into this, so --

11        MR. PRICE:  No.  This will be two more minutes.

12   BY MR. PRICE

13   Q    And you've seen the Supreme Court's opinion that discusses

14   your opinion, right?

15   A    Yes.

16   Q    And this is a copy of that, correct?

17   A    Correct.

18   Q    And this is a -- the Supreme Court of Delaware, there are

19   four justices and one judge who took part in this opinion.

20   Right?

21   A    It's five justices.

22   Q    Right.  Well, they had a judge sitting by designation in

23   this case, right?

24   A    I did not know that.  Okay.

25   Q    So there are five of them.  And they concluded, did they

1    not -- and this is at 364-20 -- that (As read):

2            "Stale..."

3            MR. APTON:  Objection.  He is reading into the record

4    again, Your Honor, and it was only being used to refresh

5    recollection.

6            THE COURT:  Sustained.

7            MR. PRICE:  This is not meant to refresh recollection.

8    BY MR. PRICE

9    Q    I asked you, isn't it true that the Supreme Court of

10   Delaware rejected the opinion you gave in the Dell case, that

11   your event studies were strong evidence that Mr. Dell added

12   value.  Isn't that true?

13   A    No.

14   Q    If you would look at 364-20.

15       (Document displayed)

16   Q    And this opinion by the Delaware Supreme Court, isn't it

17   correct that they concluded that (As read):

18            "Stale event studies and a single self-serving

19       email from Mr. Dell suggesting that a potential

20       customer might not engage the company if he were

21       replaced do not amount to sufficient evidence of

22       Mr. Dell's actual value."

23       That was the Supreme Court's conclusion.  Correct?

24   A    I read the sentence on the page.  I -- I don't know what

25   to say about that.  It's hard to explain why Mr. Dell does not

1   add value to Dell, Inc., but you see the sentence on the page

2   as written.

3   **Q**    Right.  So those five justices -- or, I'm sorry, four

4   justices and one judge looked at your opinion that those

5   stale -- sorry, that those event studies -- and you also

6   mentioned an email from Mr. Dell in your opinion as well,

7   right?

8   **A**    It's an email from Mr. Dell.

9   **Q**    Right.

10   **A**    I don't know if I cited it in my report.

11   **Q**    And they concluded that your opinion was wrong.  That, in

12   fact, those event studies were stale, and that they did not

13   amount to even sufficient evidence that Mr. Dell had value,

14   right?

15          **MR. APTON:**  Objection, Your Honor.  There is no event

16   study in this case.  This is not relevant.

17          **THE COURT:**  It's not -- it's not about an event study

18   in this case, it's about his stated methodology regarding going

19   forward, and so it's fair subject to cross-examination.

20          But again, we're not going to do a mini trial about this.

21   So --

22          **MR. PRICE:**  Right.  This is the end of this, if we

23   just get that acknowledgment from Professor Subramanian about

24   the Delaware Supreme Court rejecting his opinion in the very

25   case that you were using as a good example to compare this case

 1   to.

 2         **THE WITNESS:**  What's the question?

 3   **BY MR. PRICE**

 4   **Q**    You now acknowledge, having seen this, that the Delaware

 5   Supreme Court rejected your opinion that the event studies and

 6   an email from Mr. Dell was strong evidence that Mr. Dell added

 7   value.  In fact, they said it wasn't sufficient evidence.

 8   Right?

 9   **A**    First of all, the chancery court very much agreed with my

10   study, so that is a separate point.  My overall point that was

11   relevant for my deal process analysis is that Mr. Dell had some

12   value to Dell, Inc.  That seems, I think, like a really

13   straightforward point that Mr. Dell would have value to Dell,

14   Inc., just like Mr. Musk has value to Tesla.  They say the

15   event studies didn't show it; I respectfully disagree.

16         But regardless, as a matter of deal process, to the extent

17   that Mr. Dell had value to Dell, Inc., that would have

18   implications for the deal process which I think are standard in

19   terms of auction theory.

20   **Q**    And in fact, the Delaware Supreme Court rejected the

21   petition by the shareholders that you were testifying for to

22   change the price of the deal.  Right?

23   **A**    My recollection is the deal price was thirteen-eighty-two.

24   The chancery court awarded seventeen-sixty-five.  And then, as

25   you say, the Delaware Supreme Court reversed, as a matter of

1   law, and said that the deal price should be considered the best

2   evidence of fair value.

3   **Q**    Well, wait.  One of the reasons they reversed is because

4   they rejected your opinion that these event studies were strong

5   evidence that Mr. Dell added value.  Right?

6   **A**    I disagree.  I think it was a much broader analysis than

7   what you just said.  And it had to do with what does it take to

8   be sufficient as a matter of deal process.  And that's a matter

9   of appraisal doctrine in Delaware.  My deal process analysis, I

10  think, is a matter of economics.

11  **Q**    Well, let's talk about, then, your use of your expertise

12  in this case.  And let's start with, I guess, one -- I think it

13  was your fourth slide where you say you did an assessment of

14  Mr. Musk's -- you call "MBO proposal."  Do you recall that?

15  **A**    Yes.

16  **Q**    And in your report, you actually defined, have a

17  definition of what you mean by "MBO proposal."  Right?

18  **A**    I believe that's right, yes.

19      (Off-the-Record discussion between counsel)

20          **MR. PRICE:**  Your Honor, if I may place before the

21  witness and give to counsel and the Court a copy of Professor

22  Subramanian's report in this case?

23          **THE COURT:**  All right.

24      (Document tendered)

25          **MR. APTON:**  Thanks.

1    BY MR. PRICE

2    Q    And in your report, you define the proposal at

3    Paragraph 25.  Is that right?

4    A    Correct.  I'm using the defined term "Musk Proposal" to

5    refer to the August 7th two tweets.

6    Q    Okay.

7              MR. PRICE:  Just one second, Your Honor.

8    BY MR. PRICE

9    Q    That is a capitalized term, "Musk Proposal," correct?

10   A    Correct.

11             MR. APTON:  Excuse me, Bill.  This is the wrong

12   report, I believe.

13       (Off-the-Record discussion between counsel)

14   BY MR. PRICE

15   Q    Just to make sure, did you have a copy of your original

16   report in this case?

17   A    I think that is what you just gave me?

18   Q    Dated November 8, 2021.  Do you have that in front of you?

19   A    I think you just gave it to me.

20   Q    I want to make sure it is the right one, and not the

21   rebuttal.

22   A    It's the first report.

23   Q    Okay.  And so this capital "Musk Proposal" that you

24   define, you define as being only some of the August 7th tweets.

25   Right?

 1    **A**    You said "Some of the August 7th tweets"?

 2    **Q**    Yes.

 3    **A**    I believe there was two August 7th tweets, and it refers

 4    to both of them collectively.

 5    **Q**    And what you refer to here is what's been identified into

 6    evidence in this case Exhibit 8, which is the August 7th tweet

 7    at 12:48 p.m.

 8            **MR. PRICE:**  If we could put Exhibit 8 up.

 9            (Document displayed)

10    **BY MR. PRICE**

11    **Q**    Do you see Exhibit 8, sir?

12    **A**    Yes.  And if I could just clarify my earlier answer, it

13    also refers to the blog post on August 7th, so I believe that

14    "Musk Proposal" refers to the two tweets and the blog post.

15    **Q**    Let's look at those.  There was the August -- this tweet,

16    Exhibit 8.  Exhibit 12.

17            (Document displayed)

18    **Q**    Did it refer to this?  Is that part of the Musk proposal?

19    **A**    Yes, because it's referred to as the "email blog post" in

20    Paragraph 25 of my report.

21    **Q**    And then Exhibit 13.

22            (Document displayed)

23    **Q**    This is also part of the blog post, right?

24    **A**    I'm sorry.  You said as part of the blog post?

25    **Q**    I'm sorry.  This is also one of the things that you

1  considered in -- in defining what the Musk Proposal (Indicating

2  quotation marks) was, right?

3  **A**    Correct.

4  **Q**    And your conclusion was that there were only two terms to

5  what you a defined as the Musk Proposal (Indicating quotation

6  marks).  And that is "420" and "Funding secured."  Correct?

7  **A**    Where do you see that?

8  **Q**    I'm referring to your testimony, but I'm just asking you

9  whether or not that's true.  And then we'll see if that's the

10  testimony.

11  **A**    I'm not sure I understand your question.  There are only

12  two terms to the Musk proposal?  There's what's on the screen,

13  that it's contingent only on a shareholder vote.  That's part

14  of the proposal as well.

15  **Q**    Well, I'm asking, for purposes of your analysis, what you

16  considered to be the terms of the Musk Proposal, you know, for

17  your analysis.  Right?  And isn't it true --

18          **THE COURT:**  So you're asking him now, not what he said

19  in the report.  Let's clarify what you're asking.

20          **MR. PRICE:**  Yes, yes.

21          **THE COURT:**  Okay.

22          **MR. PRICE:**  The report simply identifies the tweets.

23  And the blog post, Your Honor; I'm sorry.

24  BY MR. PRICE

25  **Q**    But is it true that you thought the only relevant terms of

1   the Musk Proposal was "420 per share" and "Funding secured"?

2   Those are the two terms that are part of the Musk Proposal.  Is

3   that correct?

4   **A**   Is that in my report?  I don't think that's correct, no.

5        THE COURT:  Well, now you've asked a different

6   question.  Now you're asking -- first you asked if these were

7   the only two terms.  Now you've asked are these two only two

8   relevant terms.  So I think you --

9        MR. PRICE:  I'll change it.

10        THE COURT:  -- need to clarify.

11        MR. PRICE:  Sure.

12   BY MR. PRICE

13   **Q**   Was it your belief that the only two relevant terms for

14   the, quote, Musk Proposal were "420 per share" and "Funding

15   secured"?

16   **A**   The proposal is the 420 tweet.  There's this tweet.

17   There's the blog post on August 7th.  That's all the proposal.

18   There's also the prior discussions with Silver Lake.  It's all

19   the part of the overall process that I examined.  This defined

20   term, "Musk Proposal," refers to the two tweets and the blog

21   post on August 7th.

22   **Q**   Okay.  Let me just read into, if I can, Page 56 from your

23   deposition, Lines 7 through 20.

24        THE COURT:  Okay, hold on.

25        MR. PRICE:  Yep.

1              **THE COURT:**  Give me the page again.

2              **MR. PRICE:**  This is Page 56, Your Honor, Lines 7

3    through 20.

4    **BY MR. PRICE**

5    **Q**   (As read)

6              "**QUESTION:**  What are you assuming are the

7              relevant terms of the Musk proposal to the

8              extent they are disclosed?

9              "**ANSWER:**  I think the Musk Proposal as I use

10             it is defined in this Paragraph 25, as you

11             say, what are the relevant terms?  I think

12             it's the content of the tweets, so '420 per

13             share' and 'funding is secured.'  These are

14             the terms that are part of the Musk

15             proposal."

16        And you go on to say (As read):

17             "I think one of the key points in my report

18             is that there is nothing else of substance in

19             the Musk Proposal.  And even the two things

20             that are specified are either not correct or

21             not based on any analysis or both."

22        Is that correct?

23   **A**   That's what it says, correct.

24   **Q**   And, in fact, there were three other tweets that came out

25   on August 7th that actually described Mr. Musk's proposal.

1    Right?

2    **A**    Three other tweets on August 7th?

3    **Q**    Yes.

4    **A**    From Mr. Musk?

5    **Q**    Yes.

6    **A**    I know there's the "Funding secured" tweet, there's the

7    "Investor support is confirmed" tweet, and there's the blog

8    post.  What are the other tweets you're talking about?

9    **Q**    Well, do you have Exhibit 9 in front of you?

10   **A**    Is that in the binder?

11   **Q**    I have been told that it is.

12          **THE COURT:**  That's in the binder.

13       (Witness examines document)

14          **THE WITNESS:**  Okay.

15   **BY MR. PRICE**

16   **Q**    And you see --

17          **MR. PRICE:**  And, Your Honor, actually, we move

18   Exhibit 9 into evidence.

19          **THE COURT:**  Any objection?

20          **MR. APTON:**  No objection, Your Honor.

21          **THE COURT:**  All right, 9's admitted.  It can be

22   published.

23       (Trial Exhibit 9 received in evidence.)

24       (Document displayed)

25

1   **BY MR. PRICE**

2   **Q**    And so part of what Mr. Musk told the public was "I don't

3   have a controlling vote now..."

4         **MR. PRICE:**   It just disappeared.   You have something

5   else up here.

6      (Document displayed)

7   **BY MR. PRICE**

8   **Q**    "...& wouldn't expect any shareholder to have one if we go

9   private.   I won't be selling in either scenario."

10      This was part of the tweets he put out on August 7,

11  correct?

12  **A**    Correct.

13  **Q**    You did not consider that as part of the Musk Proposal,

14  correct?

15  **A**    It's not part of my defined term as I specified in

16  Paragraph 25.   It is possible that I reviewed this tweet as

17  part of my overall analysis.

18  **Q**    All right.   Throughout your report, when you say "These

19  are my conclusions" about the defined term Musk Proposal

20  (Indicating quotation marks), you are not including this tweet.

21  Right?

22  **A**    No, I think my assignment was broader than just those two

23  tweets.   My assignment was the Musk Proposal, as we defined it,

24  but also the accompanying disclosures.   So it would include the

25  tweet you just mentioned, and also the process before

**SUBRAMANIAN - CROSS / PRICE**

1    August 7th as well.

2    **Q**    All right.  Well, you defined in your report "Musk

3    Proposal," right?

4    **A**    Correct, as being the two tweets and the blog post.

5    **Q**    And then throughout your report you said:  Here are my

6    conclusions about the Musk Proposal.  Correct?

7    **A**    Should I read it to you from my report?

8    **Q**    Well, let me withdraw that, and ask you about some more

9    tweets.

10   **A**    I can respond quickly, if you don't --

11          **THE COURT:**  Yeah.  Why don't you go look at it,

12   clarify.

13          **MR. PRICE:**  Actually, Your Honor, I'll withdraw that

14   and get back to it, and get these other tweets up first.

15   **BY MR. PRICE**

16   **Q**    I'd like --

17          **THE COURT:**  That question is withdrawn.

18   **BY MR. PRICE**

19   **Q**    -- you to look at Exhibit 10.

20        (Reporter clarification)

21          **THE COURT:**  The question -- the question is withdrawn.

22          **MR. PRICE:**  Yeah.

23   **BY MR. PRICE**

24   **Q**    I'd like you to look at Exhibit 10.  That's another tweet

25   that came out on August 7th, correct?

```
 1   A     Yes, it is.

 2          MR. PRICE:  Move Exhibit 10 into evidence, Your Honor.

 3          THE COURT:  Any objection?

 4          MR. APTON:  No objection, Your Honor.

 5          THE COURT:  Admitted.

 6      (Trial Exhibit 10 received in evidence.)

 7          THE COURT:  You may publish.

 8          MR. PRICE:  Thank you.

 9      (Document displayed)

10   BY MR. PRICE

11   Q    And this is (As read):

12          "My hope is all current investors remain with

13          Tesla even if we're private.  Would create

14          special purpose fund enabling anyone to stay

15          with Tesla.  Already do this with Fidelity's

16          SpaceX investment."

17      This was part of his proposal that was sent out to the

18   public.  Correct?

19   A    Are you saying it's part of my definition of "Musk

20   Proposal"?  Or it's a tweet that went out on August 7th?

21   Q    That's -- that's a good question.  If you're going to

22   fairly characterize Mr. Musk's proposal so that you can analyze

23   it, you would include this as part of his proposal.  Right?

24   A    It's not formally part of my definition as I put it in

25   Paragraph 25, but I do remember reviewing this tweet as part of
```

1    the overall process.

2        It doesn't add anything to my analysis.  If anything, it

3    makes my analysis more problematic, because this is an

4    extraordinary structure he's proposing which has never been

5    done before.

6        (Reporter clarification)

7            THE WITNESS:  I am sorry.  I will do better.  I am

8    sorry.

9            MR. PRICE:  And then if we see Exhibit 11, if we can

10   look at that, sir.

11       (Document displayed)

12   BY MR. PRICE

13   Q    And you see -- do you see this tweet in front of you?

14   A    Yes.

15   Q    Also August 7th, right?

16   A    Correct.

17           MR. PRICE:  Move Exhibit 11 into evidence, Your Honor.

18           THE COURT:  Any objection?

19           MR. APTON:  No objection, Your Honor.

20           THE COURT:  Admitted.

21       (Trial Exhibit 11 received in evidence.)

22           THE COURT:  You can publish.

23           MR. PRICE:  Thank you.

24       (Document displayed)

25

1   BY MR. PRICE

2   Q     And this is Mr. Musk explaining (As read):

3           "Shareholders could either to sell at 420 or

4           hold shares and go private."

5       Do you see that, that that -- that was part of what he was

6   proposing.  Right?

7   A     Correct.  And it's deeply problematic.

8   Q     And sir, is it correct that for your analysis of what

9   Mr. Musk was proposing in your report, that you aren't

10  including the term that the structure would be that the

11  shareholders could have a choice of rolling over or not?

12  A     I don't understand your question.  Could you repeat it, or

13  clarify?

14  Q     Sure.  When you reference the Musk Proposal throughout

15  your report, are you assuming that one of the terms is that the

16  structure would be that the shareholders could have a choice of

17  rolling over or not?

18  A     I think the answer is yes, I am considering that factor.

19  And I mentioned earlier that because of that feature of what

20  Mr. Musk was envisioning, it would require even more process.

21  This is not a typical MBO; it's an MBO with a really

22  unprecedented twist, I think as Mr. Durban put it,

23  unprecedented to do it this way as is being shown on the

24  screen.

25      So, yes, it was part of my overall analysis.

1   **Q**   Well, so let me ask you about that.  You referred to

2   Mr. Durban, you referred to him during your direct.  That's

3   Mr. Egon Durban, correct?

4   **A**   Yes.

5   **Q**   Yes?  And he is with Silver Lake, correct?

6   **A**   Correct.

7   **Q**   And he was an adviser in the Dell MBO, correct?

8   **A**   And the buyout partner in Dell, yes.

9   **Q**   And you said that you credit what he says about this being

10  unprecedented, in part because of the experience he had with

11  Dell.  Correct?

12  **A**   I credit his comment that it was unprecedented.  I don't

13  know.  He's a very experiencer banker.  He said it was

14  unprecedented.  I agree with that assessment.  I think it's

15  part of my overall analysis.

16  **Q**   Okay.  However, you aren't giving an opinion that the

17  structure that Mr. Musk proposed was not feasible.  You're not

18  giving that opinion, are you?

19  **A**   I think that's correct.  I'm not giving that opinion.

20  **Q**   Okay.  And with respect to unprecedented, there are a lot

21  of financial tractions -- I'm sorry -- financial transactions

22  that are unprecedented until they're first done.  Correct?

23  **A**   I think that's tautologically true.

24  **Q**   Yeah.  I mean, like a poison pill.  That's part of mergers

25  and acquisitions, right?  A colorful name?

1  **A**    What's the question?

2  **Q**    Yeah.  Before it was done, it was unprecedented.  Right?

3  **A**    Well, actually, that's a good example.  It was not

4  unprecedented.  There was lots of predecessors to the poison

5  pill before it was put in the *Moran* situation in '84.  There

6  was precedent for it.  It wasn't just out of the blue.  There

7  was things that happened before that, that were similar.

8  **Q**    Well, in connection with Mr. Musk and Tesla and SpaceX

9  prior to August 7th, it's true that Mr. Musk had done many

10  things that were previously unprecedented.  Correct?

11  **A**    I don't know.  He's an extraordinary businessperson.  I

12  don't know if it was unprecedented, or just really successful,

13  or some combination of both.

14  **Q**    And since you were kind of relying on Mr. Durban saying

15  this was unprecedented, you did review his -- his testimony,

16  right?

17  **A**    It's possible I did.  I don't recall, though.

18  **Q**    Well, before giving opinions, you wanted to do all the

19  work that you thought was necessary in order to give an

20  informed opinion, right?

21  **A**    Correct.

22  **Q**    And there were a number of depositions which in your

23  report you say were reviewed.  Right?

24  **A**    Should I look and see if I reviewed Mr. Durban's

25  deposition?

1   **Q**    Sure.  Let's go to -- well, actually, is it correct that

2   you skimmed Mr. Durban's deposition?

3   **A**    So it looks like it is in my list of documents that I

4   relied upon.  So either myself or my research assistants would

5   have reviewed it in some way to identify the aspects of his

6   testimony that would be relevant for my overall assessment.

7   **Q**    And you mentioned that your research assistants reviewed

8   depositions, correct?

9   **A**    In some cases.  In some cases, I review them myself.

10  **Q**    And certainly, as of the time of your deposition, the only

11  depositions that you recall skimming were Mr. Durban and

12  Mr. Musk.  Correct?

13  **A**    That sounds possible.  I don't recall.

14  **Q**    Okay.  And you don't recall skimming any of these other

15  depositions that are listed in your report, do you?

16  **A**    I wrote this report in November, 2021.  You are asking me

17  today, do I remember whether I skimmed or reviewed these other

18  depositions?  I don't know.

19  **Q**    Well, in fact, your practice in this case was not to

20  actually read each deposition that's cited in your report.

21  Right?

22       That wasn't your practice?

23  **A**    It would depend on how relevant it looked for my overall

24  assessment.

25  **Q**    And so if you only skimmed Mr. Musk and Mr. Durban, is

1   that because you thought those were the only two relevant ones?

2   A     Certainly, they would be important.  Mr. Musk is obviously

3   central here.  And Mr. Durban was a well-known investment

4   banker who did talk to Mr. Musk before August 7th.  So I think

5   it is probably right that they were important depositions to be

6   reviewed.

7   Q     And in reviewing Mr. Durban's deposition, either you or

8   your research assistant, you, of course, found that he said

9   that this concept of having a -- a transaction where

10  shareholders had the choice to stay or to get bought out, you

11  know, with the hope that they would stay, that he concluded

12  that this was actually -- that it worked structurally and

13  legally.  You were aware of that.

14  A     It worked structurally and legally?

15  Q     It would work structurally and legally.

16  A     Mr. Durban gave that opinion?

17  Q     Excuse me.  Did you -- are you aware of what's in his

18  deposition?

19  A     Well, I'm just surprised in part because Mr. Durban's not

20  an attorney.  So to give a legal opinion would be, I think, out

21  of his scope of expertise.

22  Q     And out of the scope of yours.

23  A     I'm an attorney.  But you're right, this is a very novel

24  kind of transaction, so I'd have to do a lot of research before

25  I could figure out whether this is feasible or not.

1    Q    Let me put it this way.  If you're going to tell the jury

2    as you did in your direct examination that Mr. Durban said this

3    was unprecedented, in order to give a fair picture of what he

4    said, you would also want to tell them he said however he

5    looked at it, and this was actually structurally and legally --

6    actually, structurally and legally, this worked.

7    A    Is that a quote?  I'm surprised he would say that.  It's

8    outside his scope of -- legal opinion from a banker is just not

9    something that's normally done, especially in an $80 billion

10   MBO.

11   Q    You don't -- sitting here today, don't even recall one way

12   or the other whether he said that, do you?

13   A    I'd be happy to review his testimony if you want to show

14   it to me.  I'm just surprised that a banker would make a legal

15   opinion in an $80 billion MBO.

16   Q    Okay.  Well, one of the -- by the way, you understand that

17   Mr. Durban -- I mean, you're aware that he is scheduled to

18   testify here.  Correct?

19   A    I don't know.

20   Q    Okay.  You have been in cases, have you not, where you

21   have, like, sat in the audience as an expert and observed

22   individuals testify, and then take that into account in -- in

23   your testimony.

24   A    That sounds possible, yes.  I don't recall a specific

25   instance, but that sounds possible.

1  Q    And you don't have the benefit of Mr. Durban's trial

2  testimony in this case, because you're being called before him.

3  Right?

4  A    Correct.

5  Q    Okay.  Now, another person that's involved in this case is

6  a Mr. Daniel Dees from Goldman Sachs, correct?

7  A    He was involved in the discussions.  I don't know if he's

8  testifying in the case.  But he was certainly from Goldman, and

9  involved.

10 Q    And he's someone that worked with Mr. Musk in connection

11 with his proposal.  Right?

12 A    You said "worked with Mr. Musk."  My recollection is there

13 was a very brief period sometime after August 7th where Goldman

14 and Mr. Dees were involved, but it obviously finished very soon

15 after that.  So "involved" seems like an overstatement.

16 Q    Well, do you know the extent of his involvement?

17 A    I know it was very brief temporally.  Nothing much beyond

18 that.

19 Q    Okay.  Do you know whether he did any reports?

20 A    I believe there was some internal analysis at Goldman,

21 again, after August 7th.

22 Q    And to your understanding, he was the co-head of Goldman

23 Sachs' investment banking division?

24 A    Over all?

25 Q    Yes.

1    **A**    That's not my recollection, but it's possible.

2    **Q**    Did you -- did you know he'd been working there for 30

3    years?

4    **A**    That sounds very possible.  I don't recall.  He's a senior

5    guy at Goldman.

6    **Q**    Okay.  And if you look at your report, you see on 360-58,

7    there's a -- in terms of items you relied on, it says there is

8    a deposition transcript of Daniel Dees, correct?

9    **A**    Correct.

10   **Q**    Okay.  Now, you can't tell us one way or the other whether

11   you actually read that deposition, correct?

12   **A**    This was now more than a year ago, so that's correct.  I

13   don't recall.

14   **Q**    Well, even beyond that, the fact that it's written in your

15   report as a deposition that was reviewed, that was relied upon,

16   even that doesn't tell you will whether or not you actually

17   read it.  Right?

18   **A**    My general approach is to delegate to research assistants,

19   just as I delegate certain things in my academic articles.  And

20   it's possible that I reviewed it, myself, or delegated to an

21   assistant.

22   **Q**    Well, but you would tell your assistant what to look for.

23   Right?

24   **A**    It would depend on the process and the specific report.

25   **Q**    It would certainly be unfair for an expert who claims to

1  be an objective expert to ask an assistant only to find

2  evidence that would support an opinion to favor the person

3  that's retained you.  Right?

4  **A**    I think that's right.

5  **Q**    Yeah.  And so are you aware that Mr. Dees from Goldman

6  Sachs said that he told Mr. Musk on August 8th that the

7  structure and rationale that Mr. Musk offered for what he was

8  proposing made perfect sense?

9  **A**    What is this coming from?  This is from the Dees

10 deposition?  I see something on the screen.  What is it from?

11 **Q**    That's from the Dees deposition.

12 **A**    You say "The structure and rationale make perfect sense."

13 And this is an email from Mr. Dees to Mr. Musk?

14 **Q**    I'm sorry.  You are not aware of that?  Sitting here --

15 you sat here and told the jury this was an illusory offer.

16 That it made no sense.  That you had questions about whether it

17 would work.

18       And you don't know whether or not Mr. Dees at Goldman

19 Sachs, co-head of investment banking, said on August 8th that

20 the structure and rationale that Mr. Musk described in his

21 tweets make perfect sense.

22       You're not aware of that?

23 **A**    This is one line out of a deposition.  It's possible that

24 I reviewed it.  I can parse it, if you want.

25       So the rationale makes perfect sense.  That seems

1    possible.  This is a going-private transaction.  Mr. Musk has

2    talked repeatedly about the benefits of Tesla being a private

3    company.  So the rationale is something separate from what I'm

4    talking about.

5        The structure probably goes to this idea of the

6    shareholders continuing in the private company.  To me, for a

7    banker to be providing that as a legal opinion and saying it

8    makes perfect sense makes no sense to me.

9  **Q**    I want to understand -- well, strike that.

10       You were in court yesterday when Mr. Littleton testified.

11   Right?

12  **A**    It was two days ago.

13  **Q**    Two days ago.  And you heard him testify -- well, first of

14   all, you heard him testify that he had been following Tesla for

15   quite a while.  Correct?

16  **A**    I think I sat in on the very end of his testimony.  I

17   didn't sit in on the whole thing, but that sounds possible.

18  **Q**    And do you recall him testifying that based upon, you

19   know, his experience following Tesla, that he in fact thought

20   there were compelling reasons for Mr. Musk to want to take

21   Tesla private?

22       Do you recall him saying that, yes or no?

23  **A**    No.

24  **Q**    Okay.  And you've testified about saying that Mr. Musk did

25   not follow typical steps of coming up with an amount he was

1  going to propose for taking Tesla private; that he didn't

2  interact with advisers as frequently or as often prior to

3  making the announcement as you would have thought typical.

4      I want to make sure.  Are you testifying that by

5  August 2nd, 2018, when Mr. Musk made his proposal to the board,

6  are you giving the opinion that he did not at that time really

7  intend to make an offer to take Tesla private?

8      Are you giving that opinion to that jury, this jury,

9  today?

10 **A**   I think your question is asking whether I knew what was in

11 Mr. Musk's head on August 2nd.  And the answer is no, I do not

12 know what was in his head on August 2nd.

13 **Q**   Right.  And so all this testimony you gave about how 420

14 was flawed because he added 20 percent to the existing price to

15 come up with that, or that there were only a couple of days

16 between his July 31st meeting with the PIF and making the

17 proposal to the board, none of that is meant to suggest that

18 you have an opinion that he wasn't, in his mind, making a

19 genuine proposal to the board to try to take Tesla private.

20 Correct?

21 **A**   I think that's the same question which I've already

22 answered.  I don't know what was in his head on August 2nd.

23 That is correct.

24 **Q.**  And so -- strike that.

25      And when we -- and so one of the slides you put up is that

1  Mr. Musk did not consult with legal or financial advisors

2  before making his proposal; correct?

3  **A.**   Correct.

4  **Q.**   And that he spent extraordinarily little time between his

5  initial consultation with the PIF and his public disclosure of

6  the offer; correct?

7  **A.**   Correct.

8  **Q.**   Now, you know that one of the key issues in this case is

9  whether or not Mr. Musk made material misrepresentations to the

10  public; correct?

11  **A.**   Yes.  That sounds broadly correct, but I'm not expressing

12  any legal opinions in this case.

13  **Q.**   And you're not giving an opinion as to whether or not any

14  tweet or statement Mr. Musk made was material; correct?  You're

15  not giving an opinion on that?

16  **A.**   Correct.

17  **Q.**   And it's fair to say that whether Mr. Musk spent, you

18  know, two days deciding he wanted to take Tesla private or five

19  months or a year, you know, doesn't go to the question of

20  whether or not any statements he made to the public that were

21  inaccurate, you know, were material to the public; right?  It

22  has nothing to do with that?

23  **A.**   I don't know.  That sounds like a question of relevance

24  for the jury to decide.  I just don't know.

25  **Q.**   Well, certainly you have it in your report, said that that

1   -- that what you were testifying here about spending little

2   time between initial consultation and then buyout partner

3   that -- that that has any relevance as to whether or not

4   Mr. Musk made representations, inaccurate representations, that

5   were material; right?  Doesn't go to that issue, does it?

6   **A.**   Okay.

7           **THE COURT:**  Counsel, I think you are asking him for a

8   legal conclusion.  You already asked him whether he has an

9   opinion, and he said no, that wasn't within the scope of his

10  report, I believe.  Unless it was, then you can bring that out.

11          **MR. PRICE:**  It wasn't.

12          **THE COURT:**  Okay.  I don't know if there is a

13  convenient breaking point.

14          **MR. PRICE:**  That's a good indication.

15          **THE COURT:**  Well, we're approaching the hour.  We can

16  go another five minutes or something.

17          **MR. PRICE:**  This is fine, Your Honor.

18          **THE COURT:**  All right.  We'll go ahead and take our

19  20-minute break at this point.  We'll see you in 20 minutes.

20          **THE CLERK:**  All rise for the jury.

21      (Jury exits the courtroom at 11:56 a.m.)

22          **THE COURT:**  Just looking at the clock, how much longer

23  do you think?

24          **MR. PRICE:**  I'm hoping half an hour.

25          **THE COURT:**  All right.  And then sometime on redirect?

1          MR. APTON:  I don't know what's coming down the pike,

2   but 15 minutes?

3          THE COURT:  All right.  Then we'll get to the next

4   witness today?

5          MR. PORRITT:  Yes, Your Honor.  I hope so.  That will

6   be Mr. Musk.

7          THE COURT:  Okay.  How long are we expecting your

8   direct or your cross?

9          MR. PORRITT:  I mean, over -- between an hour and two

10  hours I would anticipate.

11         THE COURT:  So kind of spill over until Monday.

12         MR. PORRITT:  He's going to spill over until Monday

13  for sure.

14         THE COURT:  Thank you.

15         THE CLERK:  Court is in recess.

16     (Whereupon there was a recess in the proceedings

17      from 11:57 a.m. until 12:20 p.m.)

18     (Proceedings held outside the presence of the jury.)

19         THE CLERK:  Court is reconvened.

20         MR. SPIRO:  Your Honor, briefly.

21         THE COURT:  Yes.

22         MR. SPIRO:  Mr. Porritt and I conferred quickly, and

23  we worked out any issues that could arise with the next witness

24  so that if the Court wants, we can just call the next witness

25  so that the Court -- we don't have to break.  Because there

1    were a couple of unsettled issues from this morning, but

2    Mr. Porritt and I worked it out.  So you don't have to look at

3    me to take a break or anything before the next witness.

4              **THE COURT:**  Good.  All right.  Thank you.

5          (Jury enters the courtroom at 12:27 p.m.)

6              **THE COURT:**  All right.  Have a seat everyone.  Welcome

7    back ladies and gentlemen, members of the jury.  We're going to

8    pick up with cross examination.

9    **BY MR. PRICE**

10   **Q.**    Professor Subramarian, one of your conclusions was that

11   Mr. Musk spent only two days between his initial consultation

12   with the PIF and his presentation of an offer to the Board of

13   Directors; correct?

14   **A.**    Correct.

15   **Q.**    And having looked through or having someone look through

16   some of the testimony and some of the exhibits, you do know

17   that on January 31st of 2017 Mr. Musk met with the PIF and

18   talked about going private; right?

19   **A.**    Correct.  But I recall board minutes shortly after saying

20   he had shut that down.

21   **Q.**    Now, you know at that point that the PIF representative

22   said that:

23              "Even though going private would cost a lot

24              of money, that's no problem.  We have a lot

25              of money."  You know that; right?

SUBRAMANIAN - CROSS / PRICE

1   A.   This is in January of 2017?

2   Q.   Yes.

3   A.   I don't recall that specific claim.

4   Q.   You know that in March 2017 he had a dinner meeting with

5   the Saudi fund and SoftBank where they discussed taking Tesla

6   private?

7   A.   Yes, that sounds correct.

8   Q.   You know, in fact, in early 2017 he had a meeting with

9   Mr. Dees and Larry Ellison and SoftBank where they talked

10  taking Tesla private; correct?

11  A.   Again, that sounds familiar.  They shut that all down in

12  the board minutes as of mid-2017.

13  Q.   They decided not to go forward with it at that point;

14  correct?

15  A.   Correct.

16  Q.   And then you know that in both May and July of 2017 that

17  Mr. Musk met with the PIF at SpaceX to discuss taking Tesla

18  private; correct?

19  A.   That I don't recall.

20  Q.   Do you recall that at one of those meetings Mr. Musk said:

21  "If you're serious about this, start buying shares in Tesla to

22  show your interest;" correct?

23  A.   That sounds familiar.  I don't recall the specifics.

24  Q.   In any of the examples that you used, you said you looked

25  at 30, this database?

1   **A.**   Which database are we talking about?

2   **Q.**   The database you used for your report.  I forgot the name

3   of it.

4   **A.**   There's 45 in the original sample.  Then 30 in the sample

5   submitted with the report.

6   **Q.**   And then -- did the -- did the management, you know, he

7   made conditions, or she made conditions, that the potential

8   thunder proved their interest by going out and buying, you

9   know, billions in stock in the market.  Did that take place in

10  any of those other transactions?

11  **A.**   Well, you said buying billions of dollars of stock, most

12  of these deals aren't even that big.  So billions of dollars of

13  stock would be hard to buy in those deals compared to this

14  deal.

15  **Q.**   Okay.  Well, let me change it.  In those transactions, did

16  you see evidence that the -- the person in management who

17  wanted to take this -- the company private insisted that the

18  funder first, to show good faith, to show that they had a real

19  interest in this, go out and buy a significant amount of stock

20  of that company?

21  **A.**   I don't recall looking for that kind of information.  It's

22  possible Silver Lake held a stake in Dell, but I just don't

23  recall.

24  **Q.**   By the way, in the materials it says that you relied on in

25  your report you don't actually list any board minutes from

1  2017, do you?

2  **A.**   Well, the relied-on list is my list of things that are in

3  the footnotes.  So it is possible that I looked at the board

4  minutes, concluded that Mr. Musk had shut down the process in

5  2017 and then didn't rely on that fact, because the process

6  began, as I see it, on July 31st, 2018.

7  **Q.**   And when you say it's possible, is that what you're

8  telling us happened, or are you just trying to come up with a

9  reason why it's not in your report?

10 **A.**   I'm sorry.  I said it is possible that I looked at the

11 board minutes in 2017.  I don't recall as I sit here now.  But

12 just because it's not in my exhibit doesn't mean that I didn't

13 look at it.

14 **Q.**   Did you read the deposition of Mr. Ahuja or Mr. Teller,

15 which are listed in your report, to determine their -- what

16 they saw happen during those meetings in 2017 with the PIF?

17 Did you read to find out what actually happened?

18 **A.**   In 2017?

19 **Q.**   Yeah.  In the meetings that I just talked to you about.

20 **A.**   That was not a focus of my analysis because, as I said,

21 Mr. Musk had shut down those discussions and said there was no

22 buyout possibility in 2017.  It began on July 31st of 2018.

23 **Q.**   And so the process is talking buyout, Mr. Musk says no to

24 PIF.  Talking buyout, Musk says no.  Talking buyout, Musk says

25 no.  July 31st, Musk says yes.

1   A.   It's not as clear-cut as what you just said.   CEOs are

2   always talking to bankers and funders of different sorts to

3   look at different possible transactions.   They are constantly

4   trying to figure out what is the right capital structure,

5   what's the right financing for this company.   Those

6   conversations are going on on a regular basis.

7         Methodologically, to make an apples-to-apples comparison,

8   you want to think about this deal, when did this deal start.

9   So, for example, in the Dell situation Southeastern emailed

10  Mr. Dell in July of 2012 and it went forward from there.

11        Here there was a meeting on July 31st, 2018 and it went

12  forward from there.

13  Q.   So you're answer to what my question was, which was

14  characterizing what had happened at Tesla, Mr. Musk, was you

15  don't agree with that characterization I gave, which is PIF

16  approached and Mr. Musk said no.   PIF approached and Mr. Musk

17  said no.   And finally he said yes.   You disagreed with that.   I

18  just want to make sure, because that was my question.   Did that

19  happen?

20  A.   I think he shut down the discussions in 2017 in part

21  because a deal wasn't feasible, and Mr. Son from SoftBank was

22  part of the buyout group.   And so there were lots of

23  deal-breaker issues that made it a non-starter in 2017.

24  Q.   Now, you also told the jury that Mr. Musk's tweets suggest

25  that he wanted to make a first and final offer and skip over an

1  approval process by the board and that that, I think you said,

2  made this illusory.  Do you recall saying that?

3  **A.**    The "illusory" comment, I think, was in respect to the 30

4  days.  The 30 days made this an illusory offer.

5      I think the shareholder vote was just a fundamental

6  misunderstanding of the process or maybe something that's

7  incoherent, but I don't know if it's illusory or not.  The

8  illusory is representative of 30 days.

9  **Q.**    Well, let's look at both of those.  Let's first look at

10  whether or not the tweets -- well, let's look at whether or not

11  your conclusion that Mr. Musk wanted to make a first and final

12  offer, whether or not that's supported by the evidence.

13      Now, you looked at, you said, the tweets.

14      (Document displayed)

15  **Q.**    And if we look at Exhibit 13, which is in evidence, and

16  the second sentence:

17          "Only reason why this is not certain is that

18          it's contingent on a shareholder vote."

19      Do you see that?

20  **A.**    Yes.

21  **Q.**    Okay.  And you've told us you read that as being

22  supportive of your opinion that Mr. Musk's intent, you know,

23  was to make a first and final offer and skip over any other

24  process before the shareholder vote; right?

25  **A.**    This is part of it.  There's also the blog post that's

 1   attached here.  That's also relevant for that opinion.

 2   **Q.**   And does the blog post attached hear say that he's making

 3   a first and final offer; that that's the end of the process?

 4   **A.**   Yes.

 5   **Q.**   That's your characterization of Exhibit -- I think it's

 6   Exhibit 12?

 7   **A.**   Correct.  And I can show you, if you want.

 8   **Q.**   Sure.  Let's make sure we know what you're referring to,

 9   that you're saying Mr. Musk's intent was to make a first and

10   final offer.

11        (Document displayed.)

12   **Q.**   So we'll scroll up to what you want to show the jury.

13   **A.**   Okay.  So the first sentence talks about the 420.  There's

14   that number there.

15        And then if you go down to the bottom of the screen, it

16   says -- just leave it there, please.

17        The sentence that's now third paragraph from the top:

18             "Either they can stay investors in a private

19             Tesla or they can be bought out at 420 per

20             share."

21        So that's the choice that shareholders are being offered,

22   420 or stay in a private Tesla.  There is no mention of a bump

23   or negotiation with a special committee or any of the things

24   you typically see in an MBO.

25   **Q.**   That was his offer, 420 and the structure of the ability

1    to stay in a private Tesla.  That tells you nothing about

2    whether or not that's going to be his final offer or whether or

3    not there's going to be any process with the board.  It says

4    nothing about that, does it?

5    **A.**   The sentence speaks for itself.  They can either stay

6    investors in private Tesla or they can be bought out at 420 per

7    share.

8        He's not saying:  I'm going to negotiate with a special

9    committee.  There's going to be a bump in that offer from 420

10   to call at 450 and then shareholders will have a choice.  That

11   would have been the proper process, but there's nothing along

12   those lines in this sentence.

13   **Q.**   So he should have said:  My proposal is 420 per share.

14   Shareholders can stay, but if you negotiate with me, I might go

15   higher?

16   **A.**   Absolutely.  That's what every buyout says.  For example,

17   Mr. Dell said:  My proposal is contingent upon approval by a

18   special committee of directors.  There is going to be a

19   negotiation.  It will then go to shareholder vote.  That is a

20   very typical process.  That's not what was done here.

21   **Q.**   Well, in fact, if you look at this in context, you'll

22   agree you should include the offer he actually presented to the

23   board on August 2nd; right?

24   **A.**   What is the question?

25   **Q.**   If you're going to read into these tweets whether or not

1  Mr. Musk intended to have the board analyze and approve this

2  deal before being presented to the shareholders, if you -- if

3  you want to do that, you should look at the entire context and

4  see what Mr. Musk actually said to the board on August 2nd?

5  **A.**   Okay.

6           **THE COURT:**  Now you're losing me.  I thought you were

7  focusing on whether this was intended to be a first and final

8  offer, not whether -- not the process, but whether that was the

9  result.

10      I think for the jury's sake you should clarify your

11  question.

12  **BY MR. PRICE**

13  **Q.**   Your opinion is -- let me get this -- that he wanted to

14  make a first and final offer and skip over the approval process

15  and proceed directly to shareholder vote.  That was your

16  complete opinion; right?

17  **A.**   My complete opinion?

18  **Q.**   I mean, on that topic.  I didn't misread that.

19  **A.**   I think you paraphrased it, but yes, what's on the screen

20  is my opinion.

21  **Q.**   Okay.  And you said the tweets, both saying that on

22  August 7th that -- if we can put up Exhibit 8 again -- I'm

23  sorry, Exhibit 13.

24          (Document displayed.)

25  **Q.**   (As read):

1                "Only reason why this is not certain is that

2                it's contingent on a shareholder vote.  That

3                supports your conclusion that Mr. Musk's

4                intent was to skip over any approval process

5                and go straight to the shareholder vote."

6       Right?

7  **A.**   You're saying his intent.  Again, I have no idea what was

8  in his mind.  I can read the words on the page, and the words

9  on the page say "only reason why this is not certain."  It's

10 not talking about a special committee process.

11      In my data 20 percent of the deals fall apart because the

12 special committee and the CEO can't agree on a price.  There's

13 no mention of that here.

14      He's basically saying only reason why this is not certain

15 is that it's going to the shareholder vote and they might vote

16 it down.  That's just not true.  It's wrong.

17 **Q.**   Sir, isn't it a possibility, since you can't read his

18 mind, that what he meant here is that the only obstacle I,

19 Mr. Musk, think that stand in the way of this is the

20 shareholder vote, because that matters to me and I don't know

21 what the result is going to be.

22      Isn't it possible that's what he was saying about his

23 confidence?

24 **A.**   Anything is possible.  But let me observe, as I said

25 earlier, the special committee will have insight onto the long

 1  term prospects of Tesla, non-public information.

 2      There is a really important meaningful negotiation between

 3  the special committee and the CEO in any MBO, because public

 4  shareholders don't have access to that information.  The

 5  special committee does.

 6      And so for Mr. Musk to assume, as you're saying, that the

 7  special committee would just roll over and agree to 420 or

 8  somehow there would be 100 percent chance of getting the

 9  special committee approved, it's just not true.  It's just not

10  right.

11  **Q.**  Well, you may question his judgment.  And I didn't use the

12  word "roll over."

13      You've heard from a number of people, including

14  Mr. Littleton, that the market perceived Mr. Musk as being a

15  very persuasive guy; right?

16  **A.**  Mr. Littleton said that?

17  **Q.**  You didn't hear him say that?

18  **A.**  No.

19  **Q.**  Okay.  And you're not considering the possibility that

20  what Mr. Musk meant here wasn't:  I'm going to bypass the

21  entire process.  I'm going to give a first and final offer to

22  the shareholders.

23      You're not considering the possibility that what he's

24  saying here is:  I think the only thing that stands in the way

25  of this is shareholder vote?

1   A.   Well, he'd have no basis for that opinion.   But let me

2   just flag that had he gotten legal advice before he put this on

3   the table, the lawyers would have said:   There's going to be a

4   special committee.   They are going to negotiate with you.   It's

5   going to be a back-and-forth.   There's going to be a price

6   bump.

7       All that would have been part of the legal guidance that

8   an attorney would have given to Mr. Musk in advance of this

9   August 7th tweet.

10  Q.   So your read of this, just to be clear, is that he planned

11  to bypass board approval in order to present an offer to the

12  shareholders.   That wasn't going to happen.

13  A.   You said "he planned."   Again, I don't -- can't tell you

14  what's in his head.   All I can say is this is just wrong.   As a

15  matter of deal process, this is wrong.   This isn't correct.

16  Q.   Well, what you said was that this suggests he wanted to

17  bypass board approval and go straight to the shareholders;

18  right?

19  A.   That's my opinion -- that's my inference reading this

20  sentence, yes, but I don't know what was in his head.

21  Q.   Well, maybe if we look at the August 2nd proposal that he

22  actually made to the board, that's Exhibit 81.

23      (Document displayed.)

24  Q.   This is a presentation he actually made to the board on

25  August 2nd; right?

SUBRAMANIAN - CROSS / PRICE

1   **A.**   You said -- it's an email, not a presentation.

2   **Q.**   Well, it's what has been described in the documents you've

3   reviewed as an offer to the board; right?

4   **A.**   It says "Offer to take Tesla private at 420."

5   **Q.**   And so in -- in telling this jury that the August 7th

6   tweet that we looked at suggested he wanted to skip the board

7   and go straight to the shareholders -- just tell me "yes" or

8   "no" -- in considering that, did you take into context the fact

9   he had actually presented an offer to the board to take Tesla

10  at 420 on August 2nd?  Did you consider that?  "Yes" or "no."

11  **A.**   Yes.  And if you read the email text, it supports my

12  position, my opinion on this particular point.

13  **Q.**   Well, let me ask you questions about that.  If you look at

14  the second paragraph from the bottom, he says (as read):

15          "Unless another bidder comes forward with a

16          better offer, I would ask that this matter be

17          put to  a shareholder vote."

18      Do you see that?

19  **A.**   Exactly my point.

20  **Q.**   So there he's telling the board that -- I mean, don't you

21  read this as him saying:  I want you, the board, the board, to

22  approve this and put it to a shareholder vote unless you get

23  another bidder?

24  **A.**   Yes.  The 420 should go to a shareholder vote.  That's

25  what this sentence says.

1   Q.   But because he's talking about bidders, you understand

2   what he's saying here is that:  I want the board to agree to

3   put this to a shareholder vote unless you've got a better

4   offer?  Isn't that what he's saying there?

5   A.   Only the board can put it to a shareholder vote.  He can't

6   put it to a shareholder vote by himself.

7        But he is saying -- and this sentence highlights the

8   point -- I want this 420 to be put to a shareholder vote at the

9   earliest opportunity.

10  Q.   And that's --

11  A.   I don't know how more clearly it can be said.  That's

12  what's on the screen.

13  Q.   And that's what most bidders do.  They say:  I am telling

14  you, the board, this is what my offer is, and I want to get

15  your approval as quickly as possible; right?

16  A.   No.

17  Q.   Well, you mentioned -- oh, before I go there.  You also

18  looked at the August 3 minutes of the board that took place

19  after this; correct?

20  A.   Correct.

21  Q.   Okay.

22        MR. PRICE:  And if we can show that?  That's

23  Exhibit 83.

24        (Document displayed.)

25

SUBRAMANIAN - CROSS / PRICE

1    BY MR. PRICE

2    **Q.**   And there Mr. Musk actually presents himself to the board

3    and discusses his offer; correct?

4    **A.**   You said "presents himself to the board."  He's at the

5    meeting, yes.

6           **MR. PRICE:**  Your Honor, I will move Exhibit 83 into

7    evidence.

8           **THE COURT:**  Any objection?

9           **MR. APTON:**  No, Your Honor.  Thank you.

10          **THE COURT:**  Admitted.  You may publish.

11       (Trial Exhibit 83 received in evidence)

12          **MR. PRICE:**  And if we can go to 83-2?

13       (Document displayed.)

14   BY MR. PRICE

15   **Q.**   And the second paragraph you see this is where he

16   describes his desire for current shareholders to remain

17   shareholders in the company after privatization, but allowing

18   investors who aren't interested in owning shares to have their

19   shares bought out; correct?

20   **A.**   Yes.

21   **Q.**   And he talks about the basis for his price of $420 per

22   share.  He's very upfront about that; correct?

23   **A.**   You said "he's very upfront about that."  I don't know,

24   but I can read the words, explain the basis for his proposal,

25   yes.

1  **Q.**   Okay.  And then in the second to the last paragraph he

2  says (as read):

3          "As for governance, he noted his goal" --

4  **A.**   I'm sorry.  That's not on the screen.  If you can put that

5  up, it would be great.

6  **Q.**   I'm sorry.  Next to the last paragraph:

7          "As for governance, Mr. Musk noted that his

8          goal is not to materially change the

9          company's shareholder base or concentrate

10         ownership of the company into a single or

11         small group of shareholders."

12  You saw that; correct?

13  **A.**   Yes.

14  **Q.**   And that he wants to take the company private to, quote:

15         "Allowing it to better focus on execution of

16         the business."

17  Do you see that?

18  **A.**   Yes.

19  **Q.**   He said he did not view this transaction as enabling a

20  deregistration and delisting and it's not a change of control;

21  correct?

22  **A.**   That's what it says.

23  **Q.**   In the -- I guess the third example as you talk about in

24  your report that you analyzed of companies going private, those

25  all, all, involved someone in management substantially

 1    increasing their ownership of the company; is that correct?

 2    **A.**   It can be, but not necessarily.

 3    **Q.**   But no, that -- we've talked about extreme outliers.  That

 4    was the case in all of those examples; is that right?

 5    **A.**   I said no.  You're saying that management always increases

 6    its stake in the post MBO company.  That can happen.  It can

 7    also not happen.

 8        But this is not what this is describing.  This is -- as we

 9    said earlier, this is an unprecedented transaction.  This has

10    never happened before; right?  That's what this is describing

11    on the screen.

12    **Q.**   Okay.  And then if we go to the next page, 83-3.

13        (Document displayed)

14    **Q.**   The board then discussed next steps.

15            "It was noted that a detailed proposal

16            regarding a going-private transaction had not

17            yet been made and that one would be needed in

18            order for the board to properly analyze and

19            evaluate it."

20        Do you see that?

21    **A.**   Yes.

22    **Q.**   So you can tell from this that the board was saying:

23    We're going to analyze a proposal; correct?

24    **A.**   That's what it says.

25    **Q.**   Give us a detailed, more detailed proposal.

1  A.   And it highlights the point that the proposal itself was

2  not very fleshed out at this board meeting.  That's what this

3  paragraph is also saying.

4  Q.   Well, but as to process, the process is the board is going

5  to do an evaluation; correct?

6  A.   Analyze and evaluate; correct.

7  Q.   It's not going to skip that and just go straight to the

8  shareholders; right?

9  A.   What's stunning to me is there is no mention of a

10  negotiation.  It says "analyze and evaluate it."

11      And that's also true in the August 13th blog post.  It

12  says about evaluating the proposal.  There should be a

13  negotiation.  There's no contemplation of a negotiation in

14  those board minutes.

15  Q.   Well, it talks about -- in the proposal itself that there

16  might be other offers.  You're not willing to assume that as a

17  matter of course, there would be a negotiation where Mr. Musk

18  could either say:  I'm not going any higher, or I will go

19  higher?  You're -- you're taking that from the tweet and this.

20  A.   You want me to assume there was going to be a negotiation

21  even though nobody says there's going to be a negotiation?

22  Q.   Yeah.  It's the natural course of the process.

23  A.   I agree.  I agree.  A hundred percent agree with that.

24  But it was -- and it's normally disclosed as such, but it was

25  not disclosed here by either Mr. Musk or in his board minutes.

1  Q.   Did you take into account the presentation that Mr. Dugan

2  [sic] made to Mr. Musk about the process that was going to be

3  followed?

4  A.   What date was that presentation?

5  Q.   That was August 10th.

6  A.   So we're talking about three days later?

7  Q.   Yeah.  Three days later.

8  A.   It's possible that I looked at it, but I don't recall.

9  Q.   Isn't it correct -- well, you said that there was not

10 material interaction between Mr. Musk and his advisers,

11 including Silver Lake and Mr. Dugan; correct?  That was one of

12 your opinions?

13 A.   Can you repeat the name?

14 Q.   It's Egon Dugan?

15 A.   Durban.

16 Q.   Durban, I'm sorry.  You're right.  Mr. Durban, right?

17      Your opinion is there wasn't significant interaction, not

18 material interaction; right?

19 A.   Prior to August 2nd, that's certainly true.  I believe

20 it's also true as of the August 7th tweets.  There was then

21 discussions, but they were all fairly short term because the

22 whole thing went away within, I think, ten or 15 days.

23 Q.   Now, your opinion that you told the jury was Mr. Musk did

24 not meaningfully engage with bankers or lawyers at any point

25 during the process.  That's the opinion you gave the jury;

1  right?

2  **A.**   Yes.   That is correct.

3  **Q.**   And now I'm asking you about, isn't it true is that

4  Mr. Dugan made a presentation to Mr. Musk on August 10th which

5  detailed the process that they expected they would follow.   Do

6  you recall that?

7  **A.**   I believe there was a kick-off meeting scheduled at some

8  point between August 3rd and August 7th.   If you're talking

9  about that kick-off meeting, I can look at the document.   I

10  don't recall as I sit here now.

11  **Q.**   And do you recall that one of the things that was

12  discussed is that the time between the presentation of a

13  detailed proposal to the board and the board approving it to be

14  presented to the shareholders could be between one and two

15  weeks.   Do you remember that?

16  **A.**   Well, first of all, this is all after August 2nd.   This is

17  all after August 7th.   So the tweet is out there.   The proposal

18  is out there.   But this is now three days later, on

19  August 10th; right?

20       So I'm agreeing with you, that Mr. Durban is trying to

21  play some catch-up here, but that's not how these processes

22  work.   That preparation should have done weeks earlier, if not

23  months earlier.   That's my point.

24  **Q.**   You do not have the opinion -- well, strike that.

25       Are you saying that Mr. Musk, that his plan -- I'm not

1   going to use "intent," that his plan was not to negotiate with

2   the board.  Is that your opinion, "yes" or "no"?

3   **A.**   I find no evidence that he was aware that that was

4   supposed to be part of the process.  And, in part, that might

5   be explained by the fact that he did not get any significant

6   legal guidance before putting his plan on the table on

7   August 2nd and then to the public on August 7th.

8   **Q.**   Is it your opinion that giving the board 30 days to look

9   at a proposal and approve it to send to the shareholders, is it

10  your opinion that that is a -- one of the main factors in

11  coming to your opinion that the offer was illusory?

12  **A.**   Well, first of all, I think you mischaracterized the 30

13  days.  I think Mr. Musk's testimony is he wanted it to go to a

14  shareholder vote within 30 days, which certainly would have

15  made it illusory.

16       Now, to the extent that Mr. Musk is now saying that it was

17  30 days to special committee approval, in my dataset that's

18  also unprecedented.  It just doesn't happen.

19       And notice this is an $80 billion MBO.  It would be almost

20  impossible to happen, even to get the special committee

21  approval within 30 days.

22       So, yes, it is part of my overall opinion that this offer

23  was illusory.

24  **Q.**   Okay.  Let's look at Exhibit 81, the exact words here.

25       (Document displayed)

1    **Q.**    Question, last paragraph:

2           "I would ask that this matter be put to a

3           shareholder vote at the earliest opportunity.

4           This offer expires in 30 days."

5       Do you see that?

6    **A.**    Yes.

7    **Q.**    Okay.  And that is not unusual, in other words, to light

8    the fire under the board, to say:  I am putting a limit to this

9    offer, so you get off your leather seats and you start going

10   through this process.  That's not unusual at all, is it?

11   **A.**    I disagree with that.

12   **Q.**    Well, you said that the Perry Ellis transaction was

13   typical of these MBOs, except that in that transaction the

14   bidder one day, after making the presentation to the board,

15   made a public disclosure.

16       Do you remember saying that in your direct examination?

17   Because that was the big difference.

18   **A.**    That totally mischaracterizes my testimony.  I said that

19   the MBO sample, it is very common for the company to manage the

20   disclosure of the MBO offer.

21       In that instance, the Perry Ellis instance, the CEO

22   disclosed it.  That was a counter-example, but it could have

23   been different on other dimensions as well from the typical

24   proposal.

25   **Q.**    Well, let's talk about that.  In that example, the bidder,

1    the former chairman, current director and manager, set a 32-day

2    deadline for a favorable response to his offer; correct?

3    **A.**    From the special committee?

4    **Q.**    From -- it's what he said to the board:  I'm giving you a

5    32-day deadline; is that correct?

6    **A.**    If you could show me his deadline, I'd like to see it,

7    because it's the difference between the special committee

8    approval within 32 days versus shareholder approval within 32

9    days.

10         (Whereupon document was tendered to the witness.)

11   **Q.**    Do you have that in front of you, sir?

12   **A.**    I do.

13   **Q.**    And you see this is a proxy statement concerning Perry

14   Ellis; correct?

15             **THE COURT:**  Let's identify it.  Is there a proposed

16   exhibit number of 1023?

17             **MR. PRICE:**  It is 1023, Your Honor.

18             **THE COURT:**  Thank you.

19   **BY MR. PRICE**

20   **Q.**    1023 is a proxy statement from Perry Ellis, correct?

21   **A.**    Yes.

22   **Q.**    It's a proxy statement which is part of the materials you

23   purportedly relied on; right?

24   **A.**    I relied on, yes.

25   **Q.**    Okay.  And did you read this or was this something that

1  you delegated to one of your assistants?

2  **A.**   The coding of the sample is probably something I would

3  have delegated to my research assistant.

4  **Q.**   Okay.  And if we look at -- by the way, in terms of your

5  work, in order to prepare and give an opinion in this case and

6  look at all these materials, you charge $1,900 an hour; is that

7  right?

8  **A.**   That was my rate at the time that I was retained, yes.

9  **Q.**   And have you charged at a higher rate on this case?  Have

10  you charged more than 1900 per hour on this case?

11  **A.**   No.

12  **Q.**   And if we look at 1023-43.

13         **MR. PRICE:**  And we can display to witness and

14  attorneys.  No need to show it to the jury.

15      Although actually, Your Honor, I move this into evidence.

16         **THE COURT:**  Any objection?

17         **MR. APTON:**  No, Your Honor.  It's okay.

18         **THE COURT:**  Admitted.

19      (Trial Exhibit 1023-43 received in evidence).

20         **THE COURT:**  So this may be displayed to the jury.

21         **MR. PRICE:**  Thank you.

22      (Document displayed.)

23  BY MR. PRICE

24  **Q.**   Looking at the last paragraph, 1023-43, it says:

25         "On February 6, 2018 the company received an

1                    unsolicited letter from George Feldenkreis,

2                    the former chairman."

3          Do you see that?

4   **A.**   Yes.

5   **Q.**   And that was -- if you keep going.  He wanted to acquire

6   the company in an all cash transaction for $27.50 per share.

7   Do you see that?

8   **A.**   Yes.

9   **Q.**   And if you look at the last sentence:

10                   "Mr. George Feldenkreis noted that if he did

11                   not receive a favorable response from the

12                   board to the Feldenkreis proposal by

13                   March 10, 2018, he intended to evaluate all

14                   of his options at his shareholder's company

15                   and take appropriate action with respect to

16                   his investment."

17         Do you see that?

18  **A.**   Yes.

19  **Q.**   He's basically saying if you don't -- if the board doesn't

20  act, this is within 32 days, then things are going to get a

21  little iffy; right?

22  **A.**   I think you're totally mischaracterizing this paragraph,

23  and it's quite disingenuous.

24         First of all, it's 34 days.  Wait a minute -- no, February

25  is 28.  So you're right, 32 days.  Okay.  So I think your

1    numbers are right.

2         But then, also, notice he's got financial advisers.  He's

3    got lawyers.  So he's got those.  That's the prior sentence.

4         And then you're totally mischaracterizing it.  It is

5    apples and oranges between this deal and the one that's on the

6    screen because he says:

7              "Did not receive a favorable response from

8              the board."

9         Now, that probably means forming a special committee,

10   maybe doing some negotiation.  Maybe even getting to an

11   approved transaction.  That is feasible within 32 days.  It's a

12   tight timeline, but it's feasible.

13        Notice, also, this deal is a $400 million deal.  It's

14   1 percent -- or less than 1 percent as large as the Tesla MBO.

15   Literally less than 1 percent.

16        So maybe it's feasible in a deal this small.  It's

17   impossible in a deal this big.  Especially because Mr. Musk

18   says:  I want to go all the way to the shareholder vote within

19   30 days.  That is impossible.

20   Q.   Now, having given that answer, I just want to make sure:

21   You're giving that answer because you've read this and you know

22   exactly how this played out?

23   A.   I'm reading the words on the page.  If you want, I can

24   read the whole thing.

25   Q.   Okay.  But you just told us that this is not a situation

1   where he is saying that, you know, if you don't -- if the board

2   doesn't give me a favorable response within 32 days, then this

3   offer is off the table.  You're saying that's not what he said?

4   **A.**   It's an important point you're raising, which is these

5   words are heavily scripted and when he says "did not receive a

6   favorable response," he could have said "unless the board or

7   special committee agrees within 32 days, it's over."  But

8   instead he says "favorable response."  There's meaning in that.

9   What "favorable response" means is less than, yes, we agree to

10  a deal.

11       And just to be clear, this is very different than getting

12  all the way to a shareholder vote within 30 days.  This is

13  quite feasible.

14  **Q.**   Well --

15  **A.**   If I may finish.

16       This is quite feasible.  Thirty days to get to a

17  shareholder vote is impossible.

18  **Q.**   And Mr. Musk didn't say "shareholder vote in 30 days."  He

19  said "put to a shareholder;" right?  The Board of Directors is

20  to put it to them, and then lots of things have to happen

21  before that; right?

22  **A.**   You're saying that there could be a proxy that's sent out,

23  but the shareholders are going to vote sometime later on.

24       "Put to a shareholder vote" to me means shareholders vote.

25  "Putting it to a vote in a week," that means they're going to

1  vote in a week.  That's what those words mean.

2  **Q.**   Okay.  And let's continue to see about this Perry Ellis

3  transaction.  If we look at 1023-46.  This is Page 35.  And

4  it's the -- it's the paragraph that beginning "On March 9,

5  2018."

6       (Document displayed.)

7  **Q.**   You see:

8            "On March 9, 2018 Mr. George Feldenkreis

9            submitted a letter to the board which

10           reaffirmed the proposal in all respects.  The

11           letter stated that the special committee had

12           not responded to the proposal."

13      Do you see that?

14  **A.**   I see those words, yes.  But it says, "The special

15  committee sent an NDA."  So that was potentially their

16  response.

17  **Q.**   Well, he extended his deadline, didn't he?  He didn't

18  withdraw his offer; right?  On March 9; right?

19  **A.**   Where do you see that?

20  **Q.**   Well, he says he submitted a letter.  They responded, and

21  in the interests of moving forward he proposed they start the

22  due diligence process.  Do you see that?

23      The deal wasn't over because there was no approval within

24  32 days; right?

25  **A.**   I'm not sure I understand your question.  You're asking

1   me, did he extend the offer?

2   **Q.**   Did he keep the process going even though there had not

3   been an acceptance of his proposal?

4   **A.**   So, look.  This is an unfriendly offer.  As you said

5   earlier, he's a director and no longer CEO.  He's going to go

6   to a proxy context.  That's very hostile.

7       They are asking him to sign a confidentiality agreement

8   saying:  You're not going to use this information in some

9   negative way to the company.  It's a very standard thing to ask

10  for.  He's resisting that.  There's back-and-forth.

11      You're saying that because of that haggling over the NDA,

12  he's continuing the process.  That sounds right to me based on

13  this paragraph, but I'd have to look in a lot more detail.

14      Notice, just to observe, he has been advised by lawyers

15  and bankers throughout this process, including before he

16  brought the proposal to the board.  So this, I think, is closer

17  to the typical process.  Certainly much, much closer than the

18  Musk proposal here.

19  **Q.**   You understand that I'm asking you about the process of

20  saying:  There is a deadline.  Mr. Musk said 30 days.

21  Mr. Feldenkreis said 32.  And you gave opinions on the effect

22  of that deadline.

23      You understand that I'm asking you about whether or not it

24  is typical that people give deadlines and then extend them

25  through negotiation.  You understand that's the focus here;

 1  right?

 2  **A.**    I don't know what the focus is.

 3  **Q.**    Okay.  Because you keep saying:  Oh, by the way, they

 4  weren't lawyers and all this stuff.  I know that's one of your

 5  points, but I'd like to focus on your opinion that you gave and

 6  told the jury; that it was highly unusual, made the offer

 7  illusory that Mr. Musk said this offer exists for 30 days.

 8  We're focusing on that.

 9  **A.**    And you're saying that he has extended his formal offer

10  beyond the 32 days.  I don't see that in this paragraph.  If

11  you want to point to where he says that, I'm happy to look at

12  it.  I don't see that in this paragraph.

13  **Q.**    Let's continue and see what happened.  If you look at

14  1023-56.

15      (Document displayed.)

16  **Q.**    And by the way, if you had yourself done the work, at

17  $1,900 an hour, and reviewed the materials you say you relied

18  on, you would have some idea of what process happened in the

19  Perry Ellis transaction; right?

20  **A.**    I reviewed 45 deals my first sample.  I reviewed 30 deals

21  in this sample.  I was coding for certain elements of the deal.

22      So, for example, was there a financial advisor?  Was there

23  a lawyer?  Those are the things I was coding for.  I did not

24  code for whether there was a deadline in the offer, whether the

25  deadline was extended.  I did not code for those things, so I

1   don't know if I would have noticed it had I been coding myself.

2        I did observe in this deal there was a 30-day fuse put on

3   the offer.  It has to go to a shareholder vote in 30 days.

4   That is impossible.  Doesn't matter about the data.  That is

5   just impossible.

6   **Q.**   And for that, you're assuming from the August 1st offer

7   that what Mr. Musk meant wasn't that they had to put it to the

8   shareholders, but that they had to go through all the process

9   to get to a vote.  That's what you're assuming?

10  **A.**   Do you want to go back to the August 2nd email to the

11  board?  We can do that, if you want.

12  **Q.**   Let me ask you this:  As part of reaching your opinion,

13  did you look at Mr. Musk's testimony?

14  **A.**   Yes.

15  **Q.**   Okay.  And did you observe that he said that if the board

16  came back and there was another bidder, that he probably would

17  have gone higher.  Did you see that?

18  **A.**   I don't recall that, but it's possible he said that.

19  **Q.**   All right.  Now, getting back to this other example, Perry

20  Ellis, which is in your database, 1023-56.

21       You see on May 23rd it talks about Mr. Feldenkreis sent a

22  letter to the special committee made by a press release urging

23  them to commit to a deadline.  And the last sentence:

24            "He stated that if the company would not

25            enter into a definitive acquisition agreement

1              by May 29, 2018, he would withdraw his

2              proposal and pursue all other rights as a

3              shareholder."

4       Do you see that?

5    A.   Yes.

6    Q.   Well, he didn't withdraw.  That deadline was extended;

7    right?

8    A.   I think this is getting a little silly.  There was a

9    proposal put on the table.  He wanted a favorable response.

10   They had enough of a favorable response that they continued the

11   conversation.

12       Notice this is May 23rd.  This is four months after the

13   process started and it's still on the table.  They are still

14   talking about it.  That is a typical timeline.

15       I think I'm agreeing with you that there was an offer put

16   on the table back in February.  The deal still seems to be

17   puttering along as of May.  I agree with that.

18       Whether it was taken off the table, put back on the table,

19   this is a fairly typical process.  There is a long process from

20   the initiation to the closing.  We're not even close to the

21   finish here and it's been four months.

22       That's a good illustration of an overall timeline, and

23   it's only 1 percent as big as the deal would have been here.

24   Q.   And it's a good illustration about in this process when

25   someone says "this offer is on the table for 30 days," that

1  they will continue to renegotiate that; right?  This is

2  illustrative of that process.

3  **A.**   Do you want to put the email back from Mr. Musk on

4  August 2nd?  It says that there's a 30-day deadline.  There is

5  no mention of, "and if you don't meet my deadline, I'm going to

6  extend the offer."  There's nothing in that email that suggests

7  that.

8  **Q.**   Okay.  Well, here on May 23rd, at 1023-56, that I just

9  showed you, where it says:

10            "Mr. Feldenkreis stated if the company would

11            not enter into a definitive acquisition

12            agreement by May 29, 2018, he would withdraw

13            his proposal and pursue all other rights as a

14            shareholder."

15       It doesn't say here he will extend that either, does it?

16  **A.**   Correct.

17  **Q.**   All right.  But that's what he did; right?  Deadline

18  wasn't met.  Negotiations continued, right?

19  **A.**   You're saying that the May 29 deadline was not met?

20  **Q.**   Well, here, let's go forward to 1023-58.  His deadline was

21  to have a definitive agreement by May 29.

22       (Document displayed)

23  **Q.**   And here on May 31st -- this is at 1023-58.  You see that

24  on May 31st, 2018:

25            "In respect of the Feldenkreis proposal

1                advised, et cetera, that he would withdraw

2                his proposal if he couldn't enter into a

3                definitive agreement with the company by the

4                end of the day."

5        Now we're on the 31st.  So we passed one deadline.  They

6   are still negotiating; right?

7   A.    Yes.  And this is a great example.  It's been four months

8   since the offer was put on the table.  This deal is 1 percent,

9   or less than 1 percent as large than the Musk deal would have

10  been.  It's been four months.  This is the typical time line.

11       I think your point is Mr. Musk set a 30-day deadline.  He

12  could have extended it.  I agree with that.  He could have

13  extended it.  But there is no evidence that he was going to as

14  of August 2nd.

15  Q.    Was there any evidence that Mr. Feldenkreis was going to

16  when he first set his deadline?  Isn't that typical of the

17  process; that you set deadlines to get people to act and then

18  you continue the negotiations, or you can back away, but that's

19  not -- that's not unusual.

20  A.    You're saying Mr. Musk set a deadline.  He could extend

21  the deadline.  I agree with that.

22  Q.    Well, what you told the jury in your direct is the fact

23  that he said:  This offer expires in 30 days.  You said that

24  told you that this offer was illusory because that meant that

25  everything would be over in 30 days, period, end of story.

1   That's what you said on direct.

2   **A.**   If I make an offer and the deadline I put in my offer is

3   not feasible, then, yes, it is an illusory offer.

4        If you offer to buy my house and say:  Guhan, I'll buy

5   your house, but the offer expires at 4:00 o'clock today.

6   You've got to move out by 4:00 o'clock today.  That is an

7   illusory offer.  Because I cannot accept it and move out of my

8   house within three hours.  That's the equivalent of what's

9   going on here.

10  **Q.**   It is not an illusory offer if what you're saying is what

11  I expect to happen within 30 days is for the board to reach an

12  agreement with me that they will present a proposal to the

13  shareholders.  That's not illusory, is it?

14  **A.**   It's not impossible, but in my sample it has not been

15  done.  Thirty days has not been done, even in my sample of 30

16  other deals and those are deals that are much smaller.

17       So 30 days to get to special committee approval, I think

18  you're correct.  It's not impossible, but it's unprecedented.

19       Again, I think his -- his 30-day deadline was shareholder

20  vote.  It wasn't special committee.  It was shareholder vote.

21  That's what I read.

22  **Q.**   Well, again, Mr. Dugan --

23  **A.**   Who?

24  **Q.**   Durban, I'm sorry.

25       Mr. Durban, who was the adviser in the Dell transaction,

1  you said was an expert on the Dell transaction, did you

2  notice --

3  **A.**    Financial adviser on the Dell transaction.

4  **Q.**    Financial adviser.  Also an adviser on process; right?

5  **A.**    In Dell?

6  **Q.**    Yeah.

7  **A.**    No.  He was a buyer.

8  **Q.**    He was the buyer.  So you think he would be familiar with

9  the process?

10 **A.**    Yeah.  You said advising on process.  Typically it would

11 be the lawyers who advise on process.

12 **Q.**    And he says you can go from proposal to the board

13 approving something going to the shareholders in one to two

14 weeks; right?

15 **A.**    Can you direct me to his testimony?  I'm surprised by

16 that.  It's not in my sample.  That's not done in my sample.

17 **Q.**    Well, he's going to be here.  Again, you took the stand

18 before you had the opportunity to observe his testimony; right?

19 **A.**    Correct.

20 **Q.**    But you did have the opportunity to read his deposition

21 transcript and to review the exhibits to that deposition

22 transcript; right?

23 **A.**    Correct.

24 **Q.**    So if you're not aware that that was his advice, that's on

25 you, isn't it?

1    **A.**   Well, there's two possibilities.  Either you're

2    mischaracterizing his testimony, or you're characterizing it

3    correctly and he's just wrong.

4        Because in my dataset it's just not done.  It's just not

5    feasible.  Is it impossible?  No.  But it's unprecedented to

6    get to a deal this size in two to three weeks.  Even one -- he

7    said one to two weeks.  It's unprecedented.  Is it physically

8    possible?  Yes, maybe.

9    **Q.**   So in the Perry Ellis transaction the deadline on the

10   offer was 32 days; correct?

11   **A.**   The deadline on getting a positive response from the board

12   was 32 days.

13   **Q.**   And Mr. Musk said his offer expired in 30 days; right?

14   **A.**   Correct.

15   **Q.**   In the Perry Ellis situation the bidder, not the special

16   committee, made the public announcement about the bidder's bid;

17   correct?

18   **A.**   Correct.  In the 13D filing with the SEC.

19   **Q.**   But the special committee had no control over that;

20   correct?

21   **A.**   Correct.  And that was an exceptional situation.

22   **Q.**   And in Mr. Musk's case, you know, he made his tweets on

23   August 7th.  It wasn't the special committee; right?

24   **A.**   Correct.

25   **Q.**   And the time from the board disclosure to the public

1  disclosure in the Perry Ellis case was one day; right?

2  **A.**   That sounds possible.  But, again, the CEO or the buyer

3  was well advised by bankers and lawyers in advance of that

4  presentation to the board.

5       And, yes, he disclosed it unilaterally.  That was quite

6  unusual.  And I flagged it in my direct testimony.  It's

7  extraordinarily rare for that to happen.  So it happened there

8  and it happened here; correct.

9  **Q.**   And you're not making an opinion that Mr. Musk did that --

10  strike that.

11      And the time from the public announcement by the bidder in

12  the -- in Perry Ellis to the special committee being empowered

13  to negotiate, that was six days; correct?

14  **A.**   You'd have to direct me.  It took four months to get to a

15  deal, but I don't know.  You want to show me the document where

16  it says six days?

17  **Q.**   Well, I'm talking about the process.  Do you remember one

18  way or the other whether or not the time from public

19  announcement to the special committee being empowered to

20  negotiate is 26 days?

21           **MR. APTON:**  Are we talking about Perry Ellis, Your

22  Honor?  I would object if we are.

23           **THE COURT:**  Yes, Perry Ellis.

24           **MR. APTON:**  Objection, Your Honor.

25           **THE COURT:**  All right.  We've spent a lot of time on

1  this and, frankly, we're reaching a 403 issue here.  You're

2  doing a trial within a trial.  I understand your point, but I

3  urge you to move on.

4        **MR. PRICE:**  I'm coming to one last five minutes of

5  questions.

6        **THE COURT:**  Okay.

7  **BY MR. PRICE**

8  **Q.**  The premium on the Perry Ellis case was -- over market was

9  18.6 percent; right?

10 **A.**  It's possible.

11 **Q.**  And the premium Mr. Musk proposed was 20 percent; right?

12 **A.**  That was his calculation, 20 percent, yes.

13 **Q.**  So one of the things that you observed in this case, by

14 the way, was that you saw the August 13th post; right?

15 **A.**  The August 13th what?

16 **Q.**  Post.

17 **A.**  Correct, yeah.

18 **Q.**  And looking at that post, you read that post as indicating

19 that funding was not secured; right?

20 **A.**  Can you show it to me?  It says some things about funding.

21 It's not at all clear what those things are, but if you want to

22 show it to me, I can try to answer your question.

23 **Q.**  Here.  Let me direct you to your deposition testimony so

24 we can shortcut this.  You have it in front of you.  It's 215,

25 Lines 16 to 20.

 1           MR. APTON:  Your Honor, I object on completeness here.

 2   There were other portions of the testimony that addressed this.

 3           THE COURT:  Let me just look at this.  215, Lines --

 4   which?

 5           MR. PRICE:  Here.  Let's do 216, Line 17 to 217,  Line

 6   1.  This --

 7           THE COURT:  All right.  Hold on.

 8      (Brief pause.)

 9           THE COURT:  All right.  Let me point out whether you

10   have -- what do you suggest for completeness, counsel, if

11   you're objecting on completeness grounds?

12           MR. APTON:  Yeah, Your Honor.  Can I have just one

13   moment?  I'm trying to find the portion.

14           MR. PRICE:  At this point I'm going to use it just to

15   refresh his recollection.

16           THE COURT:  Well, all right.  If you want to -- well,

17   so ask the question again.  Then if he can't remember, then you

18   can direct him to some portion, without reading it.

19           MR. PRICE:  Sure.

20   BY MR. PRICE

21   Q.   Your belief, having looked at the August 13th post, is

22   that it indicated that funding wasn't secured; right?

23   A.   Could I look at it again?  Maybe I could just look on the

24   screen or something.

25   Q.   It's a long document.  You can look at that, or I'm

1    suggesting if it helps refresh your recollection, because it

2    seems like you don't recall, that you could look at your

3    deposition testimony, and particularly 216, Lines 23 to 217,

4    Line 1?

5    **A.**   Could you show me the original document, please?

6          **THE COURT:**  Well, he's trying to refresh your

7    recollection with a particular document.  If you -- after you

8    read it that still doesn't help you, you can say that and he

9    can try another document.

10         **THE WITNESS:**  Okay.

11         **THE COURT:**  So just read --

12         **THE WITNESS:**  My recollection --

13   **BY MR. PRICE**

14   **Q.**   I will put this up and see if it will help you recollect.

15        (Document displayed to the witness.)

16   **Q.**   See Line 23 there?  I'm not going to read it at this

17   point.

18   **A.**   So what's the question?

19   **Q.**   Sure.  My question was exactly that, that you believe the

20   August 13th post indicates that funding was not secured; right?

21   **A.**    My recollection of the August 13th document is that

22   Mr. Musk, through the company, said that he had been talking

23   with the Saudis; that there was likely to be funding, but it

24   was forward looking, but the funding was not yet secured.  It

25   was forward looking, but some funding may be secured.

1       And that's my recollection of the document.  I don't have

2   it in front of me.

3   Q.   And from reading that, you concluded that that August 13th

4   post indicated that funding was not secured?

5   A.   Again, my recollection of the document is that he was

6   talking about future funding from the PIF, not current funding

7   existing at the time.

8   Q.   And that is why you thought it indicated not secured?

9   A.   Well, I guess to make it clear-cut, the 13th document

10  should say:  On August 7th I tweeted "funding is secured."

11  That's not true.  Funding is not secured.  I'm still talking to

12  the Saudis.  Hopefully, it will be in place soon, but it's not

13  yet secured.

14      That would have been clarifying the thing that was tweeted

15  on August 7th, but this is, I think, more murky than that is my

16  recollection of the August 13th document.

17          MR. PRICE:  Well, Your Honor, I would just read 23  to

18  1.

19          THE COURT:  I'm sorry?

20          MR. PRICE:  I would just read those five -- four lines

21  then.

22  A.   I stand by what's on the screen.  But I'm saying it's not

23  clear-cut any more because on August 7th Mr. Musk says "funding

24  is secured," past tense.

25      On August 13th --

1          THE COURT:  All right.  Let's do this.  You can read

2   this and your attorney -- the attorney on redirect can complete

3   this.  Go ahead and read it.

4   BY MR. PRICE

5   Q.   (As read)

6               "QUESTION:So you believe the August 13th post

7               indicates that funding was not secured, in

8               past tense?

9               "ANSWER:Correct."

10          MR. PRICE:  Thank you, Your Honor.

11          THE COURT:  All right.  Redirect?

12                    REDIRECT EXAMINATION

13   BY MR. APTON

14   Q.   Professor, can you just give us and the jury just 15 more

15   minutes, okay?

16   A.   Sure.

17   Q.   Okay.  I want to start off by --

18          MR. APTON:  Can we show Exhibit 83, please?

19      (Brief pause.)

20          MR. APTON:  I'm sorry.  Is 83 up?

21      (Document displayed.)

22   BY MR. APTON

23   Q.   Professor, do you see Exhibit 83?

24   A.   Yes.

25   Q.   And at the top of the page there, that is a list of the

1  individuals who attended the August 3rd board meeting at Tesla;

2  correct?

3  **A.**   Correct.  Among the board, those are the directors

4  present.

5  **Q.**   And you see Elon Musk there; correct?

6  **A.**   Correct.

7  **Q.**   And on Page 3, it says:

8          "The board then discussed next steps.  It was

9          noted that a detailed proposal regarding a

10         going-private transaction had not yet been

11         made and that one would be needed in order

12         for the board to properly analyze and

13         evaluate it."

14  Did I read that correctly?

15  **A.**   Yes.

16  **Q.**   Okay.  And this was on August 3rd?

17  **A.**   Correct.

18  **Q.**   The 4th, 5th, 6th, 7th -- four days later he then tweets

19  "Funding secured and investor support is confirmed.  Only

20  reason why" -- do you remember the rest of the tweet?

21  **A.**   "Only reason why is the shareholder vote," something to

22  that effect.

23  **Q.**   It was Exhibit 8; right?

24          **MR. APTON:**  Can we see Exhibit 8?  That was "funding

25  secured."

1          (Document displayed)

2              **MR. APTON:**  It was Exhibit 13, I believe.

3          (Document displayed.)

4    **BY MR. APTON**

5    **Q.**   Which is somehow he's saying that this deal is done

6    pending a shareholder vote.

7          He had not yet even submitted a formal proposal to the

8    board; correct?

9    **A.**   I think that's correct, yes.

10   **Q.**   And counsel referenced some other tweets that came in on

11   August 7th.

12             **MR. APTON:**  Can we look at Exhibit 9?

13         (Document displayed.)

14             **MR. APTON:**  No. 10.

15         (Document displayed.)

16             **MR. APTON:**  And then No. 11.

17         (Document displayed.)

18   **BY MR. APTON**

19   **Q.**   During your cross, you referred to this tweet in

20   particular, in Exhibit 11, as, quote, deeply problematic.  Do

21   you recall that?

22   **A.**   Yes.

23   **Q.**   And why did you refer to it like that?

24   **A.**   Well, it does highlight this take-it-or-leave-it,

25   first-and-final nature of his 420.  He's saying the same thing

1    that he said in the August 7th blog post, which is you've got a

2    choice.  You can take the 420 or you can keep shares in the

3    private company.

4         There's two problems with that.  One is, how is that going

5    to work?  There is no precedent for shareholders staying in the

6    company when it goes private.  You can't just flip a switch and

7    suddenly the company is private, no longer public.  That just

8    isn't how securities law works.

9         But then second, as we're discussing before, it does seem

10   to indicate he wants to give them 420, take it or leave it.

11   There is no contemplation of a negotiation with a special

12   committee.  Nothing along the lines of what a typical MBO is

13   like.

14   **Q.**  You used the word "unprecedented."  That received a lot of

15   attention during your cross.  It was in the context of what

16   Egon Durban had potentially advised Elon Musk.  Do you recall

17   that?

18   **A.**  Yes.

19   **Q.**  Do you still have Egon Durban's transcript in front of

20   you?  It was dated September 12, 2018.

21   **A.**  I'm sorry.  I don't think I do.  I don't think I have it.

22            **THE COURT:**  A deposition transcript?

23            **MR. APTON:**  I have a copy right here.  May I approach?

24            **THE COURT:**  Yes.

25       (Whereupon document was tendered to the witness.)

1          **MR. APTON:**  It's tagged Exhibit 176.

2          **THE COURT:**  I don't think I have it.

3          **MR. PRICE:**  I don't have it either.

4          **MR. APTON:**  I believe it was used to refresh the

5    witness's recollection.

6          **MR. PRICE:**  No, it wasn't.  Mr. Durban's deposition?

7    No.

8          **MR. APTON:**  I believe so.

9          **MR. PRICE:**  No.

10         **MR. APTON:**  Would Your Honor like a copy?

11         **THE COURT:**  Yes.

12         **MR. APTON:**  One moment, Your Honor.

13       (Whereupon document was tendered to the Court.)

14         **THE COURT:**  Maybe you can lay the foundational

15   question.  If you're going to use this to refresh, lay your

16   foundational question.

17         **MR. APTON:**  Sure.

18   BY MR. APTON

19   **Q.**   So, Professor, on Pages 86, Line 25 to 89, Line 24, I'd

20   like you to read that and I'll ask you if that refreshes --

21         **THE COURT:**  Before he does that, what's the question

22   to which he does not have a memory for which you want this

23   refreshed?

24   BY MR. APTON

25   **Q.**   Egon Durban, as an adviser in this transaction, did he

1  refer to this structure as unprecedented?

2          **MR. PRICE:**  You know, I'm going to object.  One, they

3  can't refresh his memory about --

4          **THE COURT:**  First of all, no.  Don't look at that.

5          **THE WITNESS:**  Oh, sorry.  Sorry.

6          **THE COURT:**  Don't look at that.

7      Let's start from clean.  Ask the question first.  Pretend

8  there is no deposition.

9  **BY MR. APTON**

10  **Q.**    Professor, did Mr. Durban refer to this proposed structure

11  as unprecedented?

12  **A.**    That is my recollection, yes.

13          **THE COURT:**  Okay.  You don't have to refresh his

14  recollection.

15  **A.**    It's also consistent with my 25 years studying mergers and

16  acquisitions.  I've never seen a transaction that looks like

17  what Mr. Musk contemplated here.

18  **BY MR. APTON**

19  **Q.**    And let me ask you this:  Are you familiar with whether

20  Mr. Musk and Tesla have conducted corporate transactions in the

21  past?

22  **A.**    Yes.  In my report I document several prior transactions

23  prior to 2018 in which Tesla did a deal, and it was a very

24  standard deal, where they hired bankers, hired lawyers.  They

25  negotiated in the normal way.  It was all done very standard,

1    in a standard process.

2    **Q.**   And this deal, the tweet, the taking private, the

3    go-private, the proposal, it did not follow the form of those

4    other transactions; is that correct?

5              **MR. PRICE:**   Objection.   This is leading.

6              **THE COURT:**   Overruled.

7    **A.**   That's correct.

8    **BY MR. APTON**

9    **Q.**   I just want to make that clear.

10        It did not follow form of those other transactions;

11   correct?

12   **A.**   Correct.

13   **Q.**   And, Professor, one last question.   There has been some

14   discussion about your research assistants.   And I'd like to get

15   a better idea of how you conduct these engagements and how you

16   rely on your research assistants?

17   **A.**   Well, in general, I have lots of excellent students at

18   Harvard, both Harvard Law School and Harvard Business School.

19   And after the course is over, I will sometimes pick one of the

20   most excellent students to work with me.   It's helpful for

21   their learning and their overall career development.

22        And in this particular case I happened to have had a

23   student who was exceptional, unbelievably great student in my

24   Deals class.   We studied MBOs in that Deals class, including

25   the Dell MBO.   And I believe it was during the summer, maybe

1   early in the fall, I asked him if he would be willing to help

2   me with the report, and he was thrilled.  He was just starting

3   at his consulting firm, I believe, in January.  The report was

4   due in November, so it was perfect timing.

5        And he worked with me on it.  And I believe it was helpful

6   to him in terms of his learning, and he was exceptional,

7   exceptional as a research assistant.

8   **Q.**   His name was, is it, Izosa?

9   **A.**   I call him Izzy.  I called him Izzy.

10  **Q.**   That's his name, Izzy?

11  **A.**   You know -- yes.  I would be hesitant.  I'd like to not

12  have his name in the record, if that's okay.  I mean, I just

13  want to protect his privacy, but he was exceptional.

14  **Q.**   Okay.

15  **A.**   Former Navy Seal.  One of the best students I've ever had

16  at Harvard Business School.

17  **Q.**   Understood.  Thank you, Professor.  No further questions.

18            **THE COURT:**  Thank you.  Anything on recross?

19            **MR. PRICE:**  No questions, Your Honor.

20            **THE COURT:**  Thank you.  This witness is excused then.

21        (Witness excused.)

22            **THE COURT:**  Plaintiff may call its next witness.

23            **MR. PORRITT:**  Your Honor, plaintiff calls Elon Musk.

24            **THE COURT:**  All right.

25

1                          **ELON MUSK**,

2     called as a witness for the Plaintiff, having been duly sworn,

3     testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please have a seat.

6         Please speak clearly into the microphone.  State and spell

7     your first and last name for the record please.

8              **THE WITNESS:**  Elon Musk.  E-L-O-N, M-U-S-K.

9              **THE COURT:**  Thank you, Mr. Musk.

10        You may proceed.

11            **MR. PORRITT:**  Thank you, Your Honor.  I have a witness

12    binder here, one for the witness and one for the Court.

13        (Whereupon exhibit binder was tendered to the Court and

14    the witness.)

15                      **DIRECT EXAMINATION**

16    **BY MR. PORRITT**

17    **Q.**   Good afternoon, Mr. Musk.

18    **A.**   Good afternoon.

19    **Q.**   You are currently the Chief Executive Officer of Tesla?

20    **A.**   Yes.

21    **Q.**   And you also held that position in August of 2018;

22    correct?

23    **A.**   Correct.

24    **Q.**   And at that point you were also chairman of Tesla;

25    correct?

**MUSK - DIRECT  / PORRITT**

1   **A.**   Yes.

2   **Q.**   Now, you've had a Twitter account since 2010; is that

3   correct?

4   **A.**   Since 2009.

5   **Q.**   2009, okay.  And you understand that your Twitter account

6   has been identified by Tesla as the source of corporate

7   information; is that correct?

8   **A.**   Yes.

9   **Q.**   That's been the case since 2013; correct?

10   **A.**   I assume so.

11   **Q.**   And the Tesla board approved that decision?

12   **A.**   Yes.

13   **Q.**   And it's true that you got Twitter as part of your

14   interaction with retail investors?

15   **A.**   Yes.  I speak with retail investors quite frequently --

16   well, communicate with retail investors quite frequently on

17   Twitter.  Yeah.

18   **Q.**   And before you tweet something about Tesla, you think

19   about what effect it will have on retail investors; is that

20   correct?

21   **A.**   Yes.  I care a great deal about retail investors.  They

22   are our most loyal and steadfast, I think, investors.

23   **Q.**   And you want information that you tweet to reach your

24   millions of followers, including Tesla investors; isn't that

25   correct?

1   **A.**   Yeah.  I think it's the best way to communicate with

2   people.  It's, I think, the most democratic way to communicate

3   with people and it gives all investors, no matter whether they

4   are big or small investors, equal access to information.

5   **Q.**   And you're aware that your institutional investors also

6   follow you on Twitter; is that correct?

7   **A.**   I assume so.  I don't know.

8   **Q.**   And so you frequently use your Twitter account to tweet

9   corporate information about Twitter -- about Tesla, sorry;

10  isn't that correct?

11  **A.**   That is one of the things that I tweet about.  Also me.

12  **Q.**   And -- and Tesla itself does no conventional advertising;

13  is that correct?

14  **A.**   Correct.

15  **Q.**   Is it fair to say that your Twitter account is a primary

16  means of communication in raising brand awareness for Tesla?

17  **A.**   I don't really think about brand awareness, but I -- I

18  think it is a good way to communicate about products and to

19  enter customer's support questions and to hear, you know, what

20  people think about the product and to get feedback for

21  improvement.

22  **Q.**   And you're aware that Tesla's stock price sometimes goes

23  up or down following one of your tweets?

24  **A.**   Well, it's difficult to say if that's -- the stock price

25  is linked to the tweet.  I mean, there have been many cases

1    where I thought that if I were to tweet something, that the

2    stock price would go down.

3         I mean, for example, at one point I tweeted that I thought

4    that in my opinion the stock price was too high, and then the

5    stock price went down.  So just because I tweet something does

6    not mean people believe it or will act accordingly.

7         I found it ironic that me saying that I thought the stock

8    price was too high, because I was concerned that people might

9    buy the stock at too high a price, and then ironically it went

10   down.

11   **Q.**   But you're aware that --

12   **A.**   I'm sorry.  It didn't go down.  It went up.  I said I

13   thought the stock price was too high, and it went higher, which

14   is -- which is, you know, counterintuitive.

15   **Q.**   But you're aware that sometimes after your tweet, the

16   stock price moves either up or down.

17        I'm not asking you to make a causal relationship.  You

18   just -- you understand that happens?

19   **A.**   Yes.  What I'm trying to say is that the causal

20   relationship is clearly not there simply because of a tweet.

21   That's why I used the example of when I -- even though I said

22   that I tweeted that, in my opinion, the stock price was too

23   high, the stock price then went up from that.  And you

24   obviously think if I tweeted -- you'd think that if I tweeted

25   the stock price was too high, the stock price would go down,

 1   but it actually went up.

 2        So, you know, correlation is not causation, but the tweets

 3   don't -- you know, they aren't directly linked.

 4   **Q.**   And you're aware that your tweets about Tesla are governed

 5   by the federal securities laws; correct?

 6   **A.**   Yes.

 7   **Q.**   And that even though Twitter is an informal medium, your

 8   tweets about Tesla are the same as statements contained in a

 9   Securities and Exchange Commission filing or formal corporate

10   press release?

11        **MR. SPIRO:**  Objection.  Compound.  Calls for a legal

12   conclusion.

13        **THE COURT:**  Overruled.  You can answer the question.

14   **A.**   Well, there is a limit to what you can say in a tweet

15   obviously.  So you can put a lot more in a filing than you can

16   in a tweet.

17   **BY MR. PORRITT**

18   **Q.**   But you understand that tweets are the same under the law,

19   under the federal securities laws?

20        **MR. SPIRO:**  Same objection.

21        **THE COURT:**  A tweet is the same as what?

22        **MR. PORRITT:**  As an SEC filing or a press release.

23   **BY MR. PORRITT**

24   **Q.**   I will rephrase the question.

25        You understand that a statement by you on Twitter about

1    Tesla is a public statement in connection with Tesla's -- in

2    connection with Tesla stock in the same way or securities in

3    the same way that an SEC filing or press release is?

4    **A.**    The tweets are information that I think the public should

5    hear.

6            **THE COURT:**  Well, I don't think that answers the

7    question.  Do you want to ask it one more time?

8    **BY MR. PORRITT**

9    **Q.**    You understand that you're under the same obligation to be

10   accurate in a tweet about Tesla as you are in an SEC filing or

11   press release?

12   **A.**    Yes.  But, obviously, there is a limit, if you've got 240

13   characters, to what you can say.  You can obviously be far more

14   verbose in a filing, and everyone on Twitter understands that.

15   **Q.**    Nonetheless, the character constraints in Twitter does

16   not -- there is no exception under the SEC rules based on the

17   character limitation in Twitter, is there?

18   **A.**    There isn't, but I think one cannot ignore the character

19   limitation, and everyone on Twitter is aware of the character

20   limitation.

21   **Q.**    You don't -- when you're composing a tweet about Tesla, do

22   you think about whether you can accurately and fully and

23   truthfully communicate information in the constraints of

24   Twitter?

25   **A.**    I think you can absolutely be truthful, but can you be

**MUSK - DIRECT / PORRITT**

1   comprehensive?  Of course not.

2   **Q.**   Do you ever consider not tweeting something because you

3   can't contain its -- you can't completely explain it within the

4   context of a tweet, so it would be misleading for you to tweet

5   out some of the information?

6   **A.**   I'm not sure I understand your question.  It seems like

7   you're combining many questions in one.

8   **Q.**   Okay.  I will rephrase.

9        We're talking about the character constraints of Twitter;

10  correct?

11  **A.**   Yes.

12  **Q.**   And you -- as I understand the testimony, you've said

13  sometimes that prevents you from tweeting or disclosing all the

14  information; correct?

15  **A.**   Well, there is a 240 character limitation.

16  **Q.**   So if --

17  **A.**   You can do multiple tweets obviously.  Yeah.

18  **Q.**   Have you ever thought about not tweeting something because

19  you thought it would be -- you wouldn't be able to fully

20  express it within the context of a tweet?

21  **A.**   Yeah.  I mean, there's things, like, for example, Tesla

22  safety blogs and whatnot, which are quite lengthy.  And so, you

23  know, those are on our website.

24  **Q.**   And you wouldn't want to put out a misleading selection or

25  something from something about their safety blogs; right?

**MUSK - DIRECT  / PORRITT**

1    **A.**    Yes.  But, I mean, I have tweeted about Tesla safety in

2    tweets, but the tweets are truthful.  They are simply short.

3    I think you're trying to conflate misleading with short.

4    **Q.**    And --

5    **A.**    That's misleading.

6    **Q.**    Well, the SEC has enacted rules regulating statements

7    about public companies; right?

8    **A.**    The SEC makes rulings about public companies?

9    **Q.**    About statements made about public companies; correct?

10   **A.**    Yes, they do.

11   **Q.**    And those rules apply to your Twitter account for

12   statements about Tesla; right?

13           **MR. SPIRO:**  Objection.  These questions call for legal

14   conclusions.

15           **THE COURT:**  Overruled.  You can answer.

16   **A.**    Sorry.  Can you repeat that?

17   **BY MR. PORRITT**

18   **Q.**    The SEC rules about public statements regarding public

19   companies apply to your Twitter account in connection with

20   statements about Tesla; isn't that correct?

21   **A.**    Yes.

22   **Q.**    Okay.  And you knew that in 2018?

23   **A.**    Yes.

24   **Q.**    In August of 2018 there was no practice for anyone at

25   Tesla to review your tweets before you published them; correct?

**MUSK - DIRECT  / PORRITT**

1  **A.**   I'm sorry.  Can you talk closer to the microphone?  It's a

2  little hard to hear.

3  **Q.**   I apologize.  How about that?

4  **A.**   That's better, yeah.

5  **Q.**   Okay.  I'm often accused of speaking too loudly.

6       In August of 2018 there was no practice for anyone at

7  Tesla to review your tweets before you published them; correct?

8  **A.**   Correct.

9  **Q.**   And that was a policy approved by Tesla and its Board of

10  Directors?

11  **A.**   Yes.

12  **Q.**   So in 2018 none of your tweets were reviewed by anyone at

13  Tesla before you posted them; correct?

14  **A.**   Well, I worked at Tesla, but besides me.

15  **Q.**   You review your tweets before you post them?

16  **A.**   I mean, I read my tweet, yes.

17  **Q.**   Do you recall in July 2018 there was controversy involving

18  one of your tweets and an English diver and the cave rescue in

19  Thailand?  Do you recall that?

20  **A.**   He was not a diver.

21  **Q.**   Do you recall that controversy?

22  **A.**   I'm aware of that controversy.

23  **Q.**   And you're aware that controversy on Twitter caused a

24  decline in Tesla stock price?

25  **A.**   No.  I think you're linking things on Twitter to Tesla

1  stock prices when they are not linked.  That's why I gave the

2  example, even if I say on Twitter that I think the stock price

3  is too high, the stock price still goes higher.

4  Q.   I will rephrase.  I'll reask the question.

5       And this controversy about the cave rescue in Thailand was

6  followed by a negative impact on Tesla stock price?

7  A.   No.  I think you're creating a link that doesn't exist.

8  Q.   Well, did Tesla stock price go down after you tweeted

9  about the Thai cave rescue?

10         MR. SPIRO:  Objection.  That day?  That week?  It's

11  vague.

12         THE COURT:  Give a time frame.

13  BY MR. PORRITT

14  Q.   Within the week after that controversy?

15  A.   Well, Tesla stock price goes up and down all the time.

16  And I don't think that, you know, some tweet about something

17  completely unrelated to Tesla is going to have an effect on the

18  stock price.  That's absurd.

19  Q.   Do you recall in July 2018 being approached by Antonio

20  Gracias suggesting you take a break from Twitter after your

21  tweets about the cave rescue in Thailand?

22  A.   I don't recall that.  It was five years ago.

23  Q.   Do you recall being advised in July 2018 by Ron Baron to

24  stop using Twitter?

25  A.   No.  Again, that was five years ago.

1          **MR. PORRITT:**  Your Honor, if I may show the witness

2    Exhibit 78 just to refresh his recollection?

3          **THE COURT:**  All right.  About a question you just

4    asked?  This is about the question that you just asked about?

5          **MR. PORRITT:**  Correct.  Correct, Your Honor.

6          **THE COURT:**  Okay.

7       (Whereupon document was tendered to the Court and the

8    witness.)

9    **BY MR. PORRITT**

10   **Q.**   Can you please read to yourself Exhibit 78, Mr. Musk?

11         **THE COURT:**  All of it or some portion of it?

12         **MR. PORRITT:**  It's two -- it's just on the first --

13   it's really just the first page, about halfway down the first

14   page.

15         **THE COURT:**  All right.  So, Mr. Musk --

16         **THE WITNESS:**  What are you referring to?

17         **THE COURT:**  So read it to himself.

18         **MR. PORRITT:**  Read to it himself, yes.

19         **THE COURT:**  And then not refer to it afterwards.

20         **MR. PORRITT:**  Not refer to it.  I'm just asking if it

21   refreshes his recollection about whether Mr. Baron asked him --

22   asked the witness to take a break from Twitter.

23      Actually, I'll correct that.  "Just don't use Twitter."

24   **A.**   Yes, I read it.

25

MUSK - DIRECT / PORRITT

 1  BY MR. PORRITT

 2  Q.   Okay.  Does this refresh your recollection that Ron Baron

 3  suggested to you in July 2018 to "Just don't use Twitter"?

 4  A.   I mean, I can see that he -- he's not saying don't use

 5  Twitter.  He's -- he's saying I should not respond to criticism

 6  in the news on Twitter.

 7  Q.   Did you follow --

 8  A.   Yeah.

 9  Q.   Did you follow Mr. Baron's suggestion to stop using

10  Twitter?

11       MR. SPIRO:  Objection.  Mischaracterizes the

12  testimony.

13       THE COURT:  Sustained.  That wasn't what the witness

14  said.

15  BY MR. PORRITT

16  Q.   Do you know, who is Ron Baron?

17  A.   Ron Baron is an investor.  He's one of the best investors

18  in the world.  A very wise, smart person.

19  Q.   Do you recall in July 2018 Sam Teller providing feedback

20  from Tesla and SpaceX executives to you asking you take a break

21  from Twitter?

22  A.   Again, that was five years ago.  I don't recall it.

23       MR. PORRITT:  Your Honor, if I may show the witness

24  Exhibit 104 to refresh his recollection?

25       THE COURT:  Okay.  It would be helpful if you direct

1   the witness to a specific portion.

2          **MR. PORRITT:**  I will.

3      (Whereupon document was tendered to the Court and the

4   witness.)

5          **MR. PORRITT:**  Second paragraph in the document.

6          **MR. SPIRO:**  Your Honor, we're not doing refreshing

7   recollection exactly how it's supposed to be done in my view.

8      But if the Court could just -- or if I could have a

9   standing objection to the way it's being done.  Because the

10  witness is speaking from the document, which is obviously

11  not --

12         **THE COURT:**  Well, all right.  So what's supposed to

13  happen is if the witness doesn't remember something, he can be

14  presented with a document, read to himself, and then not read

15  from the document, just say whether it does refresh your

16  memory.  And if it doesn't, that's it.  If it does, then you

17  can say what you remember.

18         **MR. PORRITT:**  I believe that's what I'm doing, but if

19  I'm falling down, I apologize.

20         **THE COURT:**  All right.  I just want to make sure we

21  follow the procedure.

22     So, Mr. Musk, if -- you're going to direct the witness to,

23  what, the first paragraph?

24         **MR. PORRITT:**  It's the -- well, it's the second

25  paragraph in the document, which is an email chain.  So it's

 1  that first block, if you like, large paragraph in the middle

 2  there.

 3          THE COURT:  All right.  You're going to have him read

 4  that first indented block; right?

 5          MR. PORRITT:  Correct, Your Honor.

 6          THE COURT:  So, Mr. Musk, if you would just read that

 7  to yourself.  Then when you're done, you can look up.

 8          THE WITNESS:  Okay.

 9      (Witness complied.)

10  A.   Yes.  It's saying that --

11          THE COURT:  Now, that's where you -- you're not

12  supposed to recite that.

13          THE WITNESS:  Oh, my apologies.

14          THE COURT:  You're supposed to wait for the question

15  from Mr. Porritt.

16  BY MR. PORRITT:

17  Q.   I'll now ask, have you had a chance to review this, that

18  exhibit?

19  A.   I have.

20  Q.   Okay.  Does this refresh your recollection that Sam Teller

21  in July 2018 asked you to take a break from Twitter?

22  A.   It does.

23  Q.   Okay.  And do you recall investors also in July 2018

24  asking you to take a break from Twitter?

25  A.   I mean, a lot -- I can say, like, 2018 was an eventful and

**MUSK - DIRECT  / PORRITT**

1   very difficult year.  So, you know, we're sitting here five

2   years later.  If you're asking me to recall one of several

3   thousand emails or texts, it's quite difficult.  My memory is

4   simply not that good.

5   **Q.**  I understand.  That's why I'm trying to refresh your

6   recollection.  I have to do this because -- I have to do this

7   this way for the reasons we just discussed.

8       One last thing on this, if I show the witness Exhibit 40

9   to refresh his recollection.

10      So please read this to yourself and let me know when

11  you've read it.

12      (Whereupon document was tendered to the Court and the

13  witness.)

14          **MR. SPIRO:**  I would also like a standing objection to

15  relevance on any of this.

16          **THE COURT:**  Overruled.  But at some point there is a

17  403 question here, so I'd like to move on.

18          **MR. PORRITT:**  This is the last one, Your Honor.

19          **THE COURT:**  All right.

20  **BY MR. PORRITT**

21  **Q.**  This is -- this is the month before the tweets in

22  question.

23  **A.**  Yes, I see it.  It does -- I actually -- I mean, like I

24  said, I get -- I truly have, like, a Niagara Falls of email,

25  you know.  So it's really difficult to remember every email.

1   But, I mean, I -- does this refresh my recollection?  Sure.

2   **Q.**   Okay.  So it refreshes your recollection that investors

3   were asking you to take a break from Twitter in July 2018, or

4   at least an investor?

5   **A.**   I mean, the -- there's some -- I mean, we have many

6   thousands of investors.  These are a few emails.

7   **Q.**   Did you, in fact, take a break from Twitter in July 2018?

8   **A.**   I don't think so.

9   **Q.**   So you ignored the advice of Sam Teller and the Tesla

10  executives?

11  **A.**   I suppose I continued to tweet, yes.

12  **Q.**   You ignored the advice of your investor Joe Fath?

13  **A.**   Yeah.  I mean, like I said, we have many thousands of

14  investors.  These are two emails out of probably 20,000

15  investors.

16  **Q.**   During 2018 Tesla was dealing with the operational

17  challenge of the model -- scaling Model 3 production; is that

18  a fair summary?

19  **A.**   Yes.  2018 was an extremely painful and difficult year.

20  I was sleeping in the factory to help make the factory work.

21  **Q.**   So that was a big challenge, is that an understatement

22  perhaps?

23  **A.**   That would be an understatement.  The sheer level of pain

24  required to make Tesla successful in the '17 -- 2017 through

25  2019 period was excruciating for me and for many others.  I

1  wasn't sleeping in the factory because I wanted to, but because

2  I had to.

3  Q.  And, in fact, in the July 2018 Tesla shareholder meeting

4  you described the preceding month as "the most excruciating

5  hellish seven months I've maybe ever had."  Does that sound

6  familiar?

7  A.  That is an accurate statement.  Extremely -- extreme pain.

8  Q.  And you thought the -- your belief was that the stress of

9  this operational challenge was made worse by Tesla being a

10  public company with the stock; correct?

11  A.  Yes, in addition to the executional challenges.  I mean,

12  it is important to note that there has not been a successful

13  American car company to reach volume production in the United

14  States since Chrysler in the '20s.  So it's been about 100

15  years since a car company was successful in reaching volume

16  production.  The reason is because it is extremely difficult to

17  do so, and in Tesla's case we just barely succeeded in doing

18  so.

19  Q.  And one of the issues caused by being a public company is

20  that you face pressure from so-called short sellers; is that

21  correct?

22  A.  Yes.  I -- I think most people don't know what a "short

23  seller" means.  You know, it's sort of like -- sort of like a

24  -- is a sort of, you know, a seller of small stature, or is it

25  a -- like, medium and tall sellers, or what -- short sellers, I

1    think it's maybe important for -- if I'll just explain.

2         A short seller is someone who is betting that the company

3    will -- will fail.  A short seller is someone that wants the

4    company's stock to go down.  And the best case scenario for a

5    short seller is if the company goes bankrupt.

6         So they -- the short seller is basically a bunch of sharks

7    on Wall Street wanted Tesla to die, very badly.

8    Q.   And then short sellers, of course, lose money when the

9    stock price goes up; isn't that correct?

10   A.   If they exit their short position, they lose money.

11   Q.   And you had several public -- made several public

12   criticisms of short sellers during 2018; is that correct?

13   A.   Yes.  I believe short selling should be made illegal.  It

14   is a means of -- for, in my opinion, bad people on Wall Street

15   to steal money from small investors.

16   Q.   And --

17   A.   Not good.

18   Q.   And short sellers attack companies like Tesla by putting

19   negative stories in the press; isn't that correct?

20   A.   Yes.  Short sellers, meaning sellers, people who want

21   Tesla to die, will engage in what's called an FUD campaign, a

22   fear, uncertainty and doubt campaign, where they will plant

23   false stories in the media in order to get the stock to go down

24   and do anything in their power to make a company die.  It's

25   evil.

**MUSK - DIRECT  / PORRITT**

1  Q.  And you had publicly stated prior to August 2018 that you

2  wish Tesla was a private company; isn't that correct?

3  A.  Yes.  If you're a private company, then private companies

4  cannot be -- cannot be sold short.  So short sellers are unable

5  to attack a private company because private companies can be --

6  cannot be short sold, and this -- this makes it much easier to

7  execute and get things done.

8      So like SpaceX, my rocket company, is private and is not

9  subject to short seller attacks.

10      MR. SPIRO:  Your Honor, we're having an issue with the

11  real time.  I don't know if there is a way to reboot.

12      THE COURT:  I have been having that problem.  The

13  problem is -- well, we're almost at 2:00 o'clock.  It would

14  take about ten minutes to fix it, so I have been living without

15  it.

16      MR. SPIRO:  I don't want to waste the jury's time.

17      MR. PORRITT:  I have got a natural stopping point in

18  about seven more questions.

19      THE COURT:  Why don't we do that?  We'll fix it by

20  Monday.

21      MR. SPIRO:  Thank you, Your Honor.

22  BY MR. PORRITT

23  Q.  In fact, do you recall telling *Rolling Stone* magazine in

24  November 2017 that Tesla would be more efficient as a private

25  company?

**MUSK - DIRECT / PORRITT**

1   A.   I don't recall that exact thing, but I certainly feel that

2   way.

3   Q.   Okay.  And being -- but being public, being a public

4   company has brought some benefits for Tesla though; correct?

5   A.   There are pros and cons to being a public, so there are

6   some benefits to being a public company.

7   Q.   Okay.  One of those benefits is raising millions of

8   dollars from the capital markets and the public by selling

9   shares to the public?

10  A    No.  That is something that both private companies and

11  public companies can do.  SpaceX -- I mean I have two, two main

12  companies that I run.  And where I'm essentially the chief

13  technologist and product person.  And they're rough- -- they're

14  of comparable magnitude.  And you've got SpaceX on the one hand

15  which is private and is not subject to short-seller attacks,

16  and you have got Tesla which is public and is subject to

17  short-seller attacks.  But both SpaceX and Tesla have been able

18  to raise billions of dollars.  So being private does not

19  prevent you from raising money.

20  Q    No.  And I didn't suggest the opposite.  But as a public

21  company, you -- Tesla has successfully raised billions of

22  dollars, correct?

23  A    Correct.  But SpaceX also, as a private company, has

24  raised billions of dollars.

25  Q    And you're involved in all those financings done by Tesla

**MUSK - DIRECT  / PORRITT**

1  as a public company, correct, as CEO?

2  **A**    Yes.

3  **Q**    Okay.  And you worked with Tesla's bankers and lawyers in

4  connection with those financings?

5  **A**    Yes.

6  **Q**    Okay.  And with their help and advice, you filed lengthy

7  legal documents with the SEC before sending your shares to the

8  public?

9          **MR. SPIRO:**  Objection.  "You"?

10  **BY MR. PORRITT**

11  **Q**    Before Tesla sold its shares to the public?

12  **A**    Yes.  As a public company, you must do public filings when

13  selling shares.

14  **Q**    And you developed those filings with the advice of bankers

15  and lawyers?

16  **A**    Actually, most of the time we don't use bankers for our --

17  well, we -- bankers are not necessary for public financings.

18  **Q**    Yeah, but the banks, such as Goldman Sachs, didn't

19  underwrite many of your public offerings of shares?

20  **A**    It is optional to use bankers for raising money.  It is

21  not required.

22  **Q**    Okay.  But Tesla, in fact, used bankers to help it raise

23  money.

24  **A**    Yes.

25  **Q**    Okay.

1          **MR. PORRITT:**  Your Honor, I think I might -- it's

2    2:02, by my watch, so --

3          **THE COURT:**  All right.  This is a convenient stopping

4    point.  Then we will adjourn for the day, and we will resume

5    Monday morning at 8:30.

6      Just a reminder to the jury, please do not speak with

7    anyone at all about this case.  Do not read or listen or do any

8    kind of research about this case.  And do not form any opinions

9    until this case is submitted to you for deliberation.

10     Until then, have a great weekend.

11         **THE MARSHAL:**  Hang on, one second.  We've got to let

12   the witness --

13         **THE COURT:**  All right, we'll let the witness leave

14   first, and then everyone else will exit afterwards.

15     Go ahead, Mr. Musk.

16         **THE WITNESS:**  Thank you.

17   (Witness excused)

18         **THE COURT:**  Okay.  Now we can excuse the jurors.

19         **THE COURTROOM DEPUTY:**  All rise for the jury.

20   (Jury excused)

21         **THE COURT:**  All right.  One thing I did want to raise,

22   we still have this outstanding matter of Exhibit 80, the PIF

23   notes.

24         **MR. PORRITT:**  Yes, Your Honor.

25         **THE COURT:**  And since that is likely to come up, you

1  are going want to raise that with this witness, I take it?

2          **MR. PORRITT:**  Um, potentially, Your Honor, yes.  So I

3  don't know how you want to go forward.  We (Inaudible) podium

4  about the Exhibit 80 expert, I'm afraid.  So if I may, I'm

5  happy to cede the podium.

6          **THE COURT:**  All right.  Let me give you my preliminary

7  views, and then you can take it from there.

8          **MS. TRIPODI:**  Your Honor, we do have the message from

9  Akin Gump who submitted the minutes to the SEC from the PIF.

10 And there's also a text message from Yasir that will be put in,

11 I believe, in Exhibit 121, referencing that the July 31st

12 meeting was, in fact, minuted by the PIF.  And if you can give

13 me a moment, I can point to you in 121 to that.

14         **THE COURT:**  Okay.  Before we get into the actual

15 evidence, let me tell you what my view is.  First of all,

16 there's the authenticity issue.  And as I indicated, just on

17 its face, it's not sufficiently self-authenticating.  It would

18 require something akin to some kind of chain of custody, so

19 that there's reasonable assurance about where this document is,

20 and it's a genuine document, et cetera, et cetera.

21     If you get by that, then the question is, is it admissible

22 as an exception to hearsay, or how do you deal with the hearsay

23 rule.  The first instinct is, of course, business records under

24 803(6).  And my view is that you would have to meet the

25 requisites of 803(6), showing that these are indeed

1  contemporary notes, taken by somebody who -- with knowledge,

2  et cetera, and this record is kept in the course of regular

3  business, et cetera, et cetera.  Normally you have a custodian

4  or somebody familiar with the company do that.  It's often

5  perfunctory, but it seems, to me, necessary.

6      If you don't have that person, and you have cited 807, the

7  residual exception rule -- and the key there is that there has

8  to be sufficient guarantees of trustworthiness, and under --

9  considering the circumstances under which it was made, and if

10  there's any evidence of corroborating the statement.

11      So, um, we started talking about this a little bit

12  earlier.  Sounds like you may have some corroboration that in

13  fact there was a meeting on this date; it did take place.  The

14  people present, as noted, were present.

15      One question is:  Is there any corroborating evidence of

16  the contents?  That is, is what is stated in 80, is that

17  corroborated by somebody there, in some way?  Because if it is,

18  then you're scoring some points on the 807 front.

19      **MS. TRIPODI:**  Your Honor, I think there is a general

20  corroboration regarding the topics that were discussed in the

21  meeting.  I'm sure Mr. Spiro will point out that the account of

22  what has occurred by PIF differs in part from what his

23  witnesses are going to present, which is not surprising, I

24  don't think, to anyone that the Tesla witnesses would have a

25  different account than the PIF witnesses might.  But there was

1  some substance in the meeting that did overlap with

2  conversations that took place and had been testified by the

3  witnesses.

4        So if it would be helpful to Your Honor, we could put

5  together something short -- nothing long, I understand, we

6  don't -- I promise Your Honor, we're not going to make a very

7  long submission.  But if we were given the opportunity to do

8  that, and also to present something with respect to the chain

9  of custody, which of course we'll present to counsel.

10            THE COURT:  All right.

11            MR. SPIRO:  May I respond briefly, Your Honor?

12            THE COURT:  Yes, you may.

13            MR. SPIRO:  This is a frivolous application to admit

14  this exhibit.  There is zero authenticity.  Zero.  She's

15  talking about an email from an Akin Gump lawyer.  That's not

16  authenticity in a federal courtroom.  There's -- if there's

17  zero basis of authenticity --

18            THE COURT:  Well, the email explains where it came

19  from, you know -- I don't know what it says, but I could

20  imagine an email -- was Akin Gump counsel for PIF?

21            MS. TRIPODI:  Yes, they were, in conjunction with the

22  SEC investigation.  So it's a message -- it's not an email,

23  it's a letter transmitting the PIF minutes.  This was produced

24  in the course of the litigation.  So it's an email -- I'm

25  sorry.  Rather, it's a letter from Akin Gump to the SEC, with

 1 | the PIF minutes attached.

 2 |          **MR. SPIRO:**  A cover letter from a lawyer is a way to

 3 | authenticate an exhibit in Federal Court?

 4 |          **THE COURT:**  Well, from the lawyer, the lawyer of the

 5 | alleged principal here, of the document.

 6 |          **MR. SPIRO:**  Then why does anybody -- if that were the

 7 | case, and it's not, why would anybody ever call the business

 8 | record custodian?

 9 |          **THE COURT:**  Because you're risking -- if you want to

10 | get a document in and you want to do that, and -- you may lose.

11 | That's one reason why you do it.

12 |          **MR. SPIRO:**  Correct --

13 |          **THE COURT:**  It doesn't mean it can't be done.

14 |          **MR. SPIRO:**  Well, I would submit there is no support

15 | in the law, none, for --

16 |          **THE COURT:**  Okay.  Well, let's do this.  We can argue

17 | until the cows come home.  I'm not interested in arguing right

18 | now.  I want to see the evidence, and then you can argue from

19 | the evidence.

20 |     I'm just telling you, my standard is based in the rule.

21 |          **MR. SPIRO:**  Right.

22 |          **THE COURT:**  And the rule, there is a residuary -- a

23 | residual exception rule.  But I'm going to look at it, to look

24 | at whether it has sufficient guarantees of trustworthiness

25 | and -- and authenticity.  I may conclude that it's not.  But

1   I'm not going to -- I can't sit here now and say it can't be

2   met.

3           MR. SPIRO:  So the point I'm trying to simply make is

4   the residual exception is the hearsay component.  The problem

5   that is fatal, the reason this can't get off the ground, is the

6   authenticity argument.  The best that they have is, again,

7   apparently four years ago, a cover letter from a lawyer.  We

8   don't even know that this isn't minuted by a lawyer.  We don't

9   know who wrote it.  We don't know when they wrote it.  There's

10  not even a date on this that suggests it wasn't made well after

11  the fact.  This was at a time when they were trying to not meet

12  with the SEC.  The minutes are completely self-serving.

13          There's no indicia of reliability, whatsoever, and there's

14  no authenticity, because -- there just isn't.  Authenticity is

15  a very technical thing.  We don't even know who did this.

16          THE COURT:  Well, let's do this.  You should submit to

17  counsel what you're going to submit to the Court so they have a

18  chance to comment.  So when we get here first thing Monday

19  morning we'll meet at 8:00 to review what the evidence is, and

20  you'll have a chance to comment.

21          And if you have some counter evidence you should share

22  with them, and I will review it at the time and see if the

23  legal standards as I understand them are met or not met.

24          MR. SPIRO:  Understood.  Thank you, your Honor.

25          MS. TRIPODI:  Thank you, Your Honor.

**PROCEEDINGS**

 1         **THE COURT:**  I just want to lay out, that's the legal

 2    framework, as I see it.  Authenticity is a front-door question.

 3    If you can't get past that door.  There's nothing to talk

 4    about.  If you do, then there's a hearsay question, 803(6) or

 5    807; I don't see another -- the present sense, I don't buy that

 6    one.

 7         **MR. SPIRO:**  Thank you, Your Honor.

 8         **MS. TRIPODI:**  Thank you, Your Honor.

 9         **THE COURT:**  Before we adjourn, I'm going to issue,

10    just to formalize the record on all the things that we talk

11    about, the table.  We'll get to the table with the sustaineds

12    or overruleds, so you'll have a record of what we've done.  A

13    lot of that's already water under the bridge, but just in case.

14    But.

15         In terms of the depo transcripts that you're going to

16    introduce I guess after the next witness, I've already

17    indicated -- and you'll get this in your ruling -- that I'm

18    overruling pretty much the objections.

19         **MR. SPIRO:**  Yes, Your Honor.  And on that, not to get

20    the final note of the day, but I'd asked the Court earlier if

21    we could sort of wholesale speak to the objections.  And the

22    Court noted, in reviewing the deposition, it's -- it's

23    trickier, frankly, than going exhibit by exhibit, because it's

24    not clear always when a witness is talking about one thing

25    versus another.

PROCEEDINGS

```
 1        But in Brinkman's testimony, our understanding was that
 2   when you said on January 18th, at Line 286 (sic) that it's not
 3   relevant if an analyst was to do something after the class
 4   period because, quote, that's almost like expert testimony, the
 5   kind of expert testimony --
 6             THE COURT:  Right.  So let's --
 7             MR. SPIRO:  -- that invades the providence of the jury
 8   that is coming from a source not designated expert, so the
 9   effect of the listener doesn't fly --
10             THE COURT:  Right.  So let's talk about that issue.
11   So anything that is done, I think, after, it's harder to see
12   effect on the listener.
13        Number two, some of this stuff is private and never --
14   this is pre- -- this is not the actual publication.  Some of
15   the things he is talking about is his impressions, his
16   understanding why he changed the target price, et cetera,
17   et cetera.  That seems to me relevant, as what I will shorthand
18   call it, sort of slice of the market.  This is a sampling of,
19   you know, the public.
20        Now, it does begin to get into the area of, well, you
21   know, is he essentially serving as a *de facto* expert, even
22   though he hasn't been designated as such.  And that's where the
23   701 comes in.  Is he able to give opinions as somebody in the
24   marketplace, about how he interpreted, and his reaction to the
25   tweets, and the following tweets, and what happened.
```

**PROCEEDINGS**

 1          And it seems to me that in a case, in a securities case,

 2     it is appropriate if he begins to rely on -- there's a shade

 3     there between 701 and 702/703.  If he begins to rely on

 4     specialized training, expertise and knowledge, we get close to

 5     that area.  But I will note that he's given a deposition in

 6     this case.

 7          And so what is normally done, if it was a designated

 8     expert, the whole point is you -- you disclose, you give a

 9     summary.  And you get to take the expert's deposition, and you

10     prepare.

11          So at least in spirit, if he's been thoroughly questioned

12     on the things he's going to be -- I mean, in fact this is the

13     -- it's the deposition -- then it seems to me that that puts

14     less of a premium in trying to draw the line between 701 and

15     702.

16          **MR. SPIRO:**  I understand the Court's indicative ruling

17     as to that.  That's very clear.

18          We viewed the Court's previous ruling, and as the Court

19     said, and I think my adversary agreed that it had some -- we

20     took it at least to have precedential effect in the case as

21     evaluating this, that his Exhibits 23, 24 and 25 within the

22     depo, which are related to analyst reports and the aftermath

23     well after the class period, would not be coming in.  We

24     understood that, clear as day.

25          So I would just ask the Court -- I don't need a lengthy

**PROCEEDINGS**

1    colloquy on this -- to -- that's what we want to draw the

2    Court's attention to.  Because that's how we interpret --

3         **THE COURT:**  And that's a fair question.  Because my

4    initial reaction is that at least under the effect on the

5    listener rule, it doesn't really make it.  Right?  It only

6    comes in under what I've just called sort of sampling of the --

7    you know, sort of sampling of the --

8         **MR. SPIRO:**  Right --

9         **MR. PORRITT:**  I think we've withdrawn any designation.

10   I think we stop at August 20, which is that final report.

11   Which is the next trading day after the class period.  So --

12        **MR. SPIRO:**  Well, but that's -- there's a reason.  In

13   fact, there was a motion in limine where the Court couldn't

14   have been clearer.

15        And again, it's after the class period.  The Court we took

16   to already have ruled on this issue, so we would -- we would

17   ask to rely only that.  And again -- you know, these reports,

18   they have hearsay within hearsay.  So does the PIF minutes by

19   the way, has hearsay within -- we're nowhere near that, but I'm

20   just referencing that just so the Court's aware.

21        The analyst reports, they have multiple authors.  There's

22   multiple reasons.  It's -- in our judgment, you know, on shaky

23   ground, even as it were.  But after the class period, we took

24   the Court to be saying:  No, then you don't even have an

25   exception of an effect on the listener.  You know, there's no

**PROCEEDINGS**

1   testimony from any witness in this case they saw that analyst

2   report; there's no testimony in this case that that analyst

3   report moved the market.  There is no basis or relevance to

4   that analyst report that happens after the class period.

5           **THE COURT:**  So at this point, we're just talking about

6   Exhibit 23, because 24 and 25 have been withdrawn.

7           **MR. SPIRO:**  Right.  But then, again, we took the

8   withdrawal and the Court's ruling, again, just, no testimony

9   regarding them either, of course.

10          **MR. PORRITT:**  Sorry, no testimony --

11          **MR. SPIRO:**  Regarding that.  Right?  If you're going

12  to say that something's not relevant in document form --

13          **THE COURT:**  Right, there's -- there's concomitant

14  testimony that goes along with that, that would have to be

15  looked at if I were to say it isn't.

16          **MR. SPIRO:**  Agree.

17          **MR. PORRITT:**  We've withdrawn the testimony, I think,

18  relating to Exhibit 24.  Certainly to 25.  So 25 is out.

19          **THE COURT:**  23 and related testimony is what we're

20  talking about.

21          **MR. PORRITT:**  Correct.  Which he drafted over the

22  weekend.  Ryan Brinkman was deposed at length on this.  He is

23  the author of this.  He explained that.

24      He explain how he worked on the weekend, after -- you

25  know, starting on the 17th within the class period, and working

1    through the weekend.  He couldn't get it in time to publish it

2    within the class period, so he published it first thing on

3    Monday morning.  It's as close -- it's as adjacent to the class

4    period as you can get.

5         **THE COURT:**  All right.  But in terms -- it's critical

6    when it's published, if you're relying on the effect of

7    listener.  You may have planned it, you may have drafted it,

8    but it's when it's published, because if it is not published at

9    the close of the class, then you'd have to come up with some

10   creative argument why effect on the listener post-class, so

11   that's why --

12        **MR. PORRITT:**  It's --

13        (Multiple speakers)

14        (Reporter clarification)

15        **THE COURT:**  All right.  And that's why I said, whether

16   you call it sampling of the market, slice of the market,

17   representative of the market, that's the only rationale for

18   that one.  So, it is on thinner ice.

19        And I know I already made a ruling, but I've had a second

20   look.  And now my tentative view is that it does come in for

21   that purpose.  I will take one more look at it over the

22   weekend, and --

23        **MR. SPIRO:**  I appreciate that, Your Honor.

24        **THE COURT:**  -- if I say it stands, it stands.  If I

25   say no I will let you know, and you can excise that, and you

1    may have to excise some, a couple, a few pages.

2            **MR. SPIRO:**  We appreciate the Court taking a look at

3    that.  We understood the Court that it was on very thin ice.

4    And given that it was already on thin ice, we think the

5    probative value versus the prejudice, and we would ask the

6    Court to exclude it in the testimony about it.

7            Thank you very much.

8            **THE COURT:**  All right.  The other thing I will say is

9    that a lot of these things are being overruled on the basis of

10   effect on the listener.  I think I said this in my sort of

11   overview about certain things, to the extent that it reflects

12   on Mr. Musk's state of mind at the time, et cetera, et cetera.

13           If there are such documents, I'm going to rely on the --

14   any opposing party to ask for a limiting instruction.  I don't

15   intend to give it every time, but -- I'm not necessarily going

16   to do it *sua sponte*.  But if either side wants a limiting

17   instruction, the burden is on you to ask for it.

18           **MR. SPIRO:**  Yeah.  We, most respectfully, don't want

19   one because we think it will have zero effect here.  As the

20   Court is aware, in their opening statement, they made comments

21   about the PIF text messages, just to use that example, and, and

22   analysts reports from JP Morgan that made it clear as day their

23   intention is to use it as affirmative evidence.  That limiting

24   instruction will wash away under that repetition.  And that's

25   the real reason they're using it.  And so the Court should look

1    at that, I think, as well.

2          And also I think Mr. Porritt -- it may have been a slip of

3    the tongue, but at one point he sort of said that was what they

4    were using it for.

5          So, in any event, I thank the Court for its time.

6                **THE COURT:**  All right.

7                **MR. PORRITT:**  Thanks, Your Honor.

8                **THE COURT:**  I want to make sure -- you know, I'm not

9    going to do stuff spontaneously -- precisely that.  You may not

10   want me to give it, so I'm not going to give it unless you ask

11   me to give it.  Okay?

12               **MR. PORRITT:**  Thank you, Your Honor.

13               **MR. SPIRO:**  Have a nice weekend.

14               **THE COURT:**  Thank you, Your Honor.

15               **THE COURTROOM DEPUTY:**  Court is adjourned.

16        (Proceedings concluded)

17

18

19

20

21

22

23

24

25

# I N D E X

Friday, January 20, 2023 - Volume 3

|  | **PAGE** | **VOL.** |
|---|---|---|
| Jury Instruction by The Court | 554 | 3 |

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|

| **FRIES, TIMOTHY** | | |
|---|---|---|
| (SWORN) | 501 | 3 |
| Direct Examination by Ms. Tripodi | 502 | 3 |
| Cross-Examination by Mr. Spiro | 511 | 3 |
| Redirect Examination by Ms. Tripoldi | 538 | 3 |

| **SUBRAMANIAN, GUHAN** | | |
|---|---|---|
| (SWORN) | 554 | 3 |
| Direct Examination by Mr. Apton | 555 | 3 |
| Cross-Examination by Mr. Price | 592 | 3 |
| Redirect Examination by Mr. Apton | 672 | 3 |

| **MUSK, ELON** | | |
|---|---|---|
| (SWORN) | 680 | 3 |
| Direct Examination by Mr. Porritt | 680 | 3 |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 9 | | 611 | 3 |
| 10 | | 614 | 3 |
| 11 | | 615 | 3 |
| 81 | | 581 | 3 |
| 83 | | 644 | 3 |
| 103 | | 576 | 3 |
| Exhibit 360, Pages 48 to 54 | | 559 | 3 |
| 525 | | 505 | 3 |
| 1023-43 | | 653 | 3 |

CERTIFICATE OF REPORTERS


We, BELLE BALL and DEBRA PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR



_____

Belle Ball, CSR 8785, CRR, RDR

Saturday, January 21, 2023