Volume 4

Pages 716 - 905

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES      )
LITIGATION.                       ) No. 18-cv-04865-EMC
_____)
San Francisco, California
Monday, January 23, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:
                        LEVI & KORSINSKY, LLP
                        1101 30th Street NW
                        Suite 115
                        Washington, D.C.  20007
        BY:  **NICHOLAS IAN PORRITT, ESQ.**
              **ELIZABETH K. TRIPODI, ESQ.**
              **ALEXANDER A. KROT, III, ESQ.**

                        LEVI & KORSINSKY LLP
                        75 Broadway
                        Suite 202
                        San Francisco, California  94111
        BY:  **ADAM M. APTON, ESQ.**
              **ADAM C. MCCALL, ESQ.**

                        LEVI & KORSINSKY LLP
                        55 Broadway
                        10th Floor
                        New York, New York  10016
        BY:  **MAX EDWARD WEISS, ESQ.**
              **KATHY AMES VALDIVIESO, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
               Official Reporter, U.S. District Court

(Appearances continued, next page)

**<u>APPEARANCES, CONTINUED:</u>**

For Defendants:

                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    51 Madison Avenue
                    22nd Floor
                    New York, New York  10010
          BY:  **ALEXANDER B. SPIRO, ESQ.**
               **ANDREW JOHN ROSSMAN, ESQ.**
               **PHILLIP B. JOBE, ESQ.**
               **ELLYDE R. THOMPSON, ESQ.**
               **JESSE A. BERNSTEIN, ESQ.**

                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    865 South Figueroa Street
                    10th Floor
                    Los Angeles, California  90017
          BY:  **MICHAEL T. LIFRAK, ESQ.**
               **ANTHONY P. ALDEN, ESQ.**
               **MATTHEW ALEXANDER BERGJANS, ESQ.**
               **WILLIAM C. PRICE, ESQ.**

                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    555 Twin Dolphin Drive
                    Fifth Floor
                    Redwood Shores, California  94065
          BY:  **KYLE K. BATTER, ESQ.**

PROCEEDINGS

1    **<u>Monday, January 23, 2023</u>**                        **<u>8:16 a.m.</u>**

2                        P R O C E E D I N G S

3        (The following proceedings were held outside of the

4    presence of the Jury)

5                THE COURTROOM DEPUTY:  All rise.  Court is now in

6    session, the Honorable Edward M. Chen is presiding.

7                THE COURT:  Good morning.  Have a seat everyone.

8                THE COURTROOM DEPUTY:  Court is calling the case In

9    Regarding Tesla Securities Litigation, Case No. 18-4865.

10   Counsel, please state your appearances for the record,

11   beginning with plaintiff.

12           MR. PORRITT:  Good morning, Your Honor.  Nicholas

13   Porritt with Levi & Kosinsky on behalf of the plaintiff.

14           THE COURT:  Good morning, Mr. Porritt.

15           MR. SPIRO:  Good morning, Your Honor.  Alex Spiro from

16   Quinn Emanuel on behalf of the defendants.

17           THE COURT:  Good morning, Mr. Spiro.

18           MR. SPIRO:  Good morning.

19           THE COURT:  So let's talk about Exhibit 80 that I

20   received late, I think, last evening.  The plaintiff's trial

21   brief and just now some additional materials, looks like

22   regarding correspondence with the SEC?

23           MS. TRIPODI:  Yes, Your Honor that's correct.  I

24   apologize, Your Honor, for the late filing.  We were waiting

25   for correspondence from the SEC that we hoped to be able to

**PROCEEDINGS**

1  provide you yesterday but just received the secure files from

2  them this morning.

3           **THE COURT:**  All right.  So addressing first the

4  question of authenticity, is there any dispute that Mr. Pees

5  from Akin Gump represented the Saudi Arabia Public Investment

6  Fund?

7           **MR. SPIRO:**  I'm certainly not conceding that.  I have

8  no idea, I haven't had a chance to cross-examine him or take

9  testimony from him or anybody at the PIF.

10          **THE COURT:**  Do you have any reason to believe that

11  Mr. Pees does not represent, did not represent PIF?

12          **MR. SPIRO:**  No, Your Honor.

13          **THE COURT:**  So the chain of custody would go from PIF

14  to their lawyer at Akin Gump, from their lawyer to the SEC and

15  then from the SEC to plaintiffs' counsel.  That's the sequence.

16  Correct?

17          **MS. TRIPODI:**  Your Honor, that's correct.  And we've

18  also provided the email from the SEC to Mr. Al-Jarboa,

19  requesting information and a conversation.

20          **THE COURT:**  Is there any break in that chain that you

21  would like to focus on?

22          **MR. SPIRO:**  I have no idea if there's a break in that

23  chain.  I just got these documents today.  What I can tell the

24  Court is that the SEC was certainly not comfortable enough to

25  use these minutes in their case.  So I know -- I can tell the

1    Court that I know for sure.  What, what -- the exact chain of

2    custody I haven't been as focused on because of the other

3    strictures of Federal Rule of Evidence 901.

4         THE COURT:  All right.  Let's get to the -- assuming

5    for a moment that there's sufficient evidence for the Court to

6    find authenticity, then we get to the hearsay problem.

7         MR. SPIRO:  Yes.

8         THE COURT:  And so I want to get your response.  The

9    plaintiffs have suggested that although there's some

10   differences, there is overall corroborative evidence suggesting

11   that the meeting took place, the folks there who indicated that

12   the meeting did take place at that point.  That they did

13   observe one or more person from PIF taking notes, appear to be

14   taking notes, and that many of the subject matters that are

15   identified in Exhibit 80 were indeed discussed.  I understand

16   there's going to be some conflict as to the substance of it and

17   I know that's your objection.  But the level of corroboration I

18   think under 807 doesn't require complete concordance with

19   everything that is said.  But I think if there is enough

20   indicator that it seems to be what it purports to be, that it's

21   of a meeting that took place and what -- I would like to hear

22   your response.

23        MR. SPIRO:  Sure.  Just so the record is clear on the

24   901 issue before we jump to this, there is ample case law in

25   California and the various districts that even an affidavit

 1  from a lawyer saying: This is what I produced, this is correct,

 2  this is accurate is not sufficient.  The law is clear as day on

 3  that.  And --

 4          **THE COURT:**  And why isn't it?

 5          **MR. SPIRO:**  Because the person who's transmitting it

 6  themselves doesn't know that it is what it purports to be.

 7  Meaning -- this is why you see in the SEC's response here,

 8  they're talking about Form 1626.  What Form 1662 does in an SEC

 9  investigation is it requires the proponent of the document to

10  swear that it is fake, not altered, and done at the same time,

11  or they don't even count it towards their investigation.  Which

12  is what happened here, in fact.

13      But what the case law says -- and you can look at *Seoul*

14  *Semiconductor*, *L.A. Printex Indus.*   but *Sullivan versus Costco*

15  *Wholesale Corp.* --

16          **THE COURT:**  Give me the cite.

17          **MR. SPIRO:**  2018 Westlaw, 4057447, at 6, Eastern

18  District --

19          **THE COURT:**  I'm sorry, 405 --

20          **MR. SPIRO:**  7447.

21          **THE COURT:**  At 6?

22          **MR. SPIRO:**  Yes.  Eastern District of California.

23  Says that again, counsel's -- even their affidavit, a sworn --

24  so if this Akin Gump lawyer had hypothetically done a sworn

25  statement attesting to the chain of custody, that would be

 1    insufficient, because he doesn't actually know the origin.

 2        So you see, chain of custody almost misses the mark

 3    completely.  Because we firmly believe that these are not

 4    genuine notes.

 5            **THE COURT:**  Why wouldn't that be true for any lawyer

 6    response?  It always comes through a lawyer, if somebody's

 7    represented, to Rule 34 requests.  You request production of

 8    documents and the lawyers go through it and then they come to

 9    your office with a big box and say "Here it is."

10            **MR. SPIRO:**  Right.  Well, it's true that the document

11    is passed on by the lawyer.  But what the lawyer does not know

12    is if the document, itself, is authentic.  And the question

13    that 901 is focused on, if you look at the advisory opinion --

14            **THE COURT:**  So authenticity could be raised every

15    time -- even when a party produces through their lawyer in

16    response to either a subpoena or a Rule 34 request, there is

17    embedded in there an inherent and serious authenticity problem,

18    or question?

19            **MR. SPIRO:**  I don't know that I can say in every

20    single case, but --

21            **THE COURT:**  Why wouldn't it?  Under your logic that

22    the lawyer didn't swear that -- you know, or get a sworn

23    affidavit from his or her or their client, that this is an

24    authentic record in response, say, to Request No. 36, you know

25    --

1      **MR. SPIRO:** Sure.  Sure.  So there are some documents,

2  right, that you see in cases very often like emails that have

3  other indicia, right, timestamps, metadata, things that are

4  forwarded.  Recipients, things like that.

5      A single standalone -- what I will tell the Court with

6  great conviction is that a single standalone Word document, so

7  somebody produces in a case on a typed one page, or handwritten

8  notes on one page, that goes to a lawyer.  That gets produced a

9  court case?  Under no circumstances, in my view, could that

10  ever be authenticated without the person who took the notes

11  saying "These are real notes.  These are not fake notes; these

12  were made by somebody actually at the meeting."

13      You have to remember, we don't know who took the notes,

14  when they were taken, if they're really what they purport to

15  be, what the purpose of the notes were.  Were they done in the

16  regular activity?

17      And I would submit to the Court the circumstances of this

18  are awfully suspicious, too.  Because, of course, the SEC wants

19  to speak to these folks.  They live overseas, and the SEC has

20  limited ability to force them to come in.

21      If you look at the email chain I've only had a moment to

22  look at, you can see the SEC lawyers basically saying: Listen,

23  this is voluntary.  They understand that the PIF can resist a

24  formal subpoena process, just like they did in this case.  And

25  so what they're sort of saying is:  Well, give us what you've

1    got.

2        In that circumstance, the PIF has every possible reason to

3    want to pass in a document that is -- makes the SEC not want to

4    chase them through time.  Okay.  And as much as they can make

5    the SEC happy, they know that the SEC is going to let -- be

6    bothering them less.

7        And so that's my response to that issue.  I mean, the

8    document here doesn't even have the email from the PIF to us.

9    It doesn't have the date the notes were taken.  Doesn't have

10   who took the notes.  Doesn't have anything.

11       **THE COURT:**  What would -- maybe you can clarify for

12   me.  What would be the incentive of PIF to fabricate a document

13   such as Exhibit 80, to then forward that to the SEC?

14       **MR. SPIRO:**  Their incentive would be that:  If we give

15   the SEC what they want, they're not going to bother us.  Which

16   is the reason the SEC has formed 1662 to begin with.  Because

17   the SEC is well aware that people produce fabricated notes all

18   the time.

19       It doesn't need to be a full-on fabrication either,

20   Your Honor.

21       **THE COURT:**  So in other words, it's just to get the

22   SEC off their back?

23       **MR. SPIRO:**  Totally.  Of course.

24       **THE COURT:**  And why -- is this the only document that

25   was produced?

**PROCEEDINGS**

1          **MR. SPIRO:**  I don't -- we -- I haven't had a chance to

2     examine any of this.  That's --

3          **THE COURT:**  I'm not sure I understand why PIF would go

4     through -- and why would it -- why would it tilt the testimony,

5     fabricate the testimony and make inaccurate these notes -- make

6     up notes, just to get the SEC off its back?  I'm not sure I

7     understand.

8          **MR. SPIRO:**  Well, because that happens every day.  I

9     mean, and also, we're using the word "fabricate" as if this is,

10    you know, a bit -- like some thriller.  All I'm saying is that

11    if the notes were taken, and then edited, altered, if there was

12    an original version then a later version, then a late -- we

13    don't know any of that, obviously, either.

14         And our view of the case, our theory of the case, frankly,

15    is that the PIF did change their tune afterwards.  There's

16    ample evidence in this case that the PIF changed what they were

17    saying afterwards, because they wanted to re-trade the deal,

18    because they wanted to distance themselves, because of the leak

19    in the media.  For a variety of circumstances.

20         And if you give the SEC a document that purports to be

21    their narrative, of course the SEC's going to be happy with

22    you, and of course the SEC's going to be less likely -- but I

23    don't need to prove -- I mean, this is ultimately -- and I

24    don't even have to get -- I'll eventually move to the hearsay

25    question, but we don't even --

1       **THE COURT:**  Why don't you address that question right

2   now.  We've got limited time.  I want to know your response to

3   why there isn't sufficient corroboration for 807 purposes.

4       **MR. SPIRO:**  Yeah.  So, just the final point, I think

5   it's a hearsay point, too, so it works for both.  One is these

6   are not the original notes taken at the meeting, even,

7   Your Honor.  The testimony is that the notes were handwritten

8   at the meeting.  If there were any notes.  Again, we don't know

9   that the witness's observation of a person at the meeting is

10  even note-taking and not doodling.  And we don't even know who

11  made those notes, and we don't even know if it's the same

12  person who made these notes.

13      And we -- we don't believe that the original notes were

14  even in English.  We don't have any reason to believe that they

15  were in English.  In fact, we have every reason to believe they

16  were not in English.

17      So now you're talking about maybe there were hand- --

18  maybe -- 20 percent chance, who knows -- that there were

19  handwritten notes taken at this meeting.  In another language.

20  At some later point, maybe the same notes were then given to

21  another person or maybe there were many iterations of this, or

22  maybe lawyers edited this, or maybe this is literally made out

23  of whole cloth.  And --

24      **THE COURT:**  What about the contents?  The -- the point

25  that the topics were who was there, et cetera, et cetera, seems

1    to be corroborated.

2         **MR. SPIRO:**  Yeah.  The reason we are having this

3    conversation is because the notes are obviously completely

4    different from the live witnesses that are testifying here

5    today.  Meaning some bare-bones similarities are exactly what

6    an improper document would have.  If the document said at the

7    meeting it was, you know, Mickey Mouse, obviously that wouldn't

8    be a very good attempt at a person to bring in a document that

9    should not be relevant.

10        But what the indicia of reliability and the advisory

11   opinions and all the case law talk about is the kind of

12   trustworthiness in a document that is so pristine and so

13   bulletproof that a court can be comfortable that in a matter of

14   this importance, the person wouldn't have to be subject to

15   cross-examination.

16        It's incredible amounts of detail, incredible amounts of

17   precision that are required.  In this case, we have --

18        **THE COURT:**  What case stands for that proposition,

19   that you need to have, quote, an incredible amount of specific

20   corroboration?

21        **MR. SPIRO:**  Yeah, so let me just pull this up.  Hold

22   on a second.  So I -- we can give the Court -- again, the

23   submission came in last night after the deadline.  The Court

24   had told counsel to turn these documents in to us right after

25   court.  We're here, now, on the morning of.

1    And if the declarant's truthfulness is so clear from the

2    surrounding circumstances that the test of cross-examine --

3    cross-examination would be of, quote, "marginal utility."

4    Marginal --

5         THE COURT:  What case are you quoting from?

6         MR. SPIRO:  Central District of California again,

7    *Fudge versus Broomfield.*

8         THE COURT:  What's the cite?

9         MR. SPIRO:  2022 Westlaw, 2101899 at 1.  It's a 2022

10   case.  And it also says the rule was designed for exceptional

11   circumstances.

12        THE COURT:  All right.  Let me hear your response.

13        MR. SPIRO:  And, and, again, that case goes on, and it

14   cites the Ninth Circuit case of *Sanchez* where, even though the

15   declarants -- they're referring to *San-* -- even though the

16   declarants in that case were subject to the penalty of perjury,

17   the statements were videotaped, there still was not sufficient

18   rights of cross-examination to view the declarants' demeanor.

19   Right?  So that had every possible thing that one could want,

20   one would suppose.

21        This exception is not something to be used in -- other

22   than rarely, and in the most exceptional circumstances.  As all

23   of the cases in the Central District of California state.

24   Because of the issue of cross-examination.  This is a fraud

25   case.  The defendant has rights.  The defendant tried to get

PROCEEDINGS

 1   this witness here.

 2           **THE COURT:**  All right.  Let me hear --

 3           **MS. TRIPODI:**  Your Honor --

 4           **THE COURT:**  Is this going to be brought up within the

 5   first 90-minute session?

 6           **MR. PORRITT:**  Quite possibly.  We can defer.  We can

 7   work around --

 8           **THE COURT:**  I think you should work around so I have a

 9   chance to look at these cases, but I want to get your response

10   to Mr. Spiro's.

11           **MS. TRIPODI:**  Sure.  Your Honor, just a couple of

12   brief remarks.  Under the general provision of 901(a), we need

13   evidence sufficient to support a finding that the matter in

14   question -- the PIF notes, Exhibit 80 -- are what they say, the

15   proponent, we say they are.  We believe in providing this chain

16   of custody, the correspondence from the SEC, to making the

17   request to the Saudi PIF.

18           **THE COURT:**  What about we don't know what these notes

19   are, whether they were taken in a different language, when they

20   were transcribed or when they were actually taken, all the

21   things that happened before it got to there at the Akin Gump

22   lawyer.

23           **MS. TRIPODI:**  Understood, Your Honor.  We don't know

24   what language they were taken in, but we do have corroborating

25   evidence from -- and it was not handwritten notes.  The

1   testimony from Mr. Ahuja and Mr. Teller at the PIF meeting said

2   that one of the members of the PIF -- they believed it was Naif

3   al Mogren -- was taking notes on a computer.  I don't have

4   clarity as to whether that was in English or in a different

5   language.

6        But what we do know was that those notes were presented

7   from the Saudi PIF to then the lawyer, Bob Pees.  Just a couple

8   of points, Your Honor, --

9        (Document handed up to the Court)

10       **MS. TRIPODI:**  -- regarding the hearsay exception.

11  Mr. Spiro has made the argument that the PIF wanted to get the

12  SEC off their back.  For the record, I do just want to point

13  out that the PIF was not under investigation for violation of

14  federal securities laws.  And if the PIF wanted to get the SEC

15  off their back, they could have easily corroborated Mr. Musk's

16  story so there were two stories that were the same.

17       The other thing I want to point out from the minutes with

18  respect to the corroboration, my colleague has said that the

19  notes from the PIF are entirely different than what we have

20  said went on at the meeting.  That is not true, Your Honor.

21       The one point on these notes that they are taking issue

22  with is the final bullet point wherein Yasir says "I would like

23  to listen to your plan, Elon, and what are the financial

24  calculations to take it private in the next week," which, that

25  statement was corroborated by Deepak Ahuja at his deposition.

**PROCEEDINGS**

 1          But then the final statement is "If I did not receive

 2     anything, I will call you," indicating that Yasir was waiting

 3     to receive something from Elon prior to making any decision.

 4          The other points in these minutes, including Yasir saying

 5     (As read):

 6               ""There's just one thing is SVF, in PIF we

 7               are independent and I am the one calling the

 8               shots in the PIF."

 9          Mr. Spiro, in his opening statement, told the jury that

10     Yasir gave Elon at this meeting guarantees that he was the

11     decision-maker.  That same statement is in these notes.

12          **THE COURT:**  Do you have a comment on Mr. Spiro's

13     citation of the *Fudge* case that says you need a -- I don't know

14     if the words were "an incredible amount" of specific

15     corroboration, so, so corroborative that cross-examination

16     would be pretty much useless?

17          **MS. TRIPODI:**  Your Honor, I don't have a comment right

18     now, but I will review the case very quickly and can provide a

19     comment.

20          **MR. SPIRO:**  Just very briefly, Your Honor.  I want to

21     just point out a few other quick things.

22          One is in the -- in the bellwether exhibits when we dealt

23     with this long ago, the Court said that this would have to be

24     authenticated at trial, and that a foundation would have to be

25     laid.  That was the Court's indication that we --

**PROCEEDINGS**

1          THE COURT:  That didn't necessarily rule out 901.

2          MR. SPIRO:  Um, it --

3          THE COURT:  I just noted it had to be authenticated,

4     obviously, some way.

5          MR. SPIRO:  Well, and that a foundation had to be

6     laid.

7          THE COURT:  Well, a foundation under 901.  What's your

8     next point?

9          MR. SPIRO:  My next point is even in the sentence that

10    they -- "If I did not receive anything," right, even the

11    sentence that my adversary just read that's in the PIF notes is

12    written in a tense that would lead to an hour of

13    cross-examination.  Because these notes were not done

14    contemporaneously.  It's obvious, even from the tenses of some

15    of the statements in this.

16       Third, I passed up a transcript to Your Honor.  My

17    adversary misspoke --

18          THE COURT:  Yes.  Notes were taken in notebooks, not

19    on computers, is the testimony.

20          MS. TRIPODI:  My apologies, Your Honor.

21          MR. SPIRO:  So again, that's a major difference.  And

22    the Court then knows if that is to be accepted as sworn

23    testimony and true, that these notes could not have been the

24    notes that were taken, nor do we have the original notes, nor

25    do we know how this is different than the original notes.

**PROCEEDINGS**

 1      And finally, I would just say the reason we're going back

 2  and forth on this is we're talking about arguably the most

 3  critical document in this case, the most contested exhibit in

 4  the case.  And we have -- we just have questions of

 5  reliability, questions of foundation, and questions of hearsay.

 6      So when you -- when you combine an issue of authentication

 7  that is this serious, and an issue of hearsay that to -- to us

 8  is so, so clear, you have a risk of manifest prejudice.  We

 9  don't have a right to cross-examine.  And we strongly object to

10  this exhibit.

11      **THE COURT:**  All right.  So this issue will not be

12  brought up in the first 90 minutes until I have a chance to

13  look at the case law.

14      **MS. TRIPODI:**  Okay.

15      **THE COURT:**  Okay?

16      **MS. TRIPODI:**  Your Honor, may I make one final

17  comment?

18      **THE COURT:**  Quickly.

19      **MS. TRIPODI:**  I just want to point out that in opening

20  argument, the issue here really is that plaintiffs have no view

21  of what happened, or we can't present the jury with what

22  happened from the PIF side --

23      **THE COURT:**  I understand that.  This is your only

24  evidence because --

25      **MS. TRIPODI:**  And counsel has already said to the

1    jury:  Everyone in the room will tell you that that's what

2    happened.  Elon's version of the story, Deepak and Teller.

3        That's all, Your Honor.

4            **THE COURT:**  I understand.  I understand.

5            **MS. TRIPODI:**  Thank you.

6            **THE COURT:**  Thank you.

7        Let's get started.  Let's bring the jury in.

8        I have a request.  Because of the stress on our wifi

9    system -- that's what interfered, we believe, with the realtime

10   last week -- that if you would turn off your court wifi and

11   rely on your cellular data, the less devices we have on that.

12       And I'm going to ask anybody in the audience, you should

13   not have your phone on in any event.  So please turn off your

14   phone, and certainly turn off any wifi access, because that's

15   over-taxing our system and interfering with our ability to get

16   realtime reportage.  So, thank you.

17       (The following proceedings were held in the presence of

18   the Jury)

19           **THE COURTROOM DEPUTY:**  All rise for the jury.

20           **THE COURT:**  All right, have a seat.  Thank you.

21       Good morning, members of the jury.  Good morning, everyone

22   else.  I hope had you a good weekend.  Especially you

23   Forty-Niner fans.  I see some happy faces out there.

24       So, as you will recall, Mr. Musk was on the stand on

25   examination by Mr. Porritt.  So we are going to pick up right

1    where we left off on Friday.

2        So, Counsel, you may recommence.

3        **ELON MUSK, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

4            **DIRECT EXAMINATION, RESUMED**

5    **BY MR. PORRITT**

6    **Q**    Good morning, Mr. Musk.

7    **A**    Good morning.

8    **Q**    I hope you had a good weekend.

9    **A**    Thank you.

10   **Q**    Now, you've had some interactions with the Saudi Arabia

11   Public Investment Fund, isn't that correct?

12   **A**    Yeah.  Yes.

13   **Q**    And before July, 2018, a meeting we'll get to in a moment,

14   you had had some prior meetings with representatives of the

15   PIF.  Isn't that correct?

16   **A**    Yes.

17   **Q**    And those meetings were about Tesla as well as some of

18   your other companies, is that correct?

19   **A**    Really, almost entirely about Tesla.

20   **Q**    But a little bit about AI as well, isn't that correct?

21   **A**    Very little but -- almost all about Tesla.

22   **Q**    But prior to July of 2018, you had no intention of

23   going -- of using PIF to finance any going-private transaction,

24   isn't that correct.

25   **A**    Prior to 2018?

1  **Q**    To July, 2018.

2  **A**    We had had discussions about taking Tesla private before,

3  before July, 2018.

4  **Q**    Okay.  But you had decided that you did not want to

5  proceed with the PIF, correct?  At that point.

6  **A**    Are you talking about July?

7  **Q**    Prior to July, 2018.

8  **A**    Correct.

9  **Q**    And then on July 31, 2018 you met with representatives of

10 the PIF at the Tesla Fremont factory, is that correct?

11 **A**    That's correct.

12 **Q**    And you met with Yasir Al-Rumayyan?

13 **A**    Yes.

14 **Q**    And a couple of other representatives from PIF, correct?

15 **A**    Yes.

16 **Q**    Okay.  And one of those representatives took notes of the

17 meeting, correct?

18 **A**    I did not see anyone take notes.

19 **Q**    Did one of the PIF representatives have a tablet or lap --

20 computer with them?

21 **A**    I -- I -- I don't -- I don't think so.  Like I said, I do

22 not recall anyone taking notes.  Electronic or otherwise.

23 **Q**    And you were there with Sam Teller, correct?

24 **A**    With Sam Teller, and Deepak Ahuja.

25 **Q**    Okay.  Mr. Ahuja joined later in the meeting, correct?

1   **A**     He -- he joined almost as soon as the meeting started.   It

2   was -- he was there, I think, almost the entire time.

3   **Q**     No one from Tesla took notes in this meeting, correct?

4   **A**     Sorry, my back is hurting.   Sorry.

5         I -- I did not take notes.   I cannot speak for Mr. Ahuja

6   or Mr. Teller.

7   **Q**     Have you seen any notes taken at that meeting by

8   Mr. Teller or Mr. Ahuja, since 2018?

9   **A**     No.

10  **Q**     Okay.

11  **A**     Well, you mean notes of the meeting.

12  **Q**     Yes.

13  **A**     I don't believe so.

14  **Q**     And the meeting lasted about 30 minutes, correct?

15  **A**     I thought it lasted a bit longer than that.   It may be as

16  much as an hour, but -- between 30 minutes and an hour.

17  **Q**     And at the meeting, you discussed a potential go-private

18  with Tesla, correct?

19  **A**     Correct.

20  **Q**     And you also discussed Tesla production goals?

21  **A**     I think we -- we may have talked about some long-term

22  goals.

23  **Q**     Okay.

24  **A**     Yes.

25  **Q**     And you discussed solar projects in Saudi Arabia?

1   **A**    Briefly, yes.

2   **Q**    And the PIF discussed working together with Tesla in a

3   confidential manner to explore a potential transaction that

4   would take Tesla private.  Correct?

5   **A**    I don't recall them saying "confidential."  I don't think

6   they did say that.  But the -- the meeting was fundamentally

7   about taking Tesla private.

8   **Q**    And the potential transaction to take Tesla private,

9   correct?

10  **A**    I mean, they unequiv- -- the -- the PIF unequivocally

11  wanted to take Tesla private.

12  **Q**    And that would require -- at that point you owned

13  20 percent of Tesla, is that correct?  Approximately?

14  **A**    I think, actually, it was more than that.  I think, maybe

15  with options and whatnot, maybe closer to 25 percent.

16  **Q**    And PIF at this stage owned just short of 5 percent,

17  correct?

18  **A**    They owned -- yes, 5 percent.

19  **Q**    Okay.  Or 4.9 percent?

20  **A**    I mean, yes, almost -- almost exactly 5 percent.

21  **Q**    Okay.  So that left 70 percent of shares outstanding,

22  correct?

23  **A**    No.  As I mentioned, that's -- I think with my options, it

24  was I owned 25 percent, so it would mean -- yes, yes.  Seventy

25  percent -- 70 percent if you take my shares and options, plus

1   their ownership, that would constitute roughly 30 percent.  And

2   so, yes.

3   **Q**    And at this point Tesla was worth approximately

4   $60 billion, is that correct?

5   **A**    I -- the value of the company was varying quite a lot.  I

6   think it -- I think it was less than that, actually.

7   **Q**    But still in the billions of dollars, correct?

8   **A**    Yes.  Yes.

9   **Q**    In the tens of billions of dollars?

10  **A**    In the tens of billions of dollars.

11  **Q**    So you were discussing a transaction that was going to

12  involve tens of billions of financing from PIF potentially,

13  correct?

14  **A**    Not necessarily tens of billions from PIF, no.  So PIF

15  would be a participant.  But I think the amount required from

16  PIF would be, I think, potentially much less than 10 billion,

17  you know.

18  **Q**    And that's because you intended to limit PIF to only

19  having a minority interest in the private Tesla, isn't that

20  correct?

21          **MR. SPIRO:**  Objection, as to time.  When?

22          **THE COURT:**  I assume we're talking about at this

23  meeting?  Or when?

24          **MR. PORRITT:**  Yeah.  At this meeting, Your Honor.

25          **THE COURT:**  Okay.

1          **THE WITNESS:**  I mean, there was no specific -- I don't

2    recall a specific discussion about limiting PIF to a particular

3    ownership stake.  I would have to say, like, would I -- it was

4    not my expectation that PIF would have a majority, if that's

5    what you're asking.

6    **BY MR. PORRITT**

7    **Q**    Okay.

8    **A**    I would expect them to have quite a bit less than a

9    majority.

10   **Q**    Okay.  In fact, so no specific percentage was discussed

11   with the PIF at this meeting, is that correct?

12   **A**    Not a specific percentage.  Because it would depend on

13   participation from other shareholders.  And also, I think very

14   importantly, how much of Tesla that I would also purchase using

15   my SpaceX shares.

16        Which I think is actually a very important point for the

17   jury to know, which is that SpaceX -- I really have two big

18   assets, which is Tesla and SpaceX.  And I believe with the

19   SpaceX stock alone, I felt, you know, that funding was secured.

20   **Q**    So you were contemplating using your SpaceX shares to

21   purchase more than -- increase your ownership interest over

22   25 percent of Tesla.  Is that correct?

23   **A**    Well, I believe that actually, I could have sold a lot of

24   my SpaceX shares.  SpaceX is the most valuable private company

25   in the United States.  It is -- SpaceX serves as the backbone

**MUSK - DIRECT / PORRITT**

 1   of the American space program.  As such, it is a very valuable

 2   company.

 3       And just as I sold stock in Tesla to buy Twitter, which is

 4   -- I didn't want to sell Tesla stock.  But I did sell Tesla

 5   stock in order to make up the difference from -- that was not

 6   there from other investors.

 7   **Q**   So at this time you were contemplating in your own name

 8   buying additional shares in Tesla, correct, as part of this

 9   go-private?  Is that what you're saying?

10   **A**   Correct.  I think it's very important for the jury to know

11   that I think that my SpaceX shares, alone, would have meant

12   that funding was secured.  Very important.

13   **Q**   We'll come to your statement about "Funding secured" later

14   on, and what you previously testified about what you meant

15   about "Funding secured," and what you said at the time about

16   what you meant by "Funding secured."  But let's finish up this

17   July 31st meeting.

18       You said that -- at this meeting the PIF also discussed

19   building a Tesla factory in Saudi Arabia, correct?

20   **A**   Yeah.  Sorry, I apologize.  Um, I -- I had trouble

21   sleeping last night, so unfortunately, I'm not at my best.  So,

22   sorry, could you repeat the question?

23   **Q**   At the meeting, the July 31st meeting, the representatives

24   in the PIF also discussed Tesla opening -- building a factory

25   in Saudi Arabia?

1    **A**     Yes, yes, absolutely.  So obviously, you know, if you

2    think about the situation that Saudi Arabia faces in the

3    future, we are headed towards a sustainable energy future, and

4    the purpose of Tesla is to accelerate sustainability.  And in a

5    sustainable-energy future, the world would not need oil.

6        And Saudi Arabia is extremely dependent on oil.  And so

7    they are looking for ways to diversify their economy in order

8    to -- anticipating the day when oil is in low demand.  And so

9    it was obviously very important for them to find alternative

10   industries.

11   **Q**    Well, my question was:  They just discussed Tesla opening

12   a factory in Saudi Arabia at this meeting.  Isn't that correct?

13   **A**    I'm sorry, if I could -- it's a bit hard to hear you.  If

14   you --

15   **Q**    Oh, I'm sorry.  Is that better?

16   **A**    Yeah.  If you --

17   **Q**    Okay.  The question was:  At that meeting, they discussed

18   opening a factory in Saudi Arabia; isn't that correct?

19   **A**    Yes.  As -- there was a strategic element to -- there

20   would be a strategic element to their investment because of the

21   importance of transitioning Saudi Arabia to new industries as

22   oil becomes less important.

23   **Q**    You didn't agree to open a factory in Saudi Arabia at the

24   meeting, did you?

25   **A**    Actually, I -- no, I wouldn't say that's quite correct.  I

**MUSK - DIRECT / PORRITT**

1    said that the -- I recognized that it was very important for

2    them to diversify their economy.  And in fact, that I was

3    supportive of opening a factory in Saudi Arabia to help them

4    diversify their economy.

5    **Q**   In fact, the board of directors of Tesla wouldn't let you

6    open a factory in Saudi Arabia immediately, would they?

7    **A**   I mean, I think your -- I don't think that's -- I don't

8    think -- I don't think that's correct.  I never -- I don't

9    recall the board ever saying that we should not open a factory

10    in Saudi Arabia.  There's a question of timing.

11    I think you said "immediately," is that correct?

12    **Q**   That was what was being discussed at this meeting,

13    correct?

14    **A**   No, that is not correct.

15    **Q**   Okay.

16    **A**   They -- they -- they wanted to open a factory in Saudi

17    Arabia in the future.  I mean, there are still many years to go

18    before Saudi Arabia needs to diversify their economy.

19    Obviously, with -- what we're trying to do with Tesla is try to

20    accelerate a sustainable energy future for the world -- that's

21    the whole purpose of the company -- as quickly as possible.

22    But despite our best efforts, it will still take many years to

23    do so.

24    I think Tesla has done a lot of good in accelerating the

25    advent of sustainable energy.  And in fact, if it were not for

1  Tesla, the auto industry would not be moving towards

2  sustainability at this point, I think it's probably fair to

3  say.

4       But nonetheless, the -- there would not be a need for a

5  factory immediately in Saudi Arabia, because they don't need a

6  factory immediately.  But would they -- would it be important

7  for them in the future?  Absolutely.

8       And I agreed with, that -- with -- it would be important.

9  And I was supportive of creating a factory in Saudi Arabia.  I

10 -- yeah, absolutely.

11 Q    Now, at this meeting, we've talked about no specific

12 percentage of ownership in a future private Tesla for PIF was

13 discussed.  Correct?

14 A    I don't -- I don't recall a specific ownership percentage.

15 Um --

16 Q    Thank you.  So, no total amount of funding was discussed

17 at this meeting.  Correct?

18 A    Obviously, the amount required to take Tesla private would

19 be dependent on the market cap of the value of Tesla.  And to a

20 degree, myself and others would participate.

21      So, but the thing that was really absolutely unequivocal

22 was that they were absolutely supportive of taking Tesla

23 private.  That, unequivocally, without hesitation.  And in

24 fact, I asked them, I asked Yasir, who is the head of the Saudi

25 investment fund, if he was certain that -- of being supportive,

1  and he said yes.

2      And I said:  Was other -- any other decisionmakers besides

3  yourself?

4      And he said there's the Crown Prince, but he has already

5  checked with the Crown Prince, and the Crown Prince is also

6  absolutely supportive.  So from -- so, so essentially that

7  there -- I took that to mean it was a done deal.

8  Q    You didn't have -- Yasir never said "We can provide you

9  with $10 billion if you need it," did he?

10 A    Actually, I -- I think, I think there was some discussion

11 -- well, it's important to appreciate that the Saudi investment

12 fund is one of the biggest funds in the world.  They -- they

13 have more money than the value of Tesla, in its entirety.  By

14 far.  Many multiples of it.

15     So, I mean, to them, 5 billion or 10 billion or even

16 20 billion would still be a very small percentage of their

17 fund.

18 Q    All right, but they did not give you -- you didn't discuss

19 them providing 20 billion in funding for you, did you?  Not

20 that specific amount.

21 A    Not that specific amount.  But they were unequivocal --

22 Q    And in fact, not any specific amount; isn't that correct?

23 A    I think there was some discussion -- I recall -- important

24 to bear in mind, this is five years ago.  But they were

25 unequivocal about moving forward.  Yasir said he was a final

1   decision-maker.  They have more than enough money to do

2   whatever it takes.  And my understanding was that they would do

3   whatever it takes.

4   Q    Okay.  But you don't disagree that no specific amount of

5   funding was discussed -- specific amount of funding was

6   discussed at this meeting on July 31st.  Isn't that correct?

7   A    Like -- an exact number would not be knowable without

8   knowing who else would participate.  But very importantly,

9   Yasir and the Saudi investment fund, it clear that they would

10  do whatever it takes, whatever amount of money would be needed.

11  Q    And you didn't know who was -- who else might participate

12  in this potential going-private transaction at this point,

13  July 31st?

14  A    I don't know.  So, I think, confident of several other

15  investors participating.

16  Q    But you hadn't discussed it with those particular

17  investors, had you, by this point?  By July 31st, 2018?

18  A    It wouldn't be appropriate to discuss it with other

19  investors because if I were to do so, it would be material

20  non-public information.  You cannot tell this to some investors

21  and not to others, because they would have an advantage over

22  the other investors.

23  Q    Right.  Because it would move the stock price, correct?

24  A    It -- it may -- it may or may not move the stock price,

25  but it would give an advantage to some investors over others,

1   which would not be right.

2   **Q**    Right.  So you hadn't -- I'll go back to my question.  You

3   hadn't discussed this going-private transaction with any other

4   investors other than PIF by July --

5   **A**    No.

6        (Reporter clarification)

7            **MR. PORRITT:**  I apologize.

8   **BY MR. PORRITT**

9   **Q**    But my question is:  You hadn't discussed a going-private

10  transaction with any other investor for these reasons prior to

11  July 31st, 2018.  That's correct, isn't it?

12  **A**    Um, okay, so no, that is not correct.  There was a dinner

13  that I had with Larry Ellison and with Dan Dees of Goldman

14  Sachs, and with Masayoshi Son of SoftBank where the idea of

15  going public was discussed.  Not that we would go public, but

16  the idea of it.  And I believe Larry Ellison was very

17  supportive of that.

18  **Q**    And this was back in 2017, correct?

19  **A**    Correct.

20  **Q**    And no price for going private was discussed with PIF on

21  July 31st, 2018.  Correct?

22  **A**    No price was discussed, but they made it clear they would

23  do whatever it takes.

24  **Q**    Okay.  At any price?

25  **A**    Well, I suppose not if the company was needing a trillion

**MUSK - DIRECT / PORRITT**

1   dollars or something.  But I would say the Saudi fund has

2   hundreds of billions of dollars.

3        So, provided it wasn't the -- if the value of Tesla went

4   up by a factor of 10, then maybe that would make it difficult

5   for them.  But there was -- they were very clear they -- they

6   would do the take-private, essentially no matter what the price

7   was, within reason.

8   **Q**   And the price of Tesla's stock on July 31st was

9   approximately $300?  Isn't that correct?

10  **A**   I don't recall the exact price.

11  **Q**   Okay.  Does that sound about right?

12  **A**   I don't recall the exact price.

13  **Q**   Okay.  I'll represent to you that the closing price on

14  July 31st was $298.

15  **A**   Okay.

16  **Q**   And no documents were signed at this July 3 1st meeting,

17  were there?

18  **A**   No documents were signed, correct.  There were no

19  documents signed.

20  **Q**   Okay.

21  **A**   But I should point -- I should point out that in an

22  earlier meeting with Yasir of the Saudi fund, I think it was

23  earlier that year --

24  **Q**   My question was:  Was a document signed in this meeting.

25  And the answer is no.  Correct?

1    **A**    Correct.

2            **MR. SPIRO:**  Can we not interrupt the witness?

3            **MR. PORRITT:**  Can the witness answer the question,

4    please?

5            **THE COURT:**  Well, first of all he needs to answer the

6    question.  I'm going to allow a brief explanation, but not into

7    another -- you can explain your answer, but not go off into

8    another topic.

9            **THE WITNESS:**  Okay.

10           **THE COURT:**  So if you want to say something about the

11   document being signed or not, that's one thing.  If you want to

12   talk about another meeting, unless it sheds light on the

13   document in question, then you should await questioning from

14   your attorney.

15           **THE WITNESS:**  I understand, Your Honor.  The -- I

16   think it does shed some light.

17           **THE COURT:**  Go ahead.

18           **THE WITNESS:**  So I'll try not to make the answers too

19   lengthy.

20       But, but I think this prior conversation with the -- the

21   conversation earlier in the year, beginning of the year, I

22   believe it was with Yasir of the Saudi fund.  He met with me,

23   and he said he wanted to invest in Tesla, and in a significant

24   way.

25       And I said that the -- well, the way to demonstrate that

**MUSK - DIRECT / PORRITT**

1    would be to take an initial investment of 5 percent in the

2    public markets.

3        At that meeting earlier in the year, there was also no

4    document signed, and there was no discussion of price. I think

5    this is very important.  Because after that meeting, even

6    though there was no document signed, and even though there was

7    no discussion of price, they went ahead and they purchased

8    5 percent of Tesla.

9    **BY MR. PORRITT**

10   **Q**   Now, you're now talking about purchasing a much bigger

11   percentage of Tesla, right?  A lot more money.  Correct?

12   **A**   I would say it is not a lot of money by their standards.

13   **Q**   Well, it was more than the 5 percent would cost, correct?

14   **A**   Yes.  But --

15   **Q**   Okay.  Thank you.

16   **A**   Yes.

17   **Q**   So following the meeting, you had no -- if PIF refused to

18   provide any funding to go private, you had no legal recourse

19   against them to make them provide the funding.  Isn't that

20   correct?

21   **A**   In reality, there is no legal recourse against a nation

22   state, even if there is a signed document.

23   **Q**   Well, you didn't even have a signed document, though, did

24   you?

25   **A**   We did not have a signed document.  But the enforceability

**MUSK - DIRECT / PORRITT**

1  of a signed document against the Kingdom of Saudi Arabia would

2  be essentially zero.

3  **Q**    And you committed to providing additional information to

4  the PIF at the meeting, correct?  Following -- at the meeting

5  you agreed to provide them with additional information

6  following the meeting.  Correct?

7  **A**    I -- I think so.

8  **Q**    Okay.  In fact, you never gave them that information, did

9  you?

10  **A**    I -- I don't recall.  I think that there may have been

11  some information given to them.

12  **Q**    It's customary, isn't it, before signing a major

13  transaction such as an acquisition, such as a financing, to

14  obtain financial information about the transaction?

15      Wouldn't you say that's true, in your experience?

16  **A**    Well, like I said, that's not really how they do business.

17  If they say they are going to do something, then they do.  The

18  signed document is neither here nor there.  That is -- that's

19  why I mentioned the conversation earlier in the year where I

20  said -- where they agreed to buy 5 percent of the company, with

21  no signed deal, and with no discussion of price.

22      And that's -- that's very important.  Because one should

23  expect consistency between, you know, if -- if they're behaving

24  one way with the 5 percent, then one can expect that they will

25  be behaving the same way if the number was 20 or 25 percent.

```
 1   Q    And --
 2             THE COURT:  Counsel, hold on for a second.  We're
 3   having a problem with the audio feed to the public.  And so I
 4   hate to interrupt this, but we need to take a short break so
 5   that our IT people can fix that.
 6        So I'm going to take a bit of an unscheduled break for ten
 7   minutes so we can address that particular technical problem,
 8   and then you can resume.
 9             MR. PORRITT:  Thank you, Your Honor.
10             THE COURT:  All right?  Thank you.  So we will take
11   just ten minutes.
12             THE COURTROOM DEPUTY:  All rise for the jury.
13        (Jury excused)
14        (Recess taken from 9:09 a.m. to 9:24 a.m.)
15        (The following proceedings were held outside of the
16   presence of the Jury)
17             THE COURTROOM DEPUTY:  Please remain seated, court is
18   back in session.
19             THE COURT:  Okay, let's bring the jury back.
20             THE COURTROOM DEPUTY:  All rise for the jury.
21        (Jury enters the courtroom)
22             THE COURT:  All right, have a seat everyone.  Thank
23   you.  Apologize for the interruption.
24        Why don't we pick up where we left off.
25             MR. PORRITT:  Thank you, Your Honor.
```

1                    <u>DIRECT EXAMINATION, RESUMED</u>

2      **BY MR. PORRITT**

3      **Q**    I think before the interruption, Mr. Musk, we were talking

4      about -- discussion about potential due diligence by the PIF at

5      the July 31st meeting?  Isn't that correct?

6                **MR. SPIRO:**  Objection, mischaracterizes.

7                **MR. PORRITT:**  Witness can --

8                **THE COURT:**  Well, we didn't use the word "due

9      diligence."  You can rephrase it.

10     **BY MR. PORRITT**

11     **Q**    We were talking about provision of additional information

12     to the PIF before they would make any investment in the going

13     private, isn't that correct?

14     **A**    Yes, maybe?  Yes.

15     **Q**    Okay.  And that's often referred to as "due diligence"?

16     You understand that term?

17     **A**    Yes.  That's not how I would characterize it.  But I've

18     seen almost -- if -- if someone agrees to buy something that

19     they would -- you know, that you would -- in concluding the

20     transaction, you would need more information.

21     **Q**    Okay.  And you understood that would be the case with the

22     PIF at the July 31st meeting, correct?

23     **A**    No.  My understanding was that they would proceed with the

24     deal.  They understood the company.  Tesla is a -- a public

25     company with public disclosures.

**MUSK - DIRECT / PORRITT**

1   Q    But you agreed to provide them additional financial

2   information, isn't that correct?

3   A    Well, they needed to know the exact amount that would be

4   needed from them, relative to other investors.

5   Q    And they need to know the structure of what a

6   going-private would look like.  Correct?

7   A    Well, it's pretty straightforward, I.  Don't think there's

8   much in the way of additional structure that's needed.

9   Q    Okay.  So you discussed with them just buying the

10  necessary shares to take Tesla private?  Is that correct?

11  A    My understanding from them very clearly was that they were

12  committed to take Tesla private.

13  Q    And you understood at the time that that involved buying

14  the outstanding public shares of Tesla, correct?

15  A    Not all of them, but some of them.

16  Q    You didn't discuss with them the idea of allowing retail

17  investors to remain invested in a private Tesla, did you?

18  A    I don't recall having that discussion with them at that

19  time.

20  Q    Okay.  Did you ever discuss that with them?

21  A    Possibly in earlier meetings.

22  Q    We'll come to that proposal later.  But that was a very

23  novel structure.  You understand that, correct?

24  A    Yes --

25  Q    Because public -- private companies can't have more than

**MUSK - DIRECT / PORRITT**

```
 1   300 shareholders, correct?  You understand that?
 2            MR. SPIRO:  Objection, again, to him interrupting the
 3   witness.
 4            THE COURT:  All right.  Let the witness answer before
 5   you start your question.  Start again.
 6            THE WITNESS:  Sorry.  No, you are incorrect.  The --
 7   private companies are allowed to have up to 2,500 non-employee
 8   shareholders.
 9   BY MR. PORRITT
10   Q    Okay.  Tesla had many more than 2,500 shareholders on
11   July 31, 2018, correct?
12   A    Yes.
13   Q    Many thousands more?
14   A    I don't know the exact number.
15   Q    Okay.
16   A    I should say that it's possible to have more, effectively
17   more -- far more than 2,500 shareholders in a private company
18   if some of those shareholders are special purpose vehicles that
19   other investors invest in.  That's how SpaceX works.
20   Q    So does SpaceX have widespread retail investors investing
21   through special purpose vehicles?
22   A    Yes.
23   Q    Does, retail investors?
24   A    I'm not sure what you mean by "retail investors" but there
25   are effectively, through special purpose vehicles, many more
```

**MUSK - DIRECT / PORRITT**

1    than 2,500 shareholders.

2    **Q**    But I can't go out and buy an interest in any of those

3    special purpose vehicles, correct?

4    **A**    Incorrect.  You can.

5    **Q**    Now, Mr. Ahuja showed Yasir and his team out of the

6    meeting at the end, correct?

7        (Reporter clarification)

8    **BY MR. PORRITT**

9    **Q**    Mr. Ahuja showed Yasir and his team out of the meeting at

10   the end, correct?

11   **A**    Yes.  He -- he -- I think he also spoke further with Yasir

12   in giving him a tour of the factory.

13   **Q**    And after the meetings, you did not have any further

14   substantial discussions with Mr. Ahuja about what he discussed

15   with Yasir while showing him out of the factory, correct?

16   **A**    I don't recall.

17   **Q**    Now, even after the July 31st meeting with PIF, you had

18   still not decided whether to take Tesla private.  Correct?

19   **A**    Correct.

20   **Q**    And on August 2nd -- on August 1st or 2nd you spoke with

21   Anthony Gracias about taking Tesla private?  Isn't that

22   correct?

23   **A**    This -- this was five years ago, so, um, I believe -- I

24   believe that is correct.  And my apologies, if -- it's

25   difficult to remember everything that happened five years ago

1  down to the last date.

2  **Q**    I understand.

3       Mr. Gracias was not enthusiastic about taking Tesla

4  private; isn't that correct?

5  **A**    I -- I don't -- I don't recall his reaction.

6  **Q**    Okay.

7  **A**    Yeah.

8  **Q**    He told you it would be a very arduous process.  Is that

9  correct?

10 **A**    At various times I've had discussions with Anthony Gracias

11 and other members of the board about taking Tesla private

12 because I thought it would enable us to execute our mission

13 better as a private company.

14      **MR. PORRITT:**  If we can just show the witness his

15 first deposition testimony from this case, taken in August,

16 2018.

17      (Document displayed to the Witness)

18      **THE COURT:**  Do you have that -- I don't have a copy of

19 that.  Have you provided that?

20      **MR. PORRITT:**  Getting it now, Your Honor.  Thank you.

21      **THE COURT:**  Okay.  August 18th -- when was this

22 deposition?

23      **MR. PORRITT:**  It's August 29, 2018, Your Honor.

24      **THE COURT:**  August 29?

25      **MR. PORRITT:**  2018.

MUSK - DIRECT / PORRITT

```
 1          THE COURT:  2018.  Okay.

 2          MR. SPIRO:  Does the witness have a copy?

 3          MR. PORRITT:  He's about to have one.

 4          THE COURT:  All right.  Are you going to provide a

 5   copy to the witness?

 6      (Document tendered)

 7          THE WITNESS:  Thank you.

 8      Wow.

 9   BY MR. PORRITT

10   Q    I can direct to you Page 177, Line 9 to 178, Line 1.

11          THE COURT:  Okay.  177, Line 9, to what?

12          THE WITNESS:  Okay, yeah, I see it.

13          MR. PORRITT:  178, Line 1.

14          THE COURT:  Are you asking the witness to look at it

15   to refresh?  Or are you going to read that?

16          MR. PORRITT:  I'm just -- just -- one moment,

17   Your Honor, because there are --

18      (Off-the-Record discussion between counsel)

19          MR. PORRITT:  Bear with me, Your Honor.

20          THE COURT:  Okay.

21          MR. PORRITT:  I apologize.  Take that down.

22      (Document taken off display)

23          MR. PORRITT:  I'll move on, Your Honor, at this point

24   in time.

25          THE COURT:  Okay.
```

```
 1              MR. PORRITT:  It's -- if I can refer the witness to

 2     Exhibit 81, please.

 3              THE WITNESS:  Um, Exhibit 81.

 4              THE COURT:  I believe Mr. Musk has a binder.  Is there

 5     a binder with the exhibits?

 6              THE WITNESS:  I can see it on the screen, sir.

 7              THE COURT:  All right.

 8              MR. PORRITT:  This has already been admitted,

 9     Your Honor.

10              THE COURT:  Okay.

11         (Document displayed)

12     BY MR. PORRITT

13     Q    On August 2nd you sent this email to the board, correct?

14     A    Correct.

15     Q    And you hadn't -- you sent this without consulting any

16     financial advisers, correct?

17     A    Correct.

18     Q    And you took no legal advice before sending this email to

19     the board.  Correct?

20     A    I think I may have spoken to some lawyers but I'm not

21     specific -- I do not -- this was not drafted by lawyers; it's

22     was drafted by me.

23     Q    Okay.  And it says there, "Offer to Take tesla Private At

24     420," correct?

25     A    Correct.
```

1  **Q**    All right.  And you derived the 420 price by applying a

2  20 percent premium to the then-market price on August 2nd,

3  isn't that correct?

4  **A**    Correct.

5  **Q**    All right.  Although the 20 percent premium generated a

6  price of $419.  Isn't that correct?

7  **A**    I think $419 and some number of cents.

8  **Q**    Okay.  And you rounded up to 420 because you thought that

9  would be a joke that your girlfriend would enjoy?  Isn't that

10  correct?

11  **A**    No, that is not -- well, there is some, I think, karma

12  around 420.  Although, I perhaps should question whether that

13  is good or bad karma at this point.

14  **Q**    And you would agree that is not a great reason to pick a

15  price for a potential multi-billion-dollar going-private

16  transaction, correct?

17  **A**    The 420 was a coincidence.  As you point out, it is

18  approximately a 20 percent premium on the stock price.  Yeah.

19  So it's a coincidence that it's at 420.

20  **Q**    So if I can refer -- now, if I can refer you to your first

21  deposition transcript in this case.

22           **MR. SPIRO:**  Under what basis, Your Honor?

23           **THE COURT:**  Yeah, what are you -- are you impeaching?

24  Or I'm not sure what the --

25           **MR. PORRITT:**  Well, if Your Honor wants to review it,

 1   I directly -- I think it relates for impeachment purposes,

 2   essentially, Your Honor.

 3          THE COURT:  Okay.  What -- give me the page number.

 4   I'm going to look at it and see what -- whether there is some

 5   impeachment value here.

 6          MR. PORRITT:  And I believe the impeachment -- the

 7   lines, Your Honor, are 178:7 through 19.

 8       (Document displayed to the Witness)

 9          THE COURT:  I'm not sure how that's impeaching.

10          MR. PORRITT:  All right.  I'll move on then,

11   Your Honor.

12          THE COURT:  All right.

13       (Document taken off display)

14   **BY MR. PORRITT**

15   **Q**   Now, the 420 price -- strike that.

16       The Tesla stock price had increased significantly between

17   July 31st and August 2nd, isn't that correct?

18   **A**   It had increased.

19   **Q**   Okay.  You didn't contact PIF to discuss the 420 price

20   that you proposed to the board, correct?

21   **A**   Correct.

22   **Q**   All right.  You certainly didn't say that you had chosen

23   420 because of a joke, correct?

24   **A**   I think you are being misleading here, sir.  420 was not

25   chosen because of a joke; it was chosen because it was a

1   20 percent premium over the stock price.

2   **Q**   And increasing the stock price from 419 to 420 would have

3   added millions, at least, to the potential cost of the

4   transaction, correct?

5   **A**   I think -- I think it was 419 and, you know, 60 cents or

6   something like that.  So it would make sense to round up to the

7   nearest round number, which would happen to be 420.  But it

8   certainly was not a joke.

9   **Q**   Well, you said -- is it not true that you rounded it up

10  because you thought your girlfriend would find it funny?

11  **A**   I don't know if she found it funny or not.  But the 420

12  price was not a joke.

13  **Q**   So at this stage, you had --

14       **THE COURT:**  Counsel, now I'm having technical

15  difficulties.  My -- my real time.

16      (A pause in the proceedings)

17       **THE COURT:**  Thank you.

18  **BY MR. PORRITT**

19  **Q**   If I can refer you back to Exhibit 81, please, the email

20  to the board.

21  **A**   Sure.

22      (Document displayed)

23       **MR. PORRITT:**  Thank you.

24  **BY MR. PORRITT**

25  **Q**   In your -- in this email to the board on August 2nd, 2018,

**MUSK - DIRECT / PORRITT**

1  you give your reasons for wanting to go private, isn't that

2  correct?

3  **A**    That is correct.

4  **Q**    Okay.  And the first one is:  Being public subjects Tesla

5  to constant defamatory attacks by the short-selling community,

6  harming the brand, isn't that correct?

7  **A**    Yes.

8  **Q**    Okay.

9  **A**    I think it is difficult to appreciate now just how much

10  attack Tesla was under by short-sellers who wanted Tesla to

11  die.

12  **Q**    Now, following this email you expected Tesla would form a

13  special committee?  Is that correct?

14  **A**    Yes.

15  **Q**    Okay.  And that special committee would then negotiate the

16  terms for a take-private, correct?

17  **A**    They would negotiate a price.

18  **Q**    Okay.  And additional terms, correct?

19  **A**    I think it's really just -- it's really about a price that

20  would then be proposed to shareholders.

21  **Q**    Now, you'd gone through a special committee process in

22  2016 when Tesla acquired Solar City, correct?

23  **A**    Yes.

24  **Q**    Okay.  And that had been a very arduous process, isn't

25  that correct?

MUSK - DIRECT / PORRITT

1   **A**    Yes.

2   **Q**    Okay.  Now, after this August 2nd email was sent, you had

3   a further conversation with Anthony Gracias, correct?

4   **A**    Yes.

5   **Q**    And he -- you discussed with Mr. Gracias the need to

6   engage legal and financial advisers for everyone, is that

7   correct?

8   **A**    I -- I don't recall the details of that conversation.

9          **MR. PORRITT:**  If I can refer the witness to

10  Exhibit 83.  It's been admitted, Your Honor.

11         **THE COURT:**  Okay.

12      (Document displayed)

13  **BY MR. PORRITT**

14  **Q**    So you see, these are the minutes of a meeting of the

15  board of directors held on August 3, 2018.  Do you see that?

16  **A**    Yes.

17  **Q**    And you attended this meeting?

18  **A**    Yes.

19  **Q**    Okay.  And you attended by telephone?

20  **A**    I assume so, yes.

21  **Q**    Okay.  Now, if I can refer you to Page 2 of Exhibit 83.

22      (Document displayed)

23  **Q**    The first paragraph.

24      (Document enlarged)

25  **Q**    You talk there about remaining private for approximately

 1   five years, and then going public again?  Is that correct?

 2   **A**   Yes.

 3   **Q**   Okay.  That idea had not been discussed with the PIF on

 4   the July 31st meeting, correct?

 5   **A**   I don't -- I don't recall whether that was discussed or

 6   not.

 7   **Q**   Now, then, in the second paragraph on Page 2 of

 8   Exhibit 83, you also expressed to the board your desire for

 9   current shareholders in the company to remain shareholders

10   after the proposed privatization.  Isn't that correct?

11   **A**   Yes.  I care a great deal about the shareholders, and

12   would not want to force them to not be part of Tesla if they

13   wish to be part of Tesla.

14   **Q**   And the board told you that that would be really difficult

15   for small investors, correct?

16   **A**   I -- I don't recall them saying that.  As I said, in the

17   case of SpaceX, which is also a very large company, we have

18   many thousands of small investors.

19   **Q**   If I can refer you to your deposition transcript you have

20   in front of you, if I can refer you to Page 194 at Line 22 --

21         **MR. PORRITT:**  This is to refresh recollection,

22   Your Honor.

23   **BY MR. PORRITT:**

24   **Q**   -- to 195:25.

25         **THE COURT:**  All right.  So you're asking Mr. Musk to

 1  read that and see if that refreshes his recollection?

 2          **MR. PORRITT:**  Correct.

 3  **BY MR. PORRITT**

 4  **Q**    Read that to yourself, Mr. Musk.

 5          **THE COURT:**  All right.  So you can read that to

 6  yourself, Mr. Musk.  Do you have that?

 7          **THE WITNESS:**  The highlighted section?

 8          **THE COURT:**  No.  It's in your deposition.

 9  **BY MR. PORRITT**

10  **Q**    In the transcript that you have in front of you.

11  **A**    Okay.  Sorry, which page is that?

12  **Q**    194, Line 22, to 195, Line 25.

13  **A**    194 --

14          (Witness examines document)

15  **A**    Yes.  I have that page.

16          **MR. SPIRO:**  Your Honor, I apologize for interrupting

17  again, but this isn't a passage related to anything that -- if

18  the Court would take a moment --

19          (Reporter clarification)

20          **MR. SPIRO:**  Yeah, if the Court would look at the

21  passage that counsel is referring Mr. Musk to, it's not -- I

22  don't see any relation to this.  I don't see it as proper to

23  refresh recollection.  I don't see it on point.  I don't think

24  this is proper.

25          **THE COURT:**  Well, he's probably referring to the last

 1  couple paragraphs.

 2      Is that what you want to refresh on?

 3          MR. PORRITT:  Yes.  Correct, Your Honor.

 4          MR. SPIRO:  Wait -- can I -- the final paragraphs are

 5  where?

 6          THE COURT:  I think -- are you referring to Line 18,

 7  in particular, through 25?

 8          MR. PORRITT:  Yes, exactly, on 195.  I just gave -- I

 9  wanted to give the full question and answer for full context,

10  to be fair.

11          MR. SPIRO:  What page is it?

12          THE COURT:  All right.  I'm going to allow it to

13  refresh recollection.  It is not being admitted for any

14  impeachment purpose.

15      So for the limited purpose of refreshing Mr. Musk's

16  recollection, I'll allow him to read that, and then you can ask

17  a question.  I'm not sure you're going to get much of a

18  different response, but you can ask the question again.

19      So, Mr. Musk, if you could just read to yourself Page 194,

20  starting with Line 22 at the bottom, Line 22, and go through,

21  and then the entirety of the next page, 195.

22      If you'd just read that to yourself.  You don't have to

23  read it out loud.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  And Mr. Porritt will ask you a question

 1   after that.

 2        (Witness examines document)

 3        **THE WITNESS:**  I've read it.

 4   **BY MR. PORRITT**

 5   **Q**    Okay.  Does this refresh your recollection that the board

 6   brought up, that this is going to be really difficult for small

 7   investors?

 8   **A**    Um, yes.  But I -- I -- um, as I mentioned, we have many

 9   small investors in SpaceX.  What I had in mind for Tesla was a

10   structure similar to how SpaceX operates where we do have many

11   thousands of small investors.

12   **Q**    Okay.  And you referenced to the board Fidelity is a

13   shareholder in SpaceX?

14   **A**    Yes.

15   **Q**    All right.  And T. Rowe Price want to be in SpaceX,

16   correct?

17   **A**    Correct.

18   **Q**    All right.  Are those small retail investors that you're

19   referring to there?

20   **A**    No, but they represent small retail investors.  So a way

21   for small investors to potentially remain part of Tesla would

22   be to invest in -- use their investment in Fidelity to thereby

23   own Tesla, which many investors do.

24   **Q**    Now, you have still not taken any legal advice on this

25   point, on the feasibility of having widespread retail investor

 1  participation in a private Tesla, correct?

 2  **A**    Well, I had -- I have the case example which was, again,

 3  very important.  SpaceX is also a large company and has many

 4  small investors, and also has Fidelity as an investor.  And

 5  Fidelity represents many small investors in their fund.

 6          **THE COURT:**  Okay.  So Mr. Musk, I need you to answer

 7  the question first, and then I'll allow you to explain.  I

 8  don't think you actually answered the precise question.

 9          **THE WITNESS:**  Yes, Your Honor.

10          **THE COURT:**  Why don't you ask it again, Mr. Porritt.

11  **BY MR. PORRITT**

12  **Q**    You've still not taken any legal advice on this exact

13  issue about having widespread retail investor participation in

14  a private Tesla.  Correct?

15  **A**    Correct.

16  **Q**    Thank you.

17      Now, also in on the second paragraph on Exhibit 83, you

18  stated it was not your intention to provide shareholder control

19  to any single entity, but rather, to have ownership of the

20  company be dispersed over a broad base of shareholders.

21  Correct?

22  **A**    Correct.  I wanted to do right by the existing

23  shareholders of Tesla, to the best of my ability.

24  **Q**    And that wouldn't be the case if you used your SpaceX

25  shares to buy a majority interest in Tesla.  Correct?

1   **A**    I didn't say SpaceX shares would buy a majority interest,

2   but just that the SpaceX shares would be available to make up

3   the difference of those shareholders who may not wish to

4   remain.

5   **Q**    And you had only discussed this transaction with one

6   another investor at this time, correct?  PIF?

7   **A**    And Larry Ellison, who was also a major investor.

8   **Q**    Did you discuss going private at 420 with Larry Ellison in

9   2017?

10  **A**    No, not --

11  **Q**    Thank you.

12  **A**    Okay.

13  **Q**    What was the market capitalization of Tesla in 2017?  Was

14  it comparable to what it was in July, 2018?

15  **A**    I don't recall the exact number, but I think at times it

16  may have been comparable.

17  **Q**    And then Exhibit 83 continues reporting on your remarks.

18  This is you talking to the Tesla board of directors.  Correct?

19  **A**    I believe so.

20  **Q**    Okay.  And you say at the bottom of the following

21  paragraph there, towards the bottom of that page:  There'd be

22  significant demand from existing and new investors, which may

23  include the UAE Sovereign Wealth Fund, the Norwegian Sovereign

24  Wealth Fund, Silver Lake, Fidelity, Baillie Gifford, Tencent

25  and T. Rowe Price.

1       Do you see that?

2   **A**    Yes.

3   **Q**    All right.  When you made this statement to the board, you

4   hadn't spoken to UAE.  Correct?

5   **A**    I had not.

6   **Q**    Okay.  You hadn't spoken with the Norwegian Sovereign

7   Wealth Fund?

8   **A**    No, no.

9   **Q**    Okay.  You hadn't spoken to Silver Lake about a

10  going-private transaction?

11  **A**    I spoke to Silver Lake, but I'm not sure exactly when that

12  was.

13  **Q**    Okay.  You hadn't spoken to Fidelity about a going-private

14  transaction?

15  **A**    Not yet.

16  **Q**    You hadn't spoken to Baillie Gifford about a going-private

17  transaction?

18  **A**    No.

19  **Q**    You hadn't spoken to Tencent about a going-private

20  transaction?

21  **A**    No, but I was also aware that Tencent was very comfortable

22  with private investments.

23  **Q**    You hadn't spoken to T. Rowe Price about a going-private

24  transaction?

25  **A**    No.

1   Q     Okay.  And yet, you still told the board that they would

2   support a going-private transaction, without speaking to them?

3   A     Well, my statement here is that it may include.

4   Q     And after the August 7th tweets when you actually spoke to

5   many of these investors, it turned out they could not support

6   going private.  Correct?

7   A     Some of the investors could not support -- well, actually,

8   it's better to say that some of the investors preferred, um,

9   that Tesla remain public.

10  Q     But it turned out that many T. Rowe Price funds couldn't

11  participate in a private Tesla, isn't that correct?

12  A     You know, the phrasing of your question, I believe, is

13  misleading.  T. Rowe Price has made many large investments in

14  private companies in excess of a billion dollars.  Yeah.

15  Q     Well, that depends on the particular fund of T. Rowe

16  Price, correct?

17  A     Yes, but I'm talking about T. Rowe Price --

18  Q     And the funds that are invested in Tesla, you didn't know

19  whether they had any ability to invest in a private Tesla, did

20  you?

21  A     I was aware that the companies could -- could and did

22  invest in private companies.  Indeed, Fidelity continues to be

23  an investor in Twitter, even though Twitter is private.

24  Q     Right.  But the funds that -- the fund that -- Fidelity

25  fund that invests in private companies is not the same fund

1    that invested in Tesla, correct?

2    **A**    My apologies, but I think -- that is not always true.

3    Tencent, for example, which you mention here, could invest in

4    public or private at their will.

5    **Q**    I was talking about Fidelity.  The Fidelity funds that

6    invest in Tesla do not all invest in private companies.

7    Correct?

8    **A**    That is correct.  But I think --

9    **Q**    Okay, thank you.

10   **A**    Okay.

11   **Q**    If you turn to the next page on Exhibit 83, the paragraph

12   title starts "The Board Then Discussed Next Steps."

13       Do you see that?

14   **A**    Yes.

15   **Q**    And then it says the board then -- it was noted that a

16   detailed proposal regarding a going-private transaction had not

17   yet been made.  Do you see that?

18   **A**    Yes.

19   **Q**    You agree that your email that we looked at earlier was

20   not a detailed proposal?

21   **A**    Yes.

22   **Q**    Okay.  And the board couldn't properly analyze or evaluate

23   it at this stage, is that correct?

24   **A**    That they -- they could certainly give it great thought,

25   but -- I mean, they certainly could think about it.

**MUSK - DIRECT / PORRITT**

1  Q    Okay.  They couldn't properly analyze and evaluate it,

2  correct?

3  A    Well, when -- when taking a company private, there really

4  is just the -- the price is the question.

5  Q    If you look back at Exhibit 83, it says right there

6  (As read):

7            "One, a detailed proposal would be needed in

8            order for the board to properly analyze and

9            evaluate it."

10      Doesn't it say that?

11 A    Yes.

12 Q    Okay.  And you agree with that, correct?

13 A    I suppose so.

14 Q    Okay.  And then the board goes on to authorize you, as an

15 initial step, to have initial -- initial conceptual

16 conversations with a few of Tesla's top shareholders to explore

17 their interest and gauge their reaction.  Correct?

18 A    Yes.

19 Q    So this is an initial step.  Right?

20 A    Yes.

21 Q    Okay.  And you needed the board's authority to speak to

22 investors about a potential going-private transaction.

23 Correct?

24 A    Um, no, I believe that is not correct.

25 Q    Okay.  You don't think you needed the board's authority to

**MUSK - DIRECT / PORRITT**

1   speak to the shareholders of Tesla?

2   **A**    You just changed the question.  The really important point

3   here is that the -- I, as the bidder, I'm actually not allowed

4   to have detailed discussions with the board because the board

5   is -- represent the counterparty.  So it would be collusion if

6   I, um, discussed it in detail with the board.  Because I would

7   be the bidder.  So the board has to -- is the counterparty.

8   You know, I'm not sure this distinction is clear.

9   **Q**    What difference does that make as to whether you can speak

10  to Tesla investors about a potential going-private transaction?

11  **A**    It's a big difference because when I'm the -- when I'm the

12  bidder, the bidder to take Tesla private, um, the board then

13  negotiates on behalf of shareholders.

14  **Q**    So, and you knew once a special committee was formed that

15  it would control the disclosure process to Tesla investors,

16  correct?

17  **A**    Not -- not -- not quite correct, no.  The -- they would

18  speak to investors, and I, as the bidder, would speak to

19  investors.  But the two of us, the board and I, could not

20  collude in talking to investors because I would -- I would be

21  the counterparty in that situation.  I would be the bidder.

22       And as -- so the board would talk to shareholders, and I

23  would talk to shareholders, but they would be separate, because

24  the board in this case would be representing the shareholders

25  as the seller, and I am representing myself and others as the

1  buyer.

2  **Q**    Later, when the special committee was formed by Tesla,

3  they, in fact, controlled all the disclosures and reach-out to

4  investors, isn't that correct?

5  **A**    I believe that is not correct.  Nor could it be correct.

6  **Q**    At this meeting on August 3rd with the board, did you

7  discuss your intent to make a full public disclosure of your

8  going-private bid?

9  **A**    Are -- are -- I think, I think there may have been such --

10  some discussion to that effect.

11  **Q**    Did you tell the board that you were going to make a

12  public statement that you were considering taking Tesla private

13  at 420?

14  **A**    There was -- I just -- I don't recall the exact nature of

15  the discussion.

16  **Q**    The board did not authorize you to disclose the

17  going-private transaction to the entire market, did they?

18  **A**    Again, you're -- this is -- I think this is misleading,

19  because the board is the counterparty.  As the bidder, I cannot

20  discuss -- the board has to represent the shareholders.  I

21  represent the bidding coalition.

22          **THE COURT:**  Okay, but if you could answer that

23  question, then I'll allow you to explain it.  So I think

24  there's a yes-or-no answer, and then you can explain.

25      So why don't you ask the question again.

1    BY MR. PORRITT

2    Q    All right.  The board did not authorize you to disclose

3    the going private transaction at 420 to the entire market, did

4    they?

5    A    They did not, but it would not be -- that is not something

6    the board would -- is allowed to do.  The board's not allowed

7    to do that.

8    Q    Now, following this meeting, you spoke with Michael Dell

9    over the weekend, is that correct?

10   A    Yes.

11   Q    About his experience taking his company, Dell, private,

12   correct?

13   A    Yes.

14   Q    And he told you that it was a very difficult process,

15   correct?

16   A    He told me it was a difficult process, yes.

17   Q    And he told you it took approximately a year?

18   A    I don't recall him saying a specific date.

19   Q    What about a timeline?

20   A    No, the -- the conversation I had with Michael Dell was

21   just to ask him if he thought that the Dell -- the taking Dell

22   private was -- did -- did he regret taking Dell private, or did

23   he think it was a good idea.  I wanted to understand if he

24   thought that that was something, in hindsight, that he would

25   still have done.  Like, did he think it was a good thing for

1    his company or not.

2         And he -- he was unequivocal, and said that he thought it

3    was a good idea to take Dell private.

4    Q    And then you had a conversation with Egon Durban on

5    August 6th, isn't that correct?

6    A    Yes.

7    Q    And Egon Durban is the chief executive of Silver Lake, is

8    that correct?

9    A    Yes.

10   Q    Okay.  The conversation lasted about 25 minutes?

11   A    I don't recall the exact time.

12   Q    Okay.  And you didn't discuss with him pricing at 420 per

13   share, correct?

14   A    I don't think so.

15   Q    Okay.  You didn't discuss with him your idea of allowing

16   existing shareholders to retain their interest in a private

17   Tesla?

18   A    Actually, I think I did.

19   Q    Okay.

20   A    Yeah, I'm pretty sure I did.

21   Q    And during this weekend and then on to the Monday, which

22   is August 6th, you didn't have any further conversations with

23   Tesla's top shareholders about a potential going-private

24   transaction, did you?

25   A    No.  I was concerned about selective disclosure to some

1   shareholders but not others, which would advantage some

2   shareholders relative to other shareholders.

3   **Q**    You didn't have any further communications with the PIF,

4   correct?

5   **A**    I don't recall.  This is five years ago, so --

6   **Q**    Okay.  In fact, the PIF learned of your bid the same way

7   everyone else did when they saw your tweet on August 7th, isn't

8   that correct?

9   **A**    They -- they learned the price proposal on that date, yes.

10  **Q**    Okay.

11          **MR. PORRITT:**  If we can, at this point I'd like to

12  show to the witness Exhibit 87, Your Honor, not yet admitted

13  into evidence.

14      (Document displayed to the Witness)

15          **MR. SPIRO:**  No objection.

16          **THE COURT:**  Okay.  No objection as to showing or as to

17  admission?

18          **MR. SPIRO:**  Either, Your Honor.

19          **THE COURT:**  All right.

20          **MR. PORRITT:**  Permission to publish, Your Honor?

21          **THE COURT:**  All right.  You're moving to admit, I take

22  it?

23          **MR. PORRITT:**  Yes, please, yes.  Sorry.

24          **THE COURT:**  Then we will deem it admitted.  You can

25  publish.

1          (Trial Exhibit 87 received in evidence.)

2          (Document displayed)

3     **BY MR. PORRITT**

4     **Q**    Do you see Exhibit 87 in front of you, Mr. Musk?

5     **A**    Yes.

6     **Q**    And this is an email you received from Dave Arnold on the

7     morning of August 7th, correct?

8     **A**    Yes.  Yes.

9     **Q**    All right.  And you received this email from Dave Arnold

10    at 8:16 a.m., correct?

11    **A**    Yes.

12    **Q**    And you were at home when you received this email?

13    **A**    Yes.

14    **Q**    Okay.  And that's your home in Los Angeles, is that

15    correct?

16    **A**    Yes.  I don't own any houses anymore, but that is my

17    former home.

18    **Q**    Okay.  And your plan for the day was to fly to the Tesla

19    factory in Nevada that morning, isn't that correct?

20    **A**    Yes.  I was going to work on production issues.

21    **Q**    And your flight was perhaps at approximately 10:00 a.m.

22    that morning, is that correct?

23    **A**    I think so.

24    **Q**    Okay.  And that's a private jet, correct?  Not a

25    corporate -- not a commercial flight?

**MUSK - DIRECT / PORRITT**

1  **A**   Correct.

2  **Q**   Okay.  So the plane waits for you until you get there?

3  **A**   Yes.

4  **Q**   Okay.  And you drove yourself to the airport to catch that

5  flight, correct?

6  **A**   Correct.

7  **Q**   And as it's your jet, you drive right up to the aircraft,

8  isn't that correct?

9  **A**   I mean, not right -- close to the --

10 **Q**   Okay.  And either on the way or when you got to the

11 airport, you typed a tweet that we see in Exhibit 8, correct?

12 **A**   The infamous tweet?

13    (Document displayed)

14 **Q**   Well, here, we can see it here.

15    Do you see that?

16 **A**   Yes.

17 **Q**   Okay.  Did you type that while you were driving or when

18 you got to the airport?

19 **A**   I -- I believe I typed it after I arrived at the airport.

20 **Q**   Okay.  And then you sent the tweet, and then you got in

21 your jet and you took off, is that correct?

22 **A**   Yes.

23 **Q**   Okay.  Now, if I can go back to Exhibit 87.

24    (Document displayed)

25 **Q**   You see Dave Arnold is referring to a *Financial Times*

**MUSK - DIRECT / PORRITT**

1  story, correct?

2  **A**   Yes.

3  **Q**   You didn't read that *Financial Times* story before you sent

4  your tweet, did you?

5  **A**   I don't think the *Financial Times* had run the story at

6  that point.

7  **Q**   Okay.  But here, when you knew that the -- Dave Arnold

8  warned you that the *Financial Times* is preparing to run a

9  story, and proposes no comment, and you say "Ok."  Isn't that

10  correct?

11  **A**   Yes.  "Ok," just meaning that -- acknowledged.

12  **Q**   All right.  And, then, did you subsequently read -- did

13  the *Financial Times* subsequently publish a story?

14  **A**   Um, yes.

15  **Q**   Okay.  Did they publish it before your tweet, Exhibit 8?

16  **A**   I -- I don't recall the exact timing.

17  **Q**   Okay.  Was the -- so the *Financial Times* wasn't a factor

18  in you publishing the tweet, Exhibit 8?

19  **A**   No, the *Financial Times* -- learning that they were going

20  to write the story, it was a significant factor.  In fact, I

21  would say it was the driving factor behind the tweet.

22  **Q**   All right.  But you didn't know what the *Financial Times*

23  was actually going to say when you published the tweet, did

24  you?

25  **A**   Not exactly.  But the information was concerning because

1   this information was not public.

2   **Q**    But Mr. Arnold didn't tell you that the *Financial Times*

3   was going to publish anything about a going-private

4   transaction.   Correct?

5   **A**    Well, he -- I mean, the email says -- has a lot of detail

6   here that only the Saudis and maybe a handful of others would

7   know.   This was -- this was quite shocking to see this

8   information.

9   **Q**    My question was:  Dave Arnold does not tell you that the

10  *Financial Times* story is going to contain any information about

11  a going-private transaction; isn't that correct?

12  **A**    Correct.

13  **Q**    Okay.   And yet your August -- your Exhibit 8, the

14  August 7th tweet, discusses a going-private transaction at 420,

15  correct?

16  **A**    Yes.

17  **Q**    And you thought it was better to tweet it out in response

18  to a *Financial Times* story that discusses just Saudi Arabia

19  acquiring an interest in Tesla, that required you to then

20  publish that there is a potential going-private transaction at

21  420?

22  **A**    My concern here was that if they were -- if the *Financial*

23  *Times* was aware of this level of private information, then

24  there was a good chance that they were also aware of the

25  take-private.   And I was concerned that it was important for,

**MUSK - DIRECT / PORRITT**

1  you know, the market as a whole to know about the take-private

2  transaction.

3  **Q**    You were concerned that they might say that you were

4  considering taking Tesla private at 420?  Is that what you were

5  concerned about the *Financial Times* reporting?

6  **A**    I didn't know quite what the -- what -- you know, when --

7  newspapers do not tell you everything they're going to print.

8  They don't run everything by you.

9        So my concern here was that if they knew all of this

10 information, then they could also potentially know about the

11 take-private.  And I wanted to make sure that all investors

12 were aware of the take-private just in case the article

13 contained information about the take-private.

14 **Q**    So you were concerned that this *Financial Times* article

15 (Indicating) might contain reference to the going-private?  Is

16 that correct?

17 **A**    Correct.

18 **Q**    All right.  But you didn't read the article to find out

19 first before sending your tweet, correct?

20 **A**    By then it would have been too late, --

21 **Q**    Well, aren't you --

22 **A**    -- I think.

23 **Q**    Wouldn't one way to be worried about a potential leak in a

24 *Financial Times* article is to read the article to see what

25 information it contained?

**MUSK - DIRECT / PORRITT**

1  **A**    No, by the time the article is written and published,

2  the -- the cat's out of the bag.  So I didn't know what more

3  information the *Financial Times* was aware of.  And they

4  certainly could have known about the take-private, given that

5  they also knew all of this confidential information.  And I

6  wanted to make sure that all investors would be on an equal

7  footing.

8  **Q**    Well, the *Financial Times* article was published before you

9  published your tweet.  Correct?

10  **A**    I don't know of the exact timing.

11  **Q**    Okay.

12      (Documents taken off display)

13          **MR. PORRITT:**  This will just be to refresh

14  recollection, Your Honor.

15      (Document displayed)

16          **THE COURT:**  So you're showing something --

17      (Document taken off display)

18          **THE COURT:**  Are you showing a document to the --

19          **MR. PORRITT:**  Not yet, Your Honor.  Sorry.

20          **THE COURT:**  Okay.

21  **BY MR. PORRITT**

22  **Q**    There's really no reason why you couldn't have waited --

23  so, strike that.

24      First of all, you published the August 7th tweet at

25  9:48 a.m. Pacific time.  Correct?

1          (Document displayed)

2     **A**     That is the time shown.

3     **Q**     Okay.  Do you have any reason to think it's incorrect?

4     **A**     No.

5     **Q**     Okay.  Now, that's 12:48 Eastern time, correct?

6     **A**     Yes.

7     **Q**     Okay.  And yet -- so that's in the middle of a trading

8     day, correct?  This was a Tuesday?

9     **A**     Yes.

10    **Q**     Okay.  And typically you don't disclose material

11    information during a trading day.  Correct?

12    **A**     Normally, that would -- normally, you would not disclose

13    important information during a trading day.  But I was

14    concerned that the take-private would leak during, during the

15    trading day and so I wanted to make sure that the -- that the

16    shareholders, you know, would know what my intent was.

17    **Q**     And you also knew that Tesla's required by Nasdaq, its

18    exchange, to pre-clear statements regarding a -- containing

19    material information.  Correct?

20    **A**     I don't think that's correct.

21    **Q**     Okay.  Are you aware that you have to pre-clear any

22    statements with Nasdaq before you make them, before Tesla makes

23    them?

24    **A**     No, I believe that is not correct.

25    **Q**     Okay.  But either way, you didn't pre-clear your tweet

1    with Nasdaq before you published it, correct?

2    **A**    I mean, we almost never talk to Nasdaq about anything.

3         (Document taken off display)

4    **Q**    Now, refer back, refer to Exhibit 8.

5         (Document displayed)

6    **Q**    You wanted three pieces of information, right, to be

7    communicated by that tweet.  Isn't that correct?

8    **A**    Yes.

9    **Q**    All right.  You wanted to communicate that you were

10   considering taking Tesla private at a price of 420, and with

11   funding secured at 420.  Correct?

12   **A**    I wanted to -- I mean, it's quite literal.  I'm saying

13   that I am considering -- very importantly, considering -- not

14   that it will happen, but that I'm thinking about it -- taking

15   Tesla private at 420.  And that, in my opinion, the funding is

16   secured for taking Tesla private at that price.

17        The reason I said that price was that I was not confident

18   it could be done at a higher price.

19   **Q**    Okay.  And so there was a limit to the amount of funding

20   you thought you could acquire.  Correct?

21   **A**    Of course, of course, there would be a limit.  It can't

22   be, like, a trillion dollars.

23   **Q**    Okay.  Now, and you wanted to communicate this to all

24   investors of Tesla, correct?

25   **A**    Yes.

1   **Q**    And you wanted them to rely on this tweet, right, in

2   making their decisions about buying or selling Tesla

3   securities, correct?

4   **A**    Yes.

5   **Q**    Okay.  And you expected that Tesla's stock price would

6   increase following this tweet, correct?

7   **A**    It is difficult to say that whether the pricing -- price

8   would -- of Tesla would increase or decrease, because often

9   counter-intuitive things happen.  And since -- I'm not saying

10  that this deal will be done; I'm simply saying that I'm

11  considering it.  Yeah.  Not that it'll be done, but that I'm

12  considering it.

13  **Q**    Okay.

14      **MR. PORRITT:**  If we could show the witness a portion

15  from his second deposition taken, Page 183, Lines 15 to 23.

16      Impeachment purposes, Your Honor.

17          **THE COURT:**  183?

18      **MR. PORRITT:**  Page 183, Line 15 through 23.

19  (Document displayed to the Witness)

20          **THE COURT:**  This is the volume that you have given me?

21      This is different from August 29?

22          **MR. PORRITT:**  Correct, Your Honor.  This is taken

23  November 5, 2021.

24          **THE COURT:**  Okay.  What's the page?

25          **MR. PORRITT:**  183.

**MUSK - DIRECT / PORRITT**

1          **THE COURT:**  Lines?

2          **MR. PORRITT:**  15 through 23, Your Honor.

3          **THE COURT:**  All right.  Do you want to read that for

4     impeachment purposes, or refresh recollection?

5          **MR. PORRITT:**  We can play it by video if -- with the

6     Court's permission, for impeachment purposes.  We'd play the

7     video -- the video -- by video, Your Honor.

8        (Reporter clarification)

9          **MR. PORRITT:**  Okay.  That's okay, if we can play --

10    we'll just play the video.

11         **MR. SPIRO:**  This is -- because this is -- Your Honor,

12    this is because he said it would be difficult to say?  That's

13    the impeachment?

14         **THE COURT:**  Well, they can either -- I'm sorry.

15    What's your question?

16         **MR. SPIRO:**  My question is -- I'm objecting that when

17    a witness says something is difficult to say, it's not proper

18    impeachment.

19         **THE COURT:**  Overruled.  I'm going to allow it.

20       (Portion of video played, not reported)

21    **BY MR. PORRITT**

22    **Q**    So you expected there would be some increase in Tesla's

23    stock price following your tweet, correct?

24    **A**    I -- I said it was -- I said it was not certain but it --

25    that likely there would be some increase.  But as I said before

**MUSK - DIRECT / PORRITT**

 1    in prior testimony, these things are counter-intuitive.

 2         So for example, when I said that at one point I tweeted

 3    that I thought the stock price was too high, and the stock

 4    actually went higher -- you know.  It's difficult to say how

 5    the market would react to considering something.

 6              MR. SPIRO:  Your Honor, the plaintiff didn't play the

 7    whole answer to the question.

 8              THE COURT:  So you're saying for completeness purpose,

 9    that you want more played?

10              MR. SPIRO:  I think he has to play at least the

11    question and answer.  Whether he has to play other things to --

12    to adhere to the rule of completeness is, to my mind, a

13    separate question.  But at a minimum, I think he has to play

14    the whole answer, at least.  He cut it off in the middle of the

15    answer.

16              MR. PORRITT:  Well, we played the relevant portion of

17    the testimony, Your Honor.

18              THE COURT:  Pardon?

19              MR. PORRITT:  We played the relevant portion of the

20    testimony, Your Honor.

21              THE COURT:  Well, for completeness purposes, why don't

22    you play through the full answer that goes over to 184, Line 1.

23         (Portion of video played, not reported)

24    BY MR. PORRITT

25    Q    Now, going back to Exhibit 8, the "Funding secured" tweet.

**MUSK - DIRECT / PORRITT**

1       (Document displayed)

2  **Q**    The "Funding secured" there refers to the PIF, correct?

3  **A**    Um, not just the PIF.  I think, again, a very important

4  point for the jury that I want to emphasize is that I had --

5  I'm the majority shareholder of SpaceX, which is the most

6  valuable private company in the United States.  And so the

7  "secured" referred both to PIF, but also the fact that I had

8  SpaceX stock to also secure the transaction.

9       This is an extremely important point.  And you seem to be

10  deliberately avoiding it.

11  **Q**    Well, we can explain why I'm avoiding it, perhaps.

12       **MR. PORRITT:**  Your Honor, I would like to show a clip

13  of the second deposition taken of Mr. Musk on November 5, 2021,

14  Lines -- Page 189, Lines 5 through 16.

15       **MR. SPIRO:**  Your Honor, for the rule of completeness,

16  we would ask that Mr. Musk's first deposition testimony,

17  Lines -- Page 226, Lines 1 through 8 and Page 227, Lines 1

18  through 11, the testimony from August of 2018 to --

19       **THE COURT:**  You can bring that up on direct.  So we're

20  not going to read from other -- if there's something proximate

21  to this page, I'll allow it, but not other statements.  You can

22  bring that up on your questioning.

23       So 189, Line --

24       **MR. PORRITT:**  -- 5 through 16.

25       (Document displayed to the Witness)

 1          THE COURT:  All right.

 2      (Witness examines document)

 3      (Document taken off display)

 4          MR. SPIRO:  Just a moment, Your Honor, so I can pull

 5  up the other deposition.

 6          THE COURT:  This is the November 5th, right?

 7          MR. PORRITT:  Correct, Your Honor.  May I proceed?

 8      Sorry, are we ready?

 9          THE COURT:  Yeah, I was waiting --

10          MR. PORRITT:  Oh, okay.  Thank you.  Please do.

11      (Portion of video played, not reported)

12  BY MR. PORRITT

13  Q    Now, when I asked you those questions back in November,

14  you were under oath, correct?

15  A    Correct.

16  Q    And you were under the same oath you've taken here today,

17  correct?

18  A    Correct.

19  Q    All right.  And after that question, you made no reference

20  at all to SpaceX, correct?

21  A    Correct.  However --

22  Q    Okay.  Thank you.

23  A    Okay, what --

24          THE COURT:  Well, your attorney will --

25          THE WITNESS:  Okay.

**MUSK - DIRECT / PORRITT**

1          **THE COURT:** -- let you elaborate.

2    **BY MR. PORRITT**

3    **Q**    You were asked what the -- you were asked if the reference

4    to "Funding secured" referred to the Saudi Arabia PIF, and you

5    said:  Yes, correct, under oath in November, 2021.  Correct?

6    **A**    I think the -- the first deposition with the SEC, what,

7    three years earlier, is the one that should be viewed as the

8    one that is closest in time and more accurate than the one that

9    occurred three years later.

10         **THE COURT:**  All right; I need you to answer this

11   particular question.

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  Your attorney will be able to bring out

14   the other one.

15         **THE WITNESS:**  Sorry, Your Honor.  Yes, yes.

16   **BY MR. PORRITT**

17   **Q**    Okay.  So you did not reference SpaceX when it came to

18   asking what "Funding secured" referred to back in November,

19   2021, under oath.  Correct?

20   **A**    Not --

21         **MR. SPIRO:**  Objection.  Mischaracterizes his

22   testimony.

23         **THE COURT:**  Well, he's already answered yes to the

24   basic question, so I think we can move on.

25         **MR. PORRITT:**  All right.

**MUSK - DIRECT / PORRITT**

1    BY MR. PORRITT

2    **Q**    And you hadn't spoken with PIF between July 31st and

3    August 7th, correct?

4    **A**    I don't recall --

5    **Q**    Had not, correct?

6    **A**    Sorry?

7    **Q**    I'll repeat the question.

8    **A**    My apologies.  Could you speak closer to the microphone?

9    **Q**    You had not spoken to the PIF between July 31st and

10   August 7th, correct?

11   **A**    I don't recall exactly what happened between exact dates

12   five years ago.

13   **Q**    Okay.

14         **MR. PORRITT:**  Now, at this point, if we could

15   introduce Exhibit 121, Your Honor.  It's not yet admitted into

16   evidence.

17       (Document displayed to the Witness)

18         **THE COURT:**  Okay.

19         **MR. PORRITT:**  Show that to the witness?

20         **THE WITNESS:**  Yes.

21   BY MR. PORRITT

22   **Q**    Do you see that?

23   **A**    See which part of it?

24   **Q**    Well, first of all, the document itself, these are text

25   messages taken from your phone, isn't that correct?

1    **A**    Yes.

2          **MR. PORRITT:**  At this point I move them into evidence,

3    Your Honor.

4          **MR. SPIRO:**  Objection.

5          **THE COURT:**  All right.  I overrule the objection,

6    except that the parties are going to work on redacting those

7    portions that were not relevant.

8          **MR. PORRITT:**  Correct, Your Honor.  And this -- we

9    have redacted out every communication that is not relevant to

10   the transaction at issue.  It contains communications between

11   Mr. Musk, members of the board, Tesla employees, and his

12   advisers.

13         **THE COURT:**  All right.  So what we have -- let me just

14   make sure I have the same document as you do -- is this a

15   15-page document now?  Is that correct?

16         **MR. PORRITT:**  Yes, I believe so.

17       Yes, that's correct, Your Honor.

18         **THE COURT:**  And you've redacted things other than

19   communications concerning the subject matter of this action.

20         **MR. PORRITT:**  Correct, Your Honor, as well as personal

21   identifying information, et cetera.

22         **MR. SPIRO:**  We have not had an opportunity to look at

23   the redactions that plaintiff is suggesting.  If he wants to

24   point to certain specific texts.

25       I don't want to interrupt his examination, but we don't

 1 | have a blank agreement on this specific document.

 2 |         THE COURT:  All right.  Well, let's do this.  I will

 3 | allow you to utilize this in your examination.  But in terms of

 4 | filing the final document, I would like the parties to agree

 5 | that this is -- the redactions are appropriate.

 6 |         MR. PORRITT:  Very good, Your Honor.

 7 |         THE COURT:  Okay?  So I'm going to admit, subject to

 8 | redactions, clarifying and agreement on redactions.

 9 |         MR. PORRITT:  Very good, Your Honor, I think we will

10 | reach agreement.  It's just a question of timing.

11 |         THE COURT:  Okay.

12 |     (Reporter clarification)

13 |     (Trial Exhibit 121 conditionally received in evidence.)

14 |         MR. PORRITT:  May I publish to the jury, Your Honor?

15 |         THE COURT:  Yes.

16 |         MR. PORRITT:  Thank you.

17 | BY MR. PORRITT

18 | Q    So if I can refer you to a text message you received from

19 | Deepak Ahuja -- on August 7th, correct?  Well, let's just see.

20 |         THE COURT:  Do you have a page number, Counsel, so we

21 | can find that?

22 |         MR. SPIRO:  And if it would be okay with the Court, if

23 | we could see the messages first before they are published?

24 |         MR. PORRITT:  It's Page 4, 121, 4, Your Honor.

25 |         THE COURT:  All right.  I'm not sure how you can

1    segregate out just that section.  You have a copy, right, of

2    this exhibit right now, as redacted?  I assume?

3        Has that been provided to opposing counsel, Mr. Porritt?

4            MR. PORRITT:  Yes, it has, Your Honor.  It was

5    provided last night.

6            THE COURT:  All right.  So I'm not going to interrupt,

7    but if you find something inappropriate, you can make your

8    objections known at that time.

9            MR. SPIRO:  Thank you.

10            THE COURT:  Go ahead.

11            MR. PORRITT:  All right.  Thank you.

12   BY MR. PORRITT

13   Q    Mr. Musk, do you see that text highlighted in front of

14   you, August 7th?

15        (Document displayed)

16   A    Yes.

17   Q    Okay.  And just for the benefit of the jury, the time

18   there at 17:23, that's seven hours ahead of Pacific time.

19   A    Okay.

20   Q    You recall, on the morning of August 7th, receiving this

21   text from Deepak Ahuja?

22   A    It's five years ago, but I'm just going to -- this is --

23   this is a text that was received, yes.

24   Q    Okay.  And you recall that Deepak Ahuja and other members

25   of -- other Tesla executives were going to draft an email to

**MUSK - DIRECT / PORRITT**

1  Tesla employees to be published about the going-private,

2  correct?

3  **A**    Yes.

4  **Q**    And that was shortly after your tweet was published,

5  correct?

6  **A**    Yes.

7  **Q**    Okay.  And then after this text, Mr. Ahuja, Sarah O'Brien,

8  Todd Maron, and Dave Arnold drafted an email for you to send to

9  Tesla employees, and sent you a draft.  Isn't that correct?

10  **A**    Yes, yes.

11  **Q**    Okay.  And you expected there would be questions following

12  your August 7th tweet, correct?

13  **A**    Yes.

14  **Q**    Okay.  Yet, you didn't send out any more detailed tweets

15  after your initial tweet.  Correct?

16  **A**    I think there were later tweets, but I'm not sure what the

17  exact time was.

18         **THE COURT:**  You should give a time frame, Counsel.

19         **MR. PORRITT:**  Thank you.  I'll get there, Your Honor.

20  That was a poorly-phrased question.  I apologize.

21  **BY MR. PORRITT**

22  **Q**    But,, you did have -- at the time you issued your first

23  tweet, you didn't have already several other tweets ready to go

24  with additional information, did you?

25  **A**    Correct.

**MUSK - DIRECT / PORRITT**

1   **Q**    Okay.  Did you look at what was happening to the stock

2   price after your August 7th tweet?

3   **A**    I was in the factory working on production problems, so I

4   was not following the stock price.

5   **Q**    Okay.  Did you look -- over the days following your tweet,

6   did you ever look at what was happening to the stock price?

7   **A**    I think, at times.

8   **Q**    Okay.  But not all of the time?

9   **A**    No, I'm literally in the factory working on production

10  issues with the team.

11  **Q**    So if I can refer you to Exhibit 9., it was previously

12  admitted.  This is one of the subsequent tweets I think you're

13  referring to.

14       (Document displayed)

15  **Q**    Do you see that?

16  **A**    I do.

17  **Q**    Okay.  Now, you say here (As read):

18           "I don't have a controlling vote now & wouldn't

19       expect any shareholder to have one if we go private."

20       Correct?

21  **A**    Correct.

22  **Q**    All right.  At this point.  Did you have any idea about

23  what ultimate percentage any individual participant in the

24  going-private transaction may end up owning?

25  **A**    Not specifically.

**MUSK - DIRECT / PORRITT**

1    **Q**    So one could own 51 percent?

2    **A**    I thought that was very unlikely.  That's why I said I

3    wouldn't expect a shareholder to have one.  I'm not saying that

4    I wouldn't -- that they wouldn't, but that it would just simply

5    not be my expectation.

6    **Q**    And then if we can refer to Exhibit 10.

7         (Document displayed)

8    **Q**    You see there, your tweet there refers to the special

9    purpose vehicle or special purpose fund again?

10   **A**    Yes.

11   **Q**    Okay.  Again, you still had no legal advice on this point,

12   correct, when you issued this tweet?

13   **A**    No, but I was familiar with how SpaceX is structured, and

14   we had legal advice at SpaceX.  And so I thought it would be a

15   similar structure to SpaceX.

16   **Q**    So you were relying on the SpaceX legal advice when you

17   were issuing this tweet?

18   **A**    Essentially, yes.

19   **Q**    And you thought that retail investors would be able to

20   invest directly in this special purpose fund which would own

21   100 percent Tesla stock, is that correct?

22   **A**    Not that it would necessarily own 100 percent of Tesla

23   stock, but I was aware that there were and are many special

24   purpose vehicles that own SpaceX stock, and I thought the

25   similar -- something similar could work for Tesla.

**MUSK - DIRECT / PORRITT**

1  Q    So, but you thought a special purpose vehicle would only

2  own Tesla stock, correct?

3  A    Not necessarily, no.

4  Q    So you had in mind that they would own shares in other

5  companies?

6  A    Yes.

7  Q    How is that equivalent to holding -- allowing Tesla

8  private shareholders to hold their Tesla shares in a

9  going-private transaction?

10 A    Well, they would still own, indirectly, Tesla shares.

11 Q    Okay.  Do the special purpose vehicles in SpaceX own

12 shares in companies other than SpaceX or SpaceX-related

13 companies?

14 A    I don't know what all of the special purpose vehicles do.

15 I think some do just own SpaceX stock.

16 Q    And if you could go to Exhibit 11.

17     (Document displayed)

18 Q    You tweeted this at 11:13 a.m., isn't that correct?

19 A    Yes.

20 Q    Okay.  Now, at this point you knew that Tesla corporate

21 communications, including their general counsel -- Todd Maron

22 is Tesla's general counsel, correct?

23 A    Yes.

24 Q    Was, at that time?

25 A    Yes.

**MUSK - DIRECT / PORRITT**

1  **Q**    Right.  So you knew that the general counsel, global

2  communications, the CFO is drafting an email which you knew was

3  going to be published, correct?

4  **A**    Yes.

5  **Q**    Okay.  Why then are you tweeting out these statements --

6  incomplete statements about the going-private transaction,

7  rather than waiting for that drafted statement?

8  **A**    I wanted to be clear that my intent was to do the right

9  thing for Tesla shareholders, and not try to force them to sell

10  if they wish to stay part of Tesla.  I was trying to do the

11  right thing for shareholders.

12  **Q**    Right, but that's going to be communicated in this email

13  that's being drafted for you by Tesla, correct?

14  **A**    Well, I was worried that shareholders would think that I

15  was trying to exclude them, and I wanted to be clear that I was

16  trying to support them, not exclude them.

17  **Q**    Right, but my question is directed at -- you testified

18  yesterday how Tesla -- how Twitter can't always be

19  comprehensive, correct?

20        Do you recall that testimony?

21  **A**    The character limitation is 240 characters, yes.

22  **Q**    Right.  And you're having a longer communication drafted

23  for you by Tesla general counsel, Tesla communications team,

24  Tesla financial team.  Correct?

25  **A**    Yes.

**MUSK - DIRECT / PORRITT**

1  Q    And that longer statement can address this question about

2  shareholder participation in a private Tesla, correct?

3  A    Well, it can go into a lot more detail.  But I was just

4  concerned that shareholders thought that I would abandon them,

5  and I wanted to be clear that I would do my best to support

6  them.

7  Q    Well, you knew this -- 11:13 a.m., I mean, you knew this

8  statement was imminent, that your team was working on it,

9  correct?

10  A    Yes.

11  Q    So why not just wait and give all the details to all the

12  investors at once in a properly-drafted document, rather than

13  sending out these incomplete tweets?

14  A    I just -- I wanted shareholders to know that I would do my

15  best to support them.  That seemed like an important thing to

16  me to convey to the public.

17  Q    Now, by this stage, 11:13 a.m., Nasdaq had actually halted

18  trading in your stock, correct?

19  A    I'm not certain of the time.  I was in the factory working

20  on production problems.

21  Q    So you were sending these tweets while you were on the

22  factory floor, working on other issues at Tesla.  Correct?

23  A    I think this one was done perhaps, I think, just before I

24  started working on the production issues.

25  Q    Okay.

1    A    Because it -- it looks like it was -- the timing would be

2    roughly when I would be entering the factory in Nevada.

3    Q    But you are aware that Nasdaq halted trading in Tesla

4    shares in the morning, you know, late morning Pacific time,

5    August 7th, 2018, correct?

6    A    I'm not sure of the exact timing.

7    Q    Okay.  You recall Nasdaq halting trading in Tesla shares,

8    correct?

9    A    At some point in the day, I did.  I think later in the day

10   I learned that.

11   Q    Okay.

12        MR. PORRITT:  Can you pull up Exhibit 12, please.

13        (Document displayed)

14   BY MR. PORRITT

15   Q    Do you recognize this as the email to Tesla employees that

16   was drafted for you by Tesla?

17   A    Yes.

18   Q    Okay.  This doesn't say anything about funding, does it?

19   A    It does not appear to say anything specific about funding.

20   Q    Okay.  And if I could refer you to what's the third

21   paragraph from the bottom on Exhibit 12.

22        You say there (As read):

23            "Finally, this has nothing to do with

24            accumulating control for myself.  I own about

25            20 percent of the company now, and I don't

```
 1                 envision that being substantially different

 2                 after any deal is completed."

 3          Do you see that?

 4     A    Yes.  Although just to correct that, the 20 percent is

 5     shares, not including options.  Options would make it a higher

 6     number.

 7     Q    Okay.  Now, if you used your SpaceX shares to finance some

 8     of the going-private transaction, that would increase your

 9     percentage ownership in Tesla, isn't that correct?

10     A    Yes.

11     Q    Okay.  This (Indicating) says nothing about you using

12     SpaceX shares to finance any transaction, going-private

13     transaction for Tesla, does it?

14     A    This does not speak to the financing.  This particular

15     email does not reference financing details.

16     Q    Okay.  And in fact, the immediate paragraph above that

17     says:

18                 "The intention is not to merge SpaceX and

19                 Tesla."

20          Correct?

21     A    Yes.

22     Q    So, if anything, you are trying to separate the concept of

23     SpaceX from the going-private with Tesla, isn't that correct,

24     with this email?

25     A    I just wanted to be clear that I was not attempting to
```

**MUSK - DIRECT / PORRITT**

1  merge the companies.

2  **Q**    All right.  Is there any information in this email that

3  would suggest that you might use SpaceX shares to finance a

4  going private of Tesla?

5  **A**    This email does not speak to the details of the financing.

6  **Q**    Okay.  And then if we can go to Exhibit 13.

7      (Document displayed)

8  **A**    That's not me giving away the Ethereum, by the way.

9  **Q**    So you sent this tweet at 12:36 p.m.  Do you see that?  On

10  7th of August?

11  **A**    Yes.

12  **Q**    Okay.  And that's -- the link there to "Taking Tesla

13  Private," that's the link to Exhibit 12 that we were just

14  looking at?  Isn't that correct?

15  **A**    Yes.

16  **Q**    So the earlier -- the earlier tweets we looked at, 11:08,

17  et cetera, they were just one hour and 24 minutes before -- 28

18  minutes before this.  Correct?

19  **A**    I think so.

20  **Q**    All right.  During the time when the Tesla shares were not

21  trading on Nasdaq, correct?

22  **A**    I -- I don't know what the exact timing of that was.

23  **Q**    Okay.  And you tweet out:

24      "Investor support is confirmed.  Only reason

25      why this is not certain is that it's

**MUSK - DIRECT / PORRITT**

1              contingent on a shareholder vote."

2       Isn't that correct?

3   **A**    Yes.

4   **Q**    All right.  And you had not spoken -- you still had not

5   spoken to any investor other than PIF about taking Tesla

6   private in 2018.  Correct?

7   **A**    Um, and Larry Ellison, who is a major investor.

8   **Q**    Right.  That was in 2017, correct?

9   **A**    Yes.

10  **Q**    All right.  Thank you.

11      And with neither PIF, nor Larry Ellison in 2017, have you

12  mentioned 420, correct?

13  **A**    Correct.

14  **Q**    All right.  And there was no formal proposal at this point

15  for the board to consider, let alone the shareholders to vote

16  on at this time, correct?

17  **A**    I'm not sure what you mean by "formal proposal," but I had

18  certainly -- I certainly viewed the email that I sent to the

19  board as a formal proposal.

20  **Q**    Well, you agreed with me earlier when we were looking at

21  the August 3rd board minutes, you agreed that it was not a

22  formal proposal that the board could evaluate or analyze.  Do

23  you recall that testimony?

24  **A**    Well, I'm not sure what you mean by the word "formal," but

25  if -- I certainly proposed to the board taking Tesla private

1   days before this.

2   **Q**    Right.   The board said: This isn't a formal proposal that

3   we can analyze and evaluate.   Do you remember that testimony?

4   **A**    Yes.

5   **Q**    Okay.   And you agreed with that, correct?

6   **A**    I suppose so.

7   **Q**    All right, so that's -- there wasn't a formal proposal

8   that even the board of Tesla with all its information could

9   analyze and evaluate as of August 7, 2018.   Isn't that correct?

10  **A**    I think you're -- that the question is -- has a lot of --

11  your question has a lot of assumptions in it.

12  **Q**    Could you please just answer the question, Mr. Musk?

13          **MR. SPIRO:**   If the witness can't answer the question

14  as phrased, he can --

15          **THE COURT:**   Well, if you can answer the question as

16  phrased, you should answer it.   If you can't, then you

17  (Indicating) will have to rephrase your question.

18          **THE WITNESS:**   If -- if you could simplify the question

19  so it does not have lots of assumptions in it.

20  **BY MR. PORRITT**

21  **Q**    As of August 7th, 2018, there was no formal proposal for

22  the board of Tesla that the board of Tesla could evaluate or

23  analyze.   Isn't that correct?

24  **A**    There was a proposal.   I think we're getting stuck on this

25  point of formal and not formal.   But I would certainly consider

**MUSK - DIRECT / PORRITT**

1   the proposal that I made earlier to the board some days earlier

2   to be a serious proposal, and a very real one.  Yeah.

3   **Q**    Well, you previously agreed -- I'm tired of going around

4   this.  You previously agreed that it wasn't a formal proposal

5   that the board --

6           **MR. SPIRO:**  Objection.

7           **THE COURT:**  You know, it might be time better spent if

8   you draw -- if you -- your questioning was based on the minutes

9   of the meeting.  So I don't remember now whether the words were

10  "formal proposal" or "detailed proposal."

11      So to be accurate, --

12          **MR. PORRITT:**  Let's do that, Your Honor.

13          **THE COURT:**  -- why don't you go back to -- let's find

14  the minutes.

15          **MR. PORRITT:**  All right.  If we can go back to

16  Exhibit 83, Page 3.

17      (Document displayed)

18  **BY MR. PORRITT**

19  **Q**    And I will correct my question.  The email wasn't a

20  detailed proposal regarding a going-private transaction that

21  could be properly analyzed or evaluated by the board.  Isn't

22  that correct?

23  **A**    I'm just reading this.

24      (Witness examines document)

25  **A**    Yeah, that's -- it says "detailed proposal," not "formal

**MUSK - DIRECT / PORRITT**

1   proposal."

2          THE COURT:  So the question is whether you agree with

3   that.

4          THE WITNESS:  Sorry?

5          THE COURT:  The question is whether you agree with

6   that.  If the word is "detailed proposal."

7          THE WITNESS:  Um, it -- I guess it would not be a

8   detailed proposal, but it was, nonetheless, a formal and

9   serious -- oh, not -- sorry, not a formal -- it was nonetheless

10  a serious and very real proposal.

11         MR. PORRITT:  If we can -- if I could introduce

12  Exhibit 337, show that to the witness.

13         THE COURT:  All right.  Do you want to show it to the

14  witness first?

15         MR. PORRITT:  Yes, please, Your Honor.  It is not in

16  evidence yet.

17     (Document displayed to the Witness)

18  BY MR. PORRITT

19  Q    Do you see Exhibit 337, Mr. Musk?

20  A    Yes, yes.

21  Q    Okay.  And this is an email that -- do you recognize

22  Exhibit 337?

23  A    I mean, I see it.  Again, it's -- I get to -- the

24  Niagara -- my email box is like Niagara Falls, so I get a lot

25  of emails.  But I can certainly read this and understand it.

**MUSK - DIRECT / PORRITT**

1   **Q**    Okay.  And this is an email you received from Deepak

2   Ahuja, --

3   **A**    Yes.

4   **Q**    -- on August 7, 2018?

5   **A**    Yes.

6          **MR. PORRITT:**  Okay.  Move for admission, Your Honor?

7          **THE COURT:**  All right.  I have already overruled the

8   objection to it in my ruling that I issued this morning.

9          **MR. PORRITT:**  Very good, Your Honor.  Okay.

10         **THE COURT:**  So it's admitted.

11         **MR. PORRITT:**  It's admitted, thank you.  If you could

12  publish that to the jury, please.

13     (Trial Exhibit 337 received in evidence.)

14     (Document displayed)

15  **BY MR. PORRITT**

16   **Q**    So you see Exhibit 337 in front of you?

17   **A**    Um, yes.

18   **Q**    And Mr. Ahuja says (As read):

19          "We are getting a lot of enquiries from

20          investors, SEC and the media to better

21          understand the comment 'Funding secured.'"

22     Do you see that?

23   **A**    Yes.

24   **Q**    All right.  Do you recall at this point taking any steps

25  to address these inquiries to better understand the comment

**MUSK - DIRECT / PORRITT**

1    "Funding secured"?

2    **A**    That we were getting inquiries?  Well, so --

3    **Q**    You didn't take any steps to address -- to provide further

4    details about funding at this point, did you, to address these

5    inquiries?

6    **A**    I mean, this is all happening in a very short period of

7    time on August 7th.  As I mentioned, I was in the factory,

8    working on production problems.  So I --

9    **Q**    Sorry.  You didn't direct Mr. Ahuja to provide additional

10   information to investors about "Funding secured," did you?

11   **A**    Um, not on that day, no.

12   **Q**    Okay.  And we'll see later on, in fact, you didn't make

13   any disclosure regarding funding for another six days, correct,

14   until August 13, 2018?

15   **A**    I don't recall the exact dates.

16   **Q**    And Mr. Ahuja was forwarding an email from Mr. Koney,

17   correct?  Do you see that, at Jennison?

18   **A**    Yes.

19   **Q**    And Jennison was a significant shareholder in Tesla, or

20   was at the time?

21   **A**    That they -- I'm not sure of the exact holdings for the

22   word "significant," but they were a shareholder.

23   **Q**    Okay.  And Mr. Koney says he wants to know if there's some

24   kind of commitment letter, not just a verbal agreement to

25   provide the funding to go private.  This is a very serious

**MUSK - DIRECT / PORRITT**

1  matter, and saying it on a tweet is just not sufficient.

2      Do you see that?

3  **A**   Yes.

4  **Q**   All right.  Does this affect your approach to disclosures

5  regarding the going-private transaction, seeing this concern

6  from Mr. Koney?

7  **A**   Did it affect my disclosures?

8  **Q**   Yes.

9  **A**   Well, we did follow this up with more detail.

10 **Q**   Okay.  On August 13th, 2018.  Correct?

11 **A**   Um, I'll take your word for it that that's the date.

12 **Q**   Okay.  So for the -- until you provided further

13 information, you just left investors like Mr. Koney and

14 Jennison in the dark, correct?

15      **MR. SPIRO:**  Objection.  And he knows that

16 mischaracterizes it.

17      **THE COURT:**  Overruled.

18      You can answer the question.

19      **THE WITNESS:**  Well, I did not think it would be the

20 right thing to do to provide information to only some investors

21 but not others.

22 **BY MR. PORRITT**

23 **Q**   Okay.  You didn't think about making -- you didn't think

24 about making another additional public statement until

25 August 13th, correct?

1    **A**    I probably -- I probably thought about it, but, you know,

2    I -- so yeah, I probably thought about it, but I guess

3    August 13th was probably the next significant communication.

4    **Q**    And then, so the four -- there's three more trading days,

5    8th, 9th and 10th, between that and your additional

6    information, correct?

7    **A**    Yes.

8    **Q**    Okay.  And you provided no additional information about

9    the source of funding on the 8th, the 9th or the 10th, correct?

10   **A**    I -- I did not.  Again, I said I was considering it, not

11   that we -- I didn't say we were going private.  I said I was

12   considering going private.  Not that we were going private.

13   **Q**    And then after the tweet on August 7th, you had a

14   conversation with Anthony Gracias about the tweets.  Do you

15   recall that?

16   **A**    Not precisely.

17   **Q**    Okay.  Do you recall having a conversation with

18   Mr. Gracias after you published the tweet on August 7, 2018,

19   about the tweet?

20   **A**    We had many conversations.  It's possible we had one about

21   the take-private.

22   **Q**    Do you recall Mr. Gracias telling you the board wanted you

23   to give you -- you to give them a heads-up about tweets such as

24   the -- your August 7th tweets about going private?  Do you

25   recall that conversation?

1  **A**    I don't recall that exact conversation.  But as I

2  mentioned earlier, the board would be a counterparty in this

3  situation, so it actually wouldn't be correct to collude with

4  the counterparty when making a bid.

5  **Q**    Mr. Gracias didn't tell you that the board expected notice

6  ahead of time before you issued any tweet containing

7  market-moving information?

8  **A**    Well, again, it's sort of a weird thing to consider,

9  because as the bidder, I'm the counterparty.  I cannot

10 discuss -- it -- I cannot collude with the board in a

11 transaction like this because the board represents the company

12 and I represent the -- the take-private bid.  So it would be

13 improper to collude with the board in this manner.

14       **MR. PORRITT:**  Your Honor, to refresh Mr. Musk's

15 recollection, I would like to refer him to his first

16 deposition, which I think he's already referred to as his SEC

17 testimony.  Page 248, Line 7 to 249, Line 9.

18       **THE COURT:**  Do you want him to read that to refresh

19 his recollection?

20       **MR. PORRITT:**  Yes, please.

21 **BY MR. PORRITT**

22 **Q**    If you could read that to yourself, Mr. Musk?

23 **A**    Which line?  Both pages?

24 **Q**    248, Line 7 through to 249, Line 9.

25 **A**    Okay.  I will read it.

**MUSK - DIRECT / PORRITT**

1         (Witness examines document)

2    **A**    He has indeed --

3            **THE COURT:**  You don't have to comment on it.

4            **THE WITNESS:**  Okay.  Sorry.

5            **THE COURT:**  He asked you to read it to refresh your

6    memory and --

7    **BY MR. PORRITT**

8    **Q**    I think I know the answer to that question.  Does that

9    refresh your recollection, Mr. Musk?

10   **A**    It does.

11   **Q**    Do you recall having any conversation with Mr. Gracias

12   after the August 7th tweet?

13   **A**    Yes.

14   **Q**    On Tuesday afternoon, do you think?

15   **A**    I think so.  Yes.

16   **Q**    And he tells you that you should put more thought into --

17           **MR. SPIRO:**  Objection.

18   **BY MR. PORRITT**

19   **Q**    Do you recall Mr. Gracias telling you that he thinks you

20   should put more thought into your tweets?

21   **A**    Um, yes.

22   **Q**    And make sure the board has a heads-up before tweeting?

23   Do you recall him telling you that?

24           **MR. SPIRO:**  Your Honor, if the witness's memory has

25   been refreshed, typically what would occur would be that the

**MUSK - DIRECT / PORRITT**

 1  document would now not be in front of him.

 2          THE COURT:  Yes.

 3      (Document taken off display)

 4  BY MR. PORRITT

 5  Q    You can put the documents to one side now, Mr. Musk.

 6          THE COURT:  Close the document now.

 7          THE WITNESS:  It's closed.

 8          THE COURT:  So now you should testify as to your

 9  memory, if it's refreshed.

10          THE WITNESS:  Will do.

11          THE COURT:  Okay.  Go ahead and ask the question.

12  BY MR. PORRITT

13  Q    All right.  You recall Mr. Gracias telling you that you

14  should think more before tweeting, and give the board more of a

15  heads-up before tweeting?

16  A    Yes.

17  Q    Okay.  And that was for tweets that contained material

18  Tesla information?

19  A    Yes.

20  Q    Okay.  And that would be anything that would be of a

21  potentially market-moving nature?  Would that be correct?

22  A    Yes.

23  Q    Okay.

24          THE COURT:  I don't know if there is a convenient

25  break point.  Our time is a little thrown off this morning, but

 1  within the next several minutes --

 2          **MR. PORRITT:**  Actually, now would be an excellent

 3  time, Your Honor.

 4          **THE COURT:**  All right.  Why don't we take our

 5  scheduled break at this time for 20 minutes.

 6      Just a reminder, please do not discuss this case with

 7  anyone, do not read or listen to any reportage of this case, do

 8  not attempt to do any research on your own, and do not form any

 9  opinions until this case is submitted to you for deliberation.

10      See you in 20 minutes.

11      (The Witness exits the courtroom)

12          **THE COURT:**  Okay, you can show the jury out.

13          **THE COURTROOM DEPUTY:**  All rise for the jury.

14      (The Jury exits the courtroom)

15      (The following proceedings were held outside of the

16  presence of the Jury)

17          **THE COURT:**  Mr. Porritt, do you have a forecast of how

18  much longer your direct will be?

19          **MR. PORRITT:**  I'm trying to move as quickly as I can,

20  believe it or not, but I would estimate another 25 minutes,

21  perhaps, something in that order of magnitude.

22          **THE COURT:**  All right.  Any estimate on your part?

23          **MR. SPIRO:**  Usually about an hour, something like

24  this.

25          **THE COURT:**  Okay.

1          All right, then I'm going to look at the issues that we

2     talked about, because Exhibit 80 has not come up yet, so I'll

3     have a chance to look at it.

4               MR. SPIRO:  Thank you, Your Honor.

5               MR. PORRITT:  Very good, Your Honor.

6          (Recess taken from 11:04 a.m. to 11:28 a.m.)

7          (The following proceedings were held outside of the

8     presence of the Jury)

9               THE COURTROOM DEPUTY:  Please remain seated.  Court is

10    back in session.

11              THE COURT:  All right.  Before we bring the jury back,

12    I'm going to give you my ruling on Exhibit 80.

13         The objection is overruled.  I'm going to allow that

14    document to come in under 807.

15         As far as authenticity goes, this is not a case where some

16    lawyer went out and got some third-party documents on medical

17    examination of the, purported medical examination of the

18    plaintiff.  This is a document submitted in response to

19    requests, document requests or an inquiry by a governmental

20    agency, the SEC, submitted by the attorney for the party

21    providing that information.  And, and that's different from

22    defense counsel trying to verify some medical documents that --

23    of a party to which -- for which that attorney does not

24    represent.  So this is admissible.

25         In terms of the authenticity requirement, I do find that

1   the *FTC v. Willms* case is on point and well-reasoned.

2       With respect to the question of admissibility under 807,

3   for hearsay purposes, I do find that, number one, that proper

4   notice was given, even though we don't know the precise name of

5   the declarant.  It's obvious that it's somebody from PIF, so

6   knowing that precise name is not going to be dispositive.

7       I think the real question is whether the statement is

8   supported by sufficient guarantees of trustworthiness after

9   considering the totality of circumstances under which it was

10  made, and evidence, if any, corroborating the statement.

11      I find in this case that there is corroboration in terms

12  of the fact of the meeting, the date of the meeting, who was

13  present.  And, and the topic matters that were discussed aligns

14  with that.

15      It is true that courts have identified a number of other

16  factors such as whether or not the statement was given under

17  penalty of perjury, under oath; whether the declarant was

18  subject to cross-examination.  The time, any time lag between

19  the time the statements were made and the events at issue, and

20  -- however, no one factor is dispositive.

21      I find that in this instance there is enough corroboration

22  to warrant its admissibility under 807, given what I just said;

23  and given the fact that I don't find an obvious incentive for

24  the declarant in this case, whoever wrote those minutes for the

25  PIF, to have been accurate on some counts and inaccurate on

 1    other counts.

 2        The idea that this was done to get the SEC off their backs

 3    or not respond, I don't find that persuasive, especially given

 4    the fact, as defendants already acknowledged, the PIF is not

 5    within the jurisdictional or the subpoena power of the SEC, in

 6    any event.  And if they really didn't want to cooperate, they

 7    probably couldn't be made to cooperate, is my guess.

 8        So whoever wrote those notes, I don't see why there's an

 9    incentive to have a good portion of that accurate and some

10    portion of it not accurate.

11        Now, that may be the case.  And that can be argued.  But

12    for purposes of 807, I find that there are sufficient

13    guarantees of trustworthiness and that its probative value is

14    very substantial here.  And it is more probative on the point

15    for which it is offered than any other evidence that the

16    proponent can obtain through reasonable efforts, given the

17    circumstances of that particular meeting.

18        So the objection is stated for the record, but that's my

19    ruling.

20        **MR. SPIRO:**  Your Honor, just to clarify just a couple

21    of quick points.  First is I want to make sure that the Court

22    -- for appellate purposes I want to make sure this is clear in

23    the record -- did receive our memorandum and --

24        **THE COURT:**  Yes.

25        **MR. SPIRO:**  Okay.  And then, is the Court finding in

1   its assessment of this document that there would be -- the

2   Court sees no benefit of the right of the cross-examination,

3   on --

4           **THE COURT:**  I didn't say that.  I didn't say that.  I

5   said that's one factor.  That's not dispositive.  Indeed, there

6   are cases -- there's one case from the Central District of

7   California, expressly addresses the lack of cross-examination.

8   Says:  Well, that's not dispositive; there are scores of other

9   cases where that has been admitted; it is one factor.

10      I'm not saying this was a slam-dunk at all.  This is,

11  frankly, a fairly close question.

12          **MR. SPIRO:**  And then the final question that I have,

13  Your Honor, at least that I have to ask at this juncture is,

14  there's obviously hearsay within hearsay.  I would ask that the

15  document, where it contains hearsay within hearsay, be

16  redacted.  If they want Mr. Musk's statement in -- but there

17  are statements of other individuals.

18          **THE COURT:**  Well, the other individuals, I take it

19  that that's for the purpose of effect on the listener,

20  Mr. Musk's knowledge and state of mind.

21          **MR. PORRITT:**  Correct, Your Honor.  And completeness,

22  of course, too, Your Honor.  Can't have one side of the

23  conversation.

24          **MR. SPIRO:**  Yeah.  That, that wouldn't satisfy 807 or

25  any hearsay exception.  So I don't understand that, what

1    plaintiff's counsel is saying.  But --

2         **THE COURT:**  Well, 807 addresses the document, itself,

3    whether -- it doesn't address the secondary embedded hearsay.

4    But the embedded-hearsay problem is, one, once you admit the

5    document, it contains statements of party opponent which is

6    admissible under 801.  And, to the extent that there are

7    statements of others in the room where Mr. Musk was allegedly

8    present, that goes to state of mind, and is not being used for

9    the trust of the matter asserted, and therefore, it is also

10   admissible under 801.

11        **MR. SPIRO:**  Right.  But in this document, Your Honor,

12   there are statements that are done that are not

13   question-and-answer.  And there's a statement at the end of the

14   document, there's no indication that anybody even heard it, or

15   that it was said to anybody who is a party opponent.  Right?

16        So there would be no reason to think that it is -- again,

17   I don't think the effect on the listener or the completeness or

18   any of these other things have any pertinence here.

19        **THE COURT:**  Okay.  Well, I find otherwise.  The

20   objection is overruled.  I will issue a formal written ruling

21   to memorialize my findings.

22        So thank you, Counsel.  I appreciate the last-minute

23   briefing on this.

24        **MR. PORRITT:**  We move to admit at this point,

25   Your Honor, this exhibit.

1    **THE COURT:**  All right.  I'll admit it.  80 will be

2   admitted.

3        (Trial Exhibit 80 received in evidence.)

4        **MR. SPIRO:**  And just for the record, same objections.

5   403, hearsay, right to confront the witness.  And all the

6   objections we raised.

7        **THE COURT:**  So noted.  Thank you.

8        One word, Mr. Porritt.  If you could make sure you're

9   close to the microphone and speak --

10       **MR. PORRITT:**  Slowly.

11       **THE COURT:**  If you could speak more slowly and

12  clearly, because you have a tendency a little bit to kind of

13  "smerge" your words together; it's a little bit hard to hear.

14       **MR. PORRITT:**  I apologize.  Yes.  New Zealanders have

15  a habit of doing that, I'm afraid.  And I feel the clock

16  burning a mark in my back.  So I'm trying to move this along as

17  quickly as I can.

18       **THE COURT:**  All right.  So, let's bring the jury back

19  in.

20       If we could have the witness resume the stand as the jury

21  is returning.

22       (The Witness resumes the witness stand)

23       (The following proceedings were held in the presence of

24  the Jury)

25       **THE COURTROOM DEPUTY:**  All rise for the jury.

```
 1          THE COURT:  All right.  Please be seated, everyone.
 2   Welcome back, members of the jury.
 3        All right.  So, let's resume.
 4          MR. PORRITT:  Thank you, Your Honor.
 5                 DIRECT EXAMINATION, RESUMED
 6   BY MR. PORRITT
 7   Q    I would like to introduce to the witness Exhibit 333, not
 8   yet been admitted.
 9        (Document displayed to the Witness)
10          THE COURT:  Okay.
11   BY MR. PORRITT
12   Q    Do you see that exhibit in front of you, Mr. Musk?
13   A    I do.
14   Q    Do you recognize this document?
15   A    Uh, yes.  An NDA.
16   Q    If I can direct you to Page 4 of Exhibit 333.
17        (Document displayed)
18   Q    Do you see that?  Is that your signature on Page 4 of
19   Exhibit 333?
20   A    Yes.
21          MR. PORRITT:  At this point we move to admit Exhibit
22   333, Your Honor.
23          THE COURT:  Any objection?
24          MR. SPIRO:  No objection.
25          THE COURT:  Admitted.  You may publish.
```

**MUSK - DIRECT / PORRITT**

1        (Document displayed)

2        (Trial Exhibit 333 received in evidence.)

3    BY MR. PORRITT

4    Q    So you have --

5        (Document displayed)

6    Q    -- Exhibit 333 in front of you, do you see that?

7    A    Yes.

8    Q    And that's a nondisclosure agreement you signed with the

9    PIF, is that correct?

10   A    Yes.

11   Q    And you see it has at the top right-hand corner, has the

12   seal there of the Saudi Arabia PIF; do you see that?

13   A    Yes.

14   Q    And you see the first line has:

15           "Reference to a potential project..."

16       Do you see that?

17   A    Yes.

18   Q    And then in this document there is, there's no amount of

19   funding discussed in this document, correct?

20   A    It's an NDA, so it's a nondisclosure agreement.

21   Q    Okay.  And then if you turn to Page 3, Paragraph 4 of

22   Exhibit 333.

23       (Document displayed)

24   Q    See there, it says:

25           "...either party can determine it does not

**MUSK - DIRECT / PORRITT**

```
 1              wish to proceed with the potential
 2              project..."
 3          Do you see that?
 4     A    Yeah.  I mean, I think this is sort of, kind of a form
 5     letter type, sort of the standard language.
 6     Q    And this is in connection with the potentially
 7     going-private transaction, correct?
 8     A    Yes.
 9     Q    Okay.  And then finally on Page 4, as you have already
10     testified, you signed this agreement.  Correct?
11     A    Yes.
12     Q    All right.  And this is the only writing you ever received
13     from PIF that you signed, correct?
14          (Document displayed)
15     A    Um, I -- I -- I'm -- possibly; I'm not sure if we received
16     other things.  There were so many communications.  But...
17          (Reporter clarification)
18          THE WITNESS:  I'm not sure if this is the only
19     document, but there certainly were many other communications
20     with them.
21     BY MR. PORRITT
22     Q    And then, you recall on August 10th you also met with
23     Mr. Durban and Mr. Dees, correct?
24     A    Correct.
25     Q    Okay.  Separately, not together, correct?
```

**MUSK - DIRECT / PORRITT**

1        (Document taken off display)

2   **A**    I believe so.  They might have been -- yes, I think there

3   was perhaps -- might have been one meeting that they were

4   together, but I'm not sure if it was that meeting.

5   **Q**    Okay.  And you didn't speak to Mr. Dees before the

6   August 7th tweets, correct?  About going private.

7   **A**    Well, actually, the -- I believe he was at the dinner that

8   I had at Larry Ellison's house with Masayoshi Son from

9   SoftBank.

10  **Q**    That was in 2017, correct?

11  **A**    Yes, but that was also discussing -- that was like -- the

12  idea of a take-private was, I believe, just -- we talked about

13  there.  Ironically, he decided to invest in WeWork instead of

14  Tesla.

15  **Q**    So I guess I'll be more precise in my question.  That's my

16  mistake.  Between July 31st and August 7, 2018, you did not

17  speak to Dan Dees.  Correct?

18  **A**    I don't recall the exact -- I do not recall offhand if I

19  spoke to him in those exact dates, five years ago.

20  **Q**    Do you recall Mr. Durban gave you a presentation on

21  August 10, 2018?

22  **A**    He gave a presentation.  I'll take your word for it it was

23  on that day.

24  **Q**    Okay.  And Mr. Dees also gave you a presentation?

25  **A**    Yes.

**MUSK - DIRECT / PORRITT**

1  **Q**    Okay.  Do you recall anything about that presentation?

2  **A**    Um, again, I'm not sure of the exact date.  But in the

3  case of the sort of presentation with Mr. Dees, um, there were

4  a wide range of take-private possibilities discussed.

5  **Q**    Okay.

6  **A**    Um --

7         **MR. PORRITT:**  If I can show the witness Exhibit 254.

8      (Document displayed to the Witness)

9         **THE COURT:**  Okay.

10        **MR. SPIRO:**  No objection.

11        **THE COURT:**  All right.  Then I take it you would like

12  this admitted?

13        **MR. PORRITT:**  Yes, move to admit Exhibit 254.

14        **THE COURT:**  All right, it is admitted.

15     (Trial Exhibit 254 received in evidence.)

16     (Document displayed)

17  **BY MR. PORRITT**

18  **Q**    If I can turn to the second page of Exhibit 254.

19     (Document displayed)

20  **Q**    Do you see that?

21  **A**    Yes, yes.

22  **Q**    Is this the presentation you received from Mr. Dees of

23  Goldman Sachs on August 10th, 2018?

24  **A**    Um, I think -- I think so.  This may not be everything

25  that was provided, but I think this was one of the things.

**MUSK - DIRECT / PORRITT**

1  Q    If I can refer you to -- it's one, two -- Page 4 of

2  Exhibit 254.

3       (Document displayed)

4  Q    Do you see that?

5  A    Yes.

6  Q    Is that what you were referring to just a couple of

7  minutes ago?

8  A    It's part of what I was referring to.  This -- there's

9  multiple ways to take a company private, and these are some of

10 the ways.

11 Q    Okay.  And you see in the middle column there, there's a

12 discussion about using a special purpose vehicle, "SPV"?  Do

13 you see that?

14 A    Yes.

15 Q    And it notes that there's a possibility the SPV could be

16 considered a registered investment company?

17      Do you see that?

18 A    Yes.

19 Q    And it could -- if it had more than 2,000 investors, it

20 would have to register as a public company?

21 A    Yes.

22 Q    Are the SPVs in SpaceX registered as public companies?

23 A    I don't think so, but some of them may be.

24 Q    And if we turn to Page T54-7.

25      (Document displayed)

1   **Q**    Do you see that talks about the private investment

2   policies for investors in Tesla?

3   **A**    Yes.

4   **Q**    And you will see in the box at the top there, Goldman

5   Sachs had already identified that the value of these funds'

6   current Tesla holdings is large, relative to the total amount

7   of non-traded Level 3 assets held by those funds?

8   **A**    That's what it says.

9   **Q**    All right.  So Goldman Sachs is already identifying

10  limitations on the ability of Tesla's investors to maintain

11  their investment in a private Tesla, isn't that correct?

12  **A**    Yes, there are some limitations.  But it's important to,

13  um, bear in mind that Tesla is -- in any case, as a public

14  company, for all of these entities, is less than 15 percent of

15  assets in their funds as a public company.

16      Public or private, it is -- it is -- it's extremely rare

17  for these large funds to have more than 15 percent of assets in

18  any public or private company.  It's not different, public or

19  private.

20  **Q**    If I can refer you back to Exhibit 121.  It's been

21  admitted, subject to redactions.

22      (Document displayed)

23  **Q**    And specifically, if I can direct to you Page 121-8.

24      (Document displayed)

25  **Q**    Do you have that page in front of you?

**MUSK - DIRECT / PORRITT**

1    **A**    Yes.

2    **Q**    And these are your text messages from your phone, correct?

3    You recall, we discussed earlier?

4    **A**    Correct.

5    **Q**    All right.  And you'll see there, in the middle of 251 --

6    121-8, you'll see there's a text from you to Yasir, saying:

7                   "This is a major problem."

8         Do you see that?

9    **A**    I do.

10   **Q**    And it's referring to the image immediately above that?

11   Do you see that?

12   **A**    Yes.  I think this is maybe taken out of context.  There

13   are messages before this.

14   **Q**    But on that day, that's the first -- that's the first text

15   you sent to Yasir on August 10th, isn't that correct?

16   **A**    It may be the first text, but I think maybe not the --

17   maybe not the first conversation.

18   **Q**    You had a short telephone conversation with Yasir on

19   August 10th?

20   **A**    I think I may have.

21   **Q**    Okay.  But you sent -- on August 10th, you sent Yasir this

22   image, and then the text titled "This is a major problem."  Do

23   you see that?

24   **A**    Yes.

25   **Q**    Okay.  And the attachment was a newspaper article, is that

1  correct?

2  **A**   Yes.

3  **Q**   Okay.  And the newspaper article downplayed any interest

4  of PIF in a going-private transaction for Tesla, isn't that

5  correct?

6  **A**   That is correct.

7  **Q**   Okay.  And that's a major problem for you?

8  **A**   Yes.  Because the newspaper article was completely

9  different from what Yasir had told me, and to Sam Teller and

10  Deepak Ahuja, that they were committed to the take-private, and

11  they would do whatever to get it done.  That's what they told

12  me verbally.  And so the article was -- contradicted that.

13  **Q**   And then at the bottom of Page 121-8 --

14       **MR. PORRITT:**  If you can blow that up a little bit,

15  Derek, so we can see it, small text.

16       (Document enlarged)

17       **MR. PORRITT:**  This is -- Yasir sends you a lengthy

18  text message back, correct?

19  **A**   Yes.

20  **Q**   Says that PIF has purchased a passive stake in shares of

21  Tesla.

22  **A**   Yes.

23  **Q**   Correct?

24  **A**   Yes.

25  **Q**   That PIF remains interested in potential investment

**MUSK - DIRECT / PORRITT**

1  opportunities.  Do you see that?

2  **A**    Yes.

3  **Q**    (As read)

4          "We would like to explore investing in Tesla

5          subject to creating a production hub in Saudi

6          Arabia."

7  **A**    Yes.

8  **Q**    And (As read):

9          "We would like our teams to start working

10          together in a confidential manner to explore

11          a potential transaction."

12       Right?

13  **A**    That is what this text says.

14  **Q**    And you just signed a nondisclosure agreement with the

15  PIF, correct, on August 10th.  We saw that.  That was Exhibit

16  333.

17  **A**    Yes.

18  **Q**    Okay.  And if we go to the next page, 121-9, the first

19  text is your response.  And you write:

20          "Thank you, this is much appreciated."

21       Do you see that?

22  **A**    Yes.

23  **Q**    So in response to Yasir's text on 1-21-8 describing their

24  interest in exploring a potential transaction, you just say

25  "Thank you."  You have no disagreement with that categorization

**MUSK - DIRECT / PORRITT**

1    by Yasir at that point in time.  Isn't that correct?

2    **A**    Um, well, no, that's not quite correct.  The -- the -- I

3    mean, at this point, Yasir is obviously backpedaling from what

4    he told -- told me and Deepak and Sam, that they were committed

5    to the transaction.

6        I was just asking that with respect to the press, that

7    they at least, at a minimum, can say that they were, um, at a

8    minimum say that they were exploring -- that their discussions

9    were real.  I wasn't asking that they confirm their commitment

10   as they had done to -- done to us with the meeting at Tesla

11   earlier, but -- so it's more like this is like the least they

12   could do.

13       But -- you know.  This is not -- um, this is -- this is --

14   this is Yasir -- I have to be totally -- I mean, I mean, not --

15   this is to -- to -- this -- this is ass-covering, for lack of a

16   better word.

17       This is not -- it was just that -- I just wanted to say,

18   at minimum, confirm that we were in discussions.  Even if he

19   was not willing to confirm that they're committed to take Tesla

20   private, at least confirm that they were in discussions.

21   **Q**    Now, this is a private text from Yasir to you.  Correct?

22   **A**    Yes.  Well, not that private at this the point, obviously.

23   **Q**    Yasir had no idea when he sent this text that anyone other

24   than you would read it.  Correct?

25            **MR. SPIRO:**  Objection.  What does he know about what

1    Mr. Yasir was doing?

2          **THE COURT:**  Overruled.  He can testify as to his

3    understanding.

4          **THE WITNESS:**  My guess is that he thought that this

5    would possibly become public at some point.  And this strikes

6    me as something that was drafted by his lawyers.  But it is not

7    -- it does not describe the reality of the situation.

8    **BY MR. PORRITT**

9    **Q**    At this point (Indicating), was Yasir named in any

10   lawsuits arising out of your "Funding secured" tweet?

11   **A**    No.  But I suspect he anticipated that that might be the

12   case.

13   **Q**    Well, has PIF ever been named in any lawsuits arising out

14   of this "Funding secured"?

15   **A**    Not -- not yet.

16   **Q**    Was Yasir subject to investigation in connection with the

17   "Funding secured" tweets at this point in time?

18   **A**    Well, um, we -- we have tried our absolute hardest to

19   subpoena Yasir, and to have him be part of this lawsuit.

20         The interesting question for you, sir, is:  Why did you

21   not subpoena him?

22   **Q**    Well --

23   **A**    Because if you did, it would destroy your case.  That's

24   why.

25   **Q**    Well, you -- we, in fact, did send court process to Saudi

1  Arabia to get his testimony --

2          **MR. SPIRO:**  Objection, not true.

3          **THE COURT:**  Hold on.  This whole inquiry is not

4  relevant.  So I'm going to strike Mr. Musk's answer, or his

5  inquiry, and I'm going to strike Mr. Spiro's response.  It's

6  not appropriate.

7  **BY MR. PORRITT**

8  **Q**    When it comes to the two participants in this

9  conversation, you and Yasir, at this point in time, August 10,

10  2018, who has the greatest motive to ass-cover, to use your

11  words?

12          Isn't it you, Mr. Musk?

13  **A**    No.  He -- in my opinion, Yasir, um -- I think probably

14  Yasir was worried about future legal action.

15  **Q**    Weren't you being concerned about being exposed as a liar

16  in your "Funding secured" tweet?

17  **A**    Yes.  Absolutely.

18  **Q**    Okay.  And if we can move on, in 121-10 -- this is now on

19  to the next day, sorry, August 11th.  And you sent another text

20  (As read):

21              "What the hell is going on here?  This is

22              false."

23          Do you see that?

24  **A**    Yes.

25  **Q**    And that's referring to yet another news story, referenced

1   up above?  Do you see that?

2   **A**   Yes.

3   **Q**   And then down below --

4         **THE COURT:**  I'm a little confused.  Who's the

5   recipient of that?  I can't tell.

6         **MR. PORRITT:**  That's to Yasir, Your Honor.

7         **THE COURT:**  Okay.

8         **MR. PORRITT:**  If you can just -- yes, there it is.

9         **THE COURT:**  You're not showing the whole column at the

10   top; it's hard to read.

11         **MR. PORRITT:**  Sorry.  I apologize, Your Honor.  There

12   you see --- "Yasir" in the right hand indicates who the -- it's

13   outgoing from Mr. Musk, and the recipient is Yasir.

14   **BY MR. PORRITT**

15   **Q**   And then we have a statement from Yasir:

16         "It's not true. No body talked to them."

17   Do you see that?

18   **A**   Yes.

19   **Q**   That's not Yasir trying to backpedal, is it?

20   **A**   I don't know.

21   **Q**   And then you have another email from -- another text,

22   sorry, from Yasir to you, saying (As read):

23         "Just wanted to check in and see when your

24         team would be able to start sending us

25         information..."

1      And start the process.  Do you see that?

2   A    Yes.  He is asking to essentially move forward with the

3   take-private.

4   Q    Well, he's asking for a kickoff meeting.  Correct?

5   A    I mean, he's asking to begin the process of the

6   take-private.

7   Q    Starting with getting information for them to evaluate.

8   Isn't that correct?

9   A    In a take-private there would be information exchanged.

10  Q    And this is information you had agreed to provide to him

11  at the July 31st meeting; isn't that correct?

12  A    I don't -- I want to be clear in that -- in the -- in the

13  meeting at Tesla with myself and Sam Teller and Deepak Ahuja,

14  Yasir was unequivocal about taking Tesla private.  There was no

15  condition.  There were no conditions.

16  Q    All right.  Well, you then say (As read):

17          "Please refute this false statement that PIF

18          has no interest in Tesla.  This is

19          outrageous."

20      Do you see that?

21  A    Yes.  I was upset that what was -- we were reading about

22  in the press was completely contradictory to what he had told

23  me in person, that they were committed to take Tesla private.

24  Q    And it was what he told you on July 31st that led you to

25  issue the tweet "Funding secured," isn't that correct?

**MUSK - DIRECT / PORRITT**

1    **A**    Sorry?

2    **Q**    It was that statement from the July 31st meeting that led

3    you to tweet "Funding secured."  Isn't that correct?

4             **MR. SPIRO:**  Objection.  Vague.

5             **THE COURT:**  Overruled.

6             **THE WITNESS:**  You mean, the -- if you're referring to

7    the meeting at Tesla?

8    **BY MR. PORRITT**

9    **Q**    Yes.  On July 31st.

10   **A**    Yes.  The meeting, um, where Yasir, okay, confirmed

11   unequivocally that they would support Tesla going private, that

12   is part of what "Funding secured" meant.  But in addition, like

13   I said, there is the SpaceX stock which could also be used.

14   **Q**    To continue on 121-10, you'll see third entry from the

15   bottom there.  Yasir sends you a Bloomberg article.  Isn't that

16   correct?

17   **A**    Yes.

18   **Q**    And you are not satisfied with the Bloomberg article, are

19   you?

20   **A**    I am not, because it -- as I say, it is -- does not

21   reflect the conversation that Yasir and I had at Tesla.  I mean

22   -- yeah.

23   **Q**    And you say:

24             "...we cannot work together."

25        Right?

**MUSK - DIRECT / PORRITT**

1  **A**    Well, I mean --

2  **Q**    You tell Yasir you cannot work together.  It's written

3  there in black and white, isn't it?

4  **A**    That has to be read in context with the prior statement,

5  which is that Yasir -- I say Yasir had said definitely

6  interested in taking Tesla private, had wanted to do so since

7  2016.  Had made it clear that he was the decision-maker and was

8  backed by the Crown Prince, who regarded it as strategically

9  important at a national level.

10       And when I say "I'm sorry, but we cannot work together,"

11  it's like if he does not stand by his word, then we -- then we

12  cannot work together.

13  **Q**    So is it fair to say that you were very angry with Yasir

14  at this point on August 12th?

15  **A**    Yes.

16  **Q**    Okay.  And you tell him in the middle of there "Sorry,"

17  And then next, "It's over."  Do you see that?

18  **A**    Yes.

19  **Q**    So you're threatening PIF cannot participate any more in

20  the going-private transaction?  Isn't that right?

21  **A**    I believe that if someone does not stand by their word,

22  then you should not work with them.

23  **Q**    Okay.  So you wanted to pressure them into saying

24  something they weren't otherwise willing to say publicly?  Is

25  that correct?

1   **A**    I wanted them to -- I wanted Yasir to be truthful, and to

2   be clear that he had committed to take Tesla private; that is

3   what he had told us.  And he needed to keep his word.  And if

4   he did not keep his word, we could not work together.

5   **Q**    And then Yasir says (As read):

6              "Let's see the numbers, and get our people to

7              meet and discuss.  We cannot approve

8              something that we don't have sufficient

9              information on."

10   Do you see that?

11   **A**    Yes.

12   **Q**    And that is consistent with Yasir's prior text saying:

13   Please send us the information.  Isn't that right?

14   **A**    This is Yasir backpedaling, and going back on what he told

15   us at Tesla.

16   **Q**    Well, Yasir then says (As read)

17              "We've agreed that -- "We've agreed that you

18              will send the financial information and the

19              way going forward within a week, and no thing

20              happened since."

21   Isn't that right?

22   **A**    Yes.  I mean what he's saying here is that he wants to

23   move forward with the take-private.  And as a matter of course,

24   in a take-private, you would of course send the information and

25   exchange documents.

**MUSK - DIRECT / PORRITT**

1  **Q**    So, you relied on the statements -- so in your view, what

2  Mr. Musk -- what Yasir says here is consistent with you saying

3  "Funding secured."  Is that what you're saying?

4  **A**    I'm saying that Yasir needs to stick to his word about

5  taking Tesla private.

6      Now, of course, in taking something private, you have to

7  go through the -- there are documents that are exchanged.  But

8  it's like buying a house.  You say you want to buy the house.

9  PIF is like the bank, and saying that the bank says they will

10 support you.  And then there's still documentation that you do

11 after you agree to buy a house.  But that doesn't -- that's --

12 that -- you're still going through with it, like, if an offer

13 on a house is accepted.

14     And PIF being sort of like the bank here, the bank said

15 they are supportive in doing that.  But, of course, you still

16 do paperwork to do the transaction.  But the transaction, you

17 know, would -- would go through.  It's just you have to go

18 through, do the paperwork.

19 **Q**    Well, when I bought my house, I had a written commitment

20 from the bank before I made an offer on it.  So I think you are

21 now suggest- -- you may be able to buy a house without having a

22 written commitment from a bank, but the rest of us understand

23 you get a written commitment from the bank before you start

24 making offers.

25 **A**    That's not -- that's not how -- that's not how things work

**MUSK - DIRECT / PORRITT**

1    with a sovereign investment fund.  The -- I mean, with -- with

2    the prior investment that they've done, the 5 percent, there

3    was no discussion of price, there were no documents signed.

4    They agreed to buy 5 percent of Tesla.  Again, no documents

5    were signed.  It was just verbal.  And they bought 5 percent of

6    Tesla.

7         It is reasonable to expect, if that is their behavior in

8    the past, that that will be their behavior in the future.  That

9    you can take their word for it.

10   **Q**   So you're saying you would expect less documentation from

11   a multi-billion-dollar taking-private transaction of a public

12   company than for buying a house.  Is that your testimony?

13   **A**   No.  What I'm saying is that one should expect

14   consistency.  And when -- in a conversation earlier in the

15   year, I said:  If you're serious, you should buy 5 percent of

16   Tesla in the public market.  I said to Yasir:  If you're

17   serious, you should buy 5 percent in the public market.

18        There was no document signed.  There was no discussion of

19   price.  And they went forward, and they bought 5 percent of the

20   company.  Therefore, it's reasonable to expect that they will

21   behave the same in the future as they have in the past.

22   **Q**   But here they are on August 12th, asking for more

23   information, correct, before they can start approving anything.

24   Isn't that correct?

25   **A**   They're asking for more information.  That is a reasonable

1  thing to ask for.

2  **Q**    And then, if you can turn to 121-12.

3      (Document displayed)

4  **Q**    You're pointing out that they're experienced financially,

5  and that there are many other investment funds that want to be

6  part of this deal.

7      Then Yasir writes back saying (As read):

8          "We haven't taken any company private yet in

9          the U.S. or anywhere else and the agreement

10         as was minuted by my people is to wait for

11         the information to be sent by you within a

12         week on how we will move forward together."

13     Do you see that?

14 **A**    Yes.  This is, unfortunately, Yasir backpedaling on his

15 commitment.

16 **Q**    And --

17 **A**    Or at least -- I don't know.

18 **Q**    Now, you didn't have any minutes of the July 31st meeting,

19 correct?

20 **A**    No.  Nor do I recall the Saudi PIF making any minutes,

21 either.

22         **MR. PORRITT:**  Your Honor, at this point I would like

23 to show the witness Exhibit 80.  It's been admitted.

24         **THE COURT:**  All right.  You may do so.

25     (Document displayed)

1  BY MR. PORRITT

2  Q    Do you have Exhibit 80 in front of you, Mr. Musk?

3  A    Yes.

4  Q    And you see, this is the document entitled "MINUTES-ELON

5  MUSK TESLA, 31 July 2018."  Do you see that?

6  A    Yes.

7  Q    And it has the seal of the PIF on the top edge corner?

8  A    Yes.

9  Q    And that is the same as the NDA that you signed, right?

10  A    Same seal, yes.

11  Q    And I think, if I refer you to the second page --

12       (Document displayed)

13  Q    -- of Exhibit 80, you've got Yasir (As read):

14            "I believe in Tesla and would like to see

15            where we can collaborate with you.  And I'd

16            like to listen more about your plan to take

17            it private.  We are long-term investors."

18       Do you see that?

19  A    Yes.  That is not accurate.  I believe that is not

20  accurate.

21  Q    Okay.

22  A    That -- yeah.  I -- I do not observe any minutes being

23  taken.  This was done after the fact.

24  Q    And then Yasir asks later down, you know:

25            "How can we take this forward?"

**MUSK - DIRECT / PORRITT**

```
 1        And then Yasir and Elon agree the teams should talk, then
 2   they will be engaged.  Do you see that?
 3   A    Um, yes.
 4   Q    And that's exactly what Yasir was describing in his text
 5   to you we've been going through in Exhibit 121.  Isn't that
 6   correct?
 7   A    This is backpedaling, as I said.
 8   Q    Well, this is consistent with what Yasir was saying in the
 9   text, 121, we were looking at.  Right?
10   A    Yes.  The text was backpedaling, and so is this.
11   Q    And then it concludes (As read):
12            "I would like to listen to your plan, Elon,
13            and what are the financial calculations to
14            take it private in the next week and if I did
15            not receive anything I will call you."
16        Correct?
17   A    Yes.
18   Q    And isn't that exactly what we were looking at in
19   Exhibit 121, a moment ago?
20   A    I mean, that last statement, um, is him saying that he
21   wants to move forward with the take-private.  He just -- you
22   know, so...
23   Q    Says he wants to get information about moving forward to a
24   potential transaction.  Right?
25   A    I mean, he needs to know how much money to send, yeah.  I
```

1   mean it's -- the precise numbers depend on how -- what other

2   investors will remain.

3   Q   Right.  Because you didn't even know the precise money

4   yet, did you?

5   A   Sorry; say that again?

6   Q   You did not know the precise amount of money at this point

7   in time, did you?  On July 31st?

8   A   No, not the precise amount of money.  But that, I think,

9   is neither here nor there.  They have -- this is one of the

10  biggest funds in the world.  This -- this is not a large amount

11  of money for them.

12  Q   So, if we can go back to Exhibit 121.

13      (Document displayed)

14  Q   This is still on August 12th, correct?

15  A   Yes.

16  Q   Okay.  And you tell Yasir in the middle there (As read):

17          "I'm sorry, but there will be no further

18          communication unless you fix the public

19          perception of wishy washy support and

20          interest from PIF."

21      Do you see that?

22  A   Yes.

23  Q   So at this point in time you were still angry at Yasir?

24  A   Yes.  I was -- I was very upset because he had been

25  unequivocal in his support for taking Tesla private when we

1    met, and now he appeared to be backpedaling.

2    **Q**    And you were angry at Yasir because you had been caught

3    out in public in a lie, isn't that correct?

4    **A**    That is completely false.  I'm angry with Yasir because he

5    is not sticking to -- in these texts he is not sticking to what

6    he told us.  That is why I'm angry with him.  It's because he

7    said he was committed to taking Tesla private, and now he is

8    backpedaling.  Anyone would be angry about that.

9    **Q**    And what he's describing here isn't consistent with being

10   "Funding secured," is it?

11   **A**    He is backpedaling from his commitment that he made to me

12   and to Sam Teller and to Deepak Ahuja.

13   **Q**    Well, the agreement or discussions as described by Yasir

14   in Exhibit 121, the text messages, the private text messages

15   between you and him is not consistent with saying "Funding

16   secured," is it?

17           **MR. SPIRO:**  Objection.  Which messages?

18           **MR. PORRITT:**  In Exhibit 121.

19           **MR. SPIRO:**  Well, that's a 15-page exhibit.

20           **THE COURT:**  Well --

21           **MR. PORRITT:**  Your Honor --

22           **THE COURT:**  The gist of it has been summarized here.

23   You can answer the question, Mr. Musk.

24           **THE WITNESS:**  Well, when I said "Am considering taking

25   Tesla private, funding secured," that was in reference to the

1    meeting that prior weekend, I believe, with Yasir where he had

2    told me funding was committed.

3         So my tweet was truthful.  Absolutely truthful.  And

4    moreover, it's not just the PIF.  I also had SpaceX stock.  And

5    SpaceX stock, alone, meant funding secured, by itself.  It's

6    not that I want to sell SpaceX stock, but I -- I could have.

7    And if you look at the Twitter transaction, that is what I did.

8    I sold Tesla stock to buy -- to complete the Twitter

9    transaction.  And I would have done the same here.

10             MR. PORRITT:  Your Honor, I would like to play the

11   witness, for impeachment purposes, a portion of his deposition

12   transcript taken November, 2021.  Page 246, Line 20, through

13   247, Line 4.

14             THE COURT:  246, Line 20, did you say?

15             MR. PORRITT:  Yes, Your Honor.

16             THE COURT:  Through what?

17             MR. PORRITT:  247, Line 4.

18             THE COURT:  Line --

19             MR. PORRITT:  4.

20             THE COURT:  4?

21             MR. SPIRO:  Objection.  It's not inconsistent.

22             THE COURT:  Objection overruled.  You can play it.

23        (Portion of video played, not reported)

24   BY MR. PORRITT

25   Q    So those questions, again under oath, there is no

 1  reference to SpaceX in that answer, is there?

 2  **A**    I think the --

 3  **Q**    Please just answer the question, Mr. Musk.

 4  **A**    What, what I said there was -- was literally true.  That

 5  it -- it's -- but it's not the only basis for funding being

 6  secured.

 7  **Q**    We sat for a day in Austin, Texas, talking a lot about

 8  "Funding secured" tweet.  Do you remember that day, Mr. Tweet

 9  -- Mr. Musk?

10  **A**    Mr. Tweet?

11  **Q**    Mr. Tweet, sorry.

12  **A**    Probably an accurate description.

13       (Laughter)

14  **Q**    You remember that day, Mr. Musk, correct?

15  **A**    Not precisely, but yes.

16  **Q**    Okay.  And we went -- and over the course of that

17  deposition you never mentioned once, once, that your SpaceX

18  shares were a basis for you saying --

19       **MR. SPIRO:**  Objection.

20  **BY MR. PORRITT**

21  **Q**    -- "Funding secured"?

22       **MR. SPIRO:**  Objection.  It's improper, without

23  bringing a witness's attention to a question.  He never asked

24  that question, and it's in the prior deposition, as he well

25  knows.

**MUSK - DIRECT / PORRITT**

1          **THE COURT:**  Overruled.  He can ask about this.

2    Deposition and if the witness recalls, he can answer.

3          **THE WITNESS:**  You did not ask me if there was any

4    other basis for Funding secured."  However, in the SEC

5    testimony, which is closer to the time and more accurate, I did

6    mention SpaceX.  And you're aware of that too.

7    **BY MR. PORRITT**

8    **Q**    Well, I'm aware you raised it as a glimmer in your eye,

9    without any commitment, any thought.

10   **A**    I specifically mentioned SpaceX in the SEC testimony.

11   You're aware of that, and you're deliberately excluding that

12   from the jury.

13   **Q**    Well, I'm relying on your sworn answers.  But we'll move

14   on.

15          **MR. PORRITT:**  If we can turn to identify August 13 --

16   Exhibit 53, show that to the witness?  It's been admitted.

17       (Document displayed to the Witness)

18   **BY MR. PORRITT**

19   **Q**    Do you see Exhibit 53, Mr. Musk?

20   **A**    Yes.

21   **Q**    And this is another public statement drafted for you by

22   Tesla?

23   **A**    Yes.

24   **Q**    Okay.  And to your recollection, is this the first public

25   statement by you about the going-private transaction since your

1   August 7th tweet?

2   **A**    I think there may have been other tweets as well.

3   **Q**    After August 7?

4   **A**    I think so.

5   **Q**    Between your August 7th tweets and this blog post, did you

6   look at what happened to Tesla's stock price?

7   **A**    I -- I do not look at the stock price frequently because I

8   am -- especially at the time, very busy trying to make Tesla

9   succeed, and spending a lot of time in the factory.

10  **Q**    So you would send out a tweet which you knew would have an

11  impact on the stock price on August 7th, and then you have

12  complete disregard as to what impact it has on Tesla investors?

13  Is that correct?

14  **A**    No, that's not correct.

15  **Q**    Well, how can you check what's happening to Tesla

16  investors if you're not looking at the stock price?

17  **A**    The stock price moves a lot for many reasons.  And

18  correlation is not causation.

19  **Q**    But in this case, you expected a reaction from your

20  August 7th tweets.  Isn't that right?

21  **A**    Not necessarily.  As I mentioned in earlier testimony, the

22  -- when I tweeted out, for example, that I thought the stock

23  price was too high, the stock price went even higher.  So you

24  would think if I tweeted out stock price is too high, that the

25  stock price would go down.  But in fact, it went up.  So you

**MUSK - DIRECT / PORRITT**

1  cannot conclude, based on a tweet, whether it will go up or

2  down.

3  **Q**    Did it go up immediately after your tweet saying it was

4  too high?  Do you recall?

5  **A**    I don't recall.

6  **Q**    In fact, it went down the day after; isn't that correct?

7  **A**    I don't recall.  But the stock price moves a great deal

8  for many reasons that are counter-intuitive.

9  **Q**    If I can direct you to this paragraph on Exhibit 53"

10           "Why did I make a public announcement?"

11       Do you see that paragraph there?

12  **A**    Yes.

13  **Q**    Have you had a fair chance to read that paragraph?

14  **A**    Would you like me to read it now?

15  **Q**    Just to yourself.

16       (Witness examines document)

17  **A**    Yes.

18  **Q**    Now, you previously testified that you made the public

19  announcement on August 7th, and that "Funding secured" tweet in

20  response to a *Financial Times* article, correct?

21  **A**    That, that affected the timing of it, yes.

22  **Q**    Okay.  There's no reference of a *Financial Times* article

23  in this (Indicating), Exhibit 53, is there?

24  **A**    No, but that's neither here nor there.

25  **Q**    And to have a conversation with investors, you didn't need

**MUSK - DIRECT / PORRITT**

1  to tweet out in the middle of the trading day on August 7th,

2  2018, that you were considering taking Tesla private at 420,

3  "Funding secured," did you?

4  **A**    No, but I wanted to make sure that all investors were

5  aware of the take-private discussions, and that whatever leak

6  the *Financial Times* was aware of, not be that some investors

7  would know it and some others wouldn't, and therefore, those

8  who didn't know it would be disadvantaged.

9      I wanted to make sure that all investors were aware of it,

10  and not just some.  That seemed like the fairest and right

11  thing to do.

12  **Q**    All right.  But you didn't know if the *Financial Times* had

13  any information about the going-private, did you?

14  **A**    Not for sure, but I strongly suspected they did.

15  **Q**    And then you go on to say "Why did I say 'Funding

16  secured'"?

17  **A**    Yes.

18  **Q**    And then you refer to the July 31st meeting.  Do you see

19  that there?

20  **A**    Yes.

21  **Q**    And you say (As read):

22          "During the meeting the managing director of

23          the fund expressed regret...and he strongly

24          expressed his support for funding a

25          going-private transaction for Tesla at this

**MUSK - DIRECT / PORRITT**

```
 1              time."
 2        Do you see that?
 3   A     Yes.
 4   Q     All right.  That's not what he was describing in the text
 5   that he was sending you just a day earlier, is it?
 6   A     That is not what he was saying in the backpedaling text,
 7   no.
 8   Q     Okay.  You didn't run this language past PIF, did you?
 9   A     I don't think so.
10   Q     So you made public statements about PIF, without their
11   consent.
12   A     I felt this was critical information that the public
13   needed to know.
14   Q     PIF would never have agreed to this language being
15   included in this blog post, isn't that correct?
16   A     I don't know.
17   Q     If you'll also move down in Exhibit 53, you state -- and
18   if you keep moving down, sorry, Derek -- you say (As read):
19              "My best estimate right now is that..."
20        At the last sentence of that top paragraph there on the
21   screen:  "
22              "My best estimate right now is that
23              approximately two-thirds of shares owned by
24              all current investors would roll over to a
25              private Tesla."
```

1          Do you see that?

2     A    Yes.

3     Q    Okay.  You hadn't spoken to two-thirds of investors.

4     Correct?

5     A    That's why I called it an estimate.

6     Q    Okay.  In fact, you had no basis for saying two-thirds of

7     investors would roll over.  Isn't that correct?

8     A    I wouldn't say I had no basis.  I was aware that at least

9     Larry Ellison, and I think likely many others that I knew,

10    would participate in the take-private.  That's why I call it my

11    best estimate.

12    Q    And if we can go back to Exhibit 121, text messages.  You

13    received a text message from Yasir after this blog post was

14    published, correct?

15         (Document displayed)

16         (Witness examines document)

17    A    Sorry, am I --

18    Q    On 121-13.

19         THE COURT:  Can you highlight it so it we can see

20    what --

21         (Document enlarged)

22    BY MR. PORRITT

23    Q    Do you see that?

24         THE COURT:  So which, which -- do you want to

25    highlight -- are you bringing his attention to a particular --

1           **MR. PORRITT:**  Yeah.  Sorry.  It is the's one in the

2    middle there, Your Honor:

3               "Elon, I'm personally surprised."

4    **BY MR. PORRITT**

5    **Q**    Do you see that?

6    **A**    Yes.

7    **Q**    And Yasir describes the blog ill-advised and with loose

8    information.  Do you see that?

9    **A**    Yes.

10   **Q**    And you said: Don't be surprised, I'm still upset.

11          Isn't that correct?

12   **A**    Well, Yasir is making it clear that he still wants to move

13   forward.  He -- he wants the information as soon as possible.

14          And I'm still upset, yes.

15   **Q**    Following this blog post on August 13th, you sat with the

16   *New York Times* for an hour for an interview, correct?

17   Approximately an hour?

18   **A**    I explained the reason why I'm upset, because he allowed

19   people to think that I was a liar, when I was not.  And anyone,

20   I think, would be upset in my position.

21   **Q**    Um, did you sit for an interview with the *New York Times*

22   later that week?

23   **A**    There was a -- I didn't sit for an interview.  There

24   was -- I was told that there was an article coming out that had

25   a bunch of false statements in it, and I wanted to correct

1   those statements.

2   **Q**    All right.  So I don't want to be semantic over an

3   interview, but you spent time with a *New York Times* reporter on

4   an article.  Correct?

5   **A**    On a phone -- there was a phone call.  There was a lengthy

6   phone call.

7   **Q**    All right.

8   **A**    Yes.

9   **Q**    Was that phone call longer than your meeting with the PIF

10  on July 31st?

11  **A**    I think -- I think it may have been, yes.

12  **Q**    Okay.  So you spent longer with the *New York Times* than

13  you did with the PIF?

14  **A**    I don't know the exact timing.  It was a long time on the

15  phone with the *New York Times*.

16  **Q**    Okay.

17           **MR. PORRITT:**  If we can bring up Exhibit 171, please.

18       (Document displayed)

19  **BY MR. PORRITT**

20  **Q**    Do you see the headline here?

21  **A**    The headline is -- at least, the headline is accurate.

22  **Q**    This is the *New York Times* article that was based on --

23  it's this lengthy telephone conversation with you, is that

24  correct?

25  **A**    Um, yes.  Pardon me.  The -- the interview was not -- was

 1   about many things.  It was not -- I don't recall discussing the

 2   details of the take-private with the *New York Times*.

 3          **MR. PORRITT:**  Well, if you could scroll down.

 4       (Document displayed)

 5          **MR. PORRITT:**  To the bottom of the first page there.

 6          **THE WITNESS:**  Oh, yeah.  Okay, sure.

 7   BY MR. PORRITT

 8   Q    This is a discussion of the events that morning, correct?

 9   A    That's referring to the tweet.

10   Q    Okay.

11   A    Or that -- yeah.  Sorry -- yes.

12   Q    All right.  And that was based on information you gave the

13   *New York Times*?

14       (Witness examines document)

15   A    Um, probably.

16   Q    Yeah.  And you confirmed to the *New York Times* that the

17   board had not reviewed your tweet before you published it,

18   isn't that correct?

19   A    Correct.  It actually would not have been appropriate for

20   the board to review my tweet, because the board is a

21   counterparty.

22   Q    Now, following this article, from August 17th to

23   August 23rd, you were still considering taking Tesla private at

24   420.  Isn't that correct?

25   A    I was still considering taking Tesla private, 420.

**MUSK - DIRECT / PORRITT**

1   **Q**   Okay.  And the market knew that, correct?

2   **A**   After the tweet, they did.

3   **Q**   Yeah, okay.  You had not made any disclosure saying you

4   were no longer considering taking Tesla private at 420,

5   correct, until August 23rd?

6   **A**   I don't recall the exact date.  That may be correct.

7   **Q**   Okay.

8        **MR. PORRITT:**  If we could introduce Exhibit 101,

9   please.

10       (Off-the-Record discussion between counsel)

11       **MR. PORRITT:**  Sorry, it's been admitted, Your Honor.

12       **THE COURT:**  Okay.

13       (Document displayed)

14  **BY MR. PORRITT**

15  **Q**   Do you have Exhibit 101 in front of you, Mr. Musk?

16  **A**   Yes.

17  **Q**   I can refer you to the -- and you participated in this

18  board meeting, right?

19  **A**   Yes.

20  **Q**   Okay.  And --

21       (Off-the-Record discussion)

22       **MR. PORRITT:**  Oh, excuse me.  Sorry.  I misspoke,

23  Your Honor.  I apologize.  We would move to admit this exhibit

24  at this time.

25       **THE COURT:**  All right.  Any objection?

1          **MR. SPIRO:**  No objection.

2          **THE COURT:**  Admitted.  You may publish.

3      (Trial Exhibit 101 received in evidence.)

4          **MR. PORRITT:**  Thank you, Your Honor.

5  BY MR. PORRITT

6  Q    It says (As read):

7          "Mr. Musk next discussed with the board

8      information that he had learned in recent weeks

9      following his announcement, including but not limited

10     to the negative views of many of the company's current

11     stockholders regarding the prospect of the company

12     going private, the difficulties the company's current

13     stockholders would have in continuing to own Tesla's

14     stock if the company went private..."

15     Do you see that?

16  A    Yes.

17  Q    Okay.  So that was information you learned after your

18  tweets, correct?

19  A    Yes.

20  Q    So you tweeted "Investor support is confirmed" without

21  finding out whether investors had a negative view of the

22  company going private.  Isn't that correct?

23  A    Well, the views of investors are varied, considerably.

24  Some thought taking the company private was good, and some did

25  not.  There was a range of views that investors had.

1  Q    And so -- well, if I turn on to the next page of

2  Exhibit 101, you'll see there, you tell the board (As read):

3           "The problems for both institutional

4           investors as well as small investors were

5           discussed.  As part of this discussion,

6           Mr. Musk reminded the board that one of his

7           preferences when considering a going-private

8           transaction was to allow Tesla's long-term

9           investors to continue to keep their equity

10          positions in Tesla, but he had recently heard

11          from numerous investors that this was very

12          difficult for internal compliance reasons and

13          other requirements, and that many of Tesla's

14          investors preferred the company stay

15          public..."

16     Do you see that?

17 A    Yes.  Many, but not all.  And actually, some did think it

18 was better to be private.

19 Q    All right.  But you didn't go through this exercise before

20 you tweeted out "Investor support is confirmed," did you?

21 A    Sorry, the --

22 Q    Before tweeting out "Investor support is confirmed," --

23 A    Yes.

24 Q    -- you didn't learn about whether investor support was

25 actually confirmed, did you?

1  **A**    I felt -- I felt that there was sufficient -- investor

2  support was confirmed.

3  **Q**    You confirmed that -- you hadn't spoken to any investors

4  about a going-private transaction at 420, apart from PIF.

5  **A**    There was PIF, there was Larry Ellison, and obviously, my

6  own share holdings, and with SpaceX stock as a backstop.

7  **Q**    So you think people read "Investor support is confirmed,"

8  you meant to communicate that Elon Musk's support is confirmed?

9  That's what you were saying?

10  **A**    I am -- PIF's an investor, Larry Ellison's an investor,

11  and I am an investor, as well as running the company.

12  **Q**    Okay.

13  **A**    Those are investors.

14  **Q**    All right.  And you'd never mentioned the price of 420 to

15  Larry Ellison or to PIF, right?  Correct?

16  **A**    The 420 number was the lowest that I thought it could be

17  done at.  That's why -- the reason I didn't specify a number

18  higher than 420 was that I was not confident of it being done

19  above 420, but I was confident of it being -- of it being done

20  at 420.  That's why I didn't -- I didn't leave it open-ended.

21  Because if the stock were to rise dramatically, then I think

22  then funding wouldn't be secured.  I think it would be secured

23  at 420, but not at some much higher number.  That's why I --

24  you know, I didn't cite a higher number or leave it open-ended.

25  **Q**    As a result of this feedback you got from investors, you

1   then pulled the transaction, isn't that correct?

2   **A**   After a lot of consideration of all the factors, including

3   that it would be difficult to keep some of our loyal long-term

4   investors, and also I should say the -- what became clear, that

5   the level of distraction that taking the company private would

6   be, with litigation, such as this litigation, would -- on

7   balance, it was better for Tesla to stay public.

8       But that -- that is why my original tweet said that I was

9   considering it.  I didn't say the company was going private.  I

10   said I was considering it.  That is factually true.

11   **Q**   And then if we can turn to the bottom of Exhibit 101, on

12   Page 4.

13       (Document displayed)

14   **Q**   At this board meeting, which you were present at, you said

15   the board then discussed a new social media policy.  Do you see

16   that?

17       (Witness examines document)

18   **A**   Yes.

19   **Q**   Okay.  That's in connection with your tweets, correct?

20   **A**   I don't -- possibly.

21   **Q**   Then if you could just --

22       **MR. PORRITT:**  I would like to show the witness

23   Exhibit 229.

24       (Document displayed to the Witness)

25       **MR. PORRITT:**  This has not yet been admitted,

MUSK - DIRECT / PORRITT

```
 1   Your Honor.
 2            MR. SPIRO:  There is no objection.
 3            THE COURT:  All right.
 4            MR. PORRITT:  Move admission.
 5            THE COURT:  229 is admitted.
 6       (Trial Exhibit 229 received in evidence.)
 7       (Document displayed)
 8   BY MR. PORRITT
 9   Q    Do you see Exhibit 229 in front of you?
10   A    Yes.
11   Q    Okay.  And this is another public statement drafted for
12   you by Tesla, is that correct?
13   A    Drafted and reviewed by me, yes.
14   Q    Okay.  And this is you informing -- informing the market
15   on August 24, 2018, that you -- Tesla was staying public?
16   A    Yes.
17   Q    Okay.  And this was the first indication since August 7th
18   that you were no longer considering taking Tesla private at
19   420; isn't that correct?
20   A    Yes.
21   Q    Okay.
22            MR. PORRITT:  At this point, no further questions.
23   Reserve the right to redirect.
24            THE COURT:  All right.  Thank you.
25       Mr. Spiro?
```

MUSK - CROSS / SPIRO

```
 1              THE WITNESS:  I'm sorry, Your Honor; is it possible to
 2    have some more water?
 3              THE COURT:  Yeah.
 4              MR. SPIRO:  I got it.
 5              THE WITNESS:  Talking a lot.  This is --
 6              THE COURT:  It's still empty.  It's empty.
 7                         CROSS-EXAMINATION
 8    BY MR. SPIRO
 9    Q    Mr. Musk, good afternoon.
10         I think at some point plaintiff's counsel threw up a
11    nondisclosure agreement, something about you not checking
12    language with the PIF nondisclosure agreement before you.
13    Remember that?
14    A    Yes.
15    Q    As you're sitting here today, are you -- are you being
16    charged, sued with breaking a nondisclosure agreement?
17    A    No.
18    Q    Do you understand, Mr. Musk, what you are being accused of
19    here today?
20    A    I'm -- I'm being accused of making materially false
21    statements.  I'm being accused of a fraud.  It's outrageous.
22    Q    Sir, do you make mistakes?
23    A    Everyone makes mistakes, including me.
24    Q    Have you ever tried to deceive your shareholders?
25    A    Never.
```

**MUSK - CROSS / SPIRO**

1    Q    Why did -- why, in fact, did you want to take Tesla

2    private in the first place?

3    A    I thought it would be good for the shareholders to take

4    Tesla private.  The -- we were under unprecedented attack from

5    short sellers in the public market.  I think it is difficult to

6    appreciate just how much the Wall Street short sellers were

7    engaged in fear, uncertainty and doubt campaigns.  They

8    desperately wanted Tesla to die.

9         This was causing us to have problems selling cars and

10   recruiting people, because if people are reading all the time

11   about how Tesla is going to die, then that makes it hard to

12   hire people.  And hard to sell cars.

13   Q    And so in doing this for shareholders -- and we are going

14   to put up Exhibit 81 that is in evidence.

15        (Document displayed)

16   Q    You understand, Mr. Musk, that while we were going to call

17   you on our case, plaintiff called you on their case so they

18   could ask you questions first, but now I have an opportunity to

19   ask you questions.  Do you understand that?

20   A    Yes.

21   Q    Okay.  And so in this proposal to the board of Tesla,

22   however informal or undetailed it may be, did you make a bid to

23   take Tesla private?

24   A    Yes.

25   Q    Okay.  And if we could blow up -- I guess it is relatively

 1  big, can't see it on you all's screen, but was this bid to the

 2  board real and genuine?

 3  A    Absolutely.

 4  Q    Did you sign your name to it as chairman and CEO of Tesla,

 5  Inc.?

 6  A    Yes.

 7  Q    Now, you've given your reasons already as to the rationale

 8  for going private at this time, or at least considering going

 9  private at this time.

10       MR. SPIRO:  Can we highlight the sentence that starts

11  "The difference in operational efficiency..."?

12       (Document highlighted)

13       MR. SPIRO:  This is being published to the jury, I

14  take it?

15       THE COURT:  I believe so, yes.

16       MR. SPIRO:  Thank you.

17  BY MR. SPIRO

18  Q    Was SpaceX very much on your mind as you were considering

19  taking Tesla private?

20  A    Absolutely.  Absolutely.  That's why I mentioned it in the

21  email to the board, which predates the tweet.  This is very,

22  very important.  The 420 wasn't some spur-of-the-moment thing

23  that happened on a tweet.  It was -- it was referencing the

24  letter to the board that had been sent several days earlier.

25  And it specifically highlights SpaceX.

1    **Q**    So one thing it says here is "operational efficiency."

2    Can you just explain -- because some of these concepts, you

3    know, not everybody's been living with for half a decade --

4    what you mean when you say that the structure of SpaceX allowed

5    you to think that the structure of taking Tesla private would

6    work?

7    **A**    So, SpaceX is -- is a private company, but it has

8    thousands of investors.  And -- but because it is private -- I

9    mean, I outlined, I think, the three reasons here that it is

10   better.  If you're private, then you're not subject to attack

11   by Wall Street manipulation of the stock price, by the

12   short-selling community.

13         (Document displayed)

14   **A**    Yeah, exactly.  So I believe this is -- is exactly right.

15   **Q**    Moving on from the actual rationale, can you just explain

16   to the jury simply how so many people are allowed to invest in

17   SpaceX and how liquidity is generated in SpaceX so that you can

18   continue to sell your shares?  Just explain that to the jury

19   because I think we skipped over that a little bit.

20   **A**    Yes.  So, um, a very large number of investors are able to

21   own shares directly, but even more indirectly in SpaceX through

22   what's called special purpose vehicles where the special

23   purpose counts as one shareholder, but that special purpose

24   vehicle is able to have thousands of shareholders themselves.

25         And then SpaceX does liquidity events twice a year where

1  those shareholders can sell their shares or buy shares.  And so

2  SpaceX is able to, I think, achieve the best of both worlds,

3  where you can offer employees and small shareholders, offer

4  them the ability to invest in SpaceX, but you're not subject to

5  all of these sort of Wall Street sharks that are trying to

6  destroy the company.

7  **Q**   Now, does that experience and did that experience with

8  SpaceX, day after day, make you believe at this time when you

9  are sending this proposal to the board that a structure that

10  allowed the shareholders to remain was feasible?

11  **A**   Yes.

12  **Q**   And --

13  **A**   What I was -- I was really thinking, like, we've got this

14  great structure for SpaceX that allows shareholders to

15  participate but doesn't -- doesn't allow manipulation of the

16  stock by hedge funds and others.  And so we are able to focus

17  on building the rockets and launching them and advancing the

18  company but without -- without being attacked by short sellers

19  and without stock manipulation.  And that allows SpaceX to be

20  heads down, focused on building better rockets, and it makes

21  for much less distraction.

22       So SpaceX, as I say in this email, is able to operate more

23  effectively than Tesla.  And so what -- I thought, well, if

24  there's some way for Tesla to have the same structure as

25  SpaceX, then that would allow Tesla to better fulfill its

 1  mission of -- of accelerating the advent of sustainable energy.

 2  So, you know.  So, yeah.

 3  **Q**    So Mr. Musk, on cross-examination you were asked a series

 4  of questions about your statement "Funding secured" and what

 5  was in your mind at the time, and your statements here today

 6  versus the deposition that happened three years after the

 7  tweets.  Three-plus years after.

 8      In the question you were asked in the deposition, you

 9  weren't asked if the PIF and its commitment were the only thing

10  in your mind and the only source of funding.  Is that right?

11  **A**    That, that's correct.

12  **Q**    And plaintiffs' counsel, when he was asking you questions,

13  did not bring up the fact that in the very same month of your

14  tweet, you gave sworn testimony.  And is it fair to say that

15  your memory was fresher the same month of the events than it

16  was years later?

17  **A**    Absolutely.

18  **Q**    And when your memory was fresher and you gave testimony

19  about the sources of funding in your mind when you made the

20  tweet, Page 12 [sic], Line 21 to Page 214, Line 12, you were

21  asked (As read):

22          "**QUESTION:**  You wrote 'Funding secured.'  Do

23          you see that?

24          "**ANSWER:**  Yes.

25          "**QUESTION:**  Did you intend for the phrase

```
 1                   'Funding secured' to refer to the commitment

 2                   that you understood the PIF to have made at

 3                   the July 31st meeting at Tesla?

 4               ▪ANSWER:  Yes.

 5               ▪QUESTION:  Is there anything else you were

 6                   referring to when you wrote..."

 7           MR. PORRITT:  (Inaudible)

 8       (Reporter clarification)

 9           MR. PORRITT:  Mr. Spiro is just reading a transcript

10   to the witness, and asking him to agree.  That is not a proper

11   use of the transcript.

12           MR. SPIRO:  The Court said, for completeness, that I

13   could.

14           THE COURT:  Well, you can -- you can elicit a prior

15   consistent statement.

16           MR. SPIRO:  Right.

17           THE COURT:  But rather than just reading it, you

18   should tell counsel what you are going to read so he doesn't

19   have any objection, or, or he has his own completeness --

20           MR. SPIRO:  Sure, sure.

21           THE COURT:  Rather than just reading, why don't you

22   tell him what you want to read from.

23           MR. SPIRO:  Sure.  As I said -- and I apologize if he

24   didn't hear it -- 212, Line 21 to 214, Line 12.

25           THE COURT:  All right.  Any objection on grounds of
```

 1  completeness?

 2          **MR. PORRITT:**  Give me a moment, Your Honor.

 3          **THE COURT:**  Yep.  Is that -- do I -- I have that;

 4  right?

 5          **MR. SPIRO:**  It's the first transcript, Your Honor.

 6          **THE COURT:**  212, Line --

 7          **MR. SPIRO:**  21, to 214, Line 12.

 8          **THE COURT:**  All right.  Any objection on grounds of

 9  completeness?

10          **MR. PORRITT:**  I mean, I don't think it's -- it's so

11  inconsistent that -- but other than that, I state my objection.

12          **THE COURT:**  All right.  Objection overruled.  You can

13  read it.

14  **BY MR. SPIRO**

15  **Q**   Line 21 (As read):

16          "QUESTION:  You wrote 'Funding secured.'  Do

17          you see that?

18          "ANSWER:  Yes.

19          "QUESTION:  Did you intend for the phrase

20          'Funding secured' to refer to the commitment

21          that you understood the PIF to have made at

22          the July 31st meeting at Tesla?

23          "ANSWER:  Yes.

24          "QUESTION:  Is there anything else you were

25          referring to when you wrote 'Funding

**MUSK - CROSS / SPIRO**

1  secured'?

2  ▪**ANSWER:**  I had other funding sources in

3  mind.  But I felt like that effectively we

4  were -- I was subscribed based on the PIF's

5  desire to take Tesla private alone.  Even if

6  that was the only thing, that, I felt was

7  strong enough to say 'Funding secured.'  But

8  I was confident there would be many others as

9  well.

10  ▪**QUESTION:**  Did you consider those other

11  potential sources of funding to be secured at

12  the time that you wrote this tweet?

13  ▪**ANSWER:**  Essentially, in my mind, yes.

14  Something that's absolutely important to know

15  is the good old" -- oh, excuse me --

16  "Google Alphabet now has long been interested

17  in acquiring Tesla and they've always been

18  interested.  Well, at least for the last four

19  years, maybe five years.

20  ▪**QUESTION:**  So your --

21  ▪**ANSWER:**  It's a standing interest.

22  ▪**QUESTION:**  You were also referencing Google

23  had an interest in acquiring an interest when

24  you wrote 'Funding secured'?

25  ▪**ANSWER:**  Yes.

1          **"QUESTION:**  Did you have any discussions with

2          anyone at Google in August, 2018, about going

3          private transaction involving Tesla?

4          **"ANSWER:**  No.

5          **"QUESTION:**  Anything else that you were

6          intending to reference when you wrote

7          'Funding secured'?

8          **"ANSWER:**  I always thought that SpaceX, I was

9          confident that SpaceX could be a significant

10         participant in this transaction.  But from my

11         standpoint, I thought the Saudis alone were

12         at least arguably three times

13         over-subscription on what I thought was

14         likely necessary to take the company private.

15         And then you factor in SpaceX, which is space

16         exploration, factor in Google's interest

17         acquiring Tesla, this was, I mean, many times

18         over-subscribed in my mind."

19     Do you remember giving that testimony when the matters at

20     issue were fresher in your mind?

21     **A**     Yes.  Yes.

22     **Q**     Plaintiff's counsel didn't show you that testimony when

23     they were questioning you, did they?

24     **A**     I mean, they're well aware of that testimony.  And I think

25     they deceptively and knowingly ignored it.

1    **Q**    Now, when plaintiff asked you the question, you weren't

2    asked:   Was it the only source -- was PIF the only source of

3    funding, were you?

4    **A**    I was not.

5    **Q**    Okay.  And you know that even though you weren't asked

6    that, you know that in this case that you're here for, you're

7    being sued for fraud based on your use of the word "only."  Do

8    you know that?

9    **A**    Yes.

10   **Q**    Even though you believed that you could sell your SpaceX

11   shares to finance the transaction, was that actually what you

12   wanted to do?

13   **A**    No.  I would have very much hated to sell my SpaceX

14   shares.  That would have broken my heart.  But I would have

15   done it, if need be.

16   **Q**    Did you envision that you needed to?

17   **A**    I did not think it would be necessary.

18   **Q**    When you made the bid to the board, did it give you

19   comfort in making the bid that you, yourself, had the type of

20   wealth necessary to make this transaction happen?

21   **A**    Yes.

22   **Q**    Now, was it your hope to take more control or power over

23   Tesla as a private company?

24   **A**    No.

25   **Q**    Did you intend to push the shareholders out and seize

1   power and wealth for yourself?

2   **A**    Not at all.  I was -- I was trying my best to do the right

3   thing for the shareholders.

4   **Q**    And one more thing about this original proposal to the

5   board.  You see how it says a 30-day limit (As read):

6            "This offer expires in 30 days."

7   **A**    Yes.

8   **Q**    Were you hoping that the board would get moving here?

9   **A**    Yes.  I would -- I felt we -- we did not want to have a

10  protracted discussion.  So it needed to be short, and, and that

11  it either happens or it doesn't happen.

12       But then, if it were protracted for a long period of time,

13  it would be too much of a distraction for Tesla.  So it was --

14  it should be something that we -- we either get done quickly or

15  move on.  But we -- but a protracted discussion I thought would

16  be bad for Tesla.  It would be too much of a distraction.

17          **MR. SPIRO:**  Can we keep this document published for

18  the jury?  I don't know if I asked again.

19          **THE COURT:**  I'm sorry, what's that?

20          **MR. SPIRO:**  I was just simply asking just to make sure

21  that the jurors can see the document.

22          **THE COURT:**  Okay.

23          **MR. SPIRO:**  Is it visible on the screen?

24       (Jurors indicate it is not visible)

25       (Document displayed)

```
 1          (Jurors indicate it is visible)
 2              MR. SPIRO:   Okay.   Thank you.
 3   BY MR. SPIRO
 4   Q     So is it possible, when you set a deadline, to extend a
 5   deadline?
 6   A     Yes.
 7   Q     Do you do that all the time?
 8   A     That happens frequently.
 9   Q     There's also a suggestion that, you know, you didn't
10   consult with financial experts and other folks like that before
11   deciding on the price that you were comfortable making a bid
12   at, 420.   Okay?
13   A     Uh-huh.
14   Q     Did you, as the chief executive officer, have some
15   familiarity with the value of Tesla?
16   A     Yes.
17   Q     Okay.   This email has been called previously in this case
18   horrible names.   It's incoherent, incomprehensible, illusory,
19   false, bad.   Was this a real genuine email from you and a real
20   proposal?
21   A     Absolutely.   And I think it is very clear and to the
22   point.   And I think the reasoning is -- I mean, I think I
23   articulate the reasoning quite -- very, very clearly here.
24   That there are three reasons.   Those are very good reasons.
25   Q     Now, I want to --
```

1          **MR. SPIRO:**  We can take that down.

2          (Document taken off display)

3    **BY MR. SPIRO**

4    **Q**    I want to take a step back and talk about how you and the

5    Kingdom of Saudi Arabia ended up sitting in the factory that

6    day, July 31st, the day before the August 1st earnings call.

7    **A**    Uh-huh.

8          **MR. SPIRO:**  And if we could show the witness

9    Exhibit 105.  I think the Court has ruled that this is

10   admissible.  And I would, with the Court's permission, offer it

11   into evidence and publish it to the jury.

12         **THE WITNESS:**  I'm sorry for squirming around.  I have

13   quite severe back pain.

14         **MR. SPIRO:**  If you need to take a break, we can take a

15   break.

16         **THE WITNESS:**  That's okay.  I'll do it.

17         **MR. SPIRO:**  I have the same thing.

18         **THE COURT:**  Do you want to take a break?

19         **THE WITNESS:**  Sorry?

20         **MR. SPIRO:**  If you need to take a break, or we can do,

21   you know, a couple minutes more and then --

22         **THE WITNESS:**  No, I'll just power through.

23         **MR. SPIRO:**  Okay.

24         **THE COURT:**  We are coming up probably close to an

25   appropriate break time anyway, so whenever you want.

 1           MR. SPIRO:  Yeah, so we'll go a few more, if it's okay

 2   with the Court.  So with the Court's permission, I'm offering

 3   this, and then we will publish it.

 4           THE COURT:  All right.  I've already overruled the

 5   objection to 105.  And therefore, it's admissible.

 6           MR. PORRITT:  (Nods head.)

 7           THE COURT:  And you may publish it.

 8        (Trial Exhibit 105 received in evidence.)

 9           MR. SPIRO:  And could we blow that up on the screen.

10        (Document displayed)

11        (Document enlarged)

12           MR. SPIRO:  Can you move down to the --

13        (Document displayed)

14   BY MR. SPIRO

15   Q    As early as 2016, was Yasir and the PIF approaching you

16   for meetings?

17   A    Yes.

18   Q    Okay.

19           MR. SPIRO:  And if we could go back to that.

20        (Document displayed)

21           MR. SPIRO:  What you had on the screen before.  Go up

22   to Mr. Musk's email.

23        (Document displayed)

24   BY MR. SPIRO

25   Q    And as to one of those invitations, you said (As read):

 1                  "I appreciate the offer, but my obligations

 2                  prevent me from traveling to those locations

 3                  on those dates."

 4          And it ends (As read):

 5                  "This is not an urgent matter."

 6          What did you mean, not urgent?  They wanted to meet with

 7     you; you say not urgent.  Can you just tell the jury what you

 8     meant?

 9     **A**    I mean there did not seem to be any urgency to a meeting.

10     It was not clear why he wanted to meet, I think, at this time.

11     **Q**    Exhibit 106.  Fast-forwarding to 2017.

12          (Document displayed to the Witness)

13              **MR. SPIRO:**  This has also been looked at by the Court.

14     I think the Court ruled it admissible, and I would offer 106.

15              **THE COURT:**  106 is admitted.

16          (Trial Exhibit 106 received in evidence.)

17          (Document displayed)

18     **BY MR. SPIRO**

19     **Q**    And so as you can see here, January, 2017, there's a

20     confirmation for a meeting at 11:30 a.m.  Do you see that?

21     **A**    Yes.  That was during the creation of OpenAI.

22              **MR. SPIRO:**  I want to show the witness 827, March 7,

23     2017.  This exhibit has also been ruled on.  I would offer this

24     into evidence.

25              **THE COURT:**  All right, it's admitted.

**MUSK - CROSS / SPIRO**

1        (Trial Exhibit 827 received in evidence.)

2            **THE COURT:**  You may publish.

3        (Document displayed)

4   **BY MR. SPIRO**

5   **Q**    And is this an invitation to the meeting that you

6   discussed with Larry Ellison?

7   **A**    Yes.

8   **Q**    And members of SoftBank and the PIF?

9   **A**    Yes.

10  **Q**    Now, you testified on cross-examination that the topic of

11  going private and the PIF funding, it had come up through 2017,

12  into 2018.  Is that true?

13  **A**    Yes.

14  **Q**    Did Tesla's stock price change in 2017 and 2018?

15  **A**    Tesla's stock price would go up and down a lot.  It went

16  up and down a lot.

17  **Q**    And as Tesla's stock price went up and down, did the PIF

18  ever waver in speaking to you in their intention and desire to

19  take Tesla private?

20  **A**    No, they were consistent, no matter what the stock price

21  was.

22  **Q**    And did Yasir understand how much money we were talking

23  about here?

24  **A**    I assume he -- a sophisticated investor, that he did.

25  **Q**    And did you understand that he, the PIF and the Kingdom of

 1   Saudi Arabia, had more than enough funding to take Tesla

 2   private?

 3   **A**    The Saudi PIF is one of the wealthiest organizations...

 4         (Document taken off display)

 5   **A**    I mean, it is the country of Saudi Arabia.  They have a

 6   lot of money.  To say the least.

 7   **Q**    In 2017, and into 2018, as these meetings and

 8   conversations were happening, can you tell the jury what you

 9   were working on in terms of Model 3 production, briefly?

10   **A**    I mean, that's -- very briefly, is hard.  But we were

11   going through an extremely difficult and painful time to get

12   the Model 3 to volume production.

13         No company -- no American company has reached volume

14   production successfully since Chrysler in the '20's.  It's been

15   about 100 years.  Many have tried, and they've all failed.

16   **Q**    Now, you eventually, the day before the earnings call in

17   which the Model 3 production -- August 1st -- is discussed, the

18   day before, you have this meeting inside of Tesla's factory,

19   the night before the earnings call, that you were asked about

20   on cross-examination.

21         You were asked -- you mentioned in one of your a man by

22   the name of Deepak Ahuja.  But plaintiff's counsel didn't ask

23   you who he was.  Who is he?

24   **A**    Deepak was the chief financial officer of Tesla.

25   **Q**    And you mentioned in one of your answers to plaintiff's

**MUSK - CROSS / SPIRO**

1  counsel, but he didn't ask who he was -- who is Sam Teller?

2  **A**   Sam Teller was my chief of staff.

3  **Q**   Okay.  And do you know if plaintiffs have called either of

4  those individuals who were at that meeting with the PIF, to

5  date, in this trial?

6  **A**   I -- I don't know.

7  **Q**   Now, when the PIF told you in that meeting -- Yasir,

8  directly -- that they wanted to take Tesla private, did you

9  understand that to be buying 5 more percent?  Or did you

10  understand it to meaning a full take-private?

11  **A**   I -- I understand that, that there were no conditions -- I

12  understood that they would do what -- whatever it took.  That

13  there was not -- there was no -- not a limitation.

14  **Q**   And if any shareholders rolled -- can you just explain --

15  you talked a little bit back and forth during cross-examination

16  about that some shareholders or investors could remain.  And I

17  just want to make sure it's clear to the jury what you mean by

18  that.

19      What does it mean for a shareholder to roll their shares?

20  **A**   They would remain a shareholder with Tesla, private.

21  **Q**   So at the time of the going-private transaction, in its

22  simplest terms, a shareholder could decide to just remain with

23  the private entity, and then they would own a piece of the

24  private entity.

25  **A**   That's correct.

**MUSK - CROSS / SPIRO**

1  Q    So if any shareholders rolled, there's less money that you

2  need from outside investors than if no shareholders roll.

3  Fair?

4  A    Yes.  Yes.

5  Q    Okay.  And at this time, did you intend to roll all of

6  your shares?

7  A    Absolutely.

8  Q    And did you expect other people who were board members and

9  investors and long-time investors, investors for decades and

10 decades, did you expect them to roll their shares?

11 A    Absolutely.  And it's also worth noting that many of the

12 shareholders in SpaceX as a private company are also

13 shareholders in Tesla as a public company.  Therefore, it would

14 be reasonable to assume that companies like Fidelity --

15 Fidelity is an investor in SpaceX as a private company -- that

16 Fidelity would continue to be an investor in Tesla as a private

17 company.

18 Q    At the end of the meeting -- and you've described the

19 events of that meeting -- did you and Yasir shake hands?

20 A    Yes.

21 Q    Did you take him at his word?

22 A    I did.

23 Q    Did you have any doubt in your mind, leaving that meeting,

24 that the Saudi PIF would fund a Tesla go-private?

25 A    None, whatsoever.  I felt we had a deal, and it was -- we

**MUSK - CROSS / SPIRO**

 1   had a done deal.

 2          MR. SPIRO:  If we could put up Exhibit 53 and publish

 3   for the jury.

 4          (Document displayed)

 5          MR. SPIRO:  And if we can blow up the section that

 6   says -- the "Funding secured" section.

 7          (Document displayed)

 8   BY MR. SPIRO

 9   Q    You had an opportunity to discuss this a little bit on

10   cross-examination.  Is your description of the events that took

11   place in that room in this blog post accurate?

12   A    Abso- -- absolutely.  Absolutely accurate.

13   Q    Has your description of the events that happened in that

14   room some five or so years ago ever wavered at all?

15   A    Never.

16   Q    Now --

17   A    Oh, and if -- if I may reiterate the -- again, when I

18   first met with Yasir and the Saudi fund, and they wanted to be

19   part of Tesla, I said: Well, then, then buy 5 percent of Tesla

20   in the public markets.

21          There was no signed agreement.  There was no discussion of

22   price.  And so it would be reasonable to assume that that is --

23   that is -- that what -- you shake hands on it, and that's --

24   that's it.

25   Q    I mean, I -- you've said that a couple of times.

**MUSK - CROSS / SPIRO**

1   **A**    Yeah.

2   **Q**    And was it your understanding that, you know, they had put

3   their money with their mouth was, and that that was as clear a

4   commitment as there could be, that when they said that you

5   could count on them in the room on July 31st, you could count

6   on them?

7   **A**    Ye- --

8          **MR. PORRITT:**  Objection, leading, Your Honor.

9          **THE COURT:**  Sustained.

10  **BY MR. SPIRO**

11  **Q**    Did you take that statement -- did you -- is the fact that

12  they invested billions in dollars already, as you've described,

13  what impact did that on your view of how firm this commitment

14  was?

15  **A**    It had a very strong impact.  I think it -- I know I'm

16  being repetitive here.  But I said:  If you're interested in

17  investing in Tesla, then -- then buy 5 percent in the public

18  markets.

19      There was no written agreement.  There was no discussion

20  of price.  And they went ahead and bought 5 percent of Tesla

21  stock.

22  **Q**    The next day after you meet with the PIF, the earnings

23  call, August the 1st, do you invite retail shareholders to

24  those calls?

25  **A**    Yes.

MUSK - CROSS / SPIRO

1   **Q**    Is that typical?

2   **A**    No.

3   **Q**    After the earnings call on the 1st, did the stock go up?

4   **A**    I think it might have gone up.

5   **Q**    Okay.

6        **MR. SPIRO:**  And I'm going to just show the witness

7   Exhibit 83, which I believe is in evidence, and ask that it be

8   published.

9        **THE COURT:**  All right.

10     (Document displayed)

11   **BY MR. SPIRO**

12   **Q**    The day after you made the proposal to the board that the

13   jury has now heard about, you --

14        **MR. SPIRO:**  If we could --

15   **BY MR. SPIRO**

16   **Q**    You met with the board as a whole on August 3rd, 2018.

17   And this is only a couple of days after the meeting with the

18   PIF.  Fair?

19   **A**    Yes.

20   **Q**    Okay.

21        **MR. SPIRO:**  If we could blow up the paragraph that

22   says --

23     (Document enlarged)

24        **MR. SPIRO:**  Okay, that's the minutes of the special

25   meeting of the board of directors.  And can we show the

**MUSK - CROSS / SPIRO**

```
 1  attendees for a second?
 2       (Document enlarged)
 3           MR. SPIRO:  Okay.  All the attendees, maybe not that
 4  blown up.
 5       (Document reduced)
 6           MR. SPIRO:  Okay.
 7  BY MR. SPIRO
 8  Q    And do you see Deepak Ahuja was there?
 9  A    Yes.
10  Q    And Todd Maron, the general counsel?
11  A    Yes.
12  Q    And both vice-presidents of Legal were there?
13  A    Yes.
14  Q    You remember questions from plaintiffs suggesting, well,
15  there were no lawyers anywhere.  Were there lawyers at these
16  board meetings (Indicating)?
17  A    Yes.
18  Q    Okay.
19  A    The -- yes.  There were -- all three are very -- they're
20  world-class lawyers.
21  Q    Okay.
22           MR. SPIRO:  And if we can blow up the paragraph
23  following Mr. Musk's initial remarks.
24       (Document enlarged)
25           MR. SPIRO:  Okay.
```

1   BY MR. SPIRO

2   Q    And it says (As read):

3           "During such discussion, Mr. Musk noted that

4           he would like to structure a private company

5           similar to SpaceX's corporate structure,

6           where smaller shareholders could invest

7           through a type of special purpose fund."

8   Did you say that to the board?

9   A    Yes.

10  Q    And if we can skip a sentence and go to the next sentence

11  (As read):

12          "As for the funding of a possible

13          going-private transaction, Mr. Musk noted

14          that in his discussions with the Public

15          Investment Fund of Saudi Arabia, the PIF

16          indicated that it was willing to fund the

17          entire going-private transaction."

18  A    Yes.

19  Q    Okay.  And Mr. Ahuja was in that board meeting with you.

20  Right?

21  A    Yes.

22  Q    I don't have --

23          MR. SPIRO:  We can take a break now, Your Honor, or we

24  can continue.

25          THE WITNESS:  May I add something?  Maybe it's not

MUSK - CROSS / SPIRO

 1   important, but --

 2           THE COURT:  All right, let's take a break.  Yeah.

 3   Break for 20 minutes.  Thank you.

 4           THE COURTROOM DEPUTY:  All rise for the jury.

 5       (Jury excused)

 6       (The following proceedings were held outside of the

 7   presence of the Jury)

 8           THE COURT:  All right.  See you in 20.

 9       (Recess taken from 1:19 p.m. to 1:37 p.m.)

10       (The following proceedings were held outside of the

11   presence of the Jury)

12           THE COURTROOM DEPUTY:  Please remain seated, court is

13   back in session.

14           THE COURT:  All right.  Let's call the jury back.  And

15   we'll have Mr. Musk resume the stand.  We only have about 25

16   minutes for the rest of the day.

17           MR. SPIRO:  Yeah.  I always ask in every courtroom in

18   every place, but I assume...

19       (Reporter clarification)

20       (Off-the-Record discussion)

21       (The following proceedings were held in the presence of

22   the Jury)

23           THE COURTROOM DEPUTY:  All rise for the jury.

24           THE COURT:  All right.  Have a seat, everyone.  Thank

25   you.  We're going to recall Mr. Musk back to the stand.

**MUSK - CROSS / SPIRO**

```
 1          Is he -- why don't you check.

 2          (A pause in the proceedings)

 3          (The Witness retakes the witness stand)

 4              THE COURT:  All right.  Mr. Spiro, you may proceed.

 5              MR. SPIRO:  Thank you, Your Honor.

 6                      CROSS-EXAMINATION RESUMED

 7   BY MR. SPIRO

 8   Q    Mr. Musk, we have spoken now and you have spoken on cross

 9   about the meetings with the PIF and the conversations and

10   lead-up to July 31st, okay, conversations with the PIF.  The

11   offer to the board of August the 2nd.  We looked at the board

12   minutes from you speaking to the board with Deepak Ahuja on the

13   3rd of August.  And we have put up the blog post, which is

14   Exhibit 53.

15          And you've testified that you spoke to Michael Dell.

16   A    Yes.

17          (Document displayed)

18   Q    I don't think you were asked this, but you -- did you

19   speak to Michael Dell's lawyer?

20   A    Yes.

21   Q    You spoke to Egon Durban?

22   A    Yes.

23   Q    And all of this happened, everything we're describing,

24   before the tweets on the 7th.  Fair?

25   A    That is correct.
```

**MUSK - CROSS / SPIRO**

1  **Q**    Okay.  Was everything that you said in all of those

2  different contexts, to all of those different people,

3  consistent with each other?

4  **A**    I believe it was extremely consistent.

5  **Q**    Okay.  Did any of those people, groups, tell you that what

6  you were contemplating, what you were considering, was not

7  possible?

8  **A**    The -- the absolute total opposite.  They're -- they --

9  they were -- it could absolutely be done.

10      And, um, and in speaking to Michael Dell, I wanted to ask

11  him if he thought taking Michael -- taking Dell Computer

12  private was a good idea, whether he regretted that or not.  And

13  he said it was -- he felt very strongly that it was a good

14  idea, that he does not regret taking Dell Computer private.

15  And it enabled him to execute -- you know, to operate the

16  company much more efficiently.  And he strongly recommended

17  that I try to take Tesla private.

18  **Q**    And now I'm going to show you the blog post of August

19  13th, which, of course, happens -- if I wasn't afraid of that

20  easel (Indicating) I would show the calendar again, but

21  obviously the 13th is after the 7th, so now we're at a time

22  after the tweets.  Okay?

23      And just to orient the jury, you're not being sued for

24  fraud based on the blog post.  Okay?  And I want to show you

25  this line on the blog post.

MUSK - CROSS / SPIRO

```
 1            MR. SPIRO:  Okay.  If we could highlight the bottom of
 2    Exhibit 53.
 3         (Document highlighted)
 4            MR. SPIRO:  And can we publish to the jury?
 5         (Document displayed)
 6    BY MR. SPIRO
 7    Q    Okay.  And was the blog post also consistent with all
 8    those other meetings and discussions you have already testified
 9    about?
10    A    Yes.
11    Q    Okay.  And was the blog post accurate?
12    A    Yes.
13    Q    (As read)
14            "I left the July 31st meeting with no
15            question that a deal with the Saudi sovereign
16            fund could be closed, and it was just a
17            matter of getting the process moving.  This
18            is why I referred to 'funding secured' in the
19            August 7th announcement."
20         Was that truthful?
21    A    Yes.
22    Q    Now, going back in time to the days right before the
23    tweet, okay, can you explain to the jury what the issue of
24    selective disclosure is that you discussed with the board and
25    the lawyers?
```

**MUSK - CROSS / SPIRO**

 1   **A**    Yes.  It's important that all investors have the same

 2   information when making a buying or selling decision, and

 3   that's so that there's not some investors who have an advantage

 4   over other investors.  And this is often a problem with --

 5   where -- where sometimes large investors have more information

 6   than small investors.

 7        But I wanted to make sure that all investors, small and

 8   large, had the same information.

 9   **Q**    And at the board meeting on August 3rd, did you remain --

10   did you leave that meeting with concerns about how you would

11   accomplish navigating this selective disclosure issue?

12   **A**    Yes.  I mean, I was trying to figure out how can I -- how

13   can I ensure that everyone knows it at the same time.  And

14   Twitter seemed to be the best way to do that.

15   **Q**    Now, when you spoke to -- you've already testified you

16   spoke to Egon Durban the night of the 6th, August 6th, before

17   the morning of the 7th; later in the day the tweet goes.  Okay?

18        Now, did you have a plan to -- I think you've already

19   testified to this -- meet with Mr. Durban after the 7th --

20   August 10th, to have a follow-up meeting?

21   **A**    Yes.

22   **Q**    Okay.  So on the 7th of August, had you in your mind

23   already decided on the 6th that you were going to announce your

24   considerations to the world on the 7th?  Or did you not have a

25   date in mind yet?  Do you understand my question?

MUSK - CROSS / SPIRO

1   **A**    I'm not sure I fully understand your question.

2   **Q**    What I'm asking is:  Had you planned before you woke up on

3   the morning of the 7th --

4   **A**    Oh, no.  I had not planned to, no.

5   **Q**    Had you planned to at some point, sooner than later,

6   announce your considerations to the world at large?

7   **A**    Yes.

8   **Q**    Okay.  Now, you know, you testified that you woke up in

9   L.A.  You -- did you live in Los Angeles at the time?

10  **A**    I did.

11  **Q**    Okay.  And as I said before, plaintiff's' counsel called

12  you in their case, so you didn't really get to be -- you just

13  were cross-examined.  The jury didn't get to hear anything

14  about you, Mr. Musk.

15  **A**    Yes.

16  **Q**    Where are you from?

17  **A**    Um, I was born in South Africa.

18  **Q**    And what was your childhood like?

19  **A**    Not good.

20  **Q**    Okay.  Did there come a point in time -- well, can you --

21  can you -- can you explain what you mean by "Not good" in sort

22  of brief terms?

23          **MR. PORRITT:**  Objection, Your Honor, to the relevance

24  of this.

25          **THE COURT:**  Well, are you going to put on your -- are

 1  you going to call this witness in your case --

 2          **MR. SPIRO:**  No.

 3          **THE COURT:**  -- in chief?

 4          **MR. SPIRO:**  No.  Mr. Musk's here.  He's already --

 5  he'll be going to his third --

 6          **THE COURT:**  All right.  It goes to credibility.  I'll

 7  allow some.

 8          **MR. SPIRO:**  It's just a few -- it's just going to be a

 9  few questions, Your Honor.

10  **BY MR. SPIRO**

11  **Q**    But, can you just sort of, in a sentence or two, just

12  explain what you meant?

13  **A**    I'm -- I am -- I'm not sure what -- I don't think -- I

14  don't think a few -- I don't think a few sentences would

15  describe it.

16  **Q**    Okay.  So I take it you had -- you did not -- you don't

17  have fond memories of that -- that time.

18          Did there come a point in time when you immigrated to the

19  United States?

20  **A**    Yes.

21  **Q**    And --

22  **A**    Right.

23  **Q**    -- how old were you?

24  **A**    Seventeen.

25  **Q**    And can you just describe what that was like.

1  **A**     Um, well, actually, I was able to go to Canada because my

2  mother was born in Canada, and so I was able to get a Canadian

3  passport.  And then three weeks after the Canadian passport, I

4  left.  I would have left sooner, but it took three weeks to get

5  the affordable ticket.

6  **Q**     Okay.  When you came here, Mr. Musk, did you have, you

7  know, a lot of money?

8  **A**     No.

9  **Q**     Why did you come to the United States?

10  **A**     It is where great things are possible.

11  **Q**     Did you go to school?

12  **A**     Yeah, yes.  I went to -- yes.

13  **Q**     Okay.  And after you went to school, can you tell me sort

14  of how you started your career.

15  **A**     Um, sure.  Well, I am -- I worked -- worked my way through

16  college.  And I graduated -- I had a lot of student debt.  Um,

17  I had like $100,000 in debt, and $3,000 in cash and a computer.

18  And I started writing internet software in 1995.

19       Most people had not heard of the internet.  And I -- most

20  people don't know but I -- I wrote the first maps and

21  directions and white pages and yellow pages on the internet in

22  '95, by myself.  And then we got -- then my brother joined, and

23  another friend joined.

24       And then we, um, were lucky enough to get venture funding

25  in early '96.

MUSK - CROSS / SPIRO

1  **Q**    And what company was that?

2  **A**    It was called Zip2.

3  **Q**    And just in a sentence, can you just tell the jury what

4  that company did?

5  **A**    Yeah.  I mean, it was very early in the internet days,

6  but, um, the first products, like I said, were maps and

7  directions, white pages, yellow pages.

8      Kind of like an early, early version of Google Maps and

9  Directions.  I mean, I could go on, --

10 **Q**    Well --

11 **A**    -- but we're -- I should say we also wrote the software

12 that allowed or enabled hundreds of newspapers to come -- go

13 online and publish online.  And we -- we wrote part of the *New*

14 *York Times* initial website, and a lot of other things.

15 **Q**    Did you go on to start other companies?

16 **A**    Um, yes.  I was a co-founder of X.com, which became

17 PayPal.  Which, I think some people may have used that.

18 **Q**    And what other companies, as you fast-forward in your

19 life, you know, have you been intricately involved either as a

20 founder or as an early member of?  Can you just sort of list

21 off those companies?

22 **A**    SpaceX, Tesla, Neuralink, Boring Company, OpenAI.

23 **Q**    And they've -- the jury's heard about some of these

24 companies, but just again, in a sentence, if you can, what does

25 Neuralink do?

**MUSK - CROSS / SPIRO**

 1    **A**    Neuralink is making brain-computer interfaces to enable

 2    people to walk again, so -- and cure other -- anything that

 3    involves like a brain or a spinal cord injury.  So it would --

 4    our first two applications will be restoring sight, and

 5    restoring mobility to people who cannot walk.

 6    **Q**    The other companies -- OpenAI deals with artificial

 7    intelligence.  Boring is -- deals with tunneling so that cities

 8    can function?  Is that a fair description?

 9    **A**    Yeah.  The Boring Company is trying to help solve the

10    problem of traffic, by making it affordable to build road

11    tunnels under cities.  It's trying to solve traffic, is a way

12    to think of it.

13    **Q**    So about these various businesses and ventures that we're

14    here discussing, you know, there was a witness that sort of

15    came in and said that this transaction that you were

16    considering at the time of August the 7th was somewhat

17    unprecedented.

18         Mr. Musk, have you done things in your life and in your

19    career that are in some ways, fair to say, unprecedented?

20    **A**    Yes.  I've done quite a few things that are -- that are

21    unprecedented.  And, um, yes, where I've been told many times

22    that it was impossible, and, yeah.  It -- yeah.  Um, I mean, in

23    the beginning of -- yeah.  I mean, at the beginning of Tesla,

24    they said:  You can't make a compelling electric car.  And even

25    if you did, no one would buy it.  And that was the unanimous

1   view of the automotive industry.

2   **Q**    Um --

3   **A**    I was called a fool many times.

4   **Q**    The other thing that's been said by the lead plaintiff in

5   this case is that you have demonstrated an ability to raise

6   money.  Okay?

7   **A**    Yes.

8   **Q**    Across all of these companies that you have described, can

9   you explain to the jury approximately how many financing rounds

10  you have done?

11  **A**    At this point -- at this point I've done over a hundred

12  financing rounds.  I think I've raised more money than anyone

13  in history at this point, by a significant margin.  I should

14  say the -- but, you know, the reason I'm able to raise money

15  easily is because investors trust me to be truthful and

16  responsible with their money.

17      And, um, the -- you know, one of the first venture

18  capitalists I ever meet was Steve Jurvetson, in January of '96,

19  when he was at Draper Fisher Jurvetson.  Well, it wasn't even

20  called -- it was called -- he was just a junior partner.  It

21  was called Draper Fisher.  And he actually turned me down.  But

22  then, subsequently has invested in all of my companies.

23      And the reason for that is that it -- in that entire time,

24  I have always been truthful, and I have always taken care of

25  investors.  That is why.

**PROCEEDINGS**

1  **Q**    And over the course of that time, can you just estimate to

2  the jury how much money you've been able to raise?

3  **A**    I mean, at this point, it must be approaching

4  $100 billion.

5  **Q**    And you used the word "subscribed" in some of these

6  messages the jury has seen.  Or, have you ever had a round

7  which is -- a financing round where you go to raise money and

8  it not be over-subscribed?

9  **A**    No.  I don't -- I don't believe so.  I've also never lost

10  money for investors in that entire time.

11  **Q**    Is there an expression called a "down round"?  Have you

12  ever had a down round?

13  **A**    No.

14  **Q**    Ultimately, Mr. Musk, on August 7th, 2018, did you think

15  funding would be an issue in connection with the going private?

16  **A**    Definitely not.

17          **MR. SPIRO:**  Given the time, Your Honor?

18          **THE COURT:**  All right.  We're going -- we have reached

19  the 2:00 hour, so we'll go ahead and take our break for today.

20  We'll resume tomorrow morning at 8:30.

21      The usual admonition:  Please do not do any research, do

22  not discuss with anybody anything about this case, do not read

23  anything, do not listen to anything about this case, any

24  coverage.  And do not form any opinions until this case is

25  submitted to you for deliberation.

PROCEEDINGS

1        We'll see you tomorrow morning.  Thank you.

2        **THE COURTROOM DEPUTY:**  All rise for the jury.

3    (Jury excused)

4    (The following proceedings were held outside of the

5    presence of the Jury)

6        **THE COURT:**  All right.  So we'll adjourn until

7    tomorrow morning.

8        I've now ruled on, I think, enough exhibits that it will

9    get us through tomorrow, I believe, without having to venture

10   deeper.  I'm looking at these as they come in, so I'll deal

11   with those in time.

12       **MR. PORRITT:**  Very good, Your Honor.  Yeah, I think

13   it's going a bit smoother, I think.  May be faint praise,

14   but --

15       **THE COURT:**  Well, you may say that, but I'm still

16   staying up late.  But, yes, I appreciate the effort.  See you

17   tomorrow.

18       **MR. PORRITT:**  Thank you, Your Honor.

19   (Off-the-Record discussion)

20       **THE COURTROOM DEPUTY:**  Court is adjourned.

21

22

23

24

25

## **I N D E X**

Monday, January 23, 2023 - Volume 4

**PLAINTIFF'S WITNESSES**                                      **PAGE**   **VOL.**

**MUSK, ELON (RECALLED)**
(PREVIOUSLY SWORN)                                        735      4
Direct Examination Resumed by Mr. Porritt                735      4
Cross-Examination by Mr. Spiro                           867      4

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 80 | | 824 | 4 |
| 87 | | 780 | 4 |
| 101 | | 862 | 4 |
| 105 | | 881 | 4 |
| 106 | | 882 | 4 |
| 121, Conditionally | | 796 | 4 |
| 229 | | 866 | 4 |
| 254 | | 829 | 4 |
| 333 | | 826 | 4 |
| 337 | | 811 | 4 |
| 827 | | 883 | 4 |

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Monday, January 23, 2023