Volume 5

Pages 906 - 1122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES          )
LITIGATION.                           ) No. 18-cv-04865-EMC
_____)
                                      )
                                      San Francisco, California
                                      Tuesday, January 24, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:
                        LEVI & KORSINSKY, LLP
                        1101 30th Street NW
                        Suite 115
                        Washington, D.C.  20007
                   BY:  **NICHOLAS IAN PORRITT, ESQ.**
                        **ELIZABETH K. TRIPODI, ESQ.**
                        **ALEXANDER A. KROT, III, ESQ.**


                        LEVI & KORSINSKY LLP
                        75 Broadway
                        Suite 202
                        San Francisco, California  94111
                   BY:  **ADAM M. APTON, ESQ.**
                        **ADAM C. MCCALL, ESQ.**

                        LEVI & KORSINSKY LLP
                        55 Broadway
                        10th Floor
                        New York, New York  10016
                   BY:  **MAX EDWARD WEISS, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court


        (Appearances continued, next page)

**<u>APPEARANCES, CONTINUED:</u>**

For Defendants:

                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        51 Madison Avenue
                        22nd Floor
                        New York, New York  10010
        BY:  **ALEXANDER B. SPIRO, ESQ.**
             **ANDREW JOHN ROSSMAN, ESQ.**
             **PHILLIP B. JOBE, ESQ.**
             **ELLYDE R. THOMPSON, ESQ.**
             **JESSE A. BERNSTEIN, ESQ.**

                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        865 South Figueroa Street
                        10th Floor
                        Los Angeles, California  90017
        BY:  **MICHAEL T. LIFRAK, ESQ.**
             **ANTHONY P. ALDEN, ESQ.**
             **MATTHEW ALEXANDER BERGJANS, ESQ.**
             **WILLIAM C. PRICE, ESQ.**

| | |
|---|---|
| 1 | **Tuesday, January 24, 2023**                              **8:17 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | (The following proceedings were held outside of the |
| 4 | presence of the Jury) |
| 5 | **THE COURTROOM DEPUTY:** All rise.  Court is now in |
| 6 | session, the Honorable Edward M. Chen is presiding. |
| 7 | **THE COURT:** Good morning.  Have a seat everyone. |
| 8 | **THE COURTROOM DEPUTY:** Court is calling the case In |
| 9 | Regarding Tesla Securities Litigation, Case No. 18-4865. |
| 10 | Counsel, please state your appearances for the record, |
| 11 | beginning with plaintiff. |
| 12 | **MR. PORRITT:** Good morning, Your Honor.  Nicholas |
| 13 | Porritt on behalf of the plaintiff, with Levi & Korsinsky. |
| 14 | **THE COURT:** All right, thank you. |
| 15 | **MR. SPIRO:** Good morning.  On behalf of defendants, |
| 16 | Alex Spiro, Quinn Emanuel.  Good morning. |
| 17 | **THE COURT:** Good morning, Mr. Spiro. |
| 18 | A couple matters.  First, I will get out rulings shortly |
| 19 | on the day three witnesses because I don't know whether |
| 20 | Mr. Fath is going to be on or not, but I want to give my |
| 21 | rulings so you can make your adjustments accordingly.  And |
| 22 | those rulings will go up through witness Koney, I believe that |
| 23 | was, and Arnold, so that should -- that's what was covered in |
| 24 | the charts.  So you will have that this morning. |
| 25 | **MR. PORRITT:** Yes, that will be more than enough to |

1    cover us today, Your Honor.

2            **THE COURT:**  Okay.

3            **MR. SPIRO:**  Yes, Your Honor.  The issue of live

4    witnesses versus depo testimony live remains ever-present,

5    given where we are in the schedule.  And again, I think for an

6    orderly process, and with all due respect to the witnesses, the

7    Court should strive to run an efficient process.  And we are

8    asking the Court to have the live witnesses that have been here

9    and now waiting multiple days that changed their work

10   schedules, many of whom have traveled, to take priority over

11   the depo designations that can be played any time.

12           **THE COURT:**  All right.  Response?

13           **MR. PORRITT:**  Your Honor, the live witnesses, I think

14   they are referring to are witnesses that we said may come on

15   Wednesday or Friday.  And we still anticipate they will come on

16   Wednesday or Friday.  So, you know, the order of witnesses,

17   including the witnesses coming by deposition, was arranged to

18   be logical.  And that is the way we wish to present our case,

19   and that is our choice as plaintiff.  So, we don't think there

20   is any reason to delay.

21       We are working with and consulting with them to work with

22   schedules.  And as we understand it right now, the witnesses

23   who have to be here this week we can't really plan to call this

24   week.  So that -- so we don't think there is any need to

25   address it.  And we will continue to monitor it going forward.

 1    We'll see how it goes.

 2            **THE COURT:**  You anticipate that the witnesses that you

 3    have called for this week will be called for this week, if not

 4    today or tomorrow, but some time this week?

 5            **MR. PORRITT:**  We indicated -- so we have listed them,

 6    we have sort of designated, if you like, or noticed them with

 7    the exhibits.  And so -- probably ahead of schedule, because we

 8    didn't want the risk of going dark, according to your Court's

 9    schedule.  Aside from that, we indicated to defendants about a

10    month ago when we -- the days we anticipated at trial we

11    expected these witnesses to be called.  And they are --

12    currently we expect to call them on those days.

13            **MR. SPIRO:**  If I can respond just very briefly.

14        I think counsel's comments should suggest a lack of

15    conviction, "I have even more concern or equal concern."  I

16    don't believe that's correct.  I do not believe, when I look at

17    the clock and the timing, we're even close to on schedule.  And

18    there are witnesses, like I've said that have flown in.

19        I also think in terms of the jury's time, a depo

20    designation can be fit in anywhere.  If there's a witness snag,

21    if anything happens, you know, that can always be dealt with

22    that way.

23        And, frankly, while plaintiffs do have some control over

24    witness order, that is left to the sound discretion of the

25    Court.  And frankly, what the witness order suggests proves,

1  frankly, to us, is that the timing of the expert and the

2  designations and the concerns that we have about hearsay and

3  cross-examination prove and we'll prove in the record that all

4  that this is -- really is, all an end-around hearsay.  And

5  they're trying to put things in a certain order so that they

6  come in for the truth of the matter asserted, and not just for

7  the purported reasons.

8      So I don't know why that, itself, would be given much

9  weight.

10     **THE COURT:**  Well, now you're getting into the weeds,

11  and I'm not there yet.  So generally I defer to the parties'

12  order of presentation, unless there's a compelling reason.  For

13  instance, a witness is not available, is only available -- that

14  witness is only available, and pick a range, and I -- I will

15  intervene from time to time to take that witness out of order.

16     If, here, the general problem is a scheduling problem, for

17  instance the deposition -- the testimony of Mr. Musk is taking

18  longer than you all have expected, um, and I think some of the

19  other witnesses seem to take longer than one would have

20  expected, that's just the ebb and flow of trial.

21     **MR. SPIRO:**  Right.  Just so, just again, just to get

22  right to it because I get that we're talking, and maybe the

23  Court isn't fully in the weeds on all of this.

24     After Mr. Musk's testimony, even though there are live

25  witnesses that are days behind, what plaintiff would do is just

**PROCEEDINGS**

 1  start playing videos to the jury today.  And so I just want to

 2  flag very directly we're talking about today, and that.

 3      And so I think I've made my point, and we appreciate the

 4  Court.

 5          **THE COURT:**  Well, let me ask.  Are there any of the --

 6  you're planning to call Brinkman by video.

 7      Correct?

 8          **MR. PORRITT:**  Correct, Your Honor.

 9          **THE COURT:**  Viecha, live.

10          **MR. PORRITT:**  Correct.

11          **THE COURT:**  Fath by video?

12          **MR. PORRITT:**  Correct, Your Honor.

13          **THE COURT:**  Is there some reason why he can't be

14  deferred?

15          **MR. PORRITT:**  Um, first of all I think logical -- he

16  logically fits with the witnesses we're calling today.  Also,

17  um, you know, in many ways, in terms of scheduling, we know how

18  long a video witness is going to take precisely, to the second.

19  So the video witnesses are not the issue with the scheduling,

20  Your Honor.  It's the live witnesses.

21      So we think Viecha will be quick.  So we're optimistic,

22  depending on how long Mr. Musk takes this morning, that we may

23  even start -- sorry -- we may even start Mr. Ahuja this

24  afternoon, which means we will have made progress.  And in

25  terms of video witnesses, we're talking three, perhaps four, at

1   most, and two of which may be done today.  So then we will be

2   moving.

3          **MR. SPIRO:**  Yeah.  I mean, again, even the comments

4   just now highlight the problem.  So Mr. Ahuja -- who's very,

5   very busy, and has a job, and has been waiting for days -- will

6   be left until the end of the day.  Just, just to start a

7   videotape.

8          **THE COURT:**  Well, all right.  I'm not going to take

9   things out of order just because someone's been waiting here.

10  We're in trial.  It's inconvenient to everyone; it's

11  inconvenient to me.  Witnesses have been called; they have to

12  respond.  Period.

13       Now, if there's something compelling about a witness who

14  has to be somewhere, got a medical thing or, you know,

15  absolutely can't be after this week, then I'll hear that on an

16  individual basis.

17         **MR. SPIRO:**  Understood.  Your Honor, just one other

18  thing, given now that we know the order, I just need to make a

19  brief record.

20       Which is, the defense has taken the Court's comments

21  throughout, and most recently on January 18th, in which the

22  Court stated (As read):

23             "...comments after the class period" -- which

24             the Court called "post-mortem -- "are not

25             relevant.  Because that's almost like expert

 1                  testimony.  The kind of expert testimony

 2                  that, number one, invades the province of the

 3                  jury, two, that is coming from a source, not,

 4                  not a designated expert.  So the effect of

 5                  the listener doesn't fly, when it's after the

 6                  fact."

 7        When the Court made that determination on January 18th,

 8   the defense relied on that determination.  It impacted the way

 9   that we planned our trial strategy.  I can tell the Court

10   directly, it impacted the way I cross-examined Mr. Fries.  I

11   understood that to be as clear as it sounds when I read it.

12        And we will always abide by the Court's ruling, but we

13   were surprised by the Court designation determinations.  In

14   Mr. Brinkman's testimony, it seems that an exhibit that the

15   Court -- again, we took the Court to completely rule out of the

16   case -- and again, we don't even think that the exhibits that

17   are hearsay within -- that have been allowed in should be in a

18   federal courtroom.  But, but we understood the Court's ruling,

19   at least.

20        **THE COURT:**  All right.  Your objection is noted for

21   the record.  I will simply restate what I stated earlier.

22        And that is:  Yes, effect of the listener rationale does

23   not apply to comments that were published by opinion makers or

24   others that may have affected the market after close of the

25   period.  However, I have found that explanations of what

1  people's reactions were, even if it's retrospective, their

2  reactions to what happened during the class period, including

3  the disclosure notice, et cetera, et cetera, is not barred

4  simply because that reaction was explicated after the close of

5  the period.

6      So there's two different rationales.  There's the -- I

7  call it slice of the market, you know, people in the market,

8  whether they were investors, whether they were people involved

9  with Tesla, or whether they were analysts, that that is

10  probative to what the market reaction was.  Some of that

11  explanation may be retrospective in explaining what somebody

12  understood when they saw different publications.  That's

13  different from effect-on-the-listener market.

14      And so when I said that post-close statements that go to

15  the effect on the listener, yes, that is -- that rationale does

16  not fly when you're talking about post-close period.  That does

17  not preclude explanation of reactions that were -- or

18  explanation that would shed light on reactions during the class

19  period.

20      So maybe that's a thin distinction, but that's the

21  distinction I base it on.

22          **MR. SPIRO:**  Understood.  Understood, Your Honor.

23          **MR. PORRITT:**  Your Honor, if I can raise two quick

24  points.

25      One, on Fath, we have finished our meet-and-confer,

PROCEEDINGS

 1    somewhat tardily, literally this morning.  So I think we have

 2    agreement on the relevant testimony for Joe Fath coming in and

 3    out.  So that's --

 4            MR. SPIRO:  Again, we maintain all the objections,

 5    obviously, that we've had throughout this case and this trial

 6    regarding what we think is hearsay and the other relevant

 7    objections.  We are continuing to meet and confer in good

 8    faith, based on our understanding of the Court's rulings.  But

 9    I just want the record to be very, very clear that we think

10    that there's a combination of hearsay and -- and other issues,

11    and a lack of a right to cross-examine that is very, very

12    problematic in this trial.

13        And we're going to keep making that record, because we

14    think it's making this an unfair process to Mr. Musk.

15            THE COURT:  All right.  So am I to hear -- am I

16    hearing that this table, the last table I have, there's been

17    some developments in terms of stipulation or agreement?

18            MR. PORRITT:  Correct, Your Honor.  We've withdrawn

19    some testimony.  Certain objections have been withdrawn.

20            THE COURT:  Has that been communicated to the Court?

21            MR. PORRITT:  Not yet, Your Honor.  We literally

22    finished the process preceding court, before court this

23    morning.

24            THE COURT:  Can you file that right away, so I know --

25    because I'm about to issue an order with various rulings, S's

1    and O's, and if I don't need to rule on something --

2         **MR. PORRITT:**  We'll submit this.  Mr. (Inaudible) will

3    file it straight away.

4         **THE COURT:**  Okay.

5         **MR. PORRITT:**  Lastly, there's one exhibit that they

6    designated for Mr. Musk, Exhibit 825, that we objected to on

7    multiple grounds, one of which was completeness.  It was

8    incomplete.  And you sustained it on the basis of completeness.

9    Defendants have stipulated -- it was an email that was lacking

10   its attachments.

11        **THE COURT:**  Yes.

12        **MR. PORRITT:**  And they said we'll have the

13   attachments.  But we still object on the basis of hearsay.  And

14   Your Honor didn't rule one way or the other on whether it's

15   hearsay or not.  So we maintain our objection that it's hearsay

16   and --

17        **THE COURT:**  Okay, I'm overruling that.  My only basis

18   for sustaining was the lack of completeness.  So the object

19   based on hearsay is overruled.

20        **MR. PORRITT:**  All right.  Very good, Your Honor.

21        **THE COURT:**  Two more things, quickly.

22        Time on the clock, according to Ms. Ayala, is plaintiffs

23   have used five hours, 59 minutes.  Defendants, six hours and 43

24   minutes.  So I don't know how -- if you're in line with that,

25   that's what it is.  You're about a third of the way through,

1   which is about right, because we're three days out of nine so

2   far.

3        There were a little extra time that I kept track on

4   certain days of beyond the 15 minutes.  It comes out to about

5   ten minutes apiece.  So I'm going to add ten minutes.  And,

6   allocating those equitably between the parties.  So I meant

7   what I said, that I'm looking at the clock.

8            MR. SPIRO:  Understood, Your Honor.

9            MR. PORRITT:  Understood.  Appreciate it.  Thank you,

10  Your Honor.

11           THE COURT:  And then finally, the matter was raised

12  about Mr. Musk's location.  I will tell you that whatever the

13  arrangements were made, they were made with the Marshal's

14  office and the CSO on prior days.  I was not aware of what the

15  arrangements were.

16       When it was brought to my attention that the previous

17  location where he was -- parked his stuff was not available,

18  that's when the request was to use this other location.  And

19  that's when it was brought to my attention.

20       And my concern is that I don't want anybody in the

21  corridors anywhere near the Court staff or jurors.  And so

22  that's why I've arranged to have CSO court staff assure that

23  that is complied with.  So I think there is complete

24  insulation.

25           MR. PORRITT:  (Nods head)

1          **THE COURT:**  I understand one of my colleagues left a

2     note because Mr. Musk parked in his parking space yesterday,

3     but that's -- that's between those two, not me.  I have nothing

4     to do with that.  So --

5          **MR. SPIRO:**  We have not, frankly, been involved in

6     parking or where he's -- stationed by the Marshals.

7          **THE COURT:**  Neither have I, until today.

8          **MR. PORRITT:**  Very good, Your Honor.  You saw our

9     concerns, but thank you for the comments.

10          **THE COURT:**  Yeah.  I did want to make sure there was a

11     free zone.  I do not want any contact.  So --

12          **MR. PORRITT:**  Thank you, Your Honor.

13          **THE COURT:**  Thanks.  Okay.  Do we know if the jury's

14     here?

15          **MR. SPIRO:**  Somebody will get him, I assume, when --

16     the Court looked at me yesterday at some point and was looking

17     at me like, do I know where he is.

18          **THE COURT:**  And I don't know, who do we look to?

19     Who's in charge of communicating?

20          **MR. LIFRAK:**  (Raises hand)

21          **THE COURT:**  Okay.

22          **MR. SPIRO:**  My colleague can alert somebody in the

23     hallway who can alert whomever.

24          **THE COURT:**  Okay.  Do we know if the jury's here?

25          (Off-the-Record discussion between the Court and Clerk)

**MUSK - CROSS / SPIRO**

1         **THE COURT:**  You can send the signal that the witness

2  can come back.

3      (A pause in the proceedings)

4      (The following proceedings were held in the presence of

5  the Jury)

6        **THE COURTROOM DEPUTY:**  All rise for the jury.

7        **THE COURT:**  All right, have a seat, everyone.  Good

8  morning, once again, members of the jury.

9      As you will recall, Mr. Musk was being examined by

10  Mr. Spiro.  And that's where we are going to pick up.

11        <u>**ELON MY, PLAINTIFF'S WITNESS, RECALLED**</u>

12          <u>**CROSS-EXAMINATION RESUMED**</u>

13  **BY MR. SPIRO**

14  **Q**    Good morning.  And good morning, Mr. Musk.

15  **A**    Good morning.

16  **Q**    Where we left off, we were talking about you speaking to

17  Egon Durban the night of the 6th, and then the morning of the

18  7th, waking up in Los Angeles.

19      And I'm going to go back to my trusted calendar here so we

20  can keep track of everything.  And so we're talking about

21  August 7th, 2018.

22        **MR. SPIRO:**  Can we put up Exhibit 87, which is in

23  evidence, and publish it to the jury, please.

24      (Document displayed)

25        **MR. SPIRO:**  And if we could zoom in on the bottom

```
 1   email that starts "Elon."

 2        (Document enlarged)

 3   BY MR. SPIRO

 4   Q    Okay.  So you were shown this exhibit on plaintiff's

 5   examination, quickly but, I want to sort of look at it a little

 6   bit more closely.  I'm going to start at (As read):

 7                   "This comes from a visit to the U.S. by the

 8                   crown prince in March."

 9                   "The FT will also report that the Saudis

10                   previously approached Tesla about buying new

11                   shares but that we declined because we

12                   weren't looking to raise capital."

13        Okay.  So first, it's the Crown Prince.  The second part,

14   when they are talking about buying new shares, did you

15   understand that to mean, like, the way anyone can buy a share

16   of Tesla?  Or an actual approach to Tesla to buy capital

17   directly from the company?

18   A    The -- the latter.  This was -- there were -- they were

19   referring to, buying new shares would require an issuance of

20   shares by the company.  So that is not buying in the public

21   market.

22   Q    And then it goes on to say:

23                   "The reporter says the Saudis 'First

24                   approached Tesla after investment in Uber in

25                   2016.'"
```

**MUSK - CROSS / SPIRO**

1    **A**    Yes.

2    **Q**    So those meetings and emails that we showed you when I

3    began my examination of the meetings that you had with the PIF,

4    to your knowledge, was that information public before this?

5    **A**    No, none of that information was public.

6    **Q**    Now, do you remember if shortly after receiving this email

7    -- and I understand you didn't know the exact timing of the

8    article.  Do you remember, that morning before your tweet,

9    whether or not the Tesla shares began to rise in price?

10   **A**    I do not.

11         **MR. SPIRO:**  And I'm going to offer 332.  This is the

12   *Financial Times* article.  The defense would maintain its

13   objections on hearsay and other grounds, but would enter the

14   *Financial Times* story.

15        And while we're doing that, can you just put up Exhibit 8,

16   please?  That's in evidence.

17        (Document displayed)

18   **BY MR. SPIRO**

19   **Q**    Did you see that at the bottom of Exhibit 87, it said the

20   deadline -- so we are just at Exhibit 8, and I'm just going to

21   highlight, 9:48 a.m.  Okay.  And if we could put up side by

22   side Exhibit 87.

23         **MR. KOTARSKI:**  I'm sorry, could you repeat that?

24         **MR. SPIRO:**  Can we put up side by side, please,

25   Exhibit 87.

**MUSK - CROSS / SPIRO**

```
 1          (Document displayed)

 2          MR. SPIRO:  Can we blow up the same email to Mr. Musk.

 3          (Document displayed)

 4   BY MR. SPIRO

 5   Q    Do you see where it says "Their deadline is 9 a.m.

 6   Pacific"?

 7   A    Yes.

 8   Q    Mr. Musk, in your career, have you ever had to make a

 9   split-second decision before?

10   A    Many times.

11   Q    When this occurred on the morning of August 7th, did you

12   think it was important that your shareholders heard from you

13   versus the *Financial Times*?

14   A    Yes, absolutely.  Yes.

15   Q    Now, back to the Court for a moment.

16          MR. SPIRO:  I don't think there's an objection to 322

17   but I just want to make sure that's been offered.

18          THE COURT:  33 --

19          MR. SPIRO:  2 -- 322.  That's the *Financial Times*

20   story, just want to make sure that's in evidence.

21          THE COURT:  322?  Do you show -- are you asking

22   whether that's already been admitted?

23          MR. SPIRO:  No, I'm offering it, Your Honor.  I think,

24   with no objection.

25          THE COURT:  All right.
```

 1          (Off-the-Record discussion between counsel)

 2          (Reporter clarification)

 3               THE COURT:  I couldn't hear it, either.  Is there an

 4     objection?

 5               MR. SPIRO:  They said:  If it's the right number, I

 6     would agree.  Only if it's the right number.

 7          But I believe it is the right number.

 8               THE COURT:  On my chart I have 332, but I didn't see a

 9     322.  But maybe that's on another chart.

10               MR. SPIRO:  We can take it up at the break,

11     Your Honor.  I'll proceed.

12               THE COURT:  Okay.

13     BY MR. SPIRO

14     Q    And I'm just marking where again, on the August 7th, the

15     "Am considering" tweet.

16          And what were you trying to convey when you said "Am

17     considering taking Tesla private"?  That phrase, "Am

18     considering taking Tesla private."

19     A    I was trying to convey that this is a matter that I was --

20     it's very literal.  That I was considering taking Tesla

21     private.  Not that -- that I would, or -- you know.  But that

22     it was under consideration.

23     Q    And when you said "Am considering," were you intending to

24     convey to the market that this was virtually done or a virtual

25     certainty?

1  **A**    Certainly not.  I wouldn't have said "considering" --

2  yeah, I would have said something -- that's very literal, "I am

3  considering."

4  **Q**    And did you expect -- you earlier testified that you

5  expected your tweets to be read together.  Did you intend for

6  and expect that "Am considering" was something that the market

7  knew, and was to be interpreted about all of your tweets?

8  **A**    Yes.

9  **Q**    Now, the tweet ends, the end, after the main sentence it

10 says "Funding secured."  What did you intend to convey with

11 that phrase?

12 **A**    Simply that funding was not an issue.

13 **Q**    And at the time that you are sending this to the market

14 are you soliciting investors?  Do you want people calling you

15 up and trying to give you capital?

16 **A**    Uh, no.

17 **Q**    When you do an investment round, you know you, talked

18 about some of your companies, Neuralink, Boring, and you

19 announce -- or SpaceX -- and you announce "We're doing a

20 funding round," how many minutes does it take before the round

21 is over-subscribed, usually?

22 **A**    It's usually the same day, if not hours.

23 **Q**    And again "over-subscribed" means --

24 **A**    That means there's far more capital than is necessary.  I

25 believe every financing round I've ever done has been

1    over-subscribed.

2    **Q**    And again, just to make sure everybody understands what

3    that means, that means people are trying to give you money for

4    that round, and you're saying, even in the same day, "No, I

5    can't take any more money"?

6         Is that what "over-subscribed" means?

7    **A**    Yes.  It's -- it's not a problem for me to raise money.

8    I've done a very good job for investors.  If you do a good job

9    for investors, they, they give you money.

10   **Q**    So from the very first words, "Am considering," did you

11   intend to convey to the market that this was a virtual

12   certainty?

13   **A**    Definitely -- definitely not.

14   **Q**    Okay.  When you said the message "Am considering taking

15   Tesla private at $420.  Funding secured," did you doubt this

16   message and its accuracy when you sent it?

17   **A**    No.  That's absolutely what I believed.

18   **Q**    Do some things that you consider happen?

19   **A**    Well, some things, when I -- considering, it may or it may

20   not happen.

21   **Q**    Okay.  And sometimes you consider things, and they don't

22   happen.

23   **A**    Yes.  I think that's generally what people mean when they

24   say "considering."  They're thinking about it, but they've not

25   made a decision one way or the other.

1          **MR. SPIRO:**  You can take down the exhibits that are up

2    and if we can put up Exhibit 81.

3    **BY MR. SPIRO**

4    **Q**    And as we're doing that, Mr. Musk, when you sent this

5    tweet, were you acting as a bidder on this transaction?  Or in

6    some other role?

7    **A**    I was acting as the bidder.

8          (Document displayed)

9    **Q**    And can you just explain what you mean to the jury by a

10   bidder, versus your other roles?

11   **A**    Sure.  So in this context, I have to be, um, sort of

12   separate from the company.  Meaning the -- the board in this

13   case would represent the company and the shareholders and I

14   would represent the -- the ones taking the company private.  So

15   I -- so it's sort of a weird situation.

16         But essentially I -- I represent the buyer more -- with

17   others, the -- the buyer of the company or the investors

18   taking, potentially taking Tesla private.  So, and then the

19   board would represent the company as the seller.

20   **Q**    Now, at the time of your "Am considering" tweet -- and I

21   have, just to remind the jury, 81 up on the screen -- you had

22   already made an offer to the board to take Tesla private at

23   420.

24   **A**    That is correct.  Yes.  Yeah.

25   **Q**    When you sent the "Am considering" tweet, did you intend

**MUSK - CROSS / SPIRO**

1  to mislead investors?

2  **A**    Absolutely not.

3  **Q**    When you sent the "Am considering" tweet, were you trying

4  to defraud investors, Mr. Musk?

5  **A**    No.  Quite the opposite.  My intention with the tweet was

6  to make sure that all investors were aware of what the board

7  was aware of, and what the Saudi investment fund was aware of.

8  So I was considering, when receiving that email about the

9  *Financial Times* article, that there would be -- that the

10  information had leaked and that some investors would be aware

11  of the fact that I was considering taking the company private.

12  And this would disadvantage other investors, especially small

13  investors.

14  **Q**    Did you intend to deceive your shareholders?

15  **A**    No, I intended to inform them.  To make sure that all

16  shareholders were on equal footing, and there weren't some that

17  were aware of it and some that were not.

18  **Q**    On August 7th, after the "Am considering" tweet and the

19  *Financial Times* article, and putting aside movements in the

20  market because of the *Financial Times* article, or because of

21  your tweets or any other reason, at that time, if the market

22  rose, did you sell your stock?

23  **A**    No.

24  **Q**    Did you have any ill motive in the world, possibly, to

25  deceive your shareholders?

1    A    Um, not --

2                 **MR. PORRITT:**  Objection, Your Honor.  Leading.

3                 **THE COURT:**  Sustained.  Rephrase, please.

4    BY MR. SPIRO

5    Q    Did you have any ill motive?

6                 **MR. PORRITT:**  Objection, Your Honor.

7                 **MR. SPIRO:**  I'm asking.  It's a question.

8                 **THE COURT:**  Overruled.

9                 **THE WITNESS:**  No, I had no ill motive.  In fact, I

10   thought I was doing the right thing, which is to make sure that

11   shareholders -- all shareholders were aware of the take-private

12   proposal that the board was aware of and that the Saudi PIF was

13   aware of.

14       My intent here was to do the right thing for shareholders,

15   so that all shareholders were aware of the take-private, and

16   not just a few big shareholders.

17                 **MR. SPIRO:**  I'm now going to throw up Exhibit 9, in

18   evidence.

19                 **JUROR:**  I need a pen.

20       (A pause in the proceedings)

21   BY MR. SPIRO

22   Q    Okay ,now we're on Exhibit 9.  And as we pull up any

23   tweets or documents, let's just highlight the time at the

24   bottom.

25       This is 10:40 a.m.  At this time, Mr. Musk, still just

**MUSK - CROSS / SPIRO**

1  considering?

2  **A**    Yes.

3  **Q**    Yeah.  And who are you responding to here?

4  **A**    Um, Fred Lambert.  He's -- I think he is a shareholder

5  and -- although I don't know, but he writes a -- he's a writer,

6  has a website called "Electrek," writes about electric

7  vehicles.

8  **Q**    Do you respond sometimes in your tweets to random

9  shareholders?

10  **A**    Um, yes.  I -- I try to maintain a dialogue with

11  shareholders.  Actually, especially small retail shareholders,

12  who do not normally have a way to talk to the CEO.

13  **Q**    Now, if we could highlight the words "if" and the words

14  "either scenario."

15      (Document highlighted)

16  **Q**    And what I'm going to ask you, Mr. Musk, is when you say

17  "if" and you say "either scenario," and you are speaking to a

18  shareholder who writes for a website, are you intending to

19  convey that this is a virtual certainty?  Or something

20  different?

21  **A**    No, I'm being very clear here that either scenario is

22  possible.  That we may go private, or we may not.

23          **MR. SPIRO:**  Exhibit 10, please.

24      (Document displayed)

25

MUSK - CROSS / SPIRO

BY MR. SPIRO

1

2  **Q**    Okay, now we are at 11:00 a.m., if you look at the bottom.

3  Are you still just considering this, Mr. Musk?

4  **A**    Yes.

5  **Q**    And then do you see the word "if"?

6  **A**    Yes.

7  **Q**    And when you write the word "if," are you intending to

8  convey a virtual certainty?  Or maybe?

9  **A**    I'm obviously intending to convey that this may or may not

10  happen.

11  **Q**    Exhibit 11, please.

12      (Document displayed)

13  **Q**    11:13 a.m.  At this time, is this still -- and again,

14  we're on August 7th.  Is this still a consideration?

15  **A**    Yes.

16  **Q**    Okay.  And I just want to ask you again.  This came up

17  yesterday, but I want to make sure, it's very important that

18  the jury understands this.

19      Can you just explain what happens if a shareholder -- in

20  your consideration, in your mind at the time -- decides to stay

21  with the private Tesla rather than sell their shares?

22  **A**    Um, well, I wanted to try to allow shareholders who wished

23  to remain shareholders of Tesla if it were private to remain

24  shareholders of Tesla if it were private.  If that was their

25  wish.

1    Q    And at the time of this tweet, did you know how many

2    shareholders or how many shares would end up, if your

3    consideration were to come to pass, going private or being

4    bought out?

5    A    Well, no, it would depend on the will of the shareholders.

6    If the shareholder wished to remain with Tesla as a private

7    company, or wished to sell, I would support either decision.

8    Q    And if more shareholders stayed with the company, does

9    that then make it so it that the buyer, you, has to pay less

10   because they don't have to buy out as many shareholders?

11         Is that a fair characterization?

12   A    Um, yes.  But as I said, I would support either way.  If

13   shareholders wish to remain with Tesla as a private company,

14   or, or sell their stock, I would -- I mean, I was trying to be

15   -- do the right thing for shareholders here, and to do as they

16   -- as they wished.

17         MR. SPIRO:  If we can just go down so now we can see

18   the whole exhibit.

19      (Document displayed)

20         MR. SPIRO:  I want to make sure the jury sees the

21   whole exhibit.  I can't tell how big the screen is.  But maybe

22   we go down to -- okay

23      (Document displayed)

24   BY MR. SPIRO

25   Q    When you were meeting with the PIF on July 31st, okay, at

 1   that time, did you know what percentage of shareholders would

 2   end up rolling or not, in your consideration?

 3   **A**    No.

 4   **Q**    Okay.  If you -- if you didn't know how many shareholders

 5   would remain or not as of the July 31st meeting with the PIF,

 6   could you have possibly known exactly how much money was needed

 7   to buy out the shareholders?

 8   **A**    No, not exactly.

 9   **Q**    Okay.

10        **MR. SPIRO:**  If we could go back up to the tweet.

11   First tweet.

12        (Document displayed)

13   **BY MR. SPIRO**

14   **Q**    There was some testimony from an ex-professor that this

15   was, like, the worst of all of the tweets.  Do you know, as you

16   sit here today, that you weren't sued for this tweet?

17   **A**    No.

18   **Q**    Okay.  Plaintiff's counsel asked you -- we're still on

19   August 7th -- if you know that the market paused, that Nasdaq

20   paused the market on August 7th.  So your original "Am

21   considering" tweet has been in the marketplace for an hour and

22   change.  Okay.

23        (Counsel writes on easel)

24   **Q**    On August 7th.  That's it.  I mean, as you sit here today,

25   are you aware that you are being sued for billions of dollars?

1    A    Um --

2              MR. PORRITT:  Objection, Your Honor.  Leading, again.

3              THE COURT:  Overruled.

4              MR. PORRITT:  Not sure what the relevance of this is.

5              THE COURT:  Overruled.

6    BY MR. SPIRO

7    Q    Are you aware that the "Am considering" tweet that's in

8    the market for an hour, are you aware that you are being sued

9    here today, sir, for billions of dollars?

10   A    I am aware of that.  I mean, the -- yes.  I'm being sued

11   by a class action law firm from Texas that it claims to

12   represent the shareholders.  I do not believe they actually

13   represent the shareholders.

14             MR. SPIRO:  Could we put up Exhibit 1001, this's --

15             MR. PORRITT:  I move to strike that.  That -- that's

16   improper testimony from the witness.

17             THE COURT:  That's inappropriate.  That comment from

18   Mr. Musk will be disregarded, stricken from the record.

19   BY MR. SPIRO

20   Q    Okay.  Just simply -- it's a yes or no -- are you aware

21   that you're being sued for billions of dollars?

22   A    Yes.

23             MR. SPIRO:  Okay.  If we could show the witness 1001.

24   There's no objection to this exhibit, but it's not in, so I

25   just want to give the Court a moment.  And I'd be offering this

 1    exhibit.

 2              **THE COURT:**  Any objection?

 3         (Document displayed to the Witness)

 4              **MR. PORRITT:**  No objection, Your Honor.

 5              **THE COURT:**  Admitted.

 6         (Trial Exhibit 1001 received in evidence.)

 7              **THE COURT:**  You may publish.

 8              **MR. SPIRO:**  Okay.

 9         (Document displayed)

10              **MR. SPIRO:**  And if we could go up to August 7, at

11    10:55 a.m. from Ron Baron.  Okay.

12         (Document enlarged)

13    **BY MR. SPIRO**

14    **Q**    Okay so we're at 10:55 a.m., tweet's gone out, and you

15    told the jury, but just remind them, who's Ron Baron?

16    **A**    Ron Baron is an investor in Tesla.  Should I say more

17    about him?  Or--

18    **Q**    Well --

19    **A**    Okay.

20    **Q**    Let me just ask this.  Does he have about $50 billion of a

21    fund?

22         Is that about the size of his fund?  Do you know?

23              **MR. PORRITT:**  Objection Your Honor.  Again, leading.

24              **THE COURT:**  Sustained.

25

1  **BY MR. SPIRO**

2  **Q**    Well, is he a personal investor, or does he have a fund?

3  **A**    Ron Baron has a very large fund, and is one of the most

4  respected investors in the world.

5  **Q**    Okay.  He writes on August 7th at 10:55 a.m. (As read):

6            "If you decide to purchase Tesla in a 'going

7            private' transaction, I hope you will allow

8            us to continue to be an investor in your

9            newly formed business."

10  Did you receive that email from Mr. Baron?

11  **A**    Yes.

12  **Q**    And he ends the email by saying: "Thanks in advance for

13  considering us as one of your partners."

14  Was he, you know, technically, a partner?

15  **A**    Well, I think he's using "partner" in a colloquial sense,

16  he's not, strictly speaking, partner.  He's a significant

17  investor, and someone whose opinion I respect.

18  **Q**    Do you recall, on August the 7th, whether or not Ron Baron

19  announced his intention to remain with a private Tesla to the

20  whole world?

21  **A**    I don't think so.

22            **MR. SPIRO:**  Can we show Exhibit 1031 to the witness,

23  and just the witness.

24  **BY MR. SPIRO**

25  **Q**    And see if this refreshes your recollection.

**MUSK - CROSS / SPIRO**

1          (Document displayed to the Witness)

2     **A**     Oh, okay.

3          Yes, it would seem that he did announce to the world that

4     he's good with Tesla going private.

5               **MR. SPIRO:**  Now let's go to Exhibit 13.

6          (Document displayed)

7     **BY MR. SPIRO**

8     **Q**     And he did that on August the 7th.

9               **MR. PORRITT:**  Objection, Your Honor.  That document is

10    not in evidence.  And I'm not sure the witness has any

11    recollection.

12              **THE COURT:**  Well, which -- I'm not sure how this

13    exhibit aligns with the question you just asked.

14              **MR. SPIRO:**  I can -- I couldn't hear the Court

15    exactly, but I can move on.  I'm moving on to Exhibit 13 and --

16              **THE COURT:**  I'll sustain the objection for the purpose

17    of the record.

18              **MR. SPIRO:**  Exhibit 13.

19         And this has already been admitted.

20    **BY MR. SPIRO**

21    **Q**     We're still on August 7th.  At the time that you send this

22    tweet, are you still considering?

23    **A**     Yes.

24    **Q**     And attached to this tweet, what is this in the bottom of

25    the tweet (Indicating)?

**MUSK - CROSS / SPIRO**

1   **A**   That is the Tesla take-private blog that provides further

2   detail about the take-private proposal.

3   **Q**   Okay.  And did you intend for the tweet to be read

4   together with the blog post that you attached to the tweet?

5   **A**   Yes.

6   **Q**   Mr. Musk, you know, when you send an email, do you intend

7   for the email and the attachment to the email to be read

8   together?

9   **A**   Absolutely.

10  **Q**   So the "Only reason why this is not certain is that it's

11  contingent on a shareholder vote," can you tell the jury what

12  you are trying to convey with this tweet?

13  **A**   I'm just saying that the only fundamental obstacle is

14  shareholder vote.

15  **Q**   And is this what's in your mind at the time, and in your

16  considerations?

17  **A**   Yes.

18  **Q**   Now, when you say "Investor support is confirmed," what

19  are you intending to convey?

20  **A**   I'm intending to convey that there's sufficient funding to

21  take Tesla private.  Investors -- those will be the ones taking

22  private.  The shareholders would be the existing Tesla

23  shareholders.  So different, different groups.

24  **Q**   Attached to this is the blog post, Exhibit 12, in

25  evidence.

**MUSK - CROSS / SPIRO**

1    **MR. SPIRO:**  If we could throw that up.

2        (Document displayed)

3  **BY MR. SPIRO**

4  **Q**    Now, the jury was shown a text message from Deepak Ahuja,

5  your CFO -- the CFO of Tesla at the time, talking about this

6  blog post.  Was he involved in the drafting of this blog post?

7  **A**    Yes.

8  **Q**    Okay.  Was he in the meeting with you and the PIF on

9  July 31st?

10  **A**    Yes.

11        **MR. SPIRO:**  If we could highlight, if we can do the

12  highlighted version?

13        (Document highlighted)

14        **MR. SPIRO:**  Okay.

15  **BY MR. SPIRO**

16  **Q**    "A final decision has not been made yet."

17        **MR. SPIRO:**  Can we continue?

18        (Document displayed)

19  **BY MR. SPIRO**

20  **Q**    "I would like," "my intention."

21        "Intention."

22        **MR. SPIRO:**  Can we continue?

23        (Document displayed)

24  **BY MR. SPIRO**

25  **Q**    "I don't envision," "I'm trying to accomplish."   "This

 1   proposal to go private would ultimately be finalized through a

 2   vote of our shareholders."  "If the process ends..."  "Either

 3   way, the future is very bright..."

 4        Did I read those phrases within this blog post correctly?

 5   **A**   Yes.

 6   **Q**   Okay.  When you wrote words like that, on August 7th, were

 7   you intending to convey to the world that this was a virtual

 8   certainty?

 9   **A**   Definitely not.  I'm very clear here that it is dependent

10   on how the shareholders feel.

11   **Q**   Now, you talk about, at the beginning, a final decision

12   has not been made.  Right?

13   **A**   Yes.

14   **Q**   Okay.  So we've got that contingency.  You say you would

15   like to structure this.  Okay.  Structure had not been

16   finalized.

17   **A**   Correct.

18   **Q**   Okay.  Another contingency.  And if we look at the bottom,

19   it says that you were still figuring out the process.

20        **MR. SPIRO:**  Can we blow that up?  Because I don't have

21   the exact words.

22        (Document enlarged)

23   **BY MR. SPIRO**

24        "If the process ends the way I expect it

25        will..."

1      At that time, you weren't positive about a concrete

2   process.

3   **A**    Correct.  I mean, the -- fundamentally, in order to

4   understand how the Tesla shareholders felt and whether they

5   wanted Tesla to go private or not, we have to ask the

6   shareholders.  So, but in order to ask the shareholders if

7   Tesla should go private or not, it needs to be made public

8   information so that -- and all shareholders need to know, at

9   the same time.  So they can make their decision.

10         **MR. SPIRO:**  If we could put up, again, Exhibit 1001,

11   the Ron Baron email.

12      (Document displayed)

13         **MR. SPIRO:**  And if we could just highlight the

14   timestamp on when Ron Baron emailed you.

15      (Document highlighted)

16   **BY MR. SPIRO**

17   **Q**    Now, when you said -- this tweet with the blog post

18   attached, okay, toward the end of the day on the 7th, did you

19   doubt it when you sent it?  Did you doubt its accuracy?

20   **A**    No.

21   **Q**    Did you believe it to be accurate?

22   **A**    Absolutely.  I said exactly what I felt to be true.

23   **Q**    Were you intending to deceive your shareholders?

24   **A**    No, I --

25         **MR. PORRITT:**  Objection.  Leading, Your Honor.

1          THE COURT:  Overruled.

2    BY MR. SPIRO

3    Q    You can answer, Mr. Musk.

4    A    No, the -- the exact opposite.  I was trying my best to

5    keep shareholders informed, and ensure that all shareholders

6    had the same information.

7    Q    And after the tweets with the blog post, after the --

8    which is after the Ron Baron email at the end of the day,

9    whether or not the shares went up for this reason or any

10   reason, at that time, did you sell any of your shares?

11   A    No.

12   Q    Did you have any ill motive?

13   A    No, I -- my motive I believe was a good motive, which was

14   to make sure that all shareholders were aware of what was going

15   on, and not just some shareholders.

16          MR. SPIRO:  I'm going to show the witness Exhibit

17   243 -- I believe there is no objection -- and offer 243 in

18   evidence.

19          THE COURT:  Any objection?

20          MR. PORRITT:  No objection, Your Honor.

21          THE COURT:  All right.  Admitted.

22       (Trial Exhibit 243 received in evidence.)

23       (Document displayed)

24   BY MR. SPIRO

25   Q    And as we are pulling that up, just to stay efficient

1  here, what is Goldman Sachs?

2  **A**    Goldman Sachs is one of the leading investment bankers in

3  the world.  Yeah.

4  **Q**    And who is Dan Dees?

5  **A**    Dan Dees heads their investment banking division.

6  **Q**    And I want to draw your attention to the email on

7  August 7th, at the end of the day.  I don't know whether that's

8  Pacific or Eastern.  But he says in his email:

9          "I thought your letter today was excellent.

10          Very clear."

11      Did I read that right?

12  **A**    Yes.

13  **Q**    At the end of the day, the very same day, on August 7th,

14  did you think that your considerations and what you were

15  thinking was clear?

16  **A**    Yes.

17  **Q**    Do you know -- plaintiff's counsel asked you, do you know

18  that after you made your considerations, whether people were --

19  did you watch the stock?  Were people trading on your

20  considerations?

21      Do you know whether they were betting on your

22  considerations or not, people in the market?

23  **A**    I don't know.

24  **Q**    But fair to say, I mean, Mr. Musk, there was a lot of

25  media attention around this.  Is that fair?

MUSK - CROSS / SPIRO

1  **A**    Yes.

2  **Q**    Okay.  So, and then I just want to go a little bit further

3  down.  And he, Mr. Dees says:

4           "This whole topic feels very reminiscent of a

5           conversation that we started together, many,

6           many months ago at Larry's house!"

7  **A**    Yes.

8  **Q**    Who is Larry?

9  **A**    That would be Larry Ellison.

10 **Q**    And you testified yesterday that you thought -- you

11 weren't sure, but you thought that Mr. Ellison would be

12 supportive of a going-private.

13 **A**    Absolutely.

14 **Q**    And what led you to that belief?

15 **A**    We had discussed it, and he was very supportive.  And, in

16 fact, was trying to help potentially get SoftBank to assist

17 with the take-private -- with a potential take-private in the

18 future.

19 **Q**    And has Mr. Ellison invested with you before?

20 **A**    Yes.

21 **Q**    Okay.  Does Mr. Ellison -- the jury doesn't know

22 Mr. Ellison.

23 **A**    Sure.

24 **Q**    Does Mr. Ellison have the type of capital that could help

25 you with such a transaction?

**MUSK - CROSS / SPIRO**

1   **A**    Yes.  Mr. Ellison, alone, could have helped, could have

2   done the take-private.  Just by himself.  He is one of the

3   largest investors in Tesla.

4           **MR. SPIRO:**  And if we could go up to the email on

5   August 8th, the very next day.

6       (Document displayed)

7   **BY MR. SPIRO**

8   **Q**   Mr. Dees, who works at Goldman Sachs and is the head of

9   their investment banking division, as you testified, says in

10  bullet 1:

11          "The structure and rationale make perfect

12          sense."

13  **A**    Yes.

14  **Q**   Okay.  On August 8th, did believe that your consideration

15  could become possible?

16  **A**    Yes.

17  **Q**   Did anybody tell you this is impossible?

18  **A**    No.  The exact opposite.

19  **Q**   Okay.

20  **A**    I mean, Dan Dees is very clear that he thinks, as he said,

21  that the structure and rationale make perfect sense.  And he is

22  head of investment banking of the biggest investment bank in

23  the world.

24  **Q**   Okay.  And just quickly, Bullet No. 2.

25      (Document highlighted)

**MUSK - CROSS / SPIRO**

1  Q    He says:

2           "I have received a few very interesting calls from

3           funding sources that would want to add to your

4           funding mix here, and could be very interesting."

5      Okay.  So, what is Mr. Dees conveying to you already, and

6  we're just on August 8th?

7  A    That there was strong interest in -- from investors in

8  taking Tesla private.  Yeah.

9  Q    Did Goldman Sachs ultimately become an adviser on this

10 deal?

11 A    Yes.

12 Q    Why did you select them, as opposed to JP Morgan or

13 another bank?

14 A    Well, um, it was actually joint with Goldman Sachs and

15 Morgan Stanley, who are the two top investment banks in the

16 world, who were supportive of the deal.

17      In the case of JP Morgan, Tesla, um, has a very negative

18 relationship with JP Morgan.  JP Morgan used to have all of

19 Tesla's commercial banking business.  But when I asked Jamie

20 Dimon at one point for support with a Tesla automotive leasing

21 line, he declined to support Tesla.

22      And I said:  Well, if you will not support Tesla when

23 other banks will, then you cannot also have Tesla's commercial

24 banking business.  So I withdrew all commercial banking

25 business from JP Morgan, which, to say the least, made

1   JP Morgan hate Tesla and me very much.

2        We have a very negative relationship with JP Morgan.

3   **Q**   Did JP Morgan decide to sue you about the words at issue

4   in this very case?

5   **A**   Yes.

6        **MR. PORRITT:**  Objection, Your Honor.  What's the

7   relevance of this testimony?

8        **MR. SPIRO:**  There's relevance, and I can --

9        **THE COURT:**  Overruled.

10  **BY MR. SPIRO**

11  **Q**   Okay, so they sued you on this very case.

12  **A**   They're still -- they're still suing us.

13  **Q**   Do you happen to know somebody named Ryan Brinkman who

14  works at JP Morgan?

15  **A**   I don't know him.

16  **Q**   Do you know whether he's -- gave a videotaped testimony

17  that may be played in this trial?

18       **MR. PORRITT:**  Objection, Your Honor.  Lack of

19  foundation.

20       **THE COURT:**  Sustained.

21  **BY MR. SPIRO**

22  **Q**   Do you know how much money JP Morgan made off of Tesla

23  before suing you in this matter?

24  **A**   I believe they made billions of dollars off Tesla, and

25  they want even more.  And, yes.  JP Morgan hates Tesla, in a

 1   nutshell.

 2           MR. SPIRO:  Exhibit 256.  This has not been offered

 3   yet.  I understand there is no objection.  And I'll give the

 4   Court a moment, and then would offer 256.

 5           THE COURT:  All right.  No objection?

 6           MR. PORRITT:  We don't object to the document itself,

 7   Your Honor, but there's -- there's no -- I don't think there is

 8   foundation for this witness.  He's not on this email.

 9           MR. SPIRO:  Yeah, we can redact the top email, that's

10   not particularly important.  But he is on the rest of the

11   emails.

12      So we can go ahead and not show that email, and just admit

13   the -- the email, the email below?

14           THE COURT:  So what you want admitted is the lower

15   half?

16           MR. PORRITT:  Your Honor, we can withdraw that.

17   That's -- we can -- no, no objection, we can admit this.

18           THE COURT:  All right.  No objection, then it is

19   admitted.

20      (Trial Exhibit 256 received in evidence.)

21   BY MR. SPIRO

22   Q    Okay.  And now, we had shown some of these -- Mr. Dees'

23   emails in the days following August 7th.  And here we are.

24           MR. SPIRO:  And if we could blow up the email between

25   Mr. Musk and Mr. Dees on August 11th.

```
 1          (Document enlarged)
 2              MR. SPIRO:   We can go up to the top email on
 3     August 11th.
 4          (Document displayed)
 5     BY MR. SPIRO
 6     Q    And you write to Mr. Dees, after the rest of the email
 7     chain which is in evidence (As read):
 8                  "Key question to solve is:  Can we put
 9                  together a diverse enough investor/lender
10                  group, such that no single investor can
11                  demand special terms?  Saudi Arabia would do
12                  the entire thing of course, as this is
13                  strategically critical to their future, but
14                  they would require that we build a
15                  Gigafactory there sooner than we would
16                  prefer.  Hopefully, we can avoid that
17                  requirement."
18          Did you send that email to Mr. Dees in the days following
19     your "Am considering" tweet?
20     A    Yes.
21              MR. SPIRO:   825.  The Court's already ruled on this,
22     and I would offer 825.
23              MR. PORRITT:   Is this the complete version now?
24          (Off-the-Record discussion between counsel)
25              THE COURT:   So 825, with the completeness issue taken
```

 1    care of, is admitted.

 2          (Trial Exhibit 825 received in evidence.)

 3          **MR. SPIRO:**  Thank you.  And as I offer this, can we

 4    also publish it to the jury?

 5          **THE COURT:**  Yes.

 6          **MR. SPIRO:**  Okay.

 7          (Document displayed)

 8    BY MR. SPIRO

 9    **Q**    And now, again, days that follow, you, Mr. Musk, to Todd

10    Maron and others (As read):

11               "Yasir has tried to call me several times

12               today, but I will not take the call or agree

13               to a meeting unless he takes action to

14               correct the public record.

15               "There is no question that PIF said they were

16               was all-in for a Tesla take-private when we

17               met two weeks ago and I clarified whether

18               Yasir was the decision-maker and he said yes

19               unequivocally and, moreover, that this was

20               fully backed by the Crown Prince."

21    **A**    Exactly.  That's exactly what he said.

22          **MR. SPIRO:**  I'm going to offer the media story related

23    to this -- and again, we've provided the attachments -- which

24    is Exhibit 332.

25          And again, the defense maintains its objections to news

```
 1  articles and other things, but given, given the Court's --

 2          THE COURT:  Which --

 3          MR. SPIRO:  This is 332.

 4          THE COURT:  And I overruled the objection, I believe.

 5          MR. SPIRO:  Correct.

 6          THE COURT:  All right.  It is admitted.

 7       (Trial Exhibit 332 received in evidence.)

 8       (Document displayed)

 9  BY MR. SPIRO

10  Q    So while this is up on the screen, you know, in that email

11  you had talked about how you didn't want to take Yasir's calls.

12       Do you remember conversations you had with Yasir in the

13  days that followed -- 10th, 11th, 12th -- the "Am considering"

14  tweet?  Do you remember those conversations?

15  A    It has been five years, so --

16  Q    Okay.

17  A    So mostly yes, but not with precision after five years.

18  Q    Okay.  And did you know what was going on in the Kingdom

19  of Saudi Arabia in the time that you and Yasir were talking

20  after the "Am considering"  tweet?

21  A    I don't know the inner workings of Saudi Arabia.

22  Q    You were asked a question about whether or not Yasir would

23  have been concerned about litigation.  So, were you aware one

24  way or the other if an announcement had been made, as of that

25  date, that there would be litigation?
```

1    **A**    For -- the unfortunate reality is that if you are a

2    publicly-traded company, litigation is a guarantee.  There --

3    you know.  We live in a litigious world.

4    **Q**    In the blog post, on August 13th, right, we're -- that the

5    jury's seen, where you say what you say in that email, that he

6    said that he had the full support of the Crown Prince?  Do you

7    remember the blog post?

8    **A**    Yes.  That is what he told me.

9    **Q**    Yeah.  Do you know whether or not Yasir was having any

10   issues with the Crown Prince as of this date?

11   **A**    I -- I don't know.

12   **Q**    You were shown some of these text messages between you and

13   Yasir.  But you weren't shown all of them.  And you said

14   something, and I just want to make sure that this is clear as I

15   turn to Exhibit 121, which is --

16        (Document displayed)

17   **Q**    -- were you afraid of being outed as a liar?  Or were you

18   afraid of being falsely accused of being a liar when you are

19   fighting or arguing or discussing this with Yasir?

20   **A**    The latter.  I was concerned that it would appear -- it

21   would appear that I was not truthful, when in fact, I was

22   100 percent truthful.

23   **Q**    Okay.  And I want to turn now, and again we just looked at

24   the article on August the 12th, saying:  Saudi fund in talks to

25   invest in Tesla buyout deal.  Saudi fund in talks to invest in

1    Tesla buyout deal.

2        We are now going to look at 121, and you were shown some

3    messages.  If we could go to 8/12 at 26 (As read):

4            "What the hell is going on here?  This is

5            false."

6        MR. SPIRO:  Can we blow that message up?  Again, I'm

7    on August the 12th.

8        (Document displayed)

9    BY MR. SPIRO

10   Q    Okay.  And you were shown that message, right?  And if we

11   could go down to the response from Yasir at 6:59:

12           "It's not true."

13       And just for the Court and jury's benefit, there is also

14   texts between these texts.  These happen to be between you and

15   Egon Durban?

16   A    Yes.

17   Q    Okay.  But the next text from Yasir, when you say "This is

18   false," --

19       MR. SPIRO:  You can highlight that.

20       (Document highlighted)

21   BY MR. SPIRO

22   Q    He says:

23           "It's not true."

24   A    Yes.  He is confirming that the article is false.

25   Q    Okay.  And you go down -- if we could go down to the next

1   article.  And you and Yasir going back and forth.  There's a

2   Bloomberg link, right?

3        (Document highlighted)

4   **Q**   I already asked this, Mr. Musk, but there was a bit of a

5   media storm at the time, regarding all this?

6   **A**   "A media storm" would be an understatement.  A media

7   hurricane.

8   **Q**   Okay.  And you weren't asked about this message when

9   plaintiff's counsel was asking you questions, but you write

10  (As read):

11              "This is an extremely weak statement and does

12              not reflect the conversation we had at Tesla.

13              You said you were definitely interested in

14              taking Tesla private and had wanted to do so

15              since 2016.  You also made it clear that you

16              were the decision-maker..."

17       Did you tell that to Yasir?

18  **A**   Yes.  That is exactly what happened.

19  **Q**   Okay.

20  **Q**   Okay.  And then finally, I just want to go to 17:14.  And

21  if we could -- if we could, 17:29, I guess we can start at.

22  Plaintiff showed you this.  Right?

23       (Document highlighted)

24  **Q**   This was a large part of your examination on

25  cross-examination.  Do you remember this?

1    **A**    Yes.

2    **Q**    Okay.  But the jury hasn't seen the messages after this.

3          **MR. SPIRO:**  Can we go down so that we can highlight

4    those?  I guess they are all on the screen, so we can just

5    highlight the messages going down.

6    **BY MR. SPIRO**

7    **Q**    And after -- the jury hasn't seen any of these; they just

8    saw the top one.  Afterwards you say (As read):

9              "Tesla is a publicly-traded company and there

10             is detailed information in our earnings

11             newsletter and Q & A afterward."

12   **A**    Yes.

13   **Q**    And then you say:

14             "You bought 5% based on that."

15   **A**    That's correct.  I think this is -- this is a very

16   important point.  That when I first met with Yasir, he said --

17   I said:  Well, if you're interested in Tesla, you should buy

18   stock in the public market.  You should buy 5 percent in the

19   public market.  And he said he would.

20         And there was no -- there was no written agreement, nor

21   was there any discussion of price.  And he went ahead and

22   bought 5 percent of the company, again, with no written

23   agreement and no discussion of price.

24         So therefore, it is reasonable to assume that that is how

25   he will operate in the future.

**MUSK - CROSS / SPIRO**

1   Q    After you tell Yasir that he doesn't need financials, he

2   responds, same minute, okay, and he writes:

3             "Details on how we can take the company

4             private."

5        Did I read that right?

6   A    Yes.  And that's very important.  He says "how," not if we

7   can take the company private, but simply the mechanics of what

8   is -- of doing so.  The -- there was no "if" there.

9   Q    In any of these messages, does he then ask you for

10  financials?

11  A    I don't think so.  Well, the financials are all public

12  information.

13  Q    In any of these messages, does he ask you anything about

14  price in any of these messages?  Does he say:  That price, I

15  can't do -- does he say that?

16  A    No.

17  Q    (As read)

18            "Details how about we can take the company

19            private."

20       And then he says:

21            "That's what we agreed on.  What is the

22            required percentage and so on."

23       And can you just remind -- did I read that right?

24  A    Yes.

25  Q    Okay.  And can you just remind the jury that -- whether or

1   not, as of July 31st, you could have possibly known how many

2   shareholders would roll.

3       Did you know that on July 31st?

4   **A**   No.  It is unknowable until you ask the shareholders.

5   **Q**   And if we could keep going to --

6   **A**   I may add, we are talking about the Kingdom of Saudi

7   Arabia here.  They have more than enough funding to take Tesla

8   private, several times over.

9   **Q**   After these text messages that we have been discussing

10  with the jury, did -- do you know whether Yasir called -- a

11  week or so later, called your financial advisers, Egon Durban,

12  and said: Hey, wanna still invest in the take-private?

13  **A**   Yes.  They confirmed their interest in a take-private.

14          **MR. SPIRO:**  And if we could just pull up Exhibit 53.

15  The blog post.

16      (Document displayed)

17          **MR. SPIRO:**  And if we could just go to the "Funding

18  secured" section.

19      (Document enlarged)

20          **THE WITNESS:**  Exactly.

21  **BY MR. SPIRO**

22  **Q**   Was this true?

23  **A**   I think this was both true and -- true and precise.

24          **MR. SPIRO:**  And if we could go to the last sentence in

25  the second paragraph.

1          (Document highlighted)

2     **BY MR. SPIRO**

3     **Q**    And in this blog post you are referring -- just to make

4     sure it's clear for the jury, you were referring to the meeting

5     with the PIF on July 31st, right?

6     **A**    Yes.

7     **Q**    Okay.

8     **A**    Yasir told me that he was the decisionmaker, that he had

9     confirmed with the Crown Prince, and no other decisionmakers

10    were needed.  And they wished to move forward as quickly as

11    possible.  That's why he called me so many times.

12    **Q**    And you don't know -- did you ever speak directly to the

13    Crown Prince at that time?

14    **A**    I've never spoken to the Crown Prince.

15         **MR. SPIRO:**  I would offer Exhibit 179.  That's not in

16    evidence yet.  It's a -- I don't believe there is an objection.

17         **MR. PORRITT:**  No objection, Your Honor.

18         **THE COURT:**  All right.  Admitted.

19     (Trial Exhibit 179 received in evidence.)

20         **MR. SPIRO:**  And let's use Exhibit 254, that's already

21    in evidence.  179's the Silver Lake presentation.  254 is the

22    Goldman presentation.

23     (Document displayed)

24    **BY MR. SPIRO**

25    **Q**    Again, in the days that followed, you can -- did you

 1   continue to meet with Egon Durban, Silver Lake, Dan Dees,

 2   Goldman?

 3   **A**   Yes.

 4   **Q**   And did they make presentations to you, August 10th or

 5   thereabouts?

 6   **A**   Yes.

 7   **Q**   Okay.

 8       **MR. SPIRO:**  If we could go to Page 5 of this

 9   presentation.

10       (Document displayed)

11       **MR. SPIRO:**  And if we could go to Alternative 2, which

12   I think is what was being discussed with plaintiff.  And if we

13   could blow that, the middle one up, and if we could blow that

14   up even more, potentially.

15       (Document displayed)

16       (Document enlarged)

17       **MR. SPIRO:**  Okay.

18   **BY MR. SPIRO**

19   **Q**   And do you see that on the -- it says (As read):

20          "Funding before existing roll"

21   And it's under 50 billion?

22   **A**   Sorry, yes, 49.8.

23   **Q**   Right.

24       And then it said -- it says at the bottom, "Incremental"

25   -- it gives then some percentages about funding existing before

1    the roll, 49.8; it gives estimates of roll?

2         Do you see that?

3    **A**    Yes.

4    **Q**    And it says "Incremental financing needed."  Do you see

5    that?

6    **A**    Yes.

7    **Q**    This incremental financing needed, okay -- and by the way,

8    20 versus a little under 50 is -- it seems like 60-ish, 60,

9    62 percent of this, they're saying roll?  Is that about right?

10   A little over 60 percent?

11   **A**    I think they're -- yes.  They're underestimating in this

12   case how many would roll.  I think the incremental financing

13   need would actually be much less than 20 billion.

14   **Q**    Sure --

15   **A**    The conservative estimate.

16   **Q**    Sure.  No question.  But on this, I just want to make sure

17   I get a clean answer.

18        Again, they're saying of the 49-ish, about 62 percent or

19   so would roll.  Right?  Which is why you're left with 20.  Is

20   that right?

21   **A**    Yes.

22   **Q**    Now, of the 20, the conservative estimate of how many

23   would roll, this would include zero additional capital from

24   you?

25   **A**    Yeah.

**MUSK - CROSS / SPIRO**

1   **Q**    Zero from Ron Baron?

2   **A**    Right.

3   **Q**    Zero from Larry Ellison?

4   **A**    Right.

5   **Q**    Zero from Silver Lake?

6   **A**    Right.  That --

7   **Q**    Zero from the PIF?

8   **A**    Right.  That's why I'm saying it's -- this 20 billion

9   number is actually extremely conservative.  The real number

10  would be much less than that.  And, in fact, it would be

11  over-subscribed.

12  **Q**    Zero from bank financing, bank debt.

13  **A**    And, and also, as I mentioned before, I could do it with

14  my SpaceX ownership as well.  That would be a huge contributor.

15  **Q**    Zero --

16  **A**    But I don't think it would have been necessary to use my

17  SpaceX stock.

18  **Q**    Sure.  I'm just talking about even their conservative case

19  before we include any of these things.

20  **A**    Yes.

21  **Q**    It has zero increase from any single existing investor.

22  Zero increase.  Is that a yes?

23  **A**    Yes.

24  **Q**    Okay.  So, we have the blog post of the 13th.  And let's

25  just go very, very quickly to -- back to the text messages,

MUSK - CROSS / SPIRO

```
 1   121, Page 89.
 2        (Document displayed)
 3   Q    All right.  So at this point -- by the way, just to make
 4   sure that we are clear on all of this.  At this point, you are
 5   still just considering, right?
 6   A    Yeah.  Yes.
 7        MR. SPIRO:  And if you go to Page 9.
 8        (Document enlarged)
 9        MR. SPIRO:  And if we could go to Egon Durban at the
10   bottom there, we're on the 11th of August.
11   BY MR. SPIRO
12   Q    Remember, we talked about Dan Dees and what he told you on
13   the 10th.  Now we're on the 11th.  And Mr. Durban is saying to
14   you:
15            "Our largest investor..."
16        It's redacted.
17            "...reached out to us today proactively on
18            your company.  We said nothing.  This can be
19            done."
20   A    Yes.
21   Q    Back to -- was there any equivocation in your mind when
22   you received a text from Egon Durban of Silver Lake, and he
23   told you on the 11th, "This can be done"?
24        MR. PORRITT:  Objection.  Leading, Your Honor.
25        THE COURT:  Sustained.
```

1            MR. SPIRO:  Can we pull up 53, please.

2        (Document displayed)

3    BY MR. SPIRO

4    Q    Now, you testified that there was a -- "a media storm"

5    would be an understatement.  We looked at the Ron Baron email.

6        Did you know whether or not at the time of this blog post,

7    questions, media reports were circling about this possible

8    transaction?

9    A    I'm sorry, what, what point in time?

10   Q    We're now -- the blog post that we're talking about, the

11   second blog post, is on the 13th.  Okay.

12       (Counsel writes on easel)

13   A    Yes, okay.

14   Q    And at the time, you testified that, I think in words or

15   substance, that a media storm is an understatement.

16       As of August 13th, you know, one, two, three business days

17   after the "Am considering" tweet, was the media and questions

18   still circling?

19   A    Media hurricane, yes.

20   Q    And before market opened on the 13th, did you issue a blog

21   post?

22   A    Yes.

23           MR. SPIRO:  And if we could go down to -- we are not

24   going to go through this whole thing, for time's sake, but if

25   we could go down to the paragraph "Therefore, reports that...'.

```
 1          (Document displayed)

 2   BY MR. SPIRO

 3   Q    In this blog post, are you answering a variety of

 4   questions and adding information?

 5   A    Yes.

 6   Q    Okay.  We are going to deal with one.

 7              "Therefore, reports that more than

 8              70 billion..."

 9        Do you see that?

10        MR. SPIRO:  And this is being published to the jury?

11        (Members of the Jury indicate in the affirmative)

12        THE COURT:  Maybe you can highlight -- I just see one

13   big page.

14        MR. SPIRO:  That's what I was asking my colleagues, if

15   they could, just to make it easier.

16        (Document displayed)

17        MR. SPIRO:  And then we're also going to talk about

18   Mr. Musk's tweets on August 13th.

19        (Document displayed)

20   BY MR. SPIRO

21   Q    There we are.  And you say:

22              "Therefore, reports..."

23        Okay.  What are you referring to when you say "reports"?

24   A    Media stories.

25   Q    Okay.
```

**MUSK - CROSS / SPIRO**

```
 1                  "...that more than 70 billion would be needed

 2              to take Tesla private dramatically overstate

 3              the actual capital raise needed.  The 420

 4              buyout price would only by used for Tesla

 5              shareholders who do not remain with our

 6              company if it is private.  My best estimate

 7              right now is that approximately two-thirds of

 8              shares owned by all current investors would

 9              roll over into a private Tesla."

10      Do you see that?

11  A    That is correct.

12  Q    And in your cross-examination, you know, you -- you know,

13  you were said to be untruthful when you said your best

14  estimate.  Do you remember those points in cross-examination?

15  A    Yes.

16  Q    And as the jury has now seen, a day, a business day

17  earlier, Goldman Sachs, top investment banker in the world, had

18  estimated 62 percent of shares that would roll.  And you are

19  saying in this blog post, two-thirds of shares.  So you are

20  saying 66 percent.

21  A    Yes.  And, in fact, I would say the Goldman estimate was

22  conservative, it was on the low side, because not only would

23  roughly two-thirds of shareholders roll their shares into Tesla

24  as a private company, but I'm confident that many would have

25  increased their stake.
```

1    **Q**    Okay.  Well, I don't know if you know, you were called a

2    liar about this.  But your estimate -- Goldman's estimate, 62,

3    your estimate, your best estimate in the blog -- this is

4    Elon -- is 66.

5         (Counsel writes on easel)

6         **MR. SPIRO:**  I'm not going to try to move this.

7    Well -- no.  Not going to --

8         **THE WITNESS:**  I say "approximately two-thirds," so as

9    not to -- you know.  Hard to -- anyway.  We were basically

10   saying the same thing.

11        (Counsel writes on easel)

12        **MR. SPIRO:**  So again, on the 10th, Goldman Sachs

13   estimates 62.  On the 13th, when the market opens, you estimate

14   66.

15        Exhibit 361.

16        (Document displayed)

17        **THE COURT:**  Are you asking 361 to be admitted?

18        **MR. SPIRO:**  Yes.  I was just checking my notes,

19   myself.  This has not been admitted.  I would be offering 361.

20        **MR. PORRITT:**  No objection, Your Honor.

21        **THE COURT:**  All right.  Admitted.  You may publish.

22        (Trial Exhibit 361 received in evidence.)

23        **MR. SPIRO:**  And if we can just blow that up so the

24   jury can see.

25        (Document enlarged)

1   **BY MR. SPIRO**

2   **Q**   On this, on the 13th, again, there's a tweet and a blog

3   post.  Do you intend for the blog post and the tweet to be read

4   together?

5   **A**   Yes.

6   **Q**   Okay.  And you say:

7           "I'm excited to work with Silver Lake and

8           Goldman Sachs as financial advisers..."

9       Okay.  And we talked about meetings, presentations,

10  conversations, the emails.

11      Mr. Musk, are you aware that the plaintiff sued you for

12  fraud based on this tweet?

13          **MR. PORRITT:**  Objection, Your Honor.  I'm not sure of

14  the purpose of this question.  Seems improper.

15          **THE COURT:**  Sustained.

16  **BY MR. SPIRO**

17  **Q**   Are you -- when you sent this tweet, okay, did you

18  technically have a signed engagement letter with Goldman Sachs

19  or Silver Lake?

20  **A**   No.  But they had told me they were excited to work with

21  me on this transaction.  They're -- yeah.

22  **Q**   Okay.

23  **A**   This is -- this is -- they were very excited to work with

24  me, as their emails clearly indicate.

25  **Q**   Okay.  And did you run this statement by them before you

**MUSK - CROSS / SPIRO**

1    issued it?

2    **A**    No.  It's factually true.

3    **Q**    Did you intend to deceive shareholders when you said that

4    you were working with them, even though you didn't have a

5    signed engagement letter, Mr. Musk?  Were you trying to deceive

6    your investors?

7    **A**    No, I -- I already was working with them.  That is

8    factually true.

9              **MR. SPIRO:**  Exhibit 101.

10   **BY MR. SPIRO**

11   **Q**    And we're almost done.  This is in evidence.  These are

12   the board minutes.  We could pull up the attendee list.

13       (Document displayed)

14   **BY MR. SPIRO**

15   **Q**    Again, others present, there's lawyers and advisers,

16   right?  And that first name, Deepak Ahuja.

17       (Document highlighted)

18   **Q**    Was he at that meeting with you on July 31st with the PIF?

19   **A**    Yes, he was.

20             **MR. SPIRO:**  And if we could go down.

21   **BY MR. SPIRO**

22   **Q**    Mr. Musk said on Point 1, okay:

23             "He noted that there was more than enough

24             funding for any proposed transaction..."

25       Did you say that at the board meeting?

1   **A**   Yes.

2   **Q**   Was that true?

3   **A**   Yes.

4   **Q**   And if we could go down to Page 3, the board discussed

5   this with your financial advisers (As read):

6                "...assuming they would need to raise

7                approximately 30 billion to finance the

8                transaction.  The financial advisers

9                emphasized to the board that although their

10               work was preliminary, the funding was

11               available from a variety of sources."

12  **A**   Yeah.

13  **Q**   (As read)

14               "The Goldman Sachs and Silver Lake

15               representatives indicated that they had

16               substantial experience with these types of

17               transactions, and while taking Tesla private

18               would be unique, there was more than enough

19               interest and funding to execute on such a

20               transaction."

21       Did I read that right?

22  **A**   Yes.

23  **Q**   Was that what they said at the board meeting?

24  **A**   Yes.  They made it clear that there was -- it was quite

25  literal.  Not -- not merely that there would be enough funding,

1    but that there would be far more than enough funding.

2    Over-subscribed.

3    **Q**    So fair to say, just like you said on August 7th, funding

4    wasn't an issue?

5    **A**    Funding was absolutely not an issue.  Quite the opposite.

6    More funding was available than was necessary for the

7    transaction.

8             **MR. SPIRO:**  229.

9    **BY MR. SPIRO**

10   **Q**    Did you eventually announce the following day that Tesla

11   would be staying public?

12            (Document displayed)

13   **A**    Yes.

14   **Q**    Why, with the available funding, a possible structure that

15   would work, why did you remain public?

16   **A**    After talking to a number of the investors, especially the

17   small -- smaller investors, they said that they would prefer

18   that Tesla remain public.  And I -- I felt it was important to

19   be responsive to their wishes.

20   **Q**    We are not going to go through this whole document either,

21   but if we could go to the last paragraph, sort of where this,

22   you know, two-week or so consideration ended.

23            (Document enlarged)

24   **Q**    After considering --

25   **A**    Yeah.

1          **MR. SPIRO:**  Yeah, can we go down to the last

2    paragraph, please?

3         (Document highlighted)

4          **MR. SPIRO:**  And, further?  Can you go down a page?

5         (Document displayed)

6    **BY MR. SPIRO**

7    **Q**    (As read)

8              "Moving forward, we will continue to focus on

9              what matters most:  Building products that

10             people love and that make a difference to the

11             shared future of life on Earth."

12        Did you say that?

13   **A**    Yes.

14   **Q**    And you talked about Model 3?

15   **A**    Yes.

16   **Q**    And then, can you just read the last part.

17   **A**    The "Thank you" part?

18   **Q**    Yeah.

19   **A**    (As read)

20             "Thank you to all of our investors, customers

21             and employees for the support you have given

22             our company.  I'm incredibly excited to

23             continue leading Tesla as a public company.

24             It is a privilege."

25   **Q**    And did you mean what you said?

**MUSK - CROSS / SPIRO**

 1   **A**    Absolutely.

 2   **Q**    Throughout this entire process -- which, again, we're

 3   talking about this, you know, the two-week consideration.

 4        And by the way, how long, since your first involvement in

 5   Tesla, how many, you know, decades, years, have you been

 6   involved in Tesla from now, from the very beginning?

 7   **A**    It's been almost 20 years.

 8   **Q**    Okay.  So we're talking this two weeks, the "I am

 9   considering," in 20 years.

10        (Counsel writes on easel)

11   **Q**    Okay.  During those two weeks that we have been talking

12   about, did you ever try to deceive your investors?

13   **A**    No.

14   **Q**    Did you ever sell a single share?

15   **A**    Up until that point, up until that point, no.  Um --

16   **Q**    Okay.  Now --

17   **A**    Well, sorry.  I think there might have been a small sale

18   of shares at the -- at the IPO in order to not have debt.

19   But --

20   **Q**    I'm asking you only about the two-week "Am considering"

21   period.

22   **A**    No, no.  No shares were sold anywhere around that period.

23   **Q**    Okay.  Now, you were also asked about a *New York Times*

24   article.  Do you know how many thousands of articles came out

25   during that two weeks about this?

**MUSK - CROSS / SPIRO**

1    **A**    Many thousands of articles.

2    **Q**    What about like blogs or tweets?  Do you know how many?

3    Tens of -- do you have any idea?

4    **A**    Tens of thousands, I --

5    **Q**    Okay.

6    **A**    Yeah.

7    **Q**    Well, they showed you a *New York Times* article, or they

8    are asked you about a *New York Times* article, but they didn't

9    enter it into evidence.

10           **MR. SPIRO:**  So with all of my same objections,

11   including that relevance, at this time, if the Court's going to

12   let this exhibit in, we would admit it so I can ask questions.

13           **THE COURT:**  The *New York Times* article?

14           **MR. SPIRO:**  Yeah.  Exhibit 171.

15       (Reporter clarification)

16           **THE COURT:**  The *New York Times* article --

17           **MR. SPIRO:**  Right.

18           **THE COURT:**  -- is what he is asking about, 171.  I

19   thought I had had already indicated that was -- hasn't that

20   already been admitted?

21           **MR. SPIRO:**  Has not been.  So I'm -- again, I want to

22   make sure that I'm maintaining my objections.  But the Court

23   asked me if I'm calling Mr. Musk back for a fourth day later in

24   my case.  And since I have him here, I thought I would ask him

25   about this.

```
 1              THE COURT:  Okay, it's admitted.

 2          (Trial Exhibit 171 received in evidence.)

 3              MR. SPIRO:  Okay.  If we could just blow up the title.

 4          (Document displayed)

 5          (Document enlarged)

 6   BY MR. SPIRO

 7   Q    (As read)

 8              "Elon Musk Details 'Excruciating' Personal

 9              Toll Of Tesla Turmoil."

10        Mr. Musk, was 2018, I think you already said this.  Was it

11   a long year?

12   A    Yes.

13   Q    And I'm not going to make you relive all this, but it says

14   (As read):

15              "This past year has been the most difficult

16              and painful year of my career.  It was

17              excruciating."

18        Goes on to say:

19              "He" -- meaning you -- "choked up multiple

20              times, noting that he nearly missed his

21              brother's wedding this summer and spent his

22              birthday holed up in Tesla's offices as the

23              company raced to meet elusive production

24              targets on a crucial new model."

25   A    Yes.  That is when I was literally living in the factory.
```

MUSK - CROSS / SPIRO

1    **Q**    (As read)

2              "It's not been great, actually.  I've had friends

3         come by who are really concerned."

4         Did you say those things or things like them to the *New*

5    *York Times* reporter when you were on the phone with them?

6    **A**    Yes.

7    **Q**    Okay.  Did you ever tell them that this whole "Am

8    considering" was a hoax and a lie you created to deceive

9    investors?

10   **A**    Not at all.

11   **Q**    Did you ever tell them that there was no funding you were

12   in touch with, funding was far from -- far from secured?

13   **A**    No.

14   **Q**    And --

15   **A**    I mean -- yeah.

16   **Q**    That toll -- that toll that that took on you that year,

17   you know, has that toll stayed with you, Mr. Musk?

18              **MR. PORRITT:**  Objection, Your Honor, relevance.

19              **THE COURT:**  Sustained.

20   BY MR. SPIRO

21   **Q**    Let me ask you this, Mr. Musk:  In your 35-year business

22   career since you came over here with nothing, have you ever

23   tried to deceive your shareholders or investors?

24   **A**    No, I've never done so.  That -- the reason that it is

25   easy for me to find investors' support is because they know

**PROCEEDINGS**

 1   that I have always been truthful.

 2              **MR. SPIRO:**  I have no further questions at this time.

 3              **THE COURT:**  All right.  Thank you.  Redirect?

 4              **MR. PORRITT:**  Your Honor, looking at the time, two

 5   minutes past 10:00.  Coming up to 10:00.

 6              **THE COURT:**  All right.

 7              **MR. PORRITT:**  Perfect for a break now.

 8              **THE COURT:**  All right.  I take it your redirect is

 9   going to take more than two minutes.

10              **MR. PORRITT:**  More than two minutes, but hopefully not

11   too much longer.

12              **THE COURT:**  All right.  Why don't we take our

13   scheduled break for 20 minutes.

14       The usual reminder:  Do not discuss anything about this

15   case with anyone, including amongst yourselves.  Do not listen

16   or read of any coverage.  Do not do any research.  And do not

17   form any opinions until this case is submitted to you for

18   deliberation.

19       We will see you in 20 minutes.

20              **THE COURTROOM DEPUTY:**  All rise for the jury.

21       (Jury excused)

22       (The following proceedings were held outside of the

23   presence of the Jury)

24              **THE COURT:**  All right.  See you in 20.

25              **THE COURTROOM DEPUTY:**  Court is in recess.

1          (Recess taken from 9:59 a.m. to 10:22 a.m.)

2          (The following proceedings were held outside of the

3      presence of the Jury)

4              **THE COURT:**  Okay, ready to bring the jury back?

5              **THE COURTROOM DEPUTY:**  I am.

6              **THE COURT:**  All right.

7          By the way, we are still waiting for the redacted

8      Exhibit 21 to be submitted to the Court, because we are

9      supposed to post that on our server.

10             **MR. SPIRO:**  Yes, Your Honor.  That will be done in the

11     next, I would expect, day or so.

12             **THE COURT:**  Okay.  Thank you.

13         (A pause in the proceedings)

14         (The following proceedings were held in the presence of

15     the Jury)

16             **THE COURTROOM DEPUTY:**  All rise for the jury.

17             **THE COURT:**  All right, please be seated.  Welcome

18     back, ladies and gentlemen.

19         We are going to proceed with the redirect examination by

20     Mr. Porritt of Mr. Musk.

21             **MR. PORRITT:**  Thank you, Your Honor.

22                       <u>**REDIRECT EXAMINATION**</u>

23     BY MR. PORRITT

24     **Q**    Good morning, Mr. Musk.

25     **A**    Good morning.

MUSK - REDIRECT / PORRITT

1   **Q**   I want to take you to a -- you recall testifying in

2   response to questions from your counsel regarding meetings you

3   had with Dan Dees and Egon Durban following your August 7th

4   tweets?

5       Do you recall that testimony?

6   **A**   Yes.

7   **Q**   And you testified regarding receiving presentations from

8   both Goldman Sachs and Silver Lake during that process,

9   correct?

10  **A**   I mean, I saw what everyone else saw.

11  **Q**   Okay.  Well, you received a presentation from Silver Lake

12  August 10th, 2018, correct?

13  **A**   If you wish to present the document, I -- if there is more

14  to it that --

15  **Q**   Fair enough.

16  **A**   I'm not sure what you're getting at.

17      **MR. PORRITT:**  Can we bring up Exhibit 179.

18      (Document displayed)

19      **MR. PORRITT:**  Just the first page for now.

20  **BY MR. PORRITT**

21  **Q**   Do you see that?

22  **A**   I -- I see it says "Project Turbo."

23  **Q**   Okay.  And "Turbo" was Silver Lake's code name for Tesla?

24  **A**   I assume so.

25  **Q**   Okay.

```
 1              MR. PORRITT:  Is this being published to the jury?

 2              THE COURTROOM DEPUTY:  It is.

 3              MR. PORRITT:  Okay.  Thank you.

 4              THE COURTROOM DEPUTY:  You're welcome.

 5    BY MR. PORRITT:

 6    Q    If you can turn to Page 29.  So this is dated August 10,

 7    2018, and Mr. Spiro had his fancy calendar.  That's the Friday

 8    after your tweets, correct?

 9    A    I -- I assume so.

10    Q    Okay.

11    A    Bring the calendar up, if that would be helpful.

12    Q    If we can turn to Page 29.  This is part of Silver Lake's

13    presentation to you on August 10th.  You notice the first point

14    on that presentation, which is that they plan to submit a

15    formal proposal to the board following arrangement of committed

16    financing.  Do you see that?

17    A    Yes.

18    Q    That hadn't been done by August 10th, had it?

19    A    No.  Because we would need to talk to the investors to

20    find out who would be staying in Tesla as a private company

21    versus a public company.  So that would require talking to --

22    finding out who wished to stay.

23    Q    And isn't it true that you never, neither Silver Lake nor

24    Goldman Sachs, ever obtained committed financing from anybody

25    in connection with the go-private transaction.  Isn't that
```

**MUSK - REDIRECT / PORRITT**

1  correct?

2  **A**   I don't think that's an accurate assessment, no.  I think

3  you're wrong.

4  **Q**   You -- all this talk about potential -- about Ron Baron

5  funds, did you ever get committed financing from Ron Baron

6  funds?

7  **A**   I mean, he -- he -- Ron Baron is a -- someone who sticks

8  to what he says.  And if he says he's going to do it, he's

9  committed.

10  **Q**   So, did he -- how much money -- how much financing did Ron

11  Baron commit?

12  **A**   I don't recall the exact number.

13  **Q**   Did you commit any number?

14  **A**   He committed to financing the transaction.

15  **Q**   He didn't commit any amount.  He didn't commit one dollar

16  that you could actually point to on a piece of paper, did he?

17  **A**   No, he committed to the financing.

18  **Q**   Okay.  But no amount of financing was committed by Ron

19  Baron, for instance?

20  **A**   He committed to the financing.  As did the Saudi PIF.

21  **Q**   Right.  Okay.  And as you talked about with the Saudi PIF,

22  you never discussed an amount of funding you needed from the

23  Saudi PIF either, did you?

24  **A**   I think we had some discussions.  But they -- we're

25  talking about the Kingdom of Saudi Arabia here.  They could

1    literally buy Tesla several times over.

2    **Q**    All right --

3    **A**    This is not a large amount of money for them.

4    **Q**    Mr. Musk, the question was:  You didn't talk a specific

5    amount of funding with the Saudi PIF, did you?

6    **A**    I believe we did have some discussion of amounts.  And

7    they're fully aware; they were already an investor in Tesla.

8    They had 5 percent of the company.  And they are sophisticated

9    investors.  So they knew what would be required to take Tesla

10   private.  And they committed to do so.

11   **Q**    You didn't -- you testified yesterday that the July 31st

12   meeting with PIF, you never discussed an actual amount of

13   funding.  Are you changing your testimony now?

14           **MR. SPIRO:**  Objection to that characterization.

15           **THE COURT:**  I don't think he's changed his testimony.

16   He's not testified to -- why don't you ask again.  Ask the

17   question.

18   **BY MR. PORRITT**

19   **Q**    You testified yesterday that at the July 31st meeting with

20   the PIF, you did not discuss an actual amount of funding.  Do

21   you recall that testimony?

22   **A**    Um, there was some discussion of the value of the company,

23   but in order to say what the exact amount would be, we would

24   need to first talk to other investors to see who would remain.

25   But as for whether the Saudi PIF was committed to the take

1   Tesla private, they absolutely were.

2       It really feels like you're trying to use the word

3   "commitment" in a way that's not intended.

4   Q   The question is here is you did not discuss with the

5   PIF -- and I'm asking this question now for about the fourth

6   time -- an actual amount of funding on July 31st.  It's a very

7   simple question.

8           THE COURT:  And I would like you to answer that

9   question first, then I'll allow you to answer.  It's a

10  yes-or-no response.  And I think the word is not "commit," you

11  said "discuss" a specific amount.  That's your question?

12          MR. PORRITT:  Correct.  Yes, Your Honor.

13          THE COURT:  Was a specific dollar amount discussed.

14          THE WITNESS:  I mean, we discussed broadly what it

15  would take to have Tesla go private.  But what was -- the

16  salient point is that they gave an unequivocal commitment.

17  Essentially, no matter what it takes.

18          MR. PORRITT:  Your Honor --

19  BY MR. PORRITT

20  Q   Well, that's still not answering my question, though, is

21  it, Mr. Musk?  I'm not talking about their commitment to the

22  concept of going private.

23      I'm asking:  Did you discuss an actual amount of funding

24  needed from the PIF at the July 31st meeting?  That's an easy

25  yes-or-no question.  Can you answer it, please?

**MUSK - REDIRECT / PORRITT**

1   **A**   Effectively, yes.

2   **Q**   Effectively, yes.

3   **A**   Yes.

4   **Q**   What dollar amount of funding did you discuss with the PIF

5   on the July 31st meeting?

6   **A**   There would be an amount -- you -- there's an amount

7   that's needed to take the company private, which would be all

8   investors who did not participate.  Yeah.  Which would be the

9   difference between the committed investors and those who --

10  those who wished to stay with Tesla private, and those who did

11  not.

12      But the -- but I think you're glossing over the salient

13  point here, which is that they committed, no matter what it

14  took.

15  **Q**   You're glossing over my question, which is:  You didn't

16  know what number of -- amount of funding you needed on

17  July 31st.

18          **THE COURT:**  Why don't you ask the question in terms

19  of:  Was a specific number discussed?  Not concepts.  Number.

20          **THE WITNESS:**  Not -- not a specific number because --

21          **MR. PORRITT:**  Thank you.  I think you've answered the

22  question now.  Thank you.

23          **THE COURT:**  Next question.

24  BY MR. PORRITT:

25  **Q**   And wasn't that true for all the investors that you spoke

1    to in -- regarding -- in response to questions from your

2    counsel regarding Larry Ellison, you didn't discuss a specific

3    number with Larry Ellison either, did you?

4    A    No, but I knew what --

5    Q    Thank you.

6    A    Okay.

7    Q    The major investor in Silver Lake that Mr. Durban referred

8    to in a text message, you didn't have a specific number for

9    his -- their participation either, did you?

10   A    No.

11   Q    All right.  You didn't have a specific number from Ron

12   Baron, did you?

13   A    No.

14   Q    You didn't have a specific number, in fact, from any of

15   the potential participants in funding a going-private

16   transaction, did you?

17   A    Well, I mean, I certainly had one for myself.

18   Q    What do you mean by that?

19   A    I mean, certainly I would be committed.  I would -- my

20   shares would be there.

21   Q    Your Tesla shares, you mean?

22   A    Yes.

23   Q    Okay.  Thank you.

24   A    Yeah.

25   Q    So if we go back to 254.

**MUSK - REDIRECT / PORRITT**

1        (Document displayed)

2            **MR. PORRITT:**  And I think either Page 4 or 5 of the

3    exhibit.

4        (Document displayed)

5            **MR. PORRITT:**  Go forward again, sorry.  One more, one

6    more.

7        (Documents displayed)

8            **MR. PORRITT:**  You know, strike that.  Sorry.  I don't

9    have the -- I have the wrong reference for the exhibit.

10   **BY MR. PORRITT**

11   **Q**    Now, your counsel, Mr. Spiro, showed you some

12   correspondence with Dan Dees at Goldman Sachs.  Correct?

13   **A**    Yes.

14   **Q**    And Dan Dees has essentially been one of your investment

15   bankers for many years, correct?

16   **A**    Dan Dees is, um, one of the -- he heads-up -- yes, he has

17   been, yes.

18   **Q**    Okay.  He's assisted on those financings we talked about

19   in your testimony, it seems a long time ago now, the money

20   you've raised with Tesla, correct?

21   **A**    Dan Dees and Goldman have raised -- it might be tens of

22   billions of dollars at this point for Tesla.

23   **Q**    And for those services, Goldman Sachs -- you've paid

24   Goldman Sachs or Tesla has paid Goldman Sachs millions of

25   dollars in fees.

MUSK - REDIRECT / PORRITT

1        Correct?

2   **A**    It is normal to pay fees for investment bankers.

3   **Q**    Okay.  And you've paid them to Goldman Sachs for them

4   raising money for Tesla, correct?

5   **A**    It's like buying a house.  You always pay fees to the --

6   you know, the agent.

7   **Q**    And if that going-private transaction went ahead, Goldman

8   Sachs would receive a large fee if it were successful, correct?

9   **A**    They would receive the standard fee, just like -- like I

10  said, like a real estate agent selling a house would.

11  **Q**    Okay.  Once all the paperwork was completed, correct?

12  **A**    Assuming -- if the transaction went through, they who

13  receive a fee.  This is normal.

14  **Q**    Okay.  In the millions of dollars?

15  **A**    Yes.

16  **Q**    Hundreds of millions of dollars?

17  **A**    I don't -- no, I don't think so.

18  **Q**    Okay.

19          **MR. PORRITT:**  Now, if you can put up Exhibit 8 on to

20  the screen, please.  Publish to the jury.

21      (Document displayed)

22  **BY MR. PORRITT**

23  **Q**    Now, you've said -- described your wording in this text as

24  you thought it was very clear.  Is that correct?

25  **A**    Yes.

1  **Q**   Okay.  And "Funding secured" is very clear too, correct?

2  **A**   I think it's -- yes.  I think that is -- that was my firm

3  belief.

4  **Q**   Okay.  And you -- I think you testified in your direct

5  that you -- "Funding secured" is once of the three main points

6  that you wanted to communicate with that tweet.  Is that

7  correct?

8  **A**   It's -- there are three points in this tweet.  Yeah.

9  **Q**   Okay.  And they were the three salients point you wanted

10  to communicate, correct?  Considering taking private, at 420,

11  and funding secured at 420.  Isn't that correct?

12  **A**   Yes.

13  **Q**   So "Funding secured" wasn't some throwaway line that you

14  just added to the end of the tweet.  Correct?

15  **A**   It meant that I was highly confident of the funding.  That

16  funding would not be an issue.  And it obviously was not.  The

17  evidence makes that clear.

18  **Q**   Now, Mr. Spiro went through with you some of your next

19  messages with Yasir.  Do you recall that testimony?

20          **MR. PORRITT:**  If we can bring up Exhibit 121?

21  (Document displayed)

22  (Witness examines document)

23          **MR. PORRITT:**  Before we go there, I apologize, sorry.

24  (Document taken off display)

25          **MR. PORRITT:**  If you can bring up Exhibit 12.  I

1    apologize.  We'll finish this line.

2        (Document displayed)

3    **BY MR. PORRITT**

4    **Q**    Exhibit 12, this is the email drafted for you by Tesla,

5    correct?

6    **A**    Drafted with Tesla.  You know, for me, but with -- with

7    Tesla people.

8    **Q**    And you've testified about how you were -- you had a role

9    as bidder, not as Tesla's CEO.  Do you recall that testimony?

10   **A**    Yes.

11   **Q**    Okay.  You still thought it was appropriate to draw on

12   Tesla resources to draft your statements?  Or to draft

13   statements regarding this going-private transaction?

14   **A**    I had -- for information purposes, yes.

15   **Q**    So when you are drafting this email, this email was a

16   joint communication strategy between you and Tesla.  Is that

17   fair?

18   **A**    No, it's just specifically saying that this email was sent

19   to Tesla employees, because I thought it was important to keep

20   them informed of what was going on, so they did not take the

21   information from the media because the media is often wrong.

22   **Q**    And at this time, you're thinking about taking Tesla

23   private at 420, correct?

24   **A**    Yeah.  Yes.

25   **Q**    All right.

MUSK - REDIRECT / PORRITT

1   **A**     It says that.

2   **Q**     And your public tweets have an effect on Tesla stock

3   price.  Correct?

4           **MR. SPIRO:**  Objection, vague.

5           **THE COURT:**  Sustained.

6   **BY MR. PORRITT**

7   **Q**     You expected Tesla stock price to increase after you

8   issued your August 7th tweets, correct?

9   **A**     Not correct.

10  **Q**     I think you testified yesterday that you understood that

11  your -- the stock price would go up if -- after you made the

12  August 7th tweets.

13  **A**     No, actually, what I said was that you cannot predict the

14  movement of the share price based on a tweet, because very

15  often the opposite thing occurs with the stock price from what

16  you would expect from the tweet.

17       That's why I used the example that when I tweeted that I

18  -- Tesla stock price was too high, the stock price actually

19  went higher.  You would expect that if I tweeted that the stock

20  price was too high, that the stock would go lower.  So what

21  you're saying is not true.

22  **Q**     If your public statements could affect Tesla's stock

23  price, and you're bidding at a point regarding purchasing Tesla

24  at a particular stock price, doesn't that put you in a conflict

25  of interest regarding -- about the statements you would be

 1   making?

 2          MR. SPIRO:  Objection, is this a conflict of interest

 3   trial?  I don't see the relevance.

 4          THE COURT:  I'm not sure what the relevance is.

 5   BY MR. PORRITT

 6   Q    You've stated that you felt that it was important -- that

 7   the board should not be controlling your communications to the

 8   public, as you, as a bidder, you should have had complete

 9   authority to tweet whatever you wanted.  Isn't that correct?

10   A    Um, it is important to separate the role of bidder from

11   that of CEO.  The -- you know, I have no choice but to wear

12   both hats in this situation.  But the -- yeah, the -- the board

13   has to represent the shareholders, the public shareholders.

14   And I have to represent those who wish to take Tesla private.

15   Q    All right --

16   A    In this -- in this case.  You know, in this instance.

17   Q    And isn't that why you would have a special committee in

18   place that could then manage disclosures or make sure that

19   you're not able to potentially manipulate the Tesla stock price

20   while in the process of negotiating an acquisition?  Isn't that

21   correct?

22   A    I'm not sure what you mean.

23   Q    Well, you understood the special committee should -- once

24   appointed, would control the disclosures over the going-private

25   transaction?

**MUSK - REDIRECT / PORRITT**

1   **A**     No, I believe that you are -- what you're saying is false.

2   The special committee would be speaking on behalf of the

3   company; I would be speaking on behalf of the bidders.

4   **Q**     Let's go back -- well, if you go back to Exhibit 12,

5   again, this statement that was drafted for you by Tesla, and

6   you said you were seeking for transparency in your disclosures

7   on August 7th.  Is that correct?

8   **A**     Yes.

9   **Q**     Okay.  As we have gone over multiple times, there is

10  nothing about funding in this Exhibit 12, is there?

11       (Witness examines document)

12  **A**     I don't know if -- I -- the whole -- I can't see the whole

13  thing, but -- um, so...

14  **Q**     Well, feel free to read it as long as you need to.

15  **A**     Okay.

16       **THE COURT:**  It may be in a binder too if you want

17  to --

18       **THE WITNESS:**  Okay.

19       **THE COURT:**  -- look at a hard copy.

20  **BY MR. PORRITT**

21  **Q**     Oh, in the binder, it's Exhibit 12.  You should have your

22  witness binder in front of you.

23       (Witness examines document)

24  **A**     Well, actually, I mean, it does talk about funding because

25  it -- the first point that I make there is that I want this to

1    be the -- for the benefit of shareholders, and abide by

2    shareholder wishes.

3         And so I'm clear that I would prefer shareholders to

4    remain with Tesla as a private company, but would respect their

5    choice if they did not wish to remain.  So that -- that

6    obviously speaks to funding.

7    **Q**    Why does that obviously speak to funding?  It doesn't

8    mention funding.

9    **A**    Because the funding needed is dependent on how many

10   shareholders stayed with Tesla as a private company.  So, what

11   I'm saying here is that I -- I hope that -- my specific

12   statement is I hope for all shareholders to remain, but if they

13   prefer to be bought out, then this would happen at a premium

14   for them.

15   **Q**    And you think that is communicating to investors about the

16   source of funding?

17        **MR. SPIRO:**  Objection, he's mischaracterizing, and now

18   he's changed and added the word "source."

19        **THE COURT:**  Well, he can ask that question.

20        **MR. SPIRO:**  Sure.  He can ask a question about source

21   of funding, sure.

22        **THE COURT:**  I guess that's the question.

23        **THE WITNESS:**  Yeah, I mean, I think you're -- what

24   you're doing is -- this is -- as it says at the top, this is an

25   email to Tesla -- "The following email was sent to Tesla

1    employees..."  So this is not an investor email.

2    **BY MR. PORRITT**

3    Q    Well, it was always intended to publish this email, wasn't

4    it?  Publicly.

5    A    The reason the email was posted to the website was because

6    it was leaked to the media.  It -- that, that -- the media got

7    ahold of it.  So it was simply to make -- make clear that this

8    was sent to Tesla employees.  But --

9    Q    That was posted to the blog post within seconds of it

10   being sent to Tesla employees.

11   A    Yes, but you are -- I think you are trying to take

12   something in the wrong context here.  This is an email to Tesla

13   employees, not an email to investors.  So --

14   Q    This was -- sorry.

15   A    -- why are you bringing up an email to Tesla employees?

16   Q    This was always going to be published to the Tesla blog

17   post, correct?  Publicly.

18   A    The email was leaked to the media with the promise that

19   the email -- when the media writes about a Tesla email, they

20   will -- they will pick parts of the email, but not the whole

21   email.  So the media will not show the whole email.

22        And if the media -- so to avoid having investors

23   misunderstand what was a company email because of the media

24   taking quotes out of context, it was important to show the full

25   email so that the media could not take parts of an employee

1    email out of context.

2    **Q**    When was this email leaked to the media?

3    **A**    I don't know.

4    **Q**    This email was -- as I said, was posted to the blog post

5    within seconds of you sending it to Tesla employees.  It was

6    leaked in those seconds, and you learned about it and made the

7    decision to publish -- post on the blog post?  Is that what

8    you're saying?

9    **A**    No, I'm saying --

10         **MR. SPIRO:**  Objection to him testifying as to the

11   timing of everything, assuming those things in evidence.

12         **THE COURT:**  You can ask the witness about the timing.

13         **THE WITNESS:**  I don't know the exact timing.  But

14   the -- the probability of it being leaked to the media was

15   extremely high.  That is, when there are 30-, 40,000 people

16   receiving an email, there are -- it is extremely likely to be

17   seen by the media.

18         So I think, if what you're saying is true, that we would

19   have posted it immediately, that would have been the right

20   thing to do to make sure that investors did not have the wrong

21   impression from articles written where they take a specific

22   piece of the email out of context.

23   **BY MR. PORRITT**

24   **Q**    So now you're saying it wasn't posted in response to a

25   leak.

1   **A**    This is five years ago.  I don't know what the exact

2   timing was.  But the -- but I think the -- it is actually

3   important in situations like this to avoid having the media

4   write an article where they take something out of context,

5   which is very common.  And that could potentially mislead

6   investors.

7        So I think this was an attempt to ensure that the media

8   did not mislead -- could not mislead the investors with an

9   out-of-context quote, which is the right thing to do.

10  **Q**    And isn't that why you don't announce major transactions

11  like going private with funding secured at 420 through a tweet?

12  Rather, you do it through a proper corporate disclosure?

13  **A**    I said I was considering it.

14  **Q**    If you were being transparent with investors, why didn't

15  you draft a proper statement giving the details even along the

16  lines of Exhibit 12, even though that's incomplete about

17  funding, and publish that rather than your tweet?

18  **A**    As I testified earlier, I was concerned that some

19  investors would have information about the take-private, but

20  not all.  And that would allow them to trade -- potentially

21  trade the stock.  And so to ensure that all investors were

22  aware of it, and not just some, I thought it was important to

23  make it clear that a take-private transaction was under

24  consideration.

25  **Q**    This blog post we saw took about an hour and a half for

MUSK - REDIRECT / PORRITT

```
 1   your corporate team to draft, correct?
 2          MR. SPIRO:  Objection, same objection, assuming facts
 3   not in evidence.
 4          THE COURT:  Well, he can answer that if he knows.
 5          THE WITNESS:  I don't know exactly how long it took.
 6   BY MR. PORRITT
 7   Q   Well, if we look at Exhibit 8 -- counsel showed this to
 8   you.
 9          (Document displayed)
10   Q   If you look at the top, at the time, it was issued at
11   9:48 a.m.  Do you see that?
12   A   Yes.
13   Q   Okay.  Exhibit 13 --
14          MR. PORRITT:  13, Derek.
15          (Document displayed)
16   BY MR. PORRITT
17   Q   Issued at 12:36 p.m., and that attaches a link to the blog
18   post, correct?
19   A   Yes.
20   Q   All right.  So it was published in less than three hours
21   from beginning to end.  Correct?
22   A   That seems to be the case.
23   Q   Okay.  And you're saying that's impossible, that would
24   have been -- you didn't think that you should do that, spend a
25   few hours drafting a statement; instead, you would just tweet
```

1   out "Am considering taking Tesla private at $420.  Funding

2   secured."  You thought that was a better outcome for investors?

3   **A**   Yes, I did.

4   **Q**   Okay.  Now, if we can go to the Yasir text, or your text

5   exchanges with Yasir, August 10th, August 11th, August 12th,

6   Exhibit 121.

7        (Document displayed)

8   **Q**   I want to start again on Exhibit 121, Page 8, at the

9   bottom there, the long, long text from Yasir.

10        (Document enlarged)

11  **Q**   Do you see that there?

12  **A**   Yes.

13  **Q**   Okay.  And you said, you know, that they didn't -- they

14  hadn't issued any -- they never ask -- Yasir never asked for

15  any additional information after the July 31 meeting before the

16  August 13th blog post.

17       Did you say that?

18       Do you recall that testimony?

19       **MR. SPIRO:**  Objection.  He's mischaracterizing the

20  testimony.  If he has a specific page and line, he should do it

21  that way, not the way he's doing it.

22       **THE COURT:**  Sustained.

23       **MR. PORRITT:**  All right.  I'll do it this way.

24  **BY MR. PORRITT:**

25  **Q**   In Exhibit 121-8, in this email, you see here Yasir is

1   asking for the teams to start working together.  Do you see

2   that?

3   **A**    Um, yes.

4   **Q**    Okay.  And that's going to require an exchange of

5   information.  Isn't that true?

6   **A**    Well, he would obviously need to know the exact

7   percentage.  And that would depend on which investors stayed in

8   the company, going private.

9   **Q**    Right.  And you didn't know that at that point in time,

10  did you?

11  **A**    No.

12        **MR. PORRITT:**  And if we can go on to 121-11.

13     (Document displayed)

14  **BY MR. PORRITT**

15  **Q**    The middle of the page there.  Yasir (As read):

16          "Let's see the numbers and get our people to

17          meet and discuss.  We cannot approve

18          something we don't have sufficient

19          information.  We've agreed that you will send

20          the financial information and the way going

21          forward within a week and no thing happened

22          since."

23     Do you see that?

24  **A**    Yes.

25  **Q**    So he is referring to needing to see the information

1    before they can approve anything.  Isn't that correct?

2    **A**    I mean, in my opinion, he is backpedaling here.  That is

3    why I'm upset with him.

4    **Q**    He is asking in that text for you to send him information,

5    before they can approve anything.  Isn't that right?

6    **A**    I -- Tesla's a publicly traded company.  It's -- the

7    information is public.  But the -- the exact amount that would

8    be needed depends on which investors would stay with Tesla as a

9    private company.

10   **Q**    And then on 121-12 --

11         **MR. PORRITT:**  Derek?  Sorry.

12        (Document displayed)

13   **BY MR. PORRITT**

14   **Q**    You testified how the PIF bought 5 percent of Tesla, or up

15   to 5 percent of Tesla, without any agreement and so on.  Do you

16   agree with that?  Do you recall that testimony?

17   **A**    That is correct.

18   **Q**    Okay.  And the PIF had made numerous -- has made

19   investment -- large investments in numerous companies, isn't

20   that correct?

21   **A**    Yes.  They're one of the biggest funds in the world.

22   **Q**    Okay.  But as of July, 2018, or August, 2018, they hadn't

23   yet taken any company private yet.  Isn't that correct?

24   **A**    That's what the text says.

25   **Q**    Okay.  And taking the company private is different from

1    simply buying their shares in the open market.  Isn't that

2    correct?

3    **A**    It's not significantly different.

4    **Q**    Okay.  You don't think it's significantly different,

5    taking a company private is not significantly different than

6    just buying the shares in the market?

7    **A**    I don't think so.

8    **Q**    Okay.  Do you have -- does Egon Durban think that, in his

9    business on taking companies private, that's not based on the

10   fact that it's different from simply buying the shares on the

11   market?

12              **MR. SPIRO:**  Objection to what Mr. Egon Durban thinks.

13              **THE COURT:**  Sustained.

14   **BY MR. PORRITT**

15   **Q**    In your experience, do you retain two investment banks to

16   assist you in simply selling shares or buying shares in the

17   market?

18   **A**    Yes.  We retain investment banks many times in buying

19   shares on the public market.  That is normal.

20   **Q**    Do you have a special committee involved when they are

21   simply buying shares on the market?

22   **A**    No.

23   **Q**    All right.  And here, finally, Mister -- or Yasir says,

24   you know (As read):

25              "...the agreement as was minuted by my people

1           is to wait forth the information to be sent

2           by you within a week, on how we will move

3           forward..."

4      Do you see that?

5  **A**    Yes.

6  **Q**    Okay.

7           **MR. PORRITT:**  And again, if you could just show

8  Exhibit 80 at this point, Derek.

9      (Document displayed)

10  **BY MR. PORRITT**

11  **Q**    And here we have the minutes, as minuted by Yasir's

12  people.

13           **MR. SPIRO:**  Well, objection.  These aren't what we

14  believe to be real.  So that's a characterization from a

15  lawyer.

16           **MR. PORRITT:**  You know, objection, Your Honor.

17           **THE COURT:**  The -- this exhibit has been admitted, and

18  my decision stands.  And counsel can characterize it based on

19  the face of the evidence -- based on that document.

20      Go ahead.

21  **BY MR. PORRITT**

22  **Q**    Once again, we talked about on your direct, it's got the

23  seal of the PIF on the top right-hand corner there, doesn't it,

24  Exhibit 80?

25      That's a question for you.  It's got the seal of the Saudi

**MUSK - REDIRECT / PORRITT**

1  PIF on the top right-hand corner, doesn't it?

2  **A**    Yes.

3  **Q**    And that's the same seal that --

4          **MR. SPIRO:**  Objection.  Beyond the scope.

5          **THE COURT:**  Overruled.

6  **BY MR. PORRITT**

7  **Q**    And that's the same seal that was on that NDA letter that

8  you signed with the PIF, correct?

9  **A**    Yes.

10 **Q**    All right.  And then if we can -- if you just turn, just

11 roll down, just the very first, "Agreed actions."

12          "To provide the plan and the financial

13          calculation assumptions to take Tesla

14          Private.  (Elon)."

15     Do you see that?

16 **A**    Yes.  As I said, they would need to know which -- how many

17 investors would be staying with the company and how, how many

18 would be selling and that would change how much funding they

19 would provide.  That's obviously only knowable after you talk

20 to all the investors.

21     But they were very clear to me that they would take --

22 they were committed to take Tesla private, whatever it took.

23 There was no -- there were no constraints on it.

24 **Q**    Now, you talked about the media hurricane that followed

25 your August 7th tweets.  Do you recall that testimony?

**MUSK - REDIRECT / PORRITT**

1    **A**    Yes.

2    **Q**    Okay.  What were you doing to follow the media attention

3    of the -- following your August 7th tweets?

4         (Document taken off display)

5    **A**    It's not possible for me to read all the media articles.

6    There are too many.  And I -- my focus was on Tesla and making

7    -- being in the factory and getting the cars built.

8    **Q**    Okay.  Wasn't much of the media attention directed to your

9    words, "Funding secured"?  Isn't that correct?

10   **A**    I don't recall.

11   **Q**    And I think your testimony is, is that you weren't looking

12   at the Tesla stock price following your August 7th tweets.

13   Isn't that correct?

14   **A**    I mean, I occasionally look at the stock price, but it is

15   not, you know, something I look at frequently.  So, but

16   occasionally, um, but the vast majority of the time I am simply

17   heads-down in the factory, getting things built.

18   **Q**    Now, you testified under examination -- actually at the

19   end of my examination and your counsel, about you said you

20   would be willing to sell your SpaceX shares to fund the

21   going-private for Tesla?  Is that correct?

22   **A**    It would certainly not be my preference to do so, but it

23   is something that could be done, um, yes.

24   **Q**    It's something that you had in the back of your mind, I

25   think is what you said in your prior testimony.  Is that

**MUSK - REDIRECT / PORRITT**

1    correct?

2    **A**    Yes.

3    **Q**    Okay.  Now, SpaceX shares aren't publicly listed.  Is that

4    correct?

5    **A**    SpaceX is a private company.  And as I articulated in my

6    email to the board, I thought it was possible to operate SpaceX

7    much more effectively without the distraction of the public

8    markets and Wall Street speculators.  So what I had in mind was

9    structure for Tesla similar to that of SpaceX, as I said in my

10   email to the board.

11   **Q**    Although the SpaceX structure would be different if you

12   sold all your SpaceX shares to fund the going private of Tesla,

13   correct?

14        **MR. SPIRO:**  Objection to what would have happened if

15   this would have been more than a consideration, and what would

16   then happen to SpaceX's corporate structure.  Relevance.

17        **THE COURT:**  I'm not sure I understand the question.

18        **MR. PORRITT:**  Well, he's testified he would use SpaceX

19   shares to fund his going private, but the whole purpose of

20   going private with Tesla is to make a private Tesla resemble

21   SpaceX, which he is changing in order to take Tesla private.

22      I'm just trying to elaborate as to how he thought selling

23   SpaceX shares would work with a going-private transaction with

24   Tesla.

25        **THE WITNESS:**  No, SpaceX --

 1          **MR. SPIRO:**  My objection remains, Your Honor.  I don't

 2   understand --

 3          **THE COURT:**  All right.  As last phrased, the objection

 4   is overruled.

 5          **THE WITNESS:**  Um, SpaceX is the backbone of the

 6   American space industry.  It's a very valuable company.  It's

 7   the most valuable private company in the country.  And I am

 8   majority shareholder of the company.  So that would enable me

 9   to sell a large portion of SpaceX in order to fund the Tesla

10   take-private.

11          And that is exactly what I did with the Twitter

12   take-private, was that I sold Tesla shares to take Twitter

13   private.  I would have done the same thing with SpaceX.  I

14   would have sold SpaceX shares to help take Tesla private.

15          And so I just did a take-private transaction where I did

16   exactly that, which is sold shares in Tesla -- and I didn't --

17   you know, I would have preferred to sell fewer shares in Tesla,

18   but it was -- but nonetheless, that's what I did.  Meaning, I

19   -- I followed through with the Twitter take-private and sold

20   shares in a company that I love, to ensure that the transaction

21   went through.

22   **BY MR. PORRITT**

23   **Q**   And you publicly disclosed that's what you would do to

24   fund your purchase of Twitter, isn't that correct?

25   **A**   I -- that -- that -- there was a public disclosure at one

**MUSK - REDIRECT / PORRITT**

1   point, yes.

2   **Q**    And you never disclosed your intent to sell SpaceX to fund

3   your acquisition of Tesla shares in August of 2018, isn't that

4   correct?

5   **A**    I don't -- I don't recall.  But I -- it is certainly

6   common knowledge that I have really two major assets, which is

7   my SpaceX ownership and Tesla ownership.

8        And just as I used Tesla stock for the Twitter

9   take-private, I would have used SpaceX stock for the Tesla

10  take-private.  And, and like I said, that alone, SpaceX stock,

11  alone, meaning funding is secured.

12  **Q**    Um --

13  **A**    That's a really important point.

14  **Q**    Now, SpaceX shares -- we'll come to that in a minute.

15  SpaceX shares, as a private, they're harder to sell than public

16  shares?  Is that correct?

17       (Reporter clarification)

18           **MR. PORRITT:**  Sorry.

19  **BY MR. PORRITT**

20  **Q**    If SpaceX shares are private, then they are more difficult

21  to sell than public shares, isn't that correct?

22  **A**    Not in the case of SpaceX.  The demand for SpaceX stock

23  far exceeds the supply.

24  **Q**    Okay.  And your SpaceX shares -- well, first of all, how

25  much was SpaceX worth in July, 2018?

**MUSK - REDIRECT / PORRITT**

**A**    Well, um, I think probably we could have gotten -- I don't
know, 30 billion-plus, for that.

**Q**    So it was worth less than Tesla at the time.

**A**    Yes, but my ownership of SpaceX was much higher, a much
higher percentage than my ownership of Tesla.  So I believe I
owned, I don't know, 60 percent, perhaps.  I think on the order
of, you know, 15 to $20 billion, is what I think it would have
been worth.

**Q**    Fifteen to $20 billion?

**A**    Yes.

**Q**    Okay.  And those shares are pledged as security for your
personal loan, isn't that correct?

**A**    For, for Tesla loans, you mean?  No, very little of it is
pledged.

**Q**    So SpaceX shares aren't pledged for your personal loans?

          **MR. SPIRO:**  Objection, to when.

          **THE COURT:**  During 2018, I assume you are talking
about.

          **MR. PORRITT:**  Yes.

          **MR. SPIRO:**  At any point in 2018, is that the
question?

**BY MR. PORRITT**

**Q**    In July of 2018, were your SpaceX shares pledged as
security for your personal loans?

**A**    I don't recall, but if so, it would have been a very small

MUSK - REDIRECT / PORRITT

 1   amount.

 2   **Q**    Okay.  What's a small amount for you, when you're talking

 3   15 to $20 billion?

 4   **A**    I don't recall.  It was not a significant number.

 5   **Q**    Okay.  And if you sold SpaceX shares to fund the

 6   going-private, that means that you personally, Elon Musk, would

 7   acquire more Tesla shares.  Isn't that correct?

 8   **A**    In that scenario, yes.

 9   **Q**    Okay.  And that results in you substantially increasing

10   your percentage ownership in Tesla, isn't that correct?

11   **A**    Yes, yes.

12   **Q**    Right.  If we can go back to Exhibit 12, third paragraph

13   from the bottom.

14       (Document displayed)

15   **BY MR. PORRITT**

16   **Q**    Expressly says you don't envision substantially changing

17   your percentage ownership of Tesla as part of the go-private,

18   isn't that correct?

19   **A**    That's correct, because I was confident that the Saudi PIF

20   and other investors would participate in the take-private.

21       You know, in a worst-case situation, however, I had SpaceX

22   stock to secure the funding.  It would not be my preference to

23   sell SpaceX stock, but it's certainly obviously something that

24   I could have done.

25   **Q**    Right, again, it's in the back of your mind.  Isn't that a

**MUSK - REDIRECT / PORRITT**

1    fair statement?

2    **A**    I specifically mentioned it in the SEC testimony.

3    **Q**    I think you said in the SEC testimony it was in the back

4    of your mind, isn't that correct?

5    **A**    Yeah.  It's in the back of my mind.  It's not something

6    that I ideally would like to do, but it's something that I

7    could do.  You know, just sort of if you have a house, and

8    you -- you can pledge the house for a transaction but it's not

9    necessarily something you want to do.

10        Or you could sell a house, but you don't necessarily want

11   to sell the house, but it's still a thing you could do.  You

12   know, if you own a house, you can say:  Okay, I'm going to buy

13   this other thing.  And worst-case scenario, I could sell the

14   house to do so.  It's not that you want to sell the house.

15        I really didn't want to sell SpaceX stock, but I could

16   have done so.

17        **MR. PORRITT:**  Your Honor, I would like to refer the

18   witness to his interrogatory answers served on us in this case.

19   Dated April -- he signed them on April 14, 2021.

20        **THE COURT:**  Do you have a copy?

21        **MR. PORRITT:**  Yes, I do, Your Honor.

22        **MR. SPIRO:**  I need a copy as well.  And this is all

23   outside the scope.

24        **MR. PORRITT:**  I'm going to refer the witness to

25   Interrogatory No. 2 and his response.

```
 1              THE COURT:  Wait a minute.  What page is that on?
 2              MR. PORRITT:  It is Page 13.
 3              MR. SPIRO:  Your Honor, this is improper.  Could we
 4    approach?
 5              THE COURT:  Well, let me read it first.
 6              MR. SPIRO:  Sure.
 7         (The Court examines document)
 8              THE COURT:  All right, so what are you requesting,
 9    Mr. Spiro?
10              MR. SPIRO:  Your Honor, can we approach on the
11    subject, just --
12              THE COURT:  Okay.
13         (The following proceedings were heard at sidebar)
14              MR. SPIRO:  First, they objected to the terms of what
15    "funding" means, and this was not meant to mean internal
16    funding, his own funding.  It was meant to mean external
17    funding sources.  So this question is totally misleading, the
18    way he's doing it.  Meaning only if he clarifies that "funding"
19    was defined at the time as external funding, so his own
20    personal wealth.
21         Second --
22              THE COURT:  You're saying there was an objection
23    stated then?
24              MR. SPIRO:  Correct.  Yeah.  And then number two is
25    there's a supplement to this in which -- and that's what my
```

1  client was -- my client, excuse me, strike that -- that's what

2  my colleague was -- was just pointing out, which is that this

3  was immediately supplemented and includes -- and when they met

4  and conferred about funding then they added his personal

5  funding, and it specifically includes SpaceX.  In the exact

6  same 'rog response.

7          **MR. PORRITT:**  Your Honor, it wasn't immediately.  It

8  was purportedly supplemented months later, and that supplement

9  was never signed by Mr. Musk, and we never received a

10  verification.  So that is a non-answer.

11          **MR. SPIRO:**  That's not my --

12          **THE COURT:**  You can bring it up on redirect.  If you

13  want to admit something as a --

14          **MR. SPIRO:**  Well, then, I would need -- again, this

15  wasn't gone into, nor did I go into his SpaceX at all during my

16  examination.  This is all outside the scope, and it's all

17  improper.  Didn't go into SpaceX at all in his examination,

18  Your Honor.

19      So now we have something that's one, outside the scope,

20  and two, we're being sandbagged with it because again, it's

21  completely misleading.  He's not talking about his own personal

22  wealth.  This is external funding.

23          **THE COURT:**  You can bring that out on cross.

24  Objection overruled.

25          (Conclusion of sidebar discussion; the following

MUSK - REDIRECT / PORRITT

1    proceedings were held in the presence and hearing of the Jury:)

2          **THE COURT:**  The objection is overruled.  You may

3    proceed, Mr. Porritt.

4          **MR. PORRITT:**  Thank you, Your Honor.

5    **BY MR. PORRITT**

6    **Q**    You recall, Mr. Musk, that we, the plaintiffs, served you

7    with written questions during the course of discovery in this

8    case.  Do you recall that?

9    **A**    I don't recall all -- everything about what was requested.

10   **Q**    Okay.  But you have in front of you responses to written

11   questions, isn't that correct?

12   **A**    Um, that seems to be the case.

13         **MR. SPIRO:**  Well, objection.  We would ask that the

14   witness have the updated version, and --

15         **MR. PORRITT:**  Your Honor.  The objection is --

16         **MR. SPIRO:**  -- not just one of the 'rog responses.

17   That's not fair.

18         **THE COURT:**  No, you can bring that out on cross.  And

19   if there's a signed supplemental response, you can bring that

20   in.  But at this point, we're dealing with one at a time.

21         Go on.

22         **MR. PORRITT:**  Thank you, Your Honor.

23   **BY MR. PORRITT**

24   **Q**    And to these written questions you provided written

25   answers, isn't that correct?

1      You have that in front of you?

2  **A**   I have a document in front of me.

3  **Q**   Okay.  And if you turn to the last page of the document

4  you have in front of you, titled "Verification," do you see

5  that?

6  **A**   You mean this, this -- the page with the -- oh, yes, you

7  mean -- which page do you mean?

8  **Q**   The very last page.

9  **A**   Oh.

10  **Q**   Do you see that?

11  **A**   Yes.

12  **Q**   And that has your signature on it?

13  **A**   Yes.

14  **Q**   Okay.  And you say:

15          "I declare under penalty of perjury that the

16          foregoing is true and correct."

17      Do you see that?

18  **A**   Yes.

19  **Q**   Okay.  And that's the same oath you have taken here, is to

20  testify truthfully, isn't that correct?

21  **A**   That's correct.

22  **Q**   Okay.  So if I can direct you to Interrogatory No. 2 on

23  Page 13.

24      (Witness examines document)

25  **Q**   Do you have that?

1   **A**    Yeah.

2   **Q**    Okay.  Interrogatory No. 2, this is a question we asked

3   you in writing:

4              "Identify all funding that was secured as of

5              12:48 p.m. Eastern time on August 7, 2018, to

6              take Tesla private at 420 per share."

7   Do you see that question?

8   **A**    Yes.

9   **Q**    And you respond, your response begins at the bottom of

10  that page, Line 25 -- I've got a bit of reading to do, members

11  of the jury so bear with me (As read):

12             "At the July 31, 2018 meeting at Tesla's

13             Fremont factory, attended by Yasir

14             Al-Rumayyan, Saad Al-Jarboa and Naif

15             Al-Mogren from the Public Investment Fund of

16             Saudi Arabia (PIF) and Mr. Musk, Sam

17             Teller..."

18             **MR. SPIRO:**  Is this document in evidence that he is

19  just reading from?

20             **MR. PORRITT:**  "...and Deepak Ahuja from Tesla..."

21             **THE COURT:**  Hold on.  Are you --

22             **MR. PORRITT:**  I mean, I can move this into evidence if

23  you would like.

24             **THE COURT:**  Hold on, hold on.  One at a time.

25             **MR. PORRITT:**  Sorry.

 1          **THE COURT:**  Are you objecting to his reading it?

 2          **MR. SPIRO:**  Are we going to read the supplement to

 3    this?

 4          **MR. PORRITT:**  Your Honor.

 5          **THE COURT:**  No.  I've already answered that.  So the

 6    question is:  Are you asking him to admit this into evidence?

 7    Or are you going to allow him to read it?

 8          **MR. SPIRO:**  He can read it, Your Honor.

 9          **THE COURT:**  He can read it?  I think it's also fair to

10    say that the -- there were some objections stated at the outset

11    of the answer.  And, among other things, Mr. Musk objected to

12    the word "secured" as being undefined and susceptible to

13    multiple varied interpretations.

14        So I think for context you should read the entirety.

15          **MR. PORRITT:**  Apologies.  So I'm going to read the

16    objections as well?  Or --

17          **THE COURT:**  I think you should.

18          **MR. PORRITT:**  All right, I will do that.

19    **BY MR. PORRITT**

20    **Q**    Question was (As read):

21              "Identify all funding that was secured as of

22              12:48 p.m. Eastern, on August 7th, 2018, to

23              take Tesla private at 420 per share."

24        Your response:

25              "In addition to the foregoing general

1              objections and objection to instructions,

2              which are incorporated -- and definitions

3              which are incorporated by reference herein,

4              Mr. Musk objects to this interrogatory on the

5              grounds it is premature contention

6              interrogatory.  Mr. Musk also objects to this

7              interrogatory to the extent that it seeks

8              information protected from discovery by any

9              right to privacy or any other applicable

10             privilege or protection, including the right

11             to privacy of third parties.  By Mr. Musk's

12             obligation under applicable law or contract

13             to protect such confidential information,

14             including as set forth in confidentiality

15             and/or non-disclosure agreements or

16             understanding with third parties.  Mr. Musk

17             will provide such information, if any, only

18             in accordance with the protective order.

19             "Mr. Musk also objects that the word

20             'secured' is undefined and susceptible to

21             multiple varied interpretations.  Mr. Musk

22             further objects to this interrogatory to the

23             extent that it seeks information protected by

24             the attorney-client privilege, work product

25             doctrine, common interest privilege, or

1          common law privilege, doctrine, immunity,

2          rule of confidentiality, or protection from

3          disclosure that may attach the information

4          requested."

5          "Subject to and without waiving the foregoing

6          objections, Mr. Musk responds as follows:

7          "At the July 31, 2018 meeting at Tesla's

8          Fremont factory attended by Yasir

9          Al-Rumayyan, Saad Al-Jarboa and Naif

10         Al-Mogren from the PIF of Saudi Arabia (PIF)

11         and Mr. Musk, Sam Teller and Deepak Ahuja

12         from Tesla, Mr. Musk received an oral

13         commitment from Mr. Al-Rumayyan to fund the

14         contemplated going-private transaction, as

15         Mr. Musk and multiple other parties (sic)

16         confirmed in their testimony to the SEC."

17    Reference to transcripts.

18         "Mr. Musk further responds that, as Mr. Musk

19         explained in his blog post 'Update on Taking

20         Tesla Private' published on Tesla's website

21         an August 13, 2018:

22         "'Going back almost two years, the Saudi

23         Arabian sovereign wealth fund has approached

24         me multiple times about taking Tesla

25         private.... Recently, after the Saudi fund

1          bought almost 5 percent of Tesla's stock

2          through the public markets, they reached out

3          to ask for another meeting.  The meeting took

4          place on July 31st.  During the meeting, the

5          Managing Director of the fund expressed

6          regret that I had not moved forward

7          previously on a going private transaction

8          with them, and he strongly expressed his

9          support for funding a going private

10         transaction for Tesla at this time.  I

11         understood from him that no other decision

12         makers were needed and that they were eager

13         to proceed.  I left the July 31st meeting

14         with no question that a deal with the Saudi

15         sovereign fund could be closed, and that it

16         was just a matter of getting the process

17         moving.  That is why I referred to 'funding

18         secured' in the August 7th announcement.'"

19    Then you refer to the blog post here.  And you conclude

20    your answer:

21         "Discovery is ongoing and Mr. Musk reserves

22         the right to supplement or amend this

23         response should he learn any additional

24         information responsive to the interrogatory."

25    **A**    Right.

1  **Q**   And that's -- if I may ask a question.

2  **A**   Sure.

3  **Q**   You reviewed that answer, right, before you signed this as

4  true, under penalty of perjury?

5  **A**   Um, yes.

6  **Q**   Okay.  You could have made any changes you wanted to this

7  response, isn't that correct?

8  **A**   Well, actually, at the bottom of the response it says that

9  I reserve the right to supplement or amend it.

10  **Q**   Okay.  But at the time, in April, 2021, this statement was

11  correct.  Isn't that true?

12  **A**   Um, no, the SpaceX stock was available --

13  **Q**   Excuse me.  My question was as of April, 2021, you signed

14  that this statement, this response to Interrogatory No. 2 was

15  true, didn't you?

16  **A**   Yes.  And it also said --

17  **Q**   Okay.  And you reviewed it beforehand, right?

18  **A**   Yes, and --

19  **Q**   Okay.  So you didn't mention anything about SpaceX in

20  April, 2021, in response to "What funding was secured on

21  April 7, 2018," did you?  Under oath.

22  **A**   Not in this, but --

23  **Q**   All right.  Thank you.

24          **THE COURT:**  He can explain.  Now that you've raised

25  it, he can explain.  The answer is no, he did not mention it.

1          Go on, Mr. Musk.

2              **THE WITNESS:**  Thank you, Your Honor.

3          I think it's very important to note that this answer

4    reserves the right to supplement.  It specifically says in the

5    answer that there is the right to supplement it.

6          And, moreover, Mr. Porritt is well aware that I mentioned

7    the SpaceX funding in the SEC testimony at -- which was much

8    closer in time to --

9              **THE COURT:**  Okay.  We're not -- I'm going to stop

10   that.

11             **THE WITNESS:**  Sure.

12             **THE COURT:**  We're not going to go there.

13   **BY MR. PORRITT**

14   **Q**   And you reserved the right to supplement, should you learn

15   any additional information responsive to this interrogatory.

16   Correct?

17   **A**   Yes.

18   **Q**   Did you learn any additional information about your

19   thoughts about SpaceX in 2018, between -- following April,

20   2021?

21   **A**   Well, I mentioned in the SEC testimony that --

22   **Q**   That was in 2018.  Did you learn anything after April,

23   2021, about your thinking about using SpaceX to fund your

24   investment in Tesla in 2018?

25             **MR. SPIRO:**  Objection.  It mischaracterizes it.  He's

MUSK - REDIRECT / PORRITT

```
 1   not being asked in this interrogatory about his own net worth.
 2           MR. PORRITT:  Oh, Your Honor.
 3           THE COURT:  Overruled.  Objection is overruled.
 4        So the question is, the interrogatory states that you
 5   reserve the right to supplement or amend this response, should
 6   you learn any additional information responsive to this
 7   interrogatory, which was filled out in 2021.  I think the
 8   question pending is:  Did you learn any additional information
 9   after filling out this interrogatory?
10           THE WITNESS:  I -- I would have to say that -- well, I
11   -- I should have mentioned SpaceX here.  I did mention it in
12   the SEC testimony.  But it was an error on my part in not
13   mentioning it here.  So I should have mentioned it here.
14   BY MR. PORRITT
15   Q    You took longer over this interrogatory response than over
16   your August 7th tweet, isn't that correct?
17   A    I don't know how much time I spent on this.
18   Q    Okay.  Now, you testified in response to questioning from
19   Mr. Spiro that you have never lost money for investors.  Isn't
20   that correct?
21   A    Um --
22           MR. SPIRO:  Objection.  Again, if he does this, he
23   shouldn't make characterizations.  If he's going to say prior
24   testimony, he should say "Question," "Answer," and ask --
25           THE COURT:  Overruled.
```

MUSK - REDIRECT / PORRITT

1           **THE WITNESS:**  Every time I have raised money, it has

2    been at a higher price.  Yeah.  So investors have done

3    extremely well.  That is why it is -- it is relatively easy for

4    me to get investor support, because my track record is

5    extremely good.

6    **BY MR. PORRITT**

7    **Q**    Okay.  You don't recall testifying that you've never lost

8    money for investors?

9    **A**    To the best of my recollection, all of the financing

10   rounds have been up rounds.  That's what's meant by that.

11   **Q**    Would you agree with the statement that you have never

12   lost money for investors?

13   **A**    The -- every financing round that I can recall -- and

14   there have been possibly a hundred -- has been at a higher

15   valuation, unless I'm -- unless I'm perhaps misremembering one

16   or two.

17           But it is -- it would be accurate to say that I probably

18   have the best track record with investors, certainly one of the

19   best track records with investors of anyone in the world.

20   **Q**    My question was:  Would you agree with the statement that

21   you have never lost money for investors?

22   **A**    I'm not sure what you mean by that.

23   **Q**    Would you agree that investors like Glen Littleton -- who

24   believed in you and Tesla, who had been a long-term, long

25   investor in Tesla, and yet lost millions as a result of these

1  August 7th tweets.  Would you say you lost them money?  Or him

2  money?

3          MR. SPIRO:  Objection.

4          THE COURT:  If he understands the question, he can

5  answer.

6          THE WITNESS:  Um, no.  I don't think so.

7  BY MR. PORRITT

8  Q    Okay.  Would you say that Tim Fries who bought Tesla stock

9  on August 8, 2018, after your August 7th tweets because he was

10 believing in the truth of your tweet about "Funding secured,"

11 and then lost money when the stock price declined after

12 disclosures that there was no funding, would you say you lost

13 him money?

14 A    Your question contains falsehoods.

15 Q    So you don't agree that you lost him money.

16 A    I don't agree that I lost him money, no.

17 Q    Okay.  What about the thousands of other investors who

18 relied on and believed in your tweets, as you intended them to

19 do, and lost millions of dollars as a result?  You don't think

20 you lost them any money?

21 A    Um --

22          MR. SPIRO:  Objection to this question, also.

23          THE COURT:  Sustained.

24 BY MR. PORRITT

25 Q    Have you never felt any regret for the harm your tweets

MUSK - REDIRECT / PORRITT

1    caused investors like Glen Littleton and Tim Fries when the

2    market chaos followed?

3    **A**    The reality is that Tesla investors are extremely happy.

4    And the reality is, in my opinion, you don't represent them.

5          **MR. PORRITT:**  Your Honor, I'll move to strike that

6    last answer.

7          **MR. SPIRO:**  We --

8          **THE COURT:**  That last answer is stricken, and the

9    witness is directed to answer the question.

10         **MR. SPIRO:**  Okay, that's over the defense's objection.

11   He asked for a question.  It was a fair response.

12         **THE COURT:**  My statement that his response is stricken

13   stands.

14       So ask the question, again, Mr. Porritt, and the witness

15   will answer it.

16   **BY MR. PORRITT**

17   **Q**    Have you ever felt any regret for any harm that your

18   tweets may have caused for investors like Glen Littleton and

19   Tim Fries?

20   **A**    My communications have been, to the best of my ability,

21   truthful and accurate.  And the reality is that Tesla today is

22   worth ten times more --

23         **MR. PORRITT:**  Objection -- Your Honor, there's a

24   motion on this.  And an order on this.

25         **MR. SPIRO:**  Judge, he opened the door to it.

1          **THE COURT:**  No.

2          **MR. SPIRO:**  He's allowed to answer that question.

3          **THE COURT:**  No.  The jury's going to disregard that

4    last comment.

5          And the question was -- repeat the question again, and I'm

6    going to ask the witness to answer.  I'll let him explain, but

7    phrase your question precisely, and I'm going to listen to what

8    the witness needs to answer.

9    **BY MR. PORRITT**

10   **Q**    All right.  So, my question was:  Have you ever felt any

11   regret for any harm your tweets may have caused investors like

12   Glen Littleton and Tim Fries?

13         **THE COURT:**  So the answer is yes or no; then you can

14   explain.

15         **THE WITNESS:**  I certainly never want an investor to

16   lose money.  And I would -- it's -- if he did lose money on the

17   basis of that tweet, then obviously I would be sad about that.

18   But investors in the public market buy and sell stock all the

19   time.  On balance, they have done extremely well.

20   **BY MR. PORRITT**

21   **Q**    And you said you ultimately stopped going ahead with this

22   transaction because of feedback from small investors?  Is that

23   correct?

24   **A**    Yes.

25   **Q**    Okay.

MUSK - REDIRECT / PORRITT

1    **A**    From investors, yeah.

2    **Q**    I'm sorry?

3    **A**    Yes, investor -- after soliciting the investor feedback, I

4    listened to the investors.  They wished, on balance, to remain

5    public, and so we did.

6    **Q**    Okay.  And who were these small investors that you were

7    talking to?

8    **A**    Well, I would say one of the most influential things I

9    received was from Cathie Wood of Arc Invest, on Twitter.  And

10   she specifically asked if Tesla could remain public, because

11   her fund in her case could not participate in Tesla as a

12   private company, and she felt that the future would be very

13   bright for Tesla.  And she was correct.  Tesla ended up being

14   ten times worth --

15          **MR. PORRITT:**  Your Honor, at this point --

16          **THE COURT:**  Sustained.

17          **MR. PORRITT:**  Please.

18          **THE COURT:**  That comment, last comment is to be

19   disregarded.

20          **MR. PORRITT:**  And Your Honor, if we could -- I mean,

21   the witness appears to have been spring-loaded to introduce a

22   particular speaking point.

23          **THE COURT:**  Well, I'm going to direct the witness.

24          **MR. SPIRO:**  Your Honor, he has been testifying for

25   three days.

1    **THE COURT:**  I understand that.  And so I'm not

2  commenting on your last comment, Mr. Porritt, but the witness

3  is directed to stay with the question.

4    **MR. PORRITT:**  All right.

5  **BY MR. PORRITT**

6  **Q**    So Arc Investment is a multi-million dollar investment

7  fund, is that correct?

8  **A**    Yes.

9  **Q**    So that is your definition of a small investor, is a

10  multi-million dollar investment fund?

11  **A**    Well, they -- they have many small investors that invest

12  in them.  And they represent many small investors.

13  **Q**    Okay.  So when you talked about small investors not

14  wanting to -- the feedback from retail -- small investors, you

15  weren't talk about retail investors like Tim Fries..

16  **A**    I'm not sure what you're referring to here.

17  **Q**    When you talked about getting feedback from small

18  investors, you're not talking about small retail investors like

19  Tim Fries, who invested $20,000 in Tesla.

20  **A**    I'm talking about all investors.

21  **Q**    Well, you said you got feedback from small investors, and

22  that was small investors like Cathie Wood who runs a

23  multi-million dollar investment fund.

24  **A**    She represents many small investors.

25  **Q**    Okay.

**MUSK - RECROSS / SPIRO**

1   **A**    Uh --

2   **Q**    But you didn't get any feedback directly from small retail

3   investors like Tim Fries, correct?

4   **A**    I mean, I got quite a lot of feedback on Twitter, from

5   many different sources.  So I'm not sure what you're getting

6   at.

7   **Q**    Okay.  Because the small investors were busy losing money

8   during the course of -- from August 8 to August 23, isn't that

9   correct?

10          **MR. SPIRO:**  Objection.

11          **THE WITNESS:**  No, I think that's not correct.

12          **THE COURT:**  Hold on.  Sustained.  Sustained.

13          **MR. PORRITT:**  All right.  Nothing further, Your Honor.

14          **THE COURT:**  All right.  Thank you.

15      Redirect?  Recross?

16          **MR. SPIRO:**  Yes, just very briefly, Your Honor.

17                         <u>**RECROSS-EXAMINATION**</u>

18   **BY MR. SPIRO**

19   **Q**    You were saying that, Mr. Musk, that you talked to small

20   investors on Twitter.

21   **A**    Yes.

22   **Q**    Do you do that every single day, pretty much?

23   **A**    Not every day.  But I mean, if you just review my Twitter

24   feed, I talk to investors, small and large, on Twitter

25   frequently.

**MUSK - RECROSS / SPIRO**

1        And then on Tesla earnings calls, we specifically invite

2    small investors to ask questions, and that's quite unique.

3    It's rare for small investors to get to say anything.

4        And we also allow small investors to vote questions, so

5    they can vote to what questions to ask.  In fact, there's a

6    Tesla earnings call tomorrow where that will happen.

7    **Q**    And you were asked questions about if a small investor

8    bought Tesla stock during that two-week period that you were

9    considering taking it private, and you were asked --

10   **A**    Sorry, you might want to go -- closer to the mic?

11   **Q**    Yeah.  You were asked the questions that suggested that if

12   you bought stock during that two-week period, and you were a

13   small investor, while you were considering going private, that

14   you would have lost money.

15       Is that actually true?  Or if you had held your stock,

16   would you not have lost money?

17   **A**    Um --

18          **MR. PORRITT:**  Object, Your Honor, in terms of the

19   order.  We're dealing with -- the time period here is the class

20   period and the time immediately afterwards.

21          **MR. SPIRO:**  He just opened -- he just --

22          **THE COURT:**  Overruled.

23          **MR. SPIRO:**  Thank you.

24   **BY MR. SPIRO**

25   **Q**    So Your Honor -- I mean -- Your Honor.  Thank you,

1    Your Honor.

2         Mr. Musk.

3    **A**    Yeah.

4    **Q**    The question was, plaintiff's counsel --

5    **A**    Yeah.

6    **Q**    -- asked many questions about if you were a small investor

7    over that two-week period while you were considering taking

8    Tesla private, and suggested you would have lost money.

9         If you were -- if you held your stock, would you have lost

10   money?

11   **A**    No.  It would have been possibly the best investment on

12   the entire stock market.  And -- that they -- I think -- they

13   would have literally gone up 1,000 percent.  Anyone who bought

14   stock in that period and held it would have earned ten times

15   their money.

16   **Q**    And of course, every day in the stock market with a big

17   company like Tesla, somebody buys and somebody sells.

18   **A**    Yes.

19   **Q**    Okay.  So you were also asked about interrogatory

20   responses that were given at different times.  And I jumped up

21   and objected.

22        Did this interrogatory response that asks:  What funding

23   did you have secured on August the 7th -- and plaintiff's

24   counsel, as the judge instructed him, brought out the fact that

25   the definition of "secured" is -- is -- you know, there was

1    lawyerly objections to it.  Right?

2        You didn't write this document?

3    **A**    It was written by lawyers.

4        Sorry.  Sometimes if you go away from the mic, I can't

5    hear you.

6    **Q**    Sorry.  You seem so close, so --

7    **A**    I know.  Unfortunately there's a blocking thing.  So -- I

8    feel like I'm in a sound booth, yeah.

9    **Q**    I apologize.

10       Mr. Musk, do you know, when the lawyers were meeting with

11   each other, whether or not the definition of what funding was

12   secured included your own personal net worth when you were --

13   when that document was completed?

14           **MR. PORRITT:**  Objection, Your Honor.  That's leading.

15   Lacks foundation.

16           **THE COURT:**  Sustained.

17   **BY MR. SPIRO**

18   **Q**    Do you know whether or not that includes your own personal

19   net worth?

20           **MR. PORRITT:**  Objection, Your Honor.  Same objection.

21           **THE COURT:**  Sustained.  You can ask him as to his

22   understanding.

23   **BY MR. SPIRO**

24   **Q**    Was it your understanding that this answer to this

25   question about what funding had been secured included

**MUSK - RECROSS / SPIRO**

1    everything that you -- all monies, interests, homes that you,

2    yourself, had?

3              **MR. PORRITT:**  Objection, leading.

4              **THE COURT:**  Overruled.

5              **THE WITNESS:**  No.  I thought they were just talking

6    about outside investors.  Not including me.

7    **Q**    Right.  And these answers don't include -- you don't list

8    house, car --

9    **A**    Right.

10   **Q**    Okay.  And there was no, like, law or rule that you

11   couldn't have used your own capital also as the buyer and the

12   bidder in this context, that you're aware of?

13   **A**    Correct.

14   **Q**    Okay.  And you also said, in response to plaintiff's

15   questions, that in the testimony you gave immediately following

16   the events in question, and as the jury heard read in to the

17   record, you multiple times, multiple times, said that you were

18   also thinking in your mind if you needed to, you would use

19   SpaceX.  Is that fair?

20   **A**    Yes.

21   **Q**    Okay.  I'm almost done, Mr. Musk, and you've been on the

22   stand a long time.  You were asked a bunch of other questions,

23   hypotheticals, by plaintiff's counsel.

24        During that two weeks, okay, did you actually finalize the

25   take-private?  Or was it always a consideration?

1   **A**    It was always a consideration.

2   **Q**    Okay.  So when you were asked questions about:  Well, did

3   you ever announce, you know, X or Y, at that time, during that

4   two weeks, it was still always a consideration.

5   **A**    Always a consideration.

6   **Q**    Okay.  And you said at one point that it wasn't possible,

7   as of the meeting of July 31st, to discuss specific numbers.

8       Can you just explain the third and final time for the jury

9   why that question, when everybody was going back and forth,

10  that there was a commitment but not a specific number, can you

11  just explain why at that time it wasn't possible to know a

12  specific number?

13  **A**    Because we needed to talk to all the investors to find out

14  which ones wanted to be part of Tesla as a private company,

15  versus stay as a public company.  That is unknowable until you

16  talk to the investors.

17      But what really matters there is that the Saudi PIF, my

18  understanding was they were committed to take Tesla private, no

19  matter what.

20  **Q**    And when you say "no matter what," you mean the whole

21  thing.

22  **A**    Yes.

23  **Q**    Now I'm just going to put up again Exhibit 1001.  And do

24  you remember the question:  Well, you know, but did Ron Baron

25  commit a specific number?

1          Do you remember that question?

2          And other investors, a specific number?

3          (Document displayed)

4     **A**    Yes.

5     **Q**    Okay.

6               MR. SPIRO:  Can we blow up the top?

7          (Document enlarged)

8               MR. SPIRO:  Not that much of the top.  The top half, I

9     was going to say.  I apologize.  The top half of --

10         (Document displayed)

11              MR. SPIRO:  Thanks.

12    **BY MR. SPIRO**

13    **Q**    So this is Ron Baron on August 7th, saying:

14              "This would be a terrible result for us..."

15         Again, to be bought out at 420.

16              "...unless we were included in the buying

17              group, of course."

18         Right?

19    **A**    Yes.  Seems that Mr. Porritt forgot to include that part.

20    **Q**    Okay.  And when he says that it would be a "terrible

21    result for us at 420," what do you interpret him to mean?

22    **A**    Meaning that he thought the company was worth a lot more,

23    and as he makes it clear, that he would want to be a part of

24    Tesla in the take-private.  That, that's what he means.  He

25    wants to be in the buying group to take Tesla private.

**MUSK - RECROSS / SPIRO**

 1  **Q**    And when he says "unless we are included in the buying

 2  group," as of August 7th, do you think Mr. Baron was worried

 3  that there already might be not enough space?

 4  **A**    Yes.

 5  **Q**    And if you go up to the email at the top, right, he says:

 6              "I hope you will allow us to continue to be

 7              an investor in your newly formed business."

 8  **A**    Yes.

 9  **Q**    Okay.  He remains optimistic and wants to continue to

10  invest with you.  Right?

11        And then I asked you, if you recall, did Ron Baron also

12  announce to the world on August 7th, to the world, that he

13  intended to roll his shares?

14  **A**    Yes.

15  **Q**    Okay.  And --

16  **A**    I should say that that counts for a lot because he is one

17  of the most respected investors in the world.

18  **Q**    Right.  And do you remember how much -- how much the

19  shares that Ron Baron was willing to roll and announced he was

20  rolling were worth at the time?

21  **A**    I don't recall offhand.

22        **MR. SPIRO:**  If we can show the witness 1031, and see

23  if that refreshes your recollection.

24        (Document displayed)

25        **THE WITNESS:**  Yeah.  So he was a really very

1    significant shareholder.

2            MR. PORRITT:  Objection, Your Honor.  He hasn't

3    refreshed his recollection.

4    BY MR. SPIRO

5    Q    Well, I'm asking you, were you aware, Mr. Musk, as the CEO

6    of the company, which investors were larger than others?

7    A    Approximately.

8    Q    Right.  And so do you recall, approximately, was your

9    memory refreshed by looking at Mr. Baron's public announcement,

10   as to approximately how many shares he said that he would roll?

11   A    Well, he's saying that, by his email, that he would

12   roll --

13           THE COURT:  Wait a minute.  He's now testifying on the

14   basis of the email.

15           MR. SPIRO:  Well, on the -- he's is saying "email," I

16   heard "email."  I don't think he -- I don't think he's

17   referring to the article.

18           THE WITNESS:  I'm referring to the email.  In the

19   email, Mr. Baron says that he wishes to be part of the buying

20   group.  And wishes to include his shares.

21   BY MR. SPIRO

22   Q    Right.  And so when he says that, do you, do you interpret

23   his statement to mean all of his shares?

24   A    And possibly more.

25   Q    Okay.  And do you remember approximately the value of

1   Mr. Baron's holdings, as of August 7th?

2   **A**   Half a billion dollars.

3   **Q**   Okay.  And did he announce to the world on August 7th that

4   he intended to roll -- include -- his half a billion dollars?

5   **A**   Yes, he did.

6   **Q**   Okay.  Now, finally, last exhibit.  332.

7        (Document displayed)

8   **Q**   And there was a lot of talk about what was going on with

9   the PIF, you know, in the week following the "Am considering"

10  tweet.

11       If we go to the last paragraph of this article that's in

12  evidence.

13       (Document displayed)

14  **Q**   It says (As read):

15            "The Saudi government is planning to turn the

16            PIF into a 2 trillion-dollar powerhouse, to

17            help diversify the Kingdom's oil-dependent

18            economy.  In a tweet on Sunday, the nation's

19            energy department said Saudi Arabia currently

20            is working to develop a city to support the

21            supply of raw materials and parts for the

22            automobile industry."

23       Did I read that right?

24  **A**   That is correct.

25  **Q**   Well, was $2 trillion enough to take Tesla private, twenty

**MUSK - RECROSS / SPIRO**

1  times over?

2  **A**    Um, 2 trillion would have been enough to take Tesla

3  private 150 times over.

4  **Q**    You're better at math than me, Elon.  If we could go to

5  the front --

6  **A**    Less than 1 percent.  We're talking about on an order of

7  1 percent, maybe 1-1/2 half percent.  I should say, like -- it

8  depends on how much they participate, I should say.  So, but

9  depending on how much they participate, it would -- call it --

10  yes, in round numbers, they have 100 times more money than

11  needed.

12  **Q**    Okay.  And if we could go to the front of Exhibit 332.

13       (Document displayed)

14  **Q**    And there were questions about, you know, what might have

15  been going on to make everybody beyond the media frenzy a

16  little worried at this time.  Do you see, "Investor Lawsuits

17  Begin," at the top of the article?

18  **A**    Yes.

19  **Q**    And are you aware that as of the time of this article, the

20  plaintiff's firm had sued, alleging that August 7th "Am

21  considering" was a fraud that was revealed on August 8th?

22       Are you aware of that?

23          **MR. PORRITT:**  Objection, Your Honor.  That misstates

24  facts.

25          **THE COURT:**  Sustained.

```
 1   BY MR. SPIRO

 2   Q    In this article, to you, you were still -- you were still

 3   saying to the Saudi PIF, you were still saying to Yasir:  Why

 4   don't you come out and say the real truth of what happened in

 5   that meeting, in those text messages, weren't you?

 6   A    Yes.  And, um, I have to say that the thing that really

 7   bothers me the most is that it's not actually investor

 8   lawsuits.

 9        It's class action law firms that pretend to have an --

10        MR. PORRITT:  Objection, Your Honor.  This is now a --

11   this is now a speech.

12        THE COURT:  The answer will be stricken.  It's

13   non-responsive, and inappropriate.

14   BY MR. SPIRO

15   Q    Okay.  I'm misremembering my question.

16        Regardless of class action lawsuits and their veracity,

17   okay, I'm just simply asking you that even though the Saudi PIF

18   and this article talk about how they're planning to invest in

19   the Tesla take-private, to you, you were saying to Yasir in

20   those text messages that even this, even this, is not nearly

21   what happened or strong as what happened in that room at Tesla.

22   A    Correct.

23        MR. SPIRO:  Nothing further.

24        THE COURT:  All right.  Thank you.

25        Any redirect?
```

PROCEEDINGS

```
 1          MR. PORRITT:  Very briefly.  Feel free to give a

 2   hollow laugh when I say that, but it will be very brief,

 3   Your Honor.

 4              FURTHER REDIRECT EXAMINATION

 5   BY MR. PORRITT

 6   Q    First of all, Mr. Spiro just asked you about an article or

 7   a statement by Mr. Ron Baron on August 7th, about how he would

 8   intend to roll the shares owned by his fund into any private

 9   Tesla.

10        Do you recall that?

11   A    Yes.

12   Q    He made that public statement after you had tweeted

13   "Investor support is confirmed," isn't that correct?

14   A    Yes.

15   Q    Okay.  If I can refer you -- if we can put up Exhibit 332.

16        (Document displayed)

17          MR. PORRITT:  Your Honor, at this point there's

18   nothing further.  That's all I will state.  I'm done.  Sorry.

19   I've completed my examination.

20          THE COURT:  All right.

21          MR. SPIRO:  Your Honor, we're going to have to clean

22   up some of the time zones in some of the exhibits.  But other

23   than that, I don't have any more questions of Mr. Musk.

24          THE COURT:  All right.  Then, Mr. Musk, you are

25   excused as a witness.  Thank you.
```

PROCEEDINGS

1            THE WITNESS:  Thank you, Your Honor.

2       (Witness excused)

3            THE COURT:  All right.  We might as well take our

4   break before the next witness.  So we'll take a 20-minute

5   break.  Thank you.

6            THE COURTROOM DEPUTY:  All rise for the jury.

7            THE COURT:  All right, take a break.

8       (Recess taken from 11:52 a.m. to 12:21 p.m.)

9       (The following proceedings were held outside of the

10  presence of the Jury)

11           THE COURTROOM DEPUTY:  Court is reconvened.

12           THE COURT:  Okay, you may bring the jury back.

13           THE COURTROOM DEPUTY:  Yep.

14       MR. APTON:  Your Honor, before we start, can we do the

15  Brinkman exhibits?

16           THE COURT:  Oh, okay.

17       MR. APTON:  So Your Honor, these are all or have been

18  ruled on already.

19           THE COURT:  Okay.

20       MR. APTON:  Some are in evidence already, though, so

21  apologies.  It's 8, 10, 11, 12, 13, 14, 15, 17, 18, 21, 22, 23,

22  24, 25, 27, 53 and 171.  We move to admit those that are not

23  already admitted, and also for permission to publish those to

24  the jury as Mr. Brinkman is testifying by deposition.

25           MR. LIFRAK:  The list is correct, and we have no

**PROCEEDINGS**

 1   additional objections other than the ones that we have reserved

 2   previously.

 3           THE COURT:  All right, then my ruling -- I think I've

 4   ruled on all those -- stands.  Those are all -- any objections

 5   are overruled, and these are deemed admitted.

 6           MR. APTON:  Thank you, Your Honor.

 7       (Trial Exhibits 8, 10, 11, 12, 13, 14, 15, 17, 18, 21, 22,

 8   23, 24, 25, 27, 53 and 171 received in evidence.)

 9           THE COURT:  Okay, we are going to retrieve the jury.

10       (The following proceedings were held in the presence of

11   the Jury)

12           THE CLERK:  All rise for the jury.

13           THE COURT:  All right.  Have a seat, everyone.

14   Welcome back.  Good afternoon.  We are now going to hear from

15   the plaintiff's next witness.

16       Ms. Tripodi?

17           MS. TRIPODI:  Yes, Your Honor.  Plaintiffs call Martin

18   Viecha.

19           THE COURT:  All right.

20           MARTIN VIECHA, PLAINTIFF'S WITNESS, SWORN

21       THE WITNESS:  Yes.

22       THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

23       THE WITNESS:  Thank you.

24       THE COURTROOM DEPUTY:  Please speak clearly into the

25   microphone.  State and spell your first and last name for the

 1   record.

 2           THE WITNESS:  Martin Viecha.  M A-R-T-I-N,

 3   V-I-E-C-H-A.

 4           THE COURT:  Thank you, Mr. Viecha.

 5       You may proceed.

 6           MS. TRIPODI:  Your Honor, I have a witness binder for

 7   both the Court and Mr. Viecha.  May I approach?

 8           THE COURT:  Yep.

 9       (Binder tendered to the Court)

10           THE WITNESS:  Thank you.

11                        **DIRECT EXAMINATION**

12   **BY MS. TRIPODI**

13   **Q**   Good afternoon, jurors.  And good afternoon, Mr. Viecha.

14   **A**   Good afternoon.

15   **Q**   I believe we met previously on Zoom, but nice to see you

16   again today.

17   **A**   Nice to see you.

18   **Q**   Are you currently employed at Tesla?

19   **A**   Yes.

20   **Q**   What is your current position?

21   **A**   Vice-president of Investor Relations.

22   **Q**   How long have you held that position?

23   **A**   Um, as the head of IR for about five years.  A bit over

24   five years.

25   **Q**   When did you start working at Tesla?

1    **A**    I started working in October, 2017.

2    **Q**    How did you come to work at Tesla in October of 2017?

3    **A**    Um, I was told by the previous head of Investor Relations,

4    Jeff Evanson, that he's leaving the company.  And I tried to

5    interview for the role.

6    **Q**    Did you have a relationship with Mr. Evanson at that time?

7    **A**    No.

8    **Q**    And in August of 2018, you were VP of investor relations

9    at Tesla?

10   **A**    I was Senior Director of Investor Relations.

11   **Q**    As Senior Director of Investor Relations in 2018, can you

12   describe for the jury what your job function was?

13   **A**    Absolutely.  My job function was to speak with investors,

14   attend the investor conferences, write the shareholder letter,

15   host their earnings call.  Those, those would be the main

16   tasks.

17   **Q**    So you were responsible for being a point of contact with

18   both investment institutions and retail investors of Tesla?

19   **A**    Um, really only institutional investors.  At that time

20   there was no communication with retail.

21   **Q**    I'm sure there are many different types of things you

22   discussed with institutional investors, but can you give the

23   jury a general overview of what some of those things may have

24   been in 2018?

25   **A**    Absolutely.  The -- you know, investors would be asking

**VIECHA - DIRECT / MS. TRIPODI**

1    questions, anything from explaining battery technology,

2    explaining, you know, autopilot software, explaining the

3    manufacturing process of a Model 3, accounting practices.  It

4    would be a very large variety of topics.

5    **Q**    And were you responsible for providing responses to all

6    inquiries?  Or were there times when you would direct those

7    inquiries to someone else?

8    **A**    We were a team of two at that time, so some of the

9    responses would be directed to someone else, and some would be

10   done by me.

11   **Q**    And by being directed to someone else, that was to the

12   other person on your team of two?

13   **A**    Correct.

14   **Q**    And was that other person at the time in 2018 Aaron Chew?

15   **A**    Correct.

16   **Q**    As Senior Director of Investor Relations in 2018, would

17   you interact with Elon Musk?

18   **A**    Yes.

19   **Q**    And on what occasions would you typically interact with

20   Mr. Musk?

21   **A**    I would typically interact with Mr. Musk prior to the

22   earnings call, so when we were preparing for an earnings call

23   or when we were about to publish the quarterly shareholder

24   letter we would usually have a handful of meetings in

25   preparation for that.

**VIECHA - DIRECT / MS. TRIPODI**

1  **Q**    Would you help to prepare Mr. Musk for the quarterly

2  earnings calls?

3  **A**    Um, yes, we would run through the topics that will be

4  covered.

5  **Q**    In 2018, did you follow Mr. Musk on Twitter?

6  **A**    Yes.

7  **Q**    Now, in July of 2018, do you recall Mr. Musk tweeting

8  about a British -- British cave diver who helped in the rescue

9  of trapped schoolboys?

10 **A**    Yes.

11 **Q**    And these tweets by Mr. Musk, am I correct that they came

12 up in some conversations you had with investors in 2018?

13 **A**    Yes.

14 **Q**    Were some of the investors unhappy with Mr. Musk's

15 decision to tweet?

16 **A**    Yes.  There were some investors that were -- would prefer

17 to stay off these topics.

18 **Q**    In early August of 2018, can you recall Mr. Deepak Ahuja,

19 who was Tesla's CFO at the time, asking you to put together a

20 list of Tesla's current shareholders?

21 **A**    Yes.

22         **MS. TRIPODI:**  Your Honor, I would like to show the

23 witness Exhibit 143.

24         **THE COURT:**  Okay.

25         **MR. SPIRO:**  No further objection.

1           **THE COURT:**  All right.

2           **MS. TRIPODI:**  Your Honor, if we could move to admit

3    and to publish to the jury, please.

4           **THE COURT:**  All right, so admitted, you may publish.

5      (Trial Exhibit 143 received in evidence.)

6    **BY MS. TRIPODI**

7    **Q**    Mr. Viecha, do you see Exhibit 143?

8    **A**    I do.

9    **Q**    And this is a rather long email chain.  You also have your

10   witness binder, so if it's easier to flip through in the

11   binder, feel free.

12      Do you generally recognize this email between you and

13   Mr. Ahuja that started on --

14          **MS. TRIPODI:**  If we can go to the bottom page, which I

15   believe, Derek, maybe is 10.

16      (Document displayed)

17          **MS. TRIPODI:**  Oh, maybe one more.

18   **BY MS. TRIPODI**

19   **Q**    So it appears that this email chain started on August 4th.

20   Do you see that?

21   **A**    I do.

22   **Q**    Here, am I correct that Mr. Ahuja had asked you to put

23   together a table of the number of shares held by categories of

24   shareholders?

25   **A**    That is correct.

1    Q    At this time, did you have an understanding as to why you

2    were being asked to do that?

3    A    Well, Deepak has not said this specifically.  Given I was

4    aware of the meeting with the Saudi PIF at the end of July,

5    I -- I had a hunch of why he's trying to put together a list.

6    Q    But when you were responding to Mr. Ahuja as of

7    August 4th, Mr. Ahuja had not said specifically to you why he

8    was requesting this information?

9    A    No.

10   Q    If you will look at the table that's on Page 9 and 10 of

11   the exhibit.  So starting on Page 9, going over into Page 10.

12        (Document displayed)

13   Q    Do you create this table?

14   A    I believe I did.

15   Q    And what was the purpose of this table?

16   A    I -- I was asked to create a list of the largest

17   shareholders of Tesla, without any further commentary.

18   Q    And in your email above the table that's dated August 4th,

19   you say (As read):

20             "Retail could be a lot more since Saudi PIF

21             almost certainly bought from some of our top

22             holders..."

23        Do you see that?

24   A    Yes, I do.

25   Q    How did you learn about the Saudis buying their shares?

**VIECHA - DIRECT / MS. TRIPODI**

1    **A**   I learned about it from Deepak Ahuja, during my

2    conversation with him the day before our earnings call, which I

3    believe was July 31st.

4    **Q**   And can you recall what specifically you learned in that

5    conversation?

6    **A**   What Deepak mentioned is that the representatives of Saudi

7    PIF are in the building, meeting Elon.  And that they have been

8    buying a lot of shares, probably about 5 percent of the

9    company, up until that point.

10    **Q**   And was it your understanding that they had been buying

11    these shares in the open market?

12    **A**   Yes.

13    **Q**   In the same email, you say updated ownership figures would

14    be out in a month.  Is that correct?

15    **A**   That is correct.

16    **Q**   And did you have an understanding as to whether the

17    updated ownership figures would include the Saudis' stake in

18    Tesla?

19    **A**   That wasn't clear at that point, given only U.S.

20    companies, from my understanding, required to file a form

21    that's called a 13-F.  That would show how many shares does

22    each institution own.  Non-U.S. institutions don't necessarily

23    have to file this.  So it wasn't clear whether that would come

24    in public filings.

25    **Q**   Looking at Mr. Ahuja's prior email to you, at the bottom

VIECHA - DIRECT / MS. TRIPODI

```
 1   of Page 10.

 2        (Document displayed)

 3   Q    Mr. Ahuja noted -- oop, maybe scroll down a little bit

 4   more --

 5        (Document displayed)

 6           MS. TRIPODI:  Great, thanks.

 7   BY MS. TRIPODI

 8   Q    Mr. Ahuja notes (As read):

 9            "I want to send Elon some more information in

10            a simple excel file rather than this fancy

11            slide.  Please show percentages in the column

12            to the right of the shares."

13        Do you see that?

14   A    Yes.

15   Q    So you understood at this point that you were gathering

16   this information for Mr. Ahuja to then provide it to Mr. Musk.

17   Correct?

18   A    Correct.

19   Q    Did you understand why you were providing this information

20   through Mr. Ahuja to Mr. Musk?

21   A    I wasn't told specifically at that time.

22   Q    Did you have any understanding?

23   A    I don't want to speculate, but I -- from -- I understood

24   that it has to do something with a takeover bid.

25   Q    If we can go to the first page of Exhibit 143.
```

**VIECHA - DIRECT / MS. TRIPODI**

1    And looking at the top email from you, this was dated

2  August 7th.  You and Mr. Ahuja were still discussing the share

3  ownership, correct?

4  **A**    Correct.

5  **Q**    And specifically, if we look at your email from August 7th

6  at 2:39, which I will represent for the record was UTC time --

7  I know defense counsel has mentioned some issues with time

8  zones.  So this was approximately 7:39 a.m. Eastern Standard

9  Time.  You write (As read):

10           "Art wrote me an email about 2 hours ago that

11           he's pulling the retail data now."

12    Do you see that?

13  **A**    Yes.

14  **Q**    Who was Art?

15  **A**    Art was a CEO of a consultancy that was pulling out the

16  retail ownership data for us at that time.  Retail ownership

17  data is not easy to just, like, Google or something.

18  **Q**    So the files you had previously sent to Mr. Ahuja did not

19  include this retail data from Art.  Correct?

20  **A**    The -- the file had an estimated retail data, which would

21  have to be -- whatever's the unaccounted-for shares would be

22  estimated to be retail.  But we only waited for a more precise

23  number.

24  **Q**    To your knowledge, since you were still waiting on this

25  more precise number from Art, had this list of investors been

1    sent to Mr. Musk?

2    **A**    I would not be aware.

3    **Q**    On August 7th of 2018, am I correct that you were

4    preparing to fly to New York City for an investor conference?

5    **A**    That is correct.

6    **Q**    Do you recall when you flew to New York?

7    **A**    Maybe midday, but I'm not entirely sure.

8            **MS. TRIPODI:**  If we could introduce Exhibit 8, please.

9    It's already been admitted.

10           (Document displayed)

11   **BY MS. TRIPODI**

12   **Q**    Mr. Viecha, do you recognize the tweet from Mr. Musk in

13   Exhibit 8?

14   **A**    Yes.

15   **Q**    Do you recall when you first saw this tweet?

16   **A**    Yes.

17   **Q**    When was that?

18   **A**    It was at the time that it was -- you know, that it was

19   tweeted.

20   **Q**    Was this -- did you see this prior to you traveling to

21   New York?

22   **A**    Yes.

23   **Q**    And am I correct that right after this initial tweet that

24   we've seen in Exhibit 8 was posted, you started receiving

25   emails from Tesla investors?

```
 1   A    That is correct.

 2   Q    Is it fair to say that you started receiving those emails

 3   immediately?

 4   A    Yes.

 5   Q    If we could look at Exhibit 146.

 6        (Document displayed)

 7           MS. TRIPODI:  Your Honor, I don't believe there is any

 8   objection to 146.

 9           MR. LIFRAK:  No further objection.

10           THE COURT:  All right.

11           MS. TRIPODI:  Your Honor, if we could admit, please,

12   and publish to the jury.

13           THE COURT:  You may publish.  It's admitted.

14        (Trial Exhibit 146 received in evidence.)

15        (Document displayed)

16   BY MS. TRIPODI

17   Q    Mr. Viecha, if you will take a look at Exhibit 146.

18   A    Yes.

19   Q    Do you recognize this email as one that you've received in

20   response to the tweet that we just saw in Exhibit 8?

21   A    Yes.

22   Q    Who is Itay Michaeli?

23   A    Itay Michaeli is a sell-side analyst.

24   Q    And when you say "sell-side analyst," can you explain for

25   the jury what you mean?
```

1  A    Absolutely.  So the investment community is split into buy

2  side and sell side.  Sell side writes research about companies

3  and sells it to the buy side.  Buy side doesn't produce

4  research.  Buy side actually invests in companies.  So sell

5  side would be a research firm; buy side would be an investor.

6  Q    So this email generally represents an email from a

7  sell-side investor to you regarding the tweet.  Is that

8  correct?

9  A    That is correct.

10  Q    And in his email, Mr. Michaeli writes (As read):

11          "The employee letter didn't make clear

12          whether there is an actual transaction on the

13          table (with secured financing) or if this is

14          more of a strategic announcement to consider

15          pursuing such transaction."

16      Did I read that correctly?

17  A    Yes.

18  Q    When Mr. Michaeli references the employee letter here, did

19  you understand that he was referencing the blog post that Tesla

20  published on its website?

21  A    I understood it to be Elon's blog post that he's referring

22  to.

23          MS. TRIPODI:  And if we could pull up Exhibit 12, just

24  so we're clear.

25      (Document displayed)

VIECHA - DIRECT / MS. TRIPODI

1  BY MS. TRIPODI

2  Q    Exhibit 12 is the blog post.  Do you see that, Mr. Viecha?

3  A    Yes, I do.

4  Q    Did you understand that this was what Mr. Michaeli was

5  referring to?

6  A    Yes.

7  Q    Your response to Mr. Michaeli says (As read):

8         "The very first tweet mentioned a firm

9         offer."

10     Am I correct?

11 A    Yes.

12        **MS. TRIPODI:**  If we could look at this exhibit,

13 please, 146, with Exhibit 8, Mr. Musk's tweet.

14     (Documents displayed)

15 BY MS. TRIPODI

16 Q    And first, Mr. Viecha, let me ask you:  After seeing

17 Mr. Musk's tweet, had Mr. Musk, himself, provided you with any

18 information?

19 A    Sorry; could you say it again?

20 Q    Sure.  After seeing this tweet, the August 8th tweet, the

21 "Funding secured" tweet, had Mr. Musk provided you with any

22 information regarding the tweet?

23 A    No.

24 Q    Had anyone at Tesla, in the immediate aftermath of seeing

25 this tweet, provided you with any information regarding the

1    tweet?

2    **A**    Yes.  I had a call with Tesla general counsel as well as

3    the CFO, Deepak Ahuja.

4    **Q**    Do you recall when your conversation with Tesla general

5    counsel and Mr. Ahuja was?

6    **A**    A few minutes after the tweet came out.

7    **Q**    Okay.  So looking back at the tweet that's in Exhibit 8,

8    and Mr. Michaeli's email, you had responded (As read):

9             "The very first tweet mentioned a firm

10            offer."

11        Looking at the tweet in Exhibit 8, which part of this

12    tweet mentioned a firm offer?

13   **A**    I think, um --

14        (Witness examines document)

15   **A**    When I -- given I knew everything that I was aware of at

16   the time, after I read the tweet, it was a, you know, offer by

17   the bidder.  And I used my -- my own words to describe what my

18   understanding of the situation was.

19   **Q**    Does the "I am" -- or the "Am considering" portion of that

20   tweet, does that indicate a firm offer to you?

21   **A**    I really didn't think about it in separate terms.  I saw

22   the tweet, understood that what I witnessed a week prior to

23   that has become public.  And based on my prior knowledge, I

24   used my own words, saying that there's a firm offer.

25   **Q**    Did you interpret "Funding secured" as being part of the

VIECHA - DIRECT / MS. TRIPODI

1    firm offer?

2    **A**    I really didn't think about it as a -- as a separate

3    statement.  I saw the tweet, and based on my prior

4    understanding of the events, um, for me there was an offer and

5    acceptance, based on my conversation with Deepak a week prior

6    to that.

7    **Q**    At this point in time, had you seen anything in writing

8    confirming your belief that there was a firm offer?

9    **A**    No, I had not.

10   **Q**    And at this point in time, you mentioned that you had had

11   a conversation with Mr. Ahuja regarding the PIF meeting on

12   July 31st.  Did you know whether the Saudi PIF had agreed to

13   fund a going-private at $420 per share?

14   **A**    Well, Deepak Ahuja told me after the meeting with the

15   Saudi PIF, is that they have once again offered to buy Tesla,

16   and Elon said yes.  There was no mentioning our conversation

17   about the share price at which it would be taken over.

18   **Q**    And did you know whether there had been any discussion

19   with the Saudi PIF, based on what Mr. Ahuja conveyed to you,

20   regarding the overall amount of the funding that would be

21   needed for such a transaction?

22   **A**    From my understanding from conversation with Mr. Ahuja,

23   this would be acquiring of company or taking over of a company.

24   **Q**    Was there a specific amount of funding that you understood

25   to have been discussed?

 1    **A**    No.

 2          **MS. TRIPODI:**  If we can show the witness Exhibit 150,

 3    please.

 4        (Document displayed to the Witness)

 5          **MS. TRIPODI:**  Which, again, I believe Your Honor

 6    overruled any objections on.

 7          **MR. LIFRAK:**  That's correct.

 8          **THE COURT:**  All right, it's admitted.

 9        (Trial Exhibit 150 received in evidence.)

10          **MS. TRIPODI:**  Thank you.

11        If you will publish, please?

12        (Document displayed)

13    **BY MS. TRIPODI**

14    **Q**    Mr. Viecha, do you recognize Exhibit 150?

15    **A**    Yes.

16    **Q**    Is this another email you received in response to

17    Mr. Musk's "Funding secured" tweet?

18    **A**    Um, yes.

19    **Q**    Who is Bradley Erickson?

20    **A**    Bradley Erickson is another sell-side analyst from

21    KeyBank.

22    **Q**    In his email to you, Mr. Erickson wrote (As read):

23              "He" -- who I take to mean Elon -- "said

24              financing is secured but in the letter he

25              doesn't address this.  Can you clarify?"

1    Do you see that?

2  **A**   Yes.

3  **Q**   Did you understand Mr. Erickson to be questioning the

4  financing here?

5  **A**   Um, I understood that at the time, there were many people

6  trying to figure out whether this is even real.  And whether

7  there is -- you know, what would the details be.  So I

8  understood from his email that he's trying to get some

9  additional color.

10 **Q**   But am I correct that Mr. Erickson is specifically asking

11 you regarding financing being secured?

12 **A**   Yes, that's what his email mentions.

13 **Q**   And you responded:

14         "I can only say that the first tweet clearly

15         stated that 'financing is secured.'  Yes,

16         there is a firm offer."

17     Did I read your response correctly?

18 **A**   Yes.

19 **Q**   And if we can look at this again with Exhibit 8, please.

20     (Document displayed)

21 **Q**   What part of the tweet that we see in Exhibit 8 led you to

22 say to Mr. Erickson "Yes, there is a firm offer"?

23 **A**   My statement was based on my understanding of the

24 situation, due to meeting with Deepak, one week prior to the

25 call -- sorry -- to the tweet.

1    Given we've seen a repeated attempt by the Saudi PIF, and

2 after a repeated event Elon said yes, it was my understanding

3 that there was an offer and acceptance.  So I was basing this

4 on my own understanding of the situation.

5 **Q**    Had you previously been part of what you've characterized

6 as the Saudis' repeated attempts?

7 **A**    I have -- this was communicated to me by Deepak Ahuja on

8 the 31st.

9 **Q**    Understood.  If we can look at Exhibit 58, please.

10    (Document displayed to the Witness)

11        **MS. TRIPODI:**  And again, I don't believe there was any

12 objections.

13        **MR. LIFRAK:**  No further objections.

14        **THE COURT:**  Admitted.  You may publish.

15    (Trial Exhibit 58 received in evidence.)

16    (Document displayed)

17        **MS. TRIPODI:**  Thank you, Your Honor.

18 **BY MS. TRIPODI**

19 **Q**    Mr. Viecha, do you recognize this email?

20 **A**    Yes, I do.

21 **Q**    And who is Owuraka Koney?

22 **A**    Owuraka Koney is an analyst at an investment firm,

23 Jennison.

24 **Q**    Was Jennison also a substantial shareholder of Tesla at

25 this time?

1    A    Yes.

2    Q    Looking at the first email in the chain, at the bottom of

3    Page 1, Mr. Koney has only written in the subject line, "call

4    me back."  Do you see that?

5    A    Yes.

6    Q    And you respond that you were on a plane to New York City.

7    Do you see that?

8    A    Yes.

9    Q    And then you state:

10           "Did you read our official blog post on this

11           topic?"

12       Is that correct?

13   A    That's what I wrote.

14   Q    Were you referring to the August 7th blog post that we

15   previously looked at, Exhibit 12?

16   A    Yes, that's the one I was referring to.

17   Q    And Mr. Koney replied to you confirming that he saw the

18   Tesla blog post on August 7th, but he added:

19           "Nothing on funding, though?"

20       Do you see that?

21   A    Yes.

22   Q    Were you aware at this time that you were having the

23   conversation with Mr. Koney that the blog post in Exhibit 12

24   did not mention funding?

25   A    I can't recall, but from what I remember, there was no

1   mention of the Saudi PIF at that time.

2   **Q**   And was it your understanding at the time of this tweet

3   that the Saudi PIF was the source of funding for the

4   going-private?

5   **A**   Based on my conversation with Deepak, it was my

6   understanding that Saudi PIF would be taking over the company.

7   **Q**   So in your email reply to Mr. Koney in the middle of

8   Exhibit 58, you write (As read):

9           "The very first tweet simply mentioned

10          'Funding secured' which means that that is a

11          firm offer."

12  Did I read that correctly?

13  **A**   Yes.

14  **Q**   And at this point Mr. Koney responds (As read):

15          "'Firm offer' means there is a commitment

16          letter or is this a verbal agreement?"

17  Do you see that?

18  **A**   Yes.

19  **Q**   And you respond (As read):

20          "I actually don't know, but I would assume

21          that given we went full-on public with this,

22          the offer is as firm as it gets."

23  Do you see that?

24  **A**   Yes.

25  **Q**   Again, was there anything specific in the tweet of

1   August 8th, the "Funding secured" tweet, that made you believe

2   the offer was as firm as it gets?

3   **A**    As I responded to Mr. Koney, I said I don't actually know

4   if there's a commitment letter or this -- or is this a verbal

5   agreement.

6   **Q**    But you did respond that the offer is as firm as it gets.

7   Correct?

8   **A**    What I responded is I don't actually know, but I would

9   assume that, given we went full-on public with this, the offer

10  is as firm as it gets.

11  **Q**    And your assumption that the offer is as firm as it gets,

12  my question is related to the tweet.  What part of that tweet

13  led you to believe that your assumption, "The offer is as firm

14  as it gets," was correct?

15  **A**    The assumption was based on my meeting with Deepak.  And

16  as I mentioned before, the conversation we had about the

17  repeated attempt of the Saudi PIF and an offer and a -- and an

18  acceptance.

19  **Q**    Mr. Koney's response in Exhibit 58 was (As read):

20          "We're happy shareholders but the way this

21          was disclosed was all very unusual.  And a

22          tweet, which has been used as a medium of

23          humor amongst other things, is hardly the

24          right place to confirm the funding is secure.

25          We will need a little bit more than that."

1      Is that correct?

2    **A**    Yes.

3    **Q**    Was it your understanding from this series of emails with

4    Mr. Koney that Mr. Koney had questions regarding funding?

5    **A**    Yes, it was my understanding.

6    **Q**    Did you respond to Mr. Koney's feedback regarding the

7    tweeting?

8    **A**    Um, sorry, I'm not following.  Could you --

9    **Q**    Sure.  Mr. Koney was the last person to send an email on

10   this chain.  I'm just asking, did you recall responding to

11   Mr. Koney?

12   **A**    No, I don't recall responding.

13   **Q**    If we can move to Exhibit 151, please.

14          **MS. TRIPODI:**  Again, I don't believe there are

15   objections.

16          **MR. LIFRAK:**  Correct, no further objections.

17          **THE COURT:**  Admitted.  You may publish.

18          (Trial Exhibit 151 received in evidence.)

19          **MS. TRIPODI:**  Thank you, Your Honor.

20          (Document displayed)

21   **BY MS. TRIPODI**

22   **Q**    Mr. Viecha, is this another email you received in response

23   to the "Funding secured" tweet?

24   **A**    Yes, it is.

25   **Q**    Who is Toni Sacconaghi?

1   A     Toni Sacconaghi is a sell-side analyst from Bernstein.

2   Q     Looking at the first page of this exhibit, Mr. Sacconaghi

3   asks (As read):

4              "What does 'Financing secured' actually mean?

5              Are you assuming Tesla will need 60 billion

6              plus in financing, or assuming that many

7              shareholders don't take the offer and Tesla

8              needs less?  Big difference.  'Financing

9              secured' implies the former."

10  Do you see that?

11  A     Yes.

12  Q     Is it fair to say that you understood Mr. Sacconaghi had

13  questions regarding the funding for the going-private

14  transaction?

15  A     It is my understanding that he is trying to understand

16  whether there is a single major buyer or a -- whether this

17  transaction is dependent on a portfolio of buyers.

18  Q     Had you had any discussions with Mr. Ahuja or anyone else

19  regarding a potential portfolio of buyers for the

20  going-private?

21  A     In the first conversation with Deepak Ahuja he made it

22  clear that this would be a purchase of the company or takeover.

23  And given I was aware that Saudi PIF is large enough to easily

24  be able to execute this transaction by itself, I had no doubt

25  that this is -- there is no necessity for another entity.

**VIECHA - DIRECT / MS. TRIPODI**

1  Q    At this point in time, on August 7th, had you been part of

2  any discussions regarding the potential for existing Tesla

3  shareholders rolling over their shares into the going-private?

4  A    I have not.

5  Q    Your response to Mr. Sacconaghi here is (As read):

6            "It means that financing is secured

7            regardless of other assumptions."

8       Did I read that correctly?

9  A    Yes.

10 Q    What did you mean by "regardless of other assumptions"?

11 A    What I meant was that Toni was trying to understand

12 whether Tesla needs its investors to roll over to the private

13 entity or whether that's not necessary.  And I wanted to make

14 it clear that that's an unnecessary assumption.

15 Q    But am I correct that you just testified you were not part

16 of any discussions regarding existing Tesla shareholders

17 rolling their shares over into the going-private?

18 A    That is correct.  And it was my understanding, based on

19 the conversation with Deepak, that that's not a necessity.

20 Q    Were you aware that Mr. Musk had expressed a desire that

21 existing shareholders would roll their shares over into a

22 private Tesla?

23 A    I have learned that from the tweet on August 8th --

24 August 7th.

25 Q    And do you believe you learned that after responding to

1    Mr. Sacconaghi?

2    **A**    Um, I believe that the tweet happened before my email to

3    Mr. Sacconaghi.

4    **Q**    So you were aware at the time that you wrote back to

5    Mr. Sacconaghi that Mr. Musk was interested in rolling existing

6    shareholders into the Tesla going-private?

7    **A**    From my understanding, it was an option that other

8    shareholders would have, not a necessity.

9    **Q**    So by it being considered an option by you, is it fair to

10   say that you had some uncertainty as to what the ultimate

11   structure of this going-private would look like at this point?

12   **A**    Um, based on Elon's tweet, what he mentioned publicly was

13   that all current shareholders would be able to be part of the

14   private entity.  I wasn't quite -- I didn't have any experience

15   of how that sort of structure would look like at that time.

16   **Q**    Also on the first page of Exhibit 151, Mr. Sacconaghi has

17   asked another question.  He says (As read):

18                "Has this possible buyer been discussed with

19                Tesla's board or shareholders prior to

20                today?"

21        Do you see that?

22   **A**    Yes, I do.

23   **Q**    Okay.  And you replied (As read):

24                "This wasn't discussed with any shareholders

25                prior to today's tweet."

1       Did I read that correctly?

2   **A**    Yes.

3   **Q**    So, did your email confirm your understanding that there

4   had been no discussions with Tesla shareholders about the

5   going-private transaction prior to August 7th of 2018?

6   **A**    Yeah, the only shareholder this was discussed with was the

7   Saudi PIF.

8           **MS. TRIPODI:**  If we can look at Exhibit 147, please.

9   And I don't believe defense counsel has objections?

10          **MR. LIFRAK:**  No further objections.

11          **THE COURT:**  Admitted.  It may be published.

12      (Trial Exhibit 147 received in evidence.)

13      (Document displayed)

14          **MS. TRIPODI:**  Thank you, Your Honor.

15  **BY MS. TRIPODI**

16  **Q**    Mr. Viecha, do you recognize this email?

17  **A**    Yes, I do.

18  **Q**    And do you recall receiving this email?

19  **A**    Yes, I do.

20  **Q**    If we can look to the bottom of Page 1.

21      Actually, I'm sorry, Page 2.  This is an email from Matt

22  Fassnacht.  Did I say that correctly?

23  **A**    I think so.

24  **Q**    Who is Mr. Fassnacht?

25  **A**    He's an investor.

VIECHA - DIRECT / MS. TRIPODI

1  Q    And was he associated with HHR?

2  A    That is correct.

3  Q    Am I correct that he was the portfolio manager or a

4  portfolio manager at HHR?

5  A    That is correct, he was a portfolio manager at HHR.

6  Q    And was HHR a smaller hedge fund?

7  A    Correct.

8  Q    At this time was HHR invested in Tesla?

9  A    As far as I believe, it was.

10 Q    If we can look at the middle of Page 1, the timestamp is

11 13:25.  Mr. Aaron Chew -- and before I continue, Mr. Chew was

12 part of your team, correct?

13 A    That is correct.

14 Q    He was the other -- in the team of two, he was the other

15 one.  Correct?

16 A    Yes.

17 Q    So Mr. Chew forwarded a message to you and Mr. Ahuja,

18 Tesla's CFO, regarding the initial feedback from HHR.  Do you

19 see that?

20 A    Yes.

21 Q    And Mr. Fassnacht, lower down in the email, writes that

22 HHR will not support a buyout, and that he felt betrayed and

23 that he can't own private entities.

24      Do you see that?

25 A    Yes.

**VIECHA - DIRECT / MS. TRIPODI**

1  **Q**    And you replied to Mr. Chew, saying that (As read):

2            "The majority of our holders want to stay

3            with us but many of them do not have a

4            mandate to own private companies."

5       Did I read that correctly?

6  **A**    Yes.

7  **Q**    Can you explain for the jury what a mandate regarding

8  private companies is?

9  **A**    Absolutely.  When institutional investors hold a stake in

10  companies, in some cases, the investors of those institutional

11  investors want liquidity.  They want to be -- access their cash

12  whenever -- or their savings whenever they want to.  Private

13  companies have -- also have shares, but they're less liquid.

14  And as a result, some investment institutions would only be

15  allowed to own shares in a publicly-traded company but not in a

16  private company.

17  **Q**    At this time did you have a general sense of certain

18  institutions that might have a mandate preventing them from

19  owning shares in a private company?

20  **A**    Sorry, could you please say that again?

21  **Q**    Sure.  At this point in time, did you generally have an

22  understanding of what institutions might have a mandate that

23  would prevent them from owning shares in a private Tesla?

24  **A**    Um, at this point, very few.  It was my understanding at

25  that time that every major institution, whether it's Fidelity,

**VIECHA - DIRECT / MS. TRIPODI**

 1  T. Rowe, BlackRock, State Street, et cetera, all the major

 2  institutions are naturally able to hold both.  It was a matter

 3  of smaller institutions, usually, that they were not able to

 4  own private company shares.

 5  **Q**    And with respect to an institution like T. Rowe, you

 6  mentioned that they were able to hold both, or that you believe

 7  they were able to hold both.  Is that correct?

 8  **A**    That is correct.

 9  **Q**    Did you have an understanding as to whether the fund that

10  held shares of public Tesla could also own shares of private

11  Tesla?  Meaning that same fund.

12  **A**    With T. Rowe, Tesla shares were held across more than the

13  ten funds.  And it was our understanding that some of those

14  funds would and some of those funds would not be able to hold

15  Tesla shares.

16  **Q**    Did you have an understanding of what funds those were?

17  **A**    No.

18  **Q**    After the tweets came out, did you do some research to

19  determine what funds might be able to hold shares in a private

20  Tesla?

21  **A**    I've held several conversations with our large investors.

22  **Q**    Did you get to hold some of those conversations in person

23  while you were at the investor conference?

24  **A**    Probably, but I cannot recall.

25  **Q**    But is it fair to say that prior to the tweets, you

1    understood that some of Tesla's shareholders might have a

2    mandate that would prevent them from owning shares in a private

3    Tesla?

4    **A**    Yes.

5    **Q**    Were you the only one with knowledge of this at Tesla?  Or

6    did someone else have this information?

7    **A**    I haven't discussed this with anyone.

8    **Q**    Do you know whether Mr. Chew, your team member, was also

9    aware that some funds might have a mandate against holding

10   shares in a private Tesla?

11   **A**    I wouldn't remember.  I don't want to speculate.

12   **Q**    Aside from this email with Mr. Ahuja, the CFO, and

13   Mr. Chew, your team member, did you convey this email -- I'm

14   sorry.

15       Did you convey this information regarding funds that might

16   have a mandate preventing them from owning shares in private

17   Tesla, did you convey that information to anyone else?

18   **A**    Um, I cannot recall, but I do remember communicating about

19   this with Deepak, to make sure that he's aware who can and who

20   cannot.

21   **Q**    Do you recall whether those communications were

22   post-August 7th "Funding secured" tweet?

23   **A**    Yes, they were post-August 7th tweet.

24       **MS. TRIPODI:**  If we can now look at Exhibit 155,

25   please.  And I don't believe there are any outstanding

VIECHA - DIRECT / MS. TRIPODI

1    objections to this.

2            **MR. LIFRAK:**  No further objections.

3            **THE COURT:**  Admitted.

4        (Trial Exhibit 155 received in evidence.)

5        (Document displayed)

6            **MS. TRIPODI:**  Thank, Your Honor.

7    **BY MS. TRIPODI**

8    **Q**    Do you recall sending this email, Mr. Viecha?

9    **A**    Um, I recall receiving this email.

10   **Q**    Oh, my apologies.  I mixed up the From and To.

11           So you recall receiving this from Mr. Chew?

12   **A**    Yes .

13   **Q**    And Exhibit 155, am I correct that this reflects

14   conversations that the investor relations department, you and

15   Mr. Chew, had with existing Tesla shareholders?

16   **A**    Our -- our conversations with Aaron would not overlap.  So

17   I -- I believe that I had some of my own investor feedback in

18   my emails.  But we wouldn't be having conversations together.

19   We would be having separate sets of conversations.

20           **MS. TRIPODI:**  Ms. Ayala, has this been published to

21   the jury?

22           **THE COURTROOM DEPUTY:**  Uh-huh.

23           **MS. TRIPODI:**  Thank you.

24           **THE COURTROOM DEPUTY:**  You're welcome.

25

1  BY MS. TRIPODI

2  **Q**    So you had some conversations with Tesla investors, and

3  Mr. Chew may have had separate conversations?

4  **A**    Yes.

5  **Q**    Do you recall with whom you spoke?

6  **A**    Um, I have spoken to Fidelity, some portfolio managers of

7  T. Rowe Price, PRIMECAP, Allianz; I believe, UBS.  Quite a few

8  to remember off the top of my head.

9  **Q**    Okay.  If I direct your attention, in Exhibit 155, under

10  "ENCOURAGING RESPONSES."

11  **A**    Uh-huh.

12  **Q**    There are quotes in this section from T. Rowe, Fidelity,

13  and PRIMECAP.  Correct?

14  **A**    Correct.

15  **Q**    And did you speak -- I believe you just testified that you

16  had talked to Fidelity -- Fidelity, T. Rowe and PRIMECAP,

17  correct?

18  **A**    Yes.

19  **Q**    So would the feedback that we see in this email, would

20  that have been feedback that you received?

21  **A**    Each of those institutions would have, easily, 15, 20

22  different portfolio managers.  So it's likely, it's possible

23  that Aaron spoke to different folks than I have spoken to.  But

24  yes, I've definitely spoken to T. Rowe and Fidelity.

25  **Q**    So looking at T. Rowe's feedback, the paragraph indicates

**VIECHA - DIRECT / MS. TRIPODI**

```
 1    (As read):

 2              "The issue will come down to how much of a

 3              private illiquid stake our PMs are willing to

 4              retain; it's likely that most will but with a

 5              smaller stake than they currently own because

 6              of the liquidity risk."

 7         Do you see T. Rowe's comment?

 8    A    Yes.

 9    Q    Did you have that conversation with T. Rowe?

10    A    I've had a similar conversation along the lines of:  Yes,

11    we can hold private company shares, but probably less than we

12    would -- would be able to own in a publicly-traded company.

13    Q    So is it fair to say what we see here in this bullet point

14    with respect to T. Rowe, that it comports with your general

15    understanding of some restrictions that T. Rowe funds may have

16    had?

17    A    Specifically to T. Rowe, yes, this reflects my

18    understanding.

19    Q    And if we can look at the comment from Fidelity, they

20    provided similar feedback in the next paragraph, stating

21    (As read):

22              "Each of the PMs are unlikely to be able to

23              hold as high a number of shares as we do

24              today.  The key here you have to figure out

25              is how to be private but still have liquidity
```

1    (sic) security."

2    Do you see those comments?

3  **A**    Yes.

4  **Q**    And do you recall whether Fidelity conveyed those comments

5  to you?

6  **A**    I remember that this was a comment from one out of 60

7  portfolio managers, Sonu Kalra, and it was my understanding

8  that Fidelity would be able to hold private shares, just a

9  lower quantity than publicly-traded shares, just like T. Rowe.

10 **Q**    Did you have any understanding as to how much of a lower

11 quantity they would have to hold?

12 **A**    No.

13 **Q**    Did you do any work to determine how much of a lower

14 quantity they would have to hold?

15 **A**    I have asked; I don't recall getting an answer.

16     **MS. TRIPODI:**  If we can turn to the portion of the

17 email bearing the heading "FRUSTRATED FEEDBACK."

18 **BY MS. TRIPODI**

19 **Q**    There are five bullet points on the second page.  Do you

20 see that?

21 **A**    Yes.

22    (Document displayed)

23 **Q**    If we can focus on the first bullet point, please.  The

24 feedback is from Diametric?

25 **A**    Yes.

**VIECHA - DIRECT / MS. TRIPODI**

1   **Q**    And it states (As read):

2              "We can't own private investments because we

3              need liquidity."

4   **A**    Yes.

5   **Q**    Did I read that correctly?

6   **A**    That is correct.

7   **Q**    And the third bullet point, the feedback from an unnamed

8   shareholder is (As read):

9              "...we can no longer participate because we

10             aren't allowed to own private companies."

11            Did I read that correctly?

12  **A**    Correct.

13  **Q**    The bullet points that are summarized here, was this the

14  only frustrated feedback you received from investors relating

15  to their inability to own shares in a private company?

16  **A**    Well, this is feedback received by my colleague, Aaron,

17  not myself.

18      I do remember some investors mentioning that they wouldn't

19  be able to own a private stake, but as I mentioned before,

20  usually significantly smaller investors.  To put things into

21  context, the likes of Fidelity, T. Rowe, et cetera, manage well

22  over a trillion dollars in AUM.  Something like Diametric

23  Capital would be, you know, $100 million?  It would be quite a

24  disproportionate size.  Yes, there would be smaller investors

25  who would state that they cannot own private-company.

VIECHA - DIRECT / MS. TRIPODI

1   **Q**   And did you have any sense from Mr. Musk that these

2   smaller investors were not as important as the larger

3   institutional investors?

4   **A**   No.

5   **Q**   So the feedback from these smaller investors did still

6   matter, correct?

7   **A**   Yes.  Yes.

8          **MS. TRIPODI:**  If we can look at Exhibit 161, please.

9       And I don't believe defense counsel has any objection?

10          **MR. LIFRAK:**  No objection.

11          **THE COURT:**  Admitted.  You may publish.

12          **MS. TRIPODI:**  Thank you, Your Honor.

13      (Trial Exhibit 161 received in evidence.)

14      (Document displayed)

15  **BY MS. TRIPODI**

16   **Q**   Mr. Viecha, do you recognize this email?

17   **A**   Yes.

18   **Q**   Did you send this email to Mr. Ahuja and Todd Maron on

19   August 19, 2018?

20   **A**   Yes, I did.

21   **Q**   And am I correct that at this time, Mr. Todd Maron was the

22   general counsel for Tesla?

23   **A**   That is correct.

24   **Q**   So in this email you write (As read):

25          "In the past few days, I either met in person

**VIECHA - DIRECT / MS. TRIPODI**

1             or spoke on the phone with FIDO" --

2        Fidelity, I assume?

3    **A**    Correct.

4    **Q**    (As read)

5                 "... T. Rowe, Jennison, Capital World,

6                 Capital International, PRIMECAP, Baron

7                 Capital, UBS O'Connor, and many others."

8        Do you see that?

9    **A**    Yes.

10   **Q**    Looking at Point 4 of your email, titled "Privatization"

11   and then a subpoint (a):

12                "Can't hold private entity."

13   **A**    Yes, I can see it now.

14   **Q**    Okay.  There we go.

15   **A**    Yes.

16   **Q**    Here, you emphasize that quite a few midsized investors

17   share their frustration that they don't have a mandate to hold

18   a stake in a private company.  Do you see that?

19   **A**    Yes.

20   **Q**    Now, I believe in my previous question you talked about

21   large investors like T. Rowe, Fidelity --

22   **A**    Correct.

23   **Q**    -- and small investors.  Can you clarify for the jury in

24   your mind what constitutes a midsize investor?

25   **A**    Midsize investors, I would think, you know, about 20 to

1    30 billion of AUM, compared to trillions, of the large

2    investors that I've spoken about.

3    **Q**    And did you have any reason to believe at this time that

4    midsize investors were not important to the going-private?

5    **A**    No.

6    **Q**    Does this email, looking at it now, does this accurately

7    summarize your conversations with investors in the days leading

8    up to August 19th?

9    **A**    Yes.  It did that at time, for sure.

10   **Q**    Overall, if you could characterize the feedback you

11   received from midsize investors, is it fair to say that a

12   number of midsize investors had a mandate against holding

13   shares in a private company?

14   **A**    Yeah, there were some that had a mandate against holding

15   shares in a private company.

16   **Q**    And is it also correct that the smaller institutional

17   investors were going to have difficulty holding shares in a

18   private Tesla?

19   **A**    Again, some, some would have this difficulty.  That's

20   correct.

21   **Q**    And is it fair to say that with respect to the larger

22   institutions, there were some funds that wouldn't have trouble

23   owning shares in a private Tesla, but some funds would have

24   difficulty?

25   **A**    Um, from my understanding, the majority of large

1   institutions would be able to hold private shares.

2   **Q**   The majority, you say.

3   **A**   Um, of large institutions, yes.

4   **Q**   And was that information that you discovered after the

5   "Funding secured" tweets?

6   **A**   Um, it was something that I have always been aware of,

7   given some of these institutions have been investors at

8   Space -- at SpaceX for a long time, that I knew is a

9   privately-traded entity.  So I would have some level of

10  understanding of large institutions holding private shares

11  prior to the tweet.

12  **Q**   Are you familiar with the ownership structure of SpaceX?

13  **A**   No.  Other than it's a private, private entity.

14  **Q**   You just knew that there were several institutions that

15  held in Tesla that also held in SpaceX?

16  **A**   Correct.

17  **Q**   In August of 2018, so ten days after the "Funding secured"

18  tweet, were you aware that Mr. Musk gave an interview or spoke

19  with a reporter from the *New York Times*?

20  **A**   Um, I remember reading the interview, yes.

21  **Q**   And the interview that we're referring to is an article

22  that was published on August 17th.  Does that refresh your

23  recollection?

24  **A**   Yes.

25  **Q**   Did you receive emails from investors in response to that

VIECHA - DIRECT / MS. TRIPODI

 1    article?

 2    A    Yes.

 3         MS. TRIPODI:  If we could look at Exhibit 160, please.

 4    (Document displayed)

 5         MS. TRIPODI:  And I don't believe defense counsel has

 6    any objection.

 7         MR. LIFRAK:  No further objection.

 8         THE COURT:  All right.  160 is admitted.

 9    (Trial Exhibit 160 received in evidence.)

10    (Document displayed)

11    BY MS. TRIPODI

12    Q    Is this one of the emails you received on August 17th

13    regarding this *New York Times* interview?

14    A    Yes.

15    Q    Who is James Sperling?

16    A    James Sperling is a hedge fund portfolio manager of a

17    hedge fund arm of UBS.

18    Q    And was that particular hedge fund arm invested in Tesla

19    at that point?

20    A    I believe it was.

21    Q    So midway through the first page of Exhibit 160,

22    Mr. Sperling asked you:

23         "Any luck on the full interview transcript?"

24         Do you see that?

25    A    Yes.

**VIECHA - DIRECT / MS. TRIPODI**

1   **Q**     And then he asked you (As read):

2             "Importantly, did elon declaratively say

3             funding is NOT secured as the *New York Times*

4             says?"

5       Writing in capital words the word -- capital letters the

6   word "not," to emphasize his question as to whether or not Elon

7   actually said funding was not secured.  Do you see that?

8   **A**   I see that, yeah.

9   **Q**   Did you understand that Mr. Sperling was concerned about

10  funding after having reviewed this article?

11  **A**   From, from my understanding, he was referring to a comment

12  by the writer of the *New York Times* article.  I -- there was

13  nothing on the subject connected directly to Elon's statement.

14  **Q**   Understood.  But my question to you was:  Did you

15  understand that Mr. Sperling had concerns regarding funding

16  after reviewing this article?

17  **A**   I -- from what I remember with my reply, it's something

18  that I've just probably glanced over, that the vast majority,

19  basically all the emails and messages that I got about the *New*

20  *York Times* article were covering different things.

21  **Q**   But am I correct that this particular email from

22  Mr. Sperling is asking about funding?

23  **A**   I think he's asking about Elon admitting that there's no

24  funding, which is not what, from my understanding, the article

25  said.  The article -- the quote about funding not secured was

1    attributed to the journalist, not to Elon.  And from my

2    understanding, James mistakenly attributed this comment in the

3    article to Elon.

4    Q    Understood.

5              MS. TRIPODI:  Mr. Viecha, I have no further questions

6    at this time.

7         Your Honor, if I can reserve for redirect, please?

8              THE COURT:  All right.  Thank you.

9              MS. TRIPODI:  Thank you.

10             THE COURT:  Cross?

11                        **CROSS-EXAMINATION**

12   BY MR. LIFRAK

13   Q    Good afternoon, Mr. Viecha.

14   A    Good afternoon.

15   Q    We have some binders with even more documents for you to

16   look at.

17   A    Okay.  Thank you.

18   Q    And I know you have another earnings call today, so we're

19   trying to get you out of here by 2:00.  So we'll do our best to

20   move along.

21   A    Thank you.

22   Q    You talked a bit in your examination about some emails

23   that you sent to certain analysts on August 7, 2018, after

24   Mr. Musk's tweets, and after the blog post.  Do you recall that

25   testimony?

**VIECHA - CROSS / LIFRAK**

1  **A**    Yes.

2  **Q**    As of that point in August, 2018, how many months had you

3  been working at Tesla in California?

4  **A**    In California, about five months, five, six months.

5  **Q**    And prior to this time in August of 2018, had you ever

6  been involved in a go-private transaction of any kind?

7  **A**    No.

8  **Q**    Did you understand kind of the full process that it would

9  take for a company to go from a public company to a private

10  company?

11  **A**    No.

12  **Q**    Had you ever, at that point in August, 2018, been involved

13  directly in any kind of a corporate transaction from the

14  company side?

15  **A**    No.

16  **Q**    What were you doing before Tesla?

17  **A**    I used to be a sell-side analyst in London, which was

18  writing research about companies in the automotive industry.

19  **Q**    Okay.  So let's back up eight days from that, so we're --

20  July 31st, 2018, the date of the meeting with the PIF that you

21  have referenced in your prior testimony.  Do you recall

22  generally that day?

23  **A**    Yes, I do.

24  **Q**    Okay.  So what were you working on that day?

25  **A**    Deepak and I were finalizing the shareholder letter that

1   would be published on August 1st.

2   **Q**    And how frequently does that happen?

3   **A**    Once in three months.

4   **Q**    And is there also an earnings call associated with that

5   letter?

6   **A**    Correct.  So a couple of hours after the letter gets

7   published, we host an earnings call with a Q and A session.

8   **Q**    Was there anything at that point that was particularly

9   important about that earning call?

10  **A**    Yes.  Elon sent me an email that he would like to

11  apologize to two analysts that he cut off in the prior earnings

12  call.

13  **Q**    And was there any fall-out from that prior earning call

14  that you recall?

15  **A**    Yes.  In the prior earnings call, after the two analysts

16  were cut off, there was a significant backlash from both

17  investors and analysts saying that this is not a -- not a good

18  look.  And Elon then asked if he could speak directly with some

19  of our top shareholders to apologize about cutting off analysts

20  on the earnings call.

21  **Q**    And do you recall any kind of market reaction to that?

22  **A**    Yeah.  Our sell price went down quite a bit.  It was seen

23  as a -- as a red flag.

24  **Q**    And at the earning call that happened after July 31st,

25  2018, on August 1st, did Mr. Musk actually go through with that

**VIECHA - CROSS / LIFRAK**

1  apology?

2  **A**    Yes, he did go through with that apology.  There were two

3  analysts, and they were at the top of the queue, and he

4  apologized before taking their questions and answering them.

5  **Q**    You testified in your examination that you were told at

6  some point that the PIF had acquired 5 percent of Tesla.  Do

7  you recall that?

8  **A**    Yes.

9  **Q**    And when exactly, to the best of your memory, did you

10  learn that?

11  **A**    It was as we were sitting with Deepak, writing the

12  shareholder letter, there was a conversation.  We were having

13  conversations on and off all the time, but there was a

14  conversation when he mentioned that:  By the way, they have

15  been buying shares, and they have accumulated about 5 percent.

16  **Q**    So you think it was that day?

17  **A**    Yes.

18  **Q**    At some point were you alerted to the fact that there was

19  a meeting going on between the PIF and other people at Tesla on

20  that day?

21  **A**    Yes.  Deepak mentioned to me that:  By the way, the

22  representatives of Saudi PIF are in the building, at the

23  factory, meeting with Elon.

24  **Q**    And then at some point were you alerted to the fact that

25  you were wanted at that meeting?

1   **A**     Yes.  Sam Teller, our chief of staff at the time, sent me

2   a text saying that I might want to come downstairs with Deepak

3   to say hi to our new large shareholders.

4   **Q**     And were you with Mr. Ahuja at the time?

5   **A**     Yes.  I was.

6   **Q**     By the way, is it common for Mr. Musk to meet with

7   individual investors, such as what he was doing on July 31st?

8   **A**     No.  Very uncommon at the time.

9   **Q**     How frequently at the time did that happen?

10  **A**     Once a year or less.

11  **Q**     Okay.  So you get this text from Mr. Teller; you are with

12  Mr. Ahuja.  What did you do next?

13  **A**     We paused what we were doing with the shareholder letter,

14  and we went downstairs to the factory.

15  **Q**     Okay.  So then what happens when you get downstairs to the

16  meeting room where this meeting is taking place?

17  **A**     We come downstairs to the meeting room at the factory.

18  Sam Teller comes out of the meeting room, and he asks Deepak to

19  come and join, and he asked me to stay outside.

20  **Q**     So did you attend any part of that meeting between

21  Mr. Musk, Mr. Ahuja, and the PIF?

22  **A**     No.

23  **Q**     Could you hear anything that was going on in the room?

24  **A**     No.

25  **Q**     Did you -- could you see in the room, and did you observe

**VIECHA - CROSS / LIFRAK**

1    whatever was going on in there?

2    **A**    No.

3    **Q**    So when the meeting ended, then what happened?

4    **A**    When the meeting ended, everybody, including Elon and the

5    representatives of the Saudi PIF, left the room.  And Deepak

6    asked me: Hey, why don't we take -- take them for a tour of the

7    Model 3 production line.

8    **Q**    And so did you do that?

9    **A**    Yes, we did that.

10   **Q**    And were you with one or more representatives from the

11   PIF?

12   **A**    Yes.  So Deepak was with the senior representative of the

13   PIF in front, and I was at the back with the more junior

14   representative of the PIF.

15   **Q**    This junior representative, did you have any conversation

16   with him about what had occurred in the meeting that had just

17   finished?

18   **A**    No, we did not.  We only talked about the manufacturing

19   process of the Model 3.

20   **Q**    Could you hear what Mr. Ahuja was talking -- what he was

21   talking about with the more senior representative?

22   **A**    No.  The factory was very loud, so it was not possible to

23   hear anything.

24   **Q**    Okay.  So after the PIF does the tour, I assume they left?

25   **A**    Yes.  Correct.

VIECHA - CROSS / LIFRAK

1  **Q**    And then did you have a conversation with Mr. Ahuja?

2  **A**    Yes.  As soon as they left, Deepak looked at me and he

3  said: They offered again to buy the company, and Elon said

4  "Okay, let's do it."

5  **Q**    And were those his exact words?

6  **A**    I don't remember the exact words, but something along

7  those lines.

8  **Q**    And when you heard that from Mr. Ahuja, did you believe

9  him?

10  **A**    Yeah.  100 percent.  I mean, Deepak is -- you know, his

11  character, he wouldn't, like, exaggerate or joke about this

12  sort of thing.  He was a -- he is a very serious character.

13  **Q**    And so when you heard this from Mr. Ahuja, did you respond

14  to him right away?

15  **A**    No.  I was completely in shock.  And I -- it took me a

16  while to respond to him.

17  **Q**    And when you eventually did respond, do you recall what

18  you said?

19  **A**    Yes.  What I told him is that:  Well, Deepak, the issue

20  here is that a private company does not need the investor

21  relations.  So, I just moved to the U.S. five months ago.  It

22  means that I will not have -- not any work.

23  **Q**    Can you explain why a private company doesn't need

24  investor relations personnel?

25  **A**    Yeah, absolutely.  So if there are no -- if there's no

**VIECHA - CROSS / LIFRAK**

1  trading in the stock and there's no investors that are able to

2  go in and out, private companies in the vast majority of

3  scenarios do not have investor relations.

4  **Q**   Okay.  And when you pointed that out to Mr. Ahuja -- who

5  was your boss at the time, is that right?

6  **A**   Yeah.

7  **Q**   What was his response?

8  **A**   He -- he basically, he put a hand on my shoulder and he

9  said:  Martin, don't worry, we don't get rid of good people.

10 **Q**   Other than what you have just described, do you have any

11 additional knowledge of what was said in that meeting on

12 July 31st in the Tesla factory?

13 **A**   No.

14 **Q**   Based on your observation, and going to the meeting room,

15 who would have that knowledge?

16 **A**   Um, I guess Deepak, Elon and Sam Teller.

17 **Q**   Other than the discussion that you've testified about with

18 Mr. Ahuja, did you ever discuss with anyone else who was in the

19 room what happened in that room?

20 **A**   No.

21 **Q**   After the conversation that you have described with

22 Mr. Ahuja, did you, on your own, obtain additional information

23 about the PIF?

24 **A**   Yes.  I -- I wanted to find out what's PIF's AUM, or

25 assets under management, to see whether it would be easy or

**VIECHA - CROSS / LIFRAK**

1    difficult for them to make this type of transaction.  And it

2    was very clear from my initial research that this is a very,

3    very achievable transaction.

4    **Q**    You talked about in your prior examination your

5    interactions with Mr. Musk during the quarterly earnings call.

6    Do you recall that?

7    **A**    Yes.

8    **Q**    Putting that aside, in that time frame, in the 2018 time

9    frame, how common was it for you to have interactions with

10   Mr. Musk?

11   **A**    At that time, very uncommon.

12   **Q**    During this whole period, starting July 31st to today,

13   have you ever had any conversation with Mr. Musk about the PIF

14   or about the potential going-private transaction?

15   **A**    No.

16   **Q**    Did you ever discuss directly with Mr. Musk his August 7th

17   tweets or his blog posts on August 7th or August 13th?

18   **A**    Not that I recall.

19   **Q**    Were you involved in any of the discussions that Mr. Musk

20   had with the board of directors regarding the going-private

21   transaction?

22   **A**    Only what I read in Elon Musk's blog posts.

23   **Q**    Okay.  So let's move now to -- we're on July 31st,

24   August 7th, you've testified you saw the tweets and Mr. Musk's

25   responses and the blog posts on that date?

**VIECHA - CROSS / LIFRAK**

1    A    Uh-huh.

2    Q    Yes?

3    A    Yes.  I have.

4    Q    Were you surprised when you saw that Mr. Musk said that he

5    was considering taking Tesla private?

6    A    No.  I was only surprised that, um, what I understood went

7    on a week ago now became public information.  So, yeah.

8    Q    Were you surprised that Mr. Musk said "Funding secured"?

9    A    No.

10   Q    Was there anything in the tweets or in the replies that

11   followed or the blog post on August 7th that was new

12   information to you?

13   A    Yes.  The price of 420 was a new piece of information that

14   I wasn't aware of.  And secondly, the ability for current

15   shareholders to roll over to a new private entity was new.

16   Q    And you stated that the -- the statement "Funding secured"

17   did not surprise you.  Why is that?

18   A    Because from, from my perspective, there was a -- there

19   was an entity that is incredibly large that made a repeated

20   effort to buy this company.  And from my understanding, if Elon

21   said: Yeah, let's do this, then you have an offer and an

22   acceptance.

23   Q    So let's talk about some of the -- the specific

24   communications that you had with investors and analysts after

25   that, on August 7th.  And the first I'd like you to look at is

```
 1    Exhibit 145.
 2            MR. LIFRAK:  Which, I believe there are no further
 3    objections?
 4         (Document displayed to the Witness)
 5            THE COURT:  No objections?
 6            MS. TRIPODI:  No objection, Your Honor.
 7            THE COURT:  All right.
 8            MR. LIFRAK:  Request that be moved into evidence and
 9    published to the jury Your Honor.
10            THE COURT:  Admitted.  You may publish.
11         (Trial Exhibit 145 received in evidence.)
12         (Document displayed)
13    BY MR. LIFRAK
14    Q    And is this email that we are looking at, Exhibit 145, an
15    email and a response from Mr. Eirik Hogner at Lansdowne
16    Partners to you on August 7th?
17    A    Yes.
18    Q    Who is Mr. Hogner?
19    A    Mr. Hogner is a hedge fund analyst in the UK.
20    Q    And do you see, his initial email where it says (As read):
21            "Saw Elon's tweets and just wanted to confirm
22            that these tweets are real."
23    And then he says:
24            "Also see other people claim that Tesla says
25            more information is imminent."
```

**VIECHA - CROSS / LIFRAK**

1       Do you see that?

2   A    Yes.

3   Q    And could you read your response?

4   A    Yes.  My response is:

5           "Yes, these tweets are official."

6   Q    Was Mr. Hogner the only person who asked whether the

7   tweets were real?

8   A    No.

9   Q    Let's look at Exhibit 58, which was shown to you on your

10  direct examination.

11      (Document displayed)

12  Q    And this was a the series of emails that you had with

13  Mr. Koney on August 7th, is that correct?

14  A    That is correct.

15  Q    And in the middle of the page, as you testified

16  previously, you said that there was a firm offer.  Right?

17  A    Yes.

18  Q    And just to be clear, whether or not you said that to

19  Mr. Koney, that there was a firm offer, what exactly was that

20  based on?

21  A    It was based on my meeting with Deepak right after the

22  representatives of the Saudi PIF left the -- left the building.

23  Q    And what did the term "firm offer," as you used it, mean

24  to you?

25  A    I didn't think about it from a legal standpoint, as a

1  legal term.  I thought about it in the way that there's a very

2  large, incredibly wealthy buyer that makes a repeated attempt.

3  And there's Elon that says:  Yes, let's do this.  That's the

4  way I thought about it.

5  **Q**    And what was your goal, what were you trying to

6  communicate to these analysts when you told them that there was

7  a firm offer?

8  **A**    I was trying to communicate that this was not made up.  I

9  think we have to remember that back in 2017, 2018, the amount

10  of scrutiny that Tesla was under was truly exceptional.  And,

11  you know, at the time it was very hard to believe -- sorry --

12  hard to see what people should or should not believe.  So many

13  investors were just asking, like, is this even real?

14  **Q**    And we saw in your prior examination, you using the same

15  language, "firm offer" for Mr. Michaeli, for example, in

16  Exhibit 150?

17  **A**    Correct.

18  **Q**    Mr. Erickson in -- I'm sorry, 146.  Mr. Erickson in

19  Exhibit 150.  Do you recall that testimony?

20  **A**    Yes.

21  **Q**    And was your -- the basis for you saying "firm offer" to

22  them the same as you have just described to the jury?

23  **A**    Yes, it was the same basis.

24  **Q**    When you sent these emails to the analysts and said things

25  like "firm offer," did you clear that language with Mr. Musk,

1   Mr. Ahuja, or, to your recollection, anyone?

2   **A**    No.

3   **Q**    And where did they -- where did those words come from?

4   **A**    They were my -- it was my language, my words from my

5   understanding of the -- of the events that preceded.

6   **Q**    Did you tell anyone at Tesla the fact that you had told

7   these analysts that there was a firm offer?

8   **A**    No.

9   **Q**    In Mr. Koney's email, Exhibit 58, you were asked about

10  certain parts of the email.  I don't think you were asked about

11  the last line of his response right at the top.  Do you, see

12  his response is:

13          "We will need a little more than that."

14      Do you see that?

15  **A**    Yes.

16  **Q**    And what did you understand that to mean?

17  **A**    I think what that meant is that the tweet was, um, perhaps

18  too short, too vague, and it didn't -- analysts want to go into

19  specifics.  It's their job to understand the specifics of

20  what's happening.  And I think this was no different.

21  **Q**    What kind of other information did analysts want as they

22  expressed it to you?

23  **A**    Who's the buyer, how long is the transaction going to

24  take, can I be part of this transaction, um, are there any

25  legal hurdles that need to be jumped through before this

1    becomes a reality?  That sort of thing.

2    **Q**    And by the way, in your email to Mister -- was your email

3    to Mr. Koney during trading hours?  Do you recall?

4    **A**    No, it was outside of trading hours.

5    **Q**    And we've seen, as you testified, a couple of other emails

6    where you've used the term "firm offer."  Have you been sued

7    for telling analysts that there was a firm offer?

8    **A**    No.

9    **Q**    Has anyone, to your knowledge?

10   **A**    No.

11   **Q**    If we can look at Exhibit 151, which is in evidence.

12        (Document displayed)

13   **Q**   This was the email and response from Mr. Sacconaghi.  Do

14   you recall your testimony about that?

15   **A**    Yes.

16   **Q**    And in his initial email, his question is (As read):

17            "What does 'funding secured' (sic)  Actually

18            mean?"

19        Do you see that?

20   **A**    Yes.

21   **Q**    Was he the only analyst who asked you what that phrase

22   meant?

23   **A**    No.  There were many that asked the same thing.

24            **MR. LIFRAK:**  We can take that one down.  Thank you.

25

VIECHA - CROSS / LIFRAK

**BY MR. LIFRAK**

**Q**    About how many inquiries do you think you received about Mr. Musk's series of tweets and the blog post on August 7th?

**A**    Dozens.

**Q**    And what kind -- was this in person at the conference you were at?

**A**    Both in person and by email.

**Q**    And was the status of funding, in your view, the main topic of their inquiries?

**A**    Um, the main -- the generic theme was really:  Is this real?  Is this a real event?  Or is this made up?

**Q**    You testified, in addition to these emails on August 7th, you then after that received some feedback from existing investors in terms of whether they would support Tesla going private or not.  Do you recall that?

**A**    Yes.

**Q**    And who asked you to do that?

**A**    I think, I think it was Deepak.

**Q**    And did you have an understanding as to why you were asked to do that?

**A**    I understood that since Elon tweeted that he hopes that every shareholder becomes part of the private entity, that he was trying to understand what the -- what the situation is.

**Q**    And do you know if Mr. Musk was, himself, reaching out to investors during this time?  Do you have an understanding, one

VIECHA - CROSS / LIFRAK

1  way or the other?

2  **A**    Um, I think there -- there were some conversations in the

3  background, but I cannot recall.

4  **Q**    And did you learn, one way or the other, what that

5  feedback was that Mr. Musk received?

6  **A**    No.

7  **Q**    What about Goldman Sachs?  Did you have an understanding

8  whether or not they were also receiving feedback from existing

9  investors?

10  **A**    I wouldn't know.

11  **Q**    Same answer for Silver Lake?

12  **A**    Correct.

13  **Q**    You talked a little bit about this but do you recall

14  whether some of the top shareholder were at least supportive of

15  the idea of going private, initially?

16  **A**    Yeah, I think definitely some of the top shareholders

17  were.

18          **MR. LIFRAK:**  If we could look at Exhibit 147, which

19  was put evidence.

20      (Document displayed)

21  **BY MR. LIFRAK**

22  **Q**    This was an email you testified about in your prior

23  examination.  I don't think you were shown the very top line

24  and I wanted to ask you about that.

25      Do you see where it says:

**VIECHA - CROSS / LIFRAK**

1           "I just to Ron Baron..."

2      I assume you meant "just talked to"?

3  **A**   Yes.

4  **Q**   (As read)

5           "I just to Ron Baron, who definitely wants to

6           be part of this new structure."

7      And then it says:

8           "I'll meet Fidelity tomorrow."

9      Do you see that?

10 **A**   Yes.

11 **Q**   Could you describe the conversation with Mr. Baron that

12 you reference here?

13 **A**   Yes, I think Ron Baron at the time said that the -- the --

14 his investment fund does not have ability to own private shares

15 but he will -- he will make a change in order for that to be

16 possible.

17 **Q**   Do you recall the initial feedback you got from T. Rowe?

18 You, personally.

19 **A**   Um, the initial feedback I got from T. Rowe was that yes,

20 we can hold a private company.

21 **Q**   And who was that from?

22 **A**   I think it was Joe Fath.

23 **Q**   Who is Joe Fath?

24 **A**   Joe Fath is a portfolio manager at T. Rowe Price.

25 **Q**   What was the -- on a separate -- somewhat separate topic,

1   but what was the status of Tesla's relationship with Mr. Fath

2   and T. Rowe as of July, 2021, when Mr. Fath's deposition was

3   taken in this case?

4   **A**     Um, I believe by that time, um, T. Rowe has sold out a

5   vast majority of their Tesla stake.  There was a -- I don't

6   remember the exact date now, but when we did a capital raise a

7   few years back, Elon would be involved in investor discussions

8   on the day of the capital raise, and I think when there was a

9   capital raise conversation with T. Rowe Price, that the call

10  did not go very well.  The analyst from T. Rowe Price kept

11  asking fairly short-term questions at a time, and Elon said

12  something along the lines of:  I don't think -- I don't think

13  you should be investors in this company.

14  **Q**     So we've talked about Ron Baron, T. Rowe.  Do you recall

15  the initial reaction of UBS that you received?

16  **A**     Yes.  The reaction from UBS was very positive because UBS

17  has a wealth management arm.  And generally speaking, wealth

18  management companies or wealth management arms are much more

19  likely to own shares in private companies.

20       So UBS feedback was that:  We would be happy to

21  substantially increase our stake at Tesla, as a private

22  company.

23  **Q**     You testified in your previous examination that some of --

24  some smaller institutional investors may have an issue.  Is

25  smaller institutional investors, is that the same thing has a

1  retail investor?

2  **A**    No.

3  **Q**    Could you explain what that difference is?

4  **A**    Yes.  Absolutely.  Small institutional investor is an

5  investment fund that manages maybe a billion dollars of other

6  people's money.  A retail investor, if I individually hold

7  Tesla shares that I bought for my cash, that makes me a retail

8  investor.  I'm not connected to any institution that manages my

9  money.

10  **Q**    Okay.  And finally, Mr. Viecha, I wanted to ask some

11  questions about the *New York Times* article on August 17th that

12  you were asked about.

13  **A**    Yeah.

14  **Q**    You saw the article at the time, is that correct?

15  **A**    Yes.

16  **Q**    And did you get feedback from investors specifically about

17  that article?

18  **A**    Yes, I have.

19        (Document displayed)

20  **Q**    And that's Exhibit 171.

21        How many investors did you speak to regarding the *New York*

22  *Times* article?

23  **A**    Maybe a dozen.

24  **Q**    And, and why do you speak to them?  Did you -- let me take

25  a step back.  Did they reach out to you, typically?  Or did you

VIECHA - CROSS / LIFRAK

1  reach out to them?

2  **A**    They would typically reach out to me.

3  **Q**    And what generally was the feedback that you received from

4  these investors regarding the *New York Times* article?

5  **A**    The general feedback was people very concerned about

6  well-being of Elon, about burnout.  Um, people were just

7  really, really worried whether he can still continue to do this

8  job.

9  **Q**    Is there any feedback from any particular shareholder that

10  really stands out in your mind?

11  **A**    Yes.  Ron Baron called me after this article came out and

12  he was just -- he was very -- just concerned about Elon as a

13  person.  And he told me:  Hey, how can we get Elon to take some

14  holiday?  You know, he's clearly -- has just way, way, way too

15  much on.

16  **Q**    Other than the one inquiry that we saw in your

17  cross-examination from UBS that you were shown, Exhibit 160,

18  did anyone else raise that one line in the article about

19  funding?

20  **A**    No.  Not that I'm aware of.

21  **Q**    Let's take a look at Exhibit 161, which is in evidence and

22  which you testified about.

23      (Document displayed)

24  **A**    Yeah, I can see that.

25  **Q**    So again, this was an email that you sent on the 19th of

1   August to Mr. Ahuja, who is the CFO and your boss, correct?

2   A    Correct.

3   Q    And Mr. Maron, who's the general counsel of the company?

4   A    Correct.

5   Q    And was this email -- let me ask, open, what was the

6   purpose of this email?

7   A    The purpose of this email is to really provide everything

8   that I have been hearing from investors over the past few days

9   and really just lay out all the facts and all the feedback that

10  I have been getting.

11  Q    And I noticed that the email was sent on a Sunday night at

12  10:16 p.m.  Is that right?

13  A    That is correct.

14  Q    Was that a routine thing for you to be sending emails to

15  the general counsel and to the CFO on a Sunday night?

16  A    No, it was not.

17  Q    And why was it happening in this situation?

18  A    Because I just thought it was extremely important to, to

19  lay out all the, you know, unedited, honest feedback about what

20  do people think.

21  Q    Okay.  Let's look at some of the paragraphs that you

22  didn't see on your prior examination.  In particular, the first

23  paragraph.

24  A    Yes, I can see it.

25  Q    And it says:

**VIECHA - CROSS / LIFRAK**

1          "In the past few days, I either met in person

2          or spoke on the phone with:  FIDO, T. Rowe,

3          Jennison, Capital World, Capital

4          International, PRIMECAP, Baron Capital, UBS

5          O'Connor, and many others."

6     Do you see that?

7  **A**    Yes.

8  **Q**    And was that specifically in reaction to the *New York*

9  *Times* article or something else?

10 **A**    That was more of a generic, generic conversations that

11 I've had, whether in person, over the phone, et cetera.

12 **Q**    And then if you look down to the first numbered paragraph

13 entitled "Key man risk."  Do you see that?

14 **A**    Yes.

15 **Q**    And it says (As read):

16         "While 'key man risk' was always an important

17         point of Tesla investment debate, this debate

18         is currently getting significantly more

19         traction.  This debate involves Elon's health

20         and decision-making ability, given

21         exhaustion.  The secondary impact that some

22         investors mentioned was our ability to

23         recruit/retain talent, given intensity of our

24         work pace.  High churn rate of VPs and

25         C-level managers is, in a way, a part of this

1          debate."

2      Do you see that?

3  **A**    Yes, I do.

4  **Q**    And what did you mean by "key man risk" in that paragraph?

5  **A**    By "key man risk" I mean an entity that has outsize

6  dependence on a single person like Apple and Steve Jobs,

7  et cetera.

8      And investors were just really, really concerned whether,

9  you know, this sort of tempo of working and execution is

10  sustainable.  And, you know, what sort of impact can it have on

11  Elon and his health.

12  **Q**    And how, if at all, did that relate to the *New York Times*

13  article?

14  **A**    The *New York Times* article had a very dark tone, and it

15  talked about, you know, taking sleeping medication to be able

16  to go to sleep.  You know, going through a lot of pain.  There

17  was a lot of -- um -- it was a dark article, for sure.

18  **Q**    If you could look at the next page, Subsection (a) right

19  at the top.

20      (Document displayed)

21  **Q**    Where it says (As read):

22          "Worst is yet to come:  Elon's statement in

23          the NYT..."

24      Is that the *New York Times*?

25  **A**    That is correct.

**VIECHA - CROSS / LIFRAK**

1   **Q**    (As read)

2            "That 'But from a personal pain standpoint,

3            the worst is yet to come' spooked some people

4            as this statement was understood in many

5            different ways.  Jennison told me that they

6            weren't sure if they could (sic) just 'run

7            for the hills (divest).'  I did my best to

8            explain that this statement has nothing to do

9            with our current production, demand and

10           operations."

11       Do you see that?

12  **A**    Yes, I do.

13  **Q**    And can you explain what you were intending to convey with

14  that paragraph?

15  **A**    What I was trying to convey is that for many investors, we

16  sort of, from a Model 3 production standpoint -- and really, at

17  the time it was all about the Model 3 production -- um, that

18  the worst is behind us.  But Elon stated in the article that

19  the worst is yet to come, from a personal pain standpoint.

20       So investors were just not sure whether there's something

21  in the background that we are not aware of, that we should be

22  worried about.  That's the way some people were thinking about

23  it.

24  **Q**    Did others share concern with you about the statement?

25  **A**    Yes.

VIECHA - REDIRECT / TRIPODI

1  **Q**    Okay.  You have a number of paragraphs in here.  I have

2  gone through some, opposing counsel went through others.  But

3  could you tell us in this email whether you said anything about

4  feedback that you had received or inquiries that you had

5  received regarding funding?

6  **A**    No.

7  **Q**    And why is that?

8  **A**    Because it was not an important part of the debate at that

9  time.

10      **MR. LIFRAK:**  No further questions at this time,

11  Your Honor.

12      **THE COURT:**  All right.  Thank you.

13      Anything on redirect?

14      **MR. APTON:**  Mr. Viecha and Your Honor, I just have a

15  few brief questions.

16      **THE COURT:**  Okay.

17                    <u>**REDIRECT EXAMINATION**</u>

18  **BY MS. TRIPODI**

19  **Q**    Mr. Viecha, hello again.

20  **A**    Hi.

21  **Q**    Your counsel was discussing with you that you came to

22  Tesla only five to six months prior to the tweets on August,

23  2018, is that correct?

24  **A**    I moved to the U.S. with Tesla five to six months prior to

25  the tweets.

1   **Q**    Had you been working with Tesla prior to moving to the

2   U.S.?

3   **A**    I had, from London, U.K.

4   **Q**    But fair to say that once you are on U.S. soil, all of a

5   sudden this is a big job, big company, and big news in August,

6   2018.  Correct?

7   **A**    Sorry, I didn't catch the last sentence.

8   **Q**    Big news in 2018.  Is that correct?

9   **A**    Big news in which sense?  I'm not sure if --

10  **Q**    Relating to the going private.

11  **A**    Yes.

12  **Q**    Did anyone at Tesla offer to step in or take over

13  communications with investors or analysts for you?

14  **A**    No.

15  **Q**    Did anyone at Tesla indicate that you were not experienced

16  enough to respond to investors regarding the going-private

17  tweets?

18  **A**    No.

19  **Q**    If I can just cover a couple of points with respect to

20  your knowledge of the July 31st meeting.

21  **A**    Uh-huh.

22  **Q**    Am I correct that your understanding of what occurred at

23  that meeting is based on your discussion with Mr. Ahuja, the

24  CFO?

25  **A**    That is correct.

1  **Q**    And you did not have any discussion with the junior member

2  of the PIF with whom you were walking to do the factory tour

3  after the meeting?

4  **A**    That is correct.

5  **Q**    And I believe you testified that Mr. Musk, Mr. Teller, and

6  Mr. Ahuja would have knowledge of what went on in that meeting.

7  Is that correct?

8  **A**    Um, I believe so.  At least part of it.

9  **Q**    Is it fair to say that the members of the Saudi PIF who

10  were also attendees at the meeting would have knowledge?

11  **A**    Yes.

12  **Q**    And you have testified regarding the PIF, your

13  understanding that the source of funding for the "Funding

14  secured" tweet was based on what occurred at the July 31st

15  meeting with the Saudi PIF.  Is that correct?

16  **A**    It was based on my conversation with Deepak after the

17  meeting with the Saudi PIF, on top of the fact that it was

18  clarified to me that this was a repeated attempt.

19  **Q**    And when Mr. Ahuja conveyed to you what had occurred at

20  that meeting, am I correct that you testified that Mr. Ahuja

21  said that Saudi PIF was looking to buy the company?

22  **A**    I don't recall the exact words he said but he was --

23  something along the lines of buying the whole company.

24  **Q**    Now, I believe you also testified that in response to the

25  tweets, you heard from investors and analysts regarding whether

1   or not the tweets were real.  Is that correct?

2   **A**   Correct.

3   **Q**   Did you have any understanding as to whether the stated

4   price of $420 per share led analysts and investors to doubt the

5   truth of the tweet because 420 is a marijuana reference?

6   **A**   I have -- I have seen that sort of theory in -- made by

7   some journalists out there.  It's not something that I've heard

8   so much from the investment community that I can recall.

9   **Q**   After the tweet was made by Mr. Musk, did Mr. Musk ever

10  reach out to you to find out whether or not you were responding

11  to analysts and investors about the tweet?

12  **A**   No.

13  **Q**   So, fair to say that Mr. Musk never expressed that he was

14  not okay with how you were responding regarding the tweet?

15  **A**   No.

16  **Q**   Did Tesla, the company itself, or anyone working for

17  Tesla, ever express to you that they were not okay with how you

18  were responding to the tweet?

19  **A**   No.

20  **Q**   And finally, Mr. Viecha, the emails that I've showed you

21  and that your counsel has showed you today have not contained

22  any reference to your knowledge of prior internal meetings with

23  the PIF.  Is that fair to say?

24  **A**   Correct.

25  **Q**   So your emails that we have seen today, shown by me and

**PROCEEDINGS**

1   your counsel, have only referred to the wording in the tweet,

2   itself.  Not necessarily -- you are claiming that it was based

3   on what you believed, but you're responding to inquiries

4   regarding the wording of the tweet.  Is that correct?

5   **A**    Well, if I respond to any inquiries, I will have a prior

6   knowledge that is, you know, far, far deeper than, um, you

7   know, what's out there.  So, you know, I responded, based on

8   the best of my knowledge of the events.

9   **Q**    Understood.  But with respect to prior meetings to the

10  Saudi PIF, these are meetings prior to July 31st, are you

11  claiming that you were aware of such meetings?

12  **A**    I was aware of such -- I was made aware of such meetings

13  on July 31st.

14  **Q**    And am I correct to say that your emails that we've looked

15  at today, they do not mention any prior meetings or

16  interactions with the Saudi PIF?

17  **A**    That is correct.

18          **MS. TRIPODI:**  Thank you, Mr. Viecha.  I have no

19  further questions.

20          Thank you, Your Honor.

21          **MR. LIFRAK:**  Nothing further.

22          **THE COURT:**  All right.  Well, good timing.  That

23  concludes today's testimony.  We will resume again with some

24  additional witnesses tomorrow morning at 8:30.

25          Please, again, do not discuss this case with anyone, do

 1  not attempt to do any research on your own.  Do not read or

 2  listen to any coverage of this case.  And do not form any

 3  opinions until this case is submitted to you for deliberation.

 4      Before I let you go, I do want to ask, maybe tomorrow when

 5  we get an indication from you, that we have a number of

 6  witnesses that were lined up, and if there's any way that you

 7  all could stay a little extra time on Friday.

 8      I mean, if not, that's fine, but if you can stay an extra

 9  hour if we go a little longer so we can get some witnesses who

10  may have traveled in, that would be appreciated.

11      So if you could check your calendars and maybe report back

12  tomorrow whether, you know, if you could stay to either 3:00 or

13  3:30 on Friday if we go that long, just let us know.  Otherwise

14  we will see you tomorrow morning.

15      Thank you.

16          **THE COURTROOM DEPUTY:**  All rise for the jury.

17      (Jury excused)

18      (The following proceedings were held outside of the

19  presence of the Jury)

20          **THE COURT:**  All right, Mr. Viecha, you are excused.

21  Thank you.

22      (Witness excused)

23          **THE COURT:**  So we'll see if we can get a couple --

24  maybe an extra session in on Friday to accommodate the concerns

25  about the witnesses who have -- who may be scheduled.

**PROCEEDINGS**

 1    How are we looking in terms of tomorrow?  Looks like still

 2  have Brinkman.

 3        **MR. SPIRO:**  Yes, Your Honor; if, if I could just add

 4  something that I had said earlier.

 5        **THE COURT:**  Yeah.

 6        **MR. SPIRO:**  Because, again, and I was very much

 7  looking for the Court's guidance on this, and I'm not trying to

 8  overly disrupt, you know, plaintiff's hoped-to schedule, but

 9  this is how trials happen sometimes.  And they obviously spent

10  far longer with Mr. Musk than they expected.

11        They told us -- they served these directors, just so the

12  Court knows, through Counsel.  And sort of asked, even though

13  the directors are not in the state, not in the country, for

14  them to come.  They estimated far, far earlier dates.  I

15  understand that happens with trials.

16        They have now flown in, of their own volition.  Again,

17  they're not under the subpoena power.  They're just here.

18  Those subpoenas have no validity.  We've done our best to

19  accommodate this.  So this was all done, again, through

20  counsel, doing our best to accommodate plaintiffs.

21        And so we're speaking specifically now of Anthony Gracias,

22  because he's flown in, he's been here for days.  He flies out

23  on Thursday.

24        So, again -- and I just want to also point out, which

25  everybody here knows, but I just want to say it, I mean, they

1  can't both call him and play his depo.  And they also can't

2  play a depo of someone that's located in the district,

3  normally.  So -- and we obviously know all this.  But this is a

4  special circumstance, when we were asked to bring him here on

5  certain days.

6      Their day estimates, just so the Court knows, were the

7  20th to the 24th.  And so this is -- this is the problem that's

8  very easily solved by doing the live witnesses, and making sure

9  that the ones that have to leave can be -- can be --

10         THE COURT:  Well, is Mr. Gracias the main one --

11         MR. SPIRO:  I think he's the only issue now.

12         MR. PORRITT:  Well, and, Your Honor, this is the first

13  time I've heard, anyway.  I don't know if they've had

14  communications with my colleagues about this issue with

15  Mr. Gracias.

16      So, you know, we accommodated Mr. Viecha because he has a

17  commitment tomorrow.  So I think we're working, we're

18  attempting to work in good faith with defense counsel.

19      So I think that will -- I think it's fair to say that we

20  and defense counsel need to get together this afternoon and

21  talk about the scheduling of witnesses.  And we will do that.

22         THE COURT:  All right.

23         MR. SPIRO:  And we are working together, and I very

24  much appreciate it.  And to be honest, I was dealing with

25  Mr. Musk, I wasn't as focused last week with the scheduling

**PROCEEDINGS**

1    issues.

2       So I'm just bringing it to everybody's attention, because

3    I don't want to be in a position where I didn't flag this.

4    Because it's a real issue.

5        **THE COURT:**  All right.  Sounds like the critical one

6    witness in terms of scheduling at this point is Mr. Gracias.

7    And you're essentially asking whether he can be heard tomorrow,

8    because he is leaving on Thursday.

9        **MR. SPIRO:**  That -- correct.

10        **THE COURT:**  And so that would be the issue, whether --

11    it doesn't mean, I don't -- I assume he's not going to take all

12    day.

13       **MR. PORRITT:**  I'm hesitant to make a prediction after

14    my past performance, but I don't think so.  Not from our side.

15        **THE COURT:**  All right.  Yeah.  So why don't you talk

16    and see.  Whatever your order is, it's less of a deal to take

17    perhaps one out of order than a whole slew.

18       And your concern about a whole day of, you know, video

19    depos, I agree with that.  But, seems like that could be worked

20    out.

21       **MR. PORRITT:**  I agree, Your Honor.  This is the first

22    I've heard of it.  I think we can -- we should be able to work

23    it out.  We are not averse to taking witnesses out of order,

24    potentially, if it's necessary.

25        **THE COURT:**  All right.  Why don't you see if you can

**PROCEEDINGS**

1    meet and confer on that.  Meanwhile, I guess I should look at

2    the depo exhibits.  Are there exhibits to Mr. Gracias that are

3    at issue, are going to be contested that I need to --

4            **MR. PORRITT:**  I'm not sure -- I don't think there's

5    very many.

6            **MR. SPIRO:**  Yeah, certainly not anything major that's

7    left.  I think the ball should be rolling down the hill at this

8    point, Your Honor, now that we've gotten your --

9            **THE COURT:**  Well, there's kind of a repeat pattern

10   that goes over and over again, so we all know what's coming.

11   At least, my view of the evidence.  So, why don't you see what

12   you can work out.

13       Meanwhile, we've issued rulings on one set, and we

14   continue to roll through these and get as many rulings as we

15   can.

16       We did get you that -- I think we filed the rulings on the

17   depo expert -- excerpts so you could have that, so your

18   audio/visual people will know what that --

19           **MS. TRIPODI:**  Every time we look at the deposition

20   excerpts, they get shorter and shorter, you'll be pleased to

21   hear.

22           **THE COURT:**  Good.

23           **MR. SPIRO:**  Another reason, another reason.

24           **THE COURT:**  All right.

25           **MR. SPIRO:**  Thank you, Your Honor.

1          **THE COURT:**  We'll see you tomorrow.

2          **THE COURTROOM DEPUTY:**  Court is adjourned.

3      (Proceedings concluded)

<u>**I N D E X**</u>

Tuesday, January 24, 2023 - Volume 5

**<u>PLAINTIFF'S WITNESSES</u>**                          <u>PAGE</u>  <u>VOL.</u>

**<u>MUSK, ELON</u>**
(RECALLED)                                      920   5
Cross-Examination Resumed by Mr. Spiro          920   5
Redirect Examination by Mr. Porritt             977   5
Recross-Examination by Mr. Spiro               1028   5
Further Redirect Examination by Mr. Porritt    1040   5

**<u>VIECHA, MARTIN</u>**
(SWORN)                                        1042   5
Direct Examination by Ms. Tripodi              1043   5
Cross-Examination by Mr. Lifrak                1084   5
Redirect Examination by Ms. Tripodi            1109   5

**E X H I B I T S**

**<u>TRIAL EXHIBITS</u>**                        <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

8                                                     1042   5

10                                                    1042   5

11                                                    1042   5

12                                                    1042   5

13                                                    1042   5

14                                                    1042   5

15                                                    1042   5

17                                                    1042   5

18                                                    1042   5

21                                                    1042   5

22                                                    1042   5

23                                                    1042   5

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 24 | | 1042 | 5 |
| 25 | | 1042 | 5 |
| 27 | | 1042 | 5 |
| 53 | | 1042 | 5 |
| 58 | | 1060 | 5 |
| 143 | | 1047 | 5 |
| 145 | | 1094 | 5 |
| 146 | | 1053 | 5 |
| 147 | | 1068 | 5 |
| 150 | | 1058 | 5 |
| 151 | | 1064 | 5 |
| 155 | | 1073 | 5 |
| 160 | | 1082 | 5 |
| 161 | | 1078 | 5 |
| 171 | | 974 | 5 |
| 171 | | 1042 | 5 |
| 179 | | 958 | 5 |
| 243 | | 942 | 5 |
| 256 | | 948 | 5 |
| 332 | | 951 | 5 |
| 361 | | 966 | 5 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 825 | | 950 | 5 |
| 1001 | | 935 | 5 |

<u>**CERTIFICATE OF REPORTER**</u>

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, January 24, 2023