Volume 6

Pages 1123 - 1291

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES          )
LITIGATION.                            ) No. 18-cv-04865-EMC
_____)
                                       San Francisco, California
                                       Wednesday, January 25, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:

           LEVI & KORSINSKY, LLP
           1101 30th Street NW
           Suite 115
           Washington, D.C.  20007
    BY:  **NICHOLAS IAN PORRITT, ESQ.**
         **ELIZABETH K. TRIPODI, ESQ.**
         **ALEXANDER A. KROT, III, ESQ.**
         **JOSEPH LEVI, ESQ.**

           LEVI & KORSINSKY LLP
           75 Broadway
           Suite 202
           San Francisco, California  94111
    BY:  **ADAM M. APTON, ESQ.**

           LEVI & KORSINSKY LLP
           55 Broadway
           10th Floor
           New York, New York  10016
    BY:  **MAX EDWARD WEISS, ESQ.**
         **KATHY AMES VALDIVIESO, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
           Official Reporter, U.S. District Court

(Appearances continued, next page)

**<u>APPEARANCES, CONTINUED:</u>**

For Defendants:

                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                51 Madison Avenue
                22nd Floor
                New York, New York  10010
        BY: **ALEXANDER B. SPIRO, ESQ.**
              **ANDREW JOHN ROSSMAN, ESQ.**
              **PHILLIP B. JOBE, ESQ.**
              **ELLYDE R. THOMPSON, ESQ.**
              **JESSE A. BERNSTEIN, ESQ.**


                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                865 South Figueroa Street
                10th Floor
                Los Angeles, California  90017
        BY: **MICHAEL T. LIFRAK, ESQ.**
              **ANTHONY P. ALDEN, ESQ.**
              **MATTHEW ALEXANDER BERGJANS, ESQ.**
              **WILLIAM C. PRICE, ESQ.**

                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                555 Twin Dolphin Drive
                Fifth Floor
                Redwood Shores, California  94065
        BY: **KYLE K. BATTER, ESQ.**

 1   **Wednesday, January 25, 2023**                    **8:20 a.m.**

 2                      P R O C E E D I N G S

 3        (The following proceedings were held outside of the

 4   presence of the Jury)

 5             THE COURTROOM DEPUTY:  All rise.  Court is now in

 6   session, the Honorable Edward M. Chen presiding.

 7             THE COURT:  Good morning, everyone.

 8             THE COURTROOM DEPUTY:  Court is now calling the case

 9   In Regarding Tesla Inc. Securities --

10             THE COURT:  Okay, someone's got their audio on.

11   Testing.  Sounds like I'm in a stadium or something.  Testing?

12        That's better.  Great, thank you.

13             THE COURTROOM DEPUTY:  Court is now calling the case

14   In Regarding Tesla Inc. Securities Litigation, Case

15   No. 18-4865.  Counsel, please state your appearances for the

16   record, beginning with the plaintiff.

17             MR. PORRITT:  Good morning, Your Honor. Nicholas

18   Porritt of Levi & Korsinsky for the plaintiff and the class.

19             THE COURT:  Thank you, Mr. Porritt.

20             MR. SPIRO:  On behalf of the defendants, Alex Spiro,

21   Quinn Emanuel.

22             THE COURT:  All right.  Thank you, Mr. Spiro.

23        So who are we expecting?  Who's going to be called today?

24             MR. PORRITT:  Your Honor, today we expect to call in

25   the following order, Deepak Ahuja, first.  Then there will be a

PROCEEDINGS

1  video deposition witness, Joseph Fath, and following with

2  Antonio Gracias.

3          THE COURT:  All right.  And I've ruled on the Ahuja

4  exhibits and Fath exhibits already, correct?

5          MR. PORRITT:  Yes, Your Honor.  Your Honor, we have,

6  before your ruling came in we agreed a set of -- a tape, if you

7  like, or the excerpts, so that is what we -- with defendants so

8  that is what we are going to play today.

9          THE COURT:  Okay.

10         MR. PORRITT:  And just a housekeeping matter, there

11 are some exhibits attached, associated with that transcript.  I

12 would like to move them in formally as admitted now, if I may.

13         THE COURT:  Yeah.

14         MR. PORRITT:  So we would move the admission of

15 Exhibits 39, 40, 41, 42, 44, 46 and 47 at this time.

16         MR. SPIRO:  And obviously, we maintain all of our

17 objections.

18         THE COURT:  All right, but I have already given my

19 ruling on those, I believe.

20         MR. PORRITT:  Yes, Your Honor.

21         THE COURT:  And my ruling stands.  Objection's

22 overruled, the objections are noted for the record.  And let me

23 -- before I go any further let me remind you that we still need

24 the redacted version of Exhibit 121.

25         MR. SPIRO:  We are still working on that, Your Honor,

**PROCEEDINGS**

 1   and the Court will have it soon.

 2            **THE COURT:**  Today?  Or when?

 3            **MR. SPIRO:**  Certainly before -- I can assure the

 4   Court, by Friday.

 5            **THE COURT:**  Okay.  Because we, we do need that.  And

 6   then the -- the Silver Lake redactions, have you all worked

 7   anything out?

 8            **MR. SPIRO:**  I think both plaintiff and defense agree

 9   on those issues.  What we are trying to do is navigate the

10   third party.  I don't think it is an issue between plaintiffs

11   and --

12            **MR. PORRITT:**  (Nods head)

13            **MR. SPIRO:**  We are just trying to navigate the third

14   party.

15            **THE COURT:**  All right.

16            **MR. SPIRO:**  It is also my understanding Mr. Durban is

17   testifying on Friday.  That will also, we also expect to be

18   resolved before we see Your Honor on Friday, we plan on using

19   our Thursday to make great progress on these and other issues.

20            **THE COURT:**  Good.  Good, good, good.  All right.  Then

21   let's talk about --

22        (Reporter clarification)

23            **THE COURT:**  That list, yes.  Those are admitted.

24   Sorry.  Thank you.

25

**PROCEEDINGS**

1          (Trial Exhibits 39, 40, 41, 42, 44, 46 and 47 received in

2     evidence.)

3          **MR. PORRITT:**  And I think there was one or a couple of

4     outstanding objections for Mr. Gracias which I don't know if

5     you want to address now, Your Honor, or -- there will be a

6     break before then, if you want to --

7          **THE COURT:**  Well, we have got a couple minutes.

8          **MR. PORRITT:**  I think there is really one document

9     that is outstanding, Exhibit 711.

10         **MR. SPIRO:**  Yeah, we don't need to address that at

11    this time.  We don't plan to use it at this time.

12         **THE COURT:**  Oh, all right.

13         **MR. SPIRO:**  We don't have to have a long colloquy

14    about it.

15         **THE COURT:**  All right.

16         **MR. SPIRO:**  If anything changes after the testimony of

17    Mr. Ahuja for some reason I'll let the Court and parties know,

18    but I don't expect it to.

19         **THE COURT:**  There was 318 that had been flagged too;

20    is that an issue?

21         **MR. PORRITT:**  Plaintiffs will withdraw their objection

22    at this time, so defendants may use that if they --

23         **THE COURT:**  Okay.  Then plaintiff had -- your list,

24    104?

25         **MR. PORRITT:**  We are not going to proffer those

**PROCEEDINGS**

 1   exhibits.  I think they were objected to -- I think they were

 2   104 and one other.  Those are things like call records and

 3   things, which are mainly used to refresh recollection.  And we

 4   are not going to seek admission at this point.

 5          **THE COURT:**  All right.  104, and then the call record

 6   of 165 and 178, so you're not is going to use those, not

 7   seeking admission of those.

 8          **MR. PORRITT:**  We're not going to seek admission.  We

 9   may use them to refresh recollection as we go.

10          **THE COURT:**  All right, good.  Makes it simpler.

11          **MR. SPIRO:**  And the other thing that the Court should

12   know is that plaintiffs -- and we appreciate it -- sort of

13   streamlined the witnesses and issues for us last night to get

14   us back on schedule.

15          **THE COURT:**  All right.

16          **MR. SPIRO:**  So I just thought I should let the Court

17   know that.

18          **THE COURT:**  Good.

19          **MR. PORRITT:**  Fingers crossed.

20          **THE COURT:**  Appreciate that.  Plus, I don't know if

21   Vicky gave you the times.

22          **THE COURTROOM DEPUTY:**  No, but I have it right here.

23          **THE COURT:**  Announce it for the record.

24          **THE COURTROOM DEPUTY:**  As of yesterday, plaintiffs

25   have used eight hours and 18 minutes.  Defendants, nine hours

**PROCEEDINGS**

1    and 13 minutes.

2            **MR. PORRITT:**  So what was the minutes for the

3    plaintiff?

4            **THE COURTROOM DEPUTY:**  Eight hours and 18 minutes.

5            **MR. PORRITT:**  Eighteen.  Okay, thank you.

6            **THE COURTROOM DEPUTY:**  You're welcome.

7            **THE COURT:**  So technically we are about at the halfway

8    point in terms of your gas tank -- that's a bad analogy.  But

9    in other words, you are about half full.

10           **MR. SPIRO:**  Thank you, Your Honor.

11           **THE COURT:**  All right.  And the jury is going to let

12   us know by the break whether they can stay for an extra hour or

13   an hour and a half on Friday, so we will know that today before

14   we leave.  So you can plan your witnesses accordingly.

15           So.  Good.  So we're ready for the jury, as soon as

16   they're ready.  Right?

17           **THE COURTROOM DEPUTY:**  They should be here.

18           **MR. PORRITT:**  Yes, Your Honor.

19           **THE COURT:**  Okay.  All right.  We'll go check on the

20   witnesses real quick, and see where we are.

21           (Off-the-Record discussion between the Court and Clerk)

22           **THE COURT:**  Maybe we can start a couple minutes early.

23           **THE COURTROOM DEPUTY:**  Okay.

24           (The following proceedings were held in the presence of

25   the Jury)

PROCEEDINGS

1          **THE COURTROOM DEPUTY:**  All rise for the jury.

2          **THE COURT:**  All right, have a seat everyone.  Good

3    morning, ladies and gentlemen.

4       Okay.  Thank you for your promptness and we are actually

5    going to begin on time here.  And the plaintiffs are prepared

6    to call their next witness.

7          **MR. APTON:**  Good morning, Your Honor.  Again, Adam

8    Apton for the plaintiffs.  And today we will be calling Deepak

9    Sharma -- oh, I'm sorry, Deepak Ahuja.

10         **DEEPAK AHUJA, PLAINTIFF'S WITNESS, SWORN**

11         **THE WITNESS:**  I do.

12         **THE COURTROOM DEPUTY:**  Thank you.  Please have a seat.

13   Please speak clearly into the microphone.

14      State and spell your first and last name for the record.

15         **THE WITNESS:**  Deepak Ahuja.

16         **MR. APTON:**  Your Honor, we have a binder for the

17   witness, as well as the Court.

18         **THE COURT:**  That's fine.  And Mr. Ahuja, if you could

19   spell your last name for the record for our reporter, please.

20         **THE WITNESS:**  A-H-U-J-A.

21         **THE COURT:**  All right.  Thank you.

22         **MR. APTON:**  May we begin, Your Honor?

23         **THE COURT:**  Yes.

24

25

AHUJA - DIRECT / APTON

<u>DIRECT EXAMINATION</u>

**BY MR. APTON**

**Q**   Good morning, Mr. Ahuja.

**A**   Good morning.

**Q**   In 2018, August, you were Tesla's CFO, correct?

**A**   I was.

**Q**   Okay.  And as CFO, your responsibilities included overseeing Tesla's financial reporting?

**A**   It did.

**Q**   And investor relations?

**A**   Yes.

**Q**   And as CFO of Tesla, you reported directly to Elon, correct?

**A**   I did.

**Q**   And now, at that point in time when you were Tesla's CFO, did you follow Elon's Twitter account?

**A**   I did.

**Q**   And did you review any of his tweets before they were posted?

**A**   I did not.

**Q**   And in fact, no one at the company did.  Is that correct?

**A**   To my understanding, that is correct.

**Q**   And that was at times problematic for Tesla, was it not?

**A**   I do not agree with that.

**Q**   Well, is it fair to say that sometimes his -- his tweets

**AHUJA - DIRECT / APTON**

1  prompted negative responses from investors?

2  **A**   Um, difficult to say that, precisely.

3  **Q**   If we can -- do you recall an email from Ron Baron on

4  August 1st, 2018?

5  **A**   Could you point me to --

6  **Q**   Sure.

7  **A**   -- the exhibit?

8       **MR. APTON:**  If we could introduce Exhibit 78.

9       (Document displayed to the Witness)

10      (Witness examines document)

11      **THE WITNESS:**  Yes, I do recall this, as I see it here.

12      **MR. APTON:**  And Your Honor, can we publish this to the

13  jury?  I believe it is in evidence already.

14      **THE COURT:**  I believe it is, and I had overruled an

15  objection, so yes.  If it hasn't been admitted, it's admitted,

16  and you may publish.

17      (Trial Exhibit 78 received in evidence.)

18      **MR. APTON:**  Thank you.

19      (Document displayed)

20  **BY MR. APTON**

21  **Q**   And now, Mr. Ahuja, Ron Baron, he's a long-time investor

22  in Tesla, correct?

23  **A**   He was.

24  **Q**   A respected investor, no?

25  **A**   He certainly is respected.

1   **Q**     And here in this email, he's forwarding you an email that

2   he sent to Elon on July 15th of 2018.  Is that right?

3   **A**     That is correct.

4   **Q**     And the subject matter of his email, or at least one point

5   under the paragraph titled Number 1, the last sentence, he's

6   telling Elon not to tweet.  Is that right?

7   **A**     That is correct.

8   **Q**     He says (As read):

9              "The more you react, the more likely they

10             will win.  If something really upsets you, go

11             for a walk around the factory.  Get an ice

12             cream cone.  Just don't use Twitter."

13      Did I read that correctly?

14  **A**     That is correct.  If I may say, it's an opinion of Ron

15  Baron.  I'm not sure that that can be generalized to all

16  investors.

17  **Q**     Well, this was in response to a particular tweet in which

18  Elon referred to a cave diver rescuing a soccer team in

19  Thailand as a pedophile?  Is that correct?

20  **A**     I'm not sure about it, but I do see he mentions that in

21  this email.

22             **MR. APTON:**  May I please show the witness Exhibit 321?

23             **THE COURT:**  All right.  Is that in evidence, or no?

24             **MR. APTON:**  Not yet, Your Honor.

25             **THE COURT:**  All right.  You may show it to him.

**AHUJA - DIRECT / APTON**

1      (Document displayed to the Witness)

2  **BY MR. APTON**

3  **Q**    Mr. Ahuja, is this the tweet to which Ron Baron's

4  referring?

5      (Witness examines document)

6  **A**    I'm not sure that he is.

7  **Q**    Well, this is referring to a diver.  And he is Elon,

8  calling this diver a, quote, pedo guy, close quote, correct?

9  **A**    Yeah.  It could be referring to that as I look at it.  Um,

10  -- could you please repeat your question?

11  **Q**    Sure.  Why don't I do this?

12          **MR. APTON:**  Your Honor, may I move this into evidence,

13  please?

14      This is the subject of a bellwether ruling, Your Honor --

15          **THE COURT:**  Yes, admitted.  You may publish.

16      (Trial Exhibit 321 received in evidence.)

17      (Document displayed)

18          **MR. APTON:**  Thank you.

19  **BY MR. APTON**

20  **Q**    My question, Mr. Ahuja, was that a tweet like this was one

21  of the tweets to which Ron Baron was most likely referring to

22  as evidenced in the context of his email, correct?

23  **A**    I'm not sure, but it appears to be.

24  **Q**    Okay.  Let's move on then.  So, after this tweet came in,

25  and after Ron Baron's email, did anyone at that point start

1    reviewing Elon's Twitter?

2    **A**    Not to my knowledge.

3    **Q**    No.  And just so it happens, Ron Baron's email to Elon was

4    initially on July 15th but he then forwarded it to you on

5    August 1st.  Correct?

6    **A**    Correct.

7    **Q**    And that was the day after you, he and Sam Teller met with

8    the Saudi PIF.  Is that correct?

9    **A**    That is correct.

10   **Q**    Do you recall attending that meeting?  I assume you do;

11   yes?

12   **A**    I do.

13   **Q**    And you first learned about that meeting because you

14   received a text from Sam Teller that night.  Correct?

15   **A**    That is correct.

16   **Q**    And I want to get the chronology straight.  So if we can

17   look at Exhibit 79.

18        **MR. APTON:**  And Your Honor, I don't believe there is

19   any objections to this, subject to redactions of course.

20        **MR. ROSSMAN:**  No objection, Your Honor.

21        **THE COURT:**  All right, 79 is admitted.

22     (Trial Exhibit 79 received in evidence.)

23        **MR. APTON:**  And if we could publish that to the jury.

24     (Document displayed)

25

**AHUJA - DIRECT / APTON**

 1  **BY MR. APTON**

 2  **Q**    The first -- sorry, this is a lot of your text messages,

 3  correct?

 4  **A**    It is.

 5  **Q**    And the first text message is from Sam Teller, I believe?

 6  Says:

 7            "Yasir from Saudi PIF here.  Says they own

 8            almost 5% percent of Tesla."

 9       Did I read that correctly?

10  **A**    Yes.

11  **Q**    And that came in at 6:23 p.m., is that right?

12  **A**    That is correct.

13  **Q**    And you already knew that the Saudi PIF owned 5 percent.

14  Right?

15  **A**    I did not.  We knew someone in the Middle East had started

16  to buy Tesla shares but this was the first official

17  confirmation of that information.

18  **Q**    Well, if you go four lines down, you say.

19            "Not surprised.  We had heard that from

20            GS..."

21       I assume that means Goldman Sachs?

22  **A**    That's correct.

23  **Q**    So your text message says otherwise.  It says you already

24  knew that.

25            **MR. ROSSMAN:**  Objection, Your Honor.

1           **THE COURT:**  Hold on.  There's an objection.

2      What is it?

3           **MR. ROSSMAN:**  Misstates the evidence.  He should read

4   the text.  Mr. Apton should read the text.

5           **THE COURT:**  Why don't you rephrase.

6           **MR. APTON:**  I can read the text.

7   **BY MR. APTON**

8   **Q**   Mr. Ahuja, your section says:

9           "Not surprised.  We had heard that from GS

10          that 'A Saudi investor had been buying our

11          stock all the way to 5 percent.'"

12      Did I read that correctly?

13  **A**   Yes, you did.

14  **Q**   Thank you, sir.

15  **A**   We at that time did not know the name of the Saudi

16  investor, so the point I made earlier was this was the first

17  official confirmation that the Saudi PIF was buying.  Until

18  then, we were not aware of the name and I was just speculating

19  in my mind it was likely them.

20  **Q**   Are there many large Saudi investors that have the ability

21  to acquire 5 percent of Tesla?

22  **A**   I can imagine a few.

23  **Q**   Yes.  Including the Saudi PIF, though.

24  **A**   Yes.

25  **Q**   Now at 6:33 p.m. you texted Sam:

**AHUJA - DIRECT / APTON**

1           "Outside now."

2      Correct?

3   **A**   Yes.

4   **Q**   And did you join the meeting at that point?

5   **A**   Sam Teller came out, um, of the meeting when I sent him

6   this text.  And he took me aside to tell me that the Saudi PIF

7   fund has expressed interest in taking Tesla private.  It's an

8   intense meeting; let's go join the meeting.

9   **Q**   And you joined the meeting at that time?

10  **A**   I did.

11  **Q**   And the meeting continued for approximately another ten

12  minutes after you joined, is that correct?

13  **A**   About ten, 15 minutes, yes.

14  **Q**   So you weren't present for the entire meeting.  Is that

15  correct?

16  **A**   That is correct.

17  **Q**   And during the meeting, or at least the portion that you

18  attended, Elon agreed to continue the conversation, to discuss

19  a further proposed structure to take Tesla private.  Is that

20  right?

21  **A**   When I entered the meeting, Elon turned to me, and

22  Yasir -- who's the managing director of the Saudi PIF fund --

23  in his presence, to say that the Saudi PIF fund has -- is

24  interested and wants to take Tesla private.  And he also

25  indicated that they have the funds to make it happen.  And then

**AHUJA - DIRECT / APTON**

1    the conversation continued.

2    **Q**    It continued with Elon committing to get back to Yasir

3    about a structure?  Is that correct?

4    **A**    The conversation -- I think you are referring to the end.

5    **Q**    Yes.

6    **A**    At the end of the conversation, there was a question asked

7    why -- as to what are the next steps.  And Yasir's response to

8    that, to the best of my recollection, was:  We are ready to

9    act.  Once you let us know that you want to proceed, we will

10   kick off at our end.

11   **Q**    So what I would like to do is, if we could publish and

12   show the jury Exhibit 80, and yourself as well.

13            **MR. APTON:**  If we could put, Derek, both pages on at

14   the same time?

15       (Documents displayed)

16   **BY MR. APTON**

17   **Q**    Now, these were the notes, meeting minutes taken by the

18   Saudi PIF of your meeting on July 31st.  And you see on the

19   second page, the last bullet point does reflect what you just

20   said.  Is that correct?

21   **A**    Firstly, I'm not sure if these are the official minutes of

22   the meeting.  And in terms of the -- your last comment there,

23   I'm not -- I do not agree that -- this is not consistent with

24   what I heard as the closing next steps.

25   **Q**    Well, to your first point, on the left hand, that's the

**AHUJA - DIRECT / APTON**

1   Saudi PIF seal on the upper right-hand corner.  Correct?

2   **A**    It is.

3   **Q**    And it correctly indicates the location of the meeting,

4   yes?

5   **A**    It does.

6   **Q**    The date of the meeting, yes?  The attendees of the

7   meeting, too?

8   **A**    It does.

9   **Q**    And now, you might disagree with some of the wording on

10  the last point, but the gist or the sentiment is as you

11  testified earlier, right?  Elon had to get back to the PIF with

12  how he wanted to proceed.  What structure he wanted to use.

13  The financial calculations.  Correct?

14          **MR. ROSSMAN:**  Objection, misstates.

15          **THE COURT:**  Um --

16  **BY MR. APTON**

17  **Q**    What --

18          **THE COURT:**  Hold on.  Why don't you rephrase that.

19          **MR. APTON:**  Sorry.

20  **BY MR. APTON**

21  **Q**    Mr. Ahuja, at the end of the meeting, you testified just a

22  few minutes ago that Elon was to get back to Yasir with how he

23  wanted to proceed.  Correct?

24  **A**    Yes.  I was --

25  **Q**    Mister -- just yes or no.  Yes?

**AHUJA - DIRECT / APTON**

1    **A**    Sorry, then.  Could you please repeat your question, sir?

2    **Q**    Elon was to get back to Yasir with how he wanted to

3    proceed.  Yes?

4    **A**    That was part of the next steps, not all of the next

5    steps.

6    **Q**    Sure.

7    **A**    And my comment about the last section that has been

8    highlighted here is that it doesn't fully reflect all the next

9    steps, and the comment made by Yasir regarding their

10   willingness to act.  And, sorry, that they are ready to act.

11   So it seems partial in my mind.

12        And also, I don't recall the specific plan here of

13   providing financial calculations.

14   **Q**    Well, you were deposed in this case, correct?

15   **A**    Yes, I was.

16   **Q**    And when asked about this, you did testify that you agreed

17   with the gist of the notes.  Did you not?

18        **MR. ROSSMAN:**  Page and line, please, Your Honor?

19        **THE COURT:**  Well, he can ask this question first.

20   Overruled.

21        **THE WITNESS:**  I -- I did agree that one of the next

22   steps was for Elon to get back.  However, I do not recall --

23   and I may be mistaken, but at this point I do not recall that I

24   was in agreement on this financial calculations next step.

25   **Q**    So Mr. Ahuja, I'm going to, with the Court's permission,

**AHUJA - DIRECT / APTON**

1  hand you a copy of your transcript and I would like to refer

2  you to a portion.   Okay?

3  **A**    Sure.

4         **MR. APTON:**   Your Honor, may I approach?

5         **THE COURT:**   Yes.

6     (Document tendered)

7  **BY MR. APTON**

8  **Q**    Now, Mr. Ahuja, if I could --

9         **THE COURT:**   Do you have a copy for the Court?

10        **MR. APTON:**   Oh, I do.   May I --

11    (Document handed up to the Court)

12  **BY MR. APTON**

13  **Q**    Mr. Ahuja, if I could refer you to Page 97, Line 7.   And

14  let me know when you are there.

15  **A**    Yes.

16  **Q**    (As read)

17         "**QUESTION:**   Okay.   The final point here on

18         Exhibit 80 -- which is the document that's

19         currently in front of everybody -- has Yasir

20         stating 'I would like to listen to your plan,

21         Elon, and what are the financial calculations

22         to take it private in the next week.   And if

23         I did not receive anything I will call you.'

24         Do you see that?

25         "**ANSWER:**   I do see that.

```
 1              "QUESTION:  Again, do you recall Yasir saying

 2              that at the meeting in July 31st of 2018?

 3              "ANSWER:  I do not recall the exact words as

 4              they're indicated here but I do recall the

 5              gist of it which is that Yasir was

 6              fundamentally keen on hearing from Elon

 7              directly the structure that he would have in

 8              mind that he would like to do for a

 9              going-private transaction.  And what

10              percentage of that he would think would be

11              needed or the financial calculations to take

12              it private."

13         Your testimony was accurate when you were deposed in this

14    case, correct?

15              MR. ROSSMAN:  Objection, Your Honor.  Completeness?

16    Could he also read Page 81, Line 19 through 82, Line 5?

17              THE COURT:  You're saying Page 81?

18              MR. ROSSMAN:  81.

19              MR. APTON:  Your Honor, that's a separate part of the

20    examination.  81?  Can't they do that on direct or cross?

21              THE COURT:  Well, let me look at it.  81, what --

22              MR. ROSSMAN:  Actually, you could start, Your Honor,

23    with 81, Line 2, all the way to 82, Line 5 on the same exact

24    subject.

25              MR. APTON:  Your Honor, may I continue?
```

```
 1              THE COURT:  I'm reading it.

 2              MR. APTON:  Oh, sorry.

 3          (The Court examines document)

 4              THE COURT:  All right, you can bring that up on -- on

 5     cross.

 6              MR. ROSSMAN:  I will.  Thank you, Your Honor.

 7     BY MR. APTON

 8     Q    So Mr. Ahuja, after this meeting on July 31st, were you

 9     asked ever to prepare calculations, financial calculations to

10     share with the PIF?

11     A    I was not.

12     Q    And during the meeting, was there any specific funding

13     amount discussed with the Saudi PIF?

14     A    There was no specific -- no.

15     Q    There was no specific dollar amount discussed at the

16     meeting while you were present.  Correct?

17     A    There was no specific dollar amount.

18     Q    And no discussion of an approximate range of prices,

19     either.

20     A    No; to me the critical thing, if I may add --

21     Q    Sure.

22     A    -- was that the Saudi fund was willing and ready to act.

23     The less critical thing was the exact structure and the

24     pricing.

25     Q    Well, it is interesting you say that because the structure
```

**AHUJA - DIRECT / APTON**

 1  for the transaction would have affected the amount of funding

 2  that would have been required.  Correct?

 3  A    That is correct.  And there was discussion about

 4  potentially 50 percent or more of Tesla shareholders needing to

 5  be bought out.  So my impression was there was sufficient

 6  discussion here that Saudi PIF managing director, who was an

 7  extremely sophisticated professional investor, would have a

 8  good understanding of the funding.

 9  Q    And what was Tesla's market cap at that point in time?

10  A    It was somewhere in the 50, $55 billion range, if I'm

11  guessing here.

12  Q    So by your calculations, at a minimum, 50 percent buyout

13  required roughly $30 billion of money?

14  A    That's in the right ballpark, yes.

15  Q    But no structure had been decided.  Right?

16  A    There was -- that is -- at that meeting, it was not.  But

17  the higher-level willingness to proceed was there.

18  Q    And Elon was supposed to get back to the Saudi PIF with

19  the structure, which he did not do, correct?

20  A    I'm not sure what he did or not.

21  Q    What about regulatory approvals?  Was there any discussion

22  of regulatory approvals at the meeting?

23  A    That was not --

24  Q    Sorry.  That would have been necessary, too, correct,

25  regulatory approvals for this deal?

1   **A**    It was understood.

2   **Q**    And by "regulatory approvals," we're referring to the

3   Committee on Foreign Investment in the United States, is that

4   right?

5   **A**    There would be many approvals required.  Regulatory

6   approval from that committee, the CFIUS, would be one of them.

7   **Q**    CFIUS, C-F-I-U-S.  A regulatory organization operating at

8   the authority -- under the authority of the United States

9   government.  Correct?

10  **A**    That is correct.

11  **Q**    And that would have been required to allow a substantial

12  foreign investment in a United States company.  Correct?

13  **A**    That is correct.

14  **Q**    No discussion of that at the meeting, though.

15  **A**    There was none.

16  **Q**    And after the meeting -- which, if I remember correctly,

17  was about ten minutes while you were there, correct?  After the

18  meeting, you then gave the Saudi PIF a tour around the factory.

19  Correct?

20  **A**    That is correct.

21  **Q**    During that tour, did you ever discuss price for this

22  transaction?

23  **A**    I did not, but I did discuss funding for the transaction.

24  **Q**    But no specific price.  Right?

25  **A**    Yeah, we did not.  And to me, that was secondary.  But,

**AHUJA - DIRECT / APTON**

1   yeah, we did not.

2   **Q**    And now, after this meeting's done, two days later, you

3   received an email from Elon, titled "Offer to take Tesla

4   Private at 420."

5       Correct?

6           **MR. APTON:**  Bring up Exhibit 81, which is already in

7   evidence.

8       (Document displayed)

9   **BY MR. APTON**

10  **Q**    Do you recognize this email, sir?

11  **A**    Yes.  It is the email sent to the board.  And I was

12  included.

13  **Q**    And you didn't see a draft of this email before you

14  received it, correct?

15  **A**    I did not.

16  **Q**    And this was the first time, the first time you saw a

17  price attached to this potential transaction, $420 per share.

18  Correct?

19  **A**    It is the first time I saw that price.

20  **Q**    And now in response to this email the board convened a

21  special meeting on August 2nd.  Is that correct?

22  **A**    They did.

23          **MR. APTON:**  May we please introduce Exhibit 82?

24          **THE COURT:**  All right.  Has that been admitted?

25          **MR. APTON:**  It has not yet, but I will seek to do it.

1          **MR. ROSSMAN:**  No objection, Your Honor.

2          **THE COURT:**  All right.  Admitted.  You may publish.

3          (Trial Exhibit 82 received in evidence.)

4          (Document displayed)

5     **BY MR. APTON**

6     **Q**    Sir, these are the minutes from that August 2nd board

7     meeting, correct?

8     **A**    Correct.  I don't have a copy; I'll look through the

9     electronic.

10    **Q**    If you prefer a hard copy, there is one at the end of your

11    binder.  It's hidden by some of the tabs there.

12    **A**    Thank you.

13    **Q**    You attended this meeting, is that right, sir?

14    **A**    I did.

15    **Q**    And you played an important role in this meeting.  You

16    reported to the board what had occurred on July 31st.  Is that

17    right?

18    **A**    I did.

19    **Q**    Now, as CFO of a public company, or any company, frankly,

20    you would agree when speaking to your board it's important to

21    be honest and truthful, correct?

22    **A**    It is.

23    **Q**    And you always are.  Is that fair to say?

24    **A**    Yes.

25    **Q**    And now, when you spoke to the board during this meeting

1   on August 2nd in response to Elon's proposal, you were honest,

2   you were truthful, you were accurate.  Correct?

3   **A**   I was.

4   **Q**   Now, in the second paragraph on the first page, you said

5   that Musk believed that the PIF was willing to fund the entire

6   transaction.  Correct?

7   **A**   Yes.

8   **Q**   There's no mention of any other funding sources, right?

9   **A**   There isn't.

10  **Q**   Now, the next day there was another board meeting, on

11  August 3rd.  Correct?

12  **A**   That is correct.

13              **MR. APTON:**  If we could show Exhibit 83?

14      (Document displayed to the Witness)

15  **BY MR. APTON**

16  **Q**   Now, this meeting, Elon attends.  Correct?

17  **A**   That is correct.

18  **Q**   Now, he didn't give any details on the structure of this

19  transaction during this meeting, did he?

20  **A**   He did not.  He was seeking permission and guidance from

21  the board to talk to investors and develop the structure.

22  **Q**   Well, if you go down a little bit further here, I believe

23  the next page, --

24      (Document displayed)

25  **Q**   -- the big paragraph, third paragraph from the top.

**AHUJA - DIRECT / APTON**

1        Without discussing any plans for a structure, he lists a

2    number of investors that may want to contribute in this

3    going-private transaction.  The UAE, Norwegian Sovereign Wealth

4    Fund, Silver Lake, Fidelity, Baillie Gifford, Tencent, T. Rowe

5    Price.  Do you see that?

6    **A**   I do.

7    **Q**   Now, during your meeting with the Saudis on July 31st,

8    Elon didn't mention bringing any of these entities into the

9    transaction, did he?

10   **A**   No.

11   **Q**   And at the time of this board meeting, Elon hadn't spoken

12   to any of these investors either, correct?

13   **A**   That is correct.  As I said, he was seeking the approval

14   from the board to start those conversations.

15   **Q**   And what's also noticeable in here in these board meeting

16   minutes on Page 2, it's clear that Elon still hasn't engaged

17   legal advisers or financial advisers.  Is that right?

18   **A**   It appears to be that way.  Um --

19   **Q**   So, without engaging advisers, without having spoken to

20   these investors, he's made a proposal to take Tesla private, a

21   transaction, potentially billions of dollars.  That's the

22   August 2nd email.  Correct?

23   **A**   Yeah.  To me, that was consistent with the conversations I

24   was a part of with the Saudi PIF fund, in the sense that the

25   Saudi PIF fund was willing on their own to take Tesla private.

 1   And that confidence, that belief and that verbal commitment

 2   enabled Elon -- from my point of view, I could only speak from

 3   my -- from my impressions -- to send such an email, after

 4   giving it due thought.

 5        The rest of this, bringing other investors along, getting

 6   the -- the legal and the financial advisers was the process,

 7   then, leading to completion.

 8   **Q**   Well, you would agree that what Elon does internally with

 9   you and his board members is one thing, and then what he does

10   publicly is something entirely different.  You'd agree with

11   that, correct?

12   **A**   Not sure the context or how you are putting -- I don't

13   fully understand your question.

14   **Q**   Sure.  Well, we'll get there.

15        So on Page 3 of those board minutes, the board tells Elon

16   that a detailed proposal regarding a going-private transaction

17   had not yet been made.  And one would be needed in order for

18   the board to properly analyze and evaluate it.

19        Did I read that correctly?

20   **A**   That is correct.

21   **Q**   And now, the board also says as an initial step, they're

22   going to authorize Mr. Musk to have initial conceptual

23   conversations with a few of the company's top shareholders, to

24   explore their interest and gauge their reaction.  Is that

25   right?

**AHUJA - DIRECT / APTON**

 1   **A**    That's correct.

 2   **Q**    And so after this, based on that last portion we just

 3   read, you and Mr. Martin Viecha, who is your director of IR,

 4   you put together a list of top shareholders for Elon.  Correct?

 5   **A**    We were -- that was one of the assignments, we thought,

 6   just to provide information, which is public information.

 7   **Q**    Sure.

 8           **MR. APTON:**  If I can introduce Exhibit 84, and without

 9   objection, move it into evidence?

10        (Document displayed to the Witness)

11           **THE COURT:**  Any objection?

12           **MR. ROSSMAN:**  No objection, Your Honor.

13           **THE COURT:**  Admitted.

14        (Trial Exhibit 84 received in evidence.)

15           **MR. APTON:**  If we could publish that to the jury?

16           **THE COURT:**  You may.

17        (Document displayed)

18   **BY MR. APTON**

19   **Q**    Mr. Ahuja, this is reflective of your assignment, your

20   task to provide Elon with a list of shareholders so he could

21   reach out to them?  Is that correct?

22   **A**    This is an email exchange which is working on pulling that

23   information together.

24   **Q**    Now, this is dated August 5th.  Correct?

25   **A**    That is correct.

**AHUJA - DIRECT / APTON**

1   **Q**    Now, this project, it took a little bit longer than you

2   anticipated, because the next day you were still working on it.

3       If I can show you Exhibit 86, and move it into evidence?

4           **THE COURT:**  Any objection?

5           **MR. ROSSMAN:**  No objection, Your Honor.

6           **THE COURT:**  Admitted.  You may publish.

7       (Trial Exhibit 86 received in evidence.)

8       (Document displayed)

9   **BY MR. APTON**

10  **Q**    Now, this email is still you and Martin, you are working

11  together to put together this list of top Tesla shareholders.

12  Now it's August 6th.  Correct?

13  **A**    That's correct.

14  **Q**    So this is what I was getting at earlier.  Everything

15  that's going on right now is behind the curtain.  It's

16  internal.  Right?

17      The public is unaware of this potential transaction?

18          **MR. ROSSMAN:**  Objection, vague, Your Honor.

19          **THE COURT:**  The last question is not vague, so you can

20  answer the last question.

21  **BY MR. APTON**

22  **Q**    But what happens next, notwithstanding everything that's

23  happened, notwithstanding the absence of a structure, a price,

24  total amount of funding, who's going to be involved, the next

25  day, August 7th, Elon tweets out "I'm considering taking Tesla

1    private at 420.  Funding secured."

2        That's Exhibit 8.

3            MR. APTON:  If we can show the witness Exhibit 8?

4        (Document displayed)

5            MR. ROSSMAN:  Excuse me, Your Honor; is there a

6    question?

7            THE COURT:  Yeah.  First of all, I don't know -- you

8    asked a question and I overruled the objection.  There was no

9    answer.  You went on to the next question.

10       So I assume you don't need an answer to that question that

11   I overruled the objection to.

12           MR. APTON:  No, Your Honor; we can continue.

13           THE COURT:  All right.

14           MR. APTON:  Apologies.

15   BY MR. APTON

16   Q    Do you recall this tweet, Mr. Ahuja?

17   A    I do.

18   Q    I bet you do.  And you hadn't seen a draft of this tweet

19   before it was sent, correct?

20   A    I had not.

21   Q    Because no one at Tesla was reviewing Elon's tweets at

22   this point, correct?

23   A    I can only say that I had not seen it.

24   Q    Fair enough.  There had been no further conversations with

25   the Saudi PIF since July 31st; that's correct, yes?

1   **A**    I don't -- there was no conversation that I had, but I'm

2   not aware of what conversations Elon may have had.

3   **Q**    And are you aware of any conversations Elon had with the

4   investors that you had compiled in that list with Martin?

5   **A**    I'm not aware.

6   **Q**    So again, without any further information from the Saudis,

7   without any further information from major investors, Musk

8   announces potentially a $60 billion transaction in a tweet, in

9   just nine words.  Correct?

10          **MR. ROSSMAN:**  Objection, misstates.

11          **THE COURT:**  Overruled.

12          **THE WITNESS:**  To me, the words here --

13  **BY MR. APTON**

14  **Q**    I don't mean to be rude, but it's just a yes-or-no

15  question.

16          **MR. ROSSMAN:**  Objection.

17          **THE WITNESS:**  Could you please then repeat the

18  question?

19          **MR. APTON:**  Sure.

20          **THE WITNESS:**  Thank you.

21          **THE COURT:**  Let's lay the ground rules.  You ask the

22  question.  The witness will answer if it's a yes or no, yes or

23  no.

24      But I'll give you a chance to explain.  But you first have

25  to answer the question.

1           **THE WITNESS:**  Thank you.

2           **THE COURT:**  Go ahead, ask the question.

3    **BY MR. APTON**

4    **Q**    Without any details about what this transaction was going

5    to look like or who was going to be involved, Elon sends this

6    tweet.  Yes?

7    **A**    That -- that is for Elon to answer.

8    **Q**    Understood.  And in the middle of a trading day, no less.

9    Correct?

10   **A**    Yes.  It was in the middle of a trading day.

11   **Q**    Now, CFO of Tesla, familiar with rules about public

12   disclosures during trading hours and market and so on, so

13   forth.  Are you supposed to release material information in the

14   middle of a trading day?

15   **A**    The preference is not to release material information in

16   the middle of the day.

17   **Q**    And this announcement, this 60-billion corporate

18   transaction, $60 billion corporation transaction, that would

19   certainly qualify as material information.  You would agree

20   with that, yes?

21   **A**    The going-private comment does -- is material information.

22   Yes.  From my perspective, without being a legal person.

23   **Q**    Sure.  Understood.  And there's also rules that Nasdaq

24   imposed on Tesla at the time, given that Tesla's stock traded

25   on the Nasdaq market.  Is that correct?

1   **A**    If you're referring to the trading stoppage that was put,

2   they did respond to the tweet in that sense.  All, all the

3   other tweets that were there, yeah.

4   **Q**    So this tweet comes out.  And how did that lead to Nasdaq

5   halting trading?

6   **A**    I'm not -- not sure how I can answer that question.

7   **Q**    Sure.  So Nasdaq will halt trading in response to an

8   unanticipated new material announcement during trading hours.

9   Correct?

10          **MR. ROSSMAN:**  Objection, Your Honor.  This witness is

11  not testifying on behalf of Nasdaq, Your Honor.

12          **THE COURT:**  He can testify as to his understanding.

13          **MR. ROSSMAN:**  That's fine.

14          **THE WITNESS:**  They certainly have the authority to do

15  that.

16  **BY MR. APTON**

17  **Q**    Oh, more than that; that's what actually happened in this

18  case, correct?

19  **A**    It did.

20  **Q**    Thank you.  And this was in part because Mr. Musk's tweet

21  was not in compliance with those Nasdaq pre-clearance or

22  pre-disclosure rules.  Is that correct?

23          **MR. ROSSMAN:**  Objection, Your Honor.  Calls for a

24  legal conclusion.

25          **THE COURT:**  Overruled.  He can testify as to his

 1  understanding.

 2       THE WITNESS:  What other considerations Nasdaq used, I

 3  cannot say.  It was material information, and Nasdaq stopped

 4  the trading, is all I can comment.

 5  BY MR. APTON

 6  Q    Sure.  Yeah.  It was material information, and Nasdaq

 7  stopped trading as a result.  Correct?

 8  A    To me, the going-private part was the most important

 9  material information.  What else Nasdaq used to stop trading,

10  it's not for me to comment.

11  Q    Well, you are referring to this tweet (Indicating), yeah?

12  A    For me personally, it was the going-private part that was

13  more important.

14  Q    Okay.  Now, Elon's tweet comes out at 12:48 p.m. on

15  August 7th.  You then text Elon at 1:23 p.m.

16       MR. APTON:  And if I can introduce Exhibit 121, which

17  is already in evidence.

18       THE WITNESS:  I suppose your --

19  BY MR. APTON

20  Q    I'm going --

21  A    You're referring to Eastern time.  Pacific time was 9:48.

22  Q    Fair enough, using Eastern time.  Apologies for jumping

23  around time zones.

24     (Document displayed)

25  Q    Exhibit 121 here, this is an interesting text message.

**AHUJA - DIRECT / APTON**

1  Now, Elon is your boss at the time, correct?

2  **A**    He was.

3  **Q**    And you had just received this tweet announcing this major

4  corporate transaction.  And you write:

5              "Elon, am sure you have thought about a

6              broader communication on your rationale and

7              structure to employees and potential

8              investors."

9          Very well-phrased.  What did you mean by that?

10 **A**    Um, we began to get many questions from employees.  And we

11 felt it was -- it would be helpful to explain the rationale and

12 the structure that Elon had in mind, as the CEO, to his

13 employees.

14 **Q**    And so this was your way of telling Elon:  We need to

15 issue some more information about what you just tweeted.

16 Correct?

17 **A**    Um, a tweet is -- its got its limitations, so few words.

18 And clearly.  There were more questions that needed to be

19 addressed, yes.

20 **Q**    Sure.  That's why corporate transactions like this are not

21 issued in a tweet, but rather, a full form 8-K or a full proxy

22 statement, an official SEC filing.  Correct?

23 **A**    If it was a company transaction, you are completely right.

24 What Elon was doing as an individual by saying considering

25 Tesla -- considering taking Tesla private was more as an

**AHUJA - DIRECT / APTON**

1    individual, as a bidder.  So it's a slightly different point of

2    view, from my perspective.

3    **Q**    Okay.  But nonetheless, you thought it was important to

4    get more information out to investors, employees, the market in

5    general.  Correct?

6    **A**    Particularly the employees.

7    **Q**    Okay.  And so you suggest Sarah, Todd and yourself draft a

8    blog post.  Sarah is Sarah O'Brien, correct?

9    **A**    Correct.

10   **Q**    And her title, again, was?

11   **A**    Head of media communications.

12   **Q**    Todd Maron was Tesla's general counsel at the time?

13   **A**    That's correct.

14   **Q**    So head of media communications, general counsel and

15   Tesla's CFO are now drafting additional information concerning

16   Elon Musk's tweet.  Correct?

17   **A**    Again, to help explain the rationale and structure to the

18   employees from a -- Elon, or the CEO, we were.

19   **Q**    Sure.

20        **MR. APTON:**  If we could bring up Exhibit 12.

21   (Document displayed)

22   **BY MR. APTON**

23   **Q**    This is the employee email that you guys drafted, is that

24   correct?

25   **A**    That is correct.

1  Q    And --

2            MR. APTON:  Sorry, Derek.  If we could also bring up

3  503.  Which is not yet in evidence, Your Honor, but I would

4  move to admit with no objection.

5            MR. ROSSMAN:  Just a moment, Your Honor.

6            THE COURT:  All right.  503, admitted.

7        (Reporter clarification)

8            THE COURT:  Oh, I thought you said -- yes, go ahead.

9            MR. ROSSMAN:  No objection, Your Honor.

10           THE COURT:  Admitted.

11       (Trial Exhibit 503 received in evidence.)

12           THE COURT:  You may publish.

13       (Document displayed)

14  BY MR. APTON

15  Q    And in this email from Sarah O'Brien --

16           MR. APTON:  Derek, can we have the two side by side?

17       (Document displayed)

18  BY MR. APTON

19  Q    You send -- or Sarah sends, and you're copied on it, Elon

20  the letter from Exhibit 12.  Correct?

21  A    That is correct.

22  Q    And she says -- well, initially on Page 3, she says

23  (As read):

24           "Immediately after you send something to

25            employees we'll get it up on the blog"

**AHUJA - DIRECT / APTON**

1     She's referring to Tesla's blog on their website, correct?

2  **A**   She is.

3  **Q**   And then on Page 1 when she sends -- you guys send the

4  final version to Elon she again says (As read):

5         "We'll post it on the blog as a message from,

6          to, our employees."

7     That's right?

8     (Witness examines document)

9         **MR. APTON:**  If we go to Page 1?

10        **THE WITNESS:**  Yes.  I see that on the document here.

11 **BY MR. APTON**

12 **Q**   Okay.  And the letter did in fact go on Tesla's website

13 that morning, yes?

14 **A**   Yeah.  Our experience -- it did.  And our experience has

15 been that any communications from Elon to its employees -- to

16 employees became public in a matter of seconds.

17    And so our approach had become that once Elon sends an

18 email to employees, we also put it on our blog post.

19 **Q**   Sure.  Now, in Exhibit 12, Exhibit 12, the blog post or

20 the letter, there's no description of the source of funding.

21 Correct?

22 **A**   That is correct.

23 **Q**   And that was a problem.  Because as we'll see, investors,

24 the SEC, the media, they wanted information precisely on that

25 point.  Is that correct?

1          **MR. APTON:**  If we could show Exhibit 337?

2          **THE WITNESS:**  Um, can I answer your question, earlier

3     question?

4     **BY MR. APTON**

5     **Q**     Please, yes.

6     **A**     On why secured funding was not -- our explanation of that

7     was not in the --

8          **THE COURT:**  Yeah, go ahead.

9          **THE WITNESS:**  For us, this was written from my

10    implicit approach as an email from Elon as the CEO of the

11    company to employees.  What mattered was to explain the

12    rationale for taking it private and the structure, since it

13    affected their livelihood, their own stock.

14         Whatever had to be said about secured funding was Elon's

15    own personal point of responsibility, as a bidder.  Hence, we

16    had not included.

17    **BY MR. APTON**

18    **Q**     Okay.  So, but the blog post, Exhibit 12, does not specify

19    any details on the funding.  Correct?

20    **A**     It does not, for that reason.

21    **Q**     And if we could look at Exhibit 337, please?

22         **MR. APTON:**  And move into evidence, without objection?

23         **MR. ROSSMAN:**  No objection, Your Honor.

24         **THE COURT:**  All right, 337, admitted.  You may

25    publish.

**AHUJA - DIRECT / APTON**

 1          (Trial Exhibit 337 received in evidence.)

 2          (Document displayed)

 3   **BY MR. APTON**

 4   **Q**    Now, this is an email you sent to Elon.  You copied Todd

 5   Maron, who is the general counsel.  You say "Elon" -- I should

 6   say this is at 3:11 so this is after the blog post went live on

 7   the website, correct?

 8   **A**    That is correct.

 9   **Q**    You say (As read):

10                "Elon, we are getting a lot of inquiries from

11                investors, SEC and the media to better

12                understand the comment 'Funding secured.'

13                "Deepak."

14          These entities wanted information on "Funding secured,"

15   correct?

16   **A**    That's correct.  "Funding secured" was not a term of art.

17   It was -- it was -- hence, people wanted to understand that

18   term.

19   **Q**    So instead of providing -- after this, after your email,

20   instead of providing information, the board convenes a meeting

21   to discuss the tweets on August 7th.  Is that right?

22   **A**    That is correct.

23          **MR. APTON:**  If we could show, please, Exhibit 89.

24          (Document displayed to the Witness)

25          **MR. APTON:**  I'm sorry, I would like to move this into

 1    evidence too.  I don't think there is any objection.

 2            MR. ROSSMAN:  No objection, Your Honor.

 3            THE COURT:  Admitted.

 4        (Trial Exhibit 89 received in evidence.)

 5        (Document displayed)

 6    BY MR. APTON

 7    Q    Now, if we could just take a big look at the document

 8    first, there's a lot of redactions on this exhibit.

 9        (Documents displayed)

10    Q    However, you can see the date at the top and you can see

11    who attended, correct?

12    A    Yes.

13    Q    And you attended this meeting, yes?

14    A    I did.

15            MR. APTON:  And now, if we could again look at the two

16    pages together.

17        (Document displayed)

18    BY MR. APTON

19    Q    It looks like the only other piece of information here

20    that we could see outside of these redactions -- and again,

21    this meeting was in response to the tweets, correct?

22    A    Um --

23    Q    Yes?

24    A    It was in response to the continued seriousness of the

25    conversation.

**AHUJA - DIRECT / APTON**

1   **Q**    Okay.  Well, the only part that's unredacted, at least

2   from our perspective, on the second page, what it says is

3   (As read):

4                   "Mr. Gracias" -- who's Tesla's lead

5                   independent director at the time -- "was

6                   going to, quote, 'discuss with Mr. Musk the

7                   use of Twitter generally.'"

8       Is that right?

9   **A**    It is.  It also says that the board is going to engage an

10  independent adviser, and I was going to assist them in finding

11  that.

12  **Q**    Yeah.  Because advisers would be necessary in a

13  transaction like this, correct?

14  **A**    Yes.

15  **Q**    So the point now of Mr. Gracias's conversation with Elon,

16  the one that the board is authorizing Mr. Gracias to conduct,

17  was to make sure that whatever Elon tweeted relating to going

18  private was going to be shared with and approved by the board

19  before he tweeted.  Is that right?

20  **A**    Um, I'm reading through what the minutes say, that

21  Mr. Musk will coordinate the communications going forward with

22  the board.

23  **Q**    Okay.  In your deposition, you were a little bit more

24  specific about that.  Can I refer you to 211?

25  **A**    Page 211?

**AHUJA - DIRECT / APTON**

1  **Q**    Yes, sir.

2  **A**    Thank you.

3  **Q**    211, Line 25. Was Mr. Gracias instructed to tell --

4           **MR. ROSSMAN:**  Is this to impeach or to refresh,

5  Your Honor?

6           **MR. APTON:**  Impeach, Your Honor.

7           **THE COURT:**  All right, where, 211 and where?

8           **MR. APTON:**  25, to 212, 17.

9       (Document displayed)

10          **MR. ROSSMAN:**  I don't see the inconsistency that bears

11  impeachment.

12          **THE COURT:**  Hold on, let me read it.

13      (Document taken off display)

14          **THE COURT:**  You can read it.

15          **MR. APTON:**  Thank you, Your Honor.

16      (As read)

17          "**QUESTION:**  Was Mr. Gracias instructed to

18          tell Mr. Musk to stop tweeting regarding the

19          going-private transaction?

20          "**ANSWER:**  I think you will have to ask

21          Mr. Gracias -- what I recall is it was to

22          make sure that whatever he tweeted...related

23          to going private -- was discussed or shared

24          with the board or with the company was the

25          general sense I have, or recollection I have

**AHUJA - CROSS / ROSSMAN**

```
 1            of that point."
 2          MR. ROSSMAN:  Same objection, Your Honor.
 3          MR. APTON:
 4           "QUESTION:  You mean shared with the board or
 5           the company before it was published?
 6           "ANSWER:  That is correct.
 7           "QUESTION:  What would be the purpose of
 8           sharing it before it was published?
 9           "ANSWER:  To have a discussion on the timing
10           or the appropriateness or whatever else there
11           may be on that information."
12    BY MR. APTON
13    Q    That testimony was true, correct?
14    A    It was.
15    Q    Okay.
16    A    And to me, it was not inconsistent with what I said.  This
17    is a more detailed response to what I said earlier.
18    Q    I appreciate that, sir.  Thank you.
19          MR. APTON:  Your Honor, no further questions.  Just,
20    reserve for redirect.
21          THE COURT:  All right, thank you.
22        Cross?
23                    CROSS-EXAMINATION
24    BY MR. ROSSMAN
25    Q    Good morning, Mr. Ahuja.
```

**AHUJA - CROSS / ROSSMAN**

1    **A**    Good morning.

2    **Q**    I'm Andrew Rossman with Quinn Emanuel, representing the

3    defendants.  Nice to see you.

4         Now, Mr. Ahuja, I want to start by taking a minute to

5    better introduce you to the jury than Mr. Apton did.  Start

6    with your education.

7         Where did you attend college, sir?

8    **A**    I did my engineering undergraduate in India.  And then a

9    master's in engineering at Northwestern University.

10        And a master's in industrial administration at Carnegie

11   Mellon University, which is the equivalent of an MBA.

12   **Q**    I understand you tend to understate your background, sir.

13   The university you attended in India was IIT University, is

14   that right, sir?

15   **A**    It was.

16   **Q**    And you received both undergraduate and master's degrees

17   in engineering.  Have you worked as an engineer, sir, before

18   becoming a finance professional?

19   **A**    I did work as an engineer for six years, and I have

20   several patents.

21   **Q**    Okay.  Could you do all of us in the courtroom a favor and

22   draw the microphone a little bit closer to you?

23        (Request complied with by the Witness)

24   **Q**    I know you've got a soft speaking voice.  I want to make

25   sure that the jury hears you.

**AHUJA - CROSS / ROSSMAN**

1  **A**    Is that better?

2  **Q**    It's better for me.   Thank you.

3  **A**    Okay.

4  **Q**    And after your time as an engineer and after attending

5  graduate school for business, did you pursue a career in

6  finance?

7  **A**    I did.

8  **Q**    And could you tell the jury what you did before you came

9  to Tesla as CFO?

10 **A**    I worked in finance at Ford Motor Company for 15 years, in

11 a variety of roles.   And towards the end of that experience I

12 was CFO of different -- various different subsidiaries and

13 joint ventures of Ford Motor Company.

14 **Q**    And when did you come to Tesla?

15 **A**    In 2008.

16     **THE COURT:**   Counsel, can you hold on for a second?

17 I'm having technical problems.

18     Vicky?

19     **MR. ROSSMAN:**   Of course.

20     (Off-the-Record discussion between the Court and Clerk)

21     **THE COURT:**   Go ahead.   Just, without realtime, but I

22 will listen very closely.

23     **MR. ROSSMAN:**   If we don't have it in the transcript,

24 it didn't happen, Your Honor.   I understand.   Thank you for

25 bearing with us.

 1          (Off-the-Record discussion between the Court and the Court

 2    Reporter)

 3               **THE COURT:**  Go ahead.

 4               **MR. ROSSMAN:**  Very good.

 5    **BY MR. ROSSMAN**

 6    **Q**    And so you are saying you joined Tesla in what year, sir?

 7    **A**    In 2008.

 8    **Q**    And how long were you CFO of Tesla?

 9    **A**    Until end of 2015.  I took time off.  And then I came back

10    as CFO in 2017.  Early 2017.

11    **Q**    Very good.  And when did you leave Tesla?

12    **A**    In 2019.

13    **Q**    Where do you work now, sir?

14    **A**    Sorry, I couldn't hear your question.

15    **Q**    I'm sorry.  I should draw the microphone closer to me.

16    Where do you work now, Mr. Ahuja?

17    **A**    I work at Zipline, as the chief business and financial

18    officer.

19    **Q**    Very good.  And do you currently have any business or

20    financial relationship with Mr. Musk or any of his companies?

21    **A**    I do not.

22    **Q**    Very good.  I assume, you can tell the jury, do you own

23    some Tesla stock still?

24    **A**    I do.

25    **Q**    Very good.  I want to start by asking you about a meeting

**AHUJA - CROSS / ROSSMAN**

1    that took place in March of 2017.

2        Do you recall participating in a meeting with

3    representatives or a representative of the Saudi PIF in March

4    of 2017?

5    **A**    I do.

6    **Q**    And can you tell us where that meeting took place?

7    **A**    It took place in the Tesla factory.

8    **Q**    And who attended that dinner?

9    **A**    It included Yasir from the Saudi PIF fund along with

10   Masa-San the CEO of SoftBank, and Larry Ellison.  And from

11   Tesla it included Elon Musk, myself, and JB Straubel, the CTO

12   of Tesla.

13   **Q**    Could you tell the jury what Yasir's position was with the

14   PIF, as you understood it?

15   **A**    I believe he was the managing director of the Saudi PIF

16   fund, or essentially the head.

17   **Q**    And you mentioned Masa-San was at that meeting.  Could you

18   tell us who Masa-San was?

19   **A**    Masa-San I believe was the head of SoftBank.  And SoftBank

20   had a very large fund called the Vision Fund which was at least

21   $100 billion, which was meant for taking big bets on companies.

22   And investing in large amounts.

23   **Q**    Okay.  And at this dinner with you, Mr. Musk, Yasir from

24   the PIF, Masa-San from SoftBank and Larry Ellison, can you tell

25   us what the principle topic of the discussion was?

1    **A**    The principle topic turned out to be that Yasir and

2    Masa-San wanted to make a big investment in Tesla, in any form

3    that Elon would like to see.  And it ranged from a few billion

4    dollars to -- while Tesla was still a public company, all the

5    way to taking Tesla private.

6    **Q**    Did you see any reaction on the part of Yasir to a

7    discussion at that time of a transaction that would be all the

8    way to taking Tesla private?

9              **MR. APTON:**  Objection, leading.

10             **THE COURT:**  Overruled.

11             **THE WITNESS:**  My sense was that both Yasir and

12   Masa-San had had these conversations beforehand.  They were

13   coming in together with these proposals.  And being extremely

14   professional investors with huge amounts of money, in the

15   billions, they fully understood the implications of the offer

16   that they were putting on the table.

17   **BY MR. ROSSMAN**

18   **Q**    And if what was being discussed was a proposal to take

19   Tesla all the way private, what was the size of the deal that

20   was being discussed at this dinner?

21   **A**    It was clearly in many, many billions of dollars.  My

22   impression was they clearly understood this could be 30, 40,

23   $60 billions of dollars.  Although, I don't remember exactly

24   what numbers were said in the meeting.

25   **Q**    And based on your participation in the meeting that night,

**AHUJA - CROSS / ROSSMAN**

1  did you have an impression, one way or the other, as to whether

2  this was a serious proposal by PIF and the SoftBank fund to

3  take Tesla private at that time?

4  **A**    In my mind this was an extremely serious proposal.  It's

5  very unusual for powerful people like Yasir and Masa-San to

6  spend several hours at a dinner in the Tesla factory, sort of

7  taking the trouble to come to visit Tesla, and for Elon to

8  spend the time and have a very long conversation about this.

9  This was a serious matter.

10  **Q**    And how did Mr. Musk respond to the proposal at that time

11  to take Tesla private?

12  **A**    Musk was very intrigued by it.  He had that general sense

13  of the inefficiencies created in Tesla from being a public

14  company as compared to SpaceX.  So, I was quite surprised how

15  long he continued to probe on that idea with them.

16  **Q**    And do you recall what happened after the dinner ended?

17  **A**    The dinner ended very late in the night.  And I took Yasir

18  for a test drive, since he had never driven a Tesla car.

19  **Q**    And what Tesla car did you take Yasir for a test drive in?

20  **A**    It was a Tesla Model S Performance 100D car, a powerful

21  car.

22  **Q**    And you say you took him for a test drive.  Did you

23  actually let him drive the vehicle?

24  **A**    He did drive the vehicle.  I was in the passenger seat.

25  **Q**    Can you describe the drive that evening?

**AHUJA - CROSS / ROSSMAN**

1   **A**     Um, Yasir, even though he was driving that car for the

2   first time, drove that car extremely confidently and in an

3   extremely high speed.  And was -- my sense was he was just

4   blown away by the performance of the car.  And was really

5   excited about how good the product was.

6   **Q**     Okay.  Now, did Mr. Musk proceed with a potential

7   take-private transaction with the PIF and SoftBank at that time

8   in 2017?

9   **A**     He did not.

10  **Q**     Do you understand -- do you know why not, sir?

11  **A**     My sense in talking to Elon at that time, soon after that

12  March meeting, was although Elon was very interested in the

13  concept of taking Tesla private, he was not sure that he could

14  partner with Masa-San.

15  **Q**     Very good.  Now, after that dinner in 2017, did you have

16  occasion to see Yasir again in person?

17  **A**     I did not, until the July 31st, 2018, meeting.

18  **Q**     So let's talk about the July 31st, 2018, meeting.  Where

19  were you working that day?

20  **A**     I was working in the Tesla Fremont factory, in the

21  administrative building.

22  **Q**     And Mr. Ahuja, what were you working on that day?

23  **A**     That was the evening before our earnings call the next

24  afternoon, so I was working very intensely and preparing our

25  shareholder letter and the materials for the earnings call.

**AHUJA - CROSS / ROSSMAN**

1    **Q**    And how did you first learn that PIF was in the building

2    on July 31st, 2018?

3    **A**    From the text message that I received from Sam that

4    evening, while the meeting was progressing.

5    **Q**    Okay.  Let's take a look at what's in evidence, I believe,

6    as Exhibit 79.

7         (Document displayed)

8    **Q**    And these are your text messages, is that right, sir?

9    **A**    That is correct.

10   **Q**    Okay.  And focus on the first message in the chain, at

11   1 -- timestamps are off.  And translating to your local time,

12   Pacific, I believe this is 6:23 p.m.?

13   **A**    That's correct.

14   **Q**    You receive a message from Mr. Teller (As read):

15           "Yasir from Saudi PIF here."

16        (Off-the-Record discussion between counsel)

17        **MR. ROSSMAN:**  I'm sorry.  Can we publish this exhibit,

18   Your Honor?  I understand it's been admitted.

19        **THE COURT:**  I'm sorry?

20        **MR. ROSSMAN:**  It's being published.  The Court is a

21   step ahead of me, and it is appreciated.

22        **THE COURT:**  All right.

23        (Document displayed)

24   **BY MR. ROSSMAN**

25   **Q**    (As read)

**AHUJA - CROSS / ROSSMAN**

1              "Yasir from Saudi PIF here, says they own

2              almost 5 percent of Tesla (?)!"

3        That's the message you're referring to?

4    **A**    Yes.

5    **Q**    Okay.  And he writes in the same minute (As read):

6              "Feel free to come meet in 15 minutes and

7              walk him out."

8        And he continues in the next text, same minute (As read):

9              "No pressure but you are welcome."

10       And you respond to him, right?

11   **A**    I do.

12   **Q**    You write (As read):

13             "Will do.  Not surprised.  We had heard that

14             from GS that a 'Saudi investor had been

15             buying our stock all the way to 5 percent.'"

16       Right?  You recall testifying about that in response to

17   plaintiff's counsel's questions, right?

18   **A**    I do.

19   **Q**    Okay.  What plaintiff's counsel didn't ask you about were

20   the texts that follow.  Do you see at 1:26, so two minutes

21   later, there's a message (As read):

22             "Deepak you may want to join"?

23   **A**    Yes.

24   **Q**    And then Mr. Teller writes again, the same minute

25   (As read):

**AHUJA - CROSS / ROSSMAN**

1                   "In Jupiter now."

2          Right?

3    **A**    Yes.

4    **Q**    And he writes a minute later, 1:27 (As read):

5                   "Or be ready when we leave.  You should

6                   meet."

7          What did you take those messages to mean, sir?

8    **A**    In my mind those were Sam's very polite way of saying that

9    I should join.  And this is urgent.

10   **Q**    Okay.  And you were working on something important at

11   that -- at that moment, right?

12   **A**    I was.

13   **Q**    Okay.  And did you put down your work to join the meeting?

14   **A**    Yes.  I immediately put down the preparations I was doing

15   with the team on the earnings call, and I walked over to the

16   Jupiter Conference Room.

17   **Q**    And 127, your message, same minute as Mr. Teller's:

18                   "Coming over."

19         So that indicates when you left to go walk over?

20   **A**    That's right.

21   **Q**    And six minutes later your message is:

22                   "Outside now."

23         What is the distance from your office to the Jupiter

24   Conference Room?

25   **A**    It is about five- to six-minutes walk.

**AHUJA - CROSS / ROSSMAN**

1   **Q**    Okay.  And can you tell the jury what happened when you

2   arrived at the Jupiter conference room?

3   **A**    Yeah, these messages that Sam was sending also included

4   Martin, so both Martin and I walked over together to the

5   Jupiter Conference Room.

6        When I got there along with Martin, Sam came out of the

7   conference room, he pulled me aside from Martin and, um,

8   whispered to me that, as I indicated earlier:  The Saudi PIF

9   fund has expressed interest in taking Tesla private.  It's a

10  very intense conversation going on.  Let's go join the meeting.

11  **Q**    And did you enter the meeting room?

12  **A**    I did.

13  **Q**    Was -- by yourself?  With Mr. Viecha outside?

14  **A**    Correct.

15  **Q**    Okay.  And can you tell the jury what happened when you

16  entered the Jupiter Conference Room that evening?

17  **A**    Elon turned to me and indicated in Yasir's presence that

18  the Saudi PIF fund has expressed interest and want to take

19  Tesla private.  And they have the funds to make it happen.

20  **Q**    And were you able to observe Mr. Musk's body language

21  during that meeting?

22  **A**    Mr. Musk seemed very intense, very animated.  It was clear

23  to me, walking in, that this was a very serious conversation

24  and required immediate attention.

25  **Q**    Now, in addition to yourself and Mr. Musk, Mr. Teller was

**AHUJA - CROSS / ROSSMAN**

1   in the meeting?  Is that right?

2   **A**   He was.

3   **Q**   Okay.  And Yasir from the PIF was in the meeting?

4   **A**   That is correct.

5   **Q**   And there were a couple of other gentlemen from the PIF,

6   is that right?

7   **A**   That is correct.

8   **Q**   And were you able, while Mr. Musk was describing what had

9   happened in the meeting, that part of the meeting you hadn't

10  participated in, were you able to observe Yasir's reaction?

11  **A**   Yasir, um, at that -- when Elon made that comment, I

12  looked at him, and he did not say anything, but he tacitly

13  acknowledged what Elon said.  So he -- he appeared to be in

14  agreement.

15  **Q**   Okay.  So just to be clear for the jury, when you say

16  "him" you are referring to Yasir?

17  **A**   I am.

18  **Q**   So when Mr. Musk was explaining to you, updating you on

19  what had happened in the meeting and explaining to you that the

20  PIF had expressed an interest in taking Tesla private and has

21  the funds to do it, you understood Yasir to be acknowledging

22  that?

23  **A**   That is correct.

24  **Q**   Okay.  Now, did Yasir correct a single word of what

25  Mr. Musk said to you when you walked into that meeting?

**AHUJA - CROSS / ROSSMAN**

1    **A**    He did not.

2    **Q**    Okay.  Now, can you describe for the jury what the mood

3    was like in the room, sir?

4    **A**    As I shared, it was extremely serious.  It was clear that

5    this was a very serious offer that the Saudi PIF fund had

6    brought.  To me, the symbolic meaning of having Yasir

7    personally come again to Tesla -- and he's managing hundreds of

8    billions of dollars -- to come to Tesla to tell Elon that he

9    now owns 5 percent or just under 5 percent of Tesla, and then

10   to indicate his willingness and interest to take Tesla private

11   was -- it meant a lot.  It was very serious.

12   **Q**    Now, you mentioned the 5 percent.  What was the

13   significance of the PIF having purchased 5 percent of Tesla?

14   **A**    To me it showed -- to me it meant they were proving

15   themselves as credible and serious investors by already taking

16   that action.

17   **Q**    Now, to your observation, did Yasir have any documents or

18   any materials with him?

19   **A**    He appeared to have either a small computer or a -- or an

20   iPad in front of him.

21   **Q**    And could you see what was on the computer or the iPad?

22   **A**    I could see that it had information on the top

23   shareholders of Tesla, as well as a pie chart breaking up that

24   same information.  So he appeared to be totally on top of

25   the -- the investors in Tesla.

1   **Q**    Now, you mentioned in response to questions from

2   plaintiff's counsel that there was a discussion that there

3   might be a need to fund as much as 50 percent or more of the

4   market cap of the company.  Do you recall that?

5   **A**    I do.

6   **Q**    Okay.  Do you recall what Yasir -- and I think you

7   explained that that could be as much as $30 billion?

8   **A**    I did.

9   **Q**    Do you recall what Yasir's reaction was to discussing

10  numbers of that size?

11  **A**    Yasir didn't seem concerned about that.  He didn't flinch.

12  He heard that number and was -- he understood it.

13  **Q**    And you said in response to plaintiff's counsel's

14  questions that Yasir indicated -- I think these are the words

15  you used -- "We are ready to act."  That's what Yasir said on

16  behalf of PIF.  Is that right?

17  **A**    That's the best recollection I have of what he said.

18  **Q**    What did you understand Yasir to be saying on behalf of

19  Saudi PIF when he said "We are ready to act"?

20  **A**    My impression when he said that was that the Saudi PIF

21  fund is ready to do a deal.

22  **Q**    Ready to do a deal --

23  **A**    Ready to do this deal of the private transaction, was my

24  impression of it.

25  **Q**    And to provide sufficient funding to do it?

1   **A**    That is correct.

2   **Q**    Even if the funding needed were as much as $30 billion?

3          **MR. APTON:**  Objection, leading.

4          **THE COURT:**  Sustained.

5   **BY MR. ROSSMAN**

6   **Q**    Okay.  Provide whatever funding needed, was that your

7   impression?

8   **A**    Yes.  He had already heard the 50 percent, you know,

9   potential 50 percent, and so he certainly was comfortable with

10  it.  And it's consistent with the conversation I had with him

11  while walking during the tour.

12  **Q**    And we'll get to that in a moment.

13         Now, if a significant number of shareholders decided to

14  roll over their shares into a private Tesla transaction, less

15  than 50 percent would be needed?

16         **MR. APTON:**  Objection.

17  **BY MR. ROSSMAN**

18  **Q**    Is that your understanding, sir?

19         **MR. APTON:**  Objection.  Leading, Your Honor.

20         **MR. ROSSMAN:**  Do you have -- I can rephrase, Your

21  Honor.

22         **THE COURT:**  All right, rephrase.

23  **BY MR. ROSSMAN**

24  **Q**   Do you have an understanding that if investors were

25  willing to roll over their shares into a private Tesla, that

**AHUJA - CROSS / ROSSMAN**

1    less funding would be needed?

2    **A**    Yes.  It would all depend on the percentage of

3    shareholders that roll over.

4    **Q**    Okay.  And forgive me if this is obvious, but if PIF had

5    the funding and the interest to fund up to 50 percent, can we

6    conclude that they had the funding and the interest to fund

7    less?

8            **MR. APTON:**  Objection.  Leading, Your Honor.

9            **THE COURT:**  Overruled.

10           **THE WITNESS:**  I would expect that they would be more

11   than comfortable to fund less than 50 percent.

12   **BY MR. ROSSMAN**

13   **Q**   A relatively short meeting which seems to have left an

14   impression on you.  Is that fair?

15   **A**    It did.

16   **Q**    Okay.  Now, plaintiff's counsel in his examination of you

17   asked you whether there was a discussion of price.

18           And I want to ask you, sir, what's the basis for your

19   concluding that this was a serious proposal to take Tesla

20   private, to finance a take-private for Tesla, notwithstanding

21   the fact that there was no discussion of a specific price?

22   **A**    It was -- any professional investor would know that there

23   would be a premium in a go-private transaction.  And the price

24   of Tesla stock was public information.

25           Hence, for me, a discussion on the price was a lot less

1    critical than the verbal commitment, is how I looked at, from

2    Yasir that he is willing and ready to act.

3    Q    Now, there's been a suggestion made in this case by

4    plaintiffs that you need some kind of written agreement or a

5    writing to support a financing.

6         Notwithstanding the fact that there was no signed written

7    legal agreement in that meeting, what gave you the view that

8    this was a serious commitment on the part of the PIF?

9    A    The -- there are two ways.  One is that, as I said, here

10   is one of -- you know, very powerful investors in the world,

11   managing hundreds of billions of dollars, sitting here telling

12   us he's bought 5 percent of Tesla; he's willing to take us

13   private.  To me, that's a very serious verbal commitment.

14        And the other aspect is the documentation.  It was not

15   Elon's style at all of getting initial documentation done.  His

16   approach was to cut through all the bureaucracy and go straight

17   to final agreement.  His approach was to have trust and belief

18   in a partnership, get a verbal commitment, and just move on.

19   Q    You said that was not Elon's style.  Were you involved in

20   other transactions that Mr. Musk -- where Mr. Musk went

21   straight to final documents after having a verbal discussion or

22   a so-called handshake deal?

23   A    There were a few significant such transactions, some on

24   the investment side, some on the commercial side, which have

25   happened that way.

**AHUJA - CROSS / ROSSMAN**

1  **Q**     Now, after the meeting ended in the Jupiter Conference

2  Room, I think you mentioned that you took Yasir on a tour of

3  the factory?  Is that right?

4  **A**     That's correct.

5  **Q**     Can you describe to the jury what happened on that tour?

6  **A**     We first went to see the body shop, which is where the

7  Tesla Model 3 body is assembled by the robots, which was close

8  to Jupiter.  We spent 10, 15 minutes answering questions from

9  Yasir and his associates on that.

10       Yasir was running late.  I asked him, does he want to see

11  more of the factory.  He thought about it, and his interest was

12  sufficiently high that he said: Yes, I want to still see the

13  rest of the factory.

14       I told him it would be another ten-minutes walk to go see

15  the assembly line, and he still wanted to do that, so we

16  continued to do so.  And it was 30 to 45 minutes that he spent

17  walking through the factory with me.

18  **Q**     Now, at 7:00 p.m. the night before the earnings call,

19  you've go a lot to do, as you've explained to us.  Why are you

20  personally taking Yasir on a tour of the factory that night?

21  **A**     Because it was a very serious matter.  I -- I had

22  extremely rarely taken any investor for a tour of the factory.

23  It was not my role.  It was Martin Viecha, the head of investor

24  relations's role.  But this was very unusual and serious.

25  Hence, I did.

1   **Q**    Now, during the course of the tour, did you have occasion

2   to discuss with Yasir the subject of the take-private

3   transaction for Tesla that you had been talking about in the

4   Jupiter Conference Room?

5   **A**    I did.  While walking from the body shop to the assembly

6   shop, I had a few moments of a private conversation.

7   **Q**    Tell us what you discussed.

8   **A**    I -- I probed with Yasir whether he was looking to partner

9   with other -- others to -- to get the funding for taking Tesla

10  private.  Yasir's reaction was -- was an emphatic "No" to me.

11          He went on to elaborate that "I have" -- that the Saudi

12  PIF fund has sufficient funding to take Tesla private.  And if

13  they felt a need to top it off, they would approach the

14  Emirates, who had already expressed interest in buying Tesla

15  stock.

16  **Q**    And what did it signal to you that Yasir told you he was

17  not looking for partners to finance this transaction?

18  **A**    It told me that Yasir had given this sufficient thought

19  already.  He understood the amount of money we need, the

20  implications of it, and his ability to fund.  And most

21  importantly, his ability -- or the decision-making behind it,

22  that they are willing to take that level of commitment.

23  **Q**    Now, at this point in time, after the March 2017 dinner

24  that you described, after the meeting in the Jupiter Conference

25  Room and the one-on-one conversation that you just testified

**AHUJA - CROSS / ROSSMAN**

1    about with Yasir, what was your view of the willingness of the

2    Saudi PIF to finance a take-private transaction for Tesla?

3    **A**    My --

4              **MR. APTON:**  Objection, relevance.

5              **THE COURT:**  Overruled.

6              **THE WITNESS:**  I'm sorry, could you repeat your

7    question?  I lost my train of thought.

8    **BY MR. ROSSMAN**

9    **Q**    Of course.  I know it is hard when there are objections.

10        My question to you is, after the March, 2017 dinner

11   meeting, after the conversation in the Jupiter Conference Room

12   that you have described, after the tour and the one-on-one

13   conversation that you had with Yasir, what was your view of the

14   Saudi PIF's willingness and ability to finance a take-private

15   for Tesla?

16   **A**    Yeah, as I said earlier, my sense was that the -- that

17   Yasir and the Saudi PIF fund were willing to do this

18   transaction.  And they had the funds.  And this was a very

19   serious verbal offer from them.

20   **Q**    Now, am I right to understand, sir, that while you were

21   walking with Yasir, Mr. Viecha was with the other two gentlemen

22   from the PIF on the tour?

23   **A**    Yeah.  That is the few moments of a private time I had

24   with Yasir, when I asked him about the funding source.

25   **Q**    Okay.  Now, after Yasir and the other gentlemen from the

1   PIF departed, did you convey to Mr. Viecha that there had been

2   a discussion of a take-private for Tesla?

3   **A**    Mr. Viecha approached me, given how unusual the entire

4   proceedings of the evening had been, including me giving a

5   tour, and he wanted to understand what was the significance of

6   it.

7   **Q**    And, and how did Mr. Viecha react to learning about the

8   fact that there had been discussions about a take-private?

9   **A**    Yeah, when I mentioned to him that very confidentially,

10  the Saudi PIF fund is considering or has expressed willingness

11  to take Tesla private, Martin Viecha became very concerned

12  about his own job.  His reaction to me was:  If Tesla goes

13  private then you won't need an investor relations person.  And

14  what would happen to me?

15  **Q**    And how did you respond, sir?

16  **A**    My reaction was:  You are very talented and analytical and

17  very extremely good analytically in finance.  I'm not concerned

18  about you losing your job.

19  **Q**    Now, besides Mr. Viecha, that evening, did you talk to

20  anyone else about the discussions with Saudi PIF?

21  **A**    I also immediately reached out to Todd Maron, our general

22  counsel, to seek his advice.

23  **Q**    Okay.  Now, I just want to be careful.  I'm not asking

24  you, and I wouldn't want you to reveal any

25  attorney/client-privileged legal advice that Mr. Maron gave.

**AHUJA - CROSS / ROSSMAN**

1  But can you tell us generally -- actually, withdrawn.

2      Before I ask you about that, besides Mr. Maron, did you

3  speak with anyone else that evening?

4  **A**   I also spoke later that evening with Elon, along with Todd

5  Maron, to understand what was on Elon's mind, and if there

6  were -- there was any other next steps.

7  **Q**   So let's just focus on that part of the conversation for a

8  minute, so I want to make sure we don't inadvertently divulge

9  any privileged information.

10      What was the general subject matter of what you discussed

11  with Mr. Musk that evening?

12  **A**   Um, again, this was in the presence of Todd Maron, our

13  general counsel.

14      Essentially, my sense -- or the discussion there was Elon

15  expressed his desire to -- and this is to the best of my

16  recollection -- to not only have the Saudi PIF fund be part of

17  the structure, but to also perhaps bring along other investors

18  who have been loyal to Tesla.  And he was, in his mind,

19  thinking through the pros and cons of all of it.

20  **Q**   Understood.

21      **MR. ROSSMAN:**  Can we look at Exhibit 81, please.

22      (Document displayed)

23  **BY MR. ROSSMAN**

24  **Q**   And this you have seen before, sir.  This was Mr. Musk's

25  email, Subject:  Offer to take Tesla private at $420.  Do you

**AHUJA - CROSS / ROSSMAN**

1  see that?

2  **A**    I do.

3  **Q**    You received this email on that date?

4  **A**    I did.

5  **Q**    Okay.  What was your reaction to receiving it?

6  **A**    My --

7  **Q**    And this is two days after the Saudi PIF meeting, is that

8  right?

9      What was your reaction when you received it?

10  **A**    Twofold.  Firstly, it was clear that Elon had made a firm

11  decision to proceed forward with the go-private transaction.

12      And secondly, all the reasons that he has mentioned here

13  were consistent with the conversations or the impressions I had

14  of Elon's rationale.

15  **Q**    And when you say "the reasons," you are referring to the

16  three numbered points here?

17  **A**    That is correct.

18  **Q**    Okay.  That was his rationale for wanting to have Tesla be

19  a private company?

20  **A**    Right.

21  **Q**    Okay.  Let's focus on the price for a minute.  How did the

22  $420 price compare to what your expectations were of what a

23  premium would be in a take-private transaction?

24  **A**    The price of Tesla, if I recall correctly, that day, at

25  closing, was about $350.  So the $420 price reflected about a

**AHUJA - CROSS / ROSSMAN**

1  20 percent premium to the stock price.

2      To me, that was a very reasonable premium to offer to

3  shareholders who do not wish to own Tesla stock in a private

4  structure.

5  **Q**  How about the 30-day deadline that is referenced here?

6  What did you take that to mean?

7  **A**  As a layman reading this, my sense was Elon was trying to

8  communicate a huge sense of urgency to the board.  It was a

9  call to action for the board.

10  **Q**  After you received this email, did you discuss it with

11  anyone at Tesla?

12  **A**  I -- I received a call from Anthony Gracias soon after

13  this email.

14  **Q**  And what did Mr. Gracias tell you?  Or what did you tell

15  him?

16  **A**  I explained to him some of the -- the discussions with the

17  fund at that time.  And he asked me to schedule a meeting with

18  the board as soon as possible, since he also appreciated that

19  this was a call to action, and this needed to be addressed

20  urgently.

21  **Q**  Did you schedule a meeting with the board, sir?

22  **A**  Todd Maron and I did immediately schedule a meeting with

23  the board.

24  **Q**  And when did you schedule that board meeting?

25  **A**  That board meeting happened later that evening.

**AHUJA - CROSS / ROSSMAN**

1   **Q**    Okay.  Was it common for Tesla board meetings to be set

2   and convened the same day?

3   **A**    It was extremely unusual.  Tesla board -- Elon really was

4   very respectful of the time offered by the board members.  So

5   this was extremely unusual.

6   **Q**    So August 2nd, the board actually met that night?

7   **A**    They did.

8   **Q**    Did you attend the meeting?

9   **A**    I did.

10  **Q**    Did Mr. Musk attend the meeting?

11  **A**    He did not.

12  **Q**    Do you have an understanding why not?

13  **A**    The board first wanted to meet among themselves and

14  understand how to proceed, and just talk among themselves

15  before speaking to Elon.

16  **Q**    Okay.

17         **MR. ROSSMAN:**  Could we have Exhibit 82, please.

18      (Document displayed)

19  **BY MR. ROSSMAN**

20  **Q**    Now, putting it in context, August 2nd is two days after

21  the PIF meeting, five days before Mr. Musk sends out his first

22  tweet that's the subject of this case.  Is that right, sir?

23  **A**    That is right.

24  **Q**    Okay.  These are the minutes of the board meeting on

25  August 2nd that you attended?

AHUJA - CROSS / ROSSMAN

1    **A**    They are.

2         **MR. ROSSMAN:**  Okay.  I believe they're already in

3    evidence and they're being published?

4         **THE COURT:**  Yes.

5    **BY MR. ROSSMAN**

6    **Q**    Can you tell us what you recall about that board meeting,

7    sir?

8    **A**    As the minutes of the meeting indicate, I shared with the

9    board the conversations that had happened with the Saudi PIF

10   fund in March of 2017, the first conversation with Masa-San and

11   Larry Ellison.

12        And then secondly, the conversations I was part of in the

13   meeting with Yasir on July 31st, as well as the tour that we

14   had -- that I had, and the feedback that I got from Yasir.

15        **MR. ROSSMAN:**  Can we have the second paragraph first?

16   **BY MR. ROSSMAN**

17   **Q**    Because you mentioned this chronologically.

18        You told the board that night on August 2nd about the

19   dinner meeting in March of 2017 with Yasir, Masa-San from

20   SoftBank, and Larry Ellison?  Is that right?

21   **A**    That is right.

22   **Q**    And is this statement that you -- the minutes reflect, is

23   this accurate?

24             "Mr. Ahuja provided further background

25             regarding PIF's interactions with Tesla..."

**AHUJA - CROSS / ROSSMAN**

```
 1        (Reporter clarification)
 2             MR. ROSSMAN:  I'm sorry.  When I read, I tend to go
 3    too quickly.  I'll slow down.
 4    BY MR. ROSSMAN
 5    Q    The board minutes provide, sir (As read):
 6              "Mr. Ahuja provided further background
 7              regarding PIF's interactions with Tesla,
 8              noting that in early 2017, Yasir Al-Rumayyan
 9              from the PIF, Mr. Masayoshi Son from
10              SoftBank, and Larry Ellison had met with
11              Mr. Musk about the possibility of taking the
12              company private, but that Mr. Musk decided
13              not to pursue the idea at that time."
14         Is that what with you told the board that night?
15    A    I did.
16    Q    It was true?
17    A    Yes, it was.
18    Q    Now, turning to the first paragraph, if we can.
19         (Document displayed)
20    Q    It says (As read):
21              "Mr. Ahuja provided an overview of events
22              leading up to Mr. Elon Musk's August 2, 2018
23              email..."
24         Do you see that?
25    A    I do.
```

**AHUJA - CROSS / ROSSMAN**

1   Q      Okay.  And the second sentence provides (As read):

2           "Mr. Ahuja explained that representatives of

3           the Public Investment Fund of Saudi Arabia

4           (the 'PIF') had recently met with Mr. Musk,

5           that the PIF had previously acquired

6           approximately 4.9 percent of Tesla stock in

7           the public market without the company's

8           knowledge, and that the PIF was interested in

9           helping Mr. Musk take the company private."

10      Is that what you told the board that night, sir?

11   A   I did.

12   Q   And was it a truthful statement?

13   A   It was.

14   Q   Okay.  Now, if you continue back to the next paragraph, I

15   want to focus you on the sentence beginning "Finally."

16      It says (As read):

17          "Finally Mr. Ahuja noted that, based on the

18          statements made by the PIF to Mr. Musk during

19          the meeting, Mr. Musk believed that the PIF

20          was willing to fund the entire transaction."

21      Was that what you told the board that night?

22   A   I did.

23   Q   And it was a truthful statement?

24   A   It was.

25   Q   Based on all of your interactions with the Saudi PIF to

1   that date, your personal interactions, was it consistent with

2   your understanding of the facts?

3   **A**   It was completely consistent.

4   **Q**   Okay.  Now, let's turn back, if we could.

5          **MR. ROSSMAN:**  And I'm going to pause, Your Honor.  I'm

6   mindful of the time, so throw me a hook when you want to take a

7   break.  But I can keep plowing ahead, or we can --

8          **THE COURT:**  Well, we should go ahead and take our

9   break.  We're at that 90-minute point.  So we'll take our first

10  morning break.

11         Again, with a reminder that you are not to discuss this

12  case with anyone, including amongst yourselves, or with anyone

13  else.  And do not read or listen to any outside reporting of

14  this case.  And please don't do any research or form any

15  opinions until this case is submitted to you for deliberation.

16         We will see you in 20 minutes.

17         **MR. ROSSMAN:**  Thank you.

18         **THE COURTROOM DEPUTY:**  All rise for the jury.

19  (Jury excused)

20  (Recess taken from 10:07 a.m. to 10:31 a.m.)

21   (The following proceedings were held outside of the

22  presence of the Jury)

23         **THE COURTROOM DEPUTY:**  Please remain seated, court is

24  back in session.

25         **THE COURT:**  All right.  Looks like it's working.  I'm

1    wired up again.  Thank you.

2        Let's bring the jury in.

3        By the way, before I forget, the jurors indicated they are

4    willing to stay until 3:30 on Friday.  So, if you could plan

5    your witnesses accordingly.  Hopefully that might obviate this

6    problem of people having to --

7            **MR. PORRITT:**  Thank you, Your Honor.

8            **MR. SPIRO:**  Thank you, Your Honor.

9            **THE COURT:**  Don't thank me, thank the jurors.

10           **THE COURTROOM DEPUTY:**  All rise for the jury.

11       (The following proceedings were held in the

12   presence of the Jury)

13           **THE COURT:**  All right, have a seat, everyone.  Welcome

14   back.

15       We'll continue with the examination of Mr. Ahuja.

16           **MR. ROSSMAN:**  Thank you, Your Honor.

17   **BY MR. ROSSMAN**

18   **Q**    Mr. Ahuja, you can take your mask off.  And if you would,

19   just make sure the microphone is close to you.

20   **A**    Is that better?

21   **Q**    I'll do likewise.

22           **MR. ROSSMAN:**  Could we have Exhibit 83, please.

23       (Document displayed)

24   **BY MR. ROSSMAN**

25   **Q**    Now, these are the minutes of the Tesla board meeting on

1    August 3, 2018.  Do you see that?

2    **A**    I do.

3    **Q**    Okay.  This is three days after your meeting with the

4    Saudi PIF in the Fremont factory, four days before Mr. Musk's

5    first tweet.  Correct?

6    **A**    That's correct.

7    **Q**    Did you attend the board meeting on August 3, 2018?

8    **A**    I did.

9    **Q**    Now, was Mr. Musk at this meeting?

10   **A**    He was.

11   **Q**    Okay.  Can you describe for the jury generally what was

12   discussed at the August 3rd board meeting, sir.

13   **A**    Elon, um, explained in more detail the reasons he had

14   provided in his email for taking Tesla private.

15        In his mind, the operational efficiency of a private Tesla

16   was the right thing for its long-term growth.  He outlined the

17   three reasons that were in the email in more detail.  And then

18   he also explained about his conversations with the Saudi PIF

19   fund.

20   **Q**    Very good.  Now, drawing your attention to the minutes,

21   Item No. 1 (As read):

22             "Discussion of Elon Musk's August 2, 2018

23             Email to the Board Regarding Privatization."

24        Minutes indicate:

25             "Mr. Musk noted that his goal was not to

**AHUJA - CROSS / ROSSMAN**

1              assume a higher level of control in a

2              going-private transaction, but instead, to

3              remove the noise and distraction associated

4              with being a public company..."

5      Is that what he said at the board meeting?

6  **A**    He did.

7  **Q**    Turning over to the next page, and the second paragraph on

8  that page, that begins "Mr. Musk also noted..."

9          **MR. ROSSMAN:**  Can we blow that up, please, Ken?

10      (Document highlighted)

11          **MR. ROSSMAN:**  Thank you.

12  **BY MR. ROSSMAN**

13  **Q**    (As read)

14              "Mr. Musk also noted his desire for current

15              shareholders in the company to remain

16              shareholders in the company after any

17              proposed privatization, but allowing

18              investors who were not interested in owning

19              shares in a private company to have their

20              shares bought out at an appropriate premium."

21      Did Mr. Musk tell the board that on August 3rd?

22  **A**    He did.

23  **Q**    Okay.

24  **A**    It was very important for him to ensure that the loyal

25  investors in Tesla continued to be investors in a private

**AHUJA - CROSS / ROSSMAN**

1   company.

2   **Q**    And did Mr. Musk, at that board meeting, also discuss

3   where the financing would come from for a take-private

4   transaction?

5   **A**    He did.

6         **MR. ROSSMAN:**  And could we -- I'm sorry.  Could we

7   focus our attention now on the third paragraph on that page

8   that starts "Following Mr. Musk's initial remarks..."

9         (Document displayed)

10  **BY MR. ROSSMAN**

11  **Q**    And starting around the sixth line, the board minutes read

12  (As read):

13              "As for the funding of a possible

14              going-private transaction, Mr. Musk noted

15              that in his discussions with the Public

16              Investment Fund of Saudi Arabia (the 'PIF')

17              the PIF indicated that it was willing to fund

18              the entire going-private transaction."

19        Stop there for a moment.  Is that what Mr. Musk told the

20  board on August 3rd?

21  **A**    He did.

22  **Q**    And was that statement that he made to the board on

23  August 3rd consistent with your understanding of the facts?

24  **A**    It was.

25  **Q**    Okay.  Did you believe it was a truthful statement?

**AHUJA - CROSS / ROSSMAN**

1    **A**    It was.

2    **Q**    Okay.  And if Mr. Musk said anything to the board that was

3    inaccurate or incomplete, would you have told the board?

4    **A**    I would have.

5    **Q**    Okay.  And did he say anything that you thought was

6    inaccurate or incomplete that required your speaking up about

7    it?

8    **A**    Not to my knowledge.

9    **Q**    Okay.  Now, did the board at the August 3rd meeting

10   discuss what the next steps would be regarding a potential

11   take-private transaction?

12   **A**    They did.

13   **Q**    Now, at this point in time, did you understand that the

14   company was pursuing this proposal in a serious way?

15   **A**    The board of directors were giving it due and serious

16   attention, to Elon's proposal.

17   **Q**    Now, so far everything that I've asked you about happened

18   before August 7th, 2018.  I now want to take you to the day of

19   August 7th, 2018, itself.

20         **MR. ROSSMAN:**  And if we could please show Exhibit 8.

21     (Document displayed)

22   **BY MR. ROSSMAN**

23   **Q**    This is Mr. Musk's tweet that day.  I believe it is at

24   9:48 a.m. your time?  That's Pacific time?

25   **A**    Yes, it is.

1   Q    Okay.  When you saw this tweet, sir, did you think it was

2   a lie?

3   A    To me, the contents of this tweet were -- were consistent

4   with everything I had known or heard until then.

5   Q    Very good.  And when you say everything that you'd known

6   or you heard up until that time, what are you referring to?

7   A    I'm referring to the conversations with the Saudi PIF

8   fund.  My interactions from 2017, the July 31st meeting, the

9   tour that I gave to Yasir, as well as the comments that Elon

10  made that same evening after meeting.

11  Q    Very good.  Now, I want to draw your attention to another

12  tweet that went out that day.

13         MR. ROSSMAN:  And if we could have Exhibit 13, please.

14     (Document displayed)

15  BY MR. ROSSMAN

16  Q    Okay.  You saw this tweet when Mr. Musk sent it out?

17  A    I did.

18  Q    When you saw this tweet, did you think it was a lie, sir?

19  A    I did not.

20  Q    Okay.  Was it consistent with your understanding of the

21  facts?

22  A    It was consistent with my understanding of the investor

23  support from the Saudi PIF fund.  That was the only one I was

24  aware of.  And, yeah.  So this was consistent with the facts I

25  knew, from the information I had.

**AHUJA - CROSS / ROSSMAN**

1   **Q**    Very good.  Now, if we go back to the full document.

2        (Document displayed)

3   **Q**    I think you can see that there is a link in this tweet to

4   a blog post?

5   **A**    I do see that.

6   **Q**    Okay.

7        (Document enlarged)

8        **MR. ROSSMAN:**  Thank you.

9   **BY MR. ROSSMAN**

10  **Q**    And do you know what that link is to?

11  **A**    It is the link to the email communication that Elon sent

12  to the employees that was drafted by Sarah, Todd and me,

13  combined.

14  **Q**    Okay.  And just for reference, could we pull that -- give

15  me one second.

16       **MR. ROSSMAN:**  Can we pull up Exhibit 12?

17       (Document displayed)

18  **BY MR. ROSSMAN**

19  **Q**    Is this the email that was sent to Tesla employees and

20  posted on Tesla's blog?

21       **MR. APTON:**  Objection.

22       (Off-the-Record discussion between counsel)

23       **MR. ROSSMAN:**  Withdrawn.

24       **THE COURT:**  I'm not sure I understand.

25       **MR. ROSSMAN:**  Let me -- maybe I can alleviate the

1    objection.

2            **THE COURT:**  Okay.

3    **BY MR. ROSSMAN**

4    **Q**    Was this posted to Tesla's blog, as you understood it, on

5    August 7th?

6    **A**    It was.

7    **Q**    And when it was posted on the blog, was it originally in

8    the format of an email to employees from Mr. Musk?

9    **A**    To the best of my recollection, it was.

10   **Q**    And what was the significance to you -- and just to be

11   clear, you were one of the people who was involved in preparing

12   or reviewing this email to employees that got posted to Tesla's

13   blog that day?

14   **A**    I was.

15   **Q**    Did you understand that the information that was contained

16   in that blog post was true and accurate?

17   **A**    Yes, it was.

18   **Q**    Okay.  And to be clear, sir, I don't believe there's any

19   allegation in this case otherwise.

20        Now, what is the significance to you -- if we could return

21   to Exhibit 13 for a minute, what's the significance to you of

22   the fact that the tweet contained a link to that blog post?

23        (Document displayed)

24   **A**    It's -- to me, it was a way of Elon sharing and providing

25   more context behind the rationale and the structure that he has

1   in mind.  As well as some indication of the process.

2   Q    Okay.  When you say "some indication of a process," what

3   are you referring to?

4   A    The email and the blog mentions things about -- that a

5   final decision hasn't been made, or there's a process which

6   ultimately then leads to a shareholder vote.

7   Q    Very good.  And to be clear, sir, we looked at the two

8   tweets that Mr. Musk sent out that day.  We looked at the blog

9   post that was referenced in those tweets.

10       Were those consistent with your understanding of the

11   facts, based on your own personal interaction with the PIF and

12   with Mr. Musk?

13   A    It was, in the sense that the -- my sense was the -- the

14   only real hurdle in the process is the shareholder vote, while

15   recognizing that there would be other approvals internally or

16   externally needed.

17   Q    Very good, sir.

18            MR. ROSSMAN:  Now, could we look at Exhibit 92.

19       (Document displayed)

20            MR. ROSSMAN:  Now, is there an objection?

21            THE COURT:  No objection?

22            MR. APTON:  No objection, Your Honor.

23            MR. ROSSMAN:  We would move 92 into evidence,

24   Your Honor.

25            THE COURT:  Admitted.  You may publish.

1           (Trial Exhibit 92 received in evidence.)

2                **MR. ROSSMAN:**  Thank you, Your Honor.

3           (Document displayed)

4      **BY MR. ROSSMAN**

5      **Q**    Exhibit 92 is an email that Mr. Musk sent you on

6      August 10th.  Is that right?

7      **A**    That is right.

8      **Q**    And to be complete, he sent it to Mr. Maron and

9      Ms. O'Brien as well, right?

10     **A**    That is right.

11     **Q**    And what's attached to the email is a text message from

12     Yasir.  Is that right?

13     **A**    That is correct.

14     **Q**    And did you read this text message on August 10th?

15     **A**    I did.

16     **Q**    Now, what was your reaction to receiving this text message

17     that Yasir had sent to Mr. Musk?

18     **A**    I -- I felt this was not consistent, the contents of this

19     were not consistent with the conversation I was involved in.

20     And there was some new information.

21          And finally, it was an oddly formal way of writing, which

22     did not feel at all like the way Yasir would write in an

23     email -- in a text message.

24     **Q**    Okay.  You said the contents were different than what you

25     had recalled in your personal discussions with Mister -- with

AHUJA - CROSS / ROSSMAN

1    Yasir and your participation in that meeting in the Jupiter

2    room?  Is that right?

3           **MR. APTON:**  Objection, leading.

4           **THE COURT:**  Sustained.

5    **BY MR. ROSSMAN**

6    **Q**    How were the contents --

7           **MR. ROSSMAN:**  I'll rephrase, Your Honor.

8    **BY MR. ROSSMAN**

9    **Q**    How were the contents of the text message from Yasir

10   different from your own understanding of the conversations that

11   you participated in with Yasir?

12   **A**    It felt that -- Yasir's commitment to the privatization

13   proposal felt softer than how it felt to me during my presence

14   in the July 31st meeting.  He says:  We would like to explore.

15   We would like to start working together in a confidential

16   manner.  That was one aspect.

17        And the other aspect was there was a condition added here

18   of Tesla creating a production hub in Saudi Arabia, which was

19   new news to me.

20   **Q**    That was not a condition in your discussions on July 31st?

21   **A**    It was not brought up during my interactions with Yasir.

22   **Q**    Okay.  And you mentioned it was oddly formal.  Was -- was

23   this text message in Yasir's voice, as you had heard it on

24   July 31st?

25   **A**    It was not at all in his voice.  To me, this felt like a

**AHUJA - CROSS / ROSSMAN**

1  very carefully drafted message written by someone else and sent

2  by Yasir.

3  **Q**   Okay.  Now, did you come to learn, sir, how Mr. Musk

4  reacted to receiving this message or similar messages from

5  Yasir?

6  **A**   I do recollect one conversation where Elon was quite

7  frustrated and unhappy about this -- this exchange.

8  **Q**   Okay.  Was that understandable to you?

9  **A**   It was.

10  **Q**   Why is that?

11  **A**   As I said earlier, it appeared to be, to me, it felt that

12  Yasir and the Saudi PIF fund were backing away from the

13  stronger interest they expressed to take Tesla private, and

14  their willingness to act, and that they were ready to act.

15          **MR. ROSSMAN:**  Now, can we have Exhibit 53, please.

16      (Document displayed to the Witness)

17  **BY MR. ROSSMAN**

18  **Q**   Are you familiar with this document which is entitled

19  Update on Taking Tesla Private, Elon Musk, August 13, 2018?

20  **A**   I am familiar with it.

21  **Q**   This is a blog post that Mr. Musk issued that day?

22  **A**   That's correct.

23  **Q**   And I want to turn your attention to the section labeled

24  "Why did I say 'Funding secured'?"

25      Do you see that?

**AHUJA - CROSS / ROSSMAN**

1   **A**   I do.

2   **Q**   Okay.  You read it on that day?

3   **A**   Sorry, could you repeat?

4   **Q**   Did you read the blog post on that day?

5   **A**   I did.

6   **Q**   Was it consistent with the facts as you knew them?

7   **A**   It was consistent with the facts I knew.

8   **Q**   And it says (As read):

9           "During the meeting" -- if you highlight that

10          sentence -- "the managing director of the

11          fund expressed regret that I had not moved

12          forward previously on a going-private

13          transaction with them, and he strongly

14          expressed his support for funding a

15          going-private transaction for Tesla at this

16          time.  I understood from him that no other

17          decision makers were needed and that they

18          were eager to proceed."

19      Is there anything that you were aware of that was

20  inconsistent with that?

21  **A**   I was present for the conversation where he strongly

22  expressed his support for funding a going-private transaction.

23  I was not present in the conversations where he expressed

24  regret for not moving forward previously, and that there were

25  no other decision makers needed.

1      However, prior to this blog being released, I had a

2  conversation with Elon where he mentioned those points to me.

3  So it was consistent with that information.

4  **Q**    And if you look at the sentence that begins "I left the

5  July 31st meeting..."

6      (Document highlighted)

7  **Q**    (As read)

8              "I left the July 31st meeting with no

9              question that a deal with the Saudi sovereign

10              fund could be closed, and that it was just a

11              matter of getting the process moving.  This

12              is why I referred to 'Funding secured' in the

13              August 7th announcement."

14      Okay, when you read that in the blog post, was that

15  statement consistent with your understanding of the facts?

16  **A**    From the interactions that I had with the Saudi PIF fund

17  on July 31st -- in addition to earlier, but specifically to

18  that -- this was consistent with it.

19  **Q**    Okay.  Do you have any -- withdrawn.

20          **MR. ROSSMAN:**  One moment, Your Honor.

21      (Off-the-Record discussion between counsel)

22          **MR. ROSSMAN:**  Thank you, Mr. Ahuja.

23          **THE COURT:**  All right.  Thank you, Counsel.

24      Redirect?

25

1 <u>REDIRECT EXAMINATION</u>

2 **BY MR. APTON**

3 **Q**    Hello, Mr. Ahuja.  You prepared for today's testimony,

4 yes?

5 **A**    I did.

6 **Q**    You met with your lawyers?

7 **A**    I did.

8 **Q**    And, and are your lawyers over here (Indicating)?

9 **A**    They are.

10 **Q**    Those are the same lawyers who are representing Elon Musk

11 in this case, correct?

12 **A**    I believe so.

13 **Q**    That's true.  And with that, I want to ask you some

14 questions about your testimony.  Okay?

15      You testified that the conversation on the 31st, I think

16 it was in the Jupiter Conference Room, was extremely serious.

17 Do you recall that?

18 **A**    I do.

19 **Q**    But when the meeting was over, Elon, he didn't follow up,

20 did he?

21 **A**    I do not know that.

22 **Q**    Instead, he sent a tweet.  Right?  On August 7th?

23 **A**    He did send a tweet.  I don't know what other

24 conversations happened.

25 **Q**    Let me ask you, sir, is that what you would have done?

AHUJA - REDIRECT / APTON

1          **MR. ROSSMAN:**  Objection, Your Honor.

2          **THE COURT:**  Sustained.

3  **BY MR. APTON**

4  **Q**    Mr. Ahuja, you also testified that 420 per share was a

5  reasonable premium for this take-private transaction.  Do you

6  recall that?

7  **A**    I do.

8  **Q**    Now, you had not, at this point in time, been involved in

9  any major corporate transactions like the one we're dealing

10  with.  Is that correct?

11  **A**    That is correct.

12  **Q**    In fact, the transactions that you were familiar with were

13  capital raises for Tesla at a much smaller value.  Is that

14  right?

15  **A**    Could you clarify what you mean by "smaller value"?

16  **Q**    Sure.  In March of 2017, Tesla completed an offering for

17  250 million of common stock and 750 million of convertible

18  notes.  Do you recall that?

19  **A**    I do.

20  **Q**    So that's 1 billion in total.  Correct?

21  **A**    That is correct.

22  **Q**    And you would agree that 1 billion is smaller that the

23  potential size of the transaction we are dealing with here.

24  Correct?

25  **A**    It is.

**AHUJA - REDIRECT / APTON**

1  **Q**    And now, for that 1 billion offering or raise, Tesla

2  filled out lengthy SEC filings, correct?

3  **A**    Which is the right -- yeah.  The approach has to be

4  followed.

5  **Q**    Sure.  You worked with bankers and lawyers, correct?

6  **A**    We did.

7  **Q**    The deal was disclosed only once all those documents were

8  signed.  Correct?

9  **A**    Um, a portion of the deal is disclosed when Tesla makes

10  the -- has the intention to go to the market.  And then the

11  final disclosure occurs when the deal is signed.  So there are

12  a couple of disclosures starting in the beginning.

13  **Q**    And written agreements preceding those disclosures,

14  correct?

15  **A**    The first disclosure of the intent to go raise money

16  doesn't have any written agreements with investors.

17  **Q**    For this one, March of 2017, is it your testimony that

18  there was nothing in writing substantiating or describing that

19  capital raise before it was announced publicly to the market?

20  **A**    I'm sorry, I thought you were referring to any agreements

21  with investors, prior to the initial announcement.  There was

22  none there.

23  **Q**    Okay.  But for this capital raise we're talking about, of

24  course there were writings in advance of the disclosure,

25  correct?

**AHUJA - REDIRECT / APTON**

1   **A**    I'm sorry; can you please clarify the question?  I don't

2   have the full context.

3   **Q**    My point is, public offerings at Tesla, they're not done

4   on a handshake.  Correct?

5   **A**    Um, that's -- I can spend a lot of time talking about it.

6   Your question is still too broad.  I would appreciate if you

7   can help me.

8   **Q**    I -- it's okay.  We can continue.

9   **A**    Okay.

10  **Q**    My point is, though, for the transaction we're here, we're

11  talking about, after the meeting on the July -- after the

12  meeting on July 31st and you gave that factory tour to the

13  Saudi PIF, you understood from your conversations with Yasir

14  during that tour that if more money was needed than what the

15  Saudis could offer, they would seek it out from the Emirates.

16  Is that correct?

17  **A**    That's correct.

18  **Q**    And that's because it was unclear how much money was

19  needed for the transaction.  Correct?

20  **A**    Um, that is part of the answer, yes.

21  **Q**    In your meeting with the Saudi PIF on July 1st there was

22  no price discussed, correct?

23  **A**    There was no price discussed.

24  **Q**    There was nothing in writing.  Correct?

25  **A**    There was nothing in writing.

AHUJA - REDIRECT / APTON

1   **Q**    There were no percentages discussed, correct?

2   **A**    Are you referring to the premium percentage or ownership

3   percentage?

4   **Q**    Ownership percentage.

5   **A**    We did discuss that 50 percent or more would need to be

6   bought out by the Saudi PIF fund, or, of course, by someone, to

7   take the company private.

8   **Q**    But the Saudi PIF didn't know exactly how much, what

9   percentage they were going to invest, correct?

10  **A**    The conversation -- the impression I got was even in the

11  absence of any other investor, they were comfortable doing it.

12  They were not putting any condition on the go-private

13  willingness.

14  **Q**    But sir, I'm asking what was discussed in the meeting

15  while you were there.  And there were no percentages discussed.

16  Is that correct?

17           **MR. ROSSMAN:**  Objection, misstates.

18           **THE COURT:**  Overruled.  You can answer.

19           **THE WITNESS:**  There was a percentage discussed which

20  was 50 percent.

21  **BY MR. APTON**

22  **Q**    There was no discussion of the overall amount of funding

23  necessary, though, is that correct?

24  **A**    No specific discussion, you are correct.  But it's

25  implied.

**AHUJA - REDIRECT / APTON**

1  **Q**   No discussion about the regulatory requirements we were

2  talking about before, correct?

3          **MR. ROSSMAN:**  Asked and answered, Your Honor.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  No discussion about the regulatory

6  approval.

7  **BY MR. APTON**

8  **Q**   So all these facts we've just discussed, the no funding,

9  the no writing, the no regulatory discussions, you and your

10  counsel were using the term "consistent," this was consistent

11  with what you knew?

12      These facts, they were not consistent with "funding

13  secured."  Would you agree?

14  **A**   I do not.

15  **Q**   Finally, sir, just a few more questions about these texts

16  that you received from Yasir.

17      How many texts had you received from Yasir previously?

18  **A**   I did not receive any text directly from Yasir.

19  **Q**   So is it your testimony that based on the one and only

20  text you saw from Yasir, it seemed odd?

21  **A**   I -- I spoke -- I spoke to Yasir two times -- well, more

22  than two times -- two occasions, but in different conditions,

23  between giving him a test drive, giving him a tour of the

24  factory, one on one.  His style of speaking, his English, his

25  approach was completely different from the way this text

 1   language was.  Hence, my comment.

 2   **Q**    But you have nothing to compare it to.  Is that right?

 3   **A**    I had no other text message to compare to, but I had the

 4   comparison of how he spoke.

 5   **Q**    And while you were not at the meeting, because you joined

 6   the July 31st meeting late, is it possible that there was

 7   discussion about this production facility in Saudi Arabia?

 8   **A**    It is possible.  However, I did not hear that from Elon in

 9   my conversations following that meeting.

10        **MR. APTON:**  Thank you, sir.  No further questions.

11   Thank you, Your Honor.

12        **THE COURT:**  Thank you.  Anything on recross?

13        **MR. ROSSMAN:**  No further questions.  Thank you,

14   Mr. Ahuja.

15        Thank you, Your Honor.

16        **THE COURT:**  Thank you, Mr. Ahuja.  You may step down.

17   This witness is excused.

18        (Witness excused)

19        **THE COURT:**  And the plaintiffs may call their next

20   witness.

21        **MR. PORRITT:**  Thank you, Your Honor.  At this stage we

22   would call Mr. Joseph Fath, via deposition.

23        **THE COURT:**  All right.  So you are going to play

24   excerpts from a deposition?

25        **MR. PORRITT:**  That's correct, Your Honor.

**FATH / VIDEO DEPOSITION**

1        **THE COURT:**  So let me just briefly explain to the

2    jurors that you've heard reference about depositions.

3        Depositions are questions and answers asked of a witness

4    prior to the trial.  It's often done in an attorney's office,

5    and the answers are given under oath.  And so the answers are

6    to be treated as if they were given here in court.

7        And in this case, the witness won't be here physically but

8    you are going to hear clips from a prior deposition.  And so,

9    again, the statements that are made in there are to be treated

10   as any other testimony.

11       I take it -- is there a transcription that goes along with

12   that?  At the bottom of the screen?

13       **MR. PORRITT:**  Yes.  You will see subtitles, yes.

14       **THE COURT:**  All right.

15       **MR. PORRITT:**  Yes.  So let me tell you that the

16   transcriptions are there to help you hear and understand what

17   the witness is saying, in case it's not clear.  But it, itself,

18   is not evidence.  The evidence is the actual testimony that

19   you're about to see and hear.  The written transcriptions are

20   just an aid to help you.

21       So, hopefully our technology works.

22       **JOSEPH FATH, PLAINTIFF'S WITNESS, BY VIDEOTAPED DEPOSITION**

23       (Time played: 11:07 a.m to 11:56 a.m)

24       **MR. PORRITT:**  Your Honor, that concludes the

25   deposition testimony.

**PROCEEDINGS**

1              THE COURT:  All right.

2              MR. PORRITT:  I see we are close to 12:00.

3              THE COURT:  All right.  So why don't we go ahead and

4    take our break before we call our next witness.  So we will see

5    you in 20 minutes.

6              THE COURTROOM DEPUTY:  All rise for the jury.

7         (Jury excused)

8         (The following proceedings were held outside of the

9    presence of the Jury)

10             THE COURT:  Okay.  See you shortly.

11             MR. PORRITT:  So is that ten minutes?  Or 20 minutes?

12             THE COURT:  Twenty minutes.

13             MR. PORRITT:  Twenty minutes.  Thank you.

14             THE COURTROOM DEPUTY:  Court is in recess.

15        (Recess taken from 11:57 a.m. to 12:24 p.m.)

16        (The following proceedings were held outside of the

17   presence of the Jury)

18             THE COURT:  All right, ready to call the jury back?

19             THE COURTROOM DEPUTY:  Court is reconvened.

20             MR. PORRITT:  Yes, Your Honor.

21             MR. SPIRO:  Yes.  Should we get the witness,

22   Your Honor?

23             THE COURT:  Yeah.

24        (The following proceedings were held in the presence of

25   the Jury)

**PROCEEDINGS**

```
 1            THE COURTROOM DEPUTY:  All rise for the jury.

 2            THE COURT:  All right, have a seat, everyone.  Welcome

 3    back, members of the jury.

 4         Plaintiff may call their next witness.

 5            MS. TRIPODI:  Good afternoon, Your Honor.  Plaintiff

 6    calls the witness Anthony Gracias.

 7            THE COURT:  All right.

 8            MS. TRIPODI:  And Your Honor, I have a witness binder

 9    for the Court and Mr. Gracias.

10            THE COURT:  All right.  Thank you.

11         (Binders tendered)

12            MS. TRIPODI:  Good afternoon, Mr. Gracias.

13            THE WITNESS:  Good afternoon.

14            THE COURT:  Thank you.  But first, we need to

15    administer the oath.

16            MS. TRIPODI:  Oh, my apologies.

17         (Off-the-Record discussion between counsel)

18         ANTHONY JOSE GRACIAS, PLAINTIFF'S WITNESS, SWORN

19            THE WITNESS:  I do.

20            THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

21    Please speak clearly into the microphone.

22         State and spell your first and last name for the record.

23            THE WITNESS:  Antonio Jose Gracias.  A-N-T-O-N-I-O,

24    J-O-S-E, G-R-A-C-I-A-S.

25            THE COURT:  All right.  Thank you, Mr. Gracias.
```

1        You may proceed.

2                        **DIRECT EXAMINATION**

3   **BY MS. TRIPODI**

4   **Q**     Good afternoon, Mr. Gracias.

5   **A**     Good afternoon again.

6   **Q**     You were a member of the Tesla board of directors in 2018

7   when the tweets at issue in this litigation came out.   Right?

8   **A**     Yes.

9   **Q**     You joined the board in 2007.   Correct?

10  **A**     Correct.

11  **Q**     You're currently the chief executive officer and chief

12  investment officer for Valor Equity Partners.   Correct?

13  **A**     Correct.

14  **Q**     And Valor Equity Partners is a private investment firm,

15  correct?

16  **A**     Correct.

17  **Q**     Now, two Valor funds were previously invested in Tesla, is

18  that correct?

19  **A**     Yes.

20  **Q**     But you knew Mr. Musk for some time before Valor was

21  invested in Tesla.   Correct?

22  **A**     Yes.

23  **Q**     You met him around 1999, 2000, when you first invested in

24  PayPal.   Correct?

25  **A**     Correct.

GRACIAS - DIRECT / TRIPODI

1    **Q**    So you've known Mr. Musk for a long time.  Correct?

2    **A**    Yes.

3    **Q**    In 2018, Valor, your fund, had operations professionals

4    helping to scale the battery factory for Tesla in Nevada.  Is

5    that correct?

6    **A**    Yes.

7    **Q**    But Valor was not invested in Tesla in 2018.  Correct?

8    **A**    Correct.

9    **Q**    You and Mr. Musk are friends, right?

10   **A**    Yes.

11   **Q**    You were friends in 2018?

12   **A**    Yes.

13   **Q**    You've gone out to dinner with Mr. Musk?

14   **A**    Yes.

15   **Q**    You have vacationed with Mr. Musk?

16   **A**    Yes.

17   **Q**    And you personally spent time in the Nevada factory

18   helping to scale the battery operation.  Correct?

19   **A**    I did.

20   **Q**    But Valor was not compensated for the work it did in

21   connection with scaling the battery factory, except for maybe

22   expense reimbursement.  Correct?

23   **A**    Correct.

24   **Q**    You were also in and out of the Tesla's Fremont factory in

25   the summer of 2018, is that correct?

1    **A**    Correct.

2    **Q**    And when Mr. Musk was in the factory and you were in the

3    factory, you were both generally working together, is that

4    correct?

5    **A**    Um, he was working in one part of it and I was working in

6    another, but we were there at the same time.

7    **Q**    So switching to Mr. Musk's Twitter, in 2018, Tesla

8    recognized Mr. Musk's personal Twitter account as one of the

9    channels to disseminate information on Tesla.  Is that correct?

10   **A**    Correct.

11   **Q**    And this had been done via an 8-K filed with the SEC?  Do

12   you recall that?

13   **A**    Yes.

14   **Q**    But prior to the tweets that had occurred in August of

15   2018, no one at Tesla aside from Mr. Musk, himself, had any

16   oversight responsibility for Elon's Twitter account, as it

17   related to Tesla business.  Is that correct?

18   **A**    He did, yes.

19   **Q**    That was my question.

20   **A**    Yes.

21   **Q**    Only Mr. Musk, himself, had oversight responsibility for

22   his Twitter?

23   **A**    He was subject to our media policy that had, like, a bunch

24   of layers to it, but he was the one reviewing it.

25   **Q**    And in 2018, you were a member of Tesla's audit committee,

GRACIAS - DIRECT / TRIPODI

1  correct?

2  **A**   Correct.

3  **Q**   Prior to the tweets at issue here, the audit committee had

4  never reviewed tweets made by Elon prior to their

5  dissemination, had it?

6  **A**   Correct.

7  **Q**   Ultimately, after the tweets at issue in this litigation,

8  Tesla established a disclosure committee.  Is that correct?

9  **A**   Correct.

10 **Q**   And the disclosure committee was created to review

11 Mr. Musk's Twitter and social media.  Correct?

12 **A**   First it went through at the company level and then it

13 (Inaudible) --

14     (Reporter clarification)

15     **THE WITNESS:**  The tweets would first be reviewed by

16 the management.  And then, if necessary, by disclosure

17 controls.  Correct.

18 **BY MS. TRIPODI**

19 **Q**   In 2018, you personally followed Mr. Musk's Twitter

20 account.  Correct?

21 **A**   Yes.

22 **Q**   And you believed Mr. Musk's Twitter account was a great

23 asset to the company.  Right?

24 **A**   I do.

25 **Q**   His use of Twitter you consider to be a great marketing

1    advantage to the company.   Is that correct?

2    **A**    Yes.

3    **Q**    Nevertheless, you were aware that some of Mr. Musk's

4    tweets had prompted negative reactions from investors.   Right?

5    **A**    There were varying views about his tweets, correct.

6    **Q**    In July of 2018, you, yourself, had a conversation with

7    Mr. Musk about limiting Twitter and social media stuff and just

8    focusing on work at the factory.   Isn't that right?

9    **A**    Um, in July of 2018?   That sounds about right, yeah.

10           **MS. TRIPODI:**   If we could pull up Exhibit 321 please,

11   which has already been admitted.

12           **THE WITNESS:**   Is it in this book?

13   **BY MS. TRIPODI**

14   **Q**    It is.   It will also be on the screen in front of you.

15        (Document displayed)

16   **Q**    Mr. Gracias, did you see this tweet?

17   **A**    I did.

18   **Q**    Your conversation with Mr. Musk about limiting his use of

19   Twitter, that was after this tweet.   Correct?

20   **A**    Yes.

21   **Q**    And after this tweet, you also had a conversation with Sam

22   Teller, Mr. Musk's assistant, where you agreed that Mr. Musk

23   should apologize for the tweet and take a break from Twitter.

24   Is that correct?

25   **A**    Hm.   I remember talking to Sam.   I don't remember the

1    substance of the conversation but we definitely talked about

2    it.  Yes.

3    **Q**    If you want to look in your binder, this is not going to

4    be an exhibit that's admitted, but it's Exhibit 104 in your

5    binder.  If you would like to look at that to refresh your

6    recollection.

7         (Witness examines document)

8    **Q**    And let me know when you have had a chance to review.

9    **A**    Okay, I'm -- I read it.

10   **Q**    Does this refresh your recollection that you and

11   Mr. Teller discussed recommending Mr. Musk make a genuine

12   apology and take a break from Twitter after the "pedo guy"

13   tweet?

14   **A**    I don't think it says that.  It says that --

15        **MR. SPIRO:**  Objection.

16        **THE COURT:**  Okay, you don't have to read from it, but

17   that's --

18        **THE WITNESS:**  I'm sorry.

19        **THE COURT:**  Now that your memory is refreshed, you can

20   testify as to what you remember.

21        **THE WITNESS:**  Yeah, I don't remember discussing with

22   Sam that he should make an apology.  I remember discussing the

23   tweets generally, and that maybe Elon should take a break from

24   tweeting, but I don't remember the substance of this.  I don't

25   think I reviewed it before he sent it out.

GRACIAS - DIRECT / TRIPODI

1  **BY MS. TRIPODI**

2  **Q**    The Tesla board didn't make any effort to limit Mr. Musk's

3  use of Twitter after the "pedo guy" tweet, did it?

4  **A**    I don't think it was relevant to the (inaudible) MNPI; no,

5  we did not.

6      (Reporter clarification)

7          **THE WITNESS:**  I'm sorry.  It's not -- it was not -- it

8  was not MNPI, material non-public information related Tesla, so

9  we didn't think it was relevant.

10  **BY MS. TRIPODI**

11  **Q**    But Mr. Musk is the CEO of a public company with tens of

12  thousands of shareholders, correct?

13  **A**    Yes.

14  **Q**    And statements that he makes on Twitter can impact those

15  shareholders, correct?

16  **A**    Yes.

17  **Q**    If we can look at what's been marked as Exhibit 81,

18  please.

19      (Document displayed)

20  **Q**    So Mr. Gracias, at the beginning of August, 2018, the

21  board received an offer from Mr. Musk.  Is that correct?

22  **A**    That's correct.

23  **Q**    Do you recall receiving this offer?

24  **A**    I do.

25  **Q**    Prior to receiving this, you didn't discuss it with

1    Mr. Musk, did you?

2    **A**    No, I did not discuss --

3         (Reporter clarification)

4            **THE WITNESS:**  I did not discuss him sending this

5    email, no.

6         (Reporter clarification)

7            **THE WITNESS:**  I'm sorry, yeah I apologize.

8    **BY MS. TRIPODI**

9    **Q**    And after receiving this email, the board convened a

10   meeting that same day, correct?

11   **A**    Yes.

12   **Q**    If we can look at Exhibit 82, please.  And I believe this

13   has already been admitted.

14        (Document displayed)

15   **Q**    Do you see Exhibit 82, Mr. Gracias?

16   **A**    Yes, I do.

17   **Q**    And are these the minutes of the meeting of the board

18   after receiving Mr. Musk's offer?

19   **A**    Yes, they are.

20   **Q**    At this meeting, Mr. Ahuja, Tesla's CFO, gave his

21   impressions from the July 31st meeting with the Saudi PIF.  Is

22   that correct?

23   **A**    Correct.

24   **Q**    But Mr. Ahuja didn't indicate that a specific price had

25   been discussed with the PIF for taking Tesla private, did he?

1  **A**    I don't remember him discussing price, no.

2  **Q**    If you can look at Page 2, please, of the board minutes.

3      (Document displayed)

4  **Q**    And specifically I'm looking to the paragraph regarding

5  what Mr. Maron discussed.

6      First full paragraph at the top of the page.  And it

7  indicates that Mr. Maron, who is Tesla's general counsel, told

8  the board that Mr. Musk wanted as many existing shareholders as

9  possible to roll over.  Is that correct?

10  **A**    Yes.

11  **Q**    But you had no idea at this point whether or not

12  shareholders would be able to roll over into a private company,

13  did you?

14  **A**    I thought it was possible.  Um, I didn't know if it had

15  been done, but it had -- we thought it was something that he

16  was going to try.

17  **Q**    Did you need more information from Elon at this point?

18  **A**    Sorry, to conclude what?

19  **Q**    Regarding the Tesla shareholder rollover.

20  **A**    Yes.  We did not know who would roll over, how many

21  people, which short sellers.  We didn't know the totality of

22  it, no.

23  **Q**    And you needed more information from Mr. Musk regarding

24  the going-private proposal in general, correct?

25  **A**    I'm sorry, to conclude what?

1  **Q**    To include other information regarding the going private.

2  Not just the shareholder rollover, the structure of the

3  proposed transaction, timing for the proposed transaction.

4  **A**    The question's a little hard to understand, I need

5  information to deduce what?  What was I trying to conclude?

6           **THE COURT:**  You mean information for what purpose --

7           **THE WITNESS:**  For what purpose?

8           **THE COURT:**  That's missing from your question.

9  **BY MS. TRIPODI**

10 **Q**    Did the board need more information in order to act on

11 Mr. Musk's offer that we've seen as Exhibit 81?

12 **A**    No.  We did act.  We -- I -- we contacted lawyers, started

13 talking to advisers, we started putting the Delaware process in

14 place.  We did act.

15 **Q**    So let's look at the minutes from the next day, which is

16 the August 3rd board meeting.  And this is Exhibit 83 which has

17 already been admitted.

18      (Document displayed)

19 **Q**    Do you see that, Mr. Gracias?

20 **A**    Yes, I do.

21 **Q**    So this was the next day after the board had received the

22 offer on August 2nd.  Correct?

23 **A**    Yes, it is.

24 **Q**    And Mr. Musk attended this meeting to provide additional

25 information.  Is that correct?

GRACIAS - DIRECT / TRIPODI

1  **A**   That is correct.

2  **Q**   Now, if you will look to Page 2 of these minutes.  It's

3  the fourth, the fifth paragraph.  So, the final paragraph on

4  Page 2.

5  **A**   So "As for governance"?  Or "As for legal"?

6  **Q**   "As for legal."

7  **A**   Got it.

8  **Q**   So at this point Mr. Musk had not even engaged legal or

9  financial advisers, had he?

10  **A**   That's what it says, yes.

11  **Q**   And then looking at Page 3, the first paragraph at the

12  top, it reads (As read):

13            "The board then discussed next steps.  It was

14            noted that a detailed proposal regarding a

15            going private transaction had not yet been

16            made and that one would be needed in order

17            for the board to properly analyze and

18            evaluate it."

19       Do you see that?

20  **A**   I do.

21  **Q**   At this point, there was no definitive structure for a

22  going-private transaction that had been decided upon, was

23  there?

24  **A**   No, that's correct.

25  **Q**   And at this point there had been no determination as to

1  whether regulatory approval for a large investment by a foreign

2  sovereign wealth fund into a U.S. public company was even

3  possible, was there?

4  **A**    I mean, they had already made a 4.9 percent investment.

5  **Q**    But was there a determination as to whether the PIF could

6  invest a substantial amount for a going-private transaction

7  that would meet regulatory scrutiny?

8      I'm just talking about a determination as to regulatory

9  approval.

10 **A**    So you mean an additional investment.  In addition to the

11 4.9 they already owned, could they put more money in.  Is that

12 your question?

13 **Q**    Correct.

14 **A**    For sure, they would have to (inaudible) --

15     (Reporter clarification)

16         **THE WITNESS:**  I'm sorry.  Yes.  That would have to go

17 through regulatory approval.

18 **BY MS. TRIPODI**

19 **Q**    And so four days after this meeting on August 3rd,

20 Mr. Musk makes the tweet.  And if we can pull up the tweet

21 which is Exhibit 8.

22     (Document displayed)

23 **Q**    Mr. Gracias, did you see this tweet where Mr. Musk said he

24 had funding secured for a potential $60 billion deal?

25 **A**    I did.

GRACIAS - DIRECT / TRIPODI

1   Q    And when Mr. Musk made this tweet, you weren't aware of

2   any written commitment by anyone to fund the transaction, were

3   you?

4   A    Correct.

5   Q    You weren't aware of a specific price that had been

6   discussed with the Saudi PIF, were you?

7   A    Correct.

8   Q    And you weren't aware that specific ownership percentages

9   with the Saudi PIF had been agreed upon.

10  A    That's correct.

11  Q    And Mr. Musk tweeted this in the middle of a trading day.

12  Is that also correct?

13  A    That is correct.

14  Q    If we can look at Exhibit 13, which is another tweet from

15  that day.

16       (Document displayed)

17  Q    Do you recognize this tweet?

18  A    Yes, I do.

19  Q    And in this tweet, Mr. Musk claims to have investor

20  support confirmed.  Is that correct?

21  A    Correct.

22  Q    So four days after the board had met with Mr. Musk, and

23  discussed needing additional information regarding the

24  shareholder rollover, Mr. Musk claims to have investor support.

25  Is that correct?

GRACIAS - DIRECT / TRIPODI

```
 1   A      Yes.

 2   Q      And looking at the second sentence here:

 3              "Only reason why this is not certain is that

 4              it's contingent on a shareholder vote."

 5   Do you see that?

 6   A      Yes.

 7   Q      The board had to go through its own process, right?

 8   A      Yes.

 9   Q      And the board had approved nothing at this point.  Right?

10   A      Yes.  Uh, we may have approved -- sorry.  It's possible we

11   approved, um, talking to lawyers and rolling the Delaware

12   process, but nothing about the deal.

13   Q      And as of August 3rd, so four days before this tweet, the

14   board was still waiting on a detailed proposal.  Correct?

15   A      Correct.

16   Q      And as we just discussed a few moments ago, there would

17   still need to be regulatory approval, which may pose a hurdle

18   for a deal of this size.  Correct?

19   A      Correct.

20   Q      So, fair to say that all of these things were still

21   contingencies when Mr. Musk made this tweet in Exhibit 13?

22   A      Yes.  Correct.

23   Q      If we can look at Exhibit 89, please.

24          (Document displayed to the Witness)

25              MS. TRIPODI:  And Your Honor, I'm not certain that 89
```

1    has been admitted at this --

2              THE COURT:  There was no objection stated in the

3    table, so it is admitted.

4         (Trial Exhibit 89 received in evidence.)

5         (Document displayed)

6              MS. TRIPODI:  Thank you, Your Honor.

7              THE COURT:  You may publish.

8    BY MS. TRIPODI

9    Q    After the tweets came out on August 7th, Mr. Gracias, the

10   board convened a meeting.  Correct?

11   A    Correct.

12   Q    At this meeting, did Mr. Ahuja mention to the board that

13   following the tweets, Tesla had received a lot of inquiries

14   from investors, the media, and even the SEC about the meaning

15   of "Funding secured"?

16   A    I need to look at the notes, actually, I don't remember --

17   he -- he discussed, um, the basics around this, yes.  I don't

18   remember all of the specifics.  But whatever it says here is

19   correct.

20   Q    If you'll look to Page 2 of the minutes, please.

21        (Document displayed)

22   Q    There are a number of redactions on the page.  But if you

23   look down towards the bottom it is the second paragraph up from

24   the bottom, it starts "The board then discussed..."

25   A    Yes.

1   **Q**    Says (As read):

2            "The board then discussed engaging further

3            with Mr. Musk about coordinating

4            communications going forward.  In particular,

5            Mr. Gracias would discuss with Mr. Musk the

6            use of Twitter generally."

7       Do you see that?

8   **A**    Yes.

9   **Q**    So you were charged with discussing with Mr. Musk the use

10  of Twitter generally.  Right?

11  **A**    Yes.

12  **Q**    And the board had decided at this point that

13  communications about the deal from Mr. Musk needed to pass

14  through the board first.  Is that correct?

15  **A**    We were going to ask.

16  **Q**    And some time after this meeting, you spoke with Mr. Musk

17  and told him not to tweet about the deal.  Right?

18  **A**    No, I didn't tell him.  I asked him.

19  **Q**    And was Mr. Musk responsive?

20  **A**    Yes.  He said "Okay, I agree."

21  **Q**    If we can show the witness Exhibit 130, please.

22       (Document displayed to the Witness)

23       **MS. TRIPODI:**  Your Honor, this has not yet been moved

24  into evidence.  And, so I don't believe there are objections

25  from defendants.

1          **MR. SPIRO:**  There's no objection.

2          **THE COURT:**  All right.  Admitted.

3      (Trial Exhibit 130 received in evidence.)

4          **MS. TRIPODI:**  Thank you.

5      (Document displayed)

6  **BY MS. TRIPODI**

7  **Q**    Mr. Gracias, do you recognize this Exhibit 130?

8  **A**    I do.

9  **Q**    And this is a statement from Tesla's board of directors on

10 August 8th.  Correct?

11 **A**    Correct.

12 **Q**    So not the day of the tweets, August 7th, but the

13 following day, the board makes a statement.  Is that correct?

14 **A**    Correct.

15 **Q**    Now, you were aware there was a media storm related to

16 this going-private transaction.  Nasdaq had halted trading on

17 Tesla's stock; Investor Relations was getting a myriad of

18 questions from investors.

19      And the board puts out three lines regarding the

20 going-private transaction.  Is that right?

21 **A**    I think it's not exactly right.  I think that Nasdaq

22 halted then resumed trading, I think.  I think that's correct.

23 So I would amend what you said.

24      And yes, this is a statement we put out on August 8th.

25 That's correct.

GRACIAS - DIRECT / TRIPODI

1  **Q**    If you will look at the contents of the statement, please.

2  It says that Elon opened discussion with the board and

3  addressed the funding for this to occur.  Do you see that?

4  **A**    Yes.  I see it.

5  **Q**    But the board provides no information regarding the source

6  of funding.  Is that correct?

7  **A**    That's correct.  We weren't the buyers, Elon was.

8  **Q**    But the board was aware that Tesla, the company, had been

9  receiving questions and inquiries regarding "Funding secured."

10  Correct?

11  **A**    Yes.  There were lots of questions about what that meant.

12  **Q**    And so the board's response to a $60 billion potential

13  going-private involving its CEO and potentially a Saudi Arabian

14  sovereign wealth fund is to produce this statement which says

15  nothing regarding funding secured.  Correct?

16  **A**    Correct.

17  **Q**    And you personally got lots of questions regarding this

18  tweet.  Correct?

19  **A**    I mean people asked me questions about it, for sure.

20  Yeah.

21  **Q**    So this statement comes out on August 8, right?

22  **A**    Yes.

23  **Q**    And neither Tesla nor the board says anything on

24  August 9th, correct?

25  **A**    Um, if you -- yes, I think so.  If there's nothing written

1    -- yes, correct.

2    **Q**    Neither Tesla nor the board said anything on August 10th,

3    correct?

4    **A**    I think it was a weekend.  But yeah, I think the 7th was a

5    Thursday, I think 8th was a Friday, not exactly sure and then

6    there was a weekend, but something like that, yeah.

7    **Q**    The 7th was a Tuesday, I'll represent to you.

8    **A**    Okay.  Yeah, that's correct.

9    **Q**    So the first time Tesla, Mr. Musk, came out with

10    additional information regarding the going-private was in the

11    blog post on August 13th.  Is that correct?

12    **A**    Correct.  Elon put a blog post.

13    **Q**    Correct.

14    **A**    Yes.

15    **Q**    Do you recall that you had a conversation with Mr. Musk

16    via telephone on August 11th, so it was Saturday, during the

17    weekend?

18    **A**    I did, yes.

19    **Q**    And it appears that there were two phone calls between you

20    and Mr. Musk that lasted approximately 23 minutes, and 16

21    minutes.  Do you generally remember those?

22    **A**    Yes.

23    **Q**    And in one of the calls, were you telling Mr. Musk that he

24    was supposed to have gotten a blog post out on Thursday, and

25    you were wondering where that information was?

1    **A**    I remember, um, discussing with him the timing of the blog

2    post.  And I think it was supposed to go out -- I don't

3    remember if it was Thursday or Friday, but, um, some time in

4    that -- in that period, for sure.  Yes.  I think it was Friday

5    before market hours, was the idea.  And that it was -- when it

6    was going to come out, yes.

7    **Q**    So the board knew that there was more information that was

8    needed from Mr. Musk, and you were talking to Mr. Musk about

9    providing such information.  Correct?

10    **A**    Yes.  He was the buyer, he was going to write the blog

11    post; yes.

12    **Q**    And you personally knew that Todd Maron, Tesla's general

13    counsel, was working with Elon on this blog post.  Is that

14    correct?

15    **A**    Um, I don't remember.  Yeah.

16    **Q**    If I can give you the transcript from the SEC deposition,

17    I can refresh your recollection.

18    **A**    Okay.

19         **MS. TRIPODI:**  Ms. Ayala, can I give one of these to

20    the Court?

21        (Document handed up to the Court)

22         **THE WITNESS:**  Thank you.  Sorry.

23    **BY MS. TRIPODI**

24    **Q**    Mr. Gracias, if I can direct your attention to refresh

25    your recollection to Page 102 of your transcript.  And if you

```
 1   would start on Line 20, and go over on to 103, Line 21.

 2           THE WITNESS:  So where it says "You can imagine" --

 3           MR. SPIRO:  Your Honor if we could just explain to the

 4   witness the way that witnesses's recollections are refreshed,

 5   versus what is in evidence?

 6           THE COURT:  Yeah.  I think he was just asking where to

 7   start.

 8       But basically, you are being asked just to read this to

 9   yourself.  And then see if that refreshes your memory.  And

10   then from that point, you can testify as to your memory, not

11   from the document.

12           THE WITNESS:  Okay.

13           THE COURT:  So, but I think you may have had a

14   question about where to start.

15           THE WITNESS:  Yes.  Yes.  Where do I start, please?

16   BY MS. TRIPODI

17   Q     Page 102, Line 20.

18   A     Okay.

19           THE COURT:  To what, and end where?

20           MS. TRIPODI:  To 103, Line 21.

21       (Witness examines document)

22           THE WITNESS:  Okay, I read it.

23   BY MS. TRIPODI

24   Q     So my question to you was you knew that Todd Maron,

25   Tesla's general counsel, was working with Mr. Musk on this blog
```

1  post.  Correct?

2  **A**    No, I -- I don't think I remember that.  Nor does it say

3  that.

4  **Q**    The pages you have just read does not refresh your

5  recollection as to that?

6  **A**    No, they don't say that.  They say "that they" -- "Todd

7  informed us that they..."  "They" is Elon, the buyer.

8  **Q**    This blog post that you were discussing with Mr. Musk on

9  August 11th, it never went out until August 13th, correct?

10  **A**    Correct.  I just don't remember the -- what happened here.

11  I mean -- yeah.

12  **Q**    Understood.  We can move on.  So fast-forward to some time

13  around August 18th.  So, almost a week later.  You spoke with

14  Mr. Musk and gave him your thoughts regarding the

15  going-private.  Do you recall that conversation?

16  **A**    I'm sorry.  Repeat the question, please?

17  **Q**    Sure.  Some time around August 18th, you had a

18  conversation with Mr. Musk where you talked about your thoughts

19  and his thoughts on the going-private.  Correct?

20  **A**    Correct.

21  **Q**    Do you recall that conversation?

22  **A**    I do.

23  **Q**    At this point you knew that it was going to be much harder

24  to roll shareholders over into a private company.  Is that

25  correct?

1    **A**    I thought it was going to be harder than we had initially

2    anticipated, yes.  Correct.

3    **Q**    And you told Mr. Musk that it didn't seem like his goals

4    that he had laid out with respect to the going-private

5    transaction could be met with respect to corporate structure,

6    governing structure, the roll.  Is that correct?

7    **A**    Yes.  I think the biggest issue was the roll, and then the

8    other issues were secondary, yes.

9    **Q**    During this phone call, did you tell Mr. Musk that you

10   thought it probably wasn't worth it?

11   **A**    I gave my opinion that I didn't think it was worth it,

12   yeah.  Something like that.  I don't think -- I don't remember

13   the exact phrasing, but it -- something to this effect.

14   **Q**    And ultimately, Mr. Musk decided to abandon the whole

15   going private.  Is that correct?

16   **A**    He did, yes.

17         **MS. TRIPODI:**  Thank you, Mr. Gracias.  I don't have

18   any further questions at this time.

19         **THE WITNESS:**  Thank you.

20         **MS. TRIPODI:**  Your Honor, can I reserve to redirect,

21   please?

22         **THE COURT:**  Yes, you may.

23         **MS. TRIPODI:**  Thank you.

24         **THE COURT:**  Thank you.

25       Cross?

<u>**CROSS-EXAMINATION**</u>

**BY MR. SPIRO**

**Q**    Good afternoon.  Good afternoon, Mr. Gracias.

**A**    Good afternoon, Alex.

**Q**    If we could put up Exhibit 254, which is in evidence.

(Document displayed)

**Q**    Okay.  Were you -- just take that down for a second,
actually.  Let's put up 101.

(Document taken off display)

(Document displayed)

**BY MR. SPIRO**

**Q**    Okay.  And if we could go to and highlight the
Goldman Sachs and Silver Lake representatives part.

Do you recall you were just asked about your decision to
not take the company private?

Do you recall a board meeting on August 23rd where you had
information presented to you by Goldman Sachs and Silver Lake?

**A**    Yes, I do.

**Q**    Okay.  And did the board then --

            **MR. SPIRO:**  Is this being published to the jury?

            **THE COURTROOM DEPUTY:**  It is.

            **MR. SPIRO:**  Thank you so much.

            **THE COURTROOM DEPUTY:**  You're welcome.

**BY MR. SPIRO**

**Q**    Did you hear from the financial advisers about the

**GRACIAS - CROSS / SPIRO**

1  financial sources and funding available to take the company

2  private?

3  **A**    Yes, we did.

4  **Q**    And was there sufficient funding two weeks after the tweet

5  to take the company private?

6  **A**    Yes, there was.

7  **Q**    And so why didn't the company go private?

8  **A**    Because Elon decided not to do it.

9  **Q**    Did you have conversations with investors following the

10  decision of Tesla not to go private, sort of as an emissary

11  from the board?

12  **A**    I did, yes.

13  **Q**    Okay.  And so we're talking about after this two-week

14  period, conversations from investors, can you just describe the

15  general theme of those conversations.

16  **A**    Yes, I think that the most important thing people worry

17  about was this *New York Times* article that came out, and Elon's

18  mind state.  His health.  And I think that was most -- people

19  asked me:  Is he okay?

20        And I'd flown out there after the article to see him, and

21  check, myself.  And he was okay.

22  **Q**    Were investors -- after the decision to not go private in

23  those conversations, were they asking you about the definitions

24  of certain phrases and tweets?

25  **A**    No.

```
 1              MS. TRIPODI:  Objection, Your Honor, relevance.  This
 2   is after.
 3              THE COURT:  Overruled.
 4   BY MR. SPIRO
 5   Q    Okay.  And the answer was no, Mr. Gracias?
 6   A    Repeat the question, please?
 7   Q    Sure.  Afterwards, in those investor conversations when
 8   you were sent to speak to investors as an emissary of the
 9   board, were the investors asking you questions about the
10   meanings of phrases within tweets?
11   A    No.  Not at all.
12   Q    Okay.  Do you understand, as you sit here today, that the
13   jury is not being asked to decide whether Mr. Musk is a good or
14   bad tweeter, as a general matter?
15   A    They are not being asked that, no.
16   Q    And do you know whether or not this trial is about whether
17   or not Mr. Musk is a really good CEO, an okay CEO?  Do you know
18   that that's not what this trial's about?
19              MS. TRIPODI:  Objection, Your Honor.  Relevance.
20              THE COURT:  Sustained.
21              MR. SPIRO:  Okay.  Well, let me ask this.
22   BY MR. SPIRO
23   Q    Are you aware, as you sit here today, that, you, yourself,
24   are a defendant in this case, accused of violating federal
25   securities laws?
```

**A**     I am aware that I'm accused of violating securities law,
yes.  Absolutely.  Yes.

**Q**     Do you realize that you're sitting here today, and they
are suing you for billions of dollars?

**A**     I do, yes, Alex.  I do.

**Q**     At the time of the "Am considering" tweet and the other
tweets, did the board review Mr. Musk's CNBC statements, his
TED Talk statements, or his tweets, before he issued them?

**A**     No.  The tweets were covered by our media policy, our
disclosure policy.  And he could talk to media any way he
wanted to, other than MNPI.  He could not release MNPI.  But
no, absolutely not.

**Q**     Let me take a step back.  How old are you, sir?

**A**     Fifty-two years old.

**Q**     And where are you from?

**A**     I was born in Detroit, Michigan, and grew up in Grand
Rapids, Michigan.

**Q**     Were your parents born in the United States?

**A**     My parents are immigrants.  I'm the only one born here in
my family.

**Q**     Okay, it's a little -- between the glass and that we both
speak too quickly, if we could just slow down, I'll just ask
again.

        Were your parents born in the United States?

**A**     No.  My parents are immigrants.  And I'm the only one born

GRACIAS - CROSS / SPIRO

1    here in my family.

2    **Q**    Do you have children?

3    **A**    I have three children.

4    **Q**    And what is your educational background?

5    **A**    I went to Georgetown University School of Foreign Service,

6    undergraduate.  I have a undergraduate degree in international

7    economics.  I got a master's degree, also at Georgetown School

8    of Foreign Service, in international finance.  And I attended

9    the University of Chicago Law School, where I graduated in

10   1998.

11   **Q**    And just very briefly, your professional experience in a

12   couple of sentences?

13   **A**    I worked at Goldman Sachs as an associate when I was

14   young, and then left there in the '90s to start my company I

15   have today.  And I have been investing in and growing

16   technology companies for 25-plus years.

17   **Q**    In that role, have you raised many billions of dollars?

18   **A**    At least tens of, if not hundreds of billions of dollars,

19   yes.

20   **Q**    And have you raised money with Elon Musk?

21   **A**    I have raised money with Elon Musk, yes.

22   **Q**    How many, have you invested in Mr. Musk's companies?

23   **A**    I have, yes.

24   **Q**    Can you give the jury an estimate of how many companies

25   and how many rounds?

**GRACIAS - CROSS / SPIRO**

1    **A**     Four or five companies.  Um, dozens of rounds.  Dozens.

2    **Q**     Can you just explain to the jury what a round is.

3    **A**     So when we are raising financing for a company, we go out

4    to investors, and we call that a financing round.  And they

5    typically have letters like A, B, C, D, E.

6         And as you're growing you've got to feed capital in the

7    company, you put money in so it will grow.  It's like building

8    a building.  You've got to put money in, then build it, and

9    then money comes out the other end.  So that's what we're

10   doing.

11        Part of our business is to help people.  We invest money,

12   and then we help the companies raise money to continue to fund

13   their operations.

14   **Q**     And in these last 20-plus years, have you raised money

15   with and alongside Elon Musk?

16   **A**     Yes, I have.  Many times.

17   **Q**     Have you ever had a down round?

18   **A**     No.  We never had a down round.  Even in '08, '09, the

19   financial crisis we were still able to raise capital.

20   **Q**     Does Mr. Musk use his own capital sometimes?

21   **A**     Yes.  He often invests -- I'd say we have -- very often

22   invests in Tesla, in particular in the early days, in the

23   rounds, yes.

24   **Q**     And how did that come into play in '08 and '09?

25   **A**     Look, '08-'09 was the worst fundraising environment I

**GRACIAS - CROSS / SPIRO**

1  think I've seen in my career, and Tesla had to raise capital.

2  We invest in the company, and Elon -- Elon privately and my

3  fund were the two largest investors in that financing round.

4  **Q**   And what does it mean for a round to be over-subscribed?

5  **A**   That means that there's more demand for the securities

6  we're offering than we are -- we are actually selling.  So an

7  example would be we want to raise a $100, and there is $120 of

8  people that want to buy it.

9  **Q**   And are Elon Musk's companies and their rounds almost

10  always over-subscribed?

11  **A**   Elon is the -- he's like the Michael Jordan of

12  fundraising.  And I'm from Chicago.  So he is -- yes.  They're

13  always over-subscribed.  Yes.

14  **Q**   And are they usually over-subscribed within an hour of

15  them being offered to the world?

16  **A**   They are -- it's very quick, yes.  An hour or several

17  hours.  It's very quick.  Yes.

18  **Q**   Now, we're here to talk about 2018 and Tesla and your role

19  on the board.  Okay?

20       Did you have a day-to-day responsibility at Tesla?

21  **A**   No.  I did not.

22  **Q**   Okay.  And have you sat on boards of other companies

23  before?

24  **A**   Yes.  Many.

25  **Q**   And can you explain to the jury what the role is of a

1    board member versus management?

2    **A**    So the board exists to represent the interests of

3    shareholders.  That's the idea.  The fiduciaries of

4    shareholders.

5    **Q**    Right.  Just, the court reporter is struggling to keep up

6    with the two of us a little bit.  And she's very good.  And so

7    I will say again, we're going to both slow down.

8         (Reporter clarification)

9             **THE WITNESS:**  The board exists to represent the

10   shareholders and the interests of shareholders.  It also is

11   responsible for hiring and firing management.  You need to fire

12   a CEO, as an example, or hire a CEO, the board will typically

13   do that.

14        And then they're responsible for creating sort of the

15   guardrails around which the management will operate the

16   company.  So regulatory process, that sort of things.

17   **BY MR. SPIRO**

18   **Q**    And how often approximately do boards meet, in the

19   ordinary course?

20   **A**    They usually meet at least quarterly, and then committees

21   will meet more often.

22   **Q**    When you were a director of Tesla, were you a

23   non-executive outside director?

24   **A**    Yes, I was.

25   **Q**    And did you maintain a day job during that time period?

1  **A**     Yes.  I have been running my firm as the -- as we said

2  earlier, the CEO and CIO of Valor Equity Partners.

3  **Q**     And during this time period working with Elon Musk, did

4  you develop a sense of his general style of doing business,

5  whether that be formal or informal?

6  **A**     I would say it's informal.  Elon often does business on a

7  handshake.

8  **Q**     Now, you understand -- you don't live in the District

9  here, do you, Mr. Gracias?

10  **A**     You mean San Francisco?

11  **Q**     Yeah.

12  **A**     No, I do not.

13  **Q**     And you understand that while we could have played your

14  deposition -- you know -- testimony, you wanted to be here in

15  person to address this jury?

16  **A**     I did.  Listen, I'm being accused of -- of abetting and

17  aiding in a securities fraud.  And that's -- I'm responding,

18  myself.

19        **MR. SPIRO:**  Okay.  Can we put up Exhibit 81 that's in

20  evidence?

21     (Document displayed)

22  **BY MR. SPIRO**

23  **Q**     Do you recall seeing and receiving Mr. Musk's proposal to

24  the board to take Tesla private at 420?

25  **A**     Yes, I do.

**GRACIAS - CROSS / SPIRO**

1  **Q**    And when you received this, did you believe it to be a

2  real proposal?

3  **A**    I did, absolutely.

4  **Q**    Okay.  Can you tell us what your reaction was?

5  **A**    When I read it I thought, okay, we need to put the process

6  in place to work through this.  And I also knew that this kind

7  of take-private is going to be reviewed in Delaware.  So we

8  need to make sure the Delaware process was, like, really

9  well-followed.  And we needed to call a board meeting.

10 **Q**    And in terms of Mr. Musk's rationale, without going into

11 it in detail, did you agree with the reasons that he wanted to

12 go private?

13 **A**    Yes.

14 **Q**    What was your reaction to the proposed price of 420?

15 **A**    It was about a 20 percent premium to the share price, and

16 it seemed like a reasonable or average premium for a

17 take-private.

18 **Q**    And what was your reaction to the 30 days that he asked to

19 get a response by?

20 **A**    Seemed very Elon.  It's fast, but he was trying to get us

21 to move, and wanted to go quickly.

22 **Q**    And what was your original reaction to the idea that

23 shareholders could remain in a private Tesla?

24 **A**    Again, this is a very Elon thing.  He's very

25 pro-shareholder, small shareholder friendly.  And large

GRACIAS - CROSS / SPIRO

1    shareholders could roll more easily.  But getting small

2    shareholders to roll was going to be more complicated.

3    **Q**    And now I want to ask you, because it's very important, as

4    of August 2nd, was there a possible way to know how many

5    shareholders would roll?

6    **A**    No, there was no way to know.

7    **Q**    Okay.  Was there any possible way to know exactly how much

8    money would be needed?

9    **A**    No, there was no way to know.

10   **Q**    But what if you hired, like, every lawyer and every banker

11   in the world?  Would it have been possible to know?

12   **A**    Impossible to know, without asking the shareholders if

13   they would roll.

14   **Q**    This email from Mr. Musk, by Mr. Musk's levels of

15   formality, was it a formal or informal email?

16   **A**    This is very formal.  You know, he -- yes, he signs it,

17   "Chairman, CEO."  You know, he never does this.

18          **MR. SPIRO:**  I'm going to put into evidence Exhibit 802

19   which I understand is without objection, although the jury

20   hasn't seen it yet, and I would ask it to be published to the

21   jury.

22          **THE COURT:**  Any objection?

23          **MS. TRIPODI:**  No objection, Your Honor.

24          **THE COURT:**  Admitted.

25          (Trial Exhibit 802 received in evidence.)

GRACIAS - CROSS / SPIRO

```
 1              THE COURT:  You may publish.

 2         (Document displayed)

 3              MR. SPIRO:  And if we could just blow up the top part

 4    of this exhibit.

 5    BY MR. SPIRO

 6    Q    And you write (As read):

 7                   "Elon.   Thank you.   We are in receipt of your

 8                   offer.

 9                   "We will schedule a board meeting in the next

10                   24 hours to discuss this matter and get back

11                   to you with the appropriate next steps.

12                   "Antonio."

13         Did I read that right?

14    A    Yes, correct.

15    Q    And this was a formal response.  Is that fair?

16    A    This is as formal as I write, yes.

17    Q    Okay.  Within 24 hours, did you convene a board meeting?

18    A    I did, yes.

19    Q    Now, at the time of responding to Mr. Musk here, can you

20    just explain to the members of the jury how -- friend or not,

21    board member or not, what your relationship is vis-à-vis

22    Mr. Musk in this setting?

23    A    The moment he sent that offer, he became buyer and we

24    became sellers.  So we are now counterparties.  And our duty as

25    a board, and my duty as lead director, is to organize the board
```

1  activity and put the process in place to analyze and execute on

2  this transaction.  Which is what we did.

3  **Q**   And did you take those responsibilities seriously?

4  **A**   Very seriously, Alex.  I mean, A, I was a fiduciary to the

5  shareholders.  And B, I was a large shareholder in the company,

6  for my kids.

7  **Q**   Okay.  Exhibit 82, which is in evidence --

8       **MR. SPIRO:**  But, Your Honor, I would ask to pass out a

9  copy to each juror.  There's a lot of flashing of it on the

10 screen, and I would just like to give each juror a copy, if

11 that's okay?

12      **MS. TRIPODI:**  Objection, Your Honor.

13      **THE COURT:**  Pardon?

14      **MS. TRIPODI:**  It's highlighted on the screens for the

15 jurors.  I don't --

16      **THE COURT:**  All right.  For consistency's sake, I'm

17 going to stick with the screen.

18      **MR. SPIRO:**  I can't -- okay.

19 **BY MR. SPIRO**

20 **Q**   Have you had a chance -- I think you have a hard copy of

21 the board minutes, and eventually the jury will get to see all

22 of it.

23      Do you have a copy of the board minutes?  I'm going to

24 pass a copy up.

25 **A**   Where would it be?

1        (Document tendered)

2   **A**    Thanks.

3   **Q**    These are the board minutes from August 2nd, 2018.  Have

4   you had an opportunity to review those minutes before you came

5   to court here today?

6   **A**    Yes.

7   **Q**    Okay.  And do you recognize them?

8   **A**    Yes, I do.

9   **Q**    And are they fair and accurate in terms of a summary of

10  what occurred at the board meeting that you called within

11  twenty-four hours of responding to Mr. Musk's email?

12  **A**    Look, they are.  I mean, this was a probably -- I don't

13  know, three or four meeting, that -- it's an hour and a half or

14  two hours or something -- that had concluded, put into two

15  pages of notes.  So it's a summary.

16  **Q**    Okay.  In other words, board minutes are not a transcript

17  of what occurred.

18  **A**    No, no.  It's a high-level summary.

19  **Q**    But in terms of being a high-level summary, they are, to

20  your mind, having been there, in person, and here before this

21  jury, fair and accurate.

22  **A**    Yes, they are.

23  **Q**    Okay.  And also in the ordinary course of serving on

24  Tesla's board, would you review the board minutes at the

25  following meetings to confirm that they comported with you and

 1    your memory -- again, high-level -- of what occurred at that
 2    meeting?
 3    **A**    Yes, at a high level.
 4    **Q**    Okay.  And you can see at the top of this exhibit that it
 5    indicates who's present and who's not.  And Mr. Musk is not
 6    present at this meeting.  Can you just explain why?
 7    **A**    Well, he and his brother, Kimbal, are both not present
 8    because they are buyers now.  They're the counterparty.  And we
 9    are acting as seller.  And so we have a private conversation,
10    without the buyer in the room, about the situation and what to
11    do next.
12    **Q**    And there is also a series of attorneys present and
13    outside lawyers present.  Do you see the name "David Karp,"
14    among others?
15    **A**    I do, yes.
16    **Q**    And the lawyers that are at this meeting, are they
17    representing everybody at the meeting, to give them legal
18    advice?
19    **A**    Yes, they are.
20    **Q**    Oaky.  And is it common in your experience for one set of
21    lawyers to represent the board, the company, and individuals?
22    **A**    Yes, it is.
23    **Q**    Okay.  And at this meeting -- before this meeting, I
24    should say -- were you informed of the details of a meeting
25    between Elon Musk, others, and the PIF from July 31st?

GRACIAS - CROSS / SPIRO

1   **A**   Prior to this meeting?

2   **Q**   Correct.

3   **A**   Um, we discussed it in this meeting.  I mean, I saw the --

4   yeah, we discussed it in this meeting.

5   **Q**   Okay.  And Mr. Musk isn't at this meeting, but Mr. Ahuja

6   was at this meeting.

7   **A**   Yes.

8   **Q**   Okay.  And what was your assessment of Deepak Ahuja?

9   **A**   Deepak is as straight as it comes.  He is a great CFO, an

10  excellent executive, and he is a very straight shooter.

11  **Q**   What was your reaction to what Deepak Ahuja told you and

12  the other board members about the recent events and

13  conversations that Mr. Musk had with the Saudi PIF?

14  **A**   I mean, he explained it, they'd been -- they had a

15  meeting, but a couple of days prior, and that the PIF wanted to

16  back Elon in taking the company private.  And he thought they

17  were very serious.

18  **Q**   The PIF, did you learn that the PIF had acquired just

19  under 5 percent of Tesla?

20  **A**   Yes.  They were 4.9 percent.

21  **Q**   Okay.  Can you explain the significance of that to the

22  jury?

23  **A**   Yes.  So at 5 percent, the Saudi government, the PIF,

24  would have had to file a regulatory filing disclosing

25  themselves as owning 5 percent of the company, and they would

GRACIAS - CROSS / SPIRO

1   have through -- come up from behind the curtain.

2        The reason they bought 4.9 percent -- and you do this in a

3   take-private transaction -- is because you want to average down

4   your overall price.  You buy the 4.9, and then when you

5   announce the deal, the price will go up.

6        So the first 4.9 percent you bought, you bought at a lower

7   price.

8   **Q**   So I want to break that down a little bit and make sure

9   that it's clear.

10       If a company or an entity buys 4.9 percent of a public

11  company, do they have to disclose to the world that they own

12  that holding?

13  **A**   No.  At 4.9 you have not crossed the regulatory threshold.

14  At 5 percent you do.

15  **Q**   So let me ask you.  Is there any reason, in your decades

16  of business experience, that anybody, other than the reasons

17  you have given this jury, would ever buy 4.9 percent unless it

18  had the reason that you are describing?

19            **MS. TRIPODI:**  Objection, calls for speculation.

20            **THE COURT:**  Overruled.

21            **THE WITNESS:**  In my experience, the 4.9 indicates an

22  intention to take a company private.  Otherwise you would buy 4

23  or 5.2, or you wouldn't care if you were disclosed.

24       If you look at our other funds, you will see many

25  investors over 5 percent.  There were -- you wouldn't care if

1    you didn't have an intention.

2    **BY MR. SPIRO**

3    **Q**    And the second part of your explanation to the jury was

4    this idea of averaging in, and how that would impact your

5    original 4.9 percent investment.  Can you just explain that to

6    the jury?

7    **A**    Sure.  So if you think about it as -- let's say they're

8    going to end up owning a total of 20 percent.  If you owned

9    5 percent before you announce the deal, then you have that

10   5 percent at the price before the deal is announced.

11        So the example would be, say the price is $10 before the

12   deal's announced.  You now own 5 percent at $10.  You then

13   announce the deal, and own another 15 percent at, say,

14   20 percent higher.  It turns out that your original 5 percent

15   is at a discount to the overall price.  So you've averaged your

16   price down.

17   **Q**    So if you could get the company to announce that they were

18   considering going private, the shares that you own, you would

19   own more dollars' worth of shares.

20   **A**    You would -- you would own more -- your shares would be

21   worth more money.  Yes.  Correct.  Your shares are worth more

22   money.  The day the deal's announced, whatever you owned up to

23   the 4.9 percent is worth, in this case, 20 percent more.

24   **Q**    And can we just highlight the statement (As read):

25             "Based on the statements made by the PIF to

1              Mr. Musk during the meeting, Mr. Musk" --

2              who's the buyer here -- "believed that the

3              PIF was willing to fund the entire

4              transaction."

5       Did I read that right?

6    A    Yes.  And this is what, what Deepak told us.

7    Q    And when Deepak Ahuja told you that, did you believe him?

8    A    Absolutely.  Deepak's a straight shooter.

9    Q    Okay.  Now, at the time that you leave this meeting on

10   August 2nd, there's no signed contract.  Are you aware of that?

11   A    Yes.

12   Q    Okay.  Have you done business with the Saudi PIF and

13   others in that region?

14   A    I have done business in the --

15           MS. TRIPODI:  Objection, Your Honor.

16           THE COURT:  Overruled.

17   BY MR. SPIRO

18   Q    You can finish your answer, Mr. Gracias.

19   A    I have done business in the Middle East, and I have done

20   business with a subsidiary of the Saudi PIF.  Yes.

21   Q    And were you concerned at all that there wasn't a signed

22   written agreement to this at this juncture?

23   A    Not at all, no.

24   Q    Why?

25   A    This is a part of the world where you do business on a

1   handshake.  And if they say they're going to do it, they're

2   going to do it.

3   **Q**   Leaving the August 2nd board meeting, did you believe that

4   this was serious and real?

5   **A**   Absolutely.

6   **Q**   And immediately following this board meeting, the very

7   next day, did you hold another board meeting?

8   **A**   Yes, we did.

9   **Q**   Okay.

10          **MR. SPIRO:**  And if we could put up Exhibit 83.

11          (Document displayed)

12  **BY MR. SPIRO**

13  **Q**   By the way, during this time, some of the directors live

14  in different time zones.  I think Ms. Denholm lives in

15  Australia?

16  **A**   Yes.

17  **Q**   Okay.  Are you all working literally day after day after

18  day because you're treating this so seriously?

19  **A**   Yes.  This is very serious.

20  **Q**   Okay.  And is this all happening before the "Am

21  considering" tweet?

22  **A**   Yes.  Absolutely.

23  **Q**   At the next board meeting you see that the directors

24  present include Elon Musk.

25  **A**   Yes.

**GRACIAS - CROSS / SPIRO**

1  **Q**    Okay.  Now, when Mr. Musk is at this meeting -- we are now

2  a couple days later -- and we talked about this already, but I

3  just want to be very clear, was there any way for him to know

4  the exact percentages of how many shareholders would roll?

5  **A**    No.  Not possible.

6  **Q**    Would it be possible to know exactly how many dollars

7  would be needed?

8  **A**    Not possible, no.

9  **Q**    What if he hired all the bankers and lawyers in the world?

10  **A**    Not possible.

11  **Q**    Can you explain to this jury what Reg FD was, and whether

12  or not it came up at this meeting?

13  **A**    Yes.  So Reg FD is the fair disclosure rule.  That is why

14  it's called "FD."  Under the securities laws that -- what it

15  basically means is that shareholders should get material

16  information all at the same time.  So if you make a disclosure,

17  you can't give it to one person before you give it to another

18  person or that -- the first person will be advantaged over the

19  second person in the market.

20      So you have to have complete disclosure of important

21  information, material non-public information, all at the same

22  time to all shareholders so they are in the same place.

23  **Q**    And was there a legal conversation that followed about how

24  to navigate the Reg FD issue?

25  **A**    Yes.  So to figure out the role, Elon, as a buyer, needed

1    to talk to some shareholders.  We discussed that.  And, look,

2    this is a very friendly deal.  I mean, he could have done lots

3    of things.  He could have, you know, just gone to CNBC and

4    announced it, if he wanted to.  The reality is he's being very

5    friendly with us, with the company.

6         And we discussed communicating with shareholders and how

7    we would do that.  And we let him know:  Look, be careful of

8    Reg FD.  Because if you go to Fidelity, as an example, one of

9    our large shareholders, and you tell the portfolio manager at

10   Fidelity that you want to take the company private, you've now

11   made them an insider.  They've come over the wall, and they can

12   no longer trade the shares.  And people don't like that.

13   **Q**   Okay.  That's a complicated concept I want to make sure

14   the jury gets.  And we're going quickly here to be efficient

15   with our time.

16        But, why would a portfolio manager not want to learn this

17   information from Mr. Musk?

18   **A**   They don't -- they do not want to be restricted in trading

19   the shares.

20        So every day, Fidelity, which is a huge firm, is trading

21   in and out of shares in -- for whatever reason, and there's

22   more than one portfolio manager that owns the shares.  But the

23   moment one of them knows, that one person has to be like kind

24   of cordoned off.  And then there's a question about who knew

25   what, when and where, and there'll for sure be an

 1   investigation.  I mean, almost certain.

 2       And they -- this is not something anybody wants to deal

 3   with and wants to go through.  It makes their jobs and their

 4   lives a lot harder.

 5   **Q**   You said earlier, but I didn't follow up on it, that you,

 6   yourself, own shares?

 7   **A**   I did.  I was the -- I don't know, third or fourth largest

 8   individual shareholder in the company.

 9   **Q**   And as of August the 3rd, before the "Am considering"

10   tweet, were you going to roll your shares?

11   **A**   I was, yes.

12   **Q**   But because of this Reg FD issue and what you knew, at

13   that time you weren't able to trade your shares?

14   **A**   No, I couldn't buy, sell or trade my shares in any way.

15   **Q**   Now, even if Mr. Musk called some of the shareholders --

16   called the shareholders, were there still yet more restrictions

17   on what he could or could not say?

18   **A**   This was -- this was the point of the Reg FD conversation.

19   It's putting the buyer, Elon in this case, in a pretty tough

20   spot.  Because he's got to call up someone, an example, like

21   Fidelity, and say:  Hypothetically, if we were thinking about

22   doing it, what would you think?

23       And so it's -- it's a line he'd have to try to walk

24   between getting their temperature, and not disclosing so much

25   that he brought them over the wall.  It's tough.

**GRACIAS - CROSS / SPIRO**

1   **Q**   And had you fully thought in your mind how somebody would

2   call up somebody and hypothetically tell them that they were

3   considering that hypothetical?

4         Had you all figured out, even with the help of all the

5   lawyers, how that was even possible to do?

6   **A**   No.  I mean, we had -- at some level, like, we are a

7   seller.  This is not our problem; it's the buyer's problem.

8   And we'd punted to him, and said:  Be careful of Reg FD.

9   **Q**   So let's just pause on that point for a second, because

10  you're explaining this seller/buyer thing, and you said it was

11  a friendly deal.

12        Can you just explain to the jury what you mean?

13  **A**   So if a -- there are buyers and sellers in these

14  transactions.  In this case, the company's the seller, and we,

15  the board, represent the seller.  Elon is the buyer.

16        And by "friendly" I mean, like, not friendly would be a

17  full hostile takeover of the company.  Just literally announces

18  it, and tenders for shares in the marketplace, doesn't consult

19  with the board at all.  Very friendly is very collaborative

20  with the board, collaborating on communication, et cetera.

21        This was in the very friendly area.  That's what I mean.

22  **Q**   But even though it was friendly and you all know each

23  other, did you and the board have any ability to shut down the

24  proposal?

25  **A**   No.  Not at all.

**GRACIAS - CROSS / SPIRO**

1  **Q**    Did you have any ability to direct Elon in what he could

2  or could not do with the deal?

3  **A**    Not at all.

4  **Q**    Did you have any ability to tell him what to say publicly

5  or not?

6  **A**    No.  He could have said anything he wanted to.  He could

7  have gone on CNBC and announced it, if he wanted to.  It's up

8  to him.  He's the buyer.

9  **Q**    Now, as this meeting is concluding, I want to ask you

10 something:  Did you see Sam Teller that day after the meeting?

11 **A**    I saw him, you know, kind of milling around the room

12 afterwards.

13 **Q**    And who was Sam Teller?

14 **A**    Sam Teller worked close with Elon, sort of acting, I would

15 say, as his chief of staff.

16 **Q**    Do you know whether or not he was in the meeting with the

17 PIF of Saudi Arabia on July 31st?

18 **A**    He was.

19 **Q**    Now, Exhibit 225.

20      (Document displayed)

21 **Q**    You said earlier when you were being cross-examined by the

22 plaintiffs that you continued -- they asked you a question

23 like, you know, you guys had barely gotten started and you said

24 something to the effect of you had, you know, began the process

25 of getting lawyers and advisers and wanting to form a special

**GRACIAS - CROSS / SPIRO**

```
 1  committee, if possible, et cetera.
 2       And what all of a sudden happens on the morning of
 3  August 7th?
 4           MS. TRIPODI:  Objection, Your Honor.  I'm not sure
 5  that Exhibit 225 is in, admitted into evidence yet.
 6       (Document taken off display)
 7           MR. SPIRO:  It is.
 8           MS. TRIPODI:  My apologies.
 9           THE COURT:  Okay.
10           THE WITNESS:  Can you put it back up, please?
11           MR. SPIRO:  Sure.
12       (Document displayed)
13           THE WITNESS:  Yeah.
14  BY MR. SPIRO
15  Q    Do you remember news breaking on the morning of
16  August 7th?
17  A    I do.
18  Q    And can you tell this jury what, what happened in real
19  second-by-second time?
20  A    Yes.  And it's important to -- to think about this in
21  terms of the timeframes, for sure.
22       This is an article from the *Financial Times* that is
23  leaking the existence of the Saudis' investment in the company,
24  at the -- at the threshold where they might want to take it
25  private.  And this is the 3 to 5 percent we are talking about
```

1   here.  This is what people do when they take a company private.

2   And this story had leaked that morning in the FT.

3   **Q**    When you say this is what people do when they are trying

4   to take a company private, explain that to the jury, from your

5   decades of business experience.

6        (Reporter clarification)

7             **THE WITNESS:**  My apologies, again.

8        When you are at 4.9 percent, just under 5, what you're

9   saying is:  I've come right to the threshold before I want to

10  announce, and this is the intention, to take the company

11  private.

12  **BY MR. SPIRO**

13  **Q**    And as you can see from the headline, they had already

14  built a $2 billion stake?

15  **A**    Yes.

16  **Q**    And if we could put up Exhibit 8.

17       (Document displayed)

18  **Q**    What was your reaction when the "Am considering" tweet

19  came out?

20  **A**    It seemed to me that Elon was trying to get ahead of the

21  story that had leaked in the *Financial Times* that morning.  And

22  it was within an hour or so of the article about the Saudis

23  making their investment coming out.

24  **Q**    And how did you interpret the tweet, based on what you

25  knew of the facts, based on the Saudi article, at that time,

1    when you saw it?

2    **A**    Yeah, it seemed to me he was trying to inform the market

3    fully.  Because we now had this -- you know, A, the story could

4    go any way, it could have been the Saudis were trying to buy

5    the company with General Motors or something, which would have

6    been bad for Tesla.  That's kind of the first thing I thought.

7          And the second thing was that he was just -- he was trying

8    to fully inform the market, so everyone had the same

9    information.  Now, this is the Reg FD issue that we talked

10   about in the board meeting.  So he's sending this out, you

11   know, trying to describe the state of play at the moment.

12   **Q**    Well, but didn't you and the lawyers in the board meeting

13   on August 2nd discuss the hypothetical of what if the Kingdom

14   of Saudi Arabia, and there was a leak, and all of a sudden the

15   world knew?

16         Did you guys go over that potential hypothetical?

17   **A**    No.

18              **MS. TRIPODI:**  Objection, Your Honor.

19              **THE COURT:**  Overruled.

20   **BY MR. SPIRO**

21   **Q**    Did you review that hypothetical?

22   **A**    No.  We had -- we did not foresee that this leak would

23   occur.

24   **Q**    And were you with Mr. Musk when he made that split-second

25   decision?

GRACIAS - CROSS / SPIRO

1  **A**    You mean to send the tweet?

2  **Q**    Yeah.

3  **A**    No.  I wasn't even in the same city.

4  **Q**    Now, I'm going to show the witness a few exhibits that are

5  in evidence, very quickly.

6         **MR. SPIRO:**  Exhibit 41.

7     (Document displayed)

8         **MR. SPIRO:**  If we could highlight the "SAMA investment

9  news being broken by FT seems like the catalyst for him to

10  tweet this."

11     (Document highlighted)

12         **MR. SPIRO:**  Does everybody have that up on the screen?

13     (Members of the Jury respond affirmatively)

14  **BY MR. SPIRO**

15  **Q**    Okay.  This is an email from somebody named Joe Fath.  Do

16  you see that?

17  **A**    Yes, I do.

18  **Q**    Did you agree with that?

19  **A**    Yes, I do.

20         **MS. TRIPODI:**  Objection.  Foundation, Your Honor.

21         **THE COURT:**  Sustained.

22         **MR. SPIRO:**  I'm asking him if he agrees with the

23  sentence that the FT seems like the catalyst for the tweets.

24  That's all I'm asking.

25         **MS. TRIPODI:**  Same objection, Your Honor.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Yes, I do.

 3   BY MR. SPIRO

 4   Q    Okay.  And then it says (As read):

 5              "I can't believe -- I don't think he would

 6              tweet this if it was not the truth."

 7              MR. SPIRO:  Can you highlight the word "truth"?

 8        (Document highlighted)

 9   BY MR. SPIRO

10   Q    Based on everything that you knew at the time -- those

11   board meetings, Sam Teller, Deepak Ahuja, the conversations --

12   was this Mr. Musk announcing the truth to the market?

13   A    Yes, it was.

14   Q    Exhibit 44.

15        (Document displayed)

16   Q    This is an email from a guy named Joe Fath (As read):

17              "Company is reaching out to their large

18              holders now and good chance I get a call from

19              Elon directly later in the week."

20              MS. TRIPODI:  Objection.  Foundation, again.

21              MR. SPIRO:  It's in evidence.

22              THE COURT:  Well, but what --

23              MR. SPIRO:  I haven't asked the question yet.

24              THE COURT:  What's the question?

25              MR. SPIRO:  Sure.  The question is:
```

1  BY MR. SPIRO

2  **Q**   Did you expect that after the market knew everything that

3  was announced on the 7th, that Mr. Musk would reach out to

4  shareholders at large about the potential to roll their shares?

5  **A**   Yes, I did.  I mean, the Reg FD problem is now over.  It's

6  fully disclosed in the marketplace, he's considering taking the

7  company private.

8  **Q**   And just to make this clear one last time, even if before

9  the "Am considering" tweet Mr. Musk had called one shareholder,

10  three shareholders, seven shareholders, he would not have still

11  known exactly what the percentages were, or exactly how much

12  money was needed, right?

13  **A**   That's correct, yes.

14  **Q**   All right.  You'd have to announce it to everybody, and

15  speak to everybody.  Right?

16  **A**   Yes.  And get feedback, yes.

17       **MR. SPIRO:**  Last exhibit on this topic, Exhibit 42.

18  BY MR. SPIRO

19  **Q**   It's an email from a guy named Joel Grant.  And it says,

20  in one sentence (As read):

21          "If the bet here is whether Elon is serious

22          about taking this private then I think he is

23          definitely serious."

24       And if people in the market were betting on whether or not

25  Elon Musk was serious, was he serious?

**GRACIAS - CROSS / SPIRO**

1    **A**    He was very serious, yes.

2    **Q**    And by the way, if somebody later had a fight, you know,

3    in the months after this time period with Tesla about

4    something, and sold their shares, would that have been a good

5    bet?

6    **A**    That would have been a terrible bet.  I mean, the stock

7    price I think is probably --

8            **MS. TRIPODI:**  Objection.

9            **THE WITNESS:**  -- 10 to 1 from here.

10   **BY MR. SPIRO**

11   **Q**    Now, I want to show you just quickly Exhibit 10.

12       (Document displayed)

13   **Q**    Was it common for Mr. Musk to interact with his -- the

14   retail everyday shareholders on Twitter?

15   **A**    Yes.  It's one of the reasons he used Twitter.  He

16   believes in being open to small shareholders.  And that's how

17   he does it.

18   **Q**    Okay.  So can small shareholders, you know -- you know,

19   me, could I -- could we randomly email Mr. Musk or, or, you

20   know, send somebody to an investor meeting, versus contacting

21   him on Twitter?

22       What was his view on that at the time?

23   **A**    I mean, you probably would not get a response, an investor

24   meeting or on -- in an email, but in Twitter he would respond

25   to people because everyone would see it.  So it wouldn't be

1    one-on-one communication.  It would be multiple, to everyone.

2    We wouldn't have the Reg FD problem.

3         MR. SPIRO:  I'm now going to show the witness

4    Exhibit 12.

5         (Document displayed)

6         MR. SPIRO:  And this is the blog post.  Again, we're

7    still on August 7th.

8    BY MR. SPIRO

9    Q    And you were asked some questions about, looking at the

10   tweet, "Investor support confirmed, only reason why..." tweet?

11   A    Yes.

12   Q    Did you understand that you were supposed to read the

13   tweet with what was attached to it, the blog post, together?

14   A    Yes, of course.  The tweet is like the headline for the

15   blog post.  But you've got to read the blog post to gather

16   information, or you won't be able to inform -- a tweet is,

17   like, I don't know, 40 or 50 characters; you can't capture all

18   the stuff in it.  So they're attached, so you read both.

19   Q    In this tweet and blog post together, does Mr. Musk

20   indicate that there are many other contingencies besides a

21   shareholder vote?

22   A    He does, yes.

23   Q    Okay.  So when you read the "Only reason why this is not

24   certain, that it's contingent on a shareholder vote" with the

25   blog post, and understanding in this entire framework that

```
 1   Mr. Musk is just considering all of this, and, quote, "A final

 2   decision has not been made yet," how did you interpret it as a

 3   whole?

 4           MS. TRIPODI:  Objection, leading.

 5           THE COURT:  Sustained.

 6   BY MR. SPIRO

 7   Q    How did you interpret the combination of the tweet and the

 8   blog post?

 9   A    I mean, they should be read together.  He's saying: Look,

10   I haven't made my final decision.  He gives a price here, and

11   then he goes through all the things that he thinks need to

12   happen.

13        His tweet was like the headline, the thing he thought was

14   most important, which to him is the shareholder vote.

15   Q    Did you -- knowing everything that you knew at the time,

16   did you believe that the blog post was truthful and accurate?

17   A    I did, yes.

18   Q    Following the "Am considering" tweet and the events

19   on the 7th -- you were shown board minutes on the same day,

20   Exhibit 89.

21        (Document displayed)

22   Q    Did you and Tesla continue to meet?

23   A    Yes, we did.

24   Q    Exhibit 130.

25        (Document displayed)
```

1  Q    You were shown this exhibit.  And Mr. Gracias, was this

2  you and the other board members' first statement on the issue?

3  A    Yes, it was.

4  Q    Okay.  And I don't know if you remember the questions.

5  You were being criticized that it was only three sentences.  Do

6  you remember those questions?

7  A    I do remember those questions, yes.

8  Q    Do you believe that you did anything wrong in this

9  announcement?

10  A    Not at all.  We had already talked to our lawyers and, um,

11  gotten advice to make a short statement that we were putting a

12  process in place to analyze and complete the deal if it went

13  forward.

14      And the -- we are not the buyers here.  I mean, we were

15  simply responding to whatever the buyer is doing.  That is what

16  we were doing here.  And we -- we said here, we're putting a

17  process in place to evaluate next steps.

18          MR. SPIRO:  If we could put up quickly and enter into

19  evidence Exhibit 798.  I don't think there's an objection.  I

20  would offer this into evidence.

21      (Document displayed to the Witness)

22  BY MR. SPIRO

23  Q    Fair to say that by August 8th, you were continuing to

24  speak to potential advisers and consultants on the deal?

25  A    Absolutely.  We were full steam ahead, hiring lawyers,

**GRACIAS - CROSS / SPIRO**

```
 1  trying to understand the Delaware process, the best process and
 2  talking to advisers.
 3            MR. SPIRO:  Exhibit 53 --
 4            THE COURT:  Are you -- have you moved this in evidence
 5  formally?
 6            MR. SPIRO:  Yes, if I did not say that, we are
 7  formally moving this into evidence.
 8            THE COURT:  All right, admitted.
 9       (Trial Exhibit 798 received in evidence.)
10            MR. SPIRO:  Exhibit 53.
11  BY MR. SPIRO
12  Q    Before market opens on the Monday, Tesla issues another
13  blog post.  You were asked about this.
14       (Document displayed)
15  Q    And it says (As read):
16            "I left the July 31st meeting with no
17            question that a deal with the Saudi sovereign
18            fund could be closed."
19       Do you see that?
20  A    Um -- no.  Could you highlight it, please.
21            MR. SPIRO:  If you could highlight that sentence, it's
22  two paragraphs down.
23       (Document highlighted)
24            THE WITNESS:  I'm a few paragraphs up.
25            MR. SPIRO:  Sure.  I'm going to repeat it again.
```

1  **BY MR. SPIRO**

2  **Q**    It says a bunch of things.  But for the sake of time

3  (As read):

4              "I left the July 31st meeting with no

5              question that a deal with the Saudi sovereign

6              fund could be closed, and it was just a

7              matter of gettings the process moving."

8      Was that consistent with what Deepak Ahuja told you on

9  August the 2nd?

10  **A**    Yes, it was.

11  **Q**    Having reviewed this blog post, did you believe anything

12  in this blog post was inaccurate or untruthful?

13  **A**    I did not, no.

14  **Q**    Now, you mentioned that *New York Times* story that came

15  out.

16      (Document taken off display)

17  **Q**    And I entered this into evidence, Exhibit 171.  And I take

18  it you remember this article.

19      (Document displayed)

20  **A**    Yes, I remember it.

21  **Q**    And what was your reaction to this article?

22  **A**    Concern.  Um, you know, this was a description of his

23  mental state, at some level.  And it was concerning.

24      And then also we had lots of, you know, board members

25  concerned, shareholders concerned, et cetera.  It was

1    concerning.

2    **Q**    In this article, after you get past the headline and all

3    of the stuff about what's going on with Mr. Musk, there's a

4    phrase in this article that says "Funding was far from

5    secured."

6         Do you disagree with that characterization in the article?

7    **A**    I do.  And I don't think Elon said that to them.  I think

8    they're just saying this randomly, and there's no -- it's not

9    him saying it; it's the *New York Times* reporter just putting

10   this in an article.  And it wasn't true.  There's lots of stuff

11   written about Tesla that isn't true.  This was not true.

12   **Q**    Throughout this entire process we've been talking about

13   today, do you, sir, feel that you always did what was right?

14   **A**    Yes.  The best we could.

15   **Q**    And throughout this entire process, did you always act in

16   good faith?

17   **A**    Yes.  Absolutely.

18        **MR. SPIRO:**  I have no further questions for this

19   witness at this time.

20        **THE COURT:**  Thank you.  Redirect?

21        **MS. TRIPODI:**  Thank you, Your Honor,.

22                    <u>**REDIRECT EXAMINATION**</u>

23   BY MS. TRIPODI

24   **Q**    Mr. Gracias, I just have a few follow-up questions.

25   **A**    Please.

GRACIAS - REDIRECT / TRIPODI

1   Q    So during your examination by counsel for defendants, you

2   were mentioning the distinction between Mr. Musk as bidder and

3   Tesla, the company, as recipient of his offer.  Is that

4   correct?

5   A    Buyer and seller, yes.

6   Q    And you're very familiar with Delaware corporate laws

7   regarding keeping things separate from a buyer and the company

8   in the context of a going-private transaction.  Correct?

9   A    Well  --

10           MR. SPIRO:  Objection, vague.

11           THE WITNESS:  Yeah, it's super vague.

12           THE COURT:  Maybe you can be more specific.

13           MS. TRIPODI:  Sure.

14  BY MS. TRIPODI

15  Q    Let me ask you a specific question.

16       So were you aware on August 7th that Tesla, including

17  Sarah O'Brien, Deepak Ahuja and Todd Maron, that they had

18  drafted the blog post that Mr. Musk posted with his tweet that

19  was Exhibit 13?

20  A    No, I don't remember -- I don't remember that.  But -- I

21  don't remember either way.

22  Q    And in your mind, if Mr. Musk was acting as the bidder

23  here, was it appropriate for Tesla and Tesla employees to draft

24  communications on his behalf?

25           MR. SPIRO:  Objection, relevance to -- you know, this

**GRACIAS - REDIRECT / TRIPODI**

 1   isn't a trial about corporate resources.

 2         **THE COURT:**  Overruled.

 3      You can answer the question.

 4         **THE WITNESS:**  I don't think it matters.  This is a

 5   friendly deal.  We agreed to coordinate communications.  And

 6   whether they drafted it for him and he finished it is

 7   irrelevant.  He's the one who put it out.  It's over his cover.

 8      It's not a Tesla -- it's not -- Tesla can't buy itself.  I

 9   mean, whether he had them draft it or not, it doesn't matter.

10   **BY MS. TRIPODI**

11   **Q**   So, a similar question.  If Mr. Musk was acting as a

12   bidder, and almost a week later Todd Maron, Tesla's general

13   counsel, was helping him to draft the August 13th blog post,

14   was there any sort of conflict there between Mr. Musk as bidder

15   and Tesla?

16   **A**   No.  Again, this is a very friendly transaction.  We're

17   coordinating communications.  It would make sense that we would

18   even -- I don't know who did what, but we review these things.

19   I don't think so, no.

20   **Q**   Finally, you had talked about a process that would need to

21   be followed, and you were referring to a Delaware process.  Is

22   that correct?

23   **A**   Correct.

24   **Q**   And that's in the context of a management-led buyout of a

25   company, correct?

**PROCEEDINGS**

1   **A**    Any take-private, whether it's management-led or not,

2   would have a Delaware process, yes.

3        (Reporter clarification)

4   **A**    Any take-private transaction, whether management-led or

5   not, would have a process to be followed in Delaware.

6   **Q**    And you've testified that you were aware of what that

7   process is.  Correct?

8   **A**    I would say I'm not an expert, but I was aware there was a

9   process, and we had to go get lawyers who knew how to do it.

10  Yes.

11  **Q**    And regardless of how informal or unconventional as a

12  businessman Mr. Musk is, is it fair to say that he was likely

13  not a stranger to this corporate process?

14  **A**    I mean, he had been through an acquisition before that

15  Delaware law applied to, yes.

16        **MS. TRIPODI:**  No further questions, Your Honor.

17        **MR. SPIRO:**  All right.

18        **THE COURT:**  Anything on recross?

19        **MR. SPIRO:**  No, Your Honor, thank you.

20        **THE COURT:**  All right.  Mr. Gracias, you can step

21  down.

22       This witness is excused.

23       Well, you've got eight minutes.

24        **THE WITNESS:**  Thank you very much.

25        **THE COURT:**  Thank you.

**PROCEEDINGS**

1     (Witness excused)

2          **THE COURT:**  Do we have time to get started?

3          **MR. PORRITT:**  The next witness --

4     (Off-the-Record discussion between counsel)

5          **MR. PORRITT:**  So we have somewhat unexpectedly

6     finished seven minutes early, an encouraging trend.  We do not

7     have another live witness.  The next witness is potentially

8     another video witness.  We could start that video, which not

9     ideal.

10          But in scheduling of witnesses, we have witnesses coming

11    in for this Friday.

12          **MR. SPIRO:**  Can we approach briefly at sidebar?

13          **THE COURT:**  Okay.

14     (Sidebar discussion held off the Record)

15          **THE COURT:**  All right.  Well, now it's five minutes,

16    so we are just going to call it a day.  Especially since you've

17    volunteered to stay a little extra on Friday, as I understand

18    it, you all have expressed a willingness to stay up until 3:30,

19    so we can get some witnesses in.  So thank you for that.  I

20    appreciate that.  So, we'll let you go a little bit early

21    today.

22          Tomorrow is your day off, and we will see you on Friday

23    morning.  And, you remember my admonition, I don't have to give

24    it again.  But, again, please avoid any reading of anything

25    about this case or hearing about this case, and keep yourself

 1   insulated from any information about this case, except what

 2   happens here in this courtroom.

 3        So, have a great day.  See you on Friday.

 4        **THE COURTROOM DEPUTY:**  All rise for the jury.

 5        (Jury excused)

 6        (The following proceedings were held outside of the

 7   presence of the Jury)

 8        **THE COURT:**  All right.  Off the record.

 9        (Off-the-Record discussion)

10        **THE COURT:**  Let's go back on the record.

11        All right.  Just to make the record clear, we have been

12   discussing off the record who's going to appear tomorrow (sic).

13   And plaintiff has indicated video Brinkman, Durban, Dees, Buss,

14   and Denholm are the likely witnesses.

15        Mr. Spiro --

16        **MR. SPIRO:**  You know, it is my nature, Your Honor, if

17   I hear the word "agree," I'm just going to keep putting on the

18   record things that I think are very important objections.  And

19   we're obviously not agreeing to the Brinkman deposition and

20   exhibits, as we've stated.  And I think the need to continue to

21   make that objection is necessary.

22        So we have met and conferred as to the timestamps, but

23   this is not under agreement.  It's over our objection.

24        **THE COURT:**  Right.  No, I -- I understand that.  And I

25   think I ruled on the Brinkman objections, so those rulings

**PROCEEDINGS**

1    stand.  But if you can --

2         **MR. PORRITT:**  To be clear, all our agreements are

3    subject to reservation of objections, as previously stated.

4         **THE COURT:**  I understand that.

5         **MR. PORRITT:**  Yeah.

6         **THE COURT:**  Any agreement in terms of what is actually

7    presented to the jury does not waive any objection that had

8    been previously made.  That's still relevant.

9         **MR. PORRITT:**  Correct, Your Honor.

10        **THE COURT:**  All right.

11        **MR. SPIRO:**  Thank you, Your Honor.

12        **MR. PORRITT:**  Thank you, Your Honor.

13        **THE COURT:**  So do I have all your evidentiary

14   objections relative to these five or six witnesses?  I think I

15   have, right?

16        **MR. PORRITT:**  I believe so, Your Honor.

17        **MS. TRIPODI:**  (Nods head)

18        **MR. PORRITT:**  Yes, I think they are all disclosed some

19   time ago.

20        **THE COURT:**  All right.  Thank you.

21        **MR. PORRITT:**  Thank you.

22        **THE COURTROOM DEPUTY:**  Court is adjourned.

23        (Proceedings concluded)

24

25

# <u>I N D E X</u>

Wednesday, January 25, 2023 - Volume 6

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| | | |
| **AHUJA, DEEPAK** | | |
| (SWORN) | 1131 | 6 |
| Direct Examination by Mr. Apton | 1132 | 6 |
| Cross-Examination by Mr. Rossman | 1169 | 6 |
| Redirect Examination by Mr. Apton | 1213 | 6 |
| | | |
| **FATH, JOSEPH** | | |
| By Videotape Deposition (not reported) | 1220 | 6 |
| | | |
| **GRACIAS, ANTHONY JOSE** | | |
| (SWORN) | 1222 | 6 |
| Direct Examination by Ms. Tripodi | 1223 | 6 |
| Cross-Examination by Mr. Spiro | 1246 | 6 |
| Redirect Examination by Ms. Tripodi | 1283 | 6 |

# <u>E X H I B I T S</u>

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 39 | | 1127 | 6 |
| 40 | | 1127 | 6 |
| 41 | | 1127 | 6 |
| 42 | | 1127 | 6 |
| 44 | | 1127 | 6 |
| 46 | | 1127 | 6 |
| 47 | | 1127 | 6 |
| 78 | | 1133 | 6 |
| 79 | | 1136 | 6 |
| 82 | | 1149 | 6 |
| 84 | | 1153 | 6 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 86 | | 1154 | 6 |
| 89 | | 1166 | 6 |
| 89 | | 1237 | 6 |
| 92 | | 1208 | 6 |
| 130 | | 1239 | 6 |
| 321 | | 1135 | 6 |
| 337 | | 1165 | 6 |
| 503 | | 1162 | 6 |
| 798 | | 1281 | 6 |
| 802 | | 1256 | 6 |

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Wednesday, January 25, 2023