Volume 7

Pages 1292 - 1532

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES            )
LITIGATION.                             ) No. 18-cv-04865-EMC
_____  )
                                        San Francisco, California
                                        Friday, January 27, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:

                LEVI & KORSINSKY, LLP
                1101 30th Street NW
                Suite 115
                Washington, D.C.  20007
      BY:  **NICHOLAS IAN PORRITT, ESQ.**
           **ELIZABETH K. TRIPODI, ESQ.**
           **ALEXANDER A. KROT, III, ESQ.**

                LEVI & KORSINSKY LLP
                75 Broadway
                Suite 202
                San Francisco, California  94111
      BY:  **ADAM M. APTON, ESQ.**
           **ADAM C. MCCALL, ESQ.**

                LEVI & KORSINSKY LLP
                55 Broadway
                10th Floor
                New York, New York  10016
      BY:  **MAX EDWARD WEISS, ESQ.**
           **KATHY AMES VALDIVIESO, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
             **DEBRA L. PAS, CSR 11916, CRR, RMR, RPR**
             Official Reporters, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants:

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        51 Madison Avenue
        22nd Floor
        New York, New York  10010
    BY:  **ALEXANDER B. SPIRO, ESQ.**
        **ANDREW JOHN ROSSMAN, ESQ.**
        **PHILLIP B. JOBE, ESQ.**
        **ELLYDE R. THOMPSON, ESQ.**
        **JESSE A. BERNSTEIN, ESQ.**

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        865 South Figueroa Street
        10th Floor
        Los Angeles, California  90017
    BY:  **MICHAEL T. LIFRAK, ESQ.**
        **ANTHONY P. ALDEN, ESQ.**
        **MATTHEW ALEXANDER BERGJANS, ESQ.**
        **WILLIAM C. PRICE, ESQ.**

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        555 Twin Dolphin Drive
        Fifth Floor
        Redwood Shores, California  94065
    BY:  **KYLE K. BATTER, ESQ.**

For Egon Durban and Silver Lake Partners:
        DEVEBOISE & PLIMPTON
        801 Pennsylvania Avenue, N.W.
        Washington, D.C.  20004
    BY:  **JULIE M. RIEWE, ESQ.**

PROCEEDINGS

**Friday, January 27, 2023**                              **8:20 a.m.**

                    P R O C E E D I N G S

 1      (The following proceedings were held outside of the
presence of the Jury)

            THE COURTROOM DEPUTY:  All rise.  Court is now in
session, the Honorable Edward M. Chen is presiding.

            THE COURT:  Have a seat, everyone. Good morning.

            MR. PORRITT:  Good morning, Your Honor.

            MS. TRIPODI:  Good morning, Your Honor.

            THE COURTROOM DEPUTY:  Court is calling the case In
Regarding Tesla Securities Litigation, Case No. 18-4865.
Counsel, please state your appearances for the record,
beginning with plaintiff.

            MR. PORRITT:  Good morning, Your Honor.  Nicholas
Porritt of Levi & Korsinsky on behalf of the plaintiff and the
class.

            THE COURT:  All right, good morning, Mr. Porritt.

            MR. PORRITT:  Good morning.

            MR. SPIRO:  Good morning, Your Honor.  Alex Spiro,
Quinn Emanuel, on behalf of the defendants.

            THE COURT:  All right.  Good morning, Mr. Spiro.

      So we have a few things we need to address.  Well, first
of all, we're still -- you know, there are major problems with
transportation this morning, with BART being down.  So we have
got our fingers crossed.  There are three jurors from East Bay

 1    who are normally here early, but -- they haven't emailed us,

 2    but hopefully they'll get here.  So there may or may not be a

 3    delay.  But anyway, that's what's going on on that front.

 4        Two, I think we should address the question of Mr. Arnold

 5    and the emergency motion.  Seems to me that I have a rule that

 6    you have to identify witnesses two days in advance, and that

 7    wasn't done.  So the idea of compelling him to come here today,

 8    that's a tough sell.

 9        **MR. APTON:**  Well, Your Honor, we identified him and we

10    disclosed him and we worked with defendants to coordinate.

11    They wanted to get Mr. Gracias in; we accommodated their

12    request.  We pushed video depositions to the back of the line.

13    And then we have additional time, which we are appreciative of.

14        **THE COURT:**  And that additional time was known to the

15    parties, I even raised it in front of the parties with the jury

16    Monday afternoon, said:  Please check.

17        Came back Tuesday, said yes.  So you knew as of Tuesday

18    you had the extra time.

19        **MR. APTON:**  Was it not Thursday that we found out?  Or

20    Wednesday, Your Honor?  I don't quite recall which day, but

21    nonetheless, once we found out we had additional time we then

22    responded to their motion, defendants' motions to strike or

23    exclude Mr. Arnold and we said:  No, no, no, we don't want to

24    exclude him, we want to call him, and we're going to call him

25    on Friday.

1          THE COURT:  So what's the problem with calling him on

2    Tuesday?

3          MR. APTON:  It is just pushing witnesses of out of

4    order.  If Your Honor is of that mind, then we will call him on

5    Tuesday.  But we think he is important; he should be here.

6    He's under subpoena.  I don't understand why defendants let him

7    go from the subpoena, especially --

8          THE COURT:  He is still, in my view, subject to the

9    subpoenas of this Court.  But the question is, can you call him

10   on such short notice?  And the answer is no.

11       So I'm going to allow you to call him and summon him for

12   Tuesday because that complies with my two-day rule.

13         MR. APTON:  Okay.

14         THE COURT:  But I never released him.  It takes a

15   court order to release somebody from a subpoena.  As far as I'm

16   concerned, I excused him.  That's why I said "Witness is

17   excused."

18         MR. APTON:  I appreciate that, Your Honor.

19         MR. SPIRO:  So we understand the Court's ruling as to

20   today.  Just to be very clear, he was a junior person in the PR

21   department of Tesla, hasn't worked there in approximately half

22   a decade.  We don't have him under lock and key.  If they want

23   to subpoena him, they can subpoena him.

24       I'm at a loss -- he was originally scheduled to testify on

25   the 20th.  He took a day off of work, then another, then

**PROCEEDINGS**

1    another.   They then supplemented their witness list and told us

2    they weren't calling him and gave us a list until the end of

3    trial.   Forget just the Court's rules.   This, this young person

4    has now been out of work and has been told as a third-party

5    witness that he wasn't going to be testifying.   We didn't do

6    that unilaterally, we did that on their representation.   They

7    also, as the Court knows, we filed a motion saying this is

8    cumulative, it's only for a rank hearsay purpose, if any

9    purpose.   They didn't even respond to that.

10       The reason they didn't respond to that, Your Honor, when

11   they are responding to every other motion and every other thing

12   in realtime is because exactly what it shows, which is that

13   they weren't going to call him.   They told us they weren't

14   going to call him.

15       So I don't understand this sort of belated -- we're

16   already way over on what their case was supposed to be.   What's

17   going to happen here, Your Honor, is the defendants are going

18   to be prejudiced by the delay.

19       And again, I appreciate and I see very much how hard the

20   Court and everybody, frankly, that works alongside the Court

21   has been working, and I genuinely mean that.   But what ends up

22   happening in these situations, because I've done this a few

23   times, is because the plaintiffs are going so far over and

24   putting in cumulative evidence -- again, evidence that we think

25   is rank hearsay -- what ends up happening because the Court is

PROCEEDINGS

```
 1  mindful of the jury's time is the defendants end up being
 2  squeezed.  And the defendants have rights, and defendants --
 3         THE COURT:  Well, rights are determined by the hours I
 4  allocated, which are equal between the parties.  I don't know
 5  exactly what the number of hours left is, but it is dwindling
 6  for the plaintiffs.
 7         And, you know, the plaintiffs, if they are going to spend
 8  an excessive amount of time in their case-in-chief, that cuts
 9  down on their ability to conduct cross-examination in your
10  case, cuts down on their ability to have any kind of extended
11  closing.  That's why I gave a budget.  And so it works in a
12  self-policing way.
13         MR. SPIRO:  And I understand that.  And in many cases
14  and in some courts I understand that concept, and I understand
15  it here.  This does have some unique contours, though,
16  Your Honor.  Here we have many defendants, right, who could
17  very easily be represented by many different lawyers.  They
18  just happened to be -- and they all have a right to testify,
19  they all have a right to put for their defense.  And here we
20  have a very unique fact pattern that the Ninth Circuit has
21  addressed, where they actually have a burden of good faith.
22         And so what ends up happening is all of the sudden, people
23  who we don't believe -- and I think the evidence is going to
24  suggest -- have no business being in this case in the first
25  place, who have billions of dollars and reputational liability
```

1    on the line, are going to be squeezed into next, next, next,

2    next, five-minute increments, is the way this is heading.  And

3    I just think that is very unfair.

4        And what we are talking about on the other side -- and

5    that's -- you know, what in my judgment, of course, we should

6    be most concerned about, a defendant whose reputation and has

7    great risks and due process on the line versus what we're

8    talking about here, which is a belated disclosure, somebody

9    they clearly skipped over and told us they would skip over,

10   somebody who's clearly cumulative, who is being called for an

11   improper purpose.

12       And we don't think the Court should allow this.

13           THE COURT:  All right.  I will -- I will allow a short

14   discussion on the merits of what he is going to talk about and

15   the exhibits, but I'm not going to exclude somebody just

16   because, you know, the defendant doesn't think that the

17   plaintiffs are using their time effectively or using it in it a

18   way -- you have time, you have an equal amount of time to

19   respond.

20       I can't tell them:  Don't call more than X number of

21   witnesses, don't have witnesses come on for three minutes or

22   four minutes.  That is their prerogative.

23       So I'm more interested in what is Mr. Arnold going to say

24   and what's he here to testify to.

25           MR. APTON:  Thank you, Your Honor.  First, he is under

1  a subpoena, because we did serve a subpoena, the defense

2  counsel accepted the subpoena.  So I want to correct that for

3  the record.

4       **THE COURT:**  Let me make it clear.  There was no

5  withdrawal, and this Court did not quash or -- or withdraw the

6  subpoena.  So the subpoena's outstanding.  So that's -- that's

7  still a subpoena.

8       And the argument that they waived it by saying:  All

9  right, we're not going to call him for X days, you know, that

10 was for, like, a two-day period.  I'm not going to find a

11 waiver.  The subpoena stays in effect, period.

12      So let's get to the next issue.  What are you calling him

13 for?

14      **MR. APTON:**  Your Honor, he has testimony showing that

15 Tesla's corporate machinery was responding on behalf of Musk to

16 this tweet.  They, defendants, are making this argument that

17 Musk is a bidder and the company is separate and this is the

18 reason to cut off the imputation of scienter, which is now a

19 main focus point of this trial.

20      So, so long as we can show that there was no -- that Musk

21 was acting within his scope of authority as CEO using Tesla's

22 corporate machinery to respond to this tweet, that allows --

23      **THE COURT:**  That testimony you are trying to get in is

24 to show that through Arnold, Mr. Arnold, Tesla resources were

25 being used on Mr. Musk's behalf, even as a putative bidder as a

1    counterparty was being used to communicate with the Street?

2            MR. APTON:  Yeah, it directly contradicts this notion

3    that there was some delineation between Musk as bidder and the

4    company as I guess a seller, so to speak?  But that is just

5    Point One.

6            Point Two is that Dave Arnold has a lot to say about the

7    importance of "Funding secured" relative to the market as a

8    whole.  You have heard testimony on that.  But that is a very

9    important issue in this case.

10           THE COURT:  What is he going to say in that regard?

11           MR. APTON:  He is going to say the media was focused

12   on what's the funding, where's the funding coming from, is

13   funding secured, not this --

14           THE COURT:  No question as to materiality.

15           MR. APTON:  Yeah.

16           MR. SPIRO:  May I respond briefly, Your Honor?

17           THE COURT:  Yeah.

18           MR. SPIRO:  As to the first point, Mr. Musk and

19   Mr. Ahuja already testified regarding the blog post.  That is

20   why this witness is cumulative.  We're not going to say and I'm

21   not going to argue that the blog post and some of the PR wasn't

22   done by Tesla.  I've personally elicited testimony as to that

23   effect.  So that issue is not in dispute.  And because that

24   issue is not in dispute this is not a contested fact, nor is it

25   anything other than cumulative testimony.  So that's first.

1       Second, the other reason, purported reason for calling

2   this man is rank hearsay, yet again.  And all they're going to

3   testify is to what other people are saying.  That's, again, I

4   still don't understand it.  And I don't -- now we are talking

5   about a PR person.  At one point we were talking about an IR

6   person, and I understood the Court's preliminary rulings to be

7   that IR people and the people in the marketplace.  Now we're

8   talking about a man that is interacting with reporters.

9       It's -- it's like three levels of hearsay, it's completely

10  irrelevant, it's prejudicial.  And we would be objecting to any

11  testimony regarding that, anyway.

12      **THE COURT:**  Let me clarify something.  Is his

13  testimony what he heard from reporters?  Or what he heard from

14  investors and analysts?

15      **MR. APTON:**  What he was communicating to reporters,

16  what he's hearing from reporters in response to the company's

17  public statements.

18      Counsel is saying that all these facts are stipulated to,

19  they're not in dispute, they're not contested.  But what

20  they're not saying is they're not saying:  Okay we agree that

21  Musk was acting in his role as CEO.  If they want to stipulate

22  to that, then perhaps we don't need Mr. Arnold.  But I don't

23  hear them saying that.

24      **THE COURT:**  All right.  Address the second point.

25  If -- and if the exhibits were to bear this out, he's conveying

**PROCEEDINGS**

 1   lists of media reports, which in turn are based on, I take it,

 2   interviews with analysts or investors or experts, this sort of

 3   thing.

 4       Why isn't that now -- it's one thing if a group of

 5   investors went to the witness and said: What the heck's going

 6   on?  We had some of that.

 7       **MR. APTON:**  Uh-huh.

 8       **THE COURT:**  There were inquiries to -- I think it was

 9   Mr. Ahuja or whoever it was.

10       **MR. APTON:**  Yeah.

11       **THE COURT:**  What is this "Funding secured"?  And all

12   this sort of stuff.

13       **MR. APTON:**  Mr. Viecha, yeah.

14       **THE COURT:**  That came in.  But to say:  Well, here is

15   a list of newspaper articles, that adds an extra layer of

16   hearsay, seems to me.

17       I mean, if you want to introduce the articles, themselves,

18   through -- if you have an appropriate means to do that and show

19   that those were disseminated to the public and that is part of

20   the milieu that was out there, I suppose, but I'm not sure I

21   understand Mr. Arnold's role.

22       **MR. APTON:**  Your Honor, what Mr. Arnold does is he is

23   saying internally:  Hey, they want to know where the funding's

24   coming from; can we give them more information on this?  So it

25   shows that internally Tesla knew this information was material,

**PROCEEDINGS**

1   yet they did not disclose anything.

2       This is an important piece of our case for the jury to

3   hear.  It underscores the materiality, the importance of the

4   information, the "Funding secured" information, and it shows

5   that Tesla, notwithstanding the --

6           THE COURT:  So now you're talking about Tesla's state

7   of mind, in terms of knowing about potential materiality of

8   that particular phrase.

9           MR. APTON:  Yes, Your Honor.

10          THE COURT:  And that is relevant -- this is during the

11  class period?

12          MR. APTON:  Yes, Your Honor.

13          THE COURT:  And so that is relevant to what?

14          MR. APTON:  It shows that everyone, everyone involved

15  in this case -- the public, the reporters, even Tesla

16  internally -- knew this was very important information, that

17  there needed to be a -- a direct piece of news to come out to

18  cure this informational deficiency in the market.

19          THE COURT:  So this goes then to the Section 20

20  liability of a director, so they didn't take action in the face

21  of this, and didn't exercise their supervisory authority?

22  Because Musk's intent is -- at this the point, is kind of water

23  under the bridge.

24          MR. APTON:  Well, so, Your Honor, that leads to the

25  next issue before the Court.  It's not under the bridge because

**PROCEEDINGS**

1   defense counsel is claiming that he acted in good faith.  So we

2   need to counteract that notion, this narrative that's being

3   broadcast to the jury.

4        And so to the extent we can show that Musk knew

5   information was necessary, that Ahuja, that Tesla's top

6   executives knew information was lacking, that their disclosures

7   to date have been deficient, that underscores --

8        **THE COURT:**  So what you're now saying is his inaction

9   in the face of this known or possibly perceived materiality and

10  questions raised in the market was not adequate, and that

11  demonstrates bad faith?  Knowledge on his part?

12       **MR. APTON:**  It pushes back against this evidence or

13  testimony of non-culpable intent, which shouldn't be an

14  issue -- I agree with Your Honor, it should not be an issue,

15  but it has become such.

16       **THE COURT:**  All right.  Give you a brief chance to

17  respond.

18       **MR. SPIRO:**  I didn't really hear an answer to any of

19  the Court's questions.  Mr. Apton was sort of trying to come up

20  with an admissible purpose on the fly.  So I'm kind of shifting

21  between --

22       **MR. APTON:**  Can I just object, Your Honor?  This is

23  not proper.

24       **THE COURT:**  I'd like you just to respond to the

25  argument that this evidence is probative to both the state of

PROCEEDINGS

1   mind of Tesla as well as to Mr. Musk because it goes to their

2   awareness of urgent materiality that was being discussed in the

3   market and the need for information.

4        MR. SPIRO:  So, so, these emails don't even go to

5   Mr. Musk.  The emails that he's talking about.  They're

6   literally, as the Court was questioning, emails from Mr. Arnold

7   -- again, it's reporters,, as the Court just pointed out.  It's

8   their -- they're not a slice of the market, they're not

9   investors, they're not shareholders.  It's --

10       THE COURT:  It is going to others within the company.

11   Something like executives or something?

12       MR. SPIRO:  Okay.  So we'll move aside, because it

13   doesn't go to Mr. Musk.  To Tesla, if that's where the Court

14   wants to focus.  But again, Tesla's state of mind is not an

15   issue.  Doesn't go to the board.  So that, to me, ends that

16   analysis.

17       THE COURT:  Are you saying that there's an inference

18   that this information either went to Tesla -- I mean, Tesla's

19   board, who, that's whose scienter would be at stake, or and/or

20   Mr. Musk?

21       MR. APTON:  Well, so, Your Honor, because the jury

22   instructions are as they are now, there's no instruction on

23   corporate scienter.  It's just imputation of scienter from Musk

24   to Tesla.

25       The issue that we're facing here is defendants are

**PROCEEDINGS**

1     eliciting testimony suggesting that Musk did not act with a

2     culpable state of mind.  And so to the extent that we can have

3     evidence that pushes back against that narrative, we need to do

4     it.  And this is --

5          **THE COURT:**  And their response is there's no evidence

6     from the exhibits; Musk is not copied on this.

7          **MR. APTON:**  I -- I understand that, Your Honor.  But

8     nonetheless, it does give facts from which the jury can infer,

9     or discredit this good faith intent on the part of Mr. Musk.

10         **THE COURT:**  So it requires an inference that he likely

11     got word of this.

12         **MR. APTON:**  For Mr. Musk, directly?  Yeah.  Yeah.  And

13     it would support that, too.  If all of his executives are

14     receiving this?  I mean, Mr. Arnold is not some low-level line

15     worker.  He's the second person on this two-man IR team,

16     according to Mr. Viecha.  He's talking directly to Deepak

17     Ahuja, to Sarah O'Brien.  All these folks, all these folks that

18     were in direct contact with Mr. Musk on this particular issue.

19     The ones that wrote the blog post for Mr. Musk.

20         And Your Honor, you know, defendants have been on notice

21     of our intent to call Mr. Arnold for months.  They could have

22     filed a motion in limine, like we did with Sam Teller.  They

23     did not.  Only now, because they have six hours left, you know,

24     time is --

25         **THE COURT:**  Well in any event, I'm not going to

1    exclude his testimony.  If there are parts of it that you can

2    raise an objection during the course of his testimony, you can

3    do so.  But my view is that he's high up enough in the chain.

4    The emails went to people high up enough in the chain.

5        I think it also went to general counsel, is that correct?

6    Mr. Maron?

7            MR. APTON:  Yes, that's correct.

8            THE COURT:  And it went to everyone around him.  So

9    one could draw an inference -- the jury could draw an inference

10   that this was such a high-level discussion that they could find

11   that Mr. Musk -- it got Mr. Musk, even though there's not a

12   document that says that.  They could find that it went to some

13   or all of the board members, even though there is not a direct

14   document, as I understand, that says that.

15       So it's -- it's at a high enough level that a corporate,

16   corporate or individual awareness is inferable.  So it does go

17   to state of mind.

18           MR. PORRITT:  Thank you, Your Honor.  What would

19   Your Honor like to take up next?

20           THE COURT:  Well, there's this motion for a cautionary

21   instruction.  I understand your point, but I already gave a

22   mid-trial instruction that:  You may hear testimony, et cetera,

23   et cetera, that I've already found that the tweets were untrue,

24   but it could go to other issues such as knowledge, et cetera,

25   et cetera.

1    I don't see a need to do that again, because you're going

2    to get that instruction in the end.

3        **MR. APTON:**  Your Honor, if I may, what are we meant to

4    do?  Because the cautionary instruction Your Honor previously

5    gave talked about falsity.  And here, we've been hearing a lot

6    of testimony about state of mind.  Recklessness was found.  The

7    only issues for the jury to decide should be --

8        **THE COURT:**  Well, that's testimony that we heard from

9    various people:  Yeah I thought it was true, that was an

10   absolute true statement, blah, blah, blah.  That goes to their

11   state of mind.

12       **MR. APTON:**  That goes to their state of mind, but that

13   includes Mr. Musk.  And it also does include --

14       **THE COURT:**  I already instructed twice now.  At the

15   very beginning, and then I instructed again at your request,

16   midstream, after trial already started, which was an unusual --

17   it's not a typical course to do.  But I did that, exactly

18   because I thought that there's going to be some evidence, and

19   he was going to actually deny substantively, and there was

20   going to be evidence about who actually said what, and what was

21   accurate.

22       And I reminded the jury that evidence can come in not to

23   determine the truthfulness or not of the statement, but it may

24   go to other issues such as state of mind, good faith,

25   et cetera, et cetera.

1        **MR. APTON:**  So Your Honor, I just want to point out

2   when you initially gave that cautionary instruction, you did it

3   because you were worried, I believe -- or counsel was worried,

4   I should say, that jurors would say:  Oh, well maybe funding

5   was secured.  And after the past two days of testimony between

6   Mr. Musk, Ahuja and Gracias, I'm pretty certain that some

7   jurors are questioning:  Maybe funding was secured.

8        And that's a real problem, because we cannot -- Your Honor

9   has prevented us from saying "The Court has already found."

10  The Court is left with this instruction that they are to assume

11  falsity.  Nothing about state of mind yet.  And the more

12  evidence we get about Mr. Musk's good faith intentions, it

13  waters down that Court summary-judgment ruling on recklessness.

14       So the issue the jury should be deciding is:  Was this

15  recklessness or knowledge, knowing violation of the law?

16  Strictly for the purposes of this joint and several liability,

17  allocation of responsibility issue.

18       There should be no testimony about whether or not Musk

19  acted with a good intent or good non-culpable explanation for

20  his conduct.

21       **THE COURT:**  All right.  Response?

22       **MR. SPIRO:**  It's the same response that I gave last

23  time, which is all of this testimony is relevant; the witnesses

24  are allowed to testify truthfully to their state of mind.  A

25  witness is not forced into the corner of testifying

**PROCEEDINGS**

 1  untruthfully as to their own beliefs just because of some

 2  ruling.

 3      And this -- Mr. Musk's testimony is now days and days ago.

 4  You gave an instruction the day of his testimony.  Courts are

 5  loath to instruct juries mid-trial.  Their instruction is going

 6  to be coming before summations, and that's the way they should

 7  proceed.

 8      There also was no objection at the time, no request at the

 9  time.  All of that, if you look at it in context, is fair and

10  appropriate and truthful testimony from the witnesses.

11          MR. APTON:  Your Honor, I can't object --

12          THE COURT:  Well, that's one point.  You could ask for

13  a limiting instruction at some point.

14          MR. APTON:  Your Honor, we made a motion in limine on

15  this exact issue.  Your Honor denied it.  And I can't object

16  while a witness is on the stand because his testimony violates

17  the summary-judgment order.  I mean, I could do that, but --

18          THE COURT:  No.  You can ask for a limiting

19  instruction, that this witness's testimony about the truth and

20  accuracy only goes to his understanding, his state of mind,

21  et cetera, et cetera.

22          MR. APTON:  I assumed that that -- from the jury

23  instruction disputes that we have had, that were extensive, I

24  assumed that that was in place.  What we're asking for now is a

25  limiting or cautionary instruction that whatever happened in

**PROCEEDINGS**

1   the past few days is not taken as evidence of Mr. Musk's state

2   of mind, because it's already been decided.

3        **THE COURT:**  All right.  I'm not going to grant that

4   request at this juncture.  I've already given an instruction,

5   given it twice.  I'm going to give it again.  And the final

6   instruction, because of the way things worked out, will also

7   have an express instruction about recklessness.

8        If I hear testimony over the next three or four days that

9   I think compels a one more time, midstream instruction, I

10   reserve the right to do that.

11        **MR. APTON:**  So Your Honor, so we're clear on our side,

12   if we hear testimony that we think violates Your Honor's ruling

13   just now, how should we go about noting that objection?

14        **THE COURT:**  Well, if somebody testifies, for instance:

15   Yes, that tweet was accurate, the "Funding secured" was

16   accurate in my view, you can ask for an instruction that that

17   goes to state of mind, only.

18        **MR. SPIRO:**  Well, but I -- you're saying that if

19   somebody were to say: I'm looking at the words "Funding

20   secured" in isolation, and I'm testifying that I'm telling you

21   as some lay opinion that that is technically accurate...  If we

22   listen to that testimony, I would agree with the Court.

23        If a witness says:  I looked at all the information as a

24   whole, and I understood it to be consistent with the state of

25   affairs, I understood it to be accurate, I understood it to be

1   truthful in my own mind, what are we talking about --

2       **THE COURT:**  Well, if he says "in my own mind," yeah.

3       **MR. SPIRO:**  But a witness doesn't -- I think we're,

4   most respectfully, sort of torturing the way witnesses testify.

5   Witnesses don't say "in my own mind."  They're not testifying

6   as scientists or experts.  The person saying --

7       **THE COURT:**  Right.  But if it's phrased in a way that:

8   "Musk was right, he did everything right, and he knew it, and

9   his"... you know, he says something that goes to -- implies

10  more than "This was my opinion about whether this is correct,"

11  and begins to say something that opines on the ultimate fact,

12  for instance, or that as an absolute truth these matters were

13  truthful, all I'm saying is I'm going to listen to the

14  testimony.

15      If I think at some point it warrants an instruction -- and

16  I don't expect you to pop up every time.  It's going to have to

17  be something pretty severe.  Because I may deny it, you know.

18  I don't have to give a limiting instruction.  I may deny the

19  limiting instruction.  I'm going to have to hear it.  Yeah.

20      **MR. SPIRO:**  This testimony also obviously goes to

21  materiality.  But I don't want to leave this in an unsettled

22  state of affairs.

23      From my perspective -- and I've said this to the Court for

24  now quite some time -- I'm very concerned with -- I'm more

25  concerned than I've been in any case I have ever handled, about

**PROCEEDINGS**

1  the defendants getting a fair trial here.  So I'm left in a

2  position, in a situation where I've never -- I've never had

3  this experience before, frankly.

4      If they want to stand up and make an objection, I would

5  ask that we do this at sidebar.  Meaning I don't want this in

6  front of the jury, where they're standing up and saying

7  whatever they may say or may not say.  If they have an issue

8  and they want to bring it up right after witnesses' testimony,

9  nothing is more dramatic and prejudicial, frankly, to a

10  defendant than a judge, immediately after a witness's

11  testimony, issuing an instruction to a jury.

12      So what I don't want is this to now be some blessing of a

13  standing-up speaking objection, saying:  Yeah, Judge, can you

14  instruct everybody that the witness is telling a -- lying?

15      Mind you that we are on the plaintiff's case --

16      **THE COURT:**  So the answer to that, because I'm not

17  going to allow a speaking instruction, it'll be obvious to me.

18  You'll ask for a limiting instruction.  I'll either say

19  "Denied," or I may give a limiting instruction and say that

20  that testimony is taken for the purpose, as it goes to that

21  witness's understanding.  And that witness's state of mind or

22  somebody else's.

23      **MR. SPIRO:**  And if the Court is inclined to do

24  anything other than overrule it, I would be -- I'm making a

25  standing request to be heard at sidebar on this issue.  So I

PROCEEDINGS

 1   don't want to --

 2          THE COURT:  I don't take standing requests for

 3   sidebar.

 4          MR. SPIRO:  Okay, well --

 5          THE COURT:  If you have a specific one, you can do

 6   that.  You can always ask for a sidebar.  I don't always grant

 7   it.  And, but I'm already saying that, number one, I don't

 8   expect this to be launched every time somebody says something.

 9          MR. APTON:  No, Your Honor.

10          THE COURT:  Number two, it's not going to be a

11   speaking objection.  Otherwise, I'll shut that down.  I'm not

12   going to take any objection.

13       And three, I'll rule as I think it's necessary, and I may

14   not think it's necessary.  And if I do think it's necessary, it

15   will be a very succinct instruction.

16          MR. APTON:  Your Honor, when Mr. Musk was on the stand

17   he testified, "I was 100 percent truthful."  At that time, if

18   we're operating under these new rules, or these rules that

19   we're now discussing:  Objection, limiting instruction.  Is

20   that what Your Honor is suggesting?

21          MR. SPIRO:  Well, again, he's allowed to say that when

22   he said it, he believed it to be true.

23          MR. APTON:  No, he said "I was 100 percent truthful."

24          THE COURT:  In that instance, I would have denied the

25   motion.

PROCEEDINGS

1          **MR. APTON:**  He says it's factually --

2          **THE COURT:**  In that instance -- you're giving me now a

3      retrospective hypothetical -- I would deny the instruction

4      because it's obvious he is talking about his understanding.

5      And you can easily argue that and characterize that.

6          **MR. APTON:**  Understood, Your Honor.

7          **THE COURT:**  Okay?

8          **MR. APTON:**  Okay.

9          **THE COURT:**  All right.  In terms of other evidentiary

10     objections, in case you need to know, I have overruled -- find

11     my notes here -- By the way, I've got a feeling the jury's not

12     here.

13         Okay.  With respect to the two exhibits, I'm overruling

14     the objections with one exception.  At Page 160, Lines 2

15     through 17, I think that is a hearsay that I -- I don't think

16     there's an exception that applies.  Because this was after the

17     fact.  This was -- this was a message received on the 27th.

18         And so I think the state of -- any state of mind argument

19     is more difficult.  I understand it could be, but it seems to

20     me that Lines 2 through 17 are not proper, so I'm going to

21     sustain that objection.

22         With respect to all the other objections, the one that's

23     at issue is No. 614, and I'm going to sustain the objection as

24     to Pages 2 and 3, but allow the first page.

25         **MR. APTON:**  Your Honor, those are Pages 2 and 3 of

1   Exhibit 614?

2          THE COURT:   614.   That comes up twice, I guess, for

3   two witnesses.

4      Otherwise, all the objections are overruled.   And -- oh.

5   As to Mr. Egon, I'm going to sustain as to 178 on relevancy

6   grounds.   So 178 is also out.   And as far as Mr. Gracias,

7   that's water under the bridge at this point because those are

8   all mooted.

9          MR. PORRITT:   And one administrative or housekeeping

10  matter on Mr. Durban.   There are two exhibits which are his

11  text messages during the relevant time period.   They're 174 and

12  182.

13         THE COURT:   Was that on yesterday's list, or whose?

14         MR. PORRITT:   They're listed for Mr. Durban.   I can't

15  remember what day we initially disclosed them for Your Honor, I

16  apologize.   But they were in his -- the (Inaudible) matter is

17  just a --

18         THE COURT:   Okay, Durban, I see on day 6.   What

19  numbers?

20         MR. PORRITT:   Sorry.   174 and 182, Your Honor.

21         THE COURT:   174, there was no objection, according to

22  my table.

23         MR. PORRITT:   Yes, Your Honor.   So this involves

24  issues regarding confidentiality and redaction, Your Honor.

25         MS. RIEWE:   Your Honor --

PROCEEDINGS

```
 1              THE COURT:  Confidentiality and the what?
 2              MR. PORRITT:  And redacting.  So --
 3              THE COURT:  Oh.
 4              MR. PORRITT:  We've reached an accommodation with
 5     counsel for Silver Lake that for purposes of examination, both
 6     174 -- and I think 182 is on defendants' list -- may be used
 7     without restriction or without further redaction of the
 8     witness.
 9          We'll move their admission, but we'll later redact them.
10     We'll meet and confer over the weekend and we'll agree.
11     Because many of them -- it contained a lot of irrelevant and --
12     sometimes -- material, and so we'll meet and confer and agree
13     upon a version.
14              THE COURT:  This raises the redaction question.
15              MR. PORRITT:  Correct.
16              MS. RIEWE:  Thank you, Your Honor.  Julie Riewe from
17     Debevoise and Plimpton for Mr. Durban and Silver Lake.
18          So we appreciate the parties' accommodations on the large
19     text message exhibits.  That's 174 and 182.  We appreciate the
20     redactions for PII.
21          The question that we have and the concern we have today is
22     whether those large exhibits are going to be introduced as a
23     whole, as opposed to the pages that contain the particular
24     messages that the parties wants to show to the witness and the
25     jury.
```

PROCEEDINGS

1      You know, we would object to the entire document being

2    shown to the jury and to the Court and to the courtroom.

3    There's a lot of third-party information in those compendiums.

4    It's totally irrelevant, as the Court noted last week.  And so

5    we would ask the parties to limit it to the page that contains

6    the message that they want to show the witness.

7          THE COURT:  Let me find out.  What is the intent with

8    respect to its introduction in the courtroom?

9          MR. PORRITT:  So in terms of examining Mr. Durban, we

10    would only show and publish to the jury the pages with the

11    relevant -- as you've seen during the course of the trial we

12    would, of course, highlight the relevant text that we wish to

13    examine him on.  So we would move its admission, subject to

14    future redaction.

15          THE COURT:  So ultimately what's going to be admitted

16    is a fully-redacted document.  Correct?

17          MR. PORRITT:  Correct.  It will just have whatever the

18    parties, and working with counsel for Silver Lake, kind of

19    agree upon a version that can then be admitted as an exhibit

20    and also certainly uploaded to the District --

21          THE COURT:  So the only concern would be in showing

22    the witness and the jury and the gallery the documents.  Will

23    there be some PII or some other stuff that hasn't been redacted

24    that --

25          MR. PORRITT:  On today, but we'll be limiting it just

**PROCEEDINGS**

1   to the page for the relevant -- we'll be moving through and

2   highlighting relevant text messages.  So I don't think it's

3   going to be an issue.

4        We've got no interest, obviously, in irrelevant

5   information to the jury, so that's not going to be our intent.

6   But Mr. Price might have something.

7             **MR. PRICE:**  I would say, Your Honor, we have had

8   discussions, and we have blacked out specific things that

9   Silver Lake has asked us to.  And -- however, we will move the

10  entire document in, and then we can -- we can discuss offline

11  what Silver Lake thinks is not relevant.

12       Most of these texts are relevant to the go-private

13  transaction.

14            **THE COURT:**  Sure.

15            **MR. PRICE:**  We don't care for the jury to see things

16  that are totally irrelevant.  But today we're going to black

17  out the specific things that they asked.  But we'll move the

18  entire document in subject to --

19            **THE COURT:**  You'll move the entire document, but what

20  ultimately will be admitted is a redacted document.

21            **MR. PRICE:**  Yes.

22            **THE COURT:**  All right.  Well, sounds like even today

23  they're going to black out some stuff, some PII.

24            **MS. RIEWE:**  Yeah.  As long as it's blacked out.  We're

25  really concerned about today.  We understand we'll work with

 1   the parties after today to submit a redacted document.

 2           **THE COURT:**  Yeah.

 3           **MS. RIEWE:**  Just one other point.  Mr. Musk's text,

 4   Exhibit 121 --

 5           (Reporter clarification)

 6           **THE COURT:**  She wants you to slow down.

 7           **MS. RIEWE:**  Sure.

 8       Exhibit 121, which is Mr. Musk's texts, they have some of

 9   the same PII and redaction concerns.  They contain Silver Lake

10   information, just the contra side of the text messages.

11           **THE COURT:**  So the same treatment of 121?  Is that

12   going to come up today?

13           **MS. RIEWE:**  Correct.  I don't know if that's coming up

14   today; I don't think so.  But we would ask that the redactions

15   be mirrored in Mr. Musk's text.

16           **MR. PRICE:**  I think that was admitted into evidence,

17   and we did black out specific confidential informational that

18   Silver Lake requested.

19           **MS. RIEWE:**  Great.  Thank you.

20           **THE COURT:**  Has that -- that's the one -- we've been

21   waiting.  Have you all -- today was the day it was promised

22   that you'd have the jointly redacted thing that we could

23   actually post to our public server.

24           **MR. PORRITT:**  I think it's finally being delivered,

25   Your Honor.  I think we delivered it this morning.  Ms. Ayala

 1  will correct us if we're wrong.  But we have been working a lot

 2  with Silver Lake counsel, defendant counsel, to try to come up

 3  with an agreed-upon version of 121.

 4          **THE COURTROOM DEPUTY:**  Yes.

 5          **THE COURT:**  Okay.

 6          **MR. PORRITT:**  Last remaining point, Your Honor.

 7  Sorry, I appreciate, I understand we're already 50 minutes

 8  late --

 9          (Reporter clarification)

10          **MR. PORRITT:**  One last point is, in light of the extra

11  time today, so we provided notice about Mr. Arnold, and then

12  also Steve Heston, our expert who will be next in our list, if

13  we get time today.  We don't know if we will or not.  But, he

14  is sort of next in the pipeline.

15          I understand defendants object.  This is -- there were no

16  exhibits.  I think it's is very unlikely we'll even finish his

17  direct examination today, unless -- it's very unexpected.

18          **MR. SPIRO:**  If we're not beginning cross today, in the

19  spirit of expediency, you know, I defer to the Court on that.

20          One final thing, and then we'll obviously sit down,

21  eventually.

22          You know, I've made serial objections to certain things,

23  and I just want the Court to understand.  In the most recent

24  round of exhibits and the filings regarding Mr. Arnold, they

25  argued that we waived, even though we made the original

**PROCEEDINGS**

 1   objection, because then we didn't object again and again.   So

 2   I'm just going to tell the Court that I'm going to have to

 3   continue to make a record just to prevent that argument.

 4       Because, they made that argument explicitly after I

 5   understood --

 6           **THE COURT:**  And you've been doing that.  You say:

 7   Objection, Court need not rule because the Court -- or

 8   whatever.

 9           **MR. SPIRO:**  Right.  I'm just explaining to the Court

10   why I have to do that.

11           **THE COURT:**  Right.

12           **MR. SPIRO:**  Not because I want to.

13           **THE COURT:**  I understand.  I understand.

14       What do we know about the jurors?

15           **THE COURTROOM DEPUTY:**  I have all of them except for

16   one.  He's in a cab.  He should be here within the next five

17   minutes.

18           **THE COURT:**  Okay.  They are all here except one is in

19   a cab, took the extra effort to get here, and will be here

20   shortly.

21           **THE COURTROOM DEPUTY:**  Yes.

22           **THE COURT:**  So get ready to go.  We're going to start

23   in about five minutes.

24       (Off-the-Record discussion between the Court and Clerk)

25           **THE COURT:**  And now we are having a problem with the

**PROCEEDINGS**

1  audio feed to the public again, so our IT person is coming up,

2  so it may be more than three minutes.  As soon as we get that

3  squared away, we will start.

4         **MR. SPIRO:**  Thank you.

5         **THE COURT:**  And the first witness, just so I have my

6  ducks in order?

7         **MR. PORRITT:**  First witness will be Mr. Durban.

8         **THE COURT:**  Okay we'll be back shortly.

9     (Recess taken from 8:47 a.m. to 9:01 a.m.)

10    (The following proceedings were held outside of the

11  presence of the Jury)

12        **THE COURT:**  It's fixed; the jurors are here.  Have a

13  seat, everyone.  I think we should proceed.  Let's go retrieve

14  the jury.

15     So in the interest of transparency, I'll let you know that

16  I brought my favorite candy bar for the jurors, which I was

17  going to give them anyway since it's Friday, but I think they

18  will be especially awake, because it's a dark chocolate with

19  quinoa crunch, which is very healthy, got a lot of caffeine.

20  It's the adult healthy version of Nestle's Crunch.

21     But they were -- we need to thank them this morning

22  because some of them really had to go through a lot to get

23  here, but I think they're very dedicated, so...

24     (A pause in the proceedings)

25        **THE COURT:**  Oh, just to go on the record for a second.

1    As you may know, Vicky's time allotment for the depo, I

2  think it was the Brinkman depo was a little off from yours.

3  We're not accusing anybody of under-counting, but I think she

4  was at 49 minutes, and you all had 44, and it allocated the 44

5  between the parties.  But I have to go with the official

6  timekeeper.

7    So if you could let me know at some point the extra five

8  minutes, do you want to allocate it pro rata the same way you

9  did?  Or --

10    **THE COURTROOM DEPUTY:**  All rise for the jury.

11    (The following proceedings were held in the presence of

12  the Jury)

13    **THE COURT:**  All right.  Have a seat, everyone.

14    Well, good morning, members of the jury.  I understand

15  that the commute, especially for those of you coming from the

16  East Bay, was particularly difficult this morning.  And in

17  fact, some of my staff are still not here.

18    So, first of all, on behalf of the parties, as well as the

19  Court, let me thank you for your extra effort to get here.  So,

20  we really appreciate that.

21    So, with that said, luckily we did allocate a little extra

22  time today.  Again, thank you for that.  So what we should do

23  is pick up where we left off yesterday, which was we're still

24  in the plaintiff's case.  And the plaintiffs may call their

25  next witness.

1          **MR. PORRITT:**  Thank you, Your Honor.  Plaintiff calls

2    Egon Durban.

3          **MS. RIEWE:**  Mr. Durban's here, Your Honor.

4          **THE COURT:**  Great.  Thank you.

5      Why don't you come forward and take the stand, Mr. Durban.

6          **EGON DURBAN, PLAINTIFF'S WITNESS, SWORN**

7          **THE WITNESS:**  Yes.

8          **THE COURTROOM DEPUTY:**  Thank you.  Please have a seat.

9    Please speak clearly into the microphone.  State and spell your

10   first and last name for the record.

11         **THE WITNESS:**  Egon Durban.  E-G-O-N, D-U-R-B-A-N.

12         **THE COURT:**  All right.  Thank you, Mr. Durban.

13         **MR. PORRITT:**  And Your Honor, I have a binder for the

14   Court and for the witness.

15         **THE COURT:**  All right.

16         **MR. PORRITT:**  May I approach?

17         **THE COURT:**  Yes, you may.

18         **THE COURTROOM DEPUTY:**  Thank you.

19     (Binder handed up to the Court)

20     (Binder tendered to the Witness)

21         **THE COURT:**  Thank you.

22         **THE COURTROOM DEPUTY:**  You are welcome.

23                    **DIRECT EXAMINATION**

24   **BY MR. PORRITT**

25   **Q**    Good morning, Mr. Durban.

**DURBAN - DIRECT / PORRITT**

1    **A**    Good morning.

2    **Q**    You are currently employed with Silver Lake Partners, is

3    that correct?

4    **A**    Yes.

5    **Q**    Could you state your title at Silver Lake?

6    **A**    CEO and managing partner.

7    **Q**    And how long have you been employed at Silver Lake

8    Partners?

9    **A**    January, 1999.

10   **Q**    So almost 25 years?

11   **A**    Yes.

12   **Q**    Okay.  And prior to Silver Lake you were with Morgan

13   Stanley, isn't that correct?

14   **A**    Yes.

15   **Q**    Okay.  And you're a graduate of Georgetown University?

16   **A**    Yes.

17   **Q**    Okay.  Could you briefly tell us what Silver Lake Partners

18   is?

19   **A**    It's an investment firm, primarily private equity focused

20   on the technology and technology-enabled industries.

21   **Q**    Okay.  And as part of that public business, does it also

22   consider and participate in going-private transactions?

23   **A**    Yes.

24   **Q**    And in 2018, you were also managing partner of Silver Lake

25   at that time?

DURBAN - DIRECT / PORRITT

1   **A**   Yes.

2   **Q**   Okay.  And was one of the going-private transactions you

3   participated in the going-private transaction involving Dell?

4   **A**   Yes.

5   **Q**   Okay.  Now, briefly, in Dell -- or I'll go back a step.

6   Could you, again for the benefit of the jury, just briefly

7   describe what the going-private transactions involved that

8   you've been involved in?

9   **A**   I've been involved directly in overseeing SunGard, which

10  was done in 2005, and Dell Technologies.

11  **Q**   And those were public companies that went private, is that

12  correct?

13  **A**   Yes.

14  **Q**   And what does it mean for a company that's public to go

15  private?

16  **A**   It's a publicly-traded company and has listed shares that

17  has a stock price; you can pull it up on a computer or in the

18  newspaper.  And you end you delisting it, so you acquire all of

19  the shares and take it private.

20  **Q**   And in SunGard and Dell, did the company, after it went

21  private, retain any retail investors?

22  **A**   No.

23  **Q**   Are you aware of any going-private transaction where that

24  has occurred?

25  **A**   No.

DURBAN - DIRECT / PORRITT

1    **Q**    Now, you recall you had a telephone conversation with

2    Mr. Musk on the evening of August 6th, 2018?  Is that correct?

3    **A**    Yes.

4    **Q**    Okay.  Approximately how long was the telephone call?

5    **A**    I don't recall but if I had to estimate today -- I don't

6    recall specifically -- 30 minutes, plus or minus, something

7    like that.

8    **Q**    Okay.

9             **MR. PORRITT:**  At this point, if I could show to the

10   witness Exhibit 175, Your Honor.

11            **THE COURT:**  Okay.

12        (Document displayed to the Witness)

13   **BY MR. PORRITT**

14   **Q**    Do you see 175 in front of you?

15   **A**    Oh, great, yes.

16   **Q**    And it is also in your binder if --

17   **A**    Yes, I'll use the screen.  Perfect.

18   **Q**    Okay.  Do you recognize Exhibit 175?

19   **A**    Yes.  It's my handwriting.

20   **Q**    Okay.  Are these your handwritten notes taken during the

21   call with Mr. Musk on August 6th, 2018?

22   **A**    Um, yes.

23   **Q**    Okay.

24            **MR. PORRITT:**  At this point we would move to admit

25   Exhibit 175, Your Honor.

**DURBAN - DIRECT / PORRITT**

1      **MR. PRICE:**  No objection.

2      **THE COURT:**  All right.  Admitted.

3      (Trial Exhibit 175 received in evidence.)

4      **MR. PORRITT:**  We will publish these to the jury?

5      **THE COURT:**  Yes, you may.

6      (Document displayed)

7  **BY MR. PORRITT**

8  **Q**    And what was the purpose of your -- strike that.

9      Why was Mr. Musk calling you on August 6, 2018?

10  **A**    He was exploring an interest in the opportunity to take

11  Tesla private.

12  **Q**    And if you look at the top left-hand corner on

13  Exhibit 175, again, these are your notes?

14      Correct?

15  **A**    Yes.

16  **Q**    Okay.  And could you -- could you -- well, I guess I'll go

17  back.  What do you recall Mr. Musk telling you during that

18  conversation on August 6, 2018?

19  **A**    He -- he -- I mean, as you can see from the notes here, he

20  was interested in going private.  Being public was painful.  He

21  was spending a fair amount of time managing the business

22  through corporate, you know, sort of governance,

23  administration, and, you know, the things that are required to

24  be public including, you know, investor relations.

25      There was a lot of short positions in the company at the

1    time.  And he had spoken with Michael -- that's Michael Dell,

2    who took his company public -- or, sorry, took his company

3    private with Silver Lake back in 2013.  And he was prepared to

4    take the company -- or -- private.  Just to summarize.

5    **Q**    And these notes at the top left corner, do these reflect

6    the things that Mr. Musk said to you during the conversation?

7    **A**    Yes.

8    **Q**    Okay.  And you've got there, I see, the fourth point down,

9    "Public painful"?

10   **A**    Yes.

11   **Q**    Are those Mr. Musk's words, or that's your paraphrase?

12   **A**    I don't recall.

13   **Q**    And then, and then, at the bottom of that list, if you

14   like, there's the "11 to 12 billion short"?  Am I reading those

15   notes correctly?

16   **A**    Yes.

17   **Q**    That's the short seller interest you're referring to?

18   **A**    Yes, I believe so.

19   **Q**    My eyesight's poor, I'll hold this letter up.

20       Then, just below that on Exhibit 175, you've got the

21   "No..."  I think that's a delta sign?  Is that correct?  "...of

22   control"?

23   **A**    Correct.  "No change of control."

24   **Q**    Okay.  So that's what that means?

25       What do you recall -- what are those notes referring to,

1    if you recall?

2    **A**    If I look at it in the context -- to the right, it says

3    (As read):

4                "Major investors to remain investors, roll

5                into spv, encourage investors to stay as

6                investors."

7        It was this concept of -- that he had to roll over a

8    substantial amount of his shareholders.  Not in number of

9    shareholders, but as expressed in capital.

10   **Q**    Okay.  And on the right-hand side of Exhibit 175, you've

11   got "Shareholder account below 300"?  Is that right?

12   **A**    Correct.

13   **Q**    Okay.  What is that referring to?

14   **A**    I believe it's, um, the number of shareholders required

15   for him that -- oh, God, I can't remember.  I just can't

16   recall.  I think there's a number -- there's a maximum number

17   of shareholders you can have in a -- in a company which has

18   been delisted.  I think that's what that refers to.

19   **Q**    Okay.

20   **A**    I can't remember the technical law.

21   **Q**    So --

22   **A**    But we -- you know, I think the concept was to have less

23   than 300 total shareholders roll into the deal, into this SPV.

24   **Q**    Okay.  And just to be clear, I mean, you don't have a law

25   degree; isn't that correct?

**DURBAN - DIRECT / PORRITT**

1    **A**    No.

2    **Q**    Okay.  So you --

3    **A**    No.

4    **Q**    -- a working knowledge as a businessman of securities laws

5    and other laws?

6    **A**    Yes.

7    **Q**    Okay.  So we're not going to ask you for any legal

8    opinions.  We understand that today.

9    **A**    Thank you.  Thank you.

10    **Q**    But your general understanding is that if you have more

11    than 300 shareholders, you can't be a private company.  Is that

12    correct?

13    **A**    Correct.

14    **Q**    Okay.  And is this something that Mr. Musk explained to

15    you during this telephone call?

16    **A**    I believe so, yes.

17    **Q**    Okay.  So Mr. Musk described to you a contemplated

18    structure for this going-private transaction?

19    **A**    Yes.

20    **Q**    Okay.  Do you recall what your reaction to that proposed

21    structure was?

22    **A**    I -- I believe I used the words "unprecedented."

23    **Q**    Okay.  You said that to Mr. Musk?

24    **A**    I don't recall saying it to him, but I -- I definitely

25    used it in subsequent testimony with the SEC.

DURBAN - DIRECT / PORRITT

1   Q    Okay.  You had never heard of this sort of structure being

2   used before?

3   A    I haven't seen it in my professional career.

4   Q    Okay.  Now, there's also reference in the top right-hand

5   corner of Exhibit 175, it's got:

6           "Saudis and UAE and Qatar."

7       I know we just had a World Cup there.

8   A    Yes.

9   Q    I never know how to pronounce it properly, so I apologize.

10  What is that referring to?

11  A    I believe it -- just, I believe it was in reference to

12  potential investors in the going-private -- or the transaction

13  as contemplated, that would be third-party investors and help

14  finance it.

15  Q    And then, finally, on the bottom right you've got:

16          "10:00 a.m. Friday."

17      Do you see that?

18  A    Yes.

19  Q    Okay.  What's that referring to?

20  A    I think that's when we tentatively agreed to meet in

21  person.

22  Q    Okay.  And August 6th was a Monday evening?  I'll

23  represent to you it was a Monday evening.

24  A    Yes.

25  Q    So Friday would be the 10th of August?

DURBAN - DIRECT / PORRITT

1   **A**    Yes.

2   **Q**    And then immediately, immediately below the -- your notes

3   about no change of control, there's some other notes.  Are

4   those notes of your conversation with Mr. Musk?

5   **A**    Can you -- sorry.

6   **Q**    See the note, 1, 2, 3?

7   **A**    Can you scroll down, please?

8        (Document displayed)

9   **A**    I think these are notes that I made to myself, actually.

10  **Q**    Okay.  These are notes you made after the call to

11  yourself?

12  **A**    Or during or post.  I can't recall.

13  **Q**    Okay.  And then notably in that structure you've got an

14  arrow to the right saying:

15           "Silver Lake/Affiliates, 6B."

16       Six billion?  Do you see that?

17  **A**    Yes.

18  **Q**    Can you explain what you were referring to there?

19  **A**    I've reviewed some other documents preparing for this.

20       I think that would have been potentially how much we could

21  have invested, committed to with our limited partners.

22  **Q**    Okay.

23  **A**    I think in a subsequent document that was used at that

24  Friday meeting we showed 7 to 10 billion.

25  **Q**    We'll get to that later on.

**DURBAN - DIRECT / PORRITT**

1   **A**   Yeah.

2   **Q**   Is that an amount that you communicated to Mr. Musk during

3   this telephone call?

4   **A**   I don't recall.

5   **Q**   Okay.  At 6 billion, would that have been the largest

6   raise you would have made with your fund at that particular

7   point in time?

8   **A**   Was this, 2018?

9   **Q**   Yes.

10  **A**   Um, with co-invest?  If not the largest, it would have

11  been the one, two or three -- second or third largest.

12          **MR. PORRITT:**  Very good.  If I could show to the

13  witness Exhibit 174.

14      (Document displayed to Witness)

15  **BY MR. PORRITT**

16  **Q**   Do you see 174, Mr. Durban?

17  **A**   Yes.

18  **Q**   Do you recognize 174?  It's a long document, I know,

19  but --

20  **A**   I haven't seen this in four and a half years, but -- but I

21  assume -- it's a text exchange between me and Kyle Paster,

22  who's a partner at Silver Lake, who worked on this with me.

23  **Q**   174 is a lengthy document, I'll represent -- well, 174 is

24  your text messages during the relevant time period.

25          **MR. PORRITT:**  Subject to future redaction, Your Honor,

 1  at this point we would move to admit 174.

 2          **THE COURT:**  Any objection?

 3          **MR. PRICE:**  No objection.

 4          **THE COURT:**  Admitted.

 5      (Trial Exhibit 174 received in evidence.)

 6          **MR. PORRITT:**  Please, if the deputy would hold off

 7  publishing to the jury until we turn to Page 16, 174.

 8      (Document displayed to the Witness)

 9          **THE COURT:**  All right.  Do you want that published?

10          **MR. PORRITT:**  Yes, please, Your Honor.

11          **THE COURT:**  Okay.  You may publish.

12      (Document displayed)

13  **BY MR. PORRITT**

14  **Q**   If I refer you to -- you have record numbers on the side

15  there -- to 1595.

16      (Document highlighted)

17  **Q**   And I'll also represent to you that the times as indicated

18  at the top are in UTC time, so that's seven hours ahead of

19  Pacific time.

20  **A**   Okay.

21  **Q**   So by my math, which is not as good as your math, I make

22  this at 7:43 p.m.  You have a text message there to Mike Bingle

23  and others, saying (As read):

24          "Elon called, may have dough/strk..."

25      S-T-R-K, is that structure?

 1   **A**     Yes.

 2   **Q**     "...already."   Is this a text that you sent after your

 3   telephone conversation with Elon Musk?

 4   **A**     Yes.

 5   **Q**     And does this, this text reflects information that Elon

 6   Musk told you during that conversation?

 7   **A**     Yes.

 8   **Q**     And just immediately further down, Record No. 1599, let's

 9   see, if you look at 1598 and 1599, you see that also.

10          "Full p2p."

11       Do you see that?

12   **A**     Yes.

13   **Q**     Can you explain to the jury what you mean by "p2p"?

14   **A**     Public to private.

15   **Q**     And that's what we were talking about earlier, which is

16   the public shares of Tesla would be bought, and the company,

17   itself, would go private with less than 300 shareholders?

18   **A**     Yes.

19          **MR. PRICE:**  Objection.  The latter misstates.

20          **THE COURT:**  All right.  Sustained.

21   BY MR. PORRITT

22   **Q**     And then 1399 says "He has dough"?

23   **A**     Yes.

24   **Q**     And that's sent a couple minutes after the preceding

25   message that he may have dough; do you see that?

DURBAN - DIRECT / PORRITT

```
 1    A    Yes.

 2    Q    Okay.  Who is Mike Bingle and the other recipients of

 3    those text messages?

 4    A    My three partners in the firm.

 5    Q    So by these text messages, you're reporting the contents

 6    of your telephone conversation with Elon Musk to your

 7    co-partners?

 8    A    Yes.

 9    Q    Okay.  Finally --

10         MR. PORRITT:  If we can go to the next page, Derek,

11    174-17.

12         (Document displayed to the Witness)

13    BY MR. PORRITT

14    Q    Do you see record 1603 there (As read):

15              "Saudi UAE Qatar - he has talked to them.

16              Believes his major shareholders roll into

17              private spv.  We talked Apple but no bite."

18              Do you see that?

19    A    Yes.

20    Q    "Spv," what is that referring to?

21    A    Special purpose vehicle.

22    Q    And is that the structure that you were talking about that

23    you heard from Mr. Musk, that was unprecedented in your mind?

24    A    Yes.

25    Q    And again, this text message is consistent with your notes
```

DURBAN - DIRECT / PORRITT

1  we saw in 175.  Correct?

2  **A**    Yes.

3  **Q**    Were you relying on your notes when you sent these text

4  message?

5  **A**    That, and my conversation.

6  **Q**    And the meeting that you had arranged for August 10th,

7  what was going to be the purpose of that meeting?

8  **A**    To discuss the going private transaction.

9  **Q**    Okay.  At this point, was Silver Lake formally engaged in

10  any way to participate in a go-private with Tesla?

11  **A**    No.

12  **Q**    Had you, in your own mind, decided whether you would

13  participate or not?

14  **A**    No.

15  **Q**    Were you planning to decide that between August 6th and

16  August 10?

17  **A**    No.

18       **MR. PORRITT:**  If I could produce to the witness

19  Exhibit 177.

20       (Document displayed to the Witness)

21  **BY MR. PORRITT**

22  **Q**    Do you recognize Exhibit 177?

23  **A**    Yes.

24  **Q**    It's an email from Kyle Paster to you and others, is that

25  correct?

DURBAN - DIRECT / PORRITT

1   **A**   Yes.

2       **MR. PORRITT:**  At this point we would move to admit

3   Exhibit 177.

4       **MR. PRICE:**  No objection.

5       **THE COURT:**  Admitted.

6     (Trial Exhibit 177  received in evidence.)

7       **THE COURT:**  You may publish.

8     (Document displayed)

9   **BY MR. PORRITT**

10  **Q**   So I think you said Kyle Paster is one of your colleagues

11  at Silver Lake?

12  **A**   Yes.

13  **Q**   Was this the first time estimate you had seen the tweet

14  "Am considering taking Tesla private at $420.  Funding

15  secured"?

16  **A**   That day.  Yes.

17  **Q**   Okay.  What was your reaction when you first read that

18  tweet?

19  **A**   I -- I don't recall specifically, other than being

20  surprised.

21  **Q**   Okay.  Why would you -- why were you surprised?

22  **A**   I'm sure I had a lot of words that I sent around to other

23  folks.

24  **Q**   Why were you surprised that Mr. Musk tweeted out this

25  information?.

DURBAN - DIRECT / PORRITT

1  **A**    We had just spoken the night before, and he described, in

2  context or in concept, a deal to take the company private.  We

3  were meeting later that week to discuss it.

4       It's atypical in my experience for a CEO to announce

5  something like that publicly, in the middle of exploring an

6  opportunity to take a business private.

7  **Q**    Okay.

8  **A**    I can't think of other examples, actually.

9  **Q**    In your experience, is it typical for some form of

10  definitive agreement to be in place before a public

11  announcement of a going-private transaction is made?

12  **A**    Yes.

13  **Q**    Okay.  And typically, financing is arranged before a

14  definitive agreement is signed for a going-private?

15  **A**    Yes.

16  **Q**    And to your knowledge, was there any definitive agreement

17  in place with regard to the potential going-private transaction

18  of Tesla at this point in time?

19           **MR. PRICE:**  Objection, lack of foundation.

20           **THE COURT:**  Lay a foundation?

21           **MR. PORRITT:**  I asked him to his knowledge, was there

22  any definitive agreement in place.  I'm attempting to lay a

23  foundation.

24           **THE COURT:**  Okay, overruled.

25

DURBAN - DIRECT / PORRITT

BY MR. PORRITT

Q    To your knowledge, was there any definitive agreement in place at this time regarding a going-private transaction for Tesla?

A    No.

Q    And is it a lengthy process to get to a definitive agreement for a going-private transaction?

       MR. PRICE:  Objection; vague and lack of foundation.

       THE COURT:  Why don't you rephrase that.

BY MR. PORRITT

Q    You have experienced at least two going-private transactions which have concluded, correct?

A    Yes.

Q    In those transactions, was it a lengthy process to get to a definitive agreement?

A    In my experience, specifically in my two, it was three to six months.

Q    Now, the second sentence in Mr. Musk's tweet forwarded to you in Exhibit 177 says "Funding secured."  Were you surprised to see that as well?

A    Yes.

Q    And then after this August 7th tweet, you then spent the next two weeks trying to raise funding.  Isn't that correct?

A    Yes.

Q    After the August 6th telephone conversation you then met

1  with Mr. Musk on August 10th, is that correct?

2  **A**   Yes.

3  **Q**   Okay.  In between August 6th and this tweet August 7th and

4  the August 10th meeting, could you briefly describe what you

5  and your team did?

6  **A**   We did work on the company, looking at public information

7  that's available.  Research reports, public company filings.

8  Did some work around financial analysis.  Did some work around

9  transaction structure, and outlined a process around what it

10  would take to potentially get the company private, based on our

11  set of experiences.

12  **Q**   And was part of that building, starting to build what's

13  called the so-called business case for going-private?  Is that

14  fair?

15  **A**   Maybe more like an investment case.

16  **Q**   Okay.

17  **A**   Yeah.

18  **Q**   And what is -- what -- explain what you mean when you say

19  "An investment case for going private."

20  **A**   The way you think about -- I'll try to do this quickly --

21  you've got a company, how it operates in an industry, its

22  competitive dynamics.  The -- ultimately, their ability to

23  generate product and sell product.

24      That leads to a set of financials, not just what's

25  happened historically in a business model.  So you get from

**DURBAN - DIRECT / PORRITT**

1  sales down to cash flow.  And then the ability to, you know,

2  sort of project that forward.

3       As part of that you value a company based on the set of

4  projections and ultimately determine whether the value that

5  you're required to pay for something, like if you're paying for

6  a house or any asset, is worth it based on, you know, your view

7  of potential appreciation and its ability to generate the cash

8  flows, depending on the transaction structure and how much debt

9  there is, and all sorts of other stuff.

10  Q    And you met Mr. Musk at his house in Los Angeles on

11  August 10th?

12  A    Yes.

13  Q    How long did that meeting last?

14  A    I believe it was one to two hours, if I recall correctly.

15  Q    And you made a presentation to Mr. Musk?

16  A    Um, I brought a presentation, yes.

17  Q    Okay.

18       **MR. PORRITT:**  At this point -- actually, I think it is

19  in evidence.  If I can show to the witness and publish to the

20  jury the Exhibit 179.

21       **THE COURT:**  Okay.

22       (Document displayed)

23  **BY MR. PORRITT**

24  Q    Do you recognize Exhibit 179?

25  A    Yes.

1    Q    Okay.  And this is the presentation you brought to your

2    meeting with Mr. Musk on August 10th?

3    A    I'm going to -- I'm going to -- I believe so.  I don't --

4    I haven't seen the rest of it but --

5    Q    Okay.

6         (Documents displayed)

7    Q    Why don't you quickly -- we'll talk about a couple of

8    pages, so if you want to flip --

9    A    Yes, this looks like what we brought.

10   Q    Okay --

11   A    Or I brought.

12   Q    Slipping to Page 4, let's see, we're right there.

13   "Illustratively Transaction Setup."  Do you see that?

14   A    Yes.

15   Q    Can you explain just briefly what is outlined on this

16   slide?  I know there's a lot of information there.

17   A    What's outlined here is -- lays out taking the business

18   private, and the amount of money that would be required to do

19   so.  And ways to potentially raise that money.

20   Q    And it presents two scenarios of taking private?  Is that

21   correct?

22   A    Correct.

23   Q    Okay.  But -- and is that because at this time, there was

24   no agreed structure at this point in time, you're sort of

25   exploring structures?  Is that correct?

DURBAN - DIRECT / PORRITT

1   **A**   Not that I was aware of.

2   **Q**   Okay.  So you were -- you were still presenting

3   alternative structures, is that correct?

4   **A**   Correct.

5   **Q**   Okay.

6   **Q**   At this point in time you had not spoken with any

7   potential investors concerning Tesla going-private transaction?

8   Is that correct?

9   **A**   Yes.

10  **Q**   Okay.  At this point in time, did you know what percentage

11  of existing Tesla shareholders might want to participate in a

12  going-private -- in a private Tesla?

13  **A**   No.

14  **Q**   If you would turn to Slide -- or it's Page 179, 16.  It is

15  either Slide 15 or 16.

16      (Document displayed)

17  **Q**   "Alignment with Sovereign Wealth Fund Investment."  Do you

18  see that?

19  **A**   Yes.

20  **Q**   You recall -- why did you include this slide in the slide

21  deck?

22  **A**   Sources of capital, based on our first conversation.  A

23  large source of external capital would have come from Sovereign

24  wealth funds.  Sovereign wealth funds also make up a portion of

25  our investor base as well.

**DURBAN - DIRECT / PORRITT**

1  **Q**   Okay.  So this is the reference to the Saudis, UAE, Qatar?

2  **A**   Yes.

3  **Q**   Okay.  And there are other sovereign wealth funds,

4  correct, that participate?  Singapore, Norway?

5  **A**   Correct.

6  **Q**   And you subsequently had a conversation with Yasir

7  Al-Rumayyan at the Saudi PIF.  Isn't that correct?

8  **A**   Yes.

9  **Q**   Okay.  When you had your conversation with Yasir, did you

10  discuss any price of a Tesla going-private?

11  **A**   I don't recall.

12  **Q**   Did you discuss any specific amount of funding that PIF

13  could provide?

14  **A**   I don't recall.

15  **Q**   Okay.  Did you discuss a percentage investment that Saudi

16  PIF might be willing to make in a private Tesla?

17  **A**   I don't recall.

18  **Q**   Okay.  If you could refer to Page 29 of Exhibit 179.

19    (Document displayed)

20  **Q**   This again is consistent with what you previously

21  testified, that it might take about four to six months to

22  conclude a going-private transaction?

23    Is that correct?

24  **A**   Yes.

25  **Q**   Okay.  And the first point is:

```
 1              "Submit formal proposal to board following
 2              arrangement of committed financing."
 3        Is that correct?
 4   A    Yes.
 5   Q    As of August 10, 2018, was there any committed financing
 6   for the Tesla or a potential Tesla go-private transaction?
 7              MR. PRICE:  Objection, vague and lack of foundation.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  Not that I was aware.
10   BY MR. PORRITT
11   Q    Was there ever any committed financing for a Tesla
12   go-private transaction?
13              MR. PRICE:  Same objections.
14              THE COURT:  Overruled.
15              THE WITNESS:  Not that I was aware.
16   BY MR. PORRITT
17   Q    And no formal proposal had yet been admitted to the Tesla
18   board, is that correct?
19              MR. PRICE:  Objection, vague.
20              THE COURT:  Overruled.
21              THE WITNESS:  Not that I was aware.
22   BY MR. PORRITT
23   Q    So by August 10th, 2018, from your perspective, the
24   potential going-private transaction for Tesla was not even yet
25   at Stage 1.  Is that fair?
```

DURBAN - DIRECT / PORRITT

```
 1              MR. PRICE:  Objection, leading.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.

 4   BY MR. PORRITT

 5   Q    It was not -- it was not at Stage 1, I guess is my

 6   question.

 7   A    Yes.

 8   Q    Do you recall what the -- you know, what was the outcome

 9   or the next steps that were to occur following the August 10th

10   meeting with Elon Musk?

11   A    Um, somewhere over the next couple of days -- maybe it was

12   that day, or in the moment, or a day or two later -- we agreed

13   to work together to try to help him organize this.

14        Next steps were, you know, formulating diligence and a

15   business plan, and an investment case and then reaching out

16   ultimately to potential investors who would want to participate

17   in a going-private of Tesla.

18              MR. PORRITT:  If I can go back to Exhibit 174,

19   Page 23.

20        (Document displayed)

21              MR. PORRITT:  And, Record 2018.

22        (Document displayed)

23   BY MR. PORRITT

24   Q    Do you see that text message?

25   A    Yes.
```

DURBAN - DIRECT / PORRITT

1  Q    Okay.  And you write:

2              "Fun fact...saudis apparently don't have cash

3              lying around."

4      Do you recall what you are referring to there in that text

5  message?

6  A    I don't.  I think what I -- well, I don't recall

7  specifically.  I would have to look it up.  But I think around

8  this time they were funding public investments and private

9  investments on margin, which is, you know, something you do

10 when you don't have immediate cash liquidity on hand.

11         MR. PORRITT:  And then if we can go to 174-7, and

12 Record 2240.

13     (Document displayed)

14         MR. PORRITT:  Now we're on to -- on August 11th.

15 BY MR. PORRITT

16 Q    Do you see that message to Kyle Paster there?

17 A    Yes.

18 Q    Okay.  You refer to:

19             "We will need to be ready to manage the

20             largest fund raise in history - credibly"

21 A    Yes.

22 Q    Is that what you sort of understood your task to be as of

23 August 11th, 2018, for the Tesla go-private transaction?

24 A    Yes.

25         MR. PORRITT:  And if you can go to the next page,

DURBAN - DIRECT / PORRITT

1   174-8, and it is Record 2294.

2       (Document displayed)

3   **BY MR. PORRITT**

4   **Q**   It's another text message to you and Kyle Paster.

5           "He mentioned they want to own the whole

6           company.  Build giga factory...not

7           interested..."

8   Do you see that?

9   **A**   Yes, yes.

10  **Q**   Is the "he" there Elon Musk?

11  **A**   Yes.

12  **Q**   Okay.  And do you recall what this -- do you recall your

13  conversation with Elon Musk that this text is referring to?

14  **A**   Not specifically.  I recall the Saudis wanted to build --

15  wanted him to build a factory, stimulate economic growth.

16      And when I see the words "not interested" I just don't

17  know if it's him not interested or me not interested.  But,

18  somebody wasn't interested.

19  **Q**   Do you recall what Mr. Musk's attitude was towards the

20  idea that the Saudi PIF would own all of Tesla?

21  **A**   I don't think he was interested in that, based on my

22  recollection.

23  **Q**   Do you recall that he wanted to have no investor bigger

24  than his own -- his current investment in Tesla, approximately?

25  **A**   Yes, vaguely, yes.

**DURBAN - DIRECT / PORRITT**

1  Q    And at that point Mr. Musk's interest was approximately

2  20 percent of Tesla?

3  A    Yes.

4  Q    We've seen a few text messages.  Only a handful of the

5  messages with Kyle Paster.  Is it fair to say that you and Kyle

6  Paster were exchanging a lot of text messages over these few

7  days?

8  A    Yes.

9  Q    And just so the record's clear, August 11th obviously is a

10  Saturday.  So you're working weekends as well?

11  A    All weekends.  All the time.

12       MR. PORRITT:  If I could show the witness Exhibit 181.

13       (Document displayed to the Witness)

14       THE COURT:  Okay.

15  BY MR. PORRITT

16  Q    Do you recognize Exhibit 191, Mr. Durban?

17  A    Yes.

18  Q    It's an email you sent to Mr. Musk?

19  A    Yes.

20  Q    Okay.

21       MR. PORRITT:  At this point we would move the

22  admission of Exhibit 181.

23       MR. PRICE:  No objection.

24       THE COURT:  Admitted.

25       (Trial Exhibit 181 received in evidence.)

**DURBAN - DIRECT / PORRITT**

1     (Document displayed)

2   **BY MR. PORRITT**

3   **Q**   Attached to this email -- and we won't go through them,

4   you'll be pleased to know -- there are excerpts from SEC

5   filings connecting with -- connected -- in connection -- or

6   relating to the Dell going-private transaction?

7        Is that right?

8   **A**   Yes.

9   **Q**   Okay.  Why did you send these to Mr. Musk?

10  **A**   Provide some background on other things that we'd done

11  that were similar in delisting public companies.

12  **Q**   Okay.  To educate him on the process of going private?

13  **A**   Yes.

14  **Q**   Okay.  At this time, after you decided to help Mr. Musk

15  with the going-private transaction, do you recall what

16  particular issues your team was grappling with?

17  **A**   I'd put it in two buckets.  One was sort of due diligence

18  and investment case, you know.  And the second bucket is how

19  you finance it, given the size and scale of it.

20  **Q**   Okay.  And was one of the issues you were looking at this

21  novel structure that Mr. Musk was interested in pursuing?

22  **A**   Yes.

23  **Q**   Okay.  If I can refer you back to Exhibit 174, Page 12.

24       (Document displayed)

25  **Q**   And I think it is Record 2556.

**DURBAN - DIRECT / PORRITT**

1     (Document enlarged)

2  **BY MR. PORRITT**

3  **Q**   And this is from Kyle Paster to you, stating (As read):

4        "Do you want us to provide advice on

5        structure?  It's quite unique, so need

6        lawyers to help navigate."

7    Do you see that?

8  **A**   Yes.

9  **Q**   Okay.  Is this consistent with your understanding that,

10  you know, this structure was unique, and you were seeking

11  actual legal advice?

12  **A**   Yes.

13  **Q**   Okay.  And then, just immediately down that same page,

14  Record 2570.

15     (Document enlarged)

16  **Q**   Once again, Mr. Pastor uses the word "unique" to describe

17  the proposed structure.  Is that right?

18  **A**   Yes.

19  **Q**   So is it fair to say that by August 13th when these texts

20  were sent, Silver Lake still didn't have a full understanding

21  of whether the proposed structure would be viable, from a legal

22  perspective?

23  **A**   Yes.

24  **Q**   Okay.

25     **MR. PORRITT:**  If we can refer the witness to Exhibit

DURBAN - DIRECT / PORRITT

```
 1    185.
 2         (Document displayed to the Witness)
 3    BY MR. PORRITT
 4    Q    Do you recognize Exhibit 185?
 5    A    Yes.
 6    Q    Okay.  It's an email from you to Stephen Rosenblum and
 7    others?
 8    A    Yes.
 9    Q    Okay.
10         MR. PORRITT:  At this the point we would move to admit
11    185.
12         THE COURT:  Admitted.
13         MR. PORRITT:  Publish to the jury please?
14    (Trial Exhibit 185 received in evidence.)
15    (Document displayed)
16    BY MR. PORRITT
17    Q    And in Exhibit 185, it says that you are caught up with
18    Dan.  Do you see that?
19    A    Yes.
20    Q    Okay.  Who is Dan, in this context?
21    A    Dan Dees from Goldman Sachs.
22    Q    Okay.  And at this point in time, was Dan Dees also
23    involved in the Tesla going-private transaction?
24    A    Yes.  He was advising Tesla.  Or, I guess, Elon.
25    Q    Okay.
```

**DURBAN - DIRECT / PORRITT**

1   **A**   Elon.

2   **Q**   So you and he were sort of teaming up together to help

3   Elon?

4   **A**   Yes.

5   **Q**   Okay.  Did you think Elon Musk needed help at this point

6   in managing a going-private transaction?

7           **MR. PRICE:**  Objection.  Irrelevant, vague.

8           **THE COURT:**  Well, vague.  Can you be more specific?

9           **MR. PORRITT:**  Well, I'll move on, Your Honor.

10  BY MR. PORRITT

11  **Q**   So at the bottom there, after you say "Dan and I just

12  caught up," this is on August 14th, you write (As read):

13              "We will do a call later today with you and

14              our teams on outlining work items" -- I think

15              that's "investment analysis, including table

16              of contents, Financing targets, transaction

17              structure, legal/accounting, special

18              committee process."

19      Do you see that?

20  **A**   Yes.

21  **Q**   Does that describe the list, the short list of issues you

22  were working through as of August 14th, 2018?

23  **A**   Yes.

24  **Q**   Okay.  Now, you met again with Mr. Musk on August 15th?

25  Is that correct?

1    **A**    Was that Thursday?  I can't --

2    **Q**    That's a Wednesday.

3    **A**    Wednesday.  Yeah, so -- I think it was the 15th.  I can't

4    -- 15th, 16th, 14th, somewhere in there.

5    **Q**    Why don't we show you Exhibit 190.

6         (Document displayed to the Witness)

7    **BY MR. PORRITT**

8    **Q**    Do you recognize Exhibit 190?

9    **A**    Yes, that is my handwriting and my notes.

10         **MR. PORRITT:**  At this point we move for the admission

11   of Exhibit 190, Your Honor.

12         **THE COURT:**  Any objection?

13         **MR. PRICE:**  No objection.

14         **THE COURT:**  Admitted.  You may publish.

15         (Trial Exhibit 190 received in evidence.)

16         (Document displayed)

17   **BY MR. PORRITT**

18   **Q**    Does this refresh your recollection that you met with

19   Mr. Musk on August 15th?

20   **A**    Yes.

21   **Q**    Okay.  Do you recall what the purpose of this meeting was?

22   **A**    State of the union, talk about where we were, and

23   ultimately strategize on which parties to call to invite to

24   potentially participate in the going-private.

25   **Q**    And as part of that, did you ask Mr. Musk to give you a

DURBAN - DIRECT / PORRITT

1  detailed description of any conversations he may have had with

2  potential investors?

3  **A**    Yes.

4  **Q**    Okay.

5          **MR. PORRITT:**  And, if I could show the witness Exhibit

6  191.

7       (Document displayed to the Witness)

8  **BY MR. PORRITT**

9  **Q**    Do you recognize Exhibit 191?

10 **A**    Yes.  Yes.  Sorry.

11 **Q**    These are more handwritten notes?

12 **A**    Yes.

13         **MR. PORRITT:**  At this point we move for the admission

14 of Exhibit 191.

15         **MR. PRICE:**  No objection.

16         **THE COURT:**  Admitted.  You may publish.

17      (Trial Exhibit 191 received in evidence.)

18      (Document displayed)

19 **BY MR. PORRITT**

20 **Q**    And are these notes you took during your meeting with

21 Mr. Musk on August 15th, 2018?

22      (Witness examines document)

23 **A**    Yes.  I was just confused by the "1/17" at the top.  I

24 don't know what that refers to, but...

25 **Q**    Okay.  So on the left, there's some comment, there's some

1   words written down under the heading "Saudi."  Do you see that?

2   A    Yes.

3   Q    Do you know what those notes are referring to?

4   A    I believe his -- his conversations and Tesla's experiences

5   with the Saudis.

6   Q    Okay.  And then, just to the right of that, you see

7   there's a word there saying "insecure"?  Do you see that?

8   A    Yes.

9   Q    Do you know what that is referring to?

10  A    No.

11  Q    And lower down on Exhibit 191, you see there's also a

12  reference to "UAE"?

13          MR. PORRITT:  Keep scrolling down, Derek.

14      (Document displayed)

15  BY MR. PORRITT

16  Q    Do you see that?

17  A    Yes.

18  Q    Again, do you know what that's referring to?

19  A    Um, I think he met with Khaldoon from Dubai about a year

20  and a half ago.

21  Q    Okay.

22  A    Maybe in Dubai.  If I recall.

23  Q    And you referenced -- was it Abdallah --

24  A    Mubadala, it's the sovereign wealth fund or one of the

25  sovereign wealth funds of the UAE.

**DURBAN - DIRECT / PORRITT**

1  **Q**    And the UAE is --

2  **A**    The United Arab Emirates, country.

3  **Q**    Do you recall what the take-away from this meeting was on

4  August 15th, with Mr. Musk?

5  **A**    We had alignment on a series of -- well, we got updated on

6  various conversations that Mr. Musk had had with various

7  potential investors, and look -- came -- I think this set the

8  pretext for us seeking approval for a list of potential

9  financing sources to call later in the next -- whenever that

10  was, you know, the 19th, 20th, 21st of August of '18.

11  **Q**    And, seek approval from whom?

12  **A**    The special committee.  And their advisers.

13  **Q**    Okay.  This was a special committee of Tesla's board of

14  directors?

15  **A**    Correct.

16  **Q**    And why would you seek approval of the special committee

17  of Tesla board of directors to reach out to potential

18  investors?

19  **A**    That's good legal process, in my experience.

20        **MR. PORRITT:**  If I could introduce to the witness

21  Exhibit 194.

22        (Document displayed to the Witness)

23  **BY MR. PORRITT**

24  **Q**    Do you see that in front of you, Mr. Durban?

25  **A**    Yes.

DURBAN - DIRECT / PORRITT

1   Q    And this is another email you sent on August 16th, now,

2   2018?

3   A    Yes.

4          MR. PORRITT:  At this point we would move to admit

5   Exhibit 194, Your Honor.

6          MR. PRICE:  No objection.

7          THE COURT:  Admitted.

8      (Trial Exhibit 194 received in evidence.)

9          MR. PORRITT:  If we can publish it to the jury,

10  please.

11         THE COURT:  Yes.

12     (Document displayed)

13  BY MR. PORRITT

14  Q    So, listed there are some potential investors, is that

15  correct?  Saudi Arabia, UAE, et cetera?

16  A    Yes.

17  Q    Okay.  And these are the sources that you discussed with

18  Mr. Musk at the meeting on August 15th, 2018?

19  A    Yes.  Mr. Musk, and Goldman Sachs was also present.

20  Q    Did Mr. Musk list any other sources of potential

21  investment, other than these six names?

22  A    I can't recall.  We'd have to go look at the notes.  But

23  --

24  Q    Okay.  Well, we can go back to Exhibit 191, your

25  handwritten notes.

1        (Document displayed)

2   **Q**    Would you have written down every investor, potential

3   source that Mr. Musk would have mentioned during that meeting?

4   **A**    Likely.

5   **Q**    Okay.  And while we're here, you see at the bottom screen

6   -- no, in the middle, you see "Tencent"?  Do you see that?

7   **A**    Yes.

8   **Q**    Who is Tencent?

9   **A**    A large technology company in China.

10  **Q**    Okay.  And looking at the notes there, did they at that

11  time own 4.9 percent of Tesla?

12  **A**    I believe so, yes.

13  **Q**    Okay.  And that was the same amount that you understood

14  the Saudi PIF, approximately, owned at this time?

15  **A**    Yes.

16  **Q**    Okay.  Do you know if Mr. Musk was ever -- ever told you

17  that he thought Tencent might be -- itself, might be wanting to

18  take Tesla private?

19  **A**    I don't recall.

20  **Q**    Okay.

21          **MR. PORRITT:**  If we can go back to Exhibit 194.

22       (Document displayed)

23  **BY MR. PORRITT**

24  **Q**    You'll see there, the second point from the bottom it

25  says:

**DURBAN - DIRECT / PORRITT**

```
 1                 "Goldman and Silver Lake will make the calls.

 2                 Not Elon."

 3           Do you see that?

 4   A     Yes.

 5   Q     Do you know why you and Goldman -- or Silver Lake, rather,

 6   not you personally -- Silver Lake and Goldman were tasked to

 7   make the calls, rather than Elon?

 8                 MR. PRICE:  Well, objection.  This assumes facts, as

 9   phrased.  Had to.

10                 THE COURT:  Why don't you rephrase that.

11                 MR. PORRITT:  Okay.

12   BY MR. PORRITT

13   Q     You wrote here in your email:

14                 "Goldman and Silver Lake will make the calls.

15                 Not Elon."

16           Do you see that?

17   A     Yes.

18   Q     Was that a decision that was made as part of the approval

19   from the special committee, for you to make these calls?

20   A     I don't recall.

21   Q     Okay.  Do you know -- do you know why Elon Musk was not

22   going to make the calls to these investors?

23                 MR. PRICE:  Objection.  Foundation.

24                 THE COURT:  Overruled.

25                 THE WITNESS:  I don't recall.
```

**DURBAN - DIRECT / PORRITT**

1   BY MR. PORRITT

2   **Q**   If I can refer you --

3          **MR. PORRITT:**  If you could show to the jury -- to the

4   jury.  To the witness, Exhibit 196, please.

5       (Document displayed to the Witness)

6   BY MR. PORRITT

7   **Q**   This is an email from Steve Rosenblum to Sam Britton at

8   Goldman Sachs and you and others, do you see that?

9   **A**   Yes.

10         **MR. PORRITT:**  At this point, we move to admit Exhibit

11  196, Your Honor.

12         **MR. PRICE:**  No objection, Your Honor.

13         **THE COURT:**  Admitted.  You may publish.

14      (Trial Exhibit 196 received in evidence.)

15      (Document displayed)

16  BY MR. PORRITT

17  **Q**   And you'll see, starting at the bottom of Exhibit 196, the

18  first page it has the "Talking points/message"?  Do you see

19  that?

20  **A**   Yes.  I'm sorry, yes.

21  **Q**   And then it continues on to the second page of Exhibit

22  196?

23         **MR. PORRITT:**  Derek, if you could scroll down.

24         **THE WITNESS:**  Yes.

25         **MR. PORRITT:**  Derek, can you have the talking points

DURBAN - DIRECT / PORRITT

```
 1   on one page, blown up so we can see them?
 2        (Document displayed to the Witness)
 3            MR. PORRITT:  And also on the second page?
 4        (Document displayed)
 5            MR. PORRITT:  There we go.  That's it.
 6   BY MR. PORRITT
 7   Q    So these were the talking points that you agreed with the
 8   special committee, in reaching out to potential investors?
 9   A    Yes.
10   Q    And one of them is:  We're calling to get a sense as to
11   the seriousness of your interest."
12        Is that correct?
13   A    Yes.
14   Q    And you are getting back to them with respect to your
15   potential interest in taking Tesla private?
16   A    Yes.
17   Q    And these were the talking points also used with the Saudi
18   PIF; is that correct?
19   A    Yes.
20   Q    Okay.  And you developed these talking points after you'd
21   had your conversation with Mr. Musk on August 15th.  Isn't that
22   correct?
23   A    Yes.
24   Q    Okay.  Now, do you recall that on August 16th or the
25   evening of August 16th, the *New York Times* published a lengthy
```

DURBAN - DIRECT / PORRITT

```
 1  article based on an interview with Elon Musk?

 2  A    Yes.

 3  Q    Okay.

 4       MR. PORRITT:  At this point, if I could show the

 5  witness Exhibit 182.

 6       THE COURT:  Okay.

 7     (Document displayed to the Witness)

 8  BY MR. PORRITT

 9  Q    Do you recognize this exhibit as also containing text

10  messages?

11  A    Yes.

12  Q    From you?

13       MR. PORRITT:  At this point we'd move the admission of

14  Exhibit 182, Your Honor.

15       MR. PRICE:  No objection.

16       THE COURT:  Admitted.

17     (Trial Exhibit 182 received in evidence.)

18       MR. PORRITT:  And then, Derek, if you could publish to

19  the jury Exhibit 182-5.

20     (Document displayed)

21       MR. PORRITT:  And then if I can direct the witness to

22  Record No. 3362.

23     (Document enlarged)

24  BY MR. PORRITT

25  Q    So you see this is a text message from Gregg Lemkau to you
```

1  and Dan Dees?  Is that correct?

2  **A**    Yes.

3  **Q**    And who's Mr. Lemkau?

4  **A**    He is -- at the time was the head of M&A, I think, at

5  Goldman Sachs, was his title.  He was a Goldman Sachs

6  executive.

7  **Q**    And Mr. Lemkau writes (As read):

8           "Elon gave hour-long interview to *New York*

9           *Times* today.  Nothing particularly bad but so

10          much for laying low."

11     Do you see that?

12  **A**    Yes.

13  **Q**    At this time were you and Goldman Sachs hoping that Elon

14  Musk would lay low while you did the work on the going-private

15  transaction?

16  **A**    Yes.

17         **MR. PORRITT:**  And if I could just show the witness

18  Exhibit 171, which I think is in evidence -- it is in evidence.

19     (Document displayed)

20  **BY MR. PORRITT**

21  **Q**    Do you see, is this the article that Mr. Lemkau was

22  referring to?  Do you recall?

23  **A**    Yes.

24         **MR. PORRITT:**  If we can go back to Exhibit 182-5.

25

DURBAN - DIRECT / PORRITT

1  **BY MR. PORRITT**

2  **Q**   Do you recall reading this article?

3  **A**   Yes, I definitely read it, multiple times.

4  **Q**   Okay.  Do you recall what your reaction was to it when you

5  read it?

6          **MR. PRICE:**  Objection, relevance.

7          **THE COURT:**  Overruled.

8          **THE WITNESS:**  The only thing I recall is that he said

9  he wouldn't talk to the press anymore after we met, and he

10 talked to the press the next day.

11         **MR. PORRITT:**  If we could go back to Exhibit 182-5.

12     (Document displayed)

13         **MR. PORRITT:**  And if we can go to Record 3368.

14     (Document displayed)

15 **BY MR. PORRITT**

16 **Q**   So this is a text from Elon Musk to you and Dan Dees.  Do

17 you see that?

18 **A**   Yes.

19 **Q**   (As read)

20         "We had a nuke inbound from one of the major

21         shorts via *New York Times*."

22     Do you see that?

23 **A**   Yes.

24 **Q**   Do you recall what Mr. Musk was referring to there?

25 **A**   I don't.

**DURBAN - DIRECT / PORRITT**

1  **Q**    Okay.

2  **A**    I don't recall.

3           **MR. PORRITT:**  If we can go down to Record 3374.

4      (Document displayed)

5  **BY MR. PORRITT**

6  **Q**    This is another text from Elon Musk to you:

7              "The article started out extremely bad (nuke

8              level) and got turned around with massive

9              effort."

10     Do you see that?

11 **A**    Yes.

12 **Q**    Does that refresh your recollection as to how Mr. Musk was

13 interacting with the *New York Times* with that article?

14 **A**    Yes.  I mean, I vaguely recall at this time, because he

15 put this tweet out and there was a lot of sort of market

16 speculation, I guess, about whether the company would go

17 private.  And with the short position out, he was under, based

18 on this set of the text exchanges, the pressure I guess from

19 shorts' speculation to the *New York Times* that a deal wouldn't

20 be consummated.

21 **Q**    So if I can now refer you to -- well, do you recall

22 attending a board meeting with Tesla on August 23, 2018?

23 **A**    Yes.

24 **Q**    Okay.  And you attended with Goldman Sachs, is that

25 correct?

DURBAN - DIRECT / PORRITT

1    A    Yes.

2    Q    Okay.  And did you make a presentation to the board?

3    A    Together with Goldman Sachs, yes.

4    Q    Okay.

5         MR. PORRITT:  If I could show the witness Exhibit 201.

6         THE COURT:  Okay.

7         (Document displayed to the Witness)

8    BY MR. PORRITT

9    Q    Okay, so if I can show you Exhibit -- do you recognize

10   Exhibit 201?

11   A    Yes.

12   Q    Okay.  And is this the presentation that you and Goldman

13   Sachs made to the board on August 23rd, 2018?

14        MR. PORRITT:  If you could scroll through it, Derek,

15   to let them --

16        (Documents displayed)

17        THE WITNESS:  Yes.  I believe so.

18        MR. PORRITT:  Okay.  At this point we would move the

19   admission of Exhibit 201, Your Honor.

20        MR. PRICE:  No objection.

21        THE COURT:  Admitted.  You may publish.

22        (Trial Exhibit 201 received in evidence.)

23        (Document displayed)

24   BY MR. PORRITT

25   Q    And so to the board, you and Goldman discussed the

1  availability of funding for a going-private transaction, is

2  that correct?

3  A    Yes.

4  Q    Okay.  At this point in time, again, did you have any

5  committed financing for any going-private transaction?

6  A    No.

7  Q    Okay.

8        MR. PORRITT:  If we could turn to Page 58 of Exhibit

9  201.

10     (Document displayed)

11  BY MR. PORRITT

12  Q    This is illustrative sources and uses, do you see that?

13  A    Yes.

14  Q    And at the top it says:

15        "Take private of Titanium..."

16     Titanium is the code word for Titanium?

17  A    Yes.

18  Q    And then at just asterisk per share would require an

19  asterisk billion of committed capital, do you see that that?

20  A    Yes.

21  Q    Does that reflect that the full price for taking Tesla

22  private had not yet been decided as of August 23, 2018?

23  A    Yes.

24  Q    And the amount of capital needed was not decided as of

25  August 23rd?

DURBAN - DIRECT / PORRITT

1    **A**    Yes.

2    **Q**    And following the August 23rd meeting it was decided not

3    to go forward with the going-private transaction?

4    **A**    Yes.

5    **Q**    Okay.  In your work for the Tesla go-private, the

6    structure that a private Tesla would adopt was never finalized.

7    Is that correct?

8    **A**    Yes.

9    **Q**    Okay.  And you never finalized the total amount of capital

10   needed to take Tesla private?

11   **A**    Yes.

12   **Q**    And the price was never finalized?

13   **A**    Yes.

14   **Q**    Okay.  You never determined the percentage of shareholders

15   who would roll into a private Tesla?

16   **A**    Yes.

17   **Q**    No formal proposal was ever made to the Tesla board of

18   directors to take it private, correct?

19   **A**    Not that we were part of.

20          **MR. PORRITT:**  Thank you, Mr. Durban.

21          **THE WITNESS:**  Thank you.

22          **MR. PORRITT:**  Wait, you have questions from our

23   colleague on the defense side and reserve the right for

24   redirect.

25          **THE COURT:**  Thank you.  Mr. Price.

1       <u>CROSS-EXAMINATION</u>

2   BY MR. PRICE

3   Q    Good morning, Mr. Durban.  My name is Bill Price, I'm with

4   Quinn Emanuel.  And we're doing a choreography here where I'm

5   going to try to make sure you have in front of you the exhibits

6   I am going to use, largely the same.  And I want to make sure

7   that you have your deposition transcripts in front of you just

8   in case you need to refer to them.

9            MR. PRICE:  May I approach?

10           THE COURT:  You may approach.

11       (Documents tendered)

12           THE WITNESS:  Thank you.

13           MR. PRICE:  And for the Court.

14       (Documents handed up to the Court)

15           THE COURT:  Thank you.

16  BY MR. PRICE

17  Q    So Mr. Durban, you actually appeared before the Tesla

18  board of directors at a meeting on August 23rd, 2018.  Right?

19  A    Yes.

20  Q    And let me show you the minutes, which is Exhibit 101 in

21  the binder that you were just given.  I'll put it on the

22  screen, the front page.

23       (Document displayed to the Witness)

24  Q    You actually at some point looked at these minutes and

25  particularly the section that talks about availability of

**DURBAN - CROSS / PRICE**

1  financing for a potential going-private transaction and

2  determined that it accurately reflected what you said to the

3  board that day.  Correct?

4  **A**    Yes, I believe so.

5  **Q**    And when I say "you," let me step back.  Both you and

6  Mr. Dees were present at the board.  Correct?

7  **A**    Yes.

8  **Q**    And Mr. Dees is someone you had worked with before,

9  working on this particular project?

10  **A**    Yes.

11  **Q**    He was the co-head of investment banking at Goldman Sachs?

12  **A**    I don't know if that was his title at the time.  He may

13  have been company-head of the technology group and was then

14  subsequently promoted to company-head of investment banking.

15  **Q**    He's actually going to be here so we can find out.

16  **A**    You can clarify.

17  **Q**    And you had found him to be -- well first of all, Goldman

18  Sachs is probably the leading investment banking firm in the

19  coun- -- in the world?

20  **A**    One of two or three, yes.

21  **Q**    And in your dealings with Mr. Dees he had always been

22  professional, thorough and honest, correct?

23  **A**    Yes.

24  **Q**    And at this board of directors meeting, you were going to

25  make some representations to the board about -- about -- let me

1    get the exact word -- the availability of financing for a

2    potential transaction, correct?

3    **A**    Yes.

4    **Q**    And of course your intent was to be honest and truthful,

5    correct?

6    **A**    Yes.

7    **Q**    And you knew that the board would rely, might rely, at

8    least, on what you and Mr. Dees were telling them.  Right?

9    **A**    Yes.

10   **Q**    You were introduced to the board as Mr. Musk's financial

11   advisers.  Is that right?

12   **A**    Yes.

13   **Q**    And if we can go to Page 3 of 101 there's a paragraph that

14   I've got in front of you here.

15       (Document displayed)

16   **Q**    I want to call your attention to the second sentence

17   (As read):

18           "The financial advisers emphasized to the

19           board that although their work was

20           preliminary, the funding was available from a

21           variety of sources.  The Goldman Sachs and

22           Silver Lake representatives indicated that

23           they had substantial experience with these

24           types of transactions, and while taking Tesla

25           private would be unique, there was more than

1              enough interest and funding to execute on

2              such a transaction."

3      That's what you told the board on August 23rd, correct?

4   A   Yes.

5   Q   And you started your work on this on a Monday, August 6th.

6   Right?

7   A   Yes.

8   Q   So this is 17 days later.  Right?

9   A   Yes.

10  Q   And then, you look at the second paragraph, we have got it

11  highlighted there.  After mentioning possible sources, it says

12  (As read):

13              "The financial advisors discussed how much

14              they believed each of these sources would

15              fund and further indicated that raising the

16              funds to pursue Mr. Musk's proposal to take

17              the company private was very doable."

18      That's what you represented to the board on August 23rd,

19  correct?

20  A   Yes.

21  Q   Now you also joined Mr. Musk in making recommendations on

22  whether or not the board should actually consider a go-private,

23  right?

24  A   Yes.

25  Q   And the recommendation was that the board should not, as a

1    result of the advisers and Mr. Musk learning that both large

2    institutions and small investors prefer the company to stay

3    public.  Correct?

4    **A**    Yes, as one of the reasons.

5    **Q**    Okay.  Now one of the reasons was not financing, right?

6    You didn't say to the board:  You shouldn't go forward because

7    you can't get financing for this deal.  You didn't say that,

8    did you?

9    **A**    No, I did not say that.

10   **Q**    That was not one of the reasons why this transaction did

11   not go forward.  Correct?

12   **A**    Agreed.

13   **Q**    Let me take you back through this 17-day experience.  We

14   talked about the call on August 6th.  It was your understanding

15   Mr. Musk was going to call you because you had heard that he

16   had been talking to a mutual acquaintance about his desire to

17   go private, right?

18   **A**    Yes.

19   **Q**    And that person said you'd be a person to call --

20       (Reporter clarification)

21   **BY MR. PRICE**

22   **Q**    And that person had said you would be a person to call in

23   connection with that.  Correct?

24   **A**    Yes.

25   **Q**    And that's because you had the experience with the Dell,

1   the Dell transaction.  Correct?

2   **A**    Amongst others.  He's also the person -- our mutual

3   acquaintance is one of our CEOs for one of our portfolio

4   companies who I'm on the board of.

5   **Q**    And at the time, Silver Lake, your company, was known to

6   be investors as well as providers of capital for transactions

7   like the going private that Mr. Musk was considering, correct?

8   **A**    Yes.

9           **MR. PORRITT:**  Objection, leading.

10          **THE COURT:**  Overruled.

11          **MR. PRICE:**  I'm allowed to.

12          **THE WITNESS:**  Sorry, yes.

13  **BY MR. PRICE**

14  **Q**    When you got the call from Mr. Musk, your assumption is

15  that the reason he was calling you was to get funds from

16  Silver Lake.  Correct?

17  **A**    Yes.

18  **Q**    And, and through that entire August 6th call, to your

19  surprise, he didn't ask for funds from Silver Lake.  Correct?

20  **A**    Yes.

21  **Q**    So you mentioned that you took notes.  And we've seen

22  these, it's Exhibit 175.  Let me just go ahead and put that up.

23      (Document displayed)

24  **Q**    And we kind of have bullet points here of discussion,

25  topics of discussion and you've talked about some of these, for

1    example, "Public painful."  It talks about "Overhead manage,

2    70/80 percent of corporate governance."  That referred to how

3    much effort he was having to spend of his time because the

4    company was a public company.  Right?

5    **A**    Yes.

6    **Q**    You talked about shorts.  And by the way, shorts are these

7    investors who are basically betting on the company failing.  If

8    the company fails, does poorly, these investors do well.

9    Correct?

10   **A**    Yes.

11   **Q**    Also, I hear you, you see it says "20 percent premium" so

12   on August 6th Mr. Musk had talked to you about a going-private

13   where there would be a 20 percent premium over the existing

14   stock price.  Correct?

15   **A**    Yes.

16   **Q**    And at that time, a 20 percent premium over the existing

17   stock price would have been about $420, correct?

18   **A**    Correct.

19   **Q**    And he talked about no change of control, and you see next

20   to "No change of control" here it says "Vast majority buy them

21   out."  And in the vast majority of taking private cases, you

22   are trying to buy out all the shareholders.  Correct?

23   **A**    Yes.

24   **Q**    That's what Mr. Dell did, correct?

25   **A**    Yes.

**DURBAN - CROSS / PRICE**

1    **Q**    That was the standard kind of structure for a

2    going-private.

3    **A**    Yes.

4    **Q**    And on the right-hand side, you see, three down, he talks

5    about encouraging investors to stay investors.  That was one of

6    his goals, right?

7    **A**    Yes.

8    **Q**    And I think Mr. Porritt called your attention to

9    "Shareholder account below 300."  One thing Mr. Musk talked

10    about was you could use a special purpose vehicle as an

11    investor that would contain a lot of shareholders.  Correct?

12    **A**    Yes.

13    **Q**    And that was, that was one way to make this work even

14    though there is a limit on shareholders (Indicating quotation

15    marks) of 300.  Right?

16    **A**    Yes.

17    **Q**    Because that special purpose vehicle would count as only

18    one shareholder.  Right?

19    **A**    Yes.

20    **Q**    Now, this wasn't -- you didn't know about this at the

21    time, this isn't something you had looked into before.

22    Correct?

23    **A**    Correct.

24    **Q**    And if we go down further it says "Major investors to

25    remain investors."  In connection with that, isn't it correct

1   that what Mr. Musk told you was that he had major investors in

2   his private company, SpaceX, and he expected that they would

3   want to remain investors in a private company, Tesla.

4   A    I don't recall SpaceX.

5   Q    Okay.  Well, let me see if I can refresh your

6   recollection?

7   A    Yes, please.

8   Q    If you can look in front of you there's at a deposition

9   dated September 12, 2018.

10       (Document displayed to the Witness)

11  Q    And I'm going to ask you to look at Page 88.

12       (Witness complies with request)

13  Q    Looking at 88, Line 11.

14  A    Sorry --

15  Q    Actually, 88, Line 22 to 89, Line 1, if you can read that

16  to yourself and not out loud.  Just raise your hand when you've

17  completed that.  And you see the question that prompted that

18  was at 88, Line 11 to 14.  Do you see that?

19  A    Yes.

20  Q    Okay.  So does that refresh your recollection then, in

21  connection with this note, "Major investors to remain

22  investors," that he mentioned he already had investors in

23  SpaceX, and that part of the conversation was him juxtaposing

24  how much he enjoyed the SpaceX governance relative to this

25  experience with Tesla.

1    **A**    Yes.

2    **Q**    And that those investors he thought would be among the

3    major investors that would want to remain investors in Tesla?

4    **A**    Correct.

5              **MR. PRICE:**  I'll slow down, I'm sorry.

6    **BY MR. PRICE**

7    **Q**    And here it says meeting August 10th, so August 6 was a

8    Monday, August 10th is a Friday.  That was a surprise to you

9    that he wanted to meet so quickly.  Right?

10   **A**    Yes.

11   **Q**    You had hoped to meet -- like, around August 22nd, right?

12   **A**    Yes.

13   **Q**    And he said no, he was in a much more rapid timeline than

14   that.  Right?

15   **A**    Yes.

16   **Q**    This is what you came to refer to as "Elon time"?

17   **A**    Yes.

18   **Q**    And let me ask you in general about what happened in the

19   next few, 17 days or so.  You mentioned that this structure of

20   letting investors -- shareholders remain shareholders was

21   something that was unique and unprecedented.  Right?

22   **A**    Yes.

23   **Q**    And as was pointed out in one of the texts, Silver Lake

24   actually had looked at whether or not that was a structure that

25   was doable, even though it was unique and unprecedented.

1   Right?

2   **A**   Yes.

3   **Q**   And the conclusion, after looking at that, was that

4   mechanically this concept actually worked.  Right?

5   **A**   Yes.

6   **Q**   And this was kind of an illustration, your observation was

7   that Mr. Musk's mind was set to do things differently and sort

8   of reimagine the process.  Right?

9   **A**   Yes.

10  **Q**   And you didn't always have a frame of reference for that.

11  **A**   Yes.

12  **Q**   Turned out his frame of reference was doable and worked,

13  right?

14  **A**   Yes.

15  **Q**   So we talked about you meeting on August 6th.  Let me go

16  now to August 7th and that's when some tweets came out.  Right?

17  **A**   Yes.

18  **Q**   And now, before the tweets came out, I want to call your

19  attention to your texts at Exhibit  174-3.  And these texts are

20  in UTC time so we are going to subtract seven hours from the

21  time here.

22      And so this is at August 7, 12:50, that would actually be

23  5:50 a.m., right?

24  **A**   Yes.

25  **Q**   Pacific.  And here you have got:

1    "He rolls.  We put up 7-10 billion."

2    That's referring to what you said in direct that in

3  internal discussions before these tweets even came out, at

4  Silver Lake you were talking about Silver Lake investing 7 to

5  10 billion, correct?

6  A    Silver Lake and affiliates, yes.

7  Q    And one of the biggest investments Silver Lake would have

8  ever made.  Correct?

9  A    Correct.

10  Q    Now, the tweets came out, and you've told us that you were

11  surprised, right?

12  A    Yes.

13  Q    Now, the number 420, let's show the Exhibit 8, which is

14  one of the tweets very quickly.

15    (Document displayed)

16  Q    "Am considering taking Tesla private at $420.  Funding

17  secured."

18    Now, the 420 didn't surprise you because you had had the

19  conversation with him the night before about 20 percent

20  premium.  Right?

21  A    Yes.

22  Q    And with respect it to the phrase "Funding secured," you

23  didn't know what that phrase meant when you read it, correct?

24  A    Correct.

25  Q    And in fact, you said you had never seen that term before.

**DURBAN - CROSS / PRICE**

1   Correct?

2   **A**   Yeah.   The words I used is it's not a term of art in our

3   industry.

4   **Q**   It's not a term of art that you are used to dealing with,

5   right?

6   **A**   Yes.

7   **Q**   But one of the things that surprised you was that you had

8   never seen, with respect to the first sentence, "Am considering

9   taking Tesla private at $420,"  you had never seen that level

10  of transparency before.   Right you?

11  **A**   Correct.

12  **Q**   In fact, your view when looking at that was you considered

13  it to be, that, the most disclosive thing you've ever seen.

14  Right?

15  **A**   Yes, I stated that.

16  **Q**   And this is an example, again, of Mr. Musk doing things

17  differently and sort of reimagining the process.

18  **A**   Correct.

19  **Q**   So, having seen the tweet coming out, being surprised, you

20  have -- you started working to prepare for this meeting on

21  August 10th.   Right?

22  **A**   Yes.

23  **Q**   Now, before the meeting, you had a text, I want to show

24  you.   It's 174-17.

25       (Document displayed)

**DURBAN - CROSS / PRICE**

1   **Q**    And you're texting to Mr. Bingle, who is a managing

2   director at Silver Lake?

3   **A**    Managing partner.

4   **Q**    Managing partner, okay.

5           "My gut is he has and/or can raise the money

6           (maybe easily) after reading everything and

7           preparing."

8       When you say "After reading everything and preparing," to

9   get this feeling he might be able to raise the money easily?

10  **A**    Yes.

11  **Q**    What preparing and reading were you referring to?

12  **A**    Reviewing public information, researching reports, looking

13  at financial models.

14  **Q**    Then next text you say:

15          "Premise would be better risk reward than

16          Uber a year ago (or even SoftBank VM deal

17          with real IP developed.  A lot of long

18          investors have made a lot of money with

19          him.....in many companies."

20      Correct?

21  **A**    Correct.

22  **Q**    And that was part of the reason that your gut was that he

23  could raise that money maybe easily, his track record with his

24  investors.  Correct?

25  **A**    Yes.

1   **Q**    Okay.  So let me focus now about after the meeting.   And

2   if we look at these notes at Page 174-18.

3      (Document displayed)

4   **Q**   And you see there is an entry 2093 and the time here would

5   be, I guess, 12:12 p.m. because we are subtracting the seven

6   hours.  And you see the paragraph says.

7          "Offered to help him personally pull the deal

8          together..."

9      Do you see that that?

10  **A**    Yes.

11  **Q**   He had earned that right.  And it says in the

12  parenthetical:

13          "And the inbounds with lots of money being

14          thrown his way including three during our

15          meeting which lasted 1 hour and 40."   Do.

16     You see that?

17  **A**    Yes.

18  **Q**   So during this call there were inbound communications to

19  Mr. Musk with people, in your words, throwing money his way.

20  Right?

21  **A**    Yes.

22  **Q**   And then we go on to the other paragraph that's

23  highlighted:

24          "He asked what's in it for us.  Said no fee

25          and not paid by the hour.  Told him was

1              unsure/not informed enough to form a judgment

2              about the investment materials/risks (sic)

3              especially given various structures, but he

4              didn't need our money per se."

5         That's what you told him at the time, correct?

6    A    Correct.

7    Q    So that's after the meeting.  And then a little later, I'm

8    going to ask you to look at 182 which is another group of your

9    texts, I'm going to put up Page 9.

10        (Document displayed)

11   Q    And call your attention to a text which is, if we do the

12   math right, I think goes about 6:22 p.m., actually, on the

13   10th, if you do that subtraction.  I know this is again in UTC

14   time.

15        And if you look at that, you say:

16             "Our largest investor..."

17        And we've blacked that out at the request of Silver Lake.

18             "Our largest investor..."

19        This is a text you're sending to Mr. Musk, correct?

20   A    Yes.

21   Q    And you say:

22             "Our largest investor..."

23        And although we blacked out the name, this is an investor

24   that had assets under management in the hundreds of billions.

25   Right?

**DURBAN - CROSS / PRICE**

1   **A**     Yes.

2   **Q**     I mean, as large or larger than the PIF.   Correct?

3   **A**     Yes.

4   **Q**     At the time.   And so this investor had reached out to you,

5   Silver Lake, proactively, without request.   And you told

6   Mr. Musk that at this time, you said nothing.   Right?

7   **A**     Yes.

8   **Q**     What you also told Mr. Musk at this was "This can be

9   done."

10       Right?

11   **A**     Yes.

12   **Q**     And that was your belief as early as the end of the day on

13   August 10th of 2016.   Correct?

14   **A**     Yes.

15   **Q**     So, we go forward now and -- actually, let me skip a lot

16   of the detail here and talk to you about a call you had on

17   August 22nd with Yasir.   And I forgot his last name.   Do you

18   remember, last name?

19   **A**     I don't know what you're talking about.

20   **Q**     Okay.   We have called him Yasir.   And that's easier.

21   **A**     I think it's "Yasser."

22   **Q**     "Yasser."   Thank you.   And after your call with Yasir on

23   the 26th, your -- the way --

24   **A**     22nd.

25   **Q**     August 22nd, I'm sorry, right, on August 22nd, Yasir had,

1  you say, expressed his deep interest in being involved in

2  connection with this going-private transaction.   Correct?

3  **A**    Yes.

4  **Q**    And you and he talked about Yasir saying that he would

5  like Tesla to open up a factory in Saudi Arabia.   Correct?

6  **A**    Yes.

7  **Q**    But that was not -- his deep interest in -- in investing

8  in this transaction was not conditioned on opening the factory

9  in Saudi Arabia.   Correct?

10  **A**    Correct.

11  **Q**    In fact, he said that he would want that done only if it

12  were economically viable to Tesla.   Correct?

13  **A**    Correct.

14         **MR. PRICE:**  Your Honor, just one second?

15         **THE COURT:**  Yep.

16         **MR. PRICE:**  Thank you, Mr. Durban.   No further

17  questions.

18         **THE COURT:**  All right.   Thank you.

19      Redirect?

20                      **REDIRECT EXAMINATION**

21  **BY MR. PORRITT**

22  **Q**    Thank you, Mr. Durban.   I promise I'll be brief.

23      If we could -- Mr. Price showed you Exhibit 101, the board

24  minutes from August 23rd, particularly Page 3.

25         **MR. PORRITT:**  If we could pull those up.

DURBAN - REDIRECT / PORRITT

```
 1        (Document displayed)
 2           MR. PORRITT:  And again, if we could go to the page
 3    describing Mr. Durban's presentation to the board.
 4    BY MR. PORRITT
 5    Q    I think the minutes described your work as -- as based on
 6    your preliminary -- they were preliminary discussions with
 7    various equity sources.
 8         And you emphasized to the board that your work was
 9    preliminary, is that correct?
10    A    Yes.
11    Q    And that is a fair description of how you described where
12    your work was as of August 23rd?
13    A    Yes.
14    Q    Okay ands then, you go back, the next paragraph down, you
15    describe the task of raising the funds to pursue Mr. Musk's
16    proposal and loss to take the company private was, quote, "Very
17    doable."  Do you see that?
18    A    Yes.
19    Q    And we've had some discussion of terms of art.  Is "Very
20    doable"  a financial term of art?
21    A    No.
22    Q    Okay.  As of August 23rd, as I think you told me on
23    direct, the amount of capital needed for the taking-private
24    transaction was still unknown.  Correct?
25    A    Correct.
```

1  **Q**     And the price that you would take Tesla was still

2  undetermined, correct?

3  **A**     Yes.

4  **Q**     And the potential role of shareholders was still unknown.

5  Correct?

6  **A**     Yes.

7  **Q**     And the structure was still uncertain.  Correct?

8  **A**     Yes.

9  **Q**     Okay.  And Mr. Price talked to you a little bit about the

10 legal structure, using an SPV, trying to include small

11 investors, et cetera.  Did you ever reach any final conclusion

12 about whether that was viable or not?

13 **A**     No.

14 **Q**     Okay.  So it wasn't ruled in, it wasn't ruled out by

15 August 23rd?

16 **A**     Correct.

17 **Q**     Okay.  So as of August 23rd, there was still substantial

18 uncertainties as to whether a going-private transaction could

19 proceed?  Is that fair to say?

20          **MR. PRICE:**  Objection, vague, leading.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  Yes.

23 BY MR. PORRITT

24 **Q**     Okay.  And Mr. Price asked you about you received some

25 indications of interest from some investors, including one of

1    the investors from Silver Lake in the going-private transaction

2    in Tesla?  Is that correct?

3         (Reporter clarification)

4            **MR. PORRITT:**  Sorry.

5    **BY MR. PORRITT**

6    **Q**    Mr. Price asked you how you'd received some indications of

7    interest from potential investors in the going-private for

8    Tesla, is that correct?

9    **A**    Why.

10   **Q**    Including one of your own investors?

11   **A**    Yes.

12   **Q**    Okay.  Is an indication of interest expressed that way the

13   same as a commitment to financing?

14   **A**    No.

15   **Q**    Okay.  What's the difference?

16   **A**    Um, an interest is an expression of interest.  A

17   commitment is a signed legal document committing you to wire

18   money.

19   **Q**    Okay.  And I think we saw in your presentation to Mr. Musk

20   as early as August 10th that you wanted such a written

21   committed financing before making any proposal to the board.

22   Is that correct?

23   **A**    Yes.

24   **Q**    And that was Stage 1 of the going-private timeline,

25   correct?

DURBAN - RECROSS / PRICE

1    **A**    Yes.

2    **Q**    And you never got to that stage with going private for

3    Tesla.

4    **A**    No.  Not -- not I.

5              **MR. PORRITT:**  Thank you, Mr. Durban.

6              **THE COURT:**  Thank you.  All right.  Anything on

7    recross?

8                          **<u>RECROSS-EXAMINATION</u>**

9    **BY MR. PRICE**

10   **Q**    Mr. Durban, just to be clear, you just said that in

11   connection with financing, there was no signed legal document

12   with someone committing to financing.  Do you recall saying

13   that?

14   **A**    Yes.

15   **Q**    Despite that, you told the board that based upon your

16   substantial experience, there was more than enough interest and

17   funding to execute on the transaction.  Right?

18   **A**    Yes.

19   **Q**    So what you gave them was based on your experience, right,

20   that funding was not is going to be an issue.  Right?

21   **A**    Yes.

22   **Q**    And you said that we didn't -- you didn't go to Stage 1.

23   One of the reasons this did not progress beyond August 23rd or

24   go to what you have referred to as a Stage 1, is the feedback

25   that the shareholders wanted Tesla to stay public.  Right?

PROCEEDINGS

1     **A**     Correct.

2     **Q**     And that's what you told the board.

3     **A**     Correct.

4               **MR. PRICE:**  Thank you.

5               **THE COURT:**  Anything further?

6               **MR. PORRITT:**  Nothing further, Your Honor.

7               **THE COURT:**  All right.  Thank you, Mr. Durban.  You

8     may step down, and you are excused.

9               **THE WITNESS:**  Yes, sir.  Have a nice weekend.

10              **THE COURT:**  Thank you.

11         (Witness excused)

12              **THE COURT:**  The plaintiff may call the next witness.

13              **MR. PORRITT:**  I don't know, we started late,

14    Your Honor, so I don't know what time you had in mind for --

15              **THE COURT:**  Well, okay.  That is a fair point.  So I

16    guess we have been going, I don't know, an hour and a half, so

17    why don't we go ahead and take our break.  We will take a

18    20-minute break.

19         Again, just a reminder, please do not discuss this case

20    with anyone, including amongst yourselves; do not read or

21    listen to any reportage or anything about this case.  Do not do

22    any research or form any opinions until this case is submitted

23    to you for deliberation.  See you in 20 minutes.

24              **THE COURTROOM DEPUTY:**  All rise for the jury.

25         (Jury excused)

1        (The following proceedings were held outside of the

2    presence of the Jury)

3        **THE COURT:**  All right.  So, you will have to get me

4    the allocation of those four extra minutes on the Brinkman.

5    How do you want to handle that?

6        **MR. PORRITT:**  I'm sorry, Your Honor?

7        **THE COURT:**  I said that our time estimate for the

8    Brinkman depo, there's five more minutes that we have, and I

9    need to allocate that --

10       **MR. PORRITT:**  I think the difference may be we have --

11   yesterday, again, in meeting and conferring, we tried to cut

12   some more time out of Mr. Brinkman so we will make sure the

13   Court has the current -- I thought we submitted that.  So we'll

14   check.

15       **THE COURTROOM DEPUTY:**  You did, but you have 44

16   minutes.  I have 50.

17       (Off-the-Record discussion between counsel)

18       **MR. PORRITT:**  All right.  Then, yes, we'll work out

19   what the proper allocation should be and we will figure that

20   out.

21       **THE COURT:**  Thank you.

22       (Recess taken from 10:37 a.m. to 11:00 a.m.)

23       (The following proceedings were held outside of the

24   presence of the Jury)

25       **THE COURT:**  All right, ready to retrieve the jury?

 1        **THE COURTROOM DEPUTY:**  I am.  Court is reconvened.

 2        (Jury enters the courtroom at 11:03 a.m.)

 3        **THE COURT:**  All right.  Welcome back.  Have a seat,

 4   everyone.

 5                              **DAN DEES**,

 6   called as a witness for the Plaintiffs, having been duly sworn,

 7   testified as follows:

 8        **THE WITNESS:**  I do.

 9        **THE CLERK:**  Please have a seat.

10        Please speak clearly into the microphone.  State and spell

11   your first and last name for the record.

12        **THE WITNESS:**  Dan Dees.

13        **THE COURT:**  All right.  And just for the record, this

14   is the plaintiffs next witness that you're calling, Mr. Dees?

15        **MR. PORRITT:**  That's correct, Your Honor.

16        **THE COURT:**  All right.  Mr. Dees, if you could spell

17   your last name for the record, I'd appreciate it.

18        **THE WITNESS:**  D-E-E-S.

19        **THE COURT:**  Thank you.

20                         **DIRECT EXAMINATION**

21   BY MR. PORRITT

22   **Q.**  Good morning, Mr. Dees.

23   **A.**  How are you?

24   **Q.**  I'm very well.  Thank you.

25        Could you please state your current job position?

**DEES - DIRECT / PORRITT**

1  **A.**   I'm the co-head of global banking and markets at Goldman

2  Sachs.

3  **Q.**   And how long have you been at Goldman Sachs?

4  **A.**   30 years, 30 and a half.

5  **Q.**   Wow.  And do you recall when you first started working

6  for -- doing work with Tesla, Inc.?

7  **A.**   The 2014-'15 time frame.

8  **Q.**   Okay.  And are you the Goldman Sachs representative with

9  the primary client relationship with Elon Musk and Tesla?

10 **A.**   I'm the team lead with Elon Musk, yes.

11 **Q.**   Okay.  And Goldman Sachs has done a substantial amount of

12 business with Tesla over the last eight years?

13 **A.**   Yes.

14 **Q.**   Okay.  And what was your job position back in 2018 when

15 the events in question in this case occurred?

16 **A.**   In 2018 I was the head of technology, media and telecom,

17 which was a -- which is an industry group within investment

18 banking.

19 **Q.**   Okay.  Now, I'm going to get -- we'll get straight to the

20 chase.  I will refer you first to Exhibit 8, previously

21 admitted.

22      (Document displayed.)

23 **Q.**   It's the tweet we're becoming very familiar with over the

24 last couple of weeks (as read):

25           "Am considering taking Tesla private at $420.  Funding

**DEES - DIRECT / PORRITT**

1        secured."

2        Do you recognize this tweet?

3   **A.**   I do.

4   **Q.**   Okay.  Do you recall when you first saw this tweet?

5   **A.**   I don't.

6   **Q.**   Okay.  Do you recall if you saw it shortly after it was

7   posted?

8   **A.**   I do.

9   **Q.**   Okay.  Do you follow Elon Musk on Twitter?

10  **A.**   I do.

11  **Q.**   Okay.  Did you follow him back in August 2018?

12  **A.**   I did.

13  **Q.**   Okay.  And do you recall what your reaction was when you

14  saw this tweet?

15  **A.**   I was -- I was surprised.

16  **Q.**   Okay.  And why were you surprised?

17  **A.**   Surprised he was considering taking it private, surprised

18  that we weren't involved at Goldman.

19  **Q.**   So you would have expected that before Mr. Musk announced

20  something like "taking Tesla private," that he would have

21  consulted his financial -- one of his many financial advisors?

22  **A.**   Not necessarily.  I wouldn't have expected it.  I would

23  have hoped.

24  **Q.**   And do you recall what you then did after seeing this

25  tweet?

DEES - DIRECT / PORRITT

1   **A.**   I don't.

2   **Q.**   Did you attempt to contact Mr. Musk?

3   **A.**   I did at some point, yes.

4   **Q.**   Okay.  Do you recall, was that by email or by telephone?

5   Both?

6   **A.**   I -- I suspect by email.  I think by email.

7   **Q.**   Okay.  Do you recall whether you -- whether you had a

8   chance to speak with Mr. Musk?

9   **A.**   Eventually, yes.

10  **Q.**   Okay.  And you had a -- you had a meeting with him on

11  August 10th; is that correct?

12  **A.**   We had a subsequent meeting.  I don't know the exact date

13  of it.

14  **Q.**   Okay.  And I'll try and frame it for you.  August 7th was

15  a Tuesday.  August 10th would be the Friday.

16      Does that refresh your recollection you met with him on

17  August 10th?

18  **A.**   It does, and that time frame sounds reasonable for the

19  time in which -- you know, by which we met with him, but I -- I

20  just -- I don't know the exact date.

21  **Q.**   Okay.  But you recall it was a few days after the tweet?

22  **A.**   Yeah.

23  **Q.**   Okay.  And what was the purpose of that meeting?

24  **A.**   I don't recall exactly the purpose.  I -- we shared our

25  views on ways he could satisfy his objectives in -- in this

```
 1   take private, but I don't -- I would need to refresh with the
 2   materials that are I'm sure somewhere in here.
 3        MR. PORRITT:  If we could show to the witness
 4   Exhibit 252?
 5      (Document displayed.)
 6        THE COURT:  If it helps, they're also up on the
 7   screen.
 8        THE WITNESS:  These are new.  Okay.  That's a new
 9   crutch.
10      Yep, that does help.
11   BY MR. PORRITT
12   Q.   Do you recognize Exhibit 252, Mr. Dees?
13   A.   I do recognize it.
14   Q.   And is this an email exchange you had with colleagues at
15   Goldman Sachs?
16   A.   Yes.  It's an email exchange with colleagues at
17   Goldman Sachs.
18   Q.   Okay.  And this is after your meeting with Mr. Musk?
19   A.   I don't know.  It says Tuesday -- it says it's Thursday,
20   August 9th.  I thought you had referenced August 10th.
21   Q.   I was looking at the top email.
22   A.   Oh, I'm sorry.  I'm looking at the bottom.
23        MR. PORRITT:  If you scroll down there, I think there
24   is an email from Mr. Dees.
25      There it is.
```

1   **BY MR. PORRITT**

2   **Q.**   That's Thursday, August 9th; correct?

3   **A.**   Yeah.  I -- I don't know what the timing is versus

4   vis-a-vis our meeting with Elon.

5           **MR. PORRITT:**  Okay.  We would move Exhibit 252 at this

6   point marked into evidence.

7           **MR. SPIRO:**  No objection.

8           **THE COURT:**  Admitted.

9       (Trial Exhibit 252 received in evidence.)

10          **THE COURT:**  You may publish.

11      (Document displayed.)

12  **BY MR. PORRITT**

13  **Q.**   In your meeting with Mr. Musk, do you recall him

14  mentioning the Saudi Arabia Public Investment Fund?

15  **A.**   I remember him mentioning that.  I don't know if it was in

16  that meeting.  I just don't recall.

17  **Q.**   Do you recall Mr. Musk discussing that he did not want the

18  Saudi Arabia Public Investment Fund funding 100 percent of any

19  taking private?

20  **A.**   Yes.

21  **Q.**   Okay.  Do you recall any further about that, discussing

22  the percentage of the Saudi Public Investment Fund --

23  **A.**   I'm sorry.  Discussing what?

24  **Q.**   Sorry.  I'll slow down and rephrase.

25  **A.**   I've got a loud fan behind me here.

1   Q.   Do you recall anything else that Mr. Musk said about his

2   intentions regarding the percentage of involvement of the Saudi

3   Arabia Public Investment Fund and the potential going private?

4   A.   Yeah.   I remember in the context of him discussing his

5   objectives, he wanted a diversified equity base so that no

6   holder would be able to dictate terms.

7        If he could -- you know, that was one of the objectives,

8   would be such that no holder could dictate terms, including

9   with the Saudis, where they had a -- you know, a view to build

10  a Gigafactory there potentially sooner than he would want to

11  build a Gigafactory.   "There" being Saudi.

12  Q.   Do you recall he had a -- Mr. Musk expressed the view that

13  he did not want any one shareholder in a private Tesla owning

14  more of a percentage than he had?

15  A.   Yes.   That was -- that was one of the objectives he -- he

16  expressed at some point.   I don't remember if it was in that

17  meeting.

18  Q.   Okay.   And his holding at that point was approximately

19  20 percent; is that right?

20  A.   That sounds about right.

21  Q.   Okay.   And do you recall that as part of this going

22  private process, Mr. Musk expressed the view that he did not

23  intend to increase his percentage ownership in a private Tesla;

24  correct?

25  A.   Yeah.   Yes.   Correct.

1  Q.   So --

2  A.   It was in the context -- just to be clear, oftentimes

3  these take-private transactions are transactions where you put

4  leverage on the company such that the existing owners concert,

5  you know, ownership goes up.  And in this instance, he wasn't

6  thinking about putting more leverage on the company to increase

7  his ownership.

8  Q.   Okay.  So he, himself, wasn't looking personally to buy

9  shares in this going-private transaction?

10  A.   I don't know about.  He wasn't looking to -- increase his

11  equity ownership through leverage.

12  Q.   You also -- do you also recall Mr. Musk discussing his

13  intent that he hoped that institutional -- that existing

14  institutional investors in Tesla would roll their ownership

15  into a private Tesla?  Do you recall that?

16  A.   Yes.  Yes, I do.

17  Q.   Do you recall whether at this time of your initial meeting

18  on August 10th Mr. Musk had actually spoken to any of these

19  institutional investors?

20  A.   I don't recall.

21  Q.   Okay.  Do you know if he had spoken to any of them before

22  his tweets on August 7th?

23  A.   I don't know.

24        MR. PORRITT:  If we could show the witness

25  Exhibit 253?

1           Sorry.  I have one more question on 252.  I apologize.  If

2    we could go back to Exhibit 252?

3           (Document displayed.)

4    **BY MR. PORRITT**

5    **Q.**   If you look at the top email there from -- I think it's

6    Jonathan.  My eyesight is poor, too.  The blind leading the

7    blind.

8           Jonathan Armstrong, do you see that?

9    **A.**   Yes, I do.

10   **Q.**   And who's Jonathan Armstrong?

11   **A.**   He's a member of our capital markets team.  He's a

12   Goldman Sachs banker.

13   **Q.**   Do you see that top email?  It starts off "Regarding use

14   of an SPV"?

15   **A.**   Yes.

16   **Q.**   Okay.  Do you know what "SPV" is referring to?

17   **A.**   Yes.  It's a special purpose vehicle.

18   **Q.**   Okay.  And do you recall what -- what topic this email

19   from Jonathan Armstrong was addressing?

20   **A.**   Yes.  I recall generally.  The specifics of it not as

21   much, but the general issue was in the context of going

22   private.  If you wanted all of your shareholders to have the

23   opportunity to participate and continue to own the stock

24   privately, you had to find some vehicle to aggregate their

25   ownership, to allow them to continue to own.

1      It's not a very eloquent description, but that's -- so

2   forming a special purpose vehicle that could be counted as one

3   holder, but have a bunch of holders, you know, having -- having

4   an interest in it was the -- was the structure that was being

5   explored.

6   Q.   Okay.  Was this a structure you were familiar with?

7   A.   SPVs?  Yeah.

8   Q.   Okay.  What about this concept of a private company with

9   SPVs to have a quarter, sort of -- a team of investors?

10   A.   I'm familiar with it.  I know some other technology

11   companies have used something similar, but I -- but I -- I

12   don't have any more specific than that.

13   Q.   Okay.  And this is because there's a legal limit to the

14   number of shareholders a private company can have; correct?

15   A.   A limit to the number of shareholders without them

16   bringing other requirements, like reporting requirements and

17   other things like that, yes.

18   Q.   Okay.  And Mr. Armstrong cites an SEC rule saying if

19   you're circumventing the limit, then the structure sort of is

20   ignored and you'll be treated as a public company anyway; is

21   that correct?

22   A.   I think at some point -- sorry.  Let me see what he says.

23   Q.   Okay.

24   A.   Okay.  I don't know.  My understanding is if -- is if he

25   ended up with that, it may bring other reporting requirements.

**DEES - DIRECT / PORRITT**

1    You may have to get 40 Act comp readers.  There's a level of

2    mechanical issues and details that are beyond me even still

3    reading that -- the email.

4    **Q.**   And just to be clear, you're not an attorney; is that

5    correct?

6    **A.**   I am not.

7    **Q.**   Okay.  Is it fair to say this is a complicated legal

8    regulatory issue?

9    **A.**   Yes.

10   **Q.**   Okay.  Now if we can turn to Exhibit 253.

11        Do you recognize this?

12   **A.**   Yes.

13   **Q.**   And this is an email you sent to Brian Dong; is that

14   correct?

15   **A.**   I think he sent it to me.

16   **Q.**   I apologize.  Sorry.  That's correct.  Sorry.

17        **MR. PORRITT:**  At this point move to admit Exhibit 253.

18        **THE COURT:**  Any objection?

19        **MR. SPIRO:**  No objection.

20        **THE COURT:**  Admitted.

21     (Trial Exhibit 253 received in evidence.)

22     (Document displayed)

23   **BY MR. PORRITT:**

24   **Q.**   Do you recall receiving this email from Mr. Dong?

25   **A.**   Not specifically.

**DEES - DIRECT / PORRITT**

1  **Q.**   Okay.

2  **A.**   I'm sure I did, but...

3  **Q.**   Okay.  Again, this email is discussing issues arising out

4  of attempts to go private with Tesla at this point?

5  **A.**   It looks like it, yes.

6  **Q.**   Okay.  So by August 10th, this is three days after the

7  tweet, can you describe a general sort of the work that you and

8  your team were doing in connection with the go-private

9  transaction?

10 **A.**   You see some of it here.  Trying to think through

11 structures that could help Elon achieve the objectives he

12 wanted to achieve.

13      Because as you -- as you saw on the subsequent blog posts,

14 and I'm sure we'll -- we'll discuss, it wasn't just a matter of

15 having all the capital available.  He then wanted to solve for

16 different objectives ideally, including allowing existing

17 investors to roll their stock in; allowing small investors, you

18 know, mom-and-pop investors who'd been with him for a long

19 time, to continue to own; having a more diversified ownership.

20      So amongst those objectives, it was starting to work with

21 him to understand those objectives to try to continue to

22 develop this process.

23 **Q.**   Okay.  And by -- as of August 10th, 2018, was the amount

24 of capital that you'd need to finance this going private, was

25 that amount determined?

**DEES - DIRECT / PORRITT**

1   **A.**   At a 420 price you could determine -- you know, you could

2   do the math, say how much debt and how much equity you need.

3   **Q.**   But was the amount of additional financing needed?  Was

4   that understood at this point in time?

5   **A.**   I'm not sure what -- what you mean by "additional

6   financing."

7   **Q.**   Well, so you can multiply the total shares outstanding by

8   420 and that would give you a number?

9   **A.**   Yeah, and add the debt.

10  **Q.**   Yeah.  Did you know how many shares you would actually

11  need to buy in order to accomplish a go-private?

12  **A.**   Oh, are you asking how many would roll and, therefore --

13  **Q.**   Yes.

14  **A.**   Okay.  No.  You were making -- we were making assumptions

15  at that point.

16  **Q.**   Okay.  Was it ever determined how many shareholders would

17  actually roll into a potential going-private transaction at

18  Tesla?

19  **A.**   Not definitively.

20  **Q.**   Okay.  I'd like to show you Exhibit 254.

21         **MR. PORRITT:**  Please publish to the witness

22  Exhibit 254.

23         **THE COURT:**  Okay.

24         **MR. PORRITT:**  If it's not in, I'll move it in.  I'll

25  ask the witness -- I'll lay the foundation and move it in

**DEES - DIRECT / PORRITT**

1    anyway.

2              MR. SPIRO:  It's in.

3              MR. PORRITT:  Oh, it's in.

4         Okay.  So this is already in evidence.  Thank you.

5              THE COURT:  Okay.

6              MR. PORRITT:  So, Derek, if you could, for the

7    witness, just scroll through.

8         (Document displayed.)

9              THE WITNESS:  I see it.

10   BY MR. PORRITT:

11   Q.   So, once again, if you turn to the second page of

12   Exhibit 254.  See that's titled "Discussion Materials,"

13   August 10th?

14   A.   Uh-huh.

15   Q.   Does this further refresh your recollection that your

16   meeting with Elon Musk took place on August 10th?

17   A.   Yeah.  That's what it looks like.

18   Q.   Okay.

19   A.   That's when the book was dated, yes.

20   Q.   Okay.  And if I can refer you -- if I can refer you to

21   Number 3, "Overview of Selected Alternatives."

22        Do you see that?

23   A.   Yes.

24   Q.   And then is it fair to say that at this point you were

25   still exploring?  You have three potential structures at this

**DEES - DIRECT / PORRITT**

1  point in time?

2  **A.**   It's fair to say these were three structures that we were

3  discussing.  I don't know if that was the limit of the

4  structures that you could -- you could ultimately do.  But,

5  yeah, these are three structures that we were outlining to

6  potentially meet his objectives.

7  **Q.**   Okay.  And the middle one was the one involving the SPV

8  that you referred to before; is that correct?

9  **A.**   Yes.

10  **Q.**   Okay.  And one of the points underneath that

11  Alternative 3 -- Alternative 2 notes that you may be able to

12  avoid a particular classification through non-conventional

13  approaches; is that correct?

14  **A.**   That's what it says, yes.

15  **Q.**   Is that a fair description of that entire Alternative 2,

16  that it was a non-conventional approach?

17  **A.**   Yeah.  It was non-conventional, yeah.

18  **Q.**   And then if we go to the next slide.

19      (Document displayed.)

20  **Q.**   This discusses the incremental financing need --

21  **A.**   Yes.

22  **Q.**   -- for each alternative; is that correct?

23  **A.**   Uh-huh.  Uh-huh.  Yes.

24  **Q.**   And it ranges from 22 billion to $29 billion; is that

25  correct?

**DEES - DIRECT / PORRITT**

1    **A.**    Yes.

2    **Q.**    Okay.  And, again, does that confirm that at this point in

3    time the incremental financing was not -- you didn't have an

4    amount for incremental financing set at this point in time?

5    **A.**    Well, again, this is a way to look at different

6    assumptions of who -- what percentage might roll.

7         Oh, yeah, these were just assumptions and estimates at the

8    time and assuming you didn't want to take more than a certain

9    amount from the PIF; right?

10        In other words, what you see in these three alternatives

11   is the only assumption made about the PIF in this was that they

12   rolled their existing amount that they invested in.  This

13   wasn't any new.

14        So, yes, the incremental financing need would be that

15   piece spoken for by, you know, however you want to build the

16   equity book of interest.

17   **Q.**    Okay.  And you mentioned -- look at these assumptions.

18   You've got Tencent in Saudi PIF, 100 percent roll; do you see

19   that?

20   **A.**    Yes.

21   **Q.**    Had you spoken -- anyone at Goldman Sachs spoken to Saudi

22   PIF or Tencent at this point in time?

23   **A.**    I don't recall.

24   **Q.**    Okay.  So this was an assumption?

25   **A.**    I just don't remember.  I don't remember if it had been

1    confirmed or it was an assumption at the time.

2    **Q.**   Okay.  And then -- you then list T. Rowe, Fidelity,

3    Baillie Gifford, 75 percent roll.  Do you see that?

4    **A.**   Yes.

5    **Q.**   Those are the three largest institutional investors in

6    Tesla at the time?

7    **A.**   I believe they were the three largest, yeah.

8    **Q.**   Okay.  And, again, is a 75 percent roll, is that based on

9    conversations that you had with any of those, T. Rowe, Fidelity

10   or Baillie Gifford?

11   **A.**   Not that I recall specifically.  It could have been.  I

12   just -- I don't remember specific conversations.

13   **Q.**   Or it could just be an assumption --

14   **A.**   Yes.

15   **Q.**   -- that you would just choose 75 percent?

16   **A.**   Yeah.

17   **Q.**   Okay.  And "other active investors," 25 percent roll,

18   that's another assumption?

19   **A.**   Yes.

20   **Q.**   Okay.  And then "retail and other investors," it varies

21   across the different alternatives from 0 to 75 percent,

22   et cetera?

23   **A.**   Right.

24   **Q.**   Is it fair to say this is sort of scoping out the

25   potential alternatives and what it might mean for potential --

**DEES - DIRECT / PORRITT**

1  for financing?

2  **A.**   Yeah.   I think that's -- yeah.   I think that's one way to

3  characterize it.

4  **Q.**   And if you look at the -- if you look at the next slide,

5  "High-Level Process Comparison," can you explain for the jury

6  what's being explained on this slide?

7      (Document displayed.)

8  **A.**   It's a summary of the -- of the process of executing those

9  three different alternatives that we'd shown on that previous

10  slide, what you would do kind of step-by-step, including, you

11  know, meeting with the special committee, negotiating

12  agreement.   You know, the things listed here.   And then a

13  discussion of potential next steps to take --

14  **Q.**   Okay.

15  **A.**   -- depending on which of these structures you wanted to

16  choose.

17  **Q.**   And is it conventional in the going-private transactions

18  to engage with a special committee on behalf of the target or

19  the company?

20  **A.**   Yes.   If a -- if an interested party is buying such, you

21  need to set up a special committee.   So, yes, in this type of

22  circumstance, yes.

23  **Q.**   Okay.   And at this stage, by August 10th, had

24  Goldman Sachs, or anyone on behalf of Elon, started to engage

25  in the special committee for Tesla?

DEES - DIRECT / PORRITT

1   A.   I don't -- I don't recall.

2   Q.   What was the take-away from the August 10th meeting with

3   Elon Musk for you and your team?

4   A.   I don't remember.  I don't recall.

5   Q.   If you could refer to --

6        MR. PORRITT:  Actually, show the witness Exhibit 256.

7        (Document displayed.)

8   BY MR. PORRITT:

9   Q.   Do you see Exhibit 256, Mr. Dees?

10  A.   Yes.

11  Q.   Okay.

12       MR. PORRITT:  And, first of all, we would move to

13  admit Exhibit 256 at this point.

14       MR. SPIRO:  There's no objection.  I think it's in.

15       MR. PORRITT:  All right.

16       THE COURT:  Okay.

17  BY MR. PORRITT

18  Q.   If I can refer you to the second email there from

19  Elon Musk to you dated August 11th.

20  A.   Yes.

21  Q.   And then he says -- he says to you (as read):

22       "Key question to solve is:  Can we put together a

23       diverse enough investor lender group such that no single

24       investor can demand special terms?"

25  A.   Yep.

DEES - DIRECT / PORRITT

1   Q.   Is that a continuation of what we were talking about in

2   terms of --

3   A.   Yes.

4   Q.   -- Mr. Musk did not want one individual investor owning a

5   significant percentage or too large a percentage in a private

6   Tesla?

7   A.   Yes.

8   Q.   Okay.  And it says here, he then continues (as read):

9            "Saudi Arabia would do the same" -- "would do the

10       entire thing, of course, as this is strategically critical

11       to their future, but they would require that we build a

12       Gigafactory there sooner than we prefer."

13       Do you see that?

14  A.   Yes.

15  Q.   Do you recall that the Saudi Arabia Public Investment Fund

16  would condition their investment on building a Gigafactory in

17  Saudi Arabia sooner than Tesla would otherwise prefer?

18  A.   I recall it by reading this.

19  Q.   Okay.

20  A.   I don't know when in the process I was made aware, but

21  clearly I was made aware at least here.

22           MR. PORRITT:  If we can refer the witness to

23  Exhibit 257?

24  BY MR. PORRITT

25  Q.   Do you recognize Exhibit 257, Mr. Dees?

1   **A.**   I do.

2   **Q.**   And that's an email from Greg Lemkau to you?

3   **A.**   Yes.

4          **MR. PORRITT:**  Okay.  At this point we would move

5   Exhibit 257 into evidence, Your Honor.

6          **THE COURT:**  Any objection?

7          **MR. SPIRO:**  No, Your Honor.

8          **THE COURT:**  Admitted.

9      (Trial Exhibit 257 received in evidence.)

10     (Document displayed)

11  **BY MR. PORRITT**

12  **Q.**   I want to refer you to the sentence at the end of the

13  first line saying (as read):

14          "Seems there is some time pressure to

15          announce our roll."

16     Do you see that?

17  **A.**   I do.

18  **Q.**   Okay.  Do you recall that Elon Musk wanted to announce

19  Goldman Sachs' roll in any potential going-private transaction?

20  **A.**   Yes.

21  **Q.**   Okay.  And what was Goldman Sachs' response to his request

22  to disclose your involvement?

23  **A.**   We were okay with being disclosed, but we needed to get

24  through our internal processes first.

25  **Q.**   Okay.  And did he end up disclosing -- did Mr. Musk end up

 1  disclosing it before you had completed your internal processes?

 2  **A.**   He did while we were in the process of completing them,

 3  yes.

 4  **Q.**   Okay.  And if we can turn now to Exhibit 261.  Do you

 5  recognize Exhibit 261?

 6  **A.**   Yes.

 7          **MR. PORRITT:**  And at this point I move Exhibit 261

 8  into evidence.

 9          **THE COURT:**  Any objection?

10          **MR. SPIRO:**  No, Your Honor.

11          **THE COURT:**  Admitted.

12      (Trial Exhibit 261 received in evidence)

13          **MR. PORRITT:**  And if we can publish this email.

14      (Document displayed.)

15  **BY MR. PORRITT:**

16  **Q.**   This is an email.  Initially the lower email is from you

17  to Mr. Musk; is that correct?

18  **A.**   Yes.

19  **Q.**   And in it you lay out some conditions to Goldman Sachs

20  accepting the engagement to work with Mr. Musk in the

21  going-private; is that correct?

22  **A.**   Yes.

23  **Q.**   And I refer you to the three bullet points towards the end

24  there.  It says (as read):

25          "You will keep the special committee fully apprised of

1    your work and to abide by their requests.

2         "All future tweets and public communications shall be

3    precleared with your illegal and financial advisors.

4         "And our name will not be used without proper

5    consent."

6    Do you see that?

7    A.   Yes.

8    Q.   Until this time on August 14, 2018, Mr. Musk had used your

9    name without your consent; is that correct?

10   A.   Well, when he announced our involvement in the

11   transaction, it was before we were ready to announce it, yes.

12   Q.   Okay.  And he had not precleared tweets and public

13   communications about the going-private transaction with his

14   legal and financial advisors; is that correct?

15   A.   I don't know.  He hadn't precleared with us.

16   Q.   Okay.  And why did you think it was important that he keep

17   the special committee fully apprised of his work and to abide

18   by their requests?

19   A.   That's a pretty -- that's a pretty standard idea or

20   process in these -- in these situations.

21   Q.   You didn't think it was improper for the special committee

22   to control public statements made by Elon Musk, who was bidding

23   for the company, potentially bidding for the company?

24   A.   Could you ask the question again?

25   Q.   You didn't think it was inappropriate for the special

**DEES - DIRECT / PORRITT**

1  committee to have an element of control over public statements

2  by Mr. Musk in a transaction where he was potentially bidding

3  for the company?

4          **MR. SPIRO:**  Objection.  Vague.

5          **THE COURT:**  Overruled.

6  **A.**   I don't know that they did have that.  I don't know -- I

7  don't know what that -- this says something different, "fully

8  apprised of your work" and "to abide by the requests."

9       This -- the preclearing of his communications is with

10 legal and financial advisors, not the special committee.

11 **BY MR. PORRITT**

12 **Q.**   Did you understand that the special committee was going to

13 have some influence over the communications that you had with

14 Silver Lake, who you were working with in their outreach to

15 investors?

16 **A.**   Yes, in the way that's very standard in these processes.

17 **Q.**   Okay.  And you viewed that as appropriate?

18 **A.**   Yes.  Very much so.

19         **MR. PORRITT:**  Let me refer the witness to Exhibit 186.

20         **MR. SPIRO:**  There's no objection.

21         **MR. PORRITT:**  Move Exhibit 186 at this point,

22 Your Honor.

23         **THE COURT:**  Admitted.

24      (Trial Exhibit 186 received in evidence.)

25      (Document displayed)

**DEES - DIRECT / PORRITT**

1    BY MR. PORRITT

2    **Q.**   Do you recognize 186, Mr. Dees?

3    **A.**   I -- I recognize it to be a presentation from

4    Goldman Sachs.

5    **Q.**   And it was sent to -- sent to Mr. Musk as well as yourself

6    on August 14th; isn't that correct?

7    **A.**   Yes.

8    **Q.**   Okay.  And do you recall meeting with Mr. Musk on

9    August 15th, 2018?

10   **A.**   I don't recall that date, but I know we met with him

11   again.

12   **Q.**   Okay.  You recall having a second meeting --

13   **A.**   Yes.

14   **Q.**   -- roughly a week after the tweets?

15   **A.**   Yes.

16   **Q.**   Okay.  And in this, if I can refer you to -- it's 186-4.

17        (Document displayed.)

18   **Q.**   Here you map out workstreams?

19   **A.**   Yes.

20   **Q.**   Okay.  And including -- that is, one of the workstreams

21   there is "New Investors"?

22   **A.**   Yes.

23   **Q.**   And there were two sort of groups of new investors,

24   "Strategic" and "Financial"?

25   **A.**   Yes.

DEES - DIRECT / PORRITT

```
1   Q.    Okay.  And you see under "New Investors" under the
2   "Financial," there's a series of bullet points.  This was
3   your -- this was the plan to execute over the next few days; is
4   that correct?
5   A.    This is what we were proposing in this document, yes.
6   Q.    Okay.  And then the last point on -- for the "New
7   Investors" is to "require documentation/confirmation;" is that
8   correct?
9   A.    Yes.
10  Q.    So you were looking to obtain documentation confirming --
11  A.    Yes.
12  Q.    -- financing from those investors?
13  A.    Yes.
14  Q.    Okay.
15        MR. PORRITT:  And if I can refer the witness to
16  Exhibit 265, which I think is in evidence.
17        MR. SPIRO:  There's no objection.
18        THE COURT:  Okay.  Admitted.
19    (Trial Exhibit 265 received in evidence.)
20    (Document displayed.)
21  BY MR. PORRITT
22  Q.    Exhibit 265 contains another presentation from
23  Goldman Sachs?
24  A.    Yes, indeed.
25  Q.    Lots of presentations being made at this time.
```

**DEES - DIRECT / PORRITT**

1    **A.**    This is what we do.

2    **Q.**    I want to refer you especially to -- so on 265-3 and then

3    265-4.

4         (Document displayed.)

5    **Q.**    So this is entitled "Potential Investor Universe;" is that

6    right?

7    **A.**    Yes.

8    **Q.**    Okay.  So, again, this was a list -- well, it's titled

9    "Preliminary Target List;" correct?

10   **A.**    Potential investors, yes.  "Preliminary Target List," yes.

11   **Q.**    All right.  So this is a list of some of the investors you

12   were seeking to raise money for for a potential going-private

13   transaction?

14   **A.**    This would have been a list of some of the investors that

15   could have been part of the ownership group, yes.

16   **Q.**    Okay.  And then if you can turn to 265-7.

17        (Document displayed.)

18   **Q.**    You see here were the "Key Process Steps."  Do you see

19   that?

20   **A.**    Yes.

21   **Q.**    And this is another thing that you and your team prepared?

22   **A.**    Yes.

23   **Q.**    And so at this point what stage were you in as of

24   August 15th, 2018?

25   **A.**    In terms of our -- our stage?  It would have been in --

**DEES - DIRECT / PORRITT**

1 in -- well, in trying to broaden the investor base, given that

2 was what he wanted, we were in the process of -- of that early

3 part; you know, confirming the broad set of investors we'd go

4 to, confirming their interest, reaching out to a larger list,

5 you know, et cetera, all of -- all of that you see in the

6 left-hand side.

7 **Q.**   Okay.   Then I would end with "Collect Signed Commitment

8 Documents and Prepare Proposal;" is that correct?

9 **A.**   That's ending with that, yes.

10 **Q.**   Okay, yeah.

11      And as of this point, by August 15th, had you collected

12 any signed commitment documents from any potential investor in

13 a going-private transaction for Tesla?

14 **A.**   Not that I recall.

15 **Q.**   And if I can refer -- this predates what we were just

16 looking at, Exhibit 263.

17         **MR. PORRITT:**  Can we refer Exhibit 263 to the witness?

18         **THE COURT:**  Is 263 in evidence?

19         **MR. SPIRO:**  This says 236 at the bottom.

20         **MR. PORRITT:**  Yeah, not 236.  263.  Sorry.

21         **THE COURT:**  263?

22         **MR. PORRITT:**  Yes.

23      I don't believe this is in evidence, Your Honor.

24         **THE COURT:**  I'm sorry.  What?

25         **MR. PORRITT:**  It's not in evidence yet, Your Honor.

DEES - DIRECT / PORRITT

```
 1              THE COURT:  All right.

 2              MR. PORRITT:  But we would move it.

 3    BY MR. PORRITT

 4    Q.    Do you recognize 263, Mr. Dees?

 5    A.    I recognize what it is, yes.

 6    Q.    Okay.  And that's an email from Greg Lemkau to you and

 7    others?

 8    A.    Yes.

 9              MR. PORRITT:  At this point we move Exhibit 263 into

10    evidence.

11              THE COURT:  Any objection?

12              MR. SPIRO:  No, Your Honor.

13              THE COURT:  Admitted.

14         (Trial Exhibit 263 received in evidence.)

15         (Document displayed.)

16    BY MR. PORRITT

17    Q.    And so I want to refer you to the bottom email from Greg

18    Lemkau to you dated August 14th titled "Sources of Capital."

19    A.    Yes.

20    Q.    And the last two points are -- well, towards the bottom

21    are the third and fourth points (as read):

22              "Objective is to listen a bit to Elon."

23         And then (as read):

24              "Identify all sources of capital in the world."

25         Is that correct?
```

**DEES - DIRECT / PORRITT**

1    **A.**   Ambitious, yes.

2    **Q.**   And that culminated in the slide we were just looking at,

3    the "potential investors;" correct?

4    **A.**   I don't know if that culminated in that, but that is a

5    broad universe of investors on that slide, yes.

6    **Q.**   Okay.  Did that slide -- I think it was Exhibit 265.  Did

7    that contain a list of all the capital in the world?

8    **A.**   No.

9    **Q.**   But a decent subset of it?

10   **A.**   It -- it was a lot of capital, yes.

11   **Q.**   Okay.

12        **MR. PORRITT:**  And if I can show the witness

13   Exhibit 194, which I believe was admitted today.

14        **THE COURT:**  Any objection?

15        **MR. SPIRO:**  No objection.

16        **MR. PORRITT:**  I believe it was admitted prior this

17   morning, Your Honor.

18        **MR. SPIRO:**  No objection.

19        **THE COURT:**  Oh, sorry.  It was already admitted?

20        **MR. PORRITT:**  Yes, Your Honor.

21        **THE COURT:**  Okay.

22        (Document displayed.)

23   **BY MR. PORRITT**

24   **Q.**   Do you recall reaching out with a call asking permission

25   from the special committee to approach these investors listed

**DEES - DIRECT / PORRITT**

1     in Exhibit 194?

2     **A.**     I don't recall, no.

3     **Q.**     Okay.  If you look at the last point from Mr. Durban

4     saying (as read):

5            "We do realize this process step is a bit unusual

6          considering they have not engaged a financial advisor at

7          this stage.  However, speed is our collective highest

8          priority and this will help accelerate development of a

9          fully financed proposal."

10         Do you see that?

11    **A.**     I do.

12    **Q.**     Okay.  At this point were you and Silver Lake trying to

13    develop a fully financed proposal?

14    **A.**     Yes.  At this point we were going out to additional -- or

15    we were asking to go out to additional sources of capital to

16    help fill his objectives --

17    **Q.**     Okay.

18    **A.**     -- to be able to have a more diversified equity ownership

19    base and, you know, all the things we've talked about already.

20    **Q.**     Okay.  And that's -- and that's on August 16th, 2018;

21    correct?

22    **A.**     Yes, it is.

23    **Q.**     Okay.  And then did you attend a board meeting on

24    August 23rd, 2018?

25    **A.**     I attended a board meeting, and I trust it was

1    August 23rd.  I don't know the dates, but, yes, I did.

2    **Q.**   All right.

3            **MR. PORRITT:**  Well, we can quickly show Exhibit 101 to

4    the witness.  It's been admitted.

5        (Document displayed.)

6    **BY MR. PORRITT**

7    **Q.**   And this shows the attendees there?

8    **A.**   Yes.

9    **Q.**   Do you see that?

10   **A.**   I do.

11   **Q.**   Okay.  And you made -- you made a presentation to the

12   board; is that correct?

13   **A.**   Yes.

14           **MR. PORRITT:**  And if we can show Exhibit 201.

15       And if you could quickly scroll through some of the pages.

16       (Document displayed.)

17   **BY MR. PORRITT**

18   **Q.**   Is this your presentation that you made at Silver Lake?

19   **A.**   It's Silver Lake.  It says "Silver Lake" down on the

20   bottom left, but I -- I think this is the document that was

21   used in that -- that was present in that meeting, yes.

22   **Q.**   Is this the one meeting where Goldman Sachs didn't have

23   their own presentation?

24   **A.**   Yeah.  There you go.

25   **Q.**   And you recall at that meeting you recommended not

**DEES - CROSS / SPIRO**

1    proceeding with the go-private transaction; is that correct?

2    **A.**    Yes.

3    **Q.**    Okay.  Thank you, Mr. Dees.

4         **MR. PORRITT:**  I reserve time for reexamination.

5         **THE COURT:**  All right.  Thank you.

6                        <u>**CROSS-EXAMINATION**</u>

7    **BY MR. SPIRO**

8    **Q.**    Good morning.

9    **A.**    Good morning.

10        **MR. SPIRO:**  At this time I'm going to move a few of

11   the other exhibits into evidence just to be efficient.

12        234 --

13        **THE CLERK:**  Can you hold on just one minute, please.

14        **MR. SPIRO:**  Sure.

15   (Brief pause.)

16        **THE CLERK:**  Okay.

17        **MR. SPIRO:**  -- 235, 244, 250, 251, 265, 817, and 818.

18        **THE COURT:**  All right.  Any objection to those?

19        **MR. SPIRO:**  These were on the --

20        **THE COURT:**  On the list?

21        **MR. SPIRO:**  Correct.

22        **THE COURT:**  And there were no objections?

23        **MR. SPIRO:**  Correct.

24        **MR. PORRITT:**  No objection, Your Honor.

25        **THE COURT:**  All right.  All those will be admitted.

DEES - CROSS / SPIRO

```
 1    Thank you.
 2         (Trial Exhibits 234, 235, 244, 250, 251, 265, 817, and 818
 3    received in evidence)
 4    BY MR. SPIRO
 5    Q.    So I want to take you back, Mr. Dees, to, you know, about
 6    48 hours before the "Am considering" tweet.  You know, the
 7    world before the tweet.
 8         And at that time you were not aware that on August 2nd
 9    Mr. Musk made a bid to the board?
10    A.    I was not.
11    Q.    And you were not aware at that time that the board
12    convened an emergency meeting and spoke to Deepak Ahuja?
13    A.    No.
14    Q.    And you were not aware at that time that on August 3rd,
15    the day following the emergency meeting, Mr. Musk presented to
16    the board?
17    A.    No.
18    Q.    And as of that day, you also didn't know and had not
19    spoken -- well, you had not spoken directly to Mr. Musk that
20    week.  So August 3rd, August 4th, 5th, 6th, you had not spoken
21    directly to Mr. Musk about his potential take private?
22    A.    No, I had not.
23    Q.    But you did know Mr. Musk before; correct?
24    A.    Yes.
25    Q.    And you knew his history in business?
```

DEES - CROSS / SPIRO

```
 1   A.    Yes.

 2   Q.    Pretty much every investor in bank does; right?  He's

 3   Elon Musk.

 4   A.    He's very well known.

 5   Q.    And you knew him to have a unique ability to raise

 6   capital?

 7              MR. PORRITT:  Objection.  Leading.

 8              MR. SPIRO:  He's on cross-examination.

 9              THE COURT:  Overruled.

10   BY MR. SPIRO

11   Q.    Correct?

12   A.    Yes.  He was a very successful capital raiser.

13   Q.    And he often in his rounds and rounds and in business

14   history used his own capital, didn't he?

15   A.    Yes, he did.

16   Q.    Now, on August 4th --

17              MR. SPIRO:  If you could put up 174-16.  It's already

18   in evidence.  The text messages.

19        (Document displayed.)

20   BY MR. SPIRO

21   Q.    On August 4th, 48 hours before the tweets, you didn't

22   know, sir, that half a decade or so later you'd be testifying

23   in a case in which Mr. Musk was accused of securities fraud in

24   federal court, did you?

25   A.    I did not.
```

**DEES - CROSS / SPIRO**

 1   Q.   Okay.  And I'm going to read, and these were the text

 2   messages that came into evidence with Egon Durban, who was

 3   involved in Mr. Musk's considerations (as read):

 4        "Dees told me he's convinced he doesn't need

 5        money."

 6   And Egon Durban responds, "Very consistent."

 7   Do you see that message from Egon Durban, "Very

 8   consistent"?

 9        MR. PORRITT:  Objection.  Foundation, Your Honor.

10        THE COURT:  Lay a foundation, please.

11        MR. SPIRO:  This is an exhibit in evidence.

12        THE COURT:  I know, but what's the source?  What's --

13   you need to lay a foundation.  This is not an email or text

14   from this witness, is it?

15        MR. SPIRO:  Well, no.  I mean, it refers to him.  It

16   says "Dees told me."

17        THE COURT:  That's why you need to lay a foundation.

18   Did Dees speak to one of the participants in this email, for

19   instance?

20   BY MR. SPIRO

21   Q.   You know Mike Bingle?

22   A.   I do know Mike Bingle.

23   Q.   You don't remember saying this or something similar to

24   Mike Bingle?

25   A.   I don't remember specifically, but it wouldn't surprise me

**DEES - CROSS / SPIRO**

1    if I said something like that to Mike Bingle.

2    **Q.**   So here we are on the morning of August 7th -- and if we

3    could put up -- so at this time, you know, Mr. Musk's meeting

4    about his considerations with Egon Durban and according to Mike

5    Bingle he says he's convinced he doesn't need money.

6         And the -- my handwriting is really something.

7              **MR. SPIRO:**   234, please.

8         (Document displayed.)

9    **BY MR. SPIRO:**

10   **Q.**   Do you remember the morning of August 7th and an article

11   breaking in the *Financial Times* regarding the Kingdom of Saudi

12   Arabia?

13   **A.**   I do.

14             **MR. SPIRO:**   Okay.  If we could just blow that up a

15   little bit so I make sure the jury can see that.

16        (Document enlarged.)

17   **BY MR. SPIRO**

18   **Q.**   (As read):

19             "Saudi Arabia's sovereign wealth fund has built a

20        significant stake in Tesla - the latest bold bet by the

21        state fund overseen by powerful Prince Mohammed bin

22        Salman."

23        Do you see that?

24   **A.**   I don't see it on my screen, but, yes, that sounds like a

25   faithful reading of the article.

DEES - CROSS / SPIRO

1   Q.   Okay.  Thank you.

2        Is it not -- you don't have the article on your screen?

3   It's not popped up, or just a different part?

4   A.   Just a different part.  The bottom of it.

5             MR. SPIRO:  Can we go scroll a little higher and blow

6   up the top part of this?

7        (Document displayed.)

8   BY MR. SPIRO

9   Q.   Okay.  Just to orient the jury, you do remember seeing

10  this article; right?

11  A.   I do.

12  Q.   Okay.  And --

13  A.   I'm sorry.  I remember seeing the headline, yes.

14  Q.   Okay.  And the PIF was a client of Goldman Sachs, amongst

15  other banks?

16  A.   Yes.

17  Q.   And just so the jury understands, if you have two

18  different clients at Goldman Sachs or any bank, if you know

19  something about one client, you're not allowed to just go to

20  the other client and share it; true?

21  A.   Yes, unless you get the permission.

22  Q.   Okay.  And you knew from your experience with the PIF that

23  sometime before the events in question they had wanted to give

24  direct capital to Tesla; true?

25  A.   Yes.

**DEES - CROSS / SPIRO**

1          **MR. SPIRO:**  And if we could go to 235.

2          (Document displayed.)

3     **BY MR. SPIRO:**

4     **Q.**   You and your colleagues discussed this development on the

5     morning of August 7th; correct?

6     **A.**   Yes.

7     **Q.**   It says "Old News" because it's old news to you and

8     internally at Goldman Sachs, not because it's old news to the

9     world; fair?

10    **A.**   It was not old news to the world, yes.  Old news to us.

11    **Q.**   And it's written -- and, again, it's your colleague, but

12    it says (as read):

13            "I don't know what prompted them to leak it at this

14        point in time."

15        You don't know why it was leaked; right?

16    **A.**   I do not.

17    **Q.**   (As read):

18            "So far they have financed it with cash.  JPM did the

19        on-market purchase."

20        Do you see that?

21    **A.**   I do.

22    **Q.**   I don't think the jury has heard that JPM was involved in

23    this.  Who is JPM?

24    **A.**   JPMorgan.

25    **Q.**   And who is their CEO?

DEES - CROSS / SPIRO

1  **A.**   Jamie Dimon.

2  **Q.**   Now, it says more information as you guys are trying to

3  figure this out, and it says "MOF" at the bottom of the second

4  line.  It says (as read):

5       "Then some short-term funding through a delayed

6       settlement while they got money from the MOF."

7       Right?  So they needed money from JPM for a second and

8  then they went to the MOF; right?

9  **A.**   Yes.

10  **Q.**   Okay.  And the MOF for the jury is?

11  **A.**   Ministry of Finance.

12  **Q.**   Yeah.  They went to the country to get more money?

13  **A.**   That's what he's implying in this, yes.

14  **Q.**   Okay.  And you don't know what JPMorgan was up to behind

15  the scenes in this transaction, do you?

16  **A.**   I do not.

17  **Q.**   But from what you did know, the Saudi PIF had sufficient

18  capital to take Tesla private?

19  **A.**   From what I know of the Saudi PIF, yes.

20  **Q.**   Now, if you look at the time stamp on this email when you

21  all are discussing and trying to digest and figure out this

22  news, it's 9:56 a.m.

23       **MR. SPIRO:**  And if we could put up Exhibit 8.

24       (Document displayed.)

25

DEES - CROSS / SPIRO

 1    BY MR. SPIRO

 2    Q.   And you see that's 9:48 a.m.  Do you see that at the

 3    bottom of this?

 4         And what I wanted to ask you was:  The news of the PIF

 5    that you're talking about here -- well, how did you react to

 6    the "Am considering" tweet?  What did you think when you saw

 7    it?

 8    A.   By the way, I just -- I'll get to that.  I don't know if

 9    9:56 is Stuart Wrigley's time or my time.

10         THE COURT:  That's a good point.  We have to make sure

11    these two times are aligned.  Is there some adjustment that

12    needs to be made?

13         THE WITNESS:  Stuart Wrigley works in the Middle East,

14    so I -- I don't know the answer.

15         MR. SPIRO:  We know these were approximately the same

16    time.

17         THE COURT:  Same time zone?

18         MR. SPIRO:  Yes, correct.  Meaning, it's almost at the

19    same time as the tweet.

20    BY MR. SPIRO

21    Q.   I don't want to overcomplicate this.  They are talking

22    about the article that just broke, and the tweet comes out.

23         So in any event, what did you think when you saw the "am

24    considering" tweet?

25    A.   I thought he was considering taking the company private,

1  and I thought he had the capital to do it.

2  **Q.**   Now, when you saw the "am considering" tweet, you didn't

3  block from your mind at that time everything you knew about

4  Elon Musk; did you?

5  **A.**   I don't get it.

6  **Q.**   Okay.  You didn't block in your mind some way anything you

7  learned or knew about the Saudi PIF in this article and the

8  aftermath; right?

9  **A.**   I don't recall what I had in my mind, but I'm not sure

10  what you're getting at.

11  **Q.**   Well, I'm just saying you didn't, you know, try to block

12  all of your previous information and knowledge on earth from

13  your mind when you saw the tweet; fair?

14  **A.**   That is fair.

15  **Q.**   Okay.  And after the *Financial Times* article, the stock of

16  Tesla goes up more than after the "am considering" tweet.  Do

17  you remember that?

18       **MR. PORRITT:**  Objection.  Lacks foundation.

19       **THE COURT:**  Sustained.

20  **BY MR. SPIRO**

21  **Q.**   I'm asking, do you remember that?

22  **A.**   I don't remember that.  I don't remember which news would

23  cause the stock to go up more.

24  **Q.**   Okay.  And is it fair to say that no one really knows

25  exactly how or why the stock market moves the way it does?

1          MR. PORRITT:  Objection.  Vague.

2          THE COURT:  Sustained.  Overbroad question.

3   BY MR. SPIRO

4   Q.   Well, on August 7th, 2018 in the stock of Tesla, no one

5   really knows, nobody at Goldman Sachs really knew what was

6   exactly moving the stock in any which way; true?

7          MR. PORRITT:  Objection.  Lacks foundation.

8          THE COURT:  Lay a foundation.

9      (Brief pause in the proceedings.)

10          THE COURT:  You may resume, Mr. Spiro.

11          MR. SPIRO:  Thank you.

12   BY MR. SPIRO

13   Q.   There were a series of tweets that day, and one of the

14   tweets was attached to a blog post.  Do you recall reading

15   that?

16   A.   I do.

17   Q.   Okay.  And, again, when you looked at the blog post, you

18   didn't block from your mind all that other information; right?

19   A.   I did not.

20   Q.   Okay.  And your reaction after reading the blog post at

21   the end of the day, what did you think of it?

22   A.   I thought it was very good, very clear.

23   Q.   After the 7th, fair to say that there was a bit of a media

24   storm around all this?

25   A.   There was a lot of media.

DEES - CROSS / SPIRO

1  **Q.**  Hundreds of articles?

2  **A.**  There were was a lot of media.  I don't know how many

3  articles.  There was lots of media.

4  **Q.**  Blog posts, opinion pieces, memes, the whole --

5  everything; right?

6  **A.**  Yes.

7  **Q.**  Okay.  And what does it mean for a bank to be underweight

8  a stock?

9  **A.**  If the bank's Research Department is underweight a stock,

10 it means their Research Department thinks investors should have

11 less of it.  It's the vernacular equivalent of a sell.

12 **Q.**  It's a net negative on the stock?

13 **A.**  It's a net negative on the stock.

14 **Q.**  And if you were underweight Tesla in 2018, you didn't do

15 so good 2018, 2019, 2020; right?

16        **MR. PORRITT:**  Objection.  Vague.  Lacks foundation.

17        **THE COURT:**  Sustained.

18        **MR. SPIRO:**  If we can put up and show Exhibit 15,

19 which is in evidence.

20        And if we could blow up...

21 **BY MR. SPIRO**

22 **Q.**  This is just one analyst of the many analyst reports out

23 there.

24        **MR. SPIRO:**  And if you could bring up the...  Yeah.

25        (Document displayed.)

DEES - CROSS / SPIRO

1    BY MR. SPIRO

2    Q.   This report says (as read):

3         "To us this suggests more" -- referring to the blog

4         post -- "more than a mere consideration."

5         In your impression of the blog post and where Mr. Musk was

6    as to August 7th, the genuineness of his intent and the steps

7    he had taken, did you conclude it was more than just a mere

8    consideration?

9    A.   I don't remember making a specific judgment on that.  I

10   remember thinking he was quite sincere and his objectives were

11   clear.

12   Q.   And, I mean, in this -- this is the JPMorgan analyst

13   report.  This says it's 50 percent.  You know, coin flip;

14   right?  It could go either way.

15        And if you go down here on this analyst report, it says

16   that (as read):

17        "Mr. Musk stated current shareholders could continue

18        to participate in the private company, suggesting the

19        actual amount of needed cash could be far less than the

20        firm's current equity valuation."

21        And what that means is you could need far less funding if

22   people rolled and stayed in the private Tesla; right?

23   A.   Yes.

24   Q.   And there was no way to know exactly how much roll there

25   would be and how much extra funding there would be as of August

DEES - CROSS / SPIRO

```
 1    7th; fair?
 2    A.   At that time there was no way to know exactly what the
 3    roll would be.
 4    Q.   Okay.
 5         MR. SPIRO:  So if we could put away the JPMorgan
 6    analyst report and if we could put up 244, please.
 7         And if we could blow that up, please.
 8         (Document displayed.)
 9    BY MR. SPIRO:
10    Q.   Okay.  And you see here it says -- this is an email
11    with you and Kurt at Goldman Sachs.  Do you see how it says
12    (as read):
13              "Elon Musk hates JPMorgan and Jamie"?
14    A.   I see this says that, yes.
15    Q.   And Elon Musk hates JPM and Jamie, and JPM and Jamie hate
16    him; is that right?
17         MR. PORRITT:  Objection.  Objection.  Lacks
18    foundation.
19         THE COURT:  Sustained.
20    BY MR. SPIRO:
21    Q.   You are aware, as you sit here today, that Elon Musk hates
22    JPM and Jamie, are you not?
23         MR. PORRITT:  Objection.  Lacks foundation.
24         THE COURT:  If you have a basis for knowing that, you
25    can state it.
```

**DEES - CROSS / SPIRO**

1   **A.**   I know there's friction between the two partners.   I

2   don't -- I don't know about the hatred.

3   **BY MR. SPIRO:**

4   **Q.**   Well, you know that JPMorgan, after making billions of

5   dollars, sued Tesla regarding warrants at issue in this case --

6           **MR. PORRITT:**   Objection.

7   **BY MR. SPIRO:**

8   **Q.**   -- correct?

9           **MR. PORRITT:**   Objection.   Assumes facts.   Lacks

10  foundation.

11          **THE COURT:**   Sustained.

12          **MR. SPIRO:**   Exhibit 243.   If you could blow up the

13  email on August 7th.

14      (Document displayed.)

15  **BY MR. SPIRO**

16  **Q.**   And you tell Mr. Musk on August the 7th (as read):

17          "I thought your letter today was excellent.   Very

18      clear."

19      See that?

20  **A.**   Yes.

21  **Q.**   And you're referring to the blog post; right?

22  **A.**   Yes.

23  **Q.**   And what it says, if you continue, is that (as read):

24          "This whole topic feels very reminiscent of

25      conversations that we started together many, many months

DEES - CROSS / SPIRO

1    ago at Larry's house."

2    Do you see that?

3  **A.**  I do.

4  **Q.**  And is that Larry Ellison?

5  **A.**  Yes.

6  **Q.**  At the meeting at Larry's house, because I don't want to

7  confuse meetings, that was not a meeting that the CFO Deepak

8  Ahuja was at?

9  **A.**  He was not at that meeting.

10  **Q.**  Okay.  But Larry Ellison was at that meeting?

11  **A.**  Yes.

12  **Q.**  SoftBank was at that meeting?

13  **A.**  Masayoshi Son from SoftBank, yes.

14  **Q.**  And at that meeting, Larry Ellison indicated that he would

15  be supportive of a go-private transaction; true?

16  **A.**  At that meeting, Larry and Masa expressed how supportive

17  they were of Tesla, how supportive they were of Elon, and there

18  was discussion about the pros of going private -- about being

19  private.

20  **Q.**  Larry Ellison, just so the jury has some context, has tens

21  of billions of dollars?

22  **A.**  Yes.

23  **Q.**  Masa Son and SoftBank have enough money to take Tesla

24  private by themselves; right?

25  **A.**  Possibly.  They have tens of billions of dollars, yes.

**DEES - CROSS / SPIRO**

 1   Q.   And you know from your dealings over the years, many

 2   years, that a lot of the investors in Tesla are also investors

 3   in SpaceX and other of Mr. Musk's companies; true?

 4   A.   Yes.

 5   Q.   And when Mr. Musk, in your experience, goes out, for

 6   example, with a round of SpaceX, your phone even rings for

 7   people trying to get inside the deal; right?

 8   A.   People will occasionally reach out to me to -- to try to

 9   find a way in, yes.

10   Q.   Just occasionally?

11   A.   He doesn't raise equity that often at SpaceX, so, yes,

12   occasionally.

13   Q.   And what happens in those scenarios, in your experience,

14   is the rounds are very quickly oversubscribed; right?

15   A.   Yes.

16   Q.   And these people have a long history, many of them, of

17   doing business together; right?

18   A.   Many of his equity investors have a long history with him,

19   yes.

20   Q.   So it would be totally consistent with one of them calling

21   up and saying, "Hey, I'd like a billion dollars" -- Larry

22   Ellison saying, "I'd like a billion dollars' worth.  Save me

23   that amount."  End of story; right?

24        Elon Musk and Larry don't have to ever talk about that

25   again.  It goes to lawyers and other people and that's it;

DEES - CROSS / SPIRO

1  isn't that fair?

2       **MR. PORRITT:**  Objection, Your Honor.  Vague.

3  Ambiguous.

4       **THE COURT:**  If he knows.  If you have a basis for an

5  understanding.

6       **THE WITNESS:**  I don't have a basis to answer that

7  question.

8  **BY MR. SPIRO**

9  **Q.**  But it is fair to say that the shareholders at SpaceX are

10  many of the same shareholders as the shareholders at Tesla?

11  **A.**  A number of shareholders at SpaceX are shareholders at

12  Tesla, yes.

13  **Q.**  And there are also -- because I don't think the jury has

14  heard this.  We've talked about funds and whether they can own

15  privates versus publics and what percentage.  There are lots of

16  funds that own only privates; right?

17  **A.**  Yes.

18  **Q.**  Okay.  Meaning private companies; right?

19  **A.**  Yes.

20  **Q.**  And one of the things about --

21       **MR. SPIRO:**  And if we can go up to the August 8th

22  email.

23       (Document displayed.)

24  **BY MR. SPIRO**

25  **Q.**  In here just the next day, if you look at bullet point

1   two, you already have received very interested incoming calls;

2   right?

3   **A.**   Yes.

4   **Q.**   And even if the PIF wanted to and is able to fund the

5   entire thing, there were lots of reasons to continue to

6   diversify an investor base; right?

7   **A.**   If that was his objective, which it was, yes, there

8   were -- there were reasons to continue to diversify.

9   **Q.**   And another objective of his regarding the structure that

10  you're referencing in this email is that Elon Musk didn't want

11  to push the mom-and-pop retail investor out; right?

12  **A.**   That's right.

13  **Q.**   He didn't want to push the little guy out who had been his

14  investor that whole time as Tesla was growing; fair?

15  **A.**   That was one of his objectives, yes.

16  **Q.**   And that was one of the things unique about Elon Musk's

17  structure; right?

18  **A.**   Yeah.  The -- the work we were trying to do with the SPV

19  was a reflection of that.

20       (Document displayed.)

21  **Q.**   Now, you saw an exhibit where, 252, you're talking

22  internally -- and this was already shown to you by plaintiffs'

23  counsel -- and there's a debrief of your phone call on

24  August 8th or 9th with Mr. Musk, and it indicates on the second

25  page (as read):

**DEES - CROSS / SPIRO**

1           "After your and" -- that's I assume you -- "Dan Dees'

2      debrief, it sounds like there is ample potential

3      financing."

4      Right?

5   A.   Yes.

6   Q.   As you continue on with this email that you looked at, you

7   know, Goldman Sachs loops its different departments -- its

8   brainpower, its horsepower, its lawyers -- and nobody ever said

9   that this was impossible, did they?

10  A.   Not that I recall.

11  Q.   And, also, nobody thought that there was some fraud afoot

12  and that Goldman Sachs shouldn't be involved in this; right?

13  Nobody says that in this email?

14  A.   No one says that in this email.

15  Q.   And after this, there's calls between you and Mr. Musk;

16  right?

17  A.   After -- at some point after, yes.

18  Q.   Meetings?

19  A.   Meetings, yes.

20  Q.   Presentations?

21  A.   Yes.

22  Q.   And I'm not going to take you through all those

23  presentations --

24  A.   Thank you.

25  Q.   -- but Goldman Sachs stands by those presentations as

**DEES - CROSS / SPIRO**

1  their best estimates and beliefs at the time?

2  **A.**   Yes.

3  **Q.**   Now, one of those presentations, you know, was shown to

4  you by plaintiffs' counsel that had, like, an off-the-shelf

5  list of all the investors that could put in more than a billion

6  dollars?

7  **A.**   Yes.  It had a long list of investors that could put in

8  money, yes.

9  **Q.**   Okay.  But just because -- you didn't -- if Mr. Musk or

10 Silver Lake or you had spoken to an investor or had gotten a

11 verbal commitment or anything else, you didn't go back and

12 cross off that list or adjust that?  That's just an

13 off-the-shelf-type list?

14         **MR. PORRITT:**  Objection.

15         **THE COURT:**  Overruled.

16 **A.**   We wouldn't have gone back and crossed them off.  They

17 would be included on that list.

18 **BY MR. SPIRO**

19 **Q.**   Now, there were other questions about, you know, this

20 tweet that went out -- if we could just put it up.  It's 361.

21 It's in evidence -- where Elon Musk said that he was excited to

22 work with Silver Lake and Goldman Sachs.  Do you remember the

23 tweet?

24 **A.**   Yes.

25 **Q.**   Okay.

DEES - CROSS / SPIRO

1    **MR. SPIRO:**  If we could put it up on the screen.

2    (Document displayed.)

3    **BY MR. SPIRO**

4    **Q.**   And you got a bunch of questions about, you know, sort of,

5    you know, he hadn't cleared that with Goldman Sachs and, you

6    know, that was wrong.  Do you remember those type of questions?

7    **A.**   Yes.

8    **Q.**   I mean, are you aware that he was sued for securities

9    fraud by the plaintiffs?

10   **MR. PORRITT:**  Objection, Your Honor.

11   **THE COURT:**  Pardon?

12   **MR. PORRITT:**  I said objection.  That's improper.

13   **MR. SPIRO:**  He opened the door to this line of

14   questioning.

15   **THE COURT:**  Overruled.

16   **BY MR. SPIRO**

17   **Q.**   And are you aware, as you sit here today, that for

18   Mr. Musk saying "I'm excited to work with Silver Lake and

19   Goldman" before he had a technical engagement letter signed

20   with you, okay, he was sued for fraud by the plaintiffs.  Do

21   you know that?

22   **A.**   I did not.

23   **Q.**   Okay.  And while the timing of the tweet, okay, is what

24   was discussed, I think when you were being examined by

25   plaintiffs' counsel, the truth is if you look at Exhibit 817 --

DEES - CROSS / SPIRO

1      (Document displayed)

2  **Q.**   -- the substance of the tweet was shown to Goldman Sachs

3  by Sam Teller, Mr. Musk's chief of staff, previously.  It's

4  just the timing of the release that was really the issue; isn't

5  that fair?

6  **A.**   That's fair, yes.

7  **Q.**   And even after the tweet where he was sued for securities

8  fraud, you continued to work with him, didn't you?  You moved

9  past the tweet?

10  **A.**   Yes.

11  **Q.**   Okay.  And on August 15th, we've looked at, you know, the

12  presentations, and you continued to speak with Mr. Musk during

13  this time frame leading up to the board meeting; fair?

14  **A.**   Yes.

15  **Q.**   Okay.  Now, you testified earlier about, you know, line of

16  sight into funding.  That's how you viewed the tweet.  And you

17  knew at or around this time that the PIF wanted to be part of

18  the Tesla go-private in big size?

19  **A.**   Yes.  I knew that based on what Elon had said.

20  **Q.**   And you all continued to work and be in touch with folks

21  as these days and weeks progressed?

22  **A.**   Yes.

23  **Q.**   And so if some random reporter in some random outlet

24  reported that while you all are working together, you know,

25  based on your understanding of "funding secured" in the tweets

**DEES - CROSS / SPIRO**

1  that funding was far from secured, you would disagree with

2  that; right?

3         **MR. PORRITT:**  Objection.  Lacks foundation.

4         **THE COURT:**  I'm not sure I understand the question.

5  Rephrase the question.

6  **BY MR. SPIRO:**

7  Q.   You testified as to your understanding of the term; right?

8  And I'm saying, based on that understanding, you have no basis

9  to say that at that point when you're all working together,

10  that funding was far from secured?

11         **MR. PORRITT:**  Objection.

12  **BY MR. SPIRO**

13  Q.   In fact, you told the board on August 23rd that funding

14  was going to be available; true?

15         **MR. PORRITT:**  Objection.

16         **THE WITNESS:**  I don't understand the question.

17         **THE COURT:**  Well, I think you should lay the

18  foundation by saying precisely what his understanding was of

19  "funding secured," and then you can ask the follow-up question

20  about far from funding secured.  It's not clear.  So lay the

21  foundation.

22  **BY MR. SPIRO**

23  Q.   Well, earlier in your examination you testified what you

24  understood that to mean?

25  A.   What "funding secured" means?

DEES - CROSS / SPIRO

1    **Q.**   Right.

2              **MR. PORRITT:**  Objection.  Misstates testimony.

3              **MR. SPIRO:**  Well, I could read back what he said.

4              **THE COURT:**  Why don't you just ask him?

5    BY MR. SPIRO

6    **Q.**   What did you say earlier to this jury about what you took

7    it to mean?

8    **A.**   I thought it meant that he was in touch with the capital

9    required.

10   **Q.**   Right.  That he had a line of sight towards it; right?

11   **A.**   That he had a line of sight towards it, yeah.

12   **Q.**   Okay.  And you know, right, from working and being at that

13   board meeting a week later that funding ultimately was

14   available for this transaction; right?

15   **A.**   Yeah.  It was our judgment that there was ample funding

16   available for the transaction.

17   **Q.**   Ample funding; right?

18   **A.**   Yeah.

19   **Q.**   Okay.  In fact, if we pull up 101.  And if we look at the

20   assumptions that are in the board minutes.  If we go up to --

21        (Document displayed)

22   **Q.**   I mean, so -- so, I mean, Ron Baron, that's who's

23   highlighted now so we're going to go to him.  He was somebody

24   who had announced publicly that he wanted to be in; right?

25   **A.**   I don't remember his public announcement, but, yeah, Ron

1   Baron was very supportive.

2   **Q.**   Okay.  And he was supportive even if he sometimes didn't

3   like Mr. Musk's tweets and thought he should have more ice

4   cream cones.  He was still supportive when it came time to find

5   out if he had interest in this transaction; true?

6   **A.**   I don't know about his view on the tweets or any of the

7   other stuff, but, yes, he was supportive of this transaction.

8   **Q.**   And do you know who Gavin Baker is?

9   **A.**   Yes.

10  **Q.**   And he's a portfolio manager at Fidelity; right?

11  **A.**   Yes.

12  **Q.**   Okay.  And you know -- do you know of Mr. Baker and

13  Mr. Musk's conversations?

14  **A.**   Not that I recall.

15  **Q.**   And in all of these meetings, by the way, about funding

16  and structure, did -- do you know who Professor Guhan

17  Subramanian is?

18  **A.**   I do not.

19  **Q.**   He wasn't there in any of this; right?

20  **A.**   No.

21  **Q.**   Okay.  And if we could go back up to a couple other points

22  in the board minutes, which is (as read):

23          "They assumed the transaction would be financed

24       without adding debt to Tesla's balance sheet.  That the

25       transaction would be financed by approximately 50 percent

DEES - CROSS / SPIRO

1    new equity."

2        You could have added debt, bank financing to this

3    transaction and then you would have reduced the amount of

4    external capital you needed; true?

5    **A.**   Yes.  He have reduced the amount of external equity

6    capital he needed, yes.

7    **Q.**   So a lot of the assumptions and the things that are

8    written in these presentations and in these minutes assumed no

9    bank financing and no extra debt; right?

10   **A.**   No incremental debt, yes.

11   **Q.**   Okay.  And this 50 percent, do you know about the

12   conversation that Deepak Ahuja had had with the PIF about the

13   50 percent number just a couple weeks before?

14   **A.**   I do not.

15   **Q.**   And if we go down and you see the conservative estimate

16   from Goldman Sachs and others (as read):

17           "The board then discussed with Mr. Musk's financial

18       advisors their preliminary discussions, assuming that he

19       would need approximately 30 billion to finance the

20       transaction."

21       And do you know whether that 30-billion number also came

22   up between the PIF and Deepak Ahuja?

23   **A.**   Not that I -- I don't know.

24   **Q.**   Now, Mr. Musk at this meeting noted that (as read):

25           "There was more than enough funding for any proposed

1          transaction and that he had asked his financial advisors

2          to join the meeting to review the board" -- "with the

3          board the various potential financing sources available."

4          When Mr. Musk said that, do you believe his -- that view

5    was genuine?

6    **A.**   I do.

7    **Q.**   And based on everything you understood at the time, did

8    you believe that the PIF wanted to be part of this transaction?

9    **A.**   Based on what I understood at the time, yes.

10   **Q.**   And while there were questions about how it would be done

11   with the roll and the debt, it's not fair to say that Mr. Musk

12   didn't make a proposal originally to start the process with the

13   board.  That's not true?

14   **A.**   I'm sorry.  What's the question?

15   **Q.**   Yeah.  There's a question raised about whether or not

16   there had been a proposal, a formal proposal, of this and there

17   was, you know, a wordsmithing.

18        But ultimately just because there were questions around

19   how much debt there would be or how much would roll doesn't

20   mean that Mr. Musk hadn't made a proposal to the board on

21   August 2nd, does it?

22             **MR. PORRITT:**  Objection, Your Honor.

23             **THE COURT:**  Sustained.

24        That needs to be more precise.  If you're going back to

25   the reference of the process, you should make sure that what

DEES - CROSS / SPIRO

 1  you're asking is precisely in line with what was in that

 2  document.

 3          MR. SPIRO:  What document?

 4          THE COURT:  Because we've been talking about proposal,

 5  formal proposal, et cetera, et cetera.  I'm fearful that we're

 6  mixing up concepts here.

 7          MR. SPIRO:  I think they've been completely mixed up

 8  the whole time, but I don't know how to unmix them --

 9  BY MR. SPIRO

10  Q.  All I'm asking is:  Whatever the mixing has been and the

11  wordsmithing, the reality is nothing will ever change the fact

12  that on August 2nd Mr. Musk made a proposal to the board that

13  started this whole process going?

14          MR. PORRITT:  Objection.  Lacks foundation.

15          THE COURT:  I think he said he -- well, if he's aware

16  of it, you can answer that question.

17          THE WITNESS:  I'm not aware of it.

18          THE COURT:  Okay.

19  BY MR. SPIRO

20  Q.  Mr. Musk -- let me put it to you this way:  Mr. Musk was

21  the actual buying party here; right?

22  A.  Yes.

23  Q.  Okay.  Because there's some confusion, I think, also in

24  that.  Was the PIF the buyer?  Was Mr. Musk the buyer?

25  Mr. Musk is the principal buyer; is that fair?

1   **A.**    Yes.  He would lead the buyer group, yep.

2   **Q.**    And the engagement letter that he ultimately signed with

3   you indicates that Mr. Musk is the buyer.  He would owe the

4   fees, not Tesla.  He was your client?

5   **A.**    Yes.

6   **Q.**    And, in fact, one of the reasons that there was a delay

7   when he released the tweet, it was because you all had to check

8   conflicts internally because you had done work for Tesla before

9   and this would mean you would be opposite Tesla; fair?

10  **A.**    Yeah.  That's one of the things, yeah.

11  **Q.**    And, you know, in all this formal/informal conversations

12  and, you know, Michael Dell this.

13         **MR. SPIRO:**  You know, if we could just show the

14  witness 251.

15  **BY MR. SPIRO**

16  **Q.**    You know, the truth of the matter is that Mr. Musk --

17         **MR. SPIRO:**  And if we could blow up the 6:00 p.m.

18  August 9th email.

19      (Document displayed.)

20  **BY MR. SPIRO**

21  **Q.**    Mr. Musk had this -- your understanding was Mr. Musk had

22  the same lawyer as Michael Dell; right?

23  **A.**    Yes.

24  **Q.**    Okay.  And that when Michael Dell did his transaction,

25  looking back at the press release to see who was involved and

DEES - CROSS / SPIRO

 1    the army of lawyers and everything else, you write (as read):

 2              "So Michael just had a lawyer and that's it."

 3        Was that your understanding at the time?

 4    A.   That's my understanding.

 5    Q.   Now, I understand that in these big deals ultimately lots

 6    of lawyers and finance folks get involved and there's lots of

 7    contracts and documents.  Is it -- is it fair to say that these

 8    things can often start with an informal bid from a principal to

 9    a principal?

10    A.   Sure.

11    Q.   And that could come, like, a letter to a board; right?

12    A.   Yeah.

13    Q.   Somebody could make an announcement in a press release,

14    say "I intend to buy Starbucks;" right?

15    A.   Sure.

16              MR. PORRITT:  Objection, Your Honor.  Lacks

17    foundation.  I don't -- what's the relevance of this testimony?

18    BY MR. SPIRO

19    Q.   And --

20              THE COURT:  Overruled.

21    BY MR. SPIRO

22    Q.   And as those transactions progress, right, sometimes

23    investors come in, sometimes investors back out.  The principal

24    always has the option, if they have the wherewithal, to finance

25    part of the transaction themselves; right?

DEES - REDIRECT / PORRITT

1   **A.**   I can't comment on theoretical transactions.   Does a

2   principal have an opportunity to put in money to a transaction?

3   Sure.

4   **Q.**   And however unique or unconventional Mr. Musk is in some

5   of these things that you've testified about, you always

6   believed that his desire here and his intentions were genuine;

7   true?

8   **A.**   I did.

9   **Q.**   And you never reached the conclusion that anything about

10   this, you know, was, you know, some sort of a lie, big

11   elaborate lie, to the shareholders, did you?

12   **A.**   I did not.

13   **Q.**   And ultimately, as we saw in that board presentation, your

14   conclusion was that the funding, the availability of funding,

15   was just not going to be the issue?

16   **A.**   That is right.

17         **MR. SPIRO:**   I have no further questions.

18         **THE COURT:**   All right.   How much longer?   We are

19   actually past our break time, but I would like to complete this

20   witness if possible.   Do you have --

21         **MR. PORRITT:**   I'll be very quick, Your Honor.

22         **THE COURT:**   All right.

23                       <u>**REDIRECT EXAMINATION**</u>

24   BY MR. PORRITT

25   **Q.**   Thank you, Mr. Dees.

DEES - REDIRECT / PORRITT

1     You just had some questioning where Mr. Spiro described a

2  formal proposal to take a $60 billion company private as mere

3  wordsmithing.

4          MR. SPIRO:  Objection as to the characterization of

5  that, the inference of that.

6  BY MR. PORRITT

7  Q.  Is a --

8          THE COURT:  All right.  So rephrase the question.

9          MR. PORRITT:  All right.

10 BY MR. PORRITT

11 Q.  Would you regard a formal proposal to take a $60 billion

12 company private to be mere wordsmithing?

13 A.  I'm not even sure how to answer that.  The question

14 doesn't make a lot of sense to me.

15         THE COURT:  Why don't you rephrase the question.

16 BY MR. PORRITT

17 Q.  Is a formal proposal to take a $60 billion public company

18 private a serious financial and legal document?

19 A.  It depends on what stage your -- of the process you're in.

20 Q.  Now, you talked a little bit about SPVs.  We talked a

21 little bit about the structure of SpaceX.

22      To your knowledge, is it possible for retail mom-and-pop

23 investors to invest in SpaceX directly or through an SPV?

24 A.  I don't know.  They can get access to it through various

25 funds.  It could have Gavin Baker's funds in it.  A retail

1   mom-and-pop's own Gavin Baker's fund, they can get access to

2   it.  I don't know the answer on SPVs.

3   **Q.**   Okay.  But they don't own a share in SpaceX; they own a

4   share in Mr. Baker's fund, for instance?

5   **A.**   In that instance, yeah.

6   **Q.**   And Mr. Baker's funds owns lots of shares in lots of

7   different companies?

8   **A.**   In that -- in that example, yes.

9   **Q.**   Okay.  And you -- you recall your advice to the board that

10  you thought that funding for a going-private transaction was

11  reasonably available; is that right?

12  **A.**   Yeah.

13  **Q.**   Okay.  You understand there's a difference between funding

14  being available and funding being committed?  Is that a

15  distinction you have?

16  **A.**   Sure.

17  **Q.**   Okay.  And is -- I mean, all banks have funds that are

18  reasonably available.  It doesn't mean I can just assume

19  they're going to lend me money; isn't that correct?

20  **A.**   Sure.

21  **Q.**   Okay.

22       **MR. PORRITT:**  That's all I have, Your Honor.

23       **THE COURT:**  All right.  Thank you.

24       Anything on recross?

25       **MR. SPIRO:**  No, Your Honor.

 1        **THE COURT:**  All right.  Mr. Dees, thank you.  You may

 2    step down.  You're excused as a witness.

 3        (Witness excused.)

 4        **THE COURT:**  And we will go ahead and take our

 5    20-minute break.  Thank you.

 6        **THE CLERK:**  All rise for the jury.

 7        (Jury exits the courtroom at 12:30 p.m.)

 8        **THE COURT:**  Who's up next?

 9        **MR. PORRITT:**  Next we intend to call the much delayed

10    Ryan Brinkman via videotape, Your Honor.

11        **THE COURT:**  Okay.  All right.  See you in 20.

12        (Whereupon there was a recess in the proceedings

13         from 12:31 p.m. until 1:10 p.m.)

14        (The following proceedings were held outside of the

15    presence of the Jury)

16        **THE COURT:**  All right, sorry for the delay.  Had to

17    overcome yet more technical difficulties, but I think we have

18    got it straightened out.  So why don't we retrieve the jury.

19    And if you want to bring the witness up, save some time, you

20    can do that.

21        **MR. APTON:**  Sure, Your Honor.  We're going to be

22    playing or calling --

23        **THE COURT:**  That's right.

24        **MR. APTON:**  Yeah.

25        **THE COURT:**  Well, make sure you are pulled up ready to

PROCEEDINGS

 1   go.

 2           **MR. APTON:**  We are Your Honor.  We're ready.

 3           **THE COURT:**  Okay.

 4           **MR. APTON:**  And Your Honor the exhibits that will be

 5   referred to in this clip, they were moved into evidence already

 6   so they should be published to the jury, as the transcript was.

 7           **THE COURT:**  And my understanding, there were two

 8   exhibits that were inadvertently included.

 9           **MR. APTON:**  That is true, Your Honor.

10           **THE COURT:**  And that was Numbers --

11           **MR. APTON:**  24 and 25.

12           **THE COURT:**  24 and 25.  So we will remove those from

13   the admitted witness list.  Right?

14           **MR. APTON:**  Yes, Your Honor.

15           **THE COURT:**  Correct?

16           **MR. APTON:**  And they are not referenced in the

17   deposition clips.

18           **THE COURT:**  All right.  Okay.  Thank you.

19           **MR. APTON:**  And I don't know if Your Honor wants this

20   now, but we do have an agreed-upon time allocation.

21           **THE COURT:**  You can give that to Vicky, appreciate

22   that.

23           **MR. APTON:**  Okay.

24           **THE COURT:**  Thank you.

25       As we reach towards next week I do want to make sure that

**PROCEEDINGS**

1    we have an exhibit list that we can give to the jury as kind of

2    an index that briefly describes, without argumentation, stuff.

3    Especially with the number of exhibits here.  Juries, I think,

4    appreciate an index.  They'll know if they are looking for a

5    particular email from X to Y they can at least find it, rather

6    than trying to shuffle through hundreds of exhibits.

7          MR. APTON:  And Your Honor, would the descriptions we

8    had on our exhibit list, more or less suffice?

9          THE COURT:  I would have to look at it again, but

10   probably.

11         MR. APTON:  Okay.  Okay.

12         THE COURT:  All right?

13         MR. APTON:  Your Honor, one quick question.  Do you

14   intend on taking a break before the end of the day?

15         THE COURT:  Yeah.  I don't think we can go two and a

16   half hours.  We need to take some kind of break, so we'll

17   probably go like an hour and 15 or something.

18         MR. SPIRO:  And I'll just -- I feel an obligation to

19   sort of say this, but just so the Court's aware, the first

20   witness after the videotape is flying out of the country back

21   home, and so we're -- they're going to make it, but we're on a

22   tight sort of timeline from our perspective.

23         THE COURT:  Okay.

24         MR. SPIRO:  Just, you know.

25         THE COURT:  How long is the video?

PROCEEDINGS

1      **MR. APTON:**  It's an hour, Your Honor.

2      **THE COURT:**  Hour, and then that'll take us to about

3  2:15.  And how long will the testimony be of this witness?

4      **MR. SPIRO:**  I think approximately 30 minutes for both

5  sides.

6      **MR. APTON:**  Yeah, Your Honor, we spoke about this in

7  the hallway before.  Everything should be good to go on timing.

8  And Ms. Denholm's late.  She's the next witness after the

9  video.

10      **THE COURT:**  Right.

11      **MR. SPIRO:**  So I guess I would ask, again, I'm just

12  making a request to the Court, but that she be able to go right

13  after the video.

14      **THE COURT:**  All right.

15      **MR. SPIRO:**  And then break, and hopefully a short

16  break, because there's another witness, human witness, live

17  witness, that also has traveled and has been here for quite

18  some time.  Many days.

19      So I'm hoping that the break is quick and I'm hoping that

20  Ms. Denholm who's flying to Australia this afternoon can go

21  immediately following the video.

22      **THE COURT:**  All right.  So I'm going to plan on not

23  taking a break until after she testifies.

24      **MR. SPIRO:**  Thank Your Honor.

25      **THE COURT:**  But hopefully you are not going to go too

PROCEEDINGS

 1   long, because that means going two hours without a break.

 2          MR. SPIRO:  We won't.  Thank Your Honor.

 3          THE COURT:  Which will bring us close to the 3:30 hour

 4   in any event, so we'll see.

 5      (A pause in the proceedings)

 6      (The Jury enters the courtroom)

 7          THE COURTROOM DEPUTY:  All rise for the jury.

 8          THE COURT:  Okay, have a seat, everyone.  Good

 9   afternoon to the jury.  How was lunch?

10      (Jurors thank the Court)

11          THE COURT:  You're welcome.

12      They even had fried chicken while we were working, just to

13   be clear.

14      All right.  So let's pick up with the next witness which

15   we understand will appear by video.

16          MR. APTON:  Yes, Your Honor.  At this point in time,

17   plaintiffs call by deposition Ryan Brinkman of JP Morgan.

18          MR. SPIRO:  And we maintain our objection, Your Honor.

19          THE COURT:  All right.  So objection is overruled, and

20   you can go ahead and play the video.

21          RYAN JOSEPH BRINKMAN, PLAINTIFF'S WITNESS,

22              BY VIDEOTAPED DEPOSITION

23      (Time played: 1:20 p.m to 2:22 p.m)

24          MR. APTON:  That's the end of Mr. Brinkman,

25   Your Honor.

1    **THE COURT:** All right. Thank you. Why don't you go

2   ahead and call your next witness.

3    **MS. TRIPODI:** Good afternoon, Your Honor. Plaintiffs

4   are calling Robyn Denholm.

5    **THE COURT:** Okay. Thank you.

6    **MS. TRIPODI:** And Your Honor if I may, I have a

7   witness binder and a deposition transcript.

8    **THE COURT:** All right.

9      (Documents handed up to the Court)

10      (Documents tendered)

11    **THE WITNESS:** Thank you.

12      <u>**ROBYN DENHOLM, PLAINTIFF'S WITNESS, SWORN**</u>

13    **THE WITNESS:** Yes, I do.

14    **THE COURTROOM DEPUTY:** Thank you. Please be seated.

15   Please speak clearly into the microphone. State and spell your

16   first and last name for the record.

17   **A**   It is Robyn Denholm, R-O-B-Y-N, D-E-N-H-O-L-M.

18    **THE COURT:** Thank you Ms. Denholm. You may proceed

19   Ms. Tripodi.

20      <u>**DIRECT EXAMINATION**</u>

21   **BY MS. TRIPODI**

22   **Q**   Good afternoon, Ms. Denholm. I understand we are under

23   some time constraints, so I'm going to dive right in.

24   **A**   Perfect.

25   **Q**   You were a member of the Tesla board of directors in 2018,

**DENHOLM - DIRECT / TRIPODI**

1    correct?

2    **A**    Yes, I was.

3    **Q**    And you are currently serving as the chairperson of the

4    Tesla board of directors.   Correct?

5    **A**    That is correct.

6    **Q**    And also, in 2018, you were the chairperson of the Tesla

7    board's audit committee, is that correct?

8    **A**    That's correct, yes.

9    **Q**    And just so the jury understands what the audit

10   committee's's function was, some of its main responsibilities

11   were oversight of Tesla's financials?   Is that right?

12   **A**    No.   Oversight of the management's preparation of the

13   financials, yes.

14   **Q**    Okay.   And then how about ensuring that management were

15   doing their role with respect to various internal control

16   policies?   Is that right?

17   **A**    Yes.   The board's responsibility is to actually make sure

18   that the management team and the finance team and the internal

19   auditors are doing their role as it relates to internal

20   controls.

21   **Q**    Understood.   And so the internal controls that management

22   would be responsible for, those would have included the

23   disclosures related to material non-public information, is that

24   correct?

25   **A**    There's a set of disclosure controls that are in place

DENHOLM - DIRECT / TRIPODI

1    around the internal controls, yes.

2    **Q**    And the jury has heard a bit this week about material

3    non-public information, but just so that we're all on the same

4    page, MNPI, or material non-public information, generally

5    refers to corporate news or information that hasn't yet been

6    made public but could have an impact on the company's stock

7    price; is that generally correct?

8    **A**    It would need to be something that would be significant

9    enough that would make an impact that was material to the

10   financials or material used to the company.

11   **Q**    So something that would have a significant impact

12   potentially on the company and its stock price?

13   **A**    Potentially, yes.

14   **Q**    And am I correct that in 2018, Tesla had a process whereby

15   prior to disclosure of material non-public information, there

16   would be an internal review?

17   **A**    There, there was a policy that actually required the

18   internal review of any material information that was being

19   published was -- on behalf of Tesla, was actually reviewed.

20   **Q**    Now, Mr. Musk's Twitter account, that is a corporate

21   channel or it's considered by the company to be a corporate

22   channel to disseminate Tesla information.  Correct?

23   **A**    No.  His Twitter account, when he's tweeting about Tesla,

24   can be a corporate channel, but there's other channels.

25   There's a Tesla Twitter account, and obviously there are

1  regular filings and 8-Ks, press releases, those types of things

2  that are actually put out on behalf of the company.  So not

3  everything that is in Elon's Twitter account is part of Tesla

4  or Tesla information.

5  Q    Understood.  So since Mr. Musk though is the CEO of Tesla,

6  generally when he's tweeting about Tesla, is that considered to

7  be Mr. Musk tweeting about Tesla corporate information?

8  A    No.  It depends on what he's tweeting.  If he's talking

9  about product or if he's talking about activities at the

10  company, it could be on behalf of Tesla or it might be his own

11  personal information.  He tweets about SpaceX, for example.

12  That is not on behalf of Tesla.

13  Q    Understood.  But that's about SpaceX, not about Tesla.

14  Correct?

15  A    True.  Yes.

16  Q    Okay.  So if Mr. Musk wanted to put out material

17  non-public information regarding Tesla through his Twitter

18  account, would he have to go through this internal review

19  process?

20  A    If it was on behalf of Tesla, he would go through a review

21  process.

22  Q    Okay.  So in terms of what occurred in August of 2018, if

23  you will help me walk through this process.

24       On August 1st, am I correct that Mr. Musk sent the board

25  an offer to take Tesla private at $420 per share, which is

1   reflected in Exhibit 1 (sic).  So, Derek can pull that out for

2   you.

3   **A**    Exhibit 1?  Sorry.

4   **Q**    Oh, it's 81, and it will be pulled up in one moment on the

5   screen.

6   **A**    Okay, thank you.

7   **Q**    And it's also going to be in your witness binder.

8        (Document displayed)

9   **A**    Oh, yes.  So it's August 2nd, there was a letter that Elon

10  sent to the board.  And yes, I received this letter.

11  **Q**    And at this point, this offer letter that you've received,

12  Exhibit 82, was this considered to be material non-public

13  information?

14  **A**    Well, it wasn't public.  It was material to the company in

15  that he was offering in his personal capacity, to make a bid to

16  take the company private.

17  **Q**    So after the board receives the offer letter that we see

18  in Exhibit 82, the board convened to discuss the offer the same

19  day.  Is that correct?

20  **A**    That's correct.

21  **Q**    And then the following day the board, on August 3rd, met

22  with Mr. Musk to obtain more information regarding the

23  potential transaction.  Is that --

24  **A**    That's correct, yeah.

25  **Q**    And at that meeting with Mr. Musk on August 3rd, am I

1  correct that the board had questions regarding the structure of

2  the potential deal, the price, the process?

3  **A**    We asked him a series of questions.  Obviously, in

4  receiving this letter, there were questions that we had about

5  the transaction that he was contemplating.  And as a bidder in

6  this case, we asked him questions.

7  **Q**    Understood.  So if we can look at the board minutes from

8  that August 3rd meeting, that is Exhibit 83 which has already

9  been admitted and should pop up on your screen in a moment.

10 **A**    Yes, yeah.

11    (Document displayed)

12 **Q**    Do you see your name, indicating that you attended the

13 meeting?

14 **A**    Yes.  I was in Australia, so I was on the phone.

15 **Q**    Okay.  And if we can look to Page 3, please, of the

16 meeting minutes.

17    (Document displayed)

18 **Q**    You will see in that first paragraph, the minutes noted

19 that the board was needing a detailed proposal regarding a

20 going-private transaction.  Is that correct?

21 **A**    Sorry, repeat your question?

22 **Q**    Sure.  The minutes note that at this meeting the board was

23 requesting a detailed proposal from Mr. Musk regarding the

24 going-private transaction.  Is that correct?

25 **A**    What we -- we did not have a detailed proposal at this

**DENHOLM - DIRECT / TRIPODI**

1  point.  And we were saying that once we received that, we would

2  do what we needed to do, which was to evaluate whether or not

3  that proposal was in the best interest of all shareholders at

4  Tesla.

5  **Q**   The board at this same meeting -- and in the same

6  paragraph it references this -- authorized Mr. Musk to have

7  what are referred to here as "initial conceptual conversations"

8  with a few top shareholders to gauge interest.  Is that

9  correct?

10  **A**   Yes.  What -- the next steps we agreed was that Elon would

11  have hypothetical conversations with shareholders, not

12  disclosing, from a Tesla perspective, any material information,

13  but to gauge interest in this type of transaction.

14  **Q**   Understood.  And were you concerned about these types of

15  conversations?

16  **A**   Well, I wanted to make sure that because he was going to

17  have these conversations with investors, that -- that from the

18  perspective of him being a bidder and also being the CEO, he

19  had information about the company that investors did not have

20  at that point in time.

21  **Q**   Understood.  So in this process of these hypothetical

22  initial conceptual conversations, the board involved lawyers.

23  Correct?

24  **A**   I'm sorry, what does that mean?

25  **Q**   Were lawyers involved in preparing for these initial

DENHOLM - DIRECT / TRIPODI

1  conceptual conversations?

2  **A**    Ye- -- the inside counsel, Todd Maron, the GC at the time

3  at Tesla, the general counsel, was involved in the board

4  meeting and also involved in a discussion that I had with him

5  after the board meeting.

6  **Q**    So essentially at this meeting there was a plan for

7  Mr. Musk to gauge, without selectively disclosing material

8  information.  Is that correct?

9  **A**    It was to be a hypothetical conversation at a high level.

10  And it was, again, not to disclose information that Tesla did

11  not want in the public domain.

12  **Q**    At this point in time, were you of the opinion that these

13  initial conceptual conversations could occur and be successful

14  in terms of Mr. Musk's objective of gauging shareholder

15  interest?

16  **A**    I think it would have been difficult, but possible.

17  **Q**    I was going to ask.  You won't be the first person here at

18  the trial to testify that Mr. Musk can't do the impossible,

19  will you?

20  **A**    I'm sorry?

21          **MS. THOMPSON:**  Objection, relevance.

22          **MS. TRIPODI:**  I'll move on, Your Honor.

23  **BY MS. TRIPODI**

24  **Q**    So if we could look at Exhibit 8, please?

25  **A**    Uh-huh.

**DENHOLM - DIRECT / TRIPODI**

1      (Document displayed)

2  **Q**    So forget selective disclosure at this point.  Do you

3  recognize the tweet in Exhibit 8?

4  **A**    I do recognize this.

5  **Q**    So on August 7th, Mr. Musk tweets that he has funding

6  secured for taking Tesla private at $420 per share.  Am I

7  correct?

8  **A**    He says that he's considering taking Tesla private at

9  $420.  And he does say "Funding secured."

10  **Q**    So, what was material non-public information four days

11  before when the board had met with Mr. Musk has suddenly become

12  very public.  Very suddenly and unexpectedly.  Am I correct?

13  **A**    Well, it is not selective disclosure, because he's

14  published it to the world.  And what's material about this

15  statement is that he's considering taking the company private.

16  That's a very material item.

17      But it's not selective disclosure, so from that

18  perspective, everybody, all shareholders, were -- were given

19  the information at the same time.

20  **Q**    Understood.  But you were surprised that Mr. Musk had made

21  this disclosure, were you not?

22  **A**    I was surprised because at the meeting beforehand, we had

23  -- we had not agreed that this would be the course of action.

24  But having said that, he was the bidder.  And quite honestly,

25  he could have notified the shareholders or the world that he

DENHOLM - DIRECT / TRIPODI

1    was considering this.

2        If he was a third party, if it was Silver Lake bidding for

3    the company, they could have -- even after they talked to the

4    board, they could have made that information public.  Because

5    it's not -- it's not Tesla's information, it's the bidder's

6    information.

7    Q    Understood.  But here with the bidder, Elon is the bidder

8    making this information.  Would you agree that these two

9    sentences are somewhat incomplete for the type of disclosure

10   that this was?

11   A    It's a very shorthand way of putting out some information,

12   I would agree with that.

13   Q    Were you aware shortly after the tweet that Tesla, the

14   company, started to get a lot of inquiries regarding the

15   meaning of "Funding secured"?

16   A    I wasn't aware -- I mean, I don't recall just "Funding

17   secured" being part of the inquiries.  There were a lot of

18   inquiries.  I mean, there was a lot of press articles.

19       As I said, I was in Australia, so I actually saw the tweet

20   after it had already been out.  So there was already quite a

21   lot of press articles around Tesla -- around Elon talking about

22   taking the company private.  That was a very significant piece

23   of news.

24   Q    Would you say that that piece of news was, in fact,

25   material?

**DENHOLM - DIRECT / TRIPODI**

1  **A**    Of course it was material.  Yes.  But as I said before,

2  the reason I was worried on the weekend before was that

3  selective disclosure in terms of one set of shareholders versus

4  all set of shareholders is actually the issue when you're

5  talking about material non-public information.  And actually,

6  what the policy that you were referring to in the disclosure

7  document, policy document, actually tries to avoid.  If you're

8  making a material statement to everybody, it's not selective

9  disclosure.

10  **Q**    But if Mr. Musk was going to be making a material

11  statement to the market, such as if Mr. Musk was disclosing or

12  the company was disclosing its financial information for the

13  quarter, was that something that got reviewed as material

14  non-public information before it was -- before it became

15  public?

16  **A**    The financials are reviewed.  There is a process to review

17  them.  But in this case, he's not talking on behalf of the

18  company.  He's actually talking on behalf of himself,

19  announcing that he's considering taking the company private.

20  **Q**    Okay.  I --

21  **A**    And so that the policy doesn't apply in that case.  It's

22  black and white.  If he was tweeting on behalf of the company,

23  then he would have had to apply the policy, the disclosure

24  policy.  But because he was tweeting on behalf of himself, then

25  the policy doesn't apply.

**DENHOLM - DIRECT / TRIPODI**

1   Q    Okay.  So you anticipated my next question.

2   A    Sorry.

3   Q    Which was going to be -- no, that's fine -- that no one

4   had the opportunity to review the tweet, but you are saying

5   that no one needed to review the tweet because Mr. Musk at that

6   point was not covered as bidder by the company's disclosure

7   policy?  Is that correct?

8   A    That's correct, that's correct.

9   Q    So four days before, the board had convened with Mr. Musk

10  with Tesla's general counsel, and everyone was having these

11  discussions regarding initial conceptual conversations and how

12  Mr. Musk could best do that, with Tesla's general counsel

13  involved.  Correct?

14  A    Yes.  We were trying to help Elon, as the bidder, to have

15  some conceptual discussions because it was material in terms of

16  the structuring of the transaction, and also in terms of the

17  quantity of funding that would have been needed.

18       So for example, if 30 percent of the shareholders wanted

19  to participate in a private vehicle, then he wouldn't have

20  needed 30 percent of the market cap at $420 per share.

21  Q    Understood.

22  A    So that was why it was deemed that that was an appropriate

23  next step.

24  Q    And at that time, this offer was material non-public

25  information for Tesla.  Correct?

**DENHOLM - DIRECT / TRIPODI**

1  **A**    It -- it was, yes.  But as I said, in any transaction,

2  there are two sides.  One side was Tesla, our information -- if

3  we put out that information, we would have reviewed that

4  information along the way.

5       But there's also the other side, which is the bidder.  And

6  in this case, it was Elon.  And that information doesn't need

7  to go through -- as I said, if it was a third party, if it was

8  another CEO who was making a bid for Tesla to take it private,

9  then we would never have reviewed that information.  And they

10 could have put it out whenever they wanted.

11      It's generally the case that you try and get to a place

12 where both parties know what's going to be communicated.  But

13 it's not always the case.

14 **Q**    So was there a certain point in time during that August

15 3rd meeting where the board said: Elon is now acting as bidder,

16 and our disclosure control policies no longer apply to him?

17 **A**    He declared that he was bidder.  I mean, he -- he actually

18 said it was his proposal.  Even in that tweet, he said he -- he

19 is considering.  "I'm considering."

20 **Q**    So is there any board action that you can refer me to in

21 the August 3rd minutes whereby the board says:  Mr. Musk is the

22 bidder, we're helping him with this selective disclosure issue,

23 we are involving Tesla general counsel, but he is now the

24 bidder and our disclosure policies no longer apply?

25          **MS. THOMPSON:**  Objection, Your Honor.  I don't know if

1   counsel is trying to elicit privileged information, attorney

2   advice?

3         **THE COURT:**  Overruled.

4      She's asking about in the minutes, is that disclosed

5   somewhere.

6         **THE WITNESS:**  I don't recall that coming up in the

7   discussion at the board meeting.

8   **BY MS. TRIPODI**

9   **Q**   But at some point in time prior to August 7th when he made

10  this tweet, the board made a decision that Mr. Musk was a

11  bidder, and the disclosure policies no longer applied to him?

12  **A**   Well, the -- it's a fact that he was the bidder, and it's

13  a fact that the policies wouldn't apply in his role as bidder.

14  **Q**   But the board made no formal decision regarding that.

15  **A**   I don't think we needed to.

16  **Q**   Okay.  Now, the company -- after the tweets on

17  August 23rd, 2018, or thereabouts, there was a social media

18  policy that was enacted.  Is that correct?

19  **A**   I'm sorry, say that again?  I didn't hear it properly.

20  **Q**   Sure.  On or around August 23rd of 2018, --

21  **A**   Uh-huh.

22  **Q**   -- there was a social media policy that was enacted.  Is

23  that correct?

24  **A**   There was, yes.

25  **Q**   And if I can refer you to Exhibit 102.

**DENHOLM - DIRECT / TRIPODI**

1  A     Uh-huh.

2          **MS. TRIPODI:**  Your Honor, this has not yet been moved

3  into evidence so I would like to move to admit, please.

4          **THE COURT:**  All right, any objection?

5          **MS. THOMPSON:**  No objection.

6          **THE COURT:**  Admitted.  You may publish.

7          (Trial Exhibit 102 received in evidence.)

8          (Document displayed)

9          **MS. TRIPODI:**  Thank you, Your Honor.

10 BY MS. TRIPODI

11 Q     Ms. Denholm, do you recognize Exhibit 102 as being the

12 social media policy?

13 A     Yes, I do.

14 Q     And if we can look at the policy, am I correct that this

15 contemplates that social media posts that might contain

16 material non-public information are subject to prior review?

17 Is that correct?

18 A     It does say that, yes.

19 Q     And I know we're getting a bit in the weeds here.  But if

20 we look under the "Additional information" section, the

21 document lists some subject matters that are likely to contain

22 material non-public information.  And it lists in subset (b)

23 mergers, acquisitions, other significant transactions.  Is that

24 correct?

25 A     That is correct.

**DENHOLM - DIRECT / TRIPODI**

1   **Q**   So is it your understanding that this policy would have

2   applied to Mr. Musk's tweets, had it been in place?

3   **A**   No, it wouldn't have.  So the disclosure policy that we

4   had at the time didn't specifically call out social media

5   because it was -- it was put in place in 2010, where social

6   media was relatively infrequently used by Elon, or by anybody

7   else, for that matter.  And so it applied -- if he was tweeting

8   on behalf of Tesla, it would have applied in the format that it

9   was in.

10      As a board, we're constantly looking at the policies that

11   the company is -- is, you know, using, and the company's always

12   looking at their policies to make sure that if there are

13   improvements that they can make, that they do so.  So this

14   social media policy was put in place because at that point in

15   time social media was more prevalent not just by Tesla and

16   Elon, but also by other CEOs and other companies.

17      And so it was a supplementary policy or an additional

18   policy that was put in place to explicitly call out social

19   media as subject to the disclosure controls that we had in

20   place as part of the original policy.

21      So, yes, so from my perspective, irrespective of whether

22   we had this policy or the other policy in place, the tweets

23   around August 7th were not subject to these policies because

24   they were in his personal capacity as bidder.

25   **Q**   And your 2010 disclosure policy that was in place at the

**DENHOLM - DIRECT / TRIPODI**

1  time of the tweets, is it your testimony today that those did

2  not cover social media?

3  A    No, they -- they did cover.

4  Q    Okay.

5  A    It wasn't -- the word "social media" wasn't in there but

6  if you look at the appendix to the policy, it actually covers

7  all other types of disclosures that are in the public domain on

8  behalf of Tesla.

9  Q    Understood.  Just some final questions, Ms. Denholm.

10  A    Okay.

11  Q    Prior to August of 2018, were you aware that some of

12  Mr. Musk's tweets had prompted negative reactions from

13  investors?

14  A    His tweets about Tesla?  Or other tweets?

15  Q    Other tweets.

16  A    Yes.  I mean, in his personal capacity, he tweets about

17  many different topics.  Many of which are not anything do with

18  Tesla.  And there may be positive and negative views on those.

19  Q    Understood.  But did the board ever discuss Mr. Musk's

20  controversial tweets that may not have been Tesla-related?

21  A    Occasionally, we have, yes.  But again, they're not

22  contrary to the policies that we have in place around Tesla

23  business.  But, like with any CEO, one of the things the board

24  does is -- is coach and mentor the CEO as well.  And in this

25  case it's no different.

**DENHOLM - DIRECT / TRIPODI**

1  **Q**    And was there a recognition on your part that Mr. Musk is

2  the CEO of a public company with tens of thousands of

3  shareholders, some of whom follow him on Twitter?

4  **A**    Sorry.  What was the question?

5  **Q**    Do you understand as a board member that Mr. Musk is the

6  CEO of a public company, with tens of thousands of

7  shareholders, some of whom follow him on Twitter?

8  **A**    Yes.  I do recognize that.

9  **Q**    And do you recognize that what Mr. Musk says on Twitter,

10  whether it's in his personal capacity as you're differentiating

11  here today or his capacity as Tesla CEO, can have a negative

12  impact on shareholders?

13  **A**    It -- I think, most of our shareholders are very

14  accustomed to the different roles that he has.  As I mentioned

15  before, he is the CEO of SpaceX, which is a very prominent

16  example.  He tweets about SpaceX all the time.  And so for me,

17  I think our shareholders are sophisticated enough to understand

18  the difference and the different roles that he has.  If he's

19  talking about, you know, butterflies or something else, he's

20  not doing that in his capacity as -- as CEO of Tesla.  He's

21  doing that in an individual capacity.

22  **Q**    Understood.

23          **MS. TRIPODI:**  I have no further questions right now.

24  If I can reserve some time?

25          **THE COURT:**  All right, thank you.

 1      Cross?

 2           MS. THOMPSON:  Your Honor just for efficiency's sake,

 3   I'd like to move a few exhibits into the record.

 4           THE COURT:  Okay.

 5           MS. THOMPSON:  It's Exhibit 96, 134, 135, 137, 139,

 6   312, 313, 314, 315, 316, 317, and 318.  And those are board

 7   meeting minutes, special committee meeting minutes, and the

 8   disclosure policy from 2010 that Ms. Denholm referenced.

 9           THE COURT:  All right.  Any objection?

10           MS. TRIPODI:  No objections, Your Honor.

11           THE COURT:  All right, those are all admitted.  Thank

12   you.

13        (Trial Exhibits 96, 134, 135, 137, 139, 312, 313, 314,

14   315, 316, 317, and 318 received in evidence.)

15           MS. THOMPSON:  Thank you, Your Honor.

16                     <u>CROSS-EXAMINATION</u>

17   BY MS. THOMPSON

18   Q    Good afternoon.  Where are you from?

19   A    Originally from Australia.  I'm also a U.S. citizen.  I

20   lived in the U.S. for 17 years, and I have been coming

21   backwards and forwards for nearly 30 years.

22   Q    And what do you do for a living?

23   A    So today I'm an operating partner at a venture capital

24   firm in Australia called Blackbird, but I'm a finance and

25   operations professional.  By background, I've been the CFO and

DENHOLM - CROSS / THOMPSON

1    COO of companies here in the U.S. as well as in Australia.

2    **Q**    And have you served as a board member for companies in the

3    past, other than Tesla?

4    **A**    Yes, I have.  I was a board member of a public company in

5    the U.S. called Echelon Corporation, prior to becoming a board

6    member at Tesla.  And I've always been on the board of a

7    U.S.-listed European company called ABB, a very large

8    125-year-old energy company that's sort of like the equivalent

9    of GE in the U.S. but for Europe.

10   **Q**    And before you joined Tesla's board, had you ever met Elon

11   Musk?

12   **A**    No.  Only as part of the interview process of joining the

13   board, I met Elon as part of that process.

14   **Q**    Okay.  Now, you are what is referred to as an outside or

15   independent director at Tesla, right?

16   **A**    Yes, I am.

17   **Q**    Can you explain what that means?

18   **A**    It means that I don't have any ongoing affiliation with

19   the company, other than my board role.  I've never been an

20   officer of the company; I've never been part of the management

21   team of the company.

22   **Q**    Apart from the action that the board takes as a whole,

23   what ability do you, as an individual, have to control any of

24   Tesla's executives?

25   **A**    No ability.  I mean, there's the policies and procedures,

1    the code of conduct, all those sorts of things that govern how

2    the executives actually operate at the company.

3    Q    Okay.  So let's talk about, just briefly, that policy you

4    mentioned.  It's Exhibit 318, if we could just publish it

5    briefly for the jury.

6         MS. THOMPSON:  And this has been admitted.  Can we

7    publish this, please, for the jury?

8         (Document displayed)

9    BY MS. THOMPSON

10   Q    All right.  Is this the policy that you were referencing

11   in the questions you received from plaintiff's counsel?

12   A    Yes.  It's the disclosure controls and procedures policy

13   that was in place.

14   Q    And these are the policies that apply to Tesla when it

15   discloses certain information.  Right?

16   A    Yes.

17   Q    Okay.  And who is responsible for ensuring compliance with

18   these policies on a daily basis?

19   A    The management team of Tesla.

20   Q    Okay.  And I think you mentioned this, but did this

21   disclosure policy have any applicability to Mr. Musk's tweets

22   that he was considering taking Tesla private at $420 per share?

23   A    No.  I -- I don't believe so.  In his role as bidder,

24   Tesla's policies are not relevant.

25   Q    Okay.  I'm going to turn you briefly to the August, 2018,

1    timeframe.  You were shown an email from Mr. Musk with an offer

2    to take Tesla private at $420.  Do you recall that?

3    **A**    I do.

4    **Q**    And when you received that email, what capacity did you

5    understand Mr. Musk was acting as?

6    **A**    As a bidder for the company to take it private.

7    **Q**    And you were asked about a board meeting that same day,

8    August 2nd.  Do you recall that?

9    **A**    I do recall that.

10   **Q**    All right.  And do you recall -- let me just speed this

11   along and if you want to look at the meeting minutes we can.

12   **A**    Okay.

13   **Q**    But do you recall Mr. Ahuja speaking at that board

14   meeting?

15   **A**    Yes, I do.

16   **Q**    And was there also a board meeting the following day,

17   August 3rd?

18   **A**    Yes.  In fact, we asked Elon to join a board meeting on

19   August 3rd after we had the August 2nd meeting, because we

20   wanted to ask him some questions about the proposed offer to

21   take Tesla private.

22   **Q**    And between hearing from Mr. Ahuja on August 2nd and

23   Mr. Musk on August 3rd, what information did the board have

24   about the funding for the take-private transaction that

25   Mr. Musk was considering?

1   **A**    Yeah.  So on the August 2nd meeting, Deepak Ahuja, who was

2   the CFO and Todd Maron were there, who is the GC.  So Deepak

3   went through the sequence of events prior to us receiving the

4   letter which was that they had met with the Saudi PIF.  Saudi

5   PIF had accumulated about a 4.9 percent position in the Tesla

6   company, buying shares.  And at the meeting between Yasir,

7   Elon -- and Deepak was there -- they had offered the funding to

8   actually take Tesla private.  And so that was part of that.

9        He also relayed to the board that there had been a

10  previous meeting in 2017 with SoftBank as well as the Saudi

11  PIF, and I believe Larry Ellison as well, that talked about the

12  same type of thing.  That they would fund a transaction if Elon

13  wanted to take the company private.

14  **Q**    Turning to the tweets that were published on August 7th --

15       **MS. THOMPSON:**  Can we put up Exhibit 8, please, which

16  you were shown, Ms. Denholm.

17       (Document displayed)

18  **BY MS. THOMPSON**

19  **Q**    This is "Am considering taking Tesla private at $420.

20  Funding secured."  You were asked some questions about sort of

21  materiality related to this.  And I believe your answer was

22  that it was material that Mr. Musk was considering taking Tesla

23  private.

24       How did you view the significance of the second part of

25  the tweet, "Funding secured"?

1  **A.**    Quite honestly, I think the first part of the tweet was

2  the most important thing for anyone, for investors and for the

3  general public, because clearly taking Tesla private was a big

4  deal.

5  **Q.**    Was there anything in Mr. Musk's tweets on August 7 that

6  was inconsistent with what you knew from hearing from

7  Mr. Ahuja, from Mr. Musk, and receiving Mr. Musk's email on

8  August 2nd?

9  **A.**    No.  It was entirely consistent.  The funding was

10  available, at least the representations to us from both Deepak

11  and also Elon on the August 3rd.  And I left the meetings fully

12  believing that if he wanted to take the company private, he

13  would be able to fund the transaction from multiple sources.

14      I had seen him raise funding for Tesla, both in terms of

15  the debt markets and also the equity markets, in the time that

16  I'd been audit committee chair, and they were always

17  oversubscribed.  So I had no reason to believe that he wouldn't

18  be able to get the funding if he wanted to take the company

19  private.

20  **Q.**    Now, after receiving --

21          **MS. THOMPSON:**  We can take that down.

22      (Document removed from display.)

23  **BY MS. THOMPSON**

24  **Q.**    After receiving Mr. Musk's email on August 2nd offering to

25  take the company private at $420 per share, how seriously did

1    the board take its role in considering that offer as the

2    counter party to Mr. Musk?

3    **A.**   Very, very seriously.  As you can see from the record, we

4    met many times and very frequently in terms of not only

5    understanding the offer, but also then forming a special

6    committee, getting advisors, both legal counsel as well as we

7    were in the process of getting financial advisors as well.

8         I take my -- my role as board member, but also as audit

9    committee chair, incredibly seriously.

10   **Q.**   Now, Ms. Denholm, do you understand that you're here today

11   testifying because plaintiffs are trying to hold you personally

12   responsible for billions of dollars in damages they claim for

13   Mr. Musk's two tweets?

14   **A.**   Yes, I do understand that.

15   **Q.**   And, Ms. Denholm, during this time period in August 2018,

16   did you always act in good faith?

17   **A.**   I absolutely did.

18   **Q.**   And if you had thought Mr. Musk was trying to mislead

19   people with his tweets, what would you have done?

20        **MS. TRIPODI:**  Objection, Your Honor.

21        **THE COURT:**  Overruled.

22   **A.**   I would have left the board.  I have, as we talked about

23   before, many different things that I do in my life, and if I

24   believed that Elon was trying to mislead the public, I would

25   have stood down from the board.

DENHOLM - REDIRECT / TRIPODI

1  **Q.**  Thank you Mr. Denholm.

2          **MS. THOMPSON:**  No further questions.

3          **THE COURT:**  Thank you.

4      Redirect?

5                     <u>**REDIRECT EXAMINATION**</u>

6  **BY MS. TRIPODI**

7  **Q.**  Ms. Denholm, I'll be brief.

8      At the time that Mr. Musk tweeted that he had funding

9  secured at 420 on August 7th, had you seen a written agreement,

10 a written commitment, to fund the transaction?

11 **A.**  No, I had not, but -- but it wouldn't be unusual in an

12 office that I just want to have a written agreement.

13 **Q.**  And am I correct that at that point in time when he

14 tweeted "funding secured," that there was no structure that had

15 been decided upon for the deal?

16 **A.**  Nothing decided.  He -- Elon definitely outlined what he

17 wanted the structure to look like in that he wanted, you know,

18 the -- the vast majority of shareholders who had stuck with

19 Tesla over the years to actually be part of the go-private

20 transaction, and so he had outlined that.

21     But there wasn't a finalized structure at the time of him

22 putting out the tweet around considering taking Tesla private.

23 **Q.**  Understood.

24     And your understanding with respect to the funding was

25 based on the meeting that Mr. Musk had had with the Saudi PIF;

1    is that correct?

2    **A.**   Not just that meeting, but it was Deepak's representation

3    to the -- to the board of that meeting, but also previous

4    meetings around potentially funding a go-private transaction

5    that had been contemplated or at least raised a year ago, and

6    then Elon going through different sources of potential funding

7    for the -- for a deal, yes.

8    **Q.**   But at the time of the August 7th tweet, there had been no

9    determination as to whether regulatory approval from -- for a

10   large investment by the Saudi PIF, a sovereign wealth fund,

11   there had been no determination as to regulatory approval,

12   whether that would even be possible, was there?

13   **A.**   It was one of the things that we discussed at the board

14   meeting, as to whether or not we would -- you know, he would

15   need to get regulatory approval, but there was no final

16   determination.

17       But having said that, there were also alternative sources

18   of funding that were available to him at that time.

19   **Q.**   These funding sources were available, but not committed;

20   is that correct?

21   **A.**   Well, they weren't documented yet, but he believed that

22   they were available, and we believed that they were available

23   having seen him raise funding for various things in the past.

24   **Q.**   Understood.  Thank you for your time.

25       **MS. TRIPODI:**  No further questions.

1          **THE WITNESS:**  Thank you.

2          **MS. TRIPODI:**  Thank you, Your Honor.

3          **THE COURT:**  Anything on recross?

4          **MS. THOMPSON:**  No questions, Your Honor.

5          **THE COURT:**  All right.  Thank you, Ms. Denholm.  You

6    may step down.  You're excused as a witness.

7          **THE WITNESS:**  Thank you very much.

8       (Witness excused.)

9          **THE COURT:**  All right.  We've been going a long time,

10   but I do think we should take a short break even though that

11   only leaves 20 minutes with the next witness.  We've been going

12   for over two hours.

13         **MR. SPIRO:**  Yes, Your Honor.  That's fine.

14         **THE COURT:**  All right?  So we'll take -- we can make

15   this a shorter break since we're going to be leaving in 30

16   minutes.  Maybe a 10-minute break, if that's okay.

17         **THE CLERK:**  All rise for the jury.

18      (Whereupon there was a recess in the proceedings

19       from 2:59 p.m. until 3:15 p.m.)

20         **THE COURT:**  Welcome back, ladies and gentlemen.  Have

21   a seat please.

22      Plaintiffs, are you prepared to call your next witness?

23         **MR. APTON:**  Yes, Your Honor.  Plaintiffs call Bradley

24   Buss.

25

1    **BRADLEY BUSS**,

2   called as a witness for the Plaintiffs, having been duly sworn,

3   testified as follows:

4        **THE WITNESS:**  I do.

5        **THE CLERK:**  Thank you.  Please have a set.

6        **THE WITNESS:**  Thank you.

7        **THE CLERK:**  You're welcome.

8        Please speak clearly into the microphone.  State and spell

9   your first and last name for the record.

10       **THE WITNESS:**  Bradley Buss.  B-R-A-D-L-E-Y, last name

11  B-U-S-S.

12       **THE COURT:**  All right.  Thank you, Mr. Buss.

13       You may proceed.

14       **MR. APTON:**  Your Honor, I have a witness binder and a

15  copy of a transcript to pass up, if I may.

16       **THE COURT:**  Yep.

17       (Whereupon documents were tendered to the Court and the

18  witness)

19                    **DIRECT EXAMINATION**

20  **BY MR. APTON**

21  **Q.**   Good afternoon, Mr. Buss.

22  **A.**   Hello.

23  **Q.**   Hello.

24       You were a member of Tesla's board in 2018 when the tweets

25  in this case were sent; correct?

**BUSS - DIRECT / APTON**

1  **A.**   Correct.

2  **Q.**   Okay.  And while you were a director, did you communicate

3  directly with Tesla's executive management?

4  **A.**   I did.

5  **Q.**   And that would include Deepak Ahuja?

6  **A.**   Yes.

7  **Q.**   Elon Musk?

8  **A.**   Yes.

9  **Q.**   Todd Maron?

10  **A.**   Correct.

11  **Q.**   Okay.  I assume others as well?

12  **A.**   Yes.  Many different people.

13  **Q.**   And you left the board in 2019; correct?

14  **A.**   Correct.

15  **Q.**   Do you have any current relationship with Tesla

16  professionally?

17  **A.**   I do not.  Not at all.

18  **Q.**   And just curious, how come you didn't stand for renewal on

19  the board?

20  **A.**   I had done ten years, which is a pretty long time, and our

21  terms were three years.  And we were going to be adding people

22  to the board, and it was a perfect time to jump off and do some

23  other stuff.

24  **Q.**   Okay.  Now, Tesla -- prior to your joining the board,

25  Tesla had identified Elon's Twitter as a channel of corporate

**BUSS - DIRECT / APTON**

1  communication; correct?

2  **A.**   Prior to me joining the board?

3  **Q.**   When did you join the board?

4  **A.**   I joined pre-IPO, so I'm not sure about the exact time.

5  **Q.**   My mistake.

6       In 2013, Tesla identified --

7  **A.**   That sound about right.

8  **Q.**   -- Elon's Twitter channel as a corporate channel of

9  communications, yes?

10 **A.**   Correct.

11 **Q.**   And, now, several years after that, in 2018 when these

12 tweets at issue were made, was anyone on the board or anyone in

13 management reviewing Elon's tweets before he sent them?

14 **A.**   Are you referring to specific tweets?

15 **Q.**   His Twitter generally, yeah.

16 **A.**   No, not specifically.  I mean, we -- we had a disclosure

17 policy in place, and it would have fell under that as just

18 another form of communication.

19 **Q.**   And can you briefly just describe that policy that was in

20 place at that time?

21 **A.**   Yeah.  Sure.  You know, basically pre-IPO when you go

22 public, most companies will put in place a policy relating to

23 communicating externally.  So this was a heavy focus on 10-Qs,

24 10-Ks, you know, 8-Ks, how you do them, who does them, how does

25 it work, stuff like that, so...

**BUSS - DIRECT / APTON**

1  Q.   And from your perspective, given your role in the board

2  meetings, did you and the board all have a common understanding

3  of how that policy was to be enforced?

4  A.   I would say so, yeah.  It was -- I mean, it was fairly

5  straightforward and, you know, the management team was

6  well-versed.  We had, you know, great legal advice and, you

7  know, we were always doing what we needed to get done.

8  Q.   Legal advice from in-house counsel?

9  A.   In-house, as well as the corporate attorneys that the

10 company used.  You know, pretty standard process, you know, at

11 every quarterly reporting period.

12 Q.   So if we can get to August 2nd of 2018.  This is when Elon

13 sent that email to the board titled "Offer to Take Tesla

14 Private."  Do you recall that?

15 A.   I do.

16 Q.   Now, when you received that email, did you regard it as a

17 formal offer or more of just a concept that he was expressing

18 concerning taking Tesla private?

19 A.   I thought it was pretty interesting.  I mean, it obviously

20 wasn't a detailed offer, but it was maybe more of an initial

21 offer concept of what he wanted to do.

22 Q.   And, well, if we could show the witness Exhibit 81, which

23 is the email.

24      It should pop up on your screen there.

25 A.   Should I use the screen or the binder?

**BUSS - DIRECT / APTON**

1   Q.   It's up to you.  Whichever one you feel more comfortable

2   with.  The binder does have a copy of it.

3   A.   There we go.  Now it's up.

4        (Document displayed.)

5   Q.   Okay.  At the bottom of the email, it says (as read):

6        "Unless another bidder comes forward with a better

7        offer, I would ask that this matter be put to a

8        shareholder vote at the earliest opportunity."

9        Do you see that section?

10  A.   I do.

11  Q.   The terms laid out in this email offer, could they have

12  been put to a shareholder vote?

13  A.   Not at that time, no.

14  Q.   The subject line of the email says "Offer to Take Tesla

15  Private at $420."

16       This email doesn't contain any explanation for that price,

17  does it?

18  A.   Not in the email.  We had a verbal discussion on that.

19  Q.   And it also does not explain where the funding for the

20  transaction would be coming; is that correct?

21  A.   Not in the email, but, again, we did subsequent to that.

22  Q.   Sure.  So on August 2nd you and your fellow board members

23  convene a meeting of the Board of Directors.  Do you recall

24  that?

25  A.   Yeah.  We did, correct, that night.

1    Q.    Sure.

2          MR. APTON:   If we could show Exhibit 82?   These are in

3    evidence.

4          (Document displayed.)

5    BY MR. APTON

6    Q.    These are the minutes of that meeting; is that correct?

7    A.    Yes, sir.

8    Q.    And based on my review of these minutes -- and I'm hoping

9    you can confirm for me -- at this time you and your fellow

10   directors needed more information about the structure for the

11   transaction; is that right?

12   A.    Yeah.   We were looking for more than what -- the update we

13   got primarily from Deepak and Todd.

14   Q.    You guys wanted to know how the deal was going to be paid

15   for; is that right?

16   A.    Uh-huh.

17   Q.    That's a "yes," sir?

18   A.    Oh, I'm sorry.   Yes.

19   Q.    Thank you.

20         And, importantly, who is going to be involved in terms of

21   who's going to pay for it; right?

22   A.    Different elements, correct.

23   Q.    Sure.

24         Now, the next day you have another meeting.

25         MR. APTON:   If we could show Exhibit 83.   These are

BUSS - DIRECT / APTON

```
 1  also in evidence.
 2         (Document displayed.)
 3  BY MR. APTON
 4  Q.    Now, these are the minutes from that August 3rd board
 5  meeting; correct?
 6  A.    Correct.
 7  Q.    And on the last page, Page 3, do you see that the board
 8  authorized Elon to have, quote, conceptual conversations, close
 9  quote?  Do you see that?
10  A.    Yes.
11  Q.    So aside from having these conceptual conversations with
12  Tesla's top shareholders, did the board at this point authorize
13  Elon to make any other public statements about his offer?
14  A.    No.  We hadn't discussed any communication plan yet.
15  Q.    And so everyone at this point knew that Elon's offer
16  needed to be kept confidential because it was material?
17  A.    Yes.
18  Q.    Big news; correct?
19  A.    Yes.  Internally, correct.
20  Q.    Now, despite that, on August 7th, we have the tweet.
21         MR. APTON:  If we could show Exhibit 8.
22         (Document displayed.)
23  BY MR. APTON
24  Q.    I'm sure, sir, you're familiar with this tweet?
25  A.    I might have seen that before.
```

**BUSS - DIRECT / APTON**

1  **Q.**   I take it you're joking.

2  **A.**   Yes.  Sorry.

3  **Q.**   Okay.

4  **A.**   Yes.

5  **Q.**   Thank you, sir.

6       And so, now, you understood "funding secured," the last

7  part of this tweet, to be a reference to the Saudi PIF; is that

8  right?

9  **A.**   Them and others, correct.

10  **Q.**   Well, sir, you were previously deposed in this case, yes?

11  **A.**   Yes.

12  **Q.**   And at the time of that deposition, you were asked a very

13  similar question.

14       And if I could just refer you to your deposition

15  testimony.  You have a copy of your transcript in front of you.

16  Page 67, Line 23.  It says (as read):

17            ▪**QUESTION:**Did you have an understanding of

18            what Elon meant by 'funding secured' in

19            Exhibit A?

20            ▪**ANSWER:**At the point of the tweet

21            generically?  Can you clarify?

22            ▪**QUESTION:**At the time.  Sure.  Sorry.  At the

23            time of the tweet.

24            ▪**ANSWER:**Well, again, to our earlier

25            discussions on that, I think the background

1                  with the structure and the Saudi commitment,

2                  I think it was 100 percent sure that, you

3                  know, funding was not going to be an issue

4                  due to the structure, due to investor

5                  interest and, you know, having the Saudis as

6                  the backstop on everything."

7       So this "funding secured" reference in Exhibit 8, it did,

8   in fact, refer to the Saudis, to your understanding; correct?

9   **A.**   Yeah.  As the main, correct, sure.

10  **Q.**   Now, if we can go to Exhibit 13.

11      (Document displayed.)

12  **Q.**   I believe you've also seen this tweet as well.  Yes?

13  **A.**   Hang on.

14      (Brief pause.)

15  **A.**   Yes.

16  **Q.**   And you recognize the sentence, quote (as read):

17                  "Only reason why this is not certain is that it's

18          contingent on a shareholder vote."

19      Do you recognize that -- that sentence, sir?

20  **A.**   I've seen that, yes.

21  **Q.**   Yeah.  At this point in time, given what you and the board

22  had received, could a potential transaction have been presented

23  for a shareholder vote?

24  **A.**   Not at that time, but it was obviously the main element.

25  **Q.**   And so the shareholder vote referenced in this tweet, it

1  was not the only reason why a going-private transaction was not

2  certain, was it?

3  **A.**   It's the only one that mattered, but, yeah, there was

4  other things that still needed to get ironed out.

5  **Q.**   Such as what?

6  **A.**   I mean, the structure, the price, tremendous amount of

7  diligence.  You know, just basic stuff.

8       But, you know, in the end, even if we agreed as a special

9  committee, it was still dependent on the shareholder,

10 shareholder side.

11 **Q.**   Sure.  But, nonetheless, you would agree that the

12 shareholder vote was not the only reason why this deal wasn't

13 certain at this point in time.  Yes?

14 **A.**   No, it was -- well, that's the main, the main one.  It's

15 the only one that matters.  Everything else doesn't matter if

16 the shareholders don't agree.

17 **Q.**   Everything you just listed is irrelevant?  It's not

18 important?  You listed some important materials:  Due

19 diligence, structure --

20 **A.**   No, no.  Meaning that it wouldn't -- it wouldn't matter if

21 the shareholders didn't agree with it, is all I was saying.

22 **Q.**   And now -- well, it also wouldn't matter if there was no

23 funding because the whole thing would be moot anyway; correct?

24 **A.**   That would be an element.

25 **Q.**   Yeah.  And so, sir, if I could just finish up here.  If we

BUSS - DIRECT / APTON

```
 1   can go to Exhibit 289.

 2        Do you recognize this document, sir?  It's a press

 3   release -- well, do you recognize this document, sir?

 4   A.   I do.

 5             MR. APTON:  I'm not sure if this is in evidence.  I'd

 6   like to move it into evidence.

 7             MR. LIFRAK:  No objection.

 8             THE COURT:  Admitted.

 9        (Trial Exhibit 289 received in evidence.)

10        (Document displayed.)

11   BY MR. APTON:

12   Q.   This is the press release issued by the special committee

13   on August 14th, 2018.  That would include yourself; correct?

14   A.   Correct.

15   Q.   And the press release states that, quote (as read):

16        "The special committee has not received a formal

17        proposal from Mr. Musk regarding any going-private

18        transaction."

19        Is that correct?

20   A.   That's correct.

21   Q.   And as of August 14th, you're still waiting for a detailed

22   proposal?

23   A.   Yeah, a final proposal for sure.

24   Q.   Okay.  Thank you, sir.

25             MR. APTON:  I have no further questions.
```

1          **THE COURT:**  All right.  Thank you.

2      Cross?

3          **MR. LIFRAK:**  Your Honor, I'm mindful of the jury's

4  time.  My examination I estimate 10 to 15 minutes at the most.

5          **THE COURT:**  Okay.  Well, let me ask.  Does anybody

6  need to leave right sharp at 3:30?  Can you stay 10 more

7  minutes?  Does anybody have a problem with that?

8      (Jurors responding negatively.)

9          **THE COURT:**  All right.

10         **MR. LIFRAK:**  Thank you, Your Honor.

11         **THE COURT:**  You have ten minutes past the 3:30 hour to

12  get it done.

13                     **CROSS-EXAMINATION**

14  **BY MR. LIFRAK**

15  **Q.**  Good afternoon, Mr. Buss.

16  **A.**   Hello.

17  **Q.**  Let's jump right in.  August 2nd, 2018, the email from

18  Mr. Musk regarding offer to take Tesla private.  You said in

19  your direct examination that you thought that was interesting.

20  **A.**   Uh-huh.

21  **Q.**  Did you think it was something that might make sense for

22  the company at that point?

23  **A.**   Yeah.  I could see a lot of pros to it based on where the

24  company was at and where they were looking to go long term.

25  **Q.**  And you mentioned a board meeting that was convened the

1  same day, on August 2nd, in which Mr. Ahuja and Mr. Maron

2  spoke.  Do you recall that?

3  **A.**  I do.

4  **Q.**  Did Mr. Ahuja say anything in that meeting about the PIF

5  owning any portion of Tesla stock at that point?

6  **A.**  Yeah, he did.  He brought that up, which, you know, I was

7  definitely unaware of, and I was like, "Wow."  Because it's

8  pretty serious that they would do that ahead and, you know, I

9  looked at it as really a downpayment on what they were trying

10  to do.

11      So this was -- it was very real.  I hadn't heard about it

12  prior, so...

13  **Q.**  Now, did Mr. Ahuja at that meeting say anything about the

14  PIF's willingness to fund a go-private transaction?

15  **A.**  Yeah, he did.  He said they were being very aggressive.

16  They had called.  I think they had a meeting at the end of

17  July.  You know, the head guy was there.  They wanted to do the

18  whole thing.

19  **Q.**  Did Mr. Ahuja at this initial board meeting on August 2nd

20  say anything, even in general terms, about a possible structure

21  for the deal?

22  **A.**  Very high level.  There was discussions related to how

23  SpaceX, you know, was kind of configured.

24  **Q.**  And what was that?

25  **A.**  Private -- I mean, obviously a private company that had

**BUSS - CROSS / LIFRAK**

 1  institutional smaller shareholders, different structures that

 2  people, you know, were part of as a group.

 3      And I think, you know, he was talking that it was, you

 4  know, Elon's desire that everybody could -- if they wanted to,

 5  could just kind of roll into a D listing slash privatization.

 6  He wasn't trying to take over the company or control it or

 7  anything like that.

 8  **Q.**  And then the next meeting was the next day, August 3rd,

 9  with Mr. Musk doing most of the talking at that meeting; is

10  that right?

11  **A.**  Yeah.  We had asked him to join us once we had some more

12  background to understand his perspective better.

13  **Q.**  And did Mr. Musk give any indication at that meeting as to

14  how he arrived at that $420 a share price?

15  **A.**  Yeah, he did.  I mean, basically it was roughly a

16  20 percent increase from where the stock had been and that was

17  post.  It was a decent run-up.  We had a decent earnings and

18  the stock had ran up into the mid or low teens, I think.

19      So it was a real offer.  I mean, you know, in my

20  perspective.  I've done a lot of M&A stuff.  20 percent is "I'm

21  serious" and especially after a run-up.  So I was like, "Hmm.

22  Wow."

23  **Q.**  In this initial meeting, did he say anything about whether

24  he wanted a narrow base of investors in a potentially private

25  company or a broad base?

**BUSS - CROSS / LIFRAK**

1  **A.**   No.   He -- he wanted as broad as possible.   Like I said,

2  in a perfect world, people could just flip from public to

3  private; but if people didn't want to do it, couldn't, didn't

4  understand it, there would be a vehicle to buy them out at the

5  offer price.   That was kind of the rough concept at the time.

6  **Q.**   And what did he say at this meeting about the PIF's

7  willingness to fund the transaction?

8  **A.**   He was pretty adamant that they could do the whole thing;

9  and obviously depending on, you know, him rolling over the PIF,

10  already owning 5 percent, other large institutional guys

11  rolling, you know, the size of the check, you know, wasn't as

12  big as I think some of the headline numbers that people

13  expected.

14  **Q.**   You received some questions in your direct examination

15  about whether you viewed Mr. Musk's "funding secured" statement

16  as referring to the PIF or to other potential investors as

17  well.   Do you recall that?

18  **A.**   Uh-huh.   I do.

19  **Q.**   And at this meeting on the -- the 3rd of August, did

20  Mr. Musk talk about other potential investors who could fund

21  any investors who didn't roll over in the company?

22  **A.**   Yeah.   Yeah, he did.   We had a pretty extensive dialogue

23  on a handful of different companies.

24  **Q.**   Do you recall any of those names sitting here today?

25  **A.**   Yeah.   I mean, obviously the PIF doing the whole thing,

**BUSS - CROSS / LIFRAK**

1  and then there was discussions related to the A -- AEU, you

2  know, potentially partnering with the PIF if need be.

3      And then some of our larger shareholders that were also

4  shareholders at SpaceX.  So Fidelity, I think Baillie Gifford,

5  T. Rowe Price.  I think Tencent was in there as well.

6  **Q.**   And then you testified that you obviously saw the tweets

7  on August 7th; correct?

8  **A.**   I did.

9  **Q.**   And you saw the tweet that started with saying "Am

10  considering taking Tesla private at $420."  You saw that?

11  **A.**   Yes.

12  **Q.**   And did you believe when you saw that tweet on August 7th,

13  that that was different than what Mr. Ahuja and then later

14  Mr. Musk said at those meetings on August 2nd and 3rd?

15  **A.**   No.  Everything was consistent with what we had talked

16  about.

17  **Q.**   And then the words "funding secured" were also in the same

18  tweet; is that correct?

19  **A.**   Yes.

20  **Q.**   And did you believe that part of the tweet was different

21  than what you understood from Mr. Ahuja and Mr. Musk at those

22  meetings in early August?

23  **A.**   No.  It was very consistent.  I mean, there was a lot of

24  talk that he had related to, again, if a lot of people wanted

25  to roll, the number would be less than he thought.  They'd be

**BUSS - CROSS / LIFRAK**

1    very oversubscribed.  They would have to make decisions on who

2    to allocate the new investment to.

3    **Q.**   And you stated in your direct examination that tweeting at

4    this point wasn't kind of the plan for communications going

5    forward; is that right?

6    **A.**   That's -- yeah, we didn't have any communication plans

7    from the Tesla side and then him as the bidder.

8    **Q.**   Did Mr. Musk at any point explain why he had tweeted at

9    the time -- at the point that he did?

10   **A.**   Yeah.  We had a subsequent board call to try to understand

11   that.  And a lot of it, you know, was really due to there was a

12   rumor or article that was circulating early in the morning that

13   was talking about the potential PIF announcement, which, you

14   know, was obviously a major thing.

15       I think they're one of the top funds in the entire world,

16   so I think he was concerned on that and where that narrative

17   would go.  And he made an in-the-field call to put that out so

18   that it wasn't just, you know, large investors, so to speak,

19   that maybe knew.  He felt like it should go broad and deep.

20   **Q.**   So let's take a step back just for a moment.  At that

21   point in 2018, how long had you been on the Board?

22   **A.**   Nine, nine-ish years.

23   **Q.**   And your term on the Tesla board ended when?

24   **A.**   June of '19.

25   **Q.**   Was being on the Tesla board during this period your

BUSS - CROSS / LIFRAK

1   full-time job or were you doing other things?

2   **A.**   In '18?  No.  I was retired from operating role, so I was

3   doing a couple of board services and just some private

4   investing.

5   **Q.**   What about during the period before that?

6   **A.**   When I first joined the board, I was the CFO at a company

7   called Cypress Semiconductor.

8   **Q.**   All right.  During the period that you were on the Tesla

9   board, did you have any kind of a personal or social

10   relationship with Mr. Musk at all?

11   **A.**   No.  I didn't know him or any of the board members before

12   I joined.

13   **Q.**   What about at this point?

14   **A.**   No, no.

15   **Q.**   Okay.  So going back to the summer of 2018, after

16   Mr. Musk's email to the board and the meetings that we talked

17   about on the 2nd and the 3rd, was there a special committee of

18   the board formed?

19   **A.**   There was.

20   **Q.**   And could you explain what a special committee is?

21   **A.**   In one minute?  Sure.  Basically --

22   **Q.**   We have 1 minute and 15 seconds.

23   **A.**   -- it was a delegation from the board literally to make

24   the decision on this transaction.  So it was -- there was a lot

25   of power in the committee.  If we didn't agree to do it, it

**BUSS - CROSS / LIFRAK**

1   would be dead and wouldn't move on.

2       So there was a lot of fiduciary duties that we had, and we

3   took them very seriously.  We met very frequently.  More

4   lawyers than I care to talk about.  And, you know, we were

5   going at it literally every day.

6   **Q.**   During what period?  So beginning of August until the --

7   it was decided not to go forward with the transaction; is that

8   right?

9   **A.**   Yeah.  I think August 24th or '5th; correct.

10  **Q.**   And did Mr. Musk attend these meetings of the board

11  special committee?

12  **A.**   No, no.  Not at all.

13  **Q.**   Why is that?

14  **A.**   I mean, because he's the bidder.  You know, we were acting

15  on behalf of the company and the shareholders, so there's --

16  there's a pretty big wall that goes up.  Literally it happened

17  as soon as he sent that email, because he obviously became a

18  bidder and he wasn't -- you know, we excused him from any kind

19  of board things that we didn't need him and the committee

20  really took over from there.

21  **Q.**   And I know we're only talking about a matter of weeks, but

22  what did the special committee do or accomplish during the

23  period that we're talking about?

24  **A.**   So we obviously hired external counsel, and then it was a

25  tremendous amount of time related to the process of how to run

1   this.  And then that counsel was working with Elon and his

2   advisors on a host of things, you know, to move the ball

3   forward.

4        And then we had started to look at which financial

5   advisors that would have been very crucial in this to hire.  So

6   we had started an exercise on scoping out who to hire, and we

7   were going to start interviews right before it was called off.

8   Q.   And you mentioned that it was called off approximately

9   August 23rd of 2018.  Do you recall that?

10  A.   Yes.

11  Q.   And in your mind, what was the reason that the transaction

12  didn't go forward?

13  A.   Well, I mean, most of it, I think, it was a pretty crazy

14  time for Tesla.  I think, as people, you know, may not

15  remember, but it was very pivotal in getting that Model 3 out.

16  This was becoming very complicated.

17       And I think a lot of shareholder pushback that he had,

18  especially from some of the smaller retail guys that he was

19  extremely, you know, friendly with, he just decided not to do

20  it.  And obviously as a committee, if he wasn't interested,

21  there was no need for the committee.  So we disbanded that as

22  well.

23  Q.   And, finally, Mr. Buss, did your experience with this

24  potential go-private transaction change your view in any way of

25  Mr. Musk as a leader of the company?

**BUSS - REDIRECT / APTON**

1    **A.**   No, not at all.  I mean, I think he was looking at doing

2    the right thing.  And in the end, he made a decision that the

3    shareholders obviously have benefited from extremely well over

4    the last few years.

5    **Q.**  All right.  Thank you.

6          **MR. LIFRAK:**  Thank you, Your Honor.

7          **THE COURT:**  All right.  Thank you.

8       Sounds like a couple questions on redirect.

9               <u>**REDIRECT EXAMINATION**</u>

10   **BY MR. APTON**

11   **Q.**  Mr. Buss, during the August 3rd meeting with -- sorry.

12       Mr. Buss, during the August 3rd meeting with Mr. Musk when

13   he listed off a number of other shareholders who could

14   potentially invest in the deal, aside from the Saudis, he

15   hadn't spoken to any of those other shareholders, correct?

16   **A.**   He hadn't?

17   **Q.**  Right.

18   **A.**   I don't believe he had talked to them in detail, no.

19   **Q.**  And you referenced that Mr. Musk's tweet on August 7th,

20   the "funding secured" tweet, that was I think you referred to

21   it as an "in-the-field call;" right?

22   **A.**   Oh, that he made.  Yeah, he made a call upon hearing the

23   news about the PIF.

24   **Q.**  Given your experience on corporate boards and such, is

25   that the proper approach to corporate disclosures from a CEO of

**PROCEEDINGS**

1   a public company, in your opinion?

2   **A.**   Well, again, he was acting as the bidder.  So in my mind,

3   I can't control him like I could control a third party.  If he

4   was acting for the company, yeah, it would be a different

5   animal.

6   **Q.**   Thank you, sir.

7           **MR. APTON:**  Thank you.

8           **THE COURT:**  Anything further?

9           **MR. LIFRAK:**  No, Your Honor.  Thank you.

10          **THE COURT:**  All right.  Thank you, Mr. Buss.

11          **THE WITNESS:**  Thank you.

12          **THE COURT:**  Appreciate you being here.  You are

13  excused as a witness.  You may step down.

14      (Witness excused.)

15          **THE COURT:**  And that will bring us to the end of

16  today.  Thank you again, ladies and gentlemen of the jury, for

17  your patience and indulgence staying with us.

18      Have a great weekend.  We will see you on Monday morning.

19          **JUROR CADOGAN:**  Tuesday?

20          **THE COURT:**  You're right.  Tuesday morning.  I

21  promised you that.  I'm just testing your memory.

22      You're right, Tuesday.  Give us a chance to recover from

23  the 49'er victory that won't happen.

24      (Laughter)

25          **THE COURT:**  So we'll see you Tuesday morning at 8:30.

**PROCEEDINGS**

1    Have a great weekend.

2        And remember, do not discuss this case with anyone.  Do

3    not attempt to do any research on your own.  Don't read, don't

4    listen, don't talk to anybody about any coverage or anything

5    about this case.  Keep an open mind until this case -- and keep

6    your opinions open until you start the deliberations.

7        So we'll see you next week.  Thank you.

8        **THE CLERK:**  All rise for the jury.

9        (Jury exits the courtroom at 3:42 p.m.)

10       **THE COURT:**  I just want to cover a couple things.

11       We'll have to get the latest -- I noticed there's a little

12   discrepancy between your time calculations and ours.  And

13   Vicky's going to look at that, but she is the official

14   timekeeper.  So we'll see.

15       But the clock is running.  My sense is that, you know,

16   there's probably less than eight hours left total?  I mean, for

17   everyone.

18       **MR. PORRITT:**  I'm not sure if that's quite right, but

19   I don't have the figures in front of me.

20       **MR. SPIRO:**  Yeah.  It sounds like whatever Vicky says,

21   so...

22       **THE COURT:**  All right.  I know I have to resolve this

23   question about the expert and the options question.  I don't

24   want to argue the full thing now, but I have -- I do have one

25   question that would help me, and that is:  What are the

1  parties' position with respect to whether using actual

2  prices -- if one were to use actual prices as was done, is

3  there a methodology -- staying within that realm, not having to

4  use imputed prices, is there a methodology to account for the

5  micro -- what we call the microeconomic problem, buying at 30 a

6  share and somebody else buying at 40 a share?  How do you...

7      I understand there's a legal answer to that.  One legal

8  answer is that you take it as it is.

9      I'm just curious whether or not either side has a view

10  about whether or not if one goes down that road and one wanted

11  to somehow take that into account, is there a methodology to

12  deal with that?

13      **MR. PORRITT:**  I don't know the answer to that

14  question.

15      Professor Steve Heston is in the back.  He might have an

16  answer, but I'm not proposing he come up and give it.  So I

17  don't know the answer.  I don't know.

18      **THE COURT:**  All right.  Let me ask the Defense

19  position.

20      **MR. ROSSMAN:**  Your Honor, I think there may well be.

21  And one of the issues for us is that it goes to, among other

22  things, the question of whether this is an appropriate class,

23  the options class.

24      It's quite an unusual class in that you have buyers and

25  sellers.  You have puts and calls.

**PROCEEDINGS**

1          And, you know, one of our serious concerns here is that if

2     you don't get it right, you're going to brand some people

3     winners that were actually losers and vice-versa.  And it's a

4     big issue in options because of, among other things, a very

5     large bid-offer spread.

6          **THE COURT:**  Putting aside the --

7          **MR. ROSSMAN:**  But I think -- I think -- I think the

8     answer is it could have been done potentially.

9          If the answer to that is yes, then that's a problem.  We

10    should be able to cross on that.  If the answer to that is no,

11    it's also a problem because perhaps the methodology doesn't

12    work at all.

13         **THE COURT:**  I'm sorry.  If the answer is no, what?

14         **MR. ROSSMAN:**  If the answer is no, it couldn't be

15    done, then maybe the answer is the methodology doesn't work as

16    a one-size-fits-all for the class to measure damages.  You have

17    to look at each individual.

18         **THE COURT:**  Well, or the answer also is if there is no

19    way and you had advocated a -- advocated against using an

20    imputed method obviously in favor of actual method and yet now

21    you're saying that method is inherently flawed, to which there

22    is no fix, no answer, no methodology, that's why I asked the

23    question.  It seems to me that's problematic.

24         I think that raises the question of estoppel more

25    emphatically if -- if there is no -- it's one thing to say,

PROCEEDINGS

1    "Yeah, it's okay to use actual numbers, but you should have

2    done X, Y, and Z.  You should have done process X to that."

3         MR. ROSSMAN:  On that question, Your Honor, I'm more

4    than a bit puzzled because it's their obligation to come

5    forward with a damages methodology that stands up, not ours.

6    And if they can't come up with one or one can't be had, that's

7    a -- that's a flaw.

8         THE COURT:  Well, if you recall the argument,

9    wasn't -- I don't think we reached the question whether the

10   methodology that they chose using the imputed method or

11   attribution method was inherently unreliable.

12        This ended up being a negotiated settlement because I

13   raised questions and asked why are we using -- in part, because

14   of your responsive brief, why are we going into the realm of

15   hypotheticals, et cetera, et cetera?  And that's when they

16   acceded to, "Well, if you want, we'll use real numbers."  And I

17   didn't hear any objection from you about that.

18        MR. ROSSMAN:  But -- that's right, Your Honor, but

19   that's -- that's half of the equation.  So -- and let me

20   finish.  It's important.  Okay?

21        You have to start with actuals.  Okay?  That's where

22   people actually traded.  We are in agreement on that.  We're

23   not going to challenge that.

24        THE COURT:  I don't know about that.

25        MR. ROSSMAN:  Well, Your Honor --

1      **THE COURT:**  If you're saying that using actual numbers

2  is inherently flawed, to which there is no fix, and maybe the

3  next best thing is using some imputed method to account for

4  this phenomenon that you've raised, it's not clear to me that

5  that can't be done.

6      **MR. ROSSMAN:**  Yeah.  I'll respond to that, but if I

7  can finish what I was saying a moment ago, Your Honor, because

8  it's important.

9      You start with actuals.  And then what they compare them

10  to has to be a fair comparison, has to be apples to apples.

11  And if it's not, perhaps it's salvageable if you can make

12  adjustments so that it is a fair comparison.

13      Our -- our complaint and our -- you know, part of what

14  we're going to be examining the witness on, about on this is if

15  you start with actuals and you're comparing it to something

16  that differs in an important way from the actuals, then you

17  have to make an adjustment for that.  The offer is an example

18  of it.  There are others.

19      If you haven't made an adjustment, then you should admit

20  you haven't made that adjustment and the measure of damages is

21  flawed for that reason.

22      That's, I think, a very fair line of criticism.

23      **THE COURT:**  Well, this is deja vu all over.  We've had

24  this discussion.  There is an inherent disconnect because the

25  but-for price is inherently hypothetical.  So you can't.  There

PROCEEDINGS

1   is an inherent apples and oranges aspect of this and that can't

2   be the end of the inquiry.

3        **MR. ROSSMAN:**  I mean, Your Honor, I'm a little -- I

4   don't want to delve too --

5        **THE COURT:**  Can you answer my question?

6        **MR. ROSSMAN:**  I was going --

7        **THE COURT:**  I told you I didn't want to argue this.

8   All right?  And now you're rearguing, and I asked you not to

9   argue it.

10       I'm asking you a very specific question.  Do you have any

11  knowledge of whether taking actual numbers, there is a

12  methodology to account for this, what you claim to be a

13  defective phenomenon?

14       It's not clear to me it's defective because one could say:

15  You take your buyer and your seller as you find them.  You

16  know, if somebody pays 40 bucks, that's your problem.  You're

17  the guilty one, if the jury so finds.

18       But I'm not going to go there right now.  I'm asking you a

19  specific question.  If you can't answer, just tell me you can't

20  answer it.

21       **MR. ROSSMAN:**  No, Your Honor.  I don't think -- what I

22  was going to say is we have the expert in the courtroom.  If

23  you want to dive deeply, which I'm happy to, okay, I don't know

24  if it's appropriate to have the expert in the courtroom.

25       But to answer your question, Your Honor, I believe there

**PROCEEDINGS**

1  are ways that Professor Heston could have taken to try to make

2  it work.

3       **THE COURT:**  All right.  Then I will say that that

4  would be a proper basis of cross-examination and impeachment,

5  but a general approach that you cannot -- there's no inherent

6  way of using actual numbers.  That would be a problem.

7       **MR. ROSSMAN:**  And to be very clear, Your Honor, we're

8  not -- we are not saying -- we haven't said it and we're not

9  going to be saying that using actual numbers was the error.

10 Okay?

11      What we are going to be saying is two things, and I

12 thought we -- we were pretty transparent about this.  Okay?  We

13 tried to be as much as we could, and you said we could cross on

14 this.  Okay?  That using actual numbers to how you did the

15 but-for has a disconnect, and we should be able to explore that

16 disconnect.

17      If I'm wrong about it, Professor Heston will tell me I'm

18 wrong about it.  Okay?  If I'm right about it, then it will be

19 persuasive.

20      **THE COURT:**  Right.  So to be clear, I'm going to allow

21 cross-examination on the methodology and on problems that

22 essentially the defendants say could have been done but weren't

23 done here, but I'm not going to allow a general approach or

24 cross that just simply says -- that suggests that you can never

25 rely on actual numbers when you're comparing that to a but-for.

1    And I understand that's not going to be their theory and,

2  therefore, your request -- I'm not sure what your request is,

3  but I'm going to -- you know, if that's not where they're going

4  to go, then it seems to me what is being proffered is proper

5  basis for cross-examination.

6        **MR. PORRITT:**  And just two things, Your Honor,

7  quickly.

8    One is, they propose -- they suggest that there were three

9  methods proposed by plaintiffs' experts when, in fact, there

10  were only ever two, and one was a -- proposed by a counsel that

11  wasn't accepted.  And so that's -- that was a counsel -- it had

12  nothing to do with the expert.  They testified to that in

13  depositions, but clearly they had no responsibility on before

14  that and he's not endorsed it in any way, shape, or form.

15    So we would certainly object to them presenting that at

16  trial when the jury is going to go three versus two.  So that's

17  point one.

18    Second point is, we would have an issue with

19  cross-examination if there's any suggestion that the change

20  from impact quantum to actual prices was in any way a

21  concession that the impact quantum was wrong or they should

22  have used actual all along or that the use of -- the initial

23  proposal of impact quantum suggests the use of actual prices is

24  wrong, when really that has been the result of the

25  give-and-take that Your Honor has described.  I think that

PROCEEDINGS

 1   would be an improper method of cross-examination.

 2          THE COURT:  You raised the question of whether there

 3   should be inquiries into the first opinion, because if so,

 4   then -- it then has to be explained exactly what happened and

 5   why it happened, and I'm not sure that that's -- there could be

 6   a 403 problem here.

 7       Why not just take his testimony as it is and -- and if

 8   there's going to be -- certainly that's going to be grounds of

 9   impeachment.  What you should have done is the way he had

10   proposed.  I'm sure that's not going to be the cross.  I'm

11   sure -- I assume it's going to be a critique of what was done

12   within the realm of using actual numbers.

13          MR. ROSSMAN:  Can I respond, Your Honor?

14          THE COURT:  Yes.

15          MR. ROSSMAN:  So what we have is that they claim it's

16   not a methodology.  Their latest brief admits it, it's is a

17   change in methodology.

18       But there have been three, so that we're clear.  Impact

19   quantum.  In the middle they proposed a verdict form where they

20   said:  Ignore changes in implied volatility.  We'll just

21   recalculate option prices relying on one thing only, changes in

22   stock price."

23       They didn't show that to their experts apparently.  Okay?

24   But they filed it with the Court.  They're prepared to go on

25   that issue.  We objected again.  We said:  Wait a second.

1   Implied volatility changed in the interim.  You've got to get

2   the calculation right.

3       They came back and now they have a third.  And the third

4   one is it starts with actual, which is the right starting

5   place.  We're not quarreling with that.  Okay?  And then what

6   they use is they use a but-for simplifying a calculation that I

7   will want to explore with the Professor, why the simplification

8   has problems with it.  And I think Your Honor appreciates now

9   why that's fair.  Okay?

10      But I also think it's fair, and in every case I've -- I've

11  crossed 100 experts at trial, I've seen hundreds more.  Your

12  Honor has seen thousands, okay, of experts testify at trial, I

13  have no doubt.  It is commonplace to cross-examine an expert

14  with an opinion that they've previously given.

15      It's commonplace to cross-examine an expert where a Court

16  has previously rejected their opinion.  Okay?  We've seen that

17  here in this courtroom when it came to Professor Subramanian.

18      So what I think is fair game here, and we very much would

19  like to and expect to be able to cross the witness on, is you

20  had this methodology and now you have a new methodology and the

21  numbers are different.

22      And I also think it's fair game to say:  If you had

23  calculated your numbers based on the verdict form that

24  plaintiffs' counsel submitted in the interim, you'd get yet a

25  third set of numbers.  And the numbers vary tremendously and

1    meaningfully, Your Honor.  And I think that that's important to

2    the credibility of the damage assessment.

3         **MR. PORRITT:**  It's not important to the credibility of

4    the expert witness to present a methodology that they didn't

5    endorse, didn't see.  That was an attempt to reach a

6    compromise -- mistakenly, it appears that there was no

7    compromise there -- to try and remove actually this implied

8    volatility issue from the jury.

9         **THE COURT:**  And that's the problem.  I don't believe I

10   made a clear *Daubert* decision.  It's one thing for a situation

11   where a Court has outright rejected a theory.  We didn't reach

12   this here.  So this is almost a sort of voluntary withdrawal to

13   avoid that risk and to find something that was going to be --

14   what you thought was going to be acceptable and less

15   controversial.

16     So it's not just an expert.  This has an interplay with

17   Court comments, counsel attempt to accommodate, et cetera,

18   et cetera.  That's where it gets a little bit more complicated.

19     We're going to pick this up because I'm behind.  So we'll

20   take this up.

21        **MR. PORRITT:**  I understand, Your Honor.

22        **MR. SPIRO:**  Very good.

23        **MR. PORRITT:**  Thank you, Your Honor.

24        **THE CLERK:**  Court is adjourned.

25     (Proceedings concluded)

1        **I N D E X**

2     Friday, January 27, 2023 - Volume 6

3     **PLAINTIFF'S WITNESSES**                              **PAGE**   **VOL.**

4     **DURBAN, EGON**
        (SWORN)                                              1326      7
5     Direct Examination by Mr. Porritt                      1326      7
       Cross-Examination by Mr. Price                        1374      7
6     Redirect Examination by Mr. Porritt                    1391      7
       Recross-Examination by Mr. Price                      1395      7
7
       **DEES, DAN**
8       (SWORN)                                              1398      7
       Direct Examination by Mr. Porritt                     1398      7
9     Cross-Examination by Mr. Spiro                         1430      7
       Redirect Examination by Mr. Porritt                   1461      7
10
       **BRINKMAN, RYAN JOSEPH**
11     By Videotape Deposition (not reported)                1468      7

12     **DENHOLM, ROBYN**
        (SWORN)                                              1469      7
13     Direct Examination by Ms. Tripodi                     1469      7
       Cross-Examination by Ms. Thompson                     1487      7
14     Redirect Examination by Ms. Tripodi                   1494      7

15     **BUSS, BRADLEY**
        (SWORN)                                              1497      7
16     Direct Examination by Mr. Apton                       1497      7
       Cross-Examination by Mr. Lifrak                       1508      7
17     Redirect Examination by Mr. Apton                     1517      7

18                  **E X H I B I T S**

19     **TRIAL EXHIBITS**                           **IDEN**   **EVID**   **VOL.**

20       96                                                  1487      7

21       102                                                 1483      7

22       134                                                 1487      7

23       135                                                 1487      7

24       137                                                 1487      7

25

<pre>
 1                    I N D E X

 2                  E X H I B I T S

 3   TRIAL EXHIBITS                      IDEN   EVID   VOL.

 4   139                                        1487    7

 5   174                                        1337    7

 6   175                                        1330    7

 7   177                                        1341    7

 8   181                                        1353    7

 9   182                                        1367    7

10   185                                        1356    7

11   186                                        1421    7

12   190                                        1358    7

13   191                                        1359    7

14   194                                        1362    7

15   196                                        1365    7

16   201                                        1371    7

17   234                                        1431    7

18   235                                        1431    7

19   244                                        1431    7

20   250                                        1431    7

21   251                                        1431    7

22   252                                        1403    7

23   253                                        1408    7

24   257                                        1418    7

25
</pre>

1     **I N D E X**

2     **E X H I B I T S**

3     **TRIAL EXHIBITS**                          **IDEN**   **EVID**   **VOL.**

4       261                                                  1419      7

5       263                                                  1426      7

6       265                                                  1423      7

7       265                                                  1431      7

8       289                                                  1507      7

9       312                                                  1487      7

10      313                                                  1487      7

11      314                                                  1487      7

12      315                                                  1487      7

13      316                                                  1487      7

14      317                                                  1487      7

15      318                                                  1487      7

16      817                                                  1431      7

17      818                                                  1431      7

18

19

20

21

22

23

24

25

```
 1

 2                    CERTIFICATE OF REPORTERS

 3        We, BELLE BALL and DEBRA PAS, Official Reporters for the

 4   United States Court, Northern District of California, hereby

 5   certify that the foregoing is a correct transcript from the

 6   record of proceedings in the above-entitled matter. We certify

 7   that the foregoing is a correct transcript from the record of

 8   proceedings in the above-entitled matter.

 9

10

11

12        _____

13        Debra L. Pas, CSR 11916, CRR, RMR, RPR

14

15

16

17

18        _____

19           Belle Ball, CSR 8785, CRR, RDR

20

21              Saturday, January 28, 2023

22

23

24

25
```