QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (*appearing pro hac vice*)
  alexspiro@quinnemanuel.com
  Andrew J. Rossman (*appearing pro hac vice*)
  andrewrossman@quinnemanuel.com
  Ellyde R. Thompson (*appearing pro hac vice*)
  ellydethompson@quinnemanuel.com
  Jesse Bernstein (*appearing pro hac vice*)
  jessebernstein@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

  Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

*Attorneys for Defendants Tesla, Inc., Elon Musk,*
*Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,*
*Antonio J. Gracias, James Murdoch, Kimbal Musk,*
*and Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**DEFENDANTS' MOTION FOR JUDGMENT AS A LAW** |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on February 1, 2023 at 10:30 AM, or as soon thereafter as this matter may be heard, in Courtroom 5 – 17th Floor of the United States Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Defendants, through their counsel, will move, and hereby do move pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on the following grounds: (1) the evidence is insufficient as a matter of law to establish Section 20(a) liability against Defendants Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice; (2) the evidence is insufficient as a matter of law to establish a Section 10 claim against Tesla; (3) the evidence is insufficient as a matter of law to establish fraud-on-the-market reliance; (4) the evidence is insufficient as a matter of law to prove loss causation; (5) the evidence is insufficient as a matter of law to prove damages with reasonable certainty; (6) the evidence is insufficient as a matter of law to prove that the August 7 Tweets were materially false; (7) the evidence is insufficient as a matter of law to prove knowing or deliberately reckless scienter.

This motion is based upon this notice of motion and motion; the attached memorandum of points and authorities; all pleadings and papers on file in this action; such other evidence or arguments as may be presented to the Court; and such other matters of which this Court may take judicial notice.

## ISSUES TO BE DECIDED

1. Should the Court enter judgment as a matter of law on Plaintiff's Section 20(a) claim against Tesla's outside directors because the evidence is insufficient to establish that they were "controlling person" and because the evidence establishes that they acted in good faith?

2. Should the Court enter judgment as a matter of law in favor of Tesla on Plaintiff's 10b-5 claim because the evidence is insufficient to establish that Tesla was the "maker" of the August 7 Tweets and that Mr. Musk acted within the scope of his authority as a Tesla officer when he published them?

3. Should the court enter judgment as a matter of law on Plaintiff's 10b-5 claim because Plaintiff failed to establish reliance?  Specifically, should the Court enter judgment as a matter of law on (1) Plaintiff's corporate bond claims because there is no evidence that those securities were

traded on an "active, open market," (2) on Plaintiff's claims for any damage sustained after August 13 when the truth was revealed to the market, (3) on all of Plaintiff's claims because he failed to establish that the Tweets were materially false, and (4) on all of Plaintiff's claims because he failed to prove that the price of any of Tesla's securities "immediately reflect[ed] all publicly available information" and because he failed to prove that investors "reasonably relied on that market as an accurate reflection of the current market value of the securities"?

4. Should the Court enter judgment as a matter of law on Plaintiff's 10b-5 claim because there is insufficient evidence of loss causation?  Specifically, should the Court enter judgment as a matter of law on (1) Plaintiff's claims for securities traded between August 8 and August 16 because Plaintiff did not "reasonably distinguish any security-price reaction to the misrepresentations at issue from the market's reaction to other factors" for those specific dates, (2) all of Plaintiff's claims because he failed to disaggregate the impact of undisputedly true statements—like Mr. Musk was considering taking Tesla private at $420—from the allegedly false statements, and (3) all of Plaintiff's claims because he failed to show a statistically significant stock price decline absent the *New York Times* article?

5. Should the Court enter judgment as a matter of law on (1) Plaintiff's demand for damages of "consequential effects" because Plaintiff has failed to prove that Tesla's stock price would have been $312.90 throughout the class period but for the Tweets, (2) Plaintiff's entire demand for damages because he failed to disaggregate, and (3) Plaintiff's entire demand for damages because he failed to show a statistically significant stock price decline absent the *New York Times* article?

6. Should the Court enter judgment as a matter of law on Plaintiff's 10b-5 claim because there is insufficient evidence for the jury to find that the August 7 Tweets were materially false?

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................III

INTRODUCTION ...............................................................................................................1

LEGAL STANDARD.........................................................................................................2

ARGUMENT .....................................................................................................................3

I.    PLAINTIFF FAILED TO PROVE CONTROL PERSON LIABILITY AGAINST EACH INDIVIDUAL TESLA DIRECTOR ...........................................................................3

    A.    No Tesla Outside Directors Managed the Day-to-Day Operations Of Tesla Or Exercised Specific Control Over Mr. Musk's August 7 Tweets ..........................................3

    B.    Plaintiff Introduced No Evidence For Ehrenpreis, Murdoch, Musk, and Johnson Rice ...............................................................................................................6

    C.    The Undisputed Evidence Establishes The Good Faith Defense For Each Director..........7

II.   PLAINTIFF FAILED TO PROVE HIS 10B-5 CLAIM AGAINST TESLA...............................8

III.  NO REASONABLE JURY COULD FIND RELIANCE .........................................................11

    A.    Plaintiff Offered No Evidence That Tesla Bonds Traded On An Active, Open Market ...........................................................................................................11

    B.    Any Reliance Based On The Fraud-On-The-Market Presumption Ended August 13 ...................................................................................................................12

    C.    There Is Insufficient Evidence To Establish Materiality .................................................13

    D.    Plaintiff Failed To Prove The Remaining Fraud-On-The-Market Elements ....................14

IV.   NO REASONABLE JURY COULD FIND LOSS CAUSATION ............................................14

    A.    Plaintiff Did Not Prove Loss Causation For Any Security Bought After August 7 Or Sold Before August 17.................................................................................15

    B.    Plaintiff Cannot Prove Loss Causation Because He Failed To Separate The Impact Of True And Non-Actionable Statements From The Alleged Fraud...............................16

    C.    Absent The Stock Price Drop Following The Publication Of The *New York Times* Article, Plaintiff Cannot Show Loss Causation At A Statistically Significant Level........17

V.    THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW ON DAMAGES.........................................................................................................18

    A.    There Is Insufficient Evidence To Support Plaintiff's Consequential Damages Theory ............................................................................................................18

B.     Plaintiff Did Not Disaggregate and Cannot Prove Damages At A Statistically Significant Level ................................................................................................19

C.     There Is No Reliable Evidence For The Jury To Calculate Options Damages ................20

VI.   THE RECORD IS INSUFFICIENT TO PROVE MATERIAL FALSITY AND SCIENTER ......................................................................................................21

A.     There Is Insufficient Evidence To Prove That The Difference Between Mr. Musk's Tweets And The True State Of Affairs Would Have Been Significant To The Reasonable Investor ...........................................................................................21

B.     But For The Court's Summary Judgment Order And Instruction, There Is Insufficient Evidence For A Reasonable Jury To Conclude The August 7 Tweets Were Materially False Or Made With Deliberate Recklessness .......................................23

C.     There Is Insufficient Evidence To Prove Mr. Musk Acted Knowingly ...........................25

CONCLUSION ......................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   879 F.3d 474 (2d Cir. 2018) .................................................................................................. 18, 20

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................................................................... 13

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999) ................................................................................................... 12

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ...................................................................................................... 24

*Burgess v. Premier Corp.*,
   727 F.2d 826 (9th Cir. 1984) ........................................................................................................ 4

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ................................................................................................ 12

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ................................................................................................. 22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ........................................................................................................ 7

*DCD Programs v. Leighton*,
   90 F.3d 1442 (9th Cir. 1996) ...................................................................................................... 19

*Feldman v. Simkins Indus., Inc.*,
   492 F. Supp. 839 (N.D. Cal. 1980), *aff'd*, 679 F.2d 1299 (9th Cir. 1982) ............................... 19

*Frantz Mfg. Co. v. EAC Indus.*,
   501 A.2d 401 (Del. 1985) ........................................................................................................... 10

*Geffon v. Micrion Corp.*,
   249 F.3d 29 (1st Cir. 2001) ......................................................................................................... 24

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ......................................................................................... 15, 16, 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ............................................................................................................... 13, 14

*Hefler v. Wells Fargo & Co.*,
   2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ............................................................................. 9

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ............................................................................................. passim

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ................................................................................... 24

*In re Bare Escentuals, Inc. Sec. Litig.*,
  745 F. Supp. 2d 1052 (N.D. Cal. 2010) ........................................................................ 4

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) .................................................................................... 10

*In re DVI Inc. Sec. Litig.*,
  249 F.R.D. 196 (E.D. Pa. 2008), *aff'd sub nom.* 639 F.3d 623 (3d Cir. 2011) ................... 12

*In re Gupta Corp. Sec. Litig.*,
  900 F. Supp. 1217 (N.D. Cal. 1994) ..................................................................... 3, 4, 7

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................ 3, 21, 23

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) .......................................................................... 18, 20

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ................... 16, 18

*In re Petco Animal Supplies Inc. Sec. Litig.*,
  2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ................................................................. 4

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................................... 21

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ........................................................... 16, 18, 20

*In re Sci. Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010), *aff'd*, 489 F. App'x 339 (11th Cir. 2012) .......... 17, 20

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................................... 12

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .............................................................................. 24, 25

*Jackson v. Fischer*,
  931 F. Supp. 2d 1049 (N.D. Cal. 2013) ...................................................................... 10

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
  564 U.S. 135 (2011) ............................................................................................. 8, 9

*Jernberg v. Mann*,
  358 F.3d 131 (1st Cir. 2004) .................................................................................... 10

*Kaplan v. Rose*,
  49 F.3d 1363 (9th Cir. 1994) .................................................................................. 7, 8

*Lakeside-Scott v. Multnomah Cty.*,
  556 F.3d 797 (9th Cir. 2009) .................................................................................. 3

*Lilley v. Charren*,
  936 F. Supp. 708 (N.D. Cal. 1996) ......................................................................... 3

*Masters v. Bos. Sci. Corp.*,
  No. C 07-03792 JW, 2009 WL 10692986 (N.D. Cal. Feb. 4, 2009) ....................... 24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................................................ 22, 23

*Monaco v. Bear Stearns Residential Mortg. Corp.*,
  554 F. Supp. 2d 1034 (C.D. Cal. 2008) ................................................................. 23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ..................................................................... 15, 16, 20

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ......................................................................... passim

*Platforms Wireless, SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ............................................................................... 24

*Richey v. Metaxpert LLC*,
  407 F. App'x 198 (9th Cir. 2010) .......................................................................... 23

*RPost Holdings, Inc. v. Trustifi Corp.*,
  2011 WL 4802372 (C.D. Cal. Oct. 11, 2011) ......................................................... 10

*S.E.C. v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ................................................................................ 7

*Tanadgusix Corp. v. Huber*,
  404 F.3d 1201 (9th Cir. 2005) ............................................................................... 23

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ..................................................................................... 14, 21, 23

*Tuckman v. Aerosonic Corp.*,
  1982 WL 17810 (Del. Ch. May 20, 1982) ............................................................. 10

*Volk v. D.A. Davidson & Co.*,
  816 F.2d 1406 (9th Cir. 1987) ............................................................................... 19

## Rules

17 C.F.R. § 240.10b-5 ................................................................................................. 21

Fed. R. Civ. P. 50(a)(1) ............................................................................................... 3

**<u>INTRODUCTION</u>**

Defendants Elon Musk, Tesla Inc., Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice respectfully file this memorandum in support of their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a)(1). The evidence in the record is insufficient to establish liability or damages against any Defendant.

***First*,** judgment as a matter of law should be entered in favor of the outside Director Defendants Buss, Denholm, Ehrenpreis, Gracias, Murdoch, Kimbal Musk, and Johnson Rice on the Section 20(a) claim. No sufficient evidence exists for a reasonable juror to find that any of these Defendants were "controlling persons." Controlling person liability under Section 20(a) requires a finding that an outside director was active in the day-to-day affairs of the company or exercised specific control over the statements giving rise to 10b-5 liability. No evidence supports such a finding. The testimony and evidence in this case unanimously shows that none of the outside directors was a part of Tesla's management or held any responsibility over the day-to-day operations of the company or that any of the outside directors controlled the publishing of the August 7 tweets. Separately, the evidence establishes as a matter of law that each outside director acted in good faith—that is, no director induced the publication of the Tweets or knowingly or recklessly disregarded the Tweets' purported falsity.

***Second*,** the record lacks sufficient evidence to show that Tesla was the "maker" of the August 7 Tweets or that Mr. Musk—who published the Tweets in his capacity as a bidder seeking to lead a coalition to purchase Tesla stock from shareholders who did not roll over into a private Tesla—was acting within the scope of his authority when he published the Tweets. Judgment as a matter of law should be entered in favor of Tesla on the 10b-5 claim.

***Third*,** judgment should be entered in favor of all Defendants because Plaintiff has failed to prove fraud-on-the-market reliance for all Tesla securities during the class period. As to bonds, Plaintiff has offered no evidence that Tesla corporate bonds were traded on an "active, open" market, as he must to establish reliance. Additionally, the record makes clear that the market would have known the "truth" by August 13 and therefore Plaintiff cannot rely on the fraud-on-the-market presumption for any losses incurred after that date. Plaintiff is also required to prove that the August 7 Tweets were materially misleading in order to invoke the fraud-on-the-market presumption, but there is insufficient evidence to

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

1   prove that the difference between the Tweets and true state of affairs would be important to a reasonable
2   investor's decision to buy or sell Tesla securities.  And that Tesla's stock actually rose after the August
3   13 blog post rebuts the fraud-on-the-market presumption.

4       ***Fourth***, Plaintiff has failed to prove loss causation.  Plaintiff did not disaggregate general market
5   factors from any misrepresentation-specific reaction for securities traded between August 8 and August
6   16 and therefore cannot prove that the misrepresentations caused any loss for securities traded between
7   those dates.  Plaintiff also failed to distinguish the impact of the true statements—such as Mr. Musk's
8   announcement that he was considering taking Tesla private at $420—from the impact of the alleged
9   misrepresentations.  Finally, absent the stock drop following the publication of the August 16, 2018 *New*
10  *York Times* article—which did not introduce any relevant new information to the market—Plaintiff cannot
11  prove loss causation with the requisite statistical significance.

12      ***Fifth***, there is insufficient evidence to prove damages.  Plaintiff seeks damages for "consequential
13  effects" but has not proven, as he must, that Tesla's stock price would have traded at his proposed but-for
14  price of $312.90 absent the misrepresentations.  Plaintiff's damages model claims that Tesla's stock price
15  would have dropped $40 even if the Tweets were never published, but offers no explanation of that
16  purported drop.  Plaintiff also fails to prove the underlying causes of the stock price drop in his leakage
17  model, does not disaggregate, and cannot prove damages with adequate statistical significance.

18      ***Finally***, no reasonable juror could conclude—based on the evidence in the record—that the August
19  7 Tweets were materially false.  The difference between the representations in the Tweets and the true
20  state of affairs—that the PIF made a strong verbal commitment to fund a Tesla take private, that funding
21  would not be an obstacle to the transaction, and that the take private transaction was in its preliminary
22  stages—was not significant to a reasonable investor.  There is insufficient evidence proving otherwise and
23  ample affirmative evidence—including the stock price increase on August 13—showing that the Tweets
24  were not materially false.  Beyond that, no evidence suggests that Mr. Musk knew his Tweets were
25  materially false or recklessly disregarded their material falsity.

26                                  **LEGAL STANDARD**

27      Federal Rule of Civil Procedure 50(a)(1) provides that, where "a party has been fully heard on an
28  issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law is required where a party fails to present a legally sufficient basis for the jury to rule in its favor. *Lakeside-Scott v. Multnomah Cty*., 556 F.3d 797, 802 (9th Cir. 2009).

<u>**ARGUMENT**</u>

# I.   <u>PLAINTIFF FAILED TO PROVE CONTROL PERSON LIABILITY AGAINST EACH INDIVIDUAL TESLA DIRECTOR</u>

The Court should grant judgment as a matter of law on Plaintiff's Section 20(a) claims against Defendants Buss, Denholm, Ehrenpreis, Gracias, Murdoch, Kimbal Musk, and Johnson Rice because Plaintiff has failed to present legally sufficient evidence to prove that any of these individual outside directors were "controlling persons." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 n. 13 (9th Cir. 2000). An outside director is not a "controlling person" under Section 20(a) absent a showing that the director "was active in the day-to-day affairs" of the company and "exercised any specific control over the preparation and release" of the statements giving rise to the predicate 10b-5 claim. *Id.*

## A.   <u>No Tesla Outside Directors Managed the Day-to-Day Operations Of Tesla Or Exercised Specific Control Over Mr. Musk's August 7 Tweets</u>

Under Ninth Circuit law, the fact that an individual is an "outside director is ***insufficient*** to make [him or her a] control person." *In re Gupta Corp. Sec. Litig*., 900 F. Supp. 1217, 1243 (N.D. Cal. 1994) (emphasis added) ("Directors are not automatically liable as controlling persons"). Instead, a plaintiff must prove that ***each*** outside director ***individually*** "exercised a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations." *In re McKesson HBOC, Inc. Sec. Litig*., 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000); *see also Lilley v. Charren*, 936 F. Supp. 708, 716–17 (N.D. Cal. 1996) ("[P]laintiffs must allege facts showing that ***each defendant*** possessed the actual power to control the person primarily liable."). "[S]tatus alone may be sufficient when plaintiffs limit their fraud allegations to a narrowly-defined group of corporate officers, however, ***it is insufficient where plaintiffs rely on the status of outside directors as well***." *Lilley*, 936 F. Supp. at 717 (emphasis added); *see also In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052,

1081 (N.D. Cal. 2010) (dismissing Section 20(a) claim "because plaintiffs fail to plead specific facts establishing that these persons exercised a significant degree of day to day operational control over the company, as the law requires"). To be a "controlling person" under Section 20(a), an individual must (1) be involved in the corporation's day-to-day business and (2) have actual authority over the **specific** statements and representations giving rise to the underlying 10b-5 claim. *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1163–64 (9th Cir. 1996) (citing *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (holding outside director was not a controlling person because he was "uninvolved in [the corporation's] day-to-day operations…and he had nothing to do with preparation of the 1971 and 1972 prospectuses" giving rise to the 10b-5 claim); *Howard*, 228 F.3d at 1067.

As a result, under Ninth Circuit law, Plaintiff has the burden to prove that **each individual** Director was personally involved in Tesla's day-to-day operations and personally had actual power and authority over Mr. Musk's August 7 Tweets. This burden requires actual evidence of daily involvement and specific authority over the statements at issue and cannot be satisfied by merely proving an **individual's title or membership on a particular committee**. *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. at 1243; *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *32 (S.D. Cal. Aug. 1, 2006) ("membership on the board is not sufficient to support an allegation that these individuals were involved in the day-to-day operations of the company").

Plaintiff has presented no evidence that any of the individual Directors on Tesla's Board were involved in the day-to-day operations of the company or had authority over Mr. Musk's August 7 Tweets. Each and every person named in Plaintiff's Section 20(a) claim is an outside director who held a full-time job separate and apart from Tesla (or was otherwise retired), was not an officer or executive at Tesla, and was not a member of Tesla's management team. (1/25 Tr. 1253:22-1254:2 (Gracias); 1/27 Tr. 1487:22-1488:1, 1488:14-1489:2 (Denholm); 1513:25-1514:4 (Buss).) There is no evidence that the individual members of the Board, who generally met once a quarter, had any active involvement in or influence over the day-to-day operations of Tesla. (1/25 Tr. 1253:18-21.) The lack of evidence of day-to-day management precludes any verdict that the individual outside Directors were "controlling persons" as a matter of law. *See Howard*, 228 F.3d at 1067; *Paracor Fin.*, 96 F.3d 1151 at 1163–64.

Nor is there any evidence that the individual outside Directors specifically exercised any authority over or involvement with Mr. Musk's August 7 Tweets.  No individual member of the Board had any personal oversight responsibility over Mr. Musk's Twitter account because management—and not any outside director—was responsible for enforcing and ensuring compliance with Tesla's disclosure policy on a day-to-day basis.  (1/25 Tr. 1225:14-24 (Gracias); 1/27 Tr. 1489:17-19 (Denholm); Ex. 318.)  No Director reviewed, had any involvement in drafting, or even knew about Mr. Musk's Tweets before he published them.  (See e.g., 1/23 Tr. 860:16-21 (Musk).)  The evidence and testimony is unanimous that nobody at Tesla, let alone the Directors (who were not personally responsible under Tesla's disclosure policy for reviewing any information before it was publicly released) had the authority to review the August 7 Tweets because they were issued in Mr. Musk's capacity as a bidder announcing his consideration to take Tesla private.  (Id.; see also 1/27 Tr. 1479:20-1480:8 (Denholm).)  Plaintiff's own expert witness, Professor Guhan Subramanian, testified that the Directors did not have any authority over Mr. Musk's Twitter account and the Tweets at issue, noting that there was "no monitoring of Mr. Musk's Twitter feed" on the account generally and as to the August 7 Tweets specifically.  (1/20 Tr. 574:2-17 (Subramanian).)  Plaintiff has thus not only failed to present sufficient evidence that each individual outside Director "exercised direct or indirect control" over the August 7 Tweets "in any way," but affirmatively offered expert testimony that the Directors failed to exercise any authority or oversight over the Tweets.  Under this record, no reasonable jury could conclude that any of the outside Directors could have or did exercise any specific control over the August 7 Tweets.  As a result, no reasonable jury could find that the Directors were "controlling persons" in this case.  See Howard, 228 F.3d at 1067; Paracor Fin., 96 F.3d 1151 at 1163–64.

Both Paracor Fin. and Howard are instructive.  In Paracor Fin., the plaintiff brought an action under 10b-5 alleging, inter alia, that a company made fraudulent omissions in connection with a debenture offering.  Paracor Fin., 96 F.3d 1151 at 1157.  Plaintiff also asserted a Section 20(a) claim against the company's Chief Executive Officer and Chairman, Burton A. Burton.  Id. at 1161.  After applying the two "controlling person" factors—day-to-day operational control and authority over the specific statement at issue—the Ninth Circuit held that, despite his position as the CEO and Board Chairman, Burton was not a "controlling person" with respect to the debenture offering and thus could not be held liable under

Section 20(a).  *Id.* at 1163-64.  The court found that Burton had limited day-to-day operational control over the company—beyond making major decisions—because he delegated that responsibility to a management team.  *Id.*  Though there was "some evidence that Burton was involved in the management" of the company, the Ninth Circuit nonetheless held that he was not a controlling person because there was *no evidence that he "exercised direct or indirect control"* over the offering or *was "involved in the preparation of any of the offering materials" giving rise to the 10b-5 claim*.  *Id.*  In *Howard*, the Ninth Circuit held that an outside director was not a "controlling person" because there was "no showing" that he was "active in the day-to-day affairs of [the company] or that he exercised any specific control over the preparation and release of the financial statements" at issue.  *Howard,* 228 F.3d at 1067 n. 13.

So, too, here.  As in *Howard*, there is no evidence that the outside Directors were "active in the day-to-day affairs" of Tesla, nor is there any evidence that any Director "exercised any specific control over the preparation and release" of the August 7 Tweets.  *See Howard,* 228 F.3d at 1067 n. 13.  It is undisputed that the Directors did not review or even know about the August 7 Tweets before they were published.  (1/20 Tr. 574:2-17 (Subramanian).)  Likewise, under the reasoning of *Paracor Fin.*, there is no basis to find that the outside Directors were "controlling persons."  There, the CEO was not a controlling person despite having some involvement in the day-to-day management of the company (there is no evidence that the Directors in this case had any) and being placed on some notice that the company would be issuing the statements that formed the basis of the predicate 10b-5 claim (the Directors had no notice of the content of Mr. Musk's Tweets or that he even intended to publish them).  *See* 96 F.3d 1151 at 1163–64.  Plaintiff's Section 20(a) claim against Tesla's Directors fails as a matter of law.

**B.**    **Plaintiff Introduced No Evidence For Ehrenpreis, Murdoch, Musk, and Johnson Rice**

At the very least, judgment as a matter of law should be granted as to Defendants Ehrenpreis, Murdoch, Kimbal Musk, and Johnson Rice because Plaintiff has offered no evidence at all regarding their involvement in the day-to-day management of Tesla or control over Mr. Musk's August 7 Tweets. Despite seeking billions of dollars in damages against them, Plaintiff did not call or *even mention* any of these outside Directors during his case-in-chief.  The only evidence offered against them are Board Meeting Minutes (*see, e.g.,* Exs. 82, 83, 89, 96, 101) and press releases (*see, e.g.,* Ex. 130), which prove nothing more than their titles as Directors, attendance at certain meetings, and positions on certain

1   committees.[1]  But it is well established that simply holding the position as director, attending meetings,

2   and serving on committees does not make an individual a "controlling person" under Section 20(a).  *See*

3   *Howard,* 228 F.3d at 1067; *In re Gupta Corp. Sec. Litig*., 900 F. Supp. at 1243 (membership on the audit

4   committee and opportunity to review reports pre-publication insufficient to establish controlling person

5   liability).  At a minimum, judgment as a matter of law should be entered on the Section 20(a) claims

6   brought against outside Directors Ehrenpreis, Murdoch, Kimbal Musk, and Johnson Rice.

7               **C.        The Undisputed Evidence Establishes The Good Faith Defense For Each Director**

8               Judgment as a matter of law should also be entered for each individual outside Director because

9   the evidence presented establishes without dispute that (1) the Directors "did not directly or indirectly

10  induce the alleged 10b-5 violation" and (2) that each Director "did not know the [August 7 Tweets were]

11  false" or "have reckless disregard for whether the statement was true." ECF No. 573, at 62.  Accordingly,

12  no reasonable jury could conclude on this record that the Directors did not prove the Good Faith

13  affirmative defense.  *See id.*; *Kaplan v. Rose*, 49 F.3d 1363, 1383 (9th Cir. 1994), *overruled on other*

14  *grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605

15  (9th Cir. 2017) (holding that the CEO had proved good faith by submitting an uncontradicted affidavit

16  stating that he never directed anyone to make misstatements that he knew to be misleading).

17              The Good Faith defense to Section 20(a) liability can be established by proving that the alleged

18  controlling person did not induce the primary violation and did not act with scienter.  *Howard,* 228 F.3d

19  at 1067; *S.E.C. v. Todd*, 642 F.3d 1207, 1224 (9th Cir. 2011); *Paracor Fin.*, 96 F.3d 1151 at 1164; *Kaplan*,

20  49 F.3d at 1383.  For instance, in *Kaplan*, the Ninth Circuit held that the Good Faith defense was

21  established by testimony that the alleged controlling person "never directed or induced anyone to make"

22  the public statements at issue and that to his "knowledge, all information released to the public was done

23  entirely in good faith, was supported by fact, and was true." *Kaplan*, 49 F.3d at 1383.  In *Paracor Fin.*,

24  the Ninth Circuit held that plaintiff's inability to produce evidence that the controlling person was

25

26

----

27  [1]  Kimbal Musk was referenced by Elon Musk and Mr. Gracias during Defendants' examinations but only
    as a co-founder of Mr. Musk's first company, Zip2 (1/23 Tr. 899:19-899:23), and to note that he was

28  recused from the August 2, 2018 Special Board meeting (1/25 Tr. 1260:4-1260:11).

1    "involved" in the preparation and distribution of the challenged statements "in any significant way" was

2    "sufficient to prove his good faith defense as a matter of law." *Paracor Fin.*, 96 F.3d 1151 at 1164.

3        Here, the evidence is sufficient to prove each Director's good faith defense as a matter of law.

4    First, the minutes from the August 2 and August 3 Board Meetings establish that the Directors were

5    independently informed by both Deepak Ahuja and Elon Musk that the Saudi PIF communicated that it

6    was willing fund the entire take private transaction.  (Ex. 82; Ex. 83 at 83-2 ("As for the funding of a

7    possible going private transaction, Mr. Musk noted that in his discussions with the [PIF], the PIF indicated

8    that it was willing to fund the entire going-private transaction.").)  Based on the information presented to

9    them at the pre-Tweet Board meetings, the Directors had no reason to believe that the Tweets were false

10   and, at the very least, the Tweets' falsity was not "so obvious that the defendant[s] must have been aware

11   of it."  ECF No. 573, at 43.  Second, as in *Kaplan* and *Paracor*, there is no evidence that any of the

12   Directors induced Mr. Musk to publish the August 7 Tweets or even knew that he was planning on

13   tweeting his announcement.  (*See e.g.,* 1/23 Tr. 860:16-21 (Musk).)  Finally, as in *Kaplan,* the Directors

14   who have testified have offered uncontradicted testimony that they acted in good faith and did not believe

15   that Mr. Musk's August 7 Tweets were false when published. (1/25 Tr 1275:10-13, 1279:7-17, 1283:15-

16   17 (Gracias); 1/27 Tr. 1491:19-1492:19; 1493:15-17 (Denholm); 1512:9-1513:2 (Buss).)  The evidence is

17   sufficient to establish the Good Faith Defense and judgment should be entered as a matter of law in favor

18   of the outside Directors on that basis. *Kaplan*, 49 F.3d at 1383; *Paracor Fin.*, 96 F.3d 1151 at 1164.

19   **II.    PLAINTIFF FAILED TO PROVE HIS 10B-5 CLAIM AGAINST TESLA**

20       The Court should enter judgment as a matter of law on Plaintiff's 10b-5 claim against Tesla

21   because Plaintiff has not presented legally sufficient evidence that (1) Tesla was the "maker" of the Tweets

22   and (2) Mr. Musk was acting within the scope of his authority as a Tesla corporate officer when he

23   published the Tweets.  ECF No. 573 at 35, 39, 47.

24       ***First***, there is insufficient evidence to establish that Tesla was the "maker" of the Tweets.  Only a

25   defendant who "makes" an alleged misstatement can be liable under Section 10(b).  *Janus Cap. Grp., Inc.*

26   *v. First Deriv. Traders*, 564 U.S. 135, 141-42 (2011); ECF No. 573 at 39 ("To be liable for a Section 10(b)

27   violation, the plaintiff must prove that the defendant was the maker of a materially false or misleading

28   statement.").  Here, the evidence does not and cannot establish that Tesla "had ultimate authority over the

1  statement, including its content and whether and how to communicate it" and accordingly Tesla cannot

2  be found to be a "maker."  ECF No. 573 at 39; *Janus*, 564 U.S. at 142.

3        Rather, it is undisputed that the August 7 Tweets were published on Mr. Musk's personal Twitter

4  account; that fact alone is strong evidence that Mr. Musk was the exclusive "maker" of the Tweets.  *Janus*,

5  564 U.S. at 142-43 ("And in the ordinary case, attribution within a statement or implicit from surrounding

6  circumstances is strong evidence that a statement was made by—***and only by***—the party to whom it is

7  attributed.") (emphasis added); *see also Hefler v. Wells Fargo & Co*., 2018 WL 1070116, at *9 (N.D. Cal.

8  Feb. 27, 2018) (same).  Plaintiff's entire maker claim hangs on the fact that Tesla disclosed Mr. Musk's

9  personal Twitter account as a means to communicate "additional information" about Tesla.  (Ex. 103.)

10  This disclosure alone is insufficient evidence to prove that Tesla "had ultimate authority" over the ***specific***

11  Tweets or overcome the "strong evidence that the statement was made by—and only by" Mr. Musk.  *See*

12  *Janus*, 564 U.S. at 142-43.  The undisputed evidence shows that Tesla neither had *de facto* nor *de jure*

13  authority over Mr. Musk's August 7 Tweets.  Mr. Musk, Ms. Denholm, and Mr. Gracias all testified that

14  the Tweets were published in Mr. Musk's personal capacity as a bidder and therefore were not subject to

15  Tesla's review or approval under any disclosure policy.  (1/23 Tr. 860:16-21 (Musk); 1/25 Tr. 1225:14-

16  24 (Gracias); 1/27 Tr. 1479:20-1480:8 (Denholm).)  Moreover, as Plaintiff has repeatedly emphasized—

17  including through his expert witness—Tesla did not generally review or exercise any authority over Mr.

18  Musk's Tweets pre-publication.  (1/20 Tr. 574:2-17 (Subramanian).)  Accordingly, there is insufficient

19  evidence for the jury to determine that the two Tweets sent from Mr. Musk's personal account were

20  "made" by Tesla or that Tesla had "the ultimate authority over the statement[s], including [their] content

21  and whether and how to communicate [them]."  *See* ECF No. 573 at 39; *Janus*, 564 U.S. at 142.

22        ***Second***, no reasonable jury could conclude, based on the evidence presented, that Mr. Musk was

23  acting within the scope of his authority as Tesla's CEO when he published the August 7 Tweets.  The jury

24  will be instructed that an officer "is acting within the scope of authority if the officer is engaged in the

25  performance of duties which were expressly or impliedly assigned to the officer by the company" and that

26  if Mr. Musk was not "acting within the scope of authority as an officer of Tesla, you must find that Tesla

27  is not liable."  ECF No. 573 at 35, 47; *see also In re ChinaCast Educ. Corp. Sec. Litig*., 809 F.3d 471, 476

28  (9th Cir. 2015).  Here, Mr. Musk published the two August 7 Tweets announcing that he was personally

considering taking Tesla private by potentially purchasing stock from shareholders who chose not to roll over into a private Tesla.  (Exs. 8-11, 13)  It is well established that when a corporate officer purchases stock in his company, he does so in his **personal** capacity and not within the scope of his authority as a corporate officer.  *Jernberg v. Mann*, 358 F.3d 131, 135 (1st Cir. 2004) ("Ordinarily, when a director or officer purchases the company's stock from another, the former is acting in a private capacity."); *Tuckman v. Aerosonic Corp.*, 1982 WL 17810, at *9 (Del. Ch. May 20, 1982) ("It is well settled in this state…that an officer or director is free to deal in the corporation's stock."); *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 408 (Del. 1985) (similar).  It follows that, if purchasing outstanding stock is an act outside of an officer's scope of employment, then an announcement that one is considering purchasing (or leading a coalition of funders to purchase) outstanding stock would be outside the scope of employment too.  *See Jernberg*, 358 F.3d at 135.

Plaintiff has not presented sufficient evidence for a reasonable jury to find that Mr. Musk was acting within the scope of his authority as Tesla's CEO—and not as bidder seeking to take the company private—when he published the Tweets.  To prove that an act was within the scope of an employee's authority, the plaintiff must show that "the principal has the right to control the conduct of the agent" with respect to the matter at issue.  *See e.g., Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. 2013); *RPost Holdings, Inc. v. Trustifi Corp.*, 2011 WL 4802372, at *4 (C.D. Cal. Oct. 11, 2011).  Here, the evidence is undisputed that Tesla did not have the right to control Mr. Musk's conduct as the bidder.  On August 2, 2018, Mr. Musk made a personal offer to the Board of Directors to take Tesla private (Ex. 81), and that the Board immediately treated Mr. Musk as a counter-party when it held and recused Mr. Musk from a special Board meeting to discuss the offer later that day (Ex. 82).  Mr. Musk made a presentation to the Board the following day in his capacity as a bidder and indicated that he would retain separate legal and financial advisors. (Ex. 83.)  The witnesses unanimously testified that Mr. Musk's Tweets were sent in his personal capacity and were not subject to internal Tesla review before publication.  (1/23 Tr. 860:16-21 (Musk); 1/25 Tr. 1225:14-24 (Gracias); 1/27 Tr. 1479:20-1480:8 (Denholm).)  Plaintiff has not presented any evidence that Mr. Musk's August 7 Tweets were published in connection with any duty Mr. Musk had as Tesla's CEO or even identified what that duty would be.  (*See also* 53 (E. Musk: "On August 2, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

1  share.").)  Thus, there is no evidence that Tesla "had the right to control" Mr. Musk's conduct with respect

2  to his Tweets and communications about his bid to take the company private and no reasonable jury could

3  find that Mr. Musk was within the scope of his authority when he sent them.[2]

4  **III.**   **NO REASONABLE JURY COULD FIND RELIANCE**

5       Plaintiff has failed to present sufficient evidence to establish fraud-on-the-market reliance.  ***First***,

6  Plaintiff cannot establish reliance on his bondholder claims because he failed to offer any evidence that

7  Tesla's bonds were traded on an active and open market.  ***Second***, the evidence establishes that Mr. Musk's

8  August 13 Blog Post revealed the truth to the market and therefore Plaintiff can no longer rely on the

9  presumption after that disclosure.  ***Third***, Plaintiff cannot establish reliance because there is insufficient

10  evidence to show the alleged misrepresentations—as opposed to the true statement that Mr. Musk was

11  considering taking Tesla private at $420 per share—were material or affected the price of Tesla securities.

12       **A.**   **Plaintiff Offered No Evidence That Tesla Bonds Traded On An Active, Open Market**

13        Judgment as a matter of law should be entered as to Plaintiff's corporate bond claims because

14  Plaintiff did not present evidence to establish the first element of the fraud-on-the-market presumption:

15  that Tesla's corporate bonds traded on "an active, open market."  ECF No. 573 at 49.  To establish reliance

16  through the rebuttable fraud-on-the-market presumption, Plaintiff must prove that the presumption applies

17  ***to each class of security*** upon which his claim is based and thus must separately prove that Tesla's

18  common stock, corporate bonds, and options each traded on "an open and active market."  *Id.*; *In re*

19  *Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 (S.D.N.Y. 2013) (separately analyzing efficiency of

20  the bond and stock market and holding that plaintiff only established bond market was efficient for a

21  portion of the class period); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 214 (E.D. Pa. 2008) (separately

22  analyzing whether Plaintiff established fraud-on-the-market reliance for notes and common stock), *aff'd*

23  *sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011).

24  _____

25  [2]   Viewing the facts most favorably to Plaintiff, the most that the evidence establishes in this case is that

26  the August 7 Employee Email/Blog Post was prepared with the assistance of Tesla employees and may
   have been authored in Mr. Musk's capacity as CEO.  However, the Blog Post is not an actionable

27  misrepresentation in this case and its authorship is irrelevant to the question of whether the two Tweets
   that Mr. Musk independently authored without Tesla review or assistance were published in the scope of

28  his authority as Tesla's CEO.  The evidence and the law establish that they were not.

1   To prove that Tesla bonds traded on an "active, open market," Plaintiff was required to show "that

2   there were a large number of traders, a high level of activity, and frequent trades, such that the price of

3   the security immediately reflects all publicly available information."  ECF No. 573 at 49; *see also Binder*

4   *v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (outlining the five factors used to determine whether an

5   open, active market exists for a security, including trading volume, analysts, market makers, SEC

6   registration, and "empirical facts showing a cause and effect relationship between unexpected corporate

7   events or financial releases and an immediate response" in the securities' price) (citing *Cammer v. Bloom*,

8   711 F. Supp. 1264, 1286–87 (D.N.J. 1989).)  However, Plaintiff offered no bond market specific evidence

9   relating to the *Cammer* factors and his expert, Dr. Hartzmark, offered no opinion as to whether Tesla

10  bonds traded in an active, open, or efficient market.  (1/31 Tr. 1655:24-1656:15.)  Plaintiff cannot avoid

11  his burden to prove that the bond market was "active [and] open" by pointing to Dr. Hartzmark's opinions

12  regarding the efficiency of the common stock or options markets. A "comparison between equity

13  and bond markets is a comparison between the proverbial apple and orange," and therefore Plaintiff

14  cannot simply substitute testimony and evidence related to the efficiency of one market for the other.  *See*

15  *In re DVI Inc. Sec. Litig.*, 249 F.R.D. at 214.  Having failed to present any evidence for corporate bonds

16  as to the first part of the fraud-on-the-market presumption, Plaintiff cannot establish reliance.  Any claim

17  for damages by bond holders should be dismissed as a matter of law.

18      **B.      Any Reliance Based On The Fraud-On-The-Market Presumption Ended August 13**

19      Fraud-on-the-market reliance is only presumed for the period of time between when the

20  "misrepresentations were made and when the truth was revealed."  *Halliburton Co. v. Erica P. John Fund,*

21  *Inc.*, 573 U.S. 258, 267-68 (2014); *Basic Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988) (because "news

22  of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those

23  who traded Basic shares after the corrective statements would have no direct or indirect connection with

24  the fraud"); ECF No. 573 at 50.  Accordingly, Plaintiff cannot rely on the integrity of the market—and

25  establish any entitlement to damages for losses incurred—after the truth was revealed.

26      Here, the evidence establishes that the market learned the true state of affairs of what Mr. Musk

27  described in his Tweets when, in an August 13 Blog Post, Mr. Musk explained "why [he] referred to

28  'funding secured' and described his July 31 meeting with the PIF.  (Ex. 53.)  Indeed, Plaintiff's own expert

1   witness agreed that the Blog Post "indicates that funding was not secured, in the past tense." (1/20 Tr.

2   672:6-9 (Subramanian).)  Plaintiff's contention that the truth was not revealed to the market until the *New*

3   *York Times* published the August 16, 2018 article contradicts the testimony of his own expert and is

4   unsupported by the evidence. (Ex. 171.)  The information relating to funding provided in the *New York*

5   *Times* article—an aside that "funding…was far from secure" and a description of the July 31 meeting and

6   statement that the PIF had not committed to provide any cash—was no different, except for the journalist's

7   characterization, from the information provided in the August 13 Blog Post. (*Compare* Ex. 171 *with* Ex.

8   53 ("During the meeting, the Managing Director…strongly expressed his support for funding a going

9   private transaction for Tesla at this time…He has expressed support for proceeding subject to financial

10  and other due diligence and their internal review process for obtaining approvals.").)  And the evidence is

11  clear that any stock price reaction to the article was a response to revelations about Mr. Musk's physical

12  and mental health and his prediction that "from a personal pain standpoint, the worst is yet to come." (*See,*

13  *e.g.*, Ex. 161; 1/24 Tr. 1104:3-20 (Viecha).)  No reasonable jury could find that the market did not learn

14  the truth about Mr. Musk's August 7 Tweets until August 16.  At minimum, the Court should enter

15  judgment as a matter of law that any reliance period ended on August 13.  *See Halliburton*, 573 U.S. at

16  267-68.

17          **C.      There Is Insufficient Evidence To Establish Materiality**

18          Judgment as a matter of law should be entered both on the fraud-on-the-market presumption and

19  Defendants' rebuttal of the fraud-on-the-market presumption because Plaintiff has failed to establish that

20  the Tweets contained material misrepresentations or that the misrepresentations affected the market price.

21          For the fraud-on-the-market presumption, Plaintiff must prove that the "misrepresentations were

22  publicly known and material."  ECF No. 573 at 49; *Halliburton*, 573 U.S. at 267-68.  As discussed at

23  pages 20-23 *infra*, there is insufficient evidence to prove that the August 7 Tweets were materially false—

24  that the difference between the representations in the Tweets and the true state of affairs "significantly

25  altered the total mix of information they took into account in deciding whether to buy or sell the Tesla

26  security." *See* ECF No. 573 at 49; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

27          Defendants can also rebut the fraud-on-the-market presumption "by proving by a preponderance

28  of the evidence that the misrepresentation did not affect the market price of Tesla's stock."  ECF No. 573

1   at 50; *Halliburton*, 573 U.S. at 278-29.  The evidences establishes that fact here because Tesla's stock

2   price ***increased*** after Mr. Musk revealed that the PIF "strongly expressed [its] support for funding a going

3   private transaction for Tesla at this time," was "eager to proceed," and that a final proposal still needed

4   Special Committee and regulatory approvals before any plan was put to a shareholder vote.  (Ex. 53; 1/31

5   Tr. 1688:2-9 (Hartzmark).)  That Tesla's stock price rose after the correction of the Tweets and disclosure

6   of this information—instead of plummeting as would be the case after a revelation of fraud—proves that

7   the misrepresentations did not affect the market price and therefore rebuts the presumption.  ECF No. 573

8   at 50; *Halliburton*, 573 U.S. at 278-29.

9           **D.**      **Plaintiff Failed To Prove The Remaining Fraud-On-The-Market Elements**

10         The Court also should enter judgment as a matter of law because Plaintiff has failed to prove the

11   remaining elements of the fraud-on-the-market presumption.  Plaintiff has not established that there was

12   an "active, open market for Tesla securities" such that the "price of the security immediately reflects all

13   publicly available information."  ECF No. 573 at 49.  In fact, Plaintiff's damages theory assumes the

14   opposite—that the market did not reflect the publicly available information about the true state of affairs

15   behind the Tweet until the *New York Times* published an editorial comment purporting to describe the

16   status of funding days later.  Nor has Plaintiff proven that investors "reasonably relied on the market as

17   an accurate reflection of the current market value of securities."  *Id.*  Mr. Littleton's testimony and

18   documents establish that he understood that the market did not accurately reflect the value of Tesla's

19   securities due to the stock's high volatility and attention from short sellers.  (*See e.g.,* Ex. 430-2).

20   **IV.**    **NO REASONABLE JURY COULD FIND LOSS CAUSATION**

21         To prove loss causation, Plaintiff has the burden to prove that "the misrepresentations played a

22   substantial part in causing the injury or loss that Plaintiff suffered.  Plaintiff must reasonably distinguish

23   any security-price reaction to the misrepresentations at issue from the market's reaction to other factors,

24   such as other information or events that could affect the prices of Tesla's securities.  ECF No. 573 at 55.

25   To prove this element, Plaintiff must disaggregate or "separate any stock-price reaction to a disclosure of

26   the allegedly concealed information from the market's reaction to other information affecting Tesla's

27   securities prices."  ECF No. 494 at 12 ("Because there are a "tangle of factors" that may affect stock price,

28   "evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the

impact of those risks from other economic factors." (citing *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal*., 730 F.3d 1111, 1119 (9th Cir. 2013).  Plaintiff has failed to meet this burden.

A.   **Plaintiff Did Not Prove Loss Causation For Any Security Bought After August 7 Or Sold Before August 17**

Judgment as a matter of law should be entered for every Tesla security traded between August 8 and August 16 because Plaintiff has failed to "reasonably distinguish any security-price reaction to the misrepresentations at issue from the market's reaction to other factors" for any security purchased after August 7 or sold before August 17 and therefore cannot prove as a matter of law that "the misrepresentations played a substantial part in causing the injury or loss" to those securities.  *See* ECF No. 573 at 55; *Nuveen*, 730 F.3d at 1123; *Glickenhaus & Co. v. Household Int'l, Inc*., 787 F.3d 408, 421 (7th Cir. 2015) ("[I]n order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors.").

Here, Dr. Hartzmark did not account for the impact of other market and industry factors on Tesla's stock price on a day-by-day basis but instead only calculated these factors on an aggregate basis over the entire class period and then applied that aggregate calculation to all days.  If an investor purchased Tesla stock on August 7 and then sold it on August 8, Dr. Hartzmark is unable to show whether and to what extent the price at which stock was sold was impacted by the alleged fraud versus other economic factors. This error and oversight in Dr. Hartzmark's model is illustrated at Table 7 of his expert report (Ex. 375-125).  As indicated in his Table, Dr. Hartzmark assumes the same but-for price for each day of the class period, *i.e.* that Tesla stock would have ***remained static*** at $312.90 for ***eight straight trading days*** had Mr. Musk never sent the August 7 Tweets.  Not only does this assumption defy common sense and the movement of the market (both in general and for Tesla stock specifically), but it shows that Plaintiff did not disaggregate for market effects on a daily basis, as is required to prove that any losses incurred by an investor who sold stock ***before*** August 17, 2018 were caused by the alleged misrepresentations.  (1/31 Tr. 1746:18-1752:17 (Hartzmark)); *see Nuveen*, 730 F.3d at 1123.  Because Dr. Hartzmark failed to "reasonably distinguish any security-price reaction to the misrepresentations at issue from the market's reaction to other factors" for eight of the nine trading days during the class period, there is insufficient evidence for the jury to determine whether any pre-August 17 loss was caused by the misrepresentations.

1    *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary

2    judgment to defendant where plaintiffs' expert's failure to disaggregate all confounding factors left "no

3    way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss"), *aff'd*, 597

4    F.3d 501 (2d Cir. 2010).  Plaintiff cannot establish loss causation for any Tesla securities traded between

5    August 8 and August 16—including bonds and options given that Hartzmark applies his stock inflation

6    calculation to both—and judgment as a matter of law must accordingly be entered as to them.  *See id.*;

7    ECF No. 573 at 55; *Nuveen*, 730 F.3d at 1123; *Glickenhaus*, 787 F.3d at 421.

8        **B.    Plaintiff Cannot Prove Loss Causation Because He Failed To Separate The Impact**
         **Of True And Non-Actionable Statements From The Alleged Fraud**

9

10       Plaintiff is also required to isolate the impact of the allegedly false statements from other company-

11   specific information.  *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal. 2010)

12   (failure "to separate the loss caused by the disclosure of corrective information (new, negative, company-

13   specific, revealing a prior misrepresentation or omission) from loss caused by the disclosure of other

14   company-specific information" mandated exclusion of loss causation expert); *Glickenhaus*, 787 F.3d at

15   421.  Plaintiff must "reasonably distinguish" between the impact on the market of Mr. Musk's true

16   statements—that he was considering taking Tesla private at $420 per share—and his allegedly false

17   statements.  *See In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379 (N.D. Ga. 2010) (expert's

18   "failure to disentangle the effect of the new [fraudulent] information" from the confounding "negative

19   characterization" of truthful non-fraudulent news did not enable jury to "determine how much, if any, of

20   Plaintiffs' loss is attributable to Defendants'" misrepresentations), *aff'd*, 489 F. App'x 339 (11th Cir.

21   2012).  Plaintiff failed to perform this analysis, so judgment as a matter of law should be entered.

22       Fundamentally, Plaintiff cannot prove loss causation because he fails to account for the impact of

23   Mr. Musk's undeniably true statements.  Dr. Hartzmark admits he did nothing to isolate how much of the

24   purported inflation he calculated on August 7, 2018 was due to Mr. Musk's undeniably true statement that

25   he was "considering taking Tesla private at $420" from the allegedly false statement "funding secured."

26   (1/31 Tr. 1732:21-1733:2; 1735:4-9 (Hartzmark).)  Similarly, Dr. Hartzmark measures an increase in

27   "Direct Artificial Inflation" on August 14, which he attributes to the explanation that Mr. Musk's August

28   13 tweet that he was "excited to work with Silver Lake and Goldman Sachs as financial advisers" (Ex.

362) increased the deal probability and, in turn, the "Direct Artificial Inflation." (2/1 R'gh Tr.  8:49:57-8:54:17.)  But Plaintiff abandoned this alleged misstatement because, like Mr. Musk's statement that he was "considering taking Tesla private," Mr. Musk's August 13 tweet was undeniably true. (Ex. 431-184-85 (Plaintiff's Interrogatory Responses).)  In other words, not only does Dr. Hartzmark fail to isolate the impact of certain of Mr. Musk's truthful statements, *he attributes inflation to a tweet Plaintiff admits contains no false information*.  Accordingly, Dr. Hartzmark's analysis "provides no method by which a jury can determine how much, if any, of Plaintiffs' loss is attributable to" Mr. Musk's truthful statement versus his allegedly untruthful statement, *In re Sci. Atlanta*, 754 F. Supp. 2d at 1379, and Plaintiff cannot prove that the "the *misrepresentations*"—as opposed to the true statements—played a substantial part in causing the injury or loss," *see* ECF No. 573 at 55 (emphasis added).

For the same reason, Plaintiff cannot prove loss causation for options either.  Professor Heston admitted that he did not disaggregate the impact on implied volatility of Mr. Musk's true "am considering statement" from the untrue "funding secured" statement, but instead admitted that the implied volatility *would have been the same* had Mr. Musk simply announced his intention to take Tesla private. (1/31 Tr. 1617:8-1618:1).  This failure to separate out the impact precludes a reasonable jury from finding loss causation with respect to implied volatility.  *See In re Sci. Atlanta*, 754 F. Supp. 2d at 1379

### C.      Absent The Stock Price Drop Following The Publication Of The *New York Times* Article, Plaintiff Cannot Show Loss Causation At A Statistically Significant Level

The Court also should enter judgment as a matter of law on loss causation because Plaintiff cannot prove, absent the August 16 *New York Times* article, that Tesla's stock price decline at a statistically significant level. The traditional methodology for calculating loss causation and damages requires statistically significant stock reactions following specific corrective disclosures.  *REMEC*, 702 F. Supp. 2d at 1266. A decline must be statistically significant because a certain level of randomness is expected in stock price movements. *Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc*., 879 F.3d 474, 481 n.5 (2d Cir. 2018).  A stock decline that is not statistically significant "is indistinguishable from random price fluctuations." *Id*.  Thus, when a decline is not statistically significant, it "cannot be attributed to company-specific information announced on the event date." *Id*.

1    Plaintiff's loss causation and damages model fails to identify any statistically significant decline.

2    In other words, the aggregate stock price decline under any window between August 7 and August 16 is

3    indistinguishable from random price movements not caused by specific news and thus cannot provide

4    sufficient evidence of loss attributable to the alleged misstatements.  *See REMEC*, 702 F. Supp. 2d at

5    1266; *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (rejecting at class

6    certification stage claim based on disclosure for which price decline did not meet the 95% confidence

7    level as "not sufficient evidence of a link between the corrective disclosure and the price").  The ***only*** way

8    that Plaintiff can show a statistically significant decline is by including the stock price drop following the

9    publication of the August 16 *New York Times* article. (1/31 Tr. 1738:2-7 (Hartzmark).)  But as explained,

10   *supra*, at 12-13, no reasonable juror can conclude that the *New York Times* article revealed information

11   not already known to the market.  Therefore, the stock price decline on August 17 cannot, as a matter of

12   law, be a cause of Plaintiff's losses.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir.

13   2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a

14   corrective disclosure of anything but the journalists' opinions.").  As a result, Plaintiff cannot prove loss

15   causation at the minimal level of statistical significance and cannot meet his burden on this element.

16   **V.    THE COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW ON DAMAGES**

17        **A.    There Is Insufficient Evidence To Support Plaintiff's Consequential Damages Theory**

18        Judgment as a matter of law should be granted on Plaintiff's so-called "consequential effects"

19   damages because Plaintiff has failed to present sufficient evidence that the alleged fraud caused those

20   damages.  Plaintiff can only recover "consequential damages which 'can be proven with reasonable

21   certainty to ***have resulted from the fraud***.'"  *See DCD Programs v. Leighton*, 90 F.3d 1442, 1449 (9th

22   Cir. 1996) (emphasis added)(quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1449 (9th Cir. 1987));

23   ECF No. 575 at 59.  Plaintiff's "consequential effects" theory fails on two grounds.

24        *First*, Plaintiff did not present sufficient evidence to prove that Tesla's securities would have

25   traded at $312.90—his but-for price—absent the alleged misrepresentations and therefore cannot recover

26   for all of the alleged artificial inflation above that price.  Plaintiff has the burden to prove that Tesla's

27   stock would have traded at $312.90 without the Tweets but has not done so.  There is no evidence that

28   Tesla's stock would have traded at $312.90—approximately $40 less than what it closed at on August 6,

1   the day before the Tweets—instead of at or around its pre-Tweet price had Mr. Musk never tweeted.  Dr.

2   Hartzmark does not express the opinion or provide any analysis showing that Tesla's stock price would

3   have naturally plummeted more than ten percent without the Tweets.   (1/31 Tr. 1721:23-1722:3

4   (Hartzmark).)  Nor does he point to any non-Tweet related event or factor to explain the dramatic stock

5   price drop in his but-for world.  There is insufficient evidence for a reasonable jury to conclude that Tesla's

6   stock would have sold at $312.90 but-for the August 7 Tweets and thus judgment as a matter of law should

7   be entered on Plaintiff's consequential damages demand.

8        ***Second***, Plaintiff fails to provide sufficient evidence to support his consequential damages theory.

9   Any award of damages must be supported by sufficient, admissible evidence.  *Feldman v. Simkins Indus.,*

10   *Inc.*, 492 F. Supp. 839, 847 (N.D. Cal. 1980), *aff'd*, 679 F.2d 1299 (9th Cir. 1982).   Plaintiff's

11   consequential "effects" model is based on the assumption that Tesla's stock price fell because of news

12   reports that the company was under SEC investigation and that the Tweets violated NASDAQ rules.  But

13   Plaintiff cannot recover for losses caused by news stories; he can only recover for losses caused by

14   "wrongful conduct on the part of the defendants."  *See DCD Programs*, 90 F.3d at 1449.  Thus, in order

15   for Plaintiff to recover damages for price declines attributable to an SEC investigation or violations of

16   NASDAQ trading rules, Plaintiff must present sufficient evidence to prove that there was an SEC

17   investigation launched and that the Tweets did indeed violate the rules. *See id.*  There is insufficient

18   evidence in the record to prove either—just hearsay articles offered for their effect on the market and not

19   for their truth.  Even if there was proof that Defendants violated NASDAQ rules, any loss stemming from

20   those violations are not recoverable because they arise from the timing of the Tweets and not their content.

21   Since Mr. Musk's Tweets would have violated NASDAQ disclosure rules even if they were undisputedly

22   true, any loss sustained from stories about NASDAQ rules could not have been "***caused by the***

23   misrepresentations" that give rise to the 10b-5 claim.  ECF No. 573 at 58 (emphasis added).

24        **B.   <u>Plaintiff Did Not Disaggregate and Cannot Prove Damages At A Statistically</u>**
          **<u>Significant Level</u>**

25

26        The Court should grant judgment as a matter of law on damages because, as discussed, *supra*, at

27   15-18, Plaintiff has not met his burden to disaggregate or prove a statistically significant decline.

28

As to disaggregation, Plaintiff failed to present sufficient evidence for the jury to separate out any price decline caused by the alleged fraud, as opposed to wider market or industry factors for any security traded between August 8 and August 16.  *See supra*, at 15-16 (*citing Nuveen*, 730 F.3d at 1123; *Glickenhaus*, 787 F.3d at 421.).  Plaintiff also failed to isolate the impact of the allegedly false statements from other company-specific information, including undisputedly true statements like "considering taking Tesla private at $420."  *See supra*, at 16-17 (*citing REMEC*, 702 F. Supp 2d at 1273-75; *Glickenhaus*, 787 F.3d at 421; *In re Sci. Atlanta.*, 754 F. Supp. 2d at 1379).  Plaintiff failed to perform the necessary disaggregation analysis, leaving the jury without sufficient evidence to separate out fraud-based decline from any other factor.  Thus, judgment as a matter of law should be entered on damages.

Additionally, excluding the price drop attributable to the *New York Times* articles (which, as discussed *supra*, at 12-13, was not caused by the revelation of any truth regarding Mr. Musk's Tweets but rather concerns about his mental health), Plaintiff has not established any Tesla security price decline at the statistically significant 5% level.  Thus, the aggregate stock decline pre-August 17 is indistinguishable from random price movements not caused by specific news and is insufficient evidence that "any inflation or deflation [was] caused by the misrepresentations." ECF No. 573 at 58; *see REMEC*, 702 F. Supp. 2d at 1266; *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. at 493 n.11; *Ark. Tchrs. Ret. Sys*, 879 F.3d at 481 n.5. For this additional reason, judgment as a matter of law should be entered on damages.

## C.   There Is No Reliable Evidence For The Jury To Calculate Options Damages

The Court also should enter judgment as a matter of law on Plaintiff's demand for options damages because he failed to present reliable evidence upon which a reasonable jury could issue an award.  ***First***, Plaintiff uses the Black-Scholes-Merton model to calculate implied volatility but Professor Heston admitted that the model "deviate[s] from reality" and that he did not account for such deviation by calculating an error rate.  (1/31 Tr. 1633:11-18 (Heston).)  This admission renders his methodology unreliable. *See United States v. Cordoba*, 194 F.3d 1053, 1062 (9th Cir. 1999); *United States v. Fultz*, 18 F. Supp. 3d 748, 758 (E.D. Va. 2014) (excluding report that did not calculate the known or potential error rate in method).  ***Second***, because neither Heston nor Hartzmark conducted an event study on options, there is a legally insufficient basis for a jury to conclude that changes in implied volatility was solely caused by the Tweets. *See In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015 (C.D.

Cal. 2003) ("[A] number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar."); ECF No. 479 at 6-7.  **Third**, there is insufficient evidence for the jury to determine but-for implied volatility: Professor Heston offered no such opinion and Dr. Hartzmark offered a only a superficial, one sentence conclusion.  (1/31 Tr. 1610:3-12 (Heston); 1712:5-13 (Hartzmark).)  **Fourth**, Dr. Hartzmark's options opinion rests on the but-for implied volatilities calculated by Professor Heston.  But these volatilities do not represent the world but-for Mr. Musk's Tweets, they represent the world **after** the Tweets, which is not a legally permissible method to calculate damages.  (1/31 Tr. 1610:3-12 (Heston)); *In re Imperial Credit*, 252 F. Supp. 2d at 1014 ("Damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions.").  **Finally**, Plaintiff failed to provide a basis for the jury to divide options damages between "direct" and "consequential" effects.  Dr. Hartzmark simply provided numbers to the jury with no explanation as to how he arrived at them, how he calculated his purported "scalar," or even what it presents.  (1/31 Tr. 1705:22-1706:9 (Hartzmark). "[E]xpert testimony must have a reliable basis in the knowledge and experience of the relevant discipline," *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1176 (N.D. Cal. 2017).  Here, Dr. Hartzmark presents no basis at all.

## VI.   THE RECORD IS INSUFFICIENT TO PROVE MATERIAL FALSITY AND SCIENTER

### A.   There Is Insufficient Evidence To Prove That The Difference Between Mr. Musk's Tweets And The True State Of Affairs Would Have Been Significant To The Reasonable Investor

The Court should grant judgment as a matter of law because there is insufficient evidence that either August 7 Tweet—"Am considering taking Tesla private at $420. Funding secured" or "Investor support confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote"—is materially false.  To prove material falsity, Plaintiff has the burden to establish **both** that (1) there is a "substantial likelihood that a reasonable investor would consider the [misrepresented] fact important in deciding whether to buy or sell that security" and the (2) "misrepresentation gives a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  ECF No. 573 at 40; *TSC Indus.*, 426 U.S. at 449; *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d at

1259 ("there must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (alteration in original); 17 C.F.R. § 240.10b-5.

Thus, to prove that either statement is materially false, Plaintiff had the burden to prove that the difference between the actual state of affairs and the misrepresentation would have been significant to a reasonable investor. *TSC Indus.*, 426 U.S. at 449; *In re McKesson*, 126 F. Supp. 2d at 1259; *see also* ECF No. 508 (Pretrial Order) at 26; *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Plaintiff has failed to present legally sufficient evidence that the difference between the misrepresentation in either Tweet and the actual state of affairs would have been significant to the reasonable investor.

As to the first Tweet, no reasonable jury could conclude that "Am considering taking Tesla private at $420.  Funding secured," differed in a material way from the true state of affairs and that the difference would have been significant to the reasonable investor.  To start, there is no dispute that Mr. Musk was actually considering taking Tesla private at $420 at the time he published the Tweet.  (*See e.g.,* Ex. 81)  The statement "funding secured" is also not materially different from the real state of affairs, and it certainly did not differ in a way that would be significant to the reasonable investor.  There is substantial documentary and testimonial evidence showing that—prior to the Tweets—the PIF made a "strong verbal commitment" to Mr. Musk to take Tesla private and provide the necessary funding to do so.  (Exs. 82- 83; 1/23 Tr. 891:10-21 (Musk); 1/25 Tr. 1195:6-1198:3 (Ahuja).)  Although no price or percentage was discussed, the PIF made clear to the attendees of the July 31 meeting it was willing to do whatever was necessary to fund the transaction and that it had ample financing to do so.  (1/23 Tr. 744:16-746:10 (Musk); 1/25 Tr. 1180:15-1184:11, 1185:16-1186:2, 1188:1-1189:19 (Ahuja); Exs. 82-83.)  The record is clear that the reasonable investor did not find that the difference between "funding secured" and the true state of affairs with the PIF was significant: when Mr. Musk disclosed these details in his August 13 Blog post, ***Tesla's stock price increased*** and did not fall as one would have expected if the market viewed this disclosure as a revelation of a material misrepresentation.  (Ex. 53; 1/31 Tr. 1688:2-9 (Hartzmark).)  On top of that, the evidence shows that Mr. Musk had "ample funding available" to take Tesla private even without the PIF, including his personal holdings (including tens of billions of dollars in SpaceX stock) (1/23 Tr. 740:10-741:12 (Musk)) and significant interest from other outside investors. (Exs. 101; 201.)

Plaintiff also has failed to present sufficient evidence that the second Tweet, "Investor support confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote," was materially false. As to the first sentence, the record is clear that Mr. Musk had support from the PIF. As the Jury Instructions and Supreme Court law provide, the jury "must decide whether something was material based on the circumstances as they existed at the time of the statement." ECF No. 573 at 40; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011) (assessing materiality of statement "requires consideration of the source, content, and context of the [statement]"); *Carvelli v. Ocwen Fin. Corp*., 934 F.3d 1307, 1321 (11th Cir. 2019) ("the materiality inquiry includes consideration of the context in which a statement was made and the circumstances in which a reasonable investor would have heard it."). The second Tweet retweeted and linked to Tesla's August 7 Blog Post. (Ex. 13.) The August 7 Blog Post reaffirmed Mr. Musk's statement that he was only "considering" a take private and that the transaction was preliminary and required a number of steps and decisions before it would be taken to a shareholder vote. (Ex. 12.) Additionally, the second Tweet was sent *after* Mr. Musk sent a series of Tweets articulating his envisioned structure. (Exs. 8-11.) Thus, read in context—as the statement must be, *Matrixx*, 563 U.S. at 43—no reasonable investor would interpret Mr. Musk's Tweet as an announcement that the proposal would go straight to a shareholder vote. Plaintiff himself testified as such. (1/18/23 Trial Tr. 389:21-24; 390:21-23; Tr. 398:14-399:1 (Littleton).) And when Mr. Musk disclosed to the market on August 13 the additional steps necessary to take Tesla private (Ex. 53), Tesla's stock price increased— again proving that the difference between the Tweet and the true state of affairs did not "significantly alter[] the 'total mix' of information made available." (2/1 R'gh Tr. 8:39:49-8:41:55); *see TSC Indus.*, 426 U.S. at 449.

**B.**   **But For The Court's Summary Judgment Order And Instruction, There Is Insufficient Evidence For A Reasonable Jury To Conclude The August 7 Tweets Were Materially False Or Made With Deliberate Recklessness**

The Court granted summary judgment on falsity and scienter after finding as a matter of law that "funding secured" meant that "funding was not something amorphous or speculative but rather fairly concrete and reasonably certain," that "investor support" referred to the PIF, and that a "reasonable investor could *only* conclude that the sole contingency left for taking Tesla private was a shareholder vote." ECF No. 387, at 24-28. Because the state of affairs did not match the Court's definition of these

terms and because Mr. Musk was purportedly on notice of that, the Court entered summary judgment on factual falsity and recklessness.  *Id.*  However, as the testimony and evidence in trial make clear, the three phrases at issue, which are not business or financial terms of art, were ambiguous and capable of multiple interpretations.  *See e.g., Tanadgusix Corp. v. Huber*, 404 F.3d 1201, 1205 (9th Cir. 2005) (a contract is "ambiguous if reasonable people could find its terms susceptible to more than one interpretation."); *Monaco v. Bear Stearns Residential Mortg. Corp*., 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008) (accord).  Accordingly, the resolution of the meaning of the August 7 Tweets should have been left to the jury.  *See Richey v. Metaxpert LLC*, 407 F. App'x 198, 199–200 (9th Cir. 2010) ("the meaning of the ambiguous provision is a question of fact to be determined by the trier of fact"); *Masters v. Bos. Sci. Corp*., 2009 WL 10692986, at *4 (N.D. Cal. Feb. 4, 2009) (accord).

Absent the Court's instruction based on its summary judgment ruling, there is insufficient evidence to prove falsity or scienter.  As to falsity, as discussed, *supra*, at 24-26, the true state of affairs was not materially different from what the market interpreted the Tweets to mean.  Therefore, there is insufficient evidence of falsity.  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Relatedly, there is insufficient evidence to show that Mr. Musk was "deliberately reckless" or engaged in an "extreme departure from the ordinary standards of care" with regards to the veracity of the Tweets.  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424–25 (9th Cir. 1994) (granting summary judgment to defendants based on lack of scienter where defendants made minimal stock sales and did not act inconsistently with their statements); *In re Apple Computer Sec. Litig*., 886 F.2d 1109, 1116–17 (9th Cir. 1989) (granting summary judgment to defendants based on lack of scienter where corporate officers had a "reasonable basis" for their statements); *Geffon v. Micrion Corp*., 249 F.3d 29, 35–38 (1st Cir. 2001) (finding no recklessness where defendant "used[] terms differently in the challenged statements than in its normal practice").  Here, the evidence shows that all attendees of the July 31, 2018 meeting, including Mr. Ahuja, understood that the Tweets were consistent with the verbal commitment the PIF made to Mr. Musk to fund taking Tesla private.  (1/25 Tr. 1203:3-1204:10 (Ahuja).)  Moreover, all persons who were informed of the PIF's interest and commitment in the August 2 and August 3 Board meetings similarly testified that the Tweets were consistent with what they knew.  The evidenced adduced at trial therefore shows that Mr. Musk did not "ignore the facts and plead ignorance of the risk" of misleading others, *SEC*

*v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010), but rather tweeted consistently with the facts as understood by him and every other person with knowledge of the PIF's commitment.

### C.   There Is Insufficient Evidence To Prove Mr. Musk Acted Knowingly

There is insufficient evidence to prove that Mr. Musk "knew his untrue statement[s] were false." ECF No. 573 at 6; *see In re Worlds of Wonder*, 35 F.3d at 1424–25; *In re Apple Computer Sec. Litig.*, 886 F.2d at 1116–17 (granting summary judgment to defendants where corporate officers testified they acted in good faith belief that the statements at issue were accurate and not misleading); *Geffon*, 249 F.3d at 35–38 (internal documents did "not support a finding that defendants *knew* the statements would materially mislead the investing public"). Here, the evidence and testimony show that Mr. Musk had a good faith belief that funding was secured and that the only hurdle to a transaction was obtaining requisite shareholder support. This is supported by Mr. Musk's testimony (Tr. 927:25-928:17; 941:17-22 (Musk)), minutes from Board meetings held before August 7 (Exs. 82, 83), Mr. Musk's post-August 7 communications with the PIF and Tesla employees (Exs. 121, 825), and the minutes of the August 23 Board meeting confirming that funding was not an issue but that Tesla would not go private due to shareholder concerns (Ex. 101). Moreover, there is no evidence of ill-motive or profit as Mr. Musk did not sell any stock during the Class Period. (Tr. 928:18-929:16 (Musk)); *see In re Worlds of Wonder*, 35 F. 3d at 1425 ("minimal sales of stock also negates an inference of scienter").

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter judgment as a matter of law pursuant to Rule 50(a) on all claims and in favor of all Defendants.

DATED:  February 1, 2023          Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Alex Spiro*
    Alex Spiro *(appearing pro hac vice)*

    *Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,*
    *Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,*
    *James Murdoch, Kimbal Musk, and Linda Johnson Rice*