**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
        amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**PLAINTIFF'S MOTION FOR JUDGMENT AS MATTER OF LAW**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Date: TBD<br>Time: TBD<br>Location: Courtroom 5, 17th Floor<br>Judge: Hon. Edward Chen |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that, as soon as possible, on a date to be decided by the Court, in Courtroom 5 – 17th Floor of the United States Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Plaintiff, through his counsel, will move, and hereby does move pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on this issues of: (1) the Rule 10b-5 Claim element of "materiality"; and (2) classwide and individual reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Defendants have been fully heard on these issues and the evidence falls categorically in support of Plaintiff. Defendants have failed to proffer evidence to support their claim that the tweets were not material and have not rebutted the "fraud-on-the-market" presumption.

**PLEASE TAKE FURTHER NOTICE** that this motion is based on the Memorandum of Points and Authorities below, the record of evidence from trial, the arguments of counsel, and any other matters properly before this Court. Pursuant to Paragraph 11 of the Court's Civil Standing Order, Plaintiff also submits a proposed order.

## ISSUES TO BE DECIDED

1.      Should the Court grant judgment as a matter of law in favor of Plaintiff on the issue of materiality because the totality of the evidence admitted during trial shows indisputably that the tweets (1) "Am considering taking Tesla private at $420. Funding secured." and (2) "Investor support confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." were material?

2.      Should the Court grant judgment as a matter of law in favor of Plaintiff on the issue of classwide reliance because Defendants failed to introduce evidence capable of rebutting the "fraud-on-the-market" presumption?

3.      Should the Court grant judgment as a matter of law in favor of Plaintiff on the issue of direct reliance because the testimony shows Lead Plaintiff Glen Littleton and Tim Fries

directly relied on the "funding secured" tweet when deciding to invest in Tesla stock and/or options?

## <u>TABLE OF CONTENTS</u>

II.     INTRODUCTION ........................................................................................................... 1

III.   RELEVANT FACTS ...................................................................................................... 2

    A.    Elon Musk's Testimony ...................................................................................... 2

    B.    Martin Viecha's Testimony ................................................................................ 3

    C.    Testimony from JP Morgan's Ryan Brinkman and T. Rowe Price's Joe Fath ...... 4

    D.    Testimony from Michael Hartzmark, Ph.D. ........................................................ 5

    E.    Additional Witness Testimony and Trial Exhibits .............................................. 7

IV.   LEGAL STANDARD ................................................................................................... 10

V.    ARGUMENT ............................................................................................................... 10

    A.    Musk Admitted that the "Funding Secured" Tweet Was Material Market-Moving
        News. ................................................................................................................ 11

    B.    Analysts and Investors Testified that the "Funding Secured" Tweet Was
        Important and Material Information. .................................................................. 12

    C.    "Funding Secured" Materially Misstated the True State of Affairs that Existed at
        the Time of the Tweet. ...................................................................................... 13

    D.    There Is No Dispute that the "Funding Secured" Tweet Was Material. ............... 14

    E.    Defendants Cannot Rebut the "Fraud-on-the-Market" Presumption for Classwide
        Reliance. ........................................................................................................... 15

VI.   CONCLUSION ............................................................................................................ 17

1

## **TABLE OF AUTHORITIES**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013) ............................................................................................. 11

*Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008) ............................................................................... 14

*EEOC v. Go Daddy Software, Inc.,*
    581 F.3d 951 (9th Cir. 2009) ............................................................................... 10

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    563 U.S. 804, 131 S. Ct. 2179 (2011) ................................................................. 16

*Fed. Hous. Fin. Agency v. Deutsche Bank AG,*
    903 F. Supp. 2d 285 (S.D.N.Y. 2012) ................................................................. 12

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    __ U.S. __, 134 S. Ct. 2398 (2014) ................................................................ 16, 17

In re Atossa Genetics Inc. Sec. Litig.,
    868 F.3d 784 (9th Cir. 2017) ............................................................................... 17

*In re Intuitive Surgical Sec. Litig.,*
    No. 5:13-cv-01920-EJD, 2016 U.S. Dist. LEXIS 178148 (N.D. Cal. Dec. 22, 2016) .............. 17

*In re Regeneron Pharm., Inc. Sec. Litig.,*
    2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 1, 2005) .......................................... 13

*Miller v. Thane Int'l, Inc.,*
    519 F.3d 879 (9th Cir. 2008) ............................................................................... 11

*Ostad v. Oregon Health Scis. Univ.,*
    327 F.3d 876 (9th Cir. 2003) ............................................................................... 10

*Patel v. Parnes,*
    253 F.R.D. 531 (C.D. Cal. 2008) ......................................................................... 12

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) .................................. 10

*S.E.C. v. Reyes,*
    491 F. Supp. 2d 906 (N.D. Cal. 2007) ................................................................. 11

*TSC Industries, Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ............................................................................................. 11

*United States SEC v. Ustian*,
  229 F. Supp. 3d 739 (N.D. Ill. 2017) ........................................................................................ 12

**Rules**

FED. R. CIV. P. 50(a) .................................................................................................................. 10

1
## MEMORANDUM OF POINTS AND AUTHORITIES

2
## I.   INTRODUCTION

3
      Plaintiff moved for partial summary judgment on the elements of falsity, scienter, and

4 reliance. The Court granted the motion in part. The "funding secured" tweet, Exhibit 8, and the

5 "investor support confirmed" tweet, Exhibit 13, were false and made with scienter but questions

6 of fact existed as to whether they were "material" and, in turn, provided Defendants with an

7 opportunity at trial to rebut the "fraud-on-the-market" presumption of reliance. Defendants have

8 now been fully heard on these issues. The evidence admitted at trial does *not* support their

9 arguments. The jury does not have a legally sufficient evidentiary basis to find that the tweets

10 were *not* material or that Plaintiff is *not* entitled to classwide reliance under the "fraud-on-the-

11 market" presumption.

12
      Plaintiff has provided the jury with extensive evidence that the false "funding secured"

13 tweet in Exhibit 8 and the "investor support confirmed" tweet in Exhibit 13 were material to

14 investors. Elon Musk openly admitted that he intended his August 7 tweets to be read and relied

15 upon by his followers on Twitter. Immediately following the tweets, analysts and investors

16 barraged Tesla's investor relations head, Martin Viecha, with emails seeking clarification on the

17 words "funding secured." Analysts and news commentators similarly focused their reporting on

18 "funding secured," what those words meant, and how they impacted the stock. Testimony from

19 other witnesses further confirmed the materiality of the "funding secured" tweet in Exhibit 8, with

20 Michael Hartzmark, Ph.D., in particular, offering an extensive and unrebutted quantitative and

21 qualitative analyses proving without exception that the "funding secured" tweet in Exhibit 8 and

22 the "investor support confirmed" tweet in Exhibit 13 were material. By comparison, Defendants

23 offered nothing. They proffered no evidence showing that the tweets were not material. The only

24 evidence before the jury demonstrates that unequivocally that the tweets in Exhibit 8 and Exhibit

25 13 were material to investors.

26
      Where, as here, a party has no evidence in support of their argument, judgment as a matter

27 of law is appropriate under Federal Rule of Civil Procedure 50. There is no need to task the jury

28

with deliberations on the issues of materiality and reliance. They can be decided now in favor of Plaintiff.

## II.  RELEVANT FACTS

### A.  Elon Musk's Testimony

Musk also testified to the materiality of the "funding secured" tweets (both Exhibits 8 and 13). During the first day of his testimony, Musk admitted he intended his tweets about Tesla to reach his "millions of followers," that his tweets affected the price of Tesla's stock, and that information about Tesla in his tweets are "information that [Musk] think[s] the public should hear." 1/20 Tr. at 681:23-685:5. Then, during the following day of his testimony, Musk admitted that "funding secured" was one of the three central pieces of information he sought to disclose to the market on August 7, 2018 and intentionally did so for the purpose of "communicat[ing] this to all investors of Tesla" and "wanted them to rely on this tweet . . . in making their decisions about buying or selling Tesla securities." 1/23 Tr. at 787:9-788:4. Musk even admitted that he expected "that likely there would be some increase" in the price of Tesla's stock in response to his tweet. *Id*. at 789:22-25. Moreover, Musk acknowledged that news of his funding to take Tesla private was "material non-public information." *Id*. at 746:16-22. He also acknowledged that this information should not have been disclosed during market hours because "you would not disclose important information during a trading day." *Id*. at 786:7-13. Indeed, the disruption caused by the "funding secured" tweets led to Nasdaq halting trading in Tesla shares on August 7. *Id*. at 804:7-10. Musk only exacerbated this disruption with his second tweet—"Investor support is confirmed . . . ."—given that he made it without having spoken to any investors other than the Sauid PIF. 1/23 Tr. at 863:19-23. This, too, was intended to be read by investors, as explained by Musk during his testimony. 1/24 Tr. at 938:6-14.

Further proof of materiality comes from the emails Musk received in the hours following the "funding secured" tweets. Musk posted an employee email (blog post) to Tesla's blog on August 7 (which was provided to the public vis-à-vis the "Investor support is confirmed" tweet (Exhibit 13). The post did not contain anything further or "specific about funding." *Id*. at 804:18-19. Following the blog post, Tesla's CFO, Deepak Ahuja, emailed Musk alerting him that "We

are getting a lot of enquiries from investors, SEC and the media to better understand the comment 'Funding secured.'" *Id.* at 811:16-812:11 (referring to Exhibit 337). This is proof positive that "funding secured" was the driving piece of information behind the market's reaction to the tweets.

### B. Martin Viecha's Testimony

Martin Viecha, Tesla's Senior Director of Investor Relations, provided compelling evidence bearing directly on the materiality of the "funding secured" tweets. He began his testimony by confirming he "immediately" began receiving inquiries in response to the tweets. 1/24 Tr. at 1052:23-1053:4. These inquiries came from several well-known analysts that closely followed Tesla. Itay Michaeli from Citi asked, "The employee letter didn't make clear whether there is an actual transaction on the table (with secured financing) or if this is more of a strategic announcement to consider pursuing such transaction." *Id.* at 1054:10-17 (quoting Exhibit 146). Mr. Michaeli's question tracks precisely with the parties' competing views on the tweet and, tellingly, Mr. Viecha's response squarely supports Plaintiff's argument and the relief he seeks by way of this motion. In response to Mr. Michaeli's question, Mr. Viecha writes: "The very first tweet mentioned a firm offer." *Id.* at 1055:7-11.

Mr. Viecha reiterated his response in subsequent emails to other analysts and investors, including:

- Bradley Erickson from KeyBank. Mr. Erickson wrote: "He said financing is secured but in the letter he doesn't address this. Can you clarify?" Mr. Viecha responded: "I can only say that the first tweet clearly stated that 'financing is secured.' Yes, there is a firm offer." *Id.* at 1058:8-1059:18 (referring to Exhibit 150);

- Owuraka Koney from Jennison Associates. Mr. Koney wrote: "Nothing on funding, though?" Mr. Viecha responded: "The very first tweet simply mentioned 'Funding secured' which means that that is a firm offer. . . . I would assume that given we went full-on public with this, the offer is as firm as it gets." *Id.* at 1060:14-1062:24 (referring to Exhibit 58); and

- Toni Sacconaghi from Bernstein Alliance. Mr. Sacconaghi asked: "What does

'Financing secured' actually mean? Are you assuming Tesla will need 60 billion

plus in financing, or assuming that many shareholders don't take the offer and

Tesla needs less? Big difference. 'Financing secured' implies the former." Mr.

Viecha responded unequivocally, "It means that financing is secured regardless of

other assumptions." *Id*. at 1064:17-1066:14 (referring to Exhibit 151).

Mr. Viecha confirmed on cross-examination with his counsel there were "many that asked the same thing" as the above analysts. *Id*. at 1098:11-23 (Q Was he the only analyst who asked you what that phrase meant? A No. There were many that asked the same thing [referring to Exhibit 151].").[1] Moreover, Mr. Viecha testified that he did not view the "funding secured" tweet separately but instead as one succinct message. *Id*. at 1056:19-1057:6 (Q Did you interpret "Funding secured" as being part of the firm offer? A I really didn't think about it as a – as a separate statement . . . ."). Mr. Viecha also received numerous questions about the "Investor support is confirmed" tweet, similarly demonstrating its importance to the market. 1/25 Tr. at 1278:9-11.

### C. Testimony from JP Morgan's Ryan Brinkman, T. Rowe Price's Joe Fath, and Jennison Associate's Owuraka Koney.

Messrs. Brinkman, Fath, and Koney testified at length about the materiality of the "funding secured" tweets. Given their role in the market as analysts who closely followed Tesla, their opinions and observations are highly credible and of significant import. In response to "Funding secured," Ryan Brinkman, an analyst covering Tesla from JP Morgan, increased his price target "very materially" from $195 to $308. Brinkman Tr. 72:24-73:15. In the note, Brinkman provided reasons for increasing his price target and stated "Either funding is secured or it is not secured. Tesla CEO says funding is secured." Ex. 61.

Joseph Fath, a Vice President at T. Rowe Price, who served as a proxy for the market, confirmed that he believed "Funding secured" was material. Fath Dep. Tr. 45:23-46:8 ("Q. What was your understanding of the meaning of the words 'investor support is confirmed'? A. Well,

---

[1] *See also* Exhibits 145, 146, 147, 150, 151, 155 (emails from investors and discussion of media feedback focusing on "funding secured").

1    with the funding secured Tweet followed by this, that he had it lined up, whatever investors that

2    may be, to support the transaction and be able to take them private. That was my, you know - -

3    and again, I think it just reinforced the funding secured.").

4    Defendants' own witness, Owuraka Koney of Jennison Associates, an investor in Tesla,

5    confirmed that it was important to him that the CEO of Tesla had said that funding was secured

6    publicly. Koney Dep. Tr. 71:20-71:22 ("Q. Was it important to you that the CEO of Tesla had

7    said that funding was secured publicly? A. Yes.").

8    **D.  Testimony from Michael Hartzmark, Ph.D.**

9    Dr. Hartzmark testified on behalf of Plaintiff about the materiality of the "funding

10   secured" tweets. He testified that following the tweets he observed an "immediate[] . . . spike in

11   volume" and "spike in the price." 1/31 Tr. at 1651:10-12. He also observed an "immediate[] spike

12   up" once trading resumed after the Nasdaq halt. *Id*. at 1651:21-25. The tweets also caused a

13   decline and rise in the price of Tesla's options. *Id*. at 1653:3-12. Dr. Hartzmark concluded that

14   the "funding secured" tweets were "economically material" because they "change[d] the mix and

15   alter[ed] buying and selling decisions" within the market. *Id*. at 1656:21-1657:1. He confirmed

16   that, "My opinion is that the tweets caused a material impact on the prices of the Tesla stock." *Id*.

17   at 1657:2-7.

18   Dr. Hartzmark elaborated upon his opinion. He explained that Nasdaq also considered the

19   tweets to be material, given the fact that they halted trading on August 7. *Id*. 1657:19-1658:6

20   ("The trading halt in Nasdaq was basically because it was at least Nasdaq's opinion that there was

21   material information that was going to be disclosed and so that, that in and of itself, would support

22   . . . the information is material."). Dr. Hartzmark also engaged in a quantitative analysis to

23   evaluate the materiality of the tweets. He testified that he performed a statistical study referred to

24   as a "regression" and confirmed with 95% certainty that Tesla's stock price moved in response to

25   the tweets (and not from unrelated market factors). *Id*. at 1658:7-16. The materiality of the tweets

26   also impacted stock options and convertible notes. *Id*. at 1661:16-20.

27   Qualitatively, the evidence also established without a doubt that the "funding secured"

28   tweets were material. Dr. Hartzmark relied on news reports, including CNBC (Exhibit 521), as

well as internal emails (Exhibit 337) and analyst reports and emails (Exhibits 15, 151). 1/31 Tr. at 1662:4-1666:7. These materials each focused with laser precision on the import of "funding secured" and demonstrated how the market responded to those two words. CNBC highlighted the announcement while other analysts attempted to elicit further information from Tesla as to what Musk meant (*i.e.*, whether an offer had been received or a written commitment had been given). As JP Morgan said, "As surprising to us as these developments are, and as lacking aas the statements are in any details regarding who is expected to provide the required amount of financing and on what terms, they are nevertheless declarative statements from the CEO of a public company which we feel should be considered seriously. Either funding is secured or it is not secured, and Tesla's CEO says funding is secured." Exhibit 15-1. As explained by Dr. Hartzmark, JP Morgan's report was especially meaningful because it adjusted the bank's "price target" for Tesla, which required approval at senior levels. 1/31 Tr. at 1668:13-1670:11.

Dr. Hartzmark also confirmed that "Investor support is confirmed is confirmed . . ." was likewise material to investors. When asked, Dr. Hartzmark testified that "I've gone through and looked at these dates, looked at the movements in implied volatility and prices, it would suggest that, you know, that 'investor support confirmed' and 'funding secured' are very important pieces of information. And, again, the reason is that we see that the investors were interested in it. That's the quintessential definition for economic materiality." 1/31 Tr. at 1696:1-9.

Dr. Hartzmark clearly confirmed that "Based on all the information I've shown you from analysts, internal documents, price factors, volume factors, implied volatility, the convertible bonds all suggest that the tweets are material" and that "substantial qualitative evidence which would suggest that the 'funding secured' is material to the market." *Id*. at 1673:17-1674:8. Dr. Hartzmark also confirmed that this conclusion applied to the second tweet ("Investor support is confirmed . . . ."), stating that the "qualitative information . . . suggests that its information . . . is important to the mix of information investors act[ed] on." *Id*. at 1674:9-14. Dr. Hartzmark explicitly identified a substantial spike in response to the "Investor support is confirmed . . ." tweet once trading resumed on Nasdaq after the halt. *Id*. at 1651:22-25 ("Immediately at 3:45 when trading resumes, again, as you would expect in an efficient market, the price immediately

spikes up. Tremendous amount of volume ending the day a little bit lower than its peak. It ends the day at $379.57.").

### E.  Additional Witness Testimony and Trial Exhibits

All other witnesses to testify agreed (or, at least, did not dispute) that the "funding secured" tweets were highly material. Lead Plaintiff Glen Littleton testified that "funding secured" was the "primary driver," the "only thing that mattered," and the "most important" part of the August 7, 2018 tweet. 1/18 Tr. at 362:9-13 ("Q Okay. Did this change your approach to your portfolio in any way towards Tesla? A No, because 'Funding secured' was so definite to me, that that was the primary driver. This helped confirm that, but, no, it didn't change anything."); 388:16-18 ("A Um, no, 'Funding secured' is -- was the only thing that mattered to me. Because that was such a defining statement."); 426:1-5 ("But the fact that 'Funding secured' was stated on the 7th was my driving argument. My -- the only thing I could really focus on, because that was all that mattered to me. So I got out of things to -- to save my livelihood."); 462:4-6 ("Q And what to you, again, was the most important aspect of deciding that it was a done deal? A What was the most important of – 'Funding secured'?").

Tim Fries testified on January 20, 2023. Similar to Mr. Littleton, he relied on the "funding secured" tweet when deciding to invest in Tesla. Mr. Fries testified that he had been looking for a "good entry point" into Tesla for some time when, on August 7, 2018, he saw the tweet on CNBC and decided to invest. 1/20 Tr. at 507:20-509:18 (Q What led you to buy the stock in Tesla on August 8, 2018? A It was the tweet. . . . Q Was the representation 'funding secured' in that tweet important to you at that time? A Yes. The phrase 'funding secured' in that tweet was critical. Funding secured gave me the confidence that I could get in and – at that 420 price. . . . .").

Professor Guhan Subramanian echoed Messrs. Littleton and Fries on this point, despite not offering a formal opinion on this issue of materiality. In pertinent part, Professor Subramanian discussed the "highly unusual" nature of Musk's "funding secured" tweets considering that they related to a "major public company MBO" and were made in the middle of the "trading day." 1/20 Tr. at 584:10-585:7. Further, Professor Subramanian testified at length about the typical process in involved in MBOs and how Musk's "Investor support is confirmed . . ." tweet was

1    unrealistic and illusory in light of ordinary and reasonable practices. 1/20 Tr. at 635:15-639:16

2    ("He's basically saying only reason why this is not certain is that it's going to the shareholder vote

3    and they might vote it down. That's just not true. It's wrong.").

4         Deepak Ahuja, Tesla's former CFO, confirmed that the August 7 tweets were undeniably

5    material, and that Nasdaq halted trading as a direct result of the material tweets. 1/25 Tr. 1157:21

6    ("The going-private comment does - - is material information."); *id*. at 1158:2-3 ("[Nasdaq did

7    respond to the tweet in that sense. All, all the other tweets that were there, yeah."); *id*. at 1159:3-

8    4 ("It was material information, and Nasdaq stopped the trading, is all I can comment."); *id*. at

9    1165:14-16 ("Q [Investors, SEC and the media] wanted information on 'Funding secured,'

10   correct? A That's correct. 'Funding secured' was not a term of art. It was - - it was - - hence,

11   people wanted to understand that term.").

12        Antonio Gracias, Tesla's lead independent director, confirmed that "[T]here were lots of

13   questions about what [Funding secured] meant." 1/25 Tr. 1240:8-11 ("Q. But the board aware

14   that Tesla, the company, had been receiving questions and inquiries regarding 'Funding secured.'

15   Correct? A. Yes. There were lots of questions about that that meant."); *id*. at 1240:17-20 ("Q And

16   you personally got lots of questions regarding this tweet. Correct? A I mean people asked me

17   questions about it, for sure. Yeah.").

18        Robyn Denholm, the Chair of the Audit Committee of the Board, testified that while she

19   did not recall "just 'Funding secured' being part of the inquiries. There were a lot of inquiries. I

20   mean there was a lot of press articles." 1/27 Tr. at 1478:13-18. And ultimately, she testified that

21   Exhibit 8 and the news around it were material. 1/27 Tr. at 1478:24-1479:1 ("Of course it was

22   material."). When Defendants questioned Ms. Denholm regarding the significance of "Funding

23   secured," she stated that the first part of the tweet was the "most important" part but did not

24   dispute that the tweet overall was nonetheless material. 1/27 Tr. at 1491:24-1492:4 ("Q. How did

25   you view the significant of the second part of the tweet, "Funding secured"? A. Quite honestly, I

26   think the first part of the tweet was the most important thing for anyone, for investors and for the

27   general public, because clearly taking Tesla private was a big deal.").

28        Mr. Durban also confirmed that the difference between "Funding secured" and the actual

state of affairs was significant enough to influence a reasonable investor's decision whether to buy or sell securities in that company. For example, Mr. Durban affirms that "it is typical for some form of definitive agreement to be in place before a public announcement of a going-private transaction is made" (1/27 Tr. at 1342:9-12), and that "typically, financing is arranged before a definitive agreement is signed for a going-private." (*id.* at 1342:13-15). Mr. Durban acknowledged that there was not "any definitive agreement in place" (*id.* at 1343:3-5) at the time of the August 7, 2018 tweets, and that in his experience it takes "three to six months" to get a definitive agreement in place (*id.* at 1343:14-17). This stands in stark contrast to the term "funding secured." Mr. Durban affirmed that as of August 23, 2018, there still was not "any committed financing for any going-private transaction." *Id.* at 1372:4-6. He also affirmed that "the full price" and "the amount of capital" needed for taking Tesla private had still not yet been decided as of August, 23, 2018. *Id.* at 1372:18-1373:1. In fact, Mr. Durban confirmed that the neither the "structure," "total amount of capital," "price," nor "the percentage of shareholders who would roll into a private Tesla" were ever finalized. *Id.* at 1373:2-16. Indeed, due to these factors, a "formal proposal" was never sent to the board, there was never a "final conclusion about whether" using an SPV was even viable, and as of August 23, 2018, "there was still substantial uncertainties as to whether a going-private transaction could proceed." *Id.* at 1373:17-19; 1393:9-13; 1393:17-22; *see also* Exhibits 179 and 201 (presentations showing that go-private process was in earliest stages and still waiting for financing).

Mr. Durban also differentiated between an interest in doing a transaction and a commitment to finance one. *Id.* at 1394:12-18 ("Q. Is an indication of interest expressed that way the same as a commitment to financing? A. No. Q. Okay. What's the difference? A. Um, an interest is an expression of interest. A commitment is a signed legal document committing you to wire money."). Mr. Durban then testified that after the August7 tweet, he spent the next two weeks trying to raise funding. *Id.* at 1343:22-24. When he had his first in-person meeting with Elon Musk on August 10, 2018, he testified that the potential going-private transaction for Tesla was not even yet at "Stage 1." *Id.* at 1349:23-1350:3. Given the stark contrast between "Funding secured" and the true state of affairs, Mr. Durban's testimony provides further support that the

1    difference between the disclosure and the actual state of affairs is significant enough to influence

2    a reasonable investor's decision whether to buy or sell securities in that company.

3    Mr. Dees, the other financial banker hired by Mr. Musk, confirms the stark contrast of the

4    state of affairs to Mr. Musk's "funding secured" statement. Mr. Dees affirms that he had not

5    spoken to Mr. Musk prior to Mr. Musk's August 7, 2018 tweet. 1/27 Tr. at 1400:13-18 (testifying

6    that he was "surprised he was considering taking it private, surprised that we weren't involved at

7    Goldman."); *id*. at 1431:5-22. He confirms that it was never "determined how many shareholders

8    would actually roll into a potential going-private transaction." *Id*. at 1410:16-19. As of August

9    15, 2018, Mr. Dees confirms that they "were looking to obtain documentation confirming

10   financing from those investors" (*id*. at 1423:10-13) and they had not "collected any signed

11   commitment documents from any potential investor in a going-private transaction for Tesla." *Id*.

12   at 1425:11-14. In fact, Mr. Dees indicated that as of August 16, 2018, Goldman Sachs, along with

13   Silver Lake, were still "trying to develop a fully financed proposal." *Id*. at 1428:12-22. Despite

14   Defendants repeated assertions that funding secured means funding available, Mr. Dees confirms

15   that there is a difference between "funding being available and funding being committed." *Id*. at

16   1463:13-20.

17   ## III.   LEGAL STANDARD

18   Rule 50(a) provides that a court may grant "judgment as a matter of law" against a party

19   "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient

20   evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a).

21   "Judgment as a matter of law is proper when the evidence permits only one reasonable

22   conclusion[.]" *Ostad v. Oregon Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). "[I]n

23   entertaining a motion for judgment as a matter of law, the court . . . may not make credibility

24   determinations or weigh the evidence." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961

25   (9th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.

26   Ct. 2097, 147 L. Ed. 2d 105 (2000)).

27   ## IV.   ARGUMENT

28   A statement is "material" when there is a "substantial likelihood that a reasonable

1    shareholder would consider it important." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438,

2    449 (1976) ("Put another way, there must be a substantial likelihood that the disclosure of the

3    omitted fact would have been viewed by the reasonable investor as having significantly altered

4    the 'total mix' of information made available."). This is an objective test, assessing the

5    significance of a piece of information to a "reasonable investor." *Id.* at 445; *accord Amgen Inc.*

6    *v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) (noting materiality is an

7    objective test); *S.E.C. v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007) ("The law assesses the

8    materiality of a misrepresentation at the time it is made, not after intervening events or remedial

9    action have rendered it harmless."). Materiality is assessed "at the time of the [statement]." *Miller*

10   *v. Thane Int'l, Inc.*, 519 F.3d 879, 892 (9th Cir. 2008). Given the evidentiary record here, there

11   can be no question that Musk's August 7 tweets were "material" to investors.

12        **A. Musk Admitted that the "Funding Secured" Tweet Was Material Market-**

13            **Moving News.**

14        There is no dispute that Musk intended for his "funding secured" tweet to be read as one

15   cohesive message, *i.e.*, both sentences read together. As he explained during his testimony, Musk

16   tweeted "Am considering taking Tesla private at $420. Funding secured." because he was

17   "considering -- very importantly, considering -- not that it will happen, but that I'm thinking about

18   it -- taking Tesla private at 420. And that, in my opinion, the funding is secured for taking Tesla

19   private at that price." 1/23 Tr. at 787:9:16. Moreover, Musk testified that he wanted to

20   communicate these three points (*i.e.*, that he was considering taking Tesla private at a particular

21   price with funding secured) to investors of Tesla and that he wanted investors to rely on the tweet.

22   *Id.* at 787:23-788:4 (Q Okay. Now, and you wanted to communicate this to all investors of Tesla,

23   correct? A Yes. Q And you wanted them to rely on this tweet, right, in making their decisions

24   about buying or selling Tesla securities, correct? A Yes.). Mr. Viecha's testimony supported this

25   point considering that he, too, did not view the "funding secured" tweet separately but instead as

26   one succinct message. *Id.* at 1056:19-1057:6 (Q Did you interpret "Funding secured" as being

27   part of the firm offer? A I really didn't think about it as a – as a separate statement . . . .").

28

1    Musk's admission in this regard proves that he wanted and, in fact, believed his tweet to

2    be "material" market-moving information. Thus, given that Musk intended others to rely on the

3    tweet, there can be no dispute that it was "material" at the time it was made. *See Fed. Hous. Fin.*

4    *Agency v. Deutsche Bank AG*, 903 F. Supp. 2d 285, 289 (S.D.N.Y. 2012) (noting that term sheet

5    cautionary "statements are not disclaimers of reliability; to the contrary, the use of these materials

6    to market and sell the Certificates suggests that defendants fully intended the [purchasers] to rely

7    on the representations they contained").

8    **B. Analysts and Investors Testified that the "Funding Secured" Tweet Was**

9    **Important and Material Information.**

10    Extensive testimony was heard concerning the market's reaction to the "funding secured"

11    tweet and the widespread belief that it was important and highly material. Analysts and investors

12    immediately sought further information from Tesla after Musk sent the tweet, including from Itay

13    Michaeli from Citi (1/24 Tr. at 1054:10-17), Bradley Erickson from KeyBank (*id*. at 1058:8-

14    1059:18), Owuraka Koney from Jennison Associations (*id*. at 1060:14-1062:24), and Toni

15    Sacconaghi from Bernstein Alliance (*id*. at 1064:16-1066:14). Glen Littleton and Tim Fries, the

16    plaintiff-investors who testified during trial, equally said that they thought "funding secured" was

17    the most material part of the tweet. Mr. Littleton said unequivocally that "funding secured" was

18    the "primary driver," the "only thing that mattered," and the "most important" part of the August

19    7, 2018 tweet. 1/18 Tr. at 362:9-13. Mr. Fries likewise said that he had been looking for a "good

20    entry point" into Tesla for some time when, on August 7, 2018, he saw the tweet on CNBC and

21    decided to invest. 1/20 Tr. at 507:20-509:18. These analysts and investors either asked about or

22    relied upon the statement "funding secured," thereby showing that the tweet overall and that

23    portion of it in particular were highly material.

24    Analysts serve as a proxy for the market and where, as here, they focus on a particular

25    fact, that is strong evidence that the fact is material. *See Patel v. Parnes*, 253 F.R.D. 531, 546-50

26    (C.D. Cal. 2008) (incorporating analyst reports to show when the alleged misrepresentations were

27    provided to the market and their materiality); *see also  United States SEC v. Ustian*, 229 F. Supp.

28    3d 739, 761-62 (N.D. Ill. 2017) ("Courts routinely consider analyst reports during motions to

1   dismiss securities fraud claims to resolve questions about the materiality of alleged

2   misrepresentations and omissions."); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 U.S. Dist.

3   LEXIS 1350, at *62-63 (S.D.N.Y. Feb. 1, 2005) (materiality evidenced by analyst reports).

4   Analysts were laser focused on the "funding secured" tweet. Accordingly, this evidence shows

5   that it was highly material to the market.

### C. "Funding Secured" Materially Misstated the True State of Affairs that Existed at the Time of the Tweet.

8       Musk's false statement also differed materially from the true state of affairs that existed.

9   While Musk said that funding for the go-private transaction was "secured," it was not. Musk had

10  not obtained any commitment in writing, which was the defining feature of "secured" funding

11  according to his bankers. This is evidenced by the Saudi PIF's meeting minutes from the July 31,

12  2018 meeting as well as Yasir Al-Rumayyan's text messages to/from Musk in the days that

13  followed. *See* Exhibits 80, 121. These documents make clear that no agreement was reached but

14  instead their meeting left off with an agreement by Musk to provide the Saudi PIF with additional

15  information concerning how, when, and for what price Musk wanted to take Tesla private.

16       Further to this, bfoth Egon Durban from Silver Lake and Dan Dees from Goldman Sachs

17  both testified that a mere indication of interest or availability of funds does ***not*** equal a written

18  commitment for secured funding. In pertinent part, Mr. Duban testified that "some form of

19  definitive agreement" is typically in place before the "a public announcement of a going-private

20  transaction is made" (1/27 Tr. at 1342:9-12), and that "typically, financing is arranged before a

21  definitive agreement is signed for a going-private." (*id*. at 1342:13-15). In fact, as Mr. Durban

22  explained, as of August 23, 2018, there still was not "any committed financing for any going-

23  private transaction." *Id*. at 1372:4-6. Importantly, Mr. Durban confirmed that "an interest is an

24  expression of interest. A commitment is a signed legal document committing you to wire money."

25  *Id*. at 1394:12-18. This stands in stark contrast to the term "funding secured."

26       Similarly, Mr. Dees testified that it was never "determined how many shareholders would

27  actually roll into a potential going-private transaction" (*id*. at 1410:16-19) and that, as of August

28  15, 2018, Mr. Dees was still "looking to obtain documentation confirming financing from those

1   investors" (*id*. at 1423:10-13) and they had not "collected any signed commitment documents

2   from any potential investor in a going-private transaction for Tesla" (*id*. at 1425:11-14). In fact,

3   Mr. Dees indicated that as of August 16, 2018, Goldman Sachs, along with Silver Lake, were still

4   "trying to develop a fully financed proposal." *Id*. at 1428:12-22. Mr. Dees thus confirms that there

5   is a difference between "funding being available and funding being committed." *Id*. at 1463:13-

6   20.

7          Mr. Viecha also demonstrates the material difference between what Musk said and the

8   true state of affairs that existed at the time. Mr. Sacconaghi from Bernstein Alliance asked Mr.

9   Viecha: "What does 'Financing secured' actually mean? Are you assuming Tesla will need 60

10  billion plus in financing, or assuming that many shareholders don't take the offer and Tesla needs

11  less? Big difference. 'Financing secured' implies the former." Mr. Viecha responded

12  unequivocally, "It means that financing is secured regardless of other assumptions." *Id*. at

13  1064:17-1066:14 (referring to Exhibit 151). As we know, Mr. Viecha's response was untrue;

14  financing was not secured regardless of other assumptions. To the contrary, there were many

15  assumptions in play relating to the financing, including the source, amount, and terms of the

16  investment.

17         "[A] statement is misleading if it would give a reasonable investor the 'impression of a

18  state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied

19  Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Comparing Mr. Sacconaghi's inquiry with

20  Viecha's response demonstrates the difference between what was represented ("Funding

21  secured") and what actually existed at the time (the Saudi PIF's possible interest in investing). By

22  industry standards, common knowledge, and practical usage, Musk's tweet was "materially" false

23  because funding was not committed.

24         **D.  There Is No Dispute that the "Funding Secured" Tweet Was Material.**

25         Arguably the strongest evidence of materiality comes from Plaintiff's expert, Michael

26  Hartzmark, Ph.D. He testified that both quantitative and qualitative evidence proves the "funding

27  secured" tweets were material. Dr. Hartzmark observed an "immediate[] . . . spike in volume"

28  and "spike in the price" on August 7, 2018. Rough Tr. at 8. The tweets also caused a decline and

1   rise in the price of Tesla's options. Rough Tr. at 10. Nasdaq also considered the tweets to be

2   material, given the fact that they halted trading on August 7. Rough Tr. at 14. Dr. Hartzmark also

3   testified that he performed a statistical study referred to as a "regression" and confirmed with 95%

4   certainty that Tesla's stock price moved in response to the tweets (and not from unrelated market

5   factors). Rough Tr. at 16. The materiality of the tweets also impacted stock options and

6   convertible notes. Rough Tr. at 18.

7        Qualitatively, Dr. Hartzmark confirmed without a doubt that the "funding secured" tweets

8   were material. Dr. Hartzmark relied on news reports, including CNBC (Exhibit 521), as well as

9   internal emails (Exhibit 337) and analyst reports and emails (Exhibits 15, 151). Rough Tr. at 19-

10   21. These materials focused on what Musk meant when he tweeted "funding secured" (*i.e.*,

11   whether an offer had been received or a written commitment had been given). Referring to the JP

12   Morgan report, in particular, Dr. Hartzmark explained that it was especially meaningful because

13   JP Morgan adjusted the bank's "price target" for Tesla, which required approval at senior levels.

14   Rough Tr. at 26.

15        Dr. Hartzmark clearly confirmed that "Based on all the information I've shown you from

16   analysts, internal documents, price factors, volume factors, implied volatility, the convertible

17   bonds all suggest that the tweets are material" and that "substantial qualitative evidence which

18   would suggest that the 'funding secured' is material to the market." Rough Tr. at 30. Dr.

19   Hartzmark also confirmed that this conclusion applied to the second tweet ("Investor support is

20   confirmed . . . ."), stating that the "qualitative information . . . suggests that it's information . . .

21   is important to the mix of information investors act[ed] on." Rough Tr. at 30.

22        This opinion has gone unrebutted. Thus, the jury has no evidence upon which it can

23   reasonably conclude the "funding secured" tweets were **not** material. Without any sufficient

24   adverse evidence on the issue, Plaintiff is entitled to judgment on the issue of materiality.

25   **E. Defendants Cannot Rebut the "Fraud-on-the-Market" Presumption for**
26   **Classwide Reliance.**

27        Where, as here, a plaintiff alleges fraud-on-the-market, reliance is established where: "(1)

28   the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded

1    in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations

2    were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, __

3    U.S. __, 134 S. Ct. 2398, 2413 (2014) ("Halliburton II"). As set forth below, there is no dispute

4    that the false statements in this case were publicly known, that Tesla's stock traded in an efficient

5    market, and that Plaintiff and members of the Class purchased Tesla stock and options between

6    August 7, 2018, when Musk tweeted the false statements, and August 16, 2018. Defendants have

7    provided no evidence, nor can they, demonstrating that the tweets in Exhibit 8 and Exhibit 13,

8    found as false by the Court, were immaterial.

9           The evidence set forth in Plaintiff's case demonstrates that reliance is clearly established.

10   First, the tweets here in Exhibit 8 and Exhibit 13 were undisputedly publicly known, and

11   Defendants cannot offer evidence to the contrary. Second Plaintiff has offered ample evidence

12   that Tesla stock was traded in an efficient market. The fundamental element for establishing

13   classwide reliance in a fraud-on-the market case is market efficiency. *See Erica P. John Fund,

14   Inc. v. Halliburton Co.*, 563 U.S. 804, 813, 131 S. Ct. 2179, 2186 (2011) (observing that *Basic*'s

15   "fundamental premise" is "that an investor presumptively relies on a misrepresentation so long as

16   it was reflected in the market price at the time of his transaction"); Ninth Circuit Manual of Model

17   Civil Jury Instructions, No. 18.7 Securities – Justifiable Reliance – Fraud-on-the-Market Case.

18   Dr. Hartzmark testified that through his analysis of Tesla stock and stock options, he found that

19   "the common stock and stock options of Tesla traded in open, well developed, and efficient

20   markets." 1/31 Tr. at 1649:1-5. Dr. Hartzmark further found, related to notes, that "at least for the

21   price movements they were consistent with what you would expect in an efficient market." *Id.* at

22   1649:6-8. Defendants have made no effort to challenge Dr. Hartzmark's finding of market

23   efficiency.

24          Third, there is no dispute that Plaintiff purchased Tesla options between August 7, 2018,

25   when Musk tweeted the false statements, and August 16, 2018. More importantly, because this is

26   a certified class action, there is also no dispute that class members purchased stock between the

27   time of the false statements and the final disclosure of the truth. By its very definition, only

28

1  investors who purchased Tesla stock and/or options during the Class Period can be members of

2  the Class. ECF No. 298. Finally, the false tweets were material as detailed above.

3        While the presumption of class-wide reliance in a fraud-on-the-market case is rebuttable,

4  to rebut the presumption, Defendants must put forth "evidence that an alleged misrepresentation

5  did not actually affect the market price of the stock." *Halliburton II*, 134 S. Ct. at 2417; *see also*

6  *In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920-EJD, 2016 U.S. Dist. LEXIS 178148, at

7  *37-38 (N.D. Cal. Dec. 22, 2016) ("Defendants bear both the burden of production and the burden

8  of persuasion on the issue of price impact."); *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-

9  cv-00226 YGR, 2016 U.S. Dist. LEXIS 34150, at *20-21 (N.D. Cal. Mar. 16, 2016) (finding that

10  "the burden to show no price impact" rests "on [d]efendants"). Defendants have not even

11  attempted to meet this burden.[2]

12  **V.  CONCLUSION**

13        For the foregoing reasons, Plaintiff respectfully requests judgment pursuant to Rule 50(a)

14  on the issues of materiality and reliance.

15  Dated: February 1, 2023           Respectfully submitted,

16

17                     **LEVI & KORSINSKY, LLP**

18                     *s/ Adam M. Apton*

19                     Adam M. Apton (SBN 316506)
                   Adam C. McCall (SBN 302130)

20                     75 Broadway, Suite 202
                   San Francisco, CA 94111

21                     Tel.: (415) 373-1671
                   Email: aapton@zlk.com

22                     Email: amccall@zlk.com

23                     -and-

24

_____

25  [2] Plaintiff also seeks judgment on the issue of individual reliance. Both Lead Plaintiff Glen Littleton and Tim Fries testified that they relied on the "funding secured" tweet. *See* 1/18 Tr. at

26  362:9-13; 1/20 Tr. at 507:20-509:18. This testimony supports granting judgment on the issue of reliance under a direct theory of reliance. *See* In re Atossa Genetics Inc. Sec. Litig., 868 F.3d 784,

27  795 (9th Cir. 2017) ("Most directly, Plaintiffs can allege that they were aware of, and specifically relied on, Quay's false statements when deciding to purchase or sell Atossa shares.").

28

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: etripodi@zlk.com
Email: akrot@zlk.com
(admitted *pro hac vice*)

-and-

Joseph Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Email: jlevi@zlk.com
Email: ek@zlk.com
(admitted *pro hac vice*)

*Attorneys for Plaintiff and Counsel for the Class*