UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA INC. SECURITIES LITIGATION | Case No. 18-cv-04865-EMC <br><br> **ORDER DENYING DEFENDANTS' MOTION TO TRANSFER VENUE OR CONTINUE TRIAL, AND GRANTING DEFENDANTS' ADMINISTRATIVE MOTION TO SEAL** <br><br> Docket Nos. 537, 561 |

## I.    INTRODUCTION

Plaintiff Glen Littleton filed a securities class action against Defendants Tesla, Inc.; Elon Musk (Tesla's CEO and former Chairman); and Tesla's Board of Directors based on two tweets made by Mr. Musk in August 2018 about taking Tesla from a public to a private company.  After almost four and a half years of litigation, the case is now in trial.

Eleven days before the jury was set to be selected—but four days before receiving the juror questionnaire responses—Defendants moved to transfer venue or to continue the trial under the theory that local media outlets had released so many biased and negative stories about Mr. Musk that there was a presumption of juror prejudice.  After expediting briefing and hearing argument, the Court orally denied Defendants' motion.  This order memorializes the Court's ruling.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This case has been pending before the Court in the Northern District of California since August of 2018.  *See* Docket No. 1 (Complaint).  On April 18, 2022, the Court set trial to begin on January 17, 2023.  *See* Docket No. 410.

For purposes of the present motion, Defendants claim that two purportedly key events

occurred in October 2022. First, the local press began publishing an increasingly high number of stories regarding Mr. Musk as Mr. Musk's anticipated purchase of Twitter neared completion. *See* Docket No. 537 (Defendants' Motion to Transfer Venue, or "Mot.") at 2. For instance, since October 2022, the *San Francisco Chronicle* has published 121 stories which mention Mr. Musk. *Id.* at 4. Some of this coverage is negative, and some of it discusses Mr. Musk's use of Twitter. *Id.* Second, from late October to the present, Twitter (which is now owned by Mr. Musk) laid off a little under 1,000 employees from Northern California. *Id.* at 6. These layoffs resulted in protests, picketing, and news stories reporting that Mr. Musk failed to comply with federal law in terminating employees without proper notice. *Id.* at 5–6.

On January 6, 2022, Defendants moved to transfer venue or to continue the trial under 28 U.S.C. § 1404(a), claiming that the Northern District of California had been "saturated with prejudicial and inflammatory publicity" regarding Mr. Musk that was so severe that it gave rise to a presumption that a jury impaneled in that forum could not be impartial. *See* Mot. at 1. Defendants also moved to expedite the briefing schedule and hearing. *See* Docket No. 538. The Court granted the motion to expedite: Plaintiff's opposition was filed on January 11, 2022, Docket No. 550; Defendants' reply[1] was filed on January 12, 2022, Docket No. 558; and the Court heard oral argument on January 13, 2022. *See* Docket No. 584 (January 13, 2023 Transcript of Proceedings).

### III. LEGAL STANDARD

"A district judge has broad discretion in ruling on a motion for change in venue." *United States v. Rewald*, 889 F.2d 836, 863 (9th Cir. 1989) (citation omitted). A defendant must establish either actual or presumed prejudice to warrant a change in venue. *Daniels v. Woodford*, 428 F.3d

---

[1] Defendants moved to seal the portions of Defendants' reply brief which quote juror questionnaire responses and the responses themselves, which are attached as exhibits to the reply brief. *See* Docket No. 561 (Defendants' Administrative Motion to Seal) at 1. Courts in this district have recognized that juror privacy and the need to ensure a fair and impartial trial are compelling reasons that justify sealing juror questionnaire responses. *See, e.g.*, *United States v. Holmes*, 572 F. Supp. 3d 831, 834 (N.D. Cal. 2021) (denying media outlets' motion to unseal juror questionnaires); *United States v. Bonds*, No. 07-cv-00732-SI, 2011 WL 902207, at *6 (N.D. Cal. Mar. 14, 2011) (maintaining juror questionnaires under seal prior to voir dire). Defendants' administrative motion to seal is hereby **GRANTED.**

2

1181, 1211 (9th Cir. 2005) (citing *Harris v. Pulley*, 885 F.3d 1354, 1360 (9th Cir. 1988)). Prejudice is presumed only in extreme instances "when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.* (citing *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998)); *see also Harris*, 885 F.3d at 1361.

In the context of criminal cases, the Ninth Circuit has articulated three factors to consider when determining presumed prejudice: "(1) whether there was a barrage of inflammatory publicity immediately prior to trial, amounting to a huge wave of public passion; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial." *Daniels*, 428 F.3d at 1211 (citations and internal quotations omitted). Further, it is within the trial judge's discretion "whether a change of venue is compelled by pervasive prejudicial publicity." *Wash. Pub. Utilities Grp. v. U.S. Dist. Court*, 843 F.2d 319, 324 (9th Cir. 1987).

## IV. DISCUSSION

Defendants argue that the interests of justice require transfer because the flood of "excessive and adverse pretrial publicity" concerning Mr. Musk, when coupled with the recent layoffs at Twitter, show that prejudice may be presumed. Mot. at 7. Defendants are wrong.

A.   The Pretrial Publicity Does Not Establish A Presumption of Prejudice

Defendants have not shown that the pretrial publicity gives rise to a presumption of prejudice. First, while there has been significant press attention devoted to Mr. Musk over the past year, the vast majority of this coverage has involved issues which have no bearing upon the present matter. *See* Mot. at 3–4 (describing articles which focus on Mr. Musk's personal life in addition to his businesses); *see also, e.g.*, Ex. G (article regarding Mr. Musk's tweet about the size of his calves). Defendants do not rebut Plaintiff's assertion that "out of the hundreds of articles reviewed by Defendants, only one even references Musk's 'funding secured' tweet." Opp. at 6–7. Defendants have thus not shown that the "community where the trial [will be] held was saturated with prejudicial and inflammatory media publicity *about the crime* [or, here, about the alleged

3

1  wrongdoing]." *Daniels*, 428 F.3d at 1211 (internal quotation omitted) (emphasis added).

2  Second, Defendants gloss over the factual nature of the press coverage. Courts have found
3  that even substantial pretrial publicity regarding the crime itself is insufficient to create a
4  presumption of prejudice where the newspaper coverage was largely factual and neutral in nature.
5  *See United States v. Dischner*, 974 F.2d 1502, 1524 (9th Cir. 1992) (citing and collecting
6  authorities); *see also Oliver v. City & Cnty. of San Francisco*, No. 07-cv-2460-JL, 2009 WL
7  10736493, at *2 (N.D. Cal. Mar. 25, 2009) (noting that "[m]erely unfavorable publicity, in itself,
8  however, is insufficient to compel a finding that the defendants were denied an impartial jury")
9  (internal quotation marks and citation omitted); *United States v. Fuhrer*, No. 19-cr-00026, 2021
10 WL 236308, at *3 (D. Alaska Jan. 22, 2021) (finding no prejudice where "the majority of articles
11 Naughton cites to as evidence of prejudice do not appear to be hyperbolic or inflammatory").
12 Based on the article excerpts provided to the Court, the vast majority of the press coverage
13 regarding Mr. Musk appears to be primarily factual. And although Defendants emphasize the
14 "negative" press concerning Mr. Musk's recent management of Twitter, Defendants do not
15 contend that any of these articles are factually inaccurate.

16 Additionally, the considerable populace, geographic spread, and overall diversity of the
17 Northern District of California make it difficult for the Court to countenance Defendants' theory
18 of prejudice. "[W]hen the trial has been set in a large urban area, publicity has presented less
19 significant problems." *Columbia Broad. Sys., Inc. v. U.S. Dist. Court for Cent. Dist. Of*
20 *California*, 729 F.2d 1174, 1181–82 (9th Cir. 1984) (finding that in "[a]lmost all the cases in
21 which the Supreme Court has found that press coverage deprived the defendant of a fair trial have
22 been tried in small rural communities"). The Supreme Court has recognized that any potential for
23 prejudice from pre-trial publicity is mitigated by the size of a large potential jury pool. *See*
24 *Skilling v. United States*, 561 U.S. 358, 382 (2010) (noting that the "large, diverse pool of
25 potential jurors" in Houston made it "hard to sustain" Defendants' theory that pretrial publicity
26 created a presumption of prejudice). Plaintiff cites statistics showing that the Northern District of
27 California is one of the largest and most diverse populations in the country. Opp. at 8. This case
28 thus presents a far cry from *Rideau v. Louisiana*, for instance, where the Supreme Court found that

1  there was a presumption of prejudice where the defendant's videotaped confession was broadcast
2  three times to a community which consisted of 150,000 residents. *See* 373 U.S. 723, 724 (1963).
3  Moreover, as discussed below, examination of the actual pool of prospective jurors drawn in this
4  case belie the asserted presumption.
5        In sum, Defendants have not shown that the pretrial publicity gives rise to a presumption
6  of prejudice.

### B. The Layoffs At Twitter Do Not Establish A Presumption of Prejudice

8        Defendants' second argument fares no better. Because Twitter (under Mr. Musk's
9  management) laid off approximately 1,000 employees over the last three months, Defendants
10 theorize that "a substantial portion of the jury pool in this District is likely to hold a personal and
11 material bias against Mr. Musk" as "individual prospective jurors—or their friends and relatives—
12 may have been personally impacted." Mot. at 8. But this argument again ignores the size and
13 diversity of this District. In a District of "well over five million people," *see* Opp. at 8, it is
14 difficult for this Court to accept the premise that the layoffs of 1,000 individuals—even
15 accounting for the ripple effects that Defendants articulate—would bias the jury pool. And
16 indeed, as discussed below, this premise is disproven by the jury questionnaire responses, which
17 revealed that none of the potential jurors worked for Twitter and only two or three individuals
18 knew someone who worked for Twitter.

### C. The Jury Questionnaire Responses Show That Transfer Is Not Warranted

20       The jury questionnaire responses in this case are the best evidence of the ability of
21 Defendants to get a fair trial. The Court summoned an enlarged pool of prospective jurors in the
22 case—200 individuals received jury summonses. Although Defendants contend that "nearly two-
23 thirds" of potential jurors who responded and answered questionnaires "hold a negative view of
24 Mr. Musk," *see* Reply at 1, 2, the Court disagrees. The 190 jury questionnaire responses reveal a
25 more nuanced picture: 27 were solely positive, 38 were neutral, 49 were mixed, and 76 were
26 negative. Defendants make much of the colorful responses submitted by certain potential jurors,
27 *see* Reply at 1–2, but Defendants ignore that 131 of 190 potential jurors responded that Elon Musk
28 and Tesla's involvement in the case would not prevent them from serving as a juror. And of the

1   61 potential jurors who indicated that they were available during the trial dates in question (about
2   130 asserted some kind of hardship), approximately 40 of them indicated that Elon Musk and
3   Tesla's involvement in the case would not prevent them from serving as a juror.
4   　　　　The Court took great pains throughout the jury selection process to accommodate
5   Defendants' concerns.  During the final pretrial conference on January 13, the Court and the
6   parties spent hours discussing the jury questionnaire responses in advance of in-court voir dire and
7   selected over 50 individuals to come in for voir dire who appeared most qualified (in terms of
8   availability and views).  *See* Docket No. 624 (January 13, 2023 Min. Entry) at 2.  The live voir
9   dire process itself, following review of the written questionnaires, lasted several hours.  At
10  Defendants' counsel's request, certain prospective jurors were voir dired separately, outside the
11  presence of other jurors, so as to avoid any risk of tainting the jury pool.  *See id.* (describing
12  proposed voir dire process).  The Court has diligently sought to ensure that each of the selected
13  jurors will be fair and unbiased.  The Court seated nine jurors (after excuse of peremptory
14  challenges) who met that qualification.
15  　　　　The takeaway here is that a significant number of individuals—almost five times the
16  number needed—indicated that they were available to serve as jurors and that they could be fair.
17  Simply put, as the Court explained in its oral ruling, the proof is in the pudding.  Defendants'
18  motion to transfer venue based on a presumption of prejudice fails is denied.[2]  And for the same
19  reasons, a continuance is not warranted, either.
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///

---

[2] Because the Court finds that the interest of justice does not warrant a change of venue, the Court does not discuss the traditional venue transfer factors considered under 28 U.S.C. § 1404(a).

### V. CONCLUSION

For the foregoing reasons, Defendants' motion to transfer venue or continue the trial is **DENIED**.

This order disposes of Docket Nos. 537 and 561.

**IT IS SO ORDERED**.

Dated: February 1, 2023

_____
EDWARD M. CHEN
United States District Judge