# In re Tesla Inc. Securities Litigation

Guhan Subramanian
Joseph Flom Professor of Law & Business, Harvard Law School
Douglas Weaver Professor of Business Law, Harvard Business School
Faculty Chair, Harvard Law School Program on Negotiation (www.pon.harvard.edu)

# Guhan Subramanian: Qualifications

Have taught continuously at HBS and/or HLS since 1999.  First person in Harvard history to hold tenured appointments at both schools.  Author of numerous articles about corporate deals, as well as two corporate law casebooks.

Representative Publication: Deal Process Design in Management Buyouts, Harvard Law Review (2016).  Selected by scholars as one of the "top ten" articles in corporate/securities law, out of 565 articles published that year.

Vice Chancellor Glasscock (2018): "Professor Guhan Subramanian is a recognized expert in corporate affairs . . . and has been recognized by this Court as helpful on many occasions."

Chancellor McCormick (2021): Subramanian's "published work concerning policy questions of corporate law fill the footnotes of many decisions of Delaware courts."

Chairman of the Board at LKQ Corp., a Fortune 500 company in the automotive sector.

Regularly advise boards of directors and management teams on issues of corporate governance and corporate deals.

Testified numerous times by deposition and ~15 times at trial or arbitration hearing.

# Typical Deal Process in Management Buyouts

**Initiation**

In a typical MBO, management will consult internally and with outside advisors and only then privately bring a proposal to the chairperson or lead director of the board.

**Response**

The company will form a special committee of independent directors that will retain its own advisors, consider the proposal, and negotiate with management over the key deal terms, including price.

**Public Disclosure**

The special committee will typically control the public disclosure of the MBO offer. The special committee may disclose the initial offer, or it might wait until the parties have reached agreement before making any public disclosure.

**Shareholder Engagement**

Significant shareholders may offer unsolicited inbound opinions. If the special committee instead discloses only the final deal, shareholders will still get to express their views about the offer through the shareholder vote process.

**Deal Negotiation**

The special committee will negotiate with management over the terms of the offer, most importantly price and whether a vote of the disinterested shares is needed to approve the deal. In that negotiation, the special committee will always negotiate management's first offer, and, as a result, the price is almost always different from the first offer.

# The Musk Proposal

- The Musk Proposal was an extreme outlier compared to all other MBO transactions announced since 2010 in both its terms and contemplated structure.

- The Musk Proposal was incoherent, incomplete, highly preliminary, illusory, or some combination of these things.

- No other similar transaction has been disclosed at such an incomplete and preliminary stage.

# Dell Buyout

| Deal Process Feature | Dell |
|---|---|
| Time from Initial Contact with Shareholders to Board Contact | 60 days |
| Consultation With Advisors Before Presentation to Board | Yes |
| Deadline on Offer | No |
| Expectation of Negotiation With Special Committee | Yes |
| Initiation of Discussions with Shareholders During Special Committee Negotiation Process | No |
| Time from Board Presentation to Public Disclosure | 151 days |
| Special Committee Controls Disclosures | Yes |

# Comparison: Dell vs. Tesla

| Deal Process Feature | Dell | Tesla |
|---|:---:|:---:|
| Time from Initial Contact with Shareholders to Board Contact | 60 days | 2 days |
| Consultation With Advisors Before Presentation to Board | Yes | No |
| Deadline on Offer | No | Yes (30 days) |
| Expectation of Negotiation With Special Committee | Yes | No |
| Initiation of Discussions with Shareholders During Special Committee Negotiation Process | No | Yes |
| Time from Board Presentation to Public Disclosure | 151 days | 5 days |
| Special Committee Controls Disclosures | Yes | No |

# Typical Deal Process in Management Buyouts

## Initiation

In a typical MBO, management will come into a company and with outside advisors and counsel privately bring a proposal to the chairperson or lead director of the board.

## Response

The company will form a special committee of independent directors that will retain its own advisors, consider the proposal, and negotiate with management over the key deal terms, including price.

## Public Disclosure

The special committee will typically control the public disclosure of the MBO offer. The special committee might disclose the initial offer, or it might wait until the parties have reached agreement before making any public disclosure.

## Shareholder Engagement

Significant shareholders may offer unsolicited views and opinions. The special committee will and discloses only the final deal, shareholders will still get to express their views about the offer through the shareholder vote process.

## Deal Negotiation

The special committee will negotiate with management on the terms of the offer, most importantly price and whether a vote of the disinterested shares is needed to approve the deal. In that negotiation, the special committee will always negotiate management's first offer, and, as a result, the price is almost always different from the first offer.

# Opinion #1: The Musk Proposal Was Incoherent, Incomplete, Highly Preliminary, Illusory, or Some Combination of These Things

Unlike every deal in the MBO Sample, Mr. Musk did not consult with financial or legal advisors before making his offer.

Mr. Musk then unilaterally announced his offer, rather than leaving it to the Special Committee to determine the timing of disclosures.

The proposal itself was substantively flawed in numerous ways: the $420 price came from an alleged "standard" 20% premium in MBOs, when in fact no such standard premium exists.

Mr. Musk wanted to take this $420 offer directly to a shareholder vote, rather subjecting it to the normal process of a special committee negotiation; and his offer expired in 30 days, even though not a single deal in the MBO Sample was taken to a shareholder vote (or even approved by the special committee) in such a short timeframe.

# Opinion #2: Permitting Mr. Musk's Twitter Feed Was Egregious Corporate Governance

Board witnessed Musk's usage of Twitter before August 2018 and chose to take no action, implement supervision, or enact disclosure policies.

After false tweets on August 7, 2018, Board continued to take no action while investors, analysts, and market searched for further information and clarity.

Allowing Musk to tweet with unfettered oversight while on notice of his conduct represented an unprecedented and egregious corporate governance failure.

# Assessment of Musk MBO Proposal

**1** Permitting Musk's Twitter feed was egregious corporate governance

**2** Musk did not consult with financial or legal advisors

**3** Musk's unilateral announcement was highly unusual

**4** Musk's proposal was substantively flawed

# Tweets: No Defense, No Explanation, No Rationale

| | |
|---|---|
| Musk's reasons for wanting to take Tesla private do not justify his actions. If academic literature is at all relevant to his decision-making process, then he would not have tweeted "Funding Secured" or "Investor support is confirmed . . . ." |  |
| No basis to believe that the Saudi PIF would have funded the transaction had it moved forward. |  |
| Historical data demonstrates that there is no such thing as a 20% standard premium in going-private transactions. |  |

# Permitting Musk's Twitter Feed Was Egregious Corporate Governance

  Tesla Board approved Mr. Musk's Twitter feed as a formal means of communicating "additional information" about the company. But the company – and not the CEO – should control public disclosures on behalf of the company.

 Mr. Gracias and other members of management appeared to take a hands-off approach, allowing Mr. Musk to "Tweet about whatever he wants" because "[i]t's his account."

 Ms. Denholm: Tesla maintained an "overall policy around disclosures" and the "management team were responsible to adhere to that policy", though at the time "there wasn't a specific Twitter policy" in place.

 No evidence in the record that anyone reviewed Mr. Musk's "funding secured" tweet before Mr. Musk published it.

 The fact that it took six days after the initial tweet for any further substantive information to be disclosed by either Tesla or Mr. Musk about this major, transformative transaction is stunning and egregious.

# Musk Did Not Consult With Legal or Financial Advisors



Mr. Musk spent extraordinarily little time between his initial consultation with his purported buyout partner (PIF) and his public disclosure of the offer.



Mr. Musk discussed the buyout possibility with PIF on July 31, 2018, and made his public disclosure of his $420 per share offer one week later, on August 7th.   Mr. Musk took one week from initial discussion to public disclosure compared to Mr. Dell who took *seven months* (even though a Tesla MBO would have been ~4 times larger than the Dell MBO).



Mr. Musk did not consult with financial or legal advisors before making his $420 offer. Instead, he engaged Silver Lake Partners and Goldman Sachs after the announcement.



Mr. Musk did not meaningfully engage with bankers or lawyers at any point during the process, and certainly not before public disclosure occurred via the "funding secured" Tweet on August 7th. This lack of input from financial and legal advisors is unprecedented.

# Musk's Unilateral Announcement of the Offer Was Highly Unusual



Mr. Musk's announcement acknowledged that his proposal came at a challenging time for the company. The risk is that Mr. Musk timed the announcement of his MBO proposal to serve his own interests rather than the interests of the company.



Use of Twitter in this instance led to disclosures that were haphazard, incomplete, and confusing. Beyond "funding secured," no details were provided about the source or amount of financing for the going-private transaction.



Mr. Musk claimed that he made the unilateral disclosure in order to discuss the proposal with significant shareholders, but he could not provide material non-public information to these shareholders (i.e., the "gives") in order for them to be able to meaningfully assess the "gets".

# Musk's Proposal Was Substantively Flawed

 Mr. Musk applied an allegedly "standard" 20% premium to the prevailing market price to arrive at his $420 per share offer, but the data indicates that there is no "standard" premium.

 Mr. Musk's tweets suggest that he wanted to make a first-and-final offer, skip over the special committee approval process, and proceed directly to a shareholder vote, all in 30 days or less.

 All of this is unprecedented.

# Musk: Incoherent, Incomplete and Illusory Offer



Ex. 0081

Sent:      8/2/2018 3:26:59 PM

Subject: Offer to Take Tesla Private at $420

…Unless another bidder comes forward with a better offer, I would ask that this matter be put to a shareholder vote at the earliest opportunity. This offer expires in 30 days.

# Conventional Disclosure of Prior Transactional Experience

| Target | Announcement Date | Transaction Value ($MM) |
|---|---|---|
| Riviera Tool LLC | May 2015 | (undisclosed) |
| SolarCity Corp. | Jun 2016 | $5,441 |
| Grohmann Engineering GmbH | Nov 2016 | $110 |
| Perbix Machine Co., Inc. | Nov 2017 | $11 |

# False Statement #1: "Funding Secured"



Ex. 0008

# False Statement #2: "Investor Support Is Confirmed…"



Ex. 0013

# Additional Tweet



Ex. 0009



# Additional Tweet



Ex. 0010



**Elon Musk** @elonmusk

Replying to @Gfilche

My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX investment.

11:00 AM - 7 Aug 2018

**526** Retweets **3,302** Likes

# Additional Tweet



Ex. 0011