Volume 9

Pages 1768 - 1969

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES      )
LITIGATION.                       ) No. 18-cv-04865-EMC
_____    )
                                  ) San Francisco, California
                                  Wednesday, February 1, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:
                        LEVI & KORSINSKY, LLP
                        1101 30th Street NW
                        Suite 115
                        Washington, D.C.  20007
                  BY:   **NICHOLAS IAN PORRITT, ESQ.**
                        **ELIZABETH K. TRIPODI, ESQ.**
                        **ALEXANDER A. KROT, III, ESQ.**


                        LEVI & KORSINSKY LLP
                        75 Broadway
                        Suite 202
                        San Francisco, California  94111
                  BY:   **ADAM M. APTON, ESQ.**
                        **ADAM C. MCCALL, ESQ.**


                        LEVI & KORSINSKY LLP
                        55 Broadway
                        10th Floor
                        New York, New York  10016
                  BY:   **MAX EDWARD WEISS, ESQ.**
                        **KATHY AMES VALDIVIESO, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              **DEBRA L. PAS, CSR 11916, CRR, RMR, RPR**
              Official Reporters, U.S. District Court

     (Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants:

      QUINN EMANUEL URQUHART & SULLIVAN, LLP
      51 Madison Avenue
      22nd Floor
      New York, New York  10010
    BY: **ALEXANDER B. SPIRO, ESQ.**
      **ANDREW JOHN ROSSMAN, ESQ.**
      **PHILLIP B. JOBE, ESQ.**
      **ELLYDE R. THOMPSON, ESQ.**
      **JESSE A. BERNSTEIN, ESQ.**

      QUINN EMANUEL URQUHART & SULLIVAN, LLP
      865 South Figueroa Street
      10th Floor
      Los Angeles, California  90017
    BY: **MICHAEL T. LIFRAK, ESQ.**
      **ANTHONY P. ALDEN, ESQ.**
      **MATTHEW ALEXANDER BERGJANS, ESQ.**
      **WILLIAM C. PRICE, ESQ.**

      QUINN EMANUEL URQUHART & SULLIVAN, LLP
      555 Twin Dolphin Drive
      Fifth Floor
      Redwood Shores, California  94065
    BY: **KYLE K. BATTER, ESQ.**

 1  **Wednesday, February 1, 2023**                          **8:12 a.m.**

 2                     P R O C E E D I N G S

 3       (The following proceedings were held outside of the

 4  presence of the Jury)

 5            **THE COURTROOM DEPUTY:**  All rise.  Court is now in

 6  session, the Honorable Edward M. Chen is presiding.

 7            **THE COURT:**  Good morning, everyone.  Have a seat.

 8            **THE COURTROOM DEPUTY:**  Court is calling the case In

 9  Regarding Tesla, Inc. Securities Litigation, Case No. 18-4865.

10  Counsel, please state your appearances for the record,

11  beginning with the plaintiffs.

12            **MR. PORRITT:**  Good morning, Your Honor.  Nicholas

13  Porritt on behalf of Levi & Korsinsky, the plaintiff and the

14  class.

15            **THE COURT:**  Good morning.

16            **MR. PORRITT:**  Good morning, Your Honor.

17            **THE COURT:**  Mr. Spiro.

18            **MR. SPIRO:**  Good morning, Your Honor.  Alex Spiro,

19  Quinn Emanuel, on behalf of the defendants.

20            **THE COURT:**  Good morning.  Okay, I have a number of

21  things I want to talk about.

22       With respect to the slides, I've determined that I'm not

23  going to admit those as evidence.  You know, case law's not

24  particularly clear, but I think the gist is that the problem

25  with the slides to be admitted is that these are conclusions of

1    an expert.  So they really are in the nature of a portion of an

2    expert report.

3        And because they kind of reach -- go to the ultimate

4    conclusion, they're not like an intermediary piece of evidence

5    like a log of phone calls or a log of cell tower locations, and

6    picking out the prime ones for someone to see, or a list of

7    employees or something like that.  This goes to an ultimate

8    question.  And so normally this is not the kind of thing that

9    goes in as a piece of evidence.

10       On the other hand, I fully appreciate that this is an

11   unusual situation because it's not just a simple verdict of

12   yes, no, and if the damages, is it "blank" amount.  There's a

13   complicated table.

14       So I am going to allow that demonstrative to be shown to

15   the jury, if they request.  And I intend -- and that's why I

16   sent out the proposed instruction last night, that takes the --

17   the usual instruction that:  You are not going to be given a

18   transcript, but adds to that that if they want to request a

19   readback -- so I'm not going to underscore any one thing, but a

20   general readback of testimony or a review of demonstrative

21   slide, they can ask the Court and the Court will decide.  So

22   they will know they have the option, and if they ask that, then

23   we'll decide how to handle it at that point.

24       **MR. SPIRO:**  Yeah.  Thank Your Honor.

25       So obviously we understand the Court's ruling that they

**PROCEEDINGS**

1  are demonstratives and not being entered into evidence.  As to

2  the Court's proposed slight change to the instruction, there

3  was sort of two things that just caught my eye and I want to

4  make sure that I'm understanding the Court correctly.

5       One was on transcripts.  And I don't think the Court would

6  use its discretion but I'm not so sure a court -- if they were

7  to say: I want to hear Guhan Subramanian's testimony regarding

8  his resume, if they were to request that, I don't know that any

9  judge has the discretion to say yes or no.  I just -- that

10  struck me as strange phraseology on there.

11       I've always been under the impression, although never have

12  seen -- never had cause to challenge it, that if a jury does

13  actually request, it's sort of understood that they're allowed

14  to get testimony readback.  So that caught my eye.

15       But I understood the instruction to basically mean --

16  which we're fine with -- if they said:  We would like to hear

17  testimony, we would like to see a demonstrative, they'd come

18  back in, they get to see it.  We understand that.  And if

19  that's the gravamen of what the Court is so saying, we

20  understand the Court's instruction.

21            **THE COURT:**  That's it.  And to meet your concern, you

22  know, there's a whole question.  The Ninth Circuit encourages

23  full readback of the entire -- you know, which I don't think

24  anybody does.  But, that suggests there's some discretion as to

25  how much to read, and maybe even if.  I know some of my

**PROCEEDINGS**

1  colleagues simply say no.

2      But, I could just simply delete the "may or may not grant"

3  and just say I will consider the request.  And just leave it

4  open.  Maybe that's a safer thing.

5          **MR. SPIRO:**  That's probably -- again, it just caught

6  my eye, Your Honor.

7          **THE COURT:**  All right.

8          **MR. PORRITT:**  We had no order as originally drafted of

9  the slide amendment, I'd be inclined -- I'd be inclined to stay

10  with the original language but I don't have an issue with

11  "consider," "may or may not."  I don't think there's much

12  difference in those.

13          **THE COURT:**  Okay.  I'm also going to remind the jury

14  at this point, because we've been using the term

15  "demonstrative," they may not know what we're talking about,

16  and see the distinction between exhibits and demonstratives.  I

17  think -- my plan, as we start our final day of testimony, is to

18  tell them in advance that things have been admitted into

19  evidence they will get to see, they'll get to bring that

20  back -- because I'm going to tell them that anyway, you know --

21  into the jury room.  But demonstratives do not.

22      I don't want them to be under the misimpression that these

23  demonstratives will go back with them.  They should know that

24  now.  So if they want to pay particular attention -- and I

25  assume you all are going to have some demonstratives during

1  your closings -- that, you know, they should know, that's not

2  -- they can't say:  Oh, I'm not going to worry about it, I'll

3  see it in the jury room.  Because there's no promise of that.

4       **MR. SPIRO:**  We defer to the Court's discretion on that

5  issue.

6       **THE COURT:**  Okay.

7       **MR. PORRITT:**  Just to be clear, of course, we're

8  maintaining our -- we did move those slides into evidence.

9       **THE COURT:**  Yes.

10       **MR. PORRITT:**  You're overruling our motion.  I just

11  want to make sure that is preserved for the record.

12       We're not --

13       **THE COURT:**  Yes.  It is preserved for the record.  So

14  I will sustain the objection, just to be clear for the record.

15       **MR. PORRITT:**  Very good.

16       **MR. SPIRO:**  The Court had other issues?

17       **THE COURT:**  Yes.  A couple other issues.

18       A ruling on the last series of evidentiary objections, I'm

19  going to get out an order momentarily.  I don't know if -- are

20  we going to reach Mr. Fischel this first session?

21       **MR. SPIRO:**  No, Your Honor.  In light of the Court's

22  admonition day one of the trial to not create extra work for

23  the Court -- and I do genuinely appreciate how hard the Court

24  and the Court staff has been working, I see it, it's clear to

25  me -- I don't think the Court should endeavor to go too much

**PROCEEDINGS**

 1  further than this morning, because we don't know exactly until

 2  plaintiff rests what we're going to do.

 3       **THE COURT:**  Okay.  Well, I just ask because otherwise

 4  I want to give you all my oral rulings now.  But it's ready to

 5  be filed.  You'll have it in short order.

 6       **MR. SPIRO:**  Thank you, Your Honor.

 7       **MR. PORRITT:**  Very good, Your Honor.

 8       **THE COURT:**  So on that front -- and I appreciate the

 9  parties' effort, although at the end of the day some of us are

10  still burning the midnight oil, concerning the number of

11  witnesses and the number of exhibits.

12       I have my rule that I impose, and I would admit some at

13  mid-trial or after trial began as a deterrent, ended up adding

14  -- I ended up not adding a lot of time in.  There were times,

15  especially that one day with the BART problem, we would have

16  been -- we probably would have added, you know, 30, 40 minutes.

17  But I didn't, since there was no -- they weren't here anyway.

18       At the end of the day, I think I added ten minutes a side.

19  And that was from the first two days.  And out of the mercy

20  rule, I'm going to rebate those ten minutes back to you all.

21  It was ten minutes a side, so it's fair.  And so there's no

22  due-process argument that I sprung this on you after I had

23  already sent the hour limitation.  And, knowing that we're

24  going to finish today with those ten minutes, we will finish

25  evidence today.  I have no doubt about that.  If it was going

1    to delay trial -- my main goal is to make sure we get it to the

2    jury when we said we would.

3        So whatever the hours were, which are now pretty short,

4    you can add ten minutes.  And Vicky will figure that out.

5                **MR. PORRITT:**  Thank you, Your Honor.  Appreciate it.

6                **THE COURT:**  Every minute counts.  That's it.

7                **MR. SPIRO:**  Your Honor, probably the only other thing

8    I should flag for the Court is, you know, we'll have an

9    application after plaintiff rests.  We could just -- if we're

10   at a natural point to continue, we could continue, I guess, and

11   preserve that.

12               **THE COURT:**  Uh-huh.

13               **MR. SPIRO:**  But we'll want to before -- at the first

14   available break, to at least briefly address it.  And when I

15   say "briefly," I mean briefly.

16               **THE COURT:**  Yeah.

17               **MR. SPIRO:**  Just so that the Court has it flagged for

18   it.

19               **THE COURT:**  Yeah.  And if we're not at a convenient

20   point, you can simply say that you make your motion, and I'll

21   say "We'll take it up later."  So at least you've timed your

22   motion, so it's --

23               **MR. SPIRO:**  Right.  The -- I tried to actually do that

24   yesterday, Your Honor.  And I apologize if, by elbowing my

25   colleague, I interrupted.  I had understood, just so the Court

PROCEEDINGS

1  understands, that before each expert witness, the Court was

2  going to give that instruction.  That's what I understood the

3  Court to say earlier on in the case.

4      So when I said that, or when I triggered my colleague to

5  say that, I did not intend to interrupt.  I just -- so perhaps,

6  given we're mid-testimony, maybe after the testimony.

7          THE COURT:  Okay.

8          MR. SPIRO:  The other issue with the expert that I

9  mentioned at the close yesterday, Your Honor, --

10         THE COURT:  Yeah.

11         MR. SPIRO:  -- was the volunteering in violation of

12  the Court's order of the information that he did.  I'm not

13  going to get into a whole song and dance about it.  I know what

14  I saw.  I know the Court saw what the Court saw.  And I think

15  anybody who sees into this knows what happened.

16      At this time, I'm not moving to strike his entire

17  testimony as a remedy, or move for mistrial.  But I do want to

18  put on the record that it was, again, obviously an intentional

19  attempt to infect the record with that.

20      And if he does that or anything like that again, I just

21  want the Court to know, I am going to move for a mistrial, and

22  I am going to move to strike his entire testimony, because

23  there's no other remedy that puts the genie back in the bottle.

24  So I do want to put plaintiff and the Court on notice of that.

25         THE COURT:  Well, what I intend to do is before we

**PROCEEDINGS**

 1  start -- actually, might need to do this without the jury -- I

 2  can admonish the witness not to make any other reference to

 3  court rulings, so he hears it from the Court.

 4      **MR. SPIRO:**  Understood, Your Honor.  I don't want to

 5  bring it back up in front of the jury.

 6      **THE COURT:**  Yeah.

 7      **MR. SPIRO:**  But, but, the Court can admonish.  I'm

 8  going to be watching, obviously.

 9      **THE COURT:**  Right.

10      **MR. PORRITT:**  And Your Honor, Mr. Spiro's making all

11  sorts of --

12      **THE COURT:**  I understand.

13      **MR. PORRITT:**  -- insinuations.  And there's no

14  evidence of that, whatsoever.  Even in their papers, they said:

15  Mr. Porritt did not deny that he instructed the witness to say

16  this, when I obviously did.  So, I mean, that is blatantly

17  misrepresenting the record.  The Court's seen --

18      **THE COURT:**  I've made no finding that there was any

19  such instruction or purposeful directive from counsel.  So I'm

20  not going to -- and I don't need to make any of those findings.

21  Because, you know, I think right now, as it stands, it's

22  happened, and I'm going to admonish the witness not to do it

23  again.

24      So I think we're going to --

25      **MR. PORRITT:**  And perhaps counsel for defense could

**PROCEEDINGS**

1  not present questions that suggest or require, perhaps, a full

2  response that would suggest a reference to those rulings.  So

3  that might be -- perhaps, you know -- perhaps defense counsel

4  can help themselves in that regard.

5          **THE COURT:**  There's lots of things that can be done.

6  Maybe, even though he may not have intended it, perhaps you

7  could have reminded him a third time not to say -- I mean,

8  there's enough blame to go around.  My goal is let's just keep

9  this record as clean as we can.  And I'm going to admonish him,

10  and hopefully he'll listen, because it will be very clear.

11  I'll make it very clear to him.  We should have him come in

12  before the jury does, because I'll want to see him anyway

13  before the jury comes in.  I'll tell him.

14      In terms of the expert opinion, you know, I didn't give it

15  again.  Is the request to give it at the end of his testimony?

16  Or --

17          **MR. SPIRO:**  I'll confer with my colleagues.  I'm just

18  explaining to the Court that's the reason that you heard that,

19  because I had understood the Court to say that earlier in the

20  case.  But, we are where we are.

21          **THE COURT:**  Okay.

22          **MR. SPIRO:**  So I'll confer with my colleagues and --

23          **THE COURT:**  All right.  Let's see.  Did we get the

24  stipulated facts for the jury instructions yet from you?

25          **MR. PORRITT:**  Um, I don't think we have any -- we've

PROCEEDINGS

1   been trying to -- there was a lot going on last evening, so I

2   don't know if we have made any progress towards adding any to

3   what was already in the pretrial brief.  I believe that's a

4   fair statement on the status --

5        **THE COURT:**  Should I use the pretrial brief, then, as

6   the stipulated facts that listed?

7        **MR. SPIRO:**  Before there's a -- before the Court comes

8   back from the first break, we will have a firm answer to the

9   Court.

10       **THE COURT:**  Okay.

11       **MR. SPIRO:**  Because we do think you will be able to at

12  least instruct on the law today.

13       **THE COURT:**  Okay.  Because I have gone through the

14  instructions.  There's that.  I don't think there's been

15  judicial notice of anything.  So I removed that one.

16    I'm going to add the thing about the jury can request

17  readback, and that's about it.  I'm leaving everything.

18    All your objections have already been made; they've been

19  ruled on.  So --

20       **MR. SPIRO:**  Understood.

21       **THE COURT:**  Ready to roll, if we get there today.

22       **MR. SPIRO:**  Right.  Of course, we'll have an

23  application at the end of the case -- at the end of their case.

24  That's a serious application.  But with that, understood, as

25  the Court stands right now.

PROCEEDINGS

1    **THE COURT:**  Okay.  And then I got your comments on the

2  verdict form which I just received, and haven't had a chance to

3  look at it.  You may have some comments.  But obviously that

4  won't have to be decided until Friday when I give the final

5  instructions.

6       You'll want to know before you go into closings -- I'll

7  have that for you -- my final ruling on the form of the

8  verdict, because you may want to use that in your closings.

9    **MR. PORRITT:**  Absolutely, Your Honor.

10    **THE COURT:**  So I'll have that, you know, some time

11  tomorrow or tonight or something, for you.

12    **MR. SPIRO:**  Thank you.

13    **MR. PORRITT:**  Very good, Your Honor.

14    **THE COURT:**  Okay.

15    **MR. PORRITT:**  Your Honor, there's still a pending

16  motion, our motion to admit eight exhibits from Dr. Hartzmark.

17  We're still waiting for defense's response.  We tried to get

18  that last night, and we didn't hear anything.

19    **THE COURT:**  That's the 338, 429, et cetera?

20    **MR. PORRITT:**  Exactly.  Yes, Your Honor.

21    **THE COURT:**  Okay.

22    **MR. ROSSMAN:**  Hi -- good morning, Your Honor.  Sorry.

23  Getting my mask off.

24       We have good news, which is that we -- in light of the

25  prior guidance Your Honor's given, we don't have objections to

1  any exhibit except with respect to Exhibit 570.  We request,

2  consistent with other redactions, that there be one paragraph

3  redacted, which I can hand to Mr. Porritt.

4       **THE COURT:**  Hand that to counsel.

5     (Document tendered)

6       **MR. ROSSMAN:**  The Court -- I think it will appreciate

7  there's hearsay 403 and legal conclusion consistent with how he

8  handled some of the other articles that have come in.

9       **MR. PORRITT:**  No objection, Your Honor, to that

10  redaction.

11       **THE COURT:**  All right.

12       **MR. ROSSMAN:**  We preserve our prior positions, but I

13  think that is consistent with the Court's --

14       **THE COURT:**  All right.  So all those will be admitted,

15  and 570 will have the redactions as indicated.

16       **MR. PORRITT:**  Yes.  Will defendants submit a --

17       **MR. ROSSMAN:**  Yes.

18     (Reporter clarification)

19       **MR. PORRITT:**  Defendants will submit a redacted form

20  of Exhibit 570 for the Court.

21       **THE COURT:**  All right.  So just for the record, 338,

22  429, 565, 572, 594, 721 and 763 are admitted.  570 will be

23  admitted subject to redaction.

24     I am sustaining the objection to the slides that were

25  tendered by the plaintiffs, 11, 12, 22, 24, 52, 55, 46, 47, and

PROCEEDINGS

 1   I think there has a Heston slide, No. 7.

 2           MR. PORRITT:  Correct, Your Honor.

 3           THE COURT:  And for the reasons stated, the

 4   objection's sustained.  But I'm going to give the instruction

 5   about access to demonstratives.

 6           MR. PORRITT:  Very good, Your Honor.  Thank you.

 7       (Trial Exhibits 338, 429, 565, 572, 594, 721 and 763

 8   received in evidence.  Trial Exhibit 570 received in evidence,

 9   subject to redaction)

10           THE COURT:  All right?  So before we bring the jury

11   in, maybe we can have the witness come back, and I can give him

12   the admonishment.

13           MR. PORRITT:  Okay.

14       (A pause in the proceedings)

15       (Professor Hartzmark re-takes the witness stand)

16           THE COURT:  Good morning, Mr. Hartzmark.

17           THE WITNESS:  Good morning, Your Honor.

18           THE COURT:  So before the jury comes in -- and I think

19   you've probably heard our discussion this morning.  I want to

20   make sure you understand that I've already ruled that the jury

21   is not to be told anything about my rulings in an explicit way.

22       For various reasons, at the end of the day, we're going to

23   instruct the jury that they should assume that the tweets in

24   question were not true, et cetera.  But we've avoided telling

25   the jury that "The Court found that," because of the concern

PROCEEDINGS

```
1   about some undue effect that might have.  And so yesterday when
2   you made a finding -- made a comment about "Judge Chen already
3   found this," that was in contravention of what we're trying to
4   do.
5       So all I'm going to ask you to do is don't make any
6   reference to "the Judge" or "the Court found," you know, in
7   your testimony today.
8           THE WITNESS:  Okay.  I'll do that.
9           THE COURT:  All right?
10          THE WITNESS:  Yes.
11          THE COURT:  Thank you.
12          THE WITNESS:  Thank you, Your Honor.
13          MR. PORRITT:  Thank Your Honor.
14          THE COURT:  All right, so why don't we check on the
15   jury and see if they're here.
16      (A pause in the proceedings)
17      (The following proceedings were held in the presence of
18   the Jury)
19          THE COURTROOM DEPUTY:  All rise for the jury.
20          THE COURT:  All right.  Have a seat, everyone.
21      Good morning, members of the jury, welcome back.  Thank
22   you again for your promptness and for your dedication.  We
23   really appreciate that.
24      So we are in the middle of Professor Hartzmark's
25   cross-examination.  And so that's where we are going to pick
```

1  up.

2      Before we do, let me explain one thing to you.  And that

3  is, we've referred to various things, and you have seen various

4  things that we are calling "demonstratives," slides and other

5  things, and you may perhaps in closing argument see what we

6  call "demonstratives."  That's different from exhibits.  Other

7  things you have seen are exhibits, and you have heard us -- you

8  have heard me either admit or deny various things.

9      What you will have -- and I will explain this to you in

10  the final instructions -- when you deliberate, you will have

11  the exhibits.  You'll have access to all the exhibits that have

12  been admitted.  You will not have access to demonstratives.  So

13  slides and things that are being shown to help you understand

14  the testimony, those are aids to help you understand, but they

15  are not exhibits.

16      I will also explain to you, when we get to that final

17  stage, your ability to request to see certain things other than

18  exhibits.

19      But I want to make sure that it's clear in your mind that

20  when something is an exhibit and we admit it, it is part of the

21  record, a formal part of the record, and you will have those in

22  the jury room to look at.  But things that I do not admit, you

23  will not have.  So, that's the terminology.  And I'll instruct

24  you more when we get to the final instructions.

25      So, thank you.

1    Mr. Rossman, you may proceed.

2         MR. ROSSMAN:  Thank you, Your Honor.

3    **MICHAEL HARTZMARK, PLAINTIFF'S WITNESS, RECALLED**

4    **CROSS-EXAMINATION, RESUMED**

5    **BY MR. ROSSMAN**

6    **Q**    Good morning, Professor.

7    **A**    Good morning, Mr. Rossman.

8    **Q**    I'm literally on a clock, so you will bear with me, and we

9    will move as quickly as we can for everyone's benefit.  And I'm

10   sure you appreciate that I can't possibly cover all of the

11   slides and data that you have talked about.

12        Now, am I right to assume, Professor, that since you left

13   the stand yesterday, you have not discussed this case with

14   anyone else?

15   **A**    Correct.

16   **Q**    Okay.  Not with plaintiff's counsel, not with any members

17   of your team supporting you?

18   **A**    I have not.

19   **Q**    The class definition, just a couple quick technical things

20   to ask you, and then I want to return to where we were

21   yesterday.

22        The definition of the class in this case, do you

23   understand, includes short sellers?

24   **A**    Um, that's my recollection.

25   **Q**    Okay.  And if you would, I want to show a couple slides.

1    One slide in particular that you testified about, Slide 24.

2    And this is on implied volatility.

3         MR. ROSSMAN:  If we can have that up for one second,

4    please?

5         (Document displayed)

6    BY MR. ROSSMAN

7    Q    Do you see that slide in front of you?

8    A    Yes.

9    Q    Am I right, Professor, that this information in this slide

10   comes from Professor Heston?

11   A    Yes.  Yes.  Um --

12   Q    That was my only question.  Thank you, sir.

13        Now, yesterday, if you will recall, one of the things we

14   were discussing was August 13th.  And in particular, the blog

15   post on August 13th that was published by Mr. Musk.  Do you

16   recall that?

17   A    Yes.

18   Q    And it's in evidence as Exhibit 53.  If we could put that

19   up, please.

20        (Document displayed)

21   Q    Okay.  And one of the issues, one of the claims in this

22   case relates to one of the August 7th tweets.

23        MR. ROSSMAN:  And if we could show that briefly,

24   Exhibit 13, in evidence.

25        (Document displayed)

**HARTZMARK - CROSS / ROSSMAN**

1   BY MR. ROSSMAN

2   Q    And the tweet is:

3            "Investor support is confirmed.  Only reason

4            why this is not certain is that it's

5            contingent on a shareholder vote."

6        You remember that, right?

7   A    Yes.

8   Q    So I want to compare that tweet to the August 13th blog

9   post for a moment.  Okay?  And if we could, if you turn to the

10  section "Next steps," which is on the second page of the blog

11  post.  Okay?

12       (Document displayed)

13  Q    What are the next steps?

14       Do you see that?

15  A    Yes, I see it.

16  Q    Okay.  And it indicates that Mr. Musk is going to continue

17  to talk with investors, and investigate a range of potential

18  structures and options.

19       Right?  That's what it says, sir.  Correct?

20  A    Um, yeah, he's going to continue to talk with investors,

21  and he's engaged advisers to investigate a range of potential

22  structures and options, correct.

23  Q    And the blog post also tells investors (As read):

24            "If and when a final proposal is presented,

25            an appropriate evaluation process will be

```
 1                    undertaken by a special committee of Tesla's
 2                    board..."
 3        Right?
 4   A    Yes.
 5   Q    Being set up.  And:
 6                    "If the board process results in an approved
 7                    plan, any required regulatory approvals will
 8                    need to be obtained..."
 9        Right?
10   A    Yes.
11   Q    And the plan will then be submitted to shareholders for a
12   vote.  Right?
13   A    Yes.
14   Q    So to the extent that investors interpreted that
15   August 7th tweet that you saw a moment ago which said only
16   reason why this isn't certain, to the extent that they
17   interpreted that literally to mean that the only step left was
18   a shareholder vote, Mr. Musk's August 13th blog post discloses
19   a number of additional steps that still need to happen.
20        Right?
21   A    Um, yes.  There are some steps here listed in this
22   paragraph.
23   Q    Yeah.  And nevertheless, the stock price went up on the
24   13th of August.  Correct, sir?
25   A    The stock price, um, on the 13th, I think, went up.
```

**HARTZMARK - CROSS / ROSSMAN**

1  Although it was not statistically significant, but it went up.

2  **Q**   So the disclosure of additional steps did not cause the

3  stock to go down, certainly.   Right?

4  **A**   I -- I believe the stock went up, yes.

5  **Q**   Very good.   Now, one of the things that you mentioned in

6  your testimony was the statement -- was related to the

7  statement "Investor support confirmed."

8      Remember that?

9  **A**   I would have discussed that, yes.

10  **Q**   And if we go back to the August 13th blog post, and just

11  above the heading "What are the next steps?"

12      (Document displayed)

13      **MR. ROSSMAN:**   Can we highlight that sentence just

14  above "What are the next steps?"

15      (Document displayed)

16  **BY MR. ROSSMAN**

17  **Q**   Blog post says -- and highlight the last sentence if you

18  could for me, please.

19      (Document highlighted)

20  **Q**   (As read)

21      "My best estimate right now is that

22      approximately two-thirds of shares owned by

23      all current investors would roll over into a

24      private Tesla."

25      Do you see that?

HARTZMARK - CROSS / ROSSMAN

1   **A**   Yes.

2   **Q**   And you had a comment on that in the direct examination

3   yesterday.  Right?

4   **A**   Say that again?

5   **Q**   You mentioned that in your testimony yesterday.  Right?

6   It was something that you observed in the blog post.  Right?

7   **A**   I thought there was a -- I thought there was another

8   sentence, but the -- it's suggestive that there is investor

9   support.

10  **Q**   Okay.  Are you aware that just one day before this blog

11  post, on August 12th, Mr. Musk received a presentation from

12  Goldman Sachs which estimated that approximately 60 percent of

13  Tesla shareholders would roll over into a private Tesla?

14          **MR. PORRITT:**  Objection.  That misstates the facts in

15  the record.

16          **THE WITNESS:**  Yeah.

17          **THE COURT:**  Sustained.

18  **BY MR. ROSSMAN**

19  **Q**   Have you seen Exhibit 254, that's in the record as

20  evidence?

21  **A**   I can't recall.

22  **Q**   Okay.  Are you aware of testimony that was given regarding

23  a presentation that Goldman Sachs gave?

24  **A**   No.

25  **Q**   Okay.  You're not in a position to opine one way or the

1   other about the truthfulness of this statement (Indicating),

2   are you, sir?

3   **A**   Truthfulness of what statement?

4   **Q**   Of this statement that's highlighted in the exhibit before

5   you.  The August 13th blog post.  You have no basis to opine on

6   whether or not that's true, correct?

7   **A**   I am not opining as to whether it's true or false.

8   **Q**   We'll leave that to the jury to sort that evidence.  Agree

9   with me on that, sir?

10  **A**   Yes.

11  **Q**   Very good.  But you didn't -- in your testimony in

12  response to plaintiff's counsel's questions, you didn't tell

13  the jury anything about the Goldman presentation or Goldman

14  testimony in this trial, right?

15  **A**   I was focusing on public documents.

16  **Q**   Very good.

17  **Q**   We've previously talked about the period from August 7th

18  to August 13th.  Okay?  I now want to focus your attention on

19  August 14th, after the blog post.  Follow me?

20  **A**   Yes.

21  **Q**   In your direct testimony, sir, you said that there was an

22  absence of information on August 14th that was weighing on the

23  market.  Do you recall that?

24  **A**   Yes.

25  **Q**   Okay.  But that's not what you said in your report.  In

**HARTZMARK - CROSS / ROSSMAN**

1   your report, you opined that the stock price declined to close

2   on $347.64 on reports questioning the accuracy of Musk's latest

3   tweets on hiring advisors, Goldman Sachs and Silver Lake.

4        That's what you said in your report, Paragraph 109.  Isn't

5   that right, sir?

6   **A**   Yes.  It's clear that there was, as I said, confusion in

7   the market.  My recollection was that there were -- whatever

8   the truth was, which again we'll leave to the jury, there were

9   different interpretations of the relationship with Silver Lake

10  and Goldman Sachs.  There were rumors that they had been hired;

11  there were rumors that they had not been hired.

12       Again, my focus was what was being rumored and speculated

13  about in the public market.

14            **MR. ROSSMAN:**  Exhibit 361, please.

15       (Document displayed)

16  **BY MR. ROSSMAN**

17  **Q**   Okay.  This is the tweet that you are referring to in your

18  report:

19            "I'm excited to work with Silver Lake and

20            Goldman Sachs as financial advisors..."

21       Right?

22  **A**   Yes.  This was the tweet.  And then there was -- my

23  recollection is that there was, again, rumor and innuendo in

24  the markets.

25  **Q**   Now, at the time that you prepared your report, Professor,

1   you assumed that this tweet (Indicating) was a misstatement.

2   Right?

3   **A**    I can't recall.

4   **Q**    You assumed that it was an alleged misstatement.  I can

5   refer you, Professor, to your deposition testimony transcript,

6   if you have it in the witness box.  Let me know if you need a

7   little assistance.

8   **A**    Is it --

9   **Q**    Your March, 2022.  And the transcript, Page 215, starting

10  at Line 19 through -- I'm sorry.

11  **A**    Page 215?

12  **Q**    Give me one second.  I think that should be 215, starting

13  at Line 19.  Let me make sure that page number is right.  There

14  seems to be a typo.

15          **MR. ROSSMAN:**  And I'm going to just offer this to

16  refresh, for the moment, Your Honor.

17          **THE COURT:**  All right.  So you can direct the witness

18  what parts to read to himself.

19          **MR. ROSSMAN:**  Yeah.

20  **BY MR. ROSSMAN**

21  **Q**    You can just read to yourself, I think just 19 through 24

22  for now.  Right?

23      (Document displayed)

24  **A**    It looks like the discussion about Silver Lake and Goldman

25  starts on Page 214.

1    Q    Okay.

2         THE COURT:  Why don't you go ahead and read that to

3    yourself, and then the attorney will ask you a question once

4    you finish reading.

5    BY MR. ROSSMAN

6    Q    Go ahead.

7         (Witness examines document)

8         MR. PORRITT:  Your Honor, is this being broadcast to

9    the jury?

10        THE COURT:  No.

11        THE COURTROOM DEPUTY:  It was.

12        THE COURT:  Okay.

13        MR. ROSSMAN:  It should not have been.

14        THE COURT:  Okay.  You should disregard what you just

15   saw.  This is intended only for the witness.

16   BY MR. ROSSMAN

17   Q    Let me know when you are ready, Professor.

18   A    Yes, I'm ready.

19   Q    And if you could, I think it would also be helpful for you

20   to look at Page 21, starting at Line 6.

21   A    What page?

22   Q    Page 21.

23   A    I can't --

24   Q    Page 21, 2-1.

25   A    Of the deposition transcript?

1    **Q**    Same transcript.

2    **A**    Deposition?

3    **Q**    Yes, sir.

4         (Witness examines document)

5             THE COURT:  Read that through Line 10?  Is that what

6    you're asking?

7             **MR. ROSSMAN:**  Yes, Your Honor.

8             **THE COURT:**  Thank you.

9             **MR. PORRITT:**  I think the relevant testimony goes

10   through Line 21.

11            **MR. ROSSMAN:**  I'm using it to refresh.  I can point

12   him to anything I like, Your Honor.

13            **THE COURT:**  Well, he can read what he wants to refresh

14   his recollection.  If he wants to read further than that,

15   that's fine.

16        Let me know when you finish reading.

17            **THE WITNESS:**  So you want me to read Page 21 for sort

18   of the general --

19   **BY MR. ROSSMAN**

20   **Q**    Let me pause here.

21        Is your recollection now refreshed, Professor, that at the

22   time you wrote your report, you assumed that the Silver Lake

23   and Goldman Sachs tweet was a misstatement?

24   **A**    It was in -- my recollection now, in the table of

25   misstatements, it was a misstatement because the -- the day

1    afterwards, it was reported, and walked back, um, that --

2    well...

3        (Witness examines document)

4    **A**    That the bank still hadn't signed on when the -- Musk

5    tweeted the late Monday that he was working with Goldman Sachs.

6        It was, again, I -- it was a misrep because it was, I

7    guess, walked back.

8    **Q**    My question to you -- I think you answered it,

9    Professor -- was you assumed it was a misstatement when you

10   wrote your report.  True?

11   **A**    True.

12   **Q**    And you understand as we sit here in the courtroom now,

13   there's no claim in this case that that tweet was false.

14   Correct?

15           **MR. PORRITT:**  Objection, Your Honor.  We're now

16   getting into court orders, which I thought we had agreed not

17   to --

18           **MR. SPIRO:**  I'm not asking about the court --

19           **THE COURT:**  They're talking about whether that's a

20   claim in this case, not a court order.

21           **MR. ROSSMAN:**  (Nods head)

22           **THE COURT:**  So objection overruled.

23           **THE WITNESS:**  Um, it's a legal question.  I -- I don't

24   want to -- I don't know.

25

HARTZMARK - CROSS / ROSSMAN

1    BY MR. ROSSMAN

2    Q    Okay.

3    A    Okay.

4    Q    Now, are you aware that Mr. Dees -- Mr. Dees, the co-head

5    of investment banking at Goldman, testified in this trial about

6    how Goldman was actually working with Mr. Musk?

7    A    I did not come to that testimony.  I'm sorry.

8    Q    Did you come to the testimony of Mr. Durban of

9    Silver Lake, who came to this courtroom to testify about how

10   Silver Lake was working with Mr. Musk?

11   A    I was not here.

12   Q    Okay.  You didn't mention the Goldman Sachs and

13   Silver Lake tweet to the jury in your direct examination, did

14   you, sir?

15   A    Again, there were 2,400 different documents of all types.

16   That document and -- I understand in terms of the public market

17   was that there was a tweet, and then within the public market

18   there were rumors about the relationship between Tesla, Musk,

19   Silver Lake and Goldman.  So I don't know what the private

20   situation was.

21   Q    I'll make it as simple as I can for you, sir.

22        In your report, you attributed the stock decline on that

23   day, on August 14th, to that tweet, right?

24        You didn't mention that to the jury in your testimony.

25   A    Again, the stock -- wait, the stock decline?

**HARTZMARK - CROSS / ROSSMAN**

1    **Q**    On August 14th, okay?

2    **A**    Right.

3    **Q**    You, in your report, attributed the decline in the stock

4    that day, okay, to reports questioning the accuracy of that

5    tweet that is no longer in the case.  Isn't that true?

6    **A**    Yes.  As I told the jury yesterday, confusion,

7    speculation, rumor can cause, you know, uncertainty, and a

8    price can go down as a reaction.

9    **Q**    So you didn't mention the tweet in your testimony -- you

10   didn't exclude the damages that day from your damage

11   calculation, even though allegations about that tweet being

12   false are not in the case.

13   **A**    But it --

14   **Q**    Is that true, sir?

15   **A**    It's linked -- it's true, but it's linked to the

16   allegations, and it's a situation, again, within the public

17   market.  There was confusion and disruption which is, you know,

18   the nature of the consequential harm.

19   **Q**    Okay.  Consequential harm for making a truthful statement?

20         **MR. PORRITT:**  Objection, Your Honor.  That's

21   argumentative.

22         **THE COURT:**  Sustained.

23         **MR. ROSSMAN:**  Withdrawn.  Okay?

24   **BY MR. ROSSMAN:**

25   **Q**    Now, in your report, you didn't say there was the

1  confusion.  In your report, you said it was a misstatement.

2  Right?

3  **A**   Well --

4  **Q**   True?  Yes or no?

5  **A**   I said it was a misstatement.

6  **Q**   Very good.  I want to ask you about August 15th.  Okay?

7  On August 15th, there was a decline in Tesla stock, but it was

8  almost zero that day.  Right?

9  **A**   I don't have the graph in front of me, but I'll take your

10  word for it.

11  **Q**   Okay.  On August 16th, I want to ask you about what you

12  wrote that day.  Okay?

13       In your report what you said was (As read):

14            "The stock price declined during the day to

15            close at $335.45 on mixed news and analyst

16            commentary on Tesla's Model 3 production

17            forecast (favorable news) and base Model 3

18            future profitability (unfavorable news)."

19       Do you recall writing that in your report, and that's

20  Paragraph 121?

21  **A**   If I can take a look.

22  **Q**   Sure.

23  **A**   My recollection -- more than a year ago.

24  **Q**   I believe you have the report available to you, if that

25  will refresh your recollection on the stand.  It's Exhibit 375

1    for identification.  And it's at Paragraph 121, which you'll

2    find at Page 94 of the exhibit.

3         And I'm -- I believe I read that faithfully.  Let me know

4    when you have it.

5         (Document displayed to the Witness)

6    A    I'm sorry; I did it again.

7    Q    Page 94 of the exhibit, Paragraph 121.

8    A    Yeah, I'm sorry.

9         **THE COURT:**  The confusion is that the binder yesterday

10   had the wrong one.  So you're talking about --

11        **THE WITNESS:**  I went to the class cert report.  Let me

12   just check.

13   **BY MR. ROSSMAN**

14   Q    It's on your screen for your convenience, Professor.

15   You're free to look at it, but I'm only going to ask you about

16   what's on the screen.

17   A    Yeah.  I've got two copies of the class certification

18   report.  That's why I keep --

19   Q    I'm not asking about that one.

20   A    Okay.

21   Q    It's right in front of you if you want to take a look at

22   it, Professor.

23        (Document tendered to the Witness by the Courtroom Deputy)

24        **THE COURT:**  Are you directing his attention to

25   Paragraph 121?

 1           MR. ROSSMAN:  Paragraph 121, which is on the screen --

 2           THE WITNESS:  I was just handed another version of my

 3   class certification report.

 4           THE COURT:  Why don't you just look on the screen.

 5           MR. ROSSMAN:  Professor, if you would bear with me --

 6           THE WITNESS:  I -- I -- it would be good to get a

 7   sense of --

 8           THE COURT:  Yeah.  If you want to scroll down, and he

 9   wants to see the preceding paragraphs --

10   BY MR. ROSSMAN

11   Q    We'll go wherever you need to go.  But you wrote in your

12   report, Paragraph 121 -- you're looking at it (As read):

13               "The stock price declined during the day to

14               close at 335.45 on mixed news and analyst

15               commentary on Tesla's Model 3 production

16               forecast (favorable news) and base Model 3

17               future profitability (unfavorable news)."

18        That's what you wrote in your report, correct?

19   A    Yes.

20   Q    News related to the Tesla Model 3 car is unrelated to the

21   alleged misrepresentations in this case.  True?

22   A    True.

23   Q    And following what you identified as the favorable news,

24   the stock opened up that day.  Right?

25   A    Stock opened up, yeah, by .4 percent.  Yes.

1   Q    Okay.  And the unfavorable news came out at 12:20 p.m.

2   Right?

3        (Document taken off display)

4            THE COURT:  Lost me.

5            MR. ROSSMAN:  Can we pop up the screen if we can, Ken?

6   It's in that footnote.

7            THE WITNESS:  There's nothing on my screen.

8            THE COURT:  We're going to get it back, I assume.

9        (Document displayed to the Witness)

10  BY MR. ROSSMAN

11  Q    There it is, okay.  You see Footnote 201?

12           MR. PORRITT:  Your Honor, can the witness also be

13  shown 202, which is the same testimony -- it's in the same

14  text.

15           MR. ROSSMAN:  That's fine.

16           MR. PORRITT:  He's not being shown the proper part of

17  his report and they haven't given him the proper part of his

18  report he's being questioned on.  It is quite improper.

19           THE COURT:  Would you like to see Footnote 202 as

20  well?

21       (Document displayed to the Witness)

22           THE WITNESS:  Yes.  As I said, it would be great to

23  see the context, given --

24           THE COURT:  Do you want to scroll back to 120?

25           THE WITNESS:  Yeah.  Why don't we --

1          THE COURT:  Why don't you scroll back to 120.

2      (Document displayed to the Witness)

3  BY MR. ROSSMAN

4  Q    Okay.  I don't -- I don't see what that has to -- okay.

5  A    Well, I can't -- if I can't see it, I can't -- maybe it

6  has nothing to do with it.

7          THE COURT:  Okay.  Do you want to go down?

8          THE WITNESS:  Okay.

9          THE COURT:  Tell them if you want to go up or down.

10         THE WITNESS:  Down is fine.

11         THE COURT:  Okay.  Go down to 120 -- 122?

12     (Off-the-Record discussion between counsel)

13         MR. ROSSMAN:  This is not -- I can't give him this

14  (Indicating).

15     (Document displayed to the Witness)

16         MR. PORRITT:  Can we see the footnote to that text?

17  Again --

18         THE COURT:  Scroll down to the 203 footnote so we can

19  see that.

20  BY MR. ROSSMAN

21  Q    Yes.  In the binder that you have, Professor, I believe

22  it's Tab 2.

23     (Document displayed to the Witness)

24  Q    And if you could confirm that for me, that would --

25  A    Yes.

**HARTZMARK - CROSS / ROSSMAN**

1  **Q**    That would be great.

2  **A**    Okay.  I'm sorry.

3         **THE COURT:**  Now, if you have it, you can turn --

4         **THE WITNESS:**  Okay.  This is Paragraph 121?

5         **THE COURT:**  That's correct.

6  BY MR. ROSSMAN

7  **Q**    So my question that's pending is just whether that's what

8  you said in your report.

9  **A**    Whether what I wrote in 121 is what I wrote in my report?

10 **Q**    Well, withdrawn.  Let me -- what you were looking for, I'd

11 asked you about the unfavorable news.  Wasn't the unfavorable

12 news released at 12:20 p.m., and I believe that's what's

13 indicated in Footnote 12 -- I'm sorry, Footnote 201.

14    What you cite there, Footnote 201, is the unfavorable news

15 you mentioned.  True?

16 **A**    It appears, if -- I don't know if that's a -- you know, a

17 discussion of news that was indicated earlier.  Let me look at

18 my table.

19 **Q**    I'm just mindful of the time.  There may be hard

20 questions; this wasn't intended to be one of them.

21    (Witness examines documents)

22 **A**    I -- I don't have my table in front of me.

23         **MR. ROSSMAN:**  Your Honor --

24         **THE WITNESS:**  Finding --

25         **MR. ROSSMAN:**  Your Honor, I'm going to ask for a

1   little bit of a time rebate if this continues.

2           **THE COURT:**  Well, why don't you sharpen up your

3   question, and maybe you won't have to do that.  Reask the

4   question.

5   **BY MR. ROSSMAN**

6   **Q**    It's a short simple question, which is:  The unfavorable

7   news that you referenced in your report was what's at Footnote

8   201.  What was released at 12:20.  That's it.

9   **A**    It appears that that is -- that's what I cite to, but I'll

10  make it clear.  I don't -- oftentimes in financial news there's

11  news that comes out, and then it is covered.  And this was the

12  *Wall Street Journal* online; I'm not sure if they were picking

13  something else out.  But that is after the fact, if that --  it

14  is the actual first disclosure of that information.

15  **Q**    And when the news -- when the unfavorable news about the

16  Model 3 production came out at 12:20 p.m. that day, okay, at

17  that time, the stock price went down.  Correct?

18  **A**    Um, I can't --

19  **Q**    And if you need to, Professor, you can look at your

20  appendix which has the minute-by-minute stock price, and it's

21  in your report.

22  **A**    Right.

23  **Q**    Going back to the appendix, it's Page 245.

24  **A**    Oh, okay, thank you.

25  **Q**    And you can see the price at 12:20, and you can confirm

1 for me whether I'm right.

2  (Document displayed to the Witness)

3 **Q** And it's also on your screen.  Trying to appreciate the

4 clock here, and we're trying to help you out, so it's on the

5 screen.

6 **A** Yes.  So at 12:20 -- so this was announced at 12:20.  This

7 is the -- the -- oh, okay.  The interval start is 12:20; the

8 stock price went down.  The abnormal return was

9 negative-.14 percent.

10 **Q** Okay.  Very good.  Now --

11 **A** It's not statistically significant at or below the

12 5 percent level.

13   **MR. ROSSMAN:**  We can take that down.

14  (Document taken off display)

15 **BY MR. ROSSMAN**

16 **Q** Now Professor, you agree that whatever stock -- withdrawn.

17  You agree that the stock movement as a result of

18 information coming to the market about the Tesla Model 3 had

19 nothing at all to do with allegations in this case about

20 tweets.  Right?

21 **A** Yes.

22 **Q** But yet, you attribute the entire decline in the stock

23 price that day to the tweets in this case.

24 **A** Well, can I --

25 **Q** Right?

1  A   Can I see that --

2  Q   It's a simple question.

3  A   -- those numbers again?  I didn't -- Yes.

4  Q   I want you to follow my question.

5  A   Yes.

6  Q   Okay, thank you.  Now, you use the phrase "confounding

7  information"?

8  A   Yes.

9  Q   Confounding information is other information unrelated to

10 the allegations of fraud in this case, okay, that could affect

11 the stock price.  Right?

12 A   Yes.  That's generally the definition that economists use

13 when evaluating price movements.

14 Q   We just saw one with the Model 3.  Right?  That's

15 potentially confounding information.  True?

16 A   It's potentially confounding information, but I didn't --

17 there are two things.  One --

18 Q   That's my only question, Professor.

19 A   One, I did not usually --

20      MR. ROSSMAN:  Your Honor?

21      THE COURT:  He can elaborate, shortly.

22      THE WITNESS:  And in the analysis of confounding

23 information, I looked at intervals.  For example, the interval,

24 if you would put it back up on the screen --

25      MR. ROSSMAN:  Your Honor, I think he can do --

1        **THE WITNESS:**  It was not --

2        **THE COURT:**  Hold on.

3        **THE WITNESS:**  The fall was not large enough to be

4   outside of the bounds of what would be expected by chance.  And

5   therefore, it was not statistically significant.  And as an

6   economist, I then didn't use it.

7        I also -- I can't see the prices.  It might have come

8   right back up the next minute.

9   **BY MR. ROSSMAN**

10  **Q**    So Professor, if something is not statistically

11  significant, then you as an economist determine that that item

12  of news didn't cause the stock decline?

13       Is that your testimony to the jury?

14  **A**    You're confounding my testimony.  That's a one -- that's

15  one piece of information, not linked, as you've stated, it's

16  unrelated to the fraud.  And that, you would look for

17  statistical significance, to see if it's important.

18  **Q**    So when there's information that comes out unrelated to

19  the fraud, you apply your test of statistical significance.  Is

20  that what you're saying?

21  **A**    What I'm saying is, though the -- for the economic

22  analysis, you do -- you would want to do a full-blown analysis

23  to look at, as I mentioned, quantitative and qualitative

24  information.  But when I looked at confounding information, I

25  looked to see whether the movement was large enough that it

1    would be outside the bounds of what would be expected by

2    chance.  That's .14 percent.  One percent of Tesla stock was

3    about $300.  That's approximately a 30-cent change in price.

4         To the extent that the jury would expect that to be

5    important confounding negative information, then I would

6    recommend that you reduce the inflation by 30 cents.

7    Q    Okay.  Now, we talked, there's lots of other potentially

8    confounding information that you list in your reports, besides

9    the Model 3.  I don't have to go through the whole list.  I

10   think you identify issues about tax credits, solar roof tile

11   deals, car batteries being at fault.  Probes by the government

12   involving the Model 3 having nothing to do with the tweets.

13   You've got a whole laundry list of potentially confounding

14   issues, correct?

15   A    Correct.  Are you reading from my table?

16   Q    That's all I'm asking.

17   A    Yes.  I had approximately -- I think it was 14, 12 or 14

18   specific topics that had been disclosed over the ten days that

19   were -- would be -- that I consider to be confounding after I

20   went through the 2,400 or more than 2,400 articles.

21   Q    Okay.  Now, I want to ask you about a different subject

22   because we're tight on time, okay?  Love to spend more time on

23   that, but I've got to move on, okay?

24        Okay, consequential damages.  Do you recall that subject?

25   A    Yes.

**HARTZMARK - CROSS / ROSSMAN**

1   Q    And you claim that as a result of Mr. Musk's tweets, Tesla

2   experienced what you describe as consequential harms.  And you

3   give some examples of that.  Legal, regulatory, corporate

4   governance issues.

5        Do you recall that subject?

6   A    Yes.

7   Q    Okay.  And for example, one piece of consequential harm is

8   that you said that Tesla board of directors was angered that

9   Mr. Musk tweeted something out about the company without

10  running it by Tesla first.

11       Do you remember that?

12  A    Um, not specifically, but that would be a signal of the

13  lack of internal controls.  You know, again, from a public

14  perception.

15  Q    So take that issue that you just described.  You can't

16  tell the jury whether consequential harm as a result of sending

17  out tweets without internal controls would have happened,

18  whether the tweet was true or false.  Right?

19  A    Yes.  As I said, I didn't disaggregate the truthful parts

20  from the -- from the false parts.

21  Q    Thank you, Professor.

22       In particular, you had a bunch of slides; I'm not going to

23  take the time -- don't have the time to go through them all

24  with you in detail.  But you attributed consequential harm on

25  August 8, the day after the tweets, and August 9th, the day

1   after that.  Right?

2   **A**   Well, again, consequential harm for all intents and

3   purposes is a residual.  I'm able to precisely, you know, with

4   a reasonable degree of certainty, measure the direct harm, and

5   the consequential harm is the residual.

6   **Q**   When you say "the residual," it's just subtracting the

7   difference between how much the stock fell during the period

8   that you measured versus the amount that you can actually claim

9   was -- was directly due to the tweets.

10  **A**   Well, how much harm in total associated with that day,

11  less the direct amount.  So, yes.

12  **Q**   Okay.  You call it harm; I call it the stock dropping.

13  But we don't have to quibble.

14      Now, am I right, sir, that the jury decides that the full

15  details about Mr. Musk's tweets were known to the market by

16  August 13th, by the time that he published that blog post that

17  we looked at, then there would be zero consequential damages.

18  **A**   I don't -- don't agree with that.  It could -- could carry

19  beyond the 13th.

20  **Q**   Well, you might not agree with that, but didn't you

21  testify to that in your deposition?  Yes or no?

22  **A**   I believe the question was -- was different in the

23  deposition.

24  **Q**   Great.  Let's take a look at it.  Could we go to your

25  deposition, starting at Line -- sorry, on Page 231, starting at

 1    Line 25.  And we can put it on the screen.

 2         (Document displayed to the Witness)

 3              **MR. PORRITT:**  Are you refreshing?  Or impeaching?

 4              **MR. ROSSMAN:**  I'm going to impeach him.

 5              **THE COURT:**  Before you put it on the screen, you need

 6    to give counsel a chance --

 7              **MR. ROSSMAN:**  Sorry, Your Honor.  231, Line 25,

 8    through 232, Line 24.

 9              **THE COURT:**  Okay.  Give us a chance to look at it

10    before you put it on the screen.

11              **MR. ROSSMAN:**  Hold that screen.

12         (Witness examines document)

13              **THE COURT:**  Okay.

14              **MR. PORRITT:**  For completeness, can we go to 233, Line

15    17, Your Honor?  (Inaudible)

16         (Reporter clarification)

17              **MR. PORRITT:**  This is a lengthy discussion,

18    Your Honor.  He's cherrypicking.  I don't think it's fair.  For

19    completeness, I'd go through to 235:20.

20              **MR. ROSSMAN:**  Your Honor, I would ask that the Court

21    have Mr. Porritt try that on redirect.  I think the clip is

22    correct.

23              **THE COURT:**  I'm going to play the clip, as requested.

24    As requested by defense.  If you want to bring out something

25    more, you can do that on redirect.

1      Go ahead and play the clip.

2          **MR. ROSSMAN:**  Do we have the clip?

3      For expediency, Your Honor, I'll just read it, Your Honor.

4          **THE COURT:**  Okay.

5  **BY MR. ROSSMAN**

6  **Q**   You said in your deposition, Professor Hartzmark, in

7  response to my questions as follows (As read):

8          **"QUESTION:**  Okay.  So if you imagine the

9          finder of fact concludes that by August 13th,

10         okay, all the corrective material information

11         has been disclosed on the market, okay, then

12         the class period should end on August 13th.

13         Okay?

14         **"ANSWER:**  Uh-huh.

15         **"QUESTION:**  The direct -- your direct

16         inflation stops at that number 14.64.

17         **"ANSWER:**  Correct.

18         **"QUESTION:**  Okay.  And so you would -- for

19         the direct inflation -- how would you

20         allocate direct inflation across those five

21         trading days in the hypothetical I just gave

22         you?

23         **"ANSWER:**  Well, given that it -- there

24         couldn't be any consequential damages, I

25         would just take the but-for price of 356, you

1              know, the previous price, and use that as the

2              but-for price and then you would get, let's

3              see, on August, you said August 13th --

4         ▪QUESTION:  Yes, sir.

5         ▪ANSWER:  August 13th, it would basically be

6              zero.  Yeah.

7         ▪QUESTION:  Okay.  So in that scenario, there

8              would be zero consequential damages?

9         ▪ANSWER:  Correct."

10      That was the truthful testimony you gave to me in your

11   deposition, sir.  Isn't that right?

12             THE WITNESS:  Yes, but --

13             THE COURT:  Thank you.

14      You can explain on redirect.

15   BY MR. ROSSMAN

16   Q    Now, I just want to ask you briefly about August 8th, we

17   were talking about confounding information, one of the pieces

18   of information that you mentioned -- I'm sorry.  Strike that.

19   My handwriting is worse in my own notes than on the board.

20      We were talking about consequences damages.  Okay?  One of

21   the items of consequential damages you mentioned was the SEC

22   investigating the tweets.  Do you recall that?

23   A    Yes.

24   Q    And if we could, let's look at your Slide 48, briefly.

25   Okay?  Was your opinion that on August 8th --

**HARTZMARK - CROSS / ROSSMAN**

1    (Document displayed)

2  **Q**   It's on the screen.

3  **A**   Now it is, yeah.

4  **Q**   Just so we remember, Professor, August 8th is the day
5  after the tweets.

6    It was your opinion, and you testified about it on direct,
7  that the SEC -- the news of the SEC probe caused the stock
8  price to go down.

9    Do you recall that?

10  **A**   The probe took place at 10:24.  The stock went down from
11  379 to 370 over the day.

12  **Q**   Isn't it true, Professor, that at 10:24 -- and you can
13  look at your minute-by-minute if you need to -- that at 10:24,
14  following the report of the SEC probe, the stock actually went
15  up?

16  **A**   Assuming that's the first --

17    (Document displayed)

18  **A**   Yes.

19  **Q**   And isn't it true that the stock went up after that
20  report, and it stayed up for a full -- for the full next four
21  hours, after that report about the SEC probe.

22  **A**   I can't -- possibly -- it seems -- I mean, you can draw
23  across there and it's -- looks like it's maybe not four hours,
24  but like an hour.  And then it starts going down.

25  **Q**   Thank you, Professor.  I want to draw your attention to

**HARTZMARK - CROSS / ROSSMAN**

1   August 17th.

2       You were asked by Mr. Porritt about the *New York Times*

3   article that came out late on the night of August 16th.  This

4   was based on an interview with Mr. Musk.  Do you recall that?

5   **A**   Yes.

6   **Q**   This is in evidence as Exhibit 171.  Okay?

7   **A**   Again, I don't know what the exhibit number is.

8   **Q**   I'm not asking you to remember the exhibit number.  I'm

9   calling out so we can get it on it the screen.

10  **A**   Okay, I'm sorry.

11  **Q**   That would be quite a memory test.  Okay?  This is the

12  article you talked to Mr. Porritt about, right?

13  **A**   Wait a second.

14      (Witness examines document)

15  **A**   Yes, I believe so.  I'm sorry, I caught the August 23rd

16  date on top.  And I was confused.  But yes.  I assume that's

17  the date it was probably downloaded.

18  **Q**   Okay.  One thing you told the jury in your direct

19  examination about this article was that Mr. Musk had not told

20  the board about the tweet before he posted it.  True?

21  **A**   My recollection is that's in the text.

22  **Q**   Okay.  But that wasn't news.

23          **MR. ROSSMAN:**  If we could go to Exhibit 27, in

24  evidence.  Okay?

25      (Document displayed)

1   BY MR. ROSSMAN

2   **Q**    On August 13th, there was a *New York Times* article

3   reporting previously:  Tesla board surprised by Elon Musk's

4   tweet.  Right?

5   **A**    Well, but, this is from two people familiar, I mean, which

6   is different from Mr. Musk making the statement.

7   **Q**    Okay.  So the market knew from two people familiar that

8   the tweet took the board by surprise.

9   **A**    I -- you know, I don't -- I can't -- first of all, I'm

10  here to read what the market -- how it reacted, as opposed to

11  tell you how it should act.  But I'm just saying potentially

12  that's a different.

13      Here you've got two people familiar with the chain of

14  events on this, where on the August 16th interview, that was

15  from the horse's mouth.

16  **Q**    Now, I don't need to quarrel with you about the horse's

17  mouth.  It was not a surprise to the market that the tweet had

18  not been previewed to the board.  True?

19  **A**    Again, I -- I can't say.  I just read from the article.

20  **Q**    Okay.  Now, another thing you say about the *New York Times*

21  article was that it -- it contained the sentence "It turned out

22  funding was far from secure."

23          **MR. ROSSMAN:**  If we go we can go back to Exhibit 171.

24  And go to the second page.

25      (Document displayed)

1   BY MR. ROSSMAN

2   Q    You pointed out that sentence:

3              "But that funding, it turned out, was far

4              from secure."

5        That's something you mentioned in your direct, true?

6   A    Yes.

7   Q    There's no quotation mark around that statement

8   (Indicating), right?

9   A    Um, again, it's in the article.  Mr. Musk has --

10  Q    Is there a quotation mark?

11  A    There's no quotation mark in this interview with Mr. Musk.

12  Q    Okay.  There are lots of quotation marks in that article.

13  There are lots of statements that are quoted and attributed

14  directly to Mr. Musk.  Not that one.  Right?

15  A    Again, I -- I --

16  Q    Yes or no, sir.

17  A    It's not quoted.

18  Q    Okay.

19  A    Or, it's not in quotations.

20  Q    It's not in quotations, nor is it attributed to Mr. Musk,

21  right?  That's just the reporter's characterization.

22  A    You know, I don't know, it's right under -- yeah.  It's

23  right under the question.

24  Q    But you told the jury that this *New York Times* article was

25  really sort of the final revelation of the truth related to the

1  fact that funding is not secured.  That's what you said

2  yesterday.  Right?

3  **A**    Well, I -- it's -- it's evidence that that's the case.

4  We've also got the evidence of the price movement, the implied

5  volatility, and Mr. Brinkman's analyst report.

6  **Q**    Okay.  And Mr. Brinkman's analyst report's in evidence, by

7  the way.  You're aware, sir, it doesn't mention the *New York*

8  *Times* article, the actual report.

9  **A**    I'm trying to remember.  I believe his testimony --

10 **Q**    No, that's not what I asked you about.  Pay attention to

11 my question.

12 **A**    Okay.

13 **Q**    In the analyst report, the analyst report itself that you

14 referenced, okay -- we don't need to pull it up for time, but

15 it's in evidence as Exhibit 23 -- it does not mention the *New*

16 *York Times* article?

17 **A**    I don't recall.  I'll take --

18 **Q**    You're aware that it does mention the blog post?

19 **A**    Say -- I'm aware of what?  I don't recall.

20 **Q**    I asked you a different question, Professor.

21    Are you aware that the analyst report from Mr. Brinkman

22 does specifically mention the blog post?

23         **THE COURT:**  The 13th blog post?  Which blog post?

24         **MR. ROSSMAN:**  August 13th.  Thank you, Your Honor.

25

**HARTZMARK - CROSS / ROSSMAN**

1  BY MR. ROSSMAN

2  **Q**    The August 13th blog post.  Mr. Brinkman's analyst report

3  mentions --

4  **A**    August 20th.  Right?

5  **Q**    Let me --

6  **A**    I'm sorry.

7  **Q**    Before -- before we drive the court reporter absolutely

8  mad, let me just put the question down, and then I'll give you

9  a chance to answer.

10  **A**    I'm sorry.

11  **Q**    Mr. Brinkman's analyst report, okay, that you point to,

12  specifically references the blog post.  I just want to know

13  whether or not you're aware of that, as you sit here today.

14  **A**    I -- I have a vague recollection, yes.

15  **Q**    Very good.  And on the 13th, you said as a result of the

16  blog post, the market knew that "Funding secured" was premature

17  at best.  That was your phrase.  Right?

18  **A**    Yeah.  I think we had that discussion yesterday.

19  **Q**    Okay.  Now, I want to actually look at the article for a

20  second.  Okay?  You remember what the question --

21  **A**    Which, which article?

22  **Q**    I'm sorry, I was doing this for the benefit of

23  Mr. Kotarski.  Exhibit 171, the *New York Times* article on the

24  16th.  Okay, and it will be on your screen momentarily.

25      (Document displayed)

**HARTZMARK - CROSS / ROSSMAN**

1   **Q**    Do you remember what the question was that Mr. Porritt

2   asked you yesterday when you were talking about the *New York*

3   *Times* article?

4   **A**    The specific question?  I can't.  I don't -- I don't want

5   to -- there were lots of questions all day yesterday.  What was

6   the question?

7   **Q**    Okay.  Do you remember what the question was that you were

8   asked --

9            **THE COURT:**  I think the witness says he doesn't --

10           **MR. ROSSMAN:**  Fine.  That was a precursor.  Thank you,

11  Your Honor.  I appreciate that.

12  **BY MR. ROSSMAN**

13  **Q**    The question that's at 1691, Line 5 of the transcript:

14           "And what did this article say?"

15       Okay, very open-ended question.  Right?  Do you recall

16  that?

17  **A**    Um, I recall speaking about the -- the article.  What the

18  exact question was, I don't recall.  But if that's what the

19  transcript says, that was the question.

20  **Q**    And you gave testimony about the article.  But in the

21  course of your testimony, you didn't tell the jury a single

22  fact about Mr. Musk's physical or emotional well-being.

23       Right?

24  **A**    I don't think that's correct.  I think I followed up that

25  discussion with -- in fact, I believe -- I don't have the

1  transcript in front of me, but I believe that Mr. Porritt and I

2  have discussed that issue.

3  **Q**    So the transcript will -- will tell us what actually

4  happened.  But it's your testimony, as you sit here today, that

5  yesterday, in fact, you did in your direct testimony give

6  testimony about the article reporting on issues concerning

7  Mr. Musk's health and well-being?

8  **A**    My recollection is that I -- I thought I talked about it;

9  I thought I was asked a question on the -- on that issue.

10  **Q**    Okay.  In fact, isn't the title of the article revealing?

11  "Elon Musk Details 'Excruciating' Personal Toll of Tesla

12  Turmoil"?

13  **A**    That's the title, yes.

14  **Q**    And if you look at the article itself, it goes through in

15  detail, okay, what that personal toll has been.

16      Okay (As read):

17          "In an hour-long interview with the *New York*

18          *Times* he choked up multiple times, noting

19          that he nearly missed his brother's wedding

20          this summer and spent his birthday holed up

21          in Tesla's offices as the company raced to

22          meet elusive production targets on a crucial

23          new model.

24          "Asked if the exhaustion was taking a toll on

25          his physical health, Mr. Musk answered 'It

1              has not been great, actually.  I've had

2              friends come by who are really concerned.'"

3         That was in the article.  You didn't mention that

4    yesterday, right?

5    **A**    The article I think is three or four pages.

6    **Q**    Did you mention that yesterday?

7    **A**    No, I don't think I mentioned this particular sentence.

8    Again my recollection -- and maybe I did -- is associated, you

9    know, with the health.  But I -- this is -- I don't think he

10   would have wanted me to read the whole article.

11   **Q**    And the article goes on, from there.  It says board

12   members expressed concern not only about Mr. Musk's workload --

13   I'm sorry.  Board members expressed concern about his workload.

14        It goes on.  In the interview he demonstrated

15   extraordinary level of self-reflection and vulnerability,

16   acknowledging his myriad executive responsibilities are taking

17   a steep personal toll.

18        And if we go to the third page.

19        (Reporter clarification)

20            **MR. ROSSMAN:**  Of course.  I'm sorry, I didn't --

21            **THE COURT:**  Say "quote" if you're quoting.  Use the

22   word "quote" so the court reporter --

23            **MR. ROSSMAN:**  Perfect, that's good.  I couldn't hear

24   the reporter between the glass and the mask.  Thank you.

25

1    BY MR. ROSSMAN

2    Q    The article says, quote (As read):

3             "In the interview on Thursday, Mr. Musk

4             alternated between laughter and tears.

5             "He said he'd been working up to 120 hours a

6             week recently..."

7             "...Mr. Musk said he had not taken more than

8             a week off since 2001..."

9    And this one actually has quotation marks around it,

10   attributed to Mr. Musk:

11            "'There were times when I didn't leave the

12            factory for three or four days -- days when I

13            didn't go outside,' he said.  'This has

14            really come at the expense of seeing my kids.

15            And seeing friends.'"

16   End quote.  It goes on, quote:

17            "Mr. Musk stopped talking, seemingly overcome

18            by emotion.

19            "He turned 47 on June 28, and he said he

20            spent the full 24 hours of his birthday at

21            work."

22   And this is a quote attributed to Mr. Musk:

23            "'All night -- no friends, nothing,' he said,

24            struggling to get the words out."

25   I'll pause there for a second.

1    All that was reported by the *New York Times* on the evening

2  of August 16th, to the market.  Right?

3  **A**    Correct.

4  **Q**    Now, you agree that Mr. Musk is a key man at Tesla.  The

5  key man at Tesla.  Correct?

6  **A**    I'm not offering an opinion, but he is -- at this time he

7  was CEO and, I believe, chairman of Tesla.

8  **Q**    You're willing to concede that he's important to Tesla?

9  **A**    Again, I wasn't asked to offer an opinion on that, but,

10  you know, just -- I mean, yes.  He's an important person at

11  Tesla.

12  **Q**    And this information -- if there's news about Mr. Musk's

13  health and well-being, that could affect Tesla's stock price.

14  Right?

15  **A**    News about his health and well-being, to the extent it's

16  material unanticipated news, would likely by reflected in the

17  stock price.

18  **Q**    Okay.  And if you look at the last quote, he writes

19  (As read):

20              "'I thought the worst of it was over — I

21              thought it was,' he said. 'The worst is over

22              from a Tesla operational standpoint '  He

23              continued: 'But from a personal pain

24              standpoint, the worst is yet to come.'"

25    *New York Times* reported Mr. Musk as saying that on the

1   morning of August 16th.   True?

2   **A**   Yes, assuming this is -- this is -- yes.   This is what

3   that reads.

4   **Q**   And let's -- and you, in your report, you list a number of

5   articles.   You showed headlines of the articles.   There were

6   articles, dozens and dozens and dozens of articles reporting on

7   this *New York Times* article (Indicating).   Right?

8   **A**   There were articles reporting on this, as well as the

9   issues associated with the going-private tweet.   And indeed, I

10  think there were possibly even sources that suggested that, you

11  know, this interview was, in some sense, you know, a result of

12  the tweets, themselves, in that whole period.

13  **Q**   Okay.   I understand that's your opinion that you want to

14  give.

15     Let's take a look at what the articles were, that were

16  described in the *New York Times* article.   Okay?

17     (Document displayed)

18  **Q**   1:23 a.m. there's a *Business Insider* article.   This comes

19  from your appendix to your report, okay?   *Business Insider*

20  article titled:

21          "The Most Difficult and Painful Year of my

22          Career:   Tesla CEO Elon Musk Opens up About

23          Personal and Professional Struggles in a

24          Revealing Interview."

25     Do you see that?

 1              **MR. PORRITT:**  Your Honor, is this being published to

 2   the jury?

 3        (Jury indicates in the affirmative)

 4              **MR. ROSSMAN:**  I don't believe it should.

 5              **THE COURT:**  It's being published?

 6              **MR. PORRITT:**  Your Honor, that's the second time this

 7   is happening.

 8              **MR. ROSSMAN:**  That is not our intention.  I have this

 9   for the benefit of the witness.  It should be --

10              **THE COURT:**  All right, so we should not publish this

11   to the jury.

12              **MR. ROSSMAN:**  I'm offering this for the witness, okay?

13   **BY MR. ROSSMAN**

14   **Q**    Your report cited this headline in *Business Insider*,

15   right?

16   **A**    Yes.

17   **Q**    *Financial Times* published an article titled:

18           "Elon Musk Describes Excruciating Year at

19           Tesla."

20        Right?

21   **A**    Yes.

22   **Q**    CNN had an article, "Elon Musk:  This has been the most

23   painful year of my career," right?

24   **A**    Yes.

25   **Q**    Went international.  *London Evening Standard* published an

 1   article:

 2              "Elon Musk interview:  Tesla boss admits to

 3              working 120 hours a week and struggling to

 4              deal with 'excruciating' stress in tearful

 5              tell-all."

 6        Right?

 7   **A**    Yes.

 8   **Q**    And it continues.  I could read dozens of these articles,

 9   okay?  That's what the news was reporting on about the *New York*

10   *Times* article that day.  The headline of the story was about

11   Mr. Musk's emotional health.  Right?

12   **A**    The ones that you have shown us, yes.

13   **Q**    And there are many more in your report; we don't have time

14   to read them all.

15        Now, okay, having seen the content of the *New York Times*

16   article, the title of the *New York Times* article, the headlines

17   of the articles reporting on the *New York Times* article, okay,

18   are you telling this jury that issues concerning the health and

19   well-being of Mr. Musk that were described in that article are

20   not material to investors?

21   **A**    Well, again, I looked at the data.  I looked at various

22   qualitative information.  I don't know -- you know, there's

23   been no evidence that would demonstrate why you would see this

24   bounce-back in implied volatility, based on the health of

25   Mr. Musk.

1       There were some, again, positive components in this as

2   well, in some sense.  But there were two sides to this, and the

3   -- you know, I guess it's -- it's for the jury to decide how to

4   weigh it.

5   **Q**     You can't stand here and tell us that it was not material.

6   That there were concerns being raised in this tearful interview

7   with the *New York Times* about Mr. Musk's well-being and health.

8           **MR. PORRITT:**  Objection, vague.

9           **THE COURT:**  Overruled.

10          **THE WITNESS:**  First of all, I -- the --

11  **BY MR. ROSSMAN**

12  **Q**     Yes or no, Professor?  Are you saying it's immaterial or

13  are you saying it's material?

14          **MR. PORRITT:**  Objection, Your Honor.  Now that's

15  recharacterizing the question in a vague and ambiguous way.

16          **THE COURT:**  Overruled.

17      You can answer the question whether you think that

18  information was material.  I'll let you explain.  But you

19  should answer yes or no.

20          **THE WITNESS:**  Given the qualitative information that

21  you just provided, that is -- again, that would suggest that

22  again, with all those news -- and again, you gave a set of

23  curated headlines that would, based on my analysis, suggest

24  that it's -- you know, because the news stories were picking it

25  up, that it is important, the article.

**HARTZMARK - CROSS / ROSSMAN**

1     But what I would say is, well, those you read, and that's

2  the chronology that I put in my reports, give a headline.  So I

3  don't know what the second line was or I don't know if that was

4  the headline and then there was, you know, discussion of the

5  other issues.

6     But, yes.  It would suggest it's important information to

7  investors.

8  **BY MR. ROSSMAN**

9  **Q**   Okay.  And the headlines -- there are many more, okay?

10  The headlines that you cited in your report over and over and

11  over again, they're citing the health and well-being issues,

12  the personal toll on Mr. Musk.  They're not -- those headlines

13  that we read were not talking about "Funding secured."

14     Right, sir?

15  **A**   Those headlines were not.

16  **Q**   Okay.  Very good.  Now, you remember you gave testimony

17  yesterday about what was the quintessential proof of what was

18  material to investors.  Do you recall that?

19  **A**   I don't know if it was a specific -- I said that, I

20  believe, a couple times.  It probably related to a specific

21  example.

22     Can you refresh my memory on this --

23  **Q**   I believe you were testifying about internal Tesla emails.

24  And in particular, one from a gentleman in Investor Relations,

25  Martin Viecha.  Okay?

1    And you said that a query from an investor -- in that

2  case, a Mr. Koney from Jennison -- asking about something, the

3  fact that the investor asked about it made it material.

4  "Quintessential proof" was your phrase.  Right?

5  **A**    It's not just -- just that, that I had -- had, you know,

6  the one email, or whatever.  The idea that there was this

7  flurry of emails that came in asking questions suggested that

8  the lack of information about what "Funding secured" meant was

9  material, because it was important to investors.

10 **Q**    Okay.

11     **MR. ROSSMAN:**  Can we look at Exhibit 161, please.

12     (Document displayed)

13 **BY MR. ROSSMAN**

14 **Q**    And this is another internal Tesla email.  This is from

15 the gentleman in Investor Relations, Mr. Viecha.  And he's

16 reporting on what he's hearing from investors about the *New*

17 *York Times* article.  Right?

18     (Off-the-Record discussion between counsel)

19     **THE WITNESS:**  I -- I don't recall if I've seen this.

20 Can I -- Your Honor, can I read it?

21     **MR. ROSSMAN:**  161 is in evidence, and we ask that it

22 be published.

23     **THE COURTROOM DEPUTY:**  It is being published.

24     **MR. ROSSMAN:**  It is being published.  Thank you.

25     **THE COURT:**  He needs to see it before he comments on

**HARTZMARK - CROSS / ROSSMAN**

1  it.

2       **MR. ROSSMAN:**  I understand.  I want to make sure the

3  jury is seeing it as the witness is seeing it.

4       **THE COURT:**  Is it in the binder?

5       **MR. ROSSMAN:**  It should be in the binder.

6       **THE WITNESS:**  What -- if it's in the binder, then I

7  can go to -- what number is it?

8       **THE COURT:**  161.

9     (Witness examines document)

10       **THE COURT:**  And is there a question pending?

11       **MR. ROSSMAN:**  I think the witness just indicated he

12  wanted a second to see it before I ask about it.

13       **THE COURT:**  161, is it, Counsel?

14  **BY MR. ROSSMAN**

15  **Q**   Have you had a chance to look at the exhibit now?  It's

16  not very long.

17  **A**   Okay.  I didn't read it in great detail, but I will --

18  assuming what the question is, I'll answer it.

19       **MR. ROSSMAN:**  Now, if we could have from the trial

20  transcript, 1664, please?

21  **BY MR. ROSSMAN**

22  **Q**   I just want to remind you of testimony that you gave on

23  this, sir.

24     (Document displayed)

25  **Q**   Okay.  You were asked (As read):

1           "QUESTION:  What impact did this have on your

2           views on the materiality of the August 7th

3           tweets?"

4       And this is in reference to a Tesla internal

5   communication, in response to investor inquiries.  And you said

6   (As read):

7           "ANSWER:  This would suggest, again -- again,

8           this is the quintessential issue."

9       This is not -- I'm sorry.  One second.

10      I have the wrong -- yes.  1664 -- no, I'm sorry.  The

11  cite's wrong.

12      But you used that phrase, "quintessential."  Right?

13          MR. PORRITT:  Objection.  What's -- I don't know what

14  the question is.

15          MR. ROSSMAN:  That's okay.

16  BY MR. ROSSMAN

17  Q   This is the testimony you gave yesterday.

18          THE COURT:  But, the context.  I'm not sure what the

19  context is now.  What is "this"?

20  BY MR. ROSSMAN

21  Q   The question is:  Did you give this testimony?

22          MR. PORRITT:  Objection --

23          THE COURT:  It's not complete.  It's not clear what

24  the "this" is.  If you just ask him to repeat the testimony,

25  that's not --

1          MR. ROSSMAN:  Can we go to 104 -- can we go to 104,

2     please --

3          THE COURT:  Excuse me.

4          MR. ROSSMAN:  I'm trying to --

5          THE COURT:  I understand.  But let me talk, if you

6     would.

7       This is not complete.  It's worthless.  So give it

8     context.

9          MR. ROSSMAN:  One second, Your Honor, because I don't

10    think -- the difficulty seems to be the --

11       (Off-the-Record discussion between counsel)

12         MR. ROSSMAN:  Let me, if I may, I'll just take that

13    down and ask you the question generically, Professor, so we

14    don't have to fuss with the record, okay?

15       (Document taken off display)

16    BY MR. ROSSMAN

17    Q    You agree with the statement that quintessential proof,

18    quintessential proof, okay, of something being material is

19    investors asking questions about it.

20       You agree with that statement.  I believe that is the

21    essence of what you testified about yesterday.

22    A    No.  Proof?  I don't know if I used that word at all.

23    Q    You don't think you used the phrase "quintessential

24    proof"?

25    A    Maybe I did.

**HARTZMARK - CROSS / ROSSMAN**

1   **Q**   Okay.

2   **A**   Certainly, important support.

3   **Q**   You were not saying yesterday --

4   **A**   I --

5   **Q**   I'm sorry.  Professor, please.

6        You were not saying yesterday that the fact that investors

7   were asking Tesla questions was proof that the information was

8   material?

9   **A**   I -- I don't know if I used that.  It's certainly --

10  again, as I've mentioned to the jury, I look at a bundle.  It's

11  certainly -- you know, that type of email is quintessential

12  support for something being material.  Whether that, in and of

13  itself, is proof, you would have to read it.

14       As I said, I didn't use those emails, alone, as support

15  for my position that the "Funding secured" is material.

16            **MR. ROSSMAN:**  I now found the right reference.  Can we

17  look at 1665, starting at Line 24, please.  Okay, through 1666,

18  line, Line 7.

19       (Document displayed)

20  **BY MR. ROSSMAN**

21  **Q**   Okay, testimony that you gave yesterday (As read):

22            **"QUESTION:**  And what does this back-and-forth

23            between Tesla Investor Relations and these

24            investors and analysts tell you as an

25            economist?

1              "ANSWER:  Well, as I mentioned, materiality

2              from an economic perspective is -- does a mix

3              of information change that would motivate

4              buyers and sellers to take action.  And this

5              is -- again, this is the quintessential proof

6              that this is -- that this is material

7              information because investors are interested

8              in it."

9        Okay?

10   A    Yeah.

11   Q    Was that the truthful testimony that you gave yesterday,

12   sir?

13   A    Yes, probably a little over -- as I just mentioned that is

14   in support of a by -- just by itself, you know.  I -- I

15   wouldn't want to -- you know, if everything else is on the

16   opposite side, I don't, necessarily.  But yes, I stand by that.

17   Q    And if it's quintessential proof for Mr. Porritt, it's

18   quintessential proof for me?

19   A    I'm not sure what you mean by that question.

20   Q    Do you hold -- do you have a different standard if

21   something is quintessential proof because investors relied on

22   it?

23        Would you not apply that same rule when it works against

24   plaintiff's case?

25   A    Again, as I said, it's -- it's strong support.

1    Q    Okay.  Well, let's take a look at 161, with that in mind.

2    Okay?

3              MR. ROSSMAN:  Exhibit 161, please.

4        (Document displayed to the Witness)

5    BY MR. ROSSMAN:

6    Q    Okay.  And if you look, and this is -- if we look at the

7    second page of this email message from Mr. Viecha who's

8    responding to queries from large investors about the *New York*

9    *Times* article, he writes (As read)"

10               "Worst is yet to come:  Elon's statement in

11               the *New York Times* that 'But from a personal

12               pain standpoint the worst is yet to come'

13               spoked some people, as this statement was

14               understood in many different ways.  Jennison"

15               -- Mr. Koney's firm -- "told me that they

16               weren't sure if they should just, 'run for

17               the hills' (divest)."

18       Stop there for a second.  "Divest" means sell all their

19   shares.  Right?

20   A    Yes.

21   Q    This is quintessential proof that concerns about

22   Mr. Musk's health and well-being were material to investors,

23   and you didn't describe that to the jury.  Right?

24   A    Again, I thought I had -- had some discussion.  But this

25   is -- yes, there's -- this is -- and I wouldn't deny that his

**HARTZMARK - REDIRECT / PORRITT**

1   health is material.  Whether it's material, unanticipated, I

2   didn't -- didn't say.

3   **Q**    And your damages analysis takes no account of Mr. Musk's

4   health and well-being, and the impact of the *New York Times*

5   reporting on that on the night of August 16th.  Correct?

6   **A**    To the extent that it's independent of the issues

7   associated with the tweet, I did not -- what economists call

8   "parse" it.  I didn't separate it out.

9            **MR. ROSSMAN:**  Thank you, sir.  I have no further

10  questions.

11           **THE COURT:**  All right.  Thank you.

12       Redirect?

13                    <u>**REDIRECT EXAMINATION**</u>

14  **BY MR. PORRITT**

15  **Q**    Dr. Hartzmark.

16  **A**    Good morning.

17  **Q**    I'll go straight on to the point that you were just

18  discussing with Mr. Rossman regarding the mental health of Elon

19  Musk, and the market's knowledge of those issues in August --

20  on August 17th, 2018.

21       Had there been prior reporting about Mr. Musk's mental

22  health in the media?

23  **A**    Yes.

24  **Q**    And that's before August 17th?

25  **A**    Yes.

HARTZMARK - REDIRECT / PORRITT

1   Q   Okay.  And, indeed --

2          MR. PORRITT:  If I can call up Exhibit 426,

3   Your Honor, I would --

4          THE COURT:  Okay.

5          MR. PORRITT:  Is this admitted?

6      (Off-the-Record discussion between counsel)

7          THE COURT:  Is this previously admitted?

8          MR. PORRITT:  No, Your Honor.  But we would -- at this

9   point we would move to admit it.  It's the *New York Times*

10  article.

11         THE COURT:  Any objection?

12         MR. ROSSMAN:  No further objections, Your Honor.

13         THE COURT:  Admitted.

14     (Trial Exhibit 426 received in evidence.)

15     (Document displayed)

16  BY MR. PORRITT

17  Q   Do you see that this is a *New York Times* article on --

18  August 15th, in fact.  Do you see that?

19  A   Yes.

20  Q   And in fact, this is a *New York Times* article devoted

21  absolutely to Elon Musk's mental health.  Correct?

22     (Witness examines document)

23  A   It's -- it emphasizes, yes, his mental health.

24  Q   Okay.  It even contains information from a psychologist

25  regarding Mr. Musk's mental health in the context of the

**HARTZMARK - REDIRECT / PORRITT**

1    tweets.  Isn't that correct?

2    **A**    Yes.  It's in response, I believe, to the tweet.

3    **Q**    All right.  So this is from the *New York Times*, the same

4    newspaper that then published what you have discussed with

5    Mr. Rossman, Exhibit 171.  Correct?

6    **A**    Yes.

7    **Q**    And it's the day prior.  Correct?

8    **A**    Yes.  I mean, and that's why, when I answered

9    Mr. Rossman's question, I agreed that his health is material,

10   but for, as I discussed, for an efficient market.  An efficient

11   market is where a price rapidly reacts to material

12   unanticipated or new information.

13        (Document displayed)

14   **A**    And this was already out.  And I believe there's --

15   there's been -- there was other, you know, before this,

16   discussion, or at least rumor and innuendo.

17   **Q**    And I think the news that Mr. Musk had been working hard,

18   sleeping at the factory, under stress with the Model 3 rollout,

19   that was all known to the market before August 16th, 2018.

20   Isn't that true?

21   **A**    That's my understanding, yes.

22   **Q**    Okay.  So you would expect that to be incorporated into

23   the stock price long before August 7, 2018.  Would that be --

24            **MR. ROSSMAN:**  Objection, leading.

25            **THE COURT:**  Sustained.

**HARTZMARK - REDIRECT / PORRITT**

1  BY MR. PORRITT

2  **Q**    Okay.  Well, how would that prior information about the --

3  would that prior information before August 7th be incorporated

4  into the stock price?

5  **A**    Yes.  Again, it's -- it's material unanticipated or new

6  information that causes changes.

7  **Q**    And then, if you look to Exhibit 161, what you've just

8  been discussing with Mr. Rossman, --

9       (Document displayed)

10  **Q**    -- it contains Martin Viecha's feedback from a number of

11  conversations with investors.  Isn't that correct?

12  **A**    Yes.  He lists, up in the first sentence, a number of

13  investors that he had I guess either in person, or had spoke to

14  on the phone.

15  **Q**    And Mr. Rossman pointed you to certain aspects of the

16  feedback that he'd received.  In fact, Mr. Viecha has four,

17  four points in Exhibit 161, plus some collective advice.

18       Isn't that what the document says?

19  **A**    Um, yes.  It -- well, even in the second sentence it talks

20  about some, but my -- if you could scroll it, I think there at

21  least were four.  Second page.

22       (Document displayed)

23           **MR. PORRITT:**  Keep scrolling.

24           **THE WITNESS:**  Yeah, No. 4 -- yes, four, and then some

25  subcategories.

HARTZMARK - REDIRECT / PORRITT

1  BY MR. PORRITT

2  Q    All right.   And one of those is privatization.   Do you see

3  that?

4  A    Yes.

5  Q    What is your understanding of what Mr. Viecha is referring

6  to there about the privatization?

7  A    Well, this would be associated with the -- Mr. Musk's

8  tweet, "Am considering taking Tesla private at $420.   Funding

9  secured."

10  Q    Okay.   And looking at -- looking at Point 2, talks about

11  recent Twitter and media communication?   Is that what the

12  heading says?

13       (Witness examines document)

14  A    Yes.

15  Q    Okay.   And what was the most recent Twitter and media

16  communication concerning from Elon Musk on August 9th -- before

17  August 19, 2018?

18  A    The -- say that, I didn't hear the --

19  Q    What had been the most recent Twitter and media

20  communication from both Elon Musk and Tesla prior to August 19,

21  2018?

22       (Reporter clarification)

23  BY MR. PORRITT

24  Q    19th, 2018.

25  A    Well, that some investors were worried that the media

HARTZMARK - REDIRECT / PORRITT

1    coverage could negatively impact demand for their products.

2    Which is the type of, again, consequential harm that I

3    discussed yesterday.

4    Q    Were the most recent tweets by Mr. Musk concerning the

5    going-private transaction?

6    A    Well, those -- that's -- that's my recollection.

7    Q    Right.

8         (Documents taken off display)

9    Q    Now, if we could also look at Exhibit 33, talking about

10   information that was already known in the market.

11        (Document displayed)

12   Q    Do you have that in front of you?

13             MR. PORRITT:  Does the jury have that?

14        (Members of the Jury indicate in the affirmative)

15             THE COURT:  Is that in evidence?

16             MR. PORRITT:  I believe it's in evidence.

17             MS. TRIPODI:  No.

18             MR. PORRITT:  Your Honor, we would move it at this

19   point.  It's an analyst report, August 8.

20             MR. ROSSMAN:  33?  No objection.

21             THE COURT:  Admitted.  You may publish.

22        (Trial Exhibit 33 received in evidence.)

23        (Document displayed)

24   BY MR. PORRITT

25   Q    And is this a report that you've seen before?

1   A    Yes, it's one of -- again, I said there was a flurry of

2   analyst reports after the tweets.  This is one of them.

3   Q    And talks about in this context -- in this analyst report,

4   does Evercore mention that the concept of going private was not

5   a new -- not new for Elon Musk?

6   A    My recollection is, yes, that there is -- there's a

7   mention in terms of his wanting to take the company private,

8   that that was -- was well known to the market.

9   Q    All right.

10        MR. PORRITT:  We can take that down.

11        (Document taken off display)

12        MR. PORRITT:  And then if we can pull up Exhibit 8,

13   please.

14        (Document displayed)

15   BY MR. PORRITT

16   Q    We have had some questioning about this tweet, correct?

17   A    Yes.

18   Q    Okay.  Did you know whether Elon Musk testified regarding

19   his intention when he drafted this tweet in two sentences?

20   A    Um, I --

21        MR. ROSSMAN:  Objection to the characterization.

22        THE COURT:  I'm sorry, what is the question?

23   BY MR. PORRITT

24   Q    Do you recall Mr. Musk testifying about how this -- how

25   this tweet should be read in connection with the two sentences?

**HARTZMARK - REDIRECT / PORRITT**

1    **A**    I -- I believe my recollection is they should be read in

2    combination, together.

3    **Q**    Right.  Thank you.  And how did that affect your analysis

4    of this tweet?

5            **MR. ROSSMAN:**  Objection.

6            **THE COURT:**  Overruled.

7            **THE WITNESS:**  It's as I stated yesterday, I looked at

8    it as an interwoven bundle and that, you know, "Funding

9    secured" would color the previous sentence.

10   **BY MR. PORRITT**

11   **Q**    And then I think you were asked yesterday about the

12   statistical significance of the decline in Tesla's stock price

13   from August 7th to August 13th.  Do you recall that

14   questioning?

15   **A**    Yes.

16   **Q**    And I think you wanted to explain your answer in response

17   to that questioning, but Mr. Rossman would not let you.  But,

18   how would you like to expand on your answer regarding the

19   statistical significance of the decline in Tesla's stock price

20   from August 7th to August --

21           **MR. ROSSMAN:**  Objection, vague, Your Honor.

22           **THE COURT:**  Overruled.

23           **THE WITNESS:**  The timeline in the price over the

24   corrective period, from August 7 to August 17, to the extent

25   that it's linked to the material misrepresentation means,

**HARTZMARK - REDIRECT / PORRITT**

1   itself, especially given, again, the qualitative analysis, that

2   the statistics associated with it are really a secondary issue.

3        And so the idea that there have to be individual days that

4   are significant is not -- is certainly something I looked at,

5   and is something you should look at.  But you have to look at

6   the whole picture, especially in a period when there is

7   tremendous leakage.

8        I mean, this was a period -- I liken it to, like,

9   dripping, drip, drip, drip.  I mean, and had it taken -- had it

10  all happened at one time, it would have been statically

11  significant.

12  Q    And this slow decline, the "drip, drip" you've talked

13  about, that was preceded by the statistically significant

14  increase in Tesla's stock price following the tweets, isn't

15  that correct?

16  A    Yes.  And again, that's the critical issue.  This is an

17  unusual case, if I can.  Usually you'll see drip, drip, drip in

18  the front side, and those are material misrepresentations, but

19  they're not statistically significant.  And then you see the

20  disclosure of one big -- the cumulation of all those drips just

21  spills out, and that is material, and that is statistically

22  significant.  And because it's linked to that incline, over

23  time, it means that the incline would be statistically

24  significant.  Or not stati- -- would be material.

25  Q    And that's different from this case, you're saying?

HARTZMARK - REDIRECT / PORRITT

1   **A**     Well, this is almost a mirror image where we have the sort

2   of the water being put into a sink, and then it dripping out

3   through a leaky pipe.

4   **Q**     Now, there was some testimony yesterday regarding your

5   calculation of the total artificial inflation that you

6   calculate in the -- in the Tesla stock price during the class

7   period, working off the but-for price of 312.90.  Do you recall

8   that?

9   **A**     Yes.

10  **Q**     And I think there was some testimony about how that

11  related to the adjusted price that you used that was derived

12  from your event study.  Do you recall that?

13  **A**     Yes.

14  **Q**     Okay.  And you testified that it could lead -- using

15  adjusted prices could lead to greater inflation.  And then I

16  think you also testified about maybe lower inflation.

17      I was confused by that.  So, hoping you could clarify.

18  **A**     Yes.  The 312.90 but-for price is the but-for price at the

19  end of the period, after all of the market effects.  And it's

20  actually -- it's a conservative price.

21      I don't know if you can put up the -- the --

22  **Q**     Would you like Slide 19 or Slide 11?

23  **A**     What's that?

24      **MR. PORRITT:**  Actually, Derek, can you put up Slide 19

25  and Slide 11, please.

1      **THE WITNESS:**  Or the abnormal.

2      (Document displayed to Witness)

3      **THE WITNESS:**  Yeah.  And then if you could put up the

4  abnormal returns as well.

5      **MR. PORRITT:**  That's Slide 19.

6      (Document displayed)

7      **THE WITNESS:**  You know, after, you know, after --

8  looking at all of this, the but-for price is the but-for price

9  at the end of the period.  And if you look at the slide on your

10  right and the adjusted price, the difference in any measure of

11  the adjusted price is truly the harm to the investors.

12      And if you -- relative -- if they hold it over the whole

13  period, 379 less 312, 370 less 312.

14      **MR. PORRITT:**  One second.  I don't think this is being

15  published to the jury.  Can we publish to the jury, please?

16      **THE COURT:**  All right.

17      **THE COURTROOM DEPUTY:**  It's in.  It's being published.

18      **MR. PORRITT:**  All right.  Thank you.

19      (Documents displayed)

20  **BY MR. PORRITT**

21  **Q**    Sorry, Dr. Hartzmark.  Perhaps you could just repeat that.

22  Sorry.

23  **A**    Yeah.  The -- I mean, to me, I actually -- I think I made

24  a mistake here in my cut-and-paste.  And that's what I admitted

25  to Mr. Rossman yesterday.

**HARTZMARK - REDIRECT / PORRITT**

1  **Q**    All right.

2  **A**    That the stock price in the first column on your left

3  is -- should be the adjusted price.  And the but-for price is

4  the end-of-the-period but-for price.  And on any given day, the

5  total artificial inflation would be greater than what we had

6  here.

7        And it's conservative to do it at 312.90 and hold that

8  constant, but the inflation would be far greater.  And one way

9  you can see that is that I have inflation in this particular

10 graph, on August 16th, 2018, of 22.55.  And if you go over to

11 the right side and look at the very right side there, between

12 the 16th and the 17th, you've got $344, and the stock drops by

13 $30.  And the abnormal return is actually greater than the

14 return, which means that the inflation that came out or the

15 harm to investors after accounting for outside influences was

16 over $30.

17       And so needless to say, if you look at the -- if you put

18 in the adjusted price, less 312.90, you would get the

19 inflation.  If you -- if you were to substitute 340 for 335.45,

20 you would have inflation at about $30, which is the measure.

21 But, to be conservative, I held this but-for price constant.

22          **MR. ROSSMAN:**  Objection, Your Honor.  Move to strike.

23 That is outside of the scope of the opinion that the expert has

24 given in this case.  He's offering a new opinion on the stand,

25 right now.

HARTZMARK - REDIRECT / PORRITT

1    **MR. PORRITT:**  This isn't a new opinion.  He's

2    explaining his existing opinion, Your Honor.

3    **THE COURT:**  Overruled.

4    **MR. PORRITT:**  This was exactly covered by

5    cross-examination.

6    **THE COURT:**  Overruled.

7    **BY MR. PORRITT**

8    **Q**    So, just so I understand your testimony correctly, if you

9    used -- on the chart on the left, if you used actual --

10   adjusted prices on the left-hand column for all those stock

11   prices, the -- first of all, the 66.67, that would stay the

12   same, wouldn't it?  That's the price?

13   **A**    That would stay identical.  That is the basis for the

14   inflation.

15   **Q**    Right.  And the zero, it's always zero on August 17th,

16   isn't that correct?

17   **A**    Yeah, that is correct, yes.

18   **Q**    All right.  So 66.67 is the maximum amount of artificial

19   inflation that was introduced to the stock price as a result of

20   the tweets, in your opinion.  Correct?

21   **A**    Yes.

22   **MR. ROSSMAN:**  Objection, leading.

23   **THE COURT:**  Overruled.  But, watch the leading

24   questions, please.

25   **MR. PORRITT:**  Thank you, Your Honor.  I'm trying to

1    get to the material quickly.

2              **THE COURT:**  Yep.

3              **MR. PORRITT:**  So, request a bit of leeway on this

4    regard.

5    **BY MR. PORRITT**

6    **Q**    And if -- the numbers in between, what would happen to

7    those numbers, each of those numbers, if you used the adjusted

8    price in the left-hand column and deducted 312.90 from it?

9    **A**    Every day, you can seeing that if you take every day --

10   8-8, the adjusted price is 370.60 and the stock price is

11   370.34.  On 8-9, the adjusted price is 353.31 and the actual

12   price is 352.45.  Every day, the adjusted price is above the

13   stock price.

14        And so if you look at the adjusted price relative to the

15   end-of-period but-for price, total artificial inflation would

16   be higher on every day.

17   **Q**    And what impact would that have on the overall damages

18   that defendants would pay, if found liable in this case?

19   **A**    It would have substantial impact.

20   **Q**    And would it increase, or decrease?

21   **A**    Oh, I'm sorry.  It would -- it would have substantial --

22   it would substantially increase the damages.

23   **Q**    Okay.  So the numbers presented in your report, which are

24   presented here today, and yesterday, are a conservative measure

25   of the damages as a result of the tweets.

**HARTZMARK - REDIRECT / PORRITT**

1      Is that correct?

2    **A**    Yes.

3    **Q**    Okay.  And the 312.90, just to be clear, the 312.90, does

4    that -- is that the price that takes into account the market

5    effect of the stock during the corrective interval, the period

6    from August 7th to August 17th?

7    **A**    Yes, it's the -- it's the final but-for price on

8    8-17-2018.

9    **Q**    Right.  So it -- if I understand correctly, does it

10   incorporate the market effects from -- the entire period, from

11   August 7th through to August 17th, 2018?

12      Is that correct?

13   **A**    Yes.

14   **Q**    Okay.  And Mr. Rossman asked you about what happened if

15   someone bought on August 7th and then sold, I think in his

16   example, on August 13th.  Do you recall that testimony?

17   **A**    Oh, yes.

18   **Q**    Okay.  And under his model, as I understand your

19   testimony, that -- that investor, the initial investor, would

20   recover his damages.  The difference between the inflation when

21   he bought, 66.67, and the inflation on when he sold, which is

22   43.51.  Is that correct?

23   **A**    Yes.

24   **Q**    Okay.  But the person who bought from him on August 13th,

25   that person is a class member, too.  Correct?

**HARTZMARK - REDIRECT / PORRITT**

1   **A**    Yes.  He's a purchaser, and --

2   **Q**    Right.

3   **A**    -- he overpays for it.

4   **Q**    Correct.  And if that investor held all the way to

5   August 17th, you estimate his damages to be $43.51.  Isn't that

6   correct?

7   **A**    Based on, yes, this exhibit.

8   **Q**    All right.  So his damages of 43.51 and the damages of

9   23.16, which you calculated -- Mr. Rossman calculated, what

10  does that add up to?

11  **A**    Say that again?  I'm sorry.

12  **Q**    So the damages of that second purchaser at 43.51 and the

13  damages that Mr. Rossman calculated for the first purchaser of

14  $23.16, both of those, both of those amounts have to be paid by

15  defendants in this case as damages, if found liable.  Correct?

16  **A**    Yes.  There's -- no matter what happens, whether there's a

17  purchase at the beginning, purchase in the second day, third

18  day, it's always 66.67 per any damaged share.

19  **Q**    Correct.  Now, we had some testimony regarding the

20  existence of consequential damages following -- in connection

21  with the August 13th blog post this morning.  Do you recall

22  that?

23  **A**    Yes.

24  **Q**    Okay.  Could you explain, in the event that the -- you

25  know, in terms of the effect of the August 13th blog post on

1    the information available to the market, what that means in

2    terms of consequential -- the consequential harm that you

3    identified in your report?

4    A    Well, again, in this particular case, with respect to the

5    blog post, it's -- it's -- without being confirmatory, it adds

6    uncertainty.  And as I mentioned, uncertainty is sort of the

7    kryptonite of investors.

8    Q    And you'd talked about -- you had some testimony regarding

9    confounding information coming out regarding -- on August 16th,

10   some about Model 3 production?

11        Do you recall that testimony?

12   A    Yeah, vaguely.

13   Q    Well, that was this morning, right?

14        Do you recall that?

15   A    Yeah.

16   Q    Do you examine in detail these reports, this confounding

17   information that came out on August 16th regarding Model 3

18   production?

19   A    Yes.  And as I mentioned, I also did statistical tests.

20   Q    Okay.  And was that all described in the report that you

21   submitted in this case?

22   A    Yes.  In fact, I think it was -- we were citing to the

23   report.

24   Q    All right.  Mr. Rossman didn't show you those pages in

25   your report, did he?

1    **A**    Not -- just the paragraph in the footnotes.

2    **Q**    Right.  And, in fact, the footnote referred to another

3    seven paragraphs in your report discussing that exact -- just

4    that one disclosure.  Isn't that correct?

5    **A**    Um --

6    **Q**    I'll represent that the --

7    **A**    Okay.  I can't recall.

8    **Q**    Okay.  And in connection with the -- those confounding

9    information, you did both statistical quantitative analysis and

10   qualitative analysis.  Isn't that correct?

11   **A**    With respect to the -- which --

12   **Q**    Confounding information.

13   **A**    Well, yes, I would -- started with the -- well, it sort of

14   went back and forth.  You would start by looking and going

15   through the information, then doing the statistical analysis,

16   and then trying to examine other information, you know.

17        So for example, even if you found something that is

18   statistically significant, you would then look to see, you

19   know:  Okay, did it come out with something else?  Like, you

20   know, is it one line in a three-page article?  Or -- and is it

21   picked up, say, by analysts afterwards, or other news

22   organizations?

23        Yeah.  You would look at all of that information.  As I

24   told you, you look at it as a basket.

25   **Q**    And what was your conclusion after doing all that analysis

**HARTZMARK - RECROSS / ROSSMAN**

1   regarding those August 16th news stories about the Model 3

2   production that Mr. Rossman referred you to?

3   **A**    Well, the Model 3 production issues, it was -- it was not

4   material, based on the basket of factors that I examined.

5   **Q**    Okay.

6           **MR. PORRITT:**  Thank you, Mister -- Dr. Hartzmark.

7   Nothing further at this stage.

8           **THE COURT:**  All right.  Thank you.

9       Recross?

10          **MR. ROSSMAN:**  Just a couple, Your Honor.

11                          <u>**RECROSS-EXAMINATION**</u>

12  **BY MR. ROSSMAN**

13  **Q**    You referred to Exhibit 426, this is the *New York Times* --

14  if we could put it up?

15      This was not an interview, Exhibit 426.  This was a New

16  York Times article.

17          **MR. ROSSMAN:**  Can we have 426, please?

18          **THE COURT:**  Is this in evidence?

19          **THE COURTROOM DEPUTY:**  It is.

20          **MR. ROSSMAN:**  It was moved in by plaintiffs.

21      (Document displayed)

22  **BY MR. ROSSMAN**

23  **Q**    This *New York Times* article was not an interview of

24  Mr. Musk.  It was other people speculating about Mr. Musk.

25  Right?

**A**     Yes.  That's sort of, I guess, the public speculation and rumor.

**Q**     Right.  It's not what you call "the horse's mouth," not information from the horse's mouth.  Right?

**A**     That's correct.

**Q**     And you've shown us no evidence that there was any investor reaction to this article.  Right?

**A**     This article happened on the -- it was issued, I believe, on the 15th.  And if my recollection is correct, the stock was relatively flat on the 16th.

**Q**     On the 16th.  Thank you.

     And is your rule that if something is already known, then reporting on what's already known is not material?

**A**     It depends.  The issue is in an efficient market, material unanticipated information is rapidly reflected in the price. So you can have material information that is not -- that is already known, so it's not -- it's not unanticipated -- double-negative -- and that would -- you wouldn't expect that to show up.

     It really depends, again, if it's a mirror image or not of, you know, what was out there, and incorporated in the price.

          **MR. ROSSMAN:**  Can we have Exhibit 1008?

     And I'd ask that this be moved into evidence.

          **THE COURT:**  Any objection?

1          **MR. PORRITT:**  No objection, Your Honor.

2          **THE COURT:**  Okay, admitted.

3      (Trial Exhibit 1008 received in evidence.)

4      (Document displayed)

5  **BY MR. ROSSMAN**

6  **Q**    Whatever information is in this *New York Times* article is

7  known to the market by the date August 15, 2008 [sic], is that

8  right?

9  **A**    Say that again?

10 **Q**    Information in this *New York Times* article on August 15th,

11 2008, you would agree with me, is already known to the market

12 by that date?

13 **A**    By the date of August 15th?

14 **Q**    Yes, sir.

15 **A**    Oh, it's -- it's -- yeah.  If it is, for example -- I

16 don't know what time it was issued, but assuming -- let's

17 assume it was issued before the market opened on August 15th --

18 you would expect it to get incorporated into the price.

19 **Q**    Okay.  Could we look at Exhibit 161, please.

20     (Document displayed)

21 **Q**    And Exhibit -- oh, I'm sorry.  Yeah, Exhibit 161.  And

22 turn to the second page.

23     You were asked by Mr. Porritt about the subject

24 privatization?  Do you see that?

25     (Document displayed)

**HARTZMARK - RECROSS / ROSSMAN**

1  **A**     No. 4, there?  Yes.

2  **Q**    No. 4.  Okay.

3      Investors aren't asking -- after the *New York Times*

4  article, they're not asking about "Funding secured," right?

5  **A**    It's not mentioned in this, this paragraph, but it's

6  talking about the going-private.

7  **Q**    Thank you.  Thank you.

8      And if I understood your testimony from questions on

9  redirect, so, you fix to -- you admitted that there's a mistake

10  in all your numbers.  And your fix --

11          **MS. TRIPODI:**  Objection, Your Honor.  That misstates

12  the testimony.

13          **THE COURT:**  Hold on.  Yeah, that is an overstatement.

14          **MR. ROSSMAN:**  He said a mistake in his testimony, just

15  now.

16          **THE COURT:**  Yeah, but you said all his numbers.

17  You're talking about a particular column.

18  **BY MR. ROSSMAN**

19  **Q**    Okay.  With respect to your numbers for artificial

20  inflation, okay, I've --

21          **MR. PORRITT:**  Objection.  That's not his testimony,

22  either.

23          **MR. ROSSMAN:**  He said there was --

24          **THE COURT:**  Let him ask the question.

25          **MR. ROSSMAN:**  All right.

1  BY MR. ROSSMAN

2  **Q**    I believe, okay, you told me that your numbers for

3  artificial inflation needed to be adjusted, yesterday.  And

4  today you said you made a mistake in your report.  I think you

5  said "made a mistake in my cut-and-paste."

6          **MR. PORRITT:**  Objection.  Misstates testimony.

7          **THE WITNESS:**  Yeah, I mean --

8          **THE COURT:**  Overruled.

9          **THE WITNESS:**  The -- what I said is that you would

10  want to look at the -- the adjusted price -- at the adjusted

11  price on any day, less the end-of-period but-for price.  But

12  that to be conservative, I used the end-of-period but-for price

13  to estimate it, which, in essence, understates inflation every

14  day.

15  BY MR. ROSSMAN

16  **Q**    Okay.  And in response to questions about a potential

17  investor buying on the 7th and selling on the 13th, you recall

18  Mr. Porritt asked you about that, you say:  Well, a mistake

19  with respect to that investor's damages would be made up with

20  respect to a mistake involving another investor's damages who

21  bought on the 13th.

22      Do you recall giving that testimony a couple of minutes

23  ago?

24          **MR. PORRITT:**  Objection.  That misstates his

25  testimony.

```
 1            THE WITNESS:  No, no --

 2            THE COURT:  Hold on.  Sustained.  That wasn't the way

 3   it was --

 4   BY MR. ROSSMAN

 5   Q    Do you recall giving testimony in response to that

 6   question?  That if there were a mistake regarding an investor's

 7   damages who bought on the 7th and sold on the 13th, there would

 8   also be a mistake for an investor who bought on the 13th and

 9   sold later, but that the total would add up to $66.67?

10            MR. PORRITT:  Objection.  Again, that totally -- that

11   misstates his testimony.

12            THE COURT:  Sustained.

13   BY MR. ROSSMAN

14   Q    Okay.  You recall giving --

15            MR. ROSSMAN:  My question was not what the testimony

16   was.  And maybe I can try to resolve the objection, Your Honor.

17   Okay?

18            THE COURT:  Good.

19   BY MR. ROSSMAN

20   Q    You recall giving testimony about that example, an

21   investor who bought on the 7th, sold on the 13th, and another

22   investor who bought on the 13th and sold later.

23        Do you recall giving testimony about those questions?

24   A    Yes.  The idea that each share that's traded within the

25   period would have the full $66.67.
```

1  **Q**    Okay.  To each individual investor, it wouldn't matter

2  that you got the total right; it would matter that they got the

3  numbers right for each individual investor.  Right?

4  **A**    I don't understand the question.

5  **Q**    Well, for each individual investor, you were -- is it --

6  the numbers that you currently have on your chart, okay, for

7  artificial inflation, aren't correct with respect to an

8  investor who bought on the 7th, sold on the 13th.  Isn't that

9  true?

10         **MR. PORRITT:**  Objection, Your Honor.  I don't think

11  that's his testimony.

12         **THE COURT:**  Overruled.  Overruled.

13     You can answer.

14         **THE WITNESS:**  Yeah, I mean, the numbers are --

15         **MR. ROSSMAN:**  (Inaudible)

16         **THE WITNESS:**  -- a conservative measure of inflation.

17  It's my understanding that the -- I don't know.  Your Honor,

18  can I say what the jury will be determining?

19         **THE COURT:**  No.  I think you should just answer this

20  question.

21         **THE WITNESS:**  Yeah.  The numbers are the -- the

22  numbers, if you put -- what I said is if you put in that column

23  the -- the numbers for the, um, adjusted stock price, the

24  inflation at every level goes up.  And it does change.

25     And that's something I think the jury should understand.

**HARTZMARK - RECROSS / ROSSMAN**

1   BY MR. ROSSMAN

2   **Q**    Okay.  An investor in that example who bought on the 13th,

3   using your numbers -- bought on the 13th and sold later, using

4   your numbers, those numbers, that inflation could also be wrong

5   for that investor.

6   **A**    I -- I don't understand the question.

7   **Q**    Using your numbers for artificial inflation, if an

8   investor bought on the 13th, would that also -- could that also

9   be wrong for that investor?

10  **A**    It would be different.  I don't want to say it's wrong.

11  **Q**    Okay.  So is it your opinion, Professor, that it's okay to

12  get the numbers wrong for those two investors, as long as the

13  totals add up?

14          **MR. PORRITT:**  Objection, Your Honor.

15  BY MR. ROSSMAN

16  **Q**    Is that your opinion?

17          **THE COURT:**  Overruled.

18          **THE WITNESS:**  Again, I've shown that you could do it

19  and maximize it, or you could do a conservative but-for price.

20  BY MR. ROSSMAN

21  **Q**    As long as there are damages, right?

22          Is that your answer?

23          **MR. PORRITT:**  Objection.

24          **THE WITNESS:**  I, again, don't understand the question.

25          **THE COURT:**  Sustained, on that question.

1           MR. ROSSMAN:  No further questions.

2           THE COURT:  Okay, thank you.

3      Anything further?

4           MR. PORRITT:  Nothing further, Your Honor.

5           THE COURT:  All right.  Thank you.

6      Dr. Hartzmark, you are excused.  You may step down.

7           THE WITNESS:  Thank you.

8      (Witness excused)

9           THE COURT:  All right.  This is a break -- is there

10     any further witnesses from plaintiffs?

11          MR. PORRITT:  At this point, plaintiff rests,

12     Your Honor.

13          THE COURT:  All right.  The plaintiff rests, and this

14     is a good point to take our 20-minute break.  And we'll return

15     in 20 minutes.

16     Thank you.

17          THE COURTROOM DEPUTY:  All rise for the jury.

18     (Jury excused)

19     (The following proceedings were held outside of the

20     presence of the Jury)

21          THE COURT:  All right.  So that works out.

22     Make your motion.

23          MS. THOMPSON:  Ellyde Thompson for defendants.

24     Defendants move for judgment as a matter of law as to all

25     claims and all defendants.

1    Your Honor, we are filing a brief with all the bases for

2  our grounds for judgment as a matter of law.  I would like to

3  point the Court particularly to Pages 3 through 7 of our brief

4  related to the Rule 20(a) control person liability.

5    Here, we think that the Court should, at this juncture

6  before defendants begin their case, dismiss the director

7  defendants because the plaintiff has not carried their burden

8  of showing control person liability.

9    As to four directors, plaintiffs did not even call those

10  directors.  The jury does not even know who their names are.

11  As to the remaining directors, all directors are outside

12  directors.

13    For outside directors to have control person liability

14  under Ninth Circuit law, there must be day-to-day management of

15  the company, and there must be specific involvement with the

16  tweets at issue here.

17    There are neither -- there's proof of neither here.  No

18  director has testified as to any day-to-day management.  And no

19  director has testified as to any involvement with the issuance

20  of the two tweets at issue that serve as the basis for the

21  Rule 10b-5 claim.

22    The Ninth Circuit's law is clear on this question, as I'm

23  sure, actually, the Court noticed in looking at the good faith

24  instruction.

25    Here, the correct time to determine this is now.  Either

**PROCEEDINGS**

1  the Court needs to do it now, the Court needs to do it later,

2  or the Ninth Circuit will do it, because there is no sufficient

3  evidence for control person liability.

4      The Court should do it now, because there are four

5  directors who need to testify as to the affirmative defense,

6  but would not need to testify if the Court grants Rule 50(a),

7  judgment as a matter of law, as to control person liability.

8          **THE COURT:**  All right.  Thank you.

9      Quick response?

10         **MR. PORRITT:**  I think the evidence shows that

11  certainly the witnesses -- the directors called who are members

12  of the audit committee were responsible for controls over

13  the -- of the public disclosures by Tesla, which is the

14  relevant primary violator here.

15     And so I think that establishes -- certainly for the

16  members of the audit committee because they were tasked with

17  primary responsibility for controlling the public disclosures

18  on behalf of Tesla and making sure that Tesla complied with the

19  securities laws.

20     And we disagree, and we will address the briefing in due

21  course, that you need specific involvement with the specific

22  tweets in question.  I don't believe that's -- or the specific

23  public statements, representations in question.  That really

24  would turn Section 20(a) liability on its head and suggest

25  that, you know, your -- ignorance would then become a defense,

PROCEEDINGS

1  which would not be proper.

2      As for the other directors, they are overall tasked with

3  control of Tesla.  They are the board directors, and they are

4  responsible for putting in place adequate controls.

5      And the evidence is clear that the entire board approved

6  of Mr. Musk's Twitter feed being an official channel of

7  corporate communications, something that we have expert

8  testimony on, as an absolute egregious violation of corporate

9  governance.

10      So I think collectively, at a minimum, speaking in

11  immediate reaction to such a motion, we could point to that

12  evidence as sufficient to have found 20(a) liability.

13          **THE COURT:**  Is it your view that there is not a

14  different standard for outside directors?

15          **MR. PORRITT:**  I don't think there's a different -- I

16  think it's the facts and circumstances of every director, or

17  every control person.  It doesn't necessarily have to be a

18  director.  Although, in a corporate setting, directors are the

19  obvious control persons, in addition to the executives.

20      So, I think there's one standard for who is a control

21  person.  I think it's a factual circumstantial test, that is

22  fact-specific.  I think we have, certainly, sufficient evidence

23  here for the jury -- to support a jury determination that the

24  directors here were control persons of Tesla.  And then they

25  would have a burden of proving their good faith defense.

 1          **THE COURT:**  So you take issue with the proposition

 2   that outside directors can only be held liable if they were

 3   involved in day-to-day management, and specifically involved in

 4   the conduct in question?

 5          **MR. PORRITT:**  I do -- I do -- we would argue with

 6   that.  I don't believe that's a proper statement of the law.

 7          **THE COURT:**  Okay.  I'll give you a chance to respond.

 8          **MS. THOMPSON:**  Yes, Your Honor.  That is the law in

 9   the Ninth Circuit.  And we have cited on Page 4 of our brief,

10   which has been filed, is that service on the board as a whole

11   or service on a particular committee is not sufficient.

12      I believe Mr. Porritt actually even said that it's an

13   individual determination, board member by board member.  Here,

14   they did not call four of the board members, so I think that

15   takes care of them, and it will streamline the case for the

16   jury.  Those witnesses do not need to be called.

17      But it -- Mr. Porritt is absolutely incorrect that being

18   an outside director is sufficient.  The Ninth Circuit law is

19   very clear on that.  There must be day-to-day management of the

20   company, and there must be involvement with the specific

21   tweets.

22      Even if one of those is not met -- even if one of those

23   were met, which is not the case here, there's no -- there's no

24   evidence that there was specific involvement with the tweets.

25   So even if there were evidence they were day-to-day management,

 1   there is no evidence that the board members knew about the

 2   tweets, knew that they were coming.  In fact, the law is to the

 3   contrary.

 4        And just to be clear, as to the four directors who have

 5   not been called, it's not just that plaintiff didn't call them.

 6   There's no evidence about their role in this, whatsoever.  And

 7   so the Court certainly should direct a verdict, grant judgment

 8   as a matter of law to those four directors.

 9        But I would just point the Court also to the cases cited

10   in our brief on Pages 3 to 7, but mainly Page 4, that if you're

11   an outside director, it's simply -- that is simply not enough.

12   Simply serving in your role as an outside director is not

13   enough.

14        As to the audit member specifically, actually, the --

15   Ms. Denholm's testimony made clear that the audit committee

16   reviews management's responsibility for carrying out the

17   policies.  So there's no role, day to day, even for the members

18   of the audit committee.

19        Judgment as a matter of law on the Section 20(a) claim

20   should be granted.

21        **THE COURT:**  All right.  Your motion will be noted for

22   the record, and will be deemed submitted, taken under

23   submission.  I'm not going to rule on it right now.

24        **MS. THOMPSON:**  Thank you, Your Honor.

25        **THE COURT:**  Okay.  Thank you.

1          **MR. SPIRO:**  Your Honor, just so the Court knows the

2    schedule, because I think it's fair to the Court, given where

3    we are --

4          **THE COURT:**  Yeah.

5          **MR. SPIRO:**  So we are going to call Mr. Teller, and we

6    have a deposition clip.  We are doing that so that if the Court

7    does rule on the motion, there's at least a break; we're not

8    going to call the directors right now.

9       I'm in a bit of a tricky position, as the Court can

10   probably understand, because I don't want to call witnesses who

11   are defendants in a federal securities fraud trial who there

12   has not been one mention of their even name in the record.  So

13   we don't think that the case can proceed against them, so I

14   don't want to call them and introduce them into the case in

15   which there is no record of them.

16      And if the Court does find at least to those four, then we

17   would not be calling them after that break.

18          **THE COURT:**  Let me be clear.  I'm not going to grant

19   the motion right now, at this point.  So you can make your

20   decision whether you want to call them.

21          **MR. SPIRO:**  I understand.  That's what I was trying to

22   clarify.

23          **THE COURT:**  Yeah.

24          **MR. SPIRO:**  Okay.

25          **THE COURT:**  So you can call them.

PROCEEDINGS

1      **MR. SPIRO:**  We're still going to go in that order

2  because I -- I intentionally did that order so that if the

3  Court needed a minute, the Court would have the brief recess.

4  So I will confer with my colleagues and -- but that is how we

5  will proceed.

6      The next witness will be Mr. Teller.

7          **THE COURT:**  All right.

8          **MR. PORRITT:**  Is Mr. Teller live?

9      **MR. SPIRO:**  Yes.

10      **MR. PORRITT:**  Okay, I was just checking.  I was just

11  confused by the deposition cites, sorry.

12          **THE COURT:**  So Mr. Teller will be live, and then there

13  may be some -- up to you, whether you call board members or

14  not.  Some by video, or at least one?

15      **MR. SPIRO:**  There's one that has the health issue

16  that --

17          **THE COURT:**  Yeah.

18      **MR. SPIRO:**  -- as I indicated, would be by video, on

19  consent.

20          **MR. PORRITT:**  (Nods head)

21          **THE COURT:**  Okay.  And other witnesses, have you

22  decided whether to call your expert?

23      **MR. SPIRO:**  Yes, we have -- we will meet and confer on

24  these topics, and we will be ready in -- now we have about ten

25  minutes.  We will be ready to proceed in front of the jury,

**PROCEEDINGS**

1  Your Honor.

2      **THE COURT:**  All right.  So it sounds like you may be

3  taking through the day, then, if you --

4      **MR. SPIRO:**  No, I don't --

5      **THE COURT:**  No?

6      **MR. SPIRO:**  I wouldn't say that.  I think the Court

7  will have an opportunity to instruct the jury from 1:15 to

8  2:00.

9      **THE COURT:**  So I should work on the jury instructions,

10  is what you're telling me.

11      **MR. SPIRO:**  Yes.  If Your Honor has dispensed for the

12  moment with the 50(a), then not to tell the Court how to use

13  its time, but yes, Your Honor.

14      **THE COURT:**  I got you.

15      **MR. SPIRO:**  Thank you.

16      **THE COURT:**  I got you.  All right.  Thank you.

17      **MR. PORRITT:**  Thank you, Your Honor.

18      **THE COURTROOM DEPUTY:**  Court is in recess.

19     (Recess taken from 10:25 a.m. to 10:47 a.m.)

20     (Jury enters the courtroom at 10:47 a.m.)

21      **THE COURT:**  Have a seat, everyone.

22     Welcome back, members of the jury.

23     The plaintiffs have concluded their case in chief, and now

24  it's the phase where we shift to the Defendants' case.  So the

25  Defense may call their first witness.

```
 1            MR. LIFRAK:  The Defendants call Sam Teller.

 2            THE COURT:  If you could administer the oath.

 3                          SAM TELLER,

 4   called as a witness for the Defendants, having been duly sworn,

 5   testified as follows:

 6            THE WITNESS:  I do.

 7            THE CLERK:  Thank you.  Please have a seat.

 8       Please speak clearly into the microphone.  State and spell

 9   your first and last name for the record.

10            THE WITNESS:  Sure.  Does this work?  Yeah.

11       My name is Sam Teller.  S-A-M, T-E-L-L-E-R.

12            THE COURT:  Thank you, Mr. Teller.

13       You may proceed.

14            MR. LIFRAK:  Your Honor, to move things along, we

15   would ask for admission of Exhibits 109 and 110-A, to which

16   there were no objections.

17            THE COURT:  All right.  Without objection, those will

18   be admitted.

19       (Trial Exhibits 109 and 110-A received in evidence.)

20                      DIRECT EXAMINATION

21   BY MR. LIFRAK

22   Q.   Good morning, Mr. Teller.

23   A.   Good morning.

24   Q.   You used to work for SpaceX and Tesla; is that correct?

25   A.   That's correct.
```

TELLER - DIRECT / LIFRAK

1   **Q.**   During what time period?

2   **A.**   From 2014 to 2019.

3   **Q.**   And what was your title at those companies?

4   **A.**   My job title officially was director of the office of the

5   CEO and informally my title was chief of staff.

6   **Q.**   Chief of staff to whom?

7   **A.**   To Elon Musk.

8   **Q.**   And how, at a very high level, would you describe your

9   job?

10  **A.**   You know, the job varied a lot from day to day, but I'd

11  say in a lot of ways it was like air traffic control.  There

12  was a lot of problem solving.

13       Often like a chief of staff role traditionally, you know,

14  will be a gatekeeper to the CEO.  That was not as of the case

15  here.  I wasn't throttling communication to Elon.  He was the

16  type of -- or he is the type of CEO who likes to absorb

17  information directly, whether it's on Twitter or from the

18  public, from Tesla customers, from employees at SpaceX and

19  Tesla.

20       So I'd say my job was much more kind of facilitating and

21  problem solving internally, not as much gatekeeping.

22  **Q.**   And how many hours a week typically would you be working?

23  **A.**   It was -- it was pretty full on.  So most of my waking

24  hours were working in some form.

25  **Q.**   And maybe you've already answered this question, but why

TELLER - DIRECT / LIFRAK

1   did you leave?

2   **A.**   After five years, I was pretty tired and, you know, it was

3   time to do something else.

4   **Q.**   So we're going to pretty much talk about one topic in

5   particular with your testimony this morning, and that's the

6   meetings that you and Mr. Musk had with the PIF over the course

7   of 2017 and into 2018.  Okay?

8   **A.**   Okay.

9   **Q.**   So going into 2018 had Mr. Musk discussed with you the

10  possibility of Tesla going private?

11  **A.**   Yeah, absolutely.  It was something that came up from time

12  to time.  Pretty much as long as I've known him, the whole time

13  that I worked for him, it was just a subject that would come up

14  periodically.

15      He would often say that he wished that Tesla could be

16  private.  We had the direct comparison of what it was like to

17  work at SpaceX and to run SpaceX as a private company, and so I

18  would say the subject had come up a number of times over the

19  years.

20  **Q.**   So let's move to the PIF, and I'd like you to take a look

21  at Exhibit 105, which is in evidence.

22          **MR. LIFRAK:**  And could we publish that to the jury,

23  please.

24          **THE COURT:**  Okay.

25      (Document displayed.)

1  BY MR. LIFRAK

2  Q.   Now, if you look at the first email in time, which is on

3  the bottom of the first page.  And you can look at the screen

4  and see this.  It's the bottom of the first page that goes onto

5  the second page.  Do you see that email from Saad Al-Jarboa at

6  the PIF?

7  A.   I do.

8  Q.   And it was sent to an email address called the EM Desk

9  email account, and you had access to that; is that right?

10 A.   Correct.

11 Q.   And if you see on the second page of the email from

12 Mr. Al-Jarboa, it says (as read):

13        "My name is Saad Al-Jarboa and I work for His

14     Excellency Mr. Yasir Al-Rumayyan at the Public Investment

15     Fund."

16     Do you see that?

17 A.   I do.

18 Q.   And it says (as read):

19        "His Excellency has asked me to reach out to you in

20     order to inquire about your availability to meet with him

21     next week.  His Excellency would be willing to meet with

22     you in either London or New York."

23     Do you see that?

24 A.   I do.

25 Q.   What did you do with his email?

TELLER - DIRECT / LIFRAK

1  **A.**   I believe I forwarded this email to Elon and his

2  assistant.

3  **Q.**   And then in the middle of the first page do you see where

4  Mr. Musk writes essentially a response to that email

5  internally?

6  **A.**   I do see that.

7  **Q.**   And Mr. Musk states (as read):

8         "I appreciate the offer, but my obligations prevent me

9         from traveling to those locations on those dates.  Let's

10        just schedule something when he is next in California.

11        This is not an urgent matter."

12        Do you see that?

13 **A.**   I do.

14 **Q.**   And that is an email that Mr. Musk sent to you and to Emma

15 Gallagher?

16 **A.**   Correct.

17 **Q.**   And who is Emma Gallagher?

18 **A.**   She was Elon's assistant at the time.

19 **Q.**   And then do you see above that where Ms. Gallagher writes

20 to you (as read):

21        "Okay for me to convey?"

22 **A.**   Yes.

23 **Q.**   And then could you read your response to that?

24 **A.**   I wrote (as read):

25        "Don't say 'not urgent.'  Just say not possible

 1        unfortunately.  Hope to soon."

 2   **Q.**   And could you explain why you told her "Don't say not

 3   urgent"?

 4   **A.**   Yeah.  I think, you know, from time to time Elon would

 5   communicate with us or just in general in a -- like a very

 6   direct way.  You know, he has a very unique style of

 7   communication.

 8        I think maybe if you watched *Saturday Night Live* you might

 9   have even heard him say, you know, like, that he has

10   Asperger's.  And so sometimes, like, the way that he

11   communicated, I would read it and determine that maybe it could

12   use a little translation or softening in order for the language

13   to have the intended effect.

14   **Q.**   And so the meeting that's referenced here, or the

15   potential meeting, in November 2016, did that happen to your

16   recollection?

17   **A.**   I believe the meeting happened in January of 2017.

18   **Q.**   Okay.  So let's talk about that.  January 2017, do you

19   recall a meeting between the PIF and including you and

20   Mr. Musk?

21   **A.**   Yeah.

22   **Q.**   And January -- do you recall the approximate date in

23   January 2017?

24   **A.**   I don't remember what day in January.

25   **Q.**   Where was that meeting?

**TELLER - DIRECT / LIFRAK**

1  A.   The meeting was at the offices of OpenAI, which is like an

2  artificial intelligence startup that Elon had co-founded.

3  Q.   In what city?

4  A.   In San Francisco.

5  Q.   And who attended that initial meeting in January 2017?

6  A.   From our side it was Elon and me and there may have been

7  one other person on our team.  I don't remember.  And then from

8  the PIF side there was Yasir and then two of his colleagues,

9  Saad and Turqi.  I forget their last names.

10 Q.   And going into that meeting what was your understanding of

11 the purpose of meeting with these representatives of the PIF?

12 A.   The meeting had been teed up by a mutual contact who had

13 suggested the meeting to Elon in the context of a conversation

14 about Tesla going private.  The person that introduced us said

15 that the Saudi fund was, like, maybe one of the only investors

16 in the world that would have enough money and potentially the

17 desire to fund a take-private transaction.

18      And so this -- the purpose of the meeting was, like, an

19 initial get to know you, but the only reason that Elon was

20 taking a meeting with a prospective investor like this was

21 because it was, you know, up against the backdrop of

22 potentially partnering on a take-private transaction.

23 Q.   And just at a high level, what do you recall Mr. Musk

24 expressing at this meeting in January 2017?

25 A.   He gave a high level intro about the companies.  He said

1    that he would love to take Tesla private; that, you know, there

2    were a lot of headaches involved in being a public company and

3    that, you know, running SpaceX was a lot more straightforward.

4    You know, it was -- it was pretty high level along those lines.

5    **Q.**    And what, if anything, do you recall Yasir saying at this

6    initial meeting?

7    **A.**    Yasir said something to the effect of, "You know, we're

8    really interested in partnering with you.  We are really

9    interested in potentially investing or funding a take-private

10   transaction.  We -- you know, there's a -- there's a" -- I

11   think he said something like -- I don't remember the exact

12   language, but it was like, "There's a strategic -- it's of

13   strategic importance for us to diversify from oil or something

14   as a country."  It was -- it was all very high level, but he

15   was basically expressing an interest in partnering with Tesla

16   as an -- either through an investment or a take-private

17   transaction.

18   **Q.**    During this initial meeting, do you recall any kind of a

19   discussion regarding potential size of an investment in

20   whatever form?

21   **A.**    I -- you know, it's almost five years ago and so I'm not

22   certain, but there was -- I have a faint recollection of, like,

23   a discussion of -- there was no specific number that I

24   remember, but something like tens of billions or -- there was

25   something like that discussed kind of conveying the order of

 1  magnitude, and the PIF response was basically like, "That's

 2  fine."

 3  **Q.**   Were you aware -- and moving on from that meeting.  Were

 4  you aware of a March 2017 dinner meeting that involved Mr. Musk

 5  and the PIF?

 6  **A.**   Yep.

 7  **Q.**   And did you attend that meeting?

 8  **A.**   I did not.

 9  **Q.**   Do you recall after that, in May and July of 2017, two

10  meetings that Mr. Musk had with the PIF?

11  **A.**   Yeah.  There were two meetings at SpaceX that took place

12  at Elon's desk.  They -- to be honest, they kind of blend

13  together in my mind, but there were two meetings over that time

14  period between Yasir and Elon.

15  **Q.**   And do you recall any discussion in those meetings in the

16  summer of 2017 regarding a potential go-private transaction?

17  **A.**   Yeah.  At a high level Elon expressed his ongoing

18  interest.  And I think Yasir said something like -- again, not

19  a direct quote, but, like, "You know, we're still really

20  interested.  We would like to partner with you."

21       And Elon, as I, like, recall, kind of responded to that

22  and said, "Well, you know, I'd be interested, but, you know,

23  why -- if you want to partner with us or make an investment or

24  do a take-private, why don't you go out and purchase shares on

25  the open market, which you can do because Tesla is a public

**TELLER - DIRECT / LIFRAK**

1  company?"

2  **Q.**   So at this point you've testified, I believe, about four

3  meetings:   The January 2017, the two in the summer of 2017, and

4  the dinner meeting that you didn't attend; is that correct?

5  **A.**   Correct.

6  **Q.**   Were there any other meetings that you recall with the PIF

7  in 2017 leading up to the July 31st, 2018 meeting, which we'll

8  talk about in a minute?

9  **A.**   I don't remember any other meetings.

10  **Q.**   Do you have an understanding at a high level as to why

11  there weren't further meetings at that point?

12  **A.**   I mean, I can speak to what was going on with us, which

13  was, you know, an extremely intense production ramp of the

14  Model 3 sedan, you know, at Tesla.

15       We were -- you know, especially going into spring and

16  summer of 2018 we were -- part of -- some of it has been

17  reported, lots has not been reported, but, you know, we were

18  sleeping in the factory.  We were fixing production issues at

19  all hours of the night.  We spun up a new -- you know,

20  literally like a new car production line in a tent in the

21  parking lot at Tesla.  Things were extremely, extremely intense

22  and we were -- yeah, we were really busy trying to make sure

23  Tesla survived.

24  **Q.**   All right.  Let's turn to the July 31st, 2018 meeting.

25  Where did that take place?

TELLER - DIRECT / LIFRAK

1   **A.**   That was at the Tesla factory in Fremont, California.

2   **Q.**   And how did you become aware that the representatives of

3   the PIF had arrived at the factory?

4   **A.**   I believe one of Elon's assistants texted me that she

5   was -- she had, like, met Yasir in the lobby and was walking

6   out to the factory.

7   **Q.**   All right.  And could you take a look at Exhibit 110-A,

8   which is in your binder that's already in evidence?

9           **MR. LIFRAK:**  And could we publish that to the jury,

10  please.

11      (Document displayed.)

12  **BY MR. LIFRAK:**

13  **Q.**   If you look on the second page towards the bottom of

14  110-A, do you see the message at -- it's dated August 1st at

15  1:15 and then 1:16?

16  **A.**   Yes.

17  **Q.**   And that's from Reyna Ortiz?

18  **A.**   Correct.

19  **Q.**   And who is that?

20  **A.**   One of Elon's assistants.

21  **Q.**   And do you understand what times those are in Pacific

22  time?

23  **A.**   Umm, those were at 6:00 -- 6:15, 6:16 p.m. Pacific time.

24  **Q.**   On the day before, on July 31st; is that your

25  understanding?

**TELLER - DIRECT / LIFRAK**

 1  **A.**   Correct.

 2  **Q.**   And do you see Ms. Ortiz says -- in her two texts she says

 3  "Walking," and then the next one says "With Yasir"?

 4  **A.**   Yeah.

 5  **Q.**   And what did that indicate to you?

 6  **A.**   It was, like I said before, she was -- she had picked him

 7  up in the lobby, which was maybe a five, six-minute walk

 8  from -- from the conference room where we were meeting in the

 9  middle of the factory, and so she was with Yasir.

10         **MR. LIFRAK:**  Your Honor, at this time we'd ask that

11  we'd be able to publish a timeline demonstrative that we've

12  exchanged with the other side and there are no objections to.

13         **THE COURT:**  Okay.

14     (Document displayed.)

15  **BY MR. LIFRAK**

16  **Q.**   Okay.  So the first entry in the timeline is what we just

17  talked about at 6:15 and 6:16.  At that point are -- where are

18  you?

19  **A.**   I was out in the factory near the conference room, an area

20  where our desks were where the meeting would take place.

21  **Q.**   And then what did you respond at 6:16 p.m. to Ms. Ortiz?

22  **A.**   I said (as read):

23         "I can say hi and chat a couple."

24  **Q.**   Okay.  And let's put that on the timeline.

25     So based on your text, can you give us a sense of what

1    time the meeting started?

2    **A.**    Looking at this timeline, I think it was -- it would be

3    sometime between 6:16 and 6:21.

4    **Q.**    And who was there at the beginning of this meeting with

5    the PIF?

6    **A.**    From our side it was Elon and me.  And I believe at the

7    beginning of the meeting it was Yasir and maybe one of his

8    colleagues, and then one or two ended up joining late from

9    their side.  So they ended up with a total of three people.

10   **Q.**    And what, to the best of your recollection, did Mr. Musk

11   talk about initially?

12   **A.**    Yeah.  To start off the meeting, Elon pretty much just

13   gave an update about what was happening at Tesla, some of the

14   stuff I described a couple minutes ago, just how intense the

15   scaling up of the Model 3 production had been.

16   **Q.**    And what do you recall Yasir saying initially?

17   **A.**    The first thing that I remember Yasir saying was something

18   like -- you know, I think Elon said, "Well, that's what's going

19   on with us.  How are you," or something.

20       And Yasir said, "Well, you know, an update from our side

21   is we've acquired almost 5 percent of Tesla.  We've bought

22   shares on the open market."

23   **Q.**    And when you heard that, what did you do?

24   **A.**    I was really surprised, and I texted Deepak Ahuja, who was

25   the Tesla CFO, and Martin Viecha, who was the head of Investor

TELLER - DIRECT / LIFRAK

1  Relations for Tesla.

2  **Q.**   And what did you text them at that point?

3  **A.**   I said (as read):

4          "Yasir from Saudi PIF here says they own almost

5          5 percent of Tesla ."

6  **Q.**   And what time were those texts?

7  **A.**   6:23 p.m.

8  **Q.**   And if we could put that on the timeline.

9          Was that -- to the best of your recollection, those texts

10 were sent immediately after Yasir talked about the 5 percent?

11 **A.**   Correct.

12 **Q.**   What was Mr. Musk's reaction to that revelation; that the

13 PIF had purchased 4.9 percent of the company?

14 **A.**   Elon was really surprised.  I remember he, like, kind of

15 sat up straight in his chair, and I would say the tone of the

16 meeting changed slightly.  It became, like, more positive and

17 engaged.  And, you know, he said something to the effect of,

18 like, "Wow.  That's amazing.  I had no idea.  That's really

19 great to hear."

20 **Q.**   So after this period that we've talked about at 6:23,

21 what -- what happened next in the meeting?

22 **A.**   As I said, Yasir said that about five -- almost 5 percent.

23 Elon replied.  And then Yasir said something, and it was kind

24 of like -- he wasn't, like, making fun of Elon, but I would say

25 it was almost like a gentle ribbing.

1       He -- he was like, "And, you know, Elon, we're still

2   really interested in doing a take-private with you, but, you

3   know, we kind of didn't hear anything from you for a while."

4   Kind of like, what's up with that?

5   **Q.**   And what was the response?

6   **A.**   Elon said, "Well, after we had dinner" -- you know, this

7   is not a direct quote.  The gist of it was, like, you know:

8   After we had dinner with Masa and Larry last year at Tesla, I

9   got a pretty negative impression of Masa.  And my understanding

10  was that you, the Saudi PIF, and Masa and SoftBank were kind of

11  joined at the hip; that you were partners.  And, you know, as a

12  result, it kind of felt to me like it probably wasn't going to

13  make sense for us, you know, to move forward.

14  **Q.**   Okay.  And what did Yasir say to that?

15  **A.**   Yasir was like -- he's like, "We are partnered with Masa

16  in certain ways.  We are, like -- we are friends and we work

17  together, but we are a separate fund."  He said, "You know, we

18  make our own investments.  Masa makes his own investments."

19      And then the thing that I remember him saying verbatim

20  was, he said, "You know, at the PIF we make our own

21  investments."  And then he said, quote, "I am the

22  decision-maker."  And I remember that very clearly.

23  **Q.**   And so once you hear Yasir say that he's the

24  decision-maker, what did you do?

25  **A.**   At that point I texted Deepak and Martin again, and I

TELLER - DIRECT / LIFRAK

1  said --

2  **Q.**   What did you say?

3  **A.**   I said, "Deepak, you may want to join in Jupiter now."

4  **Q.**   And so that's right after -- after Yasir says, "I'm the

5  decision-maker"?

6  **A.**   Yeah.  I don't remember exactly, but it was -- I would

7  have texted that, like, pretty much as soon as that happened.

8  **Q.**   And so once Yasir makes that declaration, what was Elon's

9  reaction?

10  **A.**   It was kind of, again, he, like, sat up a little

11  straighter, leaned in.  Like, you could feel that the tone in

12  the room became a lot more serious.  It -- like, the meeting

13  had gone from a kind of casual catch-up to, like, a -- you

14  know, a real -- a more serious discussion.

15      And Elon said, "Well, if -- you know, in that case" --

16  again not a direct quote, but the gist of it was:  In that

17  case, well, I would still be interested if you're not connected

18  to Masa, and, you know, we should talk about it.

19  **Q.**   So after that point in the meeting, was there any

20  discussion about the amount of money that might be needed for a

21  go-private transaction?

22  **A.**   There was -- I don't remember a specific dollar amount,

23  but there was a discussion, like, along the lines of, like,

24  "It's going to be a lot of money."  Elon said something like

25  that.  He was, like, "Well, you know, it's going to take" -- I

1  don't remember if he said tens of billions exactly or something

2  like that, but it was, like, you know, "It's going to take a

3  lot of money."

4  Q.   And what was Yasir's reaction to that?

5  A.   Yasir was like, "Don't worry about it.  Like, we've got a

6  lot of money."

7  Q.   During this meeting, any discussion of price at all?

8  A.   I am not sure.  It's possible that it was -- that it was

9  discussed maybe, like, a 20 percent premium to the current

10  Tesla share price, but I'm not 100 percent certain if that

11  happened in that meeting or a different meeting.

12  Q.   Was there any discussion of a potential structure of a

13  go-private transaction?

14  A.   I don't remember much about a specific structure other

15  than Elon said that he would want existing shareholders in a

16  public Tesla to have the ability to remain shareholders in a

17  private Tesla.

18  Q.   So if we go back to our timeline, you had texted Mr. Ahuja

19  at 6:26.  At some point did he arrive at the conference room?

20  A.   He did.

21  Q.   And if you could turn back to Exhibit 110-A, which are

22  your text messages.  Do you see the text from Mr. Ahuja at 6:34

23  saying "Outside now"?

24  A.   Yes.

25  Q.   And what did you take that to mean?

TELLER - DIRECT / LIFRAK

1   **A.**   That he was standing outside the conference room.

2   **Q.**   And then he came into the conference room; right?

3   **A.**   Yes.

4   **Q.**   And did the discussions continue once he came into the

5   conference room?

6   **A.**   Yeah.  Yeah, the conversation continued for a bit.

7   **Q.**   And just -- the discussions that you had that you just

8   talked about about price, about potential structure in some

9   way, are you sure whether those happened before he came into

10   the room or after?

11         **MR. APTON:**  Objection.  Misstates the testimony.

12         **THE COURT:**  Overruled.

13   **A.**   I don't remember when those happened, if it was before or

14   after Deepak came in.

15   **BY MR. LIFRAK**

16   **Q.**   Okay.  So could you describe to the jury what happened at

17   the conclusion of the meeting?

18   **A.**   Sure.  At the end of the meeting, we kind of all got up

19   and gathered by the door.  We were saying goodbye and Elon and

20   Yasir, you know, shook hands and it was -- you know, the gist

21   of what they were saying was, like, "I'm really excited to do

22   this.  I'm really excited to do this."  The tone was very

23   positive and excited.

24         And they shook hands, and then Yasir said something to the

25   effect of, "If I don't hear from you in a week, I'm going to

1    call you, or I'm going to reach out."

2    **Q.**   All right.  Do you recall them saying anything when they

3    were shaking hands, or is that the discussion that you just

4    referenced?

5    **A.**   Umm, they -- I don't remember, like, a specific quote, but

6    it was, like -- you know, it was, like, "I'm really excited to

7    do this."  Like, the gist of it was, you know, a lot of, "You

8    know, we're really excited to move forward."  Like, "This

9    sounds great.  We'll have our teams -- like, we'll have our

10   teams follow-up on details."  That kind of thing.

11   **Q.**   And if you could refer back to your text messages at

12   Exhibit 110-A.  Do you see the text at 7:05 saying (as read):

13          "Omead, where you at?  He's going to come."

14   Do you see that?

15   **A.**   I do.

16   **Q.**   And what -- and that was at 7:05?

17   **A.**   Correct.

18   **Q.**   And what did -- what does that indicate to you?

19   **A.**   The meeting had ended by that point and Elon, around that

20   time, was going to head back out into the factory to continue

21   working on production issues.

22   **Q.**   So after that meeting on July 31st, what was your

23   impression of the situation in terms of the PIF potentially

24   funding a go-private transaction?

25   **A.**   My understanding was that we were going to proceed with a

**TELLER - CROSS / APTON**

1  take-private transaction.  Yasir from the PIF had very clearly

2  communicated that he was the decision-maker.  He said that he

3  had the ability, that he had the desire, that he had the intent

4  to fund a take-private transaction of Tesla.

5      And so my understanding leaving that meeting was that the

6  Saudis would be funding a take-private transaction with Tesla

7  and that at some point, you know, our teams -- finance teams,

8  legal teams -- would, you know, iron out the details.

9      But at a high level, you know, it was my sense that they

10 had made a handshake deal to proceed.

11 **Q.**  Thank you, Mr. Teller.

12      **MR. LIFRAK:**  Nothing further at this time.

13      **THE COURT:**  All right.  Thank you.

14 Cross.

15                **CROSS-EXAMINATION.**

16 **BY MR. APTON**

17 **Q.**  Good morning, Mr. Teller.  How are you doing?  Or good

18 afternoon?  Good morning?  Good morning still.

19 **A.**  Good morning.

20 **Q.**  How are you?

21 **A.**  I'm doing well.  How are you?

22 **Q.**  Okay.

23      **MR. LIFRAK:**  If I could just pull up Exhibit 80, which

24 is already in evidence.

25      (Document displayed.)

1   BY MR. LIFRAK:

2   **Q.**   These are the PIF minutes or the Saudi PIF's meeting

3   minutes from the July 31st meeting.

4   **A.**   Sure.

5   **Q.**   And on the left-hand side, you see the attendees.

6   Mr. Al-Jarboa, that was the same gentleman who was on your

7   email, Exhibit 105, talking about the meetings in 2017;

8   correct?

9   **A.**   That's correct.

10  **Q.**   And Mr. Mogren, he was the new guy that was taking notes

11  at the meeting; correct?

12  **A.**   I don't remember if it was Saad or Naif who was taking

13  notes at the meeting.

14  **Q.**   Okay.

15  **A.**   One of them was taking notes on a -- with pen and paper on

16  a notepad.

17  **Q.**   Understood.   Thank you.

18  **A.**   Yeah.

19  **Q.**   Yeah.   You didn't take notes at the meeting; correct?

20  **A.**   I did not take notes at the meeting.

21  **Q.**   And actually at a certain point in the meeting I believe

22  you said you stopped paying attention?   You were checking

23  email?   Does that sound familiar?

24  **A.**   Just from time to time in all meetings, including this

25  one, there were a lot of things going on, and so I might have

1    checked my email or my text messages.  And, as I mentioned

2    earlier, I was texting with Deepak and Martin at different

3    points in the meeting.

4    Q.   And would you describe yourself as pretty ADD?

5    A.   I would.  I do have ADHD, but I was also Elon's chief of

6    staff for five years and was able to do that job despite that.

7    Q.   Understood.

8         Now, after the five years, you left; right?  Where are --

9    where are you working now?

10   A.   I am a venture partner at Valor Equity Partners.

11   Q.   Valor Equity Partners.  That's Antonio Gracias' fund;

12   correct?

13   A.   He is the founder of Valor, correct.  I'm a part-time

14   employee there.

15   Q.   He's your boss?

16   A.   He's a -- I wouldn't characterize him as my boss.  I'm

17   more like an independent kind of -- more like a consultant.

18   He -- I was a full-time employee there for a couple years, but

19   at this moment I am not.

20   Q.   He's good friends with Elon; right?

21   A.   I believe they are good friends.

22   Q.   And if Antonio wanted you out of Valor, he could make that

23   happen; right?

24             MR. LIFRAK:  Objection.  Calls for speculation.

25             THE COURT:  Overruled.

1  A.   Certainly, he could end my agreement with Valor and he

2  could have me out of Valor for sure.

3  **BY MR. APTON**

4  Q.   One more thing.  You mentioned one thing while you were

5  testifying with Mr. Lifrak.  You said that -- would Elon rely

6  on you to, I think you said, soften his public communications

7  at times?

8  A.   That's not exactly what I said, or it's not what I

9  intended to say.  I was saying less about public

10  communications.

11      I was not -- you know, I was not composing public

12  communications for him, but from time to time in internal

13  communications or with -- in communications with external

14  parties, I -- yes, from time to time I might soften his

15  language.

16  Q.   So did he expect you to do that or did you see the need to

17  do it yourself voluntarily?

18  A.   It was something I just exercised judgment in the course

19  of, you know, day-to-day operations.

20  Q.   You didn't see the August 7 tweets before they were

21  published; did you?

22  A.   I did not.

23  Q.   Okay.  Thank you.

24      **MR. APTON:**  No further questions, Your Honor.

25      **THE COURT:**  All right.  Thank you.

```
 1        Anything further?
 2             MR. LIFRAK:  Nothing further.  Thank you.
 3             THE COURT:  All right.  Thank you, Mr. Teller.  You
 4   may step down.  You're excused.
 5             THE WITNESS:  Thank you.
 6        (Witness excused.)
 7             THE COURT:  Next witness.
 8             MR. LIFRAK:  The next witness, Your Honor, for the
 9   Defense is Owuraka Koney by video deposition.
10             THE COURT:  All right.
11                        OWURAKA KONEY,
12   called as a witness for the Defendants herein, testified via
13   videotaped deposition played in open court, not reported.
14             THE COURT:  All right.  Thank you.
15        Next witness.
16             MR. LIFRAK:  The defendants call Defendant James
17   Murdoch.
18             THE COURT:  All right.  Mr. Murdoch.
19                        JAMES MURDOCH,
20   called as a witness for the Defendants, having been duly sworn,
21   testified as follows:
22             THE WITNESS:  Yes.
23             THE CLERK:  Thank you.  Please have a seat.
24             THE WITNESS:  Thank you.
25             THE CLERK:  You're welcome.
```

MURDOCH - DIRECT / LIFRAK

```
 1        Please speak clearly into the microphone.  State and spell
 2    your first and last name for the record.
 3            THE WITNESS:  James Murdoch.  J-A-M-E-S,
 4    M-U-R-D-O-C-H.
 5            THE COURT:  Thank you, Mr. Murdoch.
 6        You may proceed, Mr. Lifrak.
 7                     DIRECT EXAMINATION
 8    BY MR. LIFRAK
 9    Q.    Good morning, Mr. Murdoch.
10    A.    Good morning.
11    Q.    Are you currently a member of the Tesla Board of
12    Directors?
13    A.    Yes, I am.
14    Q.    And how long have you been on the Tesla Board?
15    A.    I've been on the Board since around the middle of 2017.
16    Q.    Are you what is known as an outside director?
17    A.    Yes.
18    Q.    And could you explain briefly to the jury what that means?
19    A.    Yes.  I'm an -- I'm an independent director or outside
20    director.  I don't have any executive connection or function
21    within the business.  I serve solely as -- as an independent
22    director on the Board concerned with, you know, the governance
23    of -- the governance of the company.
24        And there are various rules and, you know, various
25    qualifications that, you know, the stock exchange, et cetera,
```

1  has for qualifying as an independent, which I meet.

2  **Q.**   At a high level could you describe your professional

3  background?

4  **A.**   I spent most of my -- most of my career in the film and

5  television business, in the media business in Asia, in India,

6  and China in particular, in Europe, and then in the United

7  States.

8      In film and television I was the chief executive officer

9  of two public companies:  Sky PLC, a listed company in the

10  United Kingdom, as well as chairman of that company for a

11  number of years; and the chief executive officer of

12  21st Century Fox until 2019, which is a film and television

13  company globally.

14  **Q.**   And what was it that interested you in joining the Tesla

15  Board in the first place?

16  **A.**   For me, you know, really I think the -- the primary --

17  I've had a long kind of passion for interest in environmental

18  issues, technology, environmental policy.  And Tesla's mission

19  to accelerate the world's transition to renewable energy I

20  found, you know, enormously compelling.  To see a company

21  striving to do that in the private sector and striving to

22  innovate and invest to solve major problems in a mission-driven

23  way I found very compelling.

24      And I would also say as a -- you know, as a technology

25  company, but with a -- you know, heavy manufacturing ambitions.

1      It was also, you know, a fascinating set of challenges, as

2   the company was expanding internationally and really starting

3   to get into a real growth phase.

4      So it was an interesting opportunity and I thought that

5   some of my experience could be helpful.  And when I was

6   approached, I -- you know, I thought along those lines.

7   **Q.**   Do you recall receiving an email from Mr. Musk on

8   August 2nd, 2018 entitled "Offer to Take Tesla Private at

9   $420"?

10  **A.**   Yes, I do.

11  **Q.**   And what was your initial reaction when you got that

12  email?

13  **A.**   I think -- you know, I think my mind turned first to

14  process.  You know, as an independent director to, okay, this

15  is a -- this is a serious -- you know, the email was a serious

16  approach.  It had to be taken seriously and we would have to

17  put kind of a scaffolding around the governance of dealing with

18  that approach.

19     And I think in the context of having a bidder who is, you

20  know, an outside bidder potentially offering to take the

21  company private, but who was also the chairman and CEO of the

22  company at the time, just meant that we would have to put an

23  extra set of sort of belt and braces around that.

24     So I turned quite quickly in my mind to process, to say,

25  "Okay.  The Board better -- we're going to convene soon and we

MURDOCH - DIRECT / LIFRAK

```
 1  have to deal with this."  And, indeed, we did convene and start
 2  to deal with it with alacrity.
 3  Q.   And, in fact, do you recall convening that same day on
 4  August 2nd as a Board?
 5  A.   Yes.
 6  Q.   And do you recall at that meeting the CFO of the company,
 7  Mr. Ahuja, addressing the Board at that meeting?
 8  A.   Yes, I do.
 9  Q.   Let's turn to the evening of August 2nd.  Do you recall
10  Mr. Musk was at your home that evening?  Do you recall that?
11  A.   Yes, yes.  He came by.
12  Q.   And what was the occasion of him coming by?
13  A.   It was more of a -- it was actually more of a social
14  occasion.  It was just he and my wife and I catching up after
15  some period of time.  So we sat and talked about a variety of
16  different things.
17  Q.   Did the subject of Mr. Musk's email earlier that day to
18  the Board about a potential go-private transaction come up
19  during his visit?
20  A.   It did come up, but among other things that we talked
21  about.
22  Q.   Do you recall anything that was said about that subject at
23  your home?
24  A.   I think the most -- the thing that I recall about the
25  conversation was it was mostly around this kind of approach
```

1  that Elon had, which was to allow or to really encourage

2  existing shareholders in the business to be able to roll over

3  into a private entity.  And, you know, I found that to be

4  novel.

5      My mind turned to, you know, that that might be difficult

6  for some fund managers, for some portfolio managers with

7  certain mandates they could -- some of them might be allowed by

8  their investors to be in private companies, others might not.

9      So it wasn't -- it struck me as not an easy thing to do,

10  but it was certainly novel and certainly very, I think,

11  inclusive of, you know, what shareholders' interests might be.

12  We talked about some of those dynamics more than anything else.

13  **Q.**   And then do you recall another Board meeting the next day

14  August 3rd, 2018?

15  **A.**   Yes.

16  **Q.**   And did Mr. Musk speak at that meeting?

17  **A.**   Yes, he did.

18  **Q.**   Do you recall at a high level what he said about the

19  availability of potential funding for a go-private transaction?

20  **A.**   Yes.  It was consistent with what Deepak had said and

21  Mr. Ahuja the day before.  The -- you know, I think he was --

22  he was pretty clear that there had been, you know, strong

23  interest.  There had been conversations with potential

24  investors to come and help put together a transaction like

25  this.

 1        And, you know, it struck me as, you know, at the time that

 2    given the variable amount of capital that might be necessary,

 3    given the uncertain nature of how many shareholders might roll

 4    over or not or have to sell or choose to sell, but the funding

 5    was -- you know, funding was abundant from certain sources and,

 6    you know, clear level of interest and intent had been

 7    expressed.

 8    **Q.**   And taking a step back just for a minute, have you done

 9    business in the Middle East with Middle Eastern entities?

10    **A.**   Yes, I have.

11    **Q.**   And could you describe that briefly?

12    **A.**   I did a -- I mean, from -- in a number of different

13    contexts.  I mean, one as a -- as a public company executive, I

14    had -- we had in our shareholder base a number of -- a number

15    of Middle Eastern investors over the years.  One, in

16    particular, who was a major investor for, you know, over 20

17    years in the company until we -- until we sold the company, who

18    was very, you know, consistent.  Always -- always wanted to

19    deal principal-to-principal.  Always, you know, very consistent

20    in terms of, you know, having a conversation, dealing

21    principal-to-principal and then following through.

22        And in another context I had a joint venture there in the

23    news business with a government-related entity.  And, again,

24    you know, I found -- I found -- I found dealing

25    principal-to-principal very, very important.

1      But also that, you know, you would -- you could kind of

2   make an -- you could kind of make an agreement and then you

3   would -- and then you could see it consummated.  It was

4   something that was -- it wasn't very wishy-washy.  It was

5   pretty straight.

6   Q.   So given that experience, did it -- did it surprise you

7   that Mr. Musk expressed confidence in funding via the Saudi PIF

8   even though there weren't any signed documents at that point?

9   A.   No, it didn't -- it didn't surprise me.  And I think the

10  confidence -- you know, you could have -- you could have

11  confidence in those conversations, to my understanding and in

12  my experience.

13  Q.   Moving on to August 7th, 2018.  Did you become aware at or

14  about the time of Mr. Musk's tweets that he had tweeted or

15  shortly thereafter?

16  A.   It was around that time.  I can't recall exactly the

17  moment.

18  Q.   And did Mr. Musk at some point explain to you why he

19  tweeted when he tweeted?

20  A.   I think that -- I think it was consistent with -- it was

21  consistent with my understanding, which was, you know, he

22  really -- you know, he really wanted to be transparent with

23  kind of everyone, all the shareholders, all the employees, all

24  the different stakeholders in this.

25      So his -- I can't speak to his mind.  You know, I'm under

1    oath here.  I can only talk to my own experience.  But

2    certainly in my mind -- right? -- it was, okay, this is kind of

3    a cleansing.  He wants to come out and be totally transparent

4    around his intents, and that's -- and that was -- you know,

5    that was going to get the process started in a real way, and

6    that was not something that surprised me.

7        I later understood that also there had been some news or

8    was about to be or at the same time there was news about the

9    PIF having acquired a stake in the public markets in the

10   company.  And it would be normal to try to contextualize that

11   and be proactive or be on the front foot, if you will, rather

12   than have small bits of information out in the public domain

13   without really understanding the context of what -- of what he

14   was intending to propose.

15   **Q.**   In Mr. Musk's initial tweet on August 7th do you recall

16   the statement "Am considering taking Tesla private at $420"?

17   **A.**   Yes.

18   **Q.**   And in your mind was that consistent with the information

19   that you had from Mr. Musk at that time?

20   **A.**   Yes, it was.

21   **Q.**   And do you remember seeing the term "funding secured" in

22   Mr. Musk's tweet as well?

23   **A.**   Yes.

24   **Q.**   And was that, in your mind, consistent with the

25   information that you had both from Mr. Musk and from Mr. Ahuja?

1  **A.**   Yes, that they had a great confidence in the availability

2  of funding for -- for such a transaction.

3  **Q.**   And ultimately the go-private transaction did not occur;

4  is that right?

5  **A.**   That's correct.

6  **Q.**   And do you have an understanding in your position as a

7  Board member as to why that did not happen?

8  **A.**   Yes.  And I -- and we discussed it as a Board, you know,

9  at great length.

10      You know, ultimately once the -- once Elon was able to go

11  and talk to shareholders kind of directly after having kind of

12  cleansed the situation, solved what are known as the selective

13  disclosure rules and things like that so he could go and talk

14  to shareholders, because his intent was out in the public.

15      You know, when we had the -- the last Board meeting around

16  this subject, we, you know, talked about the possibility of

17  closing a transaction, the availability of funding, you know,

18  all of those things.  Elon's outside advisors presented, if I

19  recall.

20      But ultimately certain shareholders, large shareholders,

21  really had a desire and expressed that desire for the company

22  to stay public, either because, as I mentioned before, in their

23  mandates or whatever rules they had within the particular

24  pockets of money that they were mandated to invest they

25  couldn't hold the shares.  They couldn't move from one vehicle

1    to another.  Or they just thought that the company was better

2    off being a public company and, you know, having access to

3    capital in that way, et cetera.

4        But fundamentally I think shareholders' preference or

5    major shareholders' preference in thinking staying public would

6    be a good thing, they would prefer that, ultimately I think

7    caused Elon -- and as he described to the Board consistently,

8    you know, caused him to think that, you know, better not to

9    pursue this at this time.  Better to focus on the operations of

10   the business, not be distracted by this, and shareholders kind

11   of giving him a clear signal.

12   **Q.**   Thank you, Mr. Murdoch.

13          **MR. LIFRAK:**  Nothing further.

14          **THE WITNESS:**  Thank you.

15          **THE COURT:**  All right.  Thank you.

16   Cross?

17                    <u>**CROSS-EXAMINATION**</u>.

18   **BY MS. TRIPODI**

19   **Q.**   Good morning, Your Honor.  Good morning, everyone.

20          Good morning, Mr. Murdoch.  How are you?

21   **A.**   Good.  Thank you.

22   **Q.**   You've known Elon Musk for over 20 years; right?

23   **A.**   Right.

24   **Q.**   And do you consider him a friend?

25   **A.**   Yes, we're -- we're friendly.

1    **Q.**    And your families have done things together?

2    **A.**    Yes.  We have children the same age.

3    **Q.**    And in 2018 did you own stock in Tesla?

4    **A.**    In 2018?  Yes, I believe I did.

5    **Q.**    And am I correct that at that time your Tesla stock was

6    worth approximately $30 million?

7    **A.**    No, I don't believe so.  Not in 2018.

8    **Q.**    Do you have a sense of what your stock was worth then?

9    **A.**    I think it was more like two.

10   **Q.**    Was that an important investment for you?

11   **A.**    You know, I take all investments kind of, you know,

12   seriously.  But I had bought the stock well before I became a

13   director, so it was something that I just -- as I said earlier,

14   you know, I really believe in mission-driven companies, and

15   particularly this company's mission.  And I had bought the

16   stock as a customer.  I really enjoyed the car that I had

17   bought and thought that, you know, the more people that buy the

18   cars and the more people that buy the stock, the more

19   successful the company can be in prosecuting its mission, which

20   is an important one.

21   **Q.**    Are you currently a stockholder in SpaceX?

22   **A.**    Yes, I am.

23   **Q.**    And is that also an important investment for you?

24   **A.**    Yes, it is.  It's not a -- it's not a -- it's not a huge

25   percentage or anything like that.  It's a passive investment.

1  Q.   After the tweets that are at issue in this litigation, the

2  August 7th tweets, at some point after those had been tweeted,

3  am I correct that Tesla implemented a social media policy?

4  A.   I think we -- I think we clarified.  We added to or

5  clarified an existing policy around the dissemination of

6  information, including social media.

7  Q.   And since that social media policy has been in place, have

8  there been occasions where you and your fellow directors might

9  review Elon's tweets and perhaps adjust them or provide

10  suggestions?

11  A.   The policy -- the policy requires that the -- that

12  material non-public information, like internal information

13  about Tesla's operations or future operations, et cetera, that

14  if it's desired to put that in social media, that Elon takes

15  those to either the general counsel or the company or the CFO,

16  if the general counsel isn't available.  It's not for the Board

17  to pre-clear the tweets.  It's to ensure that a process is in

18  place and is followed along those lines, and it has been

19  followed.

20       Since the -- we now have a disclosure controls committee,

21  which also meets regularly and reviews the activity after the

22  fact around:  Has that policy been implemented?  Have those

23  procedures been followed?  And are they appropriate?

24  Q.   Prior to August 7th of 2018, were you aware of any review

25  process for Elon's tweets at Tesla?

1    **A.**   There was a -- yes.   There was -- there was a policy in

2    place around material non-public information that was inclusive

3    of all communications.   The August 7th or 8th, or whenever it

4    was, clarification or additional piece there was just

5    specifically calling out that this includes social media to

6    name that, if I recall correctly.

7    **Q.**   And to your knowledge, had there ever been -- prior to

8    August 7th, had there ever been review of any of Mr. Musk's

9    tweets?

10   **A.**   I believe if there was material non-public information

11   involved, that the normal -- the normal process would have been

12   finance and audit, et cetera, would have been involved or the

13   general counsel.

14   **Q.**   But you were not involved in any such process?

15   **A.**   No, not -- not before.   I became a member of the

16   disclosure controls committee after all of this.

17   **Q.**   Thanks, Mr. Murdoch.

18        **BY MS. THOMPSON:**  No further questions.

19        **THE WITNESS:**  Thank you.

20        **THE COURT:**  All right.   Thank you.

21   Anything on redirect?

22        **MR. LIFRAK:**  Nothing further.   Thank you.

23        **THE COURT:**  All right.   Thank you, Mr. Murdoch.   You

24   are excused.   You may step down.

25        **THE WITNESS:**  Thank you very much.

 1        (Witness excused.)

 2            **THE COURT:**  All right.  Further witnesses?

 3            **MR. PRICE:**  Good morning, Your Honor.  We call

 4    Defendant Kimbal Musk.

 5            **THE COURT:**  Okay.

 6                        <u>**KIMBAL MUSK**</u>,

 7    called as a witness for the Defendants, having been duly sworn,

 8    testified as follows:

 9            **THE WITNESS:**  I do.

10            **THE CLERK:**  Thank you.  Please have a seat.

11        Please speak clearly into the microphone and please state

12    your first and last name and spell it for the record.

13            **THE WITNESS:**  My name is Kimbal Musk, K-I-M-B-A-L,

14    M-U-S-K.

15            **THE COURT:**  Thank you, Mr. Musk.

16        You may proceed, Counsel.

17            **MR. PRICE:**  Thank you.

18                    <u>**DIRECT EXAMINATION**</u>

19    **MS. TRIPODI**

20    **Q.**  So, Mr. Kimbal Musk, are you Elon Musk's brother?

21    **A.**  I am.

22    **Q.**  Let me talk to you about why you are here today.  Is it

23    correct that you are an outside director on Tesla's Board of

24    Directors?

25    **A.**  I'm a -- I'm a member of the Board of Directors.

1   **Q.**   And you were not part of management of Tesla; is that

2   right?

3   **A.**   I was not part of management.

4   **Q.**   Okay.  Have you ever been part of management at Tesla?

5   **A.**   I have never been part of management.  I've done a lot of

6   work operationally.  I've worked with the management, worked in

7   the offices over the past 20 years and really enjoyed my time

8   there, but I'm not a member of management.

9   **Q.**   And as a non-management member of Tesla's Board of

10  Directors, do you understand that in this case you're being

11  sued personally for billions of dollars for alleged violations

12  of the securities laws?

13  **A.**   I'm aware.

14  **Q.**   So let's -- let's talk about your activity then.

15       In fact, first, let's step back.  You mentioned that

16  you're Mr. Musk's brother.  Did you come from South Africa to

17  the United States around the same time your brother did?

18  **A.**   Yeah.  About two years later.

19  **Q.**   And that was about when?

20  **A.**   I arrived in the United States in 1995.

21  **Q.**   And at some point you became a member of Tesla's Board of

22  Directors; right?

23  **A.**   At the beginning, yes.

24  **Q.**   And when you say "at the beginning," could you tell the

25  jury when that was?

 1   **A.**   Sorry.  At the founding of the company, I joined the Board

 2   of Directors, I believe it was April of 2004, at the request of

 3   my brother.

 4   **Q.**   And are you also associated with SpaceX?

 5   **A.**   I am.  I joined the Board of SpaceX and was the first

 6   outside investor in 2022.

 7   **Q.**   So let's bring you to the events that matter in this case,

 8   and that's August of 2018.

 9          **MR. PRICE:**  If we could put up Exhibit 81, which is in

10   evidence, and publish that to the jury.  That's the email offer

11   to the Board of Directors on August 2nd, 2018.

12      (Document displayed.)

13   **BY MR. PRICE**

14   **Q.**   You received this email around August 2nd of 2018?

15   **A.**   Yes, I did.

16   **Q.**   And there was a Board of Directors meeting shortly after

17   the receipt of this email; is that right?

18   **A.**   There was a Board of Directors meeting that I was not part

19   of, but I was part of one the day after that.

20   **Q.**   And can you explain to the jury why you were not a member

21   of the Board of Directors meeting on August 2nd?

22   **A.**   Yes.  I'm a related Board member.  So I'm not independent.

23   And the Board regularly would meet -- wouldn't even inform me

24   that I was recused necessarily.

25      For example, I didn't even know about that Board meeting

 1  because I'm related to my brother and not considered an

 2  independent Board member.

 3  **Q.**   Now, you mentioned there was a Board meeting the second

 4  day on August 3rd and you were part that Board meeting?

 5  **A.**   Yes, I was.

 6  **Q.**   How was it you were -- you were allowed to attend that?

 7  **A.**   My brother attended as well.  It was a Board meeting that

 8  was inclusive of Elon as the bidder, and so I was able to

 9  attend.

10  **Q.**   There are minutes of that Board meeting?

11  **A.**   Yes.

12  **Q.**   And did you read the minutes of that Board meeting?

13  **A.**   I have read them in preparation for today.

14  **Q.**   Okay.  Do those minutes accurately reflect what happened

15  during that Board meeting?

16  **A.**   Yes.

17  **Q.**   Now, you mentioned that you were recused from August 2nd.

18  After the August 3rd Board meeting, what, on a high level, did

19  the Board of Directors do then in response to this August 2nd

20  offer?

21  **A.**   Well, they did their -- the regular response you would

22  expect.  They -- I believe our lead director Antonio responded

23  saying -- acknowledging receipt of the offer, and they formed a

24  committee.

25      I wasn't part of that process so I don't know the details,

1   but they also formed a committee.

2   **Q.**   Okay.  And that's what we've heard as being referred to as

3   the special committee?

4   **A.**   Yes, that's correct.

5   **Q.**   And that's something you were not involved with; correct?

6   **A.**   Not at all.

7   **Q.**   You were recused from that committee as well; correct?

8   **A.**   Yes.

9   **Q.**   Were you a part of any Board of Director decisions about

10  whether to make public statements about the offer to go private

11  or about hiring financial advisors to represent the company or

12  any other Board reactions related to this potential

13  transaction?

14  **A.**   I was not involved at all with regards to the Board

15  meetings where I was recused.  There was a period of time a

16  little bit later in August where I did attend meetings, a Board

17  meeting where I believe Silver Lake and Goldman Sachs

18  presented.

19  **Q.**   So I also want to ask you a few questions about

20  August 7th.  We're here because there were some tweets that

21  your brother made an August 7th.

22      Did you see those tweets at the time?

23  **A.**   I do recall.  I was actually offline.  I saw them a few

24  hours after they came out.

25  **Q.**   And at the time you read those tweets, in your view, was

 1    there anything in those tweets that was not consistent with

 2    what you knew were the true state of affairs?

 3    A.    It was completely consistent with the meeting on

 4    August 3rd.  Frankly, I was really excited.  I mean, it was

 5    very exciting to imagine us being a private company.

 6         I was happy for the mission, which was a mission to --

 7    which our mission still is to accelerate the world to an

 8    alternative energy system.  It was better for shareholders and

 9    also better for my brother.  I was really happy.  I was really

10    excited about it.

11              MR. PRICE:  Okay.  No further questions, Your Honor.

12              THE COURT:  Thank you.

13         Any cross?

14                        **CROSS-EXAMINATION**

15    BY MS. TRIPODI

16    Q.    Good afternoon, Mr. Musk.  Nice to see you again.

17         So you've mentioned Elon Musk is your brother.  And am I

18    correct that in July of 2018 even you asked your brother to be

19    more thoughtful about his use of Twitter?

20    A.    Yeah.  It was specifically related to exchanging insults

21    with a person, and I felt my brother was above that.

22    Q.    And you were aware that your brother had a large audience

23    on Twitter, rather many followers; correct?

24    A.    Sure.

25    Q.    Outside of the Tesla Board, am I correct that you also

1  have a strong relationship with Antonio Gracias?

2  **A.**   I do.

3  **Q.**   And is it fair to say Mr. Gracias is also your brother

4  Elon's friend?

5  **A.**   Yes.

6  **Q.**   Do you recall -- you mentioned that you were offline when

7  the August 8th tweet came out.  Do you recall where you were?

8  **A.**   Sorry.  The August 7th tweet.

9  **Q.**   August 7th.  My apologies.

10  **A.**   Yes, I was on a hike.  I live in Colorado.

11  **Q.**   Okay.

12       **MS. TRIPODI:**  Thank you.  No further questions at this

13  time?

14       **THE COURT:**  Thank you.

15     Anything further?

16       **MR. PRICE:**  No questions, Your Honor.

17       **THE COURT:**  All right.  Thank you, Mr. Musk.  You are

18  excused.  You may step down.

19       **THE WITNESS:**  Thank you.

20     (Witness excused.)

21       **THE COURT:**  Any further witnesses?

22       **MS. THOMPSON:**  Your Honor, Defendants call Defendant

23  Ira Ehrenpreis.

24       **THE COURT:**  Okay.

25

1                      **IRA EHRENPREIS**,

2    called as a witness for the Defendants, having been duly sworn,

3    testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please have a seat.

6              **THE WITNESS:**  Thank you.

7              **THE CLERK:**  You're welcome.

8         Please speak clearly into the microphone.  State and spell

9    your first and last name for the record.

10             **THE WITNESS:**  Okay.  It's Ira Ehrenpreis.  I-R-A, last

11   name is E-H-R-E-N-P-R-E-I-S.

12             **THE COURT:**  All right.  Thank you, Mr. Ehrenpreis.

13        You may proceed, Counsel.

14             **MS. THOMPSON:**  Thank you, Your Honor.

15                    **DIRECT EXAMINATION**

16   BY MS. THOMPSON:

17   **Q.**   Mr. Ehrenpreis, where are you from?

18   **A.**   I've lived in the Bay Area for the last 30 years.

19   **Q.**   And what do you do for a living?

20   **A.**   I'm an impact investor.  So I invest in companies that try

21   to achieve both a financial return, but also some form of a

22   social return or an environmental return.  You know,

23   entrepreneurs that care about one of those two things.

24   **Q.**   And how long have you been on the Tesla Board of

25   Directors?

1   **A.**   Since 2007.

2   **Q.**   Are you an independent director on the Board?

3   **A.**   I am.

4   **Q.**   And what is your day-to-day job?

5   **A.**   I'm an investor investing in purpose-driven or

6   mission-driven companies.  We call it impact investing.

7   **Q.**   And how did you first learn in August 2018 that Mr. Musk

8   was considering taking Tesla private?

9   **A.**   He sent an email to the Board.  That's when I first

10  learned about it.

11  **Q.**   And what did you understand the Board's job to be when it

12  came to considering this offer from Mr. Musk?

13  **A.**   The Board's job was to undertake a process to figure out

14  what was in the best interests of the shareholders.

15  **Q.**   And did you and the other members of the Board get legal

16  advice how to fulfill your responsibilities in this situation?

17  **A.**   Yes, we did.

18  **Q.**   And in carrying out your duties as a Board member during

19  this period, did you always act in good faith?

20  **A.**   Absolutely.

21  **Q.**   Now, after you received the email from Mr. Musk on

22  August 2nd offering to take Tesla private, was there a meeting

23  that same day?

24  **A.**   Yes, there was.

25  **Q.**   Was Mr. Musk invited to attend that Board meeting?

EHRENPREIS - DIRECT / THOMPSON

1  **A.**    No.

2  **Q.**    Why not?

3  **A.**    Well, Elon was a counterparty to -- in this transaction,

4  and so the Board wanted to have a discussion without him.

5  **Q.**    And what did you learn at the Board meeting on August 2nd

6  about the transaction?

7  **A.**    Deepak Ahuja, who was the then CFO, told us that he and

8  Elon were at a meeting with the Saudi Arabia Sovereign Wealth

9  Fund, that they call PIF, and that at that -- they had

10  discussions for dating back to, I guess, about a year he said.

11        And at that point in time when they met, they were told

12  that the Saudi Arabia fund was ready, willing, able and wanted

13  to move forward to fund Tesla going private and that they had

14  enough money and capital to do the entire thing.

15  **Q.**    And was there a Board meeting the next day, August 3rd,

16  that Mr. Musk attended?

17  **A.**    He did.

18  **Q.**    And what do you recall Mr. Musk telling the Board at the

19  August 3rd Board meeting?

20  **A.**    Elon gave the Board a more detailed rationale for why he

21  wanted -- he was considering taking Tesla private.  He

22  reiterated what Deepak told us about the Saudi Arabia PIF fund;

23  that they wanted to take Tesla private and that they had enough

24  money to do it themselves.

25        And then Elon described that he wanted a process that

1  actually had the existing shareholders' support.  And the idea

2  would be to only have people who didn't want to be private be

3  bought out, but that his hope was that the existing

4  shareholders would largely want to be part of a go-private

5  transaction.  And that he also said that he thought that there

6  were a number of both existings and new investors that would be

7  interested in funding a go-private transaction.

8  Q.  And as to funding, did you have a view on whether Mr. Musk

9  would have any issue in getting funding for a take-private

10  transaction?

11  A.  I did, because on August 2nd and 3rd we were told by both

12  Deepak and Elon that there was enough funding and interest just

13  from PIF alone to fund the entire transaction.

14      And I've also, having watched Elon, seen that he has more

15  than enough interested investors who want to fund things that

16  he's involved with.

17  Q.  When you saw the tweets from Mr. Musk on August 7th, did

18  you know that Mr. Musk was going to post those tweets?

19  A.  No, I didn't.

20  Q.  And let me show you Exhibit 8, which is in evidence.

21      MS. THOMPSON:  If we could publish for the jury.

22      (Document displayed.)

23  BY MS. THOMPSON

24  Q.  Mr. Musk writes (as read):

25          "Am considering taking Tesla private.  Funding

1          secured."

2          How did you interpret the phrase "funding secured"?

3   **A.**   I interpreted it as he felt that there was enough -- what

4   he told us and what Deepak told us at the meetings; that there

5   was -- that funding wasn't an issue because he had enough

6   interest from PIF, and he thought others, to fund the entire

7   transaction.

8   **Q.**   Now, in light of Mr. Musk's fundraising track record, how

9   significant would the information that Mr. Musk could obtain

10  the necessary funding be?

11          **MR. APTON:**  Objection.  Leading.

12          **THE COURT:**  Sustained.

13  **BY MS. THOMPSON**

14  **Q.**   In your view, how significant was the information that

15  Mr. Musk could obtain the necessary funding be?

16          **MR. APTON:**  Objection.  Leading.

17          **THE COURT:**  Overruled.

18  **A.**   I mean, it's quite well known that Elon has a large amount

19  of interest in -- from a funding perspective, from a wide array

20  of investors who want to fund things he's involved with.  And

21  what I've seen over a long period of time is there's more

22  interest in funding his endeavors than there is typically

23  amount to be invested.

24          **MS. THOMPSON:**  And then if we could show Exhibit 13,

25  which is already in evidence.

1       (Document displayed.)

2   **BY MS. THOMPSON**

3   **Q.**   This is another tweet on August 7th linking to a blog

4   post.  Mr. Musk writes (as read):

5       "Investor support is confirmed.  Only reason why this

6       is not certain is that it's contingent on a shareholder

7       vote."

8       Given that Mr. Musk was only considering taking Tesla

9   private, how did you interpret that second sentence in the

10  tweet?

11  **A.**   He had told us that whether or not he wanted to proceed

12  was a function of whether or not the shareholders were

13  supportive.  And so I interpreted it as that that was really a

14  primary consideration for him as to whether or not he wanted to

15  move forward, as to whether or not the existing shareholders

16  were supportive to do that.

17  **Q.**   And in your view, were the tweets consistent with what you

18  learned at the August 2nd and 3rd Board meeting and with

19  Mr. Musk's offer on August 2nd in the email?

20  **A.**   Absolutely.

21      **MS. THOMPSON:**  No further questions, Your Honor.

22      **THE COURT:**  Thank you.

23      Cross?

24

25

<u>**CROSS-EXAMINATION**</u>

**BY MR. APTON**

**Q.**   Good afternoon, Mr. Ehrenpreis.

**A.**   Good afternoon.

**Q.**   How long have you known Elon?

**A.**   I met Elon -- I didn't know Elon before I got involved in Tesla.  And so I joined the Board in 2007, but I didn't know him before that.  I've known him since then.

**Q.**   So coming up on 20 years?

**A.**   2007 to now is 15 years.

**Q.**   Okay.  And you are the founder and managing partner of DBL?  That's a venture capital firm; is that right?

**A.**   DBL Partners.

**Q.**   And DBL, you got into SpaceX, yes?

**A.**   Yes.

**Q.**   How did you get in there?

**A.**   They were raising around and we invested.

**Q.**   Not everyone can invest directly in SpaceX though; right?

**A.**   Well, typically in private companies everyone can't invest because it typically is institutional capital.  And so the fund -- the funds that we represent raise money from pensions and endowments and foundations, and so typically they take money from institutional investors as opposed to public companies where everyone can invest.

**Q.**   Or like a -- I don't know, an ordinary retail investor

**EHRENPREIS - CROSS / APTON**

1   like myself perhaps?

2   **A.**   Well, a retail investor not only can't invest in SpaceX,

3   but basically any of the private companies I've ever invested

4   in were typically the venture capital community investing.

5   **Q.**   I see.  So small investors cannot invest in private

6   companies, is what you're saying?

7   **A.**   There is SEC regulations about being a qualified investor.

8   And typically in order to protect small investors, there's

9   rules around who can invest in private companies as distinct

10   from public companies.

11   **Q.**   Do you know who Kathy Wood is?

12   **A.**   I do.

13   **Q.**   She's a big investor, yeah?

14   **A.**   She is.  She's -- yeah.  I don't know her personally, but

15   I know who she is.

16   **Q.**   Sure.

17       Let me continue.  Sorry for that.  In 2018 you held Tesla

18   shares; correct?

19   **A.**   I did.

20   **Q.**   Do you know how many?

21   **A.**   I don't.

22   **Q.**   Does 100,000 sound about right?

23   **A.**   I don't know.  There's been splits and whatnot.  I know

24   that in around that period of time I think most of my holdings

25   were underwater.  That means they were in the form of not

1  shares, but options.  And because the stock price around that

2  time and thereafter went below the strike price, they were

3  worthless.

4  **Q.**   If I told you that in 2018 those holdings were worth about

5  35 million, would that sound correct?

6  **A.**   I wouldn't know that, no.  Because it obviously moved

7  around and I don't know if you're referring to options or

8  shares.  And, as I said, the options ended up being worthless

9  during that period of time and after.

10 **Q.**   Okay.  Let me ask you this:  At the August 3rd meeting,

11 the one that your counsel was just talking to you about, you

12 thought that the proposal from Musk needed to have some more

13 details, some more terms included; correct?

14 **A.**   Sure.

15 **Q.**   And when Musk a few days later tweeted what he tweeted,

16 "funding secured," at that time you were not aware of any

17 written commitment for financing; correct?

18 **A.**   Correct.

19 **Q.**   You weren't aware of any specific price that had been

20 discussed with any potential investor; correct?

21 **A.**   Correct.

22 **Q.**   And the structure he was contemplating, that hadn't been

23 agreed upon with any lawyers or bankers; correct?

24 **A.**   Correct.

25 **Q.**   And Musk tweeted that tweet in the middle of a trading

1  day, yes?

2  **A.**   Yes.

3  **Q.**   So I think -- now, would it be your opinion that a more

4  traditional medium of communication would have been appropriate

5  for that tweet?  Or for that message, I should say.

6  **A.**   You know, I -- I wouldn't probably have an opinion on

7  appropriate medium or not.  He uses Twitter.  I happen to not

8  use Twitter very much.

9  **Q.**   Sure.

10  **A.**   But it is a way to disseminate information.

11  **Q.**   And now assuming momentarily that there was some policy in

12  place that was requiring some oversight for Musk's Twitter at

13  that time, did anyone check that tweet before it was sent?

14  **A.**   Elon sent that tweet in his personal capacity.  And any

15  Tesla policy would cover what we have in the company around

16  MNPI, material non-public information, and so there wouldn't

17  have been a Tesla related.

18  **Q.**   Right, I understand.  So after the fact, everyone knew

19  that he was Tweeting as a bidder, I guess is what you're

20  getting at.  But what about before?  Did anyone check the tweet

21  before it was sent because?  No one knew he was going to be a

22  bidder -- he was going to be Tweeting in his bidder capacity

23  before he sent the tweet?

24  **A.**   Well, we did know.  That's why we didn't have him in the

25  August 2nd Board meeting, because he was the counterparty.  He

1    was the bidder.  The Board knew that, and that's why he wasn't

2    invited to that August 2nd Board meeting.

3    **Q.**   So is it your testimony that between his email on

4    August 2nd and the tweet on August 7th, the Board got together

5    and said, "Hey, we're not going to enforce this social media

6    policy anymore"?

7    **A.**   Absolutely not.

8            **MS. THOMPSON:**  Objection.

9    **A.**   The policy was in place as it relates to Tesla, but it

10   wasn't -- that policy, since it was created, since the company

11   went public, does not relate to someone in their personal

12   capacity.

13   **BY MR. APTON**

14   **Q.**   But no one checked the tweet before it was sent; correct?

15   **A.**   Correct.

16   **Q.**   Thank you, sir.

17           **MR. APTON:**  No further questions, Your Honor.

18           **THE COURT:**  Anything on redirect?

19           **MS. THOMPSON:**  No, Your Honor.

20           **THE COURT:**  All right.  Thank you, Mr. Ehrenpreis.

21   You may step down.  You're excused.

22           **THE WITNESS:**  Thank you.

23       (Witness excused.)

24           **THE COURT:**  We're at our normal break point.  I don't

25   know how many more witnesses you have to call.

PROCEEDINGS

1           MS. THOMPSON:  So, Your Honor, we have one witness who

2    is being called via Zoom.  I believe she is ready.

3           THE COURT:  Oh.

4           MS. THOMPSON:  And so we can proceed with her, if that

5    makes sense to the Court.

6           THE COURT:  Let me make sure that the jurors don't

7    need a break right now because we're going at it.  How long do

8    you think this witness will be?

9           MS. THOMPSON:  About the length of the other

10   directors, Your Honor.

11          THE COURT:  About ten minutes?

12          MS. THOMPSON:  Yes, Your Honor.

13          THE COURT:  Can you all wait ten minutes or would you

14   like a break first?  Do this now?

15      (Jury panel responding affirmatively.)

16          MS. THOMPSON:  Thank you, Your Honor.

17      Defendants call Defendant Linda Johnson Rice.

18          THE COURT:  She will be appearing by Zoom, but this is

19   live?

20          MS. THOMPSON:  Yes, Your Honor.

21          THE COURT:  So hopefully the connection will work.

22      (Brief pause.)

23          THE COURT:  It didn't go quite as smoothly as we

24   thought.  Why don't we go ahead and take that break now and

25   when you come back, we'll have it all set up.  See you in 20

1    minutes.

2             **THE CLERK:**  All rise for the jury.

3        (Jury exits the courtroom at 12:19 p.m.)

4             **MR. PORRITT:**  Similar logistics matter that Mr. Spiro

5    raised earlier.  At the close of Defendants' case, assuming

6    this is one more witness, we would intend to make a Rule 50(a)

7    motion.

8        So just in terms of logistics, how Your Honor would like

9    to --

10            **THE COURT:**  I'm sorry.  What did you say?

11            **MR. PORRITT:**  At the close of Defendants' case,

12   Plaintiff intends to make a Rule 50(a) motion.

13            **THE COURT:**  Okay.

14            **MR. PORRITT:**  So the question is logistics of how Your

15   Honor wants to hear that.

16            **THE COURT:**  Well, first of all, you can state it for

17   the record so that the timing is right.

18       In terms of hearing that, I was hoping we could complete

19   the witness stuff, and then I could come back and do the

20   instructions, but I want to leave myself -- if this were ahead,

21   I want to leave enough time to do the instructions.  That's

22   probably going to take 40 minutes, something like that.

23            **MR. SPIRO:**  I can assure the Court there will be more

24   than enough time because of where we are.

25            **THE COURT:**  So what I think I'll do is I'll take a

PROCEEDINGS

1    break.  If you close with your final witness and there's no

2    rebuttal witnesses, we'll tell the jury that the evidence has

3    been completed.  Take a little break.  I will tell them when

4    they come back we'll instruct them.

5         And during that break, you can elaborate -- well, actually

6    you can make your motion at that point.

7              MR. PORRITT:  Very good, Your Honor.

8              THE COURT:  So just one more witness?

9              MR. SPIRO:  Yes, Your Honor.

10             THE COURT:  And no rebuttal witnesses?

11             MR. PORRITT:  No rebuttal witnesses.

12             THE COURT:  Great.

13        (Whereupon there was a recess in the proceedings

14         from 12:21 p.m. until 12:42 p.m.)

15             THE COURT:  Okay.  Before we bring the jury back, I

16   have now e-filed the closing jury instructions so you all have

17   a copy of that.  I believe we're actually going to make some

18   hard copies for your benefit.

19        And one thing that I like to do is to have the Jury

20   Instructions up on the screen, and so through Vicky either we

21   will do that or she's going to recruit one of you all to help.

22             THE CLERK:  I will recruit one of the techs.

23             THE COURT:  She's going to recruit one of your techs

24   to help us scroll through so that it's up on the display as I

25   read it.

**PROCEEDINGS**

1    I'm going to read all the way up through Duty to

2  Deliberate, which is Instruction Number 17.  I will save the

3  last five instructions to the final-final.  That's after

4  closing arguments are made.

5    So we're going to bring the jury back in, take testimony

6  from Ms. Rice, and I believe Defendants will close their case.

7  I'll excuse the jury for a short break.  Plaintiff make your

8  motion.  Then we'll call the jury in and deliver the

9  instructions.

10    And I think we'll have enough time to do that.  Okay?

11    (Jury enters the courtroom at 12:52 p.m.)

12    **THE COURT:**  Have a seat everyone.  Welcome back.

13    We now have our system hooked up for the next witness, who

14  is appearing, and we're on live.

15    I guess the question is:  Can we enlarge her -- pin her

16  screen so the jury can see the witness?

17    There we go.  Thank you.

18    Why don't you formally call your next witness.

19    **MS. THOMPSON:**  Yes, Your Honor.  We call Defendant

20  Linda Johnson Rice.

21    **THE COURT:**  All right.  Thank you.

22    Ms. Rice, good afternoon.

23    **THE WITNESS:**  How are you?

24    **THE COURT:**  Good.  Thank you.

25    Oh, the jury can't see.

 1          (Brief pause.)

 2          **THE CLERK:**  I guess it would be nice if I turn the

 3   monitors on.

 4          **THE COURT:**  How about now?  No?

 5          **THE CLERK:**  It takes a few seconds to go on.

 6      There we go.

 7          **THE COURT:**  Okay.  Now we're all square.

 8      And so first we have to have Ms. Rice take the oath, which

 9   will be administered by Ms. Ayala.

10                      <u>**LINDA JOHNSON RICE**</u>,

11   called as a witness for the Defendants, having been duly sworn,

12   testified via Zoom as follows:

13          **THE WITNESS:**  I do.

14          **THE CLERK:**  Thank you.

15      Please state and spell your first and last name for the

16   record.

17          **THE WITNESS:**  Linda Johnson Rice.  L-I-N-D-A,

18   J-O-H-N-S-O-N, R-I-C-E.

19          **THE COURT:**  All right.  Thank you, Ms. Rice.

20      You may proceed, Counsel.

21          **MS. THOMPSON:**  Thank you, Your Honor.

22                     <u>**DIRECT EXAMINATION**</u>

23   **BY MS. THOMPSON**

24   **Q.**  Good afternoon, Ms. Rice.  Ellyde Thompson for the

25   Defendants.

1      Ms. Rice, you are not here in San Francisco testifying

2   today.  Why is that?

3   **A.**   It is because I am visually impaired.  I'm actually blind

4   in one eye and compromised in the other, and I was unable to

5   have a companion, a traveling companion, to go with me.  I

6   cannot move around and travel by myself.

7   **Q.**   And when did your visual impairment occur?

8   **A.**   About a year and a half ago.  Two years at the most.

9   **Q.**   Would you have preferred to be here in person if it were

10  not difficult for you to travel?

11  **A.**   Yes, of course.

12  **Q.**   Now, Ms. Rice, were you formerly a member of the Tesla

13  Board of Directors?

14  **A.**   Yes.

15  **Q.**   During what time period were you a member of Tesla's

16  Board?

17  **A.**   From 2017 to 2019.  Approximately two years.

18  **Q.**   And had you met Mr. Musk before you joined Tesla's Board?

19  **A.**   No.

20  **Q.**   Were you an outside director on Tesla's Board?

21  **A.**   Yes.

22  **Q.**   Did you have any role in the day-to-day management of

23  Tesla?

24  **A.**   No.

25  **Q.**   What was your day-to-day job during the time you were on

**RICE - DIRECT / THOMPSON**

1  the Tesla Board?

2  **A.**   Chairman and CEO of Johnson Publishing Company.

3  **Q.**   Turning your attention to August 2018, do you recall the

4  Board receiving an email from Mr. Musk on August 2nd offering

5  to take Tesla private?

6  **A.**   I do.

7  **Q.**   And do you recall two Board meetings on August 2nd and 3rd

8  after the Board received the email offer from Mr. Musk?

9  **A.**   Yes.

10  **Q.**   And what did you learn at the two Board meetings on

11  August 2nd and 3rd about funding for a transaction to take

12  Tesla private?

13  **A.**   My understanding from the meetings was that Mr. Musk had

14  discussed this transaction with a PIF, I think it's Saudi

15  Arabian, and they were interested and very sincere and

16  forthright and wanting to fund the transaction and take -- help

17  him take the company private.

18  **Q.**   And who conveyed that information to the Board on

19  August 2nd and August 3rd?

20  **A.**   On August 2nd I believe it was the CFO Deepak Ahuja, and

21  on August 3rd it was Mr. Musk.

22  **Q.**   And what was your understanding at the time about whether

23  the Saudi Arabian PIF, the Public Investment Fund, had the

24  money necessary to take Tesla private?

25  **A.**   My understanding was that they were -- they had the

 1   funding, and that -- I believe they already owned about maybe 4

 2   to 5 percent of the company already and were prepared to fund

 3   the entire transaction.

 4   Q.   I'm going to read two tweets that are already in evidence.

 5   The first one is Exhibit 8.  It says (as read):

 6        "Am considering taking Tesla private at $420.  Funding

 7        secured."

 8        The second one is Exhibit 13 (as read):

 9        "Investor support is confirmed.  Only reason this is

10        not certain is that it's contingent on a shareholder

11        vote."

12        These are two tweets that Mr. Musk published on

13   August 7th.  Did you know Mr. Musk was going to publish these

14   tweets before he posted them on Twitter?

15   A.   I did not.

16   Q.   Did you view these tweets at the time as consistent with

17   the information you had received from Mr. Ahuja and Mr. Musk

18   about funding the transaction?

19   A.   Yes.

20   Q.   Ms. Rice, I have no further questions.  Thank you.

21        THE COURT:  All right.  Thank you.

22        Any cross examination?

23        MS. TRIPODI:  Nothing on cross, Your Honor.

24        THE COURT:  All right.  Then thank you, Ms. Rice.  You

25   are excused as a witness.

 1          THE WITNESS:  Thank you very much.

 2          THE COURT:  I appreciate your attendance.  Thank you.

 3          THE WITNESS:  Thank you.  Bye-bye.

 4      (Witness excused.)

 5          THE COURT:  All right.  Any further witnesses?

 6          MR. SPIRO:  Your Honor at this time, and I've tried to

 7   do this before, but Exhibit 322, which is the Saudi Arabia

 8   Sovereign Fund announcement article we've talked about in this

 9   trial is not yet in evidence.  We would offer it into evidence.

10   That's Exhibit 322, which I understand, moving past objections,

11   is fine with plaintiffs.

12      And at this time the Defense rests.

13          THE COURT:  All right.  And no objection to 322?

14          MR. PORRITT:  No objection, Your Honor.

15          THE COURT:  All right.  So 322 is admitted.

16      (Trial Exhibit 322 received in evidence.)

17          THE COURT:  Any further witnesses from the Plaintiff?

18          MR. PORRITT:  Plaintiff calls no further witnesses,

19   Your Honor.

20          THE COURT:  All right.  Well, thank you.

21      So, members of the jury, that will conclude the

22   presentation of evidence in this case.  I'm going to, since

23   there is still time, to give you the instructions on the law as

24   I promised I would.

25      But before that, we're going to take yet another break,

1  but there will be time enough.  We'll be done before the 2:00

2  o'clock hour.

3      The plan at this point is that I will give you some

4  instructions, closing instructions.  And then first thing on

5  Friday morning, you'll hear closing statements from each side.

6  And then I will give you a final-final set of instructions

7  about what to do in terms of procedure, and the case will then

8  be delivered to you for deliberation with the evidence.

9      And I believe we have prepared a little index -- hopefully

10  that will be done -- so that if you're looking for a particular

11  piece of evidence, you'll have a list and a brief description.

12      And that's the process.

13      So as I mentioned yesterday, in terms of hours, once this

14  case is given to you, you set the hours.  So if you want to

15  stay past 2:00 o'clock, we'll be here.  But that might be one

16  thing to consider and see before you leave today, whether

17  that -- so everybody can plan for tomorrow.

18      But that's the plan.  We give the instructions this

19  afternoon, and then you'll hear closing statements or closing

20  arguments Friday, and you will have the case by Friday.  Okay?

21      So let's just take a -- maybe a ten-minute break this time

22  and then we'll come back.  Thank you.

23          **THE CLERK:**  All rise for the jury.

24      (Jury exits the courtroom at 1:01 p.m.)

25          **THE COURT:**  Okay.  Make your motion.

1           **MR. APTON:**  Thank you, Your Honor.

2       For Plaintiff at this time we want to file or move and we

3   hereby move under Rule 50(a).  We believe that we are entitled

4   to judgment as a matter of law on two issues:  One being

5   reliance, both class-wide and individual reliance, and the

6   second being materiality.

7       The reliance issue, Your Honor, we have put forth

8   evidence, testimony from Dr. Hartzmark showing that the market

9   was efficient for both stock options and bonds.  We're entitled

10  to the "fraud on the market" presumption.

11      Your Honor denied our previous motion for summary judgment

12  on that issue because the Court understandably wanted to give

13  Defendants an opportunity to rebut the presumption at trial.

14  They have not put forward any evidence, no expert testimony,

15  saying that the market was not efficient or that the

16  presumption should otherwise not stand.

17      We also have testimony from Glen Littleton, our lead

18  plaintiff, who says he directly relied on the tweet.  So in

19  addition to having a presumption of reliance in his favor, he

20  also has an individual reliance, director reliance.

21      On the topic of materiality, Your Honor, we have a lot of

22  evidence, a significant amount of evidence, showing just how

23  material both these tweets were.  Within moments of them being

24  made, the market reacted very strongly, immediately.

25      So quantitative evidence through statistical analysis

1    shows that the stock price reacted sharply and immediately to

2    these two tweets.

3         Qualitatively, we also have a ton of evidence.  We have

4    emails, analyst reports, internal correspondence within Tesla

5    saying the market was laser focused on this "funding secured"

6    announcement.  Very interested in hearing more information on

7    what "investor support confirmed" actually meant.

8         And so with that evidence, Your Honor, we think it

9    establishes quite clearly that these two tweets were material

10   and that Defendants have not put forward any evidence showing

11   that they were not material.

12        And this is separate and apart from the issues of loss

13   causation and damages.  We're just focusing on materiality at

14   the time the tweets were made on August 7th.

15        **THE COURT:**  All right.  Thank you.

16   Response?

17        **MS. THOMPSON:**  Yes, Your Honor.

18        Let me address reliance first.  First, there is no

19   evidence that Tesla bonds were traded on an active open market.

20   No one opined on that issue and, therefore, there can be no

21   testimony in the record on that issue.

22        Also, if it's helpful to the Court, let me point the Court

23   to Pages 11 through 14 of the 50(a) motion, which we filed,

24   which indicates judgment as a matter of law should be granted

25   in favor of Defendants.  And I would also at this time like to

 1   renew Defendant's 50(a) motions on all the grounds I mentioned

 2   previously.

 3        So there's no evidence that Tesla bonds traded in an

 4   active and open market.  There is certainly a dispute as to

 5   whether reliance such that the "fraud on the market"

 6   presumption ended August 13 is an open question for the jury to

 7   resolve.

 8        There is insufficient evidence to establish materiality.

 9   I'll get to that very briefly in a moment.

10        But Mr. Apton ignores entirely part of the Court's

11   instruction and a key part of the law on this issue, which is

12   whether the statements that are alleged to be false differ in a

13   significant way from the actual state of affairs.

14        I think what the evidence has shown most clearly is that

15   the way everyone interpreted these tweets, the state of affairs

16   was actually identical to what Mr. Musk tweeted on August 7th.

17        So there's insufficient evidence to establish materiality

18   both for the "fraud on the market" presumption and, therefore,

19   there can be no judgment as a matter of law on that and also,

20   of course, as to materiality.

21        And then plaintiffs have failed to prove the remaining

22   elements of fraud on the market, which are the listed out on

23   the Court's Jury Instructions.

24        As to materiality, first of all, Mr. Apton noted the stock

25   price increase or reaction.  And I think even as to the

 1    quantitative evidence, there is no sufficient evidence of

 2    materiality for judgment as a matter of law to be granted.

 3        I'll give the Court a few brief examples.  And I

 4    apologize.  I know I'm going quickly.  But, first, there is no

 5    disaggregation of the true statement "Am considering taking

 6    Tesla private at $420."  That in itself could explain any stock

 7    price reaction.

 8        Second, in connection with the second tweeted issue, there

 9    was a Tesla blog post around that same time.  There has been no

10    indication that any stock reaction was as to the blog post, as

11    to the tweet.  So that's on the quantitative side.

12        And then, of course, on August 13th when the truth is,

13    quote/unquote, revealed, the stock price goes up.  On the

14    quantitative side no sufficient evidence of materiality and, in

15    fact, judgment as a matter of law should be granted in favor of

16    Defendants on that point.

17        But just as to the qualitative evidence, again, what the

18    Court has seen from witness after witness after witness is that

19    what the market understood these tweets to mean is exactly what

20    the state of affairs was.  And so there can be no sufficient

21    evidence of materiality and judgment as a matter of law.  In

22    fact, it should be granted in favor of Defendants on that

23    point.

24        **THE COURT:**  All right.  Thank you, Ms. Thompson.  I

25    appreciate it.

PROCEEDINGS

```
 1        I will take that motion as well under submission.
 2             MR. APTON:  Thank you, Your Honor.
 3             THE COURT:  So it's made for the record.
 4        And so we have -- you should have a copy available to
 5   you -- I'll bring it in if we have extra copies -- of the Jury
 6   Instructions.  I'm going to read Number 1 through Number 16.
 7             And have you recruited somebody, Vicky, to display it on
 8   the screen?
 9             THE CLERK:  Yes.
10        Thank you, Derek.
11             THE COURT:  I want the jury to see it as well as hear
12   it.
13        So that is my plan at this point.  And then just roughly,
14   how much time -- I don't know how much time is left, but I
15   don't know how long --
16             THE CLERK:  I'm doing it right now.
17             THE COURT:  We'll let you know before you leave how
18   much time is left.  That dictates certain parameters in terms
19   of your closing.  All right?
20             MR. APTON:  Thank you, Your Honor.
21             MS. THOMPSON:  Thank you, Your Honor.
22             THE COURT:  All right.  Let's bring the jury in.
23        (Jury enters the courtroom at 1:14 p.m.)
24             THE COURT:  All right.  Have a seat, everyone.
25        Welcome back, members of the jury.
```

1    I am now going to give you instructions on the law that

2  applies to this case.  And for your convenience and benefit

3  we're going to also scroll the written instructions so you

4  will -- you can see it as well as hear it.

5    You will also be given copies of -- several copies of

6  these instructions at the end of the case.  So you'll have that

7  as well.

8                        **JURY INSTRUCTIONS**

9    **THE COURT:**  All right.  First - Duty of the Jury.

10    Members of the jury, now that you have heard all the

11  evidence, it is my duty to instruct you on the law that applies

12  to this case.

13    A copy of these instructions will be sent to the jury room

14  for you to consult during your deliberations.

15    It is your duty to weigh and to evaluate all the evidence

16  received in the case and in that process to decide the facts.

17  It is also your duty to apply the law as I give it to you to

18  the facts as you find them, whether you agree with the law or

19  not.

20    You must decide the case solely on the evidence and the

21  law.  Do not allow personal likes or dislikes, opinions,

22  prejudices, sympathy, or bias, including unconscious biases,

23  influence you.  Unconscious biases are stereotypes, attitudes,

24  or preferences that people may consciously reject but may be

25  expressed without conscious awareness, control, or intention.

1   Like conscious bias, unconscious bias, too, can affect the way

2   we evaluate information and make decisions.

3       You should also not be influenced by any person's race,

4   color, religion, national ancestry, gender, sexual orientation,

5   profession, occupation, celebrity, economic circumstances, or

6   position in life or in the community.

7       Do not be afraid to examine any assumptions you or other

8   jurors have made which are not based on the evidence presented

9   at trial.  You'll recall that you took an oath promising to do

10  so at the beginning of the case.

11      You must follow all these instructions and not single out

12  some and ignore others.  They are all important.  Please do not

13  read into these instructions or anything I may have said or

14  done any suggestion as to what verdict you should return.  That

15  is a matter entirely up to you.

16      Documents and Testimony Not in Evidence.

17      In reaching your verdict, you may consider only the

18  testimony and exhibits received into evidence.  Certain things

19  are not evidence, and you may not consider them in deciding

20  what the facts are.  I will list them for you.

21      Number one, arguments and statements by lawyers are not

22  evidence.  The lawyers are not witnesses.  What they have said

23  in their opening statements, closing arguments, and at other

24  times is intended to help you interpret the evidence, but it is

25  not evidence.  If the facts as you remember them differ from

1    the way the lawyers have stated them, your memory controls.

2        Two, questions and objections by lawyers are not evidence.

3    Attorneys have a duty to their client to object when they

4    believe a question is improper under the Rules of Evidence.

5    You should not be influenced by the objection or by the Court's

6    ruling on it.

7        Three, testimony that is excluded or stricken or that you

8    have been instructed to disregard is not evidence and must not

9    be considered.  In addition, some evidence was received only

10   for a limited purpose.  If I have instructed you to consider

11   certain evidence only for a limited purpose, you must do so and

12   you may not consider the evidence for any other purpose.

13       Four, anything you may have seen or heard when court is

14   not in session is not evidence.  You are to decide the case

15   solely on the evidence received at the trial.

16       SEC Investigation.

17       During the course of the trial, you have heard testimony

18   and seen evidence related to an investigation by the U.S.

19   Securities and Exchange Commission.  You have not heard or seen

20   any evidence about how the SEC's investigation concluded.  You

21   should not make any assumptions about the outcome of the SEC

22   investigation.

23       Burden of Proof - Preponderance of the Evidence.

24       When a party has the burden of proving any claim or

25   affirmative defense by a preponderance of the evidence, it

1   means that you must be persuaded by the evidence that the claim

2   or affirmative defense is more probably true than not true.

3   You should base your decision on all of the evidence,

4   regardless of which party presents it.

5        Corporate Entities.

6        One of the parties in this case, Tesla, Inc., is a

7   corporation.  Under the law, a corporation is considered to be

8   a person.  All parties are equal under the law and a

9   corporation is entitled to the same fair and conscientious

10  consideration by you as any party.

11       Under the law, a corporation can act only through its

12  employees, agents, directors, or officers.  Therefore, a

13  corporation is responsible for the acts of its employees,

14  agents, directors, and officers performed within the scope of

15  their authority.

16       An officer of a company is acting within the scope of

17  authority if the officer is engaged in the performance of

18  duties which were expressly or impliedly assigned to the

19  officer by the company.

20       If you find against Mr. Musk but do not find that Mr. Musk

21  was acting within the scope of authority as an officer of

22  Tesla, then you must find that Tesla is not liable.

23       Rule 10b-5 Claim.

24       The buying and selling of securities is controlled by the

25  securities laws.  A 10b-5 claim is a claim brought under a

1  federal statute, Section 10b of the Securities Exchange Act of

2  1934, which in essence prohibits acts of deception in

3  connection with the purchase or sale of a security and in

4  violation of rules and regulations that the SEC has the duty

5  and power to issue.

6      A corresponding SEC rule, Rule 10b-5, prohibits the

7  misrepresentation of material facts and the omission of

8  material facts in connection with the purchase or sale of

9  securities.  A person or business entity who violates the

10 securities laws, including Rule 10b-5, may be liable for

11 damages caused by the violation.

12     Plaintiff alleges that Elon Musk and Tesla, Inc. violated

13 10b-5 and harmed investors by making materially false and

14 misleading statements about a proposed going-private

15 transaction and its financing.  This is referred to as, quote,

16 Plaintiffs' 10b-5 claim, close quote.

17     On this claim, the Plaintiff has the burden of proving

18 each of the following elements by a preponderance of the

19 evidence:

20     One, Elon Musk and/or Tesla made untrue statements of a

21 material fact in connection with the purchase or sale of

22 securities;

23     Two, Elon Musk and/or Tesla acted with the necessary state

24 of mind (i.e., knowingly or with reckless disregard for the

25 truth or falsity of the statements);

1    Three, Elon Musk and/or Tesla used an instrument of

2  interstate commerce in connection with the sale and/or purchase

3  of Tesla securities;

4    Four, Plaintiff justifiably relied on Elon Musk and/or

5  Tesla's untrue statements of material fact in buying or selling

6  Tesla securities during the class period; and,

7    Five, Elon Musk and/or Tesla's misrepresentations caused

8  Plaintiff to suffer damages.

9    An instrumentality of interstate commerce includes postal

10  mails, Elon Musk's emails, telephone, telegraph, telefax,

11  interstate highway system, internet, or similar methods of

12  communications, and travel from one state to another within the

13  United States.

14    You are to assume the statements "Funding secured" and

15  "Investor support is confirmed.  Only reason why this is not

16  certain is that it's contingent on a shareholder vote" were

17  untrue, but you must -- you still must decide whether these

18  statements were of material facts.

19    You must also assume Mr. Musk acted with reckless

20  disregard for whether the statements were true, but you must

21  still decide whether he knew that the statements weren't true.

22    Maker of Misstatement.

23    To be liable under 10b -- for a Section 10b violation, the

24  Plaintiff must prove that the Defendant was the maker of a

25  materially false or misleading statement.  A Defendant makes a

1  statement if the Defendant has ultimate authority over the

2  statement, including its content and whether and how to

3  communicate it.

4     Material Misrepresentation.

5     Plaintiff must prove by a preponderance of the evidence

6  that Elon Musk and/or Tesla's misrepresentation of a fact was

7  material.

8     A factual representation concerning a security is material

9  if there is a substantial likelihood that a reasonable investor

10  would consider the fact important in deciding whether to buy or

11  sell that security.

12     A material misrepresentation gives a reasonable investor

13  the impression of a state of affairs that differs in a material

14  way from the one that actually exists.

15     A factual representation can be untrue but not material.

16  For instance, if a company inaccurately reports its revenue,

17  that representation is untrue.  The factual representation

18  would be material if the difference between the disclosed

19  revenue and the accurate revenue is significant enough to

20  influence a reasonable investor's decision whether to buy or

21  sell securities in that company.  If not, it would not be

22  material.

23     You must decide whether something was material based on

24  the circumstances as they existed at of the statement.

25     Scienter or State of Mind.

1    Plaintiff must prove by a preponderance of the evidence

2  that Elon Musk and/or Tesla acted with a necessary state of

3  mind, which is known as scienter.  Scienter may be established

4  by showing either:

5    One, the Defendant knew his untrue statement was false;

6  or,

7    Two, the Defendant acted -- it should be with reckless

8  disregard for whether the statement was true.

9    "Reckless" means highly unreasonable conduct that is an

10  extreme departure from ordinary care, presenting a danger of

11  misleading investors, which is either known to the Defendant or

12  is so obvious that the Defendant must have been aware of it.

13    You are to assume that Elon Musk made the statement

14  "funding secured" and "Investor support is confirmed.  Only

15  reason why this is not certain is that it's contingent on a

16  shareholder vote" with at least reckless disregard for whether

17  the statements were true, but you still must decide whether

18  Mr. Musk acted knowingly.

19    Imputation of Scienter.

20    A corporation can only act through its employees, agents,

21  directors, and officers and can likewise only have scienter

22  through them.

23    If you find that Elon Musk acted with scienter and was

24  acting within the scope of his authority while Tweeting the

25  statements at issue on August 7th, then his scienter may be

1  imputed to Tesla.  If you find that Elon Musk acted with

2  scienter but was not acting within the scope of his authority

3  while Tweeting the statements at issue on August 7th, then his

4  scienter cannot be imputed to Tesla.

5       Reliance.

6       Plaintiff must prove by a preponderance of the evidence

7  that he relied on Defendant's alleged material

8  misrepresentations and that Plaintiff was justified in doing

9  so.  Plaintiff does not have to show that he and other members

10  of the class individually relied on the false and/or materially

11  misleading statements at issue if he proves the requirements

12  for invoking a presumption that he and the class relied on the

13  integrity of the market price, otherwise known as the "fraud on

14  the market" presumption.

15       If you find that Plaintiff has proven by a preponderance

16  of the evidence that, one, an active open market for Tesla

17  securities existed at the time of the transactions in question;

18  two, investors reasonably relied on that market as an accurate

19  reflection of the current market value of the securities;

20  three, the misrepresentations were publicly known and material,

21  meaning that a reasonable investor would have regarded the

22  misrepresentation as having significantly altered the total mix

23  of information they took into account in deciding whether to

24  buy or sell the Tesla security; and, four, the Plaintiff traded

25  the security between when the alleged material

1  misrepresentations were made and when the truth was revealed,

2  then the "fraud on the market" presumption applies.  This means

3  that you may find that Plaintiff has proved that he relied on

4  Defendant's statements.

5      An "active, open market" means there were a large number

6  of traders, a high level of activity, and frequent trades such

7  that the price of the security immediately reflects all

8  publicly available information.

9      Defendants may rebut the presumption that Mr. Littleton

10  relied on the integrity of the market price when purchasing

11  Tesla securities by proving by a preponderance of the evidence

12  that Mr. Littleton did not actually rely on the integrity of

13  the market price when he purchased Tesla securities.  In that

14  event, Mr. Littleton must then prove that he justifiably relied

15  directly on the misrepresentation.

16      Defendants may also rebut the presumption that the

17  Plaintiff class relied on the integrity of the marketplace when

18  purchasing Tesla securities by proving by a preponderance of

19  the evidence that the misrepresentation did not affect the

20  market price of Tesla's stock.

21      The "fraud on the market" presumption of reliance is

22  limited to the time between when the misrepresentation was made

23  and when the truth was revealed.

24      Loss Causation.

25      Plaintiff must prove by a preponderance of the evidence

1   that Mr. Musk and/or Tesla's misrepresentations caused their

2   economic injury.  To establish causation, Plaintiff must prove

3   that the misrepresentations played a substantial part in

4   causing the jury or loss that Plaintiff suffered.

5        Plaintiff must reasonably distinguish any security price

6   reaction to the misrepresentations at issue from the market's

7   reaction to other factors, such as other information or events

8   that could affect the price of Tesla securities.

9        Plaintiff need not prove that the misrepresentations were

10  the sole cause of the economic injuries.

11       Damages.

12       If you find for Plaintiff on the 10b-5 claim against Elon

13  Musk and/or Tesla, then you must consider and decide the amount

14  of damages to be awarded to the Plaintiff and the class.  You

15  may award only actual damages in that amount which will

16  reasonably and fairly compensate Plaintiff and the class for

17  the economic losses they sustained.

18       Actual damages are measured by the amount of inflation or

19  deflation caused by the misrepresentations on which you base

20  your finding of a 10b-5 claim.  In other words, actual damages

21  are measured by the difference between the price at which the

22  security sold and the price at which the security would have

23  been sold absent the alleged material misrepresentations.

24       There are three categories of securities about which you

25  will be asked to render a verdict on damages:

1    One, Tesla common stock;

2    Two, Tesla convertible bonds; and,

3    Three, Tesla stock options.

4    A stock option is a financial instrument that gives its

5    buyer (known as the option holder) the right, but not the

6    obligation, to buy or sell stock at a predetermined price at or

7    until a specified date and time in the future.

8    The price of a stock option is primarily determined by two

9    facts:  The price of the stock at the time the option is

10   purchased and the implied volatility of the stock.  Implied

11   volatility is the market's forecast of a likely movement in a

12   security's price.

13   You will be asked to determine the amount, if any, by

14   which the prices of Tesla common stock and convertible bonds

15   were artificially inflated by the misrepresentations on which

16   you base your finding of a 10b-5 claim for each day during the

17   class period.

18   You will also be asked to determine what the levels of

19   implied volatility for each Tesla stock option would have been

20   for each option maturity bought or sold during the class period

21   "but for" the misrepresentations.

22   Plaintiff bears the burden of proving that the

23   misrepresentations caused a change in the implied volatility

24   for each option maturity on each day of the class period.  The

25   Court will use your determinations of price inflation and

1  implied volatility to calculate the damages suffered by the

2  Plaintiff and the class in connection with the purchase --

3  purchases and sales of Tesla securities during the class

4  period.

5      Your award must be based on evidence and not upon

6  speculation, guesswork, or conjecture.

7      Damages need not be proven with mathematical certainty,

8  but there must be enough evidence for you to make a reasonable

9  estimate of damages.

10     Plaintiff has the burden of proving damages by a

11  preponderance of the evidence.  Plaintiff also has the burden

12  of separating out the price decline, if any, caused by factors,

13  if any, other than the alleged misrepresentations.

14     Control Person Liability.

15     Under Section 20(a) of the Securities Exchange Act of

16  1934, a Defendant may be liable as a "controlling person" if

17  during the period that someone else violated Rule 10b-5 the

18  Defendant had the authority to control that person or company.

19     A controlling person is an individual or company that

20  possesses the power to direct the management and policies of a

21  business enterprise or of another person involved in the

22  management or policymaking of the enterprise.

23     Plaintiff claims that Tesla's Board of Directors were

24  controlling persons of Tesla and are, therefore, liable under

25  the securities laws for any violations of Rule 10b-5 committed

1  by Tesla.  This is referred to as "The Plaintiff's Section

2  20(a) claim."

3      On this claim plaintiff has the burden of proving by a

4  preponderance of the evidence that each Tesla director

5  possessed, directly or indirectly, the actual power to direct

6  or cause the direction of the management and policies of Tesla

7  where Tesla is liable on Plaintiff's Rule 10b-5 claim.

8  Plaintiff does not need to prove that any Tesla director

9  actually exercised that power.

10      Defense to Control Person Liability.

11      Even if you find that any Tesla director is a controlling

12 person, you must still find that the Tesla director -- you must

13 still find that Tesla director not liable if that Tesla

14 director establishes the defense to control person liability.

15 Under the defense to control person liability, each of Tesla's

16 directors has the burden of proving both the following elements

17 by a preponderance of the evidence:

18      One, he or she did not directly or indirectly induce the

19 10b-5 violation; and,

20      Two, he or she acted in good faith.

21      The director can prove good faith by establishing that he

22 or she maintained and enforced a reasonable and proper system

23 of supervision and internal control.

24      If the director is found to have been involved in making a

25 statement which violates Section 10b-5, that director can prove

1  good faith by showing a lack of scienter; i.e., that the

2  director did not know that the statement was false, nor did the

3  director have reckless disregard for whether the statement was

4  true.

5      If you find that a Tesla director has proved both of these

6  elements, your verdict should be for that director.  If you

7  find that a director has failed to prove either or both of

8  these elements, your verdict should be for Plaintiff.

9      Apportionment of Liability.

10     If you find that Plaintiff proved the 10b-5 claim against

11  Tesla or Mr. Musk and/or Section 20(a) claims against the other

12  Defendants, then you must take two more steps.

13     First, you must determine whether any Defendant knowingly

14  violated any securities law.  A Defendant commits a knowing

15  violation of the securities laws when (1) they make an untrue

16  statement of a material fact with actual knowledge that the

17  representation is false; and (2) persons are likely to

18  reasonably rely on that misrepresentation.

19     Second, you must determine what percentage of

20  responsibility, if any, to assign to each Defendant whom you

21  have found to be liable (including those who have acted with

22  reckless disregard).

23     When apportioning responsibility, the percentages you

24  calculate must total 100 percent among the parties you find

25  responsible, even if you believe some of the Defendants are

1    zero percent responsible.

2         In determining the percentage of responsibility, you must

3    consider the nature of the conduct of each person you determine

4    caused or contributed to the losses, if any, incurred by the

5    Plaintiff and the nature and extent of the causal relationship

6    between that person's conduct and the losses, if any, incurred

7    by Plaintiff.

8         If you determine that any person's actions and omissions

9    did not proximately contribute to the loss incurred by

10   Plaintiff, then you are to assign zero percent responsibility

11   to that person.

12        All right.  So those are the instructions on the law.  I

13   will give you some final-final instructions tomorrow after we

14   hear each party's closing arguments.

15        Until then, my admonition still applies.  Since this case

16   has not been submitted to you quite yet for deliberation,

17   please still observe my direction that you are not to talk

18   about this case at this point with anyone, including amongst

19   yourselves or with anybody else.  Do not listen to, read, or

20   follow any coverage of this trial.  Do not attempt to do any

21   research on your own, and do not form any opinions until this

22   case is submitted to you for deliberation on Friday.  So we'll

23   see you at 8:30 on Friday.

24        And, again, I don't know if you've already discussed, but

25   if you would like to stay later than 2:00 o'clock on Friday,

**PROCEEDINGS**

1   you're certainly welcome to do so.

2       Til then, tomorrow you have a day off, but we'll see you

3   on Friday.  Thank you.

4           **THE CLERK:**  All rise for the jury.

5       (Jury exits the courtroom at 1:37 p.m.)

6           **THE COURT:**  Okay.  We should be clear on time

7   limitation here so each party knows.

8           **THE CLERK:**  One second.

9           **THE COURT:**  Okay.

10          **THE CLERK:**  I had to submit the jury's lunch order.

11          **THE COURT:**  Oh, that's more important.  The jury's

12  lunch order.

13          **MR. SPIRO:**  Oh, yes.

14          **THE COURT:**  Yeah, that's --

15          **MR. SPIRO:**  No question.

16      Can we discuss a couple other things?

17          **THE COURT:**  Yeah.  Yeah.

18          **MR. SPIRO:**  So the first is, just so the Court's

19  clear, we object to the jury getting copies of the

20  instructions.  It's not done in the ordinary course in my

21  experience, and we object to it.

22          **THE COURT:**  Okay.  Well, it's done in the ordinary

23  course here, and I believe the Ninth Circuit instructions maybe

24  even indicates.

25      But, in any event, that's my practice.  I've never had a

1    problem with it.  And, in fact, I have found that jurors have

2    said it's very useful to have that because often they refer to

3    the instructions because it's hard to remember everything.

4          MR. SPIRO:  And it may -- and the Court -- it may be

5    the Court's practice in the Northern District of California.

6    I'm obviously relaying my experience across the country.

7        The second thing is just about summation order.  I assume

8    we get last-ups because we have the burden of proof on the

9    defense.

10         THE COURT:  Well, you had burden of proof on the

11   defense.  On the other hand, they had burden of proof on just

12   about everything else.

13         MR. SPIRO:  Yeah, but it's not -- I mean, again,

14   we're -- it's hard to remember sometimes, but we're sort of the

15   Defendants here and Courts, in my experience, and I think, you

16   know, good judgment suggests that given -- you know, we're the

17   ones that have reputation and all sorts of liability and other

18   issues at stake here, that we ought to have, especially when we

19   carry the burden.  And so I wouldn't -- I mean, I don't know

20   what the Court's suggested order was, but that's -- that, to

21   me, is clearly what should happen.

22         MR. PORRITT:  Well, I don't think it's so clear.  I'm

23   not surprised they want it here.  I think obviously we have the

24   burden on pretty severe elements of the case, and so we would

25   expect to have a rebuttal and have the last -- last closing

1    statement in that regard.

2        THE COURT:  All right.  I'm going to maintain the -- I

3    don't know what the practice is in the courts that you appear

4    in, but it's the consistent practice here if the Plaintiff has

5    the burden of proof on the claims at issue, even whether there

6    are affirmative defenses, the Plaintiff has an opportunity for

7    rebuttal.  So that's what we're going to do.

8        MR. SPIRO:  So, then one practice that -- I do

9    sometimes try cases in California, too, but the Plaintiff is

10   not allowed to surprise attack during their rebuttal.  Meaning,

11   they can't intentionally withhold something from their direct

12   summation and then sandbag the Defense.  They can respond to

13   Defense arguments.

14       I assume that is the practice here and with Your Honor.  I

15   know there's case law on that, but I just want to make sure

16   that that's not something that we need to be concerned with.

17       THE COURT:  Well, my presumption is it follows sort of

18   like the scope of redirect.  I mean, it's scope questions

19   usually defined, for the most part, by the Defense.  The

20   rebuttal is for rebuttal.  So you can't give a two-minute

21   opening and an hour rebuttal.

22       MR. PORRITT:  That's not my intention, Your Honor.

23       THE COURT:  On the other hand, you know, I don't want

24   to hear objections over, you know, fine degrees of, "Well, we

25   didn't say anything about that in our" -- I mean, you can make

1    that objection, but I'll probably overrule it.

2         MR. SPIRO:  I have no intention of objecting during

3    Mr. Porritt's summation.  That's why I raise these issues now,

4    so that I don't.

5         THE COURT:  Okay.

6         MR. PORRITT:  The only other issue we have is kind of

7    more practical.  We were talking about the index of exhibits.

8    And, obviously, we'll work with the -- Ms. Ayala on finalizing

9    the exhibits.

10        THE COURT:  Yes.

11        MR. PORRITT:  I thought in terms of the number of

12   demonstratives and in light of the Court's instruction, whether

13   it would be helpful to have -- while clearly indicating they're

14   demonstratives, at least have a list of the demonstratives that

15   were presented by both sides during the course of trial,

16   whether that would be helpful to the jury.  That might be a

17   subject we might think about.

18        THE COURT:  Your response?

19        MR. SPIRO:  You mean at the end of the index if

20   there's some sort of --

21        THE COURT:  Yeah.  Index of -- you're saying an

22   additional index not only exhibits, but an index of

23   demonstratives?

24        MR. PORRITT:  Yes.  A separate document, if necessary,

25   or the end, one way or the other, but clearly obviously marking

 1   that they're not exhibits.

 2          **MR. SPIRO:**  I doubt there will be a problem when the

 3   parties meet-and-confer --

 4          **THE COURT:**  Okay.

 5          **MR. SPIRO:**  -- but I would like to consider that and

 6   see what the proposal specifically is.

 7          **THE COURT:**  All right.  I can see a utilitarian value

 8   to that.  If they ask for a particular -- if they do want a

 9   readback, quote/unquote, and look at a demonstrative, they can

10   identify it pretty quickly that way.  But why don't you

11   meet-and-confer and see.

12          **MR. PORRITT:**  That was our thinking, Your Honor.

13   That's all.  I just wanted to raise that now.

14          **MR. SPIRO:**  Yeah.  I mean, and on this demonstrative

15   point, you know, the titles were argumentative.  We had some

16   objections.  I don't think we want the titles on there.  So I

17   don't know if we want to be, you know, adding to the sheet, you

18   know, suggestions of certain testimony clips either.

19       So the jury has been paying a lot of attention, been

20   taking copious notes.  I think they're within the wherewithal

21   to send notes.  So I would have to think about the request and

22   consider it, and we have a day to go back and forth on this.

23       The other thing, just so the Court's aware, where

24   Mr. Porritt and I left it, exhibits that are in the case, trial

25   testimony, demonstratives that he's turned over or seen and

 1  vice-versa, we're all good with.  There's no issues with any of

 2  that at summation obviously, and we don't need to revisit that.

 3      If there is a new demonstrative or something, we will

 4  confer tomorrow and make sure that each other has seen it.

 5          **THE COURT:**  Yes.  I mean, I do want you all -- if

 6  you're going to use some new demonstrative on the other side in

 7  your closing that goes along with the exchange, then we can

 8  talk about that.

 9          **MR. PORRITT:**  Yeah.  We expect those to be exchanged

10  this afternoon if it's going to be a new demonstrative.

11          **MR. SPIRO:**  Yeah.  I'm just explaining to the Court

12  that we did meet-and-confer.  And so as to not overdo too many

13  things, if there's something new, we'd like to see it from each

14  other in terms of a demonstrative.  I don't need to see the

15  transcript.

16      And other than that, we will see you, from our

17  perspective, Friday morning.

18          **THE COURT:**  All right.  And what's the official

19  timekeeper's --

20          **THE CLERK:**  Well, I need the time for the video, the

21  division of it.

22          **MR. PORRITT:**  I think we had, like, two and a half

23  minutes and the balance is roughly --

24          **MR. SPIRO:**  We round up -- we round up in the Northern

25  District of California; right?

1        **THE CLERK:**  No.  It's two minutes in.

2        **MR. KOTARSKI:**  It's 17 and 2.

3        **MR. PORRITT:**  17 and 2, Defendants 17 and us 2.

4        **THE COURT:**  I'm curious myself how much time you all

5   have.

6        **THE CLERK:**  Not very much.

7        **THE COURT:**  Good.  It's going to make for a crisp,

8   succinct closing.

9        **MR. PORRITT:**  I think I've got enough, if our

10  recordkeeping is correct.  But, hopefully, now we'll find out.

11  I'm more nervous now than when the jury's coming back in.

12      (Brief pause.)

13       **THE CLERK:**  Plaintiffs have used 17 hours and

14  12 minutes; Defendants 16 hours and 38 minutes.

15       **MR. PORRITT:**  Does that include the 10 minutes we got

16  back that Your Honor was gracious enough to give us back?

17       **THE CLERK:**  That-includes the 10 minutes.

18       **MR. PORRITT:**  Okay.

19       **MR. SPIRO:**  Right.  And so during the summation when

20  I -- if I run up against the time and the Court tells me to sit

21  down, I'll know what that means.

22       **THE COURT:**  I mean, you know, at this point --

23       **MR. PORRITT:**  We're pretty close.

24       **THE COURT:**  -- it's a few minutes.  I'm not going

25  to -- if you guys only go a couple -- it's important enough,

**PROCEEDINGS**

 1   I'm not going to actually stop you mid-sentence.  You get the

 2   drift.  You have about an hour.

 3        **MR. PORRITT:**  I've got about an hour.  That's what I

 4   mentally estimated.

 5        **THE COURT:**  You have about an hour and a half or hour

 6   and 20, something like that.

 7      You know, if it goes over a few minutes, I'm not going to

 8   cut off the microphones; but we're not going to have, you know,

 9   two hours and that kind of stuff.

10        **MR. PORRITT:**  I didn't want to do that anyway,

11   Your Honor.

12        **THE COURT:**  Okay.

13        **MR. PORRITT:**  All right.

14        **MR. SPIRO:**  Good.  Thank you, Your Honor.

15        **MR. PORRITT:**  Thank you, Your Honor.

16        **THE COURT:**  Thank you.

17      (Proceedings adjourned at 1:46 p.m.)

18

19

20

21

22

23

24

25

1

**I N D E X**

2   Wednesday, February 1, 2023 - Volume 9

3                                                        **PAGE   VOL.**

4   Plaintiff rests                                       1865    9
    Defense Rests                                         1937    9
5   Jury Instructions                                     1944    9

6   **PLAINTIFF'S WITNESSES**                             **PAGE   VOL.**

7   **HARTZMARK, MICHAEL**
     (RECALLED)                                           1786    9
8   Cross-Examination Resumed by Mr. Rossman              1786    9
    Redirect Examination by Mr. Porritt                   1839    9
9   Recross-Examination by Mr. Rossman                    1857    9

10  **DEFENDANTS' WITNESSES**                             **PAGE   VOL.**

11  **TELLER, SAM**
     (SWORN)                                              1874    9
12  Direct Examination by Mr. Lifrak                      1874    9
    Cross-Examination by Mr. Apton                        1893    9
13
    **KONEY, OWURAKA**
14  VIDEOTAPED TESTIMONY                                  1897    9

15  **MURDOCH, JAMES**
     (SWORN)                                              1897    9
16  Direct Examination by Mr. Lifrak                      1898    9
    Cross-Examination by Ms. Tripodi                      1907    9
17
    **MUSK, KIMBAL**
18   (SWORN)                                              1911    9
    Direct Examination by Mr. Price                       1911    9
19  Cross-Examination by Ms. Tripodi                      1916    9

20  **EHRENPREIS, IRA**
     (SWORN)                                              1918    9
21  Direct Examination by Ms. Thompson                    1918    9
    Cross-Examination by Mr. Apton                        1924    9

22

23

24

25

1              **I N D E X**

2    **DEFENDANTS' WITNESSES**                        **PAGE**   **VOL.**

3    **JOHNSON RICE, LINDA**
     (SWORN) via Zoom                                 1933      9
4    Direct Examination by Ms. Thompson               1933      9

5              **E X H I B I T S**

6    **TRIAL EXHIBITS**                      **IDEN**  **EVID**   **VOL.**

7    33                                               1844      9

8    109                                              1874      9

9    110-A                                            1874      9

10   322                                              1937      9

11   338                                              1783      9

12   426                                              1840      9

13   429                                              1783      9

14   565                                              1783      9

15   570, subject to redaction                        1783      9

16   572                                              1783      9

17   594                                              1783      9

18   721                                              1783      9

19   763                                              1783      9

20   1008                                             1859      9

21

22

23

24

25

1

2

3

4                        CERTIFICATE OF REPORTERS

5          We, BELLE BALL and DEBRA PAS, Official Reporters for the

6   United States Court, Northern District of California, hereby

7   certify that the foregoing is a correct transcript from the

8   record of proceedings in the above-entitled matter. We certify

9   that the foregoing is a correct transcript from the record of

10  proceedings in the above-entitled matter.

11

12

13

14       _____

15            Debra L. Pas, CSR 11916, CRR, RMR, RPR

16

17

18

19

20       _____

21            Belle Ball, CSR 8785, CRR, RDR

22

23            Wednesday, February 1, 2023

24

25