Volume 10

Pages 1970 - 2137

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

IN RE TESLA, INC. SECURITIES      )
LITIGATION.                       ) No. 18-cv-04865-EMC
_____   )
                                  San Francisco, California
                                  Friday, February 3, 2023

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES**:

For Movants:

        LEVI & KORSINSKY, LLP
        1101 30th Street NW
        Suite 115
        Washington, D.C.  20007
  BY: **NICHOLAS IAN PORRITT, ESQ.**
      **ELIZABETH K. TRIPODI, ESQ.**
      **ALEXANDER A. KROT, III, ESQ.**

        LEVI & KORSINSKY LLP
        75 Broadway
        Suite 202
        San Francisco, California  94111
  BY: **ADAM M. APTON, ESQ.**
      **ADAM C. MCCALL, ESQ.**

        LEVI & KORSINSKY LLP
        55 Broadway
        10th Floor
        New York, New York  10016
  BY: **MAX EDWARD WEISS, ESQ.**
      **KATHY AMES VALDIVIESO, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Defendants:

                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                51 Madison Avenue
                22nd Floor
                New York, New York  10010
        BY:  **ALEXANDER B. SPIRO, ESQ.**
                **ANDREW JOHN ROSSMAN, ESQ.**
                **PHILLIP B. JOBE, ESQ.**
                **ELLYDE R. THOMPSON, ESQ.**
                **JESSE A. BERNSTEIN, ESQ.**

                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                865 South Figueroa Street
                10th Floor
                Los Angeles, California  90017
        BY:  **MICHAEL T. LIFRAK, ESQ.**
                **ANTHONY P. ALDEN, ESQ.**
                **MATTHEW ALEXANDER BERGJANS, ESQ.**
                **WILLIAM C. PRICE, ESQ.**

                QUINN EMANUEL URQUHART & SULLIVAN, LLP
                555 Twin Dolphin Drive
                Fifth Floor
                Redwood Shores, California  94065
        BY:  **KYLE K. BATTER, ESQ.**

| | |
|---|---|
| 1 | **Friday, February 3, 2023**                                    **8:22 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | (The following proceedings were held outside of the |
| 4 | presence of the Jury) |
| 5 | **THE COURTROOM DEPUTY:**  All rise.  Court is now in |
| 6 | session, the Honorable Edward M. Chen is presiding. |
| 7 | **THE COURT:**  Have a seat, everyone.  Good morning. |
| 8 | **THE COURTROOM DEPUTY:**  Court is calling the case In |
| 9 | Regarding Tesla Inc. Securities Litigation, Case No. 18-4865. |
| 10 | Counsel, please state your appearances for the record, |
| 11 | beginning with the plaintiff. |
| 12 | **MR. PORRITT:**  Good morning, Your Honor. |
| 13 | **THE COURT:**  Good morning. |
| 14 | **MR. PORRITT:**  Nicholas Porritt with Levi & Korsinsky |
| 15 | on behalf of the plaintiff and the class. |
| 16 | **THE COURT:**  Good morning, Mr. Porritt. |
| 17 | **MR. SPIRO:**  Good morning, Your Honor.  Andrew Rossman |
| 18 | with Quinn Emanuel, here.  We've got Mr. Spiro, down the hall. |
| 19 | He's coming. |
| 20 | **THE COURT:**  All right.  While he's coming, I |
| 21 | understand that we are having some technical problems with |
| 22 | display of your -- right, Vicky? |
| 23 | **THE COURTROOM DEPUTY:**  Yes, both parties. |
| 24 | **THE COURT:**  So we have our IT people coming.  But |
| 25 | obviously, I don't think we can commence argument until we have |

```
 1   that straightened out.

 2        But I want to use these few moments before IT gets here to

 3   address the late filings.  In particular, the filing of the

 4   proposed demonstratives for the defense.  And then the

 5   objections filed thereto by the plaintiff.

 6        Just to set the record straight, my understanding is that

 7   these demonstratives were served on the other side past 6:00

 8   last evening.  Is that correct?

 9            MS. TRIPODI:  Good morning, Your Honor.  Yes.  We did

10   not receive defendant's demonstratives until 6:00 p.m. last

11   evening.

12            THE COURT:  6:00 p.m.

13            MS. TRIPODI:  I'm sorry, 8:00 p.m., Your Honor.

14            THE COURT:  8:00 p.m.  And you did not file your

15   objections until some early morning hours, like 1:00 in the

16   morning?

17            MS. TRIPODI:  We did not, Your Honor.

18            THE COURT:  And you served your closing slides on

19   Wednesday?

20            MS. TRIPODI:  We did, Your Honor.

21            THE COURT:  All right.

22        So, as you know, I set two rules in this case.  The

23   two-day exchange rule which I have not altered.  You are

24   supposed to exchange demonstratives and exhibits that are going

25   to be used, two days.  And there's a reason for that.  The
```

1   reason is you give the other side notice.  You give the Court

2   notice.  And so you avoid a situation where the Court gets

3   nothing until it gets an objection at 1:00 or 2:00 in the

4   morning.

5       Number two, I set a 6:00 rule, after you all filed massive

6   filings after the first days.  You two might recall.  And I

7   said I wouldn't take anything after 6:00.  So, as far as I'm

8   concerned, the defendant has violated both rules.

9       And for your benefit, Mr. Spiro, I'm going over the fact

10  that the plaintiffs -- the defense slides were not served until

11  last night after 6:00.  That's undisputed.  Wasn't served until

12  8:00.  And that is a violation of my two-day rule and my 6:00

13  rule.  And therefore, I get this (Indicating), and this

14  (Indicating), at 2:00 in the morning.

15      **MR. SPIRO:**  I -- I apologize, Your Honor.

16      **THE COURT:**  And when you left here, you said you were

17  going to work with each other and get me the demonstratives so

18  we could avoid this very situation.

19      **MR. SPIRO:**  Your Honor, the only thing that the

20  defense can do is apologize.  We rested our case, we did our

21  best.  And frankly, from our perspective, because we're not

22  doing sort of visual graphs or other things, I mean, I don't

23  want to quibble and -- the gravamen of what I'm trying to tell

24  the Court is I apologize.

25      But we don't really view these things as demonstratives,

 1    is also the truth.   I mean, the agreement that we had with

 2    counsel that I put on the record when we were last in court and

 3    the time before that was that unless it's a graph, a chart or

 4    something that is not just directly testimony exhibit, it

 5    wouldn't be a demonstrative.   And for what it's worth, you

 6    know, I intentionally told folks, you know, don't put any

 7    titles on these, there is no titles on them.   I mean, from my

 8    perspective, it is just testimony and exhibits.

 9         If the Court doesn't want to allow lawyers' statements to

10    be in demonstratives, I've had judges say that, then both sides

11    can just remove the exhibit or two on each of ours that have

12    the words of lawyers, as opposed to witness statements.

13         Other than that, there's a few of those slides that we're

14    not even using at this point.   I don't think that there's much

15    there there with this.   But again, as I started with, we

16    apologize that there was a delay.

17              **MS. TRIPODI:**  Your Honor, if I may?

18              **THE COURT:**  Yeah.

19              **MS. TRIPODI:**  Just a few slides to flag.   And again,

20    I'm sincerely apologetic for our late response to the

21    demonstratives.

22         Slide 2, which also repeats on Slide 34 and Slide 53 has

23    an attorney's blurb regarding material misrepresentation.   And

24    my concern is that this is different than what is stated in the

25    jury instruction.   And so I think this will be very confusing

1    to the jury.  And any indication from the lawyers of what their

2    view of material misrepresentation is that doesn't comport with

3    what's in the jury instructions, is going to be prejudicial.

4         The other thing I wanted to point out was Slide 7, which

5    has some testimony from Mr. Littleton.  During the course of

6    Mr. Littleton's testimony as he was responding to defense

7    counsel's questions, he gave sort of an active response of

8    "Uh-huh" that was typically followed up with testimony.  And

9    the slides present only Mr. Littleton's response of "Uh-huh,"

10   which is not the full and complete picture.

11        So I don't want to quibble with too many of the

12   demonstratives but I do want to point out several that I think

13   will be very prejudicial and confusing to the jury.

14        **MR. SPIRO:**  I can maybe make short change of this if

15   the Court wants, which is -- I mean, we think this is the

16   correct statement of the law and drawn from the instructions.

17   I mean, I'm also going to say to the jury as the judge -- as

18   Your Honor will, that:  The judge is going to tell you what the

19   law is.  They have written jury instructions.  I don't think

20   this is a big deal.

21        If it is, and the Court orders, you know, we can -- we can

22   just copy and paste a little bit more precisely rather than

23   using the dot, dot, dot method of saying things.

24        And as to the answer from Mr. Littleton, we just changed

25   it to add what they wanted.  So I think most of this is null

PROCEEDINGS

 1   and moot at this point.

 2        **THE COURT:**  All right.  I'm going to order that

 3   attorney comments and interpretations such as attorney

 4   interpretation or reinterpretation of instructions will be

 5   removed because that is not an exhibit that's already been

 6   there.

 7        And so anything new that is a demonstrative -- I'm going

 8   to get to the merits in a minute because I think we do have to

 9   address that.  But procedurally, that is late, and I'm not

10   going to allow that to be filed.

11        So things of a factual nature, there's a fair argument

12   that that's really not a demonstrative.  You're just taking

13   snippets of exhibits.  In a way it is, because you're

14   emphasizing certain things.  But that's different, to take your

15   first point, than attorney comment.  So, attorney comments

16   should be removed.

17        **MR. SPIRO:**  So, okay.  So then taking the Court's

18   direction, we'll just change this to the law, not, not the

19   change, and both sides will then remove attorney comments.

20   Right?

21        **THE COURT:**  I didn't say both sides, because they

22   served -- at least they served theirs on you, as I understand

23   it, on Wednesday.

24        Correct?

25        **MS. TRIPODI:**  Yes, Your Honor.

1          **MR. SPIRO:**  But Your Honor, and I can show Your Honor

2    the transcript, I mean we had this in front of the Court

3    several times saying that we had reached an understanding

4    between the parties.  And when we met and conferred and when we

5    discussed this, we didn't understand them to be expecting us to

6    be providing these, based on the conversations that I had with

7    them.

8          And I put that on the record when we left court.  So if

9    the Court looks at that transcript -- and I'm happy to hand it

10   up -- this was clear as day to the defense when we left here.

11   We just literally sent this in an abundance of caution, and

12   were surprised when we heard back from them.

13         **THE COURT:**  Wait, you're saying that you didn't have

14   an understanding that you would exchange two days in advance,

15   on Wednesday?

16         **MR. SPIRO:**  Correct.  And it's in the record.

17         **MR. PORRITT:**  Well, Your Honor, if I may -- sorry.

18         The conversation I had with Mr. Spiro, I'm not sure it

19   goes as far as an agreement.  But it was, as far as he was

20   concerned that using just transcripts and exhibits, you know,

21   wouldn't need to be exchanged because, as we have discussed,

22   they are not really demonstratives, necessarily.

23         **THE COURT:**  I did read the transcript, by the way.

24   I'm familiar with it.  I just read it.

25         **MR. SPIRO:**  Okay.

1    **MR. PORRITT:**  The agreement didn't extend to true

2    demonstrative, which is attorney comments, graphs, charts,

3    those --

4         **THE COURT:**  Right.  Stuff that had already been shown,

5    that's what you all said, that wasn't going to be a problem,

6    don't worry about it.  That's why I'm saying stuff that's

7    already shown -- evidence, testimony, things that are already

8    there -- I'm not going to say is a problem with respect to my

9    expectation of timely exchange.

10        But new demonstratives, in the sense that this is fairly

11   significant, to -- to now recast or interpret an instruction is

12   an attorney comment.

13        **MR. SPIRO:**  So, in any event, that has been changed.

14   And in terms of their request regarding Mr. Littleton's sort of

15   second answer or full answer, we've changed that too.  So

16   that's why I'm saying that I think that we've mooted these

17   issues.  And we again apologize.

18        **THE COURT:**  All right, so are you going to remove

19   that?  Or are you going to just quote the instruction?

20        **MR. SPIRO:**  We'll just quote the full instruction.

21        **THE COURT:**  The full instruction, not put a twist on

22   it.

23        **MR. SPIRO:**  No, no, no.  There's a twist, but no

24   twist.

25        **THE COURT:**  Whatever you want to call it.

1        MR. SPIRO:  Sure.

2        THE COURT:  Well, if that's the case, and there's not

3   other sort of attorney comments but snippets of testimony --

4   and of course there's always going to be some debate.  Now,

5   there's some debate about -- is there another accuracy issue

6   with respect to the quote of some testimony that you think --

7        MS. TRIPODI:  No, Your Honor, I believe the accuracy

8   issue was with Slide 7.

9        And if I could request of counsel that we see the language

10  that you put on Slide 2.

11       MR. SPIRO:  Sure.

12       MS. TRIPODI:  Two other issues --

13       THE COURT:  And first, a couple other places, 53 --

14       MR. SPIRO:  We're going to switch it all, Your Honor.

15       THE COURT:  All right.

16       MS. TRIPODI:  Your Honor, with respect to Slide 26,

17  Exhibit 68 was utilized there.  And Exhibit 68 has not yet been

18  admitted into evidence.  As well as in Slide 69, there were

19  numerous headlines from articles that have not yet been

20  admitted.

21       MR. SPIRO:  We took out the headlines.  And as to 26,

22  it was part -- it was admitted as part of Mr. Koney's

23  deposition.

24       THE COURT:  Was it admitted into evidence here?

25       MR. SPIRO:  Yes.

PROCEEDINGS

```
1              THE COURT:  Okay.

2              MS. TRIPODI:  Your Honor, I don't believe that that's

3    the case.

4              THE COURT:  Well, Vicky will have that.

5         Vicky, can you check -- which number?

6              MS. TRIPODI:  68, Your Honor.

7              THE COURT:  Was 68 admitted?

8              THE COURTROOM DEPUTY:  Let me check.

9              THE COURT:  What else?

10             MR. SPIRO:  Just to be clear, this was as part of the

11   Koney deposition that we did.

12             THE COURT:  Right.  But there would have been a motion

13   at trial to admit that deposition here, admit that exhibit

14   here.

15             MR. SPIRO:  Correct, we -- we offered --

16             THE COURT:  And I assumed, I thought every day you all

17   were checking to make sure.

18             MS. TRIPODI:  We were, Your Honor.  And the

19   designations had gotten cut before Mr. Koney was played, so

20   perhaps 68 may have been cut from those designations.

21             MR. SPIRO:  It wasn't, Your Honor.  I mean, this was

22   the last day -- remember, this was the last day we were here as

23   we were racing to get the case to the jury.  Every

24   deposition -- and the parties have understood as the Court has

25   the entire time that the deposition and exhibits were going in.
```

1   So I don't see that as an issue.

2           **THE COURT:**  Well --

3           **THE COURTROOM DEPUTY:**  I don't show 68.

4           **THE COURT:**  All right.  Our records do not show 68 as

5   having been admitted.  Maybe that was an oversight on your part

6   or somebody's part.  But --

7           **MR. SPIRO:**  I would ask that the Court admit the

8   exhibits that were part of Mr. Koney's deposition.  That's what

9   we understood when it was being played.  And this is what we --

10  it was in the designations that were, and the Court ruled on

11  it.  And we submitted the deposition and its accompanying

12  exhibit.

13      So if the Court didn't accept the depo designation

14  exhibits, that seems to me on the final day of trial as

15  something that is -- frankly, the Court could let me reopen my

16  case right now.

17      So I'm asking that the Court allow, as they've already

18  ruled, that the deposition that went in, indicating --

19          **THE COURT:**  Okay, well, our record shows it has not

20  been admitted, and now you're asking to reopen to admit it.

21          **MR. SPIRO:**  Well, I'm taking issue with that, with --

22          **THE COURT:**  Okay, well --

23          **MR. SPIRO:**  I'm not taking issue -- yeah.

24          **THE COURT:**  It's not been admitted.  As far as the

25  record goes, it's not been admitted.

PROCEEDINGS

 1      So I want your response to now Mr. Spiro's request for

 2   dispensation to allow him to admit this.

 3           **MS. TRIPODI:**  Your Honor, my understanding was that 68

 4   was not disclosed in connection with Koney's deposition, nor

 5   was it admitted.

 6           **THE COURT:**  And so you object.

 7           **MS. TRIPODI:**  Yes.  We object, Your Honor.

 8           **MR. SPIRO:**  That's just factually incorrect, and we

 9   can show that to the Court, so --

10           **THE COURT:**  Well, the evidence is closed, and your

11   motion is denied.

12      So, let's get to the critical question because there's

13   going to be -- whether it's in here or not, there's going to

14   be, I assume, argument about how to interpret material

15   misrepresentation, and the question of both 1 and 2 having to

16   be satisfied to constitute material misrepresentation.

17      And I want to ask the plaintiffs if you can imagine or if

18   you can explain to me, is there a scenario where you could meet

19   1, that something is shown to be of such import that there is a

20   substantial likelihood that a reasonable investor would

21   consider that fact important in deciding whether to buy or

22   sell, which, I think all of you agree that's -- that's the

23   overall overarching definition, and yet, the investor would not

24   be under the impression that the state of affairs differs in a

25   material way from the one that actually exists.

1    Is that metaphysically possible?

2        **MR. PORRITT:**  I think -- there's nothing in the jury

3    instructions about the classic TSC definition, does it alter

4    the total mix of information available to the reasonable

5    investor.

6        I mean, my view is materiality is this nebulous sort of

7    concept.  And I view them as two statements of the same thing.

8    It's not a two-part test, in my opinion.  They are different

9    ways of stating the same test, in my view.  So I don't think --

10   I don't view them as a checklist, you need to satisfy one and

11   you need to satisfy the other.  It's:  You need to satisfy

12   materiality, and these are two ways of describing materiality.

13   That's kind of how I view it.  I don't know if that answers the

14   Court's question or is helpful, but --

15       **THE COURT:**  To be realistic here, I anticipate from

16   the slides and some of the -- the JMOL motion that there's

17   going to be an argument from the defense that the state of

18   affairs that was represented by "Funding secured," et cetera,

19   et cetera -- although --

20       **MR. PORRITT:**  Was not materially different from --

21       **THE COURT:**  Was not that materially different.  Even

22   though it wasn't actually accurate, because it wasn't actually

23   secured, as I have found, the argument is going to be:  Well,

24   it was as good as, very close to, because, you know, X, Y, Z.

25       And if the jury were to so find, this instruction suggests

PROCEEDINGS

1   that they would -- that the jury could find non-materiality.

2        **MR. PORRITT:**  Right.  And I think -- I mean, I'd say

3   we're getting awfully sort of philosophical, metaphysical at

4   this point and slicing the salami awfully thin.  I mean, those

5   are two accurate statements of the law of what materiality is.

6   I guess we would object to the idea that this is a two-part

7   test, that you need to satisfy both.

8        I view them -- we would view them as really both stating

9   two aspects, if you like, of really the same test.  I mean, is

10  it material is just sort of this very nebulous sort of concept,

11  like, is it important to the reasonable investor.  That's

12  really the test.

13       And you could say there's a change from what does "false"

14  mean?  It means it's different from what is actually the case.

15  That's what I view that statement as getting towards.

16       So I think the evidence obviously is very clear that it

17  didn't differ in a material way, so I think it's unlikely a

18  jury, certainly on this record, but really any record, would

19  find that important to a reasonable investor, but then not

20  different in a material way from the actual state of affairs?

21  I mean, I find it difficult to conceive of a state of facts

22  where that would ever really apply.  So that's kind of our

23  perspective.

24            **THE COURT:**  All right.  Response?

25            **MR. SPIRO:**  It doesn't seem the plaintiffs are taking

**PROCEEDINGS**

1    an issue with this.  They didn't file an exception, either, to

2    this jury instruction.

3        If the Court is asking me what the law is, I think the law

4    is clear that if -- I, mean in this hypothetical scenario, if a

5    juror was -- if we got a note from a juror that says:  I don't

6    think it was important, the answer is he's not liable.

7        If a juror said "Well, I think that the concept of funding

8    is important but I don't think it differed from the state of

9    affairs at all and I think he's not liable, in that

10   hypothetical which I don't think is live, the answer to both is

11   not liable.

12       So that's the way I analyze it.  And I understood the

13   Court to analyze it the same way.  In fact, I took the example

14   that the Court gave in the jury instruction to be just that.

15   And there were no exceptions filed to this jury instruction.

16   And the jury instruction is what it is.

17       **THE COURT:**  Well, the question is whether, in your

18   argument, you can represent or argue to the jury that your sort

19   of take on this instruction is more explicit about the plus

20   factor of 1 and breaking it into two things and you have to

21   have 1 and 2.

22       And my view is that unless somebody completely

23   misrepresents the instruction, you know, I remind -- well, the

24   other side has a chance to give their spin on the instruction

25   if it differs.  So long as it's sort of within the reasonable

1    universe, you know, I generally allow that, unless I think the

2    jury's going to be confused.  And then I might say something

3    about:  Well, each side is kind of giving you their take on the

4    instruction; you are to follow the instructions as I give it to

5    you.  Which is of course always singularly unhelpful to them,

6    but I guess I'll have to play that by ear.

7         **MR. SPIRO:**  I can remind them, myself, Your Honor, I'm

8    not trying to take your rule, your important rule away.  So --

9         **THE COURT:**  I'm giving you a little bit of rein,

10   you'll have some rein.  If you want to take your spin, as long

11   as you stay within the orbit, I'm not going to intervene.

12        **MR. PORRITT:**  I don't think I'm giving away a state

13   secret to say I'll be discussing the definition of materiality

14   in my closing argument as well.

15        **THE COURT:**  Again, it's probably not going to be

16   different, because we all know what the arguments are going to

17   be, and I can hear the counter arguments, and I think that's

18   probably going to be a pretty important issue, is my guess, in

19   this case.  One of many issues.

20        So, all right.  So you make your adjustments.  Please make

21   sure that they've seen it because I don't want to hear

22   objections in the middle of --

23        **MR. SPIRO:**  Yeah.  We're not going to be objecting to

24   theirs, either.

25        Your Honor the one issue that you touched on at the

**PROCEEDINGS**

1  beginning of the colloquy but we hadn't come back to is that --

2  we went back and forth on this.  They have a slide that has

3  attorney statements.  We have a slide that has an attorney

4  statement.

5      I mean, if, if some -- some judges do not allow that, some

6  judges do.  I don't -- I just wanted to make sure I have

7  consistency on that.

8          **MR. PORRITT:**  Your Honor, I'm not sure which slide

9  Mr. Spiro is referring to.  It would be helpful to have more

10  specific --

11         **MR. SPIRO:**  It's the one with all of my comments.

12         **MR. PORRITT:**  Oh.  Okay.

13         **MR. SPIRO:**  Which I like, but still think I -- I think

14  the law says -- says it's -- they have a slide about my

15  comments.

16         **THE COURT:**  What number is that?

17         **MR. SPIRO:**  47.

18         **MR. PORRITT:**  We can cut that slide, Your Honor.

19  That's fine.

20         **THE COURT:**  47, that's the egregious corporate

21  governance?

22         **MR. SPIRO:**  No.  The numbers may have changed,

23  Your Honor.  It's the --

24      (Off-the-Record discussion between counsel)

25         **THE COURT:**  48 is the Section 20 liability.  So that's

 1   not it.

 2         (Off-the-Record discussion between counsel)

 3         **MR. SPIRO:**  We have an agreement.  Your Honor doesn't

 4   have to fuss with it.

 5         **THE COURT:**  Okay.  The reporter needs to write down --

 6   what did you just say?

 7         **MR. SPIRO:**  We have an agreement.  So it's not -- the

 8   Court's not needed.

 9         **THE COURT:**  Okay.  Good.

10         **MR. PORRITT:**  And there was one slide that they had

11   which had Mr. Spiro's writing on the easel during his

12   examination of Mr. Fries.  Obviously we object to that.  That's

13   just Mr. Spiro's writing.

14         **THE COURT:**  If it's not a piece of evidence --

15         **MR. SPIRO:**  Well, wait.  That is something that was

16   the demonstrative.  And I don't want to have to redo the easel

17   and use my hour, 25.

18         **THE COURT:**  You did say demonstratives already shown

19   were --

20         **MR. SPIRO:**  Correct, exactly.

21         **THE COURT:**  Okay.

22         **MR. SPIRO:**  Correct.

23         (Reporter clarification)

24         **THE COURT:**  Are okay.  So that was in the transcript.

25         **MR. PORRITT:**  All right.  Understood, Your Honor.

1    Okay.

2           **THE COURT:**  All right.  So, we just need IT.

3           **THE COURTROOM DEPUTY:**  He's here.  He's sitting in the

4    jury room, waiting.

5           **THE COURT:**  He's here, waiting?  All right, so I'll

6    wait.  It hinges on our IT person.  As soon as that's ready to

7    go, we're going to bring the jury in.

8        (A pause in the proceedings)

9           **THE COURT:**  Just to forewarn you before you start your

10   arguments, in light of everything that we've just done, I'm

11   going to reread the -- the usual admonition that arguments and

12   statements by lawyers is not evidence.

13       (Recess taken from 8:48 a.m. to 9:09 a.m.)

14       (The following proceedings were held outside of the

15   presence of the Jury)

16          **THE COURT:**  All right, I think IT is done.  Realtime

17   is up.  Keep our fingers crossed nothing else blows up around

18   here.

19       And Vicky is retrieving the jury, so we will start

20   momentarily.

21       (The following proceedings were held in the presence of

22   the Jury)

23          **THE COURTROOM DEPUTY:**  All rise for the jury.

24          **THE COURT:**  All right.  Have a seat, everyone.  Good

25   morning, ladies and gentlemen of the jury.  Welcome back.

1    Thank you again for your promptness.  And we had a few things

2    to discuss, as well as, again, some more technical problems

3    that delayed us.  But I think all the systems are up and

4    running, at least for now.  And so we are now going to proceed.

5         You have been instructed on the law on Wednesday and, as I

6    indicated, this is now the opportunity for each side to present

7    their closing arguments.  After they do so, I will give you

8    some final instructions and then you will be directed to

9    commence your deliberations.  Just a reminder, as you are about

10   to hear closing arguments, that arguments and statements by the

11   lawyers are not evidence.  They're not witnesses.  And their

12   closing arguments is intended to help you interpret the

13   evidence, but, in itself, their statements are not evidence.

14   And so if the facts as you remember them differ from the way

15   the lawyers have stated them, it's your memory that controls.

16        So, with that stated, Mr. Porritt, you have the floor.

17        **MR. PORRITT:**  Thank you very much, Your Honor.  And I

18   have a couple of demonstratives just to put on these easels

19   here, Your Honor.

20        **THE COURT:**  Okay.

21                       **<u>CLOSING ARGUMENT</u>**

22   **BY MR. PORRITT**

23        Ladies and gentlemen of the jury, first of all, I want to

24   thank you on behalf of myself, my client, Glen Littleton, who's

25   here back in the courtroom today.  Sorry he missed a few days

1    in between, but he's back here to see -- he was here at the

2    beginning and now he's here at the end, and, of course, on

3    behalf of my colleagues here at the table, who've spent the

4    last three weeks here together, for your time and attention

5    over the last three weeks.

6         I'm sure you have learned about -- learned exciting new

7    words like "implied volatility" and "special purpose vehicle"

8    that you'll find very useful once you return to regular life

9    after your jury service is over.

10        But seriously, this is a very important case, with

11   important issues not just for Glen Littleton, the class of

12   Tesla investors who I represent, or even Elon Musk and Tesla,

13   but for every public company, and indeed, in many ways, our

14   entire society.  Because our society's based on rules.  We have

15   rules for a reason.  We need rules to save us from chaos and

16   anarchy.  And whether it is the securities markets or a

17   football game, rules must be fair and must be applied to

18   everyone.

19        And this case, ultimately, is about whether rules that

20   apply to everyone else should also apply to Elon Musk.

21        When you or I submit an official form, whether it is a

22   credit card application or a job application, we have to make

23   sure every detail is right.  If we make a mistake, say

24   something that's inaccurate, or exaggerate, we will get into

25   big trouble.

1      Elon Musk does not feel the same way.  To Elon Musk, if he

2   believes it, or even just thinks about it, then it's true, no

3   matter how objectively false or exaggerated it may be.

4      Now, that may work in his businesses; that's not an issue

5   for this trial.  But it does not work in the securities markets

6   for public companies.  Securities markets have rules governing

7   what you can and cannot say.  And one of those basic rules is

8   that what you say must be true and accurate.  And we have these

9   rules for good reason.

10      The U.S. securities markets, the stock markets, is the

11   largest in the world.  Each and every one of our lives are in

12   some way affected by them, whether it is your employer, your

13   pension, insurance company, or the mortgage on your home.  Your

14   children are affected if they are paying college tuition.

15   Everyone is affected, one way or another.  And this is unique.

16   Anyone can buy shares in America.  That's not true anywhere

17   else.  But it only works because there are rules to keep people

18   honest.  So that people can trust the information in the

19   market.  Without trust, the market stops working.  Without

20   trust, speculation takes over, which destroys markets.  It

21   brings economies to a shuddering halt because nobody knows what

22   is true and what is false.  No one can rely on the value of

23   their investments.

24      Securities rules make sure the markets are fair and

25   everyone is held to the standard.  Billionaires are treated the

1   same as everyone else.  They don't get to operate under a

2   different set of rules.  Where certain player -- when certain

3   players in the market are dishonest, any -- ordinary people can

4   get hurt.

5        Now, the Court has instructed you that you must assume

6   that Elon Musk's tweets at issue in this case were untrue.

7   That means they were false.  The Court has also instructed you

8   that Elon Musk made the tweets with reckless disregard to their

9   truth.  That is, with a fraudulent state of mind.  Elon Musk

10  acted fraudulently.  That is not in dispute in this trial.

11       So the question becomes whether Elon Musk should be held

12  accountable for his fraudulent and false tweets.  Whether he

13  should pay for the harm that they caused.  And if Elon Musk is

14  not to be held accountable for fraudulent statements as made in

15  this case, tweets made while driving to the airport without any

16  consideration or regard for the chaos in the market that

17  followed, then we need to question why we have any rules at

18  all.  If the securities laws do not prevent this sort of

19  behavior from corporate CEOs, then what behavior do they

20  prevent?  What purpose do they serve?

21       But I believe the securities laws do have a purpose.  And

22  they prohibit behavior like Elon Musk's in this case.

23       Defendants will put on a show -- you'll hear from

24  Mr. Spiro shortly -- like they've been doing for the last three

25  weeks with all these differing explanations and excuses for why

1    Elon's tweets were not really fraudulent.  Do not let them

2    confuse you.  This is simply deflection and misdirection from

3    the undisputed facts.  Elon Musk published tweets that were

4    false with reckless disregard as to their truth.  And those

5    tweets caused investors harm.  Lots of harm.  That is all that

6    is necessary to find liability here.  And I feel confident

7    asking you to make that finding.

8        In light of these findings, as I told you at the

9    beginning, and I'm telling you now after three weeks, this is a

10   simple case.

11       (Document displayed)

12       **MR. PORRITT:**  Because you've been told to assume that

13   the tweets were untrue.  And because you've been told that Elon

14   Musk -- you must assume that Elon Musk acted with reckless

15   disregard.

16       It's also a simple case when it comes to damages and harm

17   because we -- plaintiff was the only party to present evidence

18   on damages.  Defendants did not even present any expert

19   testimony or other evidence as to the actual damages at issue

20   in this case.

21       So that just leaves you with one decision:  Were Elon

22   Musk's tweets, quote, "material"?  Were they important to

23   investors?

24       Let's look at Exhibit 8.

25       (Document displayed)

1          **MR. PORRITT:**  We've seen it a lot in the last three

2    weeks.  This is the tweet that started this entire case.  Once

3    again, the Court's instructed you to assume that this

4    statement, "Funding secured," is false, and made fraudulently.

5          The Court has also instructed you -- so, that was made at

6    least with reckless disregard to whether the statement was true

7    or not.  "Reckless" means highly unreasonable conduct that is

8    an unreasonable departure from ordinary care, presenting a

9    danger to investors which was either known to Elon Musk, or so

10   obvious that Elon Musk must have been aware of it.  That's the

11   definition in the jury instructions.  That is what is to be

12   assumed.  And that is enough to establish liability under

13   Rule 10b-5.

14         If defendant has reckless disregard for whether a

15   statement is untrue, as you are to assume from Mr. Musk here,

16   then the scienter or state of mind requirement is satisfied.

17   The plaintiff does not have to show knowledge.  And you don't

18   need to find knowing conduct by Elon Musk to find him liable

19   under Rule 10b-5.  That is very clear here in the Instruction

20   No. 9, that shows it can be established either by knowledge or

21   by reckless disregard.

22         What, then, is left for you to decide, you may ask.  The

23   only issue is whether this statement, "Funding secured," was

24   material.  And let's look at the definition of "material" here

25   in the jury instructions.

1      (Document displayed)

2      **MR. PORRITT:**  It says:  Did the indisputably false

3   statement "Funding secured," give a reasonable investor the

4   impression of a state of affairs that differs in a material way

5   from the one that actually exists?

6      In other words, would a reasonable investor consider the

7   fact of funding secured important in deciding whether to buy or

8   sell Tesla's stock or options?

9      Importantly, it is not necessary for a fact to change the

10  way a reasonable investor would invest.  It only has to be

11  important to the reasonable investor to be material.  A fact

12  that confirms an existing decision to purchase or sell stock is

13  still material.  And when considering the materiality of the

14  statement of "Funding secured," first look at the data.

15  Because the data doesn't lie.

16      (Document displayed)

17      **MR. PORRITT:**  Plaintiff's expert Michael Hartzmark

18  provided you with strong evidence, qualitative and

19  quantitative, showing how the tweet affected Tesla's stock and

20  option prices.

21      Here is the chart he prepared.  See it on the screen in

22  front of you.  This is the August 7th stock price for Tesla

23  with the volume at the bottom.

24      When you look at materiality, the importance to investors

25  of the statement "Funding secured," you must first look at what

1    investors actually did.  Did they buy or sell Tesla securities

2    following the tweet?  And the evidence on this chart is stark

3    and undisputed.  Within a minute, Tesla's stock price shot up.

4    Volume shot up.  It shot up so much that Nasdaq halted trading.

5    The very stock exchange that Tesla stock trades on halted

6    trading.

7              THE COURT:  Mr. Porritt?

8              MR. PORRITT:  Yes.

9              THE COURT:  I'm going to ask you, I don't know if

10   you're going to use these -- you're using the screen, correct?

11             MR. PORRITT:  Yes.

12             THE COURT:  I don't know what these -- if these poster

13   boards have something -- because I can't see the jury.

14             MR. PORRITT:  Oh, I apologize, Your Honor.

15             THE COURT:  And I'd like you to put it up when you're

16   actually going to use it, unless there's something -- I can't

17   see what's on there.  So I would like you to put it up when you

18   are going to use it, and not just have it up for the entire

19   time because I'm -- my view is blocked.

20             MR. PORRITT:  All right.  Very good, Your Honor.  All

21   right.  I'll -- thank you.

22             MR. APTON:  Move them here (Indicating)?

23             THE COURT:  And that goes for both of those.  Just --

24   just put them down, so we all can see the jury until you use

25   it.  That goes for the other one as well.

1     MR. PORRITT:  Okay, very good, Your Honor.

2     THE COURT:  Thank you.

3     MR. PORRITT:  I was trying to avoid putting them up in

4  the middle of the presentation.

5     THE COURT:  Sorry.

6     MR. PORRITT:  That -- this is -- that's fine.

7     And you also saw on August 7th during the trading halt,

8  that clip played during Dr. Hartzmark's testimony, Mike

9  Santoli, on the floor of the New York Stock Exchange, calling

10  the funding secured the big number.

11     And if you turn to the stock options, you saw Professor

12  Heston described how the price of long-term stock options went

13  down straight after the tweets on August 7th.  The first tweet.

14  How options investors like Glen Littleton started seeing the

15  value of their investments evaporate in minutes because Elon

16  claimed to have funding discussed.

17     But it's not limited just to the trading data.  As

18  Dr. Hartzmark explained again, you look to the qualitative.

19  What investors actually thought.  And you've heard from one --

20  the first Tesla investor you heard from was Mr. Littleton,

21  himself.

22     And he testified that on learning that Elon had said

23  "Funding secured" for a going-private transaction of $420 per

24  share, he immediately knew, based on his experience, decades

25  trading, that he had to sell all his Tesla stock options

1    because they had become worthless as a result of the tweet.

2        He sold them at the market price, which was starting to

3    reflect the tweet.  And even after selling them as quickly as

4    he reasonably could, he still lost 75 percent of their value.

5    Millions of dollars to him.  There's no question that "Funding

6    secured" was material to Glen Littleton.

7        And you also heard from Tim Fries who bought Tesla stock

8    after hearing "Funding secured."  He bought it at the market

9    price of $380 because he believed Elon would take Tesla private

10   at 420 with funding secured.  He -- there is no question that

11   that affected his decision to buy or sell -- to buy, in this

12   case, Tesla's -- Tesla stock.

13       But, ultimately, materiality is an objective test.  What

14   would a reasonable investor think about the statement?  The

15   opinions of Glen Littleton and Tim Fries are just two examples.

16   You need to consider the whole range of what the market

17   thought, as well as the market data.  And what does this

18   evidence show?

19       First, bear in mind the context of a going-private

20   transaction.  Professor Subramanian explained there was a

21   recognized understood process for going-private transactions,

22   based on his analysis of over 75 of these transactions over the

23   last 15 years.  This process involves detailed financial and

24   legal analysis.  And that financing is reviewed and arranged

25   before the proposal is announced.  Before the transaction is

1   announced.

2       That was Professor Subramanian's view, and that was

3   confirmed by the evidence in this case, from Egon Durban and

4   Dan Dees.  Elon's chosen bankers confirmed this process.  They

5   agreed with Professor Subramanian, the evidence, that this

6   process is the standard that is expected to be followed.

7       (Document displayed)

8       **MR. PORRITT:**  Both of them, Silver Lake and

9   Goldman Sachs, presented to Elon a timeline by which this

10  going-private transaction would be affected.  Both of them

11  stressed getting written commitments of funding before making a

12  formal proposal and before disclosing the transaction.

13      Mr. Durban, who has special importance here because of his

14  prior experience with the Dell transaction, testified:  Funding

15  is not committed until there is a written commitment.  See the

16  testimony there in front of you.

17      So the experts, Professor Subramanian and Mr. Durban and

18  Mr. Dees, confirm that when a going-private transaction is

19  announced with funding secured, the market expects that

20  committed funding has been arranged and agreed.  And if you

21  need even further commitment -- confirmation on this point look

22  no further than Martin Viecha, Tesla's own head of investor

23  relations.  When he read the tweet, he thought it meant the

24  offer was as firm as it gets and that financing is secured,

25  regardless of other assumptions.

1        (Document displayed)

2        **MR. PORRITT:**  That is because you don't go full-on

3    public with a going-private transaction unless that has been

4    arranged.  And that is Tesla's own definition of "funding

5    secured."

6        And finally, if all of that wasn't enough that I presented

7    already, you look at what analysts -- Dr. Hartzmark described

8    how important analysts are in interpreting what the market

9    thinks is important.

10        We looked at Ryan Brinkman.  You saw him on videotape.

11    The JP Morgan analyst.  Stated categorically:  "Either funding

12    is secured or it is not secured, and Tesla's CEO says funding

13    is secured."

14        And now we've placed particular emphasis -- Dr. Hartzmark

15    placed emphasis on Ryan Brinkman and JP Morgan.  And why is

16    that important?

17        First, Mr. Brinkman was the first analyst to take

18    significant steps in response to the August 7th tweets.  He

19    adjusted his target price.  And Dr. Hartzmark explained to you

20    how important that is for analysts.  This is the price that

21    they tell their clients that they are expecting Tesla to trade

22    in the future.

23        And he was -- he -- to get -- to change the target price,

24    he needs approval within JP Morgan.  And he got that.  He

25    changed his target price after the "Funding secured" and the

 1  second "Investor support is confirmed" tweet.

 2      The second, JP Morgan is the largest commercial bank in

 3  the United States.  It's very respected.  It has millions of

 4  customers.  Mr. Brinkman's reports are read by millions of

 5  investors.  If you wanted to know what a reasonable investor is

 6  thinking, a good place to start is to read the JP Morgan

 7  analyst reports.

 8      So that is what the market understood "Funding secured" to

 9  mean.  An actual commitment.  And now, as you're instructed,

10  let's compare that to the actual state of affairs, and see if

11  there's any difference.

12      Elon claims that "Funding secured" referred to his meeting

13  with the Saudi PIF on July 31, that we have heard so much about

14  at this trial.  That is what he said at the time.  And that's

15  what he's told you in this litigation when we specifically

16  asked him what "Funding secured" referred to.  And he told us,

17  under oath:  Saudi PIF.  And as you have heard, the discussions

18  with the Saudi PIF fall a long way short of a legally committed

19  financing, as the market understood "Funding secured" to mean.

20      You have heard from three participants in the meeting with

21  PIF:  Elon Musk, Deepak Ahuja, and Sam Teller.  All of them

22  aligned with defendants.  None of them took any notes of the

23  meeting.  And that, in itself, tells you something.  No notes

24  taken at this meeting, which lasted about 45 minutes.

25  Apparently, a six -- potentially 60 billion-dollar financing

1  commitment was obtained from PIF, and no one wrote down a

2  single word to record it.  $60 billion.

3      To put that in some perspective, that's equivalent to the

4  economies, the entire economies of countries El Salvador,

5  Nicaragua and Honduras put together, equal about $60 billion.

6  A sum of money that if you earned $100 a day, it would take you

7  over 1.5 million years to earn $60 billion.  That is the sum

8  that we are talking about.

9      And Elon Musk said he secured that in a 45-minute meeting

10 with people he's met five times before, without anything being

11 written down.  Does that sound even remotely credible?

12     Now, Elon -- because they didn't have any notes, Elon and

13 Deepak Ahuja and Sam Teller testified of their recollection of

14 this meeting, which happened over four years ago.  And we all

15 know, memories fade, memories change.  Sometimes we substitute

16 what we wished happened for what actually happened.  And that

17 can happen when you are facing government investigations and

18 lawsuits for billions of dollars.

19     But you don't have to rely on the faded and unreliable

20 memories of Elon Musk, Deepak Ahuja and Sam Teller form what

21 occurred at that meeting.  Because someone did keep notes.  And

22 someone did write about the meeting at the time.

23     (Document displayed)

24         **MR. PORRITT:**  And that person was Yasir, and his other

25 members of his team at PIF.  These documents, you've seen them

 1   during the course of this trial.  The documents do not lie.

 2   Documents speak from the past clearly and unchangeably.  And

 3   these documents tell a consistent story about the status of

 4   discussions in August, 2018, between Elon and PIF.  And they

 5   show that funding was nowhere near being secured.

 6       Here are the minutes taken by the Saudi PIF at the

 7   meeting.  Agreed actions.  Elon to provide a plan and the

 8   financial calculations to take Tesla private.

 9       There is absolutely no reference, none, to billions of

10   dollars of financing being committed by the PIF at this

11   meeting.

12       The final comment (As read):

13           "I would like to listen to your plan, Elon,

14           and what are the financial calculations to

15           take it private...if I do not hear from you

16           next week, I will call you."

17       That's exactly the same message that Sam Teller heard at

18   the end of the meeting as well.

19       The PIF was interested, but this was just a potential

20   transaction for them.  As far as PIF was concerned, the

21   conversation was just beginning.  Nothing was concluded.

22   Nothing committed or secured.

23       As both Mr. Durban and Mr. Dees testified, there's a big

24   difference between a statement of interest and committed

25   funding.  Committed and secured funding counts when make --

 1   doing a going-private transaction; available funding or

 2   interested funding doesn't.

 3       Then we go forward ten days to August 10th.

 4       (Document displayed)

 5       **MR. PORRITT:**  One point to note:  Elon Musk had not

 6   even spoken to the PIF again after the July 31st meeting.

 7       Once again, how credible is it that you can commit -- get

 8   an undocumented commitment of 60 billion, up to 60 billion of

 9   financing at a meeting, and then you never follow up for ten

10   days?  Not even a phone call.

11       But Saudi PIF, not hearing from Elon Musk, sends him a

12   nondisclosure agreement.  Again, this was described by

13   Professor Subramanian as a standard step at the beginning of

14   exploring a transaction.

15       How does the agreement describe the relationship between

16   Saudi PIF and Elon Musk and Tesla?  "A potential project."

17   That's not committed financing.  That is not secured financing.

18       And what does Elon Musk, when he sees this description,

19   do?

20       (Document displayed)

21       **MR. PORRITT:**  Does he try and change it?  Does he edit

22   it to say committed financing or secured financing?  No, he

23   doesn't.  He signs on the bottom, on the dotted the line.

24       (Document displayed)

25       **MR. PORRITT:**  He signs up to the idea that it's a

1  potential project.  That's the only document he actually signed

2  with the PIF, describing it as a potential transaction.

3      (Document displayed)

4      **MR. PORRITT:**  And then later on he gets into an

5  argument with Yasir on the text messages that you saw.  There's

6  some media reporting that he disagrees with.

7      And at this stage, August 10th, Elon Musk is being

8  investigated by the SEC, and being sued by investors.  He

9  desperately needs something from PIF to cover up his lie about

10  funding being secured.  He's being exposed.

11      So he threatens PIF:  Confirm my lie or I will never speak

12  to you again.

13      This is a fund which had just bought nearly 5 percent of

14  Tesla, who obviously believe in Tesla and Elon.  This is the

15  sort of investor that Elon claims to care about, and he

16  threatens them, that -- unless they repeat his lie about

17  "Funding secured."

18      What sort of person does that?  Not someone who cares

19  about his investors, whether they're large or whether they're

20  small.

21      But Yasir won't be bullied.  He actually speaks the truth

22  to Elon, a rarity in this case, it appears.  He claims --

23  calmly states that PIF had only started exploring investing in

24  Tesla, and that PIF and Tesla need to start working together.

25  Once again, completely consistent.  A potential transaction.

1        And it continues over the weekend of August 11th and 12th.

2   We saw these.

3        (Document displayed)

4        **MR. PORRITT:**  PIF is asking for information.

5   Information that they needed to even evaluate the

6   information -- the transaction.  And that Elon had promised to

7   give them.

8              "We cannot approve something that we don't

9              have sufficient information on."

10       That seems like common sense to me, but apparently not to

11  Elon Musk.  Elon Musk apparently thinks it's easier to obtain

12  billions of dollars of financing than it is to get an auto loan

13  or a mortgage.

14       Remember my exchange with Elon Musk.  He compared this

15  funding to a going-private transaction, to getting a mortgage.

16  And when I pointed out that I needed paperwork and a committed

17  financing before I can make an offer to buy a house, he then

18  just completely turned around and said:  You know what, this is

19  nothing like buying a house after all.  That exchange shows

20  Elon's looseness with language and loose relationship with

21  truth.

22       Nonetheless, throughout this exchange, going back to the

23  PIF minutes, Yasir was completely consistent.  Potential

24  transaction; please give us information.  None of it is

25  consistent with committing -- committed or secured funding for

1    a 60 billion-dollar deal.

2         (Document displayed)

3         **MR. PORRITT:**  Even in their recollections, Elon,

4    Deepak Ahuja, Sam Teller, all remember there was no funding

5    agreement signed in writing with the PIF.  No amount of funding

6    was discussed or agreed.  The structure of a going-private

7    transaction was not even understood at the time, let alone

8    discussed, and the price at which Tesla might go private was

9    not discussed.  Any one of those elements could affect the

10   amount needed for financing by billions of dollars.  And not

11   one was even discussed with PIF, let alone agreed upon.

12        And as we know from Elon's bankers, particularly Egon

13   Durban, funding was far from secured.  Egon Durban, Egon Durban

14   finally began to work -- agreed to work with Elon Musk, spent

15   several weeks of his life trying to raise up to 50 billion in

16   capital.  You saw the texts between him and his team.  Working

17   late at night trying to raise money.  Would they do that if

18   funding was secured?  Would that be necessary?  Of course it

19   wouldn't.

20        So the evidence is clear.  On August 7th, which is when he

21   tests the materiality of a false statement, when it was made,

22   the actual state of affairs is that PIF had explained an

23   interest in a potential transaction, but that funding was not

24   secured.

25        And remember that when I showed Elon the text from Yasir

1   that we've just have been looking at, he accused Yasir of

2   backpedaling and ass-covering.  Elon Musk's words.

3        (Document displayed)

4        **MR. PORRITT:**  Well, if the other side is -- can

5   backpedal, doesn't that mean that funding is not secured?  And

6   the only backpedaling and ass-covering I saw in that exchange

7   came from Elon, not Yasir and the PIF.

8        And if we turn now to Exhibit 13, the second statement.

9        (Document displayed)

10       **MR. PORRITT:**  Once again, the Court has instructed you

11  to assume that this is false, and to assume that Elon Musk made

12  this tweet with reckless disregard to its truth.

13       This is a very important statement that has been a little

14  bit overshadowed in this trial.  It was this statement that

15  convinced Ryan Brinkman to issue his report raising his target

16  price.  It convinced Ryan Brinkman, you recall his testimony,

17  that the "Funding secured" tweet was real.

18       Remember, the stock price went up immediately after the

19  trading halt when this statement was issued.

20       (Document displayed)

21       **MR. PORRITT:**  You can see the spike on the right

22  following this tweet.  But you've heard less about this false

23  statement.  And that is because defendants simply have no

24  explanation or excuse for it.  They would just want to bury it.

25  Because the statement is categorical, "Investor support is

1    confirmed."  That's a factual statement which was false.  There

2    was nothing ambiguous about it.

3         It is undisputed at this time, Elon Musk had spoken to one

4    investor.  PIF.  And as we've seen, they were still awaiting

5    information before they could even evaluate the deal, let alone

6    confirm their support.  Elon had not spoken to a single other

7    investor.  Not an existing investor in Tesla or a potential

8    investor.

9         And on August -- back on August 3rd, Elon had named a list

10   of investors he expected to support the transaction.  He named

11   the Emirates, Fidelity, Baillie Gifford, Norwegian Investment

12   Fund, Tencent, T. Rowe Price.  He threw out this list of

13   investors to his board.  He hadn't spoken to any of them.  Not

14   on August 3rd, and he hadn't spoken to them by August 7th when

15   he tweeted out "investor support is confirmed."

16        And this was critical for the transaction.  Elon Musk

17   needed investors to roll into a private Tesla, otherwise he

18   wouldn't be able to -- he wouldn't have secured financing for

19   any of it.

20        And this is another reason why defendants have not

21   discussed this tweet very much.  Because when Elon did speak to

22   investors, their response was clear, most of them did not

23   support going private.

24        So Elon Musk announces on August 7th that he has confirmed

25   investor support -- past tense -- for a going-private

 1  transaction, without actually speaking to anyone to confirm

 2  support.  And then he pulls the transaction two weeks later

 3  when he finally speaks to them and finds out they don't

 4  support.  Meanwhile, Tesla's stock price has crashed, and

 5  investors have lost $12 billion in damages.

 6      Let's go back to Instruction No. 8 on what a material

 7  misrepresentation is.

 8      (Document displayed)

 9      **MR. PORRITT:**  You see the definition there in front of

10  you.

11      I don't know if you could find a clearer example of a

12  misrepresentation giving a reasonable investor the impression

13  of a state of affairs that differs in a material way from one

14  that actually exists than Elon's tweets that investor support

15  is confirmed on August 7th when he has not spoken to a single

16  investor, has not confirmed support, and investors do not, in

17  fact, support the transaction.

18      Now, you also have to decide whether Tesla is liable for

19  these August 7th tweets.  The critical fact you should remember

20  in making this determination is that Tesla consciously chose to

21  make Elon its public image, and specifically his Twitter feed

22  as the primary news and information source for Tesla.  That is

23  their choice.

24      (Document displayed)

25      **MR. PORRITT:**  So when Elon tweets about Tesla, people

 1    listen.  And they're treated as statements from the company, as

 2    well as from Elon Musk.  Elon Musk admitted as much in his

 3    testimony.

 4         And you saw with Ryan Brinkman in his August 8th report,

 5    he stated:  Tesla's CEO says funding is secured.

 6         (Document displayed)

 7              **MR. PORRITT:**  And also remember that the second

 8    indisputably false statement, the "Investor support is

 9    confirmed" tweet, contains within it a link to Tesla's own blog

10    post that was drafted by Tesla employees for Elon.

11         Now I want to turn briefly to the verdict form, which is

12    the task you will be facing to fill out in a few hours, or in

13    an hour or so.

14         The first question you are asked is whether plaintiff has

15    proved the Rule 10b-5 claim against Elon Musk for the "Funding

16    secured" and "Investor support is confirmed" tweets.  Let's

17    look at the elements that you will be asked to find, or to

18    consider.

19         See the first element is a material false statement.  The

20    Court has instructed you to treat both the statements, "Funding

21    secured" and "Investor support is confirmed" as false.  And we

22    just discussed the evidence is overwhelming that they were

23    material to reasonable investors.  The first element is clearly

24    met.

25         The second element is state of mind.  Or scienter.  And

1  the Court has instructed you to accept that Elon Musk acted

2  with reckless disregard to the truth of both these tweets,

3  which is sufficient to meet the state of mind for this element.

4  You are to assume this element is met.

5        The third element is the use of interstate commerce.

6  Using Twitter satisfies this element, and it's not an issue

7  between the parties.  You have not heard about much of it --

8  heard about that during the trial.

9        The fourth element is reliance.  Now, you heard both Glen

10  Littleton and Tim Fries read the August 7th tweet saying

11  funding is secured, and bought or sold Tesla stock or options

12  in response; that is undisputed by defendants.  So this element

13  is met for Glen Littleton and Tim Fries.  They knew, they had

14  read the tweets before making their transactions.

15        And for the broader class, the Court explained they are

16  presumed to rely on public statements about Tesla, such as

17  Elon's August 7th tweets, if Tesla stock or options traded in

18  an open and efficient market.  And Dr. Hartzmark testified that

19  he analyzed the market for Tesla stock and options from

20  August 7th to August 17th, and found they did trade on an

21  incredibly efficient market.

22        (Document displayed)

23        **MR. PORRITT:**  And Tesla has offered no testimony,

24  expert or otherwise, to the contrary.

25        And the final element is whether the August 7th "Funding

 1   secured" and "Investor support" tweets caused plaintiff and

 2   other Tesla investors to suffer damages.

 3        (Documents displayed)

 4        **MR. PORRITT:**   And here we go to the testimony you've

 5   heard this week from Professor Heston and Dr. Hartzmark.   Very

 6   technical and dense testimony; a lot of information, a lot of

 7   charts.

 8        I appreciate your patience in listening to it.   And I

 9   could tell you were paying it the attention it deserves.

10   Because it's critical that if Elon Musk and Tesla are going to

11   be held accountable for the false tweets and the harm they

12   caused to investors, that the full amount of that harm is

13   awarded as damages.   And that is your job as this jury.

14        And Dr. Hartzmark, assisted by Professor Heston, measured

15   that harm through painstaking analysis, minute by minute,

16   document by document, through over 2,400 articles, over 50

17   analyst reports.   We could only show a few of the documents to

18   you during his testimony because otherwise we'd still be going,

19   because that's the extent of the work that he did.   And he

20   explained the work he did and the reasons for his opinions.

21   And it showed what a reasonable, robust, and even conservative

22   approach he took to calculating damages in this case.

23        And Dr. Hartzmark is your best and only guide.   Defendants

24   did not offer a single expert in this case.   That, alone,

25   should give you confidence to accept Dr. Hartzmark's analysis

 1  and calculations.  No expert would take the stand to argue

 2  against it.

 3      **MR. SPIRO:**  Uh --

 4      **MR. PORRITT:**  You had some cross-examination by

 5  defendants' lawyers, but no actual testimony disagreeing with

 6  anything either Professor Heston or Dr. Hartzmark said.

 7      And so what did Professor Heston and Dr. Hartzmark tell

 8  you?  It's really two things.  The first is that the August 7th

 9  tweets had immediate an impact on Tesla's stock and option

10  prices on August 7th, and this lasted until about August 17th,

11  and that impact cost billions of dollars.

12      And the second thing from Dr. Hartzmark was a precise

13  measurement -- see it to my right here -- of the harms suffered

14  by investors on each day of the class period.

15      (Document displayed)

16      **MR. PORRITT:**  Now, I'm going to try and summarize that

17  as best I can, that technical evidence.

18      On the causation, look at my chart to the left here.  This

19  is loss causation shown on one chart.  You see the date of the

20  tweet and the immediate increase in Tesla's stock price, the

21  blue line.  And you see a drop in the red line.  That is what

22  Professor Heston and Dr. Hartzmark referred to as volatility,

23  implied volatility from Tesla's stock options.

24      Now, this is not an imaginary or made-up number.  This is

25  a number that is calculated from actual transactions in Tesla's

1    stock options during the class period.  Indeed, Professor

2    Heston explained that implied volatility is often used instead

3    of price, instead of dollars and cents in pricings options.  So

4    one way implied volatility is important is that it acts as a

5    price for options.

6        The second way that it is important is that it measures

7    the amount of movement expected by the market in Tesla's stock

8    price.  Think about that as the temperature of Tesla's stock

9    price.  Just as atoms moving more quickly increase the

10   temperature of a substance, so stock prices moving more quickly

11   increase the volatility of a stock.  High volatility or hot

12   prices increase value of options; low volatility or cold prices

13   decrease the value of options.

14       And Professor Heston explained that normally volatility

15   does not move in response to changes in stock prices.  Stock

16   prices go up and down all the time; volatility generally is

17   stable.  It's only when the expected amount of change increases

18   or decreases you see a movement in implied volatility.

19       So after August 7th you see an immediate drop in

20   volatility.  As Professor Heston explained, that was very

21   unusual.  Now volatility and stock prices are moving together.

22   Stock price is going up, volatility's going down, but you can

23   see what a mirror image they are of each other.

24       (Document displayed)

25           MR. PORRITT:  The August 7th tweets were like an ice

1  cube dropped in a glass of water, they immediately reduced its

2  temperature.  And you see over the course of the class period,

3  to August 17th, that the impact of the August 7th tweets, the

4  ice cube, gradually melts away.  It's not a straight line but

5  the movement is slowly up while the stock price comes down.

6      Finally, on August 17th the ice cube completely melts.

7  Volatility goes back to where it started from.  The glass of

8  water is back at room temperature, and the stock price has gone

9  down to $305.  This chart demonstrates that the August 7th

10  tweets caused losses to the investors.

11      Not only do you see these price movements, but

12  Dr. Hartzmark carefully examined all the news that entered the

13  market about Tesla during this period.  Of the 2,400 news

14  articles, only 12 or 14 talked about other topics.  And that

15  was mostly old news, or positive news for Tesla.  All the

16  negative new information related to the tweets, either about

17  the going-private transaction, itself, its funding, investor

18  support, are what Dr. Hartzmark called "consequential harm."

19  And the consequential harm, as Dr. Hartzmark explained, is

20  real, out-of-pocket losses to investors.

21      When the market learns that a CEO lies about his public

22  company, as Elon Musk did here, there are known negative

23  consequences to that company's stock price that are caused by

24  those lies.  A loss of credibility for management in the

25  future.  A so-called "liar's discount."  No one is going to

 1   believe that CEO in the future, which harms the company.  It

 2   means the market has learned that a company's internal

 3   controls, the controls that are meant to ensure it only issues

 4   accurate information, do not work.

 5        And as Professor Subramanian explained, these are very

 6   important for public companies.  And it means the company and

 7   its management are going to face legal, regulatory risks,

 8   lawsuits, government investigations, with all the expense,

 9   distraction that requires.

10        All of these happened with Tesla, and resulted in its

11   stock price dropping by August 17th to $305.50, well below what

12   it started out at August 6th at $356.  And this is a real harm

13   to Tesla investors, and it is a direct consequence of Elon's

14   August 7th tweets.

15        And if you look here, you can see we've also indicated on

16   the chart on my left here, we've chosen the Ryan Brinkman

17   reports and comments.  You see all -- we've discussed the

18   comments immediately after the August 7th tweets.

19        We now go forward to the August 13th and the blog post by

20   Elon.  We've heard a bit about that during the trial.  Again,

21   this is written for him by Tesla.  Defendants argue that this

22   blog post completely cleared up any misleading information from

23   the August 7th tweets.  The evidence is otherwise.

24        First, look at the volatility.  Goes down, and is still

25   much lower than what it was -- than it was on August 6th, and

 1   what it will be on August 17th.  Ten percent lower.  Forty

 2   percent versus 50 percent.  That shows that the August 7th

 3   tweets were still having a big impact on Tesla's stock price

 4   and option prices, even after August 13th.

 5        And second, you can look at the August 13th blog post,

 6   itself, and compare it to both the August 7th tweets and the

 7   actual state of affairs.  On "Funding secured," the blog post

 8   still identified Saudi PIF as the reason for the "Funding

 9   secured" comment.  It doesn't state that they are only

10   interested in a potential transaction.  It doesn't state that

11   Elon was threatening and bullying Yasir one day over -- earlier

12   over the weekend.

13        And we know what the Saudi PIF thought about the blog

14   post, because Yasir texted Elon almost immediately afterwards,

15   describing it as an ill-advised blog with loose information.

16   So the other side of the July 31 meeting immediately

17   disagreeing with Elon's description of the meeting in the

18   August 7th blog post.  Of course, the market didn't know that;

19   that was just between Elon and Yasir.

20        And Elon, in the August 13th blog post, also said about

21   investor support being confirmed and said that there was 66 --

22   his estimate of 66 percent chance, or 66 percent of investors

23   would roll over.  Again, it must be read in the context of his

24   prior comment that investor support was confirmed.

25        Once again, Ryan Brinkman captures where the market was

 1  after the August 13th blog post.

 2       (Document displayed)

 3       **MR. PORRITT:**  We didn't know what to believe, he says.

 4       Now, defendants point to the fact that Tesla's stock price

 5  went up slightly after the blog post.  But that is entirely

 6  consistent with the blog post being understood as confirming

 7  the August 7th tweets, saying "Funding secured," and "Investor

 8  support is confirmed."  Statements you have been instructed to

 9  assume are false.

10       And then, finally, we get to the *New York Times* article on

11  August 16th.  Once again, the volatility tells the story, on my

12  chart on the left here.  Goes back up to where it had been

13  before the tweets.  The impact of the tweets on option and

14  stock prices is over.

15       And Elon -- Ryan Brinkman remembers reading the *New York

16  Times* article, and then decides to issue another note, getting

17  permission from his -- from his -- from within JP Morgan,

18  adjusting his target price back down to what it was before the

19  tweets.

20       (Document displayed)

21       **MR. PORRITT:**  For Brinkman, just like the market, the

22  impact of the tweets is over.

23       And again, we've heard from defendants that this stock

24  price reaction was really in the context of Elon's mental

25  health or work stress.  But Dr. Hartzmark carefully analyzed

 1   all the information in the *New York Times* article that related

 2   to the transaction and the other news, and found that the other

 3   news was either old, previously reported news, or was positive

 4   for Tesla.

 5        The mental health, there had been a whole story in the

 6   same newspaper, *New York Times*, a day earlier, devoted to Elon

 7   Musk's mental health.  It wasn't -- nothing was new being

 8   reported on the -- regards to his mental health on August 16th.

 9   And the same about his stress at work.  That had been in the

10   news throughout the summer of August -- of 2018.

11        What moved the market is what moved Ryan Brinkman to

12   revise his price target:  That the representations made on

13   August 7th about "Funding secured" and investor support were

14   not true.

15        So, back to the verdict form.  I'm sorry, we had a bit of

16   diversion.  What we have been discussing establishes that the

17   August 7th tweets caused Glen Littleton and other members of

18   the class to suffer damages.

19        (Document displayed)

20        **MR. PORRITT:**  That, combined with the false statement

21   and scienter and materiality, is enough to establish liability

22   for Elon Musk.

23        And on the verdict form you should tick yes to Question

24   A-1 and Question A-3.

25        And as we discussed, Tesla should also be liable for

1  Elon's Musk -- for Elon's tweet, and you should tick yes on

2  questions A-2 and A-4.

3      And you will then turn to the amount of damages to be

4  awarded to all the Tesla investors who were harmed.  And you've

5  got three categories to deal with.  Again, Dr. Hartzmark is

6  your only and best guide on these numbers.  He offered a

7  detailed and rigorous calculation that you can rely on.

8      And first, looking at purchases of Tesla stock by Tim

9  Fries.

10      (Document displayed)

11      **MR. PORRITT:**  Tesla's stock price was inflated after

12  the tweets on August 7th, and it remained inflated all the way

13  until it went to zero on August 17th.  And Dr. Hartzmark

14  calculated that amount and removed other market effects that

15  might impact the stock price.  And that generated a price,

16  312.90, that was what he called the "but-for price," and

17  enabled him to calculate to the penny the amount of artificial

18  inflation.

19      Quite logically, it starts off at its highest after the

20  tweets at 66.67 on August 7th, and reduces to zero.  Defendants

21  again did not offer any alternative to those numbers.  66.67

22  and zero at the end.  They did criticize, in examining

23  Dr. Hartzmark, some of the intervening numbers.  And

24  Dr. Hartzmark conceded that under their -- applying their

25  methodology, you would have to adjust the numbers in this

1     chart.

2          But using defendants' numbers would increase damages.  It

3     would mean that inflation was higher on those intervening days.

4     Dr. Hartzmark chose a conservative -- the smaller measure to

5     make sure that -- to avoid any question of over-recovery.

6          It is bizarre the defendants are proposing increased

7     damages.  And of course, that's not what they're doing.

8     They're trying to confuse you.  They're trying to make you

9     think that Dr. Hartzmark's analysis was not reliable, or that

10    no calculation at all is possible, so therefore Elon Musk just

11    gets scot-free because it's all too complicated.

12         Do not let them confuse you.  You heard Dr. Hartzmark.

13    You can assess his credibility.  You heard about the massive

14    amount of work he did, and how he chose this conservative

15    measure of damages.

16         When it comes to answering question B-1 on the verdict

17    form, you can rely on these numbers prepared by Dr. Hartzmark.

18    And you can assess how much of that $66.67 inflation he

19    measured on August 7th was present each day of the class

20    period.  Your numbers could be the same, or you can reach your

21    own calculations, based on the evidence.

22         But remember, defendants have not offered any alternative

23    calculations.  He showed these calculations on his Slide 11 --

24    that's what you have on the screens in front of you -- during

25    his testimony.

1      If you need assistance, not to memorize -- it's not a

2  memory test -- you can ask the Court to provide -- you can

3  request the Court to provide you with a readback which may

4  include this Slide 11.  I ask you to remember the Slide 11 when

5  you are filling in Question B-1.

6      Question B-2, this is going to ask you to fill in the

7  implied volatilities for stock options.

8      (Document displayed)

9      **MR. PORRITT:**  And this is a bit of a daunting chart.

10  If we can go to the next slide, Derek?

11      (Document displayed)

12      **MR. PORRITT:**  It's a lot of numbers.  But again,

13  Dr. Hartzmark provided his help to you by providing this chart

14  on his Slide 24 during his testimony.

15      And again, defendants do not offer any alternative.  They

16  did not even cross-examine Dr. Hartzmark about it.  These

17  numbers are essentially uncontested.

18      And you will see at the bottom half below the green line

19  there, those numbers are the same across the entire period.

20  It's one number.  That's really just nine numbers you have to

21  choose.  For the ones above the green line, sort of the shorter

22  term, it varies day by day.

23      But again, if you need assistance you can ask for the

24  testimony of Dr. Hartzmark with this slide to be read back to

25  you.

 1      And then finally on Question B-3 and the convertible

 2  bonds.

 3      (Document displayed)

 4      **MR. PORRITT:**  This is very similar to the stock.

 5      If you go to the next slide, Derek.

 6      (Document displayed)

 7      **MR. PORRITT:**  Dr. Hartzmark calculated the amount of

 8  inflation.  And there again, no alternative figures from

 9  defendants.

10      And you can ask the Court to provide you with this slide,

11  Slide 12, with a readback of Dr. Hartzmark's testimony

12  explaining it.  And rely on this calculation, these -- this

13  chart when filling in Question B-3 on that form.

14      (Document displayed)

15      **MR. PORRITT:**  And the next section of the verdict form

16  talks about the board of directors.  Section 20(a) Liability.

17      (Document displayed)

18      **MR. PORRITT:**  Let's talk about the board of directors.

19  They utterly failed here.  They said they had a disclosure

20  policy in place, but didn't follow it.  Musk was allowed to do

21  whatever he pleased.  The only person who pushed back on him

22  was really Yasir, in the text.

23      They had numerous warnings about the problems for Tesla as

24  a result of Elon Musk's Twitter habit.  In May, 2018, Elon

25  publicly attacked investors -- attacked analysts, rather,

1    during a conference call.  Martin Viecha called that a red

2    flag.  And it caused Tesla's stock price to decline.

3         Two months later, Elon embroiled Tesla in a totally

4    unnecessary dispute when he called a Thai cave diver a

5    pedophile.  Musk was warned after this, not by his board but by

6    one of his most respected investors, Ron Baron, saying:  You

7    know what, get an ice cream cone.  Just don't tweet.

8         (Document displayed)

9         **MR. PORRITT:**  The board did nothing.  The lack of

10   guardrails about Musk's Twitter which, again, was identified

11   and deliberately chosen as the main way to communicate by

12   Tesla, gives rise, in light of these red flags, gives rise to

13   liability.  Remember, Professor Subramanian described it as an

14   egregious corporate governance breach.

15        (Document displayed)

16        **MR. PORRITT:**  So the form looks -- Tesla's directors,

17   they had the power to control statements being made on behalf

18   of Tesla, they had the obligation to control those statements,

19   and they didn't.  You should tick, in response to Section C,

20   you should tick yes.

21        (Document displayed)

22        **MR. PORRITT:**  And they have the burden to prove the

23   good faith defense.  And I don't think you have heard anything,

24   as I've described, that would meet the definition fairly of

25   good faith.

1        (Document displayed)

2        **MR. PORRITT:**  And then finally there's a question on

3    proportionate liability.  You must decide which of the

4    defendants committed a knowing violation of the federal

5    securities laws.  This is the only question that requires you

6    to decide whether a knowing violation occurred.  You do not

7    need to make that determination when deciding liability in

8    Question A of the verdict form.

9        (Document displayed)

10       **MR. PORRITT:**  And finally, for those you've found

11   liable, you need to allocate a percentage.  You should assign a

12   percentage of liability as you see fit.  And that should add up

13   to 100 percent.

14       Before I sit down, there are a few things defendants are

15   going to say.  They presented many different themes,

16   explanations, and narratives throughout the trial.  Talked

17   about shorthand, throw-away, literally mathematically not the

18   correct word, backpedaling.  They even told you that Elon sent

19   the tweets in a split-second decision.  They told you that,

20   even though Elon Musk had over an hour, an hour and a half, to

21   think about how he was going to respond supposedly to this

22   *Financial Times* story.

23       This is not a split-second decision.  This was not

24   swerving to avoid a pedestrian in the street.  This is not

25   running to catch a child before they fall off their chair onto

 1   the floor.

 2       (Document displayed)

 3       **MR. PORRITT:**  This is someone sitting on the tarmac of

 4   an airport before catching their corporate jet, deciding,

 5   choosing to send out that tweet.

 6       As I said at the beginning, the United States securities

 7   market is the largest securities market in the world.  Second

 8   to none, in terms of not only sheer size and scope, but access

 9   and regulation.  It allows people around the world to invest

10   and save for their futures.  But, it depends on rules.  The

11   rules state information disclosed by people like Elon Musk must

12   be accurate, truthful.

13       The tweets you have seen here were not truthful.  And

14   you've heard testimony from Glen Littleton and Tim Fries during

15   this trial.  They were just two investors who suffered damages

16   as a result of Mr. Musk's erratic, reckless tweets.  There are

17   thousands more in the class -- we can't bring them all here

18   today, the courthouse couldn't contain them all -- who suffered

19   just like them.

20       Just like Mr. Littleton, in a blink of an eye, at risk of

21   losing their entire life savings.  Or like Mr. Fries who has

22   three kids in college, where every dollar counts when paying

23   for college tuition.

24       And I asked Mr. Musk whether he regretted the harm he

25   caused to Mr. Littleton and Mr. Fries.  And you heard what he

 1   said.  He just said "No."

 2       Although he claimed to care for the small investor, when

 3   asked what small investors he cared about, he pointed to Cathie

 4   Wood, who is a hedge fund manager who manages $14 billion.

 5   That's not a small investor.

 6       The sort kind of conduct you have seen here today from

 7   Elon Musk is not acceptable.  It's illegal.  And if you don't

 8   hold him accountable, it sends a message that we, as a people,

 9   as ordinary investors, are okay with that.  That our savings

10   are not as important as his, even though we are the ones that

11   suffer most.  The market crash, and economies decline.

12       I said in my opening, and I've repeated again today, this

13   is a simple case.  Two critical facts necessary for liability,

14   falsity and scienter, you have been instructed to accept as

15   established by plaintiff.  The remaining elements, especially

16   materiality, established well beyond the 51 percent probability

17   that we are required to show in a civil case.  And a lot of

18   that evidence comes from our experts, plaintiffs' experts, and

19   was uncontested.

20       So I ask you on behalf of Glen Littleton, the class, to

21   find Elon Musk and Tesla and his board liable, and award the

22   full damages caused by their fraudulent conduct.

23       Thank you very much.

24           THE COURT:  All right.  Thank you, Mr. Porritt.

25       Mr. Spiro?

1

### CLOSING ARGUMENT

2 **BY MR. SPIRO**

3    Okay.  I think I heard plaintiffs say that you should

4 assume Elon Musk committed fraud.  Well, he didn't.  Not even

5 close.  Elon Musk was considering taking Tesla private, and he

6 could have.  Funding was not an issue.  That is the fundamental

7 proof and truth which will never change.

8    There's no question Elon Musk thought there were

9 compelling reasons to go private.  And he was actively pursuing

10 going private.  He was going through the process.  He knew

11 funding was secured.  The PIF told him they would go forward.

12 He thought funding was not going to be a problem for many other

13 reasons, including that it had never been a problem.

14    Investors clamored for the opportunity to invest with Elon

15 Musk.  And of course, he had his own wealth to finance a

16 going-private.

17    He wrote two words, "Funding secured," that were

18 technically inaccurate.  He published a blog post that same

19 date and those same tweets, provided further detail of what

20 that meant, just a few days later.  August 13th.  And the

21 investment public, when they saw that, they didn't bat an eye.

22 Stock went up.

23    The *New York Times* article that is essential to their

24 entire case, which they never showed to you, did not reveal

25 anything the public did not know on August 13th about funding.

1        The headline wasn't about funding.  It was about

2   Mr. Musk's mental state.  Tesla was Elon Musk.  If his mental

3   state is suffering, if he cannot go forward, that scares

4   shareholders.  And the stock took a hit because of that.

5        And they desperately strived to capture and claim this was

6   all about "Funding secured" when, in fact, the articles, the

7   articles that came out after, the focus, it wasn't on that at

8   all.  The market already knew days earlier what the state of

9   funding was from the August 13th blog post.

10       If the stock went down on the 17th for reasons other than

11  that one line they keep showing you, that the reporter says

12  "Funding far from secured," their case is over.

13       And lack of funding did not prevent this from going

14  forward.  Funding was never the issue.  What prevented it from

15  going forward was the very thing Mr. Musk identified on

16  August 7th in those tweets.  That the shareholders wanted to

17  stay public.  That was his motive, to do what was right for the

18  shareholders.

19       And plaintiffs can talk about whatever they want, all they

20  want, but they never showed you an ulterior motive he possibly

21  had.  This was always for the shareholders.

22       And, you know, they got up in their opening statement a

23  couple of weeks ago and they said the same thing.  You know:

24  Elon Musk lied, he committed fraud.  And then they went and

25  they attacked, if you remember, that August 2nd email.  Has to

1    be a fake email.  They called that email all those names, that

2    proposal to the board, they called it all those names.  Because

3    if that email is real, they lose.  If that email is real, then

4    it's a real proposal, and it's more than a mere consideration.

5    The email can't be real for them.  Because if it is, while the

6    state of affairs as disclosed, as detailed and accurate, is no

7    different in any way from what the market took from those

8    initial tweets.

9         They hate the blog posts.  They don't ever want to talk

10   about the blog posts.  Actually, the blog post on the 13th,

11   that can't be accurate for their case to work.  If the blog

12   post on August 13th is accurate, then they lose.  Even though

13   they don't claim in this case that the blog post is false.  If

14   that's the detailed state of affairs in that blog post, then

15   when the market learned the details, the stock went up.  What

16   that means is materiality, reliance, class period, causation,

17   their whole case, they can't prove it.

18        And if the blog post is accurate, the *New York Times* can't

19   reveal some supposed fraud.  And they don't get billions of

20   dollars.  So the blog post can't be accurate for their case to

21   work.  But they don't claim the blog post is false.  They

22   can't.  It isn't.  So they're stuck.

23        What can they do?  If it's the truthful, accurate,

24   detailed state of affairs, they lose.  But it's not false.  And

25   they don't allege that it's false.  So what do they have to do?

1    You saw in opening statements, they have to come up with a new

2    lie.  Something new in the blog post that's different from the

3    tweets.

4        And so they stood up and they said:  Look at this.  You

5    see?  Two thirds of shareholders, his best estimate, two

6    thirds, it's a lie.  You see, he was lying then.  This new lie

7    keeps the fraud alive.  It's different from the tweets.  And if

8    it's different from the tweets, then they can get to the *New

9    York Times* article and get billions of dollars.

10       And I stood up and told you, you know, wait a second.

11   Maybe there's another explanation here.  And that's exactly

12   what happened.  They tried to draw on your emotion, so you

13   wouldn't see the truth.  They tried to hide the ball time and

14   time again so you wouldn't see the truth.  But the fundamental

15   truth, it came out in this courtroom.

16       So this is a case, it's a class, it's -- a class is a

17   group manufactured by lawyers.  They picked the time period,

18   they picked the witnesses.  They called lead plaintiff Glen

19   Littleton.  He told you he was the reasonable investor, and

20   greatly damaged, and that's why he wanted to lead the class.

21   Stocks were his first love.

22       And they entered the first exhibit in the case -- I don't

23   know if you remember this, the first exhibit they showed him.

24   And it was an email to his broker to execute the trades.

25       (Document displayed)

1      **MR. SPIRO:**  But they didn't show you the first email

2   in the chain.  Littleton heard about this "Am considering"

3   rumor (Indicating quotation marks), something uncertain he was

4   deciding to bet on.

5          Why did, why, when they entered the very first exhibit

6   with him, not show you that?  Because they know what it proves.

7   It proves that even their hand-selected lead plaintiff, before

8   the lawyers, before the billions, when he was alone with his

9   broker, he knew this was just a consideration.  A

10  maybe/maybe-not he was gambling on.

11         And next to this is an instruction (Indicating).  And I

12  want it to say two things about legal instructions so I don't

13  have to keep saying them.  The first is the judge instructs you

14  on the law.  Not me, not him.

15         The second thing is they have the burden of proof.  They

16  have to prove every single element.  I don't have the burden of

17  proof on any of the elements I'm going to show you today.  And

18  don't forget that.  In cases when the evidence of innocence is

19  so strong, people forget that.  They have the burden of proof.

20  It doesn't shift to me.

21         And we showed you the truth.  That's why we showed you

22  this email.  That's why we showed you this was all just a

23  consideration, and everybody knew that from the start.

24         And they stood up on redirect.  I want to make sure you

25  remember this.  They stood up on redirect, and the plaintiff's

1    lawyer looked at Mr. Littleton and said:  That was bad word

2    choice, that word "rumor" was bad word choice.  And

3    Mr. Littleton looked at you all and said:  Yeah, that was bad

4    word choice.

5        This whole case is built on bad word choice.  I'm sitting

6    here thinking they accused somebody of fraud, and sued him for

7    billions of dollars over bad word choice.  And the lead

8    plaintiff at the beginning of the case looked at all of you and

9    said:  It's just bad word choice.  Who cares about bad word

10   choice?

11       And their case begins to unravel.  He told you his duty to

12   join the class and lead the class.

13       (Document displayed)

14       **MR. SPIRO:**  Well, one of the cars, one of the multiple

15   cars he wanted delivered was late, so he starts yelling at the

16   customer service person and tells them they're joining the

17   class.

18       Of course, he was gambling throughout the entire class

19   period, as you learned.  The 13th, the 14th, the 15th.  He's

20   betting.  He has blog post amnesia.  Can't remember the blog

21   post.  Didn't see it for weeks.  He told you he had talking

22   points.  Somebody gave him talking points.  Then he went back

23   to his talking points.

24       Then he says:  Okay, it's true, I saw the blog post.  And

25   he didn't think it had any different meaning than those initial

1    tweets.  He told you what he took from that blog post was no

2    different from the initial tweets.  And he told you that,

3    because his trading record proves he knew the detailed state of

4    affairs.

5         And also, because of his trading records, he couldn't have

6    possibly seen the *New York Times* story.  Wouldn't have made any

7    sense.  No talking point would have worked.  They didn't show

8    him the *New York Times* story.

9         But they needed somebody else after that.  So they called

10   Timothy Fries.  And he told you he was here, and he lost money,

11   and that's unfortunate.  If he had held onto his stock, he

12   would have made many, many times his money.  Many, many, many,

13   many, many times his money.

14        So he sold.  Okay.  It's unfortunate.  He -- he sold,

15   though, two days after reading the tantalizing solicitation

16   from the plaintiff's firm.  He clicked on the plaintiff's link

17   that had a suit with the class period ending August 8th, with

18   the fraud revealed on August 8th.  And this law firm was

19   recruiting people based on that that theory of fraud, a fraud

20   that never happened.  And their theory was that the fraud was

21   revealed the next day on the 8th.

22        As of September 5th, 2018, the case theory, the class

23   period was still very different than it is today, when the

24   information was fresher in everybody's minds, when the truth

25   was ever clearer.  The so-called fraud was uncovered on the

1   8th.  Not only is that different, but if the original

2   solicitation was true, it destroys the ability to prove

3   reliance causation in their class, and they never get to that

4   *New York Times* story and the billions.

5        And then Tim Fries, nice guy, after clicking the link, he

6   goes about his life in 2018.

7        (Document displayed)

8        **MR. SPIRO:**  And then there's 2019, he's going about

9   his life.  2020, 2021.  And he gets a call from plaintiff's

10  counsel.

11       And I asked him:  You know, after that call when you were

12  picked, you know, did you spend many, many hours and many, many

13  days with the plaintiff's lawyers?

14       And wouldn't you know it, five years later, he remembers

15  like Christmas morning, the only two words that he knows from

16  that time period are "Funding secured."  Only two words he

17  could remember.  Dozen and dozens of words in those tweets,

18  600-plus-word blog post.  The only thing he remembers is two

19  words, the talking points, "Funding secured."

20       And you start thinking:  What were those prep sections

21  like?  And that's why we have the poster board that I made, you

22  remember, with the easel, so smoothly.

23       (Document displayed)

24       **MR. SPIRO:**  And I did that because I wanted you all to

25  put yourself back in the mind of the witness half a decade ago,

1  all of the things that were really in his mind as he was making

2  these considerations, what influenced his decision to buy.

3      He had been watching the company and Elon Musk for a

4  while.  He thought they were a worthy investment.  He had all

5  these things in his mind.  And he thought the main topic

6  sentence, --

7      (Document displayed)

8      **MR. SPIRO:**  -- the main sentence in the tweet, the

9  potential going private, that's what he thought was important,

10  significant and material.

11      "Funding secured" was just this concept that some party

12  had money and expressed interest.  And that was undisputedly

13  true.  And now you know that that was true.

14      But here's the other thing.  When the blog post of the

15  13th comes out, and Mr. Fries is monitoring the news every day,

16  and the world learned of the details of "Funding secured," he

17  also didn't sell.  It didn't influence him to sell.  Just like

18  it didn't influence Mr. Littleton to sell.

19      So again, Fries, same thing, blog post amnesia, didn't

20  have it before, but he gets afflicted, and he says -- he buys

21  on the 8th -- remember, he doesn't even buy on the 7th.  He

22  buys on the 8th, and he did not see the blog post on the 7th.

23  And he doesn't sell on the 13th.  Even though he's monitoring

24  the news, he says he didn't see that one either.

25      And all of a sudden on cross the blog posts are finally

1  shown to the jury.  You didn't get a chance to see them until

2  cross.  And Fries says:  Yeah, okay maybe I did see that.

3       So again, the totality of the news on the 7th is out

4  before he buys.  And he happens, weeks after the blog post, --

5       (Document displayed)

6          MR. SPIRO:  -- of all the days, two days after the

7  plaintiff's solicitation, he sells.  And I keep putting up this

8  material misrepresentation instruction (Indicating).  And

9  because, again, Littleton tells you it's just a rumor, it's not

10 important, and, and so does Mr. Fries.  So in any event, I also

11 want to show you reliance.

12      (Document displayed)

13         MR. SPIRO:  I'm going to use a board for this.  It's

14 that important.  You see the element there?

15             "Investors reasonably rely on the market as

16             an accurate reflection of the current market

17             value of the securities."

18      Fries told you the opposite.  That's it.  Game over.  No

19 other witness contradicts this.  Not one.  Their own witness

20 proves under oath they didn't prove reliance.

21      And plaintiffs also didn't tell you that a major part of

22 their class are the short sellers.  You didn't learn that until

23 the very last day of this case, on cross-examination.  I was

24 wondering if they were going to tell you that.  The very people

25 spreading falsehoods and misinformation trying to drive Tesla

1    to zero, the people that Mr. Littleton told you are bad people,

2    they hid that from you.  That's a big part of their class.

3         But, they called the professor, Guhan Subramanian, to

4    explain how this all works.  And what he tells you is that

5    these tweets are unprecedented, unprecedented.  And on cross,

6    new tweets are finally shown to the jury.  And I saw some of

7    you reacting like:  Wait a second, I thought this was one

8    tweet, two words, and this is horrible fraud.  What are these

9    other tweets?  I never saw these other tweets.  Maybe this

10   professor can explain.

11        So the professor tries to explain, and he again goes after

12   that August 2nd email.  He says:  This is a horrible email.

13   Incomprehensible, inconclusive, a bunch of other words.

14   Because remember, the email, the proposal to the board, if it's

15   real, they lose.

16        But, the professor, this one wasn't focused on causation

17   and damages.  He was the one to tell you that tweeting's bad.

18   And he forgot to be prepped or wasn't prepped on damages and

19   talking points and whatnot, so he says that the August 13th

20   blog post revealed the fraud.  That's what he said, under oath.

21   He says nothing about the *New York Times* story.

22        None of their witnesses, the plaintiffs, the narrating

23   professor, none of them said a word about the *New York Times*

24   story.  Not one of them.  But the professor forges ahead and

25   announces to all of you that a deal by tweet is unprecedented.

1    And that, my friends, goes into the category of:  So what?

2         Elon could have gone on TV, nobody disputes that.  He

3    could have sent a letter to the board and publicized it, the

4    very email he did send to the board.  No one disputes that.

5         Often these things happen, principal to principal, with an

6    initial bid.  You know that from Goldman Sachs.  You know that

7    from your own personal experience.

8         So it's unprecedented because it's a tweet and not a

9    different medium.  And that he was trying to include the retail

10   shareholder.  The mom and pop.  The little guy.  And not seize

11   more power for himself.

12        And then they called Elon Musk.  The man who is somewhat

13   unprecedented, who's actually trying to do what's best for

14   shareholders.  And the plaintiffs want you to picture some rich

15   liar, fire-breathing dragon.  "Anarchy," they just yelled out

16   in the court, "anarchy."

17        They wanted to call him on cross-examination for days,

18   before you heard from any other witness about the facts of what

19   occurred, about the state of affairs, so they can try to make

20   him out to be a liar and bad.  That's what all that bad

21   tweeting stuff is about.  They're trying to condition you and

22   distract you:  Bad tweet, bad tweet, fraud tweet.  Just because

23   it's a bad tweet doesn't make it fraud.

24        Well, thank God you got to meet him, and thank God what

25   they say is not the law.  And you got to see him for three

 1   days, this fire-breathing, you know, tweeting monster.  But

 2   that's not who I saw.

 3        Maybe that's not who you choose to see, either.  Maybe you

 4   saw somebody whose childhood they can't even speak of.  Maybe

 5   you saw the kid coming over here with nothing and trying to

 6   find his way.  Maybe you saw the kid who was in that witness

 7   chair falsely accused of fraud, and how that has weighed on

 8   him.

 9        Three days of testimony, moments of being barked at,

10   moments of confusion and imperfect memory.  But you know what

11   the beautiful thing about witnesses that aren't coached on what

12   to say?  It's really, it's a beautiful thing.  It's why we have

13   trials.  He doesn't remember the exact timing of everything.

14   And if he remembered it perfectly, the perfect sequence that

15   helps him, they would say: Aha, he remembers it too well.

16        They threw up that, you know, gotcha slide.  You don't

17   want to be exposed (Indicating quotation marks) with Yasir.

18   It's like they -- pretending like that was some great

19   confession?  You all were there.  That wasn't a confession.

20   Day 2, Hour 5 of testimony, and Elon is frustrated and trying

21   to explain, he doesn't want to be made to look like a liar when

22   he wasn't.  A point he simply explained later.

23        And he was the same with me on direct as he was with them

24   on cross.  He was not doing this

25   question-response-question-response script.

1        I'd ask simple questions like:  Don't you talk to retail

2   shareholders on Twitter every day?

3        And he looked at me and said:  Well, not every day.

4        I was like:  Okay, great.

5        And he was going on detours and I tried to pull him back.

6   That's what real witnesses look like.  You just hadn't seen it

7   before in this trial.

8        And when he couldn't remember something, and he was

9   confused, he just kept saying:  Just show me my first sworn

10  testimony that happened weeks later.  That would be freshest,

11  that would be most accurate.  Just show that.

12       But, listen.  Ultimately whatever you think of him, this

13  isn't a bad tweeter trial.  It's

14  did-they-prove-this-man-committed-fraud trial.  And you know he

15  didn't.  And his testimony was completely corroborated, for

16  three main reasons.

17       First, now that you have seen the evidence, you know that

18  he was genuinely considering taking Tesla private and taking

19  steps to action the plan.

20       Second, Deepak Ahuja says the same thing as does Sam

21  Teller of what happened with the PIF and the board, Dees and

22  Durban, what happened after.

23       And then there's the exhibits, time and time again,

24  showing.

25       (Document displayed)

1         **MR. SPIRO:**  They told you there were no notes of

2    anything, I heard something like that.  They had board minute

3    notes.  He's sending emails.  The PIF's in.

4         But you don't need to rely on his testimony alone because

5    of all of the other evidence that irrefutably corroborates it

6    and proves the fundamental truths, that as he thought as best

7    he could, my mind returned to where he's come from and what

8    he's built.

9         He had a history of doing a little bit of business and

10   fundraising before the "Am considering" tweet.  And before the

11   "Am considering" tweet, he began to take steps to action the

12   plan.  Some people say follow actions, not tweet words.  Some

13   people say you can tell the most about someone's intentions

14   before the lights come on and the world is bearing down on

15   them.

16        On July 31st, he meets with the PIF.  Handshake deal;

17   we're ready to act.  Not written and finalized, but a handshake

18   deal.  We are ready to act.  That sounds like funding's not an

19   issue.

20        Every day from that day forward he showed his genuine

21   intentions.  He was taking steps, starting with that very first

22   proposal they hate.  And I'll tell you now why they hate it so

23   much.  Because if Elon had just published his proposal to the

24   board, the stock would have gone up far more than the "Am

25   considering" tweet.  It was an actual proposal to the board.

1   Not just a consideration.

2       If he had just published that email, which he was

3   unquestionably allowed to do, the stock would have gone up far

4   more.  That's case-ending for plaintiffs.  Because of

5   materiality.

6       You see the actual state of affairs going on behind the

7   scenes that the world didn't know at the time, that you learned

8   in this courtroom, it would have sent a signal to the market

9   that would have been interpreted even stronger than the tweet.

10      And the proposal also clarifies, once and for all, and

11  from the beginning, what you eventually begin to learn.  He is

12  the bidder.  He is the buying party.

13      You know, this mortgage analogy, Elon tried to explain,

14  he's offering to buy the shareholders for 420 a share.  PIF was

15  like a bank or a funding party, and said they were good for it.

16  They had made the 4.9 percent down payment.  To Elon, that's

17  better than any contract he's ever seen.  They put billions in.

18  Actions speak louder than words.

19      So Elon puts an offer out on the house.  He has the

20  mortgage to tap on if he wants part or all of it.  He knows his

21  decades-long investors who have made gazillions off of him are

22  going to be there.  And he thinks there'll be lots of rolls.

23  But he also has his own capital.  And he has debt and bank

24  financing if he needs it.

25      It isn't just the PIF, it's not just that he is the best

1    fundraiser ever.  It's that funding wasn't possibly an issue.

2    He had the backup of his own money.

3        This isn't something you talk about.  You don't talk about

4    securing your own money.  Let me check with myself, if I might,

5    myself be interested in also -- it doesn't make any sense.

6    This is lawyer games.  Not the real world.

7        In that email to the board, he doesn't mention the PIF.

8    Because it's important for him to know that he has that in his

9    pocket, that he's doubly-secured, he doesn't even mention that.

10   They're not the bidder.  He is.

11       But you know what he does mention in that email?  SpaceX.

12   SpaceX is what he was thinking about.  SpaceX, where he works

13   every day.  SpaceX is very much on his mind.

14       This capital in the back of his mind gave him comfort.  Of

15   course, it would.  He puts his own money in every round he's

16   ever done.  In '08 and '09 when times were tough in Twitter, he

17   puts it in every time.  Of course, the principal is allowed to

18   put in their own money.

19       And of course, when he was immediately deposed in this

20   case and the first question was:  What was the sources of

21   capital?  Not the only source of capital but what -- he said

22   his own money.  He said it then.  No one ever made an issue out

23   of it, nobody ever questioned it.  That sounds like funding is

24   not an issue.

25       Now, Deepak Ahuja recounts the PIF meeting the next day to

1  the board.  And the background of all those previous meetings

2  with the PIF.  He goes to that board meeting, alone.  No Elon

3  Musk.  Just him and the board.  And he told them the PIF

4  committed.  They were ready to act.  And so the board knew

5  funding wasn't an issue.

6      And remember, it was clear to Deepak that the PIF were

7  committed to take the whole thing private.  That's what Deepak

8  told you.  That's his take-away from what was said in that

9  meeting and what it meant to him.

10      We have been talking about how actions, and actions are

11  more important, it's said, than words.  Words are just words.

12  They have different meanings, different interpretations or

13  meanings.  You know, a tweet is a bird sound.  Or it could be a

14  tweet.  The precise meanings of a word, "tweet," it doesn't

15  matter.

16      You know what it means when you hear it in this case.  And

17  Deepak Ahuja knew that the PIF committed in that meeting.  And

18  so as they exit the meeting on that walk around the factory,

19  Deepak said to Yasir:  You know, there's lots of other funders

20  out there.  You don't need to do this alone.

21      Deepak knows.  All of Elon's deals are unprecedented, and

22  over-subscribed.  So it need not be PIF doing the whole thing.

23      And you know what Yasir said?  Remember that?  Said:

24  Funding's not an issue.  We have enough.  No need to go to

25  other investors.  We will fund the whole thing.

1       Evidence, ladies and gentlemen, doesn't come more

2    compelling than that.

3       Deepak leaves.  He goes to meet with Elon and the general

4    counsel, and the process continues.  Deepak knew funding wasn't

5    an issue.

6       Sam Teller was there too, interacting with everybody.

7    He's in and around the board meetings.  You know, whether he

8    has ADHD or not, he knew funding wasn't an issue.  They had a

9    handshake deal.

10       Board meeting after board meeting, board meetings with

11    notes, lawyer after lawyer, Elon doing his homework, he's

12    speaking to Dell and Dell's lawyer, and Egon Durban, and Dan

13    Dees.  Actions.  And you want to know something?  Nobody says

14    this is impossible.  Nobody says that.

15       (Document displayed)

16       **MR. SPIRO:**  Nobody says this is impossible.  You know

17    what they all say?  Funding's not an issue.  It's dozens of

18    people, by my count.  Dozens.

19       August 4th, before the tweet:

20           "Dees told me he's convinced he doesn't need

21           money."

22       August 6th before the tweet, Egon Durban:

23           "He has dough."

24       Everybody knew funding was not an issue.  And you know,

25    when I count them up, the dozens of people who know the most

 1  about this situation, the subject matter, the facts, have the

 2  requisite expertise, the full board, in-house counsel, outside

 3  counsel, Deepak and the Tesla executives, Egon and the Silver

 4  Lake team, Dees and everybody at Goldman on those emails,

 5  nobody says this was impossible.  Nobody says funding wasn't an

 6  issue -- was an issue.  Nobody.

 7      And guess what?  Remember this.  Not one of them thinks

 8  this was not genuine.  Not one of them thinks Elon lied, that

 9  this was some fraud.  Inside Tesla chairwoman Robyn Denholm,

10  the type of person you jurors can count on, somebody with savvy

11  and experience, and unmistakable character, she flew all the

12  way from Australia to tell you if this was anything but true

13  and genuine and pure, she would have immediately resigned.  If

14  this was fraud, she would have stood down.  That's a reason,

15  alone, to find Mr. Musk not liable.

16      And outside Tesla, Dan Dees tells you the same thing.  You

17  think he and Goldman Sachs signed that retainer letter ten days

18  later, if they think anything improper's going on here?  Of

19  course not.  And Goldman Sachs is also the banker for the PIF.

20  Dees is the man on both sides.  He sees everything.  He knows

21  there is no fraud here.  That's a reason, alone, to find

22  Mr. Musk not liable.

23      So the night before the tweets Elon is on the phone with

24  Egon Durban, and we have contemporaneous notes, handwritten

25  notes.  I mean, it doesn't really matter so much.  I don't want

1    to make this into:  Meetings that don't have notes happen, and

2    ones that do don't happen.

3        (Document displayed)

4        **MR. SPIRO:**  But the person who took the notes came in

5    here and took an oath, and testified, and was cross-examined.

6    That's what matters.  People who come into court and testify

7    and are cross-examined.  That's real evidence, credible

8    evidence, so they can be tested on it and be cross-examined.

9        And Egon says Elon told him the 20 percent.  420 was not

10   some spontaneous comment or some joke.  You know that from the

11   proposal of the board, 20 percent.  That the Saudis were there

12   and available.

13       And there's another thing that is very interesting about

14   this, Elon Musk didn't ask for any money.  Silver Lake

15   Affiliates were willing to give him $6 billion.  Egon told you

16   that.  I don't know if you've ever noticed -- that's why I have

17   my calendar -- that all those days after the PIF meeting,

18   August 1st, 2nd, 3rd, he's going and doing all these things,

19   all of these actions.  But he's not looking for any money.

20       Do you want to know why?  Because funding was never an

21   issue.

22       Egon told you that he was really considering this.  And in

23   all candor, from Elon's perspective, this would probably be a

24   done deal, but he cares about his retail shareholders and so he

25   had to figure out the structure.

1      Dees and Durban, just like the PIF, had sufficient

2   information on public filings and betting on Elon, to want to

3   give Elon Musk $6 billion.  Like everything else, Dees and

4   Durban, the real experts with real experience who were

5   independent third parties here, the men who knew he was

6   considering it, and knew his history and nothing else.  They

7   knew funding wasn't an issue before the tweets, as did every

8   reasonable investor.  They didn't know how many would roll.

9   They had no idea.

10      (Document displayed)

11          **MR. SPIRO:**  But, look, it's August 4th.  I asked

12   Mr. Dees on purpose:  You hadn't spoken to Elon.

13      No.

14      All he possibly knows at this point is that he's

15   considering the transaction, and there's a 20 percent premium,

16   and they know who the man is.  Elon Musk.  Right?

17      So, basically what he knows is the first main sentence in

18   the tweet.  It's before the tweet goes out.  He knows the main

19   sentence in the tweet.

20      And do you want to know what else he knows?  He doesn't

21   need money.  Funding's not an issue.

22      These real-life experts knew this.  You know who else knew

23   this?  Mr. Littleton.  Look at his testimony.  You know who

24   else knew he didn't need money, that funding wasn't an issue?

25   Koney from Jennison.  That videotape, he told you.  And you all

 1   know he didn't need money.

 2       And so you can almost go back to picturing Elon, he's

 3   quietly doing homework, talking to these experts and folks, and

 4   he isn't asking for money.  But he also isn't running around

 5   talking to the big shareholders.  Right?  And there's a reason.

 6   It's called Reg FD.  It's complicated stuff.  His conversations

 7   with lawyers of privilege, it's redacted in the board minutes,

 8   nothing improper, that's how this works.

 9       But you know enough about Reg FD now to know that

10   investors did not want him reaching out at that point.  It

11   would cause legal issues.  And Elon Musk wanted to be careful

12   and not cause these issues.  This was a real riddle for him.

13       (Document displayed)

14       **MR. SPIRO:**  He had to at some point publicly disclose

15   his consideration.  And, you know, it's a bit of an aside, but

16   it doesn't really matter.  Because if you talk to them, it

17   would have leaked.  Right?

18       And then the hypotheticals he gave them in those

19   conversations, somebody would have taken a hypothetical, taken

20   a word, put it under the light, filed a lawsuit.  Would have

21   solved nothing.  Even if he had talked to some investors, he

22   wasn't going to be able to talk to every investor.  There was

23   still going to be uncertainties with how many were going to

24   roll.  It would just give him a gut, a gut he already had.  He

25   was the CEO of Tesla.  Elon Musk was Tesla.

1      (Document displayed)

2      **MR. SPIRO:**  So the FT story breaks.  This is sunrise

3   in California that morning.  And I've asked him some questions

4   about this, and about split-second decisions.

5      And I'm glad the plaintiffs have brought that to the

6   foreground.  I was hoping that they would.  And they do that

7   because they know how damaging it is for their case.  They

8   know, because in that moment, Mr. Musk did not form some

9   intention to deceive.  They know, in that rushed state, it led

10  to imperfect word choices.

11     When he left Durban on the phone on the 6th, they had a

12  meeting set several days later.  He wasn't intending to do

13  this.

14     And the other reason I like it is because I get to play

15  some word games.  A split-second decision, at least to me, is

16  not literally a decision that you have to make within

17  milliseconds.

18     I mean, they just stood up and said the ten-day class

19  period was a blink of an eye.  I mean, that was technically

20  inaccurate.  You may get asked that kind of a question.  I've

21  been asked that question.  You see it at a job interview.

22  Maybe someone else asked you recently.

23     And what it means to most people is that it's a difficult

24  decision you have to make under time pressure.  A health

25  decision.  A decision about an emergency weather situation.

 1   It's a decision you cannot wait to make.  As one witness put

 2   it, it's a call on the field.

 3        And Elon doesn't sit with that information.  You can see

 4   in the email, he doesn't see it for an hour, right, after that

 5   initial email.  He was driving and racing to the airport.  He

 6   doesn't see the email.  That's why he doesn't respond before he

 7   acknowledges it.  It's a matter of minutes.  It's how many

 8   times in his mind the PIF had approached.  It's the

 9   4.9 percent, right up to the threshold, knowing they were up to

10   something.  It's not every, every little thing.  It's all of it

11   together.  He knows he cannot wait.

12        And you know, we can second-guess him all we want now.

13   Who knows what would have happened.  He wanted to be the one

14   the shareholders heard from.  He wanted to make sure they knew

15   he was considering this.  He wanted to be transparent.

16        We really want a world where nobody knows his

17   considerations?  What he did sounds like the right thing to do.

18   Egon Durban certainly thought so.

19        And the article breaks, and it's rising and rising, and

20   the stock is rising and rising.  You remember I -- to put the

21   exhibit into evidence a few times.  And you see the Saudis sort

22   of puffing a little.  You can look at the end there, about the

23   Saudis' investments, if you look at the end of the article,

24   they know about all their investments.

25        That's them sending 40 billion often to somebody.  They

**CLOSING ARGUMENT / SPIRO**

1    also's are sending up to a 20 billion-dollar commitment -- you

2    see that, up to a 20 billion-dollar commitment?  Sounds like a

3    verbal commitment.  I don't know what an "up to" commitment is,

4    signed in writing.  Sounds like a verbal commitment.  That's in

5    this article.

6        You see JP Morgan plays an appearance in this article, the

7    same JP Morgan that hates Elon.

8        And so he doesn't just sit with this info and twiddle his

9    thumbs, and neither does anybody else.

10       (Document displayed)

11       **MR. SPIRO:**  Everybody is digesting and looking at this

12   news.  Everybody knows it's big news.  Inside of Goldman Sachs

13   they're talking about who leaked this.  Joe Fath is realizing

14   as this article's breaking and the stock is rising and rising

15   and rising, that Elon had to do so something.  Joe Fath knew

16   that.  That's his email that day (Indicating).

17       (Document displayed)

18       **MR. SPIRO:**  And there's something else in the article.

19   I don't know if you ever noticed this when this exhibit came

20   into evidence, but the FT writes that (As read):

21           "The Saudis' investment appeared to confirm

22           Mr. Musk's claim last week that 'We certainly

23           could raise money.'"

24       Which means, for example, that a week before, a week

25   before the tweets, he had already told the world.  He didn't

1   need any money.  Funding wasn't the issue.

2       So they tried to attack Elon's credibility:  You don't

3   remember which order, and this, and that, from five years ago.

4       And again, it's the same thing I said before.  I guess he

5   could have been coached and given talking points and berated

6   into saying:  I saw the thing and I sent it out within

7   milliseconds so it was a split-second...  That's not real life.

8   That's not real life.  He's not just sitting there.

9       And the fact that he doesn't remember it perfectly, that

10  comports with common sense.  It's the fog of war.  This is all

11  happening as he's racing to an airport, about to be on a plane

12  where he will be disconnected.  So he sends it out.  And the

13  price is rising and rising, and he's tweeting what he's

14  thinking.

15      And again, just because it's imperfect doesn't prove

16  fraud.  There's nothing illegal about doing it when the

17  market's open, by the way.  Okay?

18      The Nasdaq looks at this, call them, and like two hours

19  later the Nasdaq says:  There is nothing to see here, and

20  reopens this for trading.

21      And it's a small thing, but it's important.  This whole

22  idea that he's, like, tweeting when the markets open, those

23  later tweets happen when the markets closed.  He's not doing it

24  because the markets open.  He's doing it because this news

25  broke.  He's doing it for the reason that everybody knows he's

 1    doing it.

 2         Frankly, he probably would have been sued if he didn't do

 3    anything.

 4         (Document displayed)

 5         **MR. SPIRO:**  And then you see Egon Durban's reaction,

 6    the man who knows the most.  The man who was on the phone with

 7    him the night before.  The man who's the subject matter expert,

 8    not the paid expert.  He knows best whether it was a fair

 9    snapshot of where this situation was in Elon's consideration.

10         And Egon Durban tells you how it is.  He's never seen that

11    kind of transparency.  Never seen something that disclosive.

12         So, listen.  The rush tweets go out, and these investors

13    you heard from, some by video, whatnot, you know, they stay at

14    their conferences, they stay at their dinners, they send some

15    emails around.  Every reasonable investor was waiting for more

16    information.

17         You never heard any witness in this case saying they

18    bought any stock on the 7th.

19         Let me say that again.  You never heard any witness in

20    this case ever say they bought any stock on the 7th.

21    Reasonable investors were waiting for more information.  And

22    the blog post came out just thereafter.

23         Fries bought the next day; Littleton, days later.  And

24    Mr. Musk was also not trading.  That's how you know this wasn't

25    fraud.

1      But, listen, the media is circling, lawyers are circling.

2   And you know, wordsmithing is a funny thing.  Language is a

3   funny thing.  Don't know if you've ever learned a landing or

4   taught a language or studied a language or -- but word choice

5   is also a funny thing.

6      You know, we've got a kid who came over here from South

7   Africa by way of Canada, who's in his dorm room drawing maps on

8   a thing called the computer.  He's alone.  He's the kind of

9   person who thinks impossible is possible, came here because

10   dreams are possible.  Met Antonio Gracias who came over here,

11   son of immigrants, and they built Tesla.  And as Sam Teller

12   told you, sometimes his words need translation.

13      And so this unique person says something that isn't a term

14   of art.  Nobody knows exactly what it means.  Everybody agrees

15   with that.  He doesn't think ahead of time in that rushed

16   moment that this could be interpreted differently than what it

17   means to him.  That's what we're talking about here.  That's

18   what this whole case is about.  That in that moment, he didn't

19   think:  How could my words be interpreted differently by you

20   than they are to me?

21      These statements, they're in an informal context.

22      (Document displayed)

23      **MR. SPIRO:**  You know, they're on Twitter.  They're not

24   even complete sentences, they're just tweets.  There's more

25   tweets than this, by the way, that day.

1    You know, 420, it's really 420 a share.  He doesn't say

2    that.  There's a 2 included in one, there's a typo, there is a

3    2 in one of the tweets.  He's answering questions live.  I

4    mean, this is the context.  The context.  And you will see in

5    the jury instructions that context matters.  You have to assess

6    this in context.

7        He's considering taking this private, and the issue is

8    will he actually go forward.  And that's what he's basically

9    saying.  But the plaintiffs have to lift two words.  "Funding

10   secured."  Pull it out.  Put a spotlight on it and gin it up.

11       And so they ask all these questions about "Funding

12   secured" to the witnesses:

13       There wasn't a signed agreement, was there?

14       No, we never said there was a signed agreement.

15       And the way the witnesses interpreted it that you saw as

16   the trial went on, they didn't think it meant the same thing as

17   the plaintiff's lawyers seemed to think it meant.  In this

18   context.  You have to look at the context.  Nobody really knew

19   what it meant.

20       (Document displayed)

21       **MR. SPIRO:**  So did you ever notice that the

22   plaintiff's lawyers never defined it either?  Did you ever

23   notice that?  They ask a question, "Was it a written

24   agreement?"  But they never defined it.  How clear and

25   important could it be?  They don't even bother to define it.

 1          Egon Durban told you it wasn't a term of art.  Egon says

 2     that it means something like the funds were available.  Dan

 3     Dees told you it means something like in touch with, or knows

 4     about capital out there.  There are terms of art in the

 5     financial world that people rely on.  This isn't one of them.

 6          So the plaintiffs kind of backpedaled with Egon, you know:

 7          Well, was it committed?  Was that a written commitment?

 8     An oral commitment?

 9          I mean if he says something and nobody knows exactly what

10     it means, how important could it be?  They never defined it.

11          And there's a reason.  Because this is all a word game and

12     a moving target.  How can they prove their case, that this

13     words -- phrase, that nobody knows what it means, defrauded

14     anybody, if they can't even tell you factually what it means?

15     That's a reason, alone, to find Mr. Musk liable -- not liable.

16          And so they try to say -- there's this argument peppered

17     throughout that, like, these two words somehow show, you know,

18     that this is more serious or something when taken in context of

19     all of the other tweets in the blog post.  This was serious.

20     This was serious.  This was a real proposal he had made to his

21     board.  So if these words left the listener with the impression

22     that this was serious, that's great.  It was serious.  It was

23     very serious.

24          So if these words made this a serious consideration

25     (Indicating quotation marks), more than a mere consideration

1   (Indicating quotation marks), then that's fine by me.  It's the

2   same state of affairs as actually existed.

3        And you know, I have been waiting a while to tell you, you

4   know, there's this thing outside of courthouses, the scales of

5   justice.  And I don't think this has occurred to too many

6   people.  But, this whole case, this whole case essentially

7   boils down to they think "Funding secured" suggests a bit of a

8   lean, a little more emphasis than what it should have, based on

9   the state of affairs, right?  Basically, this whole case.

10        Well, guess what?  The first part of the tweet, the main

11   part of the tweet, the "Am considering" topic sentence of the

12   tweet, it actually understates the state of affairs.  Don't you

13   see?

14        It was more than a mere consideration.  He had made a

15   proposal to the board.  He's meeting with experts.  He's

16   actioning the plan.  You see, if anything, this tweet in its

17   totality is an understatement.  That's a reason to find

18   Mr. Musk not liable.

19        And, listen.  I don't have the time to give you every

20   reason that you should doubt the evidence and the proof that

21   the plaintiff provided.  All nine of you could have different

22   reasons to believe they haven't met their burden of proof.  You

23   all don't have to solve every reason.  You don't have to have

24   the same reason.  Each of you could have different reasons.

25   There are lots of reasons to find Mr. Musk not liable.  No

1    fraud has ever been built off the back of a consideration.

2        If you're considering something -- and I'll give you nine.

3    If you're considering something and it's understood that you

4    could never reach a conclusion or you could change your mind in

5    an instant, everyone knows that, that's the hallmark of what a

6    consideration is.  If you're considering something, and

7    something is added onto the consideration or within the

8    consideration, it's still just a consideration.

9        Anything about funding could never, in this context, mean

10   an exact dollar amount.  He's talking in the same tweets about

11   that they have no idea who's going to roll, and anything else.

12   They couldn't have known percentage.  They couldn't have known

13   amounts.  Everybody knows that.  Everybody admits that.

14       So it's basically just this indefinite funding source.

15   That's all it could mean.  That's all it could mean to a

16   reasonable investor.  No one knew what the phrase meant.  So if

17   you decide in that instant to start gambling on it, then you're

18   betting on a consideration.

19       Never in the history of the world has a fraud been based

20   on a consideration.  On something that's -- nobody knows what

21   it means, that is too vague to have a definition.  If you don't

22   even know what something means, how important could it be?

23       It's also not material in the traditional way.  A company

24   buys a factory, they announce it, right?  New factory.  If, six

25   months later, if you want to separate the two, they get, you

 1  know, mez financing, they get a loan, you don't re-disclose

 2  that.  That's not independently important.

 3       And everybody assumes he knew it, he could get it, he had

 4  it.  Littleton, Dees, Durban, the depositions.  Everyone knew

 5  that.  So it doesn't add anything to what people already knew.

 6       And again, people didn't care.  Everybody wanted to throw

 7  billions at it before he even sent the tweet.  Dees and Durban

 8  and their investors want in for billions, with nothing more.

 9       (Document displayed)

10       **MR. SPIRO:**  And finally, whatever it means, it's not

11  something materially different from the state of affairs.

12  Again, you all don't have to have the same reason to doubt, you

13  don't have to have the same reason to think that the plaintiffs

14  haven't presented sufficient evidence.  You could all have

15  different reasons to think this isn't fraud, to check no.

16  Different interpretations under any of them, it's not fraud,

17  and check no.

18       Or maybe you have the same reason.  Maybe your reason is

19  Deepak Ahuja.  He didn't think any of this was fraud.  He was

20  in the room.  Look at his text.  He doesn't seem surprised or

21  alarmed, he isn't shocked, he doesn't think this is insane.  He

22  was in the room when it happened.  He doesn't ask:  What

23  funding?  Because he already knows.  He also knows funding is

24  not an issue.  And he took from the meeting with the PIF the

25  same essence as the tweet phrase, funding was secured.

1    Again, this is all in the "Am considering" context.  And

2    apparently all the tweets under that heading, the plaintiff

3    thinks I haven't talked about the "Investor support confirmed"

4    enough.  It's his burden, not mine.  And I think the claim is

5    absurd, but we'll talk about it quickly.

6        "Investor support confirmed," okay, is this tweet.  He has

7    the PIF and people like Antonio Gracias and Ron Baron, ice

8    cream cones or not.  And so, obviously, he has investor

9    support.  Whether it's confirmed in this sort of technical,

10   upper-case, "Investor Support," I again don't know how

11   precisely you can confirm that if you don't know what the

12   structure is and the percentages needed from them.  And no

13   reasonable investor would have interpreted it that way.

14       "Investor support" can't mean a shareholder vote.  It's in

15   the same sentence as saying it's contingent on a shareholder

16   vote.  And so everybody seems to think it means the same thing

17   as "Funding secured."

18       (Document displayed)

19       **MR. SPIRO:**  Including their lead plaintiff.  And, of

20   course, you know that Ron Baron is emailing him, the wise Ron

21   Baron, before his tweet ever goes out, saying:  I'm in.

22       Is that confirmed investor support?  It is to me.  It is

23   to everybody else I know.  That's not good enough?

24       And again, if "Investor support confirmed" means the same

25   thing as "Funding secured," then I don't know what we're even

1   doing here.  It certainly made -- made sense to Mr. Musk, the

2   same things he intended to convey through both.

3        So again, I don't know the difference, and it was

4   unmistakably true in his mind.  If anything, the "Investor

5   support confirmed" softens and kind of contextualizes the

6   "Funding secured" if you're taking them the same way.

7        But they have to press on this.  They have to press on

8   this in summation.  I knew they would, because they knew

9   funding wasn't an issue.  That's not why the deal didn't go

10  forward.  So they have to torture this tweet.

11       And remember, your mind goes back to why we're here, that

12  they advertised to Tim Fries that the so-called fraud was

13  uncovered on the 8th, but now we're in a case where it ends the

14  17th.  Not because that's true or the truth matters, but

15  because they need to get to that *New York Times* story.

16       You remember what we're doing here.  These are the folks

17  that sued Elon because he sent out a tweet about Goldman Sachs

18  and Silver Lake, saying that they were working for him, when

19  the retainer letter was signed out later.  This is what we're

20  doing here.

21       But press on, they do.  They want billions of dollars.

22  They've got to get to that *New York Times* article.  So they go

23  to the next tweet.

24       "Only reason," okay -- "Only" is the magic word in this

25  one.  And I said to you before, I guess technically,

 1   mathematically, it is not the only reason.

 2       You know, the only reason that the Forty-Niners didn't get

 3   to the Super Bowl was because of the calls by the refs.  Well,

 4   that wasn't the only reason.  Maybe the quarterback; there's

 5   other reasons, but that's how people talk.  Lots of people talk

 6   like that.  Really formal people talk like that.  "The only

 7   reason I was late to that meeting, I was in traffic."  Well,

 8   that's not the only reason I was late.  It's just how people

 9   talk.

10       No one thought this was literally the only reason.  He

11   hadn't even made a decision yet.  If you're considering

12   something and you say it from the very first words, and then

13   you attach to the tweets in the topic sentence of the blog post

14   "I have not made a decision yet," how much brighter do you want

15   to make it that this is all uncertain?

16       You've put everyone on notice.  There are multiple

17   contingencies.  Which is why lead plaintiff Littleton didn't

18   give this tweet much mind.  Elon was going to make it happen.

19   The intermediary steps, the dotting i's and crossing t's, those

20   things didn't matter.  Elon was going to make it happen.

21       Again, support can't be absolutely confirmed in the

22   technical sense, voting.  But in the real world, this was just

23   a consideration, his considerations, his thoughts:  Funding is

24   secured in my mind.  Investors are supportive and it's

25   confirmed to me.  His mind.  The only contingency I ultimately

1    see is the shareholders.  I want to do what's right by them.

2         And, ultimately, he was right.  It's the reason it didn't

3    go forward.  That's not fraud.

4         And you can see as he continues to tweet that day,

5    answering questions, interacting with everyone, this was very

6    Elon.  This is how he is.  He takes products questions; he

7    invites the retail shareholders on earnings calls.  It's just

8    his way.  These everyday shareholders, they believed in Tesla

9    when no one else would.  And he wasn't going to leave them now.

10        And as the couple of hours ends on the 7th and the blog

11   post is out, the blog post that Deepak Ahuja signs off on, the

12   blog post that general counsel attorney Todd Maron signs off,

13   Dan Dees sends him an email.  It's all perfectly clear.  It's

14   perfectly clear.  The perfectly clear blog post is 600-plus

15   words, not a two-word tweet.  It's the same time period, on the

16   same day, attached to the tweets.  We hear nothing ever from

17   them about these 600 words.  And that's the reason that you

18   need to understand that they can never prove this case.

19        Their witnesses have blog post amnesia.  All the

20   third-party witnesses, everybody else in the real world reads

21   the blog post together with the tweets.

22        That's why I asked Dan Dees:  Did you block everything

23   from your mind as you were looking at the tweets?

24        No, I didn't.  Obviously, I saw the blog post.

25        And the blog post, do you see what it says about

 1  shareholder vote?  It says:  Ultimately what I need is to get

 2  through is the shareholder vote.  Ultimately.  Not only,

 3  ultimately.

 4      And there's other contingencies in the blog post.  Lots of

 5  contingencies.  They hadn't decided on process and structure,

 6  or even made a decision.  This was just a consideration, and

 7  the blog post makes that again clear.

 8      And so the way -- you know, one way to look at it is, you

 9  know, they have to prove what it means.  Prove that what it

10  means matters.  Right?  You know, if Steph Curry's getting

11  traded, that might matter.  That he's bringing his jump shot

12  with him is nothing.  It's a throw-away.  It doesn't matter.

13  Prove whether it means something different than the state of

14  affairs.

15      And even if they get past all of that, none of which they

16  can prove, the whole thing is conditional.  You can't be liable

17  for fraud because somebody wants to bet on a consideration.

18      So Elon Musk gets back to work.  He doesn't want some

19  investor demanding a factory too soon; he wants a diverse

20  investor base.  So they work.  They work together; they work in

21  good faith.  Actions speak louder than words.

22      And the media -- no offense -- they -- you know, they do

23  what the media does at times.  They swirl and they kick up

24  dust, more dust.  You know:  What are we going to write about

25  today?

1       And I heard some questions about, like, if a reporter

2   writes about something, that makes it important.  They write

3   about lots of things.  Mr. Musk knocks over a Diet Coke,

4   they'll write about it.  They wanted to write about what the

5   "pedo guy" insult meant.  They write about Lindsay Lohan.

6   These topics aren't fraud.  They're looking for something to

7   write about.

8       What reporters write and say isn't evidence.  We're here

9   in Federal Court in a securities fraud trial.  But people had

10  questions.  That proves something?  People have questions?  It

11  proves -- I'll tell you what it proves.  It proves they didn't

12  know what it means.  It proves it wasn't a term of art.  And if

13  you're betting on that, you're just gambling and looking for

14  lawsuits as insurance.  That's what Koney told you.

15      Koney told, yeah, he was curious, like, what does it mean?

16  He didn't tell you it mattered.  And that's why we played his

17  video.  Because we wanted to show you that the emails that

18  they're entering and showing you snippets of, it's games.

19  They're showing you the emails, saying, oh, look, he's asking

20  you a question, and then they don't play you the video where

21  Koney says:  Yeah, I'm asking a question.  I ask a lot of

22  questions.  Didn't change his investment decision.

23      But when Elon sees that this dust is still in the air and

24  there's various media stories and they're coming up with

25  questions and this "Funding secured" phrase which doesn't mean

1    anything, is something that they can kick up, well, the story

2    kicks up Thursday; it isn't dead by Friday.  There's this

3    article that says the Saudis never spoke to him, then it says

4    the Saudis were in talks with them.  You saw that.

5        And so three trading days later, right, when the dust is

6    still in the air, before the market opens, they put up that

7    blog post of August 13th.  The beginning of trial, they made it

8    sound like it was, you know, years later.  It was three

9    business days.  In his 20 years at Tesla, three business days.

10       And remember, the plaintiffs do not claim that the

11   August 13th blog post is fraudulent or false.  It was signed

12   off on by lawyers.  It's over a thousand words.  It lays it all

13   out in longer-form detail.  Detail the world didn't know.

14   Detail that had always been behind the scenes.  The details

15   that you, the jury, learned over the last few weeks.

16       And you know how the market reacts?  Market goes up.  The

17   details increased confidence that funding wasn't an issue.

18       (Document displayed)

19       **MR. SPIRO:**  And they say:  Wait a minute, wait a

20   minute, that blog post ends the case.  Ends the case.  This

21   case, case over.  So they have to come up with that -- that

22   lie.  Remember in opening statement, that -- the "best

23   estimate" lie?

24       And, you know, they were crossing Elon about it.  He said:

25   Well, wait a second.  You're making it sound like I said

 1   exactly 66 percent.  I said "best estimate."  I said "best

 2   estimate."

 3        And then you -- you trace it back, and Dan Dees, his

 4   banker, gave him a presentation, which is actually -- so I told

 5   you all that it was about 62 percent.  If you really factor in

 6   Elon and affiliates, it's like 64 percent.  And so Elon says

 7   his best estimate is 66 percent.  Okay?  So, that's not a lie

 8   in the blog post.  Okay?

 9        Elon had no motive ever to do anything wrong here.  He had

10   no motive to lie in the blog post.  Somebody else here made a

11   misstatement about the blog post.  Somebody who does have a

12   motive to lie.

13        The blog post is the accurate details, and the stock goes

14   up.  And the blog post was not materially different than what

15   the world took from the tweets.  Just ask the lead plaintiff.

16        (Documents displayed)

17        **MR. SPIRO:**  And the blog post, it was signed off on by

18   Deepak Ahuja.

19        (Document displayed)

20        **MR. SPIRO:**  And they had to cross-examine Deepak

21   Ahuja.  He's fatal to their case.  There was nothing to

22   cross-examine him on, so he -- they said to him -- I don't know

23   if you remember the big moment:  You have lawyers, like every

24   other witness in this case, you have lawyers.  Right?  As you

25   are testifying.  Like every single other witness in this case.

1          But they had to say that to him, because they didn't know

2     what to do with him, because, I mean, did that man look like he

3     wasn't being straightforward with you?  That he wasn't being

4     truthful and direct with you?  Give me a break.  That man has

5     impeccable character of the highest order.  And he came in

6     here, and he told an oath, and he told you what happened.  So

7     that's the best they got, the:  Do you have a lawyer?

8          Listen.  Unless you think Deepak Ahuja committed perjury,

9     or fraud -- literally, that's what you'd have to think to find

10    Mr. Musk liable.  They can only win this case if you find that

11    Mr. Ahuja committed fraud or committed perjury.  He was there

12    in that room.

13         And your mind goes back to that meeting with the PIF.

14    Because if that meeting is real, and it's true, and it doesn't

15    differ in a material way from the state of affairs from the

16    tweet, from the blog post, then nothing else matters.  The

17    tweet, even under their view, becomes, at most, a mistake, if

18    those meetings with the PIF are true.  A painful mistake, but a

19    mistake.  Not a fraud.

20         So long as the state of affairs and the meeting with the

21    PIF is as you heard, and as the board heard right after as it

22    was immediately relayed to them, as long as you believe that,

23    this case is over.

24         Same call for Deepak Ahuja.  Deepak, Martin, busiest day

25    of the year, they get up and they move quickly through the

 1  factory to that closed-door meeting.  Deepak enters the room.

 2  The door closes behind him.  Martin can't hear anything that's

 3  going on inside the room.

 4      The conversation before Deepak arrived is recapped.  And

 5  Yasir indicates:  Yeah.  Deepak, the CFO, summoned to this

 6  serious meeting, gives the estimates of 50 percent and

 7  $30 billion.  There were numbers.  He told you that.  They were

 8  in the board minutes.

 9      And Yasir's teams has their tablet open with the charts.

10  Yasir doesn't flinch.  To the contrary, funding would not be an

11  issue.  He says to Deepak Ahuja:  We are ready to act.

12      And Martin is still waiting patiently by the door.  You

13  can almost picture it, Martin there waiting.

14      So Deepak comes back after the meeting, and he tells

15  Martin:  There was an offer and there was an acceptance.  And

16  Martin's mind starts to race.  He had just come to this

17  country.  Would he be forced to leave this country?  If Tesla

18  goes private, IR, his job, would be no longer needed.

19      And Deepak puts his hand on his shoulder and tells him:

20  Don't worry.  We always take care of good people.  You will

21  stay here at Tesla, a private Tesla.

22      They were all there that day, with the meeting with the

23  PIF.  They were all at the door of that meeting.  Sam Teller,

24  Martin Viecha and Deepak Ahuja.  They were standing at that

25  door.  They came and told you what happened.  For plaintiff to

1   win, these people have to all be lying.

2       Deepak Ahuja would have to have come up with a lie on the

3   spot in that candid moment with Martin Viecha, for them to win

4   this case.  That would have had to be a lie.  Martin would have

5   had to make it up, too, by the way.  Deepak hasn't worked there

6   in years.  You'd have to believe they both lied to find

7   Mr. Musk liable.

8       And, listen.  The PIF didn't come here, okay?  We wanted

9   them here; they didn't come here.  Plaintiffs have the burden

10  of proof; they didn't bring them here.  There's no evidence

11  they wanted them here.  You know, where they are.  But of

12  course, they didn't want them here.  Okay?  They wanted Elon

13  Musk alone on that island, called first in their case.

14      They wanted to put the plaintiffs up first to play on your

15  emotions.  The professor to come in and tell you that this

16  email is fake and the whole thing's a hoax.  So they could call

17  Elon on cross before you ever got introduced to him, or heard

18  from any of the great people who were there that day who knew

19  the facts on the ground, and would end this case.

20      And so they don't want the PIF here to be cross-examined

21  about the after-the-fact minutes and the so-called minutes and

22  the after-the-fact texts.  And you can imagine what would

23  unfold if they came here and were cross-examined, but it

24  doesn't matter.  They didn't give you any credible evidence

25  that the so-called minutes or the texts, you know, matter.

1        You know, these minutes of -- you know, purport to be a

2   transcript of a 45-minute meeting, there's like eight lines.

3   Nobody came in here and told you those were the minutes, or

4   they weren't created years later and, you know -- I mean, even

5   if you think that the minutes are real, you have no credible

6   evidence that they are or that they are what they purport to be

7   or they are complete.  They are just, at most, an approximation

8   of what happened.  Not precise.  You can't count on them being

9   precise.

10       And guess what?  It doesn't matter.  Because even if you

11  believe those minutes, it doesn't change the facts.  It doesn't

12  change the state of affairs.  It's still not fraud.  It's still

13  not materially different than what was communicated in those

14  tweets.

15       And, you can see here (Indicating) how -- from that

16  meeting, you can see from the texts how the tone and tenor of

17  that meeting changed.  You can see it.  You can feel it.

18       (Document displayed)

19       **MR. SPIRO:**  And you can also feel something in Yasir's

20  texts.  Okay?  Because eventually, in the texts, he's not

21  responding every few hours or every few days and talking to

22  whoever he's talking to.  There's a time in which he's

23  answering, like, second by second by second.

24       And so when he asks for the finances, Elon says:  Yeah,

25  right.  You just bought billions of dollars based on public

 1   financials.  Good try.

 2       And then Yasir changes to what he really wants:  Details

 3   on how we can take the company private.  That's what we agreed

 4   to.  How we can take the company private.  The steps that are

 5   made after agreeing that you would take the company private,

 6   how we're going to do it.  What is the required percentage?

 7   How much money do you need?  That's what that means.  How many

 8   people are going to roll, and what's the required percentage?

 9       You know, there's no time.  You see how quick these

10   timestamps are?  There's no time here to backpedal and think

11   and check and -- you know.

12       And there's something else you might notice.  Never once

13   does he ask about price.  Never once does he ask about money.

14   Never once does he say he isn't in.  And do you know that blog

15   post where he said like loose words, seems like:  Oh, why'd you

16   send that blog post out, loose words?

17       I don't know if you guys caught this, but in the blog

18   post, it has what Yasir says in that meeting, right?  He's over

19   here from the Kingdom of Saudi Arabia, he's in the Tesla

20   factory, he has Elon right where he wants him the night before

21   the earnings call, and he says to him, he says:  Listen, Elon,

22   don't worry about it.  I'm the decision-maker.

23       You know, and now all of a sudden, the fact that he said

24   that meeting and that meeting is going on, you know, live

25   stream and, you know, I don't know what conversation were going

 1   out about with him and other people about whether he was really

 2   the sole decision-maker and why he said that.  I mean, he

 3   didn't come here and explain that.  But in any event, it's not

 4   what he says, it's what he never says.  He never says he's out.

 5   Right?  Never says he's out.

 6        (Document displayed)

 7        MR. SPIRO:  And, in fact, after the text, he calls

 8   Egon Durban.  You know, after the media dies down and the dust

 9   is settled, he calls Egon Durban and he tells him:  We're in.

10   And Dan Dees, their banker, knew he was in all along.

11        Like I said, Goldman Sachs, remember, they worked for Elon

12   in this transaction, this potential transaction.  But they bank

13   for the PIF.  And they seem to know, on August 4th, he doesn't

14   need any money.

15        (Document displayed)

16        MR. SPIRO:  Doesn't need any money.  Look at that

17   message.  They know he doesn't need any money.  And they, at

18   the end of the day, two weeks later, say the PIF wants to be

19   involved, confirms they were always in, and that funding was

20   never an issue.

21        Egon Durban tells you he wants to give 6 billion.  They go

22   up then to 7 or 10 billion.  He wants to do all of this before

23   knowing all of the details.  He says to Elon Musk:  All of this

24   can be done before the 10th.  It's done.  Don't worry about it.

25        You know, so we hear -- you know, we have this case, what

 1   does "Funding secured" means, and how did people interpret it

 2   to mean, and what they interpreted it, what does that mean, and

 3   is it materially different?

 4       Funding was never the point.  Funding was never the issue

 5   in the real world.  It wasn't the issue on August 4th.  It

 6   wasn't the issue on August 7th.  It wasn't the issue on

 7   August 23rd, in the minutes that has those statements from

 8   Deepak Ahuja and the bankers.  It was never the issue.

 9       And when you look at the jury instructions, you will see

10   that there is an example regarding material misrepresentations.

11       (Document displayed)

12       MR. SPIRO:  And the example they give is revenue.

13   Revenue.  Something that is core to a company's being as

14   revenue is not necessarily material.  Something that big as

15   revenue, you can misstate, and it's not fraud.  It's not

16   material.  It's only material if you can show -- prove -- that

17   the state of affairs is materially different than whatever

18   you're saying.  Materially different.  Something even as big as

19   revenue.

20       (Document displayed)

21       MR. SPIRO:  Funding was never the issue.  And so

22   again, I'm just going to show you what everybody's saying about

23   facts on the ground versus the tweet.

24       (Document displayed)

25       THE COURT:  Mr. Spiro, we may need to take a break

CLOSING ARGUMENT / SPIRO

 1    soon.  We've been going at it for almost two hours and 20

 2    minutes, total.  I don't know if there's a convenient break

 3    point?

 4              MR. SPIRO:  Yes.  I'll -- 60 seconds.

 5              THE COURT:  (Nods head)

 6              MR. SPIRO:  Ultimately, the reason the company didn't

 7    go private --

 8         (Documents displayed)

 9              MR. SPIRO:  -- was the reason Elon predicted and

10    flagged as a risk from the beginning, as did the lead

11    plaintiff, by the way, in his rumor email where he says:  I

12    don't think the investors are ever going to accept this.

13         You see, Elon Musk wanted to include the retail

14    shareholders.  That's what the exhibits and testimony about

15    SPVs was all about.  The structure that would allow many to be

16    included and pool, so this funding issue doesn't cause loss to

17    the shareholders.  This whole thing was for the shareholders.

18         (Documents displayed)

19              MR. SPIRO:  And they -- when they could not be as

20    easily included --

21         (Documents displayed)

22              MR. SPIRO:  -- in the tweets, when they could not be

23    as easily included in the deal, that's why they didn't go

24    private.  Not because of funding.  Funding was never an issue.

25         Okay.  We can take a break, Your Honor.

 1              THE COURT:  All right.  We'll take a morning break,

 2     our usual 20-minute break, and see you back.

 3              THE COURTROOM DEPUTY:  All rise for the jury.

 4         (Jury excused)

 5         (The following proceedings were held outside of the

 6     presence of the Jury)

 7              THE COURT:  All right, if you can give me a time

 8     estimate of how much longer you are going to be?

 9              MR. SPIRO:  A little over 20 minutes, approximately

10     20.

11              THE COURT:  Okay.  Your rebuttal?

12              MR. PORRITT:  I'm thinking ten to 15 minutes.

13              THE COURT:  All right.  So we'll get to the jury right

14     around the noon break.  Shortly after noon.

15              MR. PORRITT:  Shortly after.  I hope so, Your Honor.

16              THE COURT:  Okay.  All right.  Thank you.

17              THE COURTROOM DEPUTY:  Court is in recess.

18         (Recess taken from 11:24 a.m. to 11:43 a.m.)

19         (The following proceedings were held outside of the

20     presence of the Jury)

21              THE COURT:  Okay, you ready to retrieve the jury?

22              THE COURTROOM DEPUTY:  Yep.

23         (The following proceedings were held in the presence of

24     the Jury)

25              THE COURTROOM DEPUTY:  All rise for the jury.

1          **THE COURT:**  All right, have a seat, everyone.  Thank

2     you.

3          Welcome back, members of the jury.  We are going to

4     continue with the defendant's closing argument.

5          Mr. Spiro?

6          **MR. SPIRO:**  Thank you.

7                    **CLOSING ARGUMENT, RESUMED**

8     BY MR. SPIRO

9          Where we left off, we were talking about how there was

10    ample funding.  That funding wasn't an issue.  And that the

11    state of affairs on the ground wasn't materially different than

12    "Funding secured."

13         The detailed state of affairs was described in the

14    August 13th blog post, "Why Did I Say 'Funding Secured'?"  And

15    the post goes on to talk about all the other contingencies and

16    next steps, all of the details of both.  Funding, and the only

17    contingency.

18         (Document displayed)

19         **MR. SPIRO:**  The stock went up on August the 7th, the

20    original tweets.  Right?  But it went up because they announced

21    a consideration of a potential transaction.  That's why it goes

22    up.  It doesn't go up because of details such as funding and

23    contingencies that have to go through.

24         And you know that because of common sense, of course, but

25    there's another reason you know that, which is because on

 1   August 13th, when the detailed state of affairs becomes known,

 2   the price goes up.  You see, the detailed state of affairs made

 3   people more confident that the deal would close.  More

 4   confident in funding, more confident in the amount of

 5   contingencies.  That's how you know they can never prove

 6   materiality.

 7        (Document displayed)

 8        **MR. SPIRO:**  As Dan Dees told you, there was ample

 9   funding.  Those were the facts on the ground.

10        (Documents displayed)

11        **MR. SPIRO:**  They all told you that.

12        (Document displayed)

13        **MR. SPIRO:**  And so what is plaintiffs to do?  They

14   have hundreds of investors, depos to be played.  You know, we

15   talked about how none of those witnesses bought any stock

16   following the tweets.  None of them say that this was fraud,

17   none of them.  Right?

18        But then JP Morgan comes in, the analyst, you know, the

19   JP Morgan that hates Elon Musk.  And, you know, they said in

20   opening statement he has no axe to grind, but they have an axe

21   to grind.  They're suing Tesla in the same related case because

22   of this hatred, and they're going to get their day in court,

23   too, I promise.

24        So as this pettiness has sort of continued, this analyst,

25   he doesn't come to trial to be cross-examined.  Right?  This is

 1 | the video that is played.  And they don't bring their star

 2 | witness here.

 3 |     So he says basically that when the news comes out, he

 4 | doesn't leave his dinner, doesn't leave his conference, doesn't

 5 | have any emails from that day -- because he doesn't leave his

 6 | dinner and he doesn't leave his conference; I wonder what those

 7 | emails would show.

 8 |     And then the tweet happens.  He's asked, you know:  Well,

 9 | who did you check with?  You're a junior analyst.  Who did you

10 | check with at JP Morgan about how these transactions happened?

11 |     He checked with nobody.  No emails about that, either.

12 | Wonder what those emails would show.  So he doesn't talk to

13 | anybody.  He has this -- these motives.  There's no emails.

14 | He's got no experience.  He checks with no one.

15 |     He doesn't even understand, if you look at it, that Elon

16 | is the bidder here.  He doesn't do the math to understand that

17 | 420 is a 20 percent premium.  He says, he actually says:  I'm

18 | speculating (Indicating quotation marks).  And he gives a

19 | 50 percent chance of its going through.  Total coin flip.

20 |     (Reporter clarification)

21 |     **MR. SPIRO:**  Total coin flip.

22 |     You jurors are not allowed to speculate.  You can only

23 | base your testimony on credible evidence.

24 |     And so they put up the analyst report.  You know,

25 | ultimately, as we tried to explain, he's underweight, Tesla.

 1   He's betting against Tesla.  He's shorting Tesla.  And people

 2   who were betting against Tesla and were shorting Tesla want bad

 3   things to happen to Tesla.  And anybody who was shorting Tesla

 4   at this time didn't do very well.

 5        In any event, when they put up the analyst report, you can

 6   see in the hide-the-ball scenario, they black out or they hide

 7   the fact that there was an attachment to a blog post, and the

 8   statement "To us this suggests more than a mere consideration."

 9        "More than a mere consideration."  So to him, it suggested

10   that this was a serious consideration, which is exactly right.

11   It was a serious consideration.

12        (Document displayed)

13        MR. SPIRO:  It was a serious consideration, and

14   everybody took that first phrase as important, even their

15   plaintiff.

16        (Document displayed)

17        MR. SPIRO:  So did T. Rowe Price.  That's what they're

18   betting on.  They're betting on:  Is Elon serious?  And if

19   that's what they took from those tweets -- again, the actual

20   language doesn't matter.  If it's the same as the state of

21   affairs, you know how serious, you know the steps, you know the

22   actions, that is why he's not liable.

23        (Document displayed)

24        MR. SPIRO:  Everybody, even this random clip from a

25   news anchor, "Am considering," right?  That's the -- that's

 1   what everybody's focused on.

 2       (Document displayed)

 3       **MR. SPIRO:**  So, but the JP Morgan analyst, you have to

 4   understand, he also says he doesn't think funding is going to

 5   ultimately be an issue, and he says that the blog post is a

 6   walk-back.  That's what he says.  He says the blog post clears

 7   it up for him.  That's what he says, it's a walk-back.  That's

 8   the quote.

 9       And guess what's not in his analyst report?  Wouldn't you

10   know it, the *New York Times* article.  Nowhere in his analyst

11   report.  Not one of their witnesses is ever shown or answers a

12   question about that *New York Times* story.

13       And he doesn't say that Mr. Musk tried to defraud him.

14   Remember, it was a small thing, but it's important.  The

15   Antonio Gracias, the lead director, goes after the decision not

16   to go private, and he goes and he meets with various investors

17   to talk to them.  And not one of them is worried about the

18   tweets and their technical meaning.  None of them are saying we

19   were defrauded.  No.  That's not what they care about.  They

20   care about Elon.  How's Elon doing?  How's his head space

21   doing?

22       They can't accept that.  They can't accept that just

23   because there's a rushed tweet, it wasn't different than the

24   more detailed state of affairs.  This wasn't a big hoax.  This

25   was very real, and very genuine.  So they have to move on to

CLOSING ARGUMENT / SPIRO

1    damages.

2        (Documents displayed)

3        **MR. SPIRO:**  They have to press ahead.  They've not

4    proved liability so they don't even get here, but I have to

5    talk about, briefly, causation damages.  Because this part of

6    their case makes our case stronger.  They can't prove why the

7    stock went up, or why the stock went down.  They have to prove

8    both.

9        They admit -- literally admitted on the stand they can't

10   prove either.  That's fatal to their case.  They admit it as to

11   both.  "Funding secured" doesn't move the market.  A possible

12   take-private does, not a funding.

13       Their expert told you that the "Am considering" tweet

14   would have the same effect, absent "Funding secured."  That is

15   the end of this case.  They cannot prove -- they admitted on

16   the stand, they told you:  We lose.  They told you, under oath,

17   that they lose.  They told you the statement would not have

18   made a difference.  They can't prove causation; game over.

19       **MR. SPIRO:**  Listen, stocks move all the time for lots

20   of reasons.  The stock was very volatile.

21       It was a very short, cherrypicked time by plaintiffs'

22   lawyers, this time that this was going on.  They want to punish

23   Musk for using two words, but the market moves all the time.

24   He apologizes, it moves the market.  It moves by random chance.

25   You heard that from their experts, "random chance."

1      The media doesn't write stories that say:  Oh, there's no
2  news, nothing to see here.  And their own expert told you that
3  it moves all the time for random chance, and that Tesla's a
4  very volatile stock.  And that it especially moves by random
5  chance.

6      And the statements in this case come directly on the heels
7  of the other Saudi news, right, and nobody blocks that from
8  their mind.  They don't deal with that.  Nobody blocks that
9  from their mind as they're seeing the Saudi news, and on the
10  heels of it, these tweets.

11      And again, one of their experts admits that they didn't
12  try to show the cause of half of the tweet.  That was Professor
13  Hartzmark.

14      (Document displayed)

15      **MR. SPIRO:**  And the other admitted the undeniably
16  truthful portion would have caused the exact same stock
17  reaction as we saw.  No causation.  Their experts didn't even
18  take the time to show you that if all the other statements made
19  by Musk on the 7th of August, including the blog post, they
20  never took the time to carve them out from the statement that
21  they don't like.  They have to do that.  It's in your jury
22  instructions.  They are not allowed to take all of the
23  information and just bundle it like they did.

24      The effect, the impact of the tweets on the market, it was
25  the same.

1      If the stock goes to the same place it would have gone if

2    he was just considering, then definitionally, there are no

3    damages.   Damages are the difference between what happened and

4    what would have happened, had the misstatements not been made.

5    He told you, the expert, there was no difference.   No damages.

6      And the second expert, Hartzmark, tells you the same

7    thing.   He doesn't disaggregate.   There's no debate; he didn't

8    disaggregate.   The jury instructions tell you he has to.   He

9    didn't.   He read those 27 tweets together, just like I told you

10   from the beginning, to all do it under the "Am considering"

11   headline.   They told you read them all separately.   Their

12   damages expert told you to read them all together.

13     He doesn't add the 600 words of the blog post, they have

14   to run from the blog post.   He says it's difficult but not

15   impossible to disaggregate.   He didn't show you.   There's no

16   debate.   He didn't disaggregate.   And he spoke for a long time.

17   And all these, you know, long answers, and they never asked

18   him -- you know, you can ask experts hypotheticals.   They never

19   asked him:   "Well, if you just took the true state of affairs,

20   what would have happened to the market?"   What would have

21   happened to the market?   Because they know the answer.   They

22   know it's not materially different.

23     (Document displayed)

24     **MR. SPIRO:**   So they can't get past that threshold,

25   either the causation threshold or the damages threshold.   But

 1  guess what?  Once they get into damages, they got all their

 2  numbers wrong.  The damages expert, the guys with the numbers,

 3  they got all their numbers wrong.

 4      The first expert redid his numbers before coming to court.

 5  You heard that.  The methodology that he used in the two

 6  different calculations changed every single number around.

 7  Turned winners into losers and losers into winners.  Not much

 8  more to say than that.  He also turns his numbers over to

 9  Professor Hartzmark.  So they're just embedded into his

10  calculations.

11      That was better than the second expert.  The second expert

12  actually figured it out live, on the stand, that all of his

13  numbers were wrong.  Live, on the stand.  And he told you that

14  he forgot, and there was a copy-and-paste error, and that he

15  did it multiple times, and he didn't catch it.  And you could

16  see an ice cube melting as he was trying to describe that.

17      And the next day he came in, and I wanted to have a

18  question asked, just, you know:  Did you talk to anybody about

19  your testimony, right, under oath?  Just tell the jury, did you

20  tell anybody about your testimony?

21      No.

22      Right?

23      Plaintiff's lawyer stands up, right?  They'd been working

24  together for -- on other cases and things, you know.

25  Plaintiff's lawyer stands up on redirect, and starts asking him

1    questions.  It's like boom, boom, boom, boom.  They're trying

2    to explain away the numbers.

3         Oh, you just take that from Slide 11 and you move it over

4    here and you move it over there.

5         Did you watch that?  Did you watch that choreographic

6    routine?  I mean, did you see that?  So they're trying to fix

7    it live.

8         And here's the punchline of this whole thing.  After all

9    of that, they're sticking to the wrong numbers.  The numbers

10   that they show you on these charts, they're the ones that he

11   said were wrong.  They didn't even fix the numbers that he

12   fixed on the stand.

13        I mean, the -- and then the explanation they give, oh,

14   they were just being conservative.  Right?  First time in the

15   history of modern law that the plaintiff's lawyer and the

16   experts were being really, really conservative with their

17   estimates, so you can just accept the now new estimates he did

18   on the stand.

19        Just take our word for it, just trust us.  Just -- just

20   enter those numbers onto the verdict form, the numbers he told

21   you were wrong.

22        So again, this other thing I have to say is they have the

23   burden of proof.  He said a few times, you know, you know, why

24   didn't he -- he has the burden of proof.  They don't just have

25   to prove this.  They have to be able to explain it well enough

1   to you that in a matter of this importance, you can be

2   comfortable that you fully understand the concepts of implied

3   volatility and all of these other things.  That you're

4   comfortable in a federal courtroom that you can issue a verdict

5   based on that.

6        This volatility routine he did, it's just the plaintiff's

7   lawyers talking with charts.  That's not evidence.  Why didn't

8   we call an expert?  I mean, they didn't prove anything.  Their

9   experts admitted to you they can't prove causation.  Under

10  oath, admitted to you.  I don't need to call an expert to read

11  their testimony back to you.  You don't need to be a weatherman

12  to know which way the wind blows.

13       But again, I'm not surprised their numbers didn't check

14  out.  Their whole story doesn't check out.  The stock wasn't

15  going down on the 17th because of some revelation of fraud.

16       Remember, I told you that in a normal case, stocks plummet

17  when there's a revelation of fraud.  That didn't happen here.

18  The blog post on the 13th truthfully discloses the detailed

19  state of affairs, and no one says otherwise.  Everyone knew the

20  details about funding; they knew that the only reason why was

21  not literally the only reason.  Stock goes up.  That's the end

22  of their case.  Truth comes out, 13th, that's it.  Because

23  anything that comes after can't be a revelation of what

24  happened on the 7th, if everything comes out on the 13th.

25  Because the truth is all out there.

1    Not only did the stock go up on the 13th, but their expert

2  admitted --

3    (Documents displayed)

4    **MR. SPIRO:**  -- that the difference between the 7th and

5  the 13th, that first time period, was not statistically

6  significant.  That it was -- it was -- randomness could just as

7  easily explain it.  It was not statistically significant.  He

8  cannot separate that movement from chance.  That's not enough.

9  That's why they need the *New York Times* article.

10    Remember, that's the whole thing.  That's why they are

11  trapped with that blog post I told you at the beginning, that's

12  the whole lie they cooked up with the two thirds of the

13  shareholders' best estimate, they need that *New York Times*

14  article or they lose, they lose.

15    So what did Professor Hartzmark say was false about the

16  blog post to keep this idea of this so-called fraud alive?  He

17  says:  Premature at best.  He says the tweets were premature at

18  best.  Those are his words.  What he says in essence is that

19  the tweets on the 7th, he's not saying that funding wasn't

20  there, he's not saying that, you know, that he wasn't

21  considering it.  He's just saying it was a bit premature.

22  Everybody else stated that that doesn't matter.  So, Hartzmark

23  gives us the ultimate fundamental truth.  He gives us the truth

24  that Elon Musk was considering it, and that funding wasn't an

25  issue.  It's just that the announcement was premature, even

1  according to Hartzmark.  And the blog post was close enough.

2  Not a material difference.  That's why the stock doesn't go

3  down.

4       But Hartzmark has to say something, he has to be

5  different.  If he says the blog post is accurate, it's the

6  reveal, and they lose.  He also can't say "It's far from

7  secure" (Indicating quotation marks), whatever that means, in

8  the *New York Times* articles, right, because then he would be

9  saying basically the blog post was the reveal.  So he has to

10 come up with some new language to describe it, to describe the

11 same thing you all know to be true.  And so what he says is

12 he's premature at best.  But he doesn't really say it; he has

13 to get it pulled from him on cross-examination.

14      And remember, these are just characterizations.  New facts

15 have to be revealed in a fraud case.  Not characterizations and

16 spins from paid experts and media reports.  New facts.  There

17 were none.

18      If the blog post reveals supposed fraud on August 13th,

19 then that's that.  There's no class period, no damages, no

20 statistical significance.  If August 13th is the true state of

21 affairs like Deepak Ahuja and every board member told you, then

22 the stock increase that day proves the difference between the

23 blog post and the tweets wasn't material.  And so they're

24 stuck.  But they've got to get to the *New York Times* story.

25 They've got to.  They've got to.

1      So what do they do?  That's the 14th.  That's why they

2   accuse him of fraud on the 14th.  Remember?  He announces that

3   he's working with Goldman and Silver Lake, which now you know

4   to be true?  He hadn't technically signed the retainer letter

5   yet?  They need something to go wrong on the 14th to get past

6   the 13th.  They sued him for fraud on that.

7      And then the Model 3 news comes out.  Remember that?  The

8   Model 3 news comes out.  He tries to just jump over that.  He

9   doesn't deal with that.  It confounds his numbers.  But finally

10  he gets to the 17th with the *New York Times* story.

11      And guess what?  He tried to hide that from you, too.

12  He'd been working for the plaintiff's firm for a long while.

13  They've been back and forth.  These answers are beautifully

14  scripted.  Open-ended question on the direct examination:  What

15  was the *New York Times* article about?

16      Not a word about Mr. Musk's health.  Not a word.  That was

17  an effort to mislead you.  Just what it was.  Just what it was.

18      Under cross-examination, he stammered again on:  What did

19  I say?  I thought I mentioned that.

20      Even in summation, they didn't show it to you.  They just

21  take out that one word, every time.  Remember I'm the one who

22  entered it into evidence.

23      (Documents displayed)

24      **MR. SPIRO:**  Okay?  I'm the one who entered it into

25  evidence.  This whole trial, they're focused on what Mr. Musk

1    says in his tweets:  Don't look at the blog posts.  Focus on

2    Mr. Musk's tweets.  Don't look at what he says in the *New York*

3    *Times* article.

4        By the way, in this article?  This is what he said

5    (Indicating).  They didn't tell you that.  They hid that from

6    you.  Because these words, they leave you with the same

7    fundamental truth.  The same one.  The same one that the *New*

8    *York Times* editor saw when they picked the headline.  Reads

9    like a psych interview.  Shows he isn't Tony Stark.  Shows he

10   can bleed, too.  His words show his suffering.

11       (Document displayed)

12       **MR. SPIRO:**  Remember what the expert said when asked

13   about a different thing?  You've got to take everything from

14   the horse's mouth?  Remember?  When he talked about something

15   else, said everything from the horse's mouth, it matters from

16   the horse's mouth.

17       But this is Elon Musk's statements about regarding his

18   health.  This is the statement about funding.  And nobody took

19   anything else from this article, other than it was a statement

20   about the man's health and his suffering.

21       (Document displayed)

22       **MR. SPIRO:**  All the followup stories, all of the

23   articles.  Because again, the market cares about what Elon Musk

24   is considering.  And when his mind is suffering, they care

25   about that too.  That's why the market went up and down.  Not

1   wordsmithing, not lawyers, not reporters, not experts.  The

2   expert eventually had to admit that it's true.  He gave his

3   interview, in his own words.  That's material.  If it's

4   material, he didn't account for it.  If he didn't account for

5   it, that's it, game over.  They can't prove damages.

6        They had to show that the decline -- remember, they

7   couldn't show the way up?  They had to show the decline was

8   because of the bad words they don't like.  Not because of his

9   health and his suffering.  They didn't.  They had to

10  distinguish any decline by his health.  They didn't.

11       (Document displayed)

12       **MR. SPIRO:**  And you know, I'm reminded of that

13  conversation that Antonio had with those investors I told you

14  about, where none of them cared about the tweets and none of

15  them cared about anything, other than Mr. Musk's health and his

16  mind.  That's what they cared about.  That's why the stock

17  dropped.

18       (Document displayed)

19       **MR. SPIRO:**  That's what the investors were asking

20  questions about.

21       (Document displayed)

22       **MR. SPIRO:**  That's what Egon Durban took from that

23  story.  That's even what JP Morgan took from that story.  The

24  only thing he could remember was Elon crying in that interview.

25  They cared about Elon Musk's mind.  Elon Musk was Tesla.

 1          I'm briefly going to talk about the jury instructions.  As

 2     you can see on the left, 10b-5, securities fraud, prohibits

 3     acts of deception.

 4          (Document displayed)

 5          **MR. SPIRO:**  Acts of deception.  They had the burden on

 6     every single element, every single element.  And under

 7     reliance, you'll see there's like another four, it's basically

 8     like nine things they have to prove.  There's nine of you.

 9     Hold them to their burden.

10          Material misrepresentation.

11          (Document displayed)

12          **MR. SPIRO:**  Again, I'm not talking any more today.

13     I'm done with technical and accurate word choices.  Don't care

14     about that right now.

15          They have to prove materiality, that it was important, and

16     what he believed in his core that funding was not an issue.

17     And now you know that funding wasn't an issue.

18          They have to prove that the state of affairs was not

19     materially different than how the tweet was interpreted.  They

20     have to prove that the state of affairs is different in a

21     material way from what people took from that tweet.  They

22     can't.  It wasn't.

23          This example of revenue is telling.  We talked about that.

24     And it's critical.  At the bottom of the instruction, it's

25     circumstances.  The circumstances of all of this matter.  For

1   them to prove this, they have to prove that what the market

2   took from that tweet was materially different than what the

3   state of affairs were that the world now, because of this

4   trial, finally knows.

5       (Document displayed)

6       **MR. SPIRO:**  Reliance, first element, it's a very

7   volatile stock.  There's no evidence to the contrary.  Fries

8   told you as to the second point here, the slide I put up, there

9   is no evidence to the contrary.

10      And again, the August 13th blog post ends the -- under any

11  view of this evidence, ends the class period.  It has to.  So

12  they can't do that either.

13      It's not an efficient market, by the way, according to

14  them, right?  Because they think that the information isn't

15  rapidly going into the markets since the blog post had the

16  market going up.  So there's no efficient market; they didn't

17  prove otherwise.

18      (Document displayed)

19      **MR. SPIRO:**  Causation, okay, they didn't prove.

20  Again, on the way up, the "Am considering" was the impact.  We

21  tease that out.  Even their expert said, even their expert

22  said:  It would have had the same effect.  Their expert, their

23  sworn expert.

24      On the way down, it's obviously the *New York Times* story,

25  it's obviously key man risk.  It's obviously his suffering.

 1   And there's no way to know, there's no way to know between the

 2   7th and the 13th, whether it's anything other than pure

 3   randomness.  That means they can't prove loss causation.  They

 4   can't prove it on the way up or the way down.  In fact, the

 5   evidence they presented proves the opposite.  It ends their

 6   case.

 7       And so they don't get to their damages, which is where

 8   they were trying to get to the whole time.  If that tweet never

 9   happens, if he keeps his considerations a secret, the stock and

10   the world would not have been below where it was that day.

11   They only get actual damages.

12       See that word "actual" in there?  That whole show about

13   consequential this and how yet in the other world where these

14   people live, that the stock would have been below where it was

15   on the 7th if we turned back the clocks of time?  That's not

16   what this jury instruction says.  This is actual damages.

17       And again, this is the most important thing about it,

18   frankly.  They have the burden to prove, explain clearly in a

19   matter of this importance, something you can take away and be

20   comfortable with, be comfortable with, that you understand and

21   digest well enough.  They want you to just -- I think at one

22   point he said:  Oh, yeah just start adjusting the numbers if

23   you want to give us a different number.  You don't have to do

24   that.  You can't use conjecture or guesswork or speculation.

25       Damages are also an element they have to prove.  Okay?

 1   You don't just write zero.  If they don't prove damages as an

 2   element, that's it.  It's over.

 3        And this is the big one.  Look at the bottom.  They didn't

 4   disaggregate.

 5        (Document displayed)

 6          MR. SPIRO:  (As read)

 7             "Plaintiff also has the burden of separating

 8              out the price decline, if any, caused by

 9              factors, if any, other than the alleged

10              misrepresentation."

11        They told you, under oath, undisputed, they did not do

12   that.

13        But nothing will ever satisfy them.

14        (Document displayed)

15          MR. SPIRO:  Here we have the verdict.  Just so you

16   understand how it works, if you check "No" to liability, check

17   "No" to liability, you've finished the questionnaire, you sign

18   the verdict, you go home.  That's how it works when plaintiffs

19   don't prove their case.  That's how it works.

20        But nothing will ever satisfy them.  That's why they had

21   to get to the *New York Times* article.  You know, a handshake

22   deal, somebody's word, that's not good enough.  An email, the

23   August 2nd email signed by the CEO of Tesla, that's not good

24   enough.

25        They don't like emails with attachments, either.  The blog

 1  post with the attachments, you know if Mr. Musk had sent an

 2  email with a signed letter attached, they don't like that.

 3      The board's response, their press release, they told

 4  Antonio Gracias:  What is this, three sentences?  This isn't

 5  good enough.  It's too short.

 6      The blog post of the 13th that nobody seems to read on

 7  their side, that everybody seems to have amnesia about, that

 8  was too long.  The press release was too short, that was too

 9  long, nobody saw it.  Nothing is ever good enough, because this

10  is a case crafted by lawyers.

11      The fundamental truth Goldman Sachs knew, the fundamental

12  truth Egon Durban knew, the fundamental truth Deepak Ahuja

13  knew.  These are independent witnesses.  They told you the

14  state of affairs.

15      So they have to go back to the board of directors.  Must

16  be wondering, what the he- -- why are they picking on the board

17  of directors?  Bad tweet, or bad board of directors.  You

18  didn't control him.  Eat some ice cream.  And so they had to

19  come here, federal Court, and answer -- fly from wherever they

20  lived, to answer in a securities fraud trial.

21      But you know what?  They came.  And they didn't phone it

22  in or appear by video.  One, one director that they want you to

23  find liable is blind and couldn't be here.  But everybody else

24  came here and looked you in the eye, took an oath, and told the

25  truth.

1    And if you believe them, you believe that the offer was

2   real on August 2nd.  You believe them that Deepak Ahuja, before

3   anyone knew about the tweet, days before, before anybody spoke

4   to Elon, told them what happened in the meeting.  If you

5   believe Robyn Denholm, that if anything wrong was happening

6   here she would have stood down and walked out, if you believe

7   them, doesn't just set them free.  It sets him (Indicating)

8   free.

9    Don't compromise on your verdict.  Right?  Add lots of

10  counts.  Two statements, lots of directors.  They want you to

11  compromise.  They want a split.  They want you to say to

12  yourselves:  Well, let the directors go.  Let them go; we'll

13  take Elon.

14    Don't do that.  That's not justice.  That's what they

15  want.  It's human nature to compromise.  Right?  We all know

16  that.  Justice is not on the 50-yard line.  Don't split the

17  baby.  Don't compromise.  We came all this way.  They were in

18  this together.  We didn't come all this way for you to check

19  one tweet and not the other.  We came here for the truth, the

20  whole truth.  Please do not compromise.

21    I asked you those nine questions in opening statement,

22  that they'll never answer.  He's about to stand back up.  I'm

23  almost done.  And then the case is yours.  Those nine questions

24  I said in opening statement, if he was trying to do something

25  improper, why did he immediately flush it out?  If he wasn't

 1   genuinely considering this wasn't, he just going to be shown to

 2   not be genuinely considering it the next moment?  Makes no

 3   sense.  He's the largest shareholder.  He never sold a share.

 4   What motive did he have?

 5        And ultimately, if funding didn't matter, how can they

 6   base their whole case about funding?

 7        Ultimately, if it did not go forward because of the

 8   shareholder vote like he said, how can they base their whole

 9   case about something he was right about?

10        And how come, when they issue the more detailed

11   statements, the stock goes up?  Not like it's a reveal of big

12   fraud, the way the market goes up.  It proves this wasn't

13   material, and they can't prove their elements.  And they didn't

14   prove disaggregation.  They can't.  There's no debate.  They

15   can't.

16        And what motive does anybody have, what illicit intention,

17   with all these lawyers and consultants and board members, what

18   evidence is there that anyone was committing fraud?  But he's

19   going to come up, he's going to stand up and say "Fraud."  He's

20   is going to say he represents the shareholders.  He's not a

21   shareholder.  Those good people that work at Tesla are

22   shareholders.  Deepak's a shareholder.  The people he talks to

23   on Twitter are shareholders.  Elon did this for the

24   shareholders.  The reason it didn't go forward was because of

25   the shareholders.  And the shareholders that stuck with him,

**CLOSING ARGUMENT / SPIRO**

1    the shareholders made 10X on their money, you learned that.

2    This case is for them.  And maybe a little bit left for the

3    gamblers.

4         They don't get to direct your verdict.  Nobody can direct

5    your verdict.  He doesn't get to spoonfeed you numbers,

6    assuming you'll just accept them.  The verdict is yours.  Stay

7    strong.  Hold onto principal.

8         The securities laws are meant to protect against deceptive

9    acts.  He didn't intend to deceive anybody.  You all know that.

10   And when this is over, and it soon will be, you will get to go

11   back to whatever it is that you do.

12        And I was going to give some long-winded speech -- but I'm

13   running out of time -- about jury service and about how

14   important this is, and how it's the most important thing when

15   somebody that's sometimes unlikeable stands trial, when

16   somebody who does other things like bad tweets -- some of his

17   tweets I don't like either -- somebody like that, that's when

18   the justice system matters most.  That's where principal

19   matters most.

20        And so when you're sitting alone, whenever that is, when

21   you're fishing or hiking or cooking or having a glass of wine,

22   whatever it is you do when you are alone, you will have these

23   moments when you do.  Today is the decision.  You won't be able

24   to come back here.  You won't be able to come back and:  Say I

25   have a doubt; I don't think they proved it.  You won't be able

1    to come back here and say:  I know he didn't do fraud, I know

2    he didn't commit fraud.  But there's no way to come back here.

3    You won't be able to do that.  You have to decide today.

4         So as I told you, I'm done focusing, at least here, about

5    wordsmithing and what's technically inaccurate.  I would rather

6    focus on what's undisputedly true and very, very real.  And

7    that is Sam Teller darting out of that conference room to get

8    Deepak Ahuja and Martin Viecha there, in a state of disbelief,

9    that Tesla is going to go private.

10        Thank God they were there.  Thank God they were there that

11   day with Elon.  Because plaintiffs can call him whatever names

12   they want, and they can say whatever they want, doesn't matter.

13   You don't need his testimony.  All the other witnesses were

14   there that night.  And the irrefutable evidence proves this was

15   very real and not a fraud.  They were there at the door of the

16   room at Tesla.  And that's that.  They can't go any further

17   with you now.

18        Neither can Antonio Gracias.  He can't go into the jury

19   room with you, either.  Neither can Robyn Denholm, chairwoman

20   of Tesla.  She can't either, and neither can I.  They have

21   taken the truth and given it to you.  The truth that he knew

22   the PIF was in.  The truth that he always had ample funding.

23   And that he could always, of course, use his own financing.

24        We've been waiting five years for the truth.  The truth is

25   now with you, the case is with you.  And it is up to you.

REBUTTAL ARGUMENT / PORRITT

 1      Thank you.

 2          **THE COURT:**  All right.  Thank you, Mr. Spiro.

 3  Mr. Porritt?

 4          **MR. PORRITT:**  Thank you, Your Honor.

 5      That was a lot of words, Mr. Spiro.

 6                    **REBUTTAL ARGUMENT**

 7  **BY MR. PORRITT**

 8      I didn't hear much about what the Court has instructed you

 9  to assume, the basic facts that should drive your determination

10  in this case.  And that is the assumption that the tweet

11  "Funding secured" was false.  That the tweet "Investor support

12  is confirmed" is false.  That is something you have to assume

13  for purposes of your deliberation.

14      Another fact that you must assume is true for the purposes

15  of your deliberation is that Elon Musk acted fraudulently when

16  he made those tweets.

17          **MR. SPIRO:**  Objection.  He --

18          **MR. PORRITT:**  That he acted with reckless disregard

19  for the truth of those tweets.  That is scienter, under Rule

20  10b-5, that is fraud.  That is the relevant state of mind to

21  establish a fraud count under the securities laws.  That is

22  what the jury instructions say, as you should follow, and that

23  is what you have been instructed to accept for the purposes of

24  your deliberations.

25      So, all those fine words, Elon Musk fraudulently tweeted

1   on August 7th when he said "Funding secured" and when he said

2   "Investor support is confirmed."  That you must accept.  And

3   you can then deliberate on how material those fraudulent tweets

4   were.

5       So once you put that in context, I'll now talk a little

6   bit more about what Mr. Spiro had to say in response.  And the

7   next thing again, very clear, inarguable, what Mr. Spiro says

8   is not evidence.  He told you that at the beginning of his

9   presentation.  He then proceeded to testify for about two

10  hours.

11      So, a few things.  I would check your notes, check

12  veracity of some of what Mr. Spiro says and check it against

13  the transcript, because you might find some surprising things

14  that he told you are just simply not true.  I can think of a

15  couple of examples.

16      He said if Elon Musk had published the August 2nd email,

17  just the email, the stock price would have gone up even more.

18  There is not a single shred of evidence to support that.  They

19  didn't present -- they could have called in an expert to say

20  that.  I don't think they would have found one --

21          **MR. SPIRO:**  Objection; he's continuing to burden-shift

22  on the experts.  We don't have an obligation to call anybody.

23          **THE COURT:**  Overruled.  Overruled.

24          **MR. PORRITT:**  So, think about that when you start

25  considering some of the assertions made by Mr. Spiro in his

**REBUTTAL ARGUMENT / PORRITT**

1    closing.  He made some -- he gave all these colorful details as

2    if he was in the room on July 31st.  Of course, he wasn't in

3    the room.  All of the stuff of what people were feeling, what

4    people saw.

5         Think of the evidence of the witnesses, themselves.  And

6    once again, remember, they're giving their memory from four

7    years ago, after meeting with lawyers to refresh.  I'm not

8    saying they're lying.

9         But, look at the documents at the time.  That is the more

10   relevant, that is the more persuasive, that is the more

11   credible evidence.  As I said, documents do not lie.  Documents

12   speak clearly.  You can trust the documents.

13        And if you look at our cases, look at the cases we

14   presented, the evidence we've presented, most of it, most of

15   the witnesses, we don't control.  They're Tesla witnesses.  But

16   we rely on the documents.  And our case is based on the

17   documents.

18        And the documents clearly show that "Funding secured" --

19   -- first of all, assumed to be true, but "Funding secured" and

20   "Investor support is confirmed" were material.  They did move

21   the stock price.  And then the stock price went down.  That is

22   the evidence.  That is the data.  He says:  Trust the data. I

23   agree.  Look at the data.

24        So another thing Mr. Spiro said, Elon Musk was always

25   going to invest his own money in this deal, apparently.  If you

 1   look at what he actually said, if you look at Exhibit 12, it is

 2   in evidence.  This is the email --

 3       (Document displayed)

 4       **MR. PORRITT:**  This is supposedly the email that we

 5   don't like to talk about, that we're hiding.

 6       Look what he says.  This has nothing to do with

 7   accumulating control: I own 20 percent; I don't envisage that

 8   increasing substantially.

 9       If he uses his own money, of course his own percentage is

10   going to increase.  Here he's saying he's not going to use his

11   own money to increase his ownership of Tesla.

12       **MR. SPIRO:**  Objection --

13       **MR. PORRITT:**  But apparently --

14       **MR. SPIRO:**  That was not what it says.

15       **THE COURT:**  Hold on, hold on.

16   What?

17       **MR. SPIRO:**  That's not what it says.  He's misstating

18   the document.

19       **THE COURT:**  Objection overruled.

20       **MR. PORRITT:**  You know, Mr. Spiro gave his version of

21   the facts.  Now I'll just point out what the facts actually

22   say.  And here we go.  That is what this is saying.

23       So now he's come up with this *ex post* rationalization that

24   he had his own money and that was the deal.  But that wasn't

25   what he said at the time.  So look again.  Look at what the

 1   documents said at the time.

 2        And when we look at the PIF minutes and the relationship

 3   of the PIF, look at the PIF minutes, look at the NDA, look at

 4   the text from Yasir.  Mr. Spiro said that we didn't want him

 5   here.  We tried to get him here, too.

 6             MR. SPIRO:  That --

 7             MR. PORRITT:  So, that is not the case.  Look at what

 8   he said.  Yasir has no motive to lie in those texts.  They're

 9   private text messages between him and Elon Musk.  He never

10   thought they were going to see the light of day.  They speak

11   the truth.

12        Elon Musk, at that point, was a defendant in a government

13   investigation.

14             MR. SPIRO:  Objection to that.  That's not true.

15             THE COURT:  Overruled.

16             MR. PORRITT:  Now, Mr. Spiro also passed a lot of

17   aspersions on myself, my colleagues, Mr. Littleton, saying how

18   we chose -- we cherrypicked everything, apparently.  We

19   cherrypicked "Funding secured" as the important text.  We

20   cherrypicked the class period.

21        Well, if we can pull up Slide 63, "Funding secured."

22        (Document displayed)

23             MR. PORRITT:  This is Deepak Ahuja, Mr. Spiro's best

24   friend, saying -- his is August 7th.  Okay?

25        August 7th, 3:11 p.m. (As read):

1          "We are getting a lot of inquiries from

2          investors, SEC and the media to better

3          understand the comment, 'Funding secured.'"

4     And you saw, Dr. Hartzmark explained it all about how

5  "Funding secured" was an intense focus for analysts, media.

6  You saw the news clip.  Some random talking head, according to

7  Mr. Spiro.  CNBC, the most widely-watched financial news

8  channel in the country.  Mike Santoli, a regular columnist,

9  speaking from the floor of the New York Stock Exchange.  That's

10 not some random person.  And all it is about is about "Funding

11 secured."

12    You heard Ryan Brinkman.  Analyst for JP Morgan.  Another

13 person who apparently Elon Musk likes to smear in his attempt

14 to get out of the consequences of his lies.  You saw Ryan

15 Brinkman on videotape.  He lives in New York and wasn't

16 prepared to fly out here.  He was cross-examined on that video

17 by Mr. Musk's counsel.  But apparently he was hiding from

18 cross-examination.

19    But you heard him.  You saw him.  Does he look like

20 someone with an axe to grind?  Does he look like someone who's

21 out to get Elon Musk?  He's just someone who is doing his job,

22 which is to provide his honest and objective opinion on Tesla

23 and its stock price, to help investors.  If he gets the price

24 wrong consistently, he gets fired.  So he's just doing his

25 best.  And that is what he told us.  And his reports clearly

```
 1   show -- they're a pattern you can follow that he believes the
 2   tweets, believes Elon Musk is going private.  "Funding
 3   secured," 420, "Investor support is confirmed."  He took into
 4   account all of that and wrote his report.
 5        And then he learned -- and again, this was crystal clear
 6   in his testimony.  Mr. Spiro says he doesn't mention the New
 7   York Times article in his analyst report.  But if you read in
 8   his testimony, he says very clearly, it was the New York Times
 9   article that convinced him that those "Funding secured" tweets,
10   the August 7th tweets were no longer accurate or true.  And
11   that is what led him to change his rating to issue his new
12   report.
13        He didn't do it on August 14th after the blog post.  He
14   read the blog post.  He didn't change then.  He changed it
15   after the New York Times article.
16        Once again, if you could pull up -- we were criticized for
17   saying that we were -- the August 17th date, the class period
18   is somehow contrived because we're desperate for some New York
19   Times, you know, (Inaudible) --
20        (Reporter clarification)
21        MR. PORRITT:  We're desperate to get some contrived
22   class period to get damages.
23        Here is -- you can see that chart.  That's data.  That's
24   not something we created.  That's the data.  And that shows the
25   clear reaction of stock prices and stock option prices going,
```

1  ending on August 17th.  That's why the class period is August 7

2  to August 17th.

3      And Mr. Spiro also attacked us for not having any

4  definition of "Funding secured."  We have put forth many --

5          **THE COURT:**  You can take the poster down, if you're

6  not going to use it again.

7      (Request complied with by counsel)

8          **MR. PORRITT:**  Put forth many and consistent

9  definitions of "Funding secured."  We started off with a

10 definition by Martin Viecha.  He says, as firm as it gets.

11 Funding is available without conditions.  That's Martin Viecha.

12 Mr. Spiro didn't talk about those emails from Martin Viecha.

13     Ryan Brinkman, again: Funding is either secured or is

14 unsecured.  That's a nice definition for you.

15     Funding -- Joe Fath -- locked and loaded.  A hundred

16 percent ready to go.  You cannot read the evidence about the

17 PIF's interaction with Elon Musk and say that funding was

18 100 percent ready to go.  They didn't even know how much was

19 needed.

20     On August 13th, the blog post, I think almost we agree,

21 Mr. Spiro and I, because he says the August 13th blog post

22 confirms the -- the August 7th tweets.  And we also say the

23 August 13th blog post helped confirm the August 7th tweets.  I

24 guess our difference of opinion is, of course, the August 7th

25 tweets are false, and fraudulently so, and that's what you have

**REBUTTAL ARGUMENT / PORRITT**

1   to assume when you're doing your deliberation so they are

2   confirming -- August 13th blog post confirms fraudulent tweets.

3   That is why the stock price didn't go down.  It's not a

4   corrective disclosure, it's not disclosing the fraud.  It's

5   continuing the fraud.

6       And even though it's not an actionable misrepresentation

7   here for you to decide, that doesn't matter when it comes to

8   calculating the damage.  The harm was in the stock price from

9   August 7th, and it stayed until August 17th, and the

10  August 13th blog post did not remove it.  That is the important

11  fact.

12      And that is what was explained by Dr. Hartzmark in his

13  analysis when he went through.  And again, they tell you about

14  he doesn't disaggregate.  That was an attack on Dr. Hartzmark,

15  that he did not disaggregate.  That is just not true.

16      Dr. Hartzmark disaggregated -- first of all, disaggregated

17  market effects.  That was very clear.  That's what gets him

18  from -- takes out $7 of the decline due to market effects,

19  nothing to do with the fraud.

20      And then he looked at, qualitatively, every single news

21  story.  None of the negative price movement during the class

22  period was attributable to any cause other than the fraudulent

23  tweets.

24      And he looked at the increase.  Mr. Spiro talked about

25  there was no statistical significant decline between August 7th

 1   and August 13th, and that means therefore it's just some random

 2   event.  You look at the chart.  You see the evidence.  You saw

 3   the evidence that Dr. Hartzmark described.  You see the analyst

 4   reports.  Is this some random event?  What is going on during

 5   this period?

 6       There are 2,400 news stories in ten days.  Fifty analyst

 7   reports, five a day.  Normally there's one every -- usually

 8   there's five every three months.  So, that is what is going on

 9   here.

10       And we do have a statistical increase, statistically

11   significant price move, and it's at the beginning of the class

12   period after the tweets.  Mr. Spiro didn't talk about that.

13   That was introduced by the tweets, that is caused by the

14   tweets.  Where did it go?  According to Mr. Spiro, it just

15   vanished into thin air.  The markets do not work that way.

16   Mister -- Dr. Hartzmark worked it out, came up with a

17   calculation and presented that calculation.

18       Now they say that Professor Heston concedes that

19   apparently nothing to do with the price movement was anything

20   to do with the "Funding secured" statement.

21       Professor Heston wasn't a damages expert.  He was talking

22   about the option prices and the movements on option prices.

23   And in any event, that statement, Mr. Spiro left out or didn't

24   emphasize a key contingent on that.

25       Professor Heston said if it was believed, at the same --

1  if the market believed the information without "Funding

2  secured," then you would expect the price movement.

3       Well, the reaction to the "Funding secured" from

4  everybody, from Ryan Brinkman, from Joe Fath, Martin Viecha,

5  all show that "Funding secured" fundamentally changed and made

6  it more believable that Elon Musk was going private at 420.

7  Of course, it changed it.  Elon Musk intended it to change.

8  Elon Musk intended "Funding secured" to affect investors and

9  tell them something about the first sentence.

10      So this supposed great concession that kills our damages

11  theory is nothing of the kind.  It's just an empty lawyer trick

12  for Mr. Spiro to come up here and tell you.

13      (Note handed up to the Court)

14           THE COURT:  You have about five minutes left.

15           MR. PORRITT:  I'm just wrapping up, Your Honor.

16      And finally, you know, we had some testimony, you know,

17  almost emotional testimony from Mr. Spiro about Elon Musk's

18  care for retail investors, his investors, small investors.

19      What we have -- you've seen two small investors.  The only

20  two small investors that testified in this trial have been

21  Mr. Littleton and Tim Fries.  Both of whom are supporters of

22  Tesla.  Both of whom believed Elon Musk at the time.  Both of

23  them have purchased Tesla motor vehicles.  These are not people

24  who are out to get Elon Musk.  They are not looking for a

25  payday at the expense of Elon Musk.  They believed in him.  And

 1   they were let down and betrayed by him when he made these false

 2   tweets.

 3        And what does Elon Musk do?  He's retained all these

 4   lawyers, and all they do is smear Glen Littleton and Tim Fries

 5   from one side of this courtroom to the other.  Is that how you

 6   treat small investors?  Is that how a person who cares about

 7   small investors acts to them?

 8        Elon Musk has not expressed the slightest bit of regret

 9   about the harm that he has put Glen Littleton through.  That

10   Glen Littleton felt that his almost entire world was being

11   destroyed that afternoon of August 7th when he saw his life

12   savings that he placed into Elon Musk, that he believed in, was

13   going up in smoke around him.  All as a result of this tweet

14   that Elon Musk tweeted on the way to the airport, and then got

15   into his plane and flew off.  That is what we're talking about

16   here.  So don't listen to this high-minded rhetoric about Elon

17   Musk is out for the little guy.  Because that's just not true.

18        And finally, I said at the beginning of my closing, you

19   know, this is an important trial.  This is about rules.  This

20   is about applying rules to billionaires like Elon Musk.  All of

21   corporate America is watching this trial.  And looking for your

22   decision.

23        The decision is:  Do the rules apply to everyone, or can

24   Elon Musk do whatever he wants, and not face the consequences?

25        I ask you, don't let that happen.  Consider your verdict.

1  Don't compromise.  Find every statement false, as it should be

2  found false.  Find Elon Musk and Tesla liable.  And return,

3  record the full amount of damages.  And I trust you will do

4  that.

5      So thank you, thank you for your time.

6      And, that completes my presentation.  Thank you.

7          **THE COURT:**  All right.  Thank you, Mr. Porritt.

8      Let me give you some final instructions, members of the

9  jury.

10     And I don't know if we can have help putting those up,

11 starting with No. 17.

12     (Document displayed)

13         **THE COURT:**  There we are, okay.  Thank you.

14                    **JURY INSTRUCTIONS**

15 **BY THE COURT**

16     First, your duty to deliberate.

17     When you begin your deliberations elect one member of the

18 jury as your foreperson who will preside over the deliberations

19 and speak for you here in court.

20     You will then discuss the case with your fellow jurors to

21 reach agreement if you can do so.  Your verdict must be

22 unanimous.

23     Each of you must decide the case for yourself, but you

24 should do so only after you have considered all the evidence,

25 discussed it fully with the other jurors, and listened to the

1   views of your fellow jurors.

2       Do not be afraid to change your opinion if the discussion

3   persuades you that you should.  But do not come to a decision

4   simply because other jurors think it is right.

5       It is important that you attempt to reach a unanimous

6   verdict but, of course, only if each of you can do so after

7   having made your own conscientious decision.  Do not change an

8   honest belief about the weight and effect of the evidence

9   simply to reach a verdict.

10      Perform these duties fairly and impartially.  Do not allow

11  personal likes or dislikes, sympathy, prejudice, fear, public

12  opinion, or biases, including unconscious biases, to influence

13  you.  You should also not be influenced by any person's race,

14  color, religion, national ancestry or gender, sexual

15  orientation, profession, occupancy [sic], celebrity, economic

16  circumstances or position in life or in the community which are

17  not based on the evidence presented at trial.

18      And please do not take anything I may say or do during the

19  trial as indicating what I think of the evidence or what your

20  verdict should be.  That is entirely up to you.

21      It is your duty as jurors to consult with one another and

22  to deliberate with one another with a view towards reaching an

23  agreement if you can do so.  During your deliberations, you

24  should not hesitate to reexamine your own views and change your

25  opinion if you become persuaded that it is wrong.

1    Conduct of the jury.

2    Because you must base your verdict only on the evidence

3    received in the case and on these instructions, I remind you

4    that you must not be exposed to any other information about the

5    case or the issues it involves.

6    Except for discussing the case with your fellow jurors

7    during your deliberations:

8    Do not communicate with anyone in any way and do not let

9    anyone else communicate with you in any way about the merits of

10   the case or anything to do with it.  This includes discussing

11   the case in person, in writing, by phone, tablet, computer, or

12   any other means, via email, via text messaging, or any internet

13   chatroom, blog, website, or application, including but not

14   limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

15   Snapchat, Tik-Tok, or any other forms of social media.  This

16   applies to communication with your family members, your

17   employer, the media or press, and the people involved in the

18   trial.  If you are asked or approached in any way about your

19   jury service or anything about this case, you must respond that

20   you have been ordered not to discuss the matter and to report

21   the contact to the Court.

22   Do not read, watch, or listen to any news or media

23   accounts or commentary about the case or anything to do with

24   it; do not do any research, such as consulting dictionaries,

25   searching the internet, or using other reference materials; and

1  do not make any investigation or in any other way try to learn

2  about the case on your own.  Do not visit or view any place

3  discussed in the case.  Do not use internet programs or other

4  devices to search for or view any place discussed during the

5  trial.

6      Also do not do any research about the case -- about this

7  case, the law, or the people involved, including the parties,

8  the witnesses or the lawyers, until you have been excused as

9  jurors.  If you happen to read or hear anything touching on

10  this case in the media, turn away and report it to me as soon

11  as possible.

12      These rules protect each party's right to have this case

13  decided only on evidence that has been presented here in court.

14  Witnesses here in court take an oath to tell the truth, and the

15  accuracy of their testimony is tested through the trial

16  process.  If you do any research or investigation outside the

17  courtroom, or gain any information through improper

18  communications, then your verdict may by influenced by

19  inaccurate, incomplete or misleading information that has not

20  been tested by the trial process.  Each of the parties is

21  entitled to a fair trial by an impartial jury, and if you

22  decide the case based on information not presented in court,

23  you will have denied the parties a fair trial.  Remember, you

24  have taken an oath to follow the rules, and it is very

25  important that you follow these rules.

1    A juror who violates these restrictions jeopardizes the

2  fairness of these proceedings.  If any juror is exposed to any

3  outside information, please notify the Court immediately.

4    Communication with the Court.

5    If it becomes necessary during your deliberations to

6  communicate with me, you may send a note through the courtroom

7  deputy, signed by your presiding juror or by one or more

8  members of the jury.  No member of the jury should ever attempt

9  to communicate with me except by a signed writing.  I will

10  communicate with any member of the jury on anything concerning

11  the case only in writing, here in open court.  If you send out

12  a question, I will consult with the parties before answering

13  it, which may take some time.  You may continue your

14  deliberations while waiting for the answer to any question.

15  Remember that you are not to tell anyone -- including me -- how

16  the jury stands, numerically or otherwise, until after you have

17  reached a unanimous verdict or have been discharged.  Do not

18  disclose any vote count in any note to the Court.

19    Request for read back.

20    During deliberations, you will not be given a transcript

21  of the trial testimony or any demonstrative slide that has not

22  been admitted into evidence.  If during jury deliberations, one

23  or more members of the jury decide that they would like a

24  readback of some or all of a witness's testimony or to review

25  one or more demonstrative slides, you may send a note through

1    the courtroom deputy, signed by your presiding juror or by one

2    or more members of the jury.  I will consider the request.

3         Return of verdict.

4         A verdict form has been prepared for you.  After you have

5    reached unanimous agreement on a verdict, your foreperson

6    should complete the verdict form according to your

7    deliberations, sign and date it, and advise the courtroom

8    deputy that you are ready to return to the courtroom.

9         With that I'm going to direct the jury to commence your

10   deliberations.  As I indicated, you will have access to all the

11   evidence that has been admitted.  And an index, I understand,

12   has been prepared for you to help you try to find pieces of

13   evidence, if you find that useful.  You will also be given

14   multiple copies of the jury instructions, in case you need to

15   refer to that, as well as the verdict form.  So with that

16   direction, I'm going to charge the jury with the -- to commence

17   the deliberations process.  Thank you.

18        **THE COURTROOM DEPUTY:**  All rise for the jury.

19        (Jury excused)

20        (The following proceedings were held outside of the

21   presence of the Jury)

22        **THE COURT:**  All right.  So, Vicky has your contact

23   information.  You should stay within five, five-to-ten-minute

24   radius so that we can gather if we get any communication from

25   the jury.

1          **MR. SPIRO:**  Yes, Your Honor.

2          **MR. PORRITT:**  I have just one quick thing to note for

3     the record, Your Honor.

4          During Mr. Spiro's closing, he published to the jury the

5     Slide 69 which is an exhibit you, a slide you maintained,

6     upheld an objection to -- and it was shown to the jury, in any

7     event.  So, that ship has sailed obviously but we just want to

8     note for the record that that occurred.

9          **MR. SPIRO:**  I don't -- not only do I not know that

10    that happened, I certainly did not do that consciously.  You

11    know, Mr. Porritt also told them in his rebuttal that he was a

12    defendant in a federal case, which is in the level of severity

13    of egregiousness, almost mistriable.  So I don't think we

14    should be going tit for tat on that.

15         **THE COURT:**  All right.  Well, let's -- the ship has

16    sailed in any event, and, and at this juncture, I'm not going

17    to give any further instructions to the jury.  And so, we will

18    await word from the jury.

19         I think the preliminary indication is that if they need

20    to, they were going to stay in session through a good part of

21    this afternoon, that is my understanding, Ms. Ayala?

22         **THE COURTROOM DEPUTY:**  Yes, until 4:00.

23         **THE COURT:**  Until 4:00.  So, you can count on spending

24    the better part of your afternoon around these hereabouts.

25         **MR. PORRITT:**  Very good, Your Honor.

PROCEEDINGS

```
 1              THE COURT:  So I will be in touch.

 2              MR. SPIRO:  Can we just see the index so we can make

 3    sure all sides are --

 4              THE COURT:  Oh, have you not?

 5              MR. PORRITT:  The index is agreed --

 6              THE COURT:  You need to speak into the microphone.

 7              MR. SPIRO:  We will confirm amongst ourselves to make

 8    sure we have given the Court an index that both sides agree on.

 9              MR. PORRITT:  I think the form of index was agreed,

10    Ms. Ayala --

11              THE COURTROOM DEPUTY:  I was given the flash drive

12    this morning and you are going to upload it into the PC --

13              MR. SPIRO:  Well, until we do that, let's make sure

14    that both sides agree on it because I don't know --

15              THE COURT:  Why don't you do that immediately.

16    Because I promised we would get that to them.  I had understood

17    that both sides had reviewed the index and agreed --

18              THE COURTROOM DEPUTY:  Uh-huh.

19              THE COURT:  But if that hasn't happened, we better do

20    that right now.

21              THE COURTROOM DEPUTY:  The jury is having lunch now.

22              MR. SPIRO:  The exhibit index was agreed, what wasn't

23    agreed is where we left off is we're not, I'm not putting, I

24    want you to review these depo clips and they are not putting we

25    want you to review these demonstratives on the exhibit list.
```

1    That's -- that was the only issue.

2        So if the exhibit list is just the exhibits, as it is in

3    every trial, then there is no issue.

4        **MR. APTON:**  Your Honor, it's the exhibits plus a list

5    of the demonstratives that were shown to the jury with

6    descriptions.  As we discussed earlier.

7        **MR. SPIRO:**  Yeah, that's not acceptable.  And that --

8    that never happens in trials, and we would object to that.  The

9    demonstratives --

10       **THE COURT:**  So that had not been stipulated to?

11       **MR. SPIRO:**  Absolutely not.  In fact, there's case law

12   in my hand that says we shouldn't do that.  So I'm not

13   stipulating to that.  It never happens in trials.

14       Just like I can't write into the -- the verdict form other

15   things I want them to ask for --

16       **THE COURT:**  If it's not stipulated to, it needs to be

17   removed.

18       **MR. SPIRO:**  Thank you.

19       **THE COURT:**  I thought it had been stipulated to.  So

20   let's square that away.

21       **MR. APTON:**  I thought it was, too, Your Honor.  We

22   were here in court the other day.  And when we left off,

23   everything was fine.  There was going to be a list of

24   demonstratives.

25       Nothing was going to be put into evidence but --

 1              THE COURT:  No, I understand that, I understand that.

 2    But there is an issue about suggestiveness, if you begin to

 3    identify certain demonstratives, even if those are the ones

 4    shown, because they're not in evidence, so the jury will have

 5    to ask for it.

 6         I had raised it, whether that was going to be acceptable

 7    to facilitate it.  And my understanding was the parties were

 8    going to talk about it.  And I didn't -- I hadn't heard back

 9    until just now that there's a disagreement about that.  And if

10    there's a disagreement about that, I'm not going to submit it

11    to the jury.

12              MR. APTON:  Sure, Your Honor, I wasn't aware there

13    wasn't an agreement.

14              THE COURT:  So we should withdraw --

15              THE COURTROOM DEPUTY:  The jury doesn't have anything

16    yet.

17              THE COURT:  Okay, good.

18              THE COURTROOM DEPUTY:  I was waiting for them to have

19    lunch.

20              THE COURT:  All right, so let's get a clean copy,

21    corrected copy of that index so we can get it to them.

22         Now, the parties have signed off on the exhibit list.

23    Correct?

24              THE CLERK:  I have the confirmation right here,

25    signed.

1        **MR. SPIRO:**  The exhibit list, yes.

2        **THE COURT:**  I don't want any misunderstanding about

3   that.

4        **MS. TRIPODI:**  Your Honor, there was -- and I'm not

5   sure that this has been resolved, but there was, in the exhibit

6   list submitted by defendants, several of the descriptions for

7   the exhibits.

8        When we had initially done it, we used what we did for the

9   Court where we described -- like, for example the PIF meeting

10  minutes, it said "Minutes of PIF," and that had been changed on

11  the exhibit list defendants circulated to just say "Meeting

12  minutes."

13       So we would ask that we could go back to the

14  descriptions -- which were not prejudicial, but they were the

15  descriptions that were in the original joint exhibit list that

16  we submitted to the Court.

17       **THE COURT:**  Well, now you're telling me that there is

18  a dispute over the exhibit list.  So how -- how many, how many

19  problems do we have here?

20       **MR. SPIRO:**  Let us get -- if it's okay with the Court,

21  because this is above my head a little bit, if we can just

22  speak for five minutes I bet we can work it out and alleviate

23  that --

24       **THE COURT:**  All right, I prefer you do that.

25       **MS. TRIPODI:**  Thank you.

1    **THE COURT:**  But if not, please let me know, because I

2    do want to get them the list and I want a stipulated-to list.

3    **MS. TRIPODI:**  Understood, Your Honor.  Thank you.

4    **THE COURT:**  All right.  Thank you.  We will reconvene

5    when the call.  Let me --

6    **THE COURTROOM DEPUTY:**  Court is in recess.

7    **THE COURT:**  Let me just say that -- let me commend

8    counsel for a very hard-fought case.  I think each side was

9    obviously well-represented in this matter.

10    I will complain that you haven't made it particularly easy

11   on the Court, notwithstanding my attempts to rein you in, noted

12   by even late filings as of last night.  But I've survived, and

13   we're here.

14    **MR. SPIRO:**  Yes.  You didn't make it easy on the

15   defense, either, Your Honor, but we appreciate the Court's hard

16   work, and I genuinely mean that.  And to all of the folks that

17   work beside you.

18    **THE COURT:**  Well, every case is important.  And of

19   course, this case is no exception, and I -- and I think you've

20   noticed that this has been a very attentive jury.  Whatever

21   happens, this jury seems to have been very attentive.

22    And I will note one thing as an aside.  It has nothing to

23   do with this case, but I found it sort of interesting.  When I

24   look at that jury it's a very -- appears to be a very diverse

25   jury, somewhat reflective of our district here.  And not

1  unusual, which I think is a good thing.  I mean, we try to

2  achieve a fair cross-section as best we can, of the jury pool.

3      I will say that the counsel tables don't quite reflect

4  that same richness.  But I just mention that.  Has nothing to

5  do with this case.  But I do think, you know, that that's a

6  larger issue for another day.

7          MR. SPIRO:  It's important.  Important, and well said.

8  Thank you, Your Honor.

9          MR. PORRITT:  Thank you, I appreciate your comments

10 too, Your Honor.

11         THE COURT:  Thank you.

12         MR. PORRITT:  And your hard work.

13         THE COURTROOM DEPUTY:  Court is in recess.

14     (Recess taken from 12:52 p.m. to 2:48 p.m.)

15     (The following proceedings were held outside of the

16 presence of the Jury)

17         THE COURT:  All right.  Have a seat, everyone.  Okay,

18 we have word that the jury has reached a verdict.  That's why

19 we're calling you back.  So if everybody's here, let's invite

20 the jurors in.

21     (A pause in the proceedings)

22     (The following proceedings were held in the presence of

23 the Jury)

24         THE COURTROOM DEPUTY:  All rise for the jury.

25         THE COURT:  All right, have a seat.  So members of the

**PROCEEDINGS**

1   jury, I understand that the jury has reached a verdict in this

2   the matter?

3        (Members of the Jury indicates in the affirmative)

4        **THE COURT:**  All right, and I see Mr. Cadogan shaking

5   your head.

6        **JURY FOREPERSON:**  Yes.

7        **THE COURT:**  And you are the foreperson.

8        **JURY FOREPERSON:**  Yes.

9        **THE COURT:**  And you have the verdict in hand there?

10       **FOREPERSON:**  I do.

11       **THE COURT:**  All right.  Ms. Ayala, could you retrieve

12   the envelope, please.

13       **THE COURTROOM DEPUTY:**  Thank you.

14       (Document handed up to the Court)

15       **THE COURT:**  Thank you.

16       **THE COURTROOM DEPUTY:**  You're welcome.

17       (The Court examines document)

18       **THE COURT:**  All right.  Ms. Ayala, could you read the

19   verdict, please.

20       **THE COURTROOM DEPUTY:**  Thank you.

21       Ladies and gentlemen of the jury, listen to your verdict

22   as it will stand recorded.

23       United States District Court, Northern District of

24   California, In Regarding Tesla Inc. Securities Litigation.

25   Case No. 18-4865.  Verdict Form.

1        RULE 10B-5 CLAIM:   LIABILITY.

2        Statement No. 1: "Am considering asking (sic) Tesla

3   private at 420.  Funding secured."

4        No. 1.  Has Plaintiff proved their Rule 10b-5 claim

5   against Elon Musk for Statement No. 1, identified above?

6        No.

7        No. 2.  Has Plaintiff proved their Rule 10b-5 claim

8   against Tesla, Inc., for Statement No. 1, identified above?

9        No.

10        Statement No. 2:  "Investor support is confirmed.  Only

11   reason why this is not certain is that it's continent on a

12   shareholder vote." [sic]

13        No. 3.  Has Plaintiff proved their Rule 10b-5 claim

14   against Elon Musk for Statement No. 2, identified above?

15        No.

16        No. 4.  Has Plaintiff proved their Rule 10b-5 claim

17   against Tesla Inc. for Statement No. 2 identified above?

18        No.

19        IF YOU CHECKED "YES" FOR ONE OR MORE QUESTIONS FOR

20   STATEMENT NO. 1 AND 2, PLEASE PROCEED TO THE NEXT PAGE.

21        IF YOU CHECKED NO FOR EVERY QUESTION IN STATEMENTS 1 AND

22   2, PLEASE PROCEED TO SECTION E.

23            **THE COURT:**  And the verdict's been signed by the

24   foreperson on Section E?

25            **THE COURTROOM DEPUTY:**  It has.

1          **THE COURT:**  All right.  Well, let me ask, ladies and

2  gentlemen of the jury, is that the verdict of -- is that your

3  verdict?

4      (Jury indicates in the affirmative)

5          **THE COURT:**  Everybody's shaking their head.  Any

6  request to poll the jury?

7      (Off-the-Record discussion between counsel)

8          **MR. PORRITT:**  Yes, Your Honor.  Please.

9          **THE COURT:**  All right.  Let me ask each of you then,

10  Juror No. 1, Mr. Tinapay, is that your verdict?

11          **JUROR NO. 1:**  Yes.

12          **THE COURT:**  Juror No. 2, Mr. Martinez, is that your

13  verdict?

14          **JUROR NO. 2:**  Yeah.

15          **THE COURT:**  And Juror No. 3, Ms. Richard, is that your

16  verdict?

17          **JUROR NO. 3:**  Ricard.  Yes.

18          **THE COURT:**  And Mr. Sharma, is that your verdict?

19          **JUROR NO. 4:**  Yes.

20          **THE COURT:**  And Mr. Moore, is that your verdict?

21          **JUROR NO. 5:**  Yes.

22          **THE COURT:**  And Ms. Cazessus, is that your verdict?

23          **JUROR NO. 6:**  Yes.

24          **THE COURT:**  And Mr. Xi, is that your verdict?

25          **JUROR NO. 7:**  Yes.

1          **THE COURT:**  And Mr. Torres, is that your verdict?

2          **JUROR NO. 8:**  Yes.

3          **THE COURT:**  And Mr. Cadogan, is that your verdict?

4          **JURY FOREPERSON:**  Yes.

5          **THE COURT:**  All right.  The record will reflect the

6     jury has reached a unanimous verdict, as read.  So that will

7     conclude the trial in this case.

8          So let me, on behalf of the parties and the Court, thank

9     you for your service.  It's been three fairly intense weeks.

10    And I know that you've paid very close attention throughout the

11    entirety of this trial, and went through a fairly extensive

12    process just to get you here and get you to this point.  And we

13    appreciate the hard work and the attention and your diligence,

14    as well as your timeliness in being here every day.  So again,

15    on behalf of the parties and the Court, let me thank you.

16         This underscores why we have a jury system here, that this

17    case has been submitted to a jury of -- that represents a fair

18    cross-section of this community to render a verdict and

19    determine the facts and apply the law to the facts.  And so,

20    this is democracy at work.  So thank you for your service.

21         It is my practice to allow to jurors -- should they wish,

22    up to them if they want to speak to the attorneys after.  But

23    it's also their prerogative not to speak with anyone.

24         But I, I do make it a practice to meet at least with the

25    -- and thank the jurors and get any feedback about the process

1   before you leave.  I know it's a Friday, so I don't know if

2   maybe you are all interested in getting going, but if you have

3   a few moments I would like to debrief with you just a bit and

4   find out if there's anything you think we can do to make this

5   process better.

6        And then, if you are inclined to speak with any of the

7   attorneys, I can indicate to them that they should stick around

8   and you might -- you could, if you want, come back and talk to

9   them.  If not, we'll just tell them that you're not inclined to

10  speak with them.

11       So, with that, the jury is discharged.  And thank you

12  again for your service.

13       And counsel, if you could hang out a bit and let me find

14  out whether jurors are interested in speaking with you at all.

15  And plus, we can try to see about further steps from here.

16       All right.  Thank you.

17          **THE COURTROOM DEPUTY:**  All rise for the jury.

18       (Jury excused)

19       (The following proceedings were held outside of the

20  presence of the Jury)

21          **THE COURT:**  All right, so I'll be back in about 20

22  minutes or so.

23       (Conclusion of record of proceedings)

24

25

# **I N D E X**

Friday, February 3, 2023 - Volume 10

|  | **PAGE** | **VOL.** |
|---|---|---|
| Closing Argument by Mr. Porritt | 1991 | 10 |
| Closing Argument by Mr. Spiro | 2031 | 10 |
| Rebuttal Argument by Mr. Porritt | 2107 | 10 |
| Jury Instructions | 2119 | 10 |

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RDR

Saturday, February 4, 2023