1

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
        amccall@zlk.com

*Attorneys for Plaintiff and Counsel for the Class*

[Additional Counsel on Signature Block]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**PLAINTIFF'S MOTION FOR JUDGMENT AS MATTER OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Date: April 6, 2023<br>Time: 1:30 p.m.<br>Location: Courtroom 5, 17th Floor<br>Judge: Hon. Edward M. Chen |

1

### NOTICE OF MOTION AND MOTION

2      **PLEASE TAKE NOTICE** that on April 6, 2023, at 1:30 p.m., in Courtroom 5 – 17th

3 Floor of the United States Court for the Northern District of California, located at 450 Golden

4 Gate Avenue, San Francisco, CA 94102, the Honorable Edward M. Chen presiding, Plaintiff,

5 through his counsel, will move, and hereby does move pursuant to Federal Rule of Civil

6 Procedure 50(b) for judgment as a matter of law on the Rule 10b-5 elements of (1) materiality;

7 and (2) reliance (classwide and individual). Defendants have fully presented their case on these

8 issues and the evidence overwhelmingly supports of Plaintiff. Defendants have failed to proffer

9 evidence to support their claim that the tweets were not material and have not rebutted the "fraud-

10 on-the-market" presumption. The only issue to be decided is the amount of damages caused by

11 Musk's tweets and, pursuant to Federal Rule of Civil Procedure 59, whether the Court should

12 order a new trial with proper instructions to ensure the jury deliberates only on the issues

13 necessary while avoiding confusion and prejudice.

14      **PLEASE TAKE FURTHER NOTICE** that this motion is based on the Memorandum of

15 Points and Authorities below, the record of evidence from trial, the arguments of counsel, and

16 any other matters properly before this Court. Pursuant to Paragraph 11 of the Court's Civil

17 Standing Order, Plaintiff also submits a proposed order.

18

### ISSUES TO BE DECIDED

19      1.    Should the Court grant judgment as a matter of law in favor of Plaintiff on the

20 remaining Rule 10b-5 elements to establish liability because the totality of the evidence admitted

21 during trial shows indisputably that the tweets (1) "Am considering taking Tesla private at $420.

22 Funding secured." and (2) "Investor support confirmed. Only reason why this is not certain is that

23 it's contingent on a shareholder vote." were material?

24      2.    Should the Court grant judgment as a matter of law in favor of Plaintiff on the

25 issue of classwide reliance because Defendants failed to introduce evidence capable of rebutting

26 the "fraud-on-the-market" presumption?

27

28

3.      Should the Court grant judgment as a matter of law in favor of Plaintiff on the issue of direct reliance because the testimony shows Lead Plaintiff Glen Littleton and class member Tim Fries directly relied on the "funding secured" tweet when deciding to invest in Tesla stock and/or options?

4.      Is a new trial warranted in order for the jury to decide damages after receiving proper instructions, including that the only remaining issues to be determined under Rule 10b-5 are the loss causation and the quantum of damages to be awarded because the other elements for liability under Rule 10b-5 have been established as a matter of law and are not subject to further deliberation?

# **TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................1

II.     RELEVANT FACTS ..............................................................................3

    A.      Elon Musk's Testimony ...............................................................3

    B.      Martin Viecha's Testimony .........................................................4

    C.      Testimony from Analysts and Investors. ....................................5

    D.      Testimony from Dr. Michael Hartzmark. ...................................6

    E.      Additional Witness Testimony and Trial Exhibits.....................8

III.    LEGAL STANDARD .............................................................................10

IV.     ARGUMENT ...........................................................................................11

    A.      Plaintiff's Evidence at Trial Establishes Materiality as a Matter of Law. ............11

        1.      Musk Admitted that the "Funding Secured" Tweet Was Material Market-Moving News.........................................................12

        2.      Analysts and Investors Testified that the "Funding Secured" Tweet Was Important and Material Information. ...........................13

        3.      "Funding Secured" Materially Misstated the True State of Affairs that Existed at the Time of the Tweet. ...............................14

        4.      There Is No Dispute that the "Funding Secured" Tweet Was Material.........15

        5.      Defendants Offered Only Speculation and Attorney Argument to Support Their Claim of Immateriality. .......................................16

    B.      Plaintiff's Evidence at Trial Establishes Reliance. .............................19

    C.      A New Trial Should Be Ordered to Allow for the Deliberation of Damages with Proper Limiting Instructions. .........................................20

        1.      With Materiality Decided, the Clear Weight of the Evidence Supports Granting a New Trial. ...............................................20

        2.      The Jury Instructions Created Confusion Amongst the Jurors that Led to the Erroneous Verdict. ...............................................20

V.      CONCLUSION........................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
4
 568 U.S. 455 (2013) ................................................................ 12

5

*In re Atossa Genetics Inc. Sec. Litig.*,
6
 868 F.3d 784 (9th Cir. 2017) ..................................................... 19

7

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ..................................................... 15

8

*Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*,
9
 498 F.2d 1137 (9th Cir. 1974) ................................................... 10

10

*Claiborne v. Blauser*,
11
 934 F.3d 885 (9th Cir. 2019) ..................................................... 11

12

*EEOC v. Go Daddy Software, Inc.*,
 581 F.3d 951 (9th Cir. 2009) ................................................ 20, 25

13

*In re First Alliance Mortgage Co.*,
14
 471 F.3d 977 (9th Cir. 2006) ..................................................... 20

15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
16
 __ U.S. __, 134 S. Ct. 2398 (2014) ........................................... 19

17

*Hatamian v. Advanced Micro Devices, Inc.*,
 No. 14-cv-00226 YGR, 2016 U.S. Dist. LEXIS 34150 (N.D. Cal. Mar. 16, 2016) ................ 19
18

19

*Hesselbein v. Beckham*,
 168 F. Supp. 3d 1252 (E.D. Cal. 2016) ...................................... 11
20

*Hsu v. Puma Biotechnology, Inc.*,
21
 No. 15-cv-00865 (C.D. Cal. Jan. 29, 2019) ............................... 24

22

*In re Intuitive Surgical Sec. Litig.*,
23
 No. 5:13-cv-01920-EJD, 2016 U.S. Dist. LEXIS 178148 (N.D. Cal. Dec. 22, 2016) ............. 19

24

*Jack v. DCo, LLC*,
 837 F. App'x 421 (9th Cir. 2021) .............................................. 11
25

26

*Janich Bros., Inc. v. Am. Distilling Co.*,
 570 F.2d 848 (9th Cir. 1977) ..................................................... 11

27

*Lakeside-Scott v. Multnomah Cnty.*,
28
 556 F.3d 797 (9th Cir. 2009) ................................................ 10, 11

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ......................................................................................... 12

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ......................................................................................... 11

*Murphy v. City of Long Beach*,
   914 F.2d 183 (9th Cir. 1990) ......................................................................................... 20

*Nutri-Metics Int'l, Inc. v. Carrington Lab'ys, Inc.*,
   1992 WL 389246 (9th Cir. Dec. 22, 1992) .................................................................... 24

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D. Cal. 2008) ................................................................................... 13

*Peralta v. Dillard*,
   744 F.3d 1076 (9th Cir. 2014) ....................................................................................... 10

*Raynor Bros. v. Am. Cyanimid Co.*,
   695 F.2d 382 (9th Cir. 1982) ......................................................................................... 11

*In re Regeneron Pharm., Inc. Sec. Litig.*,
   2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 1, 2005) ................................................. 13

*S.E.C. v. Reyes*,
   491 F. Supp. 2d 906 (N.D. Cal. 2007) .......................................................................... 12

*STM Networks, Inc. v. Clay Pac. S.R.L.*,
   224 F. App'x 609 (9th Cir. 2007) .................................................................................. 24

*STM Networks, Inc. v. Clay Pac. S.R.L.*,
   Case No. SACV03-1796-DOC (MLGx) (C.D. Cal., Feb 17, 2005) ............................... 24

*TSC Industries, Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ................................................................................................. 11, 12

*United States SEC v. Ustian*,
   229 F. Supp. 3d 739 (N.D. Ill. 2017) ............................................................................ 13

*Weaving v. City of Hillsboro*,
   763 F.3d 1106 (9th Cir. 2014) ....................................................................................... 10

**Other Authorities**

Joel Rosenblatt, *Elon Musk Jury Verdict: Case Against Tesla TSLA CEO 'Disorganized'*
   (Bloomberg, Feb. 3, 2023) ............................................................................................. 24

**Rules**

11 Fed. Prac. & Proc. §2806 (3d ed.).............................................................................. 11

Fed. R. Civ. P. 50 (adv. cmt. note 1991 amend)........................................................... 11

Fed. R. Civ. P. 50(a)............................................................................................... 1, 10

Fed. R. Civ. P. 50(b)............................................................................................. 10, 11

Fed. R. Civ. P. 59...................................................................................................... 11

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The jury's verdict in favor of Defendants should be set aside. The Court entered summary judgment in Plaintiff's favor that the August 7 tweets "funding secured" (Exhibit 8) and "investor support is confirmed" (Exhibit 13) were false and made with scienter by Elon Musk. At trial, documentary evidence and testimony from nearly a dozen witnesses overwhelmingly established that both these tweets were material when made on August 7, 2018. In particular, the critical expert testimony presented by Plaintiff on this technical issue was unrebutted by Defendants. Therefore, there was no legally sufficient evidentiary basis to find that the tweets were *not* material or that Plaintiff is *not* entitled to classwide reliance under the "fraud-on-the-market" presumption (which only depended on a finding of materiality). The sole issue that should have been left for the jury to decide was the question of loss causation and the amount of damages to be awarded to Plaintiff and the Class.

Yet, the issues of materiality and reliance were nonetheless permitted to go to the jury even though the evidence overwhelmingly supported Plaintiff and in no way, shape or form provided the jury with a "legally sufficient evidentiary basis" to conclude otherwise. FED. R. CIV. P. 50(a). Thus, it is evident that the jury's ultimate verdict was the result of an erroneous deliberation process influenced by prejudicial and improper attorney argument, speculative testimony, and confusing jury instructions. While each reason is sufficient in its own right to support a new trial, Defendants' lack of proof combined with the flawed and prejudicial deliberation compel the Court to intervene and grant Plaintiff's motion.

Plaintiff provided the jury with extensive evidence that Musk's tweets were material to investors. Musk openly admitted that he intended his August 7 tweets to be read and relied upon by his followers on Twitter. Immediately following the tweets, analysts and investors barraged Tesla's investor relations head, Martin Viecha, with emails seeking clarification on the words "funding secured" and the subsequent tweets. Analysts and news commentators similarly focused their reporting on "funding secured" and "investor support is confirmed", what those words meant, and how they impacted the stock. Testimony from other witnesses further confirmed the

materiality of the tweets in Exhibits 8 and 13, with Dr. Michael Hartzmark, in particular, offering extensive and unrebutted quantitative and qualitative analyses proving without exception that the "funding secured" tweet in Exhibit 8 and the "investor support confirmed" tweet in Exhibit 13 were material and the price impact continued from August 7, 2018 to August 17, 2018. By comparison, Defendants offered nothing. They proffered no evidence showing that the tweets were immaterial. Nevertheless, the jury returned a verdict in favor of Defendants. The evidence admitted at trial does ***not*** support this verdict. The jury did not have a legally sufficient evidentiary basis to find that the tweets were ***not*** material or that Plaintiff was ***not*** entitled to classwide reliance under the "fraud-on-the-market" presumption.

The jury instructions created confusion amongst the jurors, which ultimately led to an erroneous verdict. Instead of focusing on evidence relevant to the remaining element of "materiality" to reach a verdict, the jury relied on attorney argument, speculation, and statements elicited by Defendants' counsel improperly revisiting the issues decided on summary judgment. They accepted as evidence that a "handshake" deal with the Saudi PIF had occurred, that Musk could have raised funding for the go-private transaction if necessary, and that the first part of the "funding secured" tweet was the "most important" part of the tweet. This did not constitute a sufficient evidentiary basis for finding in favor of Defendants. The absence of evidence in this regard was exacerbated by repeated improper statements from Defendants' counsel during opening and closing statements (and, indeed, by witnesses under examination by defense counsel) suggesting if not outright representing that funding had in fact been "secured" and that Musk had acted in good faith, *i.e.*, with a non-culpable state of mind. Defendants and their attorneys also misleadingly discredited key pieces of evidence, including text messages from Yasir Al-Rumayyan (Exhibit 121) and meeting minutes for the July 31 meeting (Exhibit 80), by claiming that Plaintiff had intentionally excluded the Saudi PIF from testifying at trial. This was absolutely not true. The jury was not instructed properly on these points and, as a result, engaged in a confused and prejudicial deliberation process. Plaintiff should be granted a new trial.

## II.     RELEVANT FACTS

### A.     Elon Musk's Testimony

Musk testified to the materiality of the "funding secured" tweets (both Exhibits 8 and 13). During the first day of his testimony, Musk admitted he intended these tweets to reach his "millions of followers," that his tweets affected the price of Tesla's stock, and that information about Tesla in his tweets was "information that [Musk] think[s] the public should hear." 1/20 Tr. at 681:23-685:5. Then, during the following day of his testimony, Musk admitted that "funding secured" was one of the three central pieces of information he sought to disclose to the market on August 7, 2018 and intentionally did so for the purpose of "communicat[ing] this to all investors of Tesla" and "wanted them to rely on this tweet . . . in making their decisions about buying or selling Tesla securities." 1/23 Tr. at 787:7-788:4. Musk even admitted that he expected "there would be some increase" in the price of Tesla's stock in response to his tweet. *Id*. at 789:22-25. Moreover, Musk acknowledged that news of his funding to take Tesla private was "material non-public information." *Id*. at 746:16-22. He also acknowledged that this information should not have been disclosed during market hours because "you would not disclose important information during a trading day." *Id*. at 786:7-13. Indeed, the disruption caused by the "funding secured" tweets led to Nasdaq halting trading in Tesla shares on August 7. *Id*. at 804:3-10. Musk exacerbated this disruption with his second tweet—"Investor support is confirmed . . . ."—given that he made it without having spoken to any investors other than the Saudi PIF. *Id*. at 863:19-23. This tweet, too, was intended to be read by investors, as explained by Musk during his testimony. 1/24 Tr. at 938:3-14.

Further proof of materiality comes from an internal email Musk received. Musk posted an employee email to Tesla's blog on August 7 (which was provided to the public vis-à-vis the "Investor support is confirmed" tweet (Exhibit 13)). The post did not contain anything further or "specific about funding." 1/23 Tr. at 804:18-19. Following the email's posting, Tesla's former CFO, Deepak Ahuja, emailed Musk alerting him that "We are getting a lot of enquiries from investors, SEC and the media to better understand the comment 'Funding secured.'" *Id*. at 811:16-812:11 (referring to Exhibit 337). This is proof positive that "funding secured" was an important

1   piece of information behind the market's reaction to the tweets.

2       **B.**    **Martin Viecha's Testimony**

3       Martin Viecha, Tesla's Senior Director of Investor Relations, also provided compelling

4   evidence bearing directly on the materiality of the "funding secured" tweets. He began his

5   testimony by confirming he "immediately" began receiving inquiries in response to the tweets.

6   1/24 Tr. at 1052:23-1053:4. These inquiries came from well-known analysts following Tesla. Itay

7   Michaeli from Citi asked, "The employee letter didn't make clear whether there is an actual

8   transaction on the table (with secured financing) or if this is more of a strategic announcement to

9   consider pursuing such transaction." *Id*. at 1054:10-17 (quoting Exhibit 146). Mr. Michaeli's

10   question tracks precisely with the parties' competing views on the tweet and, tellingly, Mr.

11   Viecha's response squarely supports Plaintiff's argument. In response to Mr. Michaeli's question,

12   Mr. Viecha writes: "The very first tweet mentioned a firm offer." *Id*. at 1055:7-11.

13       Mr. Viecha repeated his response to other analysts and investors, including:

14   - Bradley Erickson from KeyBank. Mr. Erickson wrote: "He said financing is

15   secured but in the letter he doesn't address this. Can you clarify?" Mr. Viecha
    responded: "I can only say that the first tweet clearly stated that 'financing is

16   secured.' Yes, there is a firm offer." *Id*. at 1058:8-1059:18 (referring to Exhibit
    150);

17
18   - Owuraka Koney from Jennison Associates. Mr. Koney wrote: "Nothing on
    funding, though?" Mr. Viecha responded: "The very first tweet simply mentioned

19   'Funding secured' which means that that is a firm offer. . . . I would assume that
    given we went full-on public with this, the offer is as firm as it gets." *Id*. at

20   1060:14-1062:24 (referring to Exhibit 58); and

21   - Toni Sacconaghi from Bernstein Alliance. Mr. Sacconaghi asked: "What does

22   'Financing secured' actually mean? Are you assuming Tesla will need 60 billion
    plus in financing, or assuming that many shareholders don't take the offer and

23   Tesla needs less? Big difference. 'Financing secured' implies the former." Mr.
    Viecha responded unequivocally, "It means that financing is secured regardless of

24   other assumptions." *Id*. at 1064:17-1066:14 (referring to Exhibit 151).

25       Mr. Viecha confirmed on cross-examination there were "many that asked the same thing"

26   as the above analysts. *Id*. at 1098:11-23 (Q Was he the only analyst who asked you what [the

27   'funding secured'] phrase meant? A No. There were many that asked the same thing [referring to

28

Exhibit 151].").[1] Moreover, Mr. Viecha testified that he did not view the "funding secured" tweet separately but instead as one succinct message. *Id.* at 1056:19-1057:6 (Q Did you interpret "Funding secured" as being part of the firm offer? A I really didn't think about it as a – as a separate statement . . . ."). Mr. Viecha also received numerous questions about the "Investor support is confirmed" tweet, demonstrating its importance to the market. 1/25 Tr. at 1278:9-11.

### C.     Testimony from Analysts and Investors.

Messrs. Brinkman, Fath, and Koney testified at length about the materiality of the "funding secured" tweets. Given their role in the market as analysts who closely followed Tesla, their opinions and observations are highly credible and of significant import. In response to "Funding secured," Ryan Brinkman, a J.P. Morgan analyst, increased his price target "very materially" from $195 to $308. Brinkman Tr. 72:24-73:15. In the note, Brinkman provided reasons for increasing his price target and stated "Either funding is secured or it is not secured, and Tesla CEO says funding is secured." Ex. 15. Mr. Brinkman further testified that the "investor support" tweet was an "important source" for his note as it was "completing in my mind the questions that I had" following the "funding secured" tweet. Brinkman Tr. 61:2-64:2.

Joseph Fath, a Vice President at T. Rowe Price, confirmed that he believed "Funding secured" was material. Fath Dep. Tr. 45:23-46:8 ("Q. What was your understanding of the meaning of the words 'investor support is confirmed'? A. Well, with the funding secured Tweet followed by this, that he had it lined up, whatever investors that may be, to support the transaction and be able to take them private. That was my, you know - - and again, I think it just reinforced the funding secured.").

Owuraka Koney of Jennison Associates, a significant investor in Tesla, confirmed that it was important to him that the CEO of Tesla had said that funding was secured publicly. Koney Dep. Tr. 71:20-22 ("Q. Was it important to you that the CEO of Tesla had said that funding was secured publicly? A. Yes.").

---

[1] *See also* Exhibits 145, 146, 147, 150, 151, 155 (emails from investors and discussion of media feedback focusing on "funding secured").

1          D.        Testimony from Dr. Michael Hartzmark.

2          Dr. Hartzmark provided qualitative and quantitative analysis of the "funding secured" and

3  "investor support" tweets. Following the tweets, he observed an "immediate[] . . . spike in

4  volume" and "spike in the price." 1/31 Tr. at 1651:10-12. He also observed an "immediate[] spike

5  up" once trading resumed after the Nasdaq halt. *Id*. at 1651:21-25. The tweets also had an

6  immediate impact on the price of Tesla's options. *Id*. at 1653:3-12. Dr. Hartzmark concluded that

7  the tweets were "economically material" because they "change[d] the mix and alter[ed] buying

8  and selling decisions" within the market. *Id*. at 1656:21-1657:1. According to Dr. Hartzmark, "the

9  tweets caused a material impact on the prices of the Tesla stock." *Id*. at 1657:2-7.

10         Dr. Hartzmark explained that Nasdaq also considered the tweets to be material, given the

11 fact that they halted trading on August 7. *Id*. 1657:19-1658:6 ("The trading halt in Nasdaq was

12 basically because it was at least Nasdaq's opinion that there was material information that was

13 going to be disclosed and so that, that in and of itself, would support . . . the information is

14 material."). Dr. Hartzmark also engaged in a quantitative analysis to evaluate the materiality of

15 the tweets. He testified that he performed a statistical study referred to as a "regression" analysis

16 and confirmed with 95% certainty that Tesla's stock price moved in response to the tweets (and

17 not from unrelated market factors). *Id*. at 1658:7-1659:20. The materiality of the tweets also

18 impacted stock options and convertible notes. *Id*. at 1661:16-20.

19         Qualitatively, the evidence also established without a doubt that the tweets were material.

20 Dr. Hartzmark relied on news reports, including CNBC (Exhibit 521), as well as internal emails

21 (Exhibit 337) and analyst reports and emails (Exhibits 15, 151). *Id*. at 1662:2-1666:7. These

22 materials each focused with laser precision on the import of "funding secured" as well as the level

23 of investor support and demonstrated how the market responded to those two words. CNBC

24 highlighted the announcement while other analysts attempted to elicit further information from

25 Tesla as to what Musk meant (*i.e.*, whether an offer had been received or a written commitment

26 had been given). As J.P. Morgan said, "As surprising to us as these developments are, and as

27 lacking as the statements are in any details regarding who is expected to provide the required

28 amount of financing and on what terms, they are nevertheless declarative statements from the

1    CEO of a public company which we feel should be considered seriously. Either funding is secured

2    or it is not secured, and Tesla's CEO says funding is secured." Exhibit 15. As explained by Dr.

3    Hartzmark, J.P. Morgan's report was especially meaningful because it materially increased the

4    bank's "price target" for Tesla stock, which required approval at senior levels. *Id*. at 1668:13-

5    1670:11. For Dr. Hartzmark "materiality from an economic perspective" is when "a mix of

6    information change that would motivate buyers and sellers to take action." The 'funding secured'

7    tweet is "material information because investors [were] interested in it." *Id*. at 1666:2-7.

8        Dr. Hartzmark also confirmed that "Investor support is confirmed . . ." was likewise

9    material to investors. When asked, Dr. Hartzmark testified that "I've gone through and looked at

10   these dates, looked at the movements in implied volatility and prices, it would suggest that, you

11   know, that 'investor support confirmed' and 'funding secured' are very important pieces of

12   information. And, again, the reason is that we see that the investors were interested in it. That's

13   the quintessential definition for economic materiality." *Id*. at 1696:1-9. Even after the August 13,

14   2018 blogpost, analysts still regarded the confirmation of investor support given by Elon Musk

15   on August 7, 2018 as important, material information. Exhibit 429; 1/31 Tr. at 1686:20-1688:20.

16       Dr. Hartzmark clearly confirmed that "[b]ased on all the information I've shown you from

17   analysts, internal documents, price factors, volume factors, implied volatility, the convertible

18   bonds all suggest that the tweets are material" and that "there is substantial qualitative evidence

19   which would suggest that the 'funding secured' is material to the market." 1/31 Tr. at 1673:17-

20   1674:8. Dr. Hartzmark also confirmed that this conclusion applied to the second tweet ("Investor

21   support is confirmed . . . ."), stating that the "qualitative information . . . suggests it's information

22   that is important to the mix of information investors act[ed] on." *Id*. at 1674:9-14. Dr. Hartzmark

23   explicitly identified a substantial spike in response to the "Investor support is confirmed . . ."

24   tweet once trading resumed on Nasdaq after the halt. *Id*. at 1651:16-24 ("When at 3:36 p.m.

25   Eastern time Mr. Musk tweets: 'Investor support is confirmed…' And that's in the middle. That's

26   why trading is halted. Immediately at 3:45 when trading resumes, again, as you would expect in

27   an efficient market, the price immediately spikes up.").

28

E.       **Additional Witness Testimony and Trial Exhibits**

Other witnesses also agreed that the "funding secured" tweets were highly material. Lead Plaintiff Glen Littleton testified that "funding secured" was the "primary driver," the "only thing that mattered," and the "most important" part of the August 7, 2018 tweet. 1/18 Tr. at 362:9-13 ("Q Okay. Did this change your approach to your portfolio in any way towards Tesla? A No, because 'Funding secured' was so definite to me, that that was the primary driver. This helped confirm that, but, no, it didn't change anything."); 388:17-18 ("A Um, no, 'Funding secured' is - - was the only thing that mattered to me. Because that was such a defining statement."); 426:1-5 ("But the fact that 'Funding secured' was stated on the 7th was my driving argument. My -- the only thing I could really focus on, because that was all that mattered to me. So I got out of things to -- to save my livelihood."); 462:4-6 ("Q And what to you, again, was the most important aspect of deciding that it was a done deal? A What was the most important of – 'Funding secured'?").

Tim Fries testified similarly to Mr. Littleton that he relied on the "funding secured" tweet when deciding to invest in Tesla. Mr. Fries testified that he had been looking for a "good entry point" into Tesla for some time when, on August 7, 2018, he saw the tweet on CNBC and decided to invest. 1/20 Tr. at 507:20-509:18 (Q What led you to buy the stock in Tesla on August 8, 2018? A It was the tweet. . . . Q Was the representation 'funding secured' in that tweet important to you at that time? A Yes. The phrase 'funding secured' in that tweet was critical. Funding secured gave me the confidence that I could get in and – at that 420 price. . . . .").

Professor Guhan Subramanian echoed Messrs. Littleton and Fries on this point, despite not offering a formal opinion on this issue of materiality. In pertinent part, Professor Subramanian discussed the "highly unusual" nature of Musk's "funding secured" August 7 tweets considering that they related to a "major public company MBO" and were made in the middle of the "trading day." *Id.* at 584:10-585:7. Further, Professor Subramanian testified at length about the typical process involved in MBOs and how Musk's "Investor support is confirmed . . ." tweet was unrealistic and illusory in light of ordinary and reasonable practices. *Id.* at 635:15-639:16 ("He's basically saying only reason why this is not certain is that it's going to the shareholder vote and they might vote it down. That's just not true. It's wrong.").

Egon Durban of Silver Lake Partners also confirmed that the difference between "Funding secured" and the actual state of affairs was significant enough to influence a reasonable investor's decision whether to buy or sell securities in that company. For example, Mr. Durban explained that "it is typical for some form of definitive agreement to be in place before a public announcement of a going-private transaction is made" 1/27 Tr. at 1342:9-12, and that "typically, financing is arranged before a definitive agreement is signed for a going-private." *Id*. at 1342:13-15. Mr. Durban confirmed that there was not "any definitive agreement in place" (*Id*. at 1343:2-5) at the time of the August 7 tweets, and that in his experience it takes "three to six months" to get a definitive agreement in place (*Id*. at 1343:14-17). This stands in stark contrast to the phrase "funding secured." Mr. Durban also testified that as of August 23, 2018, there still was not "any committed financing for any going-private transaction." *Id*. at 1372:4-6. He said that "the full price" and "the amount of capital" needed for taking Tesla private had still not yet been decided as of August 23, 2018. *Id*. at 1372:18-1373:1. In fact, Mr. Durban confirmed that neither the "structure," "total amount of capital," "price," nor "the percentage of shareholders who would roll into a private Tesla" was ever finalized. *Id*. at 1373:2-16. Indeed, due to these factors, a "formal proposal" was never sent to the board, there was never a "final conclusion about whether" using an SPV was even viable, and as of August 23, "there was still substantial uncertainties as to whether a going-private transaction could proceed." *Id*. at 1373:17-19; 1393:9-13; 1393:17-22; *see also* Exhibits 179 and 201 (presentations showing that go-private process was in earliest stages and still waiting for financing).

Mr. Durban also differentiated between an interest in doing a transaction and a commitment to financing one. *Id*. at 1394:12-18 ("Q. Is an indication of interest expressed that way the same as a commitment to financing? A. No. Q. Okay. What's the difference? A. Um, an interest is an expression of interest. A commitment is a signed legal document committing you to wire money."). Mr. Durban then testified that after the August 7 tweet, he spent the next two weeks trying to raise funding. *Id*. at 1343:22-24. When he had his first in-person meeting with Elon Musk on August 10, 2018, he testified that the potential going-private transaction for Tesla was not even yet at "Stage 1" of a typical going-private transaction. *Id*. at 1349:23-1350:3; Ex.

1   179. Given the stark contrast between "Funding secured" and the true state of affairs that existed

2   at the time, Mr. Durban's testimony further confirms the materiality of the August 7 tweets.

3        Dan Dees of Goldman Sachs also confirmed the stark contrast between the actual state of

4   affairs and Mr. Musk's "funding secured" statement. Mr. Dees testified that he had not spoken to

5   Mr. Musk prior to Mr. Musk's August 7 tweets. 1/27 Tr. at 1400:13-18 (testifying that he was

6   "surprised he was considering taking it private, surprised that we weren't involved at Goldman.");

7   *id*. at 1431:5-22. He also confirmed that it was never "determined how many shareholders would

8   actually roll into a potential going-private transaction." *Id*. at 1410:16-19. As of August 15, 2018,

9   Mr. Dees said that they "were looking to obtain documentation confirming financing from those

10   investors" (*id*. at 1423:10-13) and they had not "collected any signed commitment documents

11   from any potential investor in a going-private transaction for Tesla." *Id*. at 1425:11-14. In fact,

12   Mr. Dees indicated that as of August 16, 2018, Goldman Sachs, along with Silver Lake, were still

13   "trying to develop a fully financed proposal." *Id*. at 1428:12-22. Despite Defendants' argument

14   that funding secured meant funding available, Mr. Dees acknowledged that there was a difference

15   between "funding being available and funding being committed." *Id*. at 1463:13-20.

16   **III.   LEGAL STANDARD**

17        The Court should enter judgment as a matter of law "when it is clear that the evidence and

18   its inferences cannot reasonably support a judgment in favor of the opposing party." *Weaving v.*

19   *City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (internal quotation marks and citation

20   omitted); *see also* Fed. R. Civ. P. 50(a)-(b). The "standard is whether or not, viewing the evidence

21   as a whole, there is ***substantial*** evidence present that could support a finding, by reasonable jurors,

22   for the nonmoving party." *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137,

23   1140 (9th Cir. 1974) (emphasis added). The Court should enter judgment as a matter of law when

24   the evidence presented at trial permits "only one reasonable conclusion," *Peralta v. Dillard*, 744

25   F.3d 1076, 1085 (9th Cir. 2014), and "the conclusion is contrary to that reached by the jury."

26   *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (internal quotation marks

27   and citation omitted). Judgment as a matter of law is also "appropriate when the jury could have

28   relied only on ***speculation*** to reach its verdict." *Id*. at 803 (emphasis added); *see also Jack v. DCo,*

*LLC*, 837 F. App'x 421, 422 (9th Cir. 2021) (same). The existence of a "mere scintilla" of evidence "is not enough to sustain a verdict." *Lakeside-Scott*, 556 F.3d at 802; *Janich Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 853 n.2 (9th Cir. 1977).

A renewed motion for judgment as a matter of law "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Under Rule 59, the court may "grant a new trial on all or some of the issues" "for any reason," including where the verdict is "against the weight of the evidence." Fed. R. Civ. P. 59; *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019). "[T]he district court has 'the duty'" to "weigh the evidence as it saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citation omitted) (alteration in original). On a new trial motion, the court "is not required to view the trial evidence in the light most favorable to the verdict," and "can weigh the evidence and assess the credibility of the witnesses." *Hesselbein v. Beckham*, 168 F. Supp. 3d 1252, 1262 (E.D. Cal. 2016). "If, having given full respect to the jury's findings," the court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed," it should grant a new trial. 11 FED. PRAC. & PROC. §2806 (3d ed.).

Entering judgment as a matter of law if the evidence cannot support a verdict "is a performance of the court's duty to assure enforcement of the controlling law." Fed. R. Civ. P. 50 (adv. cmt. note 1991 amend). Because the evidence here precludes a finding that "the jury's verdict … could reasonably have been reached" in Defendants' favor, the Court should reverse the verdict. *See Raynor Bros. v. Am. Cyanimid Co.*, 695 F.2d 382, 385 (9th Cir. 1982).

## IV.   ARGUMENT

### A.   Plaintiff's Evidence at Trial Establishes Materiality as a Matter of Law.

A statement is "material" when there is a "substantial likelihood that a reasonable shareholder would consider it important." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). This is an objective test, assessing the

1    significance of a piece of information to a "reasonable investor." *Id*. at 445; *accord Amgen Inc.*
2    *v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013) (noting materiality is an
3    objective test); *S.E.C. v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007) ("The law assesses the
4    materiality of a misrepresentation at the time it is made, not after intervening events or remedial
5    action have rendered it harmless."). Materiality is assessed "at the time of the [statement]." *Miller*
6    *v. Thane Int'l, Inc.*, 519 F.3d 879, 892 (9th Cir. 2008). Given the evidentiary record here, there
7    can be no question that Musk's August 7 tweets were "material" to investors at the time they were
8    made.

9              1.    <u>Musk Admitted that the "Funding Secured" Tweet Was Material Market-</u>
10                   <u>Moving News.</u>

11           There is no dispute that Musk intended for his "funding secured" tweet to be read as one
12    cohesive message, *i.e.*, both sentences read together. As he explained during his testimony, Musk
13    tweeted "Am considering taking Tesla private at $420. Funding secured." because he was
14    "considering -- very importantly, considering -- not that it will happen, but that I'm thinking about
15    it -- taking Tesla private at 420. And that, in my opinion, the funding is secured for taking Tesla
16    private at that price." 1/23 Tr. at 787:9:16. Moreover, Musk testified that he wanted to
17    communicate these three points (*i.e.*, that he was considering taking Tesla private at a particular
18    price with funding secured) to investors of Tesla and that he wanted investors to rely on the tweet.
19    *Id*. at 787:23-788:4 (Q Okay. Now, and you wanted to communicate this to all investors of Tesla,
20    correct? A Yes. Q And you wanted them to rely on this tweet, right, in making their decisions
21    about buying or selling Tesla securities, correct? A Yes.). Mr. Viecha's testimony supported this
22    point considering that he, too, did not view the "funding secured" tweet separately but instead as
23    one succinct message. 1/24 Tr. at 1056:19-1057:6 (Q Did you interpret "Funding secured" as
24    being part of the firm offer? A I really didn't think about it as a – as a separate statement . . . .").

25           Musk's admission in this regard proves that he wanted and, in fact, believed his tweet to
26    be "material" market-moving information. Thus, given that Musk intended others to rely on the
27    tweet, there should be no dispute that it was "material" at the time it was made.

28

1

2. <u>Analysts and Investors Testified that the "Funding Secured" Tweet Was Important and Material Information.</u>

2

3      Extensive testimony was heard concerning the market's reaction to the "funding secured"

4 and "investor support" tweets and the widespread belief that they were important and highly

5 material. Analysts and investors immediately sought further information from Tesla after Musk

6 sent the tweet, including from Itay Michaeli from Citi (1/24 Tr. at 1054:10-17), Bradley Erickson

7 from KeyBank (*id.* at 1058:8-1059:18), Owuraka Koney from Jennison Associations (*id.* at

8 1060:14-1062:24), and Toni Sacconaghi from Bernstein Alliance (*id.* at 1064:16-1066:14). Ryan

9 Brinkman from J.P. Morgan wrote a research note and explicitly raised his target price for Tesla

10 stock in response to both August 7 tweets. Brinkman Tr. 61:9-64:2; 72:24-73:15; Ex. 15.

11 Morningstar discussed throughout the Class period the level of confirmed investor support as

12 tweeted by Musk. Ex. 429. These analysts and investors either asked about or relied upon the

13 statement "funding secured," thereby showing that the tweet overall and that portion of it in

14 particular were highly material.

15      Analysts serve as a proxy for the market and where, as here, they focus on a particular

16 fact, that is strong evidence that the fact is material. *See Patel v. Parnes*, 253 F.R.D. 531, 548-49

17 (C.D. Cal. 2008) (incorporating analyst reports to show when the alleged misrepresentations were

18 provided to the market and their materiality); *see also United States SEC v. Ustian*, 229 F. Supp.

19 3d 739, 761-62 (N.D. Ill. 2017) ("Courts routinely consider analyst reports during motions to

20 dismiss securities fraud claims to resolve questions about the materiality of alleged

21 misrepresentations and omissions."); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 U.S. Dist.

22 LEXIS 1350, at *62-63 (S.D.N.Y. Feb. 1, 2005) (materiality evidenced by analyst reports).

23 Analysts were laser focused on the "funding secured" tweet. Accordingly, this evidence shows

24 that it was highly material to the market.

25      Glen Littleton and Tim Fries, the Lead Plaintiff and class member, who testified during

26 trial, equally said that they thought "funding secured" was the most material part of the tweet. Mr.

27 Littleton said unequivocally that "funding secured" was the "primary driver," the "only thing that

28 mattered," and the "most important" part of the August 7, 2018 tweet. 1/18 Tr. at 362:9-13;

389:17-18; 461:23-462:8. Mr. Fries likewise said that he had been looking for a "good entry point" into Tesla for some time when, on August 7, 2018, he saw the tweet on CNBC and decided to invest. 1/20 Tr. at 507:20-509:18.

### 3. "Funding Secured" Materially Misstated the True State of Affairs that Existed at the Time of the Tweet.

Musk's false statement also differed materially from the true state of affairs that existed. While Musk said that funding for the go-private transaction was "secured," it was not. Musk had not obtained any commitment in writing. This is evidenced by the Saudi PIF's minutes from the July 31, 2018 meeting as well as Yasir Al-Rumayyan's text messages to/from Musk in the days that followed. *See* Exhibits 80, 121. These documents made clear that no agreement was reached but instead their meeting left off with an agreement by Musk to provide the Saudi PIF with additional information concerning how, when, and for what price Musk wanted to take Tesla private. Defendants referred to these documents repeatedly throughout the trial to show "availability" of funds and "strong interest" by the PIF to justify Elon Musk tweets.

However, both Egon Durban from Silver Lake and Dan Dees from Goldman Sachs testified that a mere indication of interest or availability of funds does ***not*** equal a written commitment for secured funding. In pertinent part, Mr. Durban testified that "some form of definitive agreement" is typically in place before "a public announcement of a going-private transaction is made" (1/27 Tr. at 1342:9-12), and that "typically, financing is arranged before a definitive agreement is signed for a going-private." (*id*. at 1342:13-15). In fact, as Mr. Durban explained, as of August 23, 2018, there still was not "any committed financing for any going-private transaction." *Id*. at 1372:4-6. Importantly, Mr. Durban confirmed that "an interest is an expression of interest. A commitment is a signed legal document committing you to wire money." *Id*. at 1394:12-18. This stands in stark contrast to the term "funding secured."

Similarly, Mr. Dees testified that it was never "determined how many shareholders would actually roll into a potential going-private transaction" (*id*. at 1410:16-19) and that, as of August 15, Mr. Dees was still "looking to obtain documentation confirming financing from those investors" (*id*. at 1423:10-13) and they had not "collected any signed commitment documents

1   from any potential investor in a going-private transaction for Tesla" (*id*. at 1425:11-14). In fact,

2   Mr. Dees indicated that as of August 16, Goldman Sachs and Silver Lake were still "trying to

3   develop a fully financed proposal." *Id*. at 1428:12-22. Mr. Dees confirmed that there was a big

4   difference between "funding being available and funding being committed." *Id*. at 1463:13-20.

5       Mr. Musk himself conceded that, as of July 31, 2018, he did not know the exact amount

6   of funding needed for the going private transaction. *See* 1/23 Tr. at 847:25-848:8 ("A [Yasir]

7   needs to know how much money to send, yeah. I mean it's - - the precise numbers depend on how

8   - - what other investors will remain. […] Q You did not know the precise amount of money at

9   this point in time, did you? On July 31st? A No, not the precise amount of money."); 1/24 Tr. at

10   933:4-8 ("Q [I]f you didn't know how many shareholders would remain or not as of the July 31st

11   meeting with the PIF, could you have possibly known exactly how much money was needed to

12   buy out the shareholders? A No, not exactly."); 1/23 Tr. at 746:4-8 ("Q Okay. But you don't

13   disagree that no specific amount of funding was discussed -- specific amount of funding was

14   discussed at this meeting on July 31st. Isn't that correct? A Like -- an exact number would not be

15   knowable without knowing who else would participate."). The fact that Mr. Musk did not know

16   the exact amount of financing needed for this transaction is further evidence that funding was not

17   secured.

18       "[A] statement is misleading if it would give a reasonable investor the 'impression of a

19   state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied*

20   *Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). By industry standards, common knowledge,

21   and practical usage, Musk's tweet was "materially" false because funding was not secured.

22           4.   There Is No Dispute that the "Funding Secured" Tweet Was Material.

23   Dr. Hartzmark testified that both quantitative and qualitative evidence proved the "funding

24   secured" tweets were material. Dr. Hartzmark unequivocally testified that "Based on all the

25   information I've shown you from analysts, internal documents, price factors, volume factors,

26   implied volatility, the convertible bonds all suggest that the tweets are material" and that

27   "substantial qualitative evidence which would suggest that the 'funding secured' is material to

28   the market." 1/31 Tr. at 1673:17-1674:14. Dr. Hartzmark also confirmed that this conclusion

1    applied to the second tweet ("Investor support is confirmed . . . ."), stating that the "qualitative

2    information . . . suggests that it's information . . . is important to the mix of information investors

3    act[ed] on." *Id.* This opinion was unrebutted. Thus, the jury had no evidence to conclude that

4    Musk's tweets were ***not*** material.[2]

5                        5.    Defendants Offered Only Speculation and Attorney Argument to Support

6                              Their Claim of Immateriality.

7            Defendants summarized their "evidence" on the tweets in Exhibits 8 and 13 not being

8    material in their renewed motion for judgment as a matter of law. *See* ECF No. 663 at 22-23. But

9    the evidence on which they rely did not provide the jury with any reasonable basis to conclude

10   that Musk's tweets were immaterial. Deepak Ahuja, Tesla's former CFO, testified only that he

11   was "truthful" when telling the board that "Mr. Musk believed that the PIF was willing to fund

12   the entire transaction" and that his statement to the board was "consistent" with his

13   "understanding of the facts." 1/25 Tr. at 1197:14-1198:3. Notably, Mr. Ahuja did ***not*** testify that

14   Musk had "secured" funding for the go-private from the Saudi PIF. In fact, when asked about the

15   source of funding for the transaction on direct examination, Mr. Ahuja disclaimed knowledge

16   and/or responsibility for disclosing it. *See id.* at 1163:19-1164:20 (referring to Exhibits 12 and

17   337 when asking why Defendants did not disclose source of funding). Mr. Ahuja conspicuously

18   did ***not*** testify that Musk had "secured" funding from the Saudi PIF. *See*, *e.g.*, 1/25 Tr. at 1180:15-

19   19 (testifying that Musk said Saudi PIF had only "expressed interest" in taking Tesla private).

20   The same goes for Sam Teller who, despite having trouble remembering the conversation from

21   "five years ago" (2/1 Tr. at 1881:21), testified to the "gist" of a discussion and/or a conversation

22   "along the lines of" Musk and the Saudi PIF making only "a handshake deal to proceed" with a

23   "take-private transaction" as opposed to Musk in fact "secur[ing]" funding to take Tesla private.

24   2/1 Tr. at 1889:8:1893:10. Importantly, Mr. Teller did not recall any discussion of "price" or

25   "potential structure." *Id.* at 1890:7-17. This testimony coincides with Musk's testimony, who

26

27   _____
     [2] In opposing Plaintiff's motion for summary judgment on materiality, Defendants proffered
28   proposed expert testimony from Professor Daniel Fischel. *See* ECF No. 365, at 25 and 365-1, Ex.
     N. Prof. Fischel did not testify at trial.

admitted under examination that no "specific amount" was discussed with the Saudi PIF (1/23 Tr. at 745:18-746:22), and that he did not know "the precise amount of money" needed (*id* at 848: 6-8) because "the precise numbers depend on how – what other investors will remain." *Id* at 848:1-2. At most, Musk made a "handshake" deal to continue discussing a potential transaction; he did not secure the $60 billion of funding that would have been necessary for such a transaction.

Defendants' reliance on Plaintiff's damages expert, Dr. Hartzmark, also falls flat. Dr. Hartzmark explained that the August 13 blog post affirmed the August 7 tweets and led the market to believe that the deal was ***more*** likely to happen (as opposed to Defendants' unsubstantiated countervailing explanation that the blog post served as a "corrective disclosure"). *See* 1/31 Tr. at 1688:2-20 (referring to Slide 32, ECF No. 660-6 at 14 and explaining that "the sentiment has increased of the likelihood of the deal" in response to the August 13 blog post); *id* at 1685:16-18 (explaining that the August 13 blog post referred "also [to] a very specific statement that 66 percent of the shareholders would go into the new company, suggesting that investor support was confirmed."). Thus, without an expert of their own, the jury had no quantitative evidence to support the verdict on this point.

Similarly, the jury had no ***evidentiary basis*** for concluding that Musk had the financing to take Tesla private ***without*** the Saudi PIF. While Musk referenced other potential investors and his SpaceX holdings during trial, the record was clear that he had not spoken to any of these other investors or otherwise made any effort to use his SpaceX holdings as funding for the transaction. *See* 1/23 Tr. at 770:20-771:25 (Musk confirming he had not spoken to other investors, *e.g.*, UAE, Norwegian Sovereign Wealth Fund, Silver Lake, Fidelity, Billie Gifford, Tencent, T. Rowe Price); *id* at 746:16-20 (Musk further reconfirming that "[i]t wouldn't be appropriate to discuss [the going private transaction] with other investors because if I were to do so, it would be material non-public information."); 1/24 Tr. at 1003:18-1004:2 (Musk testifying that using SpaceX was a possibility he "had in the back of [his] mind"); 1/24 Tr. at 1007:23-1019:3 (Musk confirming that SpaceX liquidation was "worst-case situation" that he had in "back of [his] mind" and that he did not identify SpaceX as source of funding in sworn interrogatory responses); 1/23 Tr. at 804:20-806:5 (Musk conceding that if he had used his SpaceX shares to finance some of the going-private

1   transaction, his percentage ownership in Tesla would have increased, which contradicted Musk's

2   representation to investors that he would maintain his 20 percent ownership).

3          In any event, this evidence went to the element of "falsity" and not "materiality." Indeed,

4   even accepting *arguendo* that Musk received a "strong verbal commitment" from the Saudi PIF

5   and struck a "handshake deal" with them for the necessary funding (which is not reflected in the

6   Saudi PIF meeting minutes or text messages, Exhibits 80 and 121), it is incontrovertible that no

7   details about the funding had been discussed (*e.g.*, price or percentages). It was on this basis that

8   the Court in its summary judgment order held "even accepting that there is some room for

9   disagreement as to precisely how secure something must be before the term may be appropriately

10  used, the term is not so elastic as to escape any real meaning. . . . Notably, even the evidence on

11  which Defendants rely suggests that the public understood the phrase 'Funding secured' to mean

12  (1) at least a verbal commitment (2) based on a discussion of at least some details about what

13  funding would entail." ECF No. 387 at 25. The meaning and import of the word "secured" has

14  not changed since summary judgment and while the Court did not decide "materiality" at that

15  point in time, the evidence has not changed either. Thus, while Defendants' counsel argued at

16  length that "secured" was open to different interpretations, the jury had no ***evidentiary basis*** for

17  accepting the conclusion that "funding secured" meant some loose agreement to discuss a

18  potential transaction with the Saudi PIF at some point in the future.

19         Defendants also provided zero evidentiary support for finding the second August 7 tweet

20  immaterial, *i.e.*, Exhibit 13. Aside from a conclusory assertion that "no reasonable investor would

21  interpret Mr. Musk's Tweet as an announcement that the proposal would go straight to a

22  shareholder vote," Defendants point only to a few sentences from Mr. Littleton's testimony. *See*

23  ECF No. 663 at 23. These excerpts of testimony, however, do not support Defendants' argument.

24  Instead, they show that Mr. Littleton relied on Musk's statement given his unfamiliarity with the

25  "process" for taking a company private. 1/18 Tr. at 398:2-399:1.

26

27

28

1  **B.      Plaintiff's Evidence at Trial Establishes Reliance.**

2          Where, as here, a plaintiff alleges fraud-on-the-market, reliance is established where: "(1)

3  the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded

4  in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations

5  were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, __

6  U.S. __, 134 S. Ct. 2398, 2413 (2014). The evidence establishing each of these elements apart

7  from materiality was unrebutted.[3] Furthermore, as set forth above, the evidence that the August 7

8  tweets were material was overwhelming and Defendants provided no evidence suggesting that

9  the tweets in Exhibit 8 and Exhibit 13 were immaterial.

10         While the presumption of class-wide reliance in a fraud-on-the-market case is rebuttable,

11 to rebut the presumption, Defendants had to proffer "evidence that an alleged misrepresentation

12 did not actually affect the market price of the stock." *Halliburton*, 134 S. Ct. at 2417; *see also In*

13 *re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920-EJD, 2016 U.S. Dist. LEXIS 178148, at *37-

14 38 (N.D. Cal. Dec. 22, 2016) ("Defendants bear both the burden of production and the burden of

15 persuasion on the issue of price impact."); *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-

16 cv-00226 YGR, 2016 U.S. Dist. LEXIS 34150, at *20-21 (N.D. Cal. Mar. 16, 2016) (finding that

17 "the burden to show no price impact" rests "on [d]efendants"). Defendants did not do this.[4]

18 Indeed, Defendants did not offer any expert testimony or other evidence regarding the impact of

19 the August 7 tweets on the prices of Tesla securities during the Class Period. Thus they did not

20 satisfy either burden.

21 _____

[3] The tweets in Exhibits 8 and 13 were undisputedly publicly known, and Dr. Hartzmark testified
22 that through his analysis of Tesla stock and stock options, he found that "the common stock and
stock options of Tesla traded in open, well developed, and efficient markets." 1/31 Tr. at 1649:1-
23 8. Defendants made no effort to challenge Dr. Hartzmark's finding of market efficiency. There
was no dispute that Plaintiff purchased Tesla stock and options between August 7, 2018, when
24 Musk tweeted the false statements, and August 17, 2018.
[4] Plaintiff also seeks judgment on the issue of individual reliance. Both Lead Plaintiff Glen
25 Littleton and Tim Fries testified that they relied on the "funding secured" tweet. *See* 1/18 Tr. at
362:9-13; 1/20 Tr. at 507:20-509:18. This testimony supports granting judgment on the issue of
26 reliance under a direct theory of reliance. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784,
795 (9th Cir. 2017) (plaintiffs "allege[d] that they were aware of, and specifically relied on,
27 [defendant's] false statements when deciding to purchase or sell Atossa shares.").

28

**C.**    **A New Trial Should Be Ordered to Allow for the Deliberation of Damages with Proper Limiting Instructions.**

   1.    <u>With Materiality Decided, the Clear Weight of the Evidence Supports Granting a New Trial.</u>

The evidence at trial firmly supports that Musk's tweets were material and, in turn, the elements of reliance and loss causation should be decided in Plaintiff's favor. There is also no question that Plaintiff proved Musk used an instrument of interstate commerce when committing the alleged Rule 10b-5 violation, *i.e.*, Twitter. Thus, with those elements of liability decided in favor of Plaintiff, letting the jury's verdict stand would amount to a "manifest miscarriage of justice." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961-62 (9th Cir. 2009). A new trial should be ordered for the purpose of having a jury decide the damages caused by Musk's tweets.

   2.    <u>The Jury Instructions Created Confusion Amongst the Jurors that Led to the Erroneous Verdict.</u>

A new trial is also warranted based on the "erroneous jury instructions" and the "failure to give adequate instructions," as objected to by Plaintiff during the trial. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). Three instructions in particular gave rise to confusion amongst the jurors and, ultimately, led to an erroneous and prejudicial verdict. A new trial is required to correct these errors as well as allow for a jury to decide the amount of damages caused by Musk's tweets. *See In re First Alliance Mortgage Co.*, 471 F.3d 977, 1003 (9th Cir. 2006) (vacating damages verdict where jury "based the damages calculation in substantial part on an improper theory of damages" and failed to "follow the law according to its instructions").

   a.    <u>Jury Instruction No. 6: The jury should have been instructed decisively that Plaintiff already established falsity and scienter as a matter of law at summary judgment.</u>

As the Court initially anticipated, throughout the trial Defendants "elicit[ed] testimony . . . that suggest[ed] indeed it [funding] was secured because of the representations from PIF, the engagement, the excitement, the 'We're interested,' dollar signs, et cetera . . . ." 1/20 Tr. at 474:15-24. Defendants (namely Musk) testified repeatedly that he had secured a deal with the

Saudi PIF. This left the jury with a clear impression that "Oh, well, maybe funding was secured," despite the Court wanting to avoid that precise outcome given its rulings at summary judgment. *Id*. Although the Court instructed the jury to "assume" falsity and recklessness, the instruction was confusing and ultimately led to an erroneous verdict.

The jury's confusion was evident from the start. At *voir dire*, Prospective Juror Lucian Young (No. 110) asked whether he had to "believe" the tweets were "untrue" or if he could "see [the] statement" and "interpret it, as is." 1/17 Tr. at 187:23-188:25. Defendants then compounded this confusion with numerous false statements during opening arguments, claiming that the "funding secured" tweets were true and/or made without scienter. *See*, *e.g.*, 1/18 Tr. at 334:8-9 (Mr. Spiro: "[Mr. Musk] had the funding"); 1/18 Tr. at 328:7 (Mr. Spiro: "It was secured"); 1/18 Tr. at 343:7-9 (Mr. Spiro: "And here in this case on August 7, 2018, his mind was pure. His intentions were sincere. He was operating in good faith . . . .").

The jury then heard extensive testimony concerning Musk's deal with the Saudi PIF, his belief that he had the funding necessary to take Tesla private, and his supposed good faith intent when tweeting (*i.e.*, non-culpable state of mind). Repeatedly, Musk testified that he did not mean to deceive anyone and truly thought he had "secured" funding for the transaction. *See*, *e.g.*, 1/24 Tr. at 926:14-17 (Musk: "That's absolutely what I believed"); 1/24 Tr. at 927:25-928:17 (Musk: "I intended to inform them. To make sure that all shareholders were on equal footing"); 1/24 Tr. at 941:17-942:6 (Musk: Absolutely. I said exactly what I felt to be true.); 1/24 Tr. at 952:12-22 (Musk: "I was 100 percent truthful"); 1/24 Tr. at 967:25-968:2 (Musk: "A No. It's factually true."); 1/24 Tr. at 969:23-970:7 ("A Funding was absolutely not an issue. Quite the opposite. More funding was available than was necessary for the transaction."); 1/24 Tr. at 1033:6-22 (Musk: ". . . But what really matters there is that the Saudi PIF, my understanding was they were committed to take Tesla private, no matter what.").[5]

Testimony from Deepak Ahuja, Tesla's former CFO, added to the confusion. In pertinent

---

[5] Similar questioning and testimony was heard by the jury on Day 4 (Jan. 23, 2023). *See*, *e.g.*, 1/24 Tr. at 888:2-7 ("Q: ". . . was it your understanding that, you know, . . . that that was as clear a commitment as there could be . . . ? A: Ye" before objection); *id*. at 895:13-21 ("Q: . . . Was that truthful? A: Yes").

part, Mr. Ahuja carefully insinuated (without actually testifying to it) that Musk had a deal with the Saudi PIF to fund the go-private transaction. *See, e.g.*, 1/25 Tr. at 1183:18-1184:11 (Ahuja: "Q Ready to do a deal – A Ready to do this deal of the private transaction, was my impression of it. Q And to provide sufficient funding to do it? A That is correct."); 1/25 Tr. at 1197:14-1198:3 ("Q . . . 'Finally Mr. Ahuja noted that, based on the statements made by the PIF to Mr. Musk during the meeting, Mr. Musk believed that the PIF was willing to fund the entire transaction.' Was that what you told the board that night? A I did. Q And it was a truthful statement? A It was. Q Based on all of your interactions with the Saudi PIF to that date, your personal interactions, was it consistent with your understanding of the facts? A It was completely consistent.").[6]

Similarly, Antonio Gracias, one of Tesla's directors, testified that Musk had "sufficient funding two weeks after the tweet to take the company private" (1/25 Tr. at 1247:4-6), that "[Saudi Arabia] is a part of the world where you do business on a handshake. And if they say they're going to do it, they're going to do it." (1/25 Tr. at 1264:12-1265:2), and that "Elon is the – he's like the Michael Jordan of fundraising" meaning that Musk could have easily raised the funding to take Tesla private he if wanted to, regardless of whether the Saudi PIF was involved (1/25 Tr. at 1252:9-17). Ms. Denholm, another director, testified that "if I believed that Elon was trying to mislead the public, I would have stood down from the board." 1/27 Tr. at 1493:18-25. This testimony led the jury to believe that Musk had "secured" funding to take Tesla private and that the tweets at issue were not false, notwithstanding the jury instruction they received telling them to "assume" falsity and recklessness.

Defendants then capitalized on this testimony during closing arguments. Repeatedly, counsel for Defendants told the jury that "funding secured" was true and that Musk made the tweet without scienter. Below are just several instances among a closing argument that was replete

---

[6] *See also* 1/25 Tr. at 1204:1-10 ("Q Okay. When you saw this tweet, sir, did you think it was a lie? A To me, the contents of this tweet [referring to "funding secured"] were -- were consistent with everything I had known or heard until then."); 1/25 Tr. at 1204:16-25 ("Q When you saw this tweet, did you think it was a lie, sir? A I did not."); 1/25 Tr. at 1212:7-18 ("Q . . . when you read that in the blog post, was that statement consistent with your understanding of the facts? A From the interactions that I had with the Saudi PIF fund on July 31st -- in addition to earlier, but specifically to that -- this was consistent with it.").

with improper, prejudicial, factually incorrect statements:

- "He knew funding was secured. The PIF told him they would go forward." 2/3 Tr. at 2031:8-13.

- "That was his motive, to do what was right for the shareholders." *Id*. at 2032:13-18.

- "'Funding secured' was just this concept that some party had money and expressed interest. And that was undisputedly true. And now you know that that was true." *Id*. at 2039:11-13.

- "On July 31st, he meets with the PIF. Handshake deal; we're ready to act. Not written and finalized, but a handshake deal. We are ready to act. That sounds like funding's not an issue." *Id*. at 2045:16-19.

- "But he also has his own capital. And he has debt and bank financing if he needs it." *Id*. at 2046:23-24.

- "And Deepak Ahuja knew that the PIF committed in that meeting." *Id*. at 2048:16-17.

- "And you know what Yasir said? Remember that? Said: Funding's not an issue. We have enough. No need to go to other investors. We will fund the whole thing." *Id*. at 2048:23-25.

- "Everybody knew funding was not an issue." *Id*. at 2049:24.

- "He didn't need any money. Funding wasn't the issue." *Id*. at 2056:25-2057:1.

- "He was in the room when it happened. He doesn't ask: What funding? Because he already knows. He also knows funding is not an issue. And he took from the meeting with the PIF the same essence as the tweet phrase, funding was secured." *Id*. at 2064:21-25.

- "So again, I don't know the difference, and it was unmistakably true in his mind." *Id*. at 2066:3-4.

- "So Elon Musk gets back to work. . . . They work together; they work in good faith." *Id*. at 2069:18-21.

The above testimony and argument left the jury with the erroneous impression that Musk had obtained the funding to take Tesla private which, in turn, gave rise to the false conclusion that funding was "secured" and that the tweets were not materially false. This was evidenced by comments made by jurors following their deliberation, including that the jury credited Musk's defense that he secured funding with a "handshake" deal with the Saudi PIF and believed his tweets to be true when he made them. Joel Rosenblatt, *Elon Musk Jury Verdict: Case Against*

*Tesla TSLA CEO 'Disorganized'* (Bloomberg, Feb. 3, 2023). Failing to instruct the jury that these issues had been already decided created confusion and prejudice. *See* ECF No. 573 at 9 ("the jury *should* defer to the Court's summary judgment ruling. . . . These findings of fact are not open to revisitation by Defendants or the jury."). The jury should have been told decisively that falsity and scienter had been resolved. *See Hsu v. Puma Biotechnology, Inc.*, No. 15-cv-00865 (C.D. Cal. Jan. 29, 2019) (ECF No. 700 at 36) (instructing jury on summary judgment ruling); *see also* ECF No. 398 at 3 ("the jury will be told that the Court has already found that the August 2018 tweets were false and made with the requisite scienter.").[7]

        b.    <u>Jury Instruction No. 9: The jury did not need to consider whether Musk acted "knowingly" until deciding allocation of responsibility because Plaintiff had already established scienter at summary judgment.</u>

       The confusion and prejudice created by Jury Instruction No. 6 was exacerbated by Jury Instruction No. 9, which told the jury that despite Musk's acting with "at least reckless disregard," they still needed to "decide whether [he] acted knowingly." ECF No. 655 at 11. For the purposes of deciding the Rule 10b-5 Claim, it made no difference whether Musk acted recklessly or knowingly. Scienter had already been established. The jury would have completed Section A on the verdict form the same way regardless of whether Musk acted recklessly or knowingly. Whether Musk acted knowingly related *only* to the issue of allocation and/or apportionment of responsibility and, as such, the jury should have been instructed on "knowingly" in the context of the allocation/apportionment instruction (Jury Instruction No. 16). By instructing the jury in the manner it did, it prompted the jury to consider Musk's supposed non-culpable state of mind and invited the jury to revisit the Court's summary judgment rulings.

        c.    <u>Proposed Missing Witness Jury Instruction: The jury was allowed</u>

---

[7] *See also STM Networks, Inc. v. Clay Pac. S.R.L.*, Case No. SACV03-1796-DOC (MLGx), Dkt. No. 123 at 22 (C.D. Cal., Feb 17, 2005) (When addressing the summary judgment holding, the jury instructions began as follows, "the court has found the following facts to be true . . . ." ), *aff'd STM Networks, Inc. v. Clay Pac. S.R.L.*, 224 F. App'x 609, 610 (9th Cir. 2007) ("The district court did not abuse its discretion in giving jury instructions consistent with its ruling on partial summary judgment."); *see also Nutri-Metics Int'l, Inc. v. Carrington Lab'ys, Inc.*, 1992 WL 389246, at *5 (9th Cir. Dec. 22, 1992) ("[t]he court's ruling on the partial summary judgment was read to the jury, both during the trial and as part of the instructions.").

<u>to discredit key pieces of evidence after being told by Musk and his counsel that Plaintiff intentionally excluded the Saudi PIF from testifying at trial.</u>

These errors were compounded when Musk accused Plaintiff of intentionally failing to call the Saudi PIF as a witness during trial. 1/23 Tr. at 836:18-24 (Musk: "Why did you not subpoena [Yasir Al-Rumayyan from the Saudi PIF]? . . . Because if you did, it would destroy your case. That's why."). As the Court recognized, this statement was inappropriate and factually incorrect; in March 2021, Plaintiff attempted to obtain evidence from the Saudi PIF through the letters rogatory process. *See* ECF No. 315. Despite the Court striking Musk's testimony, Defendants' counsel capitalized on these comments during closing, claiming that "Plaintiffs have the burden of proof; they didn't bring them here. There's no evidence they wanted them here. . . . they didn't want them here." 2/3 Tr. at 2075:8-13; *see id*. at 2076:1-9 ("Nobody came in here and told you those were the minutes, or they weren't created years later and, you know -- I mean, even if you think that the minutes are real, you have no credible evidence that they are or that they are what they purport to be or they are complete."). Defendants' inappropriate and untrue comments tainted the credibility of the Saudi PIF's evidence (namely the text messages and meeting minutes) and unfairly influenced the jury's deliberations. The jury should have been instructed as Plaintiff proposed. *See* ECF No. 644 at 5.

## V.    CONCLUSION

Where, as here, a party has no evidence in support of a verdict, judgment as a matter of law is appropriate under Federal Rule of Civil Procedure 50. Thus, Plaintiff should be granted judgment as a matter of law on the elements of materiality and reliance along with a new trial and proper instructions so the jury can deliberate on the sole remaining issue of the amount of damages caused by Musk's tweets.[8]

//

---

[8] With materiality proven as a matter of law, the jury's verdict cannot stand and if left as is would result in a "manifest miscarriage of justice." *Go Daddy*, 581 F.3d at 961-62. The other elements of Rule 10b-5 are undisputed (such as the use of an instrument of interstate commerce, *i.e.*, Twitter). Thus, if the Court agrees with Plaintiff on materiality, then the only issue necessary for a jury to decide is the amount of damages caused by the tweets.

Dated: March 7, 2023

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 *s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
75 Broadway, Suite 202
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt
Elizabeth K. Tripodi
Alexander A. Krot III
Kathy E. Ames Valdivieso
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Email: nporritt@zlk.com
Email: etripodi@zlk.com
Email: akrot@zlk.com
Email: kavaldivieso@zlk.com
(admitted *pro hac vice*)

-and-

Joseph Levi
Eduard Korsinsky
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Email: jlevi@zlk.com
Email: ek@zlk.com
(admitted *pro hac vice*)

*Attorneys for Plaintiff and Counsel for the Class*