UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA INC., SECURITIES LITIGATION | Case No. 18-cv-04865-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL, AND DENYING DEFENDANTS' MOTION FOR COSTS**<br><br>Docket Nos. 657, 685, 689 |

## I.      INTRODUCTION

Plaintiff Glen Littleton filed a securities class action against Defendants Tesla, Inc.; Elon Musk (Tesla's CEO and former Chairman); and Tesla's Board of Directors based on two tweets made by Mr. Musk in August 2018 about taking Tesla from a public to a private company.  After a three-week trial in January 2023, the jury awarded a verdict for Defendants on all claims.

Now pending before the Court are (1) Plaintiff's motion for judgment as a matter of law or, in the alternative, for a new trial, *see* Docket No. 685, and (2) supplemental briefing from the parties regarding whether the Court shall award costs to Defendants as the prevailing party under Federal Rule of Civil Procedure 54.  *See* Docket Nos. 688; 689.  As set forth below, the Court **DENIES** Plaintiff's motion for judgment as a matter of law or for a new trial because Plaintiff failed to move on essential elements and because substantial evidence demonstrates that the tweets at issue were not material.  Plaintiff is not entitled to judgment as a matter of law with respect to materiality or reliance.  Plaintiff has, however, rebutted Rule 54(d)'s presumption that he should pay Defendants' costs as the prevailing party.  Each party shall pay their own costs.

## II.   **BACKGROUND**

A.   Plaintiff's Claims

Plaintiff Glen Littleton represents a class of individuals and entities who purchased or sold Tesla stock, options, and other securities from 9:48 a.m. PST on August 7, 2018 to August 17, 2018 (the "Class Period").  Plaintiff brought claims against Defendants Elon Musk and Tesla for violations of Sections 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j, 78t) and SEC Rule 10b-5(b) (17 C.F.R. § 240.10b-5) when Mr. Musk published from his personal Twitter account two tweets on August 7, 2018: "Am considering taking Tesla private at $420. Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."[1]  Plaintiff also brought a Section 20(a) claim against all members of Tesla's Board of Directors on the grounds that they were controlling persons of Tesla.

B.   Summary Judgment Order

On April 1, 2022, the Court granted partial summary judgment to Plaintiff on the issues of falsity and scienter.  Docket No. 387 (Summary Judgment Order).  Specifically, the Court found that the following statements in the Musk Tweets were false and made recklessly: "Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." *Id.* at 24–29.  The Court declined to grant summary judgment for Plaintiff on the element of reliance under the fraud-on-the-market presumption because there were disputed issues of material fact on materiality and Defendants were entitled to rebut the fraud-on-the-market presumption. *Id.* at 32.  Specifically, the Court found that "there is evidence suggesting that the misrepresentations [at issue] did not actually affect the market price" of Tesla securities because "there is evidence that, after the 8/13/2018 blog post, which served as a partial corrective disclosure, there was no decline or at least not a significant decline in stock price; thus, arguably, the reaction to the tweets on 8/7/2018 was a response to Mr. Musk contemplating taking Tesla private and not to statements that, e.g., funding was secured or investor support confirmed."

---

[1] Throughout this Order, the Court refers to these two tweets—"Am considering taking Tesla private at $420.  Funding secured" and "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote."—as the Tweets.

1  *Id.*

2          Defendants asked the Court to reconsider its summary judgment ruling.  *See* Docket No.

3  401 (Motion for Leave to Seek Reconsideration).  At the hearing on Defendants' motion for

4  reconsideration, the Court made clear that it found only that the statements "Funding secured" and

5  "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a

6  shareholder vote" were "false statement[s] . . . in a literal sense, not in a legal sense."  Docket No.

7  445 (June 16, 2022 Hrg. Tr.) at 4:14-21.  The Court concluded that "[t]o be clear, I did not find

8  materiality with respect to the misrepresentation or a reckless disregard or knowingly scienter with

9  regard to any such material representation."  *Id.* at 5:6-8.  In its Minute Order following the

10  hearing, the Court reiterated that "[a] statement can be factually false but not material."  Docket

11  No. 446 (June 16, 2022 Min. Entry) at 1.

12  C.      The Trial

13          On January 17, 2023, the parties went to trial on Plaintiff's claims. At trial, Plaintiff bore

14  the burden to prove each element of his Rule 10b-5 claim against Defendants Elon Musk and

15  Tesla: (1) that Elon Musk and/or Tesla made untrue statements of a material fact in connection

16  with the purchase or sale of securities, (2) Elon Musk and/or Tesla acted with the necessary state

17  of mind, (3) Elon Musk and/or Tesla used an instrument of interstate commerce, (4) Plaintiff

18  justifiably relied on Elon Musk and/or Tesla's untrue statements of material fact in buying or

19  selling Tesla securities, and (5) loss causation.  Docket No. 655 (Jury Instructions) at 7.  In

20  addition, as to Tesla, Plaintiff bore the burden to impute Mr. Musk's state of mind to Tesla.  *Id.* at

21  12.  Plaintiff also bore the burden to prove his Section 20(a) claim against each of the Director

22  Defendants.  *Id.* at 18.  Consistent with the Court's summary judgment order, the jury was

23  instructed:

24              You are to assume that the statements 'Funding secured' and
                'Investor support is confirmed. Only reason why this is not certain is
25              that it's contingent on a shareholder vote.' were untrue.  But you
                still must decide whether these statements were of material facts.
26              You must also assume Mr. Musk acted with reckless disregard for
                whether the statements were true.  But you must still decide whether
27              he knew that the statements were untrue.

28  *Id.* at 6–7.

3

United States District Court
Northern District of California

At trial, the jury heard evidence concerning Mr. Musk's Tweets and the underlying state of affairs that the Tweets concerned.[2]  Mr. Musk, Tesla's CFO Deepak Ahuja, and Mr. Musk's Chief of Staff Sam Teller testified that the Saudi Arabian Public Investment Fund ("PIF") had, since January 2017, been interested in funding Tesla going private.  *See, e.g.*, Trial Transcript ("TT") 882:19-21 (Musk); TT 883:5-21 (Musk); TT 1189:10-19 (Ahuja); TT 1880:10-17 (Teller); TT 1883:2-9 (Teller).  Mr. Musk testified that the PIF held multiple meetings with Mr. Musk in 2017 in which its Managing Director, Yasir Al-Rumayyan, repeatedly expressed interest in providing financing to take Tesla private.  TT 882:19-21; TT 883:10-13; TT 885:7-13; TT 886:23-887:1. Specifically, in March 2017, Mr. Musk and Mr. Ahuja held a dinner meeting at the Tesla factory with members of the Saudi PIF, the CEO of SoftBank, and Larry Ellison.  TT 631:4-7; TT 1173:2-12; *see also* Ex. 827 (calendar invite for March 8, 2017 meeting).  The "principle topic" discussed at this dinner was the possibility of the PIF or SoftBank making a "big investment in Tesla" in the amount of "many, many billions of dollars."  TT 1174:1-5; TT 1174:21.  Mr. Musk testified that Larry Ellison was very supportive of the idea that Tesla would go private, and indicated his intent to participate in a take-private transaction.  *See* TT 747:12-17; TT 857:8-10.  In one of those meetings, Mr. Musk informed the PIF that if it was interested in a take-private transaction, it should first purchase significant shares in Tesla stock on the public market.  TT 887:17-20.

On July 31, 2018, Mr. Musk, Mr. Ahuja, and Mr. Teller attended a meeting with the Saudi PIF at Tesla's Fremont factory.  TT 736:9-15; TT 1883:24-1884:6.  During that meeting, the PIF revealed to Mr. Musk that it had acquired nearly five percent of Tesla's stock—a multi-billion dollar holding.  TT 1882: 6-11; TT 1886:16-22.  The Tesla employees who attended this meeting testified that, during this meeting, the PIF reiterated its interest in taking Tesla private.  TT 1888:1-4 (Teller); TT 1889:19-1890:6 (Teller); TT 1180:15-19 (Ahuja); TT 1183:13-1184:1 (Ahuja).  The participants discussed—albeit at a high level—the potential size, cost, and structure

---

[2] When discussing the evidence in this Order, the Court must draw reasonable inferences in Defendants' favor.  The Court will describe the evidence as the jury reasonably could have viewed it in reaching the verdict.  It will provide citations to some of the evidence in the record, but by no means to all of the relevant evidence.  Occasionally, the Court will simply reference the testimony of particular witnesses rather than provide specific page citations.

of the transaction, and Mr. Musk expressed a preference that Tesla's existing shareholders be given the opportunity to retain their shares in a private Tesla.  TT 1890:12-17.  Although no specific amount of funding was discussed at the meeting, the Tesla participants were left with the impression that the PIF and Mr. Musk had essentially a "handshake deal" to take Tesla private, and that all that was left was to work out the details.  TT 746:4-10 (Musk); TT 886:23-887:1 (Musk); TT 887:17-24 (Musk); TT 1189:10-19 (Ahuja); TT 1892:22-1893:3 (Teller).

Mr. Musk testified at trial that no specific percentage of funding was discussed during the meeting because the amount of funding needed from the PIF depended on the degree of participation from other shareholders and how much of Tesla that Mr. Musk would purchase using his SpaceX shares.  *See* TT 740:10-19.  Mr. Musk also testified that he believed that the sale of his SpaceX shares, alone, would have meant that funding was secured, and that he believed that his shares of SpaceX were worth around "15 to $20 billion" dollars.  TT 741:7-12; TT 1007: 4-10.  Mr. Musk testified that he envisioned a corporate structure for Tesla that was similar to that of SpaceX; he hoped to have many shareholders roll over their investments into a private Tesla, thereby reducing the amount of new capital needed to go private.  TT 1004:5-10; TT 886:1-17.

Following the July 31 meeting, Mr. Musk emailed a bid to Tesla's Board of Directors to take the company private at $420 per share, *see* Ex. 81, and both Mr. Musk and Mr. Ahuja independently met with the Board to discuss the transaction and the PIF's interest and commitment.  *See* Ex. 82; Ex. 83; TT 889:16-19; TT 1195:6-14.  After these meetings, Mr. Musk arranged calls with lawyers and advisors, including Egon Durban of Silverlake Capital, to discuss the take-private transaction.  TT 778:4-20; TT 893:21-22.

On August 7, 2018, after learning that the Financial Times intended to publish an article revealing details of Mr. Musk's meeting with the PIF, Mr. Musk published his first Tweet: "Am considering taking Tesla private at $420. Funding secured."  TT 782:17-21.  Tesla's shares rose immediately following the first Tweet.  TT 1651:5-12.  Later that day, Tesla published a blog post from Mr. Musk which stated that "a final decision has not yet been made," described the potential structure, and explained that the proposal to go private would ultimately be finalized through a shareholder vote.  Ex. 12.  Mr. Musk retweeted and linked to the Blog Post in his second Tweet

which stated "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." *See* Ex. 13.  Prior to publishing this Tweet, Mr. Musk had received messages of interest and support from major Tesla investors, such as Ron Baron.  *See, e.g.*, Ex. 1001; TT 936:5-17.

At trial, the jury heard testimony that the term "funding secured" meant different things to different witnesses.  Mr. Littleton testified that he understood it to be consistent with the fact that "a [final decision] had been made," TT 389:17-19; and that "there would be a process, but [Mr. Musk] would make that happen.  Because funding was secured."  TT 402:3-5.  Investor Timothy Fries testified that the term indicated that "there had been some vetting" and "critical review" of the funding sources.  TT 509:5-7.  Goldman Sachs' head of investment banking, Dan Dees, testified that he thought "funding secured" meant "that [Mr. Musk] was in touch with the capital required."  TT 943:2-5; TT 1454:6-11.[3]

Following the publication of the Tweets, Mr. Musk worked with advisors Goldman Sachs and Silverlake Capital to take steps to effectuate the take-private transaction.  TT 946:9-11; TT 962:12-20; TT 1344:3-15; Ex. 179 (Silverlake Presentation); Ex. 254 (Goldman Sachs Presentation).  Mr. Musk's advisors testified that there was ample funding available to take Tesla private and that funding would not be an issue.  *See, e.g.*, TT 1448:21-1449:5; TT 1461:4-16; Ex. 252; Ex. 101.  Additionally, Silverlake prepared a presentation with detailed financial forecasts, projecting that Tesla would not need additional capital to go private.  Ex. 179.  Some market analysts and investors, such as Owuraka Koney of Jennison, similarly testified that they believed that "the money was out there for [Tesla] to go private."  *See* Koney Depo. Tr. at 56:20-21.

On August 13, 2018, Mr. Musk published a blog post that explained why he said "funding secured."  *See* Ex. 53 ("Why did I say 'funding secured'?").  In the blog post, Mr. Musk described his meeting with the Saudi PIF and explained that while he did not have funding in hand, the PIF

---

[3] In their opposition brief, Defendants miscite Mr. Durban's testimony instead of Mr. Dees' testimony.  *See* Opp. at 6–7; *see also* Reply at 2 ("Defendants mistakenly attribute the testimony of Egon Durban to Dan Dees").  But although the pincite was wrong, the substance was correct— Mr. Dees testified that he thought funding secured meant "in touch with the capital required."  *See* TT 1454:6-11.

"strongly expressed [] support for funding a going private transaction for Tesla," that the PIF was "eager to proceed," and that he "left the July 31st meeting with no question that a deal with the [PIF] could be closed, and that it was just a matter of getting the process moving." *Id.* Mr. Musk also explained the next steps, including submitting a final proposal, an evaluation process by a special committee, approval of the plan, regulatory approvals, and finally a shareholder vote. *Id.* Following publication, Tesla's stock price slightly increased. TT 1743:10-18.

At trial, Plaintiff called two experts—Dr. Michael Hartzmark and Dr. Steven Heston—to opine on the options market, loss causation, and damages. Dr. Hartzmark opined that, following the initial jump in stock price on August 7, the price of Tesla's stock gradually decreased over the next ten days as the truth regarding the status of "funding secured" and the other Tweet became known. TT 1699:24-1700:23. Dr. Hartzmark testified that he analyzed both sentences in the first Tweet together as "an interwoven bundle." TT 1694:24-1695:7; TT 1732:21-1733:6. In other words, Dr. Hartzmark did not separate out the price effect or market impact of the undisputedly true portion of Mr. Musk's first Tweet—that he was considering taking Tesla private at $420— from "funding secured." *Id.*

Following closing argument, the jury deliberated and found that Defendants were not liable for any of the claims. *See* Docket No. 671 (Verdict Form). Because the jurors used a general verdict form, the jurors did not make any findings as to particular elements of the claims. *See id.*

D.   Plaintiff's Pre-Verdict Rule 50(a) Motion

On February 1, 2023, before the close of evidence, Plaintiff filed a Rule 50(a) motion for judgment as a matter of law with respect to two issues: (1) the Rule 10b-5 claim element of materiality, and (2) classwide and individual reliance. Docket No. 657 (Rule 50(a) Motion) at 1–2. Plaintiff did not move for judgment as to the entire Rule 10b-5 claim or other essential elements of the claim, such as loss causation. *See, e.g.*, *id.* at ii–iii. Nor did Plaintiff move for judgment as Tesla's imputed liability or his Section 20(a) claim against the Director Defendants. *Id.*

E.   Plaintiff's Renewed Motion for Judgment as a Matter of Law

On March 7, 2023, Plaintiff filed the instant Motion for Judgment as a Matter of Law or in

1   the Alternative for a New Trial.  *See* Docket No. 685 (Renewed Motion for Judgment as a Matter

2   of Law, or "Mot.").  While Plaintiff indicated that he was moving for judgment as a matter of law

3   "on the remaining 10b-5 elements" for liability, the motion is limited to the issues of materiality,

4   class-wide reliance, and individual reliance.  *Id.* at ii–iii; *id.* at 11–19.

5         With respect to loss causation, Plaintiff appears to adopt two contradictory positions.  In

6   his introduction, Plaintiff argues that "[t]he sole issue that should have been left for the jury to

7   decide was the question of loss causation and the amount of damages to be awarded to Plaintiff

8   and the Class."  *Id.* at 1; *see also id.* at iii ("Is a new trial warranted in order for the jury to decide

9   damages after receiving proper instructions, including that the only remaining issues to be

10  determined under Rule 10b-5 are the loss causation and the quantum of damages to be awarded

11  because the other elements for liability under Rule 10b-5 have been established as a matter of

12  law . . . ?").  But in the body of his motion, Plaintiff argued that the "[t]he evidence at trial firmly

13  supports that Musk's tweets were material and, in turn, the elements of reliance and loss causation

14  should be decided in Plaintiff's favor."  *Id.* at 20; *see also* Docket No. 692 (Reply) at 5

15  (contending that "all elements, except materiality and reliance, are undisputed").  As far as the

16  Court can tell, Plaintiff argues that loss causation is (1) an undisputed element; (2) that flows from

17  a determination of materiality; and (3) should be decided by a new jury in a damages trial.

18        Plaintiff also moved for a new trial on damages based on three purportedly confusing jury

19  instructions.  Mot. at 20.

20                              **III.        LEGAL STANDARD**

21  A.    Motion for Judgment as a Matter of Law

22        Judgment as a matter of law under Federal Rule of Civil Procedure 50(b) is granted "only

23  if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Winarto*

24  *v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).  When evaluating

25  such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party,

26  and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson*

27  *Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).  The Ninth Circuit has made clear that a court

28  "cannot disturb the jury's verdict if it is supported by substantial evidence."  *Lambert v. Ackerley*,

8

180 F.3d 997, 1012 (9th Cir. 1999).  Substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence.  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (internal quotation marks omitted).  "Thus, although the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury." *Reeves*, 530 U.S. at 151.  In other words, entry of judgment as a matter of law is warranted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro*, 833 F.3d at 1066 (internal quotation marks omitted).

B.    Motion for a New Trial

Under Federal Rule of Civil Procedure 59(a)(1), a court "may, on motion, grant a new trial on all or some of the issues." Fed. R. Civ. P. 59(a).  A trial court may grant a new trial, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).  In considering a Rule 59(a) motion, the court "is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

The decision to grant a new trial falls within the sound discretion of the trial court. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  However, a court should not grant a new trial unless it is "left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) (internal quotations omitted).  A trial court's determination that the verdict is not against the clear weight of the evidence is upheld unless there is an "*absolute absence of evidence* to support the jury's verdict." *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017) (internal quotation marks omitted) (emphasis in original).

United States District Court
Northern District of California

C.      Costs

Federal Rule of Civil Procedure 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1).  "Rule 54(d) creates a presumption in favor of awarding costs to prevailing parties, and it is incumbent upon the losing party to demonstrate why the costs should not be awarded." *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1079 (9th Cir. 1999).

Because of Rule 54(d)'s presumption in favor of awarding costs to a prevailing party, "a district court need not give affirmative reasons for awarding costs; instead, it need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003).  A court that declines to award costs, however, must justify its decision by explaining "why a case is not 'ordinary' and why, in the circumstances, it would be inappropriate or inequitable to award costs." *Ass'n of Mexican–Am. Educators v. State of Cal.*, 231 F.3d 572, 593 (9th Cir. 2000) (en banc); *see Save Our Valley*, 335 F.3d at 945 ("A district court deviates from normal practice when it refuses to tax costs to the losing party, and that deviation triggers the requirement to 'specify reasons.'").

Appropriate reasons for denying costs include: (1) the substantial public importance of the case, (2) the closeness and difficulty of the issues in the case, (3) the chilling effect on future similar actions, (4) the plaintiff's limited financial resources, and (5) the economic disparity between the parties. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1247–48 (9th Cir. 2014) (citing *Ass'n of Mex.–Am. Educators*, 231 F.3d at 592–93).  This is not "an exhaustive list of 'good reasons' for declining to award costs," but rather a starting point for analysis.  *Id.*

## IV.      DISCUSSION

A.      Plaintiff's Motion for Judgment as a Matter of Law

Procedurally and substantively, Plaintiffs' motion is flawed.  The Court begins by discussing the limited scope of Plaintiffs' initial Rule 50(a) motion, which necessarily limits the relief that Plaintiffs are able to secure in their Rule 50(b) motion.  But as set forth below, even if Plaintiffs had sought judgment on all elements of their claims, the Court would still deny the motion because there was substantial evidence supporting the jury's verdict with respect to

materiality.

1.  <u>The Court Cannot Enter Judgment as a Matter of Law Because Plaintiff Did Not Move on Essential Elements of his Rule 10b-5 Claim</u>

At the outset, the Court addresses a threshold procedural issue regarding the scope of the Rule 50 motion before the Court.  As Defendants note, Plaintiff moved with respect to materiality and reliance in his initial Rule 50(a) motion.  Because Plaintiff did not move on other essential elements of the claim—most particularly, loss causation—Defendants contend that the Court cannot enter judgment for Plaintiff on the Rule 10b-5 claim.  *See* Docket No. 791 (Opposition to Plaintiff's JMOL, or "Opp.") at 9–10.

Plaintiff responds that Rule 50 permits parties to raise challenges on discrete legal issues rather than a complete legal claim.  Reply at 4.  Plaintiff is missing the point.  While a party is not required to move for judgment as a matter of law on all elements of its claims, Plaintiff's failure to seek judgment as to each element required for his Rule 10b-5 claim necessarily limits the Court's analysis of the claim and therefore precludes the Court from entering judgment as a matter of law.

*Sagicor Life Insurance Co. v. Jang* is on point.  In this malicious prosecution case, the plaintiffs sought judgment as a matter of law "only on the issue of malice."  *See* No. 19-cv-2028, 2022 WL 17328237, at *5 (C.D. Cal. Oct. 27, 2022).  Because the plaintiffs had exclusively moved on a single element, the scope of the Rule 50(b) motion was "limited to that one issue."  *Id.* The Court denied the motion because "[w]ithout reaching all elements of Plaintiffs' claim, the Court cannot enter judgment as a matter of law."  *Id.*; *see also Marker v. City of San Jose*, No. 09-cv-05956-RMW, 2014 WL 5302175, at *1 (N.D. Cal. Oct. 16, 2014) (denying plaintiff's motion for JMOL where substantial evidence supported jury's verdict as to one element, even if the court presumed plaintiff would prevail on other elements).

Plaintiff must establish loss causation in order to prevail in his section 10b-5 claim.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1052 (9th Cir. 2008) (affirming dismissal of 10b-5 claim for failure to plead loss causation); *see also* Jury Instructions at 15.  Plaintiff did not seek judgment with respect to this element in his original pre-verdict motion.  *See* Docket No. 685 at 11–19.  Nor has Plaintiff argued here that there was no legally

1    sufficient basis from which the jury could have found for Defendants on the element of loss

2    causation.  A party which has failed to establish liability is not entitled to a new trial on damages.

3          In sum: the Court cannot enter judgment as a matter of law for Plaintiff on the Rule 10b-5

4    claim because Plaintiff did not move with respect to loss causation.  Moreover, there was

5    substantial evidence at trial from which the jury could have concluded that the Tweets were not

6    material and, therefore, that the elements of materiality and reliance had not been satisfied.

7          2.    Substantial Evidence Demonstrates that the Tweets Were Not Material

8          Plaintiff's motion is unavailing because substantial evidence at trial supported the

9    conclusion that the Tweets were not material.

10         The question of materiality depends on how significant a misrepresented fact would be to a

11   reasonable investor.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976); *see also*

12   Jury Instructions at 10 (defining materiality).  To establish this element, Plaintiff needed to prove

13   both that (1) there is a "substantial likelihood that a reasonable investor would consider the

14   [misrepresented] fact important in deciding whether to buy or sell that security" and (2) the

15   "misrepresentation gives a reasonable investor the impression of a state of affairs that differs in a

16   material way from the one that actually exists."  *See* Jury Instructions at 10; *TSC Indus.*, 426 U.S.

17   at 449 ("[T]here must be a substantial likelihood that the disclosure of the omitted fact [or

18   correction of the misstated fact] would have been viewed by the reasonable investor as having

19   significantly altered the 'total mix' of information made available."); *In re McKesson HBOC, Inc.*

20   *Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000) (same).

21         The law is also clear that context matters for purposes of determining materiality.  *TSC*

22   *Indus.*, 426 U.S. at 449 (explaining that the materiality standard requires showing "a substantial

23   likelihood that, *under all the circumstances*, the omitted fact would have assumed actual

24   significance in the deliberations of the reasonable shareholder") (emphasis added); 17 C.F.R. §

25   240.10b–5(b) ("It shall be unlawful . . . [t]o make any untrue statement of a material fact or to

26   omit to state a material fact necessary in order to make the statements made, *in the light of the*

27   *circumstances under which they were made*, not misleading.") (emphasis added); *see also Matrixx*

28   *Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011) (assessing materiality of statement "requires

United States District Court
Northern District of California

consideration of the source, content, and context of the [statement]").

There was substantial evidence from which the jury could conclude that the actual state of affairs did not differ from the term "funding secured" in a way that would be significant to the reasonable investor.  As set forth above, multiple witnesses testified that the PIF had, since January 2017, been interested in funding Tesla going private, and that—following the July 31 meeting at the Fremont factory—the Tesla employees in attendance were left with the impression that the PIF and Mr. Musk had essentially a "handshake deal" to take Tesla private, and that all that was left was to work out the details.  *See* TT 882:19-21 (Musk); TT 883:5-21 (Musk); TT 1189:10-19 (Ahuja); TT 1880:10-17 (Teller); TT 746:4-10 (Musk); TT 886:23-887:1 (Musk); TT 887:17-24 (Musk); TT 1189:10-19 (Ahuja); TT 1892:22-1893:3 (Teller).  Although no price or percentage were discussed at the July 31 meeting, the jury heard testimony from Mr. Musk and Mr. Ahuja that the PIF was willing to do whatever was necessary to fund the transaction and that it had ample financing to do so.  TT 744:16-746:10 (Musk); 1180:15-1184:11, 1185:16-1186:2, 1189:10-19 (Ahuja).  Moreover, although there was evidence that the PIF's support of the Tesla transaction waned after August 7, the jury could have credited Defendants' evidence about the PIF's longstanding enthusiasm for the take-private transaction, the vast financial resources at both their and Mr. Musk's disposal, and the fact that Mr. Musk wanted many shareholders to roll over their investments into a private Tesla, thereby reducing the amount of new capital needed to go private.  *See*  TT 1174:1-5; TT 1174:21; TT: 741:7-12; TT 1007: 4-10; TT 886: 1-17.  Based on this evidence, a reasonable juror could conclude that the actual state of affairs did not differ from the term "funding secured" in a way that would be significant to the reasonable investor.  In other words, even though the funding for the deal was not technically secured and Mr. Musk's statement was therefore *factually* false, *see* Summary Judgment Order at 24–29, there was substantial evidence demonstrating that the actual status of the funding was sufficiently close to "secure" such that Mr. Musk's statement was not *materially* false.

There was also substantial evidence from which the jury could have concluded that the second Tweet—"Investor support confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote"—was not *materially* false.  As for the first sentence, the jury

13

heard evidence that Mr. Musk had support from the PIF and that he had already received confirmation of support for his contemplated transaction from Ron Baron, a significant Tesla investor, as well as Larry Ellison.  *See, e.g.*, Ex. 1001; TT 936:5-17; TT 747:12-17; TT 857:8-10. And as for the second sentence, other tweets issued by Mr. Musk shortly before this tweet suggest that—in context—this tweet was not materially false in light of other tweets which suggested that there would other steps that would need to happen before the deal was finalized, but that these steps would not pose issues.  This Tweet followed on the heels of other tweets by Mr. Musk which described his envisioned structure.  *See* Ex. 9; Ex. 10.  Thus, read in context—as the statement must be, *Matrixx*, 563 U.S. at 43—a reasonable juror could conclude that the actual state of affairs did not differ from the Tweet in a way that would be significant to the reasonable investor.  In fact, Mr. Littleton himself testified that he was aware that there was a process that would have to take place before Tesla went private.  *See* TT 398:2-399:1.

Lastly, the jury was presented with evidence that, after Mr. Musk provided more details regarding his meeting with the PIF in his August 13 blog post, Tesla's stock price increased.  *See* Ex. 53; TT 1688:2-9.  As the Court noted in its Summary Judgment Order, this stock price reaction arguably creates the inference that the stock price reaction to the tweets on August 7 stemmed from the market reaction to Mr. Musk contemplating Tesla private at $420 per share and not to statements that funding was secured or investor support was confirmed.  *See* Docket No. 398 (Summary Judgment Order) at 32.  This evidence provides further support for the conclusion that the Tweets were not material.

In sum, substantial evidence supports the finding that the Tweets were not material. Although Plaintiff marshals evidence which suggests that the Tweets were material, *see* Mot. at 12–15, the Court may grant judgment as a matter of law "only if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Winarto*, 274 F.3d at 1283; *see also Castro*, 833 F.3d at 1066 (explaining that substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence).  Because Plaintiff has not shown that no reasonable juror could have found that the Tweets were not material, the Court **DENIES** the motion on this ground.

United States District Court
Northern District of California

United States District Court
Northern District of California

3.      <u>There Was Sufficient Evidence to Support the Jury's Verdict with Respect to Reliance</u>

Plaintiff's argument with respect to reliance also fails because there was substantial evidence upon which the jury could conclude that Plaintiff failed to meet his burden to prove reliance via the fraud-on-the-market presumption.

First, materiality is an element of the fraud-on-the-market presumption of reliance.  *See* Jury Instructions at 13 (explaining that the jury must find that the "misrepresentations were publicly known and material"); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (listing the elements for the presumption of reliance).  The Court has already concluded that there is substantial evidence that the Tweets were not material.  *See* Section IV.A.2, *supra*.  Therefore, substantial evidence exists that Plaintiff had not established the fraud-on-the-market presumption of reliance.

Additionally, Defendants could also rebut the fraud-on-the-market presumption of reliance by "proving by a preponderance of the evidence that the misrepresentation did not affect the market price of Tesla's stock."  Jury Instructions at 14; *see also Halliburton*, 573 U.S. at 279 (explaining that the *Basic* presumption "affords defendants an opportunity to rebut the presumption by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price").  The jury could have credited Defendants' argument that Mr. Musk's plan to take Tesla private—rather than the status of the funding—is what animated the jump in Tesla's stock price, and that therefore Defendants had rebutted the presumption.  For these reasons, the Court **DENIES** Plaintiff's request for judgment as a matter of law with respect to the fraud-on-the-market presumption of reliance.

Plaintiff also seeks judgment as a matter of law on the issue of individual reliance based on Mr. Littleton's and Mr. Fries' testimony that they relied on the "funding secured" tweet.  Mot. at 19 n.4; *see also* TT 362:11-12 (Littleton testifying that "'funding secured' was so definite . . . that was the primary driver"); TT 509:12-13 (Fries testifying that "[t]he phrase 'funding secured' was critical" and that "[f]unding secured gave me the confidence that I could get in").  This testimony plausibly demonstrates that Mr. Littleton and Mr. Fries "were aware of, and specifically relied on,

[Mr. Musk's] false statements when deciding to purchase or sell [Tesla] shares." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 795 (9th Cir. 2017). But a theory of direct reliance still requires that the false statements be material. "[B]ecause materiality is an element of the *merits* of their securities fraud claim, [Plaintiff] cannot both fail to prove materiality yet still have a viable claim for which they would need to prove reliance individually." *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) (emphasis in original); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) ("In the usual claim under Section 10(b), the plaintiff must show individual reliance on a material misstatement."). Because, as explained above, there is substantial evidence that the Tweets were not material, the Court **DENIES** Plaintiff's motion for judgment as a matter of law on individual reliance.

Next, the Court turns to Plaintiff's request for a new trial.

B.     Plaintiff's Motion for a New Trial

Plaintiff presents two arguments in support of his request for a new trial. First, he claims that because "[t]he evidence at trial firmly supports that Musk's tweets were material and, in turn, the elements of reliance and loss causation should be decided in Plaintiff's favor . . . letting the jury's verdict stand would amount to a 'manifest miscarriage of justice.'" Mot. at 20 (quoting *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)). Second, he contends that a new trial is warranted because "the jury instructions created confusion amongst the jurors that led to the erroneous verdict." *Id.* (capitalization altered for clarity). Neither argument passes muster.

1.     The Verdict Was Not Against the Clear Weight of the Evidence

Plaintiff's theory that a defense verdict goes against the clear weight of the evidence rests on two incorrect premises—that the Tweets were indisputably material and that "the elements of liability" have been decided in favor of Plaintiff. Mot. at 20. Again, the Court has already concluded that substantial evidence demonstrates that the Tweets were not material. *See* Section IV. A.2, *supra*. And puzzlingly, it appears that Plaintiff assumes that the Court will decide loss causation in Plaintiff's favor, even though Plaintiff has not presented any argument or evidence regarding loss causation in either his initial Rule 50(a) motion or in the renewed motion. *See* Mot.

16

at 20.  This assumption is clearly unsupportable, not least because there was substantial evidence from which the jury could have concluded that Plaintiff had not established loss causation.

For example, the jury could have found that there was insufficient evidence of loss causation due to Plaintiff's failure to isolate the impact of the false "funding secured" statement from the true statement that Mr. Musk was considering taking Tesla private at $420.  *See* Jury Instructions at 15 ("Plaintiff must reasonably distinguish any security-price reaction to the misrepresentations at issue from the market's reaction to other factors, such as other information or events that could affect the prices of Tesla's securities."); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013) ("Because there are a tangle of factors that affect [price], evidence that certain [false statements] are responsible for a loss must reasonably distinguish the impact of those [statements] from other economic factors."). It is undisputed that Dr. Hartzmark analyzed both Tweets together as "an interwoven bundle" and did not separate out the price effect or market impact of the undisputedly true portion of Mr. Musk's Tweet—that he was considering taking Tesla private at $420—from the alleged false statements. TT 1694:24-1695:7; TT 1732:21-1733:6.  Thus, the jury could reasonably have found that Plaintiff had not established loss causation.

Because Plaintiff has not shown that the verdict was against the clear weight of the evidence and there is no miscarriage of justice, the Court rejects Plaintiff's first argument for a new trial.

2. <u>There Was No Instructional Error</u>

Next, Plaintiff contends that three jury instructions "gave rise to confusion amongst the jurors and, ultimately, led to an erroneous and prejudicial verdict."  Mot. at 20.  Plaintiff takes issue with Jury Instruction Nos. 6 and 9 and with the Court's rejection of Plaintiff's proposed missing witness jury instruction.  *Id.* at 20–25.  These arguments are meritless.

"The standard of review on appeal for an alleged error in jury instructions depends on the nature of the claimed error.  When an appellant alleges an error in the formulation of the jury instructions, the instructions are considered as a whole and an abuse of discretion standard is applied to determine if they are misleading or inadequate.  However, where an appellant claims

the trial court misstated the elements that must be proved at trial, the reviewing court must view the issue as one of law and review the instructions de novo." *Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 606 (9th Cir. 1993); *see also United States v. Prince*, No. 10-cv-00153-CRB, 2011 WL 6182387, at *2 (N.D. Cal. Dec. 13, 2011) ("In assessing a [party's] argument that omitted jury instructions entitle him to a new trial, the legal standard is whether the jury instructions as a whole were misleading or inadequate to guide the jury's deliberations.").  "Any error in instructing the jury in a civil case does not require reversal if it is harmless." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 827 (9th Cir. 2013).

> a.    Jury Instruction No. 6

Jury Instruction No. 6 instructed the jury on the elements of Plaintiff's Rule 10b-5 claim. As relevant here, the instruction provided that:

> You are to assume that the statements "Funding secured" and "Investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote." were untrue.  But you still must decide whether these statements were of material facts. You must also assume Mr. Musk acted with reckless disregard for whether the statements were true.  But you must still decide whether he knew that the statements were untrue.

Jury Instructions at 7 – 8.

Plaintiff asserts that the jury "should have been instructed decisively" that Plaintiff had already established falsity and scienter as a matter of law at summary judgment and that Defendants improperly argued and presented evidence to the jury that contradicted the Court's summary judgment ruling that the Tweets were false.  Mot. at 20–24.  Plaintiff further contends that the Court's "you are to assume" language was an "instructional error" that resulted in the Court misstating the elements that must be proved at trial.  Reply at 13.  The Court disagrees on both counts.

The Court's formulation of Jury Instruction No. 6 did not misstate the elements that were to be proved at trial.  The instruction adequately informed the jury of its charge—and what issues it had to assume were resolved—while protecting Defendants from the risk of prejudice arising from an express reference to a judicial finding of fact.  The Court has discretion in formulating jury instructions and is permitted to use the "you are to assume" construction. *See e.g.*, *Sherwin-*

*Williams Co. v. PPG Indus., Inc.*, 2021 WL 5648019, at *3 (W.D. Pa. Dec. 1, 2021) (adopting "you can assume" language in jury instruction to describe issue previously decided by the court and holding that the alternative phrase "it has been determined" was unnecessary and may confuse the jury).  The Court clearly instructed the jury "to assume that the statements were false and made recklessly," and the jury is presumed to have followed that instruction.  *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions . . . in all cases, juries are presumed to follow the court's instructions."); *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011) ("Jurors are presumed to follow the court's instructions.").

Moreover, the Court went to great lengths to illustrate the difference between falsity (which had been decided as a matter of law) and materiality (which remained an issue for the jury to decide).  First, in Jury Instruction No. 8, the Court explained that a "factual representation can be untrue but not material," and provided an example based on Plaintiff's own prior arguments to the Court.  *See* Jury Instructions at 10; Docket No. 445 (June 16, 2022 Hrg. Tr.) at 13:24-14:9.  Second, on the second day of trial, the Court expressly reminded the jury that it was to assume that "funding secured" and "investor support is confirmed.  Only reason why this is not certain is that it's contingent on a shareholder vote" were untrue.  *See* TT 500:20-24.  Specifically, before the jury heard testimony for the day, the Court explained:

> So I want to get started.  Before I do, I do want to give you a supplemental instruction to help you as we proceed and hear additional evidence.  You will hear testimony regarding the circumstances and communications relating to the two tweets by Elon Musk on August 7th, 2018 and Mr. Musk's state of mind as to those tweets.
>
> As I've stated, you are to assume that the statements, quote, "funding secured," close end, and quote, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote," close quote, were untrue. Therefore, the evidence is not to be used to determine whether the statements were untrue.
>
> Rather, such evidence may be relevant to other issues on which the plaintiff has the burden of proof, such as whether Mr. Musk knew the statements were untrue when he made them and/or whether the untrue statements gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that

actually existed.

So, hopefully, that will give you a framework when you listen to the testimony.  With that, I believe the plaintiff is prepared to call the next witness.

In sum: Jury Instruction No. 6 did not misstate the elements that needed to be proven at trial, nor was the Court's formulation of the instruction an abuse of instruction.  Plaintiff's argument to the contrary is **DENIED.**

          b.    Jury Instruction No. 9

Second, Plaintiff contends that Jury Instruction No. 9 was flawed because it told the jury that although they were to assume that Mr. Musk made the Tweets "with at least reckless disregard," they "must still decide whether Mr. Musk acted knowingly."  Jury Instructions at 11.  According to Plaintiff, this instruction "invited the jury to revisit the Court's summary judgment rulings" because it "prompted the jury to consider Musk's supposed non-culpable state of mind."  Mot. at 24.

Plaintiff's objection to this instruction is surprising given that Plaintiff did not initially object to including "knowing" in the scienter instruction, *see* Docket No. 549 (Plaintiff's Objections) at 8, and, in fact, included "knowing" as a component of scienter in his own proposed instructions.  *See* Docket No. 477 (Joint Proposed Jury Instructions) at 69.[4]  But even putting that aside, Plaintiff's objection is nonsensical.  Jury Instruction No. 9 expressly provided that the jury was to assume that Mr. Musk made the Tweets "with at least reckless disregard for whether the statements were true" *and* that "[s]cienter may be established by showing . . . [t]he defendant had reckless disregard for whether the statement was true."  Jury Instructions at 11.  Far from "prompt[ing] the jury to consider Musk's supposed non-culpable state of mind," the jury instruction expressly conveyed that scienter had been established for the Section 10b-5 claim.

Furthermore, the question of whether Mr. Musk acted knowingly as opposed to merely recklessly had evidentiary significance elsewhere in the trial.  First, the Court had to instruct the jury to determine whether Mr. Musk acted knowingly because this issue was necessary for

---

[4] Plaintiff did, however, object to this language in his proposed closing instructions.  *See* Docket No. 644 at 10–12.

apportionment purposes given Plaintiff's Section 20(a) claim.  *See* Jury Instruction No. 16 at 20 (apportionment instruction).  Second, the degree to which Mr. Musk acted knowingly made much of the evidence regarding what happened in meetings with the PIF, the communications in connection therewith, and Mr. Musk's perception thereof highly relevant.

The Court did not err in its formulation of Jury Instruction No. 9.  Plaintiff's argument is **DENIED.**

c.    <u>Proposed Missing Witness Instruction</u>

Lastly, Plaintiff argues that the Court erred by not administering its proposed mid-trial missing witness instruction regarding the Saudi PIF.  Mot. at 24–25.  Plaintiff's missing witness instruction provided that:

> You have seen evidence from the Saudi PIF and its representatives during the course of this trial. Plaintiff and Defendants both attempted to have the Saudi PIF appear at trial.  You should not make any assumptions as to why the Saudi PIF did not appear at trial or draw any inferences from the Saudi PIF's absence.  You should consider the evidence from the Saudi PIF as you would any other evidence admitted at trial and not discount it because the Saudi PIF did not testify.

Docket No. 644 (Proposed Jury Instructions) at 5.

"Whether to give a missing witness instruction is within the discretion of the Court." *Prince*, 2011 WL 6182387, at *2 (citing *United States v. Bautista*, 509 F.2d 675, 678 (9th Cir. 1975)); *see also Comment to the Ninth Circuit Missing Witness Pattern Instruction* (4.13) ("The Court has the discretion to give the missing witness instruction or to leave the matter to the argument of counsel").  The Court did not err or abuse its discretion in rejecting the proposed missing witness instruction.

The Court did not err in rejecting the proposed missing witness instruction.  Plaintiff's argument is **DENIED.**

C.   <u>Costs</u>

The Court turns to the final issue, which is whether the Court should order Plaintiff to pay Defendants' taxable costs as the prevailing party.  As set forth below, the Court finds that Plaintiff has rebutted Rule 54's presumption that he should pay costs and orders each party to bear its own

United States District Court
Northern District of California

costs.

"Rule 54(d) creates a presumption in favor of awarding costs to prevailing parties, and it is incumbent upon the losing party to demonstrate why the costs should not be awarded." *Stanley*, 178 F.3d at 1079 (citing *National Info. Servs., Inc. v. TRW, Inc.*, 51 F.3d 1470, 1471–72 (9th Cir. 1995)). Appropriate reasons for denying costs include: (1) the substantial public importance of the case, (2) the closeness and difficulty of the issues in the case, (3) the chilling effect on future similar actions, (4) the plaintiff's limited financial resources, and (5) the economic disparity between the parties. *Escriba*, 743 F.3d at 1247–48 (citing *Ass'n of Mex.–Am. Educators*, 231 F.3d at 592–93). This is not "an exhaustive list of 'good reasons' for declining to award costs," but rather a starting point for analysis. *Id.*

1.     Substantial Public Importance of the Case

When a case involves an issue of substantial public importance, it is a factor that weighs against awarding costs to the prevailing party. *Escriba*, 743 F.3d at 1247–48. There are multiple aspects to the present case which demonstrate that it involves an issue of substantial public importance. First, according to Plaintiff, "[o]ver 22 million individuals" received the Tweets in which Mr. Musk announced that he had secured funding for the privatization transaction, and "hundreds of thousands, if not millions, of Tesla investors saw an impact to their financial portfolios." Docket No. 688 (Plaintiff's Supplemental Briefing re Costs, or "Pl. Costs Br.") at 2. Within days of the Tweets, the U.S. Securities and Exchange Commission promptly commenced investigations and filed lawsuits in response to Mr. Musk's conduct, and news outlets published thousands of articles regarding the Tweets. The barrage of media coverage leading up to and during the trial also reveals the public interest in the case.

Second, this case is one of very few securities class actions to proceed to trial. The Supreme Court has explained that "an animating purpose" of securities law is "to insure honest securities markets and thereby promote investor confidence." *United States v. O'Hagan*, 521 U.S. 642, 658 (1997); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace. They do so by deterring fraud, in part, through the availability of private securities fraud actions." (internal citation omitted)).

United States District Court
Northern District of California

1    According to Plaintiff, since Congress passed the PSLRA in 1995, fewer than 30 cases have ever

2    made it to trial.  *Id.* at 2.  These facts also demonstrates that the case in particular involved issues

3    of substantial public importance.

4         This factor thus weighs against awarding costs to Defendants.

5         2.    Closeness and Difficulty of the Issues in the Case

6         The closer the case, the more it weighs against awarding costs to the prevailing party.

7    *Escriba*, 743 F.3d at 1248.  In *Draper*, the Ninth Circuit determined the case was close for two

8    reasons: (1) plaintiff's evidence of an Eighth Amendment violation was sufficient to survive

9    summary judgment, and (2) the case ultimately turned on which competing account of events the

10   jurors believed.  *Draper v. Rosario*, 836 F.3d 1072, 1088 (9th Cir. 2016).

11        Mr. Littleton's case was close and presented difficult issues.  Last year, the Court granted

12   partial summary judgment to Plaintiff on the issues of falsity and scienter, two elements of the

13   Section 10b-5 claim.  *See* Summary Judgment Order at 32–33.  And as in *Draper*, the issue of

14   materiality—one of the key issues in the case—turned in part on the jury's assessment of witness

15   credibility.  *Draper*, 836 F.3d at 1088; *see also Lopez v. Nguyen*, No. 13-CV-3870-CRB, 2017

16   WL 512773, at *2 (N.D. Cal. Feb. 8, 2017) ("Mr. Lopez's case was close because his claims

17   survived summary judgment as to four defendants and, as in *Draper*, turned on which witness

18   testimony the jury believed.").

19        This factor thus also weighs against awarding costs to Defendants.

20        3.    Chilling Effect on Future Similar Actions

21        If awarding costs may chill future similar actions, that too weighs against allowing their

22   recovery by the prevailing party.  *Escriba*, 743 F.3d at 1248.  Courts have found that taxing costs

23   in labor and employment class actions would have a chilling effect on similar class actions.  *See,*

24   *e.g.*, *Escriba*, 743 F.3d at 1248–49 (refusing to award costs in FMLA case); *Makaneole v.*

25   *Solarworld Indus. Am., Inc.*, No. 14-cv-1528, 2017 WL 2345706, at *3 (D. Or. May 10, 2017),

26   *report and recommendation adopted*, 2017 WL 2345694 (D. Or. May 30, 2017) (refusing to

27   award costs in wage-claim litigation because of the "significant and undesirable chilling effect on

28   future class-action wage-claim litigation"); *Alvarez v. YRC Inc.*, No. 12-cv-01374, 2021 WL

United States District Court
Northern District of California

23

4935972, at *1 (C.D. Cal. June 11, 2021) (declining to award costs in light of a chilling effect on future labor and employment class actions).

A securities fraud class action is not entirely analogous to a wage and hour class action. The high stakes and potential award may counter the chilling effect of an award of costs to the prevailing defendant.  Yet, as noted above, this case was complex and raised substantial issues. Under the circumstances of this case, this factor is neutral.

    4.   Financial Resources

A party's limited financial resources weighs against taxing costs.  *Escriba*, 743 F.3d at 1248.  Although Plaintiff characterizes himself as a "semi-retired individual investor," Plaintiff does not provide any specific information regarding his financial resources.  *See* Pl. Costs Br. at 4. Without providing information regarding Mr. Littleton's financial situation, the Court is unable to determine whether or not paying Defendants' costs would be a financial hardship.  *See Courtney v. Oregon Dep't of State Police*, No. 06-cv-6223, 2008 WL 11408791, at *2 (D. Or. Aug. 25, 2008) (ordering costs where there was "no proof of limited resources"); *cf. Escriba*, 743 F.3d at 1248 (declining to award costs where plaintiff "earned an average of $11,622 per year while working for Foster Farms, meaning that the costs being sought by the company exceed[ed] her average annual earnings"); *Hamilton v. Yavapai Cmty. Coll. Dist.*, No. 12-cv-08193, 2022 WL 504474, at *2 (D. Ariz. Feb. 18, 2022) (refusing to award costs where plaintiff provided information demonstrating that his average monthly expenses exceeded his income and that his family was financially dependent on him).

Because Mr. Littleton has not demonstrated that paying Defendants' costs would be a financial hardship, this factor weighs in favor of awarding costs.

    5.   Economic Disparity Between the Parties

The final factor turns on the economic disparity among the parties.  *Escriba*, 743 F.3d at 1248.  While an economic disparity between the parties weighs against awarding costs, "it appears to be so only where the party seeking to avoid costs has limited financial resources and thus payment of costs would present a significant hardship."  *Jardin v. DATAllegro, Inc.*, No. 08-cv-1462, 2011 WL 4835742, at *4 (S.D. Cal. Oct. 12, 2011) (citing and collecting authorities).

Plaintiff has not pointed to any authority—nor has the Court independently been able to locate any—where an economic disparity between the parties weighed against awarding costs absent a corollary finding that the party had limited financial resources (despite the logic of considering economic disparity irrespective of the plaintiffs not being impoverished). *See id.* (awarding costs despite economic disparity where plaintiff "painted himself as a 'highly successful database architecture inventor'"); *cf. Lopez*, 2017 WL 512773, at *3 (citing examples where a party's limited financial resources and economic disparity both weighed against awarding costs).

Because it appears that an economic disparity between the parties only weighs against awarding costs where a party has limited financial resources and Mr. Littleton has not made this showing, this final factor weighs in favor of awarding costs.

In sum: of the five *Escriba* factors, the first and second factors weigh against awarding costs, the third is neutral, and the fourth and fifth factors weigh in favor of awarding costs. While a somewhat close call, in light of the substantial public importance of the case and the highly disputed issues of fact (with the Court having found falsity and scienter in favor of Plaintiffs prior to trial), the Court concludes that the *Escriba* factors are sufficient to overcome the presumption of awarding costs against Plaintiff in this case. Each party shall bear their own costs.

## V.     CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for judgment as a matter of law and for a new trial. The Court **ORDERS** each party to bear their own costs.

This order disposes of Docket Nos. 657, 685, and 689.

**IT IS SO ORDERED**.

Dated: June 14, 2023

_____
EDWARD M. CHEN
United States District Judge