PAGES 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

IN RE:  TESLA SECURITIES          )
LITIGATION,                       )
                                  )  CASE NO. 18-CV-04865 EMC
                                  )
                                  )  SAN FRANCISCO, CALIFORNIA
                                  )  VIA ZOOM VIDEOCONFERENCE
_____)  THURSDAY, JULY 28, 2022


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF AND**          LEVI & KORSINSKY, LLP
**THE CLASS**                  75 BROADWAY, SUITE 202
                               SAN FRANCISCO, CALIFORNIA 94111
                     BY:  **ADAM M. APTON, ESQUIRE**

                               LEVI AND KORSINSKY
                               1101 30TH STREET NW SUITE 115
                               WASHINGTON, DC 20007
                     BY:  **NICHOLAS I. PORRITT, ESQUIRE**


**FOR DEFENDANT TESLA**        QUINN EMANUEL URQUHART OLIVER & HEDGES
                               865 SOUTH FIGUEROA STREET, 10TH FLOOR
                               LOS ANGELES, CA 90017
                     BY:  **MICHAEL T. LIFRAK, ESQUIRE**

                               QUINN, EMANUEL, URQUHART & SULLIVAN
                               51 MADISON AVENUE, 22ND FLOOR
                               NEW YORK, NEW YORK 10010
                     BY:  **ANDREW J. ROSSMAN, ESQUIRE**
                          **ELLYDE ROKO THOMPSON, ESQUIRE**


*REPORTED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
*            PRO TEM OFFICIAL COURT REPORTER, USDC*

```
1    THURSDAY, JULY 28, 2022                              1:30 P.M.

2

3              THE CLERK:  THE COURT WILL BE CALLING THE CASE: IN

4    REGARDING TESLA, INC., SECURITIES LITIGATION, CIVIL ACTION

5    18-4865.

6              COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE RECORD,

7    BEGINNING WITH THE PLAINTIFF.

8              MR. PORRITT:  GOOD AFTERNOON, YOUR HONOR.  NICHOLAS

9    PORRITT OF LEVI AND KORSINSKY FOR THE PLAINTIFF AND THE CLASS,

10   AND WITH ME IS ADAM APTON.

11             THE COURT:  ALL RIGHT.  GOOD AFTERNOON, MR. PORRITT.

12             MR. LIFRAK:  GOOD AFTERNOON, YOUR HONOR.  THIS IS

13   MICHAEL LIFRAK APPEARING FOR THE DEFENDANTS.  WITH ME TODAY,

14   ARGUING THE MOTIONS, IS ANDREW ROSSMAN AND ELLYDE THOMPSON.

15   MR. SPIRO IS ALSO ON THE ZOOM, BUT NOT ON CAMERA BECAUSE HE

16   WON'T BE ARGUING ANY OF THE MOTIONS THAT ARE PENDING.

17             THE COURT:  ALL RIGHT.  THANK YOU, MR. LIFRAK AND

18   COMPANY.

19             ALL RIGHT.  SO WE'VE GOT FOUR MOTIONS.  I WANT TO

20   SPEND MOST OF THE TIME ON THE DAUBERT MOTION, BUT LET ME JUST

21   BRIEFLY ASK A COUPLE OF QUESTIONS ABOUT THE OTHER ONES.

22             SO THE PLAINTIFF'S FIRST MOTION ASKING THAT

23   MATERIALITY BE SOMETHING THAT'S DEEMED AND THAT NO REASONABLE

24   JUROR COULD FIND THE STATEMENTS IMMATERIAL.  AS YOU KNOW, I'VE

25   ALREADY CLARIFIED THAT I FOUND A DIFFERENCE.  THERE'S A
```

1   DEFERENCE BETWEEN FALSITY AND MATERIALITY.  THOSE ARE TWO

2   DIFFERENT THINGS.  AND MATERIALITY IS TYPICALLY A QUESTION OF

3   FACT.  AND HERE THERE'S, FOR INSTANCE, A QUESTION ABOUT WHETHER

4   OR NOT THE PRICES -- CHANGE IN PRICES OF STOCK WERE

5   ATTRIBUTABLE TO THE -- THAT PART OF THE ANNOUNCEMENT THAT

6   MR. MUSK WAS INTENDING TO TAKE TESLA PRIVATE AT 420, OR WAS IT

7   ATTRIBUTABLE IN PART TO THE FUNDING SECURED.  OBVIOUSLY,

8   THERE'S SOME DISPUTE, THE EXPERT STUFF ABOUT CAUSATION AND

9   EVERYTHING ELSE, BUT ALL SEEMS TO ME TO SUGGEST THAT THESE ARE

10  FACTUAL ISSUES THAT WILL HAVE TO BE RESOLVED IN A TRIAL.

11          I HAVE A QUESTION FOR THE DEFENDANTS, AND THAT IS,

12  YOUR EXPERT SEEMS TO CONCEDE THAT THE TWO STATEMENTS, THE TRUE

13  PART AND THE FALSE PART, ARE KIND OF INSEPARABLE, OR THAT HE

14  WOULD HAVE A HARD TIME TRYING TO PARSE THOSE OUT AND

15  DISAGGREGATE THOSE.

16          IF THAT'S THE CASE, CAN YOU ALSO TAKE THE POSITION

17  THAT THEY ARE SEGREGABLE AND THAT THERE'S MATERIALITY THAT YOU

18  CAN ATTRIBUTE -- YOU CAN DETERMINE MATERIALITY BY ATTRIBUTING

19  CAUSAL FORCE TO ONE AND NOT THE OTHER?  I'M A LITTLE CONFUSED.

20  CAN YOU -- ARE THEY TIED TOGETHER INEXTRICABLY OR YOU CAN'T

21  DISCERN OR ARE THEY --

22          **MS. THOMPSON:**  YOUR HONOR, ELLYDE THOMPSON, QUINN

23  EMANUEL, FOR THE DEFENDANTS.

24          AS TO THAT QUESTION, TWO POINTS.  FIRST, AS STATED ON

25  PAGE 4 OF OUR OPPOSITION BRIEF, PLAINTIFF HAS MISCHARACTERIZED

1   PROFESSOR FISCHEL'S TESTIMONY.  THE TESTIMONY AS TO MATERIALITY

2   REALLY WAS AS TO THE AUGUST 7TH TWEETS AS A WHOLE, INCLUDING

3   THE INDISPUTABLY TRUE STATEMENT REGARDING TAKING TESLA PRIVATE.

4          AS TO HOW THAT RELATES TO LOSS CAUSATION, CERTAINLY,

5   THERE MAY BE A DEBATE ABOUT THE PROPER STANDARD FOR LOSS

6   CAUSATION IN THE JURY INSTRUCTIONS, BUT THAT'S NOT A BASIS FOR

7   INCLUDING EVIDENCE UNDER RULE 403.  CERTAINLY, THERE IS

8   EVIDENCE THAT -- PARTICULARLY, THE BLOG POST ON AUGUST 13TH

9   WHICH RELATED TO THE CORRECTIVE DISCLOSURE AS TO FUNDING

10  SECURED, THOSE PARTS OF THE AUGUST 7TH TWEETS WERE NOT DIRECTLY

11  LINKED TO ANY LOSS THAT PLAINTIFF MAY CLAIM.

12         SO THERE IS RELEVANT PROBATIVE EVIDENCE AS TO LOSS

13  CAUSATION THAT SHOWS THAT THERE'S, YOU KNOW, AN ABSENCE OF A

14  CAUSAL CONNECTION BETWEEN THE MATERIAL MISSTATEMENTS THAT

15  PLAINTIFFS ALLEGE AND THE LOSS THAT THEY CLAIM, AND THOSE, OF

16  COURSE, ARE QUESTIONS THAT GO TO THE JURY.  PROFESSOR FISCHEL'S

17  TESTIMONY DOES NOT CHANGE ANYTHING ABOUT THAT.

18         **THE COURT:**  ALL RIGHT.  WELL, IT KIND OF GOES BACK TO

19  YOUR EARLIER POINT, THAT THERE'S SOME EVIDENCE THAT -- AND

20  THERE'S A DISPUTE ABOUT WHETHER THE AUGUST 13TH WAS TRULY A

21  CORRECTIVE DISCLOSURE OR NOT, BUT ASSUMING THE JURY FINDS IT

22  WAS, I TAKE IT YOUR ARGUMENT THAT NO OBVIOUS IMPACT ON PRICING

23  DEMONSTRATES IT WASN'T MATERIAL.

24         **MS. THOMPSON:**  THAT'S CORRECT YOUR HONOR.  YES,

25  THAT'S THE *ANTHEM* POINT.  THE SUPREME COURT HAS SAID WHEN

1   THERE'S NO STOCK PRICE MOVEMENT, THAT MEANS THE ALLEGED

2   MISREPRESENTATION WAS IMMATERIAL.

3          **THE COURT:** ALL RIGHT.  AND I UNDERSTAND THERE'S THE

4   KIND OF ARGUMENT THAT, WELL, THE AUGUST 13TH WAS HARDLY A FULL

5   AND ROBUST DISCLOSURE, ET CETERA, ET CETERA, AND THERE'S OTHER

6   EVIDENCE.  SO ALL THAT SEEMS TO ME TO SUGGEST THAT THIS IS A

7   QUESTION OF FACT.  AND SO THAT WAS MY VIEW ORIGINALLY, AND IT

8   REMAINS TO BE MY VIEW.

9          SO THAT'S -- THAT'S MY CONCLUSION WITH RESPECT TO

10  THAT.

11         WITH RESPECT TO TESLA'S MOTION IN LIMINE TO EXCLUDE

12  DAMAGES, EVIDENCE OF DAMAGES, AFTER AUGUST 13TH, THAT HINGES ON

13  LARGE PART ON WHETHER THE AUGUST 17TH, OR THE MIDNIGHT.COM

14  DISCLOSURE, OR PUBLICATION OF THE NEW YORK TIMES PIECE,

15  MIDNIGHT AUGUST 16TH, PRINT BY AUGUST 17TH, HAD ANY ANYTHING

16  NEW TO DISCLOSE, AND THERE'S A DISPUTE ABOUT THAT.  AND I THINK

17  THERE'S A GOOD ARGUMENT THAT IT ADDED SOME CORRECTIVE

18  INFORMATION IN MAKING THINGS CLEAR IN TERMS OF WHAT WAS THE

19  STATUS WITH RESPECT TO THE POTENTIAL SECURITY OF FUNDING.

20         AND SO THAT'S AN ISSUE THAT IS GOING TO HAVE TO BE

21  DECIDED AND LOOKED AT BY THE JURY.  AND, TO THE EXTENT IT HAD

22  ANY CORRECTIVE POWER, ANY ATTEMPT TO SORT OF CUT OFF ANY

23  DAMAGES PERIOD TO AUGUST 13TH, AS A MATTER OF LAW, I DON'T SEE

24  THAT HERE.

25         SO I'M DETERMINING THAT I'M REJECTING THAT MOTION IN

1    LIMINE, AND I'M GOING TO ALLOW EVIDENCE POST-AUGUST 13.  THAT

2    WILL INFORM, OF COURSE THE EXPERT STUFF WE'RE GOING TO TALK

3    ABOUT.

4           BEFORE WE GET TO THE EXPERT, THE LAST THING IS THE

5    DEFENDANT'S MOTION IN LIMINE NUMBER 3 TO PRECLUDE THE UNPLED

6    AUGUST 13 REPORTED MISREPRESENTATIONS, SORT OF THE FOURTH

7    STATEMENT.  AND THERE, YOU KNOW, TO ME, I DID SET A DEADLINE OF

8    JULY 31ST, 2020, AS THE LAST DAY TO AMEND PLEADINGS, AND THE

9    SIGNIFICANCE OF THAT IS THAT THAT, I THINK, BRINGS RULE 16 INTO

10   PLAY, AND THERE HAS TO BE GOOD CAUSE.  AND EVEN IF THERE WAS

11   GOOD CAUSE FOR NOT PLEADING IT ORIGINALLY, THERE WAS A

12   SIGNIFICANT DELAY IN BRINGING THIS MATTER INTO PLAY INTO THESE

13   PROCEEDINGS.  I THINK A DELAY OF SOME 15 MONTHS.

14          AND SO THE POINT OF RULE 16 IS DUE DILIGENCE.  AND I

15   DON'T SEE HOW THAT DUE DILIGENCE IS MET HERE.  I MEAN, I'LL

16   GIVE THE PLAINTIFFS A CHANCE TO RESPOND, BUT I'M VERY MUCH

17   INCLINED TO SAY THAT'S NOT GOING TO BE ALLOWED.

18          **MR. PORRITT:**  YOUR HONOR, IF I MAY, I WOULD JUST

19   LIKE -- I'M STRUGGLING A LITTLE BIT.  IF YOU COULD CLARIFY

20   EXACTLY THE SCOPE OF THE RULING HERE, BECAUSE THE ENTIRE

21   AUGUST 13TH BLOG POST WAS PLEADED IN THE COMPLAINT, AND WAS

22   PLEADED TO BE MISLEADING IN THE COMPLAINT.

23          **THE COURT:**  YEAH, BUT THIS, YOU GOT TO DO IT

24   STATEMENT BY STATEMENT.  THAT'S THE WHOLE POINT OF PSLRA -- YOU

25   KNOW, WE WENT THROUGH THIS WHOLE THING, AND I HAVE TO GO

1   THROUGH THIS WHOLE CRUCIBLE EVERY TIME WE HAVE ONE OF THESE

2   CASES OF LINE BY LINE, FACT BY FACT, WAS THERE FALSITY, WAS

3   THERE SCIENTER, WAS THERE -- YOU KNOW.  SO THAT'S THE PURPOSE

4   OF THE SPECIFICITY OF PLEADING, AND THAT WASN'T DONE WITH THIS

5   PARTICULAR STATEMENT.

6           **MR. PORRITT:**  AGAIN, I WAS JUST -- ON THE DEFENDANT'S

7   MOTION, I WANT TO CLARIFY EXACTLY WHICH OF THE STATEMENTS THEY

8   ARE -- YOUR HONOR IS RULING ON JUST SO WE HAVE CLARITY GOING

9   FORWARD.

10          **THE COURT:**  ALL RIGHT.  LET'S MAKE SURE.  THAT'S A

11  FAIR STATEMENT.

12          I THOUGHT WHAT WAS AT ISSUE WAS THE STATEMENT FROM

13  THE BLOG, THE STATEMENT THAT SAID:

14                  "I HAVE CONTINUED TO COMMUNICATE

15          WITH THE MANAGING DIRECTOR OF THE SAUDI FUND

16          HIS EXPRESS SUPPORT FOR PROCEEDING SUBJECT TO

17          FINANCIAL AND OTHER DUE DILIGENCE AND

18          INTERNAL REVIEW PROCESSES FOR OBTAINING

19          APPROVALS.  HE ALSO ASKED FOR ADDITIONAL

20          DETAILS ON HOW THE COMPANY WOULD BE TAKEN

21          PRIVATE, INCLUDING ANY REQUIRED PERCENTAGES

22          AND ANY REGULATORY REQUIREMENTS."

23          I THOUGHT THAT WAS ONE AT ISSUE.  AM I MISTAKEN?  LET

24  ME ASK THE DEFENDANTS THAT.

25          **MR. LIFRAK:**  YES, YOUR HONOR.  MICHAEL LIFRAK FOR THE

1    DEFENDANTS.  THAT IS THE STATEMENT THAT WE PUT AT ISSUE IN THE

2    MOTION IN LIMINE, BECAUSE THAT WAS THE STATEMENT THAT THE

3    PLAINTIFF MOVED FOR SUMMARY JUDGMENT ON AND THAT WE KNEW,

4    BECAUSE OF THAT, THEY NOW INTEND TO GO TO THE JURY ON THIS

5    ALLEGED MISSTATEMENT.

6            THE ISSUE, THOUGH, IS THAT IN THE OPPOSITION TO THE

7    MOTION IN LIMINE, PLAINTIFF IDENTIFIED EVEN MORE STATEMENTS

8    FROM THE AUGUST 13TH MEMO THAT ALSO WERE NOT UNPLED THAT,

9    APPARENTLY, NOW THE PLAINTIFF INTENDS TO GO TO THE JURY ON IT.

10   SO THE SCOPE OF THE MOTION IS TO PRECLUDE THE PLAINTIFF FROM

11   GOING TO TRIAL ON ANY ALLEGED MISSTATEMENT THAT WAS NOT PLED

12   AND NOT SPECIFICALLY IDENTIFIED IN THE DISCOVERY RESPONSES.

13           THE EXAMPLE THAT WE GAVE IN THE MOTION WAS WHAT YOUR

14   HONOR JUST READ, BUT NOW PLAINTIFF IS COMING UP WITH MORE

15   UNPLED ACCUSATIONS, ALLEGED MISSTATEMENTS.  THOSE SHOULD ALSO

16   SIMILARLY BE PRECLUDED FROM GOING TO TRIAL.  WE'RE LEARNING

17   ABOUT THEM FOR THE FIRST TIME NOW.

18           **MR. PORRITT:**  IF I MAY, YOUR HONOR, WITH RESPECT, I

19   DISAGREE WITH WHAT MR. LIFRAK JUST SAID.

20           I MEAN, PARAGRAPHS -- PARAGRAPH 136 IN THE -- IN THE

21   COMPLAINT -- FIRST OF ALL, IN THE FACTUAL ALLEGATIONS WHICH ARE

22   INCORPORATED INTO THE COUNT, THE ENTIRE AUGUST 30 BLOG POST IS

23   SET FORTH.

24           SECOND, PARAGRAPH 136 IDENTIFIES A SPECIFIC QUOTE,

25   WHICH I ASSUME DEFENDANTS AND I WILL AGREE ARE NOT SUBJECT TO

1    THIS MOTION.  IT IS ACTUALLY TESTIMONY VERY CLOSELY RELATED TO

2    WHAT IS SET FORTH IN THE MOTION THAT I HAVE CONTINUED TO

3    COMMUNICATE, BUT, NONETHELESS.

4         THEN PARAGRAPH 138 IN THE COMPLAINT THAT SAYS THE

5    ENTIRE BLOG POST PERMITTED INFORMATION REGARDING FUNDING

6    INVESTOR INTEREST AND SO ON.  AND WE CLARIFIED THIS IN RESPONSE

7    TO -- IN RESPONSE TO THE INTERROGATORIES THAT WERE PROVIDED

8    DURING THE COURSE OF DISCOVERY WITH EXTENSIVE DETAIL.

9         SO I DON'T THINK WHY -- AND THAT WAS -- THOSE WERE

10   SERVED LAST YEAR ON ALL TIMES ACCORDING TO A SCHEDULE AGREED TO

11   WITH THEN DEFENSE COUNSEL.

12        SO I REALLY DON'T THINK THEY CAN ARGUE ANY PREJUDICE

13   OR ANY SURPRISE.  THIS IS NOT SOME SECRET THEORY THAT'S

14   BEING --

15        **THE COURT:**  WHEN WAS THIS -- REMIND ME OF THE

16   SEQUENCE OF THE DISCLOSURE OF THE PRECISE FALSE STATEMENTS THAT

17   WERE MADE.  IT WAS BY WAY OF INTERROGATORY?

18        **MR. PORRITT:**  YES.  THE INTERROGATORY RESPONSE, THEY

19   SAID, YOU KNOW, IDENTIFY REASONS WHY YOU SAID THE AUGUST 13TH

20   BLOG POST WAS MISLEADING, AND WE LAID FORTH WITH 20 PAGES, OR

21   18 PAGES, WHY THE AUGUST 1ST BLOG POST WAS MISLEADING.

22        AS YOUR HONOR KNOWS, WHEN YOU TALK ABOUT OMISSIONS,

23   IT'S DIFFICULT TO IDENTIFY A SPECIFIC STATEMENT THAT OMITS A

24   FACT BECAUSE EVERY STATEMENT IN THE BLOG POST OMITTED --

25        **THE COURT:**  BUT HERE YOU'RE NOT -- WHAT I'M SEEING

1    HERE IS NOT AN OMISSION.  IT'S A STATEMENT.

2          **MR. PORRITT:**  ...CONTINUES TO COMMUNICATE.  I

3    UNDERSTAND THE COURT'S RULING IN THAT REGARD.  I'M JUST TRYING

4    TO RESPOND TO MR. LIFRAK'S RECENT STATEMENT, WHICH SAYS --

5          **MR. LIFRAK:**  AND TO BE --

6          **MR. PORRITT:**  THERE ARE LOTS OF OTHER ASPECTS OF THE

7    AUGUST 13TH BLOG POST, WHICH WAS ALLEGED TO OMIT RELEVANT

8    INFORMATION THAT SHOULD NOT BE MOVED AS AN ACTUAL

9    MISREPRESENTATION.  OF COURSE, IT STILL MAY BE RELEVANT AS A

10   PARTIAL CORRECTIVE DISCLOSURE OR FULL CORRECTIVE DISCLOSURE

11   DEPENDING ON WHICH -- WHETHER YOU LISTEN TO PLAINTIFFS OR

12   DEFENDANTS.

13         **MR. LIFRAK:**  TO BE CLEAR, YOUR HONOR, THE ALLEGED

14   MISSTATEMENT YOUR HONOR READ DOESN'T APPEAR AS AN ALLEGED

15   MISSTATEMENT IN THOSE INTERROGATORY RESPONSES.

16         SO TO ANSWER YOUR QUESTION DIRECTLY, IT HAS NEVER

17   BEEN DISCLOSED UNTIL THE SUMMARY JUDGMENT MOTION.  THAT'S THE

18   FIRST TIME WE LEARNED THAT THE PLAINTIFF INTENDED TO GO TO

19   TRIAL ON THAT ALLEGED MISSTATEMENT.

20         AND THE FACT THAT THE ENTIRE BLOG POST IS MENTIONED

21   IN THE COMPLAINT, THE BLOG POST IS 1,100 WORDS, IT HAS 90

22   LINES.  AS YOUR HONOR INDICATED, WE ARE ENTITLED TO KNOW AS A

23   DEFENDANT IN A SECURITIES FRAUD CLASS ACTION WHAT THE SPECIFIC

24   ALLEGED MISSTATEMENTS ARE.  THOSE WERE NOT -- THERE ARE SOME IN

25   THE COMPLAINT.  THOSE WERE LOOKED AT BY THE COURT IN THE MOTION

1    TO DISMISS, AND THE COURT FOUND IN THE MOTION TO DISMISS RULING

2    A COUPLE OF YEARS AGO THAT NOTHING IN THE BLOG POST, AS ALLEGED

3    IN THE COMPLAINT, CONSTITUTED AN INDEPENDENT MISSTATEMENT.

4              AND SO IF PLAINTIFF WANTED TO HAVE OTHER

5    MISSTATEMENTS FROM THE AUGUST 13TH BLOG POST GO TO THE JURY,

6    PLAINTIFF SHOULD HAVE AMENDED THE COMPLAINT TO INCLUDE THOSE.

7    PLAINTIFF DIDN'T.  AND PLAINTIFF DIDN'T SPECIFICALLY IDENTIFY

8    THESE SAME ALLEGED MISSTATEMENTS IN -- SPECIFICALLY IN THOSE

9    INTERROGATORY RESPONSES.

10             **THE COURT:**  ALL RIGHT.  WELL, THE ONLY THING I HAVE

11   BEFORE ME RIGHT NOW, AS I UNDERSTAND IT, IS THE CHALLENGE TO

12   THIS ONE STATEMENT.  IT WAS NOT PREVIOUSLY IDENTIFIED AND NOT

13   IDENTIFIED IN A TIMELY WAY, AND SO MY RULING STANDS.

14             NOW, TO THE EXTENT THAT THERE ARE OTHER THINGS, I

15   GUESS I'LL -- I DON'T KNOW IF THERE'S GOING TO BE A FURTHER IN

16   LIMINE MOTION AT SOME POINT, BUT THE GENERAL RULE IS THAT

17   THINGS HAVE TO BE IDENTIFIED WITH SPECIFICITY IN THIS AREA, AND

18   THEY HAVE TO BE DONE SO IN A TIMELY WAY.  IF THEY'RE NOT DONE

19   SO, YOU KNOW, THEY'RE NOT GOING TO BE ALLOWED TO BE ADVANCED AT

20   TRIAL.

21             SO WITHOUT KNOWING EXACTLY WHAT THE PLAINTIFF INTENDS

22   AT THIS POINT, BUT I WILL SAY THAT, AS A GENERAL PRINCIPLE, IF

23   THERE ARE OTHER STATEMENTS, EVEN IF IT'S TAKEN FROM THAT SAME

24   BLOG, THAT WEREN'T PREVIOUSLY IDENTIFIED AS A FALSE STATEMENT

25   AND SUBJECT TO, YOU KNOW, THE KIND OF DISCLOSURE THAT WE EXPECT

1    IN THESE CASES, THEN IT'S GOING TO BE PROBLEMATIC.  I'M JUST

2    GOING TO LEAVE IT AT THAT AT THIS POINT.

3             LET'S TALK ABOUT MR. -- DR. HARTZMARK'S REPORT.

4             MAYBE THE PLAINTIFF CAN HELP ME UNDERSTAND.  THE

5    DIFFERENCE BETWEEN 2327 ATTRIBUTABLE TO DIRECT ARTIFICIAL

6    INFLATION AND THE ADDITIONAL 4340, OR THE TOTAL OF 4667, 4340

7    OF WHICH IS ATTRIBUTABLE TO WHAT HE CALLS CONSEQUENTIAL HARM,

8    MAYBE YOU CAN EXPLAIN IN A NUTSHELL, WHAT ARE THESE TWO

9    DIFFERENT NUMBERS AND WHY ARE THEY DIFFERENT?

10            **MR. PORRITT:**  THANK YOU VERY MUCH, YOUR HONOR.

11   THEY'RE REALLY SUBSETS OF THE OVERALL INFLATION.

12            SO I THINK THE EASIEST WAY OF ADDRESSING THIS IS TO

13   THINK OF THIS AS A -- IF THIS WAS IN THE CONTEXT OF A

14   CONVENTIONAL SECURITIES CLASS ACTION, TYPICALLY, THE -- WHY THE

15   ACCEPTED METHODOLOGY THAT HAS FOLLOWED, WHICH I'M SURE YOUR

16   HONOR IS FAMILIAR WITH, IS SOMETIMES REFERRED TO AS

17   BACKCASTING, WHICH IS YOU LOOK AT THE -- AND LET'S TALK ABOUT A

18   SITUATION WHERE YOU JUST HAVE A SINGLE END-OF-CLASS-PERIOD

19   CORRECTIVE DISCLOSURE, OR REALIZATION, OF THE RISK OR WHATEVER

20   IT MAY BE.  YOU CALCULATE, YOU DISAGGREGATE, YOU ALLOW FOR

21   MARKET FACTORS, AND YOU END UP WITH AN EXPERT IDENTIFIES --

22   LET'S CALL IT, $50, FOR EXAMPLE -- $50 OF THE TWELVE THAT WAS

23   ATTRIBUTABLE TO THE REALIZATION OF THE RISK OR CORRECTIVE

24   DISCLOSURE.

25            THEY THEN RUN THAT BACKWARDS THROUGH THE CLASS PERIOD

1    TO GET TO -- AND IF THERE'S OTHER CORRECTIVE DISCLOSURE OR WHAT

2    HAVE YOU, IT COMES OUT IN PIECES.  SO IT'S BUILT UP OVER TIME.

3    THAT IS WHAT THE -- THAT IS WHAT WE START WITH WHERE THE PRICE

4    ENDED UP ONCE THE FRAUD WAS DISCLOSED.

5         WHAT DR. HARTZMARK DOES HERE IS EXACTLY THAT, WHICH

6    IS AT THE END ON AUGUST 17, WHICH, BASED ON HIS ANALYSIS OF

7    BOTH QUALITATIVE AND QUANTITATIVE DATA, HE CONCLUDES AT THAT

8    TIME THE MARKET HAD UNDERSTOOD THE FALSITY OF THE

9    MISREPRESENTATIONS THAT STARTED ON AUGUST 7TH WITH THE TWEETS,

10   FUNDING SECURED, ET CETERA, ET CETERA.  THAT LED, AFTER

11   ACCOUNTING TO MARKET FORCES AND EFFECTS AND SO ON, HAD A PRICE

12   OF $312.90.

13        SO THAT, IF YOU LIKE, IS THE PRICE THAT REFLECTS ALL

14   THE KNOWLEDGE -- SO THAT REFLECTS THE FACT THAT THERE WAS NO

15   FUNDING SECURED.  THERE WAS NO INVESTOR SUPPORT.  THERE ARE

16   MORE AND MORE STEPS TO BE TAKEN.  STILL REFLECTS THE FACT THAT

17   ELON MUSK IS CONSIDERING TAKING TESLA PRIVATE, BECAUSE THAT

18   FACT WAS KNOWN TO THE MARKET EVEN BEFORE THE 7TH, AS PROFESSOR

19   FISCHEL, DEFENDANT'S WILL TESTIFY TO, OPINE.

20        SO THAT IS -- IF YOU LIKE, THAT IS DIRECTLY

21   EQUIVALENT TO THE PRICE YOU WOULD SEE END OF A SECURITIES CLASS

22   PERIOD.  WHAT DR. HARTZMARK HAS DONE IS THEN -- IS THEN

23   PROJECTED THAT BACKWARDS.  HE HAS A MODEL ABOUT WHICH -- THE

24   EXTENT TO WHICH THAT IS THEN -- REALLY SUBTRACTING THAT FROM

25   THE PRICE TELLS YOU THE DEGREE TO WHICH PRICE IS INFLATED ON

1    ANY GIVEN DAY.

2           NOW WHERE THE DIFFERENCE BETWEEN DIRECT AND THE

3    SO-CALLED CONSEQUENTIAL HARM, WHERE THAT PLAYS IN, IS THAT IN

4    MANY SECURITY CLASS ACTIONS, AS YOUR HONOR IS AWARE, THERE IS

5    NO INITIAL PRICE IMPACT.

6           IN FACT, THAT'S BEEN LITIGATED.  THAT'S WHAT THE

7    WHOLE *GOLDMAN SACHS*, ENDLESS, IT SEEMS, LITIGATION WITH THE

8    SECOND CIRCUIT SUPREME COURT IS ALL ABOUT, TO WHAT EXTENT YOU

9    NEED TO SHOW PRICE IMPACT AT THE FRONT END.  AND THE SUPREME

10   COURT AND MOST OF THE SECOND CIRCUIT HAD CONSISTENTLY COME DOWN

11   SAYING YOU DON'T.

12          BUT WHAT WE HAVE HERE IS WE HAVE ONE OF THOSE CASES.

13   IT'S NOT ALONE, BUT THESE ARE THE MINORITY OF SECURITY CLASS

14   ACTIONS, I THINK, WHERE YOU HAVE VERY DIRECT MEASURABLE PRICE

15   IMPACT AT THE BEGINNING OF THE CLASS PERIOD.  THAT'S THE $23.

16   SO WHAT --

17          **THE COURT:**  THE 23 REPRESENTS FRONT END DISCERNIBLE,

18   THE RISE FOLLOWING AUGUST 17TH --

19          **MR. PORRITT:**  17TH TWEET, YES.

20          AND THEN THE DIFFERENCE BETWEEN THE $23 AND THE $66,

21   WHICH IS THE DIFFERENCE BETWEEN THE MARKET HIGH, THE CLASS

22   PERIOD HIGH, AND THE 312.90, REFLECTS CONSEQUENTIAL HARM, WHICH

23   IS WHAT WE TALK ABOUT, WHICH IS CERTAINLY RECOVERABLE AS THE

24   NINTH CIRCUIT HAS ESTABLISHED IN THE *AMBASSADOR HOTEL* AND IS

25   ALWAYS RECOVERABLE IN THESE CASES, WHICH REFLECTS REPUTATIONAL

```
 1    HARM, SEC INVESTIGATION, RISK, REGULATORY RISK, DISTRACTIONS OR
 2    INVESTORS, ALL OF THAT THE HARM THAT DIRECTLY RESULTS FROM THE
 3    FRAUD.
 4              AND SO THAT EXISTS THROUGHOUT CLASS PERIOD.
 5              THE COURT:  WHAT QUALITATIVE EVIDENCE IS THERE?  SO
 6    YOU ARE ATTRIBUTING THAT THE BACK-END HARM, THE ADDITIONAL
 7    43.40 IS ATTRIBUTABLE NOT TO THE DIRECT INFLATION, BUT TO THESE
 8    CONSEQUENTIAL THINGS LIKE KNOWLEDGE OF HARM TO REPUTATION,
 9    KNOWLEDGE OR ANTICIPATION OF REGULATORY RISK, KNOWLEDGE OF LACK
10    OF SUFFICIENT CORPORATE CONTROLS WITHIN TESLA, ET CETERA, ET
11    CETERA.  IS THAT WHAT YOU'RE SAYING?
12              MR. PORRITT:  CORRECT, YOUR HONOR, WHICH IS THE CASE
13    IN EVERY -- EVERY TIME A COMPANY IS ESSENTIALLY IS FOUND LIABLE
14    FOR SECURITIES FRAUD.
15              THE COURT:  WELL, WHAT -- IS THERE ANY QUALITATIVE
16    EVIDENCE -- IS THAT SOMETHING YOU JUST ASSUME EVERY TIME
17    THERE'S A DISCLOSURE OF A SECURITIES FRAUD, THAT, WELL, HERE
18    COMES -- THE SEC IS RIGHT AROUND THE CORNER, THAT SHOWS PEOPLE
19    ARE SLEEPING ON THE -- THE DIRECTORS WEREN'T DOING WHAT THEY'RE
20    SUPPOSED TO DO; YEP, THERE'S PEOPLE IN CHARGE THAT AREN'T --
21    THEREFORE, THERE'S GOING TO BE CONSEQUENTIAL HARM THAT JUST
22    FLOWS?
23              IS THERE ANY SPECIFIC QUALITATIVE EVIDENCE HERE, SUCH
24    AS SOME INDICATION, SEC ANNOUNCEMENT SHORTLY BEFORE THIS, OR
25    COMMENTATOR ANALYSIS THAT, YOU KNOW, THIS SHOWS A DEEPER
```

```
 1   STRUCTURAL PROBLEM WITHIN TESLA?  IS THERE SOMETHING?

 2           MR. PORRITT:  I MEAN -- THE SHORT ANSWER IS YES,

 3   LOTS.  I MEAN DR. HARTZMARK'S REPORT IS FULL OF DISCUSSION OF

 4   RELEVANT NEWS REPORTS, MANY OF WHICH COVER THINGS SUCH AS --

 5   EVEN AS EARLY AS AUGUST -- YOU KNOW, AUGUST 8TH, AUGUST 9TH IS

 6   WHEN THE SEC INVESTIGATION WAS ANNOUNCED AND STOCK PRICE

 7   REACTED.  AT THAT POINT IT WENT DOWN.  THAT WOULD BE AN EXAMPLE

 8   OF THIS CONSEQUENTIAL HARM.

 9           INDEED, THE NINTH CIRCUIT RECOGNIZED IN LLOYD THAT

10   ANNOUNCEMENT OF SEC INVESTIGATION CAN AMOUNT TO HARM AND THAT

11   LOSS INDICATED --

12           THE COURT:  THAT WAS ANNOUNCED RELATIVE TO THIS

13   PARTICULAR TWEET BY AUGUST 8TH, YOU SAY?

14           MR. PORRITT:  BUT AUGUST 8TH, THEY'RE ANNOUNCING THE

15   SEC WAS LAUNCHING AN INVESTIGATION INTO THE TRUTHFULNESS OF THE

16   AUGUST 7TH TWEETS.

17           THEN THERE WAS ONGOING -- THAT WAS CONTINUED TO BE

18   DISCUSSED REALLY THROUGHOUT THE CLASS PERIOD.  THERE WAS

19   FURTHER ANNOUNCEMENTS THAT THE SEC HAD ISSUED SUBPOENAS, WHICH

20   I THINK CAME OUT ON MAYBE AUGUST 14TH.  I APOLOGIZE.  I MEAN, I

21   HAVE THE DATE DIRECTLY AT HAND.  THAT WAS FORMALLY ANNOUNCED.

22           YOU HAD, SAY, COMMENTARY.  YOU HAD PEOPLE LIKE

23   PROFESSOR JOHN COFFEE SAYING IF FUNDING IS, IN FACT, NOT

24   SECURED, THIS WOULD SEEM TO BE A VERY SERIOUS CASE OF

25   SECURITIES FRAUD WHICH WOULD HAVE CONSEQUENCES.
```

1      YOU HAVE DISCUSSION OF WHETHER THE BOARD WAS

2  REVIEWING MR. MUSK'S TWEETS BEFORE HE WAS TWEETING THEM, WHICH

3  IS OBVIOUSLY A -- NOT ONLY GOES TO THE CIRCUMSTANCES AND THE

4  RECKLESSNESS AND THE SCIENTER OF THE BOARD AND MR. MUSK

5  POTENTIALLY ISSUING THESE TWEETS, BUT ALSO DIRECTLY RAISES

6  GRAVE CORPORATE GOVERNANCE CONCERNS, WHICH, AS AN INVESTOR --

7      **THE COURT:**  ALL RIGHT.  I TAKE IT THERE WAS NO -- I

8  DON'T KNOW IF THE WORD IS EVENT ANALYSIS -- BUT NO

9  STATISTICALLY SIGNIFICANT DROP THAT COULD BE TIED TO ANY ONE OF

10  THESE SEC ANNOUNCEMENTS OR ANY ONE OF THESE COMMENTATOR

11  ANNOUNCEMENTS, ALL THESE THINGS THAT CONTRIBUTED, YOUR EXPERT

12  SAYS, TO THE CONSEQUENTIAL HARM, THERE WAS NO -- THAT COULD NOT

13  BE DISCERNED STATISTICALLY ON A CASE-BY-CASE BASIS.  IS THAT A

14  FAIR ASSUMPTION?

15      **MR. PORRITT:**  WITH RESPECT, NO, YOUR HONOR.  SO THIS

16  IS WHERE HE LOOKS AT THE ENTIRE -- BECAUSE YOU HAVE 2,400 NEWS

17  ARTICLES BEING PUBLISHED DURING THESE EIGHT DAYS IN THE CLASS

18  PERIOD, OF WHICH -- OVER 400 -- OF WHICH ONLY 12 SUBJECTS -- 12

19  ARTICLES OR NEWS MENTIONS RELATE TO ANY TOPIC OTHER THAN THE

20  GOING PRIVATE TRANSACTION.

21      AND OF THOSE 12, DR. HARTZMARK EXAMINES EACH ONE OF

22  THOSE 12, AND SAYS YOU WOULD EXPECT THOSE TO HAVE -- THEY WERE

23  MOSTLY OLD NEWS AND YOU WOULD NOT EXPECT THEM TO HAVE ANY --

24  CERTAINLY NO NEGATIVE PRICE IMPACT ON STOCK PRICE.

25      SO HE LOOKS AT THE ENTIRE PERIOD FROM AUGUST 8TH TO

1    AUGUST 16TH AS AN EVENT WINDOW.  AND UNDER THAT -- DURING THAT

2    EVENT WINDOW, THERE WAS SIGNIFICANT PRICE DECLINE, AND THEN --

3    AND IT ENDS WITH AN EVEN -- IT ENDS WITH A STATISTICALLY

4    SIGNIFICANT PRICE DECLINE FOLLOWING THE NEW YORK TIMES ARTICLE

5    ON AUGUST 17TH.

6            SO THAT IS -- SO --

7            **THE COURT:**  THE CRITIQUE BY THE DEFENDANTS THAT THERE

8    WAS NO ADEQUATE DISAGGREGATION OF ANY OTHER CAUSAL FACTORS HERE

9    THAT WERE NOT RELATED TO THE FALSE -- FALSITY AND THE TWEET, AT

10   LEAST AS I HAVE FOUND, IS THAT JUST THE OTHER SIDE OF THE SAME

11   COIN?  THAT IS, IF THERE WAS AN ADEQUATE ATTEMPT AT

12   DISAGGREGATION, THAT THIS CONSEQUENTIAL HARM IS NOTHING MORE

13   THAN SORT OF TRADITIONAL DAMAGE ANALYSIS IN A SECURITIES FRAUD

14   CASE?

15           **MR. PORRITT:**  I THINK -- I THINK WHAT YOU'RE SAYING

16   IS CORRECT, YOUR HONOR.

17           AND THAT STATEMENT THAT HE DID NOT DISAGGREGATE FOR

18   OTHER NON- -- FOR OTHER COMPANIES' SPECIFIC INFORMATION IS

19   JUST -- IS JUST INCORRECT.

20           I MEAN HE HAS 12 -- HE HAS WHOLE PARAGRAPHS IN HIS

21   COMPLAINT WHERE HE GOES THROUGH EACH ONE OF THOSE 12

22   STATEMENTS.  I MEAN HE LOOKS AT EVERY -- DR. HARTZMARK LOOKS AT

23   EVERY SINGLE STATEMENT, ALL 2,400 ISSUED DURING THE CLASS

24   PERIOD.  HE HAS AN APPENDIX LISTING THEM ALL OUT.  HE LOOKED AT

25   THE STOCK PRICE REACTION MINUTE BY MINUTE DURING THE CLASS

1    PERIOD.

2           SO TO SAY HE'S NOT DISAGGREGATING -- HE HASN'T

3    DISAGGREGATED THE WAY DEFENDANTS WOULD LIKE HIM TO

4    DISAGGREGATE, BUT HE LOOKS AT EACH ONE AND CONCLUDED THAT THEY

5    WOULD NOT -- YOU WOULD NOT EXPECT THAT THESE PRICES -- AND

6    THERE'S NO EVIDENCE THAT THESE PRICES HAD A SIGNIFICANT IMPACT

7    ON THE STOCK PRICE.  AND DEFENDANT'S OWN EXPERT HAS NOT

8    IDENTIFIED ANY NON-FRAUD RELATED INFORMATION IN THE CLASS

9    PERIOD THAT HAD A STATISTICALLY SIGNIFICANT IMPACT ON THE STOCK

10   PRICE EITHER.  HE, IN FACT, ACCEPTED DR. HARTZMARK'S EVENT

11   STUDY AND THE CONCLUSIONS IN THIS REGARD.

12          SO, YOU KNOW, THEY DIFFER TO THEIR INTERPRETATION OF

13   THE RESULTS, BUT THE ACTUAL METHODOLOGY -- THERE WAS, IN FACT,

14   AGREEMENT BETWEEN THE EXPERTS, WHICH IS NOT SURPRISING, BECAUSE

15   DR. HARTZMARK, IN FACT, BASED HIS METHODOLOGY ON THE

16   METHODOLOGY OF DR. -- BY PROFESSOR FISCHEL IN THE *HOUSEHOLD*

17   CASE, EXCEPT IN *HOUSEHOLD*, PROFESSOR FISCHEL APPLIED IT TO A

18   228-DAY PERIOD, RATHER THAN SIMPLY EIGHT TRADING DAYS.

19          **THE COURT:**  WHAT ABOUT THE ALLEGED FAILURE TO TAKE

20   INTO ACCOUNT OR DISAGGREGATE, FOR INSTANCE, NEWS ABOUT THE

21   DELAY IN THE TESLA 3 OR ISSUES ABOUT MR. MUSK'S HEALTH AND WELL

22   BEING?

23          **MR. PORRITT:**  WELL, I MEAN, I'M NOT SURE THERE WERE

24   DELAYS -- INFORMATION FROM THE DELAYS IN THE TESLA 3, BUT TO

25   THE EXTENT, DR. HARTZMARK LOOKED AT THEM, THAT WAS ALL NEW.

1  THAT HAD BEEN REPORTED LONG TIME.  THAT WAS REPORTED AT THE

2  TIME OF THE ANNUAL MEETING IN APRIL 2018, DELAYS IN THE MODEL 3

3  WAS WELL REPORTED, AS WELL AS THE STRESS THAT MR. MUSK

4  EXPRESSED TO BE EXPERIENCING DURING THE COURSE OF 2018.

5          HIS MENTAL HEALTH, DEFENDANTS POINT TO THE DISCUSSION

6  OF THAT IN THE NEW YORK TIMES ARTICLE ON AUGUST 16TH, BUT THEY

7  FAIL TO DISCUSS THE FACT THAT THERE HAD BEEN ANOTHER ARTICLE

8  RELATING TO ONLY ELON MUSK'S MENTAL HEALTH ON AUGUST 15TH, ALSO

9  PUBLISHED BY THE NEW YORK TIMES, WHICH SEEMED TO HAVE -- WHICH

10  HAS NO IMPACT ON THE STOCK PRICE.

11          SO TO THE EXTENT THAT THEY ARGUE THAT THERE'S -- YOU

12  KNOW, THEY DON'T REALLY HAVE AN EXPLANATION AS TO WHY THE STOCK

13  PRICE DECLINED FOLLOWING THE NEW YORK TIMES ARTICLE, BECAUSE

14  THEY JUST SIMPLY SAID THEY HAD NO NEW NEWS, IN WHICH CASE WHY

15  WAS THERE -- YOU KNOW, THAT WOULD -- WHY WAS THERE A

16  STATISTICALLY SIGNIFICANT STOCK PRICE DECLINE?  THAT WOULD SEEM

17  TO DEFY TRADITIONAL CAPITAL MARKETS --

18          **THE COURT:**  WHAT ABOUT THE INITIAL FAILURE -- ALLEGED

19  FAILURE OF DISAGGREGATION OF THE -- CONSIDERING TAKING TESLA

20  PRIVATE AT 420 VERSUS THE FUNDING SECURED?  YES, THERE WAS, YOU

21  KNOW, THERE HAVE BEEN NOISE ABOUT GOING PRIVATE, INTEREST IN

22  GOING PRIVATE, BUT PUTTING AN ACTUAL NUMBER ON IT, THAT WAS

23  NEW, WASN'T IT?

24          **MR. PORRITT:**  WELL, SO -- SO I HAVE TWO RESPONSES,

25  YOUR HONOR.

1          FIRST OF ALL IS -- YOU KNOW, ELON MUSK DELIBERATELY

2    WOVE THE TWO QUESTIONS TOGETHER AND TESTIFIED VERY CLEARLY TO

3    THAT EFFECT.  SO THE WHOLE POINT -- HE SAID THE WHOLE POINT OF

4    HIS TWEET WAS TO SAY FUNDING WAS SECURED AT 420.

5          SO I DON'T THINK -- I THINK IT'S -- I DON'T THINK

6    IT'S REQUIRED UNDER THE SECURITIES LAWS.  I THINK IT WOULD

7    BE -- STATEMENTS HAVE TO BE READ IN CONTEXT, AS YOUR HONOR

8    KNOWS, AND I THINK IT'S -- SO THE ENTIRE STATEMENT SHOULD BE --

9    YOUR HONOR HAS FOUND TO BE FALSE.  THE FUNDING SECURED WAS

10   FALSE.  AND I THINK THE FUNDING SECURED IS NOT SOME TRIVIAL OR

11   EASILY SEVERABLE PART OF THAT STATEMENT, THE FIRST TWEET ON

12   AUGUST 7TH.  SO I THINK THAT IS ENOUGH FOR -- POSES A LOSS

13   CAUSATION.  I THINK YOU HAVE TO ANALYZE THEM COLLECTIVELY,

14   FIRST OF ALL.

15         SECONDLY, DR. HARTZMARK DOES LOOK AT THE EVIDENCE OF

16   LOOKING AT THE QUESTION OF CONSIDERING TAKING TESLA PRIVATE.

17   HE, ONCE AGAIN, CONCLUDES YOU DO NOT HAVE TO DISAGGREGATE ANY

18   ASPECT OF THAT.

19         SO WHAT DOES HE LOOK AT?

20         SO, FIRST OF ALL, YOU LOOK AT THE PRICE IMMEDIATELY

21   PRECEDING THE AUGUST 7TH TWEET, WHICH, AS PROFESSOR FISCHEL HAS

22   TESTIFIED, DID INCLUDE THE PUBLICLY-STATED DESIRE OF ELON MUSK

23   TO CONSIDER -- YOU KNOW, THAT HE WAS CONSIDERING TAKING TESLA

24   PRIVATE AT SOME STAGE.

25         THEN YOU LOOK AT -- THEN YOU LOOK AT THE -- WHAT

1    OCCURRED AFTER AUGUST 17TH.

2            SO BY AUGUST 17TH, WE THINK THE EVIDENCE IS VERY

3    CLEAR, BOTH QUALITATIVELY AND QUANTITATIVELY, THAT THE MARKET

4    UNDERSTOOD THAT FUNDING WAS NOT SECURE AND INVESTOR SUPPORT WAS

5    NOT CONFIRMED.

6            TO THE EXTENT -- THE BEST EVIDENCE OF THAT IS A

7    REPORT -- ANALYST REPORT ISSUED BY J.P. MORGAN ON AUGUST 20.

8    SO THAT'S THE MONDAY AFTER THE NEW YORK TIMES ARTICLE, WHICH

9    WAS, YOU KNOW, INCORPORATED -- EVALUATED BY THE MARKET ON

10   AUGUST 17TH.  THAT'S A FRIDAY.  SO J.P. MORGAN ISSUED THEIR

11   REPORT.

12           **THE COURT:**  ON THE 20TH, YOU SAY IT WAS?  AUGUST 20?

13           **MR. PORRITT:**  AUGUST 20, CORRECT, YOUR HONOR.  JUST

14   BEAR WITH ME.  I'LL GET YOU THE EXHIBIT REFERENCE FOR THAT.

15   BUT IT'S -- BEAR WITH ME.  I THINK IT'S EXHIBIT EITHER 23 OR

16   25.

17           BUT IN THAT REPORT -- SO AFTER SAYING THAT FUNDING IS

18   NOT SECURED, THERE IS NO FORMAL PROPOSAL, INVESTOR SUPPORT IS

19   NOT THERE, HE THEN SAYS BUT ELON LOAN MUSK DOES CONSIDER TAKING

20   TESLA PRIVATE.  IT'S EXHIBIT 23, YOUR HONOR.

21           TESLA DOES APPEAR TO BE EXPLORING IT, GOING PRIVATE

22   TRANSACTION.  SO THAT IS STILL THE CASE.  THE MARKET UNDERSTOOD

23   THAT ON AUGUST 20TH.  BY THAT STAGE, IT WAS ALREADY -- THE

24   PRICE WAS ALREADY DOWN.  THE MARKET PRICE IS 305, ALLOWING FOR

25   MARKET FACTORS.  DR. HARTZMARK IDENTIFIES THAT AT 312.90.

 1           SO, AT THAT POINT, THE FUNDING SECURED HAS BEEN

 2    DIVORCED FROM CONSIDERING TAKING TESLA PRIVATE AT 420, BECAUSE

 3    THAT IS STILL THE STATED PRICE THAT HE WAS CONTEMPLATING IT

 4    GOING PRIVATE TRANSACTION.

 5           IT WASN'T UNTIL AUGUST 24TH THAT THAT WAS -- THAT

 6    THAT WAS THEN CORRECTED, OR REVERSED, OR WITHDRAWN, WHEN ELON

 7    MUSK SAYS HE WAS STAYING PUBLIC.

 8           SO WE KNOW HOW THE MARKET VALUED THE STATEMENT, "I'M

 9    CONSIDERING TAKING TESLA PRIVATE AT 420," BY LOOKING AT THE

10    REACTION ON AUGUST 24TH WHEN THAT WAS FINALLY WITHDRAWN.  AND

11    THE REACTION THERE WAS NOT STATISTICALLY SIGNIFICANT.  THE

12    PRICE MOVED, LIKE, $3 FOR A $305 STOCK.  SO LESS THAN --

13    APPROXIMATELY LESS THAN ONE PERCENT.

14           PUTTING ALL THAT TOGETHER, IN ADDITION TO ALL THE

15    QUALITATIVE ANALYSIS -- YOU KNOW, I'M JUST SKETCHING OUT, YOUR

16    HONOR, TRYING TO INCORPORATE A 200-PAGE REPORT IN A COUPLE OF

17    MINUTES.

18           YOU CAN ALSO LOOK AT ANOTHER THING THAT'S VERY

19    IMPORTANT AND HAS VERY PERSUASIVE POWER, IS LOOKING AT WHAT'S

20    CALLED THE IMPLIED VOLATILITY, WHICH IS A NUMBER THAT YOU

21    DERIVE FROM LOOKING AT THE MARKET PRICES, THE STOCK OPTIONS OF

22    TESLA, WHICH LOOK AT THE -- IMPLIED VOLATILITY IS AN EXPRESSION

23    OF THE EXPECTED SPREAD OR DISTRIBUTION OF OPTION PRICES IN THE

24    FUTURE -- OF STOCK PRICES OF TESLA IN THE FUTURE.

25           ACADEMIC LITERATURE HOLDS, AND PROFESSOR FISCHEL

```
 1    AGREES, THAT WHEN YOU HAVE AN ANNOUNCED TRANSACTION AT A PRICE,
 2    MERGER OR GOING PRIVATE, THEN THAT WILL REDUCE IMPLIED
 3    VOLATILITY, BECAUSE, NATURALLY, THE SPREAD TIGHTENS AROUND THE
 4    ANNOUNCED PRICE OF THE TRANSACTION.
 5              AND THAT'S EXACTLY WHAT YOU SEE ON AUGUST 7TH, WHICH
 6    IS THAT IMPLIED VOLATILITY MEASURED FROM ACTUAL MARKET PRICES
 7    OF THE TESLA STOCK OPTIONS GOES -- AFTER BEING STABLE PRIOR TO
 8    AUGUST 7TH, DROPS DRAMATICALLY.  DROPS FROM APPROXIMATELY
 9    50 PERCENT TO 32 PERCENT.
10              WHAT THEN HAPPENS IS THAT THEN THAT IMPLIED
11    VOLATILITY CREEPS UP DURING THE CLASS PERIOD, AND THEN ON
12    AUGUST 17TH IT DRAMATICALLY REVERTS, ESSENTIALLY ALL THE WAY
13    BACK TO 50 PERCENT, 49 PERCENT.
14              SO THAT IS, IF YOU LIKE, THE STABLE-STATE
15    EQUILLIBRUM, WHICH INCLUDES THE POSSIBILITY THAT ELON MUSK WILL
16    TAKE TESLA PRIVATE.  SO -- AND THEN IT CONTINUES AND DOESN'T
17    MOVE AGAIN ON AUGUST 24TH WHEN IT IS FINALLY ANNOUNCED THAT
18    HE'S NOT TAKING TESLA PRIVATE, AT LEAST NOT ANY TIME SOON.
19              SO, PUTTING ALL THAT TOGETHER -- I KNOW THAT'S A LOT,
20    AND I APOLOGIZE -- I THINK IT'S VERY CLEAR DR. HARTZMARK HAS
21    CLEARLY CONSIDERED THE POINT DEFENDANTS MAKE AS APPLIED,
22    RECOGNIZED FINANCIAL METRICS, LOOKED AT A QUANTITATIVE AND
23    QUALITATIVE ANALYSIS; AGAIN, LOOKING AT ALL THE DISCUSSION BY
24    THE MEDIA, INVESTORS, ET CETERA, DURING THE CLASS PERIOD AND
25    AFTERWARDS AND HAS CONCLUDED THAT WHAT HE HAS DONE IS MEASURED
```

1    THE EFFECT ON THE STOCK PRICE DUE TO THE MISLEADING STATEMENTS,

2    AUGUST 7TH, AND, YOU KNOW, FUNDING SECURED, INVESTOR SUPPORT IS

3    CONFIRMED, AND THE ONLY REASON THAT'S NOT CONTINGENT -- ONLY

4    REASON IT'S NOT CERTAIN IS THAT IT'S CONTINGENT ON SHAREHOLDER

5    VOTE.  AND THAT ALL THAT WAS ELIMINATED FROM THE EFFECT OF THE

6    PRICE BY AUGUST 17.

7         SO -- AND TO GO BACK TO WHERE WE STARTED WITH,

8    PROFESSOR FISCHEL LARGELY AGREES -- WELL, HE DISAGREES ABOUT

9    WHETHER -- HE WOULDN'T AGREE THAT IT WAS TRUE OR FALSE.  HE

10   OFFERED NO REAL CONCLUSION ON THAT.  HE CON- -- HE AGREED THAT

11   THE AUGUST 7TH TWEETS WERE PART OF THE OVERALL MIX OF

12   INFORMATION FOLLOWING THE AUGUST 13TH BLOGPOST.

13        HE AGREED THAT THE AUGUST 17TH NEW YORK TIMES ARTICLE

14   AND THE PRICE REACTION WOULD HAVE BEEN IN THE CONTEXT OF THE

15   AUGUST 7TH TWEETS, SO -- WHICH IS, IN FACT, ALSO CONSISTENT

16   WITH COMMON SENSE, WHICH IS TO SAY YOU HAVE THESE MAJOR

17   ANNOUNCEMENTS, AND WITHIN TEN DAYS, OF COURSE, THE MARKET IS

18   STILL GOING TO BE EVALUATED AND REACTING TO IT.

19        SO, I APOLOGIZE FOR THE VERY LONG-WINDED ANSWER.

20        **THE COURT:**  ALL RIGHT.

21        **MR. PORRITT:**  IT'S A VERY COMPLICATED SUBJECT AND --

22   BUT --

23        **THE COURT:**  LET ME ASK THE DEFENSE TO RESPOND TO --

24   THE MORE SIMPLE QUESTION IS WHY DOESN'T THIS ALL DEMONSTRATE

25   THAT THERE ARE FACTUAL ISSUES HERE, THERE ARE INTERPRETIVE

1    ISSUES ABOUT WHETHER THE APPLICATION OF THE METHODOLOGY WAS

2    CORRECT AND WHETHER SUFFICIENT WEIGHT WAS GIVEN TO VARIOUS

3    THINGS AND IF THINGS WERE TREATED SUFFICIENTLY WELL, BUT WHY IS

4    THIS A DAUBERT GATEKEEPING QUESTION?

5            **MR. ROSSMAN:**  YOUR HONOR, ANDREW ROSSMAN FOR

6    DEFENDANTS.

7            **THE COURT:**  YEAH.

8            **MR. ROSSMAN:**  SO THERE ARE TWO FUNDAMENTAL

9    SHOWSTOPPER ISSUES HERE THAT THEY CAN'T GET OVER.

10           ONE IS THEY CAN'T PROVIDE YOUR HONOR WITH A DAMAGES

11   MODEL THAT IS CONTRARY TO LAW.  AND WE RELY, FOR THE 10B-5 LAW,

12   UNITED STATES SUPREME COURT IN THE *AFFILIATED YOUTH* DECISION,

13   *IN THE GOLDMAN SACHS* DECISION MORE RECENTLY.  AND THEY DON'T

14   DISPUTE IT.

15           IN THEIR OPPOSITION BRIEF AT PAGE 9, THEY SAY,

16   "MEASURED OUT-OF-POCKET DAMAGES."  OUT-OF-POCKET DAMAGES, WHICH

17   IS WHAT 10B-5 PROVIDES IS THE DIFFERENCE PAID -- IS THE

18   DIFFERENCE PAID AND WHAT THEY WOULD HAVE PAID HAD THERE BEEN NO

19   FRAUDULENT CONDUCT.  THAT'S THE KEY POINT.  WHAT'S THE BUT-FOR

20   STATE OF THE WORLD?  NO FRAUDULENT CONDUCT.  AND WHAT'S THE

21   DIFFERENCE BETWEEN WHAT THEY PAID, WHAT THEY RECEIVED, AND WHAT

22   THEY WOULD HAVE HAD THERE BEEN NO FRAUDULENT CONDUCT AS

23   ALLEGED.

24           SO THEY CAN'T GO CONTRARY TO THE LAW, AND I'LL

25   EXPLAIN IN A SECOND WHY, YOUR HONOR, THIS MODEL RESTS ON A

1  LEGALLY ERRONEOUS ASSUMPTION.

2          THEY ALSO, YOUR HONOR --

3          **THE COURT:**  LET ME JUST STOP YOU RIGHT THERE.  I

4  MEAN, I HAVE THEIR BRIEF.  ISN'T THE ARGUMENT THAT, YEAH, HAD

5  THERE NOT BEEN FRAUDULENT CONDUCT.  BUT IF THERE IS FRAUDULENT

6  CONDUCT, IT HAS CERTAIN CONSEQUENCES, SUCH AS SHAKING THE

7  CONFIDENCE IN THE -- EITHER THE STRUCTURE, THE MANAGEMENT --

8  SECURITIES STRUCTURE OF THE ORGANIZATION AT ISSUE OR, SORT OF,

9  SKY-IS-FALLING KIND OF SCENARIO, WHICH WOULD THEN IMPACT PRICES

10  IN A WAY THAT MIGHT NOT HAVE HAPPENED HAD IT NOT BEEN FOR THE

11  FRAUD AND THE REVELATION OF THE FRAUD.

12          I'M NOT SURE WHY JUST THAT STATEMENT PRECLUDES WHAT

13  THEY CALL CONSEQUENCES DAMAGES.

14          **MR. ROSSMAN:**  IT DOES, YOUR HONOR.

15          FIRST, I'LL SAY THIS:  THEY DON'T CITE A SINGLE CASE.

16  THERE IS NONE, NONE -- OKAY -- WHERE THERE WAS CONSEQUENTIAL

17  DAMAGES BASED ON A CHANGE IN THE MARKET PRICE THAT WAS

18  SUPPORTED AS A DAUBERT, YOU KNOW, CLEARABLE MODEL BY AN EXPERT.

19  OKAY?

20          THE ONLY CASE THAT MR. PORRITT CITED WAS THE

21  *AMBASSADOR* CASE.  IN THE *AMBASSADOR* CASE, THE CONSEQUENTIAL

22  DAMAGES THE COURT FOUND THERE WERE $500,000 OF OUT OF POCKET

23  THAT WAS PAID BY PLAINTIFFS IN ORDER TO OBTAIN RESCISSION OF

24  THE STOCK.  OKAY?  TO MITIGATE THEIR RESCISSION DAMAGES IN THE

25  *AMBASSADOR HOTEL* CASE, NOT ABOUT SUBSEQUENT DECLINES IN THE

1    STOCK PRICE.

2         THE FOURTH CIRCUIT AND THE SECOND CIRCUIT IN THE

3    *OMNICOM* CASE THAT WE CITE MAKES IT CRYSTAL CLEAR THAT 10B-5

4    DOES NOT ENTITLE PLAINTIFFS TO SUBSEQUENT STOCK DECLINES THAT

5    FOLLOW AFTER THERE'S A REVELATION OF THE TRUTH BASED ON

6    KNOCK-ON EFFECTS FROM THE FRAUD, WHETHER THOSE KNOCK-ON EFFECTS

7    INCLUDE, IN ONE CASE, A LAWSUIT INVOLVING THE CEO OR NEGATIVE

8    PUBLICITY.

9         AND EXACTLY THE SAME THING WOULD APPLY, YOUR HONOR,

10   IF WE WERE TALKING ABOUT REGULATORY CONSEQUENCES.  THEY HAVE TO

11   SHOW THAT THERE IS A DIRECT AND MEASURABLE HARM PAID IN THE

12   INFLATION OF THE STOCK PRICE.  THEY SHOW THAT -- OKAY --

13   ACCORDING TO DR. HARTZMARK.  I'M NOT SAYING I AGREE WITH HIM.

14   BUT THEIR CASE, YOUR HONOR, IS THAT THERE WAS A DIRECT

15   INFLATION ON DAY ONE, AND IT'S MEASURED BY THE DIFFERENCE

16   BETWEEN THE UNAFFECTED OR PRE-TWEET PRICE OF 356.85 AND THE

17   CLOSING PRICE THAT DAY OF 379.57.  THAT'S WHERE THE $23.27

18   COMES FROM.  THAT'S AFTER ADJUSTMENT FOR OTHER MARKET FACTORS.

19   OKAY?

20        SO WHAT THEY'RE SAYING, ESSENTIALLY, IS THAT'S THE

21   AMOUNT OF INFLATION THAT YOU HAVE FROM THE EFFECTS OF THE

22   ALLEGED FALSE TWEET.

23        BEFORE I EVEN GET TO THE DISAGGREGATION PROBLEMS THEY

24   HAVE, YOUR HONOR, WHAT DR. HARTZMARK IS ASKING IS FOR YOU TO

25   TRIPLE THOSE DAMAGES, OKAY, OR ALLOW THE JURY TO CONSIDER

1    TRIPLING THOSE DAMAGES, BY MAKING THE ASSUMPTION THAT THE

2    BUT-FOR PRICE OF TESLA STOCK, BUT FOR THE ALLEGED FRAUDULENT

3    CONDUCT, WOULD BE SOMETHING THAT'S IMPOSSIBLE, LITERALLY

4    IMPOSSIBLE, IT WOULD BE $312.90.  OKAY?  THAT'S HOW PLAINTIFFS

5    DESCRIBE IT IN THEIR BRIEF AT PAGE 3.

6            SO WHAT THEY'RE ASSUMING IS, YOUR HONOR, THAT IF

7    THERE WERE NO FRAUDULENT CONDUCT, THAT THE PRICE WOULD ACTUALLY

8    BE BELOW GROUND LEVEL BY $44, THAT IT WOULD BE BELOW THE

9    UNAFFECTED PRE-TWEET PRICE.  THAT MAKES NO LOGICAL SENSE, OF

10   COURSE, BECAUSE IF THERE WERE NO TWEET AT ALL ABOUT ANYTHING,

11   RIGHT, THEN YOU WOULD EXPECT THAT THE STOCK PRICE WOULD BE AT

12   THE PRICE IT WAS A MOMENT BEFORE THE TWEET, NOT THAT THE PRICE

13   WOULD BE $44 LOWER.

14           AND THE REASON -- YOUR HONOR, ARE YOU GOING TO STEP

15   IN?  I'LL PAUSE.

16           **THE COURT:**  I'M CURIOUS.  ARE YOU SAYING YOU COULD

17   NEVER HAVE DAMAGES IN A 10B-5 CASE WHERE -- THAT WOULD EXCEED

18   THE FRONT-END INFLATION NUMBER, THAT IS, YOUR BASELINE IS

19   ALWAYS THE PRE-FALSITY NUMBER, YOU COULD NEVER HAVE DAMAGES

20   BELOW THAT -- NEVER HAVE AN END PRICE -- IN OTHER WORDS, I'M --

21   SO WHY WOULD YOU EVEN LOOK TO THE END -- WHY WOULD YOU LOOK TO

22   THE -- YOU KNOW, USE BACKCASTING, WHATEVER IT'S CALLED, WHERE

23   YOU LOOK BACKWARDS, SEEMS LIKE YOU'RE GOING TO RUN INTO THIS

24   PROBLEM NOT INOFTEN.

25           I KNOW YOU HAVE TO DISAGGREGATE.  IT MAY BE DOWN

1    BECAUSE OF MARKET CONDITIONS, ET CETERA, ONCE YOU DISAGGREGATE.

2    BUT ARE YOU SAYING IT'S IMPOSSIBLE TO HAVE DAMAGES THAT SORT OF

3    EXCEED THAT FRONT-END INFLATION NUMBER IN A CASE LIKE THIS?

4         **MR. ROSSMAN:**  WELL, YOUR HONOR.  WHAT WE HAVE HERE IS

5    WHAT PLAINTIFFS CONTEND IS A MEASURABLE FRONT END.  THE PROBLEM

6    THEY HAVE -- THE PROBLEM THAT THEY HAVE IS THEY CAN'T FIND

7    STATISTICAL SIGNIFICANCE IN CONNECTION WITH ANY OF THE CURATIVE

8    STATEMENTS.

9         SO, TYPICALLY, WHAT HAPPENS IS COMPANY ISSUES A PRESS

10   RELEASE THAT SAYS, OUR PRIOR EARNINGS WAS IN ERROR, OKAY, AND

11   THAT PRESS RELEASE IMMEDIATELY LEADS TO A STOCK DROP, AND YOU

12   GET THE BACK END, AND THEN YOU MEASURE BACKWARDS, OR BACKCAST

13   FROM THE BACK END.  OKAY?

14        HERE THE PLAINTIFFS HAVE A PROBLEM, BECAUSE IF YOU

15   LOOK AT THE PERIOD BEFORE AUGUST 17TH -- AND THAT'S THE NEW

16   YORK TIMES ARTICLE, AND THAT'S ONE OF THE REASONS WHY WE'RE

17   VERY FOCUSED ON, YOU KNOW -- I HEARD YOUR HONOR'S RULING, OF

18   COURSE.

19        BUT FOR THE EXPERT, EXPERT'S GOING TO HAVE A DEVIL OF

20   A TIME TRYING TO DISENTANGLE WHATEVER IS NEW INFORMATION THAT

21   HE THINKS HE CAN PARSE OUT FROM THE NEW YORK TIMES ARTICLE ON

22   AUGUST 17TH FROM THAT WHICH WAS ALREADY DISCLOSED IN THE MARKET

23   IN THE AUGUST 13TH BLOGPOST AND PRIOR TO THAT.  OKAY?  AND HE

24   HAS TO DO THAT.  BECAUSE WHAT HE'S GOT TO SHOW IS HE'S GOT TO

25   SHOW IT WAS THE CURATIVE INFORMATION, THE CORRECTIVE

```
 1   INFORMATION THAT CAUSED THE DECLINE.  OKAY?

 2           THEY CAN'T SHOW THAT, SO THEY FUDGE IT.  AND THE WAY

 3   THEY FUDGE IT, YOUR HONOR, IS THAT THEY TAKE THE STATISTICALLY

 4   SIGNIFICANT MOVE ON THE 17TH -- AND THERE'S ONLY TWO THINGS

 5   THAT HAPPENED HERE THAT MEET -- YOUR HONOR IS RIGHT ON IT TO

 6   ASK, YOU KNOW, WHETHER ANY OF THESE ALLEGED CONSEQUENTIAL HARMS

 7   RESULTED IN STATISTICALLY SIGNIFICANT MOVEMENTS IN STOCK

 8   PRICES.  NONE OF THEM DID.  OKAY?  NONE OF THEM DID.  THEY

 9   DON'T HAVE ANY PROOF OF THAT.  THEY JUST ASSUME IT.

10           WHAT THEY ESSENTIALLY DO IS TAKE TWO GOALPOSTS.  THEY

11   TAKE AUGUST 7TH, OKAY, WHEN THE TWEETS CAME OUT, AND THEN THEY

12   TAKE AUGUST 17TH WHEN THE NEW YORK TIMES CAME OUT.  THE REASON

13   WHY DR. HARTZMARK USES THOSE TWO IS THERE'S STATISTICAL

14   SIGNIFICANCE ON THE FRONT END.  OKAY?  HE CAN'T FIND

15   STATISTICAL SIGNIFICANCE EXCEPT ON THE 17TH, BUT ON THE 17TH

16   IT'S LOADED WITH CONFOUNDING INFORMATION.

17           SO EVEN IF THERE IS SOME ADDITIONAL INCREMENT OF

18   CURATIVE OR CORRECTIVE INFORMATION ON THE 17TH COMPARED TO THE

19   13TH, EVEN IF THERE'S A LITTLE BIT, THERE'S A TON OF MARKET

20   MOVING NON-FRAUD RELATED INFORMATION IN THAT ARTICLE, WHICH IS

21   ALL OF THE INFORMATION ABOUT MR. MUSK'S HEALTH.  THAT'S WHAT

22   THE HEADLINE WAS THAT DAY.  THAT'S WHAT DOZENS AND DOZENS AND

23   DOZENS AND DOZENS OF ARTICLES WERE ABOUT FOLLOWING THAT, YOU

24   KNOW, TEARFUL NEW YORK TIMES ARTICLE.  THAT'S WHAT RULED THE

25   STOCK PRICE THAT DAY, WERE CONCERNS ABOUT MR. MUSK'S HEALTH.
```

1          **THE COURT:**  THAT'S GOING TO BE YOUR ARGUMENT TO THE

2     JURY.  THAT'S A FACT QUESTION.

3          AND THE FACT THAT ONE COULD NOT FIND A PARTICULAR

4     MOMENT WHERE THERE'S A STATISTICALLY SIGNIFICANT MOVEMENT DUE

5     TO SOME PARTIAL DISCLOSURE DOES NOT NECESSARILY PREVENT ONE

6     LOOKING AT THE AGGREGATE -- I GUESS HE CALLS IT THE LEAKAGE

7     MODEL -- WHERE YOU COULD HAVE A SERIES, FOR INSTANCE,

8     THEORETICALLY, A SERIES OF DECLINES THAT ARE NOT EACH ONE

9     STATISTICALLY INSIGNIFICANT, BUT IN THE AGGREGATE -- AND IF YOU

10    DO THE PROPER DISAGGREGATION ANALYSIS, I COULD SEE WHERE YOU

11    COULD COME OUT WITH SOMETHING IN THE END.

12         BUT THE LARGER POINT, THOUGH, IS THAT HE'S DONE

13    SOMETHING SORT OF, IN YOUR VIEW, MORE THAN THAT, AND THAT IS

14    SAYING, WELL, YOU KNOW, THE CONSEQUENCE OF THE -- THE FALSITY

15    AND THE REVELATION OF THE FALSITY OPENS KIND OF A PANDORA'S BOX

16    AND HAS ALL SORTS OF ADDITIONAL IMPACTS ON STOCK, WHICH SHOULD

17    BE INCLUDED, WHICH SHOULD BE COGNIZABLE, AND YOU'RE SAYING,

18    WELL, CASE LAW DOESN'T SUGGEST THAT.

19         **MR. ROSSMAN:**  RIGHT.  WELL, YOUR HONOR, I GUESS I

20    WOULD PUT IT TO YOU IN THIS WAY, OKAY?  BEFORE THE QUESTION

21    SHOULD GET TO THE JURY, YOUR -- YOU KNOW, YOUR ROLE AS

22    GATEKEEPER IN A DAUBERT MOTION IS TO CONSIDER WHETHER HIS MODEL

23    GIVES THEM TOOLS TO BE ABLE TO DETERMINE WHAT THEY ARE CHARGED

24    WITH DETERMINING HERE, WHICH IS WHAT PORTION OF THE LOSS IS

25    CHARGEABLE TO FRAUDULENT STATEMENTS, AND FRAUDULENT STATEMENTS

1    BEING REVEALED, AS OPPOSED TO OTHER THINGS, EITHER INDISPUTABLY

2    TRUE STATEMENTS LIKE WE HAVE ON THE FRONT END, WHICH IS

3    MR. MUSK'S STATEMENT THAT, YOU KNOW, I'M CONSIDERING TAKING

4    TESLA PRIVATE AT 420, WHICH THEY DO NOT DISAGGREGATE -- OKAY?

5    WE'LL GO BACK TO THAT IN A MINUTE IF YOUR HONOR WILL PERMIT ME.

6    -- AND THE AUGUST 17 NEW YORK TIMES ARTICLE WHICH HAS THE

7    CONFOUNDING INFORMATION REGARDING MR. MUSK'S HEALTH, WHICH IS

8    THE SUBJECT OF PAGES AND PAGES AND PAGES AND PAGES OF ARTICLES

9    WHICH ARE CITED IN MR. HARTZMARK'S OPINION, AS OPPOSED TO ONE

10   SINGLE ARTICLE, YOU KNOW, THAT'S CITED BY NO ONE THAT

11   MR. PORRITT SUGGESTS THAT THE WORLD KNEW ABOUT, YOU KNOW,

12   MR. MUSK'S HEALTH.

13          THERE'S -- IT'S A DRAMATICALLY DIFFERENT SITUATION

14   THAT CAUSED THE STOCK TO MOVE, AND THE QUESTION IS DOES THIS

15   EXPERT PROVIDE A RELIABLE, A TESTABLE, CROSS-EXAMINABLE MODEL

16   THAT COULD ALLOW US TO DETERMINE WHAT PORTIONS OF THE ALLEGED

17   FRAUD ARE ACTUALLY CAUSING HARM HERE.

18          AND, YOUR HONOR, IT SHOULD BE, YOU KNOW, SURPRISING,

19   GIVEN THE SHEER NUMBER OF SECURITIES CASES THAT THERE HAVE

20   BEEN, YOU KNOW, CERTAINLY SINCE THE PSLRA WAS ADOPTED, THAT NO

21   ONE, NO COURT, NONE THAT THEY'VE CITED, NONE THAT WE'VE SEEN,

22   HAS FOUND A CONSEQUENTIAL DAMAGES MODEL BASED ON MOVEMENT IN

23   THE STOCK PRICE.

24          IT'S AN ENTIRELY DIFFERENT THING WHEN YOU'RE TALKING

25   ABOUT OUT-OF-POCKET OUTLAY, LIKE THE EXAMPLE I GAVE IN THE

1   *AMBASSADOR HOTELS* CASE, THE ONLY CASE THEY CITE, THEN WHEN

2   YOU'RE SAYING THERE ARE KNOCK-ON EFFECTS TO STOCK PRICE, AND

3   THE CASE LAW IS PRETTY CLEAR, LIKE *OMNICOM* SAYS, SUBSEQUENT

4   KNOCK-ON EFFECTS, IF YOU WILL, MEDIA COVERAGE AND SO FORTH,

5   THEY DON'T -- THEY DON'T COUNT AS LOSSES THAT ARE OUT-OF-POCKET

6   LOSSES.

7           **THE COURT:**  WHAT HAPPENS -- WHAT HAPPENS IF WE HAVE A

8   SITUATION WHERE SOMEBODY DOES DO AN ADEQUATE DISAGGREGATION

9   ANALYSIS, DOES TAKE INTO ACCOUNT -- INTO EFFECT, TRUTHFUL

10   STATEMENTS, ALONG WITH THE FALSE STATEMENTS, DOES TAKE INTO

11   EFFECT ALL THE CONFOUNDING FACTORS, LIKE, YOU KNOW, THE ECONOMY

12   AND OTHER THINGS THAT WOULD AFFECT, AND AFTER YOU STRIPPED THAT

13   ALL AWAY, YOU STILL END UP WITH A BIG NUMBER, A BIGGER THAN AN

14   UPFRONT NUMBER, WHICH THEN IMPLIEDLY SAYS, WELL, IT'S NOT JUST

15   THE FALSITY ITSELF, BUT IT'S SORT OF THE CONSEQUENCE OF THE

16   FALSITY IN TERMS OF THE FUTURE, YOU KNOW, OF THE COMPANY AND

17   THE LEGAL PROBLEMS YOU ARE GOING TO FACE?

18           WOULD IT BE YOUR VIEW THAT EVEN AFTER, LET'S SAY, AN

19   ADEQUATE DISAGGREGATION ANALYSIS THAT TAKES INTO ACCOUNT ALL

20   NON-FALSITY-RELATED CONFOUNDING FACTORS, THAT THERE'S STILL A

21   SORT OF LEGAL BARRIER, THAT'S JUST THE KIND OF CAUSAL FACTOR

22   YOU SHOULD NOT BE ABLE RECOVER FOR?

23           **MR. ROSSMAN:**  I DO, YOUR HONOR -- AND WE'RE TALKING

24   ABOUT HERE, OKAY, A FRAUD-ON-THE-MARKET CASE.  AND THE ESSENCE

25   OF THE FRAUD-ON-THE-MARKET PRESUMPTION BASIC IS THAT ALL

1    INFORMATION IS EMBEDDED IN THE STOCK PRICE, INCLUDING POTENTIAL

2    RAMIFICATIONS OF THAT INFORMATION.

3         SO THE EXPECTATION IS THAT THE PRICE -- WHEN THE

4    TRUTH IS KNOWN, OKAY, WHEN THE TRUTH IS REVEALED, THAT

5    INVESTORS WILL IMMEDIATELY TAKE INTO -- WILL TAKE INTO ACCOUNT

6    IN THE TRADING OF THAT STOCK THE EXPECTATION OF OTHER

7    CONSEQUENCES THAT MAY BEFALL THE COMPANY, WHETHER THEY BE

8    REGULATORY INVESTIGATIONS, WHETHER THEY BE LAWSUITS, WHETHER

9    THEY BE BAD PUBLICITY, WHETHER THEY BE CHANGES TO MANAGEMENT.

10         THOSE THINGS THAT HAPPEN LATER ON, OKAY, ARE ALREADY

11   CRYSTALLIZED IN WHERE THE STOCK TRADES ON A GIVEN DAY.  SO IT'S

12   DOUBLE COUNTING, IN EFFECT, YOUR HONOR, TO ALLOW THEM TO COUNT

13   THAT AS CONSEQUENTIAL DAMAGES IN ADDITION TO THE DIRECT

14   DAMAGES, AND I WOULD SUGGEST THERE'S NO PRECEDENT FOR IT FOR

15   GOOD REASON.  AND --

16         **THE COURT:**  WELL, BUT WHAT YOU JUST SAID -- AND IT

17   SOUNDED INTERESTING -- IF, AT THE END OF THE DISCLOSURE PERIOD,

18   AND YOU'VE ELIMINATED CONFOUNDING FACTORS THROUGH APPROPRIATE

19   DISAGGREGATION, YOU ARE LEFT WITH A -- LET'S SAY A VERY LOW

20   PRICE BECAUSE WHAT'S BAKED INTO THE PRICE AT THAT POINT IS NOT

21   ONLY THE REVELATION OF THE FRAUD, BUT, LET'S SAY, DISCLOSURE OF

22   SERIOUS MANAGEMENT PROBLEMS.  AND THERE'S GOING TO BE

23   DISRUPTION.  WE NOW KNOW THAT WHOEVER THE CEO IS IS GOING TO BE

24   GONE, WE NOW KNOW THE BOARD OF DIRECTORS -- THERE'S GOING TO BE

25   A BIG SHAKEUP IN THE COMPANY.

1          THAT, AS YOU JUST SAID, IS KIND OF ALREADY TAKEN INTO

2   ACCOUNT, BUT ISN'T THAT WHAT THEIR EXPERT HAS DONE, IS SAYING,

3   WELL, YOU LOOK AT IT, AND IT WENT ALL THE WAY DOWN TO 3- --

4   WHATEVER IT IS -- -19 OR SOMETHING, THAT REFLECTS THE

5   SHAREHOLDERS' VIEW THAT THERE'S SOME DEEPER PROBLEMS NOW THAT

6   HAVE BEEN REVEALED.  SO WHY IS THAT NOT APPROPRIATE TO TAKE

7   INTO ACCOUNT?

8          **MR. ROSSMAN:**  SO HERE'S THE PROBLEM THAT WE HAVE,

9   YOUR HONOR, AND WHY WE MAKE THIS DAUBERT MOTION, OKAY?  IF THE

10  JURY WERE TO DETERMINE THAT THE NEW YORK TIMES ARTICLE IN PART,

11  LET'S SAY, OKAY, MOVES THE STOCK PRICE BECAUSE OF CONCERNS

12  ABOUT MR. MUSK'S HEALTH AND IN PART MOVES THE STOCK PRICE --

13  AND I DON'T ACCEPT THIS, YOUR HONOR -- I'M JUST KIND OF

14  FOLLOWING ALONG PLAINTIFF'S PLAYBOOK.

15         BUT IF THE OTHER PART, PLAINTIFFS WILL CLAIM, IS

16  THERE'S SOME NEW REVELATION IN THE NEW YORK TIMES ARTICLE,

17  OKAY, THEN THE JURY HAS NO TOOLS AVAILABLE TO IT TO GIVE A

18  DAMAGES AWARD BASED ON THE SPLIT BETWEEN THOSE TWO, BECAUSE

19  THEY'RE ALL LUMPED TOGETHER, UNDIFFERENTIATED IN

20  DR. HARTZMARK'S REPORT.

21         AND THE FAILURE TO MAKE THAT DISAGGREGATION, EVEN THE

22  ONE AND ONLY CASE THEY CITE FOR THE PROPOSITION YOU COULD HAVE

23  A LEAKAGE MODEL -- IT'S NEVER BEEN ADOPTED IN THE NINTH

24  CIRCUIT, BUT THE *HOUSEHOLD* CASE IN THE SEVENTH CIRCUIT, OKAY?

25  IT'S OUR EXPERT, SO HE KNOWS OF WHAT HE SPEAKS WHEN HE SAYS THE

```
 1   LEAKAGE MODEL DOESN'T WORK HERE.  OKAY?  BUT IN THE HOUSEHOLD
 2   CASE THE CONFOUNDING INFORMATION WAS ELIMINATED.  OKAY?
 3           HERE, HERE WHAT HAPPENS IS, ESSENTIALLY,
 4   DR. HARTZMARK JUST IGNORES THE CONFOUNDING INFORMATION.  WE
 5   KNOW THERE'S TRUTHFUL INFORMATION THAT HAS THE POTENTIAL TO
 6   MOVE THE MARKET IN THE AUGUST 7TH TWEET, RIGHT?  YOUR HONOR
 7   OBSERVED IT.
 8           "I'M CONSIDERING TAKING TESLA PRIVATE AT 420," IF
 9   THAT'S ALL MR. MUSK SAID ON THAT DAY AND SAID NOTHING FURTHER,
10   RIGHT, IT WOULD BE YOU'D HAVE TO IMAGINE PLAINTIFFS' CASE THAT
11   THAT WOULDN'T MOVE THE STOCK PRICE AT ALL.  THAT'S NOT PROVEN,
12   AND IT'S NOT REALLY PLAUSIBLE, YOUR HONOR.  OKAY?
13           THEN ON THE BACK END, ON AUGUST 17TH, YOU'VE GOT THE
14   NEW YORK TIMES ARTICLE WITH REVELATIONS ABOUT MR. MUSK'S HEALTH
15   THAT HAVE NOTHING TO DO WITH FRAUD.  OKAY?
16           THE COURT:  THAT'S WHY I SAID WITH MR. PORRITT THAT,
17   AT THE END OF THE DAY, THE DEBATE REALLY SEEMS TO BE ABOUT THIS
18   EXPERT'S, IN YOUR VIEW, FAILURE TO ACCOUNT FOR LOTS OF
19   CONFOUNDING INFORMATION, AND TRUTHFUL INFORMATION; THE FRONT
20   END, THE BACK END.  IT'S NOT SO MUCH WHETHER WE CALL IT A
21   LEAKAGE MODEL.  IT'S NOT SO MUCH WHETHER YOU CALL IT
22   CONSEQUENTIAL, BECAUSE IT'S -- REALLY THE -- I THINK, FROM YOUR
23   POSITION, THE FAILURE TO DEAL ADEQUATELY WITH ALL THIS
24   NON-RELATED INFORMATION.
25           BUT THAT SEEMS TO BE -- AND THAT SEEMS TO ME PERFECT
```

1    FODDER FOR CROSS-EXAMINATION.  I CAN IMAGINE WHAT THAT'S GOING

2    TO LOOK LIKE, AND I DON'T KNOW THAT THAT -- THAT THAT'S A

3    DAUBERT ISSUE.

4            **MR. ROSSMAN:**  WELL, YOUR HONOR, I'LL SAY THIS:  THE

5    PROBLEM THAT I HAVE IS THE NATURE OF THE REPORT THAT JUST

6    ASSUMES THAT EVERYTHING THAT HAPPENS FROM THE INITIAL TWEET

7    TO -- ALL THE WAY TO THE AUGUST 17 NEW YORK TIMES REPORT

8    WITHOUT SEPARATION, IT SWEEPS WITHIN IT A TREMENDOUS AMOUNT OF

9    INFORMATION AND ACTIVITY WITH NO PROOF THAT ANY OF IT HAD

10   STATISTICAL SIGNIFICANCE.

11           SO, FOR EXAMPLE, YOUR HONOR POINTED OUT THE

12   CONSEQUENTIAL DAMAGES.  MR. PORRITT ESSENTIALLY SAYS, WE CAN

13   IGNORE OTHER CONFOUNDING INFORMATION BECAUSE THE CONFOUNDING

14   INFORMATION ALLEGEDLY DIDN'T HAVE STATISTICAL SIGNIFICANCE,

15   BUT, YET, THEY'RE GOING TO INCLUDE ALL OF THESE CONSEQUENTIAL

16   DAMAGES, EVEN THOUGH THEY CAN'T SHOW THAT THERE'S ANY

17   STATISTICAL SIGNIFICANCE FOR ANY OF THE CONSEQUENTIAL HARMS.

18   AND THAT'S TWO-THIRDS OF THE DAMAGE CLAIM.

19           THEN THERE'S A MODEL WITH NO ABILITY FOR THE JURY,

20   YOUR HONOR, TO DISENTANGLE IT AND COME TO A DAMAGES AWARD, IF

21   THEY MUST -- IF THEY AWARD DAMAGES, THAT'S DIRECTLY

22   ATTRIBUTABLE TO THE FRAUD STATEMENTS AND ONLY THE FRAUD

23   STATEMENTS.

24           THAT'S THE PROBLEM THAT WE HAVE, YOUR HONOR.

25           **THE COURT:**  THANK YOU.  LET ME TURN BACK TO

1    MR. PORRITT.

2          WHAT CASE -- IS THERE ANY CASE YOU CAN CITE THAT HAS

3    RECOGNIZED THAT, WHETHER YOU CALL IT CONSEQUENTIAL DAMAGES OR

4    BAKED INTO THE SHAREHOLDER ASSESSMENT, YOU KNOW, NUMBERS AT THE

5    END -- TAIL END AFTER THE REVELATION AND THE CORRECTIVE

6    DISCLOSURES, THAT DAMAGES OR DEPRESSION OF STOCK PRICES DUE TO

7    SHAREHOLDER UNDERSTANDING OF POTENTIAL REGULATORY CONSEQUENCES,

8    MANAGEMENT ISSUES, STUFF LIKE THAT, IS THE KIND OF THING THAT

9    IS RECOVERABLE IN A SECURITIES ACTION LIKE THIS?

10          **MR. PORRITT:**  JUST TO RESTATE -- ADDRESS SOMETHING

11   THAT MR. ROSSMAN SAYS, DON'T FORGET IT'S ONLY REFLECTED -- IT'S

12   ONLY RECOVERABLE TO THE EXTENT IT DIRECTLY IMPACTS THE STOCK

13   PRICE, WHICH MEANS IT DOES DIRECTLY CREATE AN OUT-OF-POCKET

14   LOSS.  SO THAT CREATES YOUR OUT-OF-POCKET LOSS.  SO A STOCK

15   BOUGHT AT 380 IS NOW WORTH 312.90, TAKING INTO ACCOUNT MARKET

16   EFFECTS.  THAT'S AN OUT-OF-POCKET LOSS.  SO THAT'S POINT ONE.

17          AND MR. ROSSMAN'S ARGUMENT, ESSENTIALLY, IT'S JUST A

18   REPRISE, IN MANY WAYS, OF ARGUING THAT BY AUGUST 13 THERE WAS A

19   COMPLETE CORRECTIVE DISCLOSURE, WHICH, AS YOUR HONOR HAS WIDELY

20   IDENTIFIED, IS A VERY MUCH A DISPUTED FACT.

21          SO IF IT'S NOT A COMPLETE CORRECTED DISCLOSURE, THEN

22   MARKET PRICE REACTIONS ON AUGUST 17TH -- WHICH IS

23   UNQUESTIONABLY A STATISTICALLY SIGNIFICANT PRICE REACTION,

24   CAN -- YOU KNOW, IS RESULTING FROM THE FRAUD.  IT'S RESPONDING

25   TO THE FRAUD.  NOW YOU CAN DEBATE ABOUT THE DEGREE TO WHICH

1    IT'S RESPONDING TO THE FRAUD, BUT IT'S NO QUESTION THAT IT'S

2    RESULTING FROM THE FRAUD.

3              AND FINALLY --

4         **THE COURT:**  BUT THE QUESTION IS, IF IT'S RESPONDING

5    TO THE FRAUD, BECAUSE NOW THEY KNOW FUNDING IS NOT SECURED.

6    OKAY?

7         **MR. PORRITT:**  RIGHT.

8         **THE COURT:**  EVERYBODY KNOWS THAT SHOULD BE

9    RECOVERABLE.

10             BUT IF THEY'RE RESPONDING TO THE FRAUD BY SAYING,

11   UH-OH, THIS PROBABLY MEANS SEC PROBLEMS ARE AROUND THE CORNER,

12   OR THIS MAY MEAN CHANGE IN THE COMPOSITION OR STRUCTURE --

13   THERE'S GOING TO BE SOME UPHEAVAL IN TESLA AS A RESULT, WHO

14   KNOWS WHAT'S GOING TO HAPPEN, YOU KNOW.  YOUR VIEW, I GUESS,

15   IS, WELL, IF THAT'S BAKED INTO THE PRICE, THAT'S BAKED INTO THE

16   PRICE IF THAT'S WHAT SHAREHOLDERS CONSIDER, EVEN THOUGH IT'S

17   NOT -- WHAT THEY'RE CONSIDERING IS SORT CONSEQUENCES.  THAT'S

18   THE PROBLEM.  THEY'RE SORT OF CONSIDERING CONSEQUENCES

19   BEYOND -- THEY'RE KIND OF DERIVATIVE CONSEQUENCES, SECOND

20   GENERATION.

21             YOUR POSITION IS, WELL, IF IT IS, IT IS, IT'S STILL

22   CAUSALLY RELATED, AND, THEREFORE, IT CAUSED AN OUT-OF-POCKET

23   LOSS, I CAN SEE AN ARGUMENT THAT -- WELL, I'M NOT SURE THAT'S

24   WHAT SECURITY LAWS ARE SUPPOSED TO TAKE INTO ACCOUNT.

25        **MR. PORRITT:**  WELL, FIRST OF ALL, IT'S NOT -- WE

1  WOULD ARGUE IT'S STILL VERY PROXIMATE BECAUSE THIS IS AN SEC

2  INVESTIGATION, REGULATORY RISK CREATED BY THE FACT THAT ELON

3  MUSK GAVE, YOU KNOW, A FRAUDULENT TWEET ON AUGUST 7TH.  NO

4  FRAUDULENT TWEET, NO REGULATORY RISK.

5          SO IN THAT EXTENT, IT'S VERY DIRECTLY AND PROXIMATELY

6  RELATED TO THE ALLEGATIONS OF FRAUD HERE.

7          AND, SO, THAT IS, YOU KNOW -- AND MR. ROSSMAN, YOU

8  KNOW, I'M SURE INADVERTENTLY COMPLETELY MISREPRESENTED THE

9  THEORY OF WHERE THE 312.90 COMES FROM, WHICH IS THE 312.90 IS

10  THE PRICE THAT WOULDN'T HAVE HAPPENED IF THE FRAUDULENT TWEETS

11  WERE MADE AND HAD BEEN EXPOSED ON AUGUST 7TH.

12          THEN THAT'S CONSISTENT THROUGHOUT.  YOU WOULD HAVE

13  HAD IMMEDIATE DECLINE BECAUSE YOU HAVE ALL THIS REGULATORY RISK

14  OF CONSEQUENTIAL HARM OCCURRING.  THAT WAS SORT OF FIXED.  IT

15  WAS BAKED INTO THE STOCK PRICE.  IT'S JUST A QUESTION OF WHEN

16  IT'S REVEALED.

17          THIRDLY, I WOULD SAY, YOUR HONOR, YOUR HONOR

18  ACCURATELY CAPTURED THE IDEA THAT, UNDER MR. ROSSMAN'S THEORY,

19  YOU WOULD NEVER HAVE ANY DAMAGES IF THE -- THERE WAS NO PRICE

20  IMPACT UP FRONT, WHICH HAS BEEN A THEORY THAT DEFENDANTS HAVE

21  BEEN RUNNING OUT NOW IN MULTIPLE COURTS ALL OVER THE COUNTRY,

22  AND IT'S BEEN REJECTED TIME AFTER TIME AFTER TIME, INCLUDING

23  MOST RECENTLY THE *GOLDMAN SACHS* CASE WITH THE SUPREME COURT,

24  WHICH SAID QUITE CLEARLY, YOU DON'T NEED BACK END AND FRONT END

25  IMPACT, YOU DON'T NEED FRONT END IMPACT NECESSARILY.

1          SO YOU NEED -- YOU NEED TO HAVE A PLAUSIBLE

2     EXPLANATION FOR GETTING FROM POINT A, AT THE BEGINNING OF THE

3     CLASS PERIOD, TO B, THE END OF THE CLASS PERIOD.

4          I DON'T THINK THERE COULD BE ANY QUESTION THAT

5     DR. HARTZMARK AND PLAINTIFFS HERE HAVE LAID OUT FOR THE JURY

6     AND EXPLAINED IN PAINSTAKING DETAIL, BASED UPON MARKET REACTION

7     ANALYSIS, HOW WE GET FROM POINT A TO POINT B AT THE END OF THE

8     CLASS PERIOD.

9          NOW, LOOK, DEFENDANTS -- PLAINTIFFS MAY -- AND WE

10     DON'T SEE ANY REASON -- DR. HARTZMARK HAS CONSIDERED ALL THIS

11     SUPPOSEDLY CONFOUNDING INFORMATION.

12          MR. ROSSMAN SAID THERE'S TONS, AND TONS, AND TONS OF

13     CONFOUNDING INFORMATION.  WELL, DR. HARTZMARK IDENTIFIED, AFTER

14     LOOKING AT EVERY SINGLE NEWS ITEM DURING THE CLASS PERIOD, OVER

15     2,400, HE LAYS THEM OUT ON PAGE 106 OF HIS EXPERT REPORT, AND

16     HE CONSIDERS EVERY SINGLE ONE.  SO TO SAY HE JUST IGNORES THEM

17     OR ASSUMES THEM AWAY IS JUST -- IS JUST WRONG.  THAT'S JUST

18     FLAT OUT -- FLAT OUT INCORRECT STATEMENT.

19          **THE COURT:**  AS I UNDERSTAND YOUR POSITION THAT, YES,

20     ALL THE CONFOUNDING FACTORS HAVE BEEN DISAGGREGATED ADEQUATELY,

21     AND IF WHAT YOU'RE LEFT WITH AFTER APPROPRIATE METHODOLOGY TO

22     VET OUT NON-FALSITY, NON-FRAUD RELATED CAUSES IS TAKEN INTO

23     ACCOUNT, AND YOU'RE LEFT WITH A SHAREHOLDER PRICE, A SHARE

24     PRICE, THAT IS LOWER THAN EVEN BEFORE THE FRAUD HAPPENED,

25     BECAUSE OF THE CONSEQUENCES, THAT THAT STILL IS AN

1   OUT-OF-POCKET LOSS.

2           BUT I TAKE IT -- AND I SEE FROM YOUR BRIEF YOU DON'T

3   HAVE A CASE WHERE THAT -- SOME COURT HAS RECOGNIZED THAT

4   EXPRESSLY, WITH THE IDEA THAT, WELL, EVEN THOUGH THAT LOWERED

5   SHARE PRICE REFLECTS SHAREHOLDER CONCERN, NOT ONLY, YOU KNOW,

6   CORRECTING THE FRAUD AND IGNORING TRUTH OF THE TRANSACTION, THE

7   TRUTH OF THE FINANCIAL STATE, BUT KNOWING THE CONSEQUENCES OF

8   THAT IN TERMS OF CORPORATE GOVERNANCE, CORPORATE FUTURE, THAT

9   SORT OF THING, NO COURT HAS OPINED ONE WAY OR THE OTHER WHETHER

10  THAT SHAREHOLDER RECOGNITION, AS IT'S BAKED INTO THE PRICE, IS

11  NONETHELESS APPROPRIATE.

12          **MR. PORRITT:**  WELL, I WOULD RESPOND IN THE FOLLOWING

13  WAY, WHICH IS, FIRST OF ALL, MR. ROSSMAN CITED *AFFILIATED*

14  *YOUTH*, THE VENERABLE SUPREME COURT DECISION, WHICH STRESSES

15  THAT REMEDIES FOR AND DAMAGES RECOVERABLE FOR THE INVESTORS,

16  THE VICTIMS OF FRAUD, YOU KNOW, SHOULD BE -- SHOULD BE --

17  (AUDIO TRANSMISSION DIFFICULTY) THAT THEY ARE VICTIMS OF FRAUD,

18  AND FRAUD DOERS ARE DISFAVORED UNDER THE COMMON LAW AND UNDER

19  THE SECURITIES LAWS, SUCH AS MR. MUSK, SHOULD THE JURY FIND

20  THAT HE COMMITTED FRAUD.

21          SO IN THAT CASE, FOR INSTANCE, THEY WILL ALSO

22  AGREE -- I AGREE THERE WAS, AT SOME POINT, A LINE OF PROXIMATE

23  CAUSE IN THE SAND.  I CERTAINLY AGREE WITH THAT, BUT I THINK

24  IT'S NOT -- I DON'T THINK IT'S REMOTELY A STRETCH TO SAY THE

25  CHAIN OF PROXIMATE CAUSATION RUNS FROM AUGUST 7TH TWEETS

1    THROUGH TO THE AUGUST 17 REACTION TO THE NEW YORK TIMES ARTICLE

2    AND THE GENERAL REALIZATION, AS REFLECTED BY THE J.P. MORGAN

3    ANALYST, THAT THE DEAL -- THAT FUNDING IS, IN FACT, NOT

4    SECURED; THAT, IN FACT, THAT THERE WAS NO INVESTOR SUPPORT;

5    AND, IN FACT, THERE IS NO FORMAL PROPOSAL, AND ALL WE ARE LEFT

6    WITH IS JUST A GLINT IN MR. MUSK'S EYE ABOUT GOING PRIVATE SOME

7    DAY.

8              I WOULD SAY, IN TERMS OF CASE LAW -- I MEAN PART OF

9    THE REASON IS THERE IS NO CASE LAW, THESE CASES RARELY GO TO

10   TRIAL, AS YOUR HONOR IS AWARE.  SO THESE CASES TEND NOT TO GET

11   FLESHED OUT UNTIL YOU GET TO THIS STAGE.

12             I'D SAY WE CITED THE *FIRST SOLAR* CASE, WHICH TALKS

13   ABOUT ASPECTS OF CONFOUNDING INFORMATION.  WE DO LOOK AT -- WE

14   ALSO CITED THE *LLOYD* CASE, WHICH EXPRESSLY TALKS ABOUT HOW --

15   AND RECOGNIZES IN THIS CIRCUIT THAT THE ANNOUNCEMENT OF A

16   GOVERNMENT INVESTIGATION CAN BE A REALIZATION OF THE RISK.  IT

17   CAN BE A REALIZATION OF LOSS, MATERIALIZATION OF LOSS.

18             WELL, THAT, IN AND OF ITSELF, NECESSARILY CONTAINS

19   NOT JUST A -- AN ASSESSMENT OF THE LOSS, IF YOU LIKE, TO THE

20   COMPANY FROM -- YOU KNOW, THAT BUSINESS OR OPERATIONS ITSELF

21   ARE FRAUD, BUT ALSO THE REGULATORY RISK.  AND THERE WAS NO -- I

22   MEAN, THE NINTH CIRCUIT ACCEPTED THAT AND HELD THAT, YOU KNOW,

23   QUITE STRONGLY.

24             SO I DON'T THINK THAT IS -- SO THAT, I WOULD ARGUE,

25   IS SUPPORT FOR THE FACT THAT --

1          **THE COURT:**  WELL, DIDN'T THAT INVOLVE FAILURE TO

2     DISCLOSE?

3          **MR. PORRITT:**  SORRY, YOUR HONOR?

4          **THE COURT:**  DID THAT INVOLVE -- DID *LLOYD* INVOLVE

5     FAILURE TO DISCLOSE SUCH INVESTIGATION?

6          **MR. PORRITT:**  NO, IT WAS A GOVERNMENT INVESTIGATION

7     AS A RESULT OF A -- IN CONNECTION WITH THE SUBJECT MATTER, I

8     BELIEVE, OF THE FRAUD.

9          AND, YOU KNOW, CITING TEACHERS -- YOU KNOW, THE

10    TEACHERS, THE *HUNTER* CASE, THE *CREE* CASE IN THE FOURTH

11    DISTRICT -- FOURTH CIRCUIT, IS REALLY -- THAT CASE -- THE

12    COMPLAINT WAS FILED YEARS AFTER THE EVENTS IN QUESTION, AND IT

13    WAS A FOUR-PAGE COMPLAINT WRITTEN BY -- IT'S PART OF AN

14    INTERFAMILY DISPUTE.

15          THE FACT SITUATION IS REALLY ENTIRELY DIFFERENT FROM

16    THE CASE WE HAVE HERE, WHERE THE DISCLOSURES ARE TAKING PLACE

17    OVER AN EIGHT-DAY PERIOD.

18          SO THIS IS NOT LIKE WE'RE ASKING FOR A DROP THAT

19    OCCURRED YEARS AFTER THE MISREPRESENTATION HERE.  THIS IS VERY

20    CLOSELY TIED.

21          **THE COURT:**  AND YOU WOULD ARGUE THAT THE KIND OF

22    QUALITATIVE INFORMATION THAT THE SHAREHOLDERS WERE TAKING

23    INTO -- THAT, IN ADDITION TO JUST THE FACT OF THE NOT SECURED

24    FUNDING WAS MADE APPARENT DURING THE CLASS PERIOD AS A RESULT

25    OF THE SEC -- ANNOUNCEMENT AND SUBPOENA AND --

1          **MR. PORRITT:**  WE SEE VERY CLEAR MY PRICE REACTIONS TO

2     THOSE STORIES.  THERE IS A -- ONCE AGAIN, JUST TO BE CLEAR,

3     THERE'S NO MAGIC AND NECESSARILY STATISTICAL SIGNIFICANCE.

4     THERE'S NO LEGAL REQUIREMENT.  THE NINTH CIRCUIT ACTUALLY MADE

5     THAT VERY CLEAR.  SO IT'S -- AND NONETHELESS, YOU KNOW, IT'S A

6     TEST -- YOU KNOW, IF YOU OBTAIN STATISTICAL SIGNIFICANCE ABOVE

7     FIVE PERCENT, WHICH IS KIND OF A RULE OF THUMB, THAT SEEMS LIKE

8     A SAFE HARBOR, BUT IT DOESN'T MEAN IF YOU DON'T MAKE IT, YOU

9     AUTOMATICALLY FAIL --

10          **THE COURT:**  LET ME --

11          **MR. PORRITT:**  THERE'S A VERY CLOSE TO -- A VERY

12    SIGNIFICANT MARKET REACTION TO THE ANNOUNCEMENT OF THE SEC

13    INVESTIGATION THAT IS NEGATIVE HERE THAT'S OBSERVED IN THE

14    STOCK PRICE AT TESLA.

15          SO I THINK THIS DEBATE HAS SHOWN VERY CLEARLY, YOUR

16    HONOR, THEY HAVE VALID CROSS-EXAMINATION POINTS, BUT I MEAN

17    THIS IS -- I THINK AS YOUR HONOR APTLY PUT IT, THIS IS A DEBATE

18    OVER THE APPLICATION OF A METHOD OF AN APPROPRIATE DAUBERT

19    SITUATION.

20          **THE COURT:**  LET ME GIVE MR. ROSSMAN A CHANCE TO

21    RESPOND TO MR. PORRITT'S CITATION OF THE *LLOYD* CASE WHERE

22    GOVERNMENT INVESTIGATION CAN CONTRIBUTE TO REALIZATION OF LOSS.

23    ISN'T THAT ANALOGOUS HERE?

24          **MR. ROSSMAN:**  YOUR HONOR, JUST TO ANSWER THE *LLOYD*

25    QUESTION, MY UNDERSTANDING IS THAT IS ONE WHERE THE SEC

1   INVESTIGATION REPUTED THE FRAUD -- I'M SORRY -- REVEALED.  I

2   FAILED TO READ MY WRITING.  A BIG DIFFERENCE.

3           THAT'S -- THAT IS WHERE THE -- WHAT WE TYPICALLY SEE,

4   WHICH IS THE CORRECTED INFORMATION HITTING THE MARKET IN THE

5   FORM OF THE SEC INVESTIGATION, AND YOU SEE THE STOCK PRICE

6   MOVING IN RESPONSE TO THAT, NOT THESE KNOCK-ON EFFECTS OF

7   CONSEQUENTIAL DAMAGES, WHICH IS WHY WE DON'T SEE ANY CASES IN

8   CONTEXT ON THAT.

9           IF YOUR HONOR WILL INDULGE ME FOR A MINUTE, I

10  ANTICIPATED THE QUESTION OF, YOU KNOW, HOW THIS WOULD GO TO THE

11  JURY.  I ASKED DR. HARTZMARK IN HIS DEPOSITION:

12                  "DID YOU DO ANY ANALYSIS THAT

13          ALLOWS YOU TO SEPARATE HOW MUCH THE MARKET

14          MOVES WERE ATTRIBUTABLE TO THE STATEMENT, 'AM

15          CONSIDERING TAKING TESLA PRIVATE AT 420,'

16          VERSUS THE FUNDING SECURED PORTION OF THE

17          STATEMENT?"

18          HIS COMPLETE ANSWER TO THAT QUESTION WAS "NO."  OKAY?

19  HE DIDN'T DO ANY ANALYSIS TO SEPARATE THOSE TWO.  THE PRECISE

20  SAME WOULD BE TRUE IF I ASKED HIM THAT QUESTION WITH RESPECT TO

21  THE NEW YORK TIMES ARTICLE, DID HE DO ANYTHING TO SEPARATE THE

22  PORTIONS THAT WERE NEW INFORMATION ABOUT MR. MUSK'S HEALTH

23  COMPARED TO THE PORTIONS THAT HE CLAIMS WERE NEW REVEALS, THAT

24  LEAVES ME WITH NOTHING TO CROSS-EXAMINE HIM FURTHER ON.  IT'S

25  THE ENTIRE --

1        **THE COURT:**  YOU MAY NOT NEED TO.  YOU ARE GOING TO

2    SUGGEST TO THE JURY THAT HIS WHOLE TESTIMONY RISES AND FALLS ON

3    WHAT YOU ARE GOING TO SAY IS INCREDIBLE ASSUMPTION THAT THE

4    DISCLOSURE THAT, I'M GOING PRIVATE WITH 420, THEN THE OTHER

5    DISCLOSURE AT THE BACK END ABOUT ALL HIS HEALTH PROBLEMS HAD

6    NOTHING TO DO WITH IT, AND IF HE STANDS AND SAYS, WELL, THEY

7    HAD NO IMPACT AT ALL, THOSE WERE -- THOSE WERE NOT CONFOUNDING

8    FACTORS, BECAUSE THEY WERE ALL WELL KNOWN, AND

9    BLAH-BLAH-BLAH-BLAH, YOU ARE GOING TO ARGUE, WELL, THIS WHOLE

10   THING GOES OUT THE WINDOW.

11        BUT, TO THE EXTENT HE HAS ANY BASIS -- AND HE HAS

12   SOME -- TO SAY, WELL, HERE'S WHY I DIDN'T CONSIDER IT, BECAUSE

13   EVERYBODY KNEW HE WAS GOING TO GO -- YOU KNOW, HE WANTED TO GO

14   PRIVATE, AND THEN WHEN HE ANNOUNCED LATER ON AND IT CAME OUT

15   LATER WHEN YOU HAVE THE FACTOR SHOWING, YOU KNOW, IT DIDN'T

16   HAVE ANY IMPACT ON PRICE, OR NOT A STATISTICALLY SIGNIFICANT

17   IMPACT ON PRICE, HE'LL HAVE SOME REASON TO SORT OF DEFEND THAT.

18   AND I THINK THAT'S ALL IT TAKES TO GET PAST DAUBERT.  THAT'S

19   NOT TO SAY, YOU KNOW, HIS TESTIMONY -- CONCEIVABLY, A JURY

20   MIGHT FIND THAT ALL GOES DOWN THE TUBES.

21        **MR. ROSSMAN:**  WELL, YOUR HONOR, I THINK THE HARD

22   QUESTION FOR YOU -- AND, OF COURSE, YOUR HONOR GETS ALL THE

23   HARDEST QUESTIONS -- IS WHAT IF THE JURY FINDS IT'S A MIXTURE

24   OF BOTH?

25        WHAT IF THE JURY FINDS THAT SOME OF THE INFORMATION

1    ON AUGUST 7TH IS TRUTHFUL AND MATERIAL AND WOULD HAVE MOVED THE

2    MARKET, SOME OF THE INFORMATION IS NOT?  SAME THING FOR

3    AUGUST 17TH.  WHAT IF IT FINDS IT'S A MIXTURE OF BOTH OF THOSE

4    THINGS?

5            IS YOUR HONOR'S VIEW THAT, AT THAT POINT, WE'RE

6    ENTITLED TO THROW OUT THE DAMAGE REPORT AND THERE ARE NO

7    DAMAGES, OR IS THE JURY SUPPOSED TO MAKE A GUESS ABOUT HOW TO A

8    APPORTION DAMAGES BETWEEN --

9            **THE COURT:**  WELL --

10           (SIMULTANEOUS COLLOQUY.)

11       **MR. ROSSMAN:**  -- FROM THIS EXPERT?

12       **THE COURT:**  THAT'S WHY THERE MAY BE A PREMIUM ON THE

13   INSTRUCTION ON WHO HAS THE BURDEN OF PROOF, BECAUSE IF THE

14   PLAINTIFF HAS THE BURDEN OF PROOF AND THE JURY FINDS THAT THE

15   ALL-OR-NOTHING THEORY DOESN'T FLY AND THEY'RE LEFT WITH

16   NOTHING, YOU'LL HAVE A PRETTY GOOD ARGUMENT.  I'M NOT GOING TO

17   SAY WHO'S GOING TO WIN.  YOU'LL HAVE A PRETTY GOOD ARGUMENT

18   THEY DIDN'T CARRY THEIR BURDEN OF PROOF AND THEY'RE LEFT WITH

19   ZERO EVIDENCE.

20           I'M NOT SURE IT'S A DAUBERT QUESTION.  THAT'S A JURY

21   QUESTION.

22           BUT, YOU KNOW, I THINK THE PLAINTIFF IS -- MAYBE

23   THEY'RE, YOU KNOW, PUTTING THEIR EGGS IN ONE BASKET.  I DON'T

24   KNOW.  BUT THAT'S...

25           ALL RIGHT.  THIS ACTUALLY HAS BEEN VERY HELPFUL.

```
1   ACTUALLY, I THINK I HAVE A BETTER UNDERSTANDING, AND I -- YOU
2   KNOW, IT'S A TOUGH -- THIS IS KIND OF -- I WILL SAY THIS IS A
3   BIT UNPRECEDENTED, BECAUSE, ESSENTIALLY -- ESPECIALLY ON THE
4   QUESTION OF MEASURING THE LARGER MEASURE OF DAMAGES, I
5   UNDERSTAND THE THEORY, THAT IT IS BASED STILL ON AN
6   OUT-OF-POCKET THEORY, IT IS STILL BASED ON BUT FOR THE FRAUD,
7   ET CETERA, ET CETERA, BUT IT IS -- IT DOES IMPLICITLY ACCEPT
8   THE NOTION THAT A JURY -- AND A PRICE EFFECT DUE TO WHAT MIGHT
9   BE CALLED SORT OF CONSEQUENTIAL, YOU KNOW, STEPS LIKE
10  INVESTIGATION, GOVERNANCE, LACK OF CONFIDENCE, ET CETERA, WHICH
11  IS MORE THAN JUST THE DISCLOSURE OF THE TRUE STATE OF THE
12  TRANSACTION OR THE FINANCIAL SITUATION, IS THAT COGNIZABLE.
13  AND THAT'S WHERE -- YOU KNOW, I THINK THAT'S THE MOST
14  INTERESTING PART OF THIS QUESTION.  I'M GOING TO HAVE TO THINK
15  ABOUT THIS MORE.
16          SO I WILL TAKE THE MATTER UNDER SUBMISSION,
17  OBVIOUSLY, AND -- BUT I'VE RULED ON THE OTHER THREE THINGS, BUT
18  I WILL TAKE THIS MATTER UNDER SUBMISSION, AND WE'LL GET OUT AN
19  ORDER AS QUICKLY AS I CAN.
20          THANK YOU FOR YOUR ARGUMENTS.  IT'S BEEN
21  ENLIGHTENING.  APPRECIATE IT.
22          MR. PORRITT:  THANK YOU, YOUR HONOR.
23          (PROCEEDINGS ADJOURNED AT 2:45 P.M.)
24
25
```

```
 1    STATE OF CALIFORNIA     )

 2                            )    SS

 3    COUNTY OF CONTRA COSTA )

 4

 5         I HEREBY CERTIFY THAT THE FOREGOING IN THE

 6    WITHIN-ENTITLED CAUSE WAS TAKEN AT THE TIME AND PLACE HEREIN

 7    NAMED; THAT THE TRANSCRIPT IS A TRUE RECORD OF THE PROCEEDINGS

 8    AS REPORTED BY ME, A DULY CERTIFIED SHORTHAND REPORTER AND A

 9    DISINTERESTED PERSON, AND WAS THEREAFTER TRANSCRIBED INTO

10    TYPEWRITING BY COMPUTER.

11         I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

12    OUTCOME OF THE SAID ACTION, NOR CONNECTED WITH, NOR RELATED TO

13    ANY OF THE PARTIES IN SAID ACTION, NOR TO THEIR RESPECTIVE

14    COUNSEL.

15         IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

16    25TH DAY OF AUGUST, 2022.

17

18

19    _____

20    JOAN MARIE COLUMBINI, CSR NO. 5435

21    STATE OF CALIFORNIA

22

23

24

25
```